## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| TERRY MONSKY, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     vs.<br><br>DIRECT DIGITAL HOLDINGS, INC., MARK D. WALKER, KEITH W. SMITH, DIANA P. DIAZ, and DIRECT DIGITAL MANAGEMENT, LLC,<br><br>          Defendants. | Case No. 4:24-cv-01940<br><br>(Consolidated with Case No. 4:24-cv-02567)<br><br>Judge Kenneth M. Hoyt |

## CONSOLIDATED COMPLAINT FOR VIOLATION OF
## <u>FEDERAL SECURITIES LAWS AND JURY DEMAND</u>

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF ALLEGATIONS .................................................................... 2

III.  JURISDICTION AND VENUE ........................................................................ 9

IV.   PARTIES ......................................................................................................... 10

V.    FACTUAL BACKGROUND ........................................................................... 13

    A.    Digital Advertising.............................................................................. 13

    B.    Direct Digital's Business .................................................................... 15

    C.    Direct Digital's Stock Price Skyrockets After It Reports Impressive Q3 2023 Financial Results and Significantly Raises FY 2023 Guidance............................ 22

    D.    Direct Digital's Undisclosed, Ongoing Issues with Two of the World's Largest DSPs, Including Its Largest Customers, Undermined the Basis for Its Revised Guidance and Seriously Threatened Its Growth Trajectory ................................. 23

    E.    Direct Digital's Unexpected Q4 2023 Acceleration of Its Transition Away from Cookies Undermined the Basis for Its Revised Guidance .................................. 27

    F.    The Truth Gradually Makes Its Way into the Market Despite Defendants' Attempts to Cover Up Direct Digital's Continuing Problems.............................................. 27

VI.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL FACTS ......................................................................................... 33

    A.    November 9, 2023 Press Release........................................................ 33

    B.    November 9, 2023 Form 10-Q............................................................ 34

    C.    November 11, 2023 Conference Call.................................................. 35

    D.    December 5, 2023 Noble Capital Markets 19th Annual Emerging Growth Equity Conference .......................................................................................................... 37

    E.    January 9, 2024 ICR Conference Fireside Chat.................................. 38

    F.    February 1, 2024 Pulse 2.0 Interview ................................................ 39

    G.    March 26, 2024 Press Release ............................................................ 41

H.     March 26, 2024 Conference Call ........................................................... 42

I.     May 10, 2024 Statements ..................................................................... 44

VII.    ADDITIONAL SCIENTER ALLEGATION .................................................. 45

VIII.   LOSS CAUSATION/ECONOMIC LOSS ........................................................ 47

IX.    PRESUMPTION OF RELIANCE .................................................................... 51

X.     NO SAFE HARBOR ......................................................................................... 53

XI.    CLASS ACTION ALLEGATIONS ................................................................. 54

XII.   CAUSES OF ACTION ...................................................................................... 55

XIII.  PRAYER FOR RELIEF ................................................................................... 58

XIV.  JURY DEMAND ............................................................................................... 59

Plaintiff Donald W. Hutchings ("Plaintiff," as further defined in ¶27, below) alleges the following based upon personal knowledge as to allegations concerning himself and, as to all other matters, upon the investigation of counsel, which included, a review of U.S. Securities and Exchange Commission ("SEC") filings by Direct Digital Holdings, Inc. ("Direct Digital" or the "Company") and securities analyst reports, press releases, and other public statements and news reports issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

> *"As Mark [Walker] mentioned, revenue for the fourth quarter of 2023 was lower than anticipated due to lower-than-anticipated demand, a delay in the release of Tier 1 publishers from beta testing and proactive efforts by the company during the fourth quarter to accelerate the transition towards a cookie-less advertising platform."*

- March 26, 2024 statement of Direct Digital's Chief Financial Officer ("CFO"), Diane Diaz, describing the transitory issues leading to the Company's disastrous fourth quarter 2023 which sent its stock plummeting almost 40%. (Unless noted, all emphasis is added in quoted material).

> *"These actions by The Trade Desk and Google paint a much clearer picture of why Direct Digital Holdings faced such significant financial pressure in Q4 2023. It wasn't just about transitioning to a cookie-less future; it was about the immediate and tangible impacts of losing trust and access within the industry.*
>
> *When two of the biggest players in the market essentially blacklist your subsidiary, it's not just a bump in the road—it's a full-blown crisis. This context makes the company's earlier explanations seem like a smokescreen, diverting attention from the real issues at hand.*
>
> *So, while Direct Digital Holdings tried to spin a tale of proactive adaptation to industry changes, the reality was far grimmer. The loss of trading privileges with major partners like The Trade Desk and Google likely had a direct impact on their bottom line. These events make a far more plausible explanation for their Q4 financial woes than the narrative they attempted to sell."*

- May 24, 2024 article in ADOTAT, a leading online marketing and advertising publication, addressing reports that two of the world's largest demand-side platforms ("DSPs"), The Trade

Desk and Google Display & Video 360 ("Google"), had previously limited their business with Direct Digital due to its systematic mis-reporting of user IDs.

## II.    SUMMARY OF ALLEGATIONS

1.    This is a federal securities class action on behalf of a class ("Class") consisting of all persons who purchased or otherwise acquired Direct Digital Class A common stock (hereafter, "common stock") during the period from November 10, 2023 through October 15, 2024, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Direct Digital is an end-to-end, full-service programmatic advertising platform that provides advertising technology, data-driven campaign optimization, and other solutions to markets on both the buy- and sell-side of the digital advertising ecosystem.  The Company, which went public in February 2022, is controlled by its co-founders, Chief Executive Officer ("CEO") and Chairman, Mark D. Walker ("Walker"), and President, Keith W. Smith ("Smith"), who to this day retain 77% voting power over the Company.

3.    Direct Digital operates through its three subsidiary companies.  Its primary subsidiary, accounting for 78% of 2023 revenues, is Colossus Media, LLC ("Colossus Media"), which operates its proprietary sell-side programmatic platform, Colossus SSP™ ("Colossus SSP").  The Colossus SSP platform allows Direct Digital to sell digital ad impressions from publishers to buyers.  Such buyers are the Company's customers and include the some of the world's largest DSPs (*e.g.*, The Trade Desk and Google), agencies, and individual advertisers.

4.    Colossus Media processes billions of ad impressions, reportedly processing approximately 400 billion average monthly impressions during Q4 2023.[1]  Each of these ad impressions or transactions on the Colossus SSP platform occurs automatically in an auction/bidding format, in a fraction of a second.  Such programmatic advertising depends heavily on "cookies" or sometimes other user IDs to deliver targeted ads to specific audiences.  These cookies and user IDs, like digital fingerprints, hold valuable information about users' demographics and browsing habits.  Advertisers therefore rely on cookies and other IDs to target their ads, and they will offer premium bids on a sell-side platform such as Colossus SSP to reach their targeted audience.

5.    Between Direct Digital's February 2022 initial public offering and the fall of 2023, the Company's stock price languished as it grew revenues from $21.3 million in Q2 2022, with adjusted EBITDA (earnings before interest, taxes, depreciation, and amortization) of $3.6 million, to $35.4 million in Q2 2023, with adjusted EBITDA of $3.1 million.  Its stock generally traded in the $1.50 to $3.00 per share price range, with most days seeing less than 100,000 shares changing hands.  On November 8, 2023, the Company's stock closed at $2.52 per share on a minimal volume of just 17,300 shares for the day.  Yet, Direct Digital's fortunes were about to turn.

6.    The next day, on November 9, 2023, Direct Digital issued a press release announcing its Q3 2023 financial results, with Q3 2023 revenue of $59.5 million and adjusted EBITDA of $5.4 million.  These results blew away Wall Street's expectations, with revenues beating Noble Capital Market's forecast by 84% and EBITDA beating by 104%.

---

[1] Throughout, "Q# 202#" references the Company's fiscal quarter and year, that is, Q4 2023 is fourth quarter of 2023.  FY 202# references the Company's fiscal year ended December 31st.

7.      Even better, the Company announced that it was raising its FY 2023 guidance to between $170 million to $190 million (from $125 million to $130 million)—*an increase of nearly 50%*—with just seven weeks remaining in the year and Q4 2023 almost halfway complete. Defendants said that the anticipated FY 2023 revenues, like the epic Q3 2023 results, would be driven by the recently increased capabilities of the Company's sell-side technology platform. Defendants further "committed to executing on the same growth and investment initiatives that led [Direct Digital] to the strong third quarter results."  Defendants would double down on the $170 million to $190 million revenue outlook throughout the remainder of 2023 and beyond, reaffirming the revised guidance on, for example, November 11 & 14, 2023, December 5, 2023, January 9, 2024, and February 1, 2024.

8.      Following Defendants' announcements, Direct Digital's stock price shot up as 22.8 million shares changed hands on November 10, 2023.  The Company's stock doubled from $2.61 per share on November 9, 2023 to an intraday high of $5.34 per share on Monday, November 13, 2023, on 5.8 million shares traded.  By December 29, 2023, Direct Digital's future prospects and FY 2023 financial outlook had driven its common stock to a 2023 intra-day high of $17.42 per share.  On March 15, 2024, Direct Digital stock closed at a Class Period high of $32.51 per share.

9.      But Direct Digital's growth story was not what it was cracked up to be.  The Direct Digital technology improvements which purportedly would continue to drive growth in Q4 2023 and beyond were, unbeknownst to analysts and investors, offset and in fact overshadowed by an ongoing crisis concerning the Company's Colossus SSP sell-side platform and two of the world's most prominent demand-side platforms ("DSPs"), which happened to be the Company's largest sell-side customers, Google and The Trade Desk.

- 4 -

10.     The ongoing, behind-the-scenes problems with the Colossus SSP platform went to the core of Direct Digital's business and negatively impacted its key customer relationships, demand, and ultimately revenues.  According to several reports, in 2023, Colossus SSP was observed presenting mis-declared user IDs when the transactions were run through Google and The Trade Desk.  A mis-declaration of user IDs occurs when a platform incorrectly associates users with inaccurate or mismatched identifiers.  As a result, advertisers overbid for ads and waste their ad spend by reaching the wrong audience.

11.     While not necessarily the result of intentional misconduct by or on behalf of Direct Digital, these serious and known platform issues were having a substantial, ongoing impact on Colossus SSP's operations.  The Trade Desk later confirmed the issue and stated that, as a result, in 2023 *it had partially blocked Colossus SSP across its platform*, with limited exceptions.  Google also independently discovered the same issue in "late [2023]" and *temporarily blocked Colossus SSP traffic* while issuing credits to affected advertisers.  Google later resumed some Colossus SSP traffic but at a lower volume than before.

12.     Defendants not only misled investors by failing to disclose the ongoing crisis with Direct Digital's platform and its largest customers, but they further deceived investors by raising then reaffirming revenue guidance during the crisis without revealing the associated known risk. In truth, because of the ongoing Colossus SSP platform and customer issues, the revised guidance was at significant risk with just seven weeks remaining in the year, and it became even less and less achievable as Q4 2023 progressed.

13.     Even worse, instead of adhering to the operational plan credited for the Company's strong Q3 2023 results as Defendants had pledged to do, they further disrupted its seemingly successful Q3 2023 sell-side strategy in November 2023 by accelerating its transition from

"cookies" to alternative IDs after previously indicating that this shift would not occur until 2024. This technological upheaval at Direct Digital's primary subsidiary would, at very best, delay additional revenues, effectively guaranteeing that Direct Digital would fall short of its $170 million to $190 million revenue guidance.

14.    On December 5, 2023, in the midst of the Colossus SSP mis-declared user ID crisis, and well after the Company's "cookie-less" transition had ramped up and its effects were known to Defendants—and with only three weeks left in the year—Walker reaffirmed the revised revenue guidance saying, "we were able to raise [FY 2023] guidance to about 170 to 190 million of top line revenue *and we expect for us to be within that range*."  By this time, however, Direct Digital could not reasonably be expected to meet its financial estimates.  Still, the crushing headwinds facing Direct Digital and their associated risks remained hidden from investors.

