# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| TERRY MONSKY, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>DIRECT DIGITAL HOLDINGS, INC., MARK WALKER, KEITH W. SMITH, DIANA DIAZ, and DIRECT DIGITAL MANAGEMENT, LLC,<br><br>    Defendants. | Case No. 4:24-cv-01940 (consolidated with Case No. 4:24-cv-02567) |

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

Statement of Nature and Stage of Proceedings..................................................................1

Statement of the Issues....................................................................................................1

Introduction and Summary of the Argument .....................................................................1

Background .....................................................................................................................2

    I.      Direct Digital operates a full-service digital advertising platform. .......................2

    II.     Direct Digital raises FY 2023 revenue guidance after a successful Q3 2023, as it openly discloses its efforts to transition to a cookie-free environment...........4

    III.    Direct Digital's revenue grows less than expected in Q4 2023, and the company becomes the target of a defamatory report by a for-profit entity. ............5

    IV.    Plaintiff files the CC, alleging that Defendants committed fraud by raising revenue guidance and making other generic positive statements. ...........................7

Standard of Review.........................................................................................................7

Argument and Authorities................................................................................................8

    I.      The CC fails to plead an actionably false or misleading statement. .......................8

        A.     The CC is built on a foundation of non-actionable puffery. ........................8

        B.     The CC identifies no misstatement of fact.................................................10

        C.     The CC fails to plead an actionably false or misleading omission. ...........14

        D.     The challenged revenue guidance and other predictions are forward-looking statements that are independently protected by the PSLRA's safe harbor................................................................................................19

        E.     Many of the challenged statements are also non-actionable opinions. .................................................................................................22

    II.     The CC also fails to plead the requisite strong inference of scienter....................23

        A.     The CC stakes out a fundamentally implausible scienter theory..............23

        B.     The CC's motive allegations contribute nothing to scienter.....................25

        C.     The CC's circumstantial scienter allegations are similarly deficient.........26

1.    The CC fails to plead the Individual Defendants acted with scienter. ....................................................................................................27

2.    The CC's miscellaneous scienter allegations contribute nothing. ...................................................................................................28

III.    The Section 20(a) claim necessarily fails without a cognizable primary claim....................................................................................................30

Conclusion ...............................................................................................................30

TABLE OF AUTHORITIES

Page(s)

CASES

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ...........................................................................20, 25

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
    915 F.3d 975 (5th Cir. 2019) ....................................................................................23

*Bailey v. Esperion Therapeutics, Inc.*,
    2019 WL 3296235 (E.D. Mich. Feb. 19, 2019) .......................................................26

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) .....................................................................21

*Burback v. Brock*,
    2023 WL 4532803 (5th Cir. July 13, 2023) ............................................................23

*Callinan v. Lexicon Pharms., Inc.*,
    479 F. Supp. 3d 379 (S.D. Tex. 2020) .....................................................................15

*Callinan v. Lexicon Pharms., Inc.*,
    858 F. App'x 162 (5th Cir. 2021) .............................................................................23

*Carlton v. Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016) .....................................................................19

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
    497 F.3d 546 (5th Cir. 2007) ....................................................................................26

*Crutchfield v. Match Grp., Inc.*,
    529 F. Supp. 3d 570 (N.D. Tex. 2021) .................................................................9, 17

*Dang v. Amarin Corp. plc*,
    - F. Supp. 3d -, 2024 WL 4285900 (D.N.J. Sept. 25, 2024) ....................................26

*Dawes v. Imperial Sugar Co.*,
    975 F. Supp. 2d 666 (S.D. Tex. 2013) .....................................................................29

*Denny v. Canaan Inc.*,
    2023 WL 2647855 (S.D.N.Y. Mar. 27, 2023) .........................................................17

*Edgar v. Anadarko Petroleum Corp.*,
    2018 WL 3032573 (S.D. Tex. June 19, 2018) .........................................................12

*Edwards v. McDermott Int'l,*
  2022 WL 3927828 (S.D. Tex. Aug. 30, 2022) ...........................................................8

*Hershey v. Energy Transfer Partners, L.P.,*
  610 F.3d 239 (5th Cir. 2010) ....................................................................................7

*Higginbotham v. Baxter Int'l Inc.,*
  495 F.3d 753 (7th Cir. 2007) ..................................................................................19

*In re Allscripts, Inc. Sec. Litig.,*
  2001 WL 743411 (N.D. Ill. June 29, 2001) ...........................................................16

*In re Azurix Corp. Sec. Litig.,*
  198 F. Supp. 2d 862 (S.D. Tex. 2002) .....................................................................9

*In re Blockbuster Inc. Sec. Litig.,*
  2004 WL 884308 (N.D. Tex. Apr. 26, 2004) ...........................................................9

*In re BP p.l.c. Sec. Litig.,*
  2016 WL 3090779 (S.D. Tex. May 31, 2016) ........................................................22

*In re Browning-Ferris Indus. Inc. Sec. Litig.,*
  876 F. Supp. 870 (S.D. Tex. 1995) ..........................................................................9

*In re Coinbase Glob., Inc. Sec. Litig.,*
  2024 WL 4053009 (D.N.J. Sept. 5, 2024) ..............................................................28

*In re Cryolife, Inc. Sec. Litig.,*
  2005 WL 8155579 (N.D. Ga. June 17, 2005) .........................................................14

*In re Cypress Semiconductor Sec. Litig.,*
  891 F. Supp. 1369 (N.D. Cal. 1995) .......................................................................15

*In re Fisker Auto. Holdings, Inc. S'holder Litig.,*
  2015 WL 6039690 (D. Del. Oct. 15, 2015) ............................................................14

*In re HEXO Corp. Sec. Litig.,*
  524 F. Supp. 3d 283 (S.D.N.Y. 2021) ....................................................................30

*In re Jiangbo Pharms., Inc., Sec. Litig.,*
  884 F. Supp. 2d 1243 (S.D. Fla. 2012) ..................................................................30

*In re Lottery.com, Inc. Sec. Litig.,*
  715 F. Supp. 3d 506 (S.D.N.Y. 2024) ....................................................................20

*In re Nimble Storage Sec. Litig.,*
  2017 WL 4355570 (N.D. Cal. Oct. 2, 2017) ..........................................................11

*In re Okta, Inc. Sec. Litig.*,
    2023 WL 2749193 (N.D. Cal. Mar. 31, 2023) ........................................................................11

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008) ........................................................................27

*In re Peregrine Sys., Inc. Sec. Litig.*,
    2005 WL 8158825 (S.D. Cal. Mar. 30, 2005) ........................................................25

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    437 F. Supp. 3d 329 (S.D.N.Y. 2020) ........................................................................25

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) ........................................................................22

*In re Wayfair, Inc. Sec. Litig.*,
    471 F. Supp. 3d 332 (D. Mass. 2020) ........................................................................22

*Indiana Elec. Workers Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ........................................................7, 8, 23, 25, 27, 30

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ........................................................................20

*Iron Workers Benefit & Pension Fund v. Anadarko Petroleum Corp.*,
    788 F. App'x 268 (5th Cir. 2019) ........................................................................23

*Janus Cap. Grp. v. First Deriv. Traders*,
    564 U.S. 135 (2011) ........................................................................13

*Linenweber v. Sw. Airlines Co.*,
    693 F. Supp. 3d 661 (N.D. Tex. 2023) ........................................................................7, 12

*Loc. 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*,
    2015 WL 1143081 (S.D. Tex. Mar. 13, 2015) ..................................1, 2, 10, 13, 14, 24, 28, 30

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
    810 F.3d 951 (5th Cir. 2016) ........................................................................26

*Lopez v. CTPartners Exec. Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ........................................................................20, 22

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ........................................................................15

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024) ........................................................................18

*Magruder v. Halliburton Co.*,
    359 F. Supp. 3d 452 (N.D. Tex. 2018) ...................................................................9

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*,
    2022 WL 377415 (N.D. Okla. Jan. 7, 2022).........................................................13

*MicroCapital Fund LP v. Conn's Inc.*,
    2019 WL 3451153 (S.D. Tex. July 24, 2019)........................................................25

*Naglich v. Applied Optoelectronics*,
    436 F. Supp. 3d 954 (S.D. Tex. 2020) .............................................................19, 21

*Neiman v. Bulmahn*,
    854 F.3d 741 (5th Cir. 2017) ......................................................................8, 24, 29

*New York Hotel Trades Council & Hotel Ass'n of New York City, Inc. Pension Fund v. Impax Lab'ys Inc.*,
    2019 WL 3779262 (N.D. Cal. Aug. 12, 2019) ......................................................18

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) .................................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).............................................................................................22

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*,
    2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ......................................................26

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ................................................................................27

*Plaisance v. Schiller*,
    2019 WL 1205628 (S.D. Tex. Mar. 14, 2019)........................................................22

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
    777 F. App'x 726 (5th Cir. 2019) ...........................................................................9

*R2 Invs. LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ......................................................................7, 8, 26

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) ........................................................25

*Rein v. Dutch Bros, Inc.*,
    2024 WL 3105004 (S.D.N.Y. June 24, 2024) ........................................................17

*Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*,
    935 F.3d 424 (5th Cir. 2019) ..................................................23, 25, 28

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y.2012) ...........................................18

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ........................................................14

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011)...........................................26

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)....................................................14, 24

*Smallen v. W. Union Co.*,
    2019 WL 1382823 (D. Colo. Mar. 27, 2019) ................................18

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ....................................8, 26, 27, 30

*Taubenfeld v. Hotels.com*,
    385 F. Supp. 2d 587 (N.D. Tex. 2004) ...........................................9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)......................................................2, 23, 24

*Utah Ret. Sys. v. McCollum*,
    2023 WL 8649878 (5th Cir. Dec. 14, 2023) ..................................23

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) .........................................................16

*WM High Yield Fund v. O'Hanlon*,
    964 F. Supp. 2d 368 (E.D. Pa. 2013) ............................................15

*Yang v. Nobilis Health Corp.*,
    2021 WL 3619863 (5th Cir. Aug. 13, 2021)........................23, 28, 29

**STATUTES**

15 U.S.C. § 78u-4 ........................................................................8, 23

15 U.S.C. § 78u-5 ......................................................................19, 21

**RULES**

FED. R. CIV. P. 9..............................................................................7

**OTHER AUTHORITIES**

IMPLEMENTING THE REQUIREMENTS OF THE SARBANES-OXLEY ACT § 1604,
  2005 WL 487832 (2025) .......................................................................................................... 29

Direct Digital Holdings, Inc. ("Direct Digital"), Mark D. Walker, Keith W. Smith, Diana P. Diaz, (Walker, Smith, and Diaz, the "Individual Defendants") and Direct Digital Management, LLC (collectively, "Defendants") move to dismiss the Consolidated Complaint ("CC"), Dkt. 35.

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This is a putative class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 thereunder.

## STATEMENT OF THE ISSUES

Whether the CC should be dismissed for failure to plead (i) an actionable false or misleading statement, or (ii) scienter with particularity as required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT[1]

Heading into Q4 2023, Direct Digital—a programmatic advertising platform that had been experiencing rapid growth—did what companies typically do: it updated its revenue projections (known as "guidance") to reflect its then-current outlook. But when the company ultimately tabulated and disclosed its Q4 2023 results in March 2024, its revenue—despite growing substantially year-over-year—had fallen short of its revised forecast.

The CC predictably followed, seeking to contort Direct Digital's failure to meet its revenue projections into securities fraud. It pushes that narrative without particularized factual allegations, linked to the Individual Defendants, demonstrating that the challenged guidance or any generalized positive statement was false or misleading *when made*—much less *knowingly* so. And in that way, this case closely resembles another in which this Court rejected a "classic case of pleading fraud by hindsight" and dismissed a § 10(b) complaint with prejudice. *Loc. 210 Unity Pension & Welfare*

---

[1] Unless otherwise noted, all internal quotation marks, citations, and footnotes from quoted material have been omitted.

*Funds v. McDermott Int'l Inc.*, 2015 WL 1143081, at *10 (S.D. Tex. Mar. 13, 2015) (Hoyt, J.). From non-actionable puffery, to failure to plead a misleading statement or omission, to failure to plead the requisite strong inference of scienter under the PSLRA, this Court's opinion in *McDermott* lays the blueprint for dismissing a complaint like this one, which effectively suggests "[D]efendants should have accurately predicted what the results of the next quarter would be." *Id.*

All of these shortcomings would be bad enough to warrant dismissal under the stringent standards of Rule 9(b) and the PSLRA. But the CC goes even further off the rails in its failure to answer a simple question: Why? Why would Defendants raise and reaffirm guidance that they supposedly knew Direct Digital could not meet in one quarter, only to disclose a miss in the very next quarter—all while the CEO and CFO (the Defendants who actually made the challenged projections) sold *zero* shares of stock during the class period and instead held that stock through the alleged "corrective disclosures" and corresponding price drops? The CC provides no plausible explanation for that self-destructive theory of fraud, much less one that is "cogent and *at least as compelling* as any opposing [nonculpable] inference," as the PSLRA requires. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007) (emphasis added). For that reason, and for those that follow, the Court should dismiss the CC with prejudice.

**BACKGROUND**[2]

## I. Direct Digital operates a full-service digital advertising platform.

Direct Digital is a full-service programmatic advertising platform based in Houston, Texas that provides advertising technology and other solutions to those on both the "buy" and "sell" side of the digital advertising supply chain. CC ¶¶ 2, 28. In simple terms, the buy side of the equation

---

[2] These facts are taken from the CC and public documents cited therein. *See McDermott*, 2015 WL 1143081, at *1 ("facts [in § 10(b) case] [we]re taken from the Complaint and public disclosure documents on file with the SEC"). Appendix B contains an index of exhibits identifying the paragraphs where the CC relies on each cited document.

involves Direct Digital—through its subsidiaries Huddled Masses and Orange 142—connecting clients (*i.e.*, those looking to advertise their products) with "demand side platforms" ("DSPs"), through which those clients can secure ad space. *Id.* ¶ 44. The sell side involves Direct Digital—through its subsidiary Colossus SSP ("Colossus")—connecting publishers with advertisers, so that the publishers may monetize their ad space. *Id.* ¶ 47. Direct Digital's role is demonstrated below:



Ex. 1, 10/15/24 10-K at 5.

This case involves Direct Digital's sell-side Colossus platform. Colossus operates by hosting publishers' ad inventories on its platform and selling that inventory to ad networks, through either real-time bidding ("RTB") auctions or direct deals with DSPs or other ad networks. CC ¶ 47. In the RTB process, each time a user accesses a publisher's website, Colossus's proprietary software processes and sends an "impression" reflecting that particular user to ad exchanges or DSPs to bid on that impression in real time. *Id.* ¶ 47. Colossus processes billions of impressions a month, and it focuses primarily on delivering targeted advertising to publishers with diverse and multicultural audiences. *Id.* ¶¶ 48-49. It does so through data from "cookies"—files stored on a user's device that build profiles of browsing habits—or other "user IDs." *Id.* ¶ 36; Ex. 2, 4/17/23 10-K at 25. Such data allows advertisers to purchase ad inventory for users most likely to be interested in the advertiser's products.

**II.    Direct Digital raises FY 2023 revenue guidance after a successful Q3 2023, as it openly discloses its efforts to transition to a cookie-free environment.**

Direct Digital went public in February 2022 and, as the CC acknowledges, "fostered its reputation for raising then meeting its revised financial guidance." CC ¶¶ 61-62. After beating the top end of its initial FY 2022 revenue guidance ($48-$52 million) by $37.3 million ($89.3 million total), in March 2023, Direct Digital released initial revenue guidance of $118–122 million for FY 2023. *Id.* ¶¶ 62-63. In August 2023, the company increased that FY 2023 guidance to $125–130 million. *Id.* ¶ 63.

Direct Digital followed this growth up with an impressive Q3 2023. It "easily exceeded Wall Street's expectations" by announcing quarterly revenue of $59.5 million, growing sell-side revenue by 174% year-over-year and beating market estimates by 84%. *Id.* ¶ 64. Accordingly, on November 9, 2023, Direct Digital raised FY 2023 guidance again, to $170–190 million. *Id.* ¶ 65.

Meanwhile, Google had warned, dating back to 2020, that it intended to phase out third-party cookies from its Chrome browser. *Id.* ¶ 39. Google also announced goals to accelerate that transition, including by announcing certain steps that would occur as early as Q1 2024. *Id.* In response, Direct Digital had disclosed—months before the Class Period—that it had begun taking steps in response to "the impending phase out of third-party cookies by 2024 by Google" and that its "revenue may be affected by…removal of cookies usage from the existing value chain." Ex. 2, 4/17/23 10-K at 9, 26.[3] Those disclosures continued during the Class Period, with Defendants disclosing in late 2023 and early 2024 that Direct Digital was "being proactive and starting to make that transition" to a cookie-free environment. *E.g.*, CC ¶¶ 102, 105.

---

[3] *See also* Ex. 2, 4/17/23 10-K at 9 ("we have begun integrating identity resolution solutions in order to provide our clients with accurate, targeted advertising without cookies"); *id.* at 25 ("If our ability to use cookies, mobile device IDs or other tracking technologies is limited, we may be required to develop or obtain additional applications and technologies to compensate for the lack of cookies, mobile device IDs and other tracking technology data, which could be time consuming or costly to develop, less effective and subject to additional regulation.").

**III.     Direct Digital's revenue grows less than expected in Q4 2023, and the company becomes the target of a defamatory report by a for-profit entity.**

On March 26, 2024, Direct Digital announced its Q4 and FY 2023 financial results. It reported 2023 revenue of $157.1 million—well above the top end of its previous 2023 guidance (originally $118–122 million, later revised up to $125–130 million), but below its further revised guidance of $170–190 million following Q3. CC ¶ 111. The "lower than anticipated" revenue for Q4 2023, the company explained, was "due to lower-than-anticipated demand, a delay in the release of Tier 1 publishers from beta testing and proactive efforts by the company during the fourth quarter to accelerate the transition towards a cookie-less advertising platform." *Id.* ¶ 114.

