## APPENDIX B

## DEFENDANTS' EXHIBIT LIST - MOTION TO DISMISS

| Exhibit / Tab No. | Date | Description | CC ¶¶ | Appx. page no. |
|---|---|---|---|---|
| 1. | 10/15/2024 | October 15, 2024 Form 10-K (excerpted) | 21, 87, 133 | Appx. B-001-005 |
| 2. | 4/17/2023 | April 17, 2023 Form 10-K (excerpted) | 46, 76 | Appx. B-006-024 |
| 3. | 4/23/2024 | April 23, 2024 Form 8-K | 129 | Appx. B-025-033 |
| 4. | 5/10/2024 | May 10, 2024 Campaign US article titled "Colossus SSP alleged to mismatch user IDs" | 69, 70 | Appx. B-034-040 |
| 5. | 7/3/2024 | Defendant Adalytics Research, LLC's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Amended Complaint, *Colossus Media, LLC v. Adalytics Research, LLC*, No. 8:24-cv-01402 (D. Md.) | | Appx. B-041-069 |
| 6. | 10/15/2024 | October 15, 2024 Form 10-Q for the First Quarter, 2024 | 21, 22, 90, 134 | Appx. B-070-116 |
| 7. | 2/1/2024 | February 1, 2024 Pulse 2.0 article titled "Direct Digital Holdings: This Rapidly Growing Programmatic Ad Player Generates Over 300 Billion Monthly Impressions" | 108, 109, | Appx. B-117-123 |
| 8. | 11/9/2023 | November 9, 2023 Form 8-K including a Press Release | 84, 94 | Appx. B-124-136 |
| 9. | 11/9/2023 | November 9, 2023 Form 10-Q for the Third Quarter, 2023 (excerpted) | 97 | Appx. B-137-140 |
| 10. | 11/9/2023 | Q3 2023 Earnings Call Transcript | 99, 100 | Appx. B-141-149 |
| 11. | 3/26/24 | Q4 2023 Earnings Call Transcript | 113, 114, 115 | Appx. B-150-162 |

| Exhibit / Tab No. | Date | Description | CC ₱₱ | Appx. page no. |
|---|---|---|---|---|
| 12. | 5/10/2024 | May 10, 2024 AdExchanger article titled "Adalytics Claims Colossus SSP is Misdeclaring IDs in its Bid Requests" | 68, 71 | Appx. B-163-174 |
| 13. | 5/10/2024 | May 10, 2024 AdAge article titled "Google and The Trade Desk appeared to block a supply-side platform over user ID mismatch issue" | 69 | Appx. B-175-180 |
| 14. | 4/24/24 | April 24, 2024 Research Report from Noble Capital Markets, Inc. | 84, 129 | Appx. B-181-188 |

# Exhibit 1

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2023**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM   TO  _____**

**COMMISSION FILE NUMBER 001-41261**

# DIRECT DIGITAL HOLDINGS, INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **87-2306185** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1177 West Loop South, Suite 1310 Houston, Texas** | **77027** |
| **(Address of principal executive offices)** | **(Zip code)** |

**(832) 402-1051**
**(Registrant's telephone number, including area code)**

| Securities registered pursuant to Section 12(b) of the Act: | | |
|---|---|---|
| **Title of Each Class:** | **Trading symbol(s)** | **Name of Each Exchange on Which Registered:** |
| Class A Common Stock, par value $0.001 per share | DRCT | Nasdaq Capital Market |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☐ No ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☒

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of October 11, 2024, there were 3,795,199 shares of the registrant's Class A Common Stock outstanding, par value $0.001 per share, and 10,868,000 shares of the registrant's Class B Common Stock outstanding, par value $0.001 per share. The aggregate market value of the common stock held by non-affiliates of the registrant as of the last business day of the registrant's most recently completed second fiscal quarter: $8.3 million.

**Appx. B-002**

Table of Contents

PART I

**ITEM 1.        Business**

**Company Overview**

We are an end-to-end, full-service advertising and marketing platform primarily focused on providing advertising technology, data-driven campaign optimization and other solutions to help brands, agencies, middle market businesses deliver successful marketing results that drive return on investment ("ROI") across both the sell- and buy-side of the digital advertising ecosystem. Direct Digital Holdings, Inc., incorporated as a Delaware corporation on August 23, 2021, is the holding company for DDH LLC, the business formed by our founders in 2018 through the acquisitions of Colossus Media and Huddled Masses. Colossus Media operates our proprietary sell-side programmatic platform ("SSP") operating under the trademarked banner of Colossus SSP™, which provides advertisers of all sizes a programmatic advertising platform that automates the sale of ad inventory between advertisers and agencies leveraging proprietary technology. Our platform offers extensive reach within both general market and multicultural media partners to help Fortune 500 brands and agencies scale to reach highly sought after audiences and helps publishers find the right brands for their readers, as well as drive advertising yields across all channels: web, mobile, and connected TV ("CTV").

Both buy-side advertising businesses, Orange 142 and Huddled Masses, provide technology-enabled advertising solutions and consulting services to clients through multiple leading demand side platforms ("DSPs"), across multiple industry verticals such as travel, education, healthcare, financial services, consumer products and other sectors with particular emphasis on small and mid-sized businesses transitioning into digital with growing digital media budgets. In February 2022, we completed our initial public offering and certain organizational transactions which resulted in our current structure.

In the digital advertising space, buyers, particularly small and mid-sized businesses, can potentially achieve significantly higher ROI on their advertising spend compared to traditional media advertising by leveraging data-driven over-the-top/connected TV ("OTT/CTV"), video and display, in-app, native and audio advertisements that are delivered both at scale and on a highly targeted basis.



**Programmatic Marketplace Transaction**

**The Sell-Side**

On the sell-side of the digital supply chain, the supply side platform ("SSP"), is an ad technology platform used by publishers to sell, manage and optimize the ad inventory on their websites in an automated and effective way. The SSPs help the publishers monetize the display ads, video ads, and native ads on their websites and mobile apps. The SSPs have enhanced their functionalities over the years and have included ad exchange mechanisms to efficiently manage their ad

5

**Appx. B-003**

Table of Contents

***The restatement of our consolidated financial statements for the quarterly periods in the year ended December 31, 2023 has subjected us to a number of additional costs, risks and uncertainties.***

As discussed elsewhere in this Annual Report, our management determined that our consolidated financial statements for the quarterly periods in the years ended December 31, 2023 should be restated due to accounting errors resulting from the incorrect (1) accounting for, and presentation of, noncontrolling interests ("NCI"), (2) recognition of an organizational transaction in connection with the Company's initial public offering, (3) presentation of earnings per share considering the effect of certain features of the Company's warrants and the impact of correcting the accounting for, and presentation of NCI, and (4) timing of the recording of the 2023 redemption of warrants. The restatement of our consolidated financial statements and the ongoing process of remediating the material weaknesses has caused us to incur substantial expenses for legal, accounting, and other professional services and has diverted our management's attention from our business and could continue to do so. As a result of the restatement and the change in our registered public accounting firm, we have been delayed in filing this Annual Report on Form 10-K and our Quarterly Reports on Form 10-Q for each of the periods ended March 31, 2024 and June 30, 2024, and there can be no assurance that we will be able to timely file our required reports for future periods. In addition, as a result of the restatement and associated non-reliance on previously issued quarterly financial statements, investors may lose confidence in our financial reporting and the price of our common stock could decline. We could also be subject to regulatory, stockholder or other actions in connection with the restatement and/or the associated material weaknesses, which would, regardless of the outcome, consume management's time and attention and may result in additional legal, accounting and other costs. If such proceedings arise and we do not prevail in such proceedings, we could be required to pay damages or settlement costs. The restatement and related matters could impair our reputation or could cause our stockholders or other counterparties to lose confidence in us. Any of these occurrences could adversely affect our business, financial condition and results of operations.

***High customer concentration exposes us to various risks faced by our major customers and may subject us to significant fluctuations or declines in revenues.***

There is an inherent concentration of credit risk associated with accounts receivable arising from revenue from major customers on both the sell-side and buy-side of the business. For the years ended December 31, 2023 and 2022, one customer of the sell-side business represented 73% and 63% of revenues, respectively. As of December 31, 2023 and 2022, one customer of the sell-side business accounted for 83% and 80%, respectively, of accounts receivable. In 2024, we experienced a short-pay notice from this customer resulting in reduction of our 2023 revenue to the reported amount of $157 million. The Company has not been provided with information as to the reason for the short pay, and therefore has disputed it. In conjunction with the short pay, the Company recorded a charge of $8.8 million for payments made to a few publishers, primarily because of the Company's inability to charge back the publishers for the short pay given the lack of information and related documentation supporting such transaction. We do not expect these amounts to recur in any material fashion, although there is no assurance that this or other customers will not take such action in the future.

Additionally, although we continually seek to diversify our customer base, we cannot assure you that the proportion of the revenue contribution from this customer to our total revenues will decrease in the near future. Dependence on a limited number of major customers will expose us to the risks of substantial losses and may increase our accounts receivable and extend its turn-over days if any of them reduces or even ceases business with us. Specifically, any one of the following events, among others, may cause material fluctuations or declines in our revenues and have a material and adverse effect on our business, financial condition, results of operations and prospects:

- an overall decline in the business of one or more of our significant customers;

- the decision by one or more of our significant customers to switch to our competitors;

- the reduction in the prices for our services agreed by one or more of our significant customers; or

- the failure or inability of any of our significant customers to make timely payment for our services.

**Appx. B-004**

Table of Contents

On May 10, 2024, the Company was the subject of a defamatory article / blog post. In connection with this post, one of the Company's sell-side customers paused its connection to the Company while the allegations were investigated. This customer reconnected the Company on May 22, 2024 and sell-side volumes have resumed but not yet at the levels experienced prior to the pause in May 2024. The Company is actively working with its partners to achieve prior volume levels. On May 14, 2024, the Company filed a lawsuit against the author of the defamatory article and is vigorously pursuing its rights. The Company cannot make any predictions about the final outcome of this litigation matter or the timing thereof.

*Other Expense (within Operating Expenses)*

Typically, short payments received from our customers are charged back to our publishers, in accordance our contracts with the publishers. In January 2024, we received notice from one of our sell-side customers that it would be short paying the Company's invoices. The Company has requested, but has not yet received, an explanation from the customer for the short payment, and therefore the Company disputed it. Because this information has not been received, the Company paid $

8.8 million to a few publishers related to these charges. As a result, for the year ended December 31, 2023, the Company has not recognized revenue related to the short payments and recognized $8.8 million in other expense related to the payments made to the publishers. Although the Company is attempting to recover these amounts, recovery is neither estimable or probable and there can be no assurance that the Company will recover any amounts associated with this matter. We do not expect these amounts to recur in any material fashion, although there is no assurance that customers will not take such action in the future.

*Operating Leases*

During the years ended December 31, 2023 and 2022, the Company incurred fixed rent expense associated with operating leases for real estate of $0.3 million and $0.3 million, respectively. The Company did not have any finance leases, short-term leases nor variable leases over this time period.

During the years ended December 31, 2023 and 2022, the Company had the following cash and non-cash activities associated with leases (in thousands):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2023 | 2022 |
| **Cash paid for amounts included in the measurement of lease liabilities:** | | |
| Operating cash outflow for operating leases | $    154 | $    152 |
| **Non-cash changes to the operating lease ROU assets and operating lease liabilities:** | | |
| Additions and modifications to ROU asset obtained from new operating liabilities | $    153 | $    - |

The weighted-average remaining lease term and discount rate for the Company's operating leases is 5.5 years and 8.3%, respectively, as of December 31, 2023. The weighted-average remaining lease term and discount rate for the Company's operating leases is 6.6 years and 8.3%, respectively, as of December 31, 2022.

The future payments due under operating leases as of December 31, 2023 is as follows (in thousands):

| | |
| --- | --- |
| 2024 | $    193 |
| 2025 | 239 |
| 2026 | 160 |
| 2027 | 163 |
| 2028 | 167 |
| Thereafter | 200 |
| Total undiscounted lease payments | 1,122 |
| Less effects of discounting | (223) |
| Less current lease liability | (126) |
| Total operating lease liability, net of current portion | $    773 |

# Exhibit 2

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2022**
**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**FOR THE TRANSITION PERIOD FROM   TO _____**
**COMMISSION FILE NUMBER 001-41261**

# DIRECT DIGITAL HOLDINGS, INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **87-2306185** |
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification No.)** |

| | |
|---|---|
| **1177 West Loop South, Suite 1310** | |
| **Houston, Texas** | **77027** |
| **(Address of principal executive offices)** | **(Zip code)** |

**(832) 402-1051**
**(Registrant's telephone number, including area code)**

| Securities registered pursuant to Section 12(b) of the Act: | | |
|---|---|---|
| **Title of Each Class:** | **Trading symbol(s)** | **Name of Each Exchange on Which Registered:** |
| Common Stock, par value $0.001 per share | DRCT | NASDAQ |
| Warrants to Purchase Common Stock | DRCTW | NASDAQ |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ̈ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ̈ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ̈

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ̈

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of June 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of common equity held by non-affiliates was approximately $3.6 million.

As of April 17, 2023, there were 2,902,200 shares of the registrant's Class A common stock outstanding, par value $0.001 per share, and 11,278,000 shares of the registrant's Class B common stock outstanding, par value $0.001 per share.

**DOCUMENTS INCORPORATED BY REFERENCE**
Portions of the registrant's proxy statement for the 2023 annual meeting of stockholders to be filed with the Securities and Exchange Commission within 120 days after the end of the registrant's fiscal year are incorporated by reference in Items 10, 11, 12, 13 and 14 of Part III.

Table of Contents

chain. On the Colossus SSP, we offer a wide range of niche and general market publishers an opportunity to maximize advertising revenue driven by technology-enabled targeted advertising to multicultural and other audiences. We believe our technology's ability to tailor our efforts to our clients-specific needs and inform those efforts with data and algorithmic learnings is a long-term advantage to serving this end of the market.

- **Comprehensive Processes Enhance Ad Inventory Quality and Reduce Invalid Traffic ("IVT").** We operate what we believe to be one of the most comprehensive processes in the digital advertising ecosystem to enhance ad inventory quality. In the advertising industry, inventory quality is assessed in terms of IVT, which can be impacted by fraud such as "fake eyeballs" generated by automated technologies set up to artificially inflate impression counts. As a result of our platform design and proactive IVT mitigation efforts, in 2022, less than 1% of inventory was determined to be invalid by our accredited verification partners, resulting in minimal financial impact to our customers. We address IVT on a number of fronts, including: sophisticated technology, which detects and avoids invalid traffic on the front end; direct publisher and inventory relationships, for supply path optimization; and ongoing campaign and inventory performance review, to ensure inventory quality and brand protection controls are in place.

- **Curated Data-Driven Sell-Side Platform to Support Buy-Side.** The Colossus SSP enables us to gather data to build and develop unique product offerings for our clients. The ability to curate our supply allows us to serve a broad range of clients with challenging and unique advertising needs and optimize campaign performance in a way that our siloed competitors are unable to do. This model, together with our infrastructure solutions and ability to quickly access excess server capacity, helps us scale up efficiently and allows us to grow our business at a faster pace than a pure buy-side solution would. We also provide clients access to our proprietary data through our data management platform, which only increases with continued use of our platform. We believe that the integration of data and decisioning within a single platform enables us to better serve our clients.

- **High Client Retention Rate and Cross Selling Opportunities.** During the fiscal year ended December 31, 2022, we had approximately 218 clients on the buy-side and 114,000 buyers on the sell-side. They understand the independent nature of our platform and relentless focus on driving ROI-based results. Our value proposition is complete alignment across our entire digital supply platform beginning with the first dollar in and last dollar out. We are technology and media agnostic, and our clients trust us to provide the best opportunity for success of their brands and businesses. As a result, our clients have been loyal, with approximately 90% client retention amongst the clients that represent approximately 80% of our revenues for the fiscal years ended December 31, 2022 and 2021. In addition, we cultivate client relationships through our pipeline of managed and moderate/self-serve clients that conduct campaigns through our platform. The managed services delivery model allows us to combine our technology with a highly personalized offering to strategically design and manage advertising campaigns.

- **Growing and Profitable Business Model.** We have grown our revenue steadily and have been increasing our gross profit, which we believe demonstrates the power of our technology platform, the strength of our client relationships and the leverage inherent to our business model. On September 30, 2020, we acquired Orange142 to further bolster our overall buy-side advertising platform and enhance our offerings across multiple industry verticals such as travel, healthcare, education, financial services, consumer products and others, with particular emphasis on small and mid-sized businesses transitioning into digital with growing digital media budgets. For the years ended December 31, 2022 and 2021, our net income/(loss) was $4.2 million and $(1.5) million, respectively, and Adjusted EBITDA, a non-GAAP financial measure, for the years ended December 31, 2022 and 2021 was $10.2 million and $6.4 million, respectively. Please see the section of this Annual Report titled "*Management's Discussion and Analysis of Financial Condition and Results of Operations - Non-GAAP Financial Measures*" for a reconciliation of non-GAAP financial measures to the most directly comparable measures calculated in accordance with GAAP.

- **Solutions for the Destabilization of Advertising.** As a result of the impending phase out of third-party cookies by 2024 by Google, we have begun integrating identity resolution solutions in order to provide our clients with accurate, targeted advertising without cookies. We believe these solutions provide higher CPM

9

Table of Contents

**ITEM 1A. Risk Factors**

Summary of Material Risk Factors

The following is a summary of some of the risks and uncertainties that could materially adversely affect our business, financial condition and results of operations and could make an investment in our Company speculative or risky. You should be aware that these risk factors and other information may not describe every risk facing our Company. Additional risks and uncertainties not currently known to us may also materially adversely affect our business, financial condition and/or results of operations. You should read this summary together with the more detailed description of each risk factor contained below. Some of these material risks include:

- our revenue and operating results are highly dependent on the overall demand for advertising that could be influenced by economic downturns;

- the market for programmatic advertising campaigns is relatively new and evolving, so if this market develops more slowly or differently than we expect, our business, growth prospects and results of operations would be adversely affected;

- operational and performance issues with our platform, whether real or perceived, including a failure to respond to technological changes or to upgrade our technology systems, may adversely affect our business, operating results and financial condition;

- a significant inadvertent disclosure or breach of confidential and/or personal information we hold, or of the security of our or our customers', suppliers' or other partners' computer systems could be detrimental to our business, reputation and results of operations;

- if the non-proprietary technology, software, products and services that we use are unavailable, have future terms we cannot agree to, or do not perform as we expect, our business, operating results and financial condition could be harmed;

- unfavorable publicity and negative public perception about our industry, particularly concerns regarding data privacy and security relating to our industry's technology and practices, and perceived failure to comply with laws and industry self-regulation, could adversely affect our business and operating results;

- if the use of third-party "cookies," mobile device IDs or other tracking technologies is restricted without similar or better alternatives, our platform's effectiveness could be diminished and our business, results of operations, and financial condition could be adversely affected;

- the market in which we participate is intensely competitive, and we may not be able to compete successfully with our current or future competitors;

- high customer concentration exposes us to all of the risks faced by our major customers and may subject us to significant fluctuations or declines in revenues;

- we have a limited operating history and, as a result, our past results may not be indicative of future operating performance;

- our business is subject to numerous legal and regulatory requirements and any violation of these requirements or any misconduct by our employees, subcontractors, agents or business partners could harm our business and reputation;

- we are a holding company. Our principal asset is our interest in DDH LLC, and, accordingly, we depend on distributions from DDH LLC to pay our taxes, expenses (including payments under the Tax Receivable

14

Appx. B-009

Table of Contents

Agreement) and dividends. DDH LLC's ability to make such distributions may be subject to various limitations and restrictions;

- DDH LLC may make distributions of cash to us substantially in excess of the amounts we use to make distributions to our stockholders and pay our expenses (including our taxes and payments under the Tax Receivable Agreement). To the extent we do not distribute such excess cash as dividends on our Class A common stock, DDM would benefit from any value attributable to such cash as a result of its ownership of Class A common stock upon an exchange or redemption of its LLC Units; and

- the requirements of being a public company may strain our resources, divert our management's attention and affect our ability to attract and retain qualified board members.

**Risks Related to our Business**

***We rely on highly skilled personnel and if we are unable to attract, retain or motivate substantial numbers of qualified personnel or expand and train our sales force, we may not be able to grow effectively.***

We rely on highly skilled personnel and if we are unable to attract, retain or motivate substantial numbers of qualified personnel or expand and train our sales force, we may not be able to grow effectively. Our success largely depends on the talents and efforts of key technical, sales and marketing employees and our future success depends on our continuing ability to identify, hire, develop, motivate and retain highly skilled personnel for all areas of our organization. Competition in our industry is intense and often leads to increased compensation and other personnel costs. In addition, competition for employees with experience in our industry can be intense where our development operations are concentrated and where other technology companies compete for management and engineering talent. Our continued ability to compete and grow effectively depends on our ability to attract substantial numbers of qualified new employees and to retain and motivate our existing employees.

***The digital advertising industry is intensely competitive, and if we do not effectively compete against current and future competitors, our business, results of operations, and financial condition could be harmed.***

We operate in a highly competitive and rapidly changing industry that is subject to changing technology and customer demands and that includes many companies providing competing solutions. With the introduction of new technologies and the influx of new entrants into the market, we expect competition to persist and intensify in the future, which could harm our ability to increase revenue and maintain profitability. New technologies and methods of buying advertising present a dynamic competitive challenge, as market participants offer multiple new products and services aimed at capturing advertising spend.

On the sell-side, we compete with smaller, privately-held companies and with public companies such as Pubmatic, Magnite, and Acuity Ads. Our current and potential competitors may have significantly more financial, technical, marketing and other resources than we have, allowing them to devote greater resources to the development, promotion, sale and support of their products and services. They may also have more extensive customer bases and broader supplier relationships than we have. As a result, these competitors may be better able to respond quickly to new technologies, develop deeper marketer relationships or offer services at lower prices. Increased competition may result in reduced pricing for our platform, increased sales and marketing expense, longer sales cycles or a decrease of our market share, any of which could negatively affect our revenue and future operating results and our ability to grow our business. These companies may also have greater brand recognition than we have, actively seek to serve our market, and have the power to significantly change the nature of the marketplace to their advantage. Some of our larger competitors have substantially broader product offerings and may leverage their relationships based on other products or incorporate functionality into existing products to gain business in a manner that may discourage customers from using our platform, including through selling at zero or negative margins or product bundling with other services they provide at reduced prices. Customers may prefer to purchase advertising on their own or through another platform without leveraging our buy-side business. Potential customers may also prefer to leverage larger sell-side platforms rather than a new platform regardless of product performance or features. These larger competitors often have broader product lines and market focus and may therefore

15

Appx. B-010

Table of Contents

not be as susceptible to downturns in a particular market. We may also experience negative market perception as a result of being a smaller company than our larger competitors.

We may also face competition from companies that we do not yet know about or do not yet exist. If existing or new companies develop, market or resell competitive high-value marketing products or services, acquire one of our existing competitors or form a strategic alliance with one of our competitors, our ability to compete effectively could be significantly compromised and our results of operations could be harmed.

***We may not be able to secure additional financing on favorable terms, or at all, to meet our future capital needs, which may in turn impair our growth.***

We intend to continue to grow our business, which may require additional capital to develop new features or enhance our platform, improve our operating infrastructure, finance requirements or acquire complementary businesses and technologies. Accordingly, we may need to engage in additional equity or debt financings to secure additional capital. If we raise additional funds through future issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our Class A common stock. Any debt financing that we secure in the future could involve restrictive covenants relating to our capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities. If we are unable to secure additional funding on favorable terms, or at all, when we require it, our ability to continue to grow our business to react to market conditions could be impaired and our business may be harmed.

***The effects of health pandemics have had, and could in the future have, an adverse impact on our business, financial condition and results of operations.***

Our business and operations have been and could in the future be adversely affected by health pandemics, such as the global COVID-19 pandemic. The COVID-19 pandemic and efforts to control its spread curtailed the movement of people, goods and services worldwide during 2020 and 2021, including in the regions in which we and our clients and partners operate, and are significantly impacted economic activity and financial markets during this time. Many marketers decreased or paused their advertising spending as a response to the economic uncertainty, decline in business activity and other COVID-related impacts, which negatively impacted some parts of our business, and may in the future negatively impact, our revenue and results of operations, should the pandemic once again become acute and/or severe.

Our operations are subject to a range of external factors related to the COVID-19 pandemic that are not within our control. A wide range of governmental restrictions were previously, and may again be, imposed on our employees, clients and partners' physical movement to limit the spread of COVID-19. There can be no assurance that precautionary measures, whether adopted by us or imposed by others, will be effective, and such measures could negatively affect our sales, marketing and client service efforts, delay and lengthen our sales cycles, decrease our employees', clients' or partners' productivity, or create operational or other challenges, any of which could harm our business, results of operations and financial condition.

***High customer concentration exposes us to various risks faced by our major customers and may subject us to significant fluctuations or declines in revenues.***

A limited number of our major customers have contributed a significant portion to our revenues in the past. Our revenue from the top two largest customers accounted for approximately 69% and 41% of our total revenues in the fiscal years ended December 31, 2022 and 2021, respectively. Our revenue from our top ten largest customers accounted for approximately 83% and 60% of our total revenues in the fiscal years ended December 31, 2022 and 2021, respectively. Although we continually seek to diversify our customer base, we cannot assure you that the proportion of the revenue contribution from these customers to our total revenues will decrease in the near future. Dependence on a limited number of major customers will expose us to the risks of substantial losses and may increase our accounts receivable and extend its turn-over days if any of them reduces or even ceases business with us. Specifically, any one of the following events, among others, may cause material fluctuations or declines in our revenues and have a material and adverse effect on our business, financial condition, results of operations and prospects:

16

Table of Contents

- an overall decline in the business of one or more of our significant customers;

- the decision by one or more of our significant customers to switch to our competitors;

- the reduction in the prices for our services agreed by one or more of our significant customers; or

- the failure or inability of any of our significant customers to make timely payment for our services.

***Operational and performance issues with our platform, whether real or perceived, including a failure to respond to technological changes or to upgrade our technology systems, may adversely affect our business, operating results and financial condition.***

We depend upon the sustained and uninterrupted performance of our platform to manage our advertising inventory supply; acquire advertising inventory for each campaign; collect, process and interpret data; and optimize campaign performance in real time and provide billing information to our financial systems. If our platform cannot scale to meet demand, if there are errors in our execution of any of these functions on our platform, or if we experience outages, then our business may be harmed.

Our platform is complex and multifaceted. Operational and performance issues could arise from the platform itself or from outside factors, such as cyberattacks or other third-party attacks. Errors, failures, vulnerabilities or bugs have been found in the past, and may be found in the future. Our platform also relies on third-party technology and systems to perform properly. It is often used in connection with computing environments utilizing different operating systems, system management software, equipment and networking configurations, which may cause errors in, or failures of, our platform or such other computing environments. Operational and performance issues with our platform could include the failure of our user interface, outages, errors during upgrades or patches, discrepancies in costs billed versus costs paid, unanticipated volume overwhelming our databases, server failure or catastrophic events affecting one or more server facilities. While we have built redundancies in our systems, full redundancies do not exist. Some failures will shut our platform down completely, others only partially. We provide service-level agreements to some of our customers, and if our platform is not available for specified amounts of time or if there are failures in the interaction between our platform, partner platform and third-party technologies, we may be required to provide credits or other financial compensation to our customers.

As we grow our business, we expect to continue to invest in technology services and equipment. Without these improvements, our operations might suffer from unanticipated system disruptions, slow transaction processing, unreliable service levels, impaired quality or delays in reporting accurate information regarding transactions in our platform, any of which could negatively affect our reputation and ability to attract and retain customers. In addition, the expansion and improvement of our systems and infrastructure may require us to commit substantial financial, operational and technical resources, with no assurance our business will grow. If we fail to respond to technological change or to adequately maintain, expand, upgrade and develop our systems and infrastructure in a timely fashion, our growth prospects and results of operations could be adversely affected.

Operational and performance issues with our platform could also result in negative publicity, damage to our brand and reputation, loss of or delay in market acceptance of our platform, increased costs or loss of revenue, loss of the ability to access our platform, loss of competitive position or claims by customers for losses sustained by them. Alleviating problems resulting from such issues could require significant expenditures of capital and other resources and could cause interruptions, delays or the cessation of our business, any of which may adversely affect our operating results and financial condition.

***A significant inadvertent disclosure or breach of confidential and/or personal information we hold, or of the security of our or our customers', suppliers' or other partners' computer systems, could be detrimental to our business, reputation and results of operations.***

Portions of our business require the storage, transmission and utilization of data, including access to personal information, much of which must be maintained on a confidential basis. These activities may in the future make us a target of cyber-attacks by third parties seeking unauthorized access to the data we maintain and to which we provide access,

17

Table of Contents

including our customer data, or to disrupt our ability to provide service through the Colossus SSP. Based on the types and volume of personal data on our systems, we believe that we are a particularly attractive target for such breaches and attacks.

In recent years, the frequency, severity and sophistication of cyber-attacks, computer malware, viruses, social engineering, and other intentional misconduct by computer hackers has significantly increased, and government agencies and security experts have warned about the growing risks of hackers, cyber criminals and other potential attackers targeting information technology systems. Such third parties could attempt to gain entry to our systems for the purpose of stealing data or disrupting the systems. In addition, our security measures may also be breached due to employee error, malfeasance, system errors or vulnerabilities, including vulnerabilities of our vendors, suppliers, their products or otherwise. Third parties may also attempt to fraudulently induce employees or customers into disclosing sensitive information such as usernames, passwords or other information to gain access to our customers' data or our data, including intellectual property and other confidential business information.

We currently serve the majority of Colossus SSP functions from third-party data center hosting facilities. While we and our third-party cloud providers have implemented security measures designed to protect against security breaches, these measures could fail or may be insufficient, particularly as techniques used to sabotage or obtain unauthorized access to systems change frequently and generally are not recognized until launched against a target, resulting in the unauthorized disclosure, modification, misuse, destruction or loss of our or our customers' data or other sensitive information. Any failure to prevent or mitigate security breaches and improper access to or disclosure of the data we maintain, including personal information, could result in litigation, indemnity obligations, regulatory enforcement actions, investigations, fines, penalties, mitigation and remediation costs, disputes, reputational harm, diversion of management's attention, and other liabilities and damage to our business.

We believe we have taken appropriate measures to protect our systems from intrusion, but we cannot be certain that advances in criminal capabilities, discovery of new vulnerabilities in our systems and attempts to exploit those vulnerabilities, physical system or facility break-ins and data thefts or other developments will not compromise or breach the technology protecting our systems and the information we possess.

We may incur significant costs in protecting against or remediating cyber-attacks. Any security breach could result in operational disruptions that impair our ability to meet our customers' requirements, which could result in decreased revenue. Also, whether there is an actual or a perceived breach of our security, our reputation could suffer irreparable harm, causing our current and prospective customers to reject our products and services in the future, deterring data suppliers from supplying us data or customers from uploading their data on our platform, or changing consumer behaviors and use of our technology. Further, we could be forced to expend significant resources in response to a security breach, including those expended in notifying individuals and providing mitigating services, repairing system damage, increasing cyber security protection costs by deploying additional personnel and protection technologies, and litigating and resolving legal claims or governmental inquiries and investigations, all of which could divert the attention of our management and key personnel away from our business operations. Federal, state and foreign governments continue to consider and implement laws and regulations addressing data privacy, cybersecurity, and data protection laws, which include provisions relating to breaches. For example, statutory damages may be available to users through a private right of action for certain data breaches under the California Consumer Privacy Act (the "CCPA"), and potentially other states' laws. In any event, a significant security breach could materially harm our business, operating results and financial condition.

Our customers, suppliers and other partners are primarily responsible for the security of their information technology environments, and we rely heavily on them and third parties to supply clean data content and/or to utilize our products and services in a secure manner. Each of these third parties may face risks relating to cyber security, which could disrupt their businesses and therefore materially impact ours. While we provide guidance and specific requirements in some cases, we do not directly control any of such parties' cyber security operations, or the amount of investment they place in guarding against cyber security threats. Accordingly, we are subject to any flaws in or breaches of their systems, which could materially impact our business, results of operations, and financial condition.

Table of Contents

***Our success and revenue growth are dependent on adding new customers, effectively educating and training our existing customers on how to make full use of our platform and increasing usage of our platform by our customers.***

Our success is dependent on regularly adding new customers and increasing our customers' usage of our platform. Our contracts and relationships with customers generally do not include long-term or exclusive obligations requiring them to use our platform or maintain or increase their use of our platform. Our customers typically have relationships with numerous providers and can use both our platform and those of our competitors without incurring significant costs or disruption. Our customers may also choose to decrease their overall advertising spend for any reason. Accordingly, we must continually work to win new customers and retain existing customers, increase their usage of our platform and capture a larger share of their advertising spend. We may not be successful at educating and training customers, particularly our newer customers, on how to use our platform, in particular our advanced reporting tools, in order for our customers to get the most benefit from our platform and increase their usage. If these efforts are unsuccessful or customers decide not to continue to maintain or increase their usage of our platform for any other reason, or if we fail to attract new customers, our revenue could fail to grow or decline, which would materially and adversely harm our business, results of operations, and financial condition. We cannot assure you that our customers will continue to use and increase their spend on our platform or that we will be able to attract a sufficient number of new customers to continue to grow our business and revenue. If customers representing a significant portion of our business decide to materially reduce their use of our platform or cease using our platform altogether, our revenue could be significantly reduced, which could have a material adverse effect on our business, operating results and financial condition. We may not be able to replace customers who decrease or cease their usage of our platform with new customers that will use our platform to the same extent.

***If we fail to detect advertising fraud, we could harm our reputation and hurt our ability to execute our business plan.***

The success of our buy-side advertising business depends on our ability to deliver effective digital advertising campaigns to publishers, advertisers and agencies. Some of those campaigns may experience fraudulent and other invalid impressions, clicks or conversions that advertisers may perceive as undesirable, such as non-human traffic generated by computers designed to simulate human users and artificially inflate user traffic on websites. These activities could overstate the performance of any given digital advertising campaign and could harm our reputation. It may be difficult for us to detect fraudulent or malicious activity because we do not own content and rely in part on our digital media properties to control such activity. Industry self- regulatory bodies, the U.S. Federal Trade Commission (the "FTC") and certain influential members of Congress have increased their scrutiny and awareness of, and have taken recent actions to address, advertising fraud and other malicious activity. If we fail to detect or prevent fraudulent or other malicious activity, the affected advertisers may experience or perceive a reduced return on their investment and our reputation may be harmed. High levels of fraudulent or malicious activity could lead to dissatisfaction with our solutions, refusals to pay, refund or future credit demands or withdrawal of future business, any of which could have a material adverse effect on our business, prospects or results of operations.

***The market growth forecasts included in this Annual Report on Form 10-K may prove to be inaccurate and, even if the market in which we compete achieves forecasted growth, we cannot assure you your business will grow at similar rates, if at all.***

Market growth forecasts are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The forecasts in this Annual Report on Form 10-K relating to expected growth in the digital advertising and programmatic ad markets may prove to be inaccurate. Even if these markets experience the forecasted growth, we may not grow our business at similar rates, or at all. Our growth is subject to many factors including our success in implementing our business strategy, which is subject to many risks and uncertainties. The failure of either the market in which we operate or our business to grow as forecasted could have a material adverse effect on our business, prospects or results of operations.

***The market for programmatic advertising campaigns is relatively new and evolving. If this market develops slower or differently than we expect, our business, growth prospects and results of operations would be adversely affected.***

The substantial majority of our revenue has been derived from customers that programmatically purchase or sell advertising inventory through our platform. We expect that spending on programmatic ad buying and selling will continue

Table of Contents

to be our primary source of revenue for the foreseeable future, and that our revenue growth will largely depend on increasing spend through our platform. The market for programmatic ad buying is an emerging market, and our current and potential customers may not shift quickly enough to programmatic ad buying from other buying methods, reducing our growth potential. Because our industry is relatively new, we will encounter risks and difficulties frequently encountered by early-stage companies in similarly rapidly evolving industries, including the need to:

- Maintain our reputation and build trust with advertisers and digital media property owners;

- Offer competitive pricing to publishers, advertisers and digital media agencies;

- Maintain quality and expand quantity of our advertising inventory;

- Continue to develop, launch and upgrade the technologies that enable us to provide our solutions;

- Respond to evolving government regulations relating to the internet, telecommunications, mobile, privacy, marketing and advertising aspects of our business;

- Identify, attract, retain and motivate qualified personnel; and

- Cost-effectively manage our operations.

If the market for programmatic ad buying deteriorates or develops more slowly than we expect, it could reduce demand for our platform, and our business, growth prospects and financial condition would be adversely affected.

In addition, revenue may not necessarily grow at the same rate as spend on our platform. Growth in spend may outpace growth in our revenue as the market for programmatic advertising matures due to a number of factors including quantity discounts and product, media, customer and channel mix shifts. A significant change in revenue as a percentage of spend could result in an adverse change in our business and growth prospectus. In addition, any such fluctuations, even if they reflect our strategic decisions, could cause our performance to fall below the expectations of securities analysts and investors, and adversely affect the price of our Class A common stock.

***We often have long sales cycles, which can result in significant time between initial contact with a prospect and execution of a customer agreement, making it difficult to project when, if at all, we will obtain new customers and when we will generate revenue from those customers.***

Our sales cycle, from initial contact to contract execution and implementation, can take significant time. Our sell-side sales cycle often has a duration of six-to-12 months, while our buy-side business sales cycle often has a duration of three-to-nine months. As part of our sales cycle, we may incur significant expenses before we generate any revenue from a prospective customer. We have no assurance that the substantial time and money spent on our sales efforts will generate significant revenue. If conditions in the marketplace, generally or with a specific prospective customer, change negatively, it is possible that we will be unable to recover any of these expenses. Our sales efforts involve educating our customers about the use, technical capabilities and benefits of our platform, and working through technical connections and troubleshooting technical issues with prospective customers. Some of our customers undertake an evaluation process that frequently involves not only our platform but also the offerings of our competitors. As a result, it is difficult to predict when we will obtain new customers and begin generating revenue from these customers. Even if our sales efforts result in obtaining a new customer, the customer controls when and to what extent it uses our platform and therefore the amount of revenue we generate, and it may not sufficiently justify the expenses incurred to acquire the customer and the related training support. As a result, we may not be able to add customers, or generate revenue, as quickly as we may expect, which could harm our growth prospects.

20

Table of Contents

***Failure to maintain the brand security features of our solution could harm our reputation and expose us to liabilities.***

Advertising is bought and sold through our solution in automated transactions that occur in milliseconds. It is important to sellers that the advertising placed on their media be of high quality, consistent with applicable seller standards, not conflict with existing seller arrangements, and be compliant with applicable legal and regulatory requirements. It is important to buyers that their advertisements be placed on appropriate media, in proximity with appropriate content, that the impressions for which they are charged be legitimate, and that their advertising campaigns yield their desired results. We use various measures, including technology, internal processes and protocols in an effort to store, manage and process rules set by buyers and sellers and to ensure the quality and integrity of the results delivered to sellers and advertisers through our solution. If we fail to properly implement or honor rules established by buyers and sellers, improper advertisements may be placed through our platform, which can result in harm to our reputation as well as the need to pay refunds and potential legal liabilities.

***Economic downturns and market conditions beyond our control could adversely affect our business, results of operations and financial condition.***

Our business depends on the overall demand for advertising and on the economic health of advertisers and publishers that benefit from our platform. Economic downturns or unstable market conditions, such as those potentially created by high price inflation, increasing interest rates and the lingering effects of COVID-19, or geopolitical instability, such as those potentially created by Russia's invasion of Ukraine, may cause advertisers to decrease their advertising budgets, which could reduce spend though our platform and adversely affect our business, results of operations, and financial condition. As we explore new countries into which we can expand our business, economic downturns or unstable market conditions in any of those countries could result in our investments not yielding the returns we anticipate. Additionally, actual events involving limited liquidity, defaults, non-performance or other adverse developments that affect financial institutions, transactional counterparties or other companies in the financial services industry or the financial services industry generally, or concerns or rumors about any events of these kinds or other similar risks, have recently and may in the future lead to market-wide liquidity problems, which could also lead advertisers to decrease their advertising budgets and/or reduce their spend though our platform. This uncertainty regarding liquidity concerns in the financial services industry could adversely impact our business, our business partners, or industry as a whole in ways that we cannot predict at this time.

***We have identified a material weakness in our internal control over financial reporting related to our controls over the completeness of revenue, which could, if not remediated, result in material misstatements in our financial statements.***

The Company is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934. As disclosed in Item 9A of this Annual Report on Form 10-K, the Company identified a material weakness in its internal control over the completeness of revenue. A material weakness is defined as a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. As a result of this material weakness, the Company concluded that its internal control over the completeness of revenue was not effective as of December 31, 2022.

The Company has begun the process of designing and implementing effective internal control measures to improve its internal controls over the completeness of revenue and remediate this material weakness. If these remedial measures are insufficient to address the material weakness, or if additional material weaknesses or significant deficiencies in the Company's internal control over financial reporting are discovered or occur in the future, the Company's consolidated financial statements may contain material misstatements, and the Company could be required to restate its financial results. In addition, if we are unable to successfully remediate the material weakness, our ability to produce timely and accurate financial statements, comply with applicable laws and regulations will be impaired. If we are unable to report our results in a timely and accurate manner, we may not be able to comply with the applicable covenants in our financing arrangements and may be required to seek additional amendments and waivers under these financing arrangements, which could adversely impact our liquidity and financial condition. Failure to produce timely and accurate financial statements could also impair our access to the capital markets and/or materially and adversely impact the trading price of our Class A common stock.

Appx. B-016

Table of Contents

Furthermore, as we grow our business, our disclosure controls and internal controls will become more complex, and we may require significantly more resources to ensure the effectiveness of these controls. If we are unable to continue upgrading our financial and management controls, reporting systems, information technology and procedures in a timely and effective fashion, we may need to devote additional management and other resources to assist in compliance with the disclosure and financial reporting requirements and other rules that apply to reporting companies, which could adversely affect our business, prospects, financial condition and results of operations.

***We may be required to delay recognition of some of our revenue, which may harm our financial results in any given period.***

We may be required to delay recognition of revenue for a significant period of time after entering into an agreement due to a variety of factors, including, among other things, whether:

- the transaction involves both current products and products that are under development;

- the customer requires significant modifications, configurations or complex interfaces that could delay delivery or acceptance of our products;

- the transaction involves acceptance criteria or other terms that may delay revenue recognition; or

- the transaction involves performance milestones or payment terms that depend upon contingencies.

Because of these factors and other specific revenue recognition requirements under the generally accepted accounting principles ("GAAP"), we must have very precise terms in our contracts to recognize revenue when we initially provide access to our platform or other products. Although we strive to enter into agreements that meet the criteria under GAAP for current revenue recognition on delivered performance obligations, our agreements are often subject to negotiation and revision based on the demands of our customers. The final terms of our agreements sometimes result in deferred revenue recognition, which may adversely affect our financial results in any given period. In addition, more customers may require extended payment terms, shorter term contracts or alternative licensing arrangements that could reduce the amount of revenue we recognize upon delivery of our other products and could adversely affect our short-term financial results.

Furthermore, the presentation of our financial results requires us to make estimates and assumptions that may affect revenue recognition. In some instances, we could reasonably use different estimates and assumptions, and changes in estimates are likely to occur from period to period. Accordingly, actual results could differ significantly from our estimates.

***Our credit facilities subject us to operating restrictions and financial covenants that impose risk of default and may restrict our business and financing activities.***

Our credit facilities subject us to certain financial ratio and liquidity covenants, as well as restrictions that limit our ability, among other things, to:

- dispose of or sell our assets;

- engage in any business other than our current business and substantially similar businesses;

- consolidate or merge with other entities;

- incur additional indebtedness;

- create liens on our assets except as otherwise permitted under the credit facilities;

- pay certain dividends;

**Appx. B-017**

Table of Contents

- directly and indirectly make investments other than as permitted under the credit facilities;

- directly and indirectly enter into transactions with affiliates; and

- make any payment on or redeem subordinated indebtedness.

These covenants may restrict our ability to finance our operations and to pursue our business activities and strategies. Our ability to comply with these covenants may be affected by events beyond our control. If a default were to occur and is not waived, such default could cause, among other remedies, all of the outstanding indebtedness under our credit facilities to become immediately due and payable. In such an event, our liquid assets might not be sufficient to meet our repayment obligations, and we might be forced to liquidate collateral assets at unfavorable prices or our assets may be foreclosed upon and sold at unfavorable valuations.

Our ability to renew our existing term credit facility with Lafayette Square Loan Servicing, LLC, which matures on December 3, 2026, or to enter into a new revolving credit facility may be limited due to various factors, including the status of our business, global credit market conditions and perceptions of our business or industry by sources of financing. In addition, if credit is available, lenders may seek more restrictive covenants and higher interest rates that may reduce our borrowing capacity, increase our costs and reduce our operating flexibility.

If we do not have or are unable to generate sufficient cash available to repay our debt obligations when they become due and payable, either upon maturity or in the event of a default, we may not be able to obtain additional debt or equity financing on favorable terms, if at all. Our inability to obtain financing may negatively impact our ability to operate and continue our business as a going concern.

***Our business is subject to the risk of catastrophic events such as pandemics, earthquakes, flooding, fire and power outages, and to interruption by man-made problems such as terrorism.***

Our business is vulnerable to damage or interruption from pandemics, earthquakes, flooding, fire, power outages, telecommunications failures, terrorist attacks, acts of war, human errors, break-ins and similar events. A significant natural disaster could have a material adverse effect on our business, results of operations and financial condition, and our insurance coverage may be insufficient to compensate us for losses that may occur. In addition, acts of terrorism could cause disruptions in our or our publishers' and partners' businesses or the economy as a whole. Our servers may also be vulnerable to computer viruses, break-ins, denial-of-service attacks and similar disruptions from unauthorized tampering with our computer systems, which could lead to interruptions, delays and the loss of critical data. We may not have sufficient protection or recovery plans in some circumstances. As we rely heavily on our data center facilities, computer and communications systems and the internet to conduct our business and provide high-quality customer service, these disruptions could negatively impact our ability to run our business and either directly or indirectly disrupt publishers' and partners' businesses, which could have an adverse effect on our business, results of operations, and financial condition.

***Unfavorable publicity and negative public perception about our industry, particularly concerns regarding data privacy and security relating to our industry's technology and practices, and perceived failure to comply with laws and industry self-regulation, could adversely affect our business and operating results.***

With the growth of digital advertising, there is increasing awareness and concern among the general public, privacy advocates, mainstream media, governmental bodies and others regarding marketing, advertising and data privacy matters, particularly as they relate to individual privacy interests and the global reach of the online marketplace. Concerns about industry practices with regard to the collection, use and disclosure of personal information, whether or not valid and whether driven by applicable laws and regulations, industry standards, customer or inventory provider expectations, or the broader public, may harm our reputation, result in loss of goodwill and inhibit the use of our platform by current and future customers. Any unfavorable publicity or negative public perception about us, our industry, including our competitors, or even other data-focused industries, can affect our business and results of operations, and may lead to digital publishers or our customers changing their business practices or additional regulatory scrutiny or lawmaking that affects us or our industry. For example, in recent years, consumer advocates, mainstream media and elected officials have increasingly and publicly criticized the data and marketing industry for its collection, storage and use of personal data. Additional public

Table of Contents

scrutiny may lead to general distrust of our industry, consumer reluctance to share and permit use of personal data, increased consumer opt-out rates or increased private class actions, any of which could negatively influence, change or reduce our current and prospective customers' demand for our products and services, subject us to liability and adversely affect our business and operating results.

***Our management team has limited experience managing a public company.***

Most members of our management team have limited or no experience managing a publicly-traded company, interacting with public company investors, and complying with the increasingly complex laws, rules and regulations that govern public companies. There are significant obligations to which we are now subject relating to reporting, procedures and internal controls, and our management team may not successfully or efficiently manage such obligations. These new obligations and added scrutiny require significant attention from our management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, operating results and financial condition. We expect that compliance with these requirements will increase our compliance costs. We have hired and engaged outsourced additional accounting staff and tax personnel with appropriate public company experience and technical accounting knowledge, and may hire or contract for more personnel in the future. We cannot predict or estimate the amount of additional costs we may incur as a result of being a public company or the timing of these costs.

***We are subject to payment-related risks and, if our clients do not pay or dispute their invoices, our business, financial condition and operating results may be adversely affected.***

Many of our contracts with advertising agencies provide that if the advertiser does not pay the agency, the agency is not liable to us, and we must seek payment solely from the advertiser. Contracting with these agencies, which in some cases have or may develop higher-risk credit profiles, may subject us to greater credit risk than if we were to contract directly with advertisers. This credit risk may vary depending on the nature of an advertising agency's aggregated advertiser base. We may also be involved in disputes with agencies and their advertisers over the operation of our platform, the terms of our agreements or our billings for purchases made by them through our platform. If we are unable to collect or make adjustments to bills to clients, we could incur write-offs for bad debt, which could have a material adverse effect on our results of operations for the periods in which the write-offs occur. In the future, bad debt may exceed reserves for such contingencies and our bad debt exposure may increase over time. Any increase in write-offs for bad debt could have a materially negative effect on our business, results of operations, and financial condition. Even if we are not paid by our clients on time or at all, we are still obligated to pay for the advertising we have purchased for the advertising campaign, and as a consequence, our results of operations and financial condition would be adversely impacted.

Furthermore, we are generally contractually required to pay suppliers of advertising inventory and data within a negotiated period of time, regardless of whether our customers pay us on time, or at all. While we attempt to negotiate long payment periods with our suppliers and shorter periods from our customers, we are not always successful. As a result, our accounts payable are often due on shorter cycles than our accounts receivables, requiring us to remit payments from our own funds, and accept the risk of bad debt.

***Our revenue and operating results are highly dependent on the overall demand for advertising. Factors that affect the amount of advertising spending, such as economic downturns and seasonality, particularly in the second and third quarters of our fiscal year, can make it difficult to predict our revenue and could adversely affect our business.***

Our business depends on the overall demand for advertising and on the economic health of our current and prospective sellers and advertisers. If advertisers reduce their overall advertising spending, our revenue and results of operations are directly affected. For Colossus SSP, many advertisers devote a disproportionate amount of their advertising budgets to the third and fourth quarters of the calendar year to coincide with the annual holiday purchasing season, and buyers may spend more in the second and third quarters for seasonality and budget reasons. As a result, if any events occur to reduce the amount of advertising spending during the second, third or fourth quarters, or reduce the amount of inventory available to advertisers during that period, it could have a disproportionate adverse effect on our revenue and operating results for that fiscal year. Economic downturns or instability in political or market conditions generally may cause current or new advertisers to reduce their advertising budgets. Reductions in inventory due to loss of sellers would make our solution less robust and attractive to buyers. Adverse economic conditions and general uncertainty about economic recovery are likely

Table of Contents

to affect our business prospects. In particular, uncertainty regarding the impacts of inflation, increasing interest rates and the war in Ukraine on the economy in the United States may cause general business conditions in the United States and elsewhere to deteriorate or become volatile, which could cause advertisers to delay, decrease or cancel purchases of our solution, and expose us to increased credit risk on advertiser orders. Moreover, any changes in the favorable tax treatment of advertising expenses and the deductibility thereof would likely cause a reduction in advertising demand.

***If the non-proprietary technology, software, products and services that we use are unavailable, have future terms we cannot agree to, or do not perform as we expect, our business, results of operations and financial condition could be harmed.***

We depend on various technology, software, products and services from third parties or available as open source, including for critical features and functionality of our platform and technology, payment processing, payroll and other professional services. Identifying, negotiating, complying with and integrating with third-party terms and technology are complex, costly and time-consuming matters. Failure by third-party providers to maintain, support or secure their technology either generally or for our accounts specifically, or downtime, errors or defects in their products or services, could materially and adversely impact our platform, our administrative obligations or other areas of our business. Having to replace any third-party providers or their technology, products or services could result in outages or difficulties in our ability to provide our services, which could have a material adverse effect on our business, results of operations and financial condition.

***If the use of third-party "cookies," mobile device IDs or other tracking technologies is restricted without similar or better alternatives, our platform's effectiveness could be diminished and our business, results of operations, and financial condition could be adversely affected.***

We use "cookies," which are small text files placed on consumer devices when an internet browser is used, and mobile device identifiers, to gather data that enables our platform to be more effective. Our cookies and mobile device IDs do not identify consumers directly, but record information such as when a consumer views or clicks on an advertisement, when a consumer uses a mobile app, the consumer's location, consumer demographic, psychographic interest and browser or other device information. Publishers and partners may also choose to share their information about consumers' interests or give us permission to use their cookies and mobile device IDs. We use data from cookies, mobile device IDs, and other tracking technologies to help advertisers decide whether to bid on, and how to price, an ad impression in a certain location, at a given time or for a particular consumer. Without cookies, mobile device IDs and other tracking technology data, transactions processed through our platform would be executed with less insight into consumer activity, reducing the precision of advertisers' decisions about which impressions to purchase for an advertising campaign. This could make placement of advertising through our platform less valuable and harm our revenue. If our ability to use cookies, mobile device IDs or other tracking technologies is limited, we may be required to develop or obtain additional applications and technologies to compensate for the lack of cookies, mobile device IDs and other tracking technology data, which could be time consuming or costly to develop, less effective and subject to additional regulation.

Some consumers also download free or paid "ad blocking" software on their computers or mobile devices, not only for privacy reasons, but also to counteract the adverse effect advertisements can have on the consumer experience, including increased load times, data consumption and screen overcrowding. Ad- blocking technologies and other global privacy controls may prevent some third-party cookies, or other tracking technologies, from being stored on a consumer's computer or mobile device. If more consumers adopt these measures, our business, results of operations, and financial condition could be adversely affected. Ad-blocking technologies could have an adverse effect on our business, results of operations and financial condition if they reduce the volume or effectiveness and value of advertising. In addition, some ad-blocking technologies block only ads that are targeted through use of third-party data, while allowing ads based on first-party data (i.e., data owned by the publisher). These ad blockers could place us at a disadvantage because we rely on third-party data, while some large competitors have a significant amount of first-party data they use to direct advertising. Other technologies allow ads that are deemed "acceptable," which could be defined in ways that place us or our publishers at a disadvantage, particularly if such technologies are controlled or influenced by our competitors. Even if ad blockers do not ultimately have an adverse effect on our business, investor concerns about ad blockers could cause our stock price to decline.

25

Table of Contents

Additionally, in July 2022, Alphabet Inc.'s Google subsidiary ("Alphabet") announced that it would delay its Chrome web browser timeline for the depreciation of cookies to 2024. In March 2021, Alphabet announced that it would not build alternate identifiers to track individuals as they browse across the web, nor would Google use them in its products. These changes, and other privacy controls that may be put in place by other web companies in the future, have the potential to have an adverse effect on our business, results of operations, and financial condition if they reduce the volume or effectiveness and value of advertising.

***Market pressure may reduce our revenue per impression.***

Our revenue may be affected by market changes, new demands by publishers and buyers, removal of cookies usage from the existing value chain, new solutions and competitive pressure. Our solutions may be priced too high or too low, either of which may carry adverse consequences. We may receive requests from publishers for discounts, fee revisions, rebates and refunds, or from DSPs, agencies and advertisers for volume discounts, fee revisions and rebates. Any of these developments could adversely affect our business, results of operations or financial condition. Any failure for our pricing approaches to gain acceptance could adversely affect our business, results of operations and financial condition.

***We face potential liability and harm to our business based on the human factor of inputting information into our platform.***

We or our customers set up campaigns on our platform using a number of available variables. While our platform includes several checks and balances, it is possible for human error to result in significant over- spending. We offer a number of protections such as daily or overall spending caps. However, despite these protections, the risk of overspend exists. For example, campaigns which last for a period of time can be set to pace evenly or as quickly as possible. If a customer with a high credit limit enters an incorrect daily cap with a campaign set to a rapid pace, it is possible for a campaign to accidently go significantly over budget. Our potential liability for such errors may be higher when they occur in situations in which we are executing purchases on behalf of a customer rather than the customer using the self-service feature of our platform. While our customer contracts state that customers are responsible for media purchased through our platform, we are ultimately responsible for paying the inventory providers and we may be unable to collect when such errors occur.

***If we are unable to successfully execute our strategies and continue to develop and sell the services and solutions our customers demand, our business, results of operations and financial condition may suffer.***

We must adapt to rapidly changing customer demands and preferences in order to successfully execute our strategies. This requires us to anticipate and respond to customer demands and preferences, address business model shifts, optimize our go-to-market execution by improving our cost structure, align sales coverage with strategic goals, improve channel execution and strengthen our services and capabilities in our areas of strategic focus. Any failure to successfully execute our strategies, including any failure to invest in strategic growth areas, could adversely affect our business, financial condition and results of operations.

***We have a limited operating history and, as a result, our past results may not be indicative of future operating performance.***

We have a limited operating history with the current scale of our business, which makes it difficult to forecast our future results. You should not rely on our past quarterly or annual results of operations as indicators of future performance. You should consider and evaluate our prospects in light of the risks and uncertainty frequently encountered by companies like ours.

***The loss, modification or delay of large or multiple contracts may negatively impact our financial performance.***

Our contracts have generally been for terms of relatively short duration. Additionally, our clients generally will have the ability to delay the execution of services, reduce the number of hours that services require, and terminate their contracts with us upon a short notice for convenience and upon the occurrence of certain defined events, such as "for cause." The loss or delay of a large contract or multiple contracts could adversely and materially affect our operating results.

26

Table of Contents

***Our buy-side clients include destination marketing organizations ("DMOs"), which often operate as public/private partnerships involving a national, provincial, state and local governmental entity.***

Our work for DMOs carries various risks inherent in the government contracting process. These risks include, but are not limited to, the following:

- Government entities typically fund projects through appropriated monies and demand is affected by public sector budgetary cycles and funding authorizations. While these projects are often planned and executed as multi-year projects, government entities usually reserve the right to change the scope of or terminate these projects for lack of approved funding and/or at their convenience, which also could limit our recovery of incurred costs, reimbursable expenses and profits on work completed prior to the termination.

- Government contracts are subject to heightened reputational and contractual risks compared to contracts with commercial clients. For example, government contracts and the proceedings surrounding them are often subject to more extensive scrutiny and publicity. Negative publicity, including an allegation of improper or illegal activity, regardless of its accuracy, or challenges to government contracts awarded to us, may adversely affect our reputation.

- Government contracts can be challenged by other interested parties and such challenges, even if unsuccessful, can increase costs, cause delays and defer project implementation and revenue recognition.

- Terms and conditions of government contracts also tend to be more onerous and difficult to negotiate. For example, these contracts often contain high liability for breaches and feature less favorable payment terms and sometimes require us to take on liability for the performance of third parties.

- Political and economic factors such as pending elections, the outcome of elections, changes in leadership among key executive or legislative decision makers, revisions to governmental tax or other policies and reduced tax revenues can affect the number and terms of new government contracts signed or the speed at which new contracts are signed, decrease future levels of spending and authorizations for programs that we bid, shift spending priorities to programs in areas for which we do not provide services and/or lead to changes in enforcement or how compliance with relevant rules or laws is assessed.

- If a government client discovers improper or illegal activities during audits or investigations, we may become subject to various civil and criminal penalties, including those under the civil U.S. False Claims Act and administrative sanctions, which may include termination of contracts, forfeiture of profits, suspension of payments, fines and suspensions or debarment from doing business with other agencies of that government. The inherent limitations of internal controls may not prevent or detect all improper or illegal activities.

- U.S. government contracting regulations impose strict compliance and disclosure obligations. Disclosure is required if certain company personnel have knowledge of "credible evidence" of a violation of federal criminal laws involving fraud, conflict of interest, bribery or improper gratuity, a violation of the civil U.S. False Claims Act or receipt of a significant overpayment from the government. Failure to make required disclosures could be a basis for suspension and/or debarment from federal government contracting in addition to breach of the specific contract and could also impact contracting beyond the U.S. federal level. Reported matters also could lead to audits or investigations and other civil, criminal or administrative sanctions.

The occurrences or conditions described above could affect not only our business with the DMOs and related government entities involved, but also our business with other entities of the same or other governmental bodies or with certain commercial clients and could have a material and adverse effect on our business, results of operations, and financial condition.

27

Appx. B-022

Table of Contents

***We invest significantly in development, and to the extent our development investments do not translate into new solutions or material enhancements to our current solutions, or if we do not use those investments efficiently, our business and results of operations would be harmed.***

A key element of our strategy is to invest significantly in our development efforts to improve and develop our software and the features and functionality for our platform. If we do not spend our development budget efficiently or effectively, our business may be harmed and we may not realize the expected benefits of our strategy. Moreover, development projects can be technically challenging, time-consuming and expensive. The nature of these development cycles may cause us to experience delays between the time we incur expenses associated with development and the time we are able to offer compelling platform updates and generate revenue, if any, from such investment. Additionally, anticipated enterprise demand for solutions we are developing could decrease after the development cycle has commenced, and we would nonetheless be unable to avoid substantial costs associated with the development of any such solutions. If we expend a significant amount of resources on development and our efforts do not lead to the successful introduction or improvement of solutions that are competitive in our current or future markets, our business and results of operations would be adversely affected.

***We must provide value to both publishers and buyers of advertising without being perceived as favoring one over the other or being perceived as competing with them through our service offerings.***

We provide a platform that intermediates between publishers seeking to sell advertising space and buyers seeking to purchase that space. If we were to be perceived as favoring one side of the transaction to the detriment of the other, or presenting a competitive challenge to their own businesses, demand for our platform from publishers or buyers would decrease and our business, results of operations and financial condition would be adversely affected.

***Future acquisitions or strategic investments could be difficult to identify and integrate, divert the attention of management, and could disrupt our business, dilute stockholder value and adversely affect our business, results of operations and financial condition.***

As part of our growth strategy, we may acquire or invest in other businesses, assets or technologies that are complementary to and fit within our strategic goals. Any acquisition or investment may divert the attention of management and require us to use significant amounts of cash, issue dilutive equity securities or incur debt. In addition, the anticipated benefits of any acquisition or investment may not be realized, and we may be exposed to unknown risks, any of which could adversely affect our business, results of operations and financial condition, including risks arising from:

- difficulties in integrating the operations, technologies, product or service offerings, administrative systems and personnel of acquired businesses, especially if those businesses operate outside of our core competency or geographies in which we currently operate;

- ineffectiveness or incompatibility of acquired technologies or solutions;

- potential loss of key employees of the acquired business;

- inability to maintain key business relationships and reputation of the acquired business;

- diversion of management attention from other business concerns;

- litigation arising from the acquisition or the activities of the acquired business, including claims from terminated employees, customers, former stockholders or other third parties;

- assumption of contractual obligations that contain terms that are not beneficial to us, require us to license or waive intellectual property rights, or increase our risk of liability;

- complications in the integration of acquired businesses or diminished prospects;

28

Table of Contents

- failure to generate the expected financial results related to an acquisition on a timely manner or at all; and

- failure to accurately forecast the impact of an acquisition transaction; and implementation or remediation of effective controls, procedures, and policies for acquired businesses.

To fund future acquisitions, we may pay cash or issue additional shares of our Class A common stock or securities convertible into or exchangeable for shares of our Class A common stock, which could dilute our stockholders or diminish our cash reserves. Borrowing to fund an acquisition would result in increased fixed obligations and could also subject us to covenants or other restrictions that could limit our ability to effectively run our business.

**Risks Related to Legal and Regulatory Matters**

***Our business is subject to numerous legal and regulatory requirements and any violation of these requirements or any misconduct by our employees, subcontractors, agents or business partners could harm our business and reputation.***

In addition to government contract procurement laws and regulations, we are subject to numerous other federal, state and foreign legal requirements on matters as diverse as data privacy and protection, employment and labor relations, immigration, taxation, anti-corruption, import/export controls, trade restrictions, internal and disclosure control obligations, securities regulation and anti-competition. Compliance with diverse and changing legal requirements is costly, time-consuming and requires significant resources. Violations of one or more of these requirements in the conduct of our business could result in significant fines and other damages, criminal sanctions against us or our officers, prohibitions on doing business and damage to our reputation. Violations of these regulations or contractual obligations related to regulatory compliance in connection with the performance of customer contracts could also result in liability for significant monetary damages, fines and/or criminal prosecution, unfavorable publicity and other reputational damage, restrictions on our ability to compete for work and allegations by our customers that we have not performed our contractual obligations.

Misconduct by our employees, subcontractors, agents or business partners could subject us to fines and penalties, restitution or other damages, loss of security clearance, loss of current and future customer contracts and suspension or debarment from contracting with federal, state or local government agencies, any of which could adversely affect our business, financial condition and results of operations. Such misconduct could include fraud or other improper activities such as falsifying time or other records, failure to comply with our policies and procedures or violations of applicable laws and regulations.

***Changes in legislative, judicial, regulatory or cultural environments relating to information collection, use and processing may limit our ability to collect, use and process data. Such developments could cause revenue to decline, increase the cost of data, reduce the availability of data and adversely affect the demand for our products and services.***

We receive, store and process personal information and other data from and about consumers in addition to personal information and other data from and about our customers, employees and services providers. Our handling of this data is subject to a wide variety of federal, state and foreign laws and regulations and is subject to regulation by various government authorities and consumer actions. Our data handling is also subject to contractual obligations and may be deemed to be subject to industry standards.

The U.S. federal and various state and foreign governments have adopted or proposed laws relating to the collection, disclosure, processing, use, storage and security of data relating to individuals and households, including the use of contact information and other data for marketing, advertising and other communications with individuals and businesses. In the U.S., various laws and regulations apply to the collection, disclosure, processing, use, storage and security of certain types of data. Additionally, the FTC, many state attorneys general and many courts are interpreting federal and state consumer protection laws as imposing standards for the collection, disclosure, process, use, storage and security of data. The regulatory framework for data privacy issues worldwide is complex, continually evolving and often conflicting, and is likely to remain uncertain for the foreseeable future. The occurrence of unanticipated events often rapidly drives the adoption of legislation or regulation affecting the use, collection or other processing of data and manner in which we conduct our business. As a result, further restrictions could be placed upon the collection, disclosure, processing, use,

29

# Exhibit 3

Appx. B-025

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): April 17, 2024

# Direct Digital Holdings, Inc.
**(Exact name of registrant as specified in its charter)**

| Delaware | 001-41261 | 87-2306185 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 1177 West Loop South, Suite 1310 Houston, Texas | 77027 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (832) 402-1051

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A common stock, par value $0.001 per share | DRCT | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (the "Exchange Act") (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 3.01      Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

On April 17, 2024, Direct Digital Holdings, Inc. (the "Company") received a notice (the "Notice") from the Listing Qualifications Department of the Nasdaq Stock Market LLC ("Nasdaq"), which indicated that, as a result of the Company's delay in filing its Annual Report on Form 10-K for the year ended December 31, 2023 (the "Form 10-K") by the applicable due date, the Company was not in compliance with Nasdaq Listing Rule 5250(c)(1) (the "Rule"), which requires Nasdaq-listed companies to timely file all required periodic financial reports with the U.S. Securities and Exchange Commission (the "SEC").

The Notice states that the Company has 60 calendar days from the date of the Notice, or until June 16, 2024, to submit to Nasdaq a plan to regain compliance with the Rule. If Nasdaq accepts the Company's plan to regain compliance, then Nasdaq may grant the Company up to 180 calendar days from the prescribed due date of the Form 10-K, or until October 14, 2024, to file the Form 10-K to regain compliance; however, there can be no assurance that these events will occur.

Neither the Notice nor the Company's noncompliance with the Rule has an immediate effect on the listing or trading of the Company's securities on Nasdaq, which will continue to trade on The Nasdaq Capital Market under the symbol "DRCT." The Company continues to work diligently to complete the Form 10-K and plans to file the same as promptly as possible to regain compliance with the Rule.

**Item 4.01      Changes in Registrant's Certifying Accountant.**

On April 17, 2024, Marcum LLP ("Marcum"), the Company's independent registered public accounting firm, notified the Company and the Audit Committee of the Company's board of directors (the "Audit Committee") of Marcum's decision to resign as the independent registered public accounting firm of the Company, effective immediately. Although their audit was not designed to identify or detect violations of law or fraud, Marcum's resignation was not a result of any violation of law or fraud of the Company identified during its audit procedures to date.

The reports of Marcum on the Company's consolidated financial statements as of and for the fiscal years ended December 31, 2022 and 2021 did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.

Additionally, during the fiscal years ended December 31, 2022 and 2021, as well as subsequent interim periods preceding Marcum's resignation, there were no "disagreements" (as that term is described in Item 304(a)(1)(iv) of Regulation S-K and related instructions) between the Company and Marcum with respect to any matter relating to accounting principles or practices, financial statement disclosure or auditing scope or procedures which, if not resolved to the satisfaction of Marcum, would have caused Marcum to make reference to the subject matter of the disagreements in its reports on the Company's consolidated financial statement with respect to such periods, and there were no "reportable events" (as that term is defined in Item 304(a)(1)(v) of Regulation S-K and the related instructions), except for the material weakness identified in the Company's internal controls over completeness of revenue that existed as of December 31, 2022, which was previously disclosed in Item 9A of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022 and which was discussed between the Audit Committee and Marcum.

The Company and the Audit Committee are actively seeking a new independent registered public accounting firm and intend to engage a firm as soon as practicable to complete the audit and file the Form 10-K. However, there can be no assurance as to the timing of such engagement or subsequent completion of any audit. The Company expects to authorize Marcum to respond fully to the inquiries of the successor independent accounting firm once engaged, including related to prior years' audits and the identified material weakness described above.

The Company has provided Marcum with a copy of this Current Report on Form 8-K prior to its filing with the SEC and requested that Marcum furnish the Company with a letter addressed to the SEC stating whether or not Marcum agrees with the above disclosures in this Item 4.01. A copy of the letter from Marcum dated April 23, 2024 is attached hereto as Exhibit 16.1.

---

**Item 7.01      Regulation FD Disclosure.**

On April 23, 2024, the Company issued a press release in accordance with Nasdaq Listing Rule 5810(b) announcing that the Company had received the Notice. A copy of the press release is attached hereto as Exhibit 99.1.

The information under this Item 7.01 of this Current Report on Form 8-K, including Exhibit 99.1, is being furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that Section. The information under this Item 8.01 of this Current Report on Form 8-K shall not be incorporated by reference into any filing under the Securities Act of 1933, as amended, except as shall otherwise be expressly set forth by specific reference in such filing.

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Current Report on Form 8-K may contain forward-looking statements within the meaning of federal securities laws that are subject to certain risks, trends and uncertainties.

As used below, "we," "us," and "our" refer to the Company. We use words such as "could," "would," "may," "might," "will," "expect," "likely," "believe," "continue," "anticipate," "estimate," "intend," "plan," "project" and other similar expressions to identify forward-looking statements, but not all forward-looking statements include these words. All of our forward-looking statements involve estimates and uncertainties that could cause actual results to differ materially from those expressed in or implied by the forward-looking statements. Accordingly, any such statements are qualified in their entirety by reference to the information described under the caption "Risk Factors" and elsewhere in our most recent Annual Report on Form 10-K (the "Form 10-K") and subsequent periodic and or current reports filed with the Securities and Exchange Commission.

The forward-looking statements contained in this Current Report on Form 8-K are based on assumptions that we have made in light of our industry experience and our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this Current Report on Form 8-K, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties (many of which are beyond our control) and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual operating and financial performance and cause our performance to differ materially from the performance expressed in or implied by the forward-looking statements. We believe these factors include, but are not limited to, the following: the restrictions and covenants imposed upon us by our credit facilities; our ability to secure additional financing to meet our capital needs; any significant fluctuations caused by our high customer concentration; risks related to non-payment by our clients; reputational and other harms caused by our failure to detect advertising fraud; operational and performance issues with our platform, whether real or perceived, including a failure to respond to technological changes or to upgrade our technology systems; restrictions on the use of third-party "cookies," mobile device IDs or other tracking technologies, which could diminish our platform's effectiveness; unfavorable publicity and negative public perception about our industry, particularly concerns regarding data privacy and security relating to our industry's technology and practices, and any perceived failure to comply with laws and industry self-regulation; our failure to manage our growth effectively; the difficulty in identifying and integrating any future acquisitions or strategic investments; any changes or developments in legislative, judicial, regulatory or cultural environments related to information collection, use and processing; challenges related to our buy-side clients that are destination marketing organizations and that operate as public/private partnerships; any strain on our resources or diversion of our management's attention as a result of being a public company; the intense competition of the digital advertising industry and our ability to effectively compete against current and future competitors; any significant inadvertent disclosure or breach of confidential and/or personal information we hold, or of the security of our or our customers', suppliers' or other partners' computer systems; as a holding company, we depend on distributions from Direct Digital Holdings, LLC ("DDH LLC") to pay our taxes, expenses (including payments under the Tax Receivable Agreement) and any amount of any dividends we may pay to the holders of our common stock; the fact that DDH LLC is controlled by DDM, whose interest may differ from those of our public stockholders; any risks associated with the material weakness that was identified in our review of internal control over financial reporting as of December 31, 2022; any failure by us to maintain or implement effective internal controls or to detect fraud; our ability to engage an independent registered public accounting firm and complete the audit of our financial statements for the fiscal year ended December 31, 2023; and other factors and assumptions discussed in our Form 10-K and subsequent periodic and current reports we may file with the SEC. Should one or more of these risks or uncertainties materialize, or should any of these assumptions prove to be incorrect, our actual operating and financial performance may vary in material respects from the performance projected in these forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and except as required by law, we undertake no obligation to update any forward-looking statement contained in this Current Report on Form 8-K to reflect events or circumstances after the date on which it is made or to reflect the occurrence of anticipated or unanticipated events or circumstances. New factors that could cause our business not to develop as we expect emerge from time to time, and it is not possible for us to predict all of them. Further, we cannot assess the impact of each currently known or new factor on our results of operations or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

**Item 9.01**       **Financial Statements and Exhibits.**

(d) Exhibits

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 16.1 | Letter from Marcum LLP to the Securities and Exchange Commission, dated April 23, 2024. |
| 99.1 | Press Release, dated April 23, 2024. |
| 104 | Cover Page Interactive Data File, formatted in Inline Extensible Business Reporting Language (iXBRL). |

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

April 23, 2024                                                **Direct Digital Holdings, Inc.**
(Date)                                                                    (Registrant)

                                                                  /s/ Diana P. Diaz
                                                                 Diana P. Diaz
                                                           *Chief Financial Officer*

**Exhibit 16.1**

April 23, 2024

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

Commissioners:

We have read the statements made by Direct Digital Holdings, Inc. under Item 4.01 of its Form 8-K dated April 17, 2024. We agree with the statements concerning our Firm in such Form 8-K; we are not in a position to agree or disagree with other statements contained therein.

Very truly yours,

/s/ Marcum LLP

Marcum LLP
Houston, Texas

---

**Appx. B-031**

Exhibit 99.1



**Direct Digital Holdings Announces Receipt of**
**Nasdaq Notification of Non-Compliance with Listing Rule 5250(c)(1)**

**Houston, April 23, 2024** - Today, Direct Digital Holdings, Inc. (the "Company") reported that as a result of requiring additional time to complete the audit of its financial statements, on April 17, 2024 it received a notice (the "Notice") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that it was not in compliance with requirements of Nasdaq Listing Rule 5250(c)(1) (the "Rule") as a result of not having timely filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2023 (the "Annual Report") with the Securities and Exchange Commission (the "SEC").

Pursuant to the Nasdaq Listing Rules and the Notice, the Company has been afforded 60 calendar days, or until June 16, 2024, to submit a plan to regain compliance. If Nasdaq accepts the compliance plan, the Nasdaq staff may grant the Company an exception of up to 180 calendar days from the filing's due date, or until October 14, 2024, to regain compliance.

Neither the Notice nor the Company's non-compliance with the Rule has an immediate effect on the listing or trading of the Company's securities on Nasdaq, which will continue to trade on The Nasdaq Capital Market under the symbol "DRCT." The Company is actively working to complete the audit and file the Annual Report to regain compliance with the Rule.

**About Direct Digital Holdings**

Direct Digital Holdings (Nasdaq: DRCT), owner of operating companies Colossus SSP, Huddled Masses, and Orange 142, brings state-of-the-art sell- and buy-side advertising platforms together under one umbrella company. Direct Digital Holdings' sell-side platform, Colossus SSP, offers advertisers of all sizes extensive reach within general market and multicultural media properties. The Company's subsidiaries Huddled Masses and Orange142 deliver significant ROI for middle market advertisers by providing data-optimized programmatic solutions at scale for businesses in sectors that range from energy to healthcare to travel to financial services. Direct Digital Holdings' sell- and buy-side solutions manage on average over 125,000 clients monthly, generating over 300 billion impressions per month across display, CTV, in-app and other media channels.

**Cautionary Note Regarding Forward-Looking Statements**

This press release may contain forward-looking statements within the meaning of federal securities laws that are subject to certain risks, trends and uncertainties.

As used below, "we," "us," and "our" refer to the Company. We use words such as "could," "would," "may," "might," "will," "expect," "likely," "believe," "continue," "anticipate," "estimate," "intend," "plan," "project" and other similar expressions to identify forward-looking statements, but not all forward-looking statements include these words. All of our forward-looking statements involve estimates and uncertainties that could cause actual results to differ materially from those expressed in or implied by the forward-looking statements. Accordingly, any such statements are qualified in their entirety by reference to the information described under the caption "Risk Factors" and elsewhere in our most recent Annual Report on Form 10-K (the "Form 10-K") and subsequent periodic and or current reports filed with the Securities and Exchange Commission.

---

The forward-looking statements contained in this press release are based on assumptions that we have made in light of our industry experience and our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this press release, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties (many of which are beyond our control) and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual operating and financial performance and cause our performance to differ materially from the performance expressed in or implied by the forward-looking statements. We believe these factors include, but are not limited to, the following: the restrictions and covenants imposed upon us by our credit facilities; our ability to secure additional financing to meet our capital needs; any significant fluctuations caused by our high customer concentration; risks related to non-payment by our clients; reputational and other harms caused by our failure to detect advertising fraud; operational and performance issues with our platform, whether real or perceived, including a failure to respond to technological changes or to upgrade our technology systems; restrictions on the use of third-party "cookies," mobile device IDs or other tracking technologies, which could diminish our platform's effectiveness; unfavorable publicity and negative public perception about our industry, particularly concerns regarding data privacy and security relating to our industry's technology and practices, and any perceived failure to comply with laws and industry self-regulation; our failure to manage our growth effectively; the difficulty in identifying and integrating any future acquisitions or strategic investments; any changes or developments in legislative, judicial, regulatory or cultural environments related to information collection, use and processing; challenges related to our buy-side clients that are destination marketing organizations and that operate as public/private partnerships; any strain on our resources or diversion of our management's attention as a result of being a public company; the intense competition of the digital advertising industry and our ability to effectively compete against current and future competitors; any significant inadvertent disclosure or breach of confidential and/or personal information we hold, or of the security of our or our customers', suppliers' or other partners' computer systems; as a holding company, we depend on distributions from Direct Digital Holdings, LLC ("DDH LLC") to pay our taxes, expenses (including payments under the Tax Receivable Agreement) and any amount of any dividends we may pay to the holders of our common stock; the fact that DDH LLC is controlled by DDM, whose interest may differ from those of our public stockholders; any risks associated with the material weakness that was identified in our review of internal control over financial reporting as of December 31, 2022; any failure by us to maintain or implement effective internal controls or to detect fraud; our ability to engage an independent registered public accounting firm and complete the audit of our financial statements for the fiscal year ended December 31, 2023; and other factors and assumptions discussed in our Form 10-K and subsequent periodic and current reports we may file with the SEC. Should one or more of these risks or uncertainties materialize, or should any of these assumptions prove to be incorrect, our actual operating and financial performance may vary in material respects from the performance projected in these forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and except as required by law, we undertake no obligation to update any forward-looking statement contained in this press release to reflect events or circumstances after the date on which it is made or to reflect the occurrence of anticipated or unanticipated events or circumstances. New factors that could cause our business not to develop as we expect emerge from time to time, and it is not possible for us to predict all of them. Further, we cannot assess the impact of each currently known or new factor on our results of operations or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

**Contacts:**

**Investors:**
Brett Milotte, ICR
investors@directdigitalholdings.com

---

Exhibit 4



# Colossus SSP alleged to mismatch user IDs

 by **Jessica Heygate** | *May 10, 2024* | **The Information**



*(Credit: Getty Images)*

**Adalytics found the Direct Digital Holdings' firm was the only SSP observed in a study to declare a different ID in an auction, triggering some partners to review its practices. The SSP denies any foul play.**

A supply-side platform (SSP) has been discovered to be declaring mismatched user IDs during specific transactions, causing some partners to question its techniques and put their relationship on pause.

Colossus SSP has been singled out in a new report by Adalytics, which analyzes media buys on behalf of agencies and brands, as misdeclaring the IDs assigned to a given user during transactions run through demand-side platform (DSP) The Trade Desk.

Adalytics said it examined the source code of ads and bid responses served by The Trade Desk on behalf of different advertisers and on publisher properties from large national publishers to local news, blogs and specialized sites.

It studied whether an actual user ID stored in a user's Chrome browser cookie storage matched with how 16 SSPs declared user IDs during bid transactions to uncover cases of ID stuffing.

The firm claims to have found only one SSP to report a different ID in the auction to the actual user ID: Colossus SSP.

Two publishers who spoke with Campaign US on background were able to verify that when they made calls through Colossus SSP, the bid that was returned through The Trade Desk assumed a different user ID from their own. This was based on Chrome browsers that have cookies enabled.

There could be various explanations for this mismatch.

Colossus SSP parent company Direct Digital Holdings said in a statement it "does not add or pass any Trade Desk user IDs in the bid request" because it transacts via Bidswitch, a "middleware" provider which connects various SSPs with DSPs. It said Adalytics' report is "riddled with false and misleading information."

**Partner Content**



A digital advertising researcher explained that in this relationship, Colossus passes its IDs to Bidswitch, which matches those IDs to what it discerns are the corresponding IDs from The Trade Desk. In the researcher's eyes, for the two IDs not to match is not a sign of anything nefarious; rather, it's a symptom of an ad tech supply chain that operates largely on approximations.

However, other SSPs that transact via Bidswitch do not appear to have user ID matching issues. Adalytics said it observed no discrepancies from TrustX, another SSP which appears to integrate with Bidswitch, when transacting with The Trade Desk. A media owner told Campaign US it works with several SSPs that funnel through Bidswitch and has not witnessed similar problems.

Bidswitch, owned by Criteo, hit back at any allegations that its technology could be causing the ID mismatch. It said it operates as a neutral "passthrough" platform, sending traffic from SSPs to DSPs "without manipulating the content of bid requests from SSPs or bid responses from DSPs."

"Bidswitch has been doing this for over 11 years with hundreds of partners throughout the industry, including the very largest," Criteo general counsel Ryan Damon said in a statement.

Appx. B-036

"Any claims or implications by Colossus SSP that Bidswitch is to blame for Colossus SSP's manipulation of the content of bid requests are untrue and we encourage all parties to investigate further into the merits of any such statements before publishing untrue statements," Damon added.

Direct Digital Holdings followed up with a new statement on Friday: "As a long standing partner of Bidswitch over the last five years, we are confident they are following protocol and honoring their position in the value chain. The only issue here is the false and misleading research report from Adalytics."

## Why ID mismatches can occur

Publishers and SSPs have been known to purposefully switch user IDs in order to make users appear to have desirable attributes so they can elicit higher bids. For instance, a user ID that appears to be associated with a doctor would attract pharmaceutical advertisers at higher rates.

A media owner told Campaign it had suspected "a couple of SSPs" of this activity in recent years.

A Direct Digital Holdings representative denied Colossus has engaged in "improper activities" such as ID switching, ID stuffing or ID bridging, whereby a publisher or SSP can connect an old user ID to a cookieless user via signals like an IP or email address.

"Direct Digital Holdings operates its Colossus SSP platform with transparency and in compliance with all applicable laws and industry standards," the representative said.

They said Colossus SSP "has always been diligent when it comes to quality and transparency, working with Human, Confiant, Moat and other trusted industry partners to ensure we meet the highest standards in supply."

However, multiple partners within the ad tech supply chain expressed concerns about the reliability of verification partners, with issues often slipping through the cracks. For example, none of the MRC-accredited ad verification platforms flagged Forbes' recently uncovered made-for-advertising subdomain, per Adalytics' report.

"We do have the systems set up, whether Tag or MRC, to accredit companies who are supposed to catch this. The primary problem here is that that system is not working," said Jay Friedman, CEO of advertising agency Goodway Group, which uses analytics providers to help root out fraud and waste over verification providers.

The ID mismatch could be due to a technical issue, such as users browsing in incognito mode or storing multiple cookies. But four partners within the ad tech supply chain who spoke with Campaign on background suggested such technical issues would be unlikely to affect only one seller.

## Impacts on Colossus

Colossus is a relatively small SSP. One media owner said Colossus accounts for less than 10% of its total fill rate; another put the figure at less than 5%. The SSP has a focus on diverse-owned and operated publishers.

Due to Colossus' size, it can be easier for partners to hit pause. One media owner said it had suspended working with Colossus until it can get to the bottom of the ID issue. Another said it wouldn't remove Colossus from its partner list so long as it continues to be paid on time.

DSPs have flagged issues with Colossus in the past. Google identified an issue with some bid requests from the SSP last fall within its DSP DV360 and immediately paused traffic on the inventory in question. It ended up issuing refunds to impacted advertisers and resumed its relationship with Colossus after the issue was rectified.

"Google has strict policies and robust enforcement systems to protect advertisers, publishers and people against invalid traffic. Late last year, our teams identified a source of invalid traffic that did not adhere to our guidance around how signals are shared in bid requests and took prompt action," a Google spokesperson said.

Direct Digital Holdings CEO Mark Walker said that the company has a policy to correct any issues flagged by partners "within 24 to 48 hours."

"When we identify an issue, we correct it," he said.

Walker denounced any suggestions that Colossus' ID mismatch was related to the holding company's financial situation. Direct Digital Holdings' share price has fallen 59% in the past month.

"The financial solvency of our company is very sound," he said, adding that it remains profitable and its first-quarter performance was "up 20% year over year."

Below is Direct Digital Holdings' full statement in response to Adalytics' report:

"At Direct Digital Holdings integrity, accountability, and transparency make up our company's core values.

"Unfortunately, we believe that there has been a concerted effort to seek financial gain by attempting to discredit the performance and operations of DDH. To be clear, DDH remains operationally well-positioned and financially strong with estimated 2023 FY earnings of $157 million and is experiencing continued growth into 2024. We maintain a solid financial relationship with our partners and are committed to continuous improvement and strengthening our products and services. We have learned that there is a so-called research report from Adalytics, a for-profit entity, making intentionally false, misleading, and inaccurate statements that do not accurately represent the connections within the programmatic value chain and the role of Colossus SSP through The Trade Desk.

"Because Colossus SSP is not directly connected to The Trade Desk, but rather through a publicly traded intermediary, Colossus SSP does NOT add or pass any Trade Desk user IDs in the bid request in accordance with Open RTB protocols and The Trade Desk requirements. Furthermore, Colossus SSP has always been diligent when it comes to quality and transparency, working with HUMAN, Confiant, MOAT and other trusted industry partners to ensure we meet the highest standards in supply. As we have in the past, we will continue to work with The Trade Desk to resolve any concerns that they may have.

"Despite our repeated requests to see the report, Adalytics refused to allow us to review the report prior to its publication, which we believe falls in line with a prior record of Adalytics seeking attention instead of accuracy. We will vigorously defend our company's reputation and will pursue all appropriate legal actions and remedies to address these intentionally false statements and fundamental misrepresentations."

*Tags*

  

**Start Your Free 30-Day Free Trial**

Get the very latest news and insight from *Campaign* with unrestricted access to campaignlive.com , plus get exclusive discounts to *Campaign* events.

BECOME A SUBSCRIBER

*FOLLOW US*

𝕏 Campaignliveus

f CampaignUS

in CampaignLiveUS

Campaign_US

CampaignLiveUS

**Up next:**                                                                                          **1-3 of 7**



**Exclusive | Crispin appoints Julianna Katrancha as head of strategy**

**The One Show 2025 adds AI discipline**

**'It's truly like living through horror movie:' Agencies employees**

Get more from Campaign US



VIEW   MY ACCOUNT

VIEW   MY BULLETINS

Get updates from all sorts of things that matter to you

Subscribe to push notifications

**FOLLOW US**

© Haymarket Media Group Ltd. | | | |

# Exhibit 5

**Appx. B-041**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| COLOSSUS MEDIA, LLC, | * |
| *Plaintiff,* | * |
| v. | *     Case No. 8:24-cv-01402 |
| ADALYTICS RESEARCH, LLC | * |
| *Defendant.* | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANT ADALYTICS RESEARCH, LLC'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Koushik Bhattacharya
James "Jake" Schaller
**SCHULMAN BHATTACHARYA, LLC**
6116 Executive Blvd., Suite 425
North Bethesda, MD 20852
Tel: (240) 356-8550
kbhattacharya@schulmanbh.com
jschaller@schulmanbh.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 4

STANDARD OF REVIEW ........................................................................................ 7

ARGUMENT ............................................................................................................. 7

    I.   Colossus SSP Fails to State a Claim for Lanham Act False Advertising and Unfair Competition ............................................................................................................ 8

        A.  Blog Post Does Not Constitute 'Commercial Speech' ................................ 9

        B.  Colossus SSP Does Not Adequately Allege That Adalytics' Blog Post Proximately Caused Its Damages ...................................................................... 11

        C.  Colossus SSP Fails to Identify False or Misleading Description of Fact ................. 15

    II.  Colossus SSP Fails to State a Claim for Defamation ...................................... 17

        A.  Colossus SSP Never Sets Forth Adalytics' Allegedly Defamatory Statements ........ 18

        B.  Colossus SSP Does Not Allege Properly That Adalytics was Legally at Fault ........ 20

    III.  Colossus SSP Fails to State a Claim for Injurious Falsehood ....................... 23

CONCLUSION ........................................................................................................ 26

**Appx. B-043**

Defendant Adalytics Research, LLC ("Defendant" or "Adalytics") hereby submits its Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint ("Complaint") filed by Plaintiff Colossus Media, LLC ("Plaintiff" or "Colossus SSP"), and in support thereof states as follows:

## INTRODUCTION

In its Complaint, Colossus SSP takes the unbiased, straightforward, and non-accusatory observations made by Adalytics in a report posted on the internet and attempts to recast them as the center of a nefarious scheme by Adalytics to harm Colossus SSP and, in the process, drum up business. Even if Colossus SSP's allegations were true (and Adalytics vigorously denies them), each of Colossus SSP's three causes of action is deficient and should be dismissed for failure to state a claim. Moreover, Colossus SSP's overall theory of its case is so utterly implausible that it does not pass muster under *Iqbal* and *Twombly*.

Colossus SSP is an internet advertising vendor. In technical parlance, it is a sell-side platform that interacts with media publishers, other intermediaries, and demand-side platforms to facilitate ad auctions and help serve ads to the visitors of websites and apps. In layman's terms, Colossus SSP is an on-line matchmaker that helps websites auction off the advertising space on their sites by connecting website visitors with relevant advertisers. When a visitor browses a website, Colossus SSP gathers some data and sends a bid request for the ad space on that website to an intermediary or to a demand side platform. The demand side platform then bids on the ad space on behalf of a brand.

Adalytics conducts advertising analytics, providing digital forensics to media buyers and advertisers in the digital advertising industry. As such, it is not a competitor of Colossus SSP. From time to time, Adalytics publishes reports on the internet that it considers of public interest.

It published one such report on May 10, 2024, titled "Are user IDs declared consistently in ad auctions?" The report was based upon a study of the source code of ads and bid responses served by The Trade Desk (a demand side platform) on behalf of different advertisers and on different publisher properties. The study looked at bid responses transacted by The Trade Desk through 16 supply side platforms, including Colossus SSP, on numerous websites. Among the observations Adalytics made was that in its sample data, for Colossus SSP only, the user ID declared to The Trade Desk at the time of an ad auction was different from the actual user ID stored in the user's browser cookie storage. Shortly after Adalytics released this post, other publications published articles based upon Adalytics' observations.

Claiming Adalytics intentionally made false statements in its Blog Post to somehow secure more clients and benefit itself, Colossus SSP brought the instant lawsuit, seeking relief through claims for False Advertising and Unfair Competition under the Lanham Act (Count I), and Defamation and Injurious Falsehood under Maryland Law (Counts II and III, respectively). All three causes of action, as will be explained in more detail *infra*, are subject to dismissal for failure to state a claim. As a preliminary matter, Colossus SSP never identifies exactly what statement or statements in the blog post were problematic or actionable. Rather, it uses sweeping generalizations filled with buzz words and phrases from the elements of its causes of action to present the appearance of a well-pleaded complaint. And while it fails to quote directly from Adalytics' published report, Colossus SSP quotes extensively from an article that appeared in a ***separate news publication***. But Adalytics cannot be held liable for what appears in other publications.

In addition, Colossus SSP attempts to ascribe malicious intent to Adalytics' blog post when, clearly, there is none. Adalytics takes care to state in its publication that it only made observations

based upon publicly available information, and that it was not making any assertions regarding whether Colossus SSP intended to misidentify user IDs that were sent to The Trade Desk or if Colossus SSP even was aware of it.  Indeed, it states in the post that it is "ostensibly possible that any such mis-matches were due to valid ad serving behavior."

At a more basic level, Colossus SSP's theory does not even add up.  According to Colossus SSP, "Adalytics advertises and generates demand for its services by making unfounded attacks against companies like Colossus SSP."  Complaint, ¶ 1.  Colossus SSP, therefore, would like the Court to believe that Adalytics' business plan is to take inaccurate, defamatory shots at random businesses in the hope that such actions somehow will generate business.  Such theory defies common sense.

Colossus SSP attempts to bolster its claims by trashing Adalytics' reputation and motivation.  But these statements are even less supported than Colossus SSP's claims that Adalytics' blog posts were defamatory or violative of the Lanham Act.  Indeed, while Colossus SSP states that Adalytics has "a track record of publishing inaccurate and false blog posts" (Complaint, ¶ 1) and that Adalytics is "known for publishing inflammatory blog posts regarding advertising technology vendors and products," (*Id.* at ¶ 19), Colossus SSP never indicates one proven, verifiable instance – or even an unproven, unverifiable instance – of either.  Similarly, Colossus SSP attacks Adalytics for not providing an opportunity to preview the blog post before it was published.  But such is not required and – saliently – while Colossus SSP claimed that by receiving an advance copy of the post it could have "provid[ed] all the facts and information establishing Adalytics' post was false" (Complaint, ¶ 21), it is telling that even after the post was published, Colossus SSP has not provided the purported facts and information despite repeated requests from Adalytics.

3

Putting all of this to the side, however, and taking all of Colossus SSP's unfounded allegations as true for purposes of this Motion, Colossus SSP still cannot state a claim upon which relief may be granted. The Court should dismiss the Complaint.

## **FACTUAL BACKGROUND**

Adalytics is a Maryland limited liability company that conducts advertising analytics to serve brands and advertisement buyers. Complaint, ¶¶ 3, 16. Specifically, Adalytics analyzes "digital advertising performance and advertising technology vendors, publishers, and campaigns that improperly serve advertisements." *Id.* at ¶ 17. Occasionally, Adalytics will provide public interest reports, posting results of research it conducts – "thought leadership on systemic issues affecting brands and their media investments." *Id.* at ¶ 18. Colossus SSP is a Delaware limited liability company and subsidiary of Direct Digital Holdings, Inc. ("DRCT"). *Id.* at ¶ 1.

Colossus SSP is what is known as a sell-side platform that interacts with media publishers, other ad tech intermediaries, and demand-side platforms to help provide relevant ads to specific audiences. *Id.* at ¶¶ 1, 10, 12. Essentially, Colossus SSP receives information about a person visiting a website or other platform. *Id.* at ¶ 12. Colossus SSP then sends a request for bids on the ad space available on the website or platform the person is visiting to ad tech intermediaries and demand-side platforms. *Id.* Colossus SSP sends such request – either directly or through an intermediary – by matching the person's cookie ID with an intermediary's user ID and/or with a demand-side platform user ID within the parameters of the demand-side platform's targeted audience. *Id.* In other words, the ad space available on websites and platforms is for sale; sell-side platforms like Colossus SSP and partners attempt to match the visitors of the sites with advertisers in which the visitors might be interested. *Id.*

4

A helpful explanation of this process comes directly from the online report by Adalytics that is at the center of Colossus SSP's lawsuit (hereinafter, "Blog Post") and that is attached hereto as **Exhibit 1**.[1]

> In programmatic advertising, vendors utilize user IDs to build audience profiles and decide how to serve targeted ads.  For example, a user with a given user ID might frequent a lot of gardening websites, and consequently, when ad tech vendors "see" that specific user ID, the vendors serve ads to that user ID from advertisers who are promoting gardening tools.
>
> Some user IDs can elicit higher bids from ad tech vendors on behalf of media buyers.  For example, a user ID that is thought to be associated with a doctor may elicit very high bid prices from DSPs which are trying to serve ads to healthcare providers on behalf of pharmaceutical brands.

Blog Post, p. 1.

Colossus SSP conducts transactions with several different demand-side platforms – mostly indirectly through an intermediary called BidSwitch.  Complaint, ¶ 14.  When Colossus SSP uses BidSwitch, instead of matching a website visitor's cookie ID with a demand-side platform's user ID, it matches the website visitor's cookie ID with a BidSwitch ID; BidSwitch then matches the BidSwitch ID with a demand-side platform's user ID.  *Id.*

In early May 2024, several reporters contacted Colossus SSP regarding an advance copy of the Blog Post that they had received from Adalytics.  *Id.* at ¶ 20.  On May 8 and 9, 2024, Colossus SSP and executives from its parent company, DRCT, reached out to Adalytics, claiming that based upon what they heard from the reporters, Adalytics' planned post contained false and

---

[1] Courts in the Fourth Circuit "may consider a document submitted by the movant" on a motion to dismiss "that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Goines v. Valley Community Services Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).  Here, Adalytics' Blog Post clearly is integral to the Complaint, as it is the primary basis for Plaintiff's Complaint and the allegations therein.  Further, there can be no dispute as to its authenticity.  The Blog Post is available at https://adalytics.io/blog/user-id-rotation.

inaccurate statements.  *Id.* at ¶ 21.  Adalytics responded, denying it had made defamatory statements, and stating that it would review any concerns Colossus SSP had with the Blog Post if Colossus SSP provided "a detailed and comprehensive list of what 'limited information' the media provided," and "a clear explanation of what specific statements are demonstrably false and inaccurate."  *See* May 8, 2024 Response email, included in the Correspondence attached hereto as **Exhibit 2**.[2]

On May 10, 2024, Adalytics published its blog post titled "Are user IDs declared consistently in ad auctions?" on its website, https://adalytics.io/blog/user-id-rotation.  *Id.* at ¶ 23; *see also* Blog Post.  In the post, Adalytics analyzed and compared advertisements and bid responses on The Trade Desk, a demand-side platform, through 16 supply side platforms, including Colossus SSP.  *Id.* at ¶ 25.  The post stated that, for Colossus SSP, "the majority of observed impressions had a mis-match between the declared 'tdid=' query string parameter and the actual .adsrvr.org TDID user ID in the user's chrome browser storage."  *See* Blog Post, p. 20.  In other words, Colossus SSP was returning bids with cookies that did not match the cookie in the user's chrome browser.  *Id.*  Notably, Adalytics did not assign any malicious intent to Colossus.  *See*, generally, Blog Post.  Rather, Adalytics stated that these consistent mismatches could be caused by any number of factors that Adalytics could not determine.  *Id.* at pp. 4, 30.  In addition, Adalytics stated in its Blog Post that the mis-declared user IDs in transactions with Colossus SSP did not have any technical explanation and were unrelated to Colossus SSP's indirect connection to The Trade Desk through an intermediary.  *Id.* at p. 24.

---

[2] Given Plaintiff's multiple references to its correspondence with Adalytics prior to Adalytics' publishing of the Blog Post, this correspondence is integral to the Complaint, and the correspondence is authentic.  *See Goines*, *supra*.

**Appx. B-049**

After Adalytics published its Blog Post, several media outlets published articles based upon the post.  Complaint, ¶¶ 36-39.  Specifically, the outlet AdExchanger published an article on its website on May 10, 2024, titled "Adalytics Claims Colossus SSP is Injecting Fake IDs Into Its Bid Requests."  *Id.* at ¶ 36.  Following the publication of the AdExchanger article, counsel for DRCT wrote a letter to Adalytics regarding the article.  *See* Exhibit 2.

<u>**STANDARD OF REVIEW**</u>

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the plaintiff's initial pleading and does not resolve contests surrounding the facts or the merits of a claim.  *See Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  Per *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), to withstand a motion to dismiss, a claim must be supported by well-pled factual allegations sufficient to establish its facial plausibility.  "Ultimately, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (internal quotation marks omitted).  A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, *supra*, at 678.  While the pleading standard of Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' [] it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).

<u>**ARGUMENT**</u>

Adalytics emphatically rejects the factual allegations levied by Colossus SSP.  Even accepting such allegations as true for purposes of this motion, however, Colossus SSP's Complaint

should still be dismissed for failure to state a claim upon which relief can be granted.  Each of

Colossus SSP's causes of action is flawed and should be dismissed.

**I.      Colossus SSP Fails to State a Claim for Lanham Act False Advertising and Unfair Competition**

Colossus SSP does not state a claim for False Advertising and Unfair Competition under

the Lanham Act.  As a general matter, the Lanham Act "prohibits the 'false or misleading

description of fact, or false or misleading representation of fact, which … in commercial

advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin

of his or her or another person's goods, services, or commercial activities."  *Scotts Co. v. United*

*Industries Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (quoting 15 U.S.C.A. § 1125(a)(1)(B)).  As

such, a plaintiff asserting a false advertising claim under the Lanham Act must establish that:

> (1) the defendant made a false or misleading description of fact or representation
> of fact in a commercial advertisement about his own or another's product; (2) the
> misrepresentation is material, in that it is likely to influence the purchasing
> decision; (3) the misrepresentation actually deceives or has the tendency to deceive
> a substantial segment of its audience; (4) the defendant placed the false or
> misleading statement in interstate commerce; and (5) the plaintiff has been or is
> likely to be injured as a result of the misrepresentation, either by direct diversion of
> sales or by a lessening of goodwill associated with its products.

*Scotts* at 272 (internal citations omitted).  Here, as an initial matter, Adalytics' Blog Post does not

constitute commercial advertising or promotion and, for that reason alone, the Court should

dismiss Colossus SSP's Lanham Act Claim.  Furthermore, Colossus SSP does not adequately

allege that its purported damages were proximately caused by Adalytics' Blog Post, even if the

post could be considered commercial advertising or promotion (which it cannot).  Finally, Colossus

SSP does not set forth specifically the purported false or misleading description of fact.  As such,

Colossus SSP's Lanham Act claim is fatally flawed.

## A.  Blog Post Does Not Constitute 'Commercial Speech'

Colossus SSP's Complaint does not – and cannot – properly allege that Adalytics' blog post was "commercial advertising or promotion" under the Lanham Act.

> A representation constitutes a commercial advertising or promotion under § 43(a)(1)(B) of the Lanham Act if it is 1) commercial speech; 2) by a defendant who is in commercial competition with plaintiff; 3) for the purpose of influencing consumers to buy defendant's good or service; and 4) representation must be disseminated sufficiently to the relevant purchasing public to constitute advertising promotion within that industry.

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F.Supp.2d 544, 554 (E.D.Va. 2008) (internal citations omitted).  "Although this four part test has not been expressly adopted by the Fourth Circuit, it has been relied upon by courts within this circuit."  *Neurotron, Inc. v. American Ass'n of Electrodiagnostic Medicine*, 189 F.Supp.2d 271, 275 (D. Md. 2001) (internal citations omitted).

Adalytics' blog post does not qualify as commercial speech.  Whether complained-about speech constitutes "commercial speech" is "[t]he threshold issue for a Lanham Act violation."  *Neurotron*, 189 F.Supp.2d at 275.  "The Supreme Court has defined commercial speech as speech proposing no more than a commercial transaction. … Alternatively, commercial speech can be more broadly defined as an 'expression related solely to the economic interests of the speaker and its audience.'"  *Id.* at 275-76 (internal citations omitted).  Here, while Colossus SSP claims that Adalytics' post was financially motivated to attract customers, even taking such allegation as true, it is not sufficient to establish Lanham Act liability.  *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 67 (1983) (stating the fact that the defendant "has an economic motivation" for publishing the questioned material "would clearly be insufficient by itself to turn the materials into commercial speech").

9

Furthermore, Colossus SSP does not and cannot point to any language in the Blog Post that suggests a commercial transaction.  The *Neurotron* case is instructive here.  In that case, the manufacturer of an electrodiagnostic medical device sued an association of medical professionals regarding the association's review of the manufacturer's product (the "N-CPT" – "a diagnostic tool allowing medical professionals to test and diagnose certain neurological disorders and impairments." 189 F.Supp.2d at 273).  The article stated that other publications about the N-CPT contained information "insufficient to make conclusions about the usefulness of this form of sensory testing.'"  *Id.*  While the plaintiff claimed the defendant "had a financial motive for publishing" its allegedly disparaging article, the Court noted that "nowhere in the article do the authors advocate for a commercial transaction.  It is neither suggested that the reader buy any product or service, nor that they refrain from buying any product or service." *Id.* at 276.  The same is true here.  Adalytics' post merely sets out the results of its testing; there is no direct commercial proposition suggesting that any reader enter into a business relationship with Adalytics relating to the subject of the Blog Post; and there is no suggestion to the reader to purchase a product or service (or that the reader refrain from purchasing a product or service). *See generally* Blog Post.[3] Quite the contrary, Adalytics states in the Blog Post that "[b]rands and ad tech entities are encouraged to audit their own media buys to analyze how much each entity transacted with any given vendor and whether the ad delivery via the vendor was consistent with their expectations." *Id.* at p. 31.

---

[3] Importantly, Adalytics' reports, such as the Blog Post, are offered on its website without the requirement that a reader provide an email address.  Some other companies' reports typically can be accessed only if a reader provides an email address, which is indicative of an attempt to secure lead generations for new customers.

Appx. B-053

The *Neurotron* Court added that the article in question could not even meet the broader standard (that it relate solely to the economic interests of the speaker and its audience). "[E]ven if some language in the article is commercial in nature, it is not necessarily commercial speech." *Id.* at 276. Similarly, the Adalytics blog post does not meet this broader standard. The article is academic in nature and simply sets out observations based upon research rather than offering some kind of service. While Colossus SSP includes in its Complaint the allegation that "Adalytics made false and misleading statements in commercial advertising and promotion in violation of the Lanham Act" (Complaint, ¶ 41), such are but conclusory buzz words that are insufficient to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (citations omitted) (noting that a complaint must plead more than conclusory statements or a recitation of the elements of a cause of action).

Furthermore, Colossus SSP acknowledges in its Complaint that the Blog Post is a report, rather than an advertisement or commercial speech. Specifically, Colossus SSP alleges that Adalytics "[d]epart[ed] from the standard practice of all reputable analysts or media outlets," when it "refused to provide a copy of the post to Colossus SSP or DRCT prior to publishing the post." Complaint, ¶ 22. Colossus SSP cannot on the one hand attempt to hold Adalytics to journalistic standards while, on the other, claim that the Blog Post is commercial speech. The Blog Post clearly is not commercial speech and, on that basis alone, Colossus SSP's Lanham Act claim fails.

**B. Colossus SSP Does Not Adequately Allege That Adalytics' Blog Post Proximately Caused Its Damages**

In its Complaint, Colossus SSP offers only inadequate, conclusory allegations that Adalytics' Blog Post was the proximate cause of its claimed damages. As such, Colossus SSP's Lanham Act Claim should be dismissed.

In March of 2014, the Supreme Court decided *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), and in the decision resolved a circuit split regarding

11

**Appx. B-054**

Lanham Act standing in which some circuits had permitted only actual direct competitors to bring a case under the law. In *Lexmark*, the Court concluded that to determine if a party can sue under the Lanham Act, it must meet a two-part test: (1) does the party's interests fall within the zone of interests protected by the Lanham Act; and (2) were the party's damages proximately caused by the other party's false advertisement/unfair competition. *See id.* at 129-34. Regarding proximate cause, the Court held that "when a party claims reputational injury from disparagement, competition is not required for proximate cause." *Id.* at 138.

Notably, however, the *Lexmark* decision was based upon a "'unique' set of facts." *Muhler Co., Inc. v. Ply Gem Holdings, Inc.*, 637 Fed.Appx. 746, 747 (4th Cir. 2016) (quoting *Lexmark*, 572 U.S. at 140). Specifically:

> In *Lexmark*, the Supreme Court held that Static Control Components had adequately alleged that Lexmark International's trade practices proximately caused Static Control's lost sales, despite the absence of direct competition between the parties, because of the roughly "1:1 relationship" between the sales of Lexmark's product and lost sales of Static Control's component part. [572 U.S. at 139]. Under this "unique" set of facts, there was no "discontinuity between the injury to the direct victim and the injury to the indirect victim," such that the indirect victim's injury was "surely attributable to the former (and thus also to the defendant's conduct)," rather than to "any number of other reasons." *Id.* [at 140] (internal quotation marks and alterations omitted). These facts distinguish *Lexmark* from the typical case brought by an indirect victim, in which the calculation of damages proximately attributable to the alleged misconduct is complex and uncertain.

*Muhler*, 637 Fed.Appx. 746, 747-48.

The instant case is not analogous to *Lexmark*. Not only are Adalytics and Colossus SSP not direct competitors – Colossus SSP is a sell-side platform (Complaint, ¶ 1), while Adalytics is an ad quality and transparency platform (*Id.*) – they have no relationship upon each other's sales like the parties in *Lexmark*. Adalytics does not sell to or rely upon either BidSwitch or The Trade Desk. Therefore, unlike in *Lexmark*, Adalytics does not gain the sales allegedly lost by Colossus

12

SSP because of Adalytics' allegedly false advertising.[4]  Rather, this is more "the typical case brought by an indirect victim, in which the calculation of damages proximately attributable to the alleged misconduct is complex and uncertain." *Muhler*, 637 Fed.Appx. at 747-48.

Colossus SSP makes conclusory allegations that the publication of the Blog Post led directly to The Trade Desk suspending business with it and BidSwitch suspending it from trading through its platform (Complaint, ¶¶ 43, 44); but there is no 1:1 relationship here, like in Lexmark, through which Adalytics would have earned revenue.  In addition, the very articles that Colossus SSP cites in its Complaint provide alternate (and more plausible) reasons for The Trade Desk and BidSwitch suspending their relationships with Colossus SSP.  As noted by the Court in *Muhler*, "'where the cause of plaintiff's injury may be as reasonably attributed to an act for which defendant is not liable as to one for which he is liable, plaintiff has failed to carry the burden of establishing that his injuries were the proximate result of defendants' [misconduct].'" *Muhler*, 637 Fed.Appx. at 748 (quoting *Messier v. Adicks*, 251 S.C. 268, 161 S.E.2d 845, 846 (1968)).

First, the AdExchanger article dated May 10, 2024, and attached hereto as **Exhibit 3**,[5] makes clear that The Trade Desk's decision to suspend business with Colossus SSP was in the works far in advance of Adalytics' Blog Post.  Specifically, the AdExchanger article, dated May 10, 2024, included the following: "'The Trade Desk Marketplace Quality team has been aware of issues with the SSP mentioned in the Adalytics report *for more than a year*,' according to comment from a spokesperson."  May 10, 2024 AdExchanger Article, p. 4 (emphasis added).  The

---

[4] And, as stated *supra*, Adalytics' Blog Post does not even constitute advertising or commercial promotion.

[5] Plaintiff references and quotes directly from this article in its Complaint and even includes a link to the article in a footnote (*see* Complaint, ¶¶ 37-38).  The article, therefore, is integral to the Complaint and there can be no dispute as to its authenticity. *See Goines*, *supra*.

AdExchanger Article further states: "When The Trade Desk DSP makes the calls on ad buys, it never buys Colossus inventory. The team identified Colossus *last year* when it saw aberrations in results for high-value targets, and put the puzzle pieces together, according to a source at the company on background." *Id.* at p. 5 (emphasis added).

Similarly, BidSwitch's suspension of its relationship with Colossus SSP is clearly explainable through the statement of Ryan Damon, the General Counsel of Criteo, which owns BidSwitch. In the AdExchanger Article, Mr. Damon took issue with claims that BidSwitch was responsible for the mismatches. Specifically, the AdExchanger article states:

> "Any claims or implications by Colossus SSP that BidSwitch is to blame for Colossus SSP's manipulation of the content of bid requests are untrue and we encourage all parties to investigate further into the merits of any such statements before publishing untrue statements," according to statement by Criteo's general counsel, Ryan Damon.

*Id.* at p. 4.

As for Colossus SSP's conclusory claim that the Blog post "caused damages to SSP's reputation and goodwill by accusing Colossus SSP of engaging in fraudulent activity and impeaching Colossus SSP's honesty, integrity, and core business" (Complaint, ¶ 45), as will be explained *infra*, there are no such claims in the Blog Post. Adalytics specifically stated that it made only observations and "no assertions with regards to the actual knowledge or intent of any parties observed in this study," and that any of the mis-matches identified could have been "due to valid ad serving behavior or due to new advances in user ID targeting technologies." Blog Post, p. 30. Furthermore, any purportedly defamatory statements made by other publications should be addressed with those other publications; not Adalytics.

As Colossus SSP has failed to carry its burden that its purported injuries were the proximate cause of Adalytics' purported misconduct, its Lanham Act claim fails.

14

**Appx. B-057**

### C.  Colossus SSP Fails to Identify False or Misleading Description of Fact

Even if Adalytics' Blog Post could be considered commercial speech (and it cannot) and Colossus SSP had established that the Blog Post proximately caused its purported injuries (which it did not) Colossus SSP has not properly identified any false or misleading descriptions of fact in the Blog Post.  While Colossus SSP makes conclusory statements throughout its Complaint regarding the "falsity" of statements in Adalytics' Blog Post, it never actually identifies the statements to which it is referring.  Instead, Colossus SSP relies upon broad generalizations[6] and intentional distortions of Adalytics' statements, and the statements of *other* publications that wrote articles based upon the Blog Post.

As far as the distortions of Adalytics' observations:

•       Colossus SSP claims that the Blog Post "portrayed Colossus SSP as mis-declaring user IDs in its bid requests for the purpose of selling ad space at higher prices to ad buyers seeking to serve advertisements to a targeted audience." *Id.* at ¶ 24.  In reality, Adalytics simply observed that in its examination, for Colossus SSP, "it appeared that the user ID declared to The Trade Desk at auction time was markedly different from the actual user ID stored in the user's Chrome Browser cookie storage."  Blog Post, p. 3.  Nowhere in the Blog Post does Adalytics state that Colossus SSP intentionally mis-declared IDs to sell ad space at higher prices.  *See generally* Blog Post.

•       Colossus SSP claims that Adalytics' Blog Post "falsely defines Colossus SSP's activity as 'Sophisticated Invalid Traffic' or 'Cookie Stuffing, recycling or harvesting (inserting, deleting or misattributing cookies thereby manipulating or falsifying prior activity of users).'"

---

[6] Among its generalized allegations, Colossus SSP claims: Adalytics "falsely attacked Colossus SSP" (Complaint, ¶ 1); "Colossus SSP knew that Adalytics' post contained false and inaccurate information about Colossus SSP" (*Id.* at ¶ 20); and the Blog Post "makes false and misleading statements about Colossus SSP and its business" (*Id.* at ¶ 23).

15

Complaint, ¶ 32.  But Adalytics does not so define Colossus SSP's activity.  Adalytics notes that "[t]he Media Ratings Council's (MRC) definition of Sophisticated Invalid Traffic (SIVT) includes: '*Cookie stuffing, recycling or harvesting (inserting, deleting or misattributing cookies thereby manipulating or falsifying prior activity of users).*'"  Blog Post, p. 5.  But Adalytics' Blog Post does not specifically conclude Colossus SSP's activity qualified as such.  To the contrary, Adalytics notes in the Blog Post that Colossus SSP "works with numerous vendors to filter out fraud," including HUMAN and Oracle Moat, which "are accredited by the Media Ratings Council (MRC) for Sophisticated Invalid Traffic Detention/Filtration."  Blog Post, pp. 25-26.

Notably, in its Complaint, Colossus SSP quotes directly from articles published by other outlets that wrote about Adalytics' Blog Post, but it never quotes from the Blog Post itself.  This tracks with the May 10, 2024 Letter from counsel for DRCT (attached as part of Exhibit 2), which – while written to Adalytics – complains not about the Blog Post but, rather, the AdExchanger article written about the Blog Post's observations.  *See* Exhibit 2, May 10, 2024 Letter.  Saliently, the statements in the May 10, 2024 Letter directly contradict allegations in the Complaint.  Specifically:

- While Colossus SSP alleges in its complaint that it "could not systematically 'fake' TDIDs to generate more revenue, ***as the Adalytics post states and/or implies***" (Complaint, ¶ 33 (emphasis added)), the May 10, 2024 Letter indicates that "[t]here is no evidence that the 'fake IDs' are being injected into the bid request nor is this referenced anywhere in the Adalytics report."  Exhibit 2, May 10, 2024 Letter, p. 1.

- While Colossus SSP alleges in its Complaint that the Blog Post "portrayed Colossus SSP as mis-declaring user IDs in its bid requests for the purpose of selling ad space at higher prices to ad buyers seeking to serve advertisements to a targeted audience (Complaint, ¶ 24), the May 10,

2024 Letter references the fact that the AdExchanger article notes that altered ID information was bid on highly by The Trade Desk and states: "This is a false statement.  There is no reference to this in the report."  Exhibit 2, May 10, 2024 Letter, p. 1.

- While Colossus SSP alleges in its Complaint that the Blog Post "has caused damage to Colossus SSP's reputation and goodwill by accusing Colossus SSP of engaging in fraudulent activity" (Complaint, ¶ 45), the May 10, 2024 Letter states that "[t]here is no mention of fraud in the [Blog] [R]eport."  Exhibit 2, May 10, 2024 Letter, p. 2.

Stripped of its generalized and intentionally distorted allegations, therefore, the lone allegedly "false" and "defamatory" claims identified in Colossus SSP's Complaint are that "Colossus SSP is the only SSP for which there were consistent misdeclarations of user IDs," and that for the 15 SSPs other than Colossus SSP, "the TDID declared by the SSP 'always perfectly' matched the user's actual cookie TDID."  *Id.* at ¶ 25.  But, saliently, Adalytics does not, in its Blog Post, ascribe any fault to Colossus SSP.  It does not state Plaintiff is doing anything besides returning bids with cookies that do not match the cookie in the user's Chrome browser.  Indeed, it indicates that the consistent mismatches may be the result of any number of factors ***which Adalytics cannot determine***.  And if Colossus SSP has evidence or even an explanation for the mismatches, it has yet to present it.

For all of the above reasons, Colossus SSP has failed to state a claim under the Lanham Act, and the court should dismiss Count I of the Complaint.

## II.    Colossus SSP Fails to State a Claim for Defamation

Colossus SSP's claim for Defamation in Count II of its Complaint also is deficient.  "To state a claim for defamation under Maryland law, [one] 'must allege specific facts establishing four elements[.]" *Brown v. Board of Education of Prince George's County, Maryland*, Civil Action No.

**Appx. B-060**

DLB-20-2632, 2022 WL 888424, *8 (D. Md., Mar. 25, 2022).  Those elements are: (1) defendant made a defamatory statement; (2) the statement was false; (3) defendant was legally at fault in making the statement, and (4) that plaintiff suffered harm.  *Id.* (internal citations omitted).

There are two major problems with Colossus SSP's claim for Defamation:  First, as explained above, Colossus SSP never actually sets out Adalytics' allegedly defamatory statement(s).  Second, Colossus SSP fails to allege adequately that Adalytics was legally at fault for making the allegedly defamatory statement(s) (whatever they were).  As such, the Court should dismiss Count II of Plaintiff's Complaint.

### A.  Colossus SSP Never Sets Forth Adalytics' Allegedly Defamatory Statements

As explained in Section I(c), *supra*, Colossus SSP makes conclusory statements about Adalytics' Blog Post, but it never actually identifies, specifically, any allegedly defamatory statements.  While the Complaint includes direct quotes from articles that cite to Adalytics' Blog Post, it never quotes from the Blog Post itself.

"[A] 'defamatory statement' is one that tends to expose a person to 'public scorn, hatred, contempt, or ridicule,' which, as a consequence, discourages 'others in the community from having a good opinion of, or associating with, that person.'"  *Piscatelli v. Van Smith*, 424 Md. 294, 306, 35 A.3d 1140, 1147 (2012) (quoting *Indep. Newspapers, Inc. v. Brodie*, 407 Md. 415, 411, 966 A.2d 432, 448 (2009)).  "[A] 'false' statement is one 'that is not substantially correct.'"  *Piscatelli*, 424 Md. at 306, 35 A.3d at 1142 (quoting *Batson v. Shiflett*, 325 Md. 684, 726, 602 A.2d 1191 (1992)).  "The plaintiff carries the burden to prove falsity. … To determine whether a publication is defamatory, a question of law for the court, the publication must be read as a whole: '[W]ords have different meanings depending on the context in which they are used and a meaning not

warranted by the whole publication should not be imputed.'"  *Id.* (quoting *Chesapeake Publ'g Corp. v. Williams*, 339 Md. 285, 295, 661 A.2d 1169, 1174 (1995).

Here, save for some general (and often inaccurate) descriptions of the Blog Post, Plaintiff never actually states what it claims Defendant posted that was defamatory.  There is good reason for that, as Defendant assigned no blame to Plaintiff in the Blog Post.  To the contrary, it wrote that: Adalytics was "unclear whether there is a specific use case or valid technical reason for" Adalytics' observation that there were discrepancies in the declared and actual The Trade Desk user IDs when transacting via Colossus SSP (Blog Post, p. 3); Adalytics made "no assertions with regards to the actual knowledge or intent of any parties observed or cited in this study" (*Id.* at p. 30); Adalytics could not "comment on whether any phenomenon, such as apparent mis-matches in various user ID related code parameters, were engineered for some specific reason" (*Id.*); and it was "ostensibly possible that any such mis-matches were due to valid ad serving behavior or due to new advances in user ID targeting technologies." *Id.*

Furthermore, Colossus SSP's Complaint even acknowledges that that it was not Adalytics' Blog Post but other publications writing about the Blog Post that contained allegedly problematic statements.  Colossus SSP claims that AdExhanger's "article also ***interprets the Adalytics post as concluding*** that BidSwitch is not responsible for the mis-declared IDs."  Complaint, ¶ 37 (emphasis added).  It goes on to state that "the AdExchanger article ***interpreted the Adalytics post*** as presenting 'a compelling claim of repeated fraud' by Colossus SSP."  *Id.* at ¶ 38 (emphasis added).  And it claims the article on The Drum "demonstrate[s]" the "defamatory meaning" of the

**Appx. B-062**

Adalytics Blog Post.  *Id.* at ¶ 39.  But Adalytics is not responsible for other publications'
interpretations or analysis of Adalytics straightforward and non-conclusory observations.[7]

Given this, the Court should not accept the improper, imputed meaning Colossus SSP
assigns to cherry-picked portions of Adalytics' Blog Post.

### B.  Colossus SSP Does Not Allege Properly That Adalytics was Legally at Fault

Colossus SSP does not adequately allege the third element of a claim for Defamation –
legal fault.  "This element 'requires a showing that, at a minimum, the party making the false
statement acted negligently.'"  *Mejia v. Telemundo Mid-Atlantic LLC*, 440 F.Supp.3d 495, 501 (D.
Md. 2020).

> Negligence is any conduct, except conduct recklessly disregardful of an interest of
> others, which falls below the standard established by law for protection of others
> against unreasonable risk of harm. It does not exist apart from the facts and
> circumstances upon which it is predicated, necessarily involves the breach of some
> duty owed by a defendant to the plaintiff, and is inconsistent with the exercise of
> ordinary care.

*Mayor and City Council of Baltimore v. Hart*, 395 Md. 394, 410-11, 910 A.2d 463 (2006) (internal
citations and quotation marks omitted).  Actual malice – a higher degree of fault – necessitates
showing that the defendant made a defamatory statement "with knowledge that it was false or with
reckless disregard of whether it was false or not."  *Batson*, 325 Md. At 728, 602 A.2d 1191 (internal
citations omitted).

Here, Colossus SSP asserts Adalytics acted maliciously in making the allegedly false
statements, but it does so in an insufficient manner – with "nothing more than 'legal conclusions,
elements of a cause of action, and bare assertions devoid of further factual enhancement.'"  *Mejia*,
440 F.Supp.3d at 498 (quoting *Nemet Chevrolet, Ltd.*, 591 F.3d at 255).  "[T]here is a significant

---

[7] And, furthermore, the AdExchanger article was based not only on Adalytics' Blog Post but also
direct quotes and material provided to AdExchanger by Google, BidSwitch, and The Trade Desk.

difference between proof of actual malice and mere proof of falsity." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984).

Colossus SSP's Complaint is devoid of any ***plausible*** allegations that establish Adalytics acted maliciously. First, Colossus SSP states that "Adalytics' malicious intent to target Colossus SSP is apparent from its disparate treatment of BidSwitch in the same post where it defames Colossus SSP." Compliant, ¶ 34. For the reasons stated above, however, Adalytics' statements were not in any way defamatory to Colossus SSP. Furthermore, there was no "disparate treatment of BidSwitch," as Colossus SSP alleges. While Adalytics did state in its Blog Post that "a review of Bidswitch's public documentation regarding Supplier User Matching … does not appear to contain any information on how [it] might 'override,' 'inject,' 'substitute', or 'replace user cookie IDs sent to it by an SSP partner" (Blog Post, pp. 23-24), such is merely another observation. It does not "point[] the finger at Colossus SSP," as alleged in the Complaint. Complaint, ¶ 34. Furthermore, the Blog Post goes on to note that the mis-matches observed in Colossus SSP's transactions via BidSwitch did not appear when other SSPs transacted via BidSwitch. Blog Post, p. 24. But Adalytics – after reviewing technical documentation from BidSwitch ***and Colossus SSP*** – observed that "there does ***not*** appear to be technical explanations related to these phenomena … ." *Id.* at p. 4.

Colossus SSP also alleges Adalytics acted with malice based upon the fact it "disseminated" the Blog Post "to media outlets before it was public, without ever asking Colossus SSP for an explanation." First, there is no authority for the proposition that the author of a report must show it in its entirety to the subject of the report prior to publication. Second, the correspondence between the parties attached as Exhibit 2, demonstrates that – diametrically contrary to Colossus SSP's claims – Adalytics was seeking input ***from Colossus SSP*** prior to

publication of the Blog Post.  As Adalytics' General Counsel, Jonathan Lee, wrote to counsel for

Plaintiff:

> We are asking you to work with us so that we might correct something that is false before that falsehood is published.   To this end, please share with us the false/inaccurate information so that we might help you to persuade the journalist that there has been a misunderstanding/misinterpretation.

Exhibit 2, May 9, 2024 Email.  This was one of three times prior to publication of the Blog Post

(in addition to multiple times after publication of the Blog Post) that Adalytics requested evidence

from Colossus SSP of any information that it believed to be false.  *See* Exhibit 2.[8]

Neither can Colossus SSP rely upon its allegation that "Adalytics has a track record of

publishing inaccurate and false blog posts" (Complaint, ¶ 1) to show malice.  First, even if taken

as true (which it is not), such would have nothing to do with the instant matter.  And, second, this

claim is but a generalized allegation with absolutely no support that does not pass muster under

*Iqbal* and *Twombly*.

As for Colossus SSP's allegations that "Adalytics chose to attack Colossus SSP in an effort

to instill doubt in its business operations and win new customers for its 'ad transparency' services"

(*Id.*), such also fails from an *Iqbal/Twombly* perspective.  The notion that Adalytics' model is to

attack innocent ad tech vendors to create suspicion and distrust that it can then somehow use to

attract new clients and potential revenue is entirely implausible.  Adalytics is not a competitor of

Colossus SSP and would not gain any business Colossus SSP lost.  Thus, accepting the theory

presented by Colossus SSP would necessitate the conclusion that sophisticated advertisers have no

---

[8] Notably, counsel for Colossus SSP offered in a letter to provide certain files to Adalytics that counsel for Colossus SSP claimed would demonstrate the purportedly incorrect information. Despite multiple requests from counsel for Adalytics, such files never were sent.  *See* Exhibit 2.

**Appx. B-065**

ability to discern valuable digital forensic analysis from unfounded attacks, and that they would seek to employ the services of a company that fabricates its analysis.

Colossus SSP does not even attempt to establish the lower standard – that Adalytics acted negligently in making its statements – and it could not establish as much regardless.

### III.   Colossus SSP Fails to State a Claim for Injurious Falsehood

For many of the same reasons that Colossus SSP's Lanham Act and Defamation claims should be dismissed, its claim for Injurious Falsehood under Maryland law also fails and must be dismissed.

> To state a claim of injurious falsehood under Maryland law, a plaintiff must allege: (1) the defendant published a falsehood which tended to disparage plaintiff's title to his property, or its quality, or to his business in general, or some element of his personal affairs; (2) the defendant acted with actual malice or reckless disregard for the truth; and (3) the falsehood played a material and substantial part in inducing others not to deal with the plaintiff, and that as a result the plaintiff suffered special damage.

*Display Works, LLC v. Pinnacle Exhibits, Inc.*, Civil Action No. WMN-15-2284, 2015 WL 7454084 (D. Md. Nov. 24, 2015) (citing *Horning v. Hardy*, 36 Md.App. 419, 426-27, 373 A.2d 1273, 1278 (1977)).  *See also Nat'l. Bd. For Certification in Occupational Therapy, Inc. v. American Occupational Therapy Ass'n*, 24 F.Supp.2d 494, 511 n. 27 (D. Md. 1998) (noting that to state a claim for injurious falsehood, a plaintiff must plead that the defendant published "matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, or even to some element of his personal affairs, of a kind calculated to prevent others from dealing with him, or otherwise to interfere with his relations with others to his disadvantage," and that plaintiff "must establish that [Defendant], ***with malice***, published a known falsity to a third party, that caused special damages") (emphasis added) (internal quotations and citations omitted).

Here, as stated *supra*, Adalytics' Blog Post merely reported its observation that, of the 16 SSPs analyzed, Colossus SSP was the only one for which there were consistent misdeclarations of user IDs.  *See* Blog Post, p. 18.  Even if such statements could be found to be derogatory to Colossus SSP's business, Colossus SSP has not sufficiently pled that Adalytics acted with "actual malice."

Additionally, Adalytics did not assert that Colossus SSP intentionally mis-declared user IDs to engage in ad targeting, it only reported its observations – including that, for Colossus SSP, "it appeared that the user ID declared to The Trade Desk at ad auction time was markedly different from the actual user ID stored in user's Chrome browser cookie storage."  Blog Post, p. 3. Furthermore, Adalytics went out of its way to make clear it was not assigning fault to Colossus SSP for the observed discrepancies, stating: "It is unclear whether there is a specific use case or valid technical reason for these observations.  Reviewing various public written and technical documentation did not appear to mention or explain these observations."  *Id.*  If that were not enough, Adalytics wrote the following caveat-laden conclusion to its Blog Post:

> Interpreting the results of this observational study requires nuance and caution.
>
> This observational study makes no assertions with regards to the actual knowledge or intent of any of the parties observed or cited in this study.  The study cannot comment on whether any phenomenon, such as apparent mis-matches in various user ID related code parameters, were engineered for some specific reason.  It is ostensibly possible that any such mis-matches were due to valid ad serving behavior or due to new advances in user ID targeting technologies.

*Id.* at p. 30.

Colossus SSP also alleges that Adalytics "published its statements with actual malice" because

> Adalytics knew that its statements were false and/or misleading based on its expertise in advertising technology and programmatic advertising, as well as Colossus SSP's repeated communications to Adalytics prior to publishing the post

24

to the public informing it that the post was false and Colossus SSP could demonstrate its falsity to Adalytics, which Adalytics refused.

Complaint, ¶ 64.  As noted previously, however, the communications between Adalytics and Colossus SSP prior to Adalytics publishing its Blog Post (which are integral to Colossus SSP's Complaint and attached hereto as Exhibit 2) demonstrate that Adalytics repeatedly sought any evidence or information regarding what Colossus SSP claimed was false about Adalytics' Blog Post.  Yet Colossus SSP refused to provide any such evidence or information – and, saliently, it still has not provided any.  For these and all the reasons stated in Section II.B, *supra*, Colossus SSP has not sufficiently alleged Adalytics acted with actual malice.

In addition, Colossus SSP has made merely conclusory allegations regarding special damages.  While Plaintiff is not required to provide "[d]etailed factual allegations," it must include "factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action.  *Iqbal*, 556 U.S. at 678 (citations omitted).  And, for special damages, Fed. R. Civ. P. 9(g) requires that "[i]f an item of special damage is claimed, it must be specifically stated."  *See also Cook v. Britton*, Civil Action No. WMN-11-2305, 2012 WL 14024 (D. Md. Jan. 3, 2012) (noting that "[t]his heightened pleading requirement serves not only to provide greater notice to the defendant, but also to allow a court to discovery groundless claims and dismiss them earlier in litigation").

Here, Colossus SSP alleges that "Adalytics' false statements played a material and substantial part in inducing industry partners and customers not to do business with Colossus SSP."  Complaint, ¶ 65.  Such allegations are insufficient.  And, as stated *supra*, Colossus SSP's claims that The Trade Desk and BidSwitch suspended business with Colossus SSP because of the Blog Post are contradicted by the articles Colossus SSP references in its Complaint.  Colossus SSP's claim for Injurious Falsehood, therefore, should be dismissed.

25

## <u>CONCLUSION</u>

Colossus SSP's Complaint is based upon an implausible theory, contains facts contradicted by the plain language of documents integral to the Complaint, and fails to set forth properly pled causes of action.  Try as it might, Colossus SSP is unable to take the straightforward observations Adalytics made about publicly available data and twist them into defamatory statements made with malice to (somehow) financially benefit Adalytics.  Not only does Colossus SSP fail to plead viable causes of action, but its baseline theory is implausible.  The Court should dismiss the Complaint with prejudice in its entirety.

Dated: July 3, 2024                           Respectfully submitted,

                                              **SCHULMAN BHATTACHARYA, LLC**

                              By:    <u>*/s/ Koushik Bhattacharya*</u>
                                     Koushik Bhattacharya
                                     James "Jake" Schaller
                                     6116 Executive Boulevard, Suite 425
                                     North Bethesda, Maryland 20852
                                     Tel: (240) 356-8550
                                     Facsimile: (240) 356-8558
                                     Email: kbhattacharya@schulmanbh.com
                                            jschaller@schulmanbh.com

                                     *Counsel for Defendant Adalytics Research, LLC*

Appx. B-069

# Exhibit 6

Appx. B-070

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2024**
**O R**

☐  **TRANSITION REPORT PURSUANT SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM _____ TO _____**
**COMMISSION FILE NUMBER 001-41261**

# DIRECT DIGITAL HOLDINGS, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **87-2306185** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1177 West Loop South, Suite 1310** | |
| **Houston, Texas** | **77027** |
| **(Address of principal executive offices)** | **(Zip code)** |

**(832) 402-1051**
**(Registrant's telephone number, including area code)**

| Securities registered pursuant to Section 12(b) of the Act: | | |
|---|---|---|
| **Title of Each Class:** | **Trading symbol(s)** | **Name of Each Exchange on Which Registered:** |
| Class A Common Stock, par value $0.001 per share | DRCT | Nasdaq Capital Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act .☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of October 11, 2024, there were 3,795,199 shares of the registrant's Class A Common Stock outstanding, par value $0.001 per share, and 10,868,000 shares of the registrant's Class B Common Stock outstanding, par value $0.001 per share.

Table of Contents

## TABLE OF CONTENTS

| ITEM | | PAGE |
|---|---|---|
| | Part I. Financial Information | 3 |
| 1. | FINANCIAL STATEMENTS (UNAUDITED) | 3 |
| | Condensed Consolidated Balance Sheets as of March 31, 2024 and December 31, 2023 | 3 |
| | Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2024 and 2023 | 4 |
| | Condensed Consolidated Changes in Stockholders' Deficit for the Three Months Ended March 31, 2024 and 2023 | 5 |
| | Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2024 and 2023 | 6 |
| | Notes to Condensed Consolidated Financial Statements | 7 |
| 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| 3. | Quantitative and Qualitative Disclosures About Market Risk | 38 |
| 4. | Controls and Procedures | 38 |
| | Part II. Other Information | 39 |
| 1. | Legal Proceedings | 39 |
| 1A. | Risk Factors | 40 |
| 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 40 |
| 3. | Defaults Upon Senior Securities | 40 |
| 4. | Mine Safety Disclosures | 40 |
| 5. | Other Information | 40 |
| 6. | Exhibits | 41 |
| Signatures | | 42 |

**Appx. B-072**

Table of Contents

**PART 1. FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS**
**DIRECT DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(in thousands, except share and par value amounts)

| | March 31, 2024 | December 31, 2023 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 3,334 | $ 5,116 |
| Accounts receivable, net of provision for credit losses of $337 and $344 | 21,435 | 37,207 |
| Prepaid expenses and other current assets | 849 | 759 |
| Total current assets | 25,618 | 43,082 |
| | | |
| Property, equipment and software, net | 529 | 599 |
| Goodwill | 6,520 | 6,520 |
| Intangible assets, net | 11,195 | 11,684 |
| Deferred tax asset, net | 6,332 | 6,132 |
| Operating lease right-of-use assets | 751 | 788 |
| Related party receivable | 1,737 | 1,737 |
| Other long-term assets | 88 | 130 |
| Total assets | $ 52,770 | $ 70,672 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 15,864 | $ 33,926 |
| Accrued liabilities | 2,156 | 3,816 |
| Liability related to tax receivable agreement, current portion | 41 | 41 |
| Current maturities of long-term debt | 1,473 | 1,478 |
| Deferred revenues | 557 | 381 |
| Operating lease liabilities, current portion | 151 | 126 |
| Income taxes payable | 33 | 34 |
| Total current liabilities | 20,275 | 39,802 |
| | | |
| Long-term debt, net of current portion | 32,356 | 28,578 |
| Liability related to tax receivable agreement, net of current portion | 5,201 | 5,201 |
| Operating lease liabilities, net of current portion | 728 | 773 |
| Total liabilities | 58,560 | 74,354 |
| | | |
| COMMITMENTS AND CONTINGENCIES (Note 9) | | |
| | | |
| STOCKHOLDERS' DEFICIT | | |
| Class A Common Stock, $0.001 par value per share, 160,000,000 shares authorized, 3,684,278 and 3,478,776 shares issued and outstanding, respectively | 4 | 3 |
| Class B Common Stock, $0.001 par value per share, 20,000,000 shares authorized, 10,868,000 shares issued and outstanding | 11 | 11 |
| Additional paid-in capital | 3,441 | 3,067 |
| Accumulated deficit | (3,313) | (2,538) |
| Noncontrolling interest | (5,933) | (4,225) |
| Total stockholders' deficit | (5,790) | (3,682) |
| Total liabilities and stockholders' deficit | $ 52,770 | $ 70,672 |

*See accompanying notes to the unaudited condensed consolidated financial statements.*

3

Table of Contents

**DIRECT DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
(in thousands, except per-share data)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2024 | 2023 |
| Revenues | | |
| Sell-side advertising | $ 16,500 | $ 13,783 |
| Buy-side advertising | 5,775 | 7,440 |
| Total revenues | 22,275 | 21,223 |
| | | |
| Cost of revenues | | |
| Sell-side advertising | 14,807 | 11,841 |
| Buy-side advertising | 2,470 | 2,949 |
| Total cost of revenues | 17,277 | 14,790 |
| Gross profit | 4,998 | 6,433 |
| | | |
| Operating expenses | | |
| Compensation, taxes and benefits | 4,524 | 3,634 |
| General and administrative | 3,281 | 2,940 |
| Total operating expenses | 7,805 | 6,574 |
| Loss from operations | (2,807) | (141) |
| | | |
| Other income (expense) | | |
| Other income | 85 | 50 |
| Loss on early termination of line of credit | - | (300) |
| Interest expense | (1,297) | (1,017) |
| Total other expense, net | (1,212) | (1,267) |
| | | |
| Loss before income taxes | (4,019) | (1,408) |
| Income tax benefit | (200) | (74) |
| Net loss | (3,819) | (1,334) |
| | | |
| Net loss attributable to noncontrolling interest | (3,044) | (1,120) |
| Net loss attributable to Direct Digital Holdings, Inc. | $ (775) | $ (214) |
| | | |
| Net loss per common share: | | |
| Basic | $ (0.22) | $ (0.07) |
| Diluted | $ (0.22) | $ (0.07) |
| | | |
| Weighted-average number of shares of common stock outstanding: | | |
| Basic | 3,509 | 2,901 |
| Diluted | 3,509 | 2,901 |

*See accompanying notes to the unaudited condensed consolidated financial statements.*

4

**Appx. B-074**

Table of Contents

**DIRECT DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' DEFICIT**
**(Unaudited)**
(in thousands except share data)

### Three Months Ended March 31, 2024

| | Common Stock | | | | | | | | | |
| | Class A | | Class B | | | | Accumulated | Noncontrolling | Stockholders' |
| | Units | Amount | Units | Amount | APIC | deficit | Interest | equity |
|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2023 | 3,478,776 | $ 3 | 10,868,000 | $ 11 | $ 3,067 | $ (2,538) | $ (4,225) | $ (3,682) |
| Stock-based compensation | - | - | - | - | 504 | - | - | 504 |
| Issuance related to vesting of restricted stock units, net of tax withholdings | 88,386 | 1 | - | - | (1) | - | - | - |
| Warrants exercised | 39,101 | - | - | - | 215 | - | - | 215 |
| Stock options exercised | 8,338 | - | - | - | 79 | - | - | 79 |
| Issuance of stock in lieu of cash bonus, net of tax withholdings | 69,677 | - | - | - | 913 | - | - | 913 |
| Net loss | - | - | - | - | - | (775) | (3,044) | (3,819) |
| Noncontrolling interest rebalancing | | | | | $ (1,336) | | $ 1,336 | - |
| Balance, March 31, 2024 | 3,684,278 | $ 4 | 10,868,000 | $ 11 | $ 3,441 | $ (3,313) | $ (5,933) | $ (5,790) |

### Three Months Ended March 31, 2023

| | Common Stock | | | | | | | | | |
| | Class A | | Class B | | | | Accumulated | Noncontrolling | Stockholders' |
| | Units | Amount | Units | Amount | APIC | deficit | Interest | equity |
|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2022 | 2,900,000 | $ 3 | 11,278,000 | $ 11 | $ 2,611 | $ (344) | $ 3,314 | $ 5,595 |
| Stock-based compensation | - | - | - | - | 94 | - | - | 94 |
| Warrants exercised | 2,200 | - | - | - | 12 | - | - | 12 |
| Net loss | - | - | - | - | - | (214) | (1,120) | (1,334) |
| Balance, March 31, 2023 | 2,902,200 | $ 3 | 11,278,000 | $ 11 | $ 2,717 | $ (558) | $ 2,194 | $ 4,367 |

*See accompanying notes to the unaudited condensed consolidated financial statements.*

5

**Appx. B-075**

Table of Contents

**DIRECT DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2024 | 2023 |
| **Cash Flows (Used In) Provided By Operating Activities:** | | |
| Net loss | $ (3,819) | $ (1,334) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Amortization of deferred financing costs | 186 | 136 |
| Amortization of intangible assets | 488 | 489 |
| Reduction in carrying amount of right-of-use assets | 37 | 42 |
| Depreciation and amortization of property, equipment and software | 71 | 57 |
| Stock-based compensation | 504 | 94 |
| Deferred income taxes | (200) | (74) |
| Loss on early termination of line of credit | - | 300 |
| Provision for credit losses/bad debt expense, net of recoveries | (11) | - |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 15,783 | 7,304 |
| Prepaid expenses and other assets | (89) | (242) |
| Accounts payable | (18,062) | (3,909) |
| Accrued liabilities and tax receivable agreement payable | (748) | (150) |
| Income taxes payable | - | 8 |
| Deferred revenues | 176 | 403 |
| Operating lease liability | (20) | (24) |
| Net cash (used in) provided by operating activities | (5,704) | 3,100 |
| | | |
| **Cash Flows Used In Investing Activities:** | | |
| Cash paid for capitalized software and property and equipment | - | (48) |
| Net cash used in investing activities | - | (48) |
| | | |
| **Cash Flows Provided by (Used In) Financing Activities:** | | |
| Payments on term loan | (372) | (164) |
| Proceeds from lines of credit | 4,000 | - |
| Payment of deferred financing costs | - | (228) |
| Proceeds from options exercised | 79 | - |
| Proceeds from warrants exercised | 215 | 12 |
| Net cash provided by (used in) financing activities | 3,922 | (380) |
| | | |
| Net (decrease) increase in cash and cash equivalents | (1,782) | 2,672 |
| Cash and cash equivalents, beginning of the period | 5,116 | 4,047 |
| Cash and cash equivalents, end of the period | $ 3,334 | $ 6,719 |
| | | |
| **Supplemental Disclosure of Cash Flow Information:** | | |
| Cash paid for taxes | $ 28 | $ - |
| Cash paid for interest | $ 1,078 | $ 879 |

*See accompanying notes to the unaudited condensed consolidated financial statements.*

6

Table of Contents

**DIRECT DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 1 - Organization and Description of Business**

Direct Digital Holdings, Inc., incorporated as a Delaware corporation on August 23, 2021 and headquartered in Houston, Texas, together with its subsidiaries, operates an end-to-end, programmatic advertising platform primarily focused on providing advertising technology, data-driven campaign optimization and other solutions intended for underserved and less efficient markets on both the sell- and buy-side of the digital advertising ecosystem. Direct Digital Holdings, Inc. is the holding company for Direct Digital Holdings, LLC ("DDH LLC"), which is, in turn, the holding company for the business formed by DDH LLC's founders in 2018 through the acquisition of Colossus Media, LLC ("Colossus Media") and Huddled Masses, LLC ("Huddled Masses®" or "Huddled Masses"). Colossus Media operates the Company's proprietary sell-side programmatic platform operating under the trademarked banner of Colossus SSP™ ("Colossus SSP"). In late September 2020, DDH LLC acquired Orange142, LLC ("Orange 142") to further bolster its overall programmatic buy-side advertising platform and to enhance its offerings across multiple industry verticals such as travel, healthcare, education, financial services, consumer products, and other sectors with particular emphasis intended for small and mid-sized businesses transitioning into digital with growing digital media budgets. In February 2022, Direct Digital Holdings, Inc. completed an initial public offering of its securities and, together with DDH LLC, effected a series of transactions (together, the "Organizational Transactions") whereby Direct Digital Holdings, Inc. became the sole managing member of DDH LLC, the holder of 100% of the voting interests of DDH LLC and the holder of 19.7% of the economic interests of DDH LLC, commonly referred to as an "Up-C" structure. (See Note 6 - Related Party Transactions). In these condensed consolidated financial statements, the "Company," "Direct Digital," "Direct Digital Holdings," "DDH," "we," "us" and "our" refer to Direct Digital Holdings, Inc., and, unless otherwise stated, all of its subsidiaries, including DDH LLC and its subsidiaries. All of the subsidiaries are incorporated in the state of Delaware, except for DDH LLC, which was formed under the laws of the State of Texas.

The subsidiaries of Direct Digital Holdings, Inc. are as follows:

| Subsidiary | Current % Ownership | Business Segment | Date of Formation | Date of Acquisition |
|---|---|---|---|---|
| Colossus Media, LLC | 100% | Sell-side | September 8, 2017 | June 21, 2018 |
| Orange142, LLC | 100% | Buy-side | March 6, 2013 | September 30, 2020 |
| Huddled Masses, LLC | 100% | Buy-side | November 13, 2012 | June 21, 2018 |
| Direct Digital Holdings, LLC [(1)] | | N/A | June 21, 2018 | February 15, 2022 |

[(1)] DDH owns 100% of the voting interest in Direct Digital Holding, LLC. As of March 31, 2024, DDH owns 25.3% of the economic interest in Direct Digital Holdings, LLC. See further discussion of the Up-C structure in Note 6 of our condensed consolidated financial statements.

Colossus SSP is a stand-alone platform intended to deliver targeted advertising to diverse and multicultural audiences as well as to general audiences. Both buy-side subsidiaries, Orange 142 and Huddled Masses, offer technology-enabled advertising solutions and consulting services to clients through demand side platforms ("DSPs").

Providing both the front-end, buy-side operations coupled with the Company's proprietary sell-side operations enables the Company to curate the first through the last mile in the ad tech ecosystem execution process to drive higher results.

**Note 2 - Basis of Presentation and Consolidation and Summary of Significant Accounting Policies**

*Basis of presentation and consolidation*

The accompanying condensed unaudited consolidated financial statements have been prepared by the Company in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and as required by Rule 8-03 of Regulation S-X. Accordingly, the condensed unaudited consolidated financial statements may not include all of the information and notes required by GAAP for audited financial statements. The consolidated financial statements data for the year ended December 31, 2023 included herein was derived from audited financial statements but does not include all disclosures required by GAAP for complete financial statements. In the opinion of the Company's management, the accompanying condensed unaudited consolidated financial statements contain all adjustments, consisting of items of a normal and recurring nature, necessary to present fairly the Company's financial

7

Table of Contents

position as of March 31, 2024, the results of operations, changes in stockholders' deficit and cash flows for the three-months ended March 31, 2024 and 2023, respectively. The results of operations for the three-months ended March 31, 2024 and 2023, respectively, are not necessarily indicative of the results to be expected for the full year. The preparation of condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts of assets and liabilities, and related disclosures, as of the date of the financial statements, and the amounts of revenues and expenses reported during the period. Actual results could differ from estimates. The accompanying condensed unaudited consolidated financial statements should be read in conjunction with the Company's audited financial statements and the accompanying notes for the year ended December 31, 2023, which was included in Form 10-K filed with the SEC on October 15, 2024.

The condensed consolidated financial statements include the accounts of Direct Digital Holdings, Inc. and its wholly owned subsidiaries. All material intercompany accounts and transactions have been eliminated in consolidation.

The Company is an emerging growth company, as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). Under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards otherwise applicable to public companies until such time as those standards apply to private companies. The Company has elected to use this extended transition period for complying with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date that it (i) is no longer an emerging growth company or (ii) it affirmatively and irrevocably opts out of the extended transition period provided in the JOBS Act. As a result, these condensed consolidated financial statements may not be comparable to companies that comply with the new or revised accounting pronouncements as of public company effective dates. The adoption dates discussed below reflect this election.

*Revenue recognition*

The Company recognizes revenue using the following five steps: 1) identification of a contract with a customer; 2) identification of the performance obligation(s) in the contract; 3) determination of the transaction price; 4) allocation of the transaction price to the performance obligation(s) in the contract; and 5) recognition of revenue when, or as, the performance obligation(s) are satisfied. The Company's revenues are derived primarily from two sources: sell-side advertising and buy-side advertising. Thus, the Company disaggregates the revenue earned into these two segments. For additional segment disclosures, refer to Note 7 - Segment Information of our condensed consolidated financial statements. The Company maintains agreements with its customers in the form of written service agreements, which set out the terms of the relationship, including payment terms (typically 30 to 90 days) and access to its platform.

For the sell-side advertising segment, the Company generates revenue by selling advertising inventory (digital ad units) that the Company purchases from publishers to advertisers through a process of monetizing ad impressions on the Company's proprietary sell-side programmatic platform operating under the trademarked banner Colossus SSP. For the buy-side advertising segment, the Company generates revenue from customers that enter into agreements with the Company to provide managed advertising campaigns, which include digital marketing and media services to purchase advertising space, data and other add-on features.

In connection with the Company's analysis of principal vs agent considerations, the Company has evaluated the specified goods or services and considered whether the Company controls the goods or services before they are provided to the customer, including the three indicators of control. Based upon this analysis and the Company's specific facts and circumstances, the Company concluded that it is a principal for the goods or services sold through both the Company's sell-side advertising segment and buy-side advertising segment because the Company controls the specified good or service before it is transferred to the customer and the Company is the primary obligor in the agreement with customers. Therefore, the Company reports revenue on a gross basis inclusive of all supplier costs and pays suppliers for the cost of digital media, advertising inventory, data and any add-on services or features.

In the advertising industry, companies commonly experience seasonal fluctuations in revenue. For example, in our sell-side advertising segment, many advertisers allocate the largest portion of their budgets to the fourth quarter of the calendar year in order to coincide with increased holiday purchasing while, in our buy-side segment, the second and third quarters of the year reflect our highest levels of advertising activity and the first quarter reflects the lowest level of such activity.

*Sell-side advertising*

The Company partners with publishers to sell advertising inventory to the Company's Colossus Media-curated clients and the open markets (collectively referred to as "buyers") seeking to access the general market as well as unique multi-

8

**Appx. B-078**

Table of Contents

cultural audiences. The Company generates revenue from the delivery of targeted digital media solutions, enabling advertisers to connect intelligently with their audiences across online display, video, social and mobile mediums using its proprietary programmatic sell-side platform ("SSP"). The Company refers to its publishers, app developers, and channel partners collectively as its "publishers". The Company's platform allows the Company to sell, in real time, ad impressions from publishers to buyers and provides automated inventory management and monetization tools to publishers across various device types and digital ad formats. The Company recognizes revenue at a point in time when an ad is delivered or displayed in response to a winning bid request from ad buyers.

*Buy-side advertising*

The Company purchases media based on the budget established by its customers with a focus on leveraging data services, customer branding, real-time market analysis and micro-location advertising. The Company offers its services on a fully managed basis, which is recognized over time using the output method when the performance obligation is fulfilled. An "impression" is delivered when an advertisement appears on pages viewed by users. The performance obligation is satisfied over time as the volume of impressions are delivered up to the contractual maximum. Many customers run several different campaigns throughout the year to capitalize on different seasons, special events and other happenings at their respective regions and localities. The Company provides digital advertising and media buying capabilities with a focus on generating measurable digital and financial life for its customers.

Revenue arrangements are evidenced by a fully executed insertion order ("IO") and/or a master service agreement ("MSA") covering a combination of marketing tactics. Generally, IOs specify the number and type of advertising impressions to be delivered over a specified time at an agreed upon price and performance objectives for an ad campaign. Performance objectives are generally a measure of targeting, as defined by the parties in advance, such as number of ads displayed, consumer clicks on ads or consumer actions (which may include qualified leads, registrations, downloads, inquiries or purchases). These payment models are commonly referred to as CPM (cost per impression), CPC (cost per click) and CPA (cost per action). The majority of the Company's contracts are flat-rate, fee-based contracts.

Cash payments received prior to the Company's delivery of its services are recorded to deferred revenue until the performance obligation is satisfied. The Company recorded deferred revenue (contract liabilities) to account for billings in excess of revenue recognized, primarily related to contractual minimums billed in advance and customer prepayment, of $
0.6 million and $0.4 million as of March 31, 2024 and December 31, 2023, respectively. Revenue recognized during the three months ended March 31, 2024 and 2023 from amounts included within the deferred revenue balances at the beginning of each respective period amounted to $0.4 million and $0.5 million, respectively.

Accounting Standards Codification ("ASC") 606 provides various optional practical expedients. The Company elected the use of the practical expedient relating to the disclosure of remaining performance obligations within a contract and will not disclose remaining performance obligations for contracts with an original expected duration of one year or less.

**Goodwill**

As of March 31, 2024 and December 31, 2023, goodwill was $6.5 million, which includes $2.4 million as a result of the acquisition of Huddled Masses and Colossus Media in 2018 and $4.1 million from the acquisition of Orange 142 in 2020. The Company expects to deduct goodwill for tax purposes in future years. Goodwill is attributable to entry into new markets not previously accessible and generation of future growth opportunities. Goodwill is assessed for impairment at least annually (December 31) starting with a qualitative assessment to determine whether it is more likely than not that the fair value of a reporting unit containing goodwill is less than its carrying value. This qualitative assessment may include, but is not limited to, reviewing factors such as macroeconomic conditions, industry and market considerations, cost factors, entity-specific financial performance and other events, such as changes in our management, strategy and primary user base. If the Company determines that it is more likely than not that the fair value of a reporting unit is less than its carrying value, then a quantitative goodwill impairment analysis is performed. Depending upon the results of the quantitative measurement, the recorded goodwill may be written down and an impairment expense is recorded in the condensed consolidated statements of operations when the carrying amount of the reporting unit exceeds the fair value of the reporting unit. Goodwill is reviewed annually and tested for impairment upon the occurrence of a triggering event. The Company determined that there was no impairment of goodwill during the three months ended March 31, 2024 and 2023.

**Intangible assets, net**

Intangible assets consist of customer relationships, trademarks and non-compete agreements. Intangible assets are recorded at fair value at the time of their acquisition and are stated within the condensed consolidated balance sheets net of accumulated amortization. Intangible assets are amortized on a straight-line basis over their estimated useful lives and recorded as amortization expense within general and administrative expenses in the condensed consolidated statements of

9

Table of Contents

operations. The Company's intangible assets are being amortized over their estimated useful lives, using the straight-line method with non-compete agreements over 5 years and other intangibles over 10 years.

*Impairment of long-lived assets*

The Company evaluates the recoverability of long-lived assets, including property, equipment and software costs and intangible assets if facts or circumstances indicate that any of those assets might be impaired. ASC 360-10-15 requires the Company to group assets and liabilities at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities and evaluate the asset group against the sum of the undiscounted future cash flows to determine if a write-down to fair value is necessary. No impairment loss was recognized during the three months ended March 31, 2024 and 2023.

*Stock-based compensation*

Stock-based compensation cost for options and restricted stock units ("RSU") awarded to employees and directors is measured at the grant date based on the calculated fair value of the award and is recognized as an expense over the requisite service period (generally the vesting period of the equity grant). Contingently issued awards with a requisite service period that precedes the grant date are measured and recognized at the start of the requisite service period and remeasured each reporting period until the grant date.

The Company estimates the fair value of RSU's based on the closing price of the Company's common stock on the date of the grant. The Company estimates the fair value of stock options using the Black-Scholes valuation model. Key input assumptions used to estimate the fair value of stock options include the fair value of the Company's common stock, as well as assumptions regarding the expected common stock price volatility over the term of the stock options, the expected term of the stock options, risk-free interest rates and the expected dividend yield. Given the Company's short history as a public company, the expected volatility is determined based on the trading history of several unrelated public companies within the industry that the Company considers to be comparable and the expected term is determined based on a combination of the terms of stock options and peer data. The risk-free interest rate is derived using the U.S. Treasury yield curve in effect at date of grant. Other assumptions are based on historical experience and activity. The Company considers an estimated forfeiture rate for stock options based on historical experience and the anticipated forfeiture rates during the future contract life.

*Income taxes*

In February 2022, concurrent with the Organizational Transactions, the Company entered into a tax receivable agreement ("Tax Receivable Agreement" or "TRA") with DDH LLC and Direct Digital Management, LLC ("DDM"). The TRA provides for certain income (loss) allocations between the Company and DDH LLC under the agreement. DDH LLC is a limited liability company, is treated as a partnership for federal income tax purposes and generally is not subject to any entity-level U.S. federal income tax and certain state and local income taxes. Any taxable income or loss generated by the Company is allocated to holders of LLC units ("LLC Units") in accordance with the Second Amended and Restated Limited Liability Company Agreement ("LLC Agreement"), and distributions to the owners of LLC Units in an amount sufficient to fund their tax obligations. The Company is subject to U.S. federal income taxes, in addition to state and local income taxes with respect to its allocable share of any taxable income or loss under the LLC Agreement. Pursuant to the Company's election under Section 754 of the Internal Revenue Code (the "Code"), the Company expects to obtain an increase in its share of the tax basis in the net assets of DDH, LLC when LLC Units are redeemed or exchanged by the members of DDH, LLC. The Company made an election under Section 754 of the Code for each taxable year in which a redemption or exchange of LLC interest occurred. During the three months ended March 31, 2024 and 2023, members of DDM exchanged no shares of Class B Common Stock into shares of Class A Common Stock.

Deferred tax assets and liabilities are determined based on differences between financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. A valuation allowance is established when it is more likely than not that some portion or all of the deferred tax assets will not be realized. The establishment of a valuation allowance requires significant judgment and is impacted by various estimates. Both positive and negative evidence, as well as the objectivity and verifiability of that evidence, is considered in determining the appropriateness of recording a valuation allowance on deferred tax assets. As of March 31, 2024 and December 31, 2023, the Company recorded a valuation allowance of $0.5 million and $0.5 million, respectively.

Table of Contents

*Accounts receivable, net*

Accounts receivable primarily consists of billed amounts for products and services rendered to customers under normal trade terms. The Company performs credit evaluations of its customers' financial condition and generally does not require collateral. Accounts receivable are stated at net realizable value. The Company insures a significant portion of its accounts receivable with unrelated third-party insurance companies in an effort to mitigate any future write-offs and establishes provision for credit losses as deemed necessary for accounts not covered by this insurance. Management periodically reviews outstanding accounts receivable for reasonableness. If warranted, the Company processes a claim with the third-party insurance company to recover uncollected balances, rather than writing the balances off to bad debt expense. The guaranteed recovery for the claim is approximately 90% of the original balance, and if the full amount is collected by the insurance company, the remaining 10% is remitted to the Company. If the insurance company is unable to collect the full amount, the Company records the remaining 10% to bad debt expense. The Company's provision for credit losses reflects the current expected credit loss inherent in the accounts receivable considering the Company's aging analysis, historical collection experience, customer creditworthiness, current and future economic conditions and market conditions. Accounts receivable balances are written off against the provision when the Company believes it is probable the receivable will not be recovered. For the three months ended March 31, 2024 and 2023 the Company's provision for credit losses net of recoveries, as reflected in the condensed consolidated statements of cash flows was less than $0.1 million.

*Concentrations of customers and suppliers*

There is an inherent concentration of credit risk associated with accounts receivable arising from revenue from major customers on both the sell-side and buy-side of the business. For the three months ended March 31, 2024 and 2023, one customer of the sell-side of the business represented 68% and 60% of revenues, respectively. As of March 31, 2024 and December 31, 2023, one customer of the sell-side of the business accounted for 71% and 83%, respectively, of accounts receivable.

As of March 31, 2024 and December 31, 2023, three sellers of advertising inventory each accounted for at least 10%, and collectively accounted for 57% and 77%, respectively, of consolidated accounts payable.

*Accrued Liabilities*

The components of accrued liabilities on the balance sheet as of March 31, 2024 and December 31, 2023 are as follows (in thousands):

|  | March 31, 2024 | | December 31, 2023 | |
| --- | --- | --- | --- | --- |
| Accrued compensation and benefits | $ | 944 | $ | 2,789 |
| Accrued expenses | | 931 | | 631 |
| Accrued severance | | 108 | | 190 |
| Accrued litigation settlement [1] | | 107 | | 171 |
| Accrued interest | | 66 | | 36 |
| Total accrued liabilities | $ | 2,156 | $ | 3,816 |

(1) In July 2022, the Company entered into a litigation settlement agreement with a vendor of Huddled Masses related to a delinquent balance from 2019 and agreed to pay a total of $0.5 million with monthly installment payments over 24 months beginning September 1, 2022.

*Cash and cash equivalents*

Cash and cash equivalents consist of funds deposited with financial institutions and highly liquid instruments with original maturities of three months or less. Such deposits may, at times, exceed federally insured limits. The risk of loss attributable to any uninsured balances is mitigated by depositing funds only in high credit quality financial institutions. The Company has not experienced any losses in such amounts and believes it is not exposed to any significant credit risk to cash.

**Appx. B-081**

Table of Contents

*Deferred offering costs*

The Company records certain legal, accounting and other third-party fees that are directly associated with an offering to stockholders' equity or debt in the event that the Company completes an offering. Costs associated with debt offerings are amortized to interest expense using the straight-line method over the life of the debt. As of March 31, 2024 and December 31, 2023, $1.5 million and $1.7 million, respectively, of unamortized deferred financing costs are netted against debt in the condensed consolidated balance sheets.

*Fair value measurements*

The Company employs a hierarchy which prioritizes the inputs used to measure recurring fair value into three distinct categories based on the lowest level of input that is significant to the fair value measurement. The methodology for categorizing assets and liabilities that are measured at fair value pursuant to this hierarchy gives the highest priority to unadjusted quoted prices in active markets and the lowest levels to unobservable inputs, summarized as follows:

- Level 1 - Quoted prices in active markets for identical assets or liabilities.

- Level 2 - Other significant observable inputs (including quoted prices in active markets for similar assets or liabilities).

- Level 3 - Significant unobservable inputs (including our own assumptions in determining fair value).

We use the cost, income or market valuation approaches to estimate the fair value of our assets and liabilities when insufficient market-observable data is available to support our valuation assumptions.

*Fair value of financial instruments*

The Company considers the fair value of all financial instruments, including cash, accounts receivable and accounts payable to approximate their carrying values at year-end due to their short-term nature. The carrying value of the Company's debt approximates fair value due to the market rates of interest.

*Net income (loss) per share*

Basic net income (loss) per share excludes dilution and is determined by dividing net income (loss) by the weighted average number of common shares outstanding including participating securities during the period. Diluted net income (loss) per share reflects the potential dilution that could occur if securities and other contracts to issue common stock were exercised or converted into common stock.

*Recent Accounting Pronouncements*

*Accounting pronouncements adopted*

No standards have been adopted which have had a material impact on the Company's condensed consolidated financial statements.

*Accounting pronouncements not yet adopted*

In December 2023, the Financial Accounting Standards Board (the "FASB") issued ASU 2023-09, *Improvements to Income Tax Disclosures*, a final standard on improvements to income tax disclosures. The standard requires disaggregated information about a reporting entity's effective tax rate reconciliation as well as information on income taxes paid. The standard is intended to benefit investors by providing more detailed income tax disclosures that would be useful in making capital allocation decisions and applies to all entities subject to income taxes. The new standard is effective for emerging growth companies for annual periods beginning after December 15, 2025. This accounting standard is effective in the first quarter of the Company's fiscal year ending December 31, 2026. The Company is currently evaluating the impact of adoption on our financial disclosures.

In November 2023, the FASB issued ASU 2023-07, *Segment Reporting (Topic 280) - Improvements to Reportable Segment Disclosures*. The ASU requires that an entity disclose significant segment expenses impacting profit and loss that are regularly provided to the Company's chief operating decision maker ("CODM"). The update is required to be applied retrospectively to prior periods presented, based on the significant segment expense categories identified and disclosed in the period of adoption. The amendments in this ASU are required to be adopted for fiscal years beginning after December

Appx. B-082

Table of Contents

15, 2023, and interim periods within fiscal years beginning after December 15, 2024. Early adoption is permitted. The Company is currently evaluating the impact of adoption on our financial disclosures.

Other accounting standards that have been issued or proposed by the FASB or other standards-setting bodies that do not require adoption until a future date are not expected to have a material impact on the Company's condensed consolidated financial statements.

*Liquidity and capital resources*

*Going Concern*

The Company evaluated whether relevant conditions or events, considered in the aggregate, raise substantial doubt about the Company's ability to continue as a going concern. Substantial doubt exists when conditions and events, considered in the aggregate, indicate it is probable that a company will not be able to meet its obligations as they become due within one year after the issuance date of its financial statements. Management's assessment is based on the relevant conditions that are known or reasonably knowable as of the date these consolidated financial statements were issued or were available to be issued.

As discussed in Note 9 to the condensed consolidated financial statements, one of the Company's sell-side customers paused its connection to the Company for a couple of weeks in May 2024, which reduced sell-side sales volumes. As of the date of this report, sell-side volumes related to this customer have resumed but not yet at the levels experienced prior to the pause in May 2024 which has created significant disruption in the Company's sell-side business. The Company is actively working with its partners to achieve prior volume levels. However, there can be no assurance that the Company will be able to achieve prior volume levels with its partners or on the timing of achieving such volume levels. Additionally, the Company (1) incurred a net loss of $6.8 million in 2023 primarily related to payments made to a few publishers of $8.8 million associated with a disputed short payment from a customer and a net loss of $3.8 million in the three months ended March 31, 2024 consistent with seasonal historical trends for the Company, (2) reported an accumulated deficit of $3.3 million as of March 31, 2024, (3) reported cash and cash equivalents of $3.3 million as of March 31, 2024, (4) has borrowed $7.0 million and $9.7 million as of March 31, 2024 and the date of this report, respectively, under the Credit Agreement which matures in July 2025, (5) was notified on April 17, 2024 that the Company's auditor had resigned and (6) was unable to timely file its 2023 annual report and quarterly reports for the first two quarters of 2024. The delay in filing the Company's annual and quarterly reports disrupted existing capital-raising efforts and created additional audit, legal and other expenses. These factors raise substantial doubt about the Company's ability to continue as a going concern over the next twelve months.

The Company anticipates sources of liquidity to include cash on hand and cash flow from operations and has taken several actions to address liquidity concerns. These actions include (1) a plan to reduce expenses through a staff reduction, a pause on hiring and cost savings measures that were executed on July 1, 2024, (2) working with lenders to provide temporary relief from debt covenants (see Note 3 - Long-Term Debt in the condensed consolidated financial statements) while rebuilding sell-side volumes, (3) raising capital through arrangements with various providers, and (4) regaining compliance with respect to delinquent SEC filings which will allow the Company to access the capital markets as well as other financing sources. There can be no assurance that the Company's actions will be successful or that additional financing will be available when needed or on acceptable terms.

The accompanying consolidated financial statements have been prepared assuming the Company will continue to operate as a going concern, which contemplates the realization of assets and settlement of liabilities in the normal course of business, and do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classifications of liabilities that may result from uncertainty related to its ability to continue as a going concern.

Table of Contents

**Note 3 - Long-Term Debt**

At March 31, 2024 and December 31, 2023, long-term debt consisted of the following (in thousands):

|  | March 31, 2024 | December 31, 2023 |
|---|---|---|
| 2021 Credit Facility | $ 28,221 | $ 28,594 |
| Credit Agreement | 7,000 | 3,000 |
| Economic Injury Disaster Loan | 150 | 150 |
| Total long-term debt | 35,371 | 31,744 |
| Less: deferred financing costs | (1,542) | (1,688) |
| Total long-term debt, net of deferred financing costs | 33,829 | 30,056 |
| Less: current portion | (1,473) | (1,478) |
| **Total long-term debt, net of current portion** | $ 32,356 | $ 28,578 |

The components of interest expense and related fees for long-term debt is as follows (in thousands):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2024 | 2023 |
| Interest expense - Lafayette Square | $ 974 | $ 879 |
| Interest expense - East West Bank | 136 | - |
| Interest expense - Other | 1 | 2 |
| Amortization of deferred financing costs | 186 | 136 |
| Total interest expense and amortization of deferred financing costs | $ 1,297 | $ 1,017 |

*Lafayette Square*

On December 3, 2021, the Company entered into the Term Loan and Security Agreement (the "2021 Credit Facility") with Lafayette Square Loan Services, LLC ("Lafayette Square") as administrative agent, and the various lenders thereto. The term loan under the 2021 Credit Facility initially provided for a term loan in the principal amount of up to $32.0 million, consisting of a $22.0 million closing date term loan (the "Term Loan") and an up to $10.0 million delayed draw term loan (the "Delayed Draw Loan"). The loans under the 2021 Credit Facility originally bore interest at LIBOR plus the applicable margin minus any applicable impact discount. The applicable margin under the 2021 Credit Facility was determined based on the consolidated total net leverage ratio of the Company and its consolidated subsidiaries, at a rate of 6.50% per annum if the consolidated total net leverage ratio is less than 2.00 to 1.00 and up to 9.00% per annum if the consolidated total net leverage ratio was greater than 4.00 to 1.00. On June 1, 2023, as originally contemplated under the 2021 Credit Facility, the Company entered into an agreement with Lafayette Square to convert the existing LIBOR based rate to a Term Secured Overnight Financing Rate ("SOFR") with a credit spread of 0.15% per annum for the interest periods of three months and providing for a credit spread adjustment of 0.10%, 0.15% or 0.25% per annum for interest periods of one month, three months or six months, respectively. The loans under the 2021 Credit Facility bear interest at SOFR plus the applicable credit spread adjustment plus the applicable margin minus any applicable impact discount. Prior to entering into the Fifth Amendment (as defined below), the applicable margin under the 2021 Credit Facility was based on the consolidated total net leverage ratio of the Company at a rate of 7.00% per annum if the consolidated total net leverage ratio was less than or equal to 1.00 to 1.00 with gradual increases as the ratio increased up to 10.00% per annum if the consolidated total net leverage ratio was greater than 3.50 to 1.00. The maturity date of the 2021 Credit Facility is December 3, 2026.

On July 28, 2022, the Company entered into the Second Amendment and Joinder to Term Loan and Security Agreement and received proceeds of $4.3 million borrowed under the Delayed Draw Loan to pay the balance owed on the common unit redemption as well as costs associated with the transaction.

Subsequently, on October 3, 2023, the Company entered into the Fourth Amendment to the 2021 Credit Facility (the "Fourth Amendment") and received proceeds of $3.6 million borrowed under the Delayed Draw Loan to make payments in connection with the consummation of the 2023 warrant tender offer and fees and expenses incurred as described in Note 4 - Stockholders' Deficit and Stock-Based Compensation in the notes to the condensed consolidated financial statements. In

14

Table of Contents

connection with the Fourth Amendment, the Company agreed it would not be permitted to request any additional funds under the Delayed Draw Loan, and Lafayette Square would not be obligated to fund any such requests.

Quarterly installment payments on the Term Loan and the Delayed Draw Loan, due on the last day of each fiscal quarter, began March 31, 2022 with a final installment due December 3, 2026 for remaining balances outstanding under each loan. Each quarterly installment payment under the closing date term loan was $0.1 million from January 1, 2022 through December 31, 2023, and each installment payment thereafter until maturity is $0.3 million. Each quarterly installment payment under the Delayed Draw Loan was 0.625% of the amount of the Delayed Draw Loan through December 31, 2023, and each installment payment thereafter until maturity is 1.25% of the amount of the Delayed Draw Loan.

Under the 2021 Credit Facility, dividends and distributions by DDH LLC to the Company and any shareholders of the Company are permitted so long as (i) no default or event of default is continuing or would occur after giving pro forma effect to such dividends and distributions under the 2021 Credit Facility, (ii) the Company, on a pro forma basis, maintains a consolidated senior net leverage ratio of not greater than 1.5 to 1.0, and (iii) the Company, on a pro forma basis, maintains liquidity of not less than $15.0 million.

The obligations under the 2021 Credit Facility are secured by senior, first-priority liens on all or substantially all assets of the Company. As of March 31, 2024, the Company owed a balance on the 2021 Credit Facility of $28.2 million. No additional deferred financing costs were incurred during the three months ended March 31, 2024 and less than $0.1 million of additional deferred financing costs were incurred during the three months ended March 31, 2023. Unamortized deferred financing costs as of March 31, 2024 and December 31, 2023 were $1.5 million and $1.7 million respectively. Accrued and unpaid interest was less than $0.1 million and $0.1 million as of March 31, 2024 and December 31, 2023, respectively. The 2021 Credit Facility contains customary affirmative and negative covenants. Prior to entering into the Fifth Amendment, the Company was required to maintain a net leverage ratio of no more than 3.50 to 1.00 as of December 31, 2021 and the last day of each fiscal quarter through December 31, 2023, 3.25 to 1.00 as of March 31, 2024 and the last day of each fiscal quarter through March 31, 2025, 3.00 to 1.00 as of June 30, 2025 and September 30, 2025, with incremental tightening of the ratio to 2.50 to 1.00 as of June 30, 2026 and thereafter through maturity. Prior to entering into the Fifth Amendment, the 2021 Credit Facility also required the Company to maintain a fixed charge coverage ratio of not less than 1.50 to 1.00 as of the last day of each fiscal quarter, as well as restrictions on the ability to incur indebtedness, create certain liens, make certain investments, make certain dividends and other types of distributions, and enter into or undertake certain mergers, consolidations, acquisitions and sales of certain assets and subsidiaries. The Company was in compliance with all the financial covenants under the 2021 Credit Facility as of March 31, 2024. With the Fifth Amendment, the Company expects to be in compliance with all amended covenants for at least one year from the balance sheet date in this quarterly report.

On October 15, 2024, with an effective date of June 30, 2024, the Company and Lafayette Square entered into the Fifth Amendment to the Term Loan and Security Agreement (the "Fifth Amendment") which among other things, (1) defers quarterly installment payments on the Term Loan and the Delayed Draw Loan for the periods from June 30, 2024 through December 31, 2025, (2) requires that the Company pay a commitment fee of 50 basis points or an amount of $0.1 million to Lafayette Square, (3) allows proceeds from future equity raises by the Company, if any, to cure potential financial covenant noncompliance, (4) provides for one-month and three-month interest periods, (5) replaces the calculation of the consolidated total net leverage ratio with a consolidated total leverage ratio for purposes of calculating the applicable margin and the financial covenant and (6) replaces the financial covenants under the 2021 Credit Facility (effective as of June 30, 2024) with the following:

| As of | Minimum TTM* EBITDA ($ in millions) | Minimum Liquidity ($ in millions) | Maximum Consolidated Total Leverage Ratio | Minimum Fixed Charge Coverage Ratio |
|---|---|---|---|---|
| June 30, 2024 | n/a | n/a | n/a | n/a |
| September 30, 2024 | $5.0 | $1.5 | n/a | n/a |
| December 31, 2024 | $3.5 | $1.5 | n/a | n/a |
| March 31, 2025 | $5.5 | $2.0 | n/a | n/a |
| June 30, 2025 | $7.5 | $2.0 | n/a | 1.50 to 1.00 |
| September 30, 2025 | n/a | $2.0 | 4.25 to 1.00 | 1.50 to 1.00 |
| December 31, 2025 | n/a | $2.0 | 4.00 to 1.00 | 1.50 to 1.00 |
| March 31, 2026 | n/a | $2.0 | 3.75 to 1.00 | 1.50 to 1.00 |
| June 30, 2026 | n/a | $2.0 | 3.50 to 1.00 | 1.50 to 1.00 |
| September 30, 2026 | n/a | $2.0 | 3.25 to 1.00 | 1.50 to 1.00 |

Table of Contents

\*TTM = Trailing Twelve Months

*2023 Revolving Line of Credit - East West Bank*

On July 7, 2023, the Company entered into a Credit Agreement (as amended, the "Credit Agreement"), with East West Bank ("EWB"), as lender. The Credit Agreement provides for a revolving credit facility in the principal amount of up to $10 million, subject to a borrowing base determined based on eligible accounts, and an up to $5 million uncommitted incremental revolving facility. Loans under the Credit Agreement mature on July 7, 2025 (the "Maturity Date"), unless the Credit Agreement is otherwise terminated pursuant to the terms of the Credit Agreement.

Borrowings under the Credit Agreement bear interest at a rate per annum equal to the one-month Term SOFR rate and as determined by EWB on the first day of the applicable interest period, plus 0.10% (10 basis points), plus 3.00% per annum (the "Loan Rate"); provided, that, in no event shall the Loan Rate be less than 0.50% of the Loan Rate effective as of the date of the Credit Agreement nor more than the maximum rate of interest allowed under applicable law. Upon an event of default under the Credit Agreement, the outstanding principal amounts of any advances will accrue interest at a rate per annum equal to the Loan Rate plus five percent (5%), but in no event in excess of the maximum rate of interest allowed under applicable law.

At the Company's option, the Company may at any time prepay the outstanding principal balance of the Credit Agreement in whole or in part, without fee, penalty or premium. All accrued but unpaid interest on outstanding advances under the Credit Agreement are payable in monthly installments on the last day of each monthly interest period until the Maturity Date when the then-outstanding principal balance of the advances and all accrued but unpaid interest thereon becomes due and payable. The obligations under the Credit Agreement are secured by all or substantially all of the borrowers' assets.

Prior to entering into the Third Amendment (as defined below), the Company was required to maintain compliance at all times with the following financial covenants on a consolidated basis: (i) a fixed charge coverage ratio of not less than 1.25 to 1.0, beginning with the fiscal quarter ended on June 30, 2023 and at the end of each fiscal quarter thereafter; (ii) a total funded debt-to-EBITDA ratio of no more than 3.50 to 1.00 as of June 30, 2023 and the last day of each fiscal quarter through December 31, 2023, 3.25 to 1.00 as of March 31, 2024 and the last day of each fiscal quarter through March 31, 2025 and 3.00 to 1.00 as of June 30, 2025 and thereafter through maturity; and (iii) a liquidity covenant requiring the Company to maintain minimum liquid assets at all times (calculated in the manner provided for in the Credit Agreement), in one or more accounts held with EWB plus Revolving Credit Availability in the amount of $1.0 million. Revolving Credit Availability is defined as an amount such that the ratio of the value of eligible accounts to the aggregate amount of all outstanding advances under the credit agreement at such time is not less than 2.0 to 1.0. The Company was in compliance with all the financial covenants under the Credit Agreement as of March 31, 2024. With the Third Amendment, the Company expects to be in compliance with all amended covenants for at least one year from the balance sheet date in this quarterly report.

On October 15, 2024, with an effective date of June 30, 2024, the Company and EWB entered into the Third Amendment to the Credit Agreement (the "Third Amendment") which, among other things, (1) provides that the Company will make prepayments of the outstanding principal balance of the Credit Agreement of $ 1.0 million upon execution of the Third Amendment, $1.0 million on or before January 15, 2025 and $2.0 million on or before April 15, 2025, (2) requires the Company to file a registration statement with the SEC to establish an equity line of credit offering on or before October 31, 2024 and to use commercially reasonable efforts to cause such registration statement to become effective, (3) requires the net proceeds of a potential equity line of credit to be applied to the outstanding principal balance under the Credit Agreement in an amount that would cause the ratio of the value of eligible accounts to the aggregate amount of revolving credit advances to be not less than 1.00 to 1.00, (4) requires the consent of EWB prior to the ability of the Company to make certain restricted payments, including cash dividends, (5) requires the Company to make additional prepayments in the amount by which the outstanding loans under the Credit Agreement exceed the borrowing base between the calendar months ending November 30, 2024 and April 15, 2025, and (6) replaces the financial covenants under the Credit Agreement, effective as of June 30, 2024, with the following:

16

Table of Contents

| As of | Minimum TTM[1] EBITDA ($ in millions) | Minimum Liquid Assets ($ in millions) | Maximum Total Funded Debt to EBITDA Leverage Ratio | Minimum Fixed Charge Coverage Ratio | Revolving Credit Availability (as of each month end) |
|---|---|---|---|---|---|
| June 30, 2024 | n/a | $1.0 | n/a | n/a | n/a |
| September 30, 2024 | $5.0 | $1.5 | n/a | n/a | n/a |
| December 31, 2024 | $3.5 | $1.5 | n/a | n/a | 1.00 to 1.00[2] |
| March 31, 2025 | $5.5 | $2.0 | n/a | n/a | 1.50 to 1.00[3] |
| June 30, 2025 | $7.5 | $2.0 | n/a | 1.25 to 1.00 | 2.00 to 1.00[4] |

(1)  TTM = Trailing Twelve Months
(2)  Beginning November 30, 2024
(3)  Beginning January 31, 2025
(4)  Beginning April 15, 2025

The Credit Agreement contains customary representations and warranties and includes affirmative and negative covenants applicable to the borrowers and their respective subsidiaries. The affirmative covenants include, among others, covenants requiring the Company to maintain its legal existence and governmental compliance, deliver certain financial reports and maintain insurance coverage. The negative covenants include, among others, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of other indebtedness and dividends and other distributions.

The Credit Agreement also includes customary events of default, including, among other things, non-payment defaults, covenant defaults, inaccuracy of representations and warranties, defaults under any of the loan documents, certain cross-defaults to other indebtedness, certain bankruptcy and insolvency events, invalidity of guarantees or grant of security interest, certain ERISA-related transactions and events, certain orders of forfeiture, change of control, certain undischarged attachments, sequestrations, or similar proceedings, and certain undischarged or non-stayed judgments, in certain cases subject to certain thresholds and grace periods. The occurrence of an event of default could result in the acceleration of the obligations under the Credit Agreement of the Company or other borrowers. During the three months ended March 31, 2024, the Company did not incur any deferred financing costs associated with the Credit Agreement. As of March 31, 2024, there was $7.0 million outstanding under the Credit Agreement.

The collateral securing the obligations under the 2021 Credit Facility and the Credit Agreement is subject to intercreditor agreements between Lafayette Square and EWB.

*Silicon Valley Bank ("SVB") Financing*

On January 9, 2023, the Company entered into the SVB Loan Agreement, by and among SVB, as lender, and DDH LLC, the Company, Huddled Masses, Colossus Media and Orange 142, as borrowers. The SVB Loan Agreement provided for a revolving credit facility (the "SVB Revolving Credit Facility") in the original principal amount of $5 million, subject to a borrowing base determined based on eligible accounts, and up to an additional $2.5 million incremental revolving facility subject to the lender's consent, which would increase the aggregate principal amount of the Credit Facility to $7.5 million. Loans under the SVB Revolving Credit Facility were to mature on September 30, 2024 unless the Credit Facility was otherwise terminated pursuant to the terms of the Loan Agreement.

On March 10, 2023, the California Department of Financial Protection and Innovation closed SVB and appointed the Federal Deposit Insurance Corporation as receiver. As the Company had not yet drawn any amounts under the SVB Revolving Credit Facility, on March 13, 2023, the Company issued a notice of termination of the SVB Loan Agreement. The termination of the SVB Revolving Credit Facility became effective April 20, 2023. Prior to issuing the notice of termination, the Company received consent to terminate the SVB Revolving Credit Facility and a waiver of the terms relating to the SVB Revolving Credit Facility under its Term Loan and Security Agreement, dated as of December 3, 2021, with Lafayette Square Loan Servicing, LLC ("Lafayette Square"). The Company did not hold material cash deposits or securities at Silicon Valley Bank and did not experience any adverse impact to its liquidity or to its current and projected business operations, financial condition or results of operations as a result of the SVB closure. During the three months ended March 31, 2023, the Company incurred $0.2 million of deferred financing costs. After the Company issued the notice of termination, total deferred financing costs of $0.3 million were expensed to loss on early termination of line of credit during the three months ended March 31, 2023.

17

**Appx. B-087**

Table of Contents

*U.S. Small Business Administration Loans*

*Economic Injury Disaster Loan*

In 2020, the Company applied and was approved for a loan pursuant to the Economic Injury Disaster Loan ("EIDL"), administered by the U.S. Small Business Administration ("SBA"). The Company received the loan proceeds of $0.2 million on June 15, 2020. The loan bears interest at a rate of 3.75% and matures on June 15, 2050. Installment payments, including principal and interest, of less than $0.1 million began monthly on December 15, 2022. Each payment will first be applied to pay accrued interest, then the remaining balance will be used to reduce principal. The loan is secured by substantially all assets of DDH LLC.

Accrued and unpaid interest expense as of March 31, 2024 and December 31, 2023 was less than $0.1 million and is included in accrued expenses on the condensed consolidated balance sheets.

*Overall*

As of March 31, 2024, future minimum payments related to long-term debt are as follows (in thousands):

| | | |
|---|---|---:|
| 2024 | $ | 1,105 |
| 2025 | | 8,460 |
| 2026 | | 25,660 |
| 2027 | | 3 |
| 2028 | | 3 |
| Thereafter | | 140 |
| Total | | 35,371 |
| Less current portion | | (1,473) |
| Less deferred financing costs | | (1,542) |
| Long-term debt, net | $ | 32,356 |

**Note 4 - Stockholders' Deficit and Stock-Based Compensation**

*Stockholders' Equity - Initial Public Offering*

Following the completion of the Organizational Transactions, DDH LLC's limited liability company agreement was amended and restated to, among other things, appoint the Company as the sole managing member of DDH LLC and effectuate a recapitalization of all outstanding preferred units and common units into (i) economic nonvoting units of DDH LLC held by the Company and, through their indirect ownership of DDM, the Company's Chairman and Chief Executive Officer and President, and (ii) noneconomic voting units of DDH LLC, 100% of which are held by the Company. In August 2022 and December 2023, DDM tendered 100,000 and 410,000, respectively, of its limited liability company units to the Company in exchange for newly issued shares of Class A Common Stock of the Company on a one-for-one basis. In connection with these exchanges, an equivalent number of the holder's shares of Class B Common Stock were cancelled. As of March 31, 2024, DDM held 10,868,000 shares of Class B Common Stock.

The Company is authorized to issue 160,000,000 shares of Class A Common Stock, par value $0.001 per share, 20,000,000 shares of Class B Common Stock, par value $0.001 per share, and 10,000,000 shares of preferred stock, par value $0.001 per share.

On February 15, 2022, the Company completed its initial public offering of 2,800,000 units ("Units"), each consisting of (i) one share of its Class A Common Stock and (ii) one warrant entitling the holder to purchase one share of its Class A Common Stock at an exercise price of $5.50 per share. The warrants became immediately exercisable upon issuance and were exercisable for a period of five years after the issuance date. The shares of Class A Common Stock and warrants were immediately transferable separately upon issuance. At March 31, 2024, none of these warrants were outstanding. The underwriters in our initial public offering were granted a 45-day option to purchase up to an additional 420,000 shares and/or warrants, or any combination thereof, to cover over-allotments, which they initially exercised, in part, electing to purchase warrants to purchase an additional 420,000 shares of Class A Common Stock. As of March 31, 2024, none of these warrants were outstanding. In connection with the Company's initial public offering, the Company issued to the underwriters of the offering a unit purchase option to purchase (i) an additional 140,000 Units at a per Unit exercise price

18

**Appx. B-088**

Table of Contents

of $6.60, which was equal to 120% of the public offering price per Unit sold in the initial public offering, and (ii) warrants to purchase 21,000 shares of Class A Common Stock at a per warrant exercise price of $0.012, which was equal to 120% of the public offering price per warrant sold in the offering. A group of underwriters exercised 70,000 Units and 10,500 warrants in November 2023 and exercised 70,000 Units and 10,500 warrants in February 2024.

The warrants had a fair value of $0 that was calculated using the Black-Scholes option-pricing model. Variables used in the Black-Scholes option-pricing model include: (1) discount rate of 1.94% based on the applicable U.S. Treasury bill rate, (2) expected life of 5 years, (3) expected volatility of approximately 66% based on the trading history of similar companies, and (4) zero expected dividends.

On August 29, 2023, the Company filed a Tender Offer Statement on Schedule TO pursuant to which the Company offered to purchase all of its outstanding warrants for $1.20 per warrant in cash. The Tender Offer expired at one minute after 11:59 PM, Eastern Time on September 28, 2023. The Company accepted all validly tendered warrants for purchase and settlement on October 2, 2023. As a result of the Tender Offer, a total of 2,213,652 warrants were tendered and not validly withdrawn prior to the expiration of the tender offer for a total purchase price of approximately $2.7 million. On October 23, 2023, the Company distributed a notice of redemption to the registered holders of the remaining outstanding warrants announcing the redemption of those warrants for $0.35 per warrant. The redemption closed on October 30, 2023, and all remaining 1,004,148 warrants were purchased for an aggregate price of approximately $0.4 million.

*Noncontrolling Interest*

Direct Digital Holdings, Inc. is the sole managing member of DDH LLC, and consolidates the financial results of DDH LLC. Therefore, Direct Digital Holdings, Inc. reports a noncontrolling interest ("NCI") based on the common units of DDH LLC held by DDM. While Direct Digital Holdings, Inc. retains its controlling interest in DDH LLC, changes in its ownership interest in DDH LLC are accounted for as equity transactions. As such, future redemptions or direct exchanges of LLC Units by DDM will result in a change in ownership and reduce or increase the amount recorded as noncontrolling interest and increase or decrease additional paid-in capital when DDH LLC has positive or negative net assets, respectively.

*Stock-Based Compensation Plans*

In connection with the initial public offering, the Company adopted the 2022 Omnibus Incentive Plan ("2022 Omnibus Plan") to facilitate the grant of equity awards to the Company's employees, consultants and non-employee directors. The Company's board of directors reserved 1,500,000 shares of Class A Common Stock for issuance in equity awards under the 2022 Omnibus Plan. Information on activity for both the stock options and RSUs is detailed below.

During the three months ended March 31, 2024 and 2023, the Company recognized $0.5 million and $0.1 million, respectively, of total stock-based compensation expense in the condensed consolidated statement of operations in compensation, tax and benefits.

*Stock Options*

Options to purchase shares of common stock vest annually on the grant date anniversary over a period of three years and expire 10 years following the date of grant.
The following table summarizes the stock option activity under the 2022 Omnibus Plan as of March 31, 2024:

| | Stock Options | | | |
| --- | --- | --- | --- | --- |
| | Shares | Weighted Average Exercise Price | Weighted Average Contractual Life (in years) | Aggregate Intrinsic Value (in thousands) |
| Outstanding at January 1, 2024 | 371,116 | $ 2.51 | 8.77 | $ 4,591 |
| Granted | - | $ - | - | $ - |
| Exercised | (8,338) | $ 2.62 | - | $ 172 |
| Forfeited | (1,416) | $ 2.69 | - | $ 15 |
| Outstanding at March 31, 2024 | 361,362 | $ 2.51 | 8.53 | $ 4,596 |
| Vested and exercisable at March 31, 2024 | 103,072 | $ 2.55 | 8.48 | $ 1,308 |

19

**Appx. B-089**

Table of Contents

As of March 31, 2024, unrecognized stock-based compensation of $0.3 million related to 258,290 of unvested stock options which will be recognized on a straight-line basis over a weighted-average vesting period of 1.02 years.

*Restricted Stock Units*

RSUs generally vest annually on the grant date anniversary over a period of three years. A summary of RSU activity during the three months ended March 31, 2024 and related information is as follows:

|  | Restricted Stock Units | |
| --- | --- | --- |
|  | Number of Shares | Weighted Average Grant Date Fair Value per Share |
| Unvested- January 1, 2024 | 542,396 | $ 2.87 |
| Granted | 99,474 | $ 16.90 |
| Vested | (228,898) | $ 11.83 |
| Forfeited | (917) | $ 3.28 |
| Unvested- March 31, 2024 | 412,055 | $ 2.53 |

The majority of vested RSUs were net share settled such that the Company withheld shares with a value equivalent to the employees' obligation for the applicable income and other employment taxes. The total shares withheld were 70,835 and were based on the value of the RSUs on their respective vesting dates as determined by the Company's closing stock price. As of March 31, 2024, there was unrecognized stock-based compensation of $0.8 million related to unvested RSUs which will be recognized on a straight-line basis over a weighted average period of 1.01 years.

**Note 5 - Tax Receivable Agreement and Income Taxes**

*Tax Receivable Agreement*

The Company's TRA with DDH LLC and DDM (together, the "TRA Holders") provides for payment by the Company to the TRA Holders of 85% of the net cash savings, if any, in U.S. federal, state and local income tax and franchise tax that the Company actually realizes or is deemed to realize in certain circumstances. The Company retains the benefit of the remaining 15% of these net cash savings.

The TRA liability is calculated by determining the tax basis subject to the TRA ("tax basis") and applying a blended tax rate to the basis differences and calculating the resulting impact. The blended tax rate consists of the U.S. federal income tax rate and assumed combined state and local income tax rate driven by the apportionment factors applicable to each state. Any taxable income or loss generated by the Company will be allocated to TRA Holders in accordance with the TRA, and distributions to the owners of LLC Units in an amount sufficient to fund their tax obligations will be made. Pursuant to the Company's election under Section 754 of the Code, the Company expects to obtain an increase in its share of the tax basis in the net assets of DDH, LLC when LLC interests are redeemed or exchanged by the members of DDH, LLC. The Company plans to make an election under Section 754 if the Code for each taxable year in which a redemption or exchange of LLC interest occurs. In August 2022 and December 2023, members of DDM exchanged 100,000 and 410,000 Class B shares into Class A shares, respectively.

The Company has recorded a liability related to the tax receivable agreement of $5.2 million as of March 31, 2024 and December 31, 2023. The Company has recorded a deferred tax asset primarily from the outside basis difference in the partnership interest of $6.3 million and $6.2 million as of March 31, 2024 and December 31, 2023, respectively. The deferred tax asset is net of a valuation allowance of $0.5 million as of March 31, 2024 and December 31, 2023. Payments of less than $0.1 million were made during the three months ended March 31, 2024 and 2023. The payments under the TRA will not be conditional on holder of rights under the TRA having a continued ownership interest in either DDH LLC or the Company. The Company may elect to defer payments due under the TRA if the Company does not have available cash to satisfy its payment obligations under the TRA. Any such deferred payments under the TRA generally will accrue interest from the due date for such payment until the payment date. The Company accounts for any amounts payable under the TRA in accordance with ASC Topic 450, *Contingencies*, and recognizes subsequent period changes to the measurement of the liability from the TRA in the statement of operations as a component of income before taxes. For the three months ended March 31, 2024 and 2023, no amounts were recorded as income in other income (expense) for such change.

The term of the TRA commenced upon completion of the initial public offering and will continue until all tax benefits that are subject to the TRA have been utilized or expired, unless the Company exercises its right to terminate the TRA. If

Table of Contents

the Company elects to terminate the TRA early (or it is terminated early due to changes in control), the obligations under the TRA would accelerate and the Company would be required to make an immediate payment equal to the present value of the anticipated future payments to be made by the Company under the TRA.

*Income Taxes*

Through the Organizational Transactions completed in February 2022, the Company formed an Up-C structure which allows DDM to continue to realize tax benefits associated with owning interests in an entity that is treated as a partnership for U.S. federal income tax purposes. Under the Up-C structure, the Company is subject to corporation income tax on the variable ownership changes. The Company's ownership was 20.45% as of January 1, 2023 and increased to 23.35% in the fourth quarter of 2023. There was no exchange of shares of Class B common stock for shares of Class A common stock in the first three months ended March 31, 2024.

The Company recorded a tax benefit for federal and state income tax for which the components and the effective income tax rates are as follows (in thousands):

|  | Three Months Ended March 31, | | | |
|  | 2024 | | 2023 | |
|---|---|---|---|---|
| Income tax benefit | $ | (200) | $ | (74) |
| Effective income tax rate | | 5.0 % | | 5.3 % |

The effective tax rates were lower than the statutory tax rates for the three months ended March 31, 2024 and 2023 primarily due to the Company's partnership loss that is not subject to federal and state taxes.

As of March 31, 2024, the Company had federal net operating loss carryforwards of $2.5 million that can be carried forward indefinitely.

The Company files income tax returns in the United States federal jurisdiction and various state jurisdictions. In the normal course of business, the Company can be examined by various tax authorities, including the Internal Revenue Service in the United States. There are currently no federal or state audits in process. The Company analyzes its tax filing positions in all of the U.S. federal, state and local tax jurisdictions where it is required to file income tax returns, as well as for all open tax years in these jurisdictions. Federal and various states returns for the years ended December 2022 and 2021 remain open as of March 31, 2024. The Company evaluates tax positions taken or expected to be taken in the course of preparing an entity's tax returns to determine whether it is "more-likely-than-not" that each tax position will be sustained by the applicable tax authority. As of March 31, 2024 and December 31, 2023, the Company had no uncertain tax positions. Accordingly, the Company has not recognized any penalty, interest or tax impact related to uncertain tax positions.

**Note 6 - Related Party Transactions**

*Related Party Transactions*

*Member Payable*

As of March 31, 2024 and December 31, 2023, the Company had a net receivable from members that totaled $1.7 million, which is included as a related party receivable on the condensed consolidated balance sheets.

*Up-C Structure*

In February 2022, the Company completed an initial public offering of its securities, and through the Organizational Transactions, formed an Up-C structure, which is often used by partnerships and limited liability companies and allows DDM, a Delaware limited liability company indirectly owned by Mark Walker ("Walker") and Keith Smith ("Smith"), to retain its equity ownership in DDH LLC and to continue to realize tax benefits associated with owning interests in an entity that is treated as a partnership, or "pass-through" entity, for U.S. federal income tax purposes. DDM holds economic nonvoting LLC Units in DDH LLC and holds noneconomic voting equity interests in the form of the Class B Common Stock in Direct Digital Holdings (See Note 4 - Stockholders' Deficit and Stock-Based Compensation). One of the tax benefits to DDM associated with this structure is that future taxable income of DDH LLC that is allocated to DDM will be taxed on a pass-through basis and therefore will not be subject to corporate taxes at the entity level. Additionally, DDM may, from time to time, redeem or exchange its LLC Units for shares of the Company's Class A Common Stock on a one-for-one basis. The Up-C structure also provides DDM with potential liquidity that holders of non-publicly traded limited liability companies are not typically afforded. If the Company ever generates sufficient taxable income to utilize the tax

Table of Contents

benefits, DDH expects to benefit from the Up-C structure because, in general, the Company expects cash tax savings in amounts equal to 15% of certain tax benefits arising from such redemptions or exchanges of DDM's LLC Units for Class A Common Stock or cash and certain other tax benefits covered by the TRA. (See Note 5 - Tax Receivable Agreement and Income Taxes).

The aggregate balance of tax receivable liabilities as of March 31, 2024 and December 31, 2023, is as follows (in thousands):

| | March 31, 2024 | December 31, 2023 |
|---|---|---|
| Liability related to tax receivable agreement | | |
| Short term | $ 41 | $ 41 |
| Long term | 5,201 | 5,201 |
| Total liability related to tax receivable agreement | $ 5,242 | $ 5,242 |

**Note 7 - Segment Information**

Revenue by business segment is as follows (in thousands):

| | Three Months Ended March 31, | |
|---|---|---|
| | 2024 | 2023 |
| Sell-side advertising | $ 16,500 | $ 13,783 |
| Buy-side advertising | 5,775 | 7,440 |
| Total revenues | $ 22,275 | $ 21,223 |

Operating loss by business segment reconciled to loss before income taxes is as follows (in thousands):

| | Three Months Ended March 31, | |
|---|---|---|
| | 2024 | 2023 |
| Sell-side advertising | $ 962 | $ 1,278 |
| Buy-side advertising | 293 | 1,505 |
| Corporate office expenses | (4,062) | (2,924) |
| Total operating loss | (2,807) | (141) |
| Corporate other expense | (1,212) | (1,267) |
| Loss before taxes | $ (4,019) | $ (1,408) |

Total assets by business segment are as follows (in thousands):

| | March 31, 2024 | December 31, 2023 |
|---|---|---|
| Sell-side advertising | $ 17,934 | $ 34,354 |
| Buy-side advertising | 22,569 | 22,539 |
| Corporate office | 12,267 | 13,779 |
| Total assets | $ 52,770 | $ 70,672 |

**Note 8 - Net Loss Per Share**

The Company has two classes of common stock, Class A and Class B. Shares of the Company's Class B Common Stock do not share in the earnings or losses attributable to Direct Digital Holdings, Inc. and are therefore not participating securities. The Company uses the two-class method to calculate basic and diluted earnings per share as a result of

22

**Appx. B-092**

Table of Contents

outstanding participating securities in the form of warrants for the three months ended March 31, 2023. The following table sets forth the computation of the Company's basic and diluted net loss per share (in thousands, except per share amounts):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2024 | 2023 |
| Net loss | $ (775) | $ (214) |
| Weighted average common shares outstanding - basic | 3,509 | 2,901 |
| Class B Common Stock | - | - |
| Options to purchase common stock | - | - |
| Unvested restricted stock units | - | - |
| Weighted average common shares outstanding - diluted | 3,509 | 2,901 |
| Net loss per common share, basic | $ (0.22) | $ (0.07) |
| Net loss per common share, diluted | $ (0.22) | $ (0.07) |

The following weighted-average outstanding shares of common stock equivalents were excluded from the computation of diluted net loss per share attributable to common stockholders for the periods presented because including them would have been anti-dilutive (in thousands):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2024 | 2023 |
| Class B Common Stock | 10,868 | 11,278 |
| Warrants to purchase common stock | - | 3,219 |
| Options to purchase common stock | 367 | 270 |
| Unvested restricted stock units | 535 | 397 |
| Total excludable from net loss per share attributable to common stockholders - diluted | 11,770 | 15,164 |

**Note 9 - Commitments and Contingencies**

*Litigation*

We may from time to time be subject to various legal or administrative claims and proceedings arising in the ordinary course of business. As of the date hereof, except as set forth below, we are not a party to any material legal or administrative proceedings nor are there any proceedings in which any of our directors, executive officers or affiliates, or any registered or beneficial stockholder, is an adverse party or has a material interest adverse to our interest. Litigation or any other legal or administrative proceeding, regardless of the outcome, is likely to result in substantial cost and diversion of our resources, including our management's time and attention.

On May 23, 2024, an alleged stockholder, purportedly on behalf of the persons or entities who purchased or acquired publicly traded securities of the Company between April 2023 and March 2024, filed a putative class action against the Company, certain of our officers and directors, and other defendants in the U.S. District Court for the Southern District of Texas, alleging violations of federal securities laws related to alleged false or misleading disclosures made by the Company in its public filings. On July 9, 2024, another alleged stockholder filed a similar securities class action against the Company, certain of our officers and directors, also in the Southern District of Texas. The two actions have been consolidated. Each of these complaints seeks unspecified damages, plus costs, fees, and attorneys' fees. The Company cannot make any predictions about the final outcome of this matter or the timing thereof but believes that plaintiffs' claims lack merit and intends to vigorously defend these lawsuits.

On May 10, 2024, the Company was the subject of a defamatory article / blog post. In connection with this post, one of the Company's sell-side customers paused its connection to the Company while the allegations were investigated. This customer reconnected the Company on May 22, 2024 and sell-side volumes have resumed but not yet at the levels experienced prior to the pause in May 2024. The Company is actively working with its partners to achieve prior volume levels. On May 14, 2024, the Company filed a lawsuit against the author of the defamatory article and is vigorously

23

**Appx. B-093**

Table of Contents

pursuing its rights. The Company cannot make any predictions about the final outcome of this litigation matter or the timing thereof.

*Operating Leases*

During the three months ended March 31, 2024 and 2023, the Company incurred fixed rent expense associated with operating leases for real estate of less than $
0.1 million. The Company did not have any finance leases, short-term leases nor variable leases over this time period.
During the three months ended March 31, 2024 and 2023, the Company had the following cash and non-cash activities associated with leases (in thousands):

| | Three-Months Ended March 31, | |
| | 2024 | 2023 |
|---|---|---|
| **Cash paid for amounts included in the measurement of lease liabilities:** | | |
| Operating cash outflow for operating leases | $ 37 | $ 42 |

The weighted-average remaining lease term and discount rate for the Company's operating lease is 5.3 years and 8.3%, respectively, as of March 31, 2024. The weighted-average remaining lease term and discount rate for the Company's operating leases is 6.5 years and 8.4%, respectively, as of March 31, 2023.

The future payments due under operating leases as of March 31, 2024 us as follows (in thousands):

| | |
|---|---|
| 2024 | $ 156 |
| 2025 | 239 |
| 2026 | 160 |
| 2027 | 163 |
| 2028 | 167 |
| Thereafter | 200 |
| Total undiscounted lease payments | 1,085 |
| Less effects of discounting | (206) |
| Less current lease liability | (151) |
| Total operating lease liability, net of current portion | $ 728 |

**Note 10 - Property, Equipment and Software, net**

Property, equipment and software, net consists of the following (in thousands):

| | Useful Life (Years) | March 31, 2024 | December 31, 2023 |
|---|---|---|---|
| Furniture and fixtures | 5 | $ 128 | $ 128 |
| Computer equipment | 3 | 20 | 20 |
| Leasehold improvements | 15 | 36 | 36 |
| Capitalized software | 3 | 702 | 702 |
| Property, equipment and software, gross | | 886 | 886 |
| Less: accumulated depreciation and amortization | | (357) | (287) |
| Total property, equipment and software, net | | $ 529 | $ 599 |

24

**Appx. B-094**

Table of Contents

The following table summarizes depreciation and amortization expense related to property, equipment and software by line item for the three months ended March 31, 2024 and 2023 (in thousands):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2024 | 2023 |
| Cost of revenue | $ 62 | $ 48 |
| General and administrative | 9 | 9 |
| Total depreciation and amortization | $ 71 | $ 57 |

**Note 11 - Intangible Assets, net**

In September 2020, the Company acquired Orange142 for a purchase price of $26.2 million. The acquisition of Orange142 was recorded by allocating the total purchase consideration to the fair value of the net tangible assets acquired, including goodwill and intangible assets, in accordance with ASC 805. The purchase consideration exceeded the fair value of the net assets, resulting in goodwill of $ 4.1 million and intangible assets of $18.0 million. The Company records amortization expense on a straight-line basis over the life of the identifiable intangible assets. For the three months ended March 31, 2024 and 2023, amortization expense of $0.5 million was recognized. As of March 31, 2024 and December 31, 2023, intangible assets net of accumulated amortization was $11.2 million and $11.7 million, respectively.

As of March 31, 2024, intangible assets and the related accumulated amortization, weighted-average remaining life and future amortization expense are as follows:

| | March 31, 2024 | | | |
| --- | --- | --- | --- | --- |
| | Weighted-Average Remaining Life (Years) | Original Amount | Accumulated Amortization | Net Total |
| Customer Lists | 6.5 | $ 13,028 | $ (4,560) | $ 8,468 |
| Trademarks and tradenames | 6.5 | 3,501 | (1,225) | 2,276 |
| Non-compete agreements | 1.5 | 1,504 | (1,053) | 451 |
| Total intangible assets, net | | $ 18,034 | $ (6,838) | $ 11,195 |

| | December 31, 2023 | | | |
| --- | --- | --- | --- | --- |
| | Weighted-Average Remaining Life (Years) | Original Amount | Accumulated Amortization | Net Total |
| Customer Lists | 6.8 | $ 13,028 | $ (4,234) | $ 8,794 |
| Trademarks and tradenames | 6.8 | 3,501 | (1,138) | 2,363 |
| Non-compete agreements | 1.8 | 1,504 | (978) | 527 |
| Total intangible assets, net | | $ 18,034 | $ (6,350) | $ 11,684 |

| | Total |
| --- | --- |
| 2024 | $ 1,464 |
| 2025 | 1,879 |
| 2026 | 1,653 |
| 2027 | 1,653 |
| 2028 | 1,653 |
| Thereafter | 2,893 |
| Total future amortization expense | $ 11,195 |

25

Table of Contents

**ITEM 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

You should read the following discussion together with our unaudited condensed consolidated financial statements and the related notes included elsewhere in this Quarterly Report on Form 10-Q and our audited consolidated financial statements and the related notes included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023. This discussion contains forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under the section titled "*Risk Factors*" in our Annual Report on Form 10-K or in other parts of this Quarterly Report on Form 10-Q. See "- *Cautionary Note Regarding Forward-Looking Statements*" below. Our historical results are not necessarily indicative of the results that may be expected for any period in the future.

**Cautionary Note Regarding Forward-Looking Statements**

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of the federal securities laws and which are subject to certain risks, trends and uncertainties. We use words such as "could," "would," "may," "might," "will," "expect," "likely," "believe," "continue," "anticipate," "estimate," "intend," "plan," "project" and other similar expressions to identify forward-looking statements, but not all forward-looking statements include these words. All of our forward-looking statements involve estimates and uncertainties that could cause actual results to differ materially from those expressed in or implied by the forward-looking statements. Accordingly, any such statements are qualified in their entirety by reference to the information described under the caption "*Risk Factors*" in our Annual Report on Form 10-K and elsewhere in this Quarterly Report on Form 10-Q and in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023.

The forward-looking statements contained in this Quarterly Report on Form 10-Q are based on assumptions that we have made in light of our industry experience and our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this Quarterly Report on Form 10-Q, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties (many of which are beyond our control) and assumptions.

Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual operating and financial performance and cause our performance to differ materially from the performance expressed in or implied by the forward-looking statements. We believe these factors include, but are not limited to, the following:

- the restrictions and covenants imposed upon us by our credit facilities;

- the substantial doubt about our ability to continue as a going concern, which may hinder our ability to obtain future financing;

- our ability to secure additional financing to meet our capital needs;

- ineligibility to file short-form registration statements on Form S-3, which may impair our ability to raise capital;

- failure to satisfy applicable listing standards of the Nasdaq Capital Market resulting in a potential delisting of our common stock;

- costs, risks and uncertainties related to the restatement of certain prior period financial statements;

- any significant fluctuations caused by our high customer concentration;

- risks related to non-payment by our clients;

- reputational and other harms caused by our failure to detect advertising fraud;

- operational and performance issues with our platform, whether real or perceived, including a failure to respond to technological changes or to upgrade our technology systems;

- restrictions on the use of third-party "cookies," mobile device IDs or other tracking technologies, which could diminish our platform's effectiveness;

- unfavorable publicity and negative public perception about our industry, particularly concerns regarding data privacy and security relating to our industry's technology and practices, and any perceived failure to comply with laws and industry self-regulation;

- our failure to manage our growth effectively;

**Appx. B-096**

Table of Contents

- the difficulty in identifying and integrating any future acquisitions or strategic investments;

- any changes or developments in legislative, judicial, regulatory or cultural environments related to information collection, use and processing;

- challenges related to our buy-side clients that are destination marketing organizations and that operate as public/private partnerships;

- any strain on our resources or diversion of our management's attention as a result of being a public company;

- the intense competition of the digital advertising industry and our ability to effectively compete against current and future competitors;

- any significant inadvertent disclosure or breach of confidential and/or personal information we hold, or of the security of our or our customers', suppliers' or other partners' computer systems;

- as a holding company, we depend on distributions from Direct Digital Holdings, LLC ("DDH LLC") to pay our taxes, expenses (including payments under the Tax Receivable Agreement) and any amount of any dividends we may pay to the holders of our common stock;

- the fact that DDH LLC is controlled by DDM, whose interest may differ from those of our public stockholders;

- any failure by us to maintain or implement effective internal controls or to detect fraud; and

- other factors and assumptions discussed under "*Risk Factors*" and elsewhere in this Quarterly Report on Form 10-Q and in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023.

Should one or more of these risks or uncertainties materialize or should any of these assumptions prove to be incorrect, our actual operating and financial performance may vary in material respects from the performance projected in these forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and except as required by law, we undertake no obligation to update any forward-looking statement contained in this Quarterly Report on Form 10-Q to reflect events or circumstances after the date on which it is made or to reflect the occurrence of anticipated or unanticipated events or circumstances. New factors that could cause our business not to develop as we expect emerge from time to time, and it is not possible for us to predict all of them. Further, we cannot assess the impact of each currently known or new factor on our results of operations or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

**Overview**

Direct Digital Holdings, Inc. and its subsidiaries (collectively the "Company," "DDH," "we," "us" and "our"), headquartered in Houston, Texas, is an end-to-end, full-service programmatic advertising platform primarily focused on providing advertising technology, data-driven campaign optimization and other solutions intended for underserved and less efficient markets on both the sell- and buy-side of the digital advertising ecosystem. Direct Digital Holdings, Inc. is the holding company that, since the completion of our initial public offering on February 15, 2022, owns certain common units, and serves as the manager of DDH LLC, which operates the business formed in 2018 through the acquisition of Colossus Media, LLC ("Colossus Media"), a sell-side marketing platform, and Huddled Masses, LLC ("Huddled Masses™" or "Huddled Masses"), a buy-side marketing platform.

In late September 2020, DDH LLC acquired Orange142, LLC ("Orange 142") to further bolster its overall programmatic buy-side advertising platform and enhance its offerings across multiple industry verticals such as travel, education, healthcare, financial services, consumer products and other sectors, with particular emphasis on small- and mid-sized businesses transitioning into digital with growing digital media budgets.

The subsidiaries of Direct Digital Holdings, Inc. are as follows:

| Subsidiary | Current % Ownership | Business Segment | Date of Formation | Date of Acquisition |
|---|---|---|---|---|
| Colossus Media, LLC | 100% | Sell-side | September 8, 2017 | June 21, 2018 |
| Orange142, LLC | 100% | Buy-side | March 6, 2013 | September 30, 2020 |
| Huddled Masses, LLC | 100% | Buy-side | November 13, 2012 | June 21, 2018 |
| Direct Digital Holdings, LLC [1] | N/A | | June 21, 2018 | February 15, 2022 |

27

**Appx. B-097**

Table of Contents

(1)  DDH owns 100% of the voting interest in Direct Digital Holding, LLC. As of March 31, 2024, DDH owns 25.3% of the economic interest in Direct Digital Holdings, LLC. See further discussion of the Up-C structure in Note 6 of our condensed consolidated financial statements.

Colossus Media operates our proprietary sell-side programmatic platform operating under the trademarked banner of Colossus SSP™ ("Colossus SSP"). Colossus SSP is a stand-alone sell-side platform ("SSP") intended to deliver targeted advertising to diverse and multicultural audiences as well as to general audiences, including African Americans, Latin Americans, Asian Americans and LGBTQIA+ customers, as well as general audiences. Both buy-side advertising businesses, Orange 142 and Huddled Masses, offer technology-enabled advertising solutions and consulting services to clients through demand side platforms ("DSPs").

Providing both the front-end, buy-side advertising businesses coupled with our proprietary sell-side operations enables us to curate the first through the last mile in the ad tech ecosystem execution process to drive higher results.

Operating segments are components of an enterprise for which separate financial information is available and evaluated regularly by our chief operating decision maker ("CODM") for purpose of allocating resources and assessing performance. Our CODM is our Chairman and Chief Executive Officer. We operate as two reportable segments: sell-side advertising, which includes the results of Colossus Media, and buy-side advertising, which includes the results of Orange 142 and Huddled Masses. All our revenues are attributable to the United States.

**Recent Developments**

*Nasdaq Rule Noncompliance.*

On April 17, 2024, May 21, 2024 and August 21, 2024, we received notices from the Listing Qualifications Department of Nasdaq regarding the Company's failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2023, its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2024 and its Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2023, respectively, with the SEC. The Company submitted a plan to Nasdaq to regain compliance with respect to the Delinquent Filings, and Nasdaq granted the Company an exception until October 14, 2024 to evidence compliance with the rule requiring filing of our periodic reports. Neither the notices from Nasdaq nor the Company's non-compliance with the rule has an immediate effect on the listing or trading of the Company's securities on Nasdaq, which currently continues to trade on The Nasdaq Capital Market under the symbol "DRCT." We have since filed our Annual Report on Form 10-K for the fiscal year ended December 31, 2023 on October 15, 2024 and are filing this Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2024 on the date hereof, leaving only one Delinquent Report left to file. The Company continues to work diligently to complete and file the remaining Delinquent Filing with the SEC and thereby regain compliance with the Rule as soon as practicable.

*Restatement of 2023 Quarterly Financial Information.*

On October 14, 2024, the Company's management and the audit committee of the Company's Board of Directors determined that interim financial statements (collectively, the "Prior Period Financial Statements") as of the periods ended March 31, 2023, June 30, 2023 and September 30, 2023, and for the three months ended March 31, 2023, the three and six months ended June 30, 2023 and the three and nine months ended September 30, 2023, could no longer be relied upon. During the preparation of Company's consolidated financial statements as of and for the year ended December 31, 2023, the Company identified prior-period accounting errors resulting from the incorrect (1) accounting for, and presentation of, noncontrolling interests ("NCI"), (2) recognition of an organizational transaction in connection with the Company's initial public offering, (3) presentation of earnings per share considering the effect of certain features of the Company's warrants and the impact of correcting the accounting for, and presentation of, NCI and (4) timing of the recording of the 2023 redemption of warrants. As a result, on October 14, 2024, the Audit Committee, in consultation with management, determined that the Prior Period Financial Statements could no longer be relied upon and the Company included a restatement of the Prior Period Financial Statements in the Annual Report on Form 10-K for the year ended December 31, 2023 it filed on October 15, 2024.

*Relationship with Sell-Side Customer.*

On May 10, 2024, the Company was the subject of a defamatory article / blog post which the Company believes was part of a coordinated misinformation campaign. In connection with this post, one of the Company's sell-side customers paused its connection to the Company while the allegations were investigated. This customer reconnected the Company on May 22, 2024 and sell-side volumes have resumed but not yet at the levels experienced prior to the pause in May 2024. The Company is actively working with its partners to achieve prior volume levels. On May 14, 2024, the Company filed a lawsuit against the author of the defamatory article and is vigorously pursuing its rights. The Company cannot make any predictions about the final outcome of this litigation matter or the timing thereof.

28

**Appx. B-098**

Table of Contents

**Key Factors Affecting Our Performance**

We believe our growth and financial performance are dependent on many factors, including those described below.

**Sell-side advertising business**

***Increasing revenue from customers through increased advertising spend from buyers***

Colossus Media operates our proprietary sell-side programmatic platform operating under the trademarked banner of Colossus SSP. Our customers (or buyers) include ad exchanges, DSPs, agencies and individual advertisers. We have broad exposure to the ecosystem of buyers, reaching on average approximately 141,000 advertisers per month in the three months ended March 31, 2024, a decrease of 8% over the 153,000 advertisers per month in the three months ended March 31, 2023. As spending on programmatic advertising increasingly becomes a larger share of the overall ad spend, advertisers and agencies are seeking greater control of their digital advertising supply chains. To take advantage of this industry shift, we have entered into Supply Path Optimization agreements directly with customers which address acceptable advertisements and data usage. As part of these agreements, we provide advertisers and agencies with benefits ranging from custom data and workflow integrations, product features, volume-based business terms, and visibility into campaign performance data and methodology. As a result of these direct relationships, our existing advertisers and agencies are incentivized to allocate an increasing percentage of their advertising budgets to our platform.

We also strive to retain existing publishers and add new publishers. Establishing multiple header bidding integrations by leveraging our technology capabilities allows us to maximize our access to publishers' ad formats, devices and various properties that a publisher may own. We may also up-sell additional products including our header bidding management, identity, and audience solutions. We enter into master service agreements with our publishers which, among other terms, set a fixed rate for content to be sold on Colossus SSP. Our strategy on the sell-side advertising business represents growth potential, and we believe we are well positioned to be able to bring underserved multicultural publishers into the advertising ecosystem, thereby increasing our value proposition across all customers, including large advertisers and agencies.

***Monetizing ad impressions for publishers and buyers***

We curate advertisers and increase access to publishers with valuable ad impressions. We focus on monetizing digital impressions by coordinating daily real-time auctions and bids. The publisher makes its ad inventory available on Colossus SSP and invites advertisers to bid based on the user's data received. Each time the publisher's web page loads, an ad request is sent to multiple ad exchanges and, in some cases, to the demand side platform directly from Colossus SSP. In case of real-time bidding ("RTB") media buys, many DSPs would place bids to the impressions being offered by the publisher during the auction. The advertiser that bids a higher amount compared to other advertisers will win the bid and pay the second highest price for the winning impression to serve the ads. We continuously review our available inventory from existing publishers across every format (mobile, desktop, digital video, OTT, CTV, and rich media). The factors we consider when determining which impressions we process include transparency, viewability, and whether or not the impression is human sourced. By consistently applying these criteria, we believe the ad impressions we process will be valuable and marketable to advertisers.

***Enhancing ad inventory quality***

In the advertising industry, inventory quality is assessed in terms of invalid traffic ("IVT") which can be impacted by fraud such as "fake eyeballs" generated by automated technologies set up to artificially inflate impression counts. Through our platform design and proactive IVT mitigation efforts, we address and minimize IVT on a number of fronts, including sophisticated technology, which detects and avoids IVT on the front end; direct publisher and inventory relationships, for supply path optimization; and ongoing campaign and inventory performance review, to ensure inventory quality and brand protection controls are in place.

***Growing access to valuable ad impressions***

Our recent growth has been driven by a variety of factors including increased access to mobile web (display and video) and mobile app (display and video) impressions and desktop video impressions. Our performance is affected by our ability to maintain and grow our access to valuable ad impressions from current publishers as well as through new relationships with publishers. For the three months ended March 31, 2024, we processed over 830.0 billion average monthly bid requests, up 107% from 2023.

29

**Appx. B-099**

Table of Contents

*Expanding and managing investments*

Each impression or transaction occurs in a fraction of a second. Given that most transactions take place in an auction/bidding format, we continue to make investments across the platform to further reduce the processing time. In addition to the robust infrastructure supporting our platform, it is also critical that we align with key industry partners in the digital supply chain. The Colossus SSP is agnostic to any specific demand side platform.

We automate workflow processes whenever feasible to drive predictable and value-added outcomes for our customers and increase productivity of our organization. In the first half of 2023, we transitioned our server platform to HPE Greenlake, which provides increased capacity, faster response time, and expansion capabilities to align with growth in our business.

*Managing industry dynamics*

We operate in the rapidly evolving digital advertising industry. Due to the scale and complexity of the digital advertising ecosystem, direct sales via manual, person-to-person processes are insufficient for delivering a real-time, personalized ad experience, creating the need for programmatic advertising. In turn, advances in programmatic technologies have enabled publishers to auction their ad inventory to more buyers, simultaneously, and in real time through a process referred to as header bidding. Header bidding has also provided advertisers with transparent access to ad impressions. As advertisers keep pace with ongoing changes in the way that consumers view and interact with digital media we anticipate further innovation and expect that header bidding will be extended into new areas such as OTT/CTV. We believe our focus on publishers and buyers has allowed us to understand their needs and our ongoing innovation has enabled us to quickly adapt to changes in the industry, develop new solutions and do so cost effectively. Our performance depends on our ability to keep pace with industry changes such as header bidding and the evolving needs of our publishers and buyers while continuing our cost efficiency.

*Seasonality*

In the advertising industry, companies commonly experience seasonal fluctuations in revenue. For example, in our sell-side advertising segment, many advertisers allocate the largest portion of their budgets to the fourth quarter of the calendar year in order to coincide with increased holiday purchasing. We expect our sell-side revenue to continue to fluctuate based on seasonal factors that affect the advertising industry as a whole.

**Buy-side advertising business**

*New Customer Acquisitions*

On the buy-side of our business, our customers consist of purchasers of programmatic advertising inventory (ad space) looking to place their advertisements. We serve the needs of over 230 small and mid-sized clients, consisting of advertising space buyers, including small and mid-sized companies, large advertising holding companies (which may manage several agencies), independent advertising agencies and mid-market advertising service organizations. We serve a variety of customers across multiple industries including travel/tourism (including destination marketing organizations ("DMOs")), education, energy, consumer packaged goods, healthcare, financial services (including cryptocurrency technologies) and other industries.

We are focused on increasing the number of customers that use our buy-side advertising businesses as their advertising partner. Our long-term growth and results of operations will depend on our ability to attract more customers, including DMOs, across multiple geographies.

*Expand Sales to Existing Customers*

Our customers understand the independent nature of our platform and relentless focus on driving results based on return on investment ("ROI"). Our value proposition is complete alignment across our entire digital supply platform beginning with the first dollar in and last dollar out. We are technology, DSP and media agnostic, and we believe our clients trust us to provide the best opportunity for success of their brands and businesses. As a result, our clients have been loyal, with approximately 90% client retention amongst the clients that represent approximately 80% of our revenue during the three months ended March 31, 2024. In addition, we cultivate client relationships through our pipeline of managed and moderate serve clients that conduct campaigns through our platform. The managed services delivery model allows us to combine our technology with a highly personalized offering to strategically design and manage advertising campaigns.

30

Table of Contents

*Shift to Digital Advertising*

Media has increasingly become more digital as a result of three key ongoing developments:

- Advances in technology with more sophisticated digital content delivery across multiple platforms;
- Changes in consumer behavior, including spending longer portions of the day using mobile and other devices; and
- Better audience segmentation with more efficient targeting and measurable results.

The resulting shift has enabled a variety of options for advertisers to efficiently target and measure their advertising campaigns across nearly every media channel and device. These efforts have been led by big-budgeted, large, multi-national corporations incentivized to cast a broad advertising net to support national brands.

*Increased Adoption of Digital Advertising by Small-and Mid-Sized Companies*

Only recently have small and mid-sized businesses begun to leverage the power of digital media in meaningful ways, as emerging technologies have enabled advertising across multiple channels in a highly localized nature. Campaign efficiencies yielding measurable results and higher advertising ROI have prompted these companies to begin utilizing digital advertising on an accelerated pace. We believe this market is rapidly expanding, and that small-to-mid-sized advertisers will continue to increase their digital spend.

*Seasonality*

In the advertising industry, companies commonly experience seasonal fluctuations in revenue. Historically, for our buy-side advertising segment, the second and third quarters of the year reflect our highest levels of advertising activity and the first quarter reflects the lowest level of such activity. We expect our buy-side revenue to continue to fluctuate based on seasonal factors that affect the advertising industry as a whole.

**Components of Our Results of Operations**

*Revenue*

For the sell-side advertising segment, we generate revenue by selling advertising inventory (digital ad units) that we purchase from publishers to advertisers through a process of monetizing ad impressions on our proprietary sell-side programmatic platform operating under the trademarked banner Colossus SSP. For the buy-side advertising segment, we generate revenue from customers that enter into agreements with us to provide managed advertising campaigns, which include digital marketing and media services to purchase digital advertising space, data and other add-on features.

In connection with our analysis of principal vs agent considerations, we have evaluated the specified goods or services and we considered whether we control the goods or services before they are provided to the customer including the three indicators of control. Based upon this analysis and our specific facts and circumstances, we concluded that we are a principal for the goods or services sold through both our sell-side advertising segment and our buy-side segment because we control the specified good or service before it is transferred to the customer and we are the primary obligor in the agreement with the customer. Therefore, we report revenue on a gross basis inclusive of all supplier costs. We pay suppliers for the cost of digital media, advertising inventory, data and any add-on services or features.

Our revenue recognition policies are discussed in more detail under "-*Critical Accounting Estimates and Related Policies.*"

*Cost of revenues*

For cost of revenues for our sell-side advertising segment, we pay publishers a fee, which is typically a percentage of the value of the ad impressions monetized through our platform. Cost of revenues consists primarily of publisher media fees and data center co-location costs. Media fees include the publishing and real time bidding costs to secure advertising space. For the buy-side advertising segment, cost of revenues consists primarily of digital media fees, third-party platform access fees, and other third-party fees associated with providing services to our customers.

*Operating expenses*

Operating expenses consist of compensation expenses related to our executive, sales, finance and administrative personnel (including salaries, commissions, stock-based compensation, bonuses, benefits and taxes); general and

31

**Appx. B-101**

Table of Contents

administrative expenses (including rent expense, professional fees, independent contractor costs, selling and marketing fees, administrative and operating system subscription costs, insurance, amortization expense related to our intangible assets); and other expenses (including transactions that are unusual in nature or which are occurring infrequently).

***Other expense, net***

*Other income.* Other income includes income associated with recovery of receivables and other miscellaneous credit card rebates.

*Interest expense.* Interest expense is mainly related to our debt as further described below in "-*Liquidity and Capital Resources.*"

*Loss on early termination of line of credit.* In January 2023, we entered into a Loan and Security Agreement (the "Loan Agreement"), by and among Silicon Valley Bank ("SVB"), which provided for a revolving credit facility (the "Credit Facility"). In March 2023, we issued a notice of termination and recognized a loss on the write-off of the deferred financing fees.

**Results of Operations**

***Comparison of the Three Months Ended March 31, 2024 and 2023***

The following tables set forth our condensed consolidated results of operations for the periods presented (in thousands). The period-to-period comparison of results is not necessarily indicative of results for future periods.

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2024 | 2023 | Amount | % |
| Revenues | | | | |
| Sell-side advertising | $ 16,500 | $ 13,783 | $ 2,717 | 20% |
| Buy-side advertising | 5,775 | 7,440 | (1,665) | (22)% |
| Total revenues | 22,275 | 21,223 | 1,052 | 5% |
| | | | | |
| Cost of revenues | | | | |
| Sell-side advertising | 14,807 | 11,841 | 2,966 | 25% |
| Buy-side advertising | 2,470 | 2,949 | (479) | (16)% |
| Total cost of revenues | 17,277 | 14,790 | 2,487 | 17% |
| | | | | |
| Gross profit | 4,998 | 6,433 | (1,435) | (22)% |
| | | | | |
| Operating expenses | 7,805 | 6,574 | 1,231 | 19% |
| Loss from operations | (2,807) | (141) | (2,665) | *nm |
| Other expense, net | (1,212) | (1,267) | 55 | (4)% |
| Loss before income taxes | (4,019) | (1,408) | (2,611) | 185% |
| Income tax benefit | (200) | (74) | (126) | 169% |
| Net loss | $ (3,819) | $ (1,334) | $ (2,485) | 186% |
| Adjusted EBITDA [(1)] | $ (1,659) | $ 549 | $ (2,208) | (402)% |

*nm - not meaningful*

[(1)] For a definition of Adjusted EBITDA, an explanation of our management's use of this measure, and a reconciliation of Adjusted EBITDA to net income see " - *Non-GAAP Financial Measures.*"

Table of Contents

Revenues

Our revenues of $22.3 million for the three months ended March 31, 2024 increased by $1.1 million, or 5%, from $21.2 million for the three months ended March 31, 2023. Sell-side advertising revenue increased $2.7 million, or 20%, primarily due to a continued increase in impression inventory, as well as increased publisher engagement across both general market and underrepresented publisher communities. The Company sold approximately 1.9 billion average monthly impressions over the three months ended March 31, 2024, an increase of 7% from the prior period. For the three months ended March 31, 2024, the Company processed over 248 billion average monthly impressions through its sell-side advertising segment, an increase of 20% over the same period of 2023. In addition, the Company's sell-side advertising platforms processed over 830 billion average monthly bid requests and received approximately 13 billion average monthly bid responses in the first quarter of 2024, an increase of 107% over the same period in 2023. Sell-side revenue per advertiser for the first quarter of 2024 increased 30% compared to the same period of 2023. Buy-side revenue decreased $1.7 million, or 22%, over the three months ended March 31, 2023 due to a decrease in spending from our existing customer base, completion of certain one-time campaigns in 2023 as well as a shift in timing of spend among quarters.

Cost of revenues

Consistent with the overall increase in revenues, cost of revenues of $17.3 million for the three months ended March 31, 2024 increased by $2.5 million, or 17% from $14.8 million for the three months ended March 31, 2023. Sell-side advertising cost of revenues increased $3.0 million, to $14.8 million, or 90% of revenue for the three months ended March 31, 2024, compared to $11.8 million, or 86% of revenue, for the same period in 2023. The increase in costs was primarily due to the related increase in revenue, while the 4% increase as a percentage of revenue was due to a short-term increase in fixed costs of approximately $0.6 million related to an increase in server capacity to support the growth as well as the mix and concentration of publishers and the related costs. Buy-side advertising cost of revenues decreased $0.5 million, to $2.5 million, or 43% of revenue for the three months ended March 31, 2024, compared to $2.9 million, or 40% of revenue, for the same period in 2023.

Gross profit

Gross profit was $5.0 million, or 22% of revenue, for the three months ended March 31, 2024, compared to $6.4 million, or 30% of revenue, for the same period in 2023, reflecting a decrease of $1.4 million or 22%. The change in margin for the three months ended March 31, 2024 is attributable to the mix in revenue between our business segments as our sell-side segment has higher cost of revenues compared to our buy-side segment, as well as the additional fixed costs related to an increase in server capacity.

Sell-side advertising gross profit decreased $0.2 million for the three months ended March 31, 2024 as compared to the same period in 2023, primarily due the increase in temporary fixed costs related to our servers partially offset by the increase in revenues. Sell-side advertising gross margin was 10% and 14% for the three months ended March 31, 2024 and 2023, respectively. Sell-side gross margin in 2024 was negatively impacted by additional fixed costs of approximately $0.6 million incurred in the three months ended March 31, 2024, related to an increase in server capacity to support our growth. Buy-side advertising gross profit decreased $1.2 million for the three months ended March 31, 2024, as compared to the same period in the prior year, primarily due to the decrease in revenue. Buy-side advertising gross margin was 57% and 60% for the three months ended March 31, 2024 and 2023, respectively. Buy-side gross margin in 2024 was negatively impacted by reduced leverage due to lower revenue associated with the same level of fixed costs, which the Company expects to recover with the shift of a portion of revenue to the second quarter of 2024.

Operating expenses

The following table sets forth the components of operating expenses for the periods presented (in thousands).

| | Three Months Ended March 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2024 | 2023 | Amount | % |
| Compensation, tax and benefits | $    4,524 | $    3,634 | $    890 | 24% |
| General and administrative | 3,281 | 2,940 | 341 | 12% |
| Total operating expenses | $    7,805 | $    6,574 | $    1,231 | 19% |

*Compensation, taxes and benefits*

Compensation, taxes and benefits of $4.5 million, increased by $0.9 million, or 24%, for the three months ended March 31, 2024 from $3.6 million for the same period in 2023. The increase is due to headcount additions made throughout

33

**Appx. B-103**

Table of Contents

2023 primarily in our operations area to support our growth as well as in our shared services to support our public company infrastructure and increased stock compensation, partially offset by a decrease bonus expense. Sequentially, compensation, taxes and benefits decreased by $0.3 million, or 6%, from $4.8 million for the three months ended December 31, 2023 primarily due to lower bonus accrual. We expect to continue to invest in corporate infrastructure and incur additional expenses associated with our transition to and operation as a public company, including increased compensation associated with additional headcount to support our sales initiatives.

*General and administrative expenses*

General and administrative ("G&A") expenses of $3.3 million for the three months ended March 31, 2024 increased from $2.9 million for the same period in 2023. G&A expenses as a percentage of revenue was 15% and 14% for the three months ended March 31, 2024 and 2023, respectively. During the three months ended March 31, 2024, we incurred higher professional fees and software licenses. Sequentially, G&A expenses decreased by $1.2 million, or 27%, from $4.5 million for the three months ended December 31, 2023 primarily due to lower professional fees, sales and marketing costs and travel expense. We expect to continue to invest in and incur additional expenses associated with our operation as a public company, including increased professional fees, investment in automation, and compliance costs associated with developing the requisite infrastructure required for internal controls.

Other expense, net

The following table sets forth the components of other expense, net for the periods presented (in thousands).

| | Three Months Ended March 31, | | Change | |
| | 2024 | 2023 | Amount | % |
|---|---|---|---|---|
| Interest expense | $ (1,297) | $ (1,017) | $ (280) | 27% |
| Other income | 85 | 50 | 35 | 70% |
| Loss on early termination of line of credit | - | (300) | 300 | nm |
| Total other expense, net | $ (1,212) | $ (1,267) | $ 55 | (4)% |

*nm - not meaningful*

Other expense, net for the three months ended March 31, 2024 primarily consists of $1.3 million of interest expense. Other expense, net for the three months ended March 31, 2023 is primarily consists of $1.0 million of interest expense and $0.3 million related to the loss on early termination of the line of credit with Silicon Valley Bank.

Interest expense increased for the three months ended March 31, 2024 to $1.3 million, compared to $1.0 million for the three months ended March 31, 2023. The increase in interest expense in the period is due to additional net borrowings of $10.2 million under the Company's credit facilities, as well as higher interest rates.

**Liquidity and Capital Resources**

*Going Concern*

On May 10, 2024, the Company was the subject of a defamatory article / blog post which the Company believes was part of a coordinated misinformation campaign. As discussed in Note 9, one of the Company's sell-side customers paused its connection to the Company for a couple of weeks in May 2024, which reduced sell-side sales volumes. As of the date of this report, sell-side volumes related to this customer have resumed but not yet at the levels experienced prior to the pause in May 2024 which has created significant disruption in the Company's sell-side business. The Company is actively working with its partners to achieve prior volume levels. However, there can be no assurance that the Company will be able to achieve prior volume levels with its partners or on the timing of achieving such volume levels. Additionally, the Company (1) incurred a net loss of $6.8 million in 2023 primarily related to payments made to a few publishers of $8.8 million associated with a disputed short payment from a customer and a net loss of $3.8 million in the three months ended March 31, 2024 consistent with seasonal historical trends for the Company, (2) reported an accumulated deficit of $3.3 million as of March 31, 2024 (3) reported cash and cash equivalents of $3.3 million as of March 31, 2024, (4) has borrowed $7.0 million and $9.7 million as of March 31, 2024 and the date of this report, respectively, under the Credit Agreement which matures in July 2025, (5) was notified on April 17, 2024 that the Company's auditor had resigned and (6) was unable to timely file its 2023 annual report and quarterly reports for the first two quarters of 2024. The delay in filing the Company's annual and quarterly reports disrupted existing capital-raising efforts and created additional audit,

34

Table of Contents

legal and other expenses. These factors raise substantial doubt about the Company's ability to continue as a going concern over the next twelve months.

The Company anticipates sources of liquidity to include cash on hand and cash flow from operations and has taken several actions to address liquidity concerns. These actions include (1) a plan to reduce expenses through a staff reduction, a pause on hiring and cost savings measures that were executed on July 1, 2024, (2) working with lenders to provide temporary relief from debt covenants (see Note 3 - Long-Term Debt to the Company's unaudited financial statements) while rebuilding sell-side volumes, (3) raising capital through arrangements with various providers, and (4) regaining compliance with respect to delinquent SEC filings which will allow the Company to access the capital markets as well as other financing sources. There can be no assurance that the Company's actions will be successful or that additional financing will be available when needed or on acceptable terms.

*Sources of Liquidity*

The following table summarizes our cash and cash equivalents, working capital, and availability under our Credit Agreement (as defined below) on March 31, 2024 and December 31, 2023 (in thousands):

|  | March 31, 2024 | December 31, 2023 |
|---|---|---|
| Cash and cash equivalents | $ 3,334 | $ 5,116 |
| Working capital | $ 5,343 | $ 3,280 |
| Availability under Credit Agreement | $ 3,000 | $ 7,000 |

To fund our operations and service our debt thereafter and depending on our growth and results of operations, we may raise additional capital through the issuance of additional equity and/or debt, which could have the effect of diluting our stockholders. Any future equity or debt financings may be on terms which are not favorable to us. As our credit facilities become due, we will need to repay, extend or replace such indebtedness. Our ability to do so will be subject to future economic, financial, business and other factors, many of which are beyond our control.

**Credit Facilities**

The terms and conditions of the various credit facilities we entered into are further described in Note 3 - Long-Term Debt in the notes to the condensed consolidated financial statements.

**Historical Cash Flows:**

The following table sets forth our cash flows for the three months ended March 31, 2024 and 2023 (in thousands):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2024 | 2023 |
| Net cash (used in) provided by operating activities | $ (5,704) | $ 3,100 |
| Net cash used in investing activities | - | (48) |
| Net cash provided by (used in) financing activities | 3,922 | (380) |
| Net (decrease) increase in cash and cash equivalents | $ (1,782) | $ 2,672 |

Our cash and cash equivalents at March 31, 2024 were held for working capital and general corporate purposes. The decrease in cash and cash equivalents compared with March 31, 2023, primarily resulted from $5.7 million in cash flows used in operating activities partially offset by $3.9 million in cash flows provided by financing activities.

**Operating Activities**

*For the Three Months Ended March 31, 2024 and 2023*

Cash provided by operating activities has typically been generated from net income and by changes in our operating assets and liabilities, particularly in the areas of accounts receivable and accounts payable and accrued expenses, adjusted for certain non-cash and non-operating expense items such as depreciation, amortization, stock-based compensation and deferred income taxes.

**Appx. B-105**

Table of Contents

For the three months ended March 31, 2024, net cash flows used in operating activities were $5.7 million and consisted of net loss of $3.8 million, $1.1 million in adjustments for non-cash and non-operating items and $3.0 million of cash out flows from working capital. Adjustments for non-cash and non-operating items mainly consisted of depreciation and amortization expense of $0.8 million and stock-based compensation expense of $0.5 million partially offset by $0.2 million of deferred tax benefit.

The $3.0 million decrease in cash resulting from changes in working capital primarily consisted of a $18.1 million decrease in accounts payable and a $0.7 million decrease in accrued expenses such as payroll and payroll related expenses partially offset by a $15.8 million decrease in accounts receivable. The decrease in accounts payable and accounts receivable is mainly due to the seasonal nature of the sell-side segment of the business as well as a payment of $8.8 million to a few publishers associated with a charge recorded in 2023 related to a disputed short pay from a customer.

For the three months ended March 31, 2023, net cash flows provided by operating activities were $3.1 million and mainly consisted of net loss of $1.3 million, $1.0 million in adjustments for noncash and non-operating items and $3.4 million of cash inflows from working capital. Adjustments for non-cash and non-operating items primarily consisted of depreciation and amortization expense of $0.7 million, stock-based compensation expense of $0.1 million and loss on early termination of line of credit of $0.3 million.

The $3.4 million increase in cash resulting from changes in working capital consisted primarily of a $7.3 million decrease in accounts receivable and a $0.4 million increase in deferred revenues partially offset by a $3.9 million decrease in accounts payable. The decrease in accounts receivable and accounts payable is mainly due to the seasonal nature of the sell-side segment of the business.

**Investing Activities**

*For the Three Months Ended March 31, 2024 and 2023*

Our investing activities to date have consisted primarily of purchases of software, office furniture and leasehold improvements.

For the three months ended March 31, 2023, net cash flows used in investing activities of less than $0.1 million were primarily related to leasehold improvements and office furniture.

**Financing Activities**

*For the Three Months Ended March 31, 2024 and 2023*

For the three months ended March 31, 2024, net cash provided by financing activities was $3.9 million mainly resulting from $4.0 million of proceeds from line of credit and $0.2 million proceeds from warrants exercised partially offset by $0.4 million paid on term loan.

For the three months ended March 31, 2023, net cash used in financing activities was $0.4 million mainly resulting from $0.2 million paid on term loan and $0.2 million deferred financing costs.

**Contractual Obligations and Future Cash Requirements**

As of March 31, 2024, our principal contractual obligations expected to give rise to material cash requirements consist of the 2021 Credit Facility, the Credit Agreement and non-cancelable leases for our various facilities. We anticipate that the future minimum payments related to our current indebtedness over the next five years will be $1.1 million in 2024, $8.5 million in 2025, $25.7 million in 2026, less than $0.1 million in 2027, less than $0.1 million in 2028, and $0.1 million thereafter, assuming we do not refinance our indebtedness, enter into a new revolving credit facility or make any further draws under the revolving facility. The leases will require minimum payments of $0.2 million in 2024, $0.2 million in 2025, $0.2 million in 2026, $0.2 million in 2027, $0.2 million in 2028, and $0.2 million thereafter. As of March 31, 2024, we had cash and cash equivalents of $3.3 million. Based on projections of revenue and operating results in the coming year, the available cash held by the Company and the amounts the Company may borrow under the Credit Agreement, the Company believes that it will have sufficient cash resources to finance its operations and service any maturing debt obligations for at least the next twelve months following the issuance of these financial statements.

36

**Appx. B-106**

Table of Contents

**Non-GAAP Financial Measures**

In addition to our results determined in accordance with U.S. generally accepted accounting principles ("GAAP"), including, in particular operating income, net cash provided by operating activities, and net income, we believe that earnings before interest, taxes, depreciation and amortization, as adjusted for loss on early termination of line of credit and stock-based compensation ("Adjusted EBITDA"), a non-GAAP measure, is useful in evaluating our operating performance. The most directly comparable GAAP measure to Adjusted EBITDA is net income.

The following table presents a reconciliation of Adjusted EBITDA to net loss for each of the periods presented (in thousands):

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2024 | | 2023 | |
| Net loss | $ | (3,819) | $ | (1,334) |
| Add back (deduct): | | | | |
| Interest expense | | 1,297 | | 1,017 |
| Amortization of intangible assets | | 488 | | 489 |
| Stock-based compensation | | 504 | | 94 |
| Depreciation and amortization of property, equipment and software | | 71 | | 57 |
| Loss on early termination of line of credit | | - | | 300 |
| Income tax benefit | | (200) | | (74) |
| Adjusted EBITDA | $ | (1,659) | $ | 549 |

In addition to operating income and net income, we use Adjusted EBITDA as a measure of operational efficiency. We believe that this non-GAAP financial measure is useful to investors for period-to-period comparisons of our business and in understanding and evaluating our operating results for the following reasons:

- Adjusted EBITDA is widely used by investors and securities analysts to measure a company's operating performance without regard to items such as depreciation and amortization, interest expense, provision for income taxes, stock-based compensation, revaluation of tax receivable agreement liability, and certain one-time items such as acquisition transaction costs, losses from early termination or redemption of credit agreements or preferred units and gains from settlements or loan forgiveness that can vary substantially from company to company depending upon their financing, capital structures and the method by which assets were acquired;

- Our management uses Adjusted EBITDA in conjunction with GAAP financial measures for planning purposes, including the preparation of our annual operating budget, as a measure of operating performance and the effectiveness of our business strategies and in communications with our board of directors concerning our financial performance; and

- Adjusted EBITDA provides consistency and comparability with our past financial performance, facilitates period-to-period comparisons of operations, and also facilitates comparisons with other peer companies, many of which use similar non-GAAP financial measures to supplement their GAAP results.

Our use of this non-GAAP financial measure has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our financial results as reported under GAAP.

**Critical Accounting Estimates and Related Policies**

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities and disclosure of contingent liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from these estimates. The Company bases its estimates on past experiences, market conditions, and other assumptions that the Company believes are reasonable under the circumstances, and the Company evaluates these estimates on an ongoing basis.

Table of Contents

There have been no material changes to our critical accounting estimates and related policies as compared to the critical accounting estimates and related policies described in our "Management's Discussion and Analysis of Financial Condition and Results of Operations" set forth in our Annual Report on Form 10-K for the year ended December 31, 2023.

**Recent Accounting Pronouncements**

See Note 2 to our condensed consolidated financial statements for accounting pronouncements recently adopted and accounting pronouncements not yet adopted.

**ITEM 3. Quantitative and Qualitative Disclosures About Market Risk**

As a "smaller reporting company," we are not required to provide the information required by this Part I, Item 3.

**ITEM 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

The Company maintains disclosure controls and procedures ("Disclosure Controls") as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and that such information is accumulated and communicated to management, including the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") as appropriate to allow timely decisions regarding required disclosure. The Company conducted an evaluation (the "Evaluation"), under the supervision and with the participation of the CEO and CFO, of the effectiveness of the design and operation of our Disclosure Controls as of March 31, 2024 pursuant to the Rules 13a-5(b) and 15d-15(b) of the Exchange Act. In designing and evaluating the Disclosure Controls, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives and management was required to apply judgement in evaluating its controls and procedures. Based on this Evaluation, due to the material weaknesses described below, the CEO and CFO concluded that the Company's Disclosure Controls were not effective as of March 31, 2024.

*Management's Annual Report on Internal Controls Over Financial Reporting*

The Company's management, including the Company's CEO and CFO, is responsible for establishing and maintaining adequate internal controls over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). The Company's internal controls over financial reporting is a process designed to provide reasonable assurance to our management and board of directors regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States.

The internal controls over financial reporting includes policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect transactions and dispositions of assets of the Company; (ii) provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal controls over financial reporting may not prevent or detect misstatements. All internal control systems, no matter how well designed, have inherent limitations, including the possibility of human error and the circumvention of overriding controls. Accordingly, even effective internal controls over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal controls over financial reporting as of December 31, 2023. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013). Based on this evaluation, management concluded that the Company's internal controls over financial reporting was still not effective as of March 31, 2024.

Table of Contents

We identified material weaknesses in our controls over the journal entry processes, information technology general controls ("ITGC") and the technical evaluation of accounting matters that existed as of December 31, 2023. A material weakness is a deficiency, or a combination of deficiencies, in internal controls over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. The material weaknesses are a result of our processes and related controls not operating effectively related to journal entry processes, ITGC and the technical evaluation of accounting matters. As further detailed in Note 13 - Restatement (Unaudited) of the Company's consolidated financial statements included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, the Company identified prior year accounting errors in the Company's previously reported unaudited interim consolidated financial statements beginning March 31, 2022 resulting from the incorrect (1) accounting for and presentation of noncontrolling interests ("NCI"), (2) recognition of an organizational transaction, (3) presentation of earnings per share considering the effect of certain features of the Company's warrants and the impact of correcting the accounting for, and presentation of NCI, and (4) timing of the recording of the 2023 redemption of warrants. The Company's management and the audit committee of the Company's Board of Directors concluded that it was appropriate to restate the quarterly unaudited consolidated financial statements for the quarterly periods ended March 31, 2023, June 30, 2023, and September 30, 2023.

Other than the described above, there were no material misstatements as a result of these material weaknesses; however, it could have resulted in a material misstatement to the annual or interim financial statements that would not have been prevented or detected on a timely basis. Due to the material weaknesses, we have concluded that our internal controls over financial reporting were not effective as of March 31, 2024.

*Management's Plan to Remediate the Previously Reported Material Weaknesses*

Management has implemented remediation steps to address the material weaknesses and to improve our internal controls. Specifically, in late 2023, the Company engaged consultants to assist with identifying and testing the design of controls over business processes as well as ITGC. The first phase of the project was completed in the first quarter of 2024. We are now in the process of enhancing the design of certain internal control procedures and implementing new internal controls over (1) the segregation of duties within the journal entry process, (2) the access to program and change management within our information technology environment, and (3) the evaluation of technical accounting matters. These controls are planned to be tested for design and operating effectiveness in future periods. The Company will continue the engagement with outside consultants to review the revised control processes and procedures.

While the Company has implemented remediation steps, the material weaknesses cannot be considered fully remediated until the improved controls have been in place and operate for a sufficient period of time. However, our management, including our Chief Executive Officer and Chief Financial Officer, has concluded that, notwithstanding the identified material weaknesses in our internal controls over financial reporting, the financial statements fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented in conformity with U.S. GAAP.

*Changes in Internal Controls Over Financial Reporting*

Other than as discussed above, there were no changes in internal controls over financial reporting during the three months ended March 31, 2024 that have materially affected, or are reasonably likely to materially affect, the Company's internal controls system over financial reporting.

**PART II. Other Information**

**ITEM 1. Legal Proceedings**

We may from time to time be subject to various legal or administrative claims and proceedings arising in the ordinary course of business. As of the date hereof, except as set forth below, we are not a party to any material legal or administrative proceedings nor are there any proceedings in which any of our directors, executive officers or affiliates, or any registered or beneficial stockholder, is an adverse party or has a material interest adverse to our interest. Litigation or any other legal or administrative proceeding, regardless of the outcome, is likely to result in substantial cost and diversion of our resources, including our management's time and attention.

On May 23, 2024, an alleged stockholder, purportedly on behalf of the persons or entities who purchased or acquired publicly traded securities of the Company between April 2023 and March 2024, filed a putative class action against the Company, certain of our officers and directors, and other defendants in the U.S. District Court for the Southern District of Texas, alleging violations of federal securities laws related to alleged false or misleading disclosures made by the Company

Table of Contents

in its public filings. On July 9, 2024, another alleged stockholder filed a similar securities class action against the Company, certain of our officers and directors, also in the Southern District of Texas. The two actions have been consolidated. Each of these complaints seeks unspecified damages, plus costs, fees, and attorneys' fees. The Company cannot make any predictions about the final outcome of this matter or the timing thereof.

On May 10, 2024, the Company was the subject of a defamatory article / blog post which the Company believes was part of a coordinated misinformation campaign. In connection with this post, one of the Company's sell-side customers paused its connection to the Company while the allegations were investigated. This customer reconnected the Company on May 22, 2024 and sell-side volumes have resumed but not yet at the levels experienced prior to the pause in May 2024. The Company is actively working with its partners to achieve prior volume levels. On May 14, 2024, the Company filed a lawsuit against the author of the defamatory article and is vigorously pursuing its rights. The Company cannot make any predictions about the final outcome of this litigation matter or the timing thereof.

**ITEM 1A. Risk Factors**

Not applicable.

**ITEM 2. Unregistered Sales of Equity Securities and Use of Proceeds**

*Unregistered Sales of Equity Securities*

None.

*Use of Proceeds*

None.

*Purchases of Equity Securities by the Issuer*

None.

**ITEM 3. Defaults Upon Senior Securities**

None.

**ITEM 4. Mine Safety Disclosures**

Not applicable.

**ITEM 5. Other Information**

*Rule 10b5-1 Trading Plans*

During the three months ended March 31, 2024, no director or officer of the Company adopted or terminated a "Rule 10b5-1 trading arrangement" or "non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408(a) of Regulation S-K.

Table of Contents

**ITEM 6. Exhibits**

| Exhibit No. | Description | Form | File Number | Date | Exhibit No. | Filed or Furnished herewith |
|---|---|---|---|---|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of Direct Digital Holdings, Inc. | 8-K | 001-41261 | February 16, 2022 | 3.1 | |
| 3.2 | Amended and Restated Bylaws of Direct Digital Holdings, Inc. | 8-K | 001-41261 | February 16, 2022 | 3.2 | |
| 31.1 | Certification of the Chief Executive Officer of Direct Digital Holdings, Inc., pursuant to Rule 13a-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 31.2 | Certification of the Chief Financial Officer of Direct Digital Holdings, Inc, pursuant to Rule 13a-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 32.1* | Certification of the Chief Executive Officer pursuant to Rule 13a-14(b) of the Exchange Act and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 32.2* | Certification of the Chief Financial Officer pursuant to Rule 13a-14(b) of the Exchange Act and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | X |
| 101.INS* | Inline XBRL Instance Document | | | | | X |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema | | | | | X |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase | | | | | X |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase | | | | | X |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase | | | | | X |
| 101.PRE* | Inline XBRL Extension Presentation Linkbase | | | | | X |
| 104* | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101) | | | | | X |

\*   This exhibit will not be deemed "filed" for purposes of Section 18 of the Exchange Act, or otherwise subject to the liability of that section. Such exhibit will not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

**Appx. B-111**

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934 the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: October 15, 2024                    **DIRECT DIGITAL HOLDINGS, INC.**

                    By:        /s/ Diana P. Diaz
                                    **DIANA P. DIAZ**
                                    **Chief Financial Officer**
                                    **(Duly Authorized Signatory, Principal Financial and Accounting Officer)**

42

**Appx. B-112**

**Exhibit 31.1**

**Certification Pursuant to Section 302**
**of the Sarbanes-Oxley Act of 2002**

I, Mark Walker, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Direct Digital Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    October 15, 2024               /s/ Mark Walker
                                        Mark Walker,
                                        Chairman and Chief Executive Officer
                                        *(Principal Executive Officer)*

**Appx. B-113**

**Exhibit 31.2**

**Certification Pursuant to Section 302
of the Sarbanes-Oxley Act of 2002**

I, Diana P. Diaz, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Direct Digital Holdings, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

| | |
|---|---|
| Date:    October 15, 2024 | /s/ Diana P. Diaz |
| | Diana P. Diaz, |
| | Chief Financial Officer |
| | *(Principal Financial and Accounting Officer)* |

**Appx. B-114**

**Exhibit 32.1**

**Certification Pursuant to Section 906**
**of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of Direct Digital Holdings, Inc. (the "Company") for the period ended March 31, 2024, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Mark Walker, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

    (1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    October 15, 2024

/s/ Mark Walker

Mark Walker,
Chairman and Chief Executive Officer
*(Principal Executive Officer)*

**Exhibit 32.2**

**Certification Pursuant to Section 906**
**of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of Direct Digital Holdings, Inc. (the "Company") for the period ended March 31, 2024, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Diana P. Diaz, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    October 15, 2024                    /s/ Diana P. Diaz
                                             Diana P. Diaz,
                                             Chief Financial Officer
                                             *(Principal Financial and Accounting Officer)*

# Exhibit 7

Case 4:24-cv-01940    Document 44-3    Filed on 01/27/25 in TXSD    Page 120 of 190

# Direct Digital Holdings: This Rapidly Growing Programmatic Ad Player Generates Over 300 Billion Monthly Impressions

*By Amit Chowdhry • Feb 1, 2024*

Direct Digital Holdings owns operating companies Colossus SSP, Huddled Masses, and Orange 142, which bring state-of-the-art sales and buy-side advertising platforms together under one umbrella company. Pulse 2.0 interviewed Direct Digital Holdings Co-Founder, CEO and Chairman Mark D. Walker to learn more about the company.

## Mark D. Walker's Background



**Appx. B-118**

Case 4:24-cv-01940    Document 44-3    Filed on 01/27/25 in TXSD    Page 121 of 190

Walker has roughly 20 years of experience in building relationships and revenue-generating operations for a wide variety of companies, including large Fortune 500 corporations and start-ups. And Walker said:

"Before starting Direct Digital Holdings, I served in several roles — from an early hire at startup Questia to business development director at NRG Energy and COO of EBONY Media. While I was at NRG Energy, I was able to garner a deep understanding of having a top-down view of the value chain. To complement this experience, Ebony gave me a bottom-up view of the value chain of how media is purchased. After working in both sides of the advertising world, I saw an immense opportunity for digital advertising technology platforms that are more efficient and equitable. Along with my co-founder, Keith Smith, we founded Direct Digital Holdings to essentially help companies buy and sell media — and we leverage technology to do it.

## Formation Of Direct Digital Holdings

How did the idea for Direct Digital Holdings come together? Walker shared:

"In 2018, I co-founded Direct Digital Holdings with my partner and now our President, Keith Smith. Keith and I have very complimentary professional backgrounds, and he was really the ideal partner for me to go into business with to start this pioneering and fast-growing ad-tech company."

"Keith and I founded Direct Digital Holdings to create a "one-stop shop" to make it easy for marketers to purchase curated solutions to meet their diverse media spending goals and reach the right diverse audiences where they are and return a high ROI. We were confident that this dynamic and inclusive approach to advertising would be a game-changer, as we provide programmatic, digital advertising solutions to companies of all sizes, with a specialization in reaching highly sought-after multicultural audiences and underserved middle market companies across the U.S."

## Favorite Memory

What has been your favorite memory working for the company so far? Walker reflected:

**Appx. B-119**

"Taking the company public on Nasdaq was a pivotal moment in our company history, and it has added a significant amount of credibility to our company."

"We started undergoing the rigorous IPO process a year in advance and the market was turning against us, but we felt pursuing an IPO and raising the capital would give us a strong foundation and credibility to grow the business in the strategic direction we needed to compete. The timing was certainly a huge challenge as we went public the same day that Russia invaded Ukraine in February 2022. This timing unleashed a host of macro-level issues across the economy, but we did not give up, and we were able to complete the IPO process. Our team has been hard at work as a public company, and we are proud to be the ninth black-owned company to ever go public on a US stock exchange, forging a path forward for others to follow."

## Core Products

What are the company's core products and features? Walker explained:

"Direct Digital Holdings is one of the fastest growing players in the programmatic advertising industry, with a focus on serving companies and audiences in mid-sized markets and under-represented constituencies (gender, race, sexual orientation) — those often overlooked or marginalized in the ad space."

"At the base level, we are a holding company for three core operating companies — Colossus SSP, Huddled Masses, and Orange 142. All three combine to bring state-of-the-art sell- and buy-side advertising platforms together under one umbrella company. Direct Digital Holdings' sell-side platform, Colossus SSP, offers advertisers of all sizes extensive reach within the general market and multicultural media properties. Our subsidiaries Huddled Masses and Orange142, deliver significant ROI for middle market advertisers by providing data-optimized programmatic solutions at scale for businesses in sectors that range from energy to healthcare to travel to financial services."

"Currently, our sell- and buy-side solutions manage approximately 125,000 clients monthly, generating more than 300 billion impressions per month across display, CTV, in-app and other media channels."

## Evolution Of Direct Digital Holdings' Technology

**Appx. B-120**

How has the company's technology evolved since launching? Walker noted:

"Enhancing our technological advantage and deepening our competitive moat has been a key focus for Direct Digital Holdings. We have made significant investments in our technology stack, advertising platform and operational structure. Initially, we expected to see the impact of these investments in 2024. However, we are pleased to report these benefits and associated growth began making an impact in 2023."

"Our technology partnerships and overarching business strategy enable us to meet a growing number of customer demands while also furthering the capabilities of our technology platforms. Consequently, our open marketplace CPM platform continues to benefit as businesses seek our differentiated, thoughtful and tailored approach to advertising technology and our tech-enabled solutions. Moving forward3, we believe our technological strategy, infrastructure, and operational investments will continue to bear fruit as we make considerable progress with our server transitions as well as our overall re-platforming."

## Significant Milestones

What have been some of the company's most significant milestones? Walker cited:

"As we execute on our robust growth strategy supported by key technological capabilities, our rapid growth, as evidenced by our strong earnings results in recent quarters, has been really exciting. A significant milestone for the team was crossing $100 million in revenues in, and, importantly, just in Q3we raised our guidance again to a range of $170 million to $190 million for FY 2023. We believe we are just getting started as we continue to invest in our technology and infrastructure."

## Customer Success Stories

After asking Walker about customer success stories, he highlighted:

"Our recently announced strategic partnerships with Amazon Publisher Services' Transparent Ad Marketplace, Hewlett-Packard Enterprise's GreenLake Edge-to-Edge Cloud Platform, and Beeswax's connected TV ad inventory have helped to enhance and expand our service offering as well as the industry-leading capabilities that we offer our clients."

**Appx. B-121**

"One recent client success story that I like to point out is Direct Digital Holdings' work with the University of Pennsylvania through our Orange 142 subsidiary."

"We were commissioned to help attract potential students for the University's "Penn Summer" program that provides summer classes for students in the tri-state area who wish to take courses at home or attend an Ivy League school during the summer."

"As part of the campaign, we employed various channels to efficiently reach the target audience. Most of the focus was on the Delaware Valley (Philly DMA) to attract local students, accounting for 90% of the campaign's efforts. Additionally, 10% of the targeting was allocated towards students from feeder schools such as Pepperdine, Cornell, Boston College, and Columbia."

"To optimize reach and engagement, the campaign used different methods such as paid search, social lead generation, in-need targeting, streaming audio, and display/retargeting. In the end, utilizing diverse tactics to drive leads and promote the Penn Summer program, the campaign achieved remarkable results, including 6.6 million impressions served to the target audience with more than 39 thousand qualified clicks to the designated landing page, resulting in a high overall click-through rate of 0.60%, which surpasses the industry average, indicating the campaign's effectiveness in capturing audience attention and driving engagement."

"This example is just one case study that exemplifies the capabilities and reach Direct Digital Holdings can offer our clients and our expertise. As one of the fastest growing advertising companies, with top-of-the-line technology to meet the dynamic and shifting needs of the advertising market, we're ready to help our clients achieve their goals across many industries."

## Differentiation From The Competition

What differentiates the company from its competition? Walker concluded:

"At Direct Digital Holdings, we offer customized digital marketing solutions tailored to the specific needs of verticals, including Travel & Tourism, Higher Education, Energy sectors, and many others. Our dynamic approach is designed to provide a comprehensive solution that aligns with each client's unique objectives. Through our companies Colossus SSP, Huddled Masses, and Orange 142, we bring state-of-the-art

**Appx. B-122**

sell- and buy-side advertising platforms together under one roof. Our mission is to deliver curated solutions that are seamless and hassle-free for our clients from ideation to implementation for high ROI."

"Direct Digital Holdings primarily serves two key markets: the middle market and multicultural publishing, catering to businesses with revenues ranging from $5 million to $500 million. We are big enough to service the largest publishers and advertisers but small enough to provide personal assistance and recommendations as required. This means that we harness our expertise to meet customers in unique market segments in real time. We can match the right ad with the right audience to deliver the best results through advanced technology."

"Our differentiation lies in our operational excellence and tailored approach specific to verticals like Travel & Tourism, Higher Education, and Energy to achieve digital marketing goals efficiently and effectively.  We are in tune with the evolving values of the consumer and brands, and our diversity and commitment to sustainability makes us key partners for publishers and advertisers that want to reflect the modern consumer."

 **(https://pulse2.com)**

Pulse 2.0 focuses on business news, profiles, and deal flow coverage.

**(https://www.linkedin.com/company/pulse2news)**
**(https://twitter.com/pulse2news)**
**(https://www.facebook.com/pulse2news)**

© 2024 Pulse 2.0 LLC. All rights reserved.

About (https://pulse2.com/about-us/)    Contact (https://pulse2.com/contact/)
Disclaimer (https://pulse2.com/terms-of-service/)    Privacy (https://pulse2.com/privacy-policy/)
Ethics (https://pulse2.com/news-ethics-and-standards/)
Mission (https://pulse2.com/pulse-2-0-editorial-mission/)

**Appx. B-123**

# Exhibit 8

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): November 9, 2023

# Direct Digital Holdings, Inc.

**(Exact name of registrant as specified in its charter)**

| Delaware | 001-41261 | 87-2306185 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 1177 West Loop South, Suite 1310 Houston, Texas | 77027 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (832) 402-1051**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A common stock, par value $0.001 per share | DRCT | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (the "Exchange Act") (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02**        **Results of Operations and Financial Condition.**

On November 9, 2023, Direct Digital Holdings, Inc. (the "Company") issued a press release announcing its financial results for the three months ended September 30, 2023. A copy of the press release is furnished herewith as Exhibit 99.1 to this report and is incorporated herein by reference.

The information provided in Item 2.02 of this report, including Exhibit 99.1, shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference.

**Item 9.01**        **Financial Statements and Exhibits.**

(d) Exhibits

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release, dated November 9, 2023. |
| 104 | Cover Page Interactive Data File, formatted in Inline Extensible Business Reporting Language (iXBRL). |

**SIGNATURE**

       Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

| | |
|---|---|
| **November 9, 2023** | **Direct Digital Holdings, Inc.** |
| (Date) | (Registrant) |
| | |
| | /s/ Diana Diaz |
| | Diana Diaz |
| | *Chief Financial Officer* |

Exhibit 99.1



# Direct Digital Holdings Reports
# Third Quarter 2023 Financial Results

### *Third Quarter 2023 Revenue Up 129% Year-Over-Year to $59.5 Million*

### *Company Raises Full-Year 2023 Revenue Guidance to $170 Million - $190 Million*

**Houston, November 09, 2023** -- Direct Digital Holdings, Inc. (Nasdaq: DRCT) ("Direct Digital Holdings" or the "Company"), a leading advertising and marketing technology platform operating through its companies Colossus Media, LLC ("Colossus SSP"), Huddled Masses LLC ("Huddled Masses") and Orange142, LLC ("Orange142"), today announced financial results for the third quarter ended September 30, 2023.

Mark D. Walker, Chairman and Chief Executive Officer, commented, "In recent quarters, we have made significant investments in our technology stack, advertising platform and operational structure. We initially expected to see the impact of these investments in 2024, however, we are pleased to report that these benefits have arrived much earlier in 2023. Our strong technology partnerships and our overarching business strategy have enabled us to meet a growing number of customers' demands and further the capabilities of our sell-side technology platform. On both the sell-side and the buy-side, increased spend from our buying partners has resulted in an associated increase in our impression count and organic growth profile with a direct positive impact on net income and Adjusted EBITDA[1]."

Keith Smith, President, added, "The growth seen in this quarter, as well as the past year, has been fueled by a combination of our strategic investments and partnerships, our differentiated approach to advertising solutions, as well as a set of market dynamics which have been highly beneficial to our position in the industry. We have capitalized on the shift in ad spend towards digital media on both the sell- and buy-side and will continue to grow our presence in the space through our recent partnerships and advancements of our technology stack. We remain committed to executing on the same growth and investment initiatives that led us to the strong third quarter results we are reporting today."

### **Third Quarter 2023 Business Highlights**

- For the third quarter ended September 30, 2023, Direct Digital Holdings processed over 400 billion monthly impressions through its sell-side advertising segment, an increase of 220% over the same period of 2022.

- In addition, the Company's sell-side advertising platforms received over 34 billion monthly bid responses in the third quarter of 2023, an increase of over 210% over the same period in 2022. Sell-side revenue per advertiser for the third quarter of 2023 increased 241% compared to the same period of 2022.

- The Company's buy-side advertising segment served approximately 228 customers in the third quarter of 2023 and buy-side revenue per customer increased 14% compared to the same period of 2022.

---



**Third Quarter 2023 Financial Highlights:**

- Revenue was $59.5 million in the third quarter of 2023, an increase of $33.5 million, or 129% over the $26.0 million in the same period of 2022.

  - Sell-side advertising segment revenue grew to $51.6 million and contributed $32.8 million of the increase, or 174% growth over the $18.9 million of sell-side revenue in the same period of 2022.

  - Buy-side advertising segment revenue grew to $7.9 million and contributed $0.7 million of the increase, or 10% growth over the $7.1 million of buy-side revenue in the same period of 2022.

- Consolidated operating income in the third quarter of 2023 was $4.5 million compared to consolidated operating income of $1.8 million in the same period of 2022, an increase of 144% year-over-year.

- Net income was $3.4 million in the third quarter of 2023, compared to net income of $0.8 million in the same period of 2022, an increase of 313% year-over-year.

- Adjusted EBITDA(1) was $5.4 million in the third quarter of 2023, compared to $2.4 million in the same period of 2022, an increase of 123% year-over-year.

**Financial Outlook**

Assuming the U.S. economy does not experience any major economic conditions that deteriorate or otherwise significantly reduce advertiser demand, we are increasing our previously issued estimate as disclosed in our second quarter 2023 update:

- For fiscal year 2023, we expect revenue to be in the range of $170 million to $190 million, or 101% year-over-year growth at the mid-point.

"We are thrilled to announce the raising of our fiscal year 2023 revenue guidance to $180 million at the midpoint, a 101% increase over full-year 2022 results. This increase reflects our belief in our ability to execute on our various growth strategies, demonstrates the strength of our operating leverage and highlights the favorable market trends that we expect to continue for the remainder of this year," commented Diana Diaz, Chief Financial Officer.

**Conference Call and Webcast Details**

Direct Digital will host a conference call on Thursday, November 9, 2023 at 5:00 p.m. Eastern Time to discuss the Company's third quarter 2023 financial results. The live webcast and replay can be accessed at **https://ir.directdigitalholdings.com/**. Please access the website at least fifteen minutes prior to the call to register, download and install any necessary audio software. For those who cannot access the webcast, a replay will be available at https://ir.directdigitalholdings.com/ for a period of twelve months.

**Footnotes**

(1) "Adjusted EBITDA" is a non-GAAP financial measure. The section titled "Non-GAAP Financial Measures" below describes our usage of non-GAAP financial measures and provides reconciliations between historical GAAP and non-GAAP information contained in this press release.

**Forward Looking Statements**

 This press release may contain forward-looking statements within the meaning of federal securities laws, including the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and which are subject to certain risks, trends and uncertainties.

 As used below, "we," "us," and "our" refer to the Company. We use words such as "could," "would," "may," "might," "will," "expect," "likely," "believe," "continue," "anticipate," "estimate," "intend," "plan," "project" and other similar expressions to identify forward-looking statements, but not all forward-looking statements include these words. All statements contained in this press release that do not relate to matters of historical fact should be considered forward-looking statements.

 All of our forward-looking statements involve estimates and uncertainties that could cause actual results to differ materially from those expressed in or implied by the forward-looking statements. Our forward-looking statements are based on assumptions that we have made in light of our industry experience and our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. Although we believe that these forward-looking statements are based on reasonable assumptions, many factors could affect our actual operating and financial performance and cause our performance to differ materially from the performance expressed in or implied by the forward-looking statements, including, but not limited to: our dependence on the overall demand for advertising, which could be influenced by economic downturns; any slow-down or unanticipated development in the market for programmatic advertising campaigns; the effects of health epidemics; operational and performance issues with our platform, whether real or perceived, including a failure to respond to technological changes or to upgrade our technology systems; any significant inadvertent disclosure or breach of confidential and/or personal information we hold, or of the security of our or our customers', suppliers' or other partners' computer systems; any unavailability or non-performance of the non-proprietary technology, software, products and services that we use; unfavorable publicity and negative public perception about our industry, particularly concerns regarding data privacy and security relating to our industry's technology and practices, and any perceived failure to comply with laws and industry self-regulation; restrictions on the use of third-party "cookies," mobile device IDs or other tracking technologies, which could diminish our platform's effectiveness; any inability to compete in our intensely competitive market; any significant fluctuations caused by our high customer concentration; our limited operating history, which could result in our past results not being indicative of future operating performance; any violation of legal and regulatory requirements or any misconduct by our employees, subcontractors, agents or business partners; any strain on our resources, diversion of our management's attention or impact on our ability to attract and retain qualified board members as a result of being a public company; our dependence, as a holding company, on receiving distributions from Direct Digital Holdings, LLC to pay our taxes, expenses and dividends; and other factors and assumptions discussed in the "Risk Factors," "Management's Discussion and Analysis of Financial Conditions and Results of Operations" and other sections of our filings with the Securities and Exchange Commission that we make from time to time. Should one or more of these risks or uncertainties materialize or should any of these assumptions prove to be incorrect, our actual operating and financial performance may vary in material respects from the performance projected in these forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and except as required by law, we undertake no obligation to update any forward-looking statement contained in this press release to reflect events or circumstances after the date on which it is made or to reflect the occurrence of anticipated or unanticipated events or circumstances, and we claim the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995.

---



**<u>About Direct Digital Holdings</u>**

Direct Digital Holdings (Nasdaq: DRCT), owner of operating companies Colossus SSP, Huddled Masses, and Orange 142, brings state-of-the-art sell- and buy-side advertising platforms together under one umbrella company. Direct Digital Holdings' sell-side platform, Colossus SSP, offers advertisers of all sizes extensive reach within general market and multicultural media properties. The Company's subsidiaries Huddled Masses and Orange142 deliver significant ROI for middle market advertisers by providing data-optimized programmatic solutions at scale for businesses in sectors that range from energy to healthcare to travel to financial services. Direct Digital Holdings' sell- and buy-side solutions manage on average over 125,000 clients monthly, generating over 300 billion impressions per month across display, CTV, in-app and other media channels.



**CONSOLIDATED BALANCE SHEETS**
**(unaudited)**

| | | September 30, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| CURRENT ASSETS | | | | |
| Cash and cash equivalents | $ | 5,481,949 | $ | 4,047,453 |
| Accounts receivable, net | | 54,637,634 | | 26,354,114 |
| Prepaid expenses and other current assets | | 1,426,925 | | 883,322 |
| Total current assets | | 61,546,508 | | 31,284,889 |
| | | | | |
| Property, equipment and software, net of accumulated depreciation and amortization of $219,386 and $34,218, respectively | | 625,028 | | 673,218 |
| Goodwill | | 6,519,636 | | 6,519,636 |
| Intangible assets, net | | 12,172,396 | | 13,637,759 |
| Deferred tax asset, net | | 5,082,424 | | 5,164,776 |
| Operating lease right-of-use assets | | 674,846 | | 798,774 |
| Other long-term assets | | 127,492 | | 46,987 |
| Total assets | $ | 86,748,330 | $ | 58,126,039 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| CURRENT LIABILITIES | | | | |
| Accounts payable | $ | 45,021,034 | $ | 17,695,404 |
| Accrued liabilities | | 4,071,128 | | 4,777,764 |
| Liability related to tax receivable agreement, current portion | | 41,141 | | 182,571 |
| Notes payable, current portion | | 1,146,250 | | 655,000 |
| Deferred revenues | | 1,044,069 | | 546,710 |
| Operating lease liabilities, current portion | | 49,977 | | 91,989 |
| Income taxes payable | | 113,355 | | 174,438 |
| Related party payables | | 1,428,093 | | 1,448,333 |
| Total current liabilities | | 52,915,047 | | 25,572,209 |
| | | | | |
| Notes payable, net of short-term portion and deferred financing cost of $1,722,716 and $2,115,161, respectively | | 22,323,534 | | 22,913,589 |
| Economic Injury Disaster Loan | | 150,000 | | 150,000 |
| Liability related to tax receivable agreement, net of current portion | | 4,245,234 | | 4,149,619 |
| Operating lease liabilities, net of current portion | | 717,632 | | 745,340 |
| Total liabilities | | 80,351,447 | | 53,530,757 |
| | | | | |
| COMMITMENTS AND CONTINGENCIES (Note 9) | | | | |
| | | | | |
| STOCKHOLDERS' EQUITY | | | | |
| Class A common stock, $0.001 par value per share, 160,000,000 shares authorized, 2,991,792 and 2,900,000 shares issued and outstanding, respectively | | 2,992 | | 2,900 |
| Class B common stock, $0.001 par value per share, 20,000,000 shares authorized, 11,278,000 shares issued and outstanding | | 11,278 | | 11,278 |
| Additional paid-in capital | | 8,782,092 | | 8,224,365 |
| Accumulated deficit | | (2,399,479) | | (3,643,261) |
| Total stockholders' equity | | 6,396,883 | | 4,595,282 |
| Total liabilities and stockholders' equity | $ | 86,748,330 | $ | 58,126,039 |



**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(unaudited)**

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| Revenues | | | | |
| Buy-side advertising | $ 7,850,058 | $ 7,130,736 | $ 27,092,816 | $ 22,283,044 |
| Sell-side advertising | 51,622,066 | 18,854,639 | 89,006,018 | 36,333,976 |
| Total revenues | 59,472,124 | 25,985,375 | 116,098,834 | 58,617,020 |
| | | | | |
| Cost of revenues | | | | |
| Buy-side advertising | 3,113,491 | 2,471,170 | 10,650,541 | 7,694,987 |
| Sell-side advertising | 44,605,815 | 16,053,461 | 77,189,787 | 30,344,670 |
| Total cost of revenues | 47,719,306 | 18,524,631 | 87,840,328 | 38,039,657 |
| Gross profit | 11,752,818 | 7,460,744 | 28,258,506 | 20,577,363 |
| | | | | |
| Operating expenses | | | | |
| Compensation, taxes and benefits | 4,747,081 | 3,845,918 | 12,934,406 | 9,895,646 |
| General and administrative | 2,512,330 | 1,770,002 | 8,717,584 | 5,187,875 |
| Total operating expenses | 7,259,411 | 5,615,920 | 21,651,990 | 15,083,521 |
| Income from operations | 4,493,407 | 1,844,824 | 6,606,516 | 5,493,842 |
| | | | | |
| Other income (expense) | | | | |
| Other income | 83,331 | — | 175,472 | 47,982 |
| Forgiveness of Paycheck Protection Program loan | — | — | — | 287,143 |
| Loss on redemption of non-participating preferred units | — | — | — | (590,689) |
| Contingent loss on early termination of line of credit | — | — | (299,770) | — |
| Interest expense | (1,059,890) | (905,605) | (3,104,684) | (2,269,643) |
| Total other expense | (976,559) | (905,605) | (3,228,982) | (2,525,207) |
| | | | | |
| Income before taxes | 3,516,848 | 939,219 | 3,377,534 | 2,968,635 |
| Tax expense | 165,994 | 128,436 | 165,658 | 215,112 |
| Net income | $ 3,350,854 | $ 810,783 | $ 3,211,876 | $ 2,753,523 |
| | | | | |
| Net income per common share: | | | | |
| Basic | $ 0.23 | $ 0.06 | $ 0.23 | $ 0.23 |
| Diluted | $ 0.23 | $ 0.06 | $ 0.22 | $ 0.23 |
| | | | | |
| Weighted-average number of shares of common stock outstanding: | | | | |
| Basic | 14,268,168 | 14,178,000 | 14,216,211 | 11,846,601 |
| Diluted | 14,827,165 | 14,545,241 | 14,817,770 | 11,996,969 |



**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(unaudited)**

| | For the Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Cash Flows Provided By Operating Activities:** | | |
| Net income | $ 3,211,876 | $ 2,753,523 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Amortization of deferred financing costs | 434,847 | 463,008 |
| Amortization of intangible assets | 1,465,363 | 1,465,364 |
| Amortization of right-of-use assets | 123,928 | 94,974 |
| Amortization of capitalized software | 159,057 | — |
| Depreciation of property and equipment | 26,112 | — |
| Stock-based compensation | 545,504 | 85,437 |
| Forgiveness of Paycheck Protection Program loan | — | (287,143) |
| Deferred income taxes | 82,352 | (40,591) |
| Payment on tax receivable agreement | (45,815) | — |
| Loss on redemption of non-participating preferred units | — | 590,689 |
| Contingent loss on early termination of line of credit | 299,770 | — |
| Bad debt expense | 97,740 | 2,717 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (28,381,260) | (13,520,067) |
| Prepaid expenses and other assets | (524,098) | 482,190 |
| Accounts payable | 27,325,629 | 10,008,327 |
| Accrued liabilities | (513,138) | 1,555,037 |
| Income taxes payable | (61,083) | 94,440 |
| Deferred revenues | 497,359 | (201,907) |
| Operating lease liability | (69,720) | (75,396) |
| Related party payable | — | (70,801) |
| Net cash provided by operating activities | 4,674,423 | 3,399,801 |
| | | |
| **Cash Flows Used In Investing Activities:** | | |
| Cash paid for capitalized software and property and equipment | (136,978) | — |
| Net cash used in investing activities | (136,978) | — |
| | | |
| **Cash Flows Used In Financing Activities:** | | |
| Proceeds from note payable | — | 4,260,000 |
| Payments on term loan | (491,250) | (412,500) |
| Payments of litigation settlement | (193,500) | — |
| Payments on lines of credit | — | (400,000) |
| Payment of deferred financing costs | (442,181) | (525,295) |
| Proceeds from Issuance of Class A common stock, net of transaction costs | — | 11,167,043 |
| Redemption of common units | — | (7,200,000) |
| Redemption of non-participating preferred units | — | (7,046,251) |
| Proceeds from options exercised | 215 | — |
| Proceeds from warrants exercised | 12,100 | — |
| Distributions to members | (1,988,333) | (916,433) |
| Net cash used in financing activities | (3,102,949) | (1,073,436) |
| | | |
| Net increase in cash and cash equivalents | 1,434,496 | 2,326,365 |
| Cash and cash equivalents, beginning of the period | 4,047,453 | 4,684,431 |
| Cash and cash equivalents, end of the period | $ 5,481,949 | $ 7,010,796 |
| | | |
| **Supplemental Disclosure of Cash Flow Information:** | | |
| Cash paid for taxes | $ 348,862 | $ 133,401 |
| Cash paid for interest | $ 2,667,283 | $ 1,744,365 |
| | | |
| **Non-cash Financing Activities:** | | |
| Transaction costs related to issuances of Class A shares included in accrued liabilities | $ — | $ 1,000,000 |
| Outside basis difference in partnership | $ — | $ 3,234,000 |
| Tax receivable agreement payable to Direct Digital Management, LLC | $ — | $ 278,900 |
| Tax benefit on tax receivable agreement | $ — | $ 485,100 |
| Issuance related to vesting of restricted stock units, net of tax withholdings | $ 90 | $ — |



**NON-GAAP FINANCIAL MEASURES**

In addition to our results determined in accordance with U.S. generally accepted accounting principles ("GAAP"), including, in particular operating income, net cash provided by operating activities, and net income, we believe that earnings before interest, taxes, depreciation and amortization ("EBITDA"), as adjusted for stock compensation expense, loss on early termination of line of credit, and loss on early extinguishment of debt, and loss on early redemption of non-participating preferred units ("Adjusted EBITDA"), a non-GAAP financial measure, is useful in evaluating our operating performance. The most directly comparable GAAP measure to Adjusted EBITDA is net income (loss).

In addition to operating income and net income, we use Adjusted EBITDA as a measure of operational efficiency. We believe that this non-GAAP financial measure is useful to investors for period-to-period comparisons of our business and in understanding and evaluating our operating results for the following reasons:

- Adjusted EBITDA is widely used by investors and securities analysts to measure a company's operating performance without regard to items such as depreciation and amortization, interest expense, provision for income taxes, and certain one-time items such as acquisition transaction costs and gains from settlements or loan forgiveness that can vary substantially from company to company depending upon their financing, capital structures and the method by which assets were acquired;

- Our management uses Adjusted EBITDA in conjunction with GAAP financial measures for planning purposes, including the preparation of our annual operating budget, as a measure of operating performance and the effectiveness of our business strategies and in communications with our board of directors concerning our financial performance; and

- Adjusted EBITDA provides consistency and comparability with our past financial performance, facilitates period-to-period comparisons of operations, and also facilitates comparisons with other peer companies, many of which use similar non-GAAP financial measures to supplement their GAAP results.

Our use of this non-GAAP financial measure has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our financial results as reported under GAAP. The following table presents a reconciliation of Adjusted EBITDA to net income (loss) for each of the periods presented:



**NON-GAAP FINANCIAL METRICS**
**(unaudited)**

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| Net income | $ 3,350,854 | $ 810,783 | $ 3,211,876 | $ 2,753,523 |
| Add back (deduct): | | | | |
| Interest expense | 1,059,890 | 905,605 | 3,104,684 | 2,269,643 |
| Amortization of intangible assets | 488,455 | 488,455 | 1,465,364 | 1,465,364 |
| Stock-based compensation | 241,491 | 70,030 | 545,504 | 85,438 |
| Depreciation and amortization of capitalized software, property and equipment | 63,689 | — | 185,169 | — |
| Contingent loss on early termination of line of credit | — | — | 299,770 | — |
| Tax expense | 165,994 | 128,436 | 165,658 | 215,112 |
| Forgiveness of PPP loan | — | — | — | (287,163) |
| Loss on early redemption of non-participating preferred units | — | — | — | 590,689 |
| Adjusted EBITDA | $ 5,370,373 | $ 2,403,309 | $ 8,978,025 | $ 7,092,606 |

**Contacts:**

**Investors:**
Brett Milotte, ICR
Brett.Milotte@icrinc.com

# Exhibit 9

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2023**

**OR**

☐  **TRANSITION REPORT PURSUANT SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM   TO**

**COMMISSION FILE NUMBER 001-41261**

# DIRECT DIGITAL HOLDINGS, INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **87-2306185** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1177 West Loop South,Suite 1310 Houston, Texas** | **77027** |
| **(Address of principal executive offices)** | **(Zip code)** |

**(832) 402-1051**

**(Registrant's telephone number, including area code)**

| Securities registered pursuant to Section 12(b) of the Act: | | |
|---|---|---|
| **Title of Each Class:** | **Trading symbol(s)** | **Name of Each Exchange on Which Registered:** |
| Class A Common Stock, par value $0.001 per share | DRCT | NASDAQ |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of November 7, 2023, there were 2,992,425 shares of the registrant's Class A common stock outstanding, par value $0.001 per share, and 11,278,000 shares of the registrant's Class B common stock outstanding, par value $0.001 per share.

Table of Contents

**ITEM 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

You should read the following discussion together with our unaudited consolidated financial statements and the related notes included elsewhere in this Quarterly Report on Form 10-Q and our audited consolidated financial statements and the related notes included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022. This discussion contains forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under the section titled "*Risk Factors*" in our Annual Report on Form 10-K or in other parts of this Quarterly Report on Form 10-Q. See "-*Cautionary Note Regarding Forward-Looking Statements*" below. Our historical results are not necessarily indicative of the results that may be expected for any period in the future.

**Cautionary Note Regarding Forward-Looking Statements**

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of the federal securities laws and which are subject to certain risks, trends and uncertainties. We use words such as "could," "would," "may," "might," "will," "expect," "likely," "believe," "continue," "anticipate," "estimate," "intend," "plan," "project" and other similar expressions to identify forward-looking statements, but not all forward-looking statements include these words. All of our forward-looking statements involve estimates and uncertainties that could cause actual results to differ materially from those expressed in or implied by the forward-looking statements. Accordingly, any such statements are qualified in their entirety by reference to the information described under the caption "*Risk Factors*" in our Annual Report on Form 10-K and elsewhere in this Quarterly Report on Form 10-Q and in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022.

The forward-looking statements contained in this Quarterly Report on Form 10-Q are based on assumptions that we have made in light of our industry experience and our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this Quarterly Report on Form 10-Q, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties (many of which are beyond our control) and assumptions.

Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual operating and financial performance and cause our performance to differ materially from the performance expressed in or implied by the forward-looking statements. We believe these factors include, but are not limited to, the following:

- our dependence on the overall demand for advertising, which could be influenced by economic downturns;
- any slow-down or unanticipated development in the market for programmatic advertising campaigns;
- the effects of health epidemics;
- operational and performance issues with our platform, whether real or perceived, including a failure to respond to technological changes or to upgrade our technology systems;
- any significant inadvertent disclosure or breach of confidential and/or personal information we hold, or of the security of our or our customers', suppliers' or other partners' computer systems;
- any unavailability or non-performance of the non-proprietary technology, software, products and services that we use;
- unfavorable publicity and negative public perception about our industry, particularly concerns regarding data privacy and security relating to our industry's technology and practices, and any perceived failure to comply with laws and industry self-regulation;
- restrictions on the use of third-party "cookies," mobile device IDs or other tracking technologies, which could diminish our platform's effectiveness;
- any inability to compete in our intensely competitive market;
- any significant fluctuations caused by our high customer concentration;
- our limited operating history, which could result in our past results not being indicative of future operating performance;
- any violation of legal and regulatory requirements or any misconduct by our employees, subcontractors, agents or business partners;
- any strain on our resources, diversion of our management's attention or impact on our ability to attract and retain qualified board members as a result of being a public company;
- as a holding company, we depend on distributions from Direct Digital Holdings, LLC ("DDH LLC") to pay our taxes, expenses (including payments under the Tax Receivable Agreement) and dividends;

28

Table of Contents

- DDH LLC may make distributions of cash to us substantially in excess of the amounts we use to make distributions to our stockholders and pay our expenses (including our taxes and payments under the Tax Receivable Agreement), which, to the extent not distributed as dividends on our Class A common stock, would benefit Direct Digital Management, LLC, the entity indirectly owned by our Chairman and Chief Executive Officer and President, as a result of its ownership of Class A common stock upon an exchange or redemption of its LLC Units; and
- other factors and assumptions discussed under "*Risk Factors*" and elsewhere in this Quarterly Report on Form 10-Q and in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022.

Should one or more of these risks or uncertainties materialize or should any of these assumptions prove to be incorrect, our actual operating and financial performance may vary in material respects from the performance projected in these forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made, and except as required by law, we undertake no obligation to update any forward-looking statement contained in this Quarterly Report on Form 10-Q to reflect events or circumstances after the date on which it is made or to reflect the occurrence of anticipated or unanticipated events or circumstances. New factors that could cause our business not to develop as we expect emerge from time to time, and it is not possible for us to predict all of them. Further, we cannot assess the impact of each currently known or new factor on our results of operations or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

**Overview**

Direct Digital Holdings, Inc. and its subsidiaries (collectively the "Company," "DDH," "we," "us" and "our"), headquartered in Houston, Texas, is an end-to-end, full-service programmatic advertising platform primarily focused on providing advertising technology, data-driven campaign optimization and other solutions to underserved and less efficient markets on both the buy-and sell-side of the digital advertising ecosystem. Direct Digital Holdings, Inc. is the holding company that, since the completion of our initial public offering on February 15, 2022, owns certain common units, and serves as the manager, of DDH LLC, which operates the business formed in 2018 through the acquisition of Huddled Masses, LLC ("Huddled Masses™" or, "Huddled Masses"), a buy-side marketing platform, and Colossus Media, LLC ("Colossus Media"), a sell-side marketing platform.

On September 30, 2020, DDH LLC acquired Orange142, LLC ("Orange142") to further bolster its overall programmatic buy-side advertising platform and enhance its offerings across multiple industry verticals such as travel, healthcare, education, financial services, consumer products and other sectors, with particular emphasis on small- and mid-sized businesses transitioning into digital with growing digital media budgets.

The subsidiaries of Direct Digital Holdings, Inc. are as follows:

| Subsidiary | Current % Ownership | Advertising Solution and Segment | Date of Formation | Date of Acquisition |
|---|---|---|---|---|
| Direct Digital Holdings, LLC | 100 % | N/A | June 21, 2018 | August 26, 2021 |
| Huddled Masses, LLC | 100 % | Buy-side | November 13, 2012 | June 21, 2018 |
| Colossus Media, LLC | 100 % | Sell-side | September 8, 2017 | June 21, 2018 |
| Orange142, LLC | 100 % | Buy-side | March 6, 2013 | September 30, 2020 |

Both buy-side advertising businesses, Huddled Masses and Orange142, offer technology-enabled advertising solutions and consulting services to clients through multiple leading demand side platforms ("DSPs"). Colossus Media is our proprietary sell-side programmatic platform operating under the trademarked banner of Colossus SSP™ ("Colossus SSP"). Colossus SSP is a stand-alone tech-enabled, data-driven sell-side platform ("SSP") that helps deliver targeted advertising to diverse and multicultural audiences, including African Americans, Latin Americans, Asian Americans and LGBTQIA+ customers, as well as other specific audiences.

Providing both the front-end, buy-side advertising businesses coupled with our proprietary sell-side business, enables us to curate the first through the last mile in the ad tech ecosystem execution process to drive higher results.

Operating segments are components of an enterprise for which separate financial information is available and is evaluated regularly by our chief operating decision maker in deciding how to allocate resources and assessing performance. Our chief operating decision maker is our Chairman and Chief Executive Officer. We view our business as two reportable segments, buy-side advertising, which includes the results of Huddled Masses and Orange142, and sell-side advertising, which includes the results of Colossus Media.

**Appx. B-140**

# Exhibit 10

*09-Nov-2023*

# DIRECT DIGITAL HOLDINGS, INC.

*Q3 2023 Earnings Call*

## CORPORATE PARTICIPANTS

### Mark Walker
*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

### Diana Diaz
*Chief Financial Officer*

*Direct Digital Holdings, Inc. Class A*

### Operator

## OTHER PARTICIPANTS

### Brett Milotte
*Representative*

*Direct Digital Holdings, Inc. Class A*

### Dillon Heslin
*Analyst*

*Analyst*

### Daniel Kurnos
*Analyst*

*Analyst*

### Michael Kupinski
*Analyst*

*Noble Capital Markets*

## MANAGEMENT DISCUSSION SECTION

### Operator

Good afternoon. My name is Abby, and I will be your conference operator today. At this time, I would like to welcome everyone to the Direct Digital Holdings Third Quarter 2023 Earnings Conference Call.

[Operator Instructions]

Mr. Brett Milotte, you may begin your conference.

## Brett Milotte

*Representative*

*Direct Digital Holdings, Inc. Class A*

Good afternoon, everyone, and welcome to Direct Digital Holdings Third Quarter 2023 Earnings Conference Call. My name is Brett Milotte. I'm representing Direct Digital Holdings from ICR. On today's call, we have Direct Digital Holdings' Chairman and Chief Executive Officer, Mark Walker; and Chief Financial Officer, Diana Diaz. Information discussed today is qualified in its entirety with the Form 8-K and company earnings release, which has been filed today by Direct Digital Holdings, which may be accessed at the SEC's website and DRCT's website. Today's call is also being webcast, and a replay we posted to the company's Investor Relations website.

Immediately following the speaker's presentation, there will be a question-and-answer session. Please note that the statements made during the call, including financial projections or other statements that are not historical in nature may constitute forward-looking statements. These statements are made on the basis of DRCT's views and assumptions regarding future events and business performance at the time they are made, and we do not undertake any obligation to update these statements.

Forward-looking statements are subject to risks, which could cause DRCT's actual results to differ from its historical results and forecasts, including those risks set forth in DRCT's filings with the SEC. You should refer to those for more information. This cautionary statement applies to all forward-looking statements made during the call.

During this call, DRCT will be referring to non-GAAP financial measures. These non-GAAP measures are not prepared in accordance with generally accepted accounting principles. A reconciliation of the non-GAAP financial measures to the most directly comparable GAAP measures are available in the earnings release that DRCT filed in its Form 8-K today.

I will now hand over the conference call to Mark Walker, Chief Executive Officer. Mark?

## Mark Walker

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

Thanks, Brett, and thank you to everyone joining our third quarter 2023 earnings call. Proud to report incredibly strong financial results and operational performance for this quarter. As we've discussed during recent earnings calls, we made significant investments in Direct Digital Holdings technology stack, advertising platform and operational structure. We initially expected to see the impact of these investments in 2024.

However, we're pleased to report these benefits and associated growth are coming to fruition within 2023. Our technology partnerships and our overarching business strategy have enabled us to meet a growing number of customers' demand and further the capabilities of our technology platforms.

As a result, our open marketplace CPM platform continues to benefit as middle market businesses seek our differentiating thoughtful approach to our advertiser technology and our tech-enabled solutions. Furthermore, our recently announced strategic partnerships have also helped drive our business to new highs. Our new collaboration between Amazon Publisher Services and our Colossus SSP division, integrates Amazon's transparent ad marketplace. This integration has allowed Colossus SSP's roster of publishers, which include both minority-owned and multicultural outlets and general market properties to tap into the benefits of Amazon server-side header bidding solutions that offer a direct auction approach.

Most recently, we announced the selection of HPE GreenLake Edge-to-Cloud platform to build a highly reliable, scalable and secure production environment. Our Colossus SSP division will now incorporate the HPE GreenLake platform with its on-premise infrastructure and cloud services across its entire marketplace to support Direct Digital Holding sell-side platform.

Our partnership with Beeswax, a FreeWheel-owned programmatic buying platform, has expanded our access to as well as simplify the path for buying multicultural alongside general market connected TV ad inventory, helping drive growth within Colossus SSP, Huddled Masses and Orange142.

We will continue to explore opportunities with our strategic partnerships as we continue to execute on our growth strategy. As a result of all these initiatives, DRCT saw significant growth across both the sell and buy side.

In Q3 2023, our top line revenue increased to $59.5 million, an increase of $33.5 million or 129% over $26 million in the same period of 2022. Adjusted EBITDA for the quarter was $5.4 million compared to $2.4 million in the same period in 2022, an increase of 123% year-over-year. Our revenue this quarter was driven by strong performance by both our sell-side and buy-side advertising segments. Our sell-side platform saw substantial growth as a result of our technology investments, increased operational efficiencies and partnership expansion.

We are pleased to report increases in sell-side revenue growth of 174% and buy-side revenue growth of 10% over the same period of 2022. In the third quarter, our sell-side advertising segment processed approximately 400 billion monthly impressions, an increase of 220% year-over-year. We also saw an expansion of partners increasing their investment as well as share of wallet with both our segments. In addition, this quarter, the company's sell-side advertising platform received over 34 billion monthly bid responses, an increase of 210% over the same period in 2022.

Sell-side revenue per advertiser also increased 241%. On the buy side, our businesses served approximately 228 customers and buy-side revenue per customer increased 14% over the same period in 2022. Another significant milestone for the company was the announcement that we would be purchasing all of our outstanding publicly traded warrants in an effort to protect against shareholder dilution and combat warrant overhang of the stock.

We are pleased to report the completion of this redemption initiative, and as a result, an unencumbered stock as Direct Digital Holdings turns its attention to performing for the remainder of 2023 and beyond. On that topic, for the remainder of 2023, we believe our technology strategy, infrastructure and operational investments will continue to bear fruit as we make considerable progress with our server transitions as well as our overall re-platforming.

Historically, Q4 has been our strongest quarter, and we expect to see favorable market dynamics with an increase in media spend being targeted to reach both general and multicultural audiences. Consequently, we're revising our full year 2023 revenue guidance upwards to a range of $170 million to $190 million. By removing the aforementioned warrant overhang, executing on our re-platforming strategy and continuing our operational excellence, we believe we will pave a way for growth in our stock, valuing Direct Digital Holdings at a similar level to our peers. I will now hand things over to our CFO, Diana Diaz, who will walk through some of the financial highlights in further detail.

## Diana Diaz

*Chief Financial Officer*

*Direct Digital Holdings, Inc. Class A*

Thank you. As Mark stated, our revenue increased to $59.5 million in the third quarter of 2023, an increase of $33.5 million or 129% over the $26 million in the same period of last year. The exceptional performance of our sell-side advertising segment drove the majority of the increase. Sell-side advertising segment revenue grew to $51.6 million for the third quarter and contributed $32.8 million of the increase or 174% growth over the $18.9 million in revenue in the same period last year. As Mark stated, our sell-side platform has heavily benefited this quarter from continued investments in the technology stack, operational structure and increasing publisher partner engagements.

Our buy-side advertising segment also saw strong performance, growing 10% year-over-year and contributing about $700,000 to our overall revenue growth, finishing the quarter with $7.9 million in revenue compared to $7.1 million in the same period of last year. The increase in revenue was primarily a result of increased spend and upsell opportunities from our current customers. Growth in revenue or the sell side and buy side of our business resulted in a direct positive impact on both net income and EBITDA.

Now let's talk about gross profit. Gross profit for the third quarter of 2023 was $11.8 million compared to $7.5 million for the third quarter of last year, an increase of $4.3 million, primarily as a result of our revenue mix, gross margins for the third quarter were approximately 20% compared to 29% in the same period of last year.

As we discussed last quarter, these margin results are in line with our margin expectations given the rate of accelerated growth in our sell-side advertising segment and the resulting mix of our revenue profile.

In the third quarter of 2023, the revenue mix was approximately 87% on the sell side and 13% on the buy side compared to 73% on the sell side and 27% on the buy side over the same period in 2022. The sell-side advertising segment gross margins were 14% for the third quarter of 2023 compared to 15% in the third quarter of last year. Sell-side revenues, which grew as a percentage of our overall revenue, have a lower gross margin than our buy-side segment. Additionally, incremental costs associated with investments in our sell-side technology stack, which were about $500,000 in the third quarter of 2023 impacted gross margin.

We anticipate that around half of these costs will continue until approximately March of 2024. We then expect sell-side gross margin to resort back to historical margin targets of 14% to 15% by the end of Q2 2024. The buy-side advertising segment gross margins were 60% for the third quarter of 2023 compared to 65% in the prior year period. This range for the buy side margin is in line with our strategy as the mix and timing of customer campaigns can impact the results. Buy-side gross margin decreased in 2023 to a level that we believe is sustainable, reflecting our strategic focus on customer retention and increasing customer lifetime value.

Now I'll talk about operating expenses. Operating expenses increased to $7.3 million in the third quarter of 2023 or an increase of $1.7 million over the $5.6 million level of expenses in the third quarter of last year. The $1.7 million increase in operating expenses reflects a $900,000 increase in compensation, tax and benefit expense and an $800,000 increase in general and administrative expenses.

The increase in compensation tax and benefits expense was primarily driven by headcount additions, mainly in shared services to support our public company infrastructure. The increase in G&A cost was due to expenses associated with supporting our growth and ongoing market initiatives. We expect to continue to invest in and incur additional expenses associated with our transition to operating as a public company, including increased professional fees, investment and automation and compliance costs associated with developing the requisite infrastructure required for internal controls.

Net income was $3.4 million in the third quarter of 2023 compared to net income of $800,000 in the same period of last year, a growth rate of 313% year-over-year. Our organic growth year-over-year can be measured by our sell-side and buy-side operating income results. The operating income of our business segments for the third quarter of 2023 was $7.8 million compared to the operating income of our business segments of $3.7 million in the same period of last year, an increase of 108% year-over-year.

For the third quarter, adjusted EBITDA was $5.4 million compared to $2.4 million in the third quarter of last year. That's a 123% increase which was driven by the increase in gross profit, partially offset by the increase in operating expenses that I talked about previously. And as Mark previously mentioned, we believe that currently, our stock is significantly undervalued based on the substantial growth in both revenue and EBITDA.

Turning to the balance sheet. We ended the third quarter with cash and cash equivalents of $5.5 million, an increase of $1.5 million from the $4 million that we had at the end of December 2022.

And now I'd like to turn it over to Mark for some closing comments.

## Mark Walker

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

Thank you, Diana, and thank you to everyone for joining. We sincerely appreciate your interest in Direct Digital Holdings and are looking forward to your questions. Operator, please open the line.

## Operator

[Operator Instructions]
Your first question comes from the line of Darren Aftahi from ROTH MKM.

# QUESTION AND ANSWER SECTION

## Dillon Heslin                                                                                                     Q

*Analyst*

*Analyst*

This is Dillon on for Darren. First I want to extend my congratulations on the quarter and the guidance. I guess on that note, could you sort of talk about the impact that you're seeing of those investments that were supposed to -- or you're sort of on track for it to happen in 2024, but are now happening in the second half of this year? Like was that your ability to get certain technology platforms up faster? Or was it publishers or something different that you didn't think would be on the platform until next year that are now obviously quite big in generating sizable revenue.

## Mark Walker                                                                                                      A

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

Yes. Dillon, first off, it's good to hear from you. I'd really say it's a 3-pronged approach. I mean, number one, we talked about the technology replatforming that we've been going through. I have to give -- tip my hat off to our CTO and our technology team they were able to accelerate and streamline our tech stack a little bit faster than what we initially anticipated. That gave us the type of scale that we need as we communicated to grow to that 400 billion impressions on a monthly basis, which gave us more capacity for sale.

The second piece of it is, and if you dig into the numbers a little bit, we've been able to increase and go deeper with some of our buying partners and agency groups that we work with. I mean that is starting to yield fruit and come to fruition. So we've seen a doubling of the amount of investments at some of our buying groups that we have relationships with. Increase, we had the increase in capacity with the level of impressions that we've been able to deliver. And really, some of the benefits that you've seen where we are today and what we are anticipating from now until the end of the year is really all 3 of those components coming together in the culmination of that operational execution that our team has been able to execute against.

## Dillon Heslin                                                                                                     Q

*Analyst*

*Analyst*

Great. As a second question, just given where 3Q came in, in terms of revenue mix. And I know you're talking about getting back to the 14% to 15% sell-side gross margins by Q2 of next year. But is there anything that would get in the way of that happening in terms of the revenue within sell-side skewing more towards larger publishers that could potentially hit that sort of gross profit number?

## Mark Walker

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

A

No. Where we are right now, we're anticipating us, specifically on the sell side business, living in that 14%, 15% range. And we're pretty confident that that's going to hold for us through the 2024 year.

## Dillon Heslin

*Analyst*

*Analyst*

Q

Got it. Last one for me. Could you just sort of touch on where you see yourself in terms of competition, like now that 3Q and 4Q are implying just much bigger numbers. Do you think that invites some of your peers to sort of begin to explore the middle market and other niche markets you play in more?

## Mark Walker

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

A

Yes. Well, what we think is the processes that we've been able to set up will lend ourselves to have a competitive advantage towards the middle market. I think if you look at our revenue per employee, it's significantly higher than many of our competitors. The processes we put in place, the way that we've structured our organization and the way that we are able to operate, we think that gives us the actual competitive advantage against many of our publicly traded competitors that are out there in the marketplace in some of the privately held ones that are held by other PE firms. So we feel pretty good and pretty confident about our position in the marketplace, and we're anticipating growth from now Q4 as well as in 2024.

## Operator

Your next question comes from the line of Dan Kurnos from The Benchmark Company.

## Daniel Kurnos

*Analyst*

*Analyst*

Q

I would be good, too, if I put up $60 million of revenue in Q3. A couple of questions -- a few questions. One, I mean, I appreciate the color on incremental impression growth through tech capacity. That's helpful. You've obviously had some notable partner wins. Is there any way to just kind of parse out sort of underlying organic? And it's not really a fair question because technically, all of its organic, but just between increase? Is there a way to sort of bucket between increased spend per customer, which they have some good metrics on. I'm talking mostly sell-side, by the way, versus new partner wins versus just expansion of inventory impressions with the existing partner base.

## Mark Walker

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

A

Yes. I would say it's actually a combination of all three. I mean, the amount of impressions that we grew. We went from 300 million in Q2, 400 million in Q3. I think that's one benefit, right? Second benefit that you see, if you look at our revenue per advertiser, that actually went up roughly about 200% to 260% year-over-year. And so I think that you can actually put those 2 pieces together and really kind of figure out that our growth is actually coming from both sides.

It's the strategy that we've implemented from day 1, increased level of impressions, work diligently on the buying community and the agency groups that have decided to partner with us and going deep with them by building on our relationships and honoring our commitments and operating in just. So that's really the -- everybody asks about the secret sauce for our growth. That is the secret sauce, continue growing the impressions, continue investing in the buying communities and then they come and actually spend through your platform.

## Daniel Kurnos

*Analyst*

Q

**Appx. B-146**

*Analyst*

Well, now you've given the recipe, Mark, and I'll figure it out. No, I'm just kidding. I do -- this is -- so let me just add a little bit of a follow-on to that because I'm trying to get a sense of -- like this market has been really tough for small platforms to get trials and expand its spends. And obviously, you have a unique angle in the inventory that you bring to the marketplace.

But I'm just trying to get a sense of that spend per advertiser number, I know campaigns can be small, so you can have larger growth rates off of smaller numbers. But still, to get to your number here, I'm just trying to get a sense of like has it been like they've now tested with you for 12 months and they are really willing to put more dollars to work with you just because the results have been fantastic, which, by the way, it was the narrative we saw last year, too.

It just was on a smaller base. Or is there some other dynamic at play in the marketplace just given the way that inventory has evolved both in the digital space and the video space here that equates to something that is beneficial just how you run -- the way that you run your strategy. So the dynamics of the marketplace are incrementally beneficial to the platform that you've developed.

## Mark Walker                                                                                 A
*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

Yes. I would actually say it's really operational excellence. I mean the teams that we've actually put in place. One, they come with a significant amount of experience sitting on multiple points of the value chain. So I think we have an interesting perspective that we bring to the market when we work with the different buying communities that are out in the marketplace. So I think that's number one.

Thing number two, the fact that we've been in business for 4 years, even though we were operating quietly behind the scenes, it really allowed us to get our processes and structure in order to where we can make money off of smaller campaigns. And that has been actually a benefit for us.

Now that you've seen us out in the marketplace, we're starting to mature. We've been able to upgrade our platform. I think you're going to start seeing on the go forward, continued growth out of our platform and the way that we've structured the business.

## Daniel Kurnos                                                                               Q
*Analyst*

*Analyst*

The crazy part to me, Mark, is there's not -- I mean we're not even having a self-serve conversation right now, which is what everybody else is falling over, and you're putting up way better numbers than most of the peer groups. So kudos to you on that. I just -- I'll ask just in Q4, thank you for Q4 being up sequentially from Q3. There's -- The Trade Desk is out talking about some cautiousness in Q4 that stabilized in a little rough in October, stabilized in November. And I'm just -- the momentum you're seeing seems like it's continuing, especially if your guidance history is evident here, too, but just kind of curious what you're seeing in conversations right now relative to the broader macro.

## Mark Walker                                                                                 A
*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

Yes. For the broader macro, and I think you've seen it in our revision upwards of our guidance and the conversations we have. If we weren't confident, we wouldn't have revised up the way that we did, but we're pretty confident in the relationships that we've been able to build and the platform that we've been able to establish and the growth that we actually have on our road map. So we're still bullish on our business, even though some of our peers might be having some other difficulties, but we're really confident in the model that we've been able to build here at Direct Digital.

## Daniel Kurnos                                                                               Q
*Analyst*

*Analyst*

And just last for me, Mark, and sorry, it's a few, but just on flow-through, EBITDA was really healthy in the quarter. You guys are obviously making some further investments that you're trying to balance. But how should we be thinking about growth versus profitability both in Q4 and going forward?

## Mark Walker                                                                                 A

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

Yes, I'm going to turn that over to Diana to give you some viewpoint on Q4.

## Diana Diaz                                                                                          A

*Chief Financial Officer*

*Direct Digital Holdings, Inc. Class A*

So I think we've talked about the gross profit margins that where we think those will end up for both the buy side and the sell side and that our operating expenses will be at or maybe slightly higher than what they were in the third quarter. We're continuing to spend on headcount and sales and marketing initiatives and still filling our way through the public company side, but we're about at the right level. We won't be going down.

## Daniel Kurnos                                                                                       Q

*Analyst*

*Analyst*

Okay. That's super helpful. I guess if this trend continues through the stock prices, you guys will be at 3x EBITDA. Okay. Super helpful.

## Operator

Your next question comes from the line of Michael Kupinski from NOBLE.

## Michael Kupinski                                                                                   Q

*Analyst*

*Noble Capital Markets*

I want to offer my congratulations. All I got to say is, wow, what a great quarter. I was wondering if you can just follow a little bit on what Dan was saying, but in a different way, just to talk a little bit about the state of the marketplace. You mentioned beneficial market dynamics in the quarter. And I was just wondering, what do you see as the key drivers of that -- and then I just have a couple of quick follow-ups.

## Mark Walker                                                                                        A

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

Yes. I think it's a mix of two things. One, I think it's the mix of the publishers that we actually are working with. We're still seeing in the marketplace strong demand for the multicultural publishers that we've added into our inventory. There is definitely more and more continued demand. I'm trying to reach the African-American, Hispanic-American, Asian-American LBGTQ communities along with the general market, that's number one.

Number two, really the operational efficiency of our platform has been an added benefit and the people and the process that we've actually put in place into the buying community. Really a combination of all 3 have yielded pretty much successfully for us the fruit that we saw in and we're expecting to see the same in Q4.

## Michael Kupinski                                                                                   Q

*Analyst*

*Noble Capital Markets*

And in terms of the multicultural space, the advertisers looking at the initiatives targeting that particular multiculturals market. What is the percent? Can you -- is that -- is there a way for you to kind of identify what is the percent of advertisers taking out that versus maybe just a more general advertising space?

## Mark Walker                                                                                        A

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

**Appx. B-148**

Yes. Yes. What I would say is -- I'll give you -- leave you with 2 stats. One stat is 40% of the U.S. population is made up of those groups that I actually outlined. That's number one. And the second stat where we sit, roughly about 10% to 20%, depending on the month of our inventories directly geared to those audiences through those publications, which are authentic. So we do think that there's still a significant amount of growth opportunity there with the overall advertising buying community to reach those audiences. And we're the beneficiaries of that upside.

So we're going to continue to make more investments in adding those type of publications into our ecosystem and ultimately at some point in the future, the goal really would be for 40% of all marketing spend to be geared towards those communities. But we're not near that point yet, but that's really the point that we're working towards. And I think we're actually enjoying the benefits of that differential that's actually in the marketplace versus the publishers and the impressions that are actually available.

## Michael Kupinski                                                      Q

*Analyst*

*Noble Capital Markets*

Posting these types of numbers, I mean it's very likely you're going to start to see new entrants in niche marketplace. And I was just wondering, are you starting to see additional competition kind of move in? Or is it still a pretty good open field for you?

## Mark Walker                                                           A

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

Yes. I mean I think all of our competitors, we view a lot of the publicly traded companies as competitors, and there are some private entities that are out there. They've been out in the marketplace for some time now. And so we're adept and equipped to actually to maintain and be a competitive option for the buyers to actually work through. And I think that's some of the benefit that you're seeing and they're gravitating towards us.

## Operator

There are no further questions at this time. Mr. Mark Walker, I turn the call back over to you.

## Mark Walker                                                           A

*Chairman and Chief Executive Officer*

*Direct Digital Holdings, Inc. Class A*

All right. If there's no further questions, thank you for everyone that decided to come and listen and we're looking forward to speaking to you back in Q4. Thank you.

## Operator

This concludes today's conference call. You may now disconnect.

# Exhibit 11

**S&P Global**
Market Intelligence

# Direct Digital Holdings, Inc. NasdaqCM:DRCT
# FQ4 2023 Earnings Call Transcripts

## Tuesday, March 26, 2024 9:00 PM GMT

### S&P Global Market Intelligence Estimates

| | | -FQ4 2023- | | -FQ1 2024- | -FY 2023- | | | -FY 2024- |
|---|---|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS |
| **EPS Normalized** | 0.26 | (0.11) | NM | (0.14) | 0.48 | 0.13 | ▼ (72.92 %) | 0.26 |
| **Revenue (mm)** | 65.96 | 41.01 | ▼ (37.83 %) | 23.46 | 182.05 | 157.11 | ▼ (13.70 %) | 180.22 |

Currency: USD
Consensus as of Mar-27-2024 11:33 AM GMT



Stock Price [USD] vs. Volume [mm] with earnings surprise annotations

| | - EPS NORMALIZED - | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| **FQ1 2023** | (0.08) | (0.07) | NM |
| **FQ2 2023** | 0.07 | 0.08 | ▲ 14.29 % |
| **FQ3 2023** | 0.05 | 0.23 | ▲ 360.00 % |
| **FQ4 2023** | 0.26 | (0.11) | NM |

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ................................................................ | 3 |
| Presentation | ................................................................ | 4 |
| Question and Answer | ................................................................ | 8 |

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

2

Appx. B-152

# Call Participants

**EXECUTIVES**

**Diana P. Diaz**
*Chief Financial Officer*

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

**ANALYSTS**

**Daniel Louis Kurnos**
*The Benchmark Company, LLC,*
*Research Division*

**Darren Paul Aftahi**
*ROTH MKM Partners, LLC, Research*
*Division*

**Michael A. Kupinski**
*NOBLE Capital Markets, Inc., Research*
*Division*

**ATTENDEES**

**Brett Milotte**

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good day, everyone, and welcome to the Direct Digital Holdings Fourth Quarter and Full Year 2023 Earnings Call. Today's call is being recorded [Operator Instructions].

I will now turn the conference over to Brett Milotte, VP of Investor Relations. Please go ahead.

**Brett Milotte**

Good afternoon, everyone, and welcome to Direct Digital Holdings Fourth Quarter and Full Year 2023 Earnings Conference Call. My name is Brett Milotte, and I'm representing Direct Digital Holdings from ICR.

On today's call are Direct Digital Holdings Chairman and Chief Executive Officer, Mark Walker; and Chief Financial Officer, Diana Diaz.

Information discussed today is qualified in its entirety by the Form 8-K and accompanying earnings release, which has been filed today by Direct Digital Holdings and may be accessed at the SEC's website and DRCT's website. Today's call is also being webcast and a replay that will be posted to DRCT's Investor Relations website.

Immediately following the speaker's presentation there will be a question-and-answer session. Please note that the statements made during this call including financial projections or other statements that are not historical in nature, may constitute forward-looking statements. These statements are made on the basis of DRCT's views and assumptions regarding future events and business performance at the time they are made and do not undertake any obligation to update these statements.

Forward-looking statements are subject to risks which could cause DRCT's actual results to differ from its historical results and forecasts, including those risks set forth in DRCT's filings at the SEC and on this call, and you can refer to those for more information. This cautionary statement applies to all forward-looking statements made during this call. During this call, DRCT will be referring to non-GAAP financial measures. These non-GAAP measures are not prepared in accordance to generally accepted accounting principles. Reconciliation of the non-GAAP financial measures to the most directly comparable GAAP measures is available in the earnings release that DRCT filed in its Form 8-K today.

I will now hand over the conference to Mark Walker, Chief Executive Officer. Mark?

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

Thanks, Brett, and thank you to everyone joining our fourth quarter and full year 2023 earnings call. 2023 was an inflection point for our company, and I'm incredibly proud to report our strong financial results and operational performance for the year as we're now reporting our eighth quarter of double-digit revenue growth. As we discussed in previous earnings calls, we continue to make significant investments in Direct Digital Holdings' technology stack, advertising platform and operational structure throughout 2023.

Our strong technology partnerships and our overarching business strategy have enabled us to meet a growing number of customers' demand and further capabilities of our technology platforms. As a result, our open marketplace platform continues to benefit as middle market businesses seek our differentiated, thoughtful approach to advertising solutions.

Before we get into more detail about our fourth quarter, I'd like to begin with a quick review of our year. We achieved total full year revenue of $157.1 million or 76% growth over the $89.4 million achieved in 2022, at 29% above our initial 2023 guidance. We also achieved adjusted EBITDA of $11.3 million, 11% higher than the $10.2 million adjusted EBITDA for the same period in 2022.

In 2023, we had a number of achievements, a few of which I wanted to highlight today as we're proud of how our team was able to grow the overall business. Firstly, we announced our new collaboration with Amazon Publisher Services with our Colossus SSP division integrated with Amazon's Transparent Ad Marketplace, or TAM. The integration allowed Colossus SSP's roster and publishers to tap into the benefits of TAM and serve beside header bidding solutions that offer direct-to-auction approach.

We also announced our partnership with HPE GreenLake, providing an edge-to-cloud platform to build a highly reliable, scalable and secure production environment across our technology stack. Throughout the year, we had significant growth on the buy-side with strategic wins, with the growth of our overall client portfolio by 7% and increased revenue per customer up 10% for the year.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

We began the transition to a cookieless environment and saw the integration rollout of our alternative ID solutions. In addition, we launched our AI yield management tool, which allows us to achieve bid efficiency and revenue optimization and we continued the transition DDH shared services function for increased operational scale and support.

While we saw strong growth in Q4 2023 year-over-year with revenue of $41 million, which was 33% higher than the same period last year, we were down sequentially from Q3 with Q4 revenue, which was shy of our revised guidance due to 2 primary factors. In the fourth quarter, based upon value chain changes, it became clear cookie deprecation would begin at Q1 of 2024. In addition, we noted softer demand than our revised guidance called for. As such, our team proactively began our transition off of cookies for media transactions. As a result, we believe our strategic decision to accelerate our investments has positioned us well for the future and ahead of our peers.

In addition, in Q4, we did not complete beta testing on our original schedule for several strategic publishers, including Dotdash Meredith, [ weather.com ], NBCU and [ Arete ] Group, which would have increased overall impression count. These strategic publishers have all been launched in Q1 of 2024. We continue to prioritize long-term successes for short-term gain and we are confident the strategic measures and internal calibrations were made in Q4 in 2023 will position the company to build on the successes of 2023 and continue revenue growth and market share gains in 2024.

Our fourth quarter 2023 adjusted EBITDA of $2.3 million likewise was affected by the [ in impression ] revenue impacts during the quarter. Our supply side platform continues to increase publisher partner engagements in addition to increases in our impression inventory. In the fourth quarter, our sell-side advertising segment processed approximately 400 billion monthly impressions, an increase of 201% over the same period of 2022 with close to 1 trillion monthly bid requests for the quarter.

In addition, the company's sell-side advertising platforms received over 83 billion bid responses in the fourth quarter of 2023, an increase of 367% over the same period of 2022. Our buyers within the platform did see some degradation due to our platform transition decreasing by 50% to 84,000 buyers compared to last year's fourth quarter. However, our revenue per buyer increased by 133% to $397 per customer over the same period.

On the buy-side, these businesses served approximately 234 customers, an increase of 7% compared to the same period of 2022, with buy-side revenue per customer consistent with the same period last year. As it relates to 2024, our industry outlook and point of view is the following. We believe that the middle market in the digital ad tech space remains fragmented and consolidation opportunities exist.

We will continue to evaluate those opportunities for accretive platform integration, value creation and strategic fit. We anticipate cookie deprecation will accelerate market consolidation of opportunistic investments. For our buy-side business, the introduction of AI and complex market dynamics will accelerate the market transition in digital media from traditional media. This transition will continue to present opportunities to expand our footprint and gain market share for tech-enabled services.

In addition, alternative IDs will take on more importance in the industry as well as strong understanding of the impact of the privacy sandbox on campaign performance reporting and delivery. We also believe that the bifurcation in the marketplace between alternative ID, open CPM marketplaces and walled gardens will continue to exist, along with continuing market tension between DSP and SSP relationships. We expect the streamlining of the value chain. We aim to build strategic relationships with our focus on agency and brand partnerships continuing to be the cornerstone of our strategy.

Finally, AI tools will continue to proliferate through the value chain of allowing companies to leverage these tools and offer these capabilities across both of our business segments, increasing ROI and enhancing performance. For 2024, we're providing revenue guidance for FY 2024 of $170 million to $190 million or an increase of 50% over last year's performance at the midpoint.

I will now hand things over to our CFO, Diana Diaz, who will walk through some of the financial highlights in further detail.

**Diana P. Diaz**
*Chief Financial Officer*

Thank you, Mark. As Mark stated, our revenue increased to $41 million in the fourth quarter of 2023, an increase of $10.3 million or 33% over the $30.7 million in the same period of last year. We finished the year with total revenue of $157.1 million, which was about 8% below the low point of our guidance range, but was an increase of $67.8 million or 76% growth over the $89.4 million of revenue achieved in 2022.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

As Mark mentioned, revenue for the fourth quarter of 2023 was lower than anticipated due to lower-than-anticipated demand, a delay in the release of Tier 1 publishers from beta testing and proactive efforts by the company during the fourth quarter to accelerate the transition towards a cookieless advertising platform.

Our sell-side advertising segment ended the year with a strong fourth quarter and drove the majority of the increase over the prior year. Colossus SSP grew to $33.4 million for Q4 and contributed $9.8 million of the increase or 41% over the $23.6 million of sell-side revenue in the same period of last year. For the full year, our sell-side segment achieved $122.4 million in revenue, an increase of $52.4 million or 104% of growth over the $60 million in sell-side revenue in 2022.

For the fourth quarter, our buy-side businesses, Orange142 and Huddled Masses grew 7% year-over-year and contributed $500,000 of the overall increase, finishing the quarter with $7.6 million in revenue compared to $7.1 million in the same period of 2022. For the full year, our buy-side segment grew to $34.7 million, an increase of $5.3 million or 18% over the $29.3 million of buy-side revenue in 2022.

For the fourth quarter of 2023, gross profit dollars were $9.3 million compared to $8.7 million for the fourth quarter of 2022, an increase of about $600,000 as a result of higher revenue. Gross margins for the fourth quarter of 2023 were approximately 23% compared to 28% in the same period of last year. Gross profit dollars for the year were $37.6 million compared to $29.3 million for 2022. That was an increase of $8.3 million as a result of higher revenue. Gross margin for 2023 was approximately 24% compared to approximately 33% for 2022. These margin results are in line with our margin expectations given the rate of accelerated growth in our sell-side advertising segment.

Our faster-growing sell-side segment has higher cost of revenues compared to our buy-side segment. We also saw higher sell-side fixed costs related to an increase in server capacity in the amount of $1.6 million for 2023 to support our growth. Operating expenses increased to $9.3 million in the fourth quarter of 2023 or an increase of $3 million over the $6.3 million of expenses in the fourth quarter of last year. For the full year 2023, operating expenses were $30.9 million compared to $21.3 million in 2022, an increase of $9.6 million.

Increases in compensation tax and benefits expense of $600,000 for the fourth quarter and $3.6 million for the year were primarily driven by head count additions throughout 2023, mainly in our operations area to support our growth as well as in shared services. The increases in general and administrative costs of $2.5 million for the fourth quarter and $6 million for the year were due to expenses associated with supporting our growth and ongoing marketing initiatives, as well as our continued transition to an operation as a public company beginning in February 2022. We expect to continue to invest in automation as well as additional head count to support sales initiatives.

As a consequence of the aforementioned revenue and operating expense impacts to our fourth quarter, we saw a net loss of $1.2 million in the fourth quarter compared to net income of $1.4 million in the same period of 2022. For the full year, net income was $2 million in 2023 compared to net income of $4.2 million in 2022.

For the fourth quarter, adjusted EBITDA was $2.3 million compared to adjusted EBITDA of $3.1 million for the fourth quarter of last year. For the full year, adjusted EBITDA grew to $11.3 million or 11% higher than the $10.2 million adjusted EBITDA for the full year 2022.

Now turning to the balance sheet. We ended the year with cash and cash equivalents of $5.1 million, an increase of $1.1 million over the $4 million we had as of the end of 2022. Total cash plus our accounts receivable balance as of year-end was $42.3 million compared to $30.4 million at the end of 2022.

As part of our initiative to increase shareholder value and continue to facilitate our growth, during the fourth quarter of 2023, we retired all outstanding warrants issued in connection with the company's IPO. And we improved our liquidity by securing a revolving credit facility with capacity of $10 million and up to $5 million uncommitted incremental capacity. We expect to continue to take steps in 2024 to improve liquidity in our balance sheet to support our business as well as facilitate inorganic growth opportunities.

Now let's touch on guidance. Our guidance is subject to a variety of factors that may change over the year. In particular, it assumes that U.S. economic conditions do not materially deteriorate or that the economy does not otherwise experience significantly reduced advertiser demand. We plan to offer annual guidance and update it throughout the year. At present, we expect fiscal 2024 revenue to be in the range of $170 million to $190 million or 15% growth year-over-year at the midpoint.

We are off to a good start for 2024. Based on preliminary results through mid-March 2024, we believe sell-side revenue is on pace to grow at a rate of 10% to 20% over the prior year first quarter.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Appx. B-156

And now I'd like to turn it back over to Mark for some closing comments.

**Mark D. Walker**
*CEO, Co-Founder & Chairman*
Thank you, Diana, and thank you to everyone for joining. As always, we appreciate your interest in Direct Digital Holdings and are looking forward to your questions. Operator, please open up the line.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Appx. B-157

# Question and Answer

**Operator**

[Operator Instructions] And we'll take our first question from Darren Aftahi with ROTH.

**Darren Paul Aftahi**
*ROTH MKM Partners, LLC, Research Division*

Mark, the -- I guess, the 3 kind of items you highlighted in terms of the fourth quarter, the lower demand, the pilots not coming out of beta for the Tier 1 publishers, and then the proactive kind of moves on moving to cookieless. I'm just kind of curious, can you kind of handicap a couple of things? One, like how did each of those kind of impact your quarter relative to kind of initial thoughts when you guys gave guidance, I believe, on November 9? And then as we have moved into 2024, I know you said some of those publishers have come out of beta. But how have those items kind of changed versus the fourth quarter?

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

Yes. Thanks for the question, Darren. I think a couple of things. One, I will say that I think our transition to dealing with cookie deprecation was an important strategic move for us. What we're seeing and what we have started to see in Q4 was that cookie deprecation was definitely occurring even though after it had 4 years of delay. And so switching over a platform in order to be able to manage and deal with that did take a lot of effort, and we did not anticipate that move until we got into 2024. But once we started seeing the transition in the marketplace and what we started hearing in the industry, we felt like it was a prudent approach for us to go ahead and make that transition in Q4 versus waiting to 2024 before we started making that transition. Again, looking at long-term benefit versus short-term gain.

The second thing is we want to -- if you look at the amount of impressions that we delivered between Q3 and Q4 as it relates to our SSP was roughly about 400 billion for each of those. And if you noticed, we were flat. So the way that we have been historically able to grow is really by the increase of impressions that we actually would be able to introduce into the marketplace. And so our delay in that beta was actually critical for us to ensure that we're able to grow, especially in light of the transition we were making with cookie deprecation.

So I would say that Q4, even though we still performed 33% year-over-year and we were excited about that level of growth, it didn't meet the expectations that we initially thought based upon primarily those 2 factors, and being the impression count being really our hedge to make sure that we're able to maintain growth. What we are seeing in Q1 of 2024, after we have started making our move to alternative IDs and our proactive measures for cookie deprecation, we're seeing a 10% to 20% growth as it relates to our SSP in comparison of last year's performance, which we feel is really a justification of us making the right decision.

**Darren Paul Aftahi**
*ROTH MKM Partners, LLC, Research Division*

And can you give any kind of color on maybe -- I know January always starts off as a pretty dismal month in digital advertising, but can you talk about maybe the cadence of growth? Like has it improved since you kind of put in -- since you switched the platform and working with alternative IDs, like is that what's driving the growth? Is it the new publishers coming off of beta which is driving the growth? And just going back to your -- both of your comments, sorry, you talked about softer demand. I'm just kind of curious, is the softer demand correlated with the cookies? Or is that something that's absolute and unique?

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

Yes. I would say the softer demand was a combination of the change that we saw with making the transition over cookies because of the platform impact that we actually had in Q4. And we also saw it being lighter going into the holiday season. So it was a combination of both as it relates to Q3.

What we attribute the increase in performance in Q4 has everything to do with the increase in publishers that we've actually added, the ones that were delayed in getting out of beta within Q4 and we moved those into Q1. Coupled with the transition that we've made to the alternative IDs, we are seeing an impact based upon that in regards to the level of transitions -- the level of transactions that we're actually seeing.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Diana P. Diaz**
*Chief Financial Officer*

We also see the benefits of the technology changes that we made in the second half of 2023 as we compare the first quarter to last year.

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

Yes, that is correct.

**Operator**

We'll take our next question from Dan Kurnos with The Benchmark Company.

**Daniel Louis Kurnos**
*The Benchmark Company, LLC, Research Division*

Mark, can we stay with that for a second? The Q1 SSP, your sell-side guide is -- it's lower than 2Q of last year. It feels like there is either some revenue that you've decided isn't going to continue. And I don't want to put words in your mouth, it's just -- because obviously, Q3 was big and we had a lot of momentum with the partner wins and yes, the impression growth. And your guidance for the year kind of implies that there is a scaling growth in the SSP over the course of the year, assuming buy-side is, I don't know, 10%. And maybe that's wrong.

So if you want to parse out kind of buy-side, sell-side in terms of the guide for next year, that might be helpful. I'm just trying to understand sort of how -- the choices that you made organically to -- let's call this a reset, which is fair as we move towards cookie deprecation, and how much of that volume then picks up or comes back to platform you're assuming in the back half of the year as we think about what you've just kind of laid out for us, if that makes sense?

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

Yes, absolutely. So I'll parse this out buy-side first, and then I'll go into sell-side. So buy-side, we're still anticipating and projected out the same 10% to 20% growth year-over-year, which has historically been how we performed this going into our third year of being public.

As it relates to the sell-side, we think 2 factors that we're taking into consideration in regards to our projection or pretty much our guidance that we've actually given. Number one, we're expecting the curve to maintain the same trajectory as we have historically in the past and we have no reason to think otherwise. So we're still maintaining that same curve because that's how it's been for the last 4 years with Q1 being the lowest, Q4 being the highest outside of last year's implication of what occurred.

What we are seeing is 10% to 20% growth year-over-year as it relates to our sell-side platform this year, and they're attributed to those 2 factors. One, our transition off of cookies which is one important factor in regards to how the DSPs and also how the market place is already making moves to that transition. The second being the increase in publishers that we have -- that we've added and has been a very important part of our growth trajectory. The third being, as Diana pointed out, really the platform change that we made last year and the increase in the capacity that we're actually able to handle the amount of transactions that we can.

So without going too far into the future, if you will, we are anticipating the same level of growth curve and what we're seeing in Q1 is 10% to 20% above year-over-year, and we're expecting and anticipating and working towards maintaining that level of growth trajectory to get to our recommended guidance for the year.

**Daniel Louis Kurnos**
*The Benchmark Company, LLC, Research Division*

Okay. And how should we think about SHE Media, FreeWheel, all these other things that you guys have added since we've talked before about getting deeper into video. I know you guys -- self-serve has been sort of on the table, but not necessarily where you want to go. Just how do we think about kind of new initiatives and some of the announcements that you guys have made recently?

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. I think you're really going to start seeing those impact in Q2, Q3 as those are new ones that we are getting in-staged and moving forward into monetization. So our team has been highly active in getting new publishers, specifically, like you had said, with SHE Media and also FreeWheel and others that we're working towards to really look at those monetizations for Q2 and Q3.

**Daniel Louis Kurnos**
*The Benchmark Company, LLC, Research Division*

One for you, Diana, just to finish up. How do we think about -- on this reset, how do we think about margins? Do we get margin expansion this year? How do we think about kind of fixed leverage versus variable spend to kind of drive growth?

**Diana P. Diaz**
*Chief Financial Officer*

So I think we'll be about in the same range on margin by segment. So it's just a matter of the mix of sell-side versus buy-side. And we had some hosting costs that we saw in the last 3 quarters of 2023. Those will continue in the first quarter, but should tail off after that. And from a fixed cost -- cost of sales.

**Daniel Louis Kurnos**
*The Benchmark Company, LLC, Research Division*

Should we be looking at the Q4 margin as sort of representative or the full year margin for '23 as representative? And then obviously, adjusting that because the sell-side will grow -- well, actually, I guess, sell-side and buy-side could grow similar rates this year, but historically, sell-side was growing faster.

**Diana P. Diaz**
*Chief Financial Officer*

Right. I think that if you look at the full year margins by segment, that would be a good indicator of what we'll see in 2024.

**Operator**

We'll take our next question from Michael Kupinski with NOBLE Capital Markets.

**Michael A. Kupinski**
*NOBLE Capital Markets, Inc., Research Division*

Going back to the cookies. I understand that you indicated that the marketplace is already making moves because of the deprecation of cookies. But it's also my understanding that Google has only deprecated cookies in 1% of its searches on Chrome in the last quarter. And I was just wondering, as we kind of cycle towards the deprecation and then full implementation of the deprecation of cookies later this year, do you -- how do you -- I guess I'm just trying to understand how you see the market evolving and how that might impact you as we go, especially in the second half of the year when we start to see the full implementation of what -- the deprecation of the cookies from Google?

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

No, I think that's an excellent question. I think cookie deprecation is actually going to open up a host of -- I think it's actually had an impact on 2 things. I think, one, it has really introduced a significant amount of innovation as it relates into the ad tech space. I think people looking for how to transact for the trade of media for dollars has really been this year and starting at the Q4 of last year, has really become a moment of innovation for the industry they probably haven't seen in the last 10 years. That's number one.

I think number two, even though Google has only deprecated 1% of the cookie, there are other media types that have already seen some level of deprecation as it relates to Apple, as it relates to some videos, some CTV. I think what you're going to see now in the future and what we've been experiencing is other DSPs have already started changing how they transact off of cookies. And so we work with roughly about 20 to 25 different DSPs, and not all DSPs treat data the same. And so the new paradigm that we're actually seeing is that we are adjusting how we treat each DSP differently. And we think that, that is really part of what's fueling a lot of the innovation that's in the marketplace today.

So I think for the last half of the year, the more that you're able to customize and work specifically with certain DSPs, and we are actually in conversation and already running different tests and POCs with them, that is going to give us a competitive advantage in the future, and that's really what we're looking to capture.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

**Michael A. Kupinski**
*NOBLE Capital Markets, Inc., Research Division*

And I was just wondering, in terms of the performance metric that these advertisers are getting, let's say, the ROI on the advertising. Has that gone down as a result of changes in the deprecation of the cookies and things like that?

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

I think every marketplace is saying something different. We have not experienced the degradation of campaign performance from the conversations that we've had with our clients as clients continue to work with us. And so our anticipation is that there will be different workarounds when cookies completely go away, as it relates to campaign reporting. And that's one of the things that we've been working towards with our tech team and with different partners to make sure that the reporting capabilities as well as the degradation of the campaigns actually doesn't occur and actually the quality stays intact. So that's been an important proof point that we've been working with our clients on.

**Michael A. Kupinski**
*NOBLE Capital Markets, Inc., Research Division*

And in terms of the most valued publishers that you work with, how -- where do you think they are in terms of this cookieless environment and implementing and planning for it? Because I know we talked about this in the past. But I was just wondering, do you feel like most of the publishers have already kind of adjusted for it at this point? Or what are your thoughts?

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

Yes. I would say, I think that the more -- the larger publishers have started making the transition, as what we have seen and what comes through with the partners that we work with. What we're seeing is the smaller to midsized publishers are a little bit behind or they are behind. And so I think that the small to mid-sized publishers have a lot of catch-up to do in comparison to some of your larger, more sophisticated publishers that are out there in the marketplace.

I think what you're going to see in the future come Q3 and Q4 is really a bifurcation of the marketplace as it relates to publishers that have the means and the capability to make those type of adjustments of going to alternative IDs and working with privacy sandbox. And then we have ones that can't. And there -- that's really the opportunity that we think we can provide to the marketplace, is helping those publishers that are the mid-tier publishers who might not have the means or capability of working with privacy sandbox or alternative IDs. And we're there to fill the gap for them.

**Operator**

That does conclude today's question-and-answer session. I would like to turn the call back over to Mark Walker for any additional or closing remarks.

**Mark D. Walker**
*CEO, Co-Founder & Chairman*

All right. Well, thank you very much for joining us for the Q4 and full year 2023 results, and we look forward to talking with you at the end of Q1.

**Operator**
Thank you. That does conclude today's presentation. Thank you for your participation today, and you may now disconnect.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2024 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2024 S&P Global Market Intelligence.

# Exhibit 12

 

HOME » ONLINE ADVERTISING

ADVERTISEMENT

**ADALYTICS**

# Adalytics Claims Colossus SSP Is Misdeclaring IDs In Its Bid Requests

 By James Hercher

FRIDAY, MAY 10TH, 2024 — 7:00 AM                    SHARE:

Call it another colossal error in the long history of ad tech spoofing.

Colossus SSP, a DEI-focused supply-side platform owned by Direct Digital Holdings (DDH), is the subject of Adalytics' latest report released Friday. Through matching data logs and the Chrome developer toolkit, it documented the SSP repeatedly misrepresenting IDs in openRTB fields.



The Fear Of Finding Out

What's more, the altered ID info consistently replicated cookie IDs that were recently bid on highly by The Trade Desk, the DSP used by Adalytics in the report.

Essentially, the best cookie IDs generated by sites in the Colossus network were being duplicated to impersonate particularly desirable audience targets.

ADVERTISEMENT

According to the Adalytics, an outright majority of impressions bought through Colossus on The Trade Desk over the course of several months didn't match the ID identified with data from the browser when the ad was served.

For the 15 other SSPS evaluated for the report, the IDs matched every time.

**The buck stops elsewhere**

The scandal at hand involves one vendor, but it's representative of how the programmatic ecosystem has shielded obvious bad practices in the past, and is now grappling with basic questions like, "What constitutes fraud?"

Colossus CEO Mark Walker, in a call with AdExchanger, attributed the issue to BidSwitch, a vendor it uses to manage traffic and demand, and to Colossus's status as an indirect seller.

"Because Colossus SSP is not directly connected to The Trade Desk, but rather through a publicly traded intermediary [by which they mean BidSwitch, owned by Criteo], Colossus SSP does not add or pass any Trade Desk user IDs in the bid request in accordance with Open RTB protocols and The Trade Desk requirements," according to DDH's public statement.

In its statement, DDH also levied a common compliant with Adalytics reports: "Adalytics refused to allow us to review the report prior to its publication, which we believe falls in line with a prior record of Adalytics seeking attention instead of accuracy."

The Adalytics report also looked at other supply-side vendors, such as TrustX and MediaGrid, which use BidSwitch for the same purpose, and found no ID injection.

**Appx. B-165**



**AdExchanger Daily**

Get our editors' roundup delivered to your inbox every weekday.

SUBSCRIBE

**DAILY ROUNDUP** ▸

**Know What They Can't Generate? Profit; Racing Through Infancy**

However, *something or someone* is injecting false IDs into the bidstream. And BidSwitch says it's not the one making those changes to openRTB fields.

"Any claims or implications by Colossus SSP that BidSwitch is to blame for Colossus SSP's manipulation of the content of bid requests are untrue and we encourage all parties to investigate further into the merits of any such statements before publishing untrue statements," according to statement by Criteo's general counsel, Ryan Damon.

BidSwitch operates a "passthrough" platform, Damon said in the same comment. It doesn't alter bid requests by SSPs or bid responses from advertisers.

**Who knew?**

For anyone asking themselves why The Trade Desk didn't detect this problem; the company wants you to know it's on it.



The Cookie Pool

"The Trade Desk Marketplace Quality team has been aware of issues with the SSP mentioned in the Adalytics report for more than a year," according to comment from a spokesperson.

When The Trade Desk DSP makes the calls on ad buys, it never buys Colossus inventory. The team identified Colossus last year when it saw aberrations in results for high-value targets, and put the puzzle pieces together, according to a source at the company on background. When an ID has been altered or injected to represent a different audience, it's deemed sophisticated invalid traffic (SIVT).

"The only exception has come if an advertiser makes a specific request to knowingly transact through this SSP," according to the statement.

In other words, if an advertiser bought a programmatic direct deal with Colossus, The Trade Desk will act as the pipes.

The Trade Desk is also not the only DSP to have raised an issue with Colossus. According to a source at Google speaking on background, Display & Video 360 flagged this problem last year. But the issue was rectified and Colossus was reinstated by Google's DSP.

Colossus is an unusual case, since it deals with minority-owned sites and makes much of its money via direct deals. Many large brands and agency holding companies have created requirements and marketing budgets for minority-owned media.

Sequential liability in this case is another complicating factor. The Trade Desk and other DSPs might have the right to withhold payments to Colossus for impressions deemed SIVT. But they were budgets meant for minority-owned sites as part of a DEI initiative. And the minority-owned publishers selling their inventory through Colossus would be the ones to take the hit. These publishers are generating real traffic and their own cookies. The injection of false information is happening at the tech level.

**The F word**

What Colossus is documented doing by Adalytics is plainly fraud, says Jay Friedman, CEO of the agency Goodway Group. But the agency head said the ID injection falls along a spectrum of misrepresentation issues in programmatic. All the issues involve ad tech companies extracting money from advertisers by deliberately or cynically failing to deliver on what's been sold.

Just last month, Adalytics also made headlines when it caught Forbes selling inventory on a shady subdomain – "www3.forbes.com" – to advertisers who obviously expected the actual Forbes site.

Or take bid caching, when an SSP holds on to an ad bid and applies that same price to a later impression, which remains a commonplace tactic to this day, Friedman says, despite being an obvious case of the publisher failing to deliver on their purported deal.

Does anyone remember the word "centroid"? That was an early mobile tactic when publishers realized advertisers paid more for impressions with location data attached, and so simply attached generic location info made up from whole cloth.

A big part of the issue, Friedman said, is that vendors rarely face repercussions from other ad tech companies.

After all, even The Trade Desk, which saw what Colossus was up to plainly, continued to buy the inventory and carry the SSP. The fact is, it's a vendor to agencies and advertiser; not their nanny.

**Where are the verifiers?**

Adalytics noticed the mismatched IDs coming from Colossus in the bidstream by looking at publicly available Chrome developer info. Any general Chrome user could (in theory) look up the cookie ID associated with that device and browsing session.

And just like with the recent case of a Forbes subdomain for executing made-for-arbitrage ads, there was a mismatch that wasn't called out by anyone, even verification vendors. Instead, these cases are breaking as public scandals.

"We [at Goodway Group] changed our position in 2024, to the point that we now recommend advertisers not use verification providers," Friedman said.

The typical verification partners – IAS, DoubleVerify, HUMAN and Oracle's Moat – are no longer fit for the purpose, he said. Instead of using a pre-bid technology provider, companies should adopt analytics businesses that evaluate post-campaign data for incongruities. Adalytics is one such option, he said, alongside FouAnalytics and many other pure-play ad analytics vendors.

"We've learned that stuff really doesn't work," Friedman said of the Big Four verification vendors, who predominantly use pre-bid tech to determine what media and ad placements are served. "We've been able to root out waste at orders of magnitude greater rates than when we were using verification providers."

**What happens next?**

For DDH and Colossus SSP, this scandal comes at the worst possible time.

A month ago, the company was forced to delay its earnings report, and also announced that its accounting firm had resigned. Two weeks ago, Nasdaq gave notice that DDH has 60 days to submit a plan to regain compliance or it will be delisted.

Individually, these are normal and surmountable problems. Taken as a whole, with a compelling claim of repeated fraud in their SSP business, it's a lot of red flags.

Appx. B-168

Friedman said he had no knowledge of what was going on at Colossus in particular. But he added that, although this particular issue is specific to Colossus and likely doesn't exist with other SSPs, it does reflect systemic problems within programmatic.

"Was I surprised?" he mused of this Adalytics report. "There are 40 SSPs out there where if you told me tomorrow that they're mostly fraud and are going out of business, I wouldn't be surprised."

---

ADVERTISEMENT



**Trending Ad Tech Topics**

Learn the latest on CTV, commerce media, privacy, and more from leading digital marketing and advertising innovators.

adexchanger   AdExchanger

---

**Register Today**

---

**NEXT IN ONLINE ADVERTISING ›**

## The Trade Desk Reframes Its Open Internet Vision As 'The Premium Internet'

---

ADVERTISEMENT

**RELATED STORIES ▶**



**ONLINE ADVERTISING**

### Brands Are Getting Shy On DEI, But Reaching Diverse Audiences Is Still Good Business



**AD ANALYTICS**

### Meet Adalytics, An Asteroid Headed For Ad Tech



**ONLINE ADVERTISING**

### How Atlanta's Tourism Bureau Targeted Fans Of Black Culture

---

**MUST READ** ▶





**PUBLISHERS**

### The Guardian US Is Following Programmatic Budgets To Private Marketplaces

Dave Strauss, VP of revenue operations and strategy for North America, spoke with AdExchanger about The Guardian's PMP priorities and how it's tapping into other...

**META**

### Financial Service In The UK Just G Frightful Meta B

Call it a Glitchmas m Meta finally appears glitch in its ad platfo new financial service running campaigns.

● ○ ○ ○ ○ ○ ○

ADVERTISEMENT

**POPULAR** ▶

**1**



OPINION: DATA-DRIVEN THINKING

## Why Publicis Is Winning

Publicis outperforms its agency holding company rivals because of three primary factors: technology strategy, leadership and deal-making.

**2**



PUBLISHERS

## The Guardian US Is Following Programmatic Budgets To Private Marketplaces

Dave Strauss, VP of revenue operations and strategy for North America, spoke with AdExchanger about The Guardian's PMP priorities and how it's tapping into other emerging revenue streams.

**3**



MEDIA NETWORK

## Western Union Banks On First-Party Data To Woo Brands To Its New Media Network

Western Union – which, fun fact, sent its first telegrams across the American frontier in the early 1850s – launched a media network last month that reaches 150 million people.

**4**



PROGRAMMATIC

## Forrester's SSP Wave Lists The Top 10 SSPs – With Google At The Bottom (Really)

Forrester released its first SSP wave since 2014 last week, and there's a surprise. The research firm ranked Google – whose sell-side ad tech platform is facing federal antitrust charges – as a mere challenger.



**5**

META

## Financial Services Advertisers In The UK Just Got Over A Frightful Meta Bug

Call it a Glitchmas miracle. Maybe. Meta finally appears to have resolved a glitch in its ad platform that prevented new financial services advertisers from running campaigns.

ADVERTISEMENT

Join the AdExchanger Community     JOIN NOW



**Your trusted source for in-depth programmatic news, views, education, and events.**

AdExchanger is where marketers, agencies, publishers and tech companies go for the latest information on the trends that are transforming digital media and marketing, from data, privacy, identity and AI to commerce, CTV, measurement and mobile.



NEXT EVENT

## CTV Connect

March 12-13, 2025
Metropolitan Pavilion

Appx. B-173

New York, NY

LEARN MORE

---

**ABOUT ADEXCHANGER**

About Us // Advertise // Contact Us //
Events // Subscribe // RSS //
Cookie Settings // Privacy & Terms //
Accessibility //
Diversity, Equity, Inclusion & Belonging

**CONNECT**

 



© 2024 Access Intelligence, LLC - All Rights Reserved

# Exhibit 13

# Google and The Trade Desk appeared to block a supply-side platform over user ID mismatch issue

adage.com/article/digital-marketing-ad-tech-news/google-and-trade-desk-appeared-block-supply-side-platform-over-user-id-mismatch-issue/2559331

May 10, 2024



Procter & Gamble Co. is one advertiser that has opted to continue trading via Colossus despite the reported issue.

Appx. B-176

A new report from Adalytics found that supply-side platform Colossus provided The Trade Desk with mismatched user IDs in numerous trades, raising questions about how well verification vendors are doing at preventing issues that ultimately leave advertisers footing the bill.

The mismatch problem, according to Adalytics, appears to meet the criteria of "cookie stuffing," a form of ad fraud or "sophisticated invalid traffic" (SIVT) in standards set by the Media Rating Council. Adalytics observed trades involving 16 other SSPs that had no similar ID mismatch issues, though the report does not conclude how the mismatches happened or why. The Trade Desk (TTD) said it discovered the problem more than a year ago and blocked Colossus from trading unless clients specifically opt in.

Separate from the Adalytics report, Google also appeared to block Colossus from its trading platforms last year before later restoring access due to similar issues, according to a person familiar with the situation.

Colossus' parent company, Direct Digital Holdings, denied any wrongdoing and attributed any issues to problems addressed long ago and noted it worked with TTD through an intermediary company rather than directly. Direct Digital Holdings also denied being cut off by Google.

Adalytics collected the data for its report through visits by volunteers using the Google Chrome browser, which allows tracking IDs or cookies, collecting source code from the ads they were served (Google is in the process of turning off cookies, though its plans have been continuously delayed). The report notes that the ID mismatch could allow Colossus to reap far bigger bids based on more attractive user IDs of more value to advertisers than the Trade Desk IDs would deliver. In some cases, according to the report, multiple IDs were assigned to the same user by Colossus during the same site visit, none of them matching The Trade Desk IDs.

But Adalytics CEO Krzysztof Franaszek declined to say whether bids from Colossus trades routinely came in higher than those of other SSPs whose declared IDs matched those of TTD. The report also said it could not glean intent or how the mismatches occurred.

Executives of Direct Digital Holdings, the publicly traded parent of Colossus, strongly disputed the report, which they described as flawed and inaccurate. Any ID mismatches that occurred were a result of Colossus not having a direct connection to The Trade Desk like other SSPs cited in the report have, according to statements from the company, which also said its own testing did not show the same mismatch issues occuring.

Even so, TTD largely blocked Colossus from trading last year after discovering problems.

**Appx. B-177**

"The Trade Desk Marketplace Quality team has been aware of issues with the SSP mentioned in the Adalytics report for more than a year," the company said in a statement. "At that time, our team took action to block this SSP across our platform. The only exception has come if an advertiser makes a specific request to knowingly transact through this SSP."

Procter & Gamble Co. is one advertiser that has opted to continue trading via Colossus despite this, according to people familiar with the matter. P&G declined to comment.

## Google ID mismatch issues

A publisher executive familiar with Colossus, who spoke on the condition of anonymity because of a relationship with the company, said the publisher was able to independently reproduce the Adalytics findings of ID mismatches between the SSP and The Trade Desk in its own testing. Google also appeared to block Colossus from its trading platforms last year before later restoring access. Once Colossus resumed trading through Google exchanges, it's been at a lower volume than before, the executive said, attributing the pattern to Google having discovered a similar ID mismatch problem with Colossus that later was fixed.

Another person familiar with the matter said Google issued credits to affected advertisers after identifying ID-matching issues involving Colossus.

Google declined to comment on Colossus, but a spokesman in a statement said: "Google has strict policies and robust enforcement systems to protect advertisers, publishers and people against invalid traffic. Late last year, our teams identified sources of invalid traffic that do not adhere to our guidance around how signals are shared in bid requests and took prompt action."

## Verification questions

TTD declined to say whether Human Security, which it works with for verification and ad fraud prevention, alerted the company to the problem. But a person familiar with the matter said the problem was identified by TTD's internal team, then brought to Human's attention, rather than the other way around.

Human and Oracle Moat, which is a verification vendor used by Colossus, either declined to comment or did not respond to requests for comment. Both are accredited by the Media Rating Council for SIVT detection.

Some found fault in verification vendors not finding and reporting the ID mismatch issue.

"The impact of this single incident is not what the industry needs to pay attention to," said Jay Friedman, CEO of the Goodway Group ad agency. "It's whether or not the industry has the mechanisms set up to prevent or at least catch this. We have the systems that are supposed to catch this. They appear not to be working."

**Appx. B-178**

This and some prior issues Adalytics has found recently "are clearly part of MRC accreditations, where vendors are required to catch this in order to be verified," Friedman said.

A spokesman for the MRC said the group, prior to seeing the full Adalytics report, did not believe what was reported constituted cookie stuffing or SIVT.

### Colossus response

In an interview, Direct Digital Holdings CEO Mark Walker said an initial draft of the Adalytics report didn't note that other SSPs cited had direct connections to The Trade Desk, while Colossus works through an intermediary, BidSwitch, a unit of Criteo. He denied that Colossus had been cut off by Google.

Colossus works with verification companies that include FouAnalytics, Human Security and Oracle Moat, said DDH Chief Technology Officer Anu Pillai. "We have any technology that we can utilize to ensure that we are being transparent and have clean supply," Pillai said. "So it just beats us that they would think we're doing something nefarious."

A statement from DDH read: "Because Colossus SSP is not directly connected to The Trade Desk, but rather through a publicly traded intermediary, Colossus SSP does not add or pass any Trade Desk user IDs in the bid request in accordance with Open RTB protocols and The Trade Desk requirements. As we have in the past, we will continue to work with The Trade Desk to resolve any concerns that they may have."

Later, a DDH spokeswoman forwarded screenshots of communications said to be from The Trade Desk indicating the ID issue had been dealt with in 2022, but that Colossus was blocked from the company's open exchange starting last year because it did not participate in the DSP's first-price auction format, which she said Colossus was unable to do because it was working indirectly with TTD through BidSwitch.

In a statement, DDH said, "For all intents and purposes, Bidswitch is the buyer for Colossus SSP. Colossus has no control over whether the bid request sent to Bidswitch by Colossus makes it to The Trade Desk."

## Media measurement blog

Tracking TV, social and digital updates
Though most of the other SSPs whose Trade Desk transactions Adalytics observed had direct connections to the DSP, Adalytics found data from trades another DSP that connects with TTD via BidSwitch—TrustX—showed no similar user identity mismatches with TTD.

**Appx. B-179**

Criteo, which owns BidSwitch, in a statement said the company was not at fault regarding any issues with identity mismatches. "BidSwitch operates as a neutral 'passthrough' platform, sending traffic from SSPs to DSPs without manipulating the content of bid requests from SSPs or bid responses from DSPs," according to the statement.

DDH in a statement said its testing differed from Adalytics' finding and that it populates an ID field different from the Trade Desk ID (TDID) field.

<u>Jack Neff</u>
Jack Neff, editor at large, covers household and personal-care marketers, Walmart and market research. He's based near Cincinnati and has previously written for the Atlanta Journal Constitution, Bloomberg, and trade publications covering the food, woodworking and graphic design industries and worked in corporate communications for the E.W. Scripps Co.



# Exhibit 14

# RESEARCH REPORT

**Noble** COMPANY SPONSORED

*Noble Capital Markets Independent Analysis | MEMBERS: FINRA, SIPC, MSRB*

Apr 24, 2024

Media

## DRCT

NASDAQ

Rating

## Market Perform

Unchanged

Current Price

## $6.93

Market Capitalization
**99.7M**

Shares Outstanding
**14.3M**

Float
**3.0**

Institutional Holdings
**15.5%**

12-Month Low/High
**$1.96/$35.88**

Average 90-Day Volume
**227530**

Fiscal Year End
**12/31/2024**

## Direct Digital Holdings
## Marcum Gives A Bad Impression

**Non-compliance notice**. On April 17 the company was not able to file its 10-K on time, and, subsequently, received a notification of non-compliance from NASDAQ. Notably, the company has 30 days to submit an actionable plan to regain compliance. Importantly, the failure to file its 10-K on time was attributed to the inability of its auditor, Marcum, to verify impressions data.

**New auditor expected soon.** Marcum is terminating its relationship with the company, citing its inability to verify the company's impressions data. Importantly, we expect the company to sign a top 10 US accounting firm within the 30-day window. The audit should be able to ramp quickly, given that the company will be able to provide timely access to all the data the was requested by the previous auditor. Additionally, we expect Nasdaq will accept its plan and grant the company up to 6 months to complete the10-K filing, as well as its first quarter 10-Q filing.

**Material change not expected.** Notably, we do not anticipate a significant restatement of 2023 financial results, due to Marcum's inability to verify a small portion of impression data and that the company received nearly 100% of its reported revenue. We believe the company is well positioned to regain compliance.

**What could be the share impact?** We believe that the vast majority of the impact from the issues with its auditor has already been reflected in the stock following the absence of the company's 10K filing and the 78% decline in the stock since highs achieved in March 2024.

**Maintaining Market Perform rating for now.** The recent news may cause some anxiety for investors, but, we believe that a resolution appears to be near. At this time we are maintaining our Market Perform rating, but our rating would be reevaluated on potential further share price weakness.

### Equity Research

Michael Kupinski, Director of Research, Equity Research Analyst, Digital, Media & Technology
(561) 994-5734, mkupinski@noblefinancialgroup.com

Patrick McCann, CFA, Research Analyst - pmccann@noblecapitalmarkets.com

### Noble Capital Markets, Inc.

Trading: (561) 998-5489 Sales: (561) 998-5491
www.noblecapitalmarkets.com

| Revenues ($ MIL) | | | |
|---|---|---|---|
| Period | 2022A | 2023A | 2024 |
| Q1 | 11.37 | 21.2A | 23.3E |
| Q2 | 21.26 | 35.4A | 40.5E |
| Q3 | 26.40 | 59.5A | 68.7E |
| Q4 | 30.36 | 41.0A | 48.1E |
| | 89.36 | 157.1A | 180.7E |

| EPS ($) | | | |
|---|---|---|---|
| Period | 2022A | 2023A | 2024 |
| Q1 | (0.05) | (0.09) | (0.15)E |
| Q2 | 0.18 | 0.08 | 0.04E |
| Q3 | 0.08 | 0.23 | 0.16E |
| Q4 | 0.07 | (0.08) | (0.03)E |
| | 0.34 | 0.13 | 0.02E |

# Refer to the last two pages for Analyst Certification & Disclosures

Case 25-90068 Document 454 Filed in TXSD Page 185 of 190

Direct Digital Holdings (DRCT) | Current Price: $6.93 | Market Perform | Apr 24, 2024

**Company Profile**

Direct Digital Holdings was founded in 2018 with the acquisitions of Colossus Media and Huddled Masses. Colossus Media operates the sell-side, programmatic advertising platform, which is considered to be the company's key revenue and cash flow growth driver. Huddled Masses is buy-side platform, which helps advertisers execute ad campaigns. In 2020, the company acquired Orange 142, expanding the capacity of the buy-side platform. The company's buy-side platform is predominately used by destination marketing organizations. The company focuses on middle market customers with $5 million to $500 million in sales and with customers that may have interests in targeting diverse, multicultural audiences for both publishers who need to sell advertising and advertisers who need to buy media that will reach those audiences.

**Fundamental Analysis — 3.0 / 5.0 Checks**

Our fundamental assessment is 3.0 checks, which is considered to be average. The company scored high on the market opportunity given its relatively small size and the vast total market, which is expected to grow at a 12% CAGR over the next several years. The company also scored high on its financial leverage given its reasonable balance sheet and free cash flow generation. The company has reasonable debt at roughly 3.5 times estimated cash flow. The company also scored well on its operating leverage given its relatively healthy margins and positive free cash flow. The company scored low on competitive position given that there are larger, more well financed companies in its space. Overall, the company's fundamental assessment is average, but we believe that it has dynamic revenue and cash flow growth prospects given its relative size in a large industry.

**Valuation Summary**

In recent months, the DRCT shares advanced from lows of $2.49 in November to more than $34 in March. We believe that the shares outpaced the company's current fundamentals, in light of the recent results. The shares are expected to open significantly lower based on pre-market trading. Yet we anticipate that the shares will still trade at a premium to peers, based on our lowered 2025 adj. EBITDA forecast. At $14, the DRCT shares would trade at roughly 16 times enterprise value to our 2025 adj. EBITDA forecast. We believe the shares deserve a premium valuation to peers, due to the company's above average revenue growth. However, we would look for a more opportunistic entry point and or to build a position in the shares. As such, we are lowering our rating from Outperform to Market Perform. We will re-evaluate our rating upon the prospect of further weakness in the shares.

Risks in investing in the DRCT shares include: increased competition within the digital advertising space, changes to data privacy regulations, and the potential loss of large buy-side clients that account for high margin cash flow and fuel the company's investment growth in its Sell-side business. Changes in its Buy-side business could adversely affect the revenue and cash flow trajectory of the company.

**Appx. B-183**

Direct Digital Holdings (DRCT) | Current Price: $6.93 | Market Perform | Apr 24, 2024



**Direct Digital Holdings**
Closing Price Apr 23, 2024 $6.93

A – 03/27/2024 Market Perform Current $16.04
B – 12/12/2023 Outperform Target $17.00 Current $8.42
C – 11/10/2023 Outperform Target $10.00 Current $4.04
D – 10/23/2023 Outperform Target $6.00 Current $2.44
E – 08/11/2023 Outperform Target $6.00 Current $2.41
F – 08/03/2023 Outperform Target $6.00 Current $2.77
G – 05/12/2023 Outperform Target $6.00 Current $2.88
H – 04/20/2023 Outperform Target $6.00 Current $3.16
I – 03/24/2023 Outperform Target $5.50 Current $3.51
J – 11/11/2022 Outperform Target $6.00 Current $3.49
K – 09/12/2022 Outperform Target $6.00 Current $3.45
L – 08/12/2022 Outperform Target $6.00 Current $3.05
M – 07/12/2022 Outperform Target $5.50 Current $1.43

Direct Digital Holdings (DRCT) | Current Price: $6.93 | Market Perform | Apr 24, 2024

## GENERAL DISCLAIMERS

All statements or opinions contained herein that include the words "we", "us", or "our" are solely the responsibility of Noble Capital Markets, Inc. ("Noble") and do not necessarily reflect statements or opinions expressed by any person or party affiliated with the company mentioned in this report. Any opinions expressed herein are subject to change without notice. All information provided herein is based on public and non-public information believed to be accurate and reliable, but is not necessarily complete and cannot be guaranteed. No judgment is hereby expressed or should be implied as to the suitability of any security described herein for any specific investor or any specific investment portfolio. The decision to undertake any investment regarding the security mentioned herein should be made by each reader of this publication based on its own appraisal of the implications and risks of such decision.

This publication is intended for information purposes only and shall not constitute an offer to buy/sell or the solicitation of an offer to buy/sell any security mentioned in this report, nor shall there be any sale of the security herein in any state or domicile in which said offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or domicile. This publication and all information, comments, statements or opinions contained or expressed herein are applicable only as of the date of this publication and subject to change without prior notice. Past performance is not indicative of future results.

Noble accepts no liability for loss arising from the use of the material in this report, except that this exclusion of liability does not apply to the extent that such liability arises under specific statutes or regulations applicable to Noble. This report is not to be relied upon as a substitute for the exercising of independent judgement. Noble may have published, and may in the future publish, other research reports that are inconsistent with, and reach different conclusions from, the information provided in this report. Noble is under no obligation to bring to the attention of any recipient of this report, any past or future reports. Investors should only consider this report as single factor in making an investment decision.

## IMPORTANT DISCLOSURES

This publication is confidential for the information of the addressee only and may not be reproduced in whole or in part, copies circulated, or discussed to another party, without the written consent of Noble Capital Markets, Inc. ("Noble"). Noble seeks to update its research as appropriate, but may be unable to do so based upon various regulatory constraints. Research reports are not published at regular intervals; publication times and dates are based upon the analyst's judgement. Noble professionals including traders, salespeople and investment bankers may provide written or oral market commentary, or discuss trading strategies to Noble clients and the Noble proprietary trading desk that reflect opinions that are contrary to the opinions expressed in this research report.

The majority of companies that Noble follows are emerging growth companies. Securities in these companies involve a higher degree of risk and more volatility than the securities of more established companies. The securities discussed in Noble research reports may not be suitable for some investors and as such, investors must take extra care and make their own determination of the appropriateness of an investment based upon risk tolerance, investment objectives and financial status.

### Company Specific Disclosures

The following disclosures relate to relationships between Noble and the company (the "Company") covered by the Noble Research Division and referred to in this research report.

The Company in this report is a participant in the Company Sponsored Research Program ("CSRP"); Noble receives compensation from the Company for such participation. No part of the CSRP compensation was, is, or will be directly or indirectly related to any specific recommendations or views expressed by the analyst in this research report.

Noble intends to seek compensation for investment banking services and non-investment banking services (securities and non-securities related) within the next 3 months.

Noble is not a market maker in the Company.

**Appx. B-185**

## FUNDAMENTAL ASSESSMENT

The fundamental assessment rating system is designed to provide insights on the company's fundamentals both on a macro level, which incorporates a company's market opportunity and competitive position, and on a micro/company specific level. The micro/company specific attributes include operating & financial leverage, and corporate governance/management. The number of check marks that a company receives is designed to provide a quick reference and easy determination of the company's fundamentals based upon the following five attributes of the company (weighting reflects the importance of each attribute in the overall scoring of company's fundamental analysis):

| Attribute | Weighting |
|---|---|
| Corporate Governance/Management | 20% |
| Market Opportunity Analysis | 20% |
| Competitive Position | 20% |
| Operating Leverage | 20% |
| Financial Leverage | 20% |

For each attribute, the analysts score the company from a low of zero to a high of ten based upon the analysis described below. The final rating and resulting check marks is a result of dividing the overall score (out of 100%) by ten.

| Rating | Score | Checks |
|---|---|---|
| Superior | 9.1 to 10 | Five Checks |
| Superior | 8.1 to 9 | Four & A Half Checks |
| Above Average | 7.1 to 8 | Four Checks |
| Above Average | 6.1 to 7 | Three & A Half Checks |
| Average | 5.1 to 6 | Three Checks |
| Average | 4 to 5 | Two & A Half Checks |
| Below Average | 3 to 3.9 | Two Checks |
| Below Average | 2 to 2.9 | One & A Half Checks |
| Low Quality | 0 to 1.9 | One Check |

While these are the attributes currently used for the analyst's fundamental analysis, the attributes and weighting may be reviewed, updated with additional attributes, and/or changed in the future based on discussions with the analysts and recommendations from the Director of Research.

Following is the description of each attribute in the fundamental analysis.

### Corporate Governance/Management

We believe that a review of corporate governance and assessment of the senior management are important tools to determine investment merit. Good corporate governance aligns management with the interests of stakeholders. As such, analysts are to rank the company on the basis of good corporate governance principles that may include rules and procedures, board composition and staggered term limits, rights and responsibilities, corporate objectives, monitoring of actions and policies, and accountability. In addition, analysts will assess issues with controlling shareholders and whether decisions have been made in the past that were in the interests of all shareholders. In addition, management will be assessed based on industry experience, expertise, and/or track record.

High ranking example: Board and management that is aligned with the interests of shareholders with incentives based on stock price appreciation and with an experienced management team known for exceptional shareholder returns.

Low ranking example: Concentrated ownership without independent directors that do not necessarily align with all shareholders' interests.

### The Market Opportunity Analysis

In this review, the analyst assesses the company's macro environment as a measure of understanding the industry. Factors considered include the size and growth potential of the industry under various economic conditions, the emerging demands in the market, technological benefits/disruptions, competition, geographical opportunities, and customer demands/needs, and an assessment of supply and distribution channels. In addition, the analyst will review legal and regulatory trends, as well as potential shifts in consumer or social behavior and natural environment changes.

High rank example: A company in an industry that is growing revenues well above GDP rates (which are on average 2% plus) and/or may have unmet or under-served needs in a rapidly growing market opportunity.

Low rank example: A mature industry that is in secular decline and likely to grow below GDP rates.

**Appx. B-186**

Direct Digital Holdings (DRCT) | Current Price: $6.93 | Market Perform | Apr 24, 2024

## Competitive Position

The evaluation of the company's competitive position is another macro environment attribute designed to measure the relevance, market share, position and value proposition, and sustainable differentiations of the company and its products/services within its industry. Ease of entry into the industry and the ability of other well-funded players to potentially enter the market would be determined. As such, the assessment would consider the company's strengths and advantages of its products/services against weaknesses and limitations. This may include the company's current brand awareness, pricing and cost structure, current market strategies and geographic penetration that may affect demand for its products/services. In addition, the company's competitors would be evaluated.

High rank example: An analyst would consider the company's product to be superior to its competitors and that should allow the company to gain market share.

Low rank example: A company with a "me-too" product that does not have any significant technology advantages in an industry that has low barriers to entry.

## Operating Leverage

Simplistically, operating leverage is determined by the operating income relative to changes in revenue. The analyst will calculate the impact on sensitivity on gross margins and variable costs to determine operating leverage. The analyst will take into account the ability of the company to cut fixed and variable costs in a challenged revenue environment and technological changes that may impact operating expenses. In addition, the analyst is to assess corporate strategies that include capital investment, which may be required for sustainable revenue growth, marketing expenses, and the company's ability to attract and retain talent and/or employees. The analyst should focus on the revenue opportunity and determine the price elasticity of demand for the company's products or services. In other words, the analyst is to rank the company based on improved operating margins going forward on an absolute and relative basis.

High rank example: A company that has improving margins for the foreseeable future, with significant price elasticity.

Low rank example: A company that is in a challenged revenue environment with a fixed cost structure and limited ability to cut costs, indicating an outlook for declining margins.

## Financial Leverage

A strict definition of financial leverage is total debt divided by total shareholder's equity. Financial leverage analysis is to determine the company's ability to improve shareholder value by means of utilizing its balance sheet to grow organically or to acquire assets. Analysts may look at the company's debt to cash flow leverage ratio, interest coverage ratios, or debt to equity ratios. In addition, the interest rate environment and the outlook for interest rates are a factor in determining the company's ability to manage financial leverage. Finally, the analyst is expected to determine the ability to service the debt given the industry and/or company profile, such as cyclicality, barriers to entry, history of bankruptcy, consistency in revenue and profit growth, or predictability in sales and profits and large cash reserves. The analyst is expected to take into account capital intensity of the company and the anticipated of capital allocation decisions.

High rank example: A company with predictable and growing revenue and cash flow with modest debt levels. This may indicate that the company could improve shareholder value through growth investments, including acquisitions, using debt financing.

Low rank example: A company in a cyclical industry in a late stage economic cycle that has above average debt leverage and is in an industry that has a history of financial challenges, including bankruptcies.

## ANALYST CREDENTIALS, PROFESSIONAL DESIGNATIONS, AND EXPERIENCE

Director of Research. Senior Equity Analyst specializing in Media & Entertainment. 34 years of experience as an analyst. Member of the National Cable Television Society Foundation and the National Association of Broadcasters. BS in Management Science, Computer Science Certificate and MBA specializing in Finance from St. Louis University.
Named WSJ 'Best on the Street' Analyst six times.
FINRA licenses 7, 24, 66, 86, 87.

## CONTINUING COVERAGE

Unless otherwise noted through the dropping of coverage or change in analyst, the analyst who wrote this research report will provide continuing coverage on this company through the publishing of research available through Noble Capital Market's distribution lists, website, third party distribution partners, and through Noble's affiliated website, channelchek.com.

**Appx. B-187**

Direct Digital Holdings (DRCT) | Current Price: $6.93 | Market Perform | Apr 24, 2024

**WARNING**

This report is intended to provide general securities advice, and does not purport to make any recommendation that any securities transaction is appropriate for any recipient particular investment objectives, financial situation or particular needs. Prior to making any investment decision, recipients should assess, or seek advice from their advisors, on whether any relevant part of this report is appropriate to their individual circumstances. If a recipient was referred to by an investment advisor, that advisor may receive a benefit in respect of transactions effected on the recipients behalf, details of which will be available on request in regard to a transaction that involves a personalized securities recommendation. Additional risks associated with the security mentioned in this report that might impede achievement of the target can be found in its initial report issued by . This report may not be reproduced, distributed or published for any purpose unless authorized by .

**RESEARCH ANALYST CERTIFICATION**

**Independence Of View**

All views expressed in this report accurately reflect my personal views about the subject securities or issuers.

**Receipt of Compensation**

No part of my compensation was, is, or will be directly or indirectly related to any specific recommendations or views expressed in the public appearance and/or research report.

**Ownership and Material Conflicts of Interest**

Neither I nor anybody in my household has a financial interest in the securities of the subject company or any other company mentioned in this report.

| NOBLE RATINGS DEFINITIONS | % OF SECURITIES COVERED | % IB CLIENTS |
|---|---|---|
| Outperform: potential return is >15% above the current price | 83% | 20% |
| Market Perform: potential return is -15% to 15% of the current price | 18% | 4% |
| Underperform: potential return is >15% below the current price | 0% | 0% |

**NOTE:** On August 20, 2018, Noble Capital Markets, Inc. changed the terminology of its ratings (as shown above) from "Buy" to "Outperform", from "Hold" to "Market Perform" and from "Sell" to "Underperform." The percentage relationships, as compared to current price (definitions), have remained the same.

Additional information is available upon request. Any recipient of this report that wishes further information regarding the subject company or the disclosure information mentioned herein, should contact Noble Capital Markets, Inc. by mail or phone.

Noble Capital Markets, Inc.
150 E Palmetto Park Rd, Suite 110
Boca Raton, FL 33432
561-994-1191

Noble Capital Markets, Inc. is a FINRA (Financial Industry Regulatory Authority) registered broker/dealer.
Noble Capital Markets, Inc. is an MSRB (Municipal Securities Rulemaking Board) registered broker/dealer.
Member - SIPC (Securities Investor Protection Corporation)

Report ID: 26668