# APPENDIX C

## DEFENDANTS' UNPUBLISHED CASES/AUTHORITIES
## MOTION TO DISMISS

| Case /Tab No. | CASE/AUTHORITY NAME | Appx. page no. |
|---|---|---|
| 1. | *Bailey v. Esperion Therapeutics, Inc.*, 2019 WL 3296235 (E.D. Mich. Feb. 19, 2019) | Appx. C-001-006 |
| 2. | *Burback v. Brock*, 2023 WL 4532803 (5th Cir. July 13, 2023) | Appx. C-007-015 |
| 3. | *Dang v. Amarin Corp. plc*, 2024 WL 4285900 (D.N.J. Sept. 25, 2024) | Appx. C-016-061 |
| 4. | *Denny v. Canaan Inc.*, 2023 WL 2647855 (S.D.N.Y. Mar. 27, 2023) | Appx. C-062-077 |
| 5. | *Edgar v. Anadarko Petroleum Corp.*, 2018 WL 3032573 (S.D. Tex. June 19, 2018) | Appx. C-078-092 |
| 6. | *Edwards v. McDermott Int'l*, 2022 WL 3927828 (S.D. Tex. Aug. 30, 2022) | Appx. C-093-100 |
| 7. | IMPLEMENTING THE REQUIREMENTS OF THE SARBANES-OXLEY ACT § 1604, 2005 WL 487832 (2025) | Appx. C-101-124 |
| 8. | *In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411 (N.D. Ill. June 29, 2001) | Appx. C-125-134 |
| 9. | *In re Blockbuster Inc. Sec. Litig.*, 2004 WL 884308 (N.D. Tex. Apr. 26, 2004) | Appx. C-135-152 |
| 10. | *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779 (S.D. Tex. May 31, 2016) | Appx. C-153-188 |
| 11. | *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009 (D.N.J. Sept. 5, 2024) | Appx. C-189-211 |
| 12. | *In re Cryolife, Inc. Sec. Litig.*, 2005 WL 8155579 (N.D. Ga. June 17, 2005) | Appx. C-212-240 |
| 13. | *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2015 WL 6039690 (D. Del. Oct. 15, 2015) | Appx. C-241-263 |
| 14. | *In re Nimble Storage Sec. Litig.*, 2017 WL 4355570 (N.D. Cal. Oct. 2, 2017) | Appx. C-264-271 |

| Case /Tab No. | CASE/AUTHORITY NAME | Appx. page no. |
|---|---|---|
| 15. | *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193 (N.D. Cal. Mar. 31, 2023) | Appx. C-272-290 |
| 16. | *In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825 (S.D. Cal. Mar. 30, 2005); | Appx. C-291-362 |
| 17. | *Loc. 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 2015 WL 1143081 (S.D. Tex. Mar. 13, 2015) | Appx. C-363-373 |
| 18. | *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 2022 WL 377415 (N.D. Okla. Jan. 7, 2022) | Appx. C-374-400 |
| 19. | *MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153 (S.D. Tex. July 24, 2019) | Appx. C-401-428 |
| 20. | *New York Hotel Trades Council & Hotel Ass'n of New York City, Inc. Pension Fund v. Impax Lab'ys Inc.*, 2019 WL 3779262 (N.D. Cal. Aug. 12, 2019) | Appx. C-429-435 |
| 21. | *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*, 2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) | Appx. C-436-441 |
| 22. | *Plaisance v. Schiller*, 2019 WL 1205628 (S.D. Tex. Mar. 14, 2019). | Appx. C-442-483 |
| 23. | *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089 (S.D.N.Y. July 23, 2018) | Appx. C-484-502 |
| 24. | *Rein v. Dutch Bros, Inc.*, 2024 WL 3105004 (S.D.N.Y. June 24, 2024) | Appx. C-503-525 |
| 25. | *Smallen v. W. Union Co.*, 2019 WL 1382823 (D. Colo. Mar. 27, 2019) | Appx. C-526-562 |
| 26. | *Utah Ret. Sys. v. McCollum*, 2023 WL 8649878 (5th Cir. Dec. 14, 2023) | Appx. C-563-567 |
| 27. | *Yang v. Nobilis Health Corp.*, 2021 WL 3619863 (5th Cir. Aug. 13, 2021) | Appx. C-568-571 |

# Case No. 1

Bailey v. Esperion Therapeutics, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3296235

2019 WL 3296235
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Kevin BAILEY, on behalf of himself, and
all others similarly situated, Plaintiffs,
v.
ESPERION THERAPEUTICS, INC., et al., Defendants.

Case No. 18-11438
|
Signed 02/19/2019

**Attorneys and Law Firms**

Joseph A. Hood, II, Jeremy A. Lieberman, Pomerantz LLP, New York, NY, for Plaintiffs.

Adam Slutsky, Deborah S. Birnbach, Ian Stearns, Katherine McKenney, Goodwin Procter LLP, Boston, MA, Matthew J. Boettcher, Plunkett & Cooney, Bloomfield Hills, MI, for Defendants Esperion Therapeutics, Inc., Timothy M. Mayleben, Richard B. Bartram.

Ian Stearns, Deborah S. Birnbach, Goodwin Procter LLP, Boston, MA, for Defendants Dov Goldstein, M.D., Daniel Janney, Roger S. Newton, Ph.D, Nicole Vitullo.

**ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS AMENDED COMPLAINT**

ROBERT H. CLELAND, UNITED STATES DISTRICT JUDGE

 **\*1**  This is a securities fraud action by a putative class of stock holders of the Defendant biopharmaceutical company, Esperion Therapeutics, Inc. Pending before the court is Defendants' Motion to Dismiss the Amended Complaint. (Dkt. #35.) Plaintiffs filed a response (Dkt. #38), and Defendants filed a reply (Dkt. #39). The court has reviewed the briefing and concludes that a hearing is unnecessary. *See* E.D. Mich. LR 7.1(f)(2). For the reasons stated below, the court will grant the motion.

**I. BACKGROUND**

This claim was brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder. 15 U.S.C. §§ 78j(b), 78(t)(a); 17 C.F.R. § 240.10b-5. (Dkt. #22.) Defendants are pharmaceutical company Esperion Therapeutics, Inc. and some of its key officers. (Dkt. #22, PageID 206–08.) Plaintiffs are those who purchased or acquired Esperion common stock between February 22, 2017 and May 22, 2018, when, they allege, its price was artificially inflated because of Defendants' materially false and misleading statements and omissions. (*Id.*, PageID 202, 224–52.)

The following facts are taken from Plaintiffs' Amended Complaint. (Dkt. #22.) Esperion is a company singularly focused on researching and developing a drug called bempedoic acid. The hope is that this LDL-cholesterol reducing compound would compete with Lipitor and other statins (a family of drugs that lower LDL-cholesterol). (*Id.*, PageID 202–03, 212.) Bempedoic acid works differently from other statins, and its value hinges largely on it producing fewer side effects than the LDL-cholesterol reducing drugs already on the market. (*Id.*, PageID 203, 213.) Accordingly, investors are principally concerned with the safety profile of bempedoic acid.

As part of the process to obtain Federal Drug Administration (FDA) approval to market a new drug, Esperion conducted a series of clinical tests on bempedoic acid, as well as a bempedoic acid/ezetimibe combination pill, to prove its safety and efficacy. (*Id.*, PageID 211, 214.) There are three phases to the clinical investigation process, with each phase having progressively refined goals and increased study populations. *See* 21 C.F.R. § 312.21. After these studies are completed, the company sponsoring the drug submits a New Drug Application (NDA) to the FDA for approval. *See* 21 C.F.R. § 314. The purpose of this application process is to "(a) [f]acilitate the approval of drugs shown to be safe and effective; and (b) ensure the disapproval of drugs not shown to be safe and effective." 21 C.F.R. § 314.2.

Esperion conducted its Phase 1 and 2 studies, and it then began its Phase 3 program in January 2016. (Dkt. #22, PageID 215–16.) The class period begins on February 22, 2017 and ends on May 22, 2018. (*Id.*, PageID 224, 249.) Defendants allege that during this time Esperion "trumpet[ed] bempedoic acid's safety and tolerability" despite "several red flags," and then, in May 2018, "revealed alarming safety results from the Phase 3 clinical trial" causing the share price to drop dramatically. (*Id.*, PageID 204–05, 252.)

Bailey v. Esperion Therapeutics, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3296235

## II. STANDARD

**\*2** A court may dismiss a complaint for "failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). "To survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint "requires more than labels and conclusions," and must allege facts that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 12(b)(6) acts "to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) (internal citation omitted).

Allegations of fraud are subject to heightened pleading requirements. Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Specifically, "the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Ind. State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942–43 (6th Cir. 2009) (internal citation omitted). The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b), contains additional pleading requirements for a securities fraud complaint, which will be identified and discussed below.

## III. DISCUSSION

Plaintiffs' Amended Complaint claims that Esperion violated § 10(b) of the Exchange Act and asserts derivative liability under § 20(a) against some of its officers. To state a § 10(b) claim, Plaintiffs "must allege that the defendants made material misrepresentations or omissions in connection with the sale of a security, that they did so with bad intent (*i.e.*, scienter), that the plaintiffs relied on the misrepresentations or omissions, and that they eventually suffered an economic loss as a result." *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 694 (6th Cir. 2017) (internal citation omitted). Defendants' Motion to Dismiss argues, among other

things, that Plaintiffs fail to adequately plead scienter under the PSLRA's heightened pleading requirements.

"In the securities-fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018) (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)). Recklessness, in turn, "is defined as highly unreasonable conduct which is an extreme departure from the standards of ordinary care ... akin to conscious disregard." *Id.* at 980 (internal quotation marks and citation omitted). The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

In analyzing a motion to dismiss a § 10(b) claim, the court accepts the complaint's factual allegations as true, views the complaint in its entirety, and "take[s] into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). "A strong inference of scienter 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.' " *Doshi*, 823 F.3d at 1039 (quoting *Tellabs, Inc.*, 551 U.S. at 314). The court also considers nine, non-exhaustive factors in determining whether a plaintiff adequately pleaded scienter:

**\*3** (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 6 of 573

Bailey v. Esperion Therapeutics, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3296235

personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Id.* at 1039–40 (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2011) (en banc)).

Here, Plaintiffs' theory of scienter is that Esperion knew about safety issues with its product, bempedoic acid, but repeatedly made statements that it was safe. (Dkt. #38, PageID 949–59.) Taking Plaintiffs' allegations in the complaint as true: Esperion knew about two deaths in Phase 2 by mid-2016; in mid-2017, Esperion made changes to its Phase 3 safety protocols because of serious and numerous adverse safety issues; and by late-2017, Esperion knew of deaths in Phase 3 and "out-of-control kidney filtration results." (Dkt. #22, PageID 216.) Esperion, on the other hand, argues that Plaintiffs fail to allege specific facts giving rise to a strong inference of scienter, providing only "a patchwork of generalized allegations from four confidential informants." (Dkt. #35, PageID 317.) As far as the *Helwig* factors, neither party contends that the fourth, fifth, seventh, and eighth factors are present here; they do not support an inference of scienter. That leaves the first, second, third, sixth, and ninth factors to be analyzed by the court.

The first *Helwig* factor is "insider trading at a suspicious time or in an unusual amount." *Doshi*, 823 F.3d at 1039. Plaintiffs allege that several Defendants "engaged in sizable, suspicious, and unusual sales of their Esperion common stock" during the class period. (Dkt. #22, PageID 204.) Specifically, the complaint identifies sales made by Defendants Goldstein, Janney, Newton, and Vitullo, who all served as directors on Esperion's Board and signed the company's filings with the U.S. Securities and Exchange Commission (SEC). (*Id.*, PageID 253–56.) Esperion argues that Plaintiffs "cherry-picked" these individuals, who are not specifically tied to the alleged fraud or named in the complaint's substantive allegations, because they happened to sell stock during the class period. (Dkt. #35, PageID 320–23.) The two key individual Defendants, CEO Mayleben and CFO Bartram, did not sell their stock during the class period and in fact significantly increased their holdings. (*Id.*)

Plaintiffs do not allege any facts that make the timing or amount of the sales by the four board directors particularly suspicious or unusual. The dates of the sales were spread throughout the class period: March 21 and 22, 2017; December 6, 15, and 18, 2017; January 25, 2018; and March 29, 2018. (Dkt. #22, PageID 253–56.) Nor do Plaintiffs allege any history of these Defendants' trading that would make the size of the sales notable. *See Konkol v. Diebold, Inc.*, 590 F.3d 390, 399 (6th Cir. 2009) (*abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48–50 (2011)). Over the course of the class period, Defendant Goldstein reduced his beneficial ownership of Esperion from 7.7% to less than 1%; Defendant Janney reduced his from 8% to 2.5%; Defendant Newton from 3.7% to 3.2%; and Defendant Vitullo from 10.4% to 4.4%. (Dkt. #22, PageID 253–56.) Meanwhile, Defendant Mayleben, the CEO of Esperion, increased his holdings by 31%, and Defendant Bartram, Esperion's CFO, increased his holdings by 53%. (Dkt. #35, PageID 322.)

**\*4** This factor does not support an inference of scienter. To the contrary, "[m]any courts have held that the inference of scienter is weak where an officer sells only a small fraction of the shares owned." *In re Credit Acceptance Corp. Secs. Litig.*, 50 F. Supp. 2d 662, 677 (E.D. Mich. April 23, 1999) (collecting cases). Moreover, courts have found "that the CEO and CFO would have been essential participants in any scheme, thus, their having sold no stock, undermines any suggestion of knowledge on the part of defendants due to the other sales." *In re Comshare, Inc. Secs. Litig.*, 1997 WL 1091468, at \*10 (E.D. Mich. Sept. 18, 1997). While Plaintiffs cite cases where courts "have declined dismissal simply because defendants claimed increased holdings during the class period," (Dkt. #38, PageID 955), those cases are distinguishable in that—unlike here—the CEO of the corporation was alleged to have sold stock during the class period. *See Willis v. Big Lots, Inc.*, 2016 WL 8199124 (S.D. Ohio Jan. 21, 2016); *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102 (S.D. Ohio Aug. 9, 2007).

Plaintiffs also argue that *Helwig* factor three, "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," *Doshi*, 823 F.3d at 1039, supports an inference of scienter. (Dkt. #38, PageID 948, 952.) They claim that "Defendants issued their misstatements starting on February 22, 2017, with the last misleading statement issued on April 13, 2018" and that "the revelation of inconsistent information" occurred on May 2, 2018 and May 22, 2018. (*Id.*, PageID 952.) The Sixth Circuit

2019 WL 3296235

notes that "a 'short turnaround ma[kes] it less likely that the corporation did not know that its statement was misleading.' " *Dougherty*, 905 F.3d at 981 (quoting *In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455, 484 (6th Cir. 2014)). It has identified a one-week turnaround as close in time but a four-month gap as not close in time. *Id.* (citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 684, 687–88 (6th Cir. 2005)). Here, because the issuance of dozens of similar statements over the course of 15 months falls far outside the time range of what constitutes a "short turnaround," this factor also does not weigh in Plaintiffs' favor.

Next, Plaintiffs argue that an inference of scienter is supported by the second and sixth *Helwig* factors: "divergence between internal reports and external statements on the same subject" and "disregard of the most current factual information before making statements." *Doshi*, 823 F.3d at 1039. They contend that because Esperion "received near-contemporaneous information regarding safety issues in the Phase 2 and 3 clinical trials ... including deaths occurring during the clinical trials," its statements that bempedoic acid was safe and well tolerated were made with scienter. (Dkt. #38, PageID 947–52.) Defendants respond that knowledge of safety events does not equate to acting with "a knowing and deliberate intent to manipulate, deceive, or defraud" or recklessness. (Dkt. #35, PageID 316–320.) Esperion claims that its statements reflected its reasonable and believed interpretation of the clinical trials, the results of which were publicly released. (*Id.*, PageID 324.)

Plaintiffs do not allege specific facts that show, or even suggest, Esperion did not believe what it stated. Esperion explains that the total number of adverse events, including fatalities, was not unexpected given the high-risk nature and medical history of the patient population. (*Id.*, PageID 312.) The cumulative results of the Phase 2 and Phase 3 trials indicated that there was a total of only 16 deaths out of more than 4,000 patients. (Dkt. #22, PageID 249.) Plaintiffs argue that these events were especially troubling because they "had overwhelmingly occurred in the drug group versus the placebo group during the trials," (Dkt. #38, PageID 952), but the disparity in deaths was merely 0.5% in the bempedoic-acid group compared to 0.2% in the placebo group. (Dkt. #22, PageID 249.) More importantly, Plaintiffs do not allege any facts contradicting Esperion's assertion that it was blinded to the data (i.e., did not know which patients experienced the events) until it was released. (Dkt. #35, PageID 310.) Without more, Esperion's knowledge of adverse events in ongoing

clinical trials does not strongly suggest that it acted with scienter in stating that bempedoic acid had been viewed as safe and well-tolerated.

**\*5** Finally, the court looks to *Helwig* factor nine, "the self-interested motivation of defendants in the form of saving their salaries or jobs." *Doshi*, 823 F.3d at 1040. Plaintiffs allege that Esperion's "future depends almost entirely on the successful clinical development, regulatory approval, and commercialization of bempedoic acid" and that "lucrative compensation and bonuses were based on advancing the FDA process." (Dkt. #22, PageID 203, 252.) Esperion characterizes this as a generic motive and argues that it fails to suggest "concrete benefits that could be realized," as required. (Dkt. #35, PageID 320.) The court finds that, as in *Dougherty*, "Plaintiffs' motive allegations are too general and speculative to support an inference of scienter under the ninth *Helwig* factor." *Dougherty*, 905 F.3d at 982. When "the courts distinguish motives common to corporations and executives generally from motives to commit fraud," they note that "an executive's desire to protect his position within a company or increase his compensation" is not a sufficient motive for fraud. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) (*abrogated on other grounds by Matrixx*, 563 U.S. at 48–50). Courts recognize that "earnings-based bonuses ... are common among executives and have limited probative value as to scienter." *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 835 (W.D. Mich. 2012) (internal citations omitted). The fact that Esperion wanted its key product to be successful, without more, does not raise an inference of fraud. *See In re Omnicare*, 769 F.3d at 484 ("If a well-pleaded complaint can allege only that a corporation intended to defraud based on a desire to continue earning money, without showing a particular link between the actual statement and a specific payment, then the heightened pleading standard for scienter has no bite.")

Reviewing "all the allegations holistically," the court determines that a reasonable person would not "deem the inference of scienter" presented by Plaintiffs as "cogent and at least as compelling" as the opposing inference presented by Defendants. *Matrixx*, 563 U.S. at 48 (quoting *Tellabs, Inc.*, 551 U.S. at 324–25). Plaintiffs' allegations implicate, at most, five of the *Helwig* factors and none of them provide significant support for inferring scienter against Esperion. Having failed to sufficiently plead scienter, Plaintiffs' § 10(b) claim must be dismissed. Consequently, Plaintiffs' derivative claim under § 20(a) against individual officers and directors of Esperion fails and must be dismissed as well. *See Doshi*,

**Bailey v. Esperion Therapeutics, Inc., Not Reported in Fed. Supp. (2019)**

2019 WL 3296235

823 F.3d at 1045 (citing *Ind. State Dist. Council of Laborers,* 583 F.3d at 947).

### IV. CONCLUSION

IT IS ORDERED that Defendants' Motion to Dismiss the Amended Complaint (Dkt. #35) is GRANTED. [1]

[1]  In an easily-overlooked final footnote, Plaintiff "seeks leave to amend under Rule 15." (Dkt. #38, PageID 960 n.13.) The proper way to move for such relief is to file a motion. *See* E.D. Mich. LR

15.1. The court deems the footnote "request" to be of no consequence and will not grant Plaintiffs leave to again amend the complaint. "Although [Federal Rule of Civil Procedure] 15 instructs courts to 'freely give leave' to amend, that liberal policy does not apply to the plaintiffs' one-sentence request." *Kuyat v. BioMimetic Therapeutics, Inc.,* 747 F.3d 435, 444 (6th Cir. 2014); *see also La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP,* 622 F.3d 471, 486 (6th Cir. 2010).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3296235

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 2

Burback v. Brock, Not Reported in Fed. Rptr. (2023)

2023 WL 4532803

2023 WL 4532803
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

Dennis BURBACK; Ken Eddy; Mark
Andersen, Plaintiffs—Appellants,

v.

Jordan BROCK; Four Oceans Holding, Incorporated;
Elepreneurs U.S., L.L.C.; Elevacity U.S., L.L.C.;
Sharing Services Global Corporation, formerly known as
Sharing Services, Incorporated, Defendants—Appellees.

No. 22-40609
|
FILED July 13, 2023

Appeal from the United States District Court for the Eastern
District of Texas, USDC No. 4:20-CV-946

**Attorneys and Law Firms**

Stephen W. Abbott, Attorney, Brent Taylor Caldwell, Bayko,
Prebeg, Faucett & Abbott, P.L.L.C., Houston, TX, for
Plaintiffs—Appellants.

John Whitney Bowdich, Esq., Bowdich & Associates,
P.L.L.C., Dallas, TX, Andrew Paul Speicher, Figari &
Davenport, L.L.P., Dallas, TX, for Defendant—Appellee
Jordan Brock.

Janet Douvas Chafin, Jackson Walker, L.L.P., Houston, TX,
Blake Dietrich, Jackson Walker, L.L.P., Dallas, TX, for
Defendants—Appellees Four Oceans Holding, Incorporated,
Elepreneurs, U.S., L.L.C., Elevacity U.S., L.L.C., Sharing
Services Global Corporation.

Before King, Smith, and Elrod, Circuit Judges.

**Opinion**

Per Curiam: [*]

[*]     This opinion is not designated for publication. See
5th Cir. R. 47.5.

**\*1** Plaintiffs appeal the dismissal of their claims alleging
securities fraud in connection with two investment schemes.
For the following reasons, we AFFIRM.

**I. Factual Background**

Plaintiffs-Appellants Dennis Burback, Ken Eddy, and
Mark Andersen ("Plaintiffs") are individual investors who
participated in two securities-related transactions that they
allege were actually part of two fraudulent schemes. The
first scheme involved the use of promissory notes (the "Note
Scheme"), while the second scheme is alleged to have been
related to the first and involved the purchase of stock (the
"Stock Scheme").

The Note Scheme was carried out by Robert Oblon and
Defendant-Appellee Jordan Brock, who are both alleged
to have convinced Plaintiffs to purchase promissory notes
based on false representations and insufficient disclosures.
Specifically, Oblon represented to Plaintiffs that FourOceans
Global, LLC ("Global"), a multilevel marketing travel
company that he founded, was insolvent and on the brink of
collapse and that Plaintiffs' investments were critical to its
survival. In September 2015, Plaintiffs each entered into a
note purchase agreement promising various forms of payment
from and equity ownership in Global in exchange for $33,333.
Plaintiffs allege that they were misled by Oblon and Brock as
to the legitimacy of Global's business in the months leading
up to their signing the note purchase agreements. By March
2016, it "became apparent to Plaintiffs" that Global "would be
a failure." Around this time, Oblon transferred Global's assets
to Defendants-Appellees Elevacity U.S., L.L.C. ("Elevacity")
and Elepreneurs U.S., L.L.C. ("Elepreneurs"), two other
multilevel marketing companies that he founded, without
first informing Plaintiffs. Plaintiffs never received any return
on their investment, nor the return of their principal, in
connection with the Note Scheme. According to Plaintiffs,
Oblon, Brock, and others instead used this money for their
own personal gain and to make Ponzi-like payments to
investors that were similarly situated as Plaintiffs in order to
perpetuate the Note Scheme.

The Stock Scheme is alleged to have begun in about February
or March 2018. Plaintiffs had made repeated requests for
updates regarding the status of the Note Scheme, expressing
concern as to "irregularities" surrounding their investments.
In March and April 2018, Brock spoke with Eddy over the
phone, stating that no irregularities existed and that he, Oblon,
and John "JT" Thatch had a "plan" to convert Plaintiffs'
ownership and equity interests in Global into stock in a
new company, Sharing Services, Inc., founded by Oblon.
Sharing Services, Inc., which would later become Defendant-

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 11 of 573

**Burback v. Brock, Not Reported in Fed. Rptr. (2023)**

2023 WL 4532803

Appellee Sharing Services Global Corporation ("Sharing Services"), had already acquired Four Oceans Holding, Inc. ("Holding"), Global's successor in interest; Elevacity; and Elepreneurs in October 2017.

In June 2018, Plaintiffs attended a conference call with Brock and Jeff Bollinger. During the call, Brock explained that he and Bollinger would be taking over for Oblon as Plaintiffs' point of contact. Bollinger then told Plaintiffs that Global had since been dissolved but that Plaintiffs would receive new stock in Sharing Services. Bollinger explained, though, that Plaintiffs could not directly receive Sharing Services stock and would instead need to complete their transaction with an intermediary company so as not to raise any concerns with the SEC. According to Bollinger, as a part of this plan, Plaintiffs would have to assign their interests in Global over to Custom Travel Holdings, Inc. ("Custom Travel") if they ever wanted to recover their initial investments in the Note Scheme.

 **\*2**  Each Plaintiff subsequently entered into a subscription agreement in which additional consideration (apart from that already expended in the Note Scheme) was exchanged for stock in Custom Travel. Plaintiffs never received Custom Travel stock certificates. At some point prior to the subscription agreements' execution, Brock and Bollinger "made clear" to Plaintiffs that they knew that Custom Travel would soon be acquired by Sharing Services, explaining that this was not public knowledge, Plaintiffs were not supposed to know about the acquisition, but that Plaintiffs would not be in violation of SEC rules. In a June 2019 conference call, Brock informed Plaintiffs that Sharing Services would not be acquiring Custom Travel and that all of Plaintiffs' investments in connection with both the Note and Stock Schemes were lost.

In December 2020, Plaintiffs filed an 11-count complaint (the "Complaint") in the United States District Court for the Eastern District of Texas naming, *inter alia*, Holding, Elepreneurs, Elevacity, Sharing Services (collectively, the "Entity Defendants"), Brock (collectively, with the Entity Defendants, the "Defendants"), Oblon, Bollinger, Thatch, Custom Travel, and Global as defendants. The Complaint asserts claims for federal securities fraud in violation of § 10(b) of the Exchange Act and SEC Rule 10b-5, and claims for statutory fraud, common law fraud, fraud by nondisclosure, unjust enrichment, civil conspiracy, aiding and abetting, accounting, constructive trust, and breach of fiduciary duty under Texas law. Brock and Thatch subsequently moved to dismiss the Complaint.

The district court partially granted the motions in September 2021 (the "First Dismissal Order"). The court first dismissed the federal securities fraud claim against Brock relating to the Note Scheme, holding that the claim was filed past the applicable five-year statute of repose. The court next dismissed the federal securities fraud claims against both Brock and Thatch relating to the Stock scheme, explaining that neither claim was sufficiently pleaded in accordance with the heightened pleading standards for fraud. The court then determined that the state law fraud claims were similarly not well pleaded and dismissed these claims against both defendants. The remaining claims brought against the movants were dismissed as well. Each claim that the court dismissed was dismissed without prejudice, save for the federal securities claim brought against Brock relating to the Note Scheme.

Plaintiffs filed an eight-count amended complaint in October 2021 (the "Amended Complaint") with factual allegations that, for the purpose of this appeal, mostly hew to those in the Complaint. Notably, though, Thatch is no longer named as a defendant in the Amended Complaint. Like the Complaint, the Amended Complaint contains claims for federal securities fraud, and state claims for statutory fraud, common law fraud, fraud by nondisclosure, unjust enrichment, civil conspiracy, and breach of fiduciary duty; the remaining claims from the Complaint have been eliminated. Plaintiffs bring a new claim for "joint and several liability for knowing participation and assisting in Brock's and Oblon's fraudulent conduct and breaches of fiduciary duties" in the amended complaint as well. Brock and the Entity Defendants subsequently moved to dismiss the Amended Complaint.

The court fully granted both motions in July 2022 with prejudice (the "Second Dismissal Order"). The court first addressed the claims brought against Brock, beginning by dismissing the lone federal securities fraud claim against him for the same reason it did in the First Dismissal Order, explaining that Plaintiffs again failed to meet the heightened pleading standards for fraud. The court likewise dismissed Plaintiffs' state fraud claims as it did in the First Dismissal Order. Turning to the Entity Defendants' motion, the court ruled that all claims pertaining to Brock's actions must be dismissed because it had already held that the Amended Complaint did not adequately plead the underlying claims against Brock. The court then dismissed the claims against the Entity Defendants as they pertained to Oblon, holding that the Amended Complaint failed to sufficiently link Oblon's

**Burback v. Brock, Not Reported in Fed. Rptr. (2023)**

2023 WL 4532803

actions to the Entity Defendants. The court dismissed the remaining claims against the Defendants as well.

**\*3** Following the Second Dismissal Order, the parties filed a joint stipulation dismissing the remainder of the claims with prejudice. Plaintiffs now appeal the dismissal of their federal securities fraud claim relating to the Note Scheme against Brock in the First Dismissal Order and raise various points of error in the Second Dismissal Order.

## II. Discussion

We review a district court's grant or denial of a motion to dismiss for failure to state a claim under Rule 12(b)(6) *de novo. Whitley v. BP, P.L.C.,* 838 F.3d 523, 526 (5th Cir. 2016). To survive such a motion, a complaint must allege enough facts, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, the complaint must include "factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). Conclusory statements or " 'naked assertion[s]' devoid of 'further factual enhancement' " are insufficient. *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557). "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint pleading facts "that are 'merely consistent with' a defendant's liability ... 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557). Whether the plausibility standard has been met is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Fraud claims are subject to heightened pleading requirements. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(b).* "This Court interprets Rule 9(b) strictly, requiring a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the

statements were made, and explain why the statements were fraudulent." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 339 (5th Cir. 2008) (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.,* 302 F.3d 552, 564–65 (5th Cir. 2002)). "Although Rule 9(b) expressly allows scienter to be 'averred generally', simple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b)." *Id.* (quoting *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir. 1994)). "The plaintiffs must set forth specific facts supporting an inference of fraud." *Id.* (quoting *Melder,* 27 F.3d at 1102). "Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant." *Id.* (quoting *Herrmann Holdings,* 302 F.3d at 565). "If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief. However, this luxury must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Id.* (quoting *Tuchman v. DSC Commc'ns Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994)).

**\*4** Federal securities fraud claims are subject to additional pleading requirements under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which "enhances the particularity requirements of Rule 9(b)." *Id.; see* 15 U.S.C. § 78u-4(b). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, under the PSLRA,

> in any private action ... in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. [1]

*Id.* § 78u-4(b)(2)(A).

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 13 of 573

Burback v. Brock, Not Reported in Fed. Rptr. (2023)

2023 WL 4532803

1      Subject to exceptions inapplicable to the case at bar. *See* 15 U.S.C. § 78u-4(b)(2)(A) & (B).

**A. The Contours of the Appeal**

As an initial matter, the parties disagree as to whether Plaintiffs may challenge any of the district court's holdings in the First Dismissal Order. "If [a] district court dismisse[s] [a] claim on the merits or with prejudice, [a] plaintiff may appeal that ruling without needing to include the claim in a later amended complaint." *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 787 F.3d 716, 724 (5th Cir. 2015) (citing *Williams v. Wynne*, 533 F.3d 360, 365 (5th Cir. 2008)); *see also* 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1476 (3d ed. 2023) ("A rule that a party waives all objections to the court's dismissal if the party elects to amend is too mechanical and seems to be a rigid application of the concept that a Rule 15(a) amendment completely replaces the pleading it amends. Without more, the action of the amending party should not result in completely denying the right to appeal the court's ruling."). But if a claim is dismissed without prejudice due to a "technical defect or voluntary withdrawal, [a] plaintiff forfeits the right to appeal if it files an amended complaint omitting that claim." *Lincoln Gen. Ins.*, 787 F.3d at 724 (citing *Wilson v. First Hous. Inv. Corp.*, 566 F.2d 1235, 1238 (5th Cir. 1978), *vacated on other grounds*, 444 U.S. 959 (1979)). Here, the First Dismissal Order dismissed the federal securities fraud claim relating to the Note Scheme against Brock with prejudice. Therefore, Plaintiffs were not required to replead that claim in order to preserve the issue of its dismissal for appeal. Accordingly, we begin by addressing the district court's dismissal of that claim, *i.e.*, Plaintiffs' only challenge to the First Dismissal Order, and then turn to Plaintiffs' appeal of the Second Dismissal Order.

**B. The First Dismissal Order**

In its First Dismissal Order, the district court dismissed the federal securities fraud claim relating to the Note Scheme against Brock because it was filed outside of the time prescribed by the applicable statute of repose.

Claims arising under the Exchange Act involving "fraud, deceit, manipulation, or contrivance in contravention of a

regulatory requirement concerning the securities laws ... may be brought not later than the earlier of ... (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). The outer, five-year bound in § 1658 is a statute of repose, which "begin[s] to run on the date of the last culpable act or omission of the defendant." *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 & n.1 (2018) (alteration in original) (quoting *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017)); *Hall v. Variable Annuity Life Ins. Co.*, 727 F.3d 372, 375 n.4 (5th Cir. 2013). Any prohibited conduct or omission under § 10(b) of the Exchange Act and its attendant regulation, SEC Rule 10b-5, must occur "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Prohibited conduct or omissions are " 'in connection with' the purchase or sale of securities if there is a relationship in which the fraud and the stock sale coincide or are more than tangentially related." *Roland v. Green*, 675 F.3d 503, 520 (5th Cir. 2012) (quoting *Madden v. Cowen & Co.*, 576 F.3d 957, 965–66 (9th Cir. 2009)), *aff'd sub nom. Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014).

**\*5** The Complaint alleges that Plaintiffs executed the note purchase agreements for the Note Scheme in September 2015, more than five years before they filed the Complaint in December 2020. Plaintiffs counter that Brock engaged in post-sale "lulling activities" to cover up the fraudulent nature of the Note Scheme, becoming the latest conduct relevant to the statute of repose and occurring within five years of the Complaint's filing. Specifically, Plaintiffs point to the transfer of Global's assets to Elevacity and Elepreneurs and the later transaction where those three entities were acquired by Sharing Services. But we fail to see how those actions (and other post-September 2015 statements or conduct) were connected to the execution of the note purchase agreements. Importantly, the pleadings do not sufficiently allege a connection between these post-sale actions and the original sale, *i.e.*, that these events were all linked as parts of a fraudulent scheme. Plaintiffs rely on allegations that are either conclusory or that the heightened pleading standards of Rule 9(b) and the PSLRA deem inadequate to establish such a connection.[2]

2      Representative allegations include:

[T]he statements (and omissions) made by these defendants ... propagated the impression that Plaintiffs were investing in a legal and legitimate enterprise and not ... a scheme to take their investments and transfer

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 14 of 573

**Burback v. Brock, Not Reported in Fed. Rptr. (2023)**

2023 WL 4532803

[Global's] assets, secretly or otherwise ..., to Elepreneurs, Elevacity, and/or [Holding], which were ultimately sold to [Sharing Services], with no remuneration to Plaintiffs as equity owners in [Global].

...

Each Plaintiff was presented with a unified, consistent set of exaggerations, misrepresentations and omissions about their investment, how their investments would be spent, that [Global] was an ongoing, legitimate business, and there was no mention that the assets of [Global] would be secretly transferred to one or more entities (secret or otherwise), ... which would be sold to [Sharing Services] with no remuneration as equity owners in [Global].

Plaintiffs also contend that the district court erred in considering Brock's argument that the Complaint's allegations relating to the Note Scheme and not implicated by the statute of repose were not in connection with the purchase or sale of any security. According to Plaintiffs, Brock forfeited this argument because he raised it for the first time on reply below. But this mischaracterizes the nature of Brock's argument, which was consistent throughout his briefing: that the Complaint was devoid of well-pleaded allegations concerning the Note Scheme occurring within five years of its filing. In the opening brief on his first motion to dismiss, Brock argued that Plaintiffs' claim was "barred by the 5-year statute of repose" because it was "entirely based on an alleged fraudulent scheme to induce Plaintiffs to invest $33,333 in [Global] by executing separate Note Purchase Agreements ... on or about September 10, 2015." He contended that *all* relevant allegations regarding the fraudulent scheme "occurred *before* the September 2015 transaction." Implicit in this argument is that the Complaint's remaining allegations do not relate to the Note Scheme or invoke § 10(b) and Rule 10b-5. Brock only explicitly referred to the language "in connection with the purchase or sale of any security" in his reply brief because Plaintiffs' opposition brief relied on allegations that were wholly divorced from that requirement but would otherwise fall within the five-year window. Plaintiffs' briefing on the motion is further proof that they were on notice of Brock's argument and were not prejudiced. In their initial opposition to Brock's motion, they explicitly addressed his argument regarding which culpable acts or omissions triggered the statute of repose. And Plaintiffs restated their arguments in a sur-reply where they incorrectly averred (as they do here) that Brock's argument had been forfeited.

The Complaint's federal securities fraud claim against Brock was correctly dismissed for being filed outside the five-year statute of repose.

### C. The Second Dismissal Order

#### 1. Federal Securities Fraud Claims Relating to the Stock Scheme

**\*6** The district court dismissed the federal securities fraud claim relating to the Stock Scheme against Brock, holding that the allegations in the Amended Complaint failed to meet the heightened pleading standards for fraud. Because the Entity Defendants were alleged to be implicated in this scheme through Brock under an alter ego theory of liability, the court dismissed the parallel claims brought against them as well. Plaintiffs raise two points of error in the court's analysis. First, they argue that that court inadequately addressed their theories of Defendants' "scheme liability" and "lulling activities." Second, they contend that the court did not consider an SEC filing that they assert bolstered their claims.

#### a. Theories of "Scheme Liability" and "Lulling Activities"

Section 10(b) prohibits using or employing "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe" "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). The SEC's implementing regulation, Rule 10b-5, provides three general means of liability under § 10(b):

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.

"To state a securities-fraud claim under section 10(b), and Rule 10b–5, plaintiffs must plead (1) a misstatement or

2023 WL 4532803

omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004). "A fact is material if there is 'a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.' " *Id.* (quoting *Grigsby v. CMI Corp.*, 765 F.2d 1369, 1373 (9th Cir. 1985)). "Materiality 'depends on the significance the reasonable investor would place on the withheld or misrepresented information.' " *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). "[T]he required state of mind [for scienter] is an intent to deceive, manipulate, defraud or severe recklessness." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (second alteration in original) (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009)).

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 536 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)). "To withstand a 12(b)(6) motion to dismiss, the required 'strong inference' of severe recklessness must be 'more than merely "reasonable" or "permissible"— it must be cogent and compelling, thus strong in light of other explanations.' " *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). "A reviewing court therefore must 'take into account plausible inferences opposing as well as supporting a strong inference of scienter.' " *Id.* (quoting *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)). "A complaint will survive only if the inference of scienter is 'at least as compelling as any opposing inference one could draw from the facts alleged.' '[A] tie favors the plaintiff.' " *Id.* (citation omitted) (alteration in original) (first quoting *Tellabs*, 551 U.S. at 324; and then quoting *Lormand*, 565 F.3d at 254).

*7 In its Second Dismissal Order, the district court held that the Amended Complaint did not contain non-conclusory allegations demonstrating that any of Brock's statements were false when made or that he otherwise had knowledge of those statements' falsity. The court similarly held that Plaintiffs could not establish Brock's scienter, ruling that the Amended Complaint's allegations concerning Brock's roles with Global and Sharing Services; receipt of shares in Sharing Services, Inc. that were later converted into Sharing Services shares; "knowledge of the fraudulent schemes"; and the benefits Sharing Services received because of those schemes did not meet Rule 9(b) or the PSLRA's heightened pleading requirements. Specifically, the court correctly determined that this collection of allegations was rooted in Brock's roles with Global and Sharing Services, and that "[s]cienter in a particular case may not be footed solely on motives universal to corporate executives." *Ind. Elec.*, 537 F.3d at 544. The court also correctly ruled that the allegations pertaining to the various forms of compensation Brock received, including his shares in Sharing Services, could not create a strong inference of scienter because the Amended Complaint did not allege the value of this compensation nor how it was connected to the Stock Scheme. *See id.* ("Incentive compensation packages may be considered in conjunction with other scienter allegations but only in an extraordinary case is it probative." (citation omitted)).

Plaintiffs contend that the district court neglected to consider extra-circuit caselaw that they argue supports the proposition that "lulling activities" may constitute evidence of scienter. In *United States v. Kelley*, 551 F.3d 171 (2d Cir. 2009) (per curiam), the defendant orchestrated a scheme in which he misled clients regarding their investments and subsequently produced fallacious account statements to lull them into believing that their investments were safer than they were. *Id.* at 172–73. The Second Circuit held that the district court did not abuse its discretion in admitting into evidence the account statements that had been produced two-to-four years following the purchase of securities, reasoning that although the dissemination of those statements alone could not establish a securities violation, they were relevant evidence because they "tended to demonstrate [the defendant's] intent to defraud his clients and the scope of the schemes he employed." *Id.* at 172, 175–76.

*Kelley* is inapposite, mainly because it is an evidentiary holding. It also lacks facts that are analogous to those in our case: there, the government had established a scheme to defraud that the district court determined involved post-sale

Burback v. Brock, Not Reported in Fed. Rptr. (2023)

2023 WL 4532803

account statements, whereas here, Plaintiffs have failed to adequately plead a fraudulent scheme (at all) to which post-sale lulling activities would attach. The other caselaw cited by Plaintiffs is similarly inapt because the court in each case was convinced of a scheme to defraud in which lulling activities were based. *See, e.g., SEC v. Holschuh*, 694 F.2d 130, 143–44 (7th Cir. 1982) (district court properly considered post-sale lulling activities that were "part of a single scheme or plan ... relat[ing] back to ... earlier fraudulent conduct"); *United States v. Riedel*, 126 F.2d 81, 82–83 (7th Cir. 1942) ("We are satisfied, however, that the evidence shows, and rather clearly, that the scheme was not over.... Avoidance of detection and prevention of recovery of money lost by the victims are within, and often a material part of, the illegal scheme."); *United States v. Jones*, 712 F.2d 1316, 1320–21 (9th Cir. 1983) ("Several investors testified that they relied on the mailings as demonstrating that [their investment] was doing well and that they had made a good investment.... [T]he defendants here had an interest in the bank mailings which lulled investors into complacency regarding [their investment]. The mailings furthered the fraud ....").

Plaintiffs do not otherwise meaningfully refute the district court's analysis; instead, they assert that it failed to account for their allegations pertaining to sections (a) and (c) of Rule 10b-5, which they refer to as "scheme liability." But the allegations that the district court deemed insufficient are the same that underpin Plaintiffs' theory of "scheme liability." Accordingly, Plaintiffs' legal theories do not disturb the district court's analysis.

### b. Consideration of the SEC Filing

**\*8** Plaintiffs assert that the district court erroneously failed to consider an SEC filing that was attached to their Amended Complaint ("Exhibit M").

"[A] district court 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs*, 551 U.S. at 322).

Exhibit M is a Form 10-Q that Sharing Services filed with the SEC in December 2019 summarizing the firm's performance for the third quarter of that year. Plaintiffs point to two

passages from Exhibit M that were quoted in the Amended Complaint and which they argue were overlooked by the district court. The first passage states that, in January 2019, Sharing Services "became aware of an unliquidated amount of potential liability arising from a series of cash advance loan transactions ... entered into by eight different lending sources and a Related Party entity ... owned and/or controlled by a former Company officer." The Amended Complaint alleges that, upon information and belief, this former company officer was either Brock or Oblon. The second passage states that, in June 2019, Sharing Services

> became aware of a potential liability arising out of certain previous transactions involving the formation and capitalization of two legal entities affiliated with a Company consultant who was, at the time, considered the Company spokesperson. Without the knowledge of the Company and in contravention of the express provisions of both the Company's Bylaws and the controlling Nevada Revised Statutes, this Company consultant purportedly solicited investment funds from various persons, who at the time, were independent contractors of the Company.... The Company believes that it is probable that these actions have resulted in a material loss to the investing parties and is evaluating the potential exposure of these events to the Company.

The Amended Complaint alleges that, upon information and belief, this company consultant was Oblon. According to Plaintiffs, both of these passages sufficiently allege Defendants' scienter and amount to a "public acknowledgment of fraud."

We disagree. The cited passages from Exhibit M contain no ostensible fraudulent activity. And even assuming that they do, it is not apparent that they are in any way related to the Note or Stock Schemes. The Amended Complaint is likewise devoid of any well-pleaded allegations connecting these events to the Note or Stock Schemes. There was thus

Case 4:24-cv-01940  Document 44-4  Filed on 01/27/25 in TXSD  Page 17 of 573

Burback v. Brock, Not Reported in Fed. Rptr. (2023)

2023 WL 4532803

no need for the district court to discuss Exhibit M or its citations in the Amended Complaint because, without more, it is wholly irrelevant to Plaintiffs' claims. [3]

> [3]  Plaintiffs argue that the district court was also required to take judicial notice of Exhibit M due to it being an SEC filing. *See Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) (approving of a district court taking judicial notice of a Form 10-K filed with the SEC on a motion to dismiss). A full analysis of this issue would be redundant considering that Exhibit M was both explicitly cited in and incorporated by reference into the Amended Complaint, and our reasoning above would be equally applicable regardless.

**\*9** Accordingly, the district court did not err in dismissing the federal securities fraud claims in the Second Dismissal Order.

### 2. State Fraud Claims Relating to the Note Scheme

Plaintiffs dispute the district court's dismissal of their state fraud claims relating to the Note Scheme due to the applicable statute of limitations.

The statute of limitations for fraud claims in Texas is four years. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(4). Under the discovery rule exception to the statute of limitations, accrual of a cause of action is deferred "until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Berry v. Berry*, 646 S.W.3d 516, 524 (Tex. 2022) (quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)).

The note purchase agreements were signed more than four years before filing the Complaint, which was thus filed after the statute of limitations had already run. Plaintiffs argue, however, that the discovery rule tolled the statute of limitations because they "learned of previously unknown ... facts" just "days before filing suit." Specifically, they point to a demand letter attached to the Amended Complaint that was sent to Brock in December 2020 shortly before the Complaint was filed. But Plaintiffs fail to identify which relevant facts they became aware of within four years of filing the Complaint, including those facts they first learned upon receipt of the demand letter. Plaintiffs must provide well-pleaded facts in support of their claims, including an invocation of the discovery rule; a failure to do so deprives the defense of fair notice and, relatedly, an opportunity to respond. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988) ("A defendant who has established that the suit is barred cannot be expected to anticipate the plaintiff's defenses to that bar."). Furthermore, it is not apparent that any of the facts discussed in the demand letter are related to the Note Scheme. Therefore, the district court did not err in dismissing the state fraud claims regarding the Note Scheme pursuant to the applicable statute of limitations.

### III. Conclusion

Having found no error in the district court's rulings, the judgments are AFFIRMED.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 4532803

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 3

2024 WL 4285900
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Vincent DANG, et al., Plaintiffs,

v.

AMARIN CORPORATION PLC, et al., Defendants.

Civil Action No. 21-19212 (RK) (TJB)
|
Signed September 25, 2024

**Synopsis**

**Background:** Investors brought consolidated putative class action on behalf of themselves and all others similarly situated against pharmaceutical company and three of its officers under Securities Exchange Act of 1934, alleging company and officers made material misstatements or omissions about company's pharmaceutical product, development in product-related patent litigation, and company's financial prospects. Company and officers filed motion to dismiss for failure to state a claim.

**Holdings:** The District Court, Robert Kirsch, J., held that:

[1] allegedly materially false and misleading statements by company and officers expressing belief about strength of company's patents did not support claim for securities fraud;

[2] investors' allegations that company only received patents due to withholding of material information concerning the relevant prior art from the United States Patent and Trademark Office (USPTO) did not support claim for securities fraud;

[3] allegedly materially false and misleading statements and omissions by company and officers expressing belief about strength of company's patent were brought under safe harbor under Private Securities Litigation Reform Act (PSLRA) by cautionary warnings;

[4] allegedly materially false and misleading statements by company and officers that pharmaceutical product made by company were "the single most significant advance" in preventative cardiovascular care and that study results showed a "new paradigm in treatment" did not support securities fraud claim;

[5] allegedly materially false and misleading statements by company's officers that company's "unique" properties of pharmaceutical product differentiated it from existing available products did not support claim for securities fraud;

[6] allegedly materially false and misleading statements by company's officers regarding company's financial prospects did not support claim for securities fraud; and

[7] investors' allegations that officers were focused on product and on winning patent infringement litigation did not carry inference that officers knew or recklessly disregarded patents' vulnerabilities and thus did not support strong inference of scienter.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (73)

**[1]** **Federal Civil Procedure** 🔑 **Insufficiency in general**

To survive a motion to dismiss for failure to state a claim, a pleading's factual allegations must be enough to raise a right to relief above the speculative level. Fed. R. Civ. P. 12(b)(6).

**[2]** **Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

A complaint alleging fraud claims is subject to a heightened pleading standard under Federal Rule of Civil Procedure applicable to such claims, independent of the standard applicable to motions to dismiss for failure to state a claim. Fed. R. Civ. P. 9(b), 12(b)(6).

**[3]** **Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

A party alleging fraud must support its allegations with the who, what, when, where and how of the events at issue in order to comply with heightened pleading standard under Federal Rule

of Civil Procedure applicable to fraud claims. Fed. R. Civ. P. 9(b).

**[4]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Heightened pleading standard required under Federal Rule of Civil Procedure applicable to fraud claims ensures that defendants are placed on notice of the precise misconduct with which they are charged and safeguards defendants against spurious charges of fraud. Fed. R. Civ. P. 9(b).

**[5]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

The heightened pleading standard required under Federal Rule of Civil Procedure applicable to fraud claims is rigorously applied in securities fraud cases. Securities Exchange Act of 1934 §§ 10, 20, 20A, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1; 17 C.F.R. § 240.10b-5; Fed. R. Civ. P. 9(b).

**[6]    Securities Regulation** 🔑 Pleading

Plaintiffs alleging securities fraud pursuant to the Securities Exchange Act of 1934 must also comply with the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA), which imposes another layer of factual particularity to allegations of securities fraud. Securities Exchange Act of 1934 §§ 10, 20, 20A, 21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5.

**[7]    Securities Regulation** 🔑 Pleading

**Securities Regulation** 🔑 Scienter

To allege fraud under the Private Securities Litigation Reform Act (PSLRA), a plaintiff must state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud. Securities

Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4 et seq.

**[8]    Federal Civil Procedure** 🔑 Matters considered in general

**Summary Judgment** 🔑 Motion to dismiss

While a district court may normally not consider matters extraneous to the pleadings at the motion-to-dismiss stage, it may rely on documents that are integral to or explicitly relied upon in the complaint without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(b)(6).

**[9]    Federal Civil Procedure** 🔑 Matters considered in general

Whether matters extraneous to the pleadings may be considered at the motion-to-dismiss stage turns on whether the claims in the complaint are based on an extrinsic document and not merely whether the extrinsic document was explicitly cited. Fed. R. Civ. P. 12(b)(6).

**[10]    Federal Civil Procedure** 🔑 Matters considered in general

The purpose of the rule that documents that are integral to or explicitly relied upon in the complaint may be considered by a district court at the motion-to-dismiss stage is to prevent a plaintiff from maintaining a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent. Fed. R. Civ. P. 12(b)(6).

**[11]    Evidence** 🔑 As establishing truth of facts or matters noticed in general

It is improper for a district court to take judicial notice of the veracity and validity of a public document's contents when the parties dispute the meaning and truth of the contents. Fed. R. Evid. 201(b).

**[12]**  **Federal Civil Procedure** 🔑 Matters considered in general

Only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at the motion-to-dismiss stage. Fed. R. Civ. P. 12(b)(6); Fed. R. Evid. 201(b).

**[13]**  **Evidence** 🔑 Securities

Court would take judicial notice of SEC filings that were filed prior to the class period in putative class action against pharmaceutical company and three of its officers under Securities Exchange Act of 1934, alleging company and officers made material misstatements or omissions about company's pharmaceutical product, development in product-related patent litigation, and company's financial prospects; amended complaint heavily discussed conduct of company and officers that took place prior to class period to support its allegations that statements by company and officers were misleading, disclosures in challenged SEC filings were relevant, and court could take judicial notice of them for purpose of establishing that disclosures they contained were publicly available. Securities Exchange Act of 1934 §§ 10, 20, 20A, 21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5; Fed. R. Evid. 201(b).

More cases on this issue

**[14]**  **Evidence** 🔑 Issuance and registration of copyrights, patents, and trademarks

Court would take judicial notice of documents from company's patent prosecution proceedings in putative class action against pharmaceutical company and three of its officers under Securities Exchange Act of 1934, alleging company and officers made material misstatements or omissions about company's pharmaceutical product, development in product-related patent litigation, and company's financial prospects; complaint extensively discussed proceedings

before United States Patent and Trademark Office (USPTO), including forms filed by company during patent application process, examiner's rejections of application, and company's submissions in response, and documents were integral to complaint's claim that company and officers concealed a study from USPTO. Securities Exchange Act of 1934 §§ 10, 20, 20A, 21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5; Fed. R. Evid. 201(b).

More cases on this issue

**[15]**  **Evidence** 🔑 Notice not taken

Court would not take judicial notice of two documents from patent infringement litigation in putative class action against pharmaceutical company and three of its officers under Securities Exchange Act of 1934, alleging company and officers made material misstatements or omissions about company's pharmaceutical product, development in product-related patent litigation, and company's financial prospects, although investors argued that company and officers used documents to make inappropriate merits-based argument and factual assertions; a review of company's and officers' brief showed that one document was not mentioned in the argument at all, and the other document was only mentioned in a final footnote listing arguments not made. Securities Exchange Act of 1934 §§ 10, 20, 20A, 21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5; Fed. R. Evid. 201(b).

More cases on this issue

**[16]**  **Evidence** 🔑 Securities

Court would not take judicial notice of fifteen publicly-available reports from market analysis regarding status of patent infringement litigation and analysts' investment recommendations regarding company's pharmaceutical product in putative class action against pharmaceutical company and three of its officers under Securities Exchange Act of 1934, alleging company and officers made material misstatements or

2024 WL 4285900

omissions about company's pharmaceutical product, development in product-related patent litigation, and company's financial prospects; company and officers appeared to rely on documents for truth of analysts' statements that company's litigation position was strong and officers' statements about litigation were reasonable. Securities Exchange Act of 1934 §§ 10, 20, 20A, 21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5; Fed. R. Evid. 201(b).

More cases on this issue

**[17]    Evidence** 🔑 Issuance and registration of copyrights, patents, and trademarks

Court would take judicial notice of study, referenced by company in form submitted to United States Patent and Trademark Office (USPTO) as part of company's patent application, in putative class action against company and three of its officers under Securities Exchange Act of 1934, alleging company and officers made material misstatements or omissions about company's pharmaceutical product, development in product-related patent litigation, and company's financial prospects; study was integral to complaint, and investors' claims were premised on company's and officers' alleged concealment of study from USPTO by allegedly burying it among hundreds of other studies provided to patent examiner and then allegedly failing to disclose this vulnerability in company's patent to investing public. Securities Exchange Act of 1934 §§ 10, 20, 20A, 21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5; Fed. R. Evid. 201(b).

More cases on this issue

**[18]    Evidence** 🔑 Securities

Court would not take judicial notice of pre-arranged trading plans adopted by senior vice president and executive vice president of company prior to class period in putative class action against company and three of its officers under Securities Exchange Act of 1934, alleging company and officers

made material misstatements or omissions about company's pharmaceutical product, development in product-related patent litigation, and company's financial prospects, although company and officers argued that because publicly filed forms referenced trading plans, latter could be judicially noticed despite fact they were not publicly filed; company and officers offered no authority suggesting that document not publicly filed and not relied on in amended complaint could be judicially noticed. Securities Exchange Act of 1934 §§ 10, 20, 20A, 21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5; Fed. R. Evid. 201(b).

More cases on this issue

**[19]    Evidence** 🔑 Securities

A district court may take judicial notice of properly-authenticated public disclosure documents filed with the United States Securities and Exchange Commission (SEC) because the documents are required by law to be filed with the SEC, and no serious questions as to their authenticity can exist. Fed. R. Evid. 201(b).

**[20]    Evidence** 🔑 Matters referred to or incorporated by pleadings

Court would take judicial notice of three annexes submitted by company and officers with their opposition brief that listed which of company's and officers' statements they argued were not actionable misstatements or omissions in putative class action against company and three of its officers under Securities Exchange Act of 1934 alleging company and officers made material misstatements or omissions about company's pharmaceutical product, development in product-related patent litigation, and company's financial prospects; those annexes were permissible organizational tools, and given volume of statements relevant to case by virtue of their inclusion in amended complaint, attempt by company and officers to organize their arguments that applied to some statements but not others was well taken. Securities Exchange Act of 1934 §§ 10, 20, 20A,

21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5; Fed. R. Evid. 201(b).

More cases on this issue

**[21]    Evidence** 🔑 **Matters referred to or incorporated by pleadings**

Court would not take judicial notice of three annexes submitted by company and officers with their opposition brief in putative class action against company and three of its officers under Securities Exchange Act of 1934 alleging company and officers made material misstatements or omissions about company's pharmaceutical product, development in product-related patent litigation, and company's financial prospects; those annexes contained information either not derived from exhibits submitted by company and officers or derived from exhibits court could not consider at that time. Securities Exchange Act of 1934 §§ 10, 20, 20A, 21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5; Fed. R. Evid. 201(b).

More cases on this issue

**[22]    Securities Regulation** 🔑 **Manipulative, Deceptive or Fraudulent Conduct**

To survive a motion to dismiss, a plaintiff bringing a securities fraud claim under the Securities Exchange Act of 1934 must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentations or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) and causation. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5; Fed. R. Civ. P. 12(b)(6).

**[23]    Securities Regulation** 🔑 **Employers; respondeat superior**

In a securities fraud case, a corporation is liable for statements by employees who have apparent authority to make them. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[24]    Securities Regulation** 🔑 **Materiality**
**Securities Regulation** 🔑 **Materiality of violation**

To state a securities fraud claim under the Securities Exchange Act of 1934, a plaintiff must adequately allege that the defendant made a material misrepresentation or omission. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[25]    Securities Regulation** 🔑 **Materiality**
**Securities Regulation** 🔑 **Materiality of violation**

A statement or omission of fact is material under the Securities Exchange Act of 1934 if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[26]    Securities Regulation** 🔑 **Misrepresentation**
**Securities Regulation** 🔑 **Matters to Be Disclosed**

A statement or omission only gives rise to liability under the Securities Exchange Act of 1934 if it was misleading at the time it was made; liability cannot be imposed on the basis of subsequent events. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[27]    Securities Regulation** 🔑 **Pleading**

The element of a material misrepresentation or omission, as required to state a securities fraud claim under the Securities Exchange Act of 1934, is subject to the exacting pleading requirements

of the Private Securities Litigation Reform Act (PSLRA). Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

**[28]**  **Securities Regulation** ☞ Pleading

The purpose of the heightened pleading requirement of the Private Securities Litigation Reform Act (PSLRA) is to ensure that private securities actions do not become a partial downside insurance policy against the vicissitudes of the market. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

**[29]**  **Securities Regulation** ☞ Facts or opinions
**Securities Regulation** ☞ Matters to Be Disclosed

The contours of what qualifies as an actionable misstatement are well articulated; an opinion is actionable under the Securities Exchange Act of 1934 if it (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[30]**  **Securities Regulation** ☞ Facts or opinions

In determining whether a plaintiff has adequately alleged that defendant has made a material misrepresentation or omission, as required to state a securities fraud claim under the Securities Exchange Act of 1934, a district court must distinguish material representations from statements that constitute no more than puffery and are understood by reasonable investors as such. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[31]**  **Securities Regulation** ☞ Facts or opinions

Allegedly materially false and misleading statements by company and officers expressing belief about strength of company's patents did not support claim for securities fraud in violation of Securities Exchange Act of 1934 in putative class action; statements that company believed litigation was going "very favorably," that company was "vigorously" litigating its claims, that rulings "strengthened" its position, that its arguments were "persuasive," that the litigation offered no "negative surprises," and that company had "a reasonable shot at winning" put forward company's belief about strength of its patents rather than asserting positive knowledge about what outcome of litigation would be and clearly constituted opinions rather than statements of fact. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[32]**  **Patents** ☞ Failure to disclose material information
**Securities Regulation** ☞ Facts or opinions

Opinions by company and officers expressing belief about strength of company's patents were not made in bad faith and thus did not support claims of securities fraud in violation of Securities Exchange Act of 1934; rule providing company owed duty of candor and good faith in dealing with United States Patent and Trademark Office (USPTO) required that company disclose relevant information to examiner, company did so by submitting study on competing product with its form to USPTO, investors failed to allege company ran afoul of rule by submitting study as one among several hundred documents filed with USPTO, they failed to allege bad faith or intentional misconduct, and disclosure of hundreds of patents and publications is entirely consistent with company fulfilling its duty to disclose. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[33] Securities Regulation** 🗝️ **Matters to Be Disclosed**

Investors' allegations that company only received patents for pharmaceutical product because company and officers withheld material information concerning the relevant prior art from the United States Patent and Trademark Office (USPTO) did not support claim for securities fraud in violation of Securities Exchange Act of 1934 in putative class action; investors pointed to nothing from patent infringement litigation to suggest patents' invalidation was foregone conclusion over six years of litigation, and finding opinions of company and officers actionable based on bare fact that company ultimately lost patent infringement litigation would constitute impermissible fraud by hindsight. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[34] Securities Regulation** 🗝️ **Matters to Be Disclosed**

Investors' allegations that company only received patents for pharmaceutical product because company and officers withheld material information concerning the relevant prior art from the United States Patent and Trademark Office (USPTO) did not support claim for securities fraud in violation of Securities Exchange Act of 1934 in putative class action; review of USPTO record revealed strong indications that patent examiner reviewed submitted prior art, examiner stamped references company submitted, including one listing study on competing product, with phrase "all references considered," and his search notes reflected he searched company's submissions for name of drug administered in and discussed by study. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[35] Securities Regulation** 🗝️ **Scienter**

Investors' allegations that company and officers knew that company's patents were issued in error and that company would not succeed in its patent infringement litigation did not support claim for securities fraud in violation of Securities Exchange Act of 1934 in putative class action; investors failed to plead with particularity facts that demonstrated company's and officers' actual knowledge and failed to allege any confidential witness, internal document, or any other contemporaneous source showing anyone within company at any point did not believe in the patents, let alone that study on competing product would have been fatal to their patent if it had been considered. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5; Fed. R. Civ. P. 9(b).

More cases on this issue

**[36] Securities Regulation** 🗝️ **Forecasts, estimates, predictions or projections**

Allegedly materially false and misleading statements and omissions by company and officers expressing belief about strength of company's patents did not support claim for securities fraud in violation of Securities Exchange Act of 1934 in putative class action; in same breath as language investors relied on for their claims, company and officers also disclosed risks inherent in litigation and potential that patent would not be successful, cautionary statements were not limited to generic disclosures buried in company's filings with United States Securities and Exchange Commission (SEC), and statements referred investors to their SEC disclosures which offered standard warnings that company might not receive or be able to defend its patents. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[37] Securities Regulation** 🗝️ **Forecasts, estimates, predictions or projections**

Allegedly materially false and misleading statements and omissions by company and

officers expressing belief about strength of company's patent were brought under safe harbor under Private Securities Litigation Reform Act (PSLRA) by cautionary warnings and thus did not subject company to liability for securities fraud in putative class action brought under Securities Exchange Act of 1934; each of the alleged statements was a forward-looking statement, addressing company's intent to defend its patents, its belief or hope for how litigation would proceed, and its belief as to whether it would succeed in litigation and on appeal, and each alleged statement was accompanied with meaningful, specific warnings disclosing specific risks. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

More cases on this issue

[38] **Securities Regulation** 👉 Forecasts, estimates, predictions or projections

The safe harbor for forward-looking statements under the Private Securities Litigation Reform Act (PSLRA) overlaps with the "bespeaks caution" doctrine, under which cautionary language, if sufficient, renders the alleged forward-looking omissions or misrepresentations immaterial as a matter of law. Securities Exchange Act of 1934 § 21E, 15 U.S.C.A. § 78u-5(i)(1).

[39] **Securities Regulation** 👉 Forecasts, estimates, predictions or projections

Under both the Private Securities Litigation Reform Act (PSLRA) and the bespeaks caution doctrine, cautionary language must be extensive, specific, and directly related to the alleged misrepresentation in order to render alleged forward-looking misrepresentation immaterial as a matter of law. Securities Exchange Act of 1934 § 21E, 15 U.S.C.A. § 78u-5(i)(1).

[40] **Securities Regulation** 👉 Facts or opinions

Allegedly materially false and misleading statements and omissions by company and

officers expressing belief about strength of company's patents did not support claim for securities fraud in violation of Securities Exchange Act of 1934 in putative class action; investors failed to sufficiently allege company and investors lacked a reasonable basis for their opinions and thus failed to sufficiently allege company and investors had actual knowledge that their statements were false or misleading. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

[41] **Securities Regulation** 👉 Facts or opinions

Allegedly materially false and misleading statements by company and officers that pharmaceutical product made by company was "the single most significant advance" in preventative cardiovascular care and that study results showed a "new paradigm in treatment" did not support securities fraud claim under Securities Exchange Act of 1934 in putative class action; statements were inactionable puffery. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

[42] **Securities Regulation** 👉 Facts or opinions

Vague and general statements of optimism constitute no more than "puffery" and are understood by reasonable investors as such; such statements, even if arguably misleading, do not give rise to a federal securities claim under the Securities Exchange Act of 1934 because they are not material. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[43] **Securities Regulation** 👉 Facts or opinions

Statements that a drug product is "unique," "far superior" to other generic drugs, should do "very well" and will be "well received" are puffery and thus do not give rise to a federal securities claim under the Securities Exchange Act of 1934 because they are not the kind of statements

that a reasonable investor would have relied upon. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[44]** **Securities Regulation** 👉 Misrepresentation

Statements by company's officers that company's "unique" properties of pharmaceutical product differentiated it from existing available products, allegedly materially false and misleading because only reason product received patents in first place was that company allegedly withheld material information from United States Patent and Trade Office (USPTO) examiner, did not support claim for securities fraud in violation of Securities Exchange Act of 1934 in putative class action; investors failed to plead with particularity facts demonstrating that officers did not honestly believe or lacked a reasonable basis to believe patents would be upheld, and statements that product was unique were opinions which company and officers had reasonable belief to express. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5; Fed. R. Civ. P. 9(b).

More cases on this issue

**[45]** **Securities Regulation** 👉 Matters to Be Disclosed

Statements by company's officers that company's "unique" properties of pharmaceutical product differentiated it from existing available products, allegedly materially false and misleading due to company's knowledge that product's positive effects were not unexpected given results of study on competing product made of same fatty acid extracted from fish, did not support securities fraud claim under Securities Exchange Act of 1934 in putative class action; claim that company concealed study from USPTO by burying it in reference list of prior art was unsupported by any particular allegations, and claim that company concealed two other studies was contradicted by fact that they were public knowledge and admittedly disclosed by company and officers. Securities Exchange Act

of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[46]** **Securities Regulation** 👉 Misrepresentation

Allegedly false and misleading statements by company's officers that company's "unique" properties of pharmaceutical product differentiated it from existing available products in reducing likelihood of cardiovascular events did not support securities fraud claim under Securities Exchange Act of 1934 in putative class action; company sought and eventually received patent protection for product based on results of trial showing that company's pharmaceutical product showed reduction in triglycerides, and decision in patent infringement litigation did not render those statements false as it did not touch on product's qualities or characteristics for reducing cardiovascular risk. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[47]** **Securities Regulation** 👉 Misrepresentation

Investors' allegations that company did not invent purified ingredient in pharmaceutical product or discover any of its medical characteristics did not support claim for securities fraud in violation of Securities Exchange Act of 1934 in putative class action; investors failed to cite to any statements by company or its employees suggesting that they invented ingredient or discovered its medical characteristics, and allegations failed to identify anything materially misleading. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[48]** **Securities Regulation** 👉 Misrepresentation

Allegedly materially false and misleading statements by company's officers that publications showed that the clinical effects of the active ingredient in company's

pharmaceutical product were unique did not support securities fraud claim under Securities Exchange Act of 1934 in putative class action; complaint alleged statement was false in that product was not unique, but statement referred to compound product contained in product rather than to product itself. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[49]**   **Securities Regulation** 👈 Materiality of violation

In determining whether a statement was materially false and misleading as required to state a securities fraud claim under Securities Exchange Act of 1934, a district court must read the alleged misstatements in the context in which they were made. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[50]**   **Securities Regulation** 👈 Facts or opinions

Allegedly materially false and misleading statements by company's officers regarding company's financial prospects based on results of trial showing that use of product reduced likelihood of cardiovascular events did not support securities fraud claim under Securities Exchange Act of 1934 in putative class action; challenged statements all expressed company's and officer's belief in scope of product's success in light of trial's results, investors' arguments tied back to claim that company failed to disclose it could lose patent protection which was, in turn, based on unsubstantiated claim that undisclosed study on competing product was fatal to company's patent claim, and challenged statements were all inactionable opinions. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[51]**   **Securities Regulation** 👈 Matters to Be Disclosed

Allegedly false and misleading statements by company and its officers about company's financial prospects based on results of trial showing use of product reduced likelihood of cardiovascular events did not support securities fraud claim under Securities Exchange Act of 1934 in putative class action; investors failed to allege any facts supporting assertion that company and officers understood company's patents could not withstand scrutiny of litigation, mere existence of study on competing product was insufficient to plead they had such knowledge and was not risk they were required to disclose to investing public, and while projections were predicated on company's ability to maintain its patents, that risk was disclosed in SEC filings and concurrently with cited statements in complaint. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5; Fed. R. Civ. P. 9(b).

More cases on this issue

**[52]**   **Securities Regulation** 👈 Facts or opinions
**Securities Regulation** 👈 Matters to Be Disclosed

Whether a plaintiff has alleged securities fraud under Securities Exchange Act of 1934 turns on whether he has adequately alleged that an opinion (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[53]**   **Securities Regulation** 👈 Scienter

To survive dismissal of a securities fraud claim under the Securities Exchange Act of 1934, a plaintiff must also adequately plead "scienter," which is the defendant's intention to deceive, manipulate, or defraud, requiring a knowing or reckless state of mind. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

2024 WL 4285900

**[54]**   **Securities Regulation**  ☞  Scienter

The particularity standard for pleading scienter under the Private Securities Litigation Reform Act (PSLRA) is met only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2).

**[55]**   **Securities Regulation**  ☞  Scienter

In evaluating whether the particularity standard for pleading scienter under the Private Securities Litigation Reform Act (PSLRA) is met, a district court conducts its analysis holistically to determine whether the complaint's allegations, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2).

**[56]**   **Securities Regulation**  ☞  Scienter

Omissions and ambiguities count against inferring scienter when district court evaluates whether particularity standard for pleading scienter under the Private Securities Litigation Reform Act (PSLRA) is met. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2).

**[57]**   **Securities Regulation**  ☞  Scienter

"Conscious misbehavior" that would support a strong inference of scienter under Private Securities Litigation Reform Act (PSLRA) involves intentional fraud or other deliberate illegal behavior. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2).

1 Case that cites this headnote

**[58]**   **Securities Regulation**  ☞  Scienter

A "reckless" statement that would support a strong inference of scienter under Private

Securities Litigation Reform Act (PSLRA) is one involving not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2).

1 Case that cites this headnote

**[59]**   **Securities Regulation**  ☞  Scienter

Investors' allegations that officers were focused on product and on winning patent infringement litigation did not carry inference that officers knew or recklessly disregarded patents' vulnerabilities and thus did not support strong inference of scienter in putative class action alleging securities fraud under Securities Exchange Act of 1934; decision on importance of study on competing product, whether to submit it to United States Patent & Trademark Office (USPTO), and whether to separately raise it in communications with patent examiner were granular details within broader context of patent litigation, and investors offered no particularized allegations that officers were ever asked about study or involved in any decisions about how to use it in patent prosecution. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[60]**   **Securities Regulation**  ☞  Scienter

Under the "core operations" doctrine, misstatements and omissions made on core matters of central importance to the company and its high-level executives give rise to an inference of scienter under Private Securities Litigation Reform Act (PSLRA) when taken together with additional allegations connecting the executives' positions to their knowledge. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

**[61]    Securities Regulation** 🔑 Scienter

The core operations doctrine is insufficient by itself to establish scienter under Private Securities Litigation Reform Act (PSLRA) but should be taken into consideration when viewing the entirety of a complaint's allegations of securities fraud under the Securities Exchange Act of 1934. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

**[62]    Securities Regulation** 🔑 Scienter, Intent, Knowledge, Negligence or Recklessness

The core operations doctrine does not permit imputing the requisite scienter under the Private Securities Litigation Reform Act (PSLRA) regarding any statement made within a broad perimeter of the relevant core operations to an executive. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

**[63]    Securities Regulation** 🔑 Scienter

Investors' allegations regarding departures from company by president and executive vice president did not support strong inference of scienter in putative class action alleging securities fraud under Securities Exchange Act of 1934, although officers both left company seven months after court of appeals affirmed decision invalidating product's patents; complaint did not allege departures were either contemporaneous with announcement of bad news or accompanied by any punishment, loss in patent infringement litigation did not reveal any wrongdoing by company or officers, such as concealment of study on competing product or suspicion patents were invalid, and district court's decision citing study was issued over one year before officers' departures. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[64]    Securities Regulation** 🔑 Scienter

While motive and opportunity do not offer an independent route to scienter, particularized allegations regarding motive and opportunity may, in combination with other allegations, support a strong inference of scienter under Private Securities Litigation Reform Act (PSLRA). Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

**[65]    Securities Regulation** 🔑 Scienter

Although a district court will not infer fraudulent intent from the mere fact that some officers sold stock, if the stock sales were unusual in scope or timing, they may support an inference of scienter under the Private Securities Litigation Reform Act (PSLRA); whether a sale is unusual in scope depends on factors such as the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved, as well as whether the sales were normal and routine, and whether the profits were substantial relative to the seller's ordinary compensation. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

**[66]    Securities Regulation** 🔑 Scienter

Investors' allegations regarding stock sales by president, senior vice president, and executive vice president supported a weak inference of scienter in putative class action alleging securities fraud under Securities Exchange Act of 1934; value of stock that officers sold was over $83 million, a significant amount, size of sales in comparison to officers' holdings was unusual, senior vice president and executive vice president sold significant portions of their holdings on the day results of trial demonstrating product's reduction in likelihood of cardiovascular events was announced, and president and executive vice president had not sold any stock in two years prior to that day. Securities Exchange Act of 1934 §§ 10, 21E,

2024 WL 4285900

15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[67]  Securities Regulation  👈 Scienter**

Circumstances surrounding stock sales by president, senior vice president, and executive vice president mitigated suspiciousness of sales and lessened inference of scienter in putative class action alleging securities fraud under Securities Exchange Act of 1934; class period stretched 31 months, executive stock sales following rise in stock price was not unexpected, president, who made vast majority of challenged statements, did not sell any stock on day results of trial demonstrating product's reduction in likelihood of cardiovascular events were announced, and significant portion of alleged suspicious sales and almost entirety of senior vice president's and executive vice president's sales were of officers' stock options that vested as intended part of overall compensation package. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[68]  Securities Regulation  👈 Scienter**

Circumstances surrounding stock sales by president, senior vice president, and executive vice president mitigated suspiciousness of sales and lessened inference of scienter in putative class action alleging securities fraud under Securities Exchange Act of 1934; publicly filed forms noted that every trade of all three officers, except for approximately $2.4 million of sales by president, were made pursuant to a trading plan, previously adopted by officers, consistent with terms of rule providing way for insiders of publicly-traded corporations to buy or sell company stock without violating insider trading laws. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[69]  Securities Regulation  👈 Scienter**

Trades of stock made under automatic trading plans, consistent with terms of rule providing way for insiders of publicly-traded corporations to buy or sell company stock without violating insider trading laws, are of minimal value in establishing an inference of scienter under Private Securities Litigation Reform Act (PSLRA). Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

**[70]  Securities Regulation  👈 Scienter**

A plaintiff cannot sidestep automatic trading plans, made under rule providing way for insiders of publicly-traded corporations to buy or sell company stock without violating insider trading laws, by conclusory allegations of strategic use of the plans in order to lessen inference of scienter in putative class action alleging securities fraud under Securities Exchange Act of 1934. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

**[71]  Securities Regulation  👈 Scienter**

Investors' allegations that company and officers bet company on receiving and maintaining patent protection when they allegedly knew patents could be undone by consideration of single study they allegedly failed to disclose was implausible and thus did not support strong inference of scienter in putative class action alleging securities fraud under Securities Exchange Act of 1934; history of company's prosecution of its patent application and defense of same in patent infringement litigation evidenced significant efforts company put into receiving patents over decade before district court's decision invalidating patent, and allegations also referenced company's significant investment in building infrastructure to accommodate expanded application and demand for product. Securities Exchange Act of 1934 §§ 10, 21E, 15 U.S.C.A. §§ 78j(b), 78u-5(c); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[72]  Securities Regulation**  👉  In general; control persons

Control person liability is derivative of underlying securities fraud claim based on materially false and misleading statements or omissions by the controlled person under Securities Exchange Act of 1934. Securities Exchange Act of 1934 §§ 10, 20, 20A, 21D, 15 U.S.C.A. §§ 78j(b), 78t(a), 78t-1, 78u-4 et seq.; 17 C.F.R. § 240.10b-5.

**[73]  Securities Regulation**  👉  Pleading

Insider trading claims against corporate insiders fail where plaintiffs fail to adequately plead a predicate securities fraud claim based on materially false and misleading statements or omissions under Securities Exchange Act of 1934. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**Attorneys and Law Firms**

Christopher A. Seeger, Christopher L. Ayers, Seeger Weiss LLP, Ridgefield Park, NJ, for Plaintiff 1199 SEIU Health Care Employees Pension Fund.

Edward Y. Kroub, Mizrahi Kroub LLP, New York, NY, for Plaintiff Vincent Dang.

Thomas Henry Przybylowski, Pomerantz LLP, New York, NY, for Plaintiff Todd Dorfman.

Christopher A. Seeger, Seeger Weiss LLP, Ridgefield Park, NJ, for Plaintiff Warren Drabek.

Eric Todd Kanefsky, Calcagni & Kanefsky LLP, Newark, NJ, for Defendant Joseph T. Kennedy.

Eric Todd Kanefsky, Martin Benjamin Gandelman, Calcagni & Kanefsky LLP, Newark, NJ, for Defendants Amarin Corporation PLC, John F. Thero, Michael W. Kalb.

**OPINION**

KIRSCH, District Judge

**\*1  THIS MATTER** comes before the Court on a Motion to Dismiss the Amended Class Action Complaint (the "Motion") filed by Defendants Amarin Corporation plc ("Amarin"), John F. Thero, Michael W. Kalb, and Joseph T. Kennedy (together, "Defendants"). (ECF No. 58.) The Court has carefully considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED** and all three counts of the Amended Consolidated Class Action Complaint (the "Amended Complaint"), (Am. Compl., ECF No. 50), are **DISMISSED** without prejudice.

**I. BACKGROUND**

This is a putative securities fraud class action brought on behalf of purchasers of Amarin's American Depositary Shares ("ADSs") during a two-and-a-half year period from September 24, 2018 to April 12, 2021 (the "Class Period"). Plaintiffs are the 1199SEIU Health Care Employees Pension Fund and Warren Drabek ("Drabek"). The suit alleges that Defendants—Amarin and three of its officers—made material misstatements or omissions about Amarin's pharmaceutical product Vascepa, developments in Vascepa-related patent litigation, and Vascepa's financial prospects. These assurances allegedly caused Amarin's share prices to remain artificially high, during which time the officers sold millions of dollars' worth of Amarin stock. When Amarin lost litigation over certain of its patents for Vascepa, the company's share price dropped and Plaintiffs suffered significant losses.

The facts below are taken from the Amended Complaint and assumed to be true solely for the purposes of deciding the pending Motion.

**A. AMARIN AND VASCEPA**

Amarin is a pharmaceutical company whose only product is Vascepa, a purified fish oil made up of 96% eicosapentaenoic acid ("EPA"), an omega-3 fatty acid extracted from fish. (Compl. ¶¶ 2, 28–29.) Pure EPA is known to "lower triglycerides and lipoproteins in the blood without increasing

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 33 of 573
Dang v. Amarin Corporation plc, --- F.Supp.3d ---- (2024)
2024 WL 4285900

cholesterol." (*Id.* ¶ 2.) One type of lipoprotein, an apolipoprotein called "ApoB," moves cholesterol throughout the body, including "bad" cholesterol called high-density lipoprotein cholesterol ("LDL-C"). (*Id.* ¶ 33.) People with elevated levels of triglycerides, ApoB, and LDL-C are at a higher risk for heart attacks and strokes, and use of pure EPA is known to "decrease[ ] the risk of cardiovascular events, strokes, and other negative medical outcomes." (*Id.* ¶¶ 2, 33.)

In 1990, a Japanese company launched a purified EPA product called Epadel in Japan; studies in the early 2000s showed that Epadel had positive results in lowering triglycerides, lipoproteins, cholesterol, and cardiovascular risk. (*Id.* ¶¶ 3, 35.) Amarin has acknowledged that Epadel is pharmacologically equivalent to Vascepa. (*Id.* ¶ 35.) Several studies of Epadel, of which Amarin was aware, showed the positive effects of pure EPA on different patient populations. (*Id.* ¶¶ 3, 35–36.)

In 2013, Amarin launched Vascepa as the first purified EPA drug introduced to the U.S. market. (*Id.* ¶¶ 2–3.) The Amended Complaint alleges that since 2013, Vascepa has been Amarin's "only actual or prospective product" and that the company's profitability depended solely on Vascepa's success, resulting in the company's executives and investors focusing exclusively on issues surrounding Vascepa. (*Id.* ¶¶ 29–30; *see also id.* ¶¶ 156–69 (alleging Vascepa's importance to Amarin and its executives and quoting Defendants' statements about Vascepa).)

## B. MARINE TRIAL AND NEW CHEMICAL ENTITY APPLICATION

**\*2** In late 2009, Amarin launched a clinical trial entitled "Efficacy and Safety of AMR101 (Ethyl Icosapentate) in Patients With Fasting Triglyceride (Tg) Levels ≥ 500 and ≤ 2000 mg/dL" (the "MARINE Trial") to demonstrate that Vascepa meaningfully reduces triglyceride levels in patients with severely high triglyceride levels. (*Id.* ¶ 51.) While studies in Japan had already established that pure EPA would reduce triglyceride levels, the MARINE Trial was the first U.S. study to do so. (*Id.*) The MARINE Trial concluded in July 2011, after which Amarin submitted the trial data to the U.S. Food and Drug Administration ("FDA"). (*Id.* ¶¶ 51–52.) On July 26, 2012, the FDA approved Vascepa for treatment of patients with severely high triglyceride levels. (*Id.* ¶ 52.) Amarin was the first company to gain FDA approval for an EPA drug in the United States. (*Id.* ¶ 51.)

## C. PATENT APPLICATION BEFORE THE USPTO AND THE KURABAYASHI STUDY

Amarin applied for a U.S. patent for Vascepa in 2010. (*Id.* ¶ 53.) Receiving patent protection would grant Amarin intellectual property rights as the patent owner, along with a 20-year market exclusivity period for Vascepa. (*Id.* ¶¶ 5, 38, 45, 50.)

To qualify for patent protection, a drug invention must be useful, novel, and non-obvious. (*Id.* ¶ 45.) A drug invention is useful if it provides a tangible benefit. (*Id.* (citing 35 U.S.C. § 101).) A drug invention is novel if it is not currently "in public use, on sale, or otherwise available to the public." (*Id.* (quoting 35 U.S.C. § 102).) Finally, a drug invention is non-obvious when it is "distinct enough from existing drug[ ] inventions] that its invention would not be obvious to 'a person having ordinary skill in the art to which the claimed invention pertains.' " (*Id.* (quoting 35 U.S.C. § 103).) When assessing the obviousness prong, a patent examiner considers the "prior art," which comprises all "information known publicly before the effective filing date of a U.S. patent application," including information contained in foreign patents and patent applications, journal articles, and scientific papers. (*Id.* ¶ 46 (citation not provided).) Also relevant are whether there are "secondary considerations" of non-obviousness, including "unexpected results created by the claimed invention." (*Id.* ¶ 47.) [1]

[1]     *See also* 35 U.S.C. § 103 (A patent is invalid as obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (whether a patent claim is obvious requires considering (1) "the scope and content of the prior art"; (2) "the level of ordinary skill in the pertinent art"; (3) the "differences between the prior art and the claims at issue"; and (4) "[s]uch secondary considerations as commercial success, long-felt but unsolved needs, [and the] failure of others").

An applicant seeking a patent must submit an application to the U.S. Patent and Trademark Office ("USPTO"), whose examiners assess whether the application merits patent protection. (*Id.* ¶ 45.) During the application process,

an applicant must file a Form PTO-1449 ("Form 1449") disclosing prior art "known to the applicant to be material to the patentability of the claims in the application." (*Id.* ¶ 54.) Form 1449's requirement dovetails with the "duty of candor and good faith in dealing with the USPTO" laid out in 37 C.F.R. § 1.56 ("Rule 56"), which likewise requires disclosure of information material to patentability. (*Id.* ¶ 49.) The Amended Complaint alleges that an applicant would violate Rule 56 if they were to "engage in 'inequitable conduct,' or intentionally mislead the USPTO about material information." (*Id.*) Plaintiffs state that "[o]ne form of inequitable conduct is to 'bury' highly material prior art in a long list of references in an effort to conceal the piece of material prior art from the examiner." (*Id.*)

**\*3** Amarin submitted its patent application related to Vascepa to the USPTO in February 2010. (*Id.* ¶ 53.) The application was titled "Methods of Treating Hypertriglyceridemia." (*Id.*) As Plaintiffs allege, the "crux" of the patent application was a method of treating patients with heightened triglyceride levels—between 500 and 1,500 mg/dL—with "4 grams of 96% purified EPA over a 12-week period." (*Id.*) From its initial application, Amarin claimed that the MARINE Trial resulted in "a reduction in triglycerides and ApoB without raising LDL-C levels." (*Id.*) The patent examiner rejected Amarin's application four times between June 20, 2011 and March 2, 2012. (*Id.* ¶¶ 56–70.) After each rejection, Amarin made new submissions responding to the bases on which the examiner rejected the application. (*Id.*) As the Amended Complaint describes, the examiner's first two rejections rested in part on the fact that based on the prior art, it was obvious that EPA administration would reduce triglycerides without increasing LDL-C levels. (*Id.* ¶¶ 56, 58.) Plaintiffs allege that in its responses to the first and second rejections, Amarin "focused almost exclusively" on how the reduction of triglycerides and decrease or non-increase in LDL-C from Vascepa was not "obvious in light of the prior art." (*Id.* ¶ 62; *see also id.* ¶¶ 57, 60.) After the third and fourth rejections, Amarin "dramatically changed its strategy" to argue in its third and fourth responses that the reduction in ApoB—rather than the non-increase in LDL-C —was unexpected and merited patent protection. (*Id.* ¶ 63; *see id.* ¶¶ 64–66, 68–70.)

After Amarin responded to the fourth rejection, the USPTO granted Vascepa's patents on July 26, 2012. (*Id.* ¶¶ 7, 68.) In the official Notice of Allowance published several months later, the examiner agreed with Amarin that a reduction in ApoB from treatment with purified EPA was an unexpected

result. (*Id.* ¶ 71.) The examiner wrote that the "prior art is either silent or teaches that there is no statistically significant change in Apo-B levels when patients with [triglyceride] levels less than 150 mg/dl or between 150-499 mg/dl are treated with [ ] 96% pure ethyl-EPA ...." (*Id.* ¶ 71 (emphasis omitted) (quoting the examiner's decision).) While the examiner found that "the claims in the patent were *prima facie* obvious based on the prior art," the unexpected result (a secondary consideration) of the reduction in ApoB helped overcome the *prima facie* finding of obviousness. (*Id.*)[2]

> [2]
> Amarin subsequently received additional patents related to Vascepa, which were continuations of this first patent. (Am. Compl. ¶ 72.) The District Court decision invalidating these patents, described below, describes the patents, which are each entitled "methods of treating hypertriglyceridemia." *Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 449 F. Supp. 3d 967, 971–72 (D. Nev. 2020).

As part of its application, Amarin submitted its first Form 1449 to the USPTO on May 23, 2011 that included 29 previously published studies and 6 previously issued U.S. patents. (*Id.* ¶ 55.) Shortly afterwards, Amarin submitted a second Form 1449 on June 3, 2011—several weeks before the examiner rejected Amarin's application for the first time —that included over 300 references to prior art studies and papers and over 50 previously issued U.S. and foreign patents. (*Id.*) Among the references in its second Form 1449, Amarin included a paper published in 2000 about a Japanese study entitled "[EPA] Effect on Hyperlipidemia in Menopausal Japanese Women" (the "Kurabayashi Study"). (*Id.* ¶¶ 6, 35, 55.) The Amended Complaint alleges that the Kurabayashi Study "found that pure EPA lowers triglycerides without increasing LDL-C but also has a 'stimulatory effect on lipoprotein degradation' which resulted in significantly lower ApoB levels ...." (*Id.* ¶ 35 (citation not provided).) Amarin was aware of the Kurabayashi Study "well before" it applied for a patent, as it "cited to [the study] as evidence to investors that Vascepa could treat patients with elevated triglycerides." (*Id.* ¶ 6.)

Plaintiffs allege that Amarin violated its duty of candor to the USPTO by not specifically raising and discussing the Kurabayashi Study in its multiple responses to the patent examiner, in which Amarin discussed its argument that a reduction in ApoB was unexpected and not supported by the prior art. (*Id.* ¶¶ 64–70.) The Amended Complaint quotes

Amarin's submissions to the USPTO, in which Amarin wrote that the "claimed reduction in [ApoB] is unexpected in view of the prior art of record" and discussed studies other than the Kurabayashi Study, (*id.* ¶ 64), and that "the successful reduction of apoB compared to a control group was entirely unexpected," (*id.* ¶ 66 (emphasis omitted)). Plaintiffs allege that Amarin "concealed" the Kurabayashi Study by "burying" it in the reference list of prior art included with its June 2011 Form 1449, (*id.* ¶ 7), even though the study "demonstrated the exact outcome that Amarin claimed was unexpected," (*id.* ¶ 65).

### D. NEW CHEMICAL ENTITY STATUS AND THE NEVADA PATENT LITIGATION

**\*4** While seeking patent protection for its treatment method using Vascepa, Amarin also applied to the FDA to designate Vascepa as a new chemical entity ("NCE"). (*Id.* ¶ 4.) This designation is available for a drug with an active ingredient the FDA has not previously approved. (*Id.* ¶ 42.) Classification as an NCE grants a drugmaker five years of regulatory exclusivity, during which time competitors cannot apply to the FDA to sell generic versions of the drug without conducting their own trials. (*Id.* ¶¶ 4, 42.) However, a competitor filing an Abbreviated New Drug Application ("ANDA") for a drug that is the bioequivalent of a patent-protected, designated NCE may certify that the patent for the NCE is invalid, unenforceable, or otherwise will not be infringed by the sale of the competitor's drug (a "Paragraph IV Certification"). (*Id.* ¶¶ 41–43.) In that case, the competitor may file their ANDA after only four years of NCE exclusivity, after which the patent holder may sue the ANDA-filer for patent infringement. (*Id.* ¶¶ 43–44.)

On July 26, 2016—four years after receiving patent-protection and the first day permitted under the regulatory exclusivity rules—three Amarin competitors filed ANDAs for generic versions of Vascepa, accompanied by Paragraph IV Certifications. (*Id.* ¶ 73.) Shortly afterwards, Amarin sued all three companies for infringement in federal district court in Nevada (the "Nevada Litigation"). (*Id.* ¶ 74.) Amarin settled with one competitor but proceeded to litigate its patents' validity against the remaining two in a consolidated action. (*Id.*) Amarin's competitors argued that Amarin's method patent was an obvious innovation from a prior art and that the USPTO examiner had overlooked (and Amarin had not highlighted) the relevant prior art from Japan. (*Id.* ¶ 75.) The competitors specifically cited the Kurabayashi Study's finding that patients treated with purified EPA experienced statistically significant reduction in ApoB to argue that the

examiner erred in finding that the MARINE Trial produced unexpected results that overcame the *prima facie* finding of obviousness. (*Id.*)

After a bench trial, the Honorable Miranda M. Du, U.S.D.C., invalidated the patents as obvious in a 70-page March 30, 2020 decision. (*Id.* ¶ 76); *see also Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 449 F. Supp. 3d 967, 971 (D. Nev.), *aff'd*, 819 F. App'x 932 (Fed. Cir. 2020). In her factual findings, Judge Du reviewed six studies the Court found were relevant prior art, including the Kurabayashi Study. *Id.* at 985–91. Regarding the Kurabayashi Study, Judge Du wrote that the study's administration of purified EPA with another drug (estriol, known to elevate triglyceride levels) for 48 weeks to the patient population of hyperlipidemic, menopausal women, would lead a person of ordinary skill in the art to attribute the reduction in ApoB found in the study to EPA. *Id.* at 989–90. Like the USPTO's examiner, Judge Du ruled that the prior art rendered the patents "*prima facie* obvious." *Id.* at 1007–09. Judge Du found that "the prior art showed that purified EPA produced each of the claimed effects in clinical studies," including that the "Kurabayashi [Study] disclosed that EPA reduced Apo B." *Id.* at 1007. Finally, as relevant here, Judge Du, unlike the patent examiner, found that the "positive lipid effects" Amarin relied on were not "unexpected benefits" constituting a secondary consideration, because "Kurabayashi suggested that EPA reduced Apo B levels" and the examiner "did not consider Kurabayashi." *Id.* at 1013. The Court of Appeals for the Federal Circuit affirmed the decision on September 3, 2020, (Am. Compl. ¶ 14), and the Supreme Court denied *certiorari*, *see Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, ⸺ U.S. ⸺, 141 S. Ct. 2794, 210 L.Ed.2d 928 (2021).

### E. REDUCE-IT TRIAL

In November 2011, Amarin launched a clinical trial (the "REDUCE-IT Trial") to demonstrate that Vascepa reduced the likelihood of "cardiovascular events" in patients with elevated triglycerides who were already taking a statin medication to lower cholesterol. (*Id.* ¶ 77.) Years prior, a 2007 paper published in Japan (the "JELIS Study") had demonstrated that Epadel reduced cardiovascular risk in a statistically significant way. (*Id.* ¶ 79.) Amarin's executives were aware of the JELIS Study and expected the REDUCE-IT Trial to mirror its results. (*Id.*) Amarin publicly stated that if the REDUCE-IT Trial "succeeded in showing that Vascepa lowered cardiovascular risk, then the use and profitability of Vascepa would exponentially increase." (*Id.* ¶ 78.)[3]

3

Judge Du discussed the REDUCE-IT Trial in finding that the secondary considerations did not support finding Amarin's method patents non-obvious because there was no nexus between the REDUCE-IT Trial's results and the challenged patents. *Hikma Pharms. USA Inc.*, 449 F. Supp. 3d at 1009–10. Specifically, Judge Du held that REDUCE-It's results turned on administering a statin along with Vascepa, unlike Vascepa that "can be, and often is, used without a statin"; the "benefits in REDUCE-IT, however, were unrelated to reducing triglycerides," which was the target of the challenged patents; REDUCE-IT does not avoid increasing LDL-C, which is part of the "claimed method of avoiding an increase in LDL-C" in the challenged patents; the REDUCE-IT Trial's "results were limited to patients with multiple cardiovascular risk factors that the asserted claims do not require"; and REDUCE-IT Trial did not involve patients with triglyceride levels of at least 500 mg/dL, as in the asserted claims. *Id.*

**\*5** On September 24, 2018, Amarin announced that the REDUCE-IT Study had "met its primary endpoint," demonstrating that "patients taking purified EPA were at substantially less risk for a cardiovascular event than patients taking a placebo." (*Id.* ¶ 80.)

### F. INDIVIDUAL DEFENDANTS' PUBLIC STATEMENTS AND AMARIN'S SHARE PRICE

The Amended Complaint alleges that Amarin's executives made material misrepresentations and omissions during the Class Period about Vascepa's patents and expected profitability. The Amended Complaint recites statements made by three Amarin executives (the "Individual Defendants"): John Thero ("Thero"), Amarin's President, Chief Executive Officer, and a director during the Class Period; Michael Kalb ("Kalb"), Amarin's Senior Vice President and Chief Financial Officer during the Class Period; and Joseph Kennedy ("Kennedy"), an Executive Vice President and Amarin's General Counsel during the Class Period. (*Id.* ¶¶ 23–25.) Thero had worked at Amarin since 2009, Kennedy since 2011, and Kalb since 2016. (*Id.*) The Class Period ran from September 24, 2018—the day Amarin announced the positive REDUCE-IT results—to April 12, 2021—the day Thero retired. (*Id.* ¶ 1.)

### 1. Defendants' Statements Regarding Amarin's Patents and Vascepa's Uniqueness

The Amended Complaint groups the Individual Defendants' statements into three categories. [4] One set of statements deals with the strength of Amarin's patents and the Nevada Litigation. The Amended Complaint quotes Defendants' statements about the Vascepa patents from healthcare conferences, investor calls, and SEC filings. (*Id.* ¶¶ 138–53.) These include statements made during the initial phases of the Nevada litigation, such as Kennedy's statement on a November 2018 earnings call that while the litigation was in its "early stages," the District Court's *Markman* ruling went "favorably" for Amarin, (*id.* ¶ 138); statements made after Judge Du's unfavorable March 2020 decision, such as Thero's statement on an April 2020 earnings call that "[w]e believe that we have numerous arguments that will contribute to a strong substantive appeal," (*id.* ¶ 147); and statements made after the Federal Circuit affirmed Judge Du's decision, such as Thero's statement on a November 2020 earnings call that "[w]e believe that courts were wrong in their decisions, and we will continue to pursue this matter, although we cannot provide any guarantee of success in this pursuit," (*id.* ¶ 153).

4

The Court does not re-print the entirety of the statements quoted in the Amended Complaint in the Background section, as such statements contained in block quotes are alleged in fifty paragraphs that span over thirty pages of the Amended Complaint. (Am. Compl. ¶¶ 99–153.) Defendants' specific statements are quoted and discussed at length in the Discussion section.

Plaintiffs allege that these statements were materially false and misleading because they failed to mention that Amarin was not entitled to patent protection because it "only received patents for Vascepa because Defendants withheld material information ... from the USPTO examiner," specifically the Kurabayashi Study. (*Id.* ¶ 154.) Therefore, Defendants knew or recklessly disregarded the fact that "Amarin would not succeed in its litigation ... or any appeals." (*Id.*)

**\*6** A second set of statements alleged are those regarding Vascepa's "unique" characteristics, which were made at healthcare conferences, on investor calls, and in SEC filings. (*Id.* ¶¶ 99–110.) For example, Thero stated on an earnings call in November 2018 that "[w]e continue to reinforce that REDUCE-IT results are unique to Vascepa." (*Id.* ¶ 101.)

On a February 2020 earnings call, again talking about the REDUCE-IT results, Thero said that "Vascepa is the first and only drug with this new cardiovascular risk reduction indication." (*Id.* ¶ 109.) Plaintiffs allege that Defendants made material misstatements as "Vascepa was not unique, and Amarin did not invent purified EPA or discover any of its medical characteristics," because the relevant characteristics had already been attributed to Epadel. (*Id.* ¶ 111.) Plaintiffs again conclude that Amarin was not entitled to its Vascepa patents and only received patents because it "withheld" the Kurabayashi Study. (*Id.*)

### 2. Market Reaction to the REDUCE-IT Trial and Defendants' Statements Regarding the REDUCE-IT Results

Plaintiffs allege that despite its misrepresentations about Vascepa's uniqueness and the strength of its patents, Defendants created an "inflated impression of Vascepa's prospects" through announcing the REDUCE-IT Trial results. (*Id.* ¶¶ 81–82.) Before the trial's results were announced, Thero stated that "positive REDUCE-IT results would mean that a daily dose of Vascepa would be appropriate treatment for everyone with elevated triglycerides, which comprises 'roughly 1 in 4 adults in the United States.' " (*Id.* ¶ 78 (citation not provided).) This would exponentially increase the potential market for Vascepa. (*Id.*) In this way, Defendants "conditioned the market to believe positive results" in the REDUCE-IT Trial would be, in Thero's words, a "multibillion dollar opportunity" for Amarin. (*Id.* ¶ 84.) In short, Plaintiffs essentially allege that Defendants used the results of the REDUCE-IT Trial to turbocharge market expectations about their unique, patented drug.

After Amarin announced the REDUCE-IT results in September 2018, the "corresponding share price movement was instant and dramatic," jumping from $2.99 per share on the prior trading day to $12.40 per share the day results were announced. (*Id.* ¶ 86.) Analysts attributed this spike to optimism from "the REDUCE-IT results and investors' belief about what those results meant for Vascepa's prospects." (*Id.* ¶ 87.)

In the third category of Defendants' statements cited in the Amended Complaint, Defendants talked about Vascepa's potential market size and value to the company based on the REDUCE-IT results. (*Id.* ¶¶ 112–37.) On the day Amarin announced the REDUCE-IT results, Thero stated on a call that the study showed Vascepa "has the potential to overcome the limitations of multiple blockbuster prior-generation therapies. It thus has the potential to be a significant blockbuster and help millions of patients reduce cardiovascular risk on top of standard-of-care statin therapy." (*Id.* ¶ 113.) As with the previous categories of statements, the Amended Complaint alleges that these statements were false or misleading because Amarin "did not invent purified EPA or any new use for it," Amarin was not entitled to patent protection for Vascepa, Amarin only received patents because it "withheld" the Kurabayashi Study from the USPTO, and Amarin would not succeed in the Nevada Litigation. (*Id.* ¶ 154.)

### 3. Individual Defendants' Sale of Amarin Stock

Plaintiffs allege that Defendants' knowledge of the weakness of the Vascepa patents is evidenced by the fact that the Individual Defendants "systematically unloaded their personal shares" of Amarin after the REDUCE-IT results were announced. (*Id.* ¶ 11.) After the results were announced but before Judge Du's decision in March 2020, Kennedy sold 89.19% of his shares of Amarin stock worth $36,504,087; Kalb sold 65% of his shares worth $9,779,380; and Thero sold 24% of his shares worth $36,790,688. (*Id.* ¶¶ 95–97, 170–77.) Several million dollars' worth of Kennedy's and Kalb's sales were made on the day the REDUCE-IT results were announced. (*Id.* ¶ 88.) Plaintiffs allege that "Defendants would not have dumped such large portions of their holdings if they truly believed Vascepa would grow to be a 'multiple-billion-dollar opportunity' as they had led investors to believe." (*Id.* ¶ 12.)

### 4. Market Reaction to the Patent Litigation

**\*7** Plaintiffs allege Amarin's share price "came crashing back to reality over the course of three disclosures in 2020 and 2021." (*Id.* ¶ 14.) First, after Judge Du invalidated the Vascepa patents in March 2020, Amarin's ADS price "plummeted by more than 70% to close at $4.00 per share" the following day. (*Id.* ¶ 184; *see also id.* ¶¶ 185–90.) Second, the day after the Federal Circuit affirmed Judge Du's decision in September 2020, Amarin's ADS price again "fell 40.77% to close at $4.30 per share." (*Id.* ¶ 191.) Third, Thero "suddenly" left Amarin "under suspicious circumstances" on April 12, 2021, which Plaintiffs allege "reveal[ed] to investors he had been culpable for the Company's downfall, and that the Company had given up on recovering its U.S. patents for

Vascepa." (Id. ¶ 14.) The Amended Complaint elaborates that Thero being replaced with an executive from Merck was a "strong indicator[ ] that the Company and its senior management believed Thero was to blame for the dramatic decline in the value of the Company." (Id. ¶ 178.) Kennedy retired from the company several weeks later as well. (Id. ¶ 179.) After the announcement of Thero's retirement, Amarin's ADS price "fell by approximately 13.01% to close at $5.08 per share." (Id. ¶ 195.)

### G. PROCEDURAL HISTORY [5]

[5]    The Court remarks briefly upon two prior unsuccessful securities class actions filed against Amarin over Vascepa, although neither exerts any preclusive effect. They are mentioned merely for context and because Defendants' briefing discusses them.

The first securities class action, filed in this District in 2013, alleged that Amarin and several of its executives made material misrepresentations from 2010 to 2013 about "the progress of Amarin's ultimately unsuccessful application to the FDA to approve its drug, Vascepa, for the treatment of patients with high triglyceride levels." *In re Amarin Corp. PLC Sec. Litig. (Amarin I)*, No. 13-6663, 2016 WL 1644623, at *1–2 (D.N.J. Apr. 26, 2016). The Honorable Freda L. Wolfson, U.S.D.J. (ret.) dismissed the complaint twice, first in 2015 because the plaintiffs failed to allege that the defendants made materially false or misleading statements or that the defendants acted with scienter. *Id.* *4 (discussing prior decision). The following year, Judge Wolfson again held that the plaintiffs had failed to plead existence of a materially false or misleading statement. *Id.* at *20. On appeal, the Third Circuit affirmed. 689 F. App'x 124 (3d Cir. 2017).

In the second case, filed in 2019 in this District, the plaintiffs sued Amarin and several of its officers alleging that the defendants made material misrepresentations and omissions about the execution and results of the REDUCE-IT Trial and a second trial (the ANCHOR trial). *In re Amarin Corp. PLC Sec. Litig. (Amarin II)*, No. 19-6601, 2021 WL 1171669, at *1–3 (D.N.J. Mar. 29, 2021). As with the instant action, the class period allegedly began when Amarin announced the results of the REDUCE-IT Trial in

September 2018. *Id.* at *2. The plaintiffs alleged that the defendants announced positive results from the REDUCE-IT Trial without disclosing several potential issues with the trial data. *Id.* at *2–3. The Honorable Brian R. Martinotti, U.S.D.J., dismissed the complaint for failure to state a claim for securities fraud, *id.* at *11–19, and the Third Circuit affirmed, No. 21-2071, 2022 WL 2128560 (3d Cir. June 14, 2022).

After separate plaintiffs filed complaints bringing similar claims against Amarin, Thero, and Kalb in late 2021, (Civ. Action No. 21-19212 (D.N.J.); Civ. Action No. 21-19911 (D.N.J.)), on October 27, 2022, the Honorable Georgette Castner, U.S.D.J. issued an Order consolidating the two matters and appointing the lead counsel and a lead plaintiff in the consolidated action. (ECF Nos. 34, 35.)

Plaintiffs filed the operative 114-page Amended Consolidated Class Action Complaint on January 13, 2023 on behalf of any purchaser of Amarin ADSs during the Class Period. Against all Defendants, the Amended Complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). (Am. Compl. ¶¶ 211–18.) Against the Individual Defendants, the Amended Complaint alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), (id. ¶¶ 219–24), and Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, (id. ¶¶ 225–32).

*8   On March 24, 2023, Defendants filed the Motion to Dismiss at issue here. (ECF No. 58.) Defendants' Motion is supported by a brief, (ECF No. 58-1), and 117 exhibits comprising approximately 1,200 pages, (ECF Nos. 58-2 to -125.) Plaintiffs filed a brief opposing the Motion, (ECF No. 65), and separately filed an Objection to Documents that May Be Judicially Noticed in response to Defendants' 117 exhibits ("Plaintiffs' Objection"), (ECF No. 66.) Defendants filed a reply brief on the merits of their Motion, (ECF No. 69), and separately responded to Plaintiffs' Objection, (ECF No. 70.) Plaintiffs filed a reply supporting Plaintiffs' Objection, (ECF No. 71), which Defendants objected to as an impermissible sur-reply, (ECF No. 72.)

## II. LEGAL STANDARD

[1]   Pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under this rule, it "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citation omitted). A pleading that "offers labels and conclusions," "a formulistic recitation of the elements," or "naked assertion[s] devoid of further factual enhancement," is insufficient. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citations and quotation marks omitted). In short, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citation omitted).

**[2]** **[3]** **[4]** **[5]** For fraud claims, a complaint is subject to Rule 9(b)'s heightened pleading standard "[i]ndependent of the standard applicable to Rule 12(b)(6) motions." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must support its allegations with "the who, what, when, where and how of the events at issue." *In re Rockefeller*, 311 F.3d at 216 (citation omitted); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) ("[T]he plaintiff must ... inject precision or some measure of substantiation into a fraud allegation."). Rule 9(b)'s heightened pleading standard "ensure[s] that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (citations and quotations omitted). The standard is "rigorously applied in securities fraud cases." *Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997)).

**[6]** **[7]** Plaintiffs alleging securities fraud pursuant to the Exchange Act must also comply with the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, *et seq.* The PSLRA "imposes another layer of factual particularity to allegations of securities fraud." *In re Rockefeller*, 311 F.3d at 217. To allege fraud under the PSLRA, the plaintiff

must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

## III. DISCUSSION

**\*9** Defendants contend that Plaintiffs fail to make out a Section 10(b) claim because the Amended Complaint fails to plead an actionable misstatement or omission, a strong inference of scienter, and loss causation. The Individual Defendants seek dismissal of the Section 20(a) and Section 20A claims based on the failure of Plaintiffs' Section 10(b) claim. Finally, Defendants argue that Drabek should be removed from the case caption. The Court addresses the exhibits appended to Defendants' Motion to Dismiss before reaching the merits of their arguments.

### A. JUDICIALLY NOTICEABLE DOCUMENTS

The parties raise a threshold dispute over what documents the Court may consider in connection with deciding the Motion to Dismiss. Defendants submitted 117 exhibits, (Exs. to Decl. of Peter J. Linken, ECF Nos. 58-8 to 58-125), and six annexes, (ECF Nos. 58-2 to 58-7), with their Motion. [6] Plaintiffs concede that the Court may properly consider 59 of the exhibits but contest the remaining 58 exhibits and six annexes. (ECF No. 66 at 2.) Plaintiffs contend that Defendants improperly attempt to frontload factual disputes at this motion to dismiss stage with their exhibits. (*Id.* at 5–18.) Defendants respond that many of the exhibits are integral to the Amended Complaint's allegations and that Plaintiffs selectively included facts in the Amended Complaint to distort what actually happened as an attempt to make it to discovery. (ECF No. 70 at 1–2.) [7]

[6]  In this Opinion, all references to "Exhibit" or "Ex." refer to the Exhibits to Peter J. Linken's Declaration.

[7]  The parties accuse each other of violating procedural rules in connection with Defendants' submission of exhibits and Plaintiffs' objection thereto. (ECF No. 66 at 1–2; ECF No. 70 at 2 n.1; ECF No. 72.) The Court will consider Plaintiffs' Objection, (ECF No. 66), and

Defendants' response, (ECF No. 70), but will disregard Plaintiffs' July 20, 2023 brief, (ECF No. 71), as an unauthorized sur-reply.

**[8]** **[9]** **[10]** While the Court may normally "not consider matters extraneous to the pleadings" at the motion to dismiss stage, it may rely on documents that are "*integral to or explicitly relied* upon in the complaint" without converting the motion into one for summary judgment. *See In re Burlington Coat,* 114 F.3d at 1426 (emphasis in original) (citations omitted). The exception's applicability turns on "whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.* at 1426 (citations omitted). The exception's purpose is to prevent a plaintiff from "maintain[ing] a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *Id.* at 1426 (citation omitted).

**[11]** **[12]** Under Federal Rule of Evidence 201(b), the Court may also consider documents containing facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *In re NAHC, Inc. Secs. Litig.,* 306 F.3d 1314, 1331 (3d Cir. 2002) (citing Fed. R. Evid. 201(b)). However, it "is improper for a court to take judicial notice of the veracity and validity of a public document's contents when the parties dispute the meaning and truth of the contents." *Amarin II,* 2021 WL 1171669, at *7 (quoting *Lee v. City of L.A.,* 250 F.3d 668, 690 (9th Cir. 2001)). As the Third Circuit cautioned, "[o]nly in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case" at the motion to dismiss stage. *Victaulic Co. v. Tieman,* 499 F.3d 227, 236 (3d Cir. 2007), as amended (Nov. 20, 2007).

**\*10** Defendants' exhibits fall into several categories, summarized below:

1. **Amarin's SEC filings (Exs. 32 to 65).** Plaintiffs challenge Exs. 32–50 but not Exs. 51–65.

2. **Documents from the patent application before the USPTO (Exs. 66 to 92).** Plaintiffs challenge Exs. 68–72, 75–78, 80–81, 83, 88, 92 but not Exs. 66–67, 73–74, 79, 82, 84–87, 89–91.

3. **Documents from the Nevada Litigation (Exs. 93–94).** Plaintiffs challenge these two exhibits.

4. **Analyst reports (Exs. 95–109).** Plaintiffs challenge these fifteen exhibits.

5. **Kurabayashi Study (Ex. 110).** Plaintiffs challenge this exhibit.

6. **Individual Defendants' Rule 10b5-1 trading plans (Exs. 111–117).** Plaintiffs challenges these seven exhibits.

7. **Annexes. (ECF Nos. 58-2 to -7).** Plaintiffs challenge these documents.

8. **Defendants' Statements referenced in the Amended Complaint. (Exs. 1 to 31).** Plaintiffs do not challenge these documents. [8]

Except for the documents containing statements challenged in the Amended Complaint, which Plaintiffs do not contest the Court may consider, the Court briefly discusses each category.

[8]   Plaintiffs caveat their agreement that while certain documents are permissibly considered at this posture such documents may not be "utilized for the truth of the matters asserted to factually argue against Plaintiffs' well-pled allegations of fraud." (ECF No. 66 at 4–5.) To the extent the Court cites these documents below, it will address the purpose for which it relies on them.

### 1. Amarin's SEC Filings

**[13]** Of the SEC filings included with the Motion to Dismiss, Plaintiffs contest consideration of Exhibits 32 to 50, which are filings from as early as March 2011 (Ex. 32) to August 2018 (Ex. 50). Plaintiffs argue that because these filings were made outside the Class Period, the risk disclosures they contain "cannot cure" the alleged omissions from the Class Period. (ECF No. 66 at 5–6.) The Third Circuit instructs that "[p]re-class period statements may be used to ascertain the falsity and materiality of the challenged statements." *City of Edinburgh Council v. Pfizer, Inc.,* 754 F.3d 159, 171 n.13 (3d Cir. 2014) (citing *In re Merck & Co., Inc. Sec. Litig,* 432 F.3d 261, 272 (3d Cir. 2005)). Here, the Amended Complaint heavily discusses Defendants' conduct from 2010 to 2018 to support its allegations that Defendants' statements during the

Class Period were misleading. (Am. Compl. ¶¶ 51–76.) These disclosures are relevant, and the Court may indisputably take judicial notice of the challenged SEC filings for the purpose of establishing that the disclosures they contained were publicly available. *See In re NAHC*, 306 F.3d at 1331.

### 2. USPTO Patent Prosecution

 **[14]** Defendants submit twenty-seven documents from Amarin's MARINE patent prosecution proceedings. (Exs. 66–92.) Plaintiffs object to the Court's consideration of fifteen of the documents, (Exs. 68–72, 75–78, 80–81, 83, 88, 92), because they are not referenced in the Amended Complaint. (ECF No. 66 at 6–8.) Plaintiffs do not contest Defendants' claim that each of the challenged documents is publicly available on the USPTO's website. (Decl. of Peter J. Linken ¶¶ 68–94, ECF No. 58-8.) Here, the Amended Complaint extensively discusses and quotes from the proceedings before the USPTO, including Amarin's two Form PTO-1449 (the second of which included the Kurabayashi Study), the examiner's four rejections of Amarin's application, and Amarin's multiple submissions to the examiner in response. (Am. Compl. ¶¶ 53–72.) Therefore, the documents from the patent prosecution history are appropriately considered both because they are integral to the Amended Complaint's claim that Defendants "concealed" the Kurabayashi Study from the USPTO and because they are subject to judicial notice. *See Lexington Luminance LLC v. Bulbrite Indus., Inc.*, No. 22-3787, 2023 WL 143911, at *1 (D.N.J. Jan. 10, 2023) (taking judicial notice of public records from the USPTO's website); *Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*, 72 F. Supp. 3d 521, 526 (D. Del. 2014) (same), *aff'd*, 818 F.3d 1369 (Fed. Cir. 2016).

### 3. Documents from the Nevada Litigation

 **\*11** **[15]** Plaintiffs object to consideration of the two documents from the Nevada Litigation, (Exs. 93–94), arguing that Defendants use these documents "to make inappropriate merits-based arguments and factual assertions." (ECF No. *66* at 8.) A review of Defendants' brief shows that Exhibit 94 is not mentioned in the argument at all and Exhibit 93 is only mentioned in a final footnote listing arguments *not* made. (ECF No. 58-1 at 65 n.61.) Therefore, the Court need not consider these documents.

### 4. Analyst Reports

 **[16]** Defendants submitted fifteen publicly-available reports from market analysts regarding the status of the Nevada litigation and the analysts' investment recommendations on Amarin. (Exs. 95–109.) Plaintiffs object to their consideration, contending that Defendants offer them to show "that Amarin indeed had strong [intellectual property] and therefore Defendants reasonably believed it [sic] would prevail in the patent litigation." (ECF No. 66 at 11–12.) Defendants respond that they cite the reports "to show that Defendants (and the public) would have been aware that other experts expressed agreement with Amarin's litigation position and disclosed their views that the MARINE patents were valid." (ECF No. 70 at 14.) Here, contrary to Defendants' assertions, Defendants appear to rely on these documents for the truth of the analysts' statements that Amarin's litigation position was strong and that Individual Defendants' statements about the litigation were reasonable. (*See* ECF No. 58-1 at 35–36.) The Court therefore will not consider these reports for the purpose for which Defendants offer them. *See In re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124, 2017 WL 3705801, at *3 n.5 (D.N.J. Aug. 28, 2017) ("[T]he inferences defendants wish to draw from these [analyst reports] go beyond the mere existence of statements within them").

### 5. Kurabayashi Study

 **[17]** Plaintiffs object to the Court's consideration of the Kurabayashi Study, (Ex. 110), essentially arguing that Defendants seek to contradict the results of the Nevada Litigation through discussion of the Kurabayashi Study. (ECF No. 66 at 9–10.) Defendants counter that the Kurabayashi study is the "cornerstone of Plaintiffs' claims" and is mentioned in the Amended Complaint almost thirty times. (ECF No. 70 at 9–10.) The Court will consider the Kurabayashi Study because it is plainly integral to the Amended Complaint. Plaintiffs' claims are premised on Defendants' alleged conduct with respect to the Kurabayashi Study, namely that Defendants "concealed the Kurabayashi Study from the USPTO by burying it amongst hundreds of other studies provided to the patent examiner," (Am. Compl. ¶ 7), and then failing to disclose this vulnerability in Amarin's patent to the investing public. [9]

9

Judge Wolfson's decision in *Hall v. Johnson & Johnson*, No. 18-1833, 2019 WL 7207491 (D.N.J. Dec. 27, 2019), is not to the contrary. There, the Court declined to consider a scientific study that "addresses the merits of Plaintiff's claims, is not relied upon or integral to the Complaint, and would require the court to delve into the scientific evidence that forms the crux of the parties' dispute." *Id.* at *11. In *Hall*, the contested exhibit was an outside study defendants brought into the case in their motion to dismiss, rather than a study treated at length in the plaintiffs' pleading whose alleged concealment was central to the case.

**6. Rule 10b5-1 Trading Plans**

Defendants submitted excerpts from the Individual Defendants' Rule 10b5-1 pre-arranged trading plans adopted by Kalb and Kennedy at various dates in 2017 and 2018. (Exs. 111–17.) As Judge Wolfson explained generally, "[a] Rule 10b5-1 plan is a written plan that allows corporate insiders to make prearranged stock transactions." *In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-2978, 2019 WL 2849933, at *5 (D.N.J. July 2, 2019) (citing 17 C.F.R. § 240.10b5-1(c)). Plaintiffs object that these are internal company documents, not publicly available, whose authenticity cannot be determined. (ECF No. *66* at 12–13.) Defendants respond that courts routinely consider pre-arranged trading plans at the motion to dismiss stage. (ECF No. 58-1 at 52–53; ECF No. 70 at 15, 15 n.20 (collecting cases).) Defendants contend that the Individual Defendants' Form 4s SEC filings—which Defendants also submit with their Motion, (Exs. 63–65), and to which Plaintiffs do not object, (ECF No. 66 at 2)—by themselves are sufficient "to defeat any inference of 'suspicious' sales here." (ECF No. 70 at 15.) Defendants claim that they only provided the Rule 10b5-1 plans themselves for the limited purpose of documenting the plans' entry dates, set windows, amounts, and trigger prices. (*Id.*)

**\*12** **[18]** **[19]** The Court finds that it may not take judicial notice of the Rule 10b5-1 trading plans. As explained in the scienter section below, courts in the Third Circuit regularly consider Form 4s to assess insider trading allegations on motions to dismiss. *See Amarin II*, 2021 WL 1171669, at *9 (collecting cases). The Individual Defendants' Form 4s are publicly filed, and Plaintiffs therefore concede they are appropriately considered. However, while the Form 4s are

public records, Defendants do not suggest that the Rule 10b5-1 plans are. Instead, Defendants essentially argue that because the Form 4s reference the Rule 10b5-1 plans, the latter may be judicially noticed, despite the fact that it is not publicly filed. None of the cases Defendants cite to support this proposition. As the Third Circuit explained regarding Form 4s, the Court may "take judicial notice of properly-authenticated public disclosure documents filed with the SEC." *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000). Judicial notice under Rule 201 is appropriate because "the documents are required by law to be filed with the SEC, and no serious questions as to their authenticity can exist." *Id.* (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). Because Defendants offer no authority suggesting that a document not publicly filed and not relied on in the Amended Complaint can be judicially noticed, the Court will not do so here. 10

10

While Defendants cite several cases in which Courts have relied on Rule 10b5-1 plans directly, the plans in those cases appear to have been directly filed with the SEC. *See, e.g.*, *In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-2978, 2019 WL 2849933, at *16 n.11 (D.N.J. July 2, 2019) (considering Rule 10b5-1 plans "because they are publicly-filed SEC documents").

**7. Annexes**

**[20]** **[21]** Defendants submitted six annexes with their opposition brief. 11 Plaintiffs argue that the annexes are "lawyer-created documents," "neither judicially noticeable nor relied upon by the Complaint," and offered to get around Defendants' 65-page brief limit. (ECF No. *66* at 14–15.) Plaintiffs also object that several of the charts "employ[ ] a system designed to be confusing," several other annexes contain data that "ha[s] no relevance to this litigation" and "alternative calculations" that rebut the Amended Complaint's allegations. (*Id.* at 15–17.) Defendants respond that the annexes are permissible "organizational tools" rather than legal argument. (ECF No. 70 at 16–17.)

11

Annexes A, B, and C contain charts listing which of Defendants' alleged statements Defendants argue are not actionable misstatement or omissions: Annex A lists "forward-looking statements" accompanied by cautionary language; Annex B

lists statements that are puffery; and Annex C lists "statements of historical fact." Annex D contains three charts of Amarin's historical stock price and Thero's and Kennedy's challenged stock sales. Annex E contains charts showing Defendants' calculations of the Individual Defendants' stock holdings (which Defendants contend differ from the Amended Complaints). Annex F contains charts matching each of the Individual Defendants stock sales to the exhibit of their Form 4 or Rule 10b5-1 Plan that shows the sale was pre-arranged.

The Court will not strike Annexes A, B, and C because they are permissible organizational tools. *See In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *3. Given the volume of statements relevant to this case by virtue of their inclusion in the Amended Complaint, Defendants' attempt to organize their arguments that apply to some statements but not others is well taken. In contrast, Annexes D, E, and F contain information either not derived from exhibits Defendants submitted or derived from exhibits the Court cannot consider at this juncture. Therefore, the Court will not consider them.

\* \* \*

In summary, in deciding Defendants' Motion to Dismiss, the Court will consider: documents containing Defendants' Statements referenced in the Amended Complaint, (Exs. 1 to 31); Amarin's SEC filings, (Exs. 32 to 65); documents from the patent application before the USPTO, (Exs. 66 to 92); the Kurabayashi Study, (Ex. 110); and Annexes A, B, and C, (ECF Nos. 58-2 to -4). However, the Court will not consider: the two documents from the Nevada Litigation (Exs. 93–94); the market analyst reports, (Exs. 95–109); the Individual Defendants' Rule 10b5-1 trading plans, (Exs. 111–17); and Annexes D, E, and F, (ECF Nos. 58-5 to -7).

**B. MOTION TO DISMISS SECTION 10(B) CLAIM**

 **\*13** **[22]** **[23]** Section 10(b) of the Exchange Act creates a private cause of action for the "use or employ, in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements Section 10(b), makes it unlawful, in connection with the purchase or sale of any security:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. To survive a motion to dismiss, a plaintiff bringing a claim under Section 10(b) and Rule 10b-5 must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentations or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) and causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). In a securities fraud case, "[a] corporation is liable for statements by employees who have apparent authority to make them." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008)).

**1. Actionable Misstatement or Omission**

The Court begins with Defendants' argument that the Amended Complaint does not allege an actionable material misrepresentation or omission. Plaintiffs' claims are based on statements about Vascepa made over a two-and-a-half year period, set out in detailed block quotes alleged in fifty paragraphs over thirty pages of the Amended Complaint. (Am. Compl. ¶¶ 99–153.) Within the quotations, Plaintiffs highlight certain language. Plaintiffs do not specify how any specific statement is allegedly false or misleading. Instead, Plaintiffs group the statements into three sections and at the end of each section, generally allege how those statements are misleading. (*Id.* ¶¶ 111, 137, 154.) Defendants mirror this approach, addressing Plaintiffs' arguments within each of the three categories. (ECF No. 58-1 at 34–48.) The Court will not examine each statement individually, but rather, consistent with the parties' approach, will assess each category of allegedly false and misleading statements and identify specific statements as examples, where necessary.

**[24]**  **[25]**  **[26]**  To make out a Section 10(b) claim, a plaintiff must adequately allege that the defendant made "a material misrepresentation or omission." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011)). A statement or omission of fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation omitted); *see also In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020) (statements or omissions viewed "in light of all the information then available to the market" (citation omitted)). Further, a statement or omission only gives rise to liability if it was "misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

**\*14**  **[27]**  **[28]**  This element is subject to the PSLRA's "[e]xacting pleading requirements." *City of Edinburgh*, 754 F.3d at 168 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Thus, "[a] complaint involving securities fraud must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation ... is made on information and belief ... all facts on which that belief is formed.' " *In re Newell Brands.*, 837 F. App'x at 874 (quoting 15 U.S.C. § 78u-4(b)(1)). "The purpose of the heightened pleading requirements is to ensure that private securities actions do not become 'a partial downside insurance policy' against the vicissitudes of the market." *Id.* at 874 (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp*, 908 F.3d 872, 880 (3d Cir. 2018)).

**[29]**  **[30]**  The contours of what qualifies as an actionable misstatement are well articulated. An opinion is actionable under the securities laws if it "(i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015)). [12] Next, the PSLRA creates a "safe harbor" for forward-looking statements. Alleged misrepresentations are not actionable if the statements "are (1) identified as [forward-looking], and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278 (3d Cir. 2010) (citing 15 U.S.C. § 78u-5(c)). Finally, the Court must distinguish material representations from statements that "constitute no more than 'puffery' and are understood by reasonable investors as such." *In re Newell Brands*, 837 F. App'x at 874 (quoting *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000)).

12        Although the parties' briefing, filed before the Third Circuit in *City of Warren* confirmed that *Omnicare*'s framework for opinion liability applies to Section 10(b) claims, applying *Omnicare* does not change their arguments. As the Third Circuit explained, this Circuit had "prefigured the *Omnicare* framework in imposing liability for opinions 'issued without a genuine belief or reasonable basis.' " *City of Warren Police*, 70 F.4th at 686 (quoting *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008)). Thus, the three-part *Omnicare* framework is merely a "more developed articulation" of the Third Circuit's prior test, and the Court's conclusion here does not change whether it applies *In re Merck*'s articulation or *Omnicare*'s.

The Amended Complaint identifies three categories of purported actionable misstatements or omissions, made in connection with (1) the Nevada Litigation, (2) Vascepa's "unique" characteristics, and (3) Amarin's financial prospects based on the release of the REDUCE-IT Trial results. (Am. Compl. ¶¶ 99–154.) Defendants contend that Plaintiffs fail to plead an actionable misstatement or omission with respect to each category. The Court addresses each in turn.

*i. MARINE Patent Litigation*

The Amended Complaint cites sixteen instances in which Individual Defendants made allegedly false and misleading statements relating to their expectation of the outcome of the patent litigation. (Am. Compl. ¶¶ 138–53.) Plaintiffs allege that these statements are materially false or misleading because they failed to disclose that (1) Amarin did not invent purified EPA or any use for it, (2) Amarin concealed the Kurabayashi Study from the USPTO, and (3) Amarin was not entitled to patent protection for Vascepa and would ultimately lose the patent litigation. (*Id.* ¶ 154.)

**\*15** Defendants argue that Plaintiffs have not alleged any actionable statements regarding the patent litigation. First, Defendants contend that the Individual Defendants' statements regarding their belief that the MARINE patents would be upheld are inactionable opinions. (ECF No. 58-1 at 34.) Plaintiffs failed to allege that Defendants lacked a reasonable basis for their opinions, despite the fact that Amarin was ultimately unsuccessful in defending its patents. (*Id.* at 34–36.) Defendants argue that Plaintiffs' claim that they "concealed" the Kurabayashi Study by filing it with their Form 1449 is unsupported. (*Id.* at 38–39.) Further, Defendants also point out that their statements about the litigation were repeatedly tempered by warnings about the possibility the patents would be invalidated. (*Id.* at 36–37.) Defendants' also contend that several of their statements about the litigation were forward-looking statements protected by the PSLRA's safe harbor or constituting inactionable puffery. (*Id.* at 40–42.)

Plaintiffs respond that Defendants' rosy statements about the litigation were not inactionable opinions because they lacked a "reasonable basis." (ECF No. 65 at 34.) Plaintiffs contend that Defendants ignore the Amended Complaint's allegations that Vascepa's patents were invalid because Amarin misled the USPTO. (*Id.* at 35.) Plaintiffs argue that Defendants' "generic disclosure buried in Amarin's quarterly SEC filings" are insufficient to render their omissions inactionable. (*Id.* at 36.) Plaintiffs argue that the PSLRA safe harbor is unavailable because the statements about the litigation's outcome were made with knowledge they were misleading. (*Id.* at 37–38.)

 **[31]**  The Court agrees with Defendants that the Amended Complaint fails to allege any actionable misstatements or omissions about the Nevada Litigation. First, the fourteen challenged statements in this section are plainly opinions. Describing the litigation before Judge Du's March 2020 decision, Defendants' statements characterized different stages of the litigation—after the ANDAs were filed, after the *Markman* ruling, and after summary judgment—as going "very favorably" for Amarin. (Am. Compl. ¶¶ 138–46.) [13] After Judge Du's unfavorable decision and ahead of the Federal Circuit's affirmance, Defendants continued to make statements expressing optimism in the "strong substantive appeal" it could make. (*Id.* ¶ 147–51.) [14] After the Federal Circuit affirmed, Defendants' statements showed their intent to "vigorously" defend its patents and continue litigating the matter to the Supreme Court. (*Id.* ¶ 152–53.) [15] These statements about the litigation—that Amarin

believed that the litigation was going "very favorably," that the patents were "heavily prosecuted" before the USPTO, that Amarin was "vigorously" litigating its claims, that certain rulings "strengthen[ed]" Amarin's position, that's arguments were "persuasive," that the litigation offered no "negative surprises," that Amarin was "disappointed" in Judge Du's decision, that Amarin's "patents should have been upheld," that Amarin had "numerous arguments that will contribute to a strong substantive appeal," that Amarin had a "a reasonable shot at winning"—put forward Amarin's belief about the strength of their patents, rather than asserting positive knowledge of what the outcome of the litigation would be. As Judge Wolfson held in an analogous matter, Defendants' "statements regarding the viability of the lawsuits ... clearly constitute opinions regarding the success of the litigation, rather than statements of fact." *Hall v. Johnson & Johnson,* No. 18-1833, 2019 WL 7207491, at \*19 (D.N.J. Dec. 27, 2019) (citing *Axar Master Fund, Ltd. v. Bedford,* 308 F. Supp. 3d 743, 756-57 (S.D.N.Y. 2018)); *see also Laasko v. Endo Int'l, PLC,* No. 20-7536, 2022 WL 3444038, at \*4 (D.N.J. Aug. 17, 2022) (finding no actionable misstatement where plaintiffs alleged that defendants "assured investors they would vigorously contest the merits of the opioid-related actions").

13       (*See* Am. Compl. ¶ 138 (describing the court's *Markman* ruling was going "very favorably" for Amarin and that the company "feel[s] pretty good about that"); *id.* ¶ 139 ("Any good product gets ANDA filers. It'd be almost insulting if they weren't, I guess.... I think the results coming out of that claims construction was very favorable to us.... [T]hese patents were heavily prosecuted through the U.S. Patent Office and as I say, we intend to defend them vigorously."); *id.* ¶ 140 ("So being able to show something different for that that was deemed to be unique and the ANDA filers have acknowledged that where they'd have generic product that they would infringe that patent ..."); *id.* ¶ 141 ("Our patents expire in 2030 .... We continue to defend our patents vigorously."); *id.* ¶ 142 ("This is a global epidemic, and this is – we have global rights to the product, and we feel like we're just getting started.... [Our patents] all have expiries in 2030. They all have multiple claims, and we intend to defend those patents vigorously.... So we'll see what happens relative to the end of litigation. I can't make any predictions there other than stating that we intend to defend our patents

vigorously, and we like our IP."); *id.* ¶ 143 ("The judge ruled against the [ANDA] filer's summary judgment motion that sought to end the case at this early stage in their favor .... We see this ruling as strengthening our position in the litigation ... should it be determined that case settlement is in the company's best interest."); *id.* ¶ 144 ("From a data exclusivity perspective, in the United States, we've protected, via patents, 2 different indications. Our initial indication, which is for the trig[lyceride]s greater than 500, is currently subject to ANDA litigation.... Obviously we're confident in the results [expected in the litigation], which is why we're expanding our commercial infrastructure."); *id.* ¶ 145 ("[W]e believe that our legal arguments are persuasive and should prevail. The U.S. Patent Office was convinced of the appropriateness of our patents, and we believe that the court should conclude similarly."); *id.* ¶ 146 (describing a recent proceeding in the Nevada litigation as offering no "real negative surprises and an increase in confidence" causing Amarin to "think that we are in a good position based upon our intellectual property").)

14    (*See* Am. Compl. ¶ 147 ("[W]e were surprised and disappointed that the court determined that patent, upon which we relied to build our business, should be considered invalid based upon arguments of perceived obviousness. In doing so, in my view, the court's decision ... did not fully appreciate the importance of VASCEPA as a unique and valuable breakthrough therapy, for which I believe there is considerable evidence ...."); *id.* (discussing Amarin's "broader belief that our patents should have been upheld as inventive and not obvious."); *id.* ("We believe that we have numerous arguments that will contribute to a strong substantive appeal. Many of you have expressed to us examples of arguments that go to a point that could be argued on appeal."); *id.* ¶ 148 ("Amarin believes that it has a strong basis for appeal, which will be set out in its opening brief ...."); *id.* ¶ 149 ("We have filed our appeal to the Federal Circuit. We and our outside counsel believe that we have numerous strong arguments that will contribute to a substantive appeal.... [I]t remains stunning that the invention of VASCEPA can now be viewed by anyone as obvious .... Amarin is vigorously pursuing this appeal. We are doing so fully convinced that the

invention of VASCEPA was not obvious."); *id.* ¶ 150 ("Amarin believes strongly that the lower court judgment was seriously flawed and that it has strong arguments on appeal that could result in a victory for Amarin."); *id.* ¶ 151 ("The decision was unexpected by everyone, including, we understand, the generic companies involved in the litigation. As discussed in the past, we believe that the District Court decision is flawed.... Unfortunately, the judicial process is such that it doesn't matter that I, you or others conclude that the District Court's decision was wrong.... However, while we believe that we have good legal arguments and that our patents should be upheld and that we have a reasonable shot at winning, there is no way for us to guarantee that the Federal Circuit will decide in Amarin's favor.... But regarding the patent side, clearly, we think that the right answer here should be that we win and we then have exclusivity until generics could come into the market in 2029. I think that, that is the right answer.").)

15    (*See* Am. Compl. ¶ 152 ("We believe the key court decisions regarding VASCEPA patents related to the triglyceride lowering indication have been wrong and we plan to continue to pursue this matter to the highest level."); *id.* ¶ 153 ("We believe that courts were wrong in their decisions, and we will continue to pursue this matter, although we cannot provide any guarantee of success in this pursuit.").)

**\*16** **[32]**  Plaintiffs argue that these opinions are nonetheless actionable because they allege that Defendants made them in bad faith. (ECF No. 65 at 34.) An opinion statement is not actionable unless it "(i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police,* 70 F.4th at 686. Plaintiffs' primary contention in support of this point is that Defendants could not have honestly believed they would succeed in the Nevada Litigation because they "concealed" the Kurabayashi Study and "misled" the USPTO by doing so. (ECF No. 65 at 34–35.) As alleged in the Amended Complaint, Amarin owed a "duty of candor and good faith in dealing with the [USPTO], which includes a duty to disclose to the [USPTO] all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56. The disclosure duty "is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was

cited by the [USPTO] or submitted to the [USPTO] in the manner prescribed by §§ 1.97(b)–(d) and 1.98." *Id.* The rule's requirements are not met when "the duty of disclosure was violated through bad faith or intentional misconduct." *Id.*

On its face, the rule simply requires that an applicant disclose relevant information to the examiner. That is exactly what Defendants did by submitting the Kurabayashi Study with their Form 1449. (Am. Compl. ¶ 55.) Plaintiffs fail to allege that Amarin ran afoul of this obligation by submitting the Kurabayashi study as one among several hundred documents filed with the USPTO. While Plaintiffs point to language in the rule saying that it is not met if there is "bad faith or intentional misconduct," *37 C.F.R. § 1.56,* they have alleged neither here. As one court explained, "allegations that the prosecuting attorney attempted to bury the [USPTO] Examiner with less relevant references is not persuasive because disclosure of hundreds of patents and publications is also entirely consistent with the Applicants fulfilling their duty to disclose [under section 1.56]." *Bridgestone Americas Tire Operations, LLC v. Speedways Tyres Ltd.*, No. 22-0145, 2023 WL 5105776, at *3 (N.D. Tex. Aug. 9, 2023). [16]

[16]    The Federal Circuit case Plaintiffs cite in support of their argument that Amarin violated its duty to the USPTO does not support its argument. In *Molins Plc v. Textron*, a patent practitioner had previously represented to foreign patent offices that a study was "the closest prior art" but never referenced this "highly material reference" to the USPTO. *48 F.3d 1172, 1181 (Fed. Cir. 1995).* The trial court found that when the practitioner's successors found out about the omission when reviewing the file on reexamination, their decision to "bury" the study amid other prior art violated their duty of candor because they had "knowledge of [the predecessor's] actions in the foreign prosecutions." *Id.* at 1183. The Federal Circuit reversed, finding that the trial court erred because "[t]hese circumstances therefore do not present clear and convincing evidence of intent on the part of [the successors] to conceal [the study] from the PTO during the reexamination." *Id.* at 1184.
Even had the Federal Circuit affirmed, the allegations of the Amended Complaint suggesting wrongdoing would fall well below the facts presented in *Molins.* As it is, *Molins* only underscores the point that Plaintiffs have failed to

allege that Amarin violated its duty of candor to the USPTO here.

**[33]**  Plaintiffs point to nothing from the Nevada litigation that would suggest that the patents' invalidation was a foregone conclusion over the six years of litigation. Judge Du merely disagreed with the patent examiner, finding that the Kurabayashi Study suggested that results from the MARINE Trial were not "unexpected benefits." *Amarin Pharma, Inc.*, 449 F. Supp. 3d at 1013. While Judge Du wrote that the USPTO "did not consider" the Kurabayashi Study, Judge Du did not blame Defendants for this. *Id.* Finding Defendants' opinions about the progress of the Nevada Litigation actionable based on the bare fact that Amarin ultimately lost would constitute impermissible "fraud by hindsight." *See In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 132 (3d Cir. 2017) (affirming dismissal of securities fraud claims where plaintiffs relied on the fact that the FDA changed its initial belief after receiving new data (quoting *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 497 (3d Cir. 2016))); *see also In re NAHC*, 306 F.3d at 1330 ("[L]iability cannot be imposed on the basis of subsequent events."). [17]

[17]    In fact, the patent's history supports Defendants reasonable belief in their opinions. As Defendants note, receiving the patents granted them a presumption of validity. *35 U.S.C. § 282(a).* In a 2018 *Markman* decision, Judge Du adopted Amarin's proposed definition for four of the five disputed terms. *See Amarin Pharma, Inc. v. W.-Ward Pharms. Corp.*, No. 16-2525, 2018 WL 3824348, at *7 (D. Nev. Aug. 10, 2018). In 2019, Judge Du denied-in-part the generic competitors' motion for summary judgment, delivering Amarin a partial win in defense of its patents and permitting the matter to proceed to trial. *See Amarin Pharma, Inc. v. W.-Ward Pharms. Int'l Ltd.*, 407 F. Supp. 3d 1103, 1120 (D. Nev. 2019).

**\*17** **[34]**  Although not necessary to the Court's conclusion, a review of the USPTO record—which is a matter of public record and which Plaintiffs and their attorneys surely scoured in drafting the Amended Complaint—further expose the inadequacy of Plaintiffs' allegations. As Plaintiffs note, the patent examiner stamped the references Amarin submitted, including one listing the Kurabayashi Study, with the phrase "ALL REFERENCES CONSIDERED." (Ex. 78.) The examiner's search notes reflect that he searched Amarin's submissions for the word "Epadel," (Ex. 77), which is the

**Dang v. Amarin Corporation plc, --- F.Supp.3d ---- (2024)**

2024 WL 4285900

drug administered in and discussed by the Kurabayashi Study. In the first rejection of Amarin's patent claim in June 2011, the examiner cited three studies, (Ex. 80), all of which were listed after Kurabayashi on Amarin's Form 1449, (Ex. 74). Plaintiffs fail to allege how, given these strong indications that the examiner reviewed the submitted prior art, including Kurabayashi, Defendants omitted material information by not highlighting the Kurabayashi Study to the investing public. In this light, the Amended Complaint has failed to allege facts supporting its assertion that "Amarin only received patents for Vascepa because Defendants withheld material information concerning the relevant prior art from the USPTO." (Am. Compl. ¶ 154); *see also Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1184 (Fed. Cir. 1995) (assuming examiner considered references when he "initialed each reference, indicating his consideration of the same, and stated that he had considered all of the cited prior art"). While these documents do not, at this stage of the litigation, show what the patent examiner actually did or did not do, they undermine Plaintiffs' bare allegations of what Defendants knew—*i.e.* their "reasonable basis"—for their in opinions about the litigation.[18]

[18]    Again, although not necessary for the Court's decision, a review of the Kurabayashi Study shows differences between it and the MARINE Trial—unacknowledged and unaddressed by the Amended Complaint—that undermine Plaintiffs' allegation that Defendants could not have had a reasonable basis for their opinions. For example, the MARINE Trial was conducted on patients with triglyceride levels of 500 to 2000 mg/dL, (Am. Compl. ¶ 51), and the crux of Amarin's patent based on the MARINE Trial is a treatment for patients with triglyceride levels between 500 and 1,500 mg/dL, (*id.* ¶ 53); in contrast, the Kurabayashi Study's patient population had triglyceride levels of only 150 to 400 mg/dL, (Ex. 110 at 522). The MARINE Trial subjects received only Vascepa (*i.e.* EPA), (Am. Compl. ¶ 51), while the Kurabayashi Study participants received both Epadel (EPA) and estriol, (Ex. 110 at 521).

 [35]    Plaintiffs contend that it is enough for them to allege that Defendants "knew that 'Amarin's patents were issued in error' and 'Amarin would not succeed in its litigation against the ANDA filers.' " (ECF No. 65 at 34 (quoting Am. Compl. ¶ 154).) However, Plaintiffs must not just allege "actual knowledge" but also "plead with particularity facts that so demonstrate." *GSC Partners CDO Fund v.*

*Washington*, 368 F.3d 228, 239 (3d Cir. 2004) Cases in which a complaint adequately alleges no reasonable basis point to a contradiction between the company's internal and public statements to support the claim. *See Hall*, 2019 WL 7207491, at *18 (lack of a reasonable basis found when the complaint cites "defendant's own internal statements [that] undercut their public interpretations of the data available"); *In re Chemours Co. Sec. Litig.*, 587 F. Supp. 3d 143, 159 (D. Del. 2022) (lack of reasonable basis for an opinion that a company's liability may be several hundreds of millions of dollars found when defendants had received an internal, undisclosed report that the liability may be up to two billion dollars). Even "allegations [that] show a difference of opinion within" a company regarding publicly-stated opinions may be insufficient. *See City of Edinburgh*, 754 F.3d at 170. Here, Plaintiffs do allege any confidential witness, internal document, or any other contemporaneous source, *In re Newell Brands*, 837 F. App'x at 875 ("Plaintiff's allegations fail to refer to contemporaneous sources showing that Defendants' statements were false or misleading."), showing that anyone within Amarin at any point did not believe in the MARINE patents, let alone specifically that the Kurabayashi Study would have been fatal to their patent had it been considered. Defendants are therefore not "plausibly alleged to have lacked sincerity in making" their statements. *Amaya*, 258 F. Supp. 3d at 468–69.

 [36]    Finding that these statements did not make an actionable omission is supported by Defendants' contemporaneous, tempering words about their likelihood of success in the litigation. The Court engages in a "full reading" of Defendants' statements "under the PSLRA's heightened pleading requirements," *City of Edinburgh*, 754 F.3d at 169, considering whether Defendants' "use of cautionary language in analyzing whether the plain language of [their public statements] was false or misleading," *id.* at 177 n.16. In the same breath as language Plaintiffs rely on for their claims, Defendants also disclosed the risks inherent in litigation and the potential that the patent would not be successful. For example, at a June 12, 2019 healthcare conference, Thero talked about the litigation but concluded "we'll see what happens relative to the end of litigation. I can't make any predictions there other than stating that we intend to defend our patents vigorously ...." (Am. Compl. ¶ 142.)[19] These cautionary statements are not limited to "generic disclosures buried" in the company's SEC filings, (ECF No. 65 at 36), but rather follow on the heels of the alleged misstatements from the Amended Complaint.

**19**    (*See also* Am. Compl. ¶ 138 (warning to "just wait until really the second half of [2019]"); *id.* ¶ 145 (acknowledging "risk in any litigation"); *id.* ¶ 146 ("[T]here's risk involved with any ANDA litigation ...."); *id.* ¶ 147 (maintaining belief in Amarin's patents after Judge Du's decision but cautioning that the "appeal process likely won't focus on much of the content which I just expressed, and therefore, such arguments matter little"); *id.* ¶ 151 (describing Amarin's intent to and basis for appealing Judge Du's decision but noting that "[u]nfortunately, the judicial process is such that it doesn't matter that I, you or others conclude that the District Court's decision was wrong"); *id.* ¶ 152 (acknowledging "there is no way for us to guarantee that the Federal Circuit will decide in Amarin's favor" and that the "Federal Circuit could rule in favor of the generic companies and confirm the District Court decision" because "overturning a lower court ruling has not been easy in the industry historically"); *id.* ¶ 153 (noting that Amarin "cannot provide any guarantee of success in" its appeal to the Supreme Court).)

Before Judge Du's ruling, Thero explicitly contemplated losing the Nevada Litigation, warning that "the court's decision on this matter is expected near the end of March" and that "it would be a considerable setback to pharmaceutical development and patient care if we do not prevail in this litigation." (*Id.* ¶ 145.)

**\*18**    Defendants' statements also referred investors to their SEC disclosures, such as Thero's statements on a November 5, 2019 earnings call "refer[ring] investors to the court's order and other court documents for further detail." (*Id.* ¶ 143.)[20] "[S]elective statements of optimism concerning [litigation] are generally not misleading when a company also 'explicitly caution[s] investors' that the results of the [litigation] are still uncertain." *Paxton v. Provention Bio, Inc.*, No. 21-11613, 2022 WL 3098236, at \*12 (D.N.J. Aug. 4, 2022) (quoting *City of Edinburgh*, 754 F.3d at 168–69). A review of Amarin's SEC filings from well before and into the Class Period offer standard warnings that Amarin may not receive or be able to defend its patents.[21] *In re Amarin Corp. PIC Sec. Litig.*, No. 21-2071, 2022 WL 2128560, at \*3 (3d Cir. June 14, 2022) ("We further agree with the District Court that the plaintiffs' theory of omission liability is unpersuasive given Amarin's contemporaneous disclosures [in quarterly and annual SEC filings] regarding the mineral oil placebo.").

**20**    (*See also* Am. Compl. ¶ 143 ("Due to the complex nature of patent litigation, we refer investors to the court's order and other court documents for further detail, which can be located through the FAQ section of our Investor Relations website. We also refer investors to the Risk Factors section in today's Form 10-Q for detail. We intend to continue to vigorously defend our patents but don't intend to go into more detail on that today.").) Other contemporaneous statements referred investors to the public record of the Nevada Litigation. (*See e.g.*, *id.* ¶ 141 ("The public record for the ANDA litigation is available for all to view and many have.").)

**21**    These disclosures are evident both from the public statements and SEC filings directly referenced in the Amended Complaint as well as in the filings publicly available from the SEC; from filings throughout the USPTO patent prosecution process up through the end of the Class Period. (*See generally* Exs. 3–62.)

Plaintiffs point to cases in which courts have found generic warnings of litigation risk inadequate to cure material omissions. (ECF No. 65 at 36.) However, these cases involved much more egregious misstatements and much weaker curative disclosures. In *Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.*, the company's statement that it had a "meritorious defense" in an infringement action were insufficient where it took steps to design a new system with "unnecessary components in order to make the new system appear different from" the patent-holder's and obtained opinion letters from law firms that the company knew were based on insufficient knowledge. 445 F. Supp. 2d 170, 172, 176 (D. Mass. 2006). Likewise in *Meyer v. Jinkosolar Holdings Co.*, the Second Circuit found a generic warning of regulatory risk inadequate, where the company's public statements that it employed "pollution abatement equipment and ... monitoring environmental teams on duty 24 hours a day" conflicted with concurrent private reports to environmental regulators of substantial, existing problems. 761 F.3d 245, 251 (2d Cir. 2014). While Defendants did not disclose the specific risk of Judge Du citing the Kurabayashi Study as the reason for overturning Amarin's patents, the Amended Complaint lacks any allegation that Defendants should have known of this possibility. *See Williams v. Globus Med, Inc.*, 869 F.3d 235, 243 (3d Cir. 2017) (company does not have a duty to disclose a risk that had not "actually

Dang v. Amarin Corporation plc, --- F.Supp.3d ---- (2024)

2024 WL 4285900

materialized" at the time of the allegedly misleading prior disclosure).

**[37]** **[38]** **[39]** Defendants' warnings also bring their statements under the PSLRA's safe harbor. Under the PSLRA, "forward-looking" statements are not actionable if they are "(1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *In re Aetna, Inc.*, 617 F.3d at 278 (citing 15 U.S.C. § 78u-5(c)). The PSLRA's definition of "forward-looking statement" includes "projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational performance." *Id.* at 279 (citing 15 U.S.C. § 78u–5(i)(1)). This safe harbor for forward-looking statements overlaps with the Third Circuit's "bespeaks caution" doctrine, under which "cautionary language, if sufficient, renders the alleged [forward-looking] omissions or misrepresentations immaterial as a matter of law." *EP Medsystems*, 235 F.3d at 874 (quoting *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371 (3d Cir. 1993)). "Under both the PSLRA and the bespeaks caution doctrine, cautionary language must be extensive, specific, and directly related to the alleged misrepresentation ...." *Lewakowski v. Aquestive Therapeutics, Inc.*, No. 21-3751, 2023 WL 2496504, at *5 (D.N.J. Mar. 14, 2023) (citing *In re Aetna*, 617 F.3d at 282; *In re Donald J. Trump*, 7 F.3d 357 at 371–72).

**\*19** **[40]** Each of the criteria for the PSLRA safe harbor are met here. Forward-looking statements are "broadly defined" in the PSLRA, *Avaya*, 564 F.3d at 255, to include, among other statements, those about "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission" as well as "any statement of the assumptions underlying or relating to" such statements. 15 U.S.C. § 78u-5(i)(1)(C)–(D). As summarized above, each of the alleged statements about the Nevada Litigation address Amarin's intent to defend its patents, Amarin's belief and/ or hope for how the litigation will proceed, Amarin's belief of whether it will succeed in the litigation and on appeal. (*See* Am. Compl. ¶¶ 138–53.) These sort of statements fit comfortably within the forward-looking statement definition. *See also Laasko*, 2022 WL 3444038, *5 ("litigation risk disclosures were forward-looking statements"). These statements were accompanied, often contemporaneously but also in Amarin's SEC filings from around the same time,

with meaningful, specific warnings disclosing specific risks, such as that Thero "can't make any predictions [about the Nevada Litigation] other than stating that we intend to defend our patents vigorously." (Am. Compl. ¶ 142; *see also* Exs. 3–62.) Further, Defendants' forward-looking statements are nonactionable because Plaintiffs "have not sufficiently pleaded a strong inference that defendants acted with actual knowledge that their projections were false or misleading." *Avaya*, 564 F.3d at 259. As the Amended Complaint fails to allege that Defendants lacked a reasonable basis for their opinions, they have also failed to plead actual knowledge. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184, 140 S.Ct. 768, 206 L.Ed.2d 103 (2020) ("[T]o have 'actual knowledge' of a piece of information, one must in fact be aware of it.").

### ii. Vascepa's "Unique" Characteristics

The Amended Complaint cites to a number of public statements made by Defendants—all by Thero except for one by Craig Granowitz ("Granowitz"), Amarin's Chief Medical Officer—about Vascepa's "unique" properties that differentiated it from existing available products. (Am. Compl. ¶¶ 99–110.) Plaintiffs allege that these were false or misleading statements that omitted key information because "Vascepa was not unique, and Amarin did not invent purified EPA or discover any of its medical characteristics." (*Id.* ¶ 111.) Therefore, Plaintiff concludes again, Amarin was not entitled to patent protection for Vascepa and only received a patent because it "withheld material information" from the USPTO examiner. (*Id.*)

Defendants argue that Plaintiffs' challenge to these statements "rests on the same flawed assertion of a purported failure to disclose the 'fragility' and 'vulnerability' of the MARINE patents." (ECF No. 58-1 at 43 (quoting Am. Compl. ¶¶ 13, 111).) Defendants further argue that the Amended Complaint's allegations regarding Vascepa's uniqueness "erroneously conflates *both* (i) obviousness with uniqueness and (ii) REDUCE-IT with MARINE." (*Id.* at 43).) Defendants conclude that several of the statements alleged in this section are inactionable puffery or forward-looking statements that fall under the PSLRA's safe harbor. (*Id.* at 44.)

Plaintiffs respond that statements making "specific comparisons" between two drugs are "actionable when scientific studies suggest" they are not. (ECF No. 65 at 39.) By calling Vascepa "unique," Defendants inaccurately

asserted that Vascepa was different from Epadel, which the Kurabayashi Study showed was not true. (*Id.*) Plaintiffs also point to two other studies—the JELIS study and Katayama study—that they allege demonstrated that Epadel, and therefore Vascepa, had these same qualities. (*Id.* at 39–40.) Plaintiffs argue that whether a drug is "unique" is a fact, not an opinion, and that even if it were an opinion, Defendants lacked a reasonable basis to express it. (*Id.* at 40.) Plaintiffs also argue that the several statements Defendants point to are neither puffery nor protected by the FSLA safe harbor. (*Id.* at 41–42.)

[41]  [42]  [43]  The Court finds that Plaintiffs have failed to allege any actionable statement within this group of twelve statements either. At the outset, a number of the statements constitute inactionable puffery as "vague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable investors as such.' " *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (quoting *In re Burlington Coat*, 114 F.3d at 1428 n.14). "Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material." *Id.* (citations omitted). Statements that a drug product is "unique," "far superior" to other generic drugs, should do "very well" and will be "well received" are puffery because they are "not the kind of statements that a reasonable investor would have relied upon." *Bauer v. Eagle Pharms., Inc.*, No. 16-3091, 2017 WL 2213147, at *12 (D.N.J. May 19, 2017) (citing *In re Burlington Coat*, 114 F.3d at 1426); *see also In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 734 (S.D.N.Y. 2018) (finding puffery when stating that a drug trial results "provide exciting evidence of a new therapeutic approach"). Likewise here, the Amended Complaint's allegations that Vascepa is "the single most significant advance" in preventative cardiovascular care or that the REDUCE-IT results show a "new paradigm in treatment" are inactionable puffery. (Am. Compl. ¶¶ 100–01.) [22]

[22]    (Am. Compl. ¶ 100 ("An additional 25% relative risk reduction in REDUCE-IT, on top of well-controlled LDL cholesterol through statin therapy, positions Vascepa as the single most significant advance in preventative cardiovascular drug therapy since the advent of statin therapy."); *id.* ¶ 101 ("This is a – with the REDUCE-IT results an opportunity to provide medical therapy that is a new paradigm in treatment ..."); *id.* ¶ 107 ("I'm hearing tremendous support for Vascepa from

the medical community that is familiar with this important drug. They emphasize, as do the medical society, that the results of REDUCE-IT should not be generalized to any other product."); *id.* ¶ 109 ("Vascepa represents a new class of proven preventative therapy.").)

**\*20**   [44]  Plaintiffs say the uniqueness claims were misleading because Amarin was "not entitled to patent protection for Vascepa" because the only reason it received patents in the first place was because it "withheld material information" from the USPTO examiner. (Am. Compl. ¶ 111(b).) This claim again turns on the argument that Defendants knew or should have known that the Kurabayashi Study would eventually be cited by Judge Du as part of her decision invalidating Vascepa's patents. As explained above, Plaintiffs have not alleged facts with particularity either that Defendants did "not honestly believe[ ]" or lacked a "reasonable basis" to believe the patents would be upheld. *City of Edinburgh*, 754 F.3d at 170. Therefore, statements that Vascepa was unique (and impliedly different from Epadel) are opinions which Defendants had a reasonable belief to express.

[45]  To the extent Plaintiffs allege that these statements were inaccurate not just because of Kurabayashi but also because of the JELIS and Katayama studies, (ECF No. 65 at 39–40 (discussing same)), these allegations are likewise inadequate. While Plaintiffs claim that Amarin "buried" the Kurabayashi Study from the USPTO—which, as the Court has already explained, is unsupported by any particular allegations—Plaintiffs cannot even make the same claim about either JELIS or Katayama. As alleged in the Amended Complaint, the patent examiner's rejection of Amarin's application for the MARINE patent was rejected several times in part based on the Katayama study. (Am. Compl. ¶¶ 56, 61.) While the Amended Complaint alleges that Defendants "knew the JELIS study in Japan had already proven that 'EPA treatment reduced the frequency of major coronary events' " at the time Amarin launched the REDUCE-IT Trial, its executives publicly "acknowledged it closely mirrored the JELIS study," with Granowitz telling investors several months before the start of the Class Period (when the REDUCE-IT results were announced) that "we believe that REDUCE-IT has a very high probability of success" because "JELIS was the most similar to REDUCE-IT in terms of the drug, a pure EPA product as well as the dosing." (*Id.* ¶ 79.) [23] Because the Katayama and JELIS studies were public knowledge and admittedly disclosed by Defendants, differentiating Vascepa from other drugs is not misleading. *See In re Celgene Corp. Sec. Litig.*, No. 18-4772, 2019 WL 6909463, at *12 (D.N.J.

Dec. 19, 2019) (finding no actionable statements where the "shortcomings for clinical studies" that plaintiffs allege defendant failed to disclose "was publicly disclosed and acknowledged by" defendant); *see also In re Sanofi-Aventis Sec. Litig.*, No. 07-10279, 2009 WL 3094957, at *5 (S.D.N.Y. Sept. 25, 2009) (finding no actionable statements where allegedly non-disclosed "safety data" was "unequivocally demonstrate[d]" by the complaint to have been "made available to the public through [defendant's] press releases, S.E.C. filing, and various medical publications").

23      Further undermining the Amended Complaint's allegation that the statements about REDUCE-IT were misleading in light of JELIS, Defendants further cite the Court to other portions of their SEC filings in which they repeatedly disclosed that the REDUCE-IT Trial sought to expand on the JELIS study. (*See* Ex. 52 at 12 ("In Japan, ethyl-EPA is marketed under the product name of Epadel .... Due to the limitation of JELIS, further study was needed through the REDUCE-IT study to determine the clinical benefit, if any, of EPA therapy in statin-treated patients with elevated triglyceride levels in a patient population beyond that studied in JELIS."); *see also id.* ¶ 54 at 10 (same).)

Further, the Court notes that in one of the prior securities fraud class action suits against Amarin, the plaintiffs there alleged that the defendants—Amarin and several executives, including Thero—made actionable misstatements in 2010 to 2013 when they "repeatedly miscited JELIS as support for the efficacy of Vascepa, despite their actual knowledge of critical distinctions between JELIS and ANCHOR and REDUCE–IT." *In re Amarin Corp. PLC*, No. 13-6663, 2015 WL 3954190, at *8 (D.N.J. June 29, 2015). In other words, while those plaintiffs alleged actionable statements because the defendants compared REDUCE-IT and JELIS, here Plaintiffs allege actionable statements because Defendants did not talk about JELIS when discussing REDUCE-IT. While the opposite allegations are certainly not preclusive, the inconsistency is striking.

**\*21**   **[46]**   Indeed, the Court notes the critical distinction between the MARINE Trial and the REDUCE-IT Trial. The MARINE Trial demonstrated that Vascepa reduced triglycerides in patients with severe hypertriglyceridemia. (Am. Compl. ¶ 51.) Throughout its application to the USPTO, Amarin maintained that the MARINE Trial showed "a reduction in triglycerides and ApoB without raising LDL-C levels." (*Id.* ¶ 53.) It was on the basis of the MARINE Trial results that Amarin sought and eventually received patent protection for Vascepa. (*Id.* ¶¶ 53–72.) The Amended Complaint's allegations relating to the patent prosecution before the USPTO make no mention of Vascepa's use for reducing cardiovascular risk (*i.e.* the REDUCE-IT indication). (*Id.*) In contrast, the REDUCE-IT Trial demonstrated that "patients taking purified EPA were at substantially less risk for a cardiovascular event than patients taking a placebo." (*Id.* ¶ 80.) As Judge Du explained in finding the REDUCE-IT results irrelevant to Amarin's secondary considerations arguments, "there is no nexus between REDUCE-IT and the Asserted Claims" for the patents issued by the USPTO. *Hikma Pharms. USA Inc.*, 449 F. Supp. 3d at 1010. While the patents for Vascepa were issued based on the MARINE method, any claim as to uniqueness related to the REDUCE-IT indication. (*See, e.g.*, Am. Compl. ¶ 100 (describing an "additional 25% relative risk reduction in REDUCE-IT" as "the single most significant advance in preventative cardiovascular drug therapy").) [24] Even reading these statements to mean that Defendants were representing that Amarin's REDUCE-IT indication was unique, those statements were not rendered inactionable by Judge Du's decision, which did not touch on Vascepa's qualities or characteristics for the REDUCE-IT indication, and therefore did not render these statements false.

24      (*See* Am. Compl. ¶ 100 ("An additional 25% relative risk reduction in REDUCE-IT, on top of well-controlled LDL cholesterol through statin therapy, positions Vascepa as the single most significant advance in preventative cardiovascular drug therapy since the advent of statin therapy."); *id.* ¶ 101 ("We continue to reinforce that REDUCE-IT results are unique to Vascepa it cannot be generalized any prior generation add-on to statin, such as fenofibrates and that the REDUCE-IT results cannot be generalized to common fish oil or omega-3 mixture products, particularly those that contain the omega-3 acid, DHA.... This is a – with the REDUCE-IT results an opportunity to provide medical therapy that is a new paradigm in treatment ...."); *id.* ¶ 102 ("Vascepa has demonstrated clinical effects that have not been shown for any other product. The clinical effects of Vascepa demonstrated in REDUCE-IT cannot be generalized to any other product."); *id.* ¶ 104 ("We do not envision that

we will compete with therapies for managing LDL cholesterol. Rather, Vascepa presents a new opportunity for healthcare professionals to help patients reduce their cardiovascular risk."); *id.* ¶ 107 ("I'm hearing tremendous support for Vascepa from the medical community that is familiar with this important drug. They emphasize, as do the medical society, that the results of REDUCE-IT should not be generalized to any other product."); *id.* ¶ 109 ("Vascepa represents a new class of proven preventative therapy. Vascepa is the first and only drug with this new cardiovascular risk reduction indication. Our launch of Vascepa for this new indication reflects the uniqueness of Vascepa.").)

**[47] [48] [49]** Other statements are not adequately alleged to be misleading because on their face they do not refer to Vascepa. The Amended Complaint alleges falsity in that "Vascepa was not unique." (Am. Comp. ¶ 111(a).) However, some of the complained-of statements refer not to Vascepa —Amarin's drug—but to EPA, the compound Vascepa contains, such as Thero's November 2018 statement that "[p]ublications in recent years have shown that the clinical effects *of the active ingredient* in Vascepa are unique." (*Id.* ¶¶ 101 (emphasis added).) [25] As to the Amended Complaint's claim that "Amarin did not invent purified EPA or discover any of its medical characteristics," (*id.* ¶ 111(a)), Plaintiffs cite to no statements by Amarin or its employees suggesting that they did. The Court must read the alleged misstatements in the context in which they were made. *City of Edinburgh*, 754 F.3d at 171. Read in context, these statements fail to identify anything "materially misleading" about these statements. *In re NAHC*, 306 F.3d at 1330 (citing *In re Burlington Coat*, 114 F.3d at 1419).

[25]    (*See also* Am. Compl. ¶ 102 ("The active pharmaceutical ingredient in Vascepa has a unique molecular structure. Vascepa has demonstrated clinical effects that have not been shown for any other product. The clinical effects of Vascepa demonstrated in REDUCE-IT cannot be generalized to any other product."); *id.* ¶ 103 ("There's data out there showing that EPA, ... *the active ingredient* in our drug, has a positive effect on each of those steps ...." (emphasis added)); *id.* ¶ 105 ("As a reminder, Vascepa capsules are not an omega-3 mixture but a drug product *consisting of icosapent ethyl*, the single active ingredient of which has been shown to have clinical effects which are different from any other drug." (emphasis added)); *id.* ¶ 106 ("Vascepa is – has a *mechanism of action*, which is unique. The FDA has deemed it to be a new chemical entity." (emphasis added)); *id.* ¶ 108 ("This is a unique molecule. It's been deemed a new chemical entity by the FDA. It is – it has multiple effects that have not been shown for any other molecule.").)

### *iii. Financial Prospects of REDUCE-IT and Vascepa's Prospects*

**\*22** In the final group of statements Plaintiffs cite in support of their claim, Defendants make statements regarding Amarin's financial prospects resulting from the results of the REDUCE-IT Trial. (Am. Compl. ¶¶ 112–36.) Of the 25 quoted statements, only three were made or signed by Kalb, with the rest made by Thero. (*Id.*) The Amended Complaint alleges that these statements are actionable because they failed to disclose (1) if it lost patent protection, Amarin would have to compete with generic manufacturers and would not have the same market share, (2) the loss of patent protection would "dramatically undermine the positive REDUCE-IT results," and (3) Amarin was "not entitled" to its patents and only received them because it "withheld material information ... from the USPTO." (*Id.* ¶ 137.)

Defendants argue that the Amended Complaint does not allege an actionable omission because of Amarin's extensive disclosure "warn[ing] of these very risks regarding both MARINE patent invalidity and generic competition." (ECF No. 58-1 at 45.) Further, Defendants contend that the financial predictions are inactionable opinions because the Amended Complaint does not allege that Thero and Kalb did not honestly believe their opinions and also that they fall under the PSLRA's safe harbor. (*Id.* at 45–47.) Finally, Defendants argue that some statements in this section are puffery or accurate statements of historical fact. (*Id.* at 47–48.) Plaintiffs' response, as with the prior two groups of statements, turns on the argument that Defendants failed to "disclos[e] material information concerning the validity of Vascepa's patents." (ECF No. 65 at 20–21.) Applying this allegation, Plaintiffs reason that Defendants' disclosures of litigation risks were inadequate, that their opinions about Vascepa's financial prospects lacked a reasonable basis, and that the safe harbor is unavailable. (*Id.* at 22–30.)

**[50]** The Court finds that as a matter of law, Defendants' statements about the financial prospects from the REDUCE-IT study are not materially false or misleading, largely for the reasons explained in the preceding sections. The challenged statements here all express Defendants' belief in the scope of Vascepa's success in light of the REDUCE-IT Trial's results. (Am. Compl. ¶¶ 112–36.) In pleading why these statements are allegedly false, each of the three reasons Plaintiffs give ties back to the claim that the Individual Defendants' failed to disclose that it could lose patent protection, which in turn is based on the previously-addressed, unsubstantiated claim that the undisclosed Kurabayashi Study was fatal to Amarin's patent claim. (*Id.* ¶ 137.) Plaintiffs' opposition brief affirms that this is the basis for Plaintiffs' claims about these statements. (ECF No. 65 at 22–30.) Although no further discussion is necessary to find these statements inactionable, the Court briefly addresses additional arguments when only tend to bolster and support this outcome.

First, the statements are all inactionable opinions. As one representative statement alleged, at a September 2018 call announcing the results of the REDUCE-IT Study, Thero said:

> Fast forward through over a decade and hundreds of millions of dollars of big pharma clinical development to REDUCE-IT. With approximately 25% relative risk reduction on top of statin therapy now demonstrated, we have confirmed that our easy-to-use drug, that's inexpensive, with broad reimbursement coverage, significantly reduces cardiovascular risk. It thus has the potential to overcome the limitations of multiple blockbuster prior-generation therapies. It thus has the potential to be a significant blockbuster and help millions of patients reduce cardiovascular risk on top of standard-of-care statin therapy.

(Am. Compl. ¶ 113.) The statements from Thero or Kalb reflect similar projections about the "potential for Vascepa to help millions of patients," (*id.* ¶ 114,) or their belief "that REDUCE-IT results will help transform Vascepa into becoming a multibillion-dollar brand," (*id.* ¶ 115.) [26] Each of these expressions of Vascepa's potential is "a belief, a view,

or a sentiment which the mind forms of persons or things." *Omnicare*, 474 U.S. at 183, 106 S.Ct. 477 (citation omitted) (cleaned up).

26    (*See also* Am. Compl. ¶ 115) ("[T]he REDUCE-IT results positions Vascepa to lead a new paradigm in patient care beyond cholesterol management.... While we do believe that REDUCE-IT results will help transform Vascepa into becoming a multibillion-dollar brand, we intend to wait until healthcare professionals better appreciate the results for the REDUCE-IT study and better appreciate the existing managed care coverage in affordable pricing of Vascepa before we provide revenue guidance."); *id.* ¶ 116 ("[R]oughly 1 in 4 adults in the United States have elevated triglycerides, but fewer than 4% of those patients are treated with any therapy .... Or is it all 25%, and we're about twice but that's about $80 billion. I don't think we'll get there, but that's the size of the potential opportunity."); *id.* ¶ 117 ("We will be pursuing a[n] expanded indication with the FDA for cardiovascular risk prevention, and we believe this is a multibillion-dollar opportunity."); *id.* ¶ 121 ("We anticipate Vascepa revenue growth to accelerate further after label expansion approval and with a larger sales team, and then again after we commence promotion of Vascepa for cardiovascular risk reduction on television and through other media."); *id.* ¶ 122 ("With the success of our launch of Vascepa for this important new indication, we believe that Amarin will create growth and significant shareholder value."); *id.* ¶ 123 ("[W]e're working to be at a support multiple billions in revenues, and we're using a strategy that has multiple suppliers competing against themselves."); *id.* ¶ 124 ("But if we just look at the population of patients with triglycerides from 135 and above, that's about 90 million people in United States. If we look at statin treated patients with elevated triglycerides 135 and above, that's about 15 million patients in the United States."); *id.* ¶ 126 ("At this time, we are projecting that total net revenue for 2020 will be in the range of $650 million to $700 million, mostly from sales of Vascepa in the United States.... However ... at this time, we are not providing guidance regarding annual revenue levels beyond 2020."); *id.* ¶ 127 ("We are committed to making Vascepa a

multibillion-dollar brand and a standard of care for patients with persistent high cardiovascular risk."); *id.* ¶ 130 ("This is the advent of a new era in preventative cardiovascular care."); *id.* ¶ 131 ("As previously described, we believe that a U.S. sales force of 800 sales representatives, supported by our other promotional activities, is positioned to make Vascepa a multibillion-dollar brand."); *id.* ¶ 134 ("VASCEPA is rapidly becoming a new pillar in preventative cardiovascular care. We have the drug, the signs, the people and the resources to, and we believe, being quite successful in the U.S., Europe and rest of the world.").

**\*23** **[51]** **[52]** Thus, whether Plaintiffs have alleged securities fraud turns on whether they have adequately alleged that an opinion "(i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police*, 70 F.4th at 686. Plaintiffs argue that "Defendants may not describe a favorable picture of material issue without including the details that would have presented a complete and less favorable one." (ECF No. 65 at 21 (quoting *Industriens Pensionsforsikring v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022)).)[27] Plaintiffs have failed to allege any facts supporting the assertion that "Defendants understood that Vascepa's patents could not withstand the scrutiny of litigation." (ECF No. 65 at 17.) As explained above, the mere existence of the Kurabayashi Study— Plaintiffs' only basis for their allegation that Defendants should have known of that their patents were invalid—is insufficient to plead that Defendants' had such knowledge and is not a risk Defendants were required to disclose to the investing public. While the projections for Amarin's market power after REDUCE-IT were predicated on Amarin's ability to maintain its patents, this risk was disclosed, both concurrently with the cited statements in the Amended Complaint, and in Amarin's SEC filings. Thus, the Court finds that the Amended Complaint fails to allege with particularity that Defendants lacked a reasonable basis for their opinions, that they were not sincerely held, or that they contained untrue factual assertions.

[27]   In *Industriens Pensionsforsikring*, Judge Chesler found that complaint had adequately alleged an actionable omission because defendants had made rosy financial projections about their drug without disclosing that the FDA had told the company that

there were "concerning" issues with the product and that the company should not ship the product with the issues." 620 F. Supp. 3d 167 at 186. The complaint contained "allegations from multiple confidential witnesses demonstrating that critical employees working on [the drug] and its defects ... understood that the FDA in this meeting de facto demanded the imposition of a ship hold until the BD could resolve the defects." *Id.*

\* \* \*

In sum, the Amended Complaint has not adequately alleged that any of Defendants' statement about the USPTO proceedings, the Nevada Litigation, Vascepa's characteristics, or Amarin's financial prospects based on the REDUCE-IT Study were actionable, because they were reasonably held opinions accompanied by appropriate disclosures, supported by reasonable belief, appropriately caveated, and protected by the PSLRA's safe harbor.[28] At the Amended Complaint's core is Plaintiffs' allegation that Amarin and its executives knew that the company was not entitled to patent protection for Vascepa but nonetheless sought and defended the patents. Plaintiffs' theory of liability would impose a duty that Congress sought to avoid through the PSLRA's heightened pleading standard. *See In re NAHC*, 306 F.3d at 1330 ("[L]iability cannot be imposed on the basis of subsequent events."). The Honorable Michael Vazquez, U.S.D.J. (ret.) explained the concern well:

> Plaintiffs seem to contend that a company must also make a complete mea culpa when disclosing the investigation and its potential legal implications. Such a position does not find support in the law. ... Plaintiffs do not claim that Defendants made a misrepresentation or actionable omission concerning the nature of the investigation itself nor as to the potential legal liability faced by [the corporate defendant]. Plaintiffs do contend, however, that [the corporate defendant's] disclosures were misleading because they concealed the true extent of the company's legal exposure ... The law required [the corporate defendant]

to disclose the investigation and its potential legal ramifications, which [the corporate defendant] appears to have done.

*In re Galena Biopharma, Inc. Sec. Litig.*, No. 17-929, 2019 WL 5957859, at \*10–11 (D.N.J. Nov. 12, 2019). Defendants cannot pluck a piece of evidence that the Court in the Nevada Litigation relied on in reaching its decision to argue now that Defendants' decade of optimistic opinions about their patents were fraudulent, absent any particularized allegations that Defendants had conflicting information at the time or otherwise lacked a reasonable basis for their opinions. The Amended Complaint does not do so here, and this claim must fail.

28    As explained at the outset, given Plaintiffs' pleading approach to quote large volumes of text without specifying how each statement was allegedly misleading, the Court does not quote and discuss every single statement from the Amended Complaint. For the avoidance of doubt, the Court notes that it has assessed each statement in Plaintiffs' Amended Complaint, even if not discussed herein. For the above-mentioned reasons, the Court finds that Plaintiffs fail to allege an actionable omission or misstatement.

## 2. Inference of Scienter

**\*24** **[53]** **[54]** **[55]** **[56]** To survive dismissal, Plaintiffs must also adequately plead scienter, which is "the defendant's intention to deceive, manipulate, or defraud," *Tellabs,* 551 U.S. at 313, 127 S.Ct. 2499 (citation and quotations omitted), requiring "a knowing or reckless state of mind," *Avaya,* 564 F.3d at 267 (citing *Advanta.,* 180 F.3d at 534–35). "Under the PSLRA's second pleading requirement, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Id.* at 267 (quoting 15 U.S.C. § 78u–4(b)(2)). This standard is met "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499. The Court conducts this analysis "holistically to determine whether [the complaint's] allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized

in isolation, meets that standard.' " *In re Hertz Glob. Holdings Inc.,* 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Tellabs, Inc.,* 551 U.S. at 323, 127 S.Ct. 2499). "[O]missions and ambiguities count against inferring scienter." *Tellabs, Inc.,* 551 U.S. at 323, 127 S.Ct. 2499.

The Amended Complaint asserts that its alleged facts permit the "strong[ ] infer[ence] [that] Defendants knew or recklessly disregarded that their Class Period statements were materially false or misleading to investors." (Am. Compl. ¶ 155.) Plaintiffs further allege several facts they contend support scienter. First, Plaintiffs allege that because Vascepa was Amarin's sole product on which Amarin's financial success depended, the Individual Defendants "exclusively focused on issues concerning Vascepa in their day-to-day work." (*Id.* ¶ 157; *see also id.* ¶¶ 156–61.) Second, Plaintiffs point to the Individual Defendants' repeated, detailed public statements about Vascepa as showing they played an "integral role" in REDUCE-IT and the MARINE litigation. (*Id.* ¶ 163; *see also id.* ¶¶ 162–69.) Third, Plaintiffs contend that the Individual Defendants' stock trading history during the Class Period, in which they "sold over 5.4 million shares of Amarin ADSs at artificially inflated prices," supports scienter. (*Id.* ¶ 170; *see also id.* ¶¶ 170–77.) Finally, the Amended Complaint alleges that Thero's and Kennedy's departures from the company in April 2021 support an inference of wrongdoing. (*Id.* ¶¶ 178–79.)

Defendants respond that the Amended Complaint's discussion of the Individual Defendants' stock sales, which may be probative of motive, does not establish scienter because the scope and timing of the sales were not suspicious. (ECF No. 58-1 at 48–55.) Defendants argue that Plaintiffs have offered no fact—"from a confidential witness, internal document, or otherwise"—supporting the claim that the Individual Defendants "knew or believed the MARINE patents shouldn't be granted, were invalid when granted, or would be invalidated in the MARINE Patent Litigation." (*Id.* at 56.) Defendants contend that the more compelling inference from Defendants' conduct is that they believed in their patents and that Vascepa would have the financial success they expected. (*Id.* at 56–57.) Defendants argue that the remaining allegations in the Amended Complaint—the importance of Vascepa to Amarin, the Individual Defendants' seniority at the company, and Thero's and Kennedy's retirement—even taken together are not sufficient to support a strong inference of scienter. (*Id.* at 57–59.)

**[57]** **[58]** Here, the Amended Complaint's scienter allegations are insufficient to satisfy the PSLRA's "strong inference" requirement. The Court begins with Plaintiffs' allegations of "reckless or conscious behavior." *Avaya*, 564 F.3d at 267. "Conscious misbehavior involves 'intentional fraud or other deliberate illegal behavior.' " *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 613 (E.D. Pa. 2009) (quoting *Advanta*, 180 F.3d at 535). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42 (quoting *Advanta*, 180 F.3d at 535).

***25** Plaintiffs make three related arguments about the importance of Vascepa to Amarin and the Individual Defendants' involvement with the Nevada Litigation. The basic allegations Plaintiffs rely on for these arguments are sufficiently alleged. Vascepa was Amarin's "sole product," to which the company "devoted substantial resources." (Am. Compl. ¶ 156.) The Individual Defendants each held senior leadership positions at the company during the Class Period, and Thero and Kennedy were executives at the company during the patent prosecution. (*Id.* ¶¶ 23–25, 163.) Plaintiffs allege that the Individual Defendants were "highly sophisticated" as a result of their managerial (Thero), legal (Kennedy), and financial (Kalb) experience. (*Id.* ¶¶ 157–60.) All three Individual Defendants spoke to investors about the Nevada Litigation, Vascepa's financial significance to Amarin, and the REDUCE-IT Results. (*Id.* ¶¶ 164–68; *see also id.* ¶¶ 99–153.) As such, Plaintiffs have pled facts sufficient to infer that given Vascepa's importance to the company, the Individual Defendants would have been focused on the Nevada Litigation and familiar or even involved with major litigation decisions.

**[59]** However, Plaintiffs carry their inferences too far by concluding that therefore the alleged misrepresentations and omissions—*i.e.* their patents' fundamental flaw from failing to disclose the Kurabayashi Study—were "of such a nature [that] they would have been approved by corporate officials sufficiently knowledgeable about the Company to know those statements and omissions were false and misleading." (*Id.* ¶ 161.) Plaintiffs' allegations that the Individual Defendants were focused on Vascepa and winning the Nevada Litigation does not carry the inference that they therefore knew or recklessly disregarded the patents' vulnerabilities. Plaintiffs cite *Avaya* for the proposition that

"the most powerful evidence of scienter is the content and context of [defendants'] statements themselves." 564 F.3d at 269. True, however in *Avaya*, this referred to chief financial officer's "explicit[ ]" denials that the company was discounting its products in the face of pricing pressure in response to "repeated questions about pricing by analysts." *Id.* In other words, the fact that a company officer makes a statement about a topic does not necessarily support the inference that he knows all facts relevant to that topic. *Id.* at 270 ("The mere fact that a defendant made a statement about earnings, therefore, does not necessarily imply he would have been aware of particular pricing developments."). *Avaya* may be factually similar had analysts asked about the Kurabayashi Study and the possibility of Amarin losing the Nevada Litigation because of it, and in response Individual Defendants denied that possibility. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013) (distinguishing *Avaya* because "in *Avaya* the individuals who denied that there was intense competition were responding to pointed inquiries from analysts during multiple conference calls that addressed pricing problems").

Plaintiffs do not allege anything comparable here. Instead, Plaintiffs call out only general statements by the Individual Defendants that indicate their focus on the patent litigation. (Am. Compl. ¶¶ 162–69.) The Amended Complaint alleges that Kennedy said he "[l]ed Amarin's strategy" in the successful prosecution of over 40 patents, (*id.* ¶ 163), which may refer to the six MARINE patents challenged in the Nevada Litigation. Regarding Thero, the Amended Complaint cites Thero's statement that he had been "part of Amarin" since the "genesis" of Vascepa. (*Id.* ¶ 164.) After the Nevada Litigation commenced, Thero and Kalb both made statements that Amarin was "focused on" or "prioritizing" wining the litigation. (*Id.* ¶¶ 166–68.) In contrast to these broad statements of Defendants' priorities, the decision on the importance of the Kurabayashi Study, whether to submit it to the USPTO, and whether to separately raise it in communications with the examiner are specific considerations and granular details within the broader context of the patent litigation. Plaintiffs offer no particularized allegations that the Individual Defendants were ever asked about the Kurabayashi Study or were involved in any decisions about how to use it in the patent prosecution. Therefore, these statements by the Individual Defendants do not create a strong inference that Plaintiffs knew about the alleged concealment of the Kurabayashi Study from the examiner.[29]

29  The other cases Plaintiffs cite on this point, (ECF No. 65 at 44–45), likewise support the general proposition that an executive who publicly professes expertise on a subject can broadly be inferred to know what is happening within that subject at the company. *See Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer IP*, 532 F. Supp. 3d 189, 203 (E.D. Pa. 2021); *In re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124, 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017); *Gauquie v. Albany Molecular Rsch., Inc.*, No. 14-6637, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016). They do not support the inference that because the Individual Defendants were focused on Vascepa and the Nevada Litigation, they were aware of the Kurabayashi Study, considered its potential relevance to Amarin receiving or defending its patents, and therefore possessed requisite scienter when speaking about the Nevada Litigation.

**\*26** **[60]** **[61]** **[62]** Plaintiffs' related reliance on the "core operations" doctrine fails for the same reason. (ECF No. 65 at 45–46.) "[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653–54 (E.D. Pa. 2015) (quoting *Rahman*, 736 F.3d at 246). This doctrine is insufficient by itself to establish scienter but should be taken "in consideration when viewing the entirety" of the Amended Complaint's allegations. *In re: Enzymotec Sec. Litig.*, No. 14-5556, 2015 WL 8784065, at *18 (D.N.J. Dec. 15, 2015). As explained above, Plaintiffs have certainly alleged adequately that Vascepa was important to Amarin and the Individual Defendants. The USPTO prosecution and Nevada Litigation did not involve an ancillary part of Amarin's business; plainly, the Individual Defendants were sensitive to Amarin's patents. However, the core operations doctrine does not permit imputing the requisite scienter regarding any statement made within a broad perimeter of the relevant core operations to an executive. *See Rahman*, 736 F.3d at 246 (distinguishing the core operations doctrine's application in *Avaya*); *see also Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 556 (D.N.J. 2010) ("[I]t is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question."); *Advanta*, 180 F.3d at 539 (rejecting "allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading"). While the core operations doctrine offers weak support for inferring scienter, it is not enough here.

**[63]** In contrast, here, Plaintiffs' allegations regarding Thero's and Kennedy's departures from the company do not support an inference of scienter. Plaintiffs point to the fact that they left in April 2021—"seven months after the Federal Circuit affirmed the District Court's invalidation of Vascepa's patents"—as evidence of their state of mind. (ECF No. 65 at 46.) The Third Circuit has found that "[r]esignations or terminations might form a piece to the scienter puzzle ... if, for example, a relatively contemporaneous and public firing is accompanied by extreme corporate punishment such as the denial of previously accrued benefits." *Fain v. USA Techs., Inc.*, 707 F. App'x 91, 97 (3d Cir. 2017) (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002)).

The Amended Complaint does not allege that the departures were either contemporaneous with the announcement of bad news or accompanied by any punishment. Thero and Kennedy both left the company in April 2021, (Am. Compl. ¶¶ 178–79), which was seven months after the Federal Circuit affirmed Judge Du's decision. However, Amarin's loss in the Nevada Litigation did not "reveal" any wrongdoing; in other words, as explained above, no facts came to light through Judge Du's decision or the Federal Circuit's affirmance that Amarin, let alone any Individual Defendant, concealed the Kurabayashi Study or that at the time the USPTO issued the patents, Defendants knew or even suspected them to be invalid. Therefore, the fact that two Individual Defendants' departures from the company followed the court decisions, absent any allegation that they were in any way punished or censured, does not evidence scienter. *See Hoey v. Insmed Inc.*, No. 16-4323, 2018 WL 902266, at *23 (D.N.J. Feb. 15, 2018) ("Plaintiff fails to adequately allege an extraordinary corporate punishment against Dr. Gupta."). 30 Further, Judge Du's decision citing the Kurabayashi Study was handed down in March 2020, over one year before the executives' departures. This is not the "relatively contemporaneous and public firing," *Fain*, 707 F. App'x at 97, that could support scienter. *Cf. Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) (inference of scienter supported by retirement of executive "on the same day" a research firm released a negative report about the company); *Hoey*,

2018 WL 902266, at *23 (inference of scienter not found even where executive resigned "shortly after" negative results announced). [31]

30    In fact, rather than punishment, Thero and Kennedy received consulting contracts with Amarin after departing, as set out in Amarin's public Form 8-Ks filed in April 2021. (*See* Exs. 60, 61.)

31    Statements quoted in the Amended Complaint that Thero's replacement would be "responsible for reversing the business' decline" and that Thero must "take responsibility" for Amarin's loss in the Nevada Litigation, (Am. Comp. ¶ 178), are generic statements that would be expected about any executive of a company that experienced a significant litigation disappointment, as the Nevada Litigation certainly was. *See In re Hertz*, 905 F.3d at 119 ("But pleading scienter requires more than pleading a link between bad news and an executive's resignation. Changes in leadership are only to be expected when leadership fails. That is not, in itself, a symbol of fraud.").

*27    [64]    [65]    Finally, the Court considers the Amended Complaint's allegations related to the Individual Defendants' stock sales. While "motive and opportunity" do not offer an "independent route to scienter" following *Tellabs*, particularized allegations regarding motive and opportunity may, in combination with other allegations, support a strong inference of scienter. *Avaya*, 564 F.3d at 277 (citing *Tellabs*, 551 U.S. at 323–29, 127 S.Ct. 2499). Although the Court "will not infer fraudulent intent from the mere fact that some officers sold stock," *id.* at 279 (quoting *Advanta*, 180 F.3d at 540), "if the stock sales were *unusual in scope or timing*, they may support an inference of scienter," *id.* (emphasis added). "Whether a sale is 'unusual in scope' depends on factors such as 'the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved,' " *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (quoting *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 635 (D.N.J. 2002)), as well as "whether the sales were 'normal and routine,' and whether the profits were substantial relative to the seller's ordinary compensation," *id.* (quoting *In re Burlington Coat*, 114 F.3d at 1423).

Plaintiffs would infer scienter from the Amended Complaint's allegations that the Individual Defendants "sold over 5.4 million shares of Amarin ADSs at artificially inflated prices" during the Class Period. (Am. Compl. ¶ 170; *see generally*

*id.* ¶¶ 170–77.) As summarized in its embedded charts, the Amended Complaint alleges that during the two-and-a-half year Class Period, Thero sold shares worth $36,790,688, Kennedy sold shares worth $36,504,087, and Kalb sold shares worth $9,779,380. (*Id.* ¶ 170.) Thero and Kalb had not sold any shares in the two years prior to the start of the class period, during which time Kennedy sold shares worth $2,138,688. (*Id.* ¶¶ 173–75.) On the day the Class Period began—which is also the day the REDUCE-IT results were announced—Kennedy sold 83.21% of his holdings, at the time worth over $11 million. (*Id.* ¶ 173.) On that same day, Kalb sold 90.91% of his then-holdings, which were worth over $1.5 million. (*Id.* ¶ 174.) [32] Plaintiffs argue that these sales are "suspicious" and support the inference that the Individual Defendants knew the patents would eventually be invalidated. (ECF No. 65 at 48–57.)

32    The Court recognizes that the amounts and percentages of the Individual Defendants' stock sales alleged in the Amended Complaint do not perfectly add up. For example, while the Amended Complaint alleges that Kalb sold 90.91% of his Amarin ADS holdings worth $1,563,514 on September 24, 2018, it also alleges that he sold 65.07% of his holdings worth $9,779,380 over the entire Class Period. (Am. Compl. ¶ 174.) Unless he subsequently acquired more stock after selling 90.91% of his shares worth approximately $1.5 million in September 2018, it would be impossible for the approximately $9.8 million worth of stock he acquired over the entire Class Period to constitute 65.07% of his holdings. The Court assumes that for Kalb and the other Defendants, this disconnect is explained by the fact that they acquired a substantial number of shares during the Class Period.

Defendants disagree. (ECF No. 58-1 at 48–55.) According to Defendants, Plaintiffs' focus on Kalb's and Kennedy's sales made on the day the Class Period began omits that Thero made 68 of the 73 statements which Plaintiffs challenge. (*Id.* at 49.) Defendants argue that Kalb's and Kennedy's sales on the day the REDUCE-IT results were announced, on which the share price sharply jumped after a period of low value, reflected the executives "rationally monetiz[ing]" their shares. (*Id.* at 50–51.) Defendants contest Plaintiffs' characterization of the percentages of shares the Individual Defendants sold because the Amended Complaint "wrongly ignores their exercisable options." (*Id.* at 51.) Further, the

Individual Defendants offer their Rule 10b5-1 plans, which they contend show that the Individual Defendants' trades were almost all planned prior to the Class Period. (*Id.* at 52–54.)

**\*28**  **[66]**  On balance, the Individual Defendants' stock sales somewhat contribute to an inference of scienter here, albeit weakly. In Plaintiff's favor, the value of the stock the three Individual Defendants sold was over $83 million, a significant amount. The Amended Complaint alleges that over the entire Class Period, Thero sold 24.30% of his shares; and during a portion of the Class Period—from the announcement of the REDUCE-IT results until the issuance of Judge Du's decision—Kennedy sold 89.19% of his shares and Kalb sold 65.07%. (*Id.* ¶¶ 173–75.) The size of these sales in comparison to the Individual Defendants holdings is unusual and supports Plaintiffs' position. *In re Suprema Specialties*, 438 F.3d at 278 (finding complaint "plausibly alleged that the sales were not normal or routine" for defendant officers who each "is alleged to have sold over 30 percent of his holdings"); *see also In re: Enzymotec*, 2015 WL 8784065, at *19 (finding complaint alleged stock sales "unusual in scope" where one defendant sold 35% of his total holdings and another sold 42%).[33] Likewise somewhat supporting this inference is the fact that two Defendants—Kennedy and Kalb—sold significant portions of their holdings on the day the REDUCE-IT results were announced, (Am. Compl. ¶¶ 173–74), and two Defendants—Thero and Kennedy—did not sell any stock in the two years prior to that day, (*id.* ¶¶ 174–75). *See McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 654 (E.D. Pa. 2021) (finding unusual that defendants had not "sold stock in the year-and-a-half leading up to their 2020 sales").

[33]  As noted above in the section addressing Defendants' exhibits, the Court does not consider Defendants' re-calculation of the percentages of the Individual Defendants' sales and holdings to account for their exercisable options, as that annex relies on documents not submitted to the Court in conjunction with Defendants' Motion for its data. (Annex E.)

**[67]**  However, the stock sales alleged in the Amended Complaint are a far cry from the "ship's captain exiting into the safety of a lifeboat while assuring the passengers that all is well" that Plaintiffs argue. (ECF No. 65 at 48 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 67 (2d Cir. 2001)).) As the Third Circuit has explained, "the pure percentage

of holdings sold tells only part of the story. Courts have routinely found that even large percentages of holdings sold at first blush appearing suspicious are not sufficient to infer scienter when other factors, such as the timing of the relevant sales, weigh against that inference." *In re Hertz*, 905 F.3d at 121. The fact that the Class Period stretched 31 months cuts against inferring scienter when the company's officers sold significant amounts of stock during that period. *In re Burlington Coat*, 114 F.3d at 1424 (observing that because "corporate executives are compensated in terms of stock and stock options," it is not unusual that "these individuals will trade those securities in the normal course of events"). Thus, executive stock sales following the rise in stock price is not unexpected. *See In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 312 (D.N.J. 2001) ("Trading following public announcements simply evidences compliance with the securities laws."). The significance of Kalb and Kennedy selling large portions of their shares on the day the REDUCE-IT results were announced is lessened by the fact that Thero—who made the vast majority of the statements that Plaintiffs challenged—did not sell any stock that day, (Am. Compl. ¶ 170); had the Individual Defendants in fact known since 2011 (when they allegedly "buried" the Kurabayashi Study in the Form 1449) that the patents were vulnerable, one would have expected them all, including the CEO, to unload their shares when the price spiked after the REDUCE-IT results were announced.

A review of the Individual Defendants' publicly filed Individual Form 4s further mitigates the suspiciousness of the stock sales.[34] While the Court agrees with Plaintiffs that it cannot judicially notice the Rule 10b5-1 plans themselves, Courts routinely consider publicly-filed Form 4s (which here reference the Rule 10b5-1 plans). *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *22 n.10 (D.N.J. Apr. 27, 2017), *aff'd*, 905 F.3d 106 (3d Cir. 2018) (considering Form 4s in deciding motion to dismiss and noting "it can take judicial notice of the public filings showing that the challenged sales by the defendants were made pursuant to 10b5-1 plans"); *see also Amarin II*, 2021 WL 1171669, at *9; *In re Merck Co., Inc., Sec., Derivative & "Erisa" Litig.*, No. 05-1151, 2006 WL 8460903, at *4 (D.N.J. Jan. 20, 2006) ("It is ... without dispute that SEC Forms 4 and 5 are in fact SEC filings" subject to judicial notice.). A significant portion of the suspicious sales alleged in the Amended Complaint—indeed, almost the entirety of Kalb's and Kennedy's—were of the Individual Defendants' stock options that vested. (Exs. 63–65 (showing that Individual Defendants' stock sales occurred the same day or shortly after

they were purchased at option prices).) Although the sale of stock options may still contribute to an inference of scienter, it is somewhat less because the "proceeds were the result of accumulated stock options and were an intended part of their overall compensation package." *Advanta*, 180 F.3d at 541 (citing *In re Burlington Coat*, 114 F.3d at 1424).

34    Defendants contend that it is "plaintiff's burden to plead suspicious stock sales, including that any 10b5-1 plan providing for the sales was entered into during the [class period] and at a suspicious time." (ECF No. 58-1 at 53 n.52.) Plaintiffs respond that "the existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved." (ECF No. 65 at 55.) Both parties' positions go too far. While Courts in this District routinely consider Rule 10b5-1 plans in determining whether scienter is adequately pled, the cases do not support imposing a "burden" on Plaintiffs to affirmatively plead how the Rule 10b5-1 plans do not undermine the scienter allegations.

**\*29** **[68]** **[69]** **[70]**  More importantly, almost every sale for all three Individual Defendants was entered into pursuant to a Rule 10b5-1 plan. "Pursuant to SEC Rule 10b5-1, a person's trading is not 'on the basis of' material non-public information, such as the allegedly fraudulent practices here, if the person adopted, and sold their securities pursuant to a written trading plan consistent with the terms of Rule 10b5-1." *In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-2978, 2019 WL 2849933, at \*16 (D.N.J. July 2, 2019) (discussing 17 C.F.R. § 240.10b5-1(c)(1)). Courts in this district hold that "[t]rades made under automatic trading plans are of minimal value in establishing an inference of scienter." *Lovallo v. Pacira Pharm., Inc.*, No. 14-6172, 2015 WL 7300492, at \*13 (D.N.J. Nov. 18, 2015) (citing *Avaya*, 564 F.3d at 279); *see also In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 410 n.56 (D.N.J. 2010); *In re Audible Inc. Sec. Litig.*, No. 05-1027, 2007 WL 1062986, at \*12 (D.N.J. April 3, 2007). Here, the public Form 4s note that every trade of all three Individual Defendants—except for approximately \$2.4 million of sales by Thero in November 2020—were made "pursuant to a Rule 10b5-1 trading plan previously adopted" by the Individual Defendants. (Exs. 63–65.)[35] This further undercuts the inference Plaintiffs draw from Defendants' stock sales.

35    The only sales that were not pursuant to the Rule 10b5-1 were Thero's two November 2020 sales of 567,405 shares worth a combined \$2,318,569. (Am. Compl. ¶ 170.) The two sales were made months after Judge Du's March 2020 decision and at a share price of \$4.13 and \$4.07, well below the price at which the other sales alleged in the Amended Complaint were made. (*Id.*; *see also* Ex. 63 at 7.)

Plaintiffs argue that the Rule 10b5-1 plans were entered into fraudulently while Defendants knew the patents would be invalidated, eliminating any cleansing effect the plans could have. (ECF No. 65 at 55–56); *see Villare v. Abiomed, Inc.*, No. 19-7319, 2021 WL 4311749, at \*21 (S.D.N.Y. Sept. 21, 2021) (finding a Rule 10b5-1 plan does not undermine scienter when it is "entered into or strategically amended to take advantage of an inflated stock price or insider information"). But a plaintiff cannot sidestep the Rule 10b5-1 plans by "conclusory" allegations of strategic use of the plans. *Id.* (citing *Koplyay v. Cirrus Logic, Inc.*, No. 13-790, 2013 WL 6233908, at \*6 (S.D.N.Y. Dec. 2, 2013)). Plaintiffs allege that Defendants knew of the patents' vulnerability since at least 2011 when they sought patent protection for Vascepa. Given this long time frame, it is to be expected that the executives would have entered a Rule 10b5-1 plan at some point. Plaintiffs cannot rely on their claim of Defendants' decade-long deceit in order to argue that any action taken within that period—like entering into the plans—supports their inference of scienter.

**[71]**  Cutting against scienter, Defendants argue that Amarin's investment of "hundreds of millions of dollars" in Vascepa's development weakens any inference of intent to defraud. (ECF No. 58-1 at 60.) Indeed, the history of Amarin's prosecution of its patent application before the USPTO and defense of same in the Nevada Litigation—as alleged in great detail in the Amended Complaint and chronicled in Amarin's SEC filings—evidences the significant efforts Defendants put into receiving their patents over the decade before Judge Du's decision. (*See* Am. Compl. ¶¶ 55–154; *see also* Exs. 1–62.) Defendants' statements alleged in the Amended Complaint also reference Amarin's significant investment in building infrastructure to accommodate expanded application and demand for Vascepa. For example, in a February 2020 SEC filing, Thero stated "we believe that a U.S. sales force of 800 sales representatives, supported by our other promotional

activities, is positioned to make Vascepa a multibillion-dollar brand." (*Id.* ¶ 131.) [36] The Amended Complaint's allegation that Defendants bet the company on receiving and maintaining patent protection when they knew the patents could be undone by the consideration single study they failed to disclose is implausible. *See In re Celgene*, 2019 WL 6909463, at *13 ("[I]t is not plausible (absent specific contrary evidence) to believe that Celgene would continue with this large-scale, expensive Phase III trial merely for the sake of appearances."); *see also City of Edinburgh*, 754 F.3d at 170 ("Moreover, the initiation of Phase 3 cost millions of dollars and required FDA approval, rendering it improbable that defendants would have continued if they did not believe their interpretation of the interim results or if they thought the drug a complete failure."). [37]

[36]    In March 2021, Thero informed investors that Amarin was "doubling the size of our sales force" in order to focus on what Amarin considered a "global opportunity." (Am. Compl. ¶ 136; *see also id.* ¶ 114 ("We are very excited about the potential for Vascepa to help millions of patients and we are acting accordingly to expand on our established commercial foundation, including existing broad managed care coverage and extensive key opinion leader support."); *id.* ¶ 115 ("Following REDUCE-IT success, we have been in an active dialogue with companies in our supply chain as well as with certain companies that might be added to our supply chain. To ensure that we can further increase our supply capacity.").)

[37]    *See also Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (finding no scienter inference from fact that company sued its competitors for patent infringement because "it is equally if not more plausible that [the company] consistently initiated litigation in defense of its patents because it and its officers believed the patents were valid"); *Cozzarelli v. Inspire Pharms.*, 549 F.3d 618, 627 (4th Cir. 2008) (finding inference of scienter undercut where the "complaint portrays [defendant's drug] as the 'lead development product' on which [defendant's] future as a company depended" because it was "improbable that [defendant] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure").

**\*30** Tying these pieces together, the Court conducts a "holistic review" of the Amended Complaint to weigh the inferences for and against scienter. *In re Hertz*, 905 F.3d at 121. Here, the "opposing inference one could draw from the facts alleged" is stronger than the one Plaintiffs draw from their allegations. *Tellabs, Inc.*, 551 U.S. at 324, 127 S.Ct. 2499. Certainly, the facts Plaintiffs pled create the inference that the Individual Defendants were aware of and involved with the Nevada Litigation, that they promoted Vascepa's use after the REDUCE-IT results were announced, and that they were optimistic about the strength of the MARINE patents and Vascepa's financial outlook. Likewise, Plaintiffs have alleged that the Individual Defendants' stock sales created the motive to make material omissions or misrepresentation, which offers tepid support for their scienter allegations.

However, the Amended Complaint fails to allege facts supporting a strong inference that Defendants knew or should have known that they would lose patent protection for Vascepa. Plaintiffs' case relies on Defendants knowing that the patent litigation was likely to be invalidated because of their knowledge that the Kurabayashi Study had been improperly "concealed" from the patent examiner or otherwise "buried." As explained in the preceding sections, Plaintiffs have not pled with particularity any facts supporting these assertions. Even had *someone* at the company thought the Kurabayashi Study would eventually undermine Amarin's patents, Plaintiffs have not alleged any facts suggesting that this information was shared with the named Individual Defendants. And while Plaintiffs are not required to allege scienter via any specific avenue, the absence of any allegation from inside the company—from a confidential witness or internal document—that Defendants did not believe in the strength of their patents is significant. *See Sapir v. Averback*, No. 14-7331, 2016 WL 554581, at *10 (D.N.J. Feb. 10, 2016) ("Amended Complaint fails to cite a single document or witness that corroborates allegations of scienter."). Put differently, Plaintiffs do not allege that any of the Japanese studies they point to were concealed by Defendants or not in the public domain. Rather, they argue that Defendants should have weighed the evidence differently from the outset—as Judge Du eventually did in invalidating the patents rather than as the USPTO did in granting them—and avoided making any statements about the company's future that depended on Amarin defending its patents.

The more plausible inference drawn from the Amended Complaint's allegations is that Defendants honestly believed in their patents and Amarin's opportunity to expand its

business based on the strength of its intellectual property. Plaintiffs allege that Defendants knew the patents should not be issued since Amarin first sought patent protection in 2011. For Plaintiffs to be correct, Defendants would have had to work for almost a decade—conducting long-term studies, interacting with regulatory bodies, advocating to the USPTO, suing their competitors, forcefully litigating from the district court to the Supreme Court—knowing that the patents would be invalidated and seeking to profit from their stock in the interim. Nothing in the Amended Complaint suggests such deception on the part of the Defendants. Thus, Plaintiffs do not provide sufficient allegations to support a "strong inference" of scienter. *See* 15 U.S.C. § 78u–4(b)(2). [38]

[38]    Plaintiffs argue that because they adequately alleged scienter as to each Individual Defendant, their scienter is imputed to Amarin and they have therefore adequately pleaded Amarin's scienter. (ECF No. 65 at 47.) However, the Court finds that Plaintiffs have not alleged a strong inference of scienter with respect to the any Defendant, including Amarin.

\* \* \*

**\*31**    Therefore, Plaintiffs have not met the heightened pleading standard as required by the PSLRA to plead either an actionable misstatement or omission or scienter. [39]

[39]    Because the Court has concluded that Plaintiffs have failed to sufficiently plead the first two elements of a securities fraud claim, it is unnecessary to address Plaintiffs' allegations of loss causation.

### C. MOTION TO DISMISS SECTION 20(A) CLAIM

**[72]    [73]**    Against the Individual Defendants, the Amended Complaint alleges violations of Sections 20(a) and 20A of the Exchange Act, 15 U.S.C. §§ 78t(a), 78t-1. Section 20(a) control person liability " 'is derivative of an underlying violation of Section 10(b) by the controlled person.' Inasmuch as there cannot be Section 10(b) liability here, the individual

defendants cannot be liable" under Section 20(a). *Rahman*, 736 F.3d at 247 (quoting *Avaya*, 564 F.3d at 252). Likewise, insider trading claims against corporate insiders fail where plaintiffs have "failed to adequately plead a predicate section 10(b) violation." *City of Edinburgh*, 754 F.3d at 175.

Therefore, because the Court finds that Plaintiffs fail to state a claim under Section 10(b), the Amended Complaint's counts alleging Section 20(a) and 20A claims (Counts Two and Three) must also be dismissed without prejudice for failure to state a claim.

### D. DRABEK'S STATUS ON THE CAPTION

Finally, Defendants request that the Court strike Warren Drabek from the case caption because the Amended Complaint does not "explain[ ] why his addition is necessary at this time." (ECF No. 58-1 at 63.) Defendants argue that Drabek was not named as a Plaintiff in either of the two prior complaints and that he never sought appointment as lead plaintiff. (*Id.* at 64.) Defendants contend that Drabek's inclusion is a "tactic" the Court should prevent. (*Id.* at 65.)

The Court agrees with Plaintiffs that Defendants do not cite any legal authority or concrete reasoning behind this request. (ECF No. 65 at 64–65.) Defendants do not adequately explain how Drabek's inclusion is a "tactic" or why it is improper. Absent any rationale or authority for Defendants' request, the Court declines to address Drabek's status in this action at this time and will deny Defendants' request.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED,** and Plaintiffs' Complaint is hereby **DISMISSED** without prejudice. An appropriate Order accompanies this Opinion.

### All Citations

--- F.Supp.3d ----, 2024 WL 4285900

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    **Appx. C-061** 45

# Case No. 4

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 65 of 573

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

2023 WL 2647855
United States District Court, S.D. New York.

Jason DENNY, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
v.
CANAAN INC., Nangeng
Zhang, and Tong He, Defendants.

21 Civ. 3299 (JPC)
|
Signed March 27, 2023

**Attorneys and Law Firms**

Samuel Howard Rudman, Robbins Geller Rudman & Dowd
LLP, Melville, NY, for Plaintiff.

Daniel L. Cantor, O'Melveny & Myers LLP, New York, NY,
Meg Kalikman Lippincott, Los Angeles, CA, William Ka
Hing Pao, O'Melveny & Myers, LLP, Los Angeles, CA, for
Defendant Canaan Inc.

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

 **\*1** Lead Plaintiffs Bill Lu and Liying Huang allege that
Defendants Canaan, Inc. ("Canaan"), Nangeng Zhang ("Mr.
Zhang"), and Tong He ("Mr. He") made knowingly false
and misleading statements in violation of Section 10(b) of
the Securities Exchange Act of 1934 ("Exchange Act"), 15
U.S.C. § 78j(b), and Securities and Exchange Commission
("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and in violation
of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).
Defendants have moved to dismiss the Amended Complaint,
arguing that it fails to adequately plead a substantive Section
10(b) violation because Lead Plaintiffs have not alleged that
Defendants made materially false or misleading statements or
that they did so with the requisite scienter. Because the Court
determines that one of Defendants' alleged misstatements
was outside of the class period and inactionable, another
was not materially false or misleading, and the third was not
made with the requisite scienter, the Court grants Defendants'
motion in its entirety.

**I. Background**

**A. Facts** [1]

[1]
    The following facts, which are assumed true for
    purposes of this Opinion and Order, are taken from
    the Amended Complaint, Dkt. 65 ("Am. Compl."),
    as well as documents incorporated by reference
    in the Amended Complaint. *See Interpharm, Inc.
    v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136,
    141 (2d Cir. 2011) (explaining that on a motion
    to dismiss pursuant to Rule 12(b)(6), the court
    must "assum[e] all facts alleged within the four
    corners of the complaint to be true, and draw[ ]
    all reasonable inferences in plaintiff's favor");
    *Chambers v. Time Warner, Inc.*, 282 F.3d 147,
    153 (2d Cir. 2002) ("[O]n a motion to dismiss,
    a court may consider documents attached to the
    complaint as an exhibit or incorporated in it by
    reference...." (internal quotation marks omitted)).

This case arises out of the proposed class's purchases of
American Depositary Shares ("ADSs") of Canaan between
February 10, 2021 and April 9, 2021 (the "Class Period").
Am. Compl. ¶ 1. Canaan is a Cayman Islands corporation
that primarily manufactures and sells cryptocurrency mining
equipment. *Id.* ¶¶ 16, 23. In 2018, 2019, and 2020, sales of this
equipment comprised 99.7%, 97.7% and 94.4% respectively
of Canaan's total revenue. *Id.* ¶ 27. Canaan's ADSs are
publicly traded on the Nasdaq. *Id.* ¶ 2. Mr. Zhang is the
founder of Canaan, and has served as its CEO and as
Chairman of its Board of Directors since that founding. *Id.*
¶ 18. Mr. He has served as Canaan's Director of Finance
since July 2020 and served as its acting CFO from February
2021 to August 2021. *Id.* ¶ 19. Lead Plaintiffs allege that
both Mr. Zhang and Mr. He "because of their positions within
[Canaan] possessed the power and authority to control the
contents of Canaan's SEC filings, press releases, and other
market communications." *Id.* ¶ 21. Lead Plaintiffs further
allege that Mr. Zhang and Mr. He "were provided with copies
of the Company's SEC filings and press releases ... prior to or
shortly after their issuance and had the ability and opportunity
to prevent their issuance or to cause them to be corrected." *Id.*

 **\*2** On November 30, 2020, Canaan issued a press release
attached as Exhibit 99.1 to a Form 6-K filed with the SEC,
which was titled "Canaan Inc. Reports Unaudited Third
Quarter 2020 Financial Results" and announced Canaan's
financial results for the quarter ending September 30, 2020.

*Id.* ¶ 28; *see* Dkt. 71-2 at 2-12 ("11/30/20 Press Release"). This press release reported a 20.7% decrease in total computing power sales from the same period in 2019 and a 13.4% quarter-over-quarter increase in such sales compared to the second quarter of 2020, as well as a 75.7% year-over-year revenue decrease and 8.5% quarter-over-quarter revenue decrease. 11/30/20 Press Release at 1. The press release contained quotations from both Mr. Zhang, as the Chairman and CEO of Canaan, and Quanfu Hong ("Mr. Hong"), then the CFO of Canaan. Mr. Hong mentioned, among other things, the rebounding market demand for Bitcoin mining machines and pre-sale orders that Canaan had received: "[T]he demand for mining machines in the market continued to rebound during the third quarter, and we have received a large number of pre-sale orders which are scheduled for delivery starting in the fourth quarter of 2020." *Id.* at 2.

Mr. Hong resigned as CFO effective immediately for "personal reasons" on February 9, 2021. Am. Compl. ¶ 30. The next day, which is the start of the Class Period, Canaan issued a press release again attached as Exhibit 99.1 to a Form 6-K filed with the SEC and signed by Mr. Zhang, which was titled "Canaan Announces Improved Revenue Visibility in 2021." *Id.* ¶ 32; *see* Dkt. 71-3 at 104-06 ("2/10/21 Press Release"). Lead Plaintiffs rely on multiple statements made in the February 10, 2021 press release that touted the company's increased revenue visibility thanks to purchase orders for Bitcoin mining machines. The release stated:

> Canaan ... announced that its revenue visibility has improved substantially in 2021 as a result of attaining purchase orders totaling more than 100,000 units of bitcoin mining machines from customers in North America. Many of those purchase orders were placed with prepayment and will likely occupy the Company's current manufacturing capacity entirely for the full year of 2021 and beyond.

2/10/21 Press Release at 1. It further stated that "[w]ith those fully committed purchase orders, the Company now enjoys a much higher degree of revenue visibility and more precise forecast. As such the Company is able to leverage such information and additional liquidity to conduct its component purchases, production scheduling, warehousing

and logistics." *Id.* The press release quoted Mr. Zhang as saying:

> In late 2020, we shifted our client base to mostly publicly traded companies and bitcoin-focused investment funds which tend to place sizable orders with longer-term commitment. As a result, we can now forecast our revenue much more precisely. Our increased revenue visibility is not only enabling us to plan our production and logistics well in advance, but also helping us to optimize our cost structure and improve our customer satisfaction rate. Above all, it should help us achieve profitable growth for the long run.

*Id.*

On Monday, February 8, 2021, two days before this press release was issued, Canaan's ADSs opened trading at $6.91 each. Am. Compl. ¶ 33. The shares closed trading on Friday, February 12, 2021, at $13.04 each. *Id.*

On April 9, 2021, a magazine called *Decrypt* published an interview with Mr. Zhang in an article titled, "Canaan CEO Is Bullish on Bitcoin Mining Ahead of Earnings – The Nasdaq-listed manufacturer of crypto mining hardware has seen its stock jump almost 1000% in six months." *Id.* ¶ 36; Dkt. 71-3 ("*Decrypt* Article") at 1. The article began: "Canaan founder and CEO Nangeng Zhang has reason to be chipper. His Beijing-based company is reporting earnings on Monday, when it will disclose Q4 and full 2020 results, and the outlook is rosy." Decrypt Article at 2. The article attributed several statements to Mr. Zhang. [2] Mr. Zhang was quoted as saying that "Canaan has secured a large number of pre-sale orders for its mining machines," and that "as institutional interest in Bitcoin continues to strengthen, so will the entry of more actors into Bitcoin mining." *Id.* The article described Canaan as "one of the world's largest manufacturers of mining hardware," and observed that "[a]ll [presumably referring to manufacturers of mining hardware] have seen demand for their products soar in recent months." *Id.* The article reported that "Canaan anticipates it will have no problem fulfilling its bulging order book," but did not attribute that anticipation to Mr. Zhang. *Id.* at 4. The article proceeded to paraphrase Mr.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 67 of 573

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

Zhang as saying "that the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors—which has impacted the gaming, computing, and automotive industry, as well as Bitcoin mining." *Id.* Mr. Zhang then was quoted: "Our approach is one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks." *Id.* He further was quoted: "We have been able to successfully secure an entire year's worth of orders for 2021, with orders for our Avalon A1246 miners scheduled till March 2022." *Id.* Mr. Zhang also was quoted to say that Canaan's operation of its own mining business "will significantly strengthen our inventory management capabilities, stabilize our supply chain networks, and diversify our revenue stream, allowing us to better optimize our mining hardware during the lull seasons (where demand for mining machines tends to be weaker)." *Id.*

2     The *Decrypt* article contained numerous direct quotes from Mr. Zhang, while also paraphrasing other statements that are attributed to him. For clarity purposes, the Court specifically notes when reciting a reported direct quote from Mr. Zhang.

**\*3** Then, on the morning of April 12, 2021, Canaan issued a press release regarding its fourth quarter and year end 2020 financial results attached as Exhibit 99.1 to a Form 6-K filed with the SEC and titled "Canaan Inc. Reports Unaudited Fourth Quarter and Full Year 2020 Financial Results." Am. Compl. ¶ 39; *see* Dkt. 71-3 at 141-53 ("4/12/21 Press Release"). That press release revealed a total computing power sales decrease of 93.1% both year-over-year and quarter-over-quarter, as well as a 91.75% decrease in revenue year-over-year and a 76.56% decrease in revenue quarter-over-quarter. 4/12/21 Press Release at 1. Other financial results for the quarter and year were similarly poor. *Id.* The release quoted Mr. Zhang as saying, among other things:

> Although the outbreak of COVID-19 caused supply chain disruptions and thus negatively impacted our revenues in the fourth quarter of 2020, our market leadership has enabled us to attain US$174 million of contracted orders, with US$66 million of cash advance from customers as of December 31, 2020, thus laying a solid

> foundation for solid revenue growth in 2021.

*Id.* at 2. Additionally, Mr. He was quoted as saying, among other things: "Due to supply chain disruptions, as the price of Bitcoin rallied in late 2020, we experienced a surge of demand for high-quality mining machines both in and outside of China." *Id.*

That same morning, Canaan discussed its fourth quarter and 2020 year end financial results on an earnings conference call. Am. Compl. ¶ 40; *see* Dkt. 71-3 at 166-82 ("4/12/21 Call Tr."). On that call Mr. Zhang stated through a translator that Canaan "saw a severe supply shortage in the industry" related to "chip supply" during the fourth quarter of 2020 and into 2021. 4/12/21 Call Tr. at 10. He added that he "[could not] really disclose the exact number of chips that [Canaan had] under production right now" but that the "strategies [Canaan had] adopted to address this problem" had "helped [Canaan] achieve outstanding results in terms of keeping up" and that Canaan "can effectively secure the delivery of our chips from our foundry partners." *Id.* He also stated that "since the second half of last year and the first half of this year, most of the mining machines we sold were actually sold as futures contracts, which had a fixed price. And the prices were actually lower than our existing machines." *Id.* at 13; *accord* Am. Compl. ¶ 40. While Canaan ADSs closed on Friday, April 9, 2021, at $18.67 per share, they closed on Monday, April 12, 2021, following the press release and earnings call, at $13.14 per share, with trading volume "more than three times the average daily volume over the preceding ten trading days." Am. Compl. ¶ 41.

**B. Procedural History**

Plaintiff Jason Denny filed the original Complaint in this action on April 15, 2021. Dkt. 1. On December 9, 2021, the Court granted Lu and Huang's motion for appointment as Lead Plaintiffs, and approved their selection of lead counsel. Dkt. 62. Lead Plaintiffs filed their Amended Complaint on February 7, 2022. Dkt. 65. Lead Plaintiffs allege that Defendants committed violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder (Count I), Am. Compl. ¶¶ 70-81, and that Mr. He and Mr. Zhang violated Section 20(a) of the Exchange Act (Count II), *id.* ¶¶ 82-87.

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

Defendants filed a motion to dismiss on April 8, 2022, Dkts. 69, 70 ("Motion"), accompanied by a motion requesting that the Court take judicial notice of certain materials, Dkt. 71. Defendants argue that the Amended Complaint should be dismissed because Lead Plaintiffs fail to plead falsity or scienter with respect to alleged violations of Section 10(b) and Rule 10b-5. [3] *See* Motion at 8-20. Lead Plaintiffs filed their response to both motions on June 7, 2022. Dkts. 72 ("Opposition"), 73. Defendants filed their reply in further support of their motion to dismiss on July 7, 2022. Dkt. 74 ("Reply").

[3]     Defendants seek dismissal of the entire Amended Complaint, though their arguments address only the violations of Section 10(b) and Rule 10b-5 alleged in Count One. *See generally* Motion. However, because "[t]o establish liability under section 20(a), a plaintiff 'must first establish a primary violation,' " *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 169 (S.D.N.Y. 2018) (quoting *In re Omnicom*, 597 F.3d 501, 514 n.6 (2d Cir. 2010)), dismissal of Count I would require dismissal of Count II.

## II. Standard of Review

**\*4** To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although the Court must "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under Federal Rule of Civil Procedure 9(b) in order to survive a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.

2007). A complaint making fraud allegations under Section 10(b) and Rule 10b-5 "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Diesenhouse v. Social Learning & Payments, Inc.*, No. 20 Civ. 7436 (LJL), 2022 WL 3100562, at \*4 (S.D.N.Y. Aug. 3, 2022) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Allegations that are conclusory or unsupported by factual assertions are insufficient. *See ATSI Commc'ns*, 493 F.3d at 99; *see also Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

Securities fraud claims must also satisfy the Private Securities Litigation Reform Act ("PSLRA")'s heightened pleading requirements. *Diesenhouse*, 2022 WL 3100562, at \*5. The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see Diesenhouse*, 2022 WL 3100562, at \*5. "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues Rights, Ltd.*, 551 U.S. 308, 323 (2007). For an inference of scienter to be strong, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns*, 493 F.3d at 99 (brackets and emphasis omitted) (quoting *Tellabs*, 551 U.S. at 324).

Although pleading standards are heightened for securities fraud claims, the Second Circuit has cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones.' " *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021)). The PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

## III. Discussion

### A. Judicial Notice

**\*5** As part of their motion to dismiss, Defendants have filed a motion requesting that the Court take judicial notice of certain materials, which are identified in the motion as Exhibits 1 through 9. Dkt. 71. Lead Plaintiffs have opposed this motion in part. Dkt. 73. Lead Plaintiffs do not oppose the Court taking judicial notice of Exhibits 1, 4, 6, 7, and 9, *id.* at 2, each of which is a document incorporated into the Amended Complaint by reference. [4] The Court therefore grants the motion with respect to those materials. With respect to the remaining materials, the Court need not determine whether to take judicial notice of them in resolving Defendants' motion to dismiss. The Court therefore declines to take judicial notice of Exhibits 2, 3, 5, and 8. [5]

[4]    These materials consist of the November 30, 2020, February 10, 2021, and April 12, 2021 press releases, the *Decrypt* article, and the transcript of the April 12, 2021 earnings call. Dkt. 71 at 1-3.

[5]    These materials consist of, respectively, Canaan's Form F-1 Registration Statement filed with the SEC on October 28, 2019, Canaan's ADS historical stock data, Bitcoin's historical price data, and Canaan's Form 6-K reporting financial results from the first quarter of 2021 filed with the SEC on June 1, 2021. Dkt. 71 at 1-3.

### B. Section 10(b) and Rule 10b-5 Claims

Count I alleges that Defendants "carried out a plan, scheme, and course of conduct" that violated Section 10(b) and Rule 10b-5 by deceiving investors, inflating and maintaining prices of the Canaan ADSs, and causing proposed class members to purchase ADSs at inflated prices. Am. Compl. ¶¶ 71-72. To state a claim under Section 10(b), "a complaint must adequately plead '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' " *In re DraftKings Inc. Sec. Litig.*, No. 21 Civ. 5739 (PAE), 2023 WL 145591, at \*15 (S.D.N.Y. Jan. 10, 2023) (quoting

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)). Defendants contend that Plaintiffs fail to allege a materially false or misleading statement, Motion at 8-17, and fail to plead any facts permitting an inference of scienter, *id.* at 17-20.

#### 1. Misstatements or Omissions of Material Fact

Lead Plaintiffs allege three occasions when Defendants made "made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading," Am. Compl. ¶ 73: (1) the November 30, 2020 press release, *id.* ¶ 28, (2) the February 10, 2021 press release, *id.* ¶ 32, and (3) the April 9, 2021 *Decrypt* article reporting an interview with Mr. Zhang, *id.* ¶ 36. Defendants argue that the Amended Complaint fails to adequately plead for any of those occasions a material representation that was false when made or the omission of material information that Defendants had a duty to disclose. Motion at 8. The Court will analyze the challenged statements chronologically.

#### i. The November 30, 2020 Press Release

The first challenged statements come from Mr. Zhang's and Mr. Hong's quotes in the November 30, 2020 press release. Mr. Zhang stated, among other things: "With new generations of mining machines and AI chips in the pipeline, we are confident that the enhanced performance of our new products will continue to bolster our competitive advantages and solidify our market leadership going forward." 11/30/20 Press Release at 2; *see* Am. Compl. ¶ 28. Mr. Hong, in turn, stated that "the demand for mining machines in the market continued to rebound during the third quarter [of 2020], and we have received a large number of pre-sale orders which are scheduled for delivery starting in the fourth quarter of 2020." 11/30/20 Press Release at 2; *see* Am. Compl. ¶ 28. Defendants argue that, as a threshold matter, these statements are not actionable because they occurred prior to the Class Period, which began on February 10, 2021. Motion at 9. Lead Plaintiffs respond that these statements "misled the market" and Defendants had a "duty to correct and a duty to update" the statements, thus rendering the November 30, 2020 statements actionable. Opposition at 14 & n.7.

**\*6** In the Second Circuit, a duty to update a past statement "may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event."

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 70 of 573

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)
2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

*Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630, 632 (2d Cir. 2019) (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998)). "There is, however, no duty to update vague statements of optimism or expressions of opinion, statements that are not material, or statements that are not forward looking and do not contain some factual representation that remains alive in the minds of investors as a continuing representation." *Id.* (internal quotation marks and brackets omitted). On the other hand, a duty to correct "applies when a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d at 109 (internal quotation marks omitted).

While generally a defendant is liable "only for those statements made during the class period," *id.* at 107, courts have suggested that liability may arise for earlier made statements if the duty to update or correct them subsequently arose during the class period, *see IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) ("The August 3, 2007 statements regarding RBS's exposure were made prior to the start of the Class Period and cannot be the basis of liability unless there was a duty to update or correct them."); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir. 2007) (holding that a misstatement created by the duty to correct a statement made outside the class period "was made (if at all) when a duty to correct arose"); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017) ("The Second Circuit has held that 'the duty to correct previous misstatements does not apply where the defendants made the original statements before the Class Period and became aware of the errors in those statements before the Class Period.' " (quoting *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016))).

Lead Plaintiffs argue that Mr. Hong's statement in the November 30, 2020 release that "demand for mining machines in the market continued to rebound during the third quarter, and we have received a large number of pre-sale orders which are scheduled for delivery starting in the fourth quarter of 2020," 11/30/20 Press Release at 2, "later bec[a]me misleading during the Class Period when Defendants learned that the increasing bitcoin market made those pre-sale orders a detriment rather than something positive." Opposition at 14 n.7. They further argue that Mr. Zhang's statement that a new generation of mining machines would bolster the company's

competitive advantage, 11/30/20 Press Release at 2, was "subject to a duty to update because although reasonable to believe at the time ..., once the bitcoin market price rose, due to the fact that [the] Company's mining machines were sold on prepayment, the Company was not at a competitive advantage, but a disadvantage." Opposition at 14 n.7.

As alleged, these statements were made prior to the Class Period. Yet the Amended Complaint fails to plead facts to establish that any duty to update or correct them subsequently arose within the Class Period. The Amended Complaint contains no allegation of knowledge giving rise to such a duty that was gained by Defendants during the Class Period. [6] Rather, the Amended Complaint is vague as to when exactly Defendants supposedly understood that rising Bitcoin prices would reduce the benefits of pre-selling mining machines in late 2020. Without any allegations stating that, or how, Defendants reached such an understanding during the Class Period, these November 30, 2020 statements are not actionable. [7]

[6]     If anything, the allegations in the Amended Complaint suggest that Defendants gained knowledge of the allegedly misleading nature of the November 30, 2020 statements prior to the commencement of the Class Period. For instance, Lead Plaintiffs contend that Defendants had a duty to update or correct the quotation from Canaan's CFO, Mr. Hong, in the November 30, 2020 press release. Yet, the Amended Complaint's scienter allegations specifically refer to Mr. Hong's resignation *the day before the Class Period* as supporting an inference of scienter with respect to the February 10, 2021 press release. Am. Compl. ¶ 48. Moreover, any theory that knowledge giving rise to a duty to update or correct with respect to the November 30, 2020 statements was first gained after the Class Period began on February 10, 2021 would seem in tension with Lead Plaintiffs' claim that statements in the February 10, 2021 press release were misleading due to an omission at the time they were made, which naturally would entail having the requisite knowledge at some point *before* filing the Form 6-K with the attached press release on February 10, 2021. *See id.* ¶ 32; Opposition at 14-15.

[7]     As discussed at *infra* III.C, Lead Plaintiffs' allegations on this point are insufficient to

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 71 of 573

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

establish scienter given the heightened pleading requirements, as they fail to allege with the requisite specificity that and how Defendants understood the impact of rising Bitcoin prices during the Class Period.

### ii. The February 10, 2021 Press Release

**\*7** Canaan issued a press release on February 10, 2021 titled "Canaan Announces Improved Revenue Visibility in 2021." 2/10/21 Press Release. The challenged statements in this release include Canaan's assertion that revenue visibility had improved due to prepaid purchase orders that "will likely occupy the Company's current manufacturing capacity entirely for the full year of 2021 and beyond." *Id.* at 1; *see* Am. Compl. ¶ 32. The press release added a quote from Mr. Zhang, saying that the increased revenue visibility was attributable to a late 2020 shift in Canaan's "client base to mostly publicly traded companies and bitcoin-focused investment funds." 2/10/21 Press Release at 1.

Defendants argue first that no statement in the February 10, 2021 press release was untrue, Motion at 11, and second that the Amended Complaint fails to plead a valid omissions theory because there is not a sufficiently close nexus between the statements that were made and the additional statements that Lead Plaintiffs claim had to be made to render the press release not misleading, *id.* at 11-14. Lead Plaintiffs appear to cede that they are proceeding only on an omissions theory: they respond that "each of the above statements was materially false and misleading, omitting ... that the pre-sale prepayment orders actually harmed Canaan's financial outcome for the fourth quarter of 2020," and they point to Canaan's April 12, 2021 statement that "most of the mining machines were sold as future contracts, which had a fixed price ... actually lower than our existing machines." Opposition at 15 (quoting Am. Compl. ¶¶ 38-40). Further, Lead Plaintiffs claim that Defendants' omission of the true effect of the pre-payment orders "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed," *id.* (quoting *In re Alstom SA Sec. Litig.,* 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005)), particularly when it came to how the company had performed in the fourth quarter of 2020. That matters, Lead Plaintiffs reason, because Canaan's performance in the fourth quarter of 2020 was in fact harmed by the pre-sales of mining machines, yet the release trumpeted those pre-sales only as something positive for the company. *Id.*; *see* Am. Compl. ¶ 38(b), (c) (alleging that Defendants concealed from the investing public

that "the Company's touted pre-sale orders were locked in at lower prices than the re-bounding bitcoin market prices during the third and fourth quarters of 2020, reducing the Company's ability to earn revenue from the increasing market prices during the fourth quarter 2020" and that as a result, "Canaan's fourth quarter 2020 sales and sales revenue had declined dramatically").

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives,* 563 U.S. at 44. "Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor." *Kleinman v. Elan Corp.,* 706 F.3d 145, 152-53 (2d Cir. 2013) (ellipsis omitted) (quoting *Resnik v. Swartz,* 303 F.3d 147, 154 (2d Cir. 2002)). Instead, absent an independent duty to speak, disclosure is required "only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.' " *Id.* (quoting *Matrixx Initiatives,* 563 U.S. at 44). "[W]hether a statement is misleading depends on the perspective of a reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 187 (2015) (internal quotation marks omitted). So, with respect to omissions "the court must determine whether the omitted fact would have been material to a reasonable investor – *i.e.* whether 'there is a substantial likelihood that a reasonable investor would consider it important.' " *Id.* at 196 (brackets omitted) (quoting *TSC Indus. Inc. v. Northway, Inc.,* 426 U.S. 438, 445 (1976)). And in particular "a duty [to disclose omitted facts] may arise when there is ... a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley,* 776 F.3d 94, 101 (2d Cir. 2015) (internal quotation marks omitted). Part of that analysis requires a court to examine the relatedness of the statement actually made and the facts which were omitted. *See In re Omega Healthcare Invs., Inc. Sec. Litig.,* 563 F. Supp. 3d 259, 272-73 (S.D.N.Y. 2021) ("[T]o prevail on [an omission theory], plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission to demonstrate that" there is a "duty to disclose the omitted information ... in order to prevent the statement from being materially misleading.").

**\*8** Here, Defendants argue that, because the press release concerned "only ... then-existing facts and projections about how those facts would affect Canaan's future performance," no reasonable investor would conclude that those statements had anything to do with performance in the fourth quarter, which had recently passed. Motion at

*Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)*

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

12-13 (emphasis omitted). Moreover, Defendants argue that Canaan's "statements about prepaid purchase orders were made in the context of how they would provide enhanced 'revenue visibility' in 2021; they were not about how pre-sales would impact fourth-quarter 2020 results." *Id.* at 13-14. And Defendants rely heavily on *In re Ferroglobe PLC Securities Litigation*, where the court held that statements which were "expressly directed to the future" could not be viewed by a reasonable investor as related to negative performance in the past quarter. No. 19 Civ. 2368 (RA), 2020 WL 6585715, at *8 (S.D.N.Y. Nov. 10, 2020).

Lead Plaintiffs argue that, unlike the statements in *Ferroglobe*, the statements in the February 10, 2021 press release were not solely forward-looking. The Court agrees. The Amended Complaint alleges that the omission of information in the February 10, 2021 press release—the below market prepaid prices of the mining machines sold, and the negative effect those pre-sales would have on revenue in the fourth quarter of 2020—render the statements in that release misleading to a reasonable investor. Am. Compl. ¶¶ 31-35, 38; *see id.* ¶ 33 ("The press release concealed the fourth quarter's known dismal financial performance, while promoting Canaan's expected future success."). The press release quoted Mr. Zhang as explaining that the prepaid purchase orders resulted from a "late 2020" shift [8] in Canaan's "client base to mostly publicly traded companies and bitcoin investment funds which tend to place sizable orders with longer-term commitment." 2/10/21 Press Release at 1; *see* Am. Compl. ¶ 32. Mr. Zhang continued that "as a result [of that shift] we can now forecast our revenue much more precisely" which increased revenue visibility "should help us achieve profitable growth for the long run." 2/10/21 Press Release at 1; *see* Am. Compl. ¶ 32.

[8]     Drawing all inferences in favor of Lead Plaintiffs, the Court assumes that an order made with "prepayment" in the fourth quarter of 2020 would have meant collecting the revenue associated with that order in the fourth quarter.

In other words, as alleged, Mr. Zhang explained that it was the shift in client base in "late 2020," so presumably in the fourth and perhaps third quarters of 2020, [9] which created the prepaid purchase orders that Defendants touted for increasing revenue visibility, yet the release omitted that the same late 2020 shift in the client base—and its associated increase in locked-in prepaid orders—led to significantly reduced revenue in the previous quarter. *Id.* ¶ 38. This decrease in

revenue occurred, Lead Plaintiffs allege, because the "pre-sale orders were locked in at lower prices than the re-bounding bitcoin market prices during the third and fourth quarters of 2020, reducing the Company's ability to earn revenue from the increasing market prices during the fourth quarter 2020." *Id.* ¶ 38(b). The fact that the same business practice that was lauded in the release caused both the forward-looking revenue visibility optimism and allegedly contributed significantly to the past revenue performance gloom is what creates a sufficiently close relationship between the two to require disclosure of the latter in order to render the former not misleading to a reasonable investor. Or put differently, both the future revenue visibility and the past lost revenue opportunities were significant effects of the same cause, just felt in different quarters. A reasonable investor learning of the touted positive effect on the future would find material the negative effect on the present.

[9]     This inference is strengthened by the fact that the November 30, 2020 press release referenced increase pre-sales beginning in the third quarter of 2020 and continuing into the fourth quarter. 11/30/20 Press Release at 2; *see* Am. Compl. ¶ 28

**\*9**  Nor does this determination require the Court to adopt some legally novel "freestanding completeness requirement" as Defendants argue. Motion at 13. Indeed, the fact allegedly omitted by Defendants was later acknowledged by Defendants themselves during the April 12, 2021 earnings call accounting to the fourth quarter of 2020 financial results. Am. Compl. ¶ 40; *see* Dkt. 4/12/21 Call Tr. at 13 (Mr. Zhang: "[T]he price of mining machines actually moves with the Bitcoin prices only for the mining machines that are ready for delivery. So, since the second half of last year and the first half of this year, most of the mining machines we sold were actually sold as futures contracts, which had a fixed price. And the prices were actually lower than our existing machines."). In other words, as alleged, in the February 10, 2021 press release, Defendants voluntarily touted the positive future effects of a business decision, yet hid the significant negative effects of that very same decision. "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *see also Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) (holding that when the defendant spoke regarding rental payments made by a large lessee, it put those payments "in play" and therefore had a duty to disclose that the lessee was only able to make rental payments because of a loan

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

provided by the defendant). While it is certainly conceivable that the negative effect on past revenue created by a shift to pre-orders could be small enough that a reasonable investor would not find it important, that is not what is alleged here.

Of course, corporate officials are only responsible for "revealing those material facts reasonably available to them.... Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309 (citations omitted). But Defendants do not argue that a lack of knowledge on their part defeats the alleged duty to disclose an omitted fact here. For that reason, the Court treats the question of whether Defendants knew the impact that the mining machine pre-sales would have on fourth quarter revenue at the time they issued the February 10, 2021 press release only when addressing scienter at *infra* III.C.

### iii. The April 9, 2021 *Decrypt* Article

The Court next turns to the April 9, 2021 *Decrypt* article, which was titled "Canaan CEO is Bullish on Bitcoin Mining Ahead of Earnings – The Nasdaq-listed manufacturer of crypto mining hardware has seen its stock jump almost 1000% in six months." *Decrypt* Article; *see* Am. Compl. ¶ 36. The article reported that "Zhang said that the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors" and directly quoted Mr. Zhang as saying that the company's approach is "one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks." *Decrypt* Article at 4. Lead Plaintiffs allege that these statements "concealed from the investing public" that "Canaan had experienced significant ongoing supply chain disruptions during the fourth quarter 2020." Am. Compl. ¶ 38(a). Lead Plaintiffs further contend that during the April 12, 2021 earnings call, "Defendants reported the exact opposite [of what Mr. Zhang said during the *Decrypt* interview], that Cannon had experienced a 'severe supply shortage' of 'mining machine' chips during the fourth quarter of 2020." Opposition at 9 (quoting Am. Compl. ¶ 40). Defendants argue that Lead Plaintiffs' claim based on the *Decrypt* article fails first because many statements within the article were not made by Canaan, but by an independent reporter, Motion at 14-16, and second because Mr. Zhang's statement that the company was working with leading chip manufacturers to

reduce supply chain risks was not false or misleading, *id.* at 16-17.

First, there is of course no general rule that statements made to the media cannot form the basis for securities fraud claims. *See e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 662-64 (S.D.N.Y. 2017). But courts in this District have dismissed claims arising from statements in the press that "are not reasonably attributable to defendants and accordingly do not give rise to liability under the federal securities laws." *Hershfang v. Citicorp.*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991). In *Hershfang*, for instance, the court determined that statements attributed to a defendant's "spokesman" in various news articles were insufficiently attributed to the defendant under Rule 9(b) to state a claim, [10] and then turned to other portions of those articles which were "attributed to specific defendants" and determined that they too were not actionable because they contained only statements of opinion. *Id.* at 1256.

[10]     The court in *Banco Bradesco* arguably took a different approach on this issue, rejecting an argument that a claim based on statement in an article attributed to an unidentified representative of a corporate defendant should be dismissed on the basis that it was not attributed to a specific individual. 277 F. Supp. 3d at 663.

**\*10** On the other hand, when a pleading sufficiently alleges that a statement in an article is attributable to a defendant, the statement may be treated as being made by that defendant. In *In re Columbia Securities Litigation*, the court determined that at the motion to dismiss stage, a statement in a *Forbes* article could serve as the basis for a fraud claims "[i]f, as plaintiffs allege, [one of the defendants] made a false statement to the *Forbes* reporter," because "[w]hile defendants certainly had less than complete control over what the reporter wrote, they did have control over what [that defendant] said." 747 F. Supp. 237, 245 (S.D.N.Y. 1990); *see also Banco Bradesco*, 277 F. Supp. 3d at 663 (determining that a corporate defendant could be liable for statement made to the press by an unidentified spokesperson).

Thus, the quote from Mr. Zhang in the *Decrypt* article that the company's approach "is one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks," *Decrypt* Article at 4, clearly may be attributed to him. Further, at this stage, where all reasonable inferences must be drawn

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 74 of 573

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

in favor of Lead Plaintiffs, the Court determines that the content of Zhang's statement, as reported in the article, "that the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors—which has impacted the gaming, computing, and automotive industry, as well as Bitcoin mining," *id.*, may be attributed to him as well, even though it was not a direct quote. The *Decrypt* article consists substantially of an interview with Mr. Zhang, and contains multiple direct quotes and multiple paraphrases of statements made by Mr. Zhang. The statement begins with "Zhang said," *id.*, and the Amended Complaint alleges that Mr. Zhang made this statement, Am. Compl. ¶ 37. [11] To hold that this statement could not be attributed to Mr. Zhang in such conditions would be to determine that only words within direct quotes in press articles could be attributed to securities fraud defendants, a proposition which is unsupported by any caselaw cited by Defendants and which the Court declines to endorse. [12]

[11]    Lead Plaintiffs do not appear to argue, and the Court does not hold, that the opening of the article, which included a statement that the "outlook is rosy" referring to the fourth quarter and full year 2020 results, is attributable to Defendants. Opposition at 9-10, 13. There is of course significantly more reason to doubt that such a claim, found only in the article's introduction, prior to any direct reference to statements made by Mr. Zhang and without any direct attribution to any Defendant, could be considered a statement by Defendants.

[12]    Such a rigid rule would also open avenues for fraud by making it possible for entities and insiders to make statements in the press without fear of liability so long as they secured a reporter's agreement not to put their words in quotes.

The Court therefore turns to Defendants' argument that Mr. Zhang's statements in the *Decrypt* article were not false or misleading. Motion at 16; Reply at 5-6. As stated, the Amended Complaint relies on two statements in the *Decrypt* article attributable to Mr. Zhang: (1) "Zhang said the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors," and (2) a quote from Mr. Zhang saying that "[o]ur approach is one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks." Am. Compl. ¶ 37 (emphasis omitted);

*see Decrypt* Article at 4. Lead Plaintiffs allege that these statements were false because "Canaan had experienced significant ongoing supply chain disruptions during the fourth quarter 2020." Am. Compl. ¶ 38.

**\*11**  To support this claim, Lead Plaintiffs point to statements made in Canaan's fourth quarter and year end 2020 financial results released on April 12, 2021, *id.* ¶ 39, as well as statements made by Mr. Zhang during the earnings call that day discussing those results, *id.* In particular, the press release announcing the financial results contained a statement by Mr. Zhang that "[a]lthough the outbreak of COVID-19 caused supply chain disruptions and thus negatively impacted our revenues in the fourth quarter of 2020, our market leadership has enabled us to attain US$174 million of contracted orders," and a statement by Mr. He that "[d]ue to supply chain disruptions, as the price of Bitcoin rallied in late 2020, we experienced a surge of demand for high quality mining machines both in and outside of China." 4/12/21 Press Release at 2; *see* Am. Compl. ¶ 39. And on the earnings call, Lead Plaintiffs allege that "Zhang stated that Canaan experienced 'a severe supply shortage' of 'mining machine' chips during the fourth quarter of 2020." Am. Compl. ¶ 40. A review of the full transcript of that call, however, shows that he made a different statement. Mr. Zhang said, through a translator:

Due to the low Bitcoin prices in the second half of 2020, most mining machine manufacturers reduced their investment in fabrication during the period. As a result, when the Bitcoin price bounced back in the second half of 2020, we *saw a severe supply shortage in the industry.* In addition [ ] the limited supplies across the semiconductor manufacturing sector recently also ha[ve] played a role in building the shortage of chips in 2021, further accelerating the problem of chip supply.

We cannot really disclose the exact number of chips that we have under production right now. But one of the strategies we've adopted to address this problem is to maintain our partnerships with multiple foundry partners and keep expanding our collaborations, *which has helped us achieve outstanding results in terms of keeping up.*

4/12/21 Call Tr. at 10 (emphasis added). [13]

[13]    "It is well established that 'where the plaintiffs['] allegations are contradicted by a document that the complaint incorporates by reference, the document

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 75 of 573

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)
2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

controls.' " *Optionality Consulting Pte. Ltd. v. Nekos*, No. 18 Civ. 5393 (ALC), 2019 WL 4523469, at *6 (S.D.N.Y. Sept. 18, 2019) (quoting *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 215 (S.D.N.Y. 2008)). Defendants moved the Court to consider the transcript of the April 12, 2021 earnings call as an incorporated-by-reference document in their motion for judicial notice. Dkt. 71 at 4 (referring to Exhibit 9 as incorporated by reference in the Amended Complaint). Lead Plaintiffs did not opposed that motion with respect to the April 12, 2021 transcript. Dkt. 73 at 2, 5.

Lead Plaintiffs argue that Defendants' statements "regarding securing chips [i]n advance of the worldwide shortage of processors' was an outright falsehood as Defendants' own admissions, just three days later, prove," because "Defendants reported the exact opposite, that Canaan had experienced 'a severe supply shortage' of 'mining machine' chips during the fourth quarter of 2020." Opposition at 9. They argue further that "even if Canaan had secured chips prior to the shortage, the statement gives the false impression that the Company was not affected by the shortage," effectively omitting material information. *Id.* at 9-10.

The flaw in Lead Plaintiffs' argument is that they have failed to adequately allege the true state of the world which could make either a false statement false or an omission an omission. In order to establish an outright misrepresentation, Lead Plaintiffs would need to allege either that Canaan had not "secured chips from a number of fabrication plants in advance of the worldwide shortage of chips" or that Canaan had not "reduce[d] supply-chain risks." But in support of those facts, Lead Plaintiffs point only to statements from April 12, 2021 that refer either to general supply chain disruptions without reference to chips, or to industry-wide disruptions to chips without mention of whether or to what extent those disruptions impacted Canaan in particular. To this end, it is significant to note Lead Plaintiffs' misstatement in the Amended Complaint of what Mr. Zhang said during the earnings call. They allege that "defendant Zhang stated that *Canaan* experienced 'a severe supply shortage,' " Am. Compl. ¶ 40 (emphasis added), whereas in fact Mr. Zhang stated that "we saw a severe supply shortage *in the industry*," Dkt. 71-3 at 175 (emphasis added). Neither the severity, nor even the existence, of the shortage as applied to Canaan is indicated by that statement. In short, Defendants' subsequent statements about supply chain issues or chip supply chain disruptions in the industry generally are insufficient to show that Mr. Zhang's previous statements during the *Decrypt*

interview that "the company had secured chips" and had "reduce[d] supply-chain risks" were false statements when made.

**\*12** Lead Plaintiffs' omissions theory as to Mr. Zhang's *Decrypt* interview statements fails for similar reasons. To sufficiently plead that these statements were misleading because they omitted material information, Lead Plaintiffs must identify the information that was omitted. But again, Lead Plaintiffs contend that the omitted information was a "severe supply shortage" of "mining machine" chips affecting Canaan, yet their allegations fail to establish that such a shortage occurred. In fact, Lead Plaintiffs' omission theory is weaker than their misrepresentation theory because even if the Defendants' April 12, 2021 statements had revealed that Canaan experienced a shortage of chips, they say *nothing* about the extent to which Canaan experienced that shortage. For example, a minor shortage would be consistent with the assertion that Canaan had previously "secured chips" and "reduce[d] supply chain risks." Without any information regarding the extent of any shortage, Lead Plaintiffs cannot meet the PSLRA's requirement of specifying "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). And while the PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based," *Novak*, 216 F.3d at 313, they are required to plead at least some fact supporting their belief. Lead Plaintiffs have not done so.

Accordingly, the Court determines that Lead Plaintiffs have failed to adequately allege a false or misleading statement with respect to the April 9, 2021 *Decrypt* article.

### 2. Scienter

Because the Court concludes that Lead Plaintiffs have alleged a false or misleading statement with respect to the February 10, 2021 press release, the Court assesses whether Lead Plaintiffs have adequately pleaded scienter with respect to the statements in that press release.

To plead scienter, a complaint must allege facts showing "either: 1) a 'motive and opportunity to commit the fraud'; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99). As the Second Circuit has explained:

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 76 of 573

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

A complaint will survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* (quotations omitted).

Lead Plaintiffs allege that "each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material information." Am. Compl. ¶ 42. In particular, Lead Plaintiffs allege that "[i]n their respective roles as senior officers of Canaan, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period," and that "[n]umerous facts ... considered collectively, support a strong inference that Defendants knew or, at a minimum, were severely reckless in not knowing, the true undisclosed facts when they made their false and misleading representations to investors." *Id.* ¶¶ 43-44. [14]

[14]    Because Lead Plaintiffs' theory of corporate scienter is predicated on the scienter of Mr. Zhang and Mr. He, *see* Opposition at 24-25; Am. Compl. ¶ 51, the Court does not separately analyze Canaan's scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant.").

Those "[n]umerous facts" include, first, that Defendants "made detailed statements based on purportedly personal knowledge regarding ... the Company's sales of bitcoin mining machines," showing that "the Individual Defendants were intently focused on Canaan's bitcoin mining machines ... and were intimately familiar with the Company's actual

performance and sales ... at the time they made their statements"; second, that the statements "were relayed after quarter end in February ... 2021" such that "the Individual Defendants knew, or were reckless in not knowing, the previous quarter's financial results and reasons for the results months later"; third, "the magnitude of Canaan's revenue decline in the fourth quarter 2020 makes it simply implausible that the Individual Defendants did not know of the negative financial results and causes of those results during the Class Period"; fourth, "the timing and circumstances of the departure of Canaan's former CFO," Mr. Hong; fifth, that "bitcoin mining machines were the single largest income producing segment for the Company"; and sixth, that Mr. Zhang "founded the Company and not only served as its highest-ranking officer and Chairman of the Board, but he also controlled 69.4% of the voting power as of December 31, 2020." Am. Compl. ¶¶ 45-50. Lead Plaintiffs further argue that the core operations doctrine provides supplemental support for allegations of scienter in this instance. *See* Opposition at 22.

**\*13** The flaw in each of these theories is that they amount to various ways that Defendants must have known specific information at the time of the February 10, 2021 statement. That specific information consists of Canaan's revenue figures associated with the pre-sales and that those figures were lower than otherwise achievable because of rising Bitcoin prices during the fourth quarter which Defendants could have taken advantage of had the sale price of the mining machines not been locked in. Essentially, Lead Plaintiffs say that Defendants must have known this information because of, for example, the timing of the statements, the positions of Mr. Zhang and Mr. He in Canaan, and the magnitude of the impact on revenue. But Lead Plaintiffs never allege *how* Defendants would have this information, and "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309; *accord Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*, 478 F. App'x 679, 682 (2d Cir. 2012) ("[A]n allegation that defendants had access to information that was inconsistent with their alleged misstatements 'must specifically identify the reports or statements containing this information.' " (quoting *Novak*, 216 F.3d at 309)).

The Amended Complaint contains no allegation of such a report or statement accessible to Defendants at the time of the February 10, 2021 statement, and instead argues

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

in conclusory fashion that "Canaan's dismal results [were] known to Defendants" because "the fourth quarter and year" were already completed and because the February 10, 2021 statement was made "six weeks after the fourth quarter and full year 2020 ended." Am. Compl. ¶¶ 31-32. While there may be an intuitive appeal to the idea that Defendants must have known about fourth quarter of 2020 revenue because they were touting increased revenue visibility, that revenue visibility was explicitly tied to 2021. *Id.* ¶ 32. The February 10, 2021 statement did not say that Defendants had increased revenue visibility as to the not-yet-reported financial results of 2020, or that they already had generated revenue figures for 2020. And while at least some revenue information was likely obtainable within the company related to pre-sale orders, due to the fact that these orders were locked in during late 2020, the Amended Complaint contains no allegations related to how such information for each sale might have been compiled into some sort of report accessible to Defendants, or even that Mr. He or Mr. Zhang would have been privy to individual sale prices for each of the pre-sales at the time they were made or otherwise before the February 10, 2021 statement, let alone the effects of those sale prices on the company's revenue. In short, the Amended Complaint does not "specifically identify the reports or statements containing" the revenue information; in essence they allege only that such reports *must have* existed. [15] Such allegations are insufficient to plead scienter. *See In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022)* ("These allegations amount to little more than speculation that documentation or evidence of internal control deficiencies must have existed and do not specifically identify the reports or statements containing the truthful information, as a plaintiff generally must when contending defendants had access to contrary facts." (internal quotation marks and alterations omitted)).

[15]    While not finding that any of these allegations necessarily would have been sufficient, the Court notes that Lead Plaintiffs might have alleged, for example, the existence of a sales report showing the funds brought in by pre-sales, a regular practice of reporting preliminary revenue figures within the company shortly after the end of a quarter, or that Mr. Zhang and Mr. He were intimately involved in each individual pre-sale such that they knew the prices and quantities of those sales.

Nor, with this path foreclosed, do Lead Plaintiffs' other attempts lead to a successful pleading. It may be true

that "[a]ctively communicating with the public about [an] issue demonstrates defendants' sensitivity to it," *Gauquie v. Albany Molecular Rsch., Inc.*, No. 14 Civ. 6637 (FB), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016)*, but Defendants' February 10, 2021 statements related to their pre-sales indicate only that they were sensitive to how those pre-sales would improve revenue visibility in 2021, not that they necessarily understood how those sales had impacted past revenue in late 2020. The fact that these statements were made after the fourth quarter concluded also does not raise an inference that revenue information for that quarter was available, especially absent any allegations relating to the company's practices for when it prepares its revenue information for internal review. *See Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 38 (S.D.N.Y. 2016)* ("[T]hat a quarter has concluded does not mean that the quarter's results have yet been tabulated."); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Co.*, 75 F.3d 801, 812 (2d Cir. 1996)* ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss" when allegedly false statement was made three weeks before final sales figures were announced.).

**\*14**    Next, the magnitude of the eventual revenue decline does not raise an inference of scienter both because as discussed there is no indication that Defendants had access to that information at the time of the February 10, 2021 press release and because it is not clear what portion of that decline was due to an increased volume of pre-sales. This is especially true because Lead Plaintiffs' argument is not that the pre-sales alone caused a loss of revenue, but rather that because the sales prices were locked in, Defendants were unable to take advantage of potentially higher sale prices as the price of Bitcoin, and the accompanying demand for mining machines, rose. But the magnitude of a revenue decrease from one year to another or from one quarter to another says nothing about the ability of Defendants to understand that they were leaving money on the table either while they were doing it or shortly thereafter. *See also In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 231 (S.D.N.Y. 2021)* ("[T]he magnitude (or duration) of an adverse result does not provide an independent basis for scienter." (internal quotation marks omitted)). The Court therefore determines that the magnitude of the revenue decline in this case does not raise an inference of scienter.

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 78 of 573

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

The departure of Canaan's former CFO, Mr. Hong, one day before the February 10, 2021 statement, also does not sufficiently raise an inference of scienter. "Courts ... have consistently held that an officer's resignation, without more, is insufficient to support a strong inference of scienter." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605 (S.D.N.Y. 2016) (collecting cases); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (holding that resignations "without some indicia of highly unusual or suspicious circumstances, are insufficient to support the required strong circumstantial evidence of scienter"). The Amended Complaint alleges only that Mr. Hong "suddenly resigned effective immediately" without explanation and "citing only 'personal reasons,' " Am. Compl. ¶ 30, and then alleges that *The Motley Fool* opined that the February 10, 2021 "financial update is oddly timed" since it immediately followed the CFO's resignation, *id.* ¶ 34. The suggestion appears to be that this "odd[ ] timing" indicates that Mr. Hong's resignation was related to some corporate misconduct. But the Amended Complaint alleges no other facts related to his departure that suggest that it was related in any way to the February 10, 2021 statements, let alone facts that give rise to an inference of scienter.

Finally, what remains is the "core operations" doctrine. *See* Opposition at 22. "The core operations doctrine provides that a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *Renewable Energy Grp.*, 2022 WL 14206678, at *3 n.4 (internal quotation marks omitted). But the Second Circuit has "not clearly affirmed the validity of this doctrine following the passage of the PSLRA." *Id.* And so courts in this Circuit generally treat core operations allegations as providing "supplementary but not independently sufficient means to plead scienter." *Cortina v. Anavex Life Sci. Corp.*, No. 15 Civ. 10162 (JMF), 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016) (internal quotation marks omitted). Because none of the Lead Plaintiffs' other allegations support an inference of scienter, the core operations doctrine—even if it remains a valid doctrine—cannot save Lead Plaintiffs' claims.

Ultimately the Court must assess, in light of these allegations taken collectively, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. For this Amended Complaint, without any allegation specifically identifying a report or statement containing omitted material facts, the Court concludes that the answer is no. The inference that Defendants had access to fourth quarter of 2020 revenue data related to their pre-sales is not as strong as the inference that Defendants lacked that data a mere six weeks after the close of the quarter. For that reason, the Court determines that Lead Plaintiffs have failed to adequately allege scienter for the February 10, 2021 statement and grants the motion to dismiss on that ground.

**\*15** Because those are the only statements which the Court finds actionable, the Court dismisses Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims.

**C. Section 20(a) Claims Against Mr. He and Mr. Zhang**

Because the Court has dismissed Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims, the Section 20(a) claims likewise fail for lack of a primary violation. *See, e.g., In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) (dismissing Section 20(a) control liability claims after dismissing Section 10(b) primary violations). The Court therefore also dismisses the Section 20(a) claims.

**D. Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Lead Plaintiffs have asked the Court for leave to amend their Amended Complaint should the Court rule in Defendants' favor. Opposition at 25. Because the Amended Complaint is the first complaint submitted by Lead Plaintiffs, the Court grants leave to amend. The Court emphasizes that Lead Plaintiffs should only file a Second Amended Complaint if they are able to remedy the pleading deficiencies identified herein.

**IV. Conclusion**

For the stated reasons, Defendants' motion to dismiss is granted. The Court grants Lead Plaintiffs leave to amend their Amended Complaint. In the event Lead Plaintiffs decide to file another amended complaint, they must file it within thirty days of this Opinion and Order. If Lead Plaintiffs fail to file an amended complaint within thirty days, and do not show good cause to excuse the failure to do so, the Court will dismiss this action with prejudice.

SO ORDERED.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 79 of 573

**Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)**

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2647855, Fed. Sec. L.
Rep. P 101,562

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 5

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

2018 WL 3032573
United States District Court, S.D. Texas, Houston Division.

Robert EDGAR, Individually and on behalf
of all others similarly situated, Plaintiff,
v.
ANADARKO PETROLEUM
CORPORATION, et al., Defendants.

Civil Action No. 17–1372
|
Signed 06/19/2018

**Attorneys and Law Firms**

R. Dean Gresham, Steckler Gresham Cochran PLLC, Willie C. Briscoe, The Briscoe Law Firm, PLLC, Dallas, TX, for Plaintiff.

Noelle M. Reed, Skadden, Arps, Slate, Meagher & Flom LLP, Houston, TX, Jay B. Kasner, Pro Hac Vice, Susan Leslie Saltzstein, Pro Hac Vice, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants.

**ORDER GRANTING MOTION TO DISMISS, WITHOUT PREJUDICE**

Lee H. Rosenthal, Chief United States District Judge

**\*1** The plaintiffs, a class of investors who purchased or acquired Anadarko common stock between February 8, 2016 and May 2, 2017, brought this securities class action against the defendants, Anadarko Petroleum Corporation and several of its executives.[1] (Docket Entry No. 35). The plaintiffs allege violations of § 10(b) of the Exchange Act and Rule 10b–5 against Anadarko and violations of § 20(a) of the Exchange Act against the executives. *Id.* at ¶¶ 38, 41. The defendants moved to dismiss, the plaintiffs responded, and the defendants replied. (Docket Entry Nos. 36, 46, 47). The parties appeared at a hearing on June 15 and presented oral argument.

1    The defendant executives include: R.A. Walker, Anadarko's chairman since may 14, 2013, chief executive officer since May 15, 2012, and president since February 2010; Robert G. Gwin, Anadarko's executive vice-president, finance and chief financial officer; Robert K.

Reeves, Anadarko's executive vice-president, law and chief administrative officer; and Darell E. Hollek a senior advisor at Anadarko since May 10, 2017 and Anadarko's executive vice-president, U.S. onshore exploration and production since April 28, 2015. (Docket Entry No. 35 at ¶¶ 28–31).

Based on the law, the record, and the parties' arguments, the motion to dismiss is granted, without prejudice and with leave to amend by **August 3, 2018**. The reasons for this ruling are explained below.

**I. Background**

**I. The Factual Allegations**
Anadarko is a publicly traded oil and gas exploration and production company headquartered in the Woodlands. (Docket Entry No. 35 at ¶ 27). Anadarko focuses its operations on the Gulf of Mexico, the Delaware Basin in Texas, and the Denver–Julesburg Basin in Colorado. *Id.* at ¶ 27. Approximately one quarter of Anadarko's employees work out of its Colorado offices. *Id.* at ¶ 3. The plaintiffs allege that Anadarko's disregard for safety regulations led to the endangerment and death of Colorado residents. *Id.* at ¶¶ 1, 21. The plaintiffs contend that this, and Anadarko's failure to be honest, harmed investors and violated securities laws. The plaintiffs allege the following facts.

In 2006, Anadarko acquired the oil and gas company, Kerr–McGee Corporation. *Id.* at ¶ 58. This, combined with Anadarko's acquisition of Western Gas Partners, LP, substantially increased

Anadarko's oil and gas interests in the Denver–Julesburg Basin. *Id.* at ¶ 59. By the end of 2006, this region accounted for 38% of Anadarko's proved onshore oil and gas reserves in the lower 48 states. *Id.*
Anadarko accrued $9 billion in environmental fines and settlements between 2011 and 2014. *Id.* at ¶ 4. The liabilities came primarily from the Macondo well explosion and the Kerr–McGee acquisition. *Id.* Anadarko paid what was the largest environmental settlement in United States history for the environmental damage Kerr–McGee had caused. *Id.* If not for these fines and settlements, Anadarko would have enjoyed multi-billion dollar profits between 2011 to 2013. *Id.* at ¶ 5. Instead, Anadarko lost one billion dollars. *Id.*

**\*2** On October 21, 2013, Anadarko and its closest competitor engaged in a land swap in the Wattenberg field,

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

the most actively called part of the Denver–Julesburg Basin, located just north of Denver. *Id.* at ¶¶ 61, 77. Anadarko received about 1,500 existing wells in the swap. *Id.* at ¶¶ 77–80. The land surrounding the wells was primarily rural when the wells were drilled. As Denver expanded, the surrounding land became more residential. *Id.* at ¶ 80. The wells, most of which were drilled 30 to 40 years ago, were not in compliance with Colorado's standards. *Id.* at ¶ 84. They lacked methane emission controls to prevent gas from being vented into residential airspace. *Id.* Other issues included outdated piping and oil storage tanks and deteriorated cellars and cement pits intended to prevent liquids from going into the ground or groundwater. *Id.* Anadarko's top management knew about these problems within six months after the land swap and were regularly presented with an up-to-date list of wells determined to be problematic by Anadarko's Colorado health, safety, and environment division. *Id.* at ¶¶ 85–86.

At the end of 2015, Anadarko operated approximately 5,000 vertical wells and 1,000 horizontal wells in the Wattenberg field. [2] *Id.* at ¶¶ 64–65. Drilling in the Wattenberg field accounted for 30.1% of Anadarko's worldwide oil production and 20.7% of its worldwide natural gas production. *Id.* at ¶ 65.

[2]   Anadarko had several advantages over its competitors in the Wattenberg field of the Denver–Julesburg Basin. (Docket Entry No. 35 at ¶ 69). Approximately 40% of Anadarko operations in the field were on mineral acres owned by Anadarko, so those operations incurred no lease fees. *Id.* Anadarko had the benefit of economies of scale, with enough land ownership and infrastructure to substantially reduce marginal costs. *Id.* Anadarko's subsidiary, Western Gas Partners, had "more than 240 miles of pipeline and two massive process treating plants in the Wattenberg field," which, again, allowed Anadarko to operate at a significantly reduced cost. *Id.* Altogether, "Anadarko's production costs in the Wattenberg field were only $7.46/BOE—against average worldwide productions costs of $8.31/BOE." *Id.*

Anadarko assured investors that it had turned over a new leaf in regulation compliance. *Id.* at ¶ 6. Anadarko told investors that it had the ability to monitor all the wells in the Colorado region and could rapidly identify and address safety issues. *Id.* After making these assurances, Anadarko discovered that several hundred wells acquired in the land swap were safety

and environmental hazards and would require remediation. *Id.* at ¶ 7. Anadarko authorized tens of millions of dollars for remediation. *Id.*

Oil prices dropped from $95.83 a barrel on September 1, 2014 to $54.56 a barrel on January 1, 2015. *Id.* at ¶ 73. Anadarko reversed course on its commitment and slashed its remediation budget before any substantial remediation had been performed. *Id.* at ¶ 9. Senior Colorado Anadarko executives were aware of the safety issues, but they acted to support Anadarko's bottom line by laying off 20% to 30% of the workforce in March 2016. *Id.* at ¶¶ 10–11. Included in the layoffs were 30% of the field operations personnel who were responsible for well remediation, as well as 30% of the company's health, safety, and environmental division. *Id.* at ¶ 95. There were not enough employees to operate the Denver–Julesburg Basin safely. *Id.* at ¶ 12.

In late 2016 and early 2017, Anadarko "ramped up" its activity in Colorado. *Id.* at ¶ 97. In August 2016, Anadarko had one well-drilling rig in Colorado. *Id.* By November 2016, it had five. *Id.* Despite this increased drilling, Anadarko hired no additional employees. *Id.* One former employee brought up the inadequate staffing with John Christiansen, Anadarko's vice-president of corporate communications, approximately 12 times between late 2016 and March 2017. *Id.* at ¶ 99. She also brought her concerns to Craig Walters, vice-president of the Denver–Julesburg Basin; Shane Fross, an engineer; and Paul Schneider, the health, safety, and environment manager for the Denver–Julesburg Basin. *Id.* at ¶ 99. When another former employee found out that many of Anadarko's contractors did not comply with safety regulations, he sent an email to the contractors and "everyone and their brother" within Anadarko, but he received no responses. *Id.* at ¶ 101. Anadarko continued to hire the infringing contractors. *Id.*

**\*3**  Anadarko determined that a 28,000–gallon oil spill in January 2017 was caused by the lack of trained personnel. *Id.* at ¶ 12. At an internal meeting to prepare for a hearing before the Colorado Oil and Gas Conservation Commission to discuss the spill, Anadarko officials noted that the cause of the accident was a lack of "skilled staff." *Id.* at ¶ 103. Anadarko executives decided not to inform Colorado regulators of the cause of the spill. *Id.* Fross instructed meeting attendants not to admit that cause to during the Commission hearing. *Id.* at ¶ 102. When a senior public-relations employee voiced concerns about Anadarko's lack of skilled staff and safety practices, Christiansen told her to "keep quiet" and that

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 83 of 573

Edgar v. Anadarko Petroleum Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

her job was to "shovel shit and clean up the messes that [Anadarko's employees] make." *Id.* at ¶ 104.

Anadarko used its remediation budget to support production and avoid fines. *Id.* at ¶ 105. Anadarko chose the wells to remediate based on the amount of oil they would produce or when failing to remediate would affect Anadarko's drilling schedule. *Id.* at ¶ 106. When Anadarko drilled new horizontal wells, it would:

> [C]ross-reference the location against the location of the lease-maintaining assets. Anadarko would then perform mechanical integrity tests on [an] older well to ensure they could withstand the pressure of the nearby horizontal frack. If the old well did not pass these tests, Anadarko would plug and abandon the well to install a new horizontal well. In that way, Anadarko used the remediation budget to ensure "the machine of the horizontal drilling program did not get slowed down," rather than to address the actual health and safety risks of the wells.

*Id.* at ¶ 107. Only when it faced potential fines for methane emissions did Anadarko use funds in the remediation budget to remediate the high-emitting wells. *Id.* at ¶¶ 108–09.

Safety risks and proximity to residential areas or schools were not factors considered in remediation. *Id.* at ¶ 105. According to one former employee, well remediation had "nothing to do with the probability of the wells, or flowlines, creating environmental or safety hazards. The company prioritized either the decommissioning of a well, the upgrade or a repair of the well, based on where the drilling schedule was." *Id.* at ¶ 110. Colorado-based upper executives met several times to talk about how to prioritize using remediation funds to support drilling rather than to address environmental and safety hazards. *Id.* at ¶ 111. At group leadership meetings, Korby Bracken, the director of environment, regularly raised health and safety concerns. *Id.* at ¶ 113. His concerns were pushed aside. *Id.* at ¶ 113.

On April 17, 2017, a home in Firestone, Colorado exploded, killing two people and critically injuring another. *Id.* at ¶ 14. The home was 200 feet away from the Anadarko–operated Firestone Well. *Id.* at ¶ 127. The well was one of the several hundred acquired in the land swap but was never remediated. *Id.* at ¶ 15. On April 26, 2017, Anadarko announced that the Firestone Well may have been involved in the explosion, and that the company would be shutting down 3,000 similar wells in Colorado. *Id.* at ¶ 16. Anadarko's stock price fell 4.7% the next day. *Id.* at ¶ 17.

Anadarko had turned on the Firestone Well, in January 2017 to maintain the lease. *Id.* at ¶ 121. The well did not emit methane when it was turned on because it did not have a compressor to dispose methane. *Id.* at ¶¶ 122. In early April 2017, Anadarko had sent crews to the Firestone Well. *Id.* at ¶ 123. Though the crews could not explain why the well was not emitting methane, Anadarko did not shut off the well. *Id.* Because Anadarko was short-staffed, it did not check to make sure the Firestone Well's flowlines were not leaking. [3] *Id.* at ¶ 125. It did not know about the existence of the leaking line that caused the explosion. *Id.*

> [3]   A "flowline" is a surface or subsurface pipe through which oil or gas travels from a well to process equipment or storage.

**\*4**  On May 2, 2017, the Firestone–Frederick Fire Department confirmed the link between Anadarko's well and the Firestone explosion. *Id.* at ¶ 18. A return line that was connected to the Firestone Well leaked methane into the home's drains, which exploded when a hot-water heater was being installed. *Id.* at ¶ 129. Anadarko violated Colorado Oil and Gas Conservation Commission Rule 1103 by abandoning the flowline without disconnecting and sealing it. *Id.* at ¶¶ 18, 129. On May 3, 2017, Anadarko's stock price fell by 7.7%. *Id.* at ¶ 19. On June 30, 2017, Anadarko announced that it had cut and sealed more than 2,400 abandoned flowlines located within 1,000 feet of buildings, each of which violated Rule 1103. *Id.* at ¶ 138. Anadarko additionally disconnected, plugged, and abandoned 3,600 return lines. *Id.*

Anadarko publicly expressed sympathy in a published statement attributed to its Robert Walker, Anadarko's chief executive officer, but its executives admitted internally that they were not worried about the explosion. *Id.* at ¶¶ 20, 132. At the next Anadarko town hall meeting, the Firestone explosion came up only when Walker mentioned that Anadarko was "not too concerned" about it. *Id.* at ¶ 133.

On May 24, 2017, a new methane cloud was discovered west of the Firestone explosion site, with even higher levels of methane. *Id.* at ¶ 136. The following day, a fire at an Anadarko oil container in Weld County, Colorado killed one worker and injured three others. *Id.* at ¶ 137.

### ii. The False Statement Allegations

In February 2016 and 2017, Anadarko published its 2016 and 2017 Health, Safety, and Environment Fact Sheets. *Id.* at ¶

Edgar v. Anadarko Petroleum Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

140, 153. The documents stated: "[w]e work to ensure that all of our activities are conducted to meet or surpass applicable health, safety, and environmental laws, regulations, and international standards." *Id.* The 2016 Fact Sheet additionally stated: "our [health, safety, and environment] team works seamlessly with operations and facilities to ensure compliance with all applicable laws and regulations." *Id.* at ¶ 140. The plaintiffs argue that these statements were false because: "(a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap did not comply with a variety of Colorado laws and regulations, including those violations leading to the Firestone Well explosion." *Id.* at ¶ 141, 154.

On February 16, 2016, Anadarko filed its 2015 Form 10–K, which Walker and Robert Gwin, Anadarko's executive vice-president of finance and chief financial officer, signed. *Id.* at ¶ 143. The 2015 Form 10–K stated:

Anadarko's business operations are subject to numerous international, provincial, federal, regional, state, tribal, local, and foreign environmental and occupational health and safety laws and regulations.

...

Many states where the Company operates also have, or are developing, similar environmental laws and regulations governing many of these same types of activities. In addition, many foreign countries where the Company is conducting business also have, or may be developing, regulatory initiatives or analogous controls that regulate Anadarko's environmental-related activities. While the legal requirements imposed under state or foreign law may be similar in form to U.S. laws and regulations, in some cases the actual implementation of these requirements may impose additional, or more stringent, conditions or controls that can significantly alter or delay the permitting, development or expansion of a project or substantially increase the cost of doing business. In addition, environmental laws and regulations, including new or amended legal requirements that may arise in the future to address potential environmental concerns such as air and water impacts, are expected to continue to have an increasing impact on the Company's operations.

**\*5** ...

The Company believes that it is in material compliance with existing environmental and occupational health and

safety regulations. Further, the Company believes that the cost of maintaining compliance with these existing laws and regulations will not have a material adverse effect on its business, financial condition, results of operations, or cash flows, but new or more stringently applied existing laws and regulations could increase the cost of doing business, and such increases could be material.

*Id.* at ¶¶ 143–44. The plaintiffs allege that the statement, "the Company believes that it is in material compliance with existing environmental and occupational health and safety regulations," was false because: "(a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap did not comply with a variety of Colorado laws and regulations." *Id.* at ¶ 145.

On August 12, 2016, Anadarko filed a Registration Statement on Form S–3, which incorporated the 2015 Form 10–K by reference. *Id.* at ¶ 152. On September 12, 2016, Anadarko sold 40,537,500 shares at an offering price of 54.50 per share, its largest stock offering by dollar amount. *Id.* The offering raised net proceeds of $2.2 billion. *Id.*

Anadarko published a Wattenberg Integrated Operations Center Factsheet on its website. The Factsheet stated that the Operations Center "[p]rovides real-time remote-monitoring capabilities for 6,800+ wells and 3,700+ tank facilities," and that it "applies state of the art oil, natural gas, and water management to Anadarko tank batteries, facilities and pipeline infrastructure." *Id.* at ¶ 146. It also stated that Anadarko "[i]mmediately pinpoints issues associated with field alerts and alarms." *Id.* at ¶ 146. The plaintiffs allege that these statements were false because: "(a) a large proportion of Anadarko's facilities and pipeline infrastructure was not state of the art, but old and decaying; and (b) the Operations Center could not pinpoint issues or provide real-time monitoring consistently because Anadarko did not know where many of its lines in Colorado were located." *Id.* at ¶ 147.

In March 2016 and 2017, Anadarko published its Health, Safety, Environmental and Sustainability Overviews for 2015 and 2016 on its website. *Id.* at ¶¶ 148, 156. The reports, which Walker and David McBride, Anadarko's vice-president of global health, safety, and environment signed, stated:

Oil and natural gas upstream and midstream operations are subject to laws and regulations in every country in which Anadarko operates. Anadarko operates its global onshore

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

and offshore operations in compliance with the applicable laws and associated regulations.

...

Anadarko is committed to preventing and minimizing the impacts of spills [at all operations/everywhere it operates]. This commitment is demonstrated by the implementation of best management practices, engineering design, mechanical integrity, product assessment and training. Anadarko promotes a culture that allows for employee involvement in maintaining a safe work environment while recognizing that environmental incidents are preventable. The teams strive for ZERO incidents. Spills can be prevented by designing and operating equipment and training staff to avoid releases.

**\*6** *Id.* at ¶¶ 148–50, 156–58. The plaintiffs challenge two statements: (1) "Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations"; and (2) "[t]he teams strive for ZERO incidents. We believe spills can be prevented by designing and operating equipment and training staff to avoid releases." The plaintiffs allege that the statements were false because: "(a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap were not in compliance with a variety of Colorado laws and regulations." *Id.* at ¶¶ 151, 159. The plaintiffs also allege that Anadarko knew that it did not have enough employees to prevent Colorado spills and that instead of hiring employees, it allowed spills when the costs of clean up were cheaper than remediation. *Id.*

### iii. The Legal Allegations

The plaintiffs assert that Anadarko violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and the Security Exchange Commission's Rule 10b–5. *Id.* at ¶ 170. The plaintiffs assert that the executive committee defendants, Bradley Holly, Craig Walters, and John Christiansen, violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *Id.* at ¶ 182.

### III. The Legal Standards

#### A. Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the

Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2). To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008). In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*. The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). A court may "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (internal quotation marks omitted). Consideration of documents attached to a defendant's motion to dismiss is limited to "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency. *Lovelace*, 78 F.3d at 1018 n.1. The court may consider these matters of public record without converting the motion into one seeking summary judgment. *See Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir.2011); *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366); *Jathanna v. Spring Branch Indep. Sch. Dist.*, No.

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

CIV.A. H–12–1047, 2012 WL 6096675, at *3 (S.D. Tex. Dec. 7, 2012).

**B. The Exchange Act**

**\*7** Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly,...[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made...not misleading." 17 C.F.R. § 240.10b–5. The Supreme Court has held that § 10(b) affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007). "But the statutes make these latter actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (internal citations omitted).

To state a private claim under § 10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted).

### 1. Material Misrepresentations and Omissions

A plaintiff who asserts securities fraud in violation of § 10(b) and Rule 10b–5 must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322. Rule 9(b) requires the complaint to "state with particularity the circumstances constituting the fraud." FED. R. CIV. P. 9(b). In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696

(5th Cir. 2005). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006).

As Judge Ellison explained in a similar case arising from the BP Deepwater Horizon securities fraud multidistrict litigation:

The PSLRA enhances the requirements of Rule 9(b) in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2).

In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir.2002). These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id.* What constitutes particularity will necessarily differ with the facts of each case. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir.1992). A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir.2004).

**\*8** *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012) ["*BP I*"]. For each statement that the plaintiffs identify as misleading, they must explicitly and precisely set out why the statement was false or misleading and why the speaker knew (or recklessly disregarded the fact that) the statement was misleading.

The Fifth Circuit has made clear its disapproval of "group pleading" in securities-fraud complaints. Allegations that an undifferentiated group of "defendants" made false or misleading statements are insufficient. Individualized

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 87 of 573

Edgar v. Anadarko Petroleum Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

allegations about the specific speaker are required. The plaintiffs cannot rely on or impute to individuals the collective knowledge of all or a group of persons associated with the defendant company. *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

Even if misrepresentations and omissions are pleaded with sufficient specificity and individualization, they must be material to state a claim. There is no bright-line rule for materiality. It requires a fact-intensive inquiry into "the source, content, and context" of the allegedly misleading or omitted information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). A representation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Omitted facts make a statement material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *BP I*, 843 F. Supp.2d at 747 (citing *Basic*, 485 U.S. at 232).

Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). "[N]o reasonable investor would consider such statements material and...investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *BP I*, 843 F. Supp. 2d at 748. The statements the plaintiffs rely on must be something more than a corporate officer's generalized optimistic comments about the company's policies, programs, or performance. As in other areas of the law, "puffery" is not an actionable misrepresentation.

## 2. Scienter

In addition to pleading that specific statements made by identified persons misrepresented or omitted material facts, the plaintiffs must plead that the responsible person acted with the necessary culpability, or scienter. *Tellabs*, 551 U.S. at 319. Section 10(b) and Rule 10b-5 are not insurance against bad corporate management. Rather, they protect only against intentional or knowing misstatements. *Shaw Group*, 537 F.3d at 535. "Scienter, in the context of securities fraud, is defined as 'an intent to deceive, manipulate, or defraud or that severe

recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.' " *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Investments LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) ). "[F]or each act or omission alleged,' securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Shaw Group*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u–4(b)(2) ); *TXU Corp.*, 565 F.3d at 207.

**\*9** In considering a motion to dismiss challenging whether the factual allegations create a strong inference of scienter, the court can consider documents incorporated by reference into the complaint and matters proper for judicial notice. *BP I*, 843 F. Supp. 2d at 748 (citing *Tellabs*, 551 U.S. at 323). The court looks to all of the allegations about a particular individual's state of mind when he or she made the statement to determine whether they support a strong inference of scienter. *Tellabs*, 551 U.S. at 324; *Southland*, 365 F.3d at 364–65. The inference of scienter must be "cogent and compelling," not simply "reasonable" or "permissive." The inference must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The court must consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.' " *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2) ). "Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice." *BP I*, 843 F. Supp.2d at 749 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) ).

The rule against group pleading applies to scienter allegations. The plaintiffs must make specific factual allegations about each responsible individual's state of mind when each challenged statement was made. The plaintiffs cannot simply allege that some other person at the corporation knew of facts that make the statement misleading and impute that knowledge to the speaker. *Southland*, 365 F.3d at 366. Allegations about another person's knowledge, or the defendants' collective knowledge, are insufficient. The plaintiffs must plead facts that give rise to a strong inference of scienter, for each individual defendant, for each alleged misstatement. *Id.* Simply pleading that a defendant had access

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 88 of 573

Edgar v. Anadarko Petroleum Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

to internal information that contradicted his or her public statements is not enough. *In re BP P.L.C. Sec. Litig.*, 852 F. Supp. 2d 767, 817 (S.D. Tex. 2012) ["*BP II*"]. To the extent that the plaintiffs' scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the document, its author, contents and character, and when and by whom it was received, to link it to the person making the challenged statement, at the time the statement was made. *Abrams*, 292 F.3d at 432.

### 3. Statements of Opinion After *Omnicare*

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), clarifies how a trial court should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion.[4] *Omnicare* provides "two potential avenues for plaintiffs to establish the falsity of an opinion." *In re: BP p.l.c. Sec. Litig.*, No. 4:10–MD–2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016). First, "every...statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief." *Omnicare*, 135 S. Ct. at 1327. A speaker can be liable for an opinion statement if the speaker did not in fact hold that opinion. Second, "depending on the circumstances," a reasonable investor could

> understand an opinion statement to convey facts about the speaker's basis for holding that view. Specifically, [a speaker's] statement of opinion may fairly imply facts about the inquiry the issuer conducted or the knowledge it had. And if the real facts are otherwise, but not provided, the opinion statement will mislead by omission.

*Id.* at 1328. Even if

> a speaker's opinion may be sincerely held, the statement may nonetheless be actionable under 10b–5's omissions provision if: (I) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself."

*In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *9 (quoting *Omnicare*, 135 S. Ct. at 1329).

[4]
> Even though "*Omnicare* was decided in the context of Section 11 of the Securities Act, courts have overwhelmingly applied its holdings in the context of alleged omissions under Section 10(b) of the Securities Exchange Act...." *In re: BP p.l.c. Sec. Litig.*, No. 4:10–MD–2185, 2016 WL 3090779, at *10 (S.D. Tex. May 31, 2016) (collecting cases). Its analysis bears both on the material misrepresentation aspect of a § 10(b) claim and on the scienter aspect. *Id.* Therefore, the *Omnicare* opinion's discussions about an "issuer's" statements are equally applicable to an Exchange Act defendant speaker's statements.

**\*10** The *Omnicare* Court emphasized that this avenue to liability does not allow a plaintiff to circumvent the particularity and materiality requirements of a § 10(b) claim by alleging in general terms that the defendant improperly failed to reveal the basis for his opinion, or failed to disclose "some fact cutting the other way." 135 S. Ct. at 1329. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why a [speaker] may frame a statement as an opinion, thus conveying uncertainty." *Id.*

One hypothetical the *Omnicare* Court raised bears on the dispute here:

> Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." If the [speaker] makes that statement without having consulted a lawyer, it could be misleadingly incomplete. In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere. Similarly, if the [speaker] made the statement in the face of [her] lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker]'s possession at the time.

*Omnicare*, 135 S. Ct. at 1328–29.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 89 of 573

Edgar v. Anadarko Petroleum Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

#### 4. Section 20(a) of the Securities Exchange Act of 1934

Under § 20(a) of the Exchange Act, every "person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable...." 15 U.S.C. § 78t(a). Control person liability under § 20(a) is derivative, "predicated on the existence of an independent violation of the securities laws." *Rubinstein v. Collins*, 20 F.3d 160, 166 n.15 (5th Cir. 1994). A party who fails to state an underlying primary claim for an Exchange Act violation fails to state a claim for control-person liability under § 20(a).

### IV. Analysis

Anadarko argues that the plaintiffs have not pleaded with specificity why or how any of the alleged statements were materially false and misleading.[5] (Docket Entry No. 36 at 17). "[The Private Securities Litigation Reform Act] requires the complaint to specify each allegedly misleading statement and the reason why it is misleading...." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006). Anadarko asserts its arguments statement-by-statement.

[5]     Anadarko also argues that the plaintiffs' allegations of falsity that are substantially based on unnamed witnesses' statements carry no weight. (Docket Entry No. 36 at 17). "[C]ourts must discount allegations from confidential sources. Such sources afford no basis for drawing the plausible competing inferences required...." *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (citation omitted). This argument is moot. On December 18, 2017, the court ordered the release of the confidential witnesses' names without the restriction of attorneys eyes only, on the condition that if any witness requests a job reference or similar recommendation from Anadarko, information about the witness role in this lawsuit must be kept from the person at Anadarko receiving the request as well as the person who receives the reference or recommendation. (Docket Entry No. 41).

#### A. The Health, Safety, and Environment Fact Sheet Statements

**\*11**  Anadarko published its 2016 and 2017 Health, Safety, and Environment Fact Sheets in February 2016 and 2017, respectively. (Docket Entry No. 35 at ¶¶ 140, 153). The statements are, "[w]e work to ensure that all of our activities are conducted to meet or surpass applicable health, safety, and environmental laws, regulations, and international standards," (Docket Entry No. 35 at ¶¶ 140, 153), and "our [health, safety, and environment] team works seamlessly with operations and facilities to ensure compliance with all applicable laws and regulations," *id.* at ¶ 140.

Anadarko argues that a reasonable investor would not view these high-level statements as guarantees. (Docket Entry No. 36 at 12); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 909 (S.D. Tex. 2017). It argues that:

> None of Anadarko's statements regarding high-level regulatory and legal compliance was specific to the Land Swap wells or the wells involved in the Release and Firestone Accident. Instead, it is clear that the statements broadly describe Anadarko's substantial and far-reaching global operations and its general compliance goals. Anadarko's extensive global operations require compliance with numerous different health, safety, and environmental laws and regulations.

(Docket Entry No. 36 at 19). The plaintiffs respond that Anadarko's statements are statements of "present fact" that Anadarko met or exceeded safety requirements. (Docket Entry No. 46 at 23). The plaintiffs' argument is unpersuasive because a reasonable investor would not understand Anadarko's statements as "implicitly assuring absolute compliance." *Plains*, 245 F. Supp. 3d at 909. Anadarko's statement that it "work[s] to ensure" that its activities comply with applicable laws says that Anadarko makes an effort to achieve compliance. Anadarko cites cases in which statements that a company or corporate team works or strives toward "ensuring" an outcome have been found too vague to be actionable under Section 10(b). For example, in

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 90 of 573

Edgar v. Anadarko Petroleum Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

*New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL 3112574, *15 (C.D. Cal. Sept. 25, 2009),"strive[s] to ensure appropriate loan to collateral valuations" was "so broad or vague as to not be actionable."

The plaintiffs' conclusory allegation that a regulatory violation may have occurred despite Anadarko's work might support an inference that Anadarko's efforts fell short of its goals, not that those efforts did not occur. The "work to ensure" statements are not actionably misleading.

### B. The 2015 Form 10–K Statement

#### I. Timeline

The following timeline of alleged events is helpful:

• **February 16, 2016**: Anadarko files its 2015 Form 10–K. (Docket Entry No. 35 at ¶ 143).

• **August 12, 2016**: Anadarko filed a Registration Statement on Form S–3, incorporating the 2015 Form 10–K by reference. *Id.* at ¶ 152.

• **January, 2017**: Anadarko turned on the Firestone Well. *Id.* at ¶ 121.

• **Early April, 2017**: Anadarko sent crews to the Firestone Well. *Id.* at ¶ 123.

• **April 17, 2017**: The Firestone Well exploded. *Id.* at ¶ 126.

• **May 2, 2017**: Colorado Governor John Hickenlooper sent a notice to oil and gas operators ordering inspections and tests of all active and abandoned gas pipelines within 1,000 feet of occupied buildings and reminding operators that abandoned flow lines must be cut and sealed. The notice gave operators until June 30, 2017 to comply. *Id.* at ¶ 130.

• **June 30, 2017**: In response to the May 2 notice, Anadarko announced that it cut and sealed more than 2,400 abandoned flowlines located within 1,000 feet of buildings. *Id.* at ¶ 138.

#### ii. Analysis

**\*12** Anadarko's 2015 Form 10–K was filed on February 16, 2016. (Docket Entry No. 35 at ¶ 143). The 2015 Form 10–K stated:

> [Anadarko] believes that it is in material compliance with existing environmental and occupational health and safety regulations. Further, the Company believes that the cost of maintaining compliance with these existing laws and regulations will not have a material adverse effect on its business, financial condition, results of operations, or cash flows, but new or more stringently applied existing laws and regulations could increase the cost of doing business, and such increases could be material.

(Docket Entry No. 35 at ¶ 144).

Anadarko argues that this statement is an opinion that "is not actionable unless Plaintiff alleges facts showing that the speaker did not actually hold the stated beliefs." (Docket Entry No. 36 at 19); *Omnicare*, 135 S. Ct. at 1328 ("[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect."). It asserts that the plaintiffs' allegations are conclusory and that there are no allegations that any authorities found Anadarko noncompliant at the time the statements were made. (Docket Entry No. 36 at 20). The plaintiffs respond that opinion statements can be misleading "where the speaker does not believe the opinion or...omits facts that conflict with what a reasonable investor would understand from the statement, itself." (Docket Entry No. 46 at 22); *Omnicare*, 135 S. Ct. at 1329.

"To show that these opinion statements are actionable under *Omnicare*, the plaintiffs must allege, with particularity, each individual defendant's knowledge of material facts inconsistent with the compliance-opinion statements at issue." *Plains*, 245 F. Supp. 3d at 908. In *Plains*, the court found that opinion statements as to legal compliance were not actionably misleading because the complaint "[did] not adequately allege that the individual defendants were aware of the facts the plaintiffs rely on to show that they made statements that they did not believe or knew to be false of misleading." *Plains*, 245 F. Supp. 3d at 907–08. The court found that the complaint relied on group-pleading allegations that "the company" or "the defendants" were aware of facts inconsistent with the compliance-opinion statements. *Id.* at

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 91 of 573

Edgar v. Anadarko Petroleum Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

908. "[A] bare allegation that a given specific individual knew, when the statements were made," facts inconsistent with the compliance-opinion statements is not sufficient. "[T]he plaintiffs must allege the character of the reports, the author and contents, who received them, and when." *Id.* (citing *Abrams*, 292 F.3d at 432).

The significant dates are February 16, 2016, when Anadarko filed its 2015 Form 10–K, and August 12, 2016, when it filed its Registration Statement on Form S–3. There are no allegations that on these dates, the individual defendants knew of significant violations inconsistent with the statement that Anadarko believed its operations were "in material compliance with existing environmental and occupational health and safety regulations as a whole." The allegations that come closest are:

> **\*13**  [T]he problems with the wells Anadarko received in the Land Swap were far out of proportion to what it was expecting. The thousands of wells it received had predominantly been drilled 30 or 40 years before. In the meantime, Colorado had tightened its safety and emissions rules. The wells were not in compliance with Colorado's standards. In particular, the wells did not have methane emissions controls on them at all, which were not required at the time they were drilled. And instead of pressurizing the gas emitted and placing it back into the system, the wells simply vented the gas into the air. Moreover, the wells' piping and oil storage tanks had never been upgraded. Beyond that, the wells had become dangerous with age. For example, many of the cellars and cement pits that prevent liquids from going into the ground or groundwater had completely deteriorated.
>
> ...
>
> Anadarko's top management, including the Executive Committee, well understood these problems within at most six months after the Land Swap closed. The problems were a frequent topic of conversation.
>
> ...
>
> Anadarko's Colorado Health, Safety & Environment staff put together a ranked excel spreadsheet of risky and problematic wells. There were up to several hundred wells listed on the spreadsheet. The Health, Safety & Environment staff regularly updated and presented the list to Anadarko's Colorado senior leadership team.

*Id.* at ¶¶ 84–86.

These allegations are insufficient. There are no particularized allegations as to individual defendants. *Plains*, 245 F. Supp at 908. The allegations do not include facts showing that the individual defendants necessarily, or even likely, knew the facts that made their statements false. The plaintiffs allege that Walker and Gwin signed the 2015 Form 10–K, but they allege nothing to indicate that those defendants knew material facts inconsistent with the compliance-opinion statements at issue. Unlike *Plains*, the plaintiffs do not allege regulatory notices of recordkeeping violations. The only government notice Anadarko received was Colorado Governor John Hickenlooper's May 2, 2017 notice to oil and gas operators ordering inspections and tests of all active and abandoned gas pipelines within 1,000 feet of occupied buildings. (Docket Entry No. 35 at ¶ 130). If the compliance-opinion statements in *Plains* did not form the basis of an Exchange Act claim, neither do Anadarko's 2015 Form 10–K statements. *Plains*, 245 F. Supp at 909–10 ("A reasonable investor would understand the use of 'hedges and disclaimers' like the phrase '*substantial*compliance' and would not reasonably infer that the company was in absolute compliance or that its regulators had no objections to the company's compliance on any pipeline. Instead, reasonable investors would understand that, for a very large pipeline company in this heavily regulated industry, regulatory notices of recordkeeping violations on minor portions of the company's operation are commonplace and unremarkable.").

The legal-compliance statements in Anadarko's 2015 Form 10–K are not actionable. The allegations of material falsity are not particularized or individualized.

### C. The Wattenberg Integrated Operations Center Factsheet Statements

The Wattenberg Integrated Operations Center Factsheet stated that the Operations Center "[p]rovides real-time remote-monitoring capabilities for 6,800+ wells and 3,700+ tank facilities," and that it "applies state of the art oil, natural gas, and water management to Anadarko tank batteries, facilities and pipeline infrastructure." (Docket Entry No. 35 at ¶ 146). It also stated that Anadarko "[i]mmediately pinpoints issues associated with field alerts and alarms." *Id.* at ¶ 146. The plaintiffs allege that these statements were false because: "(a) a large proportion of Anadarko's facilities and pipeline infrastructure was not state of the art, but old and decaying; and (b) the Operations Center could not pinpoint issues or provide real-time monitoring consistently because Anadarko

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 92 of 573

Edgar v. Anadarko Petroleum Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

did not know where many of its lines in Colorado were located." *Id.* at ¶ 147.

 **\*14** As to the first, Anadarko argues that the statement describes the Operations Center's management, not Anadarko's facilities and infrastructure, as "state of the art." (Docket Entry No. 36 at 21). That is right. The plaintiffs' allegations change the subject of Anadarko's statements from "management" to "infrastructure." And even if the statements did describe Anadarko's facilities and infrastructure as "state-of-the-art," this type of description is generally, and is here, the sort of "corporate cheerleading" that cannot be the basis of a securities-fraud claim. *See Plains*, 245 F. Supp. 3d at 901.

As to the second statement, the plaintiffs argue that Anadarko must have been aware of either regulatory failures in the 2,400 flowlines that violated Rule 1003, or that its safety-monitoring systems were grossly ineffective. (Docket Entry No. 46 at 26). Anadarko asserts that it did not represent that it was able to pinpoint all regulatory failures in all wells, lines, or facilities. (Docket Entry No. 36 at 21). Anadarko is correct. The statement represents that Anadarko could instantaneously identify issues associated with field alerts and alarms, not that field alerts and alarms would go off if there was an issue in each of Anadarko's wells or lines.

The statements in Anadarko's Wattenberg Integrated Operations Center Factsheet are not actionably misleading. The allegations of material falsity do not accurately describe the first statement and are not particularized or individualized as to the second.

### D. Health, Safety, Environmental and Sustainability Overviews Statements

#### I. Timeline

The following timeline is helpful:

 • **March 12, 2016**: The 2015 Health, Safety, Environmental and Sustainability Overview states: "Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations." (Docket Entry No. 35 at ¶¶ 148–49).

 • **March 3, 2017**: The 2016 Health, Safety, Environmental and Sustainability Overview states: "Anadarko operates its global onshore and offshore operations in compliance with

the applicable laws and associated regulations." *Id.* at ¶¶ 156–57.

 • **April 17, 2017**: The Firestone Well exploded. *Id.* at ¶ 126.

 • **May 2, 2017**: Anadarko published a statement attributed to Walker expressing sympathy for the families of those who had been killed. *Id.* at ¶ 132. "At the next Anadarko town hall meeting, Walker said that Anadarko was "not too concerned" with the Firestone explosion. *Id.* at ¶ 132.

 • **May 2, 2017**: Colorado Governor John Hickenlooper sent a notice to oil and gas operators ordering inspections and tests of all active and abandoned gas pipelines within 1,000 feet of occupied buildings and reminding operators that abandoned flow lines must be cut and sealed. The notice gave operators until June 30, 2017 to comply. *Id.* at ¶ 130.

 • **June 30, 2017**: In response to the May 2 notice, Anadarko announced that it cut and sealed more than 2,400 abandoned flowlines located within 1,000 feet of buildings. *Id.* at ¶ 138.

#### ii. Analysis

Anadarko published on its website its Health, Safety, Environmental and Sustainability Overviews for 2015 and 2016 in March 2016 and 2017. *Id.* at ¶¶ 148, 156. Both Overviews stated: "[t]he teams strive for ZERO incidents. Spills can be prevented by designing and operating equipment and training staff to avoid releases" and that Anadarko "operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations." *Id.* at ¶¶ 149–50, 157–58. The plaintiffs argue that these statements were false because: "(a) Anadarko intentionally violated Colorado law and regulations as a matter of course, including Rule 1103; and (b) Anadarko knew that hundreds of the wells it had acquired in the Land Swap were not in compliance with a variety of Colorado laws and regulations." (Docket Entry No. 35 at ¶¶ 151, 159. The plaintiffs also allege that although Anadarko knew that it did not have enough employees to prevent Colorado spills, instead of hiring employees, it allowed spills when the costs of clean up were cheaper than remediation. *Id.*

 **\*15** Anadarko argues that the plaintiffs' allegation, even if true, does not make the statement "[t]he teams strive for ZERO incidents" materially false or misleading. (Docket Entry No. 36 at 22). Anadarko is right. The fact that there was

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

an explosion or release does not mean that Anadarko's teams did not strive for zero spills. *See Owens v. Jastrow,* 789 F.3d 529, 544–45 (5th Cir. 2015).

The other statement, that Anadarko "operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations," is trickier. (Docket Entry No. 35 at ¶¶ 149, 157). The plaintiffs allege that the Firestone Well explosion on April 17, 2017 was caused by a flowline that was not disconnected or sealed, in violation of Colorado law. *Id.* at ¶ 129. The plaintiffs also allege that no one checked the flowlines of the Firestone Well after turning it on in January 2017 to make sure that they were not leaking. *Id.* at ¶ 125.

Anadarko's statement that it operated "in compliance with the applicable laws and associated regulations" was made in both March 12, 2016 and March 3, 2017. *Id.* at ¶¶ 148, 156. The statement is specific, is not limited, and is not an opinion. Unlike the statement in *Plains* that the company was operating in "substantial compliance," there is no qualifying language in Anadarko's statement. Anadarko asserted that it was "in compliance" with all applicable laws and regulations. The plaintiffs have sufficiently alleged that Anadarko was not in compliance with all laws and regulations. At least one regulation, Colorado Oil and Gas Conservation Commission Rule 1103, was allegedly violated. Based on the plaintiffs' allegations, the statement of compliance was an actionable misstatement, and one that a reasonable investor would consider important in making an investment decision. *Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988).

The next issues are whether the plaintiffs have adequately alleged scienter as to Walker or McBride, and whether their scienter can be imputed to Anadarko. The plaintiffs must allege that either Walker or McBride acted with the necessary culpability, or scienter; namely, "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known...or so obvious that the defendant must have been aware of it." *Flaherty & Crumrine,* 565 F.3d at 207; *Tellabs,* 551 U.S. at 319. The plaintiffs must plead facts that give rise to a "cogent and compelling inference" that persons to whom statements are attributed intended to deceive or were severely reckless. *Plains,* 245 F. Supp. 3d at 921.

The plaintiffs allege that both Walker, Anadarko's chairman, chief executive officer, and president, and McBride, Anadarko's vice-president of global health, safety, and

environment, signed the 2015 and 2016 Health, Safety, Environmental and Sustainability Overviews. (Docket Entry No. 35 at ¶¶ 148, 156). The plaintiffs do not allege that McBride knew of Anadarko's legal violations. Walker is a closer call. Anadarko is correct that "the fact that an individual defendant made a statement or signed a document containing a statement shows only that the statement is attributable to that defendant, not that he or she had the legally required state of mind." *Plains,* 245 F. Supp. 3d at 923. But the plaintiffs allege that Walker knew about the Firestone Well explosion. On May 2, 2017, Anadarko published a statement attributed to Walker expressing sympathy for the families of those who had been killed. (Docket Entry No. 35 at ¶ 132). And later, at an Anadarko town hall meeting, Walker said that Anadarko was "not too concerned" with the Firestone Well explosion. *Id.* at ¶ 133. The question is the sufficiency of allegations that when Walker made the statements, he knew or should have known that the cause of the explosion stemmed from Anadarko's violations of Rule 1103.

**\*16** The Firestone Well exploded in April 2017. *Id.* at ¶ 126. The "in compliance with the applicable laws and associated regulations" statement was made in March 12, 2016 and March 3, 2017. *Id.* at ¶¶ 148, 156. Both statements were made before the explosion. Anadarko's announcement that it had cut and sealed more than 2,400 abandoned flowlines located within 1,000 feet of buildings—statements that the plaintiffs allege show that Anadarko violated Rule 1103—did not come until June 30, 2017. *Id.* at ¶ 138. The plaintiffs have not sufficiently alleged that, at the time the 2015 and 2016 Health, Safety, Environmental and Sustainability Overviews were made, Walker had "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known...or so obvious that the defendant must have been aware of it." *Flaherty & Crumrine,* 565 F.3d at 207; *Tellabs,* 551 U.S. at 319.

The statement, "[t]he teams strive for ZERO incidents. Spills can be prevented by designing and operating equipment and training staff to avoid releases," is not actionably misleading. The statement "[Anadarko] operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations," is actionably misleading, but the plaintiffs have not sufficiently alleged Walker's scienter.

**V. Conclusion**

The plaintiffs have what at first looks like a narrative that would counsel against dismissal. The plaintiffs allege that Anadarko got bad wells in a land swap, said they were

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 94 of 573

Edgar v. Anadarko Petroleum Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

going to remediate them, failed to remediate because of costs and external financial pressures, failed to prevent explosions, and then announced that it had violated Colorado laws. The biggest hurdle for the plaintiffs is the timing of the facts alleged as the basis for this theory of liability. The plaintiffs clearly allege that at least by June 30, 2017, Anadarko knew that more than 2,400 of its abandoned flowlines were violating Rule 1103. But the only statement that is an actionable misrepresentation—that Anadarko "operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations"—predated the explosion. What the plaintiffs did not allege is that the individuals who stated that "[Anadarko] operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations" knew, or should have known, before the explosion that Anadarko was violating at least some laws. The plaintiffs' present complaint is insufficient.

The motion to dismiss is granted, but without prejudice and with leave to amend. The record does not permit the court to conclude that amendment would be futile. The plaintiffs are granted leave to amend by **August 3, 2018**.

### All Citations

Not Reported in Fed. Supp., 2018 WL 3032573, Fed. Sec. L. Rep. P 100,207

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 6

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 96 of 573

Edwards v. McDermott International, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 3927828

2022 WL 3927828
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Miriam EDWARDS, et al., Plaintiffs.

v.

MCDERMOTT INTERNATIONAL,
INC., et al., Defendants.

Civil Action No. 4:18-cv-04330
|
Signed August 30, 2022

**Attorneys and Law Firms**

Michael Kenan Oldham, Reynolds Frizzell LLP, Houston, TX, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for Plaintiff Miriam Edwards.

Chet B. Waldman, Sean M. Zaroogian, Matthew Insley-Pruitt, Robert C. Finkel, Pro Hac Vice, Wolf Popper LLP, John J. Rizio-Hamilton, Lauren Ormsbee, Pro Hac Vice, Bernstein Litowitz Berger & Grossman LLP, New York, NY, James M. Fee, Labaton Sucharow LLP, New York City, NY, Michael Kenan Oldham, Reynolds Frizzell LLP, Jeffrey W. Chambers, Chambers Law Firm, Houston, TX, for Plaintiff Public Employees' Retirement System of Mississippi.

R. Dean Gresham, Gresham Law Group, Dallas, TX, Michael Kenan Oldham, Reynolds Frizzell LLP, Houston, TX, for Plaintiff Wah Kee Ho.

Michael Kenan Oldham, Reynolds Frizzell LLP, Houston, TX, for Plaintiffs John Arden Ahnefeldt, Robert Brower, Jr., Khanh L. Bui, Jignesh Chandarana, Kruitika Chandarana, Amira Yousuf Chowdhury, Christopher Coligado, Daniel Gad, Edwin Howell, Sioe Lie Howell, Darren Hunting, Anne Ingledew, Shital Mehta, Thomas Carl Rabin, Adam Shultz, Amit Somani, Jayaprakash Srinivasan, Aarthi Srinivasan, Christopher Swedlow, Alexandre Tazi.

David D. Sterling, Amy Pharr Hefley, Anthony Joseph Lucisano, Elizabeth Pennington Furlow, Baker Botts LLP, Houston, TX, for Defendants McDermott International, Inc., David Dickson, Stuart Spence.

David D. Sterling, Baker Botts LLP, Houston, TX, for Defendant Chicago Bridge & Iron Co.

**MEMORANDUM AND RECOMMENDATION**

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before me is Defendants' Motion to Dismiss Plaintiff's § 10(b) Supplemental Class Action Complaint ("Motion to Dismiss"). Dkt. 222. After carefully reviewing the Supplemental Class Action Complaint, the excellent briefing submitted by both sides, and the applicable law, I recommend that the Motion to Dismiss be **GRANTED**.

**BACKGROUND**

This is a securities class action lawsuit brought on behalf of purchasers of the common stock of McDermott International, Inc. ("McDermott") against McDermott and two of its former top executives, President and Chief Executive Officer David Dickson ("Dickson") and Executive Vice President and Chief Financial Officer Stuart Spence ("Spence").

In the Corrected Class Action Complaint, Lead Plaintiff Nova Scotia Health Employees' Pension Plan ("Nova Scotia") brings claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.[1] The crux of the Corrected Class Action Complaint is that Defendants made misrepresentations and omissions regarding the true risks and costs of McDermott's May 2018 merger with Chicago Bridge & Iron Company, N.V. The Corrected Class Action Complaint's proposed class consists of those persons and entities who purchased or otherwise acquired McDermott common stock between December 18, 2017 and September 17, 2019.

[1]      There is a separate group of plaintiffs asserting claims under § 14(a). Those claims are not at issue in the pending Motion to Dismiss.

Defendants moved to dismiss the Corrected Class Action Complaint. In the spring of 2021, United States District Judge George C. Hanks, Jr. denied the motion to dismiss and ordered that discovery proceed. *See Edwards v. McDermott Int'l, Inc.*, No. 4:18-CV-4330, 2021 WL 1421609, at \*10 (S.D. Tex. Apr. 13, 2021).

2022 WL 3927828

Last fall, Novia Scotia sought leave to file a Supplement to its Corrected Class Action Complaint ("Supplement"). Over vigorous opposition, I granted Novia Scotia leave to file the Supplement. I also set a briefing schedule for Defendants' anticipated motion to dismiss the Supplement.

In short, the 30-page Supplement carries forward the allegations of securities fraud from September 17, 2019, through McDermott's bankruptcy filing on January 23, 2020. In doing so, the Supplement adds roughly 20 allegedly false and misleading statements made by Defendants, ranging in time from late September 2019 through January 23, 2020. The Supplement also offers a new theory of liability, arguing that Defendants had a duty to disclose that it was planning for a potential bankruptcy filing. Section V of the Supplement, titled "Additional Partial Corrective Disclosures," pleads November 4–5 of 2019 and January 21–23 of 2020 events and stock drops as partially corrective of alleged misstatements previously pleaded in the Corrected Class Action Complaint. [2] Finally, the Supplement seeks to expand the class definition to cover the time period from September 18, 2019 through January 23, 2020.

[2]  As Defendants readily acknowledged at oral argument, they have not moved to dismiss these corrective disclosures from the case.

**\*2** As expected, Defendants have moved to dismiss the Supplement, raising a number of distinct arguments. First, Defendants contend that the Supplement fails to allege any actionable false or misleading statement. Second, Defendants argue that there is no legal duty to disclose bankruptcy planning, and creating such a duty would lead to disastrous policy consequences. Third, Defendants insist that the alleged misrepresentations are nothing more than non-actionable puffery, statements of opinion, or protected forward-looking statements. Fourth, Defendants aver that the Supplement fails to establish the requisite inference of scienter required under the Private Securities Litigation Reform Act ("PSLRA").

### LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint when the plaintiff has failed to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct.

1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R § 240.10b–5(b). "A § 10b–5 claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled 'with particularity' and ... the requirements of the [PSLRA]." *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 430 (5th Cir. 2002).

Rule 9(b) requires parties claiming fraud to "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The allegations must include "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir. 2003) (quotation omitted).

Enacted by Congress in 1995, the PSLRA has "twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). To accomplish this goal, the PSLRA contains "[e]xacting pleading requirements." *Id. at 313, 127 S.Ct. 2499.* Under the PSLRA's heightened pleading requirements, a plaintiff seeking to properly state a Section 10(b) and Rule 10b–5 claim must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John*

2022 WL 3927828

*Fund, Inc.*, 573 U.S. 258, 267, 134 S.Ct. 2398, 189 L.Ed.2d 339 (2014) (quotation omitted).

The scienter, or state-of-mind element of a § 10(b) and Rule 10b–5 claim, is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To allege scienter under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

**\*3** Section 20(a) of the Exchange Act provides for joint and several liability for "controlling persons" who are found to have induced violations of the Exchange Act. 15 U.S.C. § 78t(a). "To impute liability to [Dickson] and [Spence]—the alleged 'control persons' of [McDermott] under § 20(a) of the Securities Exchange Act—the investors ha[ve] to show a 'primary violation' under § 10(b): If the § 10(b) claim is inadequate, then so is the § 20(a) claim." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429 (5th Cir. 2019).

### OBJECTIONS TO EXHIBITS 4–6 AND 8–9 ATTACHED TO THE MOTION TO DISMISS

As a preliminary matter, I need to address Nova Scotia's objection to various news articles attached to the Motion to Dismiss as Exhibits 4–6 and 8–9. Nova Scotia objects to these exhibits on the grounds that they are not attached to or incorporated in the Supplement. Nova Scotia is correct. This is not a close call.

In considering a Rule 12(b)(6) motion, a district court may consider: (1) the pleadings and any attachment to the pleadings; (2) documents incorporated into the complaint by reference; and (3) documents that a defendant attaches to its motion to dismiss if those documents are referenced in the plaintiff's complaint and are central to the plaintiff's claim. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). Because the news articles at issue clearly do not fall with any of these well-defined exceptions, I will strike Exhibits 4–6 and 8–9 from consideration.

### ANALYSIS

As noted, to state a claim for a violation of Section 10(b) and Rule 10b–5, a plaintiff must first plead a material misrepresentation or omission. For the reasons set forth below, Nova Scotia has failed to allege any actionable misrepresentation or omission by Defendants.

### A. LEGAL FRAMEWORK FOR PLEADING A MATERIAL MISREPRESENTATION OR OMISSION

Under the PSLRA, securities fraud plaintiffs must "identify the particular statement they contend is false and misleading and the reason why that statement is false or misleading. Attempting to overwhelm the court with conclusory, garrulous and esoteric allegations simply does not get the job done." *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 560–61 (N.D. Tex. 2003). A statement is misleading "if it would cause a reasonable investor to change his impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quotation omitted).

District courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under federal securities law. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). This is because "no reasonable investor would consider such statements material and ... investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 748 (S.D. Tex. 2012). "Statements that are predictive in nature are actionable only if they were false when made." *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir.1993).

To be actionable, a misrepresentation of a fact, or an omission of a fact, must also be material. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."). "A statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R & W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir. 2000).

### B. THE SUPPLEMENT FAILS TO ALLEGE A FALSE OR MISLEADING STATEMENT

Edwards v. McDermott International, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 3927828

**\*4** By my count, the Supplement identifies approximately 20 statements that it contends are materially false or misleading. A close look at those statements, however, fails to reveal any statement made by Defendants that was factually untrue or misleading at the time it was made.

As described in great detail in the Corrected Class Action Complaint, McDermott faced significant financial challenges in the fall of 2019. On September 18, 2019, the company's stock price plummeted 49 percent in morning trading after *The Wall Street Journal* reported that McDermott had "engaged turnaround consulting firm AlixPartners LLP to advise on efforts to improve cash flow and stem a recent spate of net losses." Dkt. 105 at 216. Later that same day, McDermott confirmed the hiring of the turnaround firm, stating that the company was "taking positive and proactive measures ... intended to improve its capital structure and the long-term health of its balance sheet." *Id.*

According to the Supplement, Defendants falsely convinced analysts and investors that McDermott could overcome its liquidity problems by obtaining short-term financing and then, later on, selling its Lummus Technology business. "Unbeknownst to investors," the Supplement alleges, "the operational issues, project delays, cost overruns, and cash drains of [various projects] were insurmountable absent a bankruptcy reorganization." Dkt. 220 at 5. "Defendants' statements were merely a scheme to maintain artificial inflation in McDermott's stock price while providing time to develop and execute a prepackaged Chapter 11 restructuring plan that wiped out common stockholders." *Id.* at 6. The Supplement also notes that McDermott issued a press release announcing that the company had filed a prepackaged bankruptcy on January 21, 2020. *See id.* at 21.

Although the Supplement is well-written and certainly conveys its thematic message that Defendants reportedly knew that bankruptcy was a foregone conclusion, Nova Scotia cannot point to a single statement in which Defendants affirmatively denied the possibility that it would file for bankruptcy protection. At this preliminary pleading stage, it is my job to look at each challenged statement, one by one, to determine if it contains a false statement of fact. I have done that. The statements Nova Scotia challenge merely identify strategic alternatives McDermott pursued in an effort to address its serious liquidity concerns. The statements do not promise that McDermott would never file a bankruptcy proceeding. *See, e.g,* Dkt. 220 at 8 (alleging McDermott "expects to utilize the amounts under the Agreement [with secured lenders] to finance working capital and support the issuance of required performance guarantees on new projects" (emphasis omitted)); *id.* ("McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology and the sale process for the remaining portion of the pipe fabrication business." (emphasis omitted); *id.* at 11 ("Our recently announced $1.7 billion financing agreement with our lenders signals their confidence in our underlying business. We continue working with them to achieve a long-term balance sheet solution as we remain focused on delivering value for our customers, employees, subcontractors, and suppliers." (emphasis omitted)); *id.* ("We continue to pursue the previously announced strategic alternative process for our Lummus Technology business and the sale process for the remaining portion of our pipe fabrication business." (emphasis omitted)); *id.* at 12 ("Tranche B funding is expected to allow McDermott to continue collaborative discussion regarding a long-term balance sheet solution" (emphasis omitted)).

**\*5** The above-referenced statements are a mere sampling of the statements challenged by Nova Scotia in the Supplement. Attached as Exhibit A to Defendants' Motion to Dismiss is an extremely helpful Appendix, listing, in one convenient place, each allegedly fraudulent statement made by Defendants.[3] *See* Dkt. 222-1. Although Defendants repeatedly described their efforts to ameliorate McDermott's liquidity problems, they never once promised investors that a bankruptcy filing was off the table. The reality for any company is that a bankruptcy filing always remains a possibility in the event its efforts to cure a severe liquidity crisis do not bear fruit. Indeed, McDermott expressly stated in its Form 10-Q for its third quarter (ending September 30, 2019) that the company "may be compelled to seek an in-court solution, potentially in the form of a pre-packaged or pre-arranged filing under Chapter 11 of the Bankruptcy Code if we are unable to successfully negotiate a timely out-of-court restructuring agreement with our creditors." Dkt. 222-5 at 64.

[3]     As an aside, Nova Scotia objects to Appendix A on the ground that it seeks "to rewrite the Supplement's statements and raise argument beyond the brief page limits." Dkt. 230 at 22 n.3. I overrule Nova Scotia's objections. Because Appendix A merely identifies the challenged statements **verbatim** in one easily accessible chart, I view Appendix A as a helpful guide to the Court, not a devious attempt to avoid page limitations.

Edwards v. McDermott International, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 3927828

*See* Mahoney v. Found. Med., Inc., 342 F. Supp. 3d 206, 212 (D. Mass. 2018) (rejecting attempt to exclude a chart identifying misstatements and omissions alleged in a securities fraud complaint because such information is "helpful to the Court" and not "argumentative in nature").

In short, the Supplement fails to identify a materially false or misleading statement. [4] Because I have concluded that the Supplement does not allege an actionable misrepresentation, I must now determine whether the Supplement alleges an actionable omission.

[4] Because the alleged misstatements set forth in the Supplement are not, in fact, misstatements at all, I need not address whether the challenged statements: (i) are forward-looking statements protected by the PSLRA's safe-harbor provision; or (ii) constitute nonactionable puffery.

## C. THE SUPPLEMENT FAILS TO ALLEGE AN ACTIONABLE OMISSION

"[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). *See also* Basic, 485 U.S. at 239 n.17, 108 S.Ct. 978 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). "[M]erely because a reasonable investor might really like to know [a] fact" does not mean that a corporation has a legal duty to disclose that fact. Berger v. Beletic, 248 F. Supp. 2d 597, 603 (N.D. Tex. 2003). "Disclosure is required under [§ 10(b) and Rule 10b-5(b)] only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.' " Matrixx, 563 U.S. at 44–45, 131 S.Ct. 1309 (quoting Rule 10b-5). "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." Id. at 45, 131 S.Ct. 1309.

Nova Scotia contends that once Defendants chose to speak about their efforts to combat McDermott's liquidity issues, they had an obligation to disclose the fact that they were considering the possibility of filing for bankruptcy. *See* Dkt. 220 at 12 (McDermott "failed to disclose ... that a prepackaged bankruptcy was forthcoming and that McDermott's lenders would not permit access to third tranche funding outside of a bankruptcy proceeding"); *id.* at 13

(McDermott "failed to disclose that [it] was nearing an imminent prepackaged bankruptcy that would wipe out its common stockholders"). This type of failure-to-disclose-bankruptcy-planning-claim has been considered and rejected by district courts on both sides of the Mississippi River. *See* Espinoza v. Whiting, 8 F. Supp. 3d 1142, 1154 (E.D. Mo. 2014) (rejecting claim that a company had an obligation to disclose a material risk of bankruptcy given its poor financial condition), *aff'd sub nom.* Podraza v. Whiting, 790 F.3d 828 (8th Cir. 2015); McNulty v. Kanode, No. A-13-CV-026-LY, 2013 WL 12077503, at *12 (W.D. Tex. Nov. 6, 2013) (explaining "even if [the company] had in fact hired bankruptcy counsel and was seriously considering filing for bankruptcy, Defendants would not have been required to disclose this plan to investors" absent a duty to disclose); Hutchinson v. Perez, No. 12 Civ. 1073(HB), 2012 WL 5451258, at *5 (S.D.N.Y. Nov. 8, 2012) (statement that company had "no intention" of filing for bankruptcy was not misleading even while option was under consideration); Beleson v. Schwartz, 599 F. Supp. 2d 519, 527 (S.D.N.Y. Feb. 24, 2009) (companies need not disclose contingency planning merely because contingency ultimately materializes), *aff'd,* 419 F. App'x 38 (2d Cir. 2011); In re Tower Auto. Sec. Litig., 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) (company's "failure to disclose its bankruptcy planning did not make its other disclosures"—such as a statement that it was pursuing "options for easing [its] liquidity problems"—misleading).

*6 The reason district courts almost universally reject the notion that a public company must disclose when it is contemplating bankruptcy proceedings is grounded in "public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy." Beleson, 599 F. Supp. 2d at 527. The *Beleson* court further explained:

> Any standard mandating disclosure of contingent bankruptcy planning would put an unacceptable burden on corporations and their officers. Such a standard might amount to a self-fulfilling prophecy, ensuring that all companies that begin contingent preparations for bankruptcy would inevitably go bankrupt because, upon disclosure of the plans, investors would immediately lose confidence

Edwards v. McDermott International, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 3927828

in the company and close the capital markets. In some cases, a rule requiring disclosure of bankruptcy plans might prematurely foreclose other options the company may be contemplating that could restore its financial viability and thus avert bankruptcy. Such a standard would also raise substantial practical challenges in defining the proper moment during the continuum of contingency planning at which the obligation to disclose would take effect.

*Id.*

In a footnote, Nova Scotia cites several cases for the proposition that a failure to disclose an imminent bankruptcy is a material omission. *See EnSource Invs. LLC v. Tatham*, No. 3:17-CV-00079, 2017 WL 10648061 (S.D. Cal. Mar. 9, 2017); *Anderson v. McGrath*, No. CV-11-01175-PHX-DGC, 2012 WL 5381406 (D. Ariz. Nov. 1, 2012); *In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947 (D. Minn. 2009); *In re McLeodUSA Sec. Litig.*, No. C02-0001, 2003 U.S. Dist. LEXIS 27915 (N.D. Iowa Aug. 7, 2003); *Arnlund v. Smith*, 210 F. Supp. 2d 755 (E.D. Va. 2002); *Salkind v. Wang*, No. CIV.A. 93-10912-WGY, 1995 WL 170122 (D. Mass. Mar. 30, 1995). But, as pointed out by Defendants, those cases are inapposite. Each of those cases involved "defendants affirmatively paint[ing] a rosy, misleading picture of a company's financial status and then [failing to] disclose underlying liquidity problems." Dkt. 222 at 22. By contrast, McDermott expressly acknowledged its fragile liquidity position and outlined various steps—from bridge loan financing in the short-term to a possible sale of Lummus Technology at a future date—the company considered in an effort to escape from under crippling debt. Viewed in light of all the information available at the time, it is hard to argue with a straight face that a reasonable investor would be surprised to learn that McDermott faced the real possibility of seeking bankruptcy protection. This is particularly true given the specific disclosure in McDermott's quarterly federal securities filings, discussed above, that the company "may be compelled to seek an in-court solution, potentially in the form of a pre-packaged or pre-arranged filing under Chapter 11 of the Bankruptcy Code." Dkt. 222-5 at 64. Even Nova Scotia, in this very case, recognized

in a filing with the Court on September 18, 2019, that "McDermott fil[ing] for bankruptcy protection" was a "strong possibility." Dkt. 95 at 4.

With its back against the wall, Nova Scotia contends that even though McDermott allegedly knew as early as September 2019 that bankruptcy was its "only option" and a "foregone conclusion," McDermott failed to publicly disclose such information. Dkt. 230 at 25–27. In making this argument, Nova Scotia relies heavily on statements made by McDermott's Chief Transformation Officer, John Castellano, during bankruptcy proceedings on March 12, 2020, to the effect that once the company obtained bridge financing in the fall of 2019, "there really weren't any other options at all, other than restructuring." Dkt. 240-2 at 128. In Nova Scotia's mind, this statement is an express admission that McDermott knew early on that it had no alternative other than to seek Chapter 11 protection. But this view is too simplistic, as it assumes that the term "restructuring" is synonymous with filing for bankruptcy. This certainly is not the case, as restructuring often occurs out of court by, for example, stretching out the maturity date of obligations, partial forgiveness of principal and accrued interest, changing covenants in debt instruments, or a combination of these and other changes. *See In re Solutia, Inc.*, No. 03-17949 PCB, 2007 WL 1302609, at *4 (Bankr. S.D.N.Y. May 1, 2007) (recognizing the difference between out-of-court restructuring efforts and filing for bankruptcy). Defendants maintain that McDermott's public filings, as well as the entirety of Castellano's bankruptcy testimony, expressly recognize that McDermott actively sought out-of-court restructuring before it finally concluded, as a last resort, that it had no alternative but to file for bankruptcy protection. *See* Dkt. 240-2 at 134 (Castellano specifically denying that bankruptcy was a "fait accompli" as of October 21, 2019, and testifying that "we knew a reorganization of some form or fashion was necessary"). After carefully reviewing the documents referenced in the Supplement, which clearly indicate that McDermott analyzed both in-court and out-of-court options to address its capital structure, I am unwilling to jump to the conclusion that Defendants knew all along that bankruptcy was the only real alternative to its business problems.

*7 All told, I refuse to fault Defendants for failing to disclose that McDermott was considering bankruptcy. In reaching this conclusion, I follow the reasoning of the overwhelming majority of federal courts which have held that a company's "failure to disclose its bankruptcy planning [does] not make

*Edwards v. McDermott International, Inc., Not Reported in Fed. Supp. (2022)*

2022 WL 3927828

its other disclosures misleading." *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d at 348. Accordingly, Nova Scotia has failed to allege an actionable omission.

\*\*\*

In short, the Supplement has failed to identify a misleading statement or material omission actionable under § 10(b) and Rule 10b-5(b). I thus recommend that the Supplement's new § 10(b) and Rule 10b-5(b) claims be dismissed. Nova Scotia's § 20(a) claim against Dickson and Spence likewise fails, as it is predicated on a successful § 10(b) claim. *See Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 905 (5th Cir. 2018). Because I have concluded that Nova Scotia has failed to identify a misleading statement or omission, I need not address whether the Supplement's federal securities claims should also be dismissed for the failure to allege scienter. *See Labs.' Loc. #231 Pension Fund v. PharMerica Corp.*, No. 3:18-CV-109-RGJ, 2019 WL 4645583, at \*13 (W.D. Ky. Sept. 24, 2019).

**CONCLUSION**

For the reasons explained above, I recommend that Defendants' Motion to Dismiss Plaintiff's § 10(b) Supplemental Class Action Complaint (Dkt. 222) be **GRANTED**. The claims arising out of the alleged additional materially false and misleading statements and omissions set forth in ¶¶ 6–15 of the Supplement should be dismissed. At the same time, this recommendation is not intended to impact the additional partial corrective disclosures set forth in ¶¶ 16–24 of the Supplement, or the extension of the class period to January 23, 2020 as described in ¶ 4 of the Supplement.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3927828

---

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 7

THOMSON REUTERS

CHECKPOINT™

**WGL-SOACT ¶ 1603**

**PRACTICAL GUIDE TO CORPORATE GOVERNANCE AND ACCOUNTING: IMPLEMENTING THE REQUIREMENTS OF THE SARBANES-OXLEY ACT**

Practical Guide to Corporate Governance and Accounting: Implementing the Requirements of the Sarbanes-Oxley Act

Implementing the Requirements of the Sarbanes-Oxley Act

Copyright (c) 2025 Thomson Reuters/Tax & Accounting

# 1603 Management's assessment of internal control over financial reporting.

Under Sarbanes-Oxley Section 404(a) (*see §404*), management must test, evaluate, and report on the effectiveness of internal control over financial reporting ("ICFR"). The evaluation is made as of the end of the company's most recent fiscal year. Management must conduct its evaluation based on a suitable internal control framework. A suitable framework, such as the COSO 1992 or 2013 Framework (the 1992 Framework will be superseded by the 2013 Framework after December 15, 2014), is one that is a recognized internal control framework, established by a body or group that has followed due-process procedures,including the broad distribution of the framework for public comment. (For a discussion of internal control monitoring, see §1617). Testing and evaluation must be documented in sufficient detail so that outside auditors can later examine management's work and conclude whether management's overall assessment of internal control is supported by the evidence of testing and evaluation.

Management has always been involved, to one degree or another, in designing, operating, documenting, testing, and monitoring ICFR; however reporting on internal control is a new requirements of Sarbanes-Oxley.

The discussion of management's assessment of ICFR activities is based primarily on the guidance issued by the SEC in *Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934*, SEC Release Nos. 33-8810; 34-55929, June 27, 2007 ("Guidance"). The effective date of the SEC Guidance is June 27, 2007. Also included in this discussion, however, is additional guidance provided by the SEC.

**ICFR Evaluation Requirement**

In order to comply with Sarbanes-Oxley Section 404(a) management must assess the effectiveness of its ICFR and disclose its assessment in a report accompanying its annual financial statements. The form and content of the disclosure is discussed at §1604. Management can use the SEC Guidance to make its ICFR assessment. If management follows this Guidance, which describes a top-down/risk-based approach to assessing ICFR, then it will be deemed to have satisfied the ICFR testing and evaluation requirements of Section 404(a) (). However, as discussed below, the SEC Guidance is only a safe harbor for Section 404(a) compliance, which management is not required to follow.

The top-down/risk-based approach is supposed to result in a more efficient and effective ICFR assessment because it focuses testing primarily in areas where the risk of material control weaknesses is highest, and minimizes or eliminates testing in other areas.

**Sanctions for Failure to Comply with Internal Control Rules**

The SEC has indicated its intention to pursue enforcement actions related to poor internal control and erroneous internal control reports. In its 2015 fiscal year report, the SEC stated that "enforcement will continue to prioritize financial reporting and accounting fraud with an emphasis on areas including revenue and expense recognition problems, faulty valuations supporting accounting estimates, faulty asset impairment conclusions, improper acquisition accounting, missing or insufficient disclosures, *insufficient internal controls*, and the role of auditors and other gatekeepers." *U.S. Securities and Exchange Commission, Agency Financial Report, Fiscal Year 2015* (italics added).

The SEC has the power to sanction a company that fails to comply with requirements to evaluate ICFR. It can do so, for example, when a company fails to disclose a material weakness, even if that weakness has not resulted in a material financial reporting error. In the Matter of Magnum Hunter Resources Corp (MHR) (SEC Release No. 34-77345, March 10, 2016), the SEC announced a settlement in which it imposed penalties totaling $290,000 on MHR and two of its executives. In this case, company management failed properly to implement, maintain, and evaluate internal control over financial reporting (ICFR). In this complaint, the SEC asserted, among other things, that management failed to properly evaluate ICFR, and failed to disclose the existence of a material weakness in its Section 404 report. The company reported its ICFR as being effective, after concluding, without documentation to support this conclusion, that identified weaknesses were significant but not material. Among other things, the SEC Release implies that management relied in some part on the absence of a material reporting error when it concluded that an ICFR weakness was not material. On this point, the Release states that management "failed to apply the appropriate standard when determining the severity of MHR's internal control deficiency. As detailed above, while actual errors may inform assessments of control deficiencies, the presence of an actual error is not a prerequisite to concluding that a material weakness exists. Rather, management is to consider whether there is a <u>reasonable possibility</u> that a material misstatement will not be timely detected or prevented."

**Effective Date**

An issuer must comply with the requirements of Section 404(a) after the effective date. Effective dates differ for accelerated filers, non-accelerated filers, and foreign companies. For a complete discussion of the various effective dates, see §404.

**Safe Harbor**

Under SEC rules, if management conducts an evaluation of ICFR in accordance with the SEC Guidance, management will be considered to have satisfied the annual management ICFR evaluation requirement under Section 404(a). That is, the SEC Guidance provides a safe harbor for Section 404(a) compliance. The safe harbor is expressed as follows:
Although there are many different ways to conduct an evaluation of the effectiveness of internal control over financial reporting to meet the requirements of this paragraph, an evaluation that is conducted in accordance with the [Guidance] issued by the Commission in Release 34-55929, June 27, 2007 will satisfy the evaluation required by this paragraph. Exchange Act Rules 13a-15(c) and 15d-15(c).

What this rule is telling us is that compliance with the Guidance is one way to satisfy the requirements of Section 404(a) (), but it is not the only way. It is merely a safe harbor. Companies can comply with the requirements of Section 404(a) by employing ICFR evaluation processes that differ from the approach set out in the SEC Guidance. According to the SEC, companies that currently comply with Section 404(a) using other methods can remain in compliance without adopting the Guidance. SEC Release No. 33-8809, June 20, 2007.

The SEC Guidance is discussed below, starting at *SEC Guidance*.

A safe harbor implies a prescriptive set of rules against which compliance can be measured. However, this is not the case here. The SEC Guidance is principles based, and describes goals rather than procedures. Therefore, companies can adopt a broad range of ICFR evaluation methodologies and still claim to be following the Guidance, as long as those methodologies can be described as top-down/risk-based. The SEC acknowledges that Exchange Act Rules 13a-15 and 15d-15 are unlike typical safe-harbor provisions, which ordinarily prescribe specific conditions to be met before a company can claim safe-harbor protection.

The SEC does not resolve this apparent contradiction. It says only that the Guidance serves the purpose of communicating the objectives and requirements of the ICFR evaluation. SEC Release No. 33-8811, June 20, 2007.

**Management's ICFR Reporting Requirements**

Under Section 404(a) of Sarbanes-Oxley (), each annual report of a public company is to be accompanied by a report by management on the effectiveness of ICFR. Section 404(a) requires that management perform the assessment as of the end of its most recent fiscal year.

The form and content of management's annual report on ICFR, including adverse reports, is discussed at §1604.
**Note:** Management is required to evaluate ICFR only as of the end of its fiscal year. However, one influential group takes the position that management's assessment should reflect the likelihood of a material misstatement in financial statements filed during the 12 months following the fiscal year end. For public companies such an assessment would effectively address the reliability of quarterly statements filed during that 12 month period. *See* Institute of Internal Auditors, *Sarbanes-Oxley Section 404: A Guide for Management by Internal Controls Practitioners*, January 2008.

**Outsourcing Evaluation and Testing of Controls**

Many companies do not have staff capable of designing, documenting, testing and evaluating internal control, and will have to outsource this activity. Since the passage of Sarbanes-Oxley, a number of consulting companies and software companies have created products and services necessary to meet the new requirements. A company will have no shortage of third-party providers to turn to. Although management can outsource many activities relating to internal control, management remains responsible for internal control. It also remains responsible for reporting on internal control (in the Section 404(a) report). Moreover, outsourcing internal control activities does not affect the responsibility of the company's audit committee and board of directors to exercise oversight responsibility *vis a vis* financial reporting and internal control.

As discussed at *Use of Independent Auditors in Internal Control Testing*, below, the company can use independent auditors to assist with some internal control work, but cannot completely outsource the work to the auditors.

**Use of Independent Auditors in Internal Control Testing**

Management's report on its assessment of ICFR is the result of management's own evaluation of the effectiveness of ICFR. Auditors can play a limited role in assisting management with internal control testing and with documentation of testing. Indeed, because the independent auditors must attest to management's conclusions on internal control, management is well advised to obtain auditor advice as internal control systems are being designed and tested. However, the auditors cannot perform any services that will impair their independence. In addition, any services performed in assisting management with its testing of internal control are nonaudit services that must be specifically preapproved by the audit committee.

**Preapproval of internal control related services.** Under PCAOB Rule 3525, *Audit Committee Pre-approval of Non-audit Services Related to Internal Control Over Financial Reporting*, in connection with seeking audit committee preapproval to perform for an issuer audit client any permissible nonaudit service related to internal control over financial reporting, a registered public accounting firm must do the following:
(a) describe, in writing, to the audit committee of the issuer audit client the scope of the service;

(b) discuss with the audit committee of the issuer the potential effects of the service on the independence of the firm; and

(c) document the substance of its discussion with the audit committee of the issuer. PCAOB Rule 3525.

This rule is accompanied by the following *caveat:*
Independence requirements provide that an auditor is not independent of his or her audit client if the auditor is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that the auditor is not, capable of exercising objective and impartial judgment on all issues encompassed within the accountant's engagement. Several principles guide the

application of this general standard, including whether the auditor assumes a management role or audits his or her own work. Therefore, an auditor would not be independent if, for example, management had delegated its responsibility for internal control over financial reporting to the auditor or if the auditor had designed or implemented the audit client's internal control over financial reporting. PCAOB Rule 3525, Note.

**Risks associated with auditor involvement.** It is important to get the independent auditors involved, to the extent allowable, in the design and testing of internal control. The independent auditors must independently assess the effectiveness of internal control. Because the auditors will ultimately judge the effectiveness of internal control, management needs to know, before new systems are implemented, whether those systems ensure effective internal control, in the opinion of the auditors.

Management may design "Control Module 1," a system for ensuring accurate recording of accounts receivable. After completing design and testing of "Control Module 1," management may ask the auditors to review the system, and to confirm that: (1) the control objectives of the system are appropriate to the risks related to recording accounts receivable; and (2) the system is effective in meeting those control objectives.

Failure to get the auditor's opinion on the effectiveness of internal control risks a situation where the auditors determine that the control does not work, at a time when it is too late for management to fix the control. In addition, when management makes its tests of internal control, the auditors should be consulted for the purpose of letting management know if its test methods and its level of documentation will be adequate to support management's evaluation of internal control.

However, the auditors cannot get so close to the design and testing process that they lose their independence. This can happen if the auditors (1) act in the role of management, or (2) are significantly involved in the creation of information systems or controls, the effectiveness of which they themselves must audit. For example, indicated in PCAOB Rule 3525, above, the auditors cannot design and implement controls, nor can the auditors take responsibility for testing and evaluating controls. The question is what kinds of services can be performed without impairing independence? This question is not answered clearly in the rules issued by either the SEC or the PCAOB.

The SEC has confirmed that independent auditors can give ongoing advice during the design and testing of internal control, but such advice must be given in a way that does not compromise independence. The SEC says:
When the auditor is engaged to assist management in documenting internal controls, management must be actively involved in the process. We understand the need for coordination between management and the auditor, however, we remind companies and auditors that management cannot delegate its responsibility to assess its internal controls over financial reporting to the auditor. SEC Release No. 33-8238, II.B.3.b. **Auditor can provide advice.** Ordinarily, the independent auditor can be involved in the design and implementation of the system of internal control in an advisory capacity, and with the approval of the audit committee. The auditor can also advise management on how to test controls, so long as the auditor does not make decisions as to what controls to test, and does not evaluate the testing. In addition, the auditor can advise management on the documentation of testing. **Documentation and testing of controls.** Documentation and testing of control forms the basis of management's assertion regarding the effectiveness of ICFR. The independent auditor can provide some assistance in documentation and testing, but in doing so must avoid impairing independence. If the auditor assumes responsibility for documenting or testing internal control and management relies on this work in forming its assessment of ICFR, the auditors may be deemed to audit their own work or assume a management role, which impairs their independence. This point was made by the SEC in its release accompanying its internal control regulations:
...we remind companies and their auditors that the Commission's rules on auditor independence prohibit an auditor from providing certain nonaudit services to an audit client. As the Commission stated in its auditor independence release, auditors may assist management in documenting internal controls. When the auditor is engaged to assist management in documenting internal controls, management must be actively involved in the process. We understand the need for coordination between management and the auditor, however, we remind companies and auditors that management cannot delegate its responsibility to assess its internal controls over financial reporting to the auditor. SEC Release No. 33-8238, II.B.3.b.Therefore, this area of services must be approached with caution. Neither the SEC nor the PCAOB has given clear guidance on this issue. However, in a roundtable discussion on internal control, Scott Taub, of the SEC, gave the following nonauthoritative advice:

[An appropriate role for auditors] might very well include helping management develop templates for documenting controls or documenting testing, suggesting to management new controls that management might put in place or suggesting to management

what types of tests management might perform or helping management do sample selection based on criteria that management has decided should be used.

Inappropriate roles would be doing the documentation, performing the initial testing, and I've also been asked questions about software that an auditor might provide its client. It has been asserted to me that there is software out there that some of the audit firms have developed that actually reaches conclusions about effectiveness of internal controls. I've not seen such software, but that would not be an appropriate role for the auditors to provide software that makes the assessment. However, providing software that helps with documentation, that helps with sample selection that might be things that would be appropriate for the auditors to do. PCAOB Roundtable on Reporting on Internal Control, July 29, 2003. (The complete transcript is available on the PCAOB's website, at: http://www.pcaobus.org).

### Objective of Management's Evaluation of ICFR

As discussed above at *Management's ICFR Reporting Requirements*, management of companies subject to the requirements of Section 404(a) () must annually assess and report on the effectiveness of ICFR. As discussed below, at *Effective Internal Control over Financial Reporting*, ICFR can be considered effective only if it is free of material weaknesses. To provide management with a reasonable basis for its assessment of ICFR management must evaluate ICFR. "To accomplish this, management identifies the risks to reliable financial reporting, evaluates whether controls exist to address those risks, and evaluates evidence about the operation of the controls included in the evaluation based on its assessment of risk." Guidance § II.A. If management can determine, with reasonable assurance, that its system of ICFR is free of material weakness then it will have a reasonable basis for disclosing in its annual report that ICFR is effective.

### Scope of Assessment

Management is required to assess the effectiveness of its entire system of ICFR. This system includes all significant processes, including those of subsidiaries, both domestic and foreign. In addition, significant processes outsourced to third-party service organizations (e.g., payroll processing services) are included within the company's system of ICFR that must be covered by the assessment.

**Scope limitations not permitted.** Management's annual report of the effectiveness of ICFR must contain a statement as to whether ICFR is effective. The report cannot contain a scope limitation. If management is unable to access portions of its system of ICFR for testing, instead of reporting a scope limitation management must determine whether the inability to assess controls over a particular process is significant enough to conclude in its report that ICFR is not effective. Guidance § II.B.5.

There are number of reasons management would not be able to assess the effectiveness of certain portions of its ICFR. One reason is that the company has outsourced a significant process to a service organization and management is unable to assess the effectiveness of the organization's controls. As discussed at *Service Organization*s, below, there are three ways management can assess the effectiveness of controls in a service organization. If management is not able to employ any of these three options then it is unable to assess whether controls exists that will prevent or detect misstatements related to the work of the service organization. If processes performed by the service organization are significant to the company's system of ICFR then management may not be able to conclude that its system is free of material weakness. That is, management may not be able to state that its ICFR is effective. Guidance § II.B.5.

**Entities permitted to be excluded.** Special rules allow management to exclude certain portions of its business from ICFR testing while staying in compliance with the requirements of Section 404(a). These entities are:

· Entities over which management has no control, but whose assets, liabilities, and results of operations are included in its consolidated financial statements.

· Equity investments in other entities.

· Late-year business acquisitions.

*Entities over which management has no control.* Under financial reporting standards, companies must include within their consolidated financial statements the assets, liabilities, and results of operations of certain entities over which they have no control. Where this is the case, the question arises as to management's responsibility for reporting on the internal control of these entities. If management is able to conduct an evaluation of internal control of such an entity, then the results of the evaluation can be included in the Section 404(a) Report. If, on the other hand, management does not have the right to evaluate control, and does not perform an evaluation, then management can exclude the entity from its Section 404(a) Report.

Under FASB ASC 810-10 companies must consolidate certain entities based on characteristics other than voting control. Where there is a lack of control the company may not have the legal or contractual right to assess or modify the entity's internal control. If the entity is material to the consolidated financial statements, management may be unable to express an opinion on internal control and independent auditors may be confronted with a scope limitation on their audit of internal control. Thus, the question is what is the effect of this scope limitation on management's Section 404(a) report, and on the audit of internal control?

In response, the SEC Office of the Chief Accountant has issued *SEC Frequently Asked Questions on Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports.* Revised Sept. 24, 2007. In this document, which is not authoritative, the SEC staff has indicated that, where such a scope limitation exists, management's report on internal control can exclude the entity in question; but management must disclose information related to the entity.

*Equity investments in other entities.* A similar issue relates to equity investments, where, for example, an entity's ownership of an entity does not require it to consolidate the assets, liabilities, and results of operations of the entity, but does require it to include in its own results of operations its share of net income or loss from the entity. For equity method investments, management need not evaluate internal controls of the equity investee. Instead, management should evaluate controls over its reporting, in its own financial statements, of its investment. Such controls may include, for example, controls over the selection of accounting methods for its investment, and the recognition of equity method earnings; and controls to insure the integrity of the investee's financial information, such as a requirement that the investee provide audited financial statements. *SEC Frequently Asked Questions on Management's Report on Internal Control Over FinancialReporting and Certification of Disclosure in Exchange Act Periodic Reports.* Revised Sept. 24, 2007.

*Recent business acquisitions.* Management can exclude a recently acquired business from its report on ICFR. The period in which management may omit an assessment of an acquired business's ICFR from its assessment of the registrant's ICFR may not extend beyond one year from the date of acquisition, and the assessment cannot be omitted from more than one annual management report on ICFR. As a condition of the exclusion, management must disclose the identity of the acquired business excluded and indicate the significance of the acquired business to the registrant's consolidated financial statements. Management's report on ICFR must reference this disclosure. *SEC Frequently Asked Questions on Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports.* Revised Sept. 24, 2007.

Arguably, if management is unable to assess the effectiveness of control over a significant process within its system of ICFR, there may be a material weakness in ICFR even if there is no material weakness in the process in question. The potential material weakness is management's failure to adequately monitor its ICFR. If management is unable to assess control in the service organization then it is not adequately monitoring its system of ICFR, which is at least a significant weakness in entity-level control. (For a discussion of internal control monitoring, see §1617.)

**Coordination with Independent Audit of ICFR**

At the same time the SEC was writing its Guidance the PCAOB was writing Auditing Standard No. 5 (AS 2201), which is discussed at §1605. The PCAOB and SEC made serious efforts to coordinate their respective approaches to the evaluation of ICFR. That being said, there are two significant differences.

AS 2201 and the SEC Guidance both approach the evaluation of internal control in the same way; that is, both evaluate internal control using a top-down/risk-based approach. However, while the approach is mandatory for auditors, management is free to adopt any assessment method it chooses.

In addition, management and independent auditors must approach the assessment of ICFR differently because management is familiar with its own systems while the auditors are not. For a further discussion of the differences between the SEC Guidance and AS 2201, see §1605, at *Coordination with Management's Assessment of ICFR.*

**Effective Internal Control over Financial Reporting**

The overall objective of ICFR is to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Guidance § II.A. The objective of management's assessment of ICFR is to determine if ICFR is effective. If control deficiencies, either individually or in combination, constitute material weaknesses as of the end of the fiscal year, then ICFR is not effective. Guidance § II.B.1. For a discussion of the definition of *material weakness*, see §1608.

Management's assessment of ICFR effectiveness must be made in accordance with a suitable control framework's definition of effective internal control. These frameworks define those elements of ICFR that are expected to be present and functioning in an effective internal control system. Management evaluates whether its system of ICFR includes those elements. The SEC Guidance is not intended to replace the elements of an effective system of internal control as defined within a control framework, but is instead designed to assist management in assessing its ICFR against a suitable framework. Guidance § II.A. For a discussion of internal control as described by one suitable framework, the COSO, *Internal Control—Integrated Framework*, see §1607.
**Note:** In its Guidance, the SEC identifies the following as suitable internal control frameworks: COSO, *Internal Control—Integrated Framework*, Canadian Institute of Chartered Accountants, *Guidance on Assessing Control*, Institute of Chartered Accountants in England & Wales, *Internal Control: Guidance for Directors on the Combined Code (Turnbull Report)*. Other frameworks that meet the criteria discussed at §1607 may be suitable as well.

It is important to note that, in evaluating the effectiveness of ICFR, procedures performed by auditors as part of either the audit of ICFR or the audit of the financial statements are not part of a company's ICFR. AS 2201.05.

**SEC Guidance**

The remainder of this section sets out the SEC Guidance.

**Background against Which Guidance Was Issued**

The Guidance is the first comprehensive advice the SEC has issued on management's testing and evaluation of ICFR. When the SEC initially promulgated requirements for compliance with SOX Section 404(a), it indicated only the end result to be achieved, in broad terms. The SEC required "(1) that the evaluation must be based on procedures sufficient both to evaluate the design and to test the operating effectiveness of ICFR [internal control over financial reporting]; and (2) that the assessment, including testing, must be supported by reasonable evidential matter." SEC Release No. 33-8762, I. The SEC did not issue specific guidance for meeting these two objectives, because it believed that evaluation methods should vary from company to company. The SEC continues to state that "it is impracticalto prescribe a single methodology that meets the needs of every company." SEC Release No. 33-8762, I.

**Principles Based Guidance**

The SEC Guidance is principles based rather than prescriptive. That is, it provides management with a set of principles to guide the evaluation of ICFR but does not prescribe specific procedures to be performed.

AS 2201, by comparison, is relatively prescriptive, containing a number of procedures that auditors "must" perform as part of the audit of ICFR. For a discussion of AS 2201, see §1605.

The SEC Guidance states, as a first set of principles, that "[m]anagement is responsible for maintaining a system of internal control over financial reporting ("ICFR") that provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The rules we adopted in June 2003 to implement Section 404 of the Sarbanes-Oxley Act of 2002... require management to annually

evaluate whether ICFR is effective at providing reasonable assurance and to disclose its assessment to investors. Management is responsible for maintaining evidential matter, including documentation, to provide reasonable support for its assessment. This evidence will also allow a third party, such as the company's external auditor, to consider the work performed by management." Guidance § I.

The SEC Guidance sets out a top-down/risk-based approach for the evaluation that is organized around two principles. The first is that "management should evaluate whether it has implemented controls that adequately address the risk that a material misstatement of the financial statements would not be prevented or detected in a timely manner." The second is "management's evaluation of evidence about the operation of its controls should be based on its assessment of risk." This approach means, among other things, that management can focus its testing in high-risk areas, and leave low-risk areas for such testing methods as self-assessment and on-going monitoring. (For a discussion of internal control monitoring, see §1617.) Guidance § I.

To comply with these two principles of the top-down/risk-based approach, management need not, and indeed should not, evaluate and test every conceivable control process; but instead should focus on those processes where control failure presents a real risk of a material misstatement in the financial statements. This is the essence of the top-down/risk-based approach. Management should focus its resources in those areas where the chance of material error is greatest, and should not waste valuable and limited resources testing areas where there is a low risk that control failures will result in material misstatements.

**Top-Down/Risk-Based Approach**

According to the SEC Guidance, the top-down, risk-based ("TD/RB") approach will typically be the most efficient and effective way for management to conduct the evaluation of ICFR. Guidance § II.A. The TD/RB approach to the evaluation of ICFR begins with the identification and assessment of the risks of material misstatement at the financial statement level, and then works down to process-level risks and controls. This is inherently a risk-based approach, where attention is focused on accounts, disclosures, and relevant assertions that present a reasonable possibility of material misstatement to the financial statements and related disclosures. Under this approach management identifies controls and maintains supporting documentation for those controls in a manner suited to the company's specific financial reporting risks. The controls identified and documented are those that are important to achieving the company's specific control objectives. Management tests the design and operating effectiveness of these controls and uses the results of these tests to support its conclusions on the overall effectiveness of ICFR. Guidance § II.A.1. For a further discussion of the TD/RD approach see §1605, at *Top-Down/Risk-Based Approach*.

Employing a TD/RB approach requires management to apply its knowledge, experience and judgment to identify the areas of the financial statements that present significant risk that the financial statements could be materially misstated and then proceed to identify relevant controls and design appropriate procedures for documentation and testing of those controls. It is this analysis by management that will determine the nature, extent and timing of control testing. Under the TD/RB process, management will exercise judgment in such a way that testing performed for low risk accounts will likely be different than it will be for a high risk accounts. The assessment of ICFR will likely be more effective if it focuses on processes and related controls that are most likely to have a material impact on financial reporting elements.

Contrary to the top-down/risk-based approach is the "check-the-box" approach, which focuses on documenting and testing controls, often based on checklists of controls, regardless of whether the effective operation of such controls would have a material impact on the company's financial statements. This check-the-box approach has two critical weaknesses. First, it is very inefficient, and consequently very expensive in terms of time wasted by company personnel, and fees paid to auditors. Second, it may be very ineffective, since its focus is at the individual control level and may miss entirely large internal control weaknesses.

This check-the-box approach was heavily criticized by the SEC staff, which, like the PCAOB, encourages management to approach its Section 404(a) evaluation using a top-down and risk-based approach. The following are some of the comments from a report by the SEC staff issued in May 2005:

The feedback indicated that one reason why too many controls and processes were identified, documented and tested [during 2004 Section 404 audits] was that in many cases neither a top-down nor a risk-based approach was effectively used. Rather, the assessment became a mechanistic, check-the-box exercise. This was not the goal of the Section 404 rules, and a better way to view the exercise emphasizes the particular risks of individual companies. Indeed, an assessment of internal control that is too formulaic and/or so detailed as to not allow for a focus on risk *may not fulfill the underlying purpose of the requirements*. The desired approach should devote resources to the areas of greatest risk and avoid giving all significant accounts and related controls equal attention without regard to risk. [Emphasis added]

For a further discussion of the TD/RB approach, see *SEC Staff Statement on Management's Report on Internal Control Over Financial Reporting, May 16, 2005*.

The sequential steps employed in the TD/RB approach are detailed at §1605, at *Top-Down/Risk-Based Approach*. In summary, these steps, as described in AS 2201 are

1 Identify, understand, and evaluate the effectiveness of entity-level controls.

2 Identify significant accounts, beginning at the financial-statement or disclosure level, and their relevant assertions.

3 Understand the likely sources of misstatements.

4 Assess risk of misstatement.

5 Identify controls to test that prevent or detect errors or fraud on a timely basis.

6 Test controls.

7 Evaluate the effectiveness of controls.

8 Form an opinion on the effectiveness of ICFR.

**Evaluating Entity-Level Controls**

In connection with the TD/RB approach management evaluates entity-level controls when it assesses ICFR risks and when it identifies and tests controls that address those risks. It considers how these entity-level controls relate to and impact each financial reporting element (i.e., each significant account, disclosure and relevant assertion).

What are entity-level controls? There are three general categories of entity-level controls: indirect controls, monitoring controls (discussed at §1617), and specific controls (these are not descriptive titles used in the SEC Guidance, but are convenient titles created for purposes of this discussion). The following are descriptions of the three categories of entity-level controls, and their general effects on ICFR:

*Indirect controls*. These are controls that have an important but indirect effect on the likelihood that a misstatement will be prevented or detected on a timely basis. An example of this type of control is the control environment. The SEC Guidance does not discuss the particular effects of these controls, but says that "these controls might affect the other controls management determines are necessary to adequately address financial reporting risks for a financial reporting element." Guidance § II.A.1.c. For a more complete discussion of indirect entity-level controls, see §1617.

*Monitoring controls*. These are entity-level controls that are designed to identify possible breakdowns in lower-level controls. Like indirect controls monitoring controls are not designed to adequately address financial reporting risks. Such controls may be designed to detect a misstatement and trigger an investigation to determine if a breakdown in lower-level controls has occurred. Guidance § II.A.1.c. For a more complete discussion of monitoring entity-level controls see §1608, at *Evaluating Entity-Level Controls, and Impact of Entity Level Controls*.

*Specific controls*. These entity-level controls are designed to operate at a level of precision and immediacy so as to adequately prevent or detect on a timely basis material misstatements of a financial statement element. In cases involving this type of control management may not require other controls to address the same risk, in which case management may not need to identify or evaluate other controls relating to this same risk. Guidance § II.A.1.c.

The SEC Guidance says that management should evaluate whether it has entity-level controls that its chosen control framework says are necessary for effective ICFR. The following are specific examples of such controls:

· Controls related to the control environment

· Controls over period-end financial reporting

· Controls over management override

· Entity-level risk assessment

· Monitoring activities

· Policies that address significant business control and risk management practices Guidance § II.A.1.b.

For a further discussion of specific types of entity-level controls, including the evaluation of entity-level risk, the testing of entity-level controls, and the impact of entity-level controls, see §1605, at *Evaluating Entity-Level Controls, Identifying Entity-Level Risks, Testing Entity-Level Controls*, and *Impact of Entity Level Controls*.

**General Controls over Information Technology**

A special category of entity-level control is general controls over information technology. Such controls include controls over program development, program changes, computer operations, and access to programs and data. While IT general controls alone do not ordinarily address specific financial reporting risks, the effectiveness of process-level IT controls often depends upon effective IT general controls. Management should evaluate those general IT controls that are necessary for the effective operation of other IT controls that are designed to adequately address specific financial reporting risks. It is not necessary to evaluate general IT controls that are not relevant to addressing financial reporting risks. Guidance § II.A.1.d.

**Identifying Financial Reporting Elements**

Management's responsibility is to provide investors with financial statements that are fairly stated in accordance with GAAP. When one or more financial statement amounts or disclosures contains misstatements or omissions that are material, then there is a lack of fair reporting. In evaluating ICFR, management should identify significant financial reporting elements. Financial reporting elements include, among other things, significant accounts and disclosures, and relevant assertions underlying these accounts and disclosures (i.e., presentation and disclosure, existence or occurrence, valuation or allocation, rights and obligations, and completeness). Identifying financial statement elements will enable management to take the next step in the TD/RB process, which is to identify those risks of misstatement that could, individually or in combination, result in material misstatements of these financial reporting elements. Guidance § II.A.1.a. (Material misstatements are discussed at §1608.)

Management is primarily concerned with identifying financial reporting elements in which material misstatements can exist, and the potential sources of misstatements ("financial reporting risks"). Management should focus on financial reporting elements that are material. For a further discussion of this issue, see §1605, at *Identifying Significant Accounts, Disclosures, and Assertions*.

A question that is not clearly addressed by current guidelines is whether the supplementary information, included in the financial statements, should be encompassed in the scope of management's report on its assessment of internal control over financial reporting. For a discussion of this issue, see *SEC Frequently Asked Questions on Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*. Revised Sept. 24, 2007.

Foreign private issuers that prepare their primary financial statements using home country accounting rules (e.g., IFRS) should plan and scope their ICFR evaluations based on those primary statements. In addition, if they prepare and file with the SEC a reconciliation to U.S. GAAP then the evaluation should cover procedures for preparing the reconciliation. *SEC Frequently Asked Questions on Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*. Revised Sept. 24, 2007.

**Understanding Likely Sources of Misstatement**

In order to evaluate the effectiveness of ICFR management should identify those risks of misstatement that could, individually or in combination, result in a material misstatement of the financial reporting elements ("financial reporting risks"). Once financial reporting risks are identified management can then identify and test controls that adequately address those risks. Guidance § II.A.1.a.

According to the SEC Guidance, management can use its "knowledge and understanding of the business, and its organization, operations, and processes, to consider the sources and potential likelihood of misstatements in financial reporting elements." Guidance § II.A.1.a. In addition, the SEC Guidance suggests certain factors to consider. These are:
· Internal and external risk factors that impact the business, including the nature and extent of any changes in those risks, may give rise to a risk of misstatement.

· Risks of misstatement may also arise from sources such as the initiation, authorization, processing and recording of transactions and other adjustments that are reflected in financial reporting elements.

· Management may find it useful to consider "what could go wrong" within a financial reporting element in order to identify the sources and the potential likelihood of misstatements and identify those that could result in a material misstatement of the financial statements. Guidance § II.A.1.a.

Importantly, the SEC Guidance says that the manner of identifying financial reporting risks will vary based on the characteristics of the particular company. The characteristics identified by the SEC are the size, complexity, and organizational structure of the company and its processes and financial reporting environment, as well as the control framework used by management. The SEC says that other characteristics can also affect the way risks are identified. Here are some ways large and small businesses might identify financial reporting risk:

*Larger, more complex businesses*. In this type of business management may require a variety of company personnel, including those with specialized knowledge, to identify financial reporting risks. Management may require the assistance of individuals with specialized knowledge of GAAP, and knowledge of company business processes and computer technology required to initiate, authorize, record and process transactions. Guidance § II.A.1.a.

*XYZ, Inc*. is a large company, with complex business processes. Management's evaluation will require the use of employees with specialized knowledge, who understand the company's GAAP reporting requirements, business transactions, business process activities, and information technology systems; and who know the points within the process where material misstatements, including misstatements due to fraud, may occur.

*Smaller, less complex businesses*. In a small company, with centralized, less complex business processes, and little change in the risks or processes, management gains the knowledge necessary to identify financial reporting risks through its day-to-day involvement with the system. Guidance § II.A.1.a.

*ABC, Inc*. is a small company with business processes of relatively low complexity that operate on a centralized basis. There is little year-to-year change in the business processes, or the associated control risks. In this case management's day-to-day involvement with business processes may be enough to identify financial reporting risks.

The process of identifying potential sources of misstatement is a key part of risk assessment. Risk assessment is, in turn, a linchpin of good ICFR. When risks are assessed in a larger company using a variety of personnel, including those with specialized knowledge, a fair amount of documentation of the risk-assessment process will be created. In a smaller company, on the other hand, risk-assessment may be quite informal and may not be documented well. Where there is a lack of documentation of the risk assessment process management may have difficulty demonstrating to independent auditors the extent of the process. For a discussion of the problems with the independent audit that can result from lack of documentation, see §1605, at *Scope Limitations*, and *Scaling Audits for Smaller or Less Complex Companies*.

The SEC Guidance essentially asks management to start with the overriding objective of ICFR, the preparation of materially accurate financial statements, and then bring in knowledgeable people who can identify risks to achieving the objectives associated with specific financial reporting elements, focusing on those risks that could bring about material misstatements.

It suggests bringing in people who are in the best position to identify risks. The SEC Guidance clearly disdains a "checklist" approach to this process. It emphasizes the need for individuals in a position to use judgment.

This focus on specific financial reporting risks is perhaps the most important guidance from the SEC. When companies began their initial attempts to comply with the requirements of Section 404(a) there was much discussion about the kinds of generic controls that should exist in certain industries; there were attempts to create all-purpose checklists to assist in control evaluation; and there was much effort to create and sell new software, or retrofit existing software, to automate the control documentation process. There is evidence that some of this effort, and perhaps a significant portion of this effort, was wasted on minor control systems, with relatively little importance for preventing material financial misstatements. In some cases companies may have expended so much effort on minor control systems, that they overlooked real financial reporting risks.

For example, a recent study identified a substantial number of reported weaknesses in corporate tax departments, stemming primarily from lack of trained personnel and lack of adequate supervision. In the rush to comply with Section 404(a), many companies apparently did not see the tax department as an area of financial reporting risk. This may have been due to an approach to ICFR that did not focus on identifying risks that could result in material misstatement of financial statements.

The SEC Guidance takes a completely different approach by asking company management to zero in on risks and controls that are specific to individual company reporting objectives.

**Performing Walkthroughs**

Walkthroughs are used by independent auditors to understand significant processes in connection with an independent audit of ICFR. In a walkthrough, the auditor follows a transaction from origination until it is reflected in the company's financial records. The auditor follows the transaction through company processes, including information systems, using the same documents and information technology that company personnel use to process transactions. Walkthroughs are ordinarily required procedures for independent auditors.

The SEC Guidance does not make reference to walkthroughs as a tool for evaluating ICFR. For more information about the manner in which independent auditors use walkthroughs see §1605, at *Performing Walkthroughs*.

Although not discussed in the SEC Guidance walkthroughs can be useful to management for two reasons. First, it can be useful to organize ICFR system documentation around a walkthrough. This allows management to easily see the chain of information from origination to the financial statements, and observe how various financial reporting risks within that chain might impact the financial statements. Second, auditors ordinarily perform walkthroughs as part of their ICFR audit procedures. If management prepares walkthrough documentation for all significant processes, the auditors may be able to use this information to reduce the amount of their own work. This can make for a more efficient and less costly audit.

**Assessing the Risk of Material Misstatement**

In general, management focuses most of its efforts in evaluating the effectiveness of ICFR in areas where there is the highest ICFR risk. It is in these areas that material misstatements are most likely to arise, and these are the areas where management's evidence of the sufficiency of controls must be the strongest.
**Note:** In AS 2201, ICFR risk is referred to as risk of material misstatement, or RMM. As discussed at §1605, at *Assessing the Risk of Material Misstatement*, RMM is a function of inherent risk and control risk. The accounting literature refers to inherent risk as the risk of a material misstatement resulting from a particular activity, assuming that there are no controls over that activity; and it refers to control risk as the risk that a given control will fail to prevent or detect a material misstatement on a timely basis.

The SEC Guidance discusses the same concepts using somewhat different terms. The SEC uses the terms misstatement risk and risk of control failure. *Misstatement risk* is the susceptibility of a particular account balance or transaction to a misstatement that could be material to the financial statements. The SEC appears to be referring here to inherent risk. The SEC's use of the phrase *risk of control failure* appears consistent with control risk. The combination of misstatement risk and risk of control failure gives us *ICFR risk*, which appears to be the equivalent of RMM. See Guidance, § II.A.2.a.

The SEC Guidance says that as misstatement risk and the risk of control failure increase then so does ICFR risk and the need for more evidence of control effectiveness. What this means is that as ICFR risk increases management must focus more of its ICFR evaluation and testing in those areas of increased risk, and must obtain more evidence of the effectiveness of controls. Conversely, as ICFR risk decreases the need for evidence of control effectiveness lessens, as does the amount of attention that must be paid to a particular area. Guidance § II.A.2.a.

| | | |
|---|---|---|
| Misstatement risk (inherent risk) | Low | High |
| Risk of control failure (control risk) | Low | High |
| ICFR risk (risk of material misstatement) | Low | High |
| Focus of ICFR | Less attention | More attention |
| Evidence of control effectiveness | Less evidence | More evidence |

If the misstatement risk in a particular process is low and the risk of control failure is low, then the amount of attention devoted to that area in the evaluation of ICFR would likewise be low. If, on the other hand, misstatement risk and the risk of control failure are both high, then considerable attention would be devoted to the area and management would want relatively more evidence of control effectiveness in that area.

The misstatement risk associated with an account or transaction is a function of the materiality of the associated financial reporting element and the susceptibility of the account or transaction to misstatement. Materiality is discussed at §1608, at *Materiality*. The susceptibility of a financial reporting element to misstatement depends on a number of factors. For example, misstatement risk is increased when a financial reporting element:
· Involves judgment in determining the recorded amounts;

· Is susceptible to fraud;

· Has complex accounting requirements;

· Experiences change in the nature or volume of the underlying transactions;

· Is sensitive to changes in environmental factors, such as technological and/or economic developments;

· Involves related party transactions, critical accounting policies, or related critical accounting estimates; or

· Involves significant judgment, or complexity. Guidance § II.A.2.a.

For additional factors, see §1605, at *Assessing the Risk of Material Misstatement*.

The risk of control failure is also dependent on a number of factors. These factors include
· The type of control (that is, manual or automated) and the frequency with which it operates;

· The complexity of the control;

· The risk of management override;

· The judgment required to operate the control;

· The competence of the personnel who perform the control or monitor its performance;

· Whether there have been changes in key personnel who either perform the control or monitor its performance;

· The nature and materiality of misstatements that the control is intended to prevent or detect;

· The degree to which the control relies on the effectiveness of other controls (for example, IT general controls); and

· The evidence of the operation of the control from prior year(s). Guidance § II.A.2.a.

Before it grants a line of credit to a customer, *Entity X* employs a control that creates a credit score for the customer. This control must be operated by a trained individual, and operation requires a high degree of judgment. The risk of control failure is therefore relatively high.

Before *Entity X* records an invoice for purchase of goods from a supplier the accounting department must first match the invoice with proof of receipt. This control is operated manually, and so is subject to some risk of control failure. However, this is a mechanical control calling for no judgment, and the risk of control failure is relatively low. *Impact of entity-level controls*. In evaluating both the misstatement risk and the risk of control failure management should take into account entity-level controls. In generally, as discussed at §1605, *Impact of Entity Level Controls*, strong entity-level controls, including, e.g., a strong control environment, may decrease both misstatement risk and risk of control failure. Thus, all other things being equal, management's judgment about the likelihood that a control will fail to operate effectively may be influenced by a highly effective control environment, and thereby impact the amount of attention devoted to that control in the evaluation of ICFR, and may impact the amount of evidence evaluated for that control. Note, however, that even a strong control environment would not eliminate the need to evaluate the operation of the control. Guidance § II.A.2.a.

**Assessment of Fraud Risk**

The evaluation of ICFR risk should include an evaluation of the risk of fraud, including, e.g., fraudulent financial reporting, misappropriation of assets, and corruption. Although all fraud, if discovered, is a concern for management, the primary focus is on fraud that could lead to a material misstatement of the financial statements. As with all ICFR risks, the effort devoted to the evaluation of fraud risks should be determined using the top-down/risk-based approach and should be commensurate with the company's size and complexity. Guidance § II.A.1.a.

One type of fraud specifically discussed in the SEC Guidance is improper override of internal controls in the financial reporting process. This type of fraud is also singled out for attention in AS 2201. For a more complete discussion of this fraud risk see §1605, at *Assessment of the Risk of Fraud*.

A significant risk of fraud can exist even if there is no evidence that fraud has occurred, and this risk may constitute a material weakness in control if not addressed. Like all other control deficiencies, deficiencies associated with fraud can exist if there is the possibility that a material misstatement resulting from fraud would not be prevented or detected on a timely basis. Guidance § II.A.1.a.

**Selecting Controls to Test** After management has assessed and identified financial reporting risks it should evaluate whether it has effective controls in place to adequately address those risks. A control adequately addresses a particular risk if, when operating properly, the control prevents or detects material misstatements to financial reporting elements on a timely basis. Management needs to identify for testing those controls that are needed to provide reasonable assurance that material misstatements are prevented or detected on a timely basis, and for which evidence about their operation can be obtained most efficiently. Guidance § II.A.1.b.

As discussed above, at *Assessing the Risk of Material Misstatement*, management should focus its attention on the areas of ICFR risk (risk of material misstatement). Good ICFR will rely most heavily on controls in those areas, and management will ordinarily focus its evaluation of the effectiveness of controls in areas posing the highest ICFR risk. Guidance § II.A.2.

The SEC Guidance offers the following guidance to assist management in selecting controls to test:
· Management can identify for testing controls that are preventive, detective, or a combination of both. The SEC expresses no preference as to the type of control that may be the most effective.

· Management may have to identify for testing more than one control to address a particular risk. Alternatively, a single control may adequate to address a risk.

· It is not necessary to identify for testing all controls that address a particular risk.

The management of *XYZ, Inc*. determines that a misstatement of interest expense could result in a material misstatement of its financial statements, and is a financial reporting risk that must be controlled. Management identifies an entity-level control within the company's period-end financial reporting process and makes a judgment that the control is designed in a manner that adequately addresses the risk that a material misstatement in interest expense could occur and not be detected in a timely manner. Because this control adequately addresses this risk, management may not need to identify other controls related to interest expense.

· It is not necessary to identify for testing redundant controls, unless redundancy itself is required to address a particular financial reporting risk.

· As part of its criteria for selecting controls, management may consider the efficiency with which evidence of the operation of a control can be evaluated. If more than one control adequately addresses a particular risk, management may select the control for which evidence of operating effectiveness can be obtained most efficiently.

The management of *XYZ, Inc*. has identified two controls, one automated and one manual control, which are both designed to adequately address a certain financial reporting risk. These two controls can be considered redundant controls. Management has determined that it is more efficient to evaluate the operation of the automated control, and does so. Evaluation of the operation of the manual control can be omitted without diminishing the quality of the ICFR testing.

· If information technology general controls are effective management may determine that automated controls are more efficient to evaluate than manual controls. Guidance § II.A.1.b.

The SEC is clearly attempting, with its Guidance, to drive home the point that an efficient and effective evaluation of ICFR requires much thought before controls are tested. Implicit in the process outlined by the SEC is the participation of people with the knowledge and experience to identify financial reporting risks and to make judgments on the adequacy of controls. This approach is antithetical to the "checklist" approach, which often employs inexperienced people armed with long lists of controls. What comes to mind in describing the SEC approach is the old aphorism, "brains not brawn."

For additional guidance regarding the selection of controls, see §1605, at *Selecting Controls to Test*.

*Impact of entity-level controls*. Note that management's assessment of ICFR risk, and its selection of controls to test, will take into consideration the impact of entity-level controls. For a discussion of the impact of entity-level controls, including the effect of either strong or weak controls on the tests of process-level controls, see §1605, at *Impact of Entity-Level Controls*.

**Testing the Effectiveness of Controls**

Management should obtain evidence that provides it with a basis for assessing the operating effectiveness of the controls selected for testing. Management uses its ICFR risk assessment to determine the controls to test, the extent of testing, and the types of tests to use. For a discussion of ICFR risk see *Assessing the Risk of Material Misstatement*, above. Controls with the highest ICFR risk will be the focus of testing. The higher the ICFR risk the more evidence of control effectiveness is required. In addition, tests employed for these high-risk areas will be the types of tests that garner the most evidence of operational effectiveness. Guidance § II.A.2.b.

The selection of controls to test is discussed above at *Selecting Controls to Test*, and the sufficiency of evidence is discussed below at *Evidence of Control Effectiveness*. In this section we will discuss various testing methods.

Management's evaluation of ICFR has two purposes. One purpose is to provide management with a basis for an expression of an opinion on the effectiveness of ICFR in its annual report. Much of the work associated with this evaluation will take place close to the end of the fiscal year (i.e., the "as of" date of the assessment), and will be performed solely for the purpose of the annual assessment. A second purpose is to provide ongoing monitoring of ICFR, which is part of a good control environment. In many ways the second purpose serves the first because many of the ongoing activities associated with monitoring ICFR can be used to provide evidence of control effectiveness for the annual assessment. (For a discussion of internal control monitoring, see §1617.)

What management is looking for in its tests of controls is evidence about whether the controls are effective. This testing takes into account both design effectiveness and operating effectiveness. The design of a control is effective if the control, when operated properly, adequately accomplishes its control objectives. A control is operated effectively if it is operated as designed. In testing the operation of controls, tests consider such things as how the control is applied, the consistency with which it is applied, and whether the person performing the control possesses the necessary authority and competence to perform the control effectively. Guidance § II.A.2.b. For a further discussion of tests of controls see §1605, at *Testing the Effectiveness of Controls*.

The SEC Guidance says that management can obtain evidence for evaluating controls from direct tests of controls, on-going monitoring activities, or a combination of both. The SEC Guidance also provides that evaluation methods and procedures that can provide evidence for the annual ICFR assessment can be integrated with the daily responsibilities of company employees. That is, activities that are performed for other reasons, such as the day-to-day management of the business, can provide relevant evidence of control effectiveness.

Direct tests of controls are tests ordinarily performed on a periodic basis by individuals with a high degree of objectivity relative to the controls being tested. For example, direct tests may be performed by internal auditors. These tests provide evidence as of a single point in time (i.e., the end of the fiscal year). For purposes of management's annual assessment of ICFR, many such tests will be performed in the time period close to the end of the fiscal year. Guidance § II.A.2.b. To increase the amount of evidence obtained from direct testing management can increase the period covered by direct testing.

Monitoring includes management's normal, recurring activities that provide information about the operation of controls. As discussed above, monitoring activity is important for a good control environment. In addition, however, monitoring provides evidence to support the assessment of the operating effectiveness of the controls being monitored.

Monitoring activities include, among other things, self-assessment. Self-assessment includes assessments made by the personnel who operate controls, and it includes ongoing assessment made by management. The quality and reliability of evidence provided by self-assessment depends on the training and objectivity of personnel making the assessments. For example, when the person making the assessment also operates the control then the evidence is less reliable than if management or internal auditors make the assessment. As a rule, the lower the degree of objectivity of the person who is providing evidence of control effectiveness, the less reliable is that evidence. Guidance § II.A.2.b.

Because the quality of evidence increases as the objectivity of the person evaluating the control increases, management will ordinarily use personnel who are more objective to gather evidence as the ICFR risk associated with a control increases. For example, if a control activity is judged to have a low ICFR risk, then self-assessment by the operator of the control may be sufficient evidence of its effectiveness. If, however, the control has a high risk, such as a control that requires judgment and involves material amounts, then ongoing monitoring of the control by internal auditors may be required. Guidance § II.A.2.b.

If on-going monitoring activities are performed by personnel who are not adequately objective, then the evidence obtained from monitoring can be supplemented with direct testing by those who are objective, such as internal auditors. Such supplementary testing would be appropriate for controls with relatively high ICFR risk. Direct testing of controls corroborates evidence from on-going monitoring activities. Guidance § II.A.2.b.

*Smaller public companies.* Management's daily interaction with controls in smaller or less complex public companies may provide it with sufficient evidence to evaluate the effectiveness of the operation of these controls. Management may obtain information through on-going direct supervision of those responsible for executing controls. Whether management's daily interaction with controls provides sufficient evidence to evaluate their effectiveness depends on facts and circumstances. Daily interaction may be sufficient when the operation of controls is centralized and the number of personnel involved is limited. Compare this to more complex companies, such as those with multiple management reporting layers or operating segments, where management's direct knowledge of the operation of controls would ordinarily not be sufficient evidence for purposes of

assessing their effectiveness. Guidance §II.A.2.b. For a further discussion of the problems associated with testing controls in smaller companies, see §1605, at *Scaling Audits for Smaller or Less Complex Companies*. In addition, for a further discussion of the sufficiency of evidence, see *Evidence of Control Effectiveness*, below.

The challenge for management in smaller or less complex companies, where management is able to evaluate the effectiveness of controls based on its personal observation of controls, is documentation. Under the SEC Guidance management can use its own observation of controls to support its assessment, but what will it take to satisfy the independent auditors that controls are working effectively? If there is little documentary evidence of the operation of controls, other than what is in the head of the manager who observes the controls, then the documentary evidence may be insufficient to allow independent auditors to express an opinion on internal control. In the extreme case, the auditors may be faced with a scope limitation, and may have to disclaim an opinion. For a further discussion see §1605, at *Scope Limitations*, and *Scaling Audits for Smaller or Less Complex Companies*.

**Timing of tests of controls.** The SEC Guidance does not provide detailed information on the timing of tests of controls. For a discussion of this issue see §1605, at *Timing of Tests of Controls*.

**Roll-forward procedures.** The SEC Guidance does not provide detailed information on roll-forward procedures. For a discussion of this issue see §1605, at *Roll-Forward Procedures*.

### Evidence of Control Effectiveness

Management must have reasonable evidentiary support for its annual assessment of the effectiveness of ICFR. In addition, such support should include documentation of the methods and procedures used to gather and evaluate evidence. The focus should be on evidence to support the effectiveness of those controls that management has identified as being adequate to address the financial reporting risks. For a discussion of the identification of such controls see *Selecting Controls to Test*, above.

In its original release regarding compliance with Section 404(a), the SEC said
An assessment of the effectiveness of internal control over financial reporting must be supported by evidential matter, including documentation, regarding both the design of internal controls and the testing processes. This evidential matter should provide reasonable support: for the evaluation of whether the control is designed to prevent or detect material misstatements or omissions; for the conclusion that the tests were appropriately planned and performed; and that the results of the tests were appropriately considered. The public accounting firm that is required to attest to, and report on, management's assessment of the effectiveness of the company's internal control over financial reporting also will require that the company develop and maintain such evidential matter to support management's assessment. SEC Release No. 33-8238, II.B.3.d.

The SEC Guidance obviously modifies this statement by the SEC. However, the gist of the original advice remains. No matter how management documents its assessment of internal control, that documentation must be sufficient to support that assessment.

Evidence includes documentation of the design of controls. The documentation does not need to include all controls that exist within a process that impacts financial reporting. Instead, documentation focuses on controls that management has identified as being adequate to address the financial reporting risks. Documentation can be maintained in various types of media (e.g., paper, electronic, and other media), and it can take many forms, such as policy manuals, process models, flowcharts, job descriptions, documents, internal memorandums, and forms. In addition to supporting the evaluation of specific controls, control documentation also serves as evidence of the effectiveness of the control environment. Such evidence shows that controls have been identified by management (risk assessment), are being communicated to control operators, and are capable of being monitored by management. Guidance §II.A.1.e.

Evidence also includes the results of testing the operation of specific controls. As noted above, at *Testing the Effectiveness of Controls*, evidence may be obtained from direct testing of controls, on-going monitoring activities, or both.

The extent of evidence required as to the operation of controls depends on the ICFR risk associated with the control. The higher the risk, the more evidence is required. In determining if the evidence is sufficient, management should consider both the quantity of evidence (e.g., sample size), and the quality of the evidence. The qualitative characteristics of evidence includes:
· The nature of the evaluation procedures performed,

· The period of time to which the evidence relates,

· The objectivity of those evaluating the controls, and

· In the case of on-going monitoring activities, the extent of validation through direct testing. Guidance § II.A.2.

Other factors that influence the nature and extent of evidential matter include
· The degree of complexity of the control (the more complex the control, the more evidence is needed of its proper operation);

· The level of judgment required to operate the control (controls requiring more judgment require more evidence of effectiveness than simple mechanical controls); and

· The risk of material misstatement that could result from control failure (the higher the risk of misstatement the more evidence of effectiveness is required). Guidance § II.A.2.c.

A good example of an area where controls are highly susceptible to failure, and where there should be extensive evidence of control effectiveness, is the corporate tax function. The reasons for a high risk of failure are as follows: controls are likely to be manual (e.g., supervisory review of tax calculations), the operations being controlled are highly complex, there is a significant risk of management override, and material misstatements are difficult to detect. In addition, proof that this is an area of high ICFR risk is the fact that a significant number of public company reports have identified material weaknesses involving the corporate tax function.

In addition to evidence associated with specific tests of controls, management may document its overall strategy for evaluating ICFR. Management may discuss in memorandum form such issues as the overall approach, the evaluation procedures, and the basis for assessment of ICFR effectiveness. The documentation may discuss the effectiveness of controls in relation to specific financial reporting elements, and it may discuss the entity-level controls and their impact on the effectiveness of other controls and on management's assessment of ICFR. Guidance § II.A.2.c.

In documenting its assessment of ICFR management has the option of preparing documentation that is specific to the evaluation or relying on evidential matter within the company's books and records. This latter option is available if the evidential matter contained in the books and records is sufficient to provide reasonable support for its assessment. Documentation contained within the company's books and records might include, for example, memoranda, e-mails, and instructions or directions to and from management to company employees. However, where factors exist that require a relatively high amount of control documentation (e.g., a control is complex, requires significant judgment, or involves material amounts), management may find it necessary to maintain separate documentation. One example of a need to maintain separate documentation is where the audit committee needs such documentation to exercise effective oversight over financial reporting. Guidance § II.A.2.c.

The key to good documentation is a clear focus on what is important to the evaluation, and what is not. One might refer to this as the "less is more" rule. Too much documentation, such as descriptions of every minor control system, can obscure what is important, which may cause an evaluator to miss gaping holes in ICFR. As noted earlier, many companies missed material weaknesses in corporate tax functions; weaknesses that might have been caught if evaluation, testing, and documentation focused on material financial reporting risks and controls.

*Smaller public companies.* In smaller companies, where management's daily involvement with controls forms the basis of its evaluation, there may be limited documentation created specifically for the evaluation of ICFR. While management is permitted to form an opinion on ICFR based on its own observation of control, it should consider whether to create documentation of how its own observation of controls provided it with sufficient evidence for its assessment. Guidance § II.A.2.c. For practical purposes, if there is little documentary evidence of management's interaction with controls, then the evidence may be insufficient to allow independent auditors to express an opinion on internal control. For a further discussion see §1605, at *Scope Limitations*, and *Scaling Audits for Smaller or Less Complex Companies.*

**Evaluating Identified Deficiencies**

The primary objective in management's assessment of internal control is to determine if there are any material weaknesses in ICFR. To accomplish this objective management evaluates the severity of each control deficiency that comes to its attention during its evaluation and testing of ICFR. For a discussion of what constitutes a material weakness, see §1608 and the following.

Management cannot characterize ICFR as effective if there are one or more material weaknesses in ICFR. To determine if ICFR is free of material weakness management assesses the severity of each deficiency to determine if it is, individually or in combination, a material weakness as of the end of the fiscal year. In evaluating individual deficiencies it is important to remember that multiple control deficiencies, even relatively minor deficiencies, which affect the same account or disclosure, increase the likelihood of a material misstatement. Thus, individual deficiencies that are not by themselves material weaknesses can become so if there is a reasonable possibility that these deficiencies, individually or in combination, would allow a material misstatement that would not be prevented or detected in a timely manner. Guidance § II.B.1.

It is important to emphasize that the determination of whether a material weakness exists does not depend on whether a material misstatement has actually occurred. Instead, the focus is on whether there is a reasonable possibility that the company's ICFR will fail to prevent or detect a material misstatement on a timely basis. Guidance § II.B.1. Thus, a material weakness can exist even though the deficiency in question has never caused a material misstatement in the financial statements.

The severity of a control deficiency depends upon both quantitative and qualitative factors. The SEC Guidance lists risk factors, which influence either the probability that the deficiency will allow a misstatement to occur, or the materiality of that potential misstatement.

Factors affecting the probability that a misstatement will result from a control deficiency include
· The nature of the financial reporting elements involved (for example, suspense accounts and related party transactions involve greater risk);

· The susceptibility of the related asset or liability to loss or fraud (greater susceptibility increases risk);

· The subjectivity, complexity, or extent of judgment required to determine the amount involved (greater subjectivity, complexity, or judgment, like that related to an accounting estimate, increases risk);

· The interaction or relationship of the control with other controls, including whether they are interdependent or redundant;

· The interaction of the deficiencies (when evaluating a combination of two or more deficiencies, whether the deficiencies could affect the same financial statement amounts or disclosures); and

· The possible future consequences of the deficiency. Guidance § II.B.1.


Factors affecting the materiality of a misstatement resulting from a deficiency include
· The financial statement amounts or total of transactions exposed to the deficiency; and

· The volume of activity in the account balance or class of transactions exposed to the deficiency that has occurred in the current period or that is expected in future periods. Guidance § II.B.1.


In addition, when considering the materiality of a control deficiency, or combination of deficiencies, management also should determine "the level of detail and degree of assurance that would satisfy prudent officials in the conduct of their own affairs that they have reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP. If management determines that the deficiency, or combination of deficiencies, might prevent prudent officials in the conduct of their own affairs from concluding that they have reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP, then management should treat the deficiency, or combination of deficiencies, as an indicator of a material weakness." Guidance § II.B.1.

It is worth noting that in estimating whether a potential misstatement is material the maximum amount that an account balance or total of transactions can be overstated is the recorded amount, while understatements can be larger. In addition, the probability that a small misstatement will result from a deficiency is much greater than the probability of a large misstatement. Guidance § II.B.1.

If an identified control deficiency has resulted in a number of minor errors that have not been detected, management should not immediately jump to the conclusion that a large error resulting from the deficiency would not be detected and corrected. Management should consider whether other controls exist that would detect a large misstatement, but would not operate to detect small ones.

Individual deficiencies are not considered in a vacuum. If management notes a deficiency it should determine whether there are compensating controls that can lessen the potential effect of that deficiency. A control that operates at a level of precision that allows it to prevent or detect a misstatement caused by the control deficiency would be a compensating control. Guidance § II.B.1.

The SEC indicates that management's evaluation of a control deficiency does not depend on whether a deficiency has previously resulted in a material misstatement. Obviously, considerable judgment must be exercised in concluding that there is a reasonable possibility that a control failure will occur and cause a material misstatement if such a failure has never occurred in the past. Some evaluators may be reluctant to go out on a limb and conclude that there is a material weakness in the absence of a previous material misstatement. However, controls that have never before failed do fail, and misstatements do occur.

For example, assume *XYZ, Inc.* lacks entity-level controls to prevent or detect unauthorized journal entries by the corporate controller. The fact that the controller has never made unauthorized entries should not affect the evaluation of this control deficiency. The fact that the controller could, at any time, make entries that would materially misstate financial statements, and that the misstatement would not be detected on a timely basis, is an indication of a material weakness in control.

**Indicators of Material Weakness**

As discussed above, and at §1608, whether a deficiency represents a material weakness depends on a number of quantitative and qualitative factors. However, the SEC Guidance has identified certain factors that management should evaluate to determine whether a deficiency in ICFR exists and, if so, whether it represents a material weakness (note that these are the same factors identified for the same purpose in AS 2201, discussed at §1605):
· Identification of fraud, whether or not material, on the part of senior management;

· Restatement of previously issued financial statements to reflect the correction of a material misstatement;

· Identification of a material misstatement of the financial statements in the current period in circumstances that indicate the misstatement would not have been detected by the company's ICFR; and

· Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee. Guidance § II.B.1.

It is important to note that these are only indicators of material weakness. They are not *per se* material weaknesses or even strong indicators of material weakness. For a discussion of material weaknesses, see §1608.

The discovery by auditors of a material misstatement in financial statements is an objective indication of deficiency in ICFR that has permitted a material misstatement to slip through. For example, a relatively large number of recently reported financial reporting errors involving tax provisions have been charged to deficiencies in staff training and supervision. These deficiencies have been identified as material weaknesses in ICFR. These conclusions may have been reached by the following analysis:
· The financial reporting error provides objective evidence of a problem in the preparation of the tax provision.

· That problem is identified as staff training and supervision.

· Both training and supervision are types of controls.

· These controls failed one or more times, so it is reasonably possible that they will fail again.

· The result of the control failure was a material financial reporting error, which will likely recur if the control is not remediated.

· Thus, the deficiency in staff training and supervision is a material weakness.

It is worth noting that the conclusions reached in this analysis may be less certain if there was no material misstatement in financial reporting. Without this misstatement, we do not have objective evidence of either the deficiencies in training and supervision, or the likelihood that those deficiencies will result in a material financial reporting error. This is the central dilemma for management. The SEC says that a material financial reporting misstatement is not a prerequisite to a finding of a material weakness. However, without the evidence of a material financial reporting misstatement, how is management to evaluate the probability that a control deficiency will result in a material misstatement? The answer is that the evaluation will require substantial judgment on the part of knowledgeable people.

**Forming an Opinion on the Effectiveness of ICFR**

As discussed above, management must assess the effectiveness of ICFR. ICFR is not effective if there is a reasonable possibility that a control deficiency, individually or in combination with others, would fail to prevent or detect a material misstatement in a timely manner. That is, ICFR is not effective if it contains one or more material weaknesses. Management evaluates each deficiency identified during the testing of ICFR. If there are no material weaknesses, then management should be able to conclude that ICFR is free of material weakness, and is therefore effective.

In forming an opinion on ICFR effectiveness, it is important to guard against a natural bias toward underreporting. Studies indicate that the majority of material weaknesses may not be reported until they result in restatements of financial statements. For example, in a 2012 study, researchers found that when examining companies that had to restate their financial statements "only a minority of these firms acknowledge their existing control weaknesses during their misstatement periods...." Rice, Sarah C, and David P. Weber, "How Effective is Internal Control Reporting Under SOX 404? Determinants of the (Non-) Disclosure of Existing Material Weaknesses," *Journal of Accounting Research*, Vol. 50, No. 3, pp. 811–843 (June 2012).

**Communication to Independent Auditors and the Audit Committee**

Management must communicate certain deficiencies that come to its attention to the audit committee and its independent auditors. Material weaknesses must be disclosed in management's annual report on its assessment of the effectiveness of ICFR, and they must be disclosed to the audit committee and the independent auditors. Significant deficiencies are reported to the audit committee and auditors, but need not be disclosed in the annual report. Guidance § II.B.1. For a discussion of material weaknesses and significant deficiencies, see §1608.

**Service Organizations**

When business processes are outsourced to a service organization management can assess the ICFR within the service organization in one of three ways. First, the organization can provide a Type 2 SAS 70 report (see below) that attests to the effectiveness of the organization's ICFR. Alternatively, the organization can allow management to directly test the controls in place at the service organization. If the first two options are not available management can put into place controls designed to prevent or detect material misstatements of the service organization. Guidance § II.B.5. For a further discussion see §1605, at *Service Organizations*.

For additional guidance on service organizations, see PCAOB Staff Questions and Answers, July 27, 2004, Q24 to Q26 ; also see PCAOB Staff Questions and Answers, October 4, 2004, Q29.

**Type 2 SAS 70 report.** A report (or "certification") signifies that a service organization has had its control objectives and control activities audited by an independent auditing firm. The report includes a detailed description of the service organization's controls, and the auditor's opinion of whether the controls were appropriately designed, were operational, and operating effectively. In a SAS 70 audit the auditor does not opine on the service organization ICFR as a whole, but instead provides assurance only with regard to specific processes. The SAS 70 report was replaced by the SOC 1 report (discussed below), for periods ending on or after June 15, 2011, with early adoption permitted.

The SAS 70 report takes two forms:

**Type 1.** Report on the design effectiveness of controls over a specific process.

**Type 2.** Report on both the design and operational effectiveness of controls over a specific process. To issue the Type 1 report the service auditor analyzes the controls over a process, and opines as to whether the controls would be effective, as of a specific point in time. The audit does not test the operations of the controls.

The Type 2 report is the same as Type 1, except the service auditor tests the controls over a period of time, and then opines both as to the design and operational effectiveness of the controls. When a Type 2 report is issued the user and the auditor performing procedures under AS 2201, can rely on the service auditor's opinion as to the design and operational effectiveness of controls over the specific process.

If the service auditor tests both the design and operation of controls, then the report will include a description of the specific processes being audited, and a description of the related controls; a description of the nature and scope of the service auditor's testing; and the service auditor's opinion as to the effectiveness of the controls.

Note that a registrant's management may rely on the SAS 70 audit report of the auditor of a third party service provider even if the auditor of the service provider is also the auditor of the registrant. *Frequently Asked Questions on Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports.* Revised Sept. 24, 2007.

In addition, management can rely on the SAS 70 audit report of the auditor of a third party service provider if that report is as of a year-end that is different from the registrant. *Frequently Asked Questions on Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports.* Revised Sept. 24, 2007.

**SOC 1 report.** The SOC 1 report replaces the SAS 70 report, discussed above, for periods ending on or after June 15, 2011, with early adoption permitted. In addition, the service auditor (i.e., the auditor that issues the SOC 1 report) must follow new guidance when performing a service organization audit. This new guidance is set out in Statement of Standards of Attestation Engagements 16 (SSAE 16).

The SOC 1 report is issued by the service auditor after an examination by that auditor of the service organization. The purpose of that examination is to enable the auditor to express an opinion on the controls within that organization that are likely to be relevant to the internal control over financial reporting of the users of that entity's services. Note that a service auditor can also perform engagements that result in the issuance of SOC 2 or SOC 3 reports. These reports express opinions on the service organization's controls that are relevant to the security, availability, processing integrity, confidentiality, or privacy of its services, operations or data handling. These reports are generally not meant to provide a user organization with information regarding internal control over financial reporting, so these reports will not be discussed here.

There are two types of SOC 1 reports. The Type 1 report opines on the service organization management's description of the organization's system, and the suitability of the design of controls within that system to achieve the related control objectives, as of a specified date. This is similar to the SAS 70 Type 1 report. The SOC 1 Type 2 report opines on the service organization management's description of the organization's system, the suitability of the design of controls within that system to achieve the related control objectives, and the operating effectiveness of the controls throughout a specified period. This report is similar to the SAS 70 Type 2 report.

The management of the user company is meant to rely on the SOC 1 report (ordinarily the Type 2 report) when evaluating the effect of the controls within the service organization on the user company's own internal control over financial reporting.

**Multiple Locations**

In assessing the effectiveness of ICFR management generally considers all of its locations or business units. However, management does not need to test controls in each of those locations. If financial reporting risks are adequately addressed by entity-level controls that operate centrally, then the approach to evaluation is similar to that of a business with a single location. However, if controls over significant risks cannot be tested from a central location management will have to perform tests at significant locations. Guidance § II.A.3.

As with all ICFR testing, management focuses its attention on areas of significant ICFR risk. In cases of low-risk controls, evidence gathered through self-assessment routines or other on-going monitoring activities, combined with entity-level monitoring, may be sufficient to evaluate controls. As the control risk at these locations increases, more evidence of control effectiveness will be required.

Note that when management evaluates the control risk at a location, for purposes of determining the extent of evidence required, it does so by looking at the control risk associated with each financial reporting element. It does not make a single judgment of risk for all controls at that location when deciding whether the nature and extent of evidence is sufficient. Guidance § II.A.3.

The most efficient evaluation of the operation of controls is likely to be at a central business location. If adequate controls at this location exist, or can be created, then the Section 404(a) compliance burden will likely be reduced. Evaluating controls in every nook and cranny of a far-flung business enterprise is exceedingly inefficient, and should be avoided if possible.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.



---

  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    **Appx. C-124**

# Case No. 8

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  In re Motorola Securities Litigation,  N.D.Ill.,  February 8, 2007

2001 WL 743411

United States District Court, N.D. Illinois, Eastern Division.

In re ALLSCRIPTS, INC. SECURITIES LITIGATION

No. 00 C 6796.
|
June 29, 2001.

*MEMORANDUM OPINION*

KOCORAS, J.

**\*1**  Before the Court is the Motion to Dismiss of Defendants Allscripts Healthcare Solutions, Inc., David B. Mullen, Glen E. Tullman, J. Peter Geerlofs, and Phillip J. Langley. For the following reasons, we grant the Motion.

BACKGROUND

This case arises from the sale of the common stock of Defendant Allscrpts Inc. ("Allscripts" or the "Company") on the open market. Plaintiffs are a class of persons and entities who purchased the common stock of Allscripts on the open market during the period of March 6, 2000 through and including February 27, 2001 (the "Class Period"). Plaintiffs named Allscripts as a Defendant as well as four individual officers of the Company. Defendant Glen E. Tullman ("Tullman") served as Chairman of the Board of Allscripts since May 1999 and Chief Executive Officer since August 1997. Defendant David B. Mullen ("Mullen") was Allscripts' President and Chief Financial Officer since August 1997. Defendant J. Peter Geerlofs ("Geerlofs") served as Allscripts' Chief Medical Officer since April 2000. Defendant Phil Langley ("Langley") was Allscripts' Senior Vice President of Business Development/Field Services. [1]

[1]       On occasion this Opinion refers to Defendants Tullman, Mullen, Geerlofs and Langley collectively as the "Individual Defendants."

For purposes of a motion to dismiss, we are obligated to accept as true all well-pled allegations. Founded in 1986,

Allscripts was originally a drug wholesaler that provided prepackaged medicines to certain dispensing physicians. The Company later shifted its focus toward software sales and e-commerce. It developed and began marketing an "electronic prescribing solution" software package to doctors called the TouchScript ® Personal Prescriber ^TM ("TouchScript"). Available on both palm-top and wall-mount computers, TouchScript used the Internet to route drug prescriptions to pharmacies and purported to provide "connectivity" to managed care and other organizations.

Defendants promoted the many purported benefits of TouchScript. For instance, TouchScript would allow physicians to save time, because typing prescriptions is faster than writing them down. Furthermore, the software could limit malpractice liability because the system was designed to avoid errors and detect harmful drug interactions. Finally, TouchScript would enable physicians to generate greater revenues by dispensing certain medications directly from their offices.

Not surprisingly, Allscripts also emphasized to the investing public the revenues flowing from TouchScript. Physicians paid Allscripts an initial implementation fee of up to $6,000 depending on the length of the patient list in any given office. This fee covered the installation of TouchScript by an Allscripts technician. In addition, Allscripts collected a monthly subscription of $250 from each TouchScript user. Prior to and throughout the Class Period, Defendants continually highlighted these amounts. Furthermore, Defendants emphasized that physicians actually paid for TouchScript, unlike many other e-commerce products which were given away without charge.

**\*2**  Despite these promotions, Defendants were also realistic about the potential shortcomings of the product. In their Form 10–K disclosure for 1999, [2] filed on March 30, 2000, the Company conceded that

[2]       The Court may take judicial notice of documents filed with the Securities and Exchange Commission without converting a motion to dismiss into a motion for summary judgment. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276–81 (11 ^th Cir.1999). Moreover, the Complaint specifically refers to the Form 10–K filing, so we may properly refer to that document. *See Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1248 (7 ^th Cir.1994)

(stating that documents attached to a motion to dismiss are part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim").

Our business model depends on our ability to sell our TouchScript system to physicians and other healthcare providers and to generate usage by a large number of physicians. We have not achieved this goal with previously or currently available versions of our software.
(Allscripts Form 10–K, 3/30/00, at 23.) The Company also warned potential investors about the potential obstacle of convincing doctors to abandon traditional methods of writing prescriptions in favor of new technological opportunities:

> We cannot assure you that physicians will integrate our products and services into their office work flow or that participants in the pharmaceutical healthcare market will accept our products and services as a replacement for traditional methods of conducting pharmaceutical healthcare transactions.

(*Id.*) In addition, the 10–K Form warned of the risk of errors or defects in the technology:

> [E]arly releases of software often contain errors or defects. We cannot assure you that, despite our extensive testing, errors will not be found in our new product releases and services before or after commercial release, which would result in product redevelopment costs and loss of, or delay in, market acceptance.

(*Id.* at 24.) Furthermore, the 10–K Form contained a frank conclusion about the risk of failure:

> If we fail to achieve broad acceptance of our products and services by physicians and other healthcare participants or to position our services as a preferred method for pharmaceutical healthcare delivery, our prospects for growth will be diminished.

(*Id.* at 23.) Thus, the Form 10–K disclosed that TouchScript was a new product, not yet adopted by a large number of doctors, that could contain bugs or defects that would preclude market acceptance. Because the Form 10–K is a public filing, these disclosures and warnings were available to all investors.

TouchScript turned out to be a hard sell. Physicians were reluctant to use, let alone pay for, new technology unless it added to their practice. However, TouchScript did not add to many practices because the system proved to be more time consuming and costly than prescribing in the traditional manner. The system frequently took as long as thirty minutes to process a single prescription and sometimes it failed to work at all. Additionally, the system required physicians to enter a patient's diagnostic code in order to call up a list of appropriate medications. Because TouchScript's list of diagnostic codes was limited, however, physicians frequently had to look up codes for similar ailments in the Physician's Desk Reference, enter them, and choose from the lists of medications that appeared, thereby consuming additional time. Moreover, the system was often busy and unable to communicate with the insurer. Thus, even those practices that could afford TouchScript ultimately lost money with the product due to fundamental flaws in the system.

 **\*3**  Despite these problems, in late 1999 Allscripts allegedly began to reduce the implementation fee for TouchScript. In some cases, the Company eliminated the fee altogether. In addition, the Company began waiving the monthly subscription fee. In one instance, DeerPath Medical Associates did not pay installation or set-up charges for TouchScript. In another instance, in response to Dr. Howard Baker's expression of dissatisfaction with TouchScript, the Company waived the monthly fee. Allscripts continued to represent to the public that customers paid for the product.

In re Allscripts, Inc. Securities Litigation, Not Reported in F.Supp.2d (2001)

2001 WL 743411, Fed. Sec. L. Rep. P 91,481

Realizing that TouchScript was encountering difficulty penetrating the market, Allscripts decided to purchase existing sales channels and couple TouchScript with products already being sold to doctors through those channels. Consequently, Allscripts purchased three companies with well-established sales channels in order to access physicians. Throughout this period of acquisitions, according to Plaintiffs, Allscripts was highly motivated to keep the price of its common stock high. Moreover, the Company needed to offset public shareholder concerns about dilution.

Notwithstanding these problems, Plaintiffs claim that Defendants made false and misleading statements regarding TouchScript during the Class Period. The allegedly false and misleading statements are as follows:

• March 6, 2000: Defendant Langley told *The Pink Sheet* that "one hundred percent of our clients have to pay" for TouchScript.

• March 30, 2000: In its Form 10–K for Year 1999, Allscripts made numerous representations regarding TouchScript, such as:

• TouchScript is "easy to use, enabling a physician to complete a prescription in as little as 20 seconds";

• TouchScript provides "valuable, objective information prior to and during the prescribing process";

• TouchScript offers physicians a "significant financial opportunity through better management of pharmacy risk."

• July 27, 2000: Allscripts issued a press release announcing its financial results from the second quarter of fiscal year 2000. These results included revenues of $500,000 which were improperly recognized.

• August 2000: Allscripts filed Form 10Q which also reflected the improperly recognized $500,000.

• August 2000: Defendant Geerlofs comments to *Modern Physician* magazine that "[o]ther companies are trying other ways to penetrate the market, often by giving products away, and they are frequently subsidized by pharmaceutical companies. We don't need to do that."

• December 19, 2000: Defendant Mullen states to *Business Wire* that Allscripts has "multiple recurring revenue streams. Beginning with the physician, we earn revenue from the TouchScript software fees that are charged to

the physician for using the product, which is typically received on a monthly subscription basis. We also earn revenue from the physician from the sale of the pre-packaged medication."

**\*4** • January 2001: Defendant Mullen tells *Drug Topics* magazine that "the idea that a patient, at least for the first fill, can pick up the prescription right in the physician's office is a huge convenience. Convenience is also manifest when the physician is able to electronically send the prescription straight from his handheld computer to the pharmacy so that the medication could actually be waiting by the time the patient gets there." At another point in the interview, Mullen says that the monthly fee for TouchScript was $200.

Plaintiffs believe that these statements made during the Class Period were false and misleading. As a result of the statements, Allscripts' common stock traded at artificially inflated prices during the Class Period but ultimately plummeted.

Plaintiffs assert that Defendants were highly motivated to exaggerate sales of TouchScript because they had allocated "an extravagant amount of Allscripts' cash and resources to market the system, and it simply was not selling." An additional motivation was the three acquisitions Allscripts had made. As Plaintiffs contend, "the higher the share price, the more buying power each share had." Furthermore, Defendants were motivated to keep the stock price as high as possible to offset shareholder concerns about dilution. Last, the individual Defendants had motive to exaggerate Allscripts' performance because their annual bonuses and incentives depended on it.

On March 12, 2001, Defendants filed this two-count Complaint against Allscripts and the Individual Defendants. Count I alleges violations of section 10(b) of the Securities Exchange Act of 1934 ("the '34 Act") and Rule 10b–5 of the Securities Exchange Commission. Count II alleges control person liability pursuant to section 20(a) of the '34 Act. Defendants have moved to dismiss the Complaint in its entirety.

STANDARD OF REVIEW

Plaintiffs based this action on sections 10(b) and 20(a) of the '34 Act and Rule 10b–5. Federal Rule of Civil Procedure

12(b)(6) governs all of these claims. In addition, the claims implicate Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1250 (N.D.Ill.1997).

A motion to dismiss pursuant to Rule 12(b)(6) tests whether the plaintiff has properly stated a claim for which relief may be granted. *See Pickrel v. City of Springfield, Ill.,* 45 F.3d 1115, 1118 (7th Cir.1995). The court must accept as true all of the plaintiff's well-pled factual allegations as well as all reasonable inferences. *See Coates v. Illinois State Bd. of Ed.,* 559 F.2d 445, 447 (7th Cir.1977). However, the court need "not strain to find inferences favorable to the plaintiffs" which are not apparent on the face of the complaint. *Id.* The court will dismiss a complaint under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir.1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

 **\*5** Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The rule requires plaintiffs to allege the "identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merchant Svcs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994) (quoting *Bankers Trust Co. v. Old World Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992)). In other words, pleading with particularity means stating "the who, what, when, where, and how: the first paragraph of any news story." *DiLeo,* 901 F.2d 624, 627 (7th Cir.1990).

Reflecting the heightened pleading requirements of Rule 9(b), the PSLRA requires complaints to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Furthermore, with respect to scienter, complaints must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Seventh Circuit has not yet addressed the question whether the PSLRA standard displaces past case law regarding pleading standards in private securities litigation.

Until the Seventh Circuit does so, we shall concur with other courts in this District who have adopted the Second Circuit's pleading standard but declined to bind courts to the Second Circuit's interpretation of that standard. *See Retsky Family Ltd. P'ship v. Price Waterhouse,* No. 97 C 7694, 1998 WL 774678 at \* 1 (N.D.Ill. Oct. 21, 1998); *Rehm,* 954 F.Supp. at 1252; *Fugman v. Aprogenex, Inc.,* 961 F.Supp. 1190, 1195 (N.D.Ill.1997). That standard requires plaintiffs to "allege facts that give rise to a strong inference of fraudulent intent." *Retsky,* 1998 WL 774678 at \* 1.

DISCUSSION

Defendants contend that Plaintiffs have failed to state a claim under section 10(b) of the '34 Act and Rule 10b–5. In order to state a claim under these provisions, Plaintiffs must allege that Defendants made: (1) a false representation or an omission; (2) of a material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the claimant justifiably relied; and (6) that the false representation or omission was the proximate cause of claimant's damages. *See In re Healthcare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280 (7th Cir.1996). Defendants argue that Plaintiffs cannot establish the requisite elements of a false representation or omission and scienter.

I. Count One: Securities Fraud

 A. Alleged Omissions and False Representations
 **\*6** Plaintiffs identify a handful of statements they believe are false and misleading and endeavor to explain the grounds for these allegations. We find none of the allegations supportable, especially in light of the numerous frank disclosures that appear in Defendants' SEC filings. These filings announce the risks of this e-commercial venture that any reasonable investor would have spotted on his or her own. Significantly, Plaintiffs have not challenged the veracity and forthrightness of those SEC filings. The primary purpose of these filings is, after all, to guide the decisions of the investing public. *See, e.g., United States v. Arthur Young & Co.,* 465 U.S. 805, 810, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984).

Instead, Plaintiffs contend that the Individual Defendants behaved fraudulently because they told falsehoods and made omissions about the products to newspapers and other media. The statements upon which they rely, however, cannot support such a conclusion. As we shall explain in

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 132 of 573

In re Allscripts, Inc. Securities Litigation, Not Reported in F.Supp.2d (2001)
2001 WL 743411, Fed. Sec. L. Rep. P 91,481

greater detail, many of the statements rely on subjective determinations not susceptible to an assessment of truth or falsity. Rather, the statements amount to the kind of touting that shareholders would expect of, indeed demand of, senior officers. In the words of the Seventh Circuit, the comments are mere "puffery" lacking the "requisite specificity to be considered anything but optimistic rhetoric." *Searls v. Glasser,* 64 F.3d 1061, 1066 (7 th Cir.1995). The statements do not convey any "useful information upon which a reasonable investor would base a decision to invest," *id.,* particularly when they appear in a venue directed toward potential customers, rather than shareholders.

In addition, Plaintiffs appear to argue that Defendants failed to divulge problems with TouchScript's technology and declines in customer satisfaction. However, Plaintiffs have failed to allege the existence of a duty to make such disclosures, and we find none in the case law. Such a duty would not comport with the way the business world works. Markets are wont to ebb and flow. The securities laws do not require management to apprise the public of each and every move the market may make. Nor should management "bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). As a practical matter, such a scheme would saturate the business wires and confuse investors.

Having summarized why the case at bar cannot pass muster, we now turn to a careful analysis of each of the alleged misstatements before us.

1. Statements Regarding TouchScript and Its Customers
On March 6, 2000, *The Pink Sheet* published Defendant Langley's statement that "one hundred percent of our clients have to pay" for TouchScript. Later that month, on March 30, Allscripts submitted its Form 10–K for Year 1999. In the Form 10–K, Allscript represented that TouchScript is "easy to use, enabling a physician to complete a prescription in as little as 20 seconds," and that it provides "valuable, objective information prior to and during the prescribing process." Furthermore, the Form states that TouchScript offers physicians a "significant financial opportunity through better management of pharmacy risk."

**\*7** Later, in August 2000, Defendant Geerlofs commented to *Modern Physician* magazine that "[o]ther companies are trying other ways to penetrate the market, often by

giving products away, and they are frequently subsidized by pharmaceutical companies. We don't need to do that." Then on December 19, 2000, an interview with Defendant David Mullen appeared in *Business Wire.* In the interview, Mullen stated that Allscripts has "multiple recurring revenue streams. Beginning with the physician, we earn revenue from the TouchScript software fees that are charged to the physician for using the product, which is typically received on a monthly subscription basis. We also earn revenue from the physician from the sale of the pre-packaged medication." Then in an interview in January 2001 in *Drug Topics,* Mullen stated that "the idea that a patient, at least for the first fill, can pick up the prescription right in the physician's office is a huge convenience. Convenience is also manifest when the physician is able to electronically send the prescription straight from his handheld computer to the pharmacy so that the medication could actually be waiting by the time the patient gets there." At another point in the interview, Mullen said that the monthly fee for TouchScript was $200.

Plaintiffs offer several explanations for why these statements were false and misleading. First, Allscripts waived and/ or reduced fees for two resisting physicians. Specifically, DeerPath Medical Associates did not pay installation or set-up charges in late 1999. Then in September 2000, Allscripts' sales representatives offered to waive the monthly fee for Dr. Howard Baker to induce him not to cancel the service. Second, Allscripts failed to disclose that TouchScript was not credentialed with many insurance companies, meaning that patients could not be reimbursed for obtaining their prescriptions through the physician. Third, pharmacies had difficulties in deciphering prescriptions. Fourth, TouchScript had a limited list of diagnostic codes. Last, according to Plaintiffs, Allscripts experienced an average return rate of 50%.

We find these reasons unavailing. That the Company waived the installation charge in one instance and the monthly fee in another does not amount to "giving away TouchScript" as Plaintiffs assert. Plaintiffs have not alleged that DeerPath Medical Association paid no money for TouchScript; instead, the allegation is limited to nonpayment of the installation fee but is notably silent as to the monthly subscription fee. The same is true of the allegation regarding Dr. Baker, which speaks to waiver of the monthly fee but is silent to the installation fee. Neither allegation suggests that the Company gave away TouchScript without receiving any payment. Thus, these allegations do not render false or misleading

2001 WL 743411, Fed. Sec. L. Rep. P 91,481

the statement that one hundred percent of customers pay for TouchScript.

Nor do we accept Plaintiffs' assertion that Allscripts failed to disclose that TouchScript was not credentialed with many insurance companies. As an initial matter, Plaintiffs have failed to plead this allegation with the requisite particularity. Under the PSLRA, complaints must "specify the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). At the pleading stage, a plaintiff may satisfy this requirement by referring to internal memoranda or other documents, press releases, news articles and government-mandated filings. *See In re Theragenics Corp. Sec. Litig.,* 137 F.Supp.2d 1339, 1345 (N.D.Ga.2001) (relying on *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000)). Because the instant allegation identifies no source for the information, it cannot meet this threshold requirement.

**\*8** Furthermore, even if properly pled, the Form 10–K disclosures belie this allegation. In the section outlining risks related to the Company, the Form 10–K states that "[a]chieving market acceptance for our products and services will require substantial marketing efforts.... If we fail to achieve broad acceptance of our products and services by physicians *and other healthcare participants* ... our prospects for growth will be diminished." (Form 10–K at 23; emphasis added.) Insurance companies are precisely those "other healthcare participants" on whose participation the success of TouchScript turned. Their participation comprised a risk which the Form 10–K clearly spelled out. Thus, even if many insurance companies balked at the idea of participating in TouchScript, Allscripts adequately disclosed this possibility. That this possibility actually arose did not trigger a duty to disclose on the part of Defendants. *See Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 515 (7 th Cir.1989) (stating that "[J]ust as a firm needn't disclose that 50% of all new products vanish from the market within a short time, so Commonwealth Edison needn't disclose the hazards of its business, hazards apparent to all serious observers and most casual ones").

Plaintiffs next contend that pharmacies "had great difficulties in deciphering prescriptions sent by TouchScript." We presume that Plaintiffs are alleging that Defendants failed to disclose these problems. This allegation, like the prior one, fails to meet the PSLRA's pleading requirements because of the dearth of information as to its source. Moreover, even if

the allegation were properly pled, the Form 10–K disclosures again betray this supposition. If the alleged problems were attributable to technological glitches, the disclosures addressed such risks. If the problems stemmed from the reluctance of pharmacists to learn how to use TouchScript, this possibility too was addressed by the disclosures. That the possibility of problems later materialized does not make a claim of omission actionable. Furthermore, it does not render false some of the Individual Defendants' statements as to the quality of the TouchScript. Such statements are nothing more than the " '[s]oft, puffing' statements" that representatives make to sell their products but upon which reasonable investors know not to rely. *Raab v. General Physics Corp.,* 4 F.3d 286, 289–90 (4 th Cir.1993); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1 st Cir.1996) (stating that "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available") (superseded by statute on other grounds); *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 744 (7 th Cir.1997) (noting that general statements of customer satisfaction should not make the "heart of a reasonable investor ... begin to flutter" because "[e]veryone knows that someone trying to sell something is going to look ... on the bright side"). This point is especially worthy given that many of the alleged statements were made to magazines and trade publications directed at TouchScript customers, rather than investors or stockholders.

**\*9** Plaintiffs' fourth ground goes to the quality of the design of TouchScript. When a physician prescribed medication using TouchScript, (s)he had to enter the diagnostic code for the particular ailment. Because TouchScript had a limited list of diagnostic codes, however, physicians were often unable to find applicable code in the software. Instead, they resorted to looking up codes for similar ailments in the Physician's Desk Reference, then finding a code that TouchScript recognized to produce a list containing the desired medication. According to Plaintiffs, this time-consuming process deterred physicians from using TouchScript. Even if this were the case, however, it does not mean that Defendants omitted any material information about TouchScript. Defendants disclosed in the Form 10–K that early versions of TouchScript were susceptible to technological errors. If this later proved to be the case, Plaintiffs had already been put on notice as to the potential for errors and cannot recover against Defendants for

2001 WL 743411, Fed. Sec. L. Rep. P 91,481

alleged omissions or affirmative misrepresentations. *See Gart v. Electroscope, Inc.,* 24 F.Supp.2d 969, 975 (D.Minn.1998) (stating that in a fledgling enterprise, "it is obvious to any reasonable investor that [the defendant] anticipated the continuing evolution of its products, and that any particular enhancement or new product carried with it certain risks").

Finally, Plaintiffs allege that Allscripts experienced an average return rate of 50% for TouchScript due to numerous technical problems. This allegation, too, is pled in a conclusory fashion that is ill suited to securities fraud pleadings. Plaintiffs have furnished no particularized statements of fact to support the allegation. Even assuming it were properly pled, the allegation does not present an actionable claim because Plaintiffs have not directed us to any cases establishing that Defendants had a duty to disclose the average return rate of the product. Corporate executives have no general duty to disclose every problem that arises in selling a Company's products. Indeed, if they did, the daily business news would be saturated with reports of rises and falls in corporate revenues. What matters is that investors were made aware of the potential for such technical problems. As we have stated, a reasonable investor would have recognized immediately the risks of e-commerce. In light of these considerations, Defendants had no additional duty to disclose the peaks and valleys of TouchScript's sales pattern.

In sum, we do not find any of the aforementioned conduct to be actionable as omissions or false statements. Where a company is candid about the risks it faces in selling its product, it has no companion duty to report every glitch that arises. This is especially true in a high-risk industry such as e-commerce, where even the most casual investor could recognize the risks without significant investigation. Allscripts confronted squarely in its Form 10–K the risks of its endeavor. These statements, as well as common sense, should have put Plaintiffs on notice as to the risks involved in this e-commercial endeavor. That some of the Individual Defendants made statements to magazines and trade publications painting the product in a positive light does not rise to the level of misstatements. In short, none of the aforementioned statements forms an actionable basis for a claim of securities fraud.

2. Statements Regarding Recognition of $500,000

**\*10**  On October 26, 2000, Allscripts issued a press release announcing its financial results for the third quarter ending September 30, 2000. The press release revealed that during the quarter ending June 30, 2000 (the second quarter), Allscripts improperly recognized $500,000 in revenue flowing from an agreement with IMS Health Incorporated ("IMS"). The revision adjusted previously reported revenues for the second quarter from $12.6 million to $12.1 million, and adjusted previously reported revenues for the first six months of the year from $22.2 million to $21.7 million. The revisions increased Allscripts' net loss for the second quarter of 2000 from $24.3 million to $24.8 million and net loss for the first six months of 2000 from $26.3 million to $26.8 million.

Plaintiffs believe these statements were false and misleading. Even if this were true, however, the alleged misstatement of earnings are immaterial in light of the total amount of Allscripts' earnings and losses. The allegedly improperly recognized sum reflects a mere 4% of the Company's revenues for that quarter and just over 2% of the Company's six-month revenues. It adjusted the Company's quarterly losses by a mere 2%. Given these modest numbers, the alleged improperly recognized sum cannot as a matter of law be material. *See Glassman v. Computervision Corp.,* 90 F.3d 617, 633 (1 st Cir.1996) (affirming conclusion that a minor drop of a few percentage points is inadequate to support a claim of material difference for purposes of Rule 10b–5); *In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 895 (D.N.C.2001) (dismissing as immaterial an alleged misstatement of earnings of $79 million which amounted to a mere 2.1% of operating earnings and 2.8% of earnings); *In re Newell Rubbermaid Inc. Sec. Litig.,* 2000 WL 1705279, at *8 (N.D.Ill. Nov. 14, 2000) (deeming immaterial allegedly undisclosed expenses that amounted to 1% of the overall expense budget as "nothing more than pocket change"). Because the alleged misstatement in the case at bar cannot satisfy the materiality element, Plaintiffs' claim under section 10(b) and Rule 10b–5 cannot survive.

B. Scienter

Plaintiffs' failure adequately to allege scienter provides an entirely independent basis to dismiss the Complaint. The PSLRA requires Plaintiffs to plead facts giving rise to a "strong inference" that a particular defendant made a specific statement with knowledge of its falsity. 15 U.S.C. § 78u–4(b)(2). The Seventh Circuit has not yet ruled on the question of the what constitutes a "strong inference" of such knowledge. In some circuits, the plaintiff must allege specific, detailed facts demonstrating the defendant's contemporaneous knowledge of falsity. *See Bryant v.. Avado*

*Brands, Inc.,* 187 F.3d 1271, 1286–87 (11 th Cir.1999); *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 979 (9 th Cir.1999). In other circuits, allegations of "motive and opportunity" to commit fraud will give rise to a "strong inference" of scienter. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534–35 (3d Cir.1999); *Novak v. Kasaks,* 216 F.3d 300, 310–11 (2d Cir.2000). Under either pleading standard, Plaintiffs cannot proceed.

**\*11** As we have already discussed, Defendants' Form 10–K disclosures were issued toward the beginning of the Class Period on March 30, 2000. These disclosures highlighted the risks surrounding TouchScript, particularly with respect to acceptance in the medical community and problems with the technology. Significantly, Plaintiffs have *not* alleged that Defendants ever furnished inaccurate numbers as to the Company's sales, margins and customers. Rather, Plaintiffs offer broad, unspecified allegations insinuating Defendants had "access to adverse, non-public information" about the Company, had "conducted extensive market research" on TouchScript, "received constant feedback" from salespeople and "paid close attention to sales trends" for the product. These allegations paint with too broad a brush and cannot satisfy the PSLRA's pleading standards. Without a clearer idea as to what the allegedly adverse, nonpublic information was, it is impossible for us to determine whether the allegedly undisclosed information could have rendered Defendants' subsequent statements untrue. So too are we unable to measure the timing of the allegedly adverse information against the public representations made by Defendants. It is axiomatic that Defendants could not intentionally have made false statements without previous access to accurate information.

Plaintiffs did plead with specificity regarding the two medical practices that allegedly received rebates for using TouchScript. However, these allegations cannot carry the day for Plaintiffs. In the first place, many of the allegedly false statements occurred *before* the two medical practices received the alleged rebates. Second, Plaintiffs have pointed merely to two instances among at least several hundred customers. We cannot reasonably infer from two instances the existence of "widespread problems."

Last, with respect to the improperly recognized revenue, we have already noted that the amount of the revenue is modest in comparison to the Company's total revenue. Even assuming that this accounting decision violated GAAP, merely establishing GAAP violations is not tantamount to scienter. *See Chu v. Sabratek Corp.,* 100 F.Supp.2d 815, 823–24 (N.D.Ill.2000). In fact, it is difficult to build inferences of scienter upon accounting errors because such errors often involve complex calculations about which reasonable people can differ in opinion. The small magnitude of the error, the Company's prompt acknowledgement of the error, and the fact that the revenue was ultimately realized all militate against an inference of scienter in this case.

Plaintiffs also appear to raise allegations going to Defendants' "general motive" to commit fraud. Plaintiffs suggest that the Individual Defendants had motive to commit fraud because they stood to benefit through their salaries and benefits. Moreover, Plaintiffs claim that the Company's recent acquisitions supplied Defendants with a motive to inflate the price of the Company's stock. These unsupported, generalized allegations of motive are insufficient as a matter of law. With respect to the Individual Defendants' salary and benefit incentives, that allegation is too general to satisfy the scienter requirement. Under Plaintiffs' argument, virtually any corporate executive would have the requisite intent to defraud, since most salaries and benefit packages have some incentive-based dimension. Moreover, with respect to the motive to inflate stock price, that too is vague. *See, e.g., Coates v. Heartland Wireless Comm., Inc.,* 26 F.Supp.2d 910, 918 (N.D.Tex.1998) (dismissing allegation of motive to conceal overstatements during public offering); *Novak v. Kasaks,* 997 F.Supp. 425, 430 n.5 (S.D.N.Y.1998) (concluding that allegations of motive to "raise capital" were insufficient as a matter of law to allege scienter); *Glickman v. Alexander & Alexander Servs., Inc.,* 1996 WL 88570, at *5 (S.D.N.Y. Feb. 29, 1996) (holding that vague allegations of motive, like "desire to raise much needed capital," are too general to satisfy scienter requirement). Without more particularized allegations, Plaintiffs cannot satisfy the scienter requirement by alleging motive.

## II. Count Two: Control Group Liability

**\*12** Plaintiffs have also raised a claim pursuant to section 20(a) of the '34 Act. Section 20(a) imposes civil liability upon persons who control others who are directly liable under the Act. 15 U.S.C. § 78t. If a Complaint does not adequately allege an underlying violation of the securities laws, however, the district court must dismiss the section 20(a) claim. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 207 (1st Cir.1999). Because Plaintiffs have failed to state a claim under section 10(b) of the '34 Act, they cannot assert

2001 WL 743411, Fed. Sec. L. Rep. P 91,481

the underlying claim required by section 20(a). Thus, their section 20(a) claim must fail.

For the foregoing reasons, we dismiss Plaintiffs' complaint in its entirety.

CONCLUSION

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 743411, Fed. Sec. L. Rep. P 91,481

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 9

2004 WL 884308, Fed. Sec. L. Rep. P 92,806

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Home Solutions of America Investor Group v. Fradella,
N.D.Tex.,   March 24, 2008

2004 WL 884308
United States District Court,
N.D. Texas, Dallas Division.

In re BLOCKBUSTER INC.
SECURITIES LITIGATION

No. 3:03–CV–0398–M.
|
April 26, 2004.

*MEMORANDUM OPINION AND ORDER*

LYNN, J.

 **\*1**  Before the Court is Defendants' Motion to Dismiss
Plaintiffs' Amended and Consolidated Complaint, filed on
September 22, 2003. The Court grants Defendants' Motion.
The Court dismisses Plaintiffs' Consolidated Amended
Complaint, partially with prejudice and partially without
prejudice.

I. BACKGROUND

This is a federal securities class action on behalf of those who
purchased Blockbuster securities between February 12, 2002
and December 17, 2002 (the "Class Period"). On December
18, 2002, Blockbuster announced that it would fall short of
its prior projections for the fiscal year and fourth quarter of 2002.
After this announcement, the price of Blockbuster common
stock closed at $13.64 per share, compared to the closing price
of $19.40 per share on December 17, 2002.

Plaintiffs bring suit for securities fraud under Section 10(b)
of the Securities Exchange Act, and Rule 10b–5, against
Blockbuster and John Antioco, Larry Zine, and Nigel Travis
(the "Individual Defendants"). In addition, Plaintiffs bring
suit under Section 20(a) of the Securities Exchange Act
against the Individual Defendants, as control persons of
Blockbuster. Plaintiffs' allegations of fraud fall into six
general categories.

The first category is premised on Blockbuster's alleged
failure to disclose, and failure to recognize as a contingent
liability, its dispute with Buena Vista Home Entertainment
("Buena Vista"). On December 31, 2002, Buena Vista, a
division of Disney, filed suit against Blockbuster, alleging
that Blockbuster had breached the terms of their revenue
sharing agreement, and seeking more than $120 million in
damages. Plaintiffs contend that Defendants knew about the
dispute with Buena Vista no later than June 20, 2001, and that
Defendants should have disclosed the dispute and treated it as
a contingent liability in Blockbuster's financial statements.

The second category is premised on Defendants' alleged
fraudulent scheme to hide the losses associated with
destroying Blockbuster's VHS inventory. On September 10,
2001, Blockbuster announced a merchandising campaign to
destroy 25% of its VHS inventory in order to make room
for DVDs. Blockbuster announced that the merchandising
campaign was completed in 2001. However, Plaintiffs
contend that the merchandising campaign was internally
referred to as the Merchandise Opportunity Program
("MOP") and that MOP actually continued into 2002.
Plaintiffs further contend that the financial statements for the
first half of 2002 were inaccurate, because they did not take
into account the costs of the continuing VHS destruction.
Although the costs associated with the destruction of
VHS inventory would ordinarily have been reflected in
Blockbuster's financial statements as merchandise rental
costs, Plaintiffs allege that the improperly deferred costs of
the merchandising campaign were reflected in the financial
statements for the second half of 2002 as merchandise
sales costs. Plaintiffs additionally allege that "shrink," which
Blockbuster explained was the reason for the increase in
merchandise sales costs, was a false explanation.

 **\*2**  The third category is premised on Defendants'
alleged misrepresentations and omissions relating to whether
competition from mass merchants was hurting Blockbuster's
business. According to Plaintiffs, the swing from DVD to
VHS caused consumers to more frequently purchase, rather
than rent, DVDs. Mass merchants sell DVDs for virtually no
profit, as a way to attract consumers into their stores, thus
hurting Blockbuster's sales of DVDs. Plaintiffs contend that
Defendants misrepresented and failed to disclose the effect of
this phenomenon on Blockbuster's business.

Fourth, Plaintiffs allege that Defendants misrepresented that
the gross profit margin on DVD rentals was 70%, when it was
actually lower, and that Defendants misrepresented that the

In re Blockbuster Inc. Securities Litigation, Not Reported in F.Supp.2d (2004)

2004 WL 884308, Fed. Sec. L. Rep. P 92,806

gross profit margin on DVD rentals was 10 percentage points higher than the gross profit margin on VHS rentals when the gross profit margin on DVD rentals was actually only 3 or 4 percentage points higher.

Fifth, Plaintiffs allege that Defendants misrepresented that Blockbuster was not experiencing problems with its inventory and distribution technology, and that they failed to disclose the actual problems Blockbuster was experiencing with that technology.

Finally, Plaintiffs allege that, because of the Buena Vista dispute, the continuing merchandising campaign, the competition from mass merchants, declining DVD rental margins, and the problems with Blockbuster's technology, Defendants made numerous financial projections without a reasonable basis.

Defendants contend that Plaintiffs' allegations of fraud should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because (1) all of the alleged misrepresentations and omissions are protected by the Private Securities Litigation Reform Act ("PSLRA") safe harbor provision, as forward-looking statements, (2) the allegedly misrepresented and omitted information is immaterial, (3) application of the fraud-on-the-market theory of reliance is precluded for the alleged failure to disclose the Buena Vista dispute, (4) Defendants did not have a duty to disclose the Buena Vista dispute, (5) Plaintiffs have failed to plead a sufficient factual basis for the alleged misrepresentations and omissions, and (6) Plaintiffs have failed to plead scienter adequately. The Court will analyze each argument in turn.

## II. PSLRA SAFE HARBOR

The PSLRA provides a safe harbor for "any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i). If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary statements, the statement is not actionable and the defendant's state of mind is irrelevant. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F.Supp.2d 549, 575 (S.D.Tex.2002) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999));

see also H.R. CONF. REP. NO.. 104–369, *reprinted in* 1995 U.S.C.C.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement."). The Court finds that the following statements[1] are protected under the PSLRA safe harbor for forward-looking statements, and thus dismisses Plaintiffs' claims with prejudice to the extent they are premised on these statements:

[1]   For ease of reference, the Court has assigned numbers to the statements excerpted from the Amended Complaint. These numbers do not correspond to the numbered paragraphs in the Amended Complaint.

**\*3** 1. "Going forward, the Company expects rental margins will be enhanced by the continued growth of DVD as a rental format." Am. Compl. ¶ 30.

2. "Our plan is to triple our retail share by 2006, increasing our revenues from approximately $400 million this year to 9 percent of approximately $20 billion or $1.8 billion." Am. Compl. ¶ 35; 70.

3. "For the full year [2002], gross profit is expected to increase in the mid-single digit range, driven by a combination of sales growth and margin improvement due to growth in higher margin DVD rentals. Additionally, [ ... ] the Company believes that it will achieve double digit EBITDA growth, which will result in significant EPS growth." Am. Compl. ¶ 53.

4. "For the full year [2002], gross profit is expected to increase in the mid-single digit range, driven by a combination of sales growth and margin improvement due to growth in higher margin DVD rentals. Additionally, for the full year, the percentage increase in worldwide same store revenues is expected to be in the low to mid-single range. For the full year, the Company believes that it will achieve double digit EBITDA growth, which will result in growth of 2002 EPS over 2001 cash EPS of at least 20%." Am. Compl. ¶ 60.

5. "Given the strengthening in Q2, we expect gross profit to grow in mid-single digit for the quarter and low single digit comp store sales. This growth translates into strong EBITDA growth. We expect

*In re Blockbuster Inc. Securities Litigation, Not Reported in F.Supp.2d (2004)*

2004 WL 884308, Fed. Sec. L. Rep. P 92,806

the [gross profit] to grow at least in the mid-single range that translates into double digit EBITDA growth. In summary, we are pleased with store operations that set the industry standard in terms (sic) execution and diligence." Am. Compl. ¶ 61.

6. "Moving forward, we are strategically positioning Blockbuster to become a complete source for movies and games with innovative marketing and merchandising initiatives designed to strengthen our rental proposition while increasing our share of the growing retail market." Am. Compl. ¶ 69.

7. "During the second quarter of 2002, we increased our focus on the sale of new movies and games to complement our rental offerings and to accommodate increased demand. As a result of this increased focus, we expanded the selection in our stores for DVD and games hardware and software. We expect the strong growth in merchandise sales to continue for the rest of the year and beyond, as we anticipate consumer demand for these products will continue to grow." Am. Compl. ¶ 75.

8. "Beginning in August, as a result of the investments we made in product and marketing to initiate new consumer programs, we experienced increased sales momentum in both our rental and retail business. That momentum continues, and we believe positions the company to exceed previous fourth quarter guidance and achieve full-year expectations and double-digit revenue growth in 2003 and beyond." Am. Compl. ¶ 78.

9. "In line with current analyst consensus expectations, the Company believes that it will achieve full-year 2002 EPS growth of approximately 30% over 2001 EPS, excluding charges, of $1.01." Am. Compl. ¶ 78.

**\*4** 10. "For the fourth quarter, we expect results to exceed current expectations, meaning you can expect analysts (sic) add the three cent shortfall in the third quarter to the full year results, leaving full-year estimates unchanged." Am. Compl. ¶ 79.

The definition of "forward-looking statement" includes statements containing a projection of revenues, income, or earnings per share; statements of the plans and objectives of management for future operations; and statements of future economic performance. 15 U.S.C. § 78u–5(i)(1). The ten statements listed above project future growth in rental

margins, profits, earnings before interest, taxes, depreciation, and amortization ("EBITDA"), earnings per share ("EPS"), share of the retail market, and consumer demand-thus qualifying as forward-looking statements under the PSLRA.

A statement that qualifies as forward-looking under the PSLRA is protected by the safe harbor if it is identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from those in the forward-looking statement. 15 U.S.C. § 78u–5(c)(1)(A)(i). The PSLRA specifically provides that, in the case of an oral forward-looking statement, the aforementioned requirement shall be deemed met if the forward-looking statement is accompanied by a cautionary statement that identifies the statement as forward-looking, states that actual results might differ materially from those projected, and incorporates by reference meaningful cautionary language in a readily available written document. 15 U.S.C. § 78u–5(c)(2). The PSLRA is silent about whether meaningful cautionary language can be incorporated by reference when the forward-looking statement is written, rather than oral. The PSLRA safe harbor is "based on aspects of ... the judicial[ly] created 'bespeaks caution' doctrine." H.R. CONF. REP. NO.. 104–369, *reprinted in* 1995 U.S.C.C.A.N. 730, 742. The Fifth Circuit has characterized the bespeaks caution doctrine as merely reflecting "the unremarkable proposition that statements must be analyzed in context." *Rubinstein v. Collins,* 20 F.3d 160, 167 (5th Cir.1994). In light of this characterization, the Court concludes that, as long as the reference is clear and explicit so that the referenced cautionary language can fairly be viewed as part of the "context" surrounding the written forward-looking statement, the PSLRA safe harbor for written forward-looking statements can be satisfied by meaningful cautionary language that is incorporated by reference. See *Karacand v. Edwards,* 53 F.Supp.2d 1236, 1245 (D.Utah 1999) (holding that, because the bespeaks caution doctrine does not require the cautionary language to be in the same document as the alleged misstatement or omission, the PSLRA similarly does not impose such a requirement). This conclusion is buttressed by the illogic of allowing incorporation by reference into oral statements, when the listener may mishear or forget the location of the referenced cautionary language, but not allowing incorporation by reference into written statements, when the reader is at significantly less risk of misinterpreting or forgetting.

**\*5** In order to qualify as meaningful cautionary language, the language must identify important factors that could cause actual results to differ materially from those in the forward-looking statement. 15 U.S.C. § 78u–5(c)(1)(A)(i). In *Harris v. Ivax Corp.,* the Ninth Circuit rejected the plaintiffs' argument that the cautionary language was "mere boilerplate" because it was "detailed and informative" and told "the reader in detail what kind of misfortunes could befall the company and what the effect could be." *Harris v. Ivax Corp.,* 182 F.3d 799, 807 (11th Cir.1999). Contrary to Plaintiffs' assertion, the cautionary language need not list the specific risk factor alleged to have rendered the forward-looking statement false. *Harris,* 182 F.3d at 807 ("To be 'meaningful,' must the cautionary language explicitly mention *the* factor that ultimately belies a forward-looking statement? We think not.") (citing the House Conference Report accompanying the PSLRA).

In order to analyze whether the forward-looking statements alleged in the Amended Complaint are within the PSLRA safe harbor, "the Court must examine piecemeal the statements made by the company as expressed in the pleadings." *In re Enron,* 235 F.Supp.2d 549, 576 (S.D.Tex.2002). Therefore, the Court will separately analyze each statement listed above to determine whether it satisfies the PSLRA safe harbor. Each statement is accompanied by language warning the reader that the news release, call, or report contains forward-looking statements, identifying numerous risk factors that could cause the projections to vary, and referencing additional risk factors contained in Blockbuster's annual report. For example, the following language, which accompanies Statement 1, typifies the type of language accompanying Statements 1–10.

> This news release contains forward-looking statements relating to Blockbuster's plans to re-merchandise its stores, including, without limitation, statements related to the following: Blockbuster's plans to increase the presence of DVDs and DVD players in its stores and the related elimination of slower-moving VHS units and games; Blockbuster's expectations regarding the anticipated financial impact of its re-merchandising efforts; and Blockbuster's intent to implement marketing initiatives to support its

increased focus on the DVD format. These forward-looking statements are based on Blockbuster's current intent, expectations, estimates, and projections and are not guarantees of future performance. These statements involve risks, uncertainties, assumptions, and other factors that could cause actual results to vary materially from those expressed in or indicated by them. Factors include, among others: Blockbuster's ability to effectively execute its re-merchandising plans; consumer demand for DVDs and the impact of competitive product and service offerings and pricing; the impact of technological shifts on Blockbuster's business; and other factors, as set forth under the heading "Cautionary Statements" in Blockbuster's annual report on Form 10–K for the fiscal year ended December 31, 2000.

**\*6** Blockbuster's annual report on Form 10–K for the fiscal year ended December 31, 2000 includes seven pages of cautionary statements, which are incorporated by reference into the paragraph quoted above. Therefore, the Court finds that the forward-looking statements are identified as such and are accompanied by meaningful cautionary language, thus satisfying the PSLRA safe harbor.

The following statements are forward-looking, but were not identified as such and were not accompanied by cautionary language. Thus, the safe harbor is not satisfied as to these statements:

11. In response to a question about the impact of DVD sales on Blockbuster: "We think the retail business will continue to grow and we think the rental business will continue to grow...." Am. Compl. ¶ 54.

12. "I mean, we've got a great business, a great brand ... we feel comfortable in our ability to grow our business in a meaningful and sustainable way over a long period of time. And if that translates, and hopefully it should, to a higher stock price, then we don't think the upside is over for Blockbuster." Am. Compl. ¶ 62.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 142 of 573

In re Blockbuster Inc. Securities Litigation, Not Reported in F.Supp.2d (2004)
2004 WL 884308, Fed. Sec. L. Rep. P 92,806

13. "We really did not know how to compete against retail DVD in 2001. I think we have figured that out, and you will see that reflected in our results for the balance of 2002." Am. Compl. ¶ 63.

Defendants argue that, in addition to the thirteen statements identified above as forward-looking, the Court should treat this entire case as a "forward-looking statements case." Plaintiffs' suit is premised on the drop in stock price that followed Blockbuster's amended financial projections. Therefore, relying on *Harris v. Ivax Corp.* and *Lemmer v. Nu–Kote Holding, Inc.,* Defendants argue that, even if Plaintiffs could show that Defendants made fraudulent misrepresentations and omissions about, for example, the destruction of VHS inventory, those misrepresentations and omissions would be shielded because Plaintiffs complain solely about their effect on Blockbuster's financial projections, which are themselves protected forward-looking statements. In *Harris,* the Ninth Circuit held that a plaintiff could not premise a lawsuit on the absence of a material factor in the cautionary language accompanying a forward-looking statement because "the entire list of factors is treated as a forward-looking statement." *Harris,* 182 F.3d at 807. Similarly, in *Lemmer,* the court found that a plaintiff could not assert a claim for fraudulent omissions of material fact where the plaintiff contended that the duty to disclose the material fact arose from the forward-looking statements: "That is, she bases her claims on omissions of material fact which Nu–Kote was required to communicate *because* they conflicted with Nu–Kote's vague statements about current operations and predictions about future results. Accordingly, the omissions of material fact on which the Complaint is based are subject to the 'safe harbor' for forward-looking statements." *Lemmer v. Nu–Kote Holding, Inc.,* No. 3:98–CV–0161–L, 2001 WL 1112577, at *5 (N.D.Tex. Sept. 6, 2001) (Lindsay, J.).

**\*7** The Court agrees with *Harris* that Plaintiffs' claims cannot be premised on the failure to include a risk factor in the cautionary language accompanying a forward-looking statement. Similarly, the Court agrees with *Lemmer* that Plaintiffs cannot assert a claim based on the failure to disclose information if the duty to disclose is premised on the forward-looking statement. However, the Court does not read these cases to suggest that, simply because a representation or omission would affect a forward-looking statement, the representation or omission is non-actionable. If the representation or omission is fraudulent, independent of the existence of a forward-looking statement, the representation or omission is not shielded simply because a forward-looking

statement exists. For example, assume a hypothetical case in which Company X made glowing financial projections and simultaneously fraudulently represented that Company X had entered into a profitable contract. Later, because it had not entered into the profitable contract, Company X was forced to significantly alter its financial projections and Company X's stock price dropped precipitously as a result. If Defendants' argument were accepted, the fraudulent misrepresentation about the profitable contract would not be actionable merely because it affected a financial projection. Therefore, simply by making financial projections, a company would insulate itself from liability for virtually all fraudulent statements and omissions because, in the securities context, material statements and omissions are invariably related, at least tangentially, to a company's current and future financial position. The Court rejects Defendants' argument that this is entirely a "forward-looking statements case." To the extent that Plaintiffs allege that Defendants made material misrepresentations and omissions that are independently actionable without reference to the protected forward-looking statements, the PSLRA safe harbor does not apply.

### III. MATERIALITY

A misrepresentation or omission of information is material if there is a substantial likelihood that a reasonable investor would consider the information to have significantly altered the total mix of information about investing in the company. *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 361 (5th Cir.2002). "[G]eneralized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 869 (5th Cir.2003). "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d at 888. The Court finds Statements 11–13, *supra,* and Statements 14–15, excerpted below, to be mere vague expressions of corporate optimism, and thus dismisses with prejudice Plaintiffs' claims to the extent they are premised on these statements.

2004 WL 884308, Fed. Sec. L. Rep. P 92,806

**\*8**  14. "[W]e undertook a number of key initiatives to strengthen our core business and drive growth in profitability, including re-merchandising our stores to expand our selection of higher margin DVDs and dedicating more of our sales area to high-growth new game formats and promising new business opportunities." Am. Compl. ¶ 53.

15. "Our first quarter performance speaks to the strengths of our business and validates the strategy that we implemented last year focusing on high-growth game and DVD formats." Am. Compl. ¶ 60.

In addition to arguing that many of the statements identified by Plaintiffs are immaterial puffery, Defendants argue that none of the alleged misrepresentations and omissions are material because Plaintiffs have not alleged that they affected Blockbuster's stock price. However, Plaintiffs have alleged that (1) the stock price dropped when Blockbuster announced that it would fall short of its prior projections and (2) the reason that Blockbuster was unable to meet its prior projections was because of existing problems that were misrepresented or omitted prior to the announcement. Therefore, Plaintiffs have alleged that the stock price dropped as a result of disclosure of the effect of underlying facts that were misrepresented and omitted.

Defendants, relying on *ABC Arbitrage,* contend that this indirect allegation of an effect on stock price is insufficient. In *ABC Arbitrage,* the Fifth Circuit found that the plaintiffs did not plead sufficiently that the alleged misrepresentations and omissions were material because the plaintiffs did not plead that the predictions did not account for known problems and losses. *ABC Arbitrage,* 291 F.3d at 361. Without that, the Court found that no reasonable investor would view the information as significantly altering the total mix of information about investing in the company. *Id.* Then, the Court found that the mere drop in stock price following an announced anticipated failure to meet previous expectations, where misrepresented and omitted problems allegedly contributed to the failure to meet expectations, was not sufficient to "save" Plaintiffs' claims. *Id.* at 362.

In contrast to the facts in *ABC Arbitrage,* here a reasonable jury could find that a reasonable investor would have viewed the dispute with Buena Vista, the alleged scheme to destroy Blockbuster's VHS inventory, the alleged negative effect of competition from mass merchants, and the alleged misrepresentations about DVD rental margins to have significantly altered the total mix of information about investing in Blockbuster. The Court is not looking to the drop in stock price to establish materiality and "save" Plaintiffs' claims, but rather is analyzing the potential materiality of the allegedly omitted and false information and the impact such had on the restatement. Therefore, the Court rejects Defendants' argument that *ABC Arbitrage* compels the Court to hold that, even if a reasonable jury could find the information allegedly misrepresented or omitted to be material, it is immaterial simply because Plaintiffs have failed to allege that the stock price dropped upon public disclosure of the information.

**\*9**  That this interpretation of *ABC Arbitrage* is logical is demonstrated by the following hypothetical: Company X makes glowing financial projections for the year and knowingly misrepresents that Company X has entered into a profitable contract. Because the glowing projections are based on the false representations regarding the profitable contract, halfway through the year, Company X is forced to amend its projections, projecting a poor second half of the year. The stock price of Company X plummets. The reason that Company X restates its projections is because the revenue from the unsecured contract is not forthcoming, but Company X does not disclose that this is the reason for the restatement, and manages to keep the true reason secret. If Defendants' argument were accepted, Company X's misrepresentation about the profitable contract would be immaterial and thus non-actionable. The Court does not interpret *ABC Arbitrage* to compel this result. Therefore, the Court rejects Defendants' argument that all of Plaintiffs' claims should be dismissed for failure to allege materiality.

## IV. RELIANCE

Defendants, relying on *Nathenson v. Zonagen,* 267 F.3d 400 (5th Cir.2001), contend that the failure to disclose the Buena Vista dispute is not actionable because Plaintiffs rely on the "fraud on the market" theory of reliance and the eventual disclosure of the Buena Vista lawsuit did not negatively affect the stock price. In *Nathenson,* the plaintiffs alleged that the defendants misrepresented that certain medical research trials had produced statistically significant results. *Id.* at 417. The plaintiffs relied on the fraud-on-the-market theory, which is based on the rebuttable presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market. Throughout the several months following the defendants' disclosure that

the research trials had not produced statistically significant results, the stock price rose. *Id.* at 418. The Fifth Circuit held: "If the market price was not *actually* affected by the statement, reliance on the market price does not *of itself* become reliance on the statement." *Id.* at 419. Therefore, the Court held that the plaintiffs were unable to use the fraud-on-the-market theory to establish reliance and affirmed the district court's dismissal of the complaint with respect to the alleged misrepresentations. *Id.*

In *Nathenson,* the plaintiffs' suit was premised on affirmative misrepresentations; in the present case, Plaintiffs' suit is premised on a failure to disclose the Buena Vista dispute. "[W]here the gravamen of the fraud is the failure to disclose, as opposed to a fraudulent misrepresentation, a plaintiff is entitled to a rebuttable presumption of reliance." *Krogman v. Sterritt,* 202 F.R.D. 467, 478 (N.D.Tex.2001) (Lynn, J.) (relying on *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–53 (1972), and *Smith v. Ayres,* 845 F.2d 1360, 1363 (5th Cir.1988)). Therefore, in the current case, in contrast to *Nathenson,* if here pled, Plaintiffs would be entitled to a rebuttable presumption of reliance rendering the fraud-on-the-market theory of reliance extraneous.

**\*10** Even if Plaintiffs were to rely on the fraud-on-the-market theory of reliance rather than the rebuttable presumption of reliance, the Court finds that *Nathenson* would be distinguishable if Plaintiffs had sufficiently pled that (1) the stock price dropped on December 18, 2002 as a result of the amended earnings estimates, (2) the earnings estimates had to be revised to take into account the contingent liability related to the Buena Vista dispute, and (3) the market did not react to the public disclosure of the Buena Vista dispute on January 2, 2003, because the market had already absorbed the effects of the negative information when it reacted to the restated earnings estimates, which were predicated in part on the Buena Vista dispute.

However, Plaintiffs' Amended Complaint pleads neither a presumption of reliance nor a reason why the stock price was unaffected by the public disclosure of the Buena Vista dispute. Therefore, the Court agrees with Defendants that Plaintiffs' pleading of reliance with respect to the failure to disclose the Buena Vista dispute is insufficient. The Court therefore dismisses Plaintiffs' Amended Complaint, without prejudice, to the extent it is premised on the failure to disclose the Buena Vista dispute. In other portions of this Opinion, the Court will identify additional deficiencies in the Amended Complaint with respect to this claim.

## V. DUTY TO DISCLOSE

According to Plaintiffs, Buena Vista notified Blockbuster no later than June 20, 2001 that Buena Vista viewed Blockbuster as breaching their contract and causing Buena Vista damages of almost one hundred million dollars. Buena Vista did not file suit against Blockbuster until December 31, 2002, which was after the Class Period. However, Plaintiffs allege that Blockbuster should have disclosed its dispute with Buena Vista during the Class Period. Between June 20, 2001, when Blockbuster allegedly learned of the potential for liability to Buena Vista, and December 17, 2002, the end of the Class Period, Blockbuster filed one Form 10–K report and several Form 10–Q reports. Plaintiffs allege that Blockbuster should have disclosed in these reports its potential liability to Buena Vista and that the financial statements included in these reports violated GAAP because they failed to account for this contingent liability.

Absent a duty to disclose, the failure to disclose information, even if that information is material, is not actionable. *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). Plaintiffs allege that GAAP and Item 303 of Regulation S–K required disclosure of the Buena Vista dispute. Statement of Financial Accounting Standards No. 5 ("SFAS No. 5") requires a charge to income if both of the following conditions are met:

> a. Information prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

**\*11** b. The amount of the loss can be reasonably estimated.

Additionally, if no accrual is made for a loss contingency because one or both of the above conditions are not met, SFAS No. 5 provides:

> [D]isclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been

incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. Disclosure is not required of a loss contingency involving an unasserted claim or assessment when there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless it is considered probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable.

Finally, Item 303 of Regulation S–K requires the disclosure of known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a company's liquidity, net sales, capital resources, revenues, or income from continuing operations. 17 C.F.R. § 229.303.

Plaintiffs' Amended Complaint fails to allege that, during the Class Period, it was probable or reasonably possible that the Buena Vista dispute would result in a loss, that the amount of the loss could be reasonably estimated, or that the dispute was reasonably likely to have a materially adverse effect on Blockbuster's liquidity, net sales, capital resources, revenues, or income from continuing operations. Therefore, Plaintiffs have failed to allege that Blockbuster had a duty to disclose the Buena Vista dispute during the Class Period. Although the Court is dismissing without prejudice Plaintiffs' claims to the extent they are premised on the failure to disclose the Buena Vista dispute, this is an additional defect with respect to those claims of which Plaintiffs must take account when repleading, to determine if the claim can legitimately be asserted.

## VI. PSLRA PLEADING REQUIREMENTS

In order to state a claim under section 10(b) of the 1934 Act and Rule 10b–5, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *ABC Arbitrage,* 291 F.3d at 348. The PSLRA and Federal Rule of Civil Procedure 9(b) require a plaintiff to plead fraud with particularity. The Fifth Circuit describes this requirement as follows:

[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u–4(b)(1) & 78u–4(b)(3)(A):

(1) specify ... each statement alleged to have been misleading, *i.e.,* contended to be fraudulent;

(2) identify the speaker;

**\*12** (3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA. Additionally, under 15 U.S.C. § 78u–4(b)(1), for allegations made on information and belief, the plaintiff must:

(7) state with particularity all facts on which that belief is formed, *i.e.,* set forth a factual basis for such belief.

*ABC Arbitrage,* 291 F.3d at 350.

An allegation is "made on information and belief" when it is not based on a plaintiff's personal knowledge. *Id.* at 351. Since Plaintiffs' allegations are made "based upon the investigation of their counsel" rather than on Plaintiffs' personal knowledge, Plaintiffs must set forth a factual basis for their allegations. Defendants contend that Plaintiffs' Amended Complaint fails to satisfy the pleading requirements of the PSLRA. The Court will analyze each category of alleged fraud in turn to determine whether the PSLRA pleading requirements are satisfied.

A. Alleged fraudulent scheme relating to the destruction of VHS inventory

In Blockbuster's 2001 Form 10–K, Blockbuster announced that it had completed the implementation of the merchandising campaign as of December 31, 2001. Plaintiffs contend that, under the internal name of MOP, the

2004 WL 884308, Fed. Sec. L. Rep. P 92,806

merchandising campaign continued into 2002. Plaintiffs additionally contend that the financial statements for the first half of 2002 were inaccurate because they did not take into account the costs of the continuing merchandising campaign, that the improperly deferred costs were reflected in the financial statements for the second half of 2002 as merchandise sales costs, and that Blockbuster's proffered reason for the increase in merchandise sales costs, *i.e.,* "shrink," or theft, was false.

Plaintiffs have pled a sufficient factual basis for Plaintiffs' allegation that MOP continued in 2002. According to a former manager from California, MOP "began late in 2001 and was ongoing throughout 2002." Am. Compl. ¶ 32(1). According to a former Texas store manager, MOP started at the end of 2001 and continued into 2003. Am. Compl. ¶ 32(4). Another Texas store manager stated that MOP continued into the spring of 2002. Am. Compl. ¶ 101. A former Maryland store manager stated that he received e-mails throughout 2002, instructing him to destroy VHS tapes under MOP. Am. Compl. ¶ 32(5).

However, Plaintiffs have failed to plead a sufficient factual basis for the contention that MOP was the same merchandising campaign that the 2001 Form 10–K stated was completed as of December 31, 2001. The Amended Complaint states: "A former district manager in California stated that the program became known as 'the MOP [Merchandise Opportunity Program], began in late in 2001 and was ongoing throughout 2002.' " Am. Compl. ¶ 32(1). This oblique link between the campaign described in the 2001 Form 10–K and MOP is insufficient under the PSLRA.

 **\*13**  Plaintiffs have additionally failed to plead a sufficient factual basis for their allegations that the financial statements for the first half of 2002 were inaccurate because they did not take into account the costs of the continuing merchandising campaign, that the improperly deferred costs of the merchandising campaign were reflected in the financial statements for the second half of 2002 as merchandise sales costs, and that Blockbuster's proffered reason for the increase in merchandise sales costs was false.

Plaintiffs quote a former district manager from California as stating: "[Blockbuster] was doing a program where they basically cut half of the product in every store and (sic) selling it for no price at all. In order to do that, they hid product in a different line in the P & L." Am. Compl. ¶ 32(1). Plaintiffs also quote a former store manager who managed eight stores during his tenure with Blockbuster as stating that it "doesn't

make sense" that shrinkage would have increased in the fourth quarter of 2002. Am. Compl. ¶ 111. Another store manager stated that "shrinkage happened continually and that it was unlikely that Blockbuster would record a loss on shrinkage in any one quarter." Am. Compl. ¶ 111. A former Blockbuster district manager, whose district had the highest rate in the United States of shrinkage, stated that it did not make sense for shrinkage to spike in the fourth quarter of 2002 and that historically the fourth quarter was not the quarter reflecting the highest reported shrinkage. Am. Compl. ¶ 111.

Plaintiffs' pleading is insufficient because there are no facts alleged from which one could conclude that the employees quoted were privy to how or when the costs of MOP were accounted for on Blockbuster's financial statements or to the level of company-wide shrinkage in 2002. In a case where the confidential sources are not named and the other facts do not provide an adequate basis for believing that the alleged statements were false, the personal sources must be identified "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded." *ABC Arbitrage,* 291 F.3d at 353. Here, without further description of a district manager's job, it is not probable that a district manager would be privy to how the costs of MOP were reflected in Blockbuster's financial statements. It is similarly not probable that two store managers and one district manager would know the rates of company-wide shrink in the fourth quarter of 2002. Therefore, the Court dismisses without prejudice [2] Plaintiffs' claims premised on an alleged fraudulent scheme relating to the destruction of VHS inventory.

[2]   To the extent the Court dismisses Plaintiffs' claims for pleading defects, the dismissal is without prejudice. However, in so doing, the Court does not intend to suggest that Plaintiffs should re-urge the claims upon repleading. Plaintiffs shall determine whether it is possible to cure the identified pleading defects and shall only reassert those claims, if any, that can be pled in compliance with the PSLRA.

B. Alleged fraud relating to the competition posed by mass merchants of DVDs

Plaintiffs have failed to plead adequately that Defendants failed to disclose the competition posed by mass merchants of DVDs. Rather than hiding the competition posed by mass merchants, the statements quoted by Plaintiffs in the First Amended Complaint explicitly recognize that competition. Additionally, Plaintiffs have failed to adequately plead why

Defendants' statements related to this competition were misleading or fraudulent. The statements recognize the competition and highlight Blockbuster's plan for combating that competition. Blockbuster "was under no duty to cast its business in a pejorative, rather than a positive, light." *Rosenzweig,* 332 F.3d at 869. Therefore, Plaintiffs' claims of misrepresentations and omissions related to the following statements are dismissed without prejudice:

> **\*14** 16. "We think that the retail business will continue to grow and we think the rental business will continue to grow.... I think one would be mistaken to think that they're mutually exclusive. But when it gets right down to it, when you look at number of transactions, retail transactions are, you know, only a fraction of what rental transactions are, and that's because the vast majority of movies that are produced by Hollywood, most people only want to watch them once.... Do I really need to own this movie for, you know, what today is a $20 price point. I don't think that dynamic changes very much, even if the price point went to $12." Am. Compl. ¶ 54.

> 17. "It's important to note that there is no downside implications to Blockbuster increasing its share of the retail market. In the—in addition to the opportunity for incremental sales, we make the same gross margin dollars on a DVD sale as we do on a rental. So we are ambivalent as to how customers use us. Retail, rental, new, used, DVD, VHS." Am. Compl. ¶ 70(sic).

> 18. In response to a question about how Blockbuster plans to compete with their competitors who are selling DVDs making "a buck or nothing": "So our view is the best way to combat that, quite frankly, is to use a rental promotional currency. So at Blockbuster the price of that DVD might be $17.99 or $18.99 or $19.99. Couple that with a free rental offer. We think that converts to a great value for the consumer without necessarily lowering the profit dollars on the transaction. So we feel comfortable through managing the mix, through item price management, through using promotional currency, that we can manage the margin dollars effectively and still give the consumer a great value." Am. Compl. ¶ 71.

C. Alleged fraud relating to DVD rental margins
Plaintiffs allege that Defendants misrepresented that the gross profit margin on DVD rentals was 70% when it was actually lower, and that Defendants misrepresented that the gross profit margin on DVD rentals was 10 percentage points

higher than the gross profit margin on VHS rentals, when the gross profit margin on DVD rentals was actually only 3 or 4 percentage points higher. Plaintiffs identify the following statements as alleged misrepresentations:

> 19. In 2001, "[W]e undertook a number of key initiatives to strengthen our core business and drive growth in profitability, including re-merchandising our stores to expand our selection of higher margin DVDs and dedicating more of our sales area to high-growth new game formats and promising new business opportunities." Am. Compl. ¶ 53.

> 20. "Blockbuster now has three DVD revenue sharing agreements, which help the company to lower inventory costs, increase product depth and share risk. These agreements do not include an exclusive window, but do preserve the approximate 70% margin on DVD rentals." Am. Compl. ¶ 55.

> 21. "In addition, our merchandise gross margin declined due to an increase in DVD sales as a percentage of total merchandise sales, primarily due to the current competitive environment for retail DVD. These decreases were partially offset by an increase in our rental gross margin, primarily due to an increase in the percentage of rental revenues attributable to DVD rental product, which on average has a lower overall cost than other rental product." Am. Compl. ¶ 75.

> **\*15** 22. "We are maintaining our margins on DVD rentals in the high 60s, and we are increasing our copy depth, and we are not giving up our flexibility to market and sell previously viewed DVDs, which we also feel is very important to our business." Am. Compl. ¶ 80.

Statement 20 is from a February 12, 2002 report issued by Salomon Smith Barney. Plaintiffs have failed to plead sufficient facts to impute to Defendants the "70% gross profit margin" statement in the analyst's report. "[T]o hold a defendant liable for misleading statements published by a third party, the plaintiff must at least identify the defendant who provided the information that the third party made public to the market." *In re Capstead Mortg. Corp. Sec. Litig.,* 258 F.Supp.2d 533, 562 (N.D.Tex.2003) (Lindsay, J.). Additionally, the plaintiff must plead facts "demonstrating that Defendants exercised control over any of the analysts' comments." *In re Sec. Litig. BMC,* 183 F.Supp.2d at 893. Here, since the speaker is not identified and no facts are pled to show Defendants' control over the analyst's comments, the

Court dismisses without prejudice Plaintiffs' claims based on Statement 20.

Additionally, even if Statement 20 could be attributed to Defendants, Plaintiffs have failed to adequately plead that this statement was false or misleading when made. Plaintiffs allege that this statement was false when made because, in a February 12, 2003 press release, Blockbuster stated: "Rental margin declined to 66.6% in the fourth quarter of 2002 from 67.3% in the fourth quarter of 2001 as a result of the investment in incremental rental product in support of the expected higher rental revenues, which did not materialize." Am. Compl. ¶ 87. However, this press release discusses the combined rental margin for DVD and VHS, not the rental margin for DVD alone, while the alleged 70% statement refers to DVD rental margin alone. Therefore, this press release does not support an inference that Statement 20 was false when made.

Plaintiffs additionally allege that Defendants misrepresented that there was a 10 percentage point differential between DVD and VHS rental margins, when it was later disclosed to be only a 3 to 4 percentage point differential. Am. Compl. ¶ 36, 89. However, Plaintiffs do not allege any specific facts about who made this statement, when it was made, or to whom it was made. Since Plaintiffs have completely failed to plead the "who, what, when, where, how" details about this alleged statement, the Court dismisses without prejudice Plaintiffs' claims based on this alleged misrepresentation. [3]

[3]       In their Response, Plaintiffs attempt to cure this defect by citing the following excerpt from a February 12, 2002 article in the *Hollywood Reporter:*

> According to Zine, Blockbuster has margins of 70%-plus on DVDs by buying a DVD for $17 on average, renting it and then selling it for $12 on average. VHS sell-through margins are at 70% and VHS revenue sharing margins at 60%.

Even if Plaintiffs had included this statement in their Amended Complaint, Plaintiffs would have failed to sufficiently allege that this statement was false when made. Plaintiffs contend that the *Hollywood Reporter* statement was shown to be false by the February 12, 2003 conference call discussion of the 3 to 4 percentage point differential between DVD and VHS rental margins. The *Hollywood Reporter* statement

reports a 10 percentage point differential between the gross profit margins for DVD and VHS rental products that are acquired through sell-through pricing arrangements and the gross profit margins for VHS rental products that are acquired through revenue sharing arrangements. Therefore, the February 12, 2003 conference call statement discussing the differential between DVD rental margins and VHS rental margins, regardless of how the products were acquired, does not support an inference that the *Hollywood Reporter* statement was false when made.

Finally, Plaintiffs have failed to plead any facts to support the allegation that Statements 19, 21, or 22 were false or misleading when made. In fact, Plaintiffs' Amended Complaint supports the characterization of DVDs as "higher margin," the statement that DVD rental product "on average has a lower overall cost than other rental product," and the statement that the margins on DVD rentals were "in the high 60s." Therefore, the Court dismisses without prejudice Plaintiffs' Amended Complaint to the extent it is premised on alleged misrepresentations contained in Statements 19, 21, or 22.

D. Alleged fraud relating to problems with Blockbuster's technology

**\*16** Plaintiffs claim that Blockbuster misrepresented the capability of its inventory management and product distribution systems because its national point-of-sale (POS) system and distribution system were inadequate to support Blockbuster's business, and were in fact generating increased costs. Plaintiffs identify the following alleged misrepresentations:

23. The POS system allows Blockbuster "to determine on a store-by-store basis the number of copies of each newly released movie that is to be offered by each U.S. store." Am. Compl. ¶ 46.

24. The centralized distribution system allows Blockbuster "to process and distribute a greater quantity of products while reducing costs and improving services to our stores." Am. Compl. ¶ 46.

25. In response to a question about how Blockbuster will manage the purchase of a couple hundred video game titles to be released in the second half of 2002: "As far as number of titles to manage, we're not especially troubled by that. Let's face it, we manage thousands of titles every

In re Blockbuster Inc. Securities Litigation, Not Reported in F.Supp.2d (2004)

2004 WL 884308, Fed. Sec. L. Rep. P 92,806

year. So, it's really nothing new about that." Am. Compl. ¶ 71.

In an attempt to plead with particularity facts showing that the above statements were false or misleading when made, Plaintiffs quote one former district manager from California as stating: "[I]t was very frustrating as store manager to be out of DVD movies within two hours of a release and then spend the rest of the week giving out hundreds upon hundreds of coupons because of [Blockbuster's] in stock guarantee." Am. Compl. ¶ 48. This statement, of only one store manager, does not tie the out-of-stock problem to the POS or product distribution systems.

Second, Plaintiffs refer to a former district manager's statements about repricing and inventory during the "remerchandising" program: "The manager explained that to transfer a tape from a rental to a PVT takes some time since new bar codes (sic) labels have to be printed for and placed on each tape. Under MOP, [Blockbuster] used a different method because it would take 'forever' to manually generate new bar codes and update the selling price for hundreds of movies at a time.... When the tapes were transferred back into the stores, they were reflected in [Blockbuster's] system with the designation of 'MOP,' rather than being reflected in the computer with the original title of the movie ." Am. Compl. ¶ 48. These statements about how repricing and inventory were managed during the remerchandising program do not tend to show that Blockbuster's POS and product delivery systems were inadequate to support Blockbuster's business.

Third, Plaintiffs cite Blockbuster's 2002 Form 10–K, filed on March 27, 2003, which includes the following cautionary statements: "Any Failure or Inadequacy of Our Information Technology Infrastructure Could Harm Our Business.... [F]or approximately fifteen years, we have been adding applications to our existing point-of-sale, or POS, system in order to add features and functionality relevant to our business, and we have not yet determined how we will approach updates or upgrades to this system in the future. We may not be able to effectively upgrade and expand our systems, or add new systems, in a timely manner or to integrate smoothly any newly developed or purchased technologies with our existing systems. These difficulties could harm or limit our ability to improve our business." Am. Compl. ¶ 90. This statement does not support Plaintiffs' allegation that, during 2002, the POS and inventory management systems were inadequate or caused Blockbuster any problems.

**\*17** Because Plaintiffs have failed to adequately plead that the statements about POS and the inventory management system were false, the Court dismisses without prejudice Plaintiffs' claims based on Statements 23–25.

## VII. INFERENCE OF SCIENTER

The PSLRA also requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If this requirement is not met here, the Court must dismiss the Amended Complaint. 15 U.S.C. § 78u–4 ((b) (3)(A).

Misrepresentations and omissions are actionable if the plaintiff proves that the defendant acted with "severe recklessness." Nathenson, 267 F.3d at 408 ("It seems clear to us that the PSLRA has not generally altered the substantive scienter requirement for claims brought under section 10(b) and Rule 10b–5, and therefore severe recklessness, as defined in Broad, remains a basis for such liability."). Under Broad v. Rockwell, severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Broad v. Rockwell, 642 F.2d 929, 961 (5th Cir.1981). Defendants contend that Plaintiffs have failed to state with particularity facts giving rise to a strong inference that Defendants acted with "severe recklessness" of the falsity of the alleged misrepresentations and omissions.

Although allegations of motive and opportunity may meaningfully enhance the strength of an inference of scienter, allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the PSLRA. Goldstein v. MCI WorldCom, 340 F.3d 238, 246 (5th Cir.2003). The Fifth Circuit has distinguished those complaints alleging opportunity and unrealized motive from those alleging actual insider trading. See Rosenzweig, 332 F.3d at 867 ("We note additionally that there is no allegation that defendants sold their Azurix shares, calling into question the alleged motive to artificially inflate the stock price."); Abrams v. Baker Hughes Inc., 292 F.3d 424, 434 (5th Cir.2002) ("Absent an allegation that the defendants profited from the inflated stock

2004 WL 884308, Fed. Sec. L. Rep. P 92,806

value of the offerings, such allegations fail."). Therefore, although "allegations of insider trading are essentially a form of motive and opportunity allegations," they may be sufficient to support an inference of scienter when they are in suspicious amounts, at suspicious times, and out of line with prior trading practices. *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,* No. 02–10558, 2004 WL 626721, at *8 (5th Cir. Mar. 31, 2004) (citing *Abrams,* 292 F.3d at 435). Here, Plaintiffs have alleged motive, opportunity, and insider trading.

### 1. Motive

**\*18** Plaintiffs allege that the Individual Defendants were motivated to keep the stock price high so that they could sell their holdings at a profit. *E.g.,* Am Compl. ¶ 102 ("[D]efendants were motivated not to disclose that Blockbuster's strategic re-merchandising program was ongoing during 2002 so that they could forestall the Company's reporting of the adverse financial consequences associated with such program until after they sold millions of dollars of Blockbuster stock at artificially inflated prices.").

### 2. Opportunity

Plaintiffs allege that Defendants, as a result of their positions within the Company, must have known about the Buena Vista dispute, the ongoing merchandising program, the competition posed by mass merchants, the gross profit margins on DVD rentals, and the technology problems. Am. Compl. ¶ 16. Throughout the Class Period, John Antioco was Blockbuster's CEO and Chairman of the Board, Nigel Travis was Blockbuster's President, and Larry Zine was Blockbuster's Chief Financial Officer.

### 3. Insider trading

Prior to the Class Period, none of the Individual Defendants sold any shares of common stock. Am. Compl. ¶ 50. During the Class Period, Antioco, Zine, and Travis sold, respectively, 36%, 27%, and 31% [4] of their holdings. This percentage calculation takes into account vested stock options that were not exercised. During the Class Period, Antioco, Zine, and Travis sold, respectively, 69%, 100%, and 100% of their holdings of stock, excluding options. During the Class Period,

Antioco realized a profit of $6,725,739; Zine realized a profit of $955,525; and Travis realized a profit of $1,476,799.

[4] The Court notes that the last two rows of the chart on page 553 of Defendants' Appendix seem to incorrectly tally the running totals of options exercised during the Class Period, as the Court understands the facts. In each row, a total of 96,000 options had been exercised.

Defendants argue that any suspicious motive suggested by these figures is negated because the Individual Defendants retained a large percentage of their stock options, and it was contrary to their self-interests to inflate the price in the short term at the expense of the long term price. The Court agrees that, if the Individual Defendants had actually lost more money than they gained as a result of the alleged fraud, the aggregate loss might defeat an inference of scienter. In the current case, however, what the Individual Defendants retained were primarily options, not stock. Therefore, although the lower stock price after December 2002 decreased Defendants' potential profits from an exercise of their options, Defendants did not actually lose money because they did not have to pay for the options. Therefore, the Individual Defendants' retention of their vested stock options does not foreclose an inference of fraud. Plaintiffs have stated with particularity facts supporting the allegation that the Individual Defendants engaged in trading in suspicious amounts and out of line with prior trading practices.

### 4. Individualized Pleading

As recently clarified by the Fifth Circuit in *Southland Securities Corp. v. INSpire Insurance Solutions Inc.,* the "group pleading" doctrine conflicts with the scienter requirement of the PSLRA. *Southland,* 2004 WL 626721, at *6. Therefore, generalized pleading about motive, opportunity, and insider sales during the Class Period (even if in suspicious amounts and out of line with prior trading practices) are insufficient to adequately plead scienter. Rather, Plaintiffs must "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." *Id.* (quoting Judge Means's district court opinion). In order to enlighten each Individual Defendant as to his particular part in the alleged fraud, Plaintiffs must provide "specific factual allegations link[ing] the individual to the statement at issue." *Id.* "Such specific facts tying a corporate

officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Id.* Further, although statements issued on behalf of a corporation may be attributed to the corporation without specific factual allegations linking an individual to the statement, a "defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter." *Id.* at *7. Therefore, in analyzing whether Plaintiffs' allegations raise an inference of scienter with respect to the Individual Defendants and Blockbuster, the Court must analyze whether Plaintiffs have alleged a link between each Individual Defendant's alleged insider trading and his particular part in the alleged fraud. [5] In performing this analysis, guided by the Fifth Circuit's analysis in *Southland,* the Court will examine (1) the temporal proximity of the alleged misrepresentation or omission and the stock sale, [6] and (2) the price of the stock when it was sold by the insider. *See also Abrams,* 292 F.3d at 435 (finding that Plaintiffs' allegations of insider trading did not create an inference of scienter because sales were not alleged to be "at times calculated to maximize personal profit"); *Nathenson,* 267 F.3d at 420 (finding that Plaintiffs' allegations of insider trading did not raise an inference of scienter because sales were "unrelated to any Company announcements").

[5]     In order to plead an inference of scienter with respect to Blockbuster, Plaintiffs could attempt to impute to Blockbuster the scienter of officers, directors, or employees of Blockbuster who are not named as Individual Defendants in this action. *See Southland,* 2004 WL 626721, at *7 (noting that the plaintiffs had not alleged that "any individual INSpire director, officer, or employee *other than* the named individual defendants had acted with scienter in or respecting the making or issuing of any of the complained of statements" and concluding that, as a result, it was only necessary "to address the allegations claimed to adequately show such state of mind on the part of the individual defendants"). Here, Plaintiffs have alleged insider trading by numerous individuals who are not named as parties. However, Plaintiffs have failed to plead with sufficient particularity a connection between those individuals and any of the alleged misrepresentations or omissions.

Therefore, the Court need only analyze whether Plaintiffs have pled an inference of scienter with respect to the statements or omissions of the Individual Defendants. Upon re-pleading, if Plaintiffs intend to impute to Blockbuster the scienter of individuals who are not named as parties, Plaintiffs shall identify the specific statements or omissions with which each individual is connected and demonstrate how the individual's stock sales create an inference of scienter with respect to those specific statements or omissions.

[6]     Defendants argue that, when examining the temporal proximity of an alleged misrepresentation or omission and a stock sale, the Court should consider an alternative explanation for the timing of the sale of stock: "As with other companies, Blockbuster maintains a trading window prohibiting insider transactions prior to earnings announcements." As recognized by the Fifth Circuit in *Rubinstein,* when deciding a motion to dismiss, the Court should not consider evidence of alternative explanations for the timing of sales. *Rubinstein,* 20 F.3d at 170 n. 38 ("The defendants claim in their brief and at oral argument that these sales were innocuous because they were made in response to tax considerations. While this may well turn out to be true, at this stage of the litigation we only have the Plaintiffs (sic) complaint before us. Thus, it is impossible for us to consider this 'evidence' to ascertain whether this purported insider trading occurred at suspicious times or in suspicious amounts."). Therefore, the Court will not consider the Individual Defendants' alternative explanation for the timing of sales. Further, even if the Court were to take this alternative explanation into account, the Court notes that Antioco's sale of 100,000 shares in the week preceding the filing of Blockbuster's May 14, 2002 Form 10–Q and Zine's sale of 25,000 shares the day before the filing of Blockbuster's May 14, 2002 Form 10–Q tend to raise doubts about the proffered alterative explanation.

a. John Antioco

**\*19** Between April 26, 2002 and April 30, 2002, Antioco sold 141,840 shares, at share prices of $28.6973 and $28.5151. On April 24, 2002, Blockbuster issued a press release announcing its financial results for the first quarter

of 2002. Plaintiffs have not pled specific factual allegations linking that press release to Antioco, and therefore, Antioco's sale of stock shortly after its issuance does not raise an inference of scienter with respect to that press release. On April 24, 2002, Antioco participated in a conference call with analysts; on April 25, 2002, Antioco gave an interview to *Bloomberg Business News;* and, on April 28, 2002, *Video Store* published an article quoting Antioco. Therefore, Plaintiffs have pled temporal proximity between Antioco's stock sales and the statements or omissions contained in the aforementioned conference call, interview, and article. Further, in light of Plaintiffs' allegation that Antioco's fraudulent statements or omissions contained in the aforementioned conference call, interview, and article inflated the stock price until December 18, 2002, the Court notes the dramatic difference between the price of the stock when Antioco sold it, roughly $28.00 per share, and the $13.13 price at the close of the market on December 18, 2002. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when Antioco sold it, the Court finds that Plaintiffs' allegations create an inference that Antioco, and thus Blockbuster, acted with the requisite scienter when making the alleged misrepresentations and omissions in the April 24, 2002 conference call, April 25, 2002 interview, and April 28, 2002 article.

Between May 10, 2002 and May 17, 2002, Antioco sold 275,000 shares, at share prices between $28.55 and $29.648. On May 14, 2002, Blockbuster filed its Form 10–Q for the first quarter of 2002. Since Plaintiffs allege that the Form 10–Q contained fraudulent misrepresentations and omissions that artificially *inflated* the stock price, Antioco's stock sales *prior* to May 14, 2002 do not raise an inference of scienter with respect to the Form 10–Q. Antioco did not benefit from the alleged misrepresentations and omissions by selling his stock prior to their alleged effect on the stock price. Further, Plaintiffs have not pled specific factual allegations linking the form 10–Q to Antioco, [7] and therefore, Antioco's sale of stock shortly after its filing does not raise an inference of scienter with respect to the Form 10–Q.

[7]    The Court does not reach the issue of whether, if Plaintiffs had alleged a link between the Form 10–Q and Antioco as a result of Antioco's position as CEO and Chairman of the Board, such an allegation would be sufficient.

In summary, Plaintiffs' allegations create an inference of scienter with respect to Antioco's alleged misrepresentations and omissions in the April 24, 2002 conference call, April 25, 2002 interview, and April 28, 2002 article, and that inference of scienter is imputed to Blockbuster. However, with respect to all other misrepresentations or omissions, Plaintiffs' allegations fail to create an inference that Antioco acted with the requisite scienter.

b. Larry Zine

**\*20** On April 26, 2002, Zine sold 33,333 shares, at a share price of $28.6973. On April 24, 2002, Blockbuster issued a press release announcing its financial results for the first quarter of 2002. Plaintiffs have not pled specific factual allegations linking that press release to Zine, and therefore, Zine's sale of stock shortly after its issuance does not raise an inference of scienter with respect to that press release. On April 24, 2002, Zine participated in a conference call with analysts. Therefore, Plaintiffs have pled temporal proximity between Zine's stock sales and Zine's statements or omissions contained in the aforementioned conference call. Further, because Plaintiffs allege that the fraudulent statements or omissions contained in the aforementioned conference call inflated the stock price until December 18, 2002, the Court notes the dramatic difference between the price of the stock when sold, approximately $28.00 per share, and the price at the close of the market on December 18, 2002, $13.13 per share. Therefore, in light of the alleged motive, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when sold, the Court finds that Plaintiffs have alleged that, like Antioco, Zine (and thus Blockbuster) acted with the requisite scienter when making the alleged misrepresentations and omissions in the April 24, 2002 conference call.

On May 13, 2002, Zine sold 25,000 shares, at a share price of $28 .7781. On May 16, 2002 and May 17, 2002, Zine sold a total of 40,000 shares, for share prices of $29.6459 and $29.3576. On May 14, 2002, Blockbuster filed its Form 10–Q for the first quarter of 2002, signed by Zine. Since Plaintiffs allege that the Form 10–Q contained fraudulent misrepresentations and omissions that artificially *inflated* the stock price, Zine's stock sales *prior* to May 14, 2002 do not raise an inference of scienter with respect to the Form 10–Q. However, Zine's sales on May 16, 2002 and May 17, 2002 are temporally proximate to the filing of the Form 10–Q, which was signed by Zine. Further, because Plaintiffs allege that the fraudulent statements or omissions contained in the Form 10–

2004 WL 884308, Fed. Sec. L. Rep. P 92,806

Q inflated the stock price until December 18, 2002, the Court notes the substantial difference between the price of the stock when sold, approximately $29.00 per share, and the price at the close of the market on December 18, 2002, $13.13 per share. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when sold, the Court finds that Plaintiffs have alleged that Zine, and thus Blockbuster, acted with the requisite scienter when making the alleged misrepresentations and omissions in the Form 10–Q.

In summary, Plaintiffs have pled an inference of scienter with respect to Zine's alleged misrepresentations and omissions in the April 24, 2002 conference call and the May 14, 2002 Form 10–Q, and that inference of scienter is imputed to Blockbuster. However, with respect to all other misrepresentations or omissions, Plaintiffs' allegations fail to create an inference that Zine acted with the requisite scienter.

c. Nigel Travis

**\*21** On February 14, 2002, Travis sold 66,666 shares, at a share price of $21.5066. On February 12, 2002, Blockbuster issued a press release announcing its financial results for the 2001 calendar year, Antioco gave an interview to *Bloomberg Business News,* and Salomon Smith Barney issued a report rating Blockbuster's stock as "neutral." Plaintiffs have not pled specific factual allegations linking the press release, interview, or report to Travis, and therefore, Travis's sale of stock shortly thereafter does not raise an inference of scienter with respect to the press release, interview, or report. On July 29, 2002, Travis sold 40,000 shares, at a share price of $24.0439. On July 24, 2002, Blockbuster issued a press release announcing its financial results for the second quarter of 2002, and Antioco and Zine participated in a conference call. Plaintiffs have not pled specific factual allegations linking the press release or conference call to Travis, and therefore, Travis's sale of stock shortly thereafter does not raise an inference of scienter with respect to the press release or conference call. Plaintiffs' allegations fail to create an inference that Travis acted with the requisite scienter.

VIII. SECTION 20(A) CLAIMS

Section 20(a) of the Securities Exchange Act provides in pertinent part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter

or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable...." 15 U.S.C. § 78t. There can be no liability under section 20(a) without a finding that a provision of the Securities Exchange Act has been violated. Therefore, to the extent Plaintiffs' section 20(a) claim is premised on Plaintiffs' claims related to Statements 1–15, Plaintiffs' section 20(a) claim is dismissed with prejudice. To the extent Plaintiffs' section 20(a) claim is premised on Plaintiffs' claims related to other alleged misrepresentations and omissions, Plaintiffs' section 20(a) claim is dismissed without prejudice.

IX. LEAVE TO AMEND

The Court dismisses with prejudice Plaintiffs' claims premised on Statements 1–10 because they are protected by the PSLRA safe harbor for forward-looking statements, and Plaintiffs' claims premised on Statements 11–15 because they are immaterial as a matter of law.

The remainder of Plaintiffs' claims are dismissed because they are inadequately pled. In Plaintiffs' Response to Defendants' Motion to Dismiss, Plaintiffs do not seek leave to amend Plaintiffs' Amended Complaint in the event that the Court finds Plaintiffs' pleading to be inadequate, and Defendants thus urge the Court to dismiss Plaintiffs' Amended Complaint without leave to amend. However, the Court finds that justice would be better served if Plaintiffs were afforded the opportunity to amend their complaint to comply with the PSLRA. Therefore, the Court dismisses Plaintiffs' remaining claims without prejudice and with leave to amend.

**\*22** The Court warns Plaintiffs that the Court is unlikely to grant Plaintiffs further opportunity to amend. The Court suggests that Plaintiffs consider how their Second Amended Consolidated Complaint could be better drafted than their Amended Complaint. Judge Lindsay's description of the plaintiffs' complaint in *Schiller* is equally apt here: Plaintiffs' Amended Complaint "represents a labyrinth, requiring the court to piece together the elements of the claims from allegations made all over the complaint." *Schiller v. Physicians Res. Group,* No. 2:97–CV–3158–L, 2002 WL 318441, at \*5 (N.D.Tex. Feb. 26, 2002) (Lindsay, J.).

If they wish to do so, Plaintiffs shall file a Second Amended Consolidated Complaint on or before May 21, 2004. Defendants shall answer or otherwise respond by June

In re Blockbuster Inc. Securities Litigation, Not Reported in F.Supp.2d (2004)

2004 WL 884308, Fed. Sec. L. Rep. P 92,806

18, 2004. If Defendants file a Motion to Dismiss Plaintiffs' Second Amended Consolidated Complaint, Plaintiffs shall respond within 25 days after the motion is filed, and Defendants shall reply within 15 days after the response is filed. The Court is extremely unlikely to grant any motions, agreed or otherwise, to extend these deadlines.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 884308, Fed. Sec. L. Rep. P 92,806

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 10

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 156 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Ramirez v. Exxon Mobil Corporation,   N.D.Tex.,
August 14, 2018

2016 WL 3090779
United States District Court, S.D. Texas, Houston Division.

IN RE: BP P.L.C. SECURITIES LITIGATION.

This Document Relates To:

In re: BP p.l.c. Securities Litigation
(Federal Securities Class Action).

MDL NO. 4:10-MD-2185
|
Signed 05/31/2016

**MEMORANDUM AND ORDER**

KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE

**\*1**  The Deepwater Horizon, an off-shore drilling rig leased by BP, exploded around 10:00 p.m. on Tuesday, April 20th, 2010, resulting in the deaths of eleven workers and a catastrophic oil spill.[1]  In the days and weeks following the explosion, scientists at BP, several independent contractors, and the National Oceanic and Atmospheric Association ("NOAA")[2] employed methodologies to estimate the rate at which oil was leaking into the Gulf of Mexico. Plaintiffs argue that BP publicly misrepresented the range of its internal flow-rate estimates on four different occasions, causing the market to conclude that the oil spill would be relatively small, when in fact BP's internal estimates suggested that the flow rate (and, by extension, the ultimate size of the spill) was far more severe than BP publicly represented. Plaintiffs bring their claims under Sections 10(b) and 20(a) of the Securities Exchange Act.

[1]     (Doc. Nos. 927, 928 ("Third Consolidated Amended Class Action Complaint" or "TAC"), at ¶ 263; Doc. No. 996 ("Answer"), at ¶ 263.)

[2]     The NOAA is an agency of the U.S. federal government. *About our agency*, NOAA, http://www.noaa.gov/about-our-agency. Its stated mission is "[t]o understand and predict changes in climate, weather, oceans, and coasts, to share that knowledge and information with others, and

to conserve and manage coastal and marine ecosystems and resources." *Id.*

Defendants have moved for summary judgment, seeking to dismiss Plaintiffs' case in its entirety.[3]  Plaintiffs have filed a motion for partial summary judgment, seeking judgment as a matter of law with respect to the elements of falsity and scienter. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment, and **DENIES** Plaintiffs' motion for summary judgment in its entirety.

[3]     Also pending are Defendants' motions to exclude the testimony of Chad Coffman and Gregg Perkin. The Court will take up those motions in a separate memorandum and order at a later date.

**I. FACTUAL BACKGROUND**[4]

[4]     The facts contained herein are undisputed, unless otherwise noted.

**A. Overview of Flow Rate Estimation Methodologies**

BP employed three different types of techniques to measure the flow rate of the leak: (1) hydraulic modeling; (2) surface expression estimation; and (3) velocimetry.

**(1) Hydraulic Modeling**

For the purposes of this case, "hydraulic modeling" refers to "the use of mathematical...techniques to simulate the behavior of fluids in systems and to make projections about those systems."[5]  Simplistically, "a user of a hydraulic model can typically specify two of three basic hydraulic variables in order to solve for the remaining, third variable. Those three basic hydraulic variables are (i) inlet pressure, (ii) outlet pressure, and (iii) flow rate through the system."[6] In this case, the "system" to be modeled was the reservoir through the wellbore and blow-out preventer ("BOP") to the subsurface.

[5]     (Def. Ex. 25 ("Ballard Rep."), at 3.)

[6]     (Ballard Rep. at 4.)

**\*2**  There are many software programs which perform hydraulic modeling, including: Prosper, GAP, PIPESIM, OLGA-ABC, and OLGA-WellKill.[7]  The quality of the

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 157 of 573

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

estimates produced by these programs, however, depends on how accurately the physical properties of the modeled system are defined. [8] Here, while some physical properties of the system were known as a result of the drilling process, [9] others were not. [10] The sinking of the rig and wrenching of the riser altered the well's geometry, [11] and it was unclear exactly what breaches had occurred and what restrictions were present to impede flow. [12] As a result, it was impossible to define the system with absolute certainty.

[7]    (Def. Ex. 26 ("Perkin Rep."), at 20.)

[8]    (Ballard Rep. at 4-7.)

[9]    As operator, BP had access to proprietary data relating to the reservoir, fluid properties, and the infrastructure of the well. (Pl. Ex. 6, at 52; Pl. Ex. 36, at 83; Pl. Ex. 42, at 144-47; Def. Ex. 15, at 14-15; Perkin Rep. at 20.)

[10]   In addition to the unknown flow path and restrictions, system unknowns included the amount of exposed reservoir; the "skin factor;" and the well's Productivity Index ("PI"). (Pl. Ex. 42, at 153, 376; Perkin Rep. at 20.)

[11]   (*See* Perkin Rep. at 20.)

[12]   (Ballard Rep. at 8-9; Perkin Rep. at 20; Pl. Ex. 36, at 84-85.)

Despite these unknowns, multiple individuals employed by BP (or contracted to BP) utilized hydraulic modeling in the post-explosion time period. In fact, of the three types of work product concerning flow rate produced in this time period, hydraulic modeling was the most extensively deployed and appears to have been the work product that BP and its contractors relied upon for substantive source control decisions. [13]

[13]   (*See* Pl. Ex. 18 (Barnett Dep.) at 63:15 – 64:5.)

### (2) Surface Estimates

Surface estimation involves estimating the volume of oil contained within a slick based upon surface area and assumed thickness. This technique is also called "mass balance" or "surface expression." Roughly, field observers conduct aerial overflights of the slick in order to map its size and variations

in its coloring. [14] Once the slick and its color gradations are mapped, the total surface area of each color variant is multiplied by an assumed thickness (in microns) for that variant. [15] Combining the volumes of each color variant together provides an estimate of the total volume of oil contained within the slick. [16]

[14]   (Def. Ex. 24 ("Potter Rep.") at 3; *see also* Pl. Ex. 46 (applying this methodology).)

[15]   (Potter Rep. 3; *see also* Pl. Ex. 46.)

[16]   (Potter Rep. 3; *see also* Pl. Ex. 46.)

There are multiple surface estimation methodologies, including ASTM, the Bonn Agreement, and Metcalf & Eddy. [17] The primary differences among these methodologies are (1) the number and description of color gradations within the slick and (2) the thicknesses assigned to the respective color gradations. [18]

[17]   (Potter Rep. 3.)

[18]   (*See* Potter Rep. 3-5.)

Surface estimation is typically used to determine the amount of oil contained within a slick: *i.e.*, what is sitting on the water. [19] But it can also be used to calculate the rate at which oil is being released on an ongoing basis. [20] In order to accomplish an ongoing rate calculation, the volume of oil contained within the slick is combined with the volume of oil assumed to be lost through dispersion and evaporation. [21] This total amount is then divided by the number of days that oil has been released to arrive at a daily flow rate.

[19]   (Pl. Ex. 42, at 60.)

[20]   Plaintiffs have submitted "expert" testimony from Gregg Perkin to the effect that surface estimation techniques were inapplicable to, and scientifically unreliable in, the case of a deepwater blowout. (Perkin Rep. at 53-55.) Defendants argue, convincingly, that Perkin is not qualified to offer this testimony.

[21]   (Def. Ex. 24 ("Potter Rep."), at 2-3.)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 158 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

### (3) Particle Image Velocimetry

**\*3** Particle Image Velocimetry—or simply velocimetry—involves visual observation of the underwater plume. The plume's velocity can be estimated by visually tracking a particle within the plume over time. [22] Combined with the size of the hole and an assumption of the gas-to-oil ratio, velocimetry returned a rough estimate of the flow of oil from the well.

[22]    (Pl. Ex. 39, at 251.)

### B. April 20 to April 23: The Explosion and its Aftermath

After the Deepwater Horizon exploded on the night of Tuesday, April 20th, [23] the rig burned for approximately 36 hours before sinking at 10:20 a.m. on Thursday, April 22nd. [24] When the rig sank, it wrenched and twisted the pipe attaching the rig to the wellhead (the "riser"). [25] The riser came to rest on the seafloor. Initially, no ongoing releases of hydrocarbons were detected from the riser or the blowout preventer ("BOP"). Remote-operated vehicles ("ROVs") first detected two leak points in the riser around 6 p.m. on Friday, April 23rd. [26] A third leak was detected on Wednesday, April 28th. [27]

[23]    (TAC at ¶ 263; Answer at ¶ 263.)

[24]    (Def. Ex. 64.)

[25]    (Def. Ex. 64.)

[26]    (Def. Ex. 64.)

[27]    (Pl. Ex. 3, at 2, 5.)

In the meantime, an organization known as the Unified Area Command ("UAC" or "Unified Command") was established to organize and manage any spill response. [28] The UAC included representatives from the federal government and affected state governments— particularly, the U.S. Coast Guard; the NOAA; and the Department of the Interior's Minerals Management Service ("MMS")—and from the private sector—particularly, BP. [29] Defendant Doug Suttles [30] served as BP's representative on the UAC. [31] The head of the UAC was the Federal On-Scene Coordinator

("FOSC"). [32] In the time period at issue, the FOSC was Rear Admiral Mary Landry of the U.S. Coast Guard. [33]

[28]    (TAC at ¶ 45.)

[29]    (Pl. Ex. 85, at 17-19.)

[30]    At that time, Suttles was Chief Operating Officer of BP's Exploration and Production business segment. (TAC at ¶ 45; Answer at ¶ 45.) When questioned at his May 19, 2011 deposition in MDL 2179, he could not identify the exact BP corporate entity which employed him. (Pl. Ex. 14, at 548-51.)

[31]    (Pl. Ex. 1, at 29-31.)

[32]    (Pl. Ex. 85, at 18; Def. Ex. 10, at 64.)

[33]    (Pl. Ex. 85, at 14.)

Up to this point, BP's flow rate estimates were limited—the leak was not even discovered until the evening of April 23rd. According to BP, their surface expression work resulted in estimates in the hundreds of barrels, and engineers at BP had begun employing hydraulic modeling to determine ranges of possible flow rates on the assumption that the well was leaking. [34]

[34]    (*See* Doc. No. 1128 ("Pl. Opp.") at Appendix A.)

### C. April 24th: Suttles's First Alleged Misrepresentation

On April 24, 2010, Suttles participated in a UAC press conference. He prepared two pages of remarks. [35] These scripted remarks—along with a typed summary of the press conference prepared by BP's Daren Beaudo [36] —are the only evidence of what Suttles said at the press conference; according to the Associated Press, responding to a non-party subpoena, no transcript or audio or video recording exists of the April 24th press conference. [37] Suttles, when shown the prepared remarks at his deposition, testified that they "look[ ] like my prepared remarks for the [April 24, 2010] press conference," but he could not remember if he delivered the remarks verbatim. [38]

[35]    (Pl. Ex. 2.)

[36]    (Def. Ex. 110.)

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 159 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

37

    (Doc. No. 1082 ("MSJ"), at 14 n.8.)

38

    (Pl. Ex. 1 (Suttles Dep.) at 91:9-92:8, 107:2-15.)

**\*4** In the prepared remarks, Suttles spoke in the collective "we." He claims that he was speaking on behalf of the Unified Command, [39] but his remarks can also be read—more fairly, in the Court's estimation—to refer to the BP Group rather than the combined UAC. [40] Speaking in this manner, he acknowledged the detection of leaks from the damaged riser:

> [W]e have located the Transocean Deepwater Horizon drilling rig. It lies on the seabed approximately 1300 feet northwest of the well site in 5,000 feet of water. The rig is intact and secure. We have also located the drilling riser, which connected the drilling rig to the blowout preventer.

> In addition, we have detected ongoing releases of oil from the well, emanating from the end of the riser and a section of drill pipe, at a rate of approximately 1,000 barrels per day at the seabed. [41]

39

    (Pl. Ex. 1 (Suttles Dep.) at 108:2-5.)

40

    (*E.g.,* Pl. Ex. 2, at 2 ("Working with Transocean – the owner and operator of the drilling rig – the MMS, and the Coast Guard, we are committed to finding the cause of this incident."); *id.* at 3 ("Our current efforts – in cooperation with Transocean, the MMS, and the Coast Guard – are focused on developing and implementing the most effective way to stop the flow of oil.").) At the very least, this issue is a dispute of fact appropriately resolved at trial.

41

    (Pl. Ex. 2, at 2-3.)

### D. April 25 to April 27th

BP continued its surface expression estimates, and the estimates began to increase during this period of time. David Rainey, Suttles's deputy incident commander, was tasked with "playing point" on flow rate, [42] and he began researching and experimenting with surface estimation methodologies on April 26th. Employing a variation of the ASTM method, on April 27th, Rainey produced estimates of 1,063 (low), 5,758 (best), and 14,266 bpd (high). [43] Employing the Bonn method, Rainey produced estimates of 2,784 (low), 17,328 (best), and 92,028 bpd (high). [44] There is evidence that he shared these figures with Suttles. [45]

42

    (Pl. Ex. 1, at 58:1-11.)

43

    (Pl. Ex. 19; Def. Ex. 39.). Defendants state that, "[t]he next day, Rainey's methodology estimated flow rates...with a best guess of 5,092." (Doc. No. 1123 ("Def. Opp.") at 10-11.) But there is no indication that Rainey presented these estimates to Suttles before he (Suttles) made his statement on the 29th. To the contrary, based on the evidence that Defendants have cited, it looks like Rainey himself did not receive the estimates until the afternoon of April 29th. (*See* Def. Ex. 40.)

44

    (Pl. Ex. 19; Def. Ex. 39.)

45

    (Pl. Ex. 48 (Rainey Dep.) at 149:12-150:4.)

BP employees and contractors also began hydraulic modeling work. While they acknowledged that there were too many unknowns to produce an estimate of the actual flow rate, they used the models to create ranges of potential flow rates based on varying assumptions/inputs. [46] The lower end of the assumptions were generally producing estimates in the range of 5,800 to 25,000 bpd, with more extreme assumptions producing estimates that ranged much higher. [47]

46

    (*See* Pl. Opp. at Appendix A (citing Estimates F to M).)

47

    (*See, e.g.*, Pl. Ex 22; Def. Ex. 58; Pl. Ex. 20; Def. Ex. 59)

### E. April 28th: Suttles's Second Alleged Misrepresentation

The UAC held another press conference on April 28, 2010. Admiral Landry spoke first. She told the press that BP had located an "additional breach in the riser." [48] She then stated: "[W]hile BP believes and we believed and established a thousand barrel per day estimate of what is leaking from the well, NOAA experts believe the outlook...can be as much as 5,000 barrels." [49] Suttles then spoke and confirmed that a new leak point had been discovered late that afternoon (April 28th). He then stated: "This leak is just beyond the top of the blowout preventer in the pipework called the riser. Given the location, we do not believe this changes the amount currently estimated to be released." [50] He did not expressly state what that estimate was. Specifically, he neither reiterated the 1,000 barrels per day estimate from April 24th, nor did

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 160 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

he reinforce the 5,000 barrel per day number suggested by Admiral Landry.

48    (Pl. Ex. 3, at 2:3-5.)

49    (Pl. Ex. 3, at 2.)

50    (Pl. Ex. 3, at 3.)

**\*5** Reporters picked up on this ambiguity. One asked: "Admiral, you said that the oil in NOAA's estimation is increasing by a factor of five, yet BP says it's not increasing at all. Which one is it?" Admiral Landry responded by emphasizing that the number was just an estimate. She stated that UAC—working with NOAA, BP, and MMS— initially agreed that estimate was 1,000 barrels per day. [51] "[H]owever, NOAA is telling me that now they prefer we use 5,000 barrels a day as an estimate for what has actually leaked from this well and will continue to leak until we – until BP secures the course." [52]

51    (Pl. Ex. 3, at 3.)

52    (Id.)

Another reporter immediately asked Suttles for his comment, while a third suggested that Admiral Landry hadn't answered the question: "You [i.e., Suttles] say it's a thousand and that doesn't change, and you [i.e., Admiral Landry] say it's 5,000, so..." [53] Suttles then stated:

No, actually I don't think the Admiral and I have actually said different things. I think what the Admiral stated is that when we had the initial data, it's highly uncertain, as I described there's no way to put a meter on this flow rate; so the only thing we can do is make very basic estimates at the subsurface, monitor it, and actually then start to see what we see on the surface. And that's what we're doing, but that range is actually quite wide [in terms of what] the outcome could be.

What I can tell you for certain is what we're observing at the seabed is the same as what we were observing when we first reported the two locations. The only difference is this new leak point, but I do not disagree with the Admiral's estimate that it could be 5,000 barrels a day. It's clearly within the range of uncertainty. And actually the only thing we know for certain is what we see on the surface. And of course that's what we're trying to pick up.

So I actually don't think we're saying something different. It's all about the uncertainty and inability to precisely measure this. [54]

53    (Pl. Ex. 3, at 4.)

54    (Pl. Ex. 3, at 5.)

### F. April 29th: Suttles's Third Alleged Misrepresentation

Suttles appeared on television's The Early Show the following morning around 7:00 a.m. EST. [55] The show began its coverage by stating that "Coast Guard officials" had disclosed a third point of leak and had updated their estimate of the oil flow from 1,000 barrels per day to 5,000 barrels per day. [56] The Early Show reporter, Maggie Rodriguez, immediately questioned Suttles about the discrepancy between the Coast Guard's revised estimate and his insistence that the third point of leak did not change the amount of oil coming out of the riser: "This morning, we're learning that the leak from this week is five times worse than originally estimated. Yet, we just heard you say in our report that you don't believe this will change the amount that's estimated to be released in to the ocean. I'm not an expert. But how is it possible that four thousand additional [barrels] leaking a day does not change the equation?" [57] Suttles gave the following lengthy response:

I should probably explain that on the – the difference between one and five thousand barrels a day and – and what we tried to explain is that, what we're seeing through the remote-operated vehicle cameras on the sea floor hasn't actually changed. So, physically those images are the same. And that of course is horribly difficult to estimate what the flow is. But what we can see is the amount of oil on top of the water. And based on the fact of what we're seeing on the surface, that's actually we can almost measure. We can take those aerial views. We think the range has increased of what the estimate has been. So, I think that somewhere

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 161 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

between one and five thousand barrels a day is probably the best estimate we have today. [58]

55   (Pl. Ex. 4, at 1.)

56   (Pl. Ex. 4, at 3.)

57   (Pl. Ex. 4, at 4.)

58   (Pl. Ex. 4, at 4.) Suttles sat for all three major morning television shows on April 29th. In his interviews with The Today Show and Good Morning America, he made similar statements which suggested that the "best" or "reasonable" or "range" of estimates was between 1,000-5,000 barrels per day. (Def. Ex. 77.)

**G. April 30 to May 5th**

**\*6**  It appears that there were relatively few developments during this period of time. Surface expression estimates had largely stopped due to inclement weather and other logistical difficulties. A few hydraulic modeling estimates were created, and they were largely in line with the estimates that had been produced in the prior days.

**H. May 5th: Hayward's Alleged Misstatement**

Anthony Hayward spoke with a Houston Chronicle reporter at BP's Houston offices on or shortly before May 5, 2010. One day earlier, an unnamed BP executive—David Rainey—had told U.S. lawmakers in a closed-door briefing that the damaged well could be spewing up to 60,000 barrels per day, 12 times the official 5,000 per day estimate. Dr. Hayward called this higher estimate "deeply theoretical" based on "an absolute worst-case scenario" of a totally unobstructed well. [59]  He acknowledged that the exact flow rate was unknown, and that "a guesstimate is a guesstimate." He then stated: "[T]he guesstimate remains 5,000 barrels a day." [60]

59   (Pl. Ex. 5, at 2.)

60   (Pl. Ex. 5, at 3.)

**II. <u>APPLICABLE LEGAL STANDARDS</u>**

**A. Standard for Resolving Motions for Summary Judgment**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact, and that it is entitled to judgment as a matter of law. [61] Rule 56(c) requires "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." [62]  The party moving for summary judgment bears the initial burden of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact. [63]  If the party moving for summary judgment meets this initial burden, Rule 56(c) requires the non-movant to go beyond the pleadings and show that specific facts exist over which there is a genuine issue for trial. [64]  The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports his or her claim. [65]  Factual controversies are to be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." [66]  The court should not, in the absence of proof, assume that the non-movant could or would prove the necessary facts. [67]

61   Fed. R. Civ. P. 56(c).

62   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

63   *Id.* at 323.

64   *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

65   *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

66   *Little*, 37 F.3d at 1075.

67   *Id.*

**B. Elements of Plaintiffs' Claims**

Plaintiffs assert claims under §§ 10(b) and 20(a) of the Securities Exchange Act. Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." [68]  The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 162 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." [69] To prevail on a claim under § 10(b) of the Exchange Act, a plaintiff must prove the following elements:

**\*7** (1) a material misrepresentation or omission by the defendant (*i.e.*, falsity);

(2) scienter;

(3) a connection between the misrepresentation or omission and the purchase or sale of a security;

(4) reliance upon the misrepresentation or omission;

(5) economic loss; and

(6) loss causation. [70]

[68]    15 U.S.C. § 78j(b).

[69]    17 C.F.R. § 240.10b-5.

[70]    *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011).

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." [71] If a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, then the § 20(a) claims must be dismissed.

[71]    *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

## III. FALSITY AND SCIENTER

Plaintiffs contend that Suttles misrepresented the range of BP's internal flow rate estimates in his public statements on April 24th, April 28th, and April 29th, and that Hayward did the same in his statements to the Houston Chronicle on May 5th. [72] Broadly, Plaintiffs allege that the two executives represented that BP's best flow rate estimates ranged from 1,000 bpd to 5,000 bpd, when in fact many of BP's internal estimates indicated that the flow rate could be as great as 100,000 bpd. And not only do Plaintiffs believe that they have presented sufficient evidence to defeat Defendants' motion

for summary judgment, Plaintiffs aver that the evidence is sufficient to warrant judgment in *their* favor as a matter of law on the issues of falsity and scienter.

[72]    (Doc. No. 1085 ("MPSJ") at 2.)

Defendants generally respond in two ways. First, they say, Plaintiffs have failed to present evidence that BP produced any internal flow rate estimates that rendered the representations false or misleading as of the time the statements were made. Instead, Plaintiffs point only to "worst case discharge" [73] estimates and other hydraulic modeling calculations that were not intended to calculate the actual flow rate. Second, even if Plaintiffs have presented evidence of contradictory flow rate estimates, Defendants' substantial evidence of Suttles's and Hayward's good faith negates any inference of scienter.

[73]    A worst case discharge calculation is "based upon the counterfactual assumption of unrestricted flow at the mudline." (Ballard Rep. at 10-11.)

The Court holds that neither party is entitled to judgment as a matter of law with respect to Suttles's alleged misrepresentations on April 24th, April 28th, or April 29th. The Court need not reach the issues of falsity or scienter with respect to Hayward's alleged misrepresentation because, for the reasons discussed in Section IV, *infra*, Plaintiffs have failed to establish loss causation for any of the stock drops that followed Hayward's statement.

### A. Falsity and Scienter Post–*Omnicare*

The parties' first two rounds of summary judgment briefing featured lengthy debates regarding the appropriate legal standard for evaluating the falsity of Suttles's alleged misrepresentations. Defendants argued that Suttles's statements were expressions of opinions, and statements of opinion are actionable only if the speaker did not in fact hold that opinion. [74] Plaintiffs, on the other hand, contended that Suttles's representations were statements of fact because the "truth or falsity of modeled flow rates is objectively determinable." [75] Statements of fact are subject to a less demanding legal standard. [76]

[74]    (Def. Opp. at 28.)

[75]    (Pl. Opp. at 22.)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 163 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

---

76    *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 251 (S.D.N.Y. 2015)

**\*8** Fortunately, the Supreme Court addressed a remarkably similar issue in *Omnicare v. Laborers Dist. Council Const. Industry Pension Fund*, 77 and both parties were able to use their reply briefing to apply *Omnicare* to the case at bar. The Court first turns to whether, in light of *Omnicare*, Suttles's representations should be deemed statements of facts or opinions. Because the representations were statements of opinion, the Court then discusses the legal standard that governs the elements of falsity and scienter post-*Omnicare*.

77    135 S. Ct. 1318 (2015).

### (1) Statements of Opinion versus Statements of Fact

*Omnicare* begins with a discussion of the standard for determining whether a statement is one of fact or opinion—an issue that vexed the parties in this case considerably. A fact is "a thing done or existing" or "[a]n actual happening." 78 An opinion, on the other hand, is "a belief[,] a view, [or a] sentiment which the mind forms of persons or things." 79 But "most important," the Court continues, is that "a statement of fact...expresses certainty about a thing, whereas a statement of opinion...does not." 80

78    *Omnicare*, 135 S. Ct. at 1325.

79    *Id.*

80    *Id.*

Defendants argue that each of Suttles's statements were expressions of opinion. With respect to Suttles's statements on April 28th and 29th, their arguments are particularly compelling. Estimates and projections are classic examples of opinions, 81 especially when cloaked in the context of language such as "I believe (or I think)." 82 Moreover, on the 28th and 29th, not only was Suttles expressly relaying estimates of flow rate, he made clear that he was expressing his opinion as to which of those estimates was "best," adding yet another layer of subjectivity and judgment. 83 And his statement on April 24th, while unadorned with such express language of uncertainty or personal judgment, would similarly have been understood by reasonable investors as

a statement of BP's "best" estimate—Plaintiffs themselves concede as much. 84

81    *Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1052 (5th Cir. 1992) ("An estimate is defined as 'an opinion or judgment of the nature, character, or quality of a person or thing[;]...a rough or approximate calculation.") (citing Websters New Collegiate Dictionary 426 (9th ed. 1989)).

82    *Omnicare*, 135 S. Ct. at 1326 (holding that this language can "transform[ ] [a] factual statement into one of opinion").

83    *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 2011 WL 1336473, at \*2 (D.N.M. Mar. 31, 2011) (A determination as to which estimate or piece of information is "best" is a matter of judgment or opinion); *Omnicare*, 135 S. Ct. at 1329 ("opinions sometimes rest on a weighing of competing facts").

84    (Pl. Opp. at 23 (Suttles's April 24th statement merely "purported to describe BP's then-current supposedly-***best*** information available").) Suttles's statement could potentially be construed as representing that, as a matter of fact, BP had measured the flow rate at 1,000 bpd— his statement was declarative and definitive in nature, and made no reference to other estimates. But the more reasonable interpretation, as Plaintiffs seem to concede, is that BP had multiple estimates and ostensibly chose the best one. The declarative and definitive nature of his statement is relevant to whether his opinion was misleading, however.

Plaintiffs contend Suttles's representations are nevertheless statements of fact because "the truth or falsity of [his statements] can be measured objectively against the flow rate information [that was] actually available to Defendants." 85 But that characteristic is not the exclusive province of factual statements. Take, for example, the statement that "the 2008 Texas Longhorn football team was better than the 2008 Oklahoma Sooner football team." This statement can be evaluated against objective evidence—as a matter of fact, 86 the Longhorns beat the Sooners 45-35 at the Cotton Bowl on October 11, 2008—but few would dispute that the statement is a paradigmatic example of an opinion, however well founded. 87

---

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

85      (Pl. Opp. at 23.)

86      *See Omnicare*, 135 S. Ct. at 1325 (a fact is "a thing done" or "an actual happening").

87      It seems that Plaintiffs are under the impression that Suttles's representations were statements of fact because so many underlying facts cut against it. (*See* Pl. Opp. at 23-24.) But the lack of supporting facts is relevant only to whether his statement (be it of fact or opinion) was false or misleading, not to whether the statement itself was one of fact or opinion.

**\*9** Plaintiffs also claim that this Court has already held a very similar statement made by Lamar McKay to be one of fact, and argue that the Court should follow suit here. [88] But this argument is based on a flawed premise; the Court did not necessarily hold that McKay's statement was one of fact. Instead, the Court expressed uncertainty as to how Defendants were attempting to characterize McKay's statement, and concluded that the statement was actionable regardless of whether it was one of fact or opinion. [89]

88      (Doc. No. 1147 ("Pl. Reply") at 6 (citing *In re BP P.L.C. Sec. Litig.*, 2013 WL 6383968, at \*31 (S.D. Tex. Dec. 5, 2013).)

89      *See id.* (noting that "Defendants may be attempting to argue that McKay testified as to his opinion" and analyzing his statement accordingly).

### (2) Misleading Statements of Opinion under *Omnicare*

With Suttles's representations properly identified as statements of opinion, the question becomes what a plaintiff must prove to satisfy the falsity element of securities fraud claims. *Omnicare* addresses this question at length, outlining two potential avenues for plaintiffs to establish the falsity of an opinion. [90]

90      *Omnicare*, 135 S. Ct. at 1327-1323. *See also In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 251-55 (S.D.N.Y. 2015) (providing an outstanding discussion of the standard for falsity post-*Omnicare*). Technically speaking, Omnicare only addresses opinion statements in the context of Section 11 of the Securities Act, not Section

10(b) of the Securities Exchange Act. As discussed in detail in Section III.A.3, *infra*, however, this distinction results in no practical differences. For the sake of convenience, the Court will refer to *Omnicare* as addressing claims brought under Section 10(b) of the Securities Exchange Act.

The first avenue is rooted in the provision of Rule 10b-5 that prohibits "untrue statements of a material fact." [91] Although opinion statements are at the edge of this provision's reach, they are not wholly immune from liability: "every...statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief." [92] Thus, a speaker may be liable for a statement of opinion if the plaintiff can prove that "the speaker did not hold the belief she professed." [93] This proposition is relatively uncontroversial and was already widely accepted by federal courts, including the Fifth Circuit. [94]

91      *See Omnicare*, 135 S. Ct. at 1327; 17 C.F.R. § 240.10b–5(b).

92      *Omnicare*, 135 S. Ct. at 1327.

93      *Id.*

94      *See, e.g., Greenberg v. Crossroads Systems Inc.*, 364 F.3d 657, 670 (5th Cir. 2004).

But *Omnicare* takes liability for opinions a step further by turning to the omissions provision of Rule 10b-5: "It shall be unlawful for any person...to ***omit***...a material fact necessary...to make the statements made...not misleading." [95] In the context of opinions, reasonable investors "understand [such statements] to convey facts about...the speaker's basis for holding that view." [96] Thus, although a speaker's opinion may be sincerely held, the statement may nonetheless be actionable under 10b-5's omissions provision if: (i) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself." [97]

95      17 C.F.R. § 240.10b–5(b).

96      *Omnicare*, 135 S. Ct. at 1328.

97      *Id.* at 1329.

The Supreme Court emphasized, however, that meeting this standard is "no small task for an investor." [98] An investor

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 165 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

must do more than make conclusory allegations that the issuer "failed to reveal its basis" for the opinion.[99] After all, Rule 10b-5's omissions clause "is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading."[100] Nor may the plaintiff merely "recit[e]...the statutory language" or offer bare "conclusory allegation[s]" that the issuer "lacked reasonable grounds for the belief it stated."[101] Rather, the plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."[102]

[98]    *Id.* at 1332.

[99]    *Id.*

[100]    *Id.*

[101]    *Id.* at 1333.

[102]    *Id.* at 1332.

### (3) Applicability of *Omnicare* to Falsity and Scienter Analysis under Section 10(b)

**\*10** Although *Omnicare* was decided in the context of Section 11 of the Securities Act, courts have overwhelmingly applied its holdings in the context of alleged omissions under Section 10(b) of the Securities Exchange Act[103] —the Court is aware of only one district court that held to the contrary.[104] Even Defendants generally seem to concede that *Omnicare* governs falsity analysis for claims brought under Section 10(b).[105]

[103]    *See, e.g., In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at \*38 (N.D. Cal. Oct. 1, 2015) (citing cases); *see also In re Lehman Bros. Sec. & Erisa Litig.*, 2015 WL 5514692, at \*5 n.48 (S.D.N.Y. Sept. 18, 2015) ("*Omnicare* was a Section 11 case. Nonetheless, its reasoning applies with equal force to other provisions of the federal securities laws, including, as relevant to this case, Section 10(b)..., which uses very similar language."); *City*

*of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2015 WL 5311196, at \*1 n.3 (S.D.N.Y. Sept. 11, 2015) (same); *In re Amarin Corp. PLC.*, 2015 WL 3954190, at \*7 n.14 (D.N.J. June 29, 2015) (assuming without deciding that Omnicare applies in the Section 10(b) context); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472, at \*20 (D.N.J. May 13, 2015) (noting that Omnicare "illuminates this Court's Section 10(b) scienter analysis" of defendant's allegedly misleading statements of opinion).

[104]    *See Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 2015 WL 7454598, at \*25 (E.D. La. Nov. 23, 2015).

[105]    (*See* Doc. No. 1146 ("Def. Reply") at 19.)

But Defendants' concessions end there. According to Defendants, "*Omnicare* did not address at all the scienter element of a Section 10(b) claim because the Supreme Court analyzed Section 11, a strict liability statute."[106] As a result, say Defendants, Plaintiffs must present evidence that Suttles subjectively disbelieved the flow-rate estimates to avoid summary judgment on scienter.[107]

[106]    (Def. Reply at 22.)

[107]    (*See* Def. Reply at 22-23.)

The Court disagrees. Since the Supreme Court's decision in March of 2015, no fewer than six courts have invoked *Omnicare* in their 10b-5 scienter analysis.[108] Indeed, the Southern District of New York—whose precedent in matters of security litigation is particularly persuasive—has done so on at least two occasions.[109] Once again, the Court sees no reason to depart from the emerging majority position of these district courts. To the contrary, there is substantial reason to follow their lead.

[108]    *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472, at \*1 (D.N.J. May 13, 2015); *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at \*38 (N.D. Cal. Oct. 1, 2015); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 2016 WL 634079, at \*9 (S.D.N.Y. Feb. 17, 2016); *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1159 (10th Cir.), *cert. dismissed*, 136 S. Ct. 499 (2015); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 733 (S.D.N.Y. 2015); *In re EveryWare Glob., Inc. Sec.*

Case 4:24-cv-01940     Document 44-4     Filed on 01/27/25 in TXSD     Page 166 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

*Litig.*, 2016 WL 1242689, at *15 (S.D. Ohio Mar. 30, 2016).

[109] *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 2016 WL 634079, at *9 (S.D.N.Y. Feb. 17, 2016); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 733 (S.D.N.Y. 2015).

"[T]he required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness."[110] Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of ***misleading*** buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."[111] The close relationship of this language to the definition of falsity is unmistakable. Any inquiry into the falsity of an opinion (which, as *Omnicare* confirms, looks to whether an omission renders a statement "misleading to an ordinary investor")[112] goes hand in hand with analysis of scienter (which looks to whether a speaker intended for his statement to be "misleading [to] buyers or sellers").[113] In other words, falsity is the *foundation* of scienter, not a wholly unrelated structure.[114] And to the extent that the surface area of that foundation is expanded, so too is the area upon which a plaintiff's theory of scienter can be constructed. Accordingly, to establish scienter at the summary judgment stage post-*Omnicare*, a court looks to whether the record contains evidence upon which a reasonable jury could conclude that the defendant "omit[ed] material facts about [his] inquiry into or knowledge concerning a statement of opinion" with the "intent to deceive, manipulate, or defraud or severe recklessness."[115]

[110] *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014).

[111] *Id.* (emphasis added).

[112] *Omnicare*, 135 S. Ct. at 1327-28.

[113] *Spitzberg*, 758 F.3d at 684.

[114] *See In re Velti PLC Sec. Litig.*, No. 13-CV-03889-WHO, 2015 WL 5736589, at *33 (N.D. Cal. Oct. 1, 2015) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)) ("The Ninth Circuit has observed that 'falsity and scienter in

private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA.' ")

[115] *See Omnicare*, 135 S. Ct. at 1329; *see also Merck*, 2015 WL 2250472, at *1 (concluding that defendants were not entitled to summary judgment on scienter where "The record contains evidence upon which a reasonable jury could conclude that Defendants not only lacked support for this assertion of belief but, additionally, knew that it did not "fairly align" with other information in their possession.")

**B. Suttles's April 24th Statement**

**\*11** Plaintiffs have provided evidence that, at a press conference on April 24th, Suttles stated: "[W]e have detected ongoing releases of oil from the well, emanating from the end of the riser and a section of drill pipe, at a rate of approximately 1,000 barrels per day at the seabed."[116] The Court concludes that Plaintiffs have provided sufficient evidence of falsity and scienter to defeat Defendants' motion for summary judgment, but insufficient evidence to warrant summary judgment in Plaintiffs' favor.

[116] (Pl. Ex. 2, at 2-3.)

Plaintiffs have identified two types of "omit[ed] material facts about [Suttles] knowledge concerning [his April 24th] statement of opinion."[117] First, Plaintiffs have provided evidence of the fact that Suttles knew the flow rate "could be *considerably* different" from the stated 1,000 bpd estimate[118] or, put differently, that there was a "wide" range of potential flow rates.[119] Indeed, Suttles acknowledged to the SEC that he knew the flow rate was somewhere between zero and the pre-drill theoretical limit of 160,000 bpd, "[b]ut exactly where it is in [that range], no one had ever dealt with this problem before."[120] And the evidence suggests that Suttles's understanding of this fact was not limited to the abstract. Plaintiffs have presented evidence that, on the morning of April 24th, the Houston source control team provided Suttles with an estimate of "a few thousand" barrels per day.[121] Even Charlie Henry, whom Defendants tout as the "government's foremost person on oil spills,"[122] evidently told Suttles that the range of potential flow rates "could be a thousand, could be 10,000."[123]

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 167 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

117   *Omnicare*, 135 S. Ct. at 1329.

118   (MPSJ at 21 (citing Pl. Ex. 1 (Suttles Dep.) at 83:19-84:1).)

119   (Def. Ex. 75 at 9:14-16).)

120   (Pl. Ex. 42 (Suttles SEC Tr.) at 263:12-19.)

121   (Pl. Ex. 16; Pl. Ex. 1 (Suttles Dep.) at 123:22-125:8 (admitting that the handwritten notes were his, and that he took them during the call with the Houston source control team).) This same evidence —Suttles handwritten notes—also make reference to "70,000 bopd @ surface." *Id.*

122   (MSJ at 10.)

123   (Pl. Ex. 43 (Henry Dep.) at 182:2-11; *see also* Pl. Ex. 14 (Suttles Dep.) at 403:13-404:14 (Henry "said something like I only work in orders of magnitude and – and something like 1,000").)

Second, Plaintiffs argue, not only was there a wide range of potential flow rates, Suttles omitted the fact that there was little basis for picking one particular number within that wide range over another.[124] For example, Suttles himself acknowledged that the flow rate was "highly uncertain"[125] and that there was a "high degree of uncertainty in any estimate."[126] Indeed, to the extent that the 1,000 bpd number was based on any of BP's actual estimates,[127] it was based only on "surface expression" estimation. In other words, the only estimates on which Suttles was relying were the results of field observers conducting aerial overflights, mapping out different sheens and shades of the black oil in the area of the spill, using those sheens and shades to make assumptions about the thickness (in microns) of oil in that particular spot, accounting for the amount of oil that had evaporated, and then calculating the flow rate based on how that data changed over time.[128]

124   (MPSJ at 20-22.)

125   (Pl. Ex. 1 (Suttles Dep.) at 83:19-84:1.)

126   (Pl. Ex. 1 (Suttles Dep.) at 90:11-14.)

127   As Henry testified, there was no scientific basis for the 1,000 bpd figure in particular. (Pl. Ex. 43 (Henry Dep.) at 212:8-18, 222:8-12; 225:19-24;

*see also* Pl. Reply at 14 n.3 (explaining the lack of basis for the 1,000 bpd figure and citing evidence).) Moreover, Plaintiffs have presented an email from an NOAA employee to, among others, Charlie Henry, summarizing the discussion among Landry, Suttles, and Henry that led to the 1,000 bpd estimate. (Pl. Ex. 44.) According to the email, BP told Landry that the flow rate "is about 250 bbl per day," and Landry then asked Henry if he agreed. (Pl. Ex. 44.) Henry responded that "it was more likely between 1,000 – 10,000 bbl per day." (Pl. Ex. 44.) From there, the three made a " 'handshake' agreement" to place the flow rate at 1,000 bpd, and "it was off to the press brief." (Pl. Ex. 44.)

128   *See* Section I.A.2., *supra.*

**\*12**   Defendants cite to numerous excerpts from deposition testimony indicating that surface expression was the best available means for evaluating flow rate,[129] and that may well be true. But even if it was the *best* method available (relatively speaking), it was certainly not a *good* method (absolutely speaking). As Henry noted in his April 26th estimation, "Estimating oil volume by the visual appearance of the slick is a highly unreliable process. At best, one can calculate an answer to only an order of magnitude."[130] According to David Rainey, the NOAA's Bill Lehr "expressed strong concern about the methodology in general," saying that "it's just hugely uncertain. You're not going to get the right answer."[131] Lehr himself testified that the surface expression method is "highly unreliable" and will provide only a "very, very rough estimate" of the volume of oil on the surface, "and usually on the low side."[132]

129   (*See* Def. Opp. at 7-8.)

130   (Pl. Ex. 46.) This lends further credence to Henry's testimony that, when asked on April 24th, he estimated that the flow rate was between 1,000 bpd and 10,000 bpd.

131   (Pl. Ex. 48 (Rainey Dep.) 151:3-152:19.) Plaintiffs have presented evidence that Suttles was aware of how the methodology worked. (*See* Pl. Ex. 42 (Suttles Dep.) at 107:3-21, 109:8-12 ("I was familiar that people estimated a volume based on aerial assessment of a slick.") Thus, even if Lehr's concerns were never relayed from Rainey to Suttles —and given that Rainey and Suttles discussed the

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 168 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

methodology shortly thereafter, one would assume Rainey did so—the uncertainty and margin for error of surface expression methodology would have been apparent to Suttles.

132    (Pl. Ex. 47 (Lehr Dep.) 246:16-247:8.)

These omitted facts do not "fairly align[ ]" with what a reasonable investor would have taken from Suttles's statement: [133] "[W]e have **detected** ongoing releases of oil from the well...at a rate of approximately 1,000 barrels per day at the seabed." [134] As the Supreme Court noted in *Omnicare*, "a reasonable investor generally considers the specificity of an opinion statement in making inferences about its basis." [135] And here, Suttles not only spoke with specificity (*e.g.*, "1,000 bpd" rather than providing a range of possible flow rates), but portrayed some degree of precision and certainty in the statement ("we have detected" rather than, for example, "we estimate" or "we think"). His statement was declarative and practically unequivocal. Yet this specificity and certainty is belied by the omitted facts that the 1,000 bpd estimate was based on a "highly unreliable" methodology that resulted in a "high degree of uncertainty," that the "wide" range of potential flow rates actually spanned an order of magnitude, and the fact that Suttles had received contradictory estimates from both the Houston source control team ("several thousand" bpd) and the NOAA's foremost expert (1,000 to 10,000 bpd).

133    *See Omnicare*, 135 S. Ct. at 1329 (To establish falsity under *Omnicare*, plaintiffs must prove that the omitted facts "conflict with what a reasonable investor would take from the statement itself." A reasonable investor expects that a speaker's "[statement of] opinion...fairly aligns with the information in [his] possession at the time").

134    (Pl. Ex. 2, at 2-3.)

135    *Omnicare*, 135 S. Ct. at 1329 n.8 ("Compare two new statements from our ever-voluble CEO. In the first, she says: "I believe we have 1.3 million TVs in our warehouse." In the second, she says: "I believe we have enough supply on hand to meet demand." All else equal, a reasonable person would think that a more detailed investigation lay behind the former statement.)

Defendants correctly note that the benign or misleading nature of an opinion "always depends on context." [136]

Indeed, a speaker can "avoid exposure for omissions...[by] mak[ing] clear the real tentativeness of its belief." [137] But here, if anything, the context of Suttles's statement reinforces the conclusions drawn from the statement itself. The "surrounding text" included no "hedges" or "disclaimers" of any kind that would alert investors to the extraordinarily tentative nature of BP's estimate. [138] While the presence of hedges and disclaimers are certainly capable of preventing a statement from being misleading, the absence of hedges and disclaimers can have the opposite effect.

136    *Omnicare*, 135 S. Ct. at 1330.

137    *Id.* at 1332.

138    Defendants have provided an email summary of the press conference drafted by a BP press officer, David Beaudo, that indicates Suttles may have hedged BP's estimate as "rough and preliminary." (Def. Ex. 110.) At the summary judgment stage, however, the Court cannot weigh competing evidence. Instead, facts and evidence must be considered in the light most favorable to the non-moving party. *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009). As a result, based on the considerable evidence that Plaintiffs have provided, the Court assumes for the purposes of summary judgment that Suttles's April 24th statement directly tracked his prepared remarks. (*See* Pl. Reply at 14 n.30 (citing evidence).)

**\*13** Plaintiffs' evidence is also sufficient to create a genuine dispute of material fact as to scienter. Specifically, as discussed at length in the preceding paragraphs, Plaintiffs have provided evidence indicating that: (1) Suttles knew that there was a "wide" range of potential flow rates; (2) Suttles knew that the 1,000 bpd estimate was highly uncertain and based on an inaccurate and imprecise methodology; and (3) that Suttles knew that the flow rate estimates were market sensitive. [139] As Suttles testified, "[I]n my judgment, at the time, [I] recognized that this was highly uncertain, an incredibl[y] unusual set of circumstances..., and that...*people had to recognize* it was just an estimate and the actual number could be considerably different." [140] Yet, speaking from prepared remarks, he provided investors with a specific estimate and stated it with some degree of certainty. A reasonable jury could conclude from this evidence that Suttles either knew (or was severely reckless with respect to the

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 169 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

probability) that omitting these facts would mislead investors as to BP's flow rate estimates.

139   *See* Pl. Ex. 45 at BP-HZN-2179MDL04909585-86. At the very least, it was severely reckless. The flow rate was one of two factors contributing to the total amount of oil that would be spilled into the Gulf as a result of the leak, and the amount of oil in the Gulf was one of the largest factors in cleanup costs.

140   (Pl. Ex. 1 (Suttles Dep.) at 83:19-84:1.)

The Court would be remiss, however, if it failed to emphasize the limited nature of its holding. For example, the Court is *not* holding that, as a general rule, speakers must expressly disclose the full range of every estimate—such a holding would certainly be foreclosed by *Omnicare*. [141] Nor is the Court holding that, as a general rule, *Omnicare* requires speakers to disclose the certainty of a given estimate or the methodology that produced it. To the contrary, the Court's holding is driven by the unique factual contours of the case—specifically, the unusual asymmetry of information between BP and its investors—which demand a bespoke pattern rather than a blanket approach.

141   *Omnicare*, 135 S. Ct. at 1329 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts....A reasonable investor does not expect that every fact known to an issuer supports its opinion statement.")

Most securities fraud cases involve types of estimates or projections with which investors are familiar. For example, suppose the CEO of Company X represents that the company has been valued at $1 billion. A week later, a third party values the company at $950 million, and several shareholders sue the CEO for securities fraud. In this scenario, it would be fruitless for the investor to allege that the company failed to disclose the uncertainty of the valuation, or that the $1 billion figure was really just one number within a range of potential valuations. Courts have repeatedly acknowledged that investors understand statements within "the customs and practices of the relevant industry." [142] In the financial industry, for example, investors not only understand that reasonable estimates can vary within and among established valuation models, they understand the *degree* to which those reasonable estimates can vary. [143]

142   *Omnicare*, 135 S. Ct. at 1330; *see also In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 254 (S.D.N.Y. 2015).

143   *See In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 253 (S.D.N.Y. 2015).

Here, however, the market was unable to evaluate Suttles's statements through the lens of well-known "customs and practices" in the oil industry—the leak was unprecedented. Indeed, when discussing the difficulty of estimating the flow rate, Suttles admitted that "no one had ever dealt with this problem before." [144] In other words, reasonable investors had no frame of reference for the flow rate estimate that BP provided. Omissions that might not have been misleading under conventional circumstances (*e.g.*, the Company X hypothetical) were particularly misleading given the market's relative lack of familiarity with the deepwater oil leaks. Here, as of April 24th, a reasonable investor would not necessarily have known that BP's flow rate estimates spanned an order of magnitude, nor that BP was using a "highly unreliable" surface expression methodology to produce them. And Plaintiffs have provided evidence that Suttles knew the market was dealing with an unprecedented situation, yet omitted critical facts that were "necessary...to make [his] statement[ ]...not misleading." [145]

144   (Pl. Ex. 42 (Suttles SEC Tr.) at 263:12-19; *see also* Pl. Ex. 1 (Suttles. Dep.) at 83:19-84:1 ("But as I said earlier, I think that, in my judgment, at the time, recognized that this was highly uncertain, an incredible unusual set of circumstances").)

145   17 C.F.R. § 240.10b-5.

### (C) Suttles's April 28th and April 29th Statements

**\*14**  Because Suttles's statements on the 28th and 29th were substantively similar and were each made within the span of about eight hours, they will be addressed together. Plaintiffs contend that Suttles's statements were misleading for two reasons. First, the statements were misleading because Suttles omitted facts that were within his knowledge that did not "fairly align[ ]" with what a reasonable investor would have taken from his statements. [146] Second, a reasonable investor would have expected Suttles's statements "to rest on some meaningful...inquiry," [147] yet Suttles's statements instead rested on a superficial inquiry that neglected key data produced by hydraulic modeling efforts. The Court agrees, and addresses Plaintiffs' arguments in turn.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 170 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

146    *Omnicare*, 135 S. Ct. at 1329.

147    *Id.* at 1328.

### (1) Alignment of Omitted Facts with Suttles's Opinion

The context in which Suttles's statements were presented is critical to determining how a reasonable investor would have taken them.[148] Before Suttles spoke on April 28th, Admiral Landry stated, "[W]hile ***BP believes*** and ***we believed*** and ***established*** a thousand barrel per day estimate of what is leaking from the well, NOAA experts believe the outlook...can be ***as much as*** 5,000 barrels."[149] In other words, the statement from Landry would indicate to a reasonable investor that: (1) BP "believes" (present tense) that the flow rate is 1,000 bpd; (2) while the NOAA "believed" (past tense) that the flow rate was 1,000 bpd, NOAA experts now "believe" (present tense) that the flow rate could be higher than previously thought; and (3) the NOAA— but not BP—now estimates that the flow rate could be "as much as" (*i.e.* an upper bound of) 5,000 bpd.

148    *See id.* at 1330.

149    (Pl. Ex. 3, at 2.)

Rather than concur with the NOAA's revised estimate, however, Suttles arguably doubled down on the 1,000 bpd figure following Landry's comments, saying that BP does "not believe [the new leak] changes the amount currently estimated to be released."[150] The evidence suggests that reporters at the press conference similarly interpreted Suttles's statement.[151] It was only after reporters pressed Suttles on the issue that he described the "highly uncertain" and "very basic" nature of the estimates,[152] ultimately concluding, "I do not disagree with the Admiral's estimate that it could be 5,000 barrels a day."[153] That estimate is "clearly within the range of uncertainty."[154]

150    (Pl. Ex. 3, at 3.)

151    (*See* Pl. Ex. 3, at 3.)

152    (Pl. Ex. 3, at 4.)

153    (Pl. Ex. 3, at 4.) Worth noting, however, is that the Admiral actually said that the flow rate could be

"as much as 5,000 bpd," so it is somewhat unclear as to what, precisely, Suttles was agreeing. (Pl. Ex. 3, at 2.)

154    (Pl. Ex. 3, at 4.)

While a reasonable investor likely would not have concluded that Suttles endorsed the 5,000 bpd estimate as the upper bound of *all* of BP's estimates, at the very least, a reasonable investor would have taken Suttles's statements, in the context of Landry's comments and the reporters' questions, to mean that BP's best flow rate estimates ranged from 1,000 bpd and 5,000 bpd.[155] Indeed, that is precisely what Suttles expressly represented hours later in the early morning of April 29th: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today."[156]

155    Arguably, a reasonable investor would have inferred that Suttles was emphasizing the lower end of the range. (Pl. Ex. 3 at 3-4 (BP does "not believe [the new leak] changes the amount currently estimated to be released," and "The new location is upstream of that, it's before that; so that's the reason we don't believe the total flow is different.")

156    (Pl. Ex. 4, at 3.)

Plaintiffs' have identified information that was within Suttles's knowledge, the omission of which made his opinion misleading to a reasonable investor.[157] As Defendants acknowledge,[158] Plaintiffs' evidence indicates that Suttles was in possession of two sets of BP-produced flow rate estimates as of April 28th and 29th: a range of estimates produced by David Rainey's application of the Bonn methodology, and a range of estimates that Rainey produced by using his hybrid ASTM methodology.[159] The Bonn method produced a "low" estimate of 2,783 bpd, a "best guess" of 17,328 bpd, and a "high" estimate of 92,028 bpd.[160] For several reasons, some of which are more compelling than others, Suttles and Rainey chose to disregard the Bonn estimates.[161] Thus, Rainey's ASTM estimates—which produced a "low" estimate of 1,063, a "best guess" of 5,758, and a "high" estimate of 14,266 bpd—were the only timely set of BP-produced flow rate estimates upon which Suttles's representation could have been based.[162]

157    *See Omnicare*, 135 S. Ct. at 1332.

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

158    (*See* Def. Opp. at 14.)

159    (*See* Pl. Ex. 48 (Rainey Dep.) 139:23-141:2, 147:24-150:4.)

160    (Pl. Ex. 19.)

161    (Pl. Ex. 149:18-152:2; *but see* Doc. No. 1333 ("Hr'g Tr.") 153:12-154:7 (explaining that Rainey's and Suttles's basis for disregarding the Bonn method was questionable).)

162    (Pl. Ex. 19.)

**\*15** But even the few facts upon which Suttles was purportedly relying did not fairly align with his April 28th and 29th statements. [163] By omitting these facts, Suttles's representation was misleading in several ways. First, to the extent that 1,000 bpd fell within the range of BP's "best estimate[s]," [164] so too would 14,266 bpd—each of those estimates was produced using Rainey's hybrid ASTM surface expression method. Defendants argue that there is "no evidence that the assumptions used to calculate the higher numbers were more accurate or realistic," [165] but this misses the point. Plaintiffs need not present evidence that the "high" estimate was *more* compelling than the low estimate. Omitting the "high" estimate would be misleading to investors as long as the "high" and "low" estimates were *equally* compelling. As *Omnicare* holds, investors expect that assertions rest on something more than "mere intuition." [166] Because Plaintiffs have presented evidence that the "high" and "low" figures were produced under the ASTM methodology (*i.e.*, the figures can be compared apples-to-apples), at the very least, Plaintiffs have created a dispute of material fact as to the weight of the two estimates. [167] If those two estimates are proven to be of equal weight and Suttles merely cherry-picked the more favorable of the two, then the omission of the higher estimate would be misleading to a reasonable investor. Moreover, it would suggest that Suttles acted with "intent to deceive." [168]

163    And this is to say nothing of Suttles's severe recklessness in failing to apprise himself of additional, readily-available flow rate estimates, which is discussed in the following sub-section.

164    (Pl. Ex. 4, at 3 (indicating Suttles stated, "I think that somewhere between one and five thousand

barrels a day is probably the best estimate we have today.").)

165    (Def. Opp. at 21.)

166    *Omnicare*, 135 S. Ct. at 1328.

167    Defendants argue that the high end of Rainey's hybrid ASTM methodology was actually based on more conservative assumptions (*i.e.*, that it erred on the high side as compared to the true ASTM methodology). (Def. Reply at 17 n.8.) But this is still not necessarily a reason for Suttles to discard it in favor of the low end of Rainey's findings. If anything, it could be viewed as evidence that Rainey thought the high end of the ASTM methodology would have produced too low of a figure, and that his hybrid better represented the range of potential flow rates.

168    *See Spitzberg*, 758 F.3d at 684.

Second, by suggesting that 1,000 bpd was still within the range of "best estimates," Suttles understated the potential flow rate. Suttles himself has since admitted that, by April 29th, BP's "best estimate had moved from one to five." [169] Indeed, the only expressly-designated "best" estimates that Suttles had seen were 5,758 bpd (ASTM) and 17,328 bpd (Bonn). [170] Third, even the upper bound of Suttles's "best estimate" range understated by 15% the "best" estimate on which Suttles was purportedly relying. [171] In short, the Court struggles to find any way in which the "information...in [Suttles's] possession" at the time "fairly align[ed] with" his opinion. [172] And not only does Plaintiffs' evidence suggest that Suttles's statements were misleading, it is certainly sufficient to suggest that Suttles *knew* that his representations would be misleading (or was at least severely reckless in this regard).

169    (Pl. Ex. 42 (Suttles SEC Tr.) at 239:25-240:10, 259:12-263:3; *see also* Pl. Ex. 1 (Suttles Dep.) at 275:22-24 ("I believe what we were trying to convey is our best estimate had moved to five.").

170    (Pl. Ex. 19.)

171    (*See* Pl. Ex. 19 (providing a "best guess" of 5,758 bpd).)

172    *See Omnicare*, 135 S. Ct. at 1329.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 172 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

Defendants seek safe harbor in the context of Suttles's statements, which they contend "ma[de] clear the real tentativeness of [his] belief," absolving him of any liability. [173] This argument is unavailing. No amount of caveats or hedges gives a speaker license to cherry-pick favorable data based on little more than a whim, and Plaintiffs have provided evidence that Suttles did so here. His statements were ostensibly based on one set of flow rate estimates, yet he disregarded the high-end of the range (for reasons unknown), and then represented that the low end of the range was one of BP's best estimates.

[173]    (Def. Reply at 4.)

This is markedly different from the type of scenario in which the "tentativeness" safe-harbor outlined in *Omnicare* would apply. For example, by way of comparison, suppose that Suttles had said, "BP's flow rate estimates are very tentative and wide ranging, but I think our best estimate is 5,700 bpd." In this scenario, *Omnicare* would likely afford him protection. Omitting the high end of the ASTM range would not be misleading because, in this hypothetical situation, he similarly omitted the lower end, lending a degree of balance and symmetry to the representation—in other words, the tentativeness of the statement cuts both ways. Here, that sense of symmetry and balance is lacking entirely.

#### (2) Meaningful Inquiry

**\*16**    Plaintiffs additionally argue that Suttles failed to conduct a meaningful inquiry into flow rate estimates, as would have been expected by a reasonable investor. [174] Specifically, say Plaintiffs, BP's engineers and contractors had produced thirteen sets of internal flow rate estimates as of the times Suttles spoke on April 28th and 29th, yet Suttles apprised himself of only two. [175] In fact, Suttles completely neglected all of BP's internal hydraulic modeling estimates. Defendants respond that these purported "estimates" have only a "superficial connection to [Suttles's] public statement," and he was therefore under no obligation to seek them out. [176] Defendants' conclusion predominantly rests on two arguments.

[174]    *Id.* at 1329 n.6 (holding that, under the omissions provision, a speaker's subjective belief in the truth of his opinion will not insulate him from liability "in the absence of the expected inquiry").

[175]    (*See* MPSJ at 7-8.)

[176]    (Def. Opp. at 44.)

First, Defendants argue that BP's hydraulic models were "worst case discharge" calculations based on counterfactual assumptions, rendering them of little use in estimating the actual flow rate. To some extent, Defendants are correct. For example, one of the calculations was based on the assumption that there were "open hole" flowing conditions. [177] Three other calculations were similarly intended to calculate only a worst case scenario, and the Court agrees that these types of calculations were of little relevance to Suttles's public statements. [178]

[177]    (*See* Pl. Ex. 11 (indicating that Estimate C was based on counterfactual assumption that there were "open hole" flowing conditions).)

[178]    (*See* Def. Opp. (explaining that Estimates A, B, and E are worst case discharge estimates).)

Second, Defendants argue that BP's hydraulic models were irrelevant because such models "require accurate data for several input variables," and without all of those variables, "it is impossible to use hydraulic modeling to reliably solve for flow rate." [179] For example, Defendants impugn the hydraulic modeling estimates produced on April 27th and April 28th because one of the inputs was the diameter of the orifice through which the oil was leaking, which was unknown at the time. Instead, the models were run using a range of potential orifice diameters, and they produced a range of potential flow rate estimates as a result. Thus, say Defendants, these estimates were "*not* estimates of the *actual* flow rate, but rather estimates of what the flow rate *might* be given certain assumptions...." [180]

[179]    (Def. Opp. at 15 (citing Def. Ex. 25 (Ballard Report) at 4). While four of the hydraulic models produced worst case discharge, Plaintiffs have provided evidence that the remaining models attempted to calculate the actual flow rate based on a range of reasonable factual assumptions about unknown variables. (*See* Pl. Reply at 10 n.4.)

[180]    (Def. Opp. at 43-44 (emphasis in original).)

But uncertainty does not render information completely irrelevant. Every estimate or projection is based on variable assumptions—otherwise, the "estimate" would not be an

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 173 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

estimate at all, but rather an empirical statement of fact. Indeed, the very nature of estimation involves looking at multiple data points produced from a range of assumptions and drawing a reasonable range of conclusions accordingly. Ole Ryegg, a BP contractor who developed the OLGA modeling system that BP used to model the Macondo well flow, made a similar observation in the context of hydraulic modeling: "hydraulic modeling matches known downhole well data to a description of the flowpath, identifying possible interpretations and eliminating those that cannot exist....In producing fields [of data], good data may be available and kill operations can be planned with confidence." [181]

[181]    (Pl. Ex. 143.)

**\*17**  BP's engineers must have had *some* idea as to which orifice diameters were more likely than others. As Suttles told the Coast Guard following the spill, "it doesn't take a very large opening to get a relatively large flow rate." [182] So at the very least, Suttles knew that the low end of the hydraulic modeling estimates would have yielded useful information. And on April 27th and 28th, BP engineers produced at least four different sets of calculations based on different orifice sizes. [183]  For example, on April 28th, Trevor Hill stated that, even if the diameter of the orifice was as small as .25 inches, the flow rate would be 2,523—more than two times the low end of BP's range of purported "best estimates." [184] And according to Tim Locket's calculations on April 27th, an orifice size of one inch would have resulted in a flow rate of 22,000 bpd. [185]

[182]    (Pl. Ex. 14 at 429:12-432:6.)

[183]    (*See* MPSJ at 8 (citing Estimates I, J, K, L).)

[184]    (Pl. Ex. 23.) Defendants also argue that many of the hydraulic model estimates actually support Suttles's flow rate statements. (Def. Reply at 30.) This is inaccurate. For example, Defendants state that Trevor Hill estimated a flow rate of 5,800 on April 27th. But Plaintiffs neglect to mention that this was the *low* end of the range of estimates, which also included potential flow rates of 12,900 and 22,600. (Pl. Ex. 20.) Defendants similarly misconstrue the nature of several other hydraulic modeling estimates.

[185]    (Pl. Ex. 22.)

Moreover, the Court struggles to comprehend how Defendants can castigate BP's hydraulic modeling efforts on the heels of touting the surface expression methodology on which Suttles exclusively relied. Defendants' aspersions on hydraulic modeling—that it relies on unknown variables and cannot "reliably solve for flow rate" [186]—seem to apply with equal (or perhaps even greater) force to BP's surface expression methodologies, which are similarly based on widely variable assumptions. For example, there are at least three surface expression methodologies, each of which attributes different thicknesses to different shades of oil. [187] In other words, the correlation between shades of oil and the thickness of the slick was an unknown variable—one that was widely divergent across competing methodologies. [188] The Court sees little difference between field observers making assumptions about the thickness of the oil, on the one hand, and BP's expert engineers making assumptions about orifice size, on the other. (And all of this is to say nothing of the potential for human error and variance among the field observers who are conducting aerial overflights for the surface estimates. [189] ) If it is true that, as Defendants argue, the surface expression estimates were an adequate basis for Suttles's flow rate representations, it seems only logical that the hydraulic modeling work would have been similarly informative.

[186]    (Def. Opp. at 15; *see also* Ballard Rep. at 8 ("The Macondo system was too undefined to generate a *reliable* flow estimate using hydraulic modeling") (emphasis added).)

[187]    (Potter Rep. at 3-6.)

[188]    (*See* Potter Rep. at 3-6.)

[189]    As Defendants themselves admit, "you and I could be in the same airplane looking at the same thing, and I *guarantee you we'd see something different*." (Def. Opp. at 32 (citing Def. Ex. 7 (Perkin Dep.) at 184:1-7); *see also* Hr'g Tr. 100:6 ("There is no standardization to how people describe these colors.").)

Further to the point, not only is there evidence that the hydraulic modeling estimates would have been of *relative* value to Suttles, Plaintiffs have also presented evidence that the estimates were of *actual* value to BP's response efforts—both BP's engineers and contractors were relying on hydraulic modeling estimates in their source control efforts

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 174 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

—even Defendants concede as much in their briefing. [190] If those estimates were reliable enough to inform the source control team's decision making, then they were at least arguably reliable enough to inform Suttles's public statements regarding BP's "best estimate" of the actual flow rate. [191]

[190]    (*See* Def. Reply at 24 (noting that "Both parties' experts agree that...BP and its contractors used hydraulic modeling to understand the possible impact of source control operations" and citing evidence); Def. Opp. at 15 (citing Ballard Rep. at 1); *see also* Pl. Ex. 18 (Barnett Dep.) at 63:15 – 64:5.) Even if, as Defendants' say, "the flow rates used for...this work were necessarily and intentionally biased to the high side," (Def. Opp. 15), that is no reason to disregard the data entirely. As Bill Lehr stated, surface expression modeling produces estimates that are "usually on the *low* side," (Pl. Ex. 47 (Lehr Dep.) 246:16-247:8,) yet Suttles relied on it exclusively.

[191]    Defendants argue that Plaintiffs have failed to prove that the hydraulic modeling estimates would have been material to a reasonable investor. (Def. Reply 20.) Specifically, they point to testimony from Plaintiffs' loss causation expert, Chad Coffman, stating that these estimates would have been " 'informative' to the market only 'if the methodology underlying those estimates got you closer to an assumption as to what was actually going on under the sea at that moment." (Def. Reply 20 (quoting Def. Ex. 13 (Coffman Dep.) at 121:3-23)). But for the reasons outlined in the preceding paragraphs, Plaintiffs have presented evidence from which a jury could conclude that the hydraulic modeling estimates *would* have gotten the market closer to what was "going on under the sea." Defendants' argument fails as a result.

**\*18** Plaintiffs' argument that Suttles was at least severely reckless in failing to apprise himself of BP's hydraulic modeling estimates is made all the more compelling by evidence that Suttles knew that BP's engineers were producing the models. For example, Plaintiffs have provided evidence suggesting that Suttles: (1) was generally aware that BP had the engineering expertise to potentially model the flow rate; [192] (2) Suttles knew that the Houston source control team was performing flow rate estimates; [193] (3) Suttles knew that the estimates on which he was relying

were far from perfect; [194] and (4) while on a conference call on April 27th, Suttles heard that BP's engineers were calculating ranges of flow rates based on varying orifice sizes and pressure curves. [195] Yet despite knowing of these readily available estimates—and despite knowing that the *one* surface expression estimate on which he was exclusively relying was highly unreliable— Suttles elected to forego reviewing this flow rate information before speaking publicly *about the flow rate*. [196]

[192]    (MPSJ Ex. 14 at 434:15-435:21 (noting that BP had "experts in flow assurance," which involves expertise regarding how oil "flow[s] from pipes in deepwater."); Pl. Ex. 42 (Suttles SEC Tr.) at 151:22-152:4 (Suttles explained that he "knew that you could make this [flow rate] calculation in various ways").)

[193]    (Pl. Ex. 16 (Suttles's handwritten note from call with Houston source control team that contains a reference to a flow rate estimate).)

[194]    *See* Section III.B., *supra.*

[195]    (*See* Pl. Ex. 150 (conference call notes referencing "ACTION" items for "Doug," indicating that Doug Suttles was in fact on the conference call during which hydraulic modeling efforts were discussed).)

[196]    (Pl. Ex. 14 at 4:35:15-23.) For these reasons, Defendants' assertion that this holding would "require [corporate executives] to search for and disclose *all* information throughout the company (regardless of relevance) before they speak on a subject" is misguided. (*See* Def. Reply at 26.) Here, Suttles *knew* that the information on which he was relying was far from reliable or conclusive, *knew* (at least generally) about the hydraulic modeling estimates of flow rate, and *knew* that he was about to speak *about flow rate*. This is a far cry from situations where, for example, a plaintiff sues a CEO for failing to investigate accounting regularities about which he had no notice.

This evidence is sufficient for Plaintiffs to avoid summary judgment. Suttles knew that he was going to speak about BP's flow rate estimates at the April 28th press conference and on the April 29th morning shows. A reasonable jury could conclude that it was at least severely reckless for Suttles to essentially rely on one "highly unreliable" flow rate estimate

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 175 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

instead of inquiring as to BP's numerous other calculations, particularly given that his statement was diverging from the flow rate estimates produced by the NOAA. [197]

[197] Defendants counter that Suttles was relying not only on the ASTM estimates, but also on the fact that those estimates were corroborated by the NOAA's estimates. But the notion that the NOAA's estimates corroborated Suttles's ASTM estimates overstates the facts (or is at least a disputed fact). The NOAA repeatedly emphasized that their estimates were accurate only to an order of magnitude and that surface expression methodology was highly unreliable. Indeed, the NOAA's estimates were arguably a red flag that should have led Suttles to rely on more than surface expression methodology, especially given BP's unique ability to model the conditions of the well system and leak.

### D. Hayward's May 5th Statement

The Court need not reach the issues of falsity and scienter with respect to Hayward's statement to the Houston Chronicle. Plaintiffs have failed to provide evidence that Hayward's May 5th statement proximately caused any of their losses (*i.e.*, Plaintiffs have not satisfied the loss causation element of their Section 10(b) claim). [198] As a result, Hayward is entitled to judgment as a matter of law regardless of whether he intentionally made a false or misleading statement.

[198] As the Court discusses at length in Section IV, *infra*, Plaintiffs have provided evidence of loss causation only as to the stock drops on April 29th and May 3rd, meaning that they could not have been caused by Hayward's statement on May 5th.

### E. Defendants' Evidence of Suttles Good Faith

*19 Defendants additionally argue that any possible evidence of scienter is negated by substantial evidence indicating that Suttles was acting in good faith. The Court disagrees. At most, Defendants have demonstrated that Suttles's intentions are a disputed point of fact that should be resolved at trial.

Defendants first contend that it was the UAC who announced the 1,000 and 5,000 bpd estimates, and Suttles's merely acquiesced to those estimates in good faith reliance on government experts (*e.g.*, Charlie Henry of the NOAA).

The evidence, however, suggests that a reasonable jury could conclude otherwise. As an initial matter, a reasonable investor would have understood Suttles to be speaking on behalf of BP, not merely repeating the UAC's estimate. [199] More importantly, Suttles's estimates and comments actually diverged from the NOAA's estimates, so the suggestion that he was just a supporting character in the UAC's play rings hollow. [200]

[199] (Pl. Ex. 2, at 2-3.) During his prepared remarks, Suttles spoke in the collective "we." His remarks can most fairly be read to refer to the BP Group rather than the combined UAC. (*E.g., id.* at 2 ("Working with Transocean – the owner and operator of the drilling rig – the MMS, and the Coast Guard, we are committed to finding the cause of this incident."); *id.* at 3 ("Our current efforts – in cooperation with Transocean, the MMS, and the Coast Guard – are focused on developing and implementing the most effective way to stop the flow of oil.").). Additionally, at the April 28th press conference, Landry drew a distinction between BP's estimates and the NOAA/UAC's estimates: While "BP believes and we believed and established a thousand barrel per day estimate..., NOAA experts believe the outlook...can be as much as 5,000 barrels." As a result, it is reasonable to assume that Suttles was speaking on behalf of BP, not the UAC. At the very least, this is a fact issue for the jury.

[200] See Sections III.B and III.C, *supra*. In short, the NOAA's representative told Suttles that the flow rate "could be a thousand, could be 10,000," (Pl. Ex. 43 (Henry Dep.) at 182:2-11), yet Suttles represented only the low end of that range publicly on April 24th. On April 29th, the NOAA's best estimate had moved to 5,000 bpd, yet, once again, Suttles represented that BP's best estimate was lower: somewhere between 1,000 to 5,000 bpd. If anything, this is evidence that Suttles was acting in *bad* faith by consistently providing estimates at the low end of the NOAA's range.

Defendants additionally argue that Suttles operated with a high level of transparency throughout the post-spill timeframe. But Admiral Landry, who worked extensively with Suttles, provided testimony that calls Defendants' position into question. For example, Landry indicated that

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 176 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

"Suttles attempt to downplay the flow rate," particularly on April 28th after the third leak point was detected in the piping.[201] According to Landry, Suttles advocated for increasing the flow rate estimate to only 2,500 bpd rather than the 5,000 bpd figure produced by the NOAA.[202] Not only did this 2,500 bpd figure cut against the few BP-produced estimates with which Suttles was familiar—estimates which were not shared with the UAC—it cut against the NOAA-produced estimates upon which Suttles is claiming to have relied in good faith.[203]

[201]    (Pl. Ex. 85 (Landry Dep.) 82:8-84:12.)

[202]    (Pl. Ex. 85 (Landry Dep.) 66:18-68:13, 96:1-96:18.)

[203]    (Pl. Ex. 85 (Landry Dep.) 82:8-11.)

**\*20**    Additionally, David Hayes, Deputy Secretary for the U.S. Department of the Interior, expressly suggested that BP's communications were less than forthcoming. After receiving an update from BP, Hayes emailed Suttles: "[There is] very little granularity on the key points that we are focusing on. Frankly, it looks like outside communication folks and lawyers have intervened since the template was circulated yesterday."[204]

[204]    (Pl. Ex. 86 (BP-HZN-2179MDL01446171). *See also* Pl. Ex. 85 (Landry Dep.) 69:10-71:8 (Suttles pushed back against Landry's attempts to be more transparent with the press).)

## IV. LOSS CAUSATION

Plaintiffs argue that they have identified six days on which "corrective" information—that is, negative information that revealed the truth about Defendants' fraudulent representations—entered the market, causing the value of BP ADS to drop, and thereby proximately causing injury to Plaintiffs. The corrective disclosures include:

- **April 29** – News that BP increased its estimate of the flow rate from 1,000 bpd to 5,000 bpd.

- **May 3** – News that the size of the oil slick had tripled in size over the weekend.

- **May 10** – News that BP failed to stop the oil spill via a "coffer dam" or "containment dome."

- **June 1** – News that BP failed to stop the oil spill using "Top Kill."

- **June 9** – News that members of Congress sent a letter to BP advising that BP should suspend its dividend.

- **June 14** – News that BP's Board of Directors was meeting to discuss alternatives to its Q2 dividend payment because of "anticipated costs and repercussions from the oil spill."

Defendants argue that Plaintiffs have failed to provide evidence of loss causation for any of these alleged "corrective event days." Accordingly, say Defendants, summary judgment is appropriate. The Court agrees that Defendants are entitled to judgment as a matter of law with respect to the stock drops on May 10, June 1, June 9, and June 14, but holds that Plaintiffs have met their burden of identifying specific evidence from which a reasonable jury could conclude that Defendants' misrepresentations were the proximate causes of the stock drops on April 29 and May 3.

### A. Loss Causation, Generally

"Loss causation requires proof of a causal connection between a misstatement and a subsequent decline in a stock's price.[205] Merely establishing that the stock's purchase price was artificially inflated is insufficient.[206] Instead, "the plaintiff must prove that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate," directly devaluing the stockholder's shares, and "thereby proximately caus[ing] the plaintiff's economic loss."[207]

[205]    *Alaska Elec. Pension Fund v. Flowserve Corp.,* 572 F.3d 221, 229 (5th Cir. 2009); *see also Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342 (2005) (describing loss causation as a "causal connection between the material misrepresentation and the loss").

[206]    *Dura,* 544 U.S. at 342.

[207]    *Lormand v. US Unwired, Inc.,* 565 F.3d 228, 255 (5th Cir. 2009) (citing *Dura,* 544 U.S. at 344); *In re BP p.l.c. Sec. Litig.,* 2014 WL 2112823, at *6 n.4 (S.D. Tex. May 20, 2014).

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 177 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

There are two components to establishing loss causation.[208] First, the decline in stock price must follow "a disclosure of negative truthful information that was related to the allegedly false, non-confirmatory positive statement made earlier."[209] For negative information to be "related to" a prior misstatement, it need not "specifically reveal[ ] the fraud" by correcting the prior misstatement "fact-for-fact."[210] Instead, the "disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements."[211] Second, it must be "more probable than not that...this negative statement, and not other unrelated negative statements... caused a significant amount of the decline."[212]

[208]  *Id.* at *7.

[209]  *Flowserve Corp.,* 572 F.3d at 229.

[210]  *Id.*

[211]  *Id.* at 230.

[212]  *Id.* at 228 (quoting *Greenberg v. Crossroad Sys.,* 364 F.3d 657, 666 (5th Cir. 2004)).

**B. Scope of the "Relevant Truth" and Corrective Disclosures**

**\*21**  The parties' loss causation arguments are many and span dozens of pages, but most of their arguments arise out of a fundamental disagreement regarding the scope of the "relevant truth." Plaintiffs define the concept broadly, contending that the "relevant truth" is any "truth that was obscured by the fraud, [including] instances where...a broader relevant truth follows from a misrepresentation because of the message that the statement conveys."[213] And here, Plaintiffs argue, by fraudulently misrepresenting BP's flow rate estimates, BP implicitly misrepresented (or "obscured") the true magnitude of the oil spill.[214]

[213]  (Doc. No. 1341 ("Pl. Supp.") at 2.)

[214]  (Pl. Supp. at 4.) For example, as one analyst put it, "[W]e do not see [the oil spill] materially impacting BP's outlook. The leak is relatively small (1[,000] bopd] ); it would take a year of continuous leaking to reach Exxon Valdez-type proportions." (Pl. Ex. 94, *Macondo spill overshadows solid 1Q10 results*, Bank of America Merrill Lynch April 28, 2010, at 1.)

Defendants construe the relevant truth more narrowly. According to Defendants, the "relevant truth" is the fact that BP underrepresented its flow rate estimates. Disclosures are therefore corrective only if the market understands the disclosure as corrective of the flow rate.

The Court agrees with Defendants. The general thrust of Plaintiffs' argument is intuitively appealing, but a closer inspection reveals that their conception of the "relevant truth" would lead to outcomes that cannot be harmonized with the principles outlined by the Supreme Court in *Dura Pharmaceuticals.*[215]

[215]  *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005).

**(1) Plaintiffs' Conception of the "Relevant Truth" and Corrective Disclosures**

Plaintiffs' conception of the relevant truth is based on the uncontroversial arithmetical proposition that *Magnitude of the Spill = Duration of the Leak * Flow Rate of the Leak.*[216] In other words, Plaintiffs' theory is premised on the proposition that the potential magnitude of the spill is a direct function of the flow rate; to misrepresent the latter necessarily obscures the truth about the former. And here, say Plaintiffs, because Suttles was providing the market with each of the two requisite variables for calculating the magnitude of the spill (duration and flow rate), not only was he obscuring the truth about the magnitude of the spill, in effect, he was implicitly misrepresenting it.[217] Thus, the "relevant truth"— that is, the truth obscured by Defendants' fraud—is not only that BP expressly underrepresented its estimates of the flow rate, but also that, by doing so, BP implicitly underrepresented the potential magnitude of the spill.[218]

[216]  (Pl. Supp. at 7.) The "magnitude of the spill" is the amount of oil (measured in barrels) that is spilled into the Gulf of Mexico as a result of the leak from the Macondo well.

[217]  (Pl. Supp. at 4.) For example, on April 25th, Suttles publicly stated that it could take BP up to three months to stem the flow of oil from the leak, and he reiterated this timeline throughout the class period. By extension, Plaintiffs argue, when Suttles later stated that the flow rate was estimated to

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 178 of 573

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

be 5,000 bpd, he was implicitly representing that BP's estimation of the ultimate size of the spill was 90,000 barrels of oil (1,000 bpd * 90 days = 90,000 barrels of oil). (*See* Hr'g Tr. at 49:11-50:2, 58:13-25, 140:8-140:20.)

There was much debate between the parties as to what, precisely, Suttles stated about the duration of the leak. Plaintiffs have vociferously contended that Suttles represented it would take BP 90 days to stop the leak, but this position is flatly contradicted by the very evidence that Plaintiffs cite in support. The evidence actually indicates that Suttles consistently provided the market with a *range* of duration estimates throughout the class period: BP would first try to seal the leak with a remote-operated vehicle ("ROV"), which would take a matter of about twenty-four hours; if the ROV failed, then BP would attempt to build a containment dome around the well, which would take roughly two to four weeks; in the meantime, BP would build relief wells that would take about three months to complete. Thus, the 90 day timeline to which Plaintiffs refer was merely the outer bound of the potential duration, not BP's hard and fast estimate. (*See, e.g.,* Pl. Ex. 90, Chevreux, April 27, 2010, *Clean Q1-10 net income 18% above consensus* (noting that BP was "trying to seal the leak with an ROV"; if the ROV fails, BP will build containment domes which will take "two to four weeks"; and BP will build a relief will, which could take "months"); Pl. Ex. 96, Bank of America Merrill Lynch, *Macondo Spill reaction looks overdone*, April 30, 2010 (same); Pl. Ex. 105, JPM Casenove Analyst Report, *Macondo update – first attempt with containment system fails*, May 10, 2010 (same)).

218    (Pl. Supp. at 4.)

**\*22** This definition would substantially enhance Plaintiffs' ability to recover damages for drops in the value of BP ADS. As explained in Section IV.C., Fifth Circuit law provides that plaintiffs may recover damages for any decline in stock price that follows a corrective disclosure (*i.e.,* a disclosure that reveals the relevant truth). [219] Thus, as the scope of the relevant truth expands, so too does the universe of disclosures that can qualify as "corrective." For example, under Defendants' definition of the relevant truth, Plaintiffs could establish loss causation only for stock drops that follow disclosures related to BP's fraudulent flow rate estimates.

Under Plaintiffs' definition, however, Plaintiffs could recover damages for stock drops that follow any disclosure that reveals the true magnitude of the spill. In other words, disclosures would be corrective not only if they relate to BP's fraudulent flow rate estimates, but also if they relate to BP's *non*-fraudulent estimates of the duration of the spill. [220]

219    (*See* Section IV.C., *supra.*)

220    Plaintiffs concede that BP accurately represented its estimates of the duration of the leak.

Consider, for example, how Plaintiffs' loss causation framework applies to the June 1 disclosure that the "Top Kill" containment method had failed. According to Plaintiffs, the failure of Top Kill revealed "that the duration...of the spill would continue," causing the market price of BP ADS to decline by $5.93. [221] Although this disclosure said nothing of flow rate—it speaks only to BP's estimates of the *duration* of the spill, which Plaintiffs concede was accurately represented throughout the class period—the disclosure nonetheless indicated to the market that the magnitude of the spill would be more severe than initially anticipated, and is therefore corrective. [222]

221    (Pl.' Opp. 72-73.)

222    (Ps. Opp. 72-73.) It must be remembered that the bedrock of Plaintiffs' argument is the notion that *Magnitude of the Spill = Duration of the Leak * Flow Rate of the Leak.* An increase in the duration of the spill leads to an increase in the magnitude of the spill in the same way that an increased flow rate would lead to an increase in the magnitude of the spill. Because the relevant truth is that BP underrepresented the magnitude of the spill, any disclosure that reveals the true magnitude of the spill is corrective. Under Plaintiffs' theory, whether that disclosure relates to duration or flow rate matters not. (*See* Hr'g Tr. at 50:22-51:19.)

According to Plaintiffs, this loss causation framework "present[s] a classic 'but for' methodology that 'seeks to address the question of what a stock's price would be absent the alleged fraud.' " [223] If BP had accurately represented its flow rate estimates initially, the market would have understood that the potential magnitude of the spill was substantial, and the value of BP ADS would have declined accordingly. The failure of Top Kill, although unrelated to

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 179 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

flow rate, [224] demonstrates how the market responds to news that the spill is of a greater magnitude than BP's flow rate estimates initially implied. Thus, Plaintiffs aver that they can use "BP's failure to stop the oil flow as a proxy for measuring what the 'true value' of what BP's stock would have been had Defendants' not misrepresented the severity of the spill from the outset." [225]

[223]   (Pl. Opp. 73-74 (quoting *In re Novatel Wireless Secs. Litig.*, 2013 U.S. Dist. LEXIS 164725, at *10 (S.D. Cal. Nov. 19, 2013)).)

[224]   The relationship, or lack thereof, between flow rate and the failure of Top Kill is discussed in Section IV.C., *infra*.

[225]   (Pl. Opp. 73; *see also* Pl. Opp. 68-69 and 77 (applying this "proxy" theory to the disclosures on May 10, June 9, and June 14); Doc. No. 1124 (Pl. Opp. to Def. Mot. to Exclude) at 29 ("Mr. Coffman has clearly testified that through his analysis he is calculating artificial inflation that Defendants' misrepresentations impounded into the stock. Artificial inflation is measured through the use of proxies in the form of later price declines that occurred after some portion of the truth came to light and provides an appropriate class-wide damages methodology.").)

**\*23**  Defendants contend that "Plaintiffs' formulation of the relevant truth...[has] no support in the case law," and they appear to be correct—Plaintiffs have not provided any case law that sets a precedent for their broad conception of the "relevant truth," nor is the Court otherwise aware of any. [226] But, while true that Plaintiffs have provided no case law endorsing their approach, Defendants have cited no case law that expressly forecloses it. [227] As a result, the Court must evaluate the merits of Plaintiffs' definition of the relevant truth in the more general context of the loss causation principles outlined in *Dura*.

[226]   Following the motion hearing, the Court ordered the parties to provide supplemental briefing on the proper scope of the "relevant truth." The Court instructed, "To the extent that Plaintiffs think the 'relevant truth' should be defined more broadly than 'the fact that Defendants made false statements regarding BP's flow rate estimates,' Plaintiffs should...identify any

supporting precedent." (Doc. No. 1340 ("Order") at 5.) In their supplemental briefing, Plaintiffs identified three cases in support of their position. (Pl. Supp. at 3-5 (citing *Lormand*, 565 F.3d at 249; *Spitzberg*, 758 F.3d at 680-81, 688; *Flowserve*, 572 F.3d at 231).) As Defendants correctly note, none of these cases addresses the type of theory that Plaintiffs are advocating here. (*See* Doc. No. 1345 ("Def. Supp.") at 14-18 (explaining that the relevant truth in each case involved the direct subject matter of the misrepresentation, making them inapplicable to Plaintiffs theory).)

[227]   There seems to be a dearth of case law discussing the proper scope of the "relevant truth." Instead, case law tends to focus on what constitutes a corrective disclosure. For further discussion of the distinction between a corrective disclosure and the relevant truth, *see* Order at 2-4.

### (2) The Proper Scope of the Relevant Truth and Corrective Disclosures

The Supreme Court's edict in *Dura* was clear: "the [securities laws] make actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that *misrepresentations actually cause*." [228] Here, Suttles fraudulently misrepresented BP's flow rate estimates. Yet Plaintiffs' definition of "the relevant truth" would allow them to use the market's reaction to BP's non-fraudulent ***duration*** estimates as a proxy for the economic loss that was caused by Suttles's ***flow rate*** misrepresentations. This approach —at least, as applied here—is incongruous with *Dura*'s limiting principle. Plaintiffs have presented no evidence from which a reasonable jury could find that the market's reaction to duration information is an adequate proxy for determining the "economic losses...actually cause[d]" by Suttles's misrepresentations of BP's flow rate estimates. [229]

[228]   *Dura*, 544 U.S. 336 at 345 (emphasis added); *see also id.* at 345-46 (investors must "prov[e] that the defendants' misrepresentations caused the loss for which plaintiff seeks to recover")

[229]   Plaintiffs might argue that the "misrepresentation" relevant here is Suttles's implicit misrepresentation of the magnitude of the spill (*e.g.*, 1,000 bpd

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 180 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

\* 90 days = 90,000 barrels), not just his direct misrepresentation of flow rate. But even assuming this contention has adequate factual support, (*see* n. 217, *supra*), the distinction is of no consequence in the context of *Dura*. Suttles implicitly misrepresented the magnitude of the spill only to the extent that he misrepresented the flow rate. His liability should be similarly limited.

Although ultimately unavailing, Plaintiffs' position is not entirely without force. It is indisputable that a fraudulent flow rate estimate would "obscure[ ]" the truth about the potential magnitude of the spill—even Defendants concede that *Estimated Flow Rate \* Estimated Duration of the Leak = Estimated Magnitude of the Spill.* [230] And Plaintiffs have provided reams of evidence indicating that the market was indeed internalizing BP's flow rate estimates with an eye towards the ultimate size of the spill. [231] It seems relatively simple to conclude that the market would react the same way to an increased flow rate estimate as it would to an increased duration estimate—either way, the projected size of the spill is going to increase.

[230]    It is little more than tautology to say that, if *Estimated Flow Rate \* Estimated Duration of the Leak = Projection of Total Barrels of Oil Spilled into the Gulf*, then a fraudulent flow rate would necessarily misstate the projected amount of oil spilled into the Gulf.

[231]    (*See, e.g.,* Ex. 94, "*Macondo spill overshadows solid 1Q10 results*," Bank of America Merrill Lynch April 28, 2010, at 1 ("The leak is relatively small (1[,000 bopd]; it would take a year of continuous leaking to reach Exxon Valdez-type of proportions."))

**\*24** But the attraction of Plaintiffs' argument is limited to its veneer of simplicity. When a revised flow rate estimate (or any piece of news) is disclosed, the market does not internalize the news in a vacuum. Instead, that one shard of information is examined within a pre-existing mosaic of interrelated data points and strategic considerations. In other words, just because two variables have the same effect on a given output (*e.g.*, magnitude of the spill) does not mean they have the same effect on a company's stock price. Consider the following hypothetical.

A technology company manufactures and sells two products: blank CD disks and flash drives. The company represents

that its revenue projection for Q1 is $5 million for CD sales, and $10 million for flash drive sales. The representation for flash drives is accurate, but the representation for CDs is fraudulent. In fact, the company projects only $1 million in revenue for CD sales. Under Plaintiffs' theory, by over-representing projected CD revenue by $4 million, the company has implicitly misrepresented its projection of total revenue by $4 million, and *that* is the "relevant truth." [232]

[232]    (*See* Pl. Supp. at 4.)

A few weeks later, information leaks that the revenue projection for CD sales has been revised from $5 million to $4 million, and the company's stock price drops. The following week, information leaks that the public has proven reluctant to adopt the new flash drive technology, and that the revenue projection for flash drives has been revised downward from $10 million to $7 million. Once again, the company's stock price falls as a result.

Under Plaintiffs' theory of loss causation, both of these disclosures "reveal the relevant truth," and shareholders are entitled to recover damages for *each* of the ensuing stock drops. After all, revenue is revenue. A downward revision of $4 million for CD revenue, on the one hand, should have a substantively identical effect on stock price as a downward revision of $3 million in flash drive revenue and $1 million in CD revenue, on the other hand. Either way, the market is responding to an aggregate downward revision of $4 million of total revenue. Thus, according to Plaintiffs, shareholders could use the stock drop that resulted from the *flash drive* disclosures as a proxy for what would have happened if the company had accurately disclosed revenue projections for *CDs*. [233]

[233]    Or, to paraphrase Plaintiffs, the "stock price declines" resulting from the company's non-fraudulent conduct (failure to sell more flash drives) can be used "as a proxy for measuring what the 'true value' of what [the company's] stock would have been had [the company] not misrepresented [the total revenue] from the outset." (*Cf.* Pl. Opp. 73 (arguing that Plaintiffs can use "BP's failure to stop the oil flow as a proxy for measuring what the 'true value' of what BP's stock would have been had Defendants' not misrepresented the severity of the spill from the outset").)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 181 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

But this theory relies on a false equivalence. While true that each input (CD revenue and flash drive revenue) has the same effect on a given output (total revenue), their effects on the company's stock price are markedly distinct. The market moves based not just on what the projected decrease in a product's revenue means for total revenue, but on what the decrease signifies about the company's business more generally. For example, CDs are virtually obsolete. News that the company's CD sales are worse than the company publicly projected may be relatively insignificant to the market. Indeed, the market may have already suspected that Plaintiffs' projection was overly optimistic, meaning that the artificial inflation in the stock price (*i.e.*, the inflation that resulted from the fraudulent statement) was relatively small.[234] As a result, so too would be the decline in stock price that follows a disclosure that corrects the fraudulent projections of CD revenue.

[234]  For example, suppose that, instead of overstating its revenue projection for CDs by $4 million, the company overstated the projection by almost $400 million. In this scenario, would the artificial inflation in the stock price be 100 times greater than in the original hypothetical? Of course not. Just because a company makes a projection does not mean that the market necessarily assumes the projection is infallible. Indeed, the market is not comprised of rubes or automatons. Analysts independently evaluate representations using established financial metrics and in light of extensive industry-specific knowledge, and they price companies' stocks accordingly. This is particularly true in the context of projections, which give rise to a wide range of potential opinions. So, returning to our hypothetical, no reasonable investor—knowing what they know about the relevant markets and company's earnings history—would price the company's stock based on the company's overly rosy $400 million revenue projection. Instead, the stock would trade based on a far more realistic assumption. As a result, using the market's response to unrelated decreases in revenue projections for flash drives (up to $400 million) would drastically overstate the loss that was actually caused by the company's overstated CD revenue, which the market never fully believed in the first place.

**\*25**  On the other hand, perhaps the company's future viability depends entirely on its new flash drive technology, and the market was very bullish on the technology's prospects.[235] When the market responds to news that flash drive revenue has been revised downward by $3 million, the stock drops precipitously not only because projected total revenue decreased by 20%, but because the viability of the flash-drive product—and, as a result, the viability of the company itself—has been called into question.

[235]  The Court acknowledges that flash drives are no longer a burgeoning new technology for storing data, but the concept is far easier to understand than cloud computing. For the purposes of this hypothetical, assume that flash drives are still the cutting edge storage solutions that they were in the early 2000s.

Here, similarly, Plaintiffs seem to contend that, because estimates of duration and flow rate have the same effect on a given output (estimated magnitude of the spill), the two types of information have an interchangeable effect on the market price of BP ADS. But even assuming that this approach is theoretically plausible under some hypothetical set of facts, those facts are not present here; Plaintiffs have not provided evidence that the market effects of duration estimates provide a proxy for estimating the losses "actually cause[d]" by Suttles's fraudulent flow rate estimates. Based on this conclusion alone, summary judgment is appropriate.

If anything, the evidence cuts *against* Plaintiffs' theory. Specifically, the evidence suggests that: (i) the market reacted differently to disclosures of duration and flow rate estimates; and (ii) the artificial inflation attributable to the flow rate misrepresentations had fully dissipated by even the May 10th duration disclosure.

Much like in the footnoted hypothetical above,[236] it appears that the market treated BP's flow rate estimates somewhat skeptically. After Suttles's revised estimate on April 29th, the market generally met news about flow rate with a shrug of its shoulders. For example, on May 3rd, news broke that "the oil slick over the water's surface appeared to triple in size over the past two days, which could indicate an increase in the rate that oil is spewing from the well."[237] Reuters specifically noted growing fears that "the amount of oil gushing from one of its wells...may be *far* greater" than previously represented by BP.[238] Yet BP's ADS price fell by only 4%.[239]

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

236    *See* n. 234, *supra.*

237    (Pl. Ex. 99, "*Gulf Oil Spill Swiftly Balloons, Could Move East*," Associated Press, May 1, 2010, 11:26 p.m.)

238    (*See* Pl. Ex. 89 ("Coffman Rep.") at ¶155 and ¶114 (citing *BP shares fall again as oil leak fears escalate*, Reuters, May 3, 2010) (emphasis added).)

239    (*See* Coffman Rep. ¶114).

After May 3rd, the market's indifference to flow rate estimates was even more noticeable:

- On May 13 and 14, the media reported that a Purdue University professor had estimated the flow rate at 70,000 bpd. [240]

- On May 15, The Wall Street Journal reported that the 5,000 bpd estimate was facing "growing skepticism," and noting that the NOAA was "working on a worst case scenario assuming some 50,000 barrels a day of oil are pouring into the water." [241]

- On May 27th, the FRTG announced its preliminary flow-rate estimate of 12,000 to 19,000 bpd. Additionally, analysts at Societe Generale remarked that BP's formal estimate of 5,000 bpd had been "challenged," and "independent experts [were] insist[ing] that BP [had] underestimate[d] the flow rate," which "might be anywhere between 20,000 and 95,000 b/d." [242]

*26 Despite the disclosure of these third-party estimates—which included flow rate estimates that were one to two orders of magnitude greater than BP's then-current estimate of 5,000 bpd—the price of BP's ADS did not decline by a statistically significant amount. Thus, it appears that BP's flow rate estimates resulted in relatively little artificial inflation to begin with, and the inflation quickly dissipated as the market increasingly lost confidence in BP's flow rate estimates. Indeed, by as early as mid-May, it appears the market had *no* confidence in BP's estimates.

240    (Def. Ex. 30 ("James Report") ¶ 147 n.170.)

241    (Def. Ex. 92 at 2.)

242    (Pl. Ex. 112 (citing independent estimates from John Amos, SkyTruth, Florida State University, the

University of California, and two estimates Purdue University).)

Both BP's initial representations and subsequent disclosures about the duration of the leak, however, were far more concrete. There was apparently general agreement within the market as to the methods that BP was employing, when they were employing them, and the fact that, if all else failed, BP would be able to drill a relief well within 90 days that would stop the leak. [243] The effect of information regarding flow rate presumably had—and Plaintiffs have provided no evidence suggesting that it did *not* have—a different effect on the stock price than new information regarding duration.

243    (*See, e.g.*, Pl. Ex. 90, Chevreux, April 27, 2010, *Clean Q1-10 net income 18% above consensus* (noting that BP was "trying to seal the leak with an ROV"; if the ROV fails, BP will build containment domes which will take "two to four weeks"; and BP will build a relief will, which could take "months"); Pl. Ex. 96, Bank of America Merrill Lynch, *Macondo Spill reaction looks overdone*, April 30, 2010 (same); Pl. Ex. 105, JPM Casenove Analyst Report, *Macondo update – first attempt with containment system fails*, May 10, 2010 (same)).

In summary, notwithstanding the fact that flow rate and duration estimates each affect the projections for the total size of the spill, the magnitude of their effects on stock price differ. It would be folly to use the price drop caused by revised duration estimates as a proxy for the effect of Suttles's flow rate misrepresentations (*i.e.*, for determining the "economic losses that [Suttles's] misrepresentations actually cause[d]"). Thus, Plaintiffs cannot create a genuine dispute of material fact as to the injury caused by Suttles's fraudulent *flow rate* misrepresentations by pointing to evidence that the market reacted negatively to news about BP's non-fraudulent *duration* estimates. Doing so would diverge from *Dura*'s insistence that a Plaintiff recover only for "economic losses that the misrepresentations actually caused." [244] Because Plaintiffs' definition of the "relevant truth" would necessarily lead to a result that conflicts with *Dura*, the Court must reject it. Instead, the "relevant truth" in this case is the fact that Defendants underrepresented BP's flow rate estimates.

244    *Dura*, 544 U.S. at 345.

### C. Corrective Events

Case 4:24-cv-01940  Document 44-4  Filed on 01/27/25 in TXSD  Page 183 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

With the relevant truth defined, the question becomes whether Plaintiffs have identified any corrective disclosures—that is, disclosures of negative information that revealed the relevant truth, thereby causing the price of BP ADS to decline.[245] As the Fifth Circuit has repeatedly cautioned, however, "a corrective disclosure [need not] squarely and directly contradict earlier misrepresentations."[246] Instead, "indirect" disclosures of fraud may suffice, provided that "the plaintiff...'provide[s] proof that the market recognized a relationship between the event disclosed and the fraud.' "[247]

[245]   See *Flowserve Corp.*, 572 F.3d at 229.

[246]   *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 688 (5th Cir. 2014)

[247]   *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010) (citing *McKowen Lowe & Co. v. Jasmine, Ltd.*, 2005 WL 1541062, at *8 (D.N.J. June 30, 2005); *see also In re Ikon*, 131 F.Supp.2d at 690, *aff'd*, 231 Fed.Appx. 216 (3d Cir. 2007); *In re Retek Inc.*, 621 F.Supp.2d at 699 (adopting *McKowen* approach)); *In re Williams Securities Litigation*, 496 F.Supp.2d 1195, 1266 (N.D. Okla. 2007), *aff'd* 558 F.3d 1130 (10th Cir. 2009).

### (1) Stock Price Declines on May 10, June 1, June 9, and June 14

**\*27**  Plaintiffs have provided no evidence that the market understood the disclosures of negative information on these days to be corrective of BP's fraudulent flow rate estimates. Plaintiffs have failed to satisfy the first component of loss causation, and Defendants are entitled to judgment as a matter of law on the issue of loss causation for the price drops of BP ADS on May 10, June 1, June 9, and June 14.

### (i) Stock Price Declines on June 9 and June 14 (Dividend Cut)

Coffman attributes the stock-price declines on June 9 to news that Congressional representatives criticized BP for planning to pay its quarterly dividend,[248] and attributes the declines on June 14 to news that BP's Board of Directors met to discuss alternatives to paying the dividend.[249] Plaintiffs argue that

this news of a potential dividend-cut "further revealed the severity and financial impact of the spill," and conclude that this showing is sufficient to establish loss causation.[250] The Court disagrees.

[248]   (Coffman Rep. ¶ 162.)

[249]   (Coffman Rep. ¶ 164.)

[250]   (Pl. Opp. at 75; *see also* Coffman Rep. ¶¶ 163, 165.)

While true that disclosures may be indirectly corrective, Plaintiffs still must provide evidence that the market understood the link between the indirect disclosure and the earlier misrepresentation.[251] But here, there is no indication that the market understood BP's dividend cut to relate in any way to the flow rate of the leak. To the contrary, Plaintiffs' own evidence indicates that the market viewed the dividend cut as a response to increasing political pressure.[252]

[251]   *In re DVI*, 2010 WL 3522090, at *6.

[252]   (*See* Coffman Report ¶ 162; Pl. Ex. 127 ("We believe suspending the quarterly dividend could reduce the current political pressure and public anger in the US at BP...."); Pl. Ex. 123 ("Present and future dividends look secure even if political pressure could force a short terms suspension of payments.").)

Plaintiffs alternatively argue that, even if the dividend-related disclosures are not corrective, they can cite to an additional disclosure that speaks directly to flow rate: on June 9th, the USGS released an updated flow rate estimate of 20,000 and 40,000 barrels per day.[253] Defendants correctly object to this argument on two grounds. As an initial matter, the USGS estimate "is entirely new and not supported by Coffman's expert report," and "neither Plaintiffs' complaints nor their expert ever identified higher flow-rate estimates announced on June 9 as the cause of BP's stock-price declines that day."[254] Moreover, the evidence of this updated flow-rate estimate is an analyst report dated June 11,[255] and the USGS press release upon which the report was based is dated June 10.[256] Thus, the estimate could not possibly have caused BP's stock price to decline on June 9.

[253]   (Pl. Opp. at 74-75.)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 184 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

254    (Def. Reply at 41.)

255    (Pl. Opp. at 75 n.227 (citing Pl. Ex. 122).)

256    (*See* Def. Reply Ex. 7.)

Finally, Plaintiffs also seem to advance the theory that Defendants have misconstrued the legal standard for loss causation:

> "Fifth Circuit law does not require that Plaintiffs show that the dividend cut revealed the truth about the flow rate; instead, through their expert's analysis, Plaintiffs need only demonstrate that had BP truthfully revealed the higher flow rates, analysts would have accurately calculated the spill costs to BP in late April...and been better equipped to determine that the dividend could be at risk."[257]

257    (Pl. Opp. at 78 n.243).

**\*28** Plaintiffs' provide no authority or explanation to support their argument. If anything, case law expressly contradicts their interpretation.[258] As the Court understands it, Plaintiffs' are arguing that, but for Suttles's misrepresentations, the market would have been able to accurately price the risk of a dividend cut into the value of BP ADS.[259] But even assuming this is true, it shows only that BP's misrepresentation caused an artificial inflation in the price of BP stock. As the Supreme Court has made clear, the fact that a misrepresentation artificially inflates the stock price is insufficient evidence of loss causation.[260] Instead, the loss causation inquiry focuses on whether a release of corrective information causes a *decrease* in the previously-inflated stock price (*i.e.*, whether the shareholder suffers an actual loss),[261] and Plaintiffs have provided no such evidence here.

258    *Compare* (Pl. Opp. 78, n.243. ("Fifth Circuit law does not require that Plaintiffs show that the dividend cut revealed the truth about a flow rate")) *with Flowserve, 572 F.3d at 229* (the "disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements.").

259    (*See* Pl. Opp. 78, n. 243 ("had BP truthfully revealed the higher flow rates, analysts would have accurately calculated the spill costs...and been better equipped to determine that the dividend could be at risk"); (Pl. Opp. 76 ("Had the full truth been told, my opinion is that the market would have had much better information with which to evaluate whether or not the dividend was going to be cut") (quoting Pl. Ex. 131 (Coffman Dep.) at 197:20-198:1).)

Also worth noting is that, as Defendants correctly argue, this raises materialization-of-the-risk issues. These issues are discussed in Section V.B., *infra*.

260    *BP Sec. Litig.*, 2014 WL 2112823, at *6 n. 4 (S.D. Tex. May 20, 2014) *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015).

261    *Flowserve*, 572 F.3d 221, 229 (5th Cir. 2009) ("Loss causation requires proof of a causal connection between a misstatement and a subsequent *decline in a stock's price*.")(emphasis added); *Amedisys*, 769 F.3d at 320 ("To establish proximate causation, the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, *it caused the price of the stock to depreciate* and, thereby, proximately caused the plaintiff's economic harm."); *Dura*, at 342 ("an inflated purchase price will not itself constitute or proximately cause the relevant economic loss"). To the extent that Plaintiffs are exclusively drawing from common law conceptions of proximate cause, those comparisons are inapposite. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) ("The concept of loss causation elucidated in *Dura* is closely related to the common law doctrine of proximate cause. *Dura* culls from the common law the black letter law that a fraud plaintiff must show that he acted on the basis of the fraud and suffered pecuniary loss as a result of so acting. Without doubt, these principles govern defendant's fraud claim, but Dura's conclusion that overpayment alone cannot prove loss causation, as the district court incorrectly believed, is based on the tailored application of these principles set out by the Supreme Court in the securities context. Such application does not govern here."); *see also* Thomas Lee Hazen, 4 *Law Sec. Reg.* § 12:93.

**(ii) Stock Price Decline on June 1 (Top Kill Failure)**

Coffman attributes the stock price decline on June 1 to news that the "Top Kill" containment method was unsuccessful.[262]

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 185 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

Specifically, Plaintiffs argue, "The market learned something on [this] day[ ]. The market learned that there would be more oil flowing from the well." [263] But this argument is deficient as a matter of law for the same reason that the June 9th/14th disclosures are legally deficient: Plaintiffs have provided no evidence that the market interpreted the failure of Top Kill to mean that the flow rate was greater than BP initially represented. [264]

[262]   (Coffman Rep. at ¶ 159.)

[263]   (Hr'g Tr. at 47:21-24.)

[264]   See In re DVI, 2010 WL 3522090, at *6.

**\*29**   At most, Plaintiffs have shown that, following the failure of Top Kill, analysts increased their estimates of the magnitude and financial consequences of the spill. [265] But this proves nothing with respect to the flow rate. The success or failure of Top Kill pertained to the *duration* of the flow, not the *rate* at which oil is flowing. In other words, while true that the failure of Top Kill caused analysts to increase the projected magnitude of the spill, it is not necessarily true that they attributed the increased magnitude to an increase in flow rate. [266] And Plaintiffs provide no evidence that the market otherwise saw a link between Top Kill and BP's flow rate estimates. They say only that, had the market known the true flow rate, it would have been better able to assess the risk that Top Kill would fail. [267] Even assuming this argument is true, it is insufficient to create a genuine dispute of material fact with respect to loss causation.

[265]   See, e.g., Pl. Ex. 131, Coffman June 3, 2014 Dep. Tr. ("Q. So to flip that, corrective event days are days when there is a statistically significant stock price decline and the disclosures on that day you believe are tied to disclosures of additional information about the severity or financial consequences of the spill, correct? A. I think that's fair....I think the — we've talked at length how the containment dome and top kill are ultimately related to spill severity but don't specifically mention the flow rate. And then the dividends are more of the financial consequence aspect of this.")

[266]   Plaintiffs seem to implicitly concede as much. (See Hr'g Tr. 47:25-48 (admitting that "if the view is it needs to be a one-for-one correction and we're

talking about flow rate, that is a tougher case," and instead resorting to the argument that "the related truth is a broader concept," which the Court rejected in Section IV.B., *supra*).)

[267]   (See Pl. Opp. at 73.)

**(iii) Stock Price Decline on May 10 (Containment Dome)**

Coffman attributes the stock price decline on May 10th to news that the "Containment Dome" containment method was unsuccessful. Once again, Plaintiffs are relying on the same theory that they unsuccessfully asserted in support of the June 9th and 14th disclosures, as well as the June 1st disclosure. [268] There is nothing unique about Plaintiffs' evidence regarding the failure of the containment dome (or the market's reaction to the failure) that would change the analysis here. [269] Plaintiffs have provided no evidence that the market interpreted the failure of Top Kill to mean that the flow rate was actually higher than BP initially represented. [270]

[268]   (See Pl. Opp. at 68 (citing Pl. Ex. 131 (Coffman Dep.) ("What I am trying do is model essentially had the market been told the truth, they would have had a much better picture of the financial consequences that BP was ultimately going to face as a result of this spill, and one of those consequences was revealed when top kill and containment dome failed.")); see also Hr'g Tr. at 65:20-66:5.)

[269]   The only difference of note is that Plaintiffs seem to articulate a different loss causation standard in this sub-section. Here, they say that "the relevant inquiry is whether the failure of containment efforts made it more probable than not that the earlier statements in question were, in fact, false." (Pl. Opp. at 70 (citing Amedisys, 769 F.3d at 321).) This is incorrect. As Defendants argue, this is the *pleading* standard for loss causation. The *Amedisys* quote that Plaintiffs cite occurs in the context of a discussion on "the controlling standard for pleading proximate causation in a private securities fraud-on-the-market case." Amedisys, 769 F.3d at 321 (citing Spitzberg, 758 F.3d at 687–88 (concurring with *Lormand* on the applicable

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 186 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

standard for pleading corrective disclosure)). *See also Lormand*, 565 F.3d at 256 n.19.

270    At the hearing, Plaintiffs stated that there is no difference between (i) news that the containment dome had failed and (ii) the news released on May 3rd that the size of the oil slick had expanded. (Hr'g Tr. 68:2-13.) This is incorrect. On May 3rd, information was released that the oil slick had expanded by a certain amount over a certain period of time, and Plaintiffs have provided evidence that analysts inferred that this "could indicate an increase in the rate that oil is spewing from the well." (Pl. Ex. 99; *see also* Hr'g Tr. at 79:8-13.) As Defendants correctly argue, Plaintiffs have failed to provide any evidence that the market understood a similar link between the failure of the containment dome and the flow rate of the leak. (Hr'g Tr. at 79:14-80:7.)

### (2) Stock Price Declines on April 29th and May 3rd

**\*30**  Plaintiffs have satisfied the first component of loss causation for April 29th and May 3rd by identifying disclosures of negative information that were corrective of BP's misrepresented flow rate estimates.[271] To satisfy the second component of loss causation, however, Plaintiffs must identify specific evidence showing that it is "more probable than not that it was [the fraud-related] negative statement, and not other unrelated negative statements, that caused a significant amount of the decline [in stock price]."[272]

271    (*See* Pl. Ex. 3 and Pl. Ex. 4 (The NOAA, via the UAC, disclosed that the flow rate could be "as much as 5,000 barrels per day," and BP stated that its best estimate was a flow rate of 1,000 to 5,000 bpd, correcting the previous estimate of 1,000 bpd); Pl. Ex. 99 (May 3rd news article disclosing that the size of the oil slick had tripled in size over a two day period, and noting that it "could indicate an increase in the rate that oil is spewing from the well").) Defendants conceded as much at the hearing. (Hr'g T. at 12:11-13:3.)

272    *Greenberg v. Crossroads Sys.*, Inc., 364 F.3d 657, 666 (5th Cir. 2004).

Defendants argue that Plaintiffs have failed to do so. In addition to the fraud-related negative statements that

Plaintiffs have properly identified as corrective events, Defendants contend that several "unrelated negative statements" (or "confounding information") were released on April 29th and May 3rd, and those unrelated statements contributed to the BP ADS price drop. Summary judgment is warranted, say Defendants, because Plaintiffs have failed to disentangle the effects of this confounding information from the effects of the fraud-related statements. In other words, Plaintiffs have provided no evidence showing that it was the corrective disclosures—and not the confounding information —that caused a "significant amount of the decline" in BP ADS.[273]

273    *See Flowserve*, 572 F.3d at 229.

Plaintiffs refute Defendants' arguments in two ways. First, they reject Defendants' premise that confounding information was present on any of the post-spill corrective event days. According to Plaintiffs, "Coffman considered all news on [each corrective event] day and found that no such confounding information exists.[274] Second, Plaintiffs argue that, even if confounding information existed, Coffman offered an "alternative analysis" at his deposition that adequately disentangled the effects of the confounding information.[275]

274    (*See, e.g.*, Pl. Opp. at 67 (Citing Ex. 89, Coffman Report ¶ 155 and ¶ 112).)

275    (Pl. Opp. at 67; *see also* Def. Ex. 82.)

### (i) Presence of Confounding Information

Plaintiffs' arguments that there was no confounding information on April 29th or May 3rd are unpersuasive. Indeed, the March 17, 2014 report of Plaintiffs' own expert, Chad Coffman, essentially concedes that the market responded to negative information that was completely unrelated to BP's fraudulent flow rate statements.

Coffman opined on both the pre-spill claims and post-spill claims in his expert report. Because Plaintiffs' damages theory for the pre-spill claims was substantially broader than their damages theory for the post-spill claims,[276] Coffman identified more corrective events for the pre-spill claims than for the post-spill claims. For example, Coffman identified three corrective disclosures on May 3rd in the pre-spill section of his report: (i) news that the oil slick in the Gulf

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 187 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

had tripled in size; (ii) Admiral Allen's statement that it's impossible to know the actual flow rate; and (iii) news that the Senate increased the liability cap for spill-related economic damages. [277] Coffman further concluded that these three pieces of negative information combined to cause an aggregate price drop of $2.19. [278] Yet Coffman claims the *same $2.19 price drop* in the post-spill section of his report, despite the fact that the liability cap news was in no way corrective of BP's alleged post-spill misrepresentations regarding the flow rate. [279] This is a textbook example of confounding information.

[276]    Plaintiffs theorized that any foreseeable consequence of the spill revealed BP's undisclosed process-safety risks to the pre-spill class. For the post-spill class, Defendants have identified as corrective any foreseeable consequences from BP's misrepresentation of the flow rate.

[277]    (Coffman Rep. ¶ 109-13.)

[278]    (Coffman Report ¶ 114.)

[279]    (*Compare* Coffman Report ¶ 114 (claiming $2.19 price drop for disclosures corrective of pre-spill misrepresentations) *with* Pl. Opp. at 65 (claiming $2.19 price drop for disclosures corrective of post-spill misrepresentations).) Tellingly, when Coffman describes the corrective events of May 3rd in the post-spill section of his report, he expressly references only the oil slick news and Admiral Allen's statement as corrective events. (*See* Pl. Ex. 89, Coffman Report at Exhibit C (identifying only Admiral Allen's statement and oil slick news as corrective) and ¶ 154 ("In summary, satellite surveillance indicated the Spill was larger than expected and that BP could not give an exact estimate of the rate of the Spill.").)

**(ii) Disaggregating the Confounding Information**

 **\*31**  The presence of confounding information is not an insurmountable problem *per se*, but it does mean that Plaintiffs need to present evidence that the fraud-related information—and not the confounding information—was responsible for "a significant amount of the decline" in the stock price. [280] As Defendants correctly note, the Fifth Circuit requires Plaintiffs to "offer some empirically-based

showing that the corrective disclosure was more than just present at the scene." [281] And here, say Defendants, Coffman made no attempt to disaggregate the confounding information when he prepared his initial report. Coffman himself admitted as much at his deposition. [282]

[280]    *Greenberg v. Crossroads Sys.*, Inc., 364 F.3d 657, 666 (5th Cir. 2004)

[281]    (Def. Brief at 69 (quoting *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 271 (5th Cir. 2007), *abrogated on other grounds by Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)); *see also Operating Engineers Const. Indus. & Miscellaneous Pension Fund (LOCAL 66)*, 579 F.3d 401, 409 (5th Cir. 2009).)

[282]    (Def. Ex. 13 Coffman Dep. 274:19-275:2, 276:4-18.)

Instead, Plaintiffs note that Coffman provided an "alternative analysis...in rebuttal to Defendants experts" that would allow a jury to remove the effects of confounding information. [283] In the "Alternative Analysis," Coffman notes that the fraud-related (*i.e.*, properly corrective) information was released during pre-trading hours on April 29th and May 3rd. [284] The confounding information identified by Defendants, on the other hand, was not released until the afternoon of April 29th and May 3rd [285] —well after the market had largely absorbed the fraud-related information. [286] Thus, there is a substantial period of time on each day during which the stock price was untainted by confounding information. Coffman's "Alternative Analysis" runs a regression analysis on this untainted period of time, calculating the price drop of BP ADS that occurred *before* the confounding information came into the marketplace. [287]

[283]    (*See* Pl. Opp. at 67; Def. Ex. 82 (the Alternative Analysis).)

[284]    (*See* Def. Ex. 82.)

[285]    Specifically, the first piece of confounding information on April 29th was released at 12:06 PM. The first piece of confounding information on May 3rd was released at 2:28 PM.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 188 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

286    (*See* Def. Ex. 82.)

287    (*See* Def. Ex. 82.)

Defendants seem to concede that the Alternative Analysis is sufficient to show loss causation, but they briefly argue that the analysis should be excluded as an untimely supplement, citing several cases. 288 Suttles's expert report was due on March 17, 2014, yet Suttles provided his Alternative Analysis on June 3, 2014 during his deposition.

288    (Def. Mem. Supp. at 77; Hr'g Tr. at 80:9-20.)

The Court declines to exclude the Alternative Analysis. As Plaintiffs correctly respond, Coffman proffered his supplementation well within the period for expert discovery, and any resulting judicial economy concerns and prejudice to Defendants are limited. 289 This stands in contrast to the cases cited by Defendants. 290 Moreover, it appears that at least one of Defendants' experts, Ray Perryman, was able to review the Alternative Analysis prior to his deposition, and Perryman indicated at his deposition that Coffman's "suggested modification...is quite reasonable." 291 Indeed, the analysis contained in Coffman's supplement seems to be in line with the temporal methodology employed by Dr. Christopher James, another expert whom Defendants engaged to opine on loss causation and damages.

289    Neither party addressed this issue at any length. Defendants' argument consisted of one sentence and a citation to four cases, some of which addressed rebuttal opinions, *see, e.g., Cooper Tire & Rubber Co. v. Farese*, 2008 WL 5104745 (N.D. Miss. Nov. 26, 2008), and some of which addressed supplemental disclosures, *see, e.g., Buxton v. Lil' Drug Store Products*, Inc., 2007 WL 2254492, at *6 (S.D. Miss. Aug. 1, 2007) *aff'd*, 294 Fed.Appx. 92 (5th Cir. 2008). As a result, the precise legal grounds on which Defendants are seeking to exclude the Alternative Analysis is somewhat unclear. Based on their comments at the hearing, it appears that Defendants contend that the Alternative Analysis is an untimely supplemental disclosure (as opposed to an untimely rebuttal report). (Hr'g Tr. at 80:9-20.) Accordingly, the disclosure should not be stricken if Coffman's failure to make a timely disclosure was harmless. *Hoffman v. L & M Arts*, 2013 WL 81578, at *1 (N.D. Tex. Jan. 8, 2013). *See also Miller v. Pfizer,*

Inc., 356 F.3d 1326, 1332 (10th Cir. 2004) ("We agree with the Millers that an expert's initial Rule 26 report cannot always anticipate every possible challenge to the report. Accordingly, on occasion it may be appropriate to permit the party using the expert to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning. A court's failure to permit such supplementation could even constitute an abuse of discretion in some circumstances.")

290    *See, e.g., In re Pfizer Inc. Sec. Litig.*, 2014 WL 3291230, at *1-2 (S.D.N.Y. July 8, 2014) (Rejecting supplemental analysis on judicial economy grounds because it "came long after the close of expert discovery, Dr. Fischel's delivery of two supplemental reports, and depositions and motion practice in which Dr. Fischel had been given opportunities to proffer the relevant analyses. Indeed, in his deposition, Dr. Fischel disclaimed having made any analysis with respect to the impact of the excluded Pharmacia statements."); *Buxton,* 2007 WL 2254492, at *6 ("Here, plaintiff offered Dr. Ramsey's Supplemental Affidavit almost eight months after the deadline for her expert reports and seven months after service of defendants' expert reports, not to mention on the eve of defendants' final summary judgment briefing.").

291    (Pl. Ex. 132 (Perryman Dep.) 115:23-116:1.)

## V. DAMAGES

**\*32** Defendants argue that Plaintiffs have failed to present a satisfactory theory of damages for two reasons: (1) Plaintiffs' damages model does not properly calculate the but-for price of BP ADS; and (2) Plaintiffs are applying a materialization-of-the-risk theory, yet are incorrectly claiming as damages 100% of the stock price movement on the date of correction.

### A. Legal Standard

"Traditionally, economic loss in Section 10(b) cases has been determined by use of the 'out-of-pocket' measure for damages. Under that measure,...damages consist of the difference between the price paid and the 'value' of the stock when bought." 292 "Recovering out-of-pocket damages...requires elimination of that portion of the price decline that is the result of forces unrelated to the wrong...so as to limit recovery to actual damages on account of the

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 189 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

act complaint of." [293] Plaintiffs are therefore required "to provide a method to discern by just and reasonable inference the amount of plaintiff's loss solely caused by the defendant's fraud." [294] Consequential damages are not permitted. [295]

[292]  *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (internal quotes omitted).

[293]  *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004).

[294]  *Id.* at 232.

[295]  *BP Sec. Litig.*, 2014 WL 2112823, at *12.

### B. Calculation of But-For Price

Defendants argue that Plaintiffs failed to properly calculate a but-for price for two distinct reasons. First, say Defendants, calculating a but-for price requires articulating a but-for world, and Coffman has failed to do so. [296] For example, at his deposition, Coffman could not identify what, if anything, Suttles and Hayward should have said in order to not mislead investors about the flow rate. [297] Instead, Coffman merely speculated that, if Suttles had properly disclosed BP's calculations of potential spill rates, the price of BP ADS would have dropped by the full amount of the subsequent declines.

[296]  (MSJ at 84.)

[297]  (MSJ at 84 (citing Def. Ex. 13 (Coffman Dep.) at 200:24-201:24).)

This argument is unavailing. As Plaintiffs correctly respond, Coffman defined the but-for world as one in which BP accurately disclosed the fact that the range of flow rate estimates reached into "the multiple tens of thousands." [298] He then modeled the artificial inflation caused by BP's understated flow rate estimates by measuring the dissipation in BP's ADS price as corrective information made its way into the market.

[298]  (Pl. Ex. 131 (Coffman Dep.) at 93:23-24.)

Defendants understandably take issue with the notion that Suttles should have disclosed flow rates in the "multiple tens of thousands," but their arguments on this point are of little consequence. The corrective disclosures that Plaintiffs have

identified were relatively modest, and therefore would likely fit within *any* reasonable conception of the but-for world. For example, the April 29th disclosure modeled the market's reaction to news that the flow rate was likely somewhere between only 1,000 to 5,000 bpd. Thus, regardless of how the but-for world is defined—which is a fact issue either way—Plaintiffs have provided an adequate damages model.

Defendants' second attack on Coffman's claimed but-for price is similar to the argument that they repeatedly made in the loss causation section: Coffman failed to disaggregate the effects of non-fraud related events on BP's ADS price, and his model therefore seeks damages for price declines that were "the result of forces unrelated to the wrong." [299] For example, the effects of the Senate's liability cap announcement are included in the $17.10 figure, but that announcement is completely unrelated to Suttles's alleged misrepresentation of BP's flow rate estimates. As discussed at some length above, however, Coffman eliminated the effects of the confounding information on April 29th and May 3rd in his Alternative Analysis. As a result, with respect to those two dates, Plaintiffs have provided "a method to discern by just and reasonable inference the amount of plaintiff's loss solely caused by the defendant's fraud." [300]

[299]  See *Miller*, 364 F.3d at 232.

[300]  See *id.* at 232.

### C. Materialization of the Risk

 **\*33**  Plaintiffs theorize that they are entitled to damages for the stock drops that resulted from news that Top Kill failed (May 10), that the containment dome failed (June 1), and that BP might cut its dividend (June 9 and June 14). As discussed at length in Section IV, *supra*, the Court holds that Defendants have failed to establish loss causation as to the price declines on these dates. But Defendants argue that summary judgment is warranted as to these dates for an additional reason: even assuming that the news on these days was "related to" the misrepresented flow rate (*i.e.*, that Plaintiffs established loss causation), Plaintiffs' damages model is flawed. As this Court explained at class certification, "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent." [301] Here, argue Defendants, Plaintiffs are applying a materialization-of-the-risk theory,

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 190 of 573

In re: BP p.l.c. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

yet are incorrectly claiming as damages 100% of the stock price movement on the date of correction. The Court agrees. Indeed, the Court warned Plaintiffs of this very problem in its class certification memorandum and order. [302]

301   *BP Sec. Litig.*, 2014 WL 2112823, at *10.

302   *BP Sec. Litig.*, 2014 WL 2112823, at *10 n.17.

Take, for example, Coffman's damages theory for the BP ADS price decline on May 10. Coffman premised his loss causation and damages models on the understanding that "Defendants knew or recklessly disregarded that the containment dome and other containment methods were *highly unlikely* to succeed in containing the Spill given that...BP's internal modeling of the spill rate was far higher than had been publicly disclosed, and those containment efforts viability were dependent on the spill rate." [303]   In other words, if BP had properly disclosed its flow rate estimates, at most, investors would have known that it was *highly likely* that the containment dome would fail, and that BP's ADS price would decline as a result. Put differently, while it may have been "highly likely" that the containment dome would fail, even Coffman admits that the chances of failure were less than 100%. Plaintiffs are consequently not permitted to claim 100% of the stock decline as damages upon the materialization of that understated risk. Their damages claims on May 10, June 1, June 9, and June 14 all suffer from this flaw, and are rejected accordingly.

303   (Coffman Rep. at ¶ 157. *See also* Pl. Opp. 78 n. 243 ("Plaintiffs need only demonstrate that had BP truthfully revealed the higher flow rates, analysts would have accurately calculated the spill costs to BP in late April and early May and been better equipped to determine that the *dividend could be at risk.*). *Compare* Coffman Rep. at ¶ 16 (expressly employing a materialization-of-the-risk methodology that purported to show that "[pre-spill] investors suffered a loss stemming from a foreseeable consequence of the risk Defendants

misrepresented.") *with* Coffman Rep. at ¶ 218 (purporting to *not* employ a materialization-of-the-risk methodology, yet opining that the post-spill investors "can recover losses that are suffered as the truth comes to light through the foreseeable consequences of that misrepresentation.").

## VI. CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. Specifically, the Court holds that Plaintiffs have established that there is a genuine dispute of material fact with respect to: the falsity and scienter of Suttles's statements on April 24th, April 28th, and April 29th; loss causation for the decline in value of BP ADS on April 29th and May 3rd; and damages for the decline in value of BP ADS on April 29th and May 3rd.

Defendants are entitled to judgment has a matter of law, however, to the extent that Plaintiffs' claims rely on the decline in value of BP ADS on May 10, June 1, June 9, or June 14. As a result, Defendant Hayward is entitled to judgment as a matter of law as to Plaintiffs' Section 10(b) claim because Plaintiffs have failed to provide sufficient evidence that his alleged misrepresentation proximately caused Plaintiffs' loss.

**\*34**  The Court also **DENIES** Plaintiffs' motion for summary judgment in its entirety. Although Plaintiffs have provided sufficient evidence to create triable issues of fact, their evidence is insufficient to warrant judgment as a matter of law in their favor.

**IT IS SO ORDERED**.

**SIGNED** on this the 31st day of May, 2016.

## All Citations

Not Reported in Fed. Supp., 2016 WL 3090779, Fed. Sec. L. Rep. P 99,108

---

End of Document   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.   Appx. C-188   35

# Case No. 11

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Chicago & Vicinity Laborers' District Council
Pension Fund v. Amplitude,   N.D.Cal., January 13, 2025

2024 WL 4053009

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

IN RE COINBASE GLOBAL,

INC. SECURITIES LITIGATION

Case No. 2:22-cv-04915 (BRM) (LDW)

|

Signed September 5, 2024

OPINION

Martinotti, District Judge

**\*1**  Before the Court is a Motion to Dismiss (ECF No.
78) Plaintiffs' Second Amended Consolidated Class Action
Complaint [1] ("SAC") (ECF No. 68) pursuant to Federal Rules
of Civil Procedure 9(b) and 12(b)(6) filed by Defendants
Coinbase Global, Inc. ("Coinbase" or the "Company"),
Brian Armstrong ("Armstrong"), Alesia J. Haas ("Haas"),
Emilie Choi ("Choi"), Paul Grewal ("Grewal"), Jennifer
Jones ("Jones"), Marc Andreessen ("Andreessen"), Frederick
Ernest Ehrsam III ("Ehrsam"), Kathryn Haun ("Haun"),
Kelly Kramer ("Kramer"), Gokul Rajaram ("Rajaram"),
and Fred Wilson ("Wilson") (collectively, "Defendants"). [2]
Plaintiffs filed an Opposition (ECF No. 79), and Defendants
filed a Reply (ECF No. 80). Having reviewed the parties'
submissions filed in connection with the Motion and having
declined to hold oral argument pursuant to Federal Rule
of Civil Procedure 78(b), for the reasons set forth below
and for good cause having been shown, Defendants' Motion
to Dismiss (ECF No. 78) is **GRANTED IN PART** and
**DENIED IN PART**.

[1]      Lead Plaintiff Sjunde AP-Fonden ("Lead
         Plaintiff") and Additional Plaintiffs Ryan R. Firth
         and Zvia Steinmetz (collectively, "Additional
         Plaintiffs") bring this putative class action on
         behalf of themselves, a proposed class, and a
         proposed subclass. (ECF No. 68.) Lead Plaintiff is a

[2]      Swedish public pension fund with over $100 billion
         in assets under management. (Id. ¶ 40.)

         Defendants Armstrong, Haas, Choi, and Grewal
         are collectively hereinafter referred to as the
         "Executive Defendants." Defendants Andreessen,
         Ehrsam, Haun, Kramer, Rajaram, and Wilson are
         collectively hereinafter referred to as the "Director
         Defendants." Defendants Coinbase, Armstrong,
         Haas, Jones, and the Director Defendants
         are collectively hereinafter referred to as the
         "Securities Act Defendants."

## I. BACKGROUND

### A. Factual Background

For the purposes of the Motion to Dismiss, the Court accepts
the factual allegations in the SAC as true and draws all
inferences in the light most favorable to Plaintiffs. See Phillips
v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). The
Court also considers any "document integral to or explicitly
relied upon in the complaint." In re Burlington Coat Factory
Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting Shaw
v. Digit. Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).

This is a federal securities putative class action on behalf of
persons and entities that purchased or otherwise acquired: (i)
Coinbase common stock from April 14, 2021 through June
5, 2023, inclusive (the "Class Period"), and were damaged
thereby; and (ii) Coinbase common stock in or traceable
to Coinbase's Registration Statement and/or Prospectus
(collectively, the "Offering Materials"). (ECF No. 68 at
1.) Generally, Plaintiffs allege Defendants misrepresented,
concealed, and/or omitted significant, material aspects of
Coinbase's business during the Class Period which enabled
Defendants to reap financial benefits such as cashing out
existing shares at inflated values following Coinbase's public
listing. [3] (See generally id.)

[3]      In Counts III–V, Plaintiffs allege the Securities Act
         Defendants acted negligently. (See generally id.)

**\*2**  Coinbase is a cryptocurrency platform launched in 2012
that enables its customers to buy, sell, and store digital
assets. [4] (Id. ¶¶ 1, 43.) The platform was originally designed
only for Bitcoin, but has exponentially expanded in recent
years, and now supports over 240 crypto assets. (Id. ¶ 50.)
Coinbase generates "substantially all" of its revenue from the
transactions fees its retail customers pay to trade crypto assets.

(*Id.* ¶¶ 2, 68–69.) During the Class Period, Coinbase's success depended on its ability to increase its customer base and its transaction-fee revenue. (*Id.* ¶¶ 3, 70.) One of the Company's main obstacles to growth was persuading customers that the platform was a safe place to invest. (*Id.* ¶¶ 4, 93.) Many potential customers were deterred by cryptocurrency's unsafe and unregulated reputation, underscored by: (i) customers' losses on other cryptocurrency exchanges due to insolvency or hacking; and (ii) the fact no government entity insures crypto assets against such losses. (*Id.* ¶¶ 4, 94–95.) As a result, Coinbase's ability to grow its customer base was dependent on assuring potential customers that Coinbase could keep assets safe. (*Id.* ¶¶ 4, 93.) Defendants recognized this dependence and repeatedly emphasized Coinbase was a "trusted" place to safely store customer assets. (*Id.* ¶¶ 89, 129.) Analysts thereafter noted Coinbase's advantage as a "trusted platform with a focus on security." (*Id.* ¶ 91.)

4    Digital assets, or "crypto assets," "are umbrella terms for any asset built using blockchain technology. A blockchain is a secure digital ledger or peer-to-peer database that maintains a record of all transactions that occur on the network." (*Id.* ¶ 51.)

On January 28, 2021, Coinbase announced plans to go public through a direct listing (the "Direct Listing") [5] (*Id.* ¶¶ 5, 72.) Armstrong—a co-founder, the chief executive officer, and chairman of the Company's board—was highly motivated to complete the Direct Listing as doing so would allow him to cash out his shares and entitle him to a compensation package valued at over $3.7 billion. (*Id.* ¶¶ 6, 81–82.) During this time, Defendants knew investors were focused on the stability and security of Coinbase's transaction fee revenues; therefore, Defendants made numerous representations about Coinbase's ability to generate revenue and the attendant risks to its business in the Offering Materials contemporaneously filed with the Direct Listing. (*Id.* ¶ 9.)

5    In a direct listing, an alternative to an initial public offering ("IPO"), the shareholders of the company sell existing shares of the company directly to the public. (*Id.* ¶¶ 5, 73.) A traditional IPO usually includes a "lock-up" period which restricts insiders from selling until a certain time period has passed, whereas in a direct listing, the company's board of directors decides whether to enforce a lock-up period on the company's insiders. (*Id.* ¶ 74.) Here, members of Coinbase's management petitioned

the Company's board of directors to remove any lock-up restrictions, and ultimately, the Company's board of directors elected to proceed with no lock-up period. (*Id.*)

On April 14, 2021, Coinbase "made a rousing debut on Wall Street," with shares opening at $381 per share which was over $100 above its initial reference price. (*Id.* ¶¶ 8, 122–24.) The Executive Defendants and other Coinbase insiders collectively sold over $5 billion in common stock through the Direct Listing. (*Id.* ¶¶ 8, 125–26.) Armstrong, Choi, [6] and Haas [7] made over $290 million, $223 million, and $99 million in sales proceeds, respectively, in the first two days of the Direct Listing. (*Id.* ¶¶ 125, 387.) Armstrong was motivated to keep Coinbase's stock price high as the Company had to maintain certain stock prices for 60 trading days in order for Armstrong to unlock "tranches" of stock options under his compensation plan. (*Id.* ¶¶ 81–84, 386.) On July 8, 2021, Armstrong received the first tranche valued at over $697 million. (*Id.* ¶ 386.) In total, Armstrong, Choi, Haas, and Grewal [8] netted gross proceeds of approximately $323 million, $429 million, $115 million, and $65 million, respectively, from shares sold during the Class Period. (*Id.* ¶ 125.)

6    Choi served as Coinbase's Chief Operating Officer ("COO") and President throughout the Class Period. Choi has served as the Company's COO since June 2019, and as the Company's President since November 2020. (ECF No. 46.)

7    Haas has served as Coinbase's Chief Financial Officer since April 2018, and was a signatory to the Company's filings submitted to the U.S. Securities Exchange Commission (the "SEC") during the Class Period. (*Id.* ¶ 45.)

8    Grewal served as Coinbase's Chief Legal Officer from July 2020 through the end of Class Period. (*Id.* ¶ 47.) Grewal did not sell any shares during the first two days of the Direct Listing. (*Id.* ¶ 125.)

**B. Defendants' Alleged Misrepresentations and Omissions** [9]

9    Plaintiffs' allegations challenging Defendants' actions pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") can be effectively grouped into three categories of Coinbase's failure to disclose, misrepresent, and/

2024 WL 4053009, Fed. Sec. L. Rep. P 101,922

or misleadingly conceal: the potential loss of customers' assets in the event of a bankruptcy; Coinbase's engagement in proprietary trading; and regulatory risks associated with Coinbase's business. These three categories detailed below form the basis of Plaintiffs' request for relief. The Court will hereinafter refer to these three categories as the "Bankruptcy Risk Statements", the "Proprietary Trading Statements"; and the "Regulatory Statements." They will be collectively referred to as the "Challenged Statements." Defendants provided an Appendix which listed 81 challenged statements from the SAC and grouped them into similar categories. (ECF No. 78-2.) The Court reviewed each of the challenged statements, but only provides summaries of these categories.

### 1. The Bankruptcy Risk Statements

**\*3** During the Class Period, Defendants warned investors in a series of disclosures (the "Asset Safety Disclosures") that "[o]ur failure to safeguard and manage our customers' ... assets could adversely impact our business, operating results and financial condition." (*Id.* ¶¶ 96–97, 258–59, 270, 273, 276, 284.) Coinbase acknowledged it faced two risks in safeguarding customers' assets: (i) hacking; and (ii) the "loss or destruction of private keys." (*Id.*) Plaintiffs allege Defendants misleadingly concealed a third risk to the security of customers' assets: risks associated with a potential bankruptcy of Coinbase. (*Id.* ¶¶ 11, 98.) Specifically, in the event Coinbase filed bankruptcy, its customers' assets could become part of the bankruptcy estate rendering those customers' assets as unsecured credits with little chance of recovering their deposits. (*Id.*)

In 2019, Defendants investigated whether its institutional customers' assets would become part of the Company's estate if the Company became insolvent. (*Id.* ¶¶ 13, 105–09.) Following the investigation, Coinbase submitted a comment letter to the SEC (the "SEC Comment Letter"), which demonstrates Defendants' understanding that the commingling of customers' assets could lead to adverse consequences in the event of a bankruptcy. (*Id.*) Thereafter, Defendants took affirmative steps to mitigate the potential bankruptcy risks to institutional customers' assets by not commingling assets and invoking the protection of the Uniform Commercial Code. (*Id.* ¶¶ 14–16, 112–20.) Plaintiffs allege Defendants knew Coinbase had not taken steps to protect its retail customers; instead, Defendants had increased

the risk to customers' assets by commingling those assets with others in an omnibus account. (*Id.*)

On March 24, 2022, the SEC published Staff Accounting Bulletin 121 ("SAB 121"), which provided that there were "significant legal questions surrounding" how customers' crypto assets "would be treated in a court proceeding arising from an adverse events (e.g., fraud, loss, theft, or bankruptcy)." (*Id.* ¶ 131.) The SEC advised "[t]hese risks can have a significant impact on the entity's operations and financial condition." (*Id.*) Further, the SEC recommended that public companies address the potential risks associated with a bankruptcy in public filings. (Defs.' Ex. 23, SAB 121 (ECF No. 78-26 at 4)); *see also* ECF No. 68 ¶ 132.)

Shortly thereafter, on May 10, 2022, Coinbase filed its quarterly Form 10-Q report which revised the Asset Safety Disclosures and disclosed the asset safety risk in compliance with SAB 121. (*Id.* ¶ 231.) As a result of this disclosure, Coinbase's stock price declined more than 26%. [10] (*Id.* ¶ 233.) Plaintiffs allege Defendants knew this asset safety risk was highly material to investors, as evidenced by Coinbase's concession that it was likely customers would find "custodial services more risky," resulting in a "discontinuation or reduction in use of [Coinbase's] platform" if the asset safety risk had been disclosed earlier. (*Id.* ¶¶ 103, 121.) Further, after the Company filed the May 10, 2022 Form 10-Q report, Armstrong conceded that Coinbase: "should have updated our retail terms sooner" to provide retail customers with "the same protections" as institutional customers (*id.* ¶¶ 121, 232); "didn't communicate proactively when this risk disclosure was added," (*id.*); knew that even the "protections" included for institutional clients "have not been tested in court" and did not guarantee safety (*id.* ¶¶ 101, 111, 232).

[10]     Analysts attributed the decline to the updated Asset Safety Disclosures. (*Id.* ¶¶ 234–37.)

### 2. The Proprietary Trading Statements

Prior to the Class Period, the market was concerned Coinbase might engage in proprietary trading of crypto assets —*i.e.*, trading with Coinbase's own money. (*Id.* ¶¶ 17–18.) When asked whether Coinbase did or would proprietarily trade, Defendants issued unequivocal denials in March and December 2021. (*See, e.g.*, *id.* ¶¶ 18, 138–39 (Coinbase "does not proprietarily trade against our clients."); *id.* ¶ 140 ("[W]e do not plan to engage in regular trading of crypto assets.");

*id.* ¶¶ 18, 142 (Coinbase "do[es] not engage in proprietary trading."). In various SEC filings during the Class Period, Coinbase disclosed that it purchased crypto as assets as "long-term" investments, and also to "fulfill customer transactions," but did "not plan to engage in regular trading of crypto assets." (*Id.* ¶¶ 294–97, 300–08, 312–15, 325–38.)

**\*4** On September 22, 2022, the Wall Street Journal ("WSJ") published an article (the "WSJ Article" or the "September 22, 2022 WSJ Article") revealing Coinbase's alleged proprietary trading venture which resulted in Coinbase's stock price dropping 6.9%. (*Id.* ¶¶ 32, 241–43; Defs.' Ex. 1, September 22, 2022 WSJ Article (ECF No. 78-4).) The WSJ reported Coinbase formed a proprietary trading unit in July 2021 and hired at least four Wall Street traders with the intent to use the Company's own cash to trade crypto on behalf of clients. [11] (*Id.* ¶ 144.) By early 2022, the proprietary trading unit had built sophisticated trading systems and used those systems to trade $100 million raised through a structured note. (*Id.* ¶ 147.) Although this unit was allegedly profitable for Coinbase, the WSJ detailed that the Company "discouraged" employees "from sharing information about the new trading business or discussing it in internal communications." (*Id.* ¶ 242.) Thereafter, on the same date, Coinbase issued a blog post which provided "Coinbase does not operate a proprietary trading business or act as a market maker." (Defs.' Ex. 6, September 22, 2022 Blog Post (ECF No. 78-9 at 41).) The Company also noted it "does, from time to time, purchase cryptocurrency as principal, including for our corporate treasury and operational purposes. [But] [w]e do not view this as proprietary trading because its purpose is not for Coinbase to benefit from short-term increases in value of the cryptocurrency being traded." (*Id.*; *see also* ECF No. 68 ¶ 244.) Market commentators reacted negatively to the WSJ article and reported that "Coinbase's foray into prop trading could fray the lines of trust between the company's executives and its investors." (*Id.* ¶¶ 32, 245–46.)

[11]   Based on the WSJ Article, Plaintiffs allege Haas took part in the creation of the proprietary trading unit. (*Id.* ¶¶ 144, 242.)

### 3. The Regulatory Statements

The final category of Defendants' challenged actions are related to Plaintiffs' claim that Defendants downplayed the likelihood that the SEC would bring an enforcement action. (*Id.* ¶¶ 178, 342, 345, 357.) Plaintiffs allege Defendants

continuously and knowingly concealed that Coinbase listed crypto assets from 2019 through 2021 that it knew were likely securities to grow its business and boost revenues. (*Id.* ¶¶ 25, 182–83, 379.) Since 2017, the SEC has made it clear that many crypto assets qualify as securities, and that platforms where these securities trade must register with the SEC to avoid an enforcement action. (*Id.* ¶¶ 154–66, 169–70.) The SEC has brought multiple enforcement actions against companies for failure to register crypto asset securities. (*Id.* ¶¶ 172–76.)

In 2019, Coinbase co-founded the Crypto Rating Council (the "CRC") to create a framework for assessing whether a crypto asset was likely a security. (*Id.* ¶¶ 179–81.) The Company stated that it examined each asset before it was listed to determine whether it was a security. (*Id.*) Additionally, Coinbase told investors that it was rigorously applying the framework and only "permit[ting] trading on our core platform of those crypto assets for which we determine there are reasonably strong arguments to conclude that the crypto asset is not a security." (*Id.* ¶ 188.) Analysts lauded Coinbase's "compliance infrastructure" and called the Company's "rigorous[ ] adher[ence]" "a key differentiating factor." (*Id.* ¶¶ 189–90 (alteration in original).)

By the spring of 2022, the SEC had begun actively investigating Coinbase for securities law violations. (*Id.* ¶ 150.) In July 2022, the SEC and the United States Department of Justice charged a former Coinbase manager with insider trading of crypto securities on Coinbase's platform. (*Id.* ¶ 196.) Thereafter, on July 21, 2022, the Company stated: "Coinbase does not list securities. End of story." (*Id.* ¶ 197.) Coinbase further noted that the Company "has a rigorous process to analyze and review each digital asset—a process that the SEC itself has reviewed.... [W]e remain confident that Coinbase's rigorous review process keeps securities off Coinbase's platform." (*Id.* ¶ 197.)

Four days after Coinbase's denials, Bloomberg News reported that the SEC was investigating whether Coinbase "let Americans trade digital assets that should have been registered as securities." (*Id.* ¶¶ 31, 200, 238.) Coinbase's stock price then declined 21%. (*Id.* ¶ 201.) Defendants responded by assuring investors; Grewal stated that "we are confident that our rigorous diligence process—a process the SEC has already reviewed—keeps securities off our platform." (*Id.* ¶ 202.)

In reality, the SEC had begun to take a "totally different tone," and told Defendants that "we think everything other than Bitcoin is a security." (*Id.* ¶¶ 151, 378.) Defendants met with the SEC over 30 times between June 2022 and March 2023 and provided witnesses for testimony including a witness to testify as to Coinbase's staking services. [12] (*Id.* ¶¶ 209, 378.) Armstrong later conceded that they were aware of the SEC's position by mid-2022. (*Id.*)

[12]   In a "staking program," crypto asset owners agree to lock up their holdings to obtain a reward or earn interest, similar to a certificate of deposit. (*Id.* ¶ 23 n.1.) In Coinbase's staking program, "crypto owners transfer their assets to Coinbase which pools and subsequently 'stakes' the assets for rewards. The Company takes a commission based on the rewards a customer receives, generally between 15% and 35%." (*Id.*)

**\*5** In January 2023, the SEC privately informed Defendants it was pursuing an enforcement investigation against the Company. (*Id.* ¶¶ 209, 378.) Although Defendants knew Coinbase faced "an imminent enforcement action," Defendants continued to minimize the risks of a regulatory action. (*Id.* ¶¶ 209–15.) After the SEC shut down a rival company's staking program, Coinbase claimed its staking services were "fundamentally different" and that "Coinbase's staking services are not securities." (*Id.* ¶¶ 210–15.) On March 22, 2023, Coinbase disclosed it had a received a Wells Notice from the SEC and that the potential securities fraud violations related to a "portion of our listed digital assets" and "our staking service." (*Id.* ¶¶ 33, 219, 247–48.) Based off this news, Coinbase's stock price dropped 14%. (*Id.* ¶¶ 33, 249.)

On June 6, 2023, the SEC filed a complaint (the "SEC Complaint") alleging that Coinbase had made crypto securities available on its platform assets "even where it recognized [they] had the characteristics of securities," and failed to register "with the SEC ... thus evading the disclosure regime that Congress has established for our securities markets." (*Id.* ¶¶ 221–25, 253–54.) The SEC investigation revealed that Coinbase added assets "even where it recognized [they] had the characteristics of securities." (*Id.* ¶¶ 25, 183, 222, 379.) The SEC Complaint detailed Coinbase's conduct in "elevat[ing] its interest in increasing its profits over investors' interests, and over compliance with the law and the regulatory framework that governs the securities markets and was created to protect

investors and the U.S. capital markets." (*Id.* ¶¶ 34, 253, 405.) Thereafter, Coinbase's stock fell over 12%. (*Id.* ¶ 255.)

## C. Allegations Related to Claims Brought Pursuant to the Securities Act of 1933 (the "Securities Act")

In Counts III–V, Plaintiffs bring claims arising under the Securities Act. [13] In these claims, "Plaintiffs assert strict liability and negligence claims." (*Id.* ¶ 437.) Plaintiffs assert the Securities Act Defendants are "statutorily liable under Sections 11 and 12(a)(2) of the Securities Act for the materially inaccurate statements contained in the Offering Materials." (*Id.* ¶ 438.) Plaintiffs submit the claims in Counts III–V "do not sound in fraud, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims." (*Id.* ¶ 441.)

[13]   Count IV is only raised by Additional Plaintiffs. (*Id.* ¶ 523.)

On February 25, 2021, Coinbase filed its initial Registration Statement. (*Id.* ¶ 444.) Thereafter, on March 23, 2021, Coinbase filed its final amendment to the Registration Statement. (*Id.*) The Company's Registration Statement was declared effective by the SEC on April 1, 2021. (*Id.* ¶ 445.) The Form S-1 was signed by Armstrong, Haas, Jones, and the Director Defendants. (*Id.*) Shortly thereafter, Coinbase filed its Prospectus with the SEC, incorporating and forming part of the Registration Statement. (*Id.* ¶ 446.) Coinbase stated: "You should read this prospectus and any prospectus supplement before deciding to invest in our Class A common stock." (*Id.* ¶ 447.) The Securities Act Defendants also told investors to rely on the information provided by the Company in the Offering Materials. (*Id.* ¶ 448.) Coinbase registered for the resale of up to 114,850,769 shares of Class A common stock held by registered shareholders. (*Id.* ¶ 449.)

Plaintiffs allege that they "acquired Coinbase common stock pursuant and/or traceable to the Offering Materials." (*Id.* ¶ 518.) Lead Plaintiff specifically alleges it made two purchases totaling 33,696 shares on November 30, 2021, when 74% of the shares outstanding were registered pursuant to the Offering Materials. (*Id.* ¶ 40.) Additional Plaintiffs allege they purchased Coinbase stock on April 14, 2021, the first day of Coinbase's Direct Listing, at prices near the opening price and when 88% of shares outstanding were registered pursuant to the Offering Materials. (*Id.* ¶¶ 41–42.) Collectively, Additional Plaintiffs allege they bought 350 shares of Coinbase common stock. (*Id.*)

**\*6** The claims brought pursuant to the Securities Act allege the Offering Materials "contained untrue statements of material fact, and omitted material facts, about the Company's business and operations, including: (i) substantial, material risks associated with Coinbase's ability to safeguard its customers' crypto assets; and (ii) Coinbase's involvement in proprietary trading of cryptocurrency on its own exchange." (*Id.* ¶ 439; *see also id.* ¶¶ 452–91.) Further, Counts III–V are "are also premised upon the Securities Act Defendants' negligent failure to conduct a reasonable due diligence investigation into the accuracy and completeness of the representations contained in the Offering Materials." (*Id.* ¶ 440.) Plaintiffs also allege the Offering Materials did not disclose information that was required to be disclosed under SEC Regulation S-K. (*Id.* ¶¶ 492–99.)

### D. Procedural History

On July 16, 2021, the original class action complaint was filed in this matter, previously bearing the caption *Patel v. Coinbase Global, Inc. et al.*, Case No. 2:22-cv-04915-BRM-LDW. (ECF No. 1.) The original class action complaint named Coinbase, Armstrong, and Haas as defendants and brought two claims pursuant to the Exchange Act. (*Id.*) On September 27, 2022, another prospective plaintiff filed a class action complaint—naming Choi as an additional defendant—in a separate action entitled *Laffon v. Coinbase Global, Inc. et al.*, Case No. 2:22-cv-05744-BRM-LDW. Thereafter, several Motions for Consolidation, Appointment as Lead Plaintiff, and Approval of Lead Counsel were filed. (ECF Nos. 12, 13, 18, 20, 21, 22.) On December 12, 2022, the Honorable Leda D. Wettre, U.S.M.J. consolidated *Patel* and *Laffon*, appointed Sjunde AP-Fonden as Lead Plaintiff, approved Sjunde AP-Fonden's selection of Lead Counsel and Liaison Counsel, and ordered that Case No. 2:22-cv-04915-BRM-LDW shall constitute the Master File bearing the caption *In re Coinbase Global, Inc. Securities Litigation*. (ECF Nos. 49, 50.)

On February 22, 2023, Plaintiffs filed the Consolidated Class Action Complaint naming Coinbase, Armstrong, Haas, and Choi as defendants and bringing two claims pursuant to the Exchange Act. (ECF No. 59.) Thereafter, on May 10, 2023, Plaintiffs filed the First Amended Consolidated Class Action Complaint ("FAC") raising claims against Defendants. (ECF No. 62.) The FAC brought two claims pursuant to the Exchange Act, and three claims pursuant to the Securities Act of 1933 (the "Securities Act"). (*Id.*)

On July 20, 2023, Plaintiffs filed the 193-page, operative SAC raising claims against Defendants. (ECF No. 68.) Specifically,

Plaintiffs bring two causes of action under the Exchange Act (the "Exchange Act Claims"): Count I (Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Coinbase and the Executive Defendants); and Count II (Violations of Section 20(a) of the Exchange Act Against the Executive Defendants). Plaintiffs also bring three causes of action under the Securities Act (the "Securities Act Claims"): Count III (Violations of Section 11 of the Securities Act Against the Securities Act Defendants); Count IV (Violations of Section 12(a)(2) of the Securities Act Against the Securities Act Defendants); and Count V (Violations of Section 15 of the Securities Against Armstrong, Haas, Jones, and the Director Defendants).

On December 21, 2023, the parties filed the complete briefing related to Defendants' Motion to Dismiss the SAC.[14] (ECF Nos. 78–80.) Defendants' Motion to Dismiss the SAC is docketed as ECF No. 78 with the Brief in Support docketed as ECF No. 78-1, Plaintiffs' Opposition is docketed as ECF No. 79, and Defendants' Reply is docketed as ECF No. 80.

[14]    By Letter Order dated September 20, 2023, Judge Wettre granted the parties' request for a 20% extension of the page limits under Local Civil Rule 7.2. (ECF No. 70.) The parties requested extensions in light of the SAC "which is 193 pages in 12-point font, and its complexity." (*Id.*)

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

**\*7** In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly,* 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.' " *Id.* (citing *Twombly,* 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pleaded; it must include "factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.,* 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Iqbal,* 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal,* conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670.

**B. Heightened Pleading Standard**
The Private Securities Litigation Reform Act of 1995 (the "PSLRA") provides heightened pleading rules that a plaintiff must satisfy in securities class actions. *Institutional Invs. Grp. v. Avaya, Inc.,* 564 F.3d 242, 252 (3d Cir. 2009). "The PSLRA replaced [Federal Rule of Civil Procedure 9(b)] as the applicable pleading standard in

private securities class actions.... Nonetheless, 'Rule 9(b)'s particularity requirement is comparable to and effectively subsumed by the requirements of [15 U.S.C. § 78u–4(b)(1) of] the PSLRA.' " *Rahman v. Kid Brands, Inc.,* 736 F.3d 237, 242 n.3 (3d Cir. 2013) (alteration in original) (quoting *Avaya,* 564 F.3d at 253).

**\*8** Pursuant to Rule 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.,* 868 F.3d 231, 249 (3d Cir. 2017) (quoting Fed. R. Civ. P. 9(b)); *see also United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,* 812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging fraud must ... support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.' ") (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir. 2002)). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.' " *United States ex rel. Petras v. Simparel, Inc.,* 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum v. Bank of Am.,* 361 F.3d 217, 223–24 (3d Cir. 2004), *abrogated in part on other grounds by Twombly,* 550 U.S. at 557.

Likewise, to properly allege that a defendant made a false or misleading statement under the heightened pleading standard of the PSLRA, a private securities complaint "must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading' ...; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Tellabs, Inc. w. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321 (2007) (alteration in original) (quoting 15 U.S.C. §§ 78u-4(b)(1), (b)(2)). Therefore, the PSLRA "requires that a complaint state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." *Rahman,* 736 F.3d at 241–42 (citation and internal quotation marks omitted).

"To plead falsity, Rule 9(b) and the PSLRA each demand specificity." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,* 70 F.4th 668, 680 (3d Cir. 2023). "Although the pleading standards in Rule 9(b) and the PSLRA can be generally reconciled harmoniously for allegations of falsity, the PSLRA's requirements for allegations of *scienter*

control over the more lenient standard in Rule 9(b) for mental-state allegations." *Id.* at 681 n.1 (emphasis in original) (citing *Avaya,* 564 F.3d at 253 ("The PSLRA's requirement for pleading scienter ... marks a sharp break with Rule 9(b).")); *Tellabs,* 551 U.S. at 323–24); *compare* Fed. R. Civ. P. 9(b) (permitting "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally"), *with* 15 U.S.C. § 78u-4(b)(2)(A) (requiring a particularized statement of the "facts giving rise to a strong inference that the defendant acted with the required state of mind").

### III. DECISION

Defendants argue the SAC fails to plead a claim under Section 10(b) of the Exchange Act. (ECF No. 78-1 at 14–42.) Specifically, Defendants submit the SAC fails to allege: a material misstatement or omission (*id.* at 14–31); a strong inference of scienter (*id.* at 32–40); and loss causation (*id.* at 40–42). Defendants also assert the SAC does not sufficiently plead claims under the Securities Act as Plaintiffs lack standing, and in the alternative, Plaintiffs have failed to sufficiently plead required elements for claims under Sections 11 and 12 of the Securities Act. (*Id.* at 42–48.) Defendants conclude by arguing Counts II and V of the SAC should be dismissed because Plaintiffs have not adequately pled predicate claims. (*Id.* at 48.) The Court addresses each argument in turn.

### A. Defendants' Motion to Dismiss Count I of the SAC (Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Coinbase and the Executive Defendants) [15]

[15]  Although all of the Defendants are not named as the applicable group of defendants for this claim, the parties' briefing exclusively referred to either individual defendants or Defendants as a whole. The Court will therefore interchangeably refer to the applicable group of defendants as "Defendants," or this count's actual named defendants. For example, the Court will at times use "Defendants," as the parties did, or "Coinbase and the Executive Defendants."

**\*9**  Section 10(b) of the Exchange Act makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15

U.S.C. § 78j(b). SEC Rule 10b-5(b) applies this provision and provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 CFR § 240.10b-5(b). "The private right of action under Section 10(b) and Rule 10b–5 ... creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *Burlington Coat Factory,* 114 F.3d at 1417. To state a claim for securities fraud under Section 10(b) and SEC Rule 10b-5, "plaintiffs must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.,* 754 F.3d 159, 167 (3d Cir. 2014) (citations omitted).

### 1. Determinations As to Whether Plaintiffs Have Adequately Alleged Material Misrepresentations or Omissions

Defendants argue the Bankruptcy Risk Statements are not adequately alleged misrepresentations or omissions because: (i) they do not mention bankruptcy, and therefore could not have concealed or misled investors; (ii) "the SAC fails to allege a single fact suggesting any bankruptcy risk, let alone a risk to customer assets in a bankruptcy, existed at the time the challenged statements were made"; and (iii) several statements are non-actionable puffery or opinion. (ECF No. 78-1 at 14–20; *see also* ECF No. 80 at 2–6.) Defendants assert the Proprietary Trading Statements are not actionable because: (i) they are based on the WSJ Article, which was anonymously sourced, and therefore not sufficiently reliable; (ii) the WSJ Article does not contradict any challenged statement; (iii) Plaintiffs failed to allege contemporaneous falsity; and (iv) forward-looking statements are immune under the PSLRA's safe harbor provision. (ECF No. 78-1 at 20–25; *see also* ECF No. 80 at 6–8.) Next, Defendants submit the Regulatory Statements are not actionable false or misleading statements as Defendants: (i) did not have a duty to disclose their alleged understanding of the SEC's actions; (ii) did not misleadingly minimize the risk of the SEC's investigation; and (iii) merely provided nonactionable opinions. (ECF No. 78-1 at 25–31; *see also* ECF No. 80 at 8–11.)

In opposition, Plaintiffs counter the SAC sufficiently alleges materially false and misleading statements. (ECF No. 79 at 13–30.) Plaintiffs assert the Bankruptcy Risk Statements are actionable because: (i) Defendants' statements about asset security created an affirmative duty for Defendants to fully disclose the risk that customers' assets would face in the event of a bankruptcy; (ii) the omission of the risk to customers' assets was material; and (iii) they do not constitute puffery or opinion. (*Id.* at 13–22.) Plaintiffs contend Defendants' arguments as to the Proprietary Trading Statements are misplaced because: (i) the WSJ Article is a proper basis for misleading and false statements; and (ii) the PSLRA's safe harbor provision does not apply. (*Id.* at 22–25.) As to the Regulatory Statements, Plaintiffs submit they are actionable, materially false and misleading statements because: (i) Coinbase listed crypto assets that its own review process determined were likely securities; (ii) the SEC had indicated to Defendants that most assets on the platform were securities; (iii) Defendants admitted that Coinbase faced "an imminent enforcement action"; (iv) Defendants had a duty to disclose material facts related to the potential SEC action. (*Id.* at 25–30.)

"[A] fact or omission is material only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information' available to the investor." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). "[M]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 n. 11 (3d Cir. 1992), *cert. denied*, 506 U.S. 934 (1992) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). Consequently, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Id.* (citing *TSC Indus.*, 426 U.S. at 450).

**\*10** "There is no affirmative duty to disclose all material information, but such a duty may arise when a company chooses 'to speak about a material subject to investors.' " *In re Amarin Corp. PLC Sec. Litig.*, No. 21-2071, 2022 WL 2128560, at \*3 (3d Cir. June 14, 2022) (quoting *Edinburgh Council*, 754 F.3d at 174); *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("Once a company has chosen to speak on an issue—even an issue it had no

independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading."); *In re Bristol-Myers Squibb Sec. Litig.*, Civ. A. No. 00-1990, 2005 WL 2007004, at \*23 (D.N.J. Aug. 17, 2005) ("[A] defendant may choose silence or speech based on the then-known factual basis, but cannot choose half-truths." (citation omitted)). Notably, "the question of whether disclosure was required is best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact." *In re: Enzymotec Sec. Litig.*, Civ. A. No. 14-5556, 2015 WL 8784065, at \*15 (D.N.J. Dec. 15, 2015) (citing *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997)).

### i. The Bankruptcy Risk Statements

The Court first addresses the materiality of the concealed bankruptcy risk to customers' assets. Defendants argue Plaintiffs' claims premised upon the Bankruptcy Risk Statements fail because Coinbase was not at risk of bankruptcy. (ECF No. 78-1 at 16–19; ECF No. 80 at 3–5.) Plaintiffs counter that their "claim is not that Coinbase failed to disclose an imminent risk of bankruptcy. Rather, Coinbase and the Executive Defendants failed to disclose that, in the event of a bankruptcy—a common experience among crypto peers—Coinbase's customers were at risk of losing their assets." (ECF No. 79 at 17.) Plaintiffs' framing of this issue is persuasive. To the extent Defendants assert that the risks associated with a bankruptcy are not material, Defendants' position is contradicted by the Company's admissions in the May 10, 2022 Form 10-Q report. In this SEC filing, the Company disclosed the relevant asset safety risks and conceded that this disclosure "may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition." (ECF No. 68 ¶ 231.) In this admission, the Company effectively acknowledged the "substantial likelihood" that the omission of the bankruptcy risk was material to investors. *NAHC*, 306 F.3d at 1330. Further, the materiality of this information was evidenced by the disclosure's significant impact on the market. *See In re Able Labs. Sec. Litig.*, Civ. A. No. 05-2681, 2008 WL 1967509, at \*15 (D.N.J. Mar. 24, 2008) ("[T]he significant decrease in stock price immediately following the disclosure of the adverse information satisfies the Third

In re Coinbase Global, Inc. Securities Litigation, Slip Copy (2024)

2024 WL 4053009, Fed. Sec. L. Rep. P 101,922

Circuit's standard for pleading materiality."). Based on the foregoing, the Court finds the Bankruptcy Statements are material.

Plaintiffs have also properly alleged that Coinbase and the Executive Defendants had a duty to disclose the bankruptcy risk to customers' assets. In the Asset Safety Disclosures, Coinbase and the Executive Defendants candidly detailed the need to safeguard customers' assets. (*See* ECF No. 68 ¶¶ 96–97, 258–59, 270, 273, 276, 284.) The Company specified only two risks—hacking and the "loss or destruction of private keys"—in safeguarding customers' assets. (*Id.*) Elsewhere, the Executive Defendants repeatedly emphasized the security that Coinbase offered. (*Id.* ¶¶ 89, 129.) However, Defendants knew they had not taken steps to protect the Company's retail customers' assets from potential bankruptcy risks. (*Id.* ¶¶ 14–16, 112–20.) By placing the safety of customers' assets "in play," through the statements described above, Coinbase was "bound to speak truthfully" and disclose the risks that its retail customers' assets faced. *Shapiro*, 964 F.2d at 282; *see Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe 'a favorable picture' of a material issue 'without including the details that would have presented a complete and less favorable one.' " (quoting *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018))). In noting that hacking and lost keys were risks to safeguarding customers' assets, Coinbase and the Executive Defendants had a duty to provide the complete picture of known risks to customer' assets.[16] Instead, Coinbase and the Executive Defendants concealed their knowledge of the potential bankruptcy risks to safeguarding customers' assets.[17]

[16]    Defendants' argument, that bankruptcy courts have found that customers' crypto assets are not part of a cryptocurrency platform's estate, is misguided. (*See* ECF No. 78-1 at 18–19.) The legal landscape that has played out following the period when the Bankruptcy Statements were made is not relevant to the Court's analysis.

[17]    Armstrong's admissions following the May 10, 2022 Form 10-Q report are illuminating. (*See* ECF No. 68 ¶¶ 121, 232 (conceding that Coinbase: "should have updated our retail terms sooner" to provide retail customers with "the same protections" as institutional customers; and "didn't

communicate proactively when this risk disclosure was added").

**\*11**    Additionally, the Court is guided by Item 303 of SEC Regulation S-K which requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Defendants correctly note that "Item 303 does not create an 'affirmative duty of disclosure' that, if violated, would 'automatically give rise to a material omission under Rule 10b-5.' " (ECF No. 78-1 at 15 n.3 (citing *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000)). Notwithstanding, Coinbase and the Executive Defendants' failure to disclose the known uncertainty of the risks that bankruptcy posed to asset safety in violation of Item 303 rendered the Asset Safety Disclosures materially misleading. *See In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 392 (D.N.J. 2018) ("[A]n omission in the context of Item 303 can give rise to a Rule 10b-5 claim *if the Item 303 omission renders other statements materially misleading.*" (emphasis in original)); *cf. Oran*, 226 F.3d at 288 ("Because plaintiffs have failed to plead any actionable misrepresentation or omission under [Rule 10b-5], SK-303 cannot provide a basis for liability.")

The Court concludes this section by addressing Defendants' argument that several of the Bankruptcy Risk Statements are non-actionable puffery and opinion. (*See* ECF No. 78-1 at 19–20; *see also* ECF No. 80 at 6.) The statements that Defendants argue are puffery and opinion each tout the trust that customers have in Coinbase due to its ability to safely secure customers' crypto assets. (*See* ECF No. 68 ¶¶ 268, 279, 281–82, 289–90.) "[V]ague and general statements of optimism 'constitute no more than "puffery" and are understood by reasonable investors as such.' " *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (quoting *Burlington Coat Factory*, 114 F.3d at 1428 n.14). "A statement is considered puffery only when it is immaterial." *Enzymotec*, 2015 WL 8784065, at *14. An opinion "is misleading if it: (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police*, 70 F.4th at 686.

The Court finds that the subject statements here, to the extent they highlight Coinbase's alleged ability to safely store customers' assets, are actionable as they contain "embedded" falsities and concern a central part of Coinbase's business. *See id.*; *see also W. Palm Beach Police Pension Fund v. DFC*

2024 WL 4053009, Fed. Sec. L. Rep. P 101,922

Glob. Corp., Civ. A. No. 13-6731, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) ("Far from being a vague statement of intention or optimism, fraudulent comments regarding ... a fundamental aspect of [defendant's] business are of vital importance to investors."). However, to the extent the subject statements emphasize customers' trust in Coinbase, the Court finds these portions to be non-actionable puffery and opinion. See Advanta Corp., 180 F.3d at 538; City of Warren Police, 70 F.4th at 686 ("An opinion statement ... is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.").

Accordingly, the portion of Defendants' Motion seeking to dismiss Count I, to the extent it is premised upon the Bankruptcy Statements that tout customers' trust in the Company, is **GRANTED**, as these assertions constitute puffery and opinion. The remaining portions of Defendants' Motion to Dismiss Count I for failure to properly allege that the Bankruptcy Risk Statement are actionable, material misrepresentations and omissions are **DENIED**.

ii. The Proprietary Trading Statements

The theory of recovery generally alleged in the Proprietary Trading Statements is that Defendants materially misrepresented and/or omitted the fact that they were engaged in proprietary trading. It is undisputed that Plaintiffs' allegations as to the existence of Coinbase's proprietary trading venture explicitly rely upon the September 22, 2022 WSJ Article, see Burlington Coat Factory, 114 F.3d at 1426, which describes its sources with phrases such as "people close to the matter" and "people at the company." (ECF No. 78-4 at 1.)

**\*12** To satisfy the heightened pleading standard in a securities-fraud case, "media sources must be sufficiently detailed to indicate [ ] their reliability and be based on an independent investigative effort." In re Mylan N.V. Sec. Litig., Civ. A. No. 20-955, 2023 WL 3539371, at *6 (W.D. Pa. May 18, 2023) (alteration in original) (quoting In re Loewen Grp. Inc. Sec. Litig., Civ. A. No. 98-6740, 2004 WL 1853137, at *6 (E.D. Pa. Aug. 18, 2004)); see In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." (citation

and internal quotation marks omitted)). Generally, when considering confidential witness allegations, it is proper to "evaluat[e] the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.' " Avaya, 564 F.3d at 263 (quoting Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004)).

Although the WSJ Article provides alleged details as to the background of the formation of Coinbase's proprietary trading unit and a specific trade that was executed (ECF No. 68 ¶¶ 144, 147; ECF No. 78-4 at 1–3), the Court finds that the WSJ Article, and by extension, the dependent allegations contained in the SAC do not satisfy the heightened pleading standard. In Mylan N.V., the district court found that allegations reliant upon both an anonymously sourced book and Bloomberg articles met the pleading standard because: the authors' reporting was detailed and derived from comprehensive "independent investigative efforts"; the "unnamed witnesses [were] described with enough particularity to give the Court confidence that the information they provided was reliable"; and "most of the allegations from the [operative] complaint that borrow from the [book] relate to reporting that could be plausibly corroborated by a review of documents examined by [the book's author] and the authors of the Bloomberg articles." 2023 WL 3539371, at *8. Conversely, the WSJ Article here does not provide corroborative sources, sufficient detail about the confidential sources, or any indication that it is based on independent investigative efforts. In fact, the WSJ Article does not provide any additional information, such as the sources' job titles or the bases of the sources' knowledge.

Courts have rejected similar claims based on unsubstantiated, anonymous sources. See, e.g., In re Vale S.A. Sec. Litig., Civ. A. No. 15-cv-9539, 2017 WL 1102666, at *27 (S.D.N.Y. Mar. 23, 2017) (dismissing securities fraud claims that "relie[d] on 'unattributed' statements in the [WSJ] ... for failure to satisfy the Fed. R. Civ. P. 9(b) pleading standard" because the newspaper article relied upon an "unidentified" employee as its source and neither the article nor the complaint provided further information about the source); see also Chan v. New Oriental Educ. & Tech. Grp. Inc., Civ. A. No. 16-9279, 2019 WL 2865452, at *7 (D.N.J. July 3, 2019) (finding the subject "article [did] not meet the heightened particularity required of claims under Section 10(b) and Rule 10b-5" as the article was "devoid of [relevant] information," and did not provide "the who, what, when, where, and how"); cf. Loewen

*Grp.*, 2004 WL 1853137, at *6 (applying the heightened pleading standard associated with claims under the PSLRA and declining to consider allegations from an unnamed source where plaintiffs did not provide "sufficient information about the source," as Plaintiffs did "not say for whom the source worked or in what capacity").

Therefore, the Court finds Plaintiffs have not adequately pled that the Proprietary Trading Statements are material misstatements and omissions because the WSJ Article does not provide the sufficient level of detail required by the heightened pleading standard and does not indicate an independent investigative effort. Accordingly, the portion of Defendants' Motion to Dismiss Count I, to the extent it is premised upon the Proprietary Trading Statements, is **GRANTED**. [18] Because the Court finds Plaintiffs have not adequately alleged material misrepresentations and omissions in the Proprietary Trading Statements, the Court will not address the remaining issues and arguments related to the Proprietary Trading Statements and Count I. *See Chan*, 2019 WL 2865452, at *7 n.6 ("In view of the amended complaint's failure to adequately plead material misrepresentations or scienter, the Court need not reach whether loss causation is sufficiently pleaded."); *Vale S.A.*, 2017 W.L. 1102666, at *27 ("Because the speaker of the statements quoted in the Wall Street Journal is not identified, these allegations must be dismissed, before even arriving at Defendants' loss causation arguments on this point.").

[18]　　The Court notes Defendants identified another basis that warrants dismissal of Plaintiffs' claims premised upon a subset of the Proprietary Trading Statements. Plaintiffs did not raise allegations as to when the plans for Coinbase's proprietary trading venture were supposedly made. Therefore, Plaintiffs did not adequately allege the point at which the Proprietary Trading Statements actually were false. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("[W]ithout contemporaneous falsity, there can be no fraud." (citation omitted).) As Defendants state, "a test trade made at some point in 2022 cannot show contemporaneous falsity for any statements that came before it including all of the 2021 statements." (ECF No. 78-1 at 24.)

### iii. The Regulatory Statements

**\*13**　Next, the Court addresses the parties' arguments related to the Regulatory Statements. Defendants' primary argument is that they did not have a duty to disclose their alleged understanding of the SEC's actions. (ECF No. 78-1 at 26–29.) In this category of the Challenged Statements, Plaintiffs allege Coinbase and the Executive Defendants misrepresented and omitted that Coinbase listed crypto assets that were likely securities from 2019 through 2021 thereby concealing the likelihood of a SEC enforcement action. (ECF No. 68 ¶¶ 25, 178, 182–83, 342, 345, 357, 379.) Plaintiffs allege Defendants told investors in 2022 that "Coinbase does not list securities. End of story." (*Id.* ¶ 343); *see also id.* ¶ 348 ("[T]he company does not list securities."). Grewal, speaking on behalf of Coinbase, assured investors that "Coinbase has a rigorous process to analyze and review each digital asset before making it available on our exchange—a process that the SEC itself has reviewed." (*Id.* ¶ 343.) Previously, Defendants had stated Coinbase only listed assets "for which we determine there are reasonably strong arguments to conclude that the crypto asset is not a security." (*Id.* ¶ 188.) Defendants further represented: "[w]e are confident that our rigorous diligence process ... keeps securities off our platform." (*Id.* ¶ 346.)

The Court finds Plaintiffs have adequately alleged that Defendants misleadingly described a favorable picture of the improbability that the SEC would file an enforcement action by repeatedly emphasizing that the crypto assets they listed were not securities. Although "disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing," *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citations and internal quotation mark omitted), Defendants still had an obligation to "include the details that would have presented a complete and less favorable one." *Becton*, 620 F. Supp. 3d at 186; *see also Williams*, 869 F.3d at 241 ("Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading."). The Regulatory Statements are misleading as Plaintiffs allege Coinbase decided to list crypto assets from late 2019 through 2021, that its own review process determined had "high 'risk' scores," and thus were likely to be securities." (ECF No. 68 ¶¶ 25, 182–83, 379; *see also id.* ¶ 182.) Further, a subset of the statements were misleading in that Defendants

concealed that the SEC had indicated to Defendants by mid-2022 that most crypto assets on Coinbase's platform were likely securities. (*Id.* ¶¶ 151, 378.) Therefore, the Court finds that Plaintiffs have adequately pled Defendants had a duty to disclose material facts related to the likelihood that the crypto assets listed were securities and, as a result, the likelihood that the SEC would file an enforcement action. *Cf.Becton, 620 F. Supp. 3d at 187* ("The fact that the FDA had not issued a formal warning letter ... does not mean that the [defendant] was free to issue misleading statements that failed to recognize the serious, immediate, and known risks posed by a near-certain enforcement action."); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) ("[W]hen the FDA tells a company about problems with a product, and the company nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity.") (quoting *In re MannKind Sec. Actions, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011)*). [19]

[19]    Additionally, the Court is not swayed by Defendants' argument that the Regulatory Statements did not misleadingly minimize the potential of an SEC investigation. Although Defendants warned of "regulatory uncertainty" (ECF No. 68 ¶ 205), generic warnings of a risk do "not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014). As to Defendants' contention that a portion of the Regulatory Statements— statements promoting Coinbase's review process and providing that the Company does not list securities—are nonactionable opinions, the Court disagrees and finds these statements are actionable as they did not "fairly align[ ] with the information in [their] possession." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *see alsoCity of Warren Police*, 70 F.4th at 686; *W. Palm Beach Police*, 2015 WL 3755218, at *13.

**\*14**  To the extent Defendants claim they did not have a duty to "speculate" as to the SEC's actions (ECF No. 78 at 26– 29), the Court finds this argument is misplaced as Plaintiffs' claim is better qualified as seeking recourse for the misleading nature of the Regulatory Statements in concealing "that the Company had listed assets that its own internal process had flagged as likely securities, and that the SEC had told it that

most assets it listed were likely securities, thus increasing the risk that the SEC would bring an enforcement action." (ECF No. 79 at 28 n.16.) Further, this argument is contradicted by Plaintiffs' allegations that Defendants knew Coinbase faced "an imminent enforcement action," yet continued to minimize the risks of a regulatory action. (ECF No. 68 ¶¶ 209–15.)

Accordingly, the portion of Defendants' Motion to Dismiss Count I, to the extent it is premised upon the Regulatory Statements, is **DENIED**.

### 2. Plaintiffs Have Sufficiently Alleged Scienter

Defendants also argue the SAC does not sufficiently allege a strong inference of scienter. (ECF No. 78-1 at 32–40.) Specifically, Defendants assert Plaintiffs fail to allege: (i) Defendants' motive; (ii) conscious misbehavior or recklessness; and (iii) circumstantial evidence of fraud. (*Id.*) In opposition, Plaintiffs counter the SAC adequately alleges Defendants' scienter because: (i) "Defendants knew, or at the very least were reckless to disregard, information indicating that Coinbase's customers were at risk of asset loss in the event of bankruptcy"; (ii) Defendants knew Coinbase listed crypto assets that were likely securities; and (iii) the SAC provides particularized allegations that Defendants were motivated to artificially inflate Coinbase's stock. (ECF No. 79 at 30–41.) In reply, Defendants reiterate Plaintiffs did not adequately plead scienter because Plaintiffs fail to allege Defendants' motive to commit fraud, and conscious misbehavior or recklessness. (ECF No. 80 at 11–15.) As to motive, Defendants assert, "no facts suggest that the timing of the 10b5-1 plans was linked to any attempt to increase Coinbase's stock price 'immediately before the scheduled sales,' ... to the contrary, the trading plans caused Defendants to sell at some of the lowest prices of the putative class period." (*Id.* at 12) (quoting *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015).) [20]

[20]    In their reply brief, Defendants raise arguments that Plaintiffs' allegations are improper group pleading as "Plaintiffs must allege with particularity on a defendant-by-defendant and statement-by-statement basis that the challenged statements were made with deliberate recklessness," and "Plaintiffs cannot allege 'corporate scienter.' " (*Id.* at 11–12) (citing *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007); *In re Great Atl. & P. Tea Co.*,

*Inc. Sec. Litig.*, 103 F. App'x 465, 469 (3d Cir. 2004); *In re Hertz Glob. Holdings, Inc. Secs. Litig.*, Civ. A. No. 13-7050, 2017 WL 1536223, at *23 (D.N.J. Apr. 27, 2017), *aff'd sub nom.,In re Hertz Glob. Holdings*, 905 F.3d 106 (3d Cir. 2018)). The Court did not consider these arguments because Defendants improperly raised them for the first time in their reply brief. *See Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 202–03 (3d Cir. 2004) ("[A]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court."); *see also Dana Transp. v. Ableco Fin.*, Civ. A. No. 04-2781, 2005 WL 2000152, at *6 (D.N.J. Aug. 17, 2005) (holding that it is axiomatic in federal practice that arguments raised for the first time in a reply brief should be disregarded). Defendants' arguments can be re-raised, if applicable, in a motion to dismiss Plaintiffs' amended pleading.

**\*15** To satisfy the particularity requirement of the PSLRA, the plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter, "the intent to deceive, manipulate, or defraud either knowingly or recklessly," is the required state of mind. *PAMCAH-UA Loc. 675 Pension Fund v. BT Grp. PLC*, No. 20-2106, 2021 WL 3415060, at *1 (3d Cir. Aug. 5, 2021) (citations omitted); *see also Tellabs*, 551 U.S. at 319 (noting scienter is "a mental state embracing intent to deceive, manipulate, or defraud (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). "The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). To survive a motion to dismiss, plaintiffs must plead facts that allow "a reasonable person [to] deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id.* at 324. "The inference ... need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Id.*

"In the Third Circuit, '[s]cienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud.' " *Roofer's Pension Fund v. Papa*, Civ. A. No. 16-2805, 2018 WL 3601229, at *16 (D.N.J. 2018) (quoting *In re Anadigics, Inc., Sec. Litig.*, Civ. A. No. 08-5572, 2011 WL 4594845,

at *32 (D. NJ. Sept 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012)). "Demonstrating that a defendant had a motive, such as personal financial gain, to commit a securities fraud violation is a 'relevant consideration' that 'may weigh heavily in favor of a scienter inference[.]' " *Hertz Glob. Holdings*, 905 F.3d at 119 (quoting *Tellabs*, 551 U.S. at 325); *see also Rahman*, 736 F.3d 237, 246 (3d Cir. 2013) ("Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when concluding a holistic review of the evidence."). However, "motive and opportunity" do not "serve as an independent route to [establishing] scienter." *Avaya*, 564 F.3d at 277. "[A] plaintiff properly pleads scienter by alleging facts that 'constitute circumstantial evidence of either reckless or conscious behavior.' " *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014) (quoting *Avaya*, 564 F.3d at 276–77). A plaintiff relying upon circumstantial evidence to support a strong inference of scienter "must sufficiently plead 'defendants' knowledge of facts or access to information contradicting their public statements ... [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Roofer's Pension Fund*, 2018 WL 3601229, at *18 (quoting *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001)).

### 1. Plaintiffs Have Adequately Alleged Defendants Made the Bankruptcy Risk Statements with Scienter

Plaintiffs have adequately set forth allegations that constitute circumstantial evidence by alleging Defendants' reckless and conscious actions in making the Bankruptcy Risk Statements. Plaintiffs allege the following: (i) Defendants submitted the SEC Comment Letter demonstrating Defendants' understanding that the commingling of customers' assets could lead to adverse consequences in the event of a bankruptcy (ECF No. 68 ¶¶ 13, 105–09); (ii) Defendants took affirmative steps to mitigate the potential bankruptcy risks to institutional customers' assets (*id.* ¶¶ 14–16, 112–20); (iii) Armstrong eventually conceded that Defendants "should have updated our retail terms sooner" to provide retail customers with "the same protections" as institutional customers (*id.* ¶¶ 121, 232). Based on these allegations, the Court finds Plaintiffs have alleged reckless and/or conscious behavior that supports a strong inference of scienter as plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Campbell Soup*, 145 F. Supp. 2d at 699 (quoting

*Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). Further, Plaintiffs have established a strong inference of scienter by alleging "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.* (quoting *Novak*, 216 F.3d at 308).

 **\*16** Additionally, Plaintiffs' allegations—that retail fees make up a substantial portion of Coinbase's revenue and that Defendants acknowledged asset security was vital to their efforts in retaining retail clients—are further persuasive here. *See Avaya*, 564 F.3d at 268 (acknowledging that "since competition, pricing policies, and pricing concessions are 'core matters' of central importance to [defendant] and its principal executives, a 'core operations inference' supports scienter"); *see also In re Allergan Generic Drug Pricing Sec. Litig.*, Civ. A. No. 16-9449, 2019 WL 3562134, at \*12 (D.N.J. Aug. 6, 2019) (finding scienter was supported when challenged statements were on a subject that constituted a "substantial portion" of the defendant's revenue); *In re Cell Pathways, Inc., Sec. Litig.*, Civ. A. No. 99-725, 2000 WL 805221, at \*7 (E.D. Pa. June 20, 2000) (finding "where the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the individual defendants" (citation omitted)).

### 2. Plaintiffs Have Adequately Alleged the Regulatory Statements Were Made with Scienter

Relevant to the Regulatory Statements, Plaintiffs allege: Coinbase co-founded the CRC (ECF No. 68 ¶¶ 179–81); Defendants knew that Coinbase listed crypto assets which were likely securities (*id.* ¶¶ 25, 182–83, 379); Defendants knowingly downplayed the likelihood that the SEC would bring an enforcement action (*id.* ¶¶ 178, 342, 345, 357); the SEC told Defendants that "we think everything other than Bitcoin is a security" (*id.* ¶¶ 151, 378); Armstrong conceded Defendants were aware of the SEC's position by mid-2022 (*id.* ¶¶ 209, 378); despite Defendants knowledge of "an imminent enforcement action," they continued to minimize the risks of a regulatory action (*id.* ¶¶ 209–215). Accordingly, the Court also finds Plaintiffs have adequately alleged Defendants actions support a strong inference of scienter as plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Campbell Soup*, 145 F. Supp. 2d at 699; *cf. Frater*, 996 F. Supp. 2d at 350 ("When the FDA tells a company about problems with a product, and the company

nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity.").

### 3. Plaintiffs' Allegations that Defendants Were Financially Motivated to Artificially Inflate Coinbase's Stock Further Support a Strong Inference of Scienter

The Court also finds Plaintiffs' allegations as to Armstrong's financial motivations further support a finding that Plaintiffs have sufficiently alleged the Bankruptcy Risk and Regulatory Statements were made with scienter. (*See, e.g.*, ECF No. 68 ¶¶ 6, 81–82 (alleging Armstrong was highly motivated to complete a successful Direct Listing as doing so would entitle him to a compensation package valued at over \$3.7 billion)[21]; *id.* ¶¶ 81–84, 386 (noting Armstrong was also entitled to "tranches" of stock options if the Company maintained stock prices following the Direct Listing).[22] Additionally, stock sales that are "unusual in scope or timing ... may support an inference of scienter." *Advanta Corp.*, 180 F.3d at 540 (citing *Burlington Coat Factory*, 114 F.3d at 1424; *Shaw*, 82 F.3d at 1224). Here, in the first two days that Coinbase's stock was listed, the Executive Defendants sold over 1.6 million shares netting gross proceeds over \$600 million. (ECF No. 68 ¶ 125.) During the Class Period, the Executive Defendants sold over 2.8 million shares of Coinbase netting gross proceeds of nearly one billion dollars. (*Id.*)

[21] Plaintiffs also allege Armstrong's base salary was just \$1 million (*id.* ¶ 84). *Cf. In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (noting that a factor relevant to inferring scienter is "whether the profits were substantial relative to the seller's ordinary compensation" (citing *Burlington Coat Factory*, 114 F.3d at 1423)).

[22] *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (finding particularized allegations of scienter as executives were "motivated to inflate [the company]'s financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance").

**\*17** Based on the foregoing, the Court finds Plaintiffs' additional evidence of scienter contributes to a finding of scienter. While these individual allegations may not give rise to an inference of scienter on their own, "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc.*, 551 U.S. at 323 (emphasis in original). Accordingly, the Court finds Plaintiffs have adequately alleged scienter. Defendants' Motion to Dismiss Count I for failure to allege scienter is **DENIED**.

### 3. Plaintiffs Have Properly Alleged Loss Causation

Defendants assert the SAC fails to allege loss causation "because Plaintiffs do not allege any corrective disclosure of a previously concealed truth that caused Coinbase's stock price to decline." (ECF No. 78-1 at 40 (citation and internal quotation marks omitted); *see also* ECF No. 80 at 16.) In opposition, Plaintiffs counter the SAC adequately alleges loss causation. (ECF No. 79 at 41–44.)

"Under the PSLRA, a plaintiff asserting a claim under Section 10(b) bears the burden of proving 'loss causation,' *i.e.*, 'that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages.' " *Takata v. Riot Blockchain, Inc.*, Civ. A. No. 18-02293, 2020 WL 2079375, at \*17 (D.N.J. Apr. 30, 2020) (quoting 15 U.S.C. § 78u-4(b)(4)). "Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA: all that is required is that plaintiff provide 'some indication of the loss and the causal connection that the plaintiff has in mind,' consistent with Rule 8(a)." *Dudley v. Haub*, Civ. A. No. 11-05196, 2013 WL 1845519, at \*18 (D.N.J. Apr. 30, 2013) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). The Third Circuit applies a "practical approach [to loss causation], in effect applying general causation principles." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007) (quoting *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)). Thus, "to show that a misrepresentation or omission proximately caused an economic loss," a plaintiff need only to allege "the misrepresentation [or omission] touches upon the reasons for the investment's decline in value." *Id.* at 428 (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983)).

Importantly, "[t]he issue of loss causation is usually not resolved on a motion to dismiss." *Dudley*, 2013 WL 1845519, at \*18 (citing *EP Medsystems*, 235 F.3d at 884 ("Whether the plaintiff has proven [loss] causation is usually reserved for the trier of fact.")); *see Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) ("[Plaintiff]'s burden to plead loss causation is 'not a heavy one,' and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, 'the chain of causation is ... not to be decided on a Rule 12(b)(6) motion to dismiss.' " (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015))).

Here, Plaintiffs have sufficiently set forth a causal link between the Bankruptcy Risk Statements and their alleged losses by alleging Coinbase's May 10, 2022 Form 10-Q report, which belatedly disclosed the previously concealed asset safety risks posed by a bankruptcy, caused Coinbase's stock price to drop more than 26%. [23] (ECF No. 68 ¶¶ 231, 233.) Similarly, Plaintiffs have plausibly alleged a causal link between the Regulatory Statements and their alleged losses by alleging multiple stock price drops were connected to the misleading nature of the Regulatory Statements. (*See id.* ¶¶ 197, 200–01, 219, 238, 247–49, 253–55.)

[23]     The Court is not persuaded by Defendants' argument that the risks to customers' assets associated with a bankruptcy had "already been disclosed" prior to May 10, 2022. (ECF No. 78-1 at 40–41; *see also* ECF No. 80 at 16.) The Court agrees with Plaintiff's framing of this issue and finds that dismissal is not warranted on this basis. (*See* ECF No. 79 at 42 n.25 (quoting *Roofer's Pension Fund*, 2018 WL 3601229, at \*9 ("[T]he truth on the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint.").

**\*18** Further, as Plaintiffs need only "provide some indication of the loss and the causal connection," *Dura Pharms.*, 544 U.S. at 347, the Court finds Plaintiffs have sufficiently alleged a causal link by generally alleging the Bankruptcy Risk Statements and Regulatory Trading Statements artificially inflated prices and by specifically alleging a causal link between the reveals of the concealed, material information and the Company's stock price drops. *See Jones v. Intelli-Check*, 274 F. Supp. 2d 615, 635–36 (D.N.J. 2003) (holding plaintiffs adequately pled causation where plaintiffs relied on generalized allegations); *see also EP Medsystems*, 235 F.3d at 885 ("Although ... the allegation that it 'sustained substantial financial losses as a direct result of

the aforementioned misrepresentations and omissions on the part of [defendant company]' could have more specifically connected the misrepresentation to the alleged loss, *i.e.*, investment in a company with little prospects, when we draw all reasonable inferences in plaintiff's favor, we conclude that [plaintiff] has adequately alleged loss causation."); *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, Civ. A. No. 20-3135, 2022 WL 4539119, at *20 (S.D.N.Y. Sept. 28, 2022) (finding allegations sufficiently pled loss causation because the allegations were "more than simply pleading inflated prices," instead the allegations "put defendants on notice of the loss to the class and the causal connection lead plaintiff has in mind"). Accordingly, Defendants' Motion to Dismiss Count I of the SAC for failure to adequately allege loss causation is **DENIED**.

To summarize the holdings from Section III.A., Defendants' Motion to Dismiss Count I is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Dismiss Count I, to the extent it is premised upon the Proprietary Trading Statements and the Bankruptcy Statements that tout customers' trust in the Company, is **GRANTED**. The remaining portions of Defendants' Motion to Dismiss Count I are **DENIED**.

### B. Defendants' Motion to Dismiss Count II of the SAC (Violations of Section 20(a) of the Exchange Act Against the Executive Defendants)

Defendants assert Plaintiffs' claims for control person liability under Sections 20(a) of the Exchange Act should be dismissed because Plaintiffs fail to plead an underlying violation of Section 10(b). (ECF No. 78-1 at 48; ECF No. 80 at 18.) To state a claim under Section 20(a) of the Exchange Act, the plaintiff must allege: "(1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Intelli-Check, Inc.*, 274 F. Supp. 2d at 645. Liability under Section 20(a) "is derivative of an underlying violation of Section 10(b) by the controlled person." *Rahman*, 736 F.3d at 247 (quoting *Avaya*, 564 F.3d at 252). "Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 280 (D.N.J. 2007) (citations omitted). Here, the Court has held that Plaintiffs have sufficiently pled underlying violations of Section 10(b) against the Executive Defendants in Count I of the SAC premised upon the Bankruptcy Risk Statements [24]

and the Regulatory Statements. Accordingly, Defendants' Motion to Dismiss Count II of the SAC is **DENIED**.

[24]    As held above, *supra* Section III.A.1.i., the Bankruptcy Statements that touted customers' trust in the Company are not actionable misstatements as these assertions constitute puffery and opinion.

### C. Defendants' Motion to Dismiss Count III (Violations of Section 11 of the Securities Act Against the Securities Act Defendants)

Defendants assert Plaintiffs' claims under Section 11 of the Securities Act should be dismissed for lack of standing because Plaintiffs have not adequately pled that they purchased Coinbase shares traceable to the Company's Registration Statement. (ECF No. 78-1 at 43–45; ECF No. 80 at 16–17.) Additionally, Defendants argue Plaintiffs fail to adequately plead the required elements of a Section 11 claim. (ECF No. 78-1 at 46–47; ECF No. 80 at 17–18.) In opposition, Plaintiffs argue they have adequately pled claims under Section 11 of the Securities Act because they have pled standing and the required elements. (ECF No. 79 at 44–47.) As to standing, Plaintiffs submit they have plausibly alleged that they purchased Coinbase stock traceable to the misleading Offering Materials. (*Id.* at 44–46.)

### 1. Section 11 Standing [25]

[25]    The parties frame their arguments as related to the issue of Plaintiffs' "standing" under Section 11 and Section 12 of the Securities Act, but the arguments may be "more properly characterized as arguments about the scope of the cause of action because they do not, as standing does, go to this Court's subject matter jurisdiction." *Lozada v. TaskUs, Inc.*, Civ. A. No. 22-1479, 2024 WL 68571, at *15 n.19 (S.D.N.Y. Jan. 5, 2024) (citing *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)) ("[A] plaintiff must have a cause of action under the applicable statute. This was formerly called statutory standing." (internal quotation marks omitted)). Notwithstanding, the Court will utilize the same terminology the parties used in their briefing.

**\*19** Under Section 11 of the Securities Act, standing is available to purchasers "who acquired securities issued 'pursuant to' or 'traceable to' the specific offering documents

that are alleged to be false or misleading." *De Vito v. Liquid Holdings Grp., Inc.*, Civ. A. No. 15-6969, 2018 WL 6891832, at *15 (quoting *Suprema Specialties*, 438 F.3d at 274 n.7); *see also* *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023) (holding Section 11 requires "a plaintiff to plead and prove that he purchased shares traceable to the allegedly defective registration statement").[26] Notably, "[t]he pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement." *Alta Partners, LLC v. Forge Glob. Holdings, Inc.*, Civ. A. No. 23-2647, 2024 WL 1116682, at *7 (S.D.N.Y. Mar. 13, 2024) (quoting *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011)); citing *City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020) ("[Plaintiff] alleges that it purchased [defendant's] stock pursuant or traceable to the offerings.... This is enough to confer standing at this stage to assert a [Section] 11 claim.").

[26]    In *Slack*, the United States Supreme Court did not specify what allegations would be adequate to pleading standing. *See id.*

In the SAC, Plaintiffs allege they "acquired Coinbase common stock pursuant and/or traceable to the Offering Materials."[27] (*Id.* ¶ 518.) Additional Plaintiffs[28] specifically allege: they purchased Coinbase stock on April 14, 2021, the first day of Coinbase's Direct Listing, at prices near the opening price (*id.* ¶¶ 41–43); and 88% of shares outstanding were registered pursuant to the Offering Materials when they purchased the Company's stock (*id.*). Lead Plaintiff alleges it purchased the Company's stock on November 30, 2021, when 74% of the shares outstanding were registered pursuant to the Offering Materials. (*Id.* ¶ 40.)

[27]    To the extent this is an issue of standing, "the court must accept as true all material allegations set forth in plaintiffs' complaint and must construe those facts in favor of the plaintiffs." *Mariana v. Fisher*, 338 F.3d 189, 205 (3d Cir. 2003) (citation omitted).

[28]    *See* *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) ("[T]he PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class.").

The Court finds Plaintiffs have plausibly alleged that they purchased shares pursuant and/or traceable to the Offering Materials. *See* *Alta Partners*, 2024 WL 1116682, at *7

(finding sufficient allegations where plaintiff merely alleged it purchased subject assets that were "issued pursuant to or traceable to" the registration statement); *Lozada*, 2024 WL 68571, at *16 n.21 (same); *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 866 (S.D. Ohio 2016), *aff'd sub nom. on other grounds, IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017) (finding Plaintiffs had standing where plaintiffs alleged they purchased shares on the first day of the defendant company's secondary offering at prices near the opening price, "and that 1,7500,000 [sic] shares were sold in the [secondary offering] in comparison to the pre-existing public float of 2,023,000 shares"); *see also* *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004) (collecting cases stating the rule that "at least one named plaintiff must have standing to pursue each claim alleged" for a class action suit); *but see* *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 492 n.6, 494 (5th Cir. 2005) (disagreeing with appellants' argument that standing under Section 11 can be established "by proffering nothing more than statistics indicating a high mathematical probability, based on the number of shares purchased by each individual and the number of [public offering] shares in the market, that at least some of their shares were issued pursuant to the challenged registration statement"). Accordingly, Defendants' Motion to Dismiss Count III for lack of standing is **DENIED**.

## 2. Plaintiffs Have Sufficiently Alleged Section 11 Claims

**\*20**    Under Section 11 of the Securities Act, an individual that has acquired the relevant security may bring a private action for damages "if [the] registration statement, as of its effective date: (1) 'contained an untrue statement of material fact'; (2) 'omitted to state a material fact required to be stated therein'; or (3) omitted to state a material fact 'necessary to make the statements therein not misleading.' " *Cal. Pub. Emps.' Ret. Sys.*, 394 F.3d at 167 (quoting 15 U.S.C. § 77k(a)). "As the Supreme Court has explained, Section 11 'was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.' " *Suprema Specialties*, 438 F.3d at 269 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983)) (footnote omitted). Indeed, "Section 11 is a 'virtually absolute liability provision[ ], which do[es] not require plaintiffs to allege that defendants possessed any scienter.' " *Id.* (quoting *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 n.7 (3d Cir. 2004)).

Defendants argue the Court should apply Rule 9(b)'s heightened pleading standard because "a core theory of fraud permeate[s] the entire" complaint.[29] (ECF No. 78-1 at 46 (quoting *Cal. Pub. Emps.' Ret. Sys.*, 394 F.3d at 167).) The Court disagrees. The Third Circuit's decision in *Suprema Specialties* is instructive here. In *SupremaSpecialties*, the Third Circuit applied its prior decision in *Cal. Pub. Emps.' Ret. Sys* and held that the district court erroneously found plaintiffs' Section 11 and Section 12(a)(2) claims were sounded in fraud. 438 F.3d at 269–74. The lead class plaintiff in that case "described its suit as arising out of a 'massive fraud' at [the defendant company], stemming in particular from the allegedly material misrepresentations in the registration statements" that the defendant company filed in connection with a public offering. *Id.* at 270. Further, the lead class plaintiff "prefaced its Section 11 and Section 12(a)(2) count with an explicit disclaimer—'[t]his claim is not based on and does not sound in fraud'—prior to setting for the factual allegations that support each claim for relief." *Id.* at 271 (alteration in original). The Third Circuit distinguished *Cal. Pub. Emps.' Ret. Sys.* and *Shapiro*, and held:

> We now hold that where, as here, individual defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims. In such a case, the fraud allegations cannot be said to "contaminate" the Section 11 and Section 12(a)(2) claims if the allegations are pled separately. We applied Rule 9(b) to the Section 11 and Section 12(a)(2) claims in *Shapiro* because "plaintiffs did not allege ordinary negligence" and we could "see no way to construct a negligence cause of action." *Shapiro*, 964 F.2d at 288. Here, ordinary negligence is alleged in the Section 11 and Section 12(a)(2) claims, and those claims are pled separately from the Section 10(b) fraud claims against the same defendants. That is enough to avoid triggering Rule 9(b). A contrary result would effectively preclude plaintiffs from filing suit under Section 11 and Section 12(a)(2) as well as Section 10(b)(5). There is no suggestion that Congress intended such an incongruous approach.

*Id.* at 272–73.

[29]     The parties submitted limited arguments on this issue. (*See* ECF No. 78-1 at 46; ECF No. 79 at 47; ECF No. 79 at 17.) Therefore, the Court attempts

to succinctly address this issue. *Cf. United States v. Hoffecker*, 530 F.3d 137, 163 (3d Cir. 2008) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a passel of other arguments, as [defendant]'s did. Judges are not like pigs, hunting for truffles buried in briefs." (alteration in original) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

**\*21**  Plaintiffs correctly contend that "the conduct pled for the Securities Act [C]laims is [ ] similar to the core theory of fraud pled for the Exchange Act [C]laims." (ECF No. 78-1 at 46 n.15 (citing ECF No. 68).) However, even where "a core theory of fraud permeates," this aspect alone is not dispositive. *SeeSuprema Specialties*, 438 F.3d at 272–273. Instead, as noted above, "Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims." *Id.* at 272. In this matter, Plaintiffs do not provide extensive ordinary negligence allegations, but they do expressly plead ordinary negligence by alleging the Securities Act Defendants did not exercise reasonable care. (*See* ECF No. 68 ¶ 440 ("The Securities Act Claims against the Securities Act Defendants are also premised upon the Securities Act Defendants' negligent failure to conduct a reasonable due diligence investigation into the accuracy and completeness of the representations contained in the Offering Materials. Had the Securities Act Defendants not acted negligently, and had they conducted reasonable due diligence investigations before the Direct Listing, they would have uncovered that the Offering Materials contained untrue statements of fact and omitted material facts.").)

Further, just like the lead class plaintiffs in *Suprema Specialties*, Plaintiffs expressly pled negligence in the opening paragraphs of the Securities Act Claims. (*See* ECF No. 68 ¶ 437 ("Plaintiffs assert strict liability and negligence claims."); *id.* ¶ 441 (noting the claims in Counts III–V "do not sound in fraud, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims").) Additionally, Plaintiffs clearly separated their claims under the Exchange Act and the Securities Act, and did not incorporate allegations from the Exchange Act Claims into the Securities Act Claims. (*See generally id.*) Although this may represent "artful" pleading, *seeSuprema Specialties*, 438 F.3d at 273, the Court finds the disclaimers and the structure of the SAC along with the express allegation(s) of ordinary negligence support a finding that the SAC's pleading of the Securities claim does not trigger the heightened pleading standard. *SeeIn re*

*Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 364 (D.N.J. 1999) ("Unlike the complaint in *Shapiro*, this complaint does not incorporate allegations of scienter and fraud into the § 11 claim. Rather, here the § 11 claim is [pled] before any of the other claims. Although the plaintiffs have [pled] that certain defendants acted fraudulently in violation of § 10(b), the § 11 claim is limited to negligence.").

The Court, therefore, applies the liberal notice requirements of Federal Rule of Civil Procedure 8 to Plaintiffs' Securities Act Claims. *See Suprema Specialties*, 438 F.3d at 270 ("Where a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply." (citing *Adams Golf*, 381 F.3d at 273 n.5).) Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Applying this liberal pleading standard, the Court finds Plaintiffs have sufficiently alleged claims under Section 11. [30] (*See* ECF No. 68 ¶¶ 452–91.) Accordingly, Defendants' Motion to Dismiss Count III is **DENIED**.

[30]    The parties relied in large part upon their arguments detailed above, *supra* Section III.A; therefore, the Court does not make lengthy findings here. (ECF No. 78-1 at 46 ("Plaintiffs' allegations fail to show that Defendants made any material false statements, *see supra* Section I.A., and therefore should be dismissed for the same reasons as the Exchange Act [C]laims." (citations omitted)); ECF No. 79 at 47 ("[F]or the reasons set forth in Sections I.A.1–3 *supra*, the Complaint pleads that Defendants made material statements under either standard."); ECF No. 80 at 18 ("[U]nder either Rule 8 or 9(b), Plaintiffs fail to plead falsity. *Supra* Section I.A.").) Even if the Court applied Rule 9(b)'s heightened pleading standard, Plaintiffs' claims premised upon the Securities Act Defendants' omission of risks associated with Coinbase's ability to safeguard its customers' crypto assets would survive. *See supra* Section III.A.1.i. As to the Proprietary Trading Statements, the Court held Plaintiffs' relevant allegations did not satisfy the heightened pleading standard applicable for Section 10(b) claims under the Exchange. *See supra* Section III.A.1.ii. However, the parties did not address whether Plaintiffs' allegations that the Offering Materials omitted material facts as to Coinbase's involvement in proprietary trading of cryptocurrency on its own

exchange adequately support the Securities Act Claims under the liberal pleading standard of Rule 8. Therefore, the Court does not address this theory of recovery here.

### D. Defendants' Motion to Dismiss Count IV (Violations of Section 12(a)(2) of the Securities Act Against the Securities Act Defendants)

**\*22**  Defendants contend Count IV should be dismissed as Plaintiffs fail to properly plead standing. (ECF No. 78-1 at 45–46.) Defendants submit: (i) the tracing requirement for Section 11 claims also applies to Section 12; (ii) because Plaintiffs cannot satisfy the tracing requirement, *i.e.*, that they purchased registered shares, they cannot establish standing as "there is no obligation to distribute a prospectus for transactions in unregistered shares," (*id.* at 45); and (iii) "as an aftermarket purchaser, Lead Plaintiff lacks standing because it did not purchase registered shares from a person who sold 'by means of' the prospectus" (*id.*) (quoting 15 U.S.C. § 77l(a)(2)). (ECF No. 78-1 at 45–46; *see also* ECF No. 80 at 17.) Alternatively, Defendants argue Plaintiffs have not sufficiently pled a Section 12 claim. (ECF No. 78-1 at 47–48; ECF No. 80 at 18.) Defendants assert: (i) Plaintiffs' Section 12 claim is based on the same, inadequately alleged misstatements as their Section 11 claim; (ii) "Plaintiffs fail to allege that either Coinbase or any of the Securities Act Defendants are 'statutory sellers.' " (*Id.*) (quoting *Pinter v. Dahl*, 486 U.S. 622 (1988)).

In opposition, Plaintiffs submit they have adequately pled Section 12 standing. (ECF No. 79 at 46–47.) Specifically, Plaintiffs assert "Defendants erroneously claim that Section 12 applies only to registered shares.... Section 12(a)(2) extends to any share offered or sold by means of a misleading prospectus, regardless of whether the share is registered." (*Id.* at 46 (citations omitted).) Plaintiffs further argue the SAC sufficiently alleges the required elements of a Section 12 claim. (*Id.* at 48.)

#### 1. Section 12 Standing [31]

[31]    As Count IV is raised by Additional Plaintiffs, the Court limits its analysis to whether Additional Plaintiffs have standing. (ECF No. 68 ¶ 523.)

"Section 12(a)(2) claims concern the purchase of securities pursuant to a materially false or misleading prospectus or oral communication." *Suprema Specialties*, 438 F.3d at 276 n.7.

Section 12 liability "cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption)." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 571 (1995).

The Court is not persuaded by Defendants' argument that Section 12 applies only to registered shares. (*See* ECF No. 79 at 46 (citing Thomas Lee Hazen, *Federal Securities Law* § III.E.2.a n.308 (4th ed.) ("Although not expressly contained in the statute, the Supreme Court has 'read' a public offering limitation into actions under § 12(a)(2). *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995). Although the Court has thus limited § 12(a)(2) to public offerings, it is not limited to registered offerings."); *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 306 (N.D. Cal. 1978) (holding Section 12(a)(2) "applies to the sale of all securities, registered and unregistered")).)

Based on the reasoning detailed above, *supra* Section III.C.1., the Court finds Additional Plaintiffs have sufficiently alleged standing under Section 12(a)(2) by alleging they purchased Coinbase shares pursuant and/or traceable to the Prospectus (*see* ECF No. 68 ¶¶ 41, 42). *Cf. Suprema Specialties*, 438 F.3d at 276 n.7 (accepting "as true plaintiffs' allegations that they made their stock purchases in or traceable to the [defendant company's] public offerings" for a Section 12(a)(2) claim where there was an issue of whether plaintiffs' stock purchases came from the secondary market). Accordingly, Defendants' Motion to Dismiss Count IV for lack of standing is **DENIED**.

### 2. Additional Plaintiffs Have Sufficiently Alleged a Section 12 Claim

Section 12(a)(2) establishes civil liability for any person[32] who "offers or sells" a security "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2). A plaintiff must adequately allege a defendant is a "seller." *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 716 (3d Cir. 1996). The Third Circuit has held that a seller, under Section 12(a)(2), "may be one who passes title to the buyer for value (a direct seller) or one 'who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner' (a solicitor seller)." *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 643 (1988)).

[32] The Securities Act's definition of "person" includes "a corporation." 15 U.S.C. § 77b(a)(2).

**\*23**  Here, Additional Plaintiffs provide the following allegations: Jones and the Director Defendants "participated in the review, approval, and making of the statements in the Offering Materials," (ECF No. 68 ¶¶ 428–34); Armstrong, Haas, Jones, and the Director Defendants signed the Registration Statement (ECF No. 68 ¶¶ 428–34, 445); Armstrong, Haas, Jones, Andreessen, Ehrsam, Haun, and Wilson sold a substantial amounts of shares (*id.* ¶¶ 428–31, 434, 451); Armstrong, Haas, Jones, and the Director Defendants were financially motivated (*id.* ¶¶ 74, 81, 428–31, 434, 451); "[t]he Securities Act Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's common stock offered pursuant to the Direct Listing. The Offering Materials were used to induce investors, such as [Additional Plaintiffs] ... to purchase in Coinbase's common stock in the Direct Listing," (*id.* ¶ 524); "[t]he Securities Act Defendants' acts of solicitation included participating in the preparation of the false and misleading Offering Materials. Thus, the Securities Act Defendants solicited [Additional Plaintiffs] ... to buy Coinbase common stock," (*id.* ¶ 525).

Applying the liberal pleading standard under Rule 8, *supra* Section III.C.2., the Court finds Additional Plaintiffs have adequately alleged the Securities Act Defendants constitute sellers under Section 12(a)(2) of the Securities Act. *See Westinghouse*, 90 F.3d at 717 ("Taken in the light most favorable to plaintiffs, however, the complaint does allege that the [company] defendants 'solicited plaintiffs' to purchase [the company's] securities and that in so doing they were motivated by a desire to serve their own financial interests. Contrary to the district court's statement, these are factual allegations—allegations plaintiffs will have to prove—and not bare legal conclusions."); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 637 (3d Cir. 1989) ("It cannot be said at this juncture that plaintiffs can prove no set of facts that would entitle them to relief." (citations omitted)); "*In re Measurement Specialties, Inc.*, Civ. A. No. 02-1071, 2003 WL 27398420, at \*12 (D.N.J. Sept. 29, 2003) (finding the complaint sufficiently alleged defendants were sellers where "an inference can be drawn from the totality of the circumstances alleged in the complaint," even though the complaint did not "expressly allege that defendants solicited plaintiff to purchase stock," and did not "include a specific allegation that defendants 'directly and actively participated in the solicitation of the immediate sale,' " (quoting *Westinghouse*, 90 F.3d at 717 n.19)).

In re Coinbase Global, Inc. Securities Litigation, Slip Copy (2024)

2024 WL 4053009, Fed. Sec. L. Rep. P 101,922

Accordingly, Defendants' Motion to Dismiss Count IV is **DENIED**.

### E. Defendants' Motion to Dismiss Count V (Violations of Section 15 of the Securities Act Against Armstrong, Haas, Jones, and the Director Defendants)

Defendants assert Plaintiffs' claims for control person liability under Section 15 of the Securities Act should be dismissed because Plaintiffs fail to plead an underlying violation under Section 11 of the Securities Act. (ECF No. 78-1 at 48; ECF No. 80 at 18.) To state a claim under Section 15 of the Securities Act, "the plaintiff must allege (1) a primary violation of the federal securities laws by a controlled person or entity; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation." *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (quoting *Dutton v. Harris Stratex Networks, Inc.*, 370 F.R.D. 171, 178 (D. Del. 2010)).

The Court has held Plaintiffs sufficiently pled underlying violations of Section 11 and Section 12(a)(2) against Armstrong, Haas, Jones, and the Director Defendants. Accordingly, Defendants' Motion to Dismiss Count V of the SAC is **DENIED**. *See In re Schering-Plough Corp./Enhance Sec. Litig.*, Civ. A. No. 08-397, 2009 WL 2855457, at *7 (D.N.J. Sept. 2, 2009) (denying motion to dismiss Section 15 claim because the complaint adequately alleged the individual defendant "committed primary violations of Sections 11 and 12(a)(2) of the Securities Act").

## IV. CONCLUSION

**\*24** For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 78) is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Dismiss Count I of the SAC, to the extent it is premised upon the Proprietary Trading Statements and the Bankruptcy Statements that tout customers' trust in the Company, is **GRANTED**. The remaining portions of Defendants' Motion to Dismiss are **DENIED**. Plaintiffs may, within thirty (30) days of the date of this Opinion, file a third amended consolidated class action complaint curing the deficiencies addressed herein. [33] Defendants may respond to the third amended consolidated class action complaint, if filed, as appropriate and consistent with applicable federal and local rules. An appropriate Order follows.

[33]  Plaintiffs request leave to amend. (ECF No. 79 at 48.) Federal Rule of Civil Procedure 15(a) allows a party to amend its pleadings after obtaining the Court's leave or the written consent of its adversary. Under this liberal rule, the Court must "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This lenient standard ensures that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990) (citation omitted). Given that this is the first motion to dismiss the Court has addressed, the Court will permit Plaintiffs leave to file a third amended consolidated class action complaint.

**All Citations**

Slip Copy, 2024 WL 4053009, Fed. Sec. L. Rep. P 101,922

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 12

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

KeyCite Yellow Flag - Negative Treatment

Distinguished by  In re Valeant Pharmaceuticals International, Inc.
Securities Litigation,  D.N.J., May 22, 2023

2005 WL 8155579
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

IN RE CRYOLIFE, INC. SECURITIES LITIGATION

CIVIL ACTION FILE NO. 1:02-CV-1868-BBM
|
Signed 06/17/2005

## ORDER

BEVERLY B. MARTIN, UNITED STATES DISTRICT
JUDGE

**\*1**  This securities fraud action is currently before the
court on a bevy of motions filed by the parties. Both
the consolidated class action plaintiffs ("Plaintiffs") and
defendants CryoLife, Inc. ("CryoLife"), Steven G. Anderson
("Anderson"), D. Ashley Lee ("Lee"), James C. Vander
Wyk ("Vander Wyk"), and Albert E. Heacox ("Heacox")
(collectively, "Defendants") have moved for summary
judgment. In addition to Defendants' Motion for Summary
Judgment [Doc. No. 194] and Plaintiffs' Motion for Partial
Summary Judgment [Doc. No. 197], the court is presented
with <u>eighteen</u> other motions that purport to address a variety
of matters.

Specifically, Plaintiffs have filed two discovery motions,
including a "Motion for Leave to Subpoena Documents
and Testimony From a Non-Party Law Firm and Motion to
Compel Documents from Defendants All Relating To An
Advice of Counsel Defense" ("Advice of Counsel Motion
to Compel") [Doc. No. 135] and a "Motion to Compel
Documents From Defendants' Experts Dr. Nolte and Dr.
Trainor" ("Motion to Compel Documents from Experts")
[Doc. Nos. 165 and 168].[1] The parties have also filed several
motions pertaining to the admissibility of expert witness
testimony, including Defendants' "Motion for an Evidentiary
*Daubert* Hearing" ("Motion for Daubert Hearing") [Doc.
No. 150]; Defendants' "Motion to Exclude Plaintiffs' Experts'
Opinions as to the Truth or Falsity of Certain Public

Statements Attributed to Defendants" ("Motion to Exclude
Plaintiffs' Experts' Opinions as to Truth or Falsity") [Doc.
No. 151]; Defendants' "Motion to Exclude Opinions of
Plaintiffs' Expert, Dr. Marion Kainer" ("Motion to Exclude
Kainer") [Doc. Nos. 152 and 163]; Defendants' "Motion
to Exclude Opinions of Plaintiffs' Experts Dr. Doppelt and
Dr. Eastlund" ("Motion to Exclude Doppelt and Eastlund")
[Doc. No. 153]; Plaintiffs' "Motion to Exclude Opinions of
Defendants' Expert Lance D. Trainor, M.D." ("Motion to
Exclude Trainor") [Doc. Nos. 181 and 182]; Defendants'
"Motion to Exclude Opinions of Plaintiffs' Expert Candace
L. Preston" ("Motion to Exclude Preston") [Doc. No. 184];
and Plaintiffs' "Motion to Exclude Opinions of Defendants'
Expert, James L. Benson" ("Motion to Exclude Benson")
[Doc. No. 230].

[1]    Apparently due to issues arising out of filing the
documents under seal, Plaintiffs' Motion to Compel
Documents from Experts appears twice on the
court's docket. The same is true of Defendants'
"Motion to Exclude Expert Opinions of Plaintiffs'
Expert, Dr. Marion Kainer" [Doc. Nos. 153
and 163] and Plaintiffs' "Motion to Exclude
Opinions of Defendants' Expert Lance D. Trainor,
M.D." [Doc. Nos. 181 and 182].

Finally, the court is presented with several administrative
motions, including Defendants' "Motion to Amend the
Scheduling Order Pending Resolution of Defendants'
Motions to Exclude Plaintiffs' Experts' Opinions [and]
Request for Scheduling Conference" ("Motion to Amend
the Scheduling Order") [Doc. No. 149];[2] the parties'
"Joint Motion to Extend Page Limits for Summary
Judgment Briefing" [Doc. No. 172];[3] Defendants' Motion
for "Oral Argument on Their Motion for Summary
Judgment" ("Motion for Oral Argument") [Doc. No. 195];[4]
Defendants' "Motion to File Under Seal [Volume 4 of
Their Exhibits In Support of Their Motion for Summary
Judgment]" [Doc. No. 196];[5] Plaintiffs' "Motion for Leave
to File Supplemental Brief to Address Intervening Supreme
Court Authority" [Doc. No. 231];[6] and Plaintiffs' "Motion
for Leave to File Supplemental Brief to Address Intervening
Eleventh Circuit Authority" [Doc. No. 232].[7]

[2]    Defendants' Motion to Amend the Scheduling
Order is DENIED AS MOOT, because Defendants
filed their Motion for Summary Judgment on
March 11, 2005 in compliance with the court's

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 216 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

Scheduling Order of October 14, 2004 (the "October 14 Scheduling Order"). However, the court would be remiss if it did not note that its October 14 Scheduling Order expressly stated that the deadlines therein were "set in stone, and shall not be extended." Order of October 14, 2004 at 3. Even given some of the remarkably improper arguments made by both parties throughout this litigation (see infra), the court will not accept that its October 14 Scheduling Order was somehow unclear in this regard. Defendants' insistence on filing their Motion to Amend the Scheduling Order, however well-intentioned, is illustrative of both parties' ongoing disregard of this court's obligation to manage the litigation before it. It is the court's view that if the court's deadlines and rules had been more closely followed by the parties, this case (one out of 195 civil cases) would not be solely responsible for over 10% of the court's current pending civil motions list.

3    The parties' Joint Motion to Extend Page Limits for Summary Judgment Briefing is GRANTED.

4    Defendants' Motion for Oral Argument is DENIED. As a general matter, motions are "decided by the court without oral hearing." L.R. 7.1(E), N.D. Ga. Additionally, given the mass of filings in this case and the thousands of pages of documents in the record, the court finds it difficult to imagine that the parties have anything else relevant to say.

5    Defendants' Motion to File Under Seal is GRANTED.

6    Plaintiffs' Motion for Leave to File Supplemental Brief to Address Intervening Supreme Court Authority is GRANTED.

7    Plaintiffs' Motion for Leave to File Supplemental Brief to Address Intervening Eleventh Circuit Authority is GRANTED.

## I. Factual and Procedural Background

 **\*2**  This is a class action lawsuit against CryoLife and its four principal officers (Anderson, Lee, Vander Wyk, and Heacox) for alleged violations of the Securities Exchange Act of 1934 ("Exchange Act"). At all times pertinent, Anderson was CryoLife's President, Chief Executive Officer, and Chairman; Lee was CryoLife's Vice President and Chief Financial

Officer; Vander Wyk was CryoLife's Vice President of Regulatory Affairs and Quality Assurance; and Heacox was CyroLife's Senior Vice President for Laboratory Operations.

CryoLife processes, "cryopreserves," and distributes viable human soft tissue for use in cardiovascular, vascular, and orthopedic surgical transplants. CryoLife's stock is publicly traded on the New York Stock Exchange. Plaintiffs allege that Defendants intentionally, or at least with severe recklessness, deceived investors by concealing and misrepresenting various facts about CryoLife's operations. The specific misrepresentations alleged by Plaintiffs are discussed infra. Generally, Plaintiffs allege that Defendants misled investors throughout 2001 and 2002 by concealing the truth about CryoLife's unsafe tissue processing practices; regulatory violations; lack of cooperation with Food and Drug Administration ("FDA") and Centers for Disease Control and Prevention ("CDC") investigations; and contaminated tissue inventory.

The FDA and CDC focused attention on CryoLife in the aftermath of the death of Brian Lykins ("Lykins") in November 2001. Lykins was a twenty-three year old male who underwent elective knee surgery wherein he received human soft tissue provided by CryoLife. As it happened, two other patients died from knee surgery in nearby hospitals at around the same time, and accordingly Lykins' death was widely publicized. Investigation ultimately revealed that Lykins died from a *clostridium* infection arising out of his knee surgery. The court takes judicial notice that "[c]*lostridium* is a genus of bacteria ... made up of obligate anaerobic or microaerophilic, gram positive, spore-forming, rod-shaped bacilli, with spores of greater diameter than the vegetative cells." W.B. Saunders, Clostridium (Dictionary), Merck Source (2002), at http://www.mercksource.com. Cultures were subsequently obtained from the CyroLife donor who had supplied Lykins' knee tissue (the "Lykins donor"), and those cultures tested positive for *clostridium.* Another recipient of tissue from the Lykins donor developed *septic arthritis* and a high fever in mid-November 2001, symptoms which the parties do not appear to dispute are consistent with a *clostridium* infection. Many of the alleged misstatements and omissions that are the subject of this lawsuit, discussed in greater detail infra, arise out of the aftermath of Lykins' death and the reactions thereto by CryoLife, the FDA, and the CDC.

As the court has discussed in earlier Orders, the first complaint in this action was filed almost three years ago,

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 217 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

on July 3, 2002. The Amended Consolidated Class Action Complaint ("Complaint") was filed on January 15, 2003. Discovery commenced on July 16, 2003, almost two years ago. Fact discovery was initially set to expire on June 16, 2004, but it was subsequently extended to August 28, 2004 by consent of the parties, in spite of the court's belief that "discovery could have been concluded much more expeditiously than the schedule proposed by the parties." Order of April 13, 2004 at 6. Fact discovery ultimately closed on August 28, 2004. The court extended expert discovery through February 9, 2005 and instructed the parties to file their summary judgment motions on or before March 11, 2005. Order of October 14, 2004 at 2. In its October 14 Scheduling Order, the court stated that "[t]hese deadlines are set in stone, and shall not be extended." Id. at 3 (emphasis added).

  *3  Defendants filed their Motion for Summary Judgment on March 11, 2005. Generally speaking, Defendants argue that (1) Plaintiffs are unable to point to any admissible record evidence showing that the Defendants' alleged misrepresentations were in fact false; (2) even if there are genuine issues of material fact as to the falsity of Defendants' statements or omissions, Plaintiffs are unable to point to any admissible record evidence showing that Defendants made those statements or omissions with the requisite state of mind or scienter; and (3) even if Plaintiffs can establish genuine issues of material fact as to falsity and scienter, Plaintiffs cannot point to any admissible record evidence showing that Defendants' statements or omissions proximately caused investors any loss. Plaintiffs, of course, argue that there are genuine issues of material fact on the issues of falsity, scienter, and causation.

Meanwhile, Plaintiffs filed their Motion for Partial Summary Judgment on March 14, 2005. [8] Plaintiffs argue that as a matter of law, the record evidence establishes that Defendants, with the requisite scienter, made several materially false statements upon which investors relied and which caused investors loss. Notably, the great majority of the alleged misstatements on which Plaintiffs seek summary judgment are not addressed by Defendants' Motion for Summary Judgment. According to Defendants, this is because Plaintiffs' Motion for Partial Summary Judgment improperly seeks summary judgment on various alleged misstatements that Plaintiffs did not plead in the Complaint.

[8]    The court acknowledges that Plaintiffs' Motion for Partial Summary Judgment purports to have been

filed on March 11, 2005. See Pls.' Mot. for Partial Summ. J. at 35 ("Respectfully submitted this 11th day of March 2005."). Nevertheless, the Clerk of the Court's file stamp reflects that Plaintiffs' Motion was filed with the court on March 14, 2005, and the court's docket reflects the same. Although the Federal Rules of Civil Procedure do provide a three-day time extension for a party who "is required to do some act or take some proceedings within a prescribed period" after the party is served by the opposing party, that extension is not applicable here because Plaintiffs were not taking action "after the service of [any] notice or other paper [by the opposing party] ... under Rule 5(b)(2) (B), (C), or (D)." Fed. R. Civ. P. 6(e). Accordingly, Plaintiffs' Motion for Partial Summary Judgment was to be filed with the court on or before March 11, 2005, and the court finds that it was not so filed. See Order of October 14, 2004 at 2.

In addition to their summary judgment motions, the parties have filed several motions pertaining to their proffered expert witnesses. Defendants ask the court to exclude the opinions of Dr. Marion Kainer ("Kainer"), Dr. Samuel H. Doppelt ("Doppelt"), and Dr. D. Ted Eastlund ("Eastlund"), as well as the opinions of Plaintiffs' damages expert, Candace L. Preston ("Preston"), under Federal Rule of Evidence 702 ("Rule 702") and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Defendants have also filed a separate motion wherein they ask the court to exclude testimony from Kainer, Doppelt, and Eastlund as to the truth or falsity of various statements allegedly made by Defendants. Defendants seek a Daubert hearing on their various motions to exclude Plaintiffs' experts. Plaintiffs, meanwhile, seek to exclude the opinions of Dr. Lance D. Trainor ("Trainor") and the opinions of Defendants' regulatory expert, James S. Benson ("Benson").

Finally, Plaintiffs have filed two discovery motions. In Plaintiffs' first discovery motion, filed October 18, 2004, Plaintiffs ask the court for leave to subpoena documents and testimony from the law firm Arnall Golden Gregory regarding advice given to CryoLife concerning the FDA's legal authority to regulate CryoLife's tissue processing activities. In the same motion, Plaintiffs ask the court to compel Defendants to produce documents that Plaintiffs claim Defendants are improperly withholding on the basis of attorney-client privilege. Plaintiffs' second discovery motion, filed February 24, 2005, asks the court to compel Defendants' experts Trainor and Dr. Frederick S. Nolte

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 218 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8155579

("Nolte") to produce documents that Plaintiffs allege have been improperly withheld.

## II. Applicable Legal Standards

### A. Summary Judgment

**\*4** Summary judgment is proper "if ... there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. However, the non-movant must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. Accordingly, the non-movant may not avoid summary judgment with evidence that is "merely colorable or is not significantly probative." Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1196 (11th Cir. 1997). Nevertheless, "[i]f the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Clemons v. Dougherty County, 684 F.2d 1365, 1369 (11th Cir. 1982).

### B. Expert Witnesses

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the [jury] to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under Daubert and its progeny, the court must "act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005). This requires the court to undertake " 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " Id. (citation omitted). "The most common method for fulfilling [the court's gatekeeper] function is a Daubert hearing, although such a process is not specifically mandated." Goebel v. Denver & Rio Grande W. R.R., 215 F.3d 1083, 1087 (10th Cir. 2000). " '[T]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion....' " McClain, 401 F.3d at 1238 (citation omitted). Finally, the court notes that it has "considerable leeway" in making reliability determinations under Daubert, and that the decision of whether to admit or exclude an expert witness is within the court's sound discretion. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); McClain, 401 F.3d at 1238.

### C. Discovery Motions

Under the Local Rules of this court, "a motion to compel a disclosure or discovery must be filed within the time remaining prior to the close of discovery or, if longer, within ten (10) days after service of the disclosure or discovery response upon which the objection is based." L.R. 37.1(B), N.D.Ga. Additionally, "the control of discovery is committed to the sound discretion of the trial court." Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1322 (11th Cir. 2004).

## III. Analysis

### A. Discovery Motions

The court once again notes that fact discovery closed in this action on August 28, 2004; that the parties had over one year of fact discovery despite the court's opinion that fact discovery could have been concluded much more quickly; and that although the court extended expert discovery through February 9, 2005 in its October 14 Scheduling Order, it did so under the express condition that the new deadline was "set in stone, and shall not be extended." The court additionally notes that its October 14 Scheduling Order

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 219 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

bifurcated expert discovery, such that Plaintiffs' initial expert designations and reports were due to Defendants on or before October 11, 2004; [9] Defendants were to depose Plaintiffs' experts by November 10, 2004; Defendants' designations and reports for any rebuttal experts were due to Plaintiffs on or before December 10, 2004; Plaintiffs were to depose Defendants' rebuttal experts by January 10, 2005; and Plaintiffs' designations of rebuttal experts or supplements to earlier expert reports were due to Defendants on or before January 25, 2005. Id. at 2. By February 9, 2005, Defendants were to conduct "any remaining expert discovery, including deposing Plaintiffs' rebuttal experts, if any ... deposing Plaintiffs' affirmative experts regarding their supplemental reports, if any, and serv[ing] any supplemental rebuttal expert reports." Id.

[9]     The parties had long-since commenced expert discovery and themselves proposed the initial October 11, 2004 designation deadline; accordingly, the court accepted the October 11, 2004 deadline despite entering the Scheduling Order on October 14, 2004.

**\*5** Plaintiffs' Advice of Counsel Motion to Compel, filed on October 18, 2004, is DENIED as untimely. According to Plaintiffs' Motion, this discovery dispute arose on August 31, 2004 at the absolute latest. Even if the court were to take a generous reading of Local Rule 37.1(B) and allow Plaintiffs ten days from August 31, 2004 to file their Motion instead of requiring that it have been filed prior to August 28, 2004 (the close of fact discovery), Plaintiffs' Motion still should have been filed by September 14, 2004. Thus, at best, Plaintiffs' Motion is over one month tardy. Plaintiffs do not explain why Local Rule 37.1(B) does not bar their Motion despite Defendants' argument in this regard; instead, Plaintiffs only assert that they are entitled to the discovery and that granting the discovery will "not extend the schedule for expert discovery or dispositive motions." Accordingly, Plaintiffs' Advice of Counsel Motion to Compel is DENIED. Additionally, in light of Plaintiffs' apparently callous attitude towards the court's deadlines; the court's long struggle to make the parties conform to any sort of discovery schedule in this action; the massive number of filings in this case which have required the court's extensive and ongoing attention in addition to Plaintiffs' blatantly untimely Motion; and the fact that the court previously warned the parties multiple times to be "circumspect[ ] in submitting any future discovery dispute to the court," see Order of April 14, 2004 at 7 n. 4; Order of October 26, 2004 at 3, 6, Plaintiffs are ORDERED to

pay Defendants' reasonable attorney's fees and costs incurred in responding to Plaintiffs' Advice of Counsel Motion to Compel.

For substantially the same reasons, Plaintiffs' Motion to Compel Documents from Experts is DENIED as untimely. According to Plaintiffs' Motion, Defendants' allegedly deficient responses to subpoenas were served on December 20 and December 27, 2004. According to Plaintiffs' Motion, Plaintiffs realized that the subpoena responses were deficient by January 7, 2005 at the latest. Even taking January 7, 2005 as the date of "service of the disclosure or discovery response upon which the objection is based," [10] ten days thereafter was still within the expert discovery period. Accordingly, Plaintiffs' Motion should have been filed on or before February 9, 2005, see L.R. 37.1(B), N.D. Ga., and it was not filed until February 24, 2005. Plaintiffs' Motion to Compel Documents from Experts is thus DENIED. [11]

[10]     In actuality, the latest possible date of "service of the disclosure or discovery response upon which the objection is based" is December 27, 2004, the date upon which Defendants served Plaintiffs with the allegedly deficient responses to the second set of subpoenas directed to Nolte and Trainor. L.R. 37.1(B), N.D. Ga. (emphasis added).

[11]     Because the court supposes that Plaintiffs might have thought that the relevant date of "service" implicated by Local Rule 37.1(B) was actually February 9, 2005, the court will not require Plaintiffs to pay Defendants' attorney's fees and costs incurred in responding to Plaintiffs' Motion to Compel Documents from Experts. The court, however, rejects the notion that the relevant date of "service" here could have been February 9, 2005. Although Defendants hand-delivered a letter to Plaintiffs on February 9, 2005 that apparently concluded the parties' month-long attempt to resolve this discovery dispute in good faith, the letter is irrelevant for purposes of Local Rule 37.1(B). See supra note 10. While the court appreciates Plaintiffs' attempts to resolve this dispute without immediately involving the court, once those efforts proved unsuccessful, Plaintiffs were required to file any motion to compel arising out of the discovery dispute prior to the close of the relevant discovery period.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 220 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

### B. Expert Witnesses

Preliminarily, Defendants' Motion for Daubert Hearing is GRANTED. As noted supra, a Daubert hearing is the most common way for a district court to fulfill its expert witness gatekeeper responsibility, and the court believes that it would be helpful in this instance (for both parties' motions to exclude). Although Plaintiffs assert that "such a hearing will waste valuable Court, expert, and counsel time, and will delay a trial in this case," the court cannot imagine that either of the parties can claim with a straight face at this juncture that any particular action by the court might delay this litigation. Additionally, the court assures the parties that the Daubert hearing most certainly will not delay the trial of this case. Given the remarkable length to which the schedule of this litigation has been stretched due to the torrent of filings and the parties' insistence on protracted discovery, the court will simply not tolerate any further substantial delays. Indeed, the parties are ADVISED that the Daubert hearing is hereby scheduled for Tuesday, June 28, 2005 and Wednesday, June 29, 2005, the next open dates on the court's calendar.

**\*6** Thus, the court will defer a decision on Defendants' Motion to Exclude Kainer [Doc. No. 152], Defendants' Motion to Exclude Doppelt and Eastlund, Plaintiffs' Motion to Exclude Trainor [Doc. No. 182], Defendants' Motion to Exclude Preston, and Plaintiffs' Motion to Exclude Benson until the Daubert hearing. For purposes of docket maintenance, Defendants' Motion to Exclude Kainer [Doc. No. 163] and Plaintiffs' Motion to Exclude Trainor [Doc. No. 181] are DENIED WITHOUT PREJUDICE to their identical, companion (i.e., non-redacted) motions [Doc. Nos. 152 and 182]. [12]

[12]    The court notes that the remaining version of Defendants' Motion to Exclude Kainer [Doc. No. 152] is missing two pages (pages 10 and 16). As those two pages are available in full to the court in the redacted version of Defendants' Motion to Exclude Kainer [Doc. No. 163], the court will simply refer to pages 10 and 16 of the redacted version of Defendants' Motion if and when it is necessary.

The court does not, however, believe that a hearing is required on Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity. Essentially, Defendants argue therein (1) that Doppelt, Eastlund, and Kainer cannot offer opinions as to purportedly false statements that were not pled in the Complaint; (2) that Doppelt, Eastlund, and

Kainer cannot offer opinions as to the truth or falsity of any statements allegedly made by Defendants (pled in the Complaint or otherwise), because such opinions would constitute inadmissible conclusions of law and improperly invade the province of the jury; and (3) even if Kainer is somehow generally qualified to offer opinions as to the truth or falsity of four statements that were pled in the Complaint, that testimony should nevertheless be excluded as unsupported and unreliable.

Preliminarily, as noted supra, Defendants filed separate, individual motions to exclude the expert testimony of Doppelt, Eastlund, and Kainer on Daubert grounds. Defendants nevertheless took the liberty (without the court's permission) of filing their Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity and raising certain Daubert issues therein (specifically, the competency of Plaintiffs' experts to testify about what constitutes falsity under the federal securities laws, as well as the scientific basis for certain of Kainer's opinions). Local Rule 26.2(C) does not contemplate more than one Daubert motion per expert witness; nor does Local Rule 7.1(D) contemplate the parties avoiding the page limits on a Daubert motion by filing multiple motions to exclude expert witnesses. See L.R. 7.1(D), N.D. Ga.; L.R. 26.2(C), N.D. Ga. The court once again ADVISES the parties that it does not look kindly upon attempted end runs around the Local Rules. However, because—as Plaintiffs point out—Defendants' Motion is more properly considered as a motion in limine seeking to exclude evidence (as opposed to a motion to exclude an expert witness under Daubert), the court will not reject Defendants' Motion out of hand. Plaintiffs' argument is essentially that evidence of the non-pled misstatements is admissible—even if not actionable—to show fraud under Federal Rule of Evidence 404(b). The court will defer this core question until an appropriate time before trial, when the court fully expects the parties to raise other motions in limine. The court is able to take this course of action because, in ruling on the parties' motions for summary judgment, the court does not consider Plaintiffs' experts' opinions as to the truth or falsity of the thirty statements that Defendants challenge in their Motion.

**\*7** The court notes that Plaintiffs do not contest Defendants' argument that the majority of the thirty statements at issue here are not pled in the Complaint. [13] Indeed, Plaintiffs assert that they "are not attempting to amend the Complaint," and that they "will not seek to add new claims at trial based on these statements." [14] Rather, as discussed, Plaintiffs instead argue that evidence of Defendants' similar acts of fraud, and

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 221 of 573

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

Plaintiffs' experts' opinions about those acts of fraud, are admissible to prove Defendants' scienter with regard to the alleged misstatements that are in the Complaint. See Fed. R. Evid. 404(b). Again, the court will defer this question as more appropriate for a pre-trial motion in limine; [15] however, the court wishes to make clear that it will not permit Plaintiffs to amend their Complaint or to recover on statements not pled in the Complaint. See supra note 14; see also discussion infra at Section III(C)(2).

[13]    The court nevertheless acknowledges Plaintiffs' point that Defendants incorrectly assert that twenty-six of the thirty statements at issue were not pled in the Complaint. In actuality, twenty-three of the thirty statements were not pled in the Complaint. Specifically, referencing Exhibit A to Defendants' Motion, the court notes that the statements from the "[1]2/7 press release," the "1/29 press release," and the "May 2002 White Paper" are asserted to be false and misleading in Plaintiffs' Complaint, despite Defendants' claim to the contrary. In fact, Defendants move for summary judgment on those statements, and in their Motion for Summary Judgment, Defendants acknowledge that those statements are included in Plaintiffs' Complaint. Yet Defendants' reply brief in support of their Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity does not address the complete inaccuracy of Defendants' Exhibit A in this regard. Perhaps if this were the only occurrence of such distortion of the record in this case, the court might not be so concerned. Unfortunately, as detailed infra, it is not the only such occurrence. See generally Fed. R. Civ. P. 11.

[14]    The court finds these two assertions by Plaintiffs to be extremely noteworthy, as Plaintiffs' Motion for Partial Summary Judgment seeks summary judgment on several statements that are not pled in the Complaint, including, by the court's count, at least four statements that Defendants attack in their Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity. Although the court defers the question of whether or not evidence of the (non-pled) allegedly false statements is admissible under Federal Rule of Evidence 404(b) in order to show Defendants' alleged fraud, the court—both for the alleged misstatements attacked in Defendants' Motion to Exclude Plaintiffs' Experts'

Opinions as to Truth or Falsity and for the alleged misstatements that are the subject of Plaintiffs' Motion for Partial Summary Judgment—will hold Plaintiffs to their assertion that they "are not attempting to amend the Complaint." See also 15 U.S.C. § 78u-4(b); Fed. R. Civ. P. 15; discussion infra at Section III(C)(2).

[15]    Accordingly, although Defendants' Motion is DENIED IN PART, such denial is WITHOUT PREJUDICE as to Defendants' right to seek (at the appropriate time) a pre-trial ruling on the admissibility of alleged misstatements that are not included in the Complaint.

Additionally, despite its decision to defer the ultimate question of the admissibility of alleged misstatements not in the Complaint, the court finds it appropriate to now resolve the smaller issues raised by Defendants' Motion to Exclude Plaintiffs' Experts' Opinion as to Truth or Falsity. First, the court rejects Defendants' argument that Plaintiffs' experts cannot testify to the truth or falsity of any given statement without "ipso facto" rendering an inadmissible conclusion of law. The court acknowledges that as a general proposition a witness "may not testify to the legal implications of conduct." Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990). However, "[a]n expert may testify as to his opinion on an ultimate issue of fact." Id. (emphasis added); see also Fed. R. Evid. 704. Although Defendants are correct as a matter of law that Plaintiffs' experts may not provide pure legal conclusions, the court finds that Plaintiffs' experts can opine as to the truth or falsity of statements without providing legal conclusions. For example, Plaintiffs' experts may have specialized or scientific knowledge that would assist the jury in evaluating the truth or falsity of Defendants' alleged statement that "[s]wabbing [donors] ... may produce false positives which will limit the use of donated tissue." [16] The average juror will not know whether such a statement is false or misleading; however, Kainer claims to have specialized knowledge that allows her to opine that swabbing can help determine the presence of contamination that is not susceptible to CryoLife's "antimicrobial cocktail," [17] and that such contaminants (including clostridium, which Plaintiffs allege was consistently missed by CryoLife's screening techniques) are not considered false positives. If Kainer ultimately qualifies as an expert, [18] she would certainly be permitted to testify as to her opinion of the truth or falsity of this and other similar statements, to the extent that the statements themselves are admissible. Plaintiffs' experts

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 222 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

are not seeking to (and will not be permitted to) testify as to whether Defendants made statements that are "false and misleading under the federal securities laws." Instead, Plaintiffs' experts may offer opinions about the objective truth or falsity of statements based on their specialized or scientific knowledge. For the same reasons, the court rejects Defendants' arguments that Plaintiffs' experts cannot testify to the truth or falsity of statements without impermissibly invading the province of the jury and that Plaintiffs' experts are not competent to testify as to the truth or falsity of statements because they have not been shown to possess any specialized knowledge about securities laws or standards. Simply put, if they appropriately qualify at the Daubert hearing, Plaintiffs' experts will be permitted to testify to the truth or falsity of a given statement based on their specialized or scientific knowledge. Such testimony will aid the jury. If it should become necessary at trial, the court can exclude any pure legal conclusion testimony.[19]

16    The court makes no finding as to the admissibility of this statement. Plaintiffs will not be permitted to recover on this statement, as it is not pled in the Complaint. The court merely cites the statement as an example of how Plaintiffs' experts' testimony on the truth or falsity of certain statements might be helpful to the jury, as a general proposition.

17    During the relevant time period, CryoLife apparently soaked its donors in a "antimicrobial cocktail" (immersing the tissue in an antibiotic mixture) as part of its tissue processing procedures. According to Plaintiffs, the antimicrobial cocktail is not effective against spore-forming organisms such as *clostridium*.

18    The court makes no finding in this regard at this time, instead electing to wait until the Daubert hearing. However, the court notes that Kainer was an Epidemic Intelligence Service Officer with the CDC for two years; spearheaded a lengthy CDC investigation of CryoLife upon Lykins' death; and is the co-author of a New England Journal of Medicine article discussing a study that concluded that the risk of infection from CryoLife tissue vis-a-vis its competitors' tissue was significantly higher due to CryoLife's processing methods.

19    The court notes that Plaintiffs assert that they "have not and will not offer Kainer, Doppelt, and Eastlund to testify about any legal conclusions as to liability."

*8    Finally, the court rejects Defendants' argument that Kainer should not be permitted to testify as to the truth or falsity of four statements that are in the Complaint because there is no reliable scientific basis for her opinions thereon. The first statement at issue is from CryoLife's December 14, 2001 press release, wherein CryoLife stated: "We are pleased to report that all other recipients [of tissue from the Lykins donor] are doing well with no evidence of *Clostridium sordellii*[20] infection." Kainer opines that this statement is misleading because another recipient of tissue from the Lykins donor (the "second patient") indisputably developed a fever, septic arthritis, and was given antibiotics to combat a possible *clostridium* infection. Defendants, however, argue that Kainer's opinion is based on incomplete data because Kainer consulted the second patient's medical records to form her opinion, but the second patient's medical records have not been produced in discovery and are accordingly inadmissible. Defendants also argue that Kainer's opinion is based on incomplete data because no cultures were ever taken from the second patient, so that there is no laboratory confirmation of the alleged *clostridium* infection. However, Kainer testified in her deposition that her opinion is based both on conversations with the second patient's treating physician and her review of the second patient's medical records, and Kainer further testified that she no longer had copies of the second patient's medical records in her possession because they were "at the CDC." Although Defendants argue that "Kainer cannot rely upon such records" because she "did not produce" them "despite subpoenas directed to her seeking all such information and documents," the court was presented with no motion to compel on the subject, and Kainer complied with the requirements of Federal Rule of Civil Procedure 26 that she delineate the "data or other information considered." Fed. R. Civ. P. 26(a)(2)(B). Defendants point to no case in support of their argument that Kainer's opinion must be excluded because Plaintiffs did not produce the second patient's medical records. Assuming that Kainer otherwise qualifies as an expert at the Daubert hearing, she will be able to give her opinion that the statement at issue is misleading because, among other things, the normal treatment time for a post-operative septic knee infection and fever is six weeks; the second patient did not respond to the initial, standard treatment that he was given but his fever began to subside when he was treated with an antibiotic that specifically treats *clostridium* infections; and septic arthritis and fever are consistent with a clinical diagnosis of *clostridium* infection.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 223 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

20    The court gathers that there are different types of *clostridium* bacteria, including *clostridium sordellii* and *clostridium septicum*. It appears undisputed that Lykins died of a *clostridium sordellii* infection. As far as the court can tell, the parties have failed to explain the distinction between these different types of *clostridium* (beyond Defendants' unsupported assertion in their Motion for Summary Judgment that *clostridium sordellii* is "an entirely different species" from *clostridium septicum* ). See *infra* at Section III(C)(1)(a).

Defendants next attack Kainer's opinion that another statement in the December 14, 2001 press release was misleading—specifically, CryoLife's statement therein that upon examination of other tissue from the Lykins donor, "[t]he CDC confirmed that the tissue examined contained the rare bacterium *Clostridium sordellii*. The tissue examined by the CDC had not been released for transplant and was examined by [the CDC] subsequent to its implant expiration date." Kainer opines that this statement is misleading because it implicitly attaches significance to the fact that the CDC examined the other tissue from the Lykins donor "subsequent to its implant expiration date." Defendants argue that Kainer's opinion endeavors to impermissibly invade the role of the jury to determine what is or is not misleading under the securities laws. However, for reasons similar to those discussed supra, the court finds that Kainer can assist the jury by explaining exactly why Defendants' statement might be misleading as a matter of science. Assuming that she otherwise qualifies as an expert, Kainer can testify that the CDC was no more or less likely to detect *clostridium* on the Lykins donor whether it tested the donor prior to its implant expiration date or subsequent to its implant expiration date. In fact, the court is unclear as to exactly how the jury might come to that important bit of scientific knowledge without the assistance of expert testimony.

Defendants also object to Kainer's attack on CryoLife's statement from the December 14, 2001 press release that "[n]either the [FDA] nor the CDC, after conducting thorough inspections of the CryoLife processing facilities, have recommended or suggested changes in CryoLife's processing protocols of human tissues." Kainer asserts that this is false because she herself communicated recommendations to CryoLife, through Vander Wyk, on behalf of the CDC. Defendants concede that Kainer may testify to such matters as a fact witness, but that she may not testify to such matters as an expert witness. The court agrees with Defendants (as

do Plaintiffs), although the court is not clear as to why it was necessary to address this minor issue at this point in time. Kainer will be only permitted to testify as a fact witness about what she told Vander Wyk on behalf of the CDC. The court notes, however, that Kainer might still permissibly opine that the statement at issue—whether or not the CDC recommended any processing protocol changes to CryoLife in the aftermath of its inspection of CryoLife—is false. See Fed. R. Evid. 701 (laywitnesses may offer opinions that are "rationally based on the perception of the witness").

**\*9** Finally, Defendants object to Kainer's attack on CryoLife's statements in a June 24, 2002 press release and a June 25, 2002 conference call. The statements pertain to the FDA's March 2002 investigation of CryoLife following reports of endocarditis [21] in patients who received transplants of CryoLife heart valves. Specifically, the statements at issue are that

CryoLife stated in the press release that reports from hospitals clearly demonstrated no evidence of infection in either of the two heart valves that the government had been investigating. In the conference call, CryoLife claimed that "during the [FDA] inspection [pertaining to the reported infections in heart valves] it was demonstrated that there were no such infections. So just because there is a report of infections does not mean there is one.

According to Kainer, these statements are false because CryoLife received reports evincing endocarditis in at least one of the heart valves in April and May. Defendants claim that Kainer has no knowledge of CryoLife receiving such reports, and indeed, Kainer's report cites to no record evidence in support of her claim that CryoLife received such reports. However, Kainer asserts that she has knowledge in this regard, and accordingly, if Kainer does in fact have personal knowledge that CryoLife received such reports, she may testify thereto in her capacity as a fact witness. The court notes that a July 6, 2002 Wall Street Journal Online article quotes Kainer as stating that in March 2002, CryoLife was in receipt of information that supported a diagnosis of endocarditis in one patient, which indicates that Kainer does have personal knowledge in this regard. See *infra* at Section III(C)(1)(h).

21    The court takes judicial notice that endocarditis is "aninfection of the inner lining of the heart or its valves ... usually caused by bacteria and ... more likely to occur in people who have heart valve defects or have had heart surgery

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 224 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

to treat valve disease." Heart Disease: Glossary of Terms, *WebMDHealth* (Charlotte E. Grayson, M.D. ed. June 2004), at http://mywebmd.com/content/pages/9/1675_57847.

Accordingly, Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity is GRANTED IN PART AND DENIED IN PART, without prejudice to Defendants' right to later move in limine to exclude from evidence alleged misstatements that are not in the Complaint. Plaintiffs will not be permitted to recover on any alleged misstatements not pled in the Complaint, as discussed in greater detail *infra* at Section III(C)(2). See also *supra* note 14 and accompanying text. As a general matter, however, Plaintiffs' experts will be permitted to opine as to the truth or falsity of a statement where such opinions are based on the experts' specialized or scientific knowledge and will assist the jury. Additionally, Kainer may testify as to the truth or falsity of the four specific statements discussed *supra* in the fashion described by the court, assuming that she otherwise qualifies as an expert at the Daubert hearing where necessary. [22]

[22]     Defendants' Daubert-based challenges to Kainer's testimony raised in Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity are DENIED. The court will not accept two separate Daubert motions attacking the same witness and thereby permit an end run around the court's Local Rules governing the length of briefs.

C. Summary Judgment

**\*10** Plaintiffs' Complaint alleges violations of Section 10(b) of the Exchange Act ("Section 10(b)") and Section 20(a) of the Exchange Act ("Section 20(a)"), as well as Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5a") promulgated thereunder. See 15 U.S.C. § 78j(b) (Section 10(b) ); 15 U.S.C. § 78t(a) (Section 20(a) ); 17 C.F.R. § 240.10b-5 (Rule 10b-5).

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC, provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. " 'A successful cause of action under Section 10(b) or Rule 10b-5 requires that the plaintiff prove (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiff's loss.' " Theoharous v. Fong, 256 F.3d 1219, 1224 (11th Cir. 2001) (citation omitted). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). A showing of "severe recklessness" will satisfy the scienter requirement in a Rule 10b-5 case. See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1283 (11th Cir. 1999).

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Id. at 1282 n. 18 (citations and quotation marks omitted). Evidence that a defendant had the motive and opportunity to commit fraud may be used, along with other evidence, to show wilfulness or recklessness, but motive and opportunity evidence alone cannot satisfy the scienter element. Id. at 1285-86.

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

Finally, under Section 20(a), any person who "controls" an entity that violates a provision of the Exchange Act is jointly and severally liable for the violation. 15 U.S.C. § 78t(a). For the individual Defendants to be liable under Section 20(a), it must be shown that (1) CryoLife committed a so-called "primary" violation of Rule 10b-5; (2) the individual Defendants had the power to control the general affairs of CryoLife at the time CryoLife committed its primary violation; and (3) the individual Defendants " 'had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.' " Brown v. Enstar Group, Inc., 84 F.3d 393, 396 (11th Cir. 1996) (citation omitted).

### 1. Defendants' Motion for Summary Judgment

**\*11** Defendants ask the court to grant them summary judgment on three specific grounds. First, Defendants argue that Plaintiffs are unable to point to any record evidence establishing that any of the statements at issue in the Complaint were false when made. Second, Defendants argue that even if Plaintiffs can establish a genuine issue of material fact as to the falsity of certain of the statements at issue in the Complaint, Plaintiffs are unable to point to any record evidence establishing that those statements were made with the requisite level of scienter. Finally, Defendants argue that Plaintiffs are unable to point to any record evidence establishing that Defendants' alleged misstatements or omissions caused any loss. [23] The court will evaluate Defendants' falsity and scienter arguments for each individual statement at issue, and then the court will address the general loss causation issue.

[23] The court recognizes that Defendants, in passing, make certain other arguments for summary judgment. First, Defendants argue generally at the beginning of their Motion that summary judgment is proper because "[t]he allegedly omitted facts were already known to the market." However, Defendants point to only a few specific misstatements that were allegedly known to the market prior to their disclosure. The court will address those statements where applicable. Second, Defendants argue in a footnote that Plaintiffs have failed to carry "their burden of demonstrating that each of the individual Defendants was involved in the dissemination of allegedly false or misleading

statements ... especially ... Dr. Heacox." The court disagrees, as Dr. Heacox himself testified that he would generally review some edits of press releases pertaining to laboratory operations prior to their release, and several of the statements at issue in the Complaint pertain to CryoLife's laboratory operations. Additionally, the court rejects Defendants' vague and unspecific argument that Plaintiffs have failed to demonstrate that the other individual Defendants were involved in disseminating the allegedly false or misleading statements. "[I]t is the movant's responsibility—not the Court's—to search the record and identify those portions which support the motion for summary judgment." Anderson v. Raddison Hotel Corp., 834 F. Supp. 1364, 1369 n.3 (S.D. Ga. 1993). Finally, Defendants argue that they are entitled to summary judgment on the Section 20(a) claims because Plaintiffs cannot prove a primary violation by CryoLife (i.e., because Plaintiffs' Rule 10b-5 claims fail). Thus, if the court concludes that any primary violation claim against CryoLife survives summary judgment, the Section 20(a) claim will survive summary judgment as well.

### a. December 7, 2001 press release (four statements)

Plaintiffs assert that four statements from CryoLife's December 7, 2001 press release violate Rule 10b-5. The first statement at issue is CryoLife's assertion that its "processing protocols in its clean-room environment assure the highest standard of quality control." Plaintiffs assert that this statement is false and misleading for several reasons. First, the American Association of Tissue Banks ("AATB"), a voluntary peer group organization of individuals involved in tissue banking activities, had promulgated guidelines in 2001 that required its members to obtain pre-processing cultures to identify microorganisms that might contaminate incoming tissue. CryoLife was not an AATB member, and CryoLife does not appear to contest that in 2001 it did not comply with AATB standards, including AATB's pre-processing recommendations. CryoLife does, however, vigorously contest that AATB's standards constituted the tissue processing industry standards or that there were any tissue processing industry standards at the time of the alleged misstatement. Indeed, CryoLife seeks to exclude Doppelt and Eastlund's proposed expert testimony to that effect. As the court has deferred the issue of whether Doppelt and Eastlund will be permitted to testify until the Daubert hearing, the

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 226 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

court does not consider for purposes of this motion Doppelt and Eastlund's opinion that CryoLife was not in compliance with tissue processing industry standards in December 2001, or Dopplet and Eastlund's opinion that AATB's standards were the tissue processing industry standards in December 2001. However, the mere fact that there existed a voluntary peer organization of tissue processing industry participants, of which CryoLife was not a member and whose guidelines CryoLife did not follow in December 2001, cuts against the truth of CryoLife's statement that its processing protocols assured the <u>highest</u> standard of quality control. More importantly, Plaintiffs' expert Timothy R. Wells ("Wells"), whom Defendants have <u>not</u> moved to exclude, testified in his deposition as follows:

**\*12** Q: Do you have any basis to believe that as of December 2001 that anyone at CryoLife believed that CryoLife had problem in its tissue processing operations?

....

The Witness: I do have that belief.... [P]rior to this, there had been communications to CryoLife from the CDC, and in fact, they had filed reports with the FDA of problems [of] infections. So clearly, there was knowledge on the part of CryoLife.

Dep. of Timothy R. Wells at 91-92. Additionally, it is undisputed that in 1997, CryoLife discontinued pre-processing testing, and there is record evidence that in 1998, the FDA conducted an inspection of CryoLife after a CryoLife knee tissue recipient suffered a *clostridium* infection due to tissue contamination. For all of the foregoing reasons, the court finds that there is a genuine issue of material fact as to the truth or falsity of CryoLife's statement that in December 2001, its "processing protocols in its clean-room environment assure[d] the highest standard of quality control."

Defendants also argue that Plaintiffs improperly characterize the statement about Defendants' "clean-room environment" as a broad guarantee of Defendants' tissue quality. Defendants argue that the statement at issue only focuses "on CryoLife's aseptic handling techniques as employed in the clean-room environment and [is] not [a] broad, general guarantee[ ] of tissue safety." The court does not agree with Defendants that Plaintiffs <u>mis</u>characterize the statement at issue as a broad guarantee of tissue safety. The statement at issue is Defendants' assertion that they could "assure the highest standard of quality control," <u>via</u> their processing protocols in their clean-room environment. Wells' testimony that

in December 2001 CryoLife knew of problems in its tissue processing operations, and the evidence of CryoLife's discontinuation of pre-processing testing in 1997, raise an issue of material fact as to whether the statement at issue was false when made.

As for whether the statement was made with the requisite scienter, the court first notes that, despite Defendants' exhortations to the contrary, scienter is generally a jury question—even in securities fraud cases. See Sammons v. Taylor, 967 F.2d 1533, 1545 (11th Cir. 1992) (a question of motive, if presented in a more than conclusory way, can often "make a disposition upon summary judgment inappropriate"); Croley v. Matson Navigation Co., 434 F.2d 73, 77 (5th Cir. 1970) [24] ("The court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind."); In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1412 (9th Cir. 1994) (noting, in a securities fraud case, that scienter is a fact-specific issue that should ordinarily be left to the jury); Schoch v. Dade City Ret. Hous., Inc., No. 87-388 Civ. T-10(B), 1989 WL 67745, at \*1 (M.D. Fla. Feb. 9, 1989) (noting in a Rule 10b-5 and Section 20(a) case that "summary judgment is generally inappropriate to decide questions of scienter, knowledge and intent"). Moreover, as to the specific statement at issue, the court again notes that Wells testified at his deposition that in December 2001, CryoLife had "knowledge" of problems with its tissue processing operations.

24    In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**\*13** Defendants argue that Plaintiffs have nevertheless failed to establish a genuine material fact as to scienter because Plaintiffs' sole evidence of scienter is expert witness testimony that Defendants argue is inadmissible. Additionally, Defendants assert that even if Plaintiffs' experts' testimony is admissible, at best that testimony creates a battle of expert witnesses over the question of whether Defendants were unreasonable in their scientific judgments of the adequacy of CryoLife's tissue processing. According to Defendants, if qualified expert witnesses can disagree about the reasonableness of tissue processing and testing techniques (or the lack thereof), Defendants cannot have been "severely reckless" in stating that their processing protocols assure the highest standard of quality control.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 227 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

The court disagrees with Defendants. Most crucially, as noted supra, Defendants do not seek to prevent Wells from testifying, and he testified at his deposition that CryoLife had knowledge of problems with its tissue processing operations as of December 2001. Moreover, as for Defendants' "battle of the experts" argument, the court acknowledges that In re Miller Indus., Inc. Sec. Litig., 120 F. Supp. 2d 1371, 1382-83 (N.D. Ga. 2000) (Thrash, J.), can be read to hold that a "battle of the experts" on the reasonableness of a decision requires summary judgment for a defendant on the question of scienter. However, to the extent that In re Miller so holds, this court does not agree, and instead the court finds that disposing of a claim because expert witnesses disagree as to whether a given course of action was "severely reckless" would improperly usurp the jury's responsibility to evaluate witness credibility. See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1321 (11th Cir. 1999) (noting that trial judges must carefully act as gatekeepers of expert testimony, but also noting that an overly searching inquiry "would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury"). Indeed, in the principal case relied on by the In re Miller court, Securities and Exchange Commission v. Price Waterhouse, 797 F. Supp. 1217 (S.D.N.Y. 1992), it was only after a bench trial—wherein the court itself properly evaluated the credibility of the expert witnesses, as the fact finder—that the court concluded that "no finding of fraud or recklessness [could] rationally be made in this case" because "the Court heard diametrically opposing views from experts as to the reasonableness of [the] accounting and audit judgments." Price Waterhouse, 797 F. Supp. at 1241; In re Miller, 120 F. Supp. 2d at 1382-83. The court sees no reason why, if there is a "battle of the experts" at trial, the jury could not permissibly choose to completely disregard Defendants' experts' testimony as not credible. Accordingly, for all the foregoing reasons, the court concludes that genuine issues of material fact as to falsity and scienter exist with regard to CryoLife's December 7, 2001 statement that its "processing protocols in its clean-room environment assure the highest standard of quality control."[25]

[25]   Finally, the court briefly addresses Defendants' argument that Plaintiffs' evidence that CryoLife tissue was subject to ninety-six voluntary recalls over three years was "overstated," and that, at any rate, the FDA published all voluntary recalls so that such information was already known to the market. Because the court did not rely on Plaintiffs' purported evidence of CryoLife's voluntary

recalls in evaluating CryoLife's statement that CryoLife's "processing protocols in its clean-room environment assure the highest standard of quality control," the court need not rule on the merits of Defendants' arguments at this time. Moreover, even if the market was aware of CryoLife's voluntary recalls on December 7, 2001, the court is not certain that awareness would necessarily include an awareness that CryoLife's processing protocols did not in fact assure the highest standard of quality control.

*14   The next statement at issue in the December 7, 2001 press release is CryoLife's assertion that "[i]n the past 17 years, CryoLife has processed some 250,000+ pieces of human tissue from more than 60,000+ donors, without a single known incidence of Clostridium sordellii bacterial infection." Plaintiffs assert that this statement is false and misleading because the FDA's Manufacture and User Facility Device Experience Database ("MAUDE")[26] shows that in 1998, a patient received soft knee tissue from CryoLife and developed a clostridium infection. Specifically, the MAUDE report states: "Wound culture collected 4/7/98. Final report showed 'clostridium species identified as clostridium septicum - beta lactamase negative....' [The] [a]llograft[27] was cultured at time of implant 3/27/98. Reported back 4/22/98 as 'clostridium sordelli[i] - beta lactamase negative.' " Defendants' sole argument that the statement at issue is not actionable is that "[t]he MAUDE report shows that the infection was caused by Clostridium septicum—an entirely different species from Clostridium sordellii." The court disagrees with Defendants for two reasons. First, Defendants cite no evidence in support of their assertion that clostridium sordellii is "an entirely different species" from clostridium septicum, and the court cannot simply take Defendants' word for it.[28] Indeed, had the court simply taken at face value Defendants' dismissive argument that the statement at issue is not actionable because "[t]he MAUDE report shows that the infection was caused by Clostridium septicum," the court would have missed the last sentence of the MAUDE report —left completely unaddressed by Defendants—that a culture of the transplant allograft revealed clostridium sordellii. Defendants' failure to disclose or address this important piece of information is inexcusable and violates Defendants' counsel's duty of candor to the court. Regardless, given that the MAUDE report indicates that a CryoLife allograft tested positive for clostridium sordellii in 1998, the court finds that there is a genuine issue of material fact as to the truth or falsity of CryoLife's assertion that prior to the Lykins

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 228 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

incident, it had never previously experienced an incident of *clostridium sordelli* bacterial infection. As for whether the scienter element is present, the court notes that the MAUDE report indicates that CryoLife was made aware of the findings therein, and the court further notes that the FDA apparently inspected CryoLife in 1998 in the aftermath of this incident. Moreover, Defendants do not argue the issue of whether this statement was made with the requisite scienter, and thus they concede the point. Accordingly, CryoLife's statement in the December 7, 2001 press release that "[i]n the past 17 years, CryoLife has processed some 250,000+ pieces of human tissue from more than 60,000+ donors, without a single known incidence of Clostridium sordellii bacterial infection," survives summary judgment on the falsity and scienter issues. [29]

26 According to the FDA's website, "MAUDE data represents reports of adverse events involving medical devices." Manufacturer and User Facility Device Experience Database, at http://www.fda.gov/cdrh/maude.html.

27 The court takes judicial notice that an allograft is "a transplanted organ or tissue from a genetically non-identical member of the same species. Most human tissue and organ transplants are allografts." Allograft, Wikipedia: The Free Encyclopedia, at http://en.wikipedia.org/wiki/Allograft.

28 In fact, the court notes that CryoLife's own "CryoLife Update" newsletter from May 2002 —in which CryoLife outlined steps that it was "taking" to "reduce the risk of orthopaedic allograft-associated bacterial infections"—does not differentiate between different types of *clostridium*, and instead states that CryoLife would not release tissue for distribution "[i]f any *Clostridium* [was] identified...." Ex. 33 to Defs.' Mot. for Summ. J. (emphasis added).

29 Throughout Section III(C)(1), the court may state that various statements "survive summary judgment," or words to that effect. The court implies no ruling on the loss causation issue when it states that a particular statement "survives summary judgment"; rather, the court simply means that Defendants' challenges to the statement on falsity and scienter grounds fail for summary judgment purposes.

The next statement at issue from the December 7, 2001 press release is the following:

> Based on [CryoLife's] recent conversations with state and federal public health agencies, they are unable at this time to tell us how the *Clostridium sordellii* bacterium was introduced into [Lykins'] body and they have revealed no conclusion regarding the source of the infection in [Lykins]. The CDC is testing a similar tissue from the [Lykins] donor, but the final results are not known at this time.

Plaintiffs argue that this statement was false and misleading and made with the requisite scienter because prior to December 7, 2001, the CDC had already concluded that the Lykins donor was infected with *clostridium* and informed CryoLife of that conclusion. Defendants argue, however, that the CDC itself stated in a Morbidity and Mortality Weekly Report ("MMWR") issued on December 7, 2001 that only "preliminary" results had been obtained from the Lykins donor, indicating mere growth of a *clostridium* "species" as opposed to *clostridium sordellii*. In fact, according to Defendants, "[i]t was not until January 3, 2002 ... that the CDC stated in writing its final conclusion that [the Lykins donor was infected with] *Clostridium sordellii*."

As an aside, the court notes that Defendants' argument that the CDC did not state its final conclusion in writing until January 3, 2002 is of no relevance because in CryoLife's own December 14, 2001 press release, CryoLife announced that the CDC had completed its testing of tissue from the Lykins donor and "confirmed that the tissue ... contained the rare bacterium *Clostridium sordellii*." In fact, on December 11, 2001, Kainer sent Vander Wyk an email on behalf of the CDC stating that "[t]he Clostridium from the [donor] has now been identified as ... sordelli[i]." More importantly, the court finds that there are genuine issues of material fact as to whether the statement at issue is false or misleading, because there is record evidence suggesting that the CDC had at least preliminarily concluded prior to December 7, 2001— i.e., reached some conclusion, rather than "no conclusion"— that the Lykins donor was the source of Lykins' infection. [30] There is also record evidence tending to show that the CDC informed CryoLife of its conclusion prior to December 7,

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 229 of 573

*In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)*

2005 WL 8155579

2001. Specifically, a chronology kept by Kainer indicates that on November 28, 2001, the CDC concluded that the donor tissue contained *clostridium*. Vander Wyk's diary indicates that on that same day, he received a call from Kainer reporting on the donor's tissue growth, and Kainer's chronology further indicates that on December 3, 2001, she visited CryoLife and advised Vander Wyk that the second recipient of tissue from the Lykins donor had contracted septic arthritis. Accordingly, the court finds that there are genuine issues of material fact as to whether CryoLife's December 7, 2001 statement that state and federal public health agencies had reached "no conclusion regarding the source" of Lykins' infection was knowingly false when made.

30        Additionally, the court again notes that although Defendants assert that there is a meaningful distinction between *clostridium sordellii* and other types of *clostridium*, Defendants cite no record evidence in support of this proposition. See Anderson, 834 F. Supp. at 1369 n.3; see also supra note 20.

**\*15** The final statement at issue from CryoLife's December 7, 2001 press release is a statement regarding the health of the eight other patients who were implanted with tissue from the Lykins donor. CryoLife asserted that "[p]hysician follow-ups on these patients have indicated they are all doing well." Plaintiffs argue that statement was knowingly false when made because, as noted above, Kainer's chronology indicates that on November 3, 2001, she personally informed Vander Wyk that one of the recipients of the Lykins donor tissue had contracted septic arthritis. Defendants respond that the March 15, 2002 MMWR "makes clear" that the patient's "symptoms subsided by November 23, 2001, such that Defendants' statement on December [7, 2001] that all other recipients [were all] 'doing well' was entirely accurate." However, the court observes that although the March 15, 2002 MMWR does state that the patient's 103.5 degree fever subsided on or about November 23, 2001, the MMWR also states that "[t]he patient is recovering," which implies that even as of March 15, 2002, the patient had not fully recovered. [31] More fundamentally, despite the fact that CryoLife knew by December 3, 2001 at the latest that a second recipient of tissue from the Lykins donor had contracted post-operative septic arthritis, that fact is mentioned nowhere in the December 7, 2001 press release. Instead, CryoLife merely asserted that after talking to the doctors for each of the eight other recipients of tissue from the Lykins donor, each recipient was "doing well." The court thus concludes that there are

genuine issues of material fact as to whether this statement was knowingly false or misleading when made.

31        Additionally, the court notes that if Kainer qualifies as an expert at the Daubert hearing, it is her opinion is that the ordinary treatment time for a post-operative septic knee infection is six weeks, such that a patient first treated for such an infection on November 21, 2001 would ordinarily not have even completed treatment until on orabout January 2, 2002 (to say nothing of when that patient might have fully recovered).

b. December 14, 2001 press release (four statements)

Plaintiffs also assert that four statements in CryoLife's December 14, 2001 press release were false and misleading in violation of Rule 10b-5. First, CryoLife stated in its December 14, 2001 press release—as it essentially did in its December 7, 2001 press release—that "[i]n the seventeen years since its founding CryoLife has processed tissue from over 60,000 donors without a single known incident of *Clostridium sordellii* infection." Plaintiffs' claim arising out of this statement survives summary judgment for the same reasons that Plaintiffs' claim arising out of CryoLife's nearly-identical December 7, 2001 statement survives summary judgement. As discussed supra, the 1998 MAUDE report raises genuine issues of material fact as to whether CryoLife had suffered an incident of *clostridium sordellii* infection prior to the Lykins incident, and whether CryoLife knew about that incident.

The second statement at issue in the December 14, 2001 press release is also essentially identical to a statement in the December 7, 2001 press release. Specifically, in its December 14, 2001 press release, CryoLife stated that "all other recipients of tissue from the [Lykins donor] are doing well with no evidence of *Clostridium sordellii* infection." The court finds that there are genuine issues of material fact as to the actionability of this statement for the same reasons that Plaintiffs' claim arising out of the similar December 7, 2001 statement survives summary judgment—there is record evidence tending to suggest that it was materially misleading for CryoLife to assert that all other recipients of tissue from the Lykins donor were "doing well," given that at least one recipient of the tissue contracted septic arthritis and may well have still been "recovering" in March 2002, let alone on December 14, 2001. [32]

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 230 of 573

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8155579

32     For this reason, the court need not address Defendants' argument that this statement is not actionable because there was in fact "no evidence of *Clostridium sordellii* infection" in the other recipients of Lykins donor tissue. However, the court notes that septic arthritis is apparently consistent with a *clostridium sordellii* infection, such that it was arguably misleading for CryoLife to state that there was "no evidence" of a *clostridium sordellii* infection. CryoLife was on notice by December 3, 2001 that one of the recipients of Lykins donor tissue had contracted septic arthritis. Regardless, because there are genuine issues of material fact as to whether the other recipients of tissue from the Lykins donor were all "doing well" as of December 14, 2001, this statement survives summary judgment.

**\*16** The next statement at issue in the December 14, 2001 press release does not have a counterpart in the December 7, 2001 press release. Specifically, in the December 14, 2001 press release, CryoLife made the following statement with regard to the CDC's tests on additional tissue from the Lykins donor: "The CDC confirmed that the tissue examined contained the rare bacterium *Clostridium sordellii.* The tissue examined by the CDC had not been released for transplant and was examined by [the CDC] subsequent to its implant expiration date." Plaintiffs contend that this statement is misleading because, as a matter of science, a finding of *clostridium sordellii* would be no more or less likely if tissue were examined before its implant expiration date or after its implant expiration date. See supra Section III(B). Preliminarily, the court notes that Defendants did not move for summary judgment on this specific statement, which is in the Complaint. See Complaint ¶ 70. Accordingly, unless the court fully grants Defendants summary judgment on the loss causation issue, this statement survives Defendants' Motion for Summary Judgment. Moreover, as discussed supra, presuming Kainer qualifies as an expert in her field, she will be permitted to testify as to whether she believes this statement to be misleading because as a matter of science, a finding of *clostridium sordellii* is no more likely when tissue is examined subsequent to its implant expiration date. Finally, given the individual Defendants' educational backgrounds (Vander Wyk, for instance, has a Ph.D. in microbiology) and the fact that CryoLife is in the tissue processing business, the court finds that there is a genuine issue of material fact as to whether CryoLife was severely reckless in implying that

a finding of *clostridium sordellii* might be more likely when tissue is examined subsequent to its implant expiration date.

The last statement at issue in the December 14, 2001 press release is CryoLife's assertion therein that "[n]either the [FDA] nor the CDC, after conducting thorough inspections of the CryoLife processing facilities, have recommended or suggested changes in CryoLife's processing protocols of human tissues." As discussed supra, Kainer purports to have personal knowledge in her capacity as a fact witness that this statement was false when made. Moreover, the court notes that although Defendants argue that "the record is clear" that CryoLife did not receive Kainer's December 14, 2001 email recommendations on behalf of the CDC until December 17, 2001, Vander Wyk's diary, read in conjunction with Kainer's chronology, indicates that Vander Wyk and Kainer had a telephone discussion on December 14, 2001 wherein Kainer conveyed "initial" CDC recommendations to Vander Wyk before his lunch meeting to discuss the December 14, 2001 press release. Thus, the court finds that there are genuine issues of material fact as to whether CryoLife's statement that neither the FDA nor the CDC had recommended any changes in CryoLife's human tissue processing protocols as of December 14, 2001 was knowingly false when made.

Defendants also argue that this last statement from the December 14, 2001 press release—CryoLife's assertion that neither the FDA nor the CDC had conveyed any recommendations to CryoLife for processing protocol change as of December 14, 2001—is inactionable as a matter of law because Plaintiffs' damages expert (Preston) testified at her deposition that the statement "itself caused no damage." However, Defendants take Preston's testimony out of context. Preston's full testimony was "that statement itself caused no damage, [but] when people find out the result of that [statement], it causes damages." Plaintiffs argue that the March 15, 2002 MMWR ultimately revealed this statement to be false, and accordingly that is the relevant date for loss causation purposes. The court observes that the March 15, 2002 MMWR does indeed list several recommendations that the CDC contends it "provided" to CryoLife "in response to the initial case investigation and the subsequent reports of *Clostridium ... infections.*" The record does not appear to reflect that the CDC's recommendations to CryoLife were revealed to the market prior to March 15, 2002, and accordingly, the court rejects Defendants' argument that the December 14, 2001 statement about CDC recommendations is inactionable as a result of Preston's testimony. [33]

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8155579

33    The court's finding in this regard is limited to Defendants' argument that this specific statement is inactionable because Preston supposedly testified that the statement caused no loss. The court draws no conclusions at this time regarding the general admissibility of Preston's testimony.

#### c. January 29, 2002 press release (two statements)

Plaintiffs challenge two statements from CryoLife's January 29, 2002 press release. Plaintiffs first attack CryoLife's statement that the CDC and FDA concluded "that CryoLife procedures, which met or exceeded typical industry processes for aseptic handling, were properly followed." Similar to their argument with regard to the December 7, 2001 statement that "CryoLife's processing protocols in its clean-room environment assure the highest standard of quality control," Defendants argue that the statement at issue focuses "only on CryoLife's aseptic handling techniques as employed in the clean-room environment and [is] not [a] broad, general guarantee[ ] of tissue safety." The court finds that Defendants' argument is sound with regard to the January 29, 2002 statement, though as discussed supra, the court rejects Defendants' argument with regard to the clean-room environment statement of December 7, 2001. The distinction is this: The December 7, 2001 statement can fairly be read as an assurance of general high quality control standards due (in whole or in part) to CryoLife's processing protocols in its clean-room environment. The January 29, 2002 statement, however, can only be fairly read to state (1) that CryoLife's aseptic handling procedures met or exceeded industry standards; and (2) that the CDC and FDA concluded that those procedures were properly followed. In their opposition to Defendants' Motion for Summary Judgment, Plaintiffs respond to Defendants' argument by stating that CryoLife's "actual deficiencies (and regulatory violations) had nothing to do with its aseptic practices," tacitly conceding that CryoLife was not deficient with regard to its aseptic handling procedures and practices. Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 13 (emphasis added). Although Plaintiffs assert in a footnote that Defendants' "injection of the term 'aseptic' processing into public statements was nothing more than a calculated subterfuge of the facts," Plaintiffs cite to no evidence in support of that assertion. Accordingly, given Plaintiffs' tacit concession as to the truth of the actual statement at issue—that CryoLife's aseptic handling procedures met or exceeded industry standards and that the CDC and FDA concluded that those specific procedures

were properly followed—the statement is not actionable and summary judgment is appropriate thereon.

**\*17** The second statement from the January 29, 2002 press release challenged by Plaintiffs is CryoLife's assertion that "none of the eight other recipients of tissue from [the Lykins donor] has become infected with *sordellii* and all are doing well." For the same reasons discussed supra with regard to CryoLife's similar statements in the December 7, 2001 and December 14, 2001 press releases, the court finds that there are genuine issues of material fact as to whether this statement was knowingly false when made, and accordingly the statement survives summary judgment. [34]

34    This statement is essentially identical to the companion "doing well" statements in the December 7, 2001 and December 14, 2001 press releases, but the court notes that Plaintiffs do not appear to expressly plead this statement in the Complaint. Given the court's general holding infra that Plaintiffs cannot recover on statements not pled in the Complaint, the court would under ordinary circumstances hold that this statement is thus out of the case. However, the parties appear to agree that this statement was properly pled by Plaintiffs, as Defendants move for summary judgment on the statement and also assert that their Motion for Summary Judgment addresses only those claims actually pled by Plaintiffs. Accordingly, the court will proceed as though this statement appears in the Complaint.

#### d. March 15, 2002 press release (two statements)

Plaintiffs complain of two alleged misstatements in CryoLife's March 15, 2002 press release. The first statement was made by CryoLife in response to the CDC's announcement in the March 15, 2002 MMWR that upon soliciting additional reports of allograft-associated infections in otherwise healthy patients with no known risk factors for surgical site infections, the CDC received twenty-six such reports. CryoLife stated in its March 15, 2002 press release that:

> The report of twenty six infections in tissue transplants released by the CDC this morning relates to tissue

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 232 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

> processed by four or five tissue banks
> across the U.S. and represents events
> dating back as far as 1998. Some of the
> infections are likely not to be due to
> the tissue itself and may be infections
> transmitted from other sources.

Defendants argue that they are entitled to summary judgment on this statement because it only "pointed out the fact that the *reported* infections discussed in the MMWR did not exclusively involve tissue processed by CryoLife and noted that *some* of the reported infections were likely not to have been caused by the implanted tissues." Plaintiffs, however, assert that as of March 13, 2002, Defendants were aware that (1) fourteen out of the twenty-six infected patients received tissue processed by CryoLife and (2) of the thirteen of the twenty-six patients who were infected with some type of *clostridium*, eleven of those thirteen received tissue processed by CryoLife. Accordingly, Plaintiffs argue that CryoLife's statement in the March 15, 2002 press release was knowingly false.

The court finds summary judgment is proper on this statement. As a technical matter, Plaintiffs do not appear to contest that the twenty-six patients received tissue from more than one tissue bank; nor do Plaintiffs appear to contest that less than 100% (i.e., "some") of the reported infections were caused by something other than the implanted tissues. Instead, Plaintiffs merely assert that the statement is "misleading because CryoLife knew that CDC had found that there was significant evidence implicating CryoLife's tissue." Even granting Plaintiffs' point that the statement is somewhat misleading in that it minimizes the fact that CryoLife's tissue was implicated in a high percentage of the twenty-six infections, the court cannot say that Defendants acted with the requisite scienter in making the statement. As a technical matter, the veracity of CryoLife's assertion about the CDC's report appears uncontested, such that even if the statement is somewhat misleading, the court cannot say that Defendants made the statement with severe recklessness.

**\*18** The second statement at issue in the March 15, 2002 press release is CryoLife's assertion that it "has taken all suggestions from the CDC seriously and implemented those that it can at this time." Preliminarily, the court notes that Defendants do not address this statement in their Motion for Summary Judgment, although the statement is addressed in Defendants' reply. As for the truth or falsity of the statement,

Plaintiffs argue that the statement is false because as of March 15, 2002, CryoLife had not followed at least two of the CDC's December 14, 2001 recommendations, one of which was a recommendation that CryoLife implement pre-processing testing. Defendants argue that Plaintiffs have insufficient evidence of falsity because, among other reasons, "such scientific processing changes could not be made overnight and had to be examined." Defendants also argue that CryoLife disclosed to the market on March 15, 2002 that it could not at that time implement all of the CDC's suggestions, and that accordingly, the statement at issue was true in that CryoLife had implemented all CDC suggestions that it could "at [the] time." The court, however, disagrees with Defendants. Specifically, the court again notes that in 1997, CryoLife discontinued pre-processing testing. Given that CryoLife had previously engaged in pre-processing testing, it is not unreasonable to argue that three months of discussion about the merits of pre-processing testing (from December 14, 2001 to March 15, 2002) was enough time for the merits of such testing to be "examined." In light of this, and further given that Defendants did not even address this statement in their Motion for Summary Judgment, the court finds that CryoLife's March 15, 2002 statement that it had "taken all suggestions from the CDC seriously and implemented those that it [could] at [that] time" should survive summary judgment. [35]

[35]    Similarly, although Defendants conclusorily argue in their reply that "any alleged misstatements omissions [sic] by Defendants with respect to the CDC recommendations were immaterial and caused no loss," Defendants did not raise this point in their Motion for Summary Judgment and accordingly the court does not address it beyond the court's discussion of Defendants' general loss causation argument infra.

e. March 16, 2002 newspaper article (one statement)

According to a March 16, 2002 Atlanta-Journal Constitution article, during a March 15, 2002 conference call, "CryoLife executives reiterated that the Company is doing everything possible to ensure the purity of tissues used in transplants." Defendants argue that this statement cannot be actionable because it is inadmissible hearsay and Plaintiffs have no evidence that any Defendant actually made the statement. Plaintiffs argue in response that "[t]he fact that the quote appeared in a newspaper is evidence that the statement was

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 233 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

in fact conveyed to the market and constituted part of the mix of information upon which the stock price was determined." Plaintiffs miss the point, however, which is that the court has been pointed to no admissible evidence that the statement was ever actually made. Indeed, the version of the statement provided by Plaintiffs is not even a quote; rather, it is the newspaper reporter's paraphrase of a quote or quotes from the conference call. Because Plaintiffs lack admissible evidence that the statement at issue was actually made by any Defendant, summary judgment on the statement is proper.

#### f. April 23, 2002 press release (one statement)

It is undisputed that between March 25, 2002 and April 12, 2002, the FDA conducted an inspection of CryoLife's facilities, and in the aftermath of that inspection, on or about April 12, 2002, the FDA issued what it calls a "Form 483." The implications of the FDA's issuance of the Form 483, however, are of course contested and pertain to the statement from CryoLife's April 23, 2002 press release that is at issue herein.

Specifically, CryoLife stated in its April 23, 2002 press release that it "complies with current regulatory requirements of the [FDA] in the handling and processing of human tissues." Plaintiffs assert that this statement was knowingly false when made because the FDA's issuance of the Form 483 on April 12, 2002 was equivalent to an FDA notification to CryoLife of noncompliance with certain FDA regulatory requirements. Defendants, however, argue that a Form 483 is merely a form on which individual FDA inspectors record their "observations," and that a Form 483 is not tantamount to an FDA finding of regulatory violation. Defendants cite to Fujisawa Pharm. Co. v. Kapoor, 16 F. Supp. 2d 941 (N.D. Ill. 1998) in support of their argument that the issuance of a Form 483 is only "a preliminary step in an ongoing dialogue between a regulated company and the FDA." Specifically, in Kapoor, the court stated that

> Form 483s list observations made by an FDA inspector during an inspection of a plant. When a company receives a Form 483, it usually submits a written response to the FDA disputing or explaining the inspector's observations, or promising to correct the problem if the company agrees that

it exists. Ordinarily, if the FDA finds the company's response acceptable, the FDA will take no further action. If the FDA finds the company's response unacceptable, the FDA may take further action such as the issuance of a regulatory letter.

**\*19** Kapoor, 16 F. Supp. 2d at 943. As Plaintiffs point out, however, regardless of whether a Form 483 serves to initiate a dialogue between a company and the FDA, Kapoor does not hold that the issuance of a Form 483 is not an indication of FDA noncompliance. In fact, there is authority to the contrary —even from the same court that issued the Kapoor decision. See Anderson v. Abbott Labs., 140 F. Supp. 2d 894, 900 (N.D. Ill. 2001) (stating that at the conclusion of an FDA inspection, the FDA served the defendant "with a Form 483, noting further regulatory violations"); Arla Labs., Inc. v. Am. Cyanamid Co., No. 92 C 2252, 1999 WL 160710, at \*2 (N.D. Ill. Mar. 11, 1999) (noting that after FDA inspection, the FDA issued observations in a Form 483 that "pertained to the conditions at Arla's plant, Arla's compliance with various regulations, and the competence of Arla's employees"); see also United States of America v. Barr Labs., Inc., 812 F. Supp. 458, 465-66 (D. N.J. 1993) ("After a compliance investigation, FDA inspectors must issue a Form 483 ... in which they record their observations about the firm's more serious ... violations."); United States of America v. Baxter Healthcare Corp., 901 F.2d 1401, 1415 (7th Cir. 1990) (Pell, J., dissenting) (stating that a Form 483 is the "FDA's method of informing the inspected facility of the agency's belief of a violative practice"); [36] Ex. 37 to Defs.' Mot. for Summ. J. at 3 (the FDA warning letter, issued to CryoLife on June 17, 2002 in the aftermath of this inspection, speaks of "[t]he specific violations noted in this letter and in the [Form] 483"). The court finds that in light of this authority, and in light of the fact that Kapoor does not expressly hold that receipt of a Form 483 is not equal to a finding of noncompliance with FDA regulations, there is a genuine issue of material fact as to the truth or falsity of CryoLife's assertion that it complied with all FDA regulatory requirements as of April 23, 2002.

[36]    The court nevertheless observes that Plaintiffs incorrectly and improperly classify Baxter Healthcare Corp. as a case in which the "Seventh Circuit noted" that a Form 483 is the "FDA's method of informing the inspected facility of the

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 234 of 573

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

agency's belief of a violative practice." Baxter Healthcare Corp., 901 F.2d at 1415. The quoted language is from the dissent of Senior Circuit Judge Pell and does not constitute any type of observation or holding of the "Seventh Circuit." The court once again directs the parties' attention to Rule 11 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 11.

Additionally, given that the Form 483 was issued to CryoLife on April 12, 2002, the court finds that there is a genuine issue of material fact as to whether CryoLife was severely reckless in asserting that it complied with all FDA regulatory requirements as of April 23, 2002. The court notes that the April 23, 2002 press release does expressly mention the Form 483, but the press release dismisses the Form 483 as merely "a number of observations that do not encompass requirements for significant change to CryoLife." In light of the fact that observation number eleven in the Form 483 pertains to problems with CryoLife's tissue processing operations, and in light of the fact that CryoLife (in addressing the March 15, 2002 press release) argues in this very litigation that "scientific processing changes [can]not be made overnight and [first] ha[ve] to be examined" (i.e., such changes are significant), the court finds that the statement from the April 23, 2002 press release survives summary judgment.

g. May 2002 website posting (one statement)

In a May 2002 posting to its website, entitled "CryoLife Update: Donor Criteria and Processing Changes—May 2002" CryoLife asserted:

While CryoLife continues to work to validate a processing technology to sterilize allograft tissue while maintaining its tissue integrity, we are taking the following additional steps that may reduce the risk of orthopaedic allograft-associated bacterial infections as outlined in the [CDC's] MMWR dated March 15, 2002.

1. Warm ischemic time shall not exceed 15 hours unless the body is refrigerated within 12 hours. As in the past, under no circumstances will CryoLife accept donor tissue that has been recovered after 24 hours.

2. Prior to antimicrobial treatment, a microbiological sample of representative tissue shall be taken from each donor recovery site of orthopaedic tissue. The sample shall be incubated and tested for anaerobic microorganisms. Any resulting growth shall be

identified. If any *Clostridium* is identified, all tissue processed from that donor recovery site will not be released for distribution.

**\*20** 3. Current inventory of tissue (both tissue available for distribution and tissue in quarantine) will be reviewed with regard to warm ischemic time and refrigeration time. Any tissue falling outside of the warm ischemic or refrigeration time described above will not be made available for distribution.

Ex. 34 to Defs.' Mot. for Summ. J. (emphasis added). Plaintiffs assert that this statement was false when made because CryoLife did not implement pre-processing testing on orthopaedic tissues until after September 2002. Defendants do not contest that CryoLife had not implemented pre-processing testing in May 2002. [37] Instead, Defendants argue only that "the May 2002 representation stated only that such testing was a step that 'will be taken'; it did not say that such testing was already in place as of May 2002," and accordingly, the statement is "accurate and inactionable."

[37]   The court acknowledges that Defendants assert elsewhere that CryoLife implemented such testing as of June 3, 2002; however, the point for this statement is that Defendants do not dispute that such testing was not in place when the May 2002 "CryoLife Update" was published.

The court finds Defendants' argument in this regard to be emblematic of the manner in which a great deal of this case has been litigated: incorrect, a waste of time, and quite possibly worthy of sanctions. Despite Defendants' use of quotation marks around the phrase "will be taken," that phrase appears nowhere in the May 2002 "CryoLife Update." The court acknowledges that the second "additional step" states that "[p]rior to antimicrobial treatment, a microbiological sample of representative tissue shall be taken from each donor recovery site of orthopaedic tissue," but all three "additional steps" listed in the May 2002 "CryoLife Update" are unquestionably modified by the clause "we are taking," as one can see from the court's full reproduction of the statement, supra. Thus, at the very least, the May 2002 "CryoLife Update" implies that at that time, CryoLife had already commenced implementation of the "additional steps" listed therein. Defendants' argument that the May 2002 "CryoLife Update" "stated only that such pre-processing testing was a step that 'will be taken' " in the future is simply wrong. It is also a violation of Rule 11 of the Federal Rules of Civil Procedure. [38]  See Fed. R. Civ. P. 11. The

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 235 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

court accordingly rejects Defendants' sole argument as to why summary judgment is supposedly proper on this statement.

38    The court notes that despite the fact that Plaintiffs raise the argument adopted by the court herein in their opposition to Defendants' Motion for Summary Judgment, Defendants do not even address the point in their reply brief. The court is not certain whether this should be taken as an indication that Defendants inadvertently made their "will be taken" argument in their Motion for Summary Judgment and now waive the point, or whether Defendants, having been caught red-handed in an intentional misrepresentation of the record, choose to simply hide behind their silence. Either way, Defendants' conduct is unacceptable.

h. June 24, 2002 press release (four statements)

In the aftermath of the FDA's issuance of its Form 483 in April 2002, the FDA ultimately—on June 17, 2002—issued a warning letter to CryoLife. See Kapoor, 16 F. Supp. 2d at 943 ("If the FDA finds the company's response [to the issuance of a Form 483 to be] unacceptable, the FDA may take further action such as the issuance of a regulatory letter."). The June 17, 2002 warning letter essentially dovetails with the observations recorded in the April 12, 2002 Form 483.

*21  In response to the June 17, 2002 warning letter, CryoLife issued a press release on June 24, 2002. Therein, CryoLife made four statements attacked by Plaintiffs in this case. The first statement at issue from the June 24, 2002 press release is CryoLife's assertion that "since its inception, [CryoLife had] never before received a warning letter [from the FDA]." Defendants apparently do not dispute the falsity of this statement. In 1997, Ideas for Medicine, Inc., a CryoLife subsidiary, received an FDA warning letter. According to Defendants, however, "[t]he record is clear ... that no one involved in the drafting of the June 24 press release remembered the earlier warning letter when drafting the June 24 press release." Defendants argue that "[a]t most, this was excusable neglect, which is not securities fraud."

The court disagrees with Defendants as to the supposed clarity of the record. Although the court acknowledges that Anderson and Vander Wyk aver in their affidavits that they "had previously been aware of the 1997 warning letter ... [but] did not recall it at the time of the June 24 press release," the

court notes that Anderson testified in his deposition that the 1997 warning letter was sent directly to him as President and CEO of CryoLife. Dep. of Steven G. Anderson at 153-54. Given that summary judgment is generally inappropriate on scienter, and further given that the 1997 warning letter was sent directly to Anderson himself, the court finds that there is a genuine issue of material fact as to whether CryoLife's statement that it had "never before received a warning letter" was severely reckless when made. Anderson and Vander Wyk may certainly testify at trial that they did not recall the 1997 warning letter at the time they drafted the June 24, 2002 press release, but the jury is entitled to evaluate their credibility and reject their explanation.

Defendants also argue that this statement is inactionable because when it was made public, there was no market reaction. Specifically, on June 27, 2002, the Wall Street Journal Online reported CryoLife's receipt of the 1997 warning letter, and on July 5, 2002, CryoLife itself disclosed its receipt of the 1997 warning letter in a corrective press release. According to Defendants, because there was no market reaction on either June 27, 2002 or July 5, 2002, the statement is not actionable as a matter of law because Plaintiffs cannot show that the statement caused any loss. See, e.g., Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) (plaintiff must show a substantial link between misrepresentation and investment's decline in value). According to Preston, however, the relevant price adjustment occurred on July 8, 2002, the first "full" trading day after CryoLife issued the corrective press release. Preston's opinion is that July 5, 2002 was only a half day of trading and that trading on that day was exceptionally light because the market had been closed on July 4, 2002 and July 5, 2002 preceded a traditional holiday weekend. The court takes judicial notice that July 4, 2002 was a Thursday; that July 5, 2002 was a Friday; and that July 8, 2002 was a Monday.

Although the court reserves the right to revisit its decision after the Daubert hearing if necessary, the court at this time concludes that Preston's opinion in this regard is sufficient to create a genuine issue of material fact as to whether loss was caused by CryoLife's statement that it had never before received an FDA warning letter. Of course, should the court at the Daubert hearing ultimately exclude Preston from testifying as an expert, the court would likely find summary judgment for Defendants to be appropriate on this statement, given that Defendants' damages expert—whom Plaintiffs do not seek to exclude—is of the opinion that the relevant days of

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 236 of 573

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8155579

market observation are June 27, 2002 and July 5, 2002 rather than July 8, 2002. [39]

[39]  The court notes, however, that Preston has apparently been permitted to testify as an expert witness on damages issues in securities law cases in several other federal courts. See Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude Preston at 6-7 and infra note 45.

**\*22**  The next statements at issue from the June 24, 2002 press release are CryoLife's assertions that (1) CryoLife "carefully considered the CDC's report of March 15, 2002 and adopted those recommendations which were scientifically useful and technically feasible," and (2) as of June 24, 2002, CryoLife had "either corrected the [FDA's] observations or will work closely with the FDA to correct them as soon as possible." [40] According to Plaintiffs, these statements were knowingly false when made because as of June 24, 2002, CryoLife had still not re-adopted pre-processing testing, despite the fact that CryoLife had previously engaged in pre-processing testing until 1997. Plaintiffs also point to the FDA's August recall of CryoLife's inventory as evidence of the falsity of the second statement, and on the question of scienter, Plaintiffs point to a May 15, 2002 letter from Vander Wyk to the FDA on behalf of CryoLife wherein CryoLife asserted "that the [FDA] has no legal authority to support many of the observations in the Form 483 and further asserted that "the FDA has not yet established the legal basis for such an inspection." Plaintiffs' argument is essentially that if in the aftermath of the FDA's issuance of the Form 483 CryoLife was actively questioning the FDA's authority to support the observations, CryoLife cannot have sincerely addressed or intended to address the FDA's observations.

[40]  The court was unable to locate the second of these statements in the Complaint. However, Defendants treat the statement as properly pled, and the court will accordingly follow suit. See supra note 34.

Defendants argue that it is "beyond dispute" that as of June 24, 2002 CryoLife was in good faith addressing certain of the FDA's observations and was working to address others. In support of their argument, Defendants cite the May 15, 2002 letter to the FDA as well as other correspondence between CryoLife and the FDA.

First, the court notes that Defendants neglect to address the statement about the CDC's recommendations anywhere in their Motion for Summary Judgment or in their reply in support of their Motion for Summary Judgment, although interestingly, that fact did not stop Defendants from asserting, via a chart attached to their reply brief, that they do address the statement in several places. See Ex. 61 to Defs.' Reply in Support of Their Mot. for Summ. J. ("Exhibit 61"). In fact, Defendants' Exhibit 61 asserts that Defendants address CryoLife's statement about the CDC's recommendations at pages 22-23, 25-26, and 35-36 of their Motion for Summary Judgment and at pages 11-13 of their reply, but several of those pages contain no discussion about either CryoLife's statement that it was addressing the CDC's recommendations or CryoLife's statement that it was addressing the FDA's observations, and at best, the cited pages only contain discussion about CryoLife's response to the FDA's observations. Accordingly, CryoLife's statement that as of June 24, 2002 it had "carefully considered the CDC's report of March 15, 2002 and adopted those recommendations which were scientifically useful and technically feasible" remains in the case, and the court once again finds itself forced to direct the parties' attention to Rule 11 of the Federal Rules of Civil Procedure. Defendants' Exhibit 61 (at least with regard to "statement 25a") is inaccurate and misleading.

As for Defendants' argument that CryoLife was, as of June 24, 2002, in good faith addressing the FDA's observations as noted in the April Form 483 and the June warning letter, the court agrees with Plaintiffs that the FDA's August 2002 correspondence with CryoLife raises a genuine issue of material fact as to whether CryoLife had as of June 24, 2002 corrected or was "as soon as possible" going to correct the FDA's observations. The FDA's August 12, 2002 letter specifically states that CryoLife's May 15, 2002, June 25, 2002, and July 2, 2002 letters "do not adequately address most of the violations in the Warning Letter or ... the [Form] 483 observations not specifically mentioned in the Warning Letter." Additionally, on August 13, 2002, the FDA issued its recall order letter for CryoLife's vascular non-valved cardiac and orthopaedic tissue processed by CryoLife since October 3, 2001. In the recall letter, the FDA advised CryoLife that it was the FDA's "view that CryoLife has not promptly implemented appropriate corrective measures to address the serious deficiencies that have been brought to [CryoLife's] attention," including the "CDC's recommendations" and the FDA's observations. Moreover, in light of CryoLife's argument to the FDA that the FDA lacked authority to support its observations, and further given the FDA's subsequent classification of CryoLife's letters of May 15, 2002, June 25, 2002, and July 2, 2002 as essentially unacceptable, the court

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 237 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

also finds that there are genuine issues of material fact as to whether CryoLife was severely reckless in stating that as of June 24, 2002 it had "corrected the [FDA's] observations or will work closely with the FDA to correct them as soon as possible."

**\*23** The final statement at issue in the June 24, 2002 press release pertains to CryoLife's distribution of heart valves. Specifically, in its June 24, 2002 press release, CryoLife addressed reports of endocarditis allegedly associated with two CryoLife-distributed heart valves, stating: "The ... FDA inspection at CryoLife, completed in April 2002, followed a report of two allograft heart valve infections. Subsequently, CryoLife received pathology data from the implanting hospitals' own laboratories that clearly demonstrated that there was no evidence of infection in either valve." However, on July 5, 2002, CryoLife corrected the June 24, 2002 statement, stating that "subsequent communications" with the CDC revealed "signs of fungal infection were isolated on a culture of the explanted [heart] valve." According to Defendants, the June 24, 2002 statement was true when made because—as Plaintiffs acknowledge—a cusp of the valve did in fact test negative for fungal infection at the hospital and that report was sent to CryoLife. Additionally, Defendants argue that the CDC's subsequent disclosure to CryoLife that there was evidence of fungal infection in the valves is not sufficient to render the June 24, 2002 statement false when made.

However, Plaintiffs argue that the June 24, 2002 statement was false when made, because (as reported in a July 6, 2002 Wall Street Journal Online article and discussed supra at Section III(B) ), Kainer can apparently testify that on March 22, 2002, the CDC provided CryoLife with "the relevant information" tending to show fungal infection in the heart valve. In fact, the July 6, 2002 article reports that CryoLife confirmed to the CDC that it received the patient's operation report in March, and that report at least contained evidence of fungal infection. Given that Kainer can testify about information pertaining to the patient's endocarditis that she allegedly provided to CryoLife on behalf of the CDC in March 2002, the court finds that there are genuine issues of material fact as to whether CryoLife's June 24, 2002 statement that the pathology data "clearly demonstrated that there was no evidence of infection" was knowingly false when made. See also Aug. 12, 2002 Letter from FDA to James Vander Wyk (stating that the CDC "has informed us that they notified you on March 22, 2002 that test results from the hospital where the [heart] valve was implanted confirm that the recipient ... had acquired fungal endocarditis").

i. June 25, 2002 conference call (one statement)

On June 25, 2002, CryoLife conducted an analyst conference call in order to "discuss the issues associated with the [FDA's] warning letter" of June 17, 2002. Plaintiffs challenge one statement from the conference call as false when made; specifically, Vander Wyk's response to the question of whether any of the "current issues with the FDA ... could [adversely affect CryoLife's] inventory." Vander Wyk stated, in pertinent part:

> The inventory of tissue that we are holding for the procurement agencies, I am not aware is under suspicion at all. The FDA does, have, always, if you will, standard legal language in every warning letter that they ever issue that says that a company's operations are obviously at risk and there is always a potential for action on inventory, but that is if the issues are not resolved. CryoLife intends to resolve the issues, is capable of resolving the issues, and has made a commitment to do that. My opinion right now is that there is no reflection upon that current inventory.

As discussed supra at Section III(C)(1)(h) with regard to the June 24, 2002 press release, there are genuine issues of material fact as to whether CryoLife in late June in fact "intend[ed] to resolve the issues" raised by the FDA. More specifically, as acknowledged by Defendants in the June 25, 2002 conference call, the June 17, 2002 warning letter expressly advises CryoLife of the possibility of adverse action against its inventory: "You should take prompt action to correct these deviations. [The] FDA may take additional regulatory action without further informal notice, including, but not limited to, seizure, injunction, civil penalties, and/or an Order for Retention, Recall, and/or Destruction." Given that there are issues of material fact as to whether CryoLife intended to resolve the issues raised by the FDA in the Form 483 and the warning letter, and given the language of the warning letter itself, there are genuine issues of material fact as to whether the June 25, 2002 statement that CryoLife's inventory was not under suspicion "at all"

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 238 of 573

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

was false when made. Moreover, it is apparently undisputed that in January 2002 the CDC requested that CryoLife conduct testing of a portion of its inventory to determine whether the inventory contained additional contaminated tissues. Even accepting Defendants' argument that the CDC "lacked regulatory authority to order a recall of CryoLife's tissues," the court nevertheless disagrees with Defendants that the CDC's request in this regard thus "did not indicate likely future adverse action on the inventory." Given that the CDC and the FDA unquestionably worked closely together to investigate CryoLife in the aftermath of the Lykins incident, the CDC's January 2002 request that CryoLife conduct inventory testing, viewed in the light most favorable to Plaintiffs, is evidence that CryoLife's inventory was "under suspicion" for a recall in June 2002. See, e.g., Aug. 12, 2002 Letter from FDA to James Vander Wyk (stating that the CDC "has informed us that they notified you on March 22, 2002 that test results from the hospital where the [heart] valve was implanted confirm that the recipient ... had acquired fungal endocarditis"); Aug. 13, 2002 Letter from FDA to Steven G. Anderson (noting that the CDC and the FDA conducted a "joint inspection" of CryoLife in December 2001 and criticizing CryoLife for failing to implement CDC recommendations). The evidence that as of June 24, 2002, CryoLife may not have actually intended to address the FDA's observations, combined with the evidence tending to show that as early as January 2002 CryoLife may have been on notice of a possible threat to its inventory, also allows Plaintiffs to survive summary judgment on the question of scienter.[41]

[41]  The court acknowledges that Wells (Plaintiffs' own regulatory expert) was unwilling to testify that Defendants should have known that a recall was "likely," instead only testifying that Defendants should have known that a recall was "possible." This is evidence tending to show that Defendants were not severely reckless in asserting that CryoLife's inventory was not under suspicion in June 2002; however, it is for the jury to determine which evidence is more persuasive on the question of scienter. See, e.g., Sammons, 967 F.2d at 1545. For these same reasons, Plaintiffs' Motion for Partial Summary Judgment on this statement is DENIED. See infra at Section III(C)(2).

*24  Finally, Defendants argue that the June 25, 2002 statement is not actionable because Defendants' disclosures made "the truth regarding the risk of a recall ... known to

the market [such that] any alleged omission regarding such risk is inactionable." The court, however, rejects Defendants' argument. Defendants' disclosure of the "standard legal language" in FDA warning letters indeed conveyed to the market that a recall was possible. However (as discussed), there are genuine issues of material fact as to whether the statement was severely recklessly misleading by virtue the statement's omission of (a) CryoLife's arguable intent not to comply fully with the FDA's observations, despite its assertion directly to the contrary; and/or (b) the CDC's January 2002 request for an examination of CryoLife's inventory. Accordingly, "the truth regarding the risk of a recall" was not fully known to the market at the time of the June 25, 2002 statement, and the statement remains actionable.

### j. July 23, 2002 conference call (two statements)

In a July 23, 2002 analyst conference call regarding second quarter earnings, CryoLife asserted that "the FDA observations are being addressed" and also asserted that it had implemented "pre-processing bacterial testing." Plaintiffs assert that these statements were knowingly false when made, arguing that deposition testimony from Heacox tends to show that CryoLife did not implement pre-processing testing until September 2002, and further arguing, as discussed supra, that in July 2002 CryoLife had neither addressed nor intended to address the FDA observations. Defendants argue that CryoLife actually implemented pre-processing testing by June 2002 and, as discussed, argue that CryoLife was imminently addressing or had addressed all FDA observations. The court need not decide which side has the better of the falsity and scienter arguments for the July 23, 2002 statements, however. More specifically, Defendants argue in their Motion for Summary Judgment that Preston (Plaintiffs' damages expert) is of the opinion that the July 23, 2002 statements actually decreased the percentage inflation of the CryoLife stock price, and that as a result, Plaintiffs cannot argue that the July 23, 2002 statements caused any loss. Plaintiffs in response simply state that "evidence concerning the July 23, 2002 deceptions [is] admissible, even if no particular losses are attributed to them." However, Plaintiffs do not bother to show why any "particular losses" should be attributed to the July 23, 2002 statements, and as a result, summary judgment is appropriate thereon.[42]  See Theoharous, 256 F.3d at 1224.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 239 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

42       As discussed supra, the court does not at this time decide the question of whether evidence of other alleged misstatements is admissible for the purpose of proving fraud.

### k. August 14, 2002 press release (one statement)

In its August 14, 2002 press release, announcing receipt of the FDA recall order on August 13, 2002, CryoLife made the following statement: "The [CDC] made several recommendations to CryoLife, many of which were already included in [CryoLife's] procedures. Others were adopted well in advance of the FDA's order, including recommended refrigeration protocols, preprocessing microbiological cultures and tissue discard criteria." Plaintiffs assert that this statement was knowingly false when made because CryoLife did not adopt the CDC's pre-processing or tissue discard recommendations until September 2002. As they did in defending the July 23, 2002 statements, Defendants argue that CryoLife actually implemented pre-processing testing by June 2002, such that the August 14, 2002 statement was factually accurate. In response, Plaintiffs point to Heacox's deposition testimony, wherein he testified that "the date that sits in [his] mind" for when CryoLife began to use a compulsory tissue discard list is September 2002.

Although Defendants argue that Heacox's testimony does not pertain to when CryoLife instituted pre-processing testing, that argument is irrelevant because Heacox's testimony unquestionably does pertain to the matter of when CryoLife implemented a compulsory tissue discard list. Specifically, though Heacox was not 100% certain of the date CryoLife commenced compulsory tissue discard, he testified that the "date that sits in [his] mind is the September [2002] date that I know of." Defendants argue that Heacox "could not recall" when CryoLife instituted tissue discard, but the transcript of Heacox's testimony clearly indicates that, to the best of his recollection, such discard occurred in September 2002. This is sufficient to raise a genuine issue of material fact as to the falsity of CryoLife's August 14, 2002 statement that "well in advance" of that date it had adopted the CDC's tissue discard criteria. Additionally, the court finds that there are genuine issues of material fact as to whether this statement was made with severe recklessness, given that CryoLife was unquestionably aware of the CDC's recommendations in one form or another for several months by August 14, 2002.

### l. 2000 and 2001 Form 10-Ks

**\*25**  Finally, Plaintiffs challenge statements made by CryoLife in its 2000 and 2001 Annual Report on Form 10-Ks ("Form 10-Ks"). A company's Form 10-K, filed with the SEC, is intended to provide a comprehensive overview of the company's business and financial condition. CryoLife's 2000 Form 10-K was filed with the SEC on April 2, 2001. CryoLife's 2001 Form 10-K was filed with the SEC on March 29, 2002.

Although Plaintiffs reproduce massive sections of each of CryoLife's Form 10-Ks in the Complaint, the upshot of Plaintiffs' claim is that CryoLife misleadingly asserted in its Form 10-Ks that it was in compliance with FDA regulations. According to Plaintiffs, those statements are "false and misleading because the FDA confirmed CryoLife's regulatory violations during inspections in 1998, 1999, 2001 and 2002." [43] Plaintiffs argue that because the FDA's April 2002 Form 483, June 2002 warning letter, and August 2002 recall letter all discuss past noncompliance by CryoLife that existed at the time the 2000 and 2001 Form 10-Ks were filed, there is a genuine issue of fact as to whether the statements at issue in the 2000 and 2001 Form 10-Ks were false when made.

43       The court notes that although Plaintiffs also assert that the Form 10-Ks misleadingly state that CryoLife was "inspected by the FDA and four states," Plaintiffs point to no evidence in support of that allegation, and accordingly summary judgment is proper thereon.

Even accepting Plaintiffs' contention that there is a genuine issue of material fact as to the truth or falsity of the statements in the Form 10-Ks, the court finds that Plaintiffs fail to demonstrate a genuine issue of material fact that the allegedly misleading statements in the Form 10-Ks were made with severe recklessness. Specifically, Plaintiffs do not persuasively address the fact that the Form 10-Ks were both filed with the SEC prior to the FDA's issuance of the Form 483, the warning letter, and the recall letter. [44] Although those documents arguably show that CryoLife's assertions of regulatory compliance in April 2001 and March 2002 were inaccurate, the court fails to see how those documents also show that CryoLife was severely reckless to assert regulatory compliance in April 2001 and March 2002. As of those dates, it is undisputed that CryoLife had not received a Form

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 240 of 573

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8155579

483 since 1999. Although the FDA inspected CryoLife in December 2001, no Form 483 was issued in the aftermath of that inspection. The FDA issued no Form 483 until April 2002. Accordingly, summary judgment is appropriate on the statements in CryoLife's Form 10-Ks.

44    Indeed, the court notes that the 2000 Form 10-K was filed well in advance of the Lykins incident.

### m. Motive and opportunity evidence of scienter

The court at this time makes no finding as to the viability of Plaintiffs' motive and opportunity evidence. Plaintiffs have adduced sufficient evidence of scienter to survive summary judgment where noted by the court, and Plaintiffs have adduced insufficient evidence of scienter to survive summary judgment (even if they had the benefit of motive and opportunity evidence) where the court has granted summary judgment on that basis. See Bryant, 187 F.3d at 1285-86.

### n. Loss causation

Finally, the court addresses Defendants' loss causation argument. As recently explained by the Supreme Court, loss causation is "a causal connection between the material misrepresentation[s] and the loss." Dura Pharms., Inc. v. Broudo, 125 S. Ct. 1627, 1631 (2005). In Dura, the Supreme Court rejected the Ninth Circuit's conclusion that a securities fraud plaintiff only need establish that the price of the stock at issue was " 'on the date of purchase ... inflated because of the misrepresentation.' " Id. (citation omitted). A securities fraud plaintiff must show that the stock price dropped "after the truth became known" and that the drop in stock price (i.e., the plaintiff's loss) was caused by the untruth. Id. at 1634. An artificially inflated purchase price "may prove to be a necessary condition of any such loss," so that the "misrepresentation ... 'touches upon' [the] later economic loss." Id. at 1632. But "[t]o 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." Id.

*26  In addition to seeking to exclude Preston's testimony on the various bases that will be addressed at the Daubert hearing, Defendants also argue that Preston's analysis improperly finds loss causation where the alleged misrepresentations only "touch upon" Plaintiffs' loss.[45] However, Preston's rebuttal expert report reflects Preston's opinion that the alleged misstatements and the disclosures

thereof "more than 'touch[ ] upon' the causes of investors' losses." Moreover, Preston's deposition testimony and expert reports indicate that she will testify (if she otherwise qualifies) simply that the alleged misstatements "caused" Plaintiffs' loss. Preston does not purport to (and, in fact, will not be permitted to) opine that loss causation is present in this case merely because Defendants' misrepresentations "touch upon" investors' losses.

45    The court notes that Plaintiffs inconsistently (and improperly) argue for and against the "touch upon" theory of causation. Compare Pls. Mot. for Partial Summ. J. at 20 ("To demonstrate loss causation, 'plaintiff must show that the misrepresentation touches upon the reasons for the investment's decline in value.' ") (citation and internal quotation marks omitted); with Pls.' Supplemental Mem. of Law to Address Intervening Supreme Ct. Authority at 2 n.1 ("Defendants claim that 'Plaintiffs have [mis]read [Eleventh Circuit case law] to permit proof of loss causation through evidence that an alleged misstated or omitted fact touches upon the subject matter of a later disclosure that precedes a stock drop.' Plaintiffs have done no such thing, having altogether omitted any 'touches upon' analysis from their Opposition.") (citation and internal quotation marks omitted). Regardless, Dura clarifies that a misrepresentation must do more than "touch upon" a plaintiff's loss.

As for loss causation generally, it appears otherwise undisputed that if Preston qualifies as an expert at the Daubert hearing, her opinions provide Plaintiffs with sufficient evidence of loss causation to survive summary judgment. According to Defendants' final brief on the issue:

> To be sure, Ms. Preston appears to be of the opinion that some misstatements or omissions caused loss, and she so stated various times in her reports and her depositions. The problem is that Plaintiffs ... have not shown that Ms. Preston's opinions in this regard [meet the requirements of] Federal Rule of Evidence 702 [and] Daubert.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 241 of 573

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

Defs.' Resp. to Pls.' Mot. for Leave to File Supplemental Br. to Address Intervening Supreme Ct. Authority at 2. Accordingly, although the court is willing to revisit the question of loss causation should Preston ultimately not qualify as an expert, at this time, summary judgment is not appropriate thereon. [46]

[46]    The court again notes with some interest, however, that Preston has been permitted to testify as an expert witness in front of several other federal courts, including at least once on behalf of the SEC. See Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude Preston at 6-7. The court also notes that, although the parties have not briefed the question, some courts have apparently reserved the issue of causation for a separate hearing after a finding that the other elements are present. See 4 Alan R. Bromberg & Lewis D.Lowenfels, Securities Fraud and Commodities Fraud § 7:499 (2d ed. 2004) ("Such a procedure ... helps to promote settlement and avoid confusion of the different possible functions of causation.").

2. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs themselves seek summary judgment on several other allegedly misleading statements made by Defendants. Specifically, Plaintiffs ask the court to grant them summary judgment on statements allegedly made in CryoLife's March 15, 2002 conference call (and reduced to writing in CryoLife's March 2002 "CryoLife Update"); a statement from the April 23, 2002 press release; and a statement from an April 24, 2002 conference call. [47] However, because essentially none of the statements upon which Plaintiffs seek summary judgment are in the Complaint, summary judgment for Plaintiffs is inappropriate on those statements. Indeed, Plaintiffs are precluded from recovering on any statements not pled in the Complaint.

[47]    Plaintiffs also seek summary judgment on CryoLife's June 25, 2002 assertion in an investor conference call that its inventory was not under FDA suspicion at that time. As discussed supra at note 41, Plaintiffs' Motion for Partial Summary Judgment on this statement is DENIED because there are genuine issues of material fact on the

issue of whether the statement was made with the requisite level of scienter.

**\*27**  The Private Securities Litigation Reform Act of 1995 ("PSLRA") "insists that securities fraud complaints 'specify each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " Dura, 125 S. Ct. at 1633 (citing the PSLRA, 15 U.S.C. §§ 78u-4(b)(1), (2) ) (emphasis added). This requirement is well-settled, and as illustrated by the Supreme Court's use of the word "insists," it is non-negotiable. See also Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004) ("The statute states that the complaint 'shall specify each statement alleged to have been misleading....' ") (emphasis added); Anderson, 140 F. Supp. 2d at 903-04 (holding that because statements in securities fraud class action "were not pled" in Complaint, the court "need not discuss them" and further holding that under the PSLRA, "plaintiffs must, at the very least, identify which statement is made misleading by defendants' omission. Their failure to do so is fatal to those claims").

Plaintiffs assert that "[a]ll of the alleged false statements [on which they move for summary judgment] pertain to" issues raised in the Complaint, such as CryoLife's tissue processing procedures and the government investigation of CryoLife, but that is not the point. The statements themselves are not in the Complaint, and that is unquestionably required for recovery under the PSLRA. Plaintiffs' argument that "Defendants have been on notice of all of the statements that are the subject of Plaintiffs' Motion [for Partial Summary Judgment] for many months" is unavailing for the same reason. The PSLRA requires that for a statement to be actionable, it must be pled in the Complaint. In light of the fact that Plaintiffs' attorneys purportedly specialize in securities fraud cases, Plaintiffs' Motion for Partial Summary Judgment (beyond the one statement from the June 25, 2002 conference call that is in the Complaint) thus borders on the frivolous. [48] Plaintiffs' Motion for Partial Summary Judgment is thus DENIED. [49]

[48]    The court additionally finds Plaintiffs' Motion for Partial Summary Judgment to be particularly improper in light of the assurances Plaintiffs made to the court in their response to Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity. See supra note 14 and accompanying text.

49  Finally, beyond the substantive failures of Plaintiffs' Motion for Partial Summary Judgment, the court also denies the Motion on the grounds that it is untimely. See supra note 8. For future reference, in case there was any confusion, the court advises the parties that when a deadline is "set in stone," that means it is non-negotiable.

## IV. Summary

And thus, over eighty pages after it began, the court has addressed each and every motion currently pending on the docket in this case. To recap: Plaintiffs' Advice of Counsel Motion to Compel [Doc. No. 135] is DENIED, with Plaintiffs to pay Defendants' reasonable attorney's fees and costs incurred in responding to the Motion. Plaintiffs' Motion to Compel Documents from Experts [Doc. Nos. 165 and 168] is DENIED. Defendants' Motion for Daubert Hearing [Doc. No. 150] is GRANTED. The Daubert hearing is scheduled for Tuesday, June 28, 2005 and Wednesday, June 29, 2005. 50

50  In light of the parties' dispute about the necessity for a Daubert hearing, the court is reluctantly willing to revisit the scheduling of the hearing prior to its actual commencement, via teleconference with the parties.

Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity [Doc. No. 151] is GRANTED IN PART AND DENIED IN PART, without prejudice to Defendants' right to later move in limine to exclude from evidence alleged misstatements that are not in the Complaint but that Plaintiffs might seek to introduce into evidence on the question of scienter. The court defers ruling on Defendants' Motion to Exclude Kainer [Doc. No. 152], Defendants' Motion to Exclude Doppelt and Eastlund [Doc. No. 153], Plaintiffs'

Motion to Exclude Trainor [Doc. No. 182], Defendants' Motion to Exclude Preston [Doc. No. 184], and Plaintiffs' Motion to Exclude Benson [Doc. No. 230] until the Daubert hearing, except as otherwise noted herein. Additionally, for purposes of docket maintenance, Defendants' Motion to Exclude Kainer [Doc. No. 163] and Plaintiffs' Motion to Exclude Trainor [Doc. No. 181] are DENIED.

**\*28** Defendants' Motion to Amend the Scheduling Order [Doc. No. 149] is DENIED AS MOOT. The parties' Joint Motion to Extend Page Limits for Summary Judgment Briefing [Doc. No. 172] is GRANTED. Defendants' Motion for Oral Argument [Doc. No. 195] is DENIED. Defendants' Motion to File Under Seal [Doc. No. 196] is GRANTED. Plaintiffs' Motion for Leave to File Supplemental Brief to Address Intervening Supreme Court Authority [Doc. No. 231] and Plaintiffs' Motion for Leave to File Supplemental Brief to Address Intervening Eleventh Circuit Authority [Doc. No. 232] are GRANTED.

Finally, for the foregoing reasons and in the manner described herein, Defendants' Motion for Summary Judgment [Doc. No. 194] is GRANTED IN PART AND DENIED IN PART, and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 197] is DENIED. The parties' consolidated pretrial order is due within twenty (20) days after the court's Daubert rulings, and no extensions will be granted. (That deadline is "set in stone.")

IT IS SO ORDERED, this 17 th day of June, 2005.

## All Citations

Not Reported in Fed. Supp., 2005 WL 8155579

---

**End of Document**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 13

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 244 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

2015 WL 6039690

Editor's Note: Additions are indicated by Text and deletions by Text .

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

IN RE FISKER AUTOMOTIVE HOLDINGS,

INC. SHAREHOLDER LITIGATION

Civ. No. 13-2100-SLR
|
Signed October 15, 2015

**Attorneys and Law Firms**

Norman M. Monhait, Esquire and P. Bradford deLeeuw, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Kurt Olsen, Esquire of Klafter Olsen & Lesser LLP and Todd S. Collins, Esquire and Barbara A. Podell, Esquire of Berger & Montague, P.C.

M. Duncan Grant, Esquire and Christopher B. Chuff, Esquire of Pepper Hamilton LLP, Wilmington, Delaware. Counsel for Defendant Keith Daubenspeck. Of Counsel: Min Choi, Esquire of Pepper Hamilton LLP.

Vernon R. Proctor, Esquire of Proctor Heyman Enerio LLP, Wilmington, Delaware. Counsel for Defendant Peter McDonnell. Of Counsel: Steven J. Rosenberg, Esquire of Steven J. Rosenberg, P.C.

William B. Chandler III, Esquire and Ian R. Liston, Esquire of Wilson Sonsini Goodrich & Rosati, P.C., Wilmington, Delaware. Counsel for Defendants Henrik Fisker and Bernhard Koehler. Of Counsel: David J. Berger, Esquire and Steven Guggenheim, Esquire of Wilson Sonsini Goodrich & Rosati, P.C.

J. Clayton Athey, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware. Counsel for Defendant Joe DaMour. Of Counsel: Peter M. Stone, Esquire and Panteha Abdollahi, Esquire of Paul Hastings LLP.

Samuel A. Nolen, Esquire and Katharine C. Lester, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendants Richard Li Tzar Kai and Ace Strength Ltd. Of Counsel: Glenn M. Kurtz, Esquire, Douglas P.

Baumstein, Esquire, and Kimberly A. Haviv, Esquire of White & Case LLP.

Kenneth J. Nachbar, Esquire and Lindsay M. Kwoka, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendants Kleiner Perkins Caufield & Byers LLC and Ray Lane. Of Counsel: Michael D. Celia, Esquire, Laurie Carr Mims, Esquire, and Sophie A. Hood, Esquire of Keker & Van Nest LLP.

**\* \* REVISED MEMORANDUM OPINION \* \***

ROBINSON, District Judge

**I. INTRODUCTION**

**\*1** By an order dated June 30, 2014, the court consolidated three securities fraud lawsuits filed against defendants Henrik Fisker, Bernhard Koehler, Joe DaMour, Peter McDonnell, Kleiner Perkins Caufield & Byers LLC, Ray Lane, Keith Daubenspeck, Richard Li Tzar Kai, and Ace Strength, Ltd. (collectively "defendants"). [1] (D.I. 23) On July 23, 2014, plaintiffs [2] filed an amended consolidated complaint ("complaint") alleging violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). (D.I. 24) Presently before the court are defendants' motions to dismiss the consolidated complaint. (D.I. 29; D.I. 31; D.I. 33; D.I. 36; D.I. 38; D.I. 43) Plaintiffs filed a motion for judicial notice of certain documents. (D.I. 54) The court has jurisdiction pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

[1]   The present action filed on December 27, 2013; *CK Investments LLC v. Fisker*, Civ. No. 14-118 filed on January 31, 2014; and *PEAK6 Opportunities Fund L.L.C. v. Fisker*, Civ. No. 14-119 filed on January 31, 2014. All citations are to the present action, Civ. No. 13-2100, unless otherwise indicated.

[2]   Defined below.

**II. BACKGROUND**

**A. The Parties**

Plaintiffs PEAK6 Opportunities Fund L.L.C. and MCP Fisker are Illinois-based entities. Plaintiff 8888 Investments GmbH is a Swiss-based entity. Plaintiff 12BF Global Investments,

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 245 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

Ltd. is a company organized under the laws of the Cayman Islands with limited liability. Plaintiff ASC Fisker L.L.C. is a Florida-based entity. Plaintiff CK Investments LLC ("CK Investments") is a Maryland-based entity. The following entities are based in Texas: Plaintiff Atlas Management, the general partner and investment advisor to plaintiff Atlas Fund (collectively, "Atlas"); plaintiff Hunse Investments, L.P. ("Hunse Investments"); plaintiff Southwell Partners, L.P. ("Southwell"); plaintiff Sandor Master Capital Fund ("Sandor"); and plaintiff Pinnacle Family Office Investments, L.P. ("Pinnacle"). Plaintiffs SAML Partners ("SAML Partners") and Kenneth & Kimberly Roebbelen Revocable Trust of 2001 ("KKRR Trust") are California-based entities. Plaintiffs David W. Raisbeck ("Raisbeck") and Dane Andreeff ("Andreeff") are residents of Florida. Plaintiff John S. Lemak ("Lemak") is a resident of Texas. Plaintiff Brian Smith ("Smith") is a resident of Utah. (D.I. 24 at ¶¶ 9-25)

Non-party Fisker Automotive is a Delaware corporation which had its principal place of business in Anaheim, California. Non-parties Middlebury Group LLC, Middlebury Ventures II/III, LLC, and/or Ridgemakers SPV II/III, LLC (collectively, "Middlebury") [3] are Delaware limited liability companies, which were also used by Fisker Automotive to raise capital. (Id. at ¶¶ 26, 36)

[3]  Plaintiffs Atlas, CK Investments, Raisbeck, Hunse Investments, Southwell, Sandor, Lemak, Pinnacle, Andreeff, SAML Partners, KKRR Trust, and Smith are collectively the Middlebury plaintiffs.

**\*2** Defendant Henrik Fisker ("Fisker") was a co-founder and Director of Fisker Automotive. He was also Fisker Automotive's Chief Executive Officer from its inception through February 2012. Defendant Bernhard Koehler ("Koehler") was a co-founder of Fisker Automotive's predecessor entity, Fisker Coachbuild, LLC, and was Fisker Automotive's Chief Operating Officer at all relevant times. Defendant Joe DaMour ("DaMour") was Fisker Automotive's Chief Financial Officer at all relevant times through July 2012, after which he acted as a "special adviser" to Fisker Automotive. Defendant Kleiner Perkins Caufield & Byers ("Kleiner Perkins") is a venture capital firm with its headquarters in Menlo Park, California, and was a controlling shareholder of Fisker Automotive. Defendant Ray Lane was a Managing Partner of Kleiner Perkins and was Fisker Automotive's Chairman of the Board of Directors at all relevant times. Defendant Ace Strength Ltd

("Ace Strength") is an investment vehicle through which defendant Richard Li Tzar Kai ("Li") invested in Fisker Automotive. Ace Strength was a controlling shareholder of Fisker Automotive. Li was a member of Fisker Automotive's Board of Directors at all relevant times. Defendant Keith Daubenspeck ("Daubenspeck") was a Director of Fisker Automotive and cofounder of Advanced Equities, Inc. ("Advanced Equities"), which was one of several investment banks or vehicles that Fisker Automotive used to raise capital. Defendant Peter McDonnell ("McDonnell") was the senior managing director of the investment banking group at Advanced Equities and was responsible for, inter alia, marketing Fisker Automotive's Series D-1 offering. (Id. at ¶¶ 27-35)

### B. Fisker Automotive

In 2003, Fisker and Koehler founded Fisker Coachbuild LLC to create "new exterior car designs while utilizing existing luxury car engineering." (D.I. ¶ 37) On August 7, 2007, Quantum Fuel Systems Technologies Worldwide, Inc. ("Quantum Fuel Systems") and Fisker Coachbuild, LLC, launched Fisker Automotive to build plug-in hybrid cars and in the process sold $5.5 million in Series A financing. Fisker Automotive anticipated initial deliveries of a four-door sports sedan by December 2009. (Id. at ¶¶ 38-39) In January 2008, Fisker Automotive completed a $20 million Series B round of financing, with Kleiner Perkins contributing more than $10 million and Lane joining Fisker Automotive's Board. (Id. at ¶¶ 41-42)

On or about December 31, 2008, Fisker Automotive applied for a loan with the U.S. Department of Energy ("DOE") under the DOE's Advanced Technology Vehicles Manufacturing Loan Program ("the ATVM loan"). (Id. at ¶¶ 44) On or about March 2, 2009, Fisker Automotive raised approximately $68.5 million in Series C financing, including another investment from Kleiner Perkins. (Id. at ¶ 45) On August 23, 2009, Koehler wrote an email to the DOE inquiring about the status of the ATVM loan application, because of financial concerns. (Id. at ¶ 46) On September 18, 2009, the DOE issued a $528.7 million Conditional Commitment Letter and allocated $169.3 million for Fisker Automotive to complete its first vehicle, the Fisker Karma ("Karma"), and $359 million to complete a low cost plug-in hybrid, the Fisker Nina. Fisker Automotive had to complete several "milestones" to avoid default, including raising additional outside capital by certain dates and beginning commercial production of the Karma vehicle by February 2011 ("February 2011 Karma production milestone"). (Id. at ¶¶ 47-51)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 246 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

On or about January 13, 2010, Fisker Automotive and A123 Systems, Inc. ("A123") entered into a supply agreement for automotive batteries. A123 also agreed to invest approximately $20.5 million in Fisker Automotive. (*Id.* at ¶ 49) On January 20, 2010, an article [4] based on interviews with Fisker and Lane stated: "Lane said Fisker [Automotive] will grab the investing momentum surrounding the company to complete the $150 million funding round in 'the next month or two.' " (*Id.* at ¶ 50) On or about May 5, 2010, Fisker Automotive raised an additional $145 million in Series A-1 venture capital from investors, including Kleiner Perkins and Advanced Equities (the latter raising approximately $27 million from 347 private investors a few weeks later). (*Id.* at ¶ 52)

[4]    *Car Maker Taps Funding Karma*, Wall Street Journal, January 20, 2010 (based primarily on interviews with Fisker and Lane).

In March 2011, Fisker Automotive made a non-public presentation to DOE officials, representing that it met the February 2011 Karma production milestone for the ATVM Loan, when in fact it had not. (*Id.* at ¶ 53) On or about March 23, 2011, Fisker Automotive raised an additional $190 million in private equity including investments from Kleiner Perkins and Advanced Equities. (*Id.* at ¶ 54) In April 2011, Fisker Automotive solicited qualified investors in connection with a $100 million offering of Series C-1 Preferred Stock (the "April 2011 Offering"). The related offering documents, including a Confidential Private Placement Memorandum dated March 31, 2011 ("March 2011 CPPM"), were available to plaintiffs and other investors. (*Id.* at ¶ 56) The March 2011 CPPM described related party transactions and stated that "Daubenspeck, AEFC and its affiliates, including [Advanced Equities], have an economic interest in Fisker's success as well as the success of the Offering." (*Id.* at ¶ 56; D.I. 53, ex. Eat 42) It also contained a statement on the cover page—"Preliminary Draft—Terms may Change Subject to Board and Shareholder Approval." (D.I. 53, ex. E) During the same timeframe, Middlebury circulated a Confidential Private Placement Memorandum ("April 2011 Middlebury CPPM") to the Middlebury plaintiffs soliciting qualified investors. Potential investors, including plaintiffs, could examine Fisker Automotive's "Series C-1 Transaction Documents" through a website link with the password included in the April 2011 Middlebury CPPM. (D.I. 24 at ¶ 57) The April 2011 Middlebury CPPM stated that Fisker Automotive had "incurred losses in the operation of our business and anticipate that we will continue to incur losses for the future." (*Id.* at ¶ 57; D.I. 53, ex. Eat 44) It also disclosed that "loss of key certain key personnel without DOE consent" could trigger a default on the ATVM loan. (D.I. 53, ex. Eat 44) It further included an "exculpation among purchasers" clause stating that the purchasers are relying solely on Fisker Automotive and "its officers and directors" in making the decision to invest. (D.I. 53, ex. G at 18) By May 2011, Kleiner Perkins owned a 12.61 % equity stake in Fisker Automotive and Ace Strength 10.15%. (D. I. 24 at ¶ 59) On May 13, 2011, an article [5] stated that "Lane, a managing partner at storied venture capital firm Kleiner Perkins Caufield & Byers, said Fisker Automotive also plans to go public in the future ...." (*Id.* at ¶ 60)

[5]    *Luxury hybrid electric car maker Fisker Automotive raises an extra $100M*, VentureBeat, May 13, 2011.

**\*3** Fisker Automotive continued to draw approximately $29 million on the ATVM loan from February through May 2011. (*Id.* at ¶ 64) In May 2011, after Fisker Automotive had completely drawn down the Fisker Karma portion of the ATVM Loan, the DOE issued a non-public "drawstop notice" to the Federal Financing Bank preventing Fisker Automotive from making any further draws on the Fisker Nina phase of the loan. (*Id.* at ¶ 61) In June 2011, Fisker Automotive informed the DOE that it had not met the February 2011 Karma production milestone, contrary to its March 2011 representation. On or about June 6, 2011, Fisker Automotive raised another $115 million in venture capital, including investments from Advanced Equities, Kleiner Perkins and a new investor, New Enterprise Associates. (*Id.* at ¶ 62)

In July 2011, Fisker Automotive began preparations for a new round of financing. On July 27, 2011 (on behalf of Fisker Automotive), McDonnell, Fisker, Koehler and DaMour held a conference call with analysts and investors designed to solicit investors "for a new round of private equity financing to raise approximately $150 million by issuing Series D-1 shares of Fisker Automotive." (*Id.* at ¶ 66) DaMour discussed the ATVM loan, but did not mention that funds had been cut off. He explained that the interest rates were low and refinancing would not be needed. [6] A replay of the call and a PowerPoint presentation by Fisker Automotive was made available to plaintiffs and other investors. (*Id.* at ¶¶ 66-67) On August 21, 2011, an article [7] stated that "Fisker Automotive is using a flurry of hype surrounding its first car—the $98,000 Karma hybrid—to ask for another $200

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 247 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

million from investors ....” (*Id.* at ¶ 68) On September 15, 2011, Fisker Automotive began twelve rounds of sales of Series D-1 stock (ending on December 2, 2011), raising a total of approximately $86 million based on offering documents distributed in August 2011. The Amended and Restated Series D-1 Preferred Stock Purchase Agreement (“December 2011 stock purchase agreement”) states: “The Knowledge of the Company shall mean the Knowledge of Henrik Fisker, Bernhard Koehler, and Joseph DaMour.” (*Id.* at ¶ 69) The December 2011 stock purchase agreement also contained an “exculpation among purchasers” stating that the purchasers are relying solely on Fisker Automotive and “its officers and directors” in making the decision to invest. (D.I. 53, ex. H at 21)

6      Specifically, DaMour stated:
       We've already raised over $600 million worth of equity and when you combine that with the Department of Energy loans, which we secured, which are $530 million—that's $1.1 billion of total capital already secured for the business.
       ...
       But importantly, a significant cash cushion which provides significant security and comfort to our suppliers and our dealers and all the other major partners we have that run the business with us. So in sum, we know we are very well capitalized today.
       (D.I. 24 at ¶ 67)

7      *Fisker asks investors for $200M more: Funding is being called a ‘pre-IPO’ round*, The News Journal (Wilmington, Delaware), August 21, 2011.

On October 20, 2011, the DOE posted a press release on its website touting the ATVM loan program and Fisker Automotive. (D.I. 24 at ¶ 70) The DOE press release stated in part, “[w]ith the help of a $529 million loan, Fisker is producing high performance vehicles with an advanced hybrid electric powertrain that could significantly improve performance and fuel economy.” It explained that the two-part loan provides $169 million for the Fisker Karma (developed in “Fisker [Automotive]'s US facilities, including its headquarters in Irvine, California which has 700 employees and plans to continue hiring”) and $359 million for the Fisker Nina (which will be produced in a now “shuttered General Motors plant in Delaware” and employ “more than 2,500 workers”). It also stated that “Fisker [Automotive]'s production schedule was delayed by regulatory issues that were outside of its control, but [Fisker Automotive] has

successfully raised more than $650 million in private sector investment to support its ongoing operations since closing its DOE loan.” (*Id.* at ¶ 70) On October 26, 2011, Fisker Automotive (with McDonnell, Fisker, Koehler, and DaMour participating) held a conference call with investors. Plaintiffs summarized the call as “investors expressed concerns about the ATVM Loan in light of the recent bankruptcy filing of DOE loan guarantee recipient, Solyndra. Defendant Henrik Fisker stated that there was no risk of losing the DOE loan.” (*Id.* 71)

**\*4** On November 1, 2011, Fisker Automotive confidentially informed the DOE that it would run out of cash within three days without additional government loan money or an injection of private equity. (*Id.* 72) On November 4, 2011, A123 announced it was lowering its 2011 revenue guidance range “due to an unexpected reduction in orders for battery packs from Fisker Automotive ....” (*Id.* 73) In November 2011, two articles [8] based on interviews with Lane stated that Fisker Automotive would meet its 2012 production goals. According to Lane, “[i]n production of a first vehicle, everything doesn't go the way you plan .... Next year, we'll do exactly what we plan.” (*Id.* 74-75) On November 30, 2011, Fisker Automotive confidentially informed the DOE that a modest investment increase of $37 million at mid-month had nudged its available cash up to a still-thin $20 million. (*Id.* 76)

8      *Fisker on track to make electric sports cars, despite delays*, Calgary Herald (Alberta), November 18, 2011 and *Fisker says Karma will meet 15,000 production target for 2012*, AutoblogGreen, November 26, 2011.

On December 8, 2011, Fisker Automotive's Board of Directors unanimously approved a 40% “pay to play” capital call imposed on all Fisker Automotive investors (the “December 2011 Capital Call”), based on “an obscure provision in the April 2011 Offering documents called a ‘pay to play’ capital call provision.” [9] Investors faced penalties of “having each share of preferred stock converted to one-half share of common stock, as well as the severe dilution of their existing interests in Fisker Automotive” if they did not comply. (*Id.* 79) On Sunday, December 11, 2011, Greg Osborn (“Osborn”) of Middlebury sent an email to certain investors detailing the “pay to play” plan and attempting to appease the investors. (*Id.* at ¶¶ 80-81) The email stated that “Daubenspeck, a Fisker Board member and Chairman of Advanced Equities [will] join our call” the next day. (*Id.* at ¶ 81) On December 15, 2011, Fisker Automotive made

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 248 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

available to plaintiffs and other investors offering documents associated with the December 2011 Capital Call, including the Amended and Restated Series DI Preferred Stock Purchase Agreement ("December 2011 Capital Call documents"). The December 2011 Capital Call documents provided that Fisker Automotive's

> Board of Directors and the Audit Committee of the Company's Board of Directors have reviewed and discussed the terms of the Series D-1 Financing Capital Call ... and have determined that the terms of the Series D-1 Financing Capital Call ... are in the best interests of the Company and its stockholders.

(D.I. 53, ex. F at 1) A letter from Fisker (the "December 2011 Fisker Letter) explained:

> We have had several delays to the Karma program due to component part shortages, obtaining emissions and regulatory clearances and fine tuning the Karma to get it ready for customers. Consequently, we did not realize revenue as expected in 2011. We now believe that raising equity is a prudent course of action. Improving our cash position will allow us to continue to build momentum behind the Karma production and sales launch and maintain the 2013 launch timing of the Nina sedan.

> Management and the Board of Directors have determined that it is in the best interest of Fisker Automotive to raise equity through the D-1 Financing Capital Call that is described in detail in the attached Information Statement. ... I encourage you to carefully review the Information Statement and consider a further investment in Fisker Automotive. Importantly, three of our major venture capital investors, Kleiner Perkins, NEA and Pacific Century, support this action and have already made, or committed to make, their capital calls, together totaling more than $57 million.

(*Id.* 83) The Executive Summary accompanying the December 2011 Fisker Letter described the "Board Approval Process" as using an Audit Committee and discussing the Capital Call in "working group calls and meetings." After considering "a number of factors,"

> **\*5** [t]he Board of Directors then instructed its officers to solicit the approval of the requisite vote of the stockholders of the Company, mail this Information Statement, and obtain indications of interest from interested stockholders. The Company received the requisite vote of the stockholders to approve the Series D-1 Financing Capital Call on December 14, 2011.

(D.I. 53, ex. J at 55-56)

9       It is unclear in the complaint to which specific documents this refers.

On a conference call with investors December 15, 2011, Fisker Automotive (represented by McDonnell, Fisker, Koehler, and DaMour) discussed the ATVM Loan status. The complaint states that "[o]n that call, ... DaMour discussed the ATVM [l]oan, stating that '[Fisker Automotive is] currently not drawing [on the ATVM loan] and that was a mutual agreement between [Fisker Automotive] and the government as [Fisker Automotive] work[s] to finalize the revised covenants and milestones, but as you see, [Fisker Automotive] ha[s] $340 million remaining to be drawn and that will be drawn through the 2012 and first half 2013 timeframe.' " (*Id.* at ¶ 86) "[I]n response to investor questions about the ATVM Loan, ... Fisker reiterated that 'there is not a risk that [the DOE] will not continue to fund because they have already given us a commitment by letter that they are committed to Fisker Automotive.' " (*Id.* at ¶ 87) Moreover, plaintiffs allege:

> DaMour ... stated "with the money we raised in this round, [Fisker Automotive] can continue with the [Karma] indefinitely," even if Fisker Automotive received no further funds from the DOE or other outside capital. And, in response to specific questions regarding Fisker Automotive's business plan and whether the funding from this $300 million Series D round would be sufficient to fund Fisker Automotive's business plan without another capital call or some other additional funding, Defendant DaMour stated "this is the last ... private raise, and surely the last capital call .... The $300 [million] is enough to fund the

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 249 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

complete plan as we have explained .... We are at the point now that the ... [Karma] is fully funded."

(*Id.* at ¶ 89) Plaintiffs allege that "Fisker 'responded to a question about concerns of battery fires in light of the Chevrolet Volt's reported battery fire problems by stating that it 'is not a risk for us, we have a different chemistry [a] liquid cooled battery.' " (*Id.* at ¶ 88)

On December 21, 2011, the National Highway Traffic Safety Commission ("NHTSC") acknowledged (through a "non-public letter" to Fisker Automotive) a "report of a 'safety recall campaign which [would] be conducted under Federal law' of 239 Fisker Karmas due [to] a battery problem that could cause a fire" ("Karma recall notice"). (*Id.* at ¶ 90) On December 29, 2011, the day after the first deadline to invest in the December 2011 Capital Call, Fisker Automotive publicly announced its recall of 239 Fisker Karmas due to the battery fire issue. (*Id.* at ¶¶ 90-92) On December 30, 2011, an article [10] reported that "Fisker spokesman Roger Ormiser [ ("Ormisher") ] said customers were alerted of the faulty batteries last week ...." (*Id.* at ¶ 92) The article also explained that the source of the problem is "misaligned hose clamps that could cause coolant leaks, and potentially a dangerous electrical short circuit." According to the article, the NHTSC notice stated, "[i]f coolant enters the battery compartment, an electrical short could occur, possibly resulting in a fire." (D.I. 34, ex. A)

[10]    Jonathan Starkey, *Fisker* issues *Karma recalls*, The News Journal (Wilmington, Delaware), December 30, 2011.

**\*6** A January 4, 2012 non-public report prepared by the DOE Loans Program Office discussed Fisker Automotive's missed launch dates and potential alternatives. (D.I. 24 at ¶¶ 93-94) Specifically, the report stated that Fisker Automotive had $200 million in payables as of November 30, 2011, of which $120 million were overdue—with only $20 million in cash on hand and could be out of money as early as December 15, 2011. (*Id.* ¶ 93) On February 7, 2012, an article [11] reported layoffs of workers refurbishing the manufacturing plant in Wilmington, Delaware and of workers at Fisker Automotive's California headquarters. According to the article, "Fisker officials characterized the layoffs as part of the complicated process of getting a billion-dollar car company off the ground." (*Id.* ¶ 95) The article further reported:

A Fisker spokesman said Monday that negotiations are under way with the Energy Department to modify the

loan achievement goals to allow some cash to be drawn down. "To date we have received $193 million of the $529 million Department of Energy loan, mostly for the Karma program, and received our last reimbursement in May 2011," Fisker spokesman Roger Ormiser said in a statement Monday. "We are renegotiating some terms of the DOE agreement for the $336 million balance of the loan related to the Project Nina program." Ormisher said the exact terms of the loan conditions are confidential. "The DOE can sometimes take a little bit of time," Ormisher said. "We can't keep going and going and going without that money."

(*Id.*) On February 22, 2012, Fisker Automotive (represented by McDonnell, Fisker, Koehler, and DaMour) held a conference call to update investors regarding its status and a change in the Series D-1 round of financing whereby Fisker Automotive wanted to raise an additional $100 million by the end of March. The complaint states that "Fisker acknowledged recent negative press regarding the ATVM Loan, and characterized Fisker's problems as 'essentially driven by more political views around whether the government should be lending money or not. And unfortunately, we have become somewhat a political football ....' " (D.I. 24 at ¶ 97) Further, "Fisker Automotive's Board of Directors made a decision that it was in Fisker Automotive's 'better interests ... in the future to pay back the [DOE] and basically get alternative financing,' " in order to be "self-sustaining as a company" with just the Karma. But Fisker "also stated that they would continue negotiating with the DOE to obtain the remaining funds under the ATVM Loan." (*Id.* at ¶¶ 98-99) On February 28, 2012, Fisker Automotive announced Fisker's resignation as Fisker Automotive's CEO to be replaced by Tom LaSorda ("LaSorda"). The confidential ATVM Loan contained a "Key Personnel" covenant requiring Fisker to be "responsible for the management of the borrower." (*Id.* at ¶ 100)

[11]    *Fisker slows work at former GM site, lays off 26*, The News Journal (Wilmington, Delaware), February 7, 2012.

In March 2012, Fisker Automotive notified its investors of another "pay to play" capital call (the "March 2012 Capital Call"), which raised $392 million. (*Id.* at ¶¶ 101-103) On April 19, 2012, an article [12] reported more layoffs in Delaware. (*Id.* at ¶ 104) A Fisker Automotive spokesman stated "[w]e have always had a flexible business model. The plant is now ready for the next phase of installing new production equipment." (*Id.*) On June 26, 2012, an

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 250 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

article [13] detailed Fisker Automotive's continued attempt to raise more equity, having sold 1,200 Karma vehicles. (*Id.* at ¶ 105) The article quoted Lane as stating: "I'm looking at about $400 million in revenue this year. That would make [Fisker Automotive] the fastest growing start-up ever." The article also stated that "[t]he situation with the DOE, said Lane, 'caused [Fisker Automotive] to accelerate capital raising.' " (*Id.*) On July 6, 2012, an article [14] "reported that Jim Yost, a former executive at Ford Motor Co. and Dana Holdings Corporation, had replaced Defendant DaMour as Fisker Automotive's CFO and that DaMour would 'stay on as a special advisor to [Fisker Automotive].' " (*Id.* at ¶ 106) A confidential DOE presentation dated August 2, 2012 stated that the DOE had spoken to Lane regarding the financial status of Fisker Automotive and was told that Fisker Automotive "was down to $12 million in cash and ... expected to run out of cash 'within a month.' " (*Id.* at ¶ 107)

[12]   The Detroit Free Press, April 19, 2012.

[13]   *Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension*, The Wall Street Journal Venture Capital Dispatch Blog, June 26, 2012.

[14]   In 4WheelsNews.

**\*7**  On August 14, 2012, LaSorda was replaced as CEO by the former head of the Chevy Volt hybrid program, Tony Posowatz. (*Id.* at ¶ 108) The complaint alleges that:

> On August 16, 2012, Reuters published an interview of Ray Lane in which he stated [Fisker Automotive] was seeking to raise an additional $150 million to increase cash on Fisker Automotive's balance sheet and to fund development of Fisker Automotive's next model car. Lane held out the prospect of an upcoming IPO, which would save Fisker Automotive's investors, stating that "[o]nce Fisker [Automotive] breaks even, [it] could pursue an initial public offering or a sale to a strategic investor, which could come in late 2013."

(*Id.* at ¶ 109) In late August 2012, Fisker Automotive issued offering documents in connection with a Series E round of financing/preferred stock ("2012 Series E offering documents"), seeking to raise at least $30 million in bridge loan financing which would convert into Series E Preferred stock if the full amount was actually raised. The DOE agreed to waive Fisker Automotive's covenant violations and not declare the ATVM Loan in default if Fisker Automotive

raised that amount. Fisker Automotive raised $50 million by early September. (*Id.* at ¶ 110) On or around September 19, 2012, Osborn sent plaintiffs and other investors a pay to play capital call (the "September 2012 Capital Call") for Series E preferred stock, raising approximately $104 million. (*Id.* at ¶¶ 111-12)

On or about October 16, 2012, A123 filed for bankruptcy protection. Shortly thereafter, Fisker Automotive stopped production of the Karma, laid off another 40 employees, and retained an investment banking advisory firm to find a "strategic partner" to save itself. On March 13, 2013, Fisker resigned from the Board of Directors. Fisker Automotive then hired the law firm of Kirkland & Ellis, PC to advise it on a possible bankruptcy filing. In April 2013, Fisker Automotive laid off another 160 employees (75% of its remaining workforce). (*Id.* at ¶¶ 113-115)

On April 17, 2013, PrivCo, a private research firm, made available a detailed report ("the PrivCo Report") based on documents obtained through Freedom of Information Act requests detailing Fisker Automotive's decline. On April 21, 2013, the U.S. Government reported that it had seized $21 million in cash from Fisker Automotive to fulfill the first loan payment. On April 24, 2013, a U.S. House of Representatives Subcommittee On Economic Growth, Job Creation And Regulatory Affairs Of The Committee On Oversight And Government Reform held a hearing to investigate Fisker Automotive (the "House Fisker Hearing"). (*Id.* at ¶¶ 116-122) Lane resigned from Fisker Automotive's Board of Directors in May 2013. (*Id.* at ¶ 123) On September 17, 2013, the DOE put the remaining $168 million owed on the ATVM Loan out to bid in a public auction. (*Id.* at ¶ 124) On November 22, 2013, Fisker Automotive filed for bankruptcy protection. (*Id.* at ¶ 125) [15]

[15]   From the record at bar, at least $1.4 billion was invested in Fisker Automotive prior to its bankruptcy filing.

### C. Claims

The complaint alleges violations of § 12(a)(2) of the Securities Act against all defendants except Kleiner Perkins and Ace Strength; violations of § 15 of the Securities Act against defendants Kleiner Perkins, Lane, Fisker, Koehler, DaMour, Daubenspeck, Li and Ace Strength; violations of § 10(b) of the Exchange Act and Rule 10b-5 against all defendants except Kleiner Perkins and Ace Strength; and violations of § 20(a) of the Exchange Act against

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

defendants Kleiner Perkins, Lane, Fisker, DaMour, Koehler, Daubenspeck, Li and Ace Strength. (D.I. 24 at ¶¶ 126-165).

### III. MOTION TO DISMISS

#### A. Standard

**\*8** A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 201 O); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pied facts sufficiently show that the plaintiff "has a 'plausible claim for relief.' " *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makar Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the

court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

#### B. Discussion

#### 1. Omissions and misstatements

Plaintiffs assert "the following material omissions which [d]efendants had a duty to disclose in connection with [d]efendants' efforts to solicit [p]laintiffs and other investors to purchase Fisker Automotive Securities in violation of [§] 12(a)(2) and Rule 10b-5" (D.I. 52 at 20): (1) the failure to disclose that Fisker Automotive did not meet the February 2011 Karma production milestone, the representation to the DOE that Fisker Automotive did meet such milestone in the March 2011 presentation, and the failure to disclose the DOE's drawstop decision in May 2011 (D.I. 24 at ¶¶ 53, 64, 149-51); (2) the failure to disclose the Karma recall notice, acknowledged by NHTSA on December 21, 2011 during the December 2011 Capital Call, one week before the December 2011 Capital Call closed (*id.* at ¶¶ 90-91, 152); (3) the failure to disclose during the December 2011 Capital Call Fisker Automotive's precarious cash position, i.e., that Fisker Automotive had $200 million in payables as of no later than November 30, 2011, of which $120 million was overdue—with only $20 million in cash on hand and could be out of money as early as December 15, 2011 (*id.* at ¶¶ 93, 153); and (4) the failure to disclose in connection with the March 2012 Capital Call and September 2012 Capital Call offerings that Fisker's resignation from the day-to-day management of Fisker Automotive as CEO in February 2012 caused Fisker Automotive to be in default of the ATVM Loan "Key Personnel" covenant requiring him to be "responsible for the management of the borrower" (*id.* at ¶¶ 100, 154).

#### 2. Section 12(a)(2) claims [16]

[16]    Against all defendants except Kleiner Perkins and Ace Strength. (D.I. 24 at ¶¶ 126-139)

**\*9** To state a claim under § 12(a)(2), [17] plaintiffs must allege that they purchased securities pursuant to a materially false or misleading prospectus or oral communication. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273-74 (3d Cir. 2004) (internal citations and quotations omitted). Where a plaintiff's § 12(a)(2) claims are not grounded in allegations of fraud, scienter is not required to be pied and "the liberal

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 252 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

 more pleading requirements of Rule 8 apply." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (citing *In re Adams Golf*, 381 F.3d at 273 n.5).

17    Section 12(a)(2) provides that any defendant who offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable ... to the person purchasing such security from him.

15 U.S.C. § 77l.

### a. Timeliness of plaintiffs' § 12(a)(2) claim

Section 13 of the Securities Act provides that "[n]o action shall be maintained to enforce any liability created under [§ 12(a)(2) ] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. A discovery standard governs § 13 of the Securities Act, that is, a claim "accrues '(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first.' " *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010)). Therefore, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint ... with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Pension Trust Fund*, 730 F.3d at 275 (citing *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).

In determining the time at which "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation

*Merck*, 559 U.S. at 653.

Snippets of Fisker Automotive's financial struggles were presented in various news articles and confidential memoranda published in 2011 and 2012, including references to the ATVM loan status. (D.I. 24 at ¶¶ 57, 90-91, 100, 105; 0.1. 53, ex. E at 44) However, the PrivCo Report (published on April 17, 2013) and the House Fisker Hearing (held on April 24, 2013) disclosed previously unknown material, including the OOE's termination of funding in June 2011, Fisker Automotive's $200 million in past due bills, the NHTSA Recall Notice, and the Key Personnel Milestone in the ATVM loan. (D.I. 24 at ¶¶ 116, 118; D.I. 52 at 37) While defendants argue that each of these issues was discoverable through news articles and the private offering documents, the PrivCo Report and hearing testimony contained unpublished documents and brought to light non-public information regarding the ATVM loan. (D.I. 24 at ¶¶ 116-122) The court concludes that the claims are not time-barred.

### b. Statutory sellers under § 12(a)(2)

**\*10**  In *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989), the Third Circuit adopted the Supreme Court's analysis in *Pinter v. Dahl*, 486 U.S. 622 (1988), holding that "liability under § 12(2) extends not only to those who pass title to the purchaser, but also to those who successfully solicit the purchase, motivated by their own or the securities owner's financial interests." *Id.* at 636. In evaluating whether participation falls within such scope, the language of § 12 "focuses the inquiry on the relationship between the purchaser and the participant, rather than on the latter's degree of

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 253 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

involvement in the transaction." *Id.* (citing *Pinter*, 486 U.S. at 651-52). More specifically, liability should not be imposed "on persons whose actions were merely a 'substantial factor' in causing the purchase," instead "[t]he purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller." *Id.* (citations omitted).

Plaintiffs alleged in *Craftmatic* that:

> Each of the defendants ... solicited plaintiffs ... to buy Craftmatic common stock ... and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the owner(s) of Craftmatic securities, and they ... conspired with and aided and abetted one another in connection with the preparation of the false and misleading Prospectus and Registration Statement used in conjunction with the sale of Craftmatic securities.

*Id.* at 637. Such allegation was "sufficient to survive a Rule 12(b)(6) motion to dismiss[, as i]t cannot be said at this juncture that plaintiffs can prove no set of facts that would entitle them to relief." *Id.* Similarly, in *In re Westinghouse*, the Third Circuit held that while the complaint was "not clearly drafted, ... [t]aken in the light most favorable to plaintiffs, however, the complaint does allege that the Westinghouse defendants 'solicited plaintiffs' to purchase Westinghouse securities and that in so doing they were motivated by a desire to serve their own financial interests." *In re Westinghouse Securities Litigation*, 90 F.3d 696, 717 (3rd Cir. 1996). The Third Circuit reversed the district court's dismissal of the claims even though "[p]laintiffs d[id] not, for example, make clear which defendants are alleged to be direct sellers as opposed to solicitor sellers ... or allege how the Westinghouse defendants, assuming they are alleged to be solicitor sellers, directly and actively participated in the solicitation of the immediate sales." *Id.*

The complaint at bar states that:

> Defendants, with the exceptions of Kleiner Perkins and Ace Strength which are named as control persons in Count II below, were sellers and offerors and/or solicitors of purchasers of the Fisker Automotive Securities offered, including to [p]laintiffs. Plaintiffs purchased these securities as a result of the material omissions ....

(D.I. 24 at ¶ 128) The complaint identifies Daubenspeck as a Director of Fisker Automotive and cofounder of Advanced Equities, Inc. ("Advanced Equities"),[18] which was one of several investment banks or vehicles that Fisker Automotive used to raise capital. (*Id.* at ¶ 34) With respect to the December 2011 Capital Call, Osborn wrote an email on December 11, 2011, purportedly based on his conversations with Fisker Automotive representatives, to the Middlebury Plaintiffs and others stating that "Daubenspeck, a Fisker Board member and Chairman of Advanced Equities [will] join our call" the next day. (*Id.* at ¶ 81) The complaint also references the private memorandum dated March 31, 2011 used to solicit investors, which describes related party transactions and states that "Daubenspeck, AEFC and its affiliates, including [Advanced Equities], have an economic interest in Fisker's success as well as the success of the Offering." (*Id.* at ¶ 56; D.I. 53, ex. E at 42)

[18]  The SEC censured Advanced Equities for fraudulent practices and Advanced Equities then ceased operations and is now defunct. (D.I. 24 at ¶ 34)

**\*11**  The complaint identifies Koehler as a participant and Fisker and DaMour as speakers in several conference calls with analysts and/or investors. The purpose of the conference calls was to solicit investors in Fisker Automotive securities. Certain calls were recorded for future distribution to potential investors. (D.I. 24 at ¶¶ 69, 66, 71, 86, 96) The December 2011 Fisker Letter encouraged investing.[19] (*Id.* at ¶ 83) The Executive Summary described the "Board Approval Process" as using an Audit Committee and discussing the Capital Call in "working group calls and meetings." After considering "a number of factors,"

> [t]he Board of Directors then instructed its officers to solicit the approval of the requisite vote of the stockholders of the Company, mail this Information Statement, and obtain indications of interest from interested stockholders. The Company received the requisite vote of the stockholders to approve the Series D-1 Financing Capital Call on December 14, 2011.

(D.I. 53, ex. J at 55-56) Lane was a Managing Partner of Kleiner Perkins and was Fisker Automotive's Chairman of the Board of Directors. (D.I. 24 at ¶ 31) Li was a controlling shareholder through Ace Strength (*Id.* at ¶ 32) and was on the Board of Directors, which approved the December 2011 "pay-to-play" capital call. (*Id.* at ¶ 81)

[19]    Stating in part:

> I encourage you to carefully review the Information Statement and consider a further investment in Fisker Automotive. Importantly, three of our major venture capital investors, Kleiner Perkins, NEA and Pacific Century, support this action and have already made, or committed to make, their capital calls, together totaling more than $57 million.
>
> (D.I. 24 at ¶ 83)

Taking the allegations in the complaint in the light most favorable to plaintiffs, the court concludes that as to defendants Daubenspeck, Fisker, Koehler and DaMour, plaintiffs have alleged sufficient facts regarding solicitation. As to Lane, the offering documents point to decisions regarding solicitation made by the Board, of which Lane is chairman. This, together with Lane's position as Managing Partner of Kleiner Perkins (a major investor in Fisker Automotive) is sufficient to allege solicitation at the motion to dismiss stage. [20] While plaintiffs have not used the precise language "motivated by their own or the securities owner's financial interests," plaintiffs' factual allegations are sufficient to support such motivation as the defendants stood to gain from Fisker Automotive's success though their positions as Directors of Fisker Automotive. [21] The court concludes that plaintiffs have sufficiently pled that defendants were § 12(2) sellers.

[20]    The court does not base its decision on the news articles containing general statements regarding raising capital and going public.

[21]    The court addresses Li *infra.*

### c. Public offerings

Section 12(a)(2) provides liability for misstatements made "by means of a prospectus or oral communication." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 567 (1995); *see also, In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 273 (3d Cir. 2004). "[T]he word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder" and "must include the 'information contained in a registration statement.' " *Gustafson,* 513 U.S. at 584, 569.

> An offering is considered private only if limited to investors who have no need for the protection provided by registration. To determine if an offering is sufficiently limited courts focus on such factors as: (1) the number of offerees; (2) the sophistication of the offerees, including their access to the type of information that would be contained in a registration statement; and (3) the manner of the offering.

**\*12** *See, e.g., United States v. Arutunoff,* 1 F.3d 1112, 1118 (10th Cir. 1993).

The complaint alleges that the "offering materials including Prospectuses/Private Placement Memoranda and other offering documents made available to purchasers of Fisker Automotive Securities" omitted material information. (D.I. 24 at ¶ 129) The following offering materials are identified in the complaint: The March 2011 CPPM (*id.* at ¶ 56); the April 2011 Middlebury CPPM (*id.* at ¶ 57); the December 2011 stock purchase agreement (*id.* at ¶ 69); Information Statement dated December 14, 2011 (*id.* at ¶¶ 82-85); the March 2012 D-1 offering documents (*id.* at ¶¶ 101-102); and the 2012 Series E offering documents (*id.* at ¶ 110). The March 2011

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 255 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

CPPM and April 2011 Middleburry CPPM are "Confidential Private Placement Memorand[a]." (*Id.* at ¶¶ 56-57) The April 2011 Middleburry CPPM makes clear that the shares "have not been registered under the Securities Act." (D.I. 53, ex. E) The December 2011 information statement is marked "Strictly Confidential & Proprietary." (*Id.* at ex. F) The March 2012 Capital Call D-1 offering documents are labeled "Confidential & Proprietary." (D.I. 24 at ¶ 102) Certain offering materials required a password. (*Id.* at ¶¶ 56-57)

Fisker Automotive solicited only "qualified investors." (*Id.* at ¶¶ 56-58) For example, the AEI investor acknowledgement states that the "investor is an 'accredited investor' within the meaning of Rule 501 (A) of Regulation D under the [S]ecurities Act of 1933 ...." [22] (D.I. 53, ex. L; see also, ex. G at 17; ex. H at 21; ex. K at 2-3) While the news articles mentioned the possibility of an upcoming IPO, no such offering was made to the public. Plaintiffs aver that the number of investors is in the hundreds—"Fisker Automotive raised an additional $145 million in Series A-1 venture capital from Kleiner Perkins, Palo Alto Investors and Advanced Equities (which raised approximately $27 million from 347 private investors);" however, the investment information was provided to the venture capital firms, not to the private investors. (*Id.* at ¶ 52)

[22]  Rule 501 (a) defines "accredited investor," which are more sophisticated investors, such as banks, companies and high net worth individuals. 17 C.F.R. § 230.501(a).

The court concludes that the offerings were made via private placement memoranda to sophisticated investors and were not public offerings. The motion to dismiss is granted as to the § 12(a)(2) claims. [23]  *See e.g., Vannest v. Sage, Rutty & Co.,* 960 F. Supp. 651, 654-55 (W.D.N.Y. 1997) (concluding that there was no public offering where the private placement memorandum expressly (and repeatedly) stated that the offering was not subject to registration requirements and that the securities are intended to be sold only to purchasers qualified by the Rule 506 regulations.); *In re J W.P. Inc. Securities Litigation,* 928 F. Supp. 1239, 1259 (S.D.N.Y.1996) ("Courts in this district have held that under *Gustafson,* private placement memoranda like those at issue are not 'prospectuses' for the purposes of a claim under § 12(2)"); *Walish v. Leverage Grp., Inc.,* Civ. No. 97-CV-5908, 1998 WL 314644, at *5 (E.D. Pa. June 15, 1998) ("The complaint does not allege that the sale was a public offering of securities and the 'defacto prospectus,' on which

the [p]laintiffs rely, shows that this was a private transaction involving six investors.").

[23]  Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of § 12. Accordingly, a violation of § 15 only applies when a primary violation of § 12 has been found. *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 284 (3d Cir. 2006). As plaintiffs have failed to set forth a primary violation of § 12(a)(2), plaintiffs' controlling person claims under § 15 must also be dismissed.

### 3. Section 10(b) and Rule 10b-5 [24]

[24]  Against all defendants except Kleiner Perkins and Ace Strength. (D.I. 24 at ¶¶ 145-159)

**\*13**  According to § 10(b) of the Exchange Act, it is unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 2068 of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission to implement § 10(b), makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 256 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240. 10b-5.

In order to state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630-31 (3d Cir. 2011). A statement or omission is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "A material misrepresentation or omission is actionable if it significantly altered the total mix of information made available." *Id.* (citations and quotations omitted). Material misstatements are contrasted with subjective analyses and general or vague statements of intention or optimism which constitute no more than mere corporate puffery. *In re Aetna*, 617 F.3d at 283; *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 390 (0. Del. 2010). "Scienter is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citations and quotations omitted).

Shareholders filing a securities fraud lawsuit under the Exchange Act are subject to the heightened pleading standard codified by the Private Securities Litigation Reform Act ("PSLRA"). *Avaya, Inc.*, 564 F.3d at 253; *City of Roseville Employees' Ref. Sys. v. Horizon Lines*, 686 F. Supp. 2d 404, 414 (D. Del. 2009) ("The PSLRA imposes a dramatically higher standard on a plaintiff drafting a complaint than that of traditional notice pleading."); *Brashears v. 1717 Capital Mgmt, Nationwide Mut. Ins. Co.*, 2004 WL 1196896, at *4 (D. Del. 2004) ("[B]y enacting the current version of the [PSLRA], Congress expressly intended to substantially heighten the existing pleading requirements.")[25] (internal quotations omitted). "The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss." *Avaya, Inc.*, 564 F.3d at 252. First, the complaint must "specify each

allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* at 259 (citing 15 U.S.C. § 78u-4(b)(1)). This is the falsity requirement. Second, "with respect to each act or omission alleged to violate [§ 10(b) ]," a plaintiff is required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. § 78u-4(b)(2)). This is the scienter requirement.

[25]
The PSLRA's heightened pleading requirements were constructed in order to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.

*Horizon Lines*, 686 F. Supp. 2d at 414.

**\*14** Both of these provisions require that facts be pied "with particularity." With respect to the falsity requirement,

the particularity standard echoes Rule 9(b) of the Federal Rule[s] of Civil Procedure, which is comparable to and effectively subsumed by the requirements of ... the PSLRA. Like Rule 9(b), the PSLRA requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story. Additionally, if an allegation regarding [a] statement or omission is made on information and belief, a plaintiff must state with particularity all facts on which that belief is formed.

*Horizon Lines*, 686 F. Supp. 2d at 414 (citing *Avaya, Inc.*, 564 F.3d at 253) (internal quotations and citations omitted). The scienter requirement, on the other hand, "marks a sharp break from Rule 9(b)." *Avaya*, 564 F.3d at 253. "Unlike Rule 9(b), under which a [plaintiff] could plead scienter generally, § 78u-4(b)(2) requires any private securities complaint alleging

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 257 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

that the defendant made a false or misleading statement ... [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Horizon Lines*, 686 F. Supp. 2d at 414 (citations and quotations omitted).

Aside from these two requirements, the PSLRA imposes additional burdens with respect to allegations involving forward-looking statements. The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u-5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254.

### a. Duty to disclose

**\*15** "[N]on-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information. 'Silence, absent a duty to disclose, is not misleading under Rule 10b-5.' " *See Oran v. Stafford*, 226 F.3d 275, 78-86 (3d Cir. 2000). There is no affirmative duty to disclose information unless 1) there is insider trading, 2) a statute requires disclosure, or 3) a previous disclosure becomes inaccurate, incomplete, or misleading. *Id.* In the context of insider trading, liability for securities nondisclosure "is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *See Chiarella v. United States*, 445 U.S. 222, 235 (1980). As the Supreme Court acknowledged in *Chiarella*, corporate insiders, particularly officers, directors, or controlling stockholders, assume an affirmative duty of disclosure when trading in shares of their own corporation. *Id.* at 226-27 (citing *In re Cady, Roberts & Co.,* 40 S.E.C. 907, 1961 WL 3743 (1961)). "[I]nsiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." *In re Cady*, 1961 WL at* 3. This duty extends not only to existing shareholders but also to nonshareholders when sales of securities are made to them. *See id.* at * 5. Such a duty ensures that corporate insiders "will not benefit personally through fraudulent use of material, nonpublic information." *Chiarella*, 445 U.S. at 230.

Plaintiffs allege "a duty to disclose the material omitted facts as insiders engaging in sales and purchases or otherwise

benefiting from those transactions while in a position of 'trust and confidence' and/or in a fiduciary relationship with [p]laintiffs." (D.I. 52 at 43) While defendants argue that they did not engage in "trading," to the extent defendants made statements regarding Fisker Automotive in an effort to entice plaintiffs into becoming shareholders, defendants had a duty to disclose material information. [26] *See Tse v. Ventana Med. Sys., Inc.*, Civ. No. 97-37-SLR, 1998 WL 743668, at *8 (D. Del. Sept. 23, 1998) (finding a duty to disclose when "defendants were asking plaintiffs to become equity shareholders in the acquiring corporation, defendant [Ventana]. Accordingly, as 'insiders,' defendants assumed an affirmative duty to disclose material information.").

[26]    The court does not reach plaintiffs' duty to disclose argument based on the third prong, prior misleading statements.

### b. Falsity

Plaintiffs allege material omissions in certain statements and documents made by "defendants." (D.I. 24 at ¶¶ 147-48) In *Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007), the Third Circuit made clear that "the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA." *Id.* at 337. More recently, the Supreme Court in *Janus Capital Group, Inc. v. First Derivative Traders*, --- U.S. ----, 131 S.Ct. 2296 (2011), explained that:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 258 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

statement was made by—and only by —the party to whom it is attributed.

*Id.* at 2302. The Supreme Court specifically declined to equate "create" with "make," stating that "in *Stoneridge*, we rejected a private Rule 10b-5 suit against companies involved in deceptive transactions, even when information about those transactions was later incorporated into false public statements." *Id.* at 2303-04 (citing *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 161 (2008)).

### i. Offering documents [27]

[27] Plaintiffs allege that all defendants except McDonnell had a duty to disclose related to the offering documents.

Plaintiffs allege that the offering documents expressly state that Fisker Automotive's Board of Directors had control and authority over the offering documents, by reference to statements in the April 2011 Middlebury CPPM and December 2011 stock purchase agreement regarding the "exculpation among purchasers" clause (D.I. 53, ex. G and H); the statement on the cover page of the March 2011 CPPM—"Preliminary Draft—Terms may Change Subject to Board and Shareholder Approval" (*id.*, ex. E); and the statements in the December 2011 Capital Call documents and Executive Summary (that the Board of Directors and the Audit Committee reviewed and discussed the terms of the Series D-1 Financing Capital Call). (*Id.*, ex. Fat 1) The documents associated with the solicitation of investments and various Capital Calls [28] are not signed. Fisker signed the Series C-1 preferred Stock Purchase Agreement dated April 27, 2011 on behalf of Fisker Holdings, Inc. (*Id.*, ex. G) In the case at bar, the court is not called upon to determine whether a director signing certain documents had "authority over the content of the statement and whether and how to communicate it," sufficient to be deemed to have "made" the statement. *See e.g., WM High Yield Fund v. O'Hanlon*, 964 F. Supp. 2d 368, 390 (E.D. Pa. 2013). Instead, the court is presented with documents containing statements indicating that the Board was likely involved in their creation and dissemination. [29] As discussed below, certain Board members participated in conference calls on behalf of Fisker Automotive discussing these documents and the associated

solicitations. The court concludes that this is sufficient to pass muster at the motion to dismiss stage. *See e.g., In re Merck & Co., Inc. Securities, Derivative, & ERISA Litigation*, Civ. Nos. 05-1151 (SRC), 05-367(SRC), 2011 WL 3444199 at *25 (D. NJ Aug. 8, 2011)* (citing *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)) (denying motion to dismiss where officer "signed SEC forms and was quoted in articles and reports in his [official] capacity .... pursuant to his responsibility and authority to act as an agent of Merck").

[28] Provided by plaintiffs as exhibits.

[29] Without discovery, the court struggles to envision how plaintiffs could ascertain which individuals were responsible for the creation of these types of documents.

### ii. Conference calls [30]

[30] Plaintiffs allege that McDonnell, Fisker, Koehler, and DaMour had a duty to disclose in connection with the conference calls.

**\*16** The Third Circuit has explained that

the plain language of § 10(b) and corresponding Rule 10b-5 do not contemplate the general failure to rectify misstatements of others. Moreover, in *Central Bank*, the Supreme Court determined that the scope of § 10(b) does not encompass aiding and abetting liability because the statute "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." Consequently, incorporating into the statute an obligation to rectify others' misstatements (though lacking even the aiding and abetting mens rea requirement of the initial statement made) would be illogical in light of the Supreme Court's holding.

*U.S. v. Schiff*, 602 F.3d 152, 167 (3d Cir. 2010) (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)) (internal citations omitted). This analysis is also consistent with the Supreme Court's decision in *Janus*, discussed above. The court concludes that participation in a conference call, without speaking, cannot confer liability under Rule 10b-5 for the misstatements or omissions of the speaker. As plaintiffs do not allege that Koehler and McDonnell spoke on the conference calls, no liability for misstatements made by others may attach.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 259 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

Plaintiffs identify certain statements made by DaMour and Fisker (such statements are presented in the complaint in the context of the larger transcripts).[31] The salient facts are presented in detail above. (D.I. 24 at ¶¶ 67, 70-71, 86-87, 89, 93-94, 97-99, 110) The Third Circuit has "explained that for 'misrepresentations in an opinion' or belief to be actionable, plaintiffs must show that the statement was 'issued without a genuine belief or reasonable basis'...." *In re Merck & Co., Inc. Sec., Derivative & ""ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008) (citations omitted). DaMour and Fisker's positive statements regarding the ATVM loan, while reflecting the fact that Fisker Automotive was working with the DOE to negotiate terms, contradict the actual frozen status of the loan. That the DOE's press release reported positively on Fisker Automotive's progress does not validate DaMour and Fisker's statements. DaMour and Fisker's statements regarding Fisker Automotive's cash position (presenting Fisker Automotive as well capitalized, without mentioning payables and continuing without the DOE loan) conflict with the actual state of affairs, that Fisker Automotive had payables, some of which were overdue. As to the battery fires, Fisker disputes the falsity of his response based on the cause of the fires. However, the timing of the recall belies Fisker's conclusion that there were no "concerns of battery fires." The court concludes that plaintiffs have sufficiently alleged that Fisker and DaMour's statements were misleading.

[31]    Defendants argue that plaintiffs have not identified in the complaint with specificity which statements from the conference calls are misleading and may not now do so through the briefing. *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). However, in the interests of efficiency (because an amendment would be granted) and as defendants have substantively responded to the arguments, the court reviews the identified statements.

### iii. The December 2011 Fisker Letter

**\*17**  Plaintiffs also allege that Fisker's statement in the December 2011 Fisker Letter explaining the reasons for the December 2011 Capital Call omitted any reference to the $200 million in outstanding bills, i.e., Fisker Automotive's true cash position, rendering such statement misleading. The complaint quotes a portion of such letter and describes it as "repeat[ing] the theme that the 'pay to play' capital call was merely a prudent business decision." (D.I. 24 at ¶ 83) However, the letter explicitly refers investors to the "Information Statement" and plaintiffs have alleged that the defendants distributed December 2011 Capital Call documents together with the December 2011 Fisker Letter and the Information Statement. As the December 2011 Fisker Letter is not a standalone document, the court declines to analyze it in a vacuum.

### iv. Statements in news articles

In the briefing, plaintiffs allege that two particular statements by Lane in news articles were misleading.

> However, Fisker Chairman Ray Lane says that **the issues in 2011 were a combination of difficulties faced by any start up**—such as problems with the electrical system that didn't appear until production was underway—and some one-off disasters. For example, a flood soaked the initial shipment of leather delivered for the car's interior, leaving Fisker with 250 vehicles that were ready to go, except for seats, dashboards, steering wheels and every other surface that needed to be covered in cowhide.

(D.I. 24 at ¶ 75) (emphasis added) This statement[32] cannot be reconciled with the standard articulated in *Janus*, i.e., that statements attributable to an individual are those which the individual has "ultimate authority over ..., including its content and whether and how to communicate it." The above paraphrased or summarized statement is not wholly attributable to Lane. Indeed, the author of the article had control over which portions of the interview to use and how to present any information received from Lane. The same analysis applies to plaintiffs' second citation[33] as no portion is directly attributable to Lane.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 260 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

32   *Fisker says Karma will meet 15, 000 production target for 2012*, AutoblogGreen, November 26, 2011.

33   *Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension*, The Wall Street Journal Venture Capital Dispatch Blog, June 26, 2012.

   **For a while, Irvine, Calif.-based Fisker was operating under the assumption that it has $529 million in federal loans, but last year the Department of Energy, which handles the loans, suspended issuing new checks because the car company missed some milestones. Fisker delayed the release of Karma and sold fewer Karmas than it promised under the DOE loan agreement.** As a result of the loan suspension, Fisker stopped additional work on a plant in Delaware where it was planning to build the cars and laid off some employees.

   (*Id.* at ¶ 105) (emphasis added)

The complaint generally alleges that "Lane's, Fisker's, DaMour's, Koehler's and/or McDonnell's statements described at ¶¶ 56, 60, 63, 66-67, 71, 74-75, 86-89, 96-99 and 105" failed to disclose certain facts. (*Id.* at ¶ 149) The following material (from the cited paragraphs) is directly attributable to Lane and related to plaintiffs' arguments. [34] , [35] An article [36] discussing the production of the Karma states: " 'In production of a first vehicle, everything doesn't go the way you plan,' Lane said in a recent interview. 'Next year, we'll do exactly what we plan.' " (*Id.* at ¶ 74)

34   Again, rather than entertain an amended complaint.

35   Paragraphs 56, 66-67, 71, 86-89, 96-99 relate to offering documents and conference calls. The articles cited in ¶¶ 60 and 75 do not contain direct quotations. The article in 63 states, "[q]uote: 'Reduce demand for oil by 5 to 10 percent, and you start to control pricing.' " This statement is unrelated to the issues at bar.

36   *Fisker on track to make electric sports cars, despite delays*, Calgary Herald (Alberta), November 18, 2011. The article also states: " 'The leather was useless. We had 250 cars parked and waiting for leather,' Lane said." Such statement is unrelated to the issues at bar.

**\*18**   The article cited by plaintiffs above [37] also stated:

   In the first quarter, the company said it drew in $100 million in revenue. 'I'm looking at about $400 million in revenue this year. That would make it the fastest growing start-up ever,' Lane said. These projections, he added, don't include sales in China and Middle East, where the company is building relation-ships with dealerships. Fisker Automotive, however, is not profitable, said Lane.

Discussing investments, the article stated "[w]e've added warrants as a sweetener,' said Lane." The article continued:

   The situation with the DOE, said Lane, "caused us to accelerate capital raising." That is leading to certain compromises. Advanced Equities has recently been served a Wells Notice from the Securities & Exchange Commission, which indicates the SEC may enforce action against it.

   Asked why Kleiner Perkins is continuing to use Advanced Equities' services in light of the SEC investigation, Lane said: "They are good at what they do."

(*Id.* at ¶ 105) Lane's statement regarding revenue is followed by the admission that Fisker Automotive is not profitable. The quoted statements do not conflict with the alleged facts, therefore, the court concludes that such statements are not actionable.

37   *Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension*, The Wall Street Journal Venture Capital Dispatch Blog, June 26, 2012. Other quotations do not relate to the issues at bar. " 'We have 1,700 cars sold now,' said Ray Lane ...." Discussing financing operations and its next car model, Atlantic, the article stated
   "You don't make money until volumes are up," said Lane. The company needs to build the Atlantic, which would increase its volumes, and amortize its fixed costs across more units, as well as allow Fisker to negotiate better deals with suppliers. "We can't move forward without the debt,' said Lane, referring to the Atlantic program."
   ...
   The company has been using equity, the most expensive capital, to pay for the development

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....
2015 WL 6039690

of Atlantic to date. "We spent $130 million on the Atlantic," Lane said. "No one wants to spend" [sic] more equity," he said. That is the reason Fisker is in discussions with a syndicate of private lenders, led by the Royal Bank of Canada, he added.

(*Id.* at

### c. Reliance

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), the Supreme Court examined reliance in the context of cases seeking to predicate Rule 10b-5 liability upon omissions and concluded that in cases "involving primarily a failure to disclose [material facts], positive proof of reliance is not a prerequisite to recovery." *Id.* at 153-54. "[R]eliance will be presumed from the materiality of the information not disclosed. Conversely, no presumption arises in cases of alleged misrepresentations." *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 192 (3d Cir. 2001); *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 187 (3d Cir. 1981) (overruled on other grounds by *Mccarter v. Mitcham*, 883 F.2d 196, 202 (3d Cir. 1989)). The proper approach to reliance in cases involving both omissions and misrepresentations "is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance." *Sharp*, 649 F.2d at 188.

**\*19** Applying *Affiliated Ute*, the Court of Appeals for the Tenth Circuit explained:

> Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely.

*Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000) (citations omitted). In *Wiles*, the plaintiff alleged that defendant "continually reported in its public statements that

it had achieved, and would continue to achieve, substantial growth in revenue and profits. These statements ... were materially false and misleading in that they failed to disclose the existence of the fraudulent scheme ..." *Id.* at 1163. The Tenth Circuit held that "[s]tatements such as these, while struggling valiantly to bring the alleged conduct within the definition of 'omission,' indicate that what [plaintiff] really protests are the affirmative misrepresentations allegedly made by defendants." *Id.*

The allegations at bar present a mix of both omissions (e.g., not disclosing the status of the ATVM loan) and misrepresentations (e.g., statements regarding working with the DOE to resolve issues with the ATVM loan). Considering all of plaintiffs' allegations, the court concludes that plaintiffs are principally complaining of the misrepresentations, i.e., presenting Fisker Automotive's status as stable and funded, when it was failing. The *Affiliated Ute* presumption of reliance does not apply.

The burden of reliance "requires a plaintiff to demonstrate that defendants' conduct caused him 'to engage in the transaction in question.' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 174 (3d Cir. 2001), as amended (Oct. 16, 2001) (citations omitted). In this regard, the complaint at bar identifies the offering documents and alleges that such documents were false and misleading. In the briefing, plaintiffs point out that the "prospectuses/ offering memoranda alleged in the Complaint ... required investors to sign a Subscription Agreement, warranting that they had read the agreement and were 'not relying on any representation other than that contained [t]herein.' " (D.I. 52 at 77) Defendants argue that plaintiffs continued to invest after several of the misstatements at issue were presented in news articles. The various disclosures—the snippets available in news articles, the information from the conference calls, and the information contained in the offering documents —are intertwined. The court concludes that plaintiffs have sufficiently pied reliance. *C.f.*, *Gallup v. Clarion Sintered Metals, Inc.*, 489 Fed.Appx. 553, 557 (3d Cir. 2012) (citing *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974)) (Finding no evidence of reliance at the summary judgment stage, when plaintiffs did not read the financial statements and reports, which omitted information, therefore, plaintiffs decisions "were entirely unaffected by the contents of [defendant's] financial statements.").

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 262 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

### d. Scienter* * [38] * *

[38]    As the court previously found that only risker and DaMour "made" statements, the scienter analysis is limited to these defendants .

**\*20**  Scienter is a "mental state embracing intent to deceive, manipulate, or defraud," and requires a knowing or reckless state of mind. *Avaya*, 564 F.3d at 252 (internal citations omitted). "A reckless statement is one involving ... an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267 n.42. The court must be mindful of the heightened pleading standards prescribed by the PSLRA throughout its analysis of defendants' state of mind. *See Tellabs*, 551 U.S. at 324 (defining PSLRA's characterization of "strong" inference as one that is "powerful or cogent"). The court must look to the totality of the allegations in order to determine whether defendants acted with the required level of intent. *See Avaya*, 564 F.3d at 272-73. Although the pleadings need not present an irrefutable inference of scienter, plaintiffs' allegations as to defendants' intent must remain "strong in light of other explanations." *Tellabs*, 551 U.S. at 324. Accordingly, the court must examine plaintiffs' complaint to determine whether it has adequately pied that the misrepresentations and omissions attributed to defendants give rise to an inference of scienter that is at least as compelling as any nonculpable explanations presented by the defendants. *See id.*

The Third Circuit has held that a securities fraud plaintiff may not merely allege "motive and opportunity" as the requisite scienter necessary to survive a motion to dismiss. *Avaya*, 564 F.3d at 277. Although motive may be a factor in analyzing defendant's state of mind, plaintiff's complaint must also include some element of volition on the part of the defendant. *See id.*

As discussed above, Fisker and DaMour made positive statements regarding the ATVM loan after it had been frozen, and conflicting statements regarding Fisker Automotive's cash position. Fisker additionally made statements downplaying the potential for battery fires. Plaintiffs relied on the representations in the offering documents, which allegedly contained misstatements and omissions. The totality of the circumstances, which can be succinctly described as ardently soliciting investors in order

to launch and sustain Fisker Automotive, with defendants standing to gain from Fisker Automotive's success through their positions as Directors, leads to a strong inference that defendants acted with an intent to manipulate investors. For these reasons, defendants' motions to dismiss the § 10(b) claims are denied.

### 4. Section 20(a)* * [38] * *

[38]    Against Kleiner Perkins, Lane, Fisker, DaMour, Koehler, Daubenspeck, Li and Ace Strength.

Section 20(a) of the Exchange Act imposes joint and several liability on any person who "directly or indirectly controls any person liable" under any provision of the Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a); *In re Suprema*, 438 F.3d at 284 (citing 15 U.S.C. § 78t(a)). Plaintiffs "must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws." *In re Suprema*, 438 F.3d at 284 (citation omitted). Accordingly, liability under § 20(a) is derivative of an underlying violation of those sections by the controlled person.

The court has found that plaintiffs have adequately alleged a primary violation of § 10(b) by the various defendants. [39] As to the control element, Daubenspeck, DaMour and Li were members of Fisker Automotive's Board of Directors and plaintiffs have alleged that the Board was responsible for the creation and dissemination of various confidential memoranda regarding the offerings and Capital Calls. DaMour participated in conference calls regarding Fisker Automotive. Daubenspeck cofounded Advanced Equities, an investment bank used by Fisker Automotive to raise capital. As to Ace Strength, plaintiffs have alleged that Li invested in Fisker Automotive through Ace Strength, such that Ace Strength was a controlling shareholder of Fisker Automotive. The court concludes that plaintiffs have adequately pied "actual control" as to these defendants.

[39]    Kleiner Perkins, Lane, Fisker and Koehler only challenged the § 20(a) claim as failing to allege a primary violation. (D.I. 58; D.I. 62)

### IV. PERSONAL JURISDICTION

### A. Standard

**\*21** Rule 12(b)(2) directs the court to dismiss a case when it lacks personal jurisdiction over the defendants. Fed.R.Civ.P. 12(b)(2). When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiffs and resolve all factual disputes in the plaintiffs' favor. *Traynor v. Liu*, 495 F. Supp. 2d 444, 448 (D. Del. 2007). Once a jurisdictional defense has been raised, the plaintiffs bear the burden of establishing, with reasonable particularity, that sufficient minimum contacts have occurred between the defendants and the forum to support jurisdiction. *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiffs must produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion "requires resolution of factual issues outside the pleadings." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n. 9 (3d Cir. 1984).

In determining whether a court may exercise personal jurisdiction, a court must examine the relationship among the defendants, the forum, and the litigation. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). Where the plaintiffs' cause of action is related to or arises out of the defendants' contacts with the forum, the court is said to exercise "specific jurisdiction." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). In federal court, the exercise of specific jurisdiction must satisfy the requirements of the Due Process Clause of the Fifth Amendment. *See In re Real Estate Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 766 n. 6 (3d Cir. 1989). In assessing the sufficiency of defendants' contacts with the forum as required by the Due Process Clause, "a court should look at the extent to which the defendants 'availed [themselves] of the privileges of American law and the extent to which [they] could reasonably anticipate being involved in litigation in the United States.' " *Pinker*, 292 F.3d at 370 (quoting *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 293 (3d Cir. 1985)); *see also Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The final phase of assessing whether to exercise personal jurisdiction over defendants involves an analysis of whether jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Jurisdiction over alleged violations of the Exchange Act is governed by § 27 of the Act. *See* 15 U.S.C. § 78aa. Section 78aa provides in pertinent part:

The District Courts of the United States ... shall have exclusive jurisdiction of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder. Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in [the district wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa.\* \* [40] \* \*

40    Defendants did not oppose plaintiffs' motion to take judicial notice of certain documents. (D.I. 54) Such documents are cited in the complaint (D.I. 53, ex. B-H and JN); a matter of public record (*id.*, ex. A); and filed with the SEC (*id.*, ex. I). The court takes judicial notice of such documents as needed for the present motions. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 2006) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 (3d Cir. 1994) ("We may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."); *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (taking "judicial notice of properly-authenticated public disclosure documents filed with the SEC").

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 264 of 573

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

**B. Discussion**

**\*22** Plaintiffs allege that both Li and Ace Strength possess minimum contacts with the United States. Specifically, plaintiffs allege that Li, a Hong Kong resident and member of the Fisker Automotive Board of Directors, held a "controlling interest" in Fisker Automotive through Ace Strength, a British Virgin Islands corporation which owned 10.15% of Fisker's shares. (D.I. 24 at ¶¶ 32-33, 59) Plaintiffs aver that Li voted for and/or approved the December 2011 Capital Call. (*Id.* at ¶¶ 79, 81) Plaintiffs also allege that the solicitations were directed at the United States and that "substantial acts" related to the disclosure allegations took place in the United States. Li was identified as a Director and used Fisker Automotive's address in a Notice of Exempt Offering of Securities. (D.I. 52 at 84; D.I. 53, ex. 1)41

So long as defendants have minimum contacts with the United States as a whole, § 78aa and § 77v confer personal jurisdiction over the defendant in any federal court. The due process requirement that

> a defendant have "minimum contacts" with a particular district or state ... is not a limitation imposed on the federal courts under Section 27 in a federal case. Due process concerns under the Fifth Amendment are satisfied if a federal statute provides for nationwide service of process in federal court for federal question cases.

*FS Photo, Inc. v. PictureVision, Inc.*, 48 F. Supp. 2d 442, 445 (D. Del. 1999).

Specific jurisdiction cannot be solely based upon shares in a United States corporation. *Balden Techs., Inc. v. LS Corp.* 626 F. Supp. 2d 448, 457 (D. Del. 2009) ("[m]ere ownership of a [Delaware] corporation is not sufficient to confer personal jurisdiction over a non-resident defendant"). A position of director is by itself insufficient to find specific jurisdiction. *Tracinda Corp. v. Daimlerchrysler AG*, 197 F. Supp. 2d 86, 99 (D. Del. 2002). Moreover, plaintiffs must "adequately specif[y] defendants'] alleged role" to establish specific jurisdiction. *See id.* at 96 (declining "to exercise jurisdiction over [d]efendant Kopper based solely on Tracinda's controlling person claims").

Plaintiffs assert that Li's position on Fisker's Board of Directors, identification in the Notice of Exempt Offering of Securities with Fisker Automotive's California address, along with his "active participation" and vote on the December 2011 Capital Call, mandates specific jurisdiction. While these statements demonstrate that Li had some contact with the United States, plaintiffs do not allege that the cause of action —misrepresentations and omission in the disclosures—arises out of or is related to said contact. *See IMO Indus., Inc.*, 155 F.3d at 259. Plaintiffs have not pied facts showing that Li or Ace Strength exercised control over the challenged disclosures or engaged in "substantial acts" "purposefully directed" at the United States and sufficient to establish minimum contacts. * * 42 * *, * * 43 * * *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros*, 466 U.S. at 414.

42  Plaintiffs' citation to TCS *Capital Management, LLC v. Apax Partners, L.P.*, 2008 U.S. Dist. LEXIS 19854, 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) is inapposite. Though it was indeed "foreseeable" that defendants' actions would have an "effect" in the United States, the jurisdictional issue in the case turned on the fact that the "director defendants were all primary violators by virtue of their having prepared and approved the allegedly false and/or misleading Explanatory Report." *Id.* at \*29-33.

43  Therefore, the court does not consider whether the exercise of specific jurisdiction "would comport with 'fair play and substantial justice.' " *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 106 (3d Cir. 2009) (citing *Burger King*, 471 U.S. at 476).

While plaintiffs shoulder the burden of demonstrating sufficient jurisdictional facts, "courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.' " *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (quoting *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997)). "If a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the parties] and the forum state,' the plaintiff's right to conduct jurisdictional discovery should be sustained." *Id.* at 456 (*quoting Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)). A court must determine whether certain discovery avenues, "if explored, might provide the 'something more'

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 265 of 573
In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....
2015 WL 6039690

needed" to establish personal jurisdiction. *Toys "R" Us*, 318 F.3d at 456. To receive jurisdictional discovery, plaintiffs must claim that their factual allegations establish with reasonable particularity the possible existence of requisite contacts. If they do not, to allow jurisdictional discovery would "allow plaintiff to undertake a fishing expedition based only upon bare allegations." *Inno360 v. Zakta, LLC*, 50 F. Supp. 2d 587, 597 (2014). Notably, in addition, "the United States Supreme Court has held that courts should 'exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place [on] them.' " *Telecordia Tech, Inc. v. Alcatel S.A.*, Civ. No. 04-874 GMS, 2005WL1268061, at *8 (D. Del. May 27, 2015).

**\*23** In support of the request for jurisdictional discovery, plaintiffs suggest that Ace Strength might have an alter-ego or agency relationship with a company for which this court has general jurisdiction and that Li might own property in the United States. * * [44] * * (D. I. 52 at 86-87) Plaintiffs also contend that Li may have "traveled to the United States in connection with Fisker Automotive or the offerings, particularly the pay-to-play offerings," and that such information might provide further relevant information pertaining to specific jurisdiction. (D.I. 52 at 87) These contentions, along with Li's status as a Director of Fisker Automotive, * * [45] * * raise a colorable showing of personal jurisdiction sufficient to allow jurisdictional discovery.

[44]    Plaintiffs also assert that jurisdictional discovery is supported by the fact that Ace Strength is not a public company and that a great deal of information is solely in their hands. *See Rocke v. Pebble Beach Co.,* 541 Fed.Appx. 208, 212-13 (3d Cir. 2013) (finding that a district court abused its discretion by failing to allow jurisdictional discovery where the necessary information was solely in defendants' hands resulting in an "imbalance in access to information" between the parties).

[45]    Who may have participated in the preparation of offering documents, discussed above.

## V. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part defendants Daubenspeck, Fisker and Koehler, DaMour, and Kleiner and Lane's motions to dismiss the consolidated complaint (D.I. 29; D.I. 33; D.I. 36; D.I. 43); stays Ace Strength and Li's motion to dismiss (D.I. 38) pending the completion of jurisdictional discovery; grants. McDonnell's motion to dismiss (D.I. 31); and grants plaintiffs' motion for judicial notice of certain documents (D.I. 54). An appropriate order shall issue.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 6039690

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 14

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 267 of 573
In re Nimble Storage Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 4355570, Fed. Sec. L. Rep. P 99,898

2017 WL 4355570
United States District Court, N.D. California.

IN RE NIMBLE STORAGE
SECURITIES LITIGATION

Case No. 15-cv-05803-YGR
|
Signed 10/02/2017

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 141

Yvonne Gonzalez Rogers, United States District Court Judge

**\*1** Plaintiff Arkansas Teacher Retirement System, as lead plaintiff, brings this consolidated third amended complaint against defendants Nimble Storage, Inc. ("Nimble"), Suresh Vasudevan, Anup Singh, Varun Mehta, and Dan Leary for alleged violations of the federal securities laws. (Dkt. No. 139, "TAC.") Specifically, plaintiff claims that all defendants violated section 10(b) of the Exchange Act and Rule 10-b5 promulgated thereunder for allegedly making fraudulent statements regarding Nimble's prospects and financial condition between November 24, 2014 and November 19, 2015 (the "Class Period"). Additionally, plaintiff brings control person claims against defendants Vasudevan and Singh under section 20 of the Exchange Act.

The Court has twice dismissed plaintiff's complaints.[1] In its order dismissing plaintiff's second amended complaint, the Court found that plaintiff had failed to allege adequately that defendants misled the public by: (a) failing to inform investors that Nimble's commercial segment was weakening throughout the Class Period; (b) suggesting that Nimble's enterprise segment was growing while simultaneously misclassifying commercial clients as enterprise clients; and (c) informing the public that Nimble remained on-track to "breakeven" while knowing that its commercial and enterprise segments were struggling. The Court dismissed with prejudice plaintiff's claims relating to defendants' statements about Nimble's commercial segment prior to August 25, 2015, and gave leave to amend as to the remaining claims. Specifically, with respect to statements regarding the enterprise segment, the Court gave leave to amend to the extent that plaintiff could adequately allege that defendants'

reclassifications of certain clients were both fraudulent and disclosed to the public.[2]

[1] Plaintiff's first complaint focused on allegations that defendants misled the public by failing to disclose Nimble's: (i) limiting its investments in Sales and Marketing ("S/M"); (ii) diversion of investments from its commercial segment to its enterprise segment; and (iii) failure to penetrate clients for its enterprise segment in a meaningful fashion.

[2] With regard to statements indicating that Nimble was "on track" to meet certain goals, the Court found that whether such statements were actionable would rise and fall with the first two categories of statements regarding the commercial and enterprise segments.

Now before the Court is defendants' motion to dismiss the TAC.[3] Having carefully reviewed the pleadings, the papers and exhibits submitted on this motion, and oral arguments heard on September 26, 2017, and for the reasons set forth more fully below, the Court **GRANTS** defendants' motion and **DISMISSES WITH PREJUDICE** plaintiff's TAC.[4]

[3] The Court adopts the background section and discussion of general legal standards in its order granting defendants' motion to dismiss the first amended complaint, and includes additional facts and allegations as necessary herein. (*See* Dkt. No. 113.)

[4] In connection with their motion to dismiss, defendants submitted a request for judicial notice ("RJN") for the following documents (Dkt. No. 143): (i) Exhibit A, excerpts of Nimble's Form 8-Ks filed with the Securities and Exchange Commission ("SEC"), dated November 25, 2014, February 26, 2015, May 26, 2015, August 25, 2015, and November 19, 2015; (ii) Exhibit B, excerpts of Nimble's Form 10-K filed with the SEC, for period ending January 31, 2015; (iii) Exhibit C, excerpts of Nimble's earnings calls, dated November 25, 2014, February 26, 2015, May 26, 2015, and August 25, 2015; (iv) Exhibit D, excerpts of Nimble's Form 10-Qs filed with the SEC, for the quarters ended July 31, 2014, April 30, 2015, and July 31, 2015; (v) Exhibit E, Daniel Leary Forms 4s

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 268 of 573

In re Nimble Storage Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 4355570, Fed. Sec. L. Rep. P 99,898

between March 11, 2014 and October 21, 2015; (vi) Exhibit F, Varun Mehta Forms 4s between March 11, 2014 and September 11, 2015; (vii) Exhibit G, Anup V. Singh Forms 4s between February 28, 2014 and December 1, 2015; and (vii) Exhibit H, Suresh Vasudevan Forms 4s between March 11, 2014 and December 11, 2015. Plaintiff does not oppose defendants' RJN. The Court previously took judicial notice of these same documents in its prior orders granting defendants' prior motions to dismiss. (Dkt. No. 113 at 1–2 n.1; Dkt. No. 134 at 2 n.2.) For the same reasons stated therein, the Court **GRANTS** defendants' RJN here.

## I. DISCUSSION

### A. SECTION 10(B) AND RULE 10B-5 CLAIM

**\*2** Defendants raise the following grounds upon which they argue plaintiff's claims should be dismissed: (i) plaintiff has failed to plead with particularity any false or misleading statements; (ii) certain statements are forward-looking and protected by the Private Securities Litigation Reform Act's (the "PSLRAs") safe harbor; and (iii) plaintiff has failed to plead a strong inference of scienter. Because the Court finds that plaintiff has yet again failed to plead with particularity that any of the alleged statements are false or misleading, the Court need not address specifically defendants' arguments related to the PSLRA safe harbor or scienter, and proceeds with the analysis below only as to their first ground for dismissal.

In response to the Court's order dismissing plaintiff's second amended complaint, plaintiff has, generally, alleged that defendants misled the public with regard to statements about the strength of (i) its enterprise business generally and (ii) its commercial business and enterprise business, limited to the third quarter of 2016 ("3Q16"). [5] The Court considers whether the new allegations in the TAC are now sufficient, in light of the Court's guidance in its previous orders dismissing plaintiff's claims. [6]

[5] As described in its order on defendants' motion to dismiss the First Amended Complaint, Nimble's fiscal year ends on January 31 of each year. Relevant to the claims here, its 2015 fiscal year ended on January 31, 2015, with each of its quarters (Q1, Q2, Q3, and Q4) ending on the last day of April, July, and October 2014, and January 2015, respectively. Nimble's 2016 fiscal year ended on January 31, 2016, and similarly, each quarter ending on the last day of April, July, and October 2015, and January 2016, respectively. Thus, 3Q16 would have ended on October 31, 2015.

[6] Plaintiff also alleges that certain statements regarding Nimble's "win rates" and its goal to breakeven by the end of 4Q16 were misleading because they implied that Nimble's commercial and enterprise segments were growing and strong. The Court addresses such statements as appropriate within the context of defendants' statements regarding its commercial and enterprise businesses.

### 1. Statements Regarding Nimble's Enterprise Segment

In its prior order dismissing plaintiff's claims pertaining to statements about Nimble's enterprise segment, the Court granted leave to amend "only to the extent that plaintiff can adequately allege that the reclassifications were fraudulent and such fraudulent reclassifications were disclosed to the public." (Dkt. No. 134 at 8.) Specifically, the Court found persuasive that, amidst defendants' general statements regarding the strength of the enterprise segment, defendants also provided to the market specific numbers detailing how many clients they had within the Global 5000, defined as the largest 5000 enterprises at any given time, and plaintiff failed to allege that any such numbers were inaccurate. (*Id.* at 6–7.) Sales and profit data, "when accurately reported, [are] rarely subject to misinterpretation, even if the disclosure is accompanied by generally optimistic statements about the future by corporate officers." *See In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal 1992) (further stating that "[p]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company").

Plaintiff, again, does not plead that any of the disclosed numbers were inaccurate. Rather, plaintiff offers Confidential Witness ("CW") 14, [7] who corroborates that Nimble was reclassifying "its top end commercial accounts as enterprise accounts" and avers that "if a Commercial account was reclassified as an enterprise account, that account would have been counted as a 'win' during that quarter and announced to the market as such." (TAC ¶ 202.) Plaintiff does not allege particularized facts demonstrating how these "wins" were announced to the market, other than defendants' general statements touting the success and growth of the

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 269 of 573

In re Nimble Storage Securities Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 4355570, Fed. Sec. L. Rep. P 99,898

enterprise segment. Plaintiff argues that the Court should infer falsehood based upon CW 14's declarations regarding reporting reclassifications as wins, in addition to statements from CW 3 and CW 8 reporting that reclassifications were occurring in their areas to make it appear that the enterprise segment was thriving. (*Id.* at ¶¶ 202, 204, 207.)

7       CW 14 worked as a field marketing manager in several regions from 2011 through January 2017, including in California, Hawaii, Arizona, Nevada, and South Carolina.

**\*3** However, plaintiff's theory as to how such "wins" were reported to the market are based on announcements Nimble made generally about the strength of the enterprise segment, which were often accompanied with disclosures regarding the actual numbers of Global 5000 or Global 500 companies Nimble had added to its roster. As the Court has previously found, in light of defendants' disclosure of the actual numbers of Global 5000 clients they were acquiring throughout the Class Period, defendants' more general statements of growth are not actionable. *See In re Verifone Sec. Litig.*, 784 F. Supp. at 1481. The Court previously dismissed these claims for that very reason, explaining that plaintiff must allege that the actual numbers disclosed by defendants were false. As its second amended complaint, plaintiff stops just short of alleging the falsity of the numbers disclosed. For instance, in an August 25, 2015 shareholder letter, plaintiff quoted the following language, and indicated in bold and italics the parts which plaintiff considered false and misleading: "*Continued Enterprise momentum. Our penetration of Global 5000 enterprises continues to scale* and we now have more than 70 customers within the Global 500." (TAC ¶ 281.) Accordingly, the Court finds that plaintiff has failed to allege any false or misleading statements regarding Nimble's enterprise segment, and that further amendment with respect to the same would be futile.

Accordingly, the Court **GRANTS** defendants' motion and **DISMISSES WITH PREJUDICE** plaintiff's claims relating to defendants' statements about the growth of the enterprise segment prior to 3Q16. [8]

8       Similarly, the Court finds that allegations related to defendants' statements prior to 3Q16 predicting that Nimble would breakeven by the end of the fiscal year are also **DISMISSED WITH PREJUDICE**, as the Court previously found that whether these statements would be actionable rise

and fall with statements regarding the enterprise and commercial segments.

Plaintiff, however, raises a new claim that statements made in 3Q16 regarding enterprise momentum had to have been false because, as plaintiff alleges, defendants must have known by the first day of that quarter how the quarter would end, including how both commercial and enterprise deals were progressing. (*Id.* at ¶¶ 281, 293.) Defendants argue that this new theory is in violation of the exceedingly narrow grounds for amendment the Court granted plaintiff with respect to defendants' statements about the enterprise segment. The Court agrees. Nevertheless, as articulated in its prior order, claims arising out of defendants' statements in 3Q16, at least with respect to the commercial segment, could have been possible in light of the large revenue miss and Vasudevan's subsequent concession that Nimble faced pressure throughout the third quarter. For the same reasons, the claims arising out of defendants' statements in 3Q16 with regard to Nimble's enterprise segment may have also existed. The Court will thus address defendants' statements in 3Q16 with regard to the enterprise segment together with its statements with regard to the commercial segment because they raise substantially similar issues.

### 2. Statements Regarding Nimble's Business in 3Q16

Given the Court's narrowing of the issues in this litigation and the fact that the Class Period ends on November 19, 2015 after corrective disclosures were given to the investing public, the relevant statements that remain are contained only in the following: (i) a shareholder letter released by defendants on August 25, 2015 (*see* TAC ¶¶ 278, 281, 283, 285); (ii) an earnings call on August 25, 2015 (*id.* at ¶¶ 287, 289, 291, 293, 295, 298); and (iii) a Wells Fargo Report, published on September 22, 2015 (*id.* at ¶¶ 303, 306). [9]

9       Defendants argue that that the Wells Fargo Report, which documents and opines on an analyst meeting with Mehta and Singh, cannot give rise to actionable statements. "A defendant may be held liable for '[making] false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market.' " *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1105 (N.D. Cal. 2013) (citations omitted). "When statements in analysts' reports clearly originated from the defendants,

In re Nimble Storage Securities Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 4355570, Fed. Sec. L. Rep. P 99,898

and do not represent a third party's projection, interpretation, or impression, the statements may be held to be actionable even if they are not exact quotations." *Id.* (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004)). Here, there are essentially three statements at issue in the Wells Fargo report: (i) "Our sense is the growth story is still on track"; (ii) a conclusion that Nimble "continues to have confidence in its ability to achieve FQ4 breakeven driven by revenue growth"; and (iii) a description of Mehta's belief regarding flaws he sees in all-flash array systems. While the latter two appear sufficiently to be attributable to Mehta and Singh, the analyst's opinion regarding their "sense" of Nimble's growth story is not actionable because it explicitly provides the analyst's view or impression of the situation, rather than merely describing what Singh or Mehta actually said. Thus, the Court **DISMISSES WITH PREJUDICE** plaintiff's claims as to the analyst's "sense" of Nimble's growth story.

Additionally, plaintiff alleges the following statement in paragraph 306 is misleading: "Mr. Mehta believes that data management will be a key differentiator in the industry and *sees issues with 1) the all-flash only array market as it tends to be silos that don't integrate as well with other arrays, has capacity limitations because of dedupe, an inability to move data, and high costs per MIPS (million instructions per second).*" Plaintiff claims that this is misleading because Nimble's fibre channel also contained imperfections, Nimble was not growing its base of large enterprise in a meaningful manner, and Nimble was relabeling commercial accounts as enterprise accounts to hide this fact. However, as discussed in a previous order, the market was well-aware of fibre channel's missing features, and an analyst even commented that these product deficiencies could slow Nimble's entry into the enterprise market. (Dkt. No. 113 at 14 (citing *Howard Gunty Profit Sharing v. Quantum Corp.*, No. 96-CV-20711-SW, 1997 WL 514993, at *4 (N.D. Cal. Aug. 14, 1997)) (finding that defendants need not have disclosed certain product features and consumer preferences because "information about consumer preferences is indeed available to the investing public ... and [d]efendants cannot be held liable for failing to educate the public about [the] potential impact on [the] company of publicly known facts' "). Mehta's statement here merely provides his opinions regarding faults he identifies in competing all-flash array systems. Plaintiff does not adequately explain how such statements are false or misleading, nor does plaintiff contend that Mehta's statements about competing all-flash array systems are untrue. Thus, the Court also **DISMISSES WITH PREJUDICE** claims as to that statement.

**\*4** These statements fall broadly under the following categories: First, there are statements that relate specifically to Nimble's enterprise segment during 3Q16. (*See id.* at ¶ 281 ("Continued Enterprise momentum. Our penetration of Global 5000 continues to scale...."); ¶ 283 ("Rapid growth in Global 5000 Enterprises.... These product enhancements and sales investments are yielding strong bookings growth from Global 5000 enterprise."); *see also id.* at ¶¶ 285, 293, 306.) [10] Second, many of the statements tout the success of Nimble's business generally, including its commercial segment. (*See id.* at ¶ 278 (providing revenue guidance of $86 to $88 million); *see also id.* at ¶ 295.) And third, many statements indicate that Nimble is on track to breakeven, which plaintiff claims must be premised on Nimble's supposed success in its commercial and enterprise segments. (*See id.* at ¶¶ 278 ("[W]e remain on track to achieve our goal of non-GAAP operating income break-even by the end of the current fiscal year."), 303 ("NBML also continued to have confidence in its ability to achieve FQ4 breakeven driven by revenue growth (FQ4 tends to be the strongest seasonally)"); *see also id.* at ¶¶ 295, 298.)

[10]   Plaintiff also alleges that defendants' statements about certain "win rates" are false and misleading, because at the time those statements were made, Nimble's commercial and enterprise pipelines were already weakening. (*See, e.g.*, TAC ¶¶ 287 ("[O]ur win rates have continued to remain very consistent...."); 289 ("[O]ur win rates have been as strong against [adaptive security appliance] competition as incumbents."); 291 ("[O]ur win rates have been unchanged."); *see also id.* at ¶¶ 288, 290, 292.) As an initial matter, the Court rejects defendants' arguments that the statements at issue here are mere puffery. Unlike vague statements touting the strength of its win rates generally, the statements at issue here are more comparative and concrete, and susceptible to verification. *See*

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 271 of 573

In re Nimble Storage Securities Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 4355570, Fed. Sec. L. Rep. P 99,898

*Shankar v. Imperva, Inc.*, No. 14-CV-1680-PJH, 2016 WL 2851859, at *4–5 (N.D. Cal. May 16, 2016) (finding vague statements such as "very strong" to be puffery but finding actionable claims that defendant would "win four out of five times"). However, for the same reasons discussed herein as to the other statements made during this time period, plaintiff has failed to plead particularized facts demonstrating that these statements were false or misleading when made.

Previously, the Court found that plaintiff's claims for statements made in 3Q16 could be actionable, in light of Nimble's own acknowledgement that it experienced a decline in both its commercial and enterprise segments during 3Q16, resulting in the missed revenue guidance. (Dkt. No. 134 at 4.) However, the Court dismissed such claims because plaintiff had failed to plead adequately that the statements were false or misleading at the time they were made.

Now, plaintiff offers in its TAC additional allegations from four new CWs, which it claims are sufficient to satisfy its pleading requirements under the PSLRA, at least as to the statements made in 3Q16. The additional CWs offer the following:

• CW 12, the former director of internal audit throughout the Class Period, avers that "Nimble knew months in advance that they were going to miss 3Q16 guidance," explaining that Nimble "expected to hit 20% of their quarterly forecast in the first month of the quarter (August 2015), 30% in the second month of the quarter (September 2015), and 50% in the final month of the quarter (October 2015)," but that in the months leading up to the 3Q16 miss (announced in November 2015), "nothing was hitting targets." (TAC ¶ 172.) CW 12 further recalled a growing concern among the executive management "in the months leading up to the guidance miss when it became clear that the Company would not reach its guidance." (*Id.* at ¶ 174.)

• CW 13, the Vice President for the "East" region from January 2015 through May 2016, avers that his region encountered a slow first two months in 3Q16, *i.e.*, in August and September 2016. (*Id.* at ¶ 175.) Additionally, CW 13 states that Nimble had to use backlog from 1Q16 to make up for 2Q16 booking shortfalls in the East to make guidance for that quarter.

**\*5** • CW 14, the director and then the senior director of Worldwide Channels GTM Strategy and Marketing throughout the Class Period, avers that Nimble encountered challenges in trying to penetrate the enterprise space, and corroborated that Nimble would reclassify its "top end commercial accounts as enterprise accounts," and that such reclassification would be "counted as a 'win'" in Nimble's "internal Salesforce and Cloud 9 systems." (*Id.* at ¶ 202.)

• CW 15, a field marketing manager throughout the Class Period, averred that Nimble's analytical tools would have indicated that Nimble was going to miss its guidance.

Additionally, each of the CWs above, as well as others listed in previous versions of the complaint, alleged that Nimble utilized highly advanced predictive technology, reviewed frequently by defendants, which would have demonstrated to defendants, at least by the end of the first month of the quarter what deals would close and whether defendants would meet their revenue guidance. [11]

[11] The TAC continues to contain vague, and at times conflicting, statements regarding when Nimble's predictive technology *would* have shown that Nimble would fail to meet the revenue guidance announced at the beginning of 3Q16. (*See* TAC ¶¶ 169 (CW 2 averring that it was "clear to everyone at Nimble before that last month" which deals would close); 170 (CW 10 averring that Nimble knew it would "miss guidance for 3Q16 from the beginning of the year"); 172 (CW 12 averring that defendants knew "months in advance" that they would miss 3Q16 guidance); 179 (CW 3 averring that the technology allowed Nimble to "project by the end of the first month of a quarter whether or not quarterly goals would be met").)

The Court finds that the additional allegations provided by the four confidential witnesses are insufficient to save plaintiff's complaint, for the following reasons:

First, for the same reasons the Court found that CW 14's allegations were insufficient in the context of plaintiff's claims relating to the enterprise segment, the Court also finds that CW 14's allegations do not support claims for statements made in 3Q16. Additionally, CW 14 does not aver that the reclassifications were in any way improper.

Second, CW 12's allegations provide no specificity as to when it became apparent that weaknesses in the commercial and enterprise segments would significantly impact Nimble's

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 272 of 573

In re Nimble Storage Securities Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 4355570, Fed. Sec. L. Rep. P 99,898

guidance on revenue and its projections for breakeven. CW 12 only asserts that "in the months leading up to the 3Q16 miss, nothing was hitting targets" and at some point, the Nimble executives knew it would be "impossible to achieve guidance for 3Q16." (*Id.* at ¶ 172.) However, given that the only two dates in 3Q16 on which statements were given were August 25, 2015 and September 22, 2015, greater specificity is necessary to determine whether the statements were false or misleading at the time they were made. Furthermore, as discussed above, the only actionable statement with regard to the September 22, 2015 analyst report pertained to whether Nimble would breakeven by the end of 4Q16, and the analyst acknowledged that the fourth quarter tended to be the strongest seasonally. (*Id.* at ¶ 303.) Thus, even if defendants knew by September 22, 2015 that it would be impossible for Nimble to meet its revenue guidance, no such statements were made on September 22, 2015, and there exist no particularized facts suggesting that Nimble would also fail to breakeven by the end of 4Q16. [12]

[12]  Additionally, CW 12 indicated that defendants expected 50% of 3Q16's revenue to be gained during October 2015. (TAC ¶ 172.) Thus, even accepting that Nimble encountered a weak August and September in 2015, defendants could still have expected to make up the difference in October, especially in light of CW 12's averment.

*6  Third, CW 13's allegation that Nimble utilized backlog bookings from 1Q16 to supplement 2Q16's shortfall in his region says nothing about whether booking shortfalls existed in other regions during that quarter, how much backlog had to be utilized, and whether other regions still had backlog after 2Q16. Nor does a booking shortfall in 2Q16 necessarily indicate weakness entering 3Q16. Such lack of specificity is insufficient for purposes of the PSLRA. *See In re Foundry Networks, Inc. Sec. Litig.*, No. 00-CV-4823-MMC, 2003 WL 22077729, at *7 (N.D. Cal. Aug. 29, 2003) (dismissing claims related to use of shipping backlogs because plaintiffs failed to allege with particularity the "amount of revenue implicated," explaining that plaintiffs failed to "provide any facts about the source of such information, stating only, and generally, that 'the early shipments depleted the order backlog for Foundry's product in the fourth quarter of 2000 by approximately $5.2 million' ").

Fourth, and finally, CW 15's corroboration of the seemingly uncontroversial fact that Nimble employed highly predictive technology, which defendants most likely reviewed routinely,

simply does not allege enough. Not one of the CWs alleges that any of these reports forecasted for defendants that they would miss their guidance, and, if any did provide such forecasts, when these reports began doing so. [13] This is particularly telling in light of the fact that certain CWs averred that they themselves used the predictive technology and received daily reports. (*See, e.g.*, TAC ¶ 125.) Given the limited number of statements provided in 3Q16 and the lack of any statements during the last month of that quarter, specificity as to when defendants' statements became "false and misleading" is necessary to state a claim under the PSLRA. To support plaintiff's theory, the Court would have to make inference upon inference without any particularized facts demonstrating what information the reports actually contained. The Court cannot do so under the demanding standards set forth by the PSLRA.

[13]  Additionally, assuming *arguendo* that plaintiff could have satisfied its pleading burden in this regard, the lack of specificity as to what the reports actually showed, and when, undermine the TAC's ability to allege a strong inference of scienter, given that none of plaintiff's fifteen CWs is willing to allege such facts, and other circumstances—such as defendants' retention of a high percentage of their stock—also do not support such an inference. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (plaintiffs' allegations must raise a "strong inference that the defendant acted with an intent to deceive, manipulate, or defraud") (citing 15 U.S.C. § 78u–4(b)(2) and *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007) ("A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."); *see also Applestein v. Medivation, Inc.*, No. 10-CV-998-EMC, 2011 WL 3651149, at *8 (N.D. Cal. Aug. 18, 2011) (finding the fact that defendants "maintained more stock than they sold" during the class period "strongly rebuts an inference of scienter"). However, because plaintiff has failed to allege adequately any false or misleading statements, the Court need not reach that issue here.

In re Nimble Storage Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 4355570, Fed. Sec. L. Rep. P 99,898

Accordingly, the Court **GRANTS** defendants' motion to dismiss. Given that this is plaintiff's third attempt at amending its complaint after over a year and a half of litigating this action, the Court finds that there exists no indication that plaintiff would be able to amend to cure the deficiencies described herein, or in the Court's prior orders dismissing plaintiff's complaints. Thus, the Court **DISMISSES WITH PREJUDICE** plaintiff's remaining claims under Section 10(b) and Rule 10-b5 promulgated thereunder.

### B. SECTION 20(A) CLAIM

**\*7** Defendants do not contest that Vasudevan and Singh are "controlling" individuals under the statute. Thus, the Section 20(a) claims against the same are dependent on whether plaintiff's claims under Section 10(b) and Rule 10b-5 survive. The Court has found that plaintiff has failed to plead adequately any claims under Section 10(b) and Rule 10b-5, and dismissed the same with prejudice. Accordingly, the Court **GRANTS** defendants' motion in this regard and **DISMISSES WITH PREJUDICE** plaintiff's section 20(a) claim.

### II. CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants' motion and **DISMISSES WITH PREJUDICE** plaintiff's TAC.

This Order terminates Docket Number 141.

The Clerk shall close the file.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2017 WL 4355570, Fed. Sec. L. Rep. P 99,898

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 15

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 275 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

2023 WL 2749193
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

IN RE OKTA, INC. SECURITIES LITIGATION,

Case No. 22-cv-02990-SI
|
Signed March 31, 2023

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS

Re: Dkt. No. 56

SUSAN ILLSTON, United States District Judge

**\*1** On March 17, 2023, the Court held a hearing on defendants' motion to dismiss the amended complaint. For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART the motion, and GRANTS Lead Plaintiff leave to amend. Any amended complaint shall be filed **by April 28, 2023.**

### INTRODUCTION

This securities fraud case is brought by Lead Plaintiff Nebraska Investment Council, on behalf of itself and a putative class of those who purchased the publicly traded Class A common stock of Okta, Inc. ("Okta") during the period from September 1, 2021, through September 1, 2022, inclusive ("Class Period"). Dkt. No. 48 ("AC") at 1. [1] This action arises from two main events and their aftermath: Okta's acquisition of Auth0, Inc. ("Auth0") in May 2021, and a data security incident that occurred in January 2022 but that was not disclosed until late March 2022.

[1]    References to the complaint are to the Amended Class Action Complaint, filed October 13, 2022, at Docket No. 48. For purposes of this motion to dismiss, the Court treats as true Lead Plaintiff's allegations in the complaint and construes these allegations in the light most favorable to Lead Plaintiff, the nonmoving party. See *Parks Sch. of*

*Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

Defendant Okta is a data security company that "provides identity and access management ('IAM') software that helps companies secure user authentication into applications, and for developers to build identity controls into applications, website web services, and devices. Okta primarily markets the Okta Identity Cloud as a one-stop solution that provides data security for an organization's workforce." *Id.* ¶¶ 2–3. Okta is a " 'growth company,' *i.e.*, a company that prioritizes growth over profits." *Id.* ¶ 4. The complaint alleges that Okta has yet to report any net income since its initial public offering in 2017. *Id.* ¶ 51. Also named as defendants in this case are Okta's Chief Executive Officer and Co-Founder Todd McKinnon; current Chief Financial Officer Brett Tighe; and current Executive Vice Chairman, Chief Operating Officer, and Co-Founder Frederic Kerrest (collectively, the "individual defendants"). *Id.* at 1.

Lead Plaintiff alleges that defendants made numerous false and misleading statements and omissions in filings with the Securities and Exchange Commission ("SEC"); in press releases and in interviews with the media; at technology conferences; and during quarterly investor calls throughout the Class Period.

Defendants move to dismiss the complaint, asserting that Okta consistently warned investors of the challenges it faced with the acquisition of Auth0 and the integration of its sales team. Dkt. No. 56 ("Mot.") at 1. Defendants also argue that Lead Plaintiff misapprehends the January 2022 security incident, and that hackers were unsuccessful in actually breaching Okta's or its customers' systems, and that Okta "promptly reported everything it knew about the intrusion[.]" *Id.* Defendants contend, *inter alia*, that none of the statements challenged were false or misleading when made, that Lead Plaintiff has not pled fraud with particularity, and that many of the challenged statements are inactionable puffery, forward-looking, or opinions. Defendants further argue that Lead Plaintiff fails to plead that the individual defendants acted with the requisite scienter.

### BACKGROUND

**I. Acquisition of Auth0 in May 2021 and Resulting Problems**

**\*2** On March 3, 2021, prior to the start of the Class Period, Okta announced that it would acquire Auth0 in a stock

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 276 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

transaction valued at approximately $6.5 billion. AC ¶ 58. Auth0 "provided customer identity and access management ('CIAM') software, as opposed [to] the IAM software that Okta primarily provided for an employer's workforce." *Id.* ¶ 5. Additionally, where Okta focuses "on pre-built, pre-configured solutions[,] ... Auth0 is more focused on purpose-built application developers." *Id.* ¶ 59. In a press release, Okta explained that the Auth0 acquisition would "complement Okta's growth in the CIAM market." *Id.* ¶ 58.

On May 3, 2021, Okta announced the successful completion of the Auth0 acquisition. *Id.* ¶ 61. Plaintiff alleges, however, that "soon after the close of the acquisition, Okta began to experience severe problems with the integration of Auth0" but failed to disclose these problems to investors. *See id.* ¶ 8. According to CW2, a former Auth0-turned-Okta Senior Vice President, "the integration process began as promising, but ultimately 'did not go well at all' and was a 'complete nightmare.' " *Id.* ¶¶ 39, 78.

These problems primarily took the form of employee attrition and difficulty integrating the sales teams. The complaint alleges that "[i]mmediately after the acquisition of Auth0, Okta began to shed senior employees." *Id.* ¶ 63. According to CW4, a former Account Executive, "Auth0 employees started to leave Okta 'not long after May or June' 2021." *Id.* ¶¶ 41, 66. Around August 2021, former Auth0 CEO (now Okta's President of Customer Identity) Eugenio Pace announced in an internal letter that senior leadership was leaving the company. *Id.* ¶ 65 & n.13. Auth0 executives who departed around this time included the Chief Legal Officer, the Chief Human Resources Officer, and the Chief Financial Officer. *Id.* Auth0's former Chief Revenue Officer decided to stay at Okta for a few months following the acquisition but "made it clear that he was leaving the company." *Id.* ¶ 65. CW5, an Account Executive during the Class Period, stated that Okta's Chief Revenue Officer (Steve Rowland) and the new President of Worldwide Field Operations (Susan St. Ledger) " 'pushed out' all of the 'founding fathers' of Okta as well as other employees that helped build the Company—approximately 75-80% of the VPs and SVPs." *Id.* ¶¶ 42, 67, 80. CW6, a Senior Solutions Engineer employed by Okta from February 2019 through December 2021, described a " 'mass exodus' of salespeople – both Okta and Auth0 employees – after Auth0 was acquired, around fall 2021." *Id.* ¶¶ 43, 68.

On September 1, 2021, the first day of the Class Period, Defendant McKinnon announced in an earnings call that the company was accelerating the timeline to unify the Okta and Auth0 sales teams, moving the integration up to the start of the new fiscal year in February 2022. *Id.* ¶ 73. McKinnon stated:

> We've made the decision to accelerate the timeline for integrating the sales organizations under Susan St. Ledger's leadership to the beginning of the new fiscal year in February. This move will allow the unified sales team to sell both platforms and benefits customers by providing more options to meet their unique use cases....

*Id.*

The complaint alleges that "[a]s the Class Period progressed and Auth0 employees continued to exit the Company, Okta created and adopted an integration plan." *Id.* ¶ 77. According to CW2, "the first phase of the integration plan originally involved the integration of the go-to-market (GTM) teams at each company (this included the sales and marketing teams), which was set to occur on February 1, 2022 ...." *Id.* ¶ 78. CW2 stated that this integration plan called for retaining 200 to 300 Auth0 employees as "specialists" who would train and educate Okta employees on Auth0 products for approximately one year. *Id.* ¶¶ 79, 81. Auth0 employees would continue to sell Auth0 products, while Okta employees would continue selling Okta products, "with additional sales staff brought on to help meet goals." *Id.* ¶ 79. CW2 stated that both Okta and Auth0 senior executives signed off on the integration plan and that weekly calls occurred throughout the planning period. *Id.* ¶ 80.

**\*3** In late 2021, according to CW2, Okta's "finance team determined there was 'no way' that the integration plan was 'humanly possible' for FY2024 and 'completely shut it ... down.' " [2] *Id.* ¶ 81. Now, the Auth0 sales employees would be "generalists" rather than specialists, and Okta and Auth0 employees would be expected to sell each other's products, despite having no knowledge of or training on each other's products. *Id.* ¶¶ 81–82. "CW2 recalled being informed of the decision to scrap the integration plan around December 2021, but employees were not informed until several weeks later in approximately mid-January 2022, two weeks before the integration was supposed to go into effect." *Id.* ¶ 83.

2023 WL 2749193

[2]
    It is unclear whether the reference in the complaint to FY2024 is a typo, as the allegations state that the integration plan was to go into effect at the start of fiscal year 2023.

Meanwhile, Okta publicly touted the success of its acquisition of Auth0. In a press release issued September 1, 2021, Defendant McKinnon is quoted as stating, "In our first quarter as a combined company with Auth0, we're off to a fantastic start." *Id.* ¶¶ 71, 134. In an earnings call that same day, McKinnon stated, "It's been less than four months since we closed the acquisition of Auth0, but we've already made a lot of progress and learned quite a bit.... [W]hen you think about us plus Auth0, it is going very well." *Id.* ¶¶ 72, 135. A few weeks later, at the Piper Sandler Virtual Global Technology Conference, Defendant Kerrest stated, "So the integration has gone very well. We're about 4 months in. We're pretty good at execution. So we had some pretty good goals for ourselves, but I think we've been beating even those, which is great." *Id.* ¶ 140. Likewise, on September 15, 2021, Defendant McKinnon stated at the Citi Global Virtual Technology Conference, "We're benefiting a lot on that from our -- we have the acquisition of Auth0, we completed back in May. We're really getting into the integration now." *Id.* ¶ 142. Plaintiff alleges that these statements were false and misleading because defendants knowingly or recklessly omitted the material fact that the company had already lost senior Auth0 and key Okta employees who were critical to the success of the integration. *Id.* ¶¶ 137, 141.

Plaintiff also contends that Okta's risk disclosures filed with the SEC during the Class Period were false and misleading. The risk disclosures all contained the following statements:

> ***The acquisition of Auth0 (the "Acquisition") could cause disruptions to our business or business relationships, which could have an adverse impact on results of operations....***
>
> **We may not realize potential benefits from the Acquisition because of difficulties related to integration, the achievement of synergies, and other challenges.**
>
> Prior to the consummation of the Acquisition, we and Auth0 operated independently, and there can be no assurances that our businesses can be combined in a manner that allows for the achievement of substantial benefits. Any integration process may require significant time and resources, and we may not be able to manage the process successfully as our ability to acquire and integrate larger or more complex companies, products or technologies in a successful manner is unproven. If we are not able to successfully integrate Auth0's businesses with ours or pursue our customer and product strategy successfully, the anticipated benefits of the Acquisition may not be realized fully or may take longer than expected to be realized. ***Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers, disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated.***

**\*4** *Id.* ¶¶ 138 (Form 10-Q dated Sept. 2, 2021), 153 (Form 10-Q dated Dec. 2, 2021) (emphases in complaint); *see also id.* ¶¶ 159 (Form 10-K dated Mar. 7, 2021), 165 (Form 10-Q dated June 3, 2022).[3] Lead Plaintiff alleges that "[t]hese risk disclosures were false and misleading because Defendants knew or recklessly disregarded that these risks had already materialized. Specifically, Defendants knew or recklessly disregarded the fact that senior Auth0 and key Okta employees had already left the Company." *Id.* ¶ 139; *see also id.* ¶¶ 154, 160, 166.

[3]
    Lead Plaintiff explains that the statements highlighted in bold and italics in the complaint are those that Lead Plaintiff alleges were false or misleading. AC ¶ 133.

## II. Security Incident in January 2022

According to the complaint, Okta, which prides itself on making data security a priority, "was not properly securing its administrative tools for monitoring customer tenants."[4] AC ¶¶ 97–98. CW6 explained that Okta had a "SuperUser tool" that "provided access to any customer in any Okta tenant anywhere in the world" and which "allowed pre-sale engineers and customer support employees to control and monitor customer tenants." *Id.* ¶ 98. However, "there was no formal request or vetting process for becoming a SuperUser." *Id.* ¶ 99. According to CW6, the newer and less experienced managers in the company handed out SuperUser access "like candy." *Id.* The complaint states that "CW6 went on to suggest that the SuperUser tool should have been more closely guarded against hackers[,]" such as by restricting employees from accessing the tool from their home laptops or through tighter controls on home laptops themselves. *Id.* ¶ 100. CW7 similarly "advised that it seemed too easy for anyone to access these administrative tools." *Id.* ¶ 102.

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 278 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)
2023 WL 2749193

According to CW7, there "wasn't much of a vetting process" to become a SuperUser, and the SuperUser tool required no additional training or security measures. *Id.*

4    "Tenants" in this context are comparable to "virtual servers" that Okta customer support personnel had access to for troubleshooting and monitoring purposes. AC ¶ 98 n.16.

The complaint additionally alleges that "Okta failed to require third parties, such as sub-processors and Solutions Engineers, to comply with the security requirements that are fundamental to Okta's business." *Id.* ¶ 103. "For example, Okta adopted, and strongly recommended that its customers adopt, a 'Zero Trust' security architecture." *Id.* "Zero Trust" meant that security did not operate on the assumption that there was a "trusted" internal network and an "untrusted" external network but that Okta would "securely enable access for the various users ... regardless of their location, device or network." *Id.*

On January 21, 2022, hackers known as LAPSUS$ "were able to access Okta resources after they compromised one of the Company's third-party support vendors[.]" *Id.* ¶ 104. According to the complaint, the hackers were "able to access Okta resources to view information from the Company's active customer tenants. However, ... notwithstanding their knowledge of the data breach, Defendants failed to disclose the January 2022 Breach for another two months." *Id.*

On March 7, 2022, Okta filed its Form 10-K for fiscal year 2022 with the SEC. *Id.* ¶ 159. In it, Okta provided the following risk language related to data security:

> *Security is a mission-critical issue for Okta and for our customers.* Our approach to security spans day-to-day operational practices from the design and development of our software to how customer data is segmented and secured within our multi-tenant platform. *We ensure that access to our platform is securely delegated across an organization....*
>
>   **\*5**  *The Okta Identity Cloud is monitored not only at the infrastructure level but also at the application and third-party integration level. Synthetic transaction monitoring allows our technical operations team to detect and resolve issues proactively....*
>
> ... A summary of our risks includes, but is not limited to, the following: ...

> • *An application, data security or network incident may allow unauthorized access to our systems or data or our customers' data, disable access to our service, harm our reputation, create additional liability and adversely impact our financial results.*

*Id.* Plaintiff alleges these statements "were materially false and misleading because these risks had already materialized. Specifically, Okta had experienced the January 2022 Breach due to unsecured administrative tools used for monitoring cloud tenants and the failure to require sub-processors to comply with Okta's fundamental security requirements." *Id.* ¶ 160.

On March 21, 2022, "LAPSUS$ posted screenshots on their telegram channel showing what they claimed was Okta's internal company environment." *Id.* ¶ 105. On March 22, 2022, at 4:23 a.m., Defendant McKinnon posted the following statement on his Twitter account:

> In late January 2022, Okta detected an attempt to compromise the account of a third party customer support engineer working for one of our subprocessors. The matter was investigated and contained by the subprocessor. (1 of 2)
>
> We believe the screenshots shared online are connected to this January event. Based on our investigation to date, there is no evidence of ongoing malicious activity beyond the activity detected in January. (2 of 2)

*Id.* ¶ 106. Okta's stock price fell $2.98 per share, or 1.76%, to close at $166.43 on March 22, 2022. *Id.* ¶ 107.

Later in the day on March 22, Okta's Chief Security Officer David Bradbury issued several blog posts on the security incident. According to the complaint, "[i]n this post, Bradbury admitted that Okta first detected the January 2022 Breach in January." *Id.* ¶ 108. In a follow-up post, Bradbury stated that "approximately 2.5%" of Okta's customers had "potentially been impacted and whose data may have been viewed or acted upon."[5] *Id.* Raymond James downgraded Okta from "strong buy" to "market perform," stating, "[w]hile partners were willing to trust Okta's track record, the handling of this latest security incident adds to our mounting concerns." *Id.* ¶ 109. As a result of the Raymond James downgrade and Okta's update after the close of market, Okta's stock price fell $17.88 per share, or 10.74%, to close at $148.55 on March 23, 2022. *Id.* ¶ 110. The complaint alleges, "On March 25, 2022,

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 279 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)
2023 WL 2749193

Okta acknowledged that it sat on this information for almost two months before stating, 'We want to acknowledge that we made a mistake.' " *Id.* ¶ 111.

5       A CNN article published March 23, 2022, estimated that because Okta had over 15,000 customers, 2.5% would equate to hundreds of clients potentially impacted. AC ¶ 108.

## III. Customer Responses

Several of the confidential witnesses described the fallout after the security incident was revealed. According to CW3, a Corporate Account Executive whose territory covered half of Dallas, "the Company was saying that they were losing sales because of the breach, and CW3 noted that the breach did come up with every customer she spoke with, and the Company distributed 'talking points' to employees on how to 'downplay' the breach. CW3 described the breach as 'one of many hurdles' that were necessary to clear to achieve a successful sale." AC ¶ 113. "Similarly, CW4 recalled that prospective customers were deciding against doing deals with Okta after the breach." *Id.* ¶ 114. CW4 was an Account Executive based in Europe who was employed by the company until the first quarter of fiscal year 2023. *Id.* ¶ 41. CW8, a Senior Account Executive whose clients were based in the New York City area, also "advised that Okta customers reacted negatively to the data breach that Okta disclosed in March 2022." *Id.* ¶¶ 45, 115. Following the breach, Okta customers were unwilling to expand their contracts and "express[ed] that they were no longer comfortable spending additional money with Okta[.]" *Id.* ¶ 115. The negative customer reaction impacted CW8's ability to meet quotas; although "CW8 could not quantify the amount of lost business, ... she suggested it might have been 'tens of thousands of dollars' in lost business." *Id.* This compounded Okta's struggles in the wake of the faltering Auth0 integration.

*6  On June 8, 2022, Defendant McKinnon gave a CNBC interview, where he discussed customer reaction to the security incident and what the company had done to repair those relationships. During the interview, McKinnon stated:

> And anytime there's any kind of hack, whether it's to a third party or what any kind of talk of a breach, there's a lot of concerns in the [sic] in the customer base because this is about trust. So, the first thing we did is we had these conversations. We talked to over 1000 customers face to face over, [sic] over video and had these conversations. I personally talked [sic] over 400. *And got a ton of feedback*

> *about what we could do better, how we could make sure that our support environment was not insecure, to make sure that we communicate better, to make sure that we are instill [sic] this trust. At the end of the [sic], I think we've been able to do that.*

> ...

> *We're committed to making this a $4 billion a year company by fiscal year, fiscal year 26. So, that's, that's coming up quickly. So, we have to invest to grow to that scale and we've always done it with a balance of efficiency.* We've always made sure that our, that our growth rate and our [sic] and our cash flow generation was balanced towards that goal. *So, we think we're drawing the right balance to capture this market opportunity.* And I think over time you're going to see a very highly scaled profitable company that's going to help customers and capitalize on this big market opportunity.

*Id.* ¶¶ 167–68 (underlined [sic]'s added by the Court).

## IV. Disclosure of Attrition and Integration Challenges

On August 31, 2022, after the close of the trading day, Okta held its second quarter earnings call. AC ¶ 126. Lead Plaintiff alleges that it was on this call that "Defendants finally disclosed issues related to the integration of Auth0." *Id.* Explaining the "mixed" financial results for that quarter, Defendant McKinnon stated, in part:

> **And the third area we examined was impact from the integration of the Okta and Auth0 sales teams, which occurred at the beginning of this fiscal year.** When talking about Auth0, it's important to revisit the strategic rationale of why we acquired Auth0. Individually, Okta and Auth0 were leading identity providers. Together, we offer the most comprehensive identity platform in the market that is unmatched competitively and creates powerful long-term network effects for us and for our customers. Organizations around the globe are looking for scalable and secure ways to digitally interact with our customers. Together with Auth0, we win the customer identity market faster and accelerate our vision of establishing Okta as a primary cloud.

> Integrations are always difficult and touch every part of an organization. **While we are making progress, we've experienced heightened attrition within the go-to-market organization as well as some confusion in the field, both of which have impacted our business**

2023 WL 2749193

momentum. **In order to improve our performance going forward, we've implemented a number of action items. For starters, we're committed to stem attrition within our go-to-market team. This is a top priority for me and my staff, and we're in lockstep on actions to take. This includes making changes to our organizational structure to better align on our strategy, increased sales training and enablement and also improving the comp structure for the go-to-market team to ensure they feel set up for success.**

**\*7** *Id.*

In response to a question about the integration of the Auth0 and Okta sales teams, McKinnon replied:

Yes, for sure. Thanks for the question. I think there's -- in terms of -- I'll start first with sales organization. The big change on the sales organization was at the beginning of this fiscal year, so Feb 1, and that's where we took the Auth0 sales team that sold as an independent group all through last year for the first three quarters of the -- after the acquisition and we combine them together with the Okta sales team.

And so, **the idea there is that hundreds and hundreds of Okta reps sell the whole portfolio, Okta plus Auth0. And then the Auth0 reps that came over sold the Okta portfolio and Auth0 portfolio. So that was a really significant step in the integration.** In terms of -- one thing I want to clarify is that Freddy [Kerrest] doesn't manage the sales team.

\* \* \*

**I think the headwinds are really about how do you take those hundreds and hundreds of reps and make them productive selling both customer identity cloud and workforce identity cloud, and there's a couple of things that go into that.** The first thing is that we really have to reach a new buyer for Okta, which is -- Okta traditionally was about CIOs and CISOs. But for customer identity to be successful, we have to reach VPs of technologies, CTOs, all of the chief marketing officers, chief digital officers, the whole suite of C-suite executives that will -- if we win them all and we have an identity platform for all those use cases, we can better achieve our goal of being the primary cloud and the primary piece of their strategic landscape going forward.

*Id.* ¶ 127.

Defendants McKinnon and Tighe also told investors on the call that Okta was reevaluating its current year billings outlook and its FY26 targets. McKinnon stated:

Yes, it's a great question. On the first part of your question, *so the $4 billion FY '26 target, if we're going to achieve that, when we're going to achieve that, we have to have a successful customer identity cloud. And so as we reevaluate in the short-term how to keep that momentum going, I think it's prudent to make sure that we reevaluate that target given the short-term changes that we're optimizing for the customer at a cloud.* And then -- and we're committed to coming back to everyone on the next earnings call with a very detailed refined version of that -- of those commitments and that target, I think it's very important. So, that's the first thing.

And then on the second thing, the sequence of events here, *I think, which is important for everyone to understand is that the sales teams were integrated this year. So, it's really 6 months of information and learnings that we have to iterate on this thing.*

It's not -- *last year, Auth0 ran as a separate sales team, and they had a great year. So, we know there's market fit. We know we can grow this thing. It's just about the integration of the sales teams and what that drove in terms of attrition, and some of the things we've talked about in terms of optimizing how we get that back on track to achieve this strategic imperative*, which is we have to be the winner and the opportunity is tremendous in this long-term customer identity market.

**\*8** *Id.* ¶ 128. Defendant Tighe stated:

... We will continue providing a full year billings outlook for FY '23 before discontinuing any reference to billings in FY '24. *We are lowering our calculated billings outlook for the year by approximately $140 million due to the outlook headwinds outlined earlier.* We now expect calculated billings for FY '23 to be approximately $2.04 billion to $2.05 billion, representing growth of 27% when viewed on a like-for-like basis or 19% on an as-reported basis.

*Given our near-term outlook, coupled with the uncertainties of the evolving macro environment, we are reevaluating our FY '26 targets at this time.* Having said that, we will continue to balance growth and profitability, and we look forward to updating you on our long-term outlook on the Q3 earnings call.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 281 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

*Id.* ¶ 129.

The complaint states, "On this news, the price of Okta's stock fell dramatically overnight to [sic] $22.25 per share, or ***over 24.3%***, to open at $69.15 on September 1, 2022." *Id.* ¶ 130.

On September 1, 2022, Defendant McKinnon was interviewed on TechCheck, where, according to the complaint, "he reaffirmed that Okta was having issues obtaining new customers." *Id.* ¶ 202. McKinnon stated,

> **Yeah, we have had a little bit of higher-than-average attrition in the sales team and that driving [sic] some of the near-term mixed results. I think when you look at the quarter though I think there are sales people being successful at Okta. We had a record number of $1,000,000 plus deals in the quarter and so on we had great customer retention our net retention percussion which is really emblematic of customer success is 120% plus so there's a lot of success going on but when you think about trying to reach this new buyer and bringing two sales forces together and [sic] and sort of trying to broaden that appeal in this C suite of every organization in the world that's challenging in [sic] a little bit more challenging than we thought it would be so we're gonna work through those issues can [sic] move forward.** I think on your macro question, we are seeing a little bit of macro change a little bit of lengthening sale cycles but, I think big picture wise that's [sic] that's a very small part of our mixed results, and we have a lot of these corrective actions we're taken [sic] in short term are going to yield to a lot of positive momentum in the future.

*Id.* (underlined [sic]'s added by the Court). The price of Okta's stock fell an additional $8.55 per share that day, or over 12.3%, to close at $60.60 by the close of trading on September 1, 2022. *Id.* ¶ 24.

## V. Filing of This Lawsuit

On May 20, 2022, plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust filed suit against Okta and five individual defendants regarding the January 2022 data security incident. Dkt. No. 1 (alleging class period of March 5, 2021, to March 22, 2022, inclusive). On August 26, 2022, the Court appointed Nebraska Investment Council as Lead Plaintiff. Dkt. No. 39. On October 13, 2022, Lead Plaintiff filed an amended class action complaint, which is now the operative complaint, adding allegations regarding the Auth0 integration. *See* Dkt. No. 48. Alleging that defendants committed fraud by making materially false statements and omissions throughout the Class Period, Lead Plaintiff brings this securities fraud claim pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) promulgated thereunder by the SEC. Defendants now move to dismiss for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## LEGAL STANDARDS

**\*9** To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When evaluating a motion to dismiss, the Court need not accept as true conclusory allegations, unwarranted deductions of fact, or unreasonable inferences. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Securities fraud class actions must also "meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313–14 (2007).

Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA further requires that allegations based on false or misleading statements must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and,

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "each act or omission." *Id.* § 78u-4(b)(2)(A).

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, the complaint must plausibly allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Weston Family P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

To establish falsity under the first element, the misrepresentation or omission must either "directly contradict what the defendant knew at that time" (i.e., is false) or "omit[ ] material information" (i.e., is misleading). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018). Not all omissions are actionable. *Id.* at 1009. "Disclosure is required ... only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.' " *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 CFR § 240.10b–5(b)). For a statement or omission to be misleading, it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted). "To fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (cleaned up).

The "required state of mind" for scienter covers " 'intent to deceive, manipulate, or defraud,' [and] also 'deliberate recklessness.' " *Schueneman v. Arena Pharms.*, 840 F.3d 698, 705 (9th Cir. 2016) (citations omitted). To determine whether scienter has been adequately pled, the Court must determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 310. Plaintiffs who "seek to hold individuals and a company liable on a securities fraud theory" must "allege scienter with respect

to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).

**\*10** The Supreme Court's decisions in *Tellabs*, 551 U.S. at 315–18, and *Matrixx Initiatives*, 563 U.S. at 37–49, dictate that courts not co-mingle the inquiries of falsity and scienter. *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, No. 21-16876, 2023 WL 2532061, at \*11 (9th Cir. Mar. 16, 2023). "[T]his means that we do not impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference of fraud.' Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a *strong inference* standard of plausibility." *Id.*

If the Court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## DISCUSSION

### I. Exchange Act Claims

In the analysis that follows, the Court discusses only the disputed elements of Section 10(b): material misrepresentation or omission, and scienter.

#### A. Employee Attrition and the Auth0 Integration

Lead Plaintiff challenges as false or misleading roughly 15 statements regarding the Auth0 integration. *See* Opp'n at 12 (citing AC ¶¶ 134–36, 138, 140, 142, 150–51, 153, 155–57, 162–63, 165). The Court concludes that these allegations fail to point to a violation of the PSLRA because they suffer from a lack of specificity, particularly with regard to timing, or else they do not give rise to a strong inference of scienter.

#### 1. Statements in September and Early December 2021

First, the complaint lacks particularized detail about the timing of the events that would show that statements made in September and early December 2021 regarding employee attrition and the Auth0 integration were false or misleading

Case 4:24-cv-01940     Document 44-4     Filed on 01/27/25 in TXSD     Page 283 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

when made. The complaint challenges nine statements that defendants made during that period. *See* Dkt. No. 61 ("Opp'n") at 12 (citing AC ¶¶ 134–36, 138, 140, 142, 150–51, 153). The dates of these alleged misstatements range from September 1, 2021, through December 2, 2021. But the complaint lacks particularized allegations regarding what happened and when. What we know from the complaint is that three Auth0 executives left around August 2021. AC ¶ 65. A fourth executive decided to stay for the first few months after the acquisition but, at some unspecified time, he "made it clear he was leaving the Company." *See id.* CW5 states that Okta's Steve Rowland and Susan St. Ledger " 'pushed out' all of the 'founding fathers' of Okta as well as other employees that helped build the Company—approximately 75-80% of the VPs and SVPs," but CW5 does not say who these employees are and when they left. [6] *See id.* ¶¶ 67, 80. CW4 recalls "that Auth0 employees started to leave Okta 'not long after May or June' 2021." *Id.* ¶ 66. The complaint alleges, via CW6, that there was a "mass exodus of salespeople" from both Okta and Auth0 "around fall 2021." *Id.* ¶ 68. According to the complaint, "CW1 also recalled hearing that the board was reviewing attrition figures in light of the companies' cultural differences and was 'very concerned.' CW1 clarified that this probably happened around the fall of 2021." *Id.* ¶ 221. The complaint alleges: "As the Class Period [beginning September 1, 2021,] progressed ... Okta created and adopted an integration plan" that would go into effect in February 2022. *Id.* ¶¶ 77–78. Then, "late in 2021," Okta's finance team determined there was "no way" the original integration plan was "humanly possible" for FY2024 and shut it down. *Id.* ¶ 81. CW2 found out about the decision to abandon the integration plan "around December 2021," and employees were informed in mid-January 2022, two weeks before the integration would go into effect. *Id.* ¶ 83.

[6]     The complaint states that Defendants McKinnon and Kerrest are "co-founders" of Okta. *See* AC ¶¶ 32, 34. They remain at the company.

**\*11**  Plaintiff's theory is that the loss of senior Auth0 and key Okta employees, as well as the "mass exodus" of the salesforce, caused Okta to abandon its original integration plan, and thus defendants' statements that the integration was going well were false or misleading. Even taking all of Lead Plaintiff's allegations as true, it appears that the departure of the three Auth0 executives around August 2021 had no impact on the integration plan because, according to plaintiff's own chronology of events, the original integration plan wasn't even created and approved until after the start of the Class

Period in September 2021, i.e., after these executives had already departed. *See id.* ¶¶ 65, 77. It is further unclear from the timeline whether the "mass exodus" of sales employees occurred prior to any of the statements that Okta made in September and early December 2021.

The vagueness around timing means that plaintiff has failed to state with particularity facts giving rise to a reasonable inference that the statements regarding the Auth0 integration from September and early December 2021 were false or misleading *when made.* The Ninth Circuit recently held as much in *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.* There, the appellate court explained that

> [a]lthough the CWs asserted that numerous layoffs occurred at some point in 2019, these statements are unclear as to the actual timeline at which company-wide layoffs occurred. Plaintiffs' belief that company-wide lay-offs had already begun at the time the statements were made [on March 4, May 9, or August 7, 2019] is simply not supported by the CWs' vague statements that layoffs occurred in 'spring 2019,' 'summer 2019,' or just '2019.'

2023 WL 2532061, at \*19 (analyzing allegations on a motion to dismiss). Likewise here, the only statement regarding employee attrition that is tied to a particular time period *after* the original integration plan was created is the statement of CW6 that there was a "mass exodus" of salespeople "around fall 2021." [7] *See* AC ¶ 68. "Around fall 2021" is not sufficiently particularized to render statements made in September and early December 2021 false or misleading when made.

[7]     The "mass exodus" language is also attributed to CW5, but CW5 does not say which employees were leaving and when. *See* AC ¶ 90.

Accordingly, the Court GRANTS, without prejudice, defendants' motion to dismiss, with regard to statements made in September and early December 2021 regarding employee attrition and the Auth0 integration.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 284 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

### 2. Earnings Call Statements
### on March 2 and June 2, 2022

The complaint also alleges misstatements by the individual defendants on quarterly earnings calls on March 2 and June 2, 2022. *See* AC ¶¶ 155–57, 162–63. Plaintiff alleges these were misstatements because the mass exodus of employees meant that Okta could not maintain a team of specialized staff for Auth0 products, and that Okta and Auth0 salespeople did not have the knowledge required to sell each other's products. *Id.* ¶¶ 158, 164.

On March 2, 2022, Defendant Tighe stated,

> My second priority is ensuring that we continue the seamless integration of Auth0 across all facets of the company. Now that the back office and go-to-market teams have been fully integrated, we will continue to refine our systems and processes to ensure that the tremendous growth opportunity we see will be realized. *We are off to a great start and recognize there is still a lot of work to do.*

*Id.* ¶ 155.

Defendant Kerrest stated, in response to a question about the sales force integration,

> Yes. We are -- thanks a lot for the question, Jonathan. We are very excited about the integration of Auth0. We're very excited that it's been done in just under a year from where we are because we actually announced the acquisition a year ago tomorrow. As -- to start with, I think the most important point is the go-to-market organization, which we unified under Susan's leadership on February 1. You heard Todd talk about one team, which I think is a great position to be in. We've put together a lot of the core

systems that we're using to run the business. Those are all running on one platform. *So we have one pane of glass and good visibility into all that and how it's working. There's a couple more pieces we need to finish up in terms of ticking and tying some of the systems on the back end, but those are just making sure that we're working as one organization going forward.*

**\*12** *Id.* ¶ 156.

On the same call, McKinnon stated,

> *What we're getting is we're getting synergy on the -- really on the sales side. So we have -- all of the Okta reps now can sell all the products. So we increased the capacity. We can -- we increased what they can actually sell. So there's tons of upside from that.* But Eugenio has a big job to do with the Auth0 product unit, driving that. They just delivered -- you heard the results. They delivered over 80% growth, and we expect them to produce a lot in the year ahead.

*Id.* ¶ 157.

Three months later, on an earnings call on June 2, 2022, Defendant McKinnon responded to a question regarding the sales integration process as follows:

> ... We just celebrated the 1-year anniversary of joining forces with Auth0, which is great. And as we've said in the past, the key here is keeping the momentum going in both Okta and Auth0. Both businesses were doing very well, and that's the continued focus. *We've made a lot of progress as a combined company.* Many parts of the back office functions were integrated over the course of FY'22, *which is great. And we started Q1 with the combination of go to -- combining the go-to-market organizations.*

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

I think there's no real finish line when it comes to integrations. But I think we're really focused on addressing this massive customer identity access management market in a way that, frankly, no other vendor can in terms of independence and neutrality, we have the only 2 modern public cloud solutions and certainly no in-house IT can. **So I think we've made great progress. There's still a little bit to do, but we're in good shape.**

*Id.* ¶ 162.

On the same call, Defendant Tighe stated:

> *And any integration or acquisition and integration of 2 companies, the sales integration is one of the biggest milestones there are. And for this integration between Auth0 and Okta, 2 great sales teams being brought together, it's no different, right? It was a great milestone for us. It was a big one for us, and we're pleased with the progress, thus far.*

*Id.* ¶ 163.

Suspending for the moment the question of *why* Okta scrapped the original integration plan, the complaint alleges with particularity that around December 2021 the company decided to abandon the integration plan it had had in place for months, and that on just two weeks' notice Auth0 and Okta sales employees found out they would sell each other's products while lacking the training to do so. CW2 was Senior Vice President and General Manager of the Americas, who worked for the company from August 2018 until July 2022. *Id.* ¶ 39. CW2 was "intimately involved" in the Auth0 integration, spending "eight hours per day over a period of six or seven months putting together the integration plan." *Id.* CW2 recalled that the original plan involved retaining Auth0 employees for approximately one year, while they continued to sell Auth0 products and train and educate Okta employees on those products. *Id.* ¶¶ 78–79. Meanwhile, Okta employees would continue selling Okta products. *Id.* ¶ 79. However, after Okta scrapped this plan around December 2021, sales employees were given just half a month's notice before they would begin selling each other's products, rather than one year

of working together before Okta employees began selling Auth0 products. *See id.* ¶¶ 81–83. According to CW2, neither Okta nor Auth0 employees had knowledge of each other's products and did not receive training or education on each other's products. *Id.* ¶ 92.

**\*13** Having chosen to publicly tout the integration of the sales team, it was incumbent on defendants "to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cut[ ] against the positive information." *See Schueneman*, 840 F.3d at 705–06 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)) (internal quotation marks omitted). For instance, Defendant Kerrest's statement that "[t]here's a couple more pieces we need to finish in terms of ticking and tying some of the systems on the back end" makes it sound like the company was just tying up loose ends, not that they needed to retrain the entire salesforce in the basic functions of their jobs. *See* AC ¶ 155. Defendant Tighe similarly referred to the integration as "seamless" and implied that "[n]ow that the back office and go-to-market teams have been fully integrated," all that remained to do was "refine our systems and processes[,]" which a reasonable investor would not understand to mean retraining hundreds of employees. *See id.* ¶ 155. Defendant McKinnon's statement that they had "increased the capacity" of the sales reps and that there's "tons of upside from that" because "all of the Okta reps now can sell all the products" likewise omits the material fact that the reps were not in fact capable of selling the products because they lacked the knowledge and training to do so. *See id.* ¶ 157.

The Court disagrees with defendants' characterization of these statements as inactionable corporate puffery. "The statements went beyond mere optimism by providing a concrete description" of the sales team integration. *See Glazer Capital Mgmt.*, 2023 WL 2532061, at \*15 (cleaned up). Defendants represented that the teams were now "fully integrated," whereas Lead Plaintiff alleges that "neither Okta employees nor Auth0 employees had knowledge of each other's products" at this point. AC ¶¶ 155, 164.

Nor do these allegations suffer from a lack of scienter. Whether or not the newly integrated sales team that Okta touted was in fact trained to sell the products they were tasked to sell, following the $6.5 billion acquisition of Auth0, is of such prominence "that it would be absurd to suggest that top management was unaware of [it]." *See Berson*, 527 F.3d at 989 (citation and internal quotation marks omitted). The Court finds the statements the individual defendants

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

made on the March 2 and June 2, 2022 earnings calls to be actionable under the facts alleged in the complaint and DENIES defendants' motion to dismiss claims based on these statements.

### 3. Risk Disclosures in March and June 2022

What remains, then, of the Auth0 integration statements are Lead Plaintiff's allegations that Okta's risk disclosures in SEC filings in March and June 2022 were materially false or misleading. In its Form 10-K filed March 7, 2022, and in its Form 10-Q filed June 3, 2022, Okta made the following risk disclosure regarding the acquisition of Auth0:

> *Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers, disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated.*

AC ¶¶ 159, 165. Lead Plaintiff alleges that this was materially false or misleading because defendants knew that the risk warned of had already materialized, i.e., that defendants "knew or recklessly disregard the fact that the Company had lost senior Auth0 and key Okta employees, who were critical to the Auth0 integration and that, as a result, the Company could no longer maintain a team of specialized staff for Auth0 products." *Id.* ¶ 154.

### a. Misstatements

Although it is a close call, the Court agrees with defendants that the allegations here regarding employee attrition are not sufficiently particularized to meet the pleading threshold of Federal Rule of Civil Procedure 9(b) and the PSLRA.

With regard to the loss of senior executives, as already explained above, the complaint alleges that three Auth0 executives departed before Okta even created the original integration plan, so it cannot be that their departure is what caused the integration plan to fail. The complaint also lacks

any allegation that Okta represented that these executives would stay on, or that their departure was not part of the acquisition plan. *See* AC ¶¶ 65, 67. The same is true of the allegation (untethered to any time period) that Okta executives "pushed out" all of the (unnamed) " 'founding fathers' of Okta as well as other employees that helped build the Company—approximately 75-80% of the VPs and SVPs." *See id.* ¶ 67. In fact, as we know, two of Okta's co-founders, McKinnon and Kerrest, stayed on in their roles at the company. *See id.* ¶¶ 32, 34.

**\*14** With regard to the loss of salespeople and Auth0 employees generally, the complaint is not sufficiently specific to raise a reasonable inference that the March and June 2022 risk disclosures were materially false or misleading when made. CW2 explained that Okta intended to retain 200 to 300 Auth0 sales employees and to bring on additional sales staff. *Id.* ¶¶ 79, 81. But the complaint gives no concrete sense of how many employees were lost and on what timeline. For instance, the complaint lacks context for CW1's statement that "only about 15% of the Auth0 employees who moved to Okta during the acquisition are still at the Company," or for CW2's statement that "there are 'very, very few' Auth0 people left." *Id.* ¶¶ 89, 92. Neither of these confidential witnesses specify the time period they are referring to, and both CW1 and CW2 have since left the company. *See id.* ¶¶ 38 (CW1 departed in April 2022), 39 (CW2 departed in July 2022). It is unclear from the allegations whether they meant that there were few Auth0 people left as of the filing of the amended complaint or at some earlier time.

Without more specifics, the Court cannot find that the complaint pleads with particularity that the risk disclosure statements regarding possible employee attrition "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *See Brody*, 280 F.3d at 1006.

### b. Scienter

Moreover, the complaint does not allege with particularity what the individual defendants knew regarding employee attrition and when. Although the defendants would certainly have known about the departure of high-level executives, it is not clear when the attrition of line-level sales employees would have risen to the point at which the individual defendants would have found out or would have been reckless in not knowing.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 287 of 573
In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)
2023 WL 2749193

The complaint is silent about the individual defendants' knowledge of employee attrition until the quarterly call on August 31, 2022, when Defendant McKinnon stated, "While we are making progress, we've experienced heightened attrition within the go-to-market organization as well as some confusion in the field, both of which have impacted our business momentum." *See* AC ¶ 194.

This statement does not, as plaintiff argues, provide proof of defendants' earlier scienter. The Ninth Circuit's decision in *Ronconi v. Larkin* is instructive. 253 F.3d 423 (9th Cir. 2001), *abrogated on other grounds as explained in Glazer Capital, 2023 WL 2532061, at \*11*. There, the plaintiffs alleged that the defendants' statements attributing low third quarter earnings to post-merger issues amounted to a "later statement by the defendant along the lines of 'I knew it all along.' " *Id.* at 432. The Ninth Circuit disagreed, explaining, "The statement does not support an inference that company insiders knew or with deliberate recklessness disregarded that the problems would be so substantial.... [T]he later statement admits only that the below-expectation earnings in the third quarter were a result of the prior integration of the companies' sales force, which concedes no intentional or deliberately reckless falsehood or deception at all." *Id.* Here too, Defendant McKinnon's August 31, 2022 statement attributing mixed financial results in part to "heightened attrition" does not support the inference that the individual defendants acted with intent or deliberate recklessness in issuing the earlier risk disclosures containing general warnings about possible attrition.

Plaintiff also makes an argument for corporate scienter through the knowledge of Okta executives Susan St. Ledger and Steve Rowland. Opp'n at 34 (citing AC ¶¶ 67, 80). Yet the complaint is silent as to what these executives knew regarding attrition of the company's salesforce, other than stating that they were involved in weekly status updates and "signed off on everything" regarding the integration plan. *See* AC ¶ 80.

Even viewing the allegations of the complaint holistically, the Court finds scienter regarding employee attrition lacking. Plaintiff's theory is that the loss of key executives and the mass exodus of salespeople caused defendants to have to abandon their original integration plan. But the complaint does not actually provide details to show this happened. The complaint implies—but does not actually allege with specificity—that the decision in late 2021 to abandon the initial integration plan was *because of* the departure of too many employees. On this, CW2 stated simply that "the finance team determined that there was 'no way' that the integration plan was 'humanly possible' for FY2024 and 'completely shut it [the integration plan] down.' " *Id.* ¶ 81. And although CW2's perspective was that the integration plan "was ripped out at the eleventh hour," the complaint also states that the reason employees were not notified about the change until mid-January was so as not to disrupt the fiscal year end. *See id.* ¶ 83 (internal quotation marks omitted). This might be a different situation if Okta had told investors it was going to retain specific executives while hiding that those executives had already left or would do so soon. *See Moradpour v. Velodyne Lidar, Inc.*, No. 21-cv-1486-SI, 2022 WL 2391004, at \*13–14 (N.D. Cal. July 1, 2022). There are no allegations that Okta told investors that it would retain a certain percentage of its workforce and then hid that it had not met those figures. Nor are there allegations that Okta was secretly plotting to terminate employees while publicly saying they would retain them.

**\*15** In sum, drawing all reasonable inferences in Lead Plaintiff's favor, what Lead Plaintiff describes is: following the acquisition of Auth0 in May 2021, some executives departed; and over some period of time ("around fall 2021," according to CW6) the company was not able to retain its line-level salesforce; and in December 2021 Okta's finance team pulled the plug on the original sales team integration plan. Then on August 31, 2022, Defendant McKinnon cited "heightened attrition" as one of the factors causing "headwinds" with the integration, which resulted in the company lowering its calculated billings outlook for the year by $140 million and reevaluating its FY26 targets. *See* AC ¶¶ 126–29. These allegations are not sufficiently particularized to create a strong inference that the individual defendants knew or recklessly disregarded material facts regarding employee attrition when they signed off on the risk disclosures on March 7 and June 3, 2022.

That Lead Plaintiff alleges no suspicious stock sales by senior executives also cuts against the inference of scienter, particularly where the complaint is lacking overall in allegations creating a strong inference of scienter as to employee attrition. *Cf. In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 212 L. Ed. 2d 233, 142 S. Ct. 1227 (2022) ("Allegations of suspicious stock sales or information from confidential witnesses are not needed where, as here, other allegations in the complaint raise a strong inference of scienter.").

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 288 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

Accordingly, the Court GRANTS the motion to dismiss claims regarding employee attrition as contained in the March and June 2022 risk disclosures, with leave to amend these allegations.

**B. Data Security Incident**

With regard to Okta's data security and the January 2022 incident, the complaint identifies five statements as false or misleading. *See* Opp'n at 12 (citing AC ¶¶ 143, 145, 159, 167–68). The Court finds these allegations fail to plausibly allege either falsity or scienter and so do not give rise to a claim under the PSLRA as currently stated in the complaint.

**1. Okta's Commitment to Data Security**

First, the statements Lead Plaintiff highlights regarding Okta's "commitment" to data security are not actionable. *See* AC ¶¶ 145 ("security is of the utmost importance to us"), 159 ("security is a mission-critical issue for Okta and for our customers"). [8] Such statements "amount to vague and generalized corporate commitments, aspirations, or puffery that cannot support liability under Section 10(b) and Rule 10b-5(b)." *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 708 (in suit alleging cybersecurity vulnerability, statements about Google's commitment to privacy and data security "do not rise to the level of 'concrete description of the past and present' that affirmatively created a misleading impression of a 'state of affairs that differed in a material way from the one that actually existed.' ") (citation omitted).

[8]    Plaintiff concedes that it misattributed the statement quoted in paragraph 145 of the complaint, and that the statement was made by an Okta customer rather than an Okta VP. *See* Opp'n at 19 n.8.

**2. September 15, 2021 Conference Statement**

Lead Plaintiff also challenges more specific representations that defendants made regarding data security. However, the complaint lacks particularized allegations showing that these statements were materially false when made. For instance, Lead Plaintiff challenges the following statement (in bold and italics) that Defendant McKinnon made at the Citi Global Technology Virtual Conference on September 15, 2021:

So if you really get to this -- to get to this real Zero Trust capability, one of the things you have to do is you have to make sure that you know, you have an inventory and you have an accurate representation of all the machines. So you have to have like a catalog of the machines. And then that's sometimes daunting enough. But then you have to make sure that you don't just -- you allow that machine to only do the minimum amount of things that it should be -- it should have to do.

**\*16** You can't just access anything on the network. You can't just potentially be a launching-off point for other attacks throughout your network. It has to be locked down to exactly what it has to be able to do. And to do that, you -- 9 times out of 10, you have to know the people that can do certain things from that machine. And that's the tricky part because a lot of these machines, they have a certain role that they do just in terms of processing kind of no user-related process and information around. ***But then they're left -- the administration accounts or the admin or the super user accounts are left open because it's easy for the engineers to drop in there and, like, do some admin things and maintain some network things.***

And that's why -- that specific problem. Imagine the server in the server closet. You did a good job at Zero Trust. You took an inventory of the assets. You know this machine only should be able to access this other physical area of the network. You've really locked it down. But then you can log into that with an admin count and get anywhere.

AC ¶ 143. The complaint argues McKinnon's statements were false and misleading "because they omitted the material facts that Okta was not properly securing its administrative tools for monitoring customer tenants and that the Company failed to require its sub-processors to comply with the Company's fundamental security requirements." *Id.* ¶ 144. Yet plaintiff's assertion is not supported with specific factual allegations in the complaint.

The complaint relies on two confidential witnesses who stated that Okta could have done better in securing SuperUser access. CW6 was a Senior Solutions Engineer at Okta from February 2019 through December 2021 and who had SuperUser access. *Id.* ¶ 43. CW6 "suggest[ed] that the SuperUser tool should have been more closely guarded against hackers" and that "best practice" would have been to add additional safeguards such as requiring SuperUsers to access the tool only from a secure administrative station

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)
Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 289 of 573

2023 WL 2749193

and not from their home laptops. *Id.* ¶ 100. CW7, an Okta Senior Solutions Engineer who stopped working for the company in March 2021, "advised that, in her opinion, Okta did not properly secure its administrative tools for controlling different cloud tenants[.]" [9] *Id.* ¶¶ 44, 102.

[9]   The complaint does not state that CW7 had SuperUser access.

For several reasons, the accounts of CW6 and CW7 are not sufficient to support the assertion that Okta failed to require its sub-processors to comply with Okta's fundamental security requirements. For one, neither witness states what the complaint says they do—that Okta did not require its sub-processors to comply with Okta security requirements. Moreover, the opinion of CW7 is of little utility, where CW7 stopped working for Okta in March 2021, roughly ten months before the security incident occurred. *See id.* ¶ 44. In fact, CW6 herself explained that SuperUser access became more restrictive after June 2021. According to the complaint, CW6 recalled that "prior to June 2021, Okta had granted Solutions Engineers full SuperUser access, meaning they had full read and write access to customer tenants. However, CW6 recalled that Okta restricted Solutions Engineers' SuperUser access to read-only after June 2021 ...." *Id.* ¶ 147. Finally, it is unclear how the SuperUser allegations relate to the January 2022 incident, as nowhere does the complaint allege that the incident resulted from the breach of a SuperUser account. Plaintiff's brief argues that "the Company experienced a significant data security breach that was *caused by* Okta's failure to secure its administrative tools, such as the 'SuperUser' tool," but the complaint itself does not say this. *See* Opp'n at 7 (citing AC ¶¶ 98–104) (emphasis added). At the hearing, plaintiff's counsel conceded this, clarifying that plaintiff does not allege that SuperUser status was available to third party sub-processors such as the one whose account was compromised in January 2022. Rather, plaintiff's counsel stated that the SuperUser example shows that defendants were on notice that Okta was susceptible to a data breach.

**\*17**   More fundamentally, it is not clear from the excerpt quoted in the complaint exactly what Defendant McKinnon is talking about at the September 15, 2021 conference. He could be opining on ZeroTrust as a concept, talking about aspirations that Okta has, or describing a specific data security approach that Okta has already implemented. And as defendants point out, the statement does not even mention sub-processors. *See* Mot. at 11.

For all of these reasons, without more information the Court cannot find the complaint sufficiently alleges the statement McKinnon made on September 15, 2021, was false or misleading when made.

### 3. March 7, 2022 Risk Disclosure

Plaintiff also challenges the risk disclosure that Okta made in its Form 10-K, filed with the SEC on March 7, 2022. In its lengthy risk disclosures, Okta made the following statement related to data security: "***An application, data security or network incident may allow unauthorized access to our systems or data or our customers' data, disable access to our service, harm our reputation, create additional liability and adversely impact our financial results***." AC ¶ 159.

Plaintiff argues this statement was false and misleading because the risk warned of had already materialized: "Specifically, Okta had experienced the January 2022 Breach due to unsecured administrative tools used for monitoring cloud tenants and the failure to require sub-processors to comply with Okta's fundamental security requirements." *Id.* ¶ 160. In their motion to dismiss, defendants argue that not every security incident requires disclosure, and they dispute plaintiff's use of the term "breach." Instead, defendants state that the complaint provides "no specific factual allegations that Okta was aware of a breach—let alone a material one— by March 2022." Mot. at 13.

Setting aside for now the parties' dispute regarding falsity, the claim must be dismissed for lack of scienter. Defendants argue, and the Court agrees, that the complaint fails to allege sufficient facts showing what, if anything, the individual defendants knew about the January 2022 incident at the time Okta's Form 10-K was filed on March 7, 2022. None of the CWs allege that the individual defendants knew about the incident by March 7, 2022. What the complaint states is that the incident became public on March 21, 2022, when hackers posted screenshots "showing what they claimed was Okta's internal company environment." AC ¶ 105. On March 22, 2022, at 4:23 a.m., Defendant McKinnon posted on his Twitter account:

In late January 2022, Okta detected an attempt to compromise the account of a third party customer support engineer working for one of our subprocessors. The matter was investigated and contained by the subprocessor. (1 of 2)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 290 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

We believe the screenshots shared online are connected to this January event. Based on our investigation to date, there is no evidence of ongoing malicious activity beyond the activity detected in January. (2 of 2)

*Id.* ¶ 106. Later that same day, Okta's Chief Security Officer issued a blog post that, according to 28 plaintiff, "admitted that Okta first detected the January 2022 Breach in January." *Id.* ¶ 108. The complaint also alleges that "[o]n March 25, 2022, Okta acknowledged that it sat on this information for almost two months before stating, 'We want to acknowledge that we made a mistake.' " *Id.* ¶ 111.

The complaint thus provides no particularized facts to support the assertion that *the individual defendants* were aware of the January security incident by March 7, 2022. In its opposition, Lead Plaintiff argues that "CW3 explained during an All-Hands Meeting following the January 2022 Breach, [that] Defendants informed Okta employees that Okta 'quickly' knew the breach occurred and shut the compromised account down." Opp'n at 28. This misrepresents what is stated in the complaint. The complaint states, "According to CW3, the data breach that occurred in January 2022 and was disclosed in March 2022 was discussed at the first All-Hands Meeting *following the breach being publicized by news outlets*[,]" i.e., after March 22, 2022. *See* AC ¶ 113 (emphasis added). Thus, CW3's allegations do not show that the individual defendants knew of the incident prior to March 7, 2022. Nor do later statements from Okta's CEO that "Okta detected an attempt to compromise the account of a third party customer support engineer" in January 2022 raise a strong inference that defendants were aware of the event in January. The complaint neither paints a picture of "widespread deception" nor does it "sufficiently allege the individual Defendants acted with scienter." *See Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 608.

 **\*18** Plaintiff also argues that it has adequately pled scienter under the core operations theory. Opp'n at 30, 32. "Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, ...; or witness accounts demonstrating that executives had actual involvement in creating [the fraud]." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citations omitted). Here, plaintiff has pled neither.

Finally, viewing the allegations of the complaint holistically, the Court still finds scienter lacking. Plaintiff essentially theorizes that because data security was the bread and butter of the company, it would be impossible for the individual defendants not to have known about the data incident when it happened. When conducting a holistic review of the complaint, courts "must also 'take into account plausible opposing inferences' that could weigh against a finding of scienter.... Even if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1006 (9th Cir. 2009) (quoting *Tellabs*, 551 U.S. at 323). Here, the Court cannot say that the allegations of the complaint are at least as compelling as the alternative innocent explanation, which is that a one-time attempted compromise of a third-party customer support engineer account that was "investigated and contained by the subprocessor" simply did not raise significant enough concerns when it happened to warrant alerting the company's CEO, CFO, and COO. *See* AC ¶ 106. This case is a far cry from *In re Alphabet, Inc. Securities Litigation*, on which plaintiff relies. That case involved an ongoing security glitch that the company learned had been leaving the private data of hundreds of thousands of users exposed for three years, and the complaint alleged that Google executives received an internal memo from legal and policy staff warning that disclosure of the security vulnerability would "almost guarantee[ ]" that Google's CEO would be brought to testify before Congress. 1 F.4th at 695–96. Here, the complaint lacks specific allegations regarding when the individual defendants learned of the security incident, nor does the incident on its face come close to the scale of the security concerns at issue in *Alphabet*.

### 4. Statements re: Customer Trust on June 8, 2022

Finally, plaintiff challenges statements that Defendant McKinnon made in a CNBC interview on June 8, 2022. Discussing the security incident that went public in March 2022, McKinnon stated,

And anytime there's any kind of hack, whether it's to a third party or what any kind of talk of a breach, there's a lot of concerns in the [sic] in the customer base because this is about trust. So, the first thing we did is we had these conversations. We talked to over 1000 customers face to face over, [sic] over video and had these conversations. I personally talked [sic] over 400. ***And got a ton of feedback***

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 291 of 573

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

*about what we could do better, how we could make sure that our support environment was not insecure, to make sure that we communicate better, to make sure that we are instill [sic] this trust. At the end of the [sic], I think we've been able to do that.*

...

*We're committed to making this a $4 billion a year company by fiscal year, fiscal year 26. So, that's, that's coming up quickly. So, we have to invest to grow to that scale and we've always done it with a balance of efficiency.* We've always made sure that our, that our growth rate and our [sic] and our cash flow generation was balanced towards that goal. *So, we think we're drawing the right balance to capture this market opportunity.* And I think over time you're going to see a very highly scaled profitable company that's going to help customers and capitalize on this big market opportunity.

**\*19** *Id.* ¶¶ 167–68 (underlined [sic]'s added by the Court).

Plaintiff alleges these statements were materially false and misleading when made "because Okta was actually losing sales as a direct result of the January 2022 Breach, which only compounded the severe problems the Company was having with the Auth0 integration." *Id.* ¶ 169. Plaintiff clarifies this argument in the opposition brief, charging that McKinnon's statement was false and misleading because "the January 2022 Breach had harmed Okta's reputation and sales, as customers no longer trusted the Company and were unwilling to increase their contracts or spend more money with Okta. [AC] ¶¶ 113-15." Opp'n at 23.

The complaint as it stands is not sufficiently particularized to show a false or misleading statement when made. For evidence that the company was losing sales, plaintiff relies on accounts from CW3, CW4, and CW8. CW3 reported "that the Company was saying that they were losing sales because of the breach," "that the breach did come up with every customer she spoke with," and that "the Company distributed 'talking points' to employees on how to 'downplay' the breach." AC ¶ 113. CW4 "recalled that prospective customers were deciding against doing deals with Okta after the breach." *Id.* ¶ 114. And CW8 "advised that Okta customers reacted negatively to the data breach Okta disclosed in March 2022." *Id.* ¶ 115. Although "CW8 could not recall whether customers were canceling contracts outright[,]" CW8 did recall that the negative customer reaction "impacted her ability to meet quotas." *Id.* "CW8 could not quantify the amount of lost

business, but she suggested it might have been 'tens of thousands of dollars' in lost business." *Id.*

These allegations lack particularity regarding how much sales Okta lost and when. With the exception of a single statement from CW8 estimating lost business in the tens of thousands of dollars, [10] *see id.*, nowhere does the complaint identify with particularity which sales or how many were lost as a result of the data security incident. Moreover, both CW4 and CW8 left the company around the time of the data security disclosure. CW4 worked as an Account Executive at Okta "until the first quarter of fiscal 2023," which began February 1, 2022. *Id.* ¶ 41. CW8 worked as a Senior Account Executive "until spring 2022." *Id.* ¶ 45. Without more detail regarding when they departed, it is unclear that CW4 and CW8 would have been positioned to know the status of sales when McKinnon gave his interview in early June. And CW3, who stayed at the company until August 2022, does not allege having personally lost a single sale as a result of the data security incident. *See id.* ¶¶ 40, 113.

[10]    The Court assumes, though the complaint does not specify, that this figure references lost business on CW8's own sales accounts.

For these reasons, the complaint as it stands fails to show that the statements McKinnon made on June 8, 2022, were materially false or misleading when made.

**C. Section 20(a)**
A claim under Section 20(a), which provides for control person liability, "must demonstrate: (1) a primary violation of federal securities laws and (2) that the defendant exercised actual power or control over the primary violator." (internal quotation marks and citation omitted). A control person claim under Section 20(a) requires a predicate primary violation. *See Webb v. Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018).

**\*20** Where the Court has found that plaintiff has sufficiently stated a Section 10(b) claim (i.e., with regard to the March 2 and June 2, 2022 earnings call statements regarding the progress of the integration), the Court also finds that plaintiff has stated a claim under Section 20(a). For the remainder of the claims, where the Court has found no Section 10(b) violation is sufficiently alleged, the Court likewise finds plaintiff has failed to state a claim under Section 20(a).

**II. Request for Judicial Notice**

In re Okta, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 2749193

Along with their motion and reply briefs, defendants also filed a request for judicial notice. Dkt. Nos. 57, 58, 69. As a general rule, the Court may not consider any materials beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, courts considering a motion to dismiss that is governed by the PSLRA may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322.

At this time, the Court declines to rule on defendants' request for judicial notice, as the Court did not rely on any of these documents in resolving the present motion.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby **GRANTS IN PART and DENIES IN PART** defendants' motion to dismiss, with leave to amend. The motion is GRANTED, except that the Court DENIES the motion as to omissions the individual defendants made regarding the Auth0 integration on the March 2 and June 2, 2022 earnings calls.

**The second amended complaint shall be due no later than April 28, 2023.**

When amending the complaint, Lead Plaintiff shall also attach a chart that lays out, concisely and with particularity, including paragraph citations to the second amended complaint: which statements Lead Plaintiff alleges were materially false or misleading; who made the statements; when the statements were made; and the facts (including dates) that Lead Plaintiff alleges render the statement false or misleading.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2749193

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

# Case No. 16

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 294 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

2005 WL 8158825
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

IN RE: PEREGRINE SYSTEMS,
INC. SECURITIES LITIGATION

CASE NO. 02CV870-BEN (RBB)
|
Signed 03/30/2005

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS (Docket Nos. 443,
452, 457, 468, 472, 474, 476, 481, 491, and 536)

ROGER T. BENITEZ, United States District Judge

## I.

### INTRODUCTION.

**\*1** This is a class action on behalf of all those who bought or acquired Peregrine Systems, Inc. ("Peregrine") stock between July 22, 1999 and May 3, 2002. ("Class Period"). During the Class Period, Peregrine overstated its financial results for the fiscal years 2000, 2001, and the first three quarters of 2002. On May 6, 2002, Peregrine announced it had discovered accounting irregularities during these fiscal years. Plaintiffs now seek damages based on the dramatic fall of Peregrine's stock following this statement.

Plaintiffs are divided into one main class and two sub-classes. The main class is represented by Lead Plaintiff the Loran Group.[1] The Loran Group includes all those who purchased or acquired Peregrine stock during the Class Period. The Loran Group seeks recovery under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b)78t(a), and the Securities Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5.

[1]   The Loran Group consists of lead plaintiffs David Levy, Leighton Powell, David Schenkel, John Virden, Conrad Willemse, Bill Holman, Bob Benesko, Michael Slavitch, Richard Maheu,

and Mark Rollins. (See, Amended Consolidated Complaint ("Complaint") ¶¶ 31(a)-(j).)

The two sub-classes are represented by Lead Plaintiff Heywood Waga and three individual named Plaintiffs--John Sutliff, M. Clifford Balch, Jr., and Alan Hylton. The sub-classes include those who obtained Peregrine's stock when it merged with Harbinger and Remedy Corporations. Heywood Waga and John Sutliff represent all persons and entities who held shares in Harbinger, but later acquired Peregrine's stock when Peregrine acquired Harbinger on or about June 16, 2000 ("the Harbinger Sub-Class"). M. Clifford Balch, Jr. and Alan Hylton represent those who held shares of Remedy, but then acquired Peregrine stock when Peregrine acquired Remedy on or about August 27, 2001 ("the Remedy Sub-Class."). These Plaintiffs seek recovery under Sections 11 and 15 of the Securities Exchange Act of 1933, 15 U.S.C. §§ 77k, 77*o*, as well as Sections 14(a) and 20(a) of the 1934 Act, 15 U.S.C. §§ 78n(a), 78t(a).

There were initially thirty one (31) related cases, which were consolidated. The initial consolidated complaint was dismissed with leave to amend. The operative Amended Consolidated Complaint will be referred to as "Complaint." The Complaint names as Defendants Peregrine management, board executives, and auditors.[2] All Defendants separately and/or jointly move to dismiss.[3] Individual Defendants will be referred to by their last names; the auditors--Arthur Andersen LLP and AWSC Société Coopérative, en liquidation, will be referred to as "Arthur Andersen" and "AWSC" respectively. Except when distinguishing among the Defendants, the Court uses "Defendants" to refer to all of Defendants collectively. When referring to Plaintiffs' Opposition, that reference is limited to the Opposition as to the particular Defendant's or Defendants' Motion.

[2]   The Complaint also names as Defendants Peregrine's Business Associates-KPMG, Inc., BearingPoint, and Larry Rodda. These Defendants have been dismissed and are no longer parties to this action. (See, Order dated January 19, 2005; docket No. 594.)

[3]   Defendant Douglas S. Powanda withdrew his Motion on January 26, 2005. (Docket No. 597.)

**\*2** At least three Defendants--Gless, Spitzer, Cappel--have pled guilty to securities fraud. Peregrine has also consented to entry of a Final Judgment in an action brought by the

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Securities Exchange Commission ("SEC"). SEC's complaint alleged:

> This case involves a massive financial fraud by defendant Peregrine Systems, Inc., a publicly traded San Diego-based software company. The purpose of the fraud was to inflate Peregrine's revenue and stock price. To achieve its unlawful purpose, Peregrine filed materially incorrect financial statements with the Commission for 11 consecutive quarters between April 1, 1999 and December 31, 2001 ... In February 2003, Peregrine restated its financial results for its fiscal years 2000 and 2001, and for the first three quarters of fiscal 2002. Peregrine reduced previously reported revenue of $1.34 billion by $509 million....

Accordingly, there is no question that Peregrine committed fraud. Now, the question is "who can be **held liable** for it." In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d 1018, 1020 (C.D. Cal. 2003) (Emphasis original). In this regard, the Court has already found that Plaintiffs state a Section 10(b) claim against Gardner, Gless, Spitzer, and Cappel. The Court has also found that Plaintiffs adequately state claims for control liabilities under Sections 20(a) and 15(a) against Gardner and Gless. These Defendants do not move to dismiss those claims. (See, e.g., Gardner's Motion at 3:7.) Thus, the Court's discussion of those claims will be limited to the remaining Defendants.

As to the remaining Defendants and claims, after reviewing all the papers submitted and hearing oral arguments, for the reasons that follow, the Court finds that Plaintiffs fail to state a: (1) Section 10(b) claim against Nelson, Luddy, Moores, Noell, Cole, van den Berg, Hosley, Savoy, Watrous, Dammeyer, Stulac, Arthur Andersen, and AWSC; (2) Section 14(a) claim against Moores, Cole, Hosley, Noell, van den Berg, Watrous, Stulac, and AWSC; (3) Section 20(a) control liability claim against Moores, Nelson, Noell, Cole, van den Berg, Hosley, Watrous, Savoy, Dammeyer, Stulac and AWSC; (4) Section 11 claim against AWSC, and (5) Section 15(a) claim against Moores, Savoy, Cole, Noell, Watrous, Arthur Andersen and AWSC.

However, Plaintiffs adequately state a: (1) Section 14(a) claim against Gless, Gardner, and Arthur Andersen; and (2) Section 11 claim against Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, and Arthur Andersen.

## II.

### FACTS.

"As required by Federal Rule of Civil Procedure 12(b)(6), the facts are presented in the light most favorable to the Plaintiffs. Under the incorporation by reference doctrine, [the Court] also consider[s] documents submitted by Defendants that were referenced in the [C]omplaint and whose authenticity has not been questioned." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 925 (9th Cir. 2003); seealso, United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) ("[A] document ... may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of plaintiff's claim."); Parrino v. FHP, Inc., 146 F.3d 699, 705-706 (9th Cir. 1998) ("A district court ruling on a motion to dismiss may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading."); Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) ("If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them."). But, "this is a narrow exception.... It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998). The Court will also "consider material which is properly submitted [or attached] as part of the complaint...." Parrino v. FHP, Inc., 146 F.3d 699, 705-06 (9th Cir. 1998).

 **\*3** The Court will not rely on or recite "legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." Clegg v. Cult Awareness Network, 18 F.3d 752, 755 (9th Cir. 1994). Judicial notice will be taken of the criminal records filed in this Court against certain Peregrine executives, and the Court will refer to them as needed. See, United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980) ("[A] court may take judicial notice of its own records in other cases, as well as the records

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

of an inferior court in other cases."); U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (Courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."); F.T.C. v. J.K. Publications, Inc., 99 F. Supp. 2d 1176, 1198 n. 61 (C.D. Cal. 2000) (Taking judicial notice of information contained in the criminal dockets of the Central District of California).

**A. Defendants.**

At the outset, Peregrine is not a defendant in this action, as it voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code. See, 11 U.S.C. § 362.

Turning to the Defendants, the following is the position, or relation, each had with Peregrine during the Class Period: **Gardner** was the President, Chief Executive Officer, director, and Chairman of the Board of Directors until his termination on May 3, 2002 [4]; Gless served as Chief Accounting Officer, Chief Financial Officer and director until May 5, 20 02 [5]; **Spitzer** was hired by Peregrine as Vice President, Alliances, later became Vice President, Managed Service Providers, and returned to his former position as Vice President, Alliances until he was terminated on June 28, 2002 [6]; **Cappel** acted as Treasury Senior Manager and later the Director of Treasury until June 2002. [7] Cappel's duties included financing accounts receivables, international collections, and forecasting cash and Days Sales Outstanding ("DSO") [8]; Nelson served as Vice President, Corporate Secretary, General Counsel, Vice President, Corporate Development, and Senior Vice President, IMG Operations; **Luddy** served as Vice President, Research and Development, and Chief Technology Officer; **Moores** was a director, and served as the Chairman of the Board of Directors from March 1990 until July 2000. Moores also chaired the Compensation Committee. Moores left Peregrine in February 2003; **Noell** was a director and served on the Audit and Compensation Committees; **Cole** was a director; **van den Berg** was a director and served on the Audit Committee until his resignation in October 2000; **Hosley** was a director and served on the Audit Committee until his resignation on June 15, 2000; Savoy became a director on June 15, 2000, the date of the Harbinger acquisition, on whose Board he served, through the end of the Class Period. He also served on the Audit Committee from October 17, 2000 to October 17, 2001; **Watrous** was director and served on the

Audit Committee; **Dammeyer** became a director on June 29, 2001 and also served as the Chairman of the Audit Committee from October 24, 2001; **Arthur Andersen** served as the accountant and auditor from July 1996 to April 5, 2002; **Stulac**, an employee and partner of Arthur Andersen, provided accounting and auditing services; and AWSC audited and reviewed international segments of Peregrine's business which were incorporated in Peregrine's published financial results. [9]

[4]     Gardner was recently indicted by the SEC.

[5]     On April 16, 2003, the SEC filed a Complaint against Gless which alleged that he violated, inter alia, Section 10(b) of the Exchange Act by knowingly or recklessly making misrepresentations and omissions of fact with the intent of materially misstating Peregrine's publicly reported financial results. That same day Gless pled guilty to a criminal information charging him with a conspiracy, beginning no later than June 1999, to commit, among other offenses, securities fraud.

[6]     On June 16, 2003, the SEC filed a complaint against Spitzer in this Court alleging that from at least December 1999, he knowingly or recklessly participated in a scheme by which Peregrine materially misrepresented its publicly reported financial results, including its revenue, in violation of, inter alia, Section 10(b) of the Exchange Act. That same day, a criminal information was filed against Spitzer charging securities fraud, to which he pled guilty.

[7]     On November 22, 2002, the SEC filed a Complaint against Cappel alleging that she committed bank fraud by selling falsified and illusory Peregrine receivables to banks. That same day, Cappel pled guilty to a criminal information charging her with a scheme beginning no later than June 1999 to defraud a federally insured bank by making false statements, misrepresenting the true financial condition of Peregrine, and fabricating invoices.

[8]     DSO is the average number of days that a company needs to collect its accounts receivable.

[9]     Defendant Douglas S. Powanda withdrew his Motion without prejudice on January 26, 2005.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 297 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Therefore, his relation to the case will not be discussed in this Order. (Docket No. 597.)

**B. Why the Fraud Was Committed.**

**\*4** At all relevant times, Peregrine developed and marketed software products that enabled business customers to reduce infrastructure costs and increase efficiency. Peregrine also developed and marketed business-to-business and integration software to reduce the costs of electronic commerce.

By the beginning of the Class Period, Peregrine sought to grow through acquisitions and other strategic alliances. This expanded Peregrine's product menu for asset management, fleet management, facilities management, rail management and telecommunication management. Peregrine used its stock to pay for the acquisitions and strategic alliances.

Income from software licensing substantially represented Peregrine's revenues and played a significant role in determining the market value of its stock. The higher the price of Peregrine stock, the fewer the number of shares Peregrine would have to issue for each acquisition. Peregrine's executives--who owned a substantial number of Peregrine stock- also did not want the value of their holdings diluted by issuing too many new shares.

Accordingly, Peregrine chose to report high revenues so that investors could expect record sales and earnings growth to continue quarter after quarter. With an increasing share price, Peregrine was able to complete at least thirteen (13) acquisitions or strategic alliances during the Class Period, with an announced value exceeding $3.4 billion. The most significant of its acquisitions included: (i) the June 2000 acquisition of Harbinger Corporation, which provided software enabling e-transaction management and other e-business products and services; (ii) the December 2000 acquisition of IBM's Tivoli Service Desk and customer base enabling; and (iii) the August 2001 acquisition of Remedy Corporation, a supplier of IT service management and customer relationship management software. These acquisitions were stock for stock mergers.

**C. How the Fraud Was Committed.**

**1. Improper Revenue Recognition.**

Peregrine had two kinds of software customers: end users and resellers. Peregrine initially sold software almost entirely to end users. In or about 1996, Peregrine started partnering with resellers to broaden its product distribution. Early in

Peregrine's partner program, resellers bought product from Peregrine only when an end user was already identified and ready to buy. In these transactions, "sell-in" and "sell-through" were synonymous. Over time, Peregrine sought to increase its sales and earnings through large sell-in channel deals without identified or committed end users.

Generally Accepted Accounting Principles [10], or "GAAP", prohibits recognition of any revenue from sales to channel partners unless specific criteria are met. Peregrine represented in its filings with the SEC that it recognized revenues consistent with GAAP. In the Form 10-K Peregrine filed with the SEC on or about June 29, 1999 (shortly before the Class Period), Peregrine set forth its revenue recognition policy on sales of license agreements:

> Revenues from license agreements are recognized currently, provided that all of the following conditions are met: a noncancellable license agreement has been signed, the product has been delivered, there are no material uncertainties regarding customer acceptance, collection of the resulting receivable is deemed probable and risk of concession is deemed remote, and no other significant vendor obligations exist.

**\*5** Peregrine made a similar representation about its revenue recognition policy in each of its quarterly and annual reports filed with the SEC during the Class Period.

[10]    Generally Accepted Accounting Principles, or GAAP, are "a series of general principles followed by accountants." United States v. Basin Elec. Power Coop., 248 F.3d 781, 786 (8th Cir. 2001). More specifically, GAAP "are the official standards adopted by the American Institute of Certified Public Accountants (the 'AICPA'), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the 'APB'), and the Financial Accounting Standards Board (the 'FASB')." Ganino v. Citizens Utils. Co., 228 F.3d 154, 160 n. 4 (2d Cir. 2000).

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

To achieve the appearance of increasing revenue, Peregrine began to violate its own revenue recognition policy. On its reseller deals, Peregrine prematurely recognized revenue when it entered into an agreement with the reseller. Under the agreements, however, the reseller either had no obligation to pay Peregrine or the payment was contingent on a further sale to end users. In other words, Peregrine recognized revenue before one or more conditions under GAAP were met—(i) before the fee owed to Peregrine was not fixed and determinable; (ii) before collectability of the fee was probable; or (iii) while the resellers' obligation to pay for the product was still contingent on subsequent sale of the product to an end user. Peregrine also recognized revenue on "swap" transactions. Swap transactions lack economic substance. They involve the contemporaneous buy and sale of a product, designed solely to increase reported revenue.

Peregrine's decision to prematurely recognize revenue dated back to late 1998 and early 1999. During that time, Peregrine's board authorized recording of revenue based on the sell-in method. In 1999, for example, a meeting took place in Powanda's office. Gardner and the then Chief Financial Officer Farley (now deceased) were present. During the meeting, there was a discussion as to whether revenue would be recognized currently on a transaction with IBM Global Services. Gardner told Powanda that Peregrine would book IBM's pre-commitments as revenue so that Peregrine could meet revenue goals.

A former Peregrine employee, who was a Director of the InfraCenter Workgroup ("ICW Group"), a group within the Alliance Group, recalls:

> I was involved directly in a conversation in early 1999 with Doug Powanda, who I reported to specific to I believe IBM Global Services which is one of the very first deals where channel stuffing was involved -- Powanda stated to me that Farley had told him that "we can begin to recognize pre-commitment sales in Q4, January-March 1999" -- Powanda told me that "we can really start to use it" referring to booking pre-commitments ... When I commented [to] him that we can't do this since I believed it to be wrong based on my prior experience with these matters, ... Powanda just naively shrugged his shoulders.

> I also remember that both Farley and Gardner popped their heads into Powanda's office during this meeting and acknowledged that we [should] go ahead with the IBM commitment. It was from this point in early 1999 that Peregrine had made the wholesale decision to book pre-

committed re-seller sales as revenue -- after they signed-off on the IBM deal that day in Powanda's office -- things really started to go downhill for Peregrine. Powanda was actually ready to fire Spitzer when he said that Spitzer will get the commitments and we will book them -- this was in the March-April 1999 time frame.

**\*6** Another former Director of the Alliance Group similarly recalled a meeting in late 1998 involving Powanda and Nelson, and Farley. During the meeting, they stated that from now on it would be company policy to book "commitments" from resellers as revenue irrespective of whether the reseller had a firm commitment from an end user.

Gardner, Gless, Nelson, Powanda and Spitzer then authorized Peregrine's sales personnel to enter into transactions with resellers where there was no obligation to pay Peregrine until the product was sold-through. Revenue on such transactions was recorded in full right away.

Gardner negotiated many of the larger pre-commitments from resellers which were improperly booked as revenue. After the revenue had been booked, Gardner and Gless oversaw Peregrine's efforts to assist sales by the resellers to end users so as to be able to collect money from the resellers on sell-through.

Gardner was actively involved in the improper revenue recognitions. As a former Peregrine employee, who was a Director of the ICW Group, recounts:

> In March of 2000 in a conversation with Spitzer, he talked about the intent of the company to prematurely book pre-commitments as revenue. Spitzer stated that "I am just following orders from Gardner and I am getting paid commissions on the pre-commitments as they are booked -- and I won't take the fall -- every quarter I vest my 28,000 option shares."

> I remember asking Spitzer where the deals were coming from that made our quarters when we are getting e-mails constantly to the effect that we are going to miss the quarter and then we make it at the last minute -- Spitzer told me that he was getting paid on these deals and that they were coming from Gardner - Spitzer told me that the deals that Gardner got involved in were all big and over $500,000.

Peregrine's practice of improperly booking revenue spread worldwide. As one former Peregrine employee, who was a Director of the ICW Group, recalled:

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 299 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8158825

> Powanda brought the practice of booking pre-commitments to Europe - he was head of European sales and later worldwide sales, then Europe again - Dominic O'Reilly and Jerry Crook were involved - Europe was heavily involved with the booking prematurely of pre-commitments in 1999 and 2000. O'Reilly was Gardner's buddy from a previous life - or company.

Also, on April 14, 1999, the Board officially adopted the use of the sell-in method of accounting. That is the Board abandoned the "sell-through" method of accounting and switched to the practice of recognizing revenue on agreements where there was no obligation to pay-the sell-in method. Accordingly, Peregrine would recognize revenues when it "sold" software to resellers, despite the resellers' lack of commitments from end users to buy the product. This is the heart of Peregrine's revenue recognition fraud which led to the false and misleading statements issued during the class period.

To make matters worse, Peregrine could not collect on the accounts receivable unless sell-through to the end user had occurred. For example, in the March/April 2000 time period, Peregrine made an effort to collect from 20 to 25 reseller partner accounts including accounts at O-E Systems, Barnhill and Corporate Software. The total value of these unpaid pre-commitments was more than $10 million. When these resellers were contacted, they expressed anger, telling Peregrine collectors that they were being billed net 30 days for the balance of their unpaid "commitments" despite the fact that Gardner and other executives from Peregrine had told them, at the time that the pre-commitments were made, that they did not have to pay for software until it was sold-through to the end user.

  **\*7**  As a former Peregrine employee who was a Director of the ICW Group and involved in the collection effort recalled:

> It was Spitzer who told me directly that the pre-commitments had been taken

into revenue by the company. O-E Systems was one account; Barnhill for $1.25 million was another -- Peregrine put this company in a box by extracting an unattainable commitment from them and then acquired them when they failed to pay; and Corporate Software was another -- there was a list of these accounts. When I started to call these partners they became very angry telling me that they were getting billed net 30 days for the balance of their unpaid commitments when they were told by Spitzer, Steve Gardner and others from Peregrine at the time of the commitments that they did not have to pay for software that they were unable to sell-through.

**2. Quarters Were Improperly Kept Open**

Peregrine engaged in other improper accounting practices to maintain the appearance of revenue growth. Peregrine held its books open for its reporting quarters past the end of the fiscal period, sometimes for as long as seven (7) days. By holding open the quarters, Peregrine added additional sales into the affected periods to artificially inflate its reported revenue. In its restatement, Peregrine admitted this:

> In addition, Peregrine previously recorded numerous transactions as revenue in a given period, although the sales order was not completed until after the end of the fiscal period. Revenue has been restated to record these transactions in the proper periods.

This practice of keeping the quarters open was widely known at Peregrine. As a former member of the Alliance Group recalls:

> Starting in 1999, Spitzer would tell me each quarter that if I had any outstanding deals pending, that I had a few extra days after the month's end in the quarter to process them - other Alliance managers were told the same thing.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 300 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Also, in 1999, it was routine at the end of a quarter to see John Moores, who had an office next door to our offices roam the halls of our building with Farley and Powanda. Moores and the others wanted to know how the quarter ended.

Another former Director of the Alliance Group stated that there were repeated occurrences where,

"We were not at the number for the quarter by the end of the month and then mysteriously we would hear that we had made the quarter. Quarters were held open as a practice each and every quarter over my six and one-half year tenure with the company ranging from 2-5 days after the calender end of the quarter. It was an ongoing joke in the company and was referred to as being the 34 [th] or 35 [th] of the month. It got worse quarter by quarter after 2000 when the prevailing attitude in the company was that we had to make our quarters at all costs."

One other former employee of Peregrine, who worked in sales at the ICW Group, recalled:

I can recall specifically by e-mail and through verbal directives coming from Bill Moore, Doug Powanda and Maree Chung, that we were going to keep the quarter open for 3 days, 4 days and sometimes 7 days specifically referring to each quarter ending in March 2000, June 2000, September 2000 and December 2000, The relayed intent was to bring in more sales so that the company could meet its earnings targets for the previous quarter....

**\*8** Another former employee, who also worked in sales, recalled:

Leaving the quarter open happened on a regular basis ... it was almost on a "wink-wink" basis. It was standard operating procedure. My earliest recollection was in 2001. The quarter would stay open if we had not made our number or if we were close to making our number - I remember that quarters were left open from 2001 until when I left the company ...

I remember specifically at the end of the fiscal year 2001, March 2001 that Andy Cahill, a senior sales manager, wandered into Inside Sales--he knew and understood that we were still working on deals for the quarter when the quarter should have been closed.

### 3. Improper Balance Sheet Accounting

As noted above, Peregrine booked revenue on contingent sales agreements. Peregrine thus accumulated funds in accounts receivable. This increased Peregrine's DSO. DSO represents the average number of days a company takes to collect on its accounts receivable. Analysts and investors then use the DSO to assess the quality of a company's receivables and revenue.

Defendants manipulated Peregrine's DSO. Specifically, Gless, after consulting with Gardner, instructed Cappel to remove receivables from Peregrine's balance sheet by "selling" them to banks. Accordingly, at the end of each quarter, Cappel would calculate the dollar amount of receivables that had to be "sold" to banks to reach a target range set by Gardner and Gless for the DSO, and "sold" the requisite amount for cash. The receivables were then removed from Peregrine's balance sheet. This practice was not disclosed in Peregrine's public statements, and created the appearance that Peregrine's customers were paying on a more timely basis than they actually were. The practice also concealed the contingent sales into which Peregrine entered.

For example, toward the end of the quarter ending June 30, 1999 (first quarter of fiscal year 2000) Peregrine had "sold" all available accounts receivable but still had not reached its targeted DSO. Thus, Cappel and Gless prepared invoices for transactions, which had not yet closed, for $12 million, and then sold them to banks as receivables. When some of the contracts ultimately did not close, Peregrine was left with a shortfall of several million dollars.

In June 2001, Cappel told Gless that Peregrine would miss the targeted DSO for the quarter. With Gless's approval, Cappel created a false invoice in the amount of $19.58 million and sold it to a bank. Peregrine's cash flow was thereby overstated and its accounts receivable were understated.

Peregrine also distorted and falsified its DSO and balance sheet by improperly accounting for cash collected from its customers. Peregrine had agreed with its banks that Peregrine would collect on receivables that it "sold" to the banks, and

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 301 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

remit payment within a certain time. Peregrine, however, would reduce its accounts receivable when it "sold" the accounts to a bank while still retaining the monies from the collections on these accounts until such time as it had to pay them to its banks. When Peregrine collected from the customers whose receivables had been "sold" to banks, Cappel would again reduce Peregrine's accounts receivable, thus resulting in what Cappel called a "double dip."

 **\*9** Peregrine also failed to include its liability to the bank for these "sales" and would record the cash received as its own instead of holding it in trust for the bank. Peregrine would then remit the payments to the banks in the next quarter and reverse the "double dip" entries. These "double dips" occurred almost every quarter beginning in September 1999. The double dips resulted in artificially reduced accounts receivable as well as an artificial increase in Peregrine's reported cash.

For example, on December 11, 2001, a Peregrine customer made an early payment of $13.8 million on a receivable which Peregrine had sold to a bank. The customer's payment was not due until February 13, 2002. Peregrine's contract required it to receive and hold payments in trust and remit them within two weeks. Instead, Peregrine did neither. As a result, its accounts receivable for the quarter were understated by $13.8 million as was its liability to the bank.

Peregrine's transactions with its banks did not constitute a "sale" of the receivables. Rather, these transactions were nothing more than borrowings from the banks. Peregrine routinely borrowed money from lenders and treated the funds as proceeds from the sale of assets as opposed to borrowings. The amount of the undisclosed liabilities reached up to $180 million during the Class Period and exceeded $100 million by the end of the Class Period. This significantly understated Peregrine's liabilities.

In its restatement, Peregrine admitted that "these factoring arrangements should have been recorded as loans instead of sales of receivables." Accordingly, Peregrine restated its balance sheet to reflect the accounts receivable and related bank loans. As of March 31, 2000 and 2001, Peregrine's undisclosed liability on these loans was approximately $90 million and $180 million, respectively.

### 4. Concealment Of Write Off Of Receivables

Peregrine also violated GAAP by including the write off of receivables in the expense category of "Acquisition costs and other," and in other accounts. For example, Peregrine did

so with respect to a $3 million receivable of Barnhill as of March 31, 2000. In a June 6, 2002 letter to the SEC, KPMG, Peregrine's business associate, stated that they had advised Peregrine "and its audit committee that the classification of the write offs of accounts receivable or revenue reversals recorded as an " 'Acquisition costs and other' expense in [Peregrine's] statement of operations was not in accordance with generally accepted accounting principles."

As admitted by Peregrine in its restatement, "[m]any accounts receivable balances arising from improperly recorded revenue transactions ... were inappropriately charged to bad debt expense, cost of acquisitions or accrued liabilities. The restated results reflect those transactions as reductions in previously reported revenue."

### 5. Understatement Of Stock Option Compensation

Peregrine also understated the represented value of its stock option compensation by about $100 million. In its restatement, Peregrine admitted:

> Based on Peregrine's past practice, many employee stock options contained exercise prices that were below the common stock market values on the dates the options were granted. Under APB Opinion No. 25, the Company should have recorded compensation cost equal to the aggregate difference between the fair value of the stock and the exercise price of the options granted. The Company also accelerated the vesting periods for certain options which had previously been granted to employees. Under FASB Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation, an Interpretation of APB Opinion No. 25" ("FIN 44"), the acceleration of vesting of stock options after June 30, 2000 could cause an accounting charge for the affected options. The consolidated financial statements, as restated, now reflect the appropriate accounting for stock options.

### 6. Failure To Implement And Maintain Adequate Internal Accounting Controls

 **\*10** Peregrine failed to implement and maintain adequate internal accounting. According to the Complaint, Peregrine's accounting did not comply with The Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78m(b)(2). FCPA was designed to ensure accurate record-keeping to strengthen the accuracy of corporate books and records.

2005 WL 8158825

Moreover, the Complaint alleges, SEC Rule 13b-2, promulgated under FCPA, was enacted to: (i) assure that an issuer's books and records accurately and fairly reflect its transactions and the disposition of assets, (ii) protect the integrity of the independent audit of issuer financial statements that are required under the Exchange Act, and (iii) promote the reliability and completeness of financial information that issuers are required to file with the Commission or disseminate to investors pursuant to the Exchange Act.

To comply with the FCPA, GAAP and SEC rules, and to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a public company is required to establish and maintain adequate internal financial and accounting controls. Contrary to the requirements of the FCPA, GAAP and SEC rules, Defendants failed to implement and maintain adequate internal accounting and financial controls and Arthur Andersen and AWSC had knowledge of such deficiencies. The Complaint also alleges Peregrine's lack of adequate internal accounting was a "red flag" for Defendants.

### D. The Resulting False Statements.

Peregrine reported eleven (11) quarterly revenue increases during the Class Period. Peregrine also reported annual revenue increases for the years 2000 and 2001. These statements appeared in press releases, SEC filings and analysts' reports. According to the Complaint, all the statements "were materially false and misleading because Peregrine's reported revenue was materially overstated, there was no disclosure of a material change in its accounting policy as applied to the first quarter of fiscal year 2000, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated...." (Seee.g., Complaint ¶ 512.) The Complaint also sets forth other reasons that are specific to some of the statements, which will be set forth below. The alleged misstatements from each quarter are discussed in turn.

### 1. 1st Quarter of 2000 (April 1, 1999 to June 30, 1999)

On July 21, 1999, Peregrine issued a press release stating it had achieved "record" quarterly revenues of $51.6 million for the first quarter of fiscal year 2000, ending June 30, 1999. Peregrine further stated that "[o]verall results were driven by a 131 percent increase in license revenue over the comparable quarter in the prior year." Gardner was quoted: "We are extremely pleased with the outstanding growth in both our

software license sales and our professional services activity in the first fiscal quarter...."

All Defendants, except Savoy and Dammeyer, read and approved the press release. Nelson was the principal draftsman of the press release.

On July 21, 1999, Peregrine management, led by Gardner, held a conference call with investors and analysts. During the call, Peregrine management reported on Peregrine's previously released financial results for the quarter. Peregrine management also reported that it saw strength in its product lines, distribution channels and geographic regions, that international revenues had increased 195% or 47% of total reported revenue and that DSO finished the quarter at 76 days within Peregrine expectations.

**\*11** On July 22, 1999, the brokerage firm CIBC World Markets ("CIBC") reported Peregrine's previously released financial results [11] and that Peregrine management had indicated: "Peregrine saw strength across its product lines, distribution channels and geographies." The report also stated that "International revenues soared an incredible 195% to make up 47% of the mix as Peregrine focused its attention on the world market" and that DSO finished the quarter at 76 days. CIBC raised its earnings estimates and rated Peregrine's stock a "strong buy."

[11]   Unless otherwise noted, all analyst reports repeated Peregrine's financial statements included in the respective press release.

On July 22, 1999, First Union Capital Markets ("First Union") also issued a report. In it, First Union repeated Peregrine's previously released financial results and raised its earnings estimates. First Union rated Peregrine a "buy."

Peregrine's stock closed at $15.34 per share on July 22, 1999.

On August 13, 1999, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-Q as Vice President of Finance and Chief Accounting Officer. The 10-Q included Peregrine's July 21, 1999 press release. The 10-Q also included Peregrine's revenue recognition policy:

Revenues from direct and indirect license agreements are recognized

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 303 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist. [12]

All Defendants, except Savoy, read and approved the 10-Q,

[12]     Unless otherwise noted, any further reference to Peregrine's revenue recognition policy is a reference to this quoted language.

Following the filing of the 10-Q, Defendant Gless traded an additional 11,250 shares and received proceeds totaling $383,750. Moreover, Defendant Gardner sold 100,000 shares for approximately $2,993,225 on August 4, 1999. Finally, in mid-August, Spitzer, Powanda, Nelson, and Luddy sold 27,500,16,250, 87,500, and 9,474 shares of Peregrine common stock respectively, while receiving gross proceeds of $866,250, $536,250, $2,919,870, and $307,616 respectively.

### 2. 2nd Quarter of 2000 (July 1, 1999 to September 30, 1999)

On October 20, 1999, Peregrine issued a press release announcing that it had achieved "record" quarterly results for the second quarter of 2000, ending September 30, 1999. Peregrine stated the total revenues "increased 95 percent to a record $57.8 million" from the same quarter a year ago. Gardner was quoted:

We are delighted with our continued rapid growth and with the ongoing development of customer demand for our end-to-end Infrastructure Management solutions.... This quarter marked a significant maturation of our alliances on a global basis, leading to both increased software license sales via alliances and a shift in some

service revenue growth to some of our partners....

All Defendants, except Savoy and Dammeyer, read and approved the press release. Nelson was the principal draftsman of the press release.

On October 20, 1999, Peregrine management, led by Gardner, held a conference call with investors and analysts. During the conference, Peregrine management reported on Peregrine's previously released financial results for the quarter. Peregrine management also stated that they continued to see strength for all of Peregrine's products in all geographical regions, that Peregrine was working on a number of very large orders which would have a material positive impact on future revenues and earnings and that the balance sheet had improved this quarter with $24.9 million in cash on hand.

*12    On October 21, 1999, CIBC reported that Peregrine management had indicated that Peregrine "executed flawlessly in the quarter with strength across all product lines and geographies." Management was also reported as representing that there were a number of "mega deals" that were likely to close and which would have a "material positive impact on the top-and-bottom line in the quarter in which they close" and that there was improvement in the balance sheet. CIBC continued its "strong buy" rating.

On October 21, 1999, First Union reported the Peregrine management's statements concerning the "mega deals," and that they were being described as between 20% to 25% of a quarter's revenue. First Union again assessed Peregrine a "strong buy."

Peregrine's stock closed at $20.875 per share on October 22, 1999.

On November 14, 1999, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-Q as Vice President of Finance and Chief Financial Officer. The Form incorporated the financial statements from the October 20, 1999 press release and Peregrine's revenue recognition policy. All Defendants (other than Savoy and Dammeyer) read and approved the 10-Q.

### 3. 3rd Quarter of 2000 (October 1, 1999 to December 31, 1999)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 304 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

On January 20, 2000, in a press release, Peregrine reported "record" quarterly results for the third quarter of fiscal year 2000, ending December 31, 1999. Peregrine stated it had achieved revenues of $67.5 million, a 67% increase from the same quarter a year ago. Gardner was quoted:

"[W]e had a number of large transactions and a remarkably strong surge of both interest and initial sales from our new Get.It! and Get.Resources! employee self service and e-procurement products. In addition, we exceeded our expectations for the launch of our new midrange solution, InfraCenter for Workgroups."

All Defendants (Savoy and Dammeyer) read and approved the press release. Nelson was the principal draftsman of the press release.

On January 20, 2000, Peregrine management, led by Gardner, held a conference call with investors and analysts. At the conference, Peregrine management reported on Peregrine's previously released financial results for the quarter. Peregrine management also stated that customer acceptance of Peregrine's new Get.It! e-products far surpassed expectations and that the balance sheet remained strong with cash increasing and DSO remaining steady at an acceptable level of 79 days.

On January 21, 2000, CIBC reported "[t]he enthusiastic reception of Peregrine's New Get.It! e-procurement products far exceeded management's expectations, and generated $5 million in sales in just three weeks of release." The report also indicated "that the deal pipeline was more active than usual." CIBC also noted:

The balance sheet remained strong this quarter, increasing $300,000 to $25.2 million with cash remaining at $0.38 per share. Accounts receivable rose $8.5 million to $59.6 million, with DSO remaining steady at 79, also within what management regards as an acceptable range. Deferred revenues grew $9.8 million to $31.3 million, and were made up solely of customer support.

CIBC continued to rate Peregrine as a "strong buy." First Union also rated Peregrine a "strong buy."

Peregrine's stock rose to $44.53 per share at the close of trading on January 24, 2000.

On February 11, 2000, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-Q as Vice President of Finance and Chief Accounting Officer. The 10-Q included the January 20, 2000 press release and Peregrine's revenue recognition policy. All Defendants (other than Savoy and Dammeyer) read and approved the 10-Q.

### 4. 4th Quarter of 2000 (January 1, 2000 to March 31, 2000) and Fiscal Year 2000

**\*13** On April 26, 2000, Peregrine issued a press release, stating it had "record" quarterly revenues of $76.3 million (a 66% increase compared with revenues in the comparable prior year period) and "record" annual revenue of $253.3 million (a 83% increase over prior year revenues). Gardner was quoted: "[t]he market remains strong" and "our products continue to lead in their respective areas."

All Defendants, except Savoy and Dammeyer, read and approved the press release. Nelson was the principal draftsman of the press release.

On April 26, 2000, Peregrine management, led by Gardner, held a conference call with investors and analysts. During the conference, Peregrine reported on Peregrine's previously released financial results for the quarter. Peregrine management also stated that Peregrine had closed a very large order with EDS, that Peregrine had excellent visibility into the next quarter and that it expected a $40-$50 million revenue contribution from Get.It! for the year.

On April 27, 2000, CIBC reported that Peregrine management had indicated:

Peregrine's 4Q00 results indicate that its core business remains strong. During the quarter, the company closed a particularly large deal with EDS; the size of the deal was not disclosed, but management implied that the company has "great visibility into the next quarter." We regard this as an extremely positive sign that there is no slowdown in Peregrine's business, which was a concern last quarter.

The report also stated that "management comments referring to a $40-50 million revenue contribution from Get.It! for

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 305 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

the year [which] would imply a significant ramp-up must be in store," as well as management's indication "that it was seeing a strong rebound in mid-size deal flow ($100,000 - $300,000)...." Expressing concern over possible logistical and integration difficulties associated with the acquisition of Harbinger, CIBC rated Peregrine's stock as "Hold."

Peregrine's stock closed at $24.06 per share on April 28, 2000.

On May 10, 2000, Peregrine filed its Form 10-K with the SEC. It incorporated the financial statements that were included in the April 26, 2000 press release. The 10-K also included Peregrine's revenue recognition policy. The 10-K further included Arthur Andersen's unqualified audit report on Peregrine's year end financial statements for the fiscal 2000. Gless, Gardner, Moores, Noell, van den Berg, Watrous and Hosley signed the 10-K.

On May 22, 2000, Peregrine filed Amendment No. 1 to its Form S-4 Registration Statement with the SEC. The Amendment contained a Joint Proxy Statement and Prospectus. The Amendment solicited proxies from Harbinger shareholders for approval of the proposed merger of Peregrine and Harbinger. The Joint Proxy talked about Peregrine's business, and included Peregrine's audited financial statements for the fiscal year 2000. The Joint Proxy also stated that Peregrine's "selected consolidated financial data derives from the consolidated financial statements of Peregrine Systems, Inc. and its subsidiaries," and that "[t]hese financial statements have been audited by Arthur Andersen LLP, independent public accountants." The Amendment/ Registration Statement was signed by Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg and Watrous. Arthur Andersen and AWSC consented to the use of their audit report for the fiscal year 2000.

### 5. 1st Quarter of 2001 (April 1, 2000 to June 30, 2000)

*14 On July 19, 2000, Peregrine issued a press release announcing "record" quarterly financial results for the first quarter of fiscal year 2001, ending June 30, 2000. According to Peregrine, the results were "driven by a 95 percent increase in software license revenues." Peregrine announced that total revenues had increased by 83% "to a record $94.3 million" from the same quarter a year ago. Gardner was quoted:

> Growth in the Get.It! Business was very strong this quarter,

and continued to reflect customer recognition that Get.Resources!TM offers a unique lifecycle approach to the e-procurement process associated with assets used inside our customers' businesses ... We were also very pleased to see strong performance from our Infrastructure Management products, including several large transactions and some key competitive wins[.]

All Defendants (other than Hosley and Dammeyer) read and approved the press release. Nelson was the principal draftsman of the press release.

On July 19, 2000, Peregrine management, led by defendant Gardner, held a conference call with investors and analysts. During the conference, Peregrine management reported on Peregrine's previously released financial results for the quarter. Peregrine management also stated Peregrine's cash position more than doubled to $70 million and that the increase in accounts receivable (to $128 million) and DSO (to 122 days) was attributable to the Harbinger acquisition.

On July 20, 2000, CIBC reported Peregrine's previously released financial results. CIBC noted that Peregrine's earnings per share of $0.10 had beaten CIBC's estimate of $0.09. CIBC also reported that Peregrine management had indicated:

> On the balance sheet, cash more than doubled to $70 million from $34 million, which equates to $0.57 per share, up from $0.29. Accounts receivable rose significantly to $128 million from $70 million, with the increase attributed to Harbinger. As a result, days sales outstanding rose to 122 from 82. Management indicated that it intends to address the receivables issue; consequently, DSO should trend down sharply in the next quarter.

CIBC gave Peregrine's stock a "buy" rating.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 306 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Peregrine's stock closed at $29.25 per share on July 21, 2000.

On August 14, 2000, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-Q as Vice President of Finance and Chief Accounting Officer. The 10-Q incorporated the financial statements that were included in the July 19, 2000 press release. The 10-Q also included Peregrine's revenue recognition policy. All Defendants (other than Hosley and Dammeyer) read and approved the 10-Q.

According to the Complaint, "[n]either the announcement nor related SEC filings disclosed material nonpublic adverse information, including (i) that the Company had continuing concerns about its sales teams, whose productivity was at a three-year low, (ii) that its mid-size market continued to seriously under performance, (iii) that it had no sales backlog for the coming 'always difficult' quarter, (iv) that it was running out of cash and could not complete a public offering because there was substantial doubt as to whether the Company would meet its earnings target for the second quarter of fiscal year 2001 ending September 30, 2000." (Complaint ¶ 180.) The Complaint also alleges the statements "were materially false and misleading because Peregrine's reported revenue was materially overstated, there was no disclosure of a material change in its accounting policy as applied to the first quarter of fiscal year 2001, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated...." (Id. at 557.)

### 6. 2nd Quarter of 2001 (July 1, 2000 to September 30, 2000)

**\*15**  On October 3, 2000, Peregrine issued a press release on the second quarter of fiscal year 2001, ending September 30, 2000. Peregrine stated its financial results would "meet or exceed consensus earnings per share estimates of $.11 per share and total revenue of $142 million." Peregrine issued another press release on October 24, 2000 announcing "record" quarterly results for the second quarter of fiscal year 2001, with revenues of $142.7 million. The press release noted that "[t]he record second quarter results were driven by a 136% increase in software license revenues over the comparable prior year period." The release also noted that "total revenues for the second quarter increased 147%" ... compared with revenues in the comparable prior year period. In addition, Gardner was quoted:

We had a remarkable quarter of growth in our infrastructure management solutions and Get.It! employee self service solutions. This quarter saw a large number of new products, technology, and alliances come to fruition, further establishing the basis for continued growth into the future.

All Defendants (other than Hosley and Dammeyer) read and approved both press releases (except van den Berg with regard to the October 24, 2000 press release and Arthur Andersen with regard to the October 3, 2000 press release).

On October 24, 2000, Peregrine management, led by defendant Gardner, held a conference call with investors and analysts. During the call, Peregrine management reported on Peregrine's previously released financial results for the quarter. In addition, Peregrine management stated that Peregrine expected to be cash flow positive during the second half of the year and that accounts receivable rose to $165 million while DSO fell from 122 days to 106 days.

On October 25, 2000, CIBC issued a report, the contents of which are not alleged in the Complaint, except that CIBC rated Peregrine's stock a "buy."

Peregrine's stock closed at $23.00 per share on October 26, 2000.

On November 14, 2000, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-Q as Vice President of Finance and Chief Accounting Officer. The 10-Q incorporated the financial statements from the October 24, 2000 press release as well as Peregrine's revenue recognition policy.

All Defendants (other than Hosley, van den Berg, and Dammeyer) read and approved the 10-Q.

According to the Complaint, "[n]either the announcement nor related SEC filings disclosed material nonpublic adverse information, including: (i) that results for the Company's mid-size transaction market remained extremely unsatisfactory, (ii) that it relied on 'huge deals,' which were contingent, with alliance partners to meet its forecasts, (iii) that the productivity of its sales force continued to deteriorate, (iv)

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 307 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

that it had to grant 'extraordinary terms' to get key deals done, (v) that the Company had to 'borrow from the future to make the quarter,' and (vi) that there was a desperate need for cash." (Complaint ¶ 184.)

### 7. 3rd Quarter of 2001 (October 1, 2000 to December 31, 2000)

On January 24, 2001, Peregrine issued a press release on its "record" quarterly financial results for the third quarter of fiscal year 2001. The press release stated that Peregrine had total revenues of $156.6 million. The release also stated that "[t]otal revenues ... climbed by 132%" compared with revenues in the comparable prior period. Peregrine also stated that these results were "driven by a 114% increase in software license revenues over the comparable prior year period...." Gardner was quoted: "[d]espite uncertainty and turbulence in the economy, particularly in the United States, we exceeded our objectives for the December quarter."

All Defendants (other than Hosley, van den Berg, and Dammeyer) read and approved the press release.

On the same day, Peregrine management, led by defendant Gardner, held a conference call with investors and analysts. During the conference, Peregrine management reported on Peregrine's previously released financial results for the quarter. In addition, Peregrine management stated that the balance sheet improved as DSOs fell to 97 days from 106 days last quarter and that Peregrine expected to make additional progress on this front by the end of the fourth quarter. The management also stated that international revenues had increased over 37%.

**\*16** On January 25, 2001, CIBC reported Peregrine's previously released financial results. It also reported that Peregrine management had indicated:

> During the quarter the balance sheet strengthened. Accounts receivables were flat at $165 million while DSOs fell to 97 from 106 last quarter as the company stepped up its collection activities. Management expects to make additional progress on this front and expects DSOs to fall to the low 90s by the end of the fourth-quarter. Deferred revenue increased 22% sequentially ($15 million) to $83 million. Management attributed the increase to some recent wins in its EMG operation.

\* \* \*

Internationally, Peregrine knocked the cover off the ball. License revenue increased over 37% sequentially to $40.8 million. Driving this growth were several large deals in the quarter in the infrastructure and e-markets groups. Management believes that what the company witnessed in the quarter is quite sustainable and is shifting resources to Europe and Asia.

CIBC rated Peregrine's stock a "buy."

Peregrine's stock rose to $29.81 per share at the closing of trading on January 29, 2001.

Peregrine also filed its 10-Q with the SEC, which included its revenue recognition policy. All Defendants (other than Hosley, van den Berg, and Dammeyer) read and approved the 10-Q. The Complaint is silent as to who signed the 10-Q.

According to the Complaint, "[n]either the announcement nor related SEC filings disclosed material nonpublic adverse information, including: (i) that the Company's direct business in North America was a 'disaster,' (ii) that the continued 'heavy reliance' on alliance and channel partner contingent deals made its CEO 'cautious' concerning the future, and (iii) that the productivity of the sale force was unsatisfactory and materially below plan. In addition, the Company completed a desperately needed $270 million private convertible securities offering in the quarter." (Complaint ¶ 186.)

### 8. 4th Quarter of 2001 (January 1, 2001 to March 31, 2001) and Fiscal Year 2001

On April 4, 2001, Peregrine issued a press release on its revenues and earnings for the fourth quarter of fiscal year 2001, ending March 31, 2001. The release stated that "[f]or the fiscal fourth quarter end[ing] March 31, 2001, [Peregrine] expects to report license revenues of approximately $105 million, total revenues of approximately $170 million and earnings per share of $0.16...." Gardner is quoted: "[d]espite challenging economic conditions worldwide, we were able to meet our objectives for the quarter and deliver strong profitable results, the sixteenth consecutive quarter we have done so." After the press release, Peregrine's stock gained $5.25 per share, closing at $19.06 per share on April 5, 2001.

All Defendants (other than Hosley, van den Berg, Dammeyer, Arthur Andersen, and AWSC) read and approved the press release.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 308 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

On April 26, 2001, Peregrine issued a press release confirming the preliminary results it had announced on April 4. It stated that revenue for the fourth quarter of fiscal year 2001 was "a record $171.0 million, an increase of 124 percent from the same quarter a year ago." The press release also stated that revenue totaled $564.7 million—a 123% increase from the year before. In the April 26 release, Gardner was also quoted:

**\*17** Our results this quarter in the face of challenging economic conditions demonstrate the value of our solutions ... As we enter fiscal 2002, we remain confident in our market position and the opportunity we address ...

We were particularly pleased with the strength of our sales through managed services providers and our professional services partners. As we continue to meet major milestones in our corporate development and build our solutions portfolio, these relationships become increasingly important to our ability to extend our reach to new customers and markets.

Peregrine's stock closed at $25.60 per share on April 27, 2001.

All Defendants (other than Hosley, van den Berg, and Dammeyer) read and approved the April 26, 2001 press release.

On April 26, 2001, Peregrine management, led by defendant Gardner, held a conference call with investors and analysts. During the call, Peregrine management reported on Peregrine's previously released financial results for the quarter. In addition, Peregrine management stated that Peregrine met its earnings per share guidance and that key balance sheet metrics improved or remained steady (such as a cash increase of $38 million) with DSOs remaining essentially flat at 95 days.

On April 27, 2001, CIBC reported that Peregrine management had indicated:

Not only was the company able to meet its EPS expectation, but key balance sheet metrics also improved or held steady. Even though accounts receivables showed a moderate $15 million increase in the quarter, DSOs were essentially flat at 95. Deferred revenue,

which consists almost exclusively of service related activities (maintenance, network usage, etc.) climbed $12 million ($14% sequentially) to $95 million. Cash increased in the quarter by about $38 million to $287 million. Management attributed the growth to financing activity in the quarter, option exercises, acquisitions (Extricity brought some cash) as well as a moderate amount of cash flow from operations.

CIBC rated Peregrine's stock a "strong buy."

Peregrine's stock closed at $25.78 per share on April 30, 2001.

On June 29, 2001, Peregrine filed its Form 10-K with the SEC. Gless, Gardner, Moores, Noell, Watrous and Savoy signed the 10-K. The Form incorporated the financial statements that appeared in the April 26, 2001 press release and Peregrine's revenue recognition policy.

Arthur Andersen and AWSC audited Peregrine's financial statements in the 10-K. The 10-K also included Arthur Andersen's unqualified audit report on Peregrine's fiscal 2001 financial statements.

On July 23, 2001, Peregrine filed Amendment No. 1 to its Form S-4 Registration Statement with the SEC. The Amendment included a Joint Proxy Statement and Prospectus, the purpose of which was to solicit proxies from Remedy Corporation shareholders to approve the proposed merger of Peregrine and Remedy. The Proxy also included Peregrine's financial statements (and audit reports) for the previous three fiscal years. The Proxy also stated:

Peregrine's selected consolidated financial data is presented below as of March 31, 2001, 2000, 1999, 1998 and 1997 and for each of the years in the five-year period ended March 31, 2001, and derives from the consolidated financial statements of Peregrine Systems, Inc. and its subsidiaries, which financial statements have been audited by

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 309 of 573
In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8158825

Arthur Andersen LLP, independent public accountants.

 *18  Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous signed the Amendment. The Complaint also alleges that Arthur Andersen and AWSC agreed to the use of their audit reports for the fiscal years 2000 and 2001.

### 9. 1st Quarter of 2002 (April 1, 2001 to June 30, 2001)

On July 24, 2001, Peregrine issued a press release on its financial results for the first quarter of fiscal year 2002, ending June 30, 2001. Peregrine stated that revenues for the quarter were a "record $172.0 million, an increase of 82% from the same quarter a year ago." Gardner was quoted: "We were pleased to post significant top-line [revenue] growth in this challenging economic environment[.]"

All Defendants (other than Hosley and van den Berg) read and approved the press release.

The Complaint alleges that after the press release, on August 1, 2001, Luddy sold 46,981 shares of Peregrine common stock for a total of approximately $1,317,397.

On July 24, 2001, Peregrine management, led by Gardner, held a conference call with investors and analysts. During the conference, Peregrine management reported on Peregrine's previously released financial results for the quarter. In addition, Peregrine management stated that it was comfortable with analysts projections of 30%-40% revenue growth and 25%-35% earnings per share growth based on the strength of its business and that DSOs were 99 days and expected to decrease in the next quarter to 80-90 days.

On July 24, 2001, Bear Steams & Co., Inc. ("Bear Steams") reported Peregrine's previously released financial results and that Peregrine management had indicated it saw "positive growth in Asia Pacific, Africa, and Eastern Europe." The report also stated:

In sharp contrast to the norm, management reiterated revenue and EPS guidance of 30-40% top line growth and 25-35% EPS growth for the full FY02, citing strength in all areas of business (product mix,

geographic mix, and a return to strength in key vertical markets).

Bear Steams gave Peregrine a "buy" rating.

On July 25, 2001, CIBC reported that Peregrine management had indicated: "Peregrine's revenues of $172 million came in ahead of expectations, which the Street had pegged at $165 million." The report also stated that "Management noted that the strong verticals during the quarter were financial, telecom, high tech, and government and that the mix was a return to a more typical mix, after the financial vertical was very weak in the March quarter. Excluding acquisitions, the company indicated that year over year revenue growth was about 50%." CIBC rated Peregrine a "strong buy."

On July 25, 2001, U.S. Bancorp Piper Jaffray ("Piper Jaffray") reported that Peregrine management had exceeded the revenue expectations and that Peregrine management indicated "[t]he Company expects to approach DSOs of 80-90 days in the coming quarter." Relying on management's representations and Peregrine's publicly released financial results, Piper Jaffray rated Peregrine's stock a "strong buy."

Peregrine stock rose to $27 per share at the close of trading on July 26, 2001.

On August 14, 2001, Peregrine filed its Form 10-Q with the SEC. Gless signed the 10-Q as Executive Vice President and Chief Accounting Officer. The Form included the financial statements from the July 24, 2001 press release and Peregrine's revenue recognition policy.

 *19  All Defendants (Hosley and van den Berg) read and approved the 10-Q.

The Complaint further alleges that Gardner sold 2,250 shares on September 4, 2001 resulting in proceeds of $61,875.

### 10. 2nd Quarter of 2002 (July 1, 2001 to September 30, 2001)

On October 3, 2001, Peregrine issued a press release announcing preliminary financial results for the second quarter of fiscal year 2002, ending September 30, 2001. The press release stated that "Peregrine expects to report quarterly revenue of approximately $175 million. Based on these revenues, the company expects to report net income of

approximately $.05 per share, excluding acquisition costs and restructuring charges." Gardner was quoted:

> Like many companies in our industry, the tragic events of September 11 and the subsequent effect on the global economy impacted our September quarter results. However, even during these challenging times, we were able to generate approximately $175 million in total revenue, demonstrating the strength of our product portfolio and the value proposition we deliver to our customers ...

All Defendants (except Hosley, van den Berg, Arthur Andersen and AWSC) read and approved the press release.

On October 24, 2001, in a press release, Peregrine confirmed the preliminary financial results it had announced for the second quarter of fiscal year 2002. It also stated that total revenues were a "record" $175 million, an increase of 23% from that reported in the second quarter of fiscal 2001. According to the Complaint, "[t]he press release characterized the results as 'disappointing relative to our original expectations,' but made no mention of the continuing material problems afflicting Peregrine's business, including (i) the need to collect contributions from employees to make its earnings estimate for the quarter ending December 31, 2001 and (ii) the tight cash situation and the need to raise additional capital." (Complaint ¶ 194.)

All Defendants (other than Hosley and van den Berg) read and approved Peregrine's October 24, 2001 press release.

On October 24, 2001, Peregrine management, led by defendant Gardner, held a conference call with investors and analysts. During the conference, Peregrine management reported on Peregrine's previously released financial results for the quarter. In addition, Peregrine management stated that guidance for the remainder of the current and following year remain unchanged, that Peregrine expected to finish the fiscal year with $140-$150 million in cash and that DSOs for Peregrine on a stand alone basis were 99 days and 113 days when including recently acquired Remedy.

On October 24, 2001, CIBC reported Peregrine's previously released financial results and that Peregrine management had indicated:

> Guidance for the remainder of this year and next year remain unchanged. The Company expects revenue of $450 million in the second half and a snap back in operating margins, which were 8% this quarter, vs. 17% last year. Management indicated that operations appeared to be returning to a more normal pace after a virtual standstill in late September. Peregrine expects to finish the fiscal year with $140 million to $150 million in cash.

**\*20**  On October 24, 2001, Bear Steams reported Peregrine's previously released financial results and that Peregrine management had indicated: "Management affirmed guidance -- we are maintaining estimates."

On October 25, 2001, Thomas Weisel Partners ("Weisel") reported Peregrine's previously released financial results and that Peregrine management had indicated "management commentary was encouraging."

On October 25, 2001, Piper Jaffray reported Peregrine's previously released financial results and that Peregrine management had stated that Peregrine reported revenues in line with expectations, finished the quarter with $142 million in cash and DSOs for Peregrine, excluding Remedy, remained essentially flat at 99 days.

CIBC, Bear Steams, Weisel and Piper Jaffray each rated Peregrine a "buy."

Peregrine's stock closed at $16.46 per share on October 26, 2001.

On November 21, 2001, Peregrine filed its Form 10-Q with the SEC. Gless signed the Form 10-Q as Executive Vice President and Chief Accounting Officer. The 10-Q included the financial statements that appeared in the October 24, 2001 press release and Peregrine's revenue recognition policy. All Defendants (other than Hosley and van den Berg) read and approved the 10-Q.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 311 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

**11. 3rd Quarter of 2002 (October 1, 2001 to December 31, 2001)**

On January 2, 2002, Peregrine issued a press release on Peregrine's preliminary results for the third quarter of fiscal year 2002, ending December 31, 2001. The press release stated that Peregrine anticipated total revenues of approximately $175 million.

All Defendants (other than Hosley, van den Berg, Arthur Andersen and AWSC) read and approved the press release.

On January 3, 2002, Peregrine management, led by Gardner, held a conference call with investors and analysts. During the conference, Peregrine management reported on Peregrine's previously released preliminary financial results for the quarter.

On the same day, CIBC, Piper Jaffray and Bear Steams all reported Peregrine's preliminary financial results and gave Peregrine's stock a "buy", "outperform" and "attractive" rating respectively.

Peregrine's stock closed at $9.40 per share on January 4, 2002.

On January 24, 2002, in a press release, Peregrine confirmed that revenues for the third quarter of fiscal year 2002 were $175.2 million. All Defendants (other than Hosley and van den Berg) read and approved the press release. "While admitting being 'disappointed in the results,' the press release attributed the problems solely to 'global economic weakness, particularly in Europe.' The press release quoted Gardner as stating, 'We are committed to returning to operating profitability, and we are continuing to take appropriate steps to improve our revenue performance and contain our expenses.' The press release omitted any mention of the crisis internally at Peregrine, including violations of covenants on the Company's line of credit and consideration of significant restructuring of the company's business and widespread violation of GAAP arising from improper revenue recognition." (Complaint ¶ 199.)

On January 24, 2002, Peregrine management held a conference call with investors and analysts. During the conference, Peregrine management reported on Peregrine's previously released financial results for the quarter. In addition, Peregrine management stated that its DSO remained essentially flat at 100 up one day from the prior quarter and

that Peregrine finished the quarter with approximately $107 million in cash.

**\*21** On the same day, CIBC reported the "[Peregrine] appears to be on the right track" and rated Peregrine's stock a "buy." Piper Jaffray and Bear Steams also rated Peregrine's stock as "outperform" and "attractive," respectively.

Peregrine's stock closed at $7.95 per share on January 25, 2002.

On February 14, 2002, Peregrine filed its Form 10-Q with the SEC. The Form was signed by Gless as Executive Vice President and Chief Accounting Officer. The Form incorporated the financial statements that appeared in the January 24, 2002 press release. All Defendants (other than Hosley and van den Berg) read and approved the 10-Q.

"On February 19, 2002, Peregrine announced that its Board had adopted a Stockholder Rights Plan under which Peregrine would issue a dividend of one right for each share of its common stock held by stockholders of record as of the close of business on March 12, 2002. The press release went on to state, '[t]he plan was not adopted in response to any specific attempt to acquire the company.' This was a false statement, as the plan was adopted in specific regard to then ongoing merger negotiations with BMC Software." (Complaint ¶ 200.)

**E. Restatement of Peregrine's Financial Statements**

On April 5, 2002, in a press release, Peregrine announced that it was replacing Arthur Andersen as its independent auditor with KPMG. Gardner was quoted: "we have the highest regard for our audit team's work ethic," but "in light of the current uncertainties at Arthur Andersen [relating to Enron], we felt it was in the best interest of our company and shareholders to retain KPMG as our independent auditors at this time."

After the close of trading on April 30, 2002, Peregrine issued a press release announcing that it would delay the release of its financial results for the fourth quarter and year-end 2002 due to the "continued audit activities by KPMG, the company's independent auditors." The results were supposed to be announced on May 2, 2002.

Before the market opened on May 6, 2002, Peregrine issued a press release, stating: (i) the discovery of accounting irregularities; (ii) an internal accounting investigation; and (iii) the resignation of Gardner and Gless.

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 312 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Peregrine's stock price fell approximately 67% in response to this disclosure. On May 3, 2002, Peregrine stock closed at $2.57 per share. On the next trading day (May 6, 2002), Peregrine common stock closed at $0.89 per share on extremely heavy volume.

On May 23, 2002, Peregrine announced it would be restating its financial statements for 2000 and 2001 and each of the first three quarters of 2002.

On September 22, 2002 Peregrine, "[c]iting the financial and legal issues raised by the company's inability to file audited financial reports for the 2000, 2001 and 2002 fiscal years, among other reasons," announced in a press release that it had filed a voluntary petition to reorganize under Chapter 11 of the U.S. Bankruptcy Code.

On February 28, 2003, Peregrine restated its financial statements for 2000 and 2001 and the first three quarters of 2002 with the SEC. Peregrine admitted that it improperly recognized more than $500 million in revenue, and that it materially misrepresented its balance sheet and statement of liabilities by understating its debt by as much as $130 million.

### III.

### STANDARD OF REVIEW.

**\*22** Defendants move to dismiss under Fed.R.Civ.P. 12(b)(6). "A Rule 12(b)(6) motion tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001); seealso, Neitzke v. Williams, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of dispositive issue of law."). "A claim may be dismissed only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " Id. (Citations omitted).

Under this standard, the Court's review is limited. Even if recovery is very remote and unlikely, Plaintiffs are still entitled to offer evidence to support their claims. See, United States v. City of Redwood City, 640 F.2d 963, 966 (1981) ("[E]ven if the face of the pleadings indicate that recovery is very remote, the claimant is still entitled to offer evidence to support its claims."); seealso, Kwai Fun Wong v. U.S., 373 F.3d 952, 969 (9th Cir. 2004) ("[A] court may dismiss a complaint only if it is clear that no relief could be granted

under any set of facts that could be proved consistent with the allegations."); Langford v. Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000) (The issue is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims."); Phelps v. Kapnolas, 308 F.3d 180, 184-85 (2d Cir. 2002) ("Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test."). However, it is not "proper to assume that [a plaintiff] can prove the facts it has not alleged or that the defendants have violated [laws] in ways that have not been alleged." Associated General California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983).

### IV.

### CLAIMS AND LIABILITIES UNDER
### SECTION 10(b) and RULE 10b-5.

As a preliminary matter, and as noted above, the Court has already found that Plaintiffs adequately state a Section 10(b) claim against Gardner, Gless, Spitzer, and Cappel. (See, Court's Order dated November 21, 2003 at 78:13-14: The Complaint "states with adequate particularity Section 10(b) claims against Defendants Gardner, Gless, Spitzer, and Cappel."). Thus, the Court's discussion will be limited to the remaining Defendants. Determining whether Plaintiffs state a claim under Section 10(b) against these Defendants, requires application of the following principles.

#### A. Pleading Standards.

#### 1. Pleading Elements.
Section 10(b) is designed "to insure honest securities markets and thereby promote investor confidence." United States v. O'Hagan, 521 U.S. 642, 658 (1997); seealso, Affiliated Ute Citizensof Utah v. United States, 406 U.S. 128, 151 (1972) (Section 10(b) was designed "to substitute a philosophy of full disclosure for the philosophy of caveatemptor and thus to achieve a high standard of business ethics in the securities industry."). In this regard, Section 10(b) prohibits:

> any person ... to use or employ ... any manipulative or deceptive device or contrivance in contravention of such

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 313 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

rules and regulations as the [SEC] may prescribe....

15 U.S.C. § 78j(b).

"Rule 10b-5 is the regulation [SEC] promulgated under Section 10(b)." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1229 (9th Cir. 2004). "The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." S.E.C. v. Zandford, 535 U.S. 813, 816 fn.1 (2002). "[T]herefore, [the Court may at times] use § 10(b) to refer to both the statutory provision and the Rule." Id.

**\*23** Rule 10b-5 prohibits three types of conduct. See, 17 C.F.R. § 240.10b-5(a)-(c). First, under the Rule, "it is unlawful ... '[t]o employ any device, scheme, or artifice to defraud.' " No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 932 (9th Cir. 2003), quoting 17 C.F.R. § 240.10b-5(a). The Rule "further provides that it is unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " Id., quoting § 240.10b-5(b). Lastly, the Rule prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person...." 17 C.F.R. § 240.10b-5(c).

"The majority of securities fraud claims under Section 10(b) are brought pursuant to Rule 10b-5(b) for false or misleading statements or omissions." In re Global Crossing, 322 F.Supp.2d at 328. To plead a case under this provision, a plaintiff must allege the defendant made a materially false statement or omitted a material fact, with scienter, on which the plaintiff relied and was damaged. See, Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1157 (9th Cir. 1996). "The plaintiff must [also] prove both actual cause ('transaction causation') and proximate cause ('loss causation')." Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment, 189 F.3d 1017, 1025 (9th Cir. 1999). Defendants can, therefore, be liable for both affirmative misstatements and misleading omissions.

But, Section 10(b) and Rule 10b-5(b) do not impose a general duty to disclose material information. Instead, under Section 10(b), a duty to disclose material information only arises when a defendant makes a statement. [13] So, even if a Defendant was aware of Peregrine's accounting improprieties,

that Defendant was not required to disclose it unless his or her failure to do so altered a statement that Defendant made. See, Basic v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5"); Dirks v. SEC, 463 U.S. 646 (1983) (Mere possession of confidential inside information is not sufficient to trigger duty to disclose); Hayes v. Gross, 982 F.2d 104, 106 (3d Cir. 1992) ("[A]n allegation of mismanagement on the part of a defendant will not alone support a claim under § 10(b) or Rule 10b-5; nor will an allegation that a defendant failed to disclose the existence of mismanagement.... [H]owever, ... a complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement."); In re Seagate Technology II Securities Litigation, 843 F.Supp. 1341, 1369 (N.D. Cal. 1994) ("In considering fraud-on-the-market claims brought for omissions of material information, it is important to note that generally, the corporation has no affirmative duty of disclosure."); Friedman v. Rayovac Corp., 291 F.Supp.2d 845, 854 (W.D. Wis. 2003) ("Unless defendants made public statements that would be misleading in the absence of disclosure, they would not be required to reveal any of the company's sales practices."); Time Warner, Inc. Securities Litig., 9 F.3d 259, 267 (2d Cir. 1993) ("[A] [defendant] is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). There, "even if a reasonable investor would want to know an omitted fact, there is no duty to disclose it unless omitting it alters the meaning of a statement that was made." Friedman v. Rayovac Corp., 295 F.Supp.2d at 988 (Emphasis original). Accordingly, the Complaint fails to state a claim under Section 10(b) to the extent it merely alleges that a Defendant failed to act on, or disclose, knowing material adverse information about Peregrine's accounting when that Defendant never made a statement.

13    "There is [also] an affirmative duty of disclosure if ... there is insider trading ..." In re Ford Motor Co. Securities Litigation, 184 F.Supp. 2d 626, 631-632 (E.D. Mich. 2001): U.S. v. Smith, 155 F.3d 1051, 1067 (9th Cir. 1998) ("Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information."); quoting, United States v. O'Hagan, 521 U.S. 642 (1997). However, as the Court previously found,

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 314 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Plaintiffs cannot state a claim based on allegations of insider trading. This is because Plaintiffs' case is based on "fraud on the market" theory. See, Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 975 (9th Cir. 1999). (Seealso, Complaint ¶ 48.) Moreover, the Complaint does not allege that any of the Plaintiffs traded shares at the same time as the Defendants. Standing to assert a duty to disclose extends only to contemporaneous traders during the alleged insider trading. See, 15 U.S.C. § 78t-1 (Limiting standing for insider trading claims to plaintiffs that "contemporaneously" bought or sold securities of the same class); In re Seagate Technology II Securities Litigation, 843 F.Supp. at 1370 ("Because plaintiffs here were not contemporaneous traders during the alleged insider trading, they have no standing to assert the duty to disclose imposed upon insider traders."). Therefore, the allegations in the Complaint, in particular paragraphs 157-177, do not state a claim and are irrelevant to the Court's analysis of Defendants' liability under Section 10(b).

*24 "However, if a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement." Grossman v. Novell, Inc., 120 F.3d 1112, 1125 (10th Cir. 1997). "Thus, if and when a speaker learns that a prior statement was misleading when made, a duty to correct arises." In re International Business Machines Corporate Securities Litigation, 163 F.3d 102, 109 (2nd Cir. 1998). The defendant must, however, be "certain the recently discovered adverse facts are accurate before making a corrective disclosure." In re MobileMedia Securities Litigation, 28 F.Supp.2d 901, 937 (D.N.J. 1998); Acito v. IMCERA Group, Inc., 47 F.3d 47, 52-53 (2d Cir. 1995). Plaintiffs do not assert any such claim against any of the Defendants.

Turning once again to the elements, "Section 10(b) and Rule 10b-5 are not limited to misrepresentations or omissions of material fact." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 937 (9th Cir. 2003); seealso, SEC v. Zandford, 535 U.S. at 820 ("[N]either the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act."). Even absent a fraudulent statement, a defendant can be liable under subsections (a) and (c) of Rule 10b-5 for participation in a fraudulent scheme or course of business. Id

Claims under 10b-5(a) and (c) and 10b-5(b) are distinct, with distinct elements. Unlike 10b-5(b), which requires a false statement or omission, claims under 10b-5(a) and (c) "are not so restricted." Affiliated Ute Citizens of Utah v. U.S., 406 U.S. 128, 153 (1972); seealso, In re Splash Technology Holdings, Inc. Sec. Litig., 2000 WL 1727377 at *13 (N.D. Cal. 2000) ("Whereas 10b-5(b) focuses on fraudulent statements, 10b-5(a) and (c) are not by their terms restricted to statements."). Rather, subsections (a) and (c) of the Rule "encompass the use of 'any device, scheme or artifice,' or 'any act, practice, or course of business' used to perpetuate a fraud on investors." In re Global Crossing, 322 F.Supp.2d at 336-37. Seealso, Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477 (1977) ("No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices"); Herman & MacLean v. Huddleston, 459 U.S. 375, 386 (1983) ("In furtherance of its objective, § 10(b) makes it unlawful to use '**any** manipulative or deceptive device or contrivance' in connection with the purchase or sale of any security" (Emphasis in original) ); Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 11 n. 7 (1971) (" '[Section] 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase and sale of securities, whether the artifices employed involved a garden type variety of fraud, or present a unique form of deception.' ") (Emphasis original). "Market manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company are other types of conduct prohibited by § 10(b) and Rule 10b-5 that do not fall within the category of misleading statements and omissions." In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d at 579.

To state a claim under these provisions, Plaintiffs must allege: "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." In re Global Crossing, 322 F.Supp.2d at 329. (Citations omitted). "Schemes used to artificially inflate the price of stocks by creating phantom revenue fall squarely within" the proscribed conduct. Id. at 337.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 315 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

**\*25** While claims under 10b-5(a) and (c) and 10b-5(b) are distinct, there are circumstances under which they overlap-- a scheme to publish or issue misleading statements about the financial condition of the corporation to inflate stock prices. Under such circumstance, a defendant may be held liable not only under Rule 10b-5(b) for the misstatements, but also under Rule 10b-5(a) or (c) for the scheme to publish the statements. See, Cooper v. Pickett, 137 F.3d 616, 624-625 (9th Cir. 1997) (Defendant, "through false statements to analysts, and those analysts, by issuing reports based on statements they knew were false, together engaged in a scheme to defraud the shareholders" under Rule 10b-5(a), and under Rule 10b-5(b) for "Merisel is liable for its own false statements to the analysts."). However, "[i]f the claimed fraudulent schemes or practices consisted simply of misleading statements or omissions, then they would fall entirely within the ambit of Rule 10b-5(b), and no separate (a) and (c) actions would lie." Swack v. Credit Suisse First Boston, 2004 WL 2203482 at \*10 (D. Mass. 2004).

**2. Primary Liability, As Opposed to Secondary, Must be Alleged; No Conspiracy Theory.**

No matter what subsection of Rule 10b-5 Plaintiffs proceed under, they "may not maintain an aiding and abetting suit under § 10(b)." Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A. ("Central Bank"), 511 U.S. 164, 191 (1994). [14] Thus, to survive dismissal, Plaintiffs must sufficiently allege Defendants were primary, as opposed to secondary, violators of Section 10(b) or Rule 10b-5. Id. In other words, Defendants can only be held liable under Section 10(b) or Rule 10b-5, if they themselves "employ[ed] a manipulative device or ma[d]e a material misstatement (or omission) on which [Plaintiffs] relie[d].…" Id. at 191. Otherwise, liability would attach "when at least one element critical for recovery under Section 10(b) is absent: reliance." Id. at 180. As Central Bank explained:

> A plaintiff must show reliance on the defendant's misstatement or omission to recover under 10b-5. Were we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions. Allowing plaintiffs to circumvent the reliance requirement would disregard

the careful limits on 10b-5 recovery mandated by our earlier cases.

Id. at 180 (Citations omitted).

[14]
> Before Central Bank, courts uniformly allowed aiding and abetting liability under Section 10(b). See, Id. at 169 (Listing cases); see also, In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d 1018,1038 (C.D. Cal. 2003) ("Prior to Central Bank, the lower federal courts had nearly uniformly recognized an implied right of action for aiding and abetting liability under Section 10(b) and Rule 10b-5.").

Central Bank also foreclosed a claim for conspiracy to violate Rule 10b-5, in addition to aiding and abetting. See, e.g., McGann v. Ernst & Young, 95 F.3d 821, 823 (9th Cir. 1996) ("[T]he rationale of Central Bank precludes a private right of action under § 10(b) for 'conspiracy' liability."); In re GlenFed, Inc. Securities Litigation, 60 F.3d 591, 592 (9th Cir. 1995) (Same).

To be primarily liable under Rule 10b-5(b), Defendants must have "substantial participation or intricate involvement" in the preparation of fraudulent statements "even though that participation might not lead to the actor's actual making of the statements." Howard v. Everex Systems, Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000); see also, In re Software Toolworks, 50 F.3d 615, 628-629 n.3 (9th Cir. 1994) (Accountant may become a primary violator under antifraud provision of Section 10(b) where it reviews and plays a "significant role in drafting and editing" two letters, one not identifying the accounting firm, sent by the issuer client to the SEC; a reasonable fact finder could find that the accountants "as members of the drafting group, ... had access to all information that was available and deliberately chose to conceal the truth"); In re ZZZZ Best Securities Litigation, 864 F.Supp. 960, 970 (C.D. Cal. 1994) (Where accounting firm was "intricately involved" in the creation of false and misleading documents and the "resulting deception," it may be liable as a primary violator of Section 10(b) ); Cashman v. Coopers & Lybrand, 877 F.Supp. 425, 432-34 (N.D. Ill. 1995) (Primary liability maybe established against accountants "centrally involved" in preparation of alleged false or misstated information for prospectuses or promotional material issued to investors that the accounting firm certified, audited, prepared or reported.); McNamara v. Bre-X Minerals

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 316 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Ltd., 57 F.Supp.2d 396, 426 (E.D. Tex. 1999) ("[I]f a defendant played a 'significant role' in preparing a false statement actually uttered by another, primary liability will lie"); In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d 1018, 1039 (C.D. Cal. 2003) ("[P]ersons 'outside' a corporation have been held liable as primary violators in private actions brought by shareholders of that corporation if those persons substantially and directly participated in the creation of false or misleading statements to the investing public."). "Allegations that [a Defendant] 'prepared, directed or controlled,' helped create' or 'materially assisted in' preparing false statements' [Peregrine] issued "place [his or her] involvement well beyond the realm of 'aiding and abetting' liability precluded by Central Bank." In re Global Crossing, 322 F.Supp.2d at 334.

**\*26** Defendants can also be primarily liable under Rule 10b-5(b) if they "made misleading statements [to others] with the intent that [they] communicate those statements to the market." Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1997). "In such circumstances, it was the defendant's original statement which misled investors-the person who communicated the statement to investors served as a mere conduit for [the] defendant's statement." Copland v. Grumet, 88 F.Supp.2d 326, 333 (D.N.J. 1999).

Corporate defendants, furthermore, may be directly liable under 10b-5(b) for providing false or misleading information to analysts where the corporate defendant intentionally used the analysts to disseminate false information to the public. In such a case, the defendants are not charged with aiding and abetting or secondary liability, but rather with primary liability. Cooper v. Pickett, 137 F.3d at 624, Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996) ("The Complaint asserts that [defendant] intentionally used these third parties to disseminate false information to the investing public. If this is true, [defendant] cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties").

Lastly, "the signing of [the company's] filing does establish that [an individual] made 'statements' within the meaning of the act and the rule." In re Homestore.com, Inc. Sec. Litig., 252 F. Supp. 2d at 1033; seealso, Howard v. Everex, 228 F.3d 1057, 1061-63 (9th Cir. 2000) (Finding that "signers of documents should be held responsible for the statements in the document ... a corporate official ... who, acting with scienter, signs a SEC filing containing misrepresentations,

'make[s]' a statement so as to be liable as a primary violator under § 10(b)").

Turning to Rule 10b-5(a) and (c), for primary liability to attach, "each [D]efendant [must] commit[ ] a manipulative or deceptive act in furtherance of the scheme." Cooper v. Pickett, 137 F.3d at 624 ("Central Bank does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme."); seealso, In re Global Crossing, 322 F.Supp.2d at 336; In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F. Supp. 2d 549, 693 (S.D. Tex. 2002) ("[U]nder Rule 10b-5(a) and (c), where a group of Defendants allegedly participated in a scheme to defraud the public and enrich themselves in connection with the purchase or sale of securities, any Defendant that itself, with the requisite scienter, actively employed a significant material devise, contrivance, scheme or artifice and defraud or actively engaged in a significant, material act, practice, or course of business that operated as a fraud or deceit upon any person in connection with the purchase or sale of any security may be primarily liable"). So "a complaint alleging that more than one defendant participated in a 'scheme' to defraud must allege a primary violation of § 10(b) by each defendant." In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d at 591.

Although there is no secondary liability, Section 20(a) of the 1934 Act and Section 15 of the 1933 Act, impose liability on persons who control those who have committed violations of federal securities law. See, No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003) ("In order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator."); seealso, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990) ("Although § 15 is not identical to § 20(a), the controlling person analysis is the same."). Thus, even where Plaintiffs' claims are insufficient to establish primary liability against a particular Defendant, they may be sufficient to state a claim for control person liability against that Defendant. See, Central Bank, 511 U.S. at 184.

### 3. Pleading Requirements Under The Private Securities Litigation Reform Act ("PSLRA").

**\*27** Plaintiffs must also comply with the PSLRA. Enacted in 1995, PSLRA "imposes a heightened pleading standard

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 317 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

for alleging violations under the Securities Exchange Act of 1934." In re Read-Rite Corp., 335 F.3d 843, 845-846 (9th Cir. 2003); seealso, Desaigoudar v. Meyercord, 223 F.3d 1020, 1021 (9th Cir. 2000) ("[T]he PSLRA ... modified the liberal, notice pleading standard found in the Federal Rules of Civil Procedure," such that the courts "now examine a securities fraud complaint to determine whether the plaintiff has complied with the more stringent pleading standards of the PSLRA."); In re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970, 973 (9th Cir. 1999) (In 1995, "Congress enacted PSLRA."). [15]

[15] "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.' " In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1084-1085 (9th Cir. 2002). However, "[t]he PSLRA was designed to eliminate frivolous or sham actions, ... not actions of substance." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1235 (9th Cir. 2004).

"Before the passage of the PSLRA, the pleading requirements in private securities fraud litigation were governed by Fed.R.Civ.P. 9(b), which required only that 'falsity' be pled with particularity; scienter could be averred generally. The PSLRA changed the pleading requirements ... by requiring that a complaint plead with particularity both falsity and scienter." Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1034 (9th Cir. 2002). [16]

[16] Specifically, the PSLRA imposes at least two pleading requirements on securities actions, referred to as paragraph (b)(1) and paragraph (b)(2). Paragraph (b)(1) applies to securities claims "in which the plaintiff alleges that the defendant" either "made an untrue statement of a material fact" or "omitted to state a material fact." 15 U.S.C. § 78u-4(b)(1). Paragraph (b)(2) applies to claims "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind." 15 U.S.C. § 78u-4(b)(2). The requirements of the PSLRA must be read consistently with its purpose. See, Barrett v. Van Pelt, 268 U.S. 85, 90-91(1925). Congress enacted the information and belief pleading requirement because "[n]aming a party in a civil suit for fraud is a serious matter. Unwarranted fraud claims can

lead to serious injury to reputation for which our legal system effectively offers no redress." H.R. Conf. Rep. 104-369 at 41. The purpose of the information and belief requirement--indeed, the purpose of all of the PSLRA's heightened pleading requirements--was to weed out meritless lawsuits at the pleading stage.

Thus, where material misstatements or omissions are alleged under Rule 10b-5(b), a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1085 (9th Cir. 2002); 15 U.S.C. § 78u4(b)(1). If allegations are made on information and belief [17], "a plaintiff must provide, in great detail, all the relevant facts forming the basis for her belief." In re Silicon Graphics Inc. Securities Litigation, 183 F.3d at 985; seealso, 15 U.S.C. § 78u4(b)(1) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

[17] "Allegations are deemed to have been made on information and belief until the plaintiffs demonstrate that they have personal knowledge of the facts." In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1085 (9th Cir. 2002).

**\*28** Similarly, in cases where a fraudulent scheme is alleged, i.e., claims under Rule 10b-5(a) and (c), a plaintiff must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."In re Global Crossing, 322 F.Supp.2d at 330; In re Blech Sec. Litig., 961 F.Supp. 569, 580 (S.D.N.Y. 1997).

"[T]he PSLRA [also] requires that the Complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, or scienter." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d at 1230; 15 U.S.C. § 78u-4(b)(2); seealso, In re Silicon Graphics Inc. Securities Litigation, 183 F.3d at 975 ("The 'required state of mind' in § 78u-4(b)(2) refers to the scienter...."); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976) ("[T]he term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud.").

This requires pleading "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

conscious misconduct." In re Silicon Graphics Inc., 183 F.3d at 974; seealso, Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d at 1230 ("The required state of mind is one of 'deliberate recklessness.' Recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct.").

Great detail means a plaintiff "must provide a list of all relevant circumstances in great detail." Id. at 984. Deliberate recklessness, or conscious misconduct, is a "highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 389 (9th Cir. 2002). "To allege a 'strong inference of deliberate recklessness,' plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." Id.; seealso, Linton v. Pathogenesis Corp., supra, 284 F.3d at 1035 ("[P]laintiffs who plead the required state of mind in general terms of mere 'motive and opportunity' or 'recklessness' fail to meet the PSLRA's heightened pleading requirements.").

"Scienter is [the] essential element of a § 10(b) claim." In re Read-Rite Corp., 335 F.3d 843, 846 (9th Cir. 2003); seealso, Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("Scienter is an essential element of a § 10(b) or Rule 10b-5 claim."). "In assessing whether Plaintiffs have sufficiently pled scienter [the Court] must consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d at 1230; seealso, No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d at 932 (The Court "must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements."). "In determining whether a strong inference of scienter exists, [the Court] must consider all reasonable inferences, whether or not favorable to the plaintiff." Id.; seealso, Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) (Noting the "inevitable tension ... between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to dismiss ... and the heightened pleading standard set forth under the PSLRA"); seealso, No. 84 Employer-Teamster

Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d at 945 ("In sum, although recognizing that some of Plaintiffs' allegations are individually lacking, we hold that the allegations in their totality are sufficient to meet the stringent pleading standard set forth in the PLSRA.").

**\*29** "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a strong inference of scienter, a Rule 12(b)(6) dismissal is proper." Lipton v. Pathogenesis Corp., 284 F.3d at 1035; seealso, No. 84 Employer-Teamster Joint CouncilPension Trust Fund v. America West Holding Corp., 320 F.3d at 931-932 ("If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, his or her complaint must be dismissed.").

In sum, under the PSLRA, "the [C]omplaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." Ronconi v. Larkin, 253 F.3d 423, 432 (9th Cir. 2001). "If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, the complaint must be dismissed." In re Syncor Intern. Corp. Securities Litigation, 327 F.Supp.2d 1149, 1156 (C.D. Cal. 2004).

However, "[a]lthough pleading securities fraud after the PSLRA can no longer be described as merely 'notice pleading,' courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities laws." In re PetSmart, Inc. Securities Litigation, 61 F.Supp.2d 982, 988 (D. Ariz. 1999); seealso, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 200 (1976). In particular, whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact. See, Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b) (6)." Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996).

### 4. No Claim Can Be Sustained Under the Group Published Doctrine.

The "group published" or "group pleading" doctrine presumes that false and misleading information conveyed in documents, including press releases, are made by the collective action of the officers of the corporation. See,

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

In re GlenFed. Sec. Litig., 60 F.3d 591, 593 (9th Cir. 1995) ("In cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group published information,' it is reasonable to presume that these are the collective actions of the officers."). The doctrine thus "allows Plaintiffs to attribute statements to individual defendants based upon their corporate titles, rather than pleading facts that show that a defendant actually made, authored, or communicated a statement." In re Syncor Intern. Corp. Securities Litigation, 327 F.Supp.2d 1149, 1171 (C.D. Cal. 2004). To rely upon this presumption, "plaintiffs' complaint must contain allegations that ... [the defendant] either participated in the day-to-day corporate activities or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." In re GlenFed., 60 F.3d at 593.

Since PSLRA's enactment, courts have struggled to determine the continued viability of the group published doctrine. The Ninth Circuit has not decided the issue, and the district courts are split. Compare, In re Secure Computing Corp., 184 F.Supp.2d 980, 991 (N.D. Cal. 2001) (Reaffirming its finding that the group published information presumption survives the PSLRA); In re Splash Techs. Holdings, Inc. Sec. Litig., 2000 WL 1727377 at *24-25 n.18 (N.D. Cal. 2000) (Assuming that the group pleading doctrine survived the PSLRA); Stanley v. Safeskin Corp., 2000 WL 33115908 at *4 (S.D. Cal. 2000) (Rejecting argument that group pleading doctrine did not survive the PSLRA); with Allison v. Brooktree Corp., 999 F.SUPP. 1342, 1350-51 (S.D. Cal. 1998) (Ruling that the PSLRA is fundamentally inconsistent with the group published information doctrine); In re Ashworth, Inc. Securities Litigation, 2000 WL 33176041 at *12 (S.D. Cal. 2000) (Same); In re Syncor Intern. Corp. Securities Litigation, 327 F.Supp.2d 1149, 1172 (C.D. Cal. 2004) (Same).

**\*30** In Allison v. Brooktree Corp., this Court found that the group-published information doctrine is inconsistent with the PSLRA because the doctrine allows facts to be presumed while "the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant.' " Id. at 1350 ("[T]he continued vitality of the judicially created group-published doctrine is suspect since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be plead in regards to 'each

act or omission' sufficient to give 'rise to a strong inference that **the defendant** acted with the required state of mind,' ") (Emphasis in original). Relying, in part, on Allison v. Brooktree Corp., the Fifth Circuit, the first circuit court to address the issue, recently found that the "group pleading" doctrine did not survive the PSLRA. See, Southland Sees. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 363-366 (5th Cir. 2004). The Fifth Circuit concluded that group pleading cannot be reconciled with the PSLRA's requirement that Plaintiffs must plead specific facts as to each act or omission by the defendants and demonstrate that defendants possess the requisite scienter. Id. at 365. Other courts have ruled that the doctrine is no longer applicable because it is inconsistent with the PSLRA's requirement that scienter must be pleaded with particularity for each defendant. See Coates v. Heartland Wireless Communications, Inc., 26 F.Supp.2d 910, 916 (N.D. Tex. 1998) ("It is nonsensical to require that a plaintiff specifically allege facts regarding scienter as to each defendant, but to allow him to rely on group pleading in asserting that the defendant made the statement or omission.").

"It has also been suggested that the group-published information doctrine is no longer viable because it is inconsistent with the overall spirit of the PSLRA in general, and the PSLRA's discovery stay provision at § 78u-4(b)(3) (B) in particular." In re Lockheed Martin Corp. Securities Litigation, 272 F.Supp.2d 928, 935 (C.D. Cal. 2002). "Group pleading arguably allows plaintiffs to name, as defendants, people or corporations who cannot be tied by specific facts to allegedly false or misleading statements without discovery. But, 'Congress clearly intended that complaints in [post-PSLRA] securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed.' " Id., quoting Medhekar v. Linked States Dist. Court, 99 F.3d 325, 328 (9th Cir. 1996).

The group-published doctrine is also inconsistent with the PSLRA as it requires courts to accept a plaintiff's belief regarding the individual liability of a corporate officer even when the belief is based on the officer's job title alone. The doctrine could essentially be a mechanism for pleading an officer's involvement in the issuance of a corporate statement based on information and belief. The PSLRA permits pleading on information and belief, but, as noted above, only if the complaint states with particularity all facts on which the belief is formed. See, 15 U.S.C. § 78u-4(b)(1). Implicit in this requirement is a mandate that

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 320 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

the stated facts provide an adequate basis for the asserted belief. Thus, a plaintiff can attribute to a particular defendant a false or misleading statement contained in a group-published document based on information and belief as long as the plaintiff satisfies the corresponding PSLRA requirements. For example, if alleged misleading statement appears in a press release issued by a company discussing financial performance, a plaintiff could plead on information and belief that the chief financial officer is responsible for making the statement if the plaintiff can plead with specificity why the officer's position directly involves such duties or why a specific corporate policy requires that chief financial officer make such releases. Coates v. Heartland Wireless Communications, Inc., 26 F.Supp.2d at 916 n. 2 (Holding that "[b]ecause a plaintiff can plead on the basis of information and belief, he need not rely on group pleading."). Under no circumstances should the group-published information doctrine relieve plaintiffs of their burden to plead scienter. See, 15 U.S.C. § 78u-4(b)(2); In re Digital Island Sec. Litig., 223 F.Supp.2d 546, 553 (D. Del. 2002) ("[C]ourts have reasoned that the requirement under the PSLRA that scienter be pled with particularity as to each defendant would be rendered meaningless should group pleading survive").

**\*31** Courts favoring the continued application of the group-published information doctrine offer only modest support for their positions. Some courts simply point out that the doctrine has nothing to do with scienter and reaffirm the reasonableness of the doctrine's underlying presumption. See, BankAmerica Corp. Secs. Litig., 78 F.Supp.2d 976, 988 (E.D. Mo. 1999) ("[T]he doctrine has nothing to do with scienter. Rather, it is a reasonable presumption that the contents of company-published documents and press releases are attributable to officers and directors with inside knowledge of and involvement in the day-to-day affairs of the company."). At least two courts in the Ninth Circuit, including one in this District, partially based their decision to continue recognizing group pleading because the Ninth Circuit's opinion in Silicon Graphics failed to question the enduring viability of the doctrine. See, Stanley v. Safeskin Corp., 2000 WL 33115908, at \*4 (S.D. Cal. 2000) ("The Ninth Circuit in Silicon Graphics neither accepted nor refuted the district court's reliance on this doctrine."); In re Stratosphere Corp. Sec. Litig., 1 F.Supp.2d 1096, 1108 (D. Nev. 1998) (Citing the defendant's failure to offer case authority for the doctrine's abolition as a second reason for its decision).

Accordingly, to the extent Plaintiffs rely on the group pleading doctrine, that reliance is rejected. The group

published doctrine permits an inference of wrongdoing not based on Defendant's conduct, but based solely on Defendant's status as an officer or director of a corporation. This is in contravention of the PSLRA's pleading requirements. Under the PSLRA, "a complaint seeking to attribute information published by an organization to an individual defendant should state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements." In re Lockheed Martin Corp. Securities Litigation, 272 F.Supp.2d at 936.

Plaintiffs must allege facts tying each of the alleged misstatements and omissions to each of the Defendants. See, In re Boeing Securities Litigation, 40 F.Supp.2d 1160, 1166 (W.D. Wash. 1998) ("[A] plaintiff must attribute the misleading statements upon on which his claim is based to a particular defendant."); In re Silicon Graphics, Inc. Sec. Litig., 970 F.Supp. 746, 752 (N.D. Cal. 1997) ("[T]he plaintiff is obligated to distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud.").

**B. Section 10(b) Liability Under Rule 10b-5(a) and (c).**
As noted above, subsections (a) and (c) of Rule 10b-5 prohibit "the use of 'any device, scheme or artifice,' or 'any act, practice, or course of business' used to perpetuate a fraud on investors." In re Global Crossing, 322 F.Supp.2d at 336-37. To state a claim under these provisions, Plaintiffs must allege: "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." In re Global Crossing, 322 F.Supp.2d at 329. (Citations omitted). Only elements (4) and (5) are at issue.

Manipulative conduct in Section 10(b) "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Ernst & Ernst v. Hochfelder, 425 U.S. at 199. This includes "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Indust. v. Green, 430 U.S. 462, 476 (1977) (Citations omitted). Courts have also found that "[s]chemes used to artificially inflate the price of stocks by creating phantom revenue fall squarely within" the manipulative conduct proscribed under Section 10(b). In re Global Crossing, 322 F.Supp.2d at 337. Lastly, a defendant could be liable under Rule 10b-5(a) or (c) for a scheme to

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 321 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

publish false or misleading statements. See, Cooper v. Pickett, 137 F.3d 616, 624-625 (9th Cir. 1997) (Defendant, "through false statements to analysts, and those analysts, by issuing reports based on statements they knew were false, together engaged in a scheme to defraud the shareholders" under Rule 10b-5(a), and under Rule 10b-5(b) for "Merisel is liable for its own false statements to the analysts.").

**\*32** Here, as to the remaining Defendants, the Complaint only appears to charge Nelson and Luddy with violating Rule 10b-5(a) and (c). However, as alleged, the Complaint fails to state a claim against these Defendants.

As to Nelson, the Complaint appears to charge him with "[s]chemes used to artificially inflate the price of stocks by creating phantom revenue." In re Global Crossing, 322 F.Supp.2d at 337. The Court must first determine whether Nelson was a primary actor, i.e., "committed a manipulative or deceptive act in furtherance of the scheme." Cooper v. Pickett, 137 F.3d at 624. "Those who actually 'employ' the scheme to defraud investors are primary violators, while those who merely participate in or facilitate the scheme are secondary violators."In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d at 1040. Further, "whether a defendant was a primary violator rather than an aider and abettor turns on the nature of his acts, not on his state of mind when he performed them." In re Global Crossing, Ltd. Securities Litigation, 322 F.Supp.2d at 330; seealso, SEC v. U.S. Environmental, Inc., 155 F.3d at 111 ("[W]hether Romano was a primary violator rather than an aider and abettor turns on the nature of his acts, not on his state of mind when he performed them.").

Against this backdrop, the Complaint fails to allege Nelson was a primary actor. The Complaint first alleges "Nelson was pushing to renegotiate the deal [involving Peregrine and Crossmark] in an attempt to artificially increase reported revenues for the June 2001 quarter at Peregrine." (Complaint Exh. E at 10.) The Complaint then alleges "[i]n violation of GAAP, Nelson insisted that ... Peregrine recognize the full [revenue for the] software license fee immediately in the June 2001 quarter despite the fact that the transaction was nothing more than a contingent transaction" and that Peregrine in fact did so. (Id. at 11.) The Complaint also alleges Nelson "signed the agreement on behalf of Peregrine" in a deal involving IBM "which gave rise to improper revenue recognition." (Complaint Exh. E at 42-43.) Accordingly, the only conduct alleged against Nelson is that he was somehow involved in the renegotiations of an alleged contingent deal,

that he "insisted" that Peregrine recognize revenue on a contingent deal, and that he "signed" a deal involving side letters. Such allegations are insufficient to give rise to primary liability under Central Bank. In re Global Crossing, Ltd. Securities Litigation, the complaint alleged defendant had "mastermind" the improper accounting schemes "used to circumvent GAAP and inflate the Company's revenues, that it actively participated in structuring each swap, that it was intimately involved in all of [the] accounting functions, and that it directly participated in the creation of the misleading 'pro forma' numbers that concealed these practices from investors." 322 F.Supp.2d at 336. The court found that defendant's "allegedly central role in these schemes, as their chief architect and executor" is enough for "potential liability as a primary violator under Section 10(b)." Id.; see also, SEC v. U.S. Environmental, Inc., 155 F.3d at 109 (Finding primary act where defendants, among other manipulative acts, "traded [company] shares among themselves 'for the purpose of creating the appearance of an actual market for trading [company] shares' and thus raising [the company's] stock price."). No such allegations have been made here.

**\*33** The Complaint also fails to state a claim against Luddy. Again, the Complaint fails to allege Luddy ever engaged in any act proscribed under Rule 10b-5(a) and (c). The only allegations against Luddy are that he "recommended the commercial release to" British Telecome ("BT") when "Peregrine was not in a position to deliver a commercially viable product to BT." (Complaint Exh. E at 16.) Under Central Bank and PSLRA, such allegations are insufficient to state a claim. See, Cooper v. Pickett, 137 F.3d at 624 (For primary liability to attach under subdivisions (a) and (c) "each [Defendant [must] commit[ ] a manipulative or deceptive act in furtherance of the scheme."); In re Global Crossing, 322 F.Supp.2d at 330 (For claims under Rule 10b-5(a) and (c), under PSLRA, a plaintiff must specify "what manipulative acts were performed ... and what effect the scheme had on the market for the securities at issue."). Accordingly, the Complaint fails to state a claim against Nelson and Luddy under Rule 10b-5(a) and (c).

## C. Section 10(b) Liability Under Rule 10b-5(b) For Misleading Statements or Omissions.

Most of the Complaint is devoted to Defendants' alleged misstatements or omissions. As noted in Section II (D), supra, Peregrine reported eleven (11) quarterly revenue increases as well as annual revenue increases for years 2000 and 2001. These statements appeared in press releases, analysts' reports, and SEC filings. To survive dismissal, the Complaint must

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 322 of 573
In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8158825

allege, with respect to each Defendant: (1) a primary act; (2) falsity; (3) scienter; (4) reliance; and (5) causation. Only elements (1) through (3) are at issue. Accordingly, the Court will first determine, as alleged, which of the Defendants was a primary actor with respect to: (1) Peregrine's press releases; (2) analysts' reports; and (3) Peregrine's SEC filings. The Court will then determine whether the Complaint adequately pleads falsity. Lastly, the Court will determine whether the Complaint adequately alleges scienter.

### 1. Primary Actors.

#### a. Press Releases.

Peregrine issued press releases on its financial results at the end of each quarter for the fiscal years 2000, 2001 and the first three quarters of 2002. The press releases typically would report the total revenue for the quarter, the increase in revenue as compared to the same quarter a year ago, and a quote from Gardner. For example, at the end of the first quarter of 2000, Peregrine issued a press release stating it had achieved "record" quarterly revenues of $51.6 million. Peregrine further stated that "[o]verall results were driven by a 131 percent increase in license revenue over the comparable quarter in the prior year." Gardner was quoted: "We are extremely pleased with the outstanding growth in both our software license sales and our professional services activity in the first fiscal quarter...."

The Complaint alleges some of the Defendants "read and approved" these press releases. (See, e.g. Complaint ¶ 515.) The Complaint also alleges Nelson was the "principal draftsman of the press releases" up to October 2000. (Complaint ¶ 298.) Therefore, Nelson allegedly drafted the press releases following quarters one through four in 2000 and the first quarter of 2001.

As alleged, under PSLRA and Central Bank, only Nelson is a primary violator of Section 10(b) but only as to the press releases following quarters one through four in 2000 and the first quarter of 2001. Under Central Bank, to be a primary actor, a Defendant must have a "substantial participation or intricate involvement" or "prepared, directed or controlled", or "materially assisted in" preparing the press releases. Howard v. Everex Systems, Inc., 228 F.3d at 1061; In re GlobalCrossing, 322 F.Supp.2d at 334. According to the Complaint, Nelson was a "principal draftsman of the press releases" following quarters one through four in 2000 and the first quarter of 2001. At this stage, such allegations are sufficient.

*34 Under PSLRA, Nelson can only be held liable for press releases following quarters one through four in 2000 and the first quarter of 2001; statements from the press releases attributed to Gardner, cannot be imputed to Nelson or any other Defendant.

Moreover, Defendants who allegedly "read and approved" the press releases are not primary actors. Allegations that a Defendant "read" and "approved" the press releases are insufficient to show a primary act. See, id. at 333-34; In re Autodesk Inc. Sec. Litig, 132 F.Supp.2d 833, 845 (N.D. Cal. 2000) ("For claims against corporate insiders, a plaintiff must allege that the defendants were involved in the preparation of the allegedly misleading statement."); In re Rent-Way Securities Litigation, 209 F.Supp.2d 493, 503 (W.D. Pa. 2002) ("Central Bank precludes holding PwC liable based on its review and approval of Rent-Way's unaudited 1999 and 2000 quarterly reports. Significantly, these statements were prepared and issued solely by Rent-Way, and consequently contained no misrepresentations attributable to PwC upon which investors could have relied."); In re Kendall Square Research Corp. Sec. Litig., 868 F.Supp. 26, 28 (D. Mass. 1994) ("Because [defendant] did not actually engage in the reporting of the financial statements ... but merely reviewed and approved them, the statements are not attributable to [defendant] and thus [defendant] cannot be found liable for making a material statement."); In re Oak Tech. Sec. Litig., 1997 WL 448168 at *11 (N.D. Cal. 1997) (finding allegations that members of the Audit Committee "reviewed and approved the issuance of Oak's false financial statements" to be insufficient); Danis v. USN Communications, Inc., 121 F.Supp.2d 1183, 1193 (N.D. Ill. 2000) ("Plaintiffs cannot establish that Deloitte violated Rule 10b-5 by examining USN's 1997 unaudited financial report. Aiding and abetting fraud is not sufficient for Rule 10b-5 liability.").

Accordingly, the Complaint sufficiently alleges that Nelson was a primary actor in that he drafted the press releases following quarters one through four in 2000 and the first quarter of 2001.

#### b. Analysts' Statements.

At the end of each quarter, Peregrine management, led by Gardner, held a conference call with investors and analysts and reported on Peregrine's performance. For example, the Complaint alleges, at the end of the third quarter of 2000, Peregrine management, led by Gardner, held a conference call with investors and analysts. At the conference, Peregrine

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 323 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

management reported on Peregrine's previously released financial results for the quarter. Peregrine management also stated that customer acceptance of Peregrine's new Get.It! e-products far surpassed expectations and that the balance sheet remained strong with cash increasing and DSO remaining steady at an acceptable level of 79 days.

Following the conference, CIBC reported "[t]he enthusiastic reception of Peregrine's New Get.It! e-procurement products far exceeded management's expectations, and generated $5 million in sales in just three weeks of release." The report also indicated "that the deal pipeline was more active than usual." CIBC also noted:

> The balance sheet remained strong this quarter, increasing $300,000 to $25.2 million with cash remaining at $0.38 per share. Accounts receivable rose $8.5 million to $59.6 million, with DSO remaining steady at 79, also within what management regards as an acceptable range. Deferred revenues grew $9.8 million to $31.3 million, and were made up solely of customer support.

**\*35** CIBC continued to rate Peregrine as a "strong buy." First Union also rated Peregrine a "strong buy."

The Complaint then alleges Defendants, excluding some, "either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the ... conference call was materially false and misleading" and that "defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be disseminated to the investing public." (See, e.g. Complaint ¶ 531.) As alleged, no Defendant is liable for these statements.

"[C]orporate defendants may be directly liable under 10b-5 for providing false or misleading information to third-party securities analysts" if they intended "the analysts communicate those statements to the market." Cooper v. Pickett, 137 F.3d at 624; seealso, id. ("Merisel is alleged to have made misleading statements to the analysts with the intent that the analysts communicate those statements to the market. This is not aiding and abetting or secondary

liability; the complaint alleges that Merisel is liable for its own false statements to the analysts"). Liability may also attach if Defendants "put their imprimatur, express or implied, on the [analysts'] projections." In re Syntex Corp. Securities Litigation, 95 F.3d 922, 934 (9th Cir. 1996); seealso, Allison v. Brooktree Corp., 999 F.Supp. 1342, 1349 (S.D. Cal. 1998) ("In the context of analyst statements, Rule 9(b) is satisfied where it is alleged 'that the insider provided misleading information to an analyst, that the analyst relied on this information in preparing a report and that the insider somehow endorsed or approved the report prior to or after its publication.' "); PicardChemical, Inc. Profit Sharing Plan v. Perrigo Co., 940 F.Supp. 1101, 1126 (W.D. Mich. 1996) ("Under Rule 9(b), statements made originally by independent market analysts are not actionable unless a plaintiff can plead with particularity who among defendants supplied the information, how it was supplied, and how defendants could have controlled the content of the statement"). Viewed from either angle, Plaintiffs fail to state a claim for these statements.

Although Plaintiffs identify some statements made during the conference call, Plaintiffs allege only that "contents of the analyst reports [were] based on information provided [or representations made] by Peregrine management." (Complaint ¶ 530.) Plaintiffs, however, fail to allege any particular Defendant made any particular statements "with the intent that the analysts communicate those statements to the market." Cooper v. Pickett, 137 F.3d at 624; seealso, Copland v. Grumet, 88 F.Supp.2d 326, 333 (D.N.J. 1999); c.f.In re Secure Computing Corporation Securities Litigation, 184 F.Supp.2d 980, 990 (N.D. Cal. 2001) ("For each analyst statement alleged to be attributable to Defendants, Plaintiffs sufficiently plead the conduit theory of liability. Plaintiffs allege a specific false and misleading statement by Defendants regarding the financial status of Secure, directly communicated to analysts at a specific place and time, followed on the very next day by analysts' recommendations to buy Secure stock. These allegations identify the dates of Defendants' misleading and false statements, their locations, the speakers, the content of the statements, and the dates (in each case the following day), contents and speakers of the analysts' statements. These allegations are sufficient to plead liability for the analysts' statements."). Also, "[t]he courts that have considered whether a plaintiff can proceed against an individual or corporate defendant based on an allegation of a statement attributed to the corporate defendant's 'management' have held such allegations are insufficient to survive a motion to

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 324 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

dismiss." In re Pinnacle Systems, Inc., 2002 WL 31655187 at *4 (N.D. Cal. 2002); seealso, Klein v. General Nutrition Cos., 186 F.3d 338, 345 (3rd Cir. 1999) (Holding allegation that corporate defendant's 'management' made statements to analyst insufficient to survive motion to dismiss because '[t]he complaint fails to attribute the statement to any specific member of [ ] management"); In re Visual Networks, Inc. Sec. Litig., 217 F.Supp.2d 662, 668 (D. Md. 2002) (Holding allegation that 'senior management' made statement to analyst insufficient to survive motion to dismiss; observing '[p]laintiffs do not point to, and the court has been unable to find, a single case where statements to analysts from 'senior management,' and not named individuals, provide the basis for a PSLRA claim").

*36 Nor have Plaintiffs alleged that any Defendant endorsed the analysts' statements. As "Defendants never endorsed or adopted the statements of analysts; they never put their imprimatur on the projections." In re Syntex Corp. Securities Litigation, 95 F.3d at 934. At best, as alleged, "the[ ] statements were the culmination of a one-way flow of information, from [Peregrine] representatives to analysts and from the analysts to their customers." Id. (Dismissing on such allegations). Thus, Defendants "did not adopt or entangle [themselves] in the analysts' statements Accordingly, Plaintiffs have failed to state a claim for liability based on analysts' statements." Id.; seealso, In re Miller Industries Sec. Litig., 12 F.Supp.2d 1323, 1329 (N.D. Ga. 1998)("To hold a defendant company liable for statements made by securities analysts, a plaintiff must show that the defendant sufficiently entangled itself with the analysts' forecast to render the predictions attributable to the defendant,"); Elkin v. Liggett & Meyers, Inc., 635 F.2d 156, 162 (2d Cir. 1980) (Same).

c. SEC Filings.

During the class period, Peregrine filed nine (9) 10-Q forms in 2000, 2001, and 2002 as well as two (2) 10-K forms in 2000 and 2001 with the SEC. Peregrine also filed two Amendment No.1s to its S-4 Registration Statements with the SEC regarding mergers with Harbinger and Remedy.

The 10-Q and 10-K forms included Peregrine's press releases and financial statements for the quarter preceding the filing and Peregrine's general revenue recognition policy. The 10-K forms also included an unqualified audit report by Arthur Andersen on Peregrine's year end financial statements for each respective fiscal year.

The S-4 Registration Statements solicited proxies from Harbinger and Remedy shareholders regarding Peregrine's proposed merger with those corporations. These Statements included information on Peregrine's business and Peregrine's audited financial statements. The Harbinger proxy included Peregrine's financial statements for 2000, while the Remedy proxy included Peregrine's financial statements for 1999, 2000, and 2001. The proxies also stated that Peregrine's "selected consolidated financial data derives from the consolidated financial statements of Peregrine Systems, Inc. and its subsidiaries," and that "[t]hese financial statements have been audited by Arthur Andersen LLP, independent public accountants." (Complaint ¶¶ 547 and 592.) According to the Complaint, Arthur Andersen and AWSC consented to the use of the false audit reports in these Statements.

The Complaint alleges Nelson "was ... responsible for drafting and filing SEC Forms 10-K and 10-Q" although it does not identify for which years or quarters. (Complaint ¶ 298.) The Complaint then identifies the Defendants who signed these SEC filings:

Gless signed the 10-Q forms. The Complaint is silent, however, as to who signed the 10-Q for the third quarter of 2001,

Gless, Gardner, Moores, Noell, van den Berg, Watrous and Hosley signed the 10-K for the Fiscal Year 2000,

Gless, Gardner, Moores, Noell, Watrous and Savoy signed 10-K for the Fiscal Year 2001,

Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg and Waltrous signed Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and

Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous signed Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal.

As alleged, the Complaint fails to adequately allege that Nelson was a primary actor in that he made a statement in the SEC filings. The Complaint merely alleges Nelson "was ... responsible for drafting and filing SEC Forms 10-K and 10-Q." (Complaint ¶ 298.) Such allegations are not sufficient to show a primary act on Nelson's part. Unlike other Defendants, Nelson did not sign the SEC filings. "Plaintiffs, therefore, must allege that [Nelson] substantially participated or was intricately involved in preparing the statements." In re Cylink

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 325 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Securities Litigation, 178 F.Supp.2d 1077, 1085 (N.D. Cal. 2001); seealso, Howard v. Everex Systems, Inc., 228 F.3d at 1061 n.5; Cooper v. Pickett, 137 F.3d at 624. No such allegations have been made.

**\*37** By contrast, any and all Defendants who signed these SEC filings made statements making them primary actors under Section 10(b) and Rule 10b-5. See, In re Homestore.com, Inc. Sec. Litig., 252 F. Supp. 2d at 1033 ("[T]he signing of [the company's] filing does establish that [an individual] made 'statements' within the meaning of the act and the rule."); Howard v. Everex, 228 F.3d at 1061-63 ("[S]igners of documents should be held responsible for the statements in the document ... a corporate official ... who, acting with scienter, signs a SEC filing containing misrepresentations, 'make[s]' a statement so as to be liable as a primary violator under § 10(b)."); In re Enron Corp. Securities, Derivative & ERISA Litigation, 258 F.Supp.2d at 587 ("A corporate official ... who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10-K, regardless of whether he participated in the drafting of the document, 'makes' a statement and may be liable as a primary violator under § 10(b) for making a false statement.").

Similarly, Arthur Andersen was a primary actor in issuing unqualified audit reports on Peregrine's 2000 and 2001 financial statements, which were included in Peregrine's 10-Ks for 2000 and 2001. Further, Arthur Andersen, along with AWSC, were primary actors for consenting to the use of their audit reports in the two S-4 Registration Statements regarding Harbinger and Remedy merger proposals. See, Central Bank, 511 U.S. at 191 ("Any person or entity, including a[n] accountant ... who makes a material misstatement (or omission) ... may be liable as a primary violator under 10b-5."); Vosgerichian v. Commodore Intern, 862 F.Supp. 1371, 1378 (E.D. Pa. 1994) (Dismissing claims against accountant based on misrepresentations made by client, but holding that accountant's unqualified opinion could be the basis of primary liability); In re Kendall Square Research Corp. Sec., 868 F.Supp. 26, 28-29 (D. Mass. 1994) (Same).

Thus, under Section 10(b) and Rule 10b-5(b), all Defendants who signed the SEC filings were primary actors in that they made statements. Further, Arthur Andersen and AWSC were primary actors in issuing, or consenting to the use of, the audit reports. However, under PSLRA and Central Bank, each Defendant's potential liability is limited to the respective statements they made: (1) **Gless** for the statements in the:

(a) eight (8) 10-Q [18] forms filed in 2000, 2001, and the first three quarters of 2002, (b) 10-K for the Fiscal Year 2000, (c) 10-K for the Fiscal Year 2001, (d) Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (e) Amendment No. 1 to the S-4 Registration Statement on Remedy merger proposal; (2) **Gardner** for the statements in the: (a) 10-K for the Fiscal Year 2000, (b)10-K for the Fiscal Year 2001, (c) Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (d) Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal; **Moores** for the statements in the: (a) 10-K for the Fiscal Year 2000, (b) 10-K for the Fiscal Year 2001, (c) Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (d) Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal; **Noell** for the statements in the: (a)10-K for the Fiscal Year 2000, (b) 10-K for the Fiscal Year 2001, (c) Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (d) Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal; **van den Berg** for the statements in the: (a) 10-K for the Fiscal Year 2000, and (b) Amendment No. 1 to the S-4 Registration Statement on Harbinger merger proposal; **Waltrous** for the statements in the: (a)10-K for the Fiscal Year 2000, (b) 10-K for the Fiscal Year 2001; (c) Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (d) Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal; **Hosley** for the statements in the: (a) 10-K for the Fiscal Year 2000, and (b) Amendment No.1 to the S-4; **Savoy** for the statements in the: (a) 10-K for the Fiscal Year 2001, and (b) Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal; **Cole** for the statements in the: (a) Amendment No. 1 to the S-4 Registration Statement on Harbinger merger proposal, and (b) Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal; **Arthur Andersen** for the statements in the: (a) 10-K for the Fiscal Year 2000, (b) 10-K for the Fiscal Year 2001, (c) Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (b) Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal; and **AWSC** for the statements in the: (a) Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal, and (b) Amendment No.1 to the S-4 Registration Statement on Remedy merger proposal.

18    They were actually nine (9) 10-Q forms filed with the SEC. However, as noted, the Complaint is silent as to who signed the 10-Q form for the third quarter of 2001. See, Lee v. City of Los Angeles, 250

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 326 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

F.3d 668, 688 (9th Cir. 2001) ("[W]hen the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), review is limited to the complaint.").

**d. Conclusion.**

**\*38**  Only primary actors can be held liable under Section 10(b) and Rule 10b-5. See, Central Bank, 511 U.S. 164. A Defendant is a primary actor under Rule 10b-5(b), if that Defendant had "substantial participation or intricate involvement" in the preparation of fraudulent statements Howard v. Everex Systems, Inc., 228 F.3d at 1061 n.5; or "made misleading statements [to others] with the intent that [they] communicate those statements to the market." Cooper v. Pickett, 137 F.3d at 624; or signed the statement. See, Howard v. Everex, 228 F.3d at 1061-63.

Against this backdrop, with respect to the press releases, only Nelson was a primary actor in that he drafted them following quarters one through four in 2000 and the first quarter of 2001. No Defendant was a primary actor with respect to the analyst reports. As for the SEC filings, only the Defendants identified above in bold are primary actors.

Accordingly, as alleged, the Complaint fails to state a claim under Section 10(b) and Rule 10b-5 against Luddy, Dammeyer and Stulac. Specifically, the Complaint fails to allege these Defendants either employed a scheme to defraud or made any statements.

As for the other Defendants, whether they can be held liable, depends on whether the Complaint adequately alleges falsity, scienter, causation, reliance and damages. See, Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1157 (9th Cir. 1996); Central Bank, 511 U.S. at 191. Only falsity and scienter are at issue. Each is discussed in turn,

**2. Falsity.**

The Complaint adequately alleges the above statements-press releases and SEC filings-were false or misleading. As mentioned above, to adequately plead falsity under PSLRA, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs "must [also] show that the statements were misleading as to a material

fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." Basic Inc. v. Levinson, 485 U.S. at 238; seealso, Freedman v. Louisiana-Pacific Corp., 922 F.Supp. 377, 388 (D. Or. 1996) ("[W]hether an omission is material and whether a statement is misleading are two interrelated, but separate, fact-specific inquiries"). Plaintiffs have satisfied these requirements.

First, Plaintiffs adequately identify each and every statement, including Peregrine's quarterly press releases and SEC filings, they allege was misleading. The Complaint then sets forth why the statements were misleading. Specifically, the Complaint alleges the statements omitted crucial material information regarding Peregrine's changed revenue recognition policy, and that Peregrine falsely reported its accounts receivable, liabilities, DSO, and cash balances. (See, e.g., Complaint ¶¶ 512 and 545: The 10-Q and 10-K filings "were materially false and misleading because Peregrine's reported revenue was materially overstated, there was no disclosure of a material change in its accounting policy as applied to the first quarter of fiscal year 2000, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated, and its DSO were understated....").

**\*39**  Plaintiffs further allege the reasons why Peregrine's change in its revenue-recognition practice was fraudulent or misleading. According to the Complaint, Peregrine began to account for its revenues from indirect sales in a much more "aggressive" fashion than it previously had done by prematurely recognizing millions in revenues and recording revenues on software licenses to resellers even though the resellers were not obligated to pay for those licenses until they sublicensed the product to the ultimate consumer. The result, the Complaint alleges, was that Peregrine's indirect sales' figures were inflated and materially misleading. Plaintiffs further allege "Peregrine materially misrepresented its balance sheet and statement of liabilities by failing to include significant obligations to financial institutions. These obligations arose out of Peregrine's undisclosed business practice of factoring substantial portions of its accounts receivable and treating those borrowings as sales of receivables, in violation of GAAP." (Complaint ¶ 24.) Plaintiffs also allege that, in violation of GAAP, Peregrine regularly treated loans as sales of accounts receivables. This practice, Plaintiffs allege, enabled Peregrine to conceal its contingent sales and understate its debt on financial statements and the accounts receivables on its balance sheet by as much as $180 million. Understatement of its accounts

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 327 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

receivables decreased Peregrine DSO, misleading investors and analysts about the quality of Peregrine's reported revenue. Moreover, using Peregrine's actual restatements to the public, the Complaint sets forth the representations made, what financial figures were given, and what the alleged true financial figures were. Plaintiffs have thus explicitly pled the specific material misstatements and omissions, and, for each misstatement or omission, have stated why they are misleading. In essence, Plaintiffs allege that Peregrine reported and recognized millions in revenue before it actually earned it under GAAP, in some cases having never earned it. Plaintiffs also provide charts and figures setting forth the discrepancy between the revenues Peregrine recognized and what it should have recognized under GAAP. Plaintiffs' allegations thus "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

Plaintiffs also include corroborating details of the internal reports, cite to specific reports, mention the dates or contents of reports and allege their sources of information about the reports. In other words, Plaintiffs have alleged with particularity statements that were false and/or misleading when made; they have also demonstrated contemporaneous facts which demonstrate the falsity of the defendants' statements. See, In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) (En banc) (A complaint may satisfy falsity by "pointing to inconsistent contemporaneous statements or information ... which were made by or available to the defendants."); seealso, Glaser v. Enzo Biochem, Inc., 303 F.Supp.2d 724, 735 (E.D. Va. 2003) ("The Court finds that this allegation is pled with enough specificity because Plaintiffs provide the reasons the statement is false and state with particularity the facts underlying the misrepresentation.").

Plaintiffs likewise identify the substance of the false or misleading statements and plead the corroborating details indicating how, when, and under what circumstances the statements were communicated to the public. See, In re Secure Computing Corp. Sec. Litig., 184 F.Supp.2d 980, 990 (N.D. Cal. 2001). Attachments to the Complaint also identify various transactions where Peregrine prematurely and improperly booked revenue. The Complaint further identifies the dates, identities of transacting third party companies, the products, and the amount of the transaction. Therefore, the PSLRA has clearly served its purpose by putting the Defendants on notice of the specific misstatements and omissions that are at issue. See, Cooper v. Pickett, 137 F.3d at 627 ("Overall, the complaint identifies the

circumstances of the alleged fraud so that defendants can prepare an adequate answer").

Plaintiffs have not generally averred that the statements were misleading. Nor are the proffered reasons speculative or vague. Rather, Plaintiffs have provided reasonable explanations as to why they believe specific statements or omissions were false or misleading. "Properly pled, overstating of revenues may state a claim for securities fraud, under GAAP, revenue must be earned before it can be recognized." Hockey v. Medhekar, 30 F.Supp.2d 1209, 1216 (N.D. Cal. 1998); seealso, Provenz v. Miller, 102 F.3d 1478, 1484 (9th Cir. 1996). Plaintiffs' specific references to improper revenue recognition under the GAAP, including improper balance sheet accounting on contingent sales agreements and failure to include liabilities to banks, are sufficiently particular, and that is all that the PSLRA requires. See, Queen Uno Ltd. Partnership v.Coeur D'Alene Mines Corp., 2 F.Supp.2d 1345, 1354 (D. Colo. 1998) ("Neither Rule 9(b) nor the Reform Act requires that Plaintiffs do more.").

Whether Plaintiffs' explanations are accurate is not an issue at this stage. See, Mayer v. Mylod, 988 F.2d 635, 639 (6th Cir. 1993) (Explaining, in reversing dismissal of a securities fraud complaint alleging deceptive corporate statements, "[w]hether the statements here were true or false is not an issue to be decided under Rule 12(b)(6)"). At a later stage, the issue of the reasonableness of Defendants' belief in their statements, or the accuracy of Plaintiffs' accounting explanations, may arise again. At this stage, however, it is simply not within the Court's purview to make such determinations.

**\*40** To be sure, the Supreme Court has noted,

> GAAP is not the lucid or encyclopedic set of pre-existing rules that [it might be perceived] to be. Far from a single-source accounting rule book, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time. GAAP changes and, even at any one point, is often indeterminate. The determination that a particular accounting principle is generally accepted may be difficult

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 328 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

because no single source exists for all principles.

Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 100 (Citation omitted). Indeed, GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management." Thor Power Tool Co. v. Comm'r, 439 U.S. 522, 544 (1979). But although financial accounting is a "process that involves continuous judgments and estimates," it nevertheless has "as its foundation the principle of conservatism, with its corollary that possible errors in measurement should be in the direction of understatement rather than overstatement of net income and net assets." Shalala v. Guernsey Mem'l Hosp., 514 U.S. at 100 (Citation omitted). "Even assuming ... [Peregrine's] accounting ... was arguably consistent with the terms of certain specific accounting standards, this would not insulate [Defendants] ... as a matter of law from liability under securities laws, because under both GAAP and the securities laws, business entities and their accountants are required to provide whatever additional information would be necessary to make the statements in their financial reports fair and accurate, and not misleading." In re Global Crossing, 322 F.Supp.2d at 340, citing 17 C.F.R. § 230.408 (Requiring that "in addition to the information expressly required to be included in a registration statement, there may be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading."). Plaintiffs allege Peregrine, despite statements to the public that its revenues were being recognized in accordance with GAAP, it recognized revenue on contingent, swap, and barter transactions and did not tell the public about it. In any event, again, "[w]hether or not [Peregrine's] practice of accounting ... was ever acceptable under the applicable provisions of GAAP cannot be determined in advance of the development of the record. Eventual evidence on industry practice or expert testimony are likely to shed light on this question, but at the current procedural phase, the plaintiffs' assertion that they were not generally accepted must be taken as true." In re Global Crossing, 322 F.Supp.2d at 339.

The Complaint also adequately alleges that the omissions were material. Defendants may be liable under Section 10 and Rule 10b-5 if they made statements that a reasonable investor would consider in deciding whether to buy Peregrine's stock. "[A] fact is material if there is a 'substantial likelihood' that a reasonable investor would consider it important in his or her

decision making." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 934 (9th Cir. 2003) (Citations omitted). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. In other words, materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." Id.; seealso, Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (A fact is material if there is a substantial likelihood "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). All investing is based to some degree on investors' perceptions of how the company is doing financially. Defendants would not be responsible if its investors' perceptions were based solely on Defendants' predictions about Peregrine's financial prospects, or if Defendants disclosed the basis for Peregrine's recognition of revenue. That is not the case, however. Rather, the allegations are that Defendants misstated Peregrine's finances which formed a false basis for its investors' perceptions. If Peregrine's public disclosures of its financial viability was based on fraudulent accounting or proscribed under GAAP, Plaintiffs justifiably relied on such disclosures in deciding to invest. See, Lindelow v. Hill, 2001 WL 830956 at *3 (N.D. Ill. 2001) ("[T]he disclosure required by the securities law is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."). If investors had been fully aware of Peregrine's accounting methods, the market could better have weighed the value of the statements, and the securities would have been appropriately priced. That is, if, as Plaintiffs allege, Peregrine would have disclosed that its true recognition policy and practice-Peregrine recognizing revenue before it was earned under the GAAP-then such information no doubt would "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. at 231-32.

**\*41** Moreover, the alleged misrepresentations or omissions are "in-actionable as a matter of law only when reasonable minds cannot differ on the question of materiality. Whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995); Kaplan v. Rose, 49 F.3d 1363, 1375 (9th Cir. 1994) (" '[M]ateriality' is a fact-specific issue[ ] which should ordinarily be left to the trier of fact"). "Therefore,

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 329 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." Fecht v. Price Co., 70 F.3d 1078, 1080-1081 (9th Cir. 1995); Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996) ("[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)."). "Similarly, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." Fecht v. Price Co., 70 F.3d at 1081. Accordingly, while not all investors may have considered all the alleged omissions to be important in their decision making, other investors could have. Id. The Complaint, therefore, sets forth public statements and omissions that reasonable jurors could find to be materially misleading. In sum, the Complaint adequately alleges the existence of a fraudulent scheme to inflate revenue by recognizing contingent, consignment, or even non-existent transactions as sales. This scheme culminated in the publication of false financial data in the company's publicity and SEC filings. The Court next turns to the allegations concerning particular Defendants and their complicity in the alleged fraud, i.e., scienter.

### 3. Scienter.

The Court must now determine whether, considered as a whole, the Complaint adequately pleads scienter on the part of each Defendant found to be a primary actor. See, Broudo v. Dura Pharmaceuticals, Inc., 339 F.3d 933, 940 (9th Cir 2003) ("This court has made clear that allegations of scienter must be collectively considered: Beyond each individual allegation we also consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.") (Emphasis in original; citations and quotations omitted).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," which includes "recklessness." Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996) ("To establish scienter, plaintiffs must show that defendants had a mental state embracing an intent to deceive, manipulate, or defraud. Plaintiffs can establish scienter by proving either actual knowledge or recklessness.").

"In and of itself, the magnitude of an erroneous financial statement is insufficient to raise a strong inference that a defendant acted with scienter." In re Rent-Way Securities Litigation, 209 F.Supp.2d 493, 506 (W.D. Pa. 2002); see

also, In re SCB Computer Technology, Inc. Sec. Litig., 149 F.Supp.2d 334, 357 (W.D. Tenn. 2001) (The "magnitude of an erroneous financial statement caused by allegedly fraudulent representations, without more, cannot sustain a finding that an auditor acted with scienter."); Reiser v. Price Water House Coopers LLP, 117 F.Supp.2d 1003, 1013 (S.D. Cal. 2000), aff'd, 288 F.3d 385 (9th Cir. 2002).

"[T]o establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1260-1261 (10th Cir. 2001). In other words, "a fact [must be] so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." Id. "[A]llegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud." Id.; see also, Schlifke v. Seafirst Corp., 866 F.2d 935, 946 (7th Cir. 1989) ("The plaintiffs submit that the Bank's actual knowledge of the facts withheld amply establishes the necessary degree of scienter; however, this argument misconstrues the relevant inquiry. The question is not merely whether the Bank had knowledge of the undisclosed facts; rather, it is the danger of misleading buyers that must be actually known or so obvious that any reasonable man would be legally bound as knowing."). Accordingly, allegations that a Defendant was generally aware of facts that the Court has deemed material at this stage, by itself, is not sufficient to show scienter.

**\*42** Further, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1260-1261 (10th Cir. 2001). As to individual Defendant board or committee members, the Complaint must "allege specific contemporaneous conditions known to the [D]efendants that would strongly suggest that the [D]efendants understood that their recognition of revenues ... would result in overstated revenues." In re Vantive, 283 F.3d at 1091; see also, Ronconi v. Larkin, 253 F.3d 423, 432 (9th Cir. 2001) ("[T]he [C]omplaint must contain allegations of specific 'contemporaneous statements

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 330 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."); Novak v. Kasaks, 216 F.3d 300, 308 (2nd Cir. 2000) (Allegations of recklessness include "defendants' knowledge of facts or access to information contradicting their public statements" or "fact demonstrating that defendants failed to review or check information they had a duty to monitor or ignored obvious signs of fraud"). For example, Plaintiffs may allege "contemporaneous receipt of a report with information directly at odds with an alleged misrepresentation, the inference being that the conflicting data was timely read and remembered;" or "statements by witnesses that they told the actor the true facts before the false statement was made, the inference being that the actor heard and remembered the information, saw the discrepancy, and made the statement anyway." In re Northpoint Communications Group, Inc., Sec. Litig., 184 F.Supp.2d 991, 997 (N.D. Cal. 2001) (Citation omitted).

"General allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are [also] insufficient." In re Daou Systems, Inc. Securities Litigation, 397 F.3d 704, 718 (9th Cir. 2005). "However, specific admissions from top executives that they are involved in every day detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports." Id.; Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1234 (9th Cir. 2004) ("It is reasonable to infer that the Oracle executives' [admissions of] detail-oriented management style led them to become aware of the allegedly improper revenue recognition of such significant magnitude that the company would have missed its quarterly earnings projection but for the adjustments.").

As to auditor Defendants--Arthur Andersen and AWSC--"the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. Rather, scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d at 390; seealso, In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994) (In establishing

scienter, "[t]he plaintiff must prove that ... the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.").

Against this backdrop, the Court will address the Complaint's allegations as to each Defendant to determine whether these allegations by themselves, or as a whole, give rise to a strong inference of scienter on the part of that Defendant. See, No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d at 945 ("In sum, although recognizing that some of Plaintiffs' allegations are individually lacking, we hold that the allegations in their totality are sufficient to meet the stringent pleading standard set forth in the PLSRA."). The Court's "task is ... to determine whether the Complaint alleges facts that, if true, would, by forming the basis for a strong inference, 'convince a reasonable person that the defendant knew a statement was false or misleading.' " City of Monroe Employees Retirement System v. Bridgestone Corp., —— F.3d ——, 2005 WL 264130 at 25 (6th Cir. 2005), quoting, Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1105 (10th Cir. 2003).

### a. Quarterly Review and Outlook Reports Disseminated To The Board.

*43  The Complaint sets forth various quarterly review and outlook reports that Gardner allegedly disseminated to Peregrine's board members. (Complaint ¶¶ 137-206.) The members include Moores, Nelson, Noell, Cole, Hosley, van den Berg, Watrous, and Savoy. From the reports, the Complaint alleges, these Defendants learned that Peregrine's financial statements during the Class Period were false or misleading.

The reports range from October 1998 to March 2002. Not all the reports, however, are relevant to Defendants' scienter. The Complaint charges Defendants with making false or misleading statements in press releases and SEC filings following the end of fiscal years 2000, 2001 and the first three quarters of 2002. Therefore, Defendants' alleged false or misleading statements first occurred on July 21, 1999, when Peregrine issued its first press release, and ended on February 14, 2002, when Peregrine filed its Form 10-Q for the third quarter of fiscal year 2002 with the SEC. Further, as for the Defendants found to be primary actors, the latest statement attributed to them is Amendment No.1 to Peregrine's Form S-4 Registration Statement regarding the Remedy merger. This statement was filed on July 23, 2001. Thus, only the reports that were issued

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 331 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

on or before July 23, 2001 are relevant to a Defendant's scienter. See, Ronconi v. Larkin, 253 F.3d at 432 (To show scienter, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."); Yourish v. California Amplifier, 191 F.3d 983, 997 (9th Cir. 1999) ("It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood."); Osher v. JNI Corp., 256 F.Supp.2d at 1159 (Defendant "allegedly made false statements during the conference call on October 16, 2000. It seems, however, that the 'Sxxx' email was circulated after the alleged false statements. Thus, the email does not necessarily establish that the fourth quarter was 'not looking so great' on October 16, 2000."); In re Global Crossing, 322 F.Supp.2d at 346 ("[D]efendants cannot be held liable for failing to anticipate future events...."); In re Homestore, Inc. Securities Litigation, 347 F.Supp.2d 769, 781 (C.D. Cal. 2004) ("[T]he Court finds that these emails clearly relate to a transaction between AOL and Homestore during a time period in question in this case."). With this limitation, the reports are discussed in turn.

**(i) October 1998 Report to Board of Directors.**
The Complaint alleges in a "report dated October 1998, Gardner advised the Board members that with respect to channel sales there had been Tots of smoke, little fire,' and revenue from channel sales was 'absent.' Gardner advised Board members that 'We are going to move Channels under Worldwide Sales and Marketing, focus on 3 relationships and make it happen. This change will be made in the next few weeks....' " (Complaint ¶ 137.) This report does not raise a strong inference of scienter. The Defendants are charged with issuing false or misleading financial statements for the fiscal years 2000, 2001 and part of 2002. To establish scienter, Plaintiffs must "specifically allege[ ] [D]efendants' knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308 The report does not make any reference to revenue earned in these years. It simply speaks of Peregrine's general business, including sales planning and marketing strategy. It neither suggests, nor provides any information, that Peregrine was engaged or was going to engage in improper revenue recognition. See, In re NAHC Securities Litigation, 2001 WL 1241007 at *19 (E.D. Pa. 2001) ("Where plaintiffs contend that the defendants had access to contrary facts, they must specifically identify ... statements containing this information.").

**(ii) Farley's April 1999 Meeting With The Board Of Directors.**
**\*44**  The Complaint alleges that on April 14, 1999, Peregrine's "[t]hen Chief Financial Officer Farley presented to the Board the issue of whether to apply the more aggressive sell-in method rather than the sell-through method of accounting to the Company's channel sales." (Complaint ¶ 143.) Farley, the Complaint alleges, "explained that it was only by using the sell-in method, that the Company would meet its financial goals for the prior quarter (the fourth quarter of fiscal year 1999), which had ended three weeks earlier. He [also] warned that, without adopting the new approach, the Company would fail to meet stock market expectations." (Id. ¶ 144.) According to the Complaint, Farley then "informed the ... Board" that the "sell-in [method] was not the 'preferred method.' " (Id. ¶¶ 8 and 9.) The Complaint then alleges, "[Defendants] then serving on the Board [Gardner, Moores, Nelson, Noell, Cole, Hosley, van den Berg, and Watrous] ... approved the use of the sell-in method of accounting." (Id. ¶ 8.) As alleged, this meeting did not give rise to a strong inference of scienter on the part of any Defendant.

According to the Complaint, in applying the "sell-in" method of accounting, Peregrine began to record or recognize revenue on contingent transactions in violation of GAAP. (Complaint ¶ 8 and 134: "As applied to channel sales, the sell-in method resulted in revenue recognition when software product was delivered to the channel partner and thereby 'sold into' the distribution channel. Under GAAP, the channel partner was obligated to have a binding commitment from a third party to purchase the software at the time of delivery in order for there to be proper revenue recognition under GAAP"). Also, according to the Complaint "by applying the more aggressive sell-in method for the prior quarter [fourth quarter of 1999], the Company would meet revenue expectations only by cutting into revenue for the coming first quarter of fiscal year 2000 ending June 30, 1999." (Id. ¶ 146.) However, there are no allegations that, during the meeting, Defendants learned, or were otherwise informed, that the application of the "sell-in" method would result in such consequences. That is the Complaint "fails to allege" that from the meeting Defendants learned any information "that would strongly suggest that the [D]efendants understood that their recognition of revenues" based on the sell-in method "would result in overstated revenues" during the Class Period. In re Vantive Corp. Securities Litigation, 283 F.3d at 1091. At best, the allegations suggest that Defendants were informed that the application of the "sell-in" method somehow permitted Peregrine to meet its "financial goals" for the fiscal year 1999, which is not

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 332 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158425

part of the Class Period. Similarly, although the Complaint alleges Defendants were informed that the "sell-in" method was "not" the "preferred method", it fails to also allege that the method per se violated GAAP.

To be sure, Peregrine's failure to disclose that its revenues were derived from the sell-in method made its financial statements materially misleading. However, as noted above, "allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud." City of Philadelphia v. Fleming Companies, Inc., 264 F.3d at 1260-1261; seealso, Schlifke v. Seafirst Corp., 866 F.2d 935, 946 (7th Cir. 1989) ("The plaintiffs submit that the Bank's actual knowledge of the facts withheld amply establishes the necessary degree of scienter; however, this argument misconstrues the relevant inquiry. The question is not merely whether the Bank had knowledge of the undisclosed facts; rather, it is the danger of misleading buyers that must be actually known or so obvious that any reasonable man would be legally bound as knowing."). Rather, the Complaint must allege a Defendant both: "(1) ... knew of the potentially material fact, and (2) ... that failure to reveal the potentially material fact would likely mislead investors." City of Philadelphia v. Fleming Companies, Inc., 264 F.3d at 1260-1261. In other words, "a fact [must be] so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." Id. "[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." City of Philadelphia v. Fleming Companies, Inc. 264 F.3d at 1261; seealso, In re GlenFed, 42 F.3d at 1548 (Finding "no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation....") Here, from the meeting, Defendants allegedly only learned of, and adopted, the application of the sell-in method to Peregrine's financial statements for the fourth quarter of 1999. As alleged, however, they did not learn that applying the sell-in method would result in recording revenue on contingent transactions in violation of the GAAP. Nor is there any allegation that Defendants were somehow privy to this fact. See, In re Secure Computing Corp. Securities Litigation, 120 F.Supp.2d 810, 819 (N.D. Cal 2000) (Dismissing complaint because it "ha[d] not alleged facts that adequately explain why [defendant]

was not entitled to recognize revenue on [a] contract during the fourth quarter of 1998"; the complaint must "clarify the precise reasons why [defendant] was not entitled to recognize revenue on the ... contract during the fourth quarter of 1998."); Coble v. Broadvision Inc., 2002 WL 31093589 at *8 (N.D. Cal. 2002) ("The mere fact that BroadVision sold products to Hewlett-Packard which Hewlett-Packard had not already sold to end users is wholly insufficient to support a strong inference, or even anything more than a weak inference, of scienter. The allegations as to 'creative revenue deals' are too vague and non-specific to support any reasonable inference in favor of plaintiffs."). "Allegations of a violation of GAAP provisions ..., without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." Chill, 101 F.3d at 270. Reckless conduct or scienter in a Section 10(b) claim "represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 269. A "complaint alleging accounting irregularities fails to raise a strong inference of scienter if it alleges no facts to show that Defendants knew or could have known of the errors, or that their regular accounting procedures should have alerted them to the errors sooner than they actually did." Fidel v. Farley, 392 F.3d 220, 230 (6th Cir. 2004). "The assumption that [Defendants] acted with deliberate recklessness ... requires an impermissible inferential leap." In re U.S. Aggregates, Inc. SecuritiesLitigation, 235 F.Supp.2d 1063, 1075-1076 (N.D. Cal. 2002). Accordingly, the information disclosed in meeting, even if true, falls short of establishing scienter.

**(iii) April 1999 Report To Board Of Directors.**

*45  The Complaint alleges that a meeting took place "on the afternoon of April 22, 1999 ... to review both quarterly results and results for the recently-completed fiscal year [1999], including an 'outlook and budget' for fiscal year 2000 and executive compensation issues." (Complaint ¶ 141.) According to the Complaint, in the meeting, a report entitled "Fiscal Year 1999 Review, including details of the 4th Quarter" was "disseminated." (Id. ¶ 142.) The report read:

> This was the first quarter that channels contributed meaningfully to revenue. Steve Spitzer's team came through in a big way.

> * * *

> Given the favorable valuation of the company, it is time to proceed with a follow-on offering to raise additional cash

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 333 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

for acquisition purposes. We would propose a follow-on offering which would net $70 to $100 million in cash for the company in the May 1999 time period. The total offering size would depend upon the appetite for our equity in the market and the desires of other selling shareholders.

(Id.) The Complaint then alleges "Gardner informed the Board members that in the area of 'customer satisfaction' an external survey showed 'a negative trend from the survey six months earlier.' As to productivity of sales personnel, Gardner advised ... that '[o]ur median performer is not producing enough and we have too many people who were on-quota all year who produced very little.' In projecting results for Fiscal Year 2000, Gardner informed the Board members as follows: 'We are targeting to exceed budget, as a global organization with $300 million revenue and at least $0.65 EPS for FY 2000; This is our 300/200 program.' In explaining the program to the Board members, Gardner relayed that 'if we meet the goal of $300 million in revenue in FY2000 with an EPS of at least $0.65 per share, that every employee will be fully vested at the end of one-year in 300 options for Peregrine stock at an exercise price set in April of 1999 ... Please approve the 300/200 program option grant and the attached budget submission.' " (Id.) The Complaint then alleges the "program was approved by the Board as proposed" and that "Gardner also advised the Board of a major organizational change to achieve the 300/200 goal, which involved putting defendant Powanda in charge of the 'Operations Group,' including sales, marketing, professional services and customer support. Powanda's new title was Executive Vice President for Operations. One of the reasons offered by Gardner for Powanda's promotion, and related increase in proposed compensation, was that he helped to achieve the Company goal of increasing channel revenue from less than 5% in the first half of the year to over 15% in the second half." (Id.)

Lastly, the Complaint alleges that at the meeting, "Board members also were told that defendant Arthur Andersen, the Company's auditor, was not comfortable with any level of channel activity which accounted for more than 25% of revenue. In the just-completed fourth quarter of fiscal year 1999, 22% of license revenue derived from channel sales and it was clear from Gardner's report to the Board that channel sales would represent an increasing percentage of license revenue." (Id. ¶ 145.)

As alleged, this meeting did not raise an inference of scienter. Again, the Complaint charges Defendants with making misleading financial statements for fiscal years 2000, 2001,

and first three quarters of 2002. The Complaint must thus plead the information in the meeting was different than "what [a Defendant] was telling the public **at the same time.**"In re Silicon Graphics Inc. Securities Litigation, 183 F.3d at 1000 (Emphasis original). No information in the alleged meeting even hints at Peregrine's accounting or finances during those years. See, In re Syntex Corp. Sec. Litig., 95 F.3d 922, 929 (9th Cir. 1996) ("Plaintiffs have not pled facts indicating that Defendants had inside knowledge that contradicted their public statement."); c.f, In re Homestore.com, Inc. Securities Litigation, 347 F.Supp.2d 769, 781 (C.D. Cal. 2004) ("[T]he Court finds that these emails clearly relate to a transaction between AOL and Homestore during a time period in question in this case").

### (iv) October 1999 Report To Board Of Directors.

**\*46** The Complaint alleges Gardner issued a "report for the Board's October 19, 1999 meeting" entitled "Fiscal Q2 2000 Review and Outlook." (Complaint ¶ 148.) The report stated:

> [T]his was the toughest quarter we have experienced since June of 1997. A decent performance from the West, a strong quarter (but still small) from Asia/Pacific Latin America and a very strong channel performance allowed us to compensate for these major deficiencies. We have now reached a level of channel activity that is concerning as we look to the future. We have a large amount of inventory in the channel that must be sold through, and this must be done as we simultaneously continue to grow our direct businesses.

(Id.)

These allegations do not give rise to a strong inference of scienter. From the allegations, at best, Defendants learned that Peregrine might be engaging in channel stuffing. "Channel stuffing is defined as the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as distributors no longer make orders while depleting their excess supply" In re Ramp Networks, Inc. Securities, 201 F.Supp.2d 1051, 1077 (N.D. Cal. 2002).

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Thus, "[a] number of courts have held that 'channel stuffing' gives rise to a 'very weak' inference of scienter-if any at all-in § 10(b) actions because there are a number of legitimate reasons for attempting to achieve sales earlier." Id.; seealso, In re Splash Tech. Holdings Securities Litig., 160 F.Supp.2d. 1059, 1075-76 (N.D. Cal. 2001) ("[T]his Circuit has rejected 'channel stuffing' claims.") (citations and quotations omitted); In re Trex Co., Inc. Securities Litigation, 212 F.Supp.2d 596, 608-609 (W.D. Va. 2002) ("Allegations of channel stuffing, standing alone, are insufficient to sustain the state of mind requirement in a securities fraud claim because 'there may be a number of legitimate reasons for attempting to achieve sales earlier' than in the normal course."), quoting, Greebel v. FTP Software Inc., 194 F.3d at 185 (Concluding that channel stuffing allegations "[do] not support a strong inference of scienter"). In other words, engaging in channel stuffing is not inconsistent with earning high revenues and thus reporting high revenues in the financial statements. "Plaintiffs have not alleged sufficient facts to show that Defendants knew or recklessly disregarded at the time of making the transactions that customers would be returning products...." Johnson v. Tellabs, Inc., 262 F.Supp.2d 937, 957 (N.D. Ill. 2003). "Even if channel stuffing was rampant at [Peregrine] during the [C]lass [P]eriod, this does not necessarily mean that [D]efendants' failure to disclose it made any of [D]efendants' statements false or misleading", much less prove they did so with scienter. Friedman v. Rayovac Corp., 295 F.Supp.2d at 987. Seealso, City of Philadelphia v. Fleming Companies, Inc. 264 F.3d at 1261; Coble v. Broadvision Inc., 2002 WL 31093589 at *8 (N.D. Cal. 2002) ("The mere fact that BroadVision sold products to Hewlett-Packard which Hewlett-Packard had not already sold to end users is wholly insufficient to support a strong inference, or even anything more than a weak inference, of scienter. The allegations as to 'creative revenue deals' are too vague and non-specific to support any reasonable inference in favor of plaintiffs.").

### (v) January 2000 Report To Board Of Directors.

**\*47** According to the Complaint, "[o]n January 18, 2000, Gardner disseminated a report ... in connection with the January 20, 2000 Board meeting." (Complaint ¶ 154.) The report stated:

> Once again, however, this was a very tough quarter. The opening lines from Dickens['] Tale of Two Cities summarizes it best: "It was the best of times, it was the worst of times. It was a time of wisdom. It was a time of foolishness."

* * *

Why was it the worst of times?

> We have a $2 million professional services revenue shortfall compared to plan with little or no warning. Half of the reason for this was Y2K, the remainder was the shift toward selling through alliances, which had not been adequately factored into the plan.... Our bread and butter business went to hell. The deals between $75K and $500K just were missing in action. Some of this may also be Y2K effect, most of it was undoubtably due to the huge sales force re-engineering we have undertaken. In other words, we did this to ourselves ... I suspect we have one more quarter, and perhaps two, of hand-holding and close upper management involvement in sales. Sales force productivity is at a ridiculously low level. The US is substantially under $1 million per person and EMEA is right around $1 million/ person, while we need both to be closer to $1.5 million per person. Big deals and excellent individual performances were required to cover the shortfall, when they should have been the icing on the cake.

> The US was even worse. We had a bad forecast to begin with, a gradual improvement in the middle part of the quarter, and then a $4 million melt-down in the last week of the quarter. Only the KPMG deal with Sodexho/Marriott and Gold mine saved the US performance.

Why was it a time of foolishness?

> ... I have come to the conclusion that we are at the awkward teenage stage of our existence. We are much bigger than we were but not big enough to be taken seriously...

> Our channel business is now a cause for concern. We are victims of both our own success and a changing accounting and regulatory landscape. We have been much more successful

> generating sales to channels and getting partners to buy into our message and vision. We have not been as successful, and in some cases unsuccessful, in getting the sell-through that would remove the inventory of software from the channels. Rather than a 3 to 6 month latency, the inventory is moving in closer to 9 months as partners ramp up. Due to several highly publicized incidents at other companies (Informix, Network Associates, HBOC), the rules are tightening and practices are being re-examined. The net of

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 335 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

this is that we are now at a level of channel inventory that makes our auditors uncomfortable.

(Complaint ¶ 154.) The report also stated:

Why was it the best of times?

We exceeded every expectation we could reasonably have had from our launch of our employee self-service and e-procurement application: Get.It!

Our mid-range market entry, InfraCenter for Workgroups, exceeded every expectation and garnered numerous positive comments from customers and analysts. We now [have] the number one product in the mid-range space, based on analyst assessment.

We hit some of the very large deals we were looking for: $10 million with ICL for Get.It! And the ServiceCenter/AssetCenter combination to use throughout Europe for their outsourcing business and internal needs; $5 million with Goldmine for a combination of InfraTools, InfraCenter for Workgroups, and Knowlix iKnow as a world-wide Master VAR; and over $5 million with KPMG for Sodexho/Marriott for a combination of AssetCenter, ServiceCenter, and FacilityCenter.

**\*48** We had some incredibly strategic wins: <u>Excite@home</u> selected Get.It! and AssetCenter beating the incumbent Remedy and Ariba competition. We beat Ariba and Oracle at ABM AMRO bank for Get.Resources! e-procurement. We have been quietly told that Morgan Stanley will use Get.It! instead of the $3 million investment they made in Ariba, who they were the lead underwriter for. PriceWaterhouse Coopers selected us just after the quarter ended to be their worldwide Service Desk, and during the quarter we booked close to $500K of business form various parts of PwC, despite a huge competitive push from IBM/Tivoli, PwC's audit client.

Why was it a time of wisdom?

We did some really smart things this quarter. Get.It! was better launched than any product we have ever had.... Better yet, we actually sold a lot of it, beating all expectations. Ariba, after 3 years, today has about 50 customers. In 4 weeks, we are up to 6 customers....

I believe we will add at least 12 more this quarter, and double that in Q1 of FY 2001, so we should cross-over Ariba sometime in the next 12 months ....

The positioning of Get.It! as a full employee self service solution and not just e-procurement gives us huge running room ahead. The positioning of Get.Resources! as a full life-cycle management solution and not just a purchasing solution also gave us

immediate differentiation versus Ariba.

Our technology continues to chug along at a great pace. We are truly doing some cutting edge work with the business application XML and with the integration with wireless and Palm clients. We are getting smarter and smarter about how we can integrate all of out products without having to rewrite them all.

We did one very small acquisition this quarter: KKO. KKO brings us a terrific submarket to our fleet management solution. We now have RailAnywhere to extend FleetAnywhere into the rail and transit market. This is an under-served market with huge potential and billions of dollars of assets and asset maintenance cost. We should recoup our full investment with revenue that I believe will close this quarter at New Jersey Transit and Serna Group in the UK

We added come great partners this quarter who are changing the way we work our partners model....

(Noells Exh. D at 1, 3.) This information does not raise a strong inference of scienter. The information gave both a positive and negative projection of Peregrine's business. Courts have found that such documents are insufficient to put a plaintiff on notice of fraud, much less "reveal the potentially material fact would likely mislead investors" or that "defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." <u>Philadelphia v. Fleming Companies, Inc.,</u> 264 F.3d 1245, 1260-1261. See <u>also, Bovee v. Coopers & Lybrand,</u> 320 F.Supp.2d 646, 655 (S.D. Ohio 2004) ("In reviewing the various forms of public disclosures made ... the Court concludes that, despite the many negative comments about MAW's financial wherewithal and corporate stability, reassuring statements were also made that could have negated the 'storm warning' effect of the disclosures. In this regard, the Court notes ... it is not the 'storm warning' that triggers the limitations period....."); <u>In re Infonet Services Corp. Securities Litigation,</u> 310 F.Supp.2d at 1115 (Concluding that the "statements alone do not constitute adequate warnings of the upcoming storm, as the reports' warnings were accompanied by positive statements."). Moreover, "[t]he

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 336 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

existence of documents raising concerns about the company's business does not show that a positive outlook is reckless when revealed to be inaccurate in hindsight." In re Northern Telecom Ltd. Securities Litigation, 116 F.Supp.2d 446, 465 (S.D.N.Y. 2000); seealso, In re Carter-Wallace, Inc. Securities Litig., 220 F.3d 36, 40-42 (2d Cir. 2000) (Dismissing allegations that defendants "turned a blind eye" to reports of adverse side effects of company's drug).

#### (vi) July 2000 Report To The Board Of Directors.

**\*49** The Complaint alleges Gardner's "quarterly report for the summer 2000 Board meeting ... gave ... very negative depiction of events at Peregrine" including: "(i) that the Company had continuing concerns about its sales teams, whose productivity was at a three-year low, (ii) that its mid-size market continued to seriously under performance [sic], (iii) that it had no sales backlog for the coming 'always difficult' quarter, (iv) that it was running out of cash and could not complete a public offering because there was substantial doubt as to whether the Company would meet its earnings target for the second quarter of fiscal year 2001 ending September 30, 2000." (Complaint ¶¶ 178 and 180.) The Complaint then alleges that despite these facts, Peregrine reported that it "had revenues of $94.3 million for the quarter, an 83% increase over the previous year's comparable period." (Id.) As alleged, the report does not establish that any Defendant knowingly or recklessly falsely reported that Peregrine "had revenues of $94,3 million for the quarter, an 83% increase over the previous year's comparable period."

At the outset, having reviewed Gardner's report in full, as alleged in the Complaint, the Court cannot say that Defendants learned what Plaintiffs allege they learned. In other words, the report does not say what Plaintiffs attribute to it. For example, Plaintiffs allege that from the report Defendants learned Peregrine "was running out of cash." But the report also said that Peregrine "came out of the quarter with about $70 million in cash ... [o]ur current projection is that we will end the quarter with $35 million." (Id. ¶ 178.) Furthermore, the report specifically stated that Peregrine "will show approximately $94 million in top line revenue...." (Id.) As for Plaintiffs' assertion that Peregrine "had no sales backlog for the coming 'always difficult' quarter", the report actually stated that "[i]f we close a few of these large deals and we do not have another fall-out of the 'bread-and-butter' business forecast, we will fill the gap and make the numbers. We even have the potential to carry a backlog into the December quarter...." (Id.) Further, there is no suggestion in the report that "... there was substantial doubt as to whether

the Company would meet its earnings target for the second quarter of fiscal year 2001 ending September 30, 2000." Rather, the report assured the board members that it was possible to "fill the gap and make the numbers." (Id. ¶ 178.)

Moreover, even if the Court attributes Plaintiffs' interpretation to the report, it still would not raise a strong inference of scienter. For example, even if Defendants knew of, and failed to disclose that, there was a concern in Peregrine that its sales teams' productivity was at a three-year low, that would not make Peregrine's financial statements misleading. "If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete." In re Vantive Corp. Securities Litigation, 283 F.3d at 1085. Having concerns about its employee productivity did not mean that Peregrine could not earn "revenues of $94.3 million for the quarter." "The question is not merely whether [a Defendant] had knowledge of the undisclosed facts; rather, it is the danger of misleading buyers that must be actually known or so obvious that any reasonable man would be legally bound as knowing." City of Philadelphia v. Fleming Companies, Inc., 264 F.3d at 1260. Moreover, Section 10(b) and Rule 10b-5(b) do not impose a general duty to disclose information, unless failing to do so materially altered a statement made. In re Seagate Technology II Securities Litigation, 843 F.Supp. at 1369. Accordingly, the report does not establish a strong inference of scienter.

#### (vii) October 2000 Report To The Board Of Directors.

The Complaint alleges that "[i]n his October 16, 2000 report to the Board members, Gardner reported:

> Another quarter is behind us. As you know it was a nail-biter, but in the end we pulled it off ... [w]e also had to borrow from the future to make the present happen. In other words, we had to grant some extraordinary terms on a few deals in the closing hours of the quarter to move business into the September time period. This will clearly impact December and March, but I think the damage will be manageable.

> **\*50** [S]ales productivity its far from where we want it ... The average rep and the average deal is missing in action.

> We don't have enough [cash] ... We need to raise cash now.

(Complaint ¶ 181.) This report did not raise a strong inference of scienter. Despite the alleged negative information, the report also contained positive information. For example, the report also stated "[w]e won some great deals, even in the

Case 4:24-cv-01940     Document 44-4     Filed on 01/27/25 in TXSD     Page 337 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

e-BCG side of the business. And from understanding our true strengths, we will build the future ... The Get.It! product line continues to exceed every forecast. We will report better than $17 million in Get.it! revenue this quarter, up from $12 million last quarter and $6 million the quarter before. This will exceed all external expectations ...” (Noell's Exh. E at 3.) “[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects....” Novak v. Kasaks, 216 F.3d at 309 (internal citations omitted). Also, as noted above, “[t]he existence of documents raising concerns about the company's business does not show that a positive outlook is reckless when revealed to be inaccurate in hindsight.” In re Northern Telecom Ltd. Securities Litigation, 116 F.Supp.2d at 465. Moreover, even if Peregrine was having “difficulties,” Plaintiffs fail to allege the difficulties were so severe that defendants knew, or must have known, that Peregrine could not produce the revenues disclosed in its financial statements. Accordingly, this report did not raise a strong inference of scienter.

**(viii) January 2001 Report To The Board Of Directors.**
The Complaint alleges that “[i]n his report to the Board for the third quarter of fiscal year 2001 ... in advance of the January 26, 2001 Board meeting, Gardner reported that ‘there were also some substantial business disappointments.’ ... Company's ‘direct business in North America was a disaster,’ with only slightly more than $13 million of business on a plan of over $50 million and a forecast late in the final month of the quarter of almost $40 million, Sales representative productivity was 68% of plan, U.S. productivity less than 50% of plan, ... [continued ‘heavy reliance on alliance and channel partners' remained a concern, such that ... Gardner was ‘cautious’ about the Company's prospects going into the fourth quarter.” (Complaint ¶ 185.) The Complaint then alleges Defendants acted with scienter when announcing Peregrine's “financial results for the third quarter of fiscal year 2001 ...” which stated that Peregrine “had revenues of $156.6 million for the quarter, a 132% increase over the previous year's comparable period.” (Id. ¶ 186.)

As alleged, the report does not raise a strong inference that any Defendant knew or was reckless that Peregrine's financial statement for the third quarter of fiscal year 2001 was false or misleading. “[T]o establish scienter in a securities fraud case alleging non-disclosure of potentially material facts”, the plaintiff must not only demonstrate” that “the defendant knew of the potentially material fact” but also that “the

defendant knew that failure to reveal the potentially material fact would likely mislead investors.” City of Philadelphia v. Fleming Companies, Inc., 264 F.3d at 1260-1261. Here, failing to disclose the alleged information in Gardner's report did not make Peregrine's financial statement misleading or actionable. Gardner's statements in the report were too “general for a reasonable investor to take into account when making an investment decision.” In re Boston Technology, Inc. Securities Litigation, 8 F.Supp.2d 43, 63 (D. Mass. 1998). Thus, the information was not even material. Moreover, again “[t]he existence of documents raising concerns about the company's business does not show that a positive outlook is reckless when revealed to be inaccurate in hindsight.” In re Northern Telecom Ltd. Securities Litigation, 116 F.Supp.2d at 465; seealso, Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d. 12, 20 (D. Mass. 2000) (Plaintiffs “cannot merely speculate in hindsight that because [defendant] ran into a sales slowdown and reduced revenue by the end of the Class Period” that earlier statements “of good corporate health ... must have been inaccurate”); Colby v. Hologic, Inc., 817 F.Supp. 204, 215 (D. Mass. 1993) (“[D]efendants' ... alleged ‘materially adverse’ knowledge of [the corporate defendant's] decline in September is largely inferred from their November acknowledgment of ‘continued’ declining sales. That sort of inferred omission by hindsight admission is rejected herein as a basis for a duty to disclose”). Accordingly, Plaintiffs have not pleaded any particularized facts that would suggest that Defendants knew of or recklessly disregarded the falsity of the Peregrine's financial statements.

**(ix) April 2001 Report to Board of Directors.**
**\*51**  According to the Complaint, on “April 16, 2001 Gardner disseminated a report to the Board members regarding the fourth quarter of fiscal year 2001 ... and the outlook for fiscal year 2002. In his report, ... Gardner stated that ‘the difficulty of the quarter leads us to be more cautious about the next couple of quarters than we have been previously ... Gardner referred to the ‘massive expansion of [Peregrine's] relationship with IBM’ as the highlight of the quarter. However, he observed that very large deals with Fleet Boston, Morgan Stanley, and ABN AMRO Bank (each with greater than $10 million potential) were scrapped because the customers ‘were not prepared to spend any money.’ He further told the Board members that management ‘are very concerned about the irrational buyer behavior now being seen in the market....” (Complaint ¶ 187.)

As alleged, the report does not give rise to a strong inference of scienter. See, In re Northern Telecom Ltd.

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 338 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Securities Litigation, 116 F.Supp.2d at 465 ("The existence of documents raising concerns about the company's business does not show that a positive outlook is reckless when revealed to be inaccurate in hindsight."); Rothman v. Gregor, 220 F.3d 81, 90 (2nd Cir. 2000) ("Generally, poor business judgment is not actionable under section 10(b) ... The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness."); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 117 (2d Cir. 1982) ("[E]conomic prognostication, though faulty, does not, without more, amount to fraud.") In re Symbol Techs. Class Action Litig., 950 F.Supp. 1237, 1246 (E.D.N.Y. 1997) ("The evidence shows, at most, that Symbol's senior management relied on internal forecasts that turned out, in hindsight, to be inaccurate. This is not fraud.").

#### (x) July 2001 Report To The Board Of Directors.

The Complaint alleges that "[a]t a July 18, 2001 Board meeting at the J.W. Marriott Hotel in New York City, ... [D]efendants were advised that the [Peregrine] had received an inquiry from the SEC regarding transactions with Critical Path, a software company based in San Francisco that principally focused on Internet communications. They learned that a national business magazine, Business Week, had contacted the Company in connection with an upcoming article concerning Critical Path, raising the possibility that Peregrine would be linked publicly with the ongoing federal investigation," (Complaint ¶ 190.) These allegations are insufficient to show a strong inference of scienter.

At the outset, the report does not contradict any statements Defendants allegedly made. See, In re Syntex Corp. Sec. Litig., 95 F.3d at 929 ("Plaintiffs have not pled facts indicating that Defendants had inside knowledge that contradicted their public statement."). Secondly, "[t]o contribute meaningfully toward a 'strong inference' of scienter, [ ] allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." In re Northpoint Communications Group, Inc. Sec. Litig., 221 F. Supp. 2d 1090, 1097 (N.D. Cal. 2002). Here, the Complaint merely alleges that Defendants "were advised" without identifying who advised them. Simply referring to BusinessWeek as a source is likewise insufficient. "If a plaintiff is to rely on the existence of reports as establishing knowledge, she must 'include adequate corroborating details,' such as the 'sources of her information with respect to the reports, how she learned of

the reports, who drafted them, ... which officers received them,' and 'an adequate description of their contents.' " In re Vantive, 283 F.3d at 1079, 1087-88 (Citations omitted); see also, Novak v. Kasaks, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 811 (2nd Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."); Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993) ("[R]eferences to unreleased or internal information that allegedly contradict[s] [defendants'] public statements" should indicate such matters as "who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them."). It is not enough to allege that there was "confidential non-public information" that contradicted the false statement. Yourish v. California Amplifier, 191 F.3d 983, 994 (9th Cir. 1999). Plaintiffs must also provide "some detail about the alleged information, other than that its substance contradicted the substance of the identified statement." Id. at 995. Moreover, that there was a "possibility that Peregrine would be linked publicly with the ongoing federal investigation" is too speculative or tenuous to raise a strong inference that any Defendant knew that Peregrine was involved in a fraud.

#### (xi) October 2001 Report To The Board Of Directors.

**\*52** The Complaint alleges "[o]n or about October 15, 2001, Gardner disseminated a report to the members of the Board ... in connection with the Board meeting conducted on October 17, 2001. He informed the Board ... '[a]s of right now, forecasts from our sales teams at the 'commit' level are skittish and a bit below the level we need for even the lowered guidance for the December quarter.' Gardner reported that the only way [Peregrine] would be able to meet its earnings per share guidance was by starting, in January 2002, to require employee contributions to benefits plans 'for the first time ever.' He advised the Board members: '[t]his $30 million savings will permit us to make our EPS guidance against the lower revenue guidance.' " (Complaint ¶ 192.) Again, Gardner's statements in the report were too "general for a reasonable investor to take into account when making an investment decision." In re Boston Technology, Inc. SecuritiesLitigation, 8 F.Supp.2d at 63; seealso, City of Philadelphia v. Fleming Companies, Inc., 264 F.3d at 1260-1261 ("[T]o establish scienter in a securities fraud

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 339 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors."). Moreover, "[t]he existence of documents raising concerns about the company's business does not show that a positive outlook is reckless when revealed to be inaccurate in hindsight." In re Northern Telecom Ltd. Securities Litigation, 116 F.Supp.2d at 465. "[W]hat is [also] missing is an explanation of why these particular problems contradicted the public statements made by Defendants." Osher v. JNI Corp., 308 F.Supp.2d 1168, 1188 (S.D. Cal. 2004). The information concerns Earnings Per Share numbers, not the revenue numbers-they are two different metrics. The report does nothing to establish that Defendants' statements are false.

### (xii) December 2001 Report To The Board Of Directors.

The Complaint alleges "[o]n December 31, 2001, Gardner [prepared] a report ..., which provided a summary of the third quarter of fiscal year 2002 ending December 31, 2001." (Complaint ¶ 195.) The report stated:

> This was a very tough quarter. The final numbers are not yet in and it will take a couple of weeks to get all the detailed information about expenses, balance sheet items, and breakdown of revenue, but it is clear today that we missed our external revenue targets by a wide margin (about $40 million) and we missed our internal targets by a wider margin. My best guess is that we will end at approximately $175 to $180 million in revenue. For the first time as a public company we will post a loss in operating results per share. We estimate that loss to be about $14 - $16 million or about $0.06 to $0.08 per share. This was against an expectation of a $0.10 profit.

This report does not raise a strong inference of scienter. The Complaint alleges during the third quarter of 2002, certain Defendants made the following false or misleading

statements. First, in a press release, it was stated that Peregrine "anticipated total revenues of approximately $175 million." (Complaint ¶ 622.) The Complaint further alleges "[o]n January 24, 2002, Peregrine issued a press release confirming that total revenues for the third quarter of fiscal year 2002 were $175.2 million." (Id. ¶ 630.) Lastly, the Complaint alleges "[o]n February 14, 2002, Peregrine filed its Form 10-Q for the third quarter of fiscal year 2002 with the SEC, [which] incorporated the financial statements that appeared in the January 24, 2002 press release." (Id. ¶ 638.) There is nothing in the report "contradicting [Defendants'] public statements." Novak v. Kasaks, 216 F.3d at 308. Indeed, the report stated that in all likelihood Peregrine "will end at approximately $175 to $180 million in revenue" for that quarter. See, In re Syntex Corp. Sec. Litig., 95 F.3d at 929 ("Plaintiffs have not pled facts indicating that Defendants had inside knowledge that contradicted their public statement").

### (xiii) Conclusion.

The foregoing reports fail to establish scienter on the part of any Defendant. The reports fail to show that Defendants had inside knowledge that contradicted their public statement. At times, Plaintiffs have also failed to provide any detail about the alleged information underlying the reports or that their substance contradicted the substance of the identified statements. That is there is no explanation of why the particular problems Peregrine allegedly faced contradicted the statements Defendants made. The allegations fail to even show that, from the reports, Defendants could have learned of information contradicting their public statements, much less that they actually did learn such information (or that they were deliberately reckless as to the falsity of their statements). In short, the reports "do not adequately establish that [any Defendant] had knowledge of the supposedly 'true but concealed' circumstances concerning [Peregrine's] problems[.]" In re Vantive, 283 F.3d at 1087. For these reasons, and all the reasons set forth above, the quarterly review and outlook reports fail to raise a strong inference of scienter.

### b. Adequate Internal Accounting Controls.

**\*53** The Complaint next alleges "[i]n light of the lack of adequate internal accounting controls, the aggressive growth of the Company and the lack of a functioning Audit Committee, ... Noell, van den Berg, Hosley, Watrous, Savoy, and Dammeyer [19], while on the Audit Committee, knew or were deliberately reckless in not knowing of the fraudulent

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 340 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

accounting practices alleged herein." (Complaint ¶ 215.) The Court disagrees.

19      As explained above, the Complaint does not adequately allege that Dammeyer either employed a scheme to defraud or made any statements. Thus, the issue of his scienter or mental state is irrelevant.

"A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." Abrams v. Baker Hughes Inc., 292 F.3d 424, 432 (5th Cir. 2002); seealso, In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d 1018, 1037 (C.D. Cal. 2003) ("Neither [defendant's] position within the company, Vice President of Human Resources, nor her personal relationship with [upper management] can lead to any inference of deliberate recklessness."); In re Oak Tech. Sec. Litig., 1997 WL 448168 at *11 (N.D. Cal. 1997) ("Allegations that outside directors merely held positions on committees responsible for the preparation and disclosure of a corporation's finances are insufficient to set forth the circumstances constituting fraud with particularity.").

"[B]lanket allegations of weak internal controls [also] do not alone suffice as a basis for inferring scienter." In re Rent-Way Securities Litigation, 209 F.Supp.2d 493, 508 (W.D. Pa. 2002); see also, Reiger v. Price Waterhouse Coopers LLP, 117 F.Supp.2d 1003, 1009 n. 5 (S.D. Cal. 2000) (Allegations of "weak internal accounting controls" at the audited company were "boilerplate 'red flags' " and could not support a strong inference of scienter). Similarly, "failure to follow professional standards by itself does not necessarily establish scienter, nor does the use of unreasonable accounting procedures." In re Ikon Office Solutions, Inc. Securities Litigation, 131 F.Supp.2d 680, 701 (E.D. Pa. 2001). Thus, allegations that the "members of the Committee were knowingly and/or deliberately reckless in their conduct of Committee business" does not establish scienter. (Complaint ¶ 214.) "[T]he Complaint does not identify what the Audit Committee members would have learned from exercising these responsibilities that would have put them on notice that the SEC filings that they signed were inaccurate." In re WorldCom, Inc. SecuritiesLitigation, 294 F.Supp.2d 392, 418 (S.D.N.Y. 2003).

## c. Information or Reports Disseminated to the Audit Committee.

The Complaint next points to various audit committee meetings, alleging that from the information discussed

at these meetings, the identified Defendant attendees learned that "Peregrine was improperly recognizing revenue immediately in full, on sell-in transactions where there was no binding commitment on the part of resellers." (Complaint ¶ 220.) For example, the Complaint alleges "Noell and Watrous attended an Audit Committee meeting on April 25, 2001." (Id.) "Also in attendance was ... Nelson and representatives of ... Arthur Andersen including Stulac." (Id.) In the meeting, the Complaint alleges, "Stulac specifically suggested that it would be appropriate for [Peregrine] to move to revenue recognition based on sell-through as opposed to the then operative sell-in method because he knew, and conveyed to the Audit Committee members, based on Arthur Andersen's audit procedures for the quarterly reviews and year end audit, that Peregrine was improperly recognizing revenue immediately in full, on sell-in transactions where there was no binding commitment on the part of resellers." (Id.) The Complaint then alleges "Watrous inquired at this meeting as to how 'aggressive' Peregrine was with regard to revenue recognition, and he was informed by Stulac that Peregrine was more aggressive than one of its leading competitors, citing as an example SAP, which applied the sell-through method." (Id.) For the reasons that follow, these allegations are insufficient to raise a strong inference of scienter.

*54   "[S]cienter [is] a mental state embracing intent to deceive, manipulate, or defraud." In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1424 (9th Cir. 1994), quoting, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12 (1976). "Thus, the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." In re Daou Systems, Inc. Securities Litigation, 397 F.3d 704, 718 (9th Cir. 2005). "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004). "This means that the Plaintiffs must allege specific facts showing that each Defendant acted with severe recklessness." Druskin v. Answerthink, Inc., 299 F.Supp.2d 1307, 1323 (S.D. Fla. 2004).

The Court must consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness."In re Daou Systems. Inc. Securities Litigation, 397 F.3d at 718. "In considering whether a strong inference of scienter has been pled, the [C]ourt must consider all reasonable inferences to be drawn

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 341 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

from the allegations, including inferences unfavorable to the plaintiffs." Id. at 718 (Emphasis in original); seealso, Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d at 1230 ("In determining whether a strong inference of scienter exists, [the Court] must consider all reasonable inferences, whether or not favorable to the plaintiff."); Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) (Noting the "inevitable tension,.. between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to dismiss ... and the heightened pleading standard set forth under the PSLRA").

Under this standard, the committee Defendants were not deliberately reckless, or did not act with an intent to deceive or defraud the public. Specifically, according to the Complaint, in a subsequent committee meeting, wherein the same Defendants attended, and after learning that Peregrine was "improperly" recognizing revenue, "Watrous specifically stated that he was 'concerned' ... [and] asked Stulac, 'on a scale of 1 to 10 with 10 being the most clean how Peregrine's revenue recognition procedures would rank?' " (Complaint ¶ 222,). To this, the Complaint alleges "Stulac responded they would rank in the '5-7' range." (Id.) Watrous, the Complaint alleges, then "queried why Peregrine was not a '10' [and] was told that the problems were attributable to: (i) software customers delaying purchases until late in the quarter to get discounts, (ii) as a result, the quarter ends were extremely busy, (iii) the European controller position was vacant, (iv) there was a failure on the part of Peregrine to appropriately merge the overseas processes, (v) the European sales force 'used more aggressive revenue recognition', and (vi) the frequent acquisitions made by Peregrine required the merging of different accounting systems, which had not been accomplished." (Id.) In other words, shortly after learning that Peregrine was recognizing revenue "improperly," the committee Defendants acted reasonably, not recklessly. They promptly investigated. Moreover, the reasons they were told why Peregrine's revenue recognition procedure "was not a 10" was not inconsistent or contrary to the statements they made regarding Peregrine's financial statements. For example, the reasons did not anyway hint or suggest that Peregrine's revenue figures were based on transactions involving side agreements, or contingent or barter transactions. Nor were the reasons "so obviously material that the defendant must have been aware both of its materiality and that [their] non-disclosure would likely mislead investors." City of Philadelphia v. Fleming Companies, Inc., 264 F.3d at 1261. In sum, "[b]ecause Plaintiffs have failed to plead facts that show that [committee Defendants] consciously disregarded [a] 'red flag[ ]' that

would have revealed the errors prior to their inclusion in public statements, ... the Complaint fails to allege facts that give rise to a strong inference of scienter under § 10(b) and Rule 10b-5." In re Comshare Inc. Securities Litigation, 183 F.3d 542, 554 (6th Cir. 1999). That the Committee members "had access to the documents that revealed [Peregrine's] improper revenue recognition ... [by itself] does not strongly compel an inference of intentional or deliberately reckless conduct...." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002). The Complaint fails to "allege facts sufficient to give rise to a strong inference Defendants engaged in conduct which was highly unreasonable and which represented an extreme departure from the standards of ordinary care." In re Nice Systems, Ltd. Securities Litigation, 135 F.Supp.2d 551, 587 (D.N.J. 2001). [20]

[20]      The Complaint also points to some other audit committee meeting. For essentially the reasons why the review and outlook reports did not establish scienter, the meetings also fail to show scienter. Specifically, the Complaint fails to show that from the meetings, Defendants somehow had inside knowledge that contradicted their public statement, provide any detail about the alleged information underlying the reports or that their substance contradicted the substance of the identified statements, and allegedly occurred after Defendants allegedly made their statements.

### d. "Ron Hall's" Email.

*55  The Complaint alleges "[o]n October 3, 2001 [21], Ron Hall, a Peregrine sales executive in its Asia Pacific division, sent [an] e-mail to ... [which] Gardner immediately forwarded ... to ... Moores." (Complaint ¶ 336.) "The email stated:

Attached are documents that should be of fundamental interest to yourself and all copied recipients.

They pertain directly to business activities in Asia Pacific, more specifically Australia. In all likelihood also Europe, where Dominic O'Riley was previously engaged in executive management capacity.

The attached 'Schedule A' for Planwell Technology may well be familiar, as $2 million AUD [Australian dollars] of revenue (perhaps more) was booked on September 30th, 2001 under# SCA-AU-002918V01.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 342 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

The underpinning Partner Addendum, contract # 01AB300901 may not be so familiar. I understand that you don't see all these partner agreements.

I strongly suggest you give these documents careful scrutiny, paying particular attention to page 8 of the 'Partner Addendum,' the 'Sales Guarantee' clause. Then inspect the overall wording and associated legality of the contract, the implied Peregrine responsibility and associated consequent acceptable non-payment should targets not be achieved due to failure to meet this contracted responsibility. It might pay to look at the maintenance terms, payment terms, territory, support implications and other Peregrine responsibilities.

My legal background suggests that the overall contract worthiness is questionable. At the least, certainly not what a shareholder (or an analyst) would pin faith on.

While in the process, it would be recommended you check the underpinning contracts for the following Australian Partner agreements, where large revenue amounts have already been recognised:

IMS - booked for $10 million AUD in March, 2001 - $22 million dollars gross sales required to achieve target.

Kinetica - booked for $1 million AUD in June, 2001 - $1.4 million gross sales required to achieve target.

TELE IP - booked for $2 million in September, 2001 - $3.2 million gross sales required to achieve target.

Planwell Technology - attached, booked for $5 million in September, 2001 - $10 million gross sales required to achieve target.

That's $36 million gross sales required for these partners to collectively achieve target. With implied and/or contracted sales guarantees.

Of note, IMS ($22 million dollar AUD Target) haven't booked ONE SINGLE DEAL or burnt one dollar of revenue since they signed in March, 2001. I repeat, NO business in 6 months on a $22 million AUD commit!

Without the IMS 'sale' of $10 million nett AUD in March, 2001, Australia would only have sold some $4 million dollars gross software for all of last year! They're promising $36 million this year?

21

The Court recognizes that this email came after any of the Defendants made any of the statements alleged to be false or misleading. As noted, as to the Defendants found to be primary actors, the latest statement attributed to them is Amendment No. 1 to Peregrine's Form S-4 Registration Statement regarding the Remedy merger. This statement was filed on July 23, 2001. However, since Plaintiffs are given leave to amend, and the potential importance of this email was raised during the hearing on March 4, 2005, the Court will address it.

**\*56** The above mentioned 'contracts' have a few similarities:

1. They represent ludicrous and irresponsible targets and commitments - little wonder that no 'Partner' has paid up front, particularly when you consider the current economic climate and last year's 'real' software sales. I am reliably informed that these partners were touted figures between $30 and $40 million sales in Australia for last year.

2. The payment terms are extremely loose, extensively delayed and underpinned by the 'guaranteed sales' clause, which any good lawyer would use to avoid liability if things didn't work out as Peregrine have promised. Kinetica haven't yet paid for deals that were booked in June, before their partner 'agreement' was signed. Yet revenue has been booked and valuable resources are being expended supporting their activities. What's the chances of them paying up if targets aren't met?

3. In the main, Partner 'Addendums' - the real contract - aren't signed off by Peregrine US and are exposed to non-compliance and potential litigation. 'Unconscionable Contract' comes to mind.

Yet Mr. Walsh and Mr. O'Riley are pressuring Sales Reps in Asia Pacific and Australia to find MORE Partners - so long as they commit bookable dollars up front. Their war cry is "anything less than $10 million AUD isn't worth doing the business".

Come on, what are Peregrine selling here, Amway? Vapourware? Where's the commercial substance to these so called 'contracts.'

For the record, the $10 million dollar IMS deal that Mr. Walsh 'won his stripes for' in March, has yielded absolutely NOTHING to date - not one cent worth of 'real' business (apart from the initial revenue booking).

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 343 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

I also note he Mr. Walsh doesn't manage the account and has no involvement in it's progress. It's been offloaded to a very inexperienced Sales person. Next March should be interesting when Peregrine try to get IMS to reload - or PAY for that matter. Still, Peregrine have booked the revenue. What will this do to Peregrine's partnering credibility? Or Stock value?

Were the attached documents, any of the other 'contracts' mentioned above, or this correspondence to fall into the hands of the 'Wall Street Journal' or a curious analyst, Peregrine Systems will be under serious and immediate scrutiny. That is not my intention, but as a well meaning Peregrine investor with Peregrine's best interests at heart, I feel compelled to demand your attention to these contracts and the revenue booked from them.

This is a blatant example of what can be termed 'Channel stuffing', in their crudest form. The analysts have other names.

Mr. Walsh and Mr. O'Riley have both been personally warned as to the lack of substance to these contracts, yet have chosen to ignore those warnings. I can only assume that as responsible executives and directors of Peregrine, you would have no knowledge of the underpinning contracts to the Schedule A's you receive on Partnering agreements.

This Type of contract should immediately cease and real revenue be recognised, i.e., where PRODUCT is actually DELIVERED and payment is probable.

 **\*57**  Terry Walsh' and Dominic O'Riley's contracts with Peregrine should immediately be reviewed due to breach of fiduciary duty.

Reliable information suggests that a major Asia Pacific restructure will be announced on October 8 th, 2001. This will include the termination of a number of staff, mainly sales related. I assume these staff will include anyone that has openly objected to the Channel stuffing. 'Amway' approach outlined above.

I look forward to your urgent attention to this correspondence in the hope that this is not the case."

(Complaint ¶ 336.) The Complaint also alleges when Hall "learned of his termination due to his branch office's alleged

'redundancy,' [he] sent an e-mail dated October 25, 2001 to his manager stating:

> Attached is a very important document I sent to the US a short time ago - ... John Moores ... received [a] cop[y]. I sent it because I believe what you're doing with Partner contracts here is unethical, immoral and unconscionable. There is also no justification to book revenue when no product has been ordered, there is a 'sales guarantee' and there is little likelihood of payment if things don't go as we predicted during discussions.... Here is the document, it's self explanatory. My closing comment that anyone who objected to the "channel stuffing" partner approach would be laid off is ironically relevant."

(Id. ¶ 21.) For the reasons that follow, the email does not establish a strong inference of scienter.

At the outset, the Complaint does not allege Moores ever received, or was otherwise aware, of the October 25, 2001 email. Notwithstanding, both the October 3rd and October 25th emails are simply irrelevant to Moores' scienter; the emails came **after** Moores made his alleged statements. As noted above, according to the Complaint, Moores is potentially responsible for four statements- - the Form 10-K filed in May 2000, Amendment No. 1 to the S-4 Registration Statement on the Harbinger merger proposal again filed in May 2000, Form 10-K filed in June 2001, and Amendment No.1 to the S-4 Registration Statement on the Remedy merger proposal filed in July 2001. Thus, the last statement Moores allegedly made was in June 2001.

To show scienter, the Complaint must plead "contrast[s] between what [Moores] w[as] hearing internally about" Peregrine's accounting practices and financial condition, "and what [he] was telling the public **at the same time**." In re Silicon Graphics Inc. Securities Litigation, 183 F.3d at 1000 (Emphasis original). Accordingly, the Complaint must "point[ ] to inconsistent contemporaneous statements or information ... which were made by or available to" Moores. In re GlenFed, 42 F.3d at 1548; seealso, In re Read-Rite Corp., 335 F.3d 843, 847 (9th Cir. 2003) ("[W]e hold that the district court correctly concluded that Plaintiffs did not point to any specific evidence, such as contemporaneous reports or statements of others, in support of their allegations of scienter."). By contrast, the Complaint cannot successfully allege Moores knew that the statements were false or misleading when he made them "merely by pointing to later inconsistent statements or conditions." Id. (Emphasis added). "It is clearly insufficient for [P]laintiffs to say that a **later**,

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 344 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

sobering revelation makes an earlier, cheerier statement a falsehood." Yourish v. California Amplifier, 191 F.3d 983, 997 (9th Cir. 1999); seealso, In re GlenFed, 42 F.3d at 1548 (Finding "no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation...."); Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."). Therefore, the emails, which came in October 2001 and after Moores made his last statement, are simply irrelevant and cannot establish Moores' scienter. See, Ronconi v. Larkin, 253 F.3d at 432 (To establish scienter, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the defendants knew or were deliberately reckless of the false or misleading nature of the statements when made.") (Emphasis added); seealso, Osher v. JNI Corp., 256 F.Supp.2d at 1159 (Defendant "allegedly made false statements during the conference call on October 16, 2000. It seems, however, that the 'Sxxx' email was circulated after the alleged false statements. Thus, the email does not necessarily establish that the fourth quarter was 'not looking so great' on October 16, 2000."); In re Global Crossing, 322 F.Supp.2d at 346 ("[D]efendants cannot be held liable for failing to anticipate future events....").

**\*58** Moreover, the emails are insufficiently pled under the PSLRA. "Under the PSLRA ... the [P]laintiffs are required to allege in detail facts giving rise to a strong inference of scienter." In re Vantive Corp. Securities Litigation, 283 F.3d at 1091. They have failed to do so. Specifically, Moores has submitted the email the Complaint alleges "Ron Hall" sent in October 3, 2001. (Moores Motion Attached Exh. "P"; Johnson Decl. ¶ 16.) As previously noted, "[a] district court ruling on a motion to dismiss may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." Parrino v. FHP, Inc., 146 F.3d 699, 705-706 (9th Cir. 1998). Plaintiffs do not question the authenticity of the document.

The exhibit submitted reveals that the October 3, 2001 email was anonymously sent. No where in the contents of the email is there any reference to Ron Hall. Plaintiffs must thus state "the sources of [their] information with respect to the [emails], [and] how [they] learned of the [emails]...." Silicon Graphics, 183 F.3d at 985; Novak, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to

contrary facts, they must specifically identify the reports or statements containing this information."); San Leandro, 75 F.3d at 812 ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."). Indeed, "[i]t is not sufficient for a [P]laintifff[s'] pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate [their] claim," Id. "Silicon Graphics and the PSLRA require Plaintiffs to allege the specific content of the documents upon which the plaintiff relied, identifying who prepared and who reviewed them, and setting out sources of ... information with respect to the reports." In re Peerless Systems, Corp. Securities Litigation, 182 F.Supp.2d 982, 994 (S.D. Cal. 2002) (Citations omitted). Plaintiffs fail to allege how they learned that Ron Hall was the sender. If Plaintiffs are relying on a "confidential source", they must "reveal with particularity the sources of their information.... Naming sources is unnecessary so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details" In re Daou Systems, Inc. Securities Litigation, 397 F.3d at 712 (Citations and quotations omitted). As it now stands, however, Plaintiffs' allegations are insufficient under the PSLRA.

Lastly, the exhibit dispels any suggestion that there was a strong inference that Moores was deliberately reckless, or acted with an intent to deceive or defraud the public. See, In re Worlds of Wonder Securities Litigation, 35 F.3d at 1424 ("[S]cienter [is] a mental state embracing intent to deceive, manipulate, or defraud."); Nursing Home Pension Fund. Local 144 v. Oracle Corp., 380 F.3d at 1230 ("[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct"). The exhibit reveals that less than an hour after receiving the October 3, 2001 email, Moores forwarded the email to Gardner, then chairman and CEO of Peregrine, inquiring about what the sender was "complaining about." (Moores Motion Attached Exh. "P".) The exhibit then reveals that Gardner informed Moores that Peregrine "will book a whopping $1.7 million [in the] quarter out of all of Asia Pacific (Japan, Australia, Singapore, China, etc.)", and that "it [was] pretty clear that the amounts [the sender] [was] referring to ha[d] no bearing on [Peregrine's] revenue recognition policies." (Id.) Gardner also assured Moores that he "will investigate" the matter. (Id.) The Complaint is silent as to what Moores did them after, and the Court

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 345 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

cannot speculate that Moores acted recklessly. "The Reform Act does not permit district courts to speculate as to the existence of unpled and unidentified facts that could raise a strong inference of scienter." Reiser v. Price Waterhouse Coopers LLP, 117 F.Supp.2d 1003, 1011 (S.D. Cal. 2000). Accordingly, the alleged emails do not establish scienter.

### e. Improperly Recorded Transactions.

**\*59** Attachments to the Complaint identify seventeen (17) improperly booked transactions. See, Parrino v. FHP, Inc., 146 F.3d 699, 705-06 (The Court may "consider material which is properly submitted [or attached] as part of the complaint...."). Nelson is implicated in four transactions.[22] For the reasons that follow, the allegations regarding these transactions fail to show scienter on the part of Nelson.

[22]    The Complaint identifies other Defendants-- Gardner, Gless, Cappel, Spitzer, and Powanda who were allegedly involved in the transactions. As noted, however, the Court has already found that, under Section 10(b), Plaintiffs adequately state a claim against Gardner, Gless, Cappel, and Spitzer, and thus will not discuss their involvement. Similarly, the Court will not discuss Powanda's liability as he withdrew his Motion. (Docket No. 597.)

### (i) eXchangeBridge

EXchangeBridge, Inc. ("EXB") provides electronic and paper transaction processing services to the food brokerage industry. (Complaint Attached Exh. "E" at 10.) As of February 2001, Peregrine owned approximately 78% of the preferred stock (with voting rights) in this corporation. (Id.) Moreover, two members of Peregrine management, including Nelson, constituted two-thirds of EXB's board of directors. (Id.) The Complaint alleges Nelson, on behalf of Peregrine, agreed to purchase an EXB note and another debt owed to Crossmark, a customer of EXB, for $1.5 million in Peregrine stock. (Id.) In exchange for the purchase, Crossmark agreed to "purchase" roughly $1.6 million of software from Peregrine through EXB. (Id.) According to the Complaint, "Nelson insisted that EXB - and thus Peregrine - recognize the full $1.6 million software license fee immediately in the June 2001 quarter despite the fact that the transaction was nothing more than a contingent swap transaction." (Id. at 11.) Further, the Complaint alleges that EXB's CFO was fired after objecting to Nelson's accounting treatment. (Id.)

Although the Complaint provides details concerning the EXB swap transaction, it fails to provide sufficient basis of knowledge. See, Novak, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."). The Complaint fails to allege any facts forming the basis of Plaintiffs' belief. The Complaint also fails to allege facts indicating that Nelson "knew or must have been aware of the improper revenue recognition ...." DSAM, 288 F.3d at 391.

Moreover, as previously discussed, Nelson is only responsible for press releases following quarters one through four in 2000 and the first quarter of 2001, which ended June 30, 2000. The press release following the first quarter of 2001 was allegedly issued on July 19, 2000. The EXB transaction was recorded June 30, 2001, at close of second quarter of 2002 and after Nelson allegedly made the false statements. See, Ronconi v. Larkin, 253 F.3d at 432 (To show scienter, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."); Yourish v. California Amplifier, 191 F.3d at 997 ("It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood."); In re GlenFed, 42 F.3d at 1548 (Finding "no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation...."). As such, the EXB transaction does not show scienter.

### (ii) Critical Path, Inc.

**\*60** The Complaint next alleges revenue was improperly recognized in a swap transaction involving Critical Path Inc. ("Critical Path") in September 2000. (Complaint Attached Exh. "E" at 17.) The Complaint then alleges "[e]-mail correspondence ... shows that ... Nelson ... knew the transaction was merely a swap for which revenue could not be recognized." (Id.) However, the only "e-mails" Nelson allegedly received was first " 'the latest' version of Critical Path documents on September 27, 2000" and then another "e-mail ... attaching the 'Final, Final' version of the documents." (Id. at 18.) These allegations are insufficient to show Nelson "knew or must have been aware of the improper revenue recognition ...." DSAM, 288 F.3d at 391. Moreover, the transaction was allegedly booked no sooner than September 2000, which again is after Nelson made his alleged false or misleading statements.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 346 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

#### (iii) IBM/Tivoli

The Complaint alleges "transactions with IBM gave rise to improper revenue recognition." (Complaint Attached Exh. "E" at 42.) The only allegations against Nelson are that he "signed the agreement on behalf of Peregrine." (Id. at 43.) Needless to say, these allegations are insufficient to show Nelson "knew or must have been aware of the improper revenue recognition...." DSAM, 288 F.3d at 391.

#### (iv) CI Software Solutions

Lastly, according to the Complaint, "Peregrine entered into several transactions with CI Software Solutions" ("CI Software") for which Peregrine booked the orders as revenue although CI Software was under no obligation to pay for the software until it was sold-through to the end-user. (Complaint Attached Exh. "E" at 50.) The revenue from one of the transactions was allegedly recorded "in the fourth quarter of fiscal year 2000...." (Id.) The Complaint then alleges "Nelson knew" these transactions were "improper." (Id.) As support, the Complaint points to an email Nelson allegedly wrote on April 18, 2001: "The original Reseller Agreement between the companies was put in place largely because we were led to believe that CI [Software] would be successful in winning CSC as a Peregrine System customer for asset management, which has yet to happen." (Id.) These allegations fail to show Nelson "knew or must have been aware of the improper revenue recognition ...." DSAM, 288 F.3d at 391. Indeed, the email Nelson allegedly wrote suggests that he believed "that CI [Software] would be successful in winning CSC as a Peregrine System customer ...."

Moreover, the revenue from this alleged improper transaction was recorded "in the fourth quarter of fiscal year 2000", which ended March 30,2000. There are, however, no allegations that "point[ ] to inconsistent contemporaneous statements or information ... which were made by or available to" Nelson before March 30, 2000 or at the time of his alleged statement following the fourth quarter of 2000 on April 26, 2000. In re GlenFed, 42 F.3d at 1548; seealso, In re Silicon Graphics Inc. Securities Litigation, 183 F.3d at 1000 (The Complaint must plead "contrast[s] between what [Defendant] w[as] hearing internally about and what [he] was telling the public **at the same time**.") (Emphasis original); In re Read-Rite Corp., 335 F.3d at 847 ("[W]e hold that the district court correctly concluded that Plaintiffs did not point to any specific evidence, such as contemporaneous reports or statements of others, in support of their allegations of scienter"). As such, the transaction does not give rise to scienter.

#### f. Insider Trading,

Plaintiffs allege that a strong inference of scienter exists because of widespread insider trading on the part of various Defendants. "Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter." In re Apple Computer Securities Litigation, 886 F.2d 1109, 1117 (9th Cir. 1989); seealso, In re Daou Systems, Inc. Securities Litigation, 397 F.3d at 718 ("[T]he PSLRA neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence meet the 'strong inference' standard."). But, "[i]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." Silicon Graphics, 183 F.3d at 986. "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." Id. "The central question, then, is whether the stock transactions in question were so 'suspicious' or 'unusual' as to give rise to the strong inference of fraudulent intent." Ressler v. Liz Claiborne, Inc., 75 F.Supp.2d 43, 58 (E.D.N.Y. 1999). "[M]ere pleading of insider trading, without regard to context or strength of inferences to be drawn, is not enough.... At a minimum, the trading must be in a context where defendants have incentives to withhold material, nonpublic information, and it must be unusual, well beyond the normal patterns of trading by those defendants." In re Securities Litigation BMC Software, Inc., 183 F.Supp.2d 860, 900 (S.D. Tex. 2001). "Even if these factors reveal stock sales to be 'suspicious,' some courts will not infer scienter on the basis of stock sales alone." In re Copper Mountain Securities Litigation, 311 F.Supp.2d 857, 874 (N.D. Cal. 2004) (Citations omitted). Seealso, Ronconi, 253 F.3d at 435 ("[N]ot every sale of stock by a corporate insider shows that the share price is about to decline. A corporate insider may sell stock to fund major family expenses, diversify his portfolio, or arrange his estate plan. He may sell stock twice a year when the college tuition for his children is due.").

**\*61** Against this backdrop, the Court will determine whether a Defendant's alleged insider trading shows scienter on his part. Before doing so, however, the Court notes the following limitations. As previously noted, Plaintiffs cannot state a claim based on allegations of insider trading. This is because Plaintiffs' case is based on the "fraud on the market" theory. See Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 975 (9th Cir. 1999). (Seealso, Complaint ¶ 48.) Moreover, the

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 347 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Complaint does not allege that any of the Plaintiffs traded shares at the same time as the Defendants. Standing to assert a duty to disclose extends only to contemporaneous traders during the alleged insider trading. See, 15 U.S.C. § 78t-1 (Limiting standing for insider trading claims to plaintiffs that "contemporaneously" bought or sold securities of the same class); In re Seagate Technology II Securities Litigation, 843 F.Supp. at 1370 ("Because plaintiffs here were not contemporaneous traders during the alleged insider trading, they have no standing to assert the duty to disclose imposed upon insider traders."). Therefore, the Complaint's allegations that certain Defendants engaged in insider trading without making disclosure of material information do not state a claim. (See, Complaint ¶ ¶ 16 and 177). Similarly, Plaintiffs cannot establish scienter based on allegations that from February 15, 2000 to February 19, 2000, certain Defendants engaged in insider trading based on undisclosed information relating to Peregrine's acquisition of Harbinger. Plaintiffs do not allege any false or misleading statements relating to Peregrine's acquisition of Harbinger. See, In re Vantive Corp. Securities Litigation, 283 F.3d at 1094. Moreover, and because the Complaint does not allege Defendants made any statements regarding the Harbinger merger, they did not have a duty to disclose anything about the proposed merger. See, Friedman v. Royovac Corp., 295 F.Supp.2d at 988 ("[E]ven if a reasonable investor would want to know an omitted fact, there is no duty to disclose it unless omitting it alters the meaning of a statement that was made."). With these limitations in mind, the Court will now determine whether each Defendant's alleged insider trading establishes scienter on the part of any particular Defendant.

**(i) Luddy's Insider Trading.**

As previously noted, the Complaint fails to state a Section 10(b) claim against Luddy. Luddy has neither employed a scheme to defraud or made any false or misleading statements. Thus, the Court need not address whether Luddy's scienter, but will do so anyways.

Luddy's alleged insider trading does not establish scienter on his part. The Complaint alleges Luddy sold 368,789 shares, and received gross proceeds totaling $11,823,660.44. (Complaint ¶ 332.) Before the Class Period, the Complaint alleges, Luddy held 416, 144 shares and sold 397,196, or 95% of his holdings. (Id. ¶ 334.) During the Class Period, Luddy held 465,763 shares and sold 465,763, or 100% of his Class Period holdings. (Id.) Approximately 75% of Luddy's proceeds from insider sales were derived from sales during the Class Period.

Based on these figures, Luddy's sales were not dramatically out of line with his trading before the Class Period. His sales were relatively consistent, and Luddy did not sell significantly more stock during the Class Period than he did before it. In fact, Luddy sold virtually the same amount of shares. Moreover, "[l]arge numbers of stock sales by themselves do not necessarily create a strong inference of fraud." In re Syncor Intern, Corp. Securities Litigation, 327 F.Supp.2d 1149, 1164 (C.D. Cal. 2004). Rather, as noted above, the Court must find the stock sales to be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." Silicon Graphics, 183 F.3d at 986; Osher v. JNI Corp., 256 F.Supp.2d 1144, 1163 (S.D. Cal. 2003) ("[U]nusual or suspicious stock sales by corporate insiders constitute circumstantial evidence of scienter only if the trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from the undisclosed inside information.' "), The sales in which Luddy engaged during the Class Period adhered to the pattern of his prior sales and do not appear to be "unusual" in either their amount or their timing.

The Complaint also fails to tie Luddy's sales with any of the alleged false or misleading statements. The "trading must coincide with false or misleading statements-a missing link in this case. Absent additional evidence, it is not possible to draw a strong inference of scienter based on improper trading on material, non-public information." In re Navarre Corp. Securities Litigation, 299 F.3d 735, 748 (8th Cir. 2002) (Citations omitted). "Finally, [Luddy] is not alleged to have uttered a word, or have participated in preparing statements, during the entire [C]lass [P]eriod. There accordingly is no basis for finding circumstantial evidence of fraud in [Luddy's] stock sales." In re Vantive Corp. Securities Litigation, 283 F.3d at 1094; seealso, Silicon Graphics, 183 F.3d at 987-88 (Insider's failure to utter any of the allegedly false statements helped dispel an inference of fraud that the plaintiffs asserted flowed from that insider's stock sales). (Seealso, Plaintiffs' Opposition at 6:3-4: Luddy "is not quoted in press releases or did not personally speak to securities analysts...."); Chan v. Orthologic Corp., 1998 WL 1018624 at *12 n. 9 (D. Ariz. 1998) ("Plaintiffs cannot use allegations of insider trading to attribute misstatements to insiders who are not otherwise identified as [responsible] for such misstatements."); Head v. NetManage, Inc., 1998 WL 917794 at *5 (N.D. Cal. 1998) (Defendant's trades not suspicious, "particularly in light of the

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 348 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

fact that he is not alleged to have personally made any of the false statements").

### (ii) Van den Berg's Insider Trading.

**\*62** According to the Complaint, "[b]efore the Class Period, van den Berg held 402,144 shares and sold 270,000, or 67% of his holdings. During the Class Period, on February 22, 2000, van den Berg held 78,744 shares and sold 40,000 or 51% of his Class Period holdings. (Complaint ¶ 365.) The Complaint further alleges "[a]ll 40,000 shares were sold during [Peregrine's] imposed black-out period." (Id.) As alleged, van den Berg's alleged insider trading does not establish scienter.

"The mere fact that insider stock sales occurred does not suffice to establish scienter." Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1224 (1st Cir. 1996). To create an inference of scienter, Plaintiffs must show that the stock sales during the Class Period were "suspicious" or "unusual." In re Apple Computer Secs. Litig., 886 F.2d at 1117 ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter"). Van den Berg's insider trading was isolated or limited to a single occurrence. This is not sufficient to enhance any inference of scienter. In other words, van den Berg's "trading history is too limited to give rise to an inference of intent to defraud." In re Securities Litigation BMC Software, Inc., 183 F.Supp.2d at 901-902; seealso, In re Silicon Graphics, 183 F.3d at 987 (Stock sales cannot be viewed as 'unusual' where defendant "ha[s] no significant trading history for purposes of comparison").

Moreover, no inference can be drawn that van den Berg wanted to "maximize [his] personal benefit from undisclosed inside information." In re Silicon Graphics, 183 F.3d at 986. The Complaint alleges van den Berg violated Section 10(b) by making false or misleading statements about the financial health of Peregrine in May 2000, including statements in: (a) 10-K for the Fiscal Year 2000, which was published in May 10, 2000, and (b) May 22, 2000 Amendment No.1 to the S-4 Registration Statement on Harbinger merger proposal. (See, Plaintiffs' Opposition at 7:23-25.) But ven den Berg allegedly engaged in the insider trading before he made the statements-in February 2000--not after. See, Wenger v. Lumisys, Inc., 2 F.Supp.2d at 1251 (Stock sales not suspicious where "none of the sales occurred at suspicious times such as immediately before a negative earnings announcement"). Lastly, that van den Berg allegedly traded during Peregrine's imposed black-out period, by itself, is insufficient to establish that his trading was "suspicious." According to the Complaint, "from

September 1, 1999 through February 8, 2001, there was a black out on trading by Peregrine insiders based on a series of Company events. As a result, during the Class Period, although there were 699 public trading days, the black-out periods referenced above meant that officers and directors could trade during only 225 of those days." (Complaint ¶ 234.) "But, courts have repeatedly held that the mere existence of stock sales does not raise a strong inference of fraudulent intent. Plaintiffs have the burden at the pleading stage of explaining why the stock sales were unusual or suspicious." In re PETsMART, 61 F.Supp.2d at 1000. What the Complaint fails to allege is what these "series of Company events" were and why or how they were significant to van den Berg's, or any other Defendant's, mental state. See, Ochs v. Shearson Lehman Hutton Inc., 768 F.Supp. 418, 427 (S.D.N.Y. 1991) ("Knowledge is a state of mind. So is intent to defraud, or 'scienter.' ").

### (iii) Nelson's Insider Trading.

**\*63** The Complaint alleges "[b]efore the Class Period Nelson held 386,500 shares and sold 133,500, or 35% of his holdings. During the Class Period, Nelson held 457,451 shares and sold 375,000 or 82% of his Class Period holdings. Approximately 90% of Nelson's proceeds from insider sales were derived from sales during the Class Period." (Complaint ¶ 315.) As the Complaint reflects, during the Class Period, Nelson sold shares two times, August 1999 and February 2001. In August 1999, Nelson sold 87,500 shares, which consisted of 40% of his holdings at that time. In February 2001, Nelson sold 200,000 shares of a total 276,000, or 72% of his total holdings. Based on these allegations, the Court previously found that Nelson's trading did not establish scienter on his part. (See, Order dated November 21, 2003 at 67-69.) The Complaint makes no additional, or materially different, allegations. The insider trading allegations are essentially identical to the claims of insider trading allegations the Court previously dismissed. Thus, for the same reasons stated in the Court's original Order, Nelson's alleged insider trading does not establish scienter on his part.

### (iv) Noell's Insider Trading.

Noell's alleged insider trading does not establish scienter on his part. The Complaint alleges "[b]efore the Class Period, Noell held 515,428 shares and sold 274,000 or 53% of his holdings. During the Class Period, Noell held 187,543 shares and sold 174,375, or 93% of his Class Period holdings. Approximately 74% of Noell's proceeds from insider sales were derived from sales during the Class

2005 WL 8158825

Period." (Complaint ¶ 358.) According to the Compliant, however, Noell's trading during the Class Period occurred once in February 2000, and twice in February 2001. (Id. at 356.) As alleged, Noell's "trading history is too limited to give rise to an inference of intent to defraud." In re Securities Litigation BMC Software, Inc., 183 F.Supp.2d at 901-902; seealso, In re Silicon Graphics, 183 F.3d at 987 (Stock sales cannot be viewed as 'unusual' where defendant "ha[s] no significant trading history for purposes of comparison"). Moreover, Noell received at most $43 per share-well below the peak stock price of $79. Accordingly, his alleged sales were not "calculated to maximize the personal benefit from the undisclosed inside information." Silicon Graphics, 183 F.3d at 986.

### (v) Watrous' Insider Trading.

The Complaint alleges "[b]efore the Class Period, Watrous held 20,000 shares and sold 10,000 or 50% of his holdings. During the Class Period, Watrous held 25,000 shares and sold 15,000*or* 60% of his Class Period holdings. Almost 86% of Watrous's proceeds from insider sales were derived from sales during the Class Period." (Complaint ¶ 368.) Watrous alleged insider trading during the Class Period occurred only one time--February 25, 2000. (Id. ¶ 367.) As alleged, Watrous's "trading history is too limited to give rise to an inference of intent to defraud." In re Securities Litigation BMC Software, Inc., 183 F.Supp.2d at 901-902; seealso, In re Silicon Graphics, 183 F.3d at 987 (Stock sales cannot be viewed as 'unusual' where defendant "ha[s] no significant trading history for purposes of comparison").

### (vi) Cole's Insider Trading.

The Complaint alleges "[b]efore the Class Period, Cole held 2,523,284 shares and sold 330,000, or 13% of his holdings. During the Class Period, Cole held 2,339,534 shares and sold 1,304,000 or 56% of his Class Period holdings. Almost 86% of Cole's proceeds from insider sales were derived from sales during the Class Period." (Complaint ¶ 362.) Cole's alleged insider trading occurred during July 1999, August 1999, February 2000, February 2001, November 2001, November 2002, and February 2002. See, Silicon Graphics, 183 F.3d at 986 (In determining whether stock sales give rise to scienter, the court must consider "the timing of the sales...."). The fraudulent conduct attributed to Cole is his alleged misleading statements in Amendment No. 1 to the S-4 Registration Statement on Harbinger merger proposal and Amendment No. 1 to the S-4 Registration Statement on Remedy merger proposal. These statements were filed with

the SEC on May 22, 2000 and July 23, 2001 respectively. "[S]tock sales are helpful only in demonstrating that certain statements were misleading and made with knowledge or deliberate recklessness when those sales are able to be related to the challenged statements." In re Vantive, 283 F.3d at 1093. None of Cole's alleged sales took place immediately following the dissemination of his alleged false or misleading statements, or otherwise linked to those statements. See, In re Navarre Corp. Securities Litigation, 299 F.3d at 748. Moreover, Cole received at most $50 per share--well below the peak stock price of $79. Accordingly, his alleged sales were not "calculated to maximize the personal benefit from the undisclosed inside information."Silicon Graphics, 183 F.3d at 986. Cole's alleged insider trading does not establish scienter on his part.

### (vii) Moores's Insider Trading.

**\*64** The volume of shares Moores sold was greater than that of any other Defendant. According to the Complaint, "[b]efore the Class Period, Moores held 39,098,756 shares and sold 17,123,768, or 44% of his holdings. During the Class Period, Moores held 18,515,263 shares and sold 17,407,841, or 94% of his Class Period holdings. 72% of Moores' total proceeds from insider sales of Peregrine stock were derived from sales during the Class Period." (Complaint ¶ 348.) However, "[l]arge numbers of stock sales by themselves do not necessarily create a strong inference of fraud." In re Syncor Intern. Corp. Securities Litigation, 327 F.Supp.2d at 1164; seealso, Wenger v. Lumisys, Inc., 2 F.Supp.2d 1231, 1251 (N.D. Cal. 1998)( "[S]tock sales alone cannot create a strong inference of scienter."); In re Splash Technology Holdings, Inc. Securities Litigation, 160 F.Supp.2d 1059,1081 (N.D. Cal. 2001) ("Although viable circumstantial evidence of scienter, stock sales alone cannot create a strong inference of scienter."). Similarly, as noted, "[i]nsider stock sales are not inherently suspicious; they become so only when the level of trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' " In re Vantive Corp., 283 F.3d at 1092 (quoting Ronconi, 253 F.3d at 435). "[C]omplaints based on insider trading must allege more than that the defendant benefitted from trading because of a false statement or misleading omission; the insider trades have to be 'unusual,' either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved, before they will give rise to the required inference of scienter." Florida State Bd. of Admin. v. Green Tree Financial Corp., 270 F.3d 645, 659 (8th Cir. 2001).

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 350 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

Even if stock sales alone sufficed, the sales here do not appear unusual nor suspicious. As noted above, to determine scienter, the Court must consider the timing of Moores's alleged sales. According to the Complaint, Moores sold his shares during July 1999, February 2000, and February 2001. (Complaint ¶ 346.) The fraudulent conduct Moores allegedly engaged in was making false or misleading statements in the: (a) 10-K for the Fiscal Year 2000, (b) 10-K for the Fiscal Year 2001, (c) Amendment No. 1 to the S-4 Registration Statement on Harbinger merger proposal, and (d) Amendment No. 1 to the S-4 Registration Statement on Remedy merger proposal. These statements were filed with the SEC on May 10, 2000, June 29, 2001, May 22, 2000, and July 23, 2001. As such, none of the alleged sales are related to, or immediately following, the alleged making of the false or misleading statements. See, In re Navarre Corp. Securities Litigation, 299 F.3d at 748; Wenger v. Lumisys, Inc., 2 F.Supp.2d at 1251 (Stock sales not suspicious where "none of the sales occurred at suspicious times such as immediately before a negative earnings announcement"). Moreover, Moores received at most about $53.00 per share-far below the peak stock price of $79. (Complaint ¶ 346.) Thus, his sales were not "calculated to maximize the personal benefit from the undisclosed inside information." Silicon Graphics, 183 F.3d at 986. Accordingly, as alleged, Moores' alleged insider trading do not establish scienter on his part.

### g. Allegations of Improper Motive To Commit Fraud.

Defendants' motive to falsely report Peregrine's revenue is repeatedly referenced in the Complaint. (See, e.g., Complaint ¶¶ 82-83.) For example, Plaintiffs allege that Defendants had a motive to inflate the stock price because a high price would help them pursue "acquisitions and strategic alliances while using [Peregrine's] common stock as currency for these purchases or alliances." (Id. ¶ 83; see also, Id. ¶ 3: "The higher the price of Peregrine stock, the fewer the number of shares Peregrine would have to issue for each acquisition. That was significant to the individually named defendants herein who served as officers or directors Peregrine because they owned a substantial number of shares of Peregrine common stock and did not want the value of their holdings diluted by the issuance of too many new shares. Thus, in order to keep up the price of the Company's stock, it was imperative that Peregrine meet Wall Street's expectations and continue to report strong demand for its products so that investors could expect record sales and earnings growth to continue quarter after quarter.") Under the PSLRA, these generalized assertions of motive, without more, are inadequate to establish scienter. Plaintiffs

fail to attribute the alleged motive to any particular Defendant. Moreover, such motivations are far too common to support an inference of scienter. See, Linton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002) ("If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. [Defendants'] alleged desires to obtain favorable financing and to expand abroad are in themselves ordinary and appropriate corporate objectives. Such routine business objectives, without more, cannot normally be alleged to be motivations for fraud. To hold otherwise would be to support a finding of fraudulent intent for all companies that plan to lower costs and expand sales."); Abrams v. Baker Hughes Inc., 292 F.3d 424, 434 (5th Cir. 2002) ("The plaintiffs allege that the defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation and the desire to sell stock at inflated prices. This court has held that similar allegations were insufficient to support an inference of scienter."); Nathenson v. Zonagon Inc., 267 F.3d 400, 420 (5th Cir. 2001) ("[A]llegations that corporate officers and directors would benefit from enhancing the value of their stock and/ or stock options and that the corporation would benefit by receiving more for its shares to be issued in [an upcoming] public offering are ... insufficient to support a strong inference of scienter."); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068-69 (5th Cir. 1994) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated ... [W]ere the opposite true, the executives of virtually every corporation ... would be subject to fraud allegations. It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent."); Tarica v. McDermott Int'l. Inc., 2000 WL 1346895 at *10 (E.D. La. 2000) (Corporate acquisitions do not provide legally sufficient bases for scienter; they "are routine corporate events, and the courts reject motive theories that would almost universally permit an inference of fraud").

### h. Arthur Andersen and AWSC's Scienter.

**\*65** As previously noted, Arthur Andersen is potentially responsible for their alleged false audit opinions, or statements, in Peregrine's Form 10Ks filed in 2000 and 2001 as well as the two S-4 Registrations Peregrine filed in connection with Harbinger and Remedy merger proposals. AWSC is potentially responsible only for the two S-4 Registrations. According to the Complaint, "Arthur Andersen

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 351 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158425

was engaged by Peregrine to provide independent auditing and accounting services throughout the Class Period" and AWSC assisted Arthur Andersen. (Complaint ¶¶ 402 and 456.) Most of the allegations against both Arthur Andersen and AWSC are substantially identical, though the allegations against Arthur Andersen are more inclusive. Thus, for purposes of efficiency, the Court will refer to Arthur Andersen when analyzing scienter on the part of both Defendants.

To adequately allege scienter, the Complaint must now show that Arthur Andersen's "accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002). The Complaint must allege "facts to establish that [Arthur Andersen] knew or must have been aware of the improper revenue recognition, intentionally or knowingly falsified the financial statements, or that the audit was such 'an extreme departure' from reasonable accounting practice that [Arthur Andersen] 'knew or had to have known' that its conclusions would mislead investors." Id. at 390-391. Thus, recklessness on the part of an independent auditor entails a mental state so culpable that it "approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 121 (2d Cir. 1982); Pegasus Fund, Inc. v. Laraneta, 617 F.2d 1335, 1341 (9th Cir. 1980) (Auditor's recklessness "must come closer to being a lesser form of intent [to deceive or defraud] than merely a greater degree of ordinary negligence.") (Internal quotations omitted).

Aside from the foregoing pleading requirements, Plaintiffs must also meet several additional obstacles. First, a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud. Unlike the officers and directors of the companies it represents, an independent accountant has no ability to line its pockets through insider trading, and no incentive to cover up corporate mismanagement. The accountant's success depends on maintaining a reputation for honesty and integrity, requiring a plaintiff to overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client. See, In re Worlds of Wonder Securities Litig., 35 F.3d 1407, 1427 n.7 (9th Cir. 1994); Melder v. Morris, 27 F.3d 1097, 1103 (5th Cir. 1994); DiLeo v. Ernst & Young, 901 F.2d 624, 629 (7th Cir. 1990)

("An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses [defendant] would suffer from a perception that it would muffle a client's fraud.").

Second, because an independent accountant often depends on its client to provide the information base for the audit, it is almost always more difficult to establish scienter on the part of the accountant than on the part of its client. See, Bily v. Arthur Young & Co., 834 P.2d 745, 762 (1992) ("An auditor is a watchdog, not a bloodhound. As a matter of commercial reality, audits are performed in a client-controlled environment."); Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[T]he failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability."); Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000) (Reversing dismissal of securities complaint in favor of corporation and its officers, but affirming dismissal as to independent accountant).

*66 Lastly, the report generated by an independent accountant often represents a "professional opinion based on numerous and complex factors." Bily v. Arthur Young & Co., 834 P.2d at 763. "Although ultimately expressed in shorthand form, the report is the final product of a complex process involving discretion and judgment on the part of the auditor at every stage. Using different initial assumptions and approaches, different sampling techniques, and the wisdom of 20-20 hindsight, few CPA audits [are] immune from criticism." Id.; seealso, In re GlenFed, Inc. Securities Litig., 42 F.3d 1541, 1549 (9th Cir. 1994) (En banc) (Recognizing that "flexible accounting concepts do not always (or perhaps ever) yield a single correct figure."); Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1020-21 (5th Cir. 1996) (Same). "In sum, the lack of a rational economic incentive for an independent accountant to participate in fraud, the client's central role in providing information to the accountant, and the complex professional judgment required to perform an audit, make it exceedingly difficult for a securities plaintiff to plead facts suggesting that an independent accountant acted with the deliberate state of mind now required to withstand a motion to dismiss Reiger v. Price Waterhouse Coopers, LLP, 117 F.Supp.2d 1003, 1008 (S.D. Cal. 2000). Against this backdrop, the Complaint fails to show scienter on the part of Arthur Andersen or AWSC.

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 352 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

The Complaint first alleges that "[i]n its audit opinions, Arthur Andersen falsely. represented that Peregrine's financial statements for fiscal years 2000 and 2001 were presented in accordance with GAAP and that Arthur Andersen's audits had been performed in accordance with GAAS." (Complaint ¶ 402.) The Complaint also alleges that "Arthur Andersen knew, or was deliberately reckless with regard to the fact that Peregrine's financial statements were not prepared in conformity with GAAP, causing Arthur Andersen's reports to be in violation of GAAS and SEC rules." (Complaint ¶ 1412; seealso, ¶ 417: "Arthur Andersen's intentional and/or deliberately reckless design of stock option plans and the accounting therefor ... violated GAAP...."). These allegations are conclusory and insufficient to show scienter. Plaintiffs have not alleged knowing or severely reckless publishing of materially false information by specific factual allegations. Nor do Plaintiffs show what Arthur Andersen's method of auditing was and whether it was rejected by industry practice or an independent auditor's opinion. "Therefore, [P]laintiffs have insufficiently pleaded scienter based on conscious behavior or severe recklessness with respect to [Arthur Andersen's] non-compliance with GAAP." Mortensen v. AmeriCredit Corp., 123 F.Supp.2d 1018, 1026-1027 (N.D. Tex. 2000); seealso, In re Comshare, Inc. Sec. Litig., 183 F.3d at 553 ("Although Plaintiffs speculate that it is likely that Defendants knew of the GAAP violations because they occurred over a long period of time, claims of securities fraud cannot rest on speculation and conclusory allegations.").

Moreover, "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." In re Software Toolworks Inc., 50 F.3d 615, 627 (9th Cir. 1994). "[S]cienter requires more than a misapplication of accounting principles." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d at 390. "Courts [also] uniformly hold that allegations of GAAP and GAAS violations are insufficient, without more, to state a securities fraud claim." Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 (1st Cir. 1994); seealso, Reiser v. Altris Software, 1999 WL 540893 at *7 (S.D. Cal. 1999) ("[A]llegations that an accountant or auditor conducted an inadequate audit by violating accounting or auditing principles do not, without more, adequately plead a strong inference of scienter."); Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."). Indeed, "mistakes in accounting

calculations, unreasonable accounting procedures, or even outright violations of professional standards, without more, simply do not establish scienter." In re Ikon Office Solutions, Inc. Securities Litigation, 131 F.Supp.2d 680, 692 (E.D. Pa. 2001); seealso, In re Worlds of Wonder, 35 F.3d 1407, 1426 (9th Cir. 1994) ("The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."). "Only where such allegations are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim." City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1261 (10th Cir. 2001); seealso, Abrams v. Baker Hughes, Inc., 292 F.3d 424, 432 (5th Cir. 2002) ("The party must know that it is publishing materially false information, or must be severely reckless in publishing such information."). No such allegations have been made.

*67 The Complaint next alleges "Arthur Andersen knew from its audit and review work, or was deliberately reckless with regard to the fact that [Peregrine] had material weaknesses in its internal accounting control structure such that no reliance could be placed on [Peregrine's] financial reporting system ... which in light of [Peregrine's] tremendous growth, was a blatant 'red flag' that Arthur Andersen chose to ignore...." (Complaint ¶ 406, 422 and 423.) Again, these allegations are insufficient because they are not pled with the particularity required by the PSLRA. There are no specifics as to how "Arthur Andersen knew from its audit and review work ... that [Peregrine] had material weaknesses in its internal accounting control structure." The Complaint must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d at 388-389. If allegations are made on information and belief[23], "a plaintiff must provide, in great detail, all the relevant facts forming the basis for her relief." In re Silicon Graphics Inc. Securities Litigation, 183 F.3d at 985. "There are no allegations identifying specific conversations, Board meetings, or reports where [Arthur Andersen] purportedly learned of the true and adverse information." In re Peerless Systems, Com. Securities Litigation, 182 F.Supp.2d 982, 994 (S.D. Cal. 2002). Notwithstanding, "a plaintiff cannot establish scienter by arguing that an independent auditor ignored a client's lack of internal controls, failed to exercise additional scrutiny despite knowing its client had reasons to engage in fraudulent accounting due to its need to raise additional financing and desire to locate an acquirer or merger partner, and neglected

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 353 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

to investigate obvious and easily discoverable fraud." In re SCB Computer Technology, Inc.Securities Litigation, 149 F.Supp.2d 334, 363 (W.D. Tenn 2001); seealso, Reiger v. Price Waterhouse Coopers LLP, 117 F.Supp.2d at 1009 n. 5 ("Plaintiffs also rely on boilerplate 'red flags,' present in almost every securities fraud action, that the audited company had weak internal accounting controls and needed to report strong revenues. These allegations do not meet the particularity and strong inference requirements of the Reform Act, and do not warrant further comment"). "[E]ven if [Arthur Andersen] failed to report such deficiencies ..., such failure is not a basis for concluding that [Arthur Andersen] misrepresented that its audit report complied with GAAS." In re SmarTalk Teleservices Securities, Inc. Litigation, 124 F.Supp.2d 505, 524 (S.D. Ohio 2000)seealso, Monroe v. Hughes, 31 F.3d 772, 774-75 (9th Cir. 1994) ("Neither applicable professional standards nor any legal authority of which we are aware, however, treat deficiencies in internal controls of a company as material to the audit report itself.").

23    "Allegations are deemed to have been made on information and belief until the plaintiffs demonstrate that they have personal knowledge of the facts." In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1085 (9th Cir. 2002).

The Complaint next alleges "Arthur Andersen falsely endorsed the propriety of Peregrine's financial statements because it desired to retain Peregrine as a client, to continue generating substantial fees from its engagement and to secure additional business from Peregrine, including lucrative consulting business." (Complaint ¶ 407; seealso, ¶ 409: "Arthur Andersen [ ] earned substantial fees from Peregrine ... for consultation relating to business valuations, consultation related to tax matters, and assistance with due diligence and acquisition-related matters."). Scienter can be pleaded by alleging a defendant had a motive and opportunity to commit fraud. Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged" while opportunity entails "the means and likely prospect of achieving concrete benefits by the means alleged." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2nd Cir. 1994). Most courts have held that an accounting firm's desire to maintain the fees flowing from the relationship with its client, standing alone, is not a sufficient "motive" to raise a strong inference of scienter. See, In re Worlds of Wonder Sec. Litig., 35 F.3d at 1427 n.7 ("It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain

increased fees.); DiLeo v. Ernst & Young, 901 F.2d 624, 629 (7th Cir. 1990) (Rejecting allegations that accounting firm's desire to garner fees from clients was sufficient motive to commit fraud: "An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses [the accountant] would suffer from a perception that it would muffle a client's fraud."); Melder v. Morris, 27 F.3d 1097, 1103 (5th Cir. 1994) (Rejecting as economically irrational plaintiff's claim accounting firm's purported motive to garner fees); In re Health Management, Inc. Sec. Litig., 970 F.Supp.192, 202 (E.D.N.Y. 1997) (Rejecting motive and opportunity allegations against independent accounting firm because "receipt of professional fees is not a sufficient motive to plead a 'strong inference' of scienter."); Zucker v. Sasaki, 963 F.Supp. 301, 308 (S.D.N.Y. 1997) ("[M]ere receipt of compensation and the maintenance of a profitable professional business relationship for auditing services does not constitute a sufficient motive for purposes of pleading scienter."); Kennilworth Partners L.P. v. Cendant Corp., 59 F.Supp.2d 417, 429 (D.N.J. 1999) ("[S]tatement[s that] could be made in relation to the auditor of every corporation" are not sufficient to raise the inference of scienter, because "if it were sufficient ..., it might make every auditor liable in cases of securities fraud.").

**\*68** The Complaint then alleges "[i]t was known to Arthur Andersen that [Peregrine's accounting] policy had been changed for application to the fourth quarter of fiscal year 1999, that it had been changed to provide for revenue recognition immediately upon execution of a software license agreement with resellers even though there was no commitment to pay and no identified end user committed to pay, and to allow the Company to meet fourth quarter and year end published earnings and revenue forecasts. Arthur Andersen knew the new policy would continue to be applied going forward." (Complaint ¶ 413.) The Complaint also alleges "Arthur Andersen ... was routinely consulted by ... Gless regarding how to structure transactions with customers so as to permit current and improper revenue recognition. Arthur Andersen also knew of and approved the failure of the Company to treat transactions with financial institutions as borrowings rather than sales." (Id. ¶ 406.) These allegations are conclusory. What is missing are "specific facts demonstrating [Arthur Andersen's] knowledge or state of mind...." In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d at 1043; seealso, Yadlosky v. Grant Thornton, L.L.P., 120 F.Supp.2d 622, 631 (E.D. Mich. 2000) ("Plaintiff's allegation that the auditors knew or should have

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

known 'that many of MCA's properties were illegally pledged as collateral for more than one party' lacks alleged factual support for the conclusion."). The Complaint must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d at 388-389. It does not.

To be sure, the Complaint points to "an email dated April 12, 2001" alleging that it "identified revenue recognition issues" including identifying "contracts totaling $12,000,000 as involving improper revenue recognition." (Complaint ¶ 429.) Again, "[t]hese allegations are insufficient because they are not pled with the particularity required by the PSLRA." Osher v. JNI Corp., 308 F.Supp.2d 1168, 1187 (S.D. Cal. 2004). Plaintiffs again fail to state "the sources of [their] information with respect to the [emails], [and] how [they] learned of the [emails]...." Silicon Graphics, 183 F.3d at 985. Indeed, "[i]t is not sufficient for a plaintiffs'] pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate [their] claim."Id. "Silicon Graphics and the PSLRA require Plaintiffs to allege the specific content of the documents upon which the plaintiff relied, identifying who prepared and who reviewed them, and setting out sources of ... information with respect to the reports." In re Peerless Systems, Corp. Securities Litigation, 182 F.Supp.2d 982, 994 (S.D. Cal. 2002) (Citations omitted). If Plaintiffs are relying on a "confidential source", they must "reveal with particularity the sources of their information.... Naming sources is unnecessary so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." In re Daou Systems, Inc. Securities Litigation, 397 F.3d at 712 (Citations and quotations omitted). The Complaint fails to meet these requirements.

Moreover, the allegations are insufficient so show scienter. Even allegations that an independent auditor possessed documents that would have revealed improper revenue recognition if they had been properly reviewed pursuant to GAAP and GAAS, only "raise an inference of gross negligence, but not fraud." Reiger v. Price Waterhouse Coopers, LLP 117 F.Supp.2d at 1012. In Software Toolworks, the plaintiffs alleged that sales agreements were "poorly documented, informal and conditional," the transactions were risky, management was under pressure for favorable earnings and the accountants obtained only oral confirmations of some

agreements, the Ninth Circuit found that such allegations that an accountant failed to investigate established only a negligent audit rather than scienter. 50 F.3d at 627-28. In DSAM, it was alleged that the auditor egregiously failed to detect millions of dollars in revenue that had been improperly recognized in violation of GAAP, the Ninth Circuit affirmed the district court's dismissal of the complaint. 288 F.3d at 387. The court held that "mere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of scienter." Id. at 390 (citing Software Toolworks, 50 F.3d at 628). Even where the defendant accounting firm allegedly "had in its hands the very documentation that clearly showed [the company's] violation of GAAP," the Ninth Circuit affirmed the district court's finding of no scienter. DSAM, 288 F.3d at 390-91 ("Appellants argue that Pricewaterhouse must have consciously disregarded the improper revenue recognition because it had access to the documents that revealed Altris' improper revenue recognition at the very time it conducted the original audit. That fact does not strongly compel an inference of intentional or deliberately reckless conduct as opposed to ordinary carelessness.").

*69 In sum, Plaintiffs have failed to allege any facts to establish that Arthur Andersen or AWSC knew or must have been aware of the improper revenue recognition, intentionally or knowingly falsified the financial statements, or that the audit was such an extreme departure from reasonable accounting practice that it knew or had to have known that its conclusions would mislead investors. The Complaint suffers from the same deficiency identified by the court in DSAM. There, the plaintiff alleged that the defendant's auditor "egregiously failed to see the obvious" GAAP violations in the financial statements. 288 F.3d at 387. The plaintiff in DSAM alleged specific "red flags" that should have put the defendant on notice of the GAAP violations. In particular, the fees for the transaction at issue were exorbitant, the transaction was recorded on the last day of the year, and the transaction was described as "special." These facts all suggested that the auditor should have undertaken further investigation before approving the transaction. Id. at 389. Despite the admitted failure to comply with GAAP and the undisputedly suspicious nature of the transaction, the court held that "the allegations of negligence are insufficient to establish a strong inference of deliberate recklessness." Id. at 391. Thus, under DASM, even an obvious failure to follow GAAP does not give rise to an inference of scienter.

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 355 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

The Complaint also fails to identify with sufficient particularity any letters, notes, memos, telephone calls, or conversations that suggest that Arthur Andersen and AWSC knew about Peregrine's revenue scheme. Plaintiffs' purported "red flags" consist of Arthur Andersen's possession of documentation which, if properly reviewed under GAAP and GAAS, would have revealed improperly recognized revenue. At most, however, these allegations raise an inference of gross negligence, but not fraud. Plaintiffs must allege facts showing that the magnitude and obviousness of Peregrine's accounting errors was so severe that Arthur Andersen's audit transcended mere negligence and represented either a disregard of the obvious errors or a refusal to identify the fraud. The Complaint does nothing more than allege violations of GAAP, which cannot alone establish scienter.

Nor does the Complaint allege that Arthur Andersen or AWSC had an extensive role in the management of a Peregrine, thus putting on notice of the fraud. Moreover, inferring scienter from the magnitude of Peregrine's fraud invites a court to speculate as to the existence of specific warning signs that show Arthur Andersen acted with scienter. See, Reiser v. Price Waterhouse Coopers LLP, 117 F.Supp.2d at 1013 ("Inferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the accountant acted with scienter. To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of inferences."); seealso, Zucker v. Sasaki, 963 F.Supp. 301, 308 (S.D.N.Y. 1997) (Holding that plaintiff failed to establish scienter where plaintiff's "allegations refer simply to violations of basic auditing principles without reference as to how [auditor's] violations were the result of intentional deceit or how they rise to the level of recklessness"). Magnitude of fraud only supports an inference of scienter when the plaintiff alleges specific and detailed facts showing that the magnitude either enhanced the suspiciousness of specifically identified transactions or made the overall fraud glaringly conspicuous. Id. Further, Arthur Andersen and AWSC's relationship with Peregrine "does not impute the accountant with knowledge of every idiosyncratic detail associated with [Peregrine's] business." Reiger v. Price Waterhouse Coopers LLP, 117 F.Supp.2d at 1009. For all the foregoing reasons, the Complaint fails to show Arthur Andersen or AWSC acted with scienter.

**D. Conclusion.**

For the reasons set forth above, the Complaint fails to state a claim under Section 10(b) and Rule 10b-5 against Nelson, Luddy, Moores, Noell, Cole, van den Berg, Hosley, Savoy, Watrous, Dammeyer, Stulac, Arthur Andersen, and AWSC. Specifically, the Complaint fails to allege Luddy, Dammeyer, and Stulac either employed a scheme to defraud or made any statements. As to other Defendants, while the Complaint sufficiently alleges a primary act on their part in that they made statements, it fails to allege they did so with scienter. There are no allegations identifying specific conversations, board meetings, or reports where these individuals purportedly learned of the true and adverse information regarding Peregrine's fraud. Further, there are no allegations showing that any of these Defendants directed sales personnel to enter into contingent contracts, or otherwise directed the alleged improper revenue recognition. Accordingly, in this regard, these Defendants' Motions are GRANTED.

**V.**

**CLAIMS AND LIABILITY UNDER SECTION 14(a) and RULE 14a-9.**

**\*70** Plaintiffs Waga and Sutliff allege violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n and Rule 14a-9, 17 C.F.R. § 240.14 against Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Arthur Andersen, AWSC, and Stulac on behalf of the Harbinger Subclass, while Plaintiffs Balch and Hylton allege these violations against Gardner, Gless, Moores, Savoy, Cole, Noell, Watrous, Dammeyer, Arthur Andersen, AWSC, and Stulac on behalf of the Remedy Subclass. (Complaint ¶¶ 678, 698, 717 and 734.)

Section 14(a) makes it unlawful

> for any person ... in contravention of such rules and regulations as the [SEC] may prescribe ..., to solicit or to permit the use of his name to solicit any proxy....

15 U.S.C. § 78n(a). Rule 14a-9(a) of the Proxy Regulations (17 C.F.R. § 240.14a-9) states that "No solicitation subject to this regulation shall be made ... which, at the time and

2005 WL 8158825

in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....” Id. A misstatement or omission is material under Rule 14a-9 “if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.” TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). [24]

[24]    Whether the proxies contained materially false statements is not an issue. As discussed above, at this stage, the Complaint adequately alleges the statements at issue, including Peregrine's financial statements included in the proxies, were misleading as they omitted material information.

At the outset, the Complaint fails to adequately allege that Stulac and AWSC either “solicited” or.. permit[ed] the use of [their] names to solicit any proxy....” 15 U.S.C. § 78n(a). The Complaint bases Section 14 and Rule 14a-9 liability on two proxies. The first proxy was “included in Peregrine's May 22, 2000 Amendment 1 to its S-4 Registration Statement filed with the SEC and distributed to Harbinger shareholders....” (Complaint ¶ 699.) The Complaint alleges Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg and Watrous signed the proxy. (Id. ¶ 681.) The Complaint also alleges “Arthur Andersen and AWSC consented to the use of Arthur Andersen's name” in the proxy. (Id. ¶ 700.)

The second proxy was “included in Peregrine's July 23, 2001 Amendment 1 to its S-4 Registration Statement filed with the SEC and distributed to Remedy shareholders....” (Id. ¶ 735.) The Complaint alleges Gardner, Gless, Moores, Savoy, Cole, Noell, Watrous, and Dammeryer signed the proxy. (Id. ¶ 720.) The Complaint also alleges “Arthur Andersen and AWSC also consented [to] the inclusion and/or to the incorporation by reference ... of Arthur Andersen's unqualified audit reports on Peregrine's consolidated financial statements....” (Id. ¶ 737.)

As alleged, the Complaint fails to state a claim against Stulac and AWSC. The Complaint is silent as to Stulac's role with regard to the proxies, and the Court has already found that “Stulac's name appears nowhere in the Registration Statements” and thus “cannot be held liable ... for false or misleading statements found therein.” (Order dated January 21, 2004 at 5:22-25.) As for AWSC, the Complaint does not allege AWSC was named, or that it signed, or permitted the use of its name, in the proxies or the Registration Statements.

It merely alleges AWSC consented to the use of Arthur Andersen's name or audit reports in the proxies. “Neither Section 14(a) nor Rule 14a-9 suggests that liability may attach in an instance in which a defendant has not actively solicited proxies, but merely has observed another doing so on behalf of the same camp in the proxy dispute.” Caspary v. Louisiana Land and Exploration Co., 579 F.Supp. 1105, 1110 (D.C.N.Y. 1983); seealso, Mendell v. Greenberg, 612 F.Supp. 1543, 1552 (D.C.N.Y. 1985) (“Since plaintiff does not allege that Drexel directly solicited any proxies or was a party to such solicitations, any claim of liability as a principal against Drexel is legally insufficient.”). For this threshold reason, the Complaint fails to state a Section 14(a) claim against AWSC and Stulac.

**\*71**  All other moving Defendants assert the Complaint fails to allege, with sufficient particularity, that they acted with the required state of mind. With the exception of Gless, Gardner, and Arthur Andersen, the Court agrees.

Unlike Section 10(b), pleading scienter is not required for stating a Section 14(a) and Rule 14a-9 claims. The required standard is negligence. (See, Order dated November 21, 2003 at 91: “[T]his Court finds that negligence is the appropriate standard for § 14(a) actions.”); seealso, In re McKesson HBOC, Inc. Securities Litigation, 126 F.Supp.2d 1248, 1267 (N.D. Cal. 2000) (“Plaintiff concedes that the negligence required for a Section 14(a) claim is a ‘state of mind.’ ”); Bond Opportunity Fund v. Unilab Corp., 2003 WL 21058251 at \*4 (S.D.N.Y. 2003) (“Numerous other courts have held that the negligence standard also applies to § 14(a) claims against individual defendants”). “In enforcing that standard, courts should apply the standard of due diligence rather than the standard of actual knowledge or gross negligence.” In re Reliance Securities Litigation, 135 F.Supp.2d 480, 511 (D. Del. 2001).

Like Section 10(b) claims, however, to adequately plead Section 14(a) and Rule 14a-9 claims, Plaintiffs “must comply with heightened pleading requirements of the PSLRA.” (Id. at 92:5-6.) Thus, Plaintiffs must “state with particularity all facts giving rise to a strong inference that the defendant acted with” negligence. 15 U.S.C. § 78u-4(b)(2); seealso, In re McKesson HBOC, Inc. Securities Litigation, 126 F.Supp.2d at 1267 (“[A] Section 14(a) plaintiff must plead with particularity facts that give rise to a strong inference of negligence.”). Mere allegations that Defendants “acted negligently and without due care in distributing, or causing to be distributed, the

2005 WL 8158825

Joint Proxy Statement containing the false and misleading statements [and] omissions" will not suffice. Id.

Here, there is no question that Gless acted with the requisite state of mind. In his plea agreement filed in the Court, and attached to the Complaint, Gless admitted that he "signed and submitted the [ ] financial reports, knowing that they contained materially false statements and omissions and intending to deceive and defraud the securities analysts, the SEC, the investing public, and others who rely upon them[.]" (Complaint Attached Exh. A, Gless Plea Agreement 9.) Seealso, Parrino v. FHP, Inc., 146 F.3d at 705-06 (District court may "consider material which is properly submitted [or attached] as part of the complaint...."). The Complaint also alleges that the proxies "incorporated Peregrine's audited financial statements." (Complaint ¶¶ 547, 592, 676 and 715.) Thus, the Complaint adequately states a claim against Gless for both proxies filed in connection with the Harbinger and Remedy mergers.

Similarly, the attachments to the Complaint show with sufficient particularity that Gardner also acted with the requisite state of mind, but only as to the Remedy proxy. According to the Complaint, revenue was improperly recognized in a swap transaction involving Critical Path Inc. ("Critical Path") at the end of September 2000. (Complaint Attached Exh. "E" at 17.) In his guilty plea, David Thatcher, the former president of Critical Path, stated that "[the] transaction was driven by the need to report revenue...." (Id.) In order "[t]o avoid the appearance that the transaction was a software swap, Critical Path and Peregrine prepared separate contracts for each purchase, each paid the full amounts owed, and made payment to each other on different days." (Id.) Moreover, Thatcher acknowledged speaking directly to Gardner about the software swap. (Id.: "I spoke with the CEO of Peregrine about the software swap.") (Seealso, Complaint ¶ 36.) Thatcher further noted that persons "working on the deal were **consciously** avoiding disclosure of the true nature of the transaction." (Id.) (Emphasis added.) Additionally, the Complaint alleges that each company "swapped" software at approximately $3 million from one another and booked the total value of the sale as revenue in violation of GAAP. (Complaint attached Exhibit "F".)

 *72  While the Complaint does not specifically allege in which of the Peregrine's quarterly financial statements the Critical Path transaction was recorded, it does allege Peregrine entered into the transaction the end of September 2000 which "gave rise to improper revenue recognition

by Peregrine." (Complaint attached Exh. "F".) Thus, the Court can reasonably draw an inference that the transaction was recorded in the second quarter of 2001, ending September 30,2000. The Complain thus alleges with sufficient particularity facts giving rise to a strong inference that Gardner either knew or should have known that Peregrine's financial statement for the second quarter of 2001, which was included in the Remedy proxy, was overstated by about 3 million dollars and thus false or misleading. (See, Complaint ¶¶ 592 and 721.)

However, the Complaint does not sufficiently allege that Gardner acted with the requisite state of mind with respect to the Harbinger proxy. According to the Complaint, the proxy included "Peregrine's audited financial statements for the fiscal year ending March 31, 2000", i.e., financial statements for 2000. (Complaint ¶¶ 547 and 682.) The only alleged improper transaction Peregrine entered into that year was with Corporate Software & Technology. According to the Complaint, Peregrine prematurely booked revenue on a $3.8 million transaction with Corporate Software "immediately upon execution of the agreement." (Complaint Attached Exh. "K".) Unlike the above Critical Path transaction, the Complaint fails to show that the transaction was necessarily entered into the generate artificial revenue despite the fact that the transaction was improperly recorded as revenue. Thus, the Complaint fails to allege with sufficient particularity facts giving rise to a strong inference that Gardner either knew or should have known that Peregrine's financial statement for the fiscal year 2000 was overstated.

Turning to Arthur Andersen, the Complaint alleges with sufficient particularity that Arthur Andersen was negligent. The Complaint alleges "plenty of warning signs existed that should have alerted Arthur Andersen ... that severe problems existed with [Peregrine's] accounting. Auditor guidelines for items that should receive special consideration identified almost the exact type of situation as the one that existed at Peregrine, such as significant sales volume occurring near the end of the quarter, unusual volume of sales to resellers, barter transactions and side agreements. Messages about 'bad revenue,' inquiries from the SEC, and complaints about revenue recognition were either provided to Arthur Andersen, discovered by it or readily available to it had it sought to look." (Complaint ¶ 706.) The Complaint also alleges "Arthur Andersen [was] ... involved in designing [Peregrine's] stock option compensation plan, which allowed for the exercise prices to be below the common stock market values when the options were granted. This plan was also a part of Peregrine's

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 358 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

restatement, and a further sign that should have alerted Arthur Andersen ... that a problem existed at Peregrine." (Id. ¶ 708.) The Complaint further alleges Arthur Andersen "designed a stock option compensation plan for Peregrine employees that, when applied, was a[ ] ... violation of GAAP" and specifically explains why it was so. (Id. ¶ 417.) Still further, the Complaint alleges specific facts that put Arthur Andersen on notice that Peregrine was recording revenue in violation of GAAP. (Id. ¶ 414.)

At this stage, the "[C]ourt must accept as true Plaintiffs' assertions that Arthur Andersen failed to abide by [GAAP] requirements." In re Sunterra Corp. Securities Litigation, 199 F.Supp.2d 1308, 1333 (M.D. Fla. 2002). While such allegations do not raise an inference of scienter, they do "raise an inference of gross negligence" which goes beyond the required standard. Reiger v. Price Waterhouse Coopers LLP, 117 F.Supp.2d at 1012. Seealso, In re Reliance Securities Litigation, 135 F.Supp.2d at 511 ("[C]ourts should apply the standard of due diligence rather than the standard of actual knowledge or gross negligence.").

**\*73** As to all other Defendants--Moores, Cole, Hosley, Noell, van den Berg, Watrous, Savoy, and Dammeyer--the Complaint fails to "state with particularity all facts giving rise to a strong inference that the [D]efendants acted with" negligence. 15 U.S.C. § 78u-4(b)(2). The Complaint relies on the April 14, 1999 board meeting and the review and outlook reports discussed above to show that these Defendants were negligent. (Complaint ¶¶ 686, 687 and 715.) However, as explained above, there is no particular information in the alleged April 1999 meeting and the review and outlook reports from which Defendants could have learned of the falsity of Peregrine's financial statements. Nor does the Complaint point to any specific information Defendants overlooked that would have warned them that Peregrine was engaging in fraud. Bond Opportunity Fund v. Unilab Corp., 2003 WL 21058251 at \*4 ("[W]here plaintiffs contend that the defendants had access to facts contrary to those stated in the proxy materials, they must specifically identify the reports or statements containing this information."). "Under Section 14(a), the Defendants are 'only responsible for revealing those material facts reasonably available to them.'" Hayes v. Crown Central Petroleum Corp., 249 F.Supp.2d 725, 733 (E.D. Va. 2002) (Citations omitted). Moreover, that these Defendants signed the proxies does not speak to their state of mind. See, SEC v. U.S. Environmental, 155 F.3d at 111. Plaintiffs have failed to describe with particularity actions that these Defendants could have taken to discover the

accounting improprieties. Thus, Plaintiffs have failed to plead with particularity facts establishing a strong inference of negligence.

In sum, the Complaint states a Section 14(a) claim against Gless and Arthur Andersen as to both the Harbinger and Remedy proxies. As to Gardner, the Complaint only states a Section 14(a) claim as to the Remedy proxy. As to all other Defendants-Moores, Cole, Hosley, Noell, van den Berg, Watrous, AWSC, and Stulac, the Complaint fails to adequately state a Section 14(a) claim.

## VI.

## CONTROL LIABILITY UNDER SECTION 20(a).

The Complaint alleges Section 20(a) liability against Moores, Nelson, Noell, Cole, van den Berg, Hosley, Watrous, Savoy, and Dammeyer "based on their control of Peregrine." (See, Complaint 669.) The Complaint further alleges Section 20(a) liability against "Moores based on his control of ... Gardner, Gless, Nelson, Luddy, Noell, van den Berg, and Hosley, and against AWSC and Stulac based on their control of Arthur Andersen. (See, Complaint ¶ 669, 672, 673, 689, 712, 725 and 748.)

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 359 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

"To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996). "[I]t is not necessary to show actual participation or the exercise of actual power" over the violator. Howard v. Everex Systems, Inc., 228 F.3d 1057, 1065 (9th Cir. 2000). That is "[p]laintiff need not show that the defendant was a culpable participant in the violation...." Id.; seealso, Hollineer v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990) (En banc) ("Today ... we hold that a plaintiff is **not** required to show 'culpable participation' to establish that [defendant] was a controlling person under § 20(a).") (Emphasis original). [25] Thus, "[t]o establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's [or the individual's] scienter." Arthur Children's Trust v. Keim, 994 F.2d 1390, 1398 (9th Cir. 1993); seealso, In re Cylink Securities Litigation, 178 F.Supp.2d 1077, 1089 (N.D. Cal. 2001) ("Despite the urging of at least one of the individual defendants, plaintiffs need not allege the controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing."). Similarly, "the question that must be answered on a motion to dismiss is whether plaintiffs have adequately alleged that defendants possessed power or influence over the controlled person, but not whether such power or influence was in fact exercised in the transactions in question." In re Musicmaker.com Securities Litigation, 2001 WL 34062431 at *16 (C.D.Cal. 2001)**.**

[25]    The Ninth Circuit had a different controlling liability test as set out in Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987) (Plaintiff must allege that 1) the individual defendants had the power to control or influence [the company] and 2) the individual defendants were culpable participants in [the company's] alleged illegal activity). The second prong of this test was overruled in Hollinger v. Titan Capital Corp., 914 F.2d at 1575 (9th Cir. 1990): seealso, Howard, 228 F.3d at 1066, n. 10.

 **\*74**  Plaintiffs here prevail on the first prong. As noted above, to "establish 'controlling person' liability" Plaintiffs must first "show that a primary violation was committed" under the Exchange Act, i.e., either Section 10(b) or Section 14(a). Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d at 1161. Plaintiffs allege "Peregrine violated Section

10(b) ... by issuance of materially false or misleading statements." (Complaint ¶ 671.) Although Peregrine is not a party to this action, Plaintiffs adequately allege that Gless and Gardner have violated Sections 10(b) and 14(a) of the Exchange Act. See, Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1435 (9th Cir. 1995) ("In litigation involving Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5, even though a corporation is incapable of acting except through individual directors and officers, the cumulative knowledge of its directors and officers is imputed to it.... [A] corporation's knowledge need not be possessed by a single officer or agent; the cumulative knowledge of all its agents will be imputed to the corporation."); In re Stat-Tech Securities Litigation, 905 F.Supp. 1416, 1422 (D. Colo. 1995) ("Because a corporation can act only through its agents, the rule is that the actions of corporate officers and directors are attributable to the corporate entity."). Similarly, as discussed above, Plaintiffs adequately allege Arthur Andersen's primary liability under Section 14(a).

Turning to the second prong: "Whether the defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." Howard v. Everex Systems, Inc., 228 F.3d at 1065; seealso, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1441 (9th Cir. 1987) ("[T]he concept of control, in the context of the securities law, is an elusive notion for which no clear-cut rule or standard can be devised."). "The SEC has defined 'control' to mean: '[T]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.' " Howard v. Everex Systems, Inc., 228 F.3d at 1065, quoting17 C.F.R. § 230.405. Moreover, Plaintiffs must plead the circumstances of the control relationship with sufficient particularity. See, In re Oak Technology Securities Litigation, 1997 WL 448168 at *14 (N.D. Cal. 1997) ("While Plaintiffs correctly note that section 20(a) 'premises liability solely on the control relationship,' they fail to recognize the requirement that the circumstances of that 'control relationship' be pled with particularity."); Wietschner v. Monterey Pasta Co., 294 F.Supp.2d 1102, 1110 (N.D. Cal. 2003); Howard v. Hui, 2001 WL 1159780 at *4 (N.D. Cal. 2001) (Same).

"[T]he status or position of an alleged controlling person, by itself, is insufficient to presume or warrant a finding of power to control or influence." Wool v. Tandem Computers Inc.,

*In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)*

2005 WL 8158825

818 F.2d 1433, 1441 (9th Cir. 1987). Similarly, "[m]ere titles are not adequate indicators of control authority." Wanetick v. Mel's of Modesto, Inc., 811 F.Supp. 1402, 1407 (N.D. Cal. 1992). Rather, Plaintiffs must "show[ ] that [Defendants] w[ere] active in the day-to-day affairs of [Peregrine] or that [they] exercised ... specific control over the preparation and release of the financial statements."Howard v. Everex Systems, Inc., 228 F.3d at 1067 n. 13. Merely alleging that Defendants " 'reviewed and approved financial statements ... does not rise to a level of supervision or participation sufficient for a § 20(a) violation." Id. Nor is "ownership of stock," by itself, sufficient. Id.

Here, as to Moores, Nelson, Noell, Cole, van den Berg, Hosley, Watrous, Savoy, and Dammeyer, there are no particularized allegations that they were in active in day-to-day affairs of Peregrine. As the Court previously found, "that the Board held nine meetings in Fiscal Year 2000 and nineteen meetings in Fiscal Year 2001 does not establish that any individual board members were actively involved with Peregrine on a daily basis." (Court's Order dated November 21, 2003 at 96:22-24.) Nor are there sufficient allegations to show that these Defendants were in any way involved in the alleged misleading press releases other than that they "read and approved" them. Indeed, in many instances, the Complaint even expressly excludes Savoy, Dammeyer, Hosley, and van den Berg from the individuals who allegedly read and approved the statements. And, although the Complaint alleges Nelson was the "principal draftsman of the press releases," (Complaint j 298), such allegations are insufficient. See, In re Splash Technology Holdings, Inc. Securities Litigation, 2000 WL 1727405 at * 16 (N.D. Cal. 2000). Equally insufficient are Plaintiffs' conclusory allegations that these Defendants qualify as "controlling persons of Peregrine" by "virtue of their executive positions, Board membership, and stock ownership ... [and that] these [D]efendants had the power to influence and control (and did influence and control, directly or indirectly) the decision-making of [Peregrine], including the content and dissemination." (Complaint ¶ 670.) See, In re Gupta Corp. Securities Litigation, 900 F.Supp. 1217, 1242-1243 (N.D. Cal. 1994).

**\*75** To be sure, the Complaint does allege Moores, Noell, Cole, van den Berg, Hosley, Watrous, Savoy signed some of the alleged false or misleading SEC filings. However, as the Court found, under Ninth Circuit law, "[a]lthough a signature strongly suggests that an outside director could exercise control, absent allegations of particularized facts of

a control relationship, active involvement in the Company's day-to-day affairs, or control over the preparation and release of financial statements, Section 20(a) liability has not been sufficiently alleged." (Id.); seealso, In re Splash Technology Holdings, Inc. Securities Litigation, 2000 WL 1727405 at *16 ( [Defendant's] signature unquestionably suggests the possibility of control. Likewise, the complaint's general, conclusory allegations of [defendant's] access to unspecified inside information and his purported ability to prevent the issuance of the alleged false reports in this case suggest the possibility of control. Although close, these general allegations do not constitute particular evidence of control.").

With regard to Moores, Plaintiffs further allege he controlled the identity of Peregrine's executives, kept contact with various board members regarding Peregrine's affaires, and placed business associates on Peregrine's Audit Committee or Board. (See, Complaint ¶¶ 372, 375, 377, 378, 379, 380.) These allegations are insufficient. "The control person inquiry looks at the day-to-day affairs of the company, not pre-existing or even on-going personal or professional relationships between the control person and the purported controllee."In re Homestore.com, Inc. Securities Litigation, 347 F.Supp.2d 790, 810 (C.D. Cal. 2004); seealso, Paracor Fin., Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1162 (9th Cir. 1996) (Internal quotations omitted) (Control inquiry revolves around the "management and policies of the corporation...."). Plaintiffs also allege Moores was a founder of Peregrine and owned substantial shares of Peregrine. (Complaint ¶¶ 370 and 373.) Again these allegations do not necessarily mean that Moores exercised control over the "management and policies" of Peregrine, nor that he directed its day-to-day affairs in any sense. As noted above, "at least some indicia of such control is a necessary element of 'controlling person' liability." Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1163 (9th Cir. 1996) (Dismissing on allegations that defendant "founded [the Company] in 1974, sold it for $30 million in 1981, and returned as CEO and Chairman in 1985.").

Plaintiffs also fail to state a control liability claim against Stulac and AWSC. As explained above, to establish liability as a 'controlling person,' Plaintiffs must allege with particularity facts demonstrating "the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." Howard, 228 F.3d at 1065. Further, "control" is defined as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person[.]"

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 361 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

17 C.F.R. § 230.405. No particularized allegations are made showing that either Stulac or AWSC "had the power to control or influence [Arthur Andersen]." Harmonic, 163 F. Supp. 2d at 1086. Accordingly, Plaintiffs fail to state a Section 20(a) claim against Moores, Nelson, Noell, Cole, van den Berg, Hosley, Watrous, Savoy, Dammeyer, Sutlac, and Arthur Andersen.

### VII.

### CLAIMS AND LIABILITY UNDER SECTION 11.

In Counts VI and VIII, the Complaint alleges Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Savoy, Arthur Andersen and AWSC violated Section 11 of the 1933 Act. For the reasons that follow, the Complaint adequately states a claim against all Defendants under Section 11, except for AWSC.

At the outset, the Court denies Plaintiffs' request to strike Moores, Noell, van den Berg, Hosley, and Savoy's motions to dismiss. (Docket No. 536.) Plaintiffs appear to move to strike the motions under Fed.R.Civ.P. 12(f). Under that Rule, the court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Id. "Under the express language of the rule, only pleadings are subject to motions to strike." Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983); seealso, Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 161 (C.D. Cal. 2002) ("Defendants move to strike the declaration of Robert Tollison, plaintiffs' expert. At the outset, the Court notes that the present Motion is not properly a motion to strike, which should be addressed to the pleadings only."); Wimberly v. Clark Controller Co., 364 F.2d 225, 227 (6th Cir. 1966) (Rule 12(f) "specifically relates to matters to be stricken from pleadings but does not make provision for testing the legal sufficiency of affidavits by a motion to strike"); Dawson v. City of Kent, 682 F.Supp. 920, 922 (N.D. Ohio 1988) (Rule 12(f) "relates only to pleadings and is inapplicable to other filings"), aff'd865 F.2d 257 (6th Cir. 1988); Ernest Seidelman Corp. v. Mollison, 10 F.R.D. 426, 427 (S.D. Ohio 1950) ("Rule 12(f) is applicable only to motions to strike portions of 'pleadings.' "). Butsee, Mount Sinai Hospital v. Borg-Warner Corp., 527 F.Supp. 922, 926 (D.C.N.Y. 1981) ("While Federal Rule of Civil Procedure 12(f) authorizes the court on its own motion to order stricken 'any pleading' that contains 'impertinent, or scandalous

matter,' the Court is of the view that it encompasses briefs, affidavits or any document submitted to the Court."). Rule 12(f), therefore, does not provide a proper basis for striking Defendants' motions.

**\*76** Moreover, Plaintiffs' basis for moving to strike is without merit. Plaintiffs argue that Defendants should not permitted to move to dismiss because the Court upheld the Section 11 claims against them in the original complaint. However, when Plaintiffs amended their complaint, that complaint superseded the original one and is the operative complaint. See, Gonzalez v. Paine, Webber, Jackson & Curtis, Inc., 493 F. Supp. 499, 501 (S.D.N.Y. 1980).

Turning to the merits, "Section 11 provides for civil liability for filing a false registration statement." Falkowski v. Imation Corp., 309 F.3d at 1133. A registration statement "means a filing that includes the prospectus and other information required by section 7 of the Securities Act." 12 C.F.R. § 16.2(m). A prospectus is defined as "an offering document that includes the information required by section 10(a) of the Securities Act." 12 C.F.R. § 16.2(1). Section 11 liability attaches to "(1) every person who signed the registration statement; (2) every person who was a director ... at the time of the filing;" and (3) "every accountant ... who has with his consent been named as having prepared or certified any part of the registration statement[.]" 15 U.S.C. § 77k; seealso, Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983) ("Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties [the issuer, its directors or partners, underwriters and accountants who are named as having prepared or certified the registration statement] in a registered offering when false or misleading information is included in a registration statement."). "Liability ... is virtually absolute, even for innocent misstatements." Id.; seealso, In re Stac Electronics Securities Litigation, 89 F.3d 1399, 1404 (9th Cir. 1996) ("No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions"). "A Section 11 plaintiff needs to plead only that the registration statement contained a material omission or misrepresentation." In re CBT Group PLC Securities Litigation, 2000 WL 33339615 at \*2 (N.D. Cal. 2000), citingKaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir. 1994); seealso, In re Twinlab Corp. Sec. Litig., 103 F.Supp.2d 193, 201 (E.D.N.Y. 2000) ("Section 11 'places a relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning

2005 WL 8158825

a material fact") quoting, Herman & MacLean v. Huddleston, 459 U.S. at 381-82.

Sections 11 is "not governed by the heightened pleading standards of the PSLRA...." Falkowski v. Imation Corp., 309 F.3d 1123, 1133-1134 (9th Cir. 2002). But, it is "subject to Federal Rule of Civil Procedure 9(b)." Id. However, "only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003). "The only consequence of a holding that Rule 9(b) is violated with respect to a § 11 claim would be that any allegations of fraud would be **stripped from the claim**. The allegations of innocent or negligent misrepresentation, which are at the heart of a § 11 claim, would survive." Id. (Emphasis in original). "Thus, if particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or 'strip' them from the claim. The court should then examine the allegations that remain to determine whether they state a claim." Id. This is not an issue, however, as the Complaint sufficiently states a Section 11 claim under Rule 9(b).

**\*77** The Complaint bases Section 11 liability on two registration statements. Count VI is based on the Form S-4 Registration Statement Peregrine filed regarding the acquisition of Harbinger on May 22, 2000. This claim is asserted against Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Arthur Andersen and AWSC. According to the Complaint, Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, and Watrous signed the Registration. (Complaint ¶ 755.) The Registration included Peregrine's financial statements for the fiscal year 2000 along with Arthur Andersen's unqualified audit opinion on those financial statements. (Id. ¶ 756.) The Statement also included Peregrine's policy on revenue recognition. According to the Complaint, the Statement was false because Peregrine's financial statements were overstated, revenue was improperly recognized on contingent transactions, and the financial statements did not comport with GAAP, GAAS or Peregrine's own revenue recognition polices. (Id. ¶ 759.)

Count VIII of the Complaint is based on the Form S-4 Registration Statement Peregrine filed regarding the acquisition of Remedy on July 23, 2001. This claim is asserted against Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Savoy, Arthur Andersen and AWSC.

(Complaint ¶ 774.) Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous singed the Registration. (Id. ¶ 777.) This Registration included Peregrine's financial statements from Fiscal Years 2000 and 2001 along with Arthur Andersen's unqualified audit opinion on those financial statements. The Statement also included Peregrine's revenue recognition policy. According to the Complaint, this Statement was false for essentially the same reasons the Statement for the Harbinger acquisition was false.

As alleged, the Complaint fails to state a claim against AWSC. As noted, Section 11 liability attaches to "every accountant ... who has with his consent been named as having prepared or certified any part of the registration statement[.]" 15 U.S.C. § 77k. The only allegations against AWSC are that it "consented to Arthur Andersen being named" in the registration statement. (Complaint ¶ 756.) No allegations are made that AWSC either signed or consented to be named as having prepared or certified the challenged Registration Statements. See, Herman & Mclean v. Huddleston, 459 U.S. 375, 386 n.22 (1983) ("[C]ertain individuals who play a part in preparing the registration statement generally cannot be reached by a Section 11 action. These include ... accountants with respect to parts of a registration statement which they are not named as having prepared or certified.").

As to all other Defendants named, however, the Complaint adequately states a Section 11 claim under both Rules 9(b) and 8(a). Under Rule 8, all that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. The Complaint meets this standard. According to the Complaint, each Defendant either signed the registration statements, sat on the board at the time of their filing, or was an accountant who certified Peregrine's financial statements. See, Kaplan v. Rose, 49 F.3d 1363,1371 (9th Cir. 1994) ("Section 11 states that any signer of the registration statement, any partner or director of the issuer, any professional involved in preparing or certifying the statement, and any underwriter of a registration statement may be liable....").

Rule 9(b) provides that "in all averments of fraud and mistake, the circumstances constituting the fraud or mistake shall be pleaded with particularity." Id. "A complaint meets this standard if it alleges the time, place and content of the alleged fraudulent representation or omission; the identity of the person engaged in the fraud; and 'the circumstances indicating falseness' of 'the manner in which [the] representations [or omissions] were false and

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 363 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8158825

misleading.' " Genna v. Digital Link Corp., 25 F.Supp.2d 1032, 1037-1038 (N.D. Cal. 1997), quoting, GlenFed, 42 F.3d at 1547-48; Williams v. WMX Technologies, Inc., 112 F.3d 175, 177-78 (5th Cir. 1997) (To satisfy Rule 9(b)'s pleading requirements, the plaintiffs must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."). Here, the Complaint adequately sets forth why the statements were false, which the Court has already found to be material and sufficient at this stage. (See, Section IV(B)(3)(a).) The Complaint also both "alleges the time, place and content of the alleged fraudulent representation or omission" and "the identity of the person engaged in the fraud." Genna v. Digital Link Corp., 25 F.Supp.2d at 1037-1038. (See, Complaint ¶ ¶ 754, 755, 756, 776, 777, and 778.) The Complaint's allegations are also specific enough "to give [D]efendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727. 731 (9th Cir. 1985). See also, Kaplan v. Rose, 49 F.3d at 1371 ("The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.").

**\*78** Accordingly, under both Rules 8(a) and 9(b), the Complaint adequately states a Section 11 claim against Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Savoy, and Arthur Andersen.

## VIII.

### CONTROL LIABILITY UNDER SECTION 15.

The Complaint alleges control liability under Section 15 against Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg, Watrous, Arthur Andersen and AWSC. The Court has already determined Plaintiffs adequately state a claim against Gardner and Gless. As to the remaining Defendants, Plaintiffs fail to state a claim.

"Section 15(a) of the 1933 Securities Act imposes joint and several liability upon every person who controls any person liable under [S]ection[ ] 11...."In re Daou Systems, Inc. Securities Litigation, 397 F.3d at 725; see also, In re

Diasonics Securities Litigation, 599 F.Supp. 447, 459 (N.D. Cal. 1984), quoting15 U.S.C. § 77o ("Section 15 of the Securities Act of 1933 provides for 'secondary liability' for 'every person who, by or through stock ownership, agency, or otherwise, ..., controls any person liable under [Section 11]....''). Specifically, the Section 15(a) provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Id. "Although § 15 is not identical to § 20(a), the controlling person analysis is the same." Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990); see also, In re Daou Systems, Inc. Securities Litigation, 397 F.3d at 725 (" 'Controlling person' under both of the above acts is given the same interpretation because section 20(a) [of the Exchange Act] is an analogue of section 15 of the Securities Act."). For the reasons set forth in the Court's analysis of Section 20(a), Plaintiffs fail to state a Section 15(a) claim against any of the named Defendants.

## IX.

### CONCLUSION.

For the reasons set forth above, **IT IS HEREBY ORDERED**:

(1) Gardner's motion to dismiss Section 14(a) claims as to the Remedy proxy statement is **DENIED**;

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 364 of 573

In re Peregrine Systems, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8158825

(2) Gless' motion to dismiss is **DENIED** in its entirety;

(3) Nelson's motion to dismiss is **GRANTED** in its entirety;

(4) Luddy's motion to dismiss is **GRANTED** in its entirety;

(8) Moores' motion to dismiss is **GRANTED** as to the Section 10(b), Section 14(a), Section 20(a), and Section 15 claims, but is **DENIED** with regard to Section 11;

(9) Hosley's motion to dismiss is **GRANTED** as to the Section 10(b), Section 14(a), and Section 20(a) claims, but is **DENIED** with regard to Section 11;

(10) Noell's motion to dismiss is **GRANTED** as to the Section 10(b), Section 14(a), Section 20(a), and Section 15 claims, but is **DENIED** with regard to Section 11;

(11) van den Berg's motion to dismiss is **GRANTED** as to the Section 10(b), Section 14(a), and Section 20(a) claims, but is **DENIED** with regard to Section 11;

 **\*79**  (12) Watrous' motion to dismiss is **GRANTED** as to the Section 10(b), Section 12(a)(2), Section 14(a), Section 20(a), and Section 15 claims, but is **DENIED** with regard to Section 11;

(13) Savoy's motion to dismiss is **GRANTED** as to the Section 10(b), Section 14(a), Section 20(a), and Section 15 claims, but is **DENIED** with regard to Section 11;

(14) Cole's motion to dismiss is **GRANTED** as to the Section 10(b), Section 14(a), Section 20(a), and Section 15 claims, but is **DENIED** with respect to Section 11 claim;

(16) Arthur Andersen's motion to dismiss is **GRANTED** as to Section 10(b), Section 15(a), but is **DENIED** as to Section 14(a) and Section 11;

(17) Stulac's motion to dismiss is **GRANTED** in its entirety;

(18) AWSC's motion to dismiss is **GRANTED** in its entirety;

(18) Plaintiffs Waga and Stuliff's motion to strike is **DENIED**; and

(19) Plaintiffs are **GRANTED** leave to amend their complaint within 60 days after this Order is stamped "filed."

**All Citations**

Not Reported in Fed. Supp., 2005 WL 8158825

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 17

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 366 of 573

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

2015 WL 1143081
United States District Court,
S.D. Texas,
Houston Division.

LOCAL 210 UNITY PENSION AND WELFARE
FUNDS, Individually and on Behalf of all
Others Similarly Situated, et al, Plaintiffs,
v.
McDERMOTT INTERNATIONAL
INC., et al, Defendant.

Civil Action No. 4:13–CV–2393.
|
Signed March 13, 2015.

**Attorneys and Law Firms**

Damon Joseph Chargois, Mashayekh & Chargois, P.C.,
Andrew M. Edison, Edison, McDowell & Hetherington, LLP,
Thomas Robert Ajamie, Ajamie LLP, Houston, TX, Michael
W. Stocker, Labaton Sucharow LLP, New York, NY, Danielle
S. Myers, Jonah H. Goldstein, Ashley M. Robinson, Robbins
Geller Rudman & Dowd, LLP, Blair A. Nicholas, David R.
Kaplan, Timothy A. Delange, Bernstein Litowitz Berger &
Grossman LLP, San Diego, CA, for Plaintiffs.

David D. Sterling, Baker Botts LLP, Mark Alan Junell, The
Junell Law Firm PC, Houston, TX, Nicholas I. Porritt, Levi
Korsinsky LLP, Washington, DC, for Defendants.

*MEMORANDUM OPINION AND ORDER*

KENNETH M. HOYT, District Judge.

# I. INTRODUCTION

**\*1** In this consolidated securities fraud class action,
PAMCAH–UA Local 675 Pension Fund (the "plaintiff")
brings suit against McDermott International, Inc.
("McDermott" or the "Company"), Stephen M. Johnson
("Johnson"), former President and CEO of the Company,
and Perry L. Elders ("Elders"), its Senior Vice President and
CFO (collectively, the "defendants") for alleged violations
of §§ 10(b) and 20(a) of the Securities Exchange Act of
1934 ("Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and
78t(a), and Securities and Exchange Commission ("SEC")
Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.
Pursuant to FED. R. CIV. P. 12(b)(6), the defendants move

to dismiss the Consolidated Class Action Complaint (the
"Complaint," ECF No. 54) for failure to plead fraud with
the heightened specificity required by Rule 9(b) of the
federal procedure rules, and the Private Securities Litigation
Reform Act ("PSLRA"), 15 U.S.C. § 78u–4 *et seq.* (ECF
No. 55). [1] The plaintiff filed an opposing response (ECF No.
57), in which it alternatively requests leave to amend the
Complaint if dismissal is granted, and the defendants timely
replied (ECF No. 58). Having reviewed the pleadings, motion
and responsive documents, the Court determines that the
defendants' motion should be GRANTED and the plaintiff's
request for leave to amend be DENIED.

[1]     The Court treats the plaintiff's Complaint as an
        amended one. Original class action complaints
        were filed in this district by Jerad Flood,
        under Cause No. 4:13–CV–02442, on August
        20, 2013, and by Local 210 Unity Pension
        and Welfare Funds, under the captioned case
        number, on August 15, 2013. *See* Order Granting
        Stipulation on Amended Complaint and Motion to
        Dismiss Briefing Schedule, Dec. 17, 2013, ECF
        No. 44; Order Consolidating Action, Approving
        PAMCAH–UA Local 675 Pension Fund As Lead
        Plaintiff and Approving Selection of Counsel, Dec.
        5, 2013, ECF No. 36.

# II. FACTUAL AND PROCEDURAL BACKGROUND

## A. McDermott's Business

The following facts are taken from the Complaint and
public disclosure documents on file with the SEC. [2]
McDermott, headquartered in Houston, Texas, is a global
engineering, procurement, construction and installation
("EPCI") company focused on designing and executing
complex offshore oil and gas projects. As an EPCI services
provider, the Company delivers fixed and floating production
facilities, pipeline installations and subsea systems from
concept to commissioning. McDermott conducts much of
its business through fixed-price contracts—i.e., contracts
executed for a pre-determined amount based on project
cost and profit assessments—that are awarded through a
competitive bid process. All bids over $40 million are
reviewed by executive management, including Johnson and
Elders (the "individual defendants"). Executive officers
additionally review developments on these projects on a
monthly basis.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 367 of 573

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

2    The Court takes judicial notice of the Company's 2012 annual report (Form 10–K) attached to the pending motion, cited in the Complaint, and on file with the SEC. *See* *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir.2000) ("[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim." (citing cases) (internal quotation marks omitted)); *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 & n. 1 (5th Cir.1996) (adopting rule of *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991), that in securities fraud action, judicial notice may be taken of contents of public disclosure documents required to be filed with SEC).

Because fixed-price contracts typically take years to complete, the Company often requires customers to make progress payments. McDermott employs a percentage-of-completion accounting method for determining contract revenue, which requires it to periodically review contract price and cost estimates and make profit adjustments to reflect work progress. Ultimately, successful and profitable completion of a project depends on several factors, including project bidding discipline, execution and oversight.

According to public disclosure documents, projects executed under McDermott's fixed-price contracts entail inherent risks that expose it to profitability losses. In fact, "[f]ixed-price contracts entail more risk to [the Company] because they require [it] to predetermine both the quantities of work to be performed and the costs associated with executing the work." Actual costs related to a project could exceed original projections notwithstanding measures taken in the first instance to account for "anticipated changes in labor, material and service costs." Specifically, "cost and gross profit ... could vary materially from the estimated amounts because of supplier, contractor and subcontractor performance, [the Company's] own performance, changes in job conditions, unanticipated weather conditions, variations in labor and equipment productivity and increases in the cost of raw materials ... over the term of the contract." Accordingly,

    *2    current    estimates    of [McDermott's]    contract    costs    and the  profitability  of  [its]  long-term

projects, although reasonably reliable when made, could change as a result of the uncertainties associated with these types of contracts, and if adjustments to overall contract costs are significant, the reductions or reversals of previously recorded revenues and profits could be material in future periods.

Moreover, if developed into actual events, project risks could affect the business, financial condition, results of operations or cash flows of the Company in a manner that causes the trading price of company common stock to decline. These risks are matters of public record.

**B. Alleged Misrepresentations**

The Complaint alleges that between November 6, 2012 and August 6, 2013, inclusive (the "Class Period"), the plaintiff purchased shares of McDermott common stock and that the stock value plummeted because the defendants concealed "pervasive" and "ongoing" failures related to the Company's project bidding, execution and oversight. These failures, the Complaint asserts, caused McDermott to experience significant losses. Stock prices dropped 13% in May of 2013 and another 21% in August of 2013 allegedly in response to the disclosure of these negative events. [3] It is claimed that investors suffered losses in the hundreds of millions of dollars as a result.

3    In early November, 2012, McDermott's common stock was priced just below $10 per share. The price peaked at more than $13 per share on February 8, 2013. Between February 28, 2013, when the Company announced its 4Q2012 earnings, and March 1, 2013, the stock price dropped from $12.72 to $10.70 per share, an alleged 16% decline. Between May 8, 2013, when the Company released its 1Q2013 earnings, and May 9, 2013, the price dropped from $11.03 to $9.59, an alleged 13% decline. Finally, following the announcement of 2Q2013 results on August 5, 2013, the stock price dropped from $8.73 to $6.93 overnight, representing an alleged 21% decline.

The Complaint blames the defendants for causing these losses by engaging in a course of fraudulent conduct that

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 368 of 573

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

deceived the plaintiff and other class-member investors in the process. Allegedly, the defendants artificially inflated McDermott's stock price by making overly optimistic, false and/or misleading statements and concealing truths about McDermott's business, financial status and outlook. The information concerned material losses on several problematic projects and challenges related to project bidding and execution.

The individual defendants are quoted at length as proof that the two actively participated in the fraud. Their statements are contained in paragraphs 32–96 of the Complaint and summarized in the defendants' motion to dismiss. Representative statements are reprinted here for convenience and reference:

- **"The positive results of our 2012 third quarter keep us on track for solid 2012 financial performance"** (quoting Johnson in Nov. 5, 2012 (3Q2012) Press Release (Form 8–K)). [4]

[4]     Unless otherwise noted, emphasized allegations were emphasized in the Complaint.

- The Company is on pace for "solid" performance (quoting Johnson in Nov. 5, 2012 (3Q2012) Press Release (Form 8–K), and Johnson and Elders on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

  - It is "my [Johnson's] belief that it is highly likely that we will return the Atlantic region to profitability into 2013" and that the region **"is likely to be one of the highest growth markets for the Company"** (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

  - The Atlantic Region's **"competitive situation remains stable in our view"** and **"nothing is changing in a material way up or down"** (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

  - **\*3** • **"We feel very good about our strength in the Middle East. We hold what we consider the strongest competitive position because of not only our Jebel Ali facility, but also because of the type of marine fleet we have"** (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- **"[W]e have done a number of other things in the Atlantic region to turn it around"** (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- **"I'm [Johnson] quite bullish on the Atlantic region these days." "I'm sticking with my view about 2013 for the Atlantic region until I have a reason to adjust. And I don't have good reason to do that"** (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- There is **"no particular project or discrete item that needs to be highlighted"** and **"no major project issues to discuss"** (quoting Johnson and Elders on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- Johnson "remain[ed] positive" that the Atlantic segment would be profitable in 2013 (quoting Johnson on Mar. 1, 2013 conference call reporting 4Q2012 earnings) (brackets in Complaint).

- **"I [Elders] think we're going to have a good year in 2013 in the Middle East"** (quoting Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- **"We're feeling pretty good that we fully estimated the cost to complete"** the Malaysia project (quoting Johnson on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- **"McDermott is well positioned to meet the growing customer demand in each of our market segments"** (quoting Johnson and Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- The problems faced in the Atlantic and Asia Pacific segments are **"isolated situations, and are not representative of our business as a whole"** (quoting Johnson and Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- The 1Q2013 results reflect **"isolated challenges"; "we are absolutely focused on the resolution of those issues"** (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 369 of 573

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

• The loss in the Middle East is a *"one-time situation"* and *"there's nothing that we can see, or the project team can see, that would indicate any further problems with that program"* (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

• The Company is dedicated to *"implementing a compre hens ive project execution operating model that emphasizes our key project management disciplines"* "Key elements of the model include project planning, including risk identification and mitigation planning, interface management, as well as the incorporation of clearly defined accountability across the organization." The model will enable the Company "to improve our execution on even the most challenging projects" (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

**\*4** Johnson is responsible for "bringing in project execution personnel from outside McDermott to assure best practices from industry are brought to bear on our projects" (quoting Johnson on May 9, 2013 conference call reporting 1Q2013 earnings).

• *"I [Johnson] would say we are equal to best in industry in terms of project planning, project analysis, execution, forecasting, and control. And that has been rolled out through the past 12 months throughout the entire organization"* (quoting Johnson on May 9, 2013 conference call reporting 1Q2013 earnings). [5]

[5] Without identifying specific speaker(s), paragraphs 65 and 88 of the Complaint quote the defendants as making a number of additional statements about general bidding discipline and revenue recognition.

The Complaint further alleges that the individual defendants are liable for suffered damages "[b]y virtue of their high level positions" and direct involvement in the day-to-day operations of the Company. These positions, the Complaint asserts, made Johnson and Elders "privy ... to confidential propriety information concerning the Company and its business" and, therefore, responsible for the dissemination of any false and/or misleading statement or omission.

## C. Alleged "Partial Disclosures" by McDermott

The Complaint also alleges that the defendants made the following quarterly disclosures, characterized by the plaintiff as "partial disclosures," during the Class Period:

• "The fourth quarter 2012 results were negatively affected by an aggregate of approximately *$32 million of project losses and increased costs on certain projects, including approximately $23 million in the Asia Pacific segment* as a result of incremental costs associated with anticipated productivity and project delays on one subsea project, which is expected to complete in late 2013. *The Atlantic segment also was impacted by increased cost estimates relating to two fabrication projects totaling approximately $9 million,* due to lower than expected productivity, which are expected to complete in mid–2013" (quoting Feb. 28, 2013 (4Q2012) Press Release (Form 8–K)).

• "The Company's operating income in the first quarter 2013 was $53.0 million, a decrease of $27.2 million compared to $80.2 million in the first quarter 2012. The first quarter 2013 results were affected by operating losses in the Middle East and Atlantic segments, partially offset by stronger operating income in our Asia Pacific segment. In the first quarter 2013, operating losses in the Middle East segment totaled approximately $18.5 million compared to operating income of $34.7 million for the corresponding prior year period, a decline primarily attributable to execution plan changes on a project at an advanced stage of completion, which resulted in cost increases associated with hook-up activities and the use of third-party vessels. In addition, the decline in operating income was due to lower asset utilization and project activity compared to the prior year. The operating loss for the Atlantic segment changed by approximately $4.4 million to a loss of approximately $16.4 million due to increased support costs associated with lower marine asset utilization" (quoting May 8, 2013 (1Q2013) Press Release (Form 8–K)).

**\*5** • On August 5, 2013, McDermott filed a Form 8–K with the SEC, in which McDermott announced its financial results for the second quarter ended June 30, 2013. McDermott announced a substantial decrease in the Company's year-over-year financial results driven primarily by $100 million in increased loss estimates on problematic projects. In its Asia Pacific segment, the Company incurred a $62 million charge "due to delays on a deepwater pipelay project in Malaysia" caused

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

by late deliveries and McDermott's inability to timely reconfigure the vessel required to execute the project. This $62 million charge was in addition to the $23 million the Company previously recognized in 4Q2012– costs, which, on March 1, 2013, defendant Johnson assured investors the Company was confident had been "fully estimated." Defendant Johnson conceded on August 6, 2013 that the Malaysia failure was a "significant bid miss" (citing Aug. 6, 2013 (2Q2013) Press Release (Form 8–K)).

The defendants have not yet answered the Complaint. Instead, they move to dismiss it for failing to plead fraud with specificity.

### III. PARTIES' CONTENTIONS

According to the defendants, several reasons justify dismissal: the misrepresentations alleged in the Complaint are non-actionable expressions of corporate optimism about McDermott's financial performance, projects, bidding discipline and future prospects; the Complaint alleges "fraud by hindsight" and fails to explain how any of the challenged statements were false when made; the Complaint neither pleads scienter nor contains particularized allegations giving rise to a strong inference of scienter, as required by Rule 9(b) and the PSLRA; and the Complaint's derivative claims under § 20(a) of the Exchange Act fail because primary claims under § 10(b) do not meet the established pleading requirements for fraud.

Dismissal is improper, the plaintiff contends, because the Complaint pleads specific facts demonstrating that the defendants engaged in a pattern of fraud during the Class Period. In its view, the Complaint sufficiently alleges that the defendants' quarterly statements on November 5–6, 2012, February 28–March 1, 2013, and May 8–9, 2013 were false when made; the temporal proximity between the defendants' misleading statements and the disclosures of the truth demonstrate falsity; and the defendants made actionable misrepresentations related to the Company's core EPCI projects. The plaintiff also contends that the Complaint alleges facts that command a strong inference that the defendants knew or were reckless in not knowing about the ongoing problems facing McDermott's operations. In support of this argument, the plaintiff cites to the defendants' quarterly disclosure statements and points to its assertion that the individual defendants took part in monthly review meetings where these problems were likely discussed.

### IV. STANDARD OF REVIEW

A motion to dismiss for failure to plead with the heightened specificity required by Rule 9(b), as "reinforce[d]" by the PSLRA, is properly raised in a Rule 12(b)(6) motion to dismiss for failure to state a claim. *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 186 n. 8 (5th Cir.2009); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 362 (5th Cir.2004); *Lovelace,* 78 F.3d at 1017. The Court accepts as true all well-pleaded facts and construes them in the light most favorable to the plaintiff. *Abrams v. Baker Hughs, Inc.,* 292 F.3d 424, 430 (5th Cir.2002). The Court does not, however, "strain to find inferences favorable to the plaintiff," nor does it "accept conclusory allegations, unwarranted deductions, or legal conclusions ." *See Southland,* 365 F.3d at 361 (internal quotation marks omitted); *Westfall v. Miller,* 77 F.3d 868, 870 (5th Cir.1996). Dismissal is proper when it "appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Collins,* 224 F.3d at 498 (internal quotation marks omitted).

 **\*6** Rule 9(b) and the PSLRA require that the circumstances supporting a claim for securities fraud be pleaded "with particularity." FED. R. CIV. P. 9(b); 15 U.S.C. § 78u–4(b); *see Southland,* 365 F.3d at 361–62. Rule 9(b) states:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

FED. R. CIV. P. 9(b). The PSLRA correspondingly provides, in relevant part, that a securities fraud complaint

> shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 371 of 573

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

15 U.S.C. § 78u–4(b)(1). In addition, the complaint "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

Read together, Rule 9(b) and the PSLRA direct the pleader to:

(1) specify ... each statement alleged to have been misleading, *i.e.,* contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,* 291 F.3d 336, 350 (5th Cir.2002). By Fifth Circuit nomenclature, these elements establish the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id.* A district court must dismiss a § 10(b)/SEC Rule 10b–5 complaint that does not meet these requirements. 15 U.S.C. § 78u–4(b)(3)(A).

## IV. ANALYSIS AND DISCUSSION

"Private federal securities fraud actions are based on federal securities statutes and their implementing regulations." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 238–39 (5th Cir.2009) (citing *Dura Pharmas., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). The Complaint purports to state a claim under § 10(b)/SEC Rule 10b–5 as to all defendants, and a derivative claim under § 20(a) as to the individual defendants. Under § 10(b), it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Correspondingly, SEC Rule 10b–5 prohibits any person from using any means or instrumentality of interstate commerce

(a) To employ any device, scheme, or artifice to defraud,

**\*7** (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Based on these provisions, "[s]ection 20(a) ... imposes joint and several liability upon persons who 'control' defendants that violate the Exchange Act. 15 U.S.C. § 78t(a)." *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 862 (5th Cir.2003).

## A. Section 10(b)/SEC Rule 10b–5 Claim

To state a claim under § 10(b)/SEC Rule 10b–5, a plaintiff must make: a(1) misstatement or omission (2) of material fact (3) in connection with the purchase or sale of a security, which was made (4) with scienter, i.e. "a mental state embracing intent to deceive, manipulate, or defraud," and upon which (5) the plaintiff justifiably relied, (6) proximately causing injury to it. *E.g., id.* at 865–66 (internal quotation marks omitted). The pending motion argues that the Complaint fails to adequately plead materiality and scienter.[6] The Court agrees.

[6]     The Court addresses the parties' dispute over falsity in its analysis of scienter.

### *1. Insufficient Allegations of Materiality*

The defendants argue that the statements attributed to them are immaterial because they constitute puffery. "[A] statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *E.g., ABC Arbitrage,* 291 F.3d at 359 (internal quotation marks omitted); *accord Rosenzweig,* 332 F.3d at 865 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). As the defendants point out, all of the statements casted as "misrepresentations" fall into one of four categories: (1) optimistic and vague statements regarding McDermott's future financial performance and profitability; (2) generalized statements about McDermott's positioning in various segments (regions) of operation; (3) indefinite descriptions of the challenges facing the Company and the

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 372 of 573

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

Company's response to those challenges; and (4) generalized descriptions of McDermott's bidding discipline and project planning. None of these statements are "concrete factual or material misrepresentations" of the type that can be the basis for a § 10(b)/SEC Rule 10b–5 claim. *See Southland,* 365 F.3d at 372 (internal quotation marks omitted).

In this Circuit, expressions of corporate confidence, including "generalized, positive statements about [a] company's competitive strengths, experienced management, and future prospects," are immaterial and, thus, not actionable under the federal securities laws. *Rosenzweig,* 332 F.3d at 869. [7] The vast majority of alleged statements express nothing more than corporate optimism. These statements include announcements that the Company's positive 3Q2012 results would "keep [it] on track for solid 2012 financial performance" for the remainder of the year; the defendants "remain[ed] positive" and "belie[ved] that it [was] highly likely" that they could make profitable (in 2013) their operations in the Atlantic region, where they maintained a "stable," "competitive situation"; they "fe[lt] good about [their] strength in the Middle East"; Johnson remained "quite bullish" concerning McDermott's Atlantic presence; the Company was "well positioned to meet the growing customer demand in each of [its] market segments"; and the Company was "equal to best in industry in terms of project planning, project analysis, execution, forecasting, and control." The Complaint itself defeats its own pleading objective by characterizing the defendants' statements as statements of "positivity," albeit false from the plaintiff's perspective.

[7]    The Court notes, without deciding, that under the PSLRA's "safe harbor" provision, a defendant is not liable for any "forward-looking" statement, as that term is defined by statute. 15 U.S.C. § 78u–5(c). Generally, a forward-looking statement is one that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* § 78u–5(c)(1)(A). It also includes a statement "made with actual knowledge ... that the statement was false or misleading." *Id.* § 78u–5(c)(l)(B). The parties have neither raised nor briefed this issue, however.

**\*8** The Court is hard pressed to conclude that any of the above statements expresses or creates assurances about McDermott's future profitability that would lead a rational investor to rely on them. *See ABC Arbitrage,* 291 F.3d at 359 (" '[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities law' as a matter of law."). They constitute non-actionable puffery by all reasonable inferences. The defendants did not, as the plaintiff argues, "speak in concrete terms with respect to actions they were currently taking, and had already taken," nor did they "assure" investors that the Company had remedied challenges in each of its segments. If realized, any number of risks detailed in McDermott's 2012 annual report could have compromised goals that appeared attainable when announced, or derailed Company plans altogether. The potential profitability losses associated with these risks are spelled out in this report. As extensively as the defendants are quoted in the Complaint, no allegation meaningfully reconciles the defendants' oral representations with these risk disclosures. To the extent that the plaintiff acknowledges the risks involved in McDermott's contracts, it glosses over their potential impact by clinging to the Company's touted "three-tiered approach to reviewing projects (local, global and executive level review) in order to mitigate risk."

Similarly, the allegations make no attempt to square the defendants' statements with the multi-million dollar losses acknowledged in the Complaint and announced on February 28, 2013 (4Q2012 results) and May 8–9, 2013 (1Q2013 results). Yet, this is precisely the kind of analysis a rational investor would likely have conducted before making projections about McDermott stock. Remarks made by analysts in August, 2013 make the point all too clearly. The Complaint states that at the same time analysts expressed surprise that McDermott was failing, they complained that the disappointing results from the previous quarter dealt "yet *another* blow to management credibility" and that McDermott had had issues in the past (emphasis added). They also inquired "why ... the *rest* of the business" was falling apart at that particular juncture (emphasis added). These statements suggest that analysts had been alerted to and were in fact monitoring McDermott's progress *and* setbacks, and not simply relying on the Company's optimistic representations without considering known red flags. "It is difficult to form a 'strong inference' of scienter" from such telling factual concessions. *Rosenzweig,* 332 F.3d at 868.

In any event, to the extent that McDermott faced challenges, the defendants were "under no duty to cast [the Company's] business in a pejorative, rather than a positive, light." *Id.* at

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 373 of 573

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

869; *Abrams,* 292 F.3d at 433 ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance.")). Accordingly, the defendants could have, for example, asserted that there were "no major project issues to discuss" and that problems faced in certain segments were "isolated situations" that were "not representative of our business as a whole," without running afoul of § 10(b)/SEC Rule 10b–5.

### 2. Insufficient Allegations to Raise Inference of Scienter

**\*9**  The parties dispute whether the Complaint pleads scienter, or an inference of scienter, with the requisite specificity. Scienter has been adequately pleaded if, taken together, the allegations directly or circumstantially show that a defendant has intentionally deceived, manipulated or defrauded the public, or acted with severe recklessness in doing so. *E.g., Rosenzweig,* 332 F.3d at 866. In defining severe recklessness, the Fifth Circuit has stated:

> Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Allegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter, although appropriate allegations of motive and opportunity may enhance other allegations of scienter.

*Abrams,* 292 F.3d at 430 (citing *Nat hens on v. Zonagen, Inc.,* 267 F.3d 400, 408, 410–12 (5th Cir.2001)). Guided by Supreme Court and Fifth Circuit precedent, the Court takes the following three-step approach to determine whether a " 'cogent and compelling,' [and] not merely 'reasonable' or 'permissible,' " inference of scienter exists: it assumes that the allegations to be true; to the extent applicable, it "consider[s] documents incorporated in the complaint by reference and matters subject to judicial notice"; and it "take[s] into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.,* 537 F.3d 527, 533 (5th Cir.2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321–24, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

The false and/or misleading statements alleged in the Complaint relate to the defendants' November, 2012,

February/March, 2013, and May, 2013 statements. The plaintiff bears the burden of pleading the reason or reasons why these statements are false or misleading. FED. R. CIV. P. 9(b); *Southland,* 365 F.3d at 361–62. To meet this burden, the plaintiff essentially argues that the scienter pleaded in the Complaint is one of recklessness. It relies on a string of "plausabilities" and "implausibilities" about what the individual defendants knew or should have known based on their executive positions and day-to-day involvement in McDermott's business. These positions, it is alleged, afforded them at least monthly opportunities to participate in bid and project review meetings where problematic EPCI projects were likely discussed.

These contentions do not comport with the Fifth Circuit jurisprudence, however, and the plaintiff cites no binding case to support its faulty reasoning. The Fifth Circuit has held that "[a] pleading of scienter may not rest on the inference that [the] defendants must have been aware of the misstatement based on their positions with the company." *E.g., Abrams,* 292 F.3d at 432. Moreover, falsity or scienter is not pleaded with particularity, as the plaintiff suggests, by simply alleging that a corporate officer attended a meeting. *See In re BP p.l.c. Sec. Ltg.,* 922 F.Supp.2d 600, 632 & n. 31 (S.D.Tex.2013); *cf. Ind. Elec.,* 537 F.3d at 540 (reversing denial of motion to dismiss due to lack of scienter and rejecting allegation that defendants knew or should have known that their statements were false by virtue of monthly reports discussed at meetings). Here, the allegation has not been supported by particularized evidence that the individual defendants learned specific bad facts at specific meetings and later made a false statement with knowledge of the truth of those bad facts. A corporate officer's defendant's "hands-on" management style or intimate involvement with a matter is likewise not sufficient to infer scienter. *See Ind. Elec.,* 537 F.3d at 535 ("Bernhard's [CEO] management style, coupled with his alleged boast that 'there is nothing in this company that I don't know,' are insufficient to support a strong inference of scienter."); *Goldstein v. MCI WorldCom,* 340 F.3d 238, 251 (5th Cir.2003) ("[P]laintiffs' general allegation that Ebbers was a 'hands-on' CEO and therefore must have been aware of the accounts receivable situation simply lacks the requisite specificity."); *Abrams,* 292 F.3d at 431–32.

**\*10**  Equally unavailing is the attempt to manufacture falsity by linking generalized, optimistic statements with disappointing earnings results announced weeks or months later. Absent substantiation, these later results do not establish that the earlier statements were false when made. For example

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 374 of 573

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

on August 6, 2013, when the defendants announced that the Company's Malaysia project was a "significant bid miss" requiring additional funding, this disclosure did not contradict their prior assertion on February 28/March 1, 2013 that they were "feeling pretty good that [they] fully estimated the cost to complete the project." On August 5, 2013, when the defendants made known that 2Q2013 losses in the Middle East segment were the result of "poor project management, especially around changed conditions," lack of oversight in project execution and "weaknesses" in operating performance, these so-called admissions did not convert into a falsity their previous belief that the Company was "going to have a good year in 2013 in the Middle East." Neither did the announcement discredit the earlier representation that there was nothing that would "indicate any further problems with that program." Similarly, Johnson's August, 2013 announcement regarding operating losses and the restructuring of the Atlantic segment on account of "increased support costs" and lower-than-expected utilization did not negate his November, 2012 statements regarding his "bullish" outlook on the Atlantic segment and the Company's ability to maintain its position as a formidable bidding contender in the region.

Even when construed in the light most favorable to the plaintiff, the Complaint does nothing more than allege that in McDermott's quarterly earnings calls, the defendants should have accurately predicted what the results of the next quarter would be. "[C]ompany officials should not," however, "be held responsible for failure to foresee future events." *Abrams,* 292 F.3d at 433 (approving Second Circuit's observation in *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000)). No allegation supports an inference, much less a *strong inference,* that the defendants knew or should have known that there was no basis for concluding that project objectives were achievable. This is a classic case of pleading "fraud by hindsight," and the law makes no allowance for it. *See Rosenzweig,* 332 F.3d at 867–68 (affirming dismissal of securities fraud class action where certain factual underpinnings on which plaintiffs relied were hindsight assessments of defendants' performance); *Lormand,* 565 F.3d at 248–49 (defining "fraud by hindsight" as the case where "a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly" or where "there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later"). Business misjudgments are simply not fraud. *Melder v. Morris,* 27 F.3d 1097, 1101 n. 8 (5th Cir.1994).

*11 To the extent that any of the defendants' Class Period statements is an admission at all, it is at most an admission of mismanagement. "[N]egligence, oversight or simple mismanagement [do not] rise to the standard necessary to support a securities fraud action." *Abrams,* 292 F.3d at 433; *see Ind. Elec.,* 537 F.3d at 539 ("[T]he allegation of Shaw–Trac's problems may indicate corporate mismanagement, but the securities laws do not protect investors against negligence."); *In re Anadarko Petrol. Corp. Class Action Litig.,* 957 F.Supp.2d 806, 818 (S.D.Tex.2013) ("Section 10(b) and [SEC] Rule 10b–5 do not protect investors against negligence or corporate mismanagement.").

Finally, virtually all of the challenged statements are cast in terms of personal opinions and beliefs about the future, rather than facts. A claim of securities fraud that rests on such opinion or belief is doomed to fail, however, unless the evidence shows that "the speaker did not in fact hold that belief and the statement made asserted something false or misleading about the subject matter ." *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 670 (5th Cir.2004); *see Rosenzweig,* 332 F.3d at 869 (holding that statement by management that "[w]e anticipate funding capital expenditures ... through operating cash flows and long-term debt" was immaterial because it was "qualified" as management's "anticipat[ion]," rather than fact); *see also Nolte v. Capital One Fin. Corp.,* 390 F.3d 311, 315 (4th Cir.2004) ("[T]he Supreme Court held that in a securities fraud case, a statement of opinion may be a false factual statement if the statement is false, disbelieved by its maker, and related to matters of fact which can be verified by objective evidence." (citing *Va. Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)). The Complaint makes no particularized showing that the defendants did not believe what they were saying when they said it.

Because the plaintiff fails to sufficiently plead materiality and scienter, its § 10(b)/SEC Rule 10b–5 claim must be dismissed.

### B. Section 20(a) Claim

The plaintiff's § 20(a) claim is a derivative claim of § 10(b). Based on the failure of the primary claim, it too must be dismissed.

### C. Leave to Amend

The plaintiff makes a one-sentence request seeking leave to amend the Complaint for the second time. A district court has

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

discretion to grant or deny motions to amend pleadings. Fed. R. C iv. P. 15(a) (leave to amend "shall be freely given when justice so requires"). Although Rule 15(a) "evinces a bias in favor of granting" such a motion, *Rosenzweig,* 332 F.3d at 863 (internal quotation marks omitted), deference towards this bias is not warranted here since the Court afforded the plaintiff an opportunity once already to cure pleading deficiencies in the original complaints. *See supra* note 1. The plaintiff has not presented any new information to cure the existing deficiencies. Accordingly, the request for leave to amend is denied and the Complaint is dismissed with prejudice. *See id.* at 864–65 ("The Supreme Court lists five considerations in determining whether to deny leave to amend a complaint: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of the amendment....' *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).").

## VI. CONCLUSION

**\*12** Based on the foregoing analysis and discussion, the defendants' motion to dismiss is GRANTED and the Complaint dismissed with prejudice.

It is so **ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

# Case No. 18

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 377 of 573

Meitav Dash Provident Funds and Pension Ltd. V. Spirit..., Not Reported in Fed....

2022 WL 377415

2022 WL 377415
Only the Westlaw citation is currently available.
United States District Court, N.D. Oklahoma.

MEITAV DASH PROVIDENT FUNDS
AND PENSION LTD., Lead Plaintiff,
and

Jacob Goldman, Individually and on behalf of all
other similarly situated, Gary Smith, Individually
and on behalf of all others similarly situated, and
Employees' Retirement System of the City of
Providence, City of Miami Fire Fighters' and Police
Officers' Retirement Trust, Consolidated Plaintiffs,

v.

SPIRIT AEROSYSTEMS HOLDINGS, INC., Thomas
G. Gentile, III, Jose Garcia, John Gilson, and Shawn
Campbell, Defendants/Consolidated Defendants.

Case No. 20-cv-00054-SPF-JFJ, Case No. 20-
cv-00077-SPF-JFJ, Case No. 20-cv-00117-SPF-JFJ
|
Signed 01/07/2022

## Attorneys and Law Firms

Laurence M. Rosen, Phillip Kim, The Rosen Law Firm, P.A.,
Brian Calandra, Pomerantz LLP, David J. Schwartz, Francis
Paul McConville, Irina Vasilchenko, James W. Johnson,
Labaton Sucharow LLP, John J. Esmay, Bernstein Litowitz
Berger & Grossmann LLP, New York, NY, James Michael
Reed, Hall Estill Hardwick Gable Golden & Nelson, Tulsa,
OK, for Lead Plaintiff/Consolidated Plaintiffs.

R. Richard Love, III, Conner & Winters LLP, John
Christopher Davis, Johnson & Jones PC, Jessica Lynn
Dickerson, Mary Quinn-Cooper, McAfee & Taft, Tulsa,
OK, Robert Ritchie, Vinson & Elkins LLP, Carrington
Giammittorio, Haynes and Boone, LLP, Daniel Gold,
Shearman & Sterling LLP, Dallas, TX, Andrew Rodgers,
Patrick Joseph Smith, Smith Villazor LLP, New York, NY,
Spencer Freeman Smith, McAfee & Taft, Oklahoma City,
OK, for Defendants/Consolidated Defendants.

## **ORDER**

STEPHEN P. FRIOT, UNITED STATES DISTRICT JUDGE

**\*1** Three investors [1] filed putative class actions against
Spirit AeroSystems Holdings, Inc. (Spirit), a publicly traded
company, and certain of its senior executives asserting
claims under Section 10(b) and Section 20(a) of the
Securities Exchange Act of 1934, as amended by the Private
Securities Litigation Reform Act of 1995 (PSLRA), 15
U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated
thereunder, 17 C.F.R. § 240.10b-5. The court entered an
order (1) consolidating the actions, designating Case No.
20-CV-0054 as the base file; (2) appointing Meitav Dash
Provident Funds and Pension Ltd. (Meitav) to serve as
lead plaintiff; and (3) approving the selection of lead
counsel, additional counsel, and liaison counsel. Thereafter,
as ordered by the court, Meitav and consolidated plaintiffs,
Gary Smith (Smith) and City of Miami Fire Fighters'
and Police Officers' Retirement Trust (Retirement Trust)
filed a Consolidated Class Action Complaint (consolidated
complaint), superseding all filed complaints. Defendants have
moved to dismiss the consolidated complaint. Doc. nos. 77,
78 and 79. Lead plaintiff and consolidated plaintiffs have
responded, opposing dismissal. [2] Doc. no. 90. Defendants
have replied. Doc. nos. 91, 92 and 93. Subsequently, the case
was transferred to the undersigned. Upon due consideration
of the parties' submissions and relevant law, the court makes
its determination. [3]

| | |
|---|---|
| 1 | Jacob Goldman, Gary Smith, and Employees' Retirement System of the City of Providence. |
| 2 | In their response, plaintiffs request that the court disregard or strike the "excessive, overlong footnotes," in doc. no. 77, specifically, n. 2, n. 21, and n. 26 and "six-page, single-spaced 'Appendix A' " attached to doc. no. 77 on the ground they violate the court's page limit order. Doc. no. 90, n. 6. Upon review and in its discretion, the court declines plaintiffs' request. The court is not convinced the footnotes and Appendix A are improper. |
| 3 | Although plaintiffs have requested oral argument, the court concludes that oral argument is not necessary. The present motions, focusing, as they must, on what is (and is not) down in black and white in the papers before the court, do not, by their nature, call for oral argument. That said, if the court had concluded that oral argument would aid |

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 378 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

its consideration of these motions, it would have set them for argument.

## I.

### Parties

Lead plaintiff Meitav is one of the leading investment houses in Israel. Consolidated plaintiff Retirement Trust provides retirement and disability benefits to participating firefighters and police officers of the City of Miami, Florida. Consolidated plaintiff Smith is a securities investor. Plaintiffs bring this securities fraud action, individually and on behalf of all persons and entities who or which, during the period from October 31, 2019, through February 27, 2020, inclusive (the Class Period), purchased Spirit's publicly traded common stock and suffered damages. Plaintiffs claim they purchased Spirit's stock at artificially inflated prices during the Class Period and were damaged upon revelation of alleged corrective disclosures or materializations of the risks.

**\*2** Defendant Spirit is a Delaware corporation with its headquarters in Wichita, Kansas. It is one of the largest independent non-OEM (original equipment manufacturer) commercial aerostructure designers and manufacturers in the world. Spun off in 2005 from a division of The Boeing Company ("Boeing"), Spirit is the largest independent supplier of aerostructures (primarily fuselages) for Boeing's commercial aircraft. Sales to Boeing accounted for roughly 79 percent of Spirit's net revenues in fiscal years 2018 and 2019. During the Class Period, more than 50 percent of Spirit's revenues were dependent on Boeing's 737 MAX jetliners. Spirit's securities trade on the New York Stock Exchange under the ticker symbol "SPR." As of April 29, 2020, Spirit had over 105 million shares of common stock outstanding, "owned by hundreds or thousands of investors." Doc. no. 49, ¶ 36.

Defendant Thomas C. Gentile, III (Gentile) serves as Spirit's President and Chief Executive Officer and has occupied those positions since August 1, 2016. Defendant Jose Garcia (Garcia) is Spirit's former Senior Vice President and Chief Financial Officer, having served the company in that capacity from January 9, 2019, until January 29, 2020. Defendant John Gilson (Gilson) served as Spirit's Vice President and Corporate Controller from January 8, 2018, until January 29, 2020. Defendant Shawn Campbell (Campbell) was Spirit's

Vice President for the 737 NG and 737 MAX programs,[4] serving the company from March 2016 until January of 2020.

[4]   The 737 NG is the third generation of the Boeing 737 airplane, and the 737 MAX is the fourth generation. The 737 MAX was announced in 2011 and began commercial flights in 2017.

## II.

### Background

In October of 2018 and March of 2019, two 737 MAX jetliners crashed after take-off, killing all passengers on board. All 737 MAX jetliners were grounded on March 13, 2019, pending recertification by aviation authorities.[5] Securities analysts following Spirit recognized that the 737 MAX jetliners' grounding would negatively impact Spirit's financial condition, particularly if Boeing altered its production schedule.

[5]   It was later revealed that the crashes were caused by a problem with certain software in the 737 MAX flight control computer–specifically, an automated system called the Maneuvering Characteristics Augmentation System, which was designed to automatically take over the plane and point the nose downward if a sensor detected a "pitch-up" in flight that had not been commanded.

On April 5, 2019, Boeing announced that it would reduce its production rate of the 737 MAX jetliners from 52 to 42 aircraft per month. Later that day, Spirit announced that it and Boeing had entered into a Memorandum of Agreement, wherein the companies agreed that, despite Boeing's reduction of its production rate to 42 aircraft per month, Spirit would maintain its prior production rate of 52 aircraft shipsets (fuselage and other components) per month to minimize supply chain disruptions. Spirit was to maintain its production rate of 52 aircraft shipsets per month until May 1, 2020, unless advised otherwise. Boeing would pay for all 52 aircraft shipsets each month and have Spirit store the 10 excess aircraft shipsets at its Wichita facility or at McConnell Air Force Base, adjacent to the Wichita facility. When Boeing increased its production rate per month to 57 aircraft per month as originally planned prior to the crashes, Spirit would maintain its 52 aircraft shipsets per month production rate and satisfy Boeing's increased demand by slowly "burn[ing] off"

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 379 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

its accumulated inventory of 737 MAX shipsets. Doc. no. 49, ¶ 76.

Over the next few months, defendants publicly reiterated that Spirit intended to maintain its 52 aircraft shipsets per month production rate and minimized the likelihood of any cuts in the rate of production despite the continued grounding of the 737 MAX jetliners. Analysts believed defendants' assurances that Spirit had successfully navigated the issues surrounding the 737 MAX program–critical to Spirit's financial success–and would continue to do so.

**\*3** According to a former Spirit employee, [6] designated in the consolidated complaint as FE 7, in either late September or early October of 2019 at one of the frequent meetings between Boeing and Spirit to discuss the production of the 737 MAX, Boeing told Spirit to cut the production rate of 737 MAX shipsets in half. Campbell attended that meeting. The confidential witness believed Garcia and Gilson also attended the meeting because they generally attended such meetings, and the production rate schedule required their sign-off. The confidential witness learned about the production rate cut from her direct supervisor, Angel Little, and Campbell. According to the witness, Campbell disclosed the production rate cut in a regular meeting of the business operations team relating to production. The confidential witness claims defendants began creating a plan to implement the cut, including running related layoff analyses, and the results of the analyses were approved by executives, including Campbell, and presented to Gentile just before the end of October 2019.

[6]    Plaintiffs refer to several former Spirit employees as "Confidential Former Employees." *E.g.*, Doc. no. 49, ¶ 45. For brevity, the court will refer to them simply as former employees.

Another former Spirit employee, designated in the consolidated complaint as FE 8, claimed that in September or October of 2019, other suppliers that interfaced directly with Boeing were apparently notified by Boeing that it planned to substantially reduce its 737 MAX production rate, and they called FE 8, as a supply chain procurement agent, to ask for Spirit's updated forecasts for parts and materials based upon Boeing's lower production rate. FE 8 advised that she had not received an internal update from Spirit at that point.

Plaintiffs allege that on October 31, 2019, Gentile, Garcia, and Gilson made public statements that Spirit would maintain

the 52 aircraft shipsets per month production rate, concealing Boeing's directive to cut the production rate in half.

According to another former Spirit employee, designated in the consolidated complaint as FE 2, a senior Spirit executive announced at a daily internal meeting in mid-November of 2019 that Boeing had decided that Spirit should temporarily halt 737 MAX production after the fourth quarter of 2019. Plaintiffs claim Gentile and Garcia concealed this damaging development by stating several days later at an analyst meeting hosted by Jefferies LLC that Spirit's 737 MAX production was to stay at the rate of 52 aircraft shipsets per month until May 2020.

After the close of trading on December 16, 2019, Boeing publicly disclosed that it was halting production of the 737 MAX beginning in January 2020. Spirit's stock price declined following Boeing's announcement. Plaintiffs claim Gentile downplayed the impact of the revelation by falsely reassuring Spirit's investors, among other things, that he was not expecting to have to implement layoffs, even though Spirit had begun planning for layoffs in October. However, a few weeks later, on January 10, 2020, Spirit publicly disclosed that it was laying off 2,800 employees at its Wichita facility due to the 737 MAX production halt. Spirit's stock price fell again. According to plaintiffs, Spirit's stock price declined again upon additional disclosures on January 30, 2020, and February 28, 2020, that the 737 MAX production rate in 2020 would amount to a total of 216 aircraft shipsets—over 66 percent lower than in 2019—and the company would not return to the prior 52 aircraft shipsets per month production rate until 2022.

In addition to misleading investors about the 737 MAX production rate, plaintiffs claim that during the Class Period, defendants publicly misrepresented Spirit's compliance with established accounting procedures and the effectiveness of its internal controls over its financial reporting. According to the former Spirit employees designated in the consolidated complaint as FE 9 and FE 10, there was a failure to place sufficient safeguards on the company's accounting processes related to the determination of what is known as the "estimate at completion" (EAC), in connection with valuing and recording adverse claims for compensation made by Spirit's customers, such as Boeing, with respect to the 737 MAX program. The employees claim Gentile, Garcia, and Gilson, who were involved in overseeing the EAC process, failed to implement effective internal controls, and permitted Campbell to manipulate and understate Boeing Claims [7] to

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 380 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

make the 737 MAX program appear more profitable than it really was.

7      FE 9 stated that the Boeing Claims were claims "Boeing made against Spirit for, *inter alia*, the time and expense Boeing had to expend for disruptions due to delays and certain quality issues with delivered shipsets." Doc. no. 49, ¶ 159.

**\*4** Plaintiffs claim the truth regarding the deficient internal controls over the EAC process emerged on January 30, 2020. On that date, Spirit disclosed it had not complied with its established accounting procedures relating to certain contingent liabilities (customer claims) that were received by the company after the end of the third quarter of 2019. The company announced that Garcia and Gilson had tendered their resignations "[i]n light of these findings." Doc. no. 49, ¶ 206 (emphasis omitted). According to a former Spirit employee, designated as FE 11, Campbell was fired a week before Garcia and Gilson resigned. Subsequently, on February 28, 2020, the company stated the accounting violations occurred due to a "material weakness" in the internal controls related to the EAC process for customer claims and assertions. *Id.*, ¶ 215 (emphasis omitted). The company further noted that the material weakness related to 76 percent of the company's contracts, that "noncompliance" with its established accounting procedures "is a critical item the [c]ompany must address" and that it resulted in deficient "internal controls over financial reporting." *Id.*, ¶¶ 28, 215. Spirit's stock price dropped after both the January and February disclosures.

Plaintiffs allege defendants violated Section 10(b) of the Securities Exchange Act and Subsection (b) of Rule 10b-5 by making false and materially misleading statements concerning the 52 aircraft shipset production rate and by making false and materially misleading statements concerning the compliance with established accounting procedures and the effectiveness of Spirit's internal controls.

In addition, plaintiffs allege defendants violated Section 10(b) and Subsection (a) and Subsection (c) of Rule 10(b)(5) by carrying out a common plan, scheme, and unlawful course of conduct which was intended to and did deceive the investing public, artificially inflate the price of Spirit's common stock and cause plaintiffs to purchase the stock at artificially inflated prices.

Plaintiffs further assert claims against the individual defendants under Section 20(a) of the Securities Exchange

Act, 15 U.S.C. § 78t(a), which creates joint and several liability for a "control person" of a party found liable for violations of securities laws. Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998).

III.

*Elements of Plaintiffs' Claims*

Section 10(b) of the Securities Exchange Act and its implementing regulation, Rule 10b-5, Subsection (b), "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014). The Supreme Court has "inferred from these provisions an implied private cause of action permitting the recovery of damages for securities fraud." Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System, 141 S.Ct. 1951, 1958 (2021) (citing Halliburton Co., 573 U.S. at 267).

Count I of the consolidated complaint alleges violations of Section 10(b) and Rule 10b-5, subsection (b), against Spirit, Gentile, Garcia, and Gilson. To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

Smallen v. The Western Union Company, 950 F.3d 1297, 1304 (10th Cir. 2020) (emphasis omitted).

Defendants argue that plaintiffs have failed to sufficiently plead the first and third elements.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 381 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Count III of the consolidated complaint alleges violations of Section 10(b) and Rule 10b-5, subsections (a) and (c), against all defendants. "Unlike a claim under subsection (b) of Rule 10b-5, a claim of liability for violations of subsections (a) and (c) does not require an allegation that the defendant made a false or misleading statement; rather, liability is premised on a course of deceptive or manipulative conduct." Takata v. Riot Blockchain, Inc., Civ. Action No. 18-02293 (FLW), 2020 WL 2079375, at *14 (D.N.J. Apr. 30, 2020). To state a claim under subsections (a) and (c) of Rule 10b-5, plaintiffs must allege that defendants committed a deceptive or manipulative act in addition to the other standard elements of a Section 10(b) violation. *Id.*

**\*5**  In their motions, defendants posit that plaintiffs have failed to sufficiently plead deceptive or manipulative conduct. Defendants also argue that plaintiffs have failed to plead the requisite reliance element.

Count II of the consolidated complaint asserts liability under Section 20(a) of the Securities Exchange Act against the individual defendants, Gentile, Garcia, Gilson, and Campbell. To state a claim under Section 20(a), plaintiffs must allege (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged controlling person. City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1270 (10th Cir. 2001). If a plaintiff has not adequately alleged a primary violation of the securities law, then the Section 20(a) claim is properly dismissed. *Id.*

Defendants argue that plaintiffs' Section 20(a) claims fail because they have not adequately alleged a primary violation of the securities laws.

## IV.

### *Legal Standards*

Generally, "[t]o survive a motion to dismiss [under Rule 12(b)(6), Fed. R. Civ. P.], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing Twombly, 550 U.S. at 556).

When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In addition, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss," including "documents incorporated into the complaint by reference, [ ] matters of which a court may take judicial notice," and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.*; Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002) (citation omitted).

Any complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b), Fed. R. Civ. P., and the PSLRA. Tellabs, 551 U.S. at 319-321. Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting the fraud." Rule 9(b), Fed. R. Civ. P. "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud[ ] and must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 726-27 (10th Cir. 2006), *abrogated on other grounds* by Cochise Consultancy, Inc. v. United States ex rel. Hunt, 139 S.Ct. 791 (2019) (quotations and citations omitted).

Under the PSLRA, plaintiffs are required to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." Tellabs, 551 U.S. at 313. The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). As to the scienter element, the PSLRA requires a plaintiff to, "with respect to each act or omission alleged..., state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322-23 (emphasis in original). A complaint survives dismissal "only if a reasonable person

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 382 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id.* at 324.

V.

*Consideration of Defendants' Exhibits*

**\*6** Defendants Spirit, Gentile and Campbell attach various documents to their motion and request the court to consider them without converting the motion into one for summary judgment.[8] The documents consist of (1) transcripts of the third quarter 2019 earnings conference call with analysts and reporters held on October 23, 2019, and the Baird Global Industrial Conference held on November 6, 2019, both involving Boeing (doc. nos. 77-3, 77-4); (2) Spirit's Form 10-K for the fiscal year ending December 31, 2019 and Spirit's Form 10-Q for the quarterly period ending September 26, 2019, both filed with the Securities and Exchange Commission (SEC) (doc. nos. 77-5, 77-7); (3) the Jefferies' analyst report dated November 24, 2019 (doc. no. 77-6); and (4) two Form 4, Statement of Changes in Beneficial Ownership of Securities, filed with the SEC with respect to Gentile (doc. no. 77-8).

[8]    Although Garcia and Gilson have filed separate dismissal motions (doc. nos. 78 and 79), they join and incorporate by reference the motion to dismiss of defendants Spirit, Gentile and Campbell (doc. no. 77). Garcia also joins and incorporates by reference Gilson's motion to dismiss.

Plaintiffs only object to the court's consideration of the transcripts of the earnings call and conference involving Boeing. Specifically, they assert that defendants seek judicial notice of those transcripts for the purpose of establishing the truth of the matters asserted in them, which is not permissible under Tenth Circuit authority. In response, defendants counter that the court may properly consider the publicly available investor call transcripts because they are being used for the "purpose of showing that various disclosures were made and available to investors." Doc. no. 91, ECF p. 9 (quoting Chipman v. Aspenbio Pharma, Inc., Civil No. 11-cv-00163-REB-KMT, 2012 WL 4069353, at \*2 (D. Colo. Sept. 17, 2012)).

The court agrees with plaintiffs that it should not take judicial notice of the transcripts. In the October 23, 2019 earnings call,

Boeing's Chief Executive Officer stated that Boeing's "best current estimate" was for "a return of service of the MAX that begins this quarter," and that it expected the company to "maintain [its] current production rate of 42 [737 MAX] deliveries per month ... followed by incremental rate increases that would bring [Boeing's] production rate to 57 by late 2020." Doc. no. 77-3, ECF p. 7. At the November 6, 2019 investor conference, Boeing's Chief Financial Officer stated that it was "still the plan" for Boeing "to move up from 42" 737 MAX deliveries and "try to achieve [ ] 57" deliveries a month "exiting 2020." Doc. no. 77-2, ECF pp. 10-11. Despite their response, defendants do not ask the court to consider the transcripts to establish what was publicly available to investors at the time of the alleged fraud. Rather, they seek the court's consideration of the transcripts to establish that defendants' public statements on October 31, 2019 were not actionably misleading. According to defendants, at the time Gentile, Garcia and Gilson made their October 31, 2019 statements, "the **most authoritative** and **most recent** statements they had received from Boeing indicated that Boeing was **_not_** planning any reduction in 737 MAX production." Doc. no. 77, ECF p. 22 (emphasis in original). Defendants assert that this is what they told the market in their October 31 statements, and therefore "Plaintiffs have fallen far short of alleging that [the] October 31 Statements were misleading under the stringent *Omnicare*[9] standard." *Id.* at ECF pp. 22-23. They also note that the statements render implausible the former Spirit employee's account that Boeing instructed Spirit to cut the 52 shipsets production rate in half. *Id.* at ECF p. 22, n. 9. The court concludes that defendants' submission of the transcripts is for the purpose of establishing the truth of the matters asserted in them, rather than showing what information was available to investors at the time, and therefore declines to consider the transcripts in adjudicating defendants' dismissal motions. *See*, Tal v. Hogan, 453 F.3d 1244, 1264 n. 24 (10th Cir. 2006) (documents may only be considered to show their contents, not to prove the truth of the matter asserted in them).

[9]    Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund, 575 U.S. 175 (2015).

**\*7** As to the other documents (the SEC filings and analyst's report), whose consideration is unopposed, the court concludes that they may properly be considered in adjudicating defendants' motions.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 383 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

VI.

*Count I – Claims Under Section
10(b) and Rule 10b-5, Subsection (b)*

A. <u>Alleged False and Misleading Statements</u>

(i). *Aircraft Shipset Production Rate*

a. <u>October 31, 2019</u>

Plaintiffs allege that Garcia, Gilson and Gentile publicly made false and misleading statements on October 31, 2019, reaffirming that Spirit would continue the 52 aircraft shipsets per month production rate. Plaintiffs allege that defendants' statements were false and misleading because Boeing had already told Spirit in late September or early October 2019 to cut its 737 MAX production rate in half, and soon after receiving that notification Spirit had begun planning to take the steps needed to reduce its production accordingly. The specific alleged false and misleading statements are as follows.

Form 10-Q (for the quarter ending September 26, 2019), signed by Garcia and Gilson and filed with the SEC, stated in relevant part:

> We expect that the annualized average monthly shipset deliveries over the course of the year to be at rate 52 subject to any reductions that Boeing may decide to implement.

* * * *

> For so long as the grounding of the B737 MAX fleet continues, there may be further reductions in the production rate, including a temporary shutdown in production. To the extent that the grounding of the B737 MAX fleet continues for an extended period of time and Spirit is required to further reduce its production rate on the B737 MAX aircraft, Spirit's business, financial condition, results of operations and cash flows could be materially adversely impacted.

Doc. no. 49, ¶ 225 (emphasis omitted); doc. no. 77-1, statements #1 and #2.

The press release filed with the SEC on Form 8-K signed by Garcia stated in relevant part:

> Spirit continues to produce at a rate of 52 aircraft per month in accordance with its agreement with Boeing.

Doc. no. 49, ¶ 226 (emphasis omitted); doc. no. 77-1, statement #3.

During the earnings call relating to the quarter ending September 26, 2019, Gentile stated:

> [W]e are continuing to produce at a rate of 52 aircraft per month as we agreed with Boeing[.]"

* * * *

> Our current expectations are that we will continue to produce at rate 52 ... Given current production and storage levels, our expectation is that we will not produce at a rate higher than 52 through 2020, [20]21 and possibly into 2022.

* * * *

> If Boeing goes down more, we would sit down and talk with them about what's the appropriate production level for us ... Now what I would say though is that this period of time where we're at 52, gives us a chance to achieve some stability ... Now we're going to be at 52 for an extended period of time."

Doc. no. 49, ¶¶ 227, 228 and 229 (emphasis omitted); doc. no. 77-1, statements #4, #5, and #6.

Defendants contend plaintiffs have not sufficiently alleged that any of these statements were actionably misleading. According to defendants, the alleged statements express expectations about the future rather than presently existing facts, and, therefore, constitute statements of opinion. To render opinion statements actionable, defendants assert that plaintiffs must identify " 'particular (and material) facts' that were not disclosed and 'that cannot be squared' with the statement of opinion." Doc. no. 77, ECF p. 18 (citing Omnicare Inc. v. Laborers Dist. Council Const. Industry Pension Fund, 575 U.S. 175, 191, 194 (2015)). Defendants maintain that plaintiffs cannot rely upon the account of confidential witness FE 7, a Business Operations Specialist, to establish particular and material facts not disclosed by defendants. Defendants contend that FE 7's account of Boeing

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 384 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

directing Spirit in late September or early October 2019 to cut its production rate of 737 MAX shipsets in half does not meet the PSLRA's stringent particularity requirement. Defendants assert that FE 7's account is vague, conclusory and based upon multiple hearsay. They maintain that FE 7's account is particularly deficient in that FE 7 does not claim to know the ultimate source of her hearsay information. Defendants assert that the consolidated complaint provides no information indicating who from Boeing gave the directive to Spirit to cut 737 MAX production in half or whether that individual had authority to issue the directive to Spirit. Without knowing who from Boeing made the statement and exactly what was said, defendants posit that it is impossible to discern whether the statement was a definitive directive or a mere discussion of possibilities. Defendants contend that FE 7's account suggests that the notification, if it occurred, was merely a discussion of possibilities because the allegations show Spirit did not make any immediate changes to its production, only a few of Spirit's employees were purportedly told about the directive, and FE 7 was tasked with running "exercises" about the number of resulting layoffs that would be required. Further, defendants argue that while plaintiffs attempt to corroborate FE 7's account with FE 8's account, FE 8's account of Spirit not changing its purchase orders suggests that Boeing did not issue any draconian directive of a production rate cut in late September or early October 2019. Defendants contend that if Spirit had been told to cut its production schedule, it would likely have updated its purchase orders to avoid obtaining unnecessary materials from suppliers.

**\*8**  Where allegations regarding a statement or omission are made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs are required "to identify in the complaint specific facts that support the allegations about the misleading nature of the defendant's statements. Generalized or conclusory allegations of fraud will not be sufficient." Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1098 (10th Cir. 2003). However, plaintiffs are not required to "plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." Id. at 1098-99 (quotation marks omitted). Plaintiffs "need only plead with particularity *sufficient* facts to support those beliefs." Id. (quotation omitted, emphasis in original).

The court must evaluate "the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false and misleading." Adams, 340 F.3d at 1099. That evaluation will involve "(1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading." Id. "If, measuring the nature of the facts alleged against these indicia, a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." Id.

Plaintiffs are not required to disclose the documentary or personal sources from which they learned facts alleged in an information and belief complaint. Adams, 340 F.3d at 1103. "[W]here a plaintiff does not identify the sources of the facts stated in the complaint, the facts alleged in an information and belief complaint will usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading." Id.

In their consolidated complaint, plaintiffs do not identify the source of their allegation that Boeing told Spirit in late September or early October of 2019 to cut its 737 MAX production in half. However, they describe the job title, time spent in that position, the supervisors, and the specific duties of the confidential witness FE 7. The level of facts provided demonstrate that FE 7 was positioned to have known the information alleged about the production rate cut. Plaintiffs set forth facts to show that Campbell, who was in charge of the 737 MAX program and had been present at the meeting between Boeing and Spirit, informed FE 7 of Boeing's notification at a weekly meeting related to the 737 MAX production, and because of that notification, FE 7 was tasked by her direct supervisor, Angel Little, with providing data to assist others in analyzing "the appropriate level of workers needed to continue production at the new lower rate." Doc. no. 49, ¶ 104. The facts surrounding how FE 7 came to know the facts alleged with respect to the production rate cut are particularly detailed, numerous, plausible, and objectively verifiable by defendants.

Although the information provided by FE 7 that "at one of the frequent meetings between Spirit and Boeing ...

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Boeing told Spirit to cut production of the 737 MAX in half," doc. no. 49, ¶ 102, is hearsay,[10] "the fact that a confidential witness reports hearsay does not automatically disqualify [her] statement from consideration in the [falsity or misleading] calculus." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 998 n. 4 (9th Cir. 2009). Instead, the court must examine the witness's hearsay report to determine if it is "sufficiently reliable, plausible, or coherent[.]" *Id.* The court concludes that despite not specifically identifying which manager at Boeing told Spirit to cut the production rate in half, plaintiffs have provided supporting context and details enabling the court to determine that the information is sufficiently reliable. The court is not convinced that FE 7's description of Boeing's notification is conclusory or vague as argued by defendants. In the court's view, the facts alleged will support a reasonable belief that the defendants' statements were false or misleading.

10    The court agrees with defendants that a statement by Campbell revealing what Boeing told Spirit in the meeting constitutes hearsay.

**\*9** The court additionally concludes that FE 8's account, viewed in plaintiffs' favor, corroborates FE 7's account. And the court credits the allegations attributed to both FE 7 and FE 8 because the factual allegations demonstrate they were positioned to know the information provided, and despite defendants' arguments, they form a plausible and coherent narrative. The court concludes that plaintiffs' allegations are sufficient to satisfy the particularity requirements of the PSLRA (as well as Rule 9(b)).

Next, defendants argue that even if the court were to credit FE 7's account, that account is not sufficient to render the October 31, 2019 statements actionably misleading. Defendants specifically rely upon the statements of Boeing's CEO and CFO on October 23, 2019, that the company was expecting to maintain its 42 aircraft per month production rate, with an incremental or gradual increase to 57 aircraft per month by late 2020. However, as discussed, the court has declined to take judicial notice of those statements. Consequently, the court rejects defendants' arguments that October 31, 2019 statements with respect to Spirit's 737 MAX shipsets production rate are not actionably misleading given the statements of Boeing's CEO and CFO on October 23, 2019.

In his motion, Gilson asserts that the only statement attributable to him regarding the 52 aircraft shipset production rate (expecting the shipset deliveries over the course of the year to be at rate 52 subject to any reductions that Boeing may decide to implement) was demonstrably true. Gilson points out that plaintiffs do not allege in their consolidated complaint that the shipset production rate for the remainder of 2019 was less than 52 shipsets. Also, he points out that when the "so-called 'truth' " was revealed, doc. no. 79, ECF p. 8, plaintiffs allege that Boeing announced it was suspending all production of the 737 MAX aircraft "beginning in January 2020." *Id.* at ECF p. 9 (citing doc. no. 49, ¶ 189) (emphasis omitted). Gilson asserts that there are no well-pled factual allegations suggesting the shipset production rate for 2019 was below 52 or that as of October 31, 2019, he did not expect the production rate for 2019 to be 52. Further, Gilson notes that FE 7's account, even if adequately pled, does not provide factual details suggesting that the cut would take place in 2019. However, viewing plaintiffs' factual allegations and all reasonable inferences therefrom in their favor, the court concludes that plaintiffs have sufficiently pled that Gilson's statement was in fact misleading.

Gilson also argues that his expectation statement is protected under the PSLRA's safe-harbor provision for forward-looking statements. The court disagrees. The court concludes that Gilson cannot claim protection under the PSLRA's safe-harbor provision for forward looking statements because, contrary to his arguments and as pointed out by plaintiffs, the subject statement was not cured by "meaningful" cautionary language since he cautioned about a potential cut that allegedly had already been directed by Boeing to occur. *See,* FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282, 1299 (11th Cir. 2011) (stating "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."). Further, the court concludes that the alleged facts and reasonable inferences therefrom, viewed in plaintiffs' favor, indicate that the production cut had already been ordered when the information was disseminated to FE 7. The court therefore concludes that Gilson is not entitled to dismissal of plaintiffs' claims with respect to his October 31, 2019 statement.

**\*10** In sum, the court concludes plaintiffs have sufficiently pled that defendants' public statements on October 31, 2021 were false or misleading.

(b). November 24, 2019

2022 WL 377415

In the consolidated complaint, plaintiffs allege that on November 24, 2019, Jefferies LLC published a report titled "Management Meeting Takeaways: Getting into the Spirit," which reported on the analyst's "takeaways" from a meeting with Spirit management, including Gentile and Garcia. Plaintiffs allege that based upon statements made by Gentile and Garcia, the analyst reported "[Spirit] targets 16.5% segment margins, despite stable 737 MAX rates" and "[t]he MAX is set to stay at a rate of 52/mo. until May 2020 w/a potential rate decision at that time." Doc. no. 49, ¶ 235 (emphasis omitted); doc. no. 77-1, statement #7.

Plaintiffs claim that the statements made by Gentile and Garcia, as reported by Jefferies LLC, were materially false and misleading or omitted material facts when made because of Boeing's instruction to cut the shipset production rate in half, as described by FE 7 and FE 8, and because, as revealed by confidential witness, FE 2, Boeing had decided in mid-November of 2019 that Spirit was to temporarily stop production of the shipsets at the end of the fourth quarter of 2019.

Defendants argue that the alleged statements are not actionable under Rule 9(b) and the PSLRA because the analyst report includes "no quotations from any Spirit personnel, does not indicate the date on which the purported meeting occurred, and does not provide a specific source of the information it purports to summarize and paraphrase." Doc. no. 77, ECF p. 23. Moreover, defendants contend that the statements are not actionable because purported paraphrases of statements made by unspecified Spirit personnel cannot be reconciled with the standard articulated in Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 142-43 (2011), regarding the maker of a statement.

The court agrees with defendants that the alleged statements in the analyst report are not actionable. There are insufficient facts in the consolidated complaint to support plaintiffs' assertion that Gentile and Garcia made the alleged statements. The Supreme Court stated in Janus that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." Id. at 142. The report does not directly quote Gentile or Garcia in making the challenged statements. In addition, it does not directly attribute the statements to either Gentile, or Garcia or to both. While the report indicates that Gentile and Garcia were present at the meeting, it does not reveal that they were the only Spirit managerial personnel in attendance. In any event, even if they were the only personnel present, plaintiffs have not alleged any facts showing that Gentile or Garcia controlled the content of the report and whether and how to communicate it. The court concludes that the statements in the analyst report cannot be attributed to Gentile or Garcia and therefore fail to support the Section 10(b) and Rule 10b-5 claims. *See,* In re Prudential Financial, Inc. Securities Litigation, Master File No. 2:19-cv-20839-SRC-CLW, 2020 WL 7706860, at *14 (D.N.J. Dec. 29, 2020) (statements appearing in analyst reports not attributable to defendants).[11]

[11]    Further, the court agrees with defendants that the allegations in the consolidated complaint with respect to the statements as reported by Jeffries LLC do not satisfy the requirements of Rule 9(b) and the PSLRA because plaintiffs do not allege the who (the speaker) and the when (when the statements were made).

(c).    December 17, 2019

**\*11**  Plaintiffs allege that on December 17, 2019, *The Wichita Eagle* reported on Boeing's shutdown announcement and a subsequent meeting between Kansas Governor Laura Kelly and Gentile. The newspaper article stated that "Kelly said she talked with Spirit CEO Tom Gentile on Tuesday [December 17, 2019] and he's optimistic that production of the troubled aircraft will resume soon." Doc. no. 49, ¶ 237 (emphasis omitted); doc. no. 77-1, statement #8. It also stated that "[t]he governor said Gentile told her he's not expecting to have to do layoffs, however, no workforce decisions have been made, Spirit officials said." *Id.* at ¶ 238 (emphasis omitted); doc. no. 77-1, statement #9.

Plaintiffs allege that Gentile's statements were false and misleading because Gentile knew Boeing was unlikely to resume production any time soon given the continued 737 MAX grounding and that massive layoffs were imminent. Plaintiffs allege that Gentile's statement about layoffs was contrary to the internal reality that Spirit had already been running layoff exercises because of the slowdown in production that Boeing had ordered in late September or early October of 2019.

Defendants argue that the statements from the news article are not actionable because they paraphrase what the

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 387 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Kansas Governor Laura Kelly said about what Gentile said. Defendants contend that plaintiffs cannot satisfy their pleading burden by pointing to a third party's paraphrase of a defendant's statement. Even if the statements had been direct quotes from Gentile, defendants contend the optimistic statement is not actionable because it is mere "puffery," doc. no. 77, ECF p. 26, and the layoff statement is not actionable because it is not false.

The court agrees that the statements in the news article by Governor Kelly about what Gentile said are not actionable. The statements are not direct quotes of Gentile. While the article attributes the content of the statements to Gentile, plaintiffs have not alleged sufficient facts to show that Gentile had ultimate control over the content of those statements and whether and how to communicate them. There are no allegations that he was involved in reviewing or approving of the news article. The court concludes that those statements are not attributable to Gentile for purposes of the section 10(b) and Rule 10b-5 claims. *See*, Total Equity Capital, LLC. v. Flurry, Inc., No. 15-CV-4168 (JMF), 2016 WL 3093993, at *3 (S.D.N.Y. June 1, 2016); In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Civ. No. 13-2100-SLR, 2015 WL 6039690, at *17 (D. Del. Oct. 15, 2015) (statements in articles not attributable to defendants).

The court additionally agrees with defendants that the "optimistic" statement (identified as statement #8) is not actionable because it was immaterial; it was only a vague statement of corporate optimism not capable of objective verification. Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997) ("Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."). Further, the court concludes that plaintiffs have failed to sufficiently plead that the "layoff" statement (identified as statement #9) was false or misleading. Plaintiffs contend the statement "was directly contrary to the internal reality ... that Spirit had already been running such layoff "exercises[.]" Doc. no. 49, ¶ 238. Although plaintiffs allege that Spirit had performed layoff analyses, plaintiffs do not allege the content of those analyses and they do not allege that any workforce decision as to layoffs had been made. The court concludes that plaintiffs' allegations do not demonstrate that statement #9 was false or misleading.

(ii). *Accounting Practices and Internal Controls*

**\*12** Next, plaintiffs allege that on October 31, 2019, Gentile, Garcia, and Gilson made materially false and misleading statements concerning Spirit's compliance with established accounting principles relating to contingent liabilities (Boeing Claims) and the effectiveness of Spirit's internal controls over financial reporting. The alleged false and misleading statements are as follows.

The Form 10-Q for the quarter ending September 26, 2019, signed by Garcia and Gilson and filed with the SEC, stated in relevant part:

> [T]he Company's financial statements ... have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and the instructions to Form 10-Q and Article 10 of Regulation S-X.

> * * * *

> In the opinion of management, the accompanying unaudited interim condensed consolidated financial statements contain all adjustments ... considered necessary to fairly present the results of operations for the interim period.

> * * * *

> Our President and Chief Executive Officer and Senior Vice President and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures as of September 26, 2019 and have concluded that these disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time period specified in the SEC rules and forms.

> * * * *

> There were no changes in our internal control over financial reporting during the quarter ended September 26, 2019, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Doc. no. 49, ¶¶ 240, 242, 244, 245; doc. no. 77-1, Appendix A, statements #10, #16, #17, and #18.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 388 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

The Form 10-K for the year ending 2018, signed by Gentile, Garcia, and Gilson, and incorporated by reference in the Form 10-Q ending September 26, 2019, stated in part:

> Management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2018. In making this evaluation, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework (2013 Framework). Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2018.

Doc. no. 49, ¶ 246 (emphasis omitted); doc. no. 77-1, Appendix A, statement #11.

In connection with the Form 10-Q for the quarter ending September 26, 2019, Gentile and Garcia signed a certification pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (SOX certification) which stated in part:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report.

> **\*13** The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ... and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

> * * * *

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting ...

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

> * * * *

> The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Doc. no. 49, ¶¶ 248, 249; doc. no. 77-1, Appendix A, statements #12, #13, #14, and #15.

Initially, defendants argue the alleged statements are not actionable because the accounting issue the statements purportedly concealed—deficiency in Spirit's internal controls over its accounting processes—was "undisputedly immaterial." Doc. no. 77, ECF p. 27 (emphasis omitted). The deficiency, defendants assert, was " 'that [Spirit] did not comply with its established accounting processes related to certain potential contingent liabilities that were received by Spirit after the end of [the] third quarter 2019' " and that '[a]s a result of such non-compliance, the Company concluded that it should have recorded an incremental contingent liability of less than $8.0 million for the [third quarter of 2019].' " *Id.*, quoting doc. no. 49 at ¶¶ 206, 215. Defendants contend that, as plaintiffs in their consolidated complaint "concede," the

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

less than $8.0 million contingent liability was "immaterial" to Spirit's financial results. *Id.*, citing ¶ 215. Because the $8.0 million contingent liability was immaterial to Spirit's financial results, defendants maintain that any failure to disclose facts relating to the alleged weakness of Spirit's internal controls was immaterial. Thus, defendants contend that plaintiffs cannot establish the alleged statements were materially misleading.

Plaintiffs respond that the consolidated complaint plainly alleges that the undisclosed weakness in Spirit's internal controls was material. Plaintiffs point out that the consolidated complaint alleges that defendants admitted the materiality of the weakness in their 10-K Form for 2019 and that the weakness affected processes associated with 76 percent of Spirit's contracts. In addition, plaintiffs assert that the consolidated complaint alleges it was defendants' assurances of effective internal controls and not the size of errors in the financial results that were materially misleading. Further, plaintiffs contend that courts have previously ruled that the effectiveness of a company's internal controls is information a reasonable investor would consider significant in making an investment.

**\*14**  An omitted fact is material "if there is a substantial likelihood that a reasonable [investor] would consider it important" in making an investment decision. Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) (quotation marks and citation omitted). "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231-32 (quotation marks and citation omitted). "In the context of a Rule 12(b)(6) motion, the court is reminded that materiality is a mixed question of law and fact and ordinarily should be reserved for the trier of fact." In re Sprint Corp. Securities Litigation, 232 F. Supp. 2d 1193, 1215 (D. Kan. 2002) (citation omitted). "Only if defendants' statements are obviously immaterial may the court grant defendants' request for dismissal." *Id.* at 1215-16 (citation omitted).

Upon review, the court finds that dismissal is not appropriate on the ground of materiality. Viewing the factual allegations in the consolidated complaint and reasonable inferences from those allegations in plaintiffs' favor, the court cannot conclude that the alleged undisclosed weakness in Spirit's internal controls is obviously immaterial.

Next, defendants argue that the statement regarding the evaluation of the disclosure controls as of September 26, 2019 (statement #10, doc. no. 77-1), and the statement regarding the evaluation of the internal controls as of December 31, 2018 (statement #11, doc. no. 77-1), are not actionable. Defendants contend that plaintiffs have not averred that management did not evaluate the disclosure and internal controls and determine them to be effective. According to defendants, plaintiffs merely take issue with the effectiveness of the evaluations, which is an allegation of corporate mismanagement. Defendants maintain that corporate mismanagement is not actionable under the federal securities laws as the court ruled in Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662, 683 (D. Colo. 2007).

Plaintiffs counter that defendants have misread their allegations. They contend that they have alleged that defendants misrepresented the strength and quality of existing internal controls and concealed the existence of conduct actionable under the securities laws rather than alleging any matters of business judgment or mismanagement on the part of defendants. Plaintiffs assert that the consolidated complaint alleges that defendants falsely assured investors that Spirit's internal controls were effective, when they knew they were not. According to plaintiffs, defendants' statements were half-truths because they created the misimpression that Spirit's internal controls were effective. Plaintiffs contend that the allegations of the consolidated complaint are distinguishable from those in the Andropolis case cited by defendants.

The court, viewing the factual allegations and reasonable inferences in a light most favorable to plaintiffs, concludes that statements #10 and #11 are actionable. The court concludes plaintiffs' allegations with respect to the efficacy of the disclosure and internal controls are distinguishable from those in Andropolis and dismissal of plaintiffs' claims based upon that ruling is not warranted. [12] Therefore, the court concludes that statements #10 and #11 are actionable.

[12]     In reply, defendants argue that statement #10 is not actionable because it "is not about internal controls at all, but rather disclosure controls, which the Complaint never addresses" and statement #11 is not actionable because plaintiffs' allegations do not relate to "as of December 31, 2018." Doc. no. 91, ECF pp. 14-15. The court declines to address these

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 390 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

arguments since they were raised for the first time in reply.

**\*15**  In addition, defendants argue that the challenged statements made by Gentile and Garcia in the SOX certifications (statements #12, #13, #14, and #15 in doc. no. 77-1), are not actionable. Defendants assert that courts have ruled that SOX certifications are not independently actionable. Even if the SOX certifications were independently actionable, defendants contend that plaintiffs have not alleged anything to show that statements #12 through #15 were false at the time when they were made. Defendants assert that for statements #12 and #13 to be false, plaintiffs must allege that Gentile or Garcia had "actual knowledge" that the Form 10-Q was materially misleading. As to statement #14, defendants contend that plaintiffs have failed to allege that defendants did not design disclosure controls and internal controls. Lastly, with respect to statement #15, defendants assert that plaintiffs have not alleged that their disclosure was based on something other than the recent evaluation of internal controls.

In response, plaintiffs cite case authority in which courts have determined SOX certifications to be actionable. Plaintiffs also contend, with respect to statements #12 and #13, that they have alleged defendants' knowledge or recklessness relating to Campbell's misconduct with respect to the EAC process. As to statement #14, plaintiffs assert that they have alleged the statement is actionable as a misleading "half-truth" because it creates the misimpression that Spirit's controls were effective, when they were not. Plaintiffs also assert that statement #15 is also actionable as a misleading "half-truth" because defendants omitted key facts about the existence of material weakness in the internal controls when they made the statement.

Upon review, the court declines to dismiss plaintiffs' claim based upon defendants' argument that SOX certifications are not independently actionable. The Tenth Circuit has not ruled on the issue. However, plaintiffs have cited cases, including City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 418 (D. Del. 2009), which have concluded SOX certifications can be actionable. See also, In re Toronto-Dominion Bank Securities Litigation, Civil No. 17-1665 (NLH/JS), 2018 WL 6381882, at \*10 (D.N.J. Dec. 6, 2018) (citing the Delaware decision). Without a definitive ruling from the Tenth Circuit and district courts on both sides of the issue, see, Rok v. Identiv, Inc., No. 15-cv-5775-CRB, 2017 WL 35496, at \*9, n. 14 (N.D. Calif. Jan. 4, 2017) (citing cases), the court finds that plaintiffs should be permitted to rely upon the SOX certifications as bases for their claims. The

court thus turns to defendants' other arguments as to why the statements are not actionable.

As pointed out by defendants, statements #12 and #13 begin with the phrase "[b]ased on my knowledge" and "[t]o the best of my knowledge." The court agrees with defendants that with that qualifier, the falsity of the statements depends on what Gentile and Garcia knew at the time. The court concludes that plaintiffs have not sufficiently alleged facts to show that Gentile and Garcia had actual knowledge those SOX certifications (statements #12 and #13) were false or misleading. In their response, plaintiffs point out that the consolidated complaint alleges that "Defendants discussed the EAC with Campbell at EAC reviews and other meetings, but willfully ignored whether Campbell's EAC calculations were supported, reliable, or accurate." Doc. no. 90, ECF p. 59. This information was provided by a confidential witness, designated as FE 9 in the consolidated complaint. While FE 9 indicated that Gentile and Garcia attended the EAC reviews and the Boeing Claims were raised in those reviews and were a "hot-button" issue, FE 9 does not provide any particularized facts to show that Gentile and Garcia knew about the alleged material weakness in internal controls. There are no factual allegations that Gentile and Garcia knew Campbell was understating the amount of the Boeing Claims. According to FE 9, the discrepancies between the actual value of the Boeing Claims and the value that Campbell accounted for in the EAC were not adequately discussed. Doc. no. 49, ¶ 182. However, there are no factual allegations that Gentile and Garcia knew there were any discrepancies and that such discrepancies needed to be addressed. And while FE 9 indicated that "Campbell had the final decision-making authority on the numbers for the claims estimates submitted in the EAC, *id.*, and that "Campbell had a 'tight grip' over the Boeing Claims and usually was the only speaker at such meetings on the issue," *id.*, at 183, there are no factual allegations that Gentile and Garcia knew that Campbell was manipulating the Boeing Claims. As the consolidated complaint fails to allege any knowledge of Campbell's misconduct by Gentile and Garcia, the court concludes that plaintiffs have failed to allege that the SOX certifications, based upon knowledge, designated as statements #12 and #13, were false or misleading when made by Gentile and Garcia.

**\*16**  The court rejects defendants' challenges to statements #14 and #15. Viewing the allegations in a light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently alleged statements #14 and #15 were false or misleading statements.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 391 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Next, defendants challenge statement #16 in doc. no. 77-1 regarding accounting methodology and statement #17 in doc. no. 77-1 regarding adjustments. These statements were made by Garcia and Gilson in the Form 10-Q for the quarter ending September 26, 2019. Plaintiffs, in response, address defendants' arguments relating to statement #16 but do not specifically address defendants' substantive arguments relating to statement #17. The court, in its discretion, deems defendants' motion confessed as to statement #17, and upon independent review, concludes that dismissal of plaintiffs' claim based upon statement #17 is appropriate for the reason provided by defendant – " 'Adjustments' is an accounting term of art, and [p]laintiffs fail to allege the issues later identified amounted to a failure to include such 'adjustments' in financial statements." Doc. no. 77, ECF. p. 34 (footnote and citation omitted). As to statement #16, viewing the allegations of the consolidated complaint in a light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently pleaded that statement #16 was false or misleading.

Finally, defendants challenge statement #18 in doc. no. 77-1, which was made by Garcia and Gilson in the Form10-Q for the quarter ending September 26, 2019. Specifically, defendants stated: "There were no changes in our internal control over financial reporting during the quarter ended September 26, 2019, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." Defendants contend that this statement says nothing about the sufficiency of Spirit's internal controls, only that they had not changed during the third quarter of 2019. Defendants point out that plaintiffs have not alleged that the internal controls changed.

Plaintiffs contend that this statement, along with other statements in the Form 10-Q and those incorporated by reference as well as the SOX certifications attached to the 10-Q, collectively created the misimpression that defendants' internal controls had been, and still were, effective, when they were not.

Upon review, the court agrees with defendants that plaintiffs have failed to sufficiently plead that statement #18 was a false or misleading statement of material fact. The court thus finds statement #18 is not actionable.

In sum, the court finds that statements #10, #11, #14, #15 and #16 in doc. no. 77-1 are actionable and statements #12, #13, #17 and #18 are not actionable.

## B. Scienter

"[I]t is not enough for plaintiff[s] to point out misleading statements of material fact. Under the heightened pleading standards of the PSLRA, plaintiff[s] must state with particularity facts 'giving rise to a strong inference' that the defendants acted with scienter[.]" In re Level 3 Communications, Inc. Securities Litigation, 667 F.3d 1331, 1343 (10th Cir. 2012) (quoting Adams, 340 F.3d at 1105). Scienter is " 'a mental state embracing [1] intent to deceive, manipulate, or defraud,' or [2] recklessness.' " Smallen, 950 F.3d at 1304 (quoting Anderson v. Spirit Aerosystems Holdings, Inc., 827 F.3d 1229, 1236-1237 (10th Cir. 2016) (quoting Adams, 340 F.3d at 1105); In re Zagg, Inc. Securities Litigation, 797 F.3d 1194, 1201 (10th Cir. 2015). " 'Intentional misconduct is easily identified since it encompasses deliberate illegal behavior." Smallen, 950 F.3d at 1304 (quoting Fleming, 264 F.3d at 1260, quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)). "Recklessness, on the other hand, is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " Smallen, 950 F.3d at 1304-1305 (quoting In re Zagg, 797 F.3d at 1201, quoting Fleming, 264 F.3d at 1258). In the securities fraud context, recklessness is a high bar. It is something akin to conscious disregard. Allegations of conduct that amount to negligence or even gross negligence will not suffice. In re Zagg, 797 F.3d at 1201.

**\*17** The PSLRA requires plaintiffs to, " 'with respect to each act or omission alleged ..., state with particularity facts giving rise to a *strong* inference that the defendant[s] acted with the required state of mind' in violating the securities laws." Smallen, 950 F.3d at 1305 (quoting In re Level 3 Communications, 667 F.3d at 1333) (emphasis in original).

"Although an inference of scienter 'need not be irrefutable, i.e., of the "smoking-gun" genre,' it 'must be more than merely plausible or reasonable.' " Smallen, 950 F.3d at 1305 (quoting Tellabs, 551 U.S. at 324). "Because the inference must be 'powerful or cogent' not only in its own right but 'strong in light of other explanations['], [the court] must 'consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff[s].' " Id. (quoting Tellabs, 551 U.S. at 323-324). "Under this standard, a complaint survives dismissal 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 392 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

one could draw from the facts alleged.' " *Id.* (quoting Tellabs, 551 U.S. at 324).

### (i). *Gentile*

Defendants contend that plaintiffs have failed to plead particularized facts establishing that Gentile made any alleged false and misleading statements with scienter. As to the statements regarding the aircraft shipset production rate, defendants acknowledge plaintiffs' allegations as to Gentile having indicated at various times in 2019 the existence of a close working relationship between Spirit and Boeing, and that Gentile was "hands on" and "very engaged" with the 737 MAX program. Doc. no. 77, ECF p. 36 (citing doc. no. 49, ¶¶ 296-99, 306-08). However, those allegations, defendants assert, do not aver with particularity that Boeing told Spirit anything regarding the production rate that contradicted Gentile's statements. According to defendants, plaintiffs' allegations are "a less plausible variation on the oft-rejected contention that a defendant 'must have known' of fraud because of [his] position in the company." *Id.*, ECF p. 37 (quotations omitted). In addition, defendants contend that Gentile's position and the fact he attended meetings discussing the EAC process do not contribute to a strong inference of scienter as to Gentile's statements regarding accounting issues and internal controls. Defendants further argue that Gentile's SOX certifications add nothing substantial to the scienter calculus. Finally, defendants argue that Gentile's stock sales during the Class Period are not indicative of scienter. They point out that Gentile's net holdings of Spirit stock increased during the Class Period and the "F" transaction code for the stock sales indicated they were sold for the "[p]ayment of exercise price or tax liability." *Id.*, ECF p. 39. Also, defendants assert that while Gentile sold a greater percentage of stock in 2020 than in the previous three years, the stock sales did not go "well beyond" the patterns of normal stock trading which courts have found to support an inference of scienter. *Id.* (quotation omitted). And they point out plaintiffs have not alleged that any other individual defendants engaged in any suspicious stock sales, which they claim undercuts an inference of scienter.

**\*18** Plaintiffs argue that their allegations demonstrate that Gentile was informed of Boeing's instruction to cut the aircraft shipset production rate prior to his misstatements on October 31, 2019. In support, plaintiffs rely upon FE 7's account. Plaintiffs state that FE 7 detailed how, in light of Boeing's instruction to cut production, she was tasked with contributing data to reports to determine the number of layoffs necessary to implement that cut. She indicated that the

subsequent layoff analyses were approved by Campbell and presented to Gentile by late October 2019. These allegations, plaintiffs assert, support a strong inference of scienter because they show Gentile knew of the production cut at least through the layoff analyses, which contradicted his public statements. Plaintiffs also argue that it strains credulity that Gentile was not informed by Campbell, or by Garcia and Gilson, who mostly likely attended the meeting with Boeing, of the drastic production cut because of the importance of the 737 MAX program to Spirit's operations. Plaintiffs contend that the allegations regarding Boeing's close working relationship with Spirit and the importance of the 737 MAX program to Spirit's operations (accounting for over 50 percent of annual revenue), viewed holistically with the other scienter allegations, such as FE 7's account, supports a strong inference of scienter with respect to Gentile's production rate cut statements. Further, plaintiffs contend that Gentile's misleading statements about the production rate to analysts show his scienter.

As to misstatements regarding the effectiveness of Spirit's internal controls over financial reporting, plaintiffs argue that Gentile knew or recklessly ignored the material weakness in those controls. Plaintiffs rely upon the details given by FE 9, wherein she stated that she repeatedly confronted Campbell about using unvalidated, unsupported and unreasonably low estimates of costs, including costs associated with the claims submitted by Boeing in connection with the 737 MAX program, but he either bullied or ignored her. Plaintiffs also point out that FE 9 described how Gentile knew or recklessly ignored Campbell's conduct through regular meetings such as the EAC reviews. FE 9 stated that the Boeing Claims had ballooned, and they were affecting Spirit's financial reporting and were being used by Boeing in negotiations over other issues. According to plaintiffs, the ever-increasing Boeing Claims were a serious concern and were discussed at quarterly EAC Review meetings, monthly Executive Program Reviews for Spirit's 737 program and separate briefings, all of which FE 9 attended, along with Campbell and Gentile. Plaintiffs assert that FE 9's account also indicates that Gentile ignored the alleged discrepancies between the Boeing Claims and Campbell's valuations. Additionally, plaintiffs argue that the false SOX certifications support a strong inference of scienter because Gentile knew his certifications were false. Plaintiffs further argue that the importance of the EAC process to Spirit's operations (affecting 76 percent of Spirit's contracts) supports a strong inference of scienter.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 393 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Plaintiffs also argue that Gentile's stock sales occurred on February 6, 2020, just weeks before Spirit's admission that it had a material weakness in internal controls over the EAC process and the revelation of the full, devasting impact of the 737 MAX production halt on Spirit's financial prospects. Plaintiffs contend that the timing, as well as the amount, of those sales support a strong inference of scienter for his misstatements. Specifically, as to amount, plaintiffs assert that they have alleged that over the course of two days, Gentile disposed of 22 percent of his Spirit stock for proceeds totaling $3.3 million, and these sales were much larger than his sales from 2016 to 2018. According to plaintiffs, the SEC filings do not explain whether the stock was sold for tax reasons, but regardless, plaintiffs contend the suspicious timing of those sales still supports an inference of scienter.

Upon review, the court finds that plaintiffs have failed to allege with particularity facts giving rise to a strong inference that Gentile made his alleged false and misleading statements with an intent to deceive or defraud or with recklessness. As stated, plaintiffs rely upon FE 7's account to establish that Gentile knew that his October 31, 2019 statements regarding the aircraft shipset production rate were false and misleading. According to FE 7, Gentile received the results of the layoff exercises implementing the production cut "just before the end of October 2019." Doc. no. 49, ¶ 105 (emphasis omitted). However, the consolidated complaint does not provide facts with sufficient particularity to establish that FE 7's statement is reliable and based on personal knowledge. The consolidated complaint does not provide factual averments sufficient to show that FE 7 was positioned to possess the information as to when Gentile received the results of the layoff exercises. *See*, [Zucco Partners, 552 F.3d at 995](#) ("[C]onfidential witness statements may only be relied upon where the confidential witnesses are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

**\*19** The consolidated complaint does not allege that FE 7 reported to Gentile. According to plaintiffs' allegations, FE 7 only had occasional contact with Gentile because of weekly performance meetings which Gentile attended once or twice per quarter. According to the consolidated complaint, FE 7 reported equally to Angel Little (Little) and Bill Brown (Brown). Although Brown reported to Gentile, FE 7 stated that she was tasked by Little, not Brown, to provide data to support other members of her team so they could analyze the appropriate workforce level needed to continue production

at the new lower rate. The other members of the team were responsible for different components of the layoff exercises, and the results from their work "were then rolled up to" Brown and his direct reports, including Campbell, for review and approval. *Id.* at ¶ 104. FE 7 stated that assuming Mr. Brown agreed with the results of the exercises, Brown would report the results to Gentile for approval. *Id.* According to FE 7, it took "two to three weeks to complete the first round or iteration of such a layoff exercise" and the results were thereafter presented to Gentile. *Id.* at ¶ 105. However, there are no particularized allegations to show how FE 7 knew that the results of the exercises had been "rolled up" to Brown for review and approval and were presented to Gentile just before the end of October 2019. [13] FE 7's information appears to be based upon secondhand or hearsay information and there are no particularized allegations which would make that information sufficiently reliable, plausible, or coherent. *See*, [Zucco Partners, 552 F.3d at 997, n. 4](#). The court concludes that the information provided by FE 7 is not sufficient to demonstrate that Gentile received or was aware of the layoff exercises just before the end of October 2019, and, therefore, knowingly or recklessly misled investors with his October 31, 2019 statements. [14] *See, e.g., id.* [at 996-997](#) (statements not based on confidential witnesses' personal knowledge are not sufficient to raise a strong inference of scienter); [Anderson, 827 F.3d at 1240](#) (corroborating witness's account does not establish executives' knowledge because the witness's allegations do not establish that Spirit's executives had seen a cost-study report or were aware of regularly reported losses on projects). [15] , [16]

13    The court notes that the consolidated complaint fails to describe with particularity the contents of the layoff analysis. *See*, [Anderson, 827 F.3d at 1241](#) ("To create an inference of scienter based on [ ] reports, the plaintiffs must adequately describe the content of the reports[.]"). Also, it fails to allege whether Gentile had read the results or was aware of the results before the end of October 2019. *Id.* (confidential witness's allegations did not establish executives' knowledge because they did not establish the executives had seen the report or were aware of the reported losses).

14    The court notes that the consolidated complaint alleges that Gentile sent out weekly emails regarding Spirit's operations, including Spirit's relationship with Boeing and the 737 MAX

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 394 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

production. According to FE 7, "in or around October 2019," Gentile told employees in one of the emails that "Spirit was keeping the same production schedule but said that there was a changing environment with Boeing." Doc. no. 49, ¶ 297. FE 7's account indicates that Gentile did not know of the alleged production rate cut in or around October 2019.

15    In their consolidated complaint, plaintiffs also noted that according to another confidential witness, FE 5, Gentile had daily communications with Boeing. Doc. no. 49, ECF p. 50, n. 11; ¶ 296. The level of detail in the complaint, however, is insufficient to show that FE 5, who was four levels below Gentile, was positioned to know the communications between Gentile and Boeing or the substance of those communications. FE 5's account is not sufficient to demonstrate a strong inference of scienter. *See*, Zucco Partners, LLC, 552 F.3d at 996-997 (statements of confidential witnesses not based on personal knowledge are not sufficient to raise a strong inference of scienter); Anderson, 827 F.3d at 1243 (relatively low-level employees could not provide evidence bearing on the executives' mental states).

16    The court rejects plaintiffs' argument that it strains credulity that Campbell and the other individual defendants did not advise Gentile of the production rate cut. As stated, under the heightened pleading standard of the PSLRA, plaintiffs must state with particularity facts giving rise to a strong inference that defendants acted with the requisite state of mind. Smallen, 950 F.3d at 1305. The court notes that Campbell did not report directly to Gentile. Further, as herein discussed, there are insufficient allegations to support a plausible inference that Garcia and Gilson were present at the meeting where Boeing instructed Spirit to cut the production rate in half.

The court rejects the proposition that Gentile's knowledge should be inferred because the 737 MAX program was critical to Spirit's core operations, the company had a close working relationship with Boeing, and Gentile was "hands on" and "very engaged" with the 737 MAX program. With respect to core operations, plaintiffs contend that the facts concerning the production cut were "of such prominence that it would be 'absurd' to suggest that management was without

knowledge of the matter." Doc. no. 90 (quoting Hampton v. root9b Techs., Inc., Civil Action No. 15-cv-02152, 2016 WL 7971184, at *28 (D. Colo. Aug. 4, 2016), *objections to report and recommendation sustained on other grounds*, 2016 WL 9735744 (D. Colo. Sept. 21, 2016). However, the court notes that the Tenth Circuit has not yet adopted the "absurd" presumption, and the court is not convinced that the alleged facts constitute the "rare circumstances" in which core operations allegations might "conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations." South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 786 (9th Cir. 2008). Additionally, allegations of a close relationship between companies do not establish the kind of circumstantial evidence necessary to support a claim of fraudulent intent. Vogel v. Sands Bros. & Co., Ltd., 126 F. Supp. 2d 730, 743 (S.D.N.Y. 2001). The court also notes that, while the Tenth Circuit has stated a defendant's position in the company is a relevant fact when analyzing scienter, it has also rejected "the notion that knowledge may be imputed solely from an individual's position within a company." In re Zagg, Inc., 797 F.3d at 1205 (quoting Wolfe v. Aspenbio Pharma, Inc., 587 F. Appx. 493, 497 (10th Cir. 2014)); *see also*, Anderson, 827 F.3d at 1245 ("We cannot infer scienter based only on a defendant's position in a company or involvement with a particular project."); Fleming, 264 F.3d at 1264 ("[A]llegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate....") (quotation marks and citations omitted); *see also*, Anderson, 827 F.3d at 1246 (" 'Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the [securities laws'] pleading standard.' ") (quoting South Ferry L.P. No. 2, 542 F.3d at 784). Here, the court concludes that knowledge of the production rate cut should not be imputed to Gentile based upon plaintiffs' contentions. [17]

17    Further, the court rejects plaintiffs' argument that Gentile's responses to analysts' questions relating to the 737 MAX production rates raise a strong inference of scienter, since there are no particularized facts that he knew of the production rate cut in advance of those responses.

**\*20**    Turning to the alleged false and misleading statements relating to compliance with established accounting

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 395 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

procedures and the effectiveness of internal controls, the court concludes that FE 9's account is not sufficient to establish that Gentile's statements were made with an intent to deceive or defraud or with recklessness. The consolidated complaint alleges that the material weakness was the result of Campbell intentionally underestimating the amount of Boeing Claims for the 737 program in the EAC process, which made the 737 program appear more profitable than it was. FE 9 said that Boeing Claims had become a hot-button issue and were being used by Boeing in negotiations over other issues with Spirit and potential offsets for amounts paid to Spirit. The increasing claims, FE 9 stated, were a concern to Spirit management and were discussed at EAC review meetings, attended by Gentile. According to FE 9, Gentile ignored the discrepancies as to the actual value of the Boeing Claims versus Campbell's valuation of the claims. However, there are no particularized allegations that Gentile was aware of any such discrepancies and there are no particularized allegations to support an inference that such valuation discrepancies were obvious. FE 9 said that the discrepancies were not adequately discussed during the EAC reviews. According to FE 9, "this was because Defendant Campbell had the final decision-making authority on the numbers for the claims estimates submitted in the EAC, and he was generally the only one to speak to upper management[.]" Doc. no. 49, ¶ 182. She also said that "Defendant Campbell had a 'tight grip' over the Boeing Claims and usually was the only speaker at such meetings on the issue." *Id.* at 183. But there are no particularized factual averments which, if true, would show that Gentile knew, or that it was so obvious he must have known, that Campbell had the final decision-making authority on the Boeing Claims or was manipulating the Boeing Claims by underestimating them.[18] The fact that the Boeing Claims were generally discussed at the EAC reviews does not establish that the discrepancies in valuation of the Boeing Claims were discussed. And while FE 9 alleged that the PRO-3033 policy[19] was not genuinely followed, doc. no. 49, ¶¶ 161-162, there are no particularized facts alleged to the effect that Gentile had any knowledge that the PRO-3033 policy was not genuinely followed. Nor are there any particularized facts alleged to the effect that Andy Yacenda, one of Spirit's controllers for the 737 program, was acquiescing in Campbell's decisions, as alleged by FE 9. Further, there are no particularized facts averred to establish that Gentile was told or aware of any information that contradicted any of his statements. In the court's view, FE 9's account does not support a strong inference of scienter by Gentile with respect to the alleged false and misleading

statements regarding compliance with established accounting procedures and the effectiveness of internal controls.[20]

18    The court notes that plaintiffs allege that despite her concerns, FE 9 signed off in good faith on the claims in the EAC. Doc. no. 49, ¶ 176 & n. 27.

19    According to the consolidated complaint, the PRO-3033 policy provided procedures for evaluating and validating the claims made by Spirit's customers, such as Boeing, and how the value of those claims should be factored in the EAC. Doc. no. 49, ¶ 161.

20    Plaintiffs also point to Gentile's execution of the SOX certifications to support a strong inference of scienter. The court finds "the presence of the SOX certifications unpersuasive because they are not accompanied by any 'particularized facts to support an inference that [Gentile] knew [his] sworn SOX statements were false at the time they were made." *Smallen*, 950 F.3d at 1311 n. 10 (quotation marks omitted). "[Plaintiffs'] bare assertion regarding [Gentile's] execution of the SOX certifications adds nothing substantial to the scienter calculus and, at best, support[s] an inference of negligence." *Id.* (quotation marks omitted); *see also*, In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1116 (10th Cir. 2015).

" '[M]otive can be a relevant consideration' in making the scienter determination, and 'personal financial gain may weigh heavily in favor of a scienter inference.' " In re Level 3 Communications, 667 F.3d at 1345 (quoting Tellabs, 551 U.S. at 325). Unusual or suspicious stock sales by corporate insiders may provide circumstantial evidence of scienter. Zucco Partners, 552 F.3d at 1005. Nonetheless, plaintiffs' allegations concerning Gentile's stock sales do not support a strong inference of scienter. Even though Gentile sold roughly 22.5 percent of his common stock shortly before the disclosure, on February 28, 2020, of the material weakness in the internal controls, the sales are not unusual when viewed in context. Gentile's stock holdings increased during the Class Period, and he retained a substantial percentage of his Spirit holdings. This consideration, in the court's view, rebuts any inference of scienter the court might otherwise draw regarding the stock sales. *See*, Smallen, 950 F.3d at 1310; In re Level 3 Communications, 667 F.3d at 1346-1347 (increased holdings weaken an inference of scienter). In addition, the court notes that Gentile's stock, which was

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 396 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

acquired on January 21, 2020, was sold after Spirit had publicly announced on January 30, 2020, that it did not comply with its established accounting processes and that an internal review of its accounting process compliance was ongoing. *See*, Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (sales suspicious in timing when "calculated to maximize the personal benefit from undisclosed inside information"). Further, the court notes that plaintiffs do not allege that Garcia and Gilson sold any stock during the Class Period. " '[T]he failure of other defendants to sell their stock undermine[s] [plaintiffs'] theor[y] that negative information was withheld to obtain a higher sell price.' " Smallen, 950 F.3d at 1311 (quoting In re Scholastic, 252 F.3d 63, 75 (2d Cir. 2001)). Consequently, the court is not persuaded that Gentile's stock sales demonstrate that he had a motive to defraud investors with respect to the effectiveness of Spirit's internal controls. [21]

21    Further, the court is not persuaded that Gentile's stock sales demonstrate he had a motive to defraud investors about the 737 MAX production rate.

**\*21** Viewing all of plaintiffs' allegations holistically, *see*, In re Zagg, 797 F.3d at 1201, the court concludes that the inference of scienter is neither cogent nor as compelling as the competing inference of nonfraudulent intent. Plaintiffs fail to provide particularized facts giving rise to a strong inference that Gentile intentionally misrepresented the production rate or the compliance with established accounting principles and the effectiveness of the internal controls. Plaintiffs also argue that their allegations are sufficient to show recklessness. This court disagrees. "[R]ecklessness in this context is a particularly high standard, something closer to a state of mind approximating actual intent." In re Zagg, 797 F.3d at 1206 (quotation marks and citations omitted). The more compelling inference to be drawn from the allegations of plaintiffs' consolidated complaint is, at most, one of negligence on the part of Gentile, which is insufficient to avoid dismissal. "[A]llegations of negligence or even gross negligence fall below the high threshold for liability under Section 10(b) of the Exchange Act." Smallen, 950 F.3d at 1305 (quotation omitted).

In sum, the court concludes that the consolidated complaint fails to raise a strong inference that Gentile acted with scienter. The court is not persuaded that "a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations plaintiff[s]

allege[ ]." In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1118 (10th Cir. 2015). The court therefore concludes that dismissal of plaintiffs' § 10(b) and Rule 10b-5 claims against Gentile is appropriate.

(ii).

*Garcia*

Defendants additionally contend that plaintiffs have failed to plead particularized facts establishing that Garcia made any alleged false and misleading statements with scienter. According to defendants, plaintiffs' allegations that Garcia, like Gentile, was positioned to know about the alleged improprieties in the EAC accounting process, and signed the SOX certifications, are insufficient to demonstrate a strong inference of scienter regarding the alleged false and misleading statements about compliance with established accounting procedures and the effectiveness of internal controls. Defendants assert that Garcia's resignation, following the announcement of Spirit's accounting issues, also does not support a strong inference of scienter because the resignation is equally consistent with nonfraudulent conduct.

As to the alleged false and misleading statements about the 737 MAX production rate, Garcia points out that there are no particularized facts averred which would support a conclusion that Garcia attended or was aware of any meeting where Boeing discussed the 737 MAX production cut. Garcia points out that FE 7 did not attend the subject meeting discussing the production rate cut and there are no allegations that FE 7 was told who attended the meeting. Although FE 7 believed that Garcia attended the meeting based upon her understanding that any revisions to the production schedule required his "sign off," Garcia points out that there are no allegations that the production schedule changed or that he signed off on any production changes. Garcia maintains that there are no particularized allegations which tie him to the meeting with Boeing where the production rate cut was discussed. Further, Garcia asserts that there are no particularized facts alleged to support an inference that he knew about the layoff exercises, for which FE 7 had been providing data.

Additionally, in his motion, Garcia asserts that there are no particularized factual allegations that he had any motive to commit fraud or that he profited in any way from the alleged false and misleading statements. The absence of a profit motive, Garcia argues, means that the circumstantial evidence

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 397 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

of scienter must be more compelling. Garcia contends that the consolidated complaint fails on this score as well.

Plaintiffs respond that FE 7's account of Boeing's instruction to Spirit to cut production shows that Garcia had knowledge of that fact. Plaintiffs point out that FE 7 stated Garcia "most likely" attended the meeting and that FE 7 specified what was said at the meeting–specifically that Boeing instructed Spirit to cut production of 737 MAX shipsets in half. Doc. no. 90, ECF pp. 65-67. According to plaintiffs, FE 7's account, along with the core operations allegations, is sufficient to establish a strong inference of scienter with respect to Garcia's misstatements relating to the production rate.

**\*22**  In addition, plaintiffs contend that Garcia knew of or recklessly ignored Campbell's misconduct in estimating the costs associated with the Boeing Claims through regular meetings such as the quarterly EAC reviews. Plaintiffs contend that Garcia ignored apparent discrepancies between the actual value of the Boeing Claims and the value Campbell assigned to them in the EAC. Plaintiffs also argue that Garcia's resignation strongly supports a scienter inference because it was suspicious in its timing and circumstances. According to plaintiffs, they adequately link Garcia's resignation to the alleged misconduct. Further, plaintiffs point out that Spirit acknowledged that remedial measures to address the EAC process deficiencies included management changes. Plaintiffs also contend that Garcia's SOX certifications support a strong inference of scienter because they have alleged Garcia knew his certifications were false. Lastly, plaintiffs contend that the importance of Boeing Claims and the EAC process to Spirit's bottom line supports a strong inference of scienter.

Upon review, the court concludes that plaintiffs have failed to plead with particularity facts sufficient to give rise to a strong inference that Garcia acted with an intent to deceive or with recklessness when making the alleged false and misleading statements. As to the alleged false and misleading statements concerning the 737 MAX production rate, the court concludes that FE 7's account is insufficient to establish that Garcia was aware of Boeing's instruction to cut production in half. FE 7 was not present at the meeting between Boeing and Spirit where the production rate cut was purportedly discussed and was not told by her direct supervisor, Mr. Little, or by Campbell who attended the meeting. FE 7 also did not report to Garcia. According to FE 7, she believed Garcia attended the meeting because production rate changes or the production rate schedule required his "sign-off." Doc. no. 49, ¶¶ 52,

102. However, there are no particularized allegations of any change in the production rate schedule, referred to internally as the "Master Schedule," or that Garcia signed off on any change. The lack of any particularized allegations as to a change in the Master Schedule undermines the only basis for plaintiffs' allegations that Garcia attended the meeting where Boeing told Spirit to cut production in half. Further, there are no particularized allegations that Garcia received the results of the layoff exercises for which FE 7 provided data. The court concludes that FE 7's account is insufficient to establish that Garcia knew his statements about the aircraft shipset production rate were false and misleading or that he ignored obvious signs that his statements were false and misleading. Lastly, the court concludes that plaintiffs' allegations as to the 737 MAX program's importance to Spirit's operations and Garcia's position with the company are not sufficient to establish a strong inference of scienter for the reasons previously discussed with respect to Gentile.

Turning to the alleged false or misleading statements with respect to the compliance with established accounting procedures and the effectiveness of internal controls, the court concludes that FE 9's account is insufficient to establish that Garcia acted with an intent to deceive or with recklessness. There are no particularized allegations that Garcia knew or was aware of the discrepancies concerning the valuation of the Boeing Claims or was aware that the PRO-3033 policy was not being followed. In addition, there are no particularized allegations that Garcia ignored obvious signs of the alleged manipulation of the costs associated with the 737 program, including the Boeing Claims. The fact that Boeing claims were discussed at the EAC meetings, which Garcia attended, does not suggest that Garcia knew or recklessly ignored an undervaluation of the Boeing Claims. And as stated by Tenth Circuit, "mere attendance at meetings does not contribute to an inference of scienter." Anderson, 827 F.3d at 1246; *see also*, In re Level 3 Communications, 667 F.3d at 1344 (10th Cir. 2012) (concluding that the fact the defendants "monitored the integration process through regular meetings and reports" was insufficient to "draw a strong inference" of the defendants' scienter). Further, the court concludes that Garcia's knowledge should not be imputed based upon the alleged importance of the EAC process to Spirit's bottom line or Garcia's position with the company.

**\*23**  As to the resignation of Garcia, which the company identified as a remedial measure in the 2020 annual report, the court concludes, like the Tenth Circuit in In re Zagg, that the resignation is "at most an acknowledgement that

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 398 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed at the time the alleged omissions occurred." *Id.* at 1205; *see also*, In re Hertz Global Holdings, Inc., 905 F.3d 106, 119 (3rd Cir. 2018) ("[P]leading scienter requires more than pleading a link between bad news and an executive's resignation. Changes in leadership are only to be expected when leadership fails ... [A]llegations [must] cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud."). The allegations in the consolidated complaint are not sufficient to demonstrate that Garcia's resignation resulted from his knowing or reckless disregard of noncompliance with established accounting procedures or the material weakness in the internal controls.

Additionally, "[plaintiffs'] bare assertion regarding [Garcia's] execution of the SOX certifications adds nothing substantial to the scienter calculus and at best, support[s] an inference of negligence." Smallen, 950 F.3d at 1311 n. 10 (quotation omitted). Further, the court notes that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." Fleming Cos., 264 F.3d at 1261 (quotation marks and citation omitted).

Further, as to Garcia, plaintiffs fail to offer anything in the way of a motivation to mislead investors. "Although the absence of an apparent motive does not necessarily defeat a finding of scienter, it does make such a finding more difficult to sustain." Employees' Retirement System of Rhode Island v. Williams Companies, Inc., 889 F.3d 1153, 1173 (10th Cir. 2018). Moreover, it "mitigates an inference of scienter from the plaintiffs' other factual allegations." Anderson, 827 F.3d at 1239.

Viewing plaintiffs' allegations holistically, *see*, In re Zagg, 797 F.3d at 1201, the court concludes that the inference of scienter is neither cogent nor as compelling as the competing inference of a nonfraudulent intent. The court is not persuaded that "a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations plaintiff[s] allege[ ]." In re Gold Resource Corporation, 776 F.3d at 1118. The court therefore concludes that dismissal of the Section 10(b) and Rule 10b-5(b) claims against Garcia is appropriate.

(iii).

*Gilson*

Initially, defendants contend that plaintiffs' scienter allegations relating to Gilson fail for the same reasons that they fail as to Gentile and Garcia. Defendants maintain that plaintiffs' "positional" allegations and allegations with respect to Gilson's resignation do not establish scienter on Gilson's part. Doc. no. 77, ECF p. 41.

Defendants, however, recognize that the consolidated complaint includes additional scienter allegations with respect to the misstatements regarding compliance with established accounting procedures and the effectiveness of internal controls that are not alleged against Gentile and Garcia. Defendants acknowledge that the consolidated complaint alleges that FE 9 recalled a specific instance in "early or mid-2019" when she " 'discussed her concerns with Defendant Gilson.' " Doc. no. 77, ECF p. 41. The consolidated complaint specifically alleges that FE 9 "raised her concerns about these failures in the EAC process with respect to customer claims to Defendant Gilson directly." Doc. no. 49, ¶ 178. The pleading alleges that, because of her raising such concerns to Spirit's "Finance personnel" and causing an internal "conflict," FE 9 was called into a meeting in Gilson's office, arranged by the Finance personnel, to discuss these issues. At the meeting, FE 9 discussed her concerns with Gilson and other Finance personnel, but to no avail. FE 9 left the meeting completely disappointed with the response of Gilson and the other Finance personnel because they did not take any actions to remedy the problem and they accused her team of not supporting "Program personnel." *Id.* According to FE 9, "given his responsibilities as Spirit's Controller, Defendant Gilson should have been 'pounding the table' upon hearing of such failures, but instead FE 9 was 'shut down' once again." *Id.*

**\*24**  Defendants contend, however, that plaintiffs' allegations fall short with respect to scienter. Defendants assert that the allegations do not reveal "*anything* that Gilson was actually told [at the] meeting." Doc. no. 77, ECF p. 41. Defendants maintain that without knowing what FE 9 specifically said to Gilson, it is impossible to determine whether that information given as early as "early 2019," undermined Gilson's statements made on October 31, 2019. Defendants also point out that "FE 9 ultimately 'signed off' on the accounting entries 'in good faith' 'despite her concerns.' " Doc. no. 77, ECF p. 42 (quoting doc. no. 49, ¶¶ 176, n. 27, 178). Further, defendants assert that plaintiffs' allegations are insufficient to establish scienter because FE 9 did not work at Spirit during the Class Period and her position with the company is not adequately alleged.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 399 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Plaintiffs respond that their scienter allegations are sufficient as they show Gilson knowingly or recklessly misrepresented the effectiveness of Spirit's internal controls. Plaintiffs contend that Gilson knew of or recklessly disregarded the material weakness in Spirit's internal controls. Plaintiffs specifically rely upon their allegations that FE 9 raised her concerns about Campbell directly to Gilson because of her concerns about the weaknesses in Spirit's EAC process, but Gilson ignored her. Plaintiffs contend that her confrontation with Gilson, as well as her resignation shortly after her confrontation, support a strong inference of Gilson's scienter. Plaintiffs also point to their allegations that Gilson attended regular meetings such as the EAC Reviews where the Boeing Claims were discussed. Plaintiffs contend that even though FE 9 left Spirit's employment before the start of the Class Period, her allegations are nonetheless relevant because they provide insight into what Gilson knew at the start of the Class Period. Further, plaintiffs assert that FE 9's position with Spirit is sufficiently alleged.

Upon review, the court concludes that plaintiffs have failed to sufficiently plead with particularity facts giving rise to a strong inference that Garcia acted with an intent to deceive or with recklessness. The court concludes that FE 9's account is not sufficient to establish a strong inference that Gilson's alleged false and misleading statements with respect to compliance with established accounting procedures, and the effectiveness of internal controls, were made with intent to deceive or with recklessness. Plaintiffs fail to allege with particularity what was discussed at the meeting involving FE 9, Gilson, and Finance personnel. Without particularized allegations as to what was discussed, the consolidated complaint does not establish that Gilson was specifically informed by FE 9 of Campbell's manipulation of the Boeing Claims or any alleged material weakness in the internal controls. Indeed, plaintiffs' allegations with respect to the meeting do not mention anything specifically about the Boeing Claims. Doc. no. 49, ¶ 178. As pointed out by defendants, plaintiffs allege only that FE 9 "raised her concerns about these failures in the EAC process with respect to customer claims." Doc. no. 49, ¶ 178. Also, plaintiffs' allegations indicate that other Finance personnel did not share her concerns, *id.*, and as pointed out by defendants, plaintiffs' allegations indicate that FE 9 signed off on the claims in the EAC "in good faith." *Id.*, ¶ 176 & n. 27. If other Finance personnel did not share FE 9's concerns and FE 9 signed off on the claims in the EAC in good faith despite her concerns, those concerns do not, in the court's view, provide a strong inference

that Gilson acted with an intent to deceive or to defraud or with recklessness. Although plaintiffs contend that FE 9's resignation supports the assertion that Gilson acted with scienter, there are no particularized allegations that Gilson knew of the resignation or the reasons for her resignation. Further, the fact that a material weakness in the internal controls was later identified, resulting in Gilson's resignation, does not provide a strong inference that Gilson acted with an intent to deceive or to defraud or with recklessness at the time he made the alleged false and misleading statements.

**\*25** In addition, as pointed out by Gilson, the consolidated complaint fails to allege any motive on his part to commit securities fraud. Although plaintiffs need not show that Gilson acted with a particular motive, the failure to allege facts indicating a motive for securities fraud mitigates an inference of scienter. *See*, Anderson, 827 F.3d at 1239.

The court further agrees with defendants that plaintiffs' remaining scienter allegations concerning Gilson fail for the same reasons previously discussed with respect to Gentile and Garcia.

Lastly, viewing plaintiffs' scienter allegations holistically, *see*, In re Zagg, 797 F.3d at 1201, the court concludes that the inference of scienter is neither cogent nor as compelling as the competing inference of nonfraudulent intent. The court is not persuaded that "a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations plaintiff[s] allege[ ]." In re Gold Resource Corporation, 776 F.3d at 1118. The court therefore concludes that dismissal of the Section 10(b) and Rule 10b-5(b) claims against Gilson is appropriate.

### (iv)

### *Spirit*

Plaintiffs also allege liability under Section 10(b) and Rule 10b-5 on the part of Spirit. Corporations, like Spirit, have no state of mind of their own. Instead, scienter of the corporations' agents must be imputed to them. *See*, Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1255 (11th Cir. 2008). In addition to the scienter allegations as to Gentile, Garcia, and Gentile, which the court has found to be insufficient to establish a strong inference of scienter, plaintiffs rely upon their allegations with respect to Campbell. [22] Plaintiffs assert that those allegations support a strong inference that Campbell acted with scienter. Defendants contend the scienter

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 400 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

allegations as to Campbell are irrelevant on the issue of Spirit's scienter because Campbell did not make or issue any of the challenged statements. Plaintiffs counter that Campbell's scienter is imputable to Spirit, despite the fact he did not make or issue any of the alleged false or misleading statements. They point out that the Tenth Circuit authorizes corporate scienter to be evaluated by the state of mind of the individual corporate official, who not only made or issued a false and misleading statement, but who also "furnish[ed] information or language for inclusion therein, or the like." Doc. no. 90, ECF p. 77 (quoting Smallen, 950 F.3d at 1313). Plaintiffs posit that given Campbell's critical role with the 737 MAX program and his ownership of the EAC process for Spirit's 737 program, his scienter should be imputed to Spirit. According to plaintiffs, Campbell furnished false information for inclusion in the alleged misstatements regarding the 737 MAX production rate because he instructed the Business Operation Team, including FE 7, to create layoff analyses and similar planning reports to implement Boeing's production cut. In addition, they assert that Campbell furnished false information for inclusion in the alleged misstatements regarding the effectiveness of internal controls, including through quarterly EAC reviews. Plaintiffs maintain that they have sufficiently alleged facts giving rise to a strong inference of scienter with respect to Campbell.

22      No claim under Section 10(b) and Rule 10b-5(b) has been alleged against Campbell.

**\*26** The Tenth Circuit has determined that corporate liability for a Section 10(b) and Rule 10b-5 violation may be established by looking to "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or *who furnish information or language for inclusion therein*, or the like)." Smallen, 950 F.3d at 1313 (emphasis added) (quotation marks and citation omitted). Initially, the court concludes that the consolidated complaint fails to allege particularized facts to establish that Campbell furnished information or language for inclusion in any of the alleged false and misleading statements made with respect to the 737 MAX production rates. The consolidated complaint does allege that the layoff exercises were "rolled up" to Brown and his direct reports, including Campbell, for review and approval, doc. no. 49, ¶ 104, but there are no allegations that those exercises were furnished to Gentile for inclusion in any alleged false and misleading statements involving the 737 MAX production rate on October 31, 2019. As previously discussed, the account of FE 7 is insufficient to demonstrate that Gentile even received that information prior to his alleged

misstatements. Further, there are no particularized allegations that Campbell furnished anything to Garcia or Gilson before their alleged misstatements. The court therefore concludes that Campbell's state of mind cannot be relied upon to establish Spirit's scienter for the 737 MAX production rate statements.

Regarding the statements with respect to compliance with the established accounting procedures and the effectiveness of internal controls, the consolidated complaint does allege, based upon FE 9's account, that Campbell understated or underestimated the amount of the Boeing Claims in the EAC process. Doc. no. 49, ¶ 170; ¶ 304. The consolidated complaint, however, does not plead particularized facts to demonstrate that Campbell furnished information for inclusion in the false and misleading statements at issue in this case. Nevertheless, even if the facts were sufficient for the court to conclude that Campbell furnished information for inclusion in those statements, the court finds that the consolidated complaint fails to allege particularized facts supporting a strong inference that Campbell acted with scienter (as opposed to negligence or gross negligence) in furnishing that information. The factual allegations are insufficient to support that Campbell acted with an intent to deceive, manipulate, or defraud investors or with recklessness when he furnished the information.[23] According to the consolidated complaint, Campbell engaged in the incorrect accounting "to make himself look better by showing better numbers to the Spirit Executive Team on the 737 program." Doc. no. 49, ¶ 305. As a result, the court concludes that Campbell's state of mind cannot establish Spirit's liability under Section 10(b). *See*, Pipefitters Local No. 636 Defined Ben. Plan v. Zale Corp., 499 F. Appx. 345 (5th Cir. 2012) ("[T]he most compelling inference was that [the vice president of marketing] acted with the intent to maintain the good appearance of her department rather than to defraud investors by falsely inflating the value of [the company].") The court therefore concludes that dismissal of the Section 10(b) and Rule 10b-5(b) claims against Spirit is appropriate.

23      In the consolidated complaint, plaintiffs allege that the timing and circumstances of Campbell's "resignation" support a strong inference of scienter. Relying upon FE 11, plaintiffs allege that Campbell was terminated and escorted from the premises a week before Garcia and Gilson resigned. Doc. no. 49, ¶ 314. Plaintiffs also allege that FE 9's account corroborates the reason for Campbell's termination. Id., ¶ 315. However, the court finds

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 401 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

FE 11 and FE 9's accounts are not sufficient to establish that Campbell was terminated and the reasons for that termination. FE 11 and FE 9 left Spirit's employment in the fall of 2019. *Id.*, ¶ 56, ¶ 171.

VII.

*Count III – Claims Under Section 10(b)*
*and Rule 10b-5, Subsections (a) and (c)*

In addition to claims under subsection (b) of Rule 10b-5, plaintiffs allege claims under subsections (a) and (c). These claims are alleged against all defendants. Subsections (a) and (c) make it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a) and (c). While subsection (b) requires a plaintiff to establish that a false or misleading statement was made, subsections (a) and (c) "are not so restricted." Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972). To state a claim for a violation of subsections (a) and (c), a plaintiff must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." In re Alstom SA Securities Litigation, 406 F. Supp. 2d 433, 476 (S.D.N.Y. 2005) (citing In re Global Crossing, Ltd. Securities Litigation, 322 F. Supp. 2d 319, 336 (S.D.N.Y 2004)).

**\*27** Defendants contend that plaintiffs' subsections (a) and (c) claims should be dismissed because those claims are simply a repackaging of their subsection (b) claim because they rely upon defendants' alleged material misrepresentations as the basis for the claims. Defendants point out that plaintiffs have not identified any material misrepresentation or sufficiently alleged that they disseminated any material misrepresentation with scienter. To the extent the claims are based on something besides a material misrepresentation, defendants argue that the claims fail because the only conduct alleged to be deceptive in the consolidated complaint was the purported misrepresentations. Further, defendants maintain that plaintiffs have failed to plead reliance, an essential element of subsections (a) and (c) claims. Defendants point out that aside from their alleged misrepresentations, none of their alleged conduct was publicly disclosed. Therefore, defendants contend that plaintiffs could not have relied upon that non-public conduct.

Plaintiffs respond that they have pled sufficient facts to support liability under subsections (a) and (c). Initially, they point out that the mere fact certain elements of their claims under subsections (a) and (c) also support a misrepresentation claim under subsection (b) is not grounds for dismissal. They assert that scheme-liability claims may involve conduct similar to that underlying a subsection (b) claim. In any event, plaintiffs contend that the consolidated complaint alleges defendants "engaged in a scheme to assure the market that Spirit could provide timely information regarding any changes in production levels for 737 MAX shipsets, and the revenue it could obtain from those sales, to minimize investor concerns relating to the uncertainties of Spirit's revenue stream created by the 737 MAX grounding." Doc. no. 90, ECF p. 82. According to plaintiffs, the alleged scheme included multiple actions distinct from the alleged misrepresentations, including "(i) touting its close relationship with Boeing in response to specific questions from analysts to set the expectation in investors that Spirit would immediately be aware of, respond to, and inform investors of any requests for changes [ ]; (ii) deflecting concerns about the number of 737 MAX shipsets Spirit was storing for Boeing [ ]; and (iii) making no effort to inform investors when Boeing ordered Spirit to cut production in late September or early October 2019[ ]." *Id.* These actions, plaintiffs contend, which are in furtherance of defendants' scheme are actionable under subsections (a) and (c). Additionally, plaintiffs contend that they have sufficiently pled reliance upon defendants' scheme. Plaintiffs maintain that it was the deceptive acts of defendants, rather than a third party, that "mitigated uncertainty in the minds of investors as to Spirit's shipset production and inflated the price for Spirit shares." *Id.* They assert that the cases cited by defendants in support of their reliance argument are factually distinguishable.

Upon review, the court concludes that the claims under subsections (a) and (c) should be dismissed as to all defendants. "As with claims under subsection (b) of Rule 10b-5, claims under subsections (a) and (c) are subject to the PSLRA, and, thus, a 'strong inference' of scienter must be pled 'with particularity.' " Takata, 2020 WL 2079375, at \*14 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The court concludes that plaintiffs have failed to allege particularized facts giving rise to a strong inference that any of the defendants acted with scienter when committing the alleged actions. Even when plaintiffs' allegations are considered collectively, they do not,

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 402 of 573

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

in the court's view, create a cogent, compelling inference of scienter on the part of the defendants.


## VIII.


### *Count II – Claims Under Section 20(a)*

As discussed, to state a claim under § 20(a) of the Securities Exchange Act, plaintiffs must allege (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged controlling person. Fleming, 264 F.3d at 1270. Because the consolidated complaint fails to state a primary violation under Section 10(b) and Rule 10b-5, the court concludes that the claims under Section 20(a) against the individual defendants, Gentile, Garcia, Gilson, and Campbell also fail.


## IX.


### *Request to Amend Complaint*

**\*28** At the end of their response brief, plaintiffs request the opportunity to amend the consolidated complaint if the court grants any part of defendants' motions. The court, however, concludes that plaintiffs have failed to adequately request leave to amend their consolidated complaint. Plaintiffs' "single sentence, lacking a statement for the grounds for amendment and dangling at the end of [their] memorandum, [does] not rise to the level of a motion for leave to amend." Calderon v. Kan. Dept. of Social & Rehabilitation Services, 181 F.3d 1180, 1186-87 (10th Cir. 1999). Plaintiffs have not made any effort to indicate how amending the consolidated complaint would cure the deficiencies in their claims, specifically as to the scienter element. Plaintiffs

rely heavily upon confidential witnesses to support their allegations, but do not indicate that the confidential witnesses can provide more information that was not alleged or that there are other confidential witnesses available to support their claims. Because plaintiffs have failed to adequately request amendment and to support that request and in the absence of any indication that they can cure the deficiencies of their consolidated complaint, specifically as to scienter, the court concludes that the consolidated complaint should be dismissed without leave to amend.


## X.


### *Conclusion*

Based upon the foregoing, Defendants Spirit AeroSystems Holdings, Inc., Thomas C. Gentile, and Shawn Campbell's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (doc. no. 77), Defendant Jose Garcia's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (doc. no. 78) and Defendant John Gilson's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (doc. no. 79) are **GRANTED**. Plaintiffs' Consolidated Class Action Complaint (doc. no. 49) is **DISMISSED WITH PREJUDICE**.

The Clerk of Court is **DIRECTED** to file this order and the accompanying judgment in Case Nos. 20-cv-00054-SPF-JFJ, 20-cv-00077-SPF-JFJ, and 20-cv-00117-SPF-JFJ.

IT IS SO ORDERED this 7 [th] day of January, 2022.


**All Citations**

Not Reported in Fed. Supp., 2022 WL 377415

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 19

2019 WL 3451153

2019 WL 3451153
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

MICROCAPITAL FUND LP, MicroCapital
Fund Ltd., and MicroCapital LLC, Plaintiffs,

v.

CONN'S INC., Theodore M. Wright, Brian
Taylor, and Michael J. Poppe, Defendants.

No. 4:18-CV-1020
|
Signed 07/24/2019
|
entered 07/26/2019

**Attorneys and Law Firms**

Hillary B. Stakem, Steven W. Pepich, Mark Solomon, Robbins Geller et al, San Diego, CA, Willow E. Radcliffe, Pro Hac Vice, Robbins Geller et al, San Francisco, CA, Jason Anthony Richardson, McDowell Hetherington LLP, Houston, TX, for Plaintiffs.

Jennifer Barrett Poppe, Vinson & Elkins, Austin, TX, Stephen Sullivan Gilstrap, Vinson & Elkins LLP, Dallas, TX, for Defendants.

### REPORT AND RECOMMENDATION

Dena Hanovice Palermo, United States Magistrate Judge

**\*1** Plaintiffs MicroCapital Fund LP, MicroCapital Fund Ltd., and MicroCapital LLC (collectively "Plaintiffs" or "MicroCapital") filed this action for violations of federal securities laws, common law fraud, and negligent misrepresentation against Defendants Conn's, Inc. ("Conn's" or "Corporation"), Theodore Wright, Brian Taylor, and Michael Poppe (collectively "Defendants"). Pls.' Compl., ECF No. 3. Before the Court is Defendants' motion to dismiss.[1] ECF No. 39. Having considered the record and authorities, the Court recommends that Defendants' motion to dismiss, ECF No. 39, should be granted in part and denied in part.[2]

1    Plaintiffs filed an opposition. ECF No. 47. Defendants filed a reply. ECF No. 49. Both parties

also filed supplemental briefs, ECF Nos. 55, 57, pursuant to the Court's order, ECF No. 52. Plaintiffs also filed a motion for leave to file a chart of false and misleading statements in support of their opposition to Defendants' motion to dismiss. ECF No. 42. Although Plaintiff represented that the motion was opposed, Defendants did not file a response and the time to do so expired. The Court granted Plaintiff's motion. Order, ECF No. 63.

2    The District Judge referred this case for all pretrial purposes pursuant to 28 U.S.C. § 636. ECF Nos. 50, 61. Pursuant to 28 U.S.C. 636(b)(1)(B), a motion to dismiss is a dispositive motion appropriate for a Report and Recommendation. Plaintiffs' motion is not a dispositive motion and is appropriate for an Order.

### I.

### BACKGROUND

#### A. The Parties.

This case shares a common factual background with a settled securities fraud class action (the "Class Action")[3] and a shareholder derivative suit against Conn's,[4] which sells household appliances in retail stores across the country and also has a credit arm of its business, providing in-house credit options, third-party financing programs, and third-party rent-to-own payment plans to its customers. ECF No. 3 at ¶¶ 3, 30, 43. The MicroCapital Plaintiffs were previously class members in the Class Action but opted out of the Class Action settlement and filed the instant lawsuit. *See* Letter, *In re Conn's*, No. 14-CV-548 (S.D. Tex. Sept. 20, 2018), ECF No. 189.

3    *Compare* ECF No. 3 *with* Fourth Am. Compl., *In re Conn's, Inc. Sec. Litig.*, No. 14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104.

4    *See* Compl., *Hack v. Wright et al.*, No. 4:14-CV-3442 (S.D. Tex. Dec. 1, 2014), ECF No. 1.

Beginning in February 2014, Conn's made public announcements that its Fourth Quarter Fiscal Year ("FY") 2014 bad debts in its credit segment exceeded its previously issued FY 2014 guidance and it expected earnings per share dilution in the Fourth Quarter in 2014 and in 2015. ECF No. 3 at ¶¶ 181-82. Plaintiffs allege that Defendants engaged in

2019 WL 3451153

wrongdoing between April 3, 2013 and February 20, 2014 (the "Relevant Period"). *Id.* at ¶ 2. Plaintiffs purchased Conn's stock during the Relevant Period. *Id.* at ¶¶ 27-29. Plaintiffs bring this case against Conn's and three Individual Defendants who are former Conn's executives: Wright, Conn's Chief Executive Officer ("CEO"); Taylor, Conn's Chief Financial Officer ("CFO"); and Poppe, Conn's Chief Operating Officer ("COO"). *Id.* at ¶¶ 31, 33, 35. The complaint alleges they each held these positions during the Relevant Period and have since left Conn's. *Id.*

### B. Plaintiffs' Complaint.

**\*2** In their 103-page complaint, Plaintiffs allege that Conn's lowered its underwriting standards and offered credit to riskier customers—including those with zero credit scores and very little verification—as a strategy to generate revenue. *Id.* at ¶¶ 4, 42, 46, 49, 53-56, 58, 62, 161. Plaintiffs allege this led to financial problems including increases in delinquencies, of which the Defendants were aware. *Id.* at ¶¶ 66, 84, 132, 134. Plaintiffs allege that Defendants made false and misleading public statements (including press releases, annual and quarterly financial reports, statements during conference calls and conferences, and statements to analysts) that misrepresented the extent of the underwriting policy changes, overstated Conn's financial condition, and falsely attributed the financial problems to reasons other than the lower underwriting standards, thereby violating their fiduciary duties and federal securities laws. *Id.* at ¶¶ 88-130.

Plaintiffs also allege that the false and misleading information presented to the public artificially inflated Conn's stock prices during the Relevant Period. *Id.* at ¶¶ 117, 141, 214, 215. Plaintiffs allege that they paid artificially inflated prices for Conn's securities and suffered damages as a result. *Id.* at ¶¶ 27-29, 89, 243. Plaintiffs bring claims for (1) securities fraud in violation of section 10(b) of the Securities Exchange Act ("SEA") and Securities and Exchange Commission ("SEC") Rule 10b-5, (2) control person liability under section 20(a) of the SEA, (3) insider trading in violation of section 20A of the SEA, (4) Texas common law fraud, (5) Texas common law negligent misrepresentation, (6) Connecticut common law fraud, and (7) Connecticut common law negligent misrepresentation. *Id.* at ¶¶ 230-78.

### C. Defendants' Motion to Dismiss.

Defendants seek to dismiss each of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for the following reasons:

1. Plaintiffs' securities fraud claim because Plaintiffs failed to plead material misstatements or scienter with the particularity required by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b);

2. Plaintiffs' 20(a) control person liability claim because Plaintiffs failed to plead a viable underlying securities fraud claim;

3. Plaintiffs' 20A insider trading claim because Plaintiffs failed to plead an underlying securities fraud claim and their purchases were not "contemporaneous" with the Individual Defendants' stock sales; and

4. Plaintiffs' state law claims because they are duplicative.

ECF No. 39 at 7.

## II.

### LEGAL STANDARD UNDER RULE 12(b)(6)

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The complaint must include more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citations omitted). A complaint must "contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). A claim is plausible "when the pleaded factual contents allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to

be true 'raise a right to relief above the speculative level.' " *Culliver v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

**\*3** The ultimate question "is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff." *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F. Supp. 2d 581, 590 (S.D. Tex. 2012). "[I]n considering a motion to dismiss under Rule 12(b)(6), a complaint must be liberally construed in favor of the plaintiff and all well-pleaded facts taken as true." *Duke Energy Int'l*, 748 F. Supp. at 665. "[C]ourts are required to dismiss, pursuant to [Rule 12(b)(6)], claims based on invalid legal theories, even though they may be otherwise well-pleaded." *Farshchi v. Wells Fargo Bank, N.A.*, No. H-15-1692, 2016 WL 2858903, at \*2 (S.D. Tex. May 13, 2016) (citing *Flynn v. State Farm Fire and Cas. Ins. Co.*, 605 F. Supp. 2d 811, 820 (W.D. Tex. 2009)).

### III.

### SECURITIES FRAUD UNDER SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND SECURITIES AND EXCHANGE COMMISSION RULE 10b-5

**A. Legal Standard For Securities Fraud.**

Under section 10(b) of the SEA,

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate....

15 U.S.C. § 78j(b). "SEC Rule 10b-5, promulgated pursuant to section 10(b), implements section 10(b) by forbidding,

among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " *In re BP P.L.C. Sec. Litig.*, No. 4:12-CV-1256, 2013 WL 6383968, at \*47, 2013 U.S. Dist. LEXIS 171459, at \*47 (S.D. Tex. Dec. 5, 2013) (quoting 17 C.F.R. § 240.10b-5(b)) (Ellison, J.).

To state a claim under section 10(b), the plaintiff must allege:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation, i.e., a causal connection between the misrepresentation or omission and the loss. [5]

*Id*. at \*48 (citing *Lormand*, 565 F.3d at 238-39).

[5]   Defendants only allege that the first two elements are not adequately pleaded. ECF No. 39 at 7.

### 1. Material misrepresentations and omissions.

"Because Plaintiffs assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b)." *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012) (citations omitted) (Ellison, J.). Not only does Rule 9(b) require fraud to be pleaded with particularity, but the PSLRA enhances the requirements of Rule 9(b). To meet the pleading requirements of the PSLRA, a plaintiff must

> (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 407 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Id.* (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

**\*4** "To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material." *In re BP*, 2013 U.S. Dist. LEXIS 171459, at \*49. A misrepresentation or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). "Fraud based on an omission must sufficiently allege a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 457 (S.D. Tex. 2016) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011)) (internal quotation marks omitted).

### 2. Scienter.

"In the context of federal securities fraud, scienter is defined as an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *In re BP*, 843 F. Supp. 2d at 748 (citation and quotation marks omitted).

Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

*Id.* at 748-49 (citation omitted). "Section 10(b) and Rule 10b-5 do not protect investors against negligence or corporate mismanagement." *Id.* at 748 (citation omitted).

"[T]he court may not construe allegations contained in the Complaint against the defendants as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *In re BP*, 2013 U.S. Dist. LEXIS 171459, at \*52 (citation and quotation marks omitted). The court must look to the "state of mind of the individual corporate official or officials who make or issue the statement...." *Id.* at \*52 (citation and quotation marks omitted).

The Supreme Court "outlined a three step approach to reviewing scienter allegations in a motion to dismiss a federal securities fraud case pursuant to the PSLRA." *In re BP*, 843 F. Supp. 2d at 748 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

> First, the allegations must, as in federal pleadings generally, be taken as true. Second, courts may consider documents incorporated into the complaint by reference and matters subject to judicial notice. [6] The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pleaded. ... Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible."

*Id.* (citations omitted). "A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Carlton*, 184 F. Supp. 3d at 459 (quoting *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499). While the court may look to each individual allegation, the court must still "follow this initial step with a holistic look at all the scienter allegations." *Id.* (citation omitted).

6        Both parties attached to their briefing SEC filings, press releases, transcripts of earnings calls and

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 408 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

exhibits from those calls, stock prices, and other documents referred to in the complaint. On a motion to dismiss, courts may consider documents that are referred to in the complaint and central to the plaintiff's claims without converting the motion to a motion for summary judgment. *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384-85 (S.D. Tex. 2011) (citing *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)) (Ellison, J.), *aff'd*, 464 F. App'x 334 (5th Cir. 2012); *accord Carlton*, 184 F. Supp. 3d at 451-52 (considering SEC filings, 10-Q and 10-K forms, and earnings call transcripts attached to the motions to dismiss). In securities fraud cases, courts may also take judicial notice of documents that are filed with the SEC. *In re Franklin*, 782 F. Supp. 2d at 385; *see also In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979-80 (N.D. Cal. 2010) (taking judicial notice of transcripts of analyst conference calls and PowerPoint presentations to analysts); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (courts may take judicial notice of stock prices and documents of public record).

**\*5** "[T]he strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 551 (5th Cir. 2007) (citation omitted). "It does, however, permit the court to 'engage in some weighing of the allegations to determine whether the inferences toward scienter are strong or weak.' " *Id.* (citation omitted).

## B. Alleged Misrepresentations And Omissions.

Because the volume of allegedly actionable statements is so large, the Court will not examine each statement individually but will group them as follows for ease of analysis: (1) statements that were upheld in the Class Action, (2) statements that were struck in the Class Action, (3) statements regarding Conn's loosening of underwriting standards, (4) statements regarding the cause of the deterioration of Conn's credit portfolio, (5) statements allegedly protected by the PSLRA's safe harbor, and (6) Conn's financial statements. [7]

[7]    The complaint also identifies several statements by analysts. ECF No. 3 at ¶¶ 98, 118, 120, 128, 130. However, Plaintiffs do not appear to allege that these statements are actionable. *See* ECF No. 47-1. Therefore, the Court assumes they were only

included in the complaint for context. The District Judge dismissed the analyst statements from the Class Action. *See* Mot. Hr'g Tr. at 49:6-50:2, 74:2-25, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 14, 2015), ECF No. 102.

### 1. Statements upheld in the Class Action.

Plaintiffs challenge several statements that were upheld as actionable in the Class Action. *See* ECF No. 3 at ¶¶ 91, 92, 94, 104, 106, 107, 108, 112, 113, [8] 115, and 122; [9] Order, *In re Conn's, Inc.*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125 (Ellison, J.); Mot. Hr'g Tr. at 73:1-89:10, 111:14-123:6, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (upholding statements in paragraphs 66, 67, and 96 in the Class Action Fourth Amended Complaint); Mot. Hr'g Tr. at 3:25-29:20, 31:12-41:1, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118 (upholding statements in paragraphs 96, 97, 99, 100, and 111 in the Class Action Fourth Amended Complaint). For the same reasons the District Judge found these statements actionable (and supported by scienter) in the Class Action, the Court recommends the same statements be found actionable (and supported by scienter) here. Defendants' motion as to these statements should be denied. [10]

[8]    Only part of the statement in paragraph 113 was addressed and upheld in the Class Action ("[T]hey're still the same type of customers we've always gotten. We're still using the same underwriting tools and practices that we used before."). Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 34:17-40:3, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118; Fourth Am. Compl. at ¶ 100, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. Part of the statement in paragraph 113 ("The short answer is no. We don't believe that the increase in the percentage of sales that we're financing had anything to do with the issues that we faced in collections ... And so we expect we'll get a similar result. So, no, we don't believe that that's a factor.") was not challenged in the Class Action and should be upheld for reasons addressed *infra* at Section III.B.4. *See* ECF No. 3 at ¶ 113; ECF No. 57-1 at 21.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 409 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

9    Part of the statement in paragraph 122 ("...the Company made good progress in addressing the issues we experienced in the second quarter with our credit collection system.") was found actionable in the Class Action and the other part ("We are on track to meet our timetable of 4 to 5 months from our last conference call to fully address the effects of these issues on our portfolio. Delinquency should improve markedly over the next quarter.") was struck. Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 40:4-41:1, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118; Fourth Am. Compl. at ¶ 111, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104.

10    Part of the statement challenged in paragraph 90 ("In February we made refinements to our decision process that resulted in declining higher-risk accounts with credit scores above 525 and began underwriting applications with credit scores between 500 and 525.") is nearly identical to part of the statement challenged in paragraph 94, and should be upheld for the same reasons. *Compare* ECF No. 3 at ¶ 90 *with id.* at ¶ 94. Although Defendants argue they did not lower Conn's standard minimum FICO score and scores below 500 were accepted only in new stores temporarily, Plaintiffs alleged that Defendants did not disclose the full extent of how low FICO scores Conn's accepted in new stores. ECF No. 39 at 16; ECF No. 47 at 14; ECF No. 3 at ¶¶ 49, 53, 56, 58. To the extent Defendants argue that documents cited in the complaint disprove Plaintiffs' allegations, the Court cannot decide the ultimate falsity or truth of the statements on a motion to dismiss, only whether Plaintiffs pleaded specific facts that, if proved, could form the basis of a securities fraud claim. *Rubinstein v. Collins*, 20 F.3d 160, 173 (5th Cir. 1994).

**2. Statements struck in the Class Action.**

**\*6** Plaintiffs challenge several statements that were struck in the Class Action. *See* ECF No. 3 at ¶¶ 95, 96, 97, 102, 103, 122, 11 and 124-25; Order, *In re Conn's, Inc.*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g

Tr. at 89:11-92:12, 98:13-99:17, 102:14-19, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (striking statements in paragraphs 68, 69, 82, and 83 in the Class Action Fourth Amended Complaint); Mot. Hr'g Tr. at 40:4-41:1, 41:5-8, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118 (striking statements in paragraphs 111 and 113 in the Class Action Fourth Amended Complaint).

11    *See supra*, n.9.

In the Class Action, the plaintiffs relied almost exclusively on confidential witness ("CW") allegations and the District Judge found those allegations insufficient to support these statements as actionable and therefore dismissed them. Here, Plaintiffs corroborated the same CW allegations with references to Conn's internal documents. Nevertheless, Plaintiffs' substantive arguments as to why the statements are false are similar as in the Class Action and warrant the same disposition. *Compare* ECF No. 57-1 at 7, 8, 13, 14, 28, 30 *with* Mot. Hr'g Tr. at 89:11-92:12, 98:13-99:17, 102:14-19, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 *and Mot.* Hr'g Tr. at 40:4-41:1, 41:5-8, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118. Just because here there are more sources stating similar facts, that does not automatically transform those same statements that were held to be non-actionable into actionable ones. *See, e.g.*, *In re BP*, 2013 U.S. Dist. LEXIS 171459, at *76, 78-79, 82 (holding that alleged misstatements which were struck in related Class Action remained non-actionable in subsequent suit where nothing in the complaint "compel[led] a different conclusion"). Defendants' motion as to these statements should be granted. 12

12    In paragraphs 102 and 125, Plaintiffs appear to challenge longer sections of the statements here than in the Class Action. *Compare* ECF No. 3 at ¶¶ 102, 125 *with* Fourth Am. Compl. at ¶¶ 83, 113, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. Nevertheless, the rest of the statements seem to go along with the ones the District Judge already struck in the Class Action so should be struck as well.

**3. Plaintiffs challenge statements concerning Conn's credit underwriting standards.**

Plaintiffs challenge the following statements concerning Conn's loosening of credit underwriting standards and its

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 410 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

impact on delinquencies. The Court will discuss them seriatim.

- "And I would just emphasize again that that wasn't in place after February 1; and the information that we provided from February onward, it's not a factor at all." ECF No. 3 at ¶ 93 (Wright, Fourth Quarter FY 2013 Earnings Call on Apr. 3, 2013).

The Plaintiffs challenge the statement in paragraph 93 because the lower underwriting standards continued beyond February 1, 2013. ECF No. 57-1 at 4-5. Plaintiffs point to CW-4's allegations that "every customer was approved for credit during the initial four to five months that a new Conn's store was opened...." ECF No. 3 at ¶ 42(m). Plaintiffs allege that the lower underwriting standards began in the Christmas sales season, around November or December 2012, so four to five months later would be between February and May 2013. *Id.* at ¶¶ 42(j), 56, 134(a); ECF No. 47 at 11, 13. The District Judge found another similar statement actionable in the Class Action that Wright made during the same call that lower underwriting standards applied only "for a brief period of time," when in fact plaintiffs alleged these lasted for four to five months after new stores opened, crediting the CW allegations. *See* Mot. Hr'g Tr. at 73:1-80:19, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117. This statement should be upheld as actionable for the same reasons.

- **\*7** • "For certain credit applicants that may have past credit problems or lack ... credit history, we use ... stricter underwriting criteria. The additional requirements include verification of employment and recent work history, reference checks and minimum down payment levels." *Id.* at ¶ 99 (Conn's, 2013 Form 10-K filed on Apr. 5, 2013).

Plaintiffs allege the statement in paragraph 99 is false and misleading because Conn's did not use stricter underwriting criteria, and instead lowered underwriting standards and verification requirements, including for riskier customers. ECF No. 57-1 at 10. Plaintiffs failed to adequately plead that this statement is false. While underwriting standards may have been lowered across the board for all applicants and more so for new customers in new stores, that does not necessarily mean there were no verification requirements. While Plaintiffs allege there were "virtually" no checks on riskier new customers in new stores and that verification requirements were significantly *reduced*, ECF No. 3 at ¶¶ 42(l), 49, 53-55, 62, 64, 132(e)-(f), (i), the allegations do not quite go so far as to allege there were *no* additional

requirements for such customers in new stores. For example, Plaintiffs' own allegations indicate that Conn's apparently still required at least one reference and a down payment and did not require verification of phone numbers *if* the address was verified by Accurint or the customer's bureau in new stores. *Id.* at ¶¶ 62, 132(e); Pls.' Ex. 4 at 21, ECF No. 47-3. These new customers were not automatically approved through the auto approval algorithm. ECF No. 3 at ¶ 53. Furthermore, the District Judge already struck similar statements in the Class Action referring to "raising" or "tightening" or using "stricter" underwriting standards in part because they were too vague and non-specific to be actionable. [13]

- "[W]e implemented changes in our underwriting process during the quarter. These changes were based on analysis performed over the past year to identify credit attributes that would allow us to enhance our decision model to better identify quality credit customers." *Id.* at ¶ 100 (Poppe, First Quarter FY 2014 Earnings Call on June 6, 2013).

[13]   *See* Mot. Hr'g Tr. at 94:9-14, 102:20-111:13, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117.

Plaintiffs argue the statement in paragraph 100 is false because rather than "enhance" Conn's credit portfolio, Defendants weakened it by lowering underwriting standards and knew that lower underwriting criteria increased risk and delinquencies. ECF No. 57-1 at 12. However, the District Judge already struck a similar statement in the Class Action because the mere fact that Defendants lowered underwriting standards does not necessarily mean that they were not trying to enhance their credit operations. [14]  Likewise here, the lowering of underwriting standards is not necessarily inconsistent with having performed an analysis over the past year to identify attributes of quality credit customers.

- When asked about credit metrics and 30-day delinquencies in new stores, Wright responded it "[i]s still very early." *Id.* at ¶ 101 (Wright, First Quarter FY 2014 Earnings Call on June 6, 2013).

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 411 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

14    *See* Mot. Hr'g Tr. at 92:13-23, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (striking statement in paragraph 74 in the Class Action Fourth Amended Complaint that "[w]e are also focusing on improving the profit contribution of our credit operation by raising our underwriting standards.").

**\*8** Plaintiffs contend the statement in paragraph 101 is false because it was not too early to determine the negative impact of the loosened underwriting standards, and Defendants already knew from trend data that looser underwriting standards were causing increased delinquencies. ECF No. 57-1 at 12-13. Defendants contend Plaintiffs fail to plead with particularity how this statement is false or misleading, particularly because Conn's acknowledged in the same call that it continued to open new stores on a rolling basis. ECF No. 55-1 at 20. The Court agrees with Defendants and also holds that the statement is too vague without more context to be actionable. 15 Defendants' motion should be denied as to the statement in paragraph 93 and granted as to the statements in paragraphs 99-101 in the complaint.

15    Neither party attached the June 6, 2013 earnings call transcript. *See, e.g.*, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 285 (3d Cir. 2010) (on a motion to dismiss securities fraud action, the parties' failure to attach analyst call transcripts "precludes our full consideration of the context in which the statements were made").

**4. Plaintiffs challenge statements concerning the causes of financial problems in Conn's credit segment.**

Plaintiffs challenge statements Wright and Poppe made during Conn's Second Quarter FY 2014 Earnings Call on September 5, 2013, and Wright made during Conn's Third Quarter FY 2014 Earnings Call on December 5, 2013, for falsely attributing the deterioration of Conn's credit portfolio to problems other than its underwriting policies (such as to collections issues and flawed implementation of the new electronic Latitude system) and for falsely claiming Conn's corrected those short-term issues (i.e. the systems issues). ECF No. 3 at ¶¶ 111, 113, 114, 116, 126-27. Plaintiffs contend these statements falsely concealed the true cause of the rising delinquencies—the lower underwriting standards. ECF No. 57-1 at 20-22 (citing ECF No. 3 at ¶¶ 42(d), 61-79, 134, 136-37, 193). Plaintiffs allege Defendants did not

correct the problems that were actually causing the increase in delinquencies—credit underwriting—which would have a longer-term impact on delinquencies than a one-time systems issue. *Id*. at 23 (citing ECF No. 3 at ¶¶ 4, 10, 12, 42, 61, 66-70, 74, 76-77, 87, 134, 159-61).

Defendants contend that Plaintiffs failed to plead with particularity facts that show these statements are false. ECF No. 55-1 at 34, 37, 39-40, 42, 52. Defendants contend that Plaintiffs failed to show that software issues had *no* impact on delinquency, and that some of the documents Plaintiffs rely on in the complaint show that Defendants were trying to investigate the cause of rising delinquencies and there was in fact a systems issue that at least to some extent contributed to collections issues because many customers' phone numbers were lost. *Id*.

These statements should be upheld as actionable. Even if these statements are true in part to the extent that the software issues had *some* impact on rising delinquencies, Plaintiffs alleged facts that the lower underwriting standards were the primary or at least a significant cause of rising delinquencies. 16 ECF No. 3 at ¶¶ 8, 10, 42(d), (k), 66, 68, 69(d). Plaintiffs also pleaded facts that this was evident before the misstatements were made. *Id*. at ¶¶ 10, 42(i), (r), 68, 69(d), 70, 72. In addition, the cause of the rise in delinquencies is plausibly material because an investor would have considered that this altered the basic mix of information, including whether the problem was reasonably resolved and would have a shorter or longer-term impact on Conn's financial performance. Thus, the statements could have misled investors to the extent that Conn's failed to disclose the full picture and the primary cause of rising delinquencies that was not in fact remedied. *See, e.g.*, *Wieland v. Stone Energy Corp.*, No. 05-2088, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007) (denying motion to dismiss because even though "the market knew of the general problems regarding the company's proved reserve estimates, there are factual issues concerning whether the full extent and effect of those problems was known at that time."). Furthermore, the District Judge upheld similar statements as actionable in the Class Action, so these should be upheld for the same reasons. 17 Defendants' motion should be denied as to statements in paragraphs 111, 113, 114, 116, 126-27 in the complaint.

16    Defendants also contend the statement in paragraph 113 is not actionable because it is forward-looking.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 412 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

ECF No. 55-1 at 37-38. While part of the statement ("And so we expect we'll get a similar result.") is forward-looking, it should be actionable because the statements immediately before and after it are actionable. *See supra*, section III.B.1. To the extent Plaintiffs pleaded that those statements are misleading, the future expectations based thereon are likewise misleading. This statement also lacks meaningful cautionary language. The only cautionary language was given at the beginning of the call, but this constitutes boilerplate language that is not meaningful. *See infra* n.20, Defs.' Ex. 21 at 2, 13, ECF No. 39-16; *Carlton*, 184 F. Supp. 3d at 454.

17   *See* Order, *In re Conn's, Inc., Sec. Litig.*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 111:14-123:6, *In re Conn's, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016)*, ECF No. 117 (upholding statements in paragraph 96 in the Class Action Fourth Amended Complaint); Mot. Hr'g Tr. at 3:25-29:20, 31:12-34:16, 40:4-41:1, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118 (upholding statements in paragraphs 97, 99, and 111 in the Class Action Fourth Amended Complaint).

**5. Defendants contend certain statements challenged by Plaintiffs are protected by the PSLR's safe harbor.**

*a. Applicable legal standard for PSLRA's safe harbor.*

**\*9**  "With regard to misstatements, the PSLRA establishes a 'safe harbor' protecting a forward-looking statement from liability where such a statement is made by a natural person, unless plaintiffs prove that it was made with actual knowledge that the statement was false and misleading." *In re BP*, 843 F. Supp. 2d at 747 (citing 15 U.S.C. § 78u-5(c)(1)(A)). A statement is forward-looking if it is:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); [or]

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer[.]

*Id.* (quoting 15 U.S.C. § 78u-5(i)(1)(A)). A defendant "shall not be liable with respect to any forward-looking statement, whether written or oral, if":

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading[.]

*Carlton*, 184 F. Supp. 3d at 452-53 (quoting 15 U.S.C. § 78u-5(c)(1)). Under Fifth Circuit precedent, the safe harbor provision has independent prongs. *Id.* at 453 (citation omitted).

Vague, optimistic statements are not actionable. Allegations that amount to little more than corporate "cheerleading" are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 413 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

sophisticated to rely on vague expressions of optimism rather than specific facts.

*In re BP*, 843 F. Supp. 2d at 748 (citation omitted).

### b. Analysis.

Defendants contend the following statements are forward-looking:

- "[T]he amount of the loss for an individual loan, yes, would increase with larger balances. But that doesn't necessarily mean that the rate would increase. ... And we don't think the loss rate for portfolio should be materially different with a slightly larger average balance size. ... But we don't believe that the modest increase in average loan size is going to significantly affect the portfolio loss rates." ECF No. 3 at ¶ 109 (Wright, Second Quarter FY 2014 Earnings Call on Sept. 5, 2013).

- **\*10** • "Results so far indicate that performance of current-year originations is within expectations." *Id.* at ¶ 110 (Poppe, Second Quarter FY 2014 Earnings Call on Sept. 5, 2013).

Plaintiffs contend the safe harbor does not apply because even forward-looking statements are actionable if made with knowledge of their falsity. ECF No. 3 at ¶¶ 227, 229. Regarding the statement in paragraph 109, Plaintiffs contend it is false because Wright "created the false impression that increase in the average customer balance was not materially impacting Conn's credit portfolio losses...." ECF No. 57-1 at 18. However, Wright compared different types of metrics and Plaintiffs do not appear to challenge the accuracy of the underlying numbers. Plaintiffs have not sufficiently pleaded that this statement was false when made or that Wright knew this to be false.

Regarding the statement in paragraph 110, Plaintiffs contend it is misleading because "Defendants did not disclose that Conn's had increased originations by lowering acceptable FICO scores and reducing other underwriting criteria...." and "Defendants knew (but did not disclose) that performance of current loan originations had been and was expected to be poor...." *Id.* at 19-20. However, what might fall "within expectations" is too vague to be actionable. *See, e.g., In re*

*BP*, 843 F. Supp. 2d at 774-75 (dismissing statements as too vague to be actionable). Plaintiffs point to no contrary information or report about what Conn's specific expectations were. Plaintiffs also argue that, to the extent Defendants' statements concern then-present and historical conditions, they are not protected by the safe harbor. ECF No. 47 at 20-21. The Court agrees that this statement is not forward-looking; however, Plaintiffs must still plead why the statement is false and failed to do so.

Defendants contend the following statements are opinions or mere puffery:

- "[T]he standard credit score is not a reliable predictor of credit performance at lower scores given our installment lending structure to purchase home necessities." ECF No. 3 at ¶ 90 (Poppe, Fourth Quarter FY 2013 Earnings Call on Apr. 3, 2013).

- "It is important to note that standard credit scores are not reliable predictors of customer performance at lower scores." *Id.* at ¶ 100 (Poppe, First Quarter FY 2014 Earnings Call on June 6, 2013).

- Wright told Plaintiffs that Conn's problems related to "semi-retarded investors." *Id.* at ¶ 119 (Wright, Sept. 20, 2013 e-mail to Plaintiffs' Representative).

- Wright denied an investor's comments that Conn's was growing at a reckless speed. *Id.* at ¶ 121 (Wright, Dec. 3, 2013 e-mail to Plaintiffs' Representative).

- "Many years of experience underwriting a single type of credit for our core customer limited variation in underwriting practices over time, and experience collecting this specific type of credit, allows us to deliver consistent performance." *Id.* at ¶ 123 (Poppe, Third Quarter FY 2014 Earnings Call on Dec. 5, 2013).

The Court agrees that these statements are opinions and therefore not actionable. The statement in paragraph 123, additionally, is optimistic puffery. "[I]t is well established that generalized positive statements about a company's progress are not a basis for liability." *Carlton*, 184 F. Supp. 3d at 493 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 419 (5th Cir. 2001)) (statements that "we are seeing significant operational progress ... and we believe that we are turning the corner toward steady-state operations" are vague assertions of corporate optimism); *see also In re BP*, 843 F. Supp. 2d at 775 ("'[G]eneralized positive statements about the company's competitive strengths, experienced management, and future

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 414 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

prospects' are immaterial.") (citation omitted). Regarding the statements in paragraphs 90 and 100, the District Judge struck a similar statement in the Class Action. [18] Defendants' motion should be granted as to the statements in paragraphs 90, 100, 109, 110, 119, 121, and 123 in the complaint.

[18]  *See* Mot. Hr'g Tr. at 56:11-57:6, 91:9-92:12, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (striking paragraph 69 in the Class Action Fourth Amended Complaint).

### 6. Plaintiffs challenge Conn's financial statements.

**\*11**  Plaintiffs allege that Conn's Fourth Quarter FY 2013, FY 2013, First Quarter FY 2014, Second Quarter FY 2014, and Third Quarter FY 2014 financial reports in Conn's press releases, annual 10-K form, and quarterly 10-Q forms dated April 3, 2013, April 5, 2013, June 6, 2013, September 5, 2013, and December 6, 2013 are false. ECF No. 3 at ¶¶ 143-52. Plaintiffs further allege that Wright's and Taylor's Sarbanes-Oxley ("SOX") certifications were false when made on the above-referenced annual 10-K and quarterly 10-Q forms filed with the SEC. [19] *Id*. at ¶ 174.

[19]  "Under the Sarbanes-Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724 (W.D. Tex. 2010) (citing 15 U.S.C. § 7241(a)).

Plaintiffs allege that Conn's understated and failed to properly account for doubtful accounts and provision for bad debt, which caused Conn's assets (or accounts receivable ("A/R")) and earnings per share ("EPS") to be overstated. *Id*. at ¶ 141. Plaintiffs allege the failure to properly establish a reserve for uncollectible accounts violated Generally Accepted Accounting Principles ("GAAP") and SEC accounting rules, which require Defendants to provide "reserves" for all receivables where uncollectability is "probable" and can be estimated. *Id*. at ¶¶ 141, 153, 157, 168. Plaintiffs allege that Defendants failed to follow GAAP accounting practices because even though delinquencies and the 60+ days past due balances were rising, Conn's allowance for doubtful accounts as a percentage of its receivables 60+ days past due was decreasing. *Id*. at ¶¶ 157(d), 159-67. Plaintiffs make numerous circumstantial allegations that Defendants extended credit to riskier customers, delinquencies were rising, lower underwriting standards caused the rise in

delinquencies, and therefore the financial reports must have been inaccurate. *Id*. at ¶¶ 8, 10, 42, 50, 53, 54, 58, 62-69, 77, 85, 86, 157-63.

Defendants contend the financial statements and SOX certifications are not actionable because: (1) Plaintiffs failed to plead with particularity any facts showing the statements are false, (2) Plaintiffs failed to plead particularized facts showing how Conn's miscalculated debt reserves or otherwise violated GAAP, (3) Conn's to date has not been required to restate its financials, (4) none of the CW allegations or internal documents cited in the complaint discuss Conn's financial statements or suggest bad debt reserves were understated, and (5) Plaintiffs failed to plead scienter. [20] ECF No. 55-1 at 13, 16-18, 24-26, 43-46, 53-55.

[20]  Defendants also contend that some of these are forward-looking and protected under the PSLRA's safe harbor. ECF No. 39 at 21 n.9. However, Plaintiffs cite several cases indicating that financial statements such as 10-K and 10-Q forms filed with the SEC are not subject to the safe harbor. ECF No. 47 at 20 n.18 (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 767-68 (2d Cir. 2010); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1007 (N.D. Cal. 2008); *Baker v. MBNA Corp.*, No. 05-272, 2007 WL 2009673, at *5 (D. Del. July 6, 2007); *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1171 (N.D. Ill. 2004)).

While Plaintiffs are permitted to rely on circumstantial allegations as they do here, these allegations fall short of pleading that the financial statements are actionable. Plaintiffs primarily draw their allegations from a letter the SEC sent to Defendants, requesting more information about why the percentage of bad debt allowance to account balances 60+ days past due decreased when the account balance of 60+ days past due was increasing. ECF No. 3 at ¶¶ 163-65. However, from the face of the complaint, the Court cannot infer that this metric is necessarily false or materially so, nor whether this is even the most pertinent metric. While Plaintiffs need not go so far as to allege a specific amount for how much the allowance for doubtful accounts or bad debt provision should have been increased, Plaintiffs have not alleged even an estimate of how far off these numbers were to indicate whether the understatement was material. [21] Furthermore, the fact that the SEC requested more information or initiated an investigation

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 415 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

does not necessarily mean that the financial reports were fraudulently false or even false at all. [22] Although the SEC filed a complaint against Conn's and Poppe and they entered consent judgments, the Defendants expressed they were not admitting any of the allegations in the complaint. ECF Nos. 62-1, 62-3 at 2, 62-4 at 2. [23]

[21] *See, e.g.,* *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 536 (5th Cir. 2008) (reversing denial of motion to dismiss where plaintiffs "make no attempt to estimate by how much the earnings were inflated").

[22] In their opposition brief, Plaintiffs allege that in Conn's FY 2013 10-K form, Conn's conceded that, pending the outcome of the SEC investigation, there may be "a potential restatement of our financial statements." ECF No. 47 at 24 n.25; Pls.' Ex. 19 at 24, ECF No. 44-2. However, this was not in the complaint and this potential may never materialize. Even so, the fact of a restatement does not mean the original form was fraudulent.

[23] Plaintiffs filed a request for the Court to take judicial notice of the SEC's complaint against Conn's and Poppe and the consent judgments entered in that case. ECF No. 62. The Court reviewed those documents and takes judicial notice of the information contained in them. The Court granted Plaintiff's motion. Order, ECF No. 64. However, the SEC's complaint specifies that it is pleading a claim based on negligence and that the SEC need not prove scienter. ECF No. 62-1 at 6, 11. Thus, there is nothing that shows the Defendants were actually aware of the falsity of the financial reports at the time.

**\*12** In addition to the SEC investigation, Plaintiffs rely on the following post-Relevant Period allegations to show the financial reports were false when made:

- In Conn's financial reports for FY 2015, Conn's significantly increased its allowance for doubtful accounts and bad debt provision. ECF No. 3 at ¶¶ 169, 187.

- In FY 2015 conference calls, Wright stated that over the prior year, (1) Conn's tightened underwriting standards and discontinued certain marketing messages to new customers, (2) growth in the portfolio and originations

to new customers caused the Relevant Period's increase in delinquencies, and (3) provision for loan losses were adjusted to account for increases in delinquencies. *Id.* at ¶¶ 170, 189-91.

- After the Relevant Period, Conn's established a Credit Risk and Compliance Committee and initiated a search for a Chief Risk Officer to deal with credit issues. *Id.* at ¶¶ 172, 179.

- In March 2014, Conn's staff sent an e-mail to Poppe stating that Conn's credit manual was outdated and had not been updated in over a year. ECF No. 3 at ¶ 177; Pls.' Ex. 18 at 37-38, ECF No. 47-4. Plaintiffs claim this shows Conn's lacked internal controls. ECF No. 3 at ¶ 177.

However, none of these later statements suggest that the financial statements made during the Relevant Period were false or misleading. This amounts to pleading "fraud by hindsight" which is not an actionable claim. [24] *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005); *see also* *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431-33 (5th Cir. 2002) (where "plaintiffs have not pointed to any particular reports or information ... that are contrary to the restatements[,]" allegations that senior executive defendants received "unidentified daily, weekly, and monthly financial reports that apprised them of the company's true financial status" were insufficient to show scienter and that financial statements were false); *Stockman v. Flotek Indus., Inc.*, No. H-09-2526, 2010 WL 3785586, at \*15 (S.D. Tex. Sept. 29, 2010) (earnings guidance was not actionable where plaintiffs failed to point to any specific internal projections that contradict it).

[24] "The Fifth Circuit defines 'fraud by hindsight' as a 'case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly' or 'a case where there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later.'" *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 741 (N.D. Tex. 2018) (quoting *Lormand*, 565 F.3d at 248-49); *see also* *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1249 (10th Cir. 2016) (announcement of forward loss made more than two months after alleged misstatement did not contribute to inference of

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 416 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

scienter because it did not allege that defendant was aware the alleged misstatement was false when made two months earlier, and at most "suggest[s] an honest mistake in predicting [defendant's] future production and costs"); *Southland Sec. v. INSpire Ins. Sols.*, 365 F.3d 353, 383 (5th Cir. 2004) (because fraud cannot be proved by hindsight, subsequent decline, lawsuits, or resignations are not persuasive of scienter because they "do not show what any particular individual knew, or was severely reckless in not knowing, at the time" of the alleged misstatements).

**\*13** Plaintiffs cite *In re Triton* for the proposition that "[t]o withstand a motion to dismiss, it is enough that plaintiffs alleged a violation of accounting standards and stated such violation resulted in material misstatement." ECF No. 47 at 22 n.22 (quoting *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at \*23 (E.D. Tex. Mar. 30, 2011)). However, Plaintiffs must still satisfy the heightened pleading standards under the PSLRA and cannot withstand a motion to dismiss with conclusory allegations. [25]

[25] In addition, some of the challenged statements are press releases with no individual speaker identified, other than the corporation. ECF No. 3 at ¶¶ 143, 146, 148, 149, 151; *see, e.g., Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005) (affirming grant of motion to dismiss section 10(b) claim as to press releases for which plaintiffs failed to identify a speaker), *opinion modified on denial of reh'g*, 409 F.3d 653 (5th Cir. 2005) (same). The Court construes the 10-K and 10-Q forms as being attributed to Wright and Taylor because they signed the forms. *See, e.g., In re BP*, 843 F. Supp. 2d at 749 ("[C]orporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears....") (citing *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006)).

Plaintiffs cite other cases in which courts denied motions to dismiss involving allegations of accounting fraud—including allegations that loan loss reserves were understated—but these are distinguishable because those plaintiffs alleged facts with greater particularity. [26] Thus, Defendants' motion should be granted as to the statements in paragraphs 143-52 in the complaint. *See Southland*, 365 F.3d at 383 (granting motion to dismiss allegations of inflated revenues and failure

to record losses for uncollectible receivables); *In re Alamosa*, 382 F. Supp. 2d at 852-55 (granting motion to dismiss allegations that defendants did not make sufficient allowances for uncollectible accounts). [27]

[26] Plaintiff cited the following cases, which are distinguishable. *See Barrie*, 397 F.3d at 257, 264 (denying motion to dismiss in part where allegations of accounting fraud and GAAP violations were supported by sworn expert analysis and CW allegations by witness who was directed by defendant to investigate accounting practices and submitted an accounting to defendants which defendants ignored); *Parmelee v. Santander Consumer USA Holdings, Inc.*, No. 3:16-CV-782, 2018 WL 276338, at \*4-6 (N.D. Tex. Jan. 3, 2018) (denying motion to dismiss where company's financial restatements gave rise to strong inference of scienter); *In re ArthroCare*, 726 F. Supp. 2d at 721-22 (same); *In re Netbank, Inc., Sec. Litig.*, No. 1:07-CV-2298, 2009 WL 2432359, at \*7 (N.D. Ga. Jan. 29, 2009) (denying motion to dismiss where defendants' own internal analysis showed it needed to increase loan loss reserves). Plaintiff also cited a case that was decided before the PSLRA was passed to heighten pleading standards for securities fraud and is outdated. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir. 1993) (denying motion to dismiss where plaintiffs alleged defendants understated loan loss reserves by at least $350 million), *superseded by statute as stated in Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063-64 (9th Cir. 2000).

[27] *See also, e.g., Shaw Grp.*, 537 F.3d at 535-36 (reversing denial of motion to dismiss where complaint lacked facts common in "most securities fraud cases, which are precipitated when the company announces such revelations as a restatement in earnings due to accounting mistakes.... [and] there was no mea culpa from the company in the form of acknowledge wrongdoing or restated financial reports, ... nor any publicly expressed reservations by the auditors....").

**C. Scienter.**

**1. Wright.**

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

**\*14** The Court recommended that 12 statements Wright made remain as actionable. *See supra*, section III.B. The Court must still determine whether Plaintiffs adequately pleaded scienter for those statements and holds that they have. The Court relies on the District Judge's ruling on defendants' motion to dismiss in the Class Action. *See* Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125. Although the District Judge did not explicitly explain his holding regarding scienter allegations, by partially denying the defendants' motion to dismiss, the District Judge implicitly found the Fourth Amended Complaint adequately pleaded scienter as to Wright, at least for the statements that were found actionable, many of which are challenged here or are similar. *Id*. In the Class Action, the plaintiffs' scienter allegations for the Individual Defendants consisted of CW allegations, post-Relevant Period statements, allegations of insider trading, and allegations regarding Defendants' positions and motive. *See* Fourth Am. Compl., *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. Here, Plaintiffs rely on the same allegations in addition to Conn's internal documents, the SEC investigation, Wright's departure from Conn's, and his SOX certifications. ECF No. 3. While the Court must ultimately consider the scienter allegations collectively, the Court addresses each separately first for ease of discussion.

### a. Confidential witness allegations.

Plaintiffs rely on the following CW allegations to plead scienter as to Wright (and Poppe): [28]

- CW-1, a former Conn's Senior Manager of Collections Strategy, allegedly sent daily reports to both Wright and Poppe containing detailed analytics and metrics, including first payment defaults ("FPDs") and delinquencies. *Id*. at ¶¶ 42(b), 70.

- CW-2, a former Conn's Credit Manager, alleged that Wright and Poppe were aware that relaxed underwriting standards adversely impacted the business because they were hands-on in the credit department, came into the credit department three to four times per week, and had face-to-face meetings with credit managers. *Id*. at ¶¶ 42(i), 71. CW-2 allegedly reported these credit issues directly to executives including Wright and Poppe. *Id*. at ¶ 42(i).

- CW-3, a former Conn's credit underwriter, alleged Conn's lowered underwriting standards including by modifying

its auto approval algorithm to automatically approve customers it previously would not have approved. *Id*. at ¶ 56. Plaintiffs also allege that, according to internal documents, algorithm modifications needed to be approved by the CEO (Wright) and COO (Poppe). *Id.;* Pls.' Ex. 2 at 11, ECF No. 47-3.

- CW-4, a former Conn's District Manager, allegedly attended quarterly meetings with Wright at which the amount of credit approved and utilized during store openings was discussed. ECF No. 3 at ¶ 71.

- CW-5, the former Conn's Vice President of Credit, alleged Conn's was a relatively "flat" organization, so management was frequently involved in day-to-day issues like collections. *Id*. CW-5 allegedly met with Conn's executives daily to discuss the status of collections and delinquencies. *Id*.[29]

[28]

Defendants contend that all of Plaintiffs' CW allegations should be struck because Plaintiffs copied those allegations from the Class Action Fourth Amended Complaint and did not independently verify them. ECF No. 39 at 14-15. Defendants allege this violated Plaintiffs' counsel's Rule 11 duties. *Id*. Plaintiffs respond that the CW allegations should be upheld because the District Judge already upheld them in the Class Action, and they cite authorities indicating that copying allegations from other complaints is not impermissible, particularly when, as here, they are supported by other materials personally investigated by the plaintiff. ECF No. 47 at 29-31. Other than one Supreme Court case discussing Rule 11 generally, the parties do not cite any applicable authority from the Fifth Circuit or its district courts. Nevertheless, Defendants' concerns are mitigated because (1) the District Judge already upheld the same CW allegations in the Class Action, (2) the MicroCapital Plaintiffs were previously plaintiffs in the Class Action and the CW allegations were already alleged on their behalf there before they opted out and filed their own lawsuit, and (3) Plaintiffs certified that their complaint is based on various sources including internal Conn's documents and depositions of Conn's current and/or former employees. ECF No. 3 at ¶ 1. Indeed, the complaint references in great detail other sources which corroborate

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 418 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

the CW allegations. "Rule 11 seems to allow incorporation of allegations from other complaints if they are combined with material the plaintiff has investigated personally that lend credence to the borrowed allegations." *Homeward Residential, Inc. v. Sand Canyon Corp.,* 298 F.R.D. 116, 126 (S.D.N.Y. 2014); *cf. Main State Ret. Sys. v. Countrywide Fin. Corp.,* No. 2:10-CV-302, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) (granting motion to strike allegations lifted from other complaints where plaintiffs' counsel did not claim to have taken any measures to independently investigate the bases for those allegations); *In re Connetics,* 542 F. Supp. 2d at 1005-06 (granting motion to strike paragraphs copied from SEC complaint where plaintiffs "make no effort to inform the Court what other sources of information besides the SEC complaint and press release they relied on in formulating their specific claims against defendants."). The CW allegations should not be struck.

[29]   Plaintiffs also point to statements that Conn's Vice President of Credit Strategy made about Conn's bad lending practices and deteriorating credit portfolio. ECF No. 3 at ¶¶ 10, 51, 61, 69(b), 77, 82, 134(b); Pls.' Ex. 14 at 20, ECF No. 47-4. However, his statements do not necessarily show scienter or the Individual Defendants' knowledge.

**\*15**  "Confidential source statements are a permissible basis on which to make an inference of scienter." [30]  *Carlton,* 184 F. Supp. 3d at 460 (quoting *Cent. Laborers' Pension Fund,* 497 F.3d at 552). However, even when confidential source statements are adequately pleaded, the Fifth Circuit requires district courts to give less weight to and " 'discount allegations from confidential sources' because they 'afford no basis for drawing plausible competing inferences.' " *Id.* (quoting *Shaw Grp.,* 537 F.3d at 535).

[30]   Though a plaintiff does not have to state the names of the CWs, there must be sufficient particularized details "to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements" such as "(1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the

information supporting an inference of scienter, such as when a relevant comment was made to the confidential source." *Carlton,* 184 F. Supp. 3d at 460 (citations omitted).

Standing alone, the CW allegations fall short of raising a strong inference of scienter because some courts have found similar CW allegations that defendants received unspecified reports or attended frequent meetings through which they learned information contrary to their alleged misstatements insufficient. [31]  However, while Plaintiffs do not describe in detail the content of each daily report given to Wright or the matters discussed in each meeting he attended, when considered holistically with other allegations in the complaint —and because the District Judge implicitly credited the CW allegations in the Class Action— there is enough context to infer that the reports and other information shared with Wright showed delinquencies were rising because of lower underwriting standards. Therefore, when considered holistically, the CW allegations contribute to a strong inference of scienter against Wright. [32]

[31]   *See, e.g., Neiman v. Bulmahn,* 854 F.3d 741, 748 (5th Cir. 2017) (for allegations concerning internal reports to support a strong inference of scienter, there must be "corroborating details regarding the contents of allegedly contrary reports, their authors and recipients" and that defendant actually read them) (citations omitted); *Southland,* 365 F.3d at 370 ("An unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss."); *In re ArthroCare,* 726 F. Supp. 2d at 719 (CW allegations, alone, did not raise a strong inference of scienter where "[t]here is hardly a single instance in which one of the CWs alleges they had a conversation with or overhead a comment by either [defendant] and also states when and where the conversation occurred. Many of the CWs simply state their own conclusions about what occurred ... For instance, CW 10 states that [defendant] attended 'weekly staff meetings every Tuesday or Wednesday that were attended by all the top executives and lasted for about 90 minutes,' and solely on this basis concludes that all the executives in the meetings 'knew what was going on'....").

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 419 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

32   *See, e.g., Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736, 2015 WL 5766870, at *6 (E.D. Tex. Sept. 29, 2015) (allegations that defendants were aware of facts undermining their statements because inventory purchases were the subject of monthly meetings and regular review by defendants, in combination with other allegations, contributed to a strong inference of scienter); *Brody v. Zix Corp.*, No. 3:04-CV-1931, 2006 WL 2739352, at *7, 2006 U.S. Dist. LEXIS 69302, at *20 (N.D. Tex. Sept. 26, 2006) (CW allegations that defendants regularly received tracking reports which would have alerted them to the fact that their statements were materially misleading contributed to a strong inference of scienter); *In re Fleming Co. Inc. Sec. & Deriv. Litig.*, No. CIVA503MD1530, 2004 WL 5278716, at *28-34 (E.D. Tex. June 16, 2004) (CW allegations that defendants received weekly reports and attended weekly meetings concerning data on financial performance contributed to a strong inference of scienter).

### b. Post-Relevant Period statements.

**\*16** Plaintiffs allege post-Relevant Period statements Wright made demonstrate his knowledge during the Relevant Period. ECF No. 3 at ¶¶ 17, 52, 72, 54-55, 189, 194-95. For example, Plaintiffs allege that Wright admitted in a September 22, 2014 investor and analyst meeting that "when we opened the first four stores we opened back in 2013, we did [reduce credit quality] ... a little bit and it took us about three months to figure out that was a really bad idea." *Id.* at ¶ 72. Wright also testified he recalled that in late 2012, Conn's reduced verification and down payment requirements for customers in new stores. *Id.* at ¶ 54-55. These contribute to an inference of scienter that by about March or April 2013, Wright knew that Conn's lowered underwriting standards and delinquencies were rising because of lower underwriting. *See, e.g., Lormand*, 565 F.3d at 254 (post-Relevant Period admissions regarding defendants' own state of mind at the time of their misrepresentations raise a strong inference of scienter).

### c. Insider trading.

Plaintiffs also allege Wright sold stock based on his inside information about the deterioration of the credit portfolio, which allowed him to benefit from artificially inflated stock prices. ECF No. 3 at ¶¶ 11, 212-13. Plaintiffs allege Wright sold 15,000 shares each on June 20, 2013 and December 17, 2013 for the first time since 2007, gaining proceeds of $1,932,450. *Id.* at ¶ 213. Plaintiffs allege the timing is suspicious because in June, "Defendants were setting expectations regarding the quality of Conn's credit[.]" *Id.* at ¶ 213. As for the December trade, it was purportedly suspicious because it was made (1) less than two weeks after Wright denied Conn's was reckless in its growth, (2) immediately after he assured investors that Conn's credit problems were due to systems issues, (3) on the heels of his false statements, and (4) eight weeks before the stock would fall due to news of greater delinquency rates. *Id.* at ¶ 213.

"Insider trading alone cannot create a strong inference of scienter, but it may meaningfully enhance the strength of the inference of scienter." *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharm., Inc.*, No. H-06-3022, 2007 WL 2720074, at *5 (S.D. Tex. Sept. 18, 2007). "Because corporate executives are often paid in stock and stock options, they will naturally trade those securities in the normal course of events, and courts will not infer fraudulent intent from the mere fact that some officers sold stock." *Carlton*, 184 F. Supp. 3d at 480 (quoting *Shaw Grp.*, 537 F.3d at 543) (internal quotation marks omitted). Insider trading allegations may enhance the inference of scienter when the trades occur in suspicious amounts, at suspicious times calculated to maximize personal profit, or are out of line with prior trading practices. *Id.* (citations omitted). On the other hand, when a defendant regularly sells stock, does not sell stock immediately following an alleged material misstatement, or sells stock but the price continues to climb, these circumstances do not strengthen the inference of scienter. *Id.* at 481; *In re TETRA Tech., Inc. Sec. Litig.*, No. 4:08-CV-965, 2009 WL 6325540, at *7 (S.D. Tex. July 9, 2009), *clarified*, 2009 WL 6326865 (S.D. Tex. Aug. 10, 2009) (Ellison, J.).

As to timing, while Plaintiffs allege Wright sold stock during the Relevant Period and generally after making false and misleading statements, Wright does not appear to have sold stock immediately after the alleged misstatements to take advantage of a spike in stock prices, nor have Plaintiffs alleged that Wright sold stock at a time when the stock price peaked. To the contrary, Defendants assert that Wright's sales were made when Conn's stock was not at its highest price and well before the February 2014 alleged corrective disclosures. ECF No. 39 at 28; *see, e.g., Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (stock sales did not raise an inference

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 420 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

of scienter because they were made when stock prices were below the alleged Class Period high); *Stockman,* 2010 WL 3785586, at *28 (same).

 **\*17** Furthermore, while the cash value of the stock proceeds seems high and Plaintiffs contend Wright had not sold stock since 2007, Defendants contend that Wright's stock sales represented a small percentage of his total shares. ECF No. 39 at 27. Each sale constituted 9.55% and 7.49% of his total shares. *Id.* Courts have held that such small percentages do not raise a strong inference of scienter. *See In re TETRA,* 2009 WL 6325540, at *7 ("If the defendants sell only a small percentage of their stock during the class period, the sales do not contribute to an inference of scienter."); *Oppenheim,* 2007 WL 2720074, at *5 (where defendants sold 17.59% and 13.79% of their total shares, sales did not contribute to a strong inference of scienter). These allegations contribute only slightly to an inference of scienter against Wright due to his trading history.

### d. Position and motive.

Plaintiffs allege that Wright and each of the Individual Defendants had knowledge given their positions in the company, their experience and background including in accounting, their focus on credit operations as part of their job duties, and their day-to-day involvement in the operations of the company. ECF No. 3 at ¶¶ 38-41, 200. Plaintiffs allege the Individual Defendants routinely represented to analysts and investors that they monitored and were knowledgeable about Conn's finances including credit operations. *Id.* at ¶ 201. Plaintiffs allege the Individual Defendants had motive and incentive to engage in the alleged fraud because they could receive performance-based bonuses and equity. [33] *Id.* at ¶¶ 206-08, 211.

[33]
Defendants allege that Plaintiffs rely on group pleading, which is impermissible in the Fifth Circuit. ECF No. 39 at 24; *In re BP,* 2013 U.S. Dist. LEXIS 171459, at *51-52 (citing *Shaw Grp.,* 537 F.3d at 533-34). But, "[t]he fact that [some] allegations pertain to more than one person does not make them group pleading[,]" particularly where, as here, it is sufficiently clear from the face of the complaint which scienter allegations apply to each Individual Defendant. *Alaska Elec. Pension Fund*

*v. Asar,* No. 17-50162, 768 Fed.Appx. 175, 2019 WL 1567766, at *7 (5th Cir. 2019).

While allegations of motive and opportunity alone will not support a strong inference of scienter, they may "meaningfully enhance the strength of the inference of scienter." *In re BP,* 843 F. Supp. 2d at 749 (citation omitted). However, "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. ... [W]ere the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations." *Carlton,* 184 F. Supp. 3d at 481 (quoting *Abrams,* 292 F.3d at 434) (allegations that defendant was motivated to continue receiving lucrative salary and compensation did not raise a strong inference of scienter). In addition, "[c]orporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded." *In re BP,* 843 F. Supp. 2d at 749 (citation omitted); *see also Carlton,* 184 F. Supp. 3d at 478-79 (allegations that defendants must have known the misstatements were false based on their high-level positions within the company did not raise a strong inference of scienter). Plaintiffs' allegations based on motive and Defendants' positions at Conn's contribute little, if at all, to an inference of scienter.

### e. Conn's internal documents.

Plaintiffs point to Conn's internal documents to plead that Wright knew the underwriting standards were being loosened and that the rise in FPDs was due primarily to new store underwriting:

- In a **January 31, 2013** e-mail that Poppe sent to other Conn's staff, Poppe stated that he discussed underwriting requirements for new stores with Wright and decided against "keeping the gates wide open like we were the past 2 months." ECF No. 3 at ¶ 65; Pls.' Ex. 7 at 32, ECF No. 47-3.

- **\*18** • On **March 30, 2013,** Poppe sent an e-mail to Wright attributing the rising FPDs to underwriting standards in new stores and explaining that credit verifications were tightened to avoid fraud. ECF No. 3 at ¶ 10; Defs.' Ex. 17, ECF No. 40-4.

- On **April 12, 2013,** Poppe sent an e-mail to Wright referring to their prior conversation about keeping lower underwriting standards (lower minimum FICO score cut-offs) in place for new stores permanently going

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 421 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

forward. ECF No. 3 at ¶ 73; Defs.' Ex. 19 at 2, ECF No. 40-6.

• In July 2013, Wright sent a memorandum to the Conn's Board, noting that the " 'grand opening' practices at the new stores opened in November and December" had an impact on credit performance and was at least one causal factor. ECF No. 3 at ¶ 134(a); Defs.' Ex. 24 at 4, ECF No. 40-10. [34]

[34]    Plaintiffs also make general statements that based on internal e-mails, "it was known internally at Conn's that the lowering of Conn's underwriting standards to 'significantly riskier' customers ... 'represent[ed] a straight loss for the lender.' " ECF No. 3 at ¶ 50; Defs.' Ex. 25 at 3, ECF No. 40-11. However, at least some of these internal e-mails and documents were not sent to or from any of the Individual Defendants so they cannot show scienter as to Defendants. *See* Defs.' Ex. 25 at 2-3, ECF No. 40-11; Pls.' Ex. 14 at 20, ECF No. 47-4.

While the Plaintiffs do not necessarily plead facts that Wright read the e-mails sent to him, the e-mails referring to conversations involving him and his memorandum to the Board raise the inference that by early 2013, Wright knew Conn's lowered underwriting standards and this contributed to a rise in delinquencies. In addition, the omission of facts that Wright read the e-mails is offset somewhat by the CW allegations and Wright's later statement that, after Conn's opened new stores in early 2013, it took "about three months to figure out that was a really bad idea." ECF No. 3 at ¶ 72. Standing alone, these documents raise only a slight inference of scienter against Wright, but when considered together with other allegations, contribute to a strong inference of scienter.

#### f. SEC investigation.

Plaintiffs allege that Conn's disclosed on December 10, 2014 that the SEC began investigating Conn's. *Id.* at ¶¶ 19, 157(d), 163-66, 172. However, "[g]overnment investigations can result from any number of causes, and the investors have not pointed to any facts suggesting that the SEC investigation was the result of knowing or reckless behavior by the Defendants[,]" nor have they alleged any facts regarding the outcome of the investigation. *Carlton*, 184 F. Supp. 3d at 480 (allegations of SEC investigation did not raise a strong inference of scienter) (quoting *Konkol v. Diebold, Inc.*, 590

F.3d 390, 402 (6th Cir. 2009)). Now, Plaintiffs ask the Court to take judicial notice of the outcome and filed the SEC complaint and the consent judgments against Conn's and Poppe. ECF No. 62. Because the SEC's claims are based on negligence and specifically acknowledge that the SEC does not need to prove scienter, those documents provide no support for the proposition of Defendants' actual knowledge at the time. ECF No. 62-1 at 6, 11. Moreover, the complaint was not asserted against Wright, but only Poppe. Therefore, this contributes little, if at all, to an inference of scienter.

#### g. Termination.

**\*19**   Plaintiffs allege that Conn's announced on September 9, 2015—more than a year after the Relevant Period—that Wright would be replaced as CEO, but Plaintiffs do not allege any reason for his departure. ECF No. 3 at ¶ 20. Courts have held that "[e]xecutive resignations are generally 'unavailing as proof of the commission of fraud.' " *Carlton*, 184 F. Supp. 3d at 478 (finding allegation of resignation alone insufficient to plead scienter) (citation omitted); *accord In re ArthroCare*, 726 F. Supp. 2d at 724-25 (same); *see also Neiman*, 854 F.3d at 752 (resignation did not raise an inference of scienter where there were no allegations as to the reason); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) ("the successive resignations of key officials ... is more likely probative only of the fact that the company was failing."). Thus, Wright's departure contributes little, if at all, to an inference of scienter.

#### h. Sarbanes-Oxley certifications.

Plaintiffs allege that Wright (and Taylor) signed SOX certifications on Conn's annual 10-K and quarterly 10-Q forms on April 5, 2013, June 6, 2013, September 5, 2013, and December 6, 2013, falsely certifying the financial reports were accurate. ECF No. 3 at ¶ 174. But Plaintiffs failed to show the financial statements were actionable, so they cannot show the SOX certifications raise an inference of scienter. *See supra*, section III.B.6. Even assuming Plaintiffs sufficiently pleaded that Defendants' financial statements were actionable, Plaintiffs failed to allege scienter as to those statements. [35]

[35]    Plaintiffs'   circumstantial   allegations   that Defendants knowingly increased Conn's credit risk

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 422 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

by lowering underwriting standards, knowingly increased sales and extended greater amounts of credit to new "riskier" customers, and knew delinquencies were rising as a result do not go far enough to show Defendants knew Conn's financial statements were materially misstated at the time. ECF No. 3 at ¶¶ 4, 10, 42(i), (r), 50, 52, 64, 68, 69(c), (d), 70, 72, 84, 157(a)-(b), 161, 162; ECF No. 57-1 at 9-12, 14-15, 23-26, 30-32. "[I]t is well-settled that Sarbanes-Oxley certifications, standing alone, are not indicative of scienter—otherwise, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company." *In re ArthroCare*, 726 F. Supp. 2d at 724 (citations omitted). "The certifications are probative of scienter only if the person signing ... was severely reckless in certifying the accuracy of the financial statements." *In re Franklin*, 782 F. Supp. 2d at 396 (citing *Cent. Laborers' Pension Fund*, 497 F.3d at 550). "That is, there must be facts establishing that the person ... had a 'reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.' " *Id.* (citing *Cent. Laborers' Pension Fund*, 497 F.3d at 550) (SOX certifications failed to support a strong inference of scienter); *accord In re TETRA*, 2009 WL 6325540, at *31. Post-Relevant Period financial statements that included increased bad debt provisions likewise do not show that Defendants knew any financial statements issued during the Relevant Period were understated. *See* ECF No. 3 at ¶¶ 169-73; 180-99; *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199, 2016 WL 5818590, at *8 (S.D.N.Y. Oct. 5, 2016) (rejecting allegations that defendants' *later* increase in reserve estimates gave rise to a strong inference of scienter at the time of the alleged misstatements). This may be "sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud." *Pirnik*, 2016 WL 5818590, at *8 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)).

***i. Collective allegations.***

**\*20** While several of the aforementioned allegations fail to raise a strong inference of scienter with particularity if considered in isolation, the Court concludes they do when considered collectively, albeit barely so. [36] For example, the internal documents are the only sources that provide a specific date on which Wright would have known the information contained therein. But, taking Plaintiffs' allegations as true, these documents combined with the CW allegations, post-Relevant Period statements, and other allegations raise a sufficiently strong inference of scienter that as early as April 2013, Wright knew that underwriting standards were lowered, and this was a cause of the rising delinquencies.

[36]     Plaintiffs' complaint approaches "puzzle pleading." *In re Alamosa*, 382 F. Supp. 2d at 857 (collecting cases that dismissed complaints for "puzzle pleading"); *accord In re Franklin*, 782 F. Supp. 2d at 384-85 (where "Plaintiffs group together all of the defendants' false statements made during the ... conference call, press release, and Form 8-K, and allege collective reasons why the statements were materially false and misleading ... this does not satisfy the requirement that, for *each* false or misleading statement, they are to explain the reason or reasons why the statement was misleading....") (emphasis in original). While Plaintiffs' complaint passes this threshold because in their section explaining why the statements are false, they cross reference the paragraph numbers of alleged misstatements in the prior section and relevant facts in yet another section, the complaint could more clearly and systematically identify each *actionable* statement and why *each* is actionable. *See, e.g., Singh v. 21Vianet Grp., Inc.*, No. 2:14-CV-894, 2017 WL 4322483, at *2 (E.D. Tex. Sept. 13, 2017) (denying motion to dismiss where for each alleged misstatement, the complaint explains in the paragraph immediately after the alleged misstatement why it is misleading, and follows the same pattern for each statement), *report and recommendation adopted*, 2017 WL 4310154 (S.D. Tex. Sept. 28, 2017). This would conserve judicial resources and mitigate the need for supplemental briefing that the Court requested here. "However easy the puzzle, assembling puzzles is not the duty of the Court." *In re Alamosa*, 382 F. Supp. 2d at 857.

2019 WL 3451153

The Court must weigh competing inferences of scienter as to those statements the Court found actionable. Where there is an inference of scienter at least as cogent and compelling as opposing inferences—that Wright was at most negligent or committed no wrongdoing—such as here, "[a] tie favors the plaintiff." *Carlton*, 184 F. Supp. 3d at 484 (quoting *Lormand*, 565 F.3d at 254) (when considered holistically, allegations including CW allegations raised an inference that defendant acted with scienter which is at least as compelling as the inference that he acted without it). [37] Defendants' motion to dismiss Plaintiffs' securities fraud claim against Wright should be denied, to the extent some of his statements are actionable.

[37]      *See also, e.g., Stone v. Life P'ners Holdings, Inc.,* 26 F. Supp. 3d 575, 611 (W.D. Tex. 2014) (collectively, allegations of internal reports imputing knowledge, combined with other allegations, raised a strong inference of scienter); *In re ArthroCare,* 726 F. Supp. 2d at 725 (even though some allegations of scienter, standing alone, did not raise a strong inference of scienter, collectively, the role of defendants in the company, insider trading, SOX certifications, and other allegations gave rise to a strong inference of at least severe recklessness for a certain time period); *In re TETRA,* 2009 WL 6325540, at *38 (collectively, CW allegations that defendants attended relevant meetings to discuss insurance receivables and post-class statements raised a strong inference that defendants had knowledge).

## 2. Poppe.

 **\*21**  The Court recommended that five statements by Poppe remain as actionable. *See supra*, section III.B. The Court must still determine whether Plaintiffs adequately pleaded scienter as to those statements and holds that they have. The Court again relies on the fact that the District Judge implicitly found the Class Action Fourth Amended Complaint adequately pleaded scienter as to Poppe, at least for the statements that were found actionable in the Class Action, many of which are challenged here or are similar. [38] *See* Order, *In re Conn's,* No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125.

[38]      While the parties did not brief Conn's 10(b) liability for the corporate Defendant,

"all misrepresentations attributable to Individual Defendants are also treated as having been made by [Conn's], as 'all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company.' " *In re BP*, 843 F. Supp. 2d at 788 (citation omitted). "Thus, the actionable misrepresentations discussed above that are attributable to [Wright and Poppe] are sufficient to give rise to an inference of scienter with respect to [Conn's]." *Id.*

In addition to the CW allegations discussed above which pertain to both Wright and Poppe, Plaintiffs rely on additional CW allegations specific to Poppe to plead scienter. [39] Plaintiffs also make other similar scienter allegations against Poppe as they did against Wright involving (1) insider trading, [40] (2) motive to earn performance-based compensation, (3) Poppe's departure and alleged firing on May 23, 2017, and (4) the SEC investigation. [41] ECF No. 3 at ¶¶ 11, 19-20, 157(d), 163-66, 172, 206, 209, 211-13. As with Wright, the CW allegations—when considered holistically with other allegations in the complaint—contribute to a strong inference of scienter while the latter allegations contribute little to an inference of scienter against Poppe.

[39]      CW-1 reported that if the daily analytics reports were not circulated by 10:00 a.m. each day, Poppe would call or e-mail asking for the report. ECF No. 3 at ¶¶ 42(b), 70. CW-5 stated that data on FPDs and delinquencies were discussed each day across everyone involved in collections, including Poppe. *Id.* at ¶¶ 42(r), 70.

[40]      Plaintiffs allege Poppe sold 30,000 shares on April 25, 2013 and 19,900 shares on October 21, 2013 for the first time since 2007, gaining proceeds of $2,581,911. ECF No. 3 at ¶ 213. Plaintiffs allege the timing is suspicious because in April, "Defendants were setting false expectations regarding the Company's credit risks." *Id.* As for the October trade, it was purportedly suspicious because it was made "on the heels of Defendants' false representations that Conn's credit issues related to a one-time computer system issue and omission[.]" *Id.* The timing allegations are somewhat more conclusory than the similar allegations against Wright. Defendants allege that Poppe's stock sales cannot support a strong inference of scienter because (1) the sales constituted relatively small

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 424 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

percentages of Poppe's overall holdings (18.71% and 14.53%), (2) his April sales were made at $34 per share less than the peak price during the Relevant Period months before the February 2014 corrective disclosures, and (3) they were made pursuant to a Rule 10b5-1 plan. ECF No. 39 at 27-28 (citing *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008)). However, the 10b5-1 plan is an affirmative defense, which is irrelevant at the motion to dismiss stage. *In re ArthroCare*, 726 F. Supp. 2d 696, 722-23 (W.D. Tex. 2010). While Poppe's trading history makes these trades somewhat suspicious, the timing and percentage of his total holdings do not. These allegations contribute only slightly to an inference of scienter against Poppe.

[41] As discussed above, the SEC complaint and consent judgment against Poppe is based on a negligence standard and does not prove actual knowledge at the time. ECF No. 62-1 at 6, 11. The consent judgment also states that Poppe does not admit any of the allegations in the complaint. ECF No. 62-4 at 2.

#### a. Conn's internal documents.

**\*22** Plaintiffs also rely on numerous e-mails to and from Poppe, some of which had analytics reports attached:

- E-mails in **November and December 2012** suggest that Poppe knew about lower underwriting standards being implemented in new stores, that Conn's credit portfolio was shifting toward lower FICO scores, and that lower FICO scores were at least correlated with higher delinquency rates. *Id.* at ¶¶ 53, 61; Defs.' Ex. 14 at 2, ECF No. 40-1; Defs.' Ex. 15 at 2, ECF No. 40-2; Defs.' Ex. 26 at 2, ECF No. 40-12.

- E-mails from **January 2013** suggest that Poppe knew credit performance was declining; there were concerns about fraud in at least one new store, after which verification requirements were increased slightly for new applicants with FICO scores under 520; changes were made at the end of January to the underwriting process, which included offering credit to customers with zero FICO scores in new stores, but "not keeping the gates wide open like we were the past 2 months." ECF No. 3 at ¶¶ 53, 62, 64, 65; Pls.' Ex. 3-7, ECF No. 47-3; Defs.' Ex. 16 at 2-3, ECF No. 40-3.

- E-mails throughout **March 2013** suggest that Poppe knew that FPD rates were rising, particularly in new stores; he and colleagues were trying to determine the cause; and rising FPDs were attributed to new store underwriting. ECF No. 3 at ¶¶ 10, 68, 69(a); Pls.' Ex. 8 at 36-37, ECF No. 47-3; Defs.' Ex. 17, ECF No. 40-4; Defs.' Ex. 18 at 2, ECF No. 40-2.

- E-mails from late **April through May** suggest that Poppe was aware that credit performance was declining; delinquency rates in new stores were poor and described as "very shocking," "disturbing," and "off the rails;" and that implementation of the new Latitude system did not have a large impact on phone numbers and therefore likely did not affect delinquencies. ECF No. 3 at ¶¶ 53, 74, 76, 134(c); Pls.' Ex. 9-12, ECF No. 47-4; Defs.' Ex. 22 at 3, ECF No. 40-8.

- E-mails on **June 11-12 and in July** suggest that Poppe knew delinquencies and FPDs continued to worsen and the credit segment was still underperforming. ECF No. 3 at ¶¶ 77, 134(a); Pls.' Ex. 13 at 17, ECF No. 47-4; Pls.' Ex. 17 at 27-35, ECF No. 47-4; Defs.' Ex. 23 at 2-6, ECF No. 40-9.

- In an **October 2013** e-mail, Poppe acknowledged that September data on delinquencies was poor. ECF No. 3 at ¶ 78; Pls.' Ex. 15 at 22, ECF No. 47-4.

These allegations raise a strong inference of scienter that Poppe knew before and throughout the Relevant Period that underwriting standards were being lowered, credit performance was deteriorating because of lower underwriting standards, and that the systems change was not responsible for performance deterioration (or at least not the primary cause).

#### b. Collective allegations.

When considered collectively, Plaintiffs' allegations as to Poppe raise a strong inference of scienter for actionable statements he made. *See, e.g., Carlton*, 184 F. Supp. 3d at 476, 482-84; *Stone*, 26 F. Supp. 3d at 611; *In re ArthroCare*, 726 F. Supp. 2d at 725; *In re TETRA*, 2009 WL 6325540, at *38. Plaintiffs' scienter allegations for Poppe are significantly stronger than for Wright due to the volume, time frame, and specificity of e-mails which raise a strong inference that Poppe was informed about and actively engaged in discussions and efforts to lower underwriting standards,

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 425 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

monitor credit performance, and determine the cause of rising delinquencies. This inference is more compelling than any competing theories. Defendants' motion to dismiss Plaintiffs' securities fraud claim against Poppe should be denied, to the extent some of his statements are actionable.

### 3. Taylor.

**\*23** The only statements Plaintiffs contend are actionable against Taylor are the SOX certifications and corresponding financial statements he signed, which the Court found are not actionable. *See supra*, section III.B.6. Therefore, Plaintiffs cannot establish scienter as to Taylor. [42] *See In re BP*, 843 F. Supp. 2d at 778 (dismissing defendant because where the alleged misrepresentations attributable to defendant were not actionable, plaintiffs cannot demonstrate scienter as to that defendant). Defendants' motion to dismiss Plaintiffs' securities fraud claim against Taylor should be granted.

[42]    Even if any statements attributable to Taylor are actionable, Plaintiffs still failed to plead scienter. Plaintiffs' only allegations of scienter as to Taylor—(1) his sudden departure from Conn's in December 2014, (2) motive to earn performance-based compensation, and (3) him signing the SOX certifications—do not raise a strong inference of scienter, even when considered collectively. ECF No. 3 at ¶¶ 18, 44, 174, 206, 210-11. Taylor was also dismissed from the Class Action. *See* Mot. Hr'g Tr. at 74:2-13, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 14, 2015), ECF No. 102.

## IV.

## CONTROL PERSON LIABILITY UNDER SECTION 20(a) OF THE SECURITIES EXCHANGE ACT

Section 20(a) of the SEA establishes control person liability:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent

> as such controlled person to any person to whom such controlled person is liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*In re BP*, 2013 U.S. Dist. LEXIS 171459, at \*54 (quoting 15 U.S.C. § 78t(a)). "[T]o prove a violation of section 20(a), a plaintiff must first prove an underlying securities fraud violation and prove that the controlling person had actual power over the controlled person and induced or participated in the alleged violation." *In re BP*, 843 F. Supp. 2d at 791 (citing *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990)). "Section 20(a) is a secondary liability provision[.]" *In re BP*, 2013 U.S. Dist. LEXIS 171459, at \*54 (citing *ABC Arbitrage*, 291 F.3d at 348 n.57).

Defendants' only argument for why Plaintiffs' section 20(a) claim should be dismissed is that Plaintiffs failed to plead a predicate violation under section 10(b). ECF No. 39 at 28. Because Plaintiffs failed to plead with particularity a primary violation under 10(b) against Taylor, Plaintiffs' section 20(a) claim against him fails and should be dismissed. *See In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d at 916 (finding no secondary control liability where plaintiffs failed to state a claim for securities fraud under Section 10(b) and Rule 10b-5); *accord Carlton*, 184 F. Supp. 3d at 495. However, because Plaintiffs successfully pleaded a primary violation under 10(b) against Wright and Poppe at least in part, Plaintiffs' 20(a) claims should remain to the extent the 10(b) claims based on actionable misstatements remain. *See In re TETRA*, 2009 WL 6325540, at \*38 ("Plaintiffs 20(a) claims remain only as to the claims based on misstatements" upheld as actionable); *accord Carlton*, 184 F. Supp. 3d at 495 (there is no basis for dismissing the control person claims against [defendant] because the § 10(b) claims against him have not been dismissed.").

## V.

## INSIDER TRADING UNDER SECTION 20A OF THE SECURITIES EXCHANGE ACT

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 426 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

**\*24** "Section 20A provides for a private right of action to buyers and sellers of securities who trade 'contemporaneously' with an insider in possession of material nonpublic information." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000). To state a section 20A claim, a plaintiff must plead that a defendant: "(1) used material, nonpublic information, (2) knew or recklessly disregarded that the information was material and nonpublic, and (3) traded contemporaneously with the [plaintiff]." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d at 916 (citations omitted). Both parties characterize the elements as requiring Plaintiff to state (1) a primary securities fraud violation under section 10(b) of the SEA and (2) that Plaintiffs traded "contemporaneously" with Wright and Poppe. ECF No. 39 at 29; ECF No. 47 at 31; *accord In re MicroStrategy*, 115 F. Supp. 2d at 662. Because the Court determined that Plaintiffs stated a claim under section 10(b) for at least some of Wright's and Poppe's alleged misstatements, Plaintiffs have stated a predicate securities fraud violation and the main issue is whether Plaintiffs' stock purchases were "contemporaneous."

The parties dispute the meaning of "contemporaneous." Defendants contend that "contemporaneous" means that the stock must have been traded on the same day. ECF No. 39 at 30. Plaintiffs contend that their purchases of Conn's stock one day after Poppe's April 25, 2013 sale, one day after Wright's December 17, 2013 sale, three days after Poppe's October 21, 2013 sale, and four days after Wright's June 20, 2013 sale are sufficiently "contemporaneous." ECF No. 47 at 31.

Reflective of the cases the parties cited, the Southern District of Texas has recognized that "[d]ifferent courts have found that 'contemporaneity' requires the insider and the investor/plaintiff to have traded anywhere from on the same day, to less than a week, to within a month, to 'the entire period while relevant and nonpublic information remained undisclosed.' " *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 WL 2599327, at *5 (S.D. Tex. June 15, 2017) (citing *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003)). Since section 20A does not define "contemporaneous," some courts have taken the same-day approach to "guard against 'mak[ing] the insider liable to all the world' " and in consideration for "the increasingly dynamic nature of the securities markets." *In re MicroStrategy*, 115 F. Supp. 2d at 663-64 (collecting cases) (requiring trades to be made on the same day to be contemporaneous); *accord In re Fed. Nat'l Mortg. Ass'n Sec. Deriv. & ERISA Litig.*, 503 F. Supp. 2d 25, 47-48 (D.D.C.

2007) (same); *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995) (same). But, a strict same-day rule means that

> insiders could trade near the close [of the trading day] and greatly reduce the universe of potential successful plaintiffs. On the other hand, interpreting "same day" to mean the 24-hour period after the insider's transaction presents a problem on motions to dismiss: most plaintiffs will only be able to determine the date—not the time—of the insider's transactions.

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1205 (C.D. Cal. 2008) (finding stock purchases the day after defendants' sales sufficiently contemporaneous); *see also Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (finding eight-day gap sufficiently contemporaneous).

Because of this wide range, the *In re Cobalt* court "[could] not conclude that an allegation of a six-day gap between [defendant's] sale and [plaintiff's] purchase is too long as a matter of law to constitute 'contemporaneous' trades...." 2017 WL 2599327, at *5. [43] This Court agrees. Defendants rely only on cases from other courts and have not cited any authority from the Fifth Circuit or its district courts that require application of a same-day-trading rule. Defendants failed to establish as a matter of law that Plaintiffs' section 20A claim must be dismissed at this stage. Defendants' motion to dismiss Plaintiffs' section 20A claim should be denied.

43    *See also, e.g., In re Enron*, 258 F. Supp. 2d at 600, 618 (Despite dismissing section 20A claims where plaintiffs did not trade on the same day, "find[ing] that two or three days, certainly less than a week, constitute[s] a reasonable period to measure the contemporaneity...."); *accord In re Enron Corp. Sec., Deriv. & ERISA Litig.*, No. H-01-3624, 2016 WL 4095973, at *38 (S.D. Tex. Aug. 2, 2016), *aff'd*, 725 F. App'x 278 (5th Cir. 2018), *cert. denied*, —— U.S. ——, 139 S. Ct. 199, 202 L.Ed.2d 123 (2018).

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 427 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

## VI.

### STATE LAW CLAIMS

**\*25**  Defendants argue that Plaintiffs' Texas and Connecticut common law claims for fraud and negligent misrepresentation should be dismissed because they are duplicative of Plaintiffs' section 10(b) securities fraud claim and must satisfy the particularity requirements of Rule 9(b). ECF No. 39 at 28-29. Plaintiffs contend that their fraud and negligent misrepresentation claims do not need to satisfy the heightened PSLRA pleading requirements, and even if they do, they satisfy that standard. ECF No. 47 at 28-29. Plaintiffs also contend that their negligent misrepresentation claims need only satisfy Rule 8 because these claims are based only on a subset of allegations in their complaint. *Id.* at 29.

To the extent Plaintiffs stated a claim under section 10(b) satisfying the PSLRA's heightened pleading standards, Defendants' motion to dismiss Plaintiffs' fraud and negligent representation claims should be denied as to the same alleged misstatements in paragraphs 90-94, 104-08, 111-16, 122, and 126-27 in the complaint. *See RYH Prop., LLC v. West*, No. 508-CV-172, 2009 WL 10676645, at *13 (E.D. Tex. Aug. 3, 2009) (denying defendants' motions to dismiss common law fraud claim where plaintiffs adequately pleaded federal securities fraud claims); *Patriot Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 364-65 (D. Conn. 2013) (denying defendants' motion to dismiss common law fraud and negligent misrepresentation claims where plaintiffs adequately pleaded federal securities fraud claims).

### A. Plaintiffs' Fraud Claims.

Regarding the remainder of Plaintiffs' common law fraud claims, Plaintiffs do not dispute that these must satisfy the particularity requirement of Rule 9(b), although they contend there need not be a "strong inference" of scienter because state of mind can "be alleged generally." [44] ECF No. 47 at 28-29. While the standard for scienter may be slightly more relaxed under Rule 9(b) than under the PSLRA, Plaintiffs must still plead with particularity why the alleged misstatements are false under Rule 9(b). [45] To the extent Plaintiffs failed to plead why the alleged misstatements in paragraphs 90, 95-97, 99-103, 109, 110, 119, 121-25, 143-52, and 174 in the complaint were false under the PSLRA, they likewise fail to plead why the same statements were false under Rule 9(b).

[44]  *See Flaherty v. Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009) (although "common law fraud claims are not subject to the heightened 'strong inference' of scienter standard imposed by the PSLRA, ... [they] are still subject to the pleading standard of Rule 9(b)."), *cert. denied*, 558 U.S. 873, 130 S.Ct. 199, 175 L.Ed.2d 125 (2009); *see also* FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

[45]  *See McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 561 (D. Conn. 2016) ("In order to satisfy Rule 9(b)'s particularity requirement with regard to fraud claims, the complaint must: '... (4) explain why the statements were fraudulent.' "); *see also Omni USA, Inc. v. Parker-Hannifin Corp.*, No. H-10-4728, 2012 WL 1038642, at *3 (S.D. Tex. Mar. 27, 2012) ("To plead fraud under Texas law, a plaintiff must allege (1) the defendant made a misrepresentation to the plaintiff; (2) the representation was material; (3) the representation was false....") (quoting *Shandong Yinguang Chem. Indust. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010)); *Simms v. Seaman*, 308 Conn. 523, 548, 69 A.3d 880 (2013) (Under Connecticut law, "[t]he essential elements of an action in common law fraud ... are that: (1) a false representation was made as a statement of fact....") (quoting *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142, 2 A.3d 859 (2010)).

### B. Plaintiffs' Negligent Misrepresentation Claims.

**\*26**  Ordinarily, negligent misrepresentation claims are not subject to Rule 9(b). *Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 668 (5th Cir. 2004). But Defendants argue that Rule 9(b) applies to "claims for negligent misrepresentations where the factual allegations underlying it and a fraud claim are the same." ECF No. 39 at 29; *Omni*, 2012 WL 1038642, at *2 (citing *Benchmark Elecs. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003)) (collecting cases). [46] Plaintiffs argue that their negligent misrepresentation claims are based on different facts from their fraud claims, pointing to language in their complaint that for their negligent misrepresentation claims,

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 428 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

they "incorporate each and every allegation contained above as if fully set forth herein, except all allegations concerning intentional reckless conduct, or that sound in fraud." ECF No. 3 at ¶¶ 251, 269.

46      *Accord Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 737 (N.D. Tex. 2008) (granting motion to dismiss negligent misrepresentation claim based on the same operative facts as fraud claim).

While the Court doubts that such boilerplate language is sufficient to show that different facts form the basis of Plaintiffs' negligent misrepresentation claims, *Am. Realty Trust, Inc. v. Travelers Cas. & Sur. Co. of Am.* interpreted relevant Fifth Circuit law to mean instead that negligent misrepresentation claims

> do not become subject to heightened pleading simply because they are based on the same set of operative facts as corresponding fraud claims. Rather, Rule 9(b) operates to require dismissal of a negligent misrepresentation claim only when (1) a plaintiff waives arguments to the contrary or (2) the inadequate fraud claim is so intertwined with the negligent misrepresentation claim that it is not possible to describe a simple redaction that removes the fraud claim while leaving behind a viable negligent misrepresentation claim.

362 F. Supp. 2d 744, 749 (N.D. Tex. 2005). The court held that,

> in determining whether a negligent misrepresentation claim is subject to dismissal along with an impermissibly general fraud claim, the question is whether ... the Court [can] describe a simple redaction that removes allegations of fraud from the complaint, but leaves the plaintiff's valid and intelligible negligent misrepresentation claim intact.... Conversely, when it would be necessary to engage in line-by-line redaction in order to excise inadequate averments of fraud from accompanying claims of negligent misrepresentation, several factors counsel in

favor of dismissal. ... [I]f it is unclear which allegations pertain to the fraud claim as opposed to the negligent misrepresentation claim, the court risks interpreting the complaint in a manner inconsistent with the intent of the plaintiff. Finally, a court that endeavors to separate intertwined fraud and negligence claims takes upon itself a burden that is better placed upon the party responsible for the defective pleading. Rather than "sift through allegations of fraud in search of some lesser included claim," or "rewrite ... a deficient complaint," the court should dismiss without prejudice.

*Id.* at 752. This Court's review of Defendants' cited cases and the Fifth Circuit cases they rely on suggest that Fifth Circuit precedent on this matter does not go quite as far as Defendants urge—that Rule 9(b) categorically applies to negligent misrepresentation claims whenever they are based on the same facts underlying fraud claims. *See Hamilton Lane*, 115 F. App'x at 668 (reversing dismissal of negligent misrepresentation claim under Rule 9(b)).

Nevertheless, the Court is unable to effectively distinguish between Plaintiffs' fraud and negligent misrepresentation claims without "engag[ing] in a line-by-line redaction in order to excise inadequate averments of fraud from accompanying claims of misrepresentation...." because the negligent misrepresentation claims appear to be based on the same alleged misstatements and Plaintiffs' allegations for why those statements are false. *Am. Realty Trust, Inc.*, 362 F. Supp. 2d at 752.

**\*27** In addition, even if Plaintiffs need only satisfy Rule 8, to state a claim for negligent misrepresentation under either Texas or Connecticut law, Plaintiffs must still allege that a false statement was made. [47] For the same reasons Plaintiffs failed to allege why the statements in paragraphs 90, 95-97, 99-103, 109, 110, 119, 121-25, 143-52, and 174 were actionable for their section 10(b) claim, Plaintiffs likewise failed to allege those same statements were false even under the lower Rule 8 pleading standard. Thus, Defendants' motion to dismiss Plaintiffs' state law claims should be granted in part and denied in part to the same extent as Plaintiffs' section 10(b) claim.

47      *See McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 560 (D. Conn. 2016) ("To plead a claim for negligent misrepresentation under Connecticut law, a plaintiff must allege (1) that the defendant made a misrepresentation of

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 429 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

fact....") (citations omitted); *City of Houston Tex. v. Towers Watson & Co.*, No. 4:14-CV-2213, 2015 WL 5604059, at *2 (S.D. Tex. Sept. 23, 2015) (Under Texas law, "[t]o state a claim for negligent misrepresentation, a plaintiff must allege: ... (2) the defendant supplies 'false information' ....") (quoting *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

## VII.

### LEAVE TO AMEND

Plaintiffs request that if the Court grants Defendants' motion, they be granted leave to amend. ECF No. 47 at 32. "When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice" unless it is clear the defects are incurable. *Freuler v. Parker*, 803 F. Supp. 2d 630, 635 (S.D. Tex. 2011) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)), *aff'd*, 517 F. App'x 227 (5th Cir. 2013). Courts have discretion to grant leave to amend and may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Id.* (quoting *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993)).

While Defendants did not address Plaintiffs' request for leave to amend, they point out that Plaintiffs had access to hundreds of thousands of documents and deposition testimony from the Class Action before filing this action. ECF No. 39 at 8. Therefore, amendment might be futile. Plaintiffs also have not explained what additional facts they could plead to cure any deficiencies. ECF No. 47 at 32. But, based on the parties' minimal briefing on this issue, the Court cannot conclude that amendment would in fact be futile. The operative complaint is still the original complaint and Plaintiffs should be granted at least one opportunity to amend.

## VIII.

### CONCLUSION

The Court recommends that Defendants' motion to dismiss, ECF No. 39, should be **DENIED in part** and **GRANTED in part without prejudice** as follows:

1. Defendants' motion to dismiss Plaintiffs' claim for securities fraud under section 10(b) and Rule 10b-5 claim and corresponding state law claims should be **denied** as to the alleged misstatements in paragraphs 90-94, [48] 104-08, 111-16, 122, [49] and 126-27 in the complaint.

2. Defendants' motion to dismiss Plaintiffs' claim for securities fraud under section 10(b) and Rule 10b-5 claim and corresponding state law claims should be **granted** as to the alleged misstatements in paragraphs 90, [50] 95-97, 99-103, 109, 110, 119, 121-25, [51] 143-52, and 174 in the complaint.

3. Defendants' motion to dismiss Plaintiffs' claim for control liability under section 20(a) should be **denied** as to Wright and Poppe and **granted** as to Taylor.

   **\*28** 4. Defendants' motion to dismiss Plaintiffs' claim for insider trading under section 20A should be **denied**.

5. Defendant Taylor should be **dismissed**.

[48]    This part of paragraph 90 should remain: "In February we ... began underwriting applications with credit scores between 500 and 525."

[49]    This part of paragraph 122 should remain: "....the Company made good progress in addressing the issues we experienced in the second quarter with our credit collection system."

[50]    Only this part of paragraph 90 should be struck: "[T]he standard credit score is not a reliable predictor of credit performance at lower scores given our installment lending structure...."

[51]    Only this part of paragraph 122 should be struck: "We are on track to meet our timetable of 4 to 5 months from our last conference call to fully address the effects of these issues on our portfolio. Delinquency should improve markedly over the next quarter."

**The Parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(B). Failure to file timely**

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 430 of 573

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

objections will preclude review of factual findings or legal conclusions, except for plain error. *Quinn v. Guerrero*, 863 F.3d 353, 358 (5th Cir. 2017).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3451153

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 20

Case 4:24-cv-01940     Document 44-4     Filed on 01/27/25 in TXSD     Page 432 of 573

New York Hotel Trades Council & Hotel Association of..., Not Reported in Fed....

2019 WL 3779262

🚩 KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Reversed in Part and Remanded by  New York Hotel
Trades Council & Hotel Association of New York City, Inc. Pension Fund v.
Impax Laboratories, Inc.,  9th Cir.(Cal.),  January 11, 2021

2019 WL 3779262
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

NEW YORK HOTEL TRADES COUNCIL
& HOTEL ASSOCIATION OF NEW YORK
CITY, INC. PENSION FUND, Plaintiff,

v.

IMPAX LABORATORIES INC., et al., Defendants.

Case No. 16-cv-06557-HSG
|
Signed 08/12/2019

**Attorneys and Law Firms**

Jeremy A. Lieberman, Pro Hac Vice, J. Alexander Hood,
II, Pro Hac Vice, Pomerantz LLP, New York, NY, Angel
Puimei Lau, Eric Ian Niehaus, Jeffrey James Stein, Spencer
A. Burkholz, Robbins Geller Rudman Dowd LLP, San Diego,
CA, Luke O. Brooks, Shawn A. Williams, Robbins Geller
Rudman & Dowd LLP, San Francisco, CA, Jennifer Pafiti,
Pomerantz LLP, Los Angeles, CA, for Plaintiff.

Christopher S. Turner, Pro Hac Vice, Latham & Watkins
LLP, Washington, DC, Peter Allen Wald, Marcy Christina
Priedeman, Morgan Edwin Whitworth, Latham & Watkins
LLP, San Francisco, CA, for Defendants.

**ORDER GRANTING MOTION TO DISMISS
SECOND AMENDED COMPLAINT**

Re: Dkt. No. 72

HAYWOOD S. GILLIAM, JR., United States District Judge

*1 Lead Plaintiff New York Hotel Trades Council &
Hotel Association of New York City, Inc. Pension Fund
asserts violations of Sections 10(b) and 20(a) of the
Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 against
Impax Laboratories Inc. ("Impax"), George Wilkinson, Larry
Hsu, Bryan Reasons, and Carole Ben-Maimon (collectively,
"Defendants"). On April 17, 2018, Plaintiff filed a first

amended complaint, raising these claims on behalf of itself
and others similarly situated: persons who purchased or
otherwise acquired publicly-traded Impax securities between
February 20, 2014 and January 11, 2017. Dkt. No. 32 ("FAC")
¶ 2. The Court dismissed the first amended complaint with
leave to amend, Fleming v. Impax Labs. Inc., No. 16-
cv-06557-HSG, 2018 WL 4616291 (N.D. Cal. Sept. 7, 2018)
("Order"), after which Plaintiff filed a second amended
complaint asserting the same claims, Dkt. No. 71 ("SAC").

Pending before the Court is Defendants' motion to dismiss
Plaintiff's second amended complaint, briefing for which is
complete. Dkt. Nos. 72 ("Mot."), 73 ("Opp."), 76 ("Reply").
After carefully considering the parties' arguments, the Court
**GRANTS** Defendants' motion **WITHOUT LEAVE TO
AMEND**.

**I. LEGAL STANDARD**

**A. Rule 12(b)(6) Standard**
Federal Rule of Civil Procedure ("Rule") 8(a) requires that a
complaint contain "a short and plain statement of the claim
showing that the pleader is entitled to relief." Fed. R. Civ. P.
8(a)(2). A defendant may move to dismiss a complaint for
failing to state a claim upon which relief can be granted under
Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate
only where the complaint lacks a cognizable legal theory
or sufficient facts to support a cognizable legal theory."
Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097,
1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a
plaintiff must plead "enough facts to state a claim to relief
that is plausible on its face." Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007). A claim is facially plausible when a
plaintiff pleads "factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678
(2009).

In reviewing the plausibility of a complaint, courts "accept
factual allegations in the complaint as true and construe the
pleadings in the light most favorable to the nonmoving party."
Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025,
1031 (9th Cir. 2008). Nonetheless, courts do not "accept
as true allegations that are merely conclusory, unwarranted
deductions of fact, or unreasonable inferences." In re Gilead
Scis. Secs. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting
Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.
2001)).

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 433 of 573

New York Hotel Trades Council & Hotel Association of..., Not Reported in Fed....

2019 WL 3779262

If the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal citations and quotation marks omitted). But "where the Plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad." See *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (quotations and alteration omitted).

### B. Heightened Pleading Standards

**\*2** Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Under this section, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

"At the pleading stage, a complaint alleging claims under which section 10(b) and Rule 10b-5 must not only meet the requirements of Rule 8, but must satisfy the heightened pleading requirements of both [Rule] 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC*, 552 F.3d at 990. With respect to

forward-looking statements, "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112–13 (9th Cir. 2010)).

## II. DISCUSSION

Plaintiff's 196-page second amended complaint realleges securities fraud claims based on (1) price fixing, and (2) price erosion. In dismissing the first amended complaint, the Court held that, as to the theory based on price fixing, Plaintiff adequately alleged falsity, but failed to allege both scienter and loss causation. Order at *2–5. As to the theory based on price erosion, the Court held that Plaintiff failed to allege both falsity and scienter, and thus the Court did not consider whether Plaintiff adequately pleaded loss causation. *Id.* at 5.

### A. Price Fixing

The Court previously held that Plaintiff failed to allege both scienter and loss causation as to its price fixing allegations. The Court again finds that Plaintiff has failed to plead loss causation, and thus the Court does not consider whether the operative complaint has cured the defects to its scienter allegations.

The Court previously rejected the FAC's loss causation pleadings for the following reasons:

> As a threshold matter, the mere existence of a regulatory investigation is insufficient to show cognizable fraud. In contrast to the cases on which Plaintiff relies, Plaintiff fails to identify a corrective disclosure by Defendants that is linked to both: (1) the alleged misstatements and omissions regarding digoxin and pyridostigmine pricing; and (2) a decrease in Impax's stock prices. As alleged, the negative market reaction here merely reflects reported financial losses relating to the entrance of new market competitors. Considering the lack of any disclosure by Defendants suggesting actual fraud that is causally

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 434 of 573

New York Hotel Trades Council & Hotel Association of..., Not Reported in Fed....

2019 WL 3779262

linked with loss, Plaintiff's price fixing allegations fail at this stage.

**\*3** Order at \*5 (citations omitted). Again, however, the SAC fails to identify a corrective disclosure linked to alleged misstatements and omissions and a decrease in Impax's stock prices. *See* SAC ¶¶ 450–70. For example, the operative complaint suggests that Impax disclosed on May 11, 2015 "that the DoJ had issued a grand jury subpoena to Impax for four generic medications," but then contends that "[a]nalysts took note," simply because some attributed Impax's "substandard performance" to " 'increased competition for digoxin.' " *Id.* ¶¶ 452–54. Even if Impax's statement about the grand jury subpoena constituted a disclosure, the operative complaint itself does not link it to Impax's stock price drop.

The remainder of the SAC's loss-causation allegations fall into one of two buckets: either they tie a purported misstatement to stock price decreases, which misunderstands that loss causation is about linking *corrective* disclosures to stock price changes, *see, e.g.*, ¶¶ 459–61; or they characterize disclosures of investigations as corrective disclosures, *see id.* ¶¶ 463–64, which in and of itself fails to prove loss causation under Ninth Circuit law, *see Loos v. Immersion Corp.*, 762 F.3d 880, 890 & n.3 (9th Cir. 2014) (observing that an investigation "simply puts investors on notice of a potential future disclosure of fraudulent conduct").

At the hearing on this motion, Plaintiff's principal argument against *Loos*'s application was that this case is more akin to the Ninth Circuit's more-recent decision in *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200 (9th Cir. 2017). *See, e.g.*, Dkt. No. 79 at 18:14–19 ("We have -- we have the more that *Lloyd* is -- that *Lloyd* calls for."). The Court disagrees. In *Lloyd*, the Ninth Circuit reaffirmed *Loos*'s core principle that the announcement of an investigation is insufficient to allege loss causation, but found that *Loos* did not preclude loss causation where the announcement of an investigation "related to an alleged misrepresentation" was "coupled with a subsequent revelation of the inaccuracy of that misrepresentation." *Lloyd*, 811 F.3d at 1203. In other words, the "something more" in the *Lloyd* complaint was "a subsequent corrective disclosure by the defendant." *Id.* at 1210. But the operative complaint here nowhere details a "subsequent corrective disclosure" that might convert disclosures of investigations found lacking under *Loos* into the types of disclosures found sufficient in *Lloyd*. [1]

[1] Plaintiff brought to the Court's attention a recent opinion from the District of New Jersey, which found sufficient similar loss causation arguments presented in a factually similar case: *In re Allergen Generic Drug Pricing Securities Litigation*, No. 16-9449 (KSH) (CLW), 2019 WL 3562134 (D.N.J. Aug. 6, 2019) ("*In re Allergen*"). *See* Dkt. No. 84. As an initial matter, an out-of-circuit district court case is not binding on this Court. More important, although *Allergen* referenced *Loos* and *Lloyd*, it was not bound by those cases' holdings, as is this Court. *See* 2019 WL 3562134, at \*13. And the Court cannot square *In re Allergen*'s loss causation conclusion with this binding Ninth Circuit authority. Faced with that tension, the Court must follow *Loos* and *Lloyd*.

Accordingly, the Court finds Plaintiff has again failed to plead loss causation. And because "Plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity," the Court finds that leave to amend is unwarranted. *See Zucco Partners, LLC*, 552 F.3d at 1007.

### B. Price Erosion

Plaintiff's price-erosion allegations relate to two pharmaceutical products: diclofenac and budesonide. The Court's previous Order held that the FAC failed to allege (1) a materially false or misleading statement, and (2) scienter. Order at \*5. The Court did not consider loss causation. *Id.* at \*5 n.3. For reasons detailed below, the Court finds the SAC has not cured the FAC's defects.

### 1. Diclofenac

**\*4** The SAC alleges three categories of misrepresentations or omissions related to Defendants' diclofenac sales: (1) statements maintaining annual revenue guidance for 2016 on February 22 and May 10, purportedly when diclofenac revenues were lower than anticipated; (2) statements misrepresenting the extent of diclofenac price and market share declines on May 10 and June 21; and (3) failing to warn that Impax would record a $15 million shelf stock adjustment related to diclofenac sales at the end of Q2 2016 on a June 21, 2016 conference call. SAC ¶¶ 352–97.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 435 of 573

New York Hotel Trades Council & Hotel Association of..., Not Reported in Fed....

2019 WL 3779262

The Court finds that Plaintiff again has failed to plead falsity as to diclofenac sales and thus does not consider whether the operative complaint has adequately pleaded scienter.

### a. Annual Revenue Guidance Statements

On February 22, 2016, Impax offered annual revenue guidance of $990 million. SAC ¶ 353. Impax maintained that guidance on May 10, but lowered it to $910 million on June 21. *Id.* ¶ 371. Plaintiff argues that Impax made the following actionable statement as to the May 10 revenue guidance:

> Growth in the first quarter was driven primarily by the increase in sales from products acquired last year in the Tower transaction and higher sales of select generic products led by diclofenac sodium gel.... This morning we are reaffirming our full-year guidance since we continue to expect that growth in 2016 will be driven by ... steady growth from the majority of our existing generic line and then growth from our branded portfolio.

Opp. at 21 (citing SAC ¶ 366).

Defendants argue that this statement falls within the PSLRA's safe harbor, which provides that forward-looking statements accompanied by meaningful cautionary language are not actionable unless a plaintiff proves the statements were made with "actual knowledge" of falsity. Mot. at 19 (citing 15 U.S.C. § 78u-5(c)(1) and *In re Cutera Sec. Litig.*, 610 F.3d at 1111–12). Plaintiff counters that this guidance statement falls outside of the PSLRA safe harbor because it also contained "materially false and misleading statements about past diclofenac performance and current state of 'steady growth' in the generic business." Opp. at 21 (citing *In re Quality Sys.*, 865 F.3d at 1142).

Setting aside whether *In re Quality Systems* supports Plaintiff's position—which the parties dispute—the core flaw in Plaintiff's argument is that the SAC only charges Impax with setting "unreasonable" targets. *See, e.g.*, SAC ¶¶ 369 ("The continued decline could reasonably have been

anticipated by defendants as of May 10, 2016."), 372 (arguing that "revenue guidance on May 10, 2016 was unrealistic and defendants lacked a reasonable basis for providing it"). While Plaintiff argues that those targets were unreasonable based on past performance, the same could be true of any such forward-looking statement. But the PSLRA demands more: Plaintiff must have alleged "actual knowledge" of falsity, which it has not done by averring that Impax simply "could have" anticipated a decline in sales. *See* SAC ¶ 369. The Court thus finds that Plaintiff has again failed to plead falsity as to the annual revenue guidance statements.

### b. Statements on May 10 and June 21 Regarding the Extent of Diclofenac Price and Market Share Declines

Plaintiff contends that Impax's market share of diclofenac "remain[ed] at or above 95% ... during 4Q15 and 1Q16," but fell precipitously from April to August 2016. SAC ¶¶ 362, 369. Plaintiff further contends that diclofenac prices commensurately declined. *Id.* ¶¶ 357–59. Given these changes, Plaintiff alleges that Defendants made several materially false statements regarding diclofenac market trends and its effect on Impax as a whole.

**\*5** Defendants respond that, as the Court found with respect to the FAC, the SAC's statements on this subject all fall into the following categories: (1) non-actionable puffery, (2) accurate statements of past performance, or (3) non-actionable opinion statements. *See* Mot. at 19–21. Plaintiff counters by relitigating the same points that failed on the first motion to dismiss. *See* Opp. at 21–23. For example, Plaintiff argues that Impax's statements that it "defended share" and that sales were "about on target," do not constitute puffery because they "concealed the true extent and impact of pricing erosions, market shares and volume loss." *Id.* at 22 n.14.

The Court agrees with Defendants that the SAC is not meaningfully different from the FAC, such that there would be any reason for the Court to change its prior holding regarding the falsity of these statements. Presented with no new arguments or factual allegations in the operative complaint, the Court finds that Plaintiff has again failed to plead falsity as to the statements on May 10 and June 21 regarding the extent of diclofenac price and market share declines, for the reasons stated in the Court's prior Order.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 436 of 573

New York Hotel Trades Council & Hotel Association of..., Not Reported in Fed....

2019 WL 3779262

#### c. Failing to Warn of $15 Million Shelf Stock Adjustment

The SAC alleges that Impax hosted a conference call on June 21, 2016, to announce "the acquisition of generic products from Teva and Allergan." SAC ¶ 387. On that call, Impax adjusted its 2016 revenue guidance, citing "lower revenues on diclofenac gel and metaxalone as a result of the impact of additional competition occurring during the second quarter." *Id.* ¶ 388. The SAC alleges that this statement was false, in part, for omitting that Impax was about to record shelf stock adjustments of $15 million. *Id.* ¶¶ 389, 392.

Defendants argue that Plaintiff has failed to "explain why Impax was required to disclose the shelf-stock adjustment," noting that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." Mot. at 21 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). In response, Plaintiff essentially contends that by disclosing that one reason warranted an adjustment to revenue guidance, Impax led investors to believe that other reasons did not exist. Opp. at 23.

The Court finds Plaintiff has failed to plead falsity as to the shelf stock adjustment. First, Plaintiff fails to prove that Impax had a duty to disclose the adjustment, and cites to no case law for the proposition that one adverse material fact implicitly denies that any other adverse material fact exists. More important, Plaintiff fails to explain how the shelf stock adjustment revelation made the June 21 statements themselves misleading. It is not enough for Plaintiff to allege that investors later "consider[ed] the omitted information significant." *See Markette v. XOMA Corp.*, No. 15-cv-03425-HSG, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017). But that is all Plaintiff contends.

#### 2. Budesonide

As was true of the FAC, the SAC alleges that Defendants made misleading and/or false statements regarding Impax's purchase of budesonide, as well as other generic drugs, from Teva and Allergan. Plaintiff claims that, despite Impax's awareness of increased competition and price degradation in the budesonide market, senior officials at Impax falsely represented budesonide's positive financial outlook and easy integration into the company's existing drug portfolio. According to Plaintiff, despite these statements, "months after closing, Impax took a write-down that eviscerated almost half

of the asset value, with the bulk of the charge attributed to budesonide." Opp. at 23–24.

**\*6** As to falsity, Defendants argues that "[t]he SAC fails to allege facts showing that Defendants' initial valuation of the acquisition was objectively or subjectively false, and all of the facts that allegedly contradicted Defendants' opinion statements were publicly available." Mot. at 23. As to scienter, Defendants find "entirely implausible" Plaintiff's theory that "Defendants knew the acquisition was overpriced by $251 million, yet went through with it anyway for no alleged reason." *Id.*

Plaintiff responds that it was at least misleading for Impax to tout that it "used 'all of the data,' 'built[them] into [the] model,' with 'individual valuations on ... each of the individual products,' and made 'an adjustment in the economics' to account for competition to enable the Company 'to absorb any kind of price alteration and adjustments' relating to budesonide," when Impax did not have certain pricing data. Opp. at 25. As to scienter, Plaintiff claims that the magnitude of the write off proves scienter. *Id.* (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)).

The Court finds that Plaintiff has again failed to plead scienter and thus does not consider whether Plaintiff has adequately pleaded falsity. As Defendants highlight, Plaintiff's theory relies on the unreasonable assumption that Impax willfully knew that an acquisition was overpriced by $251 million. The far more reasonable—and non-culpable—inference, however, is that Defendants simply overvalued the acquired products. *See* Mot. at 25. Further, Plaintiff's sole authority for its argument that the magnitude of a write-off proves scienter is unavailing. In *Rothman*, the defendants' gross overestimation of *their own performance* resulted in a write-off, which bolstered plaintiff's scienter allegation. 220 F.3d at 92. But overestimating one's own capabilities is categorically different from overestimating the subject of an acquisition. For the latter, there is a far more logical and non-culpable inference—innocent mistake—that is less plausible when a company overstates its own capabilities.

#### 3. Price-Erosion Conclusion

For these reasons, the Court finds Plaintiff has again failed to plead (1) falsity as to its price-erosion claims related to diclofenac, and (2) scienter as to its price-erosion claims related to budesonide. And because "Plaintiff has previously

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 437 of 573

New York Hotel Trades Council & Hotel Association of..., Not Reported in Fed....

2019 WL 3779262

been granted leave to amend and has subsequently failed to add the requisite particularity," the Court finds that leave to amend is unwarranted. *See Zucco Partners, LLC*, 552 F.3d at 1007.

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss **WITHOUT LEAVE TO AMEND**. The clerk is directed to close the file.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3779262

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 21

2007 WL 2720074
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

OPPENHEIM PRAMERICA ASSET
MANAGEMENT S.A.R.L., on behalf of
itself and others similarly situated, Plaintiffs,
v.
ENCYSIVE PHARMACEUTICALS,
INC., et al., Defendants.

No. Civ.A.H–06–3022.
|
Sept. 18, 2007.

**Attorneys and Law Firms**

Richard Eugene Norman, Timothy Joseph Crowley, Crowley & Douglas, Thomas E. Bilek, The Bilek Law Firm LLP, Patrick Andrew Zummo, Zummo & Midkiff LLP, Houston, TX, Ann K. Ritter, James M. Hughes, Joseph F. Rice, Motley Rice LLC, Mount Pleasant, SC, James M. Evangelista, Lauren S. Antonino, Motley Rice LLC, Atlanta, GA, Austin P Tighe, Jr., Feazell & Tighe LLP Bridgepoint 2, Austin, TX, Howard G. Smith, Smith & Smith LLP, Bensalem, PA, Lionel Z. Glancy, Glancy Binkow Goldberg, Los Angeles, CA, for Plaintiffs.

Gerard G. Pecht, Peter Andrew Stokes, Fulbright & Jaworski, Austin, TX, for Defendants.

*MEMORANDUM AND ORDER*

ATLAS, J.

**\*1** This securities fraud case is before the Court on Defendants' Motion to Dismiss [Doc. # 82], to which Plaintiffs filed their Opposition [Doc. # 83], and Defendants filed a Reply [Doc. # 84]. Based on the Court's review of Plaintiffs' Consolidated Class Action Complaint ("Complaint") [Doc. # 76] and all other matters of record, and the application of governing legal authorities, the Court grants the Motion to Dismiss.

I. *BACKGROUND*

Defendant Encysive Pharmaceuticals, Inc. ("Encysive") is a biopharmaceutical company. Defendant Bruce Given is Encysive's President and Chief Executive Officer, and Defendant Richard Dixon is its Chief Scientific Officer. Defendant Stephen Mueller and Defendant Terrence Coyne were each Encysive's Vice President of Finance, Secretary, and Treasurer during various portions of the relevant time frame. Defendant Gordon Busenbark was Encysive's Chief Financial Officer. Given and Dixon are also members of Encysive's Board of Directors.

Lead Plaintiff Oppenheim Pramerica Asset Management S.a.r.l ("OPAM") is a European fund management company that purchased shares of Encysive stock during the Class Period between February 19, 2004 and July 24, 2006.

Encysive developed a drug called sitaxentan, to be marketed under the trade name "Thelin," for the treatment of Pulmonary Arterial Hypertension ("PAH"). Encysive applied for approval from the Food and Drug Administration ("FDA") and from regulatory authorities in Europe, Canada, and Australia. Approval was granted in Canada, in Australia, and in Europe for all twenty-seven countries in the European Union. During the Class Period, the FDA issued two letters stating that Thelin is "approvable," but the agency has not yet given final approval for Encysive to market Thelin in the United States. [1] The FDA has not, however, denied approval of Thelin.

[1]    These letters were issued on March 24, 2006, and July 24, 2006. On July 15, 2007, the FDA issued a third "approvable" letter.

OPAM, for itself and on behalf of other similarly situated investors in Encysive stock during the Class Period, filed this Complaint alleging that Encysive engaged in securities fraud in violation of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder. Plaintiffs assert that Encysive made false and misleading statements during the Class Period that caused the price of Encysive stock to be artificially inflated. Plaintiffs also assert a claim against the individual Defendants as controlling persons under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).

Defendants filed their Motion to Dismiss. The Motion has been fully briefed and is now ripe for decision.

II. *STANDARD FOR MOTION TO DISMISS*

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 440 of 573

Oppenheim Pramerica Asset Management S.A.R.L. v...., Not Reported in...

2007 WL 2720074

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to seek dismissal of a claim if it fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A securities fraud cause of action can fail to state a "claim upon which relief can be granted" if the plaintiff fails to plead each element with particularity. *See Central Laborers' Pension Fund v. Integrated Elec.,* 497 F.3d 546, 2007 WL 2367776, *2 (5th Cir. Aug.21, 2007). The United States Supreme Court has made clear that a plaintiff is obligated to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). [2] "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 127 S.Ct. at 1965. "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests." *Id.* at 1965 n. 3 (internal quotation marks omitted). When the Complaint contains inadequate factual allegations, "this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 1966. "[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 1967 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

---

[2]    *Twombly* was decided under the less stringent pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure. Because the Private Securities Litigation Reform Act ("PSLRA") requires that each element of the securities fraud claim be pled with particularity similar to the more onerous pleading requirements of Rule 9, the Supreme Court's decision in *Twombly* applies with at least equal force to the PSLRA pleading requirements.

---

III. *ANALYSIS*

**\*2** In order to state a claim for securities fraud under § 10(a) of the Securities Exchange Act, "a plaintiff must allege, in connection with the purchase or sale of securities[:] (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately

[injured him]." *Central Laborers' Pension Fund v. Integrated Elec.,* 497 F.3d 546, 2007 WL 2367776, *2 (5th Cir. Aug.21, 2007) (quoting *Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 286 (5th Cir.2006)). The Private Securities Litigation Reform Act ("PSLRA") requires that each element be pled with particularity. *See id.*

A. *Material Misstatement or Omission*

Defendants argue that Plaintiffs have not alleged with adequate particularity a material misstatement or omission. "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* "Failure to do so results in dismissal of the complaint." *Id.*

Plaintiffs identify statements made during the Class Period by Defendants in press releases, corporate reports, and conference calls with analysts. Many of the statements relate to the clinical studies of Thelin and a comparison of Thelin to a competing drug bosentan, marketed as Tracleer. For example, in press releases during the summer of 2004, Encysive described the continuing clinical program for Thelin. In press releases during the fall of 2004, Encysive compared Thelin with Tracleer and expressed the belief that Thelin "has the potential" to be an important alternative for patients who developed liver problems when using Tracleer. Encysive continued to report the status and ultimate results of clinical testing throughout the remainder of 2004 and all of 2005.

There is no allegation that Encysive falsified or misstated the status and results of the various clinical tests involving Thelin. Indeed, Encysive fully disclosed problems that were encountered with Thelin's efficacy and safety at different dosage levels. Instead, Plaintiffs allege that these statements were false because the supporting trials were "inadequate." *See, e.g.,* Complaint, ¶¶ 39, 78. Absent any particularized allegation that Encysive knew its trials were fraudulent, the allegation that the trials themselves were inadequate fails to allege a false statement. "[W]here a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study. Medical researchers may well differ with respect to what constitutes acceptable testing procedures, as well as how best to interpret data garnered under various protocols." *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 420 (5th Cir.2001).

Other allegedly false or misleading statements Plaintiffs identify in the Complaint relate to Encysive's plan to apply

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 441 of 573

Oppenheim Pramerica Asset Management S.A.R.L. v...., Not Reported in...

2007 WL 2720074

for priority review of Thelin by the FDA and the company's hopes for a successful result. As to many of these statements, however, Plaintiffs fail to allege a factual basis for the conclusory allegation that the statement was false. For example, Encysive issued a press release in February 2005 stating that the company was "focused on filing a New Drug Application (NDA) with the [FDA] in April 2005 to seek marketing authorization." *See* Complaint, ¶ 56. During a conference call that same day, Defendant Given stated that Encysive would "absolutely request priority review." *See id .,* ¶ 57. During an April 2005 conference call, Given noted that cancer and HIV drugs frequently get priority review from the FDA and expressed the view that PAH should get priority review as well because it has a higher mortality rate than HIV and many cancers. *See id.,* ¶ 62. Plaintiffs allege no facts to indicate that these statements were false or that they omitted material information.

 **\*3** The remaining statements identified by Plaintiffs in connection with the FDA application are clearly forward looking projections as to which Defendants enjoy a "safe harbor." "Under Section 21E of the PSLRA, a defendant will not be liable for forward-looking statements, where the forward-looking statement is 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.' " *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 866 (5th Cir.2003) (quoting 15 U.S.C. § 78u–5(A)(ii) ("safe harbor provision"). Meaningful cautionary statements are "company specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 372 (5th Cir.2004). To avoid this safe harbor provision, the plaintiff must plead with particularity facts showing that the forward-looking statement was made with actual knowledge that it was false. *See* id. at 371. For example, in the February 2005 conference call referenced above, Defendant Given stated that Encysive believed it had a "good shot" at receiving priority review from the FDA, but noted clearly that it was "an FDA decision of course." *See* Complaint, ¶ 57. During a later conference call in February 2005, Given stated that Encysive did not expect the FDA to require additional clinical trials, but also stated clearly that "you never know what's going to happen when you get into a regulatory process." *See id.,* ¶ 59. Encysive's statements of its expectations regarding the FDA approval process were

clearly no more than that—statements of Encysive's hopes and expectations.

Plaintiffs have alleged in bald, conclusory fashion that Defendants knew that Thelin would not obtain FDA approval, would not be commercialized, and would not gain market share from Tracleer. *See id.,* ¶ 78. Plaintiffs have not, however, alleged with any particularity facts supporting Defendants' alleged knowledge. These conclusory assertions of knowledge and falsehoods are insufficient to withstand Defendants' Motion to Dismiss.

Plaintiffs note that Encysive received an "approvable letter" on March 24, 2006, and another one in July 2006. Although Plaintiffs concede that Encysive disclosed the receipt of each letter immediately, Plaintiffs allege that Defendants made misstatements or omissions because they declined to discuss the details of the letters with market analysts. When declining to answer such questions from analysts, Encysive explained clearly that, in order to avoid assisting competitors with their FDA applications, Encysive would keep the details confidential. Encysive's decision not to discuss publicly the details of the "approvable" letters did not constitute a material misstatement or omission. [3]

[3]     Plaintiffs have not alleged and cannot allege that this decision was unreasonable, given the competitive market conditions. During the Class Period, several other companies were testing competing drugs to treat PAH.

 **\*4** Plaintiffs have failed as a matter of law to identify any statements by Defendants that constituted misstatements or omissions in support of their securities fraud claims. As a result, Defendants are entitled to dismissal of the Complaint.

### B. *Scienter*

Defendants argue that this case should be dismissed because Plaintiffs have failed to allege scienter with adequate particularity. In any private securities fraud action under the PSLRA, the complaint shall, with respect to each alleged misstatement or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. § 78u–4(b)(2)). The plaintiff must allege and prove that the defendant acted with scienter, which means intent or severe recklessness. *Id.* "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence,

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 442 of 573
Oppenheim Pramerica Asset Management S.A.R.L. v..., Not Reported in...
2007 WL 2720074

but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.*

When determining whether a plaintiff has alleged facts that give rise to the requisite inference of scienter, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre, or even the most plausible of competing inferences ... Yet the inference of scienter must be more than merely reasonable or permissible —it must be cogent and compelling, thus strong in light of other explanations." *Id.* (internal citations and quotations omitted). A complaint, therefore, will survive dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Plaintiffs in this case have not alleged facts that raise an inference that Defendants acted with the necessary scienter. Plaintiffs argue scienter is established by Encysive's failure to disclose "any information about the FDA's refusal to approve Thelin or why it wanted additional clinical trial data." *See* Opposition, p. 17. This argument is rejected. First, the FDA has not refused to approve Thelin and Encysive promptly disclosed the FDA's approvable letters seeking additional information. Second, as is discussed above, Encysive explained its reasons for not discussing publicly the specifics of the FDA letters and that explanation is cogent and compelling. Indeed, it is as reasonable as Plaintiffs' belief that the decision to withhold those specifics constituted knowledge of some misstatement or omission.

 **5**  Plaintiffs also argue that they have adequately alleged scienter by showing that Encysive was motivated to engage in securities fraud because it needed money from public stock offerings. It is rare that a company conducts a public stock offering for any reason other than to raise money and, therefore, this does not raise an inference of scienter. Additionally, Encysive used a large part of the money it acquired from the stock sales to finance the development of Thelin, indicating Defendants' belief that Thelin's potential as a successful and lucrative product for the company justified the expenditures.

Moreover, the allegations in the Complaint do not raise an inference of intent or severe recklessness that is at least as compelling as the opposing inference one could draw from the facts alleged. For example, Encysive's applications for approval to market Thelin in Europe, Canada and Australia were approved, supporting Encysive's belief that the FDA application would similarly be approved. Encysive, as early as its 2003 Form 10–K filed in March 2004, clearly and unequivocally cautioned that "[i]f we are unable to clearly demonstrate that Thelin0 provides an acceptable risk-benefit profile as compared to currently approved therapies, we are not likely to receive regulatory approval to market" the drug. *See* Complaint, ¶ 46. Similar cautionary language was included in the other public statements regarding the clinical testing and the FDA approval process. As is noted above, Encysive invested significant resources in the development of Thelin, indicating its genuine belief that the drug would receive FDA approval and be successfully marketed. The allegations in the Complaint do not support a cogent inference of scienter.

Plaintiffs also note that two of the individual Defendants sold stock during the Class Period. "Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts." *See Central Laborers' Pension Fund,* 2007 WL 2367776 at *5 (citing *Rubinstein v. Collins,* 20 F.3d 160, 169 (5th Cir.1994)). "Suspicious in this context generally means that the sales are out of line with prior trading practices or at times calculated to maximize personal profit." *Id.* (citing *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 435 (5th Cir.2002)). "Insider trading alone cannot create a strong inference of scienter, but it may meaningfully enhance the strength of the inference of scienter." *Id.* (internal quotations and citation omitted). An insider's sales of only a small percentage of his total stock holdings does not contribute to an inference of scienter. *See id.* In this case, Given, Encysive's CEO and the person who actually made the challenged statements during the press conferences, did not sell any shares during the Class Period. Defendant Mueller sold 17.59% of his holdings and Defendant Dixon sold 13.79% of his holdings. Each had sold shares prior to the Class Period, and each retained the vast majority of their shares throughout the Class Period. Because the sales were of small percentages and only by two insiders, and because there is no other inference of scienter, the stock sales by Mueller and Dixon do not create a cogent inference of scienter.

 **6**  Absent allegations that raise an inference of scienter that is both cogent and at least as compelling as any opposing

Case 4:24-cv-01940     Document 44-4     Filed on 01/27/25 in TXSD     Page 443 of 573

Oppenheim Pramerica Asset Management S.A.R.L. v...., Not Reported in...

2007 WL 2720074

inference one could draw from the facts alleged, Plaintiffs' Complaint must be dismissed.

### C. *Section 20 Control Person Liability*

As is discussed above, Plaintiffs have failed to plead with adequate particularity facts to support either the misstatements or the scienter element of a securities fraud cause of action. Because they have failed to allege a primary securities fraud violation, they necessarily fail to state a claim for control person liability under § 20. *See Financial Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 288 (5th Cir.2006).

### IV. *CONCLUSION AND ORDER*

Plaintiffs have failed to allege with adequate particularity that Defendants made false statements with the necessary scienter. The pleading requirements of the PSLRA and the standard described by the United States Supreme Court in *Twombly* have not been met. The Consolidated Class Action Complaint [Doc. # 76] is itself an amended pleading filed after three civil cases, each with its own complaint, were consolidated. As a

result, it appears that additional attempts to amend to plead securities fraud violations in this case would be futile. The Court will not further delay the final resolution of this dispute by allowing yet another amendment. Accordingly, it is hereby

ORDERED that Defendants' Motion to Dismiss [Doc. # 82] is GRANTED. The Court will issue a separate Final Dismissal Order.

### *FINAL ORDER*

For the reasons stated in the accompanying Memorandum and Order, it is hereby

ORDERED that Defendants' Motion to Dismiss [Doc. # 82] is GRANTED. This is a final, appealable order.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2720074

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 22

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

2019 WL 1205628
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Kristen PLAISANCE, Robbie Plaisance, Rickie Corley,
Charles F. Leekley, Brett Morris, Henry Negrette,
Jim Nesbitt, Cindy Sparacino, Richard Sparacino,
Christian Schick, Jack Gostl, Santiago Cordovez, Floyd
Bone, Tom Howland, Michael Mernah, Ben A. Seale,
Joe Shupak, Marshall Whitmer, Bill Walters, Robert
Roig, Joseph C. Rosso, and Arthur D. Secor, Plaintiffs,
v.
John D. SCHILLER, Jr., D. West Griffin, Hill
A Feinberg, Norman M.K. Louie, William
Colvin, David M. Dunwoody, Cornelius
Dupré II, Kevin Flannery, Scott A. Griffiths,
James LaChance, and UHY LLP, Defendants.

Civil Action No. H-17-3741
|
Signed 03/14/2019

**Attorneys and Law Firms**

Randall Scott Newman, Mark C. Rifkin, Wolf Haldenstein et
al, New York, NY, Deirdre Carey Brown, Hoover Slovacek
LLP, Houston, TX, for Plaintiffs.

Barrett H. Reasoner, Ashley McKeand Kleber, David
Michael Sheeren, Gibbs Bruns LLP, Houston, TX, Kenneth E.
Warner, Warner Partners, P.C, Clifford Thau, Vinson Elkins,
New York, NY, Jill Rickershauser Carvalho, Paul R. Bessette,
Tyler Wayne Highful, King and Spalding, Austin, TX, Jeffrey
S. Johnston, Vinson Elkins LLP, Houston, TX Richard Kent
Piacenti, Vinson and Elkins LLP, Dallas, TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**

SIM LAKE, UNITED STATES DISTRICT JUDGE

**\*1** This action is brought by plaintiffs, Kristen Plaisance,
Robbie Plaisance, Rickie Corley, Charles F. Leekley, Brett
Morris, Henry Negrette, Jim Nesbitt, Cindy Sparacino,
Richard Sparacino, Christian Schick, Jack Gostl, Santiago
Cordovez, Floyd Bone, Tom Howland, Michael Mernah, Ben
A. Seale, Joe Shupak, Marshall Whitmer, Bill Walters, Robert
Roig, Joseph C. Rosso, and Arthur D. Secor (collectively,

"Plaintiffs"), against defendants, UHY LLP ("UHY"),
and ten individual defendants (collectively, "Individual
Defendants"): John D. Schiller ("Schiller"), D. West Griffin
("Griffin"), Hill A Feinberg ("Feinberg"), Norman M.K.
Louie ("Louie"), William Colvin ("Colvin"), David M.
Dunwoody ("Dunwoody"), Cornelius Dupré II ("Dupré"),
Kevin Flannery ("Flannery"), Scott A. Griffiths ("Griffiths"),
and James LaChance ("LaChance"), for common law fraud
and alleged violations of §§ 10(b) and 20(a) of the Securities
Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b),
78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R.
§ 240.10b-5, during the period beginning on September
28, 2007, and ending on December 30, 2016, arising from
statements and representations regarding Energy XXI Ltd.
("EXXI" or the "Company"). Plaintiffs also assert claims
for violations of § 20(a) of the Exchange Act, 15 U.S.C. §
78t(a), and for breach of fiduciary duty against the Individual
Defendants all of whom served as members of EXXI's
Board of Directors. Pending before the court are UHY
LLP's Motion to Dismiss ("UHY's MD") (Docket Entry No.
101), Defendant D. West Griffin's Motion to Dismiss the
Amended Complaint ("Griffin's MD") (Docket Entry No.
102), Defendant Norman M.K. Louie's Motion to Dismiss
the Amended Complaint ("Louie's MD") (Docket Entry No.
103), Defendant John D. Schiller, Jr.'s Motion to Dismiss
the Amended Complaint ("Schiller's MD") (Docket Entry No.
104), and The Director Defendants' Motion to Dismiss the
Amended Complaint ("Director Defendants' MD") (Docket
Entry No. 105). For the reasons stated below, the defendants'
motions to dismiss will be granted.

**I. Procedural History and Alleged Facts**

Plaintiffs initiated this action on September 6, 2017, by-
filing in the Southern District of New York a Complaint
for Violation of the Federal Securities Law, Common Law
Fraud, and Breach of Fiduciary Duty (Docket Entry No.
1), asserting claims for fraud and violation of § 10(b) of
the Exchange Act and Rule 10b-5 promulgated thereunder
against all defendants, and claims for violation of § 20(a) of
the Exchange Act and breach of fiduciary duty against the
Individual Defendants. On December 1, 2017, the Southern
District of New York entered an Order pursuant to 28 U.S.C. §
1404(a) transferring the action to this court (Docket Entry No.
52). On February 12, 2018, defendants moved for dismissal
(Docket Entry Nos. 85, 86, 89, 93, and 94). On March 29,
2018, Plaintiffs filed an Amended Complaint for Violation
of the Federal Securities Law, Common Law Fraud, and

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 446 of 573

Breach of Fiduciary Duty ("Plaintiffs' Amended Complaint") (Docket Entry No. 97), in which they reassert the same claims asserted in their initial complaint. On May 18, 2018, defendants filed the pending motions to dismiss Plaintiffs' Amended Complaint (Docket Entry Nos. 101-105). On July 16, 2018, plaintiffs filed responses to each of the pending motions to dismiss (Docket Entry Nos. 111-115), and on August 29, 2018, defendants filed replies in support of their motions to dismiss (Docket Entry Nos. 118-122).

**\*2** Plaintiffs' Amended Complaint alleges that EXXI was founded by Schiller and Griffin in 2005 to acquire, explore, develop, and operate oil and natural gas properties onshore in Louisiana and Texas and offshore in the Gulf of Mexico Shelf, funded by a $300 million initial public offering of common stock traded on the London Stock Exchange Alternative Investment Market ("AIM").[1] Plaintiffs allege that Schiller served as EXXI's President, Chief Executive Officer ("CEO"), and member of the Board of Directors ("Board") from the company's inception through and including February 2, 2017, when EXXI announced the termination of Schiller's employment as President, CEO, and member of the Board in a Current Report filed with the SEC on Form 8-K.[2] From EXXI's founding in 2005 through and including October 15, 2015, Schiller also served as Chairman of the Board. He was stripped of that title by the Board on October 9, 2015, following an internal investigation that found he borrowed funds from personal acquaintances or their affiliates, some of whom provided services to EXXI or its subsidiaries, and that in 2014 he personally borrowed $3 million from defendant Louie before Louie was appointed to the Board effective December 15, 2014.[3] Plaintiffs allege that as EXXI's Board Chairman and CEO, Schiller signed the Company's annual reports filed with the SEC on Forms 10-K and 10-K/A.[4]

[1] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 15 ¶¶ 64-65. All page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

[2] Id. at 6 ¶ 20.

[3] Id. ¶ 22.

[4] Id. ¶¶ 20-21.

Plaintiffs allege that defendant Griffin served as EXXI's Chief Financial Officer ("CFO") and Board member from the Company's inception through and including October 20, 2014, when EXXI announced Griffin's resignation in a press release and a Current Report filed with the SEC on Form 8-K/A on December 1, 2014, following BDO USA, LLP's ("BDO") acquisition of the Texas practice of UHY, which provided independent public accounting services to EXXI.[5] Plaintiffs allege that as CFO, Griffin signed EXXI's quarterly and annual reports filed with the SEC on Forms 10-Q, 10-K, and 10-K/A, and that Griffin is responsible for the content of the reports that he signed.[6]

[5] Id. at 9 ¶ 39.

[6] Id. ¶¶ 37-38.

Plaintiffs allege that UHY was engaged to audit EXXI's financial statements and to express an opinion on whether those financial statements fairly presented the financial condition of the Company.[7] Specifically, UHY was engaged to audit EXXI's financial statements for the years ended June 30, 2011, 2012, 2013, and 2014.[8] Plaintiffs allege that each audit opinion contained UHY's opinion that it audited EXXI's financial statements "in accordance with the standards of the Public Company Accounting Oversight Board (United States)" (the "PCAOB"),[9] that it "plan[ned] and perform[ed] the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects,"[10] and that each audit stated: " 'In our opinion Energy XXI (Bermuda) Limited and subsidiaries maintained, in all material respects, effective internal control over financial reporting' for the year in question."[11]

[7] Id. at 19 ¶ 85.

[8] Id.

[9] Id. at 20 ¶ 92.

[10] Id. ¶ 93.

[11] Id. at 20-21 ¶ 94.

Plaintiffs allege that in addition to serving on EXXI's Board, defendant Colvin was Chairman of the Audit Committee and a member of the Nomination and Governance Committee;[12] defendant Flannery was a member of the

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 447 of 573

2019 WL 1205628

Audit Committee and the Nomination and Governance Committee;[13] defendant Dunwoody was Chairman of the Remuneration Committee and a member of the Audit Committee;[14] defendant Griffiths served on the Audit Committee and the Compensation Committee;[15] defendant Feinberg was Lead Independent Director, Chairman of the Nomination and Governance Committee, a member of the Compensation Committee, and an ex officio member of the Audit Committee;[16] and defendant Dupré was Chairman of the Compensation Committee and a member of the Nomination and Governance Committee.[17]

[12]    Id. at 11 ¶ 48.

[13]    Id. ¶ 49.

[14]    Id. at 11-12 ¶ 50.

[15]    Id. at 12 ¶ 51.

[16]    Id. ¶ 52.

[17]    Id. at 12 ¶ 53.

Plaintiffs allege that between 2006 and 2010, EXXI completed five major acquisitions for aggregate cash consideration of approximately $2.5 billion of borrowed funds: (1) Marlin Energy, L.L.C. ("Marlin") in February 2006 for approximately $448.4 million; (2) certain Louisiana Gulf Coast producing properties from affiliates of Castex Energy, Inc. ("Castex Properties") in June 2006 for approximately $312.5 million; (3) certain Gulf of Mexico shelf properties from Pogo Producing Company ("Pogo Properties") in June 2007 for approximately $415.1 million; (4) certain Gulf of Mexico shelf oil and natural gas interests from MitEnergy Upstream LLC, a subsidiary of Mitsui & Co., Ltd. ("MitEnergy Interests") in November 2009 for $276.2 million; and (5) certain shallow water Gulf of Mexico shelf oil and natural gas interests from affiliates of Exxon Mobil Corporation ("ExxonMobil Acquisition") in December 2010 for $1.01 billion.[18]

[18]    Id. at 16 ¶¶ 69-71.

  *3  Plaintiffs allege that on July 31, 2007, following EXXI's acquisition of the Pogo Properties in June of 2007, EXXI announced that in addition to trading on the AIM in London, its common stock was approved for trading in the United States on the NASDAQ national exchange.[19] Plaintiffs

allege that on August 12, 2011, EXXI's common stock was listed for trading on the NASDAQ Global Select Market under the symbol "EXXI."[20] Plaintiffs allege that because many institutional investors are prohibited from investing in companies that do not meet certain minimum requirements such as the requirements needed to be listed on the NASDAQ Global Select Market exchange, listing thereon gave EXXI greater access to capital and increased market liquidity.[21] Plaintiffs assert their belief that after a reasonable opportunity for discovery, evidence will show that but for EXXI's use of cash flow hedge accounting, EXXI would not have met the minimum requirements for listing on the NASDAQ Global Select Market.[22]

[19]    Id. at 16-17 ¶ 72.

[20]    Id. at 17 ¶ 73.

[21]    Id. ¶ 74.

[22]    Id. ¶ 76.

Plaintiffs allege that from 2010 to 2013 EXXI made optimistic and positive statements about its ultimately unsuccessful ultra-deep exploration program, particularly the Davy Jones No. 1 and No. 2 wells, that were false and misleading when made.[23]

[23]    Id. at 25-32 ¶¶ 108-43.

Plaintiffs allege that in early 2014 defendants caused EXXI to acquire EPL, an independent oil and natural gas exploration and production company, and assert their belief that after a reasonable opportunity for discovery evidence will show that Schiller pursued the acquisition without customary and reasonable due diligence, and consequently that EXXI overpaid for EPL,[24] that following the acquisition one of EPL's Board of Directors, defendant Griffiths, joined EXXI's Board and changed EPL's method of accounting from successful efforts to full cost accounting to match EXXI's accounting method,[25] EXXI's reported goodwill rose from zero reported in EXXI's financial statements from the period ended March 31, 2014, shortly before the acquisition, to $329 million reported by EXXI in its June 30, 2014, financial statements filed immediately after the acquisition.[26]

[24]    Id. at 33-34 ¶¶ 147-155.

**Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)**

2019 WL 1205628

25   Id. at 35-36 ¶¶ 159-68.

26   Id. at 37 ¶ 173.

Plaintiffs allege that following EXXI's acquisition of EPL, EXXI issued financial statements that were false and misleading because EXXI failed to perform a quantitative goodwill impairment test and therefore failed to recognize goodwill impairments for EPL or for its other oil and gas properties [27] and failed to disclose the existence of a personal loan from defendant Louie to defendant Schiller. [28]

27   Id. at 38-49 ¶¶ 176-230.

28   Id. at 56 ¶¶ 269-70.

Plaintiffs allege that on or about December 14, 2014, EXXI common stock was cancelled for trading on the AIM in London by action of the Board taken pursuant to a shareholder vote at the annual meeting held on November 4, 2014. [29]

29   Id. at 18 ¶ 78.

Plaintiffs allege that in September of 2015, following a change in independent auditors, EXXI was required to restate more than four years of financial statements to eliminate the use of hedge accounting. [30] Plaintiffs allege that EXXI's financial statements for the years ended June 30, 2011, 2012, 2013, 2014, and 2015, filed with the SEC on August 26, 2011, August 9, 2012, August 21, 2013, August 28 and December 23, 2014, and September 29, 2015, were materially false and misleading because they stated that EXXI did not use hedging for speculative or trading purposes. [31] Plaintiffs allege that "[u]ntil EXXI's financial statements were corrected on September 29, 2015, the Company's publicly filed financial statements for at least the years ended June 30, 2011, 2012, 2013, and 2014, and for all the intervening quarters materially misstated and did not fairly and accurately present the Company's financial condition and its results of operations." [32] Plaintiffs also allege that

> **\*4** EXXI's disclosure that it was required to restate its financial statements to eliminate cash flow hedge accounting was materially false and misleading because it made it appear that the reason for the restatement was a mere technical deficiency in documentation, when the true reason for the restatement was that the Company was hedging for improper purposes, including speculating on future oil and natural gas prices or manipulating reported revenue and earnings. [33]

30   Id. at 17-18 ¶ 77.

31   Id. at 52 ¶ 249.

32   Id. at 54 ¶ 257.

33   Id. at 54-55 ¶ 259.

Plaintiffs allege that on April 16, 2016, EXXI sought protection from its creditors by filing a voluntary Chapter 11 bankruptcy petition in the Southern District of Texas. [34]

34   Id. at 68-69 ¶ 328.

Plaintiffs allege that on April 20, 2016, EXXI was informed by the Listing Qualifications Department of NASDAQ that its stock would be delisted from the NASDAQ for failure to meet the minimum listing qualifications. [35]

35   Id. at 18 ¶ 79.

Plaintiffs allege that on December 13, 2016, the Bankruptcy Court for the Southern District of Texas approved EXXI's amended plan of reorganization. [36]

36   Id. ¶ 81.

## II. Standards of Review

Defendants argue that Plaintiffs' Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted. A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom. Cloud v. United States, 122 S. Ct. 2665 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 449 of 573

2019 WL 1205628

to the Plaintiffs, and draw all reasonable inferences in the Plaintiffs' favor. Id. To defeat a motion to dismiss pursuant to Rule 12(b)(6) a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 127 S. Ct. at 1965). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 127 S. Ct. at 1965). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (quoting Twombly, 127 S. Ct. at 1966).

When considering a motion to dismiss courts generally are limited to the complaint and its proper attachments. Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008). Courts may also rely on " 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " Id. See also Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010) (When considering a motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.") (citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000) ). In securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed and are filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain; not for proving the truth of their contents. Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996) (citing and adopting rule of Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991), and explaining that rule does not apply to other forms of disclosure such as press releases and announcements at shareholder meetings).

### III. Analysis

*5  Defendants argue that all of the claims asserted against them should be dismissed because Plaintiffs have failed to state a claim for which relief may be granted.

### A. Federal Securities Law Claims

Defendants argue that the securities claims asserted against them should be dismissed because Plaintiffs have failed to satisfy the pleading requirements for stating either a primary claim under § 10(b) or Rule 10b-5, or a claim for control person liability under § 20(a), and because the factual allegations do not satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b) or the Private Securities Litigation Reform Act ("PSLRA") set forth at 15 U.S.C. § 78u-4(b).

#### 1. Applicable Law

##### (a) Federal Securities Law

Section 10(b) of the Exchange Act makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To recover damages for violations of § 10(b) and Rule 10b-5, plaintiffs must prove

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014). See also Owens v. Jastrow, 789 F.3d 529, 535 (5th Cir. 2015) (same). To satisfy the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 96 S. Ct. 2126, [449] (1976) (citing Basic Inc. v. Levinson, 108 S. Ct. 978, [231] (1988) ). The Fifth Circuit has stated that "[m]ateriality is not judged in the abstract, but in light of the surrounding circumstances." Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1448 (5th Cir. 1993). Inclusion of cautionary language along with disclosure of any firm-specific adverse facts or assumptions is relevant to the materiality inquiry, but "cautionary language as such is not per se dispositive of this inquiry." Rubinstein v. Collins, 20 F.3d 160, 168 (5th Cir. 1994).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2507 (2007) (quoting Ernst & Ernst v. Hochfelder, 96 S. Ct. 1375, 1381, n.12 (1976) ). Scienter does not require a specific intent to deceive; instead,

**\*6** the scienter element of a federal securities fraud claim may be satisfied by proof that the defendant acted with severe recklessness, which is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994) (quoting Shushany v. Allwaste, Inc., 992 F.2d 517, 521 (5th Cir. 1993) ). Plaintiffs "must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant." R2 Investments LDC v. Phillips, 401 F.3d 638, 643 (5th Cir. 2005) (citing Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004) (holding that plaintiffs claiming securities fraud against multiple defendants must "distinguish among

those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud") ). Group allegations that "the defendants" or "the company" knew something do not meet that standard. Southland, 365 F.3d at 366. The factual allegations contained in the entire complaint must be considered in determining whether plaintiffs' allegations raise a strong inference of scienter. Id. To withstand a motion to dismiss, the facts alleged must permit an inference of intentional deception that is at least equally as compelling as any alternative inference. Lormand v. US Unwired, Inc., 565 F.3d 228, 254 (5th Cir. 2009) (quoting Tellabs, 127 S. Ct. at 2499, 2510).

Plaintiffs must show a causal connection between the company's revealing of the truth regarding an earlier misrepresentation and a subsequent decline in the company's stock price. See Alaska Electrical Pension Fund v. Flowserve Corp., 572 F.3d 221, 229 (5th Cir. 2009). This corrective disclosure must be "related to" or "relevant to" the alleged fraud, meaning the disclosed information must make the existence of the alleged fraud "more probable than it would be without that alleged fact." Public Employees' Retirement System of Mississippi, Puerto Rico Teachers' Retirement System v. Amedisys, Inc., 769 F.3d 313, 321 (5th Cir. 2014), cert. denied, 135 S. Ct. 2892 (2015). The corrective disclosure "can be gradually perceived in the marketplace through a series of partial disclosures." Id. at 322. Partial disclosures are viewed collectively and considered as a whole to determine when cumulative facts support a corrective disclosure that meets the loss causation pleading standard. Id. at 325.

The parties agree that the applicable statute of limitations and repose is 28 U.S.C. § 1658(b). [37] Under 28 U.S.C. § 1658(b) an action for securities fraud must be brought no later than two years after the discovery of the facts constituting the violation or five years after the occurrence of the violation, whichever is earlier. The period of repose begins to run from the date of the misrepresentation or omission that forms the basis of the securities law violation. Hall v. Variable Annuity Life Insurance Co., Civil Action No. H-11-3639, 2012 WL 12877431, at \*4 (S.D. Tex. May 31, 2012), aff'd, 727 F.3d 372 (5th Cir. 2013) (citing In re Exxon Mobil Corp. Securities Litigation, 500 F.3d 189, 199-200 (3d Cir. 2007) ("[W]e hold that the repose period applicable to § 10(b) claims as set out in §§ 9(e) and 1658(b)(2) begins to run on the date of the alleged misrepresentation."). Because Plaintiffs filed this action on September 6, 2017, [38] the date of repose is September 6, 2012. Plaintiffs state that they "do not assert any claims for any false, misleading, or incomplete

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 451 of 573

2019 WL 1205628

statements made prior to that date." [39]  Nevertheless, citing Rubinstein, 20 F.3d at 170 n.41, Plaintiffs argue that "to the extent that untrue statements were made prior to September 6, 2012, about which Defendants had a duty to correct – such as EXXI's 2011 annual report, which improperly utilized hedge accounting – the omission of a corrective disclosure in subsequent statements made *after* that date are actionable." [40]

[37]     See, e.g., Director Defendants' MD, Docket Entry No. 105, pp. 29-30, and Plaintiffs' Memorandum of Law in Opposition to the Director Defendants' Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to Director Defendants' MD"), Docket Entry No. 115, p. 26.

[38]     See Complaint for Violation of the Federal Securities Law, Common Law Fraud, and Breach of Fiduciary Duty, Docket Entry No. 1.

[39]     Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 26.

[40]     Id.

*7  In Rubinstein, 20 F.3d at 170 n.41, the Fifth Circuit acknowledged that defendants have a duty under Rule 10b-5 to correct statements if those statements have become materially misleading in light of subsequent events, but the Rubinstein court neither held nor stated that material omissions made before the date of repose remain actionable because defendants have an ongoing duty to correct such omissions. Plaintiffs' argument that material omissions made before the date of repose are nevertheless actionable because defendants had an ongoing duty to correct those omissions would negate the five-year statute of repose by allowing plaintiffs to revive time-barred claims simply by asserting that defendants had an ongoing duty to correct their material omissions. Any claims based on misrepresentations or omissions allegedly made before September 6, 2012, are therefore barred by the statute of repose. See Hall, 2012 WL 12877431, at *4 (citing Malhotra v. The Equitable Life Assurance Society of the United States, 364 F. Supp. 2d 299, 305-06 (E.D.N.Y. 2005) (granting defendants' 12(b)(6) motion on the ground that the statute of repose began to run on the day of the initial omission).

(b) Federal Rule of Civil Procedure 9(b)

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Plaintiffs must plead the elements of their Rule 10b-5 claims with particularity. See Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003) (citing Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir.), cert. denied, 118 S. Ct. 412 (1997) ). Particularity is required so that the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. See Tuchman, 14 F.3d at 1067.

Pleading fraud with particularity in this circuit requires "the particulars of 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.' " Id. at 1068 (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992) ). See also Carroll v. Fort James Corp., 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting United States ex rel. Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370, 381 (5th Cir. 2004) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.") ). "A dismissal for failure to plead fraud with particularity as required by rule 9(b) is a dismissal on the pleadings for failure to state a claim." Southland, 365 F.3d at 361 (citing Shushany, 992 F.2d at 520-520).

(c) Private Securities Litigation Reform Act

In 1995 Congress amended the Exchange Act through the passage of the PSLRA, 15 U.S.C. § 78u-4(b)(1). In relevant part the PSLRA provides:

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant - -

(A) made an untrue statement of a material fact; or

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 452 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

**(A) In general**

**\*8** Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

...

**(3) Motion to dismiss; stay of discovery**

**(A) Dismissal for failure to meet pleading requirements**

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u-4(b).

In ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002), the court coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants:

[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4 (b) (1) & 78U-4(b) (3) (A):

(1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA. Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:

(7) state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief.

In Indiana Electric Workers' Pension Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 533 (5th Cir. 2008), the Court reiterated that the PSLRA heightened the pleading standards for private claims of securities fraud by requiring plaintiffs to allege with particularity why each one of defendants' representations or omissions was misleading under 15 U.S.C. § 78u-4(b)(1), and by requiring plaintiffs to plead with particularity those facts giving rise to a strong inference that the defendant acted with the required state of mind under 15 U.S.C. § 78u-4(b)(2). In Tellabs, 127 S. Ct. at 2510, the Supreme Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." However, in Lormand, 565 F.3d at 267, the Fifth Circuit held that the PSLRA did not heighten pleading standards for all six elements of securities fraud. The Fifth Circuit explained that the plain text of 15 U.S.C. § 78u-4(b)(4) provides only that "the plaintiff shall have the burden of proving that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages." Id. at 255 n.18. Nothing in this language expressly or impliedly heightens the standard of pleading to loss causation. Thus, when considering a motion to dismiss, courts are "not authorized or required to determine whether the plaintiff's plausible inference of loss causation [under 15 U.S.C. § 78u-4(b) (4)] is equally or more plausible than other competing inferences, as [they] must in

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 453 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

assessing allegations of scienter under the PSLRA." Id. at 267.

**\*9** The PSLRA contains a safe harbor provision that protects individuals and corporations from liability for certain forward-looking statements that later prove false. To qualify for this protection the statement at issue must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be "immaterial." 15 U.S.C. § 78u-5(c)(1) (A)(i, ii). "To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity." Southland, 365 F.3d at 371 (citing 15 U.S.C. § 78u-5(c)(1)(B); Nathenson v. Zonagen Inc., 267 F.3d 400, 409 (5th Cir. 2001) ).

### 2. Application of the Law to the Alleged Facts

#### (a) Defendant UHY

UHY argues that the federal securities law claims asserted against it should be dismissed because Plaintiffs' Amended Complaint fails to allege facts capable of establishing an actionable misstatement or omission of fact arising from its audit opinions or a strong inference of scienter. [41] UHY also joins in the arguments presented in the Director Defendants' MD with respect to the securities fraud claims regarding group pleading, loss causation, and the statute of repose. [42]

---

[41]    UHY's MD, Docket Entry No. 101, p. 12. See also UHY LLP's Reply in Support of the Motion to Dismiss the Amended Complaint (UHY's Reply"), Docket Entry No. 119, pp. 6-15.

[42]    UHY's MD, Docket Entry No. 101, p. 7 n.2.

#### (1) Alleged Misstatements and Omissions

Citing Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 135 S. Ct. 1318 (2015), UHY asserts that its audit reports are statements of opinion, not fact, and argues that the securities law claims asserted against it should be dismissed because plaintiffs fail to allege an actionable misstatement or omission of fact arising from its audit reports. [43] At least one court in this district has held that audit reports are statements of opinion, not fact, and

plaintiffs do not argue otherwise. See Johnson v. CBD Energy Ltd., Civil Action H-15-1668, 2016 WL 3654657, at \*10 (S.D. Tex. July 6, 2016) ("an auditor's 'statement regarding ... compliance inherently [is] one of opinion' "). Nevertheless, without addressing the applicability of the Supreme Court's Omnicare opinion, plaintiffs respond that UHY's

> argument ignores the fact that Plaintiffs have alleged materially false and misleading statement[s] *in UHY's own audit reports.* As alleged in the Amended Complaint, each of the Company's annual financial statements included an affirmative statement prepared by UHY that it audited the financial statements "in accordance with the standards of the [PCAOB] (United States)." ¶ 92. Plaintiffs also allege UHY represented that it planned and performed the audits to obtain reasonable assurance about whether the Company maintained effective internal control over its financial reporting. ¶ 93. And UHY also affirmatively represented in each audit report that EXXI maintained effective internal control over its financial reporting. ¶ 94.

> As alleged in the Amended Complaint, and as explained above, those statement[s] were materially false and misleading, and UHY had no basis for making them. [44]

Asserting that UHY audited EXXI's annual financial statements included in EXXI's 2011, 2012, 2013, and 2014 annual reports filed with the SEC on Form 10-K, plaintiffs allege that "[t]hose financial statements were erroneous," [45] because

> [a]s EXXI announced in a press release and a Current Report on Form 8-K filed with the SEC on September 8, 2015, the Company's previously issued consolidated financial statements for the years ended June 30, 2011, 2012, 2013 and 2014, along with its consolidated financial statements for the quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014, should no longer be relied upon and would be reinstated. ¶ 83. [46]

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 454 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

43    Id. at 20.

44    Plaintiffs' Memorandum of Law in Opposition to Defendant UHY LLP's Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to UHY's MD"), Docket Entry No. 111, p. 17.

45    Id. at 5.

46    Id. at 5-6.

**\*10**   In Omnicare the Court clarified how trial courts should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion. Omnicare provides "two potential avenues for plaintiffs to establish the falsity of an opinion." In re BP p.l.e. Securities Litigation, 2016 WL 3090779, at \*9. First, "every ... statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief." Omnicare, 135 S. Ct. at 1327. A speaker can be liable for an opinion statement if the speaker did not in fact hold that opinion. Second, "depending on the circumstances," a reasonable investor could

> understand an opinion statement to convey facts about the speaker's basis for holding that view. Specifically, [a speaker's] statement of opinion may fairly imply facts about the inquiry the issuer conducted or the knowledge it had. And if the real facts are otherwise, but not provided, the opinion statement will mislead by omission.

Id. at 1322. Thus, even if a speaker's opinion is sincerely held,

> the statement may nonetheless be actionable under 10b-5's omissions provision if: (i) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself."

In re BP p.l.e. Securities Litigation, MDL No. 4:10-MD-2185, 2016 WL 3090779, at \*9 (S.D. Tex. May 31, 2016) (quoting Omnicare, 135 S. Ct. at 1329). The Omnicare Court emphasized that the latter avenue to liability does not allow a plaintiff to circumvent the particularity and materiality requirements of a fraud claim by alleging in general terms that the defendant improperly failed to reveal the basis for his opinion, or failed to disclose "some fact cutting the other way." 135 S. Ct. at 1329 (explaining that "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why [a speaker] may frame a statement as an opinion, thus conveying uncertainty"). Id. But the Supreme Court also recognized that reasonable investors expect a speaker's statement of opinion to fairly align with the information in his or her possession at the time. Id.

In their Amended Complaint Plaintiffs allege that

> UHY's unqualified audit reports were materially false and misleading because, among other things: (a) the audits were not conducted in accordance with PCAOB standards; and (b) EXXI's financial statements did not fairly present the Company's true financial position and results of operations and did not comply with GAAP [Generally Accepted Accounting Principles].[47]

In support of their allegations that UHY's audit reports were materially false and misleading, Plaintiffs allege

102. The Company's financial statements did not comport with GAAP as they failed to disclose the millions of dollars in loans to Defendant Schiller from EXXI's vendors and from a confederate on the Board who was also an affiliate of one of the Company's largest shareholders.

103. Contrary to the Audit Report, the audit was not conducted in accordance with PCAOB standards. In particular, PCAOB Standard AU § 316 sets forth certain fraud risks or red flags, including: (a) unsupported balances or transactions; (b) inconsistent, vague or implausible responses from management arising from inquiries or analytical procedures; (c) lack of timely and appropriate documents; (d) missing documents; and (e) evasive or unreasonable responses of management to audit reports.

**\*11**   104. In conducting its audits of the financial statements in EXXI's annual reports, Defendant UHY ignored the most obvious of red flags, the missing

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 455 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

documentation necessary to permit the Company to use cash flow hedge accounting. [48]

47    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 22 ¶ 100.

48    Id. at 24 §§ 102-04.

Missing from the Plaintiffs' Amended Complaint are allegations of fact capable of proving that UHY did not subjectively believe its audit opinions when they were issued. Therefore, to state a claim against UHY for its audit reports, Plaintiffs must allege, with particularity, facts capable of establishing that UHY knew, but omitted to include in its audit reports, material facts that contradict its opinion statements. See In re Plains All American Pipeline, L.P. Securities Litigation, 245 F. Supp. 3d 870, 905 (S.D. Tex. 2017). [49] The facts that Plaintiffs allege contradict UHY's audit opinions concern loans that defendant Schiller received from defendant Louie and EXXI vendors and lack of documentation needed to support EXXI's use of hedge accounting. [50] But missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that when UHY issued its audit reports, UHY knew or should have known about Schiller's loans. Moreover, since Plaintiffs' Amended Complaint expressly alleges that Schiller's loans were undisclosed until October of 2015, long after UHY issued the audit opinions about which Plaintiffs complain, [51] the facts alleged in Plaintiffs' Amended Complaint contradict their contention that UHY's audit reports were false and misleading because they omitted information about Schiller's loans. [52]

49    In Plains All American Judge Rosenthal explained that

    [s]howing that a statement was false or misleading using this Omnicare prong blurs the lines between the falsity and scienter elements of an Exchange Act claim. Determining whether a statement is false or misleading turns on what the speaker knew, making it similar to the scienter inquiry. But even though this Omnicare inquiry overlaps with the scienter inquiry, the two are not identical. Here, the issue is whether the plaintiffs have adequately pleaded that the defendants were aware of material facts that: (1) contradicted or undermined their compliance opinion statements; and (2) that an investor

would reasonably believe were not true based on that statement. The scienter issue is the individual's state of mind in stating the opinion. 245 F. Supp. 3d at 905.

50    Plaintiffs' Opposition to UHY's MD, Docket Entry No. 111, p. 17.

51    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 3 ¶ 22, p. 4 ¶ 24, p. 10 ¶ 44.

52    See Plaintiffs' Opposition to UHY's MD, Docket Entry No. 111, p. 16 n.7 (apparently contradicting the allegations in ¶ 102 of Plaintiffs' Amended Complaint by stating: "Plaintiffs do not allege that UHY's audits were deficient because they failed to uncover the loans.").

Also missing from Plaintiffs' Amended Complaint are any allegations of fact capable of establishing that when UHY issued its audit reports, UHY knew or should have known that EXXI lacked documentation needed to support its use of cash flow hedge accounting. Asserting that "EXXI lacked the specific required documentation to utilize cash flow hedge accounting," [53] Plaintiffs argue that

    *12  [i]n any adequate audit, UHY would have requested or looked for the required documentation as part of its audit procedures. Had UHY done so, it immediately would have learned that EXXI lacked the required documentation for hedge accounting. Had UHY performed any adequate audit, the lack of specific required documentation would have been obvious to it. [54]

A careful review of Plaintiffs' Amended Complaint, however, only reveals allegations that UHY's audit reports were false when made because EXXI later restated some of its financial statements. [55]

53    Id. at 15.

54    Id.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 456 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

[55]  See Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 50-51 ¶¶ 239-243.

Plaintiffs allege that in December of 2014, following UHY's acquisition by BDO, EXXI engaged BDO as its successor auditor, and that in September of 2015 EXXI filed a Current Report on Form 8-K with the SEC announcing that the Company's previously issued consolidated financial statements for the years ended June 30, 2011, 2012, 2013, and 2014, and for the quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014, should no longer be relied upon and would be restated. [56]  Plaintiffs allege that

> 252. During the preparation of its annual report on Form 10-K for the year ended June 30, 2015, EXXI and its new auditor, BDO, determined that certain of the Company's oil and gas hedges did not qualify for cash flow hedge accounting treatment. EXXI and BDO determined that the Company's hedge documentation did not specify the hedged items and, therefore, the designations failed to meet the documentation requirements for cash flow hedge accounting treatment.

> 253. As a result of that determination, EXXI was required to restate its previously issued consolidated financial statements to reflect the unrealized recognition of gains and losses on derivative financial instruments ... [57]

But missing from Plaintiffs' Amended Complaint are allegations of fact capable of establishing that when UHY issued its audit reports, UHY knew or should have known that EXXI lacked documentation required to use cash flow hedge accounting. Instead, asserting that "[t]he lack of documentation regarding the hedged items could not be a result of a difference of opinion between the Company's auditors BDO and UHY as the Company disclosed that it had *no documentation* regarding what was being hedged," [58] Plaintiffs allege that UHY's audit reports were false and misleading because absent the missing documentation the audit reports could not have been conducted in accordance with PCAOB Auditing Standards or Generally Accepted Auditing Standards ("GAAS"). [59]

[56]  Id. at 51 ¶¶ 244-245.

[57]  Id. at 53 ¶¶ 252-53.

[58]  Id. at 50 ¶ 235 (emphasis in original).

[59]  Id. at 50-51 ¶¶ 237-43.

Despite Plaintiffs' assertion to the contrary, the Current Report on Form 8-K filed with the SEC in September of 2015 announcing the restatement did not state that EXXI had no documentation regarding what was being hedged. Instead, EXXI's September 2015 Form 8-K states:

> [I]n connection with preparing its annual report on Form 10-K for the year ended June 30, 2015 (the "2015 Form 10-K") management of Energy XXI Ltd. (the "Company") and the Audit Committee of its Board of Directors (the "Audit Committee") determined that the contemporaneous formal documentation it had historically prepared to support its initial designations of derivative financial instruments as cash flow hedges in connection with the Company's crude oil and natural gas hedging program did not meet the technical requirements to qualify for cash flow hedge accounting treatment in accordance with ASC Topic 815, Derivatives and Hedging. The primary reason for this determination was that the formal hedge documentation lacked specificity of the hedged items and, therefore, the designations failed to meet hedge documentation requirements for cash flow hedge accounting treatment. [60]

**\*13**  EXXI's disclosures in the September 2015 Form 8-K show that EXXI's management reached a judgment different from that previously reached regarding the level of specificity required for the documentation of hedged transactions; the disclosures do not show that EXXI had no documentation regarding what was being hedged. Nor do EXXI's disclosures mention UHY or its auditing services as a reason for the restatements.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 457 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

60  September 2, 2015, Form 8-K, Exhibit A to UHY's
    MD, Docket Entry No. 101-1, p. 2.

Because Plaintiffs fail to allege facts capable of establishing either that UHY did not sincerely believe the opinions stated in its audit reports, or that when UHY issued its audit reports UHY knew or should have known – but failed to disclose – material facts about its inquiry into or knowledge concerning the opinions stated in its audit reports, and that those facts conflict with what a reasonable investor would take from the reports themselves, i.e., information about Schiller's loans about and to deficiencies in documentation required to support EXXI's use of cash flow hedge accounting, Plaintiffs have failed to allege facts capable of establishing an actionable misstatement or omission of fact arising from the opinions expressed in UHY's audit reports. See Omnicare, 135 S. Ct. at 1329. Moreover, for the reasons stated below, the court concludes that even if the facts alleged in Plaintiffs' Amended Complaint were capable of establishing an actionable misstatement or omission of fact in UHY's audit reports, Plaintiffs have failed to allege facts capable of raising a strong inference that the misstatements or omissions were made with scienter.

### (2) Scienter

UHY argues that the Exchange Act claims asserted against it should be dismissed because Plaintiffs fail to allege facts capable of establishing a strong inference of scienter. Asserting that EXXI restated its financial statements for fiscal years 2011 through 2014, Plaintiffs argue that the restatements are compelling evidence of UHY's scienter because "UHY knew, or was severely reckless in not knowing, that EXXI's consolidated annual financial statements were not prepared in accordance with GAAP and did not fairly and accurately present the Company's financial results."[61] Plaintiffs argue that "UHY has provided no alternative or opposing explanation for certifying financial statements in which EXXI utilized cash flow hedge accounting without the requisite documentation of specific hedged risks."[62]

61  Plaintiffs' Opposition to UHY's MD, Docket Entry
    No. 111, p. 8.

62  Id.

To adequately plead scienter Plaintiffs must allege circumstances supporting a strong inference that UHY had actual knowledge, or recklessly disregarded, that its audit reports were false or misleading when made or were made without a reasonable basis. See Lovelace, 78 F.3d at 1018-19. Circuit courts of appeal have found that the requirement of "recklessness" in securities fraud cases is especially stringent when a claim is made against an outside auditor like UHY. See PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 693 (6th Cir. 2004) (collecting cases). "Recklessness on the part of an independent auditor entails a mental state so culpable that it 'approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.' " Id. (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 121 (2d Cir. 1982) ). Thus, Plaintiffs must allege facts capable of establishing not merely that there was a deviation from accounting principles, but

> *14 that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

Id. at 693-94 (quoting In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1426 (9th Cir. 1994) ). See also In re Franklin Bank Corp. Securities Litigation, 782 F. Supp. 2d 364, 402 (S.D. Tex. 2011); In re Dell Inc., Securities Litigation, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008).

A careful review of the Plaintiffs' allegations of scienter reveal little more than assertions that UHY's audit reports were false because EXXI later restated certain financial information. Courts in this circuit inferring scienter based in part on improper accounting do so only when other factors strongly support the inference. See In re ArthroCare Corp. Securities Litigation, 726 F. Supp. 2d 696 (W.D. Tex. 2010) (improper accounting practices and denials of media reports); In re Seitel, Inc. Securities Litigation, 447 F. Supp. 2d 693 (S.D. Tex. 2006) (improper accounting practices and overstated revenues, memoranda and meeting minutes revealing that the defendants explicitly discussed the

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 458 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

improper accounting methods, affirmatively chose to ignore potential problems, and dismissed an auditor who confronted them about the improper practices).

Plaintiffs' Amended Complaint does not allege media reports or internal company documents that would permit an inference that UHY knew of or recklessly disregarded evidence that EXXI's accounting misrepresented EXXI's financial condition. Instead, as reasons to infer UHY's scienter, Plaintiffs point to the magnitude of the restatements, and to the reason for the restatements – i.e., lack of specificity in the documentation used to support EXXI's use of cash flow hedge accounting. [63] But the magnitude of misstated financials cannot support a strong inference of scienter absent allegations of facts capable of establishing either that UHY knew or was severely reckless in not knowing of the improper accounting, or that UHY ignored warning signs or red flags indicating that such an inference is merited. See ArthroCare, 726 F. Supp. 2d at 724; Seitel, 447 F. Supp. 2d at 693.

[63]    Id. at 11-14.

Asserting that "the lack of supporting documentation of EXXI's hedging activities [needed] to permit the Company to utilize hedge accounting was a glaring red flag, giving UHY every reason to know that the financial statements contained material misstatements or omissions," [64] Plaintiffs argue that "[h]ad UHY performed any adequate audit, the lack of specific required documentation would have been obvious to it." [65] But Plaintiffs do not plead any specific facts capable of showing what UHY's audits entailed, how or why they were deficient, or why there is any reason to believe that the alleged deficiencies were purposeful or reckless as opposed to negligent mistakes. Arthrocare, 726 F. Supp. 2d at 735 (citing Dell, 591 F. Supp. 2d at 903). Instead, Plaintiffs rely on the circular reasoning that UHY must have acted with scienter simply because it did not catch the lack of specific documentation for cash flow hedge accounting later identified as the reason for EXXI's restatements. These allegations may support an inference of negligent mismanagement, but they are not sufficient to make intentional or reckless fraud at least as compelling as plausible nonculpable explanations. See Lormand, 565 F.3d at 254 (quoting Tellabs, 127 S. Ct. at 2510).

[64]    Id. at 14-15.

[65]    Id. at 15.

**\*15**  Plaintiffs' pleading on this issue consists of long explanations of the GAAP and GAAS accounting principles allegedly violated, followed by the conclusory statement that UHY clearly violated that principle based solely on the fact that the restatement was issued. [66] But the GAAS standards acknowledge that "even a properly planned ... audit may not detect a material misstatement," AU § 230.12; thus, the mere fact that the audits did not catch a later-revised accounting error in the financial statements is not conclusive. Arthrocare, 726 F. Supp. 2d at 735 (citing In re Dell, 591 F. Supp. 2d at 903) Absent facts specifying fraudulent intent or UHY's state of mind, accounting errors "merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care." In re Baker Hughes Securities Litigation, 136 F. Supp. 2d 630, 649 (S.D. Tex. 2001). The parties dispute the simplicity and obviousness of the misapplied accounting rules. [67] But reading the Plaintiffs' Amended Complaint and the record in the Plaintiffs' favor, the Amended Complaint does not sufficiently allege that EXXI violated rules that were so clear and obvious as to make its outside auditor either knowingly deceptive or severely reckless in certifying EXXI's figures on the SEC filings. Plaintiffs' factual allegations make it more plausible, or at least as plausible, to infer that UHY acted negligently than to infer that UHY knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements.

[66]    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 20-24 ¶¶ 92-104, pp. 49-51 ¶¶ 231-43.

[67]    See Plaintiff's Opposition to UHY's MD, Docket Entry No. 111, pp. 9-11.

Because Plaintiffs have failed to allege facts capable of establishing that when UHY issued its audit reports, UHY knew – or was severely reckless in not knowing – that its audit opinions contained statements that were false or misleading or that the audit opinions were so deficient that they amounted to "no audit at all," Plaintiffs' allegations against UHY are not capable of raising a strong inference of scienter. See In re Dell Inc., Securities Litigation, 591 F. Supp. 2d at 900. That UHY failed to discover in 2011 and 2014 accounting deficiencies that were not found until 2015 might arguably and at most support an allegation of negligence, but not of fraud. [68]  Accordingly, UHY's motion to dismiss the federal securities law claims asserted against it will be granted and those claims will be dismissed with prejudice.

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

68    For the reasons stated in § III.A.2(e)(3), below, the court concludes that Plaintiffs have failed to plead facts capable of establishing loss causation.

### (b) Defendant Griffin

Griffin argues that the Exchange Act claims asserted against him should be dismissed because he did not make many of the alleged misstatements, because he left EXXI on October 20, 2014 – more than two years before the last alleged misstatement, and because Plaintiffs fail to plead facts capable of raising a strong inference of scienter with respect to statements that he did make. [69] Griffin also joins in all of the arguments presented in the Director Defendants' MD and in the arguments presented in Louie's MD with respect to alleged "related party transactions." [70] Plaintiffs respond that Griffin's MD should be denied because he is liable for EXXI's false, misleading, and incomplete financial statements, and because they have adequately alleged scienter with respect to him. [71]

69    Griffin's MD, Docket Entry No. 102, p. 5.

70    Id. at 5 & n.1.

71    Plaintiffs' Memorandum of Law in Opposition to Defendant D. West Griffin's Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to Griffin's MD"), Docket Entry No. 112, pp. 7-16.

### (1) Alleged Misstatements and Omissions

Plaintiffs allege that Griffin served as EXXI's CFO and Board member from the Company's inception in 2005 through and including October 20, 2014, when EIXXI announced Griffin's resignation in a Press Release and a Current Report filed with the SEC on Form 8-K/A on December 1, 2014, following BDO's acquisition of UHY's Texas practice, which had provided independent public accounting services to EXXI. [72] Plaintiffs allege that as CFO, Griffin signed EXXI's quarterly and annual reports filed with the SEC on Forms 10-Q, 10-K, and 10-K/A, and that Griffin is responsible for the content of the reports that he signed and the financial information contained in the Company's press releases. [73] Plaintiffs allege that Griffin was responsible for preparing nearly all of the financial statements that were restated after

BDO became EXXI's auditor and determined that EXXI's financial statements for 2011 through 2014 should no longer be relied upon. [74] Asserting that

    **\*16** [t]he financial statements issued during Griffin's tenure as CEO that had to be restated after his resignation were the annual financial statements for the four years ended June 30, 2011, 2012, 2013, and 2014, and the quarterly financial statements for the quarters ended September 30, and December 31, 2013, March 31, 2014, and June 30, 2014, [75]

Plaintiffs argue that these financial statements were false and misleading because they

    were not prepared according to generally accepted accounting principles ("GAAP"), including ASC Topic 815, which requires the reporting entity to document exactly what was being hedged, specifying the exact items (i.e., the particular monthly well production) to utilize hedge accounting.... While Griffin was responsible for EXXI's financial reporting, the Company lacked the necessary documentation for its hedging program to utilize cash flow hedge [accounting] but did so anyhow. [76]

Griffin does not plausibly argue that the financial statements he signed that were ultimately restated did not contain statements that were false and misleading. [77] The court concludes, therefore, that Plaintiffs have pled specific facts sufficient to hold Griffin liable for the financial statements that he signed. See Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011) ("For purposes of Rule 10b-5, the maker of a statement is the person

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 460 of 573
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

72    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 9 ¶ 39.

73    Id. at 9 ¶¶ 37-38.

74    Plaintiffs' Opposition to Griffin's MD, Docket Entry No. 112, p. 8 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 51 ¶ 245).

75    Id. at 8.

76    Id. (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 17-18 ¶ 77).

77    Griffin's MD, Docket Entry No. 102, p. 10 (arguing that "[f]or the reasons explained in the Director Defendants' Motion to Dismiss and Defendant Norman M.K. Louie's Motion to Dismiss the Amended Complaint, Plaintiffs have not alleged that any statement in those financial statements was false or misleading when made.").

The court concludes, however, that as to statements made in press releases, Plaintiffs are relying on the group pleading doctrine – a doctrine abolished by the Fifth Circuit in Southland, 365 F.3d at 365. In Southland the Fifth Circuit held that the PSLRA requires plaintiffs to "enlighten *each defendant* as to his or her particular part in the alleged fraud," so that "corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles." Id. Specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of the entire document or specific portion of the document containing the statement. Id. Plaintiffs have not pled with particularity facts capable of showing that statements made in any of the press releases about which they complain are attributable to Griffin. Instead, Plaintiffs attempt to hold Griffin responsible for unattributed corporate statements in the press releases based solely on his title as CFO. [78] Accordingly, the court concludes that Plaintiffs have not sufficiently pled specific factual allegations linking Griffin to allegedly false and misleading statements in EXXI's press releases.

78    Id. at 9 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 29 ¶ 128, p. 34 ¶ 157, and

p. 36 ¶ 166). See also id. at 10 n.2 (asserting that "[s]ince Griffin was the Company's CFO, it is far more likely that he provided the 'numbers' to [the employee who prepared the press releases] so that they could be incorporated in the Company's press releases").

### (2) Scienter

**\*17**  Griffin argues that "[a]s explained in the Director Defendants' Motion to Dismiss, Plaintiffs' impermissible attempt to plead scienter based solely on Defendants' positions within EXXI and alleged GAAP violations mandates dismissal of their Complaint." [79] Griffin argues that the only allegations as to his scienter are that

(1) his "net worth was dependent upon his investment in EXXI stock and options," Am. Compl. ¶ 42; *se also id.* ¶¶ 40-41; (2) he had an incentive to "protect his job," *id.* ¶ 42; and (3) he had access to unspecified "material non-public information," *e.g., id.* ¶¶ 57, 59. [80]

Griffin argues that Plaintiffs fail to allege that he sold any stock during the Class Period, and that Plaintiffs' factual allegations are internally inconsistent about his alleged motivations because they allege not only that his incentive was to protect his job, but also that he " 'resigned over a disagreement regarding the Company's financial disclosures, including those related to its ultra-deep [water] investments and accounting for its acquisition of EPL.' " [81] Asserting that Plaintiffs' theory of his scienter "rests on nothing more than baseless speculation, and is not 'at least as compelling as any opposing inference one could draw from the facts alleged,' " [82] Griffin argues that "[t]he far more compelling inference is that, to the extent there was any wrongdoing occurring within EXXI, [his] resignation is evidence that he was not a participant." [83]

79    Id. at 10.

80    Id. at 11.

81    Id. at 12 (quoting Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 10 ¶ 43).

82    Id.

83    Id.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 461 of 573
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

Asserting that EXXI restated its financial statements for four years, Plaintiffs argue that the restatements are compelling evidence of Griffin's scienter because

> as EXXI's [CFO] – the senior officer directly responsible for assuring the accuracy of EXXI's financial reporting – Griffin undoubtedly knew the Company lacked the necessary documentation – *i.e.*, it had no specific documents regarding the hedged items – to utilize hedge accounting under ASC Topic 815. At the very least, Griffin was severely reckless in not knowing so. [84]

Plaintiffs also argue that the following allegations support a strong inference of Griffin's scienter: (1) the amount of EXXI's restatements was significant; (2) EXXI's hedging activities were unusually high; (3) Griffin knew or recklessly disregarded the fact that EXXI delayed recognizing impairment of assets that it acquired from EPL despite steadily declining oil and gas prices that caused EPL to write down those same assets ahead of EXXI; and (4) EXXI lost its entire investment in EPL in a year. [85]

[84]    Plaintiffs' Opposition to Griffin's MD, Docket Entry No. 112, p. 11 (emphasis in original).

[85]    *Id.* at 14-15 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 17 ¶¶ 75-76, pp. 42-43 ¶¶ 197-201, p. 46 ¶ 220.

A complaint for violation of federal securities laws "will survive [a motion to dismiss] ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. A defendant's signature on an SEC filing with false or misleading statements or omissions cannot by itself support a strong inference of scienter. *See Central Laborers' Pension Fund v. Integrated Electrical Services Inc.*, 497 F.3d 546, 555 (5th Cir. 2007) ("If we were to accept [this] proffered interpretation of Sarbanes–Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the

pleading requirements for scienter set forth in the PSLRA.") (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) ). In *Central Laborers'* the Fifth Circuit adopted the Eleventh Circuit's test for when Sarbanes-Oxley certifications, *i.e.*, signatures on SEC filings, could support an inference of scienter. [86] The "person signing the certification [must have] had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Id.*

[86]    In *Central Laborers', 497 F.3d at 554*, the Fifth Circuit explained that,

> [t]he Sarbanes-Oxley Act states that signing officers must certify that they are "responsible for establishing and maintaining internal controls [and] have designed such internal controls to insure that material information relating to the [company] and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the period reports are being prepared." *15 U.S.C. § 7241 (a)* 4).

**\*18**    In *ArthroCare, 726 F. Supp. 2d at 716*, an obstinate defendant confronted with media reports providing "blatant evidence" of the specific accounting fraud at issue nonetheless "continued to defend [the accounting] stridently and deny the allegations." Although the plaintiffs in *ArthroCare* alleged accounting errors in eight quarterly SEC filings, and the defendant signed each filing, the court held that only the two quarterly filings immediately following the detailed media reports could support an inference of scienter. *Id.* at 724. In *Seitel, 447 F. Supp. 2d at 693*, the court held that the defendant's signature on SEC filings supported a strong inference of scienter because the plaintiffs alleged not only improper accounting practices but also: (1) overstated revenues of 15 percent for the year 2000 and 30 percent for the first 9 months of 2001; (2) memoranda and meeting minutes revealing that the defendants explicitly discussed the improper accounting methods and affirmatively chose to ignore potential problems; and (3) the dismissal of an auditor who confronted the defendants over the improper practices. *Id.*

Plaintiffs allege that Griffin signed SEC filings that contained false and misleading statements of EXXI's financial condition because EXXI misapplied the accounting standard for documenting use of cash flow hedge accounting. But "the

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 462 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." Lovelace, 78 F.3d at 1020. To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. See, e.g., ArthroCare, 726 F. Supp. 2d at 721 (" '[W]hen the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.").

Plaintiffs argue that the facts they have alleged raise a strong inference of scienter as to Griffin because EXXI misapplied two accounting standards, i.e., the standards for documenting the use of hedge accounting and for reporting asset impairment, the resulting restatements covered four years, and the magnitude of the restatements was significant. Plaintiffs also allege that Griffin was motivated to inflate EXXI's profitability to help EXXI qualify for listing on the NASDAQ Global Markets. While the parties dispute the simplicity and obviousness of the misapplied accounting standards, Plaintiffs' Amended Complaint does not allege facts capable of establishing either that the standards being violated were so clear and obvious as to make Griffin either knowingly deceptive or severely reckless in certifying EXXI's SEC filings, or severely reckless by not knowing that EXXI's accounting was improper. Plaintiffs' allegations regarding the magnitude of EXXI's misstated financials do not support a strong inference of scienter because "the magnitude of the error does not show that the existence of the error was clear when it was made," Schott v. Nobilis Health Corp., 211 F. Supp. 3d 936, 955 (S.D. Tex. 2016), and because EXXI's improper accounting did not uniformly benefit EXXI or consistently line up with a motive to skew the accounting results to favor EXXI's financial position.[87] See ArthroCare, 726 F. Supp. 2d at 724; Seitel, 447 F. Supp. 2d at 693. Moreover, missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting Griffin to the accounting violations that led to the restatement of EXXI's financial statements. Nor are there any allegations that Griffin engaged in insider trading or stood to benefit personally from any of the alleged accounting errors. Plaintiffs offer no facts in support of their contention that Griffin signed the financial statements at issue with scienter other than the fact that,

like the senior financial managers of every company, he had control over EXXI's accounting policies and procedures. See Izadjoo v. Helix Energy Solutions Group, Inc., 237 F. Supp. 3d 492, 516 (S.D. Tex. 2017) (find no scienter for officers where there were no "glaring irregularities or red flags" to put them on notice of material misstatements and omissions in Sarbanes-Oxley certifications or earnings calls).

[87]    See UHY's MD, Docket Entry No. 101, p. 16 (asserting without objection from Plaintiffs: "For fiscal years 2012 and 2013 the restated net income was higher than the originally reported net income."). See also UHY's Reply, Docket Entry No. 119, pp. 9-12.

**19** Plaintiffs cannot demonstrate scienter by relying either on Griffin's position on the Board, Abrams, 292 F.3d at 432, or on the fact that certain financial statements were restated. See Central Laborers', 497 F.3d at 546 (restatement of financial data, by itself, does not create a strong inference of scienter). Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the SEC filings at issue Griffin negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers', 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court therefore concludes that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to Griffin. Accordingly, Griffin's motion to dismiss the Exchange Act claims asserted against him will be granted and those claims will be dismissed with prejudice.

### (c) Defendant Louie

Asserting that he joined EXXI's Board on December 15, 2014, and that his term expired on December 1, 2015,[88] Louie argues that the Exchange Act claims asserted against him should be dismissed because he did not make many of the alleged misstatements, because Plaintiffs allege no facts requiring disclosure of his personal loan to Schiller, and because Plaintiffs rely on group pleading and fail to plead facts capable of raising a strong inference of scienter or loss

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 463 of 573

2019 WL 1205628

causation. [89] Plaintiffs respond that Louie's MD should be denied because he knew – but failed to disclose – that he had loaned $3 million to Schiller, because he signed EXXI's 2014 amended Annual Report which had to be restated, and because scienter and loss causation are adequately pled. [90]

[88]    Louie's MD, Docket Entry No. 103, p. 6. See also Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 10 ¶¶ 44-45.

[89]    Louie's MD, Docket Entry No. 103, p. 9.

[90]    Plaintiffs' Memorandum of Law in Opposition to Defendant Norman M.K. Louie's Motion to Dismiss ("Plaintiffs' Opposition to Louie's MD"), Docket Entry No. 113, pp. 7-12.

### (1) Alleged Misstatements and Omissions

Regarding Louie plaintiffs allege:

22. From EXXI's founding in 2005 through and including October 15, 2015, Defendant Schiller ... served as Chairman of the Board. He was stripped of that title by the Board on October 9, 2015, following an internal investigation that found he borrowed funds in 2007, 2009, and 2014 from personal acquaintances or their affiliates, certain of whom provided the Company and certain of its subsidiaries with services, and in 2014 he personally borrowed $3 million from Defendant Norman Louie ("Louie"), before Louie was appointed to the Board effective December 15, 2014. At the time of the loan from Louie, Louie was a managing director at Mount Kellet Capital Management, LP, one of the Company's largest shareholders. The internal investigation was prompted by an SEC inquiry.

...

44. Defendant Louie was appointed to the Board, effective December 15, 2014, by Defendant Schiller and the rest of the Board without election by shareholders, to stand for election by shareholders at the 2015 annual meeting. When Defendant Schiller's secret loan from Defendant Louie was discovered, the Board determined not to nominate Defendant Louie for election as a director at the 2015 annual meeting.

45. During his short tenure on the Board, Defendant Louie signed the Company's Amended 2014 annual report filed on Form 10-K/A with the SEC on December 23, 2014. As a signatory of the annual report issued in the name of the Company and not attributed to an individual author, Louie is responsible for the content of the annual report he signed.

...

269. In the Current Report on Form 8-K, filed with the SEC on December 15, 2014, announcing Defendant Louie's appointment to the Board, Defendants caused EXXI to state that there were no related party transactions between Louie and the Company or any of its subsidiaries that would require disclosure pursuant to Item 404(a) of Regulation S-K, 17 C.F.R. ¶ 229.404(a).

**\*20** 270. That statement in the Current Report on Form 8-K was materially incomplete and misleading because it failed to disclose that (a) Louie had loaned Defendant Schiller $3 million and the loan was outstanding at the time the Form 8-K was filed, (b) Louie was at least indirectly interested in the hedge fund MK's ownership of EXXI common stock, (c) Louie was at least indirectly interested in the M21K partnership between the Company and MK, and (d) Louie was at least indirectly interested in M21K's $123 million asset purchase from EXXI in 2014. All of those transactions were related party transactions requiring disclosure pursuant to Item 404(a) of Regulation S-K. [91]

[91]    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 6 ¶ 22, p. 10 ¶¶ 44-45, and p. 56 ¶¶ 269-70.

Louie does not argue the Form 10-K/A he signed that was ultimately restated did not contain statements that were false and misleading. [92] The court concludes, therefore, that the plaintiffs have plead specific facts sufficient to hold Louie liable for the financial statement that he signed. See Janus, 131 S. Ct. at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

[92]    Id. at 10 ¶ 45.

Louie argues, however, that Plaintiffs' allegations fail to state an Exchange Act claim against him for statements made in the December 15, 2014, Form 8-K because he did not sign that form and cannot be held liable for the statements

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 464 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

contained therein, and because the statements in the Form 8-K are all true as the transactions at issue were not related-party transactions that Regulation S-K, 17 C.F.R. ¶ 229.404(a) require to be disclosed.[93] Plaintiffs do not dispute that Louie did not sign the Form 8-K filed on December 15, 2014, and therefore cannot be held liable as a maker of the statements contained therein. See Kerr v. Exobox Technologies Corp., Civil Action No. H-10-4221, 2012 WL 201872, at *11 (S.D. Tex. 2012) (defendant not liable under Rule 10b-5 for allegedly false statements in company's SEC filings, even if he supplied the statements at issue, because he did not sign the filings). See also Janus, 131 S. Ct. at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). Nor do Plaintiffs dispute that the transactions at issue are not "related party" transactions that Regulation S-K, 17 C.F.R. ¶ 229.404(a) require to be disclosed.[94]

[93]   Louie's MD, Docket Entry No. 103, pp. 7-8.

[94]   Id. at 7-9 (arguing that the transactions at issue were either not "related party" transactions, or that Louie did not have a material interest in them).

Citing In re Bristol Myers Squibb Co. Securities Litigation, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008), and City of Monroe Employees Retirement System v. Bridgestone Corp., 399 F.3d 651, 670 (6th Cir. 2005), plaintiffs argue, however, that their Exchange Act claims against Louie should not be dismissed because the Form 8-K "statements regarding no related party transactions, which may have been literally true under the narrow definition of 'related party,' were, if not literally false, highly misleading,"[95] and because the Form 10-K/A that Louie signed was one of EXXI's annual reports that had to be restated.[96] Plaintiffs argue that Louie's loan to Schiller and involvement with entities that owned EXXI stock

should have been disclosed to investors because they adversely impacted Schiller's and Louie's ability to manage the Company prudently and to ensure that the Company's public disclosures were truthful. Schiller's dire financial circumstances were a strong motive for him to mislead investors – precisely as he did.

Likewise, Louie was highly motivated to inflate the value of EXXI stock, which secured his secret loan to Schiller, if only to reduce his risk of loss if Schiller defaulted on the loan.[97]

[95]   Plaintiffs' Opposition to Louie's MD, Docket Entry No. 113, p. 7.

[96]   Id. at 9-10.

[97]   Id. at 8.

**\*21**  It is undisputed that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." Chiarella v. United States, 100 S. Ct. 1108, 1118 (1980) (discussing disclosure requirements in the context of insider trading and finding that silence is only fraudulent if there exists a duty to disclose). The Bristol Myers and Bridgestone cases on which Plaintiffs rely stand for the well established principle that once a party makes a disclosure, even if it is literally true, the party is under a duty to speak the full truth. See Bristol Myers, 586 F. Supp. 2d at 160 ("an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it – or other statements made – materially misleading"); Bridgestone, 399 F.3d at 670 ("If a company 'chooses to volunteer such information,' though, 'its disclosure must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts ... to the extent that the volunteered disclosure was misleading' "). See also Rubinstein, 20 F.3d at 170 (" 'a duty to speak the full truth arises when a defendant undertakes a duty to say anything' "). But the statements Plaintiffs allege were misleading due to Louie's failure to disclose his loan to Schiller and his relationship to entities that owned EXXI stock are statements made by EXXI on the Form 8-K signed by Griffin; not statements made by Louie.

Plaintiffs fail either to cite any authority or to allege any facts capable of establishing that Louie had a duty to disclose information needed to correct the allegedly misleading statements made by EXXI and Griffin. See In re Franklin Bank Corp. Securities Litigation, 782 F. Supp. 2d 364, 398 (S.D. Tex. 2011), aff'd, 464 F. App'x 334 (5th Cir. 2012) (plaintiffs failed to allege facts capable of establishing that defendant was under a duty to correct a misleading

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 465 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

statement made by a third-party analyst). Plaintiffs also fail to allege facts capable of establishing that Louie was the source of the information for the related-party statements in the Form 8-K about which Plaintiffs complain, that Louie knew those statements had been made in the Form 8-K, that those statements were material to the Plaintiffs' decision to purchase or to hold (i.e., not to sell) EXXI stock, or that those statements imposed upon Louie a duty to disclose the existence of his loan to Schiller or his relationship to entities that owned EXXI stock. See In re Securities Litigation BMC Software, Inc., 183 F. Supp. 2d 860, 871 & n.21 (S.D. Tex. 2001) (recognizing that a party generally has no liability for misleading claims made about it by a third party and no obligation to correct such statements, but that a party may be liable for allegedly misleading statements made by a third-party if sufficiently involved in preparation of those statements). Absent such allegations Plaintiffs may not maintain an Exchange Act claim against Louie arising from either the related-party statements contained in EXXI's December 15, 2014, Form 8-K, or from Louie's failure to disclose his loan to Schiller or his position with respect to entities that owned EXXI stock. See Basic Inc. v. Levinson, 108 S. Ct. 978, 987 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

### (2) Scienter

Plaintiffs' failure to allege facts capable of establishing that Louie had a duty to disclose his loan to Schiller or his position with respect to entities that owned EXXI stock precludes Plaintiffs from raising a strong inference of scienter with respect to allegedly misleading statements and/or omissions arising from the Form 8-K that EXXI filed on December 15, 2014. See In re Centerline Holdings Co. Securities Litigation, 678 F. Supp. 2d 150, 161-62 (S.D.N.Y. 2009) (defendants did not act with scienter regarding omissions "when there was no duty to disclose in the first place"). Nor have Plaintiffs alleged facts capable of raising a strong inference of scienter with respect to the Form 10-K/A that Louie signed in December of 2014 shortly after being named to the Board because missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting Louie to the accounting violations that led to the restatement of EXXI's financials. Plaintiffs offer no facts in support of their contention that Louie signed the Form 10-K/A at issue with scienter other than the fact that he was allegedly motivated to inflate the market value of EXXI because his personal loan to Schiller was purportedly secured by Schiller's EXXI shares. However,

the law in this circuit has long been well established that scienter in a particular case may not be based solely on motives universal to all corporate executives such as the desire to maintain a high stock price. See Indiana Electrical, 537 F.3d at 544. Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the Form 10-K/A at issue Louie negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers', 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court concludes therefore that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to Louie.

### (3) Loss Causation

**\*22** Louie argues that even if Plaintiffs had alleged facts capable of establishing all the elements of their Exchange Act claims, they "have not alleged, nor can they, that there was any loss associated with this loan or its disclosure."[98] Louie argues that under Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1633-34 (2005),

> Plaintiffs must allege "that the market reacted negatively to a corrective disclosure, which revealed the falsity of [the Company's] previous representations...." ... The personal loan from Mr. Louie to Mr. Schiller was disclosed on September 29, 2015. See Ex. C Energy XXI Ltd, Annual Report (Form 10-K) (Sept. 29, 2015) at 43. Immediately thereafter, EXXI's price increased. See Ex. D Energy XXI Stock Prices (showing seven consecutive trading days of increases, reaching a high of $2.28 on October 8, 2015). Even assuming there was a prior misstatement regarding the personal loan – which there was not – without any alleged loss caused by the disclosure of Mr. Louie's personal loan, all of Plaintiffs' claims relating to the personal loan must fail.[99]

Plaintiffs respond only that they "have sufficiently alleged loss causation to withstand his motion to dismiss."[100]

98      Louie's MD, Docket Entry No. 103, p. 9.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 466 of 573
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

99    Id.

100    Plaintiffs' Opposition to Louie's MD, Docket Entry No. 113, p. 12.

Under the PSLRA Plaintiffs must prove that a defendant's act or omission alleged to have violated federal securities laws "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). In Dura Pharmaceuticals, 125 S. Ct. at 1633-34, the Supreme Court held that loss causation incorporates traditional elements of proximate causation and economic loss. See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1192 (2013) (confirming that loss causation continues to be an element of a claim under § 10(b) ). Loss causation refers to a direct link between the misstatement and a plaintiff's loss, and generally requires a corrective disclosure relating to the challenged representations, followed by a decline in the stock's price. See Catogas v. Cyberonics, Inc., 292 F. App'x 311, 314 (5th Cir. 2008) ("Plaintiffs must allege ... that the market reacted negatively to a corrective disclosure, which revealed the falsity of [defendant's] previous representations regarding the accounting for its stock options."). Because Plaintiffs fail to allege in their Amended Complaint or to argue in their brief in opposition to Louie's motion to dismiss that a corrective disclosure about Louie's loan to Schiller caused EXXI's stock price to fall, Plaintiffs have failed to plead loss causation.

Because Plaintiffs have failed to allege facts capable of establishing that Louie made an actionable misstatement or omission, with scienter, that caused the loss of which the Plaintiffs complain, Louie's motion to dismiss the Plaintiffs' Exchange Act claims will be granted, and those claims will be dismissed with prejudice.

(d) Defendant Schiller

Schiller argues that the Exchange Act claims asserted against him should be dismissed because Plaintiffs' Amended Complaint fails to allege facts capable of establishing that the statements attributed to him were false or misleading, or that he acted with scienter. Schiller also joins the arguments made by Louie and by the Director Defendants that Plaintiffs' Amended Complaint fails to allege facts capable of establishing loss causation, or that his loans from Louie were "related party transactions." [101]

101    Schiller's MD, Docket Entry No. 104, p. 6.

(1) Alleged Misstatements and Omissions

*23    Plaintiffs argue that

[a]s Chairman and CEO, Schiller signed all of EXXI's Annual Reports including its 2011, 2012, 2013, and 2014 Annual Reports. ¶ 21. On September 8, 2015, the Company announced that all four annual reports should not be relied upon and had to be restated to eliminate hedge accounting from them. ¶¶ 83 & 89. The Company's Annual Reports for 2012, 2013, and 2014 also included materially false or misleading information about the Company's ultra-deep drilling activities (¶¶ 124-26, 132, & 242), and the 2014 Annual Report included materially false or misleading information about EXXI's acquisition of EPL (¶¶ 172 & 174).

And third, Schiller is tied directly to the Company's misstatements regarding its oil and gas reserves in EXXI's annual and quarterly financial statements. As Plaintiffs allege, Schiller repeatedly pressured Company employees to include unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the reserves reported in the quarterly and annual financial statements. ¶ 141. That pressure undermined the integrity of the Company's financial statements. ¶ 142. [102]

Plaintiffs argue that Schiller made false and misleading statements on three matters: EXXI's ultra-deep oil drilling activities, EXXI's accounting for the EPL acquisition, and EXXI's financial condition resulting from its use of cash flow hedge accounting. [103] Schiller argues that the statements Plaintiffs attribute to him are not actionable because Plaintiffs have failed to allege facts capable of proving that the statements were, in fact, false or misleading. [104] Schiller also argues that the statements for which Plaintiffs seek to hold him liable are not actionable because they were generally forward looking statements of opinion or belief, and because Plaintiffs have failed to plead facts capable of establishing that he did not genuinely hold the stated opinion or belief, that the opinion or belief contained embedded misstatements of fact, or that he omitted material facts about his inquiry into or knowledge of information that would conflict with what a reasonable investor would have understood from his comments. [105] See Omnicare, 135 S. Ct. at 1327-29.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 467 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

102    Id. at 24-25 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 6 ¶ 21, pp. 18-20 ¶¶ 83 & 89, pp. 27-29 ¶¶ 124-26 & 132, pp. 31-32 ¶¶ 141-42, p. 37 ¶¶ 172 & 174, and p. 51 ¶ 242).

103    Plaintiffs' Memorandum of Law in Opposition to Defendant John D. Schiller's Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to Schiller's MD"), Docket Entry No. 114, pp. 9-16.

104    Director Defendants' MD, Docket Entry No. 105, p. 11.

105    Id. at 12-13.

### (i) Statements About EXXI's Ultra-Deep Drilling Activities Are Not Actionable

Plaintiffs argue that they have plausibly alleged that Schiller either made or caused EXXI to make false and misleading statements regarding EXXI's ultra-deep drilling activities on five separate occasions: (1) a November 7, 2012, Press Release regarding the Davy Jones well production; (2) EXXI's 2013 Annual Report filed with the SEC on August 21, 2013; (3) comments made at an Oil & Gas conference on October 17, 2013; (4) EXXI's quarterly report for the second quarter of fiscal year 2014 filed with the SEC on Form 10-Q on February 7, 2014; and (5) EXXI's quarterly report for the third quarter of fiscal year 2014 filed with the SEC on Form 10-Q on May 1, 2014.[106] Plaintiffs argue that

    **\*24**  as Schiller knew, the Company's ultra-deep drilling activities were largely unsuccessful – only one of 15 target wells identified by the joint venture ever produced any oil (¶ 139) – and he lacked any basis for the upbeat statements he repeatedly made. Plaintiffs substantiate their allegations that Defendants knowingly grossly overstated the status of the ultra-deep drilling activities with information provided by a former EXXI employee who was directly responsible for managing EXXI's reserves and the Company's reserve accounting at the

time of the Davy Jones discovery. ¶ 140. In that capacity, the former employee was well positioned to know whether the Company possessed information to substantiate the stated reserves. That former employee said that when the Davy Jones 2 well was tested, it only produced ***water***, not natural gas...[107]

106    Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, pp. 10-11, 18-19 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 6 ¶ 21, pp. 28-31 ¶¶ 127-29, 132-34, 136-37).

107    Id. at 19 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 31 ¶¶ 138-40).

### (A) November 7, 2012, Press Release

Regarding the November 7, 2012, Press Release Plaintiffs allege:

    On November 7, 2012, EXXI issued a press release in which Defendants caused the Company to state as follows:

    Within the shallow-water ultra-deep exploration program with McMoRan, the Davy Jones discovery well is proceeding toward first production and the company is participating in the Blackbeard West #2, Lomand North and Lineham Creek wells.

    The Davy Jones discovery well, the first shallow-water, ultra-deep sub-salt completion on the Gulf of Mexico shelf, is being completed. The wellbore was cleaned out to enable testing of all 165 feet of perforated sands in the Wilcox and the final steps of installing the wellhead are underway. Once these steps are complete, flow testing is expected to commence...

    Completion and testing of the Davy Jones offset appraisal well (Davy Jones #2) is expected to commence following review of results from the Davy Jones discovery well.[108]

108    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 28-29, ¶ 127.

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 468 of 573

2019 WL 1205628

Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that any of the statements in the November 7, 2012, Press Release were false or misleading when made, or that they were attributed to, formulated, signed, or adopted by Schiller. Instead, Plaintiffs merely allege that "[o]nly one of 15 target wells identified by the joint venture ever produced oil." [109] But the fact that EXXI's ultra-deep drilling activities were ultimately not successful is not probative of falsity. See Carlton v. Cannon, 184 F. Supp. 3d 428, 469 (S.D. Tex. 2016) ("[T]he plaintiffs have at most alleged fraud by hindsight. Courts treat this as insufficient because it is based on 'the fact that something turned out badly must mean [the] defendant[s] knew earlier that it would turn out badly.' "). Plaintiffs fail to allege contemporaneous facts capable of showing that Schiller knew earlier material information that he chose not to disclose until later. Id. (citing Abrams, 292 F.3d at 433 ("company officials should not be held responsible for failure to foresee future events"). Because Plaintiffs fail to allege facts capable of establishing either that statements contained in the November 7, 2012, Press Release were false or that any false statements are attributable to Schiller, and because Plaintiffs neither allege nor argue that statements contained in the November 7, 2012, Press Release misled the market, the statements made in that press release are not actionable under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d 862, 882 (S.D. Tex. 2002) (holding that statements were "not actionable because plaintiffs have not pleaded any facts indicating that the statements were untrue"), aff'd sub nom. Rosenzweig v. Azurix Corp., 332 F.3d 854 (5th Cir. 2003); Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004) (holding that facts tying an officer or director to a statement "would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document" containing the false or misleading statement).

[109]     Id. at 31 ¶ 139.

### (B) EXXI's 2013 Annual Report

**\*25**  Regarding EXXI's 2013 Annual Report, Plaintiffs allege:

> In its 2013 Annual Report filed with the SEC on August 21, 2013, Defendants caused the company to state that "work is ongoing to establish commercial production"

from Davy Jones No. 1. However, when the statement was made, Defendants knew that Davy Jones No. 1 was not commercially viable. [110]

Plaintiffs also allege that

> [a]s Chairman of the Board and Chief Executive Officer of EXXI, Defendant Schiller signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A. As a signatory of the annual reports issued in the name of the Company and not attributed to an individual author, Schiller is responsible for the content of the annual reports he signed. [111]

[110]     Id. at 29-30 ¶ 132.

[111]     Id. at 6 ¶ 21.

Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that on August 21, 2013, when EXXI's 2013 Annual Report was filed, work was not ongoing to establish commercial production from Davy Jones No. 1, that Schiller knew or did not genuinely believe that work was ongoing to establish commercial production from Davy Jones No. 1, or that Schiller had contradictory information, i.e., information that Davy Jones No. 1 was not commercially viable. Absent allegations of such facts, the statements about ultra-deep drilling activities in EXXI's 2013 Annual Report are not actionable against Schiller. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

### (C) Statements at Oil & Gas Conference

Regarding Schiller's October 17, 2013, statements at an Oil & Gas Conference, Plaintiffs allege that

> [a]t an Oil & Gas conference on October 17, 2013, Schiller said that Davy Jones No. 1 was "too deep and too narrow to flow gas" but Schiller falsely stated that Davy Jones No. 2 had a "high probability" of producing and that completion of Davy Jones 2 was expected to start in December, 2013. [112]

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 469 of 573
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

Plaintiffs allege that

> Defendant Schiller's "high probability" statement was false and misleading when it was made. As Schiller knew on October 17, 2013, there was no objective or empirical evidence, such as test results or preliminary production data, to support Schiller's "high probability" statement at that time (or ever). Thus, on that date, Schiller lacked any reasonable basis for his "high probability" statement. [113]

Plaintiffs also allege that

> [a]ccording to a former EXXI employee directly responsible for managing EXXI's reserves and the Company's reserve accounting at the time of the Davy Jones discovery, when the Davy Jones No. 2 well was tested, it only produced water, not natural gas. This material adverse fact, though known by EXXI and the Individual Defendants, was not timely disclosed to investors, including Plaintiffs in particular. [114]

[112]   Id. at 30 ¶ 133.

[113]   Id. ¶ 134.

[114]   Id. at 31 ¶ 140.

Missing from Plaintiffs' Amended Complaint are allegations of fact capable of establishing that Schiller's statements that Davy Jones No. 2 had a "high probability" of producing or that completion of Davy Jones No. 2 was expected to start in December of 2013, were false, or that when Schiller made these statements he either knew that they were false

or did not genuinely believe them. Plaintiffs' assertion that Schiller lacked any reasonable basis for his "high probability" statement because he had no objective or empirical evidence to support that statement is unavailing because Plaintiffs fail to allege particularized facts capable of establishing that objective or empirical evidence existed that contradicted that statement. In Rosenzweig, 332 F.3d at 870, the Fifth Circuit reaffirmed its prior recognition in Rubinstein, 20 F.3d at 169, that "[s]imply alleging that the predictive statements ... did not have a reasonable basis – that is, that they were negligently made – would hardly suffice to state a claim under Rule 10b-5."

**\*26** Plaintiffs' reference to an unidentified former EXXI employee in support of their allegations that when Davy Jones No. 2 was tested, it produced water, not gas, is unavailing because Plaintiffs have not alleged either when the test occurred or that it occurred before Schiller made the statements alleged to be false and misleading at the Oil & Gas Conference on October 17, 2013. Nor have plaintiffs alleged any facts capable of establishing that Schiller knew about the test, knew the test demonstrated that Davy Jones No. 2 was incapable of producing gas, or knew that the test necessarily meant that completion of Davy Jones No. 2 was not expected to start in December of 2013. Because Plaintiffs do not allege facts capable of establishing that Schiller's statements at the Oil & Gas Conference on October 17, 2013, were false, or that Schiller either knew those statements were false or did not genuinely believe them, and because Plaintiffs neither allege nor argue that any of those statements misled the market, Schiller's statements at the Oil & Gas Conference on October 17, 2013, are not actionable under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

(D) Form 10-Qs Filed in Early 2014

Regarding statements on EXXI's Form 10-Q filings for the second and third quarters of fiscal year 2014, Plaintiffs allege:

136. In EXXI's quarterly report for the period ended December 31, 2013, filed on Form 10-Q with the SEC on February 7, 2014, Defendants caused the Company to state that "work is ongoing to establish commercial production" from Davy Jones 1 and that "[o]perations to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014."

137. In EXXI's quarterly report for the period ended March 31, 2014, filed on Form 10-Q with the SEC on May 1,

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 470 of 573

2019 WL 1205628

2014, Defendants failed to mention Davy Jones No. 1, but maintained that Davy Jones No. 2 was "in the process of being completed." [115]

[115]    Id. at 30-31 ¶¶ 136-37.

Plaintiffs argue that the statement in the Form 10-Q filed on February 7, 2014, that "work is ongoing to establish commercial production" from Davy Jones No. 1 was false because Schiller had stated at an October 17, 2013, Oil & Gas Conference that Davy Jones No. 1 was "too deep and too narrow to flow gas." [116] Schiller replies that Plaintiffs have not alleged any facts capable of establishing that statements in the Form 10-Q filed on February 7, 2014, were false or misleading. [117] Asserting that Plaintiffs have selectively cited only a portion of the Form 10-Q filed on February 7, 2014, Schiller argues that when read in context together with the surrounding statements, the statement that work was "ongoing to establish commercial production from Davy Jones 1," which plaintiffs allege is false and misleading because it conflicts with the statement he made on October 17, 2013, that Davy Jones No. 1 is too deep and too narrow to flow gas is, in fact, consistent with his October 17, 2013, statement. Schiller explains that Plaintiffs

> omit an important sentence in the February 7, 2014 Form 10Q filing in which the company truthfully disclosed that "work is ongoing to establish commercial production" from Davy Jones 1. Immediately following that sentence, the company stated in the 10Q: "The operator [Freeport McMoran] is developing a fit for purpose fracture stimulation process" for Davy Jones 1." [118]

[116]    Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, pp. 10-11.

[117]    Defendant John D. Schiller, Jr.'s Reply in Support of His Motion to Dismiss the Amended Complaint ("Schiller's Reply"), Docket Entry No. 122, pp. 12-13.

[118]    Id. at 13 (citing Energy XXI (Bermuda) Limited, Form 10-Q for the quarterly period ended December 31, 2013, Exhibit 2 to Declaration of David M. Sheeren, Docket Entry No. 122-3).

In pertinent part the Form 10-Q filed on February 7, 2014, states:

> *Davy Jones.* As previously reported, our operating partner, Freeport McMoRan, has drilled two wells in the Davy Jones field. The Davy Jones No. 1 well is located on South Marsh Island Block 230 in 19 feet of water and work is ongoing to establish commercial production from the well. The operator currently is developing a fit for purpose fracture stimulation process. The Davy Jones No. 2 offset appraisal well, located two and a half miles southwest of Davy Jones No. 1, confirmed 120 net feet of potential pay in multiple Wilcox sands, indicating continuity across the major structural features of the Davy Jones prospect, and also encountered 192 net feet of potential hydrocarbons in the Tuscaloosa and Lower Cretaceous carbonate sections. Operations to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014. [119]

[119]    Energy XXI (Bermuda) Limited, Form 10-Q for the quarterly period ended December 31, 2013, p. 35, Exhibit 2 to Declaration of David M. Sheeren, Docket Entry No. 122-3, p. 42. The court may properly consider the full section of this Form 10-Q at this stage of the case because in securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed and are actually filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain. See Lovelace, 78 F.3d at 1018 & n.1. See also Lone Star Fund V (U.S.), 594 F.3d at 387 (holding that when considering a motion to dismiss courts may consider documents that are "central to the claim and referenced by the complaint").

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 471 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

**\*27** Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that when the Form 10-Q was filed on February 7, 2014, the work to complete Davy Jones No. 1 was not still ongoing, that the operator was not attempting to develop a "fit for purpose fracture stimulation process" to that well, or that objective or empirical evidence existed that contradicted the statement that Plaintiffs allege was false. Because Plaintiffs do not allege facts capable of establishing that the statement that "work is ongoing to establish commercial production" from Davy Jones No. 1 made in the Form 10-Q filed on February 7, 2014, was false, because Plaintiffs neither allege nor argue that Schiller did not genuinely believe that statement or had information that contradicted it, and because Plaintiffs neither allege nor argue that the statement about the Davy Jones No. 1 well misled the market, that statement will not support a claim against Schiller under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

Plaintiffs argue that the statements that "[o]perations to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014" made in the Form 10-Q filed on February 7, 2014, and that Davy Jones No. 2 was "in the process of being completed" made in the Form 10-Q filed on May 1, 2014, were false because by 2014 specialized production equipment used for ultra-deep well production had been removed from Davy Jones No. 2 and relocated to a different site, and because an unidentified former EXXI employee has allegedly provided information that when Davy Jones No. 2 was tested, it produced water, not gas. [120] These allegations are not sufficient to state a claim for violation of the Exchange Act against Schiller because Plaintiffs have failed to allege facts capable of establishing when the specialized equipment was removed from the Davy Jones No. 2 site or even that it was removed from the site before EXXI filed the Form 10-Qs at issue on February 7, 2014, and May 1, 2014. Nor have Plaintiffs alleged facts capable of establishing the type of specialized equipment that was removed, that removal of the equipment necessarily meant the Davy Jones No. 2 well could not be completed, or that when the statements were made Schiller did not genuinely believe them or had information that contradicted them. Plaintiffs have similarly failed to allege facts capable of establishing when the test that allegedly produced water instead of gas occurred or even that it occurred before EXXI filed the Form 10-Qs at issue on February 7, 2014, and May 1, 2014. Nor have Plaintiffs alleged any facts capable of establishing that Schiller knew about the test, knew the test demonstrated that Davy Jones No. 2 was incapable of

producing gas, or knew that the test would necessarily lead to the cessation of ongoing efforts to complete Davy Jones No. 2. Absent factual allegations capable of establishing that when EXXI filed the Form 10-Qs at issue on February 7, 2014, and May 1, 2014, operations to commence completion of the Davy Jones No. 2 well were not expected during calendar year 2014, and that when EXXI filed the Form 10-Q filed on May 1, 2014, Davy Jones No. 2 was not "in the process of being completed," or that Schiller knew either that work was not ongoing on that well or that the well was not capable of producing gas, Schiller cannot be held liable under the Exchange Act for the allegedly false statements regarding Davy Jones No. 2 contained in EXXI's Form 10-Qs filed on February 7, 2014, or May 1, 2014. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

[120]   Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, p. 11 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 31 ¶¶ 139-40).

(ii) Statements About EXXI's Accounting For The EPL Acquisition Are Not Actionable

Asserting that Schiller caused EXXI to buy EPL in 2014 to turn around the Company's stagnant growth and sagging stock price, [121] Plaintiffs argue that

**\*28** [a] year earlier, the Company decided that EPL was overpriced. ¶¶ 14.9 & 160. However, Schiller was so desperate to deliver any purportedly good news to the market that he rushed the Company to complete the $2 billion purchase – its largest by far – without conducting any due diligence. ¶ 153. The haste in which Schiller forced EXXI to buy EPL was matched by the haste in which the purchase soured: less than a year after buying EPL, the assets EXXI acquired had become worthless. ¶¶ 220-21.

After EXXI acquired EPL, the Company and its subsidiary reported financial results side-by-side. Quarter after quarter, EPL wrote down assets as impaired, only to have EXXI delay doing so by one quarter. Each time, EXXI wrote down the exact same impairment charge one quarter after EPL did so. EXXI has never explained the reason for its delayed recognition of the impairment charge. [122]

[121]   Id. at 19-20 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 33 ¶ 147). See also id. at 11-15.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 472 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

122    Id. See also Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 32-49 ¶¶ 144-230.

Plaintiffs' allegations that Schiller rushed the EPL acquisition, caused EXXI to overpay for EPL, and was so desperate to bring good news to the market that he failed to do any due diligence, are not supported by allegations of particularized facts capable of establishing that any statements about the EPL acquisition attributable to Schiller were false or misleading, or that Schiller failed to disclose information needed to make his EPL statements not misleading. Even assuming that such facts were pled with specificity, the "failure to engage in due diligence before closing an acquisition does not automatically support an inference of fraud." Schiller v. Physicians Resource Group, Inc., 2002 WL 318441, *11 (N.D. Tex. February 26, 2002) (citing Brogen v. Pohlad, 933 F. Supp. 793, 799 (D. Minn. 1995) (failing "to adequately investigate the merits of a potential acquisition and subsequent steps to remedy that omission may give rise to a claim for negligence; but it cannot support a claim for securities fraud") ).

Plaintiffs' allegations that Schiller can be held liable under the Exchange Act for false or misleading statements because EXXI recognized impairment charges for EPL one quarter after EPL did so without explaining the reason for its delayed recognition, are not supported by allegations of particularized fact. Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing the relevant accounting standards, how those standards were violated, or that Schiller knew or ignored glaring red flags that statements about EPL attributable to him were false or misleading when made. Also missing from Plaintiffs' Opposition to Schiller's MD is any argument or authority for Plaintiffs' contention that a corporate parent has a duty to explain why its accounting for impairment of a subsidiary's assets differs from the subsidiary's own accounting for the same assets. See North Collier Fire Control and Rescue District Firefighter Pension Plan and Plymouth County Retirement Association v. MPC Partners, Inc., No. 15 Civ. 6034 (RJS), 2016 WL 5794774, *3, 9-11, 24 (S.D.N.Y. 2016) (dismissing § 10(b) claim that rested on allegations of how management of parent company should have tested and impaired goodwill related to subsidiary). See also Harris v. Amtrust Financial Services, Inc., 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) ("The fact that Lead Plaintiff cannot tick and tie the loss and loss adjustment expense reported in AmTrust's consolidated financial statement to the losses its individual subsidiaries reported to insurance regulators, without more, does not plausibly allege a misstatement."). Because Plaintiffs do

not allege facts capable of establishing that any of EXXI's statements about EPL were false, or that EXXI had a duty to explain the differences between its accounting for EPL's goodwill impairment and EPL's own accounting for impairment of its assets; because Plaintiffs fail to allege facts capable of establishing that Schiller either knew that any statements about EPL attributable to him were false, or did not genuinely believe any such statements; and because Plaintiffs' neither allege nor argue that any statements about EPL misled the market, the EPL statements about which Plaintiffs complain are not actionable against Schiller under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

### (iii) EXXI's Financial Statements Are Actionable

**\*29**    Asserting that "EXXI lacked the necessary documentation for its hedging activities to utilize hedge accounting," 123 Plaintiffs argue that

> [a]s a result, in September 2015, shortly after EXXI's auditor was acquired, the new auditor required the Company to restate more than four years of financial statements and to make an adjustment to its accumulated deficit to eliminate the effects of cash flow hedge accounting. ¶¶ 244-45. On September 8, 2015, EXXI announced that its previously issued consolidated financial statements for the four years ended June 30, 2011, 2012, 2013, and 2014, and for the seven quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014 – **eleven** financial statements in all – should no longer be relied upon, and would be restated. ¶ 245. The announcement stunned Plaintiffs and other EXXI investors. ¶ 247. 124

Plaintiffs argue that

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 473 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

[a]s Chairman and CEO, Schiller signed all of EXXI's Annual Reports including its 2011, 2012, 2013, and 2014 Annual Reports. ¶ 21. On September 8, 2015, the Company announced that all four annual reports should not be relied upon and had to be restated to eliminate hedge accounting from them. ¶¶ 83 & 89. The Company's Annual Reports for 2012, 2013, and 2014 also included materially false or misleading information about the Company's ultra-deep drilling activities (¶¶ 124-26, 132, & 242), and the 2014 Annual Report included materially false or misleading information about EXXI's acquisition of EPL (¶¶ 172 & 174).

And *third*, Schiller is tied directly to the Company's misstatements regarding its oil and gas reserves in EXXI's annual and quarterly financial statements. As Plaintiffs allege, Schiller repeatedly pressured Company employees to include unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the reserves reported in the quarterly and annual financial statements. ¶ 141. That pressure undermined the integrity of the Company's financial statements. ¶ 142. [125]

[123]    Id. at 15-16 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 49-50 ¶¶ 234-35).

[124]    Id. at 16 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 244-45, and 247).

[125]    Id. at 24-25 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 6 ¶ 21, pp. 18-20 ¶¶ 83 & 89, pp. 27-30 ¶¶ 124-26 & 132, pp. 31-32 ¶¶ 141-42, p. 37 ¶¶ 172 & 174, and p. 51 ¶ 242).

Regarding Schiller's alleged misstatements on EXXI's oil and gas reserves Plaintiffs allege:

141. According to the former EXXI employee, Defendant Schiller pressured Company employees to include unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the amount of reserves reported in the Company's quarterly and annual financial statements. This led to internal confrontations over accounting policies and practices.

142. Although the unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program were not included in any of

the Company's financial statements, the pressure from Defendant Schiller and the confrontations it led to created mistrust between the Company's internal accountants and senior management. [126]

**\*30**    Because Plaintiffs expressly allege that "the unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program were not included in any of the Company's financial statements," [127] they are not statements for which Schiller can be held liable under the Exchange Act. Schiller does not plausibly argue, however, that the financial statements he signed that were ultimately restated due to EXXI's lack of specific documentation needed to support its use of cash flow hedge accounting did not contain statements that were false and misleading. The court therefore concludes that the Plaintiffs have pled specific facts sufficient to hold Schiller liable for the financial statements that he signed and that were restated because EXXI improperly utilized cash flow hedge accounting. See Janus, 131 S. Ct. at 2302.

[126]    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 31-32 ¶¶ 141-42.

[127]    Id. ¶ 142.

### (iv) Conclusions

For the reasons stated above, the court concludes that the purportedly false and misleading statements that Plaintiffs allege Schiller made about EXXI's ultra-deep oil drilling activities, and EXXI's accounting for the unsuccessful EPL acquisition will not support Exchange Act claims against Schiller either because Plaintiffs have failed to allege facts capable of establishing that the statements were false when made, or that to the extent they were statements of opinion or belief, Schiller did not genuinely hold the opinions expressed, the opinions contained embedded untrue statements of fact, or Schiller omitted material facts about his inquiry or knowledge that would conflict with what a reasonable investor would have understood from his statements. See Omnicare, 135 S. Ct. at 1327-29. The court concludes, however, that the Plaintiffs have pled particularized facts capable of establishing Schiller's liability for false and misleading statements contained in EXXI's financial statements that Schiller signed, that were filed with the SEC, and that were restated because EXXI improperly utilized cash flow hedge accounting. See Janus, 131 S. Ct. at 2302.

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 474 of 573

2019 WL 1205628

### (2) Scienter

Schiller argues that "the Amended Complaint should be dismissed for failure to allege any inference of scienter, much less a strong one." [128] He argues that Plaintiffs' references to his desire to maintain a lavish lifestyle, his executive position within EXXI, his signature on SEC filings that were restated, and his loans from Louie and EXXI vendors are all inadequate – individually or collectively – to raise a strong inference of scienter. [129]

[128]    Schiller's MD, Docket Entry No. 104, p. 13.

[129]    Id. at 13-22. See also Schiller's Reply, Docket Entry No. 122, pp. 16-21.

Citing Nathenson v. Zonagen Inc., 267 F.3d 400 (5th Cir. 2001), Plaintiffs respond that they have alleged

> several "special circumstances" that strongly support an inference of Schiller's scienter. Those circumstances include: (i) Schiller's prominence as EXXI's founder, Chairman, and CEO; (ii) the importance of the Company's ultra-deep drilling activities, its oil and gas reserves, and the EPL acquisition to EXXI's net worth and future prospects; (iii) the fact that Schiller himself made several statements regarding the Company's ultra-deep drilling, its reserves, and the EPL acquisition; (iv) Schiller's attempt to influence the Company's reserve estimates; and (v) Schiller's dependence on the market price for EXXI stock to meet his need for cash to fund his lavish lifestyle. Those circumstances – particularly Schillers' need to control the Company's disclosures to satisfy his urgent need for cash – make his scienter "at the very least, equally as compelling as any alternative inference, and **a tie favors the plaintiff.**"

*Lormand*, 565 F.3d at 254 (emphasis added). [130]

Plaintiffs also point to the loans that Schiller took from Louie and from EXXI's vendors but failed to disclose to the Board or to the market as strong inferences of scienter. [131]

[130]    Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, p. 27 (emphasis in original).

[131]    Id. at 27-31.

**\*31**  In Nathenson the Fifth Circuit held that the individual defendants' positions within the defendant pharmaceutical

company enhanced the scienter allegations. Recognizing "that normally an officer's position with a company does not suffice to create an inference of scienter," id. at 424, the court found a number of special circumstances that taken together, sufficed to support a different result in that case: (1) the company was small and had only three-dozen full-time employees; (2) it was essentially a one-product company; and (3) the alleged misrepresentations were about the patent protection for that single product, the company's most crucial issue. Id. at 425.

The Fifth Circuit and other courts have been reluctant, however, to apply the limited exception recognized in Nathenson. See Rosenzweig, 332 F.3d at 867-68 (rejecting the plaintiffs' argument that "the failure of Azurix's core business – water-privatization projects – supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects for success" and holding that the plaintiffs must identify exactly who supplied the information or when they knew the information"); Abrams, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."). Instead, the Fifth Circuit has stated that only in the "rare case" will a strong inference of scienter be drawn from an officer's position in a company, and only when that factor combines with other, "special circumstances." Local 731 I.B of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc., 810 F.3d 951, 959 (5th Cir. 2016). The Fifth Circuit reiterated that such circumstances may include: (1) a small company in which corporate executives are more likely to be familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. Id.

Plaintiffs neither allege nor argue that facts capable of establishing any of the special circumstances recognized in Nathenson or Diodes are present in this case. Plaintiffs' allegations that between 2006 and 2010 EXXI completed five major acquisitions for aggregate cash consideration of approximately $2.5 billion demonstrates that EXXI differed substantially from the small, single product companies at issue in Nathenson and Diodes. [132] Instead, as special circumstances capable of allowing a strong inference of scienter to be drawn from Schiller's position with the Company, Plaintiffs point to Schiller's prominence as EXXI's founder, Chairman, and CEO known for his lavish lifestyle, the importance of EXXI's ultra-deep drilling activities, the

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 475 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

EPL acquisition, and oil and gas reserves to EXXI's net worth and future prospects, and the allegedly false and misleading statements that Schiller made about these subjects, i.e., EXXI's ultra-deep drilling activities, EPL acquisition, and gas reserves. [133] Since, however, for the reasons stated in § III.A.2(d)(1)(i)-(iii), above, the court has already concluded that Plaintiffs have failed to plead facts capable of establishing that Schiller's statements about EXXI's ultra-deep drilling activities, EPL acquisition, or reserves were false or misleading, Plaintiffs' attempt to infer a strong inference of scienter for and/or from making those statements misses the mark. The only allegedly false and misleading statements that the court has found are actionable against Schiller are the financial statements included in the EXXI SEC filings that he signed and were later restated.

[132]    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 16 ¶¶ 69-71. Moreover, Schiller argues without objection that EXXI had approximately 257 employees at the time of its bankruptcy, more than the companies falling under the Nathenson exception. See Schiller's Reply, Docket Entry No. 122, p. 19 & n.9 ("In connection with its bankruptcy petition, the company sought emergency relief to pay these employees during the course of the bankruptcy. See Ex. 3 to the Declaration of David M. Sheeren at p. 5 (disclosing 257 employees). The Court can properly take judicial notice of that adjudicative fact. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)." See also Carlton, 184 F. Supp. 3d at 479 (183 employees voids the Nathenson exception).

[133]    Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, p. 27.

**\*32**  A defendant's signature on an SEC filing with false or misleading statements or omissions cannot by itself support a strong inference of scienter. See Central Laborers', 497 F.3d at 555. "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." Lovelace, 78 F.3d at 1020. See also ArthroCare, 726 F. Supp. 2d at 716; Seitel, 447 F. Supp. 2d at 693. To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. See ArthroCare, 726 F. Supp. 2d at

721 ("[W]hen the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter."). Although Plaintiffs have argued that the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] and the restatement raise a strong inference of scienter as to Griffin, EXXI's CFO, Plaintiffs have made no such argument as to Schiller. Instead, Plaintiffs merely point to the loans that Schiller borrowed from fellow board member Louie and from EXXI vendors but did not disclose. But for the reasons stated in § III.A.2(c)(1), above, the court has already concluded that Plaintiffs have failed to allege any facts capable of establishing that Louie – or now Schiller – had a duty to disclose those loans. Absent a duty to disclose, failure to disclose is not capable of raising a strong inference of scienter. See Chiarella v. United States, 100 S. Ct. at 1118 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

Moreover, missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting Schiller to the accounting violations that led to the restatement of EXXI's financial statements. Nor are there any allegations that Schiller engaged in insider trading or stood to benefit personally from any of the alleged accounting errors. Plaintiffs offer no facts in support of their contention that Schiller signed the financial statements at issue with scienter other than the fact that, like the senior managers of every company, he had control over the Company. See Izadjoo, 237 F. Supp. 3d at 516 (find no scienter for officers where there were no "glaring irregularities or red flags" to put them on notice of material misstatements and omissions in Sarbanes-Oxley certifications or earnings calls). Plaintiffs cannot demonstrate scienter by relying either on Schiller's position on the board, Abrams, 292 F.3d at 432, or on the fact that certain financial statements were restated. See Central Laborers, 497 F.3d at 546 (restatement of financial data, by itself, does not create a strong inference of scienter). Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the SEC filings at issue Schiller negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers, 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's

2019 WL 1205628

financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court concludes therefore that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to Schiller.

### (3) Loss Causation

Schiller joins in and incorporates by reference arguments made by the Director Defendants and by Louie

> that Plaintiffs failed to show that any of the alleged misstatements were followed by corrective disclosures that caused the price of the stock to drop. Plaintiffs fail to plead loss causation because they do not allege any causal connection between the supposed fraudulent conduct and their purported losses. [134]

Although they have not responded directly to Schiller's loss causation argument, Plaintiffs argue that they "have sufficiently alleged loss causation to withstand [Schiller's] motion to dismiss." [135] Citing Lormand, 565 F.3d at 256-58, and asserting that "[l]oss causation 'is subject to the pleading standard of Federal Rule of [Civil] Procedure 8(a)(2), rather than the heightened pleading requirement of Rule 9(b)," [136] Plaintiffs argue that "[u]nder that relaxed pleading standard, [they] need only allege 'a facially "plausible" ' connection between the misstatements or omissions and their loss." [137] Citing North Port Firefighters' Pension – Local Option Plan v. Temple-Inland, Inc., 936 F. Supp. 2d 722, 761 (N.D. Tex. 2013), Plaintiffs argue that they "need not plead a fact-for-fact disclosure to establish loss causation," [138] and if the court disagrees, Plaintiffs "respectfully request the opportunity to amend their complaint to add such factual allegations in further support of loss causation." [139]

134    Schiller's Reply, Docket Entry No. 122, p. 21. See also Schiller's MD, Docket Entry No. 104, p. 6 ("Mr. Schiller joins in all of the arguments in The Director Defendants' Motion to Dismiss

and incorporates those arguments herein by reference.").

135    Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 24.

136    Id.

137    Id.

138    Id.

139    Id. at 25.

**\*33**   For the reasons stated in § III.A.2(c)(3), above, with respect to Louie, and in § III.A.2(e)(3), below, with respect to the Director Defendants, Plaintiffs have failed to plead loss causation with respect to Schiller.

### (4) Conclusions as to Schiller

Because Plaintiffs have failed to allege facts capable of establishing that Schiller made an actionable misstatement or omission, with scienter, that caused the loss of which the Plaintiffs' complain, Schiller's motion to dismiss the Plaintiffs' Exchange Act claims will be granted, and those claims will be dismissed with prejudice.

### (e) Director Defendants

The Director Defendants argue that the federal securities law and fraud claims asserted against them should be dismissed because Plaintiffs' Amended Complaint fails to plead an actionable misstatement or omission, scienter, or loss causation. The Director Defendants also argue that Plaintiffs' Amended Complaint

> fails to the extent it asserts (1) claims against the Director Defendants based on statements attributed to unspecified "Defendants" or the Company when those Director Defendants were not on the EXXI board and (2) claims barred by the five-year statute of repose or the prohibition on holder claims. [140]

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 477 of 573
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

140    Director Defendants' MD, Docket Entry No. 105, p. 11. See also Reply Brief in Support of the Director Defendants' Motion to Dismiss the Amended Complaint ("Director Defendants' Reply"), Docket Entry No. 121, pp. 6-12.

### (1) Alleged Misstatements and Omissions

Asserting that the Director Defendants are Feinberg, Colvin, Dunwoody, Dupré, Flannery, Griffiths, and LaChance, Plaintiffs argue that

[a]t relevant times, each of the Director Defendants served as a director of EXXI. In addition to serving on the Board, Defendant Colvin was Chairman of the Audit Committee and a member of the Nomination and Governance Committee. ¶ 48. Defendant Flannery was a member of the Audit Committee and the Nomination and Governance Committee of the Board. ¶ 49. Defendant Dunwoody was Chairman of the Remuneration Committee and a member of the Audit Committee. ¶ 50. Defendant Griffiths served on the Audit Committee and the Compensation Committee. ¶ 51. Defendant Feinberg was Lead Independent Director, Chairman of the Nomination and Governance Committee, a member of the Compensation Committee, and an ex officio member of the Audit Committee. ¶ 52. Defendant Dupré was Chairman of the Compensation Committee and a member of the Nomination and Governance Committee. ¶ 53.

By virtue of their Board positions and responsibilities, the Director Defendants were privy to and participated in the creation, development, and reporting of the Company's financial condition; they had significant personal contact and familiarity with the Company and its senior officers and their fellow directors; and they were advised of and had access to internal reports and other non-public data and information about the Company's finances, operations, and sales. ¶ 290. The Director Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false, misleading, and incomplete. Id.

... [T]he Amended Complaint more than sufficiently pleads claims under the [PSLRA], for common law fraud, and for breach of fiduciary duty against the Director Defendants. Their motion to dismiss the Amended Complaint should be denied in its entirety. 141

141    Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, pp. 8-10 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 11-13 ¶¶ 48-53 and p. 62 ¶ 290).

**\*34** Plaintiffs argue that they have plausibly alleged that the Director Defendants caused EXXI to make a series of materially misleading statements about three different matters: EXXI's ultra-deep oil drilling activities, EXXI's accounting for the unsuccessful EPL acquisition, EXXI's improper use of cash hedge accounting, and Schiller's secret loan from defendant Louie. 142 Unlike the specific statements on these issues made by or attributed to Schiller, Plaintiffs argue that the statements regarding EXXI's ultra-deep drilling activities for which they seek to hold the Director Defendants liable were not attributed to any person. 143 Citing Southland, 365 F.3d at 365, Plaintiffs argue that "directors may be held liable for false, misleading, or incomplete statements in corporate documents that have no stated author or are not attributed to any individual if they are sufficiently linked to the document or statement in question." 144

142    Id. at 12-22.

143    Id. at 12-13, & n.5.

144    Id. at 12.

### (i) Statements About EXXI's Ultra-Deep Drilling Activities Are Not Actionable

Plaintiffs argue that they have plausibly alleged that the Director Defendants caused EXXI to make false and misleading statements regarding EXXI's ultra-deep oil drilling activities in a November 7, 2012, Press Release regarding the McMoRan and Davy Jones well production, and in EXXI's Form 10-Q filed on February 7, 2014, for the period ended December 31, 2013. 145 Plaintiffs' allegations regarding the November 7, 2012, Press Release are quoted in § III.A.2(d)(1)(i)(A), above, and their allegations regarding the Form 10-Q filed on February 7, 2014, are quoted in § III.A.2(d)(1)(i)(D), above. For the reasons stated in those previous sections of this Memorandum Opinion and Order, the court has already concluded that Plaintiffs' Amended Complaint fails to allege facts capable of establishing that any of the statements in either the November 7, 2012, Press Release, or the February 7, 2014, Form 10-Q about

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 478 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

which Plaintiffs complain were false or misleading when made. Plaintiffs' Amended Complaint similarly fails to allege facts capable of establishing that any of the statements about EXXI's ultra-deep drilling activities contained in either of these documents was attributed to, formulated, signed, adopted, or used by any of the Director Defendants as conduits to the market. Absent such allegations, the Director Defendants cannot be held liable for statements in either the November 7, 2012, Press Release, or the February 7, 2014, Form 10-Q. See Azurix, 198 F. Supp. 2d at 882 (holding that statements were "not actionable because plaintiffs have not pleaded any facts indicating that the statements were untrue"); Southland, 365 F.3d at 365 (holding that facts tying an officer or director to a statement "would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document"). Also missing from Plaintiffs' Amended Complaint are allegations of fact capable of establishing that any of the statements contained in either the November 7, 2012, Press Release, or the February 7, 2014, Form 10-Q mislead the market. Accordingly, the court concludes that the Director Defendants cannot be held liable under the Exchange Act for allegedly false and misleading statements about EXXI's ultra-deep drilling activities made in either the November 7, 2012, Press Release or the February 7, 2014, Form 10-Q.

145    Id. 12-13 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 28-29 ¶ 127, and 30 ¶ 136.

#### (ii) Statements About EXXI's Accounting For The EPL Acquisition Are Not Actionable

Asserting that after EXXI acquired EPL, EPL wrote down assets as impaired, only to have EXXI delay doing so by one quarter,[146] that in Plaintiffs' Amended Complaint they "allege in detail the sequence of accounting for the impairment charges,"[147] and that "EXXI restated financial statements that were prepared after the Company acquired EPL in June [of 2014,"[148] Plaintiffs argue that

> **\*35** [t]he side-by-side comparison of EXXI's recognition of impairments in the Company's consolidated annual and quarterly financial statements with EPL's more timely recognition

of them in its stand-alone financial statements amply explains how and why EXXI's accounting for the assets acquired from EPL in the Company's consolidated financial statements was false, misleading, and incomplete. The adequately inform the Director Defendants of the particular misrepresentations.[149]

Citing Southland, 365 F.3d at 365, Plaintiffs argue that

> the Director Defendants are liable for the false, misleading, or incomplete statements in EXXI's financial statements because they are linked to them by virtue of their ability to control EXXI's financial disclosures.... In particular, the Director Defendants who were members of the Audit Committee – Colvin (Chair), Flannery, Dunwoody, Griffiths, and Feinberg (*ex officio*) – are closely linked to the Company's financial statements. As members of the Audit Committee, those five Director Defendants recommended the annual appointment of the Company's auditor, reviewed the scope of the audits, reviewed the Company's accounting principles, and reviewed the Company's financial statements included in the annual and quarterly reports filed with the SEC. ¶ 54. They are undoubtedly liable for the false and misleading financial statements.[150]

146    Id. at 13.

147    Id.

148    Id. at 14.

149    Id.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 479 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

150    Id. at 14-15.

Plaintiffs' argument that the Director Defendants can be held liable under the Exchange Act for false or misleading statements in EXXI's financial statements because EXXI recognized impairment charges for EPL one quarter after EPL did without explaining the reason for its delayed recognition is not supported by allegations of particularized fact. Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing the relevant accounting standards, how those standards were violated, or that any of the Director Defendants knew – or ignored glaring red flags – that EXXI's financial statements were false and misleading due to improper accounting for impairment of EPL's assets. Also missing from Plaintiffs' Amended Complaint is an allegation that any of EXXI's financial statements were restated to correct misstatements arising from a failure to properly account for the impairment of EPL's assets. Missing from Plaintiffs' Opposition to Director Defendants' MD is any argument or authority supporting their contention that a corporate parent has a duty to explain why its accounting for impairment of a subsidiary's assets differs from the subsidiary's own accounting for impairment of the same assets. See MDC Partners, 2016 WL 5794774, at *3, 9-11, 24 (dismissing § 10(b) claim that rested on allegations of how management of parent company should have tested and impaired goodwill related to subsidiary). See also Harris, 135 F. Supp. 3d at 171 ("The fact that Lead Plaintiff cannot tick and tie the loss and loss adjustment expense reported in AmTrust's consolidated financial statement to the losses its individual subsidiaries reported to insurance regulators, without more, does not plausibly allege a misstatement."). Because Plaintiffs do not allege facts capable of establishing that the Director Defendants made or caused EXXI to make any false or misleading statements about EPL and/or the impairment of its assets, or that EXXI had a duty to explain the differences between its accounting for impairment of EPL's assets and EPL's own accounting for impairment of its assets, and because Plaintiffs neither allege nor argue that any statements about EPL misled the market, the court concludes that the Director Defendants cannot be held liable under the Exchange Act for allegedly false and misleading statements about EPL and/or EXXI's accounting for impairment of EPL's assets. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

(iii) EXXI's Financial Statements Are Actionable

**\*36**  Plaintiffs allege that because EXXI used hedge accounting without required documentation, "EXXI was required to restate its financial statements for the fiscal years ended June 30, 2011, 2012, 2013, and 2014, and for the intermediate quarters from September 30, 2013 through March 31, 2015." [151]  Plaintiffs argue that "[t]he Director Defendants cannot dispute that those erroneous financial statements were materially false and misleading when issued." [152]  Because Plaintiffs' Amended Complaint alleges that each of the Director Defendants signed the Company's annual reports filed with the SEC on Forms 10-K and 10-K/A, [153] each of them can be held liable for false and misleading statements made in those annual reports. The Director Defendants do not dispute that they signed EXXI's annual reports filed with the SEC on Forms 10-K and 10-K/A and that the annual reports for fiscal years ending June 30, 2011, 2012, 2013, and 2014 that they signed and that were ultimately restated did not contain statements that were false and misleading. [154]  The court concludes, therefore, that the Plaintiffs have pled specific facts sufficient to hold the Director Defendants liable for the financial statements that they signed containing false and misleading statements resulting from EXXI's use of hedge accounting. See Janus, 131 S. Ct. at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

151    Id. at 16 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 19-20 ¶ 89).

152    Id.

153    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 11-13 ¶ 46 (LaChance), ¶ 48 (Colvin), ¶ 49 (Flannery), ¶ 50 (Dunwoody), ¶ 51 (Griffiths), ¶ 52 (Feinberg), and ¶ 53 (Dupré).

154    Id. at 11 ¶ 46.

(iv) Statements About Schiller's Loans Are Not Actionable

Plaintiffs allege that EXXI's Form 8-K filed with the SEC on December 15, 2014, was false and misleading because it "state[d] that there were no related party transactions between Louie and the Company or any of its subsidiaries that would require disclosure pursuant to Item 404(a) of Regulation S-K," but failed to disclose that Schiller had taken a personal

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 480 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

loan from Louie. [155] But for the reasons stated in § III.A.2(c)(1), above, the court has already concluded that the statement in the Form 8-K about which the Plaintiffs complain was neither false nor misleading and therefore not actionable under the Exchange Act.

[155]    Id. at 56 ¶¶ 269-70.

### (v) Conclusions

For the reasons stated above, the court concludes that the purportedly false and misleading statements that Plaintiffs allege the Director Defendants caused EXXI to make about ultra-deep drilling activities, accounting for the impairment of EPL's assets, and Schiller's secret loan from defendant Louie will not support Exchange Act claims, but that Plaintiffs have alleged an actionable claim against the Direct Defendants for false and misleading statements contained in EXXI's financial statements that they signed, that were filed with the SEC, and that were restated because EXXI improperly utilized cash flow hedge accounting. See Janus, 131 S. Ct. at 2302.

### (2) Scienter

Asserting that "[t]he facts of the restatements give rise to a strong inference of scienter[, ... as] do the facts of the related party transaction between Louie and Schiller," [156] Plaintiffs argue that

> the Director Defendants, particularly the four directors on the Nomination and Governance Committee, were severely reckless in not discovering Louie's loan to Schiller before he joined the Board. And so, too, do the facts relating to the accounting for the EPL acquisition and EXXI's ultra-deep drilling activities. The differences in accounting for impairment in EXXI's consolidated financial statements [for] EXXI when compared to the stand-alone financial statements of its subsidiary, EPL, cannot be attributed to any "overhaul" in accounting systems. Taken together, the sum of

all these misstatements and omissions of material fact easily gives rise to the requisite strong inference of scienter. [157]

[156]    Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 23.

[157]    Id.

Plaintiffs allege that the Director Defendants signed SEC filings that contained false and misleading statements of EXXI's financial condition because EXXI misapplied the accounting standard for documenting use of cash flow hedge accounting. But "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." Lovelace, 78 F.3d at 1020. See also Central Laborers, 497 F.3d at 555 (recognizing that a defendant's signature on an SEC filing with false or misleading statements or omissions cannot by itself support a strong inference of scienter). To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. See ArthroCare, 726 F. Supp. 2d at 721. Although Plaintiffs have argued that the number, size, timing, nature, frequency, and context of the misapplication of accounting principles and the restatement raise a strong inference of scienter as to Griffin, EXXI's CFO, plaintiffs have made no such argument as to the Director Defendants. Instead, Plaintiffs merely point to the loans that Schiller borrowed from fellow Board member Louie that the Director Defendants neither discovered nor disclosed. But for the reasons stated in §§ III.A.2(c)(1) and III.A.2(d)(1)(iv), above, the court has already concluded that Plaintiffs have failed to allege any facts capable of establishing that Louie or Schiller had a duty to disclose those loans. Absent a duty to disclose, failure to disclose is not capable of raising a strong inference of scienter. See Chiarella v. United States, 100 S. Ct. at 1118 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

 **\*37**    Moreover, missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting the Director Defendants to the accounting violations that led to

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 481 of 573
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

the restatement of EXXI's financial statements. Nor are there allegations that any of the Director Defendants engaged in insider trading or stood to benefit personally from any of the alleged accounting errors. Plaintiffs offer no facts in support of their contention that the Director Defendants signed the financial statements at issue with scienter other than the fact that, like the directors of every company, they had control over the Company. See Izadjoo, 237 F. Supp. 3d at 516 (find no scienter for officers where there were no "glaring irregularities or red flags" to put them on notice of material misstatements and omission in Sarbanes-Oxley certifications or earnings calls). Plaintiffs cannot demonstrate scienter by relying either on the Director Defendants' position on the Board or on certain board committees, Abrams, 292 F.3d at 432, or on the fact that certain financial statements were restated. See Central Laborers, 497 F.3d at 546 (restatement of financial data, by itself, does not create a strong inference of scienter). Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the SEC filings at issue Schiller negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers, 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court concludes therefore that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to the Director Defendants.

### (3) Loss Causation

The Director Defendants argue that even if Plaintiffs could satisfy the falsity and scienter elements of their Exchange Act claims that "[a] third, independent basis compelling dismissal is Plaintiffs' failure to plead facts demonstrating loss causation – that is, 'a causal connection between the [alleged] material misrepresentation and the loss.' "[158] The Director Defendants argue that the Plaintiffs have not alleged that there was any loss associated with any of the statements or categories of statements that Plaintiffs allege were false and misleading, i.e., statements about EXXI's ultra-deep drilling activities, EPL, Schiller's loans, or EXXI's improper use of hedge accounting.[159]

[158]    Director Defendants' MD, Docket Entry No. 105, p. 27. Defendants UHY and Schiller join the Director Defendants' argument on loss causation. See UHY's MD, Docket Entry No. 101, p. 7 & n.2 ("The arguments in the motion to dismiss of the Director Defendants are adopted for purposes of this motion to dismiss;" and n.2, "[w]ith respect to the securities fraud claim, UHY incorporates the arguments regarding group pleading, loss causation, and the statute of repose."); Schiller's MD, Docket Entry No. 104, p. 6 ("Mr. Schiller joins in all of the arguments in The Director Defendants' Motion to Dismiss and incorporates those arguments herein by reference.").

[159]    Id. at 27-29.

Plaintiffs respond that they "have sufficiently alleged loss causation to withstand [the defendants'] motion[s] to dismiss."[160] Citing inter alia Lormand, 565 F.3d at 256-58, and asserting that "[l]oss causation is subject to the pleading standard of Federal Rule of [Civil] Procedure 8(a)(2), rather than the heightened pleading requirement of Rule 9(b),"[161] Plaintiffs argue that "[u]nder that relaxed pleading standard, [they] need only allege a facially plausible connection between the misstatements or omissions and their loss."[162] Citing North Port Firefighters' Pension – Local Option Plan v. Temple-Inland, Inc., 936 F. Supp. 2d 722, 761 (N.D. Tex. 2013), Plaintiffs argue that they "need not plead a fact-for-fact disclosure to establish loss causation,"[163] and if the court disagrees, Plaintiffs "respectfully request the opportunity to amend their complaint to add such factual allegations in further support of loss causation."[164]

[160]    Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 24.

[161]    Id.

[162]    Id.

[163]    Id.

[164]    Id. at 25.

Under the PSLRA Plaintiffs must prove that a defendant's act or omission alleged to have violated federal securities laws "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Loss causation refers to a direct link between the misstatement and a plaintiff's loss,

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 482 of 573

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

and generally requires a corrective disclosure relating to the challenged representations, followed by a decline in stock price after the truth is revealed. See Spitzberg v. Houston American Energy Corp., 758 F.3d 676, & n.18 (5th Cir. 2014) (citing In re Williams Securities Litigation, 558 F.3d 1130, 1137 (10th Cir. 2009) ). In Dura Pharmaceuticals, 125 S. Ct. at 1633-34, the Court held that loss causation incorporates traditional elements of proximate causation and economic loss. See Amgen, 133 S. Ct. at 1192 (confirming that loss causation continues to be an element of a claim under § 10 (b) ). The Fifth Circuit has held that the Rule 8(a) and 12(b) (6) plausibility pleading standard, not heightened pleading, is sufficient to plead loss causation. Lormand, 565 F.3d at 258 ("[W]e conclude that Rule 8(a) (2) requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss ... or, as Twombly indicates, the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." (internal citations omitted) ). A court is "not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as [it] must in assessing allegations of scienter under the PSLRA." Id. at 267.

**\*38** In pertinent part Plaintiffs allege:

LOSS CAUSATION/ECONOMIC LOSS

278. As alleged herein, Defendants engaged in a scheme to deceive the investing market generally, and Plaintiffs in particular, and a course of conduct that artificially inflated EXXI's stock price and operated as a fraud or deceit on purchasers of EXXI stock by misrepresenting the Company's financial and operating condition and prospects as well as known trends in its industry.

279. Once Defendants' misrepresentations and fraudulent conduct were disclosed to the market, EXXI's stock price reacted negatively as the artificial inflation was removed from it. As a result of their purchases of EXXI stock alleged herein, and their decision to refrain from selling EXXI stock alleged herein, Plaintiffs suffered significant economic losses.

280. Defendants' false and misleading statements had the intended effect and caused EXXI stock to trade at artificially inflated levels at all relevant times and caused Plaintiffs to refrain from selling EXXI stock.

281. As investors and the market became aware of EXXI's prior misstatements and omissions and that EXXI's actual financial condition and business prospects were, in fact, not as represented, EXXI's stock price reacted negatively, substantially damaging Plaintiffs. [165]

[165]    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 59 ¶¶ 278-81.

Missing from Plaintiffs' Amended Complaint are allegations that identify any corrective disclosure followed by a drop in the price of EXXI stock. Argument as to the existence of any such disclosures is also missing from the briefs that Plaintiffs have filed in opposition to the defendants' motions to dismiss.

Plaintiffs allege that in September of 2015 EXXI was required to restate more than four years of financial statements to eliminate the use of hedge accounting. [166] Plaintiffs allege that EXXI's financial statements for the years ending June 30, 2011, 2012, 2013, 2014, and 2015, filed with the SEC on August 26, 2011, August 9, 2012, August 21, 2013, August 28 and December 23, 2014, and September 29, 2015, were materially false and misleading because they stated that EXXI did not use hedging for speculative or trading purposes. [167] Plaintiffs allege that "[u]ntil EXXI's financial statements were corrected on September 29, 2015, the Company's publicly filed financial statements for at least the years ended[ ] June 30, 2011, 2012, 2013, and 2014, and for all the intervening quarters materially misstated and did not fairly and accurately present the Company's financial condition and its results of operations." [168] Plaintiffs do not allege that EXXI stock price declined as a result of the disclosure that four years of financial statements would be restated. The Director Defendants argue that Plaintiffs are unable to satisfy the requirement for pleading loss causation because EXXI's stock price actually increased following disclosure in September of 2015 that certain of EXXI's financial statements would be restated and that Schiller had taken personal loans from Louie and from EXXI vendors. [169]

[166]    Id. at 17-18 ¶ 77.

**Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)**
Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 483 of 573

2019 WL 1205628

167    Id. at 52 ¶ 249.

168    Id. at 54 ¶ 257.

169    Director Defendants' MD, Docket Entry No. 105, pp. 28-29 (citing Exhibit 10, EXXI stock price table, Docket Entry No. 106-10).

**\*39** While the Fifth Circuit has recognized that courts can take judicial notice of historical stock prices, see Catogas, 292 F. App'x at 316, the court need not do so here because it is sufficient in considering the motions to dismiss that Plaintiffs have alleged no losses following the relevant disclosures in September of 2015. See Schott, 211 F. Supp. 3d at 946. Since Plaintiffs have not alleged that the restatements caused their losses, the court does not factor the restatements into its analysis of loss causation. Instead, Plaintiffs allege that

> EXXI's disclosure that it was required to restate its financial statements to eliminate cash flow hedge accounting was materially false and misleading because it made it appear that the reason for the restatement was a mere technical deficiency in documentation, when the true reason for the restatement was that the Company was hedging for improper purposes, including speculating on future oil and natural gas prices or manipulating reported revenue and earnings. 170

But also missing from Plaintiffs' Amended Complaint are facts capable of establishing that EXXI's stated reason for the restatements was false, or that the stated reason for the restatements was ever the subject of a corrective disclosure that was followed by a decline in stock price. Accordingly, Plaintiffs have failed to plead loss causation.

170    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 54-55 ¶ 259.

At the end of their responsive briefing on the issue of loss causation, Plaintiffs request leave to amend "[t]o the extent the Court requires ... specificity notwithstanding the general pleading requirements of Rule 8(a)(2), Plaintiffs respectfully request the opportunity to amend their complaint to add such

factual allegations in further support of loss causation." 171 Federal Rule of Civil Procedure 15(a)(2) states that "[t]he court should freely give leave [to amend] when justice so requires." "Although Rule 15[a] 'evinces a bias in favor of granting leave to amend,' it is not automatic." Matter of Southmark Corp., 88 F.3d 311, 314 (5th Cir. 1996), cert denied, 117 S. Ct. 686 (1997) (quoting Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 597 (5th Cir. 1981) ). "A decision to grant leave is within the discretion of the trial court. Its discretion, however, is not broad enough to permit denial if the court lacks a substantial reason to do so." Id. (citing State of Louisiana v. Litton Mortgage Co., 50 F.3d 1298, 1302-1303 (5th Cir. 1995) (per curiam) ). Generally, a district court errs in dismissing a complaint for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend. Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir.) (per curiam), cert. denied, 119 S. Ct. 156 (1998). If, however, a complaint alleges the plaintiff's best case, there is no need for further amendment. Id. See also Jones v. Greninger, 188 F.3d 322, 327 (5th Cir. 1999) (per curiam) (dismissing plaintiff's pro se action because court could perceive of no viable claim plaintiff could include in an amended complaint based on the underlying facts). The Fifth Circuit has also held that in exercising its discretion, a court may consider various criteria including, inter alia, the failure to cure deficiencies by amendments previously allowed and futility of the proposed amendment. See Whitaker v. City of Houston, Texas, 963 F.2d 831, 836 (5th Cir. 1992) (citing Foman v. Davis, 83 S. Ct. 227, 230 (1962) ). Because Plaintiffs have already had an opportunity to file an amended complaint and because the court is persuaded that Plaintiffs have pleaded their best case, the Plaintiffs' request for leave to amend will be denied.

171    Plaintiffs' Opposition to the Director Defendants' MD, Docket Entry No. 115, p. 25.

**B. Control Person Liability Claims**

**\*40** Plaintiffs allege that the Individual Defendants are all liable as "controlling persons" of EXXI under § 20(a) of the Exchange Act. Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." Southland, 365 F.3d at 383. Because the court has concluded that the Plaintiffs' primary claims under § 10(b) should be dismissed, the § 20(a) claims will also be dismissed under

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

Rule 12(b)(6) for failure to state a claim upon which relief can be granted. See Izadjoo, 237 F. Supp. 3d at 520.

## C. Common Law Fraud Claims

Plaintiffs assert claims for common law fraud against all of the defendants. [172] Under Texas law a claimant alleging fraud must prove the following:

> (1) that a material representation was made; (1) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

Aquaplex, Inc. v. Rancho La Valencia, Inc., 297 S.W.3d 768, 774 (Tex. 2009) (per curiam) (quoting In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001) ). See also Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200, 212-13 (5th Cir. 2009) (same). Although Plaintiffs' common law fraud claim is not subject to the heightened "strong inference" standard for pleading scienter under the PSLRA, Plaintiffs are nevertheless required to satisfy Rule 9(b), which requires them to state with particularity facts supporting each element of fraud. See Benchmark Electronics, Inc. v. J.M. Huber Corp., 343 F.3d 719, 724 (5th Cir. 2003). " 'At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.' " Id. (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992) ). In other words, the claimant must plead the who, what, when, where, and how of the fraud. Id.

[172]    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 66-67 ¶¶ 313-320. Although Plaintiffs' Amended Complaint does not specify that this claim is being asserted under Texas law, both defendants and Plaintiffs have cited and relied upon Texas law. See Director Defendants' MD, Docket

Entry No. 105, pp. 31-33 and Plaintiffs' Opposition to the Director Defendants' MD, Docket Entry No. 115, p. 27.

Plaintiffs' common law fraud claims rest on the same alleged misstatements underlying their Exchange Act claims and fail for the same reasons, i.e., Plaintiffs have not alleged facts with particularity showing that any of the defendants made false statements with scienter that caused injury. Accordingly, defendants' motions to dismiss Plaintiffs' common law fraud claims will be granted, and these claims will be dismissed.

## D. Breach of Fiduciary Duty Claims

Plaintiffs assert claims for breach of fiduciary duty against the Individual Defendants. [173] In pertinent part Plaintiffs allege that the Individual Defendants breached their fiduciary duties of care and loyalty to the Company and its shareholders, including the Plaintiffs, inter alia "by making or causing the Company to make the materially false and misleading statements about the Company's financial and operating condition and prospects alleged herein." [174] Plaintiffs also allege that "[t]he Individual Defendants' breaches of fiduciary duty were intertwined with the materially false and misleading statements they made or caused the Company to make about the Company's financial and operating condition and prospects alleged herein." [175] Plaintiffs' breach of fiduciary duty claims rest on the same alleged misstatements underlying their Exchange Act claims and fail for the same reasons, i.e., Plaintiffs have not alleged facts with particularity showing that any of the defendants made false statements that caused injury. Accordingly, defendants' motions to dismiss Plaintiffs' breach of fiduciary duty claims will be granted, and these claims will be dismissed.

[173]    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 67-69 ¶¶ 321-32.

[174]    Id. at 68 ¶ 324.

[175]    Id. at 69 ¶ 329.

## IV. Conclusions and Order

**\*41** For the reasons explained above, the court concludes that Plaintiffs have failed to state claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, for

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 485 of 573

**Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)**
2019 WL 1205628

common law fraud, or for breach of fiduciary duty.[176] Accordingly, UHY LLP's Motion to Dismiss (Docket Entry No. 101) is **GRANTED**. Defendant D. West Griffin's Motion to Dismiss the Amended Complaint (Docket Entry No. 102) is **GRANTED**. Defendant Norman M.K. Louie's Motion to Dismiss the Amended Complaint (Docket Entry No. 103) is **GRANTED**. Defendant John D. Schiller, Jr.'s Motion to Dismiss the Amended Complaint (Docket Entry No. 104) is **GRANTED**. The Director Defendants' Motion to Dismiss the Amended Complaint (Docket Entry No. 105) is **GRANTED**. Plaintiffs' request for leave to amend is **DENIED**.

[176]    The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1205628

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 23

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 487 of 573
Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

2018 WL 3559089
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sean REILLY, individually and on behalf
of all others similarly situated, Plaintiff,
v.
U.S. PHYSICAL THERAPY, INC., Christopher
J. Reading, Lawrance W. McAfee, Jon C.
Bates, and Glenn W. McDowell, Defendants.

17 Civ. 2347 (NRB)
|
Signed 07/23/2018

**Attorneys and Law Firms**

Counsel for Plaintiffs: Jacob A. Goldberg, Keith R. Lorenze, Phillip C. Kim, The Rosen Law Firm, P.A.

Counsel for Defendants: Bruce G. Vanyo, Michael J. Diver, Jason C. Vigna, Katten Muchin Rosenman LLP.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

**\*1** This federal securities class action was filed on behalf of all persons and entities who purchased or otherwise acquired the securities of defendant U.S. Physical Therapy, Inc. ("USPH" or the "Company") between November 6, 2014 and March 16, 2017, inclusive (the "Class Period"). Plaintiffs [1] alleged that USPH and four individual defendants, Christopher J. Reading, Lawrance W. McAfee, Glenn W. McDowell, and Jon C. Bates, violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and that the individual defendants violated Section 20(a) of the Exchange Act. Before the Court is defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). [2] Because plaintiffs failed to adequately plead scienter, the motion to dismiss is granted.

[1] On June 8, 2017, the Court appointed Sean Reilly as lead plaintiff and the Rosen Law Firm as lead counsel. Order, June 8, 2017, ECF No. 11.

[2] Also pending before the Court is plaintiffs' motion to strike certain documents submitted as exhibits to defendants' motion to dismiss. As described below, the motion to strike is granted in part and denied in part.

## II. BACKGROUND

The following allegations are drawn from plaintiffs' second amended complaint ("SAC") (ECF No. 26), and are assumed to be true for the purposes of this motion. See Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006). We also consider any statements or documents incorporated into the AC by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"), [3] and documents possessed by or known to the plaintiffs and upon which they relied in bringing this action. [4] See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

[3] Of particular relevance to this motion are: (1) USPH's Form 10-K for the period ending December 31, 2016, filed with the SEC on June 7, 2017, Vigna Decl. Ex. B, ECF No. 31-2 ("2016 10-K"); (2) USPH's Form 10-K for the period ending December 31, 2014, filed with the SEC on Mar. 12, 2015, Vigna Decl. Ex. C, ECF No. 31-3 ("2014 10-K"); (3) USPH's Form 10-K for the period ending December 31, 2013, filed with the SEC on Mar. 11, 2014, Vigna Decl. Ex. D, ECF No. 31-4 ("2013 10-K"); (4) USPH's Form 8-K, filed with the SEC on Mar. 16, 2017, Vigna Decl. Ex. H, ECF No. 31-8 ("3/16/17 8-K"); (5) USPH's Form 10-K for the period ending December 31, 2015, filed with the SEC on Mar. 4, 2016, Vigna Decl. Ex. I, ECF No. 31-9 ("2015 10-K"); (6) USPH's Form 10-Q for the period ending June 30, 2014, filed with the SEC on Aug. 7, 2014, Vigna Decl. Ex. K, ECF No. 31-11 ("2Q 2014 10-Q"); (7) USPH's Form 8-K, filed with the SEC on Mar. 10, 2016, Vigna Decl. Ex. CC, ECF No. 31-29 ("3/10/16 8-K"); (8) USPH's Form DEF14A (Definitive Proxy Statement), filed with the SEC on Aug. 15, 2017, Vigna Decl. Ex. DD, ECF No. 31-30 ("2017

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 488 of 573

*Reilly v. U.S. Physical Therapy, Inc.,* Not Reported in Fed. Supp. (2018)

2018 WL 3559089

Definitive Proxy Statement"); (9) USPH's Form DEF14A (Definitive Proxy Statement), filed with the SEC on Apr. 7, 2016, Vigna Decl. Ex. EE, ECF No. 31-31 ("2016 Definitive Proxy Statement"); (10) USPH's Form DEF14A (Definitive Proxy Statement), filed with the SEC on April 9, 2015, Vigna Decl. Ex. FF, ECF No. 31-32 ("2015 Definitive Proxy Statement"); (11) USPH's Form 8-K, filed with the SEC on Mar. 27, 2015, Vigna Decl. Ex. GG, ECF No. 31-33 ("3/27/15 8-K"); and (12) USPH's Form 8-K, filed with the SEC on Mar. 27, 2014, Vigna Decl. Ex. HH, ECF No. 31-34 ("3/27/14 8-K").

[4]     In particular, plaintiffs quoted at length from correspondence between USPH and the SEC, including: (1) Letter from SEC Staff to Christopher Reading, dated Oct. 15, 2014, Vigna Decl. Ex. J, ECF No. 31-10 ("Ex. J"); (2) Letter from Lawrance W. McAfee to SEC Staff, dated Oct. 29, 2014, Vigna Decl. Ex. M, ECF No. 31-13 ("Ex. M"); (3) Letter from SEC Staff to Christopher Reading, dated Nov. 26, 2014, Vigna Decl. Ex. N, ECF No. 31-14 ("Ex. N"); (4) Letter from Lawrance W. McAfee to SEC Staff, dated Dec. 18, 2014, Vigna Decl. Ex. O, ECF No. 31-15 ("Ex. O"); (5) Letter from SEC Staff to Christopher Reading, dated Jan. 6, 2015, Vigna Decl. Ex. P, ECF No. 31-16 ("Ex. P"); (6) Correspondence between USPH and SEC Staff, dated Dec. 12, 2016, Jan. 6, 2017, Jan. 13, 2017, Feb. 10, 2017, Feb. 23, 2017, and Mar. 3, 2017, Vigna Decl. Ex. S, ECF No. 31-19 ("Ex. S"); Letter from SEC Staff to Lawrance W. McAfee, dated Mar. 10, 2017, Vigna Decl. Ex. T, ECF No. 31-20 ("Ex. T"). Plaintiffs also references excerpts of the Transcript of USPH's Q4 2016 Earnings Call, dated Mar. 16, 2017, Vigna Decl. Ex. Y, ECF No. 31-25 ("Ex. Y").

### A. Factual Background

### 1. USPH

**\*2**   USPH is a Nevada corporation headquartered in Houston that is traded on the New York Stock Exchange. SAC ¶ 12. It operates outpatient physical therapy clinics that provide pre- and post-operative care and treatment for orthopedic-related disorders, sports-related injuries, preventative care, rehabilitation of injured workers, and neurological-related

injuries. SAC ¶ 24. Throughout the Class Period, defendant Christopher J. Reading served as USPH's CEO and Director, defendant Lawrance W. McAfee served as CFO, Executive Vice President, and Director, defendant Glenn W. McDowell served as COO, and defendant Jon C. Bates served as Corporate Controller and Vice President. SAC ¶¶ 13-16.

USPH has grown nationally over the last twelve years through strategic acquisitions of outpatient physical therapy clinics. SAC ¶ 26. As of December 31, 2016, USPH operated 423 of its 540 clinics as "Clinic Partnerships." SAC ¶ 26. Under this arrangement, USPH owns a 1% general partnership and a 49-99% limited partnership interest in these clinics, with the therapists who manage the clinics owning the remaining interest as limited partners. SAC ¶ 25.[5] USPH refers to the partnership interests owned by the managing therapists as "non-controlling interests." SAC ¶ 25.

[5]     USPH operates a minority of its clinics through wholly-owned subsidiaries under profit-sharing arrangements with therapists. SAC ¶ 25.

Under UPSH's agreements with some of its managing therapists, it is required to redeem the therapist's non-controlling interest if his or her employment ceases at any time after a specified number of years from the date that therapist acquired his or her non-controlling interest. 2016 10-K at 5. Under other agreements, USPH has the right, but not the obligation, to purchase the therapist's non-controlling interest upon termination of his or her employment. *Id.*

### 2. USPH's Accounting Practices for Non-Controlling Interests

The alleged securities fraud in this case concerns USPH's accounting practices for its managing therapists' non-controlling interests. We begin by providing some background information on accounting practices for non-controlling interests, which, according to the Financial Accounting Standards Board ("FASB"), "can be complex." Accounting Standards Codification Topic 480, Subtopic 10, Section 99 at 7 (Fin. Accounting Standards Bd. 2009), Vigna Decl. Ex. V, ECF No. 31-22 ("Ex. V"). FASB Accounting Standard Codification ("ASC") 480-10-S99 provides detailed guidance as to whether redeemable preferred stock should be classified as "temporary equity" or "permanent equity." *Id.* At its most basic level, this ASC provides that "equity instruments with redemption features that are not solely

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 489 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 3559089

within the control of the issuer" should be classified as temporary equity. Id. at 7. ASC 480-10-S99 does "not attempt to deal with the conceptual question of whether such a security is a liability." Id. at 2.

By contrast, ASC 480-10-25 provides guidance as to whether certain financial instruments should be classified as a liability or an equity. Accounting Standards Codification Topic 480 Subtopic 10, Section 25 (Fin. Accounting Stds. Bd. 2009), Vigna Decl. Ex. X, ECF No. 31-24 ("Ex. X"). ASC 480-10-25 provides that "[a] mandatorily redeemable financial instrument shall be classified as a liability unless the redemption is required to occur only upon the liquidation or termination of the reporting entity." Id. at 1.

USPH historically accounted for the managing therapists' non-controlling interests as either permanent or temporary equity. SAC ¶ 28. If a managing therapist could require USPH to purchase his or her non-controlling interest, typically after a defined period of time set forth in a limited partnership agreement (the "Holding Period"), the Company reclassified the recorded value of the non-controlling interest as temporary equity under the line item "Redeemable Non-Controlling Interests" or "RNCI." Id. The recorded value was the fair value of the non-controlling interest on the date the Company acquired a controlling interest in the partnership adjusted for any earnings attributable to the partnership and distributions made after acquisition. Id. If the Company deemed it probable that the managing therapist would assert his or her redemption rights or the Company reached an agreement to purchase some or all of the therapist's interest, the redeemable non-controlling interest was adjusted to its then-current redemption value. SAC ¶ 29. Each quarter, USPH would assess the probability that the redemption rights would be triggered, and accounted for the redeemable non-controlling interests accordingly. SAC ¶ 30.

**\*3** USPH described its historical accounting practices for redeemable non-controlling interests in the "Significant Accounting Policies" section of its 2013-15 10-Ks as follows:

The Company recognizes non-controlling interests as equity in the consolidated financial statements separate from the parent entity's equity. The amount of net income attributable to non-controlling interests is included in consolidated net income on the face of the statements of net income. Changes in a parent entity's ownership interest in a subsidiary that do not result in deconsolidation are treated as equity transactions if the parent entity retains its controlling financial interest. The Company

recognizes a gain or loss in net income when a subsidiary is deconsolidated. Such gain or loss is measured using the fair value of the non-controlling equity investment on the deconsolidation date.

When the purchase price of a non-controlling interest by the Company exceeds the book value at the time of purchase, any excess or shortfall is recognized as an adjustment to additional paid-in capital. Additionally, operating losses are allocated to non-controlling interests even when such allocation creates a deficit balance for the non-controlling interest partner.

The non-controlling interests that are reflected as redeemable non-controlling interests in the consolidated financial statements consist of those outside owners that have certain redemption rights that are currently exercisable, and that, if exercised, require that the Company purchases the non-controlling interest of the particular limited partner. At December 31, [of the applicable year], the redeemable non-controlling interests reflect the book value of the respective non-controlling interests. The redeemable non-controlling interests will be adjusted to the fair value in the reporting period in which the Company deems it probable that the limited partner will assert the redemption rights and will be adjusted each reporting period thereafter. The adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although, the adjustments are not reflected in the statements of net income, current accounting rules require that the Company reflects the charge in the earning per share calculation.

2015 10-K at 44-45; 2014 10-K at 41; 2013 10-K at 46-47; SAC ¶ 90.

### 3. USPH's 2014-2015 Correspondence with the SEC

USPH and the SEC exchanged correspondence beginning in October 2014 regarding the Company's accounting practices for its non-controlling interests. SAC ¶¶ 32-39. On October 15, 2014, the SEC sent a comment letter addressed to defendant Reading that asked, inter alia, whether it was proper for USPH to include a separate line item in its earnings per share reconciliation for earnings per share from revaluations of its redeemable non-controlling interests, rather than to include this item within its basic and diluted earnings per share from continuing operations. SAC ¶ 33; Ex. J at 4; see 2Q 2014 10-Q at 13. The letter referred to ASC 480-10-

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 490 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

S99-3A-22, which discusses the appropriate earnings per share treatment of certain non-controlling interests. SAC ¶ 33; see Ex. V at 13-14.

**\*4** On October 29, 2014, USPH responded to the SEC's letter, stating that its reporting of the revaluation of the redeemable non-controlling interests was in accordance with FASB ASC 480-10-S99-3A-22, and that its "reporting the Revaluation as a separate line gives our investors the ability to compare our Company's current results from operations to prior periods as well as to the operating results of other companies within our sector." SAC ¶ 34; Ex. M at 6. USPH's Form 10-Q for the period ended September 31, 2014, filed on November 7, 2014, did not mention any unresolved comments from the SEC. SAC ¶ 36. [6]

[6]   USPH argues that issuers have a duty to disclose unresolved SEC comments only in a Form 10-K, not a Form 10-Q, and that the issue was resolved months before the Company's 2014 10-K was filed. See Securities Offering Reform, Securities Act Release No. 33-8591 at 461-64 (effective Dec. 1, 2005), Vigna Decl. Ex. L, ECF No. 31-12.

On November 26, 2014, the SEC responded, asking USPH to provide details in support of its accounting for earnings per share using "net income attributable to common stockholders of $10,660 and not $9,574 which would reflect the adjustment for the revaluation of the redeemable non-controlling interests." Ex. N at 3; see SAC ¶ 37. USPH had a discussion with Ms. Angela Halac of the SEC on December 10, 2014, and sent a letter response on December 18, 2014. SAC ¶ 38. USPH indicated that it included the additional line item to be transparent with its investors and "so they can easily see the components and computation of [the Company's] earnings-per-share." Id.

On January 6, 2015, the SEC wrote USPH a letter stating that it had completed its review of USPH's filings and did not require any action at that time, but that its "comments or changes to disclosure in response to [its] comments do not foreclose the Commission from taking any action with respect to the company...." Ex. P; see SAC ¶ 39.

#### 4. USPH's 2016-2017 Correspondence with the SEC

On December 12, 2016, nearly two years after the SEC's prior letter, the SEC's Accounting Branch Chief of the Office of

Beverages, Apparel, and Mining sent a letter to defendant McAfee with a "comment" on USPH's Form 10-K:

> Please tell us the terms and conditions under which the non-controlling interests are redeemable. Please tell us why the probability of a limited partner actually asserting the redemption rights is relevant to your accounting for redeemable non-controlling interests. Please disclose the circumstances under which redeemable non-controlling interests are deemed probable of redemption. Please also disclose your accounting for non-controlling interests that are probable of becoming redeemable in the future, if applicable. See paragraphs 13 through 16 of ASC 480-10-S99.

SAC ¶ 71; Ex. S. at 2. As before, this letter cited ASC 480-10-S99, which addresses classification of non-controlling interests as temporary equity or permanent equity.

On January 6, 2017, defendant McAfee responded to this letter by explaining as follows:

> In conjunction with the agreements typically entered into by the Company and its subsidiaries to purchase a controlling interest in acquired partnerships which own and operate multi-clinic physical therapy practices, the Company enters into agreements with the non-controlling interest limited partners ("NC Partner") that, in the event the employment of the NC Partner ceases after a defined number of years from the acquisition date (the "Holding Period"), the Company is required to purchase the NC Partner's interest in the partnership at a predetermined multiple of earnings before interest, taxes, depreciation and amortization. In the event that the employment of the NC Partner ceases prior to the end of the Holding Period, then the Company has the option to purchase the NC Partner's interest in the partnership at a predetermined multiple of earnings before interest, taxes, depreciation and amortization, but the Company is not required to purchase the interest, regardless of which party initiates

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 491 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

the termination of employment or the reason for such termination.

**\*5** After the initial Holding Period has been satisfied, the redemption is not solely in control of the Company, i.e. the NC Partner or the Company can terminate the employment of the NC Partner. Therefore, in accordance with paragraph 12 (c) of ASC 480-10-S99, the book value, which is the fair value on the date of acquisition adjusted for any earnings attributable and distributions made subsequent to the date of acquisition, of the non-controlling interest is reclassified to temporary equity on the Company's consolidated balance sheet in the section labeled "Redeemable non-controlling interests" at the expiration of the Holding Period. Then, and in any subsequent reporting period that the Company deems it probable that the NC Partner will assert their redemption rights or the Company reaches an agreement to purchase some or all of the NC Partner interest, i.e. in the event the NC Partner continues to be employed but wants to sell a portion or all of his/her interests and the Company agrees, the redeemable non-controlling interest is adjusted to its redemption value and is adjusted in each reporting period thereafter in accordance with paragraph 15 (b) of ASC 480-10-S99 until purchased by the Company. The adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although the adjustments are not reflected in the statements of net income, current accounting rules require that the Company reflects the charge in the earning per share calculation. Quarterly, the Company assesses the probability that the redemption rights will be asserted based on discussions with the NC Partner regarding their employment status and accounts for it accordingly.

In response to the Staff's comment, the Company will revise the disclosure in its future filings to include the following information:

'In conjunction with the agreements typically entered into by the Company to purchase a controlling interest in acquired partnerships which own and operate multiclinic physical therapy practices, the Company enters into agreements with the non-controlling limited partner ("NC Partner") that, in the event that the employment of the NC Partner ceases prior to a defined number of years from the acquisition date (the "Holding Period"), then the Company has the option to purchase the NC Partner's interest in the partnership at a predetermined multiple of earnings before interest, taxes, depreciation and amortization, but

the Company is not required to purchase the interest, regardless of which party initiates the termination of employment or the reason for such termination.

After the initial Holding Period has been satisfied, the redemption is not solely in control of the Company, i.e. the NC Partner or the Company can terminate the employment of the NC Partner. Therefore, in accordance with paragraph 12 (c) of ASC 480-10-S99, the book value, which is the fair value on the date of acquisition adjusted for any earnings attributable and distributions made subsequent to the date of acquisition, of the non-controlling interest is reclassified to temporary equity on the Company's consolidated balance sheet in the section labeled "Redeemable non-controlling interests" at the expiration of the Holding Period. Then, and in any subsequent reporting period that the Company deems it probable that the NC Partner will assert their redemption rights or the Company reaches an agreement to purchase some or all of the NC Partner interest, i.e. in the event the NC Partner continues to be employed but wants to sell a portion or all of his/her interests and the Company agrees, the redeemable non-controlling interest is adjusted to its redemption value and is adjusted in each reporting period thereafter in accordance with paragraph 15 (b) of ASC 480-10-S99 until purchased by the Company. Quarterly, the Company assessed the probability that the redemption rights will be asserted based on discussions with the NC Partner regarding their employment status and accounts for it accordingly. The adjustments are charged to additional paid-in capital and are not reflected in the statements of net income. Although the adjustments are not reflected in the statements of net income, current accounting rules require that the Company reflects the charge in the earning per share calculation.'

SAC ¶ 72; Ex. S at 7-8.

The SEC, unconvinced by USPH's explanation that it accounted for the redeemable non-controlling interests differently during and after the initial Holding Period, responded a week later:

> As stated in paragraph 5 of ASC 480-10-S99-3A, the possibility that any triggering event that is not solely within the control of the issuer could occur—without regard to probability —would require the instrument to be

classified in temporary equity. You indicate that you are required to purchase the non-controlling limited partners' interests in the event their employment ceases after the holding period. As a result, it appears that upon inception these agreements with non-controlling interest limited partners have redemption provisions that may not be solely within your control. Please tell us in greater detail why the non-controlling interests subject to these redemption provisions are not presented in temporary equity at inception pursuant to ASC 480-10-S99-3A.

**\*6** SAC ¶ 73; Ex. S at 10-11. The SEC questioned USPH's consideration of the probability that a non-controlling interest "will be redeemed," as opposed to whether it "will become redeemable," which the SEC asserted was the proper analysis under paragraph 15 of ASC 480-10-S99-3A. SAC ¶ 73; Ex. S at 11.

USPH responded on February 10, 2017, conceding that its prior accounting for the non-controlling interests was incorrect and concurring with the SEC's analysis "that the non-controlling interests subject to redemption provisions should be presented in temporary equity at the inception of the agreement and adjusted at the end of each reporting period to its estimated redemption value." SAC ¶ 74; Ex. S at 14. USPH asserted that the "cumulative impact of this correction ... [was] immaterial to the consolidated financial statements taken as a whole," and stated that it would adjust its 2014 and 2015 financial statements when it released its 2016 Form 10-K in March 2017. SAC ¶ 74; Ex. S at 14. USPH provided the SEC with proposed additional disclosures and adjusted financial statements to reflect these changes. Ex. S at 15-18.

The SEC replied on February 23, 2017, asking USPH to "address the guidance in paragraphs 16(c) and 16(e) of ASC 480-10-S99-3A, and to "describe how you are applying the guidance in paragraph 22(b) of 480-10-S99-3A in accounting for your redeemable non-controlling interests." SAC ¶ 75; Ex. S at 19-22. USPH's March 3, 2017 response proposed a correction of its redemption value accounting for redeemable non-controlling interests, which would affect the amounts

reported by the Company as permanent and temporary equity, as well as additional paid-in capital and deferred taxes. SAC ¶ 76.

On March 10, 2017, the SEC raised the issue of whether the Company's non-controlling interests should be classified as liabilities instead of either permanent or temporary equities. SAC ¶ 77. This letter asked whether the non-controlling interests had any "put, call or redemption requirements" that were "mandatorily redeemable financial instruments as that term is defined in ASC 480-10-20 and further described in ASC 480-10-25-4 to -7." Id. If ASC 480-10-25-4 to 7 applied, it would require USPH to classify these mandatorily redeemable non-controlling interests as liabilities. See Ex. X at 1 ("A mandatorily redeemable financial instrument shall be classified as a liability unless the redemption is required to occur only upon the liquidation or termination of the reporting entity.").

On March 16, 2017, USPH issued a Form 8-K warning investors not to rely on its financial statements for the years ended December 31, 2014 and 2015, all quarters within 2014 and 2015, and the first three quarters of 2016. SAC ¶ 78; 3/16/17 8K at 4. Reporting a "material weakness in internal controls over financial reporting as they relate to this issue," the Company stated that its "historical accounting for redeemable non-controlling interests of acquired partnerships was incorrect due to the fact that these partnership agreements contain a provision that makes the non-controlling interests mandatorily redeemable and, thus incorrectly classified." SAC ¶ 78; 3/16/17 8K at 4. On March 16, 2017, the day this news was announced, USPH's common stock fell $3.85 per share, or 5.2%, to close at $69.90. SAC ¶ 82.

**\*7** The following day, USPH held its Q4 2016 conference call where defendant McAfee explained: "[A]s we looked at it and the accountants look at it, what we realized was ... since everybody's eventually is going to cease employment, whether that they retire or incapacitated or die, that makes it a mandatory redemption feature, which means that it needed to be treated differently on the balance sheet and the income statement than the way we had. It's not that we ever try to hide from anybody. We've told people for years how we structure stuff. It was reviewed internally and externally. And it was just missed." Ex. Y at 4; see SAC ¶ 81. McAfee added that this accounting "error" would have "no impact on previously reported cash balances or net cash flow or EBITDA," nor would it "change[ ] the real world economics of [the Company's] business." Ex. Y at 4. USPH's stock price

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 493 of 573

*Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)*

2018 WL 3559089

lost another $1.75 per share (2.5%) on Friday, March 17, 2017, and continued to fall the following week, losing $0.25 per share (0.3%) on March 20, 2017, and $3.15 per share (4.6%) on March 21, 2017, to close at $64.75. SAC ¶ 82.

On March 24, 2017, USPH acknowledged in a letter to the SEC that, based on its review of ASC 480-10-20 and ASC 480-10-25-4 to-7, "the redemption feature included in the partnership agreements should be considered a mandatorily redeemable financial instrument and accounted for accordingly, as a liability. Based on this determination, Management concluded that redeemable non-controlling interests have been historically accounted for incorrectly." SAC ¶ 83. The Company reached this conclusion because "[t]ermination of employment of such Individual is deemed certain to occur at some point in the future, such as by reason of death." Id. Because accounting for the redeemable non-controlling interests as liabilities instead of equities would result in "quantitatively large" adjustments, the Company "determined that the correction of this error is a material change to its previously issued financial statements." Id.

### 5. USPH's 2016 Form 10-K Restatement

On June 17, 2017, USPH filed its belated 2016 10-K, which included restated quarterly and annual financial statements for 2014 and 2015, restated financial data for 2012-15, and revised analyses of its financial condition and results of operations for 2014 and 2015. SAC ¶ 85(a)-(d). In the 2016 10-K, USPH "identified a material weakness in our control over financial reporting which resulted in a material misstatement in our previously issued consolidated financial statements and a failure to meet our reporting obligations." SAC ¶ 86. This "material weakness" related to the Company's mandatorily redeemable non-controlling interests. Id. USPH stated that its "historical accounting for redeemable non-controlling interests of acquired partnerships was incorrect" because these "interests should be accounted for as a liability and not as temporary equity." SAC ¶ 87.

### 6. Defendants' Alleged Misstatements

Plaintiffs allege that defendants' materially false and misleading statements during the Class Period include filing Form 10-Qs, Form 10-Ks, and press releases that did not disclose violations of GAAP with respect to redeemable non-controlling interests, overstated earnings per share,

understated total liabilities, overstated net income, and did not disclose that the Company's internal controls over financial reporting were ineffective. SAC ¶¶ 42-70. USPH acknowledges that it has restated its financial statements to correct these SEC filings and that its previously issued financial statements contained material misstatements. 2016 10-K at 1, 43-45. [7]

[7]    USPH does not contest the "material misrepresentation or omission" element of plaintiffs' 10b-5 claim.

### 7. Plaintiffs' Scienter Allegations

#### a) Bonuses

During the Class Period, defendants Reading, McAfee, and McDowell, the CEO, CFO, and COO of USPH, respectively, were eligible to receive four types of bonus awards: (1) the Objective Cash Bonus Plan provided for a potential cash bonus of a fixed percentage of their base salaries based on the Company's fully diluted earnings per share "before any extraordinary items"; [8] (2) the Discretionary Cash Bonus Plan provided for a potential cash bonus as determined at the sole discretion of the Company's Compensation Committee; (3) the Objective Long-Term Incentive Plan ("LTIP") provided for potential restricted stock awards to be awarded at the discretion of the Compensation Committee, with the maximum permissible amount based upon the achievement of performance goals relating to fully diluted earnings per share "before any extraordinary items"; and (4) the Discretionary LTIP provided for potential restricted stock awards as determined at the sole discretion of the Compensation Committee. SAC ¶ 114; 3/16/16 8-K at 3; 3/27/15 8-K at 3; 3/27/14 8-K at 3.

[8]    "Extraordinary items" is not defined in USPH's filings. See 3/16/16 8-K; 3/27/15 8-K; 3/27/14 8-K.

**\*8** Plaintiffs' allegations focus on the Objective Cash Bonus Plan and Objective LTIP. SAC ¶ 114. USPH's practice for these bonus awards was to announce the target range for earnings per share, and then award Objective Cash Bonuses and Objective LTIP by comparing the Company's actual earnings per share (with potential adjustments for "extraordinary items") with the target range. See SAC ¶ 114; 3/16/16 8-K; 3/27/15 8-K; 3/27/14 8-K. Plaintiffs argue that defendants had the incentive to artificially inflate earnings

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 494 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

per share through their accounting treatment of the non-controlling interests so as to increase these two "Objective" components of their bonuses.

### (1) 2014 Bonuses

On March 27, 2014, USPH filed a Form 8-K with the SEC that included a table for the Objective Cash Bonus calculation ranging from a bonus equal to 15% of base salary for earnings per share of $1.51 to a bonus equal to 75% of base salary for earnings per share of $1.70 or more. AC ¶ 116; 3/27/14 8-K. In USPH's 2015 Definitive Proxy Statement, filed with the SEC ON April 9, 2015, the Company calculated its earnings per share to be $1.71 and awarded defendants Reading, McAfee, and McDowell Objective Cash Bonuses equal to 75% of their base salaries ($721,250, $525,000, and $471,250, respectively), as well as Objective LTIP of 20,000, 10,000, and 10,000 shares. SAC 117, 119; 2015 Definitive Proxy Statement at 14. Reading, McAfee, and McDowell were also awarded Discretionary LTIP of 20,000, 10,000, and 10,000 shares, respectively. 2015 Definitive Proxy Statement at 14.

### (2) 2015 Bonuses

The next year, USPH set its goals for the objective bonus calculation higher, ranging from a bonus equal to 15% of salary for earnings per share of $1.77 to 75% for earnings per share equal to or exceeding $2.00. SAC ¶ 121; 3/27/15 8-K. The 2016 Proxy then calculated the adjusted fully diluted earnings per share as $1.80, which meant that Reading, McAfee, and McDowell received Objective Cash Bonuses equal to 21% of their base salaries ($124,950, $90,300, and $84,000, respectively), as well as Objective LTIP of 6,720, 3,360, and 3,360 shares. SAC ¶ 122; 2016 Definitive Proxy Statement at 14. Defendants received no Discretionary Cash Bonus in 2015, but Reading received Discretionary LTIP of 16,000 shares, and McAfee and McDowell each received 8,000 shares. 2016 Definitive Proxy Statement at 14.

### (3) 2016 Bonuses

For 2016, USPH set bonus targets equal to 15% of salary for earnings per share of $1.86 and up to 75% of salary for earnings per share of $2.04 or more. SAC ¶ 126; 3/16/16 8K. USPH made its restatement announcement before awarding

bonuses in 2016. While the Company reported its 2016 earnings per share as $1.64, reflecting the restatement, it used an "adjusted diluted earnings per share" of $1.87 in 2016 for the purpose of determining its Objective Cash Bonus and Objective LTIP. SAC ¶ 127. USPH awarded Reading, McAfee, and McDowell $230,622, $166,668, and $155,040 in Objective Cash Bonuses, and 16,350, 8,175, and 8,175 in Objective LTIP, respectively. SAC ¶ 128; 2017 Definitive Proxy Statement.

### b) Stock Sales

Plaintiffs allege that defendants Reading, McAfee, and McDowell sold shares from their USPH stock holdings that were suspicious in timing and amount. SAC ¶¶ 142-52. None of these defendants had a 10b5-1 plan that predetermined the sales of their personal stock holdings in the Company. SAC ¶ 142.

After making four open market sales in the two years before the beginning of the Class Period in March 2014, defendant Reading sold 20,000 shares in November 2014 (21% of his non-restricted shares), [9] 25,000 shares in March 2015 (24% of his non-restricted shares), 25,000 shares in November 2015 (44% of his non-restricted shares), 15,000 shares on May 10, 2016 (31% of his non-restricted shares), and 8,000 shares on September 19, 2016 (19% of his non-restricted shares). SAC 143-45. Plaintiffs do not allege that Reading has sold any USPH stock since September 19, 2016. SAC ¶ 145.

[9]     Plaintiffs point out that these sales occurred just over a month after the Company received the SEC's initial comment letter on October 15, 2014. AC ¶ 143.

**\*9** Defendant McAfee sold 10,000 shares on November 7, 2014 (36% of his non-restricted shares), [10] 10,000 shares on March 6, 2015 (46% of his non-restricted shares), 2,650 shares on March 16, 2015 (22% of his non-restricted shares), 2,350 shares on March 20, 2015 (26% of his non-restricted shares), 2,000 shares on August 7, 2015 (13% of his non-restricted shares), 2,000 shares on August 25, 2015 (15% of his non-restricted shares), 4,000 shares on November 6, 2015 (25% of his non-restricted shares), 4, 000 shares on December 16, 2015 (34% of his non-restricted shares), 5,000 shares on March 4, 2016 (42% of his non-restricted shares), 4,000 shares on May 6 and 9, 2016 (together, 38% of his non-restricted shares), 2,000 shares on June 10, 2016 (30% of his

Reilly v. U.S Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

non-restricted shares), 2,000 shares on August 5, 2016 (22% of his non-restricted shares), 2,000 shares on August 22, 2016 (29% of his non-restricted shares), 2,000 shares on September 19, 2016 (41% of his non-restricted shares), 2,000 shares on November 10, 2016 (29% of his non-restricted shares), and 2,000 shares on November 22, 2016 (41% of his non-restricted shares). SAC ¶¶ 146-48. Plaintiffs do not allege that McAfee has sold any shares of his USPH holdings since November 22, 2016. SAC ¶ 148.

10    This sale occurred approximately three weeks after the receipt of the October 15, 2014 letter from the SEC. AC ¶ 146.

Defendant McDowell made only two open market sales in the two years before the beginning of the Class Period, and then sold 19,621 shares on December 4 and 5, 2014,[11] 4,299 shares on March 16 and 17, 2015 (together, 97% of his non-restricted shares), 8,598 shares on August 10, 2015 (100% of his non-restricted shares), 4,299 shares on November 10 and 11, 2015 (100% of his non-restricted shares), 8,354 shares on May 9, 2016 (103% of his non-restricted shares),[12] 4,047 shares on August 9, 2016 (100% of his non-restricted shares), and 4,047 shares on November 15, 2016 (100% of his non-restricted shares). SAC ¶¶ 149-51. Plaintiffs do not allege that McDowell has sold any shares of USPH since November 15, 2016. SAC ¶ 151.

11    Plaintiffs note that "these sales were sold under an S transaction code—an open market or private sale —and yet were marked as restricted." AC ¶ 149.

12    Defendants object to plaintiffs' usage of the percentage of "non-restricted shares" sold, noting that this calculation is misleading because plaintiffs also allege that plaintiffs sold restricted stock during this time period. Defendants argue that when calculated as a percentage of the individual defendants' total holdings, no defendant ever sold more than 41% of his total holdings at any given time. See Vigna Decl., Ex. LL, ECF No. 31-38.

Plaintiffs do not allege that defendant Bates made any stock sales during this period.

Notably, plaintiffs do not allege that any of the defendants sold a single share of USPH stock since December 12, 2016, the beginning of the 2016-17 correspondence between the SEC and the Company.

### c) Debt Covenants

In USPH's 2016 Form 10-K, the Company disclosed that the restatement caused it to violate certain debt covenants, stating:

> Although the restatement of prior financial statements caused the Company to be in violation of our Amended Credit Agreement dated December 5, 2013, the Company was able to obtain necessary waivers and amendments, as applicable. On March 30, 2017, the Company entered into a Third Amendment to Amended and Restated Credit Agreement and Limited Waiver with its lenders. As of the date of this report, the Company is in compliance with the covenants in the Amended and Restated Credit Agreement.

SAC ¶ 153; 2016 10-K at 51.

### B. Procedural History

The initial complaint in this action was filed by Maura Culhane against USPH, Bates, McAfee, and Reading on March 31, 2017, and early notice was published the same day on Globe Newswire to all putative class members in accordance with 15 U.S.C. § 78u-4(a)(3)(A)(i). Compl., Mar. 31, 2017, ECF No. 1. The Court then appointed Sean Reilly as lead plaintiff[13] and approved his selection of the Rosen Law Firm as lead counsel. Order, June 8, 2017, ECF No. 11. Plaintiffs filed an amended complaint, adding McDowell as a defendant. Am. Compl., Aug. 4, 2017, ECF No. 18. After defendants filed a pre-motion letter previewing their arguments for this motion to dismiss, the Court granted plaintiffs leave to file a second amended complaint. Order, Sept. 28, 2017, ECF No. 25. Plaintiffs then filed the SAC, alleging securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all defendants and control person liability under section 20(a) of the Exchange Act against the individual defendants. SAC, Oct. 12, 2017, ECF No. 26. Defendants filed their motion to dismiss on December 1, 2017, arguing that plaintiffs failed to

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 496 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

allege the requisite scienter for the 10(b) claim and failed to state a control person claim against the individual defendants. Defs.' Mot. to Dismiss, Dec. 1, 2017, ECF No. 30. Along with their opposition to this motion, plaintiffs filed a motion to strike certain documents exhibited in defendants' motion to dismiss. Pls.' Mot. to Strike, Jan. 10, 2018, ECF No. 36.

13    Reilly was the only member of the putative class to file a motion to be appointed lead plaintiff. See Mot. to Appoint Counsel & Lead Pl., May 30, 2017, ECF No. 8.

### III. Discussion

#### A. Legal Standard

##### 1. Motion to Dismiss

 **\*10** On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor. City of Providence v. BATS Global Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017). Nevertheless, plaintiffs' factual allegations must "be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). In addressing a motion to dismiss, a court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff[s] and upon which [they] relied in bringing the suit." ATSI, 493 F.3d at 98. 14

14    Plaintiffs filed a motion to strike six of the forty-seven exhibits that defendants filed in connection with their motion to dismiss: four articles by PwC and WG&L describing the complexity of accounting for non-controlling interests (Vigna Decl. Exs. E, F, G, and UU, ECF Nos. 31-5, 31-6, 31-7, and 31-47), a table summarizing USPH's bonus calculations (Vigna Decl. Ex. II, ECF No. 31-35), and the transcript of a March 16, 2017 conference call (Vigna Decl. Ex. Y, ECF No. 31-25). We address these in turn.

While courts routinely take judicial notice of news articles in securities cases to assess whether

information was in the public realm, see, e.g., Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006), such documents are not appropriately considered on a motion to dismiss for the substance of their contents, see Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991). Defendants cite Exhibits E, F, G, and UU in support of their substantive argument that accounting for non-controlling interests is complex, see Mem. of Law, Dec. 1, 2017, ECF No. 32 at 3, 4 n.4, 19-20, and we will not consider them for this purpose.

The Court also will not consider the portions of Exhibit II that contain legal argument. See, e.g., Ex. II at 1 n.2 ("Plaintiff's allegations concerning those years ... are flawed in the same way.").

We clearly may consider the transcript attached as Exhibit Y, which is referred to in SAC ¶ 81. See ATSI, 493 F.3d at 98 (permitting the Court to consider "documents incorporated into the complaint by reference"). Plaintiffs argue that SAC ¶ 81 is based on a different version of this transcript, which they failed to submit to the Court, but they do not question the authenticity or accuracy of Exhibit Y as a transcript of the conference call referred to in the SAC. See Mem. of Law, Jan. 10, 2018, ECF No. 37 at 10 ("This Court also should strike Defendants' Exhibit Y because it adds nothing that bears on the resolution of the issues raised in Defendants' motion to dismiss."). Indeed, plaintiffs make no attempt to refute defendants' arguments regarding this exhibit in their reply brief.

#### 2. Securities Fraud Claims under Section 10(b)

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). In order to state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must adequately plead the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 497 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

**\*11** Claims under Section 10(b) must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure by "stat[ing] with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see ATSI, 493 F.3d at 99. A complaint alleging securities fraud must also meet the requirements of the Private Securities Litigation Reform Act ("PSLRA"), which requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996) (internal citations omitted) ). In order to plead a strong inference of scienter, plaintiffs must allege either "(1) that defendants had the motive and opportunity to commit fraud," or "(2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).

In analyzing scienter, we assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007) (emphasis in original). "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 323-24. The inference must be more than merely reasonable or permissible; it must be "cogent and compelling ... strong in light of other explanations." Id. at 324. "A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

## B. Analysis

### 1. Section 10(b) and Rule 10b-5—Scienter

Defendants challenge only the second element of a claim under Section 10(b) and Rule 10b-5, arguing that plaintiffs failed to allege scienter because they have neither adequately alleged that defendants had the requisite motive and opportunity to commit securities fraud nor adequately alleged conscious recklessness.

#### a) Motive and Opportunity

In the Second Circuit, "[s]ufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.' " Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (quoting Novak, 216 F.3d at 307). However, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit, 264 F.3d at 139.

Defendants argue that plaintiffs failed to plead any showing of motive. [15] Plaintiffs respond that they have adequately pled motive based on their allegations in the SAC regarding defendants' bonuses, stock sales, and debt covenants. We address each of these seriatim.

[15]     Defendants do not contest that they had the "opportunity" to commit fraud. Indeed, courts frequently assume that corporations and their officers and directors have the opportunity to commit fraud if they so desired. See, e.g., In re Ambac Fin. Grp. Sec. Litig., 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010) (collecting cases).

#### (1) Bonuses

**\*12** Plaintiffs allege that under USPH's Objective Bonus Plan, defendants Reading, McAfee, and McDowell earned higher bonuses than they would have absent USPH's accounting errors. [16] Plaintiffs assert that these compensation packages established a "direct link" with the alleged fraud and therefore provide the requisite strong inference of scienter. See Mem. of Law, Jan. 10, 2018, ECF No. 34 at 8.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 498 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

16    Plaintiffs make no allegations regarding defendant Bates's bonuses during the Class Period.

Motives common to any corporate officer are insufficient to plead scienter. See ECA, 553 F.3d at 198. Therefore, "incentive compensation can hardly be the basis on which an allegation of fraud is predicated." Id. at 201 (quoting Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) ); see also Kalnit, 264 F.3d at 139-40. "If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.' " ECA, 553 F.3d at 201 (quoting Acito, 47 F.3d at 54); see also Wyche v. Advanced Storage Sys., Inc., 710 F. App'x 41, 473 (2d Cir. 2017) ("Bonus compensation is not the type of 'concrete and personal' benefit upon which a finding of motive to commit securities fraud can be based.") (quoting Kalnit, 264 F.3d at 139).

Applying this rule, several courts in this Circuit have found that even multi-million dollar bonuses that plaintiffs alleged were directly tied to misstatements were insufficient evidence of motive. For example, in In re JP Morgan Chase Securities Litigation, 363 F. Supp. 2d 595, 622 (S.D.N.Y. 2005), defendants' total bonuses of $15 million that were allegedly dependent in part on the amount of business they conducted with Enron were deemed "deficient, as they involve[d] '[m]otives that are generally possessed by most corporate directors and officers.' " Id. (citing Kalnit, 264 F.3d at 139). Similarly, Lipow v. Net1 UEPS Technologies, Inc., 131 F. Supp. 3d 144, 153, 160-62 (S.D.N.Y. 2015), involved total bonus payments of $5.4 million directly linked to defendants' securing a contract that was later deemed to be illegal and invalid. The court rejected plaintiff's argument that these bonuses went beyond the "usual financial incentive arrangements of compensation based on the company's earnings," because "incentive compensation can hardly be the basis on which an allegation of fraud is predicated." Id. (quoting ECA, 553 F.3d at 201).

The same logic applies here. The bonuses paid to defendants, which allegedly were higher than they would have been but for the accounting treatment of the Company's redeemable non-controlling interests, comprise general performance-based compensation that cannot form the basis for motive to commit securities fraud. See ECA, 553 F.3d at 201.

Plaintiffs argue that the Second Circuit precedent in Acito, Kalnit, and ECA is inapposite, and that the allegations in the complaint instead "align" with the decisions in In re Wellcare Management Group, Inc. Securities Litigation, 964 F. Supp. 632, 639 (N.D.N.Y. 1997), and Florida State Board of Administration v. Green Tree Financial Corp., 270 F.3d 645, 661 (8th Cir. 2001). We initially observe that neither Wellcare nor Green Tree binds this Court. To the contrary, we join several other courts in concluding that Wellcare's finding motive because defendants' incentive compensation increased because of their allegedly fraudulent conduct is inconsistent with the Second Circuit's decisions in Acito and its progeny. See Lipow, 131 F. Supp. 3d at 161; In re Donna Karan Int'l Sec. Litig., 97 Civ. 2011 (CBA), 1998 WL 637547, at *19 (E.D.N.Y. Aug. 14, 1998).

*13    The Eight Circuit's decision in Green Tree is distinguishable on its facts. Plaintiffs in Green Tree alleged that the defendant company's CEO was the highest paid business executive in the entire United States based on an employment contract that awarded him incentive pay of 2.5% of the company's pre-tax income in addition to his base salary. 270 F.3d at 661. In the final year of this contract, the CEO pocketed a $102 million bonus based on an overstatement of earnings that the company's later restatement reduced by $25.9 million. Id. The "unusual" structure and magnitude of the CEO's compensation package and the timing of the alleged fraud that formed the basis of the decision in Green Tree are plainly inapposite here given the relative modesty and typicality of defendants' bonus compensation. Id.

Our conclusion that plaintiffs' allegations about defendants' bonuses are deficient because they comprise motives generally possessed by most corporate directors and officers ends this analysis. Kalnit, 264 F.3d at 139. Given the law in the Second Circuit regarding incentive compensation as the basis for motive, the parties' disputes over the exact amount, if any, that the Company's accounting errors affected defendants' bonuses are essentially academic. These arguments, even if properly presented, "can hardly be the basis on which an allegation of fraud is predicated." ECA, 553 F.3d at 198.

### (2) Stock Sales

Plaintiffs may sufficiently plead motive where they allege that "defendants misrepresented corporate performance to inflate stock prices while they sold their own shares." Kalnit, 264 F.3d at 139 (citing Novak, 216 F.3d at 307-08 (collecting

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 499 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

cases) ). This analysis focuses on whether the stock sales were unusual or suspicious in timing or amount. See Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999); Acito, 47 F.3d at 54; In re Iconix Brand Grp., Inc., No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *15 (S.D.N.Y. Oct. 25, 2017); In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 584 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015). Factors to be considered in this analysis include "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74-75 (2d Cir. 2001), cert. denied, 534 U.S. 1071 (2001). "[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." ECA, 553 F.3d at 198 (citing Novak, 216 F.3d at 308).

We begin by analyzing the timing of defendants' stock sales. Plaintiffs allege that defendants Reading, McAfee, and McDowell [17] sold significant portions of their stock on various occasions between the beginning of the Class Period and November 22, 2016, but do not allege that any defendant sold a single share of USPH stock after that date. Plaintiffs assert that the timing of defendants' stock sales was suspicious because some of these sales occurred shortly after the Company received a letter from the SEC on October 15, 2014 and throughout the period when USPH was exchanging correspondence with the SEC from October 2014 to January 2015. We are persuaded by defendants' response that this correspondence never addressed the possibility of accounting for non-controlling interests as liabilities, which was only raised in the 2016-17 correspondence, and thus did not bear directly on the issues that led to USPH's restatement.

[17]      Plaintiffs do not present any allegations regarding defendant Bates's stock sales during the Class Period.

The 2014-15 correspondence focused on whether it was proper for USPH to present separate line items in its financial statements for basic and diluted earnings per share related to the revaluation of redeemable non-controlling interests and earnings per share from continuing operations. Ex. J at 3; see 2014 2Q 10-Q at 3, 4, 13. USPH explained that it was important to investors to be able to compare the components of its earnings-per-share calculations (both revaluation of redeemable non-controlling interests and results from operations) across reporting periods and therefore that this data belonged in the Consolidated Statements of Net Income, rather than merely a footnote.

Ex. M at 5; Ex. O at 3. The SEC appeared to accept this explanation, stating on January 6, 2015 that it had "completed [its] review of [USPH's] filings," and posed no further questions to the Company at that time. Ex. P at 2.

*14 Plaintiffs argue that when the SEC cited ASC 480-10-S99-3A-22 in its October 2014 letter, it informed defendants that the non-controlling interests should be accounted for as liabilities. This argument is unavailing. ASC 480-10-S99-3A-22 by its explicit terms does "not attempt to deal with the conceptual question of whether [a non-controlling interest] is a liability." Ex. V at 2. The 2014-15 correspondence related to the Company's presentation of its financial statements and the propriety of its including a non-GAAP measure in its Consolidated Income Statements. The SEC did not raise the question of whether the Company should have accounted for the non-controlling interests as liabilities or cite ASC 480-10-25, the relevant accounting standards codification provision that differentiates between equity and liability, until March 10, 2017, more than three months after defendants' last stock trade. See Ex. T.

Moreover, the 2014-15 correspondence was resolved without USPH having to take any corrective action. See Ex. P. And even if the SEC had required USPH to remove the separate line item for revaluation of redeemable non-controlling interests from its Consolidated Income Statements, this adjustment would have had no effect on the computation of the Company's net income nor, correspondingly, on its earnings per share calculations. Plaintiffs' argument that the 2014-15 correspondence established that USPH's accounting treatment of its non-controlling interests was improper therefore has no basis in the underlying documents. [18] It was only in 2016-17 that the SEC raised the question of whether USPH's non-controlling interests should be accounted for as liabilities. Indeed, plaintiffs concede that the SEC's 2016-17 correspondence came "from a different angle" than the 2014-15 correspondence. Mem. of Law, Jan. 10, 2018, ECF No. 34 at 4.

[18]      While plaintiffs allege that the 2014-15 correspondence addressed the same topic as the 2016-17 correspondence, we need not accept that allegation as true where it is inconsistent with the underlying documents. See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 277 F. Supp. 3d 500, 510 (S.D.N.Y. 2017) ("If the allegations of a pleading are contradicted by documents made a part thereof, the document controls and the court need not accept

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 500 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

as true the allegations of the pleading.") (quoting In re Trusteeships Created by Tropic CDO I Ltd., 92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015) ).

The upshot of this analysis is that any stock sales that occurred prior to the 2016-17 correspondence were not "suspicious in timing," see Iconix, 2017 WL 4898228, at *15; Lululemon, 14 F. Supp. 3d at 584, because nothing in the record that suggests that the SEC questioned USPH's accounting for redeemable non-controlling interests as equity instead of liability prior to November 22, 2016, the date of the last alleged stock sale.

Further, even if the defendants could have anticipated the SEC's inquiry in advance, their stock sales here were not "calculated to maximize the personal benefit from undisclosed inside information." City of Taylor Gen. Emp. Ret. Sys. V. Magna Int'l Inc., 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013) (quoting Sec. & Exch. Comm'n v. Rorech, 720 F. Supp. 2d 367, 414 (S.D.N.Y. 2010) ). None of the defendants sold any stock in the final 100 days of the class period—the exact timing "when insiders would have 'rushed to cash out.' " City of Taylor, 967 F. Supp. 2d at 800 (quoting City of Brockton Ret. Sys. V. Shaw Grp. Inc., 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ). Indeed, courts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure. See In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) ("Plaintiffs' allegations are empty vessels, as the trades occurred ... many months before the release of any negative information that caused Gildan's stock price to plummet."); In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) ("The lapsing of ... approximately four months between these substantial sales and the revelation of the alleged falsity, inescapably attenuates any inference of scienter that may be drawn in Lead Plaintiffs' favor."); Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 154 & n.24 (D. Conn. 2007) (disregarding sales that occurred more than two months prior to disclosure); In re Sina Corp. Sec. Litig., No. 05 Civ. 2154 (NRB), 2006 WL 2742048, at *12 (S.D.N.Y. Sept. 26, 2006) (sales do not give rise to an inference of scienter when they occurred more than a month before adverse disclosure); In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 385-86 (E.D.N.Y. 2003) (two-month gap between sales and disclosure negated inference of scienter).

*15 Plaintiffs next argue that defendants' stock sales were suspicious on the basis of their amount alone. See SAC ¶¶ 144 (defendant Reading sold 44% of his non-restricted shares

on November 19 and 20, 2015), 148 (defendant McAfee sold 42% of his non-restricted shares on March 4, 2016 and 41% of his non-restricted shares on November 22, 2016), 150-51 (defendant McDowell sold all or nearly all of his non restricted shares on March 16 and 17, 2015, August 10, 2015, November 10 and 11, 2015, May 9, 2016, August 9, 2016, and November 15, 2016). But without more, the amount of stock sold cannot be determinative. Otherwise, any corporate insider who divests his stock holdings would furnish opportunistic plaintiffs with the requisite scienter to survive a motion to dismiss. To the contrary, courts routinely find that raw sales numbers alone are insufficient to establish scienter. See, e.g., Singh v. Cigna Corp., 277 F. Supp. 3d 291, 318 (D. Conn. 2017) ("The selling of even considerable shares is not sufficient, standing alone, to infer scienter."); Lululemon, 14 F. Supp. 3d at 584-85; In re CRM Holdings, Ltd. Sec. Litig., 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012) ("The sale of a large volume of stock alone, however, is not enough to adequately plead scienter."). More fundamentally, there was nothing "unusual" or "suspicious" about defendants' trades, even if they were relatively large, because they occurred before defendants were on notice of the SEC inquiry as to whether the Company's non-controlling interests should be accounted for as equities or liabilities.

### (3) Debt Covenants

Plaintiffs' final scienter argument is based on defendants' alleged motive to avoid violations of certain debt covenants in USPH's credit agreements. This argument clearly fails. It is well settled that a company's desire to maintain a high bond or credit rating does not qualify as a sufficient motive for fraud. San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 814 (2d Cir. 1996); In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 450 (S.D.N.Y. 2005) ("[C]ourts in this Circuit have consistently held that allegations that a defendant was motivated to commit securities fraud by a desire to reduce its debt burden, or otherwise reduce borrowing costs, are insufficient to raise a scienter inference."). The alleged motivation to maintain compliance with the covenants in the Company's credit agreements is plainly inadequate to support an allegation of intent to commit fraud. See In re Cross Media Marketing Corp. Sec. Litig., 314 F. Supp. 2d 256, 265 (S.D.N.Y. 2004). Plaintiff's general allegations here would apply equally to any company with debt covenants in its credit agreements, and "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 501 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

a downturn in stock price could be forced to defend securities fraud actions." Acito, 47 F.3d at 54.

Plaintiffs argue in response that the Court should draw a distinction between the general motivation to maintain a high credit rating and USPH's specific motivation to avoid violating its debt covenants and defaulting on its debt. However, plaintiffs do not plead any specific terms of the Company's covenants that provide it with anything more than the generic motivation to maintain a high credit rating, nor do they articulate why USPH was in greater peril of violating its covenants than any other corporation with a credit facility. See SAC ¶ 153.

Plaintiffs' reliance on Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000), and Howard v. Everex Systems, Inc., 228 F.3d 1057 (9th Cir. 2000), is misplaced. The Second Circuit's conclusion in Rothman that specific allegations that a company desired to keep its bond or credit rating high in order to consummate a corporate transaction may be a sufficient motive for securities fraud does not salvage plaintiffs' generic allegations here, 220 F.3d at 93, and the Ninth Circuit's decision in Howard "is at odds with the Second Circuit caselaw," Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 157 n.25 (D. Conn. 2007).

Finally, plaintiffs assert that USPH's restatement of its financial statements caused it to violate its credit agreement, and defendants observe in response that the Company obtained violation waivers and has since refinanced its debt on more favorable terms. Neither argument is relevant to our analysis, which properly focuses on an ex ante assessment of defendants' motives, rather than an ex post assessment of the actual effect of the restatement. See, e.g., Shields v. Citytrust Bancorp, Inc., 25 F. 3d 1124, 1129 (2d Cir. 1994); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 n.16 (3d Cir. 1997) ("Securities laws approach matters from an ex ante perspective.").

### b) Conscious Misbehavior and Recklessness

**\*16** Having found that plaintiffs failed to allege the requisite motive to defraud, we next turn to whether plaintiffs adequately plead strong circumstantial evidence of defendants' conscious misbehavior or recklessness.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142 (quoting Beck v. Mfrs. Hanover Tr. Co., 820 F.2d 46, 50 (2d Cir. 1987) ). The Second Circuit has held that recklessness for this purpose means "conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (quoting Novak, 216 F.3d at 312) (emphases in original). "Conscious recklessness" requires conduct that "at the least ... is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." S. Cherry, 573 F.3d at 109 (emphasis in original) (quoting In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) ).

In the context of violations of accounting rules, " '[a]llegations that the accounting rules are straightforward and the company's accounting treatment was obviously wrong' may create an inference of scienter." S.E.C. v. Egan, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) (quoting S.E.C. v. Espuelas, 579 F. Supp. 2d 461, 478 (S.D.N.Y. 2008) ) (internal quotation marks omitted). By contrast, "where accounting standards are neither simple nor easily applied, a plaintiff cannot rely on misapplication of the accounting rules alone." Egan, 994 F. Supp. 2d at 565 (citing In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 566-67 (S.D.N.Y. 2004) ).

It is readily apparent from the record in this case and the relevant Accounting Standards Codifications that the accounting issues at the heart of this dispute are neither simple nor easily applied. See Ex. V, Ex. X. A redeemable non-controlling interest may be classified as permanent equity, temporary equity, or liability depending on its character. Ex. V, Ex. X. "[P]referred securities that are redeemable for cash or other assets" must be "classified outside of permanent equity if they are redeemable (1) at a fixed or determinable price on a fixed or determinable date, (2) at the option of the holder, or (3) upon the occurrence of an event that is not solely within the control of the issuer." Ex. V at 4. "Determining whether an equity instrument is redeemable at the option of the holder or upon the occurrence of an event that is solely within the control of the issuer can be complex." Id. at 7 (emphasis added). The SEC provides that "all of the individual facts and circumstances surrounding events that could trigger redemption should be evaluated separately and that the possibility that any triggering event that is not solely

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 502 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

within the control of the issuer could occur—without regard to probability—would require the instrument to be classified in temporary equity." Id. (emphasis in original). ASC 480-10-S99-3A provides specific guidance as to potential features that might weigh in this analysis if the underlying interest is classified as a freestanding financial instrument, equity instrument subject to registration payment arrangements, share-based payment award, or convertible debt instrument with a separately classified equity component, among others. Id. at 4-7.

 **17** ASC 480-10-25, which was not cited by the SEC in its correspondence with the Company until March 2017, provides that "[a] mandatorily redeemable financial instrument shall be classified as a liability unless the redemption is required to occur only upon the liquidation or termination of the reporting entity." Ex. X at 1. That instrument could also become a liability if it "embodies a conditional obligation to redeem the instrument by transferring assets upon an event not certain to occur ... if that event occurs, the condition is resolved, or the event becomes certain to occur." Id. Some of the terms companies are instructed not to consider are whether an instrument has "a) a term extension option, b) a provision that defers redemption until a specified liquidity level is reached, [or] c) a similar provision that may delay or accelerate the timing of a mandatory redemption." Id. "If a financial instrument will be redeemed only upon the occurrence of a conditional event, redemption of that instrument is conditional and, therefore, the instrument does not meet the definition of mandatorily redeemable financial instrument ... [h]owever, that financial instrument would be assessed at each reporting period to determine whether circumstances have changed such that the instrument now meets the definition of a mandatorily redeemable instrument." Id. at 2. "If the event has occurred, the condition is resolved, or the event has become certain to occur, the financial instrument is reclassified as a liability." Id. at 2.

The complexity of these principles is self-evident to the Court. Further support for this conclusion comes from the fact that the SEC exchanged at least eleven letters over the course of nearly four years with USPH about various aspects of the Company's accounting for its non-controlling interests before the SEC even raised the issue of whether they might properly be classified as liabilities. See Exs. J, M, N, O, P, S.

By stark contrast, courts in this district have found violations of accounting rules to be "straightforward" and "obviously

wrong" in situations where a company accounts for the sale of an asset and then a lease of the same asset a few months later, Egan, 994 F. Supp. 2d at 566, or where it recognizes revenue for sales that were entirely contingent on further approval of the buyer, Espuelas, 579 F. Supp. 2d at 482. These blatant violations of basic accounting principles are clearly not analogous to the facts here.

Further, USPH's independent auditor, Grant Thornton LLP, reviewed the accounting for non-controlling interests in each of the years for which the Company eventually restated its financial statements. Each year Grant Thornton indicated that it had "assess[ed] the accounting principles used ... by management," and concluded that USPH's consolidated financial statements presented the Company's financial position fairly and "in conformity with accounting principles generally accepted in the United States of America." 2015 10-K at 36; 2014 10-K at 33. The fact that USPH's independent auditor repeatedly signed off on its financial statements further suggests that the Company's accounting for its non-controlling interests was not "obviously wrong." See Wyche v. Advanced Drainage Sys., Inc., No. 15 Civ. 5955 (KPF), 2017 WL 971805, at *17 (S.D.N.Y. Mar. 10, 2017) (finding that the independent auditor's failure to identify GAAP violations suggests "that the proper application of GAAP to the Company's finances was no easy task, even for a party with significant knowledge and expertise"); In re Turquoise Hill Res. Ltd. Sec. Litig., No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *6 ("It is noteworthy that the outside auditors did not question the corporate defendant's accounting practices.") (quoting In re Bausch & Lomb, Inc. Sec. Litig., 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008) ) (internal modifications omitted). And plaintiffs here in no way suggest that the Company's auditors were complicit in the alleged fraud. Cf., e.g., In re Winstar Commc'ns, No. 01 Civ. 3014 (GBD), 2006 WL 473885, at *2 (S.D.N.Y. Feb. 27, 2006) (alleging that GAAP violations were committed with the consent of the company's auditors or at their design).

Nor is there any allegation here that the Company concealed any relevant aspect of the non-controlling interests from its auditors or the SEC to perpetuate an accounting fraud. To the contrary, the Company's Form 10-Ks in the years prior to the restatement included fulsome disclosure about the nature of the non-controlling interests and the way USPH was (incorrectly, as it turned out) accounting for them. See 2015 10-K at 44-45; 2014 10-K at 41; 2013 10-K at 46-47; supra Section II.A.2.

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 503 of 573

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

**\*18** Plaintiffs argue in response that the SEC's 2014-15 correspondence with USPH "concern[ed] the very GAAP that ultimately caused the Company to restate," such that the Company was on notice for several years that it was accounting for these interests incorrectly. ECF No. 34 at 18. However, as discussed above, the SEC's 2014-15 correspondence never raised the question of whether the non-controlling interests should be classified as liabilities, nor did it reference the ASC provision under which UPSH eventually determined that it had made an accounting error.

Plaintiffs also rely on the "core operations doctrine," which provides that "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); see generally Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989). Plaintiffs concede that this doctrine may provide "supplemental support" but does not "independently establish scienter," see Lipow, 131 F. Supp. 3d at 163 (quoting New Orleans Emp. Ret. Sys. V. Celestica Inc., 455 F. App'x 10, 14 n.3 (2d Cir. 2011) ), and several courts in this Circuit have expressed "doubts as to the doctrine's continuing import" after the enactment of the PSLRA, In re Rockwell Med., Inc. Sec. Litig., No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at \*14 (S.D.N.Y. Mar. 30, 2018); In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) ("[T]he plain language of the PSLRA, which requires facts supporting the scienter inference to be 'state[d] with particularity,' would seem to limit the force of general allegations about core company operations."); see also Frederick v. Mechel OAO, 475 F. App'x 353, 356 (2d Cir. 2012) ("[W]e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter.").

In any event, the "core operations doctrine" typically applies only where "the operation in question constitute[s] nearly all of a company's business." Rockwell, 2018 WL 1725553, at \*14 (quoting Thomas v. Shiloh Indus., Inc., No. 15 Civ. 7449 (KMW), 2017 WL 1103664, at \*4 (S.D.N.Y. Mar. 23, 2017) ). The cases cited by plaintiff are illustrative. Atlas Air, 324 F. Supp. 2d at 484, 491, involved a company that leased aircraft to international airlines that allegedly failed to recognize the impairment of the value of those planes, resulting in a restatement of its retained earnings from \$185 million to an accumulated deficit of \$178

million. Winstar, 2006 WL 473885, at \*2-5, 7-8, involved a wireless-broadband communications company that allegedly falsified transactions to significantly inflate its revenues and would have been insolvent but for the fraudulent accounting practices implemented. By contrast, the present case involves a disputed technical accounting issue, not a large-scale accounting fraud that undermined the ongoing viability of the Company's core business. See, e.g., 2016 10-K at 31, 41 (reporting an increase from \$37,520,000 to \$51,050,000 in net cash provided by operating activities from the previous year, and stating that the "business is generating sufficient cash flow from operating activities to allow us to meet our short-term and long-term cash requirements, other than those with respect to future significant acquisitions").

More fundamentally, USPH's core operation is operating outpatient physical therapy clinics, not accounting for its managing therapists non-controlling interests. See In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d at 628 ("[P]laintiffs allege no facts suggesting that the accounting treatment of the Mahonia transactions as trades rather than as loans was at the core of JPM Chase's business.").

**\*19** Plaintiffs next argue that the Sarbanes-Oxley ("SOX") certifications signed by defendants Reading, McAfee, and Bates were probative of scienter. SOX certifications may be probative of scienter if the complaint alleges " 'glaring accounting irregularities or other red flags,' of which the certifying defendant had 'reason to know.' " In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d at 304-05 (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) ). However, these certifications typically "add nothing substantial to the scienter calculus" because "allowing Sarbanes-Oxley certifications to create an inference of scienter in every case where there was an accounting error ... by a public traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA." Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp., 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016) (quoting Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1003-04 (9th Cir. 2009) ). As discussed above, plaintiffs have not adequately alleged that defendants had any knowledge of "glaring accounting irregularities" when they executed the SOX certifications in the Company's 10-Ks. Rather, the accounting guidance at issue here was complex, the accounting treatment of the non-controlling interests was difficult to apply, and the SEC did not raise the relevant ASC until March 2017. Plaintiffs therefore do not adequately allege

Reilly v. U.S. Physical Therapy, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3559089

that the defendants' certifications were knowingly false when made.

### c) Conclusion

Plaintiffs argue in the alternative that their motive and recklessness allegations support one another, so that these allegations viewed in conjunction adequately plead scienter, even if neither does standing alone. Plaintiffs are correct that Tellabs instructs us "not to scrutinize each allegation in isolation but to assess all the allegations holistically." 551 U.S. at 326; see In re Silvercorp Metals, Inc. Sec. Litig., 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014) ("[C]ircumstantial evidence of reckless and misconduct that strongly buttress the motive alleged ... turn what might be a weak inference standing alone into a strong one."). However, inadequate allegations of motive and inadequate allegations of recklessness cannot be combined to demonstrate scienter—zero plus zero cannot equal one. See Kalnit, 264 F.3d at 141.

Here, defendants' incentive compensation cannot form the basis for scienter, defendants did not sell a single share of stock after the SEC raised the issue of whether the non-controlling interests should be accounted for as liabilities, the Company's debt covenants did not provide any motive to commit fraud, the accounting standards at issue were complex and difficult to apply, such accounting was not the Company's "core operation," and defendants' SOX certifications were not probative of scienter. Viewed holistically, plaintiffs' allegations therefore fail to state with particularity facts that would give rise to a strong inference of scienter.

### 2. Section 20(a)

Plaintiffs also allege that the individual defendants, Reading, McAfee, Bates, and McDowell, are liable under Section 20(a) of the Exchange Act because they acted as "controlling persons" of USPH who participated in its alleged securities fraud. SAC ¶¶ 179-85. Section 20(a) provides for joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of

this chapter or of any rule or regulation thereunder ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). To establish a prima facie case of control person liability, a plaintiff must show a primary violation by the controlled person. ATSI, 493 F.3d at 108. Because plaintiffs have failed to plead a primary violation by USPH, their Section 20(a) claims also fail. See Slayton v. Am. Express Co., 604 F.3d 758, 778 (2d Cir. 2010).

### IV. **CONCLUSION**

For the foregoing reasons, we grant defendants' motion to dismiss in its entirety with prejudice. [19] The Clerk of Court is respectfully directed to terminate the motions pending at ECF No. 30 and ECF No. 36, enter judgment for defendants, and close this case.

[19]  Plaintiffs have not sought leave to amend, and the Court declines to offer them an opportunity to do so. See Wyche, 2017 WL 971805 at *18; Schwartz v. HSBC Bank USA, N.A., No. 14 Civ. 9525 (KPF), 2017 WL 95118, at *8 (S.D.N.Y. Jan. 9, 2017); see also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1132 (2d Cir. 1994) ("[W]e do not deem it an abuse of the district court's discretion to order a case closed when leave to amend has not been sought."). Plaintiffs have already amended their complaint twice, and no aspect of the record provides any indication that repleading would remedy the deficiencies outlined in this opinion. See Knife Rights, Inc. v. Vance, 802 F.3d 377, 389 (2d Cir. 2015) (leave to amend may be denied if the amendment would be futile). Because plaintiffs have not requested to amend and any further leave to amend would be futile, the Court dismisses this matter with prejudice.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3559089

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 24

2024 WL 3105004
United States District Court, S.D. New York.

Douglas REIN, individually and on behalf
of all others similarly situated, Plaintiff,
v.
DUTCH BROS, INC. et al., Defendants.

23 Civ. 1794 (PAE)
|
Signed June 24, 2024

**Attorneys and Law Firms**

Kim Elaine Miller, Kahn Swick & Foti, LLC, New York, NY,
for Plaintiff.

Aric Hugo Wu, Cooley LLP, New York, NY, Patrick Gibbs,
Cooley LLP, Palo Alto, CA, for Defendants.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

**\*1** Lead plaintiff Douglas Rein brings this putative federal
securities class action against Dutch Bros, Inc. ("Dutch
Bros") and its chief executive officer Jonathan Ricci and
chief financial officer Charles L. Jemley (collectively,
"Defendants") alleging violations of Sections 10(b) and 20(a)
of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b)
and 78t(a), and the implementing rule of the Securities and
Exchange Commission, 17 C.F.R. § 240b-5 ("Rule 10b-5").
On behalf of himself and others who purchased Dutch Bros
securities between November 10, 2021, and May 11, 2022
(the "class period"), Rein claims that Defendants made a
series of false and misleading statements during the class
period touting Dutch Bros' performance and prospects, which
allegedly understated the threat to the company's sales and
profitability presented by rising inflation affecting the cost of
commodities key to its success.

Pending now is Defendants' motion to dismiss the Amended
Complaint ("AC") for failure to state a claim under Federal
Rules of Civil Procedure 12(b)(6) and 9(b). For the following
reasons, the Court grants the motion and dismisses the AC in
its entirety.

**I. Background**

**A. Factual Background** [1]

[1] These facts are drawn primarily from the AC. For
the purpose of resolving the motion to dismiss,
the Court assumes all well-pled facts to be true
and draws all reasonable inferences in favor of
plaintiffs. *See Koch v. Christie's Int'l PLC,* 699
F.3d 141, 145 (2d Cir. 2012). The Court also
considers documents incorporated into the AC
by reference, documents publicly filed with the
Securities Exchange Commission ("SEC"), *see
ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493
F.3d 87, 98 (2d Cir. 2007), transcripts of relevant
earnings calls, *Frankfurt-Tr. Inv. Luxemburg AG
v. United Techs. Corp.,* 336 F. Supp. 3d 196, 205
(S.D.N.Y. 2018), and other "matters of which a
Court may take judicial notice," *In re Pfizer, Inc.
Sec. Litig.,* 538 F. Supp. 2d 621, 627 (S.D.N.Y.
2008). As all documents attached to Defendants'
declaration in support of dismissal fall into one
or more of these categories, the Court considers
them in resolving this motion. *See* Dkt. 34 ("Wu
Decl."), Exs. 1, 2 ("3/11/22 Form 10-K"), 3
("9/16/21 Prospectus"), 4 ("5/12/22 Form 10-Q"),
5 ("11/12/21 Form 10-Q"), 6 ("11/10/21 Form 8-
K"), 7 ("11/10/21 Earnings Call Tr."), 8 ("3/1/22
Earnings Call Tr."), 9 ("3/1/22 Form 8-K"), 10
("5/11/22 Form 8-K"), 11 ("5/11/22 Earnings Call
Tr."), 12–16, 17 ("8/10/22 Earnings Call Tr."), 18
("1/11/22 ICR Interview Tr."), 19.

**1. The Parties**

Dutch Bros is a publicly traded company incorporated under
Delaware law that operates and franchises drive-through
coffee shops, which sell coffee and related products. AC ¶¶
14, 22. On September 17, 2021, Dutch Bros went public,
with an initial public offering ("IPO") in which it issued
approximately 24.2 million shares of Class A common stock
at a public offering price of $23 per share. *Id.* ¶¶ 28, 3. As
of its IPO, Dutch Bros had 471 shops in 11 states. Its IPO
was intended to facilitate the company's "expansion to at least
4,000 Dutch Bros locations in the United States." *Id.* ¶ 23.

**\*2** At all relevant times, Ricci was Dutch Bros' president
and chief executive officer, and Jemley was its chief financial
officer. *Id.* ¶¶ 15–16.

Lead plaintiff Rein is an investor who, during the class period, purchased Dutch Bros securities at what he alleges were "artificially inflated prices," which declined after Dutch Bros, on the last day of the class period, announced a decline in profitability. *Id.* ¶ 13.

### 2. Rising Commodities Prices
### Before and During the Class Period

In the months leading up to, and during, the class period, inflation and commodities prices were rising in the United States. *See id.* ¶ 3. The Bureau of Labor Statistics' Consumer Price Index for All Urban Consumers rose to 5.4% in September 2021, 7.5% in January 2022, and reached 8.3% by April 2022. *Id.* Dairy and petroleum, the commodities most central to Dutch Bros' business, were subject to these trends. *Id.* The Department of Agriculture calculated the National All-Milk Price Received at $18.30 in September 2021, $23.90 in January 2022, and $27 in April 2022. The Department of Energy reported the Gasoline Average Retail Price in September 2021 as $3.272, as $3.413 in January 2022, $3.611 in February 2022, $4.322 in March 2022, and $4.213 in April 2022. *Id.* A September 2021 *Wall Street Journal* article noted that "[e]conomists anticipate that broader, longer-lasting inflationary pressures will emerge in coming quarters"; another, published November 2021, opined that "[t]hings are going to get worse before they get better." *Id.* ¶ 26.

During the class period, Defendants made statements that were generally positive about Dutch Bros' past and forthcoming financial performance, notwithstanding that inflation in general and commodities costs in particular were rising. These statements were made in, *inter alia*, SEC filings, conference calls, and interviews. *See id.* ¶¶ 55–101.

In particular, Defendants stated that they believed that (1) given the particular ingredients that Dutch Bros required, Dutch Bros was not as susceptible to rising inflation rates and supply chain issues as other companies, (2) a price increase implemented just before the class period, and the option of future price increases, would help Dutch Bros weather the inflation it would face, and (3) inflation in gas, more than dairy, prices, was the company's biggest concern, but consumers would not necessarily cease drive-through coffee purchases as a result of rising gas prices. *See id.* The Court below reviews the specific challenged statements to these effects.

A confidential witness ("CW1")—who worked for Dutch Bros as a retail optimization manager—is cited in the AC as stating that, as of December 2021, Dutch Bros was aware of its potential need to combat rising dairy prices. *Id.* ¶¶ 18–21. CW1 and his team "worked on operational changes that would be effective in the field" and "created processes for field training," and designed "processes that would create efficiencies at the retail store-level." *Id.* ¶ 19. CW1 stated that, in or around December 2021, his team was tasked with "troubleshooting the issue of rising dairy costs[.]" *Id.* ¶ 21. This entailed steps such as "switch[ing] from purchasing dairy by the gallon to purchasing it by the half gallon." *Id.* CW1 stated that "finding additional sources of dairy, especially 2%, was important because the supply was also an issue around this time, not just the cost." *Id.* The AC does not address whether Dutch Bros adopted these or other suggestions.

### 3. Dutch Bros' Q1 2022 Earnings
### Drop, Reported May 11, 2022

**\*3** Through at least the end of 2021, Dutch Bros' performance remained stable. In the first quarter of 2022, ending March 31, 2022, however, Dutch Bros experienced "margin pressure"—that is, a decrease in its profit margins. *Cf., e.g., id.* ¶¶ 102–111 (identifying Q1 losses in 2022 as turning point).

On May 11, 2022, the last day of the class period, after the markets closed, Dutch Bros issued its earnings release for the first quarter of 2022. It revealed a big drop in performance. *See id.* It reported a net loss that quarter of $16.3 million, compared to $4.8 million in the first quarter of 2021, and an adjusted net loss of $0.02 per share, "below the market's estimated earnings of $0.01 per share." *Id.* ¶ 102

In public statements that day, Defendants attributed these losses to three factors:

> "[Dutch Bros'] decision to be disciplined on the price [they] took, which [they] believe[d] [wa]s less than half as much as many of [their] peers; faster inflation and cost of goods, especially in dairy; the pull forward of deferred expenses related to the maintenance of shops; and normal new store inefficiency amplified by the volume of new and ramping units in quarter 1."

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

*Id.* ¶ 103. As to rising costs, Ricci stated on an earnings call that day:

> Unfortunately, in this past quarter, a confluence of cost pressures overwhelmed our decisions around price and resulted in near-term margin compression. We anticipated higher expenditures. However, we did not perceive the speed and magnitude of cost escalation within the quarter. Dairy, for example, which makes up 28% of our commodity based, rose almost 25% in Q1. While costs rose throughout the quarter, we experienced a change in sales trajectory from mid-March onward as macroeconomic headwinds accelerated and comps turned negative. We are monitoring these factors and have chosen to take a more conservative stance on our 2022 outlook given macroeconomic uncertainty.

*Id.* ¶ 104. During the May 11, 2022 earnings call, Jemley attributed the drop in sales to rising gasoline prices:

> [W]ithout claiming to be a macroeconomist, I will tell you that in mid-March when gas prices jumped the way they did, we saw an immediate flip on our daily sales. It was almost to the day of the way that, that works. So I think you could infer—and we believe that we've done some analysis on the gas prices and influence related to our daily sales, and we believe it has influenced it. And we believe that if gas prices stay inflated, it will continue to influence it.

*Id.* ¶ 110. Based on these metrics and what it termed "unanticipated" cost increases, Dutch Bros that day put forward a "more conservative" forecast of its earnings and "same shop sales" in 2022. *Id.* ¶ 105.

The next day, May 12, 2022, Dutch Bros' share price fell by $9.26 or 26.9%. *Id.* ¶ 111. That share price was 59.7% below what it had been at the start of the class period on November 10, 2021. *Id.*

Throughout the second quarter of 2022, margin pressure continued. In its Q2 earnings call on August 10, 2022, Dutch Bros stated that, "[l]ike many of our peers, the macro-economic environment is impacting various aspects of our business, and our company-operated shop margins continue to be pressured by record inflation in the second quarter." *Id.* ¶ 115. It reported a 3% price increase in the second quarter and stated that it was continuing to evaluate "further menu pricing action as needed in the back half of the year." *Id.* On that earnings call, however, Jemley stated that Dutch Bros was "starting to [overcome] the inflation that began to show in Q2 of 2021." *Id.* ¶ 116.

### 4. The Individual Defendants' Stock Sales

**\*4** On approximately March 4, 2022—in the middle of the class period—Ricci and Jemley's "Lock-Up Agreements" with Dutch Bros' underwriters expired, freeing them to sell Dutch Bros' shares they owned. *See id.* ¶ 6. Each executive had entered into a Rule 10b5-1 trading plan three months earlier: Ricci on December 7, 2021, and Jemley on December 9, 2021. After the expiration of the lock-up periods, both defendants made sales pursuant to these plans. Ricci sold a total of 71,125 shares of Dutch Bros common stock, with some sales on March 7, 2022, and the rest on May 9, 2022. *Id.* ¶ 128. [2] Those sales represented about 3.3% of the 2,133,794 fully vested shares of Dutch Bros common stock that Ricci had owned as of the expiration of the lock-up periods. *Id.* ¶ 129. Jemley sold 15,000 shares on March 4, 2022, and an additional 5,000 shares on April 5, 2022. *Id.* ¶ 132. Those sales represented about 2.1% of the 932,828 fully vested shares of Dutch Bros common stock that Jemley had owned. *Id.* ¶ 133.

[2]    The AC overstates, by a factor of two, Ricci's stock sales. *See* AC ¶ 128. Rein's brief corrects this error. *See* Dkt. 35 at 20 n.13.

Rein v. Dutch Bros, Inc., Slip Copy (2024)

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

#### 5. The Appointment of a New President and CEO

In November 2022, Dutch Bros announced the appointment of a new president, Christine Barone; Ricci remained CEO. *Id.* ¶ 149. On August 8, 2023, Dutch Bros announced that Barone would replace Ricci as CEO in January 2024. *Id.* ¶ 150.

### B. Procedural History

On March 1, 2023, plaintiff Jerry Peacock filed this action on behalf of purchasers of Dutch Bros securities between March 1 and May 11, 2022. Dkt. 1. On May 1, 2023, Rein and two others filed motions to serve as lead plaintiff and for their respective attorneys to serve as lead counsel. *See* Dkts. 12–21. On August 3, 2023, the Court appointed Rein lead plaintiff and his attorneys lead counsel. Dkt. 29. Thereafter, Rein filed the now-operative AC, which moved the start of the class period earlier, to November 10, 2021. AC ¶ 2.

On September 28, 2023, Defendants filed their motion to dismiss the AC, Dkt. 32, a memorandum of law in support thereof, Dkt. 33 ("Def. Br."), and a declaration and attached exhibits, Dkt. 34 & Exs. 1–19. On October 26, 2023, Rein filed a brief in opposition. Dkt. 35 ("Pl. Br."). On November 9, 2023, Defendants filed a reply. Dkt. 36 ("Def. Reply Br.").

### II. Applicable Legal Standards

### A. Standards for Resolving a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*"). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

**\*5** Second, such a complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). *See ECA*, 553 F.3d at 196. In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements ... were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, the plaintiff "shall, with respect to each act or omission ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

### B. Elements of Rein's Claims

Rein brings claims under §§ 10(b) and 20(a) of the Exchange Act, and its implementing rule, Rule 10b-5. FAC ¶¶ 168–80.

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

To state a claim under § 10(b), a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks and citation omitted).

To state a claim under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108) (quotation marks omitted). If a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under a provision of the Exchange Act, then the § 20(a) claims must be dismissed. *See id.*

### 1. False or Misleading Statements or Omissions

To survive a motion to dismiss, the complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.' " *Matrixx Initiatives*, 563 U.S. at 38 (emphasis omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Basic*, 485 U.S. at 239 n.17. "Disclosure of ... information is not required ... simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make ... statements made, in light of the circumstances under which they were made, not misleading.' " *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) ("pure omissions" of information, absent a duty to disclose, are not actionable; however, "half-truths"—"statements that are misleading ... by virtue of what they omit to disclose"—are).

**\*6** The materiality requirement, meanwhile, "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of

information made available.' " *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32). As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). The "materiality hurdle" is, therefore, "a meaningful pleading obstacle." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (quotation marks omitted).

Still, some statements are "too general to cause a reasonable investor to rely upon them" and thus inactionable under the securities laws as "puffery." *Id.* at 206. For example, "[g]eneral expressions of corporate optimism are 'too indefinite to be actionable under the securities laws.' " *Boca Raton Firefighters and Police Pension Fund v. Bahas*, 506 F. App'x 32, 38 (2d Cir. 2012) (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998)).

### 2. Item 303

Also relevant here, Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. § 299.303, compels disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations ... [as well as] events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments)[,]" *id.* § 299.303(b)(2)(ii), as well as "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations[,]" *id.* § 299.303(b)(2)(i).

Although Item 303 itself does not support an independent cause of action, until recently, the law in this Circuit was such that "Item 303's affirmative duty to disclose in Form 10–Qs [could] serve as the basis for a securities fraud claim

*Rein v. Dutch Bros, Inc., Slip Copy (2024)*

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101–02 (2d Cir. 2015). The Circuit had held that failure to comply with an affirmative disclosure obligation, like Item 303, would cause a reasonable investor to assume the nonexistence of "known trends or uncertainties" of the type Item 303 covers, rendering omissions along these lines misleading. *Id.* However, on April 12, 2024, while this motion was pending, the Supreme Court held that "the failure to disclose information required by Item 303 can support a [§ 10(b) or] Rule 10b–5(b) claim only if the omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 144 S. Ct. 885, 892 (2024). It rejected the Circuit's prior reasoning as wrongly shifting the focus of § 10(b) and Rule 10b-5(b) "from fraud to disclosure." *Id.* Thus, Item 303 can support a claim under these provisions only where there has been an otherwise-misleading statement. *See id.* at 892 n.2.

### 3. Application to Statements of Opinion

Like objective statements of material fact, subjective statements of opinion can be actionable as fraud. As the Supreme Court has clarified, and the Second Circuit has recognized, such statements of opinion can give rise to liability in two distinct ways.

**\*7** First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.' " *See Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Labs. Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004). "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194–95). To adequately allege that a statement of opinion was misleading through the omission of material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* (quoting *Omnicare*, 575 U.S. at 194). As the Supreme Court has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuers possession at a time.' " *Id.* (quoting *Omnicare*, 575 U.S. at 188–89). "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.' " *Id.* (quoting *Omnicare*, 575 U.S. at 189).

The Supreme Court has instructed that its ruling that material omissions of facts may render a statement of opinion actionable should not be given "an overly expansive reading," and that establishing liability on such a theory "is no small task for an investor" to meet. *Id.* at 210 (quoting *Omnicare*, 575 U.S. at 194). "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts, and ... [do] not expect that *every* fact known to an issuer supports its opinion statement." *Id.* (quoting *Omnicare*, 575 U.S. at 189–90) (internal quotation marks omitted) (alterations and internal quotation marks omitted). "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.' " *Id.* (quoting *Omnicare*, 575 U.S. at 189).

Further, statements of opinion must be considered in the context in which they arise. Particularly in the context of formal documents filed with the SEC, " 'investors do not, and are not right to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments'; '[a]t the same time, an investor reads each statement within such a document ... in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.' " *Id.* (quoting *Omnicare*, 575 U.S. at 190). Moreover " 'the investor takes into account the customs and practices of the relevant industry' and ... 'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.' " *Id.* (quoting *Omnicare*, 575 U.S. at 190).

### 4. Scienter

**\*8**  As noted, Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged,' " and "the court must take into account plausible opposing inferences." *ATSI Commc'ns*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324). The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quotation marks and citation omitted).

Plaintiffs "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Where plaintiffs do not sufficiently allege that defendants had a motive to defraud the public, they "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation and emphasis omitted). To qualify as reckless, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)) (quotation marks omitted).

A plaintiff can establish recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308). In other words, defendants have acted recklessly if they "understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (quoting *Novak*, 216 F.3d at 308), *aff'd sub nom, Sanofi*, 816 F.3d 199. "The key, of course, is the honest belief of the management in the truth of information issued to the public." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 3d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom., State Univ. Ret. Sys. of Ill. V. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009).

### 5. The PSLRA Safe Harbor for Forward-Looking Statements

The PSLRA amended the Exchange Act to provide a safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u–5(c). Forward-looking statements are defined as those that contain, among other things, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance," *Id.* § 78u–5(i)(1). A forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories. *Id.* Materiality is defined above; the other two categories are defined as follows:

**\*9** *Meaningful cautionary language*: To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Id.* at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)). Language that is "vague" or "boilerplate" does not suffice. *Id.* at 772. "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.' " *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). A plaintiff may establish that cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359.

*Actual knowledge*: The scienter requirement for forward-looking statements—actual knowledge—is "stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton*, 604 F.2d at 773 (quoting *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir.

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

2009)) (internal quotation marks omitted). And under the heightened pleading standards, which apply to both scienter requirements, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be cogent, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.' " *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324).

### III. Discussion

Defendants move to dismiss all claims on two broad grounds: that (1) the challenged statements are not actionable, as each is either protected by the PSLRA safe harbor, a non-actionable statement of opinion, puffery, or an accurate statement of fact, Def. Br. at 19–22; and (2) in any event, in the AC does not adequately plead scienter, Def. Br. at 22–25. [3]

[3]    Defendants also argue that the AC fails to plead fraud with the particularity Rule 9(b) requires. *See* Def. Br. at 10–11; *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477–79 (S.D.N.Y. 2021) (complaint, which "rel[ied] primarily on bolded text in half-page block quotations to identify the allegedly misleading statements ... [and] ... include[d] a substantially similar paragraph containing some variation of the same five or so generalized, conclusory statements," failed Rule 9(b)). Finding the AC deficient on other grounds, the Court does not reach this issue. Defendants also challenge the AC's Section 20(a) claim as dependent on ill-pled primary violations of Section 10(b). Def. Br. at 25. That argument, as explained below, has merit.

For the reasons that follow, defendants are correct on both points. The Court thus grants the motion to dismiss in its entirety.

### A. Allegedly Actionable Statements

The Amended Complaint identifies 26 distinct statements —made in a range of fora—as allegedly materially false or misleading. The Court addresses these chronologically, sorting the communications at issue into eight groups.

### 1. Statements Made During
### November 1, 2021 Earnings Call

On November 10, 2021, Dutch Bros issued a press release detailing its performance in the third quarter of 2021, ending on September 30, 2021. That day, Dutch Bros held a conference call with analysts and investors to discuss those results. The AC challenges the following four statements made on that earnings call:

**\*10**  • Ricci said, addressing the number of shops Dutch Bros opened in the third quarter of 2021: "A record 33 shops opened in this quarter, of which 30 were company-operated shops. The prior opening record was 26 shops in the fourth quarter of 2020, We achieved this record despite the well documented industry supply chain challenges. The supply chain issues impacted everything from building materials to equipment to product." 11/10/21 Earnings Call Tr. 8; *see also* AC ¶ 56.

• Jemley said, in response to a question about why shop margins had been lower in third quarter 2021 versus the prior 12 months: "And you may have noted that we did pulse prices in early November, We have not taken any prices in our system of any significance since pre COVID. And so we've absorbed a little bit of general inflation, normal inflation, whether it's wage changes in markets that had legislated minimum wage, and they're getting to their last tiers or other general wage inflation, and we've been very thoughtful and careful about price escalation. And again, we've instituted a price increase to defend our margins going forward. So you've got both a seasonality aspect and then the lag of the current price increase versus what's happened inflationally over the last few quarters." 11/10/21 Earnings Call Tr. 13; *see also* AC ¶ 57.

• Jemley said, in response to a question about how to "think about the right [pricing] level in periods of outsized inflation"—whether to keep pricing higher to hold margins or price more modestly to protect traffic: "Okay. So historically, over the years, 1% to 2% pricing. And as I mentioned, very low pricing since pre COVID. The great thing, and Joth mentioned it in his script, that we have 12 ingredients. We have a—I don't want to simplify the supply chain and dismiss the great effort our teams make to get things to stores. But we don't have a complexity that others do, and therefore, we're not nearly as subject, at least to date, to the types of

inflationary pressures that others are having. We believe that that price increase we just took will defend our margins again going into next year. And we want to just stay really focused on genuinely giving value to our customers, and we'll just monitor it, right? We don't have any hard and fast philosophy. It's an environment today where you've got to be able to pivot quickly, and that's the approach we'd like to take. I think we expect our margins to generally hold up. They are industry-leading, and we're very grateful to have that, and we'll watch this over time." 11/10/21 Earnings Call Tr. 14; *see also* AC 157.

- Jemley said, in response to a follow-up question on the previous answer asking what Dutch Bros' "basket of inflation was for commodity and labor in the third quarter": "The basket is low single digits. And inflation, overall, it's very mild and tempered. And we don't say that thinking we're immune to the struggles that could happen going forward. But we've been very fortunate. Dairy is not really up, that's a big component of our cost structure. We're forward out on coffee, very long. And we have about a 3-bean blend that we can pivot around and manage our costs. And so we feel—we don't see the kind of pressure others are seeing." 11/10/21 Earnings Call Tr. 14; *see also* AC ¶ 58.

The AC pleads that the reason each statement is false or misleading is that Defendants failed to disclose, alongside it, that (1) they were "experiencing increased costs relating to commodities, including on dairy and petroleum," (2) as a result, Dutch Bros was experiencing "increased margin pressure and decreased earning and profitability," and (3) thus, "positive statements about [Dutch Bros'] business, operations, and prospects were materially misleading and/or lacked a reasonable basis." AC ¶ 60. The AC notes that in November 2021, at the time these statements were made, "inflation was skyrocketing," and "dairy prices were already rapidly rising (as opposed to being 'not really up'), with the USDA's 2021 all-milk price [ ] forecasted at $18.45 per cwt [hundredweight] in October (up from $18.15 per cwt in September) and 2022 all-milk price [ ] forecasted at $19.20 per cwt (up from $18.40 per cwt in September)." *Id.* It adds that, after the class period, Jemley "conceded that inflation actually 'began to show in Q2 of 2021.' " *Id.*

**\*11** These allegations, however, do not plead anything actionable under the PSLRA. As to the first two statements, the AC does not explain, let alone with particularity, how Ricci and Jemley's apparently accurate reports about Dutch Bros' shop openings and its price increase in Q3 2021 were made misleading by the absence of a reference to inflation. Even if "inflation was skyrocketing," AC ¶ 60, it would not make inaccurate the company's report as to the number of shops it had opened in that quarter. Nor can Dutch Bros' acknowledgment that its *lower* shop margins in 3Q 2021 were partially attributable to "what's happened inflationally" be fairly cast as misleadingly positive for failing to identify the actual inflation rates. *Cf.* 11/10/21 Tr. 13. At bottom, both statements recite apparently truthful statements about past events. And "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca Raton Firefighters*, 506 F. App'x at 38–39 (quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997)); *see also Nadoff v. Duane Reader, Inc.*, 107 F. App'x 250, 252 (2d Cir. Aug. 17, 2004) ("Accurate statements about past performance are self evidently not actionable under the securities laws[.]").

As to the third statement, by Jemley, it is one of opinion: Jemley's comment captures his expressed "belie[f] that that price increase [Dutch Bros had] just t[aken] [would] defend [their] margins again going into next year." 11/10/21 Tr. 14. For this statement to be actionably false or misleading, the AC would need to plead either that Jemley did not actually hold this opinion or that the facts in support he referenced were untrue. *See Sanofi*, 816 F.3d at 199. The AC relies on its contention that inflation and increased commodity costs were already evident in November 2021. *See* AC ¶ 60. But this argument does not say anything about whether Jemley then genuinely believed that price increases could enable Dutch Bros to preserve its margins "going into [the] next year." 11/10/21 Tr. 14. And Jemley's post–class period statement that inflation "began to show in Q2 of 2021" does not connote a disingenuous belief that Dutch Bros could effectively preserve its margins through price increases. *See Sanofi*, 816 F.3d at 211 (no liability where opinion statements did not conflict with information in possession at time statements were made). Further, the AC does not impugn as false or misleading the facts Jemley cited in support of his opinion: that Dutch Bros had relatively fewer inputs subject to inflationary pressure or supply chain issues than others in the market, and that, "to date" in November 2021, these inputs had not faced intense inflationary pressures. *Id.*; *see also* AC ¶ 60. That dairy and petroleum costs were rising is consistent with—if not the impetus for—Jemley's statement. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589–90 (S.D.N.Y. 2016) (opinion statement not actionable under PSLRA where

operative complaint did not allege any facts cited in stating opinions were themselves false).

Finally, as to the fourth statement, the AC does not adequately plead that Jemley's statement about Dutch Bros' "basket of inflation" was false or misleading. In selectively quoting the statement, the AC tellingly omits its factual crux: that Dutch Bros' "basket of inflation" was in the low single digits. *Compare* AC ¶ 58, *with* 11/10/21 Earnings Call Tr. 14. The general, qualitative statements that followed—that inflation "overall" was "very mild and tempered," and that dairy prices specifically were "not really up"—must be read in conjunction with that quantitative disclosure. *See* 17 C.F.R. § 240.10b–5 (unlawful to "omit to state a material fact necessary in order to make the statements made, *in light of the circumstances under which they were made*, not misleading" (emphasis added)). No facts pled in the AC contradict that factual statement. *See generally* AC ¶ 60. And the AC does not plead that other species of data bearing on inflation—regarding the Consumer Price Index ("CPI"), or dairy products, or some other "basket" of goods—were necessary to make Jemley's statement non-misleading. *See Matrixx Initiatives, Inc.*, 563 U.S. at 44–45. On the facts pled, that statement, made in response to an investor's question of "can you share maybe what your basket of inflation was for commodity and labor in the third quarter?" 11/10/21 Tr. 13, was not misleading. On the contrary, Jemley's answer gave reasonable investors additional context for his more subjective statements that inflation was "mild" and dairy prices were "not really up." *See, e.g.*, *In re Sanofi-Aventis Sec. Litig.*, No. 07 Civ. 10279 (GBD), 2009 WL 3094957, at *5 (S.D.N.Y. Sept. 25, 2009), *on reconsideration*, 2010 WL 2985912 (S.D.N.Y. July 27, 2010) ("[T]aken in context with the publicly available data, defendants' conclusions that the negative side effects were 'relatively mild and self-limiting' and their other characterizations, amount to little more than expressions of opinion which are not actionable misstatements under Rule 10b–5."); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 488 n.8 (D. Conn. 2013) ("[A] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analyst and investors can draw their own conclusions about the company's condition[.]"). Accordingly, the AC does not adequately plead that this statement was false or misleading.

### 2. Statements Made in November 12, 2021 Quarterly Report

**\*12**  Rein next challenges three statements from Dutch Bros' third-quarter 2021 Form 10-Q, filed with the SEC on November 12, 2021. AC ¶¶ 61–64. These are:

- Under the "Commodity Risks" subsection of the broader "Quantitative and Qualitative Disclosures about Market Risk" section, the form states: "Our profitability is dependent on, among other things, our ability to anticipate and react to changes in the costs of key operating resources, including beverage, energy and other commodities. We have been able to partially offset cost increases resulting from several factors, including market conditions, shortages or interruptions in supply due to weather or other conditions beyond our control, governmental regulations and inflation, by increasing our menu prices, as well as making other operational adjustments that increase productivity. However, substantial increases in costs and expenses could impact our operating results to the extent that such increases cannot be offset by menu price increases." 11/12/21 Form 10-Q at 46; *see also* AC ¶ 61.

- Under the "Impact of Inflation" subsection of the same section, the form states: "The primary inflation factions affecting our operations are commodity and supplies, energy costs, and materials used in the construction of company-operated shops. Our leases require us to pay taxes, maintenance, repairs, insurance, and utilities, all of which are generally subject to inflationary increases. Finally, the cost of constructing our restaurants is subject to inflation, increasing the costs of labor and materials, and resulting in higher rent expense on new shops.

  While we have been able to partially offset inflation and other changes in the costs of core operating resources by gradually increasing menu prices, coupled with more efficient purchasing practices, productivity improvements and greater economies of scale, there can be no assurance that we will be able to continue to do so in the future. From time to time, competitive conditions could limit our menu pricing flexibility. In addition, macroeconomic conditions could make additional menu price increases imprudent. There can be no assurance that future cost increases can be offset by increased menu prices or that increased menu prices will be fully absorbed by our guests without any resulting change

to their visit frequencies or purchasing patterns. In addition, there can be no assurance that we will generate same shop sales growth in an amount sufficient to offset inflationary or other cost pressures." 11/12/21 Form 10-Q at 46–47; *see also* AC ¶ 62.

- Under the "Risk Factors" section, the form states: "We also purchase significant amounts of dairy products, particularly milk, to support the needs of our shops. Additionally, and although less significant to our operations than coffee or dairy, other commodities, including but not limited to plant-based 'milks,' tea, sugar, syrups, energy and packaging material, such as plastics, corrugate, and canning materials, are important to our operations. Increases in the cost of dairy products and other commodities, such as petroleum which in turn may increase the cost of our packing materials, or lack of availability, whether due to supply shortages, delays or interruptions in processing, or otherwise, especially in international markets, could harm our business." 11/12/21 Form 10-Q at 58; *see also* AC ¶ 63.

**\*13** The AC alleges that these statements were false or misleading essentially for the same reasons as the statements challenged in the November 10, 2021 Earnings Call. *See* AC ¶ 64.

For substantially the same reasons as above, the AC falls far short of pleading with the required particularity that these statements were false or misleading. On the contrary, based on the pleadings, each presented a measured assessment of the state of play as of the end of the third quarter of 2021: Dutch Bros had thus far coped with increased costs by increasing prices, but this strategy was not assured of success going forward, with rising dairy, coffee, and petroleum prices presenting a particular risk to "harm [Dutch Bros'] business." 11/12/21 Form 10-Q at 58. The AC characterizes these excerpts as misleadingly "positive statements about the Company's business, operations, and prospects," AC ¶ 64, but the qualified and caveated quality of nearly every full sentence in the Form 10-Q belies that characterization.[4]

4     Tellingly in this respect, the AC omits to quote the bulk of Dutch Bros' disclosures in its "Impact of Inflation" subsection. *See* AC ¶ 62.

Moreover, these challenged statements fall comfortably within the PSLRA safe-harbor, as they are both forward-looking and replete with meaningful cautionary language. "To determine whether cautionary language is meaningful,

courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.' " *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). Here, the allegedly undisclosed risk is addressed squarely by the cautionary language, as both address the potential impact on Dutch Bros' future margins should petroleum and dairy costs continue to rise. In its Form 10-Q, Dutch Bros elaborated on its then-strategy for handling inflation, but it repeatedly qualified that discussion with the caveat that increased petroleum, dairy, and other costs could defeat that strategy. Those candid assessments are not actionable under the PSLRA. *See, e.g., In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) (meaningful cautionary language satisfied PSLRA safe-harbor requirement where it warned that "[p]roject's economic viability [was] subject to risks regarding capital costs, the very risks which ultimately materialized."); *In re Turquoise Hill Res. Ltd. Sec. Litig*, 625 F. Supp. 3d 164, 216–217 (S.D.N.Y. 2022) (company-specific warnings concerning significant uncertainty of "the timing and cost of the construction" of certain project sufficient to invoke safe harbor in case alleging fraud based on the same); *Olkey v. Hyperion 1999 Term Tr.*, 98 F.3d 2, 5 (2d Cir. 1996) (defendant not liable where it gave "prominent and specific" cautions regarding "exactly the risk the plaintiffs claim was not disclosed"). To the extent Reins claim is that Dutch Bros' failure to refer to specific inflationary rates precludes the PSLRA safe-harbor-defense, that is wrong. The absence of that level of precision could not have misled a reasonable investor to think that the risk presented by increased commodity costs did not exist. *See In re Delcath Sys.*, 36 F. Supp. 3d at 333.

**\*14** Rein's attempt to salvage these claims by alleging Item 303 violations is unavailing, for multiple reasons. At the threshold, because the above statements are not false or misleading, the Supreme Court's recent decision in *Macquarie Infrastructure Corporation v. Moab Partners, L.P.*, 144 S. Ct. 885 (2024), appears to bar such a claim, insofar as it precludes claims based solely on an alleged Item 303 violation. *Id.* at 889 (Item 303 cannot support a private action under Rule 10b-5(b) "even if the failure does not render any 'statements made' misleading). Moreover, the AC's Item 303 arguments fail on their own terms. It alleges that Dutch Bros' inclusion of more specific disclosures in SEC filings

after its financial troubles in the first quarter of 2022 shows that the above earlier disclosures did not "sufficiently convey the then-present risk that rising dairy and commodities prices were significantly outstripping Dutch Bros' pricing and/or margins" during 2021. AC ¶¶ 99, 101. But that argument rests on a logical fallacy. Dutch Bros' first quarter 2022 SEC filings report a "jump" in dairy and gas prices in 2022 that outpaced the company's pricing model, with adverse consequences including margin pressure. *Id.* ¶¶ 98, 100. These filings thus revealed that the very risk that the company had identified in its third quarter 2021 report had transpired: that "substantial increases in costs and expenses could impact our operating results to the extent that such increases cannot be offset by menu price increases." *Id.* ¶ 61. If anything, Dutch Bros' 2022 filings reflect the foresightedness of its 2021 filings.

The AC thus does not adequately plead that any statement in the November 12, 2021 Quarterly Report are actionable.

### 3. January 10, 2022 Form 8-K & January 11, 2022 Conference Interview

The AC alleges that the following statements in Dutch Bros' Form 8-K, filed with the SEC on January 11, 2022, and in an interview of Ricci the same day at an industry conference commenting on the material in the Form 8-K, were materially false or misleading: [5]

- A press release submitted with the Form 8-K quoting Ricci as "stating that Dutch Bros' '2020 and 2021 shop classes are performing at or above our volume expectations and within our margin expectations,' and that the Company expected 'fourth quarter revenue to exceed the upper end of the previously provided guidance, with mature shop level margins in line with expectations.' " AC ¶ 65. [6]

- Ricci, when asked by an interviewer at the conference to talk about "any supply chain challenges that you're facing" said: "You know we've certainly see things get a little bit better as the ports have freed up on the west coast and [ ] You know doesn't mean we are having challenges, but we know nothing that's gotten in the way of our ability to serve the customer, you may get a cup that doesn't have any printing on it, because the ink isn't available or the lid on our cups used to be blue now they're white because you can't get them[.] You know color differently, but you know, fortunately,

our team's done a great job of managing some of the challenges that they've had they've gotten creative[.] And we haven't had the issues I you know we look at supply chain and inflation, I think the one area we're probably most concerned about is freight[.] And we seem to be doing pretty well on the cost of goods side and working with our suppliers on that end but afraid, as we grow across the country I think we're realizing[.] You know how much that impact is going to have you know, on us and learning about what the long term might look like." 1/11/2022 ICR Conference Tr. 7; *see also* AC ¶ 67.

The AC asserts that these statements were materially false or misleading on essentially the same grounds as it challenges the November 2021 statements. The AC adds that:

> [A]t the time each statement was made, the macroeconomic conditions plaguing the U.S. economy and, in turn, Dutch Bros' business, were (as opposed to "get[ting] a little bit better") getting far worse, as the FOMC and Federal Reserve Chair Powell had now explicitly recognized inflation was not "transitory," Powell stated his expectation that elevated inflation would persist through "the middle of" 2022, and the CPI was up 6.8% year-over-year in November. At the time each statement was made, dairy prices were also rapidly rising, with the USDA's 2021 all-milk price was forecasted at $18.60 per cwt in December (up from $18.50 per cwt in November) and 2022 all-milk price was forecasted at $20.75 per cwt (up from $20.25 per cwt in November). Indeed, CW1 recalled that in or around December/late 2021, CW1's team was tasked with finding solutions to the issues of rising dairy costs and tighter dairy supply.

**\*15** *Id.* ¶ 68.

5    The AC, in ¶ 66, mistakenly refers to a statement which the parties now agree was made a year later, in January 2023, outside the class period. *See* Def. Br. at 17 n.8; Pl. Reply at 7 n.3 ("Plaintiff incorrectly attributed the language in ¶ 66 to the 2021 ICR Conference when it was, in fact, from a 2023 Conference. Plaintiff retracts that statement."). The Court disregards this allegation.

6    The Court is unable to find the above-quoted language in the Form 8-K in the form produced by counsel on this motion. Regardless, because the AC alleges and defendants do not dispute that the statement was included in this filing, the Court considers it.

There is, however, a mismatch between the fact that the AC faults Dutch Bros for omitting (national inflationary trends) and the statements it challenges (the press release and Ricci's comments on Dutch Bros' metrics and performance during a discrete timeframe). "[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as 'what was revealed would not be so incomplete as to mislead.' " *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) (quoting *In re Bristol Myers*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)). Here, the company discussed shop margins for the fourth quarter of 2021 in a press release (margins which the AC does not contend were errantly reported or below the company's targets, *cf.* AC ¶¶ 102–09) and referenced inflation in passing during an interview response with respect to how supply chain issues had affected the company. Addressing those distinct points did not oblige Dutch Bros to comment on "macroeconomic conditions plaguing the U.S. economy." AC ¶ 68; *see also Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 409 (S.D.N.Y. 2020) (where statement did not touch on certain compliance measures, not misleading to omit facts regarding those measures); *In re Ferroglobe PLC Secs. Litig.*, 19 Civ. 629 (RA), 2020 WL 6585715, at *7 (S.D.N.Y. Nov. 10, 2020) ("Ferroglobe's statements about macro-trends within its industry did not require an accompanying disclosure about the ancillary issues of pricing issues from that quarter. Nor did the mere mention of the concept of demand trigger a duty to disclose the Company's current financial health.").

The AC's references to statements by a confidential witness (CW1) do not alter this analysis. *See* AC ¶ 68. CW1's allegations—that the CW1's team was tasked with finding solutions to rising dairy costs and tighter dairy supply—

are not in tension with the challenged statements. *See id.* Nowhere in the challenged comments from early 2022 did Dutch Bros suggest that dairy was not a concern on which it was deploying resources. On the contrary, in the interview, Ricci stated that "our team's done a great job of managing some of the challenges that they've had they've gotten creative" and that "we seem to be doing pretty well on the cost of goods side and working with our suppliers on that end." *Id.* ¶ 67. These comments fairly conveyed that the company was addressing the cost of goods and that he believed the team working on finding solutions to rising dairy costs had thus far done a good job.

**\*16** The AC thus fails to adequately plead that these comments were false or misleading.

### 4. March 1, 2022 Earnings Call

The AC next challenges two sets of statements made during a March 1, 2022 conference call with analysts and investors to discuss the content of the Form 8-K that Dutch Bros filed with the SEC that same day, which reported the company's performance during the fourth quarter (and thus the entirety) of 2021. AC ¶ 69. The first set consists of these:

- During the call, Ricci said: "While we are not immune to margin pressures but are managing it appropriately, we continue to look for operational improvements and further opportunities in our market-based pricing model. In addition, we will use segmentation, personalization and innovation to excite our customers about our unique premium and, at times, higher-margin beverage offerings. In November, we successfully took a modest price increase of 2.9%. It was our first since prior to the pandemic and was well received by our customers, operators and franchisees." 3/1/2022 Earnings Call at 6; *see also* AC ¶ 70.

- Jemley stated: "[A]s we moved through the pandemic, we were very careful not to escalate our menu prices. In November, we took a modest price increase, which was our first measurable price increase in over a year for our company shops. That price advance landed well for us. It was appropriate relative to our desired positioning in the market .... Let's quickly look at the movement in beverage, food and packaging costs and labor costs, given those are the 2 most significant costs, and the industry in general has been challenged by these 2 areas over much of 2021. Beverage, food and packaging costs

increased from 22.4% to 25.3% or 290 basis points. 120 basis points of that increase is related to the change in discounts. That leaves 170 basis points of real changes." 3/1/2022 Earnings Call at 8–9; *see also* AC ¶ 71.

- Jemley stated with respect to the fourth quarter of 2021: "Beverage, food and packaging costs increased from 22.9% to 26.8% or 390 basis points. 190 basis points of this increase is related to the change in discounts. That leaves 200 basis points of real change or 30 basis points more than the full year trends noted above. Two things to point out: first, we incurred a bit more ingredient costs, driven by inflation; and second, accelerating new shop development means we will have some cost efficiencies as we open up new shops and establish logistics in new markets .... We made the conscious decision to accelerate growth in the fourth quarter and into 2022. And while we always try to balance the profit growth equation in the near term, we are also keen to focus on long-term high-quality revenue that will yield lasting profit and growth." 3/1/2022 Earnings Call at 9–10; *see also* AC ¶ 71.

The AC claims that these statements gave a falsely positive impression of the company's financial situation without taking into inflationary pressure that it alleges was, by March 1, 2022, "decimat[ing] the Company's projected earnings and margins." AC ¶ 76.

These statements, each made during introductory remarks to a call summarizing fourth quarter and full-year performance, are not actionable. Each reported recent performance and associated data. The AC does not allege that any of the data cited by Ricci and Jemley, or their limited commentary on it, was inaccurate. The AC instead emphasizes that later statements by Dutch Bros situated its troubles combatting inflation as starting during the first quarter of 2022. *See id.* But that does not put in question the accuracy of the historical data set out by Jemley or Ricci with respect to Q4 or year-end 2021 performance. Accurate statements of historical data are not a basis for Rule 10b-5 liability. *See Boca Raton Firefighters,* 506 Fed. App'x at 38–39.

**\*17** The AC also challenges these statements from the March 1, 2022 Earnings Call:

- Jemley, when asked by a researcher if he anticipated additional price increases beyond the relatively modest one Dutch Bros had already implemented, stated: "So we look typically in a normal time frame. We're going to look at our pricing windows every 6 months, right, in the

fall before holiday, in the spring before summer. And so we're very mindful of that. I think we've been fortunate to not have a lot of inflation drag, both in '21 and frankly, moving into early '22. And so we haven't felt compelled. We don't price to a margin. First of all, we want to price to what consumers are willing to pay. And so we're just—honestly, we're flexible and we're watching that closely, but we do, with the mindset of our relative position in the market and the customer, not to seek to a margin level. But we are feeling good as we enter '22 with the trajectory of our margins, given everything going on." 3/1/2022 Earnings Call at 15; *see also* AC ¶ 73.

- Jemley said, when asked "what guidance might be for the first quarter or the full year '22 on that restaurant operating margin line" given inflationary pressures: "Yes. So we're fortunate that the 2 big costs, cost of goods and labor, we don't have any real significant upward momentum in the labor line. So we're starting halfway better than everybody else, to begin with. And then secondly, we have a pretty simple pantry of goods. What we're really dealing with right now is freight and logistics costs going up. But we're able to do, as we've shown in Q4 and the walk I gave you in COGS, we're really able to handle that pretty effectively, and we'll get a full quarter of the price impact from November in our Q1. In terms of guiding a specific margin for Q1, I'd prefer not to do that, It is a—Q4 is the lowest seasonality, Q1 is the next lowest seasonality. And then we kind of get into Q2. But I just think from a—other than the discount rollover from a year-over-year perspective, we're just not feeling compression in margins. And the biggest thing for us is our labor costs are stable." 3/1/2022 Earnings Call at 16; *see also* AC ¶ 74.

- Jemley said, in response to a questioner "looking to better contextualize the guidance [Dutch Bros had provided] for 1Q [2022]": "Yes. It was softer in January. It was better in February, less outages. We're sitting ahead of the mid-singles right now. We're—like everybody, don't know where the world is going to go over the next 30 days with all that's going on. And so we're just being a little tepid about how we look at things. It doesn't really move the needle much. The biggest revenue driver is annualization of new stores and new stores getting added. So it gets a lot of talk track and it is important to the underlying health of the business, but it's really not that financially meaningful right now as fast as we're growing the top line. That's why we don't -- we try not

to overthink it." 3/1/2022 Earnings Call at 17; *see also* AC ¶ 75.

The AC alleges that these statements were materially false or misleading because Dutch Bros did not disclose the effect of increased dairy and petroleum costs: "[D]espite reassuring the market two-thirds of the way through 1Q22 that the 1Q22 results would be positive, and, in particular, that the Company's margins were healthy and not being compressed," the company later "reveal[ed], on May 11, 2022, that rising inflation and commodities prices had, in truth, decimated the Company's projected earnings and margins in 1Q22." AC ¶ 76.

**\*18** This claim fails for multiple reasons. First, the AC simplistically describes the above language as "reassuring the market two-thirds of the way through 1Q22 that the 1Q22 results would be positive." *Id.* Reading the statements on the call in full and in context, they were more nuanced and qualified. Jemley noted that Dutch Bros had "been fortunate to not have a lot of inflation drag, both in '21 and frankly, moving into early '22," but that positive assessment was supported by the company's performance data and not contradicted by any data cited in the AC. And the speakers' guardedly optimistic statements about the company's anticipated performance and margins were by and large conditional. 3/1/2022 Earnings Call at 15–17. Jemley stated that Dutch Bros was "feeling good as we enter '22 with the trajectory of our margins, *given everything going on*[,]" *id.* at 15 (emphasis added), adding that "*from a year-over-year perspective*, we're just not feeling compression in margins," *id.* at 16 (emphasis added). But, he added that Dutch Bros was remaining "flexible" as the company could not "know where the world is going to go over the next 30 days with all that's going on," *id.* at 16–17, and that the executives could evaluate the impact and efficacy of the company's pricing strategy to deal with cost of goods increases only after they received "a full quarter" of data "regarding the price impact from November [2021] in our Q1[,]" *id.* at 16. Contrary to the AC's characterization, these statements were not blanket assurances of a positive future.

Second, the AC is wrong to treat negative developments in 1Q22—in which Dutch Bros experienced accelerating "macroeconomic headwinds" that overtook its new-shop and price-oriented strategy for combatting inflation—as undermining what was said on the March 1 earnings call. The AC does not clearly situate these developments (and Dutch Bros' recognition of them) as having occurred as of March 1. Rather, it appears to situate this development in mid-March.

*See, e.g.*, AC ¶¶ 91 (mid-March 2022), 104 (quoting Ricci as referencing mid-March as point when sales took a turn), 110 (same). The opinion statements of guarded optimism on the March 1 call cannot be impeached as false or misleading based on events that had not yet occurred or information that was not yet known to the speaker. *See Vivendi, S.A.*, 838 F.3d at 262 ("Fraud depends on the state of events when a statement is made, not on what happens later.") (quoting *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010)).

The AC thus fails to plead actionable statements during this earnings call.

### 5. March 9, 2022 Conference Interview

The AC next contends that the following statements made at a March 9, 2022, Bank of America–sponsored conference were materially false or misleading:

- Asked whether he was worried about higher gas prices, among other things, Jemley responded: "I think we are concerned about the environment around us as citizens. But for Dutch Bros, we're not greatly concerned about elevated energy prices and people's ability to still come and enjoy Dutch. We feel like that would be one of the latter places that people would decide not to spend money on. Elevated energy affects our freight cost, but its—but we don't see it affecting our sales demand in the near term." AC ¶ 77.

- Asked about Dutch Bros' "moderate" pricing relative to peer companies given rising costs, Jemley responded: "[B]ecause we have a beverage-only menu, we have the power of good margins going in. We are not using margin on food, for example. So that set some context to why we sort of feel like we can give people a great value at a reasonable price .... Secondly, from a margin shape perspective, and Joth will talk about our cadence of how we actually think about price increases, but everybody's mind is around 2 things moving: one is commodity costs, and in our business that's cost of goods and labor. And really because we began this journey in a really good place with our culture and the take home pay that our people have and everything we do for our people and about our people, we have not had wage escalation pressure .... So you take that—half of that pressure off the table from a margin perspective. And you really just dial the margin pressure into freight and logistics costs, in the cost of goods, which allowed us, we don't price

to margin, we price to consumers' willingness to pay, but those things work together to really be able to take a moderate reasonable price increase back in November to kind of put us in a good spot going into this year." *Id.* ¶ 78.

**\*19** • Responding to the same question, Ricci stated: "[W]e're going to evaluate it every 6 months. We'll look at it in the spring as we head into the late spring and summertime, and then we'll look at it again in the fall as we head into the holiday season and really into winter. And we'll evaluate our costs, we'll evaluate our dynamic pricing differences between our sizes. We'll look at what we think our promotional menu will drive for us. And we'll kind of look at it holistically versus just looking at it as menu items that and a price increases. So we're going to take a lot of factors into consideration as we think about price. And yes, we're watching it every day. We're talking about it a lot, but we're also going to be considerate to the consumer." *Id.* ¶ 79.

These statements are akin to those highlighted from the March 1 Earnings Call, as is the AC's theory as to why they were materially false or misleading. In essence, Jemley and Ricci again stated, as they had eight days earlier, that (1) Dutch Bros was not immune to rising costs; (2) various factors, with those cited here including a lack of wage pressure, fewer ingredient inputs, and a general optimism surrounding consumer behavior, made them guardedly optimistic that the company could weather rising costs without substantial price increases; and (3) Dutch Bros was monitoring the situation. These statements are not actionable for the reasons given above. The one statement in this instance that is arguably new is Jemley's that the company "felt" consumers would still want to "enjoy Dutch," and be loath to cut out drive-through coffee, notwithstanding rising gas prices. That opinion statement is not actionable; the AC does not impeach it as contrary to the speaker's actual views or contrary to undisclosed known facts. It is also inactionable puffery. *See, e.g.*, *Robeco Capital Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (general, optimistic statements from defendant such as "[we] feel like [at home fitness] is a trend that's here to stay" were "textbook" cases of corporate puffery); *Schaffer v. Horizon Pharma PLC*, No. 16 Civ. 1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) (statements that a defendant-company was "on track" and had a "unique commercial business model" were inactionable puffery); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996)

(statements of "optimism" about margins and expectations of good performance were puffery).

In challenging the March 9 statements, the AC notes a later statement by Ricci, on May 11, 2022, that:

> [I]n mid-March when gas prices jumped the way they did, we saw an immediate flip on our daily sales. It was almost to the day of the way that, that works. So I think you could infer—and we believe that we've done some analysis on the gas prices and influence related to our daily sales, and we believe it has influenced it. And we believe that if gas prices stay inflated, it will continue to influence it.

AC ¶ 80. The AC implies that this statement reveals that, as of March 9, 2022, gas prices had already jumped, and Dutch Bros' sales "flip" had already occurred, such that Ricci and Jemley's statements at the Bank of America Conference were false or misleading. *See id.* But the AC does not adequately plead facts supporting that thesis. Although March 9 surely approaches "mid-March," the AC does not anywhere allege that by March 9, the company had experienced the "jump" in gas prices or the downward "flip" in its daily sales, *See id.* Nor does it plead that by March 9 Jemley or Ricci had access to, or that Dutch Bros had generated, data akin to that on which Ricci relied two months later in May 2022. Absent concrete allegations that facts then known contradicted the statements defendants made on March 9, the AC fails to plead that these statements were actionable. *See, e.g.*, *Rombach*, 355 F.3d at 174–75 (upholding dismissal under Rule 9(b) and PSLRA based on failure to plead specific evidence contradicting challenged statements concerning company's financial health); *ATSI Comm'cns, Inc.*, 493 F.3d at 106 (dismissing for failure to plead falsity element where complaint did not plead temporal facts sufficient to support this claim).

### 6. 2021 Form 10-K

**\*20** On March 11, 2022, defendants filed Dutch Bros' 2021 Form 10-K with the SEC. The AC challenges the following statements in that filing.

**Rein v. Dutch Bros, Inc., Slip Copy (2024)**

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

- Under the "Commodity Risks" subsection of the "Quantitative and Qualitative Disclosures about Market Risk", the form stated: "Our profitability is dependent on, among other things, our ability to anticipate and react to changes in the costs of key operating resources, including beverage, energy, and other commodities. We have been able to partially offset cost increases resulting from several factors, including market conditions, shortages or interruptions in supply due to weather or other conditions beyond our control, governmental regulations and inflation by increasing our menu prices as well as making other operational adjustments that increase productivity. However, substantial increases in costs and expenses could impact our operating results to the extent that such increases cannot be offset by menu price increases." 3/11/2022 Form 10-K at 75; *see also* AC ¶ 82.

- Under the "Impact of Inflation" subsection of the "Quantitative and Qualitative Disclosures about Market Risk" section, the form stated: "The primary inflation factors affecting our operations are commodity and supplies, energy costs, and materials used in the construction of company-operated shops .... While we have been able to partially offset inflation and other changes in the costs of core operating resources by gradually increasing menu prices, coupled with more efficient purchasing practices, productivity improvements and greater economies of scale ...." 3/11/2022 Form 10-K at 76; *see also* AC ¶ 83.

The AC does not plead facts plausibly suggesting that these qualified statements were false or misleading, let alone materially so. The AC attempts this showing by seizing on excerpts of the Form 10-K. It notes, for example, the start of a sentence that begins, "*[w]hile* [Dutch Bros] ha[d] been able to partially offset inflation and other changes in the costs of core operating resources" by increasing prices in addition to other tweaks around the edges. AC ¶ 83 (quoting 3/11/2022 Form 10-K at 76) (emphasis added). But it omits the critical qualifiers that follow, such that the passage reads in full:

> While we have been able to partially offset inflation and other changes in the costs of core operating resources by gradually increasing menu prices, coupled with more efficient purchasing

practices, productivity improvements and greater economies of scale, *there can be no assurance that we will be able to continue to do so in the future.* From time to time, competitive conditions could limit our menu pricing flexibility. In addition, macroeconomic conditions could make additional menu price increases imprudent. There can be no assurance that future cost increases can be offset by increased menu prices or that increased menu prices will be fully absorbed by our guests without any resulting change to their visit frequencies or purchasing patterns. In addition, there can be no assurance that we will generate same shop sales growth in an amount sufficient to offset inflationary or other cost pressures.

**\*21** 3/11/2022 Form 10-K at 76 (emphasis added). The portions that the AC cuts out overtly caution that the strategies Dutch Bros had thus far deployed to "partially offset inflation and other changes in the costs of core operating resources" might fail in the future. *Id.* The AC does not address, let alone explain, why these blunt risk disclosures, addressed at the very risk that it contends was concealed, are compatible with its claim of fraud. *See, e.g.*, *In re AppHarvest Sec. Litigation*, 2023 WL 4866233, at *41 (statements functioning as risk disclosures not false or misleading where they "warned investors of the types of risks inherent to businesses similar to [the defendant's]").

The 2021 Form 10-K thus is not fairly pled as actionable.

### 7. April 6, 2022 Podcast Interview

The AC next challenges statements made by Ricci during a podcast interview published on April 6, 2022:

- Ricci stated, when asked about Dutch Bros' competitive advantage over peer companies: "Our business is pretty simple, right? I mean, we keep a very simple ingredient base. We don't have ovens and kitchens and we're a drive-thru business. We have very few walk-in locations

of the 575 locations we have today. We're really focused on doing what we do and doing it very, very well. We don't complicate it. A lot of people have talked about supply chain problems. In those issues that you're serving food and you have all of these 150 ingredients that maybe a classic QSR chain would have, we have basically 12 and then some extensions of that. So we're a simple model, we have a very simple menu. We have a core base of espresso and energy drinks and things like that." AC ¶ 85.

- Ricci stated, when asked about how the IPO affected Dutch Bros: "Having done a few other public companies, I think that the structure and the discipline that being a public company creates, I think that makes you a better company. The infrastructure that you're, you know, really required to hire, the reporting that you're required to do, I think makes you better in everything else that you do. It forces you to look further out, it forces you to plan ahead, it forces you to be committed to a gameplan and be able to resource that. We're growing into that. We've put a lot of good people in place and we've added some great resources to the company over the last couple of years to prepare for this, but I think we're still growing into that. I think our G&A still has some work to do." *Id.* ¶ 86.

- Ricci stated, when asked to discuss how "supply chain stuff, labor cost, commodity costs" "affects you, or maybe not as much as your peers or in others in the industry": "On the supply chain. You know, like I said earlier, we work with a pretty small ingredient base and so we're working very closely with a very small amount of suppliers that are doing that. Now, we've had the occasional trip up on a part for an ice machine or something that we could get and we've had to respond accordingly and be able to pivot, which our team again has done a great job of doing. We just certainly haven't seen the inflation or supply chain challenges that we've heard about with other companies, and it goes back to simple, right? I mean, the more simple the business, the more effective, and fortunately we have the numbers to back it up, and we sit in a pretty good spot." *Id.* ¶ 87.

- Ricci stated, when asked about Dutch Bros' financial situation: "Margin-wise, we've been told that our margin numbers and our EBITDA numbers are industry-leading, and maybe we'll let other people fill in the blanks related to that. But I think because our supply chain and our logistics and everything is so simple, you

know we run a pretty efficient business with a lot of throughput." *Id.* ¶ 88.

**\*22** The AC alleges that these statements were materially false or misleading because they did not divulge relevant negative macroeconomic trends, and because by the time this interview was published, Q1 2022 had concluded—a quarter in which Dutch Bros later reported feeling the adverse effects of inflation on its profit margins. *See id.* ¶ 89.

Ricci's first two statements are plainly not actionable. In the first, he broadly described the company's business model. The AC does not dispute any fact referenced therein, nor explain why any was made misleading for failure to also address the subject of inflation. In the second, Ricci addressed how the IPO affected Dutch Bros, a subject even further afield from the impact of present-day inflation. *Cf. Richman*, 868 F. Supp. 2d at 274.

The third and fourth statements do comment on conditions later in time, with the third stating that the company hadn't "seen the inflation or supply chain challenges that we've heard about with other companies" and that relatively speaking, "we sit in a pretty good spot." The AC claims that these statements were misleading because, at some point towards the end of Q1 2022, Dutch Bros experienced a sharp increase in input costs as well as a drop in sales, putting pressure on its profit margins. *See* AC ¶¶ 102–111.

The passing reference to inflation in the third statement, however, is eclipsed by the more involved discussion elsewhere in the podcast interview of Dutch Bros' experience (or lack thereof) with supply-chain issues. And the AC does not allege that discussion was misleading. *See Sanofi*, 816 F.3d at 210 (statement or omission must be "misleading to a reasonable person reading the statement fairly and in context"). Read in context, that the discussion of supply chain issues contained a brief reference to inflation does not make the statement misleading for not having taken on the subject of commodities costs.

Further, to the extent the AC means to allege that these statements were misleading based on what was known to the company as of the moment in time the podcast aired, the AC lacks the specific time references necessary to support this claim. It does not allege when Ricci made the statements in the recorded podcast, as opposed to its air date of April 6, *see* AC ¶ 85. It does not allege that the podcast, the statements in which were largely big picture and historical, was made close in time to the air date. Nor does it that, whatever the date of

Ricci's statements, Dutch Bros by then had experienced the adverse consequences that emerged late in Q1 (or tabulated its Q1 results). *See Lopez v. Ctpartners Exec. Search Inc.,* 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016) (statements materially false and misleading only where alleged contradiction was apparent at time of statement). To the extent that Ricci's statements addressed the state of play before the "flip" in margins, these statements are compatible with the company's results. *See Boca Raton Firefighters,* 506 F. App'x at 38–39. And to the extent that the AC faults Ricci's statements as falsely positive about future performance, they are forward looking, and not contradicted by well pled facts as to the speaker's knowledge at the time. *See, e.g., Lopez,* 173 F. Supp. 3d at 39–41 (projections as to corporate earnings were forward-looking and preliminary even though made after the relevant quarter had closed); *In re Lottery.com, Inc. Sec. Litig.,* No. 22 Civ. 07111 (JLR), 2024 WL 454298, at *19 (S.D.N.Y. Feb. 6, 2024) (same).

### 8. April 7, 2022 Interview

**\*23** Finally, the AC challenges a statement made by Ricci contained in a podcast interview aired on the "Inside the Ice House" podcast feed on April 7, 2022. In response to a question as to whether Ricci saw "headwinds for your drive through [ ] from the recent rise in both coffee bean and gas prices," Ricci replied:

> A third of our business is done in espresso-based drinks. Coffee, technically, makes up a pretty small percentage of our overall cost of goods. We're not concerned about it. I think when you live in the coffee world, you're used to the C price going way up and way down and you just kind have to live in that commodity space, I think, related to fuel prices, most of our stands are, they are within a kind of a person's daily life, right? It's on the way to school or on the way to work or something that you're not going to stop doing anyway. I think that from the kind of the bubble that people live in, most of our stands to kind of work within that bubble. We'll see a little bit of hit related to kind of road trips. On the west coast, we have a stand that I hear about all the time in Davis, California. That's, if you're driving from the Bay Area to Tahoe, everyone says, "Well, I stop at that Dutch on my way to Tahoe," Well, the road trip may go down a little bit here as gas prices are high but I think for daily living, I wouldn't expect us to see much of a change.

AC ¶ 90. The AC contends that this statement was materially false or misleading because it projected a positive picture

of Dutch Bros' business model without disclosing the difficulties presented by inflation and other macroeconomic trends, as surfaced late in Q1 2022. *Id.* ¶ 91.

For much the same reasons as above, the AC does not plead facts making this statement actionable, The AC does not plead when Ricci made the statements at issue, as opposed to the date the podcast became available, nor how that date compared to the date when Ricci became aware of the extent to which inflation had cut into Q1 profit margins. More important, the statement the AC challenges is forward-looking. Ricci projects how a "recent rise in coffee bean and gas prices" would affect Dutch Bros' business in the future. *See id.* ¶ 90. The AC does not plead that Ricci's generally put projection—that the company's future business would take "a bit of a hit" because "gas prices are high" causing "road trip[ ]" to "go down a little bit," but would not experience "much of a change"—was disbelieved by Ricci at the time it was made. *See id.* ¶¶ 90–91. This forward-looking statement is thus a non-actionable of opinion and a statement protected under the PSLRA safe-harbor. *See Slayton,* 604 F.3d at 777 (forward-looking statements protected by PSLRA safe-harbor where facts pled made it at least equally likely defendants did not know statements false at time made).

* * *

For the above reasons, the AC does not adequately plead that any statement it challenges was materially false or misleading. That defeats all claims, both as to primary liability under Section 10(b) and Rule 10b-5, and secondary liability under Section 20(a). *Bristol-Myers,* 2023 WL 2308151, at *9. For completeness, however, the Court assesses defendants' challenge to the AC's scienter allegations.

### B. Scienter

To adequately plead scienter, the AC must include sufficient allegation to raise a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The AC's relevant allegations are as follows. It alleges that Ricci and Jemley had a monetary motive to artificially inflate Dutch Bros' share price, based on the quantity and timing of their sales of stocks during the class period. *See* AC ¶¶ 136–139. It further alleges that a strong inference of scienter is shown by the individual defendants' high-level positions within Dutch Bros, by statements they made during and after the class period, by allegations from CW1, and by Ricci's January 2024 departure. *Id.* ¶¶ 140–50. As to Dutch Bros, the AC pursues a theory of *respondeat superior,* based on the scienter of

the individual defendants. *Id.* ¶¶ 151–52. These allegations, however, do not support—more than the opposite inference—that the defendants acted intentionally or recklessly. *See ATSI Commc'ns*, 493 F.3d at 99.

**\*24** The Court's analysis begins with the stock sales, which the AC terms unusual. It alleges that Jemley and Ricci, capitalizing on Dutch Bros' artificially high share price, each sold shares on two days between the end of their lock-up agreements on March 4, 2022 and Dutch Bros' "corrective disclosures" on May 11, 2022, as follows.

### Charles L. Jemley Stock Sales[1]

| Transaction Date | Shares Sold | Price Per Share |
|---|---|---|
| CLASS PERIOD SALES | | |
| 03/15/2022 | 1,600 | $47.89 |
| 03/15/2022 | 8,274 | $48.58 |
| 03/15/2022 | 5,126 | $49.35 |
| 04/05/2022 | 2,790 | $53.46 |
| 04/05/2022 | 1,400 | $54.04 |
| 04/05/2022 | 310 | $55.39 |
| 04/05/2022 | 400 | $56.61 |
| 04/05/2022 | 100 | $57.74 |
| Total: | 20,000 | |
| POST–CLASS PERIOD SALES | | |
| 08/15/2022 | 35,305 | $45.79 |
| 08/15/2022 | 47,995 | $46.61 |
| 08/15/2022 | 1,700 | $47.25 |
| Total: | 85,000 | |

### Jonathan Ricci Stock Sales[1]

| Transaction Date | Shares Sold | Price Per Share |
|---|---|---|
| CLASS PERIOD SALES | | |
| 03/07/2022 | 37,918 | $45.39 |
| 03/07/2022 | 22,395 | $46.65 |
| 03/07/2022 | 10,312 | $47.26 |
| 03/07/2022 | 500 | $48.40 |
| 05/09/2022 | 38,532 | $41.66 |
| 05/09/2022 | 8,534 | $42.68 |
| 05/09/2022 | 22,859 | $43.66 |
| 05/09/2022 | 1,200 | $44.34 |
| Total: | 142,250 | |
| POST–CLASS PERIOD SALES | | |
| 08/15/2022 | 27,211 | $45.73 |
| 08/15/2022 | 42,939 | $46.64 |
| 08/15/2022 | 975 | $47.23 |
| 02/01/2023 | 67,817 | $36.67 |
| 02/01/2023 | 35,817 | $37.51 |
| 02/01/2023 | 56,366 | $38.57 |
| 08/01/2023 | 79,538 | $30.29 |
| 08/01/2023 | 462 | $30.86 |
| Total: | 311,125 | |

*See* Wu Decl., Exs. 14, 16. Significantly, Forms 4 supplied by defendants reveal that all of Jemley and Ricci's intra-class period sales were made pursuant to non-discretionary Rule 10b-5-1 plans. *See id.*, Exs. 13 (Ricci), 15 (Jemley).

These trades do not raise a strong inference of scienter. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, [and] the change in volume of insider sales[.]" *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020). It is undisputed that, during the class period, Ricci and Jemley sold 6.7% and 2.1% of their respective total holdings. *See* Def. Br. at 25 & n.11; PL Br. at 20 n.13; Def. Reply Br. at 9. These relatively modest figures are well below the proportion of a defendant's holdings which has been held sufficient to give rise to an inference of fraudulent intent. *See, e.g., City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd*, 565 F. Supp. 3d 478, 487–88 (S.D.N.Y. 2021) (no inference of scienter where defendants sold off 4% and 20%, respectively, of their holdings); *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y.

2020) (same where defendant sold 65% of shares); *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (same where defendant sold 44% of shares).

Rein fairly notes that Ricci was limited at all relevant times, under SEC Rule 144, to selling a maximum of 210,526 shares in any three-month period, such that he sold about 67% of the shares he *could have* sold. *See* PL Br. 21–22; *cf. In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) ("[T]he decisive question in assessing whether an insider's sales are indicative of scienter is how many shares the insider sold during the class period relative to the total number of shares that he or she *could have* sold."). But on the facts here, that point does not assist Rein, because Ricci forewent selling about 100,000 shares that he legally could have sold, suggesting that, to a significant extent, he "forwent [ ] the opportunity to turn a profit before disclosure of concealed bad news." *Id.* And the AC does not allege that Jemley was similarly limited, dimming any suspicious inference from his modest trading.

The AC therefore chiefly alleges that defendants' trades were suspicious not based on their sized but based on their timing. Some of each individual defendant's stock sales, it notes, occurred later in the class period, in Jemley's case five weeks (April 5, 2022) before the May 11, 2022, disclosure of its lackluster first quarter 2022 performance, and in Ricci's case two days (May 9, 2022) before that date. But an inference of scienter derived from the timing of trades does not follow here. As the Form 4s for Jemley and Ricci demonstrate, these trades were each made pursuant to non-discretionary Rule 105b-1 agreements, entered into long before the company's struggles coping with inflation crystallized. *See* Wu Decl., Exs. 13, 15; *see also* AC ¶ 128 (Ricci entered into agreement on December 7, 2021, and Jemley on December 9, 2021). As the Second Circuit has held, "sales conducted pursuant to a 10b5-1 trading plan [cannot] be *timed* suspiciously[.]" *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355–56 (2d Cir. 2022) (emphasis added). To be sure, "the mere existence of a trading plan will not defeat an otherwise strong inference of scienter where, as here, the plans were entered into during the class period[,]" *In re Aratana*, 315 F. Supp. 3d at 764. But the AC does not contain independent allegations supporting such an inference, but instead relies heavily on the timing of the stock sales. And the AC does not allege that the 10b5-1 agreements were suspect. The AC thus does not plausibly plead a financial motive on

the individual defendants' part to conceal the challenges that inflation presented for Dutch Bros.

**\*25** Absent viable pleadings as to motive, the AC bears a "correspondingly greater burden in alleging conscious misbehavior or recklessness." *In re Aratana*, 315 F. Supp. 3d at 765 (quoting *ECA*, 553 F.3d at 198–99) (internal quotation marks omitted). It does not carry that burden. The AC's remaining argument as to scienter is that inflation and other macroeconomic headwinds must have been damaging Dutch Bros' business long before defendants admitted as much, and that defendants, by virtue of their executive positions, must have known this, making their more positive assessments during the class period "conscious misbehavior or recklessness." *See* AC ¶¶ 140–50. But the AC lacks specific allegations to this effect. It does not specify the contrary information defendants ostensibly had at the time of the challenged statements.

That is fatal here. To adequately allege scienter circumstantially, a complaint must "specifically identify the reports or statements containing this information," *In re Aratana*, 315 F. Supp. 3d at 765. For example, "[w]ith respect to sales data and reports, pleadings are sufficiently specific where the plaintiffs have alleged who prepared the reports, how frequently they were prepared, and who reviewed them," *Koplyay*, 2013 WL 6233908, at *7. But the AC does not allege that any contrary such reports or statements with respect to Dutch Bros' performance existed, let alone when they were prepared and who was privy to them. The gist of its theory is instead the repeated *ipse dixit* that defendants *must* have known that inflation was or would harm Dutch Bros' performance more was being acknowledged. *See, e.g.*, AC ¶¶ 124, 125, 136–39, 144–48. But under the case law, a complaint's naked declaration to that effect does not suffice. *See, e.g.*, *Rombach*, 355 F.3d at 176 (affirming dismissal of PSLRA claims for failure to plead scienter, as complaint could not plausibly allege scienter using a "pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent.") (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (finding scienter allegations insufficient where facts not pled to suggest defendants had knowledge of or access to specific information contradicting public statements); *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528 (S.D.N.Y. 2020) ("Scienter cannot be inferred solely from the fact that, due to [a defendant's] board membership or executive managerial position, [he] had

Rein v. Dutch Bros, Inc., Slip Copy (2024)

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

access to the company's internal documentation as well as any adverse information.").

The AC accordingly fails to adequately plead scienter. Such is an independent basis supporting its dismissal.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss in its entirety and dismisses this case with prejudice. [7]

[7]    Rein seeks leave to amend in the event of dismissal, PL Br. at 25, but he does not say why "justice [would] so require" this. On the contrary, Rein has already amended once—the complaint challenged here is an amended complaint—and at the time Rein was given the opportunity to so file, the Court admonished him that "no further opportunities to amend will ordinarily be granted." *See* Dkt. 29 at 17; *see, e.g.*, *Document Techs., Inc. v. LDiscovery, LLC*, 731 F. App'x 31, 34–35 (2d Cir. 2018) (affirming dismissal with prejudice where plaintiff was "given adequate notice and opportunity to amend the deficiencies in its complaint and failed to do so"); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, 351 F. App'x 472, 474 (2d Cir. 2009) (summary order) (affirming dismissal with prejudice where plaintiff "did not move for leave to replead in opposition to [defendant's] motion to dismiss his original complaint with prejudice"); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 250 (2d Cir. 2004) (per curiam) (argument that district court abused discretion "in not permitting an amendment that was never requested" was "frivolous"). Closure in this litigation is particularly warranted, given that related shareholder litigation has been stayed in deference to this case. *See Hudson v. Ricci*, No 23 Civ. 5010 (PAE), Dkt. 12 (joint stipulation staying shareholder derivative case).

**\*26**  SO ORDERED.

## All Citations

Slip Copy, 2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 25

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 529 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

2019 WL 1382823
United States District Court, D. Colorado.

Lawrence Henry SMALLEN and Laura Anne
Smallen Revocable Living Trust, individually
and on behalf of all others similarly situated, and
UA Local 13 Pension Fund, individually and on
behalf of all others similarly situated, Plaintiffs,
v.
The WESTERN UNION COMPANY,
Hikmet Ersek, Scott T. Scheirman, Rajesh
K. Agrawal, and Barry Koch, Defendants.

Civil Action No. 17-cv-00474-KLM Consolidated
with, Civil Action No. 17-cv-00648-KLM
|
Signed 03/27/2019

**Attorneys and Law Firms**

Marc Ian Gross, Joseph Alexander Hood, II, Michael
Grunfeld, Jeremy Alan Lieberman, Pomerantz LLP-New
York, New York, NY, for Plaintiffs.

Chuan Cheng, Wheeler Trigg O'Donnell LLP, Holly Stein
Sollod, Claire Elizabeth Wells Hanson, Holland & Hart LLP,
Denver, CO, David Franklin Graham, Hille von Rosenvinge
Sheppard, Sidley Austin LLP, Chicago, IL, for Defendants.

**ORDER**

KRISTEN L. MIX, United States District Judge

**\*1**  This matter is before the Court on the **Motion to
Dismiss the Consolidated Amended Complaint Pursuant
to Federal Rules of Civil Procedure 12(b)(6) and 9(b)
and the PSLRA** [#53], [1] filed by Defendants Hikmet Ersek
("Ersek"), Scott T. Scheirman ("Scheirman"), Rajesh K.
Agrawal ("Agrawal"), and The Western Union Company
("Western Union" or the "Company"), and on the **Motion to
Dismiss the Consolidated Amended Complaint Pursuant
to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and
the PSLRA** [#55], filed by Defendant Barry Koch ("Koch").
Plaintiffs filed a combined Response [#63] in opposition to
the Motions [#53, #55], and Defendants filed separate Replies
[#70, #71]. The Court has reviewed the briefs, the entire case
file, and the applicable law, and is sufficiently advised in the

premises. As explained in detail below, the Motions [#53,
#55] are **GRANTED**. [2]

[1]   [#53] is an example of the convention the Court
      uses to identify the docket number assigned to
      a specific paper by the Court's case management
      and electronic case filing system (CM/ECF). This
      convention is used throughout this Order.

[2]   This case has been referred to the undersigned for
      all purposes pursuant to D.C.COLO.LCivR 40.1(c)
      and 28 U.S.C. § 636(c), on consent of the parties.
      *See* [#25, #26].

**I. Summary of the Case** [3]

[3]   At this stage of the litigation, the Court accepts
      the well-pled factual allegations of the Amended
      Complaint [#40], as distinguished from conclusory
      allegations, as true. *Adams v. Kinder- Morgan,
      Inc.*, 340 F.3d 1083, 1088 (10th Cir. 2003). The
      court does not "take as true the complaint's legal
      conclusions." *Dronsejko v. Thornton*, 623 F.3d 658,
      666 (10th Cir. 2011).

Western Union is a "money transfer service" which "provides
money movement and payment services worldwide." *Am.
Compl.* [#40] ¶ 33. During the alleged Class Period (from
February 24, 2012, to May 2, 2017), Defendant Hikmet
Ersek ("Ersek") was the Chief Executive Officer ("CEO")
of the Company. *Id.* ¶¶ 1, 26. Defendant Scott T. Scheirman
("Scheirman") was the Company's Chief Financial Officer
("CFO") and an Executive Vice President from sometime
prior to the Class Period until December 31, 2013, and a
Senior Advisor until February 28, 2014. *Id.* ¶ 27. Defendant
Rajesh K. Agrawal ("Agrawal") was President of Western
Union Business Solutions from sometime prior to the Class
Period through December 2013, was Interim CFO from
January 2014 to July 2014, and CFO from July 2014 to after
the end of the Class Period. *Id.* ¶ 28. He also served as an
Executive Vice President during the entire Class Period. *Id.*
Defendant Barry Koch ("Koch") was the Chief Compliance
Officer from May 2013 until about November 2015. *Id.* ¶ 29.

Plaintiffs are investors who acquired Western Union
securities during the Class Period allegedly "at artificially
inflated prices" during the Class Period and who were
"damaged upon the revelation of the alleged corrective

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 530 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

disclosures." *Id.* ¶ 24. In short, Plaintiffs assert that, during the Class Period, Defendants deliberately misled investors regarding Western Union's regulatory compliance regarding anti-money laundering ("AML") and anti-fraud practices. *Id.* ¶¶ 15-19.

**\*2** On January 19, 2017, Western Union "reached a settlement with several federal regulators [including the Federal Trade Commission ("FTC") ] in which it agreed to pay" $586 million. *Id.* ¶ 2. As part of this settlement, which covered a period from 2004 through December 2012, Western Union admitted to criminal violations including willfully failing to maintain an effective AML program and aiding and abetting wire fraud,[4] which resulted in a Deferred Prosecution Agreement ("DPA") between Western Union and the Department of Justice ("DOJ"). *Id.* ¶¶ 130-31, 139. In part, Western Union admitted to failing "to implement proper controls and discipline agents." *Id.* As stated by the DOJ, "[r]ather than ensuring their high volume agents were operating above-board, Western Union rewarded them without regard to the blatant lack of compliance and illegal practices taking place." *Id.* As part of the settlement agreement, Western Union agreed to implement a number of compliance steps, including "ensuring that the Company a) conducts adequate due diligence on its agents; b) adequately monitors agent activity for anti-fraud and AML violations; c) takes prompt disciplinary action against agents that pose an unacceptable risk of money laundering and fraudulent practices; d) reports suspicious or illegal activity by its agents as required by the AML laws; and e) establishes executive review and bonus structures that account for compliance with U.S. law." *Id.* ¶ 16.

[4]   Despite Defendants having only admitted wrong-doing through December 2012, Plaintiffs make much of the fact that the FTC reviewed evidence through October 2015 in making its findings of fact, even though they admit that the FTC generally did not distinguish between pre- and post- 2012 conduct. *See, e.g.*, *Response* [#63] at 11-12.

On January 31, 2017, Western Union also settled charges brought by the attorney generals of forty-nine states and the District of Columbia for an additional $5 million "to resolve their investigations into how fraudsters used Western Union's money transfer services to defraud customers." *Id.* ¶ 526. Between January 18, 2017, and February 1, 2017, the price of Western Union stock shares declined by 10.57%. *Id.* ¶ 527.

Plaintiffs state that as a result of Defendants' conduct, they "suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented information concerning Western Union's compliance efforts to the investing public." *Id.* ¶ 574. Plaintiffs therefore assert two claims: (1) violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder against all Defendants ("Claim One"), and (2) violation of § 20(a) of the Securities Exchange Act against the four individual Defendants, i.e., Defendants Ersek, Scheirman, Agrawal, and Koch ("Claim Two"). *Id.* ¶¶ 564-580.

## II. Standard of Review

### A. Fed. R. Civ. P. 12(b)(6)

The purpose of a motion to dismiss pursuant to Rule 12(b) (6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted."). To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.' " *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks omitted). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

**B. Private Securities Litigation Reform Act of 1995 ("PSLRA")**

**\*3** Because the PSLRA governs this case, the Court notes and applies guidance from the Tenth Circuit Court of Appeals regarding interpretation of the Act's "stringent" pleading requirements. *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1186 (10th Cir. 2003).

Under the PSLRA, "Section 10(b) and Rule 10b-5 create an implied private cause of action arising from fraud in the purchase or sale of securities." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018). Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 prohibits "any untrue statement of a material fact or [omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[,]...in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plausibly allege that "a defendant made statements that (1) contained false or misleading statements of material fact, (2) related to the purchase or sale of a security, (3) were made with intent to defraud investors or conscious disregard of a risk that shareholders would be misled (scienter), (4) led to reliance by the plaintiff, and (5) caused the plaintiff's loss (loss causation)." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146-47 (10th Cir. 2015).

The PSLRA, 15 U.S.C. § 78u-4(b), "adjusts the general pleading standard applicable under Federal Rule of Civil Procedure 12(b)(6), which requires a plaintiff to plead sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hampton*, 897 F.3d at 1298 (internal quotation marks omitted). "Specifically, under the PSLRA, a plaintiff must meet a heightened pleading standard with regards to the first and third elements of a securities-fraud claim: that is, respectively, as to whether the statements at issue were false or misleading, and whether the defendant acted with the requisite scienter." *Id.*

Under the Reform Act, a private complaint that alleges a violation of section 10(b) of the 1934 Act and Rule 10b-5 thereunder must first "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,... [must] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

*Pirraglia*, 339 F.3d at 1186 (citation omitted). "To satisfy this statutory burden, a plaintiff must explain why the statement was misleading, and allege with particularity his basis for believing that the statement was false." *Hampton*, 897 F.3d at 1298 (internal quotation marks omitted).

Second, in order to show that the defendant acted with the requisite state of mind for securities fraud cases, i.e., scienter, the complaint must also, "with respect to each act or omission alleged to violate the [1934 Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2).

**\*4** *Pirraglia*, 339 F.3d at 1186 (citation omitted).

When a complaint refers to an investigation of counsel as the basis for a plaintiff's allegations, as is the case here, *see Am. Compl.* [#40] at 5, the Court "treats [the allegations of the complaint] as having been made on information and belief." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1098 (10th Cir. 2003). As indicated above, Plaintiffs must "state with particularity all facts upon which their belief is formed." *Id.* (citation omitted). The Tenth Circuit has interpreted the statutory language about stating "all" facts to mean that Plaintiffs must plead sufficient facts "to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements...were false or misleading." *Id.* at 1099.

> In deciding whether the factual allegations support a reasonable belief that fraud occurred, courts should evaluate the facts alleged as a whole, evaluating the level of detail, number, and coherence and plausibility of the allegations; whether the allegations are specific enough to be verified or refuted by a defendant without requiring the complaint to disclose how the plaintiff learned of such facts or experts to prove such facts at trial;

Smalien v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

whether the sources of the facts are
disclosed and the reliability of those
sources; and any other factors that
might affect how strongly the facts
alleged support a reasonable belief that
the defendant's statements were false
or misleading. To meet the standard,
plaintiffs are not required to disclose
the documentary or personal sources
from which they learned the facts
alleged in an information and belief
complaint.

*Id.* at 1102-03.

"There is a meaningful distinction between statements of
opinion and statements of fact; the former require a plaintiff
to meet a higher pleading standard." *Hampton,* 897 F.3d
at 1299. "Pure statements of opinion and statements of
optimism that are not capable of objective verification are not
material misstatements unless they inaccurately represent the
speakers' beliefs concerning then-present factual conditions.
*Id.* (internal citations, brackets, and quotations marks
omitted). "Statements of opinion or belief must rest on a
factual basis that justifies them as accurate, the absence of
which renders them misleading." *Id.* (internal brackets and
quotation marks omitted).

In *Pirraglia v. Novell, Inc.,* the court first analyzed the
complaint's alleged false statements "to determine whether
plaintiffs specifi[ed] each statement alleged to have been
misleading, the reason or reasons why the statement [was]
misleading, and, if an allegation regarding the statement or
omission [was] made on information and belief,...[whether
the complaint] state[d] with particularity all facts on which
that belief [was] formed." *Id.* at 1189 (internal quotations
omitted). Second, the court "proceed[ed] to examine whether
plaintiffs met the scienter requirement," but only as to those
statements which the court found met the above particularity
requirements. *Id.* at 1190-91.

**\*5** Regardless of the order in which the Court addresses
the PSLRA's pleading requirements, the Court must decline
a defendant's invitation to conclude that facts alleged by the
plaintiffs are simply false, regardless of whether the plaintiffs'
claims "seem far-fetched." *Pirraglia,* 339 F.3d at 1193-94.
Moreover, the Court must accept the truth of the confidential
witnesses' accounts as pled in the Amended Complaint [#40]

and decline to assess those witnesses' credibility. *Anderson v.
Spirit Aerosystems Holdings, Inc.,* 827 F.3d 1229, 1239 (10th
Cir. 2016) (citing *Tellabs Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308, 322 (2007) ).

### III. Analysis

In the interest of efficiency, the Court addresses the
allegations asserted against Defendants Ersek, Scheirman,
Agrawal, and Western Union collectively but separately from
those asserted against Defendant Koch, who filed his Motion
to Dismiss [#55] separately from the other Defendants.
However, as instructed by Tenth Circuit precedent, the Court
has reviewed all of the allegations of the Amended Complaint
[#40] and has assessed it holistically. *See Hampton,* 897
F.3d at 1298. The Court has examined the allegations of the
lengthy Amended Complaint [#40] in their entirety, [5] and is
not required to make explicit findings of fact and conclusions
of law on a Rule 12(b)(6) ruling. *Adams,* 340 F.3d at 1093.

[5]     The Amended Complaint [#40] is 176 pages
        long and consists of 580 paragraphs. The Court
        appreciates the inclusion of a lengthy Table
        of Contents, and understands that the stringent
        pleading requirements of the PSLRA may not
        promote brevity and conciseness in drafting
        complaints. Nevertheless, the Amended Complaint
        is packed with redundant factual and legal
        allegations which, if omitted, would likely reduce
        its length by more than half. Plaintiffs' counsel do
        themselves no favors by including such redundant
        material, which significantly prolongs judicial
        review. Because the filing of motions to dismiss is
        common in securities fraud cases and because the
        PSLRA mandates that cases must be stayed while
        motions to dismiss are pending, filing of prolix
        complaints works against the parties' interests and
        should be avoided.

**A. Claim One: Defendant Koch**
Defendant Koch was Western Union's Chief Compliance
Officer from May 2013 until about November 2015. *Am.
Compl.* [#40] ¶ 29. He reported to the Compliance Committee
of the Board of Directors (the "Board") after its creation in
July 2013. *Id.* Plaintiffs note specifically that he attended
the Compliance Committee meetings held on July 17, 2013

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 533 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

and September 9, 2013, and the full Board meeting held on October 11, 2013. *Id.* ¶ 92.

At the July 17, 2013 Compliance Committee meeting also attended by Defendant Ersek, Defendant Koch "described a draft risk assessment that would be the 'foundation' for the risk-based AML compliance program of Western Union's core consumer-to-consumer money transfer business." *Id.* ¶ 240. At the September 9, 2013 Compliance Committee meeting attended by Defendants Ersek and Koch, "it was announced that on July 31, 2013, management first submitted a written action plan to the Monitor for his consideration, providing an agreed-to methodology for measuring and ensuring compliance with the Monitor's recommendations." [6] *Id.* ¶ 242.

[6]    The position of Monitor was a requirement of the Southwest Border Agreement ("SBA") signed on February 11, 2010, whose job was to monitor various aspects of Western Union's compliance requirements set out in the SBA. *See Am. Compl.* [#40] ¶¶ 86, 235.

**\*6** At the October 11, 2013 Board meeting attended by Defendants Ersek, Scheirman, and "likely" Agrawal, Defendant Koch "explained in a memorandum to the Board (using language that was also included in the risk assessment itself) that an 'AML Risk Assessment is the foundational document upon which [a financial institution's] risk-based AML Compliance program is based....Development and issuance of an AML Risk Assessment is also a regulatory expectation, evidenced in bank and [Money Services Businesses] examination manuals, and is implicitly required by the AML 'program requirement' of [the Bank Secrecy Act].' " *Id.* ¶ 243. According to his meeting

memorandum, "the '[i]nherent' '[g]eographic' risk for Western Union's consumer-to-consumer and business segments was 'Very High.' " *Id.*
On November 6, 2013, Western Union issued "a press release announcing that it would be joining the Blue Campaign, an anti-human trafficking initiative spearheaded by the U.S. Department of Homeland Security." *Id.* ¶ 405. Defendant Koch stated in the press release that "[e]nding human trafficking is possible only if everyone steps in and plays a role. We are committed to using the trust, reach and power of our brand along with our Agent network to engage the public and arm them with awareness and the resources to spot the signs and report suspect activity." *Id.* At this

time, Western Union was responding to two investigations– one aimed directly at Western Union– by the Department of Justice into "China Corridor agents" who facilitated the laundering of hundreds of millions of dollars used for human trafficking. *Id.* ¶¶ 131, 184, 251, 264-65. Plaintiffs argue: "Touting the Company's commitment to combating human trafficking and its agents' role in those efforts while failing to disclose the Company's failings with respect to those exact topics was therefore false and misleading." *Response* [#63] at 54. They further argue: "Even though Western Union[ ] only *admitted* to willful compliance failures as to the China Corridor Agents through 2012, it was still misleading for Koch to fail to disclose those very recent violations that subjected the Company to the substantial risk of an unprecedented forfeiture for a money services business." *Id.*

During his two and a half years as Chief Compliance Officer, Defendant Koch "regularly spoke at publicly advertised industry conferences, representing Western Union, where he portrayed Western Union as an industry leader in compliance by discussing best practices for compliance programs and combating human trafficking." *Am. Compl.* [#40] ¶ 247. On February 17, 2014, he "presented on best practices for detecting human trafficking at a conference hosted by the Council of Europe and Organization for Security and Cooperation in Europe." *Id.* On April 24, 2014, he "was one of three panelists on a publicly advertised webcast hosted by a law firm that addressed '[b]est practices for structuring and implementing compliance programs to identify and mitigate multiple financial crimes risk.' " *Id.* On October 23, 2014, he presented at the 8th Annual European AML Financial Crime Conference. *Id.* Defendant Koch left Western Union's employment no later than November 2015. *Id.* ¶ 247.

The first required element of a claim under Rule 10b-5 is that the defendant must have made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading. *Grossman,* 120 F.3d at 1118. Plaintiffs direct the Court's attention to three asserted false or misleading statements made by Defendant Koch. *Response* [#63] at 53-54.

First, in connection with Western Union's 8th Annual AML, Anti-Fraud and Compliance Conference in September 2013, Defendant Koch stated: "Together with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud." *Id.* at 54 (citing *Am. Compl.* [#40] ¶ 395). Plaintiffs argue that this statement "was misleading

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 534 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

absent disclosure of the fact that government investigations that were pending at the time posed the high risk of substantial liability for Western Union's compliance failures." *Response* [#63] at 54 (citing *Am. Compl.* [#40] ¶¶ 265, 268).

 **\*7** Second, as discussed above, in a November 6, 2013 press release concerning Western Union's efforts to combat human trafficking, Defendant Koch stated: "Ending human trafficking is possible only if everyone steps in and plays a role. We are committed to using the trust, reach and power of our brand along with our Agent network to engage the public and arm them with awareness and the resources to spot the signs and report suspect activity." *Response* [#63] at 53 (citing *Am Compl.* [#40] ¶ 405). Plaintiffs argue that "[t]outing the Company's commitment to combating human trafficking and its agents' role in those efforts while failing to disclose the Company's failings with respect to those exact topics was therefore false and misleading." *Response* [#63] at 54 (citing *Am Compl.* [#40] ¶¶ 110-13, 131, 183-99, 251, 264-65).

Third, in connection with Western Union's 2014 Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference, Defendant Koch stated: "Western Union is committed to helping protect its customers against fraud and other financial crimes. It's the right thing to do for our customers and for our business." *Response* [#63] at 54 (citing *Am. Compl.* [#40] ¶ 436). Plaintiffs argue this statement was false and misleading in light of "Defendants' other statements touting the Company's compliance practices and its reasons for its compliance expenditures while failing to disclose current and past compliance failures or the true reason for its increased compliance costs." *Response* [#63] at 54.

Defendant Koch argues that these statements were mere puffery. *Motion* [#56] at 7-8, 11-12, 13; *Reply* [#71] at 13-15. In another securities-fraud case, *Grossman v. Novell, Inc.*, the allegedly "false and misleading" statements concerned the defendant's potential market-share gain, "compelling" opportunities, "smooth" mergers, and "accelerating" product development. 120 F.3d at 1116-17. The Tenth Circuit Court of Appeals held that such "vague statements of corporate optimism" were "not actionable because reasonable investors do not rely on them in making investment decisions." *Id.* at 1119. "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Id* The sum of Plaintiffs' argument regarding whether Defendant Koch's statements are puffery is a footnote summarily denying that they are and referring

the Court to a multi-page discussion of puffery offered in connection with the other Defendants' statements. *Response* [#63] at 55 n.24 (citing *Response* [#63] at 43-47).

The Court finds that the three statements attributed to Defendant Koch are nothing more than mere puffery consisting of vague corporate optimism. The first statement ("Together with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud.") is similar to a statement analyzed in another securities case, *In re Sturm, Ruger & Co., Inc. v. Securities Litigation*, No. 3:09-cv-1293 (CFD), 2011 WL 494753, at \*5 (D. Conn. Feb. 7, 2011). There, the court found that the statement, "Employees are fully engaged, and we see nothing but opportunities ahead of us," was an expression of puffery and corporate optimism not giving rise to a securities violation. 2011 WL 494753, at \*5. Here, the Court finds that the assertion that Western Union was "fully engaged in the fight" constitutes similarly inactionable puffery.

Defendant Koch's second statement ("Ending human trafficking is possible only if everyone steps in and plays a role. We are committed to using the trust, reach and power of our brand along with our Agent network to engage the public and arm them with awareness and the resources to spot the signs and report suspect activity.") and third statement ("Western Union is committed to helping protect its customers against fraud and other financial crimes. It's the right thing to do for our customers and for our business.") constitute similarly inactionable statements of puffery. Other courts have found that general language regarding a company's commitment to risk management is inactionable. For example, in *In re Vale S.A. Securities Litigation*, No. 1:15-cv-9539-GHW, 2017 WL 1102666, at \*24 (S.D.N.Y. Mar. 23, 2017), the court held that the company's claim to be "committed to achieving the highest possible health and safety standards" was a "general, airy statement of commitment routinely found to constitute non-actionable puffery." In *Matana v. Merkin*, 989 F. Supp. 2d 313, 327 (S.D.N.Y. 2013), the court held that a statement that the company "remain[ed] focused on preserving principal and committed to managing risk" was "not actionable in fraud" because the statement was puffery. In *Woodard v. Raymond James Financial, Inc.*, 732 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2010), the court held that "Raymond James' leadership believes that the managed growth strategy, commitment to risk management and conservative lending practices...will continue to serve the company well in the coming year"

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 535 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

was puffery consisting of "nothing more than a general platitude that accompanies nearly every press release or public statement issued by a financial institution."

**\*8** Thus, because the statements made by Defendant Koch and argued by Plaintiffs to be false and misleading are actually nonactionable puffery, the Court finds that Plaintiffs fail to sufficiently allege facts regarding the first required element of a claim under Section 10b and Rule 10b-5, i.e., that Defendant Koch made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading. *See Grossman*, 120 F.3d at 1118. Accordingly, Claim One against Defendant Koch is **dismissed**.

### B. Claim One: Defendants Ersek, Scheirman, Agrawal, and Western Union [7]

[7]     Due to the repetitive nature of many of the statements to which Plaintiffs direct the Court's attention, the Court notes that it does not separately analyze every single statement but, rather, simply analyzes a material and representative sample of each category throughout Section III.B. However, the Court has considered the pleadings in their entirety. *See Adams*, 340 F.3d at 1093.

#### 1. Purported False or Misleading Statements

With respect to Defendants Ersek, Scheirman, Agrawal, and Western Union, Plaintiffs direct the Court's attention to the following purportedly fraudulent misrepresentations/ omissions, which they divide into four categories: (1) statements describing ongoing government investigations; (2) statements explaining increased compliance expenditures; (3) statements regarding legal compliance; and (4) statements touting compliance practices. *Response* [#63] at 36-53. In this section, the Court addresses the first three categories, reserving discussion of the fourth category for the scienter analysis below.

#### a. Government Investigations

Plaintiffs argue that Defendants made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding ongoing government investigations, including the investigations brought by four separate U.S. Attorney offices, the FTC, and state attorneys general. *Response* [#63] at 47-51.

### i. Filings with the Securities Exchange Commission ("SEC")

In support of this category of purportedly false/misleading statements regarding government investigations, Plaintiffs cite to the following allegations. *Id.* 1.

"On February 24, 2012, Western Union filed an annual report on Form 10-K with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "2011 10-K")." *Am. Compl.* [#40] ¶ 304. "The 2011 10-K...discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 308.

2. In March 2012, the Eastern District of Pennsylvania ("EDPA") served Western Union "with a federal grand jury [subpoena] seeking documents relating to Hong Fai... ." [8] *Id.* ¶ 264. "As the Class Period progressed, the Company received additional subpoenas from EDPA and the government interviewed several current Western Union employees as part of this investigation." *Id.*

3. On March 20, 2012, the Central District of California ("CDCA") "served the Company with a federal grand jury subpoena seeking documents relating to" U.S. Shen Zhou International Company ("Shen Zhou"). [9] *Id.* ¶ 265. "When CDCA served the Company with this subpoena, it informed Western Union that the Company itself was 'a target of an ongoing investigation into structuring and money laundering.' " *Id.*

**\*9** 4. "On May 1, 2012, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the first quarter of 2012, which ended on March 31, 2012 (the "Q1 2012 10-Q")." *Id.* ¶ 316. "The Company...described in its Q1 2012 10-Q several ongoing government investigations and claimed that all of these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 318.

5. "[A]t the May 9, 2012 Investor Day conference, Mike Salop, Western Union's Senior Vice President

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 536 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

of Investor Relations, specifically addressed DOJ's investigation into Shen Zhou—the agent in California that was arrested and late[r] pled guilty to structuring transactions—that the Company had announced in its 10-Q for the first quarter of 2012 and that Western Union was a target of. He represented that '[w]e believe the company has robust compliance and anti-money laundering policies and processes in place, and we look forward to demonstrating that fact to the U.S. Attorney's office in Los Angeles.' Salop went on to state that '[w]e are not aware of any evidence that suggests that the company or any of its employees knowingly engaged in any conduct with this former agent that would constitute a violation of the law.' " *Id.* ¶ 326. "He explained: 'We have been cooperating with the government in connection with this particular case for almost two years and assisted the government prior to the time the former agent was arrested, just as we cooperate on a daily basis with law enforcement departments throughout the U.S.' " *Id.* ¶ 250.

6. "On August 2, 2012, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the second quarter of 2012, which ended on June 30, 2012 (the "Q2 2012 10-Q")." *Id.* ¶ 341. "The Company...described in its Q2 2012 10-Q several ongoing government investigations and claimed that all of these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 344.

7. Filed February 22, 2013, the 2012 10-K signed by Defendants Ersek and Scheirman essentially repeated the information in the 2011 10-K in that it "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 365, 368.

8. "On April 30, 2013, the Company held a conference call in connection with the release of its earnings for the first quarter of 2013. During this call, an analyst noted the fact that Ersek had mentioned a few times earlier in the call at a general level new compliance and regulatory actions in addition to the Southwest Border Agreement that the Company had not disclosed previously and asked for more information about these activities. Ersek responded by explaining: 'It is no secret

that the financial service[s] overall get more regulated and within that also we want to be best-in-class. We create this culture of compliance within our company. And we – so that's the environment we are in currently and we see that as a long-term competitive advantage.' Then, at Ersek's request, Scheirman followed-up by elaborating as follows: '[A]s Hikmet said that we are committed to a strong culture of compliance and invest in compliance programs. And let me give you a flavor of maybe some things that have been ongoing not only in the first quarter, but prior quarters, too. We're doing things to really protect the customer and protect the business. They might be things such as real-time risk assessment when the transaction happens at the point-of-sale, verification programs related to high principal transactions where we – whereby we call back the sender and make sure the transaction is appropriate. But, as Hikmet mentioned, we believe this will be a long-term competitive advantage for us. Near term, there are some headwinds but it's the right investment to make in the business. We believe it'll be a competitive advantage and we continue to work towards that....***But we will continue to comply with the letter and the spirit of the law and really see that as a competitive advantage long term.***' (Emphasis added). Ersek then explained that the Company was working to adapt to the U.S. and global trend of increasing regulations. Scheirman added that the Company's efforts often went above and beyond its technical legal requirements. He represented that '***everything isn't necessar[ily] black-and-white and a rule, but we work with regulators in countries around the world to try to do the right thing for our business and for our customers.***' (Emphasis added)." *Id.* ¶ 374. "Later during this April 30, 2013 conference call, Defendant Scheirman explained that 'our goal is to comply with the letter and the spirit of the law, have best-in-class compliance programs, and really protect our customers and protect our businesses.' Defendant Ersek added, 'I think the general financial service industry is getting more regulated and we are very focused on that. I think we have a great compliance team in place and they are working hard. Generally, I see also being a market leader here as a competitive advantage.' " *Id.* ¶ 375.

**\*10** 9. "Specifically addressing the regulatory environment, Scheirman stated at [a] June 13, 2013 William Blair conference that 'the regulators start with the market leaders and we're clearly a market leader. And, again, we're going to partner with them because

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

we share the same goals of protecting our customers, protecting our business systems and so forth.' " *Id.* ¶ 386.

10. On November 25, 2013, the Middle District of Pennsylvania ("MDPA") "served the Company with a grand jury subpoena seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008." *Id.* ¶ 268. "When MDPA served the Company with this subpoena, it informed Western Union that the Company itself was the subject of this investigation." *Id.*

11. Filed February 24, 2014, the 2013 10-K signed by Defendants Ersek and Agrawal essentially repeated the information in the 2011 and 2012 10-Ks in that it "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 410, 413.

12. Filed July 31, 2014, the Q2 2014 10-Q signed by Defendants Ersek and Agrawal disclosed that the government had notified Western Union that it was a "target" of an investigation by the Southern District of Florida ("SDFL"). *Id.* ¶¶ 275, 428, 430.

13. Filed February 20, 2015, the 2014 10-K signed by Defendants Ersek and Agrawal essentially repeated the information in the 2011, 2012, and 2013 10-Ks in that it "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 446, 449.

14. Filed February 19, 2016, the 2015 10-K signed by Defendants Ersek and Agrawal, "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators. Although the 2015 10-K disclosed that MDPA 'indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012,' the Company continued to claim that all of these investigations—including MDPA's—were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 473, 476.

15. Filed on May 3, 2016, the Q1 2016 10-Q signed by Defendants Ersek and Agrawal contained "substantially the same representations" but further "disclosed that MDPA 'indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012.' The Company, however, continued to claim that all of its ongoing government investigations—including MDPA's—were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 482, 483.

16. Filed August 3, 2016, the Q2 2016 10-Q signed by Defendants Ersek and Agrawal contained substantially the same information as the Q1 2016 10-Q and further "disclosed that MDPA 'indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012,' and that the 'FTC staff has advised the Company that it has been directed to request authority from the FTC to file a complaint against the Company in United States federal court if it is not able to reach an agreement with the Company.' The Company, however, continued to claim that all of these investigations— including MDPA's and FTC's—were too preliminary for the Company to be able to predict their outcomes. The Company also contested the FTC's position by taking the strong position that '[i]f the FTC files a complaint against the Company, the Company intends to defend itself vigorously.' " *Id.* ¶¶ 488-89.

**\*11** 17. Filed November 1, 2016, the Q3 2016 10-Q signed by Defendants Ersek and Agrawal contained substantially the same information as the Q2 2016 10-Q and further "disclosed that the FTC advised the Company 'of its view that the Company violated Section 5 of the Federal Trade Commission Act and the Telemarketing Sales rule by failing to take timely, appropriate, and effective measures to mitigate fraud in the processing of money transfers sent by consumers' and that the FTC staff 'believes that the Company bears responsibility for principal amounts of what it alleges to be hundreds of millions of dollars in fraud-induced money transfers, or a multiple thereof based on the FTC's belief that fraud-induced money transfers are underreported by consumers, dating back to 2004.'

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 538 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

The Company continued, however, to claim that all of these investigations—including MDPA's and FTC's—were too preliminary for the Company to be able to predict their outcomes. The Company also contested the FTC's position by declaring that '[t]he Company strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof' and that '[i]f the FTC files a complaint against the Company, the Company intends to defend itself vigorously.' " *Id.* ¶¶ 492-93; *see also id.* ¶ 263. Plaintiffs emphasize that "even though multiple DOJ offices had already taken the position that Western Union committed serious compliance violations, even when Defendants disclosed in the Company's 10-Q for the third quarter of 2016, filed on November 1, 2016, that the Company 'anticipate[d] entering into discussions with the United States Department of Justice to potentially resolve the four investigations' being conducted by the EDPA, CDCA, MDPA, and SDFL, Defendants continued to take the position that '[d]ue to the stage of these matters and the fact that no criminal charges or civil claims have been brought, the Company is unable to predict the outcome of these matters.' " *Id.* ¶ 282.

18. As part of the January 2017 settlement agreement with the DOJ, "Western Union admitted in the Statement of Facts...that its employees knew that its analyses and internal reports show that the amount of losses from fraudulent transactions sent through the Company was much higher than the amount identified in the Company's [Consumer Fraud Reports ("CFRs") ] database, because not every victim reported fraud to the Company." *Id.* ¶ 155. "In addition, as the FTC found, fraud complaints in Western Union's database represent only a small percentage of the actual fraud perpetrated through Western Union's money transfer system because (a) as recognized by Western Union's own internal reports, the vast majority of fraud victims do not complain directly to the Company; (b) Western Union has failed to log in its complaint database all of the complaints and reports about fraud that it has received or the particular money transfers related to the complaints; and (c) in many countries, Western Union did not provide a fraud hotline or a toll-free phone number for victims to call to report fraud. Because of these multiple factors, the FTC determined that since 2004, Western Union has likely been used to send billions of dollars in fraud-induced payments to telemarketers and con artists worldwide." *Id.* ¶ 156.

**8** "Structuring" is an illegal practice in which a party evades "the law's recording and reporting requirements by breaking large transfers into multiple transactions at smaller amounts below the legal reporting threshold." *Am. Compl.* [#40] ¶ 63. Hong Fai was a Western Union agent which:

sent over $126 million in Western Union transactions from December 2007 through March 6, 2012. This agent was not terminated until March 19, 2012 even though Western Union admitted to DOJ in the Joint Settlement that "[a]s early as June 2007, [the Company] was aware of 'significant' compliance failures at Hong Fai involving structured transactions and failure to file [Suspicious Activity Reports ("SARs") ] for suspicious transactions." This knowledge was based on over a dozen onsite or transaction reviews that Western Union conducted. Western Union admitted that these reviews showed that the agent "repeatedly...violated certain elements of the [Bank Secrecy Act, as amended by the USA Patriot Act in 2001 (31 U.S.C. § 5311, et seq.), and rules promulgated thereunder (collectively, the "BSA") ] or certain aspects of Western Union policy." Despite Hong Fai's known and repeated violations that should have resulted in disciplinary action under Western Union policy, Western Union did not terminate the agent until 2012, only after law enforcement and Hong Fai's bank continued to raise concerns about illegal transactions and Hong Fai's failure to file SARs. Western Union also did not file any SARs identifying Hong Fai as a suspicious subject until after it terminated Hong Fai in 2012.

*Id.* ¶ 186; *see also* ¶¶ 187, 195.

**9** "...Western Union admitted that between 2005 and 2010, Shen Zhou, one of four particularly egregious agents that sent structured transactions to China, sent more than $310 million to China, approximately half of which were structured." *Am. Compl.* [#40] ¶ 112. "The head of Shen Zhou was arrested in 2010 for his structuring activities and pled guilty in December 2013 to structuring international money transfers." *Id.* ¶ 188. "After he was arrested, he told law enforcement authorities that a Western Union Sales employee told him that he could open another Western Union agent location in the same area. This Sales employee

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 539 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

even advised the agent on how to get away with this by cautioning him to use a relative's name instead of his own name when opening the new location." *Id.* ¶ 196. "[A]t a meeting of the Board's Governance Committee on September 22, 2010, attended by Defendant Ersek, it was discussed in reference to CDCA's investigation of Shen Zhou that a "large" Western Union agent in California was the subject of a criminal money-laundering investigation and that Western Union was "working with law enforcement to investigate the underlying activity." *Id.* ¶ 251.

**\*12** Plaintiffs do not contest that, "[s]tarting in the first quarter of 2012, Western Union's annual and quarterly filings signed by Defendants Ersek and Scheirman and Agrawal disclosed the existence of these investigations into the Company's AML and anti-fraud programs." *Response* [#63] at 47; *see also id.* (stating that "Defendants made many statements related to the ongoing government investigations by four separate U.S. Attorney offices, the FTC, and state attorneys general that would culminate in the Joint Settlement"). Plaintiffs also concede that, "[a]s the Class Period progressed, Defendants continued to disclose the existence and topics of information requested in these and other investigations" and further disclosed that "Western Union was a 'target' or 'subject' of these investigations." *Id.*

Plaintiffs' primary concern, though, is that Defendants "stated at all times that these inquiries were too preliminary to be able to predict their outcomes '[d]ue to the stage of these matters and the fact that no criminal charges or civil claims have been brought.' " *Response* [#63] at 47 (quoting *Am. Compl.* [#40] ¶ 282). Plaintiffs argue that "[t]hese descriptions of the many ongoing government investigations were false and misleading because Western Union's potential liability was in fact substantial." *Response* [#63] at 48. They state that "Defendants downplayed the likely outcome of ongoing government investigations when they knew of substantial compliance failures that subjected Western Union to the high risk of significant liability." *Id.* at 49. Plaintiffs also state that "Defendants do not get credit for disclosing the existence of these inquiries and providing generic warnings when they failed to disclose essential information showing that those inquiries raised risks that were far-more substantial than they let on." *Id.* They further argue that "Defendants failed to disclose the FTC's reasons for concluding that consumers underreported fraud" and that, regardless of Defendants' "subjective beliefs, they had a duty to disclose information

concerning FTC's position that contradicted the basis for their public statements." *Id.* at 49-50.

In support of their argument, Plaintiffs cite to several cases. *Id.* at 48. First, in *In re ITT Educational Services, Inc. Securities Litigation*, 34 F. Supp. 3d 298 (S.D.N.Y. 2014), contracts were signed between ITT (a for-profit college) and three student loan lenders which required ITT to pay for its students' loan default losses if those defaults reached a certain threshold. When the lenders informed ITT that the threshold had been reached and consequently began demanding "increasingly large sums of money," ITT continued to publicly represent that its liabilities "[w]ould be [i]mmaterial." The court held that the defendants' public statements that "they were not expecting any significant liability under the [contracts] and that they could not predict the maximum potential liability to which they were exposed" was actionable where the plaintiffs had alleged that the defendants "knew that their liability...would be substantial." Here, the Court notes that there are no allegations in the present case similar to the fact in *ITT* that Defendants publicly stated that they were not expecting any significant liability; rather, they only stated that they could not predict the outcome of those investigations.

Plaintiffs cite to three other cases in support of their argument. First, in *City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.*, No. 12-CV-5162, 2014 WL 4823876 (W.D. Ark. Sept. 26, 2014), the court held that the disclosure of an internal corruption investigation was misleading because the defendants omitted their prior knowledge of events, thereby misleading investors as to when the defendants learned of the suspected corruption. Second, in *In re Van der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005), the court held that a generic warning by the defendants regarding potential regulatory risks was affirmatively and materially misleading when the company already knew or was recklessly ignorant that its business strategy relied on practices that violated New York Stock Exchange trading laws. Third, in *SEB Asset Management S.A. v. Western Union Company*, No. 13-cv-03325-MSK-MJW, 2014 WL 5708522 (D. Colo. Sept. 29, 2015), the court held that statements acknowledging but downplaying the extent of Western Union's compliance problems in Mexico (statements like they "expected 'some slow down' " and "expected 'some challenges' ") gave rise to a duty to disclose after the point in time at which the defendants "would have had a meaningful estimate" of how many agents failed to meet compliance requirements. Based on allegations from a confidential witness, the court held

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

that details regarding an action the defendants themselves were thinking of taking (i.e., the termination of 7,000 agents) should have been revealed even if Western Union had not yet decided that it would terminate those agents, because just the "potential termination of a large number of agents" gave rise to a duty to disclose.

**\*13** In Response, Defendants argue that "they were not required to hazard guesses simply based on the potential severity of the outcome – even if that outcome may later have come to pass." *Reply* [#70] at 58. They point out that "there were numerous factors potentially affecting the resolution or outcome of the investigations" and that "Plaintiff simply ignores all of these variables." *Id.* at 59.

In support, Defendants cite to the following cases. *Id.* at 58. First, in *In re FBR Inc. Securities Litigation*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008), the court held that there was no duty to disclose an "alleged regulatory violation related to a single, isolated event" in the absence of the risk having become a "near certainty." Second, in *Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995), the Second Circuit held that prior United States Food and Drug Administration "(FDA)" inspections which did not result in "any sanctions" or "other adverse consequences" were not material and that the defendants need not disclose upcoming FDA inspection where an adverse result was not a "foregone conclusion." Third, in *In re Marsh & McLennan Companies, Inc. Securities Litigation*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006), the court held the defendants need not disclose where the result was not "substantially certain to occur" but that statements such as how the company "led the industry in terms of disclosure" were thus actionable. Fourth, in *Anderson*, 827 F.3d at 1229, the Tenth Circuit held that "the magnitude of the loss that Spirit ultimately sustained" did not necessarily constitute securities fraud when the plaintiffs' argument "amount[ed] to allegations of 'fraud by hindsight.' " *see also In re Sanofi Securities Litigation*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015) (similarly cautioning against finding "fraud by hindsight"). Fifth, in *Société Générale Securities Services, GcmH v. Caterpillar, Inc.*, No. 17 cv 1713, 2018 WL 4616356, at \*6 (N.D. Ill. Sept. 26, 2018), the plaintiff had "essentially argue[d] that [the defendant] should have admitted a securities or tax law violation while the investigations were ongoing and the failure to do so was both a material omission and a misstatement." The court found "such a position untenable. If every investigation or executed search warrant was evidence of wrongdoing then what purpose do hearings and trials have[?].. . [S]ecurities laws generally do not impose such a

duty upon publicly traded corporations to confess uncharged, unadjudicated claims of wrongdoing."

The Court agrees with Defendants that the statements regarding ongoing government investigations during the Class Period were not false or misleading. For example, in 2012, 2013, 2014, and 2015, the annual 10-K filings each disclosed the investigations, stated that Western Union "could face significant fines, damage awards or regulatory consequences" and that the investigations "could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows." *See* [#57-3] at 22; [#57-13] at 24-25, 35-36, 39; [#57-19] at 31-32, 39; [#57-22] at 32-33, 41-42. Western Union disclosed that there were investigations and that the results of those investigations could be significant and material. Plaintiffs argue that the statements were false and misleading because Western Union's potential liability was substantial and that the "generic warnings" were insufficient. However, in their Response [#47] they have not pointed to what specific additional information they believe Western Union should have disclosed, and on the basis of these pleadings, the Court cannot determine that the investing public was deceived because Defendants stated that the investigations were too preliminary to predict their outcomes. The allegations before the Court, while certainly grave, fall far short of a finding that the outcomes of the investigations were near certainties or foregone conclusions.

**\*14** Plaintiffs relatedly argue that Defendants should have disclosed "the FTC's reasons for concluding that consumers underreported fraud" and that Defendants "had a duty to disclose information concerning FTC's position that contradicted the basis for their public statements." *Response* [#63] at 49-50. In support, Plaintiffs cite to *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318, 1326, 1329 (2015). However, the cited portions of *Omnicare* do not precisely stand for the proposition as enunciated by Plaintiffs. While *Omnicare* strongly suggests that a company should make clear, if it makes a statement, whether "the Federal Government [is] taking the opposite view," nothing in the decision mandates that the company must fully lay out the opposing view's arguments and reasoning, as Plaintiffs appear to assert here. 135 S. Ct. at 1329; *Response* [#63] at 49-50. Further, to the extent that Plaintiffs argue that Defendants lied or misled regarding whether it agreed with the FTC's position that "consumers underreported fraud," it is clear that Defendants only stated that they disagreed with "potential liability

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 541 of 573
Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)
2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

and any scope thereof," and not that they disagreed that "consumers underreported fraud." *Response* [#63] at 49; *Reply* [#70] at 60; *see also* [#57-25] at 11.

In short, the Court finds that the allegations here described by Plaintiffs do not constitute legally actionable false or misleading statements.

### ii. 2013 & 2014 Statements by Defendants Ersek and Agrawal

Next, Plaintiffs direct the Court's attention to three statements made by Defendants Ersek and Agrawal in 2013 and 2014. First, with respect to Defendant Ersek, they point to the following allegation:

> On February 12, 2013, Western Union issued a press release announcing its financial results for the fiscal year and fourth quarter of 2012. On the Company's earnings conference call that was held the same day, an analyst asked "what gives you confidence that there is nothing in the compliance or something that stings you that you don't know about[?] I mean I guess one of the ways to think about it I guess is there's probably – is there anything out there that can be as large as the situation that happened with [the Southwest Border Agreement] that can have that kind of an impact on price?" In response, Defendant Ersek represented: "The regulatory environment is challenging. Obviously we are in very regulated market, but all our investments, about $100 million a year we invest in anti-money laundering and compliance, are really putting us as an industry standard. Being a market leader puts us in an industry standard, and we want to be a best-in-class and see that as a long-term as a competitive advantage. I think regulators are looking also at us, and we do have a duty to satisfy customer needs and we are working very hard on that."

*Am. Compl.* [#40] ¶ 360. Plaintiffs further allege that on this same conference call "Defendants Ersek and Scheirman also continued to characterize the Company's compliance-related issues as limited to Mexico and Latin America as part of the Southwest Border Agreement, rather than the Company's more comprehensive failure to comply with pre-existing basic AML and anti-fraud requirements." *Id.* ¶ 361.

Second, also with respect to Defendant Ersek, Plaintiffs direct the Court's attention to the following allegation:

At a May 8, 2013 Jefferies Global Technology, Media and Telecom Conference, Defendant Ersek stated that the "regulatory environment" is "one of our biggest competenc[ies] here" as to the cross-border nature of the Company's business. The Jefferies analyst leading the discussion then picked up on these statements, as well as Defendants' consistent statements elsewhere that its compliance efforts are a "competitive advantage," and asked if the "worst is over" in terms of "compliance-related events." Ersek responded that "compliance culture is in our DNA[ ]. Meanwhile, I think, creating this culture of compliance is something that it's very important" because of the life-changing benefits of remittances that customers receive through the Company.

*\*15* *Id.* ¶ 381.

Third, with respect to Defendant Agrawal, Plaintiffs direct the Court's attention to the following allegation:

> In the Company's earnings conference call for the first quarter of 2014, held on May 1, 2014, Defendant Ersek stated as to the Company's ongoing compliance costs that "from today's points of view, I think, the team is doing a great job putting the teams right in place, that we have the compliance programs that it's competitive, even a competitive advantage. And I can see that part of that competitive advantage already in some countries like Mexico. ...And it's all over actually...and I think, we have a good program that we covered world[wide] with that investment....We did put programs, compliance programs, agent programs into place [in Mexico]. They're working." Then, in response to an analyst's question about MDPA's investigation into Western Union's compliance efforts, which the Company disclosed in its 2013 10-K, Defendant Agrawal represented that "[i]t's early in the process and it's something that we're working through. We have good monitoring systems in place. We have a multi-faceted program to prevent consumer fraud, and outreach program with consumers. So, that's about all we can say right now and we're working through that."

*Id.* ¶ 417.

Plaintiffs assert that "[b]y making these positive statements concerning ongoing regulatory investigations, Defendants were required—but failed—to give investors the full picture and disclose the underlying compliance failures that gave rise to the substantial risk of liability that Western Union

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

faced." *Id.* at 51. In response, Defendants cite *Employees Retirement System of the City of Providence v. Embraer S.A.*, 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018), in which the court agreed with the argument that "[t]he Amended Complaint is premised on the faulty notion that Embraer was required to disclose details of the [United States Foreign Corrupt Practices Act] violations and admit that it had engaged in wrongdoing—before it had even been charged and before the investigations were even complete. However, the Second Circuit has held that disclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."

The Court finds that Plaintiffs overstate their case regarding Defendants' statements describing then-ongoing government investigations. First, regarding the February 12, 2013 statement by Defendant Ersek that the Company was a "market leader," *Am. Compl.* [#40] ¶ 360, Plaintiffs provide no allegations that, despite any problems Western Union may have been experiencing, the company was not still a market leader in this realm. For example, they could have alleged other companies which were actually market leaders at this time. Second, regarding the May 8, 2013 statement by Defendant Ersek that "compliance culture is in our DNA," the Court finds (despite Plaintiffs' assertion to the contrary, *see Response* [#63] at 50 n.20) that this type of statement is nothing more than unverifiable puffery. *See Grossman*, 120 F.3d at 1118. Third, Plaintiffs point to Defendant Agrawal's May 1, 2014 statement that "'[i]t's early in the process and it's something that we're working through. We have good monitoring systems in place. We have a multi-faceted program to prevent consumer fraud, and outreach program with consumers." When read in the full context of Plaintiff's allegations, as provided above, it is clear that the point was made that there was an ongoing investigation, and accordingly, the Court finds that Defendant Agrawal's subsequent statement constitutes nothing more sinister than vague statements of corporate optimism, which are simply not actionable under the securities laws. *See Pirraglia*, 339 F.3d at 1189. In short, the Court finds that the allegations here described by Plaintiffs do not constitute legally actionable false or misleading statements.

**\*16** Accordingly, to the extent Claim One is based on this category of purportedly false and misleading statements regarding government investigations, Claim One is **dismissed** against Defendants Ersek, Scheiman, Agrawal, and Western Union.

**b. Compliance Expenditures**

Plaintiffs argue that Defendants made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding compliance expenditures. *Response* [#63] at 51-53. In addition to certain previously-quoted allegations which the Court has reviewed, [10] Plaintiffs cite to the following allegations in support of this category of purportedly false/ misleading statements. *Id.* 1.

Two years prior to the Class Period (which begins on February 24, 2012), "[a]t a meeting of Western Union's Board of Directors on February 24-25, 2010, attended by Defendants Ersek [and] Scheiman, [i]t was...discussed...that Western Union conducted a test of 1,014 of its U.S.-based agents that showed that 27% of the agents visited during the review failed to meet compliance requirements. Based on these findings, Western Union retrained only 188 agents and did not take further steps to correct the issue outside of the sample that participated in the test." *Am. Compl.* [#40] ¶¶ 95-96.

2. "In the [August 2, 2012] Q2 2012 10-Q, the Company stated, in relevant part:

Enhanced Regulatory Compliance

We regularly review our compliance programs. In connection with that review and growing global regulatory complexity, and as we dialogue with governmental and regulatory authorities, we have made, and continue to make, enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity. These enhancements, along with other enhancements to improve consumer protection related to the Dodd-Frank Act and other matters, have resulted in, and in coming quarters we expect them to continue to result in, changes to certain of our business practices and increased costs. We believe some of these changes will have an adverse effect on our business, financial condition and results of operations.

*Id.* ¶ 342.

3. "[A]t th[e] November 7, 2012 Citi Financial Technology Conference, Defendant Scheirman blamed

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 543 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

the Company's compliance costs and issues on 'glob[al]' trends, stating that '[w]e now spend over $100 million a year on compliance and just given how the compliance requirements are generally tightening around the globe, that's one spend we'll probably continue to increase as we move forward.' " *Id.* ¶ 358.

4. "On February 14, 2013, ...at the Goldman Sachs Technology & Internet Conference, Defendant Ersek explained that the Company was well-positioned to build its digital platform because 'we have the anti-money laundering system, we have everything there that we don't have to deal with so we are really building on our existing fundamentals and new channel on the send side called westernunion.com. That's the biggest advantage.' Ersek also continued to describe the Company's efforts to 'upgrade our compliance activities' as limited to the Southwest Border area and described these efforts as setting the 'long term industry standard and a competitive advantage for us,' rather than meeting minimum and basic legal requirements.' " *Id.* ¶ 363. [11]

**\*17**  5. In the 2012 10-K, filed on February 22, 2013, the Company stated, in pertinent part:

> Our business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or their subagents to comply with those laws and regulations or their interpretation and increased costs or loss of business associated with compliance with those laws and regulations could have an adverse effect on our business, financial condition and results of operations....
>
> ...While we believe our fraud prevention efforts are effective and comply with applicable law, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem....
>
> \*\*\*
>
> We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory

requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements....

> \*\*\*
>
> ...While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.
>
> \*\*\*
>
> Our agents' or their subagents' failure to comply with federal and state laws and regulations as well as laws and regulations outside the United States could have an adverse effect on our business, financial condition and results of operations.

*Id* ¶ 366.

6. "On July 30, 2013, the Company held a conference call in connection with the release of its earnings for the second quarter of 2013. In response to a question about future compliance costs, Defendant Scheirman stated that compliance costs would likely increase as a result of the changing regulatory environment, rather than because of the Company's failure to meet current compliance requirements. He stated...'that having a robust compliance program and a strong culture of compliance is very important to us. And so broadly as we think about the global landscape, the regulatory environment continues to move. So as I think about 2014 and 2015, right now I'd expect our compliance and regulatory costs to increase. But what's important about that is that it protects the brand, it protects the customer, it protects our agents. And longer term we believe that's going to be a competitive advantage because of our scale and our scope of what we can do with compliance and the regulatory.' Defendant Ersek then added that 'I do see that as a competitive advantage. We have really the culture in our company. And the most importantly, it protects the consumer....We comply with all regulations world[wide] and try to be the best in class and leading our industry here.' " *Id.* ¶ 388.

Case 4:24-cv-01940     Document 44-4     Filed on 01/27/25 in TXSD     Page 544 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

**\*18** 7. "On October 29, 2013, the Company reported its third quarter 2013 financial results. A main topic on the Company's earnings conference call for the third quarter of 2013, held on that day was the Company's surprisingly high increase in compliance costs for 2014. Defendant Ersek stated:

As you are aware, regulatory requirements and expectations around financial service companies are escalating around the world. Some banks have recently faced large fines, and some have announced billions of dollars of incremental investments in compliance areas. The environments continue to evolve. In the U.S., for example, we recently initiated agent procedures at our 50,000 agent locations to comply with the Dodd-Frank Remittance Transfer Rule. And I am pleased to report that the procedures were implemented in time for the October 28 deadline. As we mentioned, earlier this year we have previously implemented new anti-money laundering and fraud prevention enhancements in countries such as Spain and UK.

Specifically addressing the Southwest Border Agreement, Ersek stated that 'in the U.S., we are now working with our third monitor on the Southwest Border Agreement. As noted in an 8-K filed today, we have agreed to an additional short-term extension to this agreement to continue discussing amendments. We could not conclude discussions on a long-term expansion under the previous timeframe for reasons including the recent passing of Arizona's primary attorney on the matter.' " *Id.* ¶ 397. "Defendant Ersek also stated on this October 29, 2013 call that '75% of our network [of agents] are banks and financial institutions,' which 'choose us because we have high standards on compliance.' He also stated that the Company's surprisingly high increase in compliance costs for the following year was 'not specific to the Western Union.' Ersek stated that Western Union was 'a market leader' setting the 'industry standard.' " *Id.* ¶ 398. "At the end of this October 29, 2013 conference [c]all, an analyst stated that Defendants' comments earlier in the call 'sound[ed] like what you guys are saying if you kind of roll up all this commentary is that, it's essentially going to cost you more than you previously thought to comply with regulations that you already knew about...as opposed to new regulations having just popped up in the last couple of months since the last earnings call.' After Defendant Ersek's equivocal response to this question,

Michael Salop, the Company's Senior Vice President of Investor Relations, stated that '[a] lot of these things are not necessarily black and white or haven't been historically. So when we work with regulators around the world and around the states and you get clarification on what's needed and make agreement on what programs you'll do, these things are kind of fluid. And so some of these are interpretations of older rules, some of these are new things, some of these are just clarifications with the regulators, some of them are own reviews, so there's a lot of different things going in here.' " *Id.* ¶ 399.

8. "The reason for the market's negative reaction was because of the Company's substantial increase in compliance costs, and corresponding decrease in projected profits that resulted directly from those costs. As Bloomberg reported on October 30, 'Western Union Plunges 19% as Compliance Costs Rise.' Indeed, Moody's Investors Service downgraded the rating of Western Union's senior unsecured debt on November 18, 2013 because of the Company's 'unexpected increase in compliance related costs' and the Company's projection that it would not have any operating profit in 2014 as a result of those compliance costs." *Id.* ¶ 503. "These increased compliance costs were a direct result of the Company's compliance failures discussed above. Although the Company did not disclose it at this time, it took these steps as a result of the ongoing government compliance failures and investigations that resulted in the Joint Settlement." *Id.* ¶ 504.

**\*19** 9. The 2013 10-K, filed on February 24, 2014, largely repeated the same statements in the 2012 10-K, *see* § III.B.1.b.5., with the following pertinent additions/alterations:

Our business is subject to a wide range of laws and regulations. Liabilities or loss of business resulting from a failure by us, our agents or their subagents to comply with laws and regulations and regulatory or judicial interpretations thereof, including laws and regulations designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity, and increased costs or loss of business associated with compliance with those laws and regulations has had and we expect will continue to have an adverse effect on our business, financial condition and results of operations....

**Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)**

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

...While we believe our fraud prevention efforts are effective and comply with applicable law, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem....

...In 2013, the Company spent over $150 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona....

\*\*\*

If we are unable to maintain our agent, subagent or global business payments networks under terms consistent with those currently in place, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected....

*Id.* ¶ 411.

10. A year later, the 2014 10-K, filed on February 20, 2015, largely repeated the same statements in the 2013 10-K, *see* § III.B.1.b.9., with the following pertinent additions/ alterations:

Our business is subject to a wide range and increasing number of laws and regulations....

\*\*\*

...As of December 31, 2014, these programs included approximately 1,900 dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance....In 2014 , the Company spent over $180 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona....

\*\*\*

If we are unable to maintain our agent, subagent or global business relationships under terms consistent with those currently in place, including due to increased costs or loss of business as a result of increased compliance requirements or difficulty for

us, our agents or their subagents in establishing or maintaining relationships with banks needed to conduct our services, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected...

*Id.* ¶ 447.

11. "At a June 9, 2015 William Blair Growth Stock Conference, Defendant Agrawal stated:

Our cross-border platform is really what sits at the center of our global money transfer business and I really believe that's unrivalled [sic] in its capabilities ....Our strong regulatory and compliance capabilities: we've been investing in this area for quite some time and we continue to strengthen our capabilities here, and we believe it's going to be a long-term competitive advantage for us in this global and complex environment that we're operating in....

**\*20**  So the significant investment we've made in the compliance area is helping us stand apart from the rest of the market. And I believe that will be more and more the case....

And nobody really has the great technology and compliance engine in the middle that I talked about. That's very, very difficult to replicate for anybody. Very few players in the market have that kind of capability."

*Id.* ¶ 459.

12. "On the earnings call for the third quarter of 2015, held on October 29, 2015, Defendant Ersek stated:

We do see in some markets that competitors are finding it difficult to operate in the market because the regulatory environment is quite – asking a lot of questions and a lot of demands for them. And as you recall, we invested – started to invest about three years ago heavily into compliance. And obviously, we do see that pay back. And this year, investments will be about – it's currently running about 3.7% of our revenue.

But it's kind of a competency now for us, running the transaction through our compliance programs in a way that's like an engine makes us definitely in way

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

– a big competitive advantage. It means also that this regulatory environment will be in 200 countries. The compliance regulatory challenges won't be less in the future, that will continue. And we are committed to be in 200 countries where we operate and comply with the regulators. And it means also that we will be there, and that could be long-term a competitive advantage."

*Id.* ¶ 465.

13. A year later, the 2015 10-K, filed on February 19, 2016, largely repeated the same statements in the 2014 10-K, *see* § III.B.1.b.10., with the following pertinent additions/alterations:

...Liabilities or loss of business resulting from a failure by us, our agents or their subagents to comply with laws and regulations and regulatory or judicial interpretations thereof, including laws and regulations designed to protect consumers, or detect and prevent money laundering, terrorist financing, fraud and other illicit activity, and increased costs or loss of business associated with compliance with those laws and regulations has had and we expect will continue to have an adverse effect on our business, financial condition, results of operations, and cash flows....

***

...As of December 31, 2015, these programs included approximately 2,200 dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance....In 2015, we spent approximately $200 million on our compliance and regulatory programs....

***

If we are unable to maintain our agent, subagent or global business relationships under terms consistent with those currently in place, including due to increased costs or loss of business as a result of increased compliance requirements or difficulty for us, our agents or their subagents in establishing or maintaining relationships with banks needed to conduct our services, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition,

results of operations, and cash flows would be adversely affected....

**\*21**  *Id.* ¶ 474.

14. "[A]t th[e] March 10, 2016 Investor Day Conference, David Thompson, Western Union's Chief Technology Officer, stated:

[W]e now have a state-of-the-art compliance platform both based on technology and people or compliance professionals....And we built this technology to prevent fraud in our network, protect our customers....And this is a very powerful capability for us in monitoring the suspicious activity and monitoring aggregation rules for our customers.

These rules also prevent and help us detect human trafficking, terrorist financing, child exploitation, and other activities that may not be allowed, like Internet gambling and associated activities. These rules are also in place to allow us to screen against government sanctions lists, and politically exposed lists provided by various governments. Now these are our proprietary tools that we've created that are a long-term competitive advantage for Western Union, and are very powerful capabilities that we provide to our partners and our customers.

So, in summary, at Western Union, we've created new technologies and platforms and processes to serve our customers. And we're now really at a state where we've transformed our capabilities....And it's exciting to be a part of this transformation at Western Union and deliver technologies that move money for better."

*Id.* ¶ 480.

15. "At a May 25, 2016 J.P. Morgan Global Technology Media and Telecom Conference, Defendant Ersek stated:

We came forward and made a big announcement that we're going to upgrade our, significantly we were always very focused on compliance, but significantly upgrade our compliance environment because the world was changing....

Western Union is, especially with the environment, helping the law enforcement governments to move good money. That's why we invested in the compliance. I think we don't want that money

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

because the good money supports people, supports governments, supports law enforcement, helps law enforcement...in a very efficient way. Money will move anyway, but it should move in a regulated way.

*Id.* ¶ 486.

16. "[T]he Federal Trade Commission ("FTC") found that for many years, Western Union knew that it failed to implement effective anti-fraud and AML programs 'to adequately and effectively detect and prevent consumer frauds employing Western Union's money transfer system.' The Company had knowledge of these inexcusable compliance deficiencies based on, among other things, '[i]nformation contained in Western Union's internal reports, communications, and other records demonstrat[ing] that the company has been aware of high levels of consumer fraud involving particular countries and agents, including network agents Western Union itself owns.' " *Id.* ¶ 9.

17. "As the Class Period progressed and Western Union became further ensnared in the government investigations that led to the Joint Settlement, the Company claimed to have begun taking steps to improve its compliance practices. The Statement of Facts that Western Union negotiated with DOJ to reach the Joint Settlement states that by September 2012—over six months after the Class Period began—Western Union began taking certain steps to improve its anti-fraud and AML compliance programs. But these efforts were too little, too late. As the DOJ Statement of Facts states, the Company did not significantly increase the number of compliance employees or its compliance budget until 2013 through 2015, well into the Class Period. Other remedial measures referenced in the Statement of Facts are not given specific dates, but rather, are described as 'continu[ing]' efforts. Western Union also admitted to DOJ that it willfully failed to implement an effective AML program and that it aided and abetted wire fraud through December 2012." *Id.* ¶ 144.

**\*22** 18. "In addition, even if Western Union implemented certain compliance measures beginning in late 2012, those efforts failed to cure the most serious compliance deficiency that the Company experienced. The FTC determined that although Western Union improved certain aspects of its anti-fraud program since 2012 because of the FTC's ongoing investigation, the Company continued well past that time to fail

'to promptly suspend and terminate agent locations facilitating fraud. Instead, Western Union has continued to profit from the activities of these agents.' These failures extended to agent 'locations that appeared to be complicit in paying out fraud-induced money transfers or repeatedly failed to comply with Western Union's anti-fraud and AML programs, policies, and procedures.' " *Id.* ¶ 148.

10    *Am. Compl.* [#40] ¶¶ 360-61 (*see* § III.B.1.a.ii.), ¶ 374 (*see* § III.B.1.a.i.8.), ¶ 483 (*see* § III.B.1.a.i.15.), ¶ 489 (*see* § III.B.1.a.i.16.), and ¶ 493 (*see* § III.B.1.a.i.17.).

11    The cited paragraph actually states, "[o]n February 14, 2013, 2012, at the Goldman Sachs Technology & Internet Conference...," but the context of this paragraph indicates that "2013," not "2012," is the correct date.

Plaintiffs argue that Defendants "falsely characterized the reason for Western Union's compliance expenditures during the Class Period." *Response* [#63] at 51. They state that "[a]ll of these statements were false and misleading because —contrary to the reasons that Defendants gave—Western Union's compliance expenditures were actually made in response to government investigations into the compliance failures that formed the basis for the Joint Settlement." *Id.* "When giving these reasons, Defendants left out the key reason for those efforts. Once Defendants chose to discuss Western Union's rationale for its increased compliance efforts, they had a duty to do so forthrightly and without omitting the most important reason." *Id.* at 52. They state that "Western Union's reason for its compliance expenditures is an objectively verifiable fact," and that "[t]he Joint Settlement makes clear that the actual reason for the Company's increased compliance costs was its reaction to the government investigations and its awareness of its significant compliance failures." *Id.*

In support, Plaintiffs cite to *Nakkhumpun v. Taylor*, 782 F.3d 1142 (10th Cir. 2015), in which the defendant had stated publicly that there was only one reason why something had occurred, i.e., that a deal to purchase a portion of the company had purportedly fell through because the potential buyer was unable to get financing, when the plaintiff had alleged facts clearly showing there was a different reason, i.e., that the investor's CEO had "unambiguous[ly]" stated that the deal fell through because the company was not worth what his company had initially thought. The Tenth Circuit held that the

Case 4:24-cv-01940 Document 44-4 Filed on 01/27/25 in TXSD Page 548 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

defendant had falsely "attributed the impasse to" financing difficulties rather than valuation concerns, and that even if the defendant's stated reason was one of several possible reasons for an event, "[t]he existence of multiple explanations is what made [the defendant's] statement misleading." *Nakkhumpun, 782 F.3d at 1149.*

However, in reading the allegations as a whole, the Court believes that Plaintiffs overstate the effect of Defendants' individual statements here. First, unlike *Nakkhumpun,* the statements here do not "unambigious[ly]" state, or even suggest, that there was only one reason for increased compliance expenditures. Second, there is no indication in these allegations that "global trends" and "increasingly complex regulatory requirements" were not or could not have been additional reasons for increased compliance expenditures. Third, as Defendants argue, the FTC statement cited by Plaintiffs ("[A]s a result of the FTC's investigation, Western Union has improved aspects of its anti-fraud program since 2012.") refers to improvements, rather than investments, refers only to anti-fraud programs and not to AML specifically or other compliance areas, and does not indicate that the FTC investigation was the only reason Western Union increased its compliance expenditures regarding anti-fraud programs. *Reply* [#70] at 63 (citing *Response* [#63] at 51).

**\*23** Fourth, the Court is not convinced by the citations provided by Plaintiffs that Defendants characterized the Company's compliance difficulties and increased efforts as limited to issues raised by the SBA. *Am. Compl.* [#40] ¶¶ 361, 363, 447. The first statement cited by Plaintiffs discusses the transcript of a February 12, 2013 conference call, but there is no indication here that Defendants Ersek and Scheiman "continued to characterize the Company's compliance-related issues as limited to Mexico and Latin America as part of the [SBA], rather than the Company's more comprehensive failure to comply with pre-existing basic AML and anti-fraud requirements," as argued by Plaintiffs. *Id.* ¶ 361; *Defs.' Ex. 93* [#70-8] at 3. [12] The second statement cited by Plaintiffs discusses how pricing changes were related to issues raised by the SBA. *Id.* ¶ 363 (quoting *Defs.' Ex. 94* [#70-9] at 13). The third statement cited by Plaintiffs clearly shows that the SBA was only a partial reason for increased compliance expenditures: "In 2014, the Company spent over $180 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona...." *Am. Compl.* [#40] ¶ 447.

[12] "[N]otwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Hampton v. root9B Techs., Inc., 897 F.3d 1291, 1297 (10th Cir. 2018)* (internal quotation marks and brackets omitted). Thus, the Court can examine this document (and others cited in this Order) as one that is centrally referred to in the Amended Complaint and whose authenticity is not disputed. Here, specifically, the Court notes that, although only one page of the transcript is provided by Defendants, Plaintiffs have not disputed the accuracy of the transcript or argued that a full transcript is required in order for the Court to accurately review its contents.

In short, the Court finds that Plaintiffs have failed to adequately allege that the statements in this category regarding compliance expenditures were legally actionable untrue or misleading statements of material fact, or that Defendants failed to state material fact necessary to make these statements not misleading. Accordingly, to the extent Claim One is based on this category of purportedly false and misleading statements regarding compliance expenditures, Claim One is **dismissed** against Defendants Ersek, Scheiman, Agrawal, and Western Union.

### c. Compliance Practices

Plaintiffs argue that Defendants also made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding compliance practices. *Response* [#63] at 41-47. In addition to certain previously-quoted allegations which the Court has also reviewed, [13] Plaintiffs cite to the following allegations in support of this category of purportedly false/ misleading statements. *Id.*

1. "On March 13, 2012, [D]efendant Scheiman attended the Credit Suisse Global Services Conference. In response to a participant question about how the Company would maintain its pricing advantages in the face of competition from other companies offering similar services, Scheiman stated that Western

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 549 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

Union's 'compliance programs' were 'really competitive strengths for us.' " *Am. Compl.* [#40] ¶ 311.

2.  "On May 9, 2012, Western Union hosted an Investor Day for analysts, media representatives and investors. Defendants Ersek and Scheirman made positive statements during their presentation about the Company's compliance and regulatory capabilities. For example, Defendant Ersek focused a portion of his prepared remarks on describing the supposed strengths of Western Union's compliance and regulatory capabilities. He stated:

> **\*24** These strengths separate us from the competitors. I believe they are a huge competitive advantage. Our global network, our strong brand, our global organization and resources and our regulatory and anti-money laundering capabilities, there are not many companies worldwide which could show these capabilities to you....
>
> Our fourth competitive advantage is our global anti-money launder[ing] and regulatory capabilities. The regulations around our business are really highly complex, and we have regulatory complexity in all our markets. We have to comply with various Acts and interdictions lists around the world, as well as maintain a very active risk management system to detect and deter potential money laundering activities.
>
> It sounds complex, and indeed it is complex, but we see that as a competitive advantage, as we comply with various Act and interdictions lists around the world in 200 countries....
>
> To protect our customers, our brand, to comply with rules and regulations, globally we dedicate about 600 employees around the globe to these efforts, and we spend nearly about $60 million on anti-money laundering and regulatory environment."

*Id.* ¶ 321. "Later during this May 9, 2012 Investor Day conference, Defendant Ersek stated that Western Union had an advantage over technology companies because 'it's important to remember Western Union is today['s] market leader in money transfer business. We have built an incredible network over the years, now with 500,000 retail locations in 200 countries and territories. Our brand is well known and trusted around the globe. We have the regulatory and anti-money laundering capabilities to operate in all countries.' Ersek subsequently closed the

conference by stating that the complexity of the business, including the 'regulatory environment' was good because although '[i]t scares to death, the competitors to enter this market,' Western Union has 'the competencies' to address these issues." *Id.* ¶ 322. "Also during this Investor Day conference, Defendant Scheirman stated in his prepared remarks that Western Union's 'compliance and regulatory capabilities' were among its 'strengths' that would allow the Company to 'deliver strong returns' for shareholders in the coming years." *Id.* ¶ 323.

3. "On May 16, 2012, Defendants Scheirman and Stockdale attended the J.P. Morgan Global Technology, Media and Telecom Conference. In response to an analyst's questions as to how Western Union could compete with technology startups, Scheirman responded that 'clearly just our compliance capabilities' were one of the Company's main advantages over other companies." *Id.* ¶ 328.

4. "On June 12, 2012, Western Union attended a William Blair & Co LLC Growth Stock Conference call for analysts, media representatives and investors. During his opening remarks, Defendant Ersek continued to represent that the Company's compliance efforts were a competitive 'strength.' He specifically touted the Company's AML program as a way of enabling customers to 'trust' in the Company. Ersek stated:

> Before I discuss about our future strategies, let me talk about the core strengths of Western Union....And ***the fourth one is the regulatory and anti-money laundering capabilities of Western Union. All thiscombination gives us a unique opportunity and unique fundamentalsfor Western Union*** ....
>
> ***One of our very strong competitive advantages is our regulatory environment, our regulatory and anti-money laundering competency capabilities. It scares to death the competition to enter this market, the regulatory environment. And I always say, I know it's sometimes tough, but I always say it's good that the regulatory environment and we, as Western Union, have these capabilities to serve the customers and give the trust to the customers they believe at Western Union....***
>
> **\*25** It's not that easy to have a money license in Gabon and Brazil or other states I'm talking about, *so it's a competitive advantage for Western Union and we are very proud of that*. (Emphasis added)."

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

*Id.* ¶ 333. "Later during this June 12, 2012 conference call, when an analyst asked about competition for sending money cross-border from companies such as PayPal, Defendant Ersek responded by again claiming that the Company's regulatory compliance efforts provided it with a competitive advantage. He stated, 'You have to get the regulatory environment, somebody has to do that. It's not easy to do that. You have to build the anti-money laundering [program], somebody has to do that. ...So that has been definitely something we are very proud [that] we buil[t].' " *Id.* ¶ 334.

5. "On July 24, 2012, Western Union issued a press release announcing its financial results from the second quarter of 2012. During the conference call that Western Union hosted that day after releasing their results, Defendant Ersek began his prepared remarks at the outset of the call by reiterating his message that the Company's 'global compliance capabilities' gave it a 'strong' foundation and 'competitive strength.' " *Id.* ¶ 336. "Later during the July 24, 2012 conference call, Defendant Scheirman described the effect of the Company's compliance efforts as part of the Southwest Border Agreement. He stated that '[w]e expect global spending on compliance activities over the next couple of years will not change significantly from the 2012 levels as the breadth and complexity of requirements and sustainability around the globe continues to expand, but we view our ability to adapt to this environment as a long-term competitive advantage.' " *Id.* ¶ 337. "In response to an analyst's question later during this July 24, 2012 conference call concerning compliance costs, Defendant Ersek responded that the Company was 'very focused here and we are very serious' about 'upgrading our compliance.' He continued:

'[I]t's a competitive advantage, long term. I think we are investing heavily here to be, really acting as an industry leader. We are setting the tone here. And I think we are very focused here and I see that there is definitely a competitive advantage.' " Defendant Ersek subsequently repeated this message when he stated that '[a]s an industry leader, obviously, we are very active here upgrading, investing heavily' in order to address new regulatory and compliance issues." *Id.* ¶ 338.

6. "On September 18, 2012, Western Union issued a press release announcing that it was hosting the 7th Annual Anti-Money Laundering, Anti-Fraud and Compliance

Conference in Denver, Colorado, near its headquarters, on September 18-20. The Company described this conference as 'one of the biggest events of its kind' with the purpose of 'teaching best practices in identifying and preventing fraud and money laundering.' Western Union's Chief Compliance Officer stated that '[o]ur conference started in 2006 and we had one goal at that time: educate Agents on [AML] best practices, regulations, and law-enforcement trends. It's now one of North America's largest [AML]/anti-fraud conferences that helps professionals from a wide variety of industries better identify and protect their organizations, and consumers, from fraud.' The Company also stated in its press release that it is 'dedicated to fighting fraud and helps consumers protect themselves from scammers.' " *Id.* ¶ 347.

**\*26** 7. "On October 30, 2012, the Company held a conference call in connection with the release of its earnings for the third quarter of 2012. During this call, Defendant Ersek stated during that conference call that 'we are investing more in being an industry leader, putting some compliance requirements [in place] for our customers, which are tougher and higher than it was in the past....We are the industry leader, we are leading that and I think we are protecting our customer.' He also stated that '[w]e have made and will continue to make compliance-related enhancements and changes around the world to meet new and evolving requirements....[W]e believe it is our responsibility to maintain our industry leadership by implementing rigorous compliance practices to protect our customers and agents around the world.' Defendant Ersek also reassured investors by representing that the Company could maintain its price premium in part because of the advantage that its 'great compliance' program gave it. Defendant Ersek also noted certain 'compliances changes' [sic] limited to issues 'related to our Southwest border agreement,' and did not address the Company's more comprehensive compliance deficiencies that would not become known until January 19, 2017." *Id.* ¶ 351.

8. "On November 7, 2012, at the Citi Financial Technology Conference, Defendant Ersek described Western Union's compliance efforts in response to the Southwest Border Agreement as going above and beyond the Company's minimum legal requirements. He characterized Western Union 'as an industry leader[ ] in this sector,' where the Company 'set[s] the standards hopefully.' Ersek

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)
Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 551 of 573
2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

also described the Company's compliance with the Southwest Border Agreement as meeting a 'quite high' and 'industry lead[ing]' standard. According to Ersek, the 'southwest border issue is unique to Western Union. It's an agreement which has been signed in 2010 and we are implementing the actions and I am very confident that the team is doing the right thing....[A]s an industry leader, in this sector, obviously we set the standards hopefully.' " *Id.* ¶ 357.

9. "At a June 13, 2013 William Blair & Company Growth Stock Conference, Defendant Scheirman stated:

> [W]e have a strong brand. Our brand resonates very well with our target customer. Again, it stands for speed, trust, convenience, reliability and value. ...And we have robust compliance and regulatory capabilities. And any time you move money cross-border, you need to be very good at operations and very good at the compliance and the regulatory environment. So it's very complex and it's hard to do. And we've got those capabilities....

> We very much can leverage our brand, our global operations and our compliance capabilities to [expand the online business]....

> Western Union has strong foundational assets. A brand that is very much trusted by our customers around the globe and that trust is so important when you're dealing with financial services....And we talked about global operations and our regulatory and compliance capabilities. And any time you're moving money cross-border, in 200 countries, 16,000 corridors, 135 currencies, it is so important to have strong regulatory and compliance capabilities and operational abilities."

*Id.* ¶ 385. "Specifically addressing the regulatory environment, Scheirman stated at this June 13, 2013 William Blair conference that 'the regulators start with the market leaders and we're clearly a market leader. And, again, we're going to partner with them because we share the same goals of protecting our customers, protecting our business systems and so forth.' " *Id.* ¶ 386.

10. Defendant Ersek "stated on [a] July 30, 2013 earnings call, in response to a question about the Company's pricing, '[w]e, as Western Union, I believe deserve the premium pricing. Our brand is very valuable. Our compliance programs are very valuable. We are

protecting the customers. The customers trust us.' Toward the end of this call, Defendant Scheirman explained, in response to an analyst's question about a particular compliance practice, that 'the important point is we very much have a culture of compliance and want to have best-in-class compliance programs, that's very important for our brand, protecting our customers, our agents and so forth.' " *Id.* ¶ 389.

**\*27** 11. "On September 17, 2013, Western Union issued a press release announcing that it was hosting the 8th Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference in its hometown of Englewood, Colorado on September 17-18. The Company described this conference as '[o]ne of the largest events of its kind, [bringing] together diverse perspectives from industry experts in [AML], compliance and fraud who share best practices with some of Western Union's largest agents.' The Company's Chief Compliance Officer said in the press release that '[t]ogether with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud.' Western Union also took this opportunity to advertise that it 'invests millions each year to run compliance programs. The company continues to increase its headcount of employees who are dedicated to compliance, fighting fraud and helping to protect and empower consumers around the globe. This dedication expands to those who are on the frontlines at approximately 520,000 Agent locations around the globe.' " *Id.* ¶ 395.

12. "On Western Union's earnings conference call for the fourth quarter and full year of 2013, held on February 11, 2014, Defendant Ersek continued to represent that "we are very much focused on our compliance activities. We are the industry leader; we are focused on that; we are driving it.' He also stated that 'the regulator[y] environment is...changing very fast, evolving and we are on – I believe as a industry leader, we are setting your best practices. We are driving it. We have the great Compliance Officer. He hired very great people. We do invest – our CIO, David Thompson, is very focused on the...technology, how we can involve – activate the technology to be more effective on the compliance making. The most focus is on the know your agent and know your customer. And so there is some diligence activities and I believe, as we gave – we were anticipating that in Q3.' Ersek later explained that the increased compliance costs were 'mainly also

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 552 of 573
Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)
2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

know your agent and know your customer activities. We have to do more questions on your customers, ask the customer, register the customers, doing diligence on the customers. But, also on the agent side with the frontline associates, we are doing more diligence, understanding who is serving our customers. They trust us and they want to trust also to the front-line associates. We do some diligences there. And I think that's the main investment [that is] going to continue to happen in the future.' " *Id.* ¶ 408.

13. "At the Jefferies Global Technology, Media & Telecom Conference on May 7, 2014, Defendant Ersek stated that the Western Union's recent substantial compliance costs were now 'a competitive advantage...[because] law enforcement are really looking up to us [and] saying that, hey, it will be great as the leader, you are leading the market and be [sic] the best practice.' " *Id.* ¶ 423.

14. "At a June 11, 2014 William Blair Growth Stock Conference, Defendant Agrawal stated that '[w]e also have compliance and regularity capabilities that are strong and continue to get even better in this increasingly complex global environment.' Toward the end of his prepared remarks, he then stated that 'in summary, we have very strong foundational assets in place. Our global brand, our global operational and compliance capabilities and our presence in 200 countries and territories around the world gives us a strong position from which to operate.' " *Id.* ¶ 425. He further stated that "one of the five reasons that Western Union was 'well positioned' to strengthen its consumer money transfer business was because of its '[c]ompliance and regulatory capabilities.' " *Id.* ¶ 426.

15. "On July 31, 2014, the Company filed its quarterly Form 10-Q with the SEC, announcing the Company's financial and operating results for the second quarter of 2013, which ended on June 30, 2014 (the "Q2 2014 10-Q")." *Id.* ¶ 428. "The Q2 2014 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q...." *Id.* ¶ 429. "The Q2 2014 10-Q contained signed certifications pursuant to [the Sarbanes-Oxley Act ("SOX") ] by Defendants Ersek and Agrawal, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 430.

**\*28** 16. "Western Union's pricing challenges that SunTrust['s Robinson Humphrey] discussed [in an August 1, 2014 report] were also a result of its compliance failures. As explained above, Defendants stated during the Class Period that the Company would maintain its pricing advantages in the face of competition from other companies because Western Union's 'compliance programs' were 'really competitive strengths for us.' Because the Company was now forced to substantially increase its compliance expenditures because of its severely deficient compliance program, it could no longer justify its premium pricing." *Id.* ¶ 516 (internal citation omitted).

17. "At a September 11, 2014 Deutsche Bank dbAccess Technology Conference, Defendant Agrawal stated:

We believe that compliance can be a competitive advantage for us. It already is a competitive advantage, and I believe it can be a bigger competitive advantage for us as we operate because it's very difficult for most other organizations to spend at the level that we are, and we've been doing this for many years. This is not just a 2014 effort, we've been in the compliance area and investing there for quite some time....

[W]e've been making a tremendous amount of progress [with complying with the amended Southwest Border Agreement]. The state has assigned a monitor to be able to monitor the activities and to assess progress around our progress in making these changes. And we've been making great progress.

In response to a question about competition from other companies, including Apple's announcement that it was moving into the payments business, Defendant Agrawal promoted Western Union's compliance capabilities as giving it an advantage over other companies:

And so, I think, we're really well-positioned....And it's about the global compliance capability that we have, that's not easy to replicate, the global operational capabilities. So we have a lot of advantages that will keep us well-positioned I believe....So I really believe that we are extremely well positioned. Nobody else has the global compliance capabilities that we have, the global operational capabilities. We operate in every country of the world and that's not an easy

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 553 of 573
Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)
2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

infrastructure to replicate. And so that's why I feel good about where we are."

*Id.* ¶ 432.

18. "On September 17, 2014, Western Union issued a press release announcing its 9th Annual Consumer Protection Compliance Conference. The Company described this conference as '[o]ne of the largest events of its kind, [bringing] together diverse perspectives from industry experts in [AML], compliance and fraud and human trafficking to share best practices with some of Western Union's largest Agents.' Defendant Ersek delivered a keynote address at this conference 'emphasizing the importance of compliance.' The Company's Chief Compliance Officer said in the press release that 'Western Union is committed to helping protect its customers against fraud and other financial crimes. It's the right thing to do for our customers and for our business.' " *Id.* ¶ 436.

19. "On October 30, 2014, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the third quarter of 2013, which ended on September 30, 2014 (the "Q3 2014 10-Q")." *Id.* ¶ 438. "The Q3 2014 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q...." *Id.* ¶ 439. "The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 440.

 *29 20. "In the conference call for earnings from the third quarter of 2014, held on October 30, 2014, Defendant Agrawal stated that '[w]e've been able to accomplish our key objectives on the compliance side, and we've also done it more efficiently.' In addition, Defendant Ersek stated that the Company had an advantage over smaller competitors who were 'having more trouble to compete in the market because they can't comply with the anti-money laundering requirements.' Defendant Ersek then stated that although the Company did not give guidance for the following year, he was 'excited about compliance investments, and that gives us a long-term competitive advantage and that helps us.' " *Id.* ¶ 434.

21. "On January 21, 2015, Western Union hosted the European Business Forum and Compliance Conference in Brussels for the second time. As was publicly reported, including by Western Union and major news publications, over 200 financial industry and regulatory experts attended this conference to discuss 'how to enable innovation in the payments industry to better meet consumer and business financial service needs in Europe, while meeting regulatory compliance.' The Company stated that this conference 'reflects the company's commitment as a leader in the payments industry to ensure customer needs are understood, while meeting regulatory compliance.' The forum was 'followed by a compliance conference attended by Western Union agents and partners from across Europe to focus on best practice[s] in anti-money laundering measures and fraud protection.' Ersek stated in connection with this conference that '[i]t's vital that consumers and businesses are protected when using financial services, especially payments and remittances, and that's why Western Union is committed to regulation to prevent financial crime. To meet this commitment, we continue to focus on our compliance efforts as a priority for our business.' " *Id.* ¶ 442.

22. "In its presentation from its February 10, 2015 earnings call for the fourth quarter and fiscal year 2014, the Defendant Ersek represented that one of Western Union's four 'key results' that it delivered in 2014 was '[e]nhanced global compliance programs.' " *Id.* ¶ 444.

23. "On February 20, 2015, the Company filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K")." *Id.* ¶ 446. "[I]n describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents and their subagents.' " *Id.* ¶ 448. "The 2014 10-K also discussed ongoing

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 449. "The 2014 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 450.

24. "On April 30, 2015, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the first quarter of 2015, which ended on March 31, 2015 (the "Q1 2015 10-Q")." *Id.* ¶ 452. "The Q1 2015 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q...." *Id.* ¶ 453. "The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 454.

**\*30** 25 "At a May 19, 2015 JPMorgan Global Technology, Media and Telecom Conference, Defendant Ersek stated that even though the Company had to lower prices in Mexico, 'overall, I will say that our brand, our locations, our compliance programs, our trust does deserve a premium and the customers pay for that. So, they are happy with that.' Ersek also stated that 'our investment in the technology over the last three years, and our investment in compliance,...it's good to invest in the compliance, it's a competitive advantage. Being regulated in 200 countries, it's a tough environment, it's good. We are investing there, it's a competitive advantage. We know how to do that, and that is also kind of a barrier for many to come and to operate in that corridor....Being an industry leader, we are doing the first attempt, and you are always setting the standards, but long-term, it will be done.' " *Id.* ¶ 456.

13    *Am. Compl.* [#40] ¶ 360 (*see* § III.B.1.a.ii.), ¶ 363 (*see* § III.B.1.b.4.), ¶¶ 374-75 (*see* § III.B.1.a.i.8.), ¶ 381 (*see* § III.B.1.a.ii.), ¶ 388 (*see* § III.B.1.b.6.), ¶ 398 (*see* § III.B.1.b.7.), ¶ 417 (*see* § III.B.1.a.ii.), ¶ 447 (*see* § III.B.1.b.10.), and ¶ 459 (*see* § III.B.1.b.11.).

In short, Plaintiffs argue that Defendants "had a duty to disclose those serious current compliance failures, as well as ones from the recent past that subjected the Company to the material risk of substantial monetary sanctions." *Response* [#63] at 41.

In *SEB Asset Management S.A.*, 2014 WL 5708522, the Court considered some statements which were essentially identical in substance to some mentioned here. Those statements included the "frequent talking point" for Western Union that its "operations in 200 countries and territories" involved compliance expenses and burdens that its competitors would find difficult to match. The Court found that Western Union's "decision to embrace the benefits of strict regulatory compliance may have been sudden and opportunistic, but the Complaint has not alleged any facts to suggest that it was misleading" because the statements about Western Union being an industry leader were limited to predictions of how Western Union "would be a leader or trend-setter in the future." The Court noted that the "statements are patently true on their face – compliance with hundreds of discrete national and international regulations is difficult and costly, and those difficulties and costs also serve to discourage competitors from attempting to match the breadth of [Western Union's] market."

The parties also discuss the impact of *In re Level 3 Communications Securities Litigation*, 667 F.3d 1331, 1339 (10th Cir. 2012), on the issue of compliance practice statements. *Response* [#63] at 45 n.16; *Reply* [#70] at 50-51. The Tenth Circuit there held that statements such as "[a] majority of the physical network interconnections are completed" and "[m]ost of the physical integration of WilTel is now complete" were not puffery, because they had "some basis in objective and verifiable fact." *In re Level 3*, 667 F.3d at 1340-41. However, statements concerning "integration efforts and the customer experience" and "general, forward-looking expressions of confidence" regarding integration efforts were deemed insufficiently concrete or specific to be actionable, even though they were made during a time when the company knew that integration was not going well. *Id.* at 1340.

The Court agrees with Defendants' assessment of these statements. They are all either "forward-looking statements predicting competitive advantages eventually to be gained from large, ongoing compliance investments" or "present-tense statements of opinions regarding the competitive advantages of having already established compliance

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 555 of 573
Smalien v. Western Union Company, Not Reported in Fed. Supp. (2019)
2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

infrastructure in more than 200 countries." *Reply* [#70] at 42. As such, the Court finds that these statements lack a demonstrable false basis and, in many cases, are mere puffery. *See Grossman*, 120 F.3d at 1119-20 ("Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions.").

For example, Plaintiffs point to the September 11, 2014 statements by Defendant Agrawal that compliance "already is a competitive advantage...we've been doing this for many years. This is not just a 2014 effort, we've been in the compliance area and investing there for quite some time" and that "[n]obody else has the global compliance capabilities that we have." *Am. Compl.* [#40] ¶ 432; *see also Response* [#63] at 46 n.17 (discussing statements where Defendants "characterized the Company as the *current* and best industry and market leader"). Especially when read in context, *see Defs.' Ex. 102* [#70-17], these statements are materially similar to those discussed in *SEB Asset Management S.A.*, 2014 WL 5708522, and Plaintiffs have provided no allegations from which the Court can reasonably infer that these statements were false, such as allegations showing that Western Union had *not* been investing in compliance prior to 2014 or that other competitors *did* indeed have similar global compliance capabilities at that time, or that Western Union was not a market leader, despite any issues that Western Union may also have been experiencing. *See, e.g., Am. Compl.* [#40] ¶ 205 (stating that Western Union only had one main competitor, MoneyGram International, Inc., without sufficiently elaborating on comparative allegations that could show some of Defendants' statements were false or misleading).

**\*31** Further, as Defendants argue, many of these statements mention the competitive advantages held by Western Union based on the global scope of its compliance infrastructure and continuing investments. *Reply* [#70] at 46. At most, the statements merely compare Western Union to its competitors and are not "absolute assurances" regarding compliance practices. *Id.* at 46-47. As one of many examples, this applies to the statement that, "longer term we believe [our increased compliance spending is] going to be a competitive advantage because of our scale and our scope of what we can do with compliance and the regulatory [sic]." *Am. Compl.* [#40] ¶ 388; *see also, e.g., id.* ¶¶ 333 (discussing "competitive advantage"), 334 (discussing the difficulty of navigating the regulatory environment for both Western Union and competitors), 336 (discussing "global compliance capabilities" as a competitive strength), 363 (discussing the

"advantage" held by Western Union when compared to competitors with respect to its digital presence); *see also Defs.' Exs. 29, 88, 89, 94* [#57-29, #70-3, #70-4, #70-9].

Accordingly, to the extent Claim One is based on this category of purportedly false and misleading statements regarding compliance practices, Claim One is **dismissed** against Defendants Ersek, Scheirman, Agrawal, and Western Union.

**2. Scienter**

Plaintiffs argue that Defendants made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding legal compliance. *Response* [#63] at 36-41. Specifically, they argue:

> Defendants' statements of legal compliance were false and misleading because, as Western Union admitted to DOJ, and as the FTC determined, the Company did not comply with its AML and anti-fraud obligations during the Class Period. Western Union's legal violations included admitted criminal liability for willfully failing to maintain an effective AML program as required by the BSA and willfully "failing to suspend and/or terminate complicit Agents" and "allowing them to continue to process fraud-induced monetary transactions" through 2012; as well as civil liability for violating the FTC Act by failing to detect and prevent consumer fraud and violating the Telemarketing Sales Rule by providing substantial assistance to parties that engaged in consumer fraud through the date of the Joint Settlement.

*Response* [#63] at 37-38. They further argue that "Defendants' statements touting Western Union's legal compliance gave investors the impression that the Company's compliance practices were up to par. It was therefore misleading for Defendants to fail to disclose the many ways that Western Union engaged in activities that gave rise to the high probability of substantial government sanctions." *Id.* at 38. In other words, Plaintiffs assert that Defendants "did not disclose that Western Union *already* failed to comply with AML and anti-fraud laws and *already* faced the high risk of substantial monetary sanctions when they made those statements throughout the Class Period." *Id.* at 39 (emphasis in original).

Defendants essentially concede that the statements regarding actual legal compliance were technically false or misleading

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

*except* that they were couched in terms of the truthful opinions of the speakers according to the information they had at the time when the statements were made. *Motion* [#54] at 40 (citing *Omnicare,* 135 S. Ct. at 1326-27 (holding that statements such as believing that the company's marketing practices were lawful were not false simply because the belief later turned out to be incorrect). Thus, in order to succeed here, Plaintiffs must provide allegations that (1) the speakers did not subjectively hold the stated beliefs at the times when the statements were made or (2) objectively, the speakers did not undertake any reasonable inquiry into the grounds underlying the statements before making the statements. *Omnicare,* S. Ct. at 1327, 1332. Based primarily on *Omnicare,* Defendants argue that "in order adequately to allege that the statements of opinion were false, Plaintiff[s] must plead with particularity facts that create a strong inference—at least as compelling as any competing innocent inferences—that each [Defendant] did not believe what he said but, instead, that each believed throughout the Class Period that the Company was engaged in ongoing violations of applicable legal requirements and believed that its compliance systems were fundamentally ineffectual." *Motion* [#54] at 42-43. Defendants assert that Plaintiffs have failed to provide adequate allegations demonstrating this. *Id.* at 43.

**\*32** The pleading requirements for scienter under the PSLRA have attracted special attention from the courts. "In a securities fraud case, the appropriate level of scienter is a mental state embracing intent to deceive, manipulate or defraud, or recklessness." *Adams,* 340 F.3d at 1105. The Tenth Circuit has made clear that adequately pleading scienter requires the plaintiffs to plead "facts with particularity giving rise to a strong inference that defendants acted with the requisite [state of mind]," and the trial court is instructed to "look to the totality of the pleadings" to determine whether the plaintiffs' allegations permit such an inference. *Pirraglia,* 339 F.3d at 1190. In addition, "an inference is a logical conclusion drawn from the facts." *Adams,* 340 F.3d at 1105. "A strong inference of scienter" means "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Id.*

> To establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate:(1) the defendant knew of the potentially material fact,

> and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors....We also take into account evidence of motive and opportunity, for, while these factors are typically insufficient in themselves to show scienter, they may be important to the totality of the pleadings.

*Pirraglia,* 339 F.3d at 1191 (internal quotation marks and brackets omitted). Moreover:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favorable to plaintiff.

*Tellabs,* 551 U.S. at 323-24.

As noted above, the state of mind necessary to sustain allegations of securities fraud is either intent or recklessness. "[P]laintiffs can adequately plead scienter by setting forth facts raising a strong inference of intentional *or* reckless misconduct." *City of Philadelphia v. Fleming Cos., Inc.,* 264 F.3d 1245, 1259 (10th Cir. 2001) (emphasis in original).

> Recklessness, defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it, can also satisfy the scienter requirement for Section 10b-5. Simple negligence,

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

however, does not satisfy the scienter requirement.

*Id.* at 1258 (internal citations and quotations omitted). Recklessness is "something akin to conscious disregard." *In re Level 3*, 667 F.3d at 1343 n.12. "Negligence, and even gross negligence, fall 'below the high threshold for liability under Section 10(b) of the Exchange Act.' " *Sanchez v. Crocs, Inc.*, 667 F. App'x 710, 719 (10th Cir. 2016) (quoting *Dronsejko v. Thornton*, 632 F.2d 658, 668 (10th Cir. 2011) ).

Regarding the adequacy of a complaint's allegations of scienter, the court has made clear that at the 12(b)(6) stage, the court's role "is simply to determine whether the plaintiff raises a strong inference of scienter...." *Pirraglia*, 339 F.3d at 1188. Courts have refused "to draw inferences in the plaintiff's favor when doing so would allow [him] to make allegations on information and belief without satisfying the particularity requirements of the [PSLRA]." *Id.*

In addition, the Tenth Circuit has provided other guidance about the sufficiency of a complaint alleging securities fraud that is useful here. Regarding allegations of reckless misconduct, the Court has concluded that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Fleming*, 264 F.3d at 1260 (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ). Further, "allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, [are] not sufficient to demonstrate that the defendant intentionally withheld these facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate or defraud." *Fleming*, 264 F.3d at 1260. In order to sufficiently allege recklessness, plaintiffs must present facts to show the "defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Id.* at 1261. Moreover, vague statements of corporate optimism are not actionable under the securities laws. *Pirraglia*, 339 F.3d at 1189. But "violation of a corporation's internal policies can support a claim of scienter when coupled with other evidence of intent to defraud, such as motive and opportunity." *Id.* at 1192.

**\*33** Also worth nothing is that the Tenth Circuit has rejected the notion that knowledge may be imputed to a high-ranking corporate officer because of his position alone:

> [A]llegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny. [14] Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company.

*Fleming*, 264 F.3d at 1264 (citing *In re: Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ). Nevertheless, the seniority of management officials who are alleged to have engaged in fraudulent conduct "is a fact relevant in [the court's] weighing of the totality of the allegations." *Adams*, 340 F.3d at 1106. The cases have been careful to emphasize that "the important issue...is not whether [d]efendants knew the underlying facts, but whether [d]efendants knew that not disclosing [them] posed substantial likelihood of misleading a reasonable investor." *Fleming*, 264 F.3d at 1264 (citing *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989) ("[I]t is the *danger of misleading buyers* that must be actually known or so obvious that any reasonable man would be legally bound as knowing." (emphasis in original) ). Finally, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." *Adams*, 340 F.3d at 1006.

14    As pointed out by the Court in *Fleming*, "the scienter pleading requirements of the PSLRA supercede the provisions of Rule 9(b) in securities fraud cases." 264 F.3d at 1255 n.13.

In assessing whether allegations of a defendant's motives to mislead are sufficient to support a finding of the requisite scienter under the PSLRA, the Tenth Circuit has addressed only motives specifically and directly related to the alleged non-disclosure, finding that other alleged motives are not

Smaller v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

relevant to the inquiry. *See Fleming*, 264 F.3d at 1268 (noting five asserted motives for the defendants' alleged fraudulent conduct, but concluding that only one arguably supported the plaintiffs' allegations because it was "specifically and directly related to the underlying facts" of the alleged non-disclosure). Moreover, it is also clear that "generalized motives shared by all companies and which are not specifically and uniquely related" to the defendant in particular, are "unavailing." *Id.* at 1269. Examples of such "shared business motives" are that the defendants desired to protect their own positions with the company, or that they wanted to protect the value of their own stock, or that they wanted to further the interests of the company. "Allegations that merely charge that executives aim to prolong the benefits they hold are, standing alone, insufficient to demonstrate the necessary strong inference of scienter....Similarly insufficient are allegations that corporate officers were motivated to defraud the public because an inflated stock price would increase their compensation." *Id.* at 1270 (quoting *Philips v. LCI Int'l, Inc.*, 190 F.3d 609, 622 (4th Cir. 1999) ); *see also Level 3*, 667 F.3d at 1346 ("Nor does plaintiff's assertion that defendants' compensation hinged on the performance of Level 3's stock price and the successful integration of WilTel lead us to infer scienter."). In addition, when the complaint "includes nothing in the allegations of the defendants' motives to indicate that they are anything more than pure speculation," the court should not accord them much weight. *Adams*, 340 F.3d at 1104-05.

**\*34** Thus, in order to pass muster under the PSLRA, the Amended Complaint [#40] must state with particularity facts giving rise to a strong inference of scienter. "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Level 3*, 667 F.3d at 1343. Here, taken as a whole, the Court finds that the Amended Complaint [#40] does not create an inference of scienter that is at least as strong as any opposing inference. For the reasons stated below, the Court concludes that Plaintiffs have failed to adequately allege the scienter necessary to state claims for securities fraud.

At the heart of the scienter inquiry in a case like this are the allegations about what information the individual Defendants knew and failed to report, and whether they knew or should have known that their non-disclosures were substantially likely to mislead a reasonable investor. *See Fleming*, 264 F.3d at 1264. In order to adequately plead scienter, Plaintiffs must allege that Defendants Ersek, Scheirman, and Agrawal each acted *either* knowingly or

recklessly. To show knowledge, Plaintiffs must sufficiently allege that Defendants Ersek, Scheirman, and Agrawal knew about certain material information and that they knew that failure to disclose this information would likely mislead investors, thus showing intent. In the alternative, Plaintiffs must allege that the misrepresentation or omitted information was so obviously material that Defendants Ersek, Scheirman, and Agrawal must have been aware that non-disclosure would likely mislead investors, thus showing recklessness. *See generally Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1202 (10th Cir. 2015). Although recklessness may be established where a defendant ignores obvious signs of fraud, "an unseen red flag cannot be heeded." *Sanchez*, 667 F. App'x at 720-722 (citing *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012); *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 574 (S.D.N.Y. 2011) ). "Possession of documents and other information which...should have revealed red flags at most.. . raises an inference of gross negligence, but not fraud." *Id.* (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1210 (11th Cir. 2001) (internal quotations omitted) ). Indeed, in order for recklessness to be adequately pled in a case asserting securities fraud claims against auditors, the Tenth Circuit has indicated that plaintiffs must cite "highly suspicious in-your-face facts that would cry out" that the company's financial status was fraudulently misrepresented. *Sanchez*, 667 F. App'x at 723 (citing *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011) ).

The crux of Plaintiffs' theory is that "Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded" the following, as summarized by Plaintiffs:

(i) Western Union's AML and anti-fraud efforts during the Class Period did not comply with applicable laws and regulations, including the BSA, the FTC Act, the [Telemarketing Sales Rules], the Telemarketing Act, the criminal wire fraud statute, the Dodd-Frank Act, and/or state or international AML or anti-fraud laws; (ii) Western Union's AML and anti-fraud efforts during the Class Period failed to comply with best practices and/or industry standard practices;

(iii) during the Class Period, Western Union failed to discipline or take corrective action against its agents or subagents that Defendants knew violated (or likely violated), and in some cases were complicit (or likely complicit) in violating, the laws described in (i) above

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 559 of 573

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)
2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

and/or Company anti-fraud or AML policies, including by processing vast amounts of transactions that defrauded (or likely defrauded) Western Union's customers and/or by structuring (or likely structuring) vast amounts of transactions;

**\*35** (iv) Defendants failed to disclose Western Union's AML and anti-fraud compliance failures and certain related government enforcement actions that took place prior to the Class Period;

(v) government investigations and enforcement actions that were ongoing during the Class Period were nearly certain —based on Western Union's compliance failures before and during the Class Period—to result in severe monetary penalties and Western Union being required to undertake comprehensive and costly remedial actions;

(vi) Western Union could not maintain its competitive premium pricing during the Class Period while implementing effective compliance policies; and

(vii) Western Union's AML and anti-fraud efforts during the Class Period failed to comply with agreements that Western Union reached to resolve government investigations and enforcement actions that were disclosed prior to the Class Period.

*Am. Compl.* [#40] ¶ 539 (incorporating ¶ 303). However, a careful reading of the cleverly-drafted Amended Complaint makes clear that the overwhelming majority of allegations of fraud depend on assertions that Defendants did not believe that compliance efforts were legally sufficient in making significant progress against major problems such as money laundering in light of the large and ever-mutating problem the Company faced from fraudsters from around the world. It goes without saying that the Amended Complaint cannot create a strong inference of the state of mind necessary to show securities fraud without sufficiently alleging that Defendants knew or recklessly disregarded these problems, i.e., that compliance efforts were dramatically failing. But behind the Amended Complaint's dense curtain of allegations relating to what was said when and about unresolved government investigations, Plaintiffs make very few particularized allegations about what the executives themselves knew at any given time. At best, the totality of the allegations regarding Defendants' conduct which bear on their state of mind leaves more questions about their intent than answers, and such allegations do not demonstrate more than, at most, gross negligence, which is insufficient to state a claim under Section 10(b). *See Sanchez*, 667 F. App'x at 719.

With a pleading as lengthy and repetitive as the Amended Complaint, the risks of attempting to list the allegations related to scienter are manifest and recognized by the Court. By sheer volume alone, one might conclude that the document must sufficiently allege Defendants' intent to commit fraud or their recklessness in doing so. Nevertheless, after an extremely careful review of the 176-page, 580-paragraph Amended Complaint, the Court cannot conclude that Plaintiffs have provided sufficient allegations to meet the high bar of pleading scienter here.

In addition to certain previously-quoted allegations which the Court has reviewed, [15] Plaintiffs also cite to the following allegations which, either alone or in combination with others, bear on the scienter issue in connection with legal compliance: 1. "Throughout the Class Period, Western Union represented to investors that it

complied with its AML and anti-fraud legal obligations. For example, in each 10-K that the Company filed during the Class Period, Defendants represented, with minor variations, that 'we believe our fraud prevention efforts are effective and comply with applicable law' and that 'that Western Union is compliant with its [AML and other] regulatory responsibilities.' " *Am. Compl.* [#40] ¶ 76 (internal footnotes omitted). "Western Union also acknowledged in these annual filings that failing to comply with AML and anti-fraud laws and regulations posed one of the most significant risks that the Company faced. In each of these filings, Defendants stated that '[o]ur business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or our subagents to comply with those laws and regulations could have an adverse effect on our business, financial condition and results of operations'—or made substantially similar statements to the same effect." *Id.* ¶ 77.

**\*36** 2. In the 2011 10-K, filed on February 24, 2012, the Company stated in pertinent part:

Our business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or our subagents to comply with those laws and regulations could have an adverse effect on our business, financial condition and results of operations....

**Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)**

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

...While we believe our fraud prevention efforts are effective and comply with applicable law and best practices, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem....

\*\*\*

We have developed and continue to enhance our global compliance programs, including our anti-money laundering program, which comprises policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices....

\*\*\*

...While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

\*\*\*

Our agents' or subagents' failure to comply with federal and [state] laws and regulations as well as laws and regulations outside the United States could have an adverse effect on our business, financial condition and results of operations.

*Id.* ¶ 305. "In addition, in describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the 2011 10-K specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents.' " *Id.* ¶ 306.

3. "[A]t [a] May 16, 2012 J.P. Morgan Global Technology, Media and Telecom Conference, [Stewart] Stockdale stated that regulatory and compliance worldwide is something

'that obviously – it's a huge competency for Western Union to deal with[ ]in 200 countries. So, regulations in Europe, in Australia, in Asia Pacific and across the world is something that we deal with across every single region and country.' " *Id.* ¶ 329.

4. "On October 16, 2012, [Stewart] Stockdale spoke on behalf of Western Union at the University of Denver's Voices of Experience program. This speech was published online the following day, on October 17, 2012. Stockdale stated:

 **\*37** Western Union is uniquely positioned at going after that underserved 2-billion person market worldwide. What makes us unique that allow[s] us to have these relationships and really our core competencies to reach consumers in 200 countries and territories is really these four pillars of our strategy.... Three is the regulatory and AML capabilities of the Company in almost every jurisdiction around the world.

\*\*\*

What really is more difficult is to make sure that you're complying with all the laws around the world. And we spend a ton of money. And we have over 600 people on an ongoing basis monitoring the system on an ongoing basis. And you have to do that. One of the core capabilities is to being able to work with governments not only the U.S. government but the governments of Vietnam, the governments of India, the governments of China to make sure that this cash movement which is in the billions of dollars is all being monitored on an ongoing basis.

Stockdale then stated, in the context of discussion [sic] the Dodd-Frank regulations, that 'all regulation' 'becomes a competitive advantage for us...because if you're in front and you have the resources to implement and do it well.' " *Id.* ¶ 349.

5. In connection with the 2012 10-K (filed on February 22, 2013), the Company stated, in part: "[I]n describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents.' " *Id.* ¶ 367.

6. "At a May 16, 2013 JPMorgan Global Technology, Media and Telecom Conference, Defendant Scheirman stated that in the first quarter of the year, in 'a few of the markets, we continued to enhance our compliance programs. And our goal is to be best-in-class with compliance. Live to the letter and the spirit of the law. And so, we're doing things around fraud prevention, real-time risk assessment at the point of sale, customer callbacks and high principal.' Scheirman also stated that 'the depth and extent of our compliance practices' allows the Company to succeed in the online market because 'sometimes folks might underestimate' how important that is for cross-border money transfers '[b]ut we're very good at that.' " *Id.* ¶ 383.

7. In the 2013 10-K (filed February 24, 2014), the Company stated, in part: "In addition, in describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents and their subagents.' " *Id.* ¶ 412.

**\*38** 8. "On the earnings conference call for the fourth quarter and fiscal year 2015, held on February 9, 2016, Defendant Ersek stated that Western Union's money transfer system 'is unique' and its success 'is that it works in 200 countries, it can pay out in 121 currencies, it can adapt to regulatory systems of 200 countries and make anti-money laundering, and process 22 transactions...per second.' He later explained that 'most of the agents are choosing the exclusivity because they know they have a quite stable partner, financially stable, good, anti-money laundering system, good settlement system, long run capability, great brand and they can drop money in 200 countries immediately.' " *Id.* ¶ 471.

9. In connection with the 2015 10-K (filed February 19, 2016), the Company stated, in part: "In addition, in describing the 'wide range of laws and regulations enacted

by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any other countries and states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents and their subagents.' " *Id.* ¶ 475.

10. "DOJ's and FTC's actions against Western Union were based on the Company's violations of the following AML and anti-fraud laws and regulations:

a. Aiding and abetting wire fraud, pursuant to 18 U.S.C. §§ 2, 1343, from 2004 through December 2012 'by failing to suspend and/or terminate complicit Agents [including subagents] and by allowing them to continue to process fraud-induced monetary transactions.' Western Union admitted it was guilty of this charge.

b. Willfully failing to maintain an effective program as required by the BSA, pursuant to 31 U.S.C. §§ 5318(g), 5322, and related regulations, from 2004 through December 2012. Western Union admitted it was guilty of this charge.

c. Engaging in unfair acts or practices in violation of Section 5 of the FTC Act by failing to take timely, appropriate, and effective action to detect and prevent fraud-induced money transfers through the Company's system.

d. Engaging in deceptive telemarketing in violation of the Telemarketing Sales Rule by Western Union, its agents, or subagents providing substantial assistance or support to sellers or telemarketers who the Company or its agents or subagents knew or consciously avoided knowing (a) induced consumers to pay for goods and services through the use of false or misleading statements and (b) requested or received payment in advance of consumers obtaining a loan."

*Id.* ¶ 139.

The Court notes with respect to this final allegation that any admitted wrong-doing only covers the first fraction of the Class Period (i.e., February 24, 2012 through December 2012), that the admitted wrong-doing does not directly

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

involve securities laws, and that Plaintiffs have not adequately tied any admitted wrong-doing to the scienter of Defendants.

15    *Am. Compl.* [#40] ¶¶ 321-22 (*see* § III.B.1.c.2.), ¶ 366 (*see* § III.B.1.b.5.), ¶¶ 374-75 (*see* III.B.1.a.i.8.), ¶¶ 385-86 (*see* § III.B.1.c.9.), ¶ 388 (*see* § III.B.1.b.6.), ¶ 411 (*see* § III.B.1.b.9.), ¶ 425 (*see* § III.B.1.c.14.), ¶ 447 (*see* § III.B.1.b.10.), ¶ 448 (*see* § III.B.1.c.23.), ¶ 456 (*see* § III.B.1.c.25.), ¶ 465 (*see* § III.B.1.b.12.), and ¶ 474 (*see* § III.B.1.b.13.).

As explained above, the Court finds that not only are many of these allegations inadequately particularized and merely conclusory, but taken as a whole, they do not create a strong inference that Defendants acted intentionally or recklessly. The Court is hard-pressed to draw any inference from these allegations that Defendants knew of or recklessly disregarded the full scope and extent of the alleged illicit behavior at Western Union, much less that they condoned it and defrauded investors despite it. Needless to say, in the absence of such an inference, not to mention the strong inference required by the PSLRA, Plaintiffs' claims cannot proceed.

**\*39**    Nor are Plaintiffs' claims rescued by sufficient allegations regarding Defendants' motive and opportunity. For example, Plaintiffs allege that Defendant Ersek sold approximately 600,000 shares of Western Union stock during the Class Period for more than $12 million. *Am. Compl.* [#40] at 285. However, Plaintiffs fail to provide adequate context for these numbers, such as the price Defendant Ersek initially paid for that stock, so the Court can reach any conclusion as to what kind of financial gain is actually at issue here. *See Motion* [#54] at 85. Further, there are no allegations regarding what percentage of Defendant Ersek's total shares these stock sales consisted of, or whether he was buying other types of shares at the same time. *See id.*; *see, e.g.*, *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 153 (D. Conn. 2007), aff'd, 312 F. App'x 400 (2d Cir. 2009) (finding no inference of fraud in the fact that a "[d]efendant...decreased his holdings by 30.84%," and noting that "[c]ourts have found no inference of scienter in cases involving similar and even greater percentages of sales"). Without these kinds of additional allegations, the mere allegation that Defendant Ersek sold 600,000 shares of Western Stock over a five year period for $12 million tells the Court very little and adds nothing material to the scienter analysis. The same goes for Plaintiffs' allegations regarding other Defendants and company executives' sales of shares during the class period. *Am. Compl.* [#40] at ¶¶ 290-95. While "personal financial gain may weigh heavily in favor of a

scienter inference," *Level 3*, 667 F.3d at 1345, the absence of any cogent allegation of a financial benefit from the alleged fraud cuts the other way. *In re Gold Resource Corp. Sec. Litig.*, 776 F.3d 1103, 1117 n.8 (10th Cir. 2015).

In short, Plaintiffs produce no convincing allegations of a motive for Defendants to engage in fraud beyond the standard financial motives common to all for-profit businesses. Under these circumstances, it is more probable that the Western Union executives "were overly optimistic and failed to give weight to financial red flags, for the plaintiffs supply little reason to suspect malevolence rather than benign optimism." *Spirit Aerosystems*, 827 F.3d at 1238. "The absence of a motive allegation...is not dispositive, but it is relevant, and in this case it counts against scienter." *Level 3*, 667 F.3d at 1347; *see also Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994) ("Where a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater.").

At the end of the day, the court must decide if a reasonable person construing the allegations as a whole would deem the inference of scienter cogent *and* at least as compelling as any plausible opposing inference one could draw from the facts alleged. *Tellabs*, 551 U.S. at 324 (emphasis added). In other words, the court must "compare the parties' dual explanations" for the alleged failures to disclose and decide which is more cogent and compelling. *See, e.g.*, *Spirit Aerosystems*, 827 F.3d at 1248. Defendants argue that "[t]he far more 'cogent and compelling' inference with respect to each of these Individual Defendants is that they genuinely believed what they said when they made the challenged statements." *Motion* [#54] at 16 (citing *Tellabs, Inc.*, 551 U.S. at 324). Taken as a whole, Defendants appear to assert that the inference to be drawn from the failures to disclose alleged by Plaintiffs is that Defendants may have made errors in business judgment, but they did not commit fraud against investors. In the Court's view, this inference is equally strong as any inference regarding fraud.

A final word about recklessness under the PSLRA. Plaintiffs assert that even if the facts alleged do not show that Defendants knew, at the time when the omissions occurred, that their statements would likely mislead investors, there is enough to conclude that they "acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015).

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

They contend that the danger of misleading investors by not disclosing these facts was so obvious that Defendants must have been aware. But recklessness "is a particularly high standard" under the PSLRA. *Dronsejko*, 632 F.3d at 668. The Tenth Circuit has noted that it is "something closer to a state of mind approximating actual intent." *Zagg*, 797 F.3d at 1206. And Plaintiffs' allegations about recklessness are overwhelmingly conclusory. *See, e.g., Am. Compl.* [#40] ¶¶ 539, 544, 547, 559, 566, 568, 570, 573. These conclusory allegations of recklessness do nothing to advance facts demonstrating that conduct. Plaintiffs' statements made specifically about Defendants' conduct are equally weak. For example, the closest Plaintiffs come to discussing recklessness in connection with Defendants' specific conduct is as follows:

**\*40** Defendants['] knowledge or reckless disregard of the deficiencies in Western Union's compliance program that contradicted their public statements is further supported by their knowledge, as disclosed in the Company's periodic SEC filings throughout the Class Period, of the several federal and state government investigations, including by EDPA, MDPA, CDCA, SDFL, the FTC, and state attorneys general, that ultimately resulted in the Joint Settlement and the settlement with the state attorneys general that were announced in January 2017. As part of these investigations, Western Union produced many documents and witnesses to these regulatory authorities and claimed to have cooperated in these investigations. These investigations provided the basis for DOJ's and FTC's findings that Western Union's own internal reports, analyses and communications showed that the Company failed to maintain an effective compliance program, that it knew its agents were complicit in money laundering and consumer fraud, and that it failed to discipline its agents for those violations. These investigations also found that

agents' rampant involvement in money laundering and consumer fraud were discussed by senior managers within the Company. Defendants thus had knowledge of the Company's compliance violations based on both a) the mass of underlying information showing those deficiencies as they occurred (including the Company's own internal reports, analyses, and communications) and b) that information having been reviewed in the course of the Company's producing it during the various lengthy government investigations that led to the Joint Settlement.

*Id.* ¶ 543. These and other statements and allegations of fact made in connection with those statements simply do not provide the necessary detail to show the level of recklessness required to adequately allege scienter on the part of each Defendant. Simply stated, even if the Amended Complaint gives rise to *some* plausible inference of scienter, it is not the strong inference required by the PSLRA. *Tellabs*, 551 U.S. at 314. Hence, Claim One is **dismissed** in full to the extent it is asserted against Defendants Ersek, Scheirman, Agrawal, and Western Union. [16]

[16] The Court reiterates once more that it is well aware that Western Union has been the subject of various investigations and has sometimes even admitted to misdeeds of varying levels occurring, in part, throughout the class period, as discussed throughout this Order and as explained at length in the Amended Complaint [#40]. However, while certainly informative, the legal standards under which those investigations occurred and by which Western Union's actions were measured are not the same as the standards for the securities law claims made here under the PSLRA. In other words, as the Court has found, simply because Western Union may have legally erred in some ways in no way automatically means that Western Union has also violated the PSLRA as claimed here.

**C. Claim Two: Defendants Ersek, Scheirman, Agrawal, and Koch**

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

Section 20 of the PSLRA provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter...[s]hall also be liable jointly and severally with and to the same extent as such controlled person...." 15 U.S.C. § 78t(a). To state a prima facie case of control person liability, plaintiffs must allege: (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). To make a showing that a person is a "control person," plaintiffs must "point to facts which indicate that the defendants had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Adams,* 340 F.3d at 1108. Allegations that a person is the chief executive officer of a company likely satisfy the control person test, and allegations that a person is the chief financial officer of a company may also do so when a plaintiff brings claims of securities fraud relating to official reports of the company's financial performance. *Id.* "Section 20 of the Exchange Act contains no requirement that plaintiffs must prove a control person's state of mind." [17] *Id.* at 1109.

---

[17]    "Section 20 does state that a controlling person is not liable if he acted in good faith and did not induce the acts on which the liability of the controlled person is founded. However, courts have held that these are affirmative defenses, to be pleaded and proved by defendants." *Adams,* 340 F.3d at 1109 n.5 (citing *Kaplan v. Rose,* 49 F.3d 1363, 1382-83 (9th Cir. 1994); *Gould v. Am.- Haw. S.S. Co.*, 535 F.2d 761, 779 (3d Cir. 1976) ).

**\*41** Because Plaintiffs have failed to allege "a primary violation of the securities laws" as asserted under Claim One, the Court finds that their Section 20(a) claim asserted under Claim Two is also not viable. *See Maher,* 144 F.3d at 1305. Hence, Claim Two is **dismissed** with respect to Defendants Ersek, Scheirman, Agrawal, and Koch.

**D. Amendment**

Finally, the Court notes that Plaintiffs failed to make an argument that their Amended Complaint could be further amended yet again to correct any deficiencies. *See generally Response* [#63]. Consequently, the Court is not inclined to permit further leave to amend. *See, e.g., In re Gold Res. Corp. Sec. Litig.*, 776 F.3d at 1118-19 (stating that "[t]he district court did not abuse its discretion in dismissing the complaint with prejudice where plaintiff's memorandum contained only one sentence at the very end of his brief alternatively requesting leave to amend in the event the district court should decide to dismiss his complaint").

**IV. Conclusion**

For the reasons set forth above, the Motions [#53, #55] are **GRANTED.** The claims are **dismissed with prejudice** and the Clerk of Court is directed to **enter** Final Judgment in favor of Defendants and **close** this case.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 26

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 566 of 573

Utah Retirement Systems v. McCollum, Not Reported in Fed. Rptr. (2023)

2023 WL 8649878

2023 WL 8649878
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

UTAH RETIREMENT SYSTEMS, Plaintiff—Appellant,

v.

Mark MCCOLLUM; Christoph Bausch; Karl
Blanchard; Krishna Shivram; Stuart Fraser; Douglas
M. Mills; Weatherford International, P.L.C.;
Bernard Duroc-Danner, Defendants—Appellees.

No. 21-20312
|
FILED December 14, 2023

Appeal from the United States District Court for the Southern
District of Texas, No. 4:19-CV-3363

**Attorneys and Law Firms**

James W. Johnson, Michael P. Canty, James T. Christie,
Philip J. Leggio, Michael H. Rogers (argued), Mark S.
Willis, Labaton Sucharow, L.L.P., New York, NY, Thomas
R. Ajamie, John Saul Edwards, Jr., Esq., Ajamie, L.L.P.,
Houston, TX, for Plaintiff—Appellant.

Peter A. Wald (argued), Latham & Watkins, L.L.P., San
Francisco, CA, Stephanie L. Holcombe, Eric Drennan Wade,
Porter Hedges, L.L.P., Houston, TX, Kristen W. Kelly, Gray
Reed & McGraw, L.L.P., Houston, TX, Roman Martinez,
Blake E. Stafford, Latham & Watkins, L.L.P., Washington,
DC, Kevin McDonough, Latham & Watkins, L.L.P., New
York, NY, for Defendants—Appellees.

Before Dennis, Southwick, and Wilson, Circuit Judges.

**Opinion**

Per Curiam: [*]

[*]    This opinion is not designated for publication. See
5th Cir. R. 47.5.

**\*1**  This appeal stems from a district court's dismissal of a
securities fraud class action lawsuit. Because we find Plaintiff
inadequately pleaded the element of scienter, we AFFIRM.

## I. FACTUAL BACKGROUND

The alleged facts are complex and span several years. [1]  We
therefore do not repeat the allegations in their entirety, though
we have carefully considered them.

[1]        To the extent we recite the facts, they are as alleged
in the complaint. *See Neiman v. Bulmahn*, 854 F.3d
741, 746 (5th Cir. 2017).

Weatherford International, P.L.C. ("Weatherford") is a
publicly traded oilfield service company that was founded
in 1998. By October 2016, Weatherford had over $7.1
billion in debt and endured seven consecutive quarterly
revenue declines. The market began to speculate that
Weatherford might be on the brink of bankruptcy. Around
that time, Weatherford publicly ushered in a series of
cost-cutting measures, including layoffs and closures of
several manufacturing plants, which were intended to make
Weatherford profitable again.

Despite those efforts, Weatherford's debt still continued to
grow. So, on July 28, 2017, then-CEO Mark McCollum
introduced a formal "Transformation Plan," encompassing
over 1,500 cost-cutting measures even more drastic than those
previously announced. The initiatives included ramping up
workforce reductions, consolidating facilities, centralizing
support functions, and regrouping eight product lines into
four business units. The Transformation Plan also called for
Weatherford to divest business units that were "not critical to
[its] strategy going forward."

Defendants then started a campaign to sell the Transformation
Plan to investors. Over the course of approximately
three years, Weatherford attempted to implement the
Transformation Plan. Relevant to this appeal, former
Weatherford employees ("FEs") allege that, from October
26, 2016, through May 10, 2019 (the "Class Period"),
"Defendants knew all along that the Transformation Plan was
insufficient to dig Weatherford out of its debt." By November
2018, Weatherford hired a restructuring advisor and by
December 31, 2018, the Company retained restructuring
counsel. On February 1, 2019, when an analyst asked
if Weatherford was considering bankruptcy, McCollum
responded, "I don't waste a lot of time thinking or planning
how to fail," and that "the actions that we can take is [sic]
continuing to execute the [T]ransformation [P]lan and do
that quarter in and quarter out and continue to improve the
profitability, which ultimately will drive the cash flow of this
organization and improve our credit metrics." Weatherford
retained additional restructuring counsel in April 2019.

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 567 of 573

Utah Retirement Systems v. McCollum, Not Reported in Fed. Rptr. (2023)

2023 WL 8649878

On May 10, 2019, Weatherford issued a press release announcing that the company had executed a restructuring support agreement with a group of its senior noteholders and was seeking Chapter 11 bankruptcy protection since it "still face[d] a high level of debt" and "w[ould] not be able to generate sufficient liquidity to service all of its debt." By all accounts, the Transformation Plan had failed. On May 13, 2019, the New York Stock Exchange suspended trading in Weatherford's stock, and on May 14, 2019, Weatherford began trading on the Over-the-Counter market. That same day, Weatherford's share price plummeted more than 86%, closing at $0.05 per share. Weatherford initiated bankruptcy proceedings on July 1, 2019, implemented the restructuring support agreement negotiated during the Class Period, and gave all ownership in Weatherford to noteholders and certain Weatherford management, including the individual defendants—leaving only 1% to existing shareholders.

**\*2** This lawsuit was initiated. The lead Plaintiff, Utah Retirement Systems, brings claims on behalf of purchasers of the common stock of Weatherford during the Class Period. Defendants are Weatherford and a handful of its former executives. Plaintiff alleges that Defendants, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10-b(5), made materially false and misleading representations and omissions about Weatherford's "Transformation Plan." The district court granted Weatherford's motion to dismiss Plaintiff's claims with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), which is now on appeal.

## II. STANDARDS OF REVIEW

"We review a district court's dismissal of federal securities law claims under Rule 12(b)(6) de novo." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015). "A 'complaint will survive a Rule 12(b)(6) motion to dismiss if, accepting its factual allegations as true, the complaint plausibly states a claim for relief.' " *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Co.*, 58 F.4th 195, 206 (5th Cir. 2023) (quoting *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)). We will accept "all well-pleaded facts as true and view[ ] those facts in the light most favorable to the plaintiff[ ]." *Moffett v. Bryant*, 751 F.3d 323, 325 (5th Cir. 2014) (internal quotation marks and citation omitted).

Under Federal Rule of Civil Procedure 9(b), allegations of fraud must be pleaded "with particularity" as to "the circumstances constituting fraud." FED. R. CIV. P. 9(b). Particularity "necessarily differs with the facts of each case," but it generally requires a plaintiff to allege "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [they] obtained thereby." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067-68 (5th Cir. 1994) (internal quotation marks and citation omitted). Under Rule 9(b), however, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

Securities fraud claims brought by private litigants, like the ones here, are also subject to the pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u-4. The PSLRA "was enacted in response to an increase in securities fraud lawsuits perceived as frivolous." *Newby v. Enron Corp.*, 338 F.3d 467, 471 (5th Cir. 2003). It requires a plaintiff to "identify each allegedly misleading statement with particularity and explain why it is misleading." *Owens*, 789 F.3d at 535 (internal quotation marks and citation omitted). Moreover, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). "At a minimum, the PSLRA pleading standard incorporates the 'who, what, when, where, and how' requirements of Rule 9(b)." *Owens*, 789 F.3d at 535 (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 349–50 (5th Cir. 2002)). Thus, pleadings that fail "to specify the alleged fraudulent statements, the speaker, when and where the statements were made, and why they are fraudulent" must be dismissed. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

## III. DISCUSSION

Plaintiff's complaint alleges that Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5. "To state a Section 10(b) and Rule 10b-5 claim, a plaintiff must allege: '(1) a material misrepresentation or omission; *(2) scienter (a wrongful state of mind)*; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a causal connection between the material misrepresentation and the loss.' " *Okla. Firefighters Pension & Ret. Sys.*, 58 F.4th at 206 (further internal quotations omitted) (emphasis added)

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 568 of 573

Utah Retirement Systems v. McCollum, Not Reported in Fed. Rptr. (2023)
2023 WL 8649878

(quoting *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 429 (5th Cir. 2019)). We focus our analysis on whether Plaintiff sufficiently pleaded scienter because our adverse finding is dispositive of this appeal.

\* \* \*

**\*3** The PSLRA imposes an exacting standard for pleading intent in the securities fraud context. It requires, "in any private action ... [where] the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind," that a complaint "state with particularity facts giving rise to a *strong inference* that the defendant acted with" scienter "with respect to each act or omission alleged." *15 U.S.C. § 78u-4(b)(2)(A)* (emphasis added). "The required state of mind [for scienter] is an intent to deceive, manipulate, or defraud or severe recklessness." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (internal quotations omitted).

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) controls our review of Plaintiff's scienter arguments. In that case, the Supreme Court saw its task as one "to prescribe a workable construction of the strong inference standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Id.* at 322 (internal citations omitted). The Supreme Court established the following prescriptions:

> *First*, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.... *Second*, ... [t]he inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.

*Id.* at 322-23 (citations omitted). "Congress required plaintiffs to plead with particularity facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference." *Id.* at 323. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. All told, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

Applying the *Tellabs* framework to the present case, it is evident that Plaintiff has not alleged facts (as opposed to conclusions not based on pleaded facts) from which a reasonable person could draw a "strong inference" that Defendants spoke or acted with scienter to mislead investors during the Class Period. Chiseled to its core, Plaintiff's scienter theory is that Defendants "knew" throughout the Class Period that bankruptcy was "inevitable." When taken as a whole, however, Plaintiff's proposed inference is not "at least as compelling as any opposing inference of nonfraudulent intent"—e.g., that Weatherford was "trying to fix its issues but was continually stymied by a weak oil market." *Id.* at 314. Plaintiff has failed to sufficiently plead facts from which a reasonable person could draw a strong inference that Defendants acted with the intent to deceive, manipulate, or defraud or with severe recklessness.

Additionally, we consider Plaintiff's motive argument because, depending on the circumstances arising from the underlying facts pleaded, motive and opportunity may be relevant to a showing of scienter "and 'may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct.' " *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 410-11 (5th Cir. 2001) (quoting *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 551 (6th Cir. 1999)). Motive alone, however, is generally insufficient to plead a strong inference of scienter under the PSLRA. *Id.* at 410-12.

**\*4** Here, the asserted motive argument is meritless. Plaintiff argues that Defendants were motivated and incentivized throughout the Class Period to misrepresent to investors the true state of Weatherford's financial situation and to delay the "inevitable" filing of bankruptcy because Defendants needed time to negotiate a Management Incentive Plan ("MIP") under which management could receive up to 5% ownership in the reorganized company. But we have

Case 4:24-cv-01940    Document 44-4    Filed on 01/27/25 in TXSD    Page 569 of 573

Utah Retirement Systems v. McCollum, Not Reported in Fed. Rptr. (2023)

2023 WL 8649878

held "incentive compensation 'can hardly be the basis on which an allegation of fraud is predicated' " because "the vast majority of corporate executives" receive this type of compensation. *Ind. Elec. Workers*, 537 F.3d at 544 (quoting *Tuchman*, 14 F.3d at 1068). However, in a limited set of circumstances—when the potential bonus is extremely high and other allegations support an inference of scienter—performance-based compensation can establish motive. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005). Here, the MIP merely gave the new board the *discretion* to award equity compensation of up to 5% but did not guarantee any concrete benefit to anyone. Further, the complaint lacks factual allegations that tie together Plaintiff's pleaded fraud theory with the asserted motive. Plaintiff argues that Defendants needed to delay bankruptcy to negotiate the MIP, but Plaintiff does not allege how the MIP would have been different—or not existed at all—had the company gone under sooner. The district court therefore did not err when it dismissed Plaintiff's claims for failure to allege facts from which a reasonable person could draw a strong inference that Defendants spoke and acted with scienter to mislead investors during the Class Period. [2]

[2] "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Sec. Corp. v. INSpire Ins. Sols.*, 365 F.3d 353, 383 (5th Cir. 2004) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)). Because Plaintiff insufficiently pleaded a primary violation, its Section 20(a) claims against the individual defendants must fail. Accordingly, we affirm the district court's dismissal of those claims too.

## IV. CONCLUSION

For these reasons, we AFFIRM the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 8649878

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 27

Case 4:24-cv-01940   Document 44-4   Filed on 01/27/25 in TXSD   Page 571 of 573
Yang v. Nobilis Health Corporation, Not Reported in Fed. Rptr. (2021)
2021 WL 3619863, Fed. Sec. L. Rep. P 101,210

2021 WL 3619863
United States Court of Appeals, Fifth Circuit.

Zhang YANG, Plaintiff—Appellant,

v.

NOBILIS HEALTH CORPORATION; Harry Fleming;
David Young; Kenneth J. Klein, Defendants—Appellees.

No. 20-20538
|
FILED August 13, 2021

Appeal from the United States District Court for the Southern
District of Texas, USDC No. 4:19-cv-145

**Attorneys and Law Firms**

Omar Jafri, Patrick V. Dahlstrom, Pomerantz, L.L.P.,
Chicago, IL, Sammy Ford, IV, Ahmad, Zavitsanos,
Anaipakos, Alavi & Mensing, P.C., Houston, TX, for
Plaintiff-Appellant.

Tyler Geoffrey Doyle, Rex Manning, Jacquelyn Rex, Crystal
Robles, Smyser Kaplan & Veselka, L.L.P., Houston, TX, for
Defendants-Appellees.

Before Jolly, Duncan, and Oldham, Circuit Judges.

**Opinion**

Per Curiam: [*]

[*]   Pursuant to 5th Circuit Rule 47.5, the court
has determined that this opinion should not be
published and is not precedent except under the
limited circumstances set forth in 5th Circuit Rule
47.5.4.

**\*1**   A putative class of stockholders of Nobilis Health
Corporation sued the company and three of its corporate
officers, claiming the company engaged in unlawful and
fraudulent misrepresentation of the company's financial
condition to inflate its stock price. The district court found
that the amended complaint failed to adequately plead scienter
under the Private Securities Litigation Reform Act of 1995
("PSLRA") and dismissed the case for failure to state a claim.
We affirm.

I.

Nobilis was a publicly traded healthcare development and
management company with 30 locations across Texas and
Arizona. Defendant Harry Fleming served as CEO from
January 2017 until December 2018, and later served as
chairman of the board. Defendant David Young served as
the company's CFO from February 2017 until October 2018.
And Defendant Kenneth Klein served as interim CFO from
October 2018 until January 2019.

The plaintiffs claim Nobilis struggled financially but
deceptively concealed its declining position with half-true
press releases and flawed financial reports. In its March 2016
10-K, Nobilis admitted that it had failed to employ personnel
with the requisite knowledge or training in the application
of Generally Accepted Accounting Principles ("GAAP"),
and that it failed to appropriately oversee the company's
accounting and financial reporting departments. In particular,
Nobilis confessed problems with "management of third-party
billing and collections of aged receivables," and noted its
efforts to remediate operational defects by hiring staff with
GAAP experience.

But according to the plaintiffs, the company's announced
remedial efforts were all smoke and mirrors. The plaintiffs
claim that the company continued to flout GAAP rules and
failed to write down accounts receivable the company knew to
be uncollectable. Worse yet, the plaintiffs allege the company
fraudulently blamed a change in GAAP rules for financial
failures and missed targets, rather than alerting investors
and analysts that the financial difficulties were caused by
uncollectable accounts receivable.

The district court determined that the plaintiffs' allegations
fell short of the heightened scienter pleading requirements of
the PSLRA and thus dismissed the case for failure to state a
claim. The plaintiffs appealed. Our review is *de novo*. *Heinze
v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020).

II.

The elements of a private securities fraud claim based on
violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–
5 are: (1) a material misrepresentation or omission by
the defendant; (2) scienter; (3) a connection between the
misrepresentation or omission and the purchase or sale of a

2021 WL 3619863, Fed. Sec. L. Rep. P 101,210

security; (4) reliance upon the misrepresentation or omission; (5) economic loss; (6) loss causation. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809–10, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011) (quotation omitted). Only scienter is relevant to this appeal.

Analyzing scienter is a holistic enterprise that asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). A court first considers "the contribution of each individual allegation to a strong inference of scienter." *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015). If "any single allegation, standing alone, create[s] a strong inference of scienter, the case should proceed"; but if not, the court must then follow the individualized analysis with a holistic review of all scienter allegations together. *Ibid.* A complaint will survive only if the plaintiffs "plead facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference" of intent or severe recklessness. *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499. We begin with an individualized analysis of plaintiffs' allegations. Then we turn to a holistic review.

### A.

**\*2** The plaintiffs offer three pieces of information in support of their scienter allegations. First, they allege that Fleming and Young signed the company's 2018 Sarbanes-Oxley ("SOX") certifications in their official capacities as corporate executives. But our court has been clear that SOX certifications standing alone are insufficient to make out a compelling inference of scienter. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007).

Next, the plaintiffs allege that the GAAP violations coupled with Young's position as CFO are sufficient to show he knew or was severely reckless in ignoring the company's faltering financial state. But GAAP violations standing alone do not make out a cogent and compelling case for scienter. *See Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 534 & n.3 (5th Cir. 2008) ("[A] failure to follow GAAP, without more, does not establish scienter." (quotation omitted)).

Last, the plaintiffs offer confidential-witness testimony from three Nobilis employees who claimed that the company retained a backlog of unpaid claims executives knew to be

uncollectable. For a confidential witness testimony to be credited towards a finding of scienter, the complaint must indicate how or when the officers became aware of what the confidential source allegedly knew. *See Shaw Group*, 537 F.3d at 542. The confidential testimony here doesn't do that. Stripped down, the testimony of the confidential witnesses makes some conclusory allegations about corporate knowledge, but none of the testimony indicates how or when corporate officers became aware of the relevant information. *See Owens*, 789 F.3d at 545 (finding no scienter where the complaint "contain[ed] no particularized allegations of ... warnings to [defendants]" of alleged fraud); *Shaw Group*, 537 F.3d at 545 (finding no scienter where the plaintiff failed to plead facts showing that the defendants were "on notice" as to their alleged misstatements).

The most particularized allegation from any of the confidential witnesses comes from confidential witness 3, who claims that Young's state of mind can be inferred because he was present in the company's billing office over the course of several months. But simply alleging that Young was in a particular office at a particular time does not permit this court to infer that Young was aware or severely reckless in failing to appreciate the uncollectablility of particular accounts. Mere proximity to information does not automatically translate to knowledge of it. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 424 (5th Cir. 2001) ("An officer's position with a company does not suffice to create an inference of scienter.").

### B.

Because plaintiffs' allegations individually do not support a "powerful or cogent" inference of scienter, we turn next to a holistic review of the complaint to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499. Our review is particular to each defendant. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (requiring plaintiffs suing under the PSLRA to "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud" (quotation omitted)).

There are no particular scienter allegations against Klein other than that he, by virtue of his corporate position, must've been aware of the company's GAAP violations and the misrepresentations made in corporate releases. Plaintiffs urge us, in our holistic review, to infer Klein's scienter based on

Yang v. Nobilis Health Corporation, Not Reported in Fed. Rptr. (2021)

2021 WL 3619863, Fed. Sec. L. Rep. P 101,210

his corporate position—but that isn't allowed. *See Nathenson, 267 F.3d at 424.*

**\*3** The allegations against Fleming are similarly thin. The plaintiffs offer two allegations they claims to be sufficient to allege scienter as to Fleming: first, Fleming's position as CEO, and second, Fleming's signatures on SOX certifications. Taken together, Fleming's corporate position and SOX signature provide neither cogent nor powerful inference of scienter and are plainly insufficient. *See ibid.*; *Cent. Laborers' Pension Fund,* 497 F.3d at 552. These allegations simply reveal a truism—that Fleming was a corporate director who performed official duties including signing SOX certificates. We know nothing about Fleming's frame of mind, nor can we infer it based on the plaintiffs' conclusory assumptions that he acted with reckless disregard of alleged fraud.

That leaves Young. Taken together, the amended complaint alleges that Young's scienter can be inferred on the basis of three allegations. First, Young's position as CFO; second, Young's signature on the SOX certifications; and third, the allegation that Young visited the business office on several occasions to stimulate debt collection. There is not a single allegation that any confidential witness or any other person informed Young about their subjective views of the company's financial situation. So rather than presenting a "powerful or cogent" allegation of scienter, *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499, the plaintiffs ask us to imagine that Young acted with scienter based on his day-to-day involvement with the company, and the fact he was in proximity to people who allegedly had the relevant information. That's plainly insufficient to plead scienter. *See Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 287 (5th Cir. 2006) ("Corporate officers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded."). †

†

The plaintiffs also ask us to forgive the insufficient scienter allegations in accordance with the special circumstances exception. In "rare case[s] ... motive and opportunity allegations alone can support a strong inference of scienter." *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund,* 810 F.3d 951, 958 (5th Cir. 2016) (quotation omitted). Under that narrow exception, one must meet some combination of four considerations. First, the company must be small. *See Alaska Elec. Pension Fund v. Flotek Indust., Inc.,* 915 F.3d 975, 985 (5th Cir. 2019) ("[This court] has never found special circumstances permitting an inference of scienter based solely on a defendant's position when the company was large."). Second, the transaction at issue is critical to the company's continued vitality. *See Local 731 I.B.,* 810 F.3d at 968. Third, the misrepresentation is readily apparent to the speaker. *See ibid.* And last, the defendants' statements are internally inconsistent. *See Plotkin v. IP Axess Inc.,* 407 F.3d 690, 700 (5th Cir. 2005). The exception does not apply in this case because Nobilis was a large company with hundreds of employees, in 30 locations, and the exception does not apply in such circumstances. *See Alaska Elec. Pension Fund,* 915 F.3d at 985.

AFFIRMED.

All Citations

Not Reported in Fed. Rptr., 2021 WL 3619863, Fed. Sec. L. Rep. P 101,210

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.