# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

TERRY MONSKY, Individually and On Behalf
of All Others Similarly Situated,

                        Plaintiff,

    vs.

DIRECT DIGITAL HOLDINGS, INC.,
MARK WALKER, KEITH W. SMITH,
DIANA DIAZ, and DIRECT DIGITAL
MANAGEMENT, LLC,

                    Defendants.

Case No. 4:24-cv-01940
(Consolidated with Case No. 4:24-cv-02567)

Judge Kenneth M. Hoyt

## LEAD PLAINTIFF'S OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ............................................. 1

STATEMENT OF THE ISSUES TO BE RULED UPON THE COURT ................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................................................. 1

FACTUAL BACKGROUND ................................................................................................. 4

ARGUMENT ....................................................................................................................... 7

I.    LEGAL STANDARDS ................................................................................................. 7

II.   PLAINTIFF APPROPRIATELY RELIES ON ALLEGATIONS FROM A FORMER COLOSSUS SSP MANAGER AND MEDIA REPORTS IN REPUTABLE INDUSTRY PUBLICATIONS ................................................................................... 8

III.  PLAINTIFF ADEQUATELY ALLEGES MATERIAL MISREPRESENTATIONS AND OMISSIONS ................................................................................................... 9

A. March 26, 2024: Defendants' Half-Truths Regarding the Reasons for Direct Digital's FY 2023 Revenue Shortfall ................................................................................ 9

B. November 9, 2023: Misleading Statements Made Prior to Colossus's Suspension by Google ............................................................................................................. 12

C. December 5, 2023 through May 10, 2024: False and Misleading Statements Made After Colossus's Suspension by Google ......................................................................... 16

1. December 5, 2023 & January 9, 2024: Material Omissions Regarding FY 2024 Growth and Guidance ................................................................................. 16

2. February 1, 2024: Misleading Statements Concerning Direct Digital's Earlier "Milestones" ................................................................................................. 19

3. May 10, 2024: False Statements Concerning the Company's Q1 2024 Operations and Performance ........................................................................................ 22

IV.   THE TOTALITY OF PLAINTIFF'S ALLEGATIONS GIVE RISE TO A STRONG INFERENCE OF SCIENTER ................................................................................... 24

A. The Court Must Consider Plaintiff's Allegations Collectively .................................. 24

B. Defendants Knew the Primary Reason for the Revenue Shortfall When They Announced FY 2023 Results on March 26, 2024 .......................................................... 25

i

C.  Plaintiff Alleges Additional Circumstantial Evidence of Scienter ............................ 25

D.  Defendants Fail to Present a *More* Compelling Inference ........................................ 29

CONCLUSION ...................................................................................................................... 30

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,*
    291 F.3d 336 (5th Cir. 2002) ............................................................................. 3

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)......................................................................................... 7

*Backe v. Novatel Wireless, Inc.,*
    642 F. Supp. 2d 1169 (S.D. Cal. 2009).......................................................... 27

*Backman v. Polaroid Corp.,*
    910 F.2d 10 (1st Cir. 1990) ............................................................................ 22

*Bielousov v. GoPro, Inc.,*
    2017 WL 3168522 (N.D. Cal. July 26, 2017)................................................ 18

*Carlucci v. Han,*
    886 F. Supp. 2d 497 (E.D. Va. 2012) ............................................................ 21

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,*
    70 F.4th 668 (3d Cir. 2023) ........................................................................... 23

*Crutchfield v. Match Grp., Inc.,*
    529 F. Supp. 3d 570 (N.D. Tex. 2021) .......................................................... 21

*Curran v. Freshpet, Inc.,*
    2018 WL 394878 (D.N.J. Jan. 12, 2018) ...................................................... 15

*Curry v. Hansen Med., Inc.,*
    2012 WL 3242447 (N.D. Cal. Aug. 10, 2012) .............................................. 27

*Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.,*
    2024 WL 83503 (S.D. Tex. Jan. 8, 2024)..................................................... 18

*Denny v. Canaan Inc.,*
    2023 WL 2647855 (S.D.N.Y. Mar. 27, 2023) .............................................. 21

*Dorsey v. Portfolio Equities, Inc.,*
    540 F.3d 333 (5th Cir. 2008) .................................................................. 27, 28

*Dougherty v. Esperion Therapeutics, Inc.,*
    905 F.3d 971 (6th Cir. 2018) ........................................................................ 15

iii

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................ 12

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
   514 F. Supp. 3d 942 (S.D. Tex. 2021) .................................................. 7

*Hutchins v. NBTY, Inc.*,
   2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ................................. 17, 26

*In re ArthroCare Corp. Sec. Litig.*,
   726 F. Supp. 2d 696 (W.D. Tex. 2010) ........................................ 17, 28, 29

*In re Cassava Scis., Inc. Sec. Litig.*,
   2023 WL 3442087 (W.D. Tex. May 11, 2023) ................................. 9, 13

*In re Cryolife, Inc. Sec. Litig.*,
   2005 WL 8155579 (N.D. Ga. June 17, 2005) ...................................... 23

*In re Fisker Auto. Holdings, Inc. S'holder Litig.*,
   2015 WL 6039690 (D. Del. Oct. 15, 2015) ......................................... 23

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................ 8

*In re Mylan N.V. Sec. Litig.*,
   2023 WL 3539371 (W.D. Pa. May 18, 2023) ........................................ 8

*In re Nat'l Golf Props., Inc.*,
   2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ................................... 21

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ........................................................................ 23

*Junius Constr. Co. v. Cohen*,
   178 N.E. 672 (N.Y. Ct. App. 1931) ................................................... 10

*Loc. 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*,
   2015 WL 1143081 (S.D. Tex. Mar. 13, 2015) .................................... 14

*Lormand v. US Unwired Inc.*,
   565 F.3d 228 (5th Cir. 2009) .................................................... passim

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) ........................................................................ 10

*Marcus v. J.C. Penney Co., Inc.*,
   2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ..................................... 8

iv

*Masel v. Villarreal*,
  924 F.3d 734 (5th Cir. 2019) ............................................................ 17, 19, 23

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ........................................................................ 13, 25, 30

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*,
  2022 WL 377415 (N.D. Okla. Jan. 7, 2022) .............................................. 23

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016) ...................................................... 28

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) .............................................................. 10

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ...................................................... 25, 27, 28

*Oklahoma Firefighters Pen. & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) .......................................................... passim

*Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*,
  575 U.S. 175 (2015) ...................................................................... passim

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) ................................................................. 8

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) .......................................................... passim

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ................................................................. 7

*Rein v. Dutch Bros, Inc.*,
  2024 WL 3105004 (S.D.N.Y. June 24, 2024) ............................................ 21

*Roofers Local No. 149 Pension Fund v. Amgen Inc.*,
  2024 WL 4354809 (S.D.N.Y. Sept. 30, 2024) ........................................... 14

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) ...................................... passim

*Rubinstein v. Collins*,
  20 F.3d 160 (5th Cir. 1994) ................................................................. 18

*Salinas v. City of Houston*,
  2023 WL 3899020 (S.D. Tex. June 8, 2023) ............................................. 30

v

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018) ........................................................... 27

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ..................................................................... 29

*Smallen v. W. Union Co.*,
   2019 WL 1382823 (D. Colo. Mar. 27, 2019) ........................................... 10

*Smith v. Reg'l Transit Auth.*,
   756 F.3d 340 (5th Cir. 2014) ....................................................................... 7

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) ............................................................... 15, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................. 24

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020) ........................................... 18, 19, 20

*Yannes v. SCWorx Corp.*,
   2021 WL 2555437 (S.D.N.Y. June 21, 2021) ........................................... 29

## STATUTES, RULES AND OTHER AUTHORITIES

15 U.S.C. § 78u-4(b)(1) ...................................................................................... 7

15 U.S.C. § 78u-4(b)(2) ...................................................................................... 7

15 U.S.C. § 78u-5(c)(1)(A)(i) ..................................................................... 18, 19

Private Securities Litigation Reform Act Rule 9(b) ....................................... 1, 21, 24

SEC Rule 10b-5 ................................................................................................. 1

Securities Exchange Act of 1934 § 10(b) ............................................... 1, 10

Securities Exchange Act of 1934 § 20(a) ........................................................ 1

Lead Plaintiff Donald W. Hutchings, on behalf of himself and various trusts (*see* ECF 31) ("Plaintiff"), submits this opposition to Defendants' Motion to Dismiss (ECF 44) ("Def. Br.").[1]

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Plaintiff brings this putative class action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder.