15.    This was doubly so after the Company's December 31, 2023 year end.  By January 2024, Direct Digital's largest customer, Google, had formally notified the Company that it would be short-paying a 2023 invoice such that the revenue could not be recognized in 2023.  Given that the short-pay resulted in an $8.8 million expense related payments to the Company's publishers, the lost revenue necessarily exceeded that amount.  Nonetheless, on January 9, 2024, Walker continued to tout the Company's FY 2023 growth story by proclaiming "we're projected to be somewhere in the hundred, the guidance we give is 170 to 190 million of top line revenue grow." Then, on February 1, 2024, he continued to deceive investors by calling Direct Digital's raising of FY 2023 guidance to between $170 million and $190 million a "significant milestone" for the Company.  It may have been—but not in the way that investors were led to believe.

16.    On March 26, 2024, Direct Digital announced its FY 2023 results.  It reported just $157.1 million in FY 2023 revenues ($41 million for Q4 2023 compared to $59.5 million in Q3

2023), badly missing the $170 million to $190 million revised revenue guidance. In explaining the substantial miss, Defendants failed to mention the serious, ongoing issues with Colossus SSP's platform, that the Company had been partially blocked by two of the world's most prominent DSPs, that its largest customer had short-paid its invoices by millions of dollars, and the resultant impact on the Company's operations and results. Instead, the Company simply blamed lower-than-anticipated demand and its proactive efforts to accelerate the transition towards a "cookie-less" advertising platform (as well as the related delay in releasing certain publishers from beta testing). On this news, the price of Direct Digital common stock plummeted nearly 40%, from a close of $26.51 per share on March 26, 2024, to $16.04 per share on March 27, 2024.

17.    On or about May 8, 2024, Adalytics Research, LLC ("Adalytics"), an ad transparency company providing digital forensics to media buyers and advertisers, began disseminating an advance copy of a report showing that Colossus SSP was systematically misidentifying user IDs sent to The Trade Desk. On May 10, 2024, Adalytics published the report which was based upon a study of the source code of ads and bid responses served by The Trade Desk on behalf of different advertisers and on different publisher properties. The study looked at bid responses transacted by The Trade Desk through sixteen supply side platforms, including Colossus SSP, on numerous websites. Among the observations Adalytics made was that in its sample data—for Colossus SSP only—the user ID declared to The Trade Desk at the time of an ad auction was different from the actual user ID stored in the user's browser cookie storage. Shortly after Adalytics released this report, other publications wrote articles based upon Adalytics' observations, some of which reported additional details concerning Colossus SSP's systematic mismatches of user IDs. These articles included the first public reports of The Trade Desk partially

blocking Colossus SSP from its platform in 2023, and Google temporarily suspending the platform late in the year.

18.     Direct Digital shot back on May 10, 2024, attempting to counter any implication that that it had purposefully altered the user IDs or that the Company was in any financial peril as a result.   Direct Digital assured investors that it "remains operationally well-positioned and financially strong with estimated 2023 FY earnings of $157 million *and is experiencing continued growth into 2024*."   Defendant Walker said that "[t]he financial solvency of our company is very sound," adding that it remains profitable and Q1 2024 performance was "*up 20% year over year*."   In actuality, Direct Digital's growth had ground to a halt in Q1 2024 and its performance was nowhere near 20% year over year.

19.     The impact of The Trade Desk and Google suspensions on Direct Digital was ground shaking.   And it became clear that Direct Digital had not been candid with the market on March 26, 2024 with respect to the true reasons for its disastrous Q4 2023.   As the publication *ADOTAT* later summarized, "[w]hen two of the biggest players in the market essentially blacklist your subsidiary, it's not just a bump in the road—it's a full-blown crisis.   This context makes the company's earlier explanations seem like a smokescreen, diverting attention from the real issues at hand."

20.     As a result of the disclosures in the Adalytics report and the follow up reporting, and despite Direct Digital's dishonest counternarrative, between May 8, 2024 and May 10, 2024, Direct Digital stock dropped from a closing price of $4.56 per share to $3.97 per share, a 13% decline.

21.     Finally, on October 15, 2024, after a nearly seven-month delay, Direct Digital filed its Form 10-K for the year ended December 31, 2023, along with its untimely Q1 2024 and Q2

2024 Form 10-Qs. The 2023 Form 10-K disclosed that the Company's largest sell-side customer at the time (which was Google), and which accounted for 73% of its 2023 revenue, had "short-paid" 2023 invoices, resulting in a $8.8 million expense and lower associated revenue in 2023. It further admitted that the risks associated with the ID mismatch issue had come to fruition as they had continued to affect revenues going forward. It said that as a result of the Adalytics report, "one of the Company's sell-side customers [which it identified as The Trade Desk in related litigation] paused its connection to the Company for a couple of weeks in May 2024, which reduced sell-side sales volumes. . . .[and] sell-side volumes related to this customer have resumed but not yet at the levels experienced prior to the pause in May 2024 which has created significant disruption in the Company's sell-side business." As a result, the Company said there was "substantial doubt" about its "ability to continue as a going concern."

22.     The Q1 and Q2 2024 Form 10-Qs further revealed the true impact of the Company's platform and customer issues. In Q1 2024, Direct Digital had only $22.27 million in revenue compared $21.22 million in Q1 2023, and its net loss ballooned to $3.8 million from $1.3 million in Q1 2023. Q2 2024 was even worse. Direct Digital reported only $21.8 million in revenue which was lower than Q1 2024 and down dramatically from $35.4 million in Q2 2023. In Q2 2024, the Company's net loss ballooned to $3.1 million from a positive net income of $1.2 million a year earlier in Q2 2022.

23.     On this news, Direct Digital's stock price sank another 23%, from a closing price of $3.59 per share on October 15, 2024, to $2.77 per share the next day.

## III.    JURISDICTION AND VENUE

24.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action under § 27 of the

Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States of America.

25.     Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)-(d).  Direct Digital is headquartered in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, interstate telephone and other electronic communications, and the facilities of a national securities exchange.

## IV.    PARTIES

27.     Plaintiff Donald W. Hutchings, Individually and as Trustee of the Brady Adam Hutchings Irrevocable Trust U/A DTD 12/18/2012, the Donald W. Hutchings Living Trust U/A DTD 09/19/1994, the Donald W. Hutchings Principal Residence Trust U/A DTD 09/19/1994, the Hutchings Community Property Trust U/A DTD 05/20/2015, the Jay Whitney Hutchings Irrevocable Trust, Grantors Donald W. Hutchings and Pamela Paul Hutchings, dated December 18, 2012, and the Pamela Paul Hutchings Principal Residence Trust U/A DTD 09/19/1994 ("Plaintiff"), as set forth in the previously filed certification (ECF No. 17-2), and incorporated by reference herein, purchased Direct Digital common stock during the Class Period and has been damaged thereby.

28.     Defendant Direct Digital is headquartered in Houston, Texas and, as of December 31, 2023, had 90 employees.  Direct Digital is the holding company for Direct Digital Holdings, LLC ("DDH LLC"), the business formed by defendants Walker and Smith in 2018 through the acquisitions of Huddled Masses LLC ("Huddled Masses") and Colossus Media.  On September

- 10 -

30, 2020, DDH LLC acquired Orange142, LLC ("Orange 142"). The Company's common stock currently trades on the NASDAQ stock exchange under the ticker symbol "DRCT." The Company's 10,868,000 shares of Class B common stock ("Class B stock") are noneconomic voting shares and are not publicly traded. Each share of Class B stock entitles the holder to one vote on all matters on which stockholders of Direct Digital are entitled to vote generally.

29.     Defendant Walker is a co-founder of the Company and has served as its CEO and Chairman of the Company's Board of Directors at all relevant times. Walker is also an owner and Managing Partner of defendant Direct Digital Management, LLC ("DDM") and has been at all relevant times. In 2023, Walker received $1,259,138 in total compensation for serving as CEO. As of December 31, 2023, Walker beneficially owned 261,935 shares of common stock (6.9% of issued and outstanding shares) and 5,489,000 shares of Class B stock (50.5% of issued and outstanding shares). As a result, Walker controls 39.2% of the voting power over Direct Digital. According to Walker, "[a]s part of my role at [Direct Digital], I am familiar with nearly all aspects of [Direct Digital's] business, including its strategic initiatives, finances, and evaluation of potential mergers, acquisitions, and strategic partnerships, among others."

30.     Defendant Smith is a co-founder of the Company has served as its President at all relevant times. Smith is also an owner and Managing Partner of DDM and has been at all relevant times. In 2023, Smith received $1,259,138 in total compensation for serving as President. As of December 31, 2023, Smith beneficially owned 192,657 shares of common stock (5.1% of issued and outstanding shares) and 5,379,000 shares of Class B stock (49.5% of issued and outstanding shares). As a result, Walker controls 38.0% of the voting power over Direct Digital. According to Smith, "[a]s part of my role at [Direct Digital], I am familiar with nearly all aspects of [Direct

Digital's] business, including its strategic initiatives, finances, and evaluation of potential mergers, acquisitions, and strategic partnerships, among others."

31.    Defendant Diana P. Diaz ("Diaz") has served as Chief Financial Officer ("CFO") of Direct Digital from October 16, 2023 to the present.  She also served as Interim CFO beginning in June 2023.  According to Diaz, "[a]s part of my role at [Direct Digital], I am very familiar with [Direct Digital's] finances, including its accounting practices, its strategic financial goals, its compliance with applicable regulatory requirements, and more"; (ii) "[a]mong many other things, my role involves reviewing and certifying [Direct Digital's] public filings with the [SEC].  As a result, I am familiar with [Direct Digital's] public filings, such as its quarterly and annual filings (Form 10-Q and Form 10-K)"; and (iii) "I am also involved in [Direct Digital's] strategic financial planning and closely monitor how internal and external stimuli impact [Direct Digital's] financial and market performance."

32.    Defendant DDM is a Delaware limited liability company owned by Walker and Smith.  DDM holds all of the issued and outstanding shares of Class B stock.  Defendants Walker and Smith each indirectly hold an approximately 50% economic and voting interest in DDM. DDM may exchange or redeem its limited liability company units for newly issued shares of Class A common stock on a one-for-one basis, in connection therewith an equivalent number of its shares of Class B stock are to be cancelled.  At the time of Direct Digital's initial public offering, DDM was issued one share of Class B stock for each limited liability company unit it owns.  As of December 31, 2023, DDM beneficially owned 10,868,000 shares of Class B stock, providing it control of 75.8% of the voting power over Direct Digital.  According to the Company's 2023 Form 10-K, "DDM is and will, for the foreseeable future, be able to substantially influence, through its ownership position, our corporate management and affairs, and is able to control virtually all

matters requiring stockholder approval."  It further states that, "[Direct Digital] is controlled by DDM, whose interests may differ from those of our public stockholders."

33.    Walker, Smith, and Diaz are collectively referred to as the "Individual Defendants." The Individual Defendants, Direct Digital, and DDM are collectively the "Defendants."

34.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's business, operations, and prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that investors were provided with accurate and complete information.  Defendants' false and misleading statements, misrepresentations, and omissions during the Class Period violated these specific requirements and obligations.

## V.    FACTUAL BACKGROUND

### A.    Digital Advertising

35.    Digital advertising refers to the practice of promoting products, services, or brands using online platforms and digital channels.  It encompasses a wide range of formats and techniques designed to reach and engage potential customers through the internet, including display and banner ads, videos, and images shown on websites, apps, or social media platforms.

36.    There are many benefits to digital advertising.  These include cost efficiency, flexibility, improved conversion rates, increased return on investment (ROI), greater customer engagement, measurable results, and global reach, among others.  The key to many of these benefits is the ability to know and understand potential ad recipients' online preferences, behavior, and interactions such that the digital ads may be effectively targeted at and limited to an

advertiser's ideal audience/customers.  Traditionally, this was and often still is accomplished through advertising "cookies."  Cookies are small text files stored on users' devices (*e.g.*, computers, smartphones, or tablets) by the website they visit.  They are used to track the user across multiple websites to build profiles of their interests and browsing habits.  By analyzing browsing behavior, interests, and past interactions, advertisers can profile users and target their ads with unprecedented accuracy.