Although the company timely released Q4 2023 earnings, it could not then file its 2023 Form 10-K because of the resignation of its auditor, Marcum LLP ("Marcum"). *Id.* ¶ 84. Marcum publicly affirmed that its "resignation was not a result of any violation of law or fraud of the Company" and denied any "'disagreements'…between the Company and Marcum with respect to any matter relating to accounting principles or practices, [or] financial statement disclosure." Ex. 3, 4/23/24 8-K.

On May 10, 2024, a company called Adalytics Research, LLC ("Adalytics") published a blog post accusing Colossus of "mis-declar[ing]" user IDs that did not match the "actual…user ID cookie value" for impressions sold through The Trade Desk ("Trade Desk"), a particular DSP. *Are User IDs declared consistently in ad auctions?*, https://adalytics.io/blog/user-id-rotation. That blog spurred a handful of news articles. CC ¶¶ 68, 85. But Adalytics's accusations were facially dubious, given its self-described motivation as a for-profit "ad quality and transparency platform" that purports to issue "thought leadership on systemic issues affecting brands" to "*attract new clientele*."[4] While ultimately immaterial to the resolution of this motion, Direct Digital has refuted

---

[4] After Direct Digital sued Adalytics for defamation, *Colossus Media, LLC v. Adalytics Research, LLC*, No. 8:24-cv-

the Adalytics allegations, *e.g.*, https://colossusmediassp.com/blog/open-letter-to-the-adtech-community-regarding-recent-false-adalytics-blog-post; Ex. 4, Campaign US Article, and Adalytics has since *disclaimed* "any assert[ion] regarding whether Colossus SSP intended to misidentify user IDs that were sent to The Trade Desk or if Colossus SSP even was aware of it," Ex. 5, Adalytics Brief at 3, Case No. 8:24-cv-01402.

On October 15, 2024, having retained a new auditor, Direct Digital was able to file its 2023 Form 10-K and Form 10-Qs containing financial results for Q1 and Q2 2024. CC ¶¶ 87, 90. Among other things, those filings reiterated the company's $157.1 million in 2023 revenue and explained that its largest sell-side customer[5] had given notice in January 2024 "that it would be short paying the Company's invoices" related to payments made "to a few publishers," resulting in Direct Digital's "not recogniz[ing] [2023] revenue related to the short payments and recogniz[ing] $8.8 million in other expense related to the payments made to the publishers." *Id.* ¶ 87; Ex. 1, 10/15/24 10-K at 97. Direct Digital explained that it "ha[d] not been provided with information as to the reason for the short pay, and therefore has disputed it." Ex. 1, 10/15/24 10-K at 18. Finally, the company disclosed that Adalytics's May 2024 blog post had caused one of its "sell-side customer[s]" to "pause…its connection to the Colossus SSP," which was a factor in Direct Digital's "substantial doubt about [its] ability to continue as a going concern." CC ¶ 88.

---

01402 (D. Md.), this "attract new clientele" language disappeared from Adalytics's website. *Compare About Adalytics*, https://web.archive.org/web/20240802194155/https://adalytics.io/about (archived from August 2, 2024) (emphasis added), *with* https://adalytics.io/about (last visited on January 27, 2025).

[5] Although ultimately immaterial to resolution of this motion, the CC improperly speculates that this customer was Google 360 (Google's DSP), based solely on the sketchy account of anonymous sources. CC ¶¶ 71, 75; *infra* § II.C.1 (explaining why those purported sources should be disregarded). In fact, Direct Digital is only connected "*indirectly*" to Google, Trade Desk, and other DSPs through Bidswitch, an intermediary that "send[s] traffic from [sell-side platforms] to DSPs." https://ir.directdigitalholdings.com/sec-filings/annual-reports##document-109-0001104659-22-041096-1 at 7 (emphasis added) (first quote); CC ¶ 70 (second quote).

**IV.    Plaintiff files the CC, alleging that Defendants committed fraud by raising revenue guidance and making other generic positive statements.**

Seizing on drops in Direct Digital's stock price on March 27, April 23, May 9-10, and October 15, 2024, Plaintiff filed the CC, asserting claims against Defendants under §§ 10(b) and 20(a) and SEC Rule 10b-5. The CC challenges as false and misleading 17 of Defendants' Class Period statements (the "Challenged Statements," or "CSs") purportedly made between November 10, 2023 and October 15, 2024 (the "Class Period"), all of which involve Direct Digital's revenue guidance or generalized positive statements about its business. CC ¶¶ 94-120.

STANDARD OF REVIEW

A Rule 12(b)(6) motion tests whether the plaintiff has pleaded facts sufficient to "state a claim that is plausible on its face." *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010). "[C]onclusory allegations, unwarranted deductions, or legal conclusions" do not suffice. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005). Fraud-based claims like these also must meet Rule 9(b), which requires that the complaint state "with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b).

To state a claim under § 10(b) and Rule 10b-5(b),[6] Plaintiff must plead: (1) a material misrepresentation or omission, (2) a defendant acting with scienter concerning the fraud, (3) reliance, (4) damages, and (5) loss causation. *Indiana Elec. Workers Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532 (5th Cir. 2008). Plaintiff also must meet the added rigors of the PSLRA, which enhances the traditional Rule 12(b)(6) pleading standards in two principal respects.

*First*, Plaintiff must specify the time, place, and content of each challenged statement; the

---

[6] Although the CC refers generally to "Rule 10b-5" and, at times, references a "fraudulent scheme," the CC identifies no "scheme" besides its theory involving false and misleading statements. CC p. 55 & ¶ 136. Thus, even if the CC asserted "scheme liability" claims under Rule 10b-5(a) or (c), the analysis would track the traditional Rule 10b-5(b) analysis and reach the same result. *See Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 687 (N.D. Tex. 2023) (scheme liability claim failed because it relied on statements that were non-actionable and not made with scienter).

speaker's identity; "the reason or reasons why the statement is misleading"; and "if an allegation regarding the statement or omission is made on information and belief,…state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361-62 (5th Cir. 2004).

*Second*, Plaintiff must plead particularized facts giving rise to a strong inference that *each* defendant acted with scienter with respect to *each* CS. *See* 15 U.S.C. § 78u-4(b)(2); *Shaw*, 537 F.3d at 534. Scienter is "an intent to deceive, manipulate or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it," *R2 Invs.*, 401 F.3d at 645, while severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Neiman v. Bulmahn*, 854 F.3d 741, 747 (5th Cir. 2017). In the Fifth Circuit, scienter must be based not on "the collective knowledge of all the corporation's officers and employees acquired in the course of their employment," but rather on facts establishing that "the *individual corporate officer* making the statement" had scienter, *Southland*, 365 F.3d at 365-66 (emphasis added).

## ARGUMENT AND AUTHORITIES

### I.    The CC fails to plead an actionably false or misleading statement.[7]

#### A.    The CC is built on a foundation of non-actionable puffery.

"[G]eneralized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial"

---

[7] The CSs discussed here are representative of those challenged in the CC. For the Court's convenience, Defendants have attached a detailed chart quoting every CS (CSs 1-17) in the CC as Appendix A and listing the reasons each is non-actionable (*e.g.*, "No False Statement of Fact," "Forward-Looking Statement," "Puffery," or "Opinion"). Courts regularly rely on such charts. *E.g.*, *Edwards v. McDermott Int'l*, 2022 WL 3927828, at *5 n.3 (S.D. Tex. Aug. 30, 2022) (citing *Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 212 (D. Mass. 2018)).

corporate puffery. *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777

F. App'x 726, 730 (5th Cir. 2019). Yet the CC challenges just those kinds of statements:

- "***We remain committed to executing on the same growth and investment initiatives that led us to the strong third quarter results we are reporting today***." CC ¶ 94.

- "***[W]e believe our technology strategy, infrastructure and operational investments will continue to bear fruit***." *Id.* ¶ 99.

- "By…***continuing our operational excellence***, we believe we will pave a way for growth in our stock, valuing Direct Digital Holdings at a similar level to our peers." *Id.* ¶ 99.

- "***[W]e are pretty confident in the relationships that we've been able to build and the platform that we've been able to establish***." *Id.* ¶ 100.

- "***[W]e are confident our company is in a position to build on the successes of 2023***, expand on emerging channel and inorganic growth opportunities ***and continue our strong revenue growth and market share gains in 2024***." *Id.* ¶ 111.

- "***[Direct Digital] remains operationally well-positioned and financially strong*** with estimated 2023 FY earnings of $157 million ***and is experiencing continued growth into 2024. We maintain a solid financial relationship with our partners*** and are committed to continuous improvement and strengthening our products and services." *Id.* ¶ 119.

- "'[T]he financial solvency of our company ***is very sound,***' he said, adding that it ***remains profitable***." *Id.* ¶ 118.