## STATEMENT OF THE ISSUES TO BE RULED UPON THE COURT

Whether Plaintiff has adequately pleaded false statements or statements rendered misleading by omission, and a strong inference of Defendants' intentional or reckless behavior, as required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT[1]

This case concerns Direct Digital Holdings, Inc. ("Direct Digital" or the "Company") and its top executives, who, after achieving unexpected success in Q3 2023, chose to continuously tout the Company's current business and rosy outlook despite serious, unaddressed technological issues that jeopardized its future viability. These unresolved issues led the Company's two largest customers, responsible for most of its revenue, to significantly scale back their business. Rather than disclose the continuing crisis and temper their outlook, Defendants engaged in a "reckless[] gamble" that this undisclosed "bad news" would eventually be overshadowed by future "good news." *Oklahoma Firefighters Pen. & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 215 (5th Cir. 2023). When they could no longer conceal the negative financial impact of these ongoing

---

[1] Unless otherwise noted, all internal quotation marks, citations, and footnotes from quoted material have been omitted, and all emphasis in case quotations is added. "¶_" references are to Plaintiff's Consolidated Complaint (ECF 35) ("Complaint"). "FY" means fiscal year and "Q#" references specific quarters during the FY. "Def. Appx. B" references Defendants' Appendix B (ECF 44-3). "Pl. Appx. A" means Plaintiff's Appendix of Exhibits in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss, submitted herewith. Plaintiff objects to Defendants' Appendix A (ECF 44-1) to the extent it contains matters outside of the Complaint or is used to make arguments not made in Def. Br.

issues, Defendants shamelessly misrepresented the true cause, continuing their deception.

On March 26, 2024, Direct Digital announced its disappointing FY 2023 financial results, reporting $157.1 million in revenues and badly missing its $170 million to $190 million revenue guidance. On this news, Direct Digital's stock price plummeted nearly 40%. While enormously disappointing, Defendants assured investors that the Company remained positioned "to continue our strong revenue growth" because the dramatic miss was caused by "two primary factors" largely confined to Q4 2023, that is: (1) "lower-than-anticipated demand" and (2) its proactive, "accelerate[d] . . . transition towards a cookie-less advertising platform."

However, Defendants deliberately concealed the true "primary factor" behind the revenue shortfall. Direct Digital's largest customer, Google Display & Video 360 ("Google"), which accounted for 94% of the revenue in its sell side segment, Colossus Media, LLC ("Colossus"), had blocked Colossus from its platform in Q4 2023 due to its systematic mis-declaration of user IDs. This occurs when a sell-side platform ("SSP") incorrectly associates users with inaccurate identifiers, causing advertisers to target the wrong audience. By January 2024, Google had notified the Company that it would "short pay" a Q4 2023 invoice such that the associated revenue—which exceeded $8.8 million—was not recognized. Thus, this Google-related short pay was the primary driver of the revenue miss, accounting for more than $8.8 million of the total $12.9 million shortfall. Moreover, the undisclosed dispute with Google, along with ongoing platform issues that led Google to drastically reduce its business in Q4 and beyond, raised serious doubts about Direct Digital's growth trajectory and long-term viability.

Defendants had long known that Colossus's platform was seriously flawed. Earlier in 2023, the Company's second-largest customer, The Trade Desk, had also detected the systematic mis-declaration of user IDs and blocked Colossus. Despite knowing about this critical defect in

Colossus's platform for nearly a year, Defendants chose to conceal it while simultaneously promoting the Company's current success and promising future.  As one industry commentator later aptly noted, "When two of the biggest players in the market [Google and The Trade Desk] essentially blacklist your subsidiary, it's not just a bump in the road—it's a full-blown crisis.  This context makes the company's earlier [March 26, 2024] explanations [regarding the FY 2023 miss] seem like a smokescreen, diverting attention from the real issues at hand."

In the Fifth Circuit, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."  *Lormand v. US Unwired Inc.*, 565 F.3d 228, 248 (5th Cir. 2009).  Throughout the class period, prospective investors were misled into believing Direct Digital's operational and growth narrative and trusting that the FY 2023 miss was a temporary setback.  In reality, Defendants were actively concealing the severe risks posed by the Company's faulty platform which could, and eventually did, cause its revenues to plummet.

Regarding scienter, Defendants rhetorically ask, "Why would Defendants raise and reaffirm guidance that they supposedly knew Direct Digital could not meet in one quarter, only to disclose a miss in the very next quarter?"  However, that mischaracterizes the Complaint.  Plaintiff alleges that Defendants knew that Colossus's platform was systematically mis-declaring user IDs but deliberately concealed the issue, along with its risks and consequences.  Ultimately, Defendants' "reckless[] gamble" failed to pay off when the financial consequences materialized and industry publications documented the "full-blown crisis" they had been secretly managing.

Because Plaintiff satisfies the PSLRA's pleading requirements, Defendants' Motion to Dismiss should be denied.  *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002) (PSLRA was enacted to prevent "abusive, frivolous strike suits," not to "raise the

pleading burdens . . . to such a level that facially valid claims . . . must be routinely dismissed.").

## FACTUAL BACKGROUND

Direct Digital is an end-to-end, full-service programmatic advertising platform for both buy and sell side digital advertising. ¶2. The Company is controlled by its co-founders, Chief Executive Officer ("CEO") and Chairman, Mark D. Walker ("Walker"), and President, Keith W. Smith ("Smith"), who together own all of its Class B common stock (exchangeable for publicly traded Class A shares) and who retain 77% voting power over its operations. ¶¶2, 28–30, 32. Diana P. Diaz ("Diaz") is the Company's Chief Financial Officer ("CFO"). ¶31.

Direct Digital's main subsidiary, accounting for 78% of FY 2023 revenues and all its growth, is Colossus. ¶¶3, 58. Colossus's SSP allows publishers to sell ad impressions to buyers, through either real-time bidding auctions or direct deals with demand side platforms ("DSPs") or other ad networks. ¶¶47–49. It depends heavily on "cookies" to its deliver targeted ads. ¶¶36–37. Colossus processes billions of ad impressions, each occurring automatically in an auction/bidding format, in a fraction of a second. ¶49. Colossus's revenue is recognized in real-time, *i.e.*, immediately "when an ad is delivered or displayed in response to a winning bid request." ¶50.

Colossus's business was highly concentrated. ¶59. In Q3 2023, 94% of its revenues and most of its quarter over quarter growth came from a single DSP customer, Google. ¶¶60, 75. Colossus's second largest customer was another large DSP, The Trade Desk. ¶¶53, 75. Google and The Trade Desk are two of the most prominent and sophisticated DSPs in world. ¶¶19, 53.

Throughout most of its history, Direct Digital's stock price languished. ¶5. But, on November 9, 2023, it surprised investors by announcing Q3 2023 revenues of $59.5 million and adjusted EBITDA of $5.4 million, blowing away Wall Street's expectations. ¶64. Even better,

with Q4 2023 almost halfway complete, the Company announced that it was raising its FY 2023 guidance by 50%, to between $170 million and $190 million. ¶65. In response, Direct Digital's stock price promptly doubled to $5.34 per share. ¶66. Defendants would reaffirm their revenue and growth outlook, purportedly driven by the Company's customer relationships and operational excellence, throughout the remainder of 2023 and beyond, driving the Company's stock price to $32.51 per share on March 15, 2024. *See, e.g.,* ¶¶8, 61, 95, 99–100, 103, 106, 108, 111, 118–119.

Despite the impressive Q3 2023 results, behind the scenes Direct Digital was grappling with a crisis involving Colossus's sell side platform. The Company's second largest customer, The Trade Desk, had in mid-2023 observed Colossus presenting mis-declared user IDs when working with its platform. ¶¶67–68. As a result, it blocked Colossus across its network, except when an advertiser specifically requested the SSP. ¶68.

With Google accounting for 94% of Colossus's Q3 2023 revenues, the suspension by The Trade Desk was manageable from a financial standpoint. ¶60. But it portended something much worse which had the potential to completely disrupt Direct Digital's business. The Company's inability to correct the problem and that its largest customer, Google, was among the most sophisticated and influential DSPs in the world, meant that when Google inevitably detected the issue, the financial ramifications would almost certainly be devastating. ¶¶53, 68–69, 73.

Predictably, in late 2023, Google discovered that Colossus was mis-declaring user IDs and blocked Colossus's SSP across its network. ¶¶71–72, 75. After issuing credits to its affected advertisers, Google ultimately reinstated Colossus, but at a fraction of previous volumes. ¶¶11, 71, 131; *see also* ¶60 (showing 51% revenue drop from Q4 2023 to Q1 2024). In January 2024, Google formally notified Direct Digital that it was short paying a Q4 2023 invoice in an amount exceeding $8.8 million, such that the Company could not recognize the associated revenue. ¶87.