37.     Cookies collect an impressive amount of information about users, tracking information about search engine interactions, page visits, time on page, purchase decisions, even social media "likes."  From this, advertisers pool data to create highly detailed user profiles such as age, gender, occupation, income, location, payment types, and interests.  The profiles may sometimes even include highly sensitive information such as medical history, sexual orientation, political affiliation, and even users' actual identity.

38.     Because utilization of tracking cookies is often perceived as intrusive, the general public has pushed back by demanding greater user privacy and data protection.  Recently, there has been a push to gradually eliminate the use of cookies for these reasons.  In 2017, Apple's Safari introduced Intelligent Tracking Prevention (ITP), a feature aimed at reducing cross-site tracking by limiting the lifespan of third-party cookies and blocking certain types of user tracking.  In 2019, Mozilla's Firefox introduced Enhanced Tracking Protection (ETP), which automatically blocked third-party cookies and certain known tracking scripts.

39.     In 2020, Google announced its intent to phase out third-party cookies from its Chrome browser.  In 2021, it unveiled the Privacy Sandbox initiative, outlining a plan to create a more privacy-preserving web while still supporting advertisers.  In July 2022, Google said it would phase-out cookies in the second half of 2024.  Then, in May 2023, Google announced that it

planned to test the elimination of third-party cookies in the Google Chrome browser for 1% of users beginning January 4, 2024, with cookie restrictions possibly applying to all users by Q3 2024. In July 2024, responding to advertiser pressure and regulatory concerns, Google did an about face and abandoned its plans to remove cookies from Chrome.

40.    With the idea of shifting away from cookies seemingly gaining steam, the digital advertising industry has looked to the use of "alternative IDs," which seek to emulate the functionality of the third-party cookie in a more privacy-safe way. Such alternative IDs include, for example, Unified ID (UID) 2.0, RampID, SharedID, ID5, and Panorama ID, among others. In Q3 2023 and in Q4 2023, despite the ongoing phase-out of third-party cookies, more than three-quarters of programmatic ad buys in various industries still relied on third-party cookies.

41.    For advertisers, publishers, agencies and those who serve them, the quality of ad impressions is paramount. Low quality impressions are a major problem in digital marketing that can waste advertisers' ad spend and negatively impact the performance of ad campaigns.

42.    Since user IDs ensure ads reach the right audience, making campaigns effective and efficient, a mismatch between the IDs stored on user browsers and the IDs presented to media buyers could result in ads being served to the wrong audiences. In other words, in this situation, advertisers are presented with and bid on a high-quality user in their target audience, when in reality they are bidding on a lower quality user outside of that audience. This could result in more than just an overpayment or financial loss. It could also damage the reputations of both the advertiser and the associated sell-side platform.

**B.    Direct Digital's Business**

43.    Direct Digital operates within the digital media industry, helping advertisers, agencies and publishers reach their target audiences more effectively through data-driven marketing strategies. The Company offers services across multiple digital platforms such as

display, video, and mobile, and provides programmatic advertising services that automate the process of buying and selling digital ad space. Direct Digital has seen significant growth in recent years, earning revenue of $157.1 million for fiscal year ended December 31, 2023, up from $89.4 million and $38.1 million for fiscal years 2022 and 2021, respectively.

44.    The programmatic marketplace in which Direct Digital operates involves both a buy-side and a sell-side. Direct Digital operates on the buy-side via its Huddled Masses and Orange 142 subsidiaries (recently combined under the Orange 142 brand), and on the sell-side via Colossus Media. Direct Digital has used the following graphic to illustrate its buy-side and sell-side businesses:



Source: Direct Digital's 2022 SEC Form 10-K filed April 17, 2023.

45.    On the buy side, digital advertising is the practice of delivering promotional content to users through various online and digital channels and leverages multiple channels, platforms such as social media, email, search engines, mobile applications and websites to display advertisements and messages to audiences. Direct Digital's buy-side operations facilitate the procurement of digital advertising inventory (ad space) on behalf of its clients (advertisers and agencies), as well as offering a comprehensive suite of end-to-end media solutions. The Company claims to offer extensive market access, enabling clients to purchase advertisements seamlessly

across various mediums such as desktop, mobile, connected TV, streaming audio, social media, and digital billboards.

46.     As of December 31, 2023, Direct Digital served approximately 234 small and mid-sized clients through its buy-side segment.  Its buy-side clients reportedly include, for example, Dollywood, Naples Zoo, Colorado Springs, Emory University, and Off Madison Ave.  Direct Digital's buy-side segment was responsible for 22% of its revenue in 2023 (that is, $34.6 million), down from 33% of revenue in 2022 ($29.3 million).

47.     On the sell-side of the digital supply chain, the supply side platform ("SSP") is an ad technology platform used by publishers to sell, manage and optimize the ad inventory on their websites in an automated and effective way.  SSPs help the publishers monetize the display ads, video ads, and native ads on their websites and mobile apps.  SSPs sell ad inventories in several ways, for example, directly to ad networks, via direct deals with DSPs, and most commonly via real-time bidding ("RTB") auctions.  The publisher makes its ad inventory available on an SSP and the SSP invites advertisers to bid based on the user's data received (via a third-party cookie or other user ID).  Each time the publisher's web page loads, an ad request is sent to multiple ad exchanges and, in some cases, to the DSP directly from the SSP.  In the case of RTB media buys, many DSPs place bids for the impressions being offered by the publisher during the auction.  The advertiser that bids a higher amount compared to other advertisers will win the bid and its ad impression will be fulfilled.

48.     Colossus Media is Direct Digital's proprietary sell-side programmatic platform operating as Colossus SSP.  Colossus SSP is described as the Company's stand-alone tech-enabled, data-driven platform that helps deliver targeted advertising to diverse and multicultural audiences, including African Americans, Latin Americans, Asian Americans and LGBTQIA+ customers, as

well as other specific audiences.  As of Q4 2023, approximately 10% to 20% of its inventories were directly geared to diverse and multicultural audiences.  According to Direct Digital, Colossus Media "compete[s] with smaller, privately-held companies and with public companies such as Pubmatic, Magnite, and Acuity Ads."

49.    The Colossus SSP platform allows the Company to sell—in real time—ad impressions from publishers to buyers, including DSPs, agencies and individual advertisers, and provides automated inventory management and monetization tools to publishers across various device types and digital ad formats.  Each impression or transaction occurs automatically in an auction/bidding format, in a fraction of a second.  During 2023, Colossus SSP claimed to process approximately 326 billion monthly ad impressions.

50.    Because of the nature of programmatic advertising, the Company recognizes sell-side revenue on its ads in real-time, that is, immediately "when an ad is delivered or displayed in response to a winning bid request from ad buyers."  These ad impressions are bought and served before any payment is made by the advertiser.  Direct Digital pays publishers for these ad buys in advance (that is, its "inventory").  It typically is later paid by the DSP/customer that sold the ad inventory after the DSP/customer is paid by the advertiser.  However, under its contracts with publishers, the publishers retain the Company's ad payments whether or not they are paid by the DSPs.  In this respect, Colossus SSP is unlike most other SSPs which almost always include sequential liability clauses in their contracts that say the SSP is not responsible for making payments to a publisher if an upstream partner such as a DSP fails to pay for ad inventory purchased on the publisher site.

51.    While Direct Digital's sell-side partners are publishers from which it buys ad "inventory," from an accounting perspective those publishers are actually providers, with the DSP

or ad-exchange typically being the "customer." Its publisher partners range from small to large in scale across both general and multicultural markets and include, for example, ESPN, Hearst, Gannett, Reuters, MediaVine, Gannett, Ebony Magazine, Blavity, La Nacion, Black Enterprise, Korea On Demand, NGL Collective, and iOne, among others.

52.    According to the Company's 2023 Form 10-K, "Colossus SSP is integrated into several leading DSPs including but not limited to The Trade Desk, Google 360, Zeta Global, Xandr, Beeswax, Basis and Stirista." Colossus Media generates most of its revenue through its DSP customers, as major brands and advertisers purchase ad space via these platforms. With a significant share of advertisers channeled through leading DSPs, Colossus Media's partnerships with the most prominent DSPs are of critical importance, as these relationships drive a substantial portion of its impressions and revenue. While Direct Digital claims to be agnostic to use of any specific DSP, it acknowledges that it is "critical that we align with key industry partners in the digital supply chain."

53.    During the Class Period, Direct Digital's largest customers included The Trade Desk and Google. The Trade Desk is the largest independent DSP in the world and one of the biggest sources of buy-side demand within the digital advertising industry. As of December 31, 2023, The Trade Desk had 3,115 full-time employees in 19 countries. Its revenue for FY 2023 was $1.95 billion. In January 2024, The Trade Desk was named the leading global DSP in Frost & Sullivan's Frost Radar™. Similarly, Google is widely considered a top DSP for programmatic advertising and is among the most widely utilized DSPs in the world. Google's DSP business reportedly booked $2.2 billion in revenue for FY 2020.

54.    Investment in technology and infrastructure is crucial for SSPs such as Colossus Media because it enables them to improve performance, optimize operations, and enhance their

competitiveness in the fast-evolving digital advertising ecosystem.  Therefore, for example, in Q1 2023, Colossus SSP transitioned its server platform to HPE Greenlake, which provides increased capacity, faster response time, and expansion capabilities to align with growth in our business.

55.    Colossus Media's investments in technology extend beyond its server platform.  As the Company's then-CFO explained in a Q1 2023 investor conference call, "investments in our technology relate to around our protection of our IVT [invalid traffic]."  According to Google Ads Traffic Quality website, invalid traffic "is any activity that doesn't come from a real user with genuine interest" and may include "falsely represented inventory."  "Falsely represented inventory is based on ad traffic falsely portrayed as coming from high-value users[.]"

56.    Historically, controlling invalid traffic and thereby building trust with the buying community has been important to Direct Digital's success, as Walker explained in the Q2 2022 investor call.  He said:

> As it comes to our supply side platform, Colossus SSP, what has fueled our growth in that business segment has really been focused on our formula. We're adding new suppliers directly to our marketplace on a monthly basis. And those fueled - and those new impressions that are being added to our marketplace are fueling our growth.  In addition to that, the way that we have managed our technology platform, as well as with the addition of more multicultural publishers being added to our mix on a monthly basis, you're seeing that there is an attraction from the marketplace to buy specifically from us. *And that's the value that we've been able to deliver, our technology has been able to perform well.  And we have a very low level of IVT. So we have been able to build trust in the market with the buying community.*

57.    Similarly, Direct Digital's then-CFO explained in a Q3 2022 investor conference call that investing in technology to lower invalid traffic is important to protecting the Company's growth because it makes "publishers comfortable with our inventory."

58.    Direct Digital's sell-side segment, Colossus Media, was and is responsible for the majority of its revenues.  Colossus Media accounted for 78% of the Company's revenue in 2023 (that is, $122.4 million), up from 67% of revenue in 2022 ($60 million).  And it was responsible

for approximately 65%, 67%, 87%, and 82% of Company revenues for Q1 through Q4 2023, respectively. *See, e.g.*, Figure 1, below. Colossus Media was and is the principal driver for Direct Digital's growth.

59.    Within Direct Digital and more specifically within Colossus Media, there is an extremely high customer concentration. This is not uncommon for SSPs since many large brands and other advertisers buy advertising space through DSPs. Indeed, one of Colossus Media's direct competitors, Pubmatic, Inc., warned in its 2023 Form 10-K, that "[a] limited number of large demand side platforms ("DSPs") – The Trade Desk and Google DV360 in particular – account for a significant portion of the ad impressions purchased on our platform. We depend upon these DSPs for a large percentage of impressions purchased and expect to do so for the foreseeable future."