Courts in the Fifth Circuit routinely reject § 10(b) claims based on statements like these.[8]

Indeed, this Court has held that highly similar statements constitute "nothing more than

corporate optimism," including statements that:

> the Company's positive 3Q2012 results would "keep it on track for solid 2012
> financial performance" for the remainder of the year; the defendants "remained

---

[8] For examples of puffery, *see, e.g.*, *In re Blockbuster Inc. Sec. Litig.*, 2004 WL 884308, at *7-8 (N.D. Tex. Apr. 26, 2004) ("performance speaks to the strengths of our business and validates the strategy that we implemented last year…."); *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 590 (N.D. Tex. 2021) ("'feeling really optimistic' and 'on track to do what it thought this year' given its growth and progress") (brackets and ellipsis omitted); *In re Browning-Ferris Indus. Inc. Sec. Litig.*, 876 F. Supp. 870, 885-86, 897-98 (S.D. Tex. 1995) ("future prospects of our core solid waste collection and disposal business are extremely attractive," and company was "poised for the next round of growth"); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 887 (S.D. Tex. 2002) (company had "assembled the core assets and capabilities for strong growth in our key markets"), *aff'd sub nom. Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 461 (N.D. Tex. 2018) ("considerable liquidity and strong cash flow"); *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 593 (N.D. Tex. 2004) ("generalized positive statements about strong growth and extreme profitability," including that "we are extremely profitable").

> positive" and "believed that it was highly likely" that they could make profitable
> (in 2013) their operations in the Atlantic region, where they maintained a "stable,"
> "competitive situation"; they "felt good about their strength in the Middle East";
> Johnson remained "quite bullish" concerning McDermott's Atlantic presence; the
> Company was "well positioned to meet the growing customer demand in each of
> its market segments"; and the Company was "equal to best in industry in terms of
> project planning, project analysis, execution, forecasting, and control."

*McDermott*, 2015 WL 1143081, at *7 (brackets omitted). That conclusion applies with full force

here, as the Court should remain similarly "hard pressed to conclude that any of the above

[challenged] statements expresses or creates assurances about [Direct Digital's] future profitability

that would lead a rational investor to rely on them." *Id.* at *8. "The[se] [statements] constitute non-

actionable puffery by all reasonable inferences." *Id.*

### B.    The CC identifies no misstatement of fact.

With respect to the handful of even arguably factual CSs, the CC identifies none that was

inaccurate when made.

***"Committed" to "growth initiatives."*** The CC attacks Smith's November 9, 2023

"committed to executing on the same growth and investment initiatives" statement (which is

puffery, *supra* § I.A), but only by distorting its context. Rather than guaranteeing Direct Digital

would never transition to a cookie-free environment, as the CC baselessly couches this CS, CC

¶ 96, Smith was referring to the "initiatives" he had just described *before* the CC's bolded

snippet—*i.e.*, "capitaliz[ing] on the shift in ad spend towards digital media on both the sell- and

buy-side and…recent partnerships and advancements of our technology stack." CC ¶ 94. The CC

never alleges Direct Digital abandoned those initiatives, which stops this theory dead in its tracks.

Even pretending that Smith disclaimed any plans to take steps to transition to a cookie-free

environment as of November 9, the CC still cannot impugn the accuracy of that statement. The CC

relies only on Direct Digital's December 5 disclosure that it had "started working on" transitioning

efforts "during the month of November/December."[9] But that Direct Digital began its transitioning efforts "*during the month* of November/December" is not a particularized allegation that it had done so (or made plans to do so) by *November 9*, when Smith spoke. *See In re Nimble Storage Sec. Litig.*, 2017 WL 4355570, at *5 (N.D. Cal. Oct. 2, 2017) (rejecting allegation of bad news "in the months leading up to the 3Q16 miss" because "greater specificity is necessary to determine whether the statements were false or misleading at the time they were made")*, aff'd*, 756 F. App'x 779 (9th Cir. 2019); *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193, at *10-11 (N.D. Cal. Mar. 31, 2023) ("'Around fall 2021' is not sufficiently particularized to render statements made in September and early December 2021 false or misleading when made.").

    ***Addressing IVT.*** Next, the CC alleges that Direct Digital's statement in its November 9, 2023 Form 10-Q—that it "address[es] [***invalid traffic ("IVT")***]] on a number of [specified] fronts"—*must* be false because, according to a May 2024 article, Trade Desk had purportedly "been aware of ***[user ID] issues*** with [Colossus] … for more than a year" (*i.e.*, before May 2023). CC ¶¶ 68, 97 (emphases added). Even setting aside the deficiencies of the Trade Desk allegation (*infra* §§ I.C, II.C.1), this narrative fails for three independent reasons:

- *First*, CS 3 was not a global disclaimer that Direct Digital could avoid *all* technical issues with its user IDs, but rather a specific discussion of IVT associated with "*fake* eyeballs," "*artificially* inflate[d] impressions count," and "*fraud*." CC ¶ 97 (emphases added). The CC, however, never alleges that the purported user ID issues identified by Trade Desk had anything to do with fake eyeballs, artificially inflated impressions, or fraud.

- *Second*, the CC tellingly fails to dispute Direct Digital's elaboration that, as of the end of Q3 2023, it had "determined that approximately 1% of inventory was invalid, resulting in minimal financial impact." *Id.* ¶ 97. That is a tacit concession that the company's steps to "address IVT" and "IVT mitigation efforts" were just as it described them. *Id.*

- *Third*, a statement that a company takes steps to address a problem is not tantamount to a

---

[9] The CC alters Walker's quote to "we actually during the month[s] of November [and] December have actually already started working on that." CC ¶ 102 (alterations in original); *see* https://www.youtube.com/watch?v=KPxN7R1zHc0&t=17s at 7:00-8:53 (actual recording). What he actually said was: "We actually during the month of November/December have actually already started working on that…."

guarantee that it eliminates every occurrence of the problem.[10] And the CC does not dispute that Direct Digital took precisely the steps it described (*e.g.*, employing "sophisticated technology" and "ongoing campaign and inventory performance review"). *Id.*

Any one of those reasons precludes this theory of fraud.

**Cookie transition (CSs 7, 9)***.* The CC challenges Walker's December 5, 2023 and January 9, 2024 statements describing Direct Digital's proactive steps to transition to a cookie-free environment. CC ¶¶ 102, 105. But the CC does not dispute that Direct Digital *actually took those steps*, alleging only that it failed to disclose that its transition would negatively impact the company's revenue guidance. *See infra* § I.C (addressing that omission theory).

**Guidance-miss explanation.** Next up are Walker and Diaz's March 26, 2024 explanations why Direct Digital's FY 2023 revenue fell short of guidance. They stated that the miss was "due to two primary factors" of "softer demand that our revised guidance called for" and "proactive[] [efforts to] beg[in] our transition off of cookies." CC ¶¶ 113-14. But the CC does not allege that those were *not* primary factors for the guidance miss; in fact, it *embraces* the revenue impacts from the cookie transition as part of its falsity theory for CSs 7 and 9. CC ¶¶ 104, 107. Instead, the CC alleges that CSs 12-15 were misleading only because they failed to *also* expressly discuss the short pay, another omission theory refuted below. *Infra* § I.C.

**Q1 2024 financial status***.* Finally, the CC challenges a partially paraphrased statement attributed to Walker in a May 10, 2024 Campaign US article describing Direct Digital's response to the Adalaytics accusations: "'The financial solvency of our company is **very sound**,' he said, adding that it **remains profitable**, and its first quarter performance was '**up 20% year over year**.'"

---

[10] *See, e.g.*, *Edgar v. Anadarko Petroleum Corp.*, 2018 WL 3032573, at *14-15 (S.D. Tex. June 19, 2018) ("The fact that there was an explosion or release does not mean that Anadarko's teams did not strive for zero spills."); *Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 678 (N.D. Tex. 2023) (statement that Southwest "has policies and procedures in place that are designed to promote compliance with the laws" was not a "guarantee that problems will not arise" and was not false or misleading absent allegations that "Southwest lacked compliance policies").

CC ¶ 118. The CC fails entirely to impugn the contemporaneous accuracy of the "financial solvency" portion of that quote (which is puffery in any event, *supra* § I.A), relying only on the fact that Direct Digital *months later* (in October 2024) disclosed a going-concern warning based in part on Trade Desk's (and others') *reaction* to the May 10 Adalytics post. CC ¶ 120. "Absent substantiation, these later results do not establish that the earlier statements were false when made." *McDermott*, 2015 WL 1143081, at *10.

Further, Rule 10b-5 liability extends only to "the maker of a statement…with ultimate authority over the statement, including its contents and whether and how to communicate it." *Janus Cap. Grp. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011). Yet the remainder of CS 16 couples part of a specific quote from Walker with the Campaign US *reporter's* paraphrased description of what Walker was taking about: "***it*** remains profitable, and ***its*** first quarter performance was 'up 20% year over year.'" CC ¶ 118 (emphasis modified). In reality, Walker's "up 20% year over year" quote accurately referenced *Colossus's* Q1 2024 year-over-year revenue growth, which makes perfect sense in an interview responding to allegations about *Colossus* and found under the subheading "Impacts on *Colossus*." *See* Ex. 6, 10/15/24 10-Q at 4 (reporting a 19.7% year-over-year growth in quarterly sell-side revenue); Ex. 4, Campaign US Article. The CC suggests otherwise only by further paraphrasing the article's reference to "it" and positing that the "it" must have been referring to Direct Digital's overall revenue. CC ¶¶ 118-19. That mangled game of telephone demonstrates why courts routinely reject reliance on reporters' paraphrasing, rather than actual statements. *See, e.g.*, *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 2022 WL 377415, at *11 (N.D. Okla. Jan. 7, 2022) (rejecting "paraphrased" statement allegation because, "[w]hile the article attributes the content of the statements to [defendant], plaintiffs have not alleged sufficient facts to show that [he] had ultimate control over

the content of those statements and whether and how to communicate them."), *aff'd*, 79 F.4th 1209 (10th Cir. 2023).[11] This Court should do the same here.