5

Then, on March 26, 2024, Direct Digital announced its FY 2023 financial results, reporting just $157.1 million in revenues and badly missing its revised revenue guidance.  ¶111.  On this news, Direct Digital's stock price plummeted nearly 40%.  ¶16.  While disappointing, Defendants assured investors that the Company remained in a position "to continue our strong revenue growth" because the miss was due to two "primary factors" that were largely confined to Q4 2023, that is: (1) soft demand and (2) its proactive, accelerated transition towards a cookie-less platform.  ¶113.  Defendants failed to disclose Google's Q4 2023 short pay, which accounted for the majority of the $12.9 million revenue shortfall.  ¶117.  They also continued to hide the ongoing crisis with Colossus's platform and the related financial ramifications.  *Id.*

On May 10, 2024, Adalytics Research, LLC ("Adalytics") published a study of The Trade Desk and sixteen SSPs, comparing each SSP's declared user IDs (upon which advertisers bid) to the actual user IDs.  ¶67.  Over the course of several months, Adalytics observed that, *for Colossus only*, the user ID declared to The Trade Desk at the time of an ad auction was different from the actual user ID stored in the user's browser.  *Id.*  Other publications soon reported additional details including the first public reports of The Trade Desk blocking Colossus in mid-2023 and Google's suspension of the platform later in the year.  ¶¶68–73.[2]  The articles also reported that at least three publishers had confirmed Colossus's mis-declaration of user IDs (¶69), further corroborating reports that Colossus was unable to fix the issue (¶73), and demonstrating that it was an ongoing issue across the Company's entire sell side platform.  ¶¶10–11, 83.

On May 23, 2024, when this case was filed, Direct Digital had not yet filed its 2023 Form 10-K due to the resignation of its independent auditor on April 17, 2024.  ¶84.  On October 15,

---

[2] Direct Digital denied that the user ID mismatches were deliberate and initially tried to blame the mismatches on its "middleware" company, Bidswitch.  ¶70.  But Bidswitch refuted the claim, and Adalytics and others found that SSPs that used Bidswitch to connect to The Trade Desk did not experience these same mismatches.  *Id.*  Colossus later sued Adalytics, which thereafter denied that it meant to suggest that the platform issues were intentional.

2024, it belatedly filed the report and disclosed for the first time that the Company's largest sell side customer (Google) had short paid 2023 invoices, resulting in an $8.8 million expense and lower associated revenue in FY 2023.  ¶87.  It further disclosed that as a result of the mis-declaration issue, a "significant customer" (The Trade Desk) had "paused its connection" and thereafter resumed its business at even lower volumes.  ¶¶91, 133.  As a result, the Company said there was substantial doubt about its ability to continue as a going concern.  ¶88.

Direct Digital also filed its overdue Form 10-Qs, which showed Q1 2024 revenue of $22.27 million and a $3.8 million net loss.  ¶134.  For Q2 2024, it reported only $21.8 million in revenue and a $3.1 million net loss.  *Id.*  On this news, Direct Digital's stock price sank 23%.  ¶135.  Today, after last reporting quarterly revenue of $9.1 million for Q3 2024, the Company's stock trades under a dollar per share.

## ARGUMENT

## I.    LEGAL STANDARDS

In evaluating a motion to dismiss, "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true."  *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 949 (S.D. Tex. 2021).  The court should not resolve any disputed issues of fact.  *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Additionally, to satisfy the PSLRA, a plaintiff must plead each misrepresentation with "particularity" and allege facts collectively giving rise to "a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(1) & (b)(2).

## II. PLAINTIFF APPROPRIATELY RELIES ON ALLEGATIONS FROM A FORMER COLOSSUS SSP MANAGER AND MEDIA REPORTS IN REPUTABLE INDUSTRY PUBLICATIONS

Defendants seek to undermine Plaintiff's particularized pleading by asking the Court to disregard allegations that rely in part on a confidential witness and industry reporting. Def. Br. at 27–28. Courts may rely on assertions from a confidential source if the person is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Owens v. Jastrow*, 789 F.3d 529, 542 n.11 (5th Cir. 2015) (quoting *ABC Arbitrage*, 291 F.3d at 352); *accord Six Flags*, 58 F.4th at 207. Plaintiff's witness is a "Colossus Media manager responsible for development of customer relationships" such that he/she would be able to identify Google as the customer responsible for 92% ($30.9 million of $33.4 million) of Q4 2023 Colossus revenues, as well as its second largest customer, The Trade Desk. ¶¶60, 75. Anyone in a fifteen or twenty-person company, and particularly someone responsible for "customer relationships," would know the customers responsible for virtually all of the Company's revenue. ¶75. A "Colossus Media manager" would likewise know when and why the 92% customer "pulled the connection." *Id.*

Plaintiffs may also rely on published articles for their pleading where such "media sources" are "sufficiently detailed" to "indicate [] their reliability" and their "independent investigative effort." *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *6 (W.D. Pa. May 18, 2023); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("if the newspaper article includes numerous factual particulars and is based on an independent investigative effort, it is a source that may be credited"); *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *2 & *2 n.4 (E.D. Tex. Sept. 29, 2015) (crediting a CNBC news report "[a]t this stage"). Here, The Trade Desk's "aware[ness] of issues" with Colossus's mis-declaration of user IDs "for more than a year," as detailed in the *AdExchanger* article, was described by The Trade Desk itself through

8

its "spokesperson."  Def. Br. at 27; ¶68.  That the spokesperson is unnamed does not alter the fact

that he/she was designated by The Trade Desk to speak on its behalf.  *See* Def. Br. at 27.  Similarly,

the *AdExchanger* article cites "a source at Google" (¶71) whose account is sufficiently detailed

and consistent with other accounts of the Colossus suspension.  *See* ¶¶73, 75.

The witness and media accounts are corroborated by other facts.  *Six Flags*, 58 F.4th at 208

(corroborated witness allegations given more weight).  When asked about blocking Colossus,

Google confirmed that "[l]ate last year [in 2023] our teams identified sources of invalid traffic that

do not adhere to our guidance around how signals are shared in bid requests and took prompt

action."  ¶72.  Direct Digital itself acknowledged Google's suspension.  ¶73.  That Google was the

largest customer, and post-suspension it resumed its Colossus business "at a lower volume," is

further corroborated by Colossus's "[l]argest [c]ustomer" revenues falling from $30.9 million

(*after* deduction of the short pay) in Q4 2023 to $15.1 million in Q1 2024.  ¶¶60, 71.

The Court should reject Defendants' effort to discard Plaintiff's particularized allegations

which are corroborated by The Trade Desk, Google, and Direct Digital itself.  At minimum, "the

reliability of the [] reports . . . is a question of fact that the Court cannot resolve at this time."  *In

re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *8 (W.D. Tex. May 11, 2023).

### III.    PLAINTIFF ADEQUATELY ALLEGES MATERIAL MISREPRESENTATIONS AND OMISSIONS

#### A.    March 26, 2024: Defendants' Half-Truths Regarding the Reasons for Direct Digital's FY 2023 Revenue Shortfall

Defendants' scheme to mislead investors by "concealing bad news in the hope that it will

be overtaken by good news" is demonstrated by their half-truth explanations for the Company's

FY 2023 revenue miss.  *See Six Flags*, 58 F.4th at 215.  On March 26, 2024, Direct Digital reported

FY 2023 revenues of $157.1 million which fell $12.9 million short of guidance.  ¶111.  Walker

and Diaz identified "two primary factors" driving the miss, both of which were reassuring to

investors since they were transitory in nature: (1) lower-than-anticipated Q4 demand and (2) the Company's accelerated transition towards a "cookie-less" platform.  ¶¶111, 113–115.  However, Defendants failed to disclose the actual "primary factor" responsible for the miss, Google's short pay.  ¶¶87, 112, 117.  This factor not only had the largest financial impact on Q4 2023, accounting for more than $8.8 million of the $12.9 million shortfall, but it also involved Direct Digital's largest customer, which raised serious concerns about the Company's future.  *Id.*  Defendants had an unmistakable duty to disclose this information to make the statements made not misleading. *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another"); *cf. Nakkhumpun v. Taylor*, 782 F.3d 1142, 1148 (10th Cir. 2015) (failure to disclose principal reason for termination of deal actionable).[3]

    As the U.S. Supreme Court explained in a recent § 10(b) securities class action, "A classic example of an actionable half-truth in contract law is the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property."  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263–64 (2024); *see also Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (N.Y. Ct. App. 1931) (Cardozo, C.J.) ("The buyer, warned of the risk, was ready to assume it.  But there was another and greater risk about which the seller was silent, a risk like in kind but vastly greater in degree.  Rutledge street, if opened, would split the plot in halves.").  Here, the undisclosed proverbial third road, the Google dispute and short pay, was the equivalent of a major thoroughfare.