60.    In FY 2022 and FY 2023, a single Colossus Media customer accounted for 63% and 73%, respectively, of Direct Digital's revenues. One customer also accounted for 92% to 95% of all Colossus Media revenues between Q1 2023 and Q1 2024, as reflected in the following chart (Figure 1):

| Figure 1: Direct Digital Holdings, Inc. (DRCT) Largest Customer | Q1 2023 | Q2 2023 | Q3 2023 | Q4 2023 | 2023 | Q1 2024 | Q2 2024 |
|---|---|---|---|---|---|---|---|
| **Direct Digital Revenues** | | | | | | | |
| Sell-side (Colossus Media) | $ 13,783,244 | $ 23,601,000 | $ 51,622,066 | $ 33,427,690 | $ 122,434,000 | $ 16,500,000 | $ 14,298,000 |
| Buy-side | $ 7,439,666 | $ 11,803,000 | $ 7,850,058 | $ 7,583,276 | $ 34,676,000 | $ 5,775,000 | $ 7,557,000 |
| *Total revenues* | $ 21,222,910 | $ 35,404,000 | $ 59,472,124 | $ 41,010,966 | $ 157,110,000 | $ 22,275,000 | $ 21,855,000 |
| | | | | | | | |
| *Largest Customer - % total revenues* | 60% | 63% | 82% | 75% | 73% | 68% | 28% |
| *Largest Customer - % sell-side revenues* | 92% | 95% | 94% | 92% | 94% | 92% | 43% |
| *Largest Customer - $ revenues* | $ 12,733,746 | $ 22,304,520 | $ 48,767,142 | $ 30,884,892 | $ 114,690,300 | $ 15,147,000 | $ 6,119,400 |
| *Non-Largest Customer sell-side revenues* | $ 1,049,498 | $ 1,296,480 | $ 2,854,924 | $ 2,542,798 | $ 7,743,700 | $ 1,353,000 | $ 8,178,600 |

61.    Direct Digital became a public company on February 15, 2022, completing its initial public offering of 2,800,000 units, each consisting of (i) one share of common stock and (ii) one warrant entitling the holder to purchase one share of common stock at an exercise price of

$5.50 per share.  The units were sold at a price of $5.50 each, and the net proceeds from the offering were approximately $10.2 million.

62.     From the very beginning, Direct Digital fostered its reputation for raising then meeting its revised financial guidance.  On March 29, 2022, the Company reported its Q4 2021 and FY 2021 results.  At the time, with two days left in Q1 2022, it also said that it expected revenue of $11.0 million to $11.5 million for the quarter.  (Q1 2022 revenues then came in at $11.4 million).  Additionally, for FY 2022, it projected revenues of $48 million to $52 million.  On August 11, 2022, it raised the revenue range to $70 million to $75 million.  On November 10, 2022, it raised the FY 2022 revenue outlook yet again to $85 million to $90 million.  This prompted one analyst to observe in the Company's November 13, 2022 conference call that "[n]obody else is raising numbers like this."  Ultimately, FY 2022 revenues came in at $89.3 million.

63.     On March 23, 2023, Direct Digital's then-CFO explained in the Q4 2022 and FY 2022 investor conference call that the Company "plan[s] to offer annual guidance and update it throughout the year."  She then stated that the Company expected $118 million to $122 million in FY 2023 revenue.  On August 10, 2023, the Company increased the revenue guidance to between $125 million to $130 million.  And, on November 9, 2023, it raised FY 2023 guidance a final time to $170 million to $190 million.

### C.     Direct Digital's Stock Price Skyrockets After It Reports Impressive Q3 2023 Financial Results and Significantly Raises FY 2023 Guidance

64.     On November 9, 2023, Direct Digital issued a press release announcing its Q3 2023 financial results with Q3 2023 revenue of $59.5 million ($51.6 sell-side and $7.9 million buy-side), resulting in adjusted EBITDA of $5.4 million, $4.5 million in operating income, and $3.4 million in net income.  Sell-side revenue grew by 174% over the prior year period.  These results easily exceeded Wall Street's expectations, with revenues beating Noble Capital Market's forecast

by 84% and EBITDA beating by 104%. (Earlier, the Company had told analysts and investors that "management focuses on two metrics to judge our performance, topline revenue and adjusted EBITDA").

65.     In addition, the Company announced that it was raising its guidance to $170 million to $190 million—nearly 50%—with seven weeks remaining in the year and Q4 2023 almost halfway complete. Defendant Walker assured investors that this growth would be achieved, in part, through the Company "continuing our operational excellence." Defendant Smith similarly assured investors that FY 2023 results would be achieved through the Company's commitment to "the same growth and investment initiatives that led us to the strong third quarter results." Defendants would double down on the $170 million to $190 million revenue outlook throughout the Class Period, reaffirming the revised guidance on, for example, on November 9, 11 & 14, 2023; December 6, 2023; and even after year end 2023 on January 9, 2024 and February 1, 2024.

66.     In the month preceding Defendants' announcement, Direct Digital common stock traded around $2.50 per share, on an average daily share volume of less than 15,000. Following Defendants' announcement, Direct Digital's stock price shot up as 22.8 million shares changed hands on November 10, 2023. The share price quickly doubled to hit an intraday high of $5.34 per share on Monday, November 13, 2023, on 5.8 million shares traded. By December 29, 2023, Direct Digital's common stock hit a 2023 high of $17.42 per share. And, on March 18, 2024, its stock price hit a Class Period intraday high of $35.88 per share.

**D.     Direct Digital's Undisclosed, Ongoing Issues with Two of the World's Largest DSPs, Including Its Largest Customers, Undermined the Basis for Its Revised Guidance and Seriously Threatened Its Growth Trajectory**

67.     Unbeknownst to investors, at this very time, Direct Digital was in the midst of a crisis involving two prominent DSPs, including the Company's largest customers. According to the May 10, 2024 Adalytics report, the user IDs being sent from Colossus SSP to The Trade Desk

were consistently not matching the IDs present when The Trade Desk responded to the bid request. According to Adalytics, an outright majority of impressions bought through Colossus SSP on The Trade Desk over the course of several months did not match the user ID identified with data from the browser when the ad was served. For the sixteen other SSPs evaluated for the report, the user IDs matched each time.

68.     As it turned out, the user ID mismatch issue had been going on since 2023 and it not only involved the world's largest independent DSP, The Trade Desk, but also another heavyweight in the DSP space, Google. In response to media inquiries, as reported in a May 10, 2023 article entitled "Adalytics Claims Colossus SSP Is Misdeclaring IDs In Its Bid Requests," by James Hercher on the AdExchanger website, The Trade Desk confirmed the issue with Colossus SSP, stating that: "The Trade Desk Marketplace Quality team has been aware of issues with the SSP mentioned in the Adalytics report *for more than a year*." According to the article, The Trade Desk flagged Colossus SSP "last year when it saw aberrations in results for high-value targets, and put the puzzle pieces together." As a result, the article reported, "*[w]hen The Trade Desk DSP makes the calls on ad buys, it never buys Colossus inventory*," with one exception. The Trade Desk explained, "[t]he only exception has come if an advertiser makes a specific request to knowingly transact through this SSP," that is, where the advertiser had a direct programmatic deal with Colossus SSP.

69.     According to an AdAge article by Jack Neff entitled, "Google and The Trade Desk appeared to block a supply-side platform over user ID mismatch issue," the user ID mismatch was confirmed by others. It stated, "[a] publisher executive familiar with Colossus, who spoke on the condition of anonymity because of a relationship with the company, said the publisher was able to independently reproduce the Adalytics findings of ID mismatches between the SSP and The Trade

Desk in its own testing." Similarly, according to an article by Jessica Heygate in Campaign US, entitled "Colossus SSP alleged to mismatch user IDs, "[t]wo publishers who spoke with Campaign US on background were able to verify that when they made calls through Colossus SSP, the bid that was returned through The Trade Desk assumed a different user ID from their own."

70.     Direct Digital denied that the user ID mismatches were intentional and initially tried to blame the mismatches on the "middleware" company it uses, Bidswitch (owned by Criteo). But Adalytics found that another SSP that had used Bidswitch to connect to The Trade Desk did not experience any mismatches. Additionally, according to reporting by Campaign US, "[a] media owner told Campaign US it works with several SSPs that funnel through Bidswitch and has not witnessed similar problems." Bidswitch also released a statement refuting the claim, pointing out: "BidSwitch operates as a neutral 'passthrough' platform, sending traffic from SSPs to DSPs without manipulating the content of bid requests from SSPs or bid responses from DSPs." It further stated, "[a]ny claims or implications by Colossus SSP that Bidswitch is to blame for Colossus SSP's manipulation of the content of bid requests are untrue and we encourage all parties to investigate further into the merits of any such statements before publishing untrue statements."

71.     In follow up reporting regarding the Adalytics report, it was revealed in AdAge and other publications that Google had temporarily blocked Colossus SSP because of the same mismatch issue and when it resumed the relationship it was at a lower volume than before. Moreover, Google reportedly issued credits to its affected advertisers after identifying the Colossus SSP mismatches. As further reported on AdExchanger, "The Trade Desk is also not the only DSP to have raised an issue with Colossus. According to a source at Google speaking on background, Display & Video 360 flagged this problem last year. But the issue was rectified and Colossus was reinstated by Google's DSP."

72. Google confirmed the issue on or about May 10, 2024. When asked about whether it ever blocked Colossus, its spokesman responded, "Google has strict policies and robust enforcement systems to protect advertisers, publishers and people against invalid traffic. *Late last year [in 2023], our teams identified sources of invalid traffic that do not adhere to our guidance around how signals are shared in bid requests and took prompt action*."

73. After Direct Digital initially denied that it had been cut off by Google, on or about May 20, 2024, *Direct Digital's Vice President of Technology confirmed to Ari Paparo, an Ad Tech commentator/influencer, that the suspension by Google had in fact happened as a result of the user ID mismatch issue*. He added that Direct Digital did not know how to fix the issue and eventually undertook the drastic step of deleting the entire cookie pool and starting over. Separately, Paparo opined, "I don't think there is any doubt that there was something going on with the way they were representing identity" and "the debate was between whether they were doing it on purpose."

74. The impact of the user ID mismatch issues with The Trade Desk and Google was severe. As noted in *ADOTAT*, "[w]hen two of the biggest players in the market essentially blacklist your subsidiary, it's not just a bump in the road—it's a full-blown crisis."

75. This is even more so when the players represent the Company's largest source of revenue. According to a Confidential Witness ("CW") who previously worked at Colossus Media, in Q4 2023 Google was Colossus Media's largest customer, which at the time reportedly represented more than 90% of its quarterly revenues. The CW confirmed that after Thanksgiving in Q4 2023, Google "pulled the connection" with Colossus Media due to mis-declared user IDs. The CW also identified The Trade Desk as Colossus Media's second largest customer. The CW was in a position to know this information because at the time he/she: (i) was employed starting

prior to the Class Period through Q1 2024 as a Colossus Media manager responsible for development of customer relationships; (ii) was provided reports showing revenue per customer in that role; and (iii) was one of only about fifteen to twenty Colossus Media employees.

> **E.  Direct Digital's Unexpected Q4 2023 Acceleration of Its Transition Away from Cookies Undermined the Basis for Its Revised Guidance**

76.  Going into the second half of Q4 2023, with just seven weeks remaining in FY 2023, Defendants assured investors that they "remain committed to executing on the same growth and investment initiatives that led us to the strong third quarter results."  Nonetheless, it the midst of its continuing platform issues, suspensions by two of the world's largest DSPs, and the related financial fall out, Defendants voluntarily chose to accelerate Direct Digital's "cookie-less" transition, knowing full well the financial ramifications.  While Direct Digital had said for some time that it would transition to an alternative user ID environment, saying in its 2022 Form 10-K that it was already starting to integrate alternative ID solutions, the Company indicated that this would not occur on a large scale until 2024.

77.  Whether or not a shrewd long-term strategy, Defendants suddenly accelerated the transition without telling investors about the related financial ramifications, and while reaffirming the $170 million to $190 million revenue range without qualification on November 11 & 14, 2023, December 5, 2023, January 9, 2024, and February 1, 2024.  Defendants had a duty to update investors about the risks and ramifications of this critical change of strategy at the Company's largest subsidiary with just weeks remaining in FY 2023.