### C.    The CC fails to plead an actionably false or misleading omission.

The CC alleges that Defendants committed fraud by making the CSs while failing to disclose (1) the financial impact of Direct Digital's cookie-transition, (2) the Colossus user-ID issues purportedly identified by Trade Desk and Google's DSP, and (3) more details regarding the short-pay. Each omission theory fails upon examining the law and facts (or lack thereof).

*Cookie-transition impact.* The CC suggests that Defendants—despite contemporaneously disclosing the company's transition away from cookies—failed to also warn that such efforts would contribute to the company missing its revised FY 2023 revenue guidance, as it ultimately announced on March 26, 2024. CC ¶¶ 102-07. But Defendants were "under no duty to cast [their] business in a pejorative, rather than a positive, light," *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003), or "take a gloomy, fearful or defeatist view of the future," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). The CC conspicuously fails to allege *when* the negative impacts from Direct Digital's cookies transition became apparent,[12] meaning it cannot particularize falsity as to any particular CS. *See McDermott*, 2015 WL 1143081, at *10 (dismissing § 10(b) claim when "[n]o allegation supports an inference, much less a *strong* inference, that the defendants knew or should have known that there was no basis for concluding that project

---

[11] *See also, e.g.*, *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2015 WL 6039690, at *17 (D. Del. Oct. 15, 2015) ("The above paraphrased or summarized statement is not wholly attributable to Lane. Indeed, the author of the article had control over which portions of the interview to use and how to present any information received from Lane."); *In re Cryolife, Inc. Sec. Litig.*, 2005 WL 8155579, at *18 (N.D. Ga. June 17, 2005) (rejecting paraphrased-statement allegation when "the version of the statement provided by Plaintiffs is not even a quote; rather, it is the newspaper reporter's paraphrase of a quote or quotes from the conference call").

[12] For example, the CC alleges that Direct Digital's cookie transition led to holding "several strategic publishers" in "beta testing," which negatively impacted revenue. CC ¶ 79. But the CC does not allege when that beta-testing hold actually occurred, much less when the revenue impacts associated with it became apparent.

objectives were achievable"). The CC's rote reliance on Direct Digital's ultimately *experiencing* those revenue-impacts is an impermissible "fraud by hindsight" pleading, in which (a) "[P]laintiff alleges that the fact that something turned out badly must mean [D]efendant[s] knew earlier that it would turn out badly," and (b) "there is no contemporaneous evidence at all that [D]efendants knew earlier what they chose not to disclose until later." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009).

*User ID issues.* The CC next alleges that Defendants misled investors by failing to disclose purported user ID issues allegedly identified by Trade Desk (sometime "more than a year" before May 2024) and Google (sometime "after Thanksgiving in Q4 2023"). *E.g.*, CC ¶ 110; *see also id.* ¶¶ 68, 75. Starting with Trade Desk, the CC does not allege that Trade Desk's purported discovery of user ID issues and purported "*partial*[] block[age]" of Colossus before May 2023 was ever *communicated* to Direct Digital. *Id.* ¶¶ 17, 68 (emphasis added). That is crucial, because a defendant "could not disclose what he did not know." *WM High Yield Fund v. O'Hanlon*, 964 F. Supp. 2d 368, 392 (E.D. Pa. 2013); *see, e.g.*, *Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 406 (S.D. Tex. 2020) (rejecting omissions theory when the complaint "d[id] not contain facts showing when, where, to whom, or how the [alleged bad news] was communicated"), *aff'd*, 858 F. App'x 162 (5th Cir. 2021). But even if the CC had pleaded that Direct Digital had experienced decreased demand from Trade Desk *before May 2023*, the CC offers no coherent duty to disclose that in the Q4 2023 and Q1 2024 CSs, which occurred after Direct Digital had undisputedly achieved guidance-beating Q3 2023 revenue *despite* the alleged "partial[] block[age]" by Trade Desk. *See In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1375-76 (N.D. Cal. 1995) (rejecting duty to disclose theory related to "past problems that had been solved"), *aff'd*, 113 F.3d 1240 (9th Cir. 1997).

No better is the CC's reliance on Google's purported suspension of Colossus in "late 2023." CC ¶ 131. Under the CC's own allegations, that purported suspension was "*temporar[y]*," and the alleged issue "was *rectified* and Colossus was reinstated by Google's DSP." *Id.* ¶¶ 71, 131 (emphases added). Because "[c]orporate executives have no general duty to disclose every problem that arises in selling a Company's products," *In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at *9 (N.D. Ill. June 29, 2001), the CC tries to connect the "rectified" Google suspension to negative revenue impacts. But all the CC does is reference the later short-pay (discussed below) and offer the naked allegation that Google "resumed the relationship…at a lower volume than before." CC ¶ 71. That allegation is doubly deficient, because (a) it lacks an adequately identified factual source, which the PSLRA requires (discussed *infra* § II.C.1), and (b) it is hopelessly vague. How much lower was the volume upon resumption? When did Direct Digital become aware of the "lower volume"? And when—if ever—did it render the company's revenue guidance unachievable? The CC answers none of those questions and thus fails to plead that anything Defendants actually said was false or misleading. *See Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) ("[C]ompanies do not have an obligation to offer an instantaneous update of every internal development" but instead "must disclose a negative internal development only if its omission would make other statements materially misleading.").

**Short pay.** The CC points to Direct Digital's October 2024 disclosure that "in January 2024, we received notice from one of our sell-side customers that it would be short paying the Company's invoices," alleging that the company's failure to disclose receipt of the short pay notice in the February 1 and March 26, 2024 CSs renders them false or misleading.[13] CC ¶¶ 110, 112,

---

[13] As with the "during the month of November/December" allegation discussed earlier, *supra* § I.B, the statement that Direct Digital received notice of the short pay "in January 2024" does not demonstrate with particularity that it had received such notice by the time of the *January 9* CS (or any earlier CS).

117. As for Walker's purported "February 1" reference to the revised guidance (CS 11), that statement appears in a news article that Pulse 2.0 happened to *publish* on that date. Ex. 7, 2/1/24 Pulse 2.0 Article. Because the article does not indicate—and the CC fails to allege—*when* Walker actually made the statement, these allegations fall short of "the requisite heightened pleading standards required by Rule 9(b)." *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 591 (N.D. Tex. 2021) ("While Plaintiffs assert that [the defendant] issued the alleged statement on December 2, 2019 (the date of the article's publication), the article does not describe when or where [the defendant] made the statement at issue."); *see also, e.g.*, *Rein v. Dutch Bros, Inc.*, 2024 WL 3105004, at *22 (S.D.N.Y. June 24, 2024) (complaint failed to "allege when [the defendant] made the statements in the recorded podcast, as opposed to its air date of April 6"). And, in any event, the CC contains no factual allegations that Direct Digital's receipt of the short pay rendered it immediately apparent (as of February 1) that its prior revenue guidance was unattainable—rather than at a future date when tabulating Q4 2023 results. *See Denny v. Canaan Inc.*, 2023 WL 2647855, at *13 (S.D.N.Y. Mar. 27, 2023) ("The fact that these statements were made after the fourth quarter concluded also does not raise an inference that revenue information for that quarter was available, especially absent any allegations relating to the company's practices for when it prepares its revenue information for internal review.").

As for the March 26 discussion of the guidance miss (CSs 12-15), the CC does not (and cannot) allege that Defendants failed to disclose the *impact* of the short-pay. The $157.1 million in disclosed revenue for FY 2023 undisputedly captured the effect of the short-pay and remained consistent with the figure disclosed in the October 2024 10-K. CC ¶¶ 87, 111. So the CC must instead complain that Defendants' discussion of "two primary factors" for the miss was misleading by way of omitting an explicit discussion of the short-pay. *Id.* ¶ 117. That fails for two reasons.