---

[3] In *Smallen v. W. Union Co.*, 2019 WL 1382823, at *22 (D. Colo. Mar. 27, 2019) (Def. Br. at 18) the court did not hold that a defendant need not disclose "the most important reason" for an occurrence.  Instead, the court did not agree with the plaintiffs' characterization of what the misleading statements meant to convey and why they were purportedly misleading in the first instance.  *Id.* at *23.  Notably, unlike here, the statements did not claim to reveal the primary factor driving the relevant expenditures.  *Id.* at *22

According to Defendants, Plaintiff must specify the amount of lost revenue from decreased demand and the cookie transition to compare it with the revenue lost due to Google's short pay. Def. Br. at 12, 18. However, from purely a financial perspective, Google's short pay was the most significant factor behind the $12.9 million miss. ¶¶15, 78, 87, 117; *cf. Six Flags*, 58 F.4th at 220–221 (plaintiff not required to plead "how much revenue was overstated" where the court may infer from other allegations of false statements that defendants "also may have overstated the revenue"). Direct Digital ultimately acknowledged this on October 15, 2024, admitting an *increase* in 2023 sell side (Colossus) demand had been partially offset by a single issue, the reduction in 2023 revenue associated with the $8.8 million short pay. ¶87.

Defendants further contend that Direct Digital had no obligation to disclose the short pay earlier because the Company purportedly did not know the reason for it and was not required to "jump the gun." Def. Br. at 18–19. However, disclosure of the short pay was not premature—it had already occurred (¶¶15, 87), and it involved Direct Digital's largest customer (¶87), Google (¶75), which contributed over 92% of Colossus's quarterly revenue (¶60). The fact that Direct Digital's most significant customer was withholding millions from the nascent company was an extraordinary event that needed to be disclosed to make the statements made not misleading. *See Rougier v. Applied Optoelectronics, Inc*., 2019 WL 6111516, at *1, *9 (S.D. Tex. Mar. 27, 2019) (disclosure of decreasing orders required for customer responsible for 50% of revenues). Unlike the two temporary issues Defendants cited as causes for the Q4 2023 shortfall, a dispute of this magnitude with Google had the potential to derail the Company's entire business. ¶¶9, 112, 117. Under Defendants' flawed logic, even their belated October 2024 disclosure of the short pay would still be premature, as they claim they never determined the reason. ¶87.

11

Notwithstanding the short pay, Defendants were required to disclose the ongoing platform issues, the resulting Google suspension, and its resumption at significantly reduced volumes to ensure that their voluntary statements were not misleading.  ¶¶112, 117.  *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("both quantitative and qualitative factors should be considered in assessing a statement's materiality").[4] As a leading online industry journal summarized (¶86):

> These actions by The Trade Desk and Google paint a much clearer picture of why Direct Digital Holdings faced such significant financial pressure in Q4 2023.  It wasn't just about transitioning to a cookie-less future; it was about the immediate and tangible impacts of losing trust and access within the industry.
>
> *When two of the biggest players in the market essentially blacklist your subsidiary, it's not just a bump in the road—it's a full-blown crisis.  This context makes the company's earlier explanations seem like a smokescreen, diverting attention from the real issues at hand.*
>
> So, while Direct Digital Holdings tried to spin a tale of proactive adaptation to industry changes, the reality was far grimmer.  *The loss of trading privileges with major partners like The Trade Desk and Google likely had a direct impact on their bottom line.  These events make a far more plausible explanation for their Q4 financial woes than the narrative they attempted to sell.*[5]

## B.    November 9, 2023: Misleading Statements Made Prior to Colossus's Suspension by Google

On November 9, 2023, Direct Digital announced record financial results and raised its FY 2023 revenue guidance by 50% to between $170 million and $190 million.  ¶¶94–95.  Investors

---

[4] While not determinative, Plaintiff is entitled to the reasonable inference that the Google short pay was connected to the ongoing user ID issues, and that Defendants knew or had strong reason to expect that was the case.  *See Applied Optoelectronics*, 2019 WL 6111516, at *10 ("Plaintiff's allegations create an inference that . . . AOI's declining committed orders from Amazon were caused by AOI's production and quality control problems"); *Lormand*, 565 F.3d at 239 (for falsity, plaintiff entitled to "all reasonable inferences").  The Company's statement that it did not know why Google short paid the invoices (Def. Br. at 6, 18) was not made until October 15, 2024, almost five months after this case was filed.  That ten months after receiving the short pay notice the Company still did not know why Google refused to pay is not credible and, at best, would show deliberate indifference.

[5] Defendants' March 26, 2024 statements regarding the Company being well-positioned to continue its growth trajectory were also misleading.  ¶¶111, 113.  With just five days left in Q1 2024, Defendants already knew that the quarter was an unmitigated disaster.  ¶60 (showing Q1 revenues down nearly 50% from Q4 2023); ¶¶112, 117.

were understandably anxious to learn the basis for this drastic and exciting move.  Defendants'

explanations, however, only told half the story and were materially misleading when made.  ¶96.

In truth, the Company's Q3 2023 success and FY 2023 outlook was built on a precarious

foundation—one that Defendants knew was at serious risk of collapsing.  *Id.*  At the time, Direct

Digital was experiencing a crisis with Colossus's sell side platform.  *Id.*  The Company's second

largest customer, industry behemoth The Trade Desk, had in mid-2023 observed Colossus

systematically presenting mis-declared user IDs and partially blocked the SSP across its platform.

¶¶53, 68.  Direct Digital was able to offset its loss of The Trade Desk business by relying on its

largest customer, Google.  ¶60.  But this near-total reliance on Google came with an additional

risk.  Like The Trade Desk, Google was one of the world's most sophisticated DSPs.  ¶53.  If and

when Google learned that Colossus's platform was mis-declaring user IDs, the resulting disruption

to Direct Digital's business would be devastating.[6]

Having chosen to discuss Direct Digital's operational/platform strength (¶¶95, 97, 99-100),

customer relationships (¶100), and resultant revenue (¶¶95, 99), Defendants had a duty to disclose

the known "significant and material risk" to its platform and largest customers.  *See* ¶101; *Matrixx*

*Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (disclosure required where "information

indicat[ed] a significant risk to its leading revenue-generating product"); *Cassava*, 2023 WL

3442087, at *7 (disclosure of questionable data required when touting scientific study of primary

drug).  Thus, whether Direct Digital's financial guidance was theoretically achievable when

---

[6] Defendants suggest that The Trade Desk never communicated the issue and they remained ignorant of the associated risk.  Def. Br. at 15.  Yet, when Direct Digital's second largest customer stopped buying "Colossus inventory," except where there are "direct programmatic deal[s]," the only reasonable inference is that the Company knew.  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("allegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation").  This is particularly true since Colossus's revenues were recognized in real time.  ¶50.  Moreover, it is implausible that The Trade Desk would resume its business even at a lower volume (¶68) if Direct Digital did not know about the issue and attempt to address it.

initially issued, Defendants nonetheless "concealed the extent of the risk the company was facing" in connection with the ongoing mis-declaration issues. *Roofers Local No. 149 Pension Fund v. Amgen Inc.*, 2024 WL 4354809, at *12 (S.D.N.Y. Sept. 30, 2024) (despite describing potential IRS liability as "substantial," disclosure of actual financial exposure needed to be clear and complete).

Defendants claim these misstatements are inactionable, immaterial puffery. *See* Def. Br. at 9. Yet, otherwise vague statements are actionable when contextually connected to more concrete misstatements. *Plotkin*, 407 F.3d at 698–699. Defendants' challenged statements here explained the increased guidance, referencing factors such as a quality "platform" or "infrastructure," strong "operating leverage," and "inventory quality," and were "designed to create an impression that a substantial payoff would soon flow from" them. *See Plotkin,* 407 F.3d at 698; ¶¶95–97, 99–101. Because these statements accompanied and explained the 50% increase in FY 2023 guidance, they were important to reasonable investors.[7] *Six Flags*, 58 F.4th at 220 (statements describing construction as "continuing" or "progressing nicely" are not immaterial puffery since they supported the company's earlier projections).[8]

Defendants further challenge the invalid traffic ("IVT") allegations (¶97), faulting Plaintiff for not alleging that the mis-declaration issues constituted a particular type of IVT, such as "artificially inflated impressions." Def. Br. at 11–12. But the Company's discussion of IVT is not so limited, and Google's description of the issue aligns with Defendants' misleading disclosures. *See* ¶72 (describing Colossus's mis-declaration problem, "our teams identified sources of *invalid*

---

[7] In that respect, this case is distinguishable from *Loc. 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 2015 WL 1143081, at *7–*8 (S.D. Tex. Mar. 13, 2015) (Hoyt, J.) (Def. Br. at 1–2, 10) where the indefinite statements were not tied to more concrete assertions.

[8] Smith's November 9, 2023 statement that Defendants were committed to executing Q3's growth initiatives in Q4 (¶94) is material and plausibly rendered false by the fact that Defendants immediately reversed course in "November/December." *Plotkin*, 407 F.3d at 698 (then-current state may be inferred from later-emerging facts).