> **F.  The Truth Gradually Makes Its Way into the Market Despite Defendants' Attempts to Cover Up Direct Digital's Continuing Problems**

78.  On March 26, 2024, after the market close, Direct Digital issued a press release announcing the Company's Q4 2023 and FY 2023 results.  In the press release, defendant Walker stated that the Company's "performance in the fourth quarter [2023] was not as strong as we

initially expected due to proactive measures we are taking in the face of changing macro industry trends." According to the press release, FY 2023 revenue came in at only $157.1 million, well short of the midpoint of the $170 million to $190 million guidance first provided to investors with less than two months remaining in the fiscal year and repeatedly reaffirmed. Given that revenue through Q3 2023 was $116.1 million, the reported actual Q4 2023 revenue of $41 million was $22.9 million (36%) short of the guidance midpoint.

79.     Later that day, the Company held a conference call with analysts and investors. In that call, defendant Walker stated:

> While we saw strong growth in Q4 2023 year-over-year with revenue of $41 million, which was 33% higher than the same period last year, we were down sequentially from Q3 with Q4 revenue, which was shy of our revised guidance due to two primary factors. In the fourth quarter, based upon value change changes, it became clearer cookie deprecation would begin at Q1 2024. In addition, we noted softer demand that our revised guidance called for. As such, our team proactively began our transition off of cookies for media transactions. As a result, we believe our strategic decision to accelerate our investments has positioned us well for the future and ahead of our peers.
>
> In addition, in Q4, we did our complete beta testing on our original schedule for several strategic publishers, including Dotdash Meredith, Weather.com, NBCU and Arete Group, which would have increased overall the pressure count. These strategic publishers have all been launched in Q1 of 2024. We continue to prioritize long-term successes for short-term gain and we are confident the strategic measures in internal calibrations were made in Q4 2023 will position the company to build on the successes of 2023 and continue revenue growth and market share gains in 2024.

80.     Defendant Diaz added that:

> As Mark mentioned, revenue for the fourth quarter of 2023 was lower than anticipated due to lower-than-anticipated demand, a delay in the release of Tier 1 publishers from beta testing and proactive efforts by the company during the fourth quarter to accelerate the transition towards a cookie-less advertising platform.

81.     During the question-and-answer portion of the call, defendant Walker responded to an analyst question regarding the reasons for the "softer demand" as follows:

Yeah. I would say the softer demand was a combination of the change that we saw with making the transition over cookies because of the platform impact that we actually had in Q4. And we also saw it being lighter going into the holiday season. So it was a combination of both as it relates to Q3.

82.     In a March 27, 2024 Noble Research report entitled "Direct Digital Holdings Hits the Reset Button," a Noble securities analyst noted that the "delay in the release of Tier 1 publishers from beta testing" was due to the Q4 2023 transition away from cookies, stating:

> The company reported disappointing Q4 results, due primarily to impacts from system changes that the company made to its [s]ell-side platform during the quarter. Revenue of $41.0 million and adj. EBITDA of $2.3 million were well below our estimates of $67.9 million and $6.4 million, respectively. . . . Technological changes were made to enable the SSP to transact using alternative IDs, a key step in the company's preparation for Google's impending third-party cookie deprecation. *One impact of the transition process was that the company did not add new publishers during the quarter, opting to keep new publishers in beta during the transition period.*

83.     In reality, Direct Digital's poor financial performance and revenue short fall was not only the result of Defendants' abrupt decision to delay revenues until 2024 as a result of an early transition to alternative IDs.  Instead, the Company's disastrous Q4 and FY 2023 was largely caused by Colossus SSP's ongoing platform-related issues which resulted in the mis-declaration of user IDs, the sale of lower quality impressions to advertisers than represented, related DSP refunds to advertisers for the poor quality impressions, and the undisclosed suspensions by, and thereafter lower volumes from Google and The Trade Desk.

84.     Then, on April 23, 2024, Direct Digital announced that its independent auditor, Marcum LLP ("Marcum"), had resigned on April 17, 2024 and that it would not file its Form 10-K on time.  A Noble Capital Market analyst report the next week disclosed that "Marcum is terminating its relationship with the company, citing its inability to verify the company's impressions data."  A Roth MKM analyst note later characterized Marcum's concerns as being "around SOC-1 Type 2 reports for publishers."

85.    On or about May 8, 2024, Adalytics began disseminating an advance copy of its blog post to media outlets claiming that Colossus SSP was misidentifying user IDs sent to DSPs. On Friday, May 10, 2024, Adalytics published its report. Also, on May 10, 2024, multiple news outlets reported that The Trade Desk had independently identified Colossus' ID mismatch issue and limited Colossus SSP traffic across its platform. Google also reportedly identified the same issue in late 2023, temporarily suspended Colossus's traffic, and was forced to issue credits to affected advertisers as a result.

86.    The impact of these revelations on Direct Digital was ground shaking. It was now clear that Direct Digital had not been candid with the market on March 26, 2024 with respect to the true reasons for its disastrous Q4 2023. As *ADOTAT*, a leading online journal for the Digital Chief Marketing Officers, later aptly summarized:

> These actions by The Trade Desk and Google paint a much clearer picture of why Direct Digital Holdings faced such significant financial pressure in Q4 2023. It wasn't just about transitioning to a cookie-less future; it was about the immediate and tangible impacts of losing trust and access within the industry.
>
> *When two of the biggest players in the market essentially blacklist your subsidiary, it's not just a bump in the road—it's a full-blown crisis. This context makes the company's earlier explanations seem like a smokescreen, diverting attention from the real issues at hand.*
>
> So, while Direct Digital Holdings tried to spin a tale of proactive adaptation to industry changes, the reality was far grimmer. *The loss of trading privileges with major partners like The Trade Desk and Google likely had a direct impact on their bottom line. These events make a far more plausible explanation for their Q4 financial woes than the narrative they attempted to sell.*

87.    On October 15, 2024, Direct Digital belatedly filed its 2023 Form 10-K with its new independent auditor, BDO USA, P.C. The Form 10-K confirmed 2023 revenue was $157.1 million, as previously reported, and disclosed an entirely new reason for missing the Company's revised 2023 revenue guidance of $170 million to $190 million. It revealed the impact of the platform issues with Google (although it did not specifically name Google), stating that *"[i]n*

*January 2024, we received notice from one of our sell-side customers that it would be short paying*

*the Company's invoices.*"  It further revealed that this particular customer was *its largest customer*,

"[f]or the years ended December 31, 2023 and 2022 . . . represent[ing] 73% and 63% of revenues,

respectively."  As a result, the Company stated that for 2023 it "*has not recognized revenue related*

*to the short payments* and recognized $8.8 million in other expense[s]."  The Form 10-K further

stated:

> Our revenues of $157.1 million in 2023 increased by $67.8 million, or 76%, from
> $89.4 million in 2022.  Sell-side advertising revenue increased $62.4 million, or
> 104%, while buy-side revenue increased $5.3 million, or 18%, over fiscal year
> 2022. The increase in our sell-side advertising revenue was primarily due to a
> continued increase in impression inventory, as well as increased publisher
> engagement across both general market and underrepresented publisher
> communities. *This was partially offset by a short-pay notice we received from a*
> *customer, resulting in a reduction of our 2023 revenue to the reported amount of*
> *$157 million. The Company has not been provided with information as to the*
> *reason for the short pay, and therefore has disputed it. In conjunction with the short*
> *pay, the Company recorded a charge of $8.8 million for payments made to a few*
> *publishers, primarily because of the Company's inability to charge back the*
> *publishers for the short pay given the lack of information and related*
> *documentation supporting such transaction.*

88.    The Company also issued a going concern warning tied, in part, to the issues

surrounding Colossus Media's systematic user ID mismatches on its platform.  The warning stated

in pertinent part:

> **There is substantial doubt about our ability to continue as a going concern, which**
> **may hinder our ability to obtain future financing.**
>
> Our audited consolidated financial statements as of December 31, 2023 have been
> prepared under the assumption that we will continue as a going concern for the next
> twelve months. As of December 31, 2023, we had cash and cash equivalents of $5.1
> million and an accumulated deficit of $2.5 million.  <u>We do not believe that our cash</u>
> <u>and cash equivalents are sufficient for the next twelve months. As a result of our</u>
> <u>financial condition and other factors described herein, there is substantial doubt</u>
> <u>about our ability to continue as a going concern. Among these factors include the</u>
> <u>May 2024 pause by a sell-side customer of its connection to the Colossus SSP</u>
> <u>resulting from allegations contained in a defamatory article / blog post</u>, which we
> believe was part of coordinated misinformation campaign. <u>Our ability to continue</u>
> <u>as a going concern will depend on our ability to</u> successfully manage costs after

executing a reorganization plan on July 1, 2024, <u>work with partners to achieve prior volume levels of sells-side revenue</u> and obtain additional funding, as to which no assurances can be given. We continue to analyze various alternatives, including potentially obtaining additional or expanded lines of credit, debt or equity financings, or other arrangements. Our future success depends on our ability to raise capital and/or implement the various strategic alternatives discussed above. We cannot be certain that these initiatives or raising additional capital, whether through selling additional debt or equity securities or obtaining a line of credit or other loan, will be available to us or, if available, will be on terms acceptable to us. If we issue additional securities after the closing of this offering to raise funds, these securities may have rights, preferences, or privileges senior to those of our common stock, and our current shareholders may experience dilution. If we are unable to obtain funds when needed or on acceptable terms, we may be required to modify our business plans and operations, further cut operating costs, forego future development and other opportunities, or even terminate our operations.

(Underline emphasis added).

89.    The Form 10-K also confirmed that the Company's financial statements were and had always been the sole responsibility of the Company's management.  As explained by the Company's independent auditor, BDO USA, P.C., "[t]hese consolidated financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audit."

90.    On October 15, 2024, Direct Digital also belatedly filed its Q1 and Q2 2024 Form 10-Qs, revealing the true impact of the Company's ongoing platform and customer issues.  In Q1 2024, Direct Digital had only $22.27 million in revenue compared to $21.22 million in Q1 2023, and its net loss ballooned to $3.8 million from $1.3 million in Q1 2023.  For Q2 2024 was, Direct Digital reported only $21.8 million in revenue which was lower than Q1 2024 and down dramatically from $35.4 million in Q2 2023.  In Q2 2024, the Company's net loss ballooned to $3.1 million from a positive net income of $1.2 million a year earlier in Q2 2022.

91.    In the Q2 2024 Form 10-Q, the Company disclosed that a "significant customer" had temporarily paused its connection to Colossus SSP "for a couple of weeks in May 2024" and reconnected at a lower volume "creat[ing] [a] significant disruption in the Company's sell-side

business." Direct Digital also blamed its year-over-year fall off in Q2 2024 revenue on the pause saying, "[s]ell-side advertising revenue decreased $9.3 million, or 39%, primarily due to a decrease in impression inventory. This decrease was primarily caused by one of the Company's sell-side customers pausing its connection to the Company while it investigated allegations made against the Company . . . [t]his customer reconnected the Company on May 22, 2024 and sell-side volumes have resumed but not yet at the levels experienced prior to the pause in May 2024."

92.   While Direct Digital did not identify this customer in its SEC filings, it did name the customer in another context. According to Colossus Media's complaint in its lawsuit concerning the Adalytics report, "on May 9, 2024, [The] Trade Desk suspended business with Colossus SSP because of the post's claims that Colossus SSP misrepresented user IDs in its bid requests."

93.   On November 12, 2024, Direct Digital reported its financial results for Q3 2024. It reported only $9.1 million in quarterly revenue with just $2.2 million of that on the sell-side.