First, § 10(b) "do[es] not create an affirmative duty to disclose any and all material information"; it requires disclosure "only when necessary to make…statements made…not misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024). Likewise, "revealing one fact about a subject does not trigger a duty to reveal all facts on the subject." *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y.2012). Defendants' discussion of "two primary factors" of decreased demand and the company's cookie transition therefore did not compel disclosure of *every other* factor contributing to the revenue miss. *See, e.g.*, *New York Hotel Trades Council & Hotel Ass'n of New York City, Inc. Pension Fund v. Impax Lab'ys Inc.*, 2019 WL 3779262, at *5 (N.D. Cal. Aug. 12, 2019) (rejecting theory "that by disclosing that one reason warranted an adjustment to revenue guidance, Impax led investors to believe that other reasons did not exist"), *rev'd in part on other grounds*, 843 F. App'x 27 (9th Cir. 2021); *Smallen v. W. Union Co.*, 2019 WL 1382823, at *22 (D. Colo. Mar. 27, 2019) (rejecting theory that defendants "omit[ted] the most important reason" for compliance expenditures, when "the statements here do not unambiguous[ly] state, or even suggest, that there was only one reason for increased compliance expenditures") (alterations in original), *aff'd*, 950 F.3d 1297 (10th Cir. 2020). Plus, without alleging the magnitude of expected revenue lost from decreased demand and the cookies transition, the CC cannot possibly make the comparison (with the impacts of the short-pay) necessary to even *try* to impugn the accuracy of Defendants' description of "two primary factors" for the guidance miss.

Second, the CC never alleges that the customer communicated the *reason* for the short pay to Direct Digital. *See* CC ¶ 87 (quoting Direct Digital's October 2024 10-K statement that the company "has not been provided with information as to the reason for the short pay, and therefore has disputed it"). Hence, the CC says Defendants committed securities fraud by not immediately

discussing an unexplained short pay that the company was actively investigating and disputing. The law, however, does not require such knee-jerk disclosures. "Taking the time necessary to get things right is both proper and lawful" under § 10(b); "[m]anagers cannot tell lies but are entitled to *investigate for a reasonable time*, until they have a full story to reveal." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007) (emphasis added); *see Naglich v. Applied Optoelectronics*, 436 F. Supp. 3d 954, 974 (S.D. Tex. 2020) (holding that "defendants were entitled to conduct a reasonable investigation before making an update" and collecting cases in which "four and six-month investigations [were] deemed reasonable"). The Court should reject the CC's theory that Defendants should have "jump[ed] the gun with half-formed stories as soon as a problem c[ame] to their attention." *Higginbotham*, 495 F.3d at 761.

### D.    The challenged revenue guidance and other predictions are forward-looking statements that are independently protected by the PSLRA's safe harbor.

Under the PSLRA's safe harbor, "forward-looking statements" do not give rise to liability if they are (1) "identified as…forward-looking…and…accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" *or* (2) not made with "actual knowledge" that "the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). The "disjunctive" "or" means that Defendants cannot be liable if *either* prong applies. *Carlton v. Cannon*, 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016). The CC fails to overcome either prong of the safe harbor—much less *both*.

The CC challenges many such forward-looking statements, including Direct Digital's revenue guidance (*i.e.*, "projection[s] of revenues") and other "statement[s] of the plans and objectives of management for future operations" or "statement[s] of future economic performance." 15 U.S.C. § 78u-5(i)(1) (defining forward-looking statements).[14] The fact that

---

[14] *E.g,* CC ¶¶ 95, 99, 103, 106, 108 (guidance); *id.* ¶ 99 ("we believe our technology strategy, infrastructure and

Defendants supposedly "reaffirmed" such guidance on certain dates (CC ¶ 14)[15] does not change its forward-looking nature. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 254-55 (3d Cir. 2009) (statement that "we are on track to meet our goals for the year" remains forward-looking). And it would be "incorrect" to assume that discussing revenue guidance after "a quarter that was complete" suddenly renders such projections non-forward-looking. *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016). "That a quarter has concluded does not mean that the quarter's results have yet been tabulated," and such projections remain forward-looking so long as they remain projections of not-yet-finalized results—"without regard to whether the last day of the covered earnings period had passed." *Id.*; *see also In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 540 (S.D.N.Y. 2024) (rejecting argument that "statements were 'simply not forward-looking' because they 'concern[ed] revenue results for Q3 2021, a quarter that had already closed when the statement was made'").

Under the first prong of the safe harbor, the forward-looking CSs made in press releases, SEC filings, and earnings calls were accompanied by thorough and substantive cautionary statements tailored to the specific risks applicable to Direct Digital's future.

- ***November 9, 2023 Press Release*** (**CSs 1-2**)*.* The press release announcing revised revenue guidance (a) stated that "[a]ll statements contained in this press release that do not relate to matters of historical fact should be considered forward-looking statements," (b) identified key factors that could cause actual results to differ, including "any significant fluctuations caused by our high customer concentration" and "operational and performance issues with our platform, whether real or perceived," and (c) further incorporated the robust risks factors described in Direct Digital's SEC filings. Ex. 8, 11/9/23 8-K, Press Release at 3.

- ***SEC Filings*** (**CS 3**)*.* Direct Digital's SEC filings detailed risks including how "[d]ependence on a limited number of major customers" and any nonpayment or disputes

---

operational investments *will continue to bear fruit*") (emphasis modified); *see also* App'x A (collecting more forward-looking CSs).

[15] The CC alleges without elaboration that Direct Digital "reaffirmed" guidance on, among other dates, November 14 and December 6, 2023. CC ¶¶ 65, 77. But it never alleges *where* those November 14 and December 6 "reaffirm[ations]" took place, so the Court can reject those dates out of hand. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431 (5th Cir. 2002) (plaintiff must "state when and *where* the statements were made") (emphasis added).

over invoices could affect revenue; how detecting operational flaws and advertising fraud and responding to technological developments were ongoing challenges; and how customer perceptions of performance could affect the company's competitiveness and financial performance. Ex. 2, 4/17/23 10-K at 14-29; Ex. 9, 11/9/23 10-Q at 28-29.

- *November 9, 2023 Earnings Call* (**CSs 4-6**).[16] Direct Digital incorporated this same cautionary language from its SEC filings into its earnings calls. Ex. 10 11/9/23 Call Tr. at 2; Ex. 11, 3/26/24 Call Tr. at 4; *see* 15 U.S.C. § 78u-5(c)(2) (oral forward-looking statements can reference "readily available written document[s]").

The safe harbor's first prong accordingly bars liability for these statements.

Under the safe harbor's second prong and its "actual knowledge" standard, Plaintiff must show "proof of *knowing falsity*" for forward-looking statements—an even "*higher* scienter standard" than ordinarily applies. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 214-15 (5th Cir. 2023) (emphases added). The CC simply has no factual allegations showing that, at the time of the CSs, the Individual Defendants had "actual knowledge" that final revenue numbers would fall below the low end of the guidance range or that the other forward-looking CSs (which are puffery in any event) would not come to fruition. The CC's challenges to forward-looking statements therefore fail. *See Naglich*, 436 F. Supp. 3d at 962, 973 (applying safe harbor to dismiss challenged guidance statements, despite company missing guidance by $30 million); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 929-30 (N.D. Cal. 2017) (same as to nearly $100 million guidance miss when "Plaintiff has not alleged facts that would show Defendants had actual knowledge that GoPro's guidance was false or could not be met when issued").

Having offered no facts about how or when Direct Digital compiled its revenue figures, the CC tries to fill this factual void with the theory that the Individual Defendants *must* have known the guidance statements were false because they occurred shortly before and after the end of 2023. *E.g.*, CC ¶¶ 103, 106. But, as noted above, it is well settled "[t]hat [merely because] a quarter has

---

[16] The CC incorrectly alleges that this earnings call took place on November 11, 2023. Ex. 10, 11/9/23 Call Tr. at 1.

concluded does not mean that the quarter's results have yet been tabulated." *Lopez*, 173 F. Supp. 3d at 38-39 (dismissing challenge to post-quarter-end statement of "preliminary" results projecting a gain that company later revised to show a loss). In fact, "the SEC permits companies" significant time after quarter- or year-end to file financial results precisely because "it takes some time for a company to analyze its finances accurately and thoroughly." *In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 346 n.4 (D. Mass. 2020). The CC cannot rely on such must-have-known speculation to meet the exceedingly high "actual knowledge" standard. *Infra* § II (further discussing absence of scienter). Thus, the safe harbor requires dismissal as to all forward-looking CSs.

### E.    Many of the challenged statements are also non-actionable opinions.

Under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), opinion statements are subjected to a heightened liability standard. Many of the CSs qualify, as they are expressly cloaked in language like "we believe" or "we are pretty confident," *e.g.*, CC ¶¶ 99-100, or are predictive guidance or assessments inherently conveying a subjective belief. *See In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *8 (S.D. Tex. May 31, 2016) ("Estimates and projections are classic examples of opinions."); *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023) ("language like 'we believe' or 'we think' is *sufficient—not necessary*—to render a statement one of opinion rather than fact"); App'x A (collecting CSs 1-2, 4-6, 8, 10-13, and 16-17 as non-actionable opinions).

Such statements are actionable only if (1) the defendants "did not genuinely hold the opinions expressed"; (2) the "opinions contained embedded untrue statements of fact"; or (3) the speaker "omitted material facts about his inquiry or knowledge that would conflict with what a reasonable investor would have understood from his statements." *Plaisance v. Schiller*, 2019 WL 1205628, at *30 (S.D. Tex. Mar. 14, 2019). Satisfying any of these three *Omnicare* prongs "is no small task for an investor," 575 U.S. at 194, and the CC meets none of them.