*traffic* that do not adhere to our guidance"); ¶55 ("invalid traffic 'is any activity that doesn't come from a real user with genuine interest' and may include '*falsely represented inventory*'"). And while Plaintiff does not dispute that the Company reported a 1% IVT rate or touted its "sophisticated technology" (Def. Br. at 11–12), he alleges that these statements were materially misleading because the technology failed to detect the mis-declaration issue, which The Trade Desk itself ultimately identified. ¶¶68, 98. Further, the Company's efforts to address IVT were far less effective than implied, as "invalid traffic issues with one of its most prominent DSP customers [The Trade Desk] had already impacted performance and posed a significant and material risk to the Company's purported growth trajectory and its FY 2023 guidance." ¶98.

Defendants also contend that some of their statements (¶¶95, 99) are forward-looking and protected by the PSLRA's safe harbor. Def. Br. at 19–21. However, the *then-existing* platform issues "represented a significant and material *risk* to Direct Digital's purported growth trajectory and to its FY 2023 guidance." ¶¶96, 98, 101. These statements, which are misleading due to the omission of present facts, are therefore not forward-looking. *Applied Optoelectronics*, 2019 WL 6111516, at *10 (omissions of "present facts" undercutting projections not forward-looking); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018) (same); *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) (safe harbor inapplicable where misleading nature of statements was discernible when they were made).[9]

Finally, Defendants argue that many of the statements (¶¶94–95, 99–100) are inactionable

---

[9] Even if considered forward-looking, Defendants' cautionary language regarding general "operational or performance issues" or "customer concentration" (Def. Br. at 20–21) would not suffice as a substitute for a risk disclosure that is specifically tailored to address the already-partially-materialized risk to the Company's relationships with its key customers. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (risk warning must provide "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely [] boilerplate . . . risk factors"). Plaintiff's allegations further support a strong inference that the statements were made with actual knowledge that they were misleading. *See* section IV, below.

opinions.  Def. Br. at 22–23.  To the extent they may be characterized as such, Plaintiff's

allegations demonstrate that they did not "fairly align[] with the information in the [Defendants']

possession at the time," including the known risks to the Company's relationships with its largest

customers due to the ongoing platform issues.  ¶¶96, 101; *Omnicare*, 575 U.S. at 189.  Moreover,

Plaintiff's allegations "show[] that Defendants either did not actually hold the opinion they . . .

stated or that Defendants omitted material facts that conflicted with what a reasonable investor

would take from the statement itself."  *Applied Optoelectronics*, 2019 WL 6111516, at *10.

### C.    December 5, 2023 through May 10, 2024: False and Misleading Statements Made After Colossus's Suspension by Google

#### 1.    December 5, 2023 & January 9, 2024: Material Omissions Regarding FY 2024 Growth and Guidance

Although Direct Digital was plagued with platform issues since mid-2023 (¶68), it still

managed significant growth in Q3 2023.  ¶60.  Its success was driven by Google-related revenues

more than doubling quarter over quarter.  *Id.*  For Q3 2023, Google accounted for $48.8 million of

Colossus's $51.6 million in revenue.  *Id.*  The known but undisclosed risk that, like The Trade

Desk, Google would eventually identify the issue manifested itself in late 2023.  ¶72; *see also* ¶75

("after Thanksgiving").[10]  Then, Google discovered the Company's systematic mis-declaration of

user IDs and "took prompt action" to suspended Colossus from its platform.  ¶¶72–75.  Google

would later reinstate Colossus, but at a much lower volume.  ¶¶11, 71.

While Defendants now suggest the mis-declaration issue was fully rectified (Def. Br. at

16), Direct Digital admitted that it did not know how to correct the issue.  ¶73.  This is further

substantiated by the fact that Adalytics, "over the course of several months," and at least three

---

[10] Given that the Q4 invoice amounts Google refused to pay after issuing refunds to its advertisers is so large, a reasonable inference is that "late 2023" and "after Thanksgiving" means shortly after Thanksgiving and prior to December 5, 2023.  *See* ¶¶71–72, 75; *compare* Def. Appx. B-037 ("last fall"); *Lormand*, 565 F.3d at 239 (for falsity, plaintiff entitled to "all reasonable inferences").

other publishers were still able to document Colossus's systematic mis-declaration of user IDs in May 2024.  ¶¶67, 69.  The drop in Google revenues from $30.9 million in Q4 2023 (*after* deduction of the short pay) to just $15.1 million in Q1 2024 also shows that the mis-declaration issue had not been fully resolved.  ¶60; *Plotkin*, 407 F.3d at 698 ("allegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation"); *accord Masel v. Villarreal,* 924 F.3d 734, 750 (5th Cir. 2019).   Further, because Colossus booked its revenue "in real-time," meaning immediately "when an ad [was] delivered or displayed in response to a winning bid request," the drop in revenues would have been obvious to Defendants.  ¶50.

After Google's suspension, Defendants could have skipped their Boca Raton and Orlando publicity tour and opted to remain silent on December 5, 2023 and January 9, 2024.  ¶¶102–103, 105-106.  Once they "voluntarily chose to speak publicly" on the topics, however, "they were required to speak the full truth and accurately inform, rather than mislead."  *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 716 (W.D. Tex. 2010).  Thus, when Defendants touted the Company's growth trajectory and reaffirmed guidance, they misled investors by not disclosing the full-blown crisis with its sell side platform and largest customers, and the associated risks.  *See* ¶¶104, 107 ("These undisclosed issues represented a significant and material *risk* to Direct Digital's purported growth trajectory and to its FY 2023 guidance."); *Hutchins v. NBTY, Inc*., 2012 WL 1078823, at *5 (E.D.N.Y. Mar. 30, 2012) (omission that company's "biggest wholesale customer[] was soliciting competitive bids for the first time in 10 years" rendered positive financial disclosures misleading); *Six Flags*, 58 F.4th at 214 (plaintiff provided "factual allegations about inadequate construction to explain why a reassurance like 'our parks are progressing nicely towards their anticipated opening dates' is misleading, even if still theoretically possible (though highly unlikely)").

As explained in section III(B), above, these misstatements by omission (¶¶103, 106) are not forward-looking.  Def. Br. at 19 n.14; *Applied Optoelectronics*, 2019 WL 6111516, at *10 (omissions undercutting projections not forward-looking).  Even if they were, they would not be protected by the safe harbor because the statements were neither "identified as a forward-looking statement[s]" nor "accompanied by meaningful cautionary [language]."   15 U.S.C. § 78u-5(c)(1)(A)(i).  Because any risk "factors were not [Direct Digital]-specific and were not tailored to [Direct Digital]'s circumstances at the particular time" and were "generic and formulaic," they are insufficient to warn investors.  *Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2024 WL 83503, at *12 (S.D. Tex. Jan. 8, 2024); *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."). In any event, the statements were allegedly made with actual knowledge that they were misleading. *See* section IV, below.[11]

With FY 2023 complete, on January 9, 2024, Walker also chose to speak about the Company's accelerated Q4 2023 efforts to phase out cookies (¶105) but failed to "disclose the negative financial impact in Q4 2023 of that effort" which "represented a significant and material

---

[11] If considered opinions (Def. Br. at 22), Defendants' statements about guidance would be *current* opinions.  *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.,* 495 F. Supp. 3d 622, 655 (N.D. Ill. 2020) (that a defendant "expects" "sales to be in the range of $740 million to $745 million" is not a forward looking statement; it is a statement of current opinion; finding "[a] reasonable investor could infer that while the exact range of net sales was still being finalized, [the defendant] had enough information to make the challenged statements of fact"); *Bielousov v. GoPro, Inc*., 2017 WL 3168522, at *4 (N.D. Cal. July 26, 2017) ("we believe" that the company is still on track to make guidance is a "statement of [] present opinion"); ¶103 ("we *expect* . . . to be within that range"). Plaintiff's allegations show any purported opinion did not "fairly align[]" with "the information in the [Defendants'] possession at the time" or the "inquiry into or knowledge" a reasonable investor would expect.  *Omnicare*, 575 U.S. at 189.  With FY 2023 complete and having experienced the worst-case scenario with Google's Q4 2023 suspension, a reasonable investor would expect Defendants to have tempered any FY 2023 projection and, at minimum, disclosed the specific, now glaring platform and customer-related risks associated with the foregoing.  Any opinions also include "the allegedly false embedded fact" that the Company's guidance was not at serious risk due to such platform and customer issues.  *Applied Optoelectronics*, 2019 WL 6111516, at *10.