## VI.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL FACTS

### A.   November 9, 2023 Press Release

94.   On November 9, 2023, after the markets closed, Direct Digital issued a press release announcing its Q3 2023 financial results, which was also filed with the SEC on a Form 8-K signed by defendant Diaz. The press release announced Q3 2023 revenue of $59.5 million ($51.6 sell-side and $7.9 million buy-side) resulting in adjusted EBITDA of $5.4 million, $4.5 million in operating income, and $3.4 million in net income. The press release quoted defendant Smith as stating the following:

> "The growth seen in this quarter, as well as the past year, has been fueled by a combination of our strategic investments and partnerships, our differentiated approach to advertising solutions, as well as a set of market dynamics which have been highly beneficial to our position in the industry. We have capitalized on the

shift in ad spend towards digital media on both the sell- and buy-side and will continue to grow our presence in the space through our recent partnerships and advancements of our technology stack. ***We remain committed to executing on the same growth and investment initiatives that led us to the strong third quarter results we are reporting today.***"

95.     The Company's press release further stated Direct Digital was increasing its fiscal 2023 financial guidance issued in its Q2 2023 update—which was "in the range of $125 million to $130 million"—such that it now "***expect[ed] revenue to be in the range of $170 million to $190 million***."  Defendant Diaz explained, "[t]his increase reflects our belief in our ability to execute on our various growth strategies, ***demonstrates the strength of our operating leverage*** and highlights the favorable market trends that we expect to continue for the remainder of this year."

96.     The bolded and italicized statements referenced in ¶¶94–95 above, considered in context, were materially misleading and omitted material facts necessary to make them not misleading when made.  In connection with announcing the greatly-increased, revised guidance, based in part upon the Company's strong "operating leverage," Defendants failed to disclose adverse facts about the significant risks and ramifications associated with the Direct Digital's core operations, that is, The Trade Desk had partially blocked Colossus SSP, as well as the ongoing issues with mis-matched customer IDs on the Colossus SSP platform.  These undisclosed issues represented significant and material risks to Direct Digital's purported growth trajectory and to its FY 2023 guidance.  Moreover, Defendants were not "committed" to executing the previous quarters' "same growth and investment initiatives," as Direct Digital had accelerated its alternate ID transition in November 2023, which would limit revenues and undermine some of the purported justifications for the increased estimate.

    **B.    November 9, 2023 Form 10-Q**

97.     On November 9, 2023, after the markets closed, Direct Digital filed its SEC Form 10-Q for Q3 2023 ended September 30, 2023, which was signed by defendant Diaz.  In the filing,

- 34 -

Defendants provided additional detail on the Company's Q3 2023 financial results and the factors affecting its performance. Direct Digital stated the following concerning "[e]nhancing ad inventory quality" in the "Key Factors Affecting Our Performance" section:

> In the advertising industry, inventory quality is assessed in terms of invalid traffic ("IVT") which can be impacted by fraud such as "fake eyeballs" generated by automated technologies set up to artificially inflate impression counts. As a result of our platform design and proactive IVT mitigation efforts, in the nine months ended September 30, 2023, we determined that approximately 1% of inventory was invalid, resulting in minimal financial impact to our customers. ***We address IVT on a number of fronts, including sophisticated technology, which detects and avoids IVT on the front end; direct publisher and inventory relationships, for supply path optimization; and ongoing campaign and inventory performance review, to ensure inventory quality and brand protection controls are in place.***

98.     The bolded and italicized statements referenced in ¶97 above, considered in context, were materially misleading and omitted material facts necessary to make them not misleading when made. While recognizing the key factor of "address[ing] IVT" with "sophisticated technology" that "detects and avoids IVT on the front end," Defendants failed to disclose that invalid traffic issues with one of its most prominent DSP customers had already impacted performance and posed a significant and material risk to the Company's purported growth trajectory and to its FY 2023 guidance. Further, this key factor affecting performance had been identified by The Trade Desk itself and was not prevented by Direct Digital's "sophisticated technology."

### C.     November 11, 2023 Conference Call

99.     On November 11, 2023, Direct Digital held an earnings call with analysts and investors concerning its reported financial results for Q3 2023. Defendants Walker and Diaz represented the Company on the call. On the call, defendant Walker that, "***for the remainder of 2023, we believe our technology strategy, infrastructure and operational investments will continue to bear fruit*** as we make considerable progress with our server transitions as well as our

overall re-platforming." He further announced that Direct Digital was raising its financial guidance to a range of $170 million to $190 million which would be achieved through its continuing "operational excellence":

> Historically, Q4 has been our strongest quarter, and we expect to see favorable market dynamics with an increase in media spend being targeted to reach both general and multicultural audiences. Consequently, *we're revising our full year 2023 revenue guidance upwards to a range of $170 million to $190 million*.
>
> By removing the aforementioned warrant overhang, executing on our re-platforming strategy *and continuing our operational excellence*, we believe we will pave a way for growth in our stock, valuing Direct Digital Holdings at a similar level to our peers.

100.    Later in the conference call defendant Walker had the following colloquy with a securities analyst, assuring investors that the Company's "relationships" and its "platform" would allow it to continue its momentum into Q4 2023:

> [Analyst:] . . . I just – I'll ask just in Q4, thank you for Q4 being up sequentially from Q3. There's -- The Trade Desk is out talking about some cautiousness in Q4 that stabilized in a little rough in October, stabilized in November. And *I'm just -- the momentum you're seeing seems like it's continuing, especially if your guidance history is evident here, too*, but just kind of curious what you're seeing in conversations right now relative to the broader macro.
>
> [Defendants Walker:] Yes. For the broader macro, and I think you've seen it in our revision upwards of our guidance and the conversations we have. If we weren't confident, we wouldn't have revised up the way that we did, *but we are pretty confident in the relationships that we've been able to build and the platform that we've been able to establish* and the growth that we actually have on our road map. So we are still bullish on our business, even though some of our peers might be having some other difficulties, but we are really confident in the model that we've been able to build here at Direct Digital.

101.    The bolded and italicized statements referenced in ¶¶99–100 above, considered in context, were materially misleading and omitted material facts necessary to make them not misleading when made. In connection with announcing the greatly-increased, revised guidance, based in part upon the Company's "operational excellence," its current "infrastructure" and "platform," as well as the "relationships" it built, Defendants failed to disclose adverse facts about

the significant risks and ramifications associated with the Direct Digital's core operations.  Such omitted facts called into question its operational competence, the adequacy of its platform and infrastructure, and the quality of its relationships with customer/partners including The Trade Desk and Google.  The Trade Desk had already partially blocked Colossus SSP and there were ongoing issues with mis-matched customer IDs on the Colossus SSP platform.  These undisclosed issues represented a significant and material risk to Direct Digital's purported growth trajectory and to its FY 2023 guidance.

### D. December 5, 2023 Noble Capital Markets 19th Annual Emerging Growth Equity Conference

102.    On December 5, 2023, defendant Walker presented on behalf of Direct Digital at the 2023 Noble Capital Markets 19th Annual Emerging Growth Equity Conference in Boca Raton, Florida.  In speaking about Apple and Google phasing out of cookies (that is, cookie deprecation) and Direct Digital's response, defendant Walker stated that "*we actually during the month[s] of November [and] December have actually already started working on that*."  He continued, "so what we're doing to prep for that [cookie deprecation] is there is a significant amount of other IDs that buyers are interested in leveraging, ID5, they also have Ramp has their own ID or [unintelligible], Trade Desk has their own ID, there's a host of other IDs . . . and we're making our own platform compatible . . . so, we're doing integrations currently with each of those and starting to test out by capabilities so we're prepared in 2024."  Defendant Walker concluded that, "*we are being proactive and starting to make that transition* because it's a definite that it's gonna be here this time."

103.    Even with transition in progress, and now with only about three weeks remaining in the year, defendant Walker reaffirmed the earlier FY 2023 guidance noting that "*we were able*

*to raise guidance to about 170 to 190 million of top line revenue and we expect for us to be within that range.*"

104.    The bolded and italicized statements referenced in ¶¶102–103 above, considered in context, were materially misleading and omitted material facts necessary to make them not misleading when made.  Having chosen to speak about Direct Digital's proactive efforts to position the Company for cookie-less advertising through its Q4 2023 transition, Walker had a duty to speak fully and truthfully on the subject, and disclose the negative financial impact in Q4 2023 of that effort.  This is particularly true since Walker reaffirmed, without qualification, the $170 million to $190 million FY 2023 revenue guidance in the conversation.  So too, it was materially misleading for him to reiterate the guidance without disclosing facts seriously undermining and calling into question such statements, such as the crisis with Direct Digital's platform mis-identifying user IDs, as well as the operational and financial impact thereof for FY 2023.  These undisclosed issues represented a significant and material risk to Direct Digital's purported growth trajectory and to its FY 2023 guidance.  With just three weeks remaining in FY 2023, the impact of such issues were already being realized.

### E.    January 9, 2024 ICR Conference Fireside Chat

105.    On January 9, 2024, defendant Walker presented on behalf of Direct Digital in a "fireside chat" at the 2024 ICR Conference at the Grande Lakes Resort in Orlando, FL.  In speaking about phasing out of cookies (that is, cookie deprecation) and Direct Digital's response, defendant Walker stated:

> *I think one of the things that our company has done is we've been prepping for this for the last year and specifically in Q4 we started taking steps to automatically change our platform to adjust for this change which is coming on in six months.*
> . . . So from now until it actually occurs in the middle of Q3 we're going to be prepared for that and those are some of the changes we are actually making today.

106.    Even with the acknowledged cookie-less transition during Q4 2023, and with Direct Digital's 2023 year end now past, defendant Walker reaffirmed the FY 2023 guidance, stating:

> This year we were able to raise and beat guidance and *we're projected to be somewhere in the hundred, the guidance we give is 170 to 190 million of top line revenue grow. Um, so with that we've been able to grow and I think the market has finally started catching up with our story.*

107.    The bolded and italicized statements referenced in ¶¶105–106 above, considered in context, were materially misleading and omitted material facts necessary to make them not misleading when made.  Having chosen to speak about Direct Digital's proactive efforts to position the Company for cookie-less advertising through its Q4 2023 transition, Walker had a duty to speak fully and truthfully on the subject, and disclose the negative financial impact in Q4 2023 of that effort.  This is particularly true since Walker reaffirmed, without qualification, the $170 million to $190 million FY 2023 revenue guidance in the conversation.  So too, it was materially misleading for him to reiterate the guidance without disclosing facts seriously undermining and calling into question such statements, such as The Trade Desk and Google suspensions, the full-blown crisis with Direct Digital's platform mis-identifying user IDs, as well as the operational and financial impact thereof for FY 2023.  These undisclosed issues represented a significant and material risk to Direct Digital's purported growth trajectory and to its FY 2023 guidance.  With FY 2023 now complete, the impact of such issues had already been realized.  Direct Digital had fallen far short of its FY 2023 guidance.

### F.    February 1, 2024 Pulse 2.0 Interview

108.    On February 1, 2024, the Pulse 2.0 news website published an interview with defendant Walker.  Defendant Walker was quoted as follows:

[Pulse 2.0:] *What have been some of the company's most significant milestones?*

[Defendant Walker:]  "As we execute on our robust growth strategy supported by key technological capabilities, our rapid growth, as evidenced by our strong

earnings results in recent quarters, has been really exciting. ***A significant milestone for the team was crossing $100 million in revenues in, and, importantly, just in Q3 we raised our guidance again to a range of $170 million to $190 million for FY 2023.*** We believe we are just getting started as we continue to invest in our technology and infrastructure."

109.    The next day, on February 2, 2024, Direct Digital's LinkedIn social media page promoted the Pulse 2.0 interview, providing a link to the article and thanking Pulse 2.0 "for diving into the story behind Direct Digital Holdings."

110.    The bolded and italicized statement referenced in ¶108 above, considered in context, was materially misleading and omitted material facts necessary to make it not misleading when made.  Stating in February 2024, after 2023 year-end, that raising FY 2023 revenue guidance to $170 million to $190 million was one of Direct Digital's most "significant milestone[s]," particularly right after boasting of its "rapid growth" and "strong earnings" in "recent quarters," was materially misleading and omitted material facts necessary to make it not misleading when made.  Such statements indicated to investors that Direct Digital's 2023 guidance was reasonable, had been largely met, and that the Company was continuing on its growth trajectory as expected. So too, it was materially misleading for him to trumpet FY 2023 the guidance, without qualification, without disclosing facts seriously undermining and calling into question such statements, such as The Trade Desk and Google suspensions, Google's Q4 2023 short-pay, the full-blown crisis with Direct Digital's platform mis-identifying user IDs, as well as the operational and financial impact thereof for FY 2023.  These undisclosed issues represented a significant and material risk to Direct Digital's purported growth trajectory and to its FY 2023 guidance.  With FY 2023 now complete, the impact of such issues had already been realized.  Direct Digital had fallen far short of its FY 2023 guidance.