Under the first prong, the CC does not even *allege*, much less plead facts showing, that Defendants disbelieved their opinions when they spoke. Under the second prong, the CC does not identify any untrue statement of fact "embedded" in any opinion, nor does it allege with particularity how any embedded fact was false. Under the third prong, the CC identifies no omitted material facts about that Defendant's "inquiry" or investigation before offering a challenged opinion, and, to the extent the CC asserts that a Defendant omitted material facts about that Defendant's "knowledge" concerning the opinion, that assertion fails for the same reasons as the CC's omissions theory and scienter theory, *supra* § I.C (addressing omissions theory), *infra* § II (addressing scienter theory). The CC's challenges to opinion statements are accordingly barred.

## II.      The CC also fails to plead the requisite strong inference of scienter.

The CC independently fails to establish a strong inference of scienter, 15 U.S.C. § 78u-4(b)(2)(A), which requires an "intent to deceive, manipulate, or defraud[,] or severe recklessness." *Shaw*, 537 F.3d at 533. Its scienter theory makes no sense. Its motive allegations do not move the needle. And its critical lack of scienter facts cannot be fixed with boilerplate theories that courts routinely reject. What remains is a pleading that should join the long list of recent cases in which the Fifth Circuit has affirmed dismissals for lack of a strong inference of scienter.[17]

### A.      The CC stakes out a fundamentally implausible scienter theory.

The requisite "strong inference" of scienter cannot be met with "facts from which an inference of scienter rationally *could* be drawn," nor will an inference of scienter that is "merely 'reasonable' or 'permissible'" suffice. *Tellabs*, 551 U.S. at 323-24. Rather, a 10b-5 claim can

---

[17] *E.g.*, *Utah Ret. Sys. v. McCollum*, 2023 WL 8649878 (5th Cir. Dec. 14, 2023); *Burback v. Brock*, 2023 WL 4532803 (5th Cir. July 13, 2023); *Callinan v. Lexicon Pharms., Inc.*, 858 F. App'x 162 (5th Cir. 2021) (per curiam); *Yang v. Nobilis Health Corp.*, 2021 WL 3619863 (5th Cir. Aug. 13, 2021); *Iron Workers Benefit & Pension Fund v. Anadarko Petroleum Corp.*, 788 F. App'x 268 (5th Cir. 2019); *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424 (5th Cir. 2019); *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975 (5th Cir. 2019).

survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. A court must therefore "consider plausible, nonculpable explanations for the defendant's conduct." *Id.*

Far from "compelling" or "cogent," the CC's theory of fraud is downright puzzling. Just consider the following confounding questions:

- Why would Walker and Diaz knowingly raise and repeat unreachable revenue guidance in late 2023 and early 2024, only to voluntarily disclose the guidance miss in March 2024?

- Why would Smith fraudulently disclaim that Direct Digital would take steps to transition away from cookies on November 9, 2023, only for Walker to voluntarily disclose the company's efforts to transition away from cookies on December 5, 2023?

- Why would Walker fraudulently tout inaccurate year-over-year Q1 2024 growth figures for Direct Digital (rather than accurate figures for Colossus) in May 2024, only for the company to voluntarily disclose the true figures in October 2024.

- If Direct Digital were bent on fraudulently hiding the January 2024 short-pay, why would it include the impact on revenue from the short-pay in 2023, as reported in March 2024?

With motive lacking (*infra* § II.B), and without any apparent answer to these questions, this case resembles ones in which courts struggle "to see what benefits accrue from a short respite from an inevitable day of reckoning." *Shields*, 25 F.3d at 1130; *see also Neiman*, 854 F.3d at 747 ("It would have made little sense for [one defendant] to lie about Well #4's production in September only for [another] to disclose the true production in November.").

Conversely, the nonculpable inference is readily apparent—Defendants believed in the revenue guidance, only for the company to fall short and promptly disclose its miss once Q4 2023 results were tabulated. Equating missed projections with fraud is "a classic case of pleading 'fraud by hindsight,' and the law makes no allowance for it." *McDermott*, 2015 WL 1143081, at *10. Even "[n]egligence, oversight or simple mismanagement [do not] rise to the standard necessary to support a securities fraud action." *Id.* at *11 (alternations partially in original).

### B.        The CC's motive allegations contribute nothing to scienter.

A cognizable "motive and opportunity" to commit fraud "may enhance other allegations of scienter" but cannot, alone, satisfy the PSLRA. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). A plaintiff must "show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 430-31 (5th Cir. 2019). The CC alleges motive based only on the purported "insider trading" of *one defendant*, Smith. CC ¶ 125. Those allegations fall flat.

"Because corporate executives are often paid in stock and stock options, they will naturally trade those securities," so "courts will not infer fraudulent intent from the mere fact that some officers sold stock." *Shaw*, 537 F.3d at 543. That is true here, where Smith—who made a *single*, patently non-actionable CS at the beginning of the Class Period[18]—appears to have been added as a token defendant simply because he sold stock. Once Smith's only CS is properly dismissed and he becomes a non-defendant, his sales lose any conceivable probative value, as they cannot be "linked" to "the dissemination of his alleged false or misleading statements." *In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825, at *63 (S.D. Cal. Mar. 30, 2005); *see, e.g.*, *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 360 (S.D.N.Y. 2020) (rejecting "allegations regarding trading of stock involv[ing] non-defendants"), *aff'd*, 89 F.4th 408 (2d Cir. 2023).

Even setting aside Smith's should-be-non-defendant status and ignoring that his sales were not "unusual,"[19] "[t]h[e] [Fifth Circuit] has repeatedly cautioned…that *even unusual sales* by one

---

[18] CC ¶ 94 ("We remain committed to executing on the same growth and investment initiatives that led us to the strong third quarter results we are reporting today.") (emphasis omitted); *supra* 9-11 (discussing that CS as not actionable).

[19] *Compare Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (finding sales of 40% of shares, without more, not suspicious and holding that "courts routinely find that raw sales numbers alone are insufficient to establish scienter"), *and MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153, at *16 (S.D. Tex. July 24, 2019) (discounting scienter for sales "made when stock prices were below the alleged Class Period high"), *R&R adopted*, 2019 WL 4673209 (S.D. Tex. Sept. 24, 2019), *with* CC ¶¶ 8, 125 (alleging Smith "sold 45% of his Class A shares" at prices of $10.22 and $11.13—well below the Class Period high of $32.51).

insider do not give rise to scienter when," as here, "*other defendants do not sell some or all of their shares during the Class Period.*" *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016) (emphases added) (collecting cases); *see also Southland*, 365 F.3d at 369 ("The fact that other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit."). It is undisputed that Walker and Diaz—the CEO and CFO who purportedly carried out the scheme and made almost all the CSs—did not sell a single share during the Class Period and held their stock through the various price drops. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 553 (5th Cir. 2007) ("the fact that [defendant] retained [substantial number of] shares of…stock indicates that he did not possess scienter regarding the alleged fraud, because otherwise he would have sold these shares before the price fell")*.* And that is what makes the CC so perplexing, as it "gives no indication as to why [Walker and Diaz] would have been motivated to defraud investors"—and engage in self-sabotage—"in order to enrich *others*, *not themselves*." *Russo v. Bruce*, 777 F. Supp. 2d 505, 518-19 (S.D.N.Y. 2011) (emphasis added). Courts routinely rejected such disjointed allegations.[20]

## C.    The CC's circumstantial scienter allegations are similarly deficient.

Because the CC "has not alleged a clear motive for the alleged misstatements or omissions, the strength of its circumstantial evidence of scienter must be correspondingly greater." *R2 Invs.*, 401 F.3d at 644. The CC comes nowhere close to meeting that high bar.

---

[20] *See, e.g., Bailey v. Esperion Therapeutics, Inc.*, 2019 WL 3296235, at *4 (E.D. Mich. Feb. 19, 2019) ("courts have found that the CEO and CFO would have been essential participants in any scheme, thus, their having sold no stock, undermines any suggestion of knowledge on the part of defendants due to the other sales"); *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*, 2007 WL 2720074, at *5 (S.D. Tex. Sept. 18, 2007) (rejecting insider-trading allegations when the "CEO and the person who actually made the challenged statements during the press conferences, did not sell any shares during the Class Period"); *Dang v. Amarin Corp. plc*, – F. Supp. 3d –, 2024 WL 4285900, at *28 (D.N.J. Sept. 25, 2024) ("[H]ad the Individual Defendants in fact known [bad facts]…one would have expected *them all*, including the CEO, to unload their shares when the price spiked") (emphasis added).

1.    **The CC fails to plead the Individual Defendants acted with scienter.**

The CC offers zero factual allegations—from *any* source—identifying what the Individual Defendants knew and when that could be probative of their scienter. *Southland*, 365 F.3d at 365-66 (scienter must be pleaded as to "the *individual corporate officer* making the statement") (emphasis added). Even worse, the CC's only factual allegations are derived from anonymous sources—one "confidential witness" and a handful of unnamed sources in news articles.