risk to Direct Digital's purported growth trajectory and to its FY 2023 guidance." ¶107.  Although Defendants say Plaintiff did not allege *when* the financial impact became apparent (Def. Br. at 14), Walker admitted that "[i]n the fourth quarter" "we noted softer demand tha[n] our revised guidance called for" and instead of stepping on the gas, the Company hit the brakes, "proactively beg[inning] our transition off of cookies."  ¶¶113, 116.  As a result, the Company did not add *any* new publishers in Q4 2023, "opting to keep new publishers in beta during the transition period."[12]  *See id.*  "A reasonable investor could infer that while the exact range of [lost revenues] was still being finalized, [Walker] had enough information to make the challenged statements of fact."  *Conagra*, 495 F. Supp. 3d at 655; ¶50 (revenues tallied in real-time).  Accordingly, even if Defendants had not yet precisely tallied the lost revenues, they still needed to disclose the likely impact of their new strategy when reaffirming FY 2023 guidance for their statements not to be misleading.  ¶107.[13]

### 2.    February 1, 2024: Misleading Statements Concerning Direct Digital's Earlier "Milestones"

On February 1, 2024, prior to Direct Digital releasing its FY 2023 financial results, the Pulse 2.0 website posted an interview in which Walker was asked to opine "what have been some of [Direct Digital's] most significant milestones."  ¶108.  He responded that "in Q3 we raised our guidance again to a range of $170 million to $190 million for FY 2023."  *Id.*[14]  Plaintiff alleges

---

[12] Plaintiff's allegations are not "fraud by hindsight."  Def. Br. at 15.  In the Fifth Circuit, "fraud-by-hindsight issues arise in the context of the *scienter* factor, not the misrepresentation factor."  *Villarreal*, 924 F.3d at 750; *Lormand*, 565 F.3d at 254 ("This is not the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant *knew* earlier that it would turn out badly.").

[13] Walker's earlier December 5, 2023 statements regarding the cookie transition were also misleading because Defendants had already decided to accelerate the transition, and would have known there would be negative financial consequences as a result.  ¶¶79, 82, 102.

[14] Although Defendants claim that the statement is forward-looking (Def. Br. at 19 n.14), the question was what "have been" significant Company milestones which Walker identified as including having previously "raised" guidance in Q3 2023.  ¶108.  Regardless, the statements were neither "identified as a forward-looking statement[s]" nor "accompanied by meaningful cautionary [language]."  *See* ¶108; 15 U.S.C. § 78u-5(c)(1)(A)(i).

such statements indicated to reasonable investors[15] that Direct Digital's "milestone" 2023 guidance was reasonable, had been largely met or at least was not at considerable risk of being badly missed, and the Company was continuing its strong growth trajectory as expected. ¶110. It was therefore misleading for Walker to trumpet the raising of FY 2023 the guidance, without qualification, without disclosing facts seriously undermining any claim that FY 2023 guidance was a milestone, or at least a *positive* milestone as investors were led to believe. ¶¶15, 110; *see Conagra*, 495 F. Supp. 3d at 655 ("while the exact range of net sales was still being finalized" after quarter end, "a reasonable investors could infer" defendant "had enough information" to support its optimistic statements). Such undisclosed facts include: (i) the Q4 Google suspension (¶71); (ii) the Q4 Google short pay (which exceeded $8.8 million) (¶87); (iii) the "softer demand" in Q4 than "revised guidance called for" (¶113); (iv) the impact of the November/December cookie-less transition acceleration (¶¶102, 113); and (v) the related decision not to add any new publishers in Q4 2023 (¶¶113, 116). "These undisclosed issues represented a significant and material *risk* to Direct Digital's purported growth trajectory and to its FY 2023 guidance." ¶110. Consequently, "the[se] excluded fact[s] show[] that [Walker] lacked the basis for making those statements that a reasonable investor would expect." *Omnicare*, 575 U.S. at 196; *see also Applied Optoelectronics*, 2019 WL 6111516, at *10 (the "Complaint alleges that Amazon's drop in demand was caused by [defendant's] manufacturing problems, although Defendants omitted these facts from investors. [It] therefore shows that Defendants either did not actually hold the opinion they orally stated or that Defendants omitted material facts that conflicted with what a reasonable

---

[15] Whether Defendants' omissions rendered their opinion statements misleading is an objective determination which focuses on a reasonable investor. *Omnicare*, 575 U.S. at 188.

investor would take from the statement itself.").[16]

Defendants counter that Plaintiff is required to provide the actual date of the interview quoted in the February 1, 2024 article. Def. Br. at 17. However, there is no such requirement under Rule 9(b) or the PSLRA in the Fifth Circuit. *INSpire Ins.*, 365 F.3d at 372 (stating "Rule 9(b) does not require that a specific date and time always be alleged as to each misrepresentation").[17] The court's holding in *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 591 (N.D. Tex. 2021), upon which Defendants rely (Def. Br. at 17), is fully consistent with Fifth Circuit authority. In *Crutchfield*, the defendant was not interviewed for the relevant December 2, 2019 article. 529 F. Supp. 3d at 591. Instead, that article vaguely claimed that the defendant "has said" the statement. *See* Pl. Appx. A, Exh. A-1 (*Crutchfield*, ECF 39 (excerpt), Ex. 4 at Appx. 263). When repleaded, the plaintiff clarified that the statement was lifted from a December 21, *2018* article. *See id.*, Exh. A-2 (*Crutchfield*, ECF 51 at ¶¶6, 104). The court accepted that allegation without requiring allegations of when the actual interview took place. *See id.*, Exh. A-3 (*Crutchfield*, ECF 63).[18]

In any event, on February 2, 2024, the day after the Pulse 2.0 article was published, Direct Digital's LinkedIn social media page promoted the Pulse 2.0 interview, provided a link to the

---

[16] Further, one month after the close of FY 2023, Walker knew or was reckless in not knowing the likely amount of the Company's FY 2023 revenues, which are automatically recognized in real time when an ad is displayed. ¶¶50, 11; *compare Denny v. Canaan Inc.*, 2023 WL 2647855, at *13 (S.D.N.Y. Mar. 27, 2023) (Def. Br. at 17) ("Plaintiffs never allege how Defendants would have this information").

[17] *See also Carlucci v. Han*, 886 F. Supp. 2d 497, 518 (E.D. Va. 2012) (plaintiffs "need not match each alleged misrepresentation with a specific date" to satisfy the PSLRA); *In re Nat'l Golf Props., Inc.*, 2003 WL 23018761, at *6 (C.D. Cal. Mar. 19, 2003) (Rule 9(b) and the PSLRA's particularity requirements satisfied where "plaintiffs have detailed . . . the dates these statements were made *or became public*").

[18] *Rein v. Dutch Bros, Inc.*, 2024 WL 3105004, at *22 (S.D.N.Y. June 24, 2024) (Def. Br. at 17) does not concern the requisite specifics of the statement being pleaded. Instead, it concerns pleading falsity of a statement, such that the plaintiff must plausibly allege that the company had experienced the adverse consequences at the time of such statement. *Id.* at *22. Here, a plaintiff-favorable inference (and the most plausible one) is that the article, which is entirely a reproduction of Walker's quoted answers to a list of questions, was published shortly after Walker provided his answers. *See* Def. Appx. B-117 to B-123.

article, and thanked Pulse 2.0 "for diving into the story behind Direct Digital Holdings."  ¶109.

Instead of correcting Walker's materially misleading statements, the Company promoted them and

provided significant, additional credibility to the reporting.  *Cf. Backman v. Polaroid Corp.*, 910

F.2d 10, 16–17 (1st Cir. 1990) ("Obviously, if a disclosure is in fact misleading when made, and

the speaker thereafter learns of this, there is a duty to correct it.").

### 3.    May 10, 2024: False Statements Concerning the Company's Q1 2024 Operations and Performance

On May 10, 2024, responding to reports that Direct Digital had been blocked by The Trade

Desk and Google for systematically mis-declaring user IDs, Defendants tried to reassure investors

that the Company was not in any financial peril.  ¶¶18, 118.  Direct Digital stated that it "remains

*operationally well-positioned and financially strong* with estimated 2023 FY earnings of $157

million *and is experiencing continued growth into 2024*."  ¶119.  With Q1 2024 having concluded

six weeks earlier, Walker assured investors "[t]he financial solvency of our company *is very

sound*," it *remains profitable*, and Q1 2024 performance is "*up 20% year over year*."  ¶118.  In

reality, Direct Digital did not remain profitable.  In Q1 2024, for which Direct Digital's Form 10-

Q was due in less than a week, the Company experienced a significant quarterly net loss of $3.8

million, down from the $2.0 million net income for FY 2023 the Company had reported weeks

earlier.  ¶120.  Rather than "20% year over year" growth or "continued growth into 2024," Direct

Digital's revenues grew less than 5% year over year, with quarterly revenues dropping off a cliff,

from $41 million in Q4 2023 to $22.3 million in Q1 2024.  ¶120.

Defendants respond that the "up 20% year over year" referenced Colossus's Q1 2024

revenue growth and that any misrepresentation was due to the reporter's imprecise paraphrasing.

Def. Br. at 12–13.[19]   But most of Walker's statements are exact quotes.   *See* ¶¶118–119. Defendants' real quarrel is not whether Walker was "the maker of [the] statement[s]" but whether the statements were accurately reported, a question of fact not appropriate for resolution on a motion to dismiss.   *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("One 'makes' a statement by stating it."); *Six Flags*, 58 F.4th at 221 (because this question "[is] disputed, dismissal is not appropriate").[20]   All the same, paraphrased statements attributed to a specific defendant satisfy the PSLRA's heightened pleading standards.   In *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc*., the Third Circuit found that the district court erred in rejecting a defendant's paraphrased false statement appearing in an analyst report.   70 F.4th 668, 687–688 (3d Cir. 2023).   The Court found that because "contents of [the defendant's] statement and its attribution to him are not based on information and belief, and they do not rely on confidential sources," even under the PSLRA "nothing more is needed to accept those allegations as true at this stage."   *Id.* at 688 (citing *Janus*, 564 U.S. at 142–141).[21]

Still, Defendants' claim that Walker was speaking of Colossus's financial situation, and that the reporter made a mistake, is implausible.   Def. Br. at 12–13.   The reporter specifically references *Direct Digital's* stock drop in connection with stating that "Walker denounced any

---

[19] Defendants do not similarly argue that Colossus had "remain[ed] profitable."  Def. Br. at 13–14; ¶120.

[20] In the Fifth Circuit it is perfectly appropriate for even a plaintiff to allege their account of a defendant's oral false representations.  *Villarreal*, 924 F.3d at 739, 750 (upholding allegations of a misleading oral statement "during a chance encounter" under the PSLRA).  There is no need for a transcript, even under the PSLRA.  *See id.*

[21] Defendants' cases are distinguishable.  *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 2022 WL 377415 (N.D. Okla. Jan. 7, 2022) involved a newspaper report stating what the Governor claimed that Spirit's CEO (the defendant) had said to her.  *Id.* at *11.  The defendant was speaking to the Governor and did not knowingly provide statements to the newspaper such that he did not control whether and how the statements would be communicated.  *Id.  In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2015 WL 6039690, at *17 (D. Del. Oct. 15, 2015) was based in part on the fact that the defendant was not quoted such that it was not apparent what part of the statement, if any, was "directly attributable" to him.  *In re Cryolife, Inc. Sec. Litig.*, 2005 WL 8155579 (N.D. Ga. June 17, 2005) does not involve PSLRA pleading at all.  *Id.* at *18.  Instead, summary judgment was granted due to "inadmissible hearsay" and a failure to provide "evidence" that a defendant made the statement at issue.  *Id.*

suggestions that Colossus' ID mismatch was related to *the holding company's* financial situation." Def. Appx. B-038.  Walker then touted the "company's" sound solvency and 20% growth.  *Id*. The author would not reference the "holding company" and its stock price if Walker's statement only concerned Colossus.  Tellingly, the next part of the article provides "*Direct Digital's* full statement" which speaks in terms of "DDH" (Direct Digital Holdings).  *Id*.[22]

For these reasons, Plaintiff has satisfied Rule 9(b) and the PSLRA, and adequately pleaded false statements and statements rendered misleading by the omission of material facts.

## IV.    THE TOTALITY OF PLAINTIFF'S ALLEGATIONS GIVE RISE TO A STRONG INFERENCE OF SCIENTER

### A.    The Court Must Consider Plaintiff's Allegations Collectively

To plead scienter, a plaintiff must allege facts giving rise to a strong inference of either intentional or reckless behavior.  *Six Flags*, 58 F.4th at 214.  A plaintiff adequately pleads a "strong inference" of scienter if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  "Allegations of circumstantial evidence justifying a strong inference of scienter will suffice."  *Lormand*, 565 F.3d at 251.  While courts may consider plausible nonculpable explanations, they must assume the truth of plaintiff's allegations in undertaking a comparative analysis.  *Tellabs*, 551 U.S. at 323.  The question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

---

[22] Direct Digital's statement about maintaining "a solid financial relationship with our partners" (¶119) was misleading and omitted material facts since, at the time, the Company's relationship with its largest partner and customer—Google—had been severely damaged due to ongoing technological issues with Colossus.  Given the ongoing nature of platform and customer issues, and the related effect on Direct Digital's financial situation, it could not fairly be said that the Company was "operationally well-positioned," "financially strong," or that its financial solvency was "very sound."  ¶¶118–120.  Six weeks after the close of Q1 2024, Defendants knew that Q1 2024 revenues had plummeted 45% from Q4 2023.  ¶¶50, 120.  These types statements are not puffery (Def. Br. at 13), as explained in section III(B), above.  Nor are they inactionable opinions (Def. Br. at 22), since they did not "fairly align[]" with "the information in the [Defendants'] possession at the time" or the "inquiry into or knowledge" a reasonable investor would expect.  *Omnicare*, 575 U.S. at 189.

whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*

### B. Defendants Knew the Primary Reason for the Revenue Shortfall When They Announced FY 2023 Results on March 26, 2024

When Defendants announced FY 2023 revenue on March 26, 2024, they knew that more than $8.8 million of the $12.9 million shortfall was from the Google short pay but failed to disclose it. ¶¶111–117. Instead, they volunteered two lesser, transitory reasons, which they falsely described as the "two primary factors" for the miss. *Id.* Certainly, having chosen to speak in detail on the subject, they had a duty to know. *Matrixx*, 563 U.S. at 49 & n.15 (defendant's statement that drug did not cause specific medical condition, when defendant did not know whether this was true, supported scienter). Defendants' conduct, therefore, fits perfectly into the definition of "severe recklessness," that is, their omission was an "extreme departure from the standards of ordinary care, [presenting] a danger of misleading buyers or sellers which [was] either known to the defendant[s] or [was] so obvious that the defendant[s] must have been aware of it." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). Thus, "the misleading nature of [Direct Digital]'s press release [and public statements are] sufficient to render the inference of scienter at least as compelling as the inference suggested by [Defendants]." *Matrixx*, 563 U.S. at 49 n.15.

### C. Plaintiff Alleges Additional Circumstantial Evidence of Scienter

Plaintiff alleges additional circumstantial evidence of intent or recklessness that goes beyond the allegations found by the Fifth Circuit to support a "strong inference." In *Plotkin*, the defendants allegedly knew that the defendant company's highly touted new customers "were not likely to be able to make the payments they contracted to make." 407 F.3d at 700. The Court found it was "reasonable to assume, given the importance of these deals to the company" that the defendant company "would have familiarized itself with the financial condition of [the customers] and would have discovered details about their poor financial condition." *Id.* Given this reasonable

inference, the district "court was incorrect to fault [plaintiff] for failing to allege specific facts conclusively proving that [defendant] knew this information." *Id.* The court further credited allegations that the defendant company "has referred in inconsistent ways to shipments of its product under the agreement," thereby "strengthening the permissible inference that [it] intended to deceive or mislead its investors." *Id.* Based upon these allegations, the court found a strong inference of scienter. *Id.* at 699–700.

Similarly, "[i]t is reasonable to assume, given the importance of [Google and The Trade Desk] to the [C]ompany, that [Defendants] would have familiarized [themselves] with" the severe operational issues affecting these customers. *Id.* at 700. The risks associated with these developments were so extreme that Defendants "must have been aware of the danger of misleading the investing public." *Id.* at 697; *see NBTY,* 2012 WL 1078823, at *6 (finding "strong circumstantial evidence of" scienter "given [defendants'] failure to disclose material adverse information concerning the company's largest customer"). Plaintiff also alleges Defendants provided varying explanations for Direct Digital's disappointing FY 2023 revenue, with the Company citing the cookie transition and lower-than-anticipated demand on March 26, 2024, but much later pointing to the Google short pay. ¶¶87, 113. This strengthens the inference of conscious or severely reckless since "it is curious why this [incredibly] important . . . detail was omitted in the earlier [statements]." *Plotkin*, 407 F.3d at 700. And, after first denying the Google suspension, Defendants later conceded that it had occurred (but only after Google publicly confirmed it). ¶¶72–73. Defendants also first blamed the user ID mis-declarations on Bidswitch but then admitted that it occurred on the Colossus's platform. ¶¶70, 73.

Plaintiff's allegations also meet the four core operations factors courts consider in assessing the strength of the scienter inference. *Six Flags*, 58 F.4th at 219; Def. Br. at 29. First, Colossus is

alleged to be extremely small, having only fifteen to twenty employees. ¶75; *Nathenson*, 267 F.3d at 425 (small size of company, 32 to 35 employees, contributes to inference of scienter).[23]

Second, Colossus's platform issues, and related suspensions by Google and The Trade Desk, put the Company's continued vitality at serious risk. With Google alone accounting for $48.7 million of $59.4 million in total Company Q3 2023 revenues, the loss of its business would be devastating. ¶60; *see Nathenson*, 267 F.3d at 425 (that a company's future prospects are substantially dependent on one product supports scienter); *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 342 (5th Cir. 2008) (that company essentially had one customer added to scienter inference). As previously noted, "[w]hen two of the biggest players in the market essentially blacklist your subsidiary, it's not just a bump in the road—it's a full-blown crisis." ¶¶74, 86.

Third, the omitted facts were readily apparent to the speakers. Walker and Diaz frequently commented on the Company's operations, customer relationships, cookie-less transition, and they provided the purported reasons for the FY 2023 miss. ¶¶100, 102, 105, 111, 113-115; *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (scienter pled where executives made "public comments regarding the clinical data" because the "officers were speaking as authoritative sources"). They therefore had a duty to know. *See Six Flags*, 58 F.4th at 219 (defendants' comments on the timelines "impl[ied] they knew the details of the progress"); *Nathenson*, 267 F.3d at 425 (patent was acquired in April 1994, "so there was ample opportunity to become familiar with it prior to June 1996"). Moreover, the critical operational issues would have been obvious to the Company's top officers and majority owners. ¶¶29–32; *Dorsey*, 540

---

[23] Defendants cite to Direct Digital's additional employees on the buy side (Huddled Masses and Orange 142) to argue for a lesser inference. Def. Br. at 29. Yet "[t]his case involves Direct Digital's sell-side Colossus platform" (Def. Br. at 3), which accounted for 94% of its revenues (¶60) and virtually all of its growth (¶¶58, 60). Even at 90 employees, the Company is very small. *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1173, 1186 (S.D. Cal. 2009) ("small company" with 300 employees supports inference of scienter); *Curry v. Hansen Med., Inc.*, 2012 WL 3242447, at *11 (N.D. Cal. Aug. 10, 2012) ("less than 200 employees").

F.3d at 342 (president, vice-president, and directors in small company would be aware of transactions); *Nathenson*, 267 F.3d at 424–425 (president and CEO would know). While Defendants suggest they needed time to discover the shortfall (Def. Br. at 21–22), they would have immediately seen the revenue drop off since Colossus's revenues are recognized the instant an ad is displayed. ¶50.

Fourth, as discussed above, Defendants' initial denials and statements regarding the "primary factors" causing the FY 2023 miss were inconsistent. *Plotkin*, 407 F.3d at 700 (inconsistent statements "strengthen[] the permissible inference that [defendant] intended to deceive or mislead [] investors"); *ArthroCare*, 726 F. Supp. 2d at 711–712 (such denials can indicate that a defendant was "either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial.").

There are additional facts contributing to a strong inference of scienter. That CEO Walker and CFO Diaz each made the same misrepresentation regarding the two primary reasons for the FY 2023 shortfall (while each leaving out the actual primary reason), supports that their coordinated effort to mislead was intentional. ¶¶111, 113–115. That that Defendants waited nearly nine months, until October 15, 2024, to disclose the Q4 2023 short pay further supports an inference of Defendants' intent to mislead and withhold material information that would have earlier called into doubt Direct Digital's purported growth trajectory. ¶¶87, 123–124; *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016) (scienter found where defendants "waited to disclose" investigations). The resignation of Direct Digital's auditor on April 17, 2024, two weeks after the Form 10-K deadline, due to its inability to verify impressions data (for which valid traffic was exaggerated due to Colossus's mis-declaration problem) and reports for publishers (who were paid for invalid traffic as a result), further supports that the

28

Company, and certainly its CFO and CEO, knew how serious the platform issues were for some time but purposefully continued to hide them from investors.  ¶¶71, 87, 123, 125, 129; *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *6 (S.D.N.Y. June 21, 2021) ("[T]he timing and circumstances of resignations . . . can add to a pleading of circumstantial evidence of fraud.").

Finally, Smith's suspicious stock sales add weight to the strong inference.[24]  On December 11 & 12, 2023, Smith sold 45% of his Direct Digital shares for $1.3 million, after not selling any shares for a year and only having sold $187,800 in shares, ever.  ¶125; Def. Br. at 25–26.  These sales happened immediately after Google "pulled the connection," which greatly threatened the Company's FY 2023 results and put the Company's growth trajectory at risk.  ¶¶72–75.  The sales also came days before the Company's insider trading blackout period, which would extend until at least April 2, 2024, that is, *after* the release of the Company's FY 2023 results.  ¶125.  Because these stock sales are out of line with previous trading and at times calculated to maximize profits, they "add to the inference of scienter."  *ArthroCare*, 726 F. Supp. 2d at 722–723.

### D.    Defendants Fail to Present a *More* Compelling Inference

Defendants say the "readily apparent" "nonculpable inference" is that "Defendants believed in the revenue guidance, only for the company to fall short and promptly disclose its miss once Q4 2023 results were tabulated." Def. Br. at 24.  This narrative, however, sidesteps Plaintiff's actual allegations that Defendants' growth and guidance related statements were misleading due the failure to disclose the ongoing crisis with Colossus's platform and the resultant fallout. Notably, Defendants' explanation makes no effort to explain why Defendants would lie about the true reasons for the FY 2023 miss, a fact weighing strongly in favor of scienter.

---

[24] Although Defendants suggest that Smith should not be a defendant (Def. Br. at 25), they do not contest he is a control person of Direct Digital.  Def. Br. at 30; ¶¶30, 32, 159–164.  Anyhow, even non-defendant sales can support an inference of what was known by company executives but not disclosed.  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996).

Considered collectively, Plaintiff's allegations give rise to an equally compelling (really, much more compelling) inference that Defendants misled investors through a "reckless[] gamble" of intentionally "concealing bad news in the hope that it will be overtaken by good news." *Six Flags*, 58 F.4th at 215.[25]  Defendants were aware of Colossus's systematic mis-declaration of user IDs but purposefully hid the crisis and related risks from investors.  When Google short paid the Company after "pulling the connection" in Q4 2023, Defendants dishonestly blamed the FY 2023 miss on two lesser, transitory matters.  Only when forced to issue the Company's long-delayed 2023 Form 10-K in October 2024, and with new auditors onboard, Direct Digital disclosed that a short pay by its largest customer had been the actual primary cause of the FY 2023 miss.  This inference of scienter is at least as cogent and compelling as Defendants' proposed inference or any innocent inference that may be drawn from the facts alleged.

## CONCLUSION

Plaintiff requests that the Court deny Defendants' Motion to Dismiss in its entirety.  Should the Court grant the motion in whole or in part, Plaintiff respectfully requests that the dismissal be without prejudice, and that he be allowed an opportunity to amend.[26]

---

[25] Defendants ask, "[w]hy would Defendants raise and reaffirm guidance that they supposedly knew Direct Digital could not meet in one quarter, only to disclose a miss in the very next quarter[?]"  Def. Br. at 2, 24.  Putting aside that motive allegations are unnecessary, Plaintiff does not allege the guidance was always impossible to meet.  *E.g.*, ¶96; *Six Flags*, 58 F.4th at 214 (a plaintiff need not "plead future deadlines are categorically 'impossible'"); *Matrixx*, 563 U.S. at 48 (motive allegations unnecessary).  Defendants' other questions also misrepresent Plaintiff's allegations.  Def. Br. at 24.  For example, Plaintiff alleges Walker failed to disclose the *impact* of the *accelerated* cookie transition (¶104), Walker recklessly misstated Q1 growth figures (¶120), and while the Company booked the decreased revenue, it failed to timely disclose the short pay's existence and that it involved Google, its largest customer (¶112).

[26] Plaintiff has not previously amended.  The two now consolidated actions filed prior to appointment of lead plaintiff were filed by other plaintiffs represented by other law firms.  *See Salinas v. City of Houston*, 2023 WL 3899020, at *1 (S.D. Tex. June 8, 2023) (Hoyt, J.) (allowing amendment where "plaintiffs have amended their complaint only once, so there has been no opportunity for repeated failures").

DATED:  March 14, 2025                     JOHNSON FISTEL, LLP


_/s/ Michael I. Fistel, Jr._
Michael I. Fistel, Jr.
  *Attorney-In-Charge*
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
michaelf@johnsonfistel.com

JOHNSON FISTEL, LLP
Jeffrey A. Berens
2373 Central Park Boulevard, Suite 100
Denver, CO 80238-2300
Telephone: (303) 861-1764
jeffb@johnsonfistel.com

**Lead Counsel for Plaintiff and the Class**

SPONSEL MILLER PLLC
Thane Tyler Sponsel III (Texas SBN 24056361)
Federal ID No. 690068
520 Post Oak Blvd.
Houston, TX 77027
Telephone: (713) 892-5400
sponsel@smglawgroup.com

**Local Counsel for Plaintiff and the Class**

31

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on March 14, 2025.

*/s/ Michael I. Fistel, Jr.*

MICHAEL I. FISTEL, JR.