### G.    March 26, 2024 Press Release

111.    On March 26, 2024, after the market close, Direct Digital issued a press release announcing the Company's disappointing Q4 2023 and FY 2023 results, which was also filed with the SEC on a Form 8-K signed by defendant Diaz.  According to the press release, 2023 revenue came in at only $157.1 million, well short of the $170 million to $190 million guidance.  In the press release, defendant Walker stated that "[a]lthough performance in the fourth quarter [2023] was not as strong as we initially expected *due to proactive measures we are taking in the face of changing macro industry trends*, *we are confident our company is in a position to build on the successes of 2023*, expand on emerging channel and inorganic growth opportunities *and continue our strong revenue growth and market share gains in 2024*."

112.    The bolded and italicized statements referenced in ¶111 above, considered in context, were materially misleading and omitted material facts necessary to make them not misleading when made.  Direct Digital's weak performance in Q4 2023 was not mainly due to the proactive transition to alternative IDs, which would have been just a temporary setback in the Company's growth path.  Instead, it was largely driven by a substantial quarter-over-quarter revenue decline tied to its largest customer and partner, Google.  This decline resulted from ongoing, unresolved issues with Colossus SSP, which prompted Google to scale back its business with Direct Digital.  Tellingly, Google also "short paid" Direct Digital by more than $8.8 million for amounts invoiced in Q4 2023, which caused a material portion of the quarter's shortfall.  Likewise, The Trade Desk, one of the world's largest DSPs, had partially blocked Colossus SSP due to the mis-matched ID issues.  Defendants' failure to disclose the full-blown crisis with its largest customers, some of its most important partners, and two of the largest and most influential DSPs in the world, rendered Walker's statement materially misleading when made.  Further, due to these undisclosed material facts, it was misleading for Walker to assure investors that the

Company was well-positioned to continue its strong revenue growth and market share gains in 2024. With just five days left in Q1 2024, Defendants already knew that the risks related to these factors had already been realized and resulted in Q1 2024 being an unmitigated disaster. FY 2023 was not just a temporary setback.

### H.    March 26, 2024 Conference Call

113.    On March 26, 2024, Direct Digital held an earnings call with analysts and investors concerning its reported financial results for Q4 2023 and FY 2023. Defendants Walker and Diaz represented the Company on the earnings call. On the call, defendant Walker stated that the disappointing Q4 2023 results were primarily due to the Company proactively transitioning to a "cookie-less" environment, which would represent a temporary bump in the road, and would not otherwise inhibit Direct Digital's purported expected growth path going forward. He stated:

> While we saw strong growth in Q4 2023 year-over-year with revenue of $41 million, which was 33% higher than the same period last year, we were down sequentially from Q3 with Q4 revenue, which was shy of our revised guidance due to two primary factors. ***In the fourth quarter, based upon value change changes, it became clearer cookie deprecation would begin at Q1 2024.*** In addition, ***we noted softer demand that our revised guidance called for. As such, our team proactively began our transition off of cookies for media transactions. As a result, we believe our strategic decision to accelerate our investments has positioned us well for the future and ahead of our peers.***
>
> ***In addition, in Q4, we did our complete beta testing on our original schedule for several strategic publishers, including Dotdash Meredith, Weather.com, NBCU and Arete Group, which would have increased overall the pressure count. These strategic publishers have all been launched in Q1 of 2024.*** We continue to prioritize long-term successes for short-term gain and ***we are confident the strategic measures in internal calibrations were made in Q4 2023 will position the company to build on the successes of 2023 and continue revenue growth and market share gains in 2024***.

114.    Defendant Diaz added that:

> As Mark mentioned, ***revenue for the fourth quarter of 2023 was lower than anticipated due to lower-than-anticipated demand, a delay in the release of Tier 1 publishers from beta testing and proactive efforts by the company during the***

*fourth quarter to accelerate the transition towards a cookie-less advertising platform.*

115.    During the question-and-answer portion of the call, defendant Walker responded to an analyst question regarding the reasons for the "softer demand" as follows:

> Yeah.  ***I would say the softer demand was a combination of the change that we saw with making the transition over cookies because of the platform impact that we actually had in Q4.*** And we also saw it being lighter going into the holiday season. So it was a combination of both as it relates to Q3.

116.    In a March 27, 2024 Noble Market Research report entitled "Direct Digital Holdings Hits the Reset Button," which was based upon management's representations, a Noble securities analyst noted that the "delay in the release of Tier 1 publishers from beta testing" was due to the Q4 2023 transition away from cookies, stating:

> The company reported disappointing Q4 results, due primarily to impacts from system changes that the company made to its Sell-side platform during the quarter. Revenue of $41.0 million and adj. EBITDA of $2.3 million were well below our estimates of $67.9 million and $6.4 million, respectively. . . . Technological changes were made to enable the SSP to transact using alternative IDs, a key step in the company's preparation for Google's impending third-party cookie deprecation.  One impact of the transition process was that the company did not add new publishers during the quarter, opting to keep new publishers in beta during the transition period.

117.    The bolded and italicized statements referenced in ¶¶113–115 above, considered in context, were materially misleading and omitted material facts necessary to make them not misleading when made.  Direct Digital's weak performance in Q4 2023 was not mainly due to the proactive transition to alternative IDs, which would have been just a temporary setback in the Company's growth path.  Instead, it was largely driven by a substantial quarter-over-quarter revenue decline tied to its largest customer and partner, Google.  This decline resulted from ongoing, unresolved issues with Colossus SSP, which prompted Google to scale back its business with Direct Digital.  Tellingly, Google also "short paid" Direct Digital by more than $8.8 million for amounts invoiced in Q4 2023, which caused a material portion of the quarter's shortfall.

Likewise, The Trade Desk, one of the world's largest DSPs, had partially blocked Colossus SSP due to the mis-matched ID issues. Defendants' failure to disclose the full-blown crisis with its largest customers, some of its most important partners, and two of the largest and most influential DSPs in the world, rendered Walker's and Diaz's statements materially misleading when made. Further, due to these undisclosed material facts, it was misleading for Walker to assure investors that the Company was well-positioned to continue its strong revenue growth and market share gains in 2024. With just five days left in Q1 2024, Defendants already knew that the risks related to these factors had already been realized and resulted in Q1 2024 being an unmitigated disaster. FY 2023 was not just a temporary setback.

## I.    May 10, 2024 Statements

118.    On May 10, 2024, Direct Digital issued a statement regarding the Adalytics report and defending itself against any implication that the user ID mismatch involved intentional conduct on its part. As reported in an article on the *CampaignUS* website on May 10, 2024 entitled "Colossus SSP alleged to mismatch user IDs," the Company further responded to suggestions that the ID mismatch was related to Direct Digital's deteriorating financial situation following the March 26, 2024 disclosures and associated stock drop. The article reported defendant Walker's statements as follows, "'[t]he financial solvency of our company *is very sound*,' he said, adding that it *remains profitable*, and its first-quarter [2024] performance was '*up 20% year over year*.'"

119.    Direct Digital also provided a statement which was quoted in the article and which said in relevant part:

> "Unfortunately, we believe that there has been a concerted effort to seek financial gain by attempting to discredit the performance and operations of [Direct Digital]. To be clear, *[Direct Digital] remains operationally well-positioned and financially strong* with estimated 2023 FY earnings of $157 million *and is experiencing continued growth into 2024. We maintain a solid financial relationship with our partners* and are committed to continuous improvement and strengthening our products and services.

120.    Each of the bolded and italicized statements referenced in ¶¶118–119 above, considered in context, was materially false and misleading or omitted material facts necessary to make it not misleading when made.  At the time, Direct Digital had not remained profitable.  For Q1 2024, which had already closed on March 31, 2024 and for which the SEC Form 10-Q was due in less than a week, Direct Digital had experienced a significant quarterly net loss of $3.8 million, down from the $2.0 million net income for FY 2023 the Company had reported weeks earlier. Rather than "20% year over year" growth or "continued growth into 2024," Direct Digital had actually experienced less than 5% year over year growth in revenue, with quarter-to-quarter revenues dropping off a cliff, from $41 million in Q4 2023 to $22.3 million in Q1 2024.  Direct Digital's statement about maintaining "a solid financial relationship with our partners" was misleading and omitted material facts since, at the time, the Company's relationship with its largest partner and customer—Google—had been severely damaged due to ongoing technological issues with Colossus SSP, which led Google to pull back on its business.  It also "short paid" Direct Digital by more than $8.8 million for amounts invoiced in Q4 2023.  Given the ongoing nature of platform and customer issues, and the related effect on Direct Digital's financial situation, it could not fairly be said that the Company was "operationally well-positioned," "financially strong," or that its financial solvency was "very sound."

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

121.    In engaging in an unlawful scheme and course of conduct, making materially false and misleading statements, and in omitting material facts necessary to make their statements not misleading, Defendants acted intentionally and/or with extreme recklessness.  In addition to the allegations above which by themselves establish a strong inference of Defendants' scienter, the following additional facts, when considered together with the totality of all circumstances alleged in this Complaint, further contribute to this already strong inference of Defendants' scienter.

122.     The Individual Defendants each spoke publicly and held themselves out to investors and analysts as knowledgeable as to Direct Digital's operations, technology, advertising platform, customers, current finances, future plans, and projected financial results, such that they each had a duty to know, and in fact knew, of the undisclosed facts and related risks rendering Defendants' statements materially misleading when made.

123.     The timing of and reported reasons for Marcum's resignation as the Company's independent auditor support an inference of scienter.  Marcum resigned on April 17, 2024, reportedly because of its inability to verify Direct Digital's impressions data and concerns about its reports for publishers.  This resignation came shortly after Direct Digital announced its FY 2023 results including $157.1 million in revenues, which would have been millions of dollars greater absent Google's short payment of invoices.  Google and The Trade Desk had also limited their business with Colossus SSP due to ongoing issues with mis-matched user IDs such that advertisers were overpaying on their bids for impressions.  Marcum also would have seen Defendants' materially incomplete and/or highly deceptive public statements regarding the purported reasons for the FY 2023 short fall, including Defendants' failure to acknowledge that the short pay by its largest customer was a significant factor in the miss.

124.     That Defendants waited nearly nine months, until October 15, 2024, to disclose the Q4 2023 short pay in connection with the FY 2023 financials signed off on by the new independent auditor (while previously disclosing other purported reasons for the miss), supports an inference of Defendants' intent to mislead and withhold material information that would have earlier undercut and called into doubt Direct Digital's purported growth trajectory.  Presumably a new independent auditor, much like the previous auditor, would not sign off on a Form 10-K that was materially misleading and would have required such a disclosure.

- 46 -

125.    Defendant Smith was motivated in part to deceive investors to sell his personally held Direct Digital shares at inflated prices.  On December 11, 2023, Smith sold 77,930 shares of Direct Digital common stock at an average price of $11.13 per share for proceeds of $867,361.  On December 12, 2023, Smith sold 41,348 shares of Direct Digital common stock at an average price of $10.22 per share for proceeds of $422,577.  In total, Smith sold 45% of his Class A shares for proceeds of $1,289,937.  In the previous twelve months, Smith had not sold any shares.  Outside of these transactions, Smith has only sold $187,800 in Direct Digital Class A shares ever.  Smith's Class Period sales came with less than three weeks remaining in FY 2023 and just one week after Walker reaffirmed the $170 million to $190 million FY 2023 revenue guidance.  Moreover, Smith sold these shares shortly before the Company's insider trading blackout period began after Friday, December 15, 2023 (fifteen days before end of quarter).  Smith knew that the blackout would last at least until April 2, 2024 (two days after the Form 10-K deadline)—after which the disastrous Q4 2023 would be known and its negative impact on the Company's stock price realized.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

126.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, made materially false and misleading statements, and omitted to state material facts necessary in order to make their statements made not misleading.  By artificially inflating and manipulating the price of Direct Digital common stock, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed and/or the concealed risks materialized.  When Defendants' prior misrepresentations, omissions, and fraudulent conduct became apparent to the market, it caused Direct Digital's stock price to fall precipitously as the prior artificial inflation left the stock price.  As a result of their purchases of Direct Digital common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss.

127.    On March 26, 2024, after the market close, Direct Digital issued a press release announcing the Company's Q4 2003 and FY 2003 results and claiming that the Company's "performance in the fourth quarter [2023] was not as strong as we initially expected due to proactive measures we are taking in the face of changing macro industry trends[.]"  According to the press release, 2023 revenue came in at only $157.1 million, well short of the guidance midpoint of the $170 million to $190 million.  Later that day, in a conference call with analysts and investors, Walker blamed the short fall on "softer demand that our revised guidance called for" and that "our team proactively began our transition off of cookies for media transactions."  Defendant Diaz summarized that "revenue for the fourth quarter of 2023 was lower than anticipated due to lower-than-anticipated demand, a delay in the release of Tier 1 publishers from beta testing and proactive efforts by the company during the fourth quarter to accelerate the transition towards a cookie-less advertising platform."

128.    On these partial corrective disclosures and/or the materialization of concealed risks, the price of Direct Digital common stock declined by $10.47 per share, or approximately 39%, from $26.51 per share on March 26, 2024 to close at $16.04 on March 27, 2024 on an unusually high volume of 1.5 million shares.  By March 28, 2024, the Company's share price had fallen to $15.24 per share as the market digested the news.  In reality, Direct Digital's poor financial performance and revenue short fall was largely the result of Colossus SSP's undisclosed, ongoing platform-related user ID mismatch issues, as well as Google and The Trade Desk partially blocking Colossus SSP traffic.

129.    On April 23, 2024, Direct Digital announce that its independent auditor had resigned on April 17, 2024 and that it would not file its Form 10-K on time.  A Noble Capital Market analyst reported that "Marcum is terminating its relationship with the company, citing its

inability to verify the company's impressions data." A Roth MKM analyst note later characterized Marcum's concerns as being "around SOC-1 Type 2 reports for publishers." As alleged herein, the Company was experiencing but concealing its significant platform issues which resulted in invalid traffic for its ad impressions, which further led to overpayment by advertisers.

130.    On this partial corrective disclosure and/or the materialization of concealed risks, Direct Digital's stock dropped from a close of $6.93 per share on April 23, 2024, to a close of $6.24 per share the next day on a high volume.

131.    On or about May 8, 2024, Adalytics began disseminating an advance copy of its blog post to media outlets claiming that Colossus SSP was misidentifying user IDs sent to DSPs. On Friday, May 10, 2024, Adalytics formally published its report. Also, on May 10, 2024, multiple news outlets reported that The Trade Desk had independently identified Colossus' ID mismatch issue and limited Colossus SSP traffic across its platform. Google also reportedly identified the same issue in late 2023, temporarily suspended Colossus's traffic, and was forced to issue credits to affected advertisers as a result.

132.    On these partial corrective disclosures and/or the materialization of concealed risks, Direct Digital's common stock dropped $0.28 per share, or 6.1%, to close at $4.28 per share on May 9, 2023, and on May 10, 2024 dropped another $0.31 per share, or 7.2%, to close at $3.97 per share, on higher than usual volume.

133.    On October 15, 2024, Direct Digital filed its 2023 Form 10-K disclosing that its largest customer (Google) had refused to pay millions of dollars in customer receivables. As a result, the Company stated that for 2023 it "has not recognized revenue related to the short payments and recognized $8.8 million in other expense[s]." Moreover, it disclosed that the ID mismatch issue continued to affect revenues going forward. It said that as a result of the Adalytics

report, "one of the Company's sell-side customers [which it identified as The Trade Desk in related litigation] paused its connection to the Company for a couple of weeks in May 2024, which reduced sell-side sales volumes. . . .[and] sell-side volumes related to this customer have resumed but not yet at the levels experienced prior to the pause in May 2024 which has created significant disruption in the Company's sell-side business."  The Company also issued a going concern warning tied, in part, to the issues surrounding Colossus Media's systematic user ID mismatches on its platform.

134.    On October 15, 2024, Direct Digital also filed its Q1 and Q2 2024 Form 10-Qs, which showed that the Company's undisclosed issues had caused lasting damage.  The Form 10-Qs revealed that in Q1 2024, Direct Digital had only $22.27 million in revenue and its net loss ballooned to $3.8 million.  For Q2 2024, Direct Digital reported only $21.8 million in revenue and a net loss of $3.1 million.

135.    On these partial corrective disclosures and/or the materialization of concealed risks, Direct Digital's stock price dropped another 23% from a closing price of $3.59 per share on October 15, 2024 to $2.77 per share the next day.

136.    The timing and magnitude of the price declines that Direct Digital common stock experienced compared to those of its peers and the overall market negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' deceptive conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Direct Digital common stock and the subsequent significant decline in the value of Direct Digital common stock

when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed or the concealed risks materialized.

## IX.    PRESUMPTION OF RELIANCE

137.    The market for Direct Digital common stock was open, well-developed, and efficient at all relevant times.  As a result of the Defendants' deceptive scheme and materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying on the integrity of the market price of such securities and on publicly available market information relating to Direct Digital.  Plaintiff and Class members have been damaged thereby.

138.    During the Class Period, the artificial inflation of the value of Direct Digital common stock was caused by the deceptive scheme and/or the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members.  As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, operations, and prospects causing the price of the Company's securities to be artificially inflated at all relevant times.  When the truth was made its way into the market and the concealed risks materialized, it drove down the value of the Company's common stock, causing Plaintiff and other Class members that had purchased the common stock at artificially inflated prices to be damaged as a result.

139.    At all relevant times, the market for Direct Digital common stock was an efficient market for the following reasons, among others:

(a)    Direct Digital's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)    as a regulated issuer, Direct Digital filed periodic public reports with the SEC and the NASDAQ;

(c)    Direct Digital regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Direct Digital was followed by securities analysts employed by major firms who wrote reports which were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace.

140.    Based on the foregoing, during the Class Period, the market for Direct Digital common stock promptly digested information regarding the Company from all publicly available sources and incorporated such information into the price of Direct Digital securities.  Under these circumstances, the market for Direct Digital common stock was efficient during the Class Period and, therefore, investors' purchases of Direct Digital common stock at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

141.    In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omission of material facts.

142.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of

the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.      NO SAFE HARBOR

143.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was entirely a forward-looking statement.  Rather, each statement was a statement of purportedly historical or current facts and conditions, and/or included a component of purportedly historical or current facts and conditions, and/or omitted material historical or current facts and conditions necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts undermined and contradicted the statements by the Defendants regarding Direct Digital's business, operations, and prospects, among others.  Given the then-existing facts undermining and contradicting the statements by the Defendants, any generalized risk disclosures made by Direct Digital were not sufficient to insulate the Defendants from liability for their materially false and misleading statements.

145.    Further, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was

authorized and approved by executive(s) or director(s) of Direct Digital who knew the statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

146.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased or otherwise acquired Direct Digital common stock during the Class Period, that is, between November 10, 2023 through October 15, 2024, inclusive.  Excluded from the Class are Defendants and members of their immediate families, Company and DDM officers, directors, partners, and members of their immediate families, and the legal representatives, heirs, successors, assigns, owners, or managers of any of the foregoing, and any entity in which Defendants have or had a controlling interest.

147.    The members of the Class are so numerous that joinder of all members is impracticable.  Direct Digital reported in its Q2 2024 Form 10-Q that as of October 11, 2024 there were 3,795,199 shares of common stock issued and outstanding.  Moreover, throughout the Class Period, Direct Digital common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds if not thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Direct Digital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

148.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

149.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

150.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented or omitted material facts about Direct Digital's business, operations, and prospects; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

151.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    CAUSES OF ACTION

### COUNT I

**For Violation of § 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder
Against Direct Digital and the Individual Defendants**

152.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

153.    This Count is asserted on behalf of all members of the Class against Direct Digital and the Individual Defendants for violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

154.    The defendants named in this Count engaged in a course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, and practices which operated as a fraud and deceit upon Plaintiff and the other Class members in connection with the purchase and sale of securities.  These defendants also knowingly and/or recklessly made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed a course of business, which conduct was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members; (ii) artificially inflate and maintain the market price of Direct Digital stock; and (iii) cause Plaintiff and other Class members to purchase or otherwise acquire Direct Digital stock at artificially inflated prices.  In furtherance of this unlawful scheme and course of conduct, these defendants, and each of them, took the actions set forth herein.

155.    During the Class Period, Direct Digital stock was traded on an active and efficient market.  As a result of these defendants' misconduct, the market price of Direct Digital stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Direct Digital's business, operations, financial condition, and prospects which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Direct Digital stock at prices artificially inflated by these defendants' wrongful conduct and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or the defendants' statements, and were damaged thereby.

156.    Direct Digital's stock price declined as defendants' scheme unraveled and the relevant truth and its impact on Direct Digital's financial results and prospects entered the market through a series of partial disclosures, or through the materialization of undisclosed risks, causing

- 56 -

injury to Plaintiff and Class members.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said stock, or would not have purchased or otherwise acquired shares at the inflated prices paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Direct Digital stock was substantially lower than the prices paid by members of the Class.  The market price of Direct Digital stock declined upon public disclosure of the facts alleged herein or the materialization of the undisclosed risk to the injury of Plaintiff and Class members.

157.    By reason of the conduct alleged herein, Direct Digital and the Individual Defendants knowingly or recklessly violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

158.    As a direct and proximate result of Direct Digital's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Direct Digital stock during the Class Period.

## COUNT II

### For Violation of § 20(a) of the Exchange Act
### Against Walker, Smith, Diaz, and DDM

159.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

160.    This Count is asserted on behalf of all members of the Class against defendants Walker, Smith, Diaz, and DDM for violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

161.    During the Class Period, Walker, Smith, Diaz, and DDM were each a controlling person of Direct Digital within the meaning of § 20(a) of the Exchange Act.  By reason of their stock ownership, their high-level and influential positions with Direct Digital, and/or their participation in and/or awareness of the Company's operations, and/or intimate knowledge of the

materially false or misleading statements and omissions of material fact in statements made by the Company or each other and disseminated to the investing public, each of these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including controlling their wrongful conduct and their scheme and the content and dissemination of the various statements that Plaintiff contends were materially false or misleading.

162.    Each of these defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false or misleading representations and omissions during the Class Period.  Accordingly, each defendant was a culpable participant in the underlying violations of § 10(b) alleged herein.

163.    As set forth above, Direct Digital violated § 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Direct Digital and, as a result of their own aforementioned conduct, each of the defendants in this count is liable pursuant to § 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Direct Digital is liable under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiff and other members of the Class who purchased or otherwise acquired Direct Digital securities during the Class Period at artificially inflated prices.

164.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Direct Digital securities during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

B.      Awarding Plaintiff and other members of the Class damages together with interest thereon;

C.      Awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.      Awarding Plaintiff and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## XIV.   JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 13, 2024                    **JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
michaelf@johnsonfistel.com

**JOHNSON FISTEL, LLP**
Jeffrey A. Berens
2373 Central Park Boulevard, Suite 100
Denver, CO 80238-2300
Telephone: (303) 861-1764
jeffb@johnsonfistel.com

***Lead Counsel for Plaintiff and the Putative Class***

**SPONSEL MILLER GREENBERG PLLC**
Thane Tyler Sponsel III (Texas SBN 24056361)
Federal ID No. 690068
Roger B. Greenberg (Texas SBN 08390000)
Federal ID No. 3932
50 Briar Hollow Lane, Suite 370 W
Houston, TX 77027
Telephone: (713) 892-5400
sponsel@smglawgroup.com
roger@smglawgroup.com

*Local Counsel for Plaintiff and the Putative Class*