"[C]ourts must discount allegations from [such] confidential sources." *Shaw*, 537 F.3d at 535. For even discounted weight, there must be particularized allegations that a person in the source's position would possess the alleged information. *Id.* at 535, 539. Absent such details, confidential-witness-based allegations must be disregarded. *E.g.*, *Owens v. Jastrow*, 789 F.3d 529, 542 n.13 (5th Cir. 2015). Likewise, "[n]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008).

The CC's sources flunk these tests. The CC describes its "confidential witness" in the vaguest of ways—as a Colossus "manager responsible for development of customer relationships" who "was provided reports showing revenue per customer in that role." CC ¶ 75. The CC never says what reports he or she "was provided," who created or provided them, when or how often they were provided, or how, whether, or when the reports showed that "after Thanksgiving in Q4 2023, Google 'pulled the connection'" with Colossus. *See id.* Without such details, the Court must disregard these claims. *Shaw*, 537 F.3d at 535; *Owens*, 789 F.3d at 542 n.13.

The media articles also rely on sources they describe with no particularity. For example, the AdExchanger article describing The Trade Desk's "aware[ness] of issues" with Colossus "for more than a year" (CC ¶ 68) relies on an unnamed Trade Desk "spokesperson." Ex. 12, 5/10/24 AdExchanger. Similarly, the AdAge report that Google appeared to temporarily block Colossus

before later restoring access at "lower volumes" and "issu[ing] credits to its affected advertisers" (CC ¶ 71) cites "a person familiar with the situation" and a "publisher executive familiar with Colossus." Ex. 13, 5/10/24 AdAge. Whether reliance on such amorphous sources is acceptable journalism is debatable. But what matters is that the total absence of descriptions of the sources of the alleged information and the basis for their knowledge falls well short of the PSLRA's pleading standard. *See In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *11-12 (D.N.J. Sept. 5, 2024) (disregarding "WSJ Article [that] d[id] not provide any additional information, such as the sources' job titles or the bases of the sources' knowledge" and merely "describe[d] its sources with phrases such as 'people close to the matter' and 'people at the company'").

Anonymity aside, these sources attribute no facts or knowledge to the Individual Defendants. *See McDermott*, 2015 WL 1143081, at *9 (rejecting allegation that "has not been supported by particularized evidence that the individual defendants learned specific bad facts at specific meetings and later made a false statement with knowledge of the truth of those bad facts"). In fact, none of these sources "relate *any interaction* with [the Individual Defendants]," so the Court "must discount them" further. *See Pier 1*, 935 F.3d at 434 (emphasis added). Such sources cannot compensate for the CC's lack of actual, particularized allegations of Defendants' scienter.

### 2.      The CC's miscellaneous scienter allegations contribute nothing.

Without cognizable factual allegations, the CC dips into a familiar well of boilerplate and disconnected scienter theories courts routinely reject. Those theories should fare no better here.

***Core Operations***. The CC obliquely references "adverse facts…associated with Direct Digital's core operations." CC ¶ 96. If that is a reference to the four-factor "special circumstances" (also known as "core operations") doctrine—which serves as a "narrow exception" in which courts can in rare circumstances impute scienter to executives—then that analogy fails. *Yang v. Nobilis Health Corp.*, 2021 WL 3619863, at *3 n.1 (5th Cir. Aug. 13, 2021). Under that doctrine, "[f]irst,

the company must be small. Second, the transaction at issue is critical to the company's continued vitality. Third, the misrepresentation is readily apparent to the speaker. And last, the defendants' statements are internally inconsistent." *Id*. None of those factors is present here.

- *First*, with approximately 90 employees during the Class Period, Direct Digital was not a "small" company. CC ¶ 28; *see, e.g.*, *Neiman*, 854 F.3d at 750 ("[W]ith over 60 employees, ATP was approximately twice as large as the companies in the cases where this court has found a 'special circumstance.'").

- *Second*, the CC's theory—that Direct Digital actually *grew* revenue but failed to disclose adverse facts that ultimately caused it to miss the low end of twice-upwardly-revised guidance by 8%—is lightyears from facts critical to the company's *continued vitality*. *See, e.g.*, *Neiman*, 854 F.3d at 750 (rejecting core operations as to well "projected to produce 22.5% of [company's] total output").

- *Third,* the CC pleads no misrepresentation at all, much less an egregious falsehood that would have been "readily apparent to the speaker."

- *Fourth*, the CC alleges no "internally inconsistent" statements.

"The Fifth Circuit and other courts have been reluctant to apply [this] limited exception to the particularized pleading required for scienter." *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 699 (S.D. Tex. 2013). This case deserves that same treatment.

    ***Unrelated Auditor Resignation.*** Grasping further, the CC suggests that the April 2024 resignation of Direct Digital's auditor, Marcum, somehow creates scienter. But the only reasons the CC factually attribute to that resignation are Marcum's purported "inability to verify the company's *impressions data*" and "concerns…around SOC-1 Type 2 reports[21] *for publishers*" that provide services to Direct Digital. CC ¶ 84 (emphases added).[22] That has nothing to do with

---

[21] *See* Implementing the Requirements of the Sarbanes-Oxley Act § 1604, 2005 WL 487832 (2025) (explaining that a "SOC 1 report is issued by the *service* auditor after an examination by that auditor of the *service organization* [here, Direct Digital's publishers]. The purpose of that examination is to enable the auditor to express an opinion on the controls within that organization that are likely to be relevant to the internal control over financial reporting of the users of that entity's services [here, Direct Digital itself].") (emphases added).

[22] The CC derives the first of these quotes from a Noble report but fails to mention that that report also states: "**Material change not expected.** Notably, we do not anticipate a significant restatement of 2023 financial results, due to Marcum's inability to verify a small portion of impression data and that the company received nearly 100% of its reported revenue. We believe the company is well positioned to regain compliance." Ex. 14, 4/24/24 Noble Report.

the CC's theory of fraud. Indeed, the CC does not (a) dispute the company's impressions counts (much less suggest it ever restated those figures), (b) challenge the accounting or controls of Direct Digital's publishers (much less Direct Digital itself), or (c) refute Marcum's confirmation of "no 'disagreements'" regarding Direct Digital's "disclosure[s]." Ex. 3, 4/23/24 8-K. The CC's attempt to spin this resignation into scienter is thus naked conjecture—not a coherent allegation.[23]

**Executive Roles.** That the Individual Defendants were knowledgeable about and spoke about Direct Digital's business adds nothing to scienter. *Contra* CC ¶ 29-31 (quoting Individual Defendants' nearly identical statements about being "familiar" with Direct Digital's business or finances); *id.* ¶ 122 (the "Individual Defendants each spoke publicly and held themselves out to investors and analysts as knowledgeable"). As this Court recognized, "[t]he Fifth Circuit has held that [a] pleading of scienter may not rest on the inference that [the] defendants must have been aware of the misstatement based on their positions with the company." *McDermott*, 2015 WL 1143081, at *9; *see, e.g.*, *Shaw*, 537 F.3d at 535 (defendant's "hands-on management style" and statement that "there is nothing in this company that I don't know" did not create scienter).

## III.    The Section 20(a) claim necessarily fails without a cognizable primary claim.

"Control person liability" under § 20(a) of the Exchange Act "is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383. Because the CC's § 10(b) claim fails, so does its § 20(a) claim. *E.g.*, *Shaw,* 537 F.3d at 545.

### CONCLUSION

The Court should dismiss the CC with prejudice.

---

[23] *See, e.g.*, *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 315 (S.D.N.Y. 2021) (even "clash[es] with" company over financials did not support scienter absent "facts non-speculatively linking [auditor's] resignations" to alleged fraud); *In re Jiangbo Pharms., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1268 (S.D. Fla. 2012) ("The mere departure of executives or auditors, without more, is insufficient to support a strong inference of scienter, and Plaintiffs fail to allege any facts linking the departures with the alleged accounting fraud."), *aff'd*, 781 F.3d 1296 (11th Cir. 2015).

Respectfully submitted,

BAKER BOTTS L.L.P.

By*: /s/ Danny David*
    Danny David
       *Attorney-In-Charge*
    Texas Bar No. 24028267
    Federal I.D. No. 37808
    Amy Pharr Hefley
    Texas Bar No. 24046046
    Federal I.D. No. 870378
    Anthony J. Lucisano
    Texas Bar No. 24102118
    Federal I.D. No. 3369146
    Frank Mace
    Texas Bar No. 24110609
    Federal I.D. No. 3385915
    Claire M. Mahoney
    Texas Bar No. 24132497
    Federal I.D. No. 3885858
    910 Louisiana Street
    Houston, Texas 77002
    (713) 229-4055
    (713) 229-2855 (Fax)
    danny.david@bakerbotts.com
    amy.hefley@bakerbotts.com
    anthony.lucisano@bakerbotts.com
    frank.mace@bakerbotts.com
    claire.mahoney@bakerbotts.com

**ATTORNEYS FOR DEFENDANTS
DIRECT DIGITAL HOLDINGS, INC., MARK D.
WALKER, DIANA P. DIAZ, KEITH W. SMITH,
AND DIRECT DIGITAL MANAGEMENT, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served via ECF and/or electronic mail on all counsel of record on this 27th day of January, 2025.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley