# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| TERRY MONSKY, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 4:24-cv-01940 (Consolidated with Case No. 4:24-cv-02567) |
| vs. | |
| DIRECT DIGITAL HOLDINGS, INC., MARK WALKER, KEITH W. SMITH, DIANA DIAZ, and DIRECT DIGITAL MANAGEMENT, LLC, | Judge Kenneth M. Hoyt |
| Defendants. | |

## APPENDIX OF UNPUBLISHED CASES/AUTHORITIES IN SUPPORT OF LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Lead Plaintiff Donald W. Hutchings, by and through undersigned counsel, respectfully submit this Appendix in support of his opposition to Defendants' Motion to Dismiss (ECF 44).

# APPENDIX B

# INDEX OF UNPUBLISHED CASES/AUTHORITIES

| TAB | CASES/AUTHORITY NAME | APP. PAGE # |
|---|---|---|
| 1. | *Bielousov v. GoPro, Inc.*, 2017 WL 3168522 (N.D. Cal. July 26, 2017) | Pl. Appx. B-001–008 |
| 2. | *Curran v. Freshpet, Inc.*, 2018 WL 394878 (D.N.J. Jan. 12, 2018) | Pl. Appx. B-009–016 |
| 3. | *Curry v. Hansen Med., Inc.,* 2012 WL 3242447 (N.D. Cal. Aug. 10, 2012) | Pl. Appx. B-017–030 |
| 4. | *Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2024 WL 83503 (S.D. Tex. Jan. 8, 2024). | Pl. Appx. B-031–047 |
| 5. | *Denny v. Canaan Inc.*, 2023 WL 2647855 (S.D.N.Y. Mar. 27, 2023) | Pl. Appx. B-048–063 |
| 6. | *Hutchins v. NBTY, Inc.*, 2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) | Pl. Appx. B-064–069 |
| 7. | *In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087 (W.D. Tex. May 11, 2023). | Pl. Appx. B-070–081 |
| 8. | *In re Cryolife, Inc. Sec. Litig.*, 2005 WL 8155579 (N.D. Ga. June 17, 2005) | Pl. Appx. B-082–111 |
| 9. | *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2015 WL 6039690 (D. Del. Oct. 15, 2015) | Pl. Appx. B-112–136 |
| 10. | *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371 (W.D. Pa. May 18, 2023) | Pl. Appx. B-137–155 |
| 11. | *In re Nat'l Golf Props., Inc.*, 2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) | Pl. Appx. B-156–167 |
| 12. | *Loc. 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 2015 WL 1143081 (S.D. Tex. Mar. 13, 2015) | Pl. Appx. B-168–178 |
| 13. | *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) | Pl. Appx. B-179–187 |
| 14. | *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 2022 WL 377415 (N.D. Okla. Jan. 7, 2022) | Pl. Appx. B-188–215 |
| 15. | *Rein v. Dutch Bros, Inc.*, 2024 WL 3105004 (S.D.N.Y. June 24, 2024) | Pl. Appx. B-216–239 |

| 16. | *Roofers Local No. 149 Pension Fund v. Amgen Inc.*, 2024 WL 4354809 (S.D.N.Y. Sept. 30, 2024) | Pl. Appx. B-240–261 |
| 17. | *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) | Pl. Appx. B-262–275 |
| 18. | *Salinas v. City of Houston*, 2023 WL 3899020 (S.D. Tex. June 8, 2023) | Pl. Appx. B-276–278 |
| 19. | *Smallen v. W. Union Co.*, 2019 WL 1382823 (D. Colo. Mar. 27, 2019) | Pl. Appx. B-279–316 |
| 20. | *Yannes v. SCWorx Corp.*, 2021 WL 2555437 (S.D.N.Y. June 21, 2021) | Pl. Appx. B-317–325 |

DATED:  March 14, 2025                     JOHNSON FISTEL, LLP


                                           */s/ Michael I. Fistel, Jr.*
                                           Michael I. Fistel, Jr.
                                             *Attorney-In-Charge*
                                           Murray House
                                           40 Powder Springs Street
                                           Marietta, GA 30064
                                           Telephone: (470) 632-6000
                                           Facsimile: (770) 200-3101
                                           michaelf@johnsonfistel.com

                                           JOHNSON FISTEL, LLP
                                           Jeffrey A. Berens
                                           2373 Central Park Boulevard, Suite 100
                                           Denver, CO 80238-2300
                                           Telephone: (303) 861-1764
                                           jeffb@johnsonfistel.com

                                           **Lead Counsel for Plaintiff and the Class**

                                           SPONSEL MILLER PLLC
                                           Thane Tyler Sponsel III (Texas SBN 24056361)
                                           Federal ID No. 690068
                                           520 Post Oak Blvd.
                                           Houston, TX 77027
                                           Telephone: (713) 892-5400
                                           sponsel@smglawgroup.com

                                           **Local Counsel for Plaintiff and the Class**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on March 14, 2025.

/s/ *Michael I. Fistel, Jr.*
MICHAEL I. FISTEL, JR.

# TAB No. 1

Case 4:24-cv-01940     Document 45-2     Filed on 03/14/25 in TXSD     Page 7 of 330
Bielousov v. GoPro, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 3168522, Fed. Sec. L. Rep. P 99,827

2017 WL 3168522
United States District Court, N.D. California.

Anton BIELOUSOV, Individually and on
Behalf of All others Similarly Situated, Plaintiff,
v.
GOPRO, INC. and Nicholas D. Woodman, Defendants.

No. 16-cv-06654-CW
|
Signed 07/26/2017

**Attorneys and Law Firms**

J. Alexander Hood, II, Jeremy A. Lieberman, Pomerantz LLP, Richard W. Gonnello, Sherief Morsy, Katherine M. Lenahan, Faruqi & Faruqi, LLP, New York, NY, Jennifer Pafiti, Pomerantz LLP, Beverly Hills, CA, Barbara Ann Rohr, Benjamin Heikali, Faruqi and Faruqi, LLP, Los Angeles, CA, for Plaintiff.

Kaitlin O. Keller, Catherine Duden Kevane, Susan Samuels Muck, Vincent Barredo, Fenwick & West LLP, San Frrancisco, CA, for Defendants.

ORDER DENYING MOTION TO DISMISS
FIRST AMENDED COMPLAINT

(Docket Nos. 57, 58, 64)

CLAUDIA WILKEN, United States District Judge

**\*1** Defendants GoPro, Inc., Nicholas Woodman, Brian McGee, and Anthony Bates move to dismiss Lead Plaintiff Troy Larkin's Amended Class Action Complaint (1AC).[1] Plaintiff opposed the motion and Defendants filed a reply. The Court held a hearing on June 27, 2017. Having considered the parties' papers and argument, the Court denies the motion to dismiss.[2]

BACKGROUND

The following facts are alleged in the 1AC.

GoPro is a publicly traded Delaware corporation headquartered in San Mateo, California. 1AC ¶ 28. It makes and sells mountable and wearable cameras, drones and accessories. Id. ¶¶ 2, 28, 32. Nicholas Woodman is GoPro's founder and chief executive officer. Id. ¶ 29. Brian McGee is the company's chief financial officer. Id. ¶ 30. Anthony Bates is a director of the company and previously served as its president. Id. ¶ 31.

On September 19, 2016, GoPro unveiled two new HERO5 model cameras and the Karma® quadcopter drone, which was GoPro's entry into the drone market. Id. ¶¶ 3-4; 64-66; 94. GoPro stated that the Karma drone would be available on October 23, 2016, globally, at select retailers and announced pricing for the drone. Id. ¶¶ 4, 70, 94. McGee told investors that the drone would take GoPro to "new heights" and that the company was on track to meet February 3, 2016 revenue guidance of $1.35-1.5 billion revenue for 2016. Id. ¶ 6; see alsoid. ¶¶ 56, 70, 96-101.

Plaintiff alleges, however, that these and other statements by Defendants were false and misleading. GoPro was suffering a severe shortage of Karma drones. Id. ¶¶ 7-8, 18, 71-76, 80. There also was a shortage of HERO5 cameras. Id. ¶¶ 81-84. Those drones that were available had an obvious battery latch design defect that led to a product recall on November 8, 2016. Id. ¶¶ 10, 18, 67-69, 78-80, 88-89. As this information became public, GoPro's share price fell from a class period high of $17.68 per share on October 5, 2016 to close at $10.41 per share on November 9, 2016. Id. ¶¶ 9, 11, 16, 19-21, 90-93, 160-163.

Plaintiff alleges that Defendants knew of the product shortages due to GoPro's use of a cloud-based NetSuite enterprise resource planning system that gave them real-time access to supply chain information. Id. ¶¶ 11-13, 22, 33-47, 61, 63, 135. They were motivated to use the NetSuite system because of previous inventory issues. Id. ¶¶ 13, 50-53. They also were or should have been aware of the design defect because it would have been obvious during adequate product testing and Woodman himself had used the drone extensively. Id. ¶¶ 11, 14, 22, 60. Additionally, GoPro scoured the Internet for videos captured via the company's devices, and thus Defendants likely were aware of user videos of crashing drones that were posted on YouTube. Id. ¶¶ 14, 48-49, 78-79, 137.

**\*2** On November 16, 2016, Plaintiff Anton Bielousov filed the original complaint in this action. On February 6, 2017, the Court appointed Troy Larkin as lead plaintiff for a putative class of purchasers of GoPro stock. On March 14, 2017, Lead

Bielousov v. GoPro, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 3168522, Fed. Sec. L. Rep. P 99,827

Plaintiff Larkin filed the 1AC, alleging that Defendants made various false or misleading statements between September 19, 2016 and November 8, 2016 about GoPro's HERO5 camera and Karma drone and misled investors regarding its ability to meet its previous revenue guidance. Plaintiff asserts two claims for violations of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78a–78lll. The first claim is against all Defendants for violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The second claim is against the individual Defendants only as control persons of GoPro, for violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the Court takes all material allegations as true and construes them in the light most favorable to the plaintiff. Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008). However, this principle is inapplicable to legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).

"In addition to the pleading requirements of Rule 8, there are more demanding pleading requirements for certain causes of action, especially securities fraud." In re Rigel Pharm., Inc., Sec. Litig, 697 F.3d 869, 876 (9th Cir. 2012). Rule 9(b) provides that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen

v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). Statements of the time, place and nature of the alleged fraudulent activities are sufficient, provided the plaintiff sets forth "what is false or misleading about a statement, and why it is false." In re GlenFed, Inc., Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994), superseded by statute on other grounds, Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 104-67.

In 1995, Congress enacted the PSLRA, which amends the Exchange Act. Under the PSLRA, a plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (internal quotation marks omitted).

The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "This means that a plaintiff must provide, in great detail, all the relevant facts forming the basis of her belief." In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 985 (9th Cir. 1999), abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008). Factual allegations that are not based on a plaintiff's personal knowledge are allegations that are made on information and belief. See id. at 985, 998 n.21. Thus, for example, if a plaintiff's sole basis for an allegation is a statement from a non-plaintiff witness, that allegation is made on information and belief, and the plaintiff must plead all facts on which that belief is based. See id. at 985, 998 n.21. This does not mean, however, that a plaintiff must, for each allegation plead on information and belief, state every fact possessed that is in any way related to the allegation. Id. at 999 & n.24.

**\*3** Although Rule 9(b) does not require that scienter be plead with particularity, see Concha v. London, 62 F.3d 1493, 1503 (9th Cir. 1995), the PSLRA does. See 15 U.S.C. § 78u-4(b)(2). The PSLRA provides that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of

2017 WL 3168522, Fed. Sec. L. Rep. P 99,827

mind." 15 U.S.C. § 78u-4(b)(2). The " 'required state of mind' in § 78u–4(b)(2) refers to the scienter requirement applicable to the underlying securities fraud claim brought by the plaintiff." Silicon Graphics, 183 F.3d at 975.

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5(b) provides that it is "unlawful for any person, directly or indirectly, ... to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5(b). The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness. See 15 U.S.C. § 78u-4(b)(2); Silicon Graphics, 183 F.3d at 977.

Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. See Silicon Graphics, 183 F.3d at 979. In order to satisfy the heightened pleading requirement of the PSLRA for scienter, a plaintiff "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." Id. The necessary strong inference must be more than merely reasonable or permissible—it must be cogent and at least as compelling as any opposing inference that a reasonable person could draw from the facts alleged." Tellabs, 551 U.S. at 324. In pleading scienter, a plaintiff "has to provide a narrative of fraud—facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." ESG Capital Partners, LP v. Stratos, 828 F.3d 1023, 1035 (9th Cir. 2016).

When analyzing the sufficiency of a plaintiff's scienter allegations, the Court first determines "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter." N.M. State Inv. Council v. Ernst & Young LLP, 641 F.3d 1089, 1095 (9th Cir. 2011). If no individual allegation is sufficient, the Court conducts "a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to

create a strong inference of intentional conduct or deliberate recklessness." Id.; see also Tellabs, 551 U.S. at 326 ("When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").

REQUESTS FOR JUDICIAL NOTICE

The Court's review is limited to the complaint, materials incorporated into the complaint by reference and matters of which the Court may take judicial notice. Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008). Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994).

**\*4** Both sides filed requests for judicial notice. The Court grants Plaintiff's unopposed request for judicial notice of various dictionary definitions. The Court also grants Defendants' request for judicial notice, which Plaintiff opposes in part, of certain Securities and Exchange Commission (SEC) filings, press releases, investor forums, news reports, and earnings call transcripts. To the extent these documents are relied upon in the 1AC, the Court considers them as incorporated by reference. With regard to the other public documents, the Court takes judicial notice of the fact that the statements in those documents were made on the dates specified, but not of the truth of the matters asserted therein.

DISCUSSION

I. Section 10(b)

A. Materially False or Misleading Statements

1. "On Track" Statement

Plaintiff alleges that on September 19, 2016, McGee held a conference call with investors about the new Karma drone and HERO5 cameras at which he represented that GoPro was still

*Bielousov v. GoPro, Inc., Not Reported in Fed. Supp. (2017)*

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 10 of 330

2017 WL 3168522, Fed. Sec. L. Rep. P 99,827

"on track" to make its previously-issued revenue guidance. 1AC ¶ 96. Plaintiff alleges that McGee's statements were false and misleading when made because GoPro was not then "on track" to reach the revenue guidance and McGee either did not believe his stated opinion or his opinion was misleading because he had not checked GoPro's real-time inventory and supply monitoring systems prior to speaking. Id. ¶ 97.

Defendants move to dismiss Plaintiff's claims based on this statement, arguing that it falls within the protection of the PSLRA's "safe harbor" protecting forward-looking statements. 15 U.S.C. § 78u-5(c)(1). A forward-looking statement is not actionable if it is immaterial, made without actual knowledge that it is false or misleading or is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." Id.; see also In re Cutera Sec. Litig., 610 F.3d 1103, 1108, 1111-13 (9th Cir. 2010) (holding that subsections of safe harbor provision are disjunctive, not conjunctive, and noting that an "earnings projection is by definition a forward-looking statement").

In support of their contention that McGee's statement was forward-looking, Defendants point out that at the outset of the September 19, 2016 call, GoPro stated that its financial projections were forward-looking statements based on current assumptions that did not guarantee future performance, and pointed investors to the discussion of risk factors in the company's SEC filings. See Declaration of Vincent Barredo, Ex. C, at 2. Courts have held that language that a company is "on track" to meet a previously-made projection cannot "meaningfully be distinguished from the future projection of which [it was] a part." Xu v. Chinacache Int'l Holdings Ltd., No. 15-cv-7952-CAS, 2016 WL 4370030, at *7 (C.D. Cal. Aug. 15, 2016) (quoting Inst'l Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 255 (3d Cir. 2009)); see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., No. 10-CV-03451-LHK, 2012 WL 1868874, at *10 (N.D. Cal. May 22, 2012) (statement that company was "on track to grow 55% this year" provided "indication of a forward-looking projection").

Plaintiff responds that McGee's statement did not fall under the safe harbor provision because he included the phrase "we believe," and therefore his words were a factual statement of his present opinion, not a forward-looking statement of revenue guidance. See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1326

2015) ("every such statement explicitly affirms one fact: that the speaker actually holds the stated belief"); see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 610 (9th Cir. 2017) (holding that Omnicare standards apply to § 10(b) and Rule 10b-5 claims). As such, Plaintiff contends, the statement was either false (if McGee checked database information regarding supply shortages) or misleading (if he failed to check but investors would reasonably have expected him to do so).

**\*5** Under Omnicare, McGee was representing his and GoPro's existing state of mind when he stated, "In addition, we talked about our revenue guidance for 2016, its $1.35 billion to $1.5 billion. We believe we're still on track to make that as well." This statement of present opinion is not forward-looking, and therefore is not covered by the PSLRA safe harbor provision.

2. Statements Regarding Karma's Availability

Plaintiff alleges that Defendants made various statements during the class period regarding the availability on October 23, 2016 of the Karma drone. 1AC ¶¶ 94, 98, 104, 106, 111. Defendants contend that these statements were neither false nor misleading because the drone was, in fact, available for sale on that date, and Plaintiff alleges that at least 2,500 drones were sold within the first two weeks after the launch date.

The first statement alleged to be false or misleading was in a press release announcing the new products. GoPro stated:

> Karma will be available October 23rd in the following bundles: [1] Karma without a GoPro camera for $799.99 MSRP; [2] Karma bundled with HERO5 Black for $1099.99 MSRP; [and] [3] Karma bundled with HERO5 Session for $999.99 MSRP (available in early 2017).

1AC ¶ 94 (alterations in original) (emphasis omitted). Plaintiff alleges that this statement was false or misleading because GoPro had at most 2500 drones, an insufficient supply to make Karma "readily available" for sale. The press release does not, however, say "readily available."

Bielousov v. GoPro, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3168522, Fed. Sec. L. Rep. P 99,827

Plaintiff has not adequately plead that this statement is false or misleading. The same is true of the similar statement made by Woodman in an October 3, 2016 interview. Id. ¶ 104. This analysis also applies to GoPro's October 23, 2016 statement on its Twitter account, "#GoProKarma is here," which did not say that any specific quantity of drones were "here" or readily available for sale. Id. ¶ 106.

Plaintiff also alleges, however, that during the September 19, 2016 conference call, Woodman stated, "Karma is initially going to be distributed through select retailers around the world, and then rolling out from there." Id. ¶ 98. This statement presents a different question because Woodman referred to availability at multiple retailers around the world. Plaintiff alleges that in fact, Karma was only distributed in the United States online and at a single retailer, Best Buy— and Best Buy did not have sufficient supply for Karma to be truly available even there. Id. ¶¶ 71, 80. Accordingly, Plaintiff has adequately alleged that Woodman's statement was false or misleading.

Likewise, Plaintiff alleges that on November 4, 2016, GoPro filed a Form 10-Q with the SEC for the third quarter of 2016, signed by Woodman and McGee, which included the statement, "We began shipping our Karma drone and accessories after quarter-end, which became available online beginning October 23, 2016 and now available at major U.S. retailers." Id. ¶ 111. In this statement, again, GoPro referred to more than one retailer, although only in the United States rather than around the world. On November 8, 2017, only four days later, Defendants recalled "approximately 2,500 Karma drones purchased by consumers since October 23," 2016. Id. ¶ 121. On the same day, an analyst reported that this was "not only a surprise to us, but another ding on management's credibility having just announced both the HERO5 and Karma drone at full production." Id. ¶ 123. Plaintiff has adequately alleged that GoPro's SEC filing stating that Karma was "now available to major U.S. retailers" was false or misleading when made because in reality the drone was available only at Best Buy, in very limited quantity.

### 3. Statements Regarding Karma's Capabilities

**\*6** In the complaint, Plaintiff alleges that Defendants made statements that Karma was capable of flight time of eighteen minutes and could capture "amazingly smooth" aerial footage, which were materially false or misleading because the drone's flight time and recording capabilities were severely limited by a design defect in Karma's battery latch that caused it to lose power mid-flight and crash. 1AC ¶¶ 67-69, 78-80, 114-119. Plaintiff alleges that Defendants must have been aware that the design defect prevented the drone from flying and capturing smooth footage because adequate quality control testing would have detected it, Woodman himself had used the drone extensively, and in the usual course of business GoPro would have viewed user videos of crashing drones on the Internet. Id. ¶¶ 11, 14, 22, 48-49, 60, 78-79, 137.

Defendants argue that the optimistic statements regarding Karma's flight time and smooth footage are not inherently incompatible with the drone's actual performance, especially in light of the cautionary statements issued by GoPro regarding risks related to quality controls and product defects. Additionally, Defendants argue that the challenged statements are mere "puffery" that is not actionable. The statements, however, are not mere corporate optimism, but objectively verifiable promises of flight time and video quality. Plaintiff has alleged that these statements were false or misleading in light of the experiences of users whose drones crashed before the eighteen-minute mark.

### B. Scienter

Defendants argue that Plaintiff fails to plead scienter because the 1AC lacks any mention of specific data or reports, any non-speculative description of the information that GoPro's internal reporting system showed, or any allegation of who actually accessed that information. The Ninth Circuit has made clear that allegations of negative internal reports, lacking specifics, are insufficient to plead scienter. See, e.g., Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1036 (9th Cir. 2002) (finding insufficient plaintiffs' allegations of "what they think the data shows"); see also In re Leapfrog Enterprise, Inc. Securities Litigation, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2016) (finding insufficient allegations that the defendant "maintained weekly POS reports regarding LeapPad sales that showed the previous week's sales, as well as year-to-date sales and the inventory levels being held by retailers."); In re Autodesk, Inc. Securities Litigation, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (plaintiff "must do more than allege that these key officers had the requisite knowledge by virtue of their 'hands on' positions, because that would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position.")

2017 WL 3168522, Fed. Sec. L. Rep. P 99,827

Here, too, however, Plaintiff alleges not only that Defendants had access to a NetSuite enterprise resource planning system with real-time reporting capabilities, but also that Defendants were motivated to use that system due to prior inventory problems. Moreover, GoPro's executives, including Defendants Woodman and McGee, boasted that GoPro closely tracked its inventory and knew how much inventory was in the channel. See, e.g., 1AC ¶¶ 61, 63, 135. Plaintiff alleges that GoPro had at most 2,500 drones for sale globally on October 23, 2016. Id. ¶¶ 95, 105, 107, 112. In light of the company's ability to track its inventory, it is plausible to infer that Defendants knew that 2,500 drones would be insufficient to make Karma globally available at multiple retailers on the launch date. The inference of scienter is particularly strong, because Defendants, despite the low number of drones alleged to be available, were priming the market for the sale of 100,000 to 150,000 drones during the fourth quarter of 2016. Id. ¶¶ 55, 71.

**\*7** These allegations are bolstered by allegations of circumstantial evidence. These include the timing of corrective statements and updates to risk factors as well as the resignation of Bates as GoPro's president. Most notably, Woodman and McGee's Sarbanes-Oxley Act certifications filed with the SEC support their scienter, because those certifications required them to access sufficient reporting information to certify that the information provided did not omit any material facts to make the report not misleading. 1AC ¶ 149.

### C. Loss Causation

Finally, Defendants argue that Plaintiff has not plead loss causation. A securities fraud plaintiff must, at the pleading stage, "allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." Loos v. Immersion Corp., 762 F.3d 880, 887 (9th Cir. 2014); see also 15 U.S.C. § 78u–4(b)(4) ("the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages"). Plaintiff must allege that the market learned of and reacted to the "fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." Id. at 887-88 (quoting Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1063 (9th Cir. 2008)).

Plaintiff alleges that GoPro's stock dropped in response to reports that supplies of cameras and drones were insufficient to meet demand, that only 2500 drones had been sold and that the drone had a battery latch defect that led to a recall— all facts that belied Defendants' earlier statements. He further alleges that analysts specifically identified the news release regarding the small number of recalled drones to be "another ding on management's credibility" in light of management's recent inaccurate statements. 1AC ¶ 123. Accordingly, Plaintiff has "alleged that a material misrepresentation or omission kept the share price artificially inflated and that as a result of a corrective disclosure, the share price fell." Greenberg v. Cooper Companies, Inc., No. 11-cv-05697 YGR, 2013 WL 2403648, at \*14 (N.D. Cal. May 31, 2013).

### II. Section 20(a)

In the second claim in the 1AC, Plaintiff alleges that the individual Defendants violated § 20(a) of the Exchange Act as control persons of GoPro. Under § 20(a), "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.' " Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009) (quoting No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003)). Defendants argue that if Plaintiff fails to plead a predicate violation of § 10(b), his control person claim also fails. As discussed above, however, Plaintiff has sufficiently alleged a primary violation of federal securities law under § 10(b) and Rule 10b-5. Accordingly, Plaintiff's § 20(a) claim may proceed.

### CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss (Docket No. 57).

Within fourteen days after the date of this order, Plaintiff must file a second amended complaint naming all Defendants he intends to sue. No other amendments are permitted except as provided by Federal Rule of Civil Procedure 15.

**\*8** IT IS SO ORDERED.

Bielousov v. GoPro, Inc., Not Reported in Fed. Supp. (2017)

Case 4:24-cv-01940     Document 45-2     Filed on 03/14/25 in TXSD     Page 13 of 330

2017 WL 3168522, Fed. Sec. L. Rep. P 99,827

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3168522, Fed. Sec. L.
Rep. P 99,827

---

### Footnotes

1    The caption of the 1AC lists only two Defendants: GoPro and Woodman. The title of a complaint "must name
     all the parties." Fed. R. Civ. P. 10(a). The allegations in the body of the 1AC make it plain that McGee
     and Bates also are intended as Defendants, however. 1AC ¶¶ 28-31. Plaintiff must file a second amended
     complaint naming all Defendants he intends to sue.

2    The Court notes that Plaintiff has withdrawn his claims based on statements alleged to have been made on
     November 3, 2016. Opp. at 4 n.8. The Court does not consider the withdrawn claims in this order.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 2

Curran v. Freshpet, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 394878, Fed. Sec. L. Rep. P 100,001

KeyCite Yellow Flag - Negative Treatment
Distinguished by   In re Campbell Soup Company Securities Litigation,
D.N.J.,   October 11, 2022

2018 WL 394878
United States District Court, D. New Jersey.

Gary CURRAN, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
v.
FRESHPET, INC., Richard Thompson, Rchard Kassar,
Scott Morris and Charles A. Norris, Defendants.

Civil Action No. 16–2263
|
Signed 01/09/2018
|
Filed 01/12/2018

**Attorneys and Law Firms**

James E. Cecchi, Carella Byrne Cecchi Olstein Brody &
Agnello, P.C., Roseland, NJ, for Plaintiff.

Angelo A. Stio, III, Pepper Hamilton LLP, Princeton, NJ,
Robert L. Hickok, Ryan Elliot Peters, Pepper Hamilton, LLP,
Philadelphia, PA, for Defendants.

**OPINION**

Madeline Cox Arleo, United States District Judge

 **\*1 THIS MATTER** comes before the Court by way of
Defendants Freshpet, Inc. ("Freshpet"), Richard Thompson,
Richard Kassar, Scott Morris, and Charles A. Norris's
(together, "Defendants") Motion to Dismiss Lead Plaintiff
Alaska Electrical Pension Fund's ("Lead Plaintiff") Amended
Complaint on behalf of itself and others similarly situated
("Plaintiffs"), ECF No. 28, pursuant to Fed. R. Civ. P. 12(b)
(6). ECF No. 29. For the following reasons, the motion is
**DENIED.**

**I. BACKGROUND**

Plaintiffs are purchasers of Freshpet common stock between
April 1, 2015 and November 11, 2015 (the "Class Period").
Am. Compl. ¶ 1. Plaintiffs allege that Defendants, a publicly
traded company and several of its officers and directors, made

misrepresentations in their statements to investors in violation
of the Securities Act of 1933, 15 U.S.C. §§ 77k,  77l, 77o
(the "Securities Act") and the Securities Exchange Act of
1934,  15 U.S.C. §§ 78j, 78t (the "Exchange Act"). Id. ¶¶
7–12. Lead Plaintiff seeks to certify a class of stockholders.
Id. ¶¶ 13–19.

**A. Freshpet Business Model**
Defendant Freshpet is a manufacturer and marketer of natural
fresh foods, refrigerated meals, and treats for dogs and cats.
Id. ¶ 20. Freshpet describes its business model as "disrupting
the North American pet food industry" by offering healthy,
organic alternatives to traditional pet food. Id. ¶ 22. It
distributes its products through branded refrigerators, known
as "Freshpet Fridges" ("Fridges"), which are placed in retail
locations. Id. ¶ 20. Freshpet claimed that its Fridges gave
them a competitive advantage in several ways, including
guaranteeing Freshpet exclusive shelf space in retail stores
and allowing it greater control over its brand identity. Id. ¶ 23.
Plaintiffs allege that Freshpet's growth strategy is therefore
directly linked with its ability to install new Fridges in retail
stores. Id. ¶ 24. These retailers include Petco, PetSmart,
Target, and Walmart. Id. ¶¶ 33–51. At the beginning of the
Class Period, Freshpet reported that it had installed 14,019
Fridges in stores. Id.

**B. Allegedly Misleading Statements**
Plaintiffs allege that throughout the Class Period, Freshpet
experienced issues with its largest customers and most
popular products, which ultimately stunted the growth of its
Fridges. Plaintiffs allege that despite being aware of these
issues in early 2015, Defendants failed to disclose them until
their November 2015 earnings report.

Freshpet made its initial public offering in November 2014,
and subsequently filed its annual financial report on Form
10–K for the period ending December 31, 2014 on March
31, 2015. Id. ¶¶ 79, 110. That same day, Freshpet issued a
press release and held a conference call to discuss its earnings
release and operations. Id. ¶ 112. On the call, individual
Defendants provided details regarding Freshpet's outlook for
the year, including statements about the growth of Freshpet
Fridges. Id. They specifically stated, "For full-year 2015, we
expect Freshpet Fridges in the range of 15,100 to 15,600," and
"we are very confident that we are going to be where we need
to be by the end of the year." Id. ¶¶ 113–14. Following the

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 16 of 330

Curran v. Freshpet, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 394878, Fed. Sec. L. Rep. P 100,001

March 31, 2015 call, the price of Freshpet common stock rose to a Class Period high of $25.46 on April 9, 2015. Id. ¶ 116.

**\*2** Freshpet subsequently filed a registration statement in connection with its Secondary Offering (the "Registration Statement") on April 13, 2015. Id. ¶¶ 20, 25. The Registration Statement included guidance about the expected growth of Fridges (i.e. "We have successfully expanded our network of Freshpet Fridges within leading blue-chip retail chains ... we believe there is an opportunity to install a Freshpet Fridge in at least 35,000 stores across North America."). Id. ¶ 51. Plaintiffs allege that Freshpet insiders and Defendants collectively sold 6.1 million shares of their personally held common stock in the Secondary Offering, earning gross proceeds of $131.1 million. Id. ¶ 154.

Defendants reiterated this guidance in their August 11, 2015 earnings call. Id. ¶¶ 124–32. Defendant Kassar stated that he projected "net sales, excluding Freshpet Baked test product, to be in the range of $112 million to $114.5 million, representing an increase of 29% to 32% compared to 2014." Id. ¶ 129. Also on August 11, Freshpet disclosed that its gross margin gains throughout the rest of 2015 were likely to be more modest than contemplated and were forecasted to come in 100 to 200 basis points below prior forecast for the year. Id. ¶ 132. In addition, the Company predicted it would be closer to the low end of its guidance for Fridge placement. Id. Plaintiffs allege that these statements caused analysts to lower their earnings per share ratings for Freshpet. Id. On August 12, 2015, the price of Freshpet common stock declined $0.87 per share, to close at $13.73 per share. Id. ¶ 133.

On November 11, 2015, Freshpet issued a press release announcing its financial results for the third quarter of 2015, updating its previous guidance to note challenges to its business. Id. ¶ 133. Specifically, Defendants stated:

> We experienced lower than expected Freshpet Fridge growth and our gross margin was negatively affected by manufacturing inefficiencies from new product innovation and the near term cost of adjusting processes on our primary products.

Id. ¶ 135. Defendants noted, "production capabilities including the production throughput of our new Freshpet

Shredded product has been lower than originally projected," "we now expect Freshpet Fridges in the range of 14,900 to 15,000," and "[i]n the third quarter, our production rates were significantly lower than we had ever projected." Id. ¶¶ 137–39.

Plaintiffs allege that following the November 2015 disclosures, Freshpet was downgraded by several analysts. Id. ¶¶ 144–48. The price of Freshpet subsequently fell to $6.28 per share on November 12, 2015, the end of the Class Period. Id. ¶ 149.

Plaintiffs allege that Defendants "artificially inflated" the price of Freshpet common stock during the Class Period by publicly stating materially false and misleading statements throughout 2015 about its "manufacturing, operations, forecasts, and business prospects." Id. ¶¶ 156–57. Plaintiffs allege that they suffered losses from the decline in the common stock price of Freshpet after Defendants disclosed the truth about the company to the public in November 2015. Id.

Plaintiffs specifically allege that Defendants misled investors about Freshpet's growth potential by failing to disclose material information with respect to: (1) Freshpet's ability to expand its Fridges in retail locations, including stores such as Target, BJ's, A&P, and Haggen; (2) difficulties producing Freshpet's baked product line at the forecasted profit margin stemming from a factory fire that halted production for two weeks; (3) and production problems with Freshpet's shredded product line stemming from the frequent break down of manufacturing equipment. Id. ¶¶ 86–108.

**\*3** Plaintiffs seek damages for violations of the Securities Act Sections 11, 12(a)(2) and 15, and the Exchange Act Sections 10(b) and 20(a). Id. ¶¶ 58–78, 165–70. Defendants move to dismiss all counts for failure to state a claim.

## II. LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff. 🚩 Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Moreover, dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id. However, the facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

Curran v. Freshpet, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 394878, Fed. Sec. L. Rep. P 100,001

not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). That is, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In addition to the customary pleading requirements under Rule 8, plaintiffs must meet the heightened pleading requirements under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") for Exchange Act claims sounding in fraud. See City of Edinburgh, 754 F.3d at 168. To allege fraud under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). At a minimum, "plaintiffs [must] support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of a newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." In re Alpharma Inc. Sec. Litig. 372 F.3d 137, 147 (3d Cir. 2004) (citation omitted).

### III. DISCUSSION

#### A. Exchange Act Claims

In a securities fraud action, to state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 167 (3d Cir. 2014). "A corporation is liable for statements by employees who have apparent authority to make them." Inst. Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 251 (3d Cir. 2009) (internal citation omitted).

Here, Defendants assert that Plaintiffs have failed to show the first, second, and sixth elements of a 10–b(5) claim, namely (1) a material misrepresentation or omission by Defendants, (2) scienter, and (3) loss causation. The Court disagrees.

#### 1. PSLRA Safe Harbor

Defendants first argue that the allegedly misrepresentative statements all qualify for immunity under the PSLRA safe

harbor for forward-looking statements. See 15 U.S.C. § 78u–5(c). Plaintiffs counter that despite the forward-looking nature of some of the statements, they do not fall under the PSLRA safe harbor because they contain omissions of present fact. The Court agrees.

**\*4** The PSLRA's safe harbor provision, 15 U.S.C. § 77z–2, "immunizes from liability any forward–looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." Avaya, 564 F.3d at 254. However, this safe harbor provision does not apply to a " 'mixed present/future statement ... with respect to the part of the statement that refers to the present.' " Id. at 255 (quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 705 (7th Cir. 2008)). As such, "to the extent plaintiffs [ ] challenge defendants' alleged omission of present facts with respect to the challenged statements, PSLRA's safe harbor does not apply." Mallen v. Alphatec Holdings, Inc., 861 F. Supp.2d 1111, 1126 (S.D. Cal. 2012) (concluding that defendants' statements that the company had "already begun to realize synergies from the Scient'x acquisition" and "we anticipate that our revenues throughout the balance of 2010 *will continue to grow* " were not protected by the PSLRA safe harbor for "forward-looking" statements, but dismissing the case on other grounds); see also In re Majesco Securities Litig., 2006 WL 2846281, at *4 (D.N.J. Sept. 29, 2006) (noting "allegations based upon omissions of existing facts or circumstances do not constitute forward-looking statements protected by the safe harbor") (quoting In re MobileMedia Securities Litig., 28 F. Supp. 2d 901, 930 n.18 (D.N.J. 1998)).

Defendants are correct that many of the allegedly misleading statements are forward-looking, because they predict future Fridge placement. But a number of these statements encompass representations of present fact, and those representations are not subject to the PSLRA safe harbor. These statements include: (1) "We expect continued demand for our Freshpet Fridges;" (2) "The store count is obviously growing;" (3) "We are also pleased with our initial test of Freshpet's new baked product;" and (4) "we have enhanced our strategic manufacturing infrastructure capabilities at our Freshpet Kitchens." These statements incorporate representations about current Fridge growth and Freshpet's current manufacturing capacity.

Pl. Appx. B-012   3

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 18 of 330

Curran v. Freshpet, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 394878, Fed. Sec. L. Rep. P 100,001

Similarly, Plaintiffs primarily allege that Defendants' statements are misleading by virtue of omission of existing facts. Plaintiffs claim that Defendants omitted facts about their Fridge-placement and sales problems at major retailers, as well as manufacturing problems affecting the production of its shredded and baked products during their March and August 2015 earnings calls. See id. ¶¶ 117, 134. Representative statements made during the calls include: (1) "We continue to expect to install approximately 2,000 Freshpet fridges in new store locations each year. Long-term, we believe 35,000 store locations are achievable;" (2) For full-year 2015, we expect Freshpet fridges in the range of 15,100 to 15,600; (3) "For the full year 2015, I'll reiterate our previously disclosed guidance. We continue to expect Freshpet Fridges in the range of 15,100 to 15,600;" (4) "We are also pleased with our initial test of Freshpet's new baked product;" (5) "in order to keep up with demand and support our fantastic sales growth .... we are upsizing much of the equipment in phase two to provide increased capacity;" and (6) "we took advantage of a unique opportunity to purchase a 60,000 square foot building on 6.5 acres directly adjacent to our current Freshpet Kitchens location in Bethlehem, Pennsylvania." Id. ¶¶ 112–13, 126–29.

Reading Defendants' statements in context, and construing all inferences in Plaintiffs' favor, the Court finds that Plaintiffs have adequately alleged that Defendants made actionable misleading statements about their ability to grow Fridge placement across North American retailers in their March and August 2015 earnings calls. Plaintiffs have plausibly alleged that Defendants misled investors by suggesting that Freshpet was able to continue to place Fridges at the same rate of growth as it had experienced between 2011 and 2014, when Defendants knew by early 2015 that Freshpet was facing substantial obstacles that would impede the growth of its Fridges. Plaintiffs allege that Defendants were aware of Freshpet's problems with major retailers as early as March 2015 because: (1) "in the beginning of 2015," individual Defendants Kassar and Morris received production updates from Freshpet's Bethlehem facility reflecting the alleged manufacturing problems with Freshpet's shredded product; (2) throughout the Class Period, retailers PetSmart, BJ's, and Walmart had expressed concerns about the products; (3) A&P filed for bankruptcy in the first half of 2015 while Target closed all 133 Canadian stores in April 2015. Plaintiffs allege these issues with specificity. For example, the Amended Complaint details the origins of the manufacturing problems, alleging that Freshpet was using production equipment such

as rotators that were not designed to manufacture shredded product. Am. Compl. ¶ 104. "As a result, Freshpet was replacing manufacturing equipment at a faster rate than anticipated." Id.

**\*5** Plaintiffs allege that the problems only continued throughout the year. By August 2015, Defendants had been presented with more evidence that it could not meet the 15,100 to 15,600 Fridge placement projection. With respect to Freshpet's baked product, they allege that due to manufacturing issues, including a fire at Freshpet's Baxter Springs facility on July 6, 2015, "the profit margin for the baked product was significantly lower than Freshpet's original expectations." Id. ¶ 108. They allege that "in the first half of 2015," Freshpet was on the verge of being fined by Walmart for not being able to keep its products in stock, thereby limiting its growth opportunities at the store. Id. ¶ 107. The company was also fined by BJ's in the summer of 2015 for not maintaining sufficient frozen products. Id. ¶ 100.

The omission of any information with respect to challenges with retailers and manufacturing problems was material and misleading because that omission led investors to believe that Freshpet was on track to meet its predicted Fridge growth for the year 2015 of 15,100 to 15,600. In fact, as Defendants later revealed, their Fridge placement for the year would fall several hundred below the original guideline range. Indeed, by November 2015, Freshpet had only placed a total of 14,670 Fridges. Am. Compl. ¶ 135.

The Court's reading of these statements is further bolstered by analysts' comments during the earnings calls, indicating that they understood Defendants' statements to reflect current growth. For instance, during the August 2015 call, an analyst asked, "you describe first quarter definitely ahead of your plan. Second quarter you said you were happy with the results. Is it fair to say that the first half of the year is ahead of plan as you originally had it be?"

Accordingly, Defendants' statements in the March and August 2015 earnings calls, taken in light of the overall context in which they were made, are not subject to the PSLRA safe harbor for forward-looking statements because they (1) incorporated misleading representations of present fact, and/or (2) were made misleading by material omissions.[1]

2. Scienter

Curran v. Freshpet, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 394878, Fed. Sec. L. Rep. P 100,001

Defendants next contend that even if the allegedly misrepresentative statements are not protected by the PSLRA Safe Harbor, they are still inactionable because Plaintiffs have failed to allege that they were made with a strong inference of scienter. The Court disagrees.

The Third Circuit has established that in an Exchange Act matter, plaintiffs may establish the requisite scienter in one of two ways. "They may either allege facts that establish that defendants had the motive and opportunity to commit fraud, or they may set forth facts that constitute circumstantial evidence of reckless or conscious misbehavior." In re Great Atlantic and Pacific Tea Co., 103 Fed. App'x 465, 468–69 (3d Cir. 2004). Where, as here, the alleged fraud is based on non-disclosure of facts, "evidence that the defendants had actual knowledge of the facts is sufficient to show scienter."

Id. (citing GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237–38, (3d Cir. 2004)).

Here, Plaintiffs properly allege scienter based on Defendants' conscious decision to omit presently known facts. As discussed above, Plaintiffs have alleged that Defendants had extensive information about difficulties facing their largest customers, as well as challenges meeting demand due to manufacturing problems. See supra Section III(A)(1).

Plaintiffs have pled such knowledge with particularity. Especially compelling are their allegations that in the beginning of 2015, Defendants Kassar and Morris were presented with production updates from the Bethlehem production facility that reflected manufacturing problems with the shredded product. These manufacturing problems allegedly included the frequent breakdown of the equipment used to produce the shredded product. As discussed above, Plaintiffs allege that Defendants were also aware that the manufacturing issues affected their ability to expand their Fridges because customers such as Walmart and BJ's had reprimanded Freshpet in the first half of 2015 about its failure to keep their products sufficiently stocked in their stores. In addition, the Amended Complaint details countless examples of financial troubles at Freshpet's leading customers, including the closure of Target's Canadian stores, A&P's bankruptcy, and declining growth at Petco and PetSmart.

*6 Plaintiffs have also pled Defendants' motive and opportunity to commit fraud. "Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when conducting a

holistic review of the evidence." Rahman v. Kid Brands, Inc., 736 F.3d 237, 245 (3d Cir. 2013) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325–26 (2007)). Here, Plaintiffs have pled motivation. They allege that Individual Defendants timed their Secondary Offering at just below Freshpet's peak price. After Freshpet announced its first annual results on March 31, 2015, the price of its stock rose to the Class Period high of $25.46 on April 9, 2015. The next day, Individual Defendants filed a Registration Statement that allowed them to sell their own shares, reaping proceeds of $131 million. Accordingly, Plaintiffs have alleged motive.

Defendants' arguments that Plaintiffs have not sufficiently alleged scienter are unavailing. In Tellabs, the Supreme Court instructed lower courts to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." 551 U.S. at 323. But "the inference ... need not be irrefutable, i.e. of the "smoking-gun" genre, or even the most plausible of competing inferences." Id. (quotations omitted). Here, Plaintiffs have provided a theory that Defendants omitted material information to inflate the Freshpet stock price, allowing them to profit after the Secondary Offering. Defendants, however, have not provided the Court with any cogent non-fraudulent inference that is more compelling than the inferences of fraud alleged by Plaintiffs.

Defendants also contend that Plaintiffs have failed to allege that Defendants were aware of the materiality of any specific omitted fact on Freshpet's growth projections. Defs.' Opp'n at 20. But the proper inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Avaya, 564 F.3d at 269 (quoting Tellabs, 127 S.Ct. at 2509)). Here, Plaintiffs have alleged that Plaintiffs were aware of manufacturing issues and retailer issues from the beginning of 2015, such that the inclusion of these facts would have presented a materially different outlook for the company's growth to a reasonable investor.

Finally, Defendants also dispute many of the allegations, denying Freshpet's strained relationship with BJ's, the stagnation of its growth at Petco and PetSmart, and the discovery of low profit margins for its baked product. Defs.' Opp'n at 20–21. But at the motion to dismiss stage, the Court is obliged to accept all factual allegations in the Complaint as true. In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig., No. 08–2177, 2009 WL 2855601, at *4 (D.N.J. Sept. 2, 2009)

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 20 of 330

Curran v. Freshpet, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 394878, Fed. Sec. L. Rep. P 100,001

(denying dismissal for lack of scienter where "the inference of scienter created by Plaintiffs' allegations is at least as compelling as any other plausible inference that be drawn.").

Accordingly, the Exchange Act claims cannot be dismissed at this time for failure to plead scienter.

### 3. Loss Causation

Defendants also dispute whether Plaintiffs have sufficiently alleged loss causation. The PSLRA requires a plaintiff to allege that a defendant's act or omission "caused the loss" for which he seeks to recover. 15 U .S.C. § 78u–4(b)(4); see also McCabe v. Ernst & Young, LLP, 494 F.3d 418, 426 (3d Cir.2007) ("In order to satisfy the loss causation requirement ... the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss"). An allegation that the value of a stock declined following the public announcement of "bad news" does not, by itself, demonstrate loss causation. In re Tellium, Inc. Sec. Litig., No. 02–5878, 2005 WL 2090254, at *4 (D.N.J. Aug.26, 2005) ("loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud"). Rather, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell v. Merrill Lynch, 396 F.3d 161, 173 (2d Cir.2005). Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. Dura Pharms, Inc. v. Broudo, 544 U.S. 336, 348 (2005). The issue of loss causation is usually not resolved on a motion to dismiss. EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000) ("Whether the plaintiff has proven [loss] causation is usually reserved for the trier of fact.").

**\*7** Here, the Amended Complaint sufficiently pleads loss causation with respect to the alleged omissions on the March and August earnings calls. Plaintiffs assert that on April 9, 2015, there was a 31% increase in Freshpet's stock price to $25.46 per share as a result of the company's announcement on March 31, 2015 predicting that Freshpet Fridges will be in 15,100 to 15,600 stores by year end. Am. Compl. ¶¶ 112–16. Plaintiffs allege that Freshpet's stock price was artificially inflated at that time because it was based on a "misleading picture of Freshpet's manufacturing, operations, forecasts,

and business prospects." Id. ¶ 157. Plaintiffs allege that on August 11, 2015, Freshpet disclosed that its gross margin gains throughout the rest of 2015 would be more modest than it had predicted earlier in the year, and pointed to the lower end of its 15,100 to 15,600 Fridge range. Id. ¶ 132. In response to the news, Freshpet stock fell 6% to a close of 13.73 on august 12, 2015. Id. ¶ 133. Finally, Plaintiffs allege that when Freshpet finally revealed its manufacturing and retailer issues on November 11, 2015, its stock price fell 25% to close at $6.28 on November 12, 2015. Id. ¶ 149.

Therefore, the Exchange Act claims cannot be dismissed for failure to plead loss causation. Because the Court finds that Plaintiffs have sufficiently pled Exchange Act claims, it cannot dismiss the derivative Section 20 claim against individual Defendants at this time.

### B. Securities Act

Section 11 of the Securities Act permits recovery by purchasers of securities where "a registration statement, as of its effective date: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statements therein no misleading."

In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 269 (3d Cir. 2006) (internal quotations omitted). It is a "virtually absolute liability provision[ ], which do[es] not require plaintiffs to allege that defendants possessed any scienter. Id. (quoting In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 274 n.7 (3d Cir. 2004)).

Plaintiffs allege that Defendants omitted information about Freshpet's sales and Fridge placement issues, as well as its manufacturing issues from its April 30, 2015 Registration Statement in violation of Item 303. Am. Compl. ¶¶ 32–57. Representative statements include: (1) "We have successfully expanded our network of Freshpet Fridges within leading blue-chip retail chains including Albertsons, BJ's, Kroger, Petco, PetSmart, Publix, Safeway, Target, Wal–Mart and Whole Foods;" (2) "we believe there is an opportunity to install a Freshpet Fridge in at least 35,000 stores across North America;" (3) "We believe there is a significant opportunity to continue to grow our network of Freshpet Fridges by expanding within the store base of existing and new customers;" and (4) "Over the next three years, we plan to install over 6,000 Freshpet Fridges in new retail locations." Id.

Case 4:24-cv-01940 Document 45-2 Filed on 03/14/25 in TXSD Page 21 of 330
Curran v. Freshpet, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 394878, Fed. Sec. L. Rep. P 100,001

Defendants first argue that several of the alleged statements [2] are inactionable statements of opinion. Defs.' Opp'n at 28. The Court disagrees. In Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, the Supreme Court held that a statement of opinion is subject to omissions liability under the second clause of Section 11 if a plaintiff can plead particular material facts underlying the opinion, the omission of which made the opinion misleading "to a reasonable person reading the statement fairly and in context." 135 S. Ct. 1318, 1332 (2015). Plaintiffs have sufficiently pled such an omission here. They allege that at the time of the Registration Statement, manufacturing and retailer problems had already affected Freshpet's ability to expand its fridge growth. As such, their statements that they believe that Freshpet could expand by 6,000 Fridges over the next few years, with an opportunity to ultimately install 35,000 Fridges in North America were misleading.

*8 Next, Defendants argue that the Registration Statement is protected by the PSLRA Safe Harbor for forward–looking statements. The Court finds that for the reasons stated above (see supra Section III(A)(1)), Plaintiffs have sufficiently pled a violation based on the omission of known facts. Therefore, the statements are not protected by the PSLRA Safe Harbor.

Finally, Defendants contend that Plaintiffs failed to satisfy the pleading standard for claims based on a violation of Item 303. The Court disagrees. Item 303 requires registrants to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R.

§ 229.303. A registrant must "describe any unusual or infrequent events or transactions or any significant economic change that materially affected the amount of reported income from continuing operations." To bring a claim pursuant to the Securities Act based on an Item 303 violation, a plaintiff must allege that the defendant had actual knowledge of of the alleged undisclosed relevant rent or uncertainty. See Indiana Pub. Ret. Sys. V. SAIC, Inc., 818 F 3d 85, 95 (2d Cir. 2017). Plaintiffs have done so here. As discussed above, reading Defendants' statements in context, and construing all inferences in Plaintiffs' favor, they have alleged that by April 2015, Defendants were aware of the manufacturing and retailer issues that would impede Freshpet's ability to expand Fridge placement. Accordingly, Plaintiffs' claims based on violations of Item 303 cannot be dismissed.

Because the Court finds that Plaintiffs have sufficiently pled Securities Act claims, it cannot dismiss the derivative Section 15 claim against individual Defendants at this time.

### IV. CONCLUSION
For the reasons set forth above, Defendants Freshpet, Inc., Richard Thompson, Richard Kassar, Scott Morris and Charles A. Norris' Motion to Dismiss, ECF No. 28, is **DENIED**. An appropriate Order accompanies this Opinion.

### All Citations
Not Reported in Fed. Supp., 2018 WL 394878, Fed. Sec. L. Rep. P 100,001

### Footnotes

1 Because the Court finds that Plaintiffs have pled misrepresentations based on omissions of material information, it does not consider whether Defendants' forward-looking statements were accompanied by sufficient cautionary language.

2 E.g. "We believe there is an opportunity to install a Freshpet Fridge in at least 35,000 stores across North America;" "We believe our Freshpet Fridges generate compelling economics," "We believe there is a a significant opportunity to continue to grow our network of Freshpet Fridges." Am. Compl. ¶¶ 51–52.

# TAB No. 3

Curry v. Hansen Medical, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

2012 WL 3242447
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Robert CURRY, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
v.

HANSEN MEDICAL, INC.; Frederic
H. Moll; Steven M. Van Dick; Gary C.
Restani; and christopher sells, Defendants.

No. C 09–5094 CW.
|
Aug. 10, 2012.

**Attorneys and Law Firms**

Michael M. Goldberg, Ex Kano S. Sams, II, Lionel Z. Glancy, Robin B. Howald, Robert V. Prongay, Peter A. Glancy Binkow & Goldberg LLP, Los Angeles, CA, for Plaintiffs.

Charlene Sachi Shimada, John D. Pernick, Bingham McCutchen LLP, San Francisco, CA, for Defendants.

ORDER GRANTING, IN PART,
DEFENDANTS' MOTION TO DISMISS THIRD
CONSOLIDATED AMENDED COMPLAINT

CLAUDIA WILKEN, District Judge.

**\*1** In this consolidated securities fraud class action, Defendants Hansen Medical, Inc., and former Hansen employees Frederic H. Moll, Steven M. Van Dick, Gary C. Restani and Christopher Sells move to dismiss the Third Consolidated Amended Complaint (3AC).[1] Lead Plaintiffs Mina and Nader Farr, and Plaintiffs Robert Curry, Kim M. Prenter, Muthusamy Sivanantham, and Jean and Gary Cawood, (collectively, Plaintiffs), bringing this putative class action on behalf of the Hansen shareholders who purchased or acquired stock between February 19, 2008 and October 18, 2009 (Class Period), oppose the motion. Plaintiffs allege that, during the Class Period, Defendants induced them to acquire Hansen stock at artificially inflated prices by making knowing and intentional misstatements regarding Hansen's revenue recognition and sales performance in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934

(Exchange Act), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. The motion was heard on May 3, 2012. Having considered all of the parties' papers and oral argument on the motion, the Court grants Defendants' motion in part, with leave to amend.

BACKGROUND

I. Second Amended Complaint
The parties in this action previously stipulated to the filing of a first amended complaint and a second consolidated amended complaint (2AC). On August 25, 2011, another judge of this Court granted Defendants' motion to dismiss the 2AC, with leave to amend. Docket No. 59. The statement of facts in that order is summarized as follows.

Defendants are Hansen, Hansen's former Chief Executive Officer (CEO), Defendant Moll; Hansen's former Chief Financial Officer (CFO), Defendant Dick; Hansen's former Chief Operating Officer (COO), Defendant Restani; and Hansen's former Senior Vice President (SVP) of Commercial Operations, Defendant Sells. Hansen's revenue recognition policy for its main product, the Sensei Robotic Catheter System (Sensei unit), is based on American Institute of Certified Accountants, Statement of Position 97–2 (SOP 97–2), Software Revenue Recognition, which allows recognition of revenue only after installation of the product and training of the end-users are complete. In August 2009, an investigation conducted by Hansen's audit team with independent counsel concluded that data on certain sales transactions was withheld from Hansen's accounting department and outside auditors, and that documents related to some revenue were falsified so that Hansen's accounting department had incomplete information about temporary installations, unfulfilled training obligations and undisclosed side agreements. Also, the investigation raised questions about Hansen's distributors' ability to install Sensei units and train end-users independently. On October 8, 2009, these findings were made public in Hansen's Form 8–K filed with the Securities and Exchange Commission (SEC). On November 16, 2009, Hansen restated its financial statements for the year ending December 31, 2008, and for the quarters ending March 31, June 30 and September 30, 2008 and March 31 and June 30, 2009 (the Restatement). As a result of the Restatement, Hansen's stock price decreased significantly.

**\*2** In the August 25, 2011 Order, the Court found that Plaintiffs had not alleged that Defendants made misstatements

Curry v. Hansen Medical, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

with actual knowledge of their falsity. Order at 7. The Court held that the accounts from twelve confidential witnesses (CWs) were insufficient to allege scienter because: (1) only one of the CWs was employed by Hansen throughout the entirety of the class period; (2) none of the CWs worked directly with revenue recognition; (3) many of the allegations were hearsay and, even at face value, failed to demonstrate Defendants had knowledge of the alleged fraudulent activity; and (4) the allegations stated information that could only circumstantially give rise to an inference of scienter. Order at The Court found the following allegations were insufficient to show scienter: (1) Defendants' presumed knowledge of Hansen's core business activity; (2) the magnitude of the Restatement and accounting violations; (3) Defendants' certifications pursuant to the Sarbanes–Oxley Act of 2002(SOX), 🚩 15 U.S.C. § 7201, et seq.; and (4) Defendants' decision to conduct two public equity offerings during the Class Period. Order at 9–11.

## II. Third Amended Complaint

### A. Allegations Against Defendant Sells

Sells was one of only six Hansen executives and, as the SVP of Commercial Operations, he was responsible for sales, training, installation and customer service. 3AC ¶ 23. He participated in weekly meetings with other Defendants regarding the status of Sensei unit sales and installations, received Sensei unit sales and installations reports, and monitored utilization of Sensei units and catheter sales data. [2] During installation status meetings, Van Dick, Moll and Sells would reach a consensus on which Sensei units could be recognized as revenue. 3AC ¶ 52. Sells participated in calls with Hospital A and reprimanded a Hansen employee for documenting an agreement that the Sensei unit installed would immediately be taken apart, stored and reinstalled in a later quarter when the construction of Hospital A's laboratory was complete. 3AC ¶¶ 125, 127. Sells directed a Hansen employee to obtain signatures required to recognize revenue from a Sensei unit sold to Hospital B, even though Sells knew it would be impossible for the required training to be completed before the end of the quarter. 3AC ¶¶ 134–36. Sells entered into a side agreement to make a leasing company whole if Hospital C returned its Sensei unit, by helping the leasing company find another buyer. 3AC ¶¶ 142–48. Sells helped arrange for the installation and immediate dismantling and storage of a Sensei unit sold to Hospital D, which allowed Hansen to record approximately $550,000 in revenue for the quarter. 3AC ¶¶ 149–54.

### B. Allegations Against Other Individual Defendants

In meetings and conversations with financial analysts, Defendants Moll, Van Dick and Restani consistently gave optimistic predictions about the pipeline for future Sensei unit sales and the utilization of Sensei units by purchaser hospitals. In these conversations, Moll, Van Dick and Restani also provided positive interpretations of questionable data regarding sales of catheters. Based upon the sales data and reports they received on a weekly basis, Defendants Moll, Van Dick and Restani knew or should have known that revenue was recognized for installations that did not meet Hansen's accounting guidelines. Based upon sales of catheters, Defendants Moll, Van Dick and Restani knew or should have known that utilization of Sensei units at customer hospitals was not strong.

**\*3** Plaintiffs assert the following claims for relief:

(1) against all Defendants, violation of § 10(b) of the Exchange Act and Rule 10b–5(b); (2) against Sells alone, violation of § 10(b) of the Exchange Act and Rules 10b–5(a) and (c); and (3) against all Defendants, violation of § 20(a) of the Exchange Act.

## LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. 🚩 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. 🚩 NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir.1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. 🚩 Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) (citing 🚩 Twombly, 550 U.S. at 555).

2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

REQUESTS FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994).

Defendants request that the Court take judicial notice of copies of completed SEC filings by Hansen, Stereotaxis and Intuitive Services, Inc. They also request that the Court take judicial notice of conference call transcripts. Plaintiffs object to the request for judicial notice of these documents if they are taken for the truth of the matter asserted. Plaintiffs seek judicial notice of two SEC filings by Sells documenting that he sold Hansen securities on August 8, 2008 and March 3, 2009.

The Court grants Plaintiffs' request for judicial notice of Sells' SEC filings. *See Dreiling v. American Exp. Co.,* 458 F.3d 942, 946 n. 2 (9th Cir.2006) (SEC filings may be judicially noticed). The Court takes judicial notice of the filings by Hansen, Stereotaxis and Intuitive Services and the conference calls for the fact that they were made on the dates specified, but not for the truth of the matters asserted therein.

DISCUSSION

I. Section 10(b) of the Exchange Act and Rule 10b–5(b)
Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b–5 (Rule 10b–5). Rule 10b–5(b) clarifies that it is "unlawful for any person, directly or indirectly, ... to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ..." 17 C.F.R. § 240.10b–5(b). To state a claim under Rule 10b–5(b), a plaintiff must allege: "(1) a

misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (3) transaction and loss causation, and (5) economic loss." *In re Gilead Sciences Securities Litig.,* 536 F.3d 1049, 1055 (9th Cir.2008).

**\*4** Plaintiffs must plead any allegations of fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1543 (9th Cir.1994) (en banc). Pursuant to the requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4 (b) (1).

A. Misrepresentation or Omission of a Material Fact
To state a claim pursuant to Rule 10b–5(b), Plaintiffs must allege, among other things, a misrepresentation or omission of a material fact. "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Investment v. Corinthian Colleges,* 540 F.3d 1049, 1070 (9th Cir.2008); *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1133 (9th Cir.2002).

1. Sells' Liability for Rule 10b–5(b) Violation
Sells argues that, because there are no allegations that he made statements or that he was required to make statements, he cannot be liable under Rule 10b–5(b). Plaintiffs do not allege that Sells made any false or misleading statements or omissions of material facts. In the appendix to the 3AC, Plaintiffs present a list of press releases and investor calls in which Hansen's financial situation was discussed. No statements are attributed to Sells. Nor do Plaintiffs allege that Sells signed any of Hansen's SEC filings.

Nevertheless, Plaintiffs argue that, as a result of the decisions Sells took to manipulate Hansen's financial results, he made it necessary and inevitable that false and misleading statements regarding Hansen's financial condition would be communicated to investors. They also argue that, as a member of the disclosure committee, Sells had responsibility for the

Curry v. Hansen Medical, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

accurate and fair presentation of Hansen's press releases and SEC quarterly filings.

Both sides cite a recent Supreme Court case, 📁 *Janus Capital Group, Inc. v. First Derivative Traders,* —— U.S. ——, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011), in support of their positions. In *Janus,* the Court held that, for purposes of Rule 10b–5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 2302. The Court explained that, without control, a person can only suggest what to say, not make a statement in his or her own right. *Id.* The Court noted that this was exemplified by the relationship between a speechwriter and speaker; the speechwriter drafts the speech, but the speaker is responsible for its content and is the person who takes the credit, or the blame, for what is said. *Id.*

**\*5** Plaintiffs' argument that their allegations regarding Sells are sufficient under *Janus* is unavailing. *Janus* clarifies that the lack of allegations that an individual was the maker of a statement is fatal to a Rule 10b–5(b) claim against that individual. Therefore, the Rule 10b–5(b) claim against Sells is dismissed. Because this claim was alleged for the first time in Plaintiffs' 3AC, dismissal is with leave to amend, if Plaintiffs can truthfully allege that Sells made a statement as required by *Janus.*

2. Other Defendants' Liability Under Rule 10b–5(b)

Plaintiffs allege that, throughout the Class Period, Hansen published false statements about its financial performance, the number of Sensei units installed each quarter and the market outlook for Sensei units. In the Restatement, Hansen admitted making these false statements and Defendants do not dispute this. Because, as discussed below, Plaintiffs sufficiently allege Hansen made these misstatements with scienter, they have stated a Rule 10b–5(b) claim against Hansen.

Plaintiffs allege that Defendants Moll, Van Dick and Restani made false statements regarding Hansen's past and present sales of Sensei units. For instance, during a 4Q07 conference call with industry analysts, Moll stated that "we've been able to move from four units in the second quarter to five in the third and sixth—six units in our fourth quarter. I think we're going to continue, we would continue to expect to see a stair-step approach going into '08, and as a natural consequence of a stair step, you're going to see obviously more units in the

back half of the year than the front half." 3AC ¶ 204. Plaintiffs allege that this was false because Hansen's 4Q07 sales were not reported accurately and sales were flat between 3Q07 and 4Q07.

In the 1Q08 conference call, Moll stated, "I'm pleased to report that since commercialization we have achieved four consecutive quarters of increases in the number of systems placed." 3AC ¶ 207. During the same call, Restani stated that Hansen had experienced "steady quarterly growth, four quarters in a row." 3AC ¶ 207. Plaintiffs allege this was false because the Restatement reflects that Hansen improperly recognized revenue for two Sensei units in 1Q08. 3AC ¶ 208. Without these two "manufactured" sales, Hansen's growth for 1Q08 would be flat. 3AC ¶ 208. Plaintiffs have sufficiently alleged that these statements, of past and present financial and sales results, were false.

During a 3Q08 conference call with industry analysts, a question was asked about the stagnant growth in catheter sales and utilization of installed Sensei units that might be "sitting idle" or "sleeping," as an indicator of future sales of Sensei units. Moll replied, "No, I wouldn't call it sitting idle. I mean, certainly there are-there's probably a couple examples where Sensei that actually have had the time to percolate through the process aren't being used a lot. But, there's—there are a number of systems in that we are growing placements rapidly per quarter, so there is [sic] a lot of systems that are sort of in the early stages of utilization.... And so, there is-there aren't a lot of systems that are sleeping. There are systems that are not anywhere near up to full utilization because they haven't sort of gone through the process of getting up to full independence and utilization by the institution ..." 3AC ¶ 163. Plaintiffs allege that Moll made this statement when reports showed that at least three of the forty-five Sensei units sold were never used and customers for these Sensei units never purchased any catheters. 3AC ¶ 164. Plaintiffs have sufficiently alleged that this statement of present utilization of Sensei units was false.

**\*6** Plaintiffs also allege that Defendants first stated in a 4Q07 conference call that Hansen's customers do not buy catheters in bulk and that "there's not a lot of stocking built into our numbers at this point." 3AC ¶ 220 (Restani statement). Van Dick added that this was because the "current shelf life on a catheter is not that long." *Id.* Moll explained that the number of catheters sold was a better indicator of utilization than reporting the number of procedures performed with each Sensei unit. 3AC ¶ 221. In 1Q08, Hansen reported

Curry v. Hansen Medical, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

sales of 401 catheters. 3AC ¶ 223. However, Defendants failed to disclose that this number was inflated by twenty to twenty-five percent because three customers placed large orders near the end of the first quarter. 3AC ¶ 225a. The report of such a high number of catheter sales in 1Q08 created the misleading impression among investors that utilization of Sensei units was increasing faster than it was. 3AC ¶¶ 226, 227 (positive analyst reports based on 401 catheter sales as compared to analysts' 230 unit estimate). Plaintiffs have sufficiently alleged that the failure to disclose the fact that a significant number of catheter sales in 1Q08 was made in bulk to three customers was an omission of material fact.

Defendants argue that the alleged misstatements are protected by the PSLRA safe harbor provision because they are forward-looking and accompanied by meaningful cautionary language.

In order for the safe harbor provision to apply, a statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i). The "bespeaks caution" doctrine, which was formulated by courts prior to the enactment of the PSLRA, operates in a similar fashion. This doctrine

> provides a mechanism by which a court can rule as a matter of law ... that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.

*Provenz v. Miller,* 102 F.3d 1478, 1493 (9th Cir.1996) (citing *In re Worlds of Wonder Securities Litigation,* 35 F.3d 1407, 1413–14 (9th Cir.1994)). "Cautionary statements must be precise and directly address[ ] ... the [defendants'] future projections ... Blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim." *Id.*

Defendants correctly argue that Plaintiffs cannot assert claims based solely on Hansen's alleged failure to predict the

extent to which the 2008 economic recession would affect Hansen's sales, 3AC ¶¶ 249–70, or on vague predictions of "stair-step" growth or puffery of "strong demand" or a "healthy" pipeline, 3AC ¶¶ 206–07, 264–65. *See In re Cutera Securities Litig.,* 610 F.3d 1103, 1111 (9th Cir.2010) (optimistic, subjective assessments do not rise to the level of a securities violation; investors devalue the optimism of corporate executives). Indeed, the Court's August 25, 2011 Order held that statements such as " 'we feel very confident that given the pipeline ... we're going to have a very reason[able] 2009' " are protected by the safe harbor provision. Order at 6–7. However, in the Order, the Court noted that references to concrete rates of Sensei unit sales and user activity would not be immune. Order at 6 (citing *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 947–48 (9th Cir.2005) (statements of present or historical fact are not protected under safe harbor provision)).

**\*7** In addition to puffery and optimistic forward-looking statements, as discussed above, Plaintiffs cite statements of historical or present fact made by Defendants. Defendants' report of a high number of catheter sales, without clarifying that a significant percentage was due to large orders from three customers, misrepresented present customer utilization activity and Defendants' statement that Hansen had experienced steady growth for four quarters in a row misrepresented historical facts. Therefore, some of Defendants' alleged statements are not protected by the safe harbor provision.

### B. Scienter For Rule 10b–5(b) Claim

Pursuant to the requirements of the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness. 15 U.S.C. § 78u–4(b)(2); *In re Silicon Graphics, Inc. Secs. Litig.,* 183 F.3d 970, 977 (9th Cir.1999). Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. *Id.* at 979. To satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.*

2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

When evaluating the strength of an inference, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 325, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). "The inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. However, "the inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible' of competing inferences.' " *Id.* The *Tellabs* decision suggests that *Silicon Graphics* and its progeny may have been "too demanding and too focused too narrowly in dismissing vague, ambiguous, or general allegations outright." *South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 784 (9th Cir.2008). Thus, *Tellabs* "permits a series of less precise allegations to be read together to meet the PSLRA requirement.... Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *Id.*

Scienter also can be shown by pleading "a highly unreasonable omission, involving an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 991 (9th Cir.2009).

**\*8** In the August 25, 2011 Order, the Court noted that:

Witness accounts can give rise to a strong inference of scienter if: (1) witnesses are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged;" and (2) the statements attributed to witnesses are indicative of scienter." *In re Daou Sys., Inc.,* 411 F.3d 1006, 1015–16 (9th Cir.2005). The Ninth Circuit concluded in *Zucco* that allegations made by witnesses who were not employed throughout the length of the relevant time period were unreliable." 552 F.3d at 996–97.

August 25, 2011 Order at 7.

The Order noted that the 2AC set forth accounts from twelve confidential witnesses (CWs), but rejected most of the allegations from these witnesses for the following reasons: (1) only one of the twelve CWs was employed by Hansen throughout the entirety of the class period; (2) none of the twelve witnesses worked with revenue recognition; (3) none of the witnesses would have been in a position to know whether the individual Defendants knew or should have known of Hansen's improper recognition of revenue; and (4) certain allegations relied on hearsay and, even at face value, failed to demonstrate that the individual Defendants had knowledge of the alleged fraudulent activities. August 25, 2011 Order at 8. The Court found that the most compelling allegations came from CW1, who was the only witness who was employed throughout the Class Period, and who allegedly worked with customer support and managed installations. *Id.* In its previous Order, the Court found that CW1 was described with sufficient particularity. CW1 was Director of Customer Support from April 2006 to November 2009. Initially, CW1 completed sales in Europe and later managed all of Hansen's Sensei unit installers. CW1 attended weekly installation meetings with Van Dick and Moll where they discussed, line by line, reports showing installations for each customer, with columns for the order, installation date and training dates. *Id.* The August 25, 2011 Order indicated that CW1 mentioned that there were several incomplete transactions for which revenue should have been deferred, but that he did not indicate that this information was made known to Defendants at the weekly meetings. *Id.* at 9. The Court also noted that CW1 stated that catheter sales would be talked about at the meetings, but did not indicate how this would alert Defendants to the misstatements noted in the Restatement. *Id.*

In the 3AC, Plaintiffs again include statements from CW1 and include statements from two new CWs, CW2 and CW3. CW2 was Sales Director for Central and Eastern Europe from 2007 through 2011. He participated in conference calls with Defendants, during which the participants discussed the status of Sensei unit sales, one at a time. 3AC ¶ 26. CW3 was Sales Director of the Southeast Region from September 2006 through June 2009. 3AC ¶ 27. CW3 stated that, on occasion, he received calls from Van Dick wanting to know about the closure of particular deals. 3AC ¶ 27.

**\*9** Unlike the other confidential witnesses mentioned in the 2AC, CW2 and CW3, as well as CW1, worked for Hansen during the Class Period and had direct knowledge of Sensei unit sales and installations. Moreover, CW1 and CW2 attended weekly meetings with Defendants at which they discussed sales and installations to specific customers, which are central to the alleged misstatements about

2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

premature revenue recognition. Therefore, their accounts of the circumstances surrounding Sensei unit sales and installations and of what occurred at the staff meetings are relevant to scienter. The statement alleged to be made by CW3, that Van Dick wanted to know about deals closing, provides some support for Defendants' knowledge or scienter.

1. Scienter of Individual Defendants Moll, Van Dick and Restani For Rule 10b–5(b) Claim

Plaintiffs argue that Hansen's Restatement of its financial statements for 4Q07 through 2Q09 demonstrates Defendants' direct knowledge of the previous misstatements they made. The Court previously held, in the August 25, 2011 Order, that the accounting mistakes acknowledged in Hansen's Restatement were not so egregious that Defendants must have been aware of them. Order at 10–11. The Court also addressed Plaintiffs' allegations regarding core operations, the magnitude of the Restatement, and the certifications made pursuant to the Sarbanes–Oxley Act of 2002(SOX), and concluded that "Plaintiffs have laid a foundation for their 10(b) claim, but additional specificity is needed to show that Defendants acted with the requisite mental state." Order at 12.

As discussed below, Plaintiffs now provide specific allegations that Defendants ignored information that it was impossible for Hansen to meet its training obligations to certain distributors in the quarter in which Hansen recognized revenue from Sensei unit sales to those distributors. These allegations sufficiently state that Defendants willfully ignored information in their possession and exclude the Court's previous hypothesis, based on the allegations in the 2AC, that Defendants could have been ignorant of the improper revenue recognition because they were provided with false information.

The 3AC alleges that, in its Restatement, Hansen disclosed that, for Sensei unit sales to "independent distributors," it had "recognized revenue upon shipment of Systems to those distributors that we believed were independently capable of performing required installation and training," but "the distributors were not independently capable of installing systems and/or clinically training end users at the time we recognized revenue on systems purchased by distributors" and "therefore, revenue on such Systems should have been deferred until installation and training had occurred at the distributor's end user." 3AC ¶ 57.

Plaintiffs allege that Defendants knew or recklessly disregarded Hansen's post-shipment obligations that made

revenue recognition upon shipment to its purportedly independent distributors improper. For instance, CW1 explained that the two days of training that distributors received was insufficient for them independently to install Sensei units for their customers and to train them. 3AC ¶ 59. Defendants would have been aware of this because Hansen installation personnel received two weeks of training at a Hansen facility and then three to six months of training in the field under the supervision of a senior employee. 3AC ¶ 59.

*10  In a 4Q07 conference call, Restani admitted that training new end-users took three to six months, 3AC ¶ 97, and Van Dick explained, during a 2Q09 conference call, that Hansen had to complete its training obligations to distributors before it could recognize revenue on its sales to them. 3AC ¶ 46.

CW2 confirmed that distributors' personnel attended only a three or five-day training session for both installations and end-user support. 3AC ¶ 61. CW2 indicated that, during weekly conference calls with the individual Defendants, training was often discussed. 3AC ¶ 68. CW2 also indicated that two of Hansen's distributors were incapable of supporting an end-user. 3AC ¶¶ 68–69. To show that Defendants knew that the distributors required extensive training from Hansen personnel, Plaintiffs cite the reselling and distribution agreements that Hansen entered into with its distributors. 3AC, Ex. 14 (October 31, 2007 Agreement with Italian distributor AB Medica signed by Restani on behalf of Hansen). Exhibit C to the Agreement, titled "Clinical Support Services for Reseller," indicated that Hansen would provide appropriate training for the Reseller's clinical support personnel and that the Reseller would be responsible for providing ongoing clinical support for end-users. Exhibit D to the Agreement, titled, "End–User Training Provided by Hansen," provided that every end-user was required to attend and satisfactorily complete end-user peer training before making human clinical use of the Sensei units and that Hansen would evaluate each participant who was trained to determine whether certification was appropriate or whether further training was needed.

These allegations show that Moll, Van Dick and Restani were aware of the amount of training of distributors that was necessary to ensure that they could install Sensei units and train end-users.

Plaintiffs also allege that, in several instances, Hansen recognized revenue at the time it sold a Sensei unit to a distributor rather than after the distributor sold the unit to

an end-user. In conjunction with allegations of Defendants' knowledge of this practice, this raises an inference of scienter. Revenue recognition upon the sale to a distributor was improper because Hansen accounting procedures did not allow revenue recognition until the end-user had been sufficiently trained. For instance, Plaintiffs allege that one Sensei unit was sold to AB Medica on the last day of 1Q08 and revenue was recognized for its sale in that quarter. Plaintiffs allege that AB Medica personnel were not sufficiently trained to install the unit for an end-user; AB Medica was independently unable to provide clinical support for an end-user; AB Medica, as of March 31, 2008, did not have an end-user to purchase the Sensei unit; and, even if AB Medica did have a purchaser in mind, an end-user could not have completed the required training to allow Hansen to recognize revenue in that quarter. 3AC ¶ 94. Plaintiffs allege that these facts were known to Defendants because by March 31, 2008, it was clear that AB Medica had been unable independently to install and support a system it sold to a hospital end-user. 3AC ¶ 94.

*11 Plaintiffs also allege that Hansen recognized revenue in 1Q08 from a sale to Palex, another distributor, made on the last day of 1Q08. 3AC ¶¶ 96–97. Plaintiffs allege that Moll, Van Dick and Restani knew or should have known that it was improper to recognize revenue from this sale because it was impossible for a Palex employee to have received sufficient training by the end of 1Q08 to be able independently to provide clinical support to an end-user. 3AC ¶ 97.

Also, according to CW1, Hansen sold a Sensei unit to a Canadian distributor in December 2008 and recognized the revenue from that sale, although the unit was never installed and the distributor did not obtain approval from the Canadian government to use the equipment. 3AC ¶ 108.

In sum, these allegations give rise to an inference of scienter on the part of Moll, Van Dick and Restani: (1) Defendants met weekly to go over each Sensei unit sale on an individual basis; (2) Defendants knew that Hansen's training obligations to distributors had to be met before it could recognize revenue from a sale to a distributor; and (3) at least two of the sales to distributors took place on the last day of the quarter, when Defendants knew the distributors' personnel had not been adequately trained to install the Sensei units and to train end-users. These allegations show that Defendants either knew or were reckless in not knowing that recognizing revenue from these sales to distributors violated Hansen's revenue recognition policy.

Defendants cite cases for the proposition that the fact that corporate officers monitor financial or sales data does not establish that they are deliberately reckless. *See e.g.,* *In re Daou Systs., Inc.,* 411 F.3d 1006, 1022 (9th Cir.2005) ("General allegations of defendants' hands-on management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient" to support an inference of scienter). However, in *Zucco Partners,* 552 F.3d at 1000–01, the court stated that an inference of scienter is permitted where the information misrepresented was readily apparent to the corporation's senior management. This is such a case. Hansen was a small company, with less than 200 employees, focused on selling only one product, with quarterly sales derived from the sale of only three to fourteen units of that product. 3AC ¶ 2, 120, 211. Because Hansen sold so few units and because each unit was vitally important to Hansen's revenue stream, Defendants discussed, and must have known about, each of them. Furthermore, even though hands-on management style alone is insufficient to establish scienter, "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports." *Daou Systs.,* 411 F.3d at 1022. Here, Van Dick, Restani and Moll made statements indicating that they were familiar with and closely monitored the revenue recognition of every transaction, *see* 3AC ¶¶ 6, 45, 46, 49, and the utilization data for the units that had been installed, *see* 3AC ¶ 163.

*12 Taken collectively, all of the allegations add up to a strong inference of deliberate recklessness on the part of Defendants Moll, Van Dick and Restani. Therefore, Plaintiffs' allegations are sufficient to assert that these Defendants acted with the required scienter for the Rule 10b–5(b) claim.

2. Sells' Scienter for Rule 10b–5(a) and (c) Claim
Although the Rule 10b–5(b) claim against Sells is dismissed, the Court addresses Sells' scienter under Rule 10b–5(a) and (c) because, as discussed below, Sells' motion to dismiss the Rule 10b–5(a) and (c) claims is denied and Plaintiffs rely on Sells' scienter to impute scienter to Hansen.

To plead scienter in the context of scheme liability under Rule 10b–5(a) and (c), a complaint must allege that the defendant

Curry v. Hansen Medical, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

engaged in deceptive conduct with scienter. 🚩 *Simpson v. AOL Time Warner Inc.,* 452 F.3d 1040, 1047 (9th Cir.2006), *vacated on other grounds,* 552 U.S. 1162, 128 S.Ct. 1119, 169 L.Ed.2d 945 (2008). To claim a "scheme to defraud," the complaint must allege that the defendant engaged in a manipulative or deceptive act that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme to defraud. 🚩 *Id.* at 1048. A deceptive act, in this context, is defined as "engaging in a transaction whose principal purpose and effect is to create a false appearance of revenues." *Id.*

Sells argues that this claim must be dismissed because Plaintiffs have failed to allege facts giving rise to a strong inference of his scienter. The 3AC includes the same allegations as the SEC's complaint in *SEC v. Sells,* about Sells' actions in regard to four sales of Sensei units to Hospitals A, B, C and D. *See* Order Denying Defendants' Motion to Dismiss in *SEC v. Sells,* C 11–4941 CW.[3] In that Order, the Court describes Sells' deceptive acts involving these transactions, the purpose of which was to cause Hansen to recognize revenue improperly, before its accounting principles and procedures would allow, so that its revenue stream would appear to be increasing each quarter. The allegations that Sells undertook these actions to manipulate the timing of Hansen's revenue recognition are sufficient to allege that he had the required scienter.

As discussed above, Plaintiffs also allege that Sells, as SVP of Commercial Operations, attended meetings with Moll, Restani and Van Dick during which the installation of each Sensei unit was discussed and Sells, Van Dick and Moll would reach a consensus on which sales of Sensei units could be recognized as revenue. 3AC ¶ 52. Thus, for the same reasons that these allegations raise an inference of scienter on the part of Van Dick, Moll and Restani, they also raise an inference of Sells' scienter.

3. Hansen's Scienter For Rule 10b–5(b) Claim
Plaintiffs argue that they have alleged Hansen's scienter under the doctrine of respondeat superior, based upon Sells' scienter.[4] According to Plaintiffs, even if the Court finds that Sells did not make a false statement, his scienter of improper revenue recognition, inferred from actions he took within the scope of his employment, can be imputed to Hansen. Defendants respond that Sells' alleged knowledge of improper revenue recognition cannot be imputed to Hansen because

there is no allegation that he shared this knowledge with anyone.

**\*13** In the Ninth Circuit, a corporate entity can be vicariously liable under § 10(b) for the fraudulent acts of its officers, if officers are alleged to have acted within the scope of their employment and for the benefit of the company. 📁 *In re Cylink Securs. Litig.,* 178 F.Supp.2d 1077, 1088 (N.D.Cal.2001) (citing 📁 *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1576–78 (9th Cir.1990)). In *Hollinger,* the Ninth Circuit overturned its previous rule that the vicarious liability provisions in certain sections of the Securities Act supplanted the common law doctrine of respondeat superior. 📁 914 F.2d at 1578; 📁 *In re Network Equipment Techs., Inc., Litig.,* 762 F.Supp. 1359, 1363–64 (N.D.Cal.1991). "So long as scienter is appropriately alleged for the officers and directors of a company, then it is appropriately alleged for the company itself." 📁 *Cylink Securs.,* 178 F.Supp.2d at 1088.

Because the 3AC adequately alleges Sells' scienter in regard to the scheme to recognize revenue prematurely and that Sells undertook this scheme in the scope of his employment, to benefit his employer, his scienter is imputed to Hansen through vicarious liability.

Defendants' argument that *Hollinger* should be limited to its facts regarding broker-dealers was addressed and rejected in 📁 *Network Equipment Techs.,* 762 F.Supp. at 1364, where the court held that *Hollinger* embraced "the old traditional common law doctrine" which contains no limitation that would confine its application exclusively to broker-dealers. Furthermore, *Network Equipment Techs.* addressed Defendants' second argument that Hansen cannot be liable because there is no evidence that it knew of any contradictory information at the time of the alleged misstatements. Regarding this argument, the court explained that, "respondeat superior liability establishes a form of secondary liability which does not require actual knowledge or recklessness on the part of the vicariously liable principal." 📁 762 F.Supp. at 1364. Defendants' last argument is that scienter cannot be imputed to Hansen because, in *Hollinger,* the court dismissed the plaintiffs' claim against the corporate defendant where there was no allegation of the corporation's scienter. 📁 914 F.2d at 1572. Defendants misread the import of *Hollinger's* vicarious liability analysis. Although the court found insufficient allegations of the defendant's

scienter and dismissed the claim on that ground, it found
that the defendant was secondarily liable under the theory
of *respondeat superior. Id.* at 1577–78. Therefore, as in
*Hollinger,* although Hansen may not be primarily liable for
securities fraud, it is secondarily liable under the theory of
respondeat superior.

### II. Rule 10b–5(a) and (c) Claim Against Sells

Plaintiffs assert the Rule 10b–5(a) and (c) claim against Sells
only. In the related case, *SEC v. Sells,* C 11–4941 CW, the
Court addressed the SEC's claim against Sells pursuant to
Rule 10b–5(a) and (c). The Court held that Sells' first two
arguments here-that this claim is precluded by the Supreme
Court's holding in *Janus,* and that the claim is a Rule 10b–
5(b) claim disguised as a fraudulent scheme claim-were
unpersuasive. The Court adopts that holding here.

**\*14** Sells also contends that the allegations of fraud are
not stated with the particularity required under ⚑ Rule 9(b).
In *SEC v. Sells,* the Court found that the allegations of
sales transactions with Hospitals A through D were stated
with sufficient particularity to allege a fraudulent scheme.
Therefore, Sells' motion to dismiss Plaintiffs' Rule 10b–5(a)
and (c) claims against him is denied.

### III. Loss Causation

As indicated above, loss causation is an element of the claims
under Rule 10b–5(b). Although Defendants do not contest
Plaintiffs' claim that they suffered losses due to the decline
in the price of Hansen's stock in October 2009 immediately
after Hansen issued its Restatement, they do dispute Plaintiffs'
claim that they suffered losses from declines in Hansen's stock
price based on pre-October 2009 alleged false statements.
Defendants move to dismiss the claims to the extent they
are based on allegations of pre-October 2009 statements and
stock declines.

To plead loss causation adequately, a plaintiff must provide
the defendant with fair notice of what the relevant economic
loss might be and the causal connection between that loss
and the misrepresentation. ⚑ *Dura Pharmaceuticals, Inc. v.
Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577
(2005). This is not subject to the heightened pleading standard
of ⚑ Rule 9(b) or the PSLRA; Rule 8's requirement of a short
and plain statement of the claim showing that the pleader is
entitled to relief is sufficient. ⚑ *Id.* at 346. Nonetheless, the

complaint must allege that the allegedly fraudulent practices
were revealed to the market and caused the resulting losses.

⚑ *Metzler Inv. v. Corinthian Colleges, Inc.,* 540 F.3d 1049,
1063 (9th Cir.2008). A plaintiff is not required to show that a
misrepresentation was the sole reason for the stock's decline
in value; as long as the misrepresentation is one substantial
cause of the investment's decline, other contributing factors
will not bar recovery, but will play a role in determining
recoverable damages. 🚩 *In re Daou Systs.,* 411 F.3d at 1025.

### A. Loss Causation Based on 1Q08 Statements Regarding Catheter Sales

As discussed above, Plaintiffs sufficiently allege the
misleading nature of Defendants' statement regarding the
sale of 401 catheters in 1Q08, which created the false
impression that utilization of Sensei units was increasing
when Defendants knew that this number was inflated by
three large orders placed at the end of 1Q08. 3AC ¶¶ 223–
25. When Defendants reported Hansen's 2Q08 results, they
admitted that 1Q08 catheter sales had been inflated. 3AC
¶¶ 228–29. Plaintiffs allege that analysts expressed surprise
that the 1Q08 number of reported catheter sales had been
inflated and on, August 1, 2008, the first day after this
revelation by Defendants, Hansen's stock price declined by
$2.01 per share or 13.18% and, on August 4, 2008, the second
trading day following the catheter report, Hansen's stock price
fell another $1.30 per share, or 9.82%. 3AC ¶¶ 316–324.
These allegations are sufficient to allege loss causation due to
Defendants' statements regarding catheter sales.

### B. Misrepresentations Concerning Demand, Utilization, Inactive Systems and Guidance about the Future

**\*15** Plaintiffs allege that Defendants' statements about the
actual sales of Sensei units each quarter, the utilization of
Sensei units and, thus, their predictions of demand were
false and that when the market realized the falsity of
these statements, the price of Hansen's stock declined. The
allegations supporting this claim are as follows.

At the end of FY07, due to Defendants' positive outlook
for FY08, analysts were impressed with Hansen's strong
past performance and promising future performance. 3AC
¶ 306–11. On the news about Hansen's 1Q08 earnings, its
shares increased 5.52% to close on May 2, 2008 at $18.54
per share. 3AC ¶ 311. The following trading day, Hansen's
shares increased another $.62 or 3.34%, to close at $19.16
per share. On May 13, 2008, the day after Hansen filed its

2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

quarterly report on Form 10–Q for 1Q08 with the SEC, its
stock increased $1.35 per share or 7.41% to close at a Class
Period high of $19.57 per share. *Id.*

On July 28, 2008, JP Morgan reported that Hansen's 2Q08
sales would be flat due to the timing of shipments, but that JP
Morgan's checks continued to indicate that momentum was
strong. 3AC ¶ 313. On July 29, 2008, the day after this report
was published, Hansen's stock price declined $.88 per share,
nearly 5%, to close at $17.52 per share. 3AC ¶ 315. On July 30
and 31, the price declined again and closed at $15.25 per share
for a total decline of 17.12%. 3AC ¶ 315. Plaintiffs tie this
decline in price to Defendants' improper revenue recognition
for one Sensei unit in 4Q07 and for two units in 1Q08, which
allowed them to portray a steady increase in revenue over the
few quarters it had been selling the Sensei units. 3AC ¶ 313.

On December 5, 2008, during an analyst conference call,
Moll allegedly falsely assured the market that, although the
economy was tougher, the enthusiasm for Hansen's Sensei
units remained, Hansen was working harder, and it would,
therefore, deliver in the face of the declining economic
environment. 3AC ¶ 258. On January 8, 2009, Morgan
Stanley issued a report lowering its 2009 forecast for Sensei
unit sales from seventy-four to fifty-six, based on a survey of
fifty hospitals, only one of which was considering purchasing
a Sensei unit. 3AC ¶ 330. The same day, Hansen issued a
press release reporting lower than expected sales and 2009
guidance of fifty-three to sixty-five units. 3AC ¶ 333. The
following day, Hansen's shares declined $.50 per share, or
7.99%, closing at $5.76 per share. On the next trading day,
the stock declined another $.60 to close at $5.16 per share.
3AC ¶ 337. Moll's December 5, 2008 statement, cited as
the alleged misstatement causing Hansen's stock decline, is
a forward-looking statement regarding sales in the midst of
a declining economy. This statement is protected by the safe
harbor provision and is not actionable under the Rule 10b–
5(b). Therefore, Moll's December 5, 2008 statement cannot
be considered to be a factor in the loss causation analysis.

 *16  On July 6, 2009, Hansen issued a press release
announcing that its FY09 guidance for sales was unattainable;
it faced further issues delaying revenue recognition, and
demand for and utilization of Sensei units were not as high
as suggested in the past. 3AC ¶ 342. The press release cited
Moll as saying that sales were adversely affected by "general
macroeconomic conditions that continue to significantly
impact our potential customers' capital spending." 3AC ¶
342. Moll reiterated, "While sales cycles will continue to

be influenced by macroeconomic trends, we are confident
that our current technology and planned product development
activities present a compelling value proposition to hospitals
and payors." 3AC ¶ 342. On July 7, 2009, the day following
Hansen's press release, its stock declined $1.58 per share, or
33.40%, to close at $3.15 per share. 3AC ¶ 351. The following
day it declined another $.27, or 8.57%, to close at $2.88 per
share.

On August 4, 2009, Defendants reported 2Q09 financial
results which revealed that the sales cycle was longer than
had been anticipated, demand for Sensei units was lower than
anticipated and utilization rates were declining. 3AC ¶ 352.
On August 5, 2009, Hansen's shares fell $.33 per share, more
than 8%, to close at $3.71 per share. 3AC ¶ 354.

Plaintiffs allege that these disclosures regarding the true
nature of Hansen's financial situation and revised demand
predictions revealed previous misstatements and caused
Hansen's stock price to decline. These claims of loss
causation adequately allege a causal connection between
Defendants' alleged previous fraudulent statements, their
2009 disclosures, and the decline in the price of Hansen's
stock.

IV. Section 20(a) Claim Against all Defendants
Plaintiffs assert a § 20(a) claim against all Defendants,
alleging that Hansen, Moll, Van Dick, Restani and Sells acted
as control persons within the meaning of § 20(a) of the
Exchange Act.

Section 20(a) provides, in relevant part:

> Every person who, directly or
> indirectly, controls any person liable
> under any provision of [the Exchange
> Act] or of any rule or regulation
> thereunder shall also be liable jointly
> and severally with and to the same
> extent as such controlled person ...

15 U.S.C. § 78t(a).

To plead liability under § 20(a), a plaintiff must allege that:
(1) there is a primary violation of federal securities law, and
(2) the defendant exercised actual power or control over the

primary violator. *Howard v. Everex Systs., Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000). Plaintiffs need not show that the control persons had scienter or that they culpably participated in the wrongdoing. *Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996). Thus, to allege that an individual is a control person, the plaintiff does not have to allege that the person had scienter distinct from the scienter of the controlled corporation or the controlled individual. *Everex,* 228 F.3d at 1065. However, the individual who is alleged to be a control person may assert a good faith defense to prove the absence of scienter and a failure directly or indirectly to induce the violations at issue. *Id.*

**\*17** Plaintiffs adequately allege that Moll, Van Dick, Restani and Sells controlled Hansen by virtue of their supervisory involvement in the day-to-day operations of Hansen. 3AC ¶ 20–24. Therefore, this claim sufficiently alleges that these individual Defendants were control persons in regard to Hansen. Plaintiffs also allege that Hansen controlled the individual Defendants. 3AC ¶ 388. However, a fictitious entity cannot control those who act on its behalf. Plaintiffs cite no authority for the proposition that a corporation can control its employees or officers. Therefore, this claim is dismissed. Dismissal is without leave to amend as amendment would be futile.

Plaintiffs also allege that Hansen, Moll, Van Dick and Restani exercised control over Sells through their ability to supervise, monitor and direct Sells' conduct and activities and because of their superior positions of power within the corporation. 3AC ¶ 389. As stated above, Hansen cannot exercise control over its employee. Therefore, this claim against Hansen is dismissed without leave to amend. However, by virtue of their positions, Moll, Van Dick and Restani exercised control over Sells, who was their subordinate. Therefore, this claim is adequately alleged against Moll, Van Dick and Restani.

Finally, Plaintiffs allege that Hansen, Moll, Van Dick, Restani and Sells exercised control over Murawski. 3AC ¶ 388. For the reasons stated previously, this claim is dismissed without leave to amend against Hansen. This claim against the individual Defendants is dismissed because there is no

allegation in the 3AC that Murawski committed a primary securities law violation and because the allegation is general, conclusory and lacking in factual support. Because the Court did not address this claim in its previous Order, it is dismissed with leave to amend against the individual Defendants.

Therefore, Defendants' motion to dismiss the claim of control person liability is granted in part.

CONCLUSION

Based on the foregoing, the Court rules as follows: the Rule 10b–5(b) claim against Sells is dismissed with leave to amend; the Rule 10b–5(b) claim against the other Defendants is sufficiently alleged; the Rule 10b–5(a) and (c) claim against Sells is sufficiently alleged; the control person claim against all individual Defendants based on their control of Hansen is sufficiently alleged; the control person claim against Moll, Van Dick and Restani based on their control of Sells is sufficiently alleged; the control person claim against Moll, Van Dick, Restani and Sells based on their control of Murawski is dismissed with leave to amend; the control person claim against Hansen based on its control of Sells and Murawski is dismissed without leave to amend. The element of loss causation for the Rule 10b–5(b) claim is sufficiently alleged.

If Plaintiffs wish to file a fourth amended complaint (4AC), they must do so within fourteen days from the date of this Order, with a red-lined version showing the changes made. Defendants' answer or motion to dismiss is due fourteen days thereafter. If Defendants file a motion to dismiss, Plaintiffs' opposition is due two weeks thereafter and Defendants reply is due one week later. The motion will be taken under submission and decided on the papers.

**\*18** IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3242447, Fed. Sec. L. Rep. P 96,972

---

### Footnotes

1    Sells, who is named as a defendant for the first time in the 3AC, files his motion separately. In a related action, the Securities and Exchange Commission charges Sells and Timothy Murawski, another former Hansen employee, with violations of federal securities laws. *See SEC v. Sells and Murawski,* C 11–4941 CW. Sells and Murawski's motion to dismiss the SEC's complaint is addressed in a separate order.

2    Catheter sales were an indicator of Hansen's hospital customers' utilization of the Sensei units they had purchased.

3    Scienter is not an issue in *SEC v. Sells* because the PSLRA does not apply to claims brought by the SEC. *See* ⚑ *SEC v. Yuen,* 221 F.R.D. 631, 636 (C.D.Cal.2004).

4    Plaintiffs do not argue that the scienter of Restani, Van Dick and Moll can be imputed to Hansen.

---

End of Document                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 4

2024 WL 83503, Fed. Sec. L. Rep. P 101,744

2024 WL 83503
United States District Court, S.D. Texas, Houston Division.

DELAWARE COUNTY EMPLOYEES
RETIREMENT SYSTEM, individually and on
behalf of all others similarly situated, Plaintiffs,

v.

CABOT OIL & GAS
CORPORATION, et al., Defendants.

Civil Action No. H-21-2045
|
Signed January 8, 2024

**Attorneys and Law Firms**

Darryl James Alvarado, Pro Hac Vice, Francisco J Mejia, Pro Hac Vice, Jack Abbey Gephart, Pro Hac Vice, Kevin Lavelle, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Lawrence F. Stengel, Saxton & Stump LLC, Lancaster, PA, Joe Kendall, Kendall Law Group, Dallas, TX, Alex B. Heller, Andrew L. Zivitz, Pro Hac Vice, Helen J Bass, Kessler Topaz Meltzer & Check LLP, Henry W. Longley, Pro Hac Vice, Jamie M. McCall, Pro Hac Vice, Joshua Edward D'Ancona, Stuart L. Berman, Pro Hac Vice, Kessler Topaz Meltzer & Check LLP, Radnor, PA, for Plaintiffs Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan.

Gerard G. Pecht, Pro Hac Vice, Kelly A. Potter, Norton Rose Fulbright US LLP, Houston, TX, Peter Andrew Stokes, Norton Rose Fulbright US LLP, Austin, TX, Amy L. Barrette, Buchanan Ingersoll & Rooney PC, Pittsburgh, PA, for Defendants.

**MEMORANDUM AND OPINION**

Lee H. Rosenthal, United States District Judge

 **\*1**  The named plaintiffs in this class action lawsuit—Delaware County Employees Retirement System and the Iron Workers District Council (Philadelphia & Vicinity) Retirement and Pension Plan—represent shareholders of Cabot Oil & Gas Corporation. The plaintiffs allege that Cabot and two of its executive officers, Dan Dinges and Scott Schroeder, made material misrepresentations or omissions that caused their representations to be misleading, in violation of Section 10(b) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, 🔖 15 U.S.C. §§ 78j(b), 78t(a), and its implementing regulation, Rule 10b–5, 17 C.F.R. § 240.10b–5.

The plaintiffs seek leave to file a second amended complaint adding new alleged misrepresentations and omissions. (Docket Entry No. 185). The defendants are opposed. (Docket Entry No. 191). Based on the pleadings, the motion, the response, and the applicable law, leave to amend is granted. However, the plaintiffs' claims based on the 2018 production guidance are dismissed with prejudice because they are time-barred. The reasons are set out below.

**I. Background**

**A. Cabot's Wells Polluted Susquehanna County Water Supplies**
The factual background is summarized in detail in the court's memorandum and opinion granting the motion for class certification. (Docket Entry No. 173). The court merely sketches the allegations here.

Cabot does hydraulic fracturing of the Marcellus Shale underneath Susquehanna County, Pennsylvania. (Docket Entry No. 110 at ¶ 29). In 2009, the Pennsylvania Department of Environmental Protection (the "Department") concluded that Cabot's wells had been releasing dissolved methane into nearby residential water supplies. (*Id.* at ¶ 45). This led to a series of consent orders and agreements between Cabot and the Department. (*Id.*). The consent orders and agreements required Cabot to remediate both the defective wells that had been leaking dissolved methane and the residential water supplies that the methane had contaminated. (*Id.* at ¶¶ 46–49, 133–34). The orders and agreements also restricted Cabot's ability to operate wells within certain areas of Susquehanna County. (*Id.* at ¶¶ 133–34).

The plaintiffs allege that Cabot ignored its obligations under the consent orders and agreements for nearly a decade. (*Id.* at ¶¶ 136–49). They allege that Cabot's dereliction of its legal obligations led the Pennsylvania Attorney General to charge Cabot with felonies in 2020. (*Id.* at ¶¶ 50, 208). This lawsuit was filed in 2020. (Docket Entry No. 1).

**B. The Alleged Misrepresentations and Omissions**
In January 2022, the court granted the defendants' motion to dismiss. (Docket Entry No. 109). The plaintiffs then filed a first amended complaint. (Docket Entry No. 110). That

complaint alleged that Cabot had made several material misrepresentations and omissions concerning its compliance with environmental laws in Susquehanna County and its remediation of defective wells and contaminated waters, violating the consent orders and agreements. (*Id.* at ¶¶ 184–204). In August 2022, the court dismissed some of these claims with prejudice. (Docket Entry No. 118). In September 2023, the court granted the plaintiffs' motion to certify a class "of all persons or entities who purchased or otherwise acquired Cabot common stock between February 22, 2016, and June 12, 2020, inclusive and were damaged thereby." (Docket Entry No. 173 at 1–2).

**\*2** In October 2023, on the deadline to amend pleadings under the scheduling and docket control order, (Docket Entry No. 156), the plaintiffs moved for leave to file a second amended complaint. (Docket Entry No. 185). The proposed second amended complaint alleges not only that Cabot misrepresented the extent to which it was complying with environmental laws and regulations and remediating defective wells and contaminated waters, but also that Cabot had: (1) publicly announced production guidance in 2018 and 2019 that it knew it would not meet; (2) knowingly failed to disclose that it had reduced its 2018 production guidance because of a gas migration investigation by the Department; (3) knowingly failed to disclose that it would soon be charged with felonies by the Pennsylvania Attorney General; and (4) knowingly failed to disclose a proposed consent order and agreement it had received from the Department to address its alleged noncompliance with environmental laws and regulations. These alleged misrepresentations and omissions were not alleged in the plaintiffs' previous complaints. The defendants oppose the motion for leave to amend on the grounds that amendment would be futile and would cause undue delay and prejudice. (Docket Entry No. 191).

The plaintiffs' new claims, with one exception, satisfy the applicable pleading standards and amendment would therefore not be futile. The exception is the claim based on the 2018 production guidance, which is barred by the applicable five-year statute of repose. Amendment would not cause undue delay or prejudice. The motion for leave to amend is therefore granted, but the 2018 production guidance claims are dismissed with prejudice. The reasons are set out below.

## II. The Legal Standards

### A. Rule 15(a)

Rule 15(a) provides that a party may amend its pleading once without seeking leave of court or the consent of the adverse party at any time before a responsive pleading is served. FED. R. CIV. P. 15(a). After a responsive pleading is served, a party may amend only "with the opposing party's written consent or the court's leave." *Id.* Although a court "should freely give leave when justice so requires," *id.*, leave to amend "is not automatic." *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)). A district court reviewing a motion to amend pleadings under Rule 15(a) may consider factors such as "undue delay, bad faith or dilatory motive ... undue prejudice to the opposing party, and futility of amendment." *In re Southmark Corp.*, 88 F.3d 311, 314–15 (5th Cir. 1996). Amendment is futile when the amended complaint would fail to state a claim upon which relief could be granted or would otherwise be subject to dismissal. *Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016), *cert. denied sub nom. Legate v. Collier*, 137 S. Ct. 489, 196 L.Ed.2d 389 (2016), *reh'g denied*, 137 S. Ct. 1139, 197 L.Ed.2d 239 (2017); *Daniels v. Corr. Corp*, 47 F.3d 426 (5th Cir. 1995).

### B. Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has a facial plausibility when the plaintiff pleads factual content that allows the courts to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement.' But it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A complaint 'does not need detailed factual allegations,' but facts alleged 'must be enough to raise a right to relief above the speculative level.' " *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however, true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

**\*3** A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

### C. Section 10(b) of the Securities Exchange Act of 1934

Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulation as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R § 240.10b–5(b). While providing a cause of action to securities purchasers or sellers injured by statutory and rule violations, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007), "these latter actions [are] available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentation actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

To state a claim under § 10(b), a plaintiff must allege facts sufficient to show: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted); *see also Dura Pharm.*, 544 U.S. at 338 (citing 15 U.S.C. § 78u–4(b)(4)).

#### 1. Material Misrepresentations and Omissions

A plaintiff who asserts securities fraud in violation of § 10(b) and Rule 10b–5 must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322–23. Rule 9(b) requires the complaint to "state with particularity the circumstances constituting fraud." FED. R. CIV. P 9(b). In the Fifth Circuit, "the Rule 9(b) standards require 'specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation omitted); *see also Martin Res. Mgmt. Corp. v. Fed. Ins. Co.*, No. 20-40571, 2021 WL 4269565, at \*5 (5th Cir. Sept. 20, 2021); *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017).

**\*4** The Private Securities Litigation Reform Act requires the party to "specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *Neiman*, 854 F.3d at 746 (quoting *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)). "[F]or each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *Id.* (quoting *Diodes*, 810 F.3d at 956)).

Even if misrepresentations and omissions are pleaded with sufficient specificity, they must be material. There is no

bright-line rule; determining materiality is a fact-intensive inquiry into "the source, content, and context" of the allegedly misleading or omitted information. 🚩*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). A representation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. 🚩*Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Omitted facts are material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Emp. Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018) (quoting 🚩*Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003)).

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." 🚩*Lormand*, 565 F.3d at 248. Opinion statements, such as those prefaced by "we believe" or "we think," may, or may not, be actionable. 🚩*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015). Whether representations in an opinion statement are actionable depends on whether (1) "the speaker did not hold the belief she professed" and (2) "the supporting fact she supplied [was] untrue." 🚩*Id.* at 185–86. Whether omissions in an opinion statement are actionable depends on whether the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." 🚩*Id.* at 189.

Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws. 🚩*Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). A statement "of the vague and optimistic type ... cannot support a securities fraud action [because it] contain[s] no concrete factual or material misrepresentation." 🚩*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (quotation marks omitted). "[G]eneralized positive characterization[s] [are] not actionable under the securities laws." 🚩*Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003). "[N]o reasonable investor would consider such statements material and ...

investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." 🚩*In re BP p.l.c. Sec. Litig. (BP I)*, 843 F.Supp. 2d 712, 748 (S.D. Tex. 2012) (citing 🚩*Krim v. BancTexas Grp.*, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993)). The statements the plaintiffs rely on must be something more than a corporate officer's generalized optimistic comments about the company's policies, programs, or performance. As in other areas of the law, "puffery" is not actionable. 🚩*BP I*, 843 F. Supp. 2d at 748; 🚩*Omnicare*, 583 F.3d at 944.

### 2. Scienter

**\*5** In addition to pleading that specific statements misrepresented or omitted material facts, the plaintiffs must plead that the responsible person acted with the necessary culpability, or scienter. 🚩*Tellabs*, 551 U.S. at 319. Section 10(b) and Rule 10b–5 do not insure against bad corporate management. Rather, they protect against only knowing or severely reckless misstatements. 🚩*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008). "Scienter, in the context of securities fraud, is defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" 🚩*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2*, 401 F.3d at 643). "[F]or 'each act or omission alleged,' securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" 🚩*Shaw Grp.*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u–4(b)(2)).

The court may consider documents incorporated by reference into the complaint and matters proper for judicial notice. 🚩*BP I*, 843 F. Supp. 2d at 748 (citing 🚩*Tellabs*, 551 U.S. at 323). The court looks to the allegations about an individual's state of mind when that individual made a challenged statement to determine whether the allegations support a strong inference of scienter. *Tellabs*, 551 U.S. at 33; 🚩*Southland*, 365 F.3d at 364–65. The inference must be "cogent and compelling," not simply "reasonable" or "permissive," and "at least as compelling as any opposing

inference one could draw from the facts alleged." *Tellabs, 551 U.S. at 324*. The court must consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.' " *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b) (2)). "[A]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but ... allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the [Private Securities Litigation Reform Act]." *Owens v. Jastrow, 789 F.3d 529, 539 (5th Cir. 2015)* (quoting *Goldstein v. MCI WorldCom, 340 F.3d 238, 246 (5th Cir. 2003)*). The plaintiffs must plead facts that give rise to a strong inference of scienter, for each individual defendant, for each alleged misstatement.

The plaintiffs cannot simply allege that some person at the corporation knew of facts that make a challenged statement misleading and impute that person's knowledge to the speaker. *Southland, 365 F.3d at 366*. The plaintiffs must make specific factual allegations about each responsible person's state of mind when each challenged statement was made. Allegations about another person's knowledge, or about the defendants' collective knowledge, are insufficient. Simply pleading that internal information contradicted an individual defendant's public statements is not enough. *In re BP P.L.C. Sec. Litig. (BP II), 852 F. Supp. 2d 767, 817 (S.D. Tex. 2012)* (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk, 291 F.3d 336, 356 (5th Cir. 2002)*). To the extent that a plaintiff's scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the document, its author, contents, and character, and when and by whom it was received, to link it to the person making the challenged statement when the statement was made. *Abrams v. Baker Hughes Inc., 292 F.3d 424, 432 (5th Cir. 2002)*.

### 3. Loss Causation

**\*6** Under the Private Securities Litigation Reform Act, "the plaintiff shall have the burden of proving that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b) (4). The Act "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Broudo, 544 U.S. at 346*. "To establish proximate cause, the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc., 769 F.3d 313, 320 (5th Cir. 2014)*. The Fifth Circuit has stated that

> [l]oss causation in fraud-on-the-market cases can be demonstrated circumstantially by: (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of price drop.

*Id.* at 320–21 (internal quotation marks and citation omitted).

Although the corrective-disclosure information need not "precisely mirror" the alleged misrepresentations, *Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 230 (5th Cir. 2009)* (quotation marks omitted), a corrective disclosure must be " 'related to' or 'relevant to' the defendants' fraud and earlier misstatements." *Amedisys, 769 F.3d at 321*. "The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Id.*

2024 WL 83503, Fed. Sec. L. Rep. P 101,744

**D. The Private Securities Litigation Reform Act "Safe Harbor"**

The Private Securities Litigation Reform Act protects certain "forward-looking statements." A forward-looking statement includes:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u–5(i)(1).

Under the Act's "safe-harbor" provision, a defendant "shall not be liable with respect to any forward-looking statement, whether written or oral, if":

(A) the forward-looking statement is--

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

**\*7** (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement--

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was--

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

§ 78u-5(c)(1).

The Fifth Circuit has described the test for applying the safe-harbor provision as "two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind." 🚩*Southland*, 365 F.3d at 371. Under the first prong, the safe harbor protects a forward-looking statement if it is either (1) identified as forward looking and accompanied by "meaningful cautionary statements" or (2) immaterial. *Id.* Under the second prong, the safe harbor protects a forward-looking statement if the plaintiff fails to prove that the statement was made with "actual knowledge" that it was false or misleading. *Id.*

The safe harbor is disjunctive. *See* 15 U.S.C. § 78u–5(c)(1) (using the word "or"). Fifth Circuit case law makes clear that the safe harbor applies to a statement that is identified as forward-looking and accompanied by meaningful cautionary language, that is immaterial, or that was not made with actual knowledge that it was false or misleading. 🚩*Lormand*, 565 F.3d at 243 (a three-pronged, disjunctive inquiry); 🚩*Southland*, 365 F.3d at 371 ("two independent prongs"). Even if the plaintiffs show actual knowledge, the safe harbor may still apply if the statement is either immaterial or is identified as forward looking and is accompanied by meaningful cautionary language. 🚩*Southland*, 365 F.3d at 371; *see also* BP I, 843 F. Supp. 2d at 777. Other circuits are consistent. [2]

**\*8** A cautionary statement must "identify important factors that could cause actual results to differ materially from those in the forward-looking statement." § 78u–5(c)(1)(A)(i). This standard is "somewhat ambiguous given the variety of possible factual circumstances that could arise." 🚩*In*

2024 WL 83503, Fed. Sec. L. Rep. P 101,744

_re Harman Int'l Indus., Inc._, 791 F.3d 90, 101 (D.C. Cir. 2015) (citations omitted). The question is how to separate those disclosures that provide investors with "meaningful" and "important" information from those that are either too vague for an investor to find relevant or too specific to expect a reasonable issuer to identify as important. The case law is clear that while "cautions must be tailored to the risks that accompany the particular projections," the cautionary-statement requirement does not demand prescience. _Asher v. Baxter Int'l Inc._, 377 F.3d 727, 732 (7th Cir. 2004) (collecting cases). "[T]he cautions need not identify what actually goes wrong and causes the projections to be inaccurate." _Id._ This tension reflects a safe-harbor provision born out of "a compromise between legislators who did not want any safe harbor ... and those who wanted a safe harbor ... that did not require any cautionary statements but just required the projection to have a reasonable basis." _Id._

A "meaningful" cautionary statement "calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." _Southland_, 365 F.3d at 372. A "generic and formulaic" cautionary statement that is repeated "only with slight variations" and used "in conjunction with _each_ alleged misrepresentation" is not meaningful. _Lormand_, 565 F.3d at 245 (emphasis in original). Nor are "[s]tatements along the lines of 'all businesses are risky' or 'the future lies ahead,' " which at bottom "come to nothing other than caveat emptor." _Asher_, 377 F.3d at 733; _see also Lormand_, 565 F.3d at 244 (the following disclaimer was not meaningfully cautionary: "[The statements are] not guarantees of future performance ... and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them."); _Plotkin v. IP Axess, Inc._, 407 F.3d 690, 694 (5th Cir. 2005) (the following disclaimer was not meaningfully cautionary: "These forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results.").

A cautionary statement must be tailored "to a particular company's status at a particular time." _In re Harman_, 791 F.3d at 101. The disclaimer must warn of what "could cause actual results to differ materially from those in the forward-

looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i); _see In re Harman_, 791 F.3d at 102. The investor must be "warned of risks of a significance similar to that actually realized" so that she "is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." _Harris v. Ivax Corp._, 182 F.3d 799, 807 (11th Cir. 1999) (quotation marks omitted). That said, while "investors would like to have ... a full disclosure of the assumptions and calculations _behind_ the projections[,] ... this is not a sensible requirement. Many of the assumptions and calculations would be more useful to a firm's rivals than to its investors." _Asher_, 377 F.3d at 733. "[D]isclosing assumptions, methods, or confidence intervals" underlying a projection is not required. _Id._ at 734. "The PSLRA does not require the _most_ helpful caution; ... it is enough to point to the principal contingencies that could cause actual results to depart from the projection." _Id._

In keeping with the statutory and case-law emphasis on tailored disclosures, "[e]ach statement that benefits from the safe harbor must be addressed individually." _Lormand_, 565 F.3d at 245. When a statement is forward looking only in part, the "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." _Spitzberg v. Houston Am. Energy Corp._, 758 F.3d 676, 691 (5th Cir. 2014) (quoting _Makor Issues & Rights, Ltd. v. Tellabs Inc._, 513 F.3d 702, 705 (7th Cir. 2008)).

## III. Analysis

**\*9** The defendants argue that leave to amend should be denied because amendment would be futile and would cause undue delay and prejudice. The defendants argue that amendment would be futile because (1) the production guidance statements are subject to the Private Securities Litigation Reform Act safe harbor; (2) the 2018 production guidance claims are time-barred under the applicable statute of repose; and (3) the plaintiffs fail to state a claim under Rule 12(b)(6) and the Private Securities Litigation Reform Act's heightened pleading standard.

For the reasons that follow, only the second argument is persuasive.

### A. The Production Guidance Claims

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 44 of 330

Delaware County Employees Retirement System v. Cabot Oil &..., Slip Copy (2024)
2024 WL 83503, Fed. Sec. L. Rep. P 101,744

### 1. The Safe Harbor

The defendants argue that the production guidance statements fall within the Private Securities Litigation Reform Act safe harbor. The plaintiffs argue that the safe harbor does not apply because: (1) the production guidance was "knowingly false"; (2) "the alleged misrepresentations are not accompanied by meaningful cautionary language"; and (3) the production guidance contained certain statements that were not forward-looking. (Docket Entry No. 193-2 at 16–19). The court disagrees with the defendants that the safe harbor applies. Before explaining the reasons, the court summarizes the allegations related to the production guidance.

The proposed second amended complaint alleges that Dinges and Schroeder knowingly issued false statements about Cabot's production guidance in press releases and investor conference calls. The production guidance statements fall into two categories: (1) production guidance for fiscal year 2018 and (2) production guidance for fiscal year 2019.

The alleged misrepresentations regarding the 2018 production guidance are as follows:

- On April 27, 2018, Cabot stated in a press release that "[t]he Company has [ ] reaffirmed its total 2018 daily production growth guidance of 10 to 15 percent." (Docket Entry No. 186-4 at ¶ 191; Docket Entry No. 190-12 at 8).

- On July 27, 2018, Cabot issued another press release announcing a reduction of its "2018 daily production growth guidance range from 10 - 15 percent to 10 - 12 percent." (Docket Entry No. 186-4 at ¶ 192; Docket Entry No. 190-17 at 10). The press release explained that the reduced guidance was "[d]ue to our year-to-date actual volumes being slightly lower than originally budgeted, primarily resulting from delays in third-party compressor stations in the first-quarter and downtime on Transco and Millenium during the second-quarter[.]" (Docket Entry No. 190-17 at 10).

The alleged misrepresentations regarding the 2019 production guidance are as follows:

- On October 26, 2018, Cabot issued a press release announcing "its preliminary 2019 production growth guidance range of 20 to 25 percent[.]" (Docket Entry No. 19-12 at 10; Docket Entry No. 186-4 at ¶ 193).

- Dinges stated on Cabot's third quarter 2018 earnings call, held the same day as the press release, that: "We felt like we were prudent in dialing back our capital spend, dialing back our '19 guidance to 20% to 25% growth in 2019, which is 25% to 30% growth on a debt adjusted per share basis. And that's off a 2 Bcf plus net production. We think that's fairly robust production. Regardless of what we said earlier, we think that's fairly ... productive. But we get reports that have come out, and some of the headlines and reports are guidance and production is light in 2019. Yes, it's light, Okay, it's only 20%, 25%, but we think it's also reasonable to take in consideration the value proposition that Cabot brings to the table." (Docket Entry No. 186-4 at ¶ 194).

**\*10** • On February 22, 2019, Cabot issued a press release announcing that it had "updated its 2019 production growth guidance to 20 percent[.]" (Docket Entry No. 190-13 at 12; Docket Entry No. 186-4 at ¶ 196). The release explained that "[t]his production growth is based on an updated capital budget of $800 million. Approximately $160 million of the 2019 capital budget relates to wells that are drilled and / or completed in 2019 but not placed on production until 2020." (Docket Entry No. 190-13 at 12).

- On April 26, 2019, Cabot issued a press release "reiterat[ing] its 2019 production growth guidance of 20 percent[.]" (Docket Entry No. 190-14 at 9; Docket Entry No. 186-4 at ¶ 196).

The proposed second amended complaint contains numerous allegations supporting scienter—that is, that Dinges and Schroeder knew that Cabot would not be able to meet the production guidance numbers that it gave investors. The plaintiffs allege that the production guidance was "falsely manufactured ... to appease shareholders." (Docket Entry No. 186-4 at ¶ 197).

Each press release containing the allegedly false production guidance featured this forward-looking statements disclaimer:

> This press release includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities

Exchange Act of 1934, as amended. The statements regarding future financial and operating performance and results, strategic pursuits and goals, market prices, future hedging and risk management activities, and other statements that are not historical facts contained in this report are forward-looking statements. The words "expect", "project", "estimate", "believe", "anticipate", "intend", "budget", "plan", "forecast", "outlook", "predict", "may", "should", "could", "will" and similar expressions are also intended to identify forward-looking statements. Such statements involve risks and uncertainties, including, but not limited to, market factors, market prices (including geographic basis differentials) of natural gas and crude oil, results of future drilling and marketing activity, future production and costs, legislative and regulatory initiatives, electronic, cyber or physical security breaches and other factors detailed herein and in our other Securities and Exchange Commission (SEC) filings. See "Risk Factors" in Item 1A of the Form 10-K and subsequent public filings for additional information about these risks and uncertainties. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual outcomes may vary materially from those indicated. Any forward-looking statement speaks only as of the date on which such statement is made, and the Company does not undertake any obligation to correct or update any forward-looking statement, whether as the result of new information, future events or otherwise, except as required by applicable law.

(Docket Entry No. 190-10 at 11–12).

Cabot's Form 10-Ks, which the disclaimer references as containing additional "Risk Factors," stated in relevant part:

Our growth is materially dependent upon the success of our drilling program. Drilling for natural gas and oil involves numerous risks, including the risk that no commercially productive natural gas or oil reservoirs will be encountered. The cost of drilling, completing and operating wells is substantial and uncertain, and drilling operations may be curtailed, delayed or canceled as a result of a variety of factors beyond our control, including:

**\*11** • decreases in natural gas and oil prices;

• unexpected drilling conditions, pressure or irregularities in formations;

• equipment failures or accidents;

• adverse weather conditions;

• surface access restrictions;

• loss of title or other title related issues;

• lack of available gathering or processing facilities or delays in the construction thereof;

• compliance with, or changes in, governmental requirements and regulation, including with respect to wastewater

• disposal, discharge of greenhouse gases and fracturing; and

• costs or shortages or delays in the availability of drilling rigs or crews and the delivery of equipment and materials.

Our future drilling activities may not be successful and, if unsuccessful, such failure will have an adverse effect on our future results of operations and financial condition. Our overall drilling success rate or our drilling success rate within a particular geographic area may decline. We may be unable to lease or drill identified or budgeted prospects within our expected time frame, or at all. We may be unable to lease or drill a particular prospect because, in some cases, we identify a prospect or drilling location before seeking an option or lease rights in the prospect or location. Similarly, our drilling schedule may vary from our capital budget. The final determination with respect to the drilling of any

*Delaware County Employees Retirement System v. Cabot Oil &..., Slip Copy (2024)*

2024 WL 83503, Fed. Sec. L. Rep. P 101,744

scheduled or budgeted wells will be dependent on a number of factors, including:

• the results of exploration efforts and the acquisition, review and analysis of seismic data;

• the availability of sufficient capital resources to us and the other participants for the drilling of the prospects;

• the approval of the prospects by other participants after additional data has been compiled;

• economic and industry conditions at the time of drilling, including prevailing and anticipated prices for natural gas and oil and the availability of drilling rigs and crews;

• our financial resources and results; and

• the availability of leases and permits on reasonable terms for the prospects and any delays in obtaining such permits.

These projects may not be successfully developed and the wells, if drilled, may not encounter reservoirs of commercially productive natural gas or oil.

(Docket Entry No. 190-15 at 39).

The applicability of the safe harbor to the production guidance depends on whether the disclaimer in the press releases (1) sufficiently identified the production guidance as forward-looking statements and (2) meaningfully cautioned investors with "statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." § 78u–5(c)(1)(A).

The disclaimer satisfies the first inquiry because it identified the production guidance as forward-looking statements. It stated that "[t]his press release includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended." It identified these forward-looking statements as including "[t]he statements regarding future financial and operating performance and results ... and other statements that are not historical facts[.]" That description clearly included the production guidance statements.

**\*12** However, the disclaimer fails the second inquiry because it did not contain "meaningful cautionary statements." The factors that the disclaimer identified as

having the potential to cause Cabot's actual production to differ materially from its production guidance were "a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372. The factors were not Cabot-specific and were not tailored to Cabot's circumstances at the particular time. *See Southland*, 365 F.3d at 372; *In re Harman*, 791 F.3d at 101. Cabot used the same "generic and formulaic" disclaimer in each press release. *Lormand*, 565 F.3d at 245 (emphasis in original). An investor reading the disclaimer would not have been "sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris*, 182 F.3d at 807 (quotation marks omitted).

The defendants argue that the disclaimer warned of the specific risk that the plaintiffs allege caused Cabot's actual production to differ materially from its production guidance. The defendants presumably refer to the disclaimer's warnings about "legislative and regulatory initiatives" and "compliance with ... governmental requirements and regulation." However, these generic warnings are insufficiently specific to put an investor on notice of the danger of the investment, particularly because the plaintiffs allege that Cabot's production from specific wells was already being negatively affected by the Department's enforcement of environmental laws and regulations.

As other circuits have recognized, "cautionary language cannot be meaningful if it is misleading in light of historical facts[ ] that were established at the time the statement was made" because "[s]uch statements are neither significant nor of useful quality or purpose." *In re Harman*, 791 F.3d at 102 (citing *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010)) (quotation marks omitted). The proposed second amended complaint alleges that, from 2017 to 2019, Cabot's drilling manager, Steven Novakowsi, "repeatedly informed" Dinges and Schroeder "that ongoing gas migration investigations at various Cabot wells had the potential to negatively impact the company's performance." (Docket Entry No. 186-4 at ¶ 191(b)). The proposed second amended complaint also alleges that the defendants were informed in April 2018 that "drilling issues" and "remedial work" was causing production delays. (*Id.* at ¶ 191(f)). Finally, the plaintiffs allege that, just weeks before Cabot issued its 2019 production guidance, Novakowsi again warned the defendants about the "potential impact of gas migration and/

Delaware County Employees Retirement System v. Cabot Oil &..., Slip Copy (2024)
2024 WL 83503, Fed. Sec. L. Rep. P 101,744

or alleged gas migration issues on the ability of the company to meet guidance." (*Id.* at ¶ 197(b)).

These allegations support an inference that the defendants knew that a specific risk that had materialized that was significantly likely to cause Cabot's actual production to differ materially from the production guidance that it had issued. In light of these allegations, it was insufficient for Cabot to warn vaguely of "legislative and regulatory initiatives" and "compliance with ... governmental requirements and regulation."

The D.C. Circuit's opinion in *In re Harman* is analogous. The defendant in that case had warned that actual outcomes might differ from forward-looking statements because of "amassed inventory." 791 F.3d at 104. The court held that this statement was not meaningful because it "did not convey that inventory was obsolete, as opposed to stocked with the latest, cutting-edge models. Even if viewed as implicitly raising the specter of obsolescence, the statements were insufficient for at least the reason that they did not warn of actual obsolescence that had already manifested itself." *Id.* Likewise, it was not sufficiently meaningful for Cabot to raise the specter of regulatory compliance issues when specific regulatory action had already begun affecting Cabot's production.

**\*13** The safe harbor does not apply to the production guidance.

### 2. Falsity and Scienter

The defendants argue that, even if the safe harbor does not apply, the proposed second amended complaint fails to state a claim on which relief can be granted as to the production guidance statements. (Docket Entry No. 191 at 27). The court disagrees.

As already partially detailed, the plaintiffs have alleged facts giving rise to the reasonable inference that the defendants issued production guidance with knowledge—or at least with "severe recklessness"—that Cabot was unlikely to meet the production guidance. Nathenson, 267 F.3d at 408. The plaintiffs allege that the defendants had been informed by internal analysts that Cabot's "overall production level was [ ] forecasted to be lower than the production level disclosed to the market." (Docket Entry No. 186-4 at ¶

191(i)). Nonetheless, the plaintiffs allege that Cabot publicly reaffirmed its 2018 production guidance a few days later. (*Id.* at ¶ 192). The proposed second amended complaint further alleges that, just weeks before Cabot issued its 2019 production guidance, Novakowski had informed the defendants "about the potential impact of gas migration and/or alleged gas migration issues on the ability of the company to meet guidance." (*Id.* at ¶ 197(b)). The plaintiffs allege that Cabot's own internal forecasts "were never at 20% production growth" even though its 2019 production guidance announced a low end of 22% growth. (*Id.* at ¶ 197(h)).

The plaintiffs have stated a claim on which relief can be granted with respect to the production guidance statements.

### 3. The Statute of Repose

The defendants argue that the plaintiffs' claims based on the 2018 production guidance are time-barred under 28 U.S.C. § 1658(b). (Docket Entry No. 191 at 28). Section 1658(b) provides that "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws[ ] ... may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."

The defendants note that the motion for leave to amend was filed more than five years after the alleged misstatements. (Docket Entry No. 191 at 22). They argue that the 2018 production guidance allegations do not relate back to prior complaints because they "are based on substantially different disclosures, documents, and theories." (*Id.*).

The plaintiffs respond that § 1658(b) does not apply because they filed the action within the five-year repose period. (Docket Entry No. 193-2 at 20). The plaintiffs rely on *Southeastern Pennsylvania Transportation Authority v. Orrstown Financial Services Inc.*, 12 F.4th 337, 351 (3rd Cir. 2021), for the proposition that "statutes of repose create a deadline for *filing* actions, rather than *resolving* them." The plaintiffs misread *Orrstown*. The plaintiffs in that case sought to "reassert the *same* claims against the *same* parties" that they had previously brought within the repose period, but which had been dismissed. *Id. at 344.* The Third Circuit held that the claims that the plaintiffs sought to reassert through an

amended complaint related back to the previously dismissed claims and were not time-barred. *Id.* at 352–53. If, as the plaintiffs contend, the court had interpreted the statute of repose to limit only the time that an action could be filed, rather than the time that a claim could be brought, relation-back would have been a moot point.

**\*14** The plaintiffs' reliance on *Hogan v. Pilgrim's Pride Corporation,* 73 F.4th 1150 (10th Cir. 2023), is also misplaced. The Tenth Circuit held that relation-back applied to § 1658(b). It also interpreted § 1658(b) to apply to initiating or commencing a claim rather than amending one. *Id.* at 1157. However, the court made the following disclaimer:

> This is not to say, however, that once a complaint is filed within the repose period, § 1658(b)(2) always continues to be satisfied despite later amendments to the complaint. The repose statute is claim specific. It speaks in terms of a cause of action "that involves a claim of fraud." A claim raised for the first time in an amendment to a complaint may well be barred by the statute. But that is not the situation here, where the SAC adds no parties or causes of action; it does not even add additional statements alleged to be fraudulent. We thus see no reason to bar the SAC under the repose statute.

*Id.* at 1157–58.

Unlike the amended complaint at issue in *Hogan,* the plaintiffs' second amended complaint does "add additional statements alleged to be fraudulent." The question, therefore, is whether the new statements relate back to the claims that were brought within the repose period.

Federal Rule of Civil Procedure 15(c) provides that: "An amendment to a pleading relates back to the date of the original pleading when: ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading. FED. R. CIV. P. 15(c)(1)(B).

"[R]elation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Mayle v. Felix,* 545 U.S. 644, 659 (2005). "The fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the

original pleading." *F.D.I.C. v. Bennett,* 898 F.2d 477, 480 (5th Cir. 1990) (quoting WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE 6A, § 1497, p. 94). However, "when new or distinct conduct, transactions, or occurrences are alleged as grounds for recovery, there is no relation back, and recovery under the amended complaint is barred by limitations if it was untimely filed." *Holmes v. Greyhound Lines, Inc.,* 757 F.2d 1563, 1566 (5th Cir. 1985); *see also F.D.I.C. v. Conner,* 20 F.3d 1376, 1385 (5th Cir. 1994) ("If a plaintiff attempts to interject entirely different transactions or occurrences into a case, then relation back is not allowed."). "In a securities fraud action, courts examine whether the allegations relate to the same statements and/or documents referenced in the original complaint." *In re Enron Corp.,* No. H-01-3624, 2005 WL 1638039, at \*4 (S.D. Tex. June 21, 2005) (quoting reference and quotation marks omitted). The relation-back doctrine is "liberally applied ... 'based on the idea that a party who is notified of litigation concerning a given transaction or occurrence is entitled to no more protection from statutes of limitation than one who is informed of the precise legal description of the rights sought to be enforced.' " *Williams v. United States,* 405 F.2d 234, 236 (5th Cir. 1968) (quoting 3 MOORE, FEDERAL PRACTICE ¶ 15.15[2]).

**\*15** The plaintiffs argue that the 2018 production guidance allegations relate back to the first amended complaint because the allegations arise "from the same operative conduct alleged in the FAC and amplify that Cabot's ongoing remedial work negatively impacted Cabot's ability to meet its production guidance." (Docket Entry No. 193-2 at 23).

The plaintiffs are correct that the first amended complaint alleged that Cabot's environmental compliance issues were "reasonably likely to, and would, adversely impact Cabot's ability to achieve its financial and operational projections." (Docket Entry No. 110 at ¶¶ 190(i), 259). However, the first amended complaint did not allege that Cabot's 2018 production guidance was a material misrepresentation, and it did not allege the facts that are the basis for that theory. *Compare In re Enron Corp.,* 2005 WL 1638039, at \*4 (applying relation-back because the amended complaint "assert[ed] claims based on the same alleged misrepresentations and omissions" as the original complaint); *Hogan,* 73 F.4th at 1157–58. The 2018 production guidance allegations are based on "new or distinct conduct, transactions, or occurrences" and do not relate-back

2024 WL 83503, Fed. Sec. L. Rep. P 101,744

to the allegations in the first amended complaint. The claims based on the 2018 production guidance are time-barred.

### B. The Failure-to-Disclose Claims

The proposed second amended complaint alleges that the defendants failed to disclose the following material facts that made Cabot's public statements misleading: (1) that its lowered production guidance announced in a July 17, 2019 press release had been caused by a gas migration investigation conducted by the Department; (2) that it had received a proposed consent order and agreement from the Department relating to ongoing violations of a previous consent order; and (3) that the Pennsylvania Attorney General was preparing to file criminal charges against Cabot. The defendants argue that the proposed second amended complaint fails to state a claim on which relief can be granted as to each alleged omission. The court disagrees.

The second amended complaint alleges that, beginning July 17, 2019, an "ongoing gas migration investigation at the Powers M well pad[ ] required a lengthy cessation of drilling operations there, indefinitely delaying the completion of the wells and, therefore, gas production." (Docket Entry No. 186-4 at ¶ 200). The plaintiffs further allege that Dinges and Schroeder had been informed of the investigation and suspension. (*Id.*). Instead of disclosing this investigation, the plaintiffs allege that Cabot attributed the lowered production guidance "in large part to a change in the operating plan resulting from a unique opportunity to acquire acreage adjacent to an eight-well paid, allowing the Company to increase the total lateral footage on the pad." (*Id.*). The defendants contend that the non-disclosure is not actionable because "Cabot did not represent that the acreage acquisition rationale was the only reason for the guidance change." (Docket Entry No. 191 at 29). This argument is unavailing because Cabot incurred "a duty to speak the full truth" when it released a statement about the delayed production from the Powers M well pad. *See Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) (quoting 🔖 *Lormand*, 565 F.3d at 249). Cabot cannot avoid liability by arguing that the statement was a partial truth.

**\*16** The defendants argue that the plaintiffs do not sufficiently claim that Cabot failed to disclose the proposed consent order and criminal charges because the plaintiffs have not pleaded particularized facts showing that: (1) "Cabot was required to disclose these alleged items under 17 C.F.R.

§ 229.103(c)(3)"; (2) "the alleged omissions rendered any affirmative statements misleading"; (3) "Dinges or Schroeder knew for sure Cabot would be charged, let alone charged with felonies"; (4) "Dinges or Schroeder had no reasonable basis to believe that the alleged proposed consent order or charges would result in less than $100,000 in penalties, or that Cabot had no reasonable chance of prevailing at trial." (Docket Entry No. 191 at 29).

The defendants' argument with respect to the proposed consent order fails because, as explained above, once the defendants addressed the proposed consent orders and agreements, they were obligated to do so accurately. The plaintiffs allege that the defendants disclosed only two proposed consent orders and agreements and failed to disclose a proposed consent order and agreement that Cabot had received on the same day as the other two consent orders and agreements. (Docket Entry No. 186-4 at ¶ 201). The plaintiffs have stated a claim that the defendants breached their duty to disclose this proposed consent order and agreement.

The defendants' argument with respect to the criminal charges also fails. 17 C.F.R. § 229.103(a) requires registrants to "[d]escribe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject." This requirement applies also to "any such proceedings known to be contemplated by governmental authorities." *Id. Section 229.103(c)* further requires disclosure of "[a]dministrative or judicial proceedings (including proceedings which present in large degree the same issues) arising under any Federal, State, or local provisions that have been enacted or adopted regulating the discharge of materials into the environment or primarily for the purpose of protecting the environment." Such proceedings "shall not be deemed 'ordinary routine litigation incidental to the business' and shall be described if:

(i) Such proceeding is material to the business or financial condition of the registrant;

(ii) Such proceeding involves primarily a claim for damages, or involves potential monetary sanctions, capital expenditures, deferred charges or charges to income and the amount involved, exclusive of interest and costs, exceeds 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis; or

(iii) A governmental authority is a party to such proceeding and such proceeding involves potential

monetary sanctions, unless the registrant reasonably believes that such proceeding will result in no monetary sanctions, or in monetary sanctions, exclusive of interest and costs, of less than $300,000 or, at the election of the registrant, such other threshold that (A) the registrant determines is reasonably designed to result in disclosure of any such proceeding that is material to the business or financial condition is disclosed, (B) the registrant discloses (including any change thereto) in each annual and quarterly report, and (C) does not exceed the lesser of $1 million or one percent of the current assets of the registrant and its subsidiaries on a consolidated basis; provided, however, that such proceedings that are similar in nature may be grouped and described generically.

§ 229.103(c)(3). The version of § 229.103 that was in place during the relevant time required, in (c)(3)(iii), disclosure of governmental environmental proceedings unless the company "reasonably believes" that the proceeding will not result in "monetary sanctions, exclusive of interest and costs, of less than $100,000," rather than the $300,000 in the current version. (Docket Entry No. 191 at 23).

 *17  The second amended complaint sufficiently alleges that the criminal charges were not "ordinary routine litigation incidental to the business" and were subject to the disclosure requirements of § 229.103. The plaintiffs allege that, when Cabot filed its 2019 Form 10-K and 1Q20 Form 10-Q—which failed to disclose the criminal charges—the defendants "(i) ha[d] received the Grand Jury's subpoena ..., (ii) kn[ew] of the Attorney General's criminal complaint, and (iii) expect[ed] that criminal charges would be forthcoming[.]" (Docket Entry No. 186-4 at ¶ 202). The plaintiffs have further alleged that the criminal charges were "material to the business or financial condition" of Cabot. § 229.103(c)(3). They have alleged that Cabot's "Susquehanna County gas exploration and production operations ... were existential to the Company's business" and that "[s]ubstantially all of Cabot's oil and gas production occurred in Susquehanna County during the Class Period." (Docket Entry No. 186-4 at ¶¶ 251–52). Finally, drawing all reasonable inferences in the plaintiffs' favor, it would have been unreasonable for the defendants to believe that the criminal charges would result in monetary sanctions less than $100,000 because, as the plaintiffs allege, the defendants knew that a single notice of violation it had received from the Department in September 2011 would "likely" result in the payment of a penalty between $100,000 and $300,000. (Docket Entry No. 186-4 at ¶ 187).

The plaintiffs have stated a claim that Cabot failed to disclose material facts necessary to make its statements not misleading.

### C. Undue Delay and Prejudice

Finally, the defendants argue that, even if the amendment is not futile, it should not be allowed because (1) the plaintiffs' "effort to add new claims based on litigation discovery is [ ] an improper end-run around the PSLRA's pleading standards"; and (2) amendment would cause delay and prejudice because a new class certification proceeding would be required. (Docket Entry No. 191 at 31–32).

The court is not persuaded that amendment would be an "end-run around the PSLRA's pleading standards." The defendants cite several cases describing a "tension" between the Act's heightened pleading standard and the liberal leave to amend under Rule 15. But these cases deny leave to amend only when the plaintiff presents no explanation for not including the new allegations earlier, *see* In re Bristol-Myers Squibb Sec. Litig., 228 F.R.D. 221, 229–30 (D.N.J. 2005), or when the claims asserted in the amended complaint were previously dismissed for failure to meet the heightened pleading standard, *see* In re Bisys Sec. Litig., 496 F. Supp. 2d 384, 387 (S.D.N.Y. 2007), *aff'd sub nom.* Pub. Employees Ret. Ass'n of New Mexico v. PricewaterhouseCoopers LLP, 305 Fed. Appx. 742 (2d Cir. 2009); Zwick Partners, LP v. Quorum Health Corp., 394 F. Supp. 3d 804, 813 (M.D. Tenn. 2019), or when amendment would be futile, *see* Miller v. Champion Enterprises Inc., 346 F.3d 660, 692 (6th Cir. 2003), In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002).

In this situation, in which the plaintiffs met the heightened pleading standard initially but seek to add additional claims based on information learned in discovery, the purpose behind the heightened pleading standard—"to screen out lawsuits that have no factual basis," In re NAHC, 306 F.3d at 1332—would not be frustrated by amendment. The Third Circuit has recognized that amendment ought to be permitted when the plaintiff learns the basis of a claim through discovery and could not have done so earlier. *See* Werner v. Werner, 267 F.3d 288, 297 (3d Cir. 2001) ("Given the high burdens the PSLRA placed on plaintiffs, justice and fairness require that the plaintiffs before us be allowed an opportunity

to amend their complaint to include allegations relating to the newly discovered Board meeting minutes."); *see also*

🚩 *In re Livent, Inc. Noteholders Secs. Lit.*, 174 F. Supp. 2d 144, 148 (S.D.N.Y. 2001) (allowing a third amendment);

🚩 *McNamara v. Bre–X Minerals, Ltd.*, 197 F. Supp. 2d 622 (E.D. Tex.2001) (allowing a fourth amendment); 🚩 *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 844 & n. 14 (N.D. Ill. 2000) (allowing a sixth amendment); 🚩 *In re Southern Pac. Funding Corp. Sec. Lit.*, 83 F. Supp. 2d 1172, 1174 (D. Or. 1999) (allowing a fourth amendment). On these facts, amendment would not frustrate the Act's heightened pleading standard.

**\*18** The court is also not convinced that amendment would cause undue delay or prejudice. The defendants argue that amendment "would require a new class certification proceeding to assess the 2018 stock drop," but, as the court has explained, the 2018 production guidance claim is time-barred. (Docket Entry No. 191 at 31). The defendants also argue that amendment would require resolving "potential predominance issues based on the expiration of the two-year statute of limitations for the new 2019 and 2020 claims (which were brought within the five-year repose period but, without relation back, would be beyond the two-year limitations period and subject to inquiry notice)." (*Id.*). The court doubts that any putative class members learned of the facts underlying those claims over two years ago, but to the extent there are genuine predominance issues, they can be resolved efficiently and without undue delay or prejudice to the defendants.

## IV. Conclusion

The motion for leave is granted, (Docket Entry No. 185), but the claims based on the 2018 production guidance are dismissed with prejudice.

## All Citations

Slip Copy, 2024 WL 83503, Fed. Sec. L. Rep. P 101,744

---

## Footnotes

2   *See, e.g.,* 🚩 *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."); 🚩 *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278–79 (3d Cir. 2010) ("[T]he safe harbor applies to statements that are forward-looking as defined by the statute provided that they are (1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading."); 🚩 *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) ("[T]he investors argue for a conjunctive reading of the safe harbor provision, under which a sufficiently strong inference of actual knowledge would overcome a claim of safe harbor protection even for statements identified as forward-looking and accompanied by meaningful cautionary language. The difficulty with this approach is that it ignores the plain language of the statute, which is written in the disjunctive as to each subpart."); 🚩 *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010) ("The statute offers several ways for a defendant to avoid liability, all written in the disjunctive.... First, a defendant may avoid liability by showing that his statement was issued with meaningful cautionary language. Or, the defendant can show that the statement was simply immaterial. As a third alternative, the defendant can avail himself of the safe harbor if the plaintiff fails to prove that the statement was made with actual knowledge that it was false. Any one of these suffices for the defendant; a top-to-bottom reading of the statute shows that the plaintiff's inability to show knowledge of falsity is only relevant if the defendant is unable to produce meaningful cautionary statements or evidence of immateriality." (citations omitted)); 🚩 *Ind. State Dist. Council & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009) (the safe-harbor provision "is overcome only if the statement

**Delaware County Employees Retirement System v. Cabot Oil &..., Slip Copy (2024)**

2024 WL 83503, Fed. Sec. L. Rep. P 101,744

was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements." (quotation marks omitted)).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB No. 5

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

2023 WL 2647855
United States District Court, S.D. New York.

Jason DENNY, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
v.
CANAAN INC., Nangeng
Zhang, and Tong He, Defendants.

21 Civ. 3299 (JPC)
|
Signed March 27, 2023

**Attorneys and Law Firms**

Samuel Howard Rudman, Robbins Geller Rudman & Dowd
LLP, Melville, NY, for Plaintiff.

Daniel L. Cantor, O'Melveny & Myers LLP, New York, NY,
Meg Kalikman Lippincott, Los Angeles, CA, William Ka
Hing Pao, O'Melveny & Myers, LLP, Los Angeles, CA, for
Defendant Canaan Inc.

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

**\*1** Lead Plaintiffs Bill Lu and Liying Huang allege that
Defendants Canaan, Inc. ("Canaan"), Nangeng Zhang ("Mr.
Zhang"), and Tong He ("Mr. He") made knowingly and
misleading statements in violation of Section 10(b) of the
Securities Exchange Act of 1934 ("Exchange Act"), 15
U.S.C. § 78j(b), and Securities and Exchange Commission
("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and in violation
of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).
Defendants have moved to dismiss the Amended Complaint,
arguing that it fails to adequately plead a substantive Section
10(b) violation because Lead Plaintiffs have not alleged that
Defendants made materially false or misleading statements or
that they did so with the requisite scienter. Because the Court
determines that one of Defendants' alleged misstatements
was outside of the class period and inactionable, another
was not materially false or misleading, and the third was not
made with the requisite scienter, the Court grants Defendants'
motion in its entirety.

## I. Background

### A. Facts[1]

This case arises out of the proposed class's purchases of
American Depositary Shares ("ADSs") of Canaan between
February 10, 2021 and April 9, 2021 (the "Class Period").
Am. Compl. ¶ 1. Canaan is a Cayman Islands corporation
that primarily manufactures and sells cryptocurrency mining
equipment. *Id.* ¶¶ 16, 23. In 2018, 2019, and 2020, sales of this
equipment comprised 99.7%, 97.7% and 94.4% respectively
of Canaan's total revenue. *Id.* ¶ 27. Canaan's ADSs are
publicly traded on the Nasdaq. *Id.* ¶ 2. Mr. Zhang is the
founder of Canaan, and has served as its CEO and as
Chairman of its Board of Directors since that founding. *Id.*
¶ 18. Mr. He has served as Canaan's Director of Finance
since July 2020 and served as its acting CFO from February
2021 to August 2021. *Id.* ¶ 19. Lead Plaintiffs allege that
both Mr. Zhang and Mr. He "because of their positions within
[Canaan] possessed the power and authority to control the
contents of Canaan's SEC filings, press releases, and other
market communications." *Id.* ¶ 21. Lead Plaintiffs further
allege that Mr. Zhang and Mr. He "were provided with copies
of the Company's SEC filings and press releases ... prior to or
shortly after their issuance and had the ability and opportunity
to prevent their issuance or to cause them to be corrected." *Id.*

**\*2** On November 30, 2020, Canaan issued a press release
attached as Exhibit 99.1 to a Form 6-K filed with the SEC,
which was titled "Canaan Inc. Reports Unaudited Third
Quarter 2020 Financial Results" and announced Canaan's
financial results for the quarter ending September 30, 2020.
*Id.* ¶ 28; *see* Dkt. 71-2 at 2-12 ("11/30/20 Press Release").
This press release reported a 20.7% decrease in total
computing power sales from the same period in 2019 and a
13.4% quarter-over-quarter increase in such sales compared
to the second quarter of 2020, as well as a 75.7% year-over-
year revenue decrease and 8.5% quarter-over-quarter revenue
decrease. 11/30/20 Press Release at 1. The press release
contained quotations from both Mr. Zhang, as the Chairman
and CEO of Canaan, and Quanfu Hong ("Mr. Hong"), then
the CFO of Canaan. Mr. Hong mentioned, among other things,
the rebounding market demand for Bitcoin mining machines
and pre-sale orders that Canaan had received: "[T]he demand
for mining machines in the market continued to rebound
during the third quarter, and we have received a large number
of pre-sale orders which are scheduled for delivery starting in
the fourth quarter of 2020." *Id.* at 2.

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

Mr. Hong resigned as CFO effective immediately for "personal reasons" on February 9, 2021. Am. Compl. ¶ 30. The next day, which is the start of the Class Period, Canaan issued a press release again attached as Exhibit 99.1 to a Form 6-K filed with the SEC and signed by Mr. Zhang, which was titled "Canaan Announces Improved Revenue Visibility in 2021." *Id.* ¶ 32; *see* Dkt. 71-3 at 104-06 ("2/10/21 Press Release"). Lead Plaintiffs rely on multiple statements made in the February 10, 2021 press release that touted the company's increased revenue visibility thanks to purchase orders for Bitcoin mining machines. The release stated:

> Canaan ... announced that its revenue visibility has improved substantially in 2021 as a result of attaining purchase orders totaling more than 100,000 units of bitcoin mining machines from customers in North America. Many of those purchase orders were placed with prepayment and will likely occupy the Company's current manufacturing capacity entirely for the full year of 2021 and beyond.

2/10/21 Press Release at 1. It further stated that "[w]ith those fully committed purchase orders, the Company now enjoys a much higher degree of revenue visibility and more precise forecast. As such the Company is able to leverage such information and additional liquidity to conduct its component purchases, production scheduling, warehousing and logistics." *Id.* The press release quoted Mr. Zhang as saying:

> In late 2020, we shifted our client base to mostly publicly traded companies and bitcoin-focused investment funds which tend to place sizable orders with longer-term commitment. As a result, we can now forecast our revenue much more precisely. Our increased revenue visibility is not only enabling us to plan our production and logistics well in advance, but also helping us to optimize our cost structure and improve our customer satisfaction rate.

> Above all, it should help us achieve profitable growth for the long run.

*Id.*

On Monday, February 8, 2021, two days before this press release was issued, Canaan's ADSs opened trading at $6.91 each. Am. Compl. ¶ 33. The shares closed trading on Friday, February 12, 2021, at $13.04 each. *Id.*

On April 9, 2021, a magazine called *Decrypt* published an interview with Mr. Zhang in an article titled, "Canaan CEO Is Bullish on Bitcoin Mining Ahead of Earnings – The Nasdaq-listed manufacturer of crypto mining hardware has seen its stock jump almost 1000% in six months." *Id.* ¶ 36; Dkt. 71-3 ("*Decrypt* Article") at 1. The article began: "Canaan founder and CEO Nangeng Zhang has reason to be chipper. His Beijing-based company is reporting earnings on Monday, when it will disclose Q4 and full 2020 results, and the outlook is rosy." Decrypt Article at 2. The article attributed several statements to Mr. Zhang. [2] Mr. Zhang was quoted as saying that "Canaan has secured a large number of pre-sale orders for its mining machines," and that "as institutional interest in Bitcoin continues to strengthen, so will the entry of more actors into Bitcoin mining." *Id.* The article described Canaan as "one of the world's largest manufacturers of mining hardware," and observed that "[a]ll [presumably referring to manufacturers of mining hardware] have seen demand for their products soar in recent months." *Id.* The article reported that "Canaan anticipates it will have no problem fulfilling its bulging order book," but did not attribute that anticipation to Mr. Zhang. *Id.* at 4. The article proceeded to paraphrase Mr. Zhang as saying "that the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors—which has impacted the gaming, computing, and automotive industry, as well as Bitcoin mining." *Id.* Mr. Zhang then was quoted: "Our approach is one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks." *Id.* He further was quoted: "We have been able to successfully secure an entire year's worth of orders for 2021, with orders for our Avalon A1246 miners scheduled till March 2022." *Id.* Mr. Zhang also was quoted to say that Canaan's operation of its own mining business "will significantly strengthen our inventory management capabilities, stabilize our supply chain networks, and diversify our revenue stream, allowing us to better optimize our mining hardware during the

Case 4:24-cv-01940 Document 45-2 Filed on 03/14/25 in TXSD Page 56 of 330
Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)
2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

lull seasons (where demand for mining machines tends to be weaker)." *Id.*

**\*3** Then, on the morning of April 12, 2021, Canaan issued a press release regarding its fourth quarter and year end 2020 financial results attached as Exhibit 99.1 to a Form 6-K filed with the SEC and titled "Canaan Inc. Reports Unaudited Fourth Quarter and Full Year 2020 Financial Results." Am. Compl. ¶ 39; *see* Dkt. 71-3 at 141-53 ("4/12/21 Press Release"). That press release revealed a total computing power sales decrease of 93.1% both year-over-year and quarter-over-quarter, as well as a 91.75% decrease in revenue year-over-year and a 76.56% decrease in revenue quarter-over-quarter. 4/12/21 Press Release at 1. Other financial results for the quarter and year were similarly poor. *Id.* The release quoted Mr. Zhang as saying, among other things:

> Although the outbreak of COVID-19 caused supply chain disruptions and thus negatively impacted our revenues in the fourth quarter of 2020, our market leadership has enabled us to attain US$174 million of contracted orders, with US$66 million of cash advance from customers as of December 31, 2020, thus laying a solid foundation for solid revenue growth in 2021.

*Id.* at 2. Additionally, Mr. He was quoted as saying, among other things: "Due to supply chain disruptions, as the price of Bitcoin rallied in late 2020, we experienced a surge of demand for high-quality mining machines both in and outside of China." *Id.*

That same morning, Canaan discussed its fourth quarter and 2020 year end financial results on an earnings conference call. Am. Compl. ¶ 40; *see* Dkt. 71-3 at 166-82 ("4/12/21 Call Tr."). On that call Mr. Zhang stated through a translator that Canaan "saw a severe supply shortage in the industry" related to "chip supply" during the fourth quarter of 2020 and into 2021. 4/12/21 Call Tr. at 10. He added that he "[could not] really disclose the exact number of chips that [Canaan had] under production right now" but that the "strategies [Canaan had] adopted to address this problem" had "helped [Canaan] achieve outstanding results in terms of keeping up" and that Canaan "can effectively secure the delivery of our

chips from our foundry partners." *Id.* He also stated that "since the second half of last year and the first half of this year, most of the mining machines we sold were actually sold as futures contracts, which had a fixed price. And the prices were actually lower than our existing machines." *Id.* at 13; *accord* Am. Compl. ¶ 40. While Canaan ADS closed on Friday, April 9, 2021, at $18.67 per share, they closed on Monday, April 12, 2021, following the press release and earnings call, at $13.14 per share, with trading volume "more than three times the average daily volume over the preceding ten trading days." Am. Compl. ¶ 41.

**B. Procedural History**

Plaintiff Jason Denny filed the original Complaint in this action on April 15, 2021. Dkt. 1. On December 9, 2021, the Court granted Lu and Huang's motion for appointment as Lead Plaintiffs, and approved their selection of lead counsel. Dkt. 62. Lead Plaintiffs filed their Amended Complaint on February 7, 2022. Dkt. 65. Lead Plaintiffs allege that Defendants committed violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder (Count I), Am. Compl. ¶¶ 70-81, and that Mr. He and Mr. Zhang violated Section 20(a) of the Exchange Act (Count II), *id.* ¶¶ 82-87.

Defendants filed a motion to dismiss on April 8, 2022, Dkts. 69, 70 ("Motion"), accompanied by a motion requesting that the Court take judicial notice of certain materials, Dkt. 71. Defendants argue that the Amended Complaint should be dismissed because Lead Plaintiffs fail to plead falsity or scienter with respect to alleged violations of Section 10(b) and Rule 10b-5. [3] *See* Motion at 8-20. Lead Plaintiffs filed their response to both motions on June 7, 2022. Dkts. 72 ("Opposition"), 73. Defendants filed their reply in further support of their motion to dismiss on July 7, 2022. Dkt. 74 ("Reply").

**II. Standard of Review**

**\*4** To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 57 of 330

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)
2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555.* Although the Court must "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor," *Biro v. Condé Nast, 807 F.3d 541, 544 (2d Cir. 2015),* it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC, 570 F.3d 471, 475-76 (2d Cir. 2009).*

Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under Federal Rule of Civil Procedure 9(b) in order to survive a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).* A complaint making fraud allegations under Section 10(b) and Rule 10b-5 "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Diesenhouse v. Social Learning & Payments, Inc., No. 20 Civ. 7436 (LJL), 2022 WL 3100562, at *4 (S.D.N.Y. Aug. 3, 2022)* (quoting *Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)).* Allegations that are conclusory or unsupported by factual assertions are insufficient. *See ATSI Commc'ns, 493 F.3d at 99; see also Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986).*

Securities fraud claims must also satisfy the Private Securities Litigation Reform Act ("PSLRA")'s heightened pleading requirements. *Diesenhouse, 2022 WL 3100562, at *5.* The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 462 (2d Cir. 2019).* In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see Diesenhouse, 2022 WL 3100562, at *5.* "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues Rights, Ltd., 551 U.S. 308, 323 (2007).* For an

inference of scienter to be strong, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns, 493 F.3d at 99* (brackets and emphasis omitted) (quoting *Tellabs, 551 U.S. at 324*).

Although pleading standards are heightened for securities fraud claims, the Second Circuit has cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones.' " *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., 19 F.4th 145, 150 (2d Cir. 2021)* (quoting *In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 161 (2d Cir. 2021)).* The PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks, 216 F.3d 300, 313 (2d Cir. 2000).* Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001).*

### III. Discussion

#### A. Judicial Notice

**\*5**  As part of their motion to dismiss, Defendants have filed a motion requesting that the Court take judicial notice of certain materials, which are identified in the motion as Exhibits 1 through 9. Dkt. 71. Lead Plaintiffs have opposed this motion in part. Dkt. 73. Lead Plaintiffs do not oppose the Court taking judicial notice of Exhibits 1, 4, 6, 7, and 9, *id.* at 2, each of which is a document incorporated into the Amended Complaint by reference.[4] The Court therefore grants the motion with respect to those materials. With respect to the remaining materials, the Court need not determine whether to take judicial notice of them in resolving Defendants' motion to dismiss. The Court therefore declines to take judicial notice of Exhibits 2, 3, 5, and 8.[5]

#### B. Section 10(b) and Rule 10b-5 Claims

Count I alleges that Defendants "carried out a plan, scheme, and course of conduct" that violated Section 10(b) and Rule 10b-5 by deceiving investors, inflating and maintaining prices of the Canaan ADSs, and causing proposed class members to purchase ADSs at inflated prices. Am. Compl. ¶¶ 71-72. To state a claim under Section 10(b), "a complaint

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 58 of 330

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

must adequately plead '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' "

*In re DraftKings Inc. Sec. Litig.*, No. 21 Civ. 5739 (PAE), 2023 WL 145591, at *15 (S.D.N.Y. Jan. 10, 2023) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)). Defendants contend that Plaintiffs fail to allege a materially false or misleading statement, Motion at 8-17, and fail to plead any facts permitting an inference of scienter, *id.* at 17-20.

**1. Misstatements or Omissions of Material Fact**

Lead Plaintiffs allege three occasions when Defendants made "made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading," Am. Compl. ¶ 73: (1) the November 30, 2020 press release, *id.* ¶ 28, (2) the February 10, 2021 press release, *id.* ¶ 32, and (3) the April 9, 2021 *Decrypt* article reporting an interview with Mr. Zhang, *id.* ¶ 36. Defendants argue that the Amended Complaint fails to adequately plead for any of those occasions a material representation that was false when made or the omission of material information that Defendants had a duty to disclose. Motion at 8. The Court will analyze the challenged statements chronologically.

**i. The November 30, 2020 Press Release**

The first challenged statements come from Mr. Zhang's and Mr. Hong's quotes in the November 30, 2020 press release. Mr. Zhang stated, among other things: "With new generations of mining machines and AI chips in the pipeline, we are confident that the enhanced performance of our new products will continue to bolster our competitive advantages and solidify our market leadership going forward." 11/30/20 Press Release at 2; *see* Am. Compl. ¶ 28. Mr. Hong, in turn, stated that "the demand for mining machines in the market continued to rebound during the third quarter [of 2020] and we have received a large number of pre-sale orders which are scheduled for delivery starting in the fourth quarter of 2020." 11/30/20 Press Release at 2; *see* Am. Compl. ¶ 28. Defendants argue that, as a threshold matter, these statements are not actionable because they occurred prior to the Class Period, which began on February 10, 2021. Motion at 9.

Lead Plaintiffs respond that these statements "misled the market" and Defendants had a "duty to correct and a duty to update" the statements, thus rendering the November 30, 2020 statements actionable. Opposition at 14 & n.7.

**\*6** In the Second Circuit, a duty to update a past statement "may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630, 632 (2d Cir. 2019) (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998)). "There is, however, no duty to update vague statements of optimism or expressions of opinion, statements that are not material, or statements that are not forward looking and do not contain some factual representation that remains alive in the minds of investors as a continuing representation." *Id.* (internal quotation marks and brackets omitted). On the other hand, a duty to correct "applies when a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d at 109 (internal quotation marks omitted).

While generally a defendant is liable "only for those statements made during the class period," *id.* at 107, courts have suggested that liability may arise for earlier made statements if the duty to update or correct them subsequently arose during the class period, *see* *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) ("The August 3, 2007 statements regarding RBS's exposure were made prior to the start of the Class Period and cannot be the basis of liability unless there was a duty to update or correct them."); *see also* *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir. 2007) (holding that a misstatement created by the duty to correct a statement made outside the class period "was made (if at all) when a duty to correct arose"); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017) ("The Second Circuit has held that 'the duty to correct previous misstatements does not apply where the defendants made the original statements before the Class Period and became aware of the errors in those statements before the Class Period.' " (quoting *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016))).

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 59 of 330

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

Lead Plaintiffs argue that Mr. Hong's statement in the November 30, 2020 release that "demand for mining machines in the market continued to rebound during the third quarter, and we have received a large number of pre-sale orders which are scheduled for delivery starting in the fourth quarter of 2020," 11/30/20 Press Release at 2, "later bec[a]me misleading during the Class Period when Defendants learned that the increasing bitcoin market made those pre-sale orders a detriment rather than something positive." Opposition at 14 n.7. They further argue that Mr. Zhang's statement that a new generation of mining machines would bolster the company's competitive advantage, 11/30/20 Press Release at 2, was "subject to a duty to update because although reasonable to believe at the time ..., once the bitcoin market price rose, due to the fact that [the] Company's mining machines were sold on prepayment, the Company was not at a competitive advantage, but a disadvantage." Opposition at 14 n.7.

As alleged, these statements were made prior to the Class Period. Yet the Amended Complaint fails to plead facts to establish that any duty to update or correct them subsequently arose within the Class Period. The Amended Complaint contains no allegation of knowledge giving rise to such a duty that was gained by Defendants during the Class Period. [6] Rather, the Amended Complaint is vague as to when exactly Defendants supposedly understood that rising Bitcoin prices would reduce the benefits of pre-selling mining machines in late 2020. Without any allegations stating that, or how, Defendants reached such an understanding during the Class Period, these November 30, 2020 statements are not actionable. [7]

### ii. The February 10, 2021 Press Release

**\*7** Canaan issued a press release on February 10, 2021 titled "Canaan Announces Improved Revenue Visibility in 2021." 2/10/21 Press Release. The challenged statements in this release include Canaan's assertion that revenue visibility had improved due to prepaid purchase orders that "will likely occupy the Company's current manufacturing capacity entirely for the full year of 2021 and beyond." *Id.* at 1; *see* Am. Compl. ¶ 32. The press release added a quote from Mr. Zhang, saying that the increased revenue visibility was attributable to a late 2020 shift in Canaan's "client base to mostly publicly traded companies and bitcoin-focused investment funds." 2/10/21 Press Release at 1.

Defendants argue first that no statement in the February 10, 2021 press release was untrue, Motion at 11, and second that the Amended Complaint fails to plead a valid omissions theory because there is not a sufficiently close nexus between the statements that were made and the additional statements that Lead Plaintiffs claim had to be made to render the press release not misleading, *id.* at 11-14. Lead Plaintiffs appear to cede that they are proceeding only on an omissions theory: they respond that "each of the above statements was materially false and misleading, omitting ... that the pre-sale prepayment orders actually harmed Canaan's financial outcome for the fourth quarter of 2020," and they point to Canaan's April 12, 2021 statement that "most of the mining machines were sold as future contracts, which had a fixed price ... actually lower than our existing machines." Opposition at 15 (quoting Am. Compl. ¶¶ 38-40). Further, Lead Plaintiffs claim that Defendants' omission of the true effect of the pre-payment orders "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed," *id.* (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005)), particularly when it came to how the company had performed in the fourth quarter of 2020. That matters, Lead Plaintiffs reason, because Canaan's performance in the fourth quarter of 2020 was in fact harmed by the pre-sales of mining machines, yet the release trumpeted those pre-sales only as something positive for the company. *Id.*; *see* Am. Compl. ¶ 38(b), (c) (alleging that Defendants concealed from the investing public that "the Company's touted pre-sale orders were locked in at lower prices than the re-bounding bitcoin market prices during the third and fourth quarters of 2020, reducing the Company's ability to earn revenue from the increasing market prices during the fourth quarter 2020" and that as a result, "Canaan's fourth quarter 2020 sales and sales revenue had declined dramatically").

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives*, 563 U.S. at 44. "Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor." *Kleinman v. Elan Corp.*, 706 F.3d 145, 152-53 (2d Cir. 2013) (ellipsis omitted) (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)). Instead, absent an independent duty to speak, disclosure is required "only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.' " *Id.* (quoting *Matrixx Initiatives*, 563 U.S. at 44). "[W]hether a statement is misleading depends on

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

the perspective of a reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015) (internal quotation marks omitted). So, with respect to omissions "the court must determine whether the omitted fact would have been material to a reasonable investor – *i.e.* whether 'there is a substantial likelihood that a reasonable investor would consider it important.' " *Id. at 196* (brackets omitted) (quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976)). And in particular "a duty [to disclose omitted facts] may arise when there is ... a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (internal quotation marks omitted). Part of that analysis requires a court to examine the relatedness of the statement actually made and the facts which were omitted. *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272-73 (S.D.N.Y. 2021) ("[T]o prevail on [an omission theory], plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission to demonstrate that" there is a "duty to disclose the omitted information ... in order to prevent the statement from being materially misleading.").

**\*8** Here, Defendants argue that, because the press release concerned "only ... then-existing facts and projections about how those facts would affect Canaan's future performance," no reasonable investor would conclude that those statements had anything to do with performance in the fourth quarter, which had recently passed. Motion at 12-13 (emphasis omitted). Moreover, Defendants argue that Canaan's "statements about prepaid purchase orders were made in the context of how they would have provided enhanced 'revenue visibility' in 2021; they were not about how pre-sales would impact fourth-quarter 2020 results." *Id.* at 13-14. And Defendants rely heavily on *In re Ferroglobe PLC Securities Litigation*, where the court held that statements which were "expressly directed to the future" could not be viewed by a reasonable investor as related to negative performance in the past quarter. No. 19 Civ. 2368 (RA), 2020 WL 6585715, at \*8 (S.D.N.Y. Nov. 10, 2020).

Lead Plaintiffs argue that, unlike the statements in *Ferroglobe*, the statements in the February 10, 2021 press release were not solely forward-looking. The Court agrees. The Amended Complaint alleges that the omission of information in the February 10, 2021 press release—the below market prepaid prices of the mining machines sold, and the negative effect those pre-sales would have on revenue

in the fourth quarter of 2020—render the statements in that release misleading to a reasonable investor. Am. Compl. ¶¶ 31-35, 38; *see id.* ¶ 33 ("The press release concealed the fourth quarter's known dismal financial performance, while promoting Canaan's expected future success."). The press release quoted Mr. Zhang as explaining that the prepaid purchase orders resulted from a "late 2020" shift [8] in Canaan's "client base to mostly publicly traded companies and bitcoin investment funds which tend to place sizable orders with longer-term commitment." 2/10/21 Press Release at 1; *see* Am. Compl. ¶ 32. Mr. Zhang continued that "as a result [of that shift] we can now forecast our revenue much more precisely" which increased revenue visibility "should help us achieve profitable growth for the long run." 2/10/21 Press Release at 1; *see* Am. Compl. ¶ 32.

In other words, as alleged, Mr. Zhang explained that it was the shift in client base in "late 2020," so presumably in the fourth and perhaps third quarters of 2020,[9] which created the prepaid purchase orders that Defendants touted for increasing revenue visibility, yet the release omitted that the same late 2020 shift in the client base—and its associated increase in locked-in prepaid orders—led to significantly reduced revenue in the previous quarter. *Id.* ¶ 38. This decrease in revenue occurred, Lead Plaintiffs allege, because the "pre-sale orders were locked in at lower prices than the re-bounding bitcoin market prices during the third and fourth quarters of 2020, reducing the Company's ability to earn revenue from the increasing market prices during the fourth quarter 2020." *Id.* ¶ 38(b). The fact that the same business practice that was lauded in the release caused both the forward-looking revenue visibility optimism and allegedly contributed significantly to the past revenue performance gloom is what creates a sufficiently close relationship between the two to require disclosure of the latter in order to render the former not misleading to a reasonable investor. Or put differently, both the future revenue visibility and the past lost revenue opportunities were significant effects of the same cause, just felt in different quarters. A reasonable investor learning of the touted positive effect on the future would find material the negative effect on the present.

**\*9** Nor does this determination require the Court to adopt some legally novel "freestanding completeness requirement" as Defendants argue. Motion at 13. Indeed, the fact allegedly omitted by Defendants was later acknowledged by Defendants themselves during the April 12, 2021 earnings call as contributing to the fourth quarter of 2020 financial results. Am. Compl. ¶ 40; *see* Dkt. 4/12/21 Call Tr. at 13

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)
2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

(Mr. Zhang: "[T]he price of mining machines actually moves with the Bitcoin prices only for the mining machines that are ready for delivery. So, since the second half of last year and the first half of this year, most of the mining machines we sold were actually sold as futures contracts, which had a fixed price. And the prices were actually lower than our existing machines."). In other words, as alleged, in the February 10, 2021 press release, Defendants voluntarily touted the positive future effects of a business decision, yet hid the significant negative effects of that very same decision. "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *see also Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) (holding that when the defendant spoke regarding rental payments made by a large lessee, it put those payments "in play" and therefore had a duty to disclose that the lessee was only able to make rental payments because of a loan provided by the defendant). While it is certainly conceivable that the negative effect on past revenue created by a shift to pre-orders could be small enough that a reasonable investor would not find it important, that is not what is alleged here.

Of course, corporate officials are only responsible for "revealing those material facts reasonably available to them.... Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309 (citations omitted). But Defendants do not argue that a lack of knowledge on their part defeats the alleged duty to disclose an omitted fact here. For that reason, the Court treats the question of whether Defendants knew the impact that the mining machine pre-sales would have on fourth quarter revenue at the time they issued the February 10, 2021 press release only when addressing scienter at *infra* III.C.

### iii. The April 9, 2021 *Decrypt* Article

The Court next turns to the April 9, 2021 *Decrypt* article, which was titled "Canaan CEO is Bullish on Bitcoin Mining Ahead of Earnings – The Nasdaq-listed manufacturer of crypto mining hardware has seen its stock jump almost 1000% in six months." *Decrypt* Article; *see* Am. Compl. ¶ 36. The article reported that "Zhang said that the company had secured chips from a number of fabrication plants in advance

of the worldwide shortage of processors" and directly quoted Mr. Zhang as saying that the company's approach is "one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks." *Decrypt* Article at 4. Lead Plaintiffs allege that these statements "concealed from the investing public" that "Canaan had experienced significant ongoing supply chain disruptions during the fourth quarter 2020." Am. Compl. ¶ 38(a). Lead Plaintiffs further contend that during the April 12, 2021 earnings call, "Defendants reported the exact opposite [of what Mr. Zhang said during the *Decrypt* interview], that Cannon had experienced a 'severe supply shortage' of 'mining machine' chips during the fourth quarter of 2020." Opposition at 9 (quoting Am. Compl. ¶ 40). Defendants argue that Lead Plaintiffs' claim based on the *Decrypt* article fails first because many statements within the article were not made by Canaan, but by an independent reporter, Motion at 14-16, and second because Mr. Zhang's statement that the company was working with chip manufacturers to reduce supply chain risks was not false or misleading, *id.* at 16-17.

First, there is of course no general rule that statements made to the media cannot form the basis for securities fraud claims. *See e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 662-64 (S.D.N.Y. 2017). But courts in this District have dismissed claims arising from statements in the press that "are not reasonably attributable to defendants and accordingly do not give rise to liability under the federal securities laws." *Hershfang v. Citicorp.*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991). In *Hershfang*, for instance, the court determined that statements attributed to a defendant's "spokesman" in various news articles were insufficiently attributed to the defendant under Rule 9(b) to state a claim,[10] and then turned to other portions of those articles which were "attributed to specific defendants" and determined that they too were not actionable because they contained only statements of opinion. *Id.* at 1256.

**\*10** On the other hand, when a pleading sufficiently alleges that a statement in an article is attributable to that defendant, the statement may be treated as being made by that defendant. In *In re Columbia Securities Litigation*, the court determined that at the motion to dismiss stage, a statement in a *Forbes* article could serve as the basis for a fraud claims "[i]f, as plaintiffs allege, [one of the defendants] made a false statement to the *Forbes* reporter," because "[w]hile defendants certainly had

Case 4:24-cv-01940 Document 45-2 Filed on 03/14/25 in TXSD Page 62 of 330

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

less than complete control over what the reporter wrote, they did have control over what [that defendant] said." 747 F. Supp. 237, 245 (S.D.N.Y. 1990); *see also* Banco Bradesco, 277 F. Supp. 3d at 663 (determining that a corporate defendant could be liable for statement made to the press by an unidentified spokesperson).

Thus, the quote from Mr. Zhang in the *Decrypt* article that the company's approach "is one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks," *Decrypt* Article at 4, clearly may be attributed to him. Further, at this stage, where all reasonable inferences must be drawn in favor of Lead Plaintiffs, the Court determines that the content of Zhang's statement, as reported in the article, "that the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors— which has impacted the gaming, computing, and automotive industry, as well as Bitcoin mining," *id.*, may be attributed to him as well, even though it was not a direct quote. The *Decrypt* article consists substantially of an interview with Mr. Zhang, and contains multiple direct quotes and multiple paraphrases of statements made by Mr. Zhang. The statement begins with "Zhang said," *id.*, and the Amended Complaint alleges that Mr. Zhang made this statement, Am. Compl. ¶ 37.[11] To hold that this statement could not be attributed to Mr. Zhang in such conditions would be to determine that only words within direct quotes in press articles could be attributed to securities fraud defendants, a proposition which is unsupported by any caselaw cited by Defendants and which the Court declines to endorse.[12]

The Court therefore turns to Defendants' argument that Mr. Zhang's statements in the *Decrypt* article were not false or misleading. Motion at 16; Reply at 5-6. As stated, the Amended Complaint relies on two statements in the *Decrypt* article attributable to Mr. Zhang: (1) "Zhang said that the company had secured chips from a number of fabrication plants in advance of the worldwide shortage of processors," and (2) a quote from Mr. Zhang saying that "[o]ur approach is one of a multi-fab strategy, where we collaborate and work with a number of leading chip manufacturers to reduce supply-chain risks." Am. Compl. ¶ 37 (emphasis omitted); *see Decrypt* Article at 4. Lead Plaintiffs allege that these statements were false because "Canaan had experienced significant ongoing supply chain disruptions during the fourth quarter 2020." Am. Compl. ¶ 38.

**\*11** To support this claim, Lead Plaintiffs point to statements made in Canaan's fourth quarter and year end 2020 financial results released on April 12, 2021, *id.* ¶ 39, as well as statements made by Mr. Zhang during the earnings call that day discussing those results, *id.* In particular, the press release announcing the financial results contained a statement by Mr. Zhang that "[a]lthough the outbreak of COVID-19 caused supply chain disruptions and thus negatively impacted our revenues in the fourth quarter of 2020, our market leadership has enabled us to attain US$174 million of contracted orders," and a statement by Mr. He that "[d]ue to supply chain disruptions, as the price of Bitcoin rallied in late 2020, we experienced a surge of demand for high quality mining machines both in and outside of China." 4/12/21 Press Release at 2; *see* Am. Compl. ¶ 39. And on the earnings call, Lead Plaintiffs allege that "Zhang stated that Canaan experienced 'a severe supply shortage' of 'mining machine' chips during the fourth quarter of 2020." Am. Compl. ¶ 40. A review of the full transcript of that call, however, shows that he made a different statement. Mr. Zhang said, through a translator:

> Due to the low Bitcoin prices in the second half of 2020, most mining machine manufacturers reduced their investment in fabrication during the period. As a result, when the Bitcoin price bounced back in the second half of 2020, we *saw a severe supply shortage in the industry.* In addition [ ] the limited supplies across the semiconductor manufacturing sector recently also ha[ve] played a role in building the shortage of chips in 2021, further accelerating the problem of chip supply.

> We cannot really disclose the exact number of chips that we have under production right now. But one of the strategies we've adopted to address this problem is to maintain our partnerships with multiple foundry partners and keep expanding our collaborations, *which has helped us achieve outstanding results in terms of keeping up.*

4/12/21 Call Tr. at 10 (emphasis added).[13]

Lead Plaintiffs argue that Defendants' statements "regarding securing chips [i]n advance of the worldwide shortage of processors' was an outright falsehood as Defendants' own admissions, just three days later, prove," because "Defendants reported the exact opposite, that Canaan had experienced 'a severe supply shortage' of 'mining machine' chips during the fourth quarter of 2020." Opposition at 9. They argue further that "even if Canaan had secured chips prior to the shortage, the statement gives the false impression that

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

the Company was not affected by the shortage," effectively omitting material information. *Id.* at 9-10.

The flaw in Lead Plaintiffs' argument is that they have failed to adequately allege the true state of the world which could make either a false statement false or an omission an omission. In order to establish an outright misrepresentation, Lead Plaintiffs would need to allege either that Canaan had not "secured chips from a number of fabrication plants in advance of the worldwide shortage of chips" or that Canaan had not "reduce[d] supply-chain risks." But in support of those facts, Lead Plaintiffs point only to statements from April 12, 2021 that refer either to general supply chain disruptions without reference to chips, or to industry-wide disruptions to chips without mention of whether or to what extent those disruptions impacted Canaan in particular. To this end, it is significant to note Lead Plaintiffs' misstatement in the Amended Complaint of what Mr. Zhang said during the earnings call. They allege that "defendant Zhang stated that *Canaan* experienced 'a severe supply shortage,' " Am. Compl. ¶ 40 (emphasis added), whereas in fact Mr. Zhang stated that "we saw a severe supply shortage *in the industry*," Dkt. 71-3 at 175 (emphasis added). Neither the severity, nor even the existence, of the shortage as applied to Canaan is indicated by that statement. In short, Defendants' subsequent statements about supply chain issues or chip supply chain disruptions in the industry generally are insufficient to show that Mr. Zhang's previous statements during the *Decrypt* interview that "the company had secured chips" and had "reduce[d] supply-chain risks" were false statements when made.

**\*12** Lead Plaintiffs' omissions theory as to Mr. Zhang's *Decrypt* interview statements fails for similar reasons. To sufficiently plead that these statements were misleading because they omitted material information, Lead Plaintiffs must identify the information that was omitted. But again, Lead Plaintiffs contend that the omitted information was a "severe supply shortage" of "mining machine" chips affecting Canaan, yet their allegations fail to establish that such a shortage occurred. In fact, Lead Plaintiffs' omission theory is weaker than their misrepresentation theory because even if the Defendants' April 12, 2021 statements had revealed that Canaan experienced a shortage of chips, they say *nothing* about the extent to which Canaan experienced that shortage. For example, a minor shortage would be consistent with the assertion that Canaan had previously "secured chips" and "reduce[d] supply chain risks." Without any information regarding the extent of any shortage, Lead Plaintiffs cannot

meet the PSLRA's requirement of specifying "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). And while the PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based," *Novak*, 216 F.3d at 313, they are required to plead at least some fact supporting their belief. Lead Plaintiffs have not done so.

Accordingly, the Court determines that Lead Plaintiffs have failed to adequately allege a false or misleading statement with respect to the April 9, 2021 *Decrypt* article.

**2. Scienter**

Because the Court concludes that Lead Plaintiffs have alleged a false or misleading statement with respect only to the February 10, 2021 press release, the Court assesses whether Lead Plaintiffs have adequately pleaded scienter with respect to the statements in that press release.

To plead scienter, a complaint must allege facts showing "either: 1) a 'motive and opportunity to commit the fraud'; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99). As the Second Circuit has explained:

Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

A complaint will survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* (quotations omitted).

Lead Plaintiffs allege that "each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 64 of 330

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)
2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

contained materially false and/or misleading information and omitted material information." Am. Compl. ¶ 42. In particular, Lead Plaintiffs allege that "[i]n their respective roles as senior officers of Canaan, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period," and that "[n]umerous facts ... considered collectively, support a strong inference that Defendants knew or, at a minimum, were severely reckless in not knowing, the true undisclosed facts when they made their false and misleading representations to investors." *Id.* ¶¶ 43-44. [14]

Those "[n]umerous facts" include, first, that Defendants "made detailed statements based on purportedly personal knowledge regarding ... the Company's sales of bitcoin mining machines," showing that "the Individual Defendants were intently focused on Canaan's bitcoin mining machines ... and were intimately familiar with the Company's actual performance and sales ... at the time they made their statements"; second, that the statements "were relayed after quarter end in February ... 2021" such that "the Individual Defendants knew, or were reckless in not knowing, the previous quarter's financial results and reasons for the results months later"; third, "the magnitude of Canaan's revenue decline in the fourth quarter 2020 makes it simply implausible that the Individual Defendants did not know of the negative financial results and causes of those results during the Class Period"; fourth, "the timing and circumstances of the departure of Canaan's former CFO," Mr. Hong; fifth, that "bitcoin mining machines were the single largest income producing segment for the Company"; and sixth, that Mr. Zhang "founded the Company and not only served as its highest-ranking officer and Chairman of the Board, but he also controlled 69.4% of the voting power as of December 31, 2020." Am. Compl. ¶¶ 45-50. Lead Plaintiffs further argue that the core operations doctrine provides supplemental support for allegations of scienter in this instance. *See* Opposition at 22.

**\*13** The flaw in each of these theories is that they amount to various ways that Defendants must have known specific information at the time of the February 10, 2021 statement. That specific information consists of Canaan's revenue figures associated with the pre-sales and that those figures were lower than otherwise achievable because of rising Bitcoin prices during the fourth quarter which Defendants could have taken advantage of had the sale price of the mining machines not been locked in. Essentially,

Lead Plaintiffs say that Defendants must have known this information because of, for example, the timing of the statements, the positions of Mr. Zhang and Mr. He in Canaan, and the magnitude of the impact on revenue. But Lead Plaintiffs never allege *how* Defendants would have this information, regardless of how important it may have been, and "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309; *accord* *Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*, 478 F. App'x 679, 682 (2d Cir. 2012) ("[A]n allegation that defendants had access to information that was inconsistent with their alleged misstatements 'must specifically identify the reports or statements containing this information.' " (quoting *Novak*, 216 F.3d at 309)).

The Amended Complaint contains no allegation of such a report or statement accessible to Defendants at the time of the February 10, 2021 statement, and instead argues in conclusory fashion that "Canaan's dismal results [were] known to Defendants" because "the fourth quarter and year" were already completed and because the February 10, 2021 statement was made "six weeks after the fourth quarter and full year 2020 ended." Am. Compl. ¶¶ 31-32. While there may be an intuitive appeal to the idea that Defendants must have known about fourth quarter of 2020 revenue because they were touting increased revenue visibility, that revenue visibility was explicitly tied to 2021. *Id.* ¶ 32. The February 10, 2021 statement did not say that Defendants had increased revenue visibility as to the not-yet-reported financial results of 2020, or that they already had generated revenue figures for 2020. And while at least some revenue information was likely obtainable within the company related to pre-sale orders, due to the fact that these orders were locked in during late 2020, the Amended Complaint contains no allegations related to how such information for each sale might have been compiled into some sort of report accessible to Defendants, or even that Mr. He or Mr. Zhang would have been privy to individual sale prices for each of the pre-sales at the time they were made or otherwise before the February 10, 2021 statement, let alone the effects of those sale prices on the company's revenue. In short, the Amended Complaint does not "specifically identify the reports or statements containing" the revenue information; in essence they allege only that such reports *must have* existed. [15] Such allegations are insufficient to plead scienter. *See* *In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022)* ("These allegations amount to little more than

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 65 of 330

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

speculation that documentation or evidence of internal control deficiencies must have existed and do not specifically identify the reports or statements containing the truthful information, as a plaintiff generally must when contending defendants had access to contrary facts." (internal quotation marks and alterations omitted)).

Nor, with this path foreclosed, do Lead Plaintiffs' other attempts lead to a successful pleading. It may be true that "[a]ctively communicating with the public about [an] issue demonstrates defendants' sensitivity to it," *Gauquie v. Albany Molecular Rsch., Inc.,* No. 14 Civ. 6637 (FB), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016), but Defendants' February 10, 2021 statements related to their pre-sales indicate only that they were sensitive to how those pre-sales would improve revenue visibility in 2021, not that they necessarily understood how those sales had impacted past revenue in late 2020. The fact that these statements were made after the fourth quarter concluded also does not raise an inference that revenue information for that quarter was available, especially absent any allegations relating to the company's practices for when it prepares its revenue information for internal review. *See Lopez v. CTPartners Exec. Search Inc.,* 173 F. Supp. 3d 12, 38 (S.D.N.Y. 2016) ("[T]hat a quarter has concluded does not mean that the quarter's results have yet been tabulated."); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Co.,* 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss" when allegedly false statement was made three weeks before final sales figures were announced.).

**\*14** Next, the magnitude of the eventual revenue decline does not raise an inference of scienter both because as discussed there is no indication that Defendants had access to that information at the time of the February 10, 2021 press release and because it is not clear what portion of that decline was due to an increased volume of pre-sales. This is especially true because Lead Plaintiffs' argument is not that the pre-sales alone caused a loss of revenue, but rather that because the sales prices were locked in, Defendants were unable to take advantage of potentially higher sale prices as the price of Bitcoin, and the accompanying demand for mining machines, rose. But the magnitude of a revenue decrease from one year to another or from one quarter to another says nothing about the ability of Defendants to understand that they were

leaving money on the table either while they were doing it or shortly thereafter. *See also In re Nielsen Holdings PLC Sec. Litig.,* 510 F. Supp. 3d 217, 231 (S.D.N.Y. 2021) ("[T]he magnitude (or duration) of an adverse result does not provide an independent basis for scienter." (internal quotation marks omitted)). The Court therefore determines that the magnitude of the revenue decline in this case does not raise an inference of scienter.

The departure of Canaan's former CFO, Mr. Hong, one day before the February 10, 2021 statement, also does not sufficiently raise an inference of scienter. "Courts ... have consistently held that an officer's resignation, without more, is insufficient to support a strong inference of scienter." *Gillis v. QRX Pharma Ltd.,* 197 F. Supp. 3d 557, 605 (S.D.N.Y. 2016) (collecting cases); *see also Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (holding that resignations "without some indicia of highly unusual or suspicious circumstances, are insufficient to support the required strong circumstantial evidence of scienter"). The Amended Complaint alleges only that Mr. Hong "suddenly resigned effective immediately" without explanation and "citing only 'personal reasons,' " Am. Compl. ¶ 30, and then alleges that *The Motley Fool* opined that the February 10, 2021 "financial update is oddly timed" since it immediately followed the CFO's resignation, *id.* ¶ 34. The suggestion appears to be that this "odd[ ] timing" indicates that Mr. Hong's resignation was related to some corporate misconduct. But the Amended Complaint alleges no other facts related to his departure that suggest that it was related in any way to the February 10, 2021 statements, let alone facts that give rise to an inference of scienter.

Finally, what remains is the "core operations" doctrine. *See* Opposition at 22. "The core operations doctrine provides that a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *Renewable Energy Grp.,* 2022 WL 14206678, at *3 n.4 (internal quotation marks omitted). But the Second Circuit has "not clearly affirmed the validity of this doctrine following the passage of the PSLRA." *Id.* And so courts in this Circuit generally treat core operations allegations as providing "supplementary but not independently sufficient means to plead scienter." *Cortina v. Anavex Life Sci. Corp.,* No. 15 Civ. 10162 (JMF), 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016) (internal quotation marks omitted). Because none of the Lead

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 66 of 330

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)
2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

Plaintiffs' other allegations support an inference of scienter, the core operations doctrine—even if it remains a valid doctrine—cannot save Lead Plaintiffs' claims.

Ultimately the Court must assess, in light of these allegations taken collectively, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" ⚑ *Tellabs*, 551 U.S. at 326. For this Amended Complaint, without any allegation specifically identifying a report or statement containing omitted material facts, the Court concludes that the answer is no. The inference that Defendants had access to fourth quarter of 2020 revenue data related to their pre-sales is not as strong as the inference that Defendants lacked that data a mere six weeks after the close of the quarter. For that reason, the Court determines that Lead Plaintiffs have failed to adequately allege scienter for the February 10, 2021 statement and grants the motion to dismiss on that ground.

**\*15** Because those are the only statements which the Court finds actionable, the Court dismisses Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims.

**C. Section 20(a) Claims Against Mr. He and Mr. Zhang**
Because the Court has dismissed Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims, the Section 20(a) claims likewise fail for lack of a primary violation. *See, e.g.,* ⚑ *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) (dismissing Section 20(a) control liability claims after dismissing Section 10(b) primary violations). The Court therefore also dismisses the Section 20(a) claims.

**D. Leave to Amend**
Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Lead Plaintiffs have asked the Court for leave to amend their Amended Complaint should the Court rule in Defendants' favor. Opposition at 25. Because the Amended Complaint is the first complaint submitted by Lead Plaintiffs, the Court grants leave to amend. The Court emphasizes that Lead Plaintiffs should only file a Second Amended Complaint if they are able to remedy the pleading deficiencies identified herein.

**IV. Conclusion**

For the stated reasons, Defendants' motion to dismiss is granted. The Court grants Lead Plaintiffs leave to amend their Amended Complaint. In the event Lead Plaintiffs decide to file another amended complaint, they must file it within thirty days of this Opinion and Order. If Lead Plaintiffs fail to file an amended complaint within thirty days, and do not show good cause to excuse the failure to do so, the Court will dismiss this action with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

---

**Footnotes**

1    The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 65 ("Am. Compl."), as well as documents incorporated by reference in the Amended Complaint. *See* ⚑ *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[ ] all reasonable inferences in plaintiff's favor"); ⚑ *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference...." (internal quotation marks omitted)).

Denny v. Canaan Inc., Not Reported in Fed. Supp. (2023)

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 67 of 330

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

2   The *Decrypt* article contained numerous direct quotes from Mr. Zhang, while also paraphrasing other statements that are attributed to him. For clarity purposes, the Court specifically notes when reciting a reported direct quote from Mr. Zhang.

3   Defendants seek dismissal of the entire Amended Complaint, though their arguments address only the violations of Section 10(b) and Rule 10b-5 alleged in Count One. *See generally* Motion. However, because "[t]o establish liability under section 20(a), a plaintiff 'must first establish a primary violation,' " *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 169 (S.D.N.Y. 2018) (quoting *In re Omnicom*, 597 F.3d 501, 514 n.6 (2d Cir. 2010)), dismissal of Count I would require dismissal of Count II.

4   These materials consist of the November 30, 2020, February 10, 2021, and April 12, 2021 press releases, the *Decrypt* article, and the transcript of the April 12, 2021 earnings call. Dkt. 71 at 1-3.

5   These materials consist of, respectively, Canaan's Form F-1 Registration Statement filed with the SEC on October 28, 2019, Canaan's ADS historical stock data, Bitcoin's historical price data, and Canaan's Form 6-K reporting financial results from the first quarter of 2021 filed with the SEC on June 1, 2021. Dkt. 71 at 1-3.

6   If anything, the allegations in the Amended Complaint suggest that Defendants gained knowledge of the allegedly misleading nature of the November 30, 2020 statements prior to the commencement of the Class Period. For instance, Lead Plaintiffs contend that Defendants had a duty to update or correct the quotation from Canaan's CFO, Mr. Hong, in the November 30, 2020 press release. Yet, the Amended Complaint's scienter allegations specifically refer to Mr. Hong's resignation *the day before the Class Period* as supporting an inference of scienter with respect to the February 10, 2021 press release. Am. Compl. ¶ 48. Moreover, any theory that knowledge giving rise to a duty to update or correct with respect to the November 30, 2020 statements was first gained after the Class Period began on February 10, 2021 would seem in tension with Lead Plaintiffs' claim that statements in the February 10, 2021 press release were misleading due to an omission at the time they were made, which naturally would entail having the requisite knowledge at some point *before* filing the Form 6-K with the attached press release on February 10, 2021. *See id.* ¶ 32; Opposition at 14-15.

7   As discussed at *infra* III.C, Lead Plaintiffs' allegations on this point are insufficient to establish scienter given the heightened pleading requirements, as they fail to allege with the requisite specificity that and how Defendants understood the impact of rising Bitcoin prices during the Class Period.

8   Drawing all inferences in favor of Lead Plaintiffs, the Court assumes that an order made with "prepayment" in the fourth quarter of 2020 would have meant collecting the revenue associated with that order in the fourth quarter.

9   This inference is strengthened by the fact that the November 30, 2020 press release referenced increase pre-sales beginning in the third quarter of 2020 and continuing into the fourth quarter. 11/30/20 Press Release at 2; *see* Am. Compl. ¶ 28

10  The court in *Banco Bradesco* arguably took a different approach on this issue, rejecting an argument that a claim based on statement in an article attributed to an unidentified representative of a corporate defendant should be dismissed on the basis that it was not attributed to a specific individual. 277 F. Supp. 3d at 663.

11  Lead Plaintiffs do not appear to argue, and the Court does not hold, that the opening of the article, which included a statement that the "outlook is rosy" referring to the fourth quarter and full year 2020 results, is attributable to Defendants. Opposition at 9-10, 13. There is of course significantly more reason to doubt that

2023 WL 2647855, Fed. Sec. L. Rep. P 101,562

such a claim, found only in the article's introduction, prior to any direct reference to statements made by Mr. Zhang and without any direct attribution to any Defendant, could be considered a statement by Defendants.

12    Such a rigid rule would also open avenues for fraud by making it possible for entities and insiders to make statements in the press without fear of liability so long as they secured a reporter's agreement not to put their words in quotes.

13    "It is well established that 'where the plaintiffs['] allegations are contradicted by a document that the complaint incorporates by reference, the document controls.' " *Optionality Consulting Pte. Ltd. v. Nekos*, No. 18 Civ. 5393 (ALC), 2019 WL 4523469, at *6 (S.D.N.Y. Sept. 18, 2019) (quoting *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 215 (S.D.N.Y. 2008)). Defendants moved the Court to consider the transcript of the April 12, 2021 earnings call as an incorporated-by-reference document in their motion for judicial notice. Dkt. 71 at 4 (referring to Exhibit 9 as incorporated by reference in the Amended Complaint). Lead Plaintiffs did not opposed that motion with respect to the April 12, 2021 transcript. Dkt. 73 at 2, 5.

14    Because Lead Plaintiffs' theory of corporate scienter is predicated on the scienter of Mr. Zhang and Mr. He, *see* Opposition at 24-25; Am. Compl. ¶ 51, the Court does not separately analyze Canaan's scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant.").

15    While not finding that any of these allegations necessarily would have been sufficient, the Court notes that Lead Plaintiffs might have alleged, for example, the existence of a sales report showing the funds brought in by pre-sales, a regular practice of reporting preliminary revenue figures within the company shortly after the end of a quarter, or that Mr. Zhang and Mr. He were intimately involved in each individual pre-sale such that they knew the prices and quantities of those sales.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

  © 2025 Thomson Reuters. No claim to original U.S. Government Works.  Pl. Appx. B-063

# TAB No. 6

2012 WL 1078823, Fed. Sec. L. Rep. P 96,791

KeyCite Yellow Flag - Negative Treatment

Distinguished by   SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.,
D.Del.,   November 4, 2020

2012 WL 1078823
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

John F. HUTCHINS, Individually and On Behalf
of All Others Similarly Situated, Plaintiff,
v.
NBTY, INC., et al., Defendants.

No. CV 10–2159(LDW)(WDW).
|
March 30, 2012.

**Attorneys and Law Firms**

Michael I. Fistel, William W. Stone, Holzer Holzer & Fistel,
LLC, Atlanta, GA, David A. Rosenfeld, Mario Alba, Jr.,
Robert M. Rothman, Samuel H. Rudman, Robbins Geller
Rudman & Dowd, LLP, Melville, NY, for Plaintiff.

Michael R. Young, Antonio Yanez, Jr., Willkie Farr &
Gallagher LLP, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

WEXLER, District Judge.

**\*1** Plaintiff John F. Hutchins brings this federal securities
fraud class action against defendants NBTY, Inc. ("NBTY")
and NBTY directors/officers Scott Rudolph ("Rudolph") and
Harvey Kamil ("Kamil"), alleging violation of § 10(b) of the
Securities Exchange Act of 1934 (the "Exchange Act"), 15
U.S.C. § 78j(b), and Securities and Exchange Commission
("SEC") Rule 10b–5, as well as § 20(a) of the Exchange Act,
15 U.S.C. § 78t(a). Plaintiff sues individually and on behalf of
all purchasers of NBTY's common stock from November 9,
2009 to April 27, 2010 (the "class period"). Defendants move
to dismiss the amended complaint pursuant to Federal Rules
of Civil Procedure ("FRCP") 9(b) and 12(b)(6). Plaintiff
opposes the motion. Upon oral argument, the Court denied
the motion for the reasons below.

*I. BACKGROUND*

For present purposes, the allegations of the amended
complaint can be summarized as follows. NBTY
manufactures, markets, and distributes nutritional
supplements. NBTY's common stock trades on the New York
Stock Exchange. Rudolph served as chairman of the board
and chief executive officer during the class period. Kamil
served as president and chief financial officer during the class
period.

NBTY conducts its business through four business segments,
one of which is the Wholesale/U.S. Nutrition segment. This
segment includes branded products that are marketed under
various brand names and private-label brands that NBTY
manufactures for many leading retailers. Before and during
the class, NBTY's largest customer was Wal–Mart Stores, Inc.
("Wal–Mart"). During the class period, Wal–Mart accounted
for 30% of NBTY's net sales and 80% of its private-label
sales. In the fall of 2009, Wal–Mart told NBTY that, for the
first time in 10 years, it would put out for competitive bids
the products it had been purchasing from NBTY. Thereafter,
Wal–Mart sent mass emails to suppliers of such private-label
products encouraging them to bid on products previously sold
to Wal–Mart by NBTY. According to plaintiff, defendants
knew that NBTY would have to lower prices of products
sold to Wal–Mart, or lose the business, and that the resulting
pricing pressure would threaten or cause NBTY to suffer
materially lower gross margins and operating results. Plaintiff
alleges that defendants and the investment community were
keenly focused on an adverse trend in NBTY's gross margins,
as all of NBTY's growth from 2007 to 2009 was generated
by its lower margin Wholesale/U.S. Nutrition segment, which
had caused a downward trend in its reported gross margins.
Consequently, NBTY's reported gross margins were a key
metric used by investors to gauge NBTY's financial condition.

During the class period, defendants issued press releases
making positive statements about NBTY's business, gross
margins and future operating performance, but never told
investors about Wal–Mart's competitive bidding initiative or
discussed the resulting adverse impact on NBTY's sales,
pricing and future prospects. For instance, on November
9, 2009, Kamil stated to the investing public that NBTY's
reported gross margins of approximately 45% for the
two most recent fiscal quarters (ending June 30, 2009
and September 30, 2009) were indicative of its ongoing
performance, not the lower reported gross margins of the

prior three quarters. Kamil made this statement even though defendants—but not investors—knew that NBTY's largest customer was soliciting competing bids for products NBTY had been supplying it and that, as a result, NBTY's gross margins would be decreasing. At the end of NBTY's December 2009 quarter, defendants purportedly assuaged investor concerns about lower gross margins for the quarter by stating that NBTY had become more efficient by improving supply chain management and employing effective controls over advertising and selling, general, and administrative costs. Then, on March 11, 2010, a few weeks prior to the quarter ending March 31, 2010, Kamil again stated publicly that NBTY's recently reported gross margins were sustainable. Similarly, defendants allegedly knew that NBTY would be further adversely impacted by Wal–Mart's competitive bidding initiative because NBTY would have to ramp up advertising costs associated with marketing NBTY's branded products to offset the decline in the private-label business, yet they told investors at the time that they were advertising more "efficiently."

**\*2** On November 30, 2009, NBTY filed its annual 10–K form for the fiscal year ended September 30, 2009 (the "2009 Form 10–K"). The 2009 Form 10–K stated, *inter alia,* that (1) Wal–Mart accounted for 30% of NBTY's Wholesale/U.S. Nutrition net sales and 18% of company-wide net sales; (2) Wal–Mart had no commitment to purchase from NBTY; (3) NBTY had no obligation to sell to Wal–Mart; and (4) that loss of Wal–Mart, or any other major customer, would have a material adverse effect on NBTY's operations if NBTY were unable to replace that customer. The 2009 Form 10–K did not mention Wal–Mart's competitive bidding initiative.

On April 27, 2010, defendants announced, *inter alia,* that NBTY faced increasing competition in its private-label business, that it anticipated a decrease in gross profits in the wholesale division for the remainder of 2010, and that it had spent $51 million more on television advertising in its 2010 fiscal second quarter than in the prior fiscal second quarter—a 54% increase, adversely affecting the company's net income. After analysts publicly disclosed Wal–Mart's competitive bidding initiative, NBTY's stock fell 21% on unusually heavy trading volume. In August 2010, NBTY filed its Form 10–Q for the quarter ended June 30, 2010, which reported that sales to Wal–Mart that quarter dropped "precipitously."

According to plaintiff, defendants knew that the public documents and statements issued or disseminated in NBTY's

name were materially false and misleading, and that such documents and statements would be issued or disseminated to the investing public. Plaintiff alleges that a motivation for defendants' course of conduct was to allow NBTY insiders, including Rudolph and Kamil, to sell substantial amounts of NBTY common stock during the class period at prices artificially inflated by their fraud. In this respect, NBTY insiders collectively sold 1,655,063 shares of their personally-held NBTY common stock, generating proceeds in excess of $73 million during the six-month class period. Allegedly, these sales were 24 times the amount of insider sales—$3 million—in the prior 12–month period. In particular, Rudolph sold 500,000 shares, 9.4% of his holdings, in November 2009, generating $21.2 million; Kamil sold 677,713 shares, 50.9% of his holdings, in November 2009 and January 2010, generating $29.5 million. Plaintiff alleges that Rudolph's and Kamil's stock sales were made pursuant to a stock trading plan established under SEC Rule 10b5–1 and NBTY policies to avoid concerns about whether insiders had material adverse inside information when they sold their stock. However, plaintiff alleges, defendants did have such information and adopted the stock trading plan to take advantage of the artificially inflated stock prices.

## II. *DISCUSSION*

A. *Motion to Dismiss Standard*

In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court held that to avoid dismissal a plaintiff is required to plead enough facts "to state a claim for relief that is plausible on its face." *Id.* at 570; *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009). While heightened factual pleading is not required, *Twombly* holds that a "formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. On a motion to dismiss, the court must, as always, assume that all allegations in the complaint are true and draw all inferences in favor of the nonmoving party. *Plair v. City of New York,* 789 F.Supp.2d 459, 463 (S.D.N.Y.2011). However, the court must ensure that the complaint sets forth "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570; *see Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 57 (2d Cir.2010). A pleading that does nothing more than recite facts and bare legal conclusions is insufficient to "unlock the doors of discovery ... and only

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 72 of 330
Hutchins v. NBTY, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1078823, Fed. Sec. L. Rep. P 96,791

a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,* 129 S.Ct. at 1950. Although a Rule 12(b)(6) motion is directed only to the sufficiency of the pleading, the court may consider written documents attached to the complaint as well as documents incorporated therein by reference and those of which plaintiff had knowledge and relied upon in commencing the action. *See Brass v. Amer. Film Techn., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

**\*3** Moreover, a complaint alleging securities fraud must satisfy the heightened pleading requirements of FRCP 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, "by stating with particularity the circumstances constituting fraud." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir.2009). Under the PSLRA, "the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Id.* (quoting 15 U.S.C. § 78u–4(b) (1), (2)); *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.* 493 F.3d 87, 99 (2d Cir.2007) ("A securities fraud complaint based on misstatements must: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent.").

**B.** *Applicable Law*

1. *Section 10(b) and Rule 10b–5*
To prevail on a securities fraud claim under § 10(b) and Rule 10b–5, a plaintiff "must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' " *Matrixx Initiatives, Inc. v. Siracusano,* ––– U.S. ––––, ––––, 131 S.Ct. 1309, 1317, 179 L.Ed.2d 398 (2011) (quoting *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)); *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000); *In re Int'l Bus. Mach. Corp. Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998). Here, defendants argue that plaintiff fails to allege that defendants

made material misstatements or omissions of fact and that they acted with scienter.

At the pleading stage, the materiality requirement is satisfied if a plaintiff alleges a misstatement or omission that "a reasonable investor would have considered significant in making investment decisions." *Ganino,* 228 F.3d at 161 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). As the Supreme Court has explained, " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " *Basic,* 485 U.S. at 231–32 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). "Because materiality is a mixed question of law and fact, in the context of a Fed.R.Civ.P. 12(b)(6) motion, a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134,* 553 F.3d at 197 (internal quotation marks omitted).

**\*4** A securities fraud complaint based on omissions "is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993). Such a duty "arises when disclosure is necessary to make prior statements not misleading." *Id.* at 268.

Under the PLSRA, a plaintiff's securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Matrixx Initiatives, Inc.,* 131 S.Ct. at 1324. A complaint adequately pleads scienter " 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2549, 2499 (2007)). "The requisite scienter can be established by alleging facts to show either: (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134,* 553 F.3d at 198. Under the first prong, motive

and opportunity to commit fraud is usually met where the complaint alleges facts that show the "defendants benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks,* 216 F.3d 300, 307–08 (2d Cir.2000). This element generally is met "when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 74 (2d Cir.2001). " 'Unusual' insider sales at the time of the alleged withholding of negative corporate news may permit an inference of ... scienter." *Id.* "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stock holdings sold, the change in volume of insider sales, and the number of insiders selling." *Id.* at 74–75. Under the second prong, "the strength of the circumstantial allegations must be correspondingly greater" if there is no motive. *Kalnit v. Eichler,* 264 F.3d 131, 143 (2d Cir.2001). To qualify as recklessness, "defendants' conduct must have been 'highly unreasonable' and 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 76 (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)). "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately plead for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *Id.*

### 2. *Section 20(a)*

**\*5** To state a claim for control person liability under § 20(a), a plaintiff must allege (1) a primary violation by a controlled person; (2) actual control by the defendant; and (3) the controlling person's culpable participation in the primary violation. *In re Bristol Meyers Squibb Co. Sec. Litig.,* 586 F.Supp.2d 148, 170 (S.D.N.Y. Aug.20, 2008). Thus, any claim for "control person" liability under § 20(a) must be predicated on a primary violation of securities law. *See* 15 U.S.C. § 78t(a) (imposing liability on any person who "controls any person liable" for securities fraud); *Rombach v. Chang,* 355 F.3d 164, 177–78 (2d Cir.2004).

### C. *Analysis of Claims*

### 1. *Violation of § 10(b) and Rule 10b–5*

#### a. *Material Misstatement or Omission*

Defendants argue that they made no misstatement or omission of material fact because NBTY met its stated gross margin projections for the class period and their projections were labeled as "best guesses" and were indicative of past quarter earnings. Defendants maintain that NBTY's 2009 Form 10–K refutes plaintiff's claim because it stated that (1) Wal–Mart bought NBTY's products on an individual basis, (2) Wal–Mart had no commitment to purchase NBTY's products, (3) NBTY had no obligation to sell Wal–Mart its products, and (4) losing Wal–Mart or any other major customer would have a material adverse effect on NBTY. Defendants further maintain that they made no actionable misstatement because NBTY's statements about gross profits were "forward looking" and accompanied by "meaningful cautionary language," thereby satisfying the "bespeaks caution" doctrine and statutory "safe harbor" provision of the PSLRA. *See* 15 U.S.C. § 78u–5(c) (providing "safe harbor" for a forward-looking statement identified as such and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"); *In re IAC/InterActiveCorp Sec. Litig.,* 478 F.Supp.2d 574, 586 (S.D.N.Y.2007) (observing that under "bespeaks caution" doctrine courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial).

Plaintiff maintains that the amended complaint sufficiently alleges that defendants made misstatements or omissions of material fact. According to plaintiff, defendants' positive statements about NBTY's business, gross margins and operating leverage and profitability during the class period were misleading because the information that Wal–Mart, NBTY's then-biggest wholesale customer, was soliciting competitive bids for the first time in 10 years meant NBTY's current results were not indicative of its future performance. According to plaintiff, defendants knew that Wal–Mart's decision to solicit competitive bids meant that NBTY's operating leverage would decline materially, making defendants' statements concerning NBTY's positive financial results false and misleading for omitting any discussion of Wal–Mart's decision and its inevitable consequences. Defendants also allegedly knew that NBTY would be further adversely impacted by Wal–Mart's competitive bidding initiative because NBTY would have to ramp up advertising

2012 WL 1078823, Fed. Sec. L. Rep. P 96,791

costs associated with marketing NBTY's branded products to offset the decline in the private-label business.

**\*6** Upon consideration, the Court concludes that plaintiff sufficiently pleads with particularity material misstatements or omissions by defendants. The information relating to Wal–Mart's competitive bidding initiative, in light of statements made, was not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA & Local 134, 553 F.3d at 197. Reasonable minds could differ on the importance to reasonable investors of the information relating to Wal–Mart in light of the information disclosed, particularly since NBTY was Wal–Mart's exclusive nutritional supplement supplier and Wal–Mart accounted for a substantial percentage of NBTY's sales. It is plausible that a reasonable investor would view NBTY's potential loss of Wal–Mart's business—or retaining it at lower prices—significant to an investment decision under the circumstances. See Ganino, 228 F.3d at 161. Moreover, to the extent NBTY's alleged statements were "forward looking," the Court cannot say, as a matter of law, that there was sufficiently "meaningful cautionary language" to satisfy the "bespeaks caution" doctrine and "safe harbor" provision.

### b. Scienter

As for scienter, plaintiff argues that (1) defendants' substantial stock sales during the class period show a motive and opportunity to commit fraud; and (2) defendants' conduct shows strong circumstantial evidence of conscious misbehavior or recklessness because defendants knew that Wal–Mart was soliciting competitive bids from other suppliers, yet did not disclose this information while making positive statements of NBTY's costs, sales, gross margins, operating leverage and profitability. Defendants argue that there was no motive and opportunity to commit fraud because their stock sales were not unusual and were made pursuant to a Rule 10b5–1 trading plan, and the Wal–Mart information was sufficiently disclosed in the 2009 Form 10–K, while the gross margin projections were indicated as "best guesses" and ultimately achieved.

Upon consideration, the Court concludes that plaintiff pleads with particularity facts giving rise to a strong inference that defendants acted with the required state of mind. In this respect, plaintiff sufficiently pleads "unusual" sales by NBTY insiders, particularly defendants Rudolph and Kamil, during the class period, given the substantial amounts and percentages sold during that period and as compared to the prior 12 months. Moreover, the Court finds that plaintiff sufficiently pleads strong circumstantial evidence of conscious misbehavior or recklessness by defendants, given their failure to disclose material adverse information concerning the company's largest customer and the potential resulting adverse impact on costs, sales, pricing, operating leverage and profitability, while making positive statements about costs, sales, gross margins, and operating leverage and profitability, all while engaging in substantial insider stock sales.

**\*7** Thus, the Court concludes that the amended complaint sufficiently pleads a violation of § 10(b) and Rule 10b–5 against defendants.

### 2. Violation of § 20(a)

As for the alleged violation of § 20(a), Rudolph and Kamil do not dispute that they are "control persons." Given the Court's conclusion that the amended complaint sufficiently states a claim of primary violation under § 10(b) by Rudolph and Kamil, and given their culpable participation therein, the Court concludes that the amended complaint sufficiently pleads that Rudolph and Kamil violated § 20(a).

### III. CONCLUSION

For the above reasons, defendants' motion to dismiss is denied.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1078823, Fed. Sec. L. Rep. P 96,791

---

**End of Document**                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 7

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

2023 WL 3442087
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Austin Division.

IN RE CASSAVA SCIENCES,
INC. SECURITIES LITIGATION
This Document Relates to: All Actions.

Master File No. 1:21-CV-751-DAE CLASS ACTION
|
Signed May 11, 2023

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS

David Alan Ezra, Senior Judge

**\*1** Before the Court is Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint filed on October 25, 2022. (Dkt. # 81.) The Court held a hearing on Defendants' Motion on April 26, 2023. After careful consideration of the memoranda filed in support of and in opposition to the Motion, as well as the arguments advanced at the hearing, the Court, for the reasons below, **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss.

BACKGROUND

This case arises from four securities class action lawsuits brought against Cassava Sciences, Inc. ("Cassava") and Cassava executives Remi Barbier, Eric Schoen, Lindsay Burns, and Nadav Friedmann (the "Individual Defendants," and together with Cassava, "Defendants"). After this Court consolidated the cases into a single action (dkt. # 58), Lead Plaintiff Mohammad Bozorgis and additional 1 plaintiffs Ken Calderone and Manohar Rao (collectively, "Plaintiffs") filed a Consolidated Complaint on behalf of those who purchased or otherwise acquired Cassava securities between September 14, 2020, and July 26, 2022 (the "Class Period") (dkt. # 68).

Plaintiffs allege securities fraud claims against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. (Id. ¶¶ 520–24.) Plaintiffs also bring claims for control person liability against the Individual

Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Id. ¶¶ 525–26.)

I. The Company

Cassava is a small biotechnology company based in Austin, Texas. (Dkt. # 68 ¶ 73.) Cassava's primary drug candidate is simufilam, a small-molecule drug designed to treat Alzheimer's disease. (Id. ¶ 80.) Some analysts have predicted that simufilam could generate billions of dollars in annual revenue within the next decade should it prove to be an effective treatment for Alzheimer's disease. (Id. ¶ 81.)

Cassava was founded by Remi Barbier ("Barbier"), who serves as its Chairman, President, and Chief Executive Officer. (Id. ¶¶ 1, 59.) Lindsay Burns ("Dr. Burns") is Cassava's Senior Vice President of Neuroscience. (Id. ¶ 61.) Both are members of Cassava's product development and management teams. (Id. ¶¶ 59, 61.) Nadav Friedmann ("Dr. Friedmann") served as Cassava's Chief Operating Officer and Chief Medical Officer and was a member of its board of directors.[1] (Id. ¶¶ 64, 65.) Eric Schoen ("Schoen") is Cassava's Chief Financial Officer. (Id. ¶ 67.) Hoau-Yan Wang ("Dr. Wang")[2] is an Associate Medical Professor at the City University of New York ("CUNY") School of Medicine and is a member of Cassava's scientific advisory board, a Cassava consultant, and the co-inventor of simufilam. (Id. ¶ 57.)

Cassava's predecessor entity, Pain Therapeutics, Inc., began operating in 1998. (Id. ¶ 74.) Pain Therapeutic's primary drug candidate, a painkiller named Remoxy, never received approval from the United States Food and Drug Administration ("FDA"). (Id.) On August 6, 2018, after Pain Therapeutics announced that it had received a Complete Response Letter from the FDA denying its Remoxy New Drug Application, its stock price "lost nearly all of its value." (Id. ¶¶ 74, 75.) In March 2019, Pain Therapeutics rebranded as Cassava and announced that it would be "align[ing] its resources on advancing its drug and diagnostic assets in Alzheimer's disease." (Id. ¶ 75.)

**\*2** Cassava developed simufilam during research conducted at the company from about 2008 to 2018. (Id. ¶ 80.) (During this time, Cassava also developed SavaDx, a diagnostic product candidate aimed at detecting Alzheimer's disease.) (Id.) Simufilam is intended to restore a protein, filamin A, that Cassava's scientists state is misshapen in the brains of Alzheimer's patients. (Id. ¶ 83.) Dr. Burns and Dr. Wang

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 77 of 330

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

published their research on filamin A and simufilam in several peer-reviewed scientific journals. (Id. ¶ 87.)

In July 2017, the company announced that the FDA had approved its Investigational New Drug application to study simufilam in patients with Alzheimer's disease. (Id. ¶ 88.) The press release noted that "[t]he underlying science for [simufilam] has been published in Journal of Neuroscience, Neurobiology of Aging, Journal of Biological Chemistry, PLOS-One and other peer-reviewed scientific journals." (Id.)

Following the successful completion of its Phase 1 and Phase 2a clinical studies, Cassava launched a Phase 2b study (a placebo-controlled, blind trial) in September 2019. (Id. ¶¶ 88, 89.) The bioanalysis for the study was conducted by a lab at Lund University. (Id. ¶ 94.) On May 15, 2020, Cassava announced that the Phase 2b study "did not meet its primary endpoint" because it did not show that simufilam lowered certain biomarkers of Alzheimer's disease. (Id. ¶¶ 8, 90.) Cassava's stock price tumbled. (Id. ¶ 91.)

## II. The Class Period

A few months later, on September 14, 2020, Cassava issued a press release announcing the "final results" of its Phase 2b study. (Id. ¶¶ 93, 268.) The press release stated that all samples "were sent to outside labs for bioanalysis" to measure the biomarkers and that "[a]n academic lab generated final results." (Id. ¶ 271.) According to Cassava, "an initial bioanalysis by a different lab showed highly anomalous data .... With its validity in question, the initial bioanalysis serves no useful purpose." (Id.) But the "final results" showed that simufilam "significantly improved an entire panel of validated biomarkers" of Alzheimer's disease. (Id. ¶ 269.)

Cassava did not disclose, however, that the reanalysis had been conducted by Dr. Wang's lab [3] and contained "highly anomalous" results. (Id. ¶ 96.) Immediately following the press release and an investor conference call— during which Barbier stated that the reanalysis was performed by an "academic lab"—Cassava's stock price climbed. (Id. ¶¶ 276, 279.)

A few weeks earlier, in August 2020, Cassava's Board of Directors had approved a "cash incentive bonus plan" that tied cash bonuses to increases in Cassava's stock price. (Id. ¶¶ 2, 98, 100–03.) Thus, "Barbier and other Cassava executives stood ready to cash in on the Phase 2b study reanalysis." [4] (Id. ¶ 98.) Cassava reached the first valuation milestone under

the bonus plan in October 2020. (Id. ¶ 101.) On November 13, 2020, Cassava sold 9,375,000 shares of common stock for $75 million. (Id. ¶ 288.)

In February 2021, Cassava's stock leapt again after Cassava reported results from another trial that indicated simufilam may renew cognitive function in patients with Alzheimer's disease. (Id. ¶ 10.) Cassava sold over four million shares of its common stock at $49 per share on February 10, 2021. (Id. ¶¶ 10, 11.) On February 22, 2021, Cassava announced that the FDA and Cassava had reached an agreement on key elements of a Phase 3 program for simufilam. (Id. ¶ 297.)

**\*3** On July 26, 2021, a Cassava poster authored by Dr. Burns, Dr. Wang, and others on the Phase 2b trial was presented at the Alzheimer's Association International Conference. (Id. ¶ 218.) However, a key plasma biomarker data point had been inserted into the placebo group rather than the 100mg group. (Id. ¶¶ 222, 329.)

By July 29, 2021, Cassava's stock price had reached $146 per share. (Id. ¶ 6.) But on August 18, 2021, a Citizen Petition was filed with the FDA raising "grave concerns about the quality and integrity of the laboratory-based studies" involving simufilam. (Id. ¶ 105.) The Citizen Petition noted that all the foundational research supporting simufilam came from journal articles "with two common co-authors": Dr. Wang and Dr. Burns. (Id. ¶ 106.)

The Citizen Petition cited three primary concerns: 1) the Western blots in the journal articles contained "a series of anomalies that are strongly suggestive of systematic data manipulation and misrepresentation"; 2) Cassava's presentation of its Phase 2b "final results" raised questions about the validity of the data, while the July 26, 2021 poster showed "signs of data anomalies or manipulation"; and 3) some experiments conducted by Dr. Wang and Dr. Burns were on postmortem human brain tissue and presented data that also bore "hallmarks of manipulation." (Id. ¶ 107.) The Petition further noted that Cassava (and before that, Pain Therapeutics) has funded Dr. Wang's lab at CUNY for over fifteen years. (Id. ¶ 108.)

The authors of the Citizen Petition were later revealed to be Dr. David Bredt and Dr. Geoffrey Pitt. (Id. ¶ 105.) After reviewing Cassava's pre-clinical research, Drs. Bredt and Pitt had noticed that some images of Cassava's Western-blot tests "looked ... as though they had been tweaked by a program such as Photoshop." (Id. ¶ 120.) The science behind simufilam

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

also "didn't make sense." (Id.) Although neither worked for short seller firms, both shorted Cassava's stock. (Id. ¶ 112.)

On August 25, 2021, Cassava issued a public statement before the market opened to respond to the Citizen Petition, which had been "posted on-line [on August 24, 2021] after market hours." (Id. ¶ 316.) Cassava called the Petition's claims "false and misleading," declared that Cassava "stands behind its science, its scientists and its scientific collaborators," and provided a list of statements labeled either "fiction" or "fact." (Id. ¶¶ 316, 317.) Two of the statements concerned the biomarker data from the reanalysis:

> **Fiction**: Biomarker data is generated by Cassava Sciences or its science collaborators and therefore are falsified.

> **Fact**: Cassava Sciences' plasma p-tau data from Alzheimer's patients was generated by [Quanterix], an independent company, and presented at the recent Alzheimer's Association International Conference[ ].

(Id. ¶ 317.) Despite its denials, Cassava's stock fell sharply. (Id. ¶ 15.) Two days later, Cassava's stock fell again when Quanterix issued the following statement: "Cassava previously engaged Quanterix' Accelerator laboratory to perform sample testing based on blinded samples provided by Cassava. Quanterix or its employees did not interpret the test results or prepare the data charts presented by Cassava at the Alzheimer's Association International Conference (AAIC) in July 2021 or otherwise." (Id. ¶ 323.) Cassava responded the same day and confirmed that "Quanterix' sole responsibility with regard to this clinical study was to perform sample testing, specifically, to measure levels of p-tau in plasma samples collected from study subjects." (Id. ¶ 324.)

 *4  That day, Dr. Elisabeth Bik, an expert in identifying manipulation in biomedical images, posted online that she had reviewed the photos included in the Citizen Petition and "agree[d] with most of those concerns." (Id. ¶¶ 132, 135.) She also stated that "[a]t least five other articles from the Wang lab at CUNY appear to show image concerns." (Id. ¶ 135.) Cassava's stock price continued to fall after an August 30, 2021 supplement to the Citizen Petition "identified new instances of scientific misconduct by Cassava and Dr. Wang." (Id. ¶¶ 18, 19.) A few days later, it fell again after Cassava issued a press release in which Barbier again denied the allegations in the Citizen Petition but did acknowledge "visual errors" in "one publication and one poster presentation." (Id. ¶ 20.)

Cassava's stock price jumped by almost 50% on November 4, 2021, after Cassava issued a press release stating that it "had been informed by the *Journal of Neuroscience* that there is no evidence of data manipulation in an article it published in July 2012 describing a new approach to treating Alzheimer's disease." (Id. ¶¶ 22, 23, 339.) Cassava explained that the journal had requested "raw data for the article, including images of original, uncropped Western blots. Having received that data and completed its review, the *Journal of Neuroscience* stated: 'No evidence of data manipulation was found for Western blot data.' " (Id. ¶ 22.) But Cassava's stock price then dropped again when Dr. Bik posted a few days later that she had reviewed the images and they did not appear to be the originals.[5] (Id. ¶¶ 24, 25.)

Cassava's stock price dropped even lower when Cassava disclosed in November 2021 that "[c]ertain government agencies have asked us to provide them with corporate information and documents." (Id. ¶¶ 26, 27.) A *Wall Street Journal* article subsequently revealed that the U.S. Securities and Exchange Commission and the National Institutes of Health were investigating the research manipulation claims, and that CUNY had begun to investigate Dr. Wang's lab. (Id. ¶ 28.)

Cassava's stock price further declined after a third supplement to the Citizen Petition was filed in November 2021 (alleging that several biomarkers analyzed by Dr. Wang's lab in the Phase 2a study "also appear to have wildly anomalous baseline measures" and that certain of Drs. Wang and Burns's experiments "seem scientifically undoable"), and then again when a fourth supplement was filed in December 2021 (alleging that Drs. Bredt and Pitt had found "irrefutable evidence of data manipulation/fabrication"). (Id. ¶¶ 29–32, 372–73, 380.) In 2022, several journals retracted papers authored by Dr. Wang and Dr. Burns, and another journal issued an Expression of Concern.[6] (Id. ¶¶ 37– 39.)

On February 10, 2022, the FDA denied the Citizen Petition, stating that it was "being denied solely on the grounds that your requests are not the appropriate subject of a citizen petition." (Id. ¶ 411.) Cassava's press release the same day contained a statement from Barbier: "The news is very welcome but not surprising .... We said from the outset that the allegations are false. I think the message may be that the FDA's citizen petition privilege is not to be trifled with by stock market participants." (Id. ¶ 412.)

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 79 of 330

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

**\*5** Even so, Cassava's stock price fell again after *The New York Times* published an April 18, 2022 article in which nine "prominent experts" said that "they did not trust [Cassava's] methods, results or even the premise underlying [simufilam's] supposed effectiveness." (Id. ¶¶ 40, 41.) And the price fell yet again when *Reuters* revealed that the Department of Justice had opened a criminal probe into Cassava's research results. (Id. ¶¶ 43, 44.)

In short, Plaintiffs allege that Cassava misrepresented the research on simufilam by manipulating data and failing to disclose conflicts of interest. By misrepresenting its research results, Defendants were able to raise millions of dollars to fund simufilam's development and stood to personally profit from cash bonuses.

## LEGAL STANDARDS

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.' " United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In addition, when alleging claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must:

(1) specify each statement alleged to have been misleading, i.e. contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby;

(6) explain the reason or reasons why the statement is misleading, i.e. why the statement is fraudulent.

ABC Arbitrage Plaintiffs Grp. v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002). Further, if an allegation regarding a statement or omission is "made on information and belief, the plaintiff must (7) state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief." Id. (citing 15 U.S.C. § 78u–4(b)(1)). According to the Fifth Circuit, "this is the 'who, what, when, where, and how' required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA." Id.

## DISCUSSION

The elements of a securities-fraud claim under Section 10(b) and Rule 10b–5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Sci.- Atlanta, 552 U.S. 148, 157 (2008).

Defendants contend that the Complaint violates basic pleading rules by "puzzle pleading." Defendants also challenge the adequacy of the Complaint's allegations regarding material misrepresentations or omissions, scienter, and loss causation.

### I. Puzzle Pleading

**\*6** "Puzzle pleading" requires a court to "wade through a complaint and pick out properly pleaded segments." Owens v. Jastrow, 789 F.3d 529, 537 (5th Cir. 2015); see also In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 841 (N.D. Cal. 2000) (declining to solve the puzzle of "try[ing] to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading").

According to Defendants, the Complaint is a "paradigm example" of puzzle pleading and should be dismissed on this

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

ground alone. (Dkt. # 81 at 12– 13.) Defendants assert that the Complaint is improperly pleaded because Plaintiffs did not tie each of the alleged misstatements to the reason or reasons each statement is false or misleading, "leaving the reader to decipher which of the 15 purported reasons apply to each of the 47 alleged misstatements." (Id.) Plaintiffs respond that the Complaint contains a dedicated section in which Plaintiffs set out each of the alleged false and misleading statements, with the relevant portions bolded and italicized, followed by the corresponding adverse facts. (Dkt. # 86 at 3.) Plaintiffs argue that the Motion to Dismiss itself demonstrates that Defendants were able to identify the statements and the reasons for their alleged falsity. (Id.)

The Court does not find this Complaint to be a paradigm example of puzzle pleading. The reader can logically connect the bolded and italicized statements to the reasons Plaintiffs allege they are false or misleading. See Rougier v. Applied Optoelectronics, Inc, No. 4:17-CV-2399, 2019 WL 6111516, at *8 (S.D. Tex. Mar. 27, 2019) (declining to dismiss a complaint because the plaintiff's explanations for the falsity of the statements logically corresponded with each alleged misstatement); In re Concho Res. Inc., No. 4:21-CV-2473, 2023 WL 2297425, at *17 (S.D. Tex. Feb. 23, 2023) (same); cf. Primo v. Pac. Biosciences of California, Inc., 940 F. Supp. 2d 1105, 1112 (N.D. Cal. 2013) (noting that while the plaintiffs made "some attempt to connect the alleged omissions to particular statements," they did so "in a general manner that require[d] the reader to guess what particular statements they mean or how those statements were rendered false and misleading"). Because the Court is able to discern which reasons apply to each allegedly false or misleading statement without undue effort, the Court will not dismiss the Complaint on the ground that it engages in impermissible puzzle pleading.

## II. Actionable Misstatements or Omissions

Defendants argue Plaintiffs have failed to adequately plead an actionable misstatement or omission. (Dkt. # 81 at 13.) Defendants contend that the misstatements or omissions detailed in the Complaint are not actionable either because there is no duty to disclose, because they are not supported by particularized allegations of fact, or because they are true. (Id. at 2, 13, 15, 19.)

### A. Disclosure Obligations

Defendants assert that Plaintiffs' arguments about Defendants' failure to disclose "run[ ] contrary to the well-settled principle that there is no duty to 'confess' to unadjudicated allegations of wrongdoing." (Id. at 2.) Plaintiffs respond that they do not allege "an independent duty to disclose uncharged criminal behavior," but that Defendants' statements were false and misleading because Defendants omitted important information when making public statements. (Dkt. # 86 at 17.)

*7 Along with pleading "the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading," Carroll v. Fort James Corp., 470 F.3d 1171, 1174 (5th Cir. 2006), a plaintiff must establish "a substantial likelihood" that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231– 32 (1988). "[D]etermining materiality is a 'fact-specific inquiry that requires consideration of the source, content, and context' of the allegedly omitted information." Rougier, 2019 WL 6111516, at *8 (citing Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 43 (2011)).

Although "corporate officials need not present an overly gloomy or cautious picture of the company's current performance," its public statements must still be "reasonably consistent with reasonably available data." Abrams v. Baker Hughes Inc., 292 F.3d 424, 433 (5th Cir. 2002) (citing Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)). "[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything." In re Concho Res. Inc., 2023 WL 2297425, at *17 (quoting Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp., 58 F.4th 195, 217 (5th Cir. 2023)).

Defendants had a duty to disclose certain facts relating to its clinical trial results. According to Plaintiffs, Defendants failed to disclose that:

- The Phase 2a study and 2b reanalysis "suffered from highly anomalous baseline measurements." (Dkt. # 86 at 19.)

- Defendants "intentionally removed unfavorable data" from Cassava's presentation of the Phase 2b results. (Id.)

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 81 of 330

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

• The Phase 2b reanalysis was conducted by Dr. Wang's lab. (Id. at 20.)

• Quanterix did not interpret the test results or prepare the data for the Phase 2b reanalysis. (Id. at 21.)

• The missing data point from the AAIC poster reflected a 150% increase rather than a 38% increase. (Id.)

A reasonable investor could certainly have viewed these omissions— particularly the omission related to the involvement of Dr. Wang's lab—as significantly altering the total mix of information available. See Frater v. Hemispherx Biopharma, Inc., 996 F. Supp. 2d 335, 346 (E.D. Pa. 2014) (concluding that a "factfinder could easily determine that announcements that [the company's] studies demonstrated [a drug's] effectiveness implied those studies' empirical validity and analytic soundness"); The MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc., No. CIV.09-12613, 2009 WL 4506418, at *8 (E.D. Mich. Nov. 30, 2009) (collecting cases holding that undisclosed conflicts of interest are material).

Plaintiffs further claim that Defendants touted the research by Cassava that supported simufilam but failed to disclose that this research was "rife with manipulated data." (Dkt. # 86 at 14.) Taking Plaintiffs' allegations as true—as the Court must do at this stage—the Court finds that, if ultimately proven, the statements regarding manipulated or falsified data would be actionable.

The Court agrees with Defendants that "an investigation is not a violation." See In re Key Energy Servs., Inc. Sec. Litig., 166 F. Supp. 3d 822, 863 (S.D. Tex. 2016) (collecting cases holding same). But the initiation of government investigations into Cassava is not the only evidence relied on by Plaintiffs to support their claims of extensive data manipulation. The Complaint details specific instances of allegedly intentional manipulation and supports these allegations with "photographic evidence." In addition, Plaintiffs describe the response from scientific journals (which included retractions and expressions of concern) and independent experts who reviewed Cassava's research. Cf. In re KBR, Inc. Sec. Litig., No. CV H-17-1375, 2018 WL 4208681, at *3 (S.D. Tex. Aug. 31, 2018) ("Plaintiffs simply assumed the worst based on the fact that certain governmental agencies have announced the opening of investigations ...."); Parker v. Hyperdynamics Corp., 126 F. Supp. 3d 830, 843 (S.D. Tex. 2015) ("The only authoritative evidence in the

record that FCPA violations occurred is [the company's] disclosure of subpoena requests" by the DOJ and SEC).

**\*8** The materiality of Cassava's alleged omissions regarding its research is supported by the drops in stock price that accompanied each revelation of an alleged omission or misrepresentation. Frater, 996 F. Supp. 2d at 347. The Court concludes Plaintiffs have sufficiently pled actionable misstatements and omissions by Defendants to survive a motion to dismiss.

B. Particularized Allegations

Defendants argue that because the allegations of data manipulation and other misconduct have never been adopted or advanced by any entity or person with personal knowledge of the underlying facts, the Complaint does not meet the PSLRA's requirement that the Complaint be supported by particularized allegations of fact. [7] (Dkt. # 81 at 15.)

However, the "the PSLRA acknowledges that complaints will often have to be pleaded based on acquired information." Bond v. Clover Health Invs., Corp., 587 F. Supp. 3d 641, 667 (M.D. Tenn. 2022). "[T]he particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession." In re Fleming Cos. Inc. Sec. & Derivative Litig., No. CIVA503MD1530TJW, 2004 WL 5278716, at *6 (E.D. Tex. June 16, 2004) (citing ABC Arbitrage, 291 F.3d at 348).

Other courts have found it permissible for plaintiffs to rely on short-seller reports to allege falsity at the motion to dismiss stage. Bond, 587 F. Supp. 3d at 668 (citing McIntire v. China MediaExpress Holdings, Inc., 927 F. Supp. 2d 105 (S.D.N.Y. 2013); Snellink v. Gulf Res., Inc., 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012). This is because the reliability of short-seller reports—here, the Citizen Petitions —is a question of fact that the Court cannot resolve at this time. See McIntire, 927 F. Supp. 2d at 123–24 (collecting cases).

C. Literal Truth

Finally, Defendants argue that several statements are not actionable because they are true. (Dkt. # 81 at 19, 20.) But it is well-settled that "[t]he ability of a statement to provide

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 82 of 330

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

accurate information, rather than the statement's literal truth, is the benchmark by which statements to the market are measured in securities fraud cases." KB Partners I, L.P. v. Pain Therapeutics, Inc., No. A-11-CA-1034-SS, 2015 WL 7760201, at *9 (W.D. Tex. Dec. 1, 2015) (citing Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 248 (5th Cir. 2009)); see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.") For example, while it may be literally true that Dr. Wang's lab is an "outside lab," a factfinder might find this statement misleading given Dr. Wang's ties to Cassava. See Bond, 587 F. Supp. 3d at 672 ("[T]here is a point at which a speaker's use of elision and obfuscation becomes actionable, even if he has in his back pocket an anticipated defense that nothing he said was technically untrue.")

### III. Scienter

**\*9** The PSLRA requires that a complaint in a securities case support allegations of scienter with "facts giving rise to a strong inference that the defendant acted with the required state of mind." Six Flags Ent. Corp., 58 F.4th at 214 (citing 15 U.S.C. § 78u-4(b)(2)(A)). "A complaint adequately pleads scienter by alleging facts that support the defendant acted with an 'intent to deceive, manipulate, or defraud or severe recklessness.' " Id. (citing Lormand, 565 F.3d at 251).

When evaluating scienter, a court must (1) take the factual allegations as true, (2) "consider the complaint's allegations in its entirety," and (3) "take into account plausible inferences opposing as well as supporting a strong inference of scienter." Id. The inference of scienter must be "cogent and compelling." Id. (citing Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314 (2007)).

Defendants assert that Plaintiffs have not alleged specific facts that give rise to a strong inference of scienter. (Dkt. # 81 at 23.) Defendants also argue that Plaintiffs' allegations regarding Defendants' motives do not support an inference of scienter and that Plaintiffs rely on generalized and group pleading. (Id. at 24, 27.)

#### A. Specific Facts
Selective reporting supports an inference of scienter. Ho v. Flotek Indus., Inc., 248 F. Supp. 3d 847, 852 (S.D. Tex.

2017), aff'd sub nom. Alaska Elec. Pension Fund v. Flotek Indus., Inc., 915 F.3d 975 (5th Cir. 2019). Plaintiffs have made several allegations regarding selective reporting by Defendants, including that Defendants did not divulge that the "outside lab" for the reanalysis was in fact Dr. Wang's lab (despite disclosing Dr. Wang's involvement with the 2a trial results), and that the Phase 2b "final results" contained anomalous data.

Scienter can also be "supported by the reaction" of the scientific community "to the disclosure of Defendants' manipulation of data." In re Fibrogen, Inc., No. 21-CV-02623-EMC, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022). Plaintiffs allege that the main reaction of ten prominent scientists to Cassava's research papers was "Oh, my God, how could they get away with this?" (Dkt. # 68 ¶ 123.) According to one scientist, "numerous top Alzheimer's experts, plus forensic image specialists ... were stunned by the apparent extreme manipulations." (Id. ¶ 127.) An author of the Citizen Petition claimed that "[i]n my thirty-five years of research, I've never seen such a long trail of apparently clear misrepresented scientific data." (Id. ¶ 128.) When *The New York Times* "contacted nine prominent experts for comment about the scientific underpinnings of Cassava's trials," all the experts said that they "did not trust the company's methods, results or even the premise underlying the drug's supposed effectiveness." (Id. ¶ 425.)

Further, when confronted with the Citizen Petition, Cassava issued a statement almost immediately, calling the Petition's claims "false and misleading" and declaring that Cassava "stands behind its science, its scientists and its scientific collaborators." Such denials can indicate that a defendant was "either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial." In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d 696, 711–12 (W.D. Tex. 2010).

#### B. Motive
Contrary to Defendants' assertions, the allegations here suggest that Defendants had motive to inflate Cassava's stock price. Weeks before releasing the "final results" of Phase 2b, Cassava's Board instituted a new cash bonus plan tying executive bonuses to short-term increases in Cassava's stock price. Plaintiffs point out that, although Defendants never ultimately received the hundreds of millions of dollars in bonus payments provided for by the plan, Defendants "obviously did not orchestrate the unforeseen filing of the

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

Citizen Petition" and the bonus plan nonetheless "allowed Defendants to profit regardless of the long-term value of Cassava's stock price." (Dkt. # 86 at 30.) Barbier allegedly earned nearly $27 million in salary, bonuses, and stock option grants as CEO of Pain Therapeutics even though the stock price of Pain Therapeutics ultimately lost 98% of its value. (Dkt. # 68 ¶ 76.)

**\*10** Defendants have not explained the timing of the cash bonus plan or the reason for its structure. Although "incentive compensation" typically cannot be the basis on which an allegation of fraud is predicated," Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1068 (5th Cir. 1994), the circumstances and structure of this cash bonus plan support an inference of scienter. See Six Flags Ent. Corp., 58 F.4th at 215 (quoting Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc., 935 F.3d 424, 431 (5th Cir. 2019) ("[P]erformance-based compensation can establish motive in circumstances 'when the potential bonus is extremely high and other allegations support an inference of scienter.' ")

In addition, by pumping up Cassava's stock price, Defendants were able to raise much-needed working capital for the future development of simufilam. This can be probative of scienter. See Skiadas v. Acer Therapeutics Inc., No. 1:19-CV-6137-GHW, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) (noting that when a company needs to fundraise to survive, an executive "has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure"); In re Portal Software, Inc. Sec. Litig., No. C-03-5138 VRW, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (the contention that the defendants "were motivated to inflate artificially [the company's] stock price in the short term in order to conduct a successful secondary public offering and obtain much-needed operating capital does allege facts of a palpable motive for fraud").

### C. Generalized or Group Pleading

The PSLRA requires that plaintiffs "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud. As such, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles." Southland Sec. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 365 (5th Cir. 2004).

The "core operations" theory of scienter provides that "special circumstances, *taken together with an officer's position*, may support a strong inference of scienter." Six Flags Ent. Corp., 58 F.4th at 219 (emphasis added). Relevant factors may include: (1) the size of the company; (2) whether the transactions are "critical to the company's continued vitality"; (3) whether the misrepresented information "would have been readily apparent to the speaker"; and (4) whether "the defendant's statements were internally inconsistent with one another." Id. at 219 (quoting Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 959 (5th Cir. 2016)).

Barbier served as Cassava's Chief Executive Officer; Dr. Burns as Senior Vice President of Neuroscience; Dr. Friedmann as Chief Operating Officer and Chief Medical Officer; and Schoen as Chief Financial Officer. (Dkt. # 68 ¶¶ 59–68.)

The first two circumstances are clearly present. Cassava is a small company, with only eight or nine employees in 2019 and eleven in 2020. (Id. ¶ 440.) Simufilam is Cassava's primary drug candidate, and the company has no other revenue. (Id.)

As for the third circumstance, Plaintiffs note that Barbier, Dr. Burns, and Dr. Friedmann authored Cassava's 2020 paper on the (allegedly manipulated) 2a study results. (Dkt. # 86 at 24.) Dr. Burns, who is married to Barbier, co-authored the research papers and Cassava presentations alleged to contain manipulated data. (Dkt. # 68 ¶ 61.) Barbier, Dr. Burns, and Dr. Friedmann were members of Cassava's product development and management teams. (Id. ¶¶ 59– 64.) Each of these Defendants had important responsibilities at Cassava: "global responsibilities for the scientific direction, management, operations, strategy, and financing of the Company" (Barbier), "monitor[ing] the proof-of-concept research, lead selection and efficacy experiments for [simufilam] and over[seeing] IND-enabling studies, chronic toxicity studies, and first-in-human and first-in-patient clinical trials" (Dr. Burns), and "over[seeing] the clinical development of simufilam" (Dr. Friedmann).

**\*11** The presence of these circumstances contributes to an inference of scienter as to these three Defendants with respect to the alleged material misstatements regarding Cassava's research. See also Frater, 996 F. Supp. 2d at 350 ("The defendants are sophisticated scientists running a regulated, publicly traded corporation ....")

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

The scienter allegations regarding Schoen are weaker. Schoen, as CFO, does not appear to have been directly involved with Cassava's scientific research. He is not alleged to have authored the journal articles or posters in question. And Defendants are correct that "a basis for scienter beyond signatures on SEC filings is required." (Dkt. # 90 at 11 n.17) (citing Izadjoo v. Helix Energy Sols. Grp., Inc., 237 F. Supp. 3d 492, 520 (S.D. Tex. 2017)).

However, Plaintiffs have alleged facts supporting an inference that, at least as to Cassava's failure to disclose that the "outside lab" conducting the reanalysis for the Phase 2b study was Dr. Wang's lab, Schoen possessed the requisite scienter. On September 14, 2020, the day that Cassava announced its Phase 2b "final results," a Form 8-K—signed by Schoen and attaching Cassava's September 14, 2020 press release and presentation regarding the results—was filed with the SEC. (Dkt. # 68 ¶ 268.) The misleading nature of certain statements in the press release—"[a]ll CSF samples were sent to outside labs for bioanalysis" and "[a]n academic lab generated final results"—would have been readily apparent given the importance of these results to Cassava, even to someone without a science background. Schoen's participation in the Company's cash bonus plan, though not sufficient on its own, also supports an inference of scienter. (Id. ¶ 68.)

Although it is a closer call, the Court concludes that the necessary strong inference of scienter has been adequately pleaded as to Schoen.

In conclusion, accepting the factual allegations as true, and considering inferences supporting as well as opposing scienter, the Court finds that Plaintiffs have adequately alleged scienter as to each Defendant.

## IV. Loss Causation

Finally, Defendants contend that Plaintiffs have not established loss causation. (Dkt. # 81 at 29.) Defendants state that none of the corrective disclosures identified by Plaintiffs reveal a "truth" that was misstated or omitted— rather, most of the disclosures contain "uncharged or unadjudicated public accusations of wrongdoing." (Id. at 31.)

For a complaint to adequately plead loss causation, "it need only set forth 'a short and plain statement of the claim showing that the pleader is entitled to relief' and provide the defendant with 'fair notice of what the plaintiff's claim is and

the grounds upon which it rests.' " Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 320 (5th Cir. 2014) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005)). The complaint must include "sufficient allegations the misrepresentations actually *caused* plaintiffs' loss—it is insufficient to simply allege the misrepresentation 'touches upon' a later economic loss." In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d at 725–26; see also Congregation of Ezra Sholom v. Blockbuster, Inc., 504 F. Supp. 2d 151, 167 (N.D. Tex. 2007) ("To allege loss causation adequately, Plaintiffs must explicitly allege a corrective disclosure—i.e., a statement that corrects a previous misrepresentation or discloses a prior omission—that, when disclosed, negatively affected the value of the security.").

**\*12** "[T]he truth can be gradually perceived in the marketplace through a series of parties disclosures"—for example, the market may learn of possible fraud from newspapers and journals, analysts' questioning financial results, and whistleblowers." Amedisys, 769 F.3d at 322 (citing In re Enron Corp. Sec., Derivative & ERISA Litig., No. MDL–1446, 2005 WL 3504860, at *16 (S.D. Tex. 2005)). Plaintiffs may thus rely on sources like the Citizen Petitions, news articles, Quanterix's press release, and Dr. Bik's postings.

Plaintiffs have alleged that immediately following each partial disclosure, Cassava's stock price dropped. Viewed collectively, these partial disclosures "gradually informed the market of the relevant truth" regarding Cassava's clinical trial results and published research, "and, thus, collectively constitute a corrective disclosure that adequately pleads loss causation." Parmelee v. Santander Consumer USA Holdings, Inc., No. 3:16-CV-783-K, 2018 WL 276338, at *6 (N.D. Tex. Jan. 3, 2018).

## V. Control Person Liability

Individual Defendants argue that the § 20(a) control person liability claim must be dismissed because Plaintiffs failed to allege a primary claim under § 10(b) and Rule 10b-5. However, Plaintiffs have adequately alleged the primary claim as to Barbier, Schoen, Dr. Burns, and Dr. Friedmann. Plaintiffs' § 20(a) claim is therefore not subject to dismissal on this basis. See Georgia Firefighters' Pension Fund v.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 85 of 330

In re Cassava Sciences, Inc. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3442087

Anadarko Petroleum Corp., 514 F. Supp. 3d 942, 957 (S.D. Tex. 2021).

VI. Rule 25a Dismissal

On January 27, 2023, Defendants filed a Suggestion of Death of Defendant Nadav Friedmann. (Dkt. # 91.) The Federal Rules of Civil Procedure provide:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Fed. R. Civ. P. 25(a)(1).

More than ninety days have passed since Defendants notified the Court and parties of the death of Dr. Friedmann. Because no motion for substitution has been filed, Plaintiffs' claims against Dr. Friedmann must be dismissed. See Ray v. Koester, 85 F. App'x 983, 985 (5th Cir. 2004) (affirming dismissal following the plaintiff's failure to timely file a motion to substitute).

CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss the Complaint (Dkt. # 81) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' claims against Defendant Nadav Friedmann are **DISMISSED WITH PREJUDICE** pursuant to Federal Rule of Civil Procedure 25(a)(1). The Motion to Dismiss Plaintiffs' claims as to all other Defendants is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3442087

---

**Footnotes**

1    On January 27, 2023, a Suggestion of Death of Defendant Nadav Friedmann was filed. (Dkt. # 91.)

2    Dr. Wang is not a defendant in this case.

3    Plaintiffs note that a previous presentation by Cassava about the results of the simufilam Phase 2a study *did* disclose that Dr. Wang was a Cassava consultant and that Dr. Wang and others at CUNY conducted the biomarker analysis. (Id. ¶¶ 259, 260.)

4    Dr. Wang was apparently also a participant in an unspecified Cassava bonus plan. (Id. ¶ 104.)

5    Emails between the editor-in-chief of the *Journal of Neuroscience* and Dr. Wang from November 3, 2021, reflect that Dr. Wang provided a PowerPoint "containing the requested uncropped blots"—rather than the original blots—because it was "more difficult than [Dr. Wang] anticipated to find the blots." (Id. ¶ 355.) The *Journal of Neuroscience* later changed its editorial note into an Expression of Concern. (Id. ¶¶ 33, 357.)

6    One journal, *Neuroscience*, stated in an editorial note on December 20, 2021, that it found "no evidence" of manipulation in a 2005 paper by Drs. Burns and Wang. (Id. ¶ 387.) The journal reported that it "asked the authors for images of the original, uncropped Western blots from this study" and "[a]fter careful examination of these original material ... found no evidence of manipulation of the Western blot data or other figures of

2023 WL 3442087

this publication." (Id.) But Drs. Wang and Burns allegedly did not provide the original, uncropped Western blots to *Neuroscience*. (Id. ¶¶ 389, 396.)

7    Defendants also argue that the PSLRA does not permit opinions to substitute for facts. (Id. at 13.) Plaintiffs respond that "detailed facts and supporting documentation (including photographic evidence) pled in the Complaint show specific and widespread instances of data manipulation based on first-hand analysis of Cassava's own data." (Dkt. # 86 at 15.) Upon reviewing the Complaint, the Court agrees that Plaintiffs have included sufficient factual allegations to support the claims of data manipulation.

---

End of Document                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 8

2005 WL 8155579

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Valeant Pharmaceuticals International, Inc. Securities Litigation,  D.N.J.,  May 22, 2023

2005 WL 8155579
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

IN RE CRYOLIFE, INC. SECURITIES LITIGATION

CIVIL ACTION FILE NO. 1:02-CV-1868-BBM
|
Signed 06/17/2005

### ORDER

BEVERLY B. MARTIN, UNITED STATES DISTRICT JUDGE

 *1  This securities fraud action is currently before the court on a bevy of motions filed by the parties. Both the consolidated class action plaintiffs ("Plaintiffs") and defendants CryoLife, Inc. ("CryoLife"), Steven G. Anderson ("Anderson"), D. Ashley Lee ("Lee"), James C. Vander Wyk ("Vander Wyk"), and Albert E. Heacox ("Heacox") (collectively, "Defendants") have moved for summary judgment. In addition to Defendants' Motion for Summary Judgment [Doc. No. 194] and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 197], the court is presented with eighteen other motions that purport to address a variety of matters.

Specifically, Plaintiffs have filed two discovery motions, including a "Motion for Leave to Subpoena Documents and Testimony From a Non-Party Law Firm and Motion to Compel Documents from Defendants All Relating To An Advice of Counsel Defense" ("Advice of Counsel Motion to Compel") [Doc. No. 135] and a "Motion to Compel Documents From Defendants' Experts Dr. Nolte and Dr. Trainor" ("Motion to Compel Documents from Experts") [Doc. Nos. 165 and 168].[1] The parties have also filed several motions pertaining to the admissibility of expert witness testimony, including Defendants' "Motion for an Evidentiary *Daubert* Hearing" ("Motion for Daubert Hearing") [Doc. No. 150]; Defendants' "Motion to Exclude Plaintiffs' Experts' Opinions as to the Truth or Falsity of Certain Public

Statements Attributed to Defendants" ("Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity") [Doc. No. 151]; Defendants' "Motion to Exclude Opinions of Plaintiffs' Expert, Dr. Marion Kainer" ("Motion to Exclude Kainer") [Doc. Nos. 152 and 163]; Defendants' "Motion to Exclude Opinions of Plaintiffs' Experts Dr. Doppelt and Dr. Eastlund" ("Motion to Exclude Doppelt and Eastlund") [Doc. No. 153]; Plaintiffs' "Motion to Exclude Opinions of Defendants' Expert Lance D. Trainor, M.D." ("Motion to Exclude Trainor") [Doc. Nos. 181 and 182]; Defendants' "Motion to Exclude Opinions of Plaintiffs' Expert Candace L. Preston" ("Motion to Exclude Preston") [Doc. No. 184]; and Plaintiffs' "Motion to Exclude Opinions of Defendants' Expert, James L. Benson" ("Motion to Exclude Benson") [Doc. No. 230].

Finally, the court is presented with several administrative motions, including Defendants' "Motion to Amend the Scheduling Order Pending Resolution of Defendants' Motions to Exclude Plaintiffs' Experts' Opinions [and] Request for Scheduling Conference" ("Motion to Amend the Scheduling Order") [Doc. No. 149];[2] the parties' "Joint Motion to Extend Page Limits for Summary Judgment Briefing" [Doc. No. 172];[3] Defendants' Motion for "Oral Argument on Their Motion for Summary Judgment" ("Motion for Oral Argument") [Doc. No. 195];[4] Defendants' "Motion to File Under Seal [Volume 4 of Their Exhibits In Support of Their Motion for Summary Judgment]" [Doc. No. 196];[5] Plaintiffs' "Motion for Leave to File Supplemental Brief to Address Intervening Supreme Court Authority" [Doc. No. 231];[6] and Plaintiffs' "Motion for Leave to File Supplemental Brief to Address Intervening Eleventh Circuit Authority" [Doc. No. 232].[7]

### I. Factual and Procedural Background
 *2  This is a class action lawsuit against CryoLife and its four principal officers (Anderson, Lee, Vander Wyk, and Heacox) for alleged violations of the Securities Exchange Act of 1934 ("Exchange Act"). At all times pertinent, Anderson was CryoLife's President, Chief Executive Officer, and Chairman; Lee was CryoLife's Vice President and Chief Financial Officer; Vander Wyk was CryoLife's Vice President of Regulatory Affairs and Quality Assurance; and Heacox was CyroLife's Senior Vice President for Laboratory Operations.

CryoLife processes, "cryopreserves," and distributes viable human soft tissue for use in cardiovascular, vascular,

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 89 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

and orthopedic surgical transplants. CryoLife's stock is publicly traded on the New York Stock Exchange. Plaintiffs allege that Defendants intentionally, or at least with severe recklessness, deceived investors by concealing and misrepresenting various facts about CryoLife's operations. The specific misrepresentations alleged by Plaintiffs are discussed infra. Generally, Plaintiffs allege that Defendants misled investors throughout 2001 and 2002 by concealing the truth about CryoLife's unsafe tissue processing practices; regulatory violations; lack of cooperation with Food and Drug Administration ("FDA") and Centers for Disease Control and Prevention ("CDC") investigations; and contaminated tissue inventory.

The FDA and CDC focused attention on CryoLife in the aftermath of the death of Brian Lykins ("Lykins") in November 2001. Lykins was a twenty-three year old male who underwent elective knee surgery wherein he received human soft tissue provided by CryoLife. As it happened, two other patients died from knee surgery in nearby hospitals at around the same time, and accordingly Lykins' death was widely publicized. Investigation ultimately revealed that Lykins died from a _clostridium_ infection arising out of his knee surgery. The court takes judicial notice that "[c]lostridium is a genus of bacteria ... made up of obligate anaerobic or microaerophilic, gram positive, spore-forming, rod-shaped bacilli, with spores of greater diameter than the vegetative cells." W.B. Saunders, Clostridium (Dictionary), Merck Source (2002), at http://www.mercksource.com. Cultures were subsequently obtained from the CyroLife donor who had supplied Lykins' knee tissue (the "Lykins donor"), and those cultures tested positive for _clostridium_. Another recipient of tissue from the Lykins donor developed septic arthritis and a high fever in mid-November 2001, symptoms which the parties do not appear to dispute are consistent with a _clostridium_ infection. Many of the alleged misstatements and omissions that are the subject of this lawsuit, discussed in greater detail infra, arise out of the aftermath of Lykins' death and the reactions thereto by CryoLife, the FDA, and the CDC.

As the court has discussed in earlier Orders, the first complaint in this action was filed almost three years ago, on July 3, 2002. The Amended Consolidated Class Action Complaint ("Complaint") was filed on January 15, 2003. Discovery commenced on July 16, 2003, almost two years ago. Fact discovery was initially set to expire on June 16, 2004, but it was subsequently extended to August 28, 2004 by consent of the parties, in spite of the court's belief

that "discovery could have been concluded much more expeditiously than the schedule proposed by the parties." Order of April 13, 2004 at 6. Fact discovery ultimately closed on August 28, 2004. The court extended expert discovery through February 9, 2005 and instructed the parties to file their summary judgment motions on or before March 11, 2005. Order of October 14, 2004 at 2. In its October 14 Scheduling Order, the court stated that "[t]hese deadlines are set in stone, and shall not be extended." Id. at 3 (emphasis added).

**\*3** Defendants filed their Motion for Summary Judgment on March 11, 2005. Generally speaking, Defendants argue that (1) Plaintiffs are unable to point to any admissible record evidence showing that the Defendants' alleged misrepresentations were in fact false; (2) even if there are genuine issues of material fact as to the falsity of Defendants' statements or omissions, Plaintiffs are unable to point to any admissible record evidence showing that Defendants made those statements or omissions with the requisite state of mind or scienter; and (3) even if Plaintiffs can establish genuine issues of material fact as to falsity and scienter, Plaintiffs cannot point to any admissible record evidence showing that Defendants' statements or omissions proximately caused investors any loss. Plaintiffs, of course, argue that there are genuine issues of material fact on the issues of falsity, scienter, and causation.

Meanwhile, Plaintiffs filed their Motion for Partial Summary Judgment on March 14, 2005.[8] Plaintiffs argue that as a matter of law, the record evidence establishes that Defendants, with the requisite state of mind, made several materially false statements upon which investors relied and which caused investors loss. Notably, the great majority of the alleged misstatements on which Plaintiffs seek summary judgment are not addressed by Defendants' Motion for Summary Judgment. According to Defendants, this is because Plaintiffs' Motion for Partial Summary Judgment improperly seeks summary judgment on various alleged misstatements that Plaintiffs did not plead in the Complaint.

In addition to their summary judgment motions, the parties have filed several motions pertaining to their proffered expert witnesses. Defendants ask the court to exclude the opinions of Dr. Marion Kainer ("Kainer"), Dr. Samuel H. Doppelt ("Doppelt"), and Dr. D. Ted Eastlund ("Eastlund"), as well as the opinions of Plaintiffs' damages expert, Candace L. Preston ("Preston"), under Federal Rule of Evidence 702 ("Rule 702") and 🔖 Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

(1993). Defendants have also filed a separate motion wherein they ask the court to exclude testimony from Kainer, Doppelt, and Eastlund as to the truth or falsity of various statements allegedly made by Defendants. Defendants seek a Daubert hearing on their various motions to exclude Plaintiffs' experts. Plaintiffs, meanwhile, seek to exclude the opinions of Dr. Lance D. Trainor ("Trainor") and the opinions of Defendants' regulatory expert, James S. Benson ("Benson").

Finally, Plaintiffs have filed two discovery motions. In Plaintiffs' first discovery motion, filed October 18, 2004, Plaintiffs ask the court for leave to subpoena documents and testimony from the law firm Arnall Golden Gregory regarding advice given to CryoLife concerning the FDA's legal authority to regulate CryoLife's tissue processing activities. In the same motion, Plaintiffs ask the court to compel Defendants to produce documents that Plaintiffs claim Defendants are improperly withholding on the basis of attorney-client privilege. Plaintiffs' second discovery motion, filed February 24, 2005, asks the court to compel Defendants' experts Trainor and Dr. Frederick S. Nolte ("Nolte") to produce documents that Plaintiffs allege have been improperly withheld.

## II. Applicable Legal Standards

### A. Summary Judgment

**\*4** Summary judgment is proper "if ... there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. However, the non-movant must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. Accordingly, the non-movant may not avoid summary judgment with evidence that is "merely colorable or is not significantly probative." Raney v. Vinson Guard Serv., Inc., 120 F.3d

1192, 1196 (11th Cir. 1997). Nevertheless, "[i]f the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Clemons v. Dougherty County, 684 F.2d 1365, 1369 (11th Cir. 1982).

### B. Expert Witnesses

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the [jury] to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under Daubert and its progeny, the court must "act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005). This requires the court to undertake " 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " Id. (citation omitted). "The most common method for fulfilling [the court's gatekeeper] function is a Daubert hearing, although such a process is not specifically mandated." Goebel v. Denver & Rio Grande W. R.R., 215 F.3d 1083, 1087 (10th Cir. 2000). " '[T]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion....' " McClain, 401 F.3d at 1238 (citation omitted). Finally, the court notes that it has "considerable leeway" in making reliability determinations under Daubert, and that the decision of whether to admit or exclude an expert witness is within the court's sound discretion. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); McClain, 401 F.3d at 1238.

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8155579

C. Discovery Motions

Under the Local Rules of this court, "a motion to compel a disclosure or discovery must be filed within the time remaining prior to the close of discovery or, if longer, within ten (10) days after service of the disclosure or discovery response upon which the objection is based." L.R. 37.1(B), N.D.Ga. Additionally, "the control of discovery is committed to the sound discretion of the trial court." Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1322 (11th Cir. 2004).

### III. Analysis

A. Discovery Motions

The court once again notes that fact discovery closed in this action on August 28, 2004; that the parties had over one year of fact discovery despite the court's opinion that fact discovery could have been concluded much more quickly; and that although the court extended expert discovery through February 9, 2005 in its October 14 Scheduling Order, it did so under the express condition that the new deadline was "set in stone, and shall not be extended." The court additionally notes that its October 14 Scheduling Order bifurcated expert discovery, such that Plaintiffs' initial expert designations and reports were due to Defendants on or before October 11, 2004;[9] Defendants were to depose Plaintiffs' experts by November 10, 2004; Defendants' designations and reports for any rebuttal experts were due to Plaintiffs on or before December 10, 2004; Plaintiffs were to depose Defendants' rebuttal experts by January 10, 2005; and Plaintiffs' designations of rebuttal experts or supplements to earlier expert reports were due to Defendants on or before January 25, 2005. Id. at 2. By February 9, 2005, Defendants were to conduct "any remaining expert discovery, including deposing Plaintiffs' rebuttal experts, if any ... deposing Plaintiffs' affirmative experts regarding their supplemental reports, if any, and serv[ing] any supplemental rebuttal expert reports." Id.

*5 Plaintiffs' Advice of Counsel Motion to Compel, filed on October 18, 2004, is DENIED as untimely. According to Plaintiffs' Motion, this discovery dispute arose on August 31, 2004 at the absolute latest. Even if the court were to take a generous reading of Local Rule 37.1(B) and allow Plaintiffs ten days from August 31, 2004 to file their Motion instead of requiring that it have been filed prior to August 28, 2004 (the close of fact discovery), Plaintiffs' Motion still

should have been filed by September 14, 2004. Thus, at best, Plaintiffs' Motion is over one month tardy. Plaintiffs do not explain why Local Rule 37.1(B) does not bar their Motion despite Defendants' argument in this regard; instead, Plaintiffs only assert that they are entitled to the discovery and that granting the discovery will "not extend the schedule for expert discovery or dispositive motions." Accordingly, Plaintiffs' Advice of Counsel Motion to Compel is DENIED. Additionally, in light of Plaintiffs' apparently callous attitude towards the court's deadlines; the court's long struggle to make the parties conform to any sort of discovery schedule in this action; the massive number of filings in this case which have required the court's extensive and ongoing attention in addition to Plaintiffs' blatantly untimely Motion; and the fact that the court previously warned the parties multiple times to be "circumspect[ ] in submitting any future discovery dispute to the court," see Order of April 14, 2004 at 7 n. 4; Order of October 26, 2004 at 3, 6, Plaintiffs are ORDERED to pay Defendants' reasonable attorney's fees and costs incurred in responding to Plaintiffs' Advice of Counsel Motion to Compel.

For substantially the same reasons, Plaintiffs' Motion to Compel Documents from Experts is DENIED as untimely. According to Plaintiffs' Motion, Defendants' allegedly deficient responses to subpoenas were served on December 20 and December 27, 2004. According to Plaintiffs' Motion, Plaintiffs realized that the subpoena responses were deficient by January 7, 2005 at the latest. Even taking January 7, 2005 as the date of "service of the disclosure or discovery response upon which the objection is based,"[10] ten days thereafter was still within the expert discovery period. Accordingly, Plaintiffs' Motion should have been filed on or before February 9, 2005, see L.R. 37.1(B), N.D. Ga., and it was not filed until February 24, 2005. Plaintiffs' Motion to Compel Documents from Experts is thus DENIED.[11]

B. Expert Witnesses

Preliminarily, Defendants' Motion for Daubert Hearing is GRANTED. As noted supra, a Daubert hearing is the most common way for a district court to fulfill its expert witness gatekeeper responsibility, and the court believes that it would be helpful in this instance (for both parties' motions to exclude). Although Plaintiffs assert that "such a hearing will waste valuable Court, expert, and counsel time, and will delay a trial in this case," the court cannot imagine that either of the parties can claim with a straight face at this juncture that any particular action by the court might delay this litigation.

Additionally, the court assures the parties that the <u>Daubert</u> hearing <u>most certainly will not</u> delay the trial of this case. Given the remarkable length to which the schedule of this litigation has been stretched due to the torrent of filings and the parties' insistence on protracted discovery, the court will simply not tolerate any further substantial delays. Indeed, the parties are ADVISED that the <u>Daubert</u> hearing is hereby scheduled for Tuesday, June 28, 2005 and Wednesday, June 29, 2005, the next open dates on the court's calendar.

**\*6** Thus, the court will defer a decision on Defendants' Motion to Exclude Kainer [Doc. No. 152], Defendants' Motion to Exclude Doppelt and Eastlund, Plaintiffs' Motion to Exclude Trainor [Doc. No. 182], Defendants' Motion to Exclude Preston, and Plaintiffs' Motion to Exclude Benson until the <u>Daubert</u> hearing. For purposes of docket maintenance, Defendants' Motion to Exclude Kainer [Doc. No. 163] and Plaintiffs' Motion to Exclude Trainor [Doc. No. 181] are DENIED WITHOUT PREJUDICE to their identical, companion (i.e., non-redacted) motions [Doc. Nos. 152 and 182].[12]

The court does not, however, believe that a hearing is required on Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity. Essentially, Defendants argue therein (1) that Doppelt, Eastlund, and Kainer cannot offer opinions as to purportedly false statements that were not pled in the Complaint; (2) that Doppelt, Eastlund, and Kainer cannot offer opinions as to the truth or falsity of <u>any</u> statements allegedly made by Defendants (pled in the Complaint or otherwise), because such opinions would constitute inadmissible conclusions of law and improperly invade the province of the jury; and (3) even if Kainer is somehow generally qualified to offer opinions as to the truth or falsity of four statements that <u>were</u> pled in the Complaint, that testimony should nevertheless be excluded as unsupported and unreliable.

Preliminarily, as noted <u>supra</u>, Defendants filed separate, individual motions to exclude the expert testimony of Doppelt, Eastlund, and Kainer on <u>Daubert</u> grounds. Defendants nevertheless took the liberty (without the court's permission) of filing their Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity and raising certain <u>Daubert</u> issues therein (specifically, the competency of Plaintiffs' experts to testify about what constitutes falsity under the federal securities laws, as well as the scientific basis for certain of Kainer's opinions). Local Rule 26.2(C) does not contemplate more than one <u>Daubert</u> motion per

expert witness; nor does Local Rule 7.1(D) contemplate the parties avoiding the page limits on a <u>Daubert</u> motion by filing multiple motions to exclude expert witnesses. <u>See</u> L.R. 7.1(D), N.D. Ga.; L.R. 26.2(C), N.D. Ga. The court once again ADVISES the parties that it does not look kindly upon attempted end runs around the Local Rules. However, because—as Plaintiffs point out—Defendants' Motion is more properly considered as a motion in limine seeking to exclude evidence (as opposed to a motion to exclude an expert witness under <u>Daubert</u>), the court will not reject Defendants' Motion out of hand. Plaintiffs' argument is essentially that <u>evidence</u> of the non-pled misstatements is <u>admissible</u>—even if not <u>actionable</u>—to show fraud under <u>Federal Rule of Evidence 404(b)</u>. The court will defer this core question until an appropriate time before trial, when the court fully expects the parties to raise other motions in limine. The court is able to take this course of action because, in ruling on the parties' motions for summary judgment, the court does not consider Plaintiffs' experts' opinions as to the truth or falsity of the thirty statements that Defendants challenge in their Motion.

**\*7** The court notes that Plaintiffs do not contest Defendants' argument that the majority of the thirty statements at issue here are not pled in the Complaint.[13] Indeed, Plaintiffs assert that they "are not attempting to amend the Complaint," and that they "will not seek to add new claims at trial based on these statements."[14] Rather, as discussed, Plaintiffs instead argue that evidence of Defendants' similar acts of fraud, and Plaintiffs' experts' opinions about those acts of fraud, are admissible to prove Defendants' scienter with regard to the alleged misstatements that <u>are</u> in the Complaint. <u>See</u> <u>Fed. R. Evid. 404(b)</u>. Again, the court will defer this question as more appropriate for a pre-trial motion in limine;[15] however, the court wishes to make clear that it <u>will not</u> permit Plaintiffs to amend their Complaint or to recover on statements not pled in the Complaint. <u>See</u> <u>supra</u> note 14; <u>see also</u> discussion <u>infra</u> at Section III(C)(2).

Additionally, despite its decision to defer the ultimate question of the admissibility of alleged misstatements not in the Complaint, the court finds it appropriate to now resolve the smaller issues raised by Defendants' Motion to Exclude Plaintiffs' Experts' Opinion as to Truth or Falsity. First, the court rejects Defendants' argument that Plaintiffs' experts cannot testify to the truth or falsity of any given statement without "<i>ipso facto</i>" rendering an inadmissible conclusion of law. The court acknowledges that as a general proposition a witness "may not testify to the legal implications of conduct."

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990). However, "[a]n expert *may* testify as to his opinion on an ultimate issue of fact." Id. (emphasis added); see also Fed. R. Evid. 704. Although Plaintiffs are correct as a matter of law that Plaintiffs' experts may not provide pure legal conclusions, the court finds that Plaintiffs' experts can opine as to the truth or falsity of statements without providing legal conclusions. For example, Plaintiffs' experts may have specialized or scientific knowledge that would assist the jury in evaluating the truth or falsity of Defendants' alleged statement that "[s]wabbing [donors] ... may produce false positives which will limit the use of donated tissue."[16] The average juror will not know whether such a statement is false or misleading; however, Kainer claims to have specialized knowledge that allows her to opine that swabbing can help determine the presence of contamination that is not susceptible to CryoLife's "antimicrobial cocktail,"[17] and that such contaminants (including *clostridium*, which Plaintiffs allege was consistently missed by CryoLife's screening techniques) are not considered false positives. If Kainer ultimately qualifies as an expert,[18] she would certainly be permitted to testify as to her opinion of the truth or falsity of this and other similar statements, to the extent that the statements themselves are admissible. Plaintiffs' experts are not seeking to (and will not be permitted to) testify as to whether Defendants made statements that are "false and misleading under the federal securities laws." Instead, Plaintiffs' experts may offer opinions about the objective truth or falsity of statements based on their specialized or scientific knowledge. For the same reasons, the court rejects Defendants' arguments that Plaintiffs' experts cannot testify to the truth or falsity of statements without impermissibly invading the province of the jury and that Plaintiffs' experts are not competent to testify as to the truth or falsity of statements because they have not been shown to possess any specialized knowledge about securities laws or standards. Simply put, if they appropriately qualify at the Daubert hearing, Plaintiffs' experts will be permitted to testify to the truth or falsity of a given statement based on their specialized or scientific knowledge. Such testimony will aid the jury. If it should become necessary at trial, the court can exclude any pure legal conclusion testimony.[19]

**\*8** Finally, the court rejects Defendants' argument that Kainer should not be permitted to testify as to the truth or falsity of four statements that are in the Complaint because there is no reliable scientific basis for her opinions thereon. The first statement at issue is from CryoLife's December

14, 2001 press release, wherein CryoLife stated: "We are pleased to report that all other recipients [of tissue from the Lykins donor] are doing well with no evidence of *Clostridium sordelli*[20] infection." Kainer opines that this statement is misleading because another recipient of tissue from the Lykins donor (the "second patient") indisputably developed a fever, septic arthritis, and was given antibiotics to combat a possible *clostridium infection*. Defendants, however, argue that Kainer's opinion is based on incomplete data because Kainer consulted the second patient's medical records to form her opinion, but the second patient's medical records have not been produced in discovery and are accordingly inadmissible. Defendants also argue that Kainer's opinion is based on incomplete data because no cultures were ever taken from the second patient, so that there is no laboratory confirmation of the alleged *clostridium infection*. However, Kainer testified in her deposition that her opinion is based both on conversations with the second patient's treating physician and her review of the second patient's medical records, and Kainer further testified that she no longer had copies of the second patient's medical records in her possession because they were "at the CDC." Although Defendants argue that "Kainer cannot rely upon such records" because she "did not produce" them "despite subpoenas directed to her seeking all such information and documents," the court was presented with no motion to compel on the subject, and Kainer complied with the requirements of Federal Rule of Civil Procedure 26 that she delineate the "data or other information considered." Fed. R. Civ. P. 26(a)(2)(B). Defendants point to no case in support of their argument that Kainer's opinion must be excluded because Plaintiffs did not produce the second patient's medical records. Assuming that Kainer otherwise qualifies as an expert at the Daubert hearing, she will be able to give her opinion that the statement at issue is misleading because, among other things, the normal treatment time for a post-operative septic knee infection and fever is six weeks; the second patient did not respond to the initial, standard treatment that he was given but his fever began to subside when he was treated with an antibiotic that specifically treats *clostridium infections*; and septic arthritis and fever are consistent with a clinical diagnosis of *clostridium infection*.

Defendants next attack Kainer's opinion that another statement in the December 14, 2001 press release was misleading—specifically, CryoLife's statement therein that upon examination of other tissue from the Lykins donor, "[t]he CDC confirmed that the tissue examined contained the rare bacterium *Clostridium sordellii*. The tissue examined by the CDC had not been released for transplant and was

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 94 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

examined by [the CDC] subsequent to its implant expiration date." Kainer opines that this statement is misleading because it implicitly attaches significance to the fact that the CDC examined the other tissue from the Lykins donor "subsequent to its implant expiration date." Defendants argue that Kainer's opinion endeavors to impermissibly invade the role of the jury to determine what is or is not misleading under the securities laws. However, for reasons similar to those discussed supra, the court finds that Kainer can assist the jury by explaining exactly why Defendants' statement might be misleading as a matter of science. Assuming that she otherwise qualifies as an expert, Kainer can testify that the CDC was no more or less likely to detect *clostridium* on the Lykins donor whether it tested the donor prior to its implant expiration date or subsequent to its implant expiration date. In fact, the court is unclear as to exactly how the jury might come to that important bit of scientific knowledge without the assistance of expert testimony.

Defendants also object to Kainer's attack on CryoLife's statement from the December 14, 2001 press release that "[n]either the [FDA] nor the CDC, after conducting thorough inspections of the CryoLife processing facilities, have recommended or suggested changes in CryoLife's processing protocols of human tissues." Kainer asserts that this is false because she herself communicated recommendations to CryoLife, through Vander Wyk, on behalf of the CDC. Defendants concede that Kainer may testify to such matters as a fact witness, but that she may not testify to such matters as an expert witness. The court agrees with Defendants (as do Plaintiffs), although the court is not clear as to why it was necessary to address this minor issue at this point in time. Kainer will be only permitted to testify as a fact witness about what she told Vander Wyk on behalf of the CDC. The court notes, however, that Kainer might still permissibly opine that the statement at issue—whether or not the CDC recommended any processing protocol changes to CryoLife in the aftermath of its inspection of CryoLife—is false. See Fed. R. Evid. 701 (laywitnesses may offer opinions that are "rationally based on the perception of the witness").

**\*9** Finally, Defendants object to Kainer's attack on CryoLife's statements in a June 24, 2002 press release and a June 25, 2002 conference call. The statements pertain to the FDA's March 2002 investigation of CryoLife following reports of endocarditis [21] in patients who received transplants of CryoLife heart valves. Specifically, the statements at issue are that

CryoLife stated in the press release that reports from hospitals clearly demonstrated no evidence of infection in either of the two heart valves that the government had been investigating. In the conference call, CryoLife claimed that "during the [FDA] inspection [pertaining to the reported infections in heart valves] it was demonstrated that there were no such infections. So just because there is a report of infections does not mean there is one."

According to Kainer, these statements are false because CryoLife received reports evincing endocarditis in at least one of the heart valves in April and May. Defendants claim that Kainer has no knowledge of CryoLife receiving such reports, and indeed, Kainer's report cites to no record evidence in support of her claim that CryoLife received such reports. However, Kainer asserts that she has knowledge in this regard, and accordingly, if Kainer does in fact have personal knowledge that CryoLife received such reports, she may testify thereto in her capacity as a fact witness. The court notes that a July 6, 2002 Wall Street Journal Online article quotes Kainer as stating that in March 2002, CryoLife was in receipt of information that supported a diagnosis of endocarditis in one patient, which indicates that Kainer does have personal knowledge in this regard. See infra at Section III(C)(1)(h).

Accordingly, Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity is GRANTED IN PART AND DENIED IN PART, without prejudice to Defendants' right to later move in limine to exclude from evidence alleged misstatements that are not in the Complaint. Plaintiffs will not be permitted to recover on any alleged misstatements not pled in the Complaint, as discussed in greater detail infra at Section III(C)(2). See also supra note 14 and accompanying text. As a general matter, however, Plaintiffs' experts will be permitted to opine as to the truth or falsity of a statement where such opinions are based on the experts' specialized or scientific knowledge and will assist the jury. Additionally, Kainer may testify as to the truth or falsity of the four specific statements discussed supra in the fashion described by the court, assuming that she otherwise qualifies as an expert at the Daubert hearing where necessary. [22]

### C. Summary Judgment

**\*10** Plaintiffs' Complaint alleges violations of Section 10(b) of the Exchange Act ("Section 10(b)") and Section 20(a) of the Exchange Act ("Section 20(a)"), as well as Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5a")

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

promulgated thereunder. See 15 U.S.C. § 78j(b) (Section 10(b)); 15 U.S.C. § 78t(a) (Section 20(a)); 17 C.F.R. § 240.10b-5 (Rule 10b-5).

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC, provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. " ' A successful cause of action under Section 10(b) or Rule 10b-5 requires that the plaintiff prove (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiff's loss.' " Theoharous v. Fong, 256 F.3d 1219, 1224 (11th Cir. 2001) (citation omitted). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). A showing of "severe recklessness" will satisfy the scienter requirement in a Rule 10b-5 case. See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1283 (11th Cir. 1999).

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care,

> and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Id. at 1282 n. 18 (citations and quotation marks omitted). Evidence that a defendant had the motive and opportunity to commit fraud may be used, along with other evidence, to show willfulness or recklessness, but motive and opportunity evidence alone cannot satisfy the scienter element. Id. at 1285-86.

Finally, under Section 20(a), any person who "controls" an entity that violates a provision of the Exchange Act is jointly and severally liable for the violation. 15 U.S.C. § 78t(a). For the individual Defendants to be liable under Section 20(a), it must be shown that (1) CryoLife committed a so-called "primary" violation of Rule 10b-5; (2) the individual Defendants had the power to control the general affairs of CryoLife at the time CryoLife committed its primary violation; and (3) the individual Defendants " 'had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.' " Brown v. Enstar Group, Inc., 84 F.3d 393, 396 (11th Cir. 1996) (citation omitted).

### 1. Defendants' Motion for Summary Judgment

**\*11** Defendants ask the court to grant them summary judgment on three specific grounds. First, Defendants argue that Plaintiffs are unable to point to any record evidence establishing that any of the statements at issue in the Complaint were false when made. Second, Defendants argue that even if Plaintiffs can establish a genuine issue of material fact as to the falsity of certain of the statements at issue in the Complaint, Plaintiffs are unable to point to any record evidence establishing that those statements were made with the requisite level of scienter. Finally, Defendants argue that Plaintiffs are unable to point to any record evidence establishing that Defendants' alleged misstatements or omissions caused any loss.[23] The court will evaluate Defendants' falsity and scienter arguments for each individual statement at issue, and then the court will address the general loss causation issue.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 96 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

a. December 7, 2001 press release (four statements)

Plaintiffs assert that four statements from CryoLife's December 7, 2001 press release violate Rule 10b-5. The first statement at issue is CryoLife's assertion that its "processing protocols in its clean-room environment assure the highest standard of quality control." Plaintiffs assert that this statement is false and misleading for several reasons. First, the American Association of Tissue Banks ("AATB"), a voluntary peer group organization of individuals involved in tissue banking activities, had promulgated guidelines in 2001 that required its members to obtain pre-processing cultures to identify microorganisms that might contaminate incoming tissue. CryoLife was not an AATB member, and CryoLife does not appear to contest that in 2001 it did not comply with AATB standards, including AATB's pre-processing recommendations. CryoLife does, however, vigorously contest that AATB's standards constituted the tissue processing industry standards or that there were any tissue processing industry standards at the time of the alleged misstatement. Indeed, CryoLife seeks to exclude Doppelt and Eastlund's proposed expert testimony to that effect. As the court has deferred the issue of whether Doppelt and Eastlund will be permitted to testify until the Daubert hearing, the court does not consider for purposes of this motion Doppelt and Eastlund's opinion that CryoLife was not in compliance with tissue processing industry standards in December 2001, or Dopplet and Eastlund's opinion that AATB's standards were the tissue processing industry standards in December 2001. However, the mere fact that there existed a voluntary peer organization of tissue processing industry participants, of which CryoLife was not a member and whose guidelines CryoLife did not follow in December 2001, cuts against the truth of CryoLife's statement that its processing protocols assured the highest standard of quality control. More importantly, Plaintiffs' expert Timothy R. Wells ("Wells"), whom Defendants have not moved to exclude, testified in his deposition as follows:

**\*12**  Q: Do you have any basis to believe that as of December 2001 that anyone at CryoLife believed that CryoLife had problem in its tissue processing operations?

....

The Witness: I do have that belief.... [P]rior to this, there had been communications to CryoLife from the CDC, and in fact, they had filed reports with the FDA of problems

[of] infections. So clearly, there was knowledge on the part of CryoLife.

Dep. of Timothy R. Wells at 91-92. Additionally, it is undisputed that in 1997, CryoLife discontinued pre-processing testing, and there is record evidence that in 1998, the FDA conducted an inspection of CryoLife after a CryoLife knee tissue recipient suffered a *clostridium* infection due to tissue contamination. For all of the foregoing reasons, the court finds that there is a genuine issue of material fact as to the truth or falsity of CryoLife's statement that in December 2001, its "processing protocols in its clean-room environment assure[d] the highest standard of quality control."

Defendants also argue that Plaintiffs improperly characterize the statement about Defendants' "clean-room environment" as a broad guarantee of Defendants' tissue quality. Defendants argue that the statement at issue only focuses "on CryoLife's aseptic handling techniques as employed in the clean-room environment and [is] not [a] broad, general guarantee[ ] of tissue safety." The court does not agree with Defendants that Plaintiffs *mis*characterize the statement at issue as a broad guarantee of tissue safety. The statement at issue is Defendants' assertion that they could "assure the highest standard of quality control," *via* their processing protocols in their clean-room environment. Wells' testimony that in December 2001 CryoLife knew of problems in its tissue processing operations, and the evidence of CryoLife's discontinuation of pre-processing testing in 1997, raise an issue of material fact as to whether the statement at issue was false when made.

As for whether the statement was made with the requisite scienter, the court first notes that, despite Defendants' exhortations to the contrary, scienter is generally a jury question—even in securities fraud cases. See Sammons v. Taylor, 967 F.2d 1533, 1545 (11th Cir. 1992) (a question of motive, if presented in a more than conclusory way, can often "make a disposition upon summary judgment inappropriate"); Croley v. Matson Navigation Co., 434 F.2d 73, 77 (5th Cir. 1970)[24] ("The court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind."); In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1412 (9th Cir. 1994) (noting, in a securities fraud case, that scienter is a fact-specific issue that should ordinarily be left to the jury); Schoch v. Dade City Ret. Hous., Inc., No. 87-388 Civ. T-10(B), 1989 WL 67745, at *1 (M.D. Fla. Feb.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 97 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

9, 1989) (noting in a Rule 10b-5 and 🚩 Section 20(a) case that "summary judgment is generally inappropriate to decide questions of scienter, knowledge and intent"). Moreover, as to the specific statement at issue, the court again notes that Wells testified at his deposition that in December 2001, CryoLife had "knowledge" of problems with its tissue processing operations.

**\*13** Defendants argue that Plaintiffs have nevertheless failed to establish a genuine material fact as to scienter because Plaintiffs' sole evidence of scienter is expert witness testimony that Defendants argue is inadmissible. Additionally, Defendants assert that even if Plaintiffs' experts' testimony is admissible, at best that testimony creates a battle of expert witnesses over the question of whether Defendants were unreasonable in their scientific judgments of the adequacy of CryoLife's tissue processing. According to Defendants, if qualified expert witnesses can disagree about the reasonableness of tissue processing and testing techniques (or the lack thereof), Defendants cannot have been "severely reckless" in stating that their processing protocols assure the highest standard of quality control.

The court disagrees with Defendants. Most crucially, as noted <u>supra</u>, Defendants do not seek to prevent Wells from testifying, and he testified at his deposition that CryoLife had knowledge of problems with its tissue processing operations as of December 2001. Moreover, as for Defendants' "battle of the experts" argument, the court acknowledges that 🚩 In re Miller Indus., Inc. Sec. Litig., 120 F. Supp. 1371, 1382-83 (N.D. Ga. 2000) (Thrash, J.), can be read to hold that a "battle of the experts" on the reasonableness of a decision requires summary judgment for a defendant on the question of scienter. However, to the extent that <u>In re Miller</u> so holds, this court does not agree, and instead the court finds that disposing of a claim <u>because</u> expert witnesses disagree as to whether a given course of action was "severely reckless" would improperly usurp the jury's responsibility to evaluate witness credibility. See 🚩 Allison v. McGhan Med. Corp., 184 F.3d 1300, 1321 (11th Cir. 1999) (noting that trial judges must carefully act as gatekeepers of expert testimony, but also noting that an overly searching inquiry "would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury"). Indeed, in the principal case relied on by the

<u>In re Miller</u> court, 🚩 Securities and Exchange Commission v. Price Waterhouse, 797 F. Supp. 1217 (S.D.N.Y. 1992), it was only <u>after a bench trial</u>—wherein the court itself properly evaluated the credibility of the expert witnesses, as

the fact finder—that the court concluded that "no finding of fraud or recklessness [could] rationally be made in this case" because "the Court heard diametrically opposing views from experts as to the reasonableness of [the] accounting and audit judgments." 🚩 Price Waterhouse, 797 F. Supp. at 1241; 🚩 In re Miller, 120 F. Supp. 2d at 1382-83. The court sees no reason why, if there is a "battle of the experts" at trial, the jury could not permissibly choose to completely disregard Defendants' experts' testimony as not credible. Accordingly, for all the foregoing reasons, the court concludes that genuine issues of material fact as to falsity and scienter exist with regard to CryoLife's December 7, 2001 statement that its "processing protocols in its clean-room environment assure the highest standard of quality control." [25]

**\*14** The next statement at issue in the December 7, 2001 press release is CryoLife's assertion that "[i]n the past 17 years, CryoLife has processed some 250,000+ pieces of human tissue from more than 60,000+ donors, without a single known incidence of *Clostridium sordellii* bacterial infection." Plaintiffs assert that this statement is false and misleading because the FDA's Manufacture and User Facility Device Experience Database ("MAUDE") [26] shows that in 1998, a patient received soft knee tissue from CryoLife and developed a *clostridium* infection. Specifically, the MAUDE report states: "Wound culture collected 4/7/98. Final report showed 'clostridium species identified as clostridium septicum - beta lactamase negative....' [The] [a]llograft [27] was cultured at time of implant 3/27/98. Reported back 4/22/98 as 'clostridium sordelli[i] - beta lactamase negative.' " Defendants' sole argument that the statement at issue is not actionable is that "[t]he MAUDE report shows that the infection was caused by *Clostridium septicum*—an entirely different species from *Clostridium sordellii.*" The court disagrees with Defendants for two reasons. First, Defendants cite no evidence in support of their assertion that *clostridium sordellii* is "an entirely different species" from *clostridium septicum*, and the court cannot simply take Defendants' word for it. [28] Indeed, had the court simply taken at face value Defendants' dismissive argument that the statement at issue is not actionable because "[t]he MAUDE report shows that the infection was caused by *Clostridium septicum,*" the court would have missed the last sentence of the MAUDE report —left completely unaddressed by Defendants—that a culture of the transplant allograft revealed *clostridium sordellii.* Defendants' failure to disclose or address this important piece of information is inexcusable and violates Defendants' counsel's duty of candor to the court. Regardless, given that

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

the MAUDE report indicates that a CryoLife allograft tested positive for *clostridium sordellii* in 1998, the court finds that there is a genuine issue of material fact as to the truth or falsity of CryoLife's assertion that prior to the Lykins incident, it had never previously experienced an incident of *clostridium sordellii* bacterial infection. As for whether the scienter element is present, the court notes that the MAUDE report indicates that CryoLife was made aware of the findings therein, and the court further notes that the FDA apparently inspected CryoLife in 1998 in the aftermath of this incident. Moreover, Defendants do not argue the issue of whether this statement was made with the requisite scienter, and thus they concede the point. Accordingly, CryoLife's statement in the December 7, 2001 press release that "[i]n the past 17 years, CryoLife has processed some 250,000+ pieces of human tissue from more than 60,000+ donors, without a single known incidence of Clostridium sordellii bacterial infection," survives summary judgment on the falsity and scienter issues. [29]

The next statement at issue from the December 7, 2001 press release is the following:

> Based on [CryoLife's] recent conversations with state and federal public health agencies, they are unable at this time to tell us how the *Clostridium sordellii* bacterium was introduced into [Lykins'] body and they have revealed no conclusion regarding the source of the infection in [Lykins]. The CDC is testing a similar tissue from the [Lykins] donor, but the final results are not known at this time.

Plaintiffs argue that this statement was false and misleading and made with the requisite scienter because prior to December 7, 2001, the CDC had already concluded that the Lykins donor was infected with *clostridium* and informed CryoLife of that conclusion. Defendants argue, however, that the CDC itself stated in a Morbidity and Mortality Weekly Report ("MMWR") issued on December 7, 2001 that only "preliminary" results had been obtained from the Lykins donor, indicating mere growth of a *clostridium* "species" as opposed to *clostridium sordellii*. In fact, according to Defendants, "[i]t was not until January 3, 2002 ... that the

CDC stated in writing its final conclusion that [the Lykins donor was infected with] *Clostridium sordellii*."

As an aside, the court notes that Defendants' argument that the CDC did not state its final conclusion in writing until January 3, 2002 is of no relevance because in CryoLife's own December 14, 2001 press release, CryoLife announced that the CDC had completed its testing of tissue from the Lykins donor and "confirmed that the tissue ... contained the rare bacterium *Clostridium sordellii*." In fact, on December 11, 2001, Kainer sent Vander Wyk an email on behalf of the CDC stating that "[t]he Clostridium from the [donor] has now been identified as ... sordelli[i]." More importantly, the court finds that there are genuine issues of material fact as to whether the statement at issue is false or misleading, because there is record evidence suggesting that the CDC had at least preliminarily concluded prior to December 7, 2001— i.e., reached some conclusion, rather than "no conclusion"— that the Lykins donor was the source of Lykins' infection. [30] There is also record evidence tending to show that the CDC informed CryoLife of its conclusion prior to December 7, 2001. Specifically, a chronology kept by Kainer indicates that on November 28, 2001, the CDC concluded that the donor tissue contained *clostridium*. Vander Wyk's diary indicates that on that same day, he received a call from Kainer reporting on the donor's tissue growth, and Kainer's chronology further indicates that on December 3, 2001, she visited CryoLife and advised Vander Wyk that the second recipient of tissue from the Lykins donor had contracted septic arthritis. Accordingly, the court finds that there are genuine issues of material fact as to whether CryoLife's December 7, 2001 statement that state and federal public health agencies had reached "no conclusion regarding the source" of Lykins' infection was knowingly false when made.

**\*15** The final statement at issue from CryoLife's December 7, 2001 press release is a statement regarding the health of the eight other patients who were implanted with tissue from the Lykins donor. CryoLife asserted that "[p]hysician follow-ups on these patients have indicated they are all doing well." Plaintiffs argue that statement was knowingly false when made because, as noted above, Kainer's chronology indicates that on December 3, 2001, she personally informed Vander Wyk that one of the recipients of the Lykins donor tissue had contracted septic arthritis. Defendants respond that the March 15, 2002 MMWR "makes clear" that the patient's "symptoms subsided by November 23, 2001, such that Defendants' statement on December [7, 2001] that all other recipients [were all] 'doing well' was entirely accurate." However, the

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 99 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

court observes that although the March 15, 2002 MMWR does state that the patient's 103.5 degree <u>fever</u> subsided on or about November 23, 2001, the MMWR also states that "[t]he patient is <u>recovering</u>," which implies that even as of March 15, 2002, the patient had not fully <u>recovered</u>. [31] More fundamentally, despite the fact that CryoLife knew by December 3, 2001 at the latest that a second recipient of tissue from the Lykins donor had contracted post-operative <u>septic arthritis</u>, that fact is mentioned nowhere in the December 7, 2001 press release. Instead, CryoLife merely asserted that after talking to the doctors for each of the eight other recipients of tissue from the Lykins donor, each recipient was "doing well." The court thus concludes that there are genuine issues of material fact as to whether this statement was knowingly false or misleading when made.

b. <u>December 14, 2001 press release (four statements)</u>

Plaintiffs also assert that four statements in CryoLife's December 14, 2001 press release were false and misleading in violation of Rule 10b-5. First, CryoLife stated in its December 14, 2001 press release—as it essentially did in its December 7, 2001 press release—that "[i]n the seventeen years since its founding CryoLife has processed tissue from over 60,000 donors without a single known incident of *Clostridium sordellii* infection." Plaintiffs' claim arising out of this statement survives summary judgment for the same reasons that Plaintiffs' claim arising out of CryoLife's nearly-identical December 7, 2001 statement survives summary judgement. As discussed <u>supra</u>, the 1998 MAUDE report raises genuine issues of material fact as to whether CryoLife had suffered an incident of *clostridium sordellii* infection prior to the Lykins incident, and whether CryoLife knew about that incident.

The second statement at issue in the December 14, 2001 press release is also essentially identical to a statement in the December 7, 2001 press release. Specifically, in its December 14, 2001 press release, CryoLife stated that "all other recipients of tissue from the [Lykins donor] are doing well with no evidence of *Clostridium sordellii* infection." The court finds that there are genuine issues of material fact as to the actionability of this statement for the same reasons that Plaintiffs' claim arising out of the similar December 7, 2001 statement survives summary judgment—there is record evidence tending to suggest that it was materially misleading for CryoLife to assert that all other recipients of tissue from the Lykins donor were "doing well," given that at least one

recipient of the tissue contracted <u>septic arthritis</u> and may well have still been "recovering" in March 2002, let alone on December 14, 2001. [32]

**\*16** The next statement at issue in the December 14, 2001 press release does not have a counterpart in the December 7, 2001 press release. Specifically, in the December 14, 2001 press release, CryoLife made the following statement with regard to the CDC's tests on additional tissue from the Lykins donor: "The CDC confirmed that the tissue examined contained the rare bacterium *Clostridium sordellii*. The tissue examined by the CDC had not been released for transplant and was examined by [the CDC] subsequent to its implant expiration date." Plaintiffs contend that this statement is misleading because, as a matter of science, a finding of *clostridium sordellii* would be no more or less likely if tissue were examined before its implant expiration date or after its implant expiration date. See <u>supra</u> Section III(B). Preliminarily, the court notes that Defendants did not move for summary judgment on this specific statement, which is in the Complaint. <u>See</u> Complaint ¶ 70. Accordingly, unless the court fully grants Defendants summary judgment on the loss causation issue, this statement survives Defendants' Motion for Summary Judgment. Moreover, as discussed <u>supra</u>, presuming Kainer qualifies as an expert in her field, she will be permitted to testify as to whether she believes this statement to be misleading because as a matter of science, a finding of *clostridium sordellii* is no more likely when tissue is examined subsequent to its implant expiration date. Finally, given the individual Defendants' educational backgrounds (Vander Wyk, for instance, has a Ph.D. in microbiology) and the fact that CryoLife is in the tissue processing business, the court finds that there is a genuine issue of material fact as to whether CryoLife was severely reckless in implying that a finding of *clostridium sordellii* might be more likely when tissue is examined subsequent to its implant expiration date.

The last statement at issue in the December 14, 2001 press release is CryoLife's assertion therein that "[n]either the [FDA] nor the CDC, after conducting thorough inspections of the CryoLife processing facilities, have recommended or suggested changes in CryoLife's processing protocols of human tissues." As discussed <u>supra</u>, Kainer purports to have personal knowledge in her capacity as a fact witness that this statement was false when made. Moreover, the court notes that although Defendants argue that "the record is clear" that CryoLife did not receive Kainer's December 14, 2001 email recommendations on behalf of the CDC until December 17, 2001, Vander Wyk's diary, read in conjunction with Kainer's

2005 WL 8155579

chronology, indicates that Vander Wyk and Kainer had a telephone discussion on December 14, 2001 wherein Kainer conveyed "initial" CDC recommendations to Vander Wyk before his lunch meeting to discuss the December 14, 2001 press release. Thus, the court finds that there are genuine issues of material fact as to whether CryoLife's statement that neither the FDA nor the CDC had recommended any changes in CryoLife's human tissue processing protocols as of December 14, 2001 was knowingly false when made.

Defendants also argue that this last statement from the December 14, 2001 press release—CryoLife's assertion that neither the FDA nor the CDC had conveyed any recommendations to CryoLife for processing protocol change as of December 14, 2001—is inactionable as a matter of law because Plaintiffs' damages expert (Preston) testified at her deposition that the statement "itself caused no damage." However, Defendants take Preston's testimony out of context. Preston's full testimony was "that statement itself caused no damage, [but] when people find out the result of that [statement], it causes damages." Plaintiffs argue that the March 15, 2002 MMWR ultimately revealed this statement to be false, and accordingly that is the relevant date for loss causation purposes. The court observes that the March 15, 2002 MMWR does indeed list several recommendations that the CDC contends it "provided" to CryoLife "in response to the initial case investigation and the subsequent reports of *Clostridium ... infections*." The record does not appear to reflect that the CDC's recommendations to CryoLife were revealed to the market prior to March 15, 2002, and accordingly, the court rejects Defendants' argument that the December 14, 2001 statement about CDC recommendations is inactionable as a result of Preston's testimony.[33]

### c. January 29, 2002 press release (two statements)

Plaintiffs challenge two statements from CryoLife's January 29, 2002 press release. Plaintiffs first attack CryoLife's statement that the CDC and FDA concluded "that CryoLife procedures, which met or exceeded typical industry processes for aseptic handling, were properly followed." Similar to their argument with regard to the December 7, 2001 statement that "CryoLife's processing protocols in its clean-room environment assure the highest standard of quality control," Defendants argue that the statement at issue focuses "only on CryoLife's aseptic handling techniques as employed in the clean-room environment and [is] not [a] broad, general guarantee[ ] of tissue safety." The court finds that

Defendants' argument is sound with regard to the January 29, 2002 statement, though as discussed supra, the court rejects Defendants' argument with regard to the clean-room environment statement of December 7, 2001. The distinction is this: The December 7, 2001 statement can fairly be read as an assurance of general high quality control standards due (in whole or in part) to CryoLife's processing protocols in its clean-room environment. The January 29, 2002 statement, however, can only be fairly read to state (1) that CryoLife's aseptic handling procedures met or exceeded industry standards; and (2) that the CDC and FDA concluded that those procedures were properly followed. In their opposition to Defendants' Motion for Summary Judgment, Plaintiffs respond to Defendants' argument by stating that CryoLife's "actual deficiencies (and regulatory violations) had nothing to do with its aseptic practices," tacitly conceding that CryoLife was not deficient with regard to its aseptic handling procedures and practices. Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 13 (emphasis added). Although Plaintiffs assert in a footnote that Defendants' "injection of the term 'aseptic' processing into public statements was nothing more than a calculated subterfuge of the facts," Plaintiffs cite to no evidence in support of that assertion. Accordingly, given Plaintiffs' tacit concession as to the truth of the actual statement at issue—that CryoLife's aseptic handling procedures met or exceeded industry standards and that the CDC and FDA concluded that those specific procedures were properly followed—the statement is not actionable and summary judgment is appropriate thereon.

**\*17** The second statement from the January 29, 2002 press release challenged by Plaintiffs is CryoLife's assertion that "none of the eight other recipients of tissue from [the Lykins donor] has become infected with *sordellii* and all are doing well." For the same reasons discussed supra with regard to CryoLife's similar statements in the December 7, 2001 and December 14, 2001 press releases, the court finds that there are genuine issues of material fact as to whether this statement was knowingly false when made, and accordingly the statement survives summary judgment.[34]

### d. March 15, 2002 press release (two statements)

Plaintiffs complain of two alleged misstatements in CryoLife's March 15, 2002 press release. The first statement was made by CryoLife in response to the CDC's announcement in the March 15, 2002 MMWR that upon soliciting additional reports of allograft-associated infections

2005 WL 8155579

in otherwise healthy patients with no known risk factors for surgical site infections, the CDC received twenty-six such reports. CryoLife stated in its March 15, 2002 press release that:

> The report of twenty six infections in tissue transplants released by the CDC this morning relates to tissue processed by four or five tissue banks across the U.S. and represents events dating back as far as 1998. Some of the infections are likely not to be due to the tissue itself and may be infections transmitted from other sources.

Defendants argue that they are entitled to summary judgment on this statement because it only "pointed out the fact that the *reported* infections discussed in the MMWR did not exclusively involve tissue processed by CryoLife and noted that *some* of the reported infections were likely not to have been caused by the implanted tissues." Plaintiffs, however, assert that as of March 13, 2002, Defendants were aware that (1) fourteen out of the twenty-six infected patients received tissue processed by CryoLife and (2) of the thirteen of the twenty-six patients who were infected with some type of *clostridium*, eleven of those thirteen received tissue processed by CryoLife. Accordingly, Plaintiffs argue that CryoLife's statement in the March 15, 2002 press release was knowingly false.

The court finds summary judgment is proper on this statement. As a technical matter, Plaintiffs do not appear to contest that the twenty-six patients received tissue from more than one tissue bank; nor do Plaintiffs appear to contest that less than 100% (i.e., "some") of the reported infections were caused by something other than the implanted tissues. Instead, Plaintiffs merely assert that the statement is "misleading because CryoLife knew that CDC had found that there was significant evidence implicating CryoLife's tissue." Even granting Plaintiffs' point that the statement is somewhat misleading in that it minimizes the fact that CryoLife's tissue was implicated in a high percentage of the twenty-six infections, the court cannot say that Defendants acted with the requisite scienter in making the statement. As a technical matter, the veracity of CryoLife's assertion about the CDC's report appears uncontested, such that even if the

statement is somewhat misleading, the court cannot say that Defendants made the statement with severe recklessness.

**\*18** The second statement at issue in the March 15, 2002 press release is CryoLife's assertion that it "has taken all suggestions from the CDC seriously and implemented those that it can at this time." Preliminarily, the court notes that Defendants do not address this statement in their Motion for Summary Judgment, although the statement is addressed in Defendants' reply. As for the truth or falsity of the statement, Plaintiffs argue that the statement is false because as of March 15, 2002, CryoLife had not followed at least two of the CDC's December 14, 2001 recommendations, one of which was a recommendation that CryoLife implement pre-processing testing. Defendants argue that Plaintiffs have insufficient evidence of falsity because, among other reasons, "such scientific processing changes could not be made overnight and had to be examined." Defendants also argue that CryoLife disclosed to the market on March 15, 2002 that it could not at that time implement all of the CDC's suggestions, and that accordingly, the statement at issue was true in that CryoLife had implemented all CDC suggestions that it could "at [the] time." The court, however, disagrees with Defendants. Specifically, the court again notes that in 1997, CryoLife discontinued pre-processing testing. Given that CryoLife had previously engaged in pre-processing testing, it is not unreasonable to argue that three months of discussion about the merits of pre-processing testing (from December 14, 2001 to March 15, 2002) was enough time for the merits of such testing to be "examined." In light of this, and further given that Defendants did not even address this statement in their Motion for Summary Judgment, the court finds that CryoLife's March 15, 2002 statement that it had "taken all suggestions from the CDC seriously and implemented those that it [could] at [that] time" should survive summary judgment. [35]

### e. March 16, 2002 newspaper article (one statement)

According to a March 16, 2002 Atlanta-Journal Constitution article, during a March 15, 2002 conference call, "CryoLife executives reiterated that the Company is doing everything possible to ensure the purity of tissues used in transplants." Defendants argue that this statement cannot be actionable because it is inadmissible hearsay and Plaintiffs have no evidence that any Defendant actually made the statement. Plaintiffs argue in response that "[t]he fact that the quote appeared in a newspaper is evidence that the statement was

Case 4:24-cv-01940  Document 45-2  Filed on 03/14/25 in TXSD  Page 102 of 330

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

in fact conveyed to the market and constituted part of the mix of information upon which the stock price was determined." Plaintiffs miss the point, however, which is that the court has been pointed to no admissible evidence that the statement was ever actually made. Indeed, the version of the statement provided by Plaintiffs is not even a quote; rather, it is the newspaper reporter's paraphrase of a quote or quotes from the conference call. Because Plaintiffs lack admissible evidence that the statement at issue was actually made by any Defendant, summary judgment on the statement is proper.

### f. April 23, 2002 press release (one statement)

It is undisputed that between March 25, 2002 and April 12, 2002, the FDA conducted an inspection of CryoLife's facilities, and in the aftermath of that inspection, on or about April 12, 2002, the FDA issued what it calls a "Form 483." The implications of the FDA's issuance of the Form 483, however, are of course contested and pertain to the statement from CryoLife's April 23, 2002 press release that is at issue herein.

Specifically, CryoLife stated in its April 23, 2002 press release that it "complies with current regulatory requirements of the [FDA] in the handling and processing of human tissues." Plaintiffs assert that this statement was knowingly false when made because the FDA's issuance of the Form 483 on April 12, 2002 was equivalent to an FDA notification to CryoLife of noncompliance with certain FDA regulatory requirements. Defendants, however, argue that a Form 483 is merely a form on which individual FDA inspectors record their "observations," and that a Form 483 is not tantamount to an FDA finding of regulatory violation. Defendants cite to Fujisawa Pharm. Co. v. Kapoor, 16 F. Supp. 2d 941 (N.D. Ill. 1998) in support of their argument that the issuance of a Form 483 is only "a preliminary step in an ongoing dialogue between a regulated company and the FDA." Specifically, in Kapoor, the court stated that

> Form 483s list observations made by an FDA inspector during an inspection of a plant. When a company receives a Form 483, it usually submits a written response to the FDA disputing or explaining the inspector's observations, or promising to correct the problem if the company agrees that

it exists. Ordinarily, if the FDA finds the company's response acceptable, the FDA will take no further action. If the FDA finds the company's response unacceptable, the FDA may take further action such as the issuance of a regulatory letter.

**\*19** Kapoor, 16 F. Supp. 2d at 943. As Plaintiffs point out, however, regardless of whether a Form 483 serves to initiate a dialogue between a company and the FDA, Kapoor does not hold that the issuance of a Form 483 is not an indication of FDA noncompliance. In fact, there is authority to the contrary —even from the same court that issued the Kapoor decision.

See Anderson v. Abbott Labs., 140 F. Supp. 2d 894, 900 (N.D. Ill. 2001) (stating that at the conclusion of an FDA inspection, the FDA served the defendant "with a Form 483, noting further regulatory violations"); Arla Labs., Inc. v. Am. Cyanamid Co., No. 92 C 2252, 1999 WL 160710, at \*2 (N.D. Ill. Mar. 11, 1999) (noting that after FDA inspection, the FDA issued observations in a Form 483 that "pertained to the conditions at Arla's plant, Arla's compliance with various regulations, and the competence of Arla's employees"); see also United States of America v. Barr Labs., Inc., 812 F. Supp. 458, 465-66 (D. N.J. 1993) ("After a compliance investigation, FDA inspectors must issue a Form 483 ... in which they record their observations about the firm's more serious ... violations."); United States of America v. Baxter Healthcare Corp., 901 F.2d 1401, 1415 (7th Cir. 1990) (Pell, J., dissenting) (stating that a Form 483 is the "FDA's method of informing the inspected facility of the agency's belief of a violative practice"); [36] Ex. 37 to Defs.' Mot. for Summ. J. at 3 (the FDA warning letter, issued to CryoLife on June 17, 2002 in the aftermath of this inspection, speaks of "[t]he specific violations noted in this letter and in the [Form] 483"). The court finds that in light of this authority, and in light of the fact that Kapoor does not expressly hold that receipt of a Form 483 is not equal to a finding of noncompliance with FDA regulations, there is a genuine issue of material fact as to the truth or falsity of CryoLife's assertion that it complied with all FDA regulatory requirements as of April 23, 2002.

Additionally, given that the Form 483 was issued to CryoLife on April 12, 2002, the court finds that there is a genuine issue of material fact as to whether CryoLife was severely reckless in asserting that it complied with all FDA regulatory requirements as of April 23, 2002. The court notes that the

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 103 of 330

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

April 23, 2002 press release does expressly mention the Form 483, but the press release dismisses the Form 483 as merely "a number of observations that do not encompass requirements for significant change to CryoLife." In light of the fact that observation number eleven in the Form 483 pertains to problems with CryoLife's tissue processing operations, and in light of the fact that CryoLife (in addressing the March 15, 2002 press release) argues in this very litigation that "scientific processing changes [can]not be made overnight and [first] ha[ve] to be examined" (i.e., such changes are significant), the court finds that the statement from the April 23, 2002 press release survives summary judgment.

g. May 2002 website posting (one statement)

In a May 2002 posting to its website, entitled "CryoLife Update: Donor Criteria and Processing Changes—May 2002" CryoLife asserted:

While CryoLife continues to work to validate a processing technology to sterilize allograft tissue while maintaining its tissue integrity, we are taking the following additional steps that may reduce the risk of orthopaedic allograft-associated bacterial infections as outlined in the [CDC's] MMWR dated March 15, 2002.

1. Warm ischemic time shall not exceed 15 hours unless the body is refrigerated within 12 hours. As in the past, under no circumstances will CryoLife accept donor tissue that has been recovered after 24 hours.

2. Prior to antimicrobial treatment, a microbiological sample of representative tissue shall be taken from each donor recovery site of orthopaedic tissue. The sample shall be incubated and tested for anaerobic microorganisms. Any resulting growth shall be identified. If any Clostridium is identified, all tissue processed from that donor recovery site will not be released for distribution.

 *20  3. Current inventory of tissue (both tissue available for distribution and tissue in quarantine) will be reviewed with regard to warm ischemic time and refrigeration time. Any tissue falling outside of the warm ischemic or refrigeration time described above will not be made available for distribution.

Ex. 34 to Defs.' Mot. for Summ. J. (emphasis added). Plaintiffs assert that this statement was false when made

because CryoLife did not implement pre-processing testing on orthopaedic tissues until after September 2002. Defendants do not contest that CryoLife had not implemented pre-processing testing in May 2002. [37] Instead, Defendants argue only that "the May 2002 representation stated only that such testing was a step that 'will be taken'; it did not say that such testing was already in place as of May 2002," and accordingly, the statement is "accurate and inactionable."

The court finds Defendants' argument in this regard to be emblematic of the manner in which a great deal of this case has been litigated: incorrect, a waste of time, and quite possibly worthy of sanctions. Despite Defendants' use of quotation marks around the phrase "will be taken," that phrase appears nowhere in the May 2002 "CryoLife Update." The court acknowledges that the second "additional step" states that "[p]rior to antimicrobial treatment, a microbiological sample of representative tissue shall be taken from each donor recovery site of orthopaedic tissue," but all three "additional steps" listed in the May 2002 "CryoLife Update" are unquestionably modified by the clause "we are taking," as one can see from the court's full reproduction of the statement, supra. Thus, at the very least, the May 2002 "CryoLife Update" implies that at that time, CryoLife had already commenced implementation of the "additional steps" listed therein. Defendants' argument that the May 2002 "CryoLife Update" "stated only that such pre-processing testing was a step that 'will be taken' " in the future is simply wrong. It is also a violation of Rule 11 of the Federal Rules of Civil Procedure. [38] See Fed. R. Civ. P. 11. The court accordingly rejects Defendants' sole argument as to why summary judgment is supposedly proper on this statement.

h. June 24, 2002 press release (four statements)

In the aftermath of the FDA's issuance of its Form 483 in April 2002, the FDA ultimately—on June 17, 2002—issued a warning letter to CryoLife. See Kapoor, 16 F. Supp. 2d at 943 ("If the FDA finds the company's response [to the issuance of a Form 483 to be] unacceptable, the FDA may take further action such as the issuance of a regulatory letter."). The June 17, 2002 warning letter essentially dovetails with the observations recorded in the April 12, 2002 Form 483.

 *21  In response to the June 17, 2002 warning letter, CryoLife issued a press release on June 24, 2002. Therein, CryoLife made four statements attacked by Plaintiffs in this case. The first statement at issue from the June 24,

2002 press release is CryoLife's assertion that "since its inception, [CryoLife had] never before received a warning letter [from the FDA]." Defendants apparently do not dispute the falsity of this statement. In 1997, Ideas for Medicine, Inc., a CryoLife subsidiary, received an FDA warning letter. According to Defendants, however, "[t]he record is clear ... that no one involved in the drafting of the June 24 press release remembered the earlier warning letter when drafting the June 24 press release." Defendants argue that "[a]t most, this was excusable neglect, which is not securities fraud."

The court disagrees with Defendants as to the supposed clarity of the record. Although the court acknowledges that Anderson and Vander Wyk aver in their affidavits that they "had previously been aware of the 1997 warning letter ... [but] did not recall it at the time of the June 24 press release," the court notes that Anderson testified in his deposition that the 1997 warning letter was sent directly to him as President and CEO of CryoLife. Dep. of Steven G. Anderson at 153-54. Given that summary judgment is generally inappropriate on scienter, and further given that the 1997 warning letter was sent directly to Anderson himself, the court finds that there is a genuine issue of material fact as to whether CryoLife's statement that it had "never before received a warning letter" was severely reckless when made. Anderson and Vander Wyk may certainly testify at trial that they did not recall the 1997 warning letter at the time they drafted the June 24, 2002 press release, but the jury is entitled to evaluate their credibility and reject their explanation.

Defendants also argue that this statement is inactionable because when it was made public, there was no market reaction. Specifically, on June 27, 2002, the *Wall Street Journal Online* reported CryoLife's receipt of the 1997 warning letter, and on July 5, 2002, CryoLife itself disclosed its receipt of the 1997 warning letter in a corrective press release. According to Defendants, because there was no market reaction on either June 27, 2002 or July 5, 2002, the statement is not actionable as a matter of law because Plaintiffs cannot show that the statement caused any loss.

See, e.g., 📁 Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) (plaintiff must show a substantial link between misrepresentation and investment's decline in value). According to Preston, however, the relevant price adjustment occurred on July 8, 2002, the first "full" trading day after CryoLife issued the corrective press release. Preston's opinion is that July 5, 2002 was only a half day of trading and that trading on that day was exceptionally light because the market had been closed on July 4, 2002 and July 5, 2002 preceded

a traditional holiday weekend. The court takes judicial notice that July 4, 2002 was a Thursday; that July 5, 2002 was a Friday; and that July 8, 2002 was a Monday.

Although the court reserves the right to revisit its decision after the Daubert hearing if necessary, the court at this time concludes that Preston's opinion in this regard is sufficient to create a genuine issue of material fact as to whether loss was caused by CryoLife's statement that it had never before received an FDA warning letter. Of course, should the court at the Daubert hearing ultimately exclude Preston from testifying as an expert, the court would likely find summary judgment for Defendants to be appropriate on this statement, given that Defendants' damages expert—whom Plaintiffs do not seek to exclude—is of the opinion that the relevant days of market observation are June 27, 2002 and July 5, 2002 rather than July 8, 2002. [39]

**\*22** The next statements at issue from the June 24, 2002 press release are CryoLife's assertions that (1) CryoLife "carefully considered the CDC's report of March 15, 2002 and adopted those recommendations which were scientifically useful and technically feasible," and (2) as of June 24, 2002, CryoLife had "either corrected the [FDA's] observations or will work closely with the FDA to correct them as soon as possible." [40] According to Plaintiffs, these statements were knowingly false when made because as of June 24, 2002, CryoLife had still not re-adopted pre-processing testing, despite the fact that CryoLife had previously engaged in pre-processing testing until 1997. Plaintiffs also point to the FDA's August recall of CryoLife's inventory as evidence of the falsity of the second statement, and on the question of scienter, Plaintiffs point to a May 15, 2002 letter from Vander Wyk to the FDA on behalf of CryoLife wherein CryoLife asserted "that the [FDA] has no legal authority to support many of the" observations in the Form 483 and further asserted that "the FDA has not yet established the legal basis for such an inspection." Plaintiffs' argument is essentially that if in the aftermath of the FDA's issuance of the Form 483 CryoLife was actively questioning the FDA's authority to support the observations, CryoLife cannot have sincerely addressed or intended to address the FDA's observations.

Defendants argue that it is "beyond dispute" that as of June 24, 2002 CryoLife was in good faith addressing certain of the FDA's observations and was working to address others. In support of their argument, Defendants cite the May 15, 2002 letter to the FDA as well as other correspondence between CryoLife and the FDA.

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 105 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8155579

First, the court notes that Defendants neglect to address the statement about the <u>CDC's</u> recommendations anywhere in their Motion for Summary Judgment or in their reply in support of their Motion for Summary Judgment, although interestingly, that fact did not stop Defendants from asserting, via a chart attached to their reply brief, that they <u>do</u> address the statement in several places. <u>See</u> Ex. 61 to Defs.' Reply in Support of Their Mot. for Summ. J. ("Exhibit 61"). In fact, Defendants' Exhibit 61 asserts that Defendants address CryoLife's statement about the CDC's recommendations at pages 22-23, 25-26, and 35-36 of their Motion for Summary Judgment and at pages 11-13 of their reply, but several of those pages contain no discussion about <u>either</u> CryoLife's statement that it was addressing the CDC's recommendations <u>or</u> CryoLife's statement that it was addressing the FDA's observations, and at best, the cited pages only contain discussion about CryoLife's response to the FDA's observations. Accordingly, CryoLife's statement that as of June 24, 2002 it had "carefully considered the CDC's report of March 15, 2002 and adopted those recommendations which were scientifically useful and technically feasible" remains in the case, and the court once again finds itself forced to direct the parties' attention to [Rule 11 of the Federal Rules of Civil Procedure](). Defendants' Exhibit 61 (at least with regard to "statement 25a") is inaccurate and misleading.

As for Defendants' argument that CryoLife was, as of June 24, 2002, in good faith addressing the <u>FDA's</u> observations as noted in the April Form 483 and the June warning letter, the court agrees with Plaintiffs that the FDA's August 2002 correspondence with CryoLife raises a genuine issue of material fact as to whether CryoLife had as of June 24, 2002 corrected or was "as soon as possible" going to correct the FDA's observations. The FDA's August 12, 2002 letter specifically states that CryoLife's May 15, 2002, June 25, 2002, and July 2, 2002 letters "do not adequately address most of the violations in the Warning Letter or ... the [Form] 483 observations not specifically mentioned in the Warning Letter." Additionally, on August 13, 2002, the FDA issued its recall order letter for CryoLife's vascular non-valved cardiac and orthopaedic tissue processed by CryoLife since October 3, 2001. In the recall letter, the FDA advised CryoLife that it was the FDA's "view that CryoLife has not promptly implemented appropriate corrective measures to address the serious deficiencies that have been brought to [CryoLife's] attention," including the "CDC's recommendations" and the FDA's observations. Moreover, in light of CryoLife's argument to the FDA that the FDA lacked authority to support

its observations, and further given the FDA's subsequent classification of CryoLife's letters of May 15, 2002, June 25, 2002, and July 2, 2002 as essentially unacceptable, the court also finds that there are genuine issues of material fact as to whether CryoLife was severely reckless in stating that as of June 24, 2002 it had "corrected the [FDA's] observations or will work closely with the FDA to correct them as soon as possible."

**\*23** The final statement at issue in the June 24, 2002 press release pertains to CryoLife's distribution of heart valves. Specifically, in its June 24, 2002 press release, CryoLife addressed reports of [endocarditis]() allegedly associated with two CryoLife-distributed heart valves, stating: "The ... FDA inspection at CryoLife, completed in April 2002, followed a report of two [allograft]() heart valve infections. Subsequently, CryoLife received pathology data from the implanting hospitals' own laboratories that clearly demonstrated that there was no evidence of infection in either valve." However, on July 5, 2002, CryoLife corrected the June 24, 2002 statement, stating that "subsequent communications" with the CDC revealed "signs of [fungal infection]() were isolated on a culture of the explanted [heart] valve." According to Defendants, the June 24, 2002 statement was true when made because—as Plaintiffs acknowledge—a cusp of the valve did in fact test negative for [fungal infection]() at the hospital and that report was sent to CryoLife. Additionally, Defendants argue that the CDC's <u>subsequent</u> disclosure to CryoLife that there was evidence of [fungal infection]() in the valves is not sufficient to render the June 24, 2002 statement false when made.

However, Plaintiffs argue that the June 24, 2002 statement was false when made, because (as reported in a July 6, 2002 <u>Wall Street Journal Online</u> article and discussed <u>supra</u> at Section III(B) ), Kainer can apparently testify that on March 22, 2002, the CDC provided CryoLife with "the relevant information" tending to show [fungal infection]() in the heart valve. In fact, the July 6, 2002 article reports that CryoLife confirmed to the CDC that it received the patient's operation report in March, and that report at least contained evidence of [fungal infection](). Given that Kainer can testify about information pertaining to the patient's [endocarditis]() that she allegedly provided to CryoLife on behalf of the CDC in March 2002, the court finds that there are genuine issues of material fact as to whether CryoLife's June 24, 2002 statement that the pathology data "<u>clearly</u> demonstrated that there was <u>no evidence</u> of infection" was knowingly false when made. <u>See also</u> Aug. 12, 2002 Letter from FDA to James Vander Wyk (stating that the CDC "has informed us that they

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 106 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

notified you on March 22, 2002 that test results from the hospital where the [heart] valve was implanted confirm that the recipient ... had acquired fungal endocarditis").

i. June 25, 2002 conference call (one statement)

On June 25, 2002, CryoLife conducted an analyst conference call in order to "discuss the issues associated with the [FDA's] warning letter" of June 17, 2002. Plaintiffs challenge one statement from the conference call as false when made; specifically, Vander Wyk's response to the question of whether any of the "current issues with the FDA ... could [adversely affect CryoLife's] inventory." Vander Wyk stated, in pertinent part:

> The inventory of tissue that we are holding for the procurement agencies, I am not aware is under suspicion at all. The FDA does, have, always, if you will, standard legal language in every warning letter that they ever issue that says that a company's operations are obviously at risk and there is always a potential for action on inventory, but that is if the issues are not resolved. CryoLife intends to resolve the issues, is capable of resolving the issues, and has made a commitment to do that. My opinion right now is that there is no reflection upon that current inventory.

As discussed supra at Section III(C)(1)(h) with regard to the June 24, 2002 press release, there are genuine issues of material fact as to whether CryoLife in late June in fact "intend[ed] to resolve the issues" raised by the FDA. More specifically, as acknowledged by Defendants in the June 25, 2002 conference call, the June 17, 2002 warning letter expressly advises CryoLife of the possibility of adverse action against its inventory: "You should take prompt action to correct these deviations. [The] FDA may take additional regulatory action without further informal notice, including, but not limited to, seizure, injunction, civil penalties, and/or an Order for Retention, Recall, and/or Destruction." Given that there are issues of material fact as to whether CryoLife intended to resolve the issues raised by the FDA in the Form 483 and the warning letter, and given the language

of the warning letter itself, there are genuine issues of material fact as to whether the June 25, 2002 statement that CryoLife's inventory was not under suspicion "at all" was false when made. Moreover, it is apparently undisputed that in January 2002 the CDC requested that CryoLife conduct testing of a portion of its inventory to determine whether the inventory contained additional contaminated tissues. Even accepting Defendants' argument that the CDC "lacked regulatory authority to order a recall of CryoLife's tissues," the court nevertheless disagrees with Defendants that the CDC's request in this regard thus "did not indicate likely future adverse action on the inventory." Given that the CDC and the FDA unquestionably worked closely together to investigate CryoLife in the aftermath of the Lykins incident, the CDC's January 2002 request that CryoLife conduct inventory testing, viewed in the light most favorable to Plaintiffs, is evidence that CryoLife's inventory was "under suspicion" for a recall in June 2002. See, e.g., Aug. 12, 2002 Letter from FDA to James Vander Wyk (stating that the CDC "has informed us that they notified you on March 22, 2002 that test results from the hospital where the [heart] valve was implanted confirm that the recipient ... had acquired fungal endocarditis"); Aug. 13, 2002 Letter from FDA to Steven G. Anderson (noting that the CDC and the FDA conducted a "joint inspection" of CryoLife in December 2001 and criticizing CryoLife for failing to implement CDC recommendations). The evidence that as of June 24, 2002, CryoLife may not have actually intended to address the FDA's observations, combined with the evidence tending to show that as early as January 2002 CryoLife may have been on notice of a possible threat to its inventory, also allows Plaintiffs to survive summary judgment on the question of scienter.[41]

*24 Finally, Defendants argue that the June 25, 2002 statement is not actionable because Defendants' disclosures made "the truth regarding the risk of a recall ... known to the market [such that] any alleged omission regarding such risk is inactionable." The court, however, rejects Defendants' argument. Defendants' disclosure of the "standard legal language" in FDA warning letters indeed conveyed to the market that a recall was possible. However (as discussed), there are genuine issues of material fact as to whether the statement was severely recklessly misleading by virtue the statement's omission of (a) CryoLife's arguable intent not to comply fully with the FDA's observations, despite its assertion directly to the contrary; and/or (b) the CDC's January 2002 request for an examination of CryoLife's inventory. Accordingly, "the truth regarding the risk of a

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8155579

recall" was not fully known to the market at the time of the June 25, 2002 statement, and the statement remains actionable.

j. July 23, 2002 conference call (two statements)

In a July 23, 2002 analyst conference call regarding second quarter earnings, CryoLife asserted that "the FDA observations are being addressed" and also asserted that it had implemented "pre-processing bacterial testing." Plaintiffs assert that these statements were knowingly false when made, arguing that deposition testimony from Heacox tends to show that CryoLife did not implement pre-processing testing until September 2002, and further arguing, as discussed supra, that in July 2002 CryoLife had neither addressed nor intended to address the FDA observations. Defendants argue that CryoLife actually implemented pre-processing testing by June 2002 and, as discussed, argue that CryoLife was imminently addressing or had addressed all FDA observations. The court need not decide which side has the better of the falsity and scienter arguments for the July 23, 2002 statements, however. More specifically, Defendants argue in their Motion for Summary Judgment that Preston (Plaintiffs' damages expert) is of the opinion that the July 23, 2002 statements actually decreased the percentage inflation of the CryoLife stock price, and that as a result, Plaintiffs cannot show that the July 23, 2002 statements caused any loss. Plaintiffs in response simply state that "evidence concerning the July 23, 2002 deceptions [is] admissible, even if no particular losses are attributed to them." However, Plaintiffs do not bother to show why any "particular losses" should be attributed to the July 23, 2002 statements, and as a result, summary judgment is appropriate thereon.[42] See 🚩 Theoharous, 256 F.3d at 1224.

k. August 14, 2002 press release (one statement)

In its August 14, 2002 press release, announcing receipt of the FDA recall order on August 13, 2002, CryoLife made the following statement: "The [CDC] made several recommendations to CryoLife, many of which were already included in [CryoLife's] procedures. Others were adopted well in advance of the FDA's order, including recommended refrigeration protocols, preprocessing microbiological cultures and tissue discard criteria." Plaintiffs assert that this statement was knowingly

false when made because CryoLife did not adopt the CDC's pre-processing or tissue discard recommendations until September 2002. As they did in defending the July 23, 2002 statements, Defendants argue that CryoLife actually implemented pre-processing testing by June 2002, such that the August 14, 2002 statement was factually accurate. In response, Plaintiffs point to Heacox's deposition testimony, wherein he testified that "the date that sits in [his] mind" for when CryoLife began to use a compulsory tissue discard list is September 2002.

Although Defendants argue that Heacox's testimony does not pertain to when CryoLife instituted pre-processing testing, that argument is irrelevant because Heacox's testimony unquestionably does pertain to the matter of when CryoLife implemented a compulsory tissue discard list. Specifically, though Heacox was not 100% certain of the date CryoLife commenced compulsory tissue discard, he testified that the "date that sits in [his] mind is the September [2002] date that I know of." Defendants argue that Heacox "could not recall" when CryoLife instituted tissue discard, but the transcript of Heacox's testimony clearly indicates that, to the best of his recollection, such discard occurred in September 2002. This is sufficient to raise a genuine issue of material fact as to the falsity of CryoLife's August 14, 2002 statement that "well in advance" of that date it had adopted the CDC's tissue discard criteria. Additionally, the court finds that there are genuine issues of material fact as to whether this statement was made with severe recklessness, given that CryoLife was unquestionably aware of the CDC's recommendations in one form or another for several months by August 14, 2002.

l. 2000 and 2001 Form 10-Ks

**\*25** Finally, Plaintiffs challenge statements made by CryoLife in its 2000 and 2001 Annual Report on Form 10-Ks ("Form 10-Ks"). A company's Form 10-K, filed with the SEC, is intended to provide a comprehensive overview of the company's business and financial condition. CryoLife's 2000 Form 10-K was filed with the SEC on April 2, 2001. CryoLife's 2001 Form 10-K was filed with the SEC on March 29, 2002.

Although Plaintiffs reproduce massive sections of each of CryoLife's Form 10-Ks in the Complaint, the upshot of Plaintiffs' claim is that CryoLife misleadingly asserted in its Form 10-Ks that it was in compliance with FDA regulations. According to Plaintiffs, those statements are

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 108 of 330

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

"false and misleading because the FDA confirmed CryoLife's regulatory violations during inspections in 1998, 1999, 2001 and 2002." [43] Plaintiffs argue that because the FDA's April 2002 Form 483, June 2002 warning letter, and August 2002 recall letter all discuss past noncompliance by CryoLife that existed at the time the 2000 and 2001 Form 10-Ks were filed, there is a genuine issue of fact as to whether the statements at issue in the 2000 and 2001 Form 10-Ks were false when made.

Even accepting Plaintiffs' contention that there is a genuine issue of material fact as to the truth or falsity of the statements in the Form 10-Ks, the court finds that Plaintiffs fail to demonstrate a genuine issue of material fact that the allegedly misleading statements in the Form 10-Ks were made with severe recklessness. Specifically, Plaintiffs do not persuasively address the fact that the Form 10-Ks were both filed with the SEC prior to the FDA's issuance of the Form 483, the warning letter, and the recall letter. [44] Although those documents arguably show that CryoLife's assertions of regulatory compliance in April 2001 and March 2002 were inaccurate, the court fails to see how those documents also show that CryoLife was severely reckless to assert regulatory compliance in April 2001 and March 2002. As of those dates, it is undisputed that CryoLife had not received a Form 483 since 1999. Although the FDA inspected CryoLife in December 2001, no Form 483 was issued in the aftermath of that inspection. The FDA issued no Form 483 until April 2002. Accordingly, summary judgment is appropriate on the statements in CryoLife's Form 10-Ks.

### m. Motive and opportunity evidence of scienter

The court at this time makes no finding as to the viability of Plaintiffs' motive and opportunity evidence. Plaintiffs have adduced sufficient evidence of scienter to survive summary judgment where noted by the court, and Plaintiffs have adduced insufficient evidence of scienter to survive summary judgment (even if they had the benefit of motive and opportunity evidence) where the court has granted summary judgment on that basis. See Bryant, 187 F.3d at 1285-86.

### n. Loss causation

Finally, the court addresses Defendants' loss causation argument. As recently explained by the Supreme Court,

loss causation is "a causal connection between the material misrepresentation[s] and the loss." Dura Pharms., Inc. v. Broudo, 125 S. Ct. 1627, 1631 (2005). In Dura, the Supreme Court rejected the Ninth Circuit's conclusion that a securities fraud plaintiff only need establish that the price of the stock at issue was " 'on the date of purchase ... inflated because of the misrepresentation.' " Id. (citation omitted). A securities fraud plaintiff must show that the stock price dropped "after the truth became known" and that the drop in stock price (i.e., the plaintiff's loss) was caused by the untruth. Id. at 1634. An artificially inflated purchase price "may prove to be a necessary condition of any such loss," so that the "misrepresentation ... 'touches upon' [the] later economic loss." Id. at 1632. But "[t]o 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." Id.

**\*26** In addition to seeking to exclude Preston's testimony on the various bases that will be addressed at the Daubert hearing, Defendants also argue that Preston's analysis improperly finds loss causation where the alleged misrepresentations only "touch upon" Plaintiffs' loss. [45] However, Preston's rebuttal expert report reflects Preston's opinion that the alleged misstatements and the disclosures thereof "more than 'touch[ ] upon' the causes of investors' losses." Moreover, Preston's deposition testimony and expert reports indicate that she will testify (if she otherwise qualifies) simply that the alleged misstatements "caused" Plaintiffs' loss. Preston does not purport to (and, in fact, will not be permitted to) opine that loss causation is present in this case merely because Defendants' misrepresentations "touch upon" investors' losses.

As for loss causation generally, it appears otherwise undisputed that if Preston qualifies as an expert at the Daubert hearing, her opinions provide Plaintiffs with sufficient evidence of loss causation to survive summary judgment. According to Defendants' final brief on the issue:

> To be sure, Ms. Preston appears to be of the opinion that some misstatements or omissions caused loss, and she so stated various times in her reports and her depositions. The problem is that Plaintiffs ... have not shown that Ms. Preston's opinions in this regard [meet

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 109 of 330

In re CryoLife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

the requirements of] Federal Rule of Evidence 702 [and] Daubert.

Defs.' Resp. to Pls.' Mot. for Leave to File Supplemental Br. to Address Intervening Supreme Ct. Authority at 2. Accordingly, although the court is willing to revisit the question of loss causation should Preston ultimately not qualify as an expert, at this time, summary judgment is not appropriate thereon. [46]

### 2. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs themselves seek summary judgment on several other allegedly misleading statements made by Defendants. Specifically, Plaintiffs ask the court to grant them summary judgment on statements allegedly made in CryoLife's March 15, 2002 conference call (and reduced to writing in CryoLife's March 2002 "CryoLife Update"); a statement from the April 23, 2002 press release; and a statement from an April 24, 2002 conference call. [47] However, because essentially none of the statements upon which Plaintiffs seek summary judgment are in the Complaint, summary judgment for Plaintiffs is inappropriate on those statements. Indeed, Plaintiffs are precluded from recovering on any statements not pled in the Complaint.

**\*27** The Private Securities Litigation Reform Act of 1995 ("PSLRA") "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " 🔖 Dura, 125 S. Ct. at 1633 (citing the PSLRA, 15 U.S.C. §§ 78u-4(b)(1), (2) ) (emphasis added). This requirement is well-settled, and as illustrated by the Supreme Court's use of the word "insists," it is non-negotiable. See also 🔖 Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004) ("The statute states that the complaint 'shall specify each statement alleged to have been misleading....' ") (emphasis added); 🔖 Anderson, 140 F. Supp. 2d at 903-04 (holding that because statements in securities fraud class action "were not pled" in Complaint, the court "need not discuss them" and further holding that under the PSLRA, "plaintiffs must, at the very least, identify which

statement is made misleading by defendants' omission. Their failure to do so is fatal to those claims").

Plaintiffs assert that "[a]ll of the alleged false statements [on which they move for summary judgment] pertain to" issues raised in the Complaint, such as CryoLife's tissue processing procedures and the government investigation of CryoLife, but that is not the point. The statements themselves are not in the Complaint, and that is unquestionably required for recovery under the PSLRA. Plaintiffs' argument that "Defendants have been on notice of all of the statements that are the subject of Plaintiffs' Motion [for Partial Summary Judgment] for many months" is unavailing for the same reason. The PSLRA requires that for a statement to be actionable, it must be pled in the Complaint. In light of the fact that Plaintiffs' attorneys purportedly specialize in securities fraud cases, Plaintiffs' Motion for Partial Summary Judgment (beyond the one statement from the June 25, 2002 conference call that is in the Complaint) thus borders on the frivolous. [48] Plaintiffs' Motion for Partial Summary Judgment is thus DENIED. [49]

### IV. Summary

And thus, over eighty pages after it began, the court has addressed each and every motion currently pending on the docket in this case. To recap: Plaintiffs' Advice of Counsel Motion to Compel [Doc. No. 135] is DENIED, with Plaintiffs to pay Defendants' reasonable attorney's fees and costs incurred in responding to the Motion. Plaintiffs' Motion to Compel Documents from Experts [Doc. Nos. 165 and 168] is DENIED. Defendants' Motion for Daubert Hearing [Doc. No. 150] is GRANTED. The Daubert hearing is scheduled for Tuesday, June 28, 2005 and Wednesday, June 29, 2005. [50]

Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity [Doc. No. 151] is GRANTED IN PART AND DENIED IN PART, without prejudice to Defendants' right to later move in limine to exclude from evidence alleged misstatements that are not in the Complaint but that Plaintiffs might seek to introduce into evidence on the question of scienter. The court defers ruling on Defendants' Motion to Exclude Kainer [Doc. No. 152], Defendants' Motion to Exclude Doppelt and Eastlund [Doc. No. 153], Plaintiffs' Motion to Exclude Trainor [Doc. No. 182], Defendants' Motion to Exclude Preston [Doc. No. 184], and Plaintiffs' Motion to Exclude Benson [Doc. No. 230] until the Daubert hearing, except as otherwise noted herein. Additionally, for purposes of docket maintenance, Defendants' Motion to

Case 4:24-cv-01940 Document 45-2 Filed on 03/14/25 in TXSD Page 110 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

Exclude Kainer [Doc. No. 163] and Plaintiffs' Motion to Exclude Trainor [Doc. No. 181] are DENIED.

**\*28** Defendants' Motion to Amend the Scheduling Order [Doc. No. 149] is DENIED AS MOOT. The parties' Joint Motion to Extend Page Limits for Summary Judgment Briefing [Doc. No. 172] is GRANTED. Defendants' Motion for Oral Argument [Doc. No. 195] is DENIED. Defendants' Motion to File Under Seal [Doc. No. 196] is GRANTED. Plaintiffs' Motion for Leave to File Supplemental Brief to Address Intervening Supreme Court Authority [Doc. No. 231] and Plaintiffs' Motion for Leave to File Supplemental Brief to Address Intervening Eleventh Circuit Authority [Doc. No. 232] are GRANTED.

Finally, for the foregoing reasons and in the manner described herein, Defendants' Motion for Summary Judgment [Doc. No. 194] is GRANTED IN PART AND DENIED IN PART, and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 197] is DENIED. The parties' consolidated pretrial order is due within twenty (20) days after the court's <u>Daubert</u> rulings, and <u>no extensions will be granted</u>. (That deadline is "set in stone.")

IT IS SO ORDERED, this 17th day of June, 2005.

**All Citations**

Not Reported in Fed. Supp., 2005 WL 8155579

---

## Footnotes

[1]    Apparently due to issues arising out of filing the documents under seal, Plaintiffs' Motion to Compel Documents from Experts appears twice on the court's docket. The same is true of Defendants' "Motion to Exclude Expert Opinions of Plaintiffs' Expert, Dr. Marion Kainer" [Doc. Nos. 153 and 163] and Plaintiffs' "Motion to Exclude Opinions of Defendants' Expert Lance D. Trainor, M.D." [Doc. Nos. 181 and 182].

[2]    Defendants' Motion to Amend the Scheduling Order is DENIED AS MOOT, because Defendants filed their Motion for Summary Judgment on March 11, 2005 in compliance with the court's Scheduling Order of October 14, 2004 (the "October 14 Scheduling Order"). However, the court would be remiss if it did not note that its October 14 Scheduling Order <u>expressly stated</u> that the deadlines therein were "set in stone, and shall not be extended." Order of October 14, 2004 at 3. Even given some of the remarkably improper arguments made by both parties throughout this litigation (<u>see infra</u>), the court will not accept that its October 14 Scheduling Order was somehow unclear in this regard. Defendants' insistence on filing their Motion to Amend the Scheduling Order, however well-intentioned, is illustrative of both parties' ongoing disregard of this court's obligation to manage the litigation before it. It is the court's view that if the court's deadlines and rules had been more closely followed by the parties, this case (one out of 195 civil cases) would not be solely responsible for over 10% of the court's current pending civil motions list.

[3]    The parties' Joint Motion to Extend Page Limits for Summary Judgment Briefing is GRANTED.

[4]    Defendants' Motion for Oral Argument is DENIED. As a general matter, motions are "decided by the court without oral hearing." L.R. 7.1(E), N.D. Ga. Additionally, given the mass of filings in this case and the thousands of pages of documents in the record, the court finds it difficult to imagine that the parties have anything else relevant to say.

[5]    Defendants' Motion to File Under Seal is GRANTED.

[6]    Plaintiffs' Motion for Leave to File Supplemental Brief to Address Intervening Supreme Court Authority is GRANTED.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 111 of 330
In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)
2005 WL 8155579

7    Plaintiffs' Motion for Leave to File Supplemental Brief to Address Intervening Eleventh Circuit Authority is GRANTED.

8    The court acknowledges that Plaintiffs' Motion for Partial Summary Judgment purports to have been filed on March 11, 2005. See Pls.' Mot. for Partial Summ. J. at 35 ("Respectfully submitted this 11th day of March 2005."). Nevertheless, the Clerk of the Court's file stamp reflects that Plaintiffs' Motion was filed with the court on March 14, 2005, and the court's docket reflects the same. Although the Federal Rules of Civil Procedure do provide a three-day time extension for a party who "is required to do some act or take some proceedings within a prescribed period" after the party is served by the opposing party, that extension is not applicable here because Plaintiffs were not taking action "after the service of [any] notice or other paper [by the opposing party] ... under Rule 5(b)(2)(B), (C), or (D)." Fed. R. Civ. P. 6(e). Accordingly, Plaintiffs' Motion for Partial Summary Judgment was to be filed with the court on or before March 11, 2005, and the court finds that it was not so filed. See Order of October 14, 2004 at 2.

9    The partieshadlong-since commenced expert discovery and themselves proposed the initial October 11, 2004 designation deadline; accordingly, the court accepted the October 11, 2004 deadline despite entering the Scheduling Order on October 14, 2004.

10   In actuality, the latest possible date of "service of the disclosure or discovery response upon which the objection is based" is December 27, 2004, the date upon which Defendants served Plaintiffs with the allegedly deficient responses to the second set of subpoenas directed to Nolte and Trainor. L.R. 37.1(B), N.D. Ga. (emphasis added).

11   Because the court supposes that Plaintiffs might have thought that the relevant date of "service" implicated by Local Rule 37.1(B) was actually February 9, 2005, the court will not require Plaintiffs to pay Defendants' attorney's fees and costs incurred in responding to Plaintiffs' Motionto Compel Documents from Experts. The court, however, rejects the notion that the relevant date of "service" here could have been February 9, 2005. Although Defendants hand-delivered a letter to Plaintiffs on February 9, 2005 that apparently concluded the parties' month-long attempt to resolve this discovery dispute in good faith, the letter is irrelevant for purposes of Local Rule 37.1(B). See supra note 10. While the court appreciates Plaintiffs' attempts to resolve this dispute without immediately involving the court, once those efforts proved unsuccessful, Plaintiffs were required to file any motion to compel arising out of the discovery dispute prior to the close of the relevant discovery period.

12   The court notes that the remaining version of Defendants' Motion to Exclude Kainer [Doc. No. 152] is missing two pages (pages 10 and 16). As those two pages are available in full to the court in the redacted version of Defendants' Motion to Exclude Kainer [Doc. No. 163], the court will simply refer to pages 10 and 16 of the redacted version of Defendants' Motion if and when it is necessary.

13   The court nevertheless acknowledges Plaintiffs' point that Defendants incorrectly assert that twenty-six of the thirty statements at issue were not pled in the Complaint. In actuality, twenty-three of the thirty statements were not pled in the Complaint. Specifically, referencing Exhibit A to Defendants' Motion, the court notes that the statements from the "[1]2/7 press release," the "1/29 press release," and the "May 2002 White Paper" are asserted to be false and misleading in Plaintiffs' Complaint, despite Defendants' claim to the contrary. In fact, Defendants move for summary judgment on those statements, and in their Motion for Summary Judgment, Defendants acknowledge that those statements are included in Plaintiffs' Complaint. Yet Defendants' reply brief in support of their Motionto Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity does not address the complete inaccuracy of Defendants' Exhibit A in this regard. Perhaps if this were the only occurrence of such distortion of the record in this case, the court might not be so concerned. Unfortunately, as detailed infra, it is not the only such occurrence. See generally Fed. R. Civ. P. 11.

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 112 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

14    The court finds these two assertions by Plaintiffs to be extremely noteworthy, as Plaintiffs' Motion for Partial Summary Judgment seeks summary judgment on several statements that <u>are not pled in the Complaint</u>, including, by the court's count, at least four statements that Defendants attack in their Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity. Although the court defers the question of whether or not evidence of the (non-pled) allegedly false statements is <u>admissible</u> under <u>Federal Rule of Evidence 404(b)</u> in order to show Defendants' alleged fraud, the court—both for the alleged misstatements attacked in Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity and for the alleged misstatements that are the subject of Plaintiffs' Motion for Partial Summary Judgment—will hold Plaintiffs to their assertion that they "are not attempting to amend the Complaint." <u>See also</u> <u>15 U.S.C. § 78u-4(b)</u>; <u>Fed. R. Civ. P. 15</u>; discussion infra at Section III(C)(2).

15    Accordingly, although Defendants' Motion is DENIED IN PART, such denial is WITHOUT PREJUDICE as to Defendants' right to seek (at the appropriate time) a pre-trial ruling on the admissibility of alleged misstatements that are not included in the Complaint.

16    The court makes no finding as to the admissibility of this statement. Plaintiffs will not be permitted to recover on this statement, as it is not pled in the Complaint. The court merely cites the statement as an example of how Plaintiffs' experts' testimony on the truth or falsity of certain statements might be helpful to the jury, as a general proposition.

17    During the relevant time period, CryoLife apparently soaked its donors in a "antimicrobial cocktail" (immersing the tissue in an antibiotic mixture) as part of its tissue processing procedures. According to Plaintiffs, the antimicrobial cocktail is not effective against spore-forming organisms such as *clostridium.*

18    The court makes no finding in this regard at this time, instead electing to wait until the <u>Daubert</u> hearing. However, the court notes that Kainer was an Epidemic Intelligence Service Officer with the CDC for two years; spearheaded a lengthy CDC investigation of CryoLife upon Lykins' death; and is the co-author of a <u>New England Journal of Medicine</u> article discussing a study that concluded that the risk of infection from CryoLife tissue vis-a-vis its competitors' tissue was significantly higher due to CryoLife's processing methods.

19    The court notes that Plaintiffs assert that they "have not and will not offer Kainer, Doppelt, and Eastlund to testify about any legal conclusions as to liability."

20    The court gathers that there are different types of *clostridium* bacteria, including *clostridium sordellii* and *clostridium septicum.* It appears undisputed that Lykins died of a *clostridium sordellii* infection. As far as the court can tell, the parties have failed to explain the distinction between these different types of *clostridium* (beyond Defendants' unsupported assertion in their Motion for Summary Judgment that *clostridium sordellii* is "an entirely different species" from *clostridium septicum* ). <u>See</u> <u>infra</u> at Section III(C)(1)(a).

21    The court takes judicial notice that <u>endocarditis</u> is "aninfection of the inner lining of the heart or its valves ... usually caused by bacteria and ... more likely to occur in people who have heart valve defects or have had heart surgery to treat valve disease." <u>Heart Disease</u>: Glossary of Terms, *Web*MD*Health* (Charlotte E. Grayson, M.D. ed. June 2004), at http://mywebmd.com/content/pages/9/1675_57847.

22    Defendants' <u>Daubert</u>-based challenges to Kainer's testimony raised in Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity are DENIED. The court will not accept two separate <u>Daubert</u> motions attacking the same witness and thereby permit an end run around the court's Local Rules governing the length of briefs.

23    The court recognizes that Defendants, in passing, make certain other arguments for summary judgment. First, Defendants argue generally at the beginning of their Motion that summary judgment is proper because "[t]he allegedly omitted facts were already known to the market." However, Defendants point to only a few specific

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

misstatements that were allegedly known to the market prior to their disclosure. The court will address those statements where applicable. Second, Defendants argue in a footnote that Plaintiffs have failed to carry "their burden of demonstrating that each of the individual Defendants was involved in the dissemination of allegedly false or misleading statements ... especially ... Dr. Heacox." The court disagrees, as Dr. Heacox himself testified that he would generally review some edits of press releases pertaining to laboratory operations prior to their release, and several of the statements at issue in the Complaint pertain to CryoLife's laboratory operations. Additionally, the court rejects Defendants' vague and unspecific argument that Plaintiffs have failed to demonstrate that the other individual Defendants were involved in disseminating the allegedly false or misleading statements. "[I]t is the movant's responsibility—not the Court's—to search the record and identify those portions which support the motion for summary judgment." Anderson v. Raddison Hotel Corp., 834 F. Supp. 1364, 1369 n.3 (S.D. Ga. 1993). Finally, Defendants argue that they are entitled to summary judgment on the 🚩 Section 20(a) claims because Plaintiffs cannot prove a primary violation by CryoLife (i.e., because Plaintiffs' Rule 10b-5 claims fail). Thus, if the court concludes that any primary violation claim against CryoLife survives summary judgment, the 🚩 Section 20(a) claim will survive summary judgment as well.

24   In 📁⚠ Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

25   Finally, the court briefly addresses Defendants' argument that Plaintiffs' evidence that CryoLife tissue was subject to ninety-six voluntary recalls over three years was "overstated," and that, at any rate, the FDA published all voluntary recalls so that such information was already known to the market. Because the court did not rely on Plaintiffs' purported evidence of CryoLife's voluntary recalls in evaluating CryoLife's statement that CryoLife's "processing protocols in its clean-room environment assure the highest standard of quality control," the court need not rule on the merits of Defendants' arguments at this time. Moreover, even if the market was aware of CryoLife's voluntary recalls on December 7, 2001, the court is not certain that awareness would necessarily include an awareness that CryoLife's processing protocols did not in fact assure the highest standard of quality control.

26   According to the FDA's website, "MAUDE data represents reports of adverse events involving medical devices." Manufacturer and User Facility Device Experience Database, at http://www.fda.gov/cdrh/maude.html.

27   The court takes judicial notice that an allograft is "a transplanted organ or tissue from a genetically non-identical member of the same species. Most human tissue and organ transplants are allografts." Allograft, Wikipedia: The Free Encyclopedia, at http://en.wikipedia.org/wiki/Allograft.

28   In fact, the court notes that CryoLife's own "CryoLife Update" newsletter from May 2002—in which CryoLife outlined steps that it was "taking" to "reduce the risk of orthopaedic allograft-associated bacterial infections"—does not differentiate between different types of clostridium, and instead states that CryoLife would not release tissue for distribution "[i]f any Clostridium [was] identified...." Ex. 33 to Defs.' Mot. for Summ. J. (emphasis added).

29   Throughout Section III(C)(1), the court may state that various statements "survive summary judgment," or words to that effect. The court implies no ruling on the loss causation issue when it states that a particular statement "survives summary judgment"; rather, the court simply means that Defendants' challenges to the statement on falsity and scienter grounds fail for summary judgment purposes.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 114 of 330

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

30    Additionally, the court again notes that although Defendants assert that there is a meaningful distinction between *clostridium sordellii* and other types of *clostridium*, Defendants cite no record evidence in support of this proposition. See Anderson, 834 F. Supp. at 1369 n.3; see also supra note 20.

31    Additionally, the court notes that if Kainer qualifies as an expert at the Daubert hearing, it is her opinion that the ordinary treatment time for a post-operative septic knee infection is six weeks, such that a patient first treated for such an infection on November 21, 2001 would ordinarily not have even completed treatment until on orabout January 2, 2002 (to say nothing of when that patient might have fully recovered).

32    For this reason, the court need not address Defendants' argument that this statement is not actionable because there was in fact "no evidence of *Clostridium sordellii* infection" in the other recipients of Lykins donor tissue. However, the court notes that septic arthritis is apparently consistent with a *clostridium sordellii* infection, such that it was arguably misleading for CryoLife to state that there was "no evidence" of a *clostridium sordellii* infection. CryoLife was on notice by December 3, 2001 that one of the recipients of Lykins donor tissue had contracted septic arthritis. Regardless, because there are genuine issues of material fact as to whether the other recipients of tissue from the Lykins donor were all "doing well" as of December 14, 2001, this statement survives summary judgment.

33    The court's finding in this regard is limited to Defendants' argument that this specific statement is inactionable because Preston supposedly testified that the statement caused no loss. The court draws no conclusions at this time regarding the general admissibility of Preston's testimony.

34    This statement is essentially identical to the companion "doing well" statements in the December 7, 2001 and December 14, 2001 press releases, but the court notes that Plaintiffs do not appear to expressly plead this statement in the Complaint. Given the court's general holding infra that Plaintiffs cannot recover on statements not pled in the Complaint, the court would under ordinary circumstances hold that this statement is thus out of the case. However, the parties appear to agree that this statement was properly pled by Plaintiffs, as Defendants move for summary judgment on the statement and also assert that their Motion for Summary Judgment addresses only those claims actually pled by Plaintiffs. Accordingly, the court will proceed as though this statement appears in the Complaint.

35    Similarly, although Defendants conclusorily argue in their reply that "any alleged misstatements omissions [sic] by Defendants with respect to the CDC recommendations were immaterial and caused no loss," Defendants did not raise this point in their Motion for Summary Judgment and accordingly the court does not address it beyond the court's discussion of Defendants' general loss causation argument infra.

36    The court nevertheless observes that Plaintiffs incorrectly and improperly classify Baxter Healthcare Corp. as a case in which the "Seventh Circuit noted" that a Form 483 is the "FDA's method of informing the inspected facility of the agency's belief of a violative practice." Baxter Healthcare Corp., 901 F.2d at 1415. The quoted language is from the dissent of Senior Circuit Judge Pell and does not constitute any type of observation or holding of the "Seventh Circuit." The court once again directs the parties' attention to Rule 11 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 11.

37    The court acknowledges that Defendants assert elsewhere that CryoLife implemented such testing as of June 3, 2002; however, the point for this statement is that Defendants do not dispute that such testing was not in place when the May 2002 "CryoLife Update" was published.

38    The court notes that despite the fact that Plaintiffs raise the argument adopted by the court herein in their opposition to Defendants' Motion for Summary Judgment, Defendants do not even address the point in their reply brief. The court is not certain whether this should be taken as an indication that Defendants inadvertently made their "will be taken" argument in their Motion for Summary Judgment and now waive

In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)

2005 WL 8155579

the point, or whether Defendants, having been caught red-handed in an <u>intentional</u> misrepresentation of the record, choose to simply hide behind their silence. Either way, Defendants' conduct is unacceptable.

<u>39</u>   The court notes, however, that Preston has apparently been permitted to testify as an expert witness on damages issues in securities law cases in several other federal courts. <u>See</u> Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude Preston at 6-7 and <u>infra</u> note 45.

<u>40</u>   The court was unable to locate the second of these statements in the Complaint. However, Defendants treat the statement as properly pled, and the court will accordingly follow suit. <u>See supra</u> note 34.

<u>41</u>   The court acknowledges that Wells (Plaintiffs' own regulatory expert) was unwilling to testify that Defendants should have known that a recall was "likely," instead only testifying that Defendants should have known that a recall was "possible." This is evidence tending to show that Defendants were <u>not</u> severely reckless in asserting that CryoLife's inventory was not under suspicion in June 2002; however, it is for the jury to determine which evidence is more persuasive on the question of scienter. <u>See, e.g.</u>, 📙<u>Sammons, 967 F.2d at 1545</u>. For these same reasons, Plaintiffs' Motion for Partial Summary Judgment on this statement is DENIED. <u>See</u> <u>infra</u> at Section III(C)(2).

<u>42</u>   As discussed <u>supra</u>, the court does not at this time decide the question of whether evidence of other alleged misstatements is admissible for the purpose of proving fraud.

<u>43</u>   The court notes that although Plaintiffs also assert that the Form 10-Ks misleadingly state that CryoLife was "inspected by the FDA and four states," Plaintiffs point to no evidence in support of that allegation, and accordingly summary judgment is proper thereon.

<u>44</u>   Indeed, the court notes that the 2000 Form 10-K was filed well in advance of the Lykins incident.

<u>45</u>   The court notes that Plaintiffs inconsistently (and improperly) argue for and against the "touch upon" theory of causation. <u>Compare</u> Pls. Mot. for Partial Summ. J. at 20 ("To demonstrate loss causation, 'plaintiff must show that the misrepresentation touches upon the reasons for the investment's decline in value.' ") (citation and internal quotation marks omitted); <u>with</u> Pls.' Supplemental Mem. of Law to Address Intervening Supreme Ct. Authority at 2 n.1 ("Defendants claim that 'Plaintiffs have [mis]read [Eleventh Circuit case law] to permit proof of loss causation through evidence that an alleged misstated or omitted fact touches upon the subject matter of a later disclosure that precedes a stock drop.' Plaintiffs have done no such thing, having altogether omitted any 'touches upon' analysis from their Opposition.") (citation and internal quotation marks omitted). Regardless, <u>Dura</u> clarifies that a misrepresentation must do <u>more</u> than "touch upon" a plaintiffs' loss.

<u>46</u>   The court again notes with some interest, however, that Preston has been permitted to testify as an expert witness in front of several other federal courts, including at least once on behalf of the SEC. <u>See</u> Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude Preston at 6-7. The court also notes that, although the parties have not briefed the question, some courts have apparently reserved the issue of causation for a separate hearing after a finding that the other elements are present. <u>See</u> 4 Alan R. Bromberg & Lewis D.Lowenfels, <u>Securities Fraud and Commodities Fraud</u> § 7:499 (2d ed. 2004) ("Such a procedure ... helps to promote settlement and avoid confusion of the different possible functions of causation.").

<u>47</u>   Plaintiffs also seek summary judgment on CryoLife's June 25, 2002 assertion in an investor conference call that its inventory was not under FDA suspicion at that time. As discussed <u>supra</u> at note 41, Plaintiffs' Motion for Partial Summary Judgment on this statement is DENIED because there are genuine issues of material fact on the issue of whether the statement was made with the requisite level of scienter.

**In re Cryolife, Inc. Securities Litigation, Not Reported in Fed. Supp. (2005)**

2005 WL 8155579

48    The court additionally finds Plaintiffs' Motion for Partial Summary Judgment to be particularly improper in light of the assurances Plaintiffs made to the court in their response to Defendants' Motion to Exclude Plaintiffs' Experts' Opinions as to Truth or Falsity. See supra note 14 and accompanying text.

49    Finally, beyond the substantive failures of Plaintiffs' Motion for Partial Summary Judgment, the court also denies the Motion on the grounds that it is untimely. See supra note 8. For future reference, in case there was any confusion, the court advises the parties that when a deadline is "set in stone," that means it is non-negotiable.

50    In light of the parties' dispute about the necessity for a Daubert hearing, the court is reluctantly willing to revisit the scheduling of the hearing prior to its actual commencement, via teleconference with the parties.

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.   Pl. Appx. B-111    29

# TAB No. 9

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 118 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

2015 WL 6039690

Editor's Note: Additions are indicated by Text and deletions by Text .

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

IN RE FISKER AUTOMOTIVE HOLDINGS,
INC. SHAREHOLDER LITIGATION

Civ. No. 13-2100-SLR
|
Signed October 15, 2015

**Attorneys and Law Firms**

Norman M. Monhait, Esquire and P. Bradford deLeeuw, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Kurt Olsen, Esquire of Klafter Olsen & Lesser LLP and Todd S. Collins, Esquire and Barbara A. Podell, Esquire of Berger & Montague, P.C.

M. Duncan Grant, Esquire and Christopher B. Chuff, Esquire of Pepper Hamilton LLP, Wilmington, Delaware. Counsel for Defendant Keith Daubenspeck. Of Counsel: Min Choi, Esquire of Pepper Hamilton LLP.

Vernon R. Proctor, Esquire of Proctor Heyman Enerio LLP, Wilmington, Delaware. Counsel for Defendant Peter McDonnell. Of Counsel: Steven J. Rosenberg, Esquire of Steven J. Rosenberg, P.C.

William B. Chandler III, Esquire and Ian R. Liston, Esquire of Wilson Sonsini Goodrich & Rosati, P.C., Wilmington, Delaware. Counsel for Defendants Henrik Fisker and Bernhard Koehler. Of Counsel: David J. Berger, Esquire and Steven Guggenheim, Esquire of Wilson Sonsini Goodrich & Rosati, P.C.

J. Clayton Athey, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware. Counsel for Defendant Joe DaMour. Of Counsel: Peter M. Stone, Esquire and Panteha Abdollahi, Esquire of Paul Hastings LLP.

Samuel A. Nolen, Esquire and Katharine C. Lester, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendants Richard Li Tzar Kai and Ace Strength Ltd. Of Counsel: Glenn M. Kurtz, Esquire, Douglas P.

Baumstein, Esquire, and Kimberly A. Haviv, Esquire of White & Case LLP.

Kenneth J. Nachbar, Esquire and Lindsay M. Kwoka, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendants Kleiner Perkins Caufield & Byers LLC and Ray Lane. Of Counsel: Michael D. Celia, Esquire, Laurie Carr Mims, Esquire, and Sophie A. Hood, Esquire of Keker & Van Nest LLP.

**\* \* REVISED MEMORANDUM OPINION \* \***

ROBINSON, District Judge

**I. INTRODUCTION**

 **\*1** By an order dated June 30, 2014, the court consolidated three securities fraud lawsuits filed against defendants Henrik Fisker, Bernhard Koehler, Joe DaMour, Peter McDonnell, Kleiner Perkins Caufield & Byers LLC, Ray Lane, Keith Daubenspeck, Richard Li Tzar Kai, and Ace Strength, Ltd. (collectively "defendants"). [1] (D.I. 23) On July 23, 2014, plaintiffs [2] filed an amended consolidated complaint ("complaint") alleging violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). (D.I. 24) Presently before the court are defendants' motions to dismiss the consolidated complaint. (D.I. 29; D.I. 31; D.I. 33; D.I. 36; D.I. 38; D.I. 43) Plaintiffs filed a motion for judicial notice of certain documents. (D.I. 54) The court has jurisdiction pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

**II. BACKGROUND**

**A. The Parties**

Plaintiffs PEAK6 Opportunities Fund L.L.C. and MCP Fisker are Illinois-based entities. Plaintiff 8888 Investments GmbH is a Swiss-based entity. Plaintiff 12BF Global Investments, Ltd. is a company organized under the laws of the Cayman Islands with limited liability. Plaintiff ASC Fisker L.L.C. is a Florida-based entity. Plaintiff CK Investments LLC ("CK Investments") is a Maryland-based entity. The following entities are based in Texas: Plaintiff Atlas Management, the general partner and investment advisor to plaintiff Atlas Fund (collectively, "Atlas"); plaintiff Hunse Investments, L.P. ("Hunse Investments"); plaintiff Southwell Partners, L.P. ("Southwell"); plaintiff Sandor Master Capital

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 119 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

Fund ("Sandor"); and plaintiff Pinnacle Family Office Investments, L.P. ("Pinnacle"). Plaintiffs SAML Partners ("SAML Partners") and Kenneth & Kimberly Roebbelen Revocable Trust of 2001 ("KKRR Trust") are California-based entities. Plaintiffs David W. Raisbeck ("Raisbeck") and Dane Andreeff ("Andreeff") are residents of Florida. Plaintiff John S. Lemak ("Lemak") is a resident of Texas. Plaintiff Brian Smith ("Smith") is a resident of Utah. (D.I. 24 at ¶¶ 9-25)

Non-party Fisker Automotive is a Delaware corporation which had its principal place of business in Anaheim, California. Non-parties Middlebury Group LLC, Middlebury Ventures II/III, LLC, and/or Ridgemakers SPV II/III, LLC (collectively, "Middlebury")[3] are Delaware limited liability companies, which were also used by Fisker Automotive to raise capital. (*Id.* at ¶¶ 26, 36)

**\*2** Defendant Henrik Fisker ("Fisker") was a co-founder and Director of Fisker Automotive. He was also Fisker Automotive's Chief Executive Officer from its inception through February 2012. Defendant Bernhard Koehler ("Koehler") was a co-founder of Fisker Automotive's predecessor entity, Fisker Coachbuild, LLC, and was Fisker Automotive's Chief Operating Officer at all relevant times. Defendant Joe DaMour ("DaMour") was Fisker Automotive's Chief Financial Officer at all relevant times through July 2012, after which he acted as a "special adviser" to Fisker Automotive. Defendant Kleiner Perkins Caufield & Byers ("Kleiner Perkins") is a venture capital firm with its headquarters in Menlo Park, California, and was a controlling shareholder of Fisker Automotive. Defendant Ray Lane was a Managing Partner of Kleiner Perkins and was Fisker Automotive's Chairman of the Board of Directors at all relevant times. Defendant Ace Strength Ltd ("Ace Strength") is an investment vehicle through which defendant Richard Li Tzar Kai ("Li") invested in Fisker Automotive. Ace Strength was a controlling shareholder of Fisker Automotive. Li was a member of Fisker Automotive's Board of Directors at all relevant times. Defendant Keith Daubenspeck ("Daubenspeck") was a Director of Fisker Automotive and cofounder of Advanced Equities, Inc. ("Advanced Equities"), which was one of several investment banks or vehicles that Fisker Automotive used to raise capital. Defendant Peter McDonnell ("McDonnell") was the senior managing director of the investment banking group at Advanced Equities and was responsible for, inter alia, marketing Fisker Automotive's Series D-1 offering. (*Id.* at ¶¶ 27-35)

**B. Fisker Automotive**

In 2003, Fisker and Koehler founded Fisker Coachbuild LLC to create "new exterior car designs while utilizing existing luxury car engineering." (D.I. ¶ 37) On August 7, 2007, Quantum Fuel Systems Technologies Worldwide, Inc. ("Quantum Fuel Systems") and Fisker Coachbuild, LLC, launched Fisker Automotive to build plug-in cars and in the process sold $5.5 million in Series A financing. Fisker Automotive anticipated initial deliveries of a four-door sports sedan by December 2009. (*Id.* at ¶¶ 38-39) In January 2008, Fisker Automotive completed a $20 million Series B round of financing, with Kleiner Perkins contributing more than $10 million and Lane joining Fisker Automotive's Board. (*Id.* at ¶¶ 41-42)

On or about December 31, 2008, Fisker Automotive applied for a loan with the U.S. Department of Energy ("DOE") under the DOE's Advanced Technology Vehicles Manufacturing Loan Program ("the ATVM loan"). (*Id.* at ¶¶ 44) On or about March 2, 2009, Fisker Automotive raised approximately $68.5 million in Series C financing, including another investment from Kleiner Perkins. (*Id.* at ¶ 45) On August 23, 2009, Koehler wrote an email to the DOE inquiring about the status of the ATVM loan application, because of financial concerns. (*Id.* at ¶ 46) On September 18, 2009, the DOE issued a $528.7 million Conditional Commitment Letter and allocated $169.3 million for Fisker Automotive to complete its first vehicle, the Fisker Karma ("Karma"), and $359 million to complete a low cost plug-in hybrid, the Fisker Nina. Fisker Automotive had to complete several "milestones" to avoid default, including raising additional outside capital by certain dates and beginning commercial production of the Karma vehicle by February 2011 ("February 2011 Karma production milestone"). (*Id.* at ¶¶ 47-51)

On or about January 13, 2010, Fisker Automotive and A123 Systems, Inc. ("A123") entered into a supply agreement for automotive batteries. A123 also agreed to invest approximately $20.5 million in Fisker Automotive. (*Id.* at ¶ 49) On January 20, 2010, an article[4] based on interviews with Fisker and Lane stated: "Lane said Fisker [Automotive] will grab the investing momentum surrounding the company to complete the $150 million funding round in 'the next month or two.' " (*Id.* at ¶ 50) On or about May 5, 2010, Fisker Automotive raised an additional $145 million in Series A-1 venture capital from investors, including Kleiner Perkins and Advanced Equities (the latter raising approximately $27

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

million from 347 private investors a few weeks later). (*Id.* at ¶ 52)

In March 2011, Fisker Automotive made a non-public presentation to DOE officials, representing that it met the February 2011 Karma production milestone for the ATVM Loan, when in fact it had not. (*Id.* at ¶ 53) On or about March 23, 2011, Fisker Automotive raised an additional $190 million in private equity including investments from Kleiner Perkins and Advanced Equities. (*Id.* at ¶ 54) In April 2011, Fisker Automotive solicited qualified investors in connection with a $100 million offering of Series C-1 Preferred Stock (the "April 2011 Offering"). The related offering documents, including a Confidential Private Placement Memorandum dated March 31, 2011 ("March 2011 CPPM"), were available to plaintiffs and other investors. (*Id.* at ¶ 56) The March 2011 CPPM described related party transactions and stated that "Daubenspeck, AEFC and its affiliates, including [Advanced Equities], have an economic interest in Fisker's success as well as the success of the Offering." (*Id.* at ¶ 56; D.I. 53, ex. Eat 42) It also contained a statement on the cover page—"Preliminary Draft—Terms may Change Subject to Board and Shareholder Approval." (D.I. 53, ex. E) During the same timeframe, Middlebury circulated a Confidential Private Placement Memorandum ("April 2011 Middlebury CPPM") to the Middlebury plaintiffs soliciting qualified investors. Potential investors, including plaintiffs, could examine Fisker Automotive's "Series C-1 Transaction Documents" through a website link with the password included in the April 2011 Middlebury CPPM. (D.I. 24 at ¶ 57) The April 2011 Middlebury CPPM stated that Fisker Automotive had "incurred losses in the operation of our business and anticipate that we will continue to incur losses for the future." (*Id.* at ¶ 57; D.I. 53, ex. Eat 44) It also disclosed that "loss of key certain key personnel without DOE consent" could trigger a default on the ATVM loan. (D.I. 53, ex. Eat 44) It further included an "exculpation among purchasers" clause stating that the purchasers are relying solely on Fisker Automotive and "its officers and directors" in making the decision to invest. (D.I. 53, ex. G at 18) By May 2011, Kleiner Perkins owned a 12.61 % equity stake in Fisker Automotive and Ace Strength 10.15%. (D. I. 24 at ¶ 59) On May 13, 2011, an article [5] stated that "Lane, a managing partner at storied venture capital firm Kleiner Perkins Caufield & Byers, said Fisker Automotive also plans to go public in the future ...." (*Id.* at ¶ 60)

**\*3** Fisker Automotive continued to draw approximately $29 million on the ATVM loan from February through May

2011. (*Id.* at ¶ 64) In May 2011, after Fisker Automotive had completely drawn down the Fisker Karma portion of the ATVM Loan, the DOE issued a non-public "drawstop notice" to the Federal Financing Bank preventing Fisker Automotive from making any further draws on the Fisker Nina phase of the loan. (*Id.* at ¶ 61) In June 2011, Fisker Automotive informed the DOE that it had not met the February 2011 Karma production milestone, contrary to its March 2011 representation. On or about June 6, 2011, Fisker Automotive raised another $115 million in venture capital, including investments from Advanced Equities, Kleiner Perkins and a new investor, New Enterprise Associates. (*Id.* at ¶ 62)

In July 2011, Fisker Automotive began preparations for a new round of financing. On July 27, 2011 (on behalf of Fisker Automotive), McDonnell, Fisker, Koehler and DaMour held a conference call with analysts and investors designed to solicit investors "for a new round of private equity financing to raise approximately $150 million by issuing Series D-1 shares of Fisker Automotive." (*Id.* at ¶ 66) DaMour discussed the ATVM loan, but did not mention that funds had been cut off. He explained that the interest rates were low and refinancing would not be needed. [6] A replay of the call and a PowerPoint presentation by Fisker Automotive was made available to plaintiffs and other investors. (*Id.* at ¶¶ 66-67) On August 21, 2011, an article [7] stated that "Fisker Automotive is using a flurry of hype surrounding its first car—the $98,000 Karma hybrid—to ask for another $200 million from investors ...." (*Id.* at ¶ 68) On September 15, 2011, Fisker Automotive began twelve rounds of sales of Series D-1 stock (ending on December 2, 2011), raising a total of approximately $86 million based on offering documents distributed in August 2011. The Amended and Restated Series D-1 Preferred Stock Purchase Agreement ("December 2011 stock purchase agreement") states: "The Knowledge of the Company shall mean the Knowledge of Henrik Fisker, Bernhard Koehler, and Joseph DaMour." (*Id.* at ¶ 69) The December 2011 stock purchase agreement also contained an "exculpation among purchasers" stating that the purchasers are relying solely on Fisker Automotive and "its officers and directors" in making the decision to invest. (D.I. 53, ex. H at 21)

On October 20, 2011, the DOE posted a press release on its website touting the ATVM loan program and Fisker Automotive. (D.I. 24 at ¶ 70) The DOE press release stated in part, "[w]ith the help of a $529 million loan, Fisker is producing high performance vehicles with an advanced hybrid electric powertrain that could significantly

improve performance and fuel economy." It explained that the two-part loan provides $169 million for the Fisker Karma (developed in "Fisker [Automotive]'s US facilities, including its headquarters in Irvine, California which has 700 employees and plans to continue hiring") and $359 million for the Fisker Nina (which will be produced in a now "shuttered General Motors plant in Delaware" and employ "more than 2,500 workers"). It also stated that "Fisker [Automotive]'s production schedule was delayed by regulatory issues that were outside of its control, but [Fisker Automotive] has successfully raised more than $650 million in private sector investment to support its ongoing operations since closing its DOE loan." (*Id.* at ¶ 70) On October 26, 2011, Fisker Automotive (with McDonnell, Fisker, Koehler, and DaMour participating) held a conference call with investors. Plaintiffs summarized the call as "investors expressed concerns about the ATVM Loan in light of the recent bankruptcy filing of DOE loan guarantee recipient, Solyndra. Defendant Henrik Fisker stated that there was no risk of losing the DOE loan." (*Id.* 71)

**\*4** On November 1, 2011, Fisker Automotive confidentially informed the DOE that it would run out of cash within three days without additional government loan money or an injection of private equity. (*Id.* 72) On November 4, 2011, A123 announced it was lowering its 2011 revenue guidance range "due to an unexpected reduction in orders for battery packs from Fisker Automotive ...." (*Id.* 73) In November 2011, two articles [8] based on interviews with Lane stated that Fisker Automotive would meet its 2012 production goals. According to Lane, "[i]ln production of a first vehicle, everything doesn't go the way you plan .... Next year, we'll do exactly what we plan." (*Id.* 74-75) On November 30, 2011, Fisker Automotive confidentially informed the DOE that a modest investment increase of $37 million at mid-month had nudged its available cash up to a still-thin $20 million. (*Id.* 76)

On December 8, 2011, Fisker Automotive's Board of Directors unanimously approved a 40% "pay to play" capital call imposed on all Fisker Automotive investors (the "December 2011 Capital Call"), based on "an obscure provision in the April 2011 Offering documents called a 'pay to play' capital call provision." [9] Investors faced penalties of "having each share of preferred stock converted to one-half share of common stock, as well as the severe dilution of their existing interests in Fisker Automotive" if they did not comply. (*Id.* 79) On Sunday, December 11, 2011, Greg Osborn ("Osborn") of Middlebury sent an email to certain investors detailing the "pay to play" plan and attempting

to appease the investors. (*Id.* at ¶¶ 80-81) The email stated that "Daubenspeck, a Fisker Board member and Chairman of Advanced Equities [will] join our call" the next day. (*Id.* at ¶ 81) On December 15, 2011, Fisker Automotive made available to plaintiffs and other investors offering documents associated with the December 2011 Capital Call, including the Amended and Restated Series DI Preferred Stock Purchase Agreement ("December 2011 Capital Call documents"). The December 2011 Capital Call documents provided that Fisker Automotive's

> Board of Directors and the Audit Committee of the Company's Board of Directors have reviewed and discussed the terms of the Series D-1 Financing Capital Call ... and have determined that the terms of the Series D-1 Financing Capital Call ... are in the best interests of the Company and its stockholders.

(D.I. 53, ex. F at 1) A letter from Fisker (the "December 2011 Fisker Letter") explained:

> We have had several delays to the Karma program due to component part shortages, obtaining emissions and regulatory clearances and fine tuning the Karma to get it ready for customers. Consequently, we did not realize revenue as expected in 2011. We now believe that raising equity is a prudent course of action. Improving our cash position will allow us to continue to build momentum behind the Karma production and sales launch and maintain the 2013 launch timing of the Nina sedan.

> Management and the Board of Directors have determined that it is in the best interest of Fisker Automotive to raise equity through the D-1 Financing Capital Call that is described in detail in the attached Information Statement. ... I encourage you to carefully review the Information Statement and consider a further investment in Fisker Automotive. Importantly, three of our major venture capital investors, Kleiner Perkins, NEA and Pacific Century, support this action and have already made, or committed to make, their capital calls, together totaling more than $57 million.

(*Id.* 83) The Executive Summary accompanying the December 2011 Fisker Letter described the "Board Approval

Process" as using an Audit Committee and discussing the Capital Call in "working group calls and meetings." After considering "a number of factors,"

> **\*5** [t]he Board of Directors then instructed its officers to solicit the approval of the requisite vote of the stockholders of the Company, mail this Information Statement, and obtain indications of interest from interested stockholders. The Company received the requisite vote of the stockholders to approve the Series D-1 Financing Capital Call on December 14, 2011.

(D.I. 53, ex. J at 55-56)

On a conference call with investors December 15, 2011, Fisker Automotive (represented by McDonnell, Fisker, Koehler, and DaMour) discussed the ATVM Loan status. The complaint states that "[o]n that call, ... DaMour discussed the ATVM [l]oan, stating that '[Fisker Automotive is] currently not drawing [on the ATVM loan] and that was a mutual agreement between [Fisker Automotive] and the government as [Fisker Automotive] work[s] to finalize the revised covenants and milestones, but as you see, [Fisker Automotive] ha[s] $340 million remaining to be drawn and that will be drawn through the 2012 and first half 2013 timeframe.' " (*Id.* at ¶ 86) "[I]n response to investor questions about the ATVM Loan, ... Fisker reiterated that 'there is not a risk that [the DOE] will not continue to fund because they have already given us a commitment by letter that they are committed to Fisker Automotive.' " (*Id.* at ¶ 87) Moreover, plaintiffs allege:

> DaMour ... stated "with the money we raised in this round, [Fisker Automotive] can continue with the [Karma] indefinitely," even if Fisker Automotive received no further funds from the DOE or other outside capital. And, in response to specific questions regarding Fisker Automotive's business plan and whether the funding from this $300 million Series D round would be sufficient to fund Fisker Automotive's business plan without another capital call or some other additional funding, Defendant DaMour stated "this is the last ... private raise, and surely the last capital call .... The $300 [million] is enough to fund the

complete plan as we have explained .... We are at the point now that the ... [Karma] is fully funded."

(*Id.* at ¶ 89) Plaintiffs allege that "Fisker 'responded to a question about concerns of battery fires in light of the Chevrolet Volt's reported battery fire problems by stating that it 'is not a risk for us, we have a different chemistry [a] liquid cooled battery.' " (*Id.* at ¶ 88)

On December 21, 2011, the National Highway Traffic Safety Commission ("NHTSC") acknowledged (through a "non-public letter" to Fisker Automotive) a "report of a 'safety recall campaign which [would] be conducted under Federal law' of 239 Fisker Karmas due [to] a battery problem that could cause a fire" ("Karma recall notice"). (*Id.* at ¶ 90) On December 29, 2011, the day after the first deadline to invest in the December 2011 Capital Call, Fisker Automotive publicly announced its recall of 239 Fisker Karmas due to the battery fire issue. (*Id.* at ¶¶ 90-92) On December 30, 2011, an article [10] reported that "Fisker spokesman Roger Ormisher [ ("Ormisher") ] said customers were alerted of the faulty batteries last week ...." (*Id.* at ¶ 92) The article also explained that the source of the problem is "misaligned hose clamps that could cause coolant leaks, and potentially a dangerous electrical short circuit." According to the article, the NHTSC notice stated, "[i]f coolant enters the battery compartment, an electrical short could occur, possibly resulting in a fire." (D.I. 34, ex. A)

**\*6** A January 4, 2012 non-public report prepared by the DOE Loans Program Office discussed Fisker Automotive's missed launch dates and potential alternatives. (D.I. 24 at ¶¶ 93-94) Specifically, the report stated that Fisker Automotive had $200 million in payables as of November 30, 2011, of which $120 million were overdue—and only $20 million in cash on hand and could be out of money as early as December 15, 2011. (*Id.* ¶ 93) On February 7, 2012, an article [11] reported layoffs of workers refurbishing the manufacturing plant in Wilmington, Delaware and of workers at Fisker Automotive's California headquarters. According to the article, "Fisker officials characterized the layoffs as part of the complicated process of getting a billion-dollar car company off the ground." (*Id.* 95) The article further reported:

> A Fisker spokesman said Monday that negotiations are under way with the Energy Department to modify the loan achievement goals to allow some cash to be drawn down. "To date we have received $193 million of the $529 million Department of Energy loan, mostly for the

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 123 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

Karma program, and received our last reimbursement in May 2011," Fisker spokesman Roger Ormisher said in a statement Monday. "We are renegotiating some terms of the DOE agreement for the $336 million balance of the loan related to the Project Nina program." Ormisher said the exact terms of the loan conditions are confidential. "The DOE can sometimes take a little bit of time," Ormisher said. "We can't keep going and going and going without that money."

(*Id.*) On February 22, 2012, Fisker Automotive (represented by McDonnell, Fisker, Koehler, and DaMour) held a conference call to update investors regarding its status and a change in the Series D-1 round of financing whereby Fisker Automotive wanted to raise an additional $100 million by the end of March. The complaint states that "Fisker acknowledged recent negative press regarding the ATVM Loan, and characterized Fisker's problems as 'essentially driven by more political views around whether the government should be lending money or not. And unfortunately, we have become somewhat a political football ....' " (D.I. 24 at ¶ 97) Further, "Fisker Automotive's Board of Directors had made a decision that it was in Fisker Automotive's 'better interests ... in the future to pay back the [DOE] and basically get alternative financing,' " in order to be "self-sustaining as a company" with just the Karma. But Fisker "also stated that they would continue negotiating with the DOE to obtain the remaining funds under the ATVM Loan." (*Id.* at ¶¶ 98-99) On February 28, 2012, Fisker Automotive announced Fisker's resignation as Fisker Automotive's CEO to be replaced by Tom LaSorda ("LaSorda"). The confidential ATVM Loan contained a "Key Personnel" covenant requiring Fisker to be "responsible for the management of the borrower." (*Id.* at ¶ 100)

In March 2012, Fisker Automotive notified its investors of another "pay to play" capital call (the "March 2012 Capital Call"), which raised $392 million. (*Id.* at ¶¶ 101-103) On April 19, 2012, an article [12] reported more layoffs in Delaware. (*Id.* at ¶ 104) A Fisker Automotive spokesman stated "[w]e have always had a flexible business model. The plant is now ready for the next phase of installing new production equipment." (*Id.*) On June 26, 2012, an article [13] detailed Fisker Automotive's continued attempt to raise more equity, having sold 1,700 Karma vehicles. (*Id.* at ¶ 105) The article quoted Lane as stating: "I'm looking at about $400 million in revenue this year. That would make [Fisker Automotive] the fastest growing start-up ever." The article also stated that "[t]he situation with the DOE,

said Lane, 'caused [Fisker Automotive] to accelerate capital raising.' " (*Id.*) On July 6, 2012, an article [14] "reported that Jim Yost, a former executive at Ford Motor Co. and Dana Holdings Corporation, had replaced Defendant DaMour as Fisker Automotive's CFO and that DaMour would 'stay on as a special advisor to [Fisker Automotive].' " (*Id.* at ¶ 106) A confidential DOE presentation dated August 2, 2012 stated that the DOE had spoken to Lane regarding the financial status of Fisker Automotive and was told that Fisker Automotive "was down to $12 million in cash and ... expected to run out of cash 'within a month.' " (*Id.* at ¶ 107)

**\*7** On August 14, 2012, LaSorda was replaced as CEO by the former head of the Chevy Volt hybrid program, Tony Posowatz. (*Id.* at ¶ 108) The complaint alleges that:

> On August 16, 2012, Reuters published an interview of Ray Lane in which he stated [Fisker Automotive] was seeking to raise an additional $150 million to increase cash on Fisker Automotive's balance sheet and to fund development of Fisker Automotive's next model car. Lane held out the prospect of an upcoming IPO, which would save Fisker Automotive's investors, stating that "[o]nce Fisker [Automotive] breaks even, [it] could pursue an initial public offering or a sale to a strategic investor, which could come in late 2013."

(*Id.* at ¶ 109) In late August 2012, Fisker Automotive issued offering documents in connection with a Series E round of financing/preferred stock ("2012 Series E offering documents), seeking to raise at least $30 million in bridge loan financing which would convert into Series E Preferred stock if the full amount was actually raised. The DOE agreed to waive Fisker Automotive's covenant violations and not declare the ATVM Loan in default if Fisker Automotive raised that amount. Fisker Automotive raised $50 million by early September. (*Id.* at ¶ 110) On or around September 19, 2012, Osborn sent plaintiffs and other investors a pay to play capital call (the "September 2012 Capital Call") for Series E preferred stock, raising approximately $104 million. (*Id.* at ¶¶ 111-12)

On or about October 16, 2012, A123 filed for bankruptcy protection. Shortly thereafter, Fisker Automotive stopped production of the Karma, laid off another 40 employees, and retained an investment banking advisory firm to find a "strategic partner" to save itself. On March 13, 2013, Fisker resigned from the Board of Directors. Fisker Automotive then hired the law firm of Kirkland & Ellis, PC to advise it on a possible bankruptcy filing. In April 2013, Fisker

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 124 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

Automotive laid off another 160 employees (75% of its remaining workforce). (*Id.* at ¶¶ 113-115)

On April 17, 2013, PrivCO, a private research firm, made available a detailed report ("the PrivCo Report") based on documents obtained through Freedom of Information Act requests detailing Fisker Automotive's decline. On April 21, 2013, the U.S. Government reported that it had seized $21 million in cash from Fisker Automotive to fulfill the first loan payment. On April 24, 2013, a U.S. House of Representatives Subcommittee On Economic Growth, Job Creation And Regulatory Affairs Of The Committee On Oversight And Government Reform held a hearing to investigate Fisker Automotive (the "House Fisker Hearing"). (*Id.* at ¶¶ 116-122) Lane resigned from Fisker Automotive's Board of Directors in May 2013. (*Id.* at ¶ 123) On September 17, 2013, the DOE put the remaining $168 million owed on the ATVM Loan out to bid in a public auction. (*Id.* at ¶ 124) On November 22, 2013, Fisker Automotive filed for bankruptcy protection. (*Id.* at ¶ 125) [15]

### C. Claims

The complaint alleges violations of § 12(a)(2) of the Securities Act against all defendants except Kleiner Perkins and Ace Strength; violations of § 15 of the Securities Act against defendants Kleiner Perkins, Lane, Fisker, Koehler, DaMour, Daubenspeck, Li and Ace Strength; violations of § 10(b) of the Exchange Act and Rule 10b-5 against all defendants except Kleiner Perkins and Ace Strength; and violations of § 20(a) of the Exchange Act against defendants Kleiner Perkins, Lane, Fisker, DaMour, Koehler, Daubenspeck, Li and Ace Strength. (D.I. 24 at ¶¶ 126-165)

### III. MOTION TO DISMISS

#### A. Standard

**\*8** A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly,* 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings

in *Twombly* and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.,* 610 F.3d 217, 219 (3d Cir. 201 O); *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler,* 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pied facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal,* 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *Christopher v. Harbury,* 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makar Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.,* 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips,* 515 F.3d at 234 (quoting *Twombly,* 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 663-64.

### B. Discussion

#### 1. Omissions and misstatements

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 125 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

Plaintiffs assert "the following material omissions which [d]efendants had a duty to disclose in connection with [d]efendants' efforts to solicit [p]laintiffs and other investors to purchase Fisker Automotive Securities in violation of [§] 12(a)(2) and Rule 10b-5" (D.I. 52 at 20): (1) the failure to disclose that Fisker Automotive did not meet the February 2011 Karma production milestone, the representation to the DOE that Fisker Automotive did meet such milestone in the March 2011 presentation, and the failure to disclose the DOE's drawstop decision in May 2011 (D.I. 24 at ¶¶ 53, 64, 149-51); (2) the failure to disclose the Karma recall notice, acknowledged by NHTSA on December 21, 2011 during the December 2011 Capital Call, one week before the December 2011 Capital Call closed (id. at ¶¶ 90-91, 152); (3) the failure to disclose during the December 2011 Capital Call Fisker Automotive's precarious cash position, i.e., that Fisker Automotive had $200 million in payables as of no later than November 30, 2011, of which $120 million were overdue—with only $20 million in cash on hand and could be out of money as early as December 15, 2011 (id. at ¶¶ 93, 153); and (4) the failure to disclose in connection with the March 2012 Capital Call and September 2012 Capital Call offerings that Fisker's resignation from the day-to-day management of Fisker Automotive as CEO in February 2012 caused Fisker Automotive to be in default of the ATVM Loan "Key Personnel" covenant requiring him to be "responsible for the management of the borrower" (id. at ¶¶ 100, 154).

### 2. Section 12(a)(2) claims [16]

**\*9** To state a claim under § 12(a)(2),[17] plaintiffs must allege that they purchased securities pursuant to a materially false or misleading prospectus or oral communication." *In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 273-74 (3d Cir. 2004) (internal citations and quotations omitted). Where a plaintiff's § 12(a)(2) claims are not grounded in allegations of fraud, scienter is not required to be pled and "the liberal notice pleading requirements of Rule 8 apply." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 270 (3d Cir. 2006) (citing *In re Adams Golf,* 381 F.3d at 273 n.5).

#### a. Timeliness of plaintiffs' § 12(a)(2) claim

Section 13 of the Securities Act provides that "[n]o action shall be maintained to enforce any liability created under [§

12(a)(2) ] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. A discovery standard governs § 13 of the Securities Act, that is, a claim "accrues '(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first.' "

*Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.,* 730 F.3d 263, 273 (3d Cir. 2013) (quoting *Merck & Co. v. Reynolds,* 559 U.S. 633, 637 (2010)). Therefore, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint ... with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Pension Trust Fund,* 730 F.3d at 275 (citing *City of Pontiac General Employees' Retirement System v. MBIA, Inc.,* 637 F.3d 169, 175 (2d Cir. 2011)).

> In determining the time at which "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation

*Merck,* 559 U.S. at 653.

Snippets of Fisker Automotive's financial struggles were presented in various news articles and confidential memoranda published in 2011 and 2012, including references to the ATVM loan status. (D.I. 24 at ¶¶ 57, 90-91, 100, 105; 0.1. 53, ex. E at 44) However, the PrivCo Report (published on April 17, 2013) and the House Fisker Hearing

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

(held on April 24, 2013) disclosed previously unknown material, including the OOE's termination of funding in June 2011, Fisker Automotive's $200 million in past due bills, the NHTSA Recall Notice, and the Key Personnel Milestone in the ATVM loan. (D.I. 24 at ¶¶ 116, 118; D.I. 52 at 37) While defendants argue that each of these issues was discoverable through news articles and the private offering documents, the PrivCo Report and hearing testimony contained unpublished documents and brought to light non-public information regarding the ATVM loan. (D.I. 24 at ¶¶ 116-122) The court concludes that the claims are not time-barred.

### b. Statutory sellers under § 12(a)(2)

**\*10** In *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989), the Third Circuit adopted the Supreme Court's analysis in *Pinter v. Dahl*, 486 U.S. 622 (1988), holding that "liability under § 12(2) extends not only to those who pass title to the purchaser, but also to those who successfully solicit the purchase, motivated by their own or the securities owner's financial interests." *Id.* at 636. In evaluating whether participation falls within such scope, the language of § 12 "focuses the inquiry on the relationship between the purchaser and the participant, rather than on the latter's degree of involvement in the transaction." *Id.* (citing *Pinter*, 486 U.S. at 651-52). More specifically, liability should not be imposed "on persons whose actions were merely a 'substantial factor' in causing the purchase," instead "[t]he purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller." *Id.* (citations omitted).

Plaintiffs alleged in *Craftmatic* that:

> Each of the defendants ... solicited plaintiffs ... to buy Craftmatic common stock ... and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the owner(s) of Craftmatic securities, and they ... conspired with and aided and abetted one another in connection with the preparation of the false and misleading Prospectus

and Registration Statement used in conjunction with the sale of Craftmatic securities.

*Id.* at 637. Such allegation was "sufficient to survive a Rule 12(b)(6) motion to dismiss[, as i]t cannot be said at this juncture that plaintiffs can prove no set of facts that would entitle them to relief." *Id.* Similarly, in *In re Westinghouse*, the Third Circuit held that while the complaint was "not clearly drafted, ... [t]aken in the light most favorable to plaintiffs, however, the complaint does allege that the Westinghouse defendants 'solicited plaintiffs' to purchase Westinghouse securities and that in so doing they were motivated by a desire to serve their own financial interests." *In re Westinghouse Securities Litigation*, 90 F.3d 696, 717 (3rd Cir. 1996). The Third Circuit reversed the district court's dismissal of the claims even though "[p]laintiffs d[id] not, for example, make clear which defendants are alleged to be direct sellers as opposed to solicitor sellers ... or allege how the Westinghouse defendants, assuming they are alleged to be solicitor sellers, directly and actively participated in the solicitation of the immediate sales." *Id.*

The complaint at bar states that:

> Defendants, with the exceptions of Kleiner Perkins and Ace Strength which are named as control persons in Count II below, were sellers and offerors and/or solicitors of purchasers of the Fisker Automotive Securities offered, including to [p]laintiffs. Plaintiffs purchased these securities as a result of the material omissions ....

(D.I. 24 at ¶ 128) The complaint identifies Daubenspeck as a Director of Fisker Automotive and cofounder of Advanced Equities, Inc. ("Advanced Equities"),[18] which was one of several investment banks or vehicles that Fisker Automotive used to raise capital. (*Id.* at ¶ 34) With respect to the December 2011 Capital Call, Osborn wrote an email on December 11, 2011, purportedly based on his conversations with Fisker Automotive representatives, to the Middlebury Plaintiffs and others stating that "Daubenspeck, a Fisker Board member and Chairman of Advanced Equities [will] join our call" the next

day. (*Id.* at ¶ 81) The complaint also references the private memorandum dated March 31, 2011 used to solicit investors, which describes related party transactions and states that "Daubenspeck, AEFC and its affiliates, including [Advanced Equities], have an economic interest in Fisker's success as well as the success of the Offering." (*Id.* at ¶ 56; D.I. 53, ex. E at 42)

**\*11** The complaint identifies Koehler as a participant and Fisker and DaMour as speakers in several conference calls with analysts and/or investors. The purpose of the conference calls was to solicit investors in Fisker Automotive securities. Certain calls were recorded for future distribution to potential investors. (D.I. 24 at ¶¶ 69, 66, 71, 86, 96) The December 2011 Fisker Letter encouraged investing. [19] (*Id.* at ¶ 83) The Executive Summary described the "Board Approval Process" as using an Audit Committee and discussing the Capital Call in "working group calls and meetings." After considering "a number of factors,"

> [t]he Board of Directors then instructed its officers to solicit the approval of the requisite vote of the stockholders of the Company, mail this Information Statement, and obtain indications of interest from interested stockholders. The Company received the requisite vote of the stockholders to approve the Series D-1 Financing Capital Call on December 14, 2011.

(D.I. 53, ex. J at 55-56) Lane was a Managing Partner of Kleiner Perkins and was Fisker Automotive's Chairman of the Board of Directors. (D.I. 24 at ¶ 31) Li was a controlling shareholder through Ace Strength (*Id.* at ¶ 32) and was on the Board of Directors, which approved the December 2011 "pay-to-play" capital call. (*Id.* at ¶ 81)

Taking the allegations in the complaint in the light most favorable to plaintiffs, the court concludes that as to defendants Daubenspeck, Fisker, Koehler and DaMour, plaintiffs have alleged sufficient facts regarding solicitation. As to Lane, the offering documents point to decisions regarding solicitation made by the Board, of which Lane is chairman. This, together with Lane's position as Managing Partner of Kleiner Perkins (a major investor in Fisker Automotive) is sufficient to allege solicitation at the motion

to dismiss stage. [20] While plaintiffs have not used the precise language "motivated by their own or the securities owner's financial interests," plaintiffs' factual allegations are sufficient to support such motivation as the defendants stood to gain from Fisker Automotive's success though their positions as Directors of Fisker Automotive. [21] The court concludes that plaintiffs have sufficiently pled that defendants were § 12(2) sellers.

### c. Public offerings

Section 12(a)(2) provides liability for misstatements made "by means of a prospectus or oral communication." 🚩 *Gustafson v. Alloyd Co.,* 513 U.S. 561, 567 (1995); *see also,* 🚩 *In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 273 (3d Cir. 2004). "[T]he word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder" and "must include the 'information contained in a registration statement.' " 🚩 *Gustafson,* 513 U.S. at 584, 569.

> An offering is considered private only if limited to investors who have no need for the protection provided by registration. To determine if an offering is sufficiently limited courts focus on such factors as: (1) the number of offerees; (2) the sophistication of the offerees, including their access to the type of information that would be contained in a registration statement; and (3) the manner of the offering.

**\*12** *See, e.g.,* 🚩 *United States v. Arutunoff,* 1 F.3d 1112, 1118 (10th Cir. 1993).

The complaint alleges that the "offering materials including Prospectuses/Private Placement Memoranda and other offering documents made available to purchasers of Fisker Automotive Securities" omitted material information. (D.I. 24 at ¶ 129) The following offering materials are identified in the complaint: The March 2011 CPPM (*id.* at ¶ 56); the April 2011 Middlebury CPPM (*id.* at ¶ 57); the December 2011

2015 WL 6039690

stock purchase agreement (*id.* at ¶ 69); Information Statement dated December 14, 2011 (*id.* at ¶¶ 82-85); the March 2012 D-1 offering documents (*id.* at ¶¶ 101-102); and the 2012 Series E offering documents (*id.* at ¶ 110). The March 2011 CPPM and April 2011 Middleburry CPPM are "Confidential Private Placement Memorand[a]." (*Id.* at ¶¶ 56-57) The April 2011 Middlebury CPPM makes clear that the shares "have not been registered under the Securities Act." (D.I. 53, ex. E) The December 2011 information statement is marked "Strictly Confidential & Proprietary." (*Id.* at ex. F) The March 2012 Capital Call D-1 offering documents are labeled "Confidential & Proprietary." (D.I. 24 at ¶ 102) Certain offering materials required a password. (*Id.* at ¶¶ 56-57)

Fisker Automotive solicited only "qualified investors." (*Id.* at ¶¶ 56-58) For example, the AEI investor acknowledgement states that the "investor is an 'accredited investor' within the meaning of Rule 501 (A) of Regulation D under the [S]ecurities Act of 1933 ...."[22] (D.I. 53, ex. L; see also, ex. G at 17; ex. H at 21; ex. K at 2-3) While the news articles mentioned the possibility of an upcoming IPO, no such offering was made to the public. Plaintiffs aver that the number of investors is in the hundreds—"Fisker Automotive raised an additional $145 million in Series A-1 venture capital from Kleiner Perkins, Palo Alto Investors and Advanced Equities (which raised approximately $27 million from 347 private investors);" however, the investment information was provided to the venture capital firms, not to the private investors. (*Id.* at ¶ 52)

The court concludes that the offerings were made via private placement memoranda to sophisticated investors and were not public offerings. The motion to dismiss is granted as to the § 12(a)(2) claims.[23] *See e.g., Vannest v. Sage, Rutty & Co.,* 960 F. Supp. 651, 654-55 (W.D.N.Y. 1997) (concluding that there was no public offering where the private placement memorandum expressly (and repeatedly) stated that the offering was not subject to registration requirements and that the securities are intended to be sold only to purchasers qualified by the Rule 506 regulations.);

*In re J.W.P. Inc. Securities Litigation,* 928 F. Supp. 1239, 1259 (S.D.N.Y.1996) ("Courts in this district have held that under *Gustafson*, private placement memoranda like those at issue are not 'prospectuses' for the purposes of a claim under § 12(2)"); *Walish v. Leverage Grp., Inc.,* Civ. No. 97-CV-5908, 1998 WL 314644, at *5 (E.D. Pa. June 15, 1998) ("The complaint does not allege that the sale was a public offering of securities and the 'defacto prospectus,' on which

the [p]laintiffs rely, shows that this was a private transaction involving six investors.").

### 3. Section 10(b) and Rule 10b-5 [24]

**\*13** According to § 10(b) of the Exchange Act, it is unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission to implement § 10(b), makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240. 10b-5.

In order to state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 129 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630-31 (3d Cir. 2011). A statement or omission is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "A material misrepresentation or omission is actionable if it significantly altered the total mix of information made available." *Id.* (citations and quotations omitted). Material misstatements are contrasted with subjective analyses and general or vague statements of intention or optimism which constitute no more than mere corporate puffery. *In re Aetna*, 617 F.3d at 283; *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 390 (0. Del. 2010). "Scienter is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citations and quotations omitted).

Shareholders filing a securities fraud lawsuit under the Exchange Act are subject to the heightened pleading standard codified by the Private Securities Litigation Reform Act ("PSLRA"). *Avaya, Inc.*, 564 F.3d at 253; *City of Roseville Employees' Ref. Sys. v. Horizon Lines*, 686 F. Supp. 2d 404, 414 (D. Del. 2009) ("The PSLRA imposes a dramatically higher standard on a plaintiff drafting a complaint than that of traditional notice pleading."); *Brashears v. 1717 Capital Mgmt, Nationwide Mut. Ins. Co.*, 2004 WL 1196896, at *4 (D. Del. 2004) ("[B]y enacting the current version of the [PSLRA], Congress expressly intended to substantially heighten the existing pleading requirements.")[25] (internal quotations omitted). "The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss." *Avaya, Inc.*, 564 F.3d at 252. First, the complaint must "specify each allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* at 259 (citing 15 U.S.C. § 78u-4(b)(1)). This is the falsity requirement. Second, "with respect to each act or omission alleged to violate [§ 10(b) ]," a plaintiff is required to "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. § 78u-4(b)(2)). This is the scienter requirement.

**\*14**  Both of these provisions require that facts be pied "with particularity." With respect to the falsity requirement,

> the particularity standard echoes Rule 9(b) of the Federal Rule[s] of Civil Procedure, which is comparable to and effectively subsumed by the requirements of ... the PSLRA. Like Rule 9(b), the PSLRA requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story. Additionally, if an allegation regarding [a] statement or omission is made on information and belief, a plaintiff must state with particularity all facts on which that belief is formed.

*Horizon Lines*, 686 F. Supp. 2d at 414 (citing *Avaya, Inc.*, 564 F.3d at 253) (internal quotations and citations omitted). The scienter requirement, on the other hand, "marks a sharp break from Rule 9(b)." *Avaya*, 564 F.3d at 253. "Unlike Rule 9(b), under which a [plaintiff] could plead scienter generally, § 78u-4(b)(2) requires any private securities complaint alleging that the defendant made a false or misleading statement ... [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Horizon Lines*, 686 F. Supp. 2d at 414 (citations and quotations omitted).

Aside from these two requirements, the PSLRA imposes additional burdens with respect to allegations involving forward-looking statements. The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u-5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254.

### a. Duty to disclose

**\*15**  "[N]on-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information. 'Silence, absent a duty to disclose, is not misleading under Rule 10b-5.' "

*See* ⚐ *Oran v. Stafford,* 226 F.3d 275, 78-86 (3d Cir. 2000). There is no affirmative duty to disclose information unless 1) there is insider trading, 2) a statute requires disclosure, or 3) a previous disclosure becomes inaccurate, incomplete, or misleading. *Id.* In the context of insider trading, liability for securities nondisclosure "is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *See* ⚐ *Chiarella v. United States,* 445 U.S. 222, 235 (1980). As the Supreme Court acknowledged in *Chiarella,* corporate insiders, particularly officers, directors, or controlling stockholders, assume an affirmative duty of disclosure when trading in shares of their own corporation. ⚐ *Id.* at 226-27 (citing *In re Cady, Roberts & Co.,* 40 S.E.C. 907, 1961 WL 3743 (1961)). "[I]nsiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." *In re Cady,* 1961 WL at* 3. This duty extends not only to existing shareholders but also to nonshareholders when sales of securities are made to them. *See id.* at * 5. Such a duty ensures that corporate insiders "will not benefit personally through fraudulent use of material, nonpublic information." ⚐ *Chiarella,* 445 U.S. at 230.

Plaintiffs allege "a duty to disclose the material omitted facts as insiders engaging in sales and purchases or otherwise benefiting from those transactions while in a position of 'trust and confidence' and/or in a fiduciary relationship with [p]laintiffs." (D.I. 52 at 43) While defendants argue that they did not engage in "trading," to the extent defendants made statements regarding Fisker Automotive in an effort to entice plaintiffs into becoming shareholders, defendants had a duty to disclose material information.[26] *See Tse v. Ventana Med. Sys., Inc.,* Civ. No. 97-37-SLR, 1998 WL 743668, at *8 (D. Del. Sept. 23, 1998) (finding a duty to disclose when "defendants were asking plaintiffs to become equity shareholders in the acquiring corporation, defendant [Ventana]. Accordingly, as 'insiders,' defendants assumed an affirmative duty to disclose material information.").

### b. Falsity

Plaintiffs allege material omissions in certain statements and documents made by "defendants." (D.I. 24 at ¶¶ 147-48)

In ⚐ *Winer Family Trust v. Queen,* 503 F.3d 319 (3d Cir. 2007), the Third Circuit made clear that "the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA." ⚐ *Id.* at 337. More recently, the Supreme Court in ⚐ *Janus Capital Group, Inc. v. First Derivative Traders, --- U.S. ----, 131 S.Ct. 2296 (2011),* explained that:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.

*Id.* at 2302. The Supreme Court specifically declined to equate "create" with "make," stating that "in *Stoneridge,* we rejected a private Rule 10b-5 suit against companies involved in deceptive transactions, even when information about those transactions was later incorporated into false public statements." *Id.* at 2303-04 (citing ⚐ *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148, 161 (2008)).

### i. Offering documents[27]

Plaintiffs allege that the offering documents expressly state that Fisker Automotive's Board of Directors had control and authority over the offering documents, by reference

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 131 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

to statements in the April 2011 Middlebury CPPM and December 2011 stock purchase agreement regarding the "exculpation among purchasers" clause (D.I. 53, ex. G and H); the statement on the cover page of the March 2011 CPPM—"Preliminary Draft—Terms may Change Subject to Board and Shareholder Approval" (*id.*, ex. E); and the statements in the December 2011 Capital Call documents and Executive Summary (that the Board of Directors and the Audit Committee reviewed and discussed the terms of the Series D-1 Financing Capital Call). (*Id.*, ex. Fat 1) The documents associated with the solicitation of investments and various Capital Calls [28] are not signed. Fisker signed the Series C-1 preferred Stock Purchase Agreement dated April 27, 2011 on behalf of Fisker Holdings, Inc. (*Id.*, ex. G) In the case at bar, the court is not called upon to determine whether a director signing certain documents had "authority over the content of the statement and whether and how to communicate it," sufficient to be deemed to have "made" the statement. *See e.g.,* *WM High Yield Fund v. O'Hanlon, 964 F. Supp. 2d 368, 390 (E.D. Pa. 2013)*. Instead, the court is presented with documents containing statements indicating that the Board was likely involved in their creation and dissemination. [29] As discussed below, certain Board members participated in conference calls on behalf of Fisker Automotive discussing these documents and the associated solicitations. The court concludes that this is sufficient to pass muster at the motion to dismiss stage. *See e.g.,* *In re Merck & Co., Inc. Securities, Derivative, & ERISA Litigation, Civ. Nos. 05-1151 (SRC), 05-367(SRC), 2011 WL 3444199 at *25 (D. NJ Aug. 8, 2011)* (citing *Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001)*) (denying motion to dismiss where officer "signed SEC forms and was quoted in articles and reports in his [official] capacity .... pursuant to his responsibility and authority to act as an agent of Merck").

### ii. Conference calls [30]

**\*16**  The Third Circuit has explained that

the plain language of § 10(b) and corresponding Rule 10b-5 do not contemplate the general failure to rectify misstatements of others. Moreover, in *Central Bank*, the Supreme Court determined that the scope of § 10(b) does not encompass aiding and abetting liability because the statute "prohibits only the making of a

material misstatement (or omission) or the commission of a manipulative act." Consequently, incorporating into the statute an obligation to rectify others' misstatements (though lacking even the aiding and abetting mens rea requirement of the initial statement made) would be illogical in light of the Supreme Court's holding.

*U.S. v. Schiff, 602 F.3d 152, 167 (3d Cir. 2010)* (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994)*) (internal citations omitted). This analysis is also consistent with the Supreme Court's decision in *Janus*, discussed above. The court concludes that participation in a conference call, without speaking, cannot confer liability under Rule 10b-5 for the misstatements or omissions of the speaker. As plaintiffs do not allege that Koehler and McDonnell spoke on the conference calls, no liability for misstatements made by others may attach.

Plaintiffs identify certain statements made by DaMour and Fisker (such statements are presented in the complaint in the context of the larger transcripts). [31] The salient facts are presented in detail above. (D.I. 24 at ¶¶ 67, 70-71, 86-87, 89, 93-94, 97-99, 110) The Third Circuit has "explained that for 'misrepresentations in an opinion' or belief to be actionable, plaintiffs must show that the statement was 'issued without a genuine belief or reasonable basis'...." *In re Merck & Co., Inc. Sec., Derivative & ""ERISA" Litig., 543 F.3d 150, 166 (3d Cir. 2008)* (citations omitted). DaMour and Fisker's positive statements regarding the ATVM loan, while reflecting the fact that Fisker Automotive was working with the DOE to negotiate terms, contradict the actual frozen status of the loan. That the DOE's press release reported positively on Fisker Automotive's progress does not validate DaMour and Fisker's statements. DaMour and Fisker's statements regarding Fisker Automotive's cash position (presenting Fisker Automotive as well capitalized, without mentioning payables and continuing without the DOE loan) conflict with the actual state of affairs, that Fisker Automotive had payables, some of which were overdue. As to the battery fires, Fisker disputes the falsity of his response based on the cause of the fires. However, the timing of the recall belies Fisker's conclusion that there were no "concerns of battery fires." The court concludes that plaintiffs have sufficiently alleged that Fisker and DaMour's statements were misleading.

### iii. The December 2011 Fisker Letter

**\*17**  Plaintiffs also allege that Fisker's statement in the December 2011 Fisker Letter explaining the reasons for the December 2011 Capital Call omitted any reference to the $200 million in outstanding bills, i.e., Fisker Automotive's true cash position, rendering such statement misleading. The complaint quotes a portion of such letter and describes it as "repeat[ing] the theme that the 'pay to play' capital call was merely a prudent business decision." (D.I. 24 at ¶ 83) However, the letter explicitly refers investors to the "Information Statement" and plaintiffs have alleged that the defendants distributed December 2011 Capital Call documents together with the December 2011 Fisker Letter and the Information Statement. As the December 2011 Fisker Letter is not a standalone document, the court declines to analyze it in a vacuum.

### iv. Statements in news articles

In the briefing, plaintiffs allege that two particular statements by Lane in news articles were misleading.

> However, Fisker Chairman Ray Lane says that **the issues in 2011 were a combination of difficulties faced by any start up**—such as problems with the electrical system that didn't appear until production was underway—and some one-off disasters. For example, a flood soaked the initial shipment of leather delivered for the car's interior, leaving Fisker with 250 vehicles that were ready to go, except for seats, dashboards, steering wheels and every other surface that needed to be covered in cowhide.

(D.I. 24 at ¶ 75) (emphasis added) This statement [32] cannot be reconciled with the standard articulated in *Janus*, i.e., that statements attributable to an individual are those which the individual has "ultimate authority over ..., including its content and whether and how to communicate it." The above paraphrased or summarized statement is not wholly

attributable to Lane. Indeed, the author of the article had control over which portions of the interview to use and how to present any information received from Lane. The same analysis applies to plaintiffs' second citation [33] as no portion is directly attributable to Lane.

The complaint generally alleges that "Lane's, Fisker's, DaMour's, Koehler's and/or McDonnell's statements described at ¶¶ 56, 60, 63, 66-67, 71, 74-75, 86-89, 96-99 and 105" failed to disclose certain facts. (*Id.* at ¶ 149) The following material (from the cited paragraphs) is directly attributable to Lane and related to plaintiffs' arguments. [34] , [35]  An article [36] discussing the production of the Karma states: " 'In production of a first vehicle, everything doesn't go the way you plan,' Lane said in a recent interview. 'Next year, we'll do exactly what we plan.' " (*Id.* at ¶ 74)

**\*18**  The article cited by plaintiffs above [37] also stated:

> In the first quarter, the company said it drew in $100 million in revenue. 'I'm looking at about $400 million in revenue this year. That would make it the fastest growing start-up ever,' Lane said. These projections, he added, don't include sales in China and Middle East, where the company is building relation-ships with dealerships. Fisker Automotive, however, is not profitable, said Lane.

Discussing investments, the article stated "[w]e've added warrants as a sweetener,' said Lane." The article continued:

> The situation with the DOE, said Lane, "caused us to accelerate capital raising." That is leading to certain compromises. Advanced Equities has recently been served a Wells Notice from the Securities & Exchange Commission, which indicates the SEC may enforce action against it.
>
> Asked why Kleiner Perkins is continuing to use Advanced Equities' services in light of the SEC investigation, Lane said: "They are good at what they do."

(*Id.* at ¶ 105) Lane's statement regarding revenue is followed by the admission that Fisker Automotive is not profitable. The quoted statements do not conflict with the alleged facts, therefore, the court concludes that such statements are not actionable.

### c. Reliance

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), the Supreme Court examined reliance in the context of cases seeking to predicate Rule 10b-5 liability upon omissions and concluded that in cases "involving primarily a failure to disclose [material facts], positive proof of reliance is not a prerequisite to recovery." *Id.* at 153-54. "[R]eliance will be presumed from the materiality of the information not disclosed. Conversely, no presumption arises in cases of alleged misrepresentations." *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 192 (3d Cir. 2001); *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 187 (3d Cir. 1981) (overruled on other grounds by *Mccarter v. Mitcham*, 883 F.2d 196, 202 (3d Cir. 1989)). The proper approach to reliance in cases involving both omissions and misrepresentations "is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance." *Sharp, 649 F.2d at 188*.

**\*19** Applying *Affiliated Ute*, the Court of Appeals for the Tenth Circuit explained:

> Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely.

*Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000) (citations omitted). In *Wiles*, the plaintiff alleged that defendant "continually reported in its public statements that it had achieved, and would continue to achieve, substantial growth in revenue and profits. These statements ... were materially false and misleading in that they failed to disclose the existence of the fraudulent scheme ..." *Id.* at 1163.

The Tenth Circuit held that "[s]tatements such as these, while struggling valiantly to bring the alleged conduct within the definition of 'omission,' indicate that what [plaintiff] really protests are the affirmative misrepresentations allegedly made by defendants." *Id.*

The allegations at bar present a mix of both omissions (e.g., not disclosing the status of the ATVM loan) and misrepresentations (e.g., statements regarding working with the DOE to resolve issues with the ATVM loan). Considering all of plaintiffs' allegations, the court concludes that plaintiffs are principally complaining of the misrepresentations, i.e., presenting Fisker Automotive's status as stable and funded, when it was failing. The *Affiliated Ute* presumption of reliance does not apply.

The burden of reliance "requires a plaintiff to demonstrate that defendants' conduct caused him 'to engage in the transaction in question.' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 174 (3d Cir. 2001), as amended (Oct. 16, 2001) (citations omitted). In this regard, the complaint at bar identifies the offering documents and alleges that such documents were false and misleading. In the briefing, plaintiffs point out that the "prospectuses/ offering memoranda alleged in the Complaint ... required investors to sign a Subscription Agreement, warranting that they had read the agreement and were 'not relying on any representation other than that contained [t]herein.' " (D.I. 52 at 77) Defendants argue that plaintiffs continued to invest after several of the misstatements at issue were presented in news articles. The various disclosures—the snippets available in news articles, the information from the conference calls, and the information contained in the offering documents —are intertwined. The court concludes that plaintiffs have sufficiently pled reliance. *C.f.*, *Gallup v. Clarion Sintered Metals, Inc.*, 489 Fed.Appx. 553, 557 (3d Cir. 2012) (citing *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974)) (Finding no evidence of reliance at the summary judgment stage, when plaintiffs did not read the financial statements and reports, which omitted information, therefore, plaintiffs decisions "were entirely unaffected by the contents of [defendant's] financial statements.").

### d. Scienter * * [38] * *

**\*20** Scienter is a "mental state embracing intent to deceive, manipulate, or defraud," and requires a knowing or reckless

Case 4:24-cv-01940 Document 45-2 Filed on 03/14/25 in TXSD Page 134 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

state of mind. *Avaya, 564 F.3d at 252* (internal citations omitted). "A reckless statement is one involving ... an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id. at 267 n.42*. The court must be mindful of the heightened pleading standards prescribed by the PSLRA throughout its analysis of defendants' state of mind. *See Tellabs, 551 U.S. at 324* (defining PSLRA's characterization of "strong" inference as one that is "powerful or cogent"). The court must look to the totality of the allegations in order to determine whether defendants acted with the required level of intent. *See Avaya, 564 F.3d at 272-73*. Although the pleadings need not present an irrefutable inference of scienter, plaintiffs' allegations as to defendants' intent must remain "strong in light of other explanations." *Tellabs, 551 U.S. at 324*. Accordingly, the court must examine plaintiffs' complaint to determine whether it has adequately pied that the misrepresentations and omissions attributed to defendants give rise to an inference of scienter that is at least as compelling as any nonculpable explanations presented by the defendants. *See id.*

The Third Circuit has held that a securities fraud plaintiff may not merely allege "motive and opportunity" as the requisite scienter necessary to survive a motion to dismiss. *Avaya, 564 F.3d at 277*. Although motive may be a factor in analyzing defendant's state of mind, plaintiff's complaint must also include some element of volition on the part of the defendant. *See id.*

As discussed above, Fisker and DaMour made positive statements regarding the ATVM loan after it had been frozen, and conflicting statements regarding Fisker Automotive's cash position. Fisker additionally made statements downplaying the potential for battery fires. Plaintiffs relied on the representations in the offering documents, which allegedly contained misstatements and omissions. The totality of the circumstances, which can be succinctly described as ardently soliciting investors in order to launch and sustain Fisker Automotive, with defendants standing to gain from Fisker Automotive's success through their positions as Directors, leads to a strong inference that defendants acted with an intent to manipulate investors. For these reasons, defendants' motions to dismiss the § 10(b) claims are denied.

### 4. Section 20(a)* * [38] * *

Section 20(a) of the Exchange Act imposes joint and several liability on any person who "directly or indirectly controls any person liable" under any provision of the Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *15 U.S.C. § 78t(a)*; *In re Suprema, 438 F.3d at 284* (citing *15 U.S.C. § 78t(a)*). Plaintiffs "must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws." *In re Suprema, 438 F.3d at 284* (citation omitted). Accordingly, liability under § 20(a) is derivative of an underlying violation of those sections by the controlled person.

The court has found that plaintiffs have adequately alleged a primary violation of § 10(b) by the various defendants.[39] As to the control element, Daubenspeck, DaMour and Li were members of Fisker Automotive's Board of Directors and plaintiffs have alleged that the Board was responsible for the creation and dissemination of various confidential memoranda regarding the offerings and Capital Calls. DaMour participated in conference calls regarding Fisker Automotive. Daubenspeck cofounded Advanced Equities, an investment bank used by Fisker Automotive to raise capital. As to Ace Strength, plaintiffs have alleged that Li invested in Fisker Automotive through Ace Strength, such that Ace Strength was a controlling shareholder of Fisker Automotive. The court concludes that plaintiffs have adequately pied "actual control" as to these defendants.

## IV. PERSONAL JURISDICTION

### A. Standard

**\*21** *Rule 12(b)(2)* directs the court to dismiss a case when it lacks personal jurisdiction over the defendants. *Fed.R.Civ.P. 12(b)(2)*. When reviewing a motion to dismiss pursuant to *Rule 12(b)(2)*, a court must accept as true all allegations of jurisdictional fact made by the plaintiffs and resolve all factual disputes in the plaintiffs' favor. *Traynor v. Liu, 495 F. Supp. 2d 444, 448 (D. Del. 2007)*. Once a jurisdictional defense has been raised, the plaintiffs bear the burden of establishing, with reasonable particularity, that sufficient minimum contacts have occurred between the defendants and the forum to support jurisdiction. *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987)*. To meet

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

this burden, the plaintiffs must produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion "requires resolution of factual issues outside the pleadings."

🟡⚠️ *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n. 9 (3d Cir. 1984).

In determining whether a court may exercise personal jurisdiction, a court must examine the relationship among the defendants, the forum, and the litigation. 🟡 *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). Where the plaintiffs' cause of action is related to or arises out of the defendants' contacts with the forum, the court is said to exercise "specific jurisdiction." 🟡 *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (quoting 🟡 *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). In federal court, the exercise of specific jurisdiction must satisfy the requirements of the Due Process Clause of the Fifth Amendment. *See* 🟡 *In re Real Estate Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 766 n. 6 (3d Cir. 1989). In assessing the sufficiency of defendants' contacts with the forum as required by the Due Process Clause, "a court should look at the extent to which the defendants 'availed [themselves] of the privileges of American law and the extent to which [they] could reasonably anticipate being involved in litigation in the United States.' " 🟡 *Pinker*, 292 F.3d at 370 (quoting 🟡 *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 293 (3d Cir. 1985)); *see also* 🟡 *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The final phase of assessing whether to exercise personal jurisdiction over defendants involves an analysis of whether jurisdiction comports with "traditional notions of fair play and substantial justice." 🟡 *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Jurisdiction over alleged violations of the Exchange Act is governed by § 27 of the Act. *See* 15 U.S.C. § 78aa. Section 78aa provides in pertinent part:

> The District Courts of the United States ... shall have exclusive jurisdiction of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules

> and regulations thereunder. Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in [the district wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa.* * *[40]* * *

**B. Discussion**

**\*22**  Plaintiffs allege that both Li and Ace Strength possess minimum contacts with the United States. Specifically, plaintiffs allege that Li, a Hong Kong resident and member of the Fisker Automotive Board of Directors, held a "controlling interest" in Fisker Automotive through Ace Strength, a British Virgin Islands corporation which owned 10.15% of Fisker's shares. (D.I. 24 at ¶¶ 32-33, 59) Plaintiffs aver that Li voted for and/or approved the December 2011 Capital Call. (*Id.* at ¶¶ 79, 81) Plaintiffs also allege that the solicitations were directed at the United States and that "substantial acts" related to the disclosure allegations took place in the United States. Li was identified as a Director and used Fisker Automotive's address in a Notice of Exempt Offering of Securities. (D.I. 52 at 84; D.I. 53, ex. 1)[41]

So long as defendants have minimum contacts with the United States as a whole, § 78aa and § 77v confer personal jurisdiction over the defendant in any federal court. The due process requirement that

> a defendant have "minimum contacts" with a particular district or state ... is not a limitation imposed on the federal courts under Section 27 in a federal case. Due process concerns under the Fifth Amendment are satisfied if a federal statute provides for nationwide

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 136 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

service of process in federal court for
federal question cases.

*FS Photo, Inc. v. PictureVision, Inc.*, 48 F. Supp. 2d 442, 445
(D. Del. 1999).

Specific jurisdiction cannot be solely based upon shares
in a United States corporation. *Balden Techs., Inc.
v. LS Corp.* 626 F. Supp. 2d 448, 457 (D. Del. 2009)
("[m]ere ownership of a [Delaware] corporation is not
sufficient to confer personal jurisdiction over a non-resident
defendant"). A position of director is by itself insufficient to
find specific jurisdiction. *Tracinda Corp. v. Daimlerchrysler
AG*, 197 F. Supp. 2d 86, 99 (D. Del. 2002). Moreover,
plaintiffs must "adequately specif[y defendants'] alleged role"
to establish specific jurisdiction. *See id.* at 96 (declining "to
exercise jurisdiction over [d]efendant Kopper based solely on
Tracinda's controlling person claims").

Plaintiffs assert that Li's position on Fisker's Board of
Directors, identification in the Notice of Exempt Offering of
Securities with Fisker Automotive's California address, along
with his "active participation" and vote on the December
2011 Capital Call, mandates specific jurisdiction. While these
statements demonstrate that Li had some contact with the
United States, plaintiffs do not allege that the cause of
action—misrepresentations and omission in the disclosures
—arises out of or is related to said contact. *See IMO
Indus., Inc.*, 155 F.3d at 259. Plaintiffs have not pied facts
showing that Li or Ace Strength exercised control over
the challenged disclosures or engaged in "substantial acts"
"purposefully directed" at the United States and sufficient
to establish minimum contacts. * * *[42] * * *,* * *[43] * * *

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472
(1985); *Helicopteros*, 466 U.S. at 414.

While plaintiffs shoulder the burden of demonstrating
sufficient jurisdictional facts, "courts are to assist the plaintiff
by allowing jurisdictional discovery unless the plaintiff's
claim is 'clearly frivolous.' " *Toys "R" Us, Inc. v.
Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (quoting
*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,
107 F.3d 1026, 1042 (3d Cir. 1997)). "If a plaintiff presents
factual allegations that suggest 'with reasonable particularity'
the possible existence of the requisite 'contacts between

[the parties] and the forum state,' the plaintiff's right to
conduct jurisdictional discovery should be sustained." *Id.
at 456* (quoting *Mellon Bank (East) PSFS, Nat'l Ass'n v.
Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)). A court must
determine whether certain discovery avenues, "if explored,
might provide the 'something more' needed" to establish
personal jurisdiction. *Toys "R" Us*, 318 F.3d at 456. To
receive jurisdictional discovery, plaintiffs must claim that
their factual allegations establish with reasonable particularity
the possible existence of requisite contacts. If they do
not, to allow jurisdictional discovery would "allow plaintiff
to undertake a fishing expedition based only upon bare
allegations." *Inno360 v. Zakta, LLC*, 50 F. Supp. 2d 587,
597 (2014). Notably, in addition, "the United States Supreme
Court has held that courts should 'exercise special vigilance
to protect foreign litigants from the danger that unnecessary,
or unduly burdensome, discovery may place [on] them.' "
*Telecordia Tech, Inc. v. Alcatel S.A.*, Civ. No. 04-874 GMS,
2005WL1268061, at *8 (D. Del. May 27, 2015).

**\*23** In support of the request for jurisdictional discovery,
plaintiffs suggest that Ace Strength might have an alter-
ego or agency relationship with a company for which
this court has general jurisdiction and that Li might own
property in the United States. * * *[44] * * * (D. I. 52 at 86-87)
Plaintiffs also contend that Li may have "traveled to the
United States in connection with Fisker Automotive or the
offerings, particularly the pay-to-play offerings," and that
such information might provide further relevant information
pertaining to specific jurisdiction. (D.I. 52 at 87) These
contentions, along with Li's status as a Director of Fisker
Automotive, * * *[45] * * * raise a colorable showing of personal
jurisdiction sufficient to allow jurisdictional discovery.

**V. CONCLUSION**

For the foregoing reasons, the court grants in part and
denies in part defendants Daubenspeck, Fisker and Koehler,
DaMour, and Kleiner and Lane's motions to dismiss the
consolidated complaint (D.I. 29; D.I. 33; D.I. 36; D.I. 43);
stays Ace Strength and Li's motion to dismiss (D.I. 38)
pending the completion of jurisdictional discovery; grants
McDonnell's motion to dismiss (D.I. 31); and grants plaintiffs'
motion for judicial notice of certain documents (D.I. 54). An
appropriate order shall issue.

2015 WL 6039690

**All Citations**

Not Reported in Fed. Supp., 2015 WL 6039690

---

### Footnotes

1    The present action filed on December 27, 2013; *CK Investments LLC v. Fisker*, Civ. No. 14-118 filed on January 31, 2014; and *PEAK6 Opportunities Fund L.L.C. v. Fisker*, Civ. No. 14-119 filed on January 31, 2014. All citations are to the present action, Civ. No. 13-2100, unless otherwise indicated.

2    Defined below.

3    Plaintiffs Atlas, CK Investments, Raisbeck, Hunse Investments, Southwell, Sandor, Lemak, Pinnacle, Andreeff, SAML Partners, KKRR Trust, and Smith are collectively the Middlebury plaintiffs.

4    *Car Maker Taps Funding Karma*, Wall Street Journal, January 20, 2010 (based primarily on interviews with Fisker and Lane).

5    *Luxury hybrid electric car maker Fisker Automotive raises an extra $100M*, VentureBeat, May 13, 2011.

6    Specifically, DaMour stated:

> We've already raised over $600 million worth of equity and when you combine that with the Department of Energy loans, which we secured, which are $530 million—that's $1.1 billion of total capital already secured for the business.
>
> ...
>
> But importantly, a significant cash cushion which provides significant security and comfort to our suppliers and our dealers and all the other major partners we have that run the business with us. So in sum, we know we are very well capitalized today.

(D.I. 24 at ¶ 67)

7    *Fisker asks investors for $200M more: Funding is being called a 'pre-IPO' round*, The News Journal (Wilmington, Delaware), August 21, 2011.

8    *Fisker on track to make electric sports cars, despite delays*, Calgary Herald (Alberta), November 18, 2011 and *Fisker says Karma will meet 15,000 production target for 2012*, AutoblogGreen, November 26, 2011.

9    It is unclear in the complaint to which specific documents this refers.

10   Jonathan Starkey, *Fisker* issues *Karma recalls*, The News Journal (Wilmington, Delaware), December 30, 2011.

11   *Fisker slows work at former GM site, lays off 26*, The News Journal (Wilmington, Delaware), February 7, 2012.

12   The Detroit Free Press, April 19, 2012.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 138 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

13    *Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension*, The Wall Street Journal Venture Capital Dispatch Blog, June 26, 2012.

14    In 4WheelsNews.

15    From the record at bar, at least $1.4 billion was invested in Fisker Automotive prior to its bankruptcy filing.

16    Against all defendants except Kleiner Perkins and Ace Strength. (D.I. 24 at ¶¶ 126-139)

17    Section 12(a)(2) provides that any defendant who

offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable ... to the person purchasing such security from him.

15 U.S.C. § 77l.

18    The SEC censured Advanced Equities for fraudulent practices and Advanced Equities then ceased operations and is now defunct. (D.I. 24 at ¶ 34)

19    Stating in part:

I encourage you to carefully review the Information Statement and consider a further investment in Fisker Automotive. Importantly, three of our major venture capital investors, Kleiner Perkins, NEA and Pacific Century, support this action and have already made, or committed to make, their capital calls, together totaling more than $57 million.

(D.I. 24 at ¶ 83)

20    The court does not base its decision on the news articles containing general statements regarding raising capital and going public.

21    The court addresses Li *infra.*

22    Rule 501 (a) defines "accredited investor," which are more sophisticated investors, such as banks, companies and high net worth individuals. 17 C.F.R. § 230.501(a).

23    Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of § 12. Accordingly, a violation of § 15 only applies when a primary violation of § 12 has been found. 🚩 *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006). As plaintiffs have failed to set forth a primary violation of § 12(a)(2), plaintiffs' controlling person claims under § 15 must also be dismissed.

24    Against all defendants except Kleiner Perkins and Ace Strength. (D.I. 24 at ¶¶ 145-159)

25    The PSLRA's heightened pleading requirements were constructed in order to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.

Case 4:24-cv-01940 Document 45-2 Filed on 03/14/25 in TXSD Page 139 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

🚩 *Horizon Lines, 686 F. Supp. 2d at 414*.

26    The court does not reach plaintiffs' duty to disclose argument based on the third prong, prior misleading statements.

27    Plaintiffs allege that all defendants except McDonnell had a duty to disclose related to the offering documents.

28    Provided by plaintiffs as exhibits.

29    Without discovery, the court struggles to envision how plaintiffs could ascertain which individuals were responsible for the creation of these types of documents.

30    Plaintiffs allege that McDonnell, Fisker, Koehler, and DaMour had a duty to disclose in connection with the conference calls.

31    Defendants argue that plaintiffs have not identified in the complaint with specificity which statements from the conference calls are misleading and may not now do so through the briefing. 🚩 *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). However, in the interests of efficiency (because an amendment would be granted) and as defendants have substantively responded to the arguments, the court reviews the identified statements.

32    *Fisker says Karma will meet 15, 000 production target for 2012*, AutoblogGreen, November 26, 2011.

33    *Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension*, The Wall Street Journal Venture Capital Dispatch Blog, June 26, 2012.

> **For a while, Irvine, Calif.-based Fisker was operating under the assumption that it has $529 million in federal loans, but last year the Department of Energy, which handles the loans, suspended issuing new checks because the car company missed some milestones. Fisker delayed the release of Karma and sold fewer Karmas than it promised under the DOE loan agreement.** As a result of the loan suspension, Fisker stopped additional work on a plant in Delaware where it was planning to build the cars and laid off some employees.

> (*Id.* at ¶ 105) (emphasis added)

34    Again, rather than entertain an amended complaint.

35    Paragraphs 56, 66-67, 71, 86-89, 96-99 relate to offering documents and conference calls. The articles cited in ¶¶ 60 and 75 do not contain direct quotations. The article in 63 states, "[q]uote: 'Reduce demand for oil by 5 to 10 percent, and you start to control pricing.' " This statement is unrelated to the issues at bar.

36    *Fisker on track to make electric sports cars, despite delays*, Calgary Herald (Alberta), November 18, 2011. The article also states: " 'The leather was useless. We had 250 cars parked and waiting for leather,' Lane said." Such statement is unrelated to the issues at bar.

37    *Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension*, The Wall Street Journal Venture Capital Dispatch Blog, June 26, 2012. Other quotations do not relate to the issues at bar. " 'We have 1,700 cars sold now,' said Ray Lane ...." Discussing financing operations and its next car model, Atlantic, the article stated

> "You don't make money until volumes are up," said Lane. The company needs to build the Atlantic, which would increase its volumes, and amortize its fixed costs across more units, as well as allow Fisker to

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 140 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

negotiate better deals with suppliers. "We can't move forward without the debt,' said Lane, referring to the Atlantic program."

...

The company has been using equity, the most expensive capital, to pay for the development of Atlantic to date. "We spent $130 million on the Atlantic," Lane said. "No one wants to spend" [sic] more equity," he said. That is the reason Fisker is in discussions with a syndicate of private lenders, led by the Royal Bank of Canada, he added.

(*Id.* at

38    ~~As the court previously found that only risker and DaMour "made" statements, the scienter analysis is limited to these defendants~~  .

38    Against Kleiner Perkins, Lane, Fisker, DaMour, Koehler, Daubenspeck, Li and Ace Strength.

39    Kleiner Perkins, Lane, Fisker and Koehler only challenged the § 20(a) claim as failing to allege a primary violation. (D.I. 58; D.I. 62)

40    Defendants did not oppose plaintiffs' motion to take judicial notice of certain documents. (D.I. 54) Such documents are cited in the complaint (D.I. 53, ex. B-H and JN); a matter of public record (*id.*, ex. A); and filed with the SEC (*id.*, ex. I). The court takes judicial notice of such documents as needed for the present motions. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 2006) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 (3d Cir. 1994) ("We may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."); *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (taking "judicial notice of properly-authenticated public disclosure documents filed with the SEC").

42    Plaintiffs' citation to *TCS Capital Management, LLC v. Apax Partners, L.P.*, 2008 U.S. Dist. LEXIS 19854, 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) is inapposite. Though it was indeed "foreseeable" that defendants' actions would have an "effect" in the United States, the jurisdictional issue in the case turned on the fact that the "director defendants were all primary violators by virtue of their having prepared and approved the allegedly false and/or misleading Explanatory Report." *Id.* at *29-33.

43    Therefore, the court does not consider whether the exercise of specific jurisdiction "would comport with 'fair play and substantial justice.' " *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 106 (3d Cir. 2009) (citing *Burger King*, 471 U.S. at 476).

44    Plaintiffs also assert that jurisdictional discovery is supported by the fact that Ace Strength is not a public company and that a great deal of information is solely in their hands. *See Rocke v. Pebble Beach Co.*, 541 Fed.Appx. 208, 212-13 (3d Cir. 2013) (finding that a district court abused its discretion by failing to allow jurisdictional discovery where the necessary information was solely in defendants' hands resulting in an "imbalance in access to information" between the parties).

45    Who may have participated in the preparation of offering documents, discussed above.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 141 of 330

In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Not Reported in Fed....

2015 WL 6039690

---

**End of Document**                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB No. 10

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3539371

2023 WL 3539371
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

IN RE MYLAN N.V. SECURITIES LITIGATION

2:20-cv-955-NR
|
Signed May 18, 2023

## OPINION

J. Nicholas Ranjan, United States District Judge

**\*1**  In this putative securities class action, Lead Plaintiff Public Employees' Retirement System of Mississippi sues Defendants Mylan N.V., CEO Heather Bresch, President Rajiv Malik, and CFO Kenneth Parks under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder. Defendants move to dismiss the amended complaint for failure to state a claim. For the reasons below, Defendants' motion to dismiss will be granted in part and denied in part.

## FACTUAL BACKGROUND

**I. Regulatory environment for Mylan's core business.**

As pled in the amended complaint, Mylan is one of the largest generic drug manufacturers in the world. ECF 39, ¶ 2. Mylan has fifty manufacturing facilities worldwide, sixteen of which are in North America. *Id.* at ¶ 281. One of those North American facilities is in Morgantown, West Virginia. *Id.* at ¶ 1. The Morgantown facility accounted for roughly 85% of the tablets and gel capsule drugs that Mylan sold in the United States each year during what is defined as the "class period" (February 16, 2016, through May 7, 2019). *Id.* at ¶¶ 7, 34. [1]

Mylan operates in a heavily regulated industry, and, as a result, its success and reputation depends on producing safe and efficacious products. *Id.* at ¶¶ 26, 35, 43. Drug manufacturers like Mylan must comply with FDA quality control regulations, including Current Good Manufacturing Practices ("CGMP"). *Id.* at ¶¶ 2, 43. The FDA relies on manufacturers to conduct testing (and implement data quality controls to validate that testing), since the FDA cannot test

every drug distributed in the U.S. *Id.* at ¶¶ 44, 54. If drugs fail testing, manufacturers are prohibited from re-testing them to achieve a passing result, because doing so could conceal the production of unsafe drugs. *Id.* at ¶¶ 49-50.

As another safeguard to ensure compliance with CGMP requirements, the FDA conducts periodic inspections of drug manufacturing facilities. *Id.* at ¶ 52. Those inspections can result in the issuance of a "Form 483," which is a report setting forth "conditions that in [the FDA inspector's] judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act[.]" ECF 47-10, FDA 483, FAQs. But this Form only lists inspectional observations and "does not constitute a final Agency determination of whether any condition [at a facility] is in violation of the FD&C Act[.]" *Id.* Manufacturers, like Mylan, are encouraged to respond to any issues noted in a Form 483 that they receive. ECF 47-1, p. 1.

The FDA may follow up on Form 483 inspectional observations by issuing an untitled letter or a "Warning Letter." ECF 39, ¶ 152. Untitled letters document less significant issues and do not "warn" about potential enforcement actions. ECF 47-12. Warning Letters are reserved for more "significant violations" that "may lead to an enforcement action if not promptly and adequately corrected." ECF 47-13.

**\*2**  At all relevant times, Mylan recognized that "failure to comply with CGMP" could result in a host of serious regulatory sanctions, including "warning letter[s], fines, penalties, disgorgement, unanticipated compliance expenditures," product recalls, and even criminal prosecution. ECF 39, ¶ 56.

**II. Inspection of Mylan's Nashik facility.**

In September 2016, the FDA inspected Mylan's facility in Nashik, India. ECF 39, ¶ 91. After that inspection, the FDA issued a Form 483 to Mylan, documenting a series of safety and data failures. *Id.* at ¶¶ 91-93; ECF 39-3, pp. 1-4. Later, the FDA issued a Warning Letter to Mylan about the issues observed during the inspection. ECF 39, ¶ 146. Mylan publicly acknowledged the letter. *Id.* at ¶ 277. The FDA eventually issued a "Closeout Letter," stating that it "had completed an evaluation of [Mylan]'s corrective actions" and "it appears that [Mylan has] addressed the violations contained in th[e] [Nashik] Warning Letter." ECF 47-4.

**III. Inspections of Morgantown facility.**

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)
2023 WL 3539371

In November 2016, the FDA inspected Mylan's facility in Morgantown, West Virginia. ECF 39, ¶ 95. Once again, after that inspection, the FDA issued a Form 483 to Mylan. *Id.* at ¶¶ 95, 97; ECF 47-1. The Morgantown Form 483 focused on problematic laboratory controls and documentation practices, including the practice of impermissibly "testing into compliance." ECF 39, ¶ 97; ECF 47-1. In a separate letter, not a Warning Letter, the FDA informed Mylan that the inspections "raised questions regarding the integrity and reliability of data generated" by Mylan's quality control functions. ECF 39, ¶ 145. As a result, the FDA classified the Morgantown facility as "Voluntary Action Indicated." *Id.* at ¶ 152.

In March and April 2018, the FDA conducted another inspection of Morgantown. *Id.* at ¶ 164. Following that inspection, on April 12, 2018, the FDA issued another Form 483 for Morgantown. *Id.*; ECF 47-2. This Form 483 focused on manufacturing operations, including the processes and procedures for cleaning manufacturing equipment and utensils. ECF 47-2, pp. 2-13, 18-25.

On May 3, 2018, Mylan submitted a detailed response to the 2018 Form 483, and Mylan continued to engage with the FDA on proposed corrective actions to address the FDA's observations. ECF 47-8.

Even so, on November 9, 2018, the FDA issued a Warning Letter to Mylan about Morgantown, which "summarize[d] significant violation of current good manufacturing practice (CGMP) regulations for finished pharmaceuticals" that had been laid out in the April 2018 Form 483. ECF 39, ¶¶ 195-206. It added that Mylan "lack[ed] an adequate ongoing program for monitoring process control to ensure stable manufacture operations and consistent drug quality." *Id.* at ¶¶ 199, 281, 283.

#### IV. Mylan's response to Morgantown inspection and correspondence from the FDA.

Mylan acted in response to the Warning Letter. It halted production at Morgantown while it sought to remediate the noticed violations (ECF 39, ¶ 178); it dramatically reduced the facility's production volume (*id.*); it implemented remedial measures under consultant supervision and ensured that those measures were validated and scalable before resuming production (*id.*); and it recalled at least seven drugs manufactured at Morgantown (*id.* at ¶ 180).

Publicly, as early as April 20, 2018, Mylan announced that it was "right-sizing" the Morgantown plant to make it "less complex." *Id.* at ¶¶ 11, 179, 290. At the time, Mylan explained that the rightsizing tracked discussions it was having with the FDA. *Id.*

*3 In June 2018, Mylan acknowledged receipt of the 2018 Form 483 and stated that it had "submitted a comprehensive response to the [FDA] and committed to a robust improvement plan." ECF 39, ¶¶ 181, 184-85; ECF 47-29.

In August 2018, Mylan publicly disclosed that the restructuring and remediation program at Morgantown would include the discontinuation of several products, that the program had harmed operations (*e.g.*, it had lowered production levels and increased expenses), and that it would continue to have a negative impact through the end of 2018. ECF 39, ¶ 186; ECF 47-26, p. 3.

In November 2018, Mylan updated investors again—this time stating that the remediation program would continue into 2019 and that expenses related to these additional restructuring activities could not reasonably be estimated. ECF 39, ¶ 194; ECF 47-22; ECF 47-31.

On January 31, 2019, *Bloomberg Law* published an article in which Mylan's spokeswoman responded to allegations of CGMP and data integrity failure at Mylan's plants by stating that "[a]ny explicit or implicit suggestion that Mylan employees circumvented data and quality systems that jeopardized the quality of the medications we manufacture—for time pressures or any other reason—is simply false." ECF 39, ¶ 299.

#### V. Changes in Mylan's share price.

According to the amended complaint, the "relevant truth" about the FDA's inspections and Mylan's data integrity failures only began to partially surface in 2018. For example, on June 27, 2018, *Bloomberg* reported that the FDA inspected Morgantown in 2018 and issued a Form 483 listing 13 significant deficiencies in Morgantown's operations. ECF 39, ¶ 181. Soon after, Mylan's share price fell about 4%, from $37.45 per share to $36.33 per share. *Id.* at ¶ 183.

During Mylan's first earnings call after the article, Defendant Malik described the issues as "temporary" and claimed that Mylan's restructuring efforts had been planned before receiving the Form 483. *Id.* at ¶ 187. Mr. Malik tried to

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3539371

assuage investors that Mylan would "re-bring volume back up" following remediation of the issues observed by the FDA. *Id.* at ¶ 187. After this news, Mylan's stock price fell around 7% from $39.23 per share to $36.61 per share. *Id.* at ¶ 188.

On February 26, 2019, Mylan released its financial results for the fourth quarter of 2018. These results disclosed a 5% decline of total quarterly revenues, a 16% decline for the quarter in North American segment net sales, the discontinuation of 250 products, and $258 million in remediation costs. *Id.* at ¶¶ 207-11. In response to this report, Mr. Malik assured investors that the negative impact from the Morgantown remediation was "largely behind" Mylan. *Id.* at ¶ 213. Once again, Mylan's stock price fell—this time $4.61 per share—but analysts were encouraged by Mr. Malik's assurance that the worst was over. *Id.* at ¶¶ 212-16.

On May 7, 2019, Mylan reported a loss for the first quarter of 2019. *Id.* at ¶ 217. After this news, Mylan's share price fell another $6.73 per share. *Id.* at ¶ 219.

### VI. Plaintiff files suit.

**\*4** From these core facts, Plaintiff sued Mylan, along with Ms. Bresch, its CEO, Mr. Malik, its President, and Mr. Parks, its CFO, alleging claims under Sections 10(b) and 20(a) of the Exchange Act. ECF 39. Defendants then moved to dismiss the claims in their entirety. ECF 45.

### TIMELINE OF KEY EVENTS

| Date | Event |
| --- | --- |
| Feb. 16, 2016 | Beginning of class period |
| Sept. 5, 2016 | FDA conducts surprise inspection of Nashik, India facility |
| Sept. 2016 | FDA issues Form 483 to Mylan outlining observations from Nashik inspection |
| Nov. 7, 2016 | FDA conducts inspection of Morgantown, West Virginia facility |
| Nov. 18, 2016 | FDA issues Form 483 to Mylan outlining observations from Morgantown inspection |
| Nov. or Dec. 2016 | FDA writes private letter to Mylan demanding answers for issues outlined in Form 483 |
| Jan. 2017 | Mylan privately responds to FDA letter |
| Apr. 3, 2017 | FDA issues Warning Letter to Mylan concerning Nashik facility |
| Apr. 2017 | Mylan executives meet in person with FDA officials |
| Mar. 19, 2018 | FDA conducts another surprise inspection of Morgantown facility |
| Apr. 12, 2018 | FDA issues Form 483 re: second Morgantown inspection |
| Apr. 20, 2018 | Mylan announces that it is laying off 15% of the employees at Morgantown |
| May 2018 | Mylan recalls several drugs manufactured at Morgantown |
| June 27, 2018 | *Bloomberg* publishes report that FDA inspected Morgantown and "made 13 observations"; share price falls $1.12 (about 3%) |
| Aug. 8, 2018 | Mr. Malik discloses that Morgantown had undertaken a remediation plan following the issuance of the Form 483; share price falls $2.62 per share (about 7%) |
| Nov. 9, 2018 | FDA issues Warning Letter to Mylan concerning Morgantown facility |
| Feb. 26, 2019 | Mylan releases financial results for fourth quarter of 2018 and full year of 2018; reports a decline in quarterly and yearly revenues and a decline in net sales for North American segment; explains that drops are "primarily due to lower volumes on existing products, which was primarily driven by actions associated with the restructuring and remediation activities at Morgantown plant" |
| May 7, 2019 | Mylan reports loss for the first quarter of 2019 due, in part, to costs associated with Morgantown restructuring; Mylan's share price falls $6.73 (about 24%) |
| May 7, 2019 | End of class period; over the course of the class period, Mylan's share price drops by over 50% |

### DISCUSSION & ANALYSIS

**I. The Court will consider Plaintiff's allegations based on former employees and media sources.**

Before the Court can begin to analyze the sufficiency of Plaintiff's claims, it must first establish the rules of engagement. That's because Defendants argue that the Court should disregard huge swaths of the amended complaint that are based on (1) statements from "low-level former employees" and (2) "other unnamed sources borrowed from *Bottle of Lies: The Inside Story of the Generic Drug Boom* and two articles from *Bloomberg*." ECF 46, p. 12. After careful consideration, the Court will credit these allegations in its analysis.

**A. The Court will consider the statements from the former employees.**

"[T]he PSLRA imposes a particularity requirement on all allegations, whether they are offered in support of a statement's falsity or of a defendant's scienter."

🔖 *Institutional Inv'rs Grp. v. Avaya, Inc.,* 564 F.3d 242, 263 (3d Cir. 2009) (citation omitted). "Thus, when considering allegations from confidential sources, the Third Circuit instructs that courts apply the particularity requirement by evaluating the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3539371

from other sources, the coherence and plausibility of the allegations, and similar indicia." *In re Aurora Cannabis, Inc. Sec. Litig.*, No. 19-20588, 2022 WL 4446125, at *6 (D.N.J. Sept. 23, 2022) (cleaned up).

The crucial aspect of this evaluation is whether the confidential witnesses "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Wu v. GSX Techedu Inc.*, No. 20-4457, 2023 WL 2207422, at *5 (D.N.J. Feb. 24, 2023) (citing *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013)). Courts typically find sufficient particularity where the plaintiff has alleged "(1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 290

(D.N.J. 2007) (citing *Chubb*, 394 F.3d at 147) (other citations omitted).

**\*5** Defendants maintain that the allegations made by the former employees "fail to satisfy the Third Circuit's rigorous pleading requirements" and should not be credited, either to "establish falsity or [to] support an inference of scienter." ECF 46, p. 13. Defendants' position centers on two main arguments, neither of which is convincing.

First, Defendants argue that Plaintiff has failed to provide enough detail about the tenure, position, and responsibilities of the former employees to provide the Court with the necessary detail to conclude that they plausibly possessed the information alleged. The Court disagrees. The amended complaint provides the following information about the tenure and job titles of all the former employees:

| FE | Tenure | Job Title |
|---|---|---|
| 1 | Entire class period (ECF 39, ¶ 95) | Quality Control and Technical Area Lead in Packaging at Morgantown (*id.*) |
| 2 | Before class period until April 2018 (*id.* at ¶ 111) | Quality Assurance Specialist at Morgantown (*id.*) |
| 3 | 2016 to 2019 (*id.* at ¶ 112) | Chemist (*id.*) |
| 4 | Start of class period until mid-2016 (*id.* at ¶ 113) | Quality Control Chemist at Morgantown (*id.*) |
| 5 | Start of class period until November 2016 (*id.* at ¶ 115) | Quality Compliance Manager (*id.* at ¶ 115) |
| 6 | Before class period until Spring 2018 (*id.* at ¶ 131) | Lead Financial Analyst (*id.*) |
| 7 | Before class period until November 2018 (*id.* at ¶ 143) | Quality Assurance Supervisor (*id.*) |
| 8 | 2016 to 2018 (*id.* at ¶ 160) | Technical Area Lead in Manufacturing (*id.*) |

And although the descriptions of each former employee's job responsibilities vary in the degree of specificity, all are sufficient at the motion-to-dismiss stage of the case for the Court to credit the challenged allegations.

Some descriptions, like those for former employee (or "FE") 2, FE3, FE6, and FE 7, are more detailed. For example, as the

Lead Financial Analysis, FE6 is alleged to have been assigned to Morgantown to help "oversee the site operations budget, with significant work on the Company's quality budget." ECF 39, ¶ 131. In that role, FE6 is said to have "supported the Vice President and Site Head of Quality at Morgantown." *Id.* Given those descriptions, the Court finds it plausible that FE6 would know details about the budget (*id.* at ¶¶ 131-35) and could

offer information on the impact that the budget would have on production and compliance goals at the Morgantown facility (*id.* at ¶ 131).

The descriptions for FE2 and FE3 also provide insights into the job responsibilities of FE1, FE4, and FE5, who held similar positions. As a "Quality Assurance Specialist" at Morgantown, FE2 was "responsible for analyzing drugs and equipment for compliance with quality standards." *Id.* at ¶ 111. FE3 worked as a chemist "responsible for quality control and validation" at Morgantown. Based on those consistent descriptions, and the job titles for and nature of the statements from FE1, FE4, and FE5, the Court infers that those former compliance-related employees had similar duties and responsibilities. And in that capacity, each of these former employees would be qualified to speak on the compliance and quality-control processes and procedures at Mylan generally, and the Morgantown facility specifically, if the former employee was alleged to have worked there during his or her tenure. *See Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, No. 22-2155, 2022 WL 3273879, at *11 (D.N.J. Aug. 11, 2022)* ("FE-9 and FE-10's respective job title and functions further support the plausibility that they would have the information alleged. Accepting these allegations as true, as the Court must, Plaintiff has satisfactorily alleged how the FEs had access to such information." (cleaned up)).

**\*6** Along with those descriptions, the mutual consistency of the former employees' accounts reinforces their reliability. They tell a story of widespread compliance and product-quality issues at Morgantown that were driven by outsized production demands imposed by management. *See, e.g.*, ECF 39, ¶¶ 108-62. They also describe that these issues were directly communicated to management and high-level executives at Mylan but not meaningfully addressed until after repeated serious warnings from the FDA. That these accounts tell the same coherent story enhances the plausibility of that story. *See Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 468 n.8 (E.D. Pa. 2020)* ("[T]he [FE] allegations are specific, mutually consistent, and plausibly within the scope of knowledge each [FE] would have acquired during his or her employment[.]").

Not only that, contrary to Defendants' argument that the accounts of the former employees are "uncorroborated by any document, meeting or witnessed discussion," they are supported by the several Forms 483 and the Warning Letter that the FDA issued to Mylan regarding the Morgantown facility. *See generally* ECF 47-1; ECF 47-2; ECF 47-3; ECF

47-6. They are further corroborated by the book *Bottle of Lies*, which is discussed below.

Considering all these allegations together, Plaintiff has set forth sufficient facts to establish the reliability of the former employees' statements, and the Court will consider them.

**B. The Court will consider the allegations based on *Bottle of Lies* and the *Bloomberg* articles.**

Defendants also argue that the Court should discredit Plaintiff's allegations that reference or are otherwise based on information in *Bottle of Lies* and two *Bloomberg* articles. According to Defendants, these sources are not reputable, are not particular and detailed enough to reflect their reliability, or both. The Court disagrees.

The parties agree, generally, that plaintiffs in securities actions can rely on certain media sources when making their allegations. ECF 46, p. 20; ECF 48, p. 32. Their disagreement is whether Plaintiff can rely on the specific media sources at issue. To meet the heightened pleading requirements in securities-fraud cases, "media sources must be sufficiently detailed to indicate [ ] their reliability and be based on an independent investigative effort." *In re Loewen Grp. Inc.*, No. 98-6740, 2004 WL 1853137, at *6 (E.D. Pa. Aug. 18, 2004)* (cleaned up). [2] *Bottle of Lies* and the *Bloomberg* articles meet both requirements.

**\*7** Taking *Bottle of Lies* first, author Katherine Eban's reporting is detailed enough to reflect its reliability and comes from an exhaustive independent investigative effort.

Ms. Eban, helpfully, describes her reporting process in considerable detail. As she states in her forward, the book is based on "extensive interviews, firsthand reporting, and documentation." ECF 47-33. She "interviewed over 240 people, a number of them multiple times, including regulators, drug investigators, criminal investigators, diplomats, prosecutors, scientists, lawyers, public-health experts, doctors, patients, company executives, consultants, and whistleblowers." *Id.* Her primary reporting took her to "India, China, Ghana, England, Ireland, and Mexico" and she "travel[ed] throughout the United States" to get "on-the-ground" information. *Id.* She also obtained a "significant number of confidential documents," including "20,000 internal documents from the [FDA]." *Id.* Those internal documents, in turn, contained "emails, memorandum [sic], meeting minutes, reports, and data; thousands of internal

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 148 of 330

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)
2023 WL 3539371

government records related to the investigation of the generic drug company Ranbaxy; and thousands of internal corporate records from several generic drug companies, including emails, reports, strategy documents, correspondence, and sealed court records." *Id.* Ms. Eban also obtained other documentation from "sixteen Freedom of Information Act requests" that she filed with the FDA, "as well as from a lawsuit that [she] filed to obtain calendar and meeting records for an FDA official." *Id.* Finally, she "read through years of publicly available FDA inspection records." *Id.*

Ms. Eban's on-the-ground reporting and firsthand review of core documents allowed her to provide insights related to several relevant topics, including, but not limited to, the 2015 and 2016 FDA whistleblower reports, Mylan's correspondence with the FDA in 2016 and 2017, and Mylan's reaction to the 2016 Form 483. ECF 39, ¶¶ 89, 91. The Court will credit this kind of effort. *See, e.g.,* 🔶 *In re JPMorgan Chase & Co. Sec. Litig.,* No. 06-4675, 2007 WL 4531794, at *5 (N.D. Ill. Dec. 18, 2007) (crediting "an independent investigation" conducted by a journalist "who interviewed several individuals with personal knowledge of the merger" and provided "detail about the people involved ... and the details of the negotiations, including where and when the negotiations took place, the existence of the no-premium offer, and terms of the final deal").

The same goes for the *Bloomberg* articles. Defendants do not dispute that *Bloomberg* is a "reputable" media source, because it plainly is. *See, e.g.,* ECF 47-36, p. 3 ("In a year-long investigation into FDA's regulation of the generic-drug industry, Bloomberg examined hundreds of pages of inspection documents; reviewed more than 10 years of inspection data and thousands of pages of pretrial depositions; and interviewed more than two dozen current and former FDA inspectors and agency officials, lawmakers, and industry experts."). The Court can credit articles "published in industry journals ... and reputable newspapers" based on detailed reporting, like *Bloomberg's* publications, because they "meet the requirements of being independent and reliable." 🔶 *Loewen Grp.,* 2004 WL 1853137, at *6.

**\*8** In one last attempt to convince the Court to disregard the allegations based on *Bottle of Lies* and the *Bloomberg* articles, Defendants argue that these publications rely too heavily on "anonymous sources" that are not described with sufficient particularity to credit the information that they provide. ECF 54, pp. 21-22. However, most of the allegations

from the amended complaint that borrow from *Bottle of Lies* relate to reporting that could be plausibly corroborated by a review of documents examined by Ms. Eban and the authors of the *Bloomberg* articles. And on top of that, contrary to Defendants' suggestion, many of the unnamed witnesses are described with enough particularity to give the Court confidence that the information they provided was reliable.

For these reasons, the Court will consider the allegations in the amended complaint based on *Bottle of Lies* and the *Bloomberg* articles. *See* 🔶 *In re Lehman Bros. Sec. & ERISA Litig.,* No. 10-6637, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013)* (recognizing that "a plaintiff may rely in its complaint on witness statements recounted in newspaper articles" and similar sources). [3]

## II. Plaintiff has alleged a material misrepresentation or omission.

With those threshold issues resolved, the Court now turns to Plaintiff's securities-fraud claim under Rule 10b-5. That rule states that it violates the Exchange Act "[t]o make any untrue statement of material fact or to omit to state a material fact ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. To state a claim under Rule 10b-5, Plaintiff must show: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.,* a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e.,* a causal connection between the material misrepresentation and the loss." 🔶 *In re Aetna, Inc. Sec. Litig.,* 617 F.3d 272, 277 (3d Cir. 2010) (cleaned up). Defendants only argue at this stage that Plaintiff failed to adequately allege the first and second elements.

The first step in the Court's analysis of the Rule 10b-5 claim, then, is to determine whether Plaintiff has alleged any actionable misstatements. The heightened pleading standard of the PSLRA requires that complaints alleging securities fraud "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

"Although Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a duty to be both accurate and complete."

2023 WL 3539371

*Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, No. 19-3354, 2020 WL 3268531, at *9 (S.D.N.Y. June 17, 2020) (cleaned up). "Disclosure is required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (cleaned up).

**\*9** For omitted facts to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *Id.* at 10 (cleaned up). "Because materiality is a mixed question of law and fact, a complaint may not be properly dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (cleaned up); *see also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992) (citation omitted). "[A]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *Aetna*, 617 F.3d at 283.

Over the course of 129 pages and 354 individually numbered paragraphs, Plaintiff alleges that Defendants made many actionable misrepresentations and omissions.

For purposes of its analysis, the Court has organized the allegations of fraud into these categories: (1) statements on Mylan's public website; (2) Mylan's other self-congratulatory statements about aspects of its performance, business strategy, and compliance measures; (3) statements about Mylan's regulatory compliance; (4) statements about the "suitability" of manufacturing facilities; (5) other statements of opinion; (6) statements about "right sizing" the Morgantown facility; and (7) a statement that appears in a *Bloomberg Law* article.

After carefully reviewing the allegations, the Court finds that only the alleged misstatement or omission in paragraph 299 of the amended complaint from the *Bloomberg Law* article is actionable. Nothing else in the amended complaint can serve as the basis for Plaintiff's Rule 10b-5 claim in Count I.

**A. The statements on Mylan's public website are not actionable.**

Plaintiff has alleged that several statements on Mylan's website regarding the quality and reliability of its manufacturing processes were material misrepresentations. *See* ECF 39, ¶¶ 254, 256, 258, 260, 262, 264. These statements, however, cannot serve as the basis for Plaintiff's securities-fraud claim.

Rule 10b-5 states that to be actionable, an alleged misrepresentation must be made "in connection with the purchase or sale of any security[.]" 15 U.S.C. § 78j(b). This "in connection with" requirement is met "where material misrepresentations are disseminated to the public in a medium upon which a reasonable investor would rely" in deciding whether to buy or sell a security. *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 301 (3d Cir. 2005) (cleaned up). The Court must construe this requirement "flexibly" in order to effectuate the "remedial purposes" of the statute. *SEC v. Zandford*, 535 U.S. 813, 819 (2002). But the Court must also keep in mind that the statements must "make[ ] a *significant difference* to someone's decision to purchase or sell" a security. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) (emphasis added).

After careful consideration, the Court concludes that the statements from Mylan's website are not the type of statements upon which a reasonable investor would rely.

To start, the alleged misstatements appeared on Mylan's general website, not its investor-relations page. While certainly not dispositive, this fact suggests that investors visiting Mylan's website would view the information contained on the separate investor-relations page to have more value to them, since it was specifically targeted to them. The information on the other pages within Mylan's website drives this point.

These other pages included things like descriptions of products, general statements about safety and quality, and narratives regarding the company's history. Essentially, these pages are all about promoting Mylan, its brand, and its products. "No reasonable investor would rely upon these promotional phrases in making investment decisions." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1030 (D. Minn. 2009) (holding that information published "about the Fidelis lead on its website to promote it to physicians" was not made in connection with the sale of securities), *aff'd sub*

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 150 of 330

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3539371

*nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010).[4]

**\*10** The nature of the statements themselves further underscores this fact. They are best characterized as statements of "corporate optimism," "mere puffing," or "generalized statements of optimism." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Classic examples of puffery are when a company offers "[v]ague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices[.]" *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021). A reasonable investor cannot rely on such statements because they are too general.

All the statements from Mylan's website fall into this category:

- "[T]here's nothing generic about our standards. Our internal teams conduct reviews of all products, start to finish." ECF 39, ¶ 254.

- "[O]ur priorities are to meet or exceed industry standards. Our own teams conduct ongoing reviews to ensure quality and integrity of products, start to finish, and to continually improve for optimal quality and consistency." *Id.* at ¶ 256.

- "Mylan uses advanced testing and monitoring systems to assure product adheres to testing acceptance criteria that are in alignment with requirements established by standard-setting organizations around the world." *Id.* at ¶ 258.

- "Mylan utilizes state-of-the-art monitoring systems that can automatically evaluate and reject a product that does not meet specifications." *Id.* at ¶ 260.

- "Mylan assures product potency, purity, and drug release through expiration date by testing the stability of our products at specific intervals." *Id.* at ¶ 262.

These general statements about Mylan's "standards" and "systems" are non-actionable because "they do no more than reflect statements that are loosely optimistic regarding [the] company's well-being, and they are so vague, broad, and non-specific that a reasonable investor would not rely on them." *In re AstraZeneca PLC Sec. Litig.*, No. 21-722, 2022 WL 4133258, at \*8 (S.D.N.Y. 2022) (cleaned up; collecting cases). That's especially true here since Mylan was

simultaneously publicly disclosing the significant regulatory risks facing the company in all its SEC filings. A reasonable investor would therefore recognize that while Mylan might subjectively believe that it uses "advanced" and "state-of-the-art" systems and that its standards were not "generic," it was possible regulators might not agree. *See In re Peabody Energy Corp. Sec. Litig.*, No. 20-8024, 2022 WL 671222, at \*13-14 (S.D.N.Y. Mar. 7, 2022).

The allegations based on statements from Mylan's public website do not state a claim.

**B. Mylan's other self-congratulatory statements about aspects of its performance, business strategy, and compliance measures are not actionable.**

The same "puffery" analysis discussed in the previous section applies with equal force to various soft statements cited in the amended complaint. This is all puffery—Mylan describing: (1) its overall "operational excellence" (ECF 39, ¶ 271), (2) its "deep and unwavering commitment to quality" (*id.* at ¶ 279), (3) its manufacturing platform as "[p]owerful" and "high quality" (*id.* at ¶ 281), (4) its quality standards as "stringent" (*id.* at ¶ 283), (5) its investments in "quality" (*id.* at ¶¶ 284, 292-93), (6) its business strategy as "win-win" (*id.* at ¶ 303), (7) its manufacturing operations as "extensive" (*id.* at ¶ 304), and (8) its supply chain as "reliable" and "second to none" (*id.* at ¶¶ 305-07). *See, e.g., Aetna*, 617 F.3d at 280 n.7, 283-84 (dismissing claims where underwriting and pricing practices were described as "strong," "disciplined," and "rigor[ous]"); *SEPTA v. Orrstown Fin. Servs., Inc.*, No. 12-993, 2015 WL 3833849, at \*19 (M.D. Pa. June 22, 2015) (finding that "representations of ... 'stringent' underwriting standards are ... accurately characterized as puffery, or a positive portrayal so vague as to be immaterial to a reasonable investor."); *Freedman v. St. Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1107-13 (D. Minn. 2014) (finding "strict design rules" and "high quality product designs" immaterial despite Forms 483 citing design deficiencies). These adjective-laden statements are too vague to be verified. What makes a manufacturing platform "powerful"? What constitutes "operational excellence"? A reasonable investor would not put stock in these corporate platitudes.

**\*11** Similarly, these statements too are all puffery: Mylan's statements about (1) its "commitment" to "maintaining the highest quality manufacturing standards at its facilities around the world" (ECF 39, ¶ 297), (2) being "best positioned

2023 WL 3539371

to take [its] entire product portfolio across the globe" (*id.* at ¶ 310), (3) its ability to "leverage" its platform and portfolio (*id.* at ¶¶ 311-12), and (4) "celebrating" or expressing "excitement" about "the credibility of [Mylan's] science, our portfolio, our ability, our operational excellence, the ability to manufacture high-quality, high-volume products around the globe" (*id.* at ¶¶ 317, 319). *See, e.g.,* 🚩 *Advanta,* 180 F.3d at 537-38 (statements puffery where cost structure, credit quality, and customer recruiting process described as "superior," "excellent" and "high quality"); 📒 *In re Hertz Glob. Holdings, Inc. Sec. Litig.,* No. 13-7050, 2017 WL 1536223, at *10-11 (D.N.J. Apr. 27, 2017)* ("sustained operational excellence" statement was immaterial because it was not "determina[ble]" or "verifiable"), *aff'd sub nom.* 📒 *In re Hertz Glob. Holdings Inc.,* 905 F.3d 106 (3d Cir. 2018); *In re AstraZeneca,* 2022 WL 4133258, at *8 (finding that statements about "various commitments to public safety and equitable access" could not support a claim "even if the statements are in tension with any omissions in some abstract sense"). These aspirational statements "read like mission statements rather than guarantees" in that they outline goals toward which Mylan is working, rather than listing objective accomplishments. *Howard v. Arconic Inc.,* 395 F. Supp. 3d 516, 547 (W.D. Pa. 2019) (Hornak, C.J.); *see, e.g.,* ECF 39, ¶ 284 (Mylan conducting a "series of reviews *designed to* meet or exceed ... regulatory ... standards ... around the globe" (emphasis added)).

**C. Statements about Mylan's regulatory compliance are not actionable**.

Plaintiff next alleges that Defendants misled investors about the status of Mylan's regulatory compliance in several of Mylan's SEC filings during the class period. Specifically, Plaintiff claims that it was misleading for Mylan to suggest that "there is no guarantee" that its compliance programs and policies "will meet regulatory agency standards in the future or will prevent instances of non-compliance with applicable laws and regulations," and that Mylan only "may receive" notices of regulatory violations in the future. ECF 39, ¶¶ 269, 275, 289, 296. According to Plaintiff, these statements were misleading because they only stated that compliance-related risks might occur in the future, when, in fact, Mylan had already received notices of significant violations. *Id.* at ¶¶ 270, 276, 289, 296. Plaintiff's claim fails, ironically, because of what it selectively omitted from its quotation of the at-issue SEC filings.

In the amended complaint, Plaintiff left out this important bit of adjacent information from the SEC disclosure:

> [D]espite our efforts at compliance, from time to time we receive notices of manufacturing and quality-related observations following inspections by regulatory authorities around the world, as well as official agency correspondence regarding compliance. We may receive similar observations and correspondence in the future.

*See, e.g.,* ECF 47-20, p. 36. Adding in the unedited "context of the complained-of statements ... actually cuts [Plaintiff's] argument out from under it." 📒 *Carvelli v. Ocwen Fin. Corp.,* 934 F.3d 1307, 1322 (11th Cir. 2019). That's because Plaintiff's omission demonstrates that Mylan disclosed the very thing that Plaintiff claims was left out—that Mylan had already received "quality-related observations following inspections by regulatory authorities." 📒⚠️ *In re Lions Gate Entm't Corp. Sec. Litig.,* 165 F. Supp. 3d 1, 15-16 (S.D.N.Y. 2016) (finding that there was "nothing false or misleading" about repeated statements in SEC filings that "[f]rom time to time, the Company is involved in certain claims and legal proceeding arising in the normal course of business" because "they accurately describe that there were currently pending claims or legal proceedings").

The added context of the other risk disclosures in these same SEC filings further undermines Plaintiff's position. In each of Mylan's SEC quarterly and annual filings during the class period, Mylan included the following cautionary statements:

• THE PHARMACEUTICAL INDUSTRY IS HEAVILY REGULATED AND WE FACE SIGNIFICANT COSTS AND UNCERTAINTIES ASSOCIATED WITH OUR EFFORTS TO COMPLY WITH APPLICABLE LAWS AND REGULATIONS (ECF 47-19, pp. 33-34 (emphasis in original); *see also* ECF 47-18, pp. 22-23; ECF 47-20, pp. 35-36; ECF 47-21, pp. 33-34); and

**\*12** • Although we have established internal quality and regulatory compliance programs and policies, there is no guarantee that these programs and policies, as currently designed, will meet regulatory agency standards in the

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 152 of 330

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3539371

future or will prevent instances of non-compliance with applicable laws and regulations (ECF 47-18, p. 23).

Mylan also advised investors of the potentially severe consequences of any non-compliance, including "receipt of an untitled or warning letter, ... unanticipated compliance expenditures, ... [and/or] total or partial suspension of production and/or distribution," which could materially affect Mylan's "business, financial condition, [and] results of operations[.]" ECF 47-19, p. 33; *see also* ECF 47-20, p. 36.

These added disclosures made it clear that, even under the best circumstances, there was "uncertainty as to the very possibility of adequate compliance ... in light of complex and shifting government regulations." 🏳️ *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019). That uncertainty was even more pronounced here since Mylan was telling investors that it, in fact, had already received (and would continue to receive) notices of non-compliance. *See* 🏳️ *Garnett v. RLX Tech. Inc.*, No. 21-5125, 2022 WL 4632323, at *19 (S.D.N.Y. Sept. 30, 2022) ("Viewed as a whole, these statements in the Offering Materials fairly alerted investors to the existing regulatory strictures in China governing e-cigarettes, the prospect that heightened regulation of these products would be undertaken, and the attendant risks to investors.").

Considering what securities law refers to as the "total mix" of information available to investors, Mylan's compliance disclosures did not misleadingly "suggest that adverse consequences were only a possibility" and that the company was currently compliant despite allegedly "widespread" and "serious compliance issues." ECF 39, ¶¶ 269, 275, 289, 296. Rather, they told investors the truth: Mylan faced serious business risk because of the heavily regulated industry in which it operated, and that maintaining adequate compliance would be a significant undertaking—an undertaking at which it would sometimes come up short. Therefore, the alleged misrepresentations in paragraphs 269, 275, 289, and 296 of the amended complaint cannot serve as the basis for Plaintiff's Rule 10b-5 claim.

**D. Mylan's opinion statements about the "suitability" of its manufacturing facilities are not actionable.**

Plaintiff also challenges Mylan's repeated statement about the "suitability" of its manufacturing facilities:

> We believe that all of our facilities are in good operating condition, the machinery and equipment are well-maintained, the facilities are suitable for their intended purposes and they have capacities adequate for the current operations.

*See* ECF 39, ¶¶ 267, 273, 288. Plaintiff alleges that this statement was misleading because Mylan's facilities "were rife with serious, repeat CGMP and data integrity violations." *Id.* at ¶ 268. The Court, though, does not find this statement to be actionable.

Mylan's statement, with its "we believe" language, is clearly an opinion. 🏳️ *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) (words like "I think" or "I believe" connote opinions). Of course, an opinion can be "misleading if it omits material facts about the inquiry into or knowledge concerning a statement of opinion." *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 717 (3d Cir. 2020) (cleaned up). "But liability attaches only if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* (cleaned up). Thus, alleging an actionable opinion "is no small task" because "a reasonable investor understands that sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion." *Id.* (cleaned up).

**\*13** Plaintiff's allegations do not meet this "rigorous benchmark." *Id.* The facts that Plaintiff alleges were omitted don't even relate to the content of the statement at issue. That statement speaks to whether Mylan's facilities had the necessary operational equipment to allow for manufacturing at the levels required for its business. In other words, this statement is clearly and objectively about the physical condition of the manufacturing facilities and the machinery and equipment contained within them. It does not go to whether those facilities complied with all the regulatory requirements related to quality control testing, data integrity, or cleaning that was the focus of the FDA's observations and warnings. Because there is no allegation that Mylan offered an insincere opinion about the physical characteristics of its manufacturing facilities, any claim based on these

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 153 of 330
In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3539371

"suitability" statements fails. *See, e.g.,* Omnicare, 575 U.S. at 194 (plaintiff must "identify particular (and material) facts" that "call into question the issuer's basis for offering the opinion."); *PolarityTE, 2020 WL 6873798, at *10* ("there is no plausible basis to think ... the Form [483] somehow alters the meaning of the statement" describing manufacturing facilities layout and capabilities).

### E. Mylan's other statements of opinion are not actionable.

Similarly, the amended complaint does not state a claim based on allegations that Defendants' positive opinions about Mylan's business strategy or outlook during the class period were misleading.

The challenged statements in this category outline Mylan's decision not to reduce its product portfolio in the hope that its reputation as a reliable supplier would put the company in a good position to gain market share as competitors exited certain segments of the market. *See, e.g.,* ECF 39, ¶ 302 (Bresch: "our ability to be nimble, to react to market opportunities, to react to customer disruption ... certainly then puts a different perspective of how you're leveraged with the customers"); ¶ 305 (Bresch: "I think" that the "need for a reliable supply" will "be a differentiator" and "a real value driver and growth driver for us"); ¶ 307 (Bresch: "I truly think" that "ability to be that reliable supplier" will allow for "capacity to do the kind of the [sic] volumes that need to be done"); ¶ 313 (Bresch: "I think, where Mylan has differentiated itself is, one, having that broad base, that portfolio, the capacity to truly meet the supply that's needed[.]"); ¶ 314 (Bresch: "I think we have found ourselves in a position" to maintain production levels for generics); ¶ 315 (Bresch: "I think" that as other "companies are rationalizing" Mylan is "able to kind of be patient"); ¶ 316 (Parks: "I think some of these larger customers value the fact that you can bring to them more today than 5 years ago the ability to supply them with a broader range of products"). Plaintiff alleges that these statements were misleading because Defendants did not disclose that Mylan was quietly compromising quality to meet volume demands. ECF 48, p. 38. The Court disagrees.

Defendants did not base their belief that Mylan could gain market share on the ***quality*** of its manufacturing processes, but instead based it on Mylan's "ability to provide all the different products [its customers] need[ed]." ECF 39, ¶¶ 303, 308, 309, 312, 315. On that score, Plaintiff does not allege that

Defendants did not genuinely believe that Mylan possessed the ability to produce a diverse portfolio of products in volumes that would provide a competitive advantage; only that compromising quality (and the attendant regulatory risks that would come with such a compromise) could jeopardize Mylan's rosy outlook. Plaintiff's argument "essentially boils down to an allegation that the statements are misleading for failure to include a fact that would have potentially undermined Defendants' optimistic projections." *Tongue v. Sanofi, 816 F.3d 199, 212 (2d Cir. 2016).*

The problem with that argument is that when expressing an optimistic opinion about Mylan's future, Defendants didn't have to disclose every possible problem that could arise along the way. *Omnicare, 575 U.S. at 194* ("[a]n opinion statement ... is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way"). Rather, such an obligation could only arise if the undisclosed fact made it impossible for the speaker's opinion to be correct. But the individual Defendants' alleged knowledge of systemic quality and data integrity issues would not mean that "it was *impossible*" for Mylan to execute its business strategy. *Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1329 n.13 (11th Cir. 2019)* (emphasis in original).

**\*14** This is true even where, as Plaintiff alleges, some of the individual Defendants' knowledge came from asserted violations on the Forms 483. Importantly, a Form 483 is simply "interim FDA feedback." *Schaeffer v. Nabriva Therapeutics PLC, No. 19-4813, 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020).* The "advisory language that accompanies all Forms 483" makes clear that the forms "do not represent the FDA's final word" and "do not represent a final agency determination regarding ... compliance." *In re Genzyme Corp. Sec. Litig., 754 F.3d 31, 35 (1st Cir. 2014)* (cleaned up). Consequently, Mylan, as it did here, had the opportunity to address that feedback, while continuing its operations. Any quality and data integrity issues might have made it tougher for Mylan to meet its production goals if the problems could not be adequately resolved, but they wouldn't have made it impossible.

In the end, "Plaintiff may disagree with Defendants' opinion, but so long as Defendants conducted a meaningful inquiry and in fact held the stated view, the statements did not mislead in a manner that is actionable." *In re Investment Tech. Grp., Inc. Sec. Litig., 251 F. Supp. 3d 596, 619 (S.D.N.Y.*

2017) (cleaned up). The Court finds that these opinion statements about Mylan's business strategy and outlook are not actionable.

### F. Statements about "right sizing" the Morgantown facility were not materially misleading.

Plaintiff next argues that "Defendants made false and misleading statements about the expansive remediation that was undertaken at Morgantown." ECF 48, p. 41. According to Plaintiff, Defendants "downplayed the Morgantown issues" by claiming that a "compelled remediation" was part of an existing plan to "right size" the facility and that any disruption would be "temporary." *Id.* at p. 42. After carefully reviewing the statements that serve as the crux for this claim, the Court finds that the statements were not misleading because they did not downplay anything—they, in fact, painted a grim picture of the circumstances at Morgantown. [5] *See, e.g.*, ECF 39, ¶¶ 290, 321-23, 325.

Most of these statements were made during two earnings calls. During the first call, Mr. Malik discussed the FDA inspection at Morgantown and the observations in the Form 483. ECF 47-32, pp. 6-7. He then said in the next breath that Mylan had "undertaken a restructuring and remediation program," which included "a discontinuation of a number of products" to "reduc[e] complexity." *Id.* at p. 7. Those actions led to a "negative impact on production levels, product supply and operations." *Id.* In response to investor questions, Mr. Malik and Ms. Bresch would only say that Mylan was "hopeful" that it would "be able to rebring volume back up" by the end of the year. *Id.* at p. 9. But that hope was tempered by the reality that it would be "difficult for [Mylan] to manage [the] sort of complexity which Morgantown [had]." *Id.* Importantly, Mr. Malik never denied that this program was put in place because of the FDA's observations. *Id.* Later on, Mr. Parks disclosed that the program had cost the company $87 million. *Id.* at p. 7.

**\*15** The outlook didn't get any rosier during the second call a few months later. Mr. Malik noted that Mylan was still working to "reduce the complexity" of the Morgantown facility and reiterated that the company had "discontinued a number of products while also transferring some to other sites." ECF 47-31, p. 5. He stated again that these actions led to a "disruption" of the "supply of certain products for [Mylan's] customers and reduced volume in North America generic sales." *Id.* He also made clear that the "remediation and restructuring activities" would "continue in the near

term." *Id.* at p. 6. Mr. Parks then updated investors that the costs of restructuring and remediation had materially increased to $98 million. *Id.*

Taking these two earnings calls together, Mylan was being forthright about the challenges facing the Morgantown facility. There was no definitive end in sight for the restructuring and remediation program and only "hope" that production volumes would match previous levels in the near term.

Mylan painted an even bleaker picture in its contemporaneous SEC filings. In its 8-K filed on the same day as the first earnings call, Mylan stated that its restructuring and remediation program at Morgantown had "a ***significantly negative impact*** on production levels, product supply and operations." ECF 47-26, p. 3 (emphasis added). Similar statements were repeated in the 8-K filed on the same day as the second call. ECF 47-25, p. 2 ("[remediation] program includes the discontinuation and transfer to other manufacturing sites of a number of products, a reduction of the workforce and extensive remediation activities. These actions have led to a temporary disruption in supply of certain products."). Mylan further stated that it "expected" its "remediation activities, lower production levels, [and] the negative impact on operations and related expenses to ***continue through the end of 2018***." ECF 47-26, p. 3 (emphasis added). The added context of these SEC filings makes it even clearer that Defendants did not mislead investors about the state of the remediation and restricting activities during the at-issue conference calls.

In sum, Defendants' statements during the earnings calls cannot be actionable omissions because they disclosed the exact information that Plaintiff alleges was concealed to the market (*i.e.*, that the remediation efforts triggered, in part, by the FDA's inspections and observations significantly affected Morgantown's productivity). *See Anderson v. StoneMor Partners, L.P.*, 296 F. Supp. 3d 693, 703 (E.D. Pa. 2017) (dismissing claim where defendant "disclosed the very information Plaintiffs allege was concealed from the market"), *aff'd sub nom.* 🚩 *Fan v. StoneMor Partners, L.P.*, 927 F.3d 710 (3d Cir. 2019); *Shemian v. Research In Motion Ltd.*, No. 11-4068, 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013) (dismissing claim based on alleged omission where information at issue was in fact disclosed), *aff'd*, 570 F. App'x 32 (2d Cir. 2014). [6]

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 155 of 330
In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3539371

#### G. Mylan's declaration in the *Bloomberg Law* article is actionable.

That leaves one final statement that has not been addressed elsewhere in this opinion. That statement appeared in an article in *Bloomberg Law* on January 31, 2019. ECF 39, ¶ 299. In that article, a Mylan spokeswoman, Lauren Kashtan, responded to allegations of CGMP and data integrity failures at Mylan's plants by declaring that "[a]ny explicit or implicit suggestion that Mylan employees circumvented data and quality systems that jeopardized the quality of the medications we manufacture—for time pressures or any other reason—is simply false." ECF 47-37, p. 6. Unlike the other statements that Mylan made, this one is actionable.

**\*16** Ms. Kashtan's statement on behalf of Mylan wasn't corporate puffery or a statement of her opinion. It wasn't qualified. It wasn't aspirational. It was a declaration that, at that moment in time, any "suggestion" that Mylan employees circumvented "data and quality systems that jeopardized the quality of the medications" it manufactured was "simply false." The amended complaint alleges in detail—largely through accounts of former employees—the clear circumvention of quality controls at Mylan to cut corners for time pressure and in a way that jeopardized the quality of the medications. ECF 39, ¶¶ 108-77. The Court therefore finds that this statement by Mylan, which was published in the January 2019 *Bloomberg Law*, was a material misrepresentation and can serve as the basis for Plaintiff's Rule 10b-5 claim.

#### III. Plaintiff has adequately alleged corporate scienter.

Having found one alleged material misrepresentation, the Court must now turn to the second step of its analysis—determining whether Plaintiff has adequately alleged scienter as it relates to that statement.

"Scienter is a mental state embracing intent to deceive, manipulate, or defraud." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (cleaned up). A plaintiff alleging scienter must assert facts giving rise to a strong inference of reckless or conscious behavior." *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 153-54 (3d Cir. 2018) (citation omitted). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor

must have been aware of it." *Avaya*, 564 F.3d at 267 n.42 (citation omitted).

To determine whether the allegations in the amended complaint satisfy the scienter requirement, the Court must engage in a three-part analysis.

First, the Court accepts "all factual allegations in the complaint as true." *Martin*, 757 F. App'x at 154 (citation omitted).

Second, the Court determines "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (cleaned up); *see also OFI Asset Mgmt.*, 834 F.3d at 493 (noting that the court must "consider[ ] all the arguments presented by the Complaint and assess[ ] scienter holistically"). Such an inference can arise where the defendants "knew facts or had access to information suggesting that their public statements were not accurate ... or ... failed to check information they had a duty to monitor." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 298 (S.D.N.Y. 2010) (citation omitted).

Third, "to determine whether the allegations give rise to a 'strong' inference of scienter, [the Court] take[s] into account plausible opposing inferences." *Martin*, 757 F. App'x. at 154 (cleaned up). In other words, on this last part, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* (cleaned up). "A securities fraud complaint will therefore only survive a 12(b)(6) motion to dismiss if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (cleaned up).

To begin with, Plaintiff cannot establish scienter as to the *Bloomberg Law* statement with respect to the three individual Defendants. There are no allegations in the amended complaint as to their role in drafting, reviewing, or approving the statement. Therefore, Count I of the amended complaint as against the individual Defendants will be dismissed. *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 232 (E.D. Pa. 2021) ("[A] person with ultimate authority over a statement can be liable under Rule 10b-5, even without uttering the

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)
2023 WL 3539371

words of the statement. But Plaintiffs have not alleged with particularity facts showing that McGinn or Hennigan had ultimate authority for any of the statements at issue."). [7]

**\*17**  But the Court finds that Plaintiff has adequately pled "corporate scienter," and so the claim against Mylan may proceed. "Courts are divided on whether and when scienter is adequately alleged as to a corporation in the absence of scienter allegations as to the individual who made the material misstatement." *In re Cognizant Tech. Sols.* 🚩 *Corp. Sec. Litig.*, No. 16-6509, 2018 WL 3772675, at \*31 (D.N.J. Aug. 8, 2018). And the Third Circuit has not squarely decided the issue. [8] *Id.* at \*32 (cleaned up).

On the facts alleged here, the concept of corporate scienter seems particularly applicable. The unattributed statements contained in the *Bloomberg Law* article "are all statements made ex cathedra, on behalf of the corporation," and "there is ample evidence that high-ranking corporate officials were personally engaged in the details of the project, making it highly unlikely that the unattributed statements were rogue pronouncements by employees lacking authority to speak on the corporation's behalf." 🚩 *Energy Transfer*, 532 F. Supp. 3d at 237. And then there is the nature of that statement. It was a statement of then-existing fact that Mylan's senior management team allegedly knew was false (or at least materially misleading) given the corporation's recent history of compliance issues at several of its flagship manufacturing facilities.

There are three approaches to corporate scienter the Court could adopt: broad, intermediate, and narrow. First, the broad approach. "Some courts, including the Second and Seventh Circuits, have adopted a [broad] theory of 'collective' or 'corporate' scienter and held that allegations can give rise to a strong inference of scienter as to the corporation even if they do not give rise to an inference of scienter as to the individual who uttered the material misstatement." 🚩 *In re Cognizant*, 2018 WL 3772675, at \*31 (cleaned up). [9]

In contrast, courts adopting the narrow approach "require a strong inference of scienter as to the individual corporate official or officials who make or issue the statement rather than generally to the collective knowledge of all the corporation's officers and employees." *Id.* (citing cases from the Fifth and Eleventh Circuits).

And finally, the Sixth Circuit has carved out a middle ground or intermediate approach, in which the court considers the mental state of "[t]he individual agent who uttered or issued the misrepresentation; ... [a]ny individual agent who authorized, requested, commanded, furnished information for, prepared ..., reviewed, or approved the statement ...; [and] ... [a]ny high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." 🚩 *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014).

**\*18**  Like the other district courts from this Circuit that have waded into these waters, this Court declines to adopt the narrow approach. *See* 🚩 *In re Cognizant*, 2018 WL 3772675, at \*33; 🚩 *Energy Transfer*, 532 F. Supp. 3d at 237. That approach "has a significant disadvantage: it allows corporations to evade liability through tacit encouragement and willful ignorance and fails to address instances where widespread corporate fraud cannot be connected to individual defendants at the pleading stage." 🚩 *Energy Transfer*, 532 F. Supp. 3d at 237 (cleaned up). Plus, "[s]lanting too far toward" the narrow approach "risks running counter to the goals and purposes of the 1934 Act—which includes fostering an attitude of full disclosure by publicly traded corporations, rather than a philosophy of caveat emptor for securities buyers." *Id.* (cleaned up).

Having rejected the narrow approach, the Court need not predict whether the Third Circuit would adopt the broad or intermediate approach because the allegations in the amended complaint satisfy both.

Starting with the broader approach, Plaintiff alleges in the amended complaint that there was a pervasive, top-down scheme to dupe the FDA and ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits. It was not limited to a "group of rogue employees perpetuating fraud and concealing it from corporate management, but instead was a pervasive operation extending from senior management itself." 🚩 *In re Cognizant*, 2018 WL 3772675, at \*33. Under these circumstances, an inference of fraud is at least as likely, if not more so, than an inference of recklessness. *See* 🚩 *id.* at \*34 ("[W]hen there is circumstantial evidence creating a strong inference that someone involved in the making of the misstatement was aware of its falsity, the 'collective

2023 WL 3539371

scienter' theory is appropriate to allow plaintiffs to proceed to discovery.").

The Court reaches the same conclusion on scienter under the intermediate approach. The scienter of Defendants Malik, Bresch, and Parks may be imputed to Mylan because each is a "high managerial agent ... who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *Omnicara*, 769 F.3d at 476. These individual Defendants had access to observations and warnings from the FDA that directly contradicted the company's public statement in the *Bloomberg Law* article. The clearest examples of this access are the Forms 483 and Warning Letters that Mylan received about its Nashik and Morgantown facilities.

For example, with respect to Morgantown, in March 2018, the FDA observed that the "responsibilities and procedures applicable to the quality control unit are not fully followed." ECF 47-2, p. 1. One consequence of this failure was that "[l]aboratory analyses are repeated until passing results are obtained." *Id.* at p. 13. Many of these violations were repeat violations, as the FDA outlined in its Warning Letter dated November 9, 2018. ECF 47-6, pp. 6-7. According to the FDA, those "repeated failures at multiple sites demonstrate[d] that Mylan's management oversight and control over the manufacture of drugs [wa]s inadequate." *Id.* at p. 7. And that lack of oversight, in turn, was "a major factor in the unexpected variation observed in [Mylan's] drug products." *Id.* at p. 5. These issues were serious. As the FDA put it in its Warning Letter, Mylan's failure to correct them could lead to "legal action without further notice including, without limitation, seizure and injunction." *Id.* at p. 7. The FDA could also "withhold approval of pending drug applications" from drugs manufactured at those facilities. *Id.* The Warning Letter was addressed directly to Ms. Bresch and was sent less than a year before the *Bloomberg Law* article was published. *Id.* at p. 1. These issues were clearly fresh in the minds of senior management.

**\*19** But that's not all. Even earlier, the FDA allegedly told Mylan executives, including Mr. Malik, that it was "stunned" by the "egregious" violations in the 2016 Form 483 and questioned whether Mylan was being "transparent at all of its sites." ECF 39, ¶¶ 9, 150, 224. According to the former employees detailed in the amended complaint, Mr. Malik balked at implementing meaningful changes to address the violations, and instead internally demanded that Morgantown increase its annual production goals and cut its regulatory

compliance and quality control budget. *Id.* at ¶¶ 8, 132, 135, 157.

These direct warnings to Mylan's senior management support a strong inference of their scienter, which can, in turn, be imputed to Mylan. *See Able Labs*, 2008 WL 1967509, at *16-17 (finding scienter where: (i) Form 483 and warning letter "provided notice to the defendants that serious problems existed in the [company's] manufacturing process"; (ii) the president's "receipt and review of the FDA warning letter should have alerted him to potential problems"; and (iii) the "FDA investigation and Form 483 demonstrate that numerous problems with ... quality controls continued" after receiving initial warnings).

The last step in the scienter analysis requires the Court to examine any non-culpable competing inferences. On this issue, Defendants argue that "there are numerous non-culpable and far more compelling explanations as to why Mylan did [ ] or did not immediately disclose the Form[s] 483," including that Forms 483 "are non-final; it was reasonable to wait to disclose until the FDA's concerns and proposed remediations crystalized; Defendants reasonably believed the FDA's concerns could be remedied; and investors were repeatedly warned that compliance was not guaranteed and that Form[s 483] were received from time to time." ECF 54, p. 26 (cleaned up).

But none of those proffered "compelling explanations" really apply to the statement in the *Bloomberg Law* article. At that point, the FDA's concerns had been repeatedly clarified. And while Mylan may have believed it could remedy those concerns, claiming that any "suggestion" of compliance issues was objectively "false" flies in the face of the reality facing the company at the time. At that point, any warnings issued to investors previously did not inoculate Mylan against materially misrepresenting the state of compliance at Morgantown. For these reasons, the Court finds that Defendants' alternative non-culpable explanations are not compelling. [10]

At this stage, the Court must not "improperly conflate pleading rules and liability rules." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). To survive a motion to dismiss, Plaintiff only needs to state facts "giving rise to strong inference that the defendant acted with the required state of

2023 WL 3539371

mind." 15 U.S.C. § 78u-4(b)(2)(A). Plaintiff has met that burden. [11]

## IV. Plaintiff has stated a claim for scheme liability.

**\*20** Defendants next argue that "Plaintiff's claim for scheme liability under Rule 10b-5(a) and (c) fails because ... Plaintiff has failed to allege an actionable misrepresentation or scienter, and therefore has not alleged any deceptive conduct." ECF 54, p. 30. In other words, according to Defendants, the scheme liability claim is entirely derivative of the misrepresentation claim.

Because the Court has found that Plaintiff has pled at least one actionable misrepresentation and scienter, Defendants' argument is not a basis to dismiss this claim, and the Court will deny the motion.

## V. Plaintiff has stated a claim for control-person liability against the individual Defendants.

Finally, Defendants move to dismiss Plaintiff's claim under Section 20(a) of the Exchange Act. ECF 46, p. 60 n.30. That section provides that, "[e]very person who, directly or indirectly, controls any person [12] liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

"Defendants' argument, however, is premised entirely on the principle that claims under Section 20(a) are derivative, and must be dismissed if the underlying Section 10(b) claim is dismissed." 🚩 *Mill Bridge V, Inc. v. Benton*, No. 08-2806, 2009 WL 4639641, at \*34 (E.D. Pa. Dec. 3, 2009) (cleaned up). But, as discussed above, the Court is not dismissing the Section 10(b) claims against Mylan and therefore this argument does not hold water. *Id.* Defendants "do not

specifically dispute" the individual Defendants "control over [Mylan] at this stage of the proceedings," and therefore the Court finds that the statement in the *Bloomberg Law* article "is a proper predicate for establishing control person liability[.]"

🚩 *Owl Creek I, L.P. v. Ocwen Fin. Corp.*, No. 18-80506, 2018 WL 4844019, at \*11 (S.D. Fla. Oct. 4, 2018); *see also In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359-60 (S.D. Fla. 2005) (noting that courts "have held that allegations that individuals, because of their management and/or director positions, could control a company's general affairs, including the content of public statements ... disseminated by the company, are sufficient to state a cause of action for controlling person liability" (collecting cases)).

## CONCLUSION

For these reasons, the Court will grant in part and deny in part Defendants' motion to dismiss (ECF 45). Specifically, as discussed above, the Court has narrowed the claims at issue to the one actionable misrepresentation. The claims related to that statement in Count I of the amended complaint may proceed, but only against Defendant Mylan. The derivative control-person liability claim in Count II may proceed against the individual Defendants (Bresch, Malik, and Parks), as they relate to the actionable misrepresentation. The Court will not grant leave to amend as to the scope of the actionable statements, because the defects in the amended complaint (*i.e.*, whether certain statements are actionable) are purely legal issues, and so amendment would be futile. *See* 🚩 *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002). But the Court will allow Plaintiff to seek leave to amend during discovery to add back in the individual Defendants as to Count I if Plaintiff can establish their involvement as to the one remaining actionable statement at issue. 🚩 *Winer, 503 F.3d at 337*. An appropriate order follows.

## All Citations

Not Reported in Fed. Supp., 2023 WL 3539371

---

## Footnotes

Case 4:24-cv-01940 Document 45-2 Filed on 03/14/25 in TXSD Page 159 of 330

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3539371

1   Mylan, as a corporate entity, no longer exists. In November 2020, it merged with Upjohn Co. to now form Viatris Inc. ECF 46, p. 1 n.1.

2   Defendants attempt to graft on top of this standard a requirement that the media source meet some undefined and amorphous understanding of being "reputable" within the journalistic community. ECF 46, pp. 19-24. Defendants, however, cite no authority for this extra requirement, and the Court declines to impose it on Plaintiff. That said, even if the Court did adopt this extra requirement, *Bottle of Lies* and the two *Bloomberg* articles would meet it. Defendants argue that *Bottle of Lies* is "hardly a well-known and reputable source" and in support cite a single critical *Washington Post* book review. ECF 46, p. 21. On the flip side, Plaintiff cites a host of favorable reviews and awards for Ms. Eban's work. ECF 48, p. 33 n.11. It is not the Court's province to wade into literary criticism and decide which opinion is the right one. The Court, instead, must focus on what Ms. Eban described as her process and decide whether that process is sufficient to yield reliable results. If so, the work is "reputable" for the purposes of the Court's analysis, regardless of any literary criticism the book may have received. As discussed in this opinion, Ms. Eban's comprehensive reporting makes *Bottle of Lies* a reputable source of information under this definition.

3   Defendants also suggest that Plaintiff was required to have "conducted its own investigation which corroborates the information in the article or journal." ECF 46, p. 20 (citing cases). Not so. That suggestion misreads 🚩 *McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000). In *McKesson*, the court required that "the article be the result of independent investigative efforts by those authorizing or sponsoring the article." ⚠️ *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 80-81 (D. Del. 2002) (discussing *McKesson*). Counsel need not conduct a **separate** investigation into the article to corroborate its contents. But even if such a requirement did exist, the voluminous allegations in the amended complaint that reference witness interviews and specific documents support an inference that such an investigation was done.

4   Unlike the defendant in 🚩 *Howard v. Arconic*, No. 17-cv-1057, 2021 WL 2561895 (W.D. Pa. June 23, 2021) (Hornak, C.J.), a case cited by Plaintiff, Mylan specifically directed investors to its "Investor Relations" page, which did not include the challenged statements. *See* ECF 54, p. 12 n.13.

5   They are also, explicitly, forward-looking statements. ECF 47-31, p. 4 ("During today's call, we will be making forward-looking statements on a number of matters" that are "subject to risks and uncertainties that could cause future results or events to differ materially from today's projections."); ECF 47-32, p. 4 (same). Forward-looking statements are protected if they are "either accompanied by 'substantive and tailored' cautionary statements or if the plaintiff fails to show actual knowledge of falsehood." 🚩 *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491 (3d Cir. 2016) (cleaned up). The statements here are protected under both prongs. There were substantive and tailored cautionary statements made contemporaneously with the earnings calls about the "risks and uncertainties" regarding the predictions made by senior management, including the fact that Mylan might be "unable to achieve expected synergies and operating efficiencies in connection with ... restructuring programs within the expected time-frames or at all." ECF 47-26, p. 10. Plaintiff also does not allege sufficient facts to establish that the individual Defendants who spoke on these earnings calls knew their statements were false at the time they were made.

6   The same is true about Mylan's allegedly misleading statement in its Form 10-Q on May 10, 2018, that there had been no material changes in the company's risk factors. ECF 39, ¶ 295. That statement is talking about the regulatory risk from a macro perspective, and those risks had not changed. And that also goes for Mr. Malik's statement during an earnings call in 2017 about the FDA warning letter at the Nashik site, which is quoted in paragraph 286 of the amended complaint.

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 160 of 330

In re Mylan N.V. Securities Litigation, Not Reported in Fed. Supp. (2023)

2023 WL 3539371

7    Any effort to attribute the statement in the January 2019 *Bloomberg* article to the individual Defendants fails "because it represents impermissible group-pleading." 🚩 *Energy Transfer*, 532 F. Supp. 3d at 235. "Group-pleading is a judicial presumption that statements in group-published documents are attributable to officers in that group." *Id.* (cleaned up). When group-pleading is permitted, it allows a "plaintiff to plead that defendants made a misstatement or omission of a material fact without pleading particular facts associating the defendants to the alleged fraud." 🚩 *Winer Family Tr. v. Queen*, 503 F.3d 319, 335 (3d Cir. 2007). The Third Circuit, though, has rejected group-pleading as inconsistent with the heightened pleading standards of the PSLRA. 🚩 *Id.* at 336-37. In *Winer*, the Third Circuit found an effort to connect unattributed statements to the corporation by pleading that the individual Defendants had "access to, control over, and ability to edit and withhold dissemination of [the corporation's] press releases and SEC filings" was insufficient. 🚩 *Id.* at 334-35. To attribute the statements from the *Bloomberg Law* article to any of the individual Defendants, Plaintiff would have to make this same (already rejected) argument.

8    "We, however, neither have accepted nor rejected the doctrine of corporate scienter in securities fraud actions, and we do not do so now[.]" 🚩 *Rahman*, 736 F.3d at 246; *see also* 🚩 *In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018) ("We have neither accepted nor rejected that doctrine and decline to do so here because the ... allegations would not give rise to corporate scienter under any recognized theory of that doctrine." (citation omitted)).

9    The Ninth Circuit has also recognized that "in certain circumstances, some form of collective scienter pleading might be appropriate." 🚩 *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008).

10   Defendants also argue that the lack of clear motive undermines the fraud allegations. But Plaintiff has pled a motive; according to Plaintiff, Defendants were "motivated to hide misconduct at Morgantown as they knew remediation would be costly, reduce production, and signal that CGMP violations were not isolated to Nashik." ECF 39, ¶¶ 148, 153; ECF 48, p. 57. They also "could not afford another setback after facing criticism over" numerous other issues. ECF 48, p. 57.

11   The Court has undergone this analysis because the amended complaint is silent on whether any of the individual Defendants participated in the drafting, delivery, or approval of the statement in the *Bloomberg Law* article. Of course, given their important roles, maybe one or all the individual Defendants were at least consulted on the content of the statement—especially considering the importance of avoiding any suggestion that Mylan had compliance issues in such a highly regulated industry. If, in discovery, it turns out that those individual Defendants were involved in making that statement, Plaintiff can seek leave to amend the amended complaint. 🚩 *Winer*, 503 F.3d at 337 ("If a private securities case proceeds past the pleadings stage against a corporation and discovery reveals individual culpability, a plaintiff may seek permission to amend the complaint to assert claims against individual defendants.").

12   "Person" also includes any entity, such that if the individual Defendants have control over a liable corporate entity (like Mylan), then they could be liable under a control-person theory of liability. 🚩 *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006) ("[T]he plaintiff must prove that one person controlled another person *or entity* and that the controlled person *or entity* committed a primary violation of the securities laws." (emphasis added)).

# TAB No. 11

2003 WL 23018761

2003 WL 23018761
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

In re NATIONAL GOLF PROPERTIES
INC. Securities Litigation

No. CV 02–1383GHK(RZX).
|
March 19, 2003.

**Synopsis**
**Background:** Purchasers of real estate investment trust's stock brought class action against trust, trust's primary lessee, trust's chairman, and chairman's wife, based on alleged federal securities law violations in connection with secondary offering of trust's stock.

**Holdings:** On Defendants' motions to dismiss, the District Court, King, J., held that:

[1] purchasers had standing to assert claim under Securities Act provision barring untrue statements of material fact or omissions of a material fact in a registration statement or prospectus;

[2] lessee was a proper defendant;

[3] trust and its chairman were statutory sellers of trust's stock;

[4] allegations were sufficient to state claim against lessee;

[5] purchasers plead fraud with sufficient particularity;

[6] Private Securities Litigation Reform Act (PSLRA) did not require purchasers to state the names and titles of their sources at pleadings stage; and

[7] chairman's wife was not subject to control person liability.

Motions granted in part and denied in part.

West Headnotes (15)

**[1]   Securities Regulation**  ⟜ Persons entitled to sue or recover

Purchasers of real estate investment trust's stock had standing to assert claim under Securities Act provision barring untrue statements of material fact or omissions of a material fact in a registration statement or prospectus, although the lead plaintiffs could not trace their shares to secondary offering from which claim arose, where the original and named plaintiff could trace her shares to the allegedly offending prospectus. Securities Act of 1933 §11(a), 15 U.S.C.A. § 77k(a).

2 Cases that cite this headnote

**[2]   Federal Civil Procedure**  ⟜ Stockholders, investors, and depositors

Private Securities Litigation Reform Act (PSLRA) did not require lead plaintiffs in class action to have standing to assert all claims; it only required that they have the greatest financial stake in the action. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4.

1 Case that cites this headnote

**[3]   Securities Regulation**  ⟜ Persons Liable

Lessee of real estate investment trust's property, by including its financial statements in trust's prospectus for secondary offering of its shares, did not become an expert who certified to facts made in a registration, so as to make it a proper defendant in action for violation of Securities Act provision barring untrue statements of material fact or omissions of a material fact in a registration statement or prospectus. Securities Act of 1933 §11(a)(4), 15 U.S.C.A. § 77k(a)(4).

**[4]   Securities Regulation**  ⟜ Persons entitled to sue or recover

Allegation that at least one named plaintiff purchased shares of real estate investment trust

pursuant to registration/prospectus for secondary offering of its shares sufficiently alleged standing under Securities Act provision imposing liability on any person who offers or sells a security by means of a prospectus or oral communication which includes an untrue statement of a material fact. Securities Act of 1933 §12(a)(2), 🚩 15 U.S.C.A. § 77*l*(a)(2).

2 Cases that cite this headnote

**[5]**    **Securities Regulation** 🐾 Sellers

Real estate investment trust and its chairman were statutory sellers of trust's stock that was sold at secondary offering by school that had previously received the stock as a donation, for purposes of Securities Act provision imposing liability on any person who offers or sells a security by means of prospectus or oral communication which includes untrue statement of material fact; chairman signed prospectus on trust's behalf and was board member and founder of the school, and trust stood to benefit from successful issuance of its shares. Securities Act of 1933 §12, 🚩 15 U.S.C.A. § 77*l*.

**[6]**    **Securities Regulation** 🐾 Sellers

Allegations that real estate investment trust's lessee was controlled by trust's chairman, actively solicited sale of trust's stock at secondary offering by including its financial statement in prospectus, and that proceeds of offering help fund construction project that lessee managed were sufficient to state claim against the lessee under Securities Act provision imposing liability on any person who offers or sells a security by means of prospectus or oral communication which includes untrue statement of material fact. Securities Act of 1933 §12, 🚩 15 U.S.C.A. § 77*l*.

2 Cases that cite this headnote

**[7]**    **Securities Regulation** 🐾 False Statements or Omissions;  Accuracy

Securities Act provision imposing liability on any person who offers or sells a security by means of prospectus or oral communication which includes untrue statement of material fact applied to sale of real estate investment trust stock at secondary offering to public for first time pursuant to a prospectus; provision was not limited to initial public offerings. Securities Act of 1933 §12, 🚩 15 U.S.C.A. § 77*l*.

**[8]**    **Securities Regulation** 🐾 Pleading

Rule requiring fraud to be plead with particularity applied to claims under Securities Act provisions barring material misstatements in a registration statement or prospectus, although plaintiffs expressly disclaimed fraud in those claims; plaintiffs did not plead that the misstatements were the result of negligence, or allege alternative theory for the misstatements or omissions. Securities Act of 1933 §§11,12, 15 U.S.C.A. §§ 77k, 🚩 77*l*; 🚩 Fed. Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[9]**    **Securities Regulation** 🐾 False Statements or Omissions;  Accuracy

**Securities Regulation** 🐾 Fiscal or accounting data

Allegations that financial statements incorporated by reference in prospectus for secondary offering of real estate investment trust's stock overstated accumulated earnings of trust's primary lessee by 101% and its net earnings by 114%, and that trust's shares suffered a 13% one-day decline in value when those earnings were restated after the offering were sufficient to allege material misstatements in offering's prospectus with sufficient particularity to state claim under Securities Act provisions barring material misstatements in registration statement or prospectus. Securities Act of 1933 §§11,12, 15 U.S.C.A. §§ 77k, 🚩 77*l*; 🚩 Fed. Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

In re National Golf Properties, Inc., Not Reported in F.Supp.2d (2003)

2003 WL 23018761

**[10]    Securities Regulation** 🔑 **False Statements or Omissions; Accuracy**

**Securities Regulation** 🔑 **False Statements or Omissions; Accuracy**

Allegations that financial statements of real estate investment trust's primary lessee, which were incorporated into registration/prospectus for secondary offering of trust's stock, failed to disclose over $53 million owed lessee by its majority stockholder and related affiliates were sufficient to allege material omissions in offering's prospectus with sufficient particularity to state claim under Securities Act provisions barring material omissions in registration statement or prospectus. Securities Act of 1933 §§11,12, 15 U.S.C.A. §§ 77k, 77l; Fed. Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[11]    Securities Regulation** 🔑 **Misrepresentation**

Purchasers of real estate investment trust's stock sufficiently alleged facts of false or misleading statements in connection with a secondary offering of trust's stock to state securities fraud claim; purchasers explained that financial statements incorporated into the prospectus were false, and alleged that trust's statements about its rental income and growth made to analysts at time it was making millions of dollars in loans to a shareholder who could not repay them were false and misleading. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u–4(b)(1); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

2 Cases that cite this headnote

**[12]    Securities Regulation** 🔑 **Pleading**

Private Securities Litigation Reform Act (PSLRA) did not require plaintiffs in securities fraud action to state the names and titles of their sources at pleadings stage; allegations regarding position each witness held at the relevant time that allowed them to personally observe or know the facts that they assert were sufficient.

Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u–4(b)(1).

**[13]    Securities Regulation** 🔑 **Scienter, Intent, Knowledge, Negligence or Recklessness**

Allegations regarding false statements made in connection with secondary offering of shares in real estate investment trust supported a strong inference of scienter, as required to state securities fraud claim; plaintiffs alleged that trust and its chairman made positive statements about rental income and growth despite knowing of financial distress of its primary lessee, that there was centralized control of all involved entities, and that chairman actually controlled lessee's operations and received large loans from it. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u–4(b)(1); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[14]    Securities Regulation** 🔑 **In general; control persons**

Inclusion of financial statement of real estate investment trust's primary lessee in registration statement for secondary offering of trust's stock was sufficient to make the lessee a proper defendant in securities fraud action based on false statements in the prospectus; lessee should have known that financial statement, which allegedly contained false statements or omissions, would be communicated to investors. 15 U.S.C.A. §78j(b).

**[15]    Securities Regulation** 🔑 **In general; control persons**

Wife of chairman of real estate investment trust was not subject to control person liability in securities fraud action arising from secondary offering of trust's stock, absent allegations that she played an active role in any of the entities against whom primary liability was asserted. Securities Act §§15, 20.

In re National Golf Properties, Inc., Not Reported in F.Supp.2d (2003)

2003 WL 23018761

**Attorneys and Law Firms**

Charles D. Hoornstra, Assistant Attorney General, Madison, WI, for Defendants.

Curtis L. Bowman, J Allen Carney, Randall K. Pulliam, Steven E. Cauley, T. Brent Walker, Cauley, Geller, Bowman & Coates, Little Rock, AR, Darren J. Robbins, Douglas R. Britton, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, Jonathan E. Behar, Milberg, Weiss, Bershad, Hynes & Lerach, Los Angeles, CA, Stephen D. Oestreich, Entwistle & Cappucci, New York, NY, Stephen D. Oestreich, Slotnick, Shapiro & Crocker, New York, NY, for Plaintiffs.

**Opinion**

KING, J.

PROCEEDINGS: Defendants' Motions to Dismiss

**\*1** This matter is before the court on the above-titled motion and is appropriate for resolution without oral argument. Fed.R.Civ.P. 78; Local Rule 7–15. After fully considering the briefs and papers pertaining to this matter, we rule as follows:

### I. Background

This action arises from a secondary offering of securities of National Golf Properties, a publicly traded Real Estate Investment Trust that leases golf course properties to property managers. Plaintiffs allege the following facts give rise to this action: National Golf leases 98% of its properties to American Golf. David Price is the Chairman of both National Golf and American Golf, the majority shareholder of American Golf, a minority shareholder of National Golf, and active in the day-to day operations of both companies. The shares offered in this registration/prospectus were sold by the Oaks Christian High School. (Hereinafter "Oaks"). National Golf issued the Oaks shares in a public offering on May 17, 2001. David Price and his ex-wife Dallas Price are both on the board of directors of Oaks and had given the shares of National Golf to Oaks as a donation back in 1999. Following the issuance of these securities, American Golf announced a business reversal in which it was forced to restate its earnings for fiscal years 1999 and 2000 This had adverse results on National Golf's stock price.

Plaintiffs are a class of National Golf stock purchasers. They bring claims for violations of Sections 11 and 12 of the Securities Act of 1933, and Section 10(b) of the Exchange Act of 1934. Plaintiffs also bring claims against David and Dallas Price as individuals under § 15 of the Securities Act and § 20(a) of the Exchange Act. All Defendants move to dismiss.

### II. Discussion

#### A. The Securities Act of 1933

1. Section 11

Section 11 imposes liability based on registration statements and prospectuses that contain "untrue statements of material fact or [omissions of] a material fact required" to make the statements therein not misleading. 15 U.S.C. § 77(a). Liability under this section is broad, requiring plaintiffs to prove only that they had purchased shares from a registration or prospectus that contained a material misstatement or omission.

(a) Standing under § 11

**[1]**    In order to bring a § 11 claim, plaintiffs must allege they purchased securities from the offending registration or prospectus. *Hertzberg v. Dignity Partners,* 191 F.3d 176, 180–82 (9th Cir.1999). Defendants claim that the Lead Plaintiffs, Random Walk Investment Club, Alan Klein, and Randall N. Kirk, cannot trace their shares to the Oaks issuance and thus have no standing to assert the § 11 claim. They argue that if Lead Plaintiffs have no standing, the claim must be dismissed.

**[2]**    Lead Plaintiffs concede that they cannot trace their shares to the Oaks issuance. They counter, however, that Ellen Brodsky, the original and a named plaintiff in this case, can trace her shares and has sufficiently pleaded that her shares were purchased "pursuant to" the offending prospectus. *Shapiro v. UJB,* 964 F.2d 272; 286 (3d Cir.1992) (pleading that securities were purchased pursuant to the registration sufficiently alleged the tracing requirement). Further, the Private Securities Litigation Reform Act (hereinafter "PSLRA") does not require Lead Plaintiffs to have standing to assert all claims, only that they have the greatest financial stake in the action.

*In re National Golf Properties, Inc., Not Reported in F.Supp.2d (2003)*

2003 WL 23018761

**\*2** At this stage of the litigation, we conclude dismissal is not warranted on this basis because a named plaintiff has sufficiently alleged an ability to trace her shares to the allegedly offending prospectus. *See In re IPO Sec. Litig.,* 2002 U.S. Dist. LEXIS 23823, \*13 (S.D.N.Y. Dec. 12, 2002). Moreover, we agree with Plaintiffs that nothing in the PSLRA requires Lead Plaintiffs be able to assert each claim against Defendants. Brodsky's ability to assert a § 11 claim does not reduce the fact that Lead Plaintiffs still have the greatest financial stake in the action. Accordingly, we conclude that at least a plaintiff in this action has standing to sue under § 11.

#### (b) American Golf's liability under § 11

**[3]** In order to assert a § 11, claim against American Golf, plaintiffs must be able to allege that American Golf falls within one of the enumerated categories of proper § 11 defendants. In their opposition, Plaintiffs argue only that American Golf, by including its financial statements in the National Golf prospectus, is liable under 15 U.S.C. § 77k(a) (4)[1] as an expert who certifies to facts made in a registration. Defendants argue Plaintiffs' attempt to shoehorn American Golf into this definition by analogizing its role in the offending prospectus to that of an expert is an unsupportable extension of § 11 liability.

We conclude that American Golf does not fall within one of the categories of proper § 11 defendants merely because its financial statements are included in the offending prospectus. The plain language of § 77k(a)(4) requires that a defendant must be, among other things, a "person whose profession gives authority to a statement made by him...." American Golf is not such a person. While it can be argued that American Golf can be seen as knowledgeable in its own financial statements, the plain meaning of sub-section (4) does not extend liability to a company in its use of its own financial statements in the manner alleged. Were it otherwise, the language of sub-section (4) would have to be broader so as to include any person who could be expected to be knowledgeable about any statement it makes. Thus, as to American Golf, we grant its motion to dismiss the § 11 claim against it.

#### 2. Section 12

Liability is imposed under § 12 on "any person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact required" to make the statements therein not misleading. 15 U.S.C. § 77l(a)(2).

Defendants argue that Plaintiffs have failed to state a § 12 claim because: (1) plaintiffs cannot trace their purchase to the Oaks issuance, (2) defendants are not statutory sellers of the Oaks issuance, and (3) the Oaks issuance is not a public offering covered by § 12. We address each in turn.

#### (a) Standing under § 12

**[4]** Section 12 expressly limits recovery to only those purchasers who purchase their shares from a seller who makes use of a false or misleading statements. 15 U.S.C. § 77l(a)(2) (seller "shall be liable to the person purchasing such security from him"). In this case, Plaintiffs must allege that they purchased the offending Oaks securities. Plaintiffs have pleaded that at least one named plaintiff, Ellen Brodsky, purchased shares pursuant to the Oaks registration/prospectus. Thus, at the pleading state, Plaintiffs have sufficiently alleged standing under § 12. *See ⚠ In re Ultrafem Inc. Sec. Litig.,* 91 F.Supp.2d 678, 694 (S.D.N.Y.2000) (finding plaintiffs who alleged they purchased shares pursuant to or traceable to a prospectus had standing to assert § 12 claim). *See also* discussion, *supra,* at II A 1(a).

#### (b) Statutory Seller Status

**\*3** **[5]** Defendants argue that they are not statutory sellers under § 12 because they did not pass title to the securities and thus § 12 liability cannot attach to their conduct. They further argue that without privity between the seller and the purchaser, § 12 liability cannot lie.

The Supreme Court has not read § 12 liability so restrictively. *See* Pinter v. Dahl, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). "A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase." *Id*. at 645. Although the Securities Act "does not define the term 'purchase,' the soundest interpretation of the term is a correlative to both 'sell' and 'offer' at least to the extent that the latter entails active solicitation of an offer to buy." *Id*. The *Dahl* court found that active solicitation coupled with a motivation, at least in part, to benefit one's own financial interests or those of the securities owner was sufficient to satisfy the statutory requirement. *Id.* at 649.

Furthermore, allegations that an issuer signed a registration statement is sufficient to allege active solicitation. *See In*

2003 WL 23018761

*re Proxima Corp. Sec. Litig.,* [1993–1994 Transfer Binder] Fed.Sec.L.Rep. (CCH) P98, 236 at 99,619 (S.D.Cal.1994)Fed.Sec.L.Rep. (CCH) P98, 236 at 99,619 (S.D.Cal.1994) (because the registration/prospectus is a solicitation document, those who sign registration statement effectively solicit purchase of securities).

Under the foregoing authority, Plaintiffs have sufficiently alleged that both David Price and National Golf meet the statutory seller requirement under § 12. David Price is Chairman of National Golf and signed the prospectus on its behalf. Moreover, as a board member and founder of the Oaks school, and as one of the two persons who donated the shares to Oaks, it cannot be said that David Price was disinterested in financially benefitting the Oaks school. National Golf was the issuer of the securities and stood to benefit from a successful issuance of the Oaks shares. *See* Compl., at ¶¶ 2,5. As such, National Golf and David Price can be said to have actively solicited with a motivation, at least in part, to benefit their own or Oaks' financial interests.

Defendants' arguments that they had no role in the individual solicitation of specific sales of the Oaks issuance is unavailing. *In re OPUS380 Corp., Sec. Litig.,* 2002 U.S. Dist. LEXIS 18558, *29–30 (S.D.N.Y. Oct. 5, 2002) (allegations that a specific sale was solicited unnecessary when Defendant signed the registration/prospectus). Therefore, we deny National Golf and David Price's motion to dismiss this claim.

[6] Defendant American Golf argues that applying § 12 to it would impose liability for mere participation in an issuance, a position the *Dahl* Court expressly declined to adopt. *Dahl,* 486 U.S. at 649–50. Plaintiffs allege that David Price controlled American Golf and argue that the inclusion of American Golf's financial statements under Price's direction also constitutes active solicitation. Furthermore, Plaintiffs allege that American Golf was the manager of the Oaks Christian High School construction project, and that the proceeds of the Oaks issuance helped fund that project. At the pleading stage, this is sufficient to state a § 12 claim against American Golf under the *Dahl* standard.

(c) Section 12 Applicability to Secondary Offerings

**\*4** [7] Defendants American Golf and David Price also argue that § 12 liability can only attach to activity in connection with an initial public offering (hereinafter "IPO"), not a secondary offering as here. Defendants cite *Gustafson v. Alloyd,* 513 U.S. 561, 115 S.Ct. 1061, 131

L.Ed.2d 1 (1995), for the proposition that only initial public offerings are subject to the provisions of § 12.

Plaintiffs respond that *Gustafson'*s holding distinguishes between offerings to the public from a company for the first time and other purchases and sales made in the secondary market. Section 12 liability applies to all securities issued pursuant to a prospectus. Accordingly, the Oaks issuance qualifies under § 12.

*Gustafson'*s holding limits § 12 liability, but not as far as Defendants claim. Although not applicable to secondary sales made in the open market, *Gustafson* does not hold that § 12 applies solely to IPOs. Section 12 regulates any sales of securities to the public for the first time via a prospectus. *Gustafson,* 513 U.S. at 576–77. Therefore, we conclude that § 12 does apply to the Oaks offering. American Golf's and David Price's motion to dismiss the § 12 claim on this ground is denied.

3. Material Misstatements and Omissions

[8] Finally, to successfully assert either a § 11 or § 12 claim, Plaintiffs must allege material misstatements or omissions. *See* 15 U.S.C. § 77k(a) and 15 U.S.C. § 771(a)(2).

Defendants argue that plaintiffs have failed to plead such material misstatements or omissions with sufficient particularity to satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure because these claims sound in fraud. *In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1404 (9th Cir.1994). Plaintiffs counter that Rule 9(b) does not apply to their claims because they have expressly disclaimed fraud on these claims in their First Amended Complaint (hereinafter "FAC").

Plaintiffs must do more, however, than expressly disclaim fraud in order to avoid the heightened pleading requirements of Rule 9(b). *Stac,* 89 F.3d 1399, 1405 n. 2 ("These nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the prospectus."). Plaintiffs have not pleaded that the misstatements here were the result of negligence. In fact, Plaintiffs have alleged no alternative theory for the misstatements or omissions. Therefore, we find plaintiffs' claims sound in fraud, and as such must meet the heightened pleading requirements set forth in Rule 9(b).

Rule 9(b) requires particularized allegations of the circumstances constituting fraud. *In re Glenfed Sec. Litig., 42 F.3d 1541, 1545–46* (9th Cir.1994). The time, place, and content of an alleged misrepresentation may identify the statement or the omission complained of, but these circumstances do not "constitute" fraud. *Id.* Accordingly, the Ninth Circuit requires that in addition to the time, place and content of an alleged misrepresentation, plaintiffs must "set forth what is false or misleading about a statement and why it is false." *Id.*

    a. Material Misstatements
   **\*5** **[9]**   Plaintiffs allege the following statements were false when made. In 1999, National Golf reported American Golf's Net Earnings were $8 .7 million and its Shareholder Equity was $14.2 million. In 2000, it reported American Golf had positive net income of $2.1 million. These financial statements were made in filings to the SEC and incorporated by reference into the Oaks registration/prospectus.

After being restated, American Golf's 1999 Net Earnings were $5.7 million (a 33% decrease) and its shareholder equity was reduced to only $218,000. For 2000, American Golf restated its earnings and posted a net loss of $.03 million. Furthermore, after the restatement, it was apparent that American Golf's 2000 accumulated earnings had been overstated by 101% and its 2000 net earnings were overstated by 114%. By restating these financials after the Oaks issuance, Defendants essentially admit that the statements included in the Oaks issuance were false.

It cannot be said, at least at the pleading stage, that these disparities would not be material to a reasonable investor. In fact, after the restatements, National Golf's shares suffered a one-day decline in value of 13%.

    b. Material Omissions
   **[10]**   Plaintiffs also allege omissions, which, if revealed in the Oaks registration statement would have made National Golf's and American Golf's financials not misleading. Specifically, American Golf "failed to disclose the credit concentration of American Golf related to the receivables owed to American Golf by Golf Enterprises ." FAC ¶ 38–39. Plaintiffs allege that throughout the class period American Golf's financials, incorporated into National Golf's Oaks registration/prospectus, omitted to include $40–60 million

note receivable that the Prices owed American Golf. ¶ 38–39. In addition, these financials also erroneously classified $27 million loaned to David Price as a current receivable (an asset) when the Prices and their wholly owned affiliate Golf Enterprises could not repay the note. *Id.* This $27 million note represented "in excess of 28% of American Golf's total current assets" for that time period. FAC ¶ 39. Plaintiffs allege that by the end of 2000, David Price and Price related affiliates owed American Golf at least $53 million. This figure represents "19.6% of total assets of American Golf and 330.5% its shareholder equity" for the class period. FAC ¶ 39.

These loan relationships were not disclosed in the financials incorporated into the Oaks registration and were taking place regardless of signs that American Golf was in financial distress. Had these loans been accounted for properly, they would have been included in the financials that were incorporated into the Oaks registration and prospectus. Thus, American Golf's poor financial health would have been public prior to the Oaks issuance and would not need to be restated after Plaintiffs had already purchased National Golf securities.

We conclude that Plaintiffs' allegations satisfy the heightened pleading requirements of Rule 9(b). Thus we deny Defendants' motion to dismiss Plaintiffs' § 11 and § 12 claims on this basis.


    B. The Exchange Act of 1934
   **\*6**   Plaintiffs also bring a claim against all Defendants for violation of § 10(b) and Rule 10b–5 (hereinafter "10(b) claim"). To assert this claim, Plaintiffs must allege (1) material misrepresentations or omissions, (2) in connection with the sale or purchase of a security, (3) made with the requisite scienter, and (4) reliance. *See Ambassador Hotel Co. v. Wei–Chuan Inv., 189 F.3d 1017, 1025* (9th Cir.1999).

    1. Pleading with Particularity
   **[11]**   Under the PSLRA and Rule 9(b), Plaintiffs must meet a heightened pleading standard when asserting claims of fraud. 15 U.S.C. § 78u–4(b)(1); Fed.R.Civ.P. 9(b). This heightened requirement serves to put Defendants on notice of the charges levied against them, and seeks to curb attempts by plaintiffs to assert claims first, then use discovery to build a case.

*In re National Golf Properties, Inc., Not Reported in F.Supp.2d (2003)*

2003 WL 23018761

Defendants argue that Plaintiffs' averments of fraud regarding National Golf's false financial statements as well as other statements made "in connection with" the Oaks offering do not meet this heightened pleading requirement. We disagree.

Plaintiffs have detailed specific statements that are false and misleading, the dates these statements were made or became public, where each statement was made, and what about each of the statements was false. *See* FAC, ¶¶ 32, 34–35, 37, 41, 43, 48, 50, 52–53.

First, Plaintiffs explain that financial statements made in filings with the SEC from May 11, 1999 until November 14, 2001, and incorporated into the Oaks prospectus, are false. *See* discussion, *supra* at II A 3.

Second, Plaintiffs allege that National Golf's statements about its rental income and growth, made to Merrill Lynch analysts on June 7, 2001, were false and misleading. Specifically, National Golf's statements that its property revenues had "picked up" and that American Golf would have "ample coverage" to service its lease payments and debt service requirements to National Golf were false because of the known financial distress of American Golf, National Golf's primary lessee, from whom National Golf derives 98% of its rental income.

Plaintiffs allege these statements were false because they were made while American Golf was cutting costs in response to decreased earnings, and while it was lending millions of dollars to David Price, who could not repay the loans.

 **[12]**    Defendants argue that Plaintiffs have not sufficiently identified the confidential witnesses whose statements form the basis for these allegations. Defendants argue that the Exchange Act requires a plaintiff to state the names and titles of his/her sources and the bases of the source of knowledge.

Such evidentiary facts are not necessary at the pleading stage. The text of the Exchange Act does not require such specificity. [15 U .S.C. § 78u–4(b)(1).](#) Moreover, neither the PSLRA nor Ninth Circuit authority requires the naming of sources. *See,e.g.,* [In re McKesson HBOC, Inc. Sec. Litig., 126 F.Supp.2d 1248, 1271 (N.D.Cal.2000)](#) ("Nowhere, however, did the *Silicon Graphics* court require naming ... of sources.") (citing [In re Silicon Graphics Sec. Litig., 183 F.3d 970, 985 (9th Cir.1999)](#)).

**\*7**  Plaintiffs have alleged the position each witness held at the relevant time that allowed them to personally observe or know the facts that they assert. This sufficiently identifies such witnesses at the pleading stage. [In re McKesson HBOC, 126 F.Supp.2d at 1271](#) ("It is possible to identify sources and provide other corroborating details without disclosing the names of sources."). Requiring greater disclosure on a motion to dismiss "serves no legitimate pleading purpose" but could have the effect of deterring informants from providing information. [Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir.2000).](#)

Under [Rule 9(b),](#) Plaintiffs have alleged sufficiently facts of false or misleading statements in connection with a securities offering that form the basis of their 10(b) claim. [2](#) As such, Defendants motion to dismiss the 10(b) claim on this basis is denied.

### 2. Strong Inference of Scienter

In order to survive a motion to dismiss, Plaintiffs must also allege facts that, taken together, create a strong inference of scienter. [15 U.S.C. § 78u–4(b)(2).](#) Scienter requires proof of "deliberately reckless or conscious misconduct." [In re Silicon Graphics, 183 F.3d at 974.](#) At the pleading stage, this means a plaintiff must state facts that "come closer to demonstrating intent, as opposed to just motive and opportunity." *Id.;seealso* [Ronconi v. Larkin, 253 F.3d 423, 429](#) (9 th Cir.2001).

 **[13]**    Plaintiffs allege the following to support a strong inference of scienter.

First, Plaintiffs allege that Defendants knew or were deliberately reckless in not knowing the falsity of their statements because of the temporal proximity of these positive statements to objective signs of American Golf's financial distress. American Golf was responding to mounting financial difficulties by laying off employees and eliminating certain employee benefits. Plaintiffs support these allegations with percipient witness testimony. FAC ¶¶ 46–50.

Second, a strong inference of scienter is further supported by the centralized control of all of the involved entities. Not only was American Golf National Golf's primary tenant, both companies were run by David Price, who held a substantial

In re National Golf Properties, Inc., Not Reported in F.Supp.2d (2003)

2003 WL 23018761

ownership position in both companies and was involved in the day-to-day operations of both.

Plaintiffs also alleged that David Price was involved in and actually controlled American Golf's operations. Price had frequent closed door meetings with American Golf's vice-president of acquisitions and its co-CEOs where they discussed American Golf's failing operations. Moreover, the proceeds of the Oaks issuance funded the construction of an extensive complex on the school's grounds, a construction project managed by American Golf. David Price's hand was allegedly in every entity involved with the sale of these securities. This too supports a strong inference that Defendants knew or were deliberately reckless in not knowing that their statements were false when made.

**\*8** Plaintiffs provide other circumstantial evidence to support a strong inference of scienter. Plaintiffs point to the large loans David Price and his wholly owned entity Golf Enterprises were receiving from American Golf during the class period. Plaintiffs allege Price failed to repay $60 million that he and Dallas Price had borrowed. Instead of repaying these loans, Price arranged to have these loans reclassified on American Golf's balance sheet as a long term receivable. While this provided a deferred payment and an extremely low interest rate to the Prices, it drastically reduced American Golf's current assets during the class period.

Because David Price was the personal recipient of these loans from American Golf he knew they would not be repaid within the class period. Therefore, he knew that American Golf's financials were false when they reflected that these loans were current receivables, instead of long term notes.

Plaintiffs also provide ample evidence of motive and opportunity. The proceeds of the Oaks issuance were going to fund further expansion of the Oaks Christian High School. David and Dallas Price were members of the three-person Oaks Christian High School board. It was their earlier gift of National Golf's shares to Oaks that was going to be used to fund the planned expansion. These facts provide sufficient motive.

As for opportunity, David Price's position of control in all entities involved in this transaction provides ample support for the proposition that he possessed the opportunity to commit these alleged violations.

Taken together, the quantum of evidence indicating control, contemporaneous knowledge of negative financial information, as well as motive and opportunity provide sufficient allegations of a strong inference of scienter. [3]

### 3. Proper 10(b) Defendants

**[14]** From the facts alleged, it is clear that David Price and National Golf are proper 10(b) defendants because of their roles in the issuance of the Oaks securities. The question is whether American Golf's role is sufficient to render it primarily liable for fraud in connection with National Golf's securities issuance.

Defendant American Golf argues that merely including its financial information in the prospectus used to sell the National Golf securities without more does not amount to the type of manipulative or deceptive practice 10(b) seeks to proscribe. It argues that Plaintiffs are attempting to "revive aiding and abetting liability" by holding American Golf liable for "assenting to the inclusion of American Golf's financial statements in National Golf's public filings."

There is no aiding and abetting liability in a private 10(b) action. See *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). However, the Court in *Central Bank* cautioned that "in any complex securities fraud, [ ] there are likely to be multiple violators[.]" *Id.* "Any person or entity, [ ] who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming all of the requirements for primary liability under Rule 10b–5 are met." *Id.*

**\*9** To be liable under 10(b), a defendant must know or should know that his representations would be communicated to investors. *Wright v. Ernst & Young*, 152 F.3d 169, 175 (2d Cir.1998). *See also Shapiro v. Cantor*, 123 F.3d 717, 719 (2d Cir.1997), *Anixter v. Home–Stake Prod.*, 77 F.3d 1215, 1226–27 (10th Cir.1996). However, "there is no requirement that the alleged violator directly communicate his misrepresentations to investors for primary liability to attach." *Anixter, 77 F.3d at 1226.* It is sufficient that the statement be attributable to the defendant, and publicly

Case 4:24-cy-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 171 of 330
In re National Golf Properties, Inc., Not Reported in F.Supp.2d (2003)
2003 WL 23018761

disseminated prior to the investment decision. 🚩 *Wright, 152 F.3d at 175.*

Here, American Golf allegedly made false statements (or omissions) in its financial statements that were incorporated into the registration statement upon which purchasers relied. From this, American Golf knew or should have known that these misstatements would be communicated to investors. 🚩 *Wright, 152 F.3d at 175.* Defendant's argument that it did not communicate these false statements directly, but only allowed them to be included in the registration/ prospectus, does not insulate it from primary liability. Direct communication of the alleged misstatements is unnecessary. Therefore, Defendant American Golf's motion to dismiss the 10(b) claim on this basis is denied.

### C. Control Person Liability

To assert a claim under § 15 of the Securities Act and § 20 of the Exchange Act, Plaintiffs must show (a) an underlying securities violation by the entity that the defendant is alleged to control, and (b) that the individual had actual control over the entities. 🚩 *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9 th Cir.1990). This is known as "control person" liability. David and Dallas Price move to dismiss these claims against them.

### 1. David Price

We have concluded that Plaintiffs have stated securities violations against National Golf and American Golf. David Price's argument that he is not liable under §§ 15 and 20 because no primary violation can be made against National Golf thus fails. Therefore, David Price's motion to dismiss the §§ 15 and 20 claims is denied.

### 2. Dallas Price

**[15]** Dallas Price also challenges Plaintiffs' claims against her for "control person" liability. To establish the liability of a control person, Plaintiffs must make some showing that

the Defendant was in a position to exercise actual power and control over the offending entity. 🚩 *Howard v. Everex,* 228 F.3d 1057, 1065 (9 th Cir.2000).

Plaintiffs assert Dallas Price was a control person by virtue of her ownership interest in National Golf and American Golf, her role on the board of the Oaks School, her status as the wife of David Price, and that she "enjoyed a special relationship" with American Golf because her husband received loans from it from which she benefitted.

Plaintiffs provide no allegations that Dallas Price was in a position to exert actual control over National Golf. Being the wife of the chairman cannot subject someone to liability for the alleged wrongdoing associated with her husband's business dealings. Without allegations of an active role in any of the entities against whom primary liability is asserted, Plaintiffs cannot allege control person liability under either §§ 15 or 20 against Dallas Price. Dallas Price's motion to dismiss these claims against her is hereby granted.

### III. Disposition

**\*10** In light of the foregoing, we DENY National Golf's and David Price's motion to dismiss in its entirety; we GRANT American Golf's motion to dismiss the § 11 claim against it and we DENY its motion to dismiss the § 12 claim; we DENY American Golf's motion to dismiss the 10(b) claim; finally, we DENY David Price's motion to dismiss the §§ 15 and 20 claims against him in his individual capacity, and we GRANT Dallas Price's motion to dismiss the §§ 15 and 20 claims against her.

The remaining Defendants shall answer the First Amended Consolidated Complaint within 20 days hereof.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 23018761

---

### Footnotes

1    15 U.S.C. § 77k(a) details the classes of proper § 11 defendants. Sub-section four (4) specifically provides that a plaintiff may sue, "every accountant, engineer ....or any person whose profession gives authority to a

2003 WL 23018761

statement made by him, who has with his consent been named as having prepared or certified any report or valuation which is used in connection with the registration statement ... [and] which purports to be certified by him[.]"

2      Defendants American Golf and David Price incorrectly claim that Plaintiffs argue that GAAP violations alone render American Golf liable under 10(b). As noted above Plaintiffs provided multiple allegations of material misstatements made in connection with the Oaks offering, upon which a reasonable investor could have relied and which, if true, could render American Golf and David Price primarily liable under 10(b).

3      American Golf and David Price argue that GAAP violations alone cannot support a finding of a strong inference of scienter. We need not decide that issue because, as noted above, Plaintiffs have pleaded sufficient facts to show a strong inference of scienter apart from any argument that American Golf or David Price may have violated GAAP principles.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.    Pl. Appx. B-167

# TAB No. 12

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

2015 WL 1143081
United States District Court,
S.D. Texas,
Houston Division.

LOCAL 210 UNITY PENSION AND WELFARE
FUNDS, Individually and on Behalf of all
Others Similarly Situated, et al, Plaintiffs,
v.
McDERMOTT INTERNATIONAL
INC., et al, Defendant.

Civil Action No. 4:13–CV–2393.
|
Signed March 13, 2015.

**Attorneys and Law Firms**

Damon Joseph Chargois, Mashayekh & Chargois, P.C., Andrew M. Edison, Edison, McDowell & Hetherington, LLP, Thomas Robert Ajamie, Ajamie LLP, Houston, TX, Michael W. Stocker, Labaton Sucharow LLP, New York, NY, Danielle S. Myers, Jonah H. Goldstein, Ashley M. Robinson, Robbins Geller Rudman & Dowd, LLP, Blair A. Nicholas, David R. Kaplan, Timothy A. Delange, Bernstein Litowitz Berger & Grossman LLP, San Diego, CA, for Plaintiffs.

David D. Sterling, Baker Botts LLP, Mark Alan Junell, The Junell Law Firm PC, Houston, TX, Nicholas I. Porritt, Levi Korsinsky LLP, Washington, DC, for Defendants.

***MEMORANDUM OPINION AND ORDER***

KENNETH M. HOYT, District Judge.

**I. INTRODUCTION**

**\*1** In this consolidated securities fraud class action, PAMCAH–UA Local 675 Pension Fund (the "plaintiff") brings suit against McDermott International, Inc. ("McDermott" or the "Company"), Stephen M. Johnson ("Johnson"), former President and CEO of the Company, and Perry L. Elders ("Elders"), its Senior Vice President and CFO (collectively, the "defendants") for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. Pursuant to FED. R. CIV. P. 12(b)(6), the defendants move

to dismiss the Consolidated Class Action Complaint (the "Complaint," ECF No. 54) for failure to plead fraud with the heightened specificity required by Rule 9(b) of the federal procedure rules, and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4 *et seq.* (ECF No. 55).[1] The plaintiff filed an opposing response (ECF No. 57), in which it alternatively requests leave to amend the Complaint if dismissal is granted, and the defendants timely replied (ECF No. 58). Having reviewed the pleadings, motion and responsive documents, the Court determines that the defendants' motion should be GRANTED and the plaintiff's request for leave to amend be DENIED.

**II. FACTUAL AND PROCEDURAL BACKGROUND**

**A. McDermott's Business**

The following facts are taken from the Complaint and public disclosure documents on file with the SEC.[2] McDermott, headquartered in Houston, Texas, is a global engineering, procurement, construction and installation ("EPCI") company focused on designing and executing complex offshore oil and gas projects. As an EPCI services provider, the Company delivers fixed and floating production facilities, pipeline installations and subsea systems from concept to commissioning. McDermott conducts much of its business through fixed-price contracts—i.e., contracts executed for a pre-determined amount based on project cost and profit assessments—that are awarded through a competitive bid process. All bids over $40 million are reviewed by executive management, including Johnson and Elders (the "individual defendants"). Executive officers additionally review developments on these projects on a monthly basis.

Because fixed-price contracts typically take years to complete, the Company often requires customers to make progress payments. McDermott employs a percentage-of-completion accounting method for determining contract revenue, which requires it to periodically review contract price and cost estimates and make profit adjustments to reflect work progress. Ultimately, successful and profitable completion of a project depends on several factors, including project bidding discipline, execution and oversight.

According to public disclosure documents, projects executed under McDermott's fixed-price contracts entail inherent risks that expose it to profitability losses. In fact, "[f]ixed-price contracts entail more risk to [the Company] because they

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 175 of 330

Local 2n0 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

require [it] to predetermine both the quantities of work to be performed and the costs associated with executing the work." Actual costs related to a project could exceed original projections notwithstanding measures taken in the first instance to account for "anticipated changes in labor, material and service costs." Specifically, "cost and gross profit ... could vary materially from the estimated amounts because of supplier, contractor and subcontractor performance, [the Company's] own performance, changes in job conditions, unanticipated weather conditions, variations in labor and equipment productivity and increases in the cost of raw materials ... over the term of the contract." Accordingly,

*2      current     estimates    of [McDermott's] contract costs and the profitability of [its] long-term projects, although reasonably reliable when made, could change as a result of the uncertainties associated with these types of contracts, and if adjustments to overall contract costs are significant, the reductions or reversals of previously recorded revenues and profits could be material in future periods.

Moreover, if developed into actual events, project risks could affect the business, financial condition, results of operations or cash flows of the Company in a manner that causes the trading price of company common stock to decline. These risks are matters of public record.

**B. Alleged Misrepresentations**
The Complaint alleges that between November 6, 2012 and August 6, 2013, inclusive (the "Class Period"), the plaintiff purchased shares of McDermott common stock and that the stock value plummeted because the defendants concealed "pervasive" and "ongoing" failures related to the Company's project bidding, execution and oversight. These failures, the Complaint asserts, caused McDermott to experience significant losses. Stock prices dropped 13% in May of 2013 and another 21% in August of 2013 allegedly in response to the disclosure of these negative events. [3] It is claimed that investors suffered losses in the hundreds of millions of dollars as a result.

The Complaint blames the defendants for causing these losses by engaging in a course of fraudulent conduct that deceived the plaintiff and other class-member investors in the process. Allegedly, the defendants artificially inflated McDermott's stock price by making overly optimistic, false and/or misleading statements and concealing truths about McDermott's business, financial status and outlook. The information concerned material losses on several problematic projects and challenges related to project bidding and execution.

The individual defendants are quoted at length as proof that the two actively participated in the fraud. Their statements are contained in paragraphs 32–96 of the Complaint and summarized in the defendants' motion to dismiss. Representative statements are reprinted here for convenience and reference:

• *"The positive results of our 2012 third quarter keep us on track for solid 2012 financial performance"* (quoting Johnson in Nov. 5, 2012 (3Q2012) Press Release (Form 8–K)). [4]

• The Company is on pace for "solid" performance (quoting Johnson in Nov. 5, 2012 (3Q2012) Press Release (Form 8–K), and Johnson and Elders on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

• It is "my [Johnson's] belief that it is highly likely that we will return the Atlantic region to profitability into 2013" and that the region *"is likely to be one of the highest growth markets for the Company"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

• The Atlantic Region's *"competitive situation remains stable in our view"* and *"nothing is changing in a material way up or down"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

*3 • *"We feel very good about our strength in the Middle East. We hold what we consider the strongest competitive position because of not only our Jebel Ali facility, but also because of the type of marine fleet we have"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

**Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...**
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

- *"[W]e have done a number of other things in the Atlantic region to turn it around"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- *"I'm [Johnson] quite bullish on the Atlantic region these days." "I'm sticking with my view about 2013 for the Atlantic region until I have a reason to adjust. And I don't have good reason to do that"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- There is *"no particular project or discrete item that needs to be highlighted"* and *"no major project issues to discuss"* (quoting Johnson and Elders on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- Johnson "remain[ed] positive" that the Atlantic segment would be profitable in 2013 (quoting Johnson on Mar. 1, 2013 conference call reporting 4Q2012 earnings) (brackets in Complaint).

- *"I [Elders] think we're going to have a good year in 2013 in the Middle East"* (quoting Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- *"We're feeling pretty good that we fully estimated the cost to complete"* the Malaysia project (quoting Johnson on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- *"McDermott is well positioned to meet the growing customer demand in each of our market segments"* (quoting Johnson and Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- The problems faced in the Atlantic and Asia Pacific segments are *"isolated situations, and are not representative of our business as a whole"* (quoting Johnson and Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- The 1Q2013 results reflect *"isolated challenges"; "we are absolutely focused on the resolution of those issues"* (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

- The loss in the Middle East is a *"one-time situation"* and *"there's nothing that we can see, or the project team can see, that would indicate any further problems with that program"* (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

- The Company is dedicated to *"implementing a compre hens ive project execution operating model that emphasizes our key project management disciplines"* "Key elements of the model include project planning, including risk identification and mitigation planning, interface management, as well as the incorporation of clearly defined accountability across the organization." The model will enable the Company "to improve our execution on even the most challenging projects" (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

**\*4** Johnson is responsible for "bringing in project execution personnel from outside McDermott to assure best practices from industry are brought to bear on our projects" (quoting Johnson on May 9, 2013 conference call reporting 1Q2013 earnings).

- *"I [Johnson] would say we are equal to best in industry in terms of project planning, project analysis, execution, forecasting, and control. And that has been rolled out through the past 12 months throughout the entire organization"* (quoting Johnson on May 9, 2013 conference call reporting 1Q2013 earnings). [5]

The Complaint further alleges that the individual defendants are liable for suffered damages "[b]y virtue of their high level positions" and direct involvement in the day-to-day operations of the Company. These positions, the Complaint asserts, made Johnson and Elders "privy ... to confidential propriety information concerning the Company and its business" and, therefore, responsible for the dissemination of any false and/or misleading statement or omission.

### C. Alleged "Partial Disclosures" by McDermott
The Complaint also alleges that the defendants made the following quarterly disclosures, characterized by the plaintiff as "partial disclosures," during the Class Period:

- "The fourth quarter 2012 results were negatively affected by an aggregate of approximately *$32 million of*

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 177 of 330

Local 2I0 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

*project losses and increased costs on certain projects, including approximately $23 million in the Asia Pacific segment* as a result of incremental costs associated with anticipated productivity and project delays on one subsea project, which is expected to complete in late 2013. *The Atlantic segment also was impacted by increased cost estimates relating to two fabrication projects totaling approximately $9 million,* due to lower than expected productivity, which are expected to complete in mid–2013" (quoting Feb. 28, 2013 (4Q2012) Press Release (Form 8–K)).

• "The Company's operating income in the first quarter 2013 was $53.0 million, a decrease of $27.2 million compared to $80.2 million in the first quarter 2012. The first quarter 2013 results were affected by operating losses in the Middle East and Atlantic segments, partially offset by stronger operating income in our Asia Pacific segment. In the first quarter 2013, operating losses in the Middle East segment totaled approximately $18.5 million compared to operating income of $34.7 million for the corresponding prior year period, a decline primarily attributable to execution plan changes on a project at an advanced stage of completion, which resulted in cost increases associated with hook-up activities and the use of third-party vessels. In addition, the decline in operating income was due to lower asset utilization and project activity compared to the prior year. The operating loss for the Atlantic segment changed by approximately $4.4 million to a loss of approximately $16.4 million due to increased support costs associated with lower marine asset utilization" (quoting May 8, 2013 (1Q2013) Press Release (Form 8–K)).

**\*5** • On August 5, 2013, McDermott filed a Form 8–K with the SEC, in which McDermott announced its financial results for the second quarter ended June 30, 2013. McDermott announced a substantial decrease in the Company's year-over-year financial results driven primarily by $100 million in increased loss estimates on problematic projects. In its Asia Pacific segment, the Company incurred a $62 million charge "due to delays on a deepwater pipelay project in Malaysia" caused by late deliveries and McDermott's inability to timely reconfigure the vessel required to execute the project. This $62 million charge was in addition to the $23 million the Company previously recognized in 4Q2012–costs, which, on March 1, 2013, defendant Johnson assured investors the Company was confident had

been "fully estimated." Defendant Johnson conceded on August 6, 2013 that the Malaysia failure was a "significant bid miss" (citing Aug. 6, 2013 (2Q2013) Press Release (Form 8–K)).

The defendants have not yet answered the Complaint. Instead, they move to dismiss it for failing to plead fraud with specificity.

### III. PARTIES' CONTENTIONS

According to the defendants, several reasons justify dismissal: the misrepresentations alleged in the Complaint are non-actionable expressions of corporate optimism about McDermott's financial performance, projects, bidding discipline and future prospects; the Complaint alleges "fraud by hindsight" and fails to explain how any of the challenged statements were false when made; the Complaint neither pleads scienter nor contains particularized allegations giving rise to a strong inference of scienter, as required by Rule 9(b) and the PSLRA; and the Complaint's derivative claims under § 20(a) of the Exchange Act fail because primary claims under § 10(b) do not meet the established pleading requirements for fraud.

Dismissal is improper, the plaintiff contends, because the Complaint pleads specific facts demonstrating that the defendants engaged in a pattern of fraud during the Class Period. In its view, the Complaint sufficiently alleges that the defendants' quarterly statements on November 5–6, 2012, February 28–March 1, 2013, and May 8–9, 2013 were false when made; the temporal proximity between the defendants' misleading statements and the disclosures of the truth demonstrate falsity; and the defendants made actionable misrepresentations related to the Company's core EPCI projects. The plaintiff also contends that the Complaint alleges facts that command a strong inference that the defendants knew or were reckless in not knowing about the ongoing problems facing McDermott's operations. In support of this argument, the plaintiff cites to the defendants' quarterly disclosure statements and points to its assertion that the individual defendants took part in monthly review meetings where these problems were likely discussed.

### IV. STANDARD OF REVIEW

A motion to dismiss for failure to plead with the heightened specificity required by Rule 9(b), as "reinforce[d]" by the PSLRA, is properly raised in a Rule 12(b)(6) motion to

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 178 of 330

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

dismiss for failure to state a claim. *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 186 n. 8 (5th Cir.2009); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 362 (5th Cir.2004); *Lovelace,* 78 F.3d at 1017. The Court accepts as true all well-pleaded facts and construes them in the light most favorable to the plaintiff. *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 430 (5th Cir.2002). The Court does not, however, "strain to find inferences favorable to the plaintiff," nor does it "accept conclusory allegations, unwarranted deductions, or legal conclusions ." *See Southland,* 365 F.3d at 361 (internal quotation marks omitted); *Westfall v. Miller,* 77 F.3d 868, 870 (5th Cir.1996). Dismissal is proper when it "appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Collins,* 224 F.3d at 498 (internal quotation marks omitted).

**\*6** Rule 9(b) and the PSLRA require that the circumstances supporting a claim for securities fraud be pleaded "with particularity." FED. R. CIV. P. 9(b); 15 U.S.C. § 78u–4(b); *see Southland,* 365 F.3d at 361–62. Rule 9(b) states:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

FED. R. CIV. P. 9(b). The PSLRA correspondingly provides, in relevant part, that a securities fraud complaint

> shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the

> complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). In addition, the complaint "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

Read together, Rule 9(b) and the PSLRA direct the pleader to:

(1) specify ... each statement alleged to have been misleading, *i.e.,* contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,* 291 F.3d 336, 350 (5th Cir.2002). By Fifth Circuit nomenclature, these elements establish the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id.* A district court must dismiss a § 10(b)/SEC Rule 10b–5 complaint that does not meet these requirements. 15 U.S.C. § 78u–4(b)(3) (A).

## IV. ANALYSIS AND DISCUSSION

"Private federal securities fraud actions are based on federal securities statutes and their implementing regulations." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 238–39 (5th Cir.2009) (citing *Dura Pharmas., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). The Complaint purports to state a claim under § 10(b)/SEC Rule 10b–5 as to all defendants, and a derivative claim under § 20(a) as to the individual defendants. Under § 10(b), it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Correspondingly, SEC Rule 10b–5 prohibits any person from using any means or instrumentality of interstate commerce

> (a) To employ any device, scheme, or artifice to defraud,

> **\*7** (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Based on these provisions, "[s]ection 20(a) ... imposes joint and several liability upon persons who 'control' defendants that violate the Exchange Act. 15 U.S.C. § 78t(a)." *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 862 (5th Cir.2003).

### A. Section 10(b)/SEC Rule 10b–5 Claim
To state a claim under § 10(b)/SEC Rule 10b–5, a plaintiff must plead: a(1) misstatement or omission (2) of material fact (3) in connection with the purchase or sale of a security, which was made (4) with scienter, i.e. "a mental state embracing intent to deceive, manipulate, or defraud," and upon which (5) the plaintiff justifiably relied, (6) proximately causing injury to it. *E.g., id.* at 865–66 (internal quotation marks omitted). The pending motion argues that the Complaint fails to adequately plead materiality and scienter.[6] The Court agrees.

### 1. Insufficient Allegations of Materiality
The defendants argue that the statements attributed to them are immaterial because they constitute puffery. "[A] statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *E.g., ABC Arbitrage,* 291 F.3d at 359 (internal quotation marks omitted); *accord Rosenzweig,* 332 F.3d at 865 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). As the defendants point out, all of the

statements casted as "misrepresentations" fall into one of four categories: (1) optimistic and vague statements regarding McDermott's future financial performance and profitability; (2) generalized statements about McDermott's positioning in various segments (regions) of operation; (3) indefinite descriptions of the challenges facing the Company and the Company's response to those challenges; and (4) generalized descriptions of McDermott's bidding discipline and project planning. None of these statements are "concrete factual or material misrepresentations" of the type that can be the basis for a § 10(b)/SEC Rule 10b–5 claim. *See Southland,* 365 F.3d at 372 (internal quotation marks omitted).

In this Circuit, expressions of corporate confidence, including "generalized, positive statements about [a] company's competitive strengths, experienced management, and future prospects," are immaterial and, thus, not actionable under the federal securities laws. *Rosenzweig,* 332 F.3d at 869.[7] The vast majority of alleged statements express nothing more than corporate optimism. These statements include announcements that the Company's positive 3Q2012 results would "keep [it] on track for solid 2012 financial performance" for the remainder of the year; the defendants "remain[ed] positive" and "belie [ved] that it [was] highly likely" that they could make profitable (in 2013) their operations in the Atlantic region, where they maintained a "stable," "competitive situation"; they "fe[lt] good about [their] strength in the Middle East"; Johnson remained "quite bullish" concerning McDermott's Atlantic presence; the Company was "well positioned to meet the growing customer demand in each of [its] market segments"; and the Company was "equal to best in industry in terms of project planning, project analysis, execution, forecasting, and control." The Complaint itself defeats its own pleading objective by characterizing the defendants' statements as statements of "positivity," albeit false from the plaintiff's perspective.

**\*8** The Court is hard pressed to conclude that any of the above statements expresses or creates assurances about McDermott's future profitability that would lead a rational investor to rely on them. *See ABC Arbitrage,* 291 F.3d at 359 (" '[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities law' as a matter of law."). They constitute non-actionable puffery by all reasonable inferences. The defendants did not, as the plaintiff argues, "speak in concrete terms with respect to actions they were currently taking,

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

and had already taken," nor did they "assure" investors that the Company had remedied challenges in each of its segments. If realized, any number of risks detailed in McDermott's 2012 annual report could have compromised goals that appeared attainable when announced, or derailed Company plans altogether. The potential profitability losses associated with these risks are spelled out in this report. As extensively as the defendants are quoted in the Complaint, no allegation meaningfully reconciles the defendants' oral representations with these risk disclosures. To the extent that the plaintiff acknowledges the risks involved in McDermott's contracts, it glosses over their potential impact by clinging to the Company's touted "three-tiered approach to reviewing projects (local, global and executive level review) in order to mitigate risk."

Similarly, the allegations make no attempt to square the defendants' statements with the multi-million dollar losses acknowledged in the Complaint and announced on February 28, 2013 (4Q2012 results) and May 8–9, 2013 (1Q2013 results). Yet, this is precisely the kind of analysis a rational investor would likely have conducted before making projections about McDermott stock. Remarks made by analysts in August, 2013 make the point all too clearly. The Complaint states that at the same time analysts expressed surprise that McDermott was failing, they complained that the disappointing results from the previous quarter dealt "yet *another* blow to management credibility" and that McDermott had had issues in the past (emphasis added). They also inquired "why ... the *rest* of the business" was falling apart at that particular juncture (emphasis added). These statements suggest that analysts had been alerted to and were in fact monitoring McDermott's progress *and* setbacks, and not simply relying on the Company's optimistic representations without considering known red flags. "It is difficult to form a 'strong inference' of scienter" from such telling factual concessions. *Rosenzweig, 332 F.3d at 868.*

In any event, to the extent that McDermott faced challenges, the defendants were "under no duty to cast [the Company's] business in a pejorative, rather than a positive, light." *Id. at 869*; *Abrams, 292 F.3d at 433* ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance.")). Accordingly, the defendants could have, for example, asserted that there were "no major project issues to discuss" and that problems faced in certain segments were

"isolated situations" that were "not representative of our business as a whole," without running afoul of § 10(b)/SEC Rule 10b–5.

### 2. Insufficient Allegations to Raise Inference of Scienter

**\*9**  The parties dispute whether the Complaint pleads scienter, or an inference of scienter, with the requisite specificity. Scienter has been adequately pleaded if, taken together, the allegations directly or circumstantially show that a defendant has intentionally deceived, manipulated or defrauded the public, or acted with severe recklessness in doing so. *E.g., Rosenzweig, 332 F.3d at 866*. In defining severe recklessness, the Fifth Circuit has stated:

> Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Allegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter, although appropriate allegations of motive and opportunity may enhance other allegations of scienter.

*Abrams, 292 F.3d at 430* (citing *Nat hens on v. Zonagen, Inc., 267 F.3d 400, 408, 410–12 (5th Cir.2001)*). Guided by Supreme Court and Fifth Circuit precedent, the Court takes the following three-step approach to determine whether a " 'cogent and compelling,' [and] not merely 'reasonable' or 'permissible,' " inference of scienter exists: it assumes that the allegations to be true; to the extent applicable, it "consider[s] documents incorporated in the complaint by reference and matters subject to judicial notice"; and it "take[s] into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 533 (5th Cir.2008)* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321–24, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)*).

The false and/or misleading statements alleged in the Complaint relate to the defendants' November, 2012, February/March, 2013, and May, 2013 statements. The plaintiff bears the burden of pleading the reason or reasons why these statements are false or misleading. *FED. R.*

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 181 of 330

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

CIV. P. 9(b); 🔖 *Southland,* 365 F.3d at 361–62. To meet this burden, the plaintiff essentially argues that the scienter pleaded in the Complaint is one of recklessness. It relies on a string of "plausabilities" and "implausabilities" about what the individual defendants knew or should have known based on their executive positions and day-to-day involvement in McDermott's business. These positions, it is alleged, afforded them at least monthly opportunities to participate in bid and project review meetings where problematic EPCI projects were likely discussed.

These contentions do not comport with the Fifth Circuit jurisprudence, however, and the plaintiff cites no binding case to support its faulty reasoning. The Fifth Circuit has held that "[a] pleading of scienter may not rest on the inference that [the] defendants must have been aware of the misstatement based on their positions with the company." *E.g.,* 🔖 *Abrams,* 292 F.3d at 432. Moreover, falsity or scienter is not pleaded with particularity, as the plaintiff suggests, by simply alleging that a corporate officer attended a meeting. *See* 🔖 *In re BP p.l.c. Sec. Ltg.,* 922 F.Supp.2d 600, 632 & n. 31 (S.D.Tex.2013); *cf.* 🔖 *Ind. Elec.,* 537 F.3d at 540 (reversing denial of motion to dismiss due to lack of scienter and rejecting allegation that defendants knew or should have known that their statements were false by virtue of monthly reports discussed at meetings). Here, the allegation has not been supported by particularized evidence that the individual defendants learned specific bad facts at specific meetings and later made a false statement with knowledge of the truth of those bad facts. A corporate officer's defendant's "hands-on" management style or intimate involvement with a matter is likewise not sufficient to infer scienter. *See* 🔖 *Ind. Elec.,* 537 F.3d at 535 ("Bernhard's [CEO] management style, coupled with his alleged boast that 'there is nothing in this company that I don't know,' are insufficient to support a strong inference of scienter."); 🔖 *Goldstein v. MCI WorldCom,* 340 F.3d 238, 251 (5th Cir.2003) ("[P]laintiffs' general allegation that Ebbers was a 'hands-on' CEO and therefore must have been aware of the accounts receivable situation simply lacks the requisite specificity."); 🔖 *Abrams,* 292 F.3d at 431–32.

**\*10** Equally unavailing is the attempt to manufacture falsity by linking generalized, optimistic statements with disappointing earnings results announced weeks or months later. Absent substantiation, these later results do not establish that the earlier statements were false when made. For example

on August 6, 2013, when the defendants announced that the Company's Malaysia project was a "significant bid miss" requiring additional funding, this disclosure did not contradict their prior assertion on February 28/March 1, 2013 that they were "feeling pretty good that [they] fully estimated the cost to complete the project." On August 5, 2013, when the defendants made known that 2Q2013 losses in the Middle East segment were the result of "poor project management, especially around changed conditions," lack of oversight in project execution and "weaknesses" in operating performance, these so-called admissions did not convert into a falsity their previous belief that the Company was "going to have a good year in 2013 in the Middle East." Neither did the announcement discredit the earlier representation that there was nothing that would "indicate any further problems with that program." Similarly, Johnson's August, 2013 announcement regarding operating losses and the restructuring of the Atlantic segment on account of "increased support costs" and lower-than-expected utilization did not negate his November, 2012 statements regarding his "bullish" outlook on the Atlantic segment and the Company's ability to maintain its position as a formidable bidding contender in the region.

Even when construed in the light most favorable to the plaintiff, the Complaint does nothing more than allege that in McDermott's quarterly earnings calls, the defendants should have accurately predicted what the results of the next quarter would be. "[C]ompany officials should not," however, "be held responsible for failure to foresee future events." 🔖 *Abrams,* 292 F.3d at 433 (approving Second Circuit's observation in 🔖 *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000)). No allegation supports an inference, much less a *strong inference,* that the defendants knew or should have known that there was no basis for concluding that project objectives were achievable. This is a classic case of pleading "fraud by hindsight," and the law makes no allowance for it. *See* 🔖 *Rosenzweig,* 332 F.3d at 867–68 (affirming dismissal of securities fraud class action where certain factual underpinnings on which plaintiffs relied were hindsight assessments of defendants' performance); 🔖 *Lormand,* 565 F.3d at 248–49 (defining "fraud by hindsight" as the case where "a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly" or where "there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later"). Business misjudgments are simply not

Case 4:24-cv-01940  Document 45-2  Filed on 03/14/25 in TXSD  Page 182 of 330

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

fraud. 🚩 *Melder v. Morris,* 27 F.3d 1097, 1101 n. 8 (5th Cir.1994).

**\*11** To the extent that any of the defendants' Class Period statements is an admission at all, it is at most an admission of mismanagement. "[N]egligence, oversight or simple mismanagement [do not] rise to the standard necessary to support a securities fraud action." 🚩 *Abrams,* 292 F.3d at 433; *see* 🚩 *Ind. Elec.,* 537 F.3d at 539 ("[T]he allegation of Shaw–Trac's problems may indicate corporate mismanagement, but the securities laws do not protect investors against negligence."); 🚩 *In re Anadarko Petrol. Corp. Class Action Litig.,* 957 F.Supp.2d 806, 818 (S.D.Tex.2013) ("Section 10(b) and [SEC] Rule 10b–5 do not protect investors against negligence or corporate mismanagement.").

Finally, virtually all of the challenged statements are cast in terms of personal opinions and beliefs about the future, rather than facts. A claim of securities fraud that rests on such opinion or belief is doomed to fail, however, unless the evidence shows that "the speaker did not in fact hold that belief and the statement made asserted something false or misleading about the subject matter ." 🚩 *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 670 (5th Cir.2004); *see* 🚩 *Rosenzweig,* 332 F.3d at 869 (holding that statement by management that "[w]e anticipate funding capital expenditures ... through operating cash flows and long-term debt" was immaterial because it was "qualified" as management's "anticipat[ion]," rather than fact); *see also* 🚩 *Nolte v. Capital One Fin. Corp.,* 390 F.3d 311, 315 (4th Cir.2004) ("[T]he Supreme Court held that in a securities fraud case, a statement of opinion may be a false factual statement if the statement is false, disbelieved by its maker, and related to matters of fact which can be verified by objective evidence." (citing 🚩 *Va. Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)). The Complaint makes no particularized showing that the defendants did not believe what they were saying when they said it.

Because the plaintiff fails to sufficiently plead materiality and scienter, its § 10(b)/SEC Rule 10b–5 claim must be dismissed.

### B. Section 20(a) Claim

The plaintiff's § 20(a) claim is a derivative claim of § 10(b). Based on the failure of the primary claim, it too must be dismissed.

### C. Leave to Amend

The plaintiff makes a one-sentence request seeking leave to amend the Complaint for the second time. A district court has discretion to grant or deny motions to amend pleadings. 🚩 Fed. R. C iv. P. 15(a) (leave to amend "shall be freely given when justice so requires"). Although Rule 15(a) "evinces a bias in favor of granting" such a motion, 🚩 *Rosenzweig,* 332 F.3d at 863 (internal quotation marks omitted), deference towards this bias is not warranted here since the Court afforded the plaintiff an opportunity once already to cure pleading deficiencies in the original complaints. *See supra* note 1. The plaintiff has not presented any new information to cure the existing deficiencies. Accordingly, the request for leave to amend is denied and the Complaint is dismissed with prejudice. *See* 🚩 *id.* at 864–65 ("The Supreme Court lists five considerations in determining whether to deny leave to amend a complaint: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of the amendment....' 🚩 *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).").

### VI. CONCLUSION

**\*12** Based on the foregoing analysis and discussion, the defendants' motion to dismiss is GRANTED and the Complaint dismissed with prejudice.

It is so **ORDERED.**

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

## Footnotes

1   The Court treats the plaintiff's Complaint as an amended one. Original class action complaints were filed
    in this district by Jerad Flood, under Cause No. 4:13–CV–02442, on August 20, 2013, and by Local 210
    Unity Pension and Welfare Funds, under the captioned case number, on August 15, 2013. *See* Order
    Granting Stipulation on Amended Complaint and Motion to Dismiss Briefing Schedule, Dec. 17, 2013, ECF
    No. 44; Order Consolidating Action, Approving PAMCAH–UA Local 675 Pension Fund As Lead Plaintiff and
    Approving Selection of Counsel, Dec. 5, 2013, ECF No. 36.

2   The Court takes judicial notice of the Company's 2012 annual report (Form 10–K) attached to the pending
    motion, cited in the Complaint, and on file with the SEC. *See* Collins v. Morgan Stanley Dean Witter,
    224 F.3d 496, 498–99 (5th Cir.2000) ("[D]ocuments that a defendant attaches to a motion to dismiss are
    considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its]
    claim." (citing cases) (internal quotation marks omitted)); Lovelace v. Software Spectrum, Inc., 78 F.3d
    1015, 1018 & n. 1 (5th Cir.1996) (adopting rule of Kramer v. Time Warner, Inc., 937 F.2d 767, 774
    (2d Cir.1991), that in securities fraud action, judicial notice may be taken of contents of public disclosure
    documents required to be filed with SEC).

3   In early November, 2012, McDermott's common stock was priced just below $10 per share. The price peaked
    at more than $13 per share on February 8, 2013. Between February 28, 2013, when the Company announced
    its 4Q2012 earnings, and March 1, 2013, the stock price dropped from $12.72 to $10.70 per share, an alleged
    16% decline. Between May 8, 2013, when the Company released its 1Q2013 earnings, and May 9, 2013, the
    price dropped from $11.03 to $9.59, an alleged 13% decline. Finally, following the announcement of 2Q2013
    results on August 5, 2013, the stock price dropped from $8.73 to $6.93 overnight, representing an alleged
    21% decline.

4   Unless otherwise noted, emphasized allegations were emphasized in the Complaint.

5   Without identifying specific speaker(s), paragraphs 65 and 88 of the Complaint quote the defendants as
    making a number of additional statements about general bidding discipline and revenue recognition.

6   The Court addresses the parties' dispute over falsity in its analysis of scienter.

7   The Court notes, without deciding, that under the PSLRA's "safe harbor" provision, a defendant is not liable
    for any "forward-looking" statement, as that term is defined by statute. 15 U.S.C. § 78u–5(c). Generally,
    a forward-looking statement is one that is "identified as a forward-looking statement, and is accompanied
    by meaningful cautionary statements identifying important factors that could cause actual results to differ
    materially from those in the forward-looking statement." *Id.* § 78u–5(c)(1)(A). It also includes a statement
    "made with actual knowledge ... that the statement was false or misleading." *Id.* § 78u–5(c)(I)(B). The parties
    have neither raised nor briefed this issue, however.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 13

Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5766870

2015 WL 5766870
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Tyler Division.

Alan B. MARCUS, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,

v.

J.C. PENNEY COMPANY, INC., et. al., Defendants.

CIVIL ACT ION NO. 6:13-cv-736-MHS-KNM
|
Signed 09/29/2015

**Attorneys and Law Firms**

Danielle Suzanne Myers, Austin P. Brane, Darren Jay
Robbins, David J. Harris, Jr., David Conrad Walton, James
Albert Caputo, Robbins Geller Rudman & Dowd LLP, San
Diego, CA, Rocky M. Lawdermilk, Rocky Lawdermilk-
Attorney at Law, Beaumont, TX, Samuel H. Rudman,
Robbins Geller Rudman & Dowd, Melville, NY, Thomas
John Ward, Jr, Jack Wesley Hill, Ward, Smith & Hill, PLLC,
Longview, TX, for Plaintiff.

Jason Jacob Mendro, Gibson Dunn & Crutcher LLP,
Washington, DC, Meryl L. Young, Gibson Dunn & Crutcher
LLP, Irvine, CA, Robert C. Walters, Gibson Dunn & Crutcher,
Dallas, TX, Michael E. Jones, Potter Minton, A Professional
Corporation, Tyler, TX, for Defendants.

## *ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE*

MICHAEL H. SCHNEIDER, UNITED STATES DISTRICT
JUDGE

**\*1** On September 25, 2015, Defendants JC Penney
Company, Inc., Kenneth H. Hannah, and Myron E. Ullman,
III (collectively "Defendants") filed Objections to the
Magistrate Judge's Report and Recommendation denying
Defendants' Motion to Dismiss (Doc. No. 101). Having made
a *de novo* review of the written objections filed by Defendant,
the Court concludes that the findings and conclusions of the
Magistrate Judge are correct and the objections are without
merit. For the reasons below, Defendants' Objections are
**OVERRULED.** Defendants' Request for Oral Hearing (Doc.
No. 86) is **DENIED**.

## *ANALYSIS*

Defendants seek a *de novo* review of the Magistrate Judge's
Report and Recommendation denying Defendants' Motion
to Dismiss. Specifically, Defendants argue that there are no
actionable statements in the Complaint, there is no causation,
and the Report misapplies the PSLRA's safe harbor provision.

### 1. Plaintiffs have alleged sufficient specific statements amounting to actionable misrepresentations or omissions by Defendants.

Defendants' Objections 1, 2, 3 and 5 take issue with the
specific allegedly misleading statements that the Report
addresses. Defendants first argue that the Complaint never
alleged that the Defendants represented that JC Penney had
the required inventory by the end of 2Q13. Doc. No. 101
at 2. However, Defendants admit that "[t]he Complaint does
allege that Defendant Ullman stated that J.C. Penny [sic]
'ha[d] the inventory to do the business' during a conference
call with analysts on August 20, 2013." Doc. No. 101 at 3
n. 4 (citing Compl. ¶ 41(b)[1]). Plaintiffs' Complaint alleges
that this statement was made on August 20, 2013 (at the
beginning of 3Q13). The Complaint goes on to clarify that the
statements made on August 20, 2013 were discussing the
Company's status as of the end of 2Q13, which ended August
3, 2013[2]. Plaintiffs' theory is that Defendants spoke about
JC Penney's inventory during the 2Q13 conference call using
inventory information as of August 20 without informing
investors of the temporal distinction. "The disclosure required
by the securities laws is measured *not by literal truth*, but by
the ability of the statements to accurately inform rather than
mislead." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228,
248 (5th Cir.2009) (emphasis added). Therefore Plaintiffs
have alleged enough facts to plausibly show that Defendants
represented that they had sufficient inventory as of the end of
2Q13 and that this statement was misleading when made[3].

**\*2** Next Defendants claim that the CNBC report cannot be
attributable to Defendants. Even under the PSLRA, "plaintiffs
are only required to plead facts, not to produce admissible
evidence." *In re McKesson HBOC, Inc. Securities
Litigation,* 126 F.Supp.2d 1248, 1272 (N.D.Cal.2000). The
Complaint alleges that Ullman attended a Sterne Agee
conference and "unequivocally told attendees that JCPenney
would end the year with sufficient liquidity and that he
'[did] not see conditions for the rest of the year where

Case 4:24-cv-01940 Document 45-2 Filed on 03/14/25 in TXSD Page 186 of 330

**Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2015)**
2015 WL 5766870

[JCPenney] would need to raise liquidity.'" Compl. ¶ 7. The Complaint again states that "on the morning of September 25, 2013, Ullman attended an investor meeting in New York hosted by Sterne Agee. Following that meeting, Sterne Agee immediately reiterated defendant Ullman's representations via an upbeat report issued later that morning." *Id.* ¶ 52. This was followed up with "[t]he next day, September 26, 2013, before the market opened, CNBC.com published an article ... reporting that 'J.C. Penney CEO Mike Ullman told investors the retailer does not see conditions for the rest of the year where it would need to raise liquidity.'" *Id.* ¶ 54. Plaintiffs have sufficiently alleged that Ullman attended a Sterne Agee conference, said JC Penney did not see conditions where it would need to raise liquidity, and this was reported by CNBC. There is no reason to believe that CNBC is not a credible source of information [4]. At this stage, Plaintiffs have met their pleading burden to avoid a motion to dismiss.

### 2. The Report correctly applies the PSLRA's safe harbor provision as interpreted by the Fifth Circuit.

The Fifth Circuit has been very clear about when defendants may avail themselves of the safe harbor provision and when they may not. The safe harbor provision is inapplicable when Plaintiffs adequately allege that defendants actually knew their statements were misleading at the time they were made. *Lormand,* 565 F.3d at 244 (Safe harbor would apply *only if* "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading.") (emphasis added); *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 371 (5th Cir.2004) ("To avoid safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity"); *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 409 (5th Cir.2001). The safe harbor provision "does not protect statements that defendants knew were false or misleading." *In re UICI Sec. Litig.,* No. 3:04–CV–1149–P, 2006 U.S. Dist. LEXIS 73753, at \*17, 2006 WL 7354417 (N.D.Tex. Sept. 29, 2006); *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860 (S.D.Tex.2001) [5]. Therefore, defendants may only attempt to invoke the protections of the safe harbor provision if plaintiffs fail to adequately plead that the defendants made these statements with actual knowledge of their falsity.

**\*3** Once in the realm of safe harbor, the analysis now turns to the cautionary language that accompanies the forward-looking statements. Defendants argue that there was extensive cautionary language accompanying the forward-looking statements [6]. However, cautionary statements are not evaluated in a vacuum; they are necessarily context specific. *Lormand,* 565 F.3d at 245. When risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future. When cautionary language is "glossed over as a future risk ... rather than the certain dangers that had already begun to materialize" then the warnings are no longer meaningful. *Id.* at 247. Those types of warnings "fail to correct the false impression created by defendants' public statements or to supply the trust that they omitted." *Id.* Plaintiffs have pled enough facts to show that the risks of insufficient liquidity and inadequate inventory had already begun to materialize. Plaintiffs claim that Defendants failed to correct the false impression of success created by their public statements and thus these cautionary warnings are insufficient to provide safe harbor protection as a matter of law. There are enough facts alleged in the Complaint to show the risk had materialized and the warnings are thus inadequate.

### 3. Plaintiffs pled sufficient facts to establish causation between Defendants' misrepresentations and omissions and Plaintiffs' harm.

Defendants admit that they do not "challenge Plaintiffs' pleadings that J.C. Penney's announcement about the offering caused its stock price to decline on September 27." Doc. No. 101 at 7–8. Defendants' causation argument focuses on the drop in stock price on September 25, 2013. After the market closed on September 24, 2013, Goldman Sachs issues a report revealing that JC Penney would be "looking to build a bigger liquidity buffer." Compl. ¶ 50. Plaintiffs alleged that "[t]he news contained in the ... report surprised investors as, just 14 days earlier, defendants had reassured investors that JCPenney's existing liquidity was adequate 'for the remainder of 2013.' When the market opened on September 25, 2013, JCPenney stock price dropped to a 13–year intra-day low." *Id.* ¶ 51. The Complaint states that JC Penney's need for a larger liquidity buffer was disclosed to the market on September 25, 2013, "partially revealing the Company's dire financial situation" and because of that news, JC Penney's stock price declined. *Id.* ¶ 69. The Complaint further states that the "decline cannot properly be attributed to any market or industry event or force, but rather was a direct result of the disclosure." *Id.* Plaintiffs clearly pled sufficient facts to show causation.

**Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2015)**

2015 WL 5766870

Accordingly, the Court adopts the Magistrate Judge's Report and Recommendation (Doc. No. 98). It is

**ORDERED** that Defendants' Request for Oral Hearing (Doc. No. 86) and Defendants' Motion to Dismiss Lead Plaintiff's Consolidated Complaint (Doc. No. 73) are **DENIED**. Lead Plaintiff's Request for Judicial Notice (Doc. No. 80) is **GRANTED**.

### REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

K. NICOLE MITCHELL, UNITED STATES MAGISTRATE JUDGE

**\*4** Before the Court is Defendants' Motion to Dismiss Plaintiff's Consolidated Complaint for Failure to State a Claim (ECF 73) and Plaintiffs' Request for Judicial Notice (ECF 80). Having considered the motions, responses, reply briefs, and sur-reply briefs, the Court recommends that the Motion to Dismiss be **DENIED** and the Request for Judicial Notice be **GRANTED**.

### BACKGROUND

On July 18, 2014, Plaintiffs filed an Amended Consolidated Complaint for Violation of the Federal Securities Laws against Defendants. Plaintiffs brought a securities fraud class action on behalf of all purchasers of JC Penney common stock between August 20, 2013 and September 26, 2013 against JC Penney, its Chief Executive Officer ("CEO"), Myron E. Ullman III ("Ullman"), and its former Chief Financial Officer ("CFO"), Kenneth H. Hannah ("Hannah") for making materially false and misleading statements in violation of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b–5.

Defendants filed a Motion requesting that the Consolidated Complaint be dismissed for failure to state a claim. Defendants argue that the Plaintiffs did not meet the pleading standards required by the Private Securities Litigation Reform Act ("PSLRA"). Lead Plaintiff filed a Request for Judicial Notice in support of Lead Plaintiff's Response to Defendants' Motion to Dismiss.

### APPLICABLE LAW

On a motion to dismiss under 12(b)(6), the Court must determine whether the Complaint contains "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face". *Spitzberg v. Houston American Energy Corp.,* 758 F.3d 676, 683 (5th Cir.2014); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Normally, the Court must constrain itself to the facts stated in the Complaint and documents attached to or incorporated within the Complaint. However, in a securities fraud case, the Court may consider "the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC." *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996).

Rule 9 of the Federal Rules of Civil Procedure typically governs allegations of fraud, but the PSLRA has heightened the pleading standards for certain elements of private claims of securities fraud [1]. *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 532–33 (5th Cir.2008) (The Plaintiff must: (1) allege with particularity why each of defendants' statements or omissions was misleading under 15 U.S.C. 78u–4(b)(1); and (2) allege with particularity those facts giving rise to a "strong inference" that the defendant acted with the requisite state of mind under 15 U.S.C. § 78u–4(b)(2).) Under the PSLRA, as in all Rule 9(b) and 12(b)(6) motions to dismiss, the Court accepts all of Plaintiffs' factual allegations as true. *ABC Arbitrage v. Tchuruk,* 291 F.3d 336, 341 (5th Cir.2002).

To state a claim for private securities fraud claim based on violations of 10(b) and Rule 10b–5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S.Ct. 2179, 2184 (2011).

### DISCUSSION

Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5766870

### Judicial Notice:

**\*5**  Lead Plaintiff asks this Court to take judicial notice of excerpts of two SEC forms filed by JC Penney. Doc. No. 80 at 1. Defendants do not object to the judicial notice requested by Lead Plaintiff but rather urge the Court to take notice of both of the forms in their entirety, as opposed to just the excerpts [2]. Doc. No. 85 at 2. The Court may take judicial notice of documents filed with the SEC "for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Lovelace, 78 F.3d at 1018*. Therefore, this Court will take judicial notice of the entirety of (1) SEC Form 10–K, JC Penney Annual Report filed March 20, 2013, and (2) SEC Form 10–Q, JC Penney Quarterly Report filed on December 5, 2013.

### Motion to Dismiss:

Defendants' arguments against the § 10(b) claim are threefold and all stem from the position that the plaintiff failed to meet its pleading requirements under the PSLRA: First, that the Complaint fails to plead that any of the Defendants' statements are actionable; second, that the Complaint did not sufficiently plead scienter; and third, that the Complaint did not plead causation. Because Defendants argue that the § 10(b) claim does not hold up, they argue that the § 20(a) claim must be dismissed as well.

### § 10(b) claim:

### Safe Harbor Provision:

First, Defendants argue that the allegedly misleading statements in the Plaintiffs' Complaint are forward-looking statements and, as such, are given extra protection by the PSLRA's "safe harbor" provision. The PSLRA protects forward-looking statements: (1) made without actual knowledge that the statements were false; and (2) accompanied by meaningful cautionary language. *15 U.S.C. § 78u–5(c)(1)(A)*. For plaintiffs to adequately show "actual knowledge" at the motion to dismiss stage they must plead with particularity that defendants: "(1) did not genuinely believe the [statement when made], (2) actually knew they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement[.]" *Slayton v. American Exp.*

*Co., 604 F.3d 758, 775 (2nd Cir.2010)*. The facts pled must give rise to an inference of actual knowledge "cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007)*.

Certain statements alleged in the Complaint are forward-looking statements. However, Plaintiffs have sufficiently pled facts [3] to show that the defendants were aware of undisclosed facts that would tend to seriously undermine the accuracy of those forward-looking statements. For example, on September 25, 2013, defendant Ullman assured investors that JC Penney "did not see conditions for the rest of the year where it would need to raise liquidity [4]." Doc. No. 72 at ¶ 7. At the time of this statement, defendants were "in the midst of pricing an almost $1 billion offering that they would announce the next day, and a collapse in JC Penney's stock prior thereto would have resulted in a failed offering, which in turn would have forced JC Penney into bankruptcy." Doc. No. 72 at ¶ 52. Plaintiffs also allege that Defendants made similar misleading statements concerning inventory and suppliers while possessing knowledge to the contrary of those statements. The Complaint claims that Defendants admitted that the offering was necessary to "eas[e] the concerns of our vendors" and to "take away the concern that our ... supplier partners have." Doc. No. 72 at ¶ 63. These statements tend to undermine the previous statements by defendants claiming that "supplier relationships remain as strong as ever." Doc. No. 72 at ¶ 37. Even if these statements were looked upon as mere "puffery", as the defense claims, that does not negate the duty to disclose other information necessary to make those statements not misleading. *Rubinstein v. Collins, 20 F.3d 160, 170 (5th Cir.1994)*. Looking at the facts in the light most favorable to the plaintiff, Plaintiffs have pled enough facts to demonstrate that the defendants were aware of undisclosed facts that would undermine the veracity of its statements at the time those statements were made.

**\*6**  Defendants next assert that the forward-looking statements were all accompanied by meaningful, cautionary language and as such are protected under the PSLRA. But the PSLRA is very specific about the type of language that must accompany these statements: "meaningful, cautionary statements *identifying important factors that could cause actual results to differ materially from those in the forward-looking statement*". *15 U.S.C. § 78u–5(c)(1)(A)(i)* (emphasis added). Forward-looking statements only accompanied by boilerplate warnings that do not warn of a materialized risk

Pl. Appx. B-183

4

Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 5766870

are not afforded protection under the safe harbor provision. *Lormand, 565 F.3d at 248.*

Defendants point to specific cautionary language in their motion: "The presentation this morning includes forward-looking statements ... Any such forward-looking statements are subject to risks and uncertainties and the Company's future results of operations could differ materially from historical results or current expectations." Doc. 73 at 18 n.10 (citing Aug. 20 Call Tr. At 2). First, calling a statement "forward-looking" does not automatically endow it with the protections of the safe harbor provision. Second, the only cautionary language is too vague and general to "identify important factors that could cause actual results to differ materially from those in the forward-looking statement." This "warning" merely states that there are "risks and uncertainties" and thus the future result could be different than projected. That does not rise to the level of "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances." *Southland, 365 F.3d at 372.* Rather, this warning is "merely a boilerplate litany of generally applicable risk factors," which is not sufficient to warrant safe harbor protection [5]. *Id.* Further, if reasonable minds could disagree as to whether the overall understanding of the statements and warnings is misleading, "the statutory safe harbor provision cannot provide the basis for dismissal as a matter of law." *Lormand, 565 F.3d at 248.* As such, the defendants' statements are not offered protection under the safe harbor provision of the PSLRA and are actionable.

### *Scienter:*

Defendants next argue that Plaintiffs failed to sufficiently plead scienter. The analysis of whether or not the plaintiffs sufficiently pled actual knowledge has already been discussed. By showing "actual knowledge" sufficient to remove the safe-harbor protection from forward-looking statements, the plaintiffs managed to sufficiently plead scienter to satisfy the second element of § 10(b). Non forward-looking statements have a "severe recklessness" state of mind requirement, which is below that of "actual knowledge." *Lormand, 565 F.3d at 251.* Therefore, if the Plaintiffs sufficiently pled facts to demonstrate "actual knowledge", they have satisfied the scienter requirement of § 10(b). In addition to the forward-looking statements discussed above, Plaintiffs pointed to other specific statements that, if taken as true, were made with severe recklessness or actual knowledge

of falsity. For example, on August 3, 2013, at the end of 2Q13, Plaintiffs have pled that JCPenney's inventory was substantially depleted in core categories and "lacked the inventory it needed 'to do the business.'" Doc. No. 72 at ¶ 42(a). Plaintiffs allege that JC Penney purposefully delayed delivery of nearly $600 million in inventory until after the end of 2Q13 so as not to have to reveal that $600 million in accounts payable exceeded JC Penney's available liquidity during 2Q13. However, in the August 20, 2013 earnings conference call led by Ullman and Hannah discussing JC Penney's status as of August 3 (when 2Q13 ended), Plaintiffs have pled that Defendants represented that JC Penney had the required inventory by the end of 2Q13. Doc. No. 72 at ¶ 40. The Complaint states that Defendants were aware of facts undermining their statements because inventory purchases were the subject of monthly meetings and subject to regular review by defendants. Doc. No. 72 at ¶ 42(c). Defendants also later admitted to having knowledge of the timing of the inventory. Doc. No. 72 at ¶ 42(a). Taking all of the Plaintiffs' allegations as true, they have sufficiently pled scienter.

### *Causation:*

**\*7** Finally, Defendants argue that the Plaintiffs failed to plead causation. JC Penney stock declined after a Goldman Sachs report was released after the market closed on September 24, 2013 and again declined 13% after the announcement of the offering after the market closed on September 26, 2013. Defendants argue that the Goldman Sachs report did not contain a previously concealed fact and thus cannot be used to plead causation. Doc. No. 73 at 29. They argue that the truth about the actual capital requirements was not revealed until September 26, 2013 and thus the truth about the offering could not be the cause of the price drop on September 24. Defendants' argument seems to be that because JC Penney stock declined on September 25, 2013 the September 26 announcement could not have been the cause of the decline in stock prices on September 27.

Actual timing of the loss is separate from the question of whether the plaintiff pled a plausible causal relationship between the defendants' fraudulent statements and the plaintiffs' economic loss. *Lormand,* 267 n. 33. The actual timing is a factual question and is "not enough to dismiss a complaint that alleges a specific causal link." *Id.* The truth can be gradually perceived in the marketplace through a series of partial disclosures. *Id.* at 261. Under 12(b)(6), at the pleading stage, the plaintiff is only required to plead a plausible cause of action; it is not for this Court to decide whether that cause

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 190 of 330
Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 5766870

of action will ultimately be successful. 🔖 *Twombly*, 550 U.S. at 556; 🔖 *Tellabs*, 551 U.S. at 324. Here Plaintiffs have stated that the Goldman Sachs report was released on September 24, 2013 after the market closed and thus the stock price decreased the next day. Doc. No. 72 at ¶¶ 50–51. Plaintiffs' pled that Defendants then attempted to immediately dispel any concerns over JC Penney's financial status on September 25 at the Stern Agee conference. Doc. No. 72 at ¶ 52. JC Penney finally made the announcement of its $800 million offering on September 26 after the stock market closed and the following day the stock decreased another 13%. Doc. No. 72 at ¶¶ 59, 62. Plaintiffs have pled enough facts that, if taken as true, could establish the causal link between the Defendants' misleading statements and the Plaintiffs' economic loss.

### § 20(a) Claim:

The Defendants' only challenge to Count II, the § 20(a) claim, is that a § 20(a) claim is predicated on an underlying § 10(b) violation and thus if Count I is dismissed, Count II must necessarily be dismissed as well. Doc. No. 73 at 30. The defense makes no other arguments as to dismissal of Count II. Therefore, because there is sufficient evidence, at this stage, to show a § 10(b) violation, there is also sufficient evidence to uphold the § 20(a) claim.

### *RECOMMENDATION*

It is hereby **RECOMMENDED** that the Motion to Dismiss (ECF 73) be **DENIED** and Request for Judicial Notice (ECF 80) be **GRANTED**.

Within fourteen days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 🔖 28 U.S.C. § 636(b).

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after service shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. 🚩 *Douglass v. United Servs. Auto. Assn.*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc), *superseded by statute on other grounds*, 🔖 28 U.S.C. 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 11th day of September, 2015.

### All Citations

Not Reported in Fed. Supp., 2015 WL 5766870

---

### Footnotes

1   Defendants cite to ¶ 42(b) but this statement is actually found in ¶ 41(b).

2   These statements fall under the heading "2Q13 Earnings Release and Conference Call". Compl. at 12. The specific statements under this heading also explain that the subject of the August 20, 2013 call was the status of the Company as of August 3, 2013.

3   This is not the only statement that is actionable. The Complaint details multiple actionable liquidity, inventory, and supplier statements sufficient to overcome a motion to dismiss. Compl. ¶¶ 3, 4, 7, 35–41((1) "We are not assuming we need any additional financing", (2) "we believe our existing cash and cash equivalents will be adequate ... ", (3) "[I] do not see conditions for the rest of the year where [JCPenney] would need to raise liquidity", (4) the Company "continues to receive strong support from its suppliers", (5) "our supplier relationships remain as strong as ever", (6) "we expect to end the year with an excess of $1.5 billion in liquidity.")

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 191 of 330

Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 5766870

4    Defendants cite to cases regarding confidential witnesses to support the conclusion that Plaintiffs must plead that the source is credible. This is true when the source is a confidential witness whose credibility is unknown. *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.,* 67 F.Supp.3d 782, 788 (E.D.Tex.2014). Here, we are not dealing with a confidential witness, but rather an established news source alleging a very specific statement. Plaintiffs allege that Ullman made statements at an investor meeting and the next day CNBC, a well-known news source, reported specific statements that were made.

*In re McKesson,* 126 F.Supp.2d at 1272 (stating that a newspaper article that corroborates plaintiff's own investigation and provides detailed factual allegations could be a reasonable source of information and belief allegations).

5    In addition, other Circuits have noted the Fifth Circuit's interpretation of the safe harbor provision. *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,* 594 F.3d 783, 794–95 (11th Cir.2010) ("the Fifth Circuit held that the PSLRA's safe harbor provision is not available to defendants who have actual knowledge that their forward-looking statements are false at the time they are made ... The court cited the statutory safe harbor for the proposition that a defendant may only seek shelter if the plaintiff fails to plead that the defendant had actual knowledge of the statement's falsity when he made it.")

6    There are three specific warnings that defendants reference in their motion: (1) "we cannot assure that cash flows and other internal and external sources of liquidity will at all times be sufficient for our cash requirements" and "[i]f necessary, we may need to consider actions and steps to improve our cash position and mitigate any potential liquidity shortfall, such as modifying our business plan [and] pursuing additional financing to the extent available"; (2) the Company "may need to consider actions and steps to improve our cash position and mitigate any potential liquidity shortfall"; and (3) "Our profitability depends upon our ability to manage appropriate inventory levels and respond quickly to shifts in consumer demand patterns" and "[i]f we underestimate customer demand for our merchandise, we may experience inventory shortages which may result in missed sales opportunities." Doc. No. 73 at 19, 27. The first two statements go to liquidity, the third goes to inventory. *Id.* Defendants did not argue that the supplier statements were accompanied by meaningful, cautionary language.

1    The PSLRA did not create heightened pleading standards for all six elements in a claim of securities fraud, only the first two: the material misrepresentations and scienter. *Lormand v. U.S. Unwired Inc.,* 565 F.3d 228, 267 (5th Cir.2009).

2    Defendants also urge this Court that the Plaintiffs' use of material outside of the pleadings supports a dismissal with prejudice. This is a misreading of *ABC Arbitrage.* In that case, the Court afforded the Plaintiffs two chances to replead their cause of action before dismissal with prejudice was warranted. *ABC Arbitrage,* 291 F.3d at 362. Defendants have also pointed to no case law stating that requesting judicial notice of a relevant public disclosure document would qualify as an "amendment" to the Complaint. Rather, Fifth Circuit precedent provides that a court may look outside the Complaint in securities cases and take judicial notice of SEC filings. *Lovelace,* 78 F.3d at 1018.

3    At the motion to dismiss stage, stating facts upon "information and belief" can be sufficient to meet the PSLRA pleading standard. If an allegation is made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." *ABC Arbitrage,* 291 F.3d at 349.

4    This statement was made public in a report by Stern Agee and CNBC. Defendants argue that the Plaintiffs cannot attribute the CNBC and Stern Agee reports to the defendants. Doc. No. 73 at 20. Securities issuers are liable for statements by securities analysts when they have "sufficiently entangled [themselves] with the

**Marcus v. J.C. Penney Company, Inc., Not Reported in Fed. Supp. (2015)**

2015 WL 5766870

analysts' forecasts [so as] to render those predictions attributable to [the issuers]." *Southland Sec. Corp. v. INSpireIns.* Solutions, Inc., 365 F.3d 353, 373 (5th Cir.2004). The Complaint must allege "who supplied the information to the analyst, how the analyst received the information, and how the defendant was entangled with or manipulated the information and the analyst." *Id.* Here, Plaintiffs' Complaint states that defendant Ullman made statements to attendees at a Stern Agee conference on September 25 which were then reported by CNBC and Stern Agee. Doc. No. 72 at ¶¶ 7, 52–54. Plaintiffs sufficiently stated that a defendant provided misleading information to an analyst who relied on that information to prepare a report.

5    Defendants also point to another statement tending to prove that these statements were in fact forward-looking: "[T]he Company **expects** to end the year with in excess of $1.5 billion ... we have **projected** we are not assuming that we need any additional financing." Doc. No. 73 at 18 n.11. But again, merely noting that a statement may be forward-looking does not mean that it is automatically afforded safe harbor protection under the PSLRA. There must be meaningful, cautionary language accompanying the statement.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 14

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....
2022 WL 377415

2022 WL 377415
Only the Westlaw citation is currently available.
United States District Court, N.D. Oklahoma.

MEITAV DASH PROVIDENT FUNDS
AND PENSION LTD., Lead Plaintiff,
and

Jacob Goldman, Individually and on behalf of all
other similarly situated, Gary Smith, Individually
and on behalf of all others similarly situated, and
Employees' Retirement System of the City of
Providence, City of Miami Fire Fighters' and Police
Officers' Retirement Trust, Consolidated Plaintiffs,
v.

SPIRIT AEROSYSTEMS HOLDINGS, INC., Thomas
G. Gentile, III, Jose Garcia, John Gilson, and Shawn
Campbell, Defendants/Consolidated Defendants.

Case No. 20-cv-00054-SPF-JFJ, Case No. 20-
cv-00077-SPF-JFJ, Case No. 20-cv-00117-SPF-JFJ
|
Signed 01/07/2022

Attorneys and Law Firms

Laurence M. Rosen, Phillip Kim, The Rosen Law Firm, P.A.,
Brian Calandra, Pomerantz LLP, David J. Schwartz, Francis
Paul McConville, Irina Vasilchenko, James W. Johnson,
Labaton Sucharow LLP, John J. Esmay, Bernstein Litowitz
Berger & Grossmann LLP, New York, NY, James Michael
Reed, Hall Estill Hardwick Gable Golden & Nelson, Tulsa,
OK, for Lead Plaintiff/Consolidated Plaintiffs.

R. Richard Love, III, Conner & Winters, LLP, John
Christopher Davis, Johnson & Jones PC, Jessica Lynn
Dickerson, Mary Quinn-Cooper, McAfee & Taft, Tulsa,
OK, Robert Ritchie, Vinson & Elkins LLP, Carrington
Giammittorio, Haynes and Boone, LLP, Daniel Gold,
Shearman & Sterling LLP, Dallas, TX, Andrew Rodgers,
Patrick Joseph Smith, Smith Villazor LLP, New York, NY,
Spencer Freeman Smith, McAfee & Taft, Oklahoma City,
OK, for Defendants/Consolidated Defendants.

## ORDER

STEPHEN P. FRIOT, UNITED STATES DISTRICT JUDGE

**\*1** Three investors[1] filed putative class actions against
Spirit AeroSystems Holdings, Inc. (Spirit), a publicly traded
company, and certain of its senior executives asserting
claims under Section 10(b) and Section 20(a) of the
Securities Exchange Act of 1934, as amended by the Private
Securities Litigation Reform Act of 1995 (PSLRA), 15
U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated
thereunder, 17 C.F.R. § 240.10b-5. The court entered an
order (1) consolidating the actions, designating Case No.
20-CV-0054 as the base file; (2) appointing Meitav Dash
Provident Funds and Pension Ltd. (Meitav) to serve as
lead plaintiff; and (3) approving the selection of lead
counsel, additional counsel, and liaison counsel. Thereafter,
as ordered by the court, Meitav and consolidated plaintiffs,
Gary Smith (Smith) and City of Miami Fire Fighters'
and Police Officers' Retirement Trust (Retirement Trust)
filed a Consolidated Class Action Complaint (consolidated
complaint), superseding all filed complaints. Defendants have
moved to dismiss the consolidated complaint. Doc. nos. 77,
78 and 79. Lead plaintiff and consolidated plaintiffs have
responded, opposing dismissal.[2] Doc. no. 90. Defendants
have replied. Doc. nos. 91, 92 and 93. Subsequently, the case
was transferred to the undersigned. Upon due consideration
of the parties' submissions and relevant law, the court makes
its determination.[3]

I.

*Parties*

Lead plaintiff Meitav is one of the leading investment
houses in Israel. Consolidated plaintiff Retirement Trust
provides retirement and disability benefits to participating
firefighters and police officers of the City of Miami, Florida.
Consolidated plaintiff Smith is a securities investor. Plaintiffs
bring this securities fraud action, individually and on behalf
of all persons and entities who or which, during the
period from October 31, 2019, through February 27, 2020,
inclusive (the Class Period), purchased Spirit's publicly traded
common stock and suffered damages. Plaintiffs claim they
purchased Spirit's stock at artificially inflated prices during
the Class Period and were damaged upon revelation of alleged
corrective disclosures or materializations of the risks.

**\*2** Defendant Spirit is a Delaware corporation with its
headquarters in Wichita, Kansas. It is one of the largest

2022 WL 377415

independent non-OEM (original equipment manufacturer) commercial aerostructure designers and manufacturers in the world. Spun off in 2005 from a division of The Boeing Company ("Boeing"), Spirit is the largest independent supplier of aerostructures (primarily fuselages) for Boeing's commercial aircraft. Sales to Boeing accounted for roughly 79 percent of Spirit's net revenues in fiscal years 2018 and 2019. During the Class Period, more than 50 percent of Spirit's revenues were dependent on Boeing's 737 MAX jetliners. Spirit's securities trade on the New York Stock Exchange under the ticker symbol "SPR." As of April 29, 2020, Spirit had over 105 million shares of common stock outstanding, "owned by hundreds or thousands of investors." Doc. no. 49, ¶ 36.

Defendant Thomas C. Gentile, III (Gentile) serves as Spirit's President and Chief Executive Officer and has occupied those positions since August 1, 2016. Defendant Jose Garcia (Garcia) is Spirit's former Senior Vice President and Chief Financial Officer, having served the company in that capacity from January 9, 2019, until January 29, 2020. Defendant John Gilson (Gilson) served as Spirit's Vice President and Corporate Controller from January 8, 2018, until January 29, 2020. Defendant Shawn Campbell (Campbell) was Spirit's Vice President for the 737 NG and 737 MAX programs,[4] serving the company from March 2016 until January of 2020.

## II.

### Background

In October of 2018 and March of 2019, two 737 MAX jetliners crashed after take-off, killing all passengers on board. All 737 MAX jetliners were grounded on March 13, 2019, pending recertification by aviation authorities.[5] Securities analysts following Spirit recognized that the 737 MAX jetliners' grounding would negatively impact Spirit's financial condition, particularly if Boeing altered its production schedule.

On April 5, 2019, Boeing announced that it would reduce its production rate of the 737 MAX jetliners from 52 to 42 aircraft per month. Later that day, Spirit announced that it and Boeing had entered into a Memorandum of Agreement, wherein the companies agreed that, despite Boeing's reduction of its production rate to 42 aircraft per month, Spirit would maintain its prior production rate of 52 aircraft shipsets (fuselage and other components) per month to minimize supply chain disruptions. Spirit was to maintain its production rate of 52 aircraft shipsets per month until May 1, 2020, unless advised otherwise. Boeing would pay for all 52 aircraft shipsets each month and have Spirit store the 10 excess aircraft shipsets at its Wichita facility or at McConnell Air Force Base, adjacent to the Wichita facility. When Boeing increased its production rate per month to 57 aircraft per month as originally planned prior to the crashes, Spirit would maintain its 52 aircraft shipsets per month production rate and satisfy Boeing's increased demand by slowly "burn[ing] off" its accumulated inventory of 737 MAX shipsets. Doc. no. 49, ¶ 76.

Over the next few months, defendants publicly reiterated that Spirit intended to maintain its 52 aircraft shipsets per month production rate and minimized the likelihood of any cuts in the rate of production despite the continued grounding of the 737 MAX jetliners. Analysts believed defendants' assurances that Spirit had successfully navigated the issues surrounding the 737 MAX program–critical to Spirit's financial success–and would continue to do so.

**\*3** According to a former Spirit employee,[6] designated in the consolidated complaint as FE 7, in either late September or early October of 2019 at one of the frequent meetings between Boeing and Spirit to discuss the production of the 737 MAX, Boeing told Spirit to cut the production rate of 737 MAX shipsets in half. Campbell attended that meeting. The confidential witness believed Garcia and Gilson also attended the meeting because they generally attended such meetings, and the production rate schedule required their sign-off. The confidential witness learned about the production rate cut from her direct supervisor, Angel Little, and Campbell. According to the witness, Campbell disclosed the production rate cut in a regular meeting of the business operations team relating to production. The confidential witness claims defendants began creating a plan to implement the cut, including running related layoff analyses, and the results of the analyses were approved by executives, including Campbell, and presented to Gentile just before the end of October 2019.

Another former Spirit employee, designated in the consolidated complaint as FE 8, claimed that in September or October of 2019, other suppliers that interfaced directly with Boeing were apparently notified by Boeing that it planned to substantially reduce its 737 MAX production rate, and they called FE 8, as a supply chain procurement agent, to ask for

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 196 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Spirit's updated forecasts for parts and materials based upon Boeing's lower production rate. FE 8 advised that she had not received an internal update from Spirit at that point.

Plaintiffs allege that on October 31, 2019, Gentile, Garcia, and Gilson made public statements that Spirit would maintain the 52 aircraft shipsets per month production rate, concealing Boeing's directive to cut the production rate in half.

According to another former Spirit employee, designated in the consolidated complaint as FE 2, a senior Spirit executive announced at a daily internal meeting in mid-November of 2019 that Boeing had decided that Spirit should temporarily halt 737 MAX production after the fourth quarter of 2019. Plaintiffs claim Gentile and Garcia concealed this damaging development by stating several days later at an analyst meeting hosted by Jefferies LLC that Spirit's 737 MAX production was to stay at the rate of 52 aircraft shipsets per month until May 2020.

After the close of trading on December 16, 2019, Boeing publicly disclosed that it was halting production of the 737 MAX beginning in January 2020. Spirit's stock price declined following Boeing's announcement. Plaintiffs claim Gentile downplayed the impact of the revelation by falsely reassuring Spirit's investors, among other things, that he was not expecting to have to implement layoffs, even though Spirit had begun planning for layoffs in October. However, a few weeks later, on January 10, 2020, Spirit publicly disclosed that it was laying off 2,800 employees at its Wichita facility due to the 737 MAX production halt. Spirit's stock price fell again. According to plaintiffs, Spirit's stock price declined again upon additional disclosures on January 30, 2020, and February 28, 2020, that the 737 MAX production rate in 2020 would amount to a total of 216 aircraft shipsets—over 66 percent lower than in 2019—and the company would not return to the prior 52 aircraft shipsets per month production rate until 2022.

In addition to misleading investors about the 737 MAX production rate, plaintiffs claim that during the Class Period, defendants publicly misrepresented Spirit's compliance with established accounting procedures and the effectiveness of its internal controls over its financial reporting. According to the former Spirit employees designated in the consolidated complaint as FE 9 and FE 10, there was a failure to place sufficient safeguards on the company's accounting processes related to the determination of what is known as the "estimate at completion" (EAC), in connection with valuing

and recording adverse claims for compensation made by Spirit's customers, such as Boeing, with respect to the 737 MAX program. The employees claim Gentile, Garcia, and Gilson, who were involved in overseeing the EAC process, failed to implement effective internal controls, and permitted Campbell to manipulate and understate Boeing Claims[7] to make the 737 MAX program appear more profitable than it really was.

**\*4** Plaintiffs claim the truth regarding the deficient internal controls over the EAC process emerged on January 30, 2020. On that date, Spirit disclosed it had not complied with its established accounting procedures relating to certain contingent liabilities (customer claims) that were received by the company after the end of the third quarter of 2019. The company announced that Garcia and Gilson had tendered their resignations "[i]n light of these findings." Doc. no. 49, ¶ 206 (emphasis omitted). According to a former Spirit employee, designated as FE 11, Campbell was fired a week before Garcia and Gilson resigned. Subsequently, on February 28, 2020, the company stated the accounting violations occurred due to a "material weakness" in the internal controls related to the EAC process for customer claims and assertions. *Id.*, ¶ 215 (emphasis omitted). The company further noted that the material weakness related to 76 percent of the company's contracts, that "noncompliance" with its established accounting procedures "is a critical item the [c]ompany must address" and that it resulted in deficient "internal controls over financial reporting." *Id.*, ¶¶ 28, 215. Spirit's stock price dropped after both the January and February disclosures.

Plaintiffs allege defendants violated Section 10(b) of the Securities Exchange Act and Subsection (b) of Rule 10b-5 by making false and materially misleading statements concerning the 52 aircraft shipset production rate and by making false and materially misleading statements concerning the compliance with established accounting procedures and the effectiveness of Spirit's internal controls.

In addition, plaintiffs allege defendants violated Section 10(b) and Subsection (a) and Subsection (c) of Rule 10(b)(5) by carrying out a common plan, scheme, and unlawful course of conduct which was intended to and did deceive the investing public, artificially inflate the price of Spirit's common stock and cause plaintiffs to purchase the stock at artificially inflated prices.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 197 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Plaintiffs further assert claims against the individual defendants under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), which creates joint and several liability for a "control person" of a party found liable for violations of securities laws. ⚑ Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998).

### III.

#### Elements of Plaintiffs' Claims

Section 10(b) of the Securities Exchange Act and its implementing regulation, Rule 10b-5, Subsection (b), "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." ⚑ Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014). The Supreme Court has "inferred from these provisions an implied private cause of action permitting the recovery of damages for securities fraud." ⚑ Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System, 141 S.Ct. 1951, 1958 (2021) (citing ⚑ Halliburton Co., 573 U.S. at 267).

Count I of the consolidated complaint alleges violations of Section 10(b) and Rule 10b-5, subsection (b), against Spirit, Gentile, Garcia, and Gilson. To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessly; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

Smallen v. The Western Union Company, 950 F.3d 1297, 1304 (10th Cir. 2020) (emphasis omitted).

Defendants argue that plaintiffs have failed to sufficiently plead the first and third elements.

Count III of the consolidated complaint alleges violations of Section 10(b) and Rule 10b-5, subsections (a) and (c), against all defendants. "Unlike a claim under subsection (b) of Rule 10b-5, a claim of liability for violations of subsections (a) and (c) does not require an allegation that the defendant made a false or misleading statement; rather, liability is premised on a course of deceptive or manipulative conduct." Takata v. Riot Blockchain, Inc., Civ. Action No. 18-02293 (FLW), 2020 WL 2079375, at *14 (D.N.J. Apr. 30, 2020). To state a claim under subsections (a) and (c) of Rule 10b-5, plaintiffs must allege that defendants committed a deceptive or manipulative act in addition to the other standard elements of a Section 10(b) violation. *Id.*

**\*5** In their motions, defendants posit that plaintiffs have failed to sufficiently plead deceptive or manipulative conduct. Defendants also argue that plaintiffs have failed to plead the requisite reliance element.

Count II of the consolidated complaint asserts liability under Section 20(a) of the Securities Exchange Act against the individual defendants, Gentile, Garcia, Gilson, and Campbell. To state a claim under Section 20(a), plaintiffs must allege (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged controlling person. ⚑ City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1270 (10th Cir. 2001). If a plaintiff has not adequately alleged a primary violation of the securities law, then the Section 20(a) claim is properly dismissed. *Id.*

Defendants argue that plaintiffs' Section 20(a) claims fail because they have not adequately alleged a primary violation of the securities laws.

### IV.

#### Legal Standards

Generally, "[t]o survive a motion to dismiss [under Rule 12(b)(6), Fed. R. Civ. P.], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " ⚑ Ashcroft v. Iqbal, 556 U.S. 662,

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing Twombly, 550 U.S. at 556).

When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In addition, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss," including "documents incorporated into the complaint by reference, [ ] matters of which a court may take judicial notice," and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.*; Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002) (citation omitted).

Any complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b), Fed. R. Civ. P., and the PSLRA. Tellabs, 551 U.S. at 319-321. Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting the fraud." Rule 9(b), Fed. R. Civ. P. "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud[ ] and must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." United States ex. rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 726-27 (10th Cir. 2006), *abrogated on other grounds* by Cochise Consultancy, Inc. v. United States ex rel. Hunt, 139 S.Ct. 791 (2019) (quotations and citations omitted).

Under the PSLRA, plaintiffs are required to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." Tellabs, 551 U.S. at 313. The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on

which that belief is formed." 15 U.S.C. § 78u-4(b)(1). As to the scienter element, the PSLRA requires a plaintiff to, "with respect to each act or omission alleged..., state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322-23 (emphasis in original). A complaint survives dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id.* at 324.

V.

*Consideration of Defendants' Exhibits*

**\*6** Defendants Spirit, Gentile and Campbell attach various documents to their motion and request the court to consider them without converting the motion into one for summary judgment.[8] The documents consist of (1) transcripts of the third quarter 2019 earnings conference call with analysts and reporters held on October 23, 2019, and the Baird Global Industrial Conference held on November 6, 2019, both involving Boeing (doc. nos. 77-3, 77-4); (2) Spirit's Form 10-K for the fiscal year ending December 31, 2019 and Spirit's Form 10-Q for the quarterly period ending September 26, 2019, both filed with the Securities and Exchange Commission (SEC) (doc. nos. 77-5, 77-7); (3) the Jefferies' analyst report dated November 24, 2019 (doc. no. 77-6); and (4) two Form 4, Statement of Changes in Beneficial Ownership of Securities, filed with the SEC with respect to Gentile (doc. no. 77-8).

Plaintiffs only object to the court's consideration of the transcripts of the earnings call and conference involving Boeing. Specifically, they assert that defendants seek judicial notice of those transcripts for the purpose of establishing the truth of the matters asserted in them, which is not permissible under Tenth Circuit authority. In response, defendants counter that the court may properly consider the publicly available investor call transcripts because they are being used for the "purpose of showing that various disclosures were made and available to investors." Doc. no. 91, ECF p. 9

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....
2022 WL 377415

(quoting 🔖 *Chipman v. Aspenbio Pharma, Inc.*, Civil No. 11-cv-00163-REB-KMT, 2012 WL 4069353, at *2 (D. Colo. Sept. 17, 2012)).

The court agrees with plaintiffs that it should not take judicial notice of the transcripts. In the October 23, 2019 earnings call, Boeing's Chief Executive Officer stated that Boeing's "best current estimate" was for "a return of service of the MAX that begins this quarter," and that it expected the company to "maintain [its] current production rate of 42 [737 MAX] deliveries per month ... followed by incremental rate increases that would bring [Boeing's] production rate to 57 by late 2020." Doc. no. 77-3, ECF p. 7. At the November 6, 2019 investor conference, Boeing's Chief Financial Officer stated that it was "still the plan" for Boeing "to move up from 42" 737 MAX deliveries and "try to achieve [ ] 57" deliveries a month "exiting 2020." Doc. no. 77-2, ECF pp. 10-11. Despite their response, defendants do not ask the court to consider the transcripts to establish what was publicly available to investors at the time of the alleged fraud. Rather, they seek the court's consideration of the transcripts to establish that defendants' public statements on October 31, 2019 were not actionably misleading. According to defendants, at the time Gentile, Garcia and Gilson made their October 31, 2019 statements, "the **_most authoritative_** and **_most recent_** statements they had received from Boeing indicated that Boeing was **_not_** planning any reduction in 737 MAX production." Doc. no. 77, ECF p. 22 (emphasis in original). Defendants assert that this is what they told the market in their October 31 statements, and therefore "Plaintiffs have fallen far short of alleging that [the] October 31 Statements were misleading under the stringent *Omnicare*[9] standard." *Id.* at ECF pp. 22-23. They also note that the statements render implausible the former Spirit employee's account that Boeing instructed Spirit to cut the 52 shipsets production rate in half. *Id.* at ECF p. 22, n. 9. The court concludes that defendants' submission of the transcripts is for the purpose of establishing the truth of the matters asserted in them, rather than showing what information was available to investors at the time, and therefore declines to consider the transcripts in adjudicating defendants' dismissal motions. *See,* 🔖 *Tal v. Hogan*, 453 F.3d 1244, 1264 n. 24 (10th Cir. 2006) (documents may only be considered to show their contents, not to prove the truth of the matter asserted in them).

**\*7** As to the other documents (the SEC filings and analyst's report), whose consideration is unopposed, the court concludes that they may properly be considered in adjudicating defendants' motions.

VI.

*Count I – Claims Under Section*
*10(b) and Rule 10b-5, Subsection (b)*

A. Alleged False and Misleading Statements

(i). *Aircraft Shipset Production Rate*

a. October 31, 2019

Plaintiffs allege that Garcia, Gilson and Gentile publicly made false and misleading statements on October 31, 2019, reaffirming that Spirit would continue the 52 aircraft shipsets per month production rate. Plaintiffs allege that defendants' statements were false and misleading because Boeing had already told Spirit in late September or early October 2019 to cut its 737 MAX production rate in half, and soon after receiving that notification Spirit had begun planning to take the steps needed to reduce its production accordingly. The specific alleged false and misleading statements are as follows.

Form 10-Q (for the quarter ending September 26, 2019), signed by Garcia and Gilson and filed with the SEC, stated in relevant part:

> We expect that the annualized average monthly shipset deliveries over the course of the year to be at rate 52 subject to any reductions that Boeing may decide to implement.
>
> \* \* \* \*
>
> For so long as the grounding of the B737 MAX fleet continues, there may be further reductions in the production rate, including a temporary shutdown in production. To the extent that the grounding of the B737 MAX fleet continues for an extended period of time and Spirit is required to further reduce its production rate on the B737 MAX aircraft, Spirit's business, financial condition, results of operations and cash flows could be materially adversely impacted.

Doc. no. 49, ¶ 225 (emphasis omitted); doc. no. 77-1, statements #1 and #2.

2022 WL 377415

The press release filed with the SEC on Form 8-K signed by Garcia stated in relevant part:

> Spirit continues to produce at a rate of 52 aircraft per month in accordance with its agreement with Boeing.

Doc. no. 49, ¶ 226 (emphasis omitted); doc. no. 77-1, statement #3.

During the earnings call relating to the quarter ending September 26, 2019, Gentile stated:

> [W]e are continuing to produce at a rate of 52 aircraft per month as we agreed with Boeing[.]"

> * * * *

> Our current expectations are that we will continue to produce at rate 52 ... Given current production and storage levels, our expectation is that we will not produce at a rate higher than 52 through 2020, [20]21 and possibly into 2022.

> * * * *

> If Boeing goes down more, we would sit down and talk with them about what's the appropriate production level for us ... Now what I would say though is that this period of time where we're at 52, gives us a chance to achieve some stability ... Now we're going to be at 52 for an extended period of time."

Doc. no. 49, ¶¶ 227, 228 and 229 (emphasis omitted); doc. no. 77-1, statements #4, #5, and #6.

Defendants contend plaintiffs have not sufficiently alleged that any of these statements were actionably misleading. According to defendants, the alleged statements express expectations about the future rather than presently existing facts, and, therefore, constitute statements of opinion. To render opinion statements actionable, defendants assert that plaintiffs must identify " 'particular (and material) facts' that were not disclosed and 'that cannot be squared' with the statement of opinion." Doc. no. 77, ECF p. 18 (citing *Omnicare Inc. v. Laborers Dist. Council Const. Industry Pension Fund, 575 U.S. 175, 191, 194 (2015)*). Defendants

maintain that plaintiffs cannot rely upon the account of confidential witness FE 7, a Business Operations Specialist, to establish particular and material facts not disclosed by defendants. Defendants contend that FE 7's account of Boeing directing Spirit in late September or early October 2019 to cut its production rate of 737 MAX shipsets in half does not meet the PSLRA's stringent particularity requirement. Defendants assert that FE 7's account is vague, conclusory and based upon multiple hearsay. They maintain that FE 7's account is particularly deficient in that FE 7 does not claim to know the ultimate source of her hearsay information. Defendants assert that the consolidated complaint provides no information indicating who from Boeing gave the directive to Spirit to cut 737 MAX production in half or whether that individual had authority to issue the directive to Spirit. Without knowing who from Boeing made the statement and exactly what was said, defendants posit that it is impossible to discern whether the statement was a definitive directive or a mere discussion of possibilities. Defendants contend that FE 7's account suggests that the notification, if it occurred, was merely a discussion of possibilities because the allegations show Spirit did not make any immediate changes to its production, only a few of Spirit's employees were purportedly told about the directive, and FE 7 was tasked with running "exercises" about the number of resulting layoffs that would be required. Further, defendants argue that while plaintiffs attempt to corroborate FE 7's account with FE 8's account, FE 8's account of Spirit not changing its purchase orders suggests that Boeing did not issue any draconian directive of a production rate cut in late September or early October 2019. Defendants contend that if Spirit had been told to cut its production schedule, it would likely have updated its purchase orders to avoid obtaining unnecessary materials from suppliers.

**\*8** Where allegations regarding a statement or omission are made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)(B)*. Plaintiffs are required "to identify in the complaint specific facts that support the allegations about the misleading nature of the defendant's statements. Generalized or conclusory allegations of fraud will not be sufficient." *Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1098 (10th Cir. 2003)*. However, plaintiffs are not required to "plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Id. at 1098-99* (quotation marks omitted). Plaintiffs "need only plead with particularity *sufficient* facts to support those beliefs." *Id.* (quotation omitted, emphasis in original).

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 201 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

The court must evaluate "the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false and misleading." 🚩 Adams, 340 F.3d at 1099. That evaluation will involve "(1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading." *Id.* "If, measuring the nature of the facts alleged against these indicia, a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." *Id.*

Plaintiffs are not required to disclose the documentary or personal sources from which they learned facts alleged in an information and belief complaint. 🚩 Adams, 340 F.3d at 1103. "[W]here a plaintiff does not identify the sources of the facts stated in the complaint, the facts alleged in an information and belief complaint will usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading." *Id.*

In their consolidated complaint, plaintiffs do not identify the source of their allegation that Boeing told Spirit in late September or early October of 2019 to cut its 737 MAX production in half. However, they describe the job title, time spent in that position, the supervisors, and the specific duties of the confidential witness FE 7. The level of facts provided demonstrate that FE 7 was positioned to have known the information alleged about the production rate cut. Plaintiffs set forth facts to show that Campbell, who was in charge of the 737 MAX program and had been present at the meeting between Boeing and Spirit, informed FE 7 of Boeing's notification at a weekly meeting related to the 737 MAX production, and because of that notification, FE 7 was tasked by her direct supervisor, Angel Little, with providing data to assist others in analyzing "the appropriate level of workers needed to continue production at the new lower rate."

Doc. no. 49, ¶ 104. The facts surrounding how FE 7 came to know the facts alleged with respect to the production rate cut are particularly detailed, numerous, plausible, and objectively verifiable by defendants.

Although the information provided by FE 7 that "at one of the frequent meetings between Spirit and Boeing ... Boeing told Spirit to cut production of the 737 MAX in half," doc. no. 49, ¶ 102, is hearsay,[10] "the fact that a confidential witness reports hearsay does not automatically disqualify [her] statement from consideration in the [falsity or misleading] calculus." 🚩 Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 998 n. 4 (9th Cir. 2009). Instead, the court must examine the witness's hearsay report to determine if it is "sufficiently reliable, plausible, or coherent[.]" *Id.* The court concludes that despite not specifically identifying which manager at Boeing told Spirit to cut the production rate in half, plaintiffs have provided supporting context and details enabling the court to determine that the information is sufficiently reliable. The court is not convinced that FE 7's description of Boeing's notification is conclusory or vague as argued by defendants. In the court's view, the facts alleged will support a reasonable belief that the defendants' statements were false or misleading.

**\*9** The court additionally concludes that FE 8's account, viewed in plaintiffs' favor, corroborates FE 7's account. And the court credits the allegations attributed to both FE 7 and FE 8 because the factual allegations demonstrate they were positioned to know the information provided, and despite defendants' arguments, they form a plausible and coherent narrative. The court concludes that plaintiffs' allegations are sufficient to satisfy the particularity requirements of the PSLRA (as well as 🚩 Rule 9(b)).

Next, defendants argue that even if the court were to credit FE 7's account, that account is not sufficient to render the October 31, 2019 statements actionably misleading. Defendants specifically rely upon the statements of Boeing's CEO and CFO on October 23, 2019, that the company was expecting to maintain its 42 aircraft per month production rate, with an incremental or gradual increase to 57 aircraft per month by late 2020. However, as discussed, the court has declined to take judicial notice of those statements. Consequently, the court rejects defendants' arguments that October 31, 2019 statements with respect to Spirit's 737 MAX shipsets production rate are not actionably misleading given

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 202 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

the statements of Boeing's CEO and CFO on October 23, 2019.

In his motion, Gilson asserts that the only statement attributable to him regarding the 52 aircraft shipset production rate (expecting the shipset deliveries over the course of the year to be at rate 52 subject to any reductions that Boeing may decide to implement) was demonstrably true. Gilson points out that plaintiffs do not allege in their consolidated complaint that the shipset production rate for the remainder of 2019 was less than 52 shipsets. Also, he points out that when the "so-called 'truth' " was revealed, doc. no. 79, ECF p. 8, plaintiffs allege that Boeing announced it was suspending all production of the 737 MAX aircraft "beginning in January 2020." *Id.* at ECF p. 9 (citing doc. no. 49, ¶ 189) (emphasis omitted). Gilson asserts that there are no well-pled factual allegations suggesting the shipset production rate for 2019 was below 52 or that as of October 31, 2019, he did not expect the production rate for 2019 to be 52. Further, Gilson notes that FE 7's account, even if adequately pled, does not provide factual details suggesting that the cut would take place in 2019. However, viewing plaintiffs' factual allegations and all reasonable inferences therefrom in their favor, the court concludes that plaintiffs have sufficiently pled that Gilson's statement was in fact misleading.

Gilson also argues that his expectation statement is protected under the PSLRA's safe-harbor provision for forward-looking statements. The court disagrees. The court concludes that Gilson cannot claim protection under the PSLRA's safe-harbor provision for forward looking statements because, contrary to his arguments and as pointed out by plaintiffs, the subject statement was not cured by "meaningful" cautionary language since he cautioned about a potential cut that allegedly had already been directed by Boeing to occur.

*See,* 🔖 FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282, 1299 (11th Cir. 2011) (stating "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."). Further, the court concludes that the alleged facts and reasonable inferences therefrom, viewed in plaintiffs' favor, indicate that the production cut had already been ordered when the information was disseminated to FE 7. The court therefore concludes that Gilson is not entitled to dismissal of plaintiffs' claims with respect to his October 31, 2019 statement.

**\*10** In sum, the court concludes plaintiffs have sufficiently pled that defendants' public statements on October 31, 2021 were false or misleading.

(b). November 24, 2019

In the consolidated complaint, plaintiffs allege that on November 24, 2019, Jefferies LLC published a report titled "Management Meeting Takeaways: Getting into the Spirit," which reported on the analyst's "takeaways" from a meeting with Spirit management, including Gentile and Garcia. Plaintiffs allege that based upon statements made by Gentile and Garcia, the analyst reported "[Spirit] targets 16.5% segment margins, despite stable 737 MAX rates" and "[t]he MAX is set to stay at a rate of 52/mo. until May 2020 w/a potential rate decision at that time." Doc. no. 49, ¶ 235 (emphasis omitted); doc. no. 77-1, statement #7.

Plaintiffs claim that the statements made by Gentile and Garcia, as reported by Jefferies LLC, were materially false and misleading or omitted material facts when made because of Boeing's instruction to cut the shipset production rate in half, as described by FE 7 and FE 8, and because, as revealed by confidential witness, FE 2, Boeing had decided in mid-November of 2019 that Spirit was to temporarily stop production of the shipsets at the end of the fourth quarter of 2019.

Defendants argue that the alleged statements are not actionable under 🔖 Rule 9(b) and the PSLRA because the analyst report includes "no quotations from any Spirit personnel, does not indicate the date on which the purported meeting occurred, and does not provide a specific source of the information it purports to summarize and paraphrase." Doc. no. 77, ECF p. 23. Moreover, defendants contend that the statements are not actionable because purported paraphrases of statements made by unspecified Spirit personnel cannot be reconciled with the standard articulated in 🔖 Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 142-43 (2011), regarding the maker of a statement.

The court agrees with defendants that the alleged statements in the analyst report are not actionable. There are insufficient facts in the consolidated complaint to support plaintiffs' assertion that Gentile and Garcia made the alleged statements. The Supreme Court stated in Janus that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say,

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

not 'make' a statement in its own right." 🚩 *Id.* at 142. The report does not directly quote Gentile or Garcia in making the challenged statements. In addition, it does not directly attribute the statements to either Gentile, or Garcia or to both. While the report indicates that Gentile and Garcia were present at the meeting, it does not reveal that they were the only Spirit managerial personnel in attendance. In any event, even if they were the only personnel present, plaintiffs have not alleged any facts showing that Gentile or Garcia controlled the content of the report and whether and how to communicate it. The court concludes that the statements in the analyst report cannot be attributed to Gentile or Garcia and therefore fail to support the Section 10(b) and Rule 10b-5 claims. *See,* 🚩 In re Prudential Financial, Inc. Securities Litigation, Master File No. 2:19-cv-20839-SRC-CLW, 2020 WL 7706860, at *14 (D.N.J. Dec. 29, 2020) (statements appearing in analyst reports not attributable to defendants). [11]

(c). December 17, 2019

**\*11** Plaintiffs allege that on December 17, 2019, *The Wichita Eagle* reported on Boeing's shutdown announcement and a subsequent meeting between Kansas Governor Laura Kelly and Gentile. The newspaper article stated that "Kelly said she talked with Spirit CEO Tom Gentile on Tuesday [December 17, 2019] and he's optimistic that production of the troubled aircraft will resume soon." Doc. no. 49, ¶ 237 (emphasis omitted); doc. no. 77-1, statement #8. It also stated that "[t]he governor said Gentile told her he's not expecting to have to do layoffs, however, no workforce decisions have been made, Spirit officials said." *Id.* at ¶ 238 (emphasis omitted); doc. no. 77-1, statement #9.

Plaintiffs allege that Gentile's statements were false and misleading because Gentile knew Boeing was unlikely to resume production any time soon given the continued 737 MAX grounding and that massive layoffs were imminent. Plaintiffs allege that Gentile's statement about layoffs was contrary to the internal reality that Spirit had already been running layoff exercises because of the slowdown in production that Boeing had ordered in late September or early October of 2019.

Defendants argue that the statements from the news article are not actionable because they paraphrase what the Kansas Governor Laura Kelly said about what Gentile said. Defendants contend that plaintiffs cannot satisfy their

pleading burden by pointing to a third party's paraphrase of a defendant's statement. Even if the statements had been direct quotes from Gentile, defendants contend the optimistic statement is not actionable because it is mere "puffery," doc. no. 77, ECF p. 26, and the layoff statement is not actionable because it is not false.

The court agrees that the statements in the news article by Governor Kelly about what Gentile said are not actionable. The statements are not direct quotes of Gentile. While the article attributes the content of the statements to Gentile, plaintiffs have not alleged sufficient facts to show that Gentile had ultimate control over the content of those statements and whether and how to communicate them. There are no allegations that he was involved in reviewing or approving of the news article. The court concludes that those statements are not attributable to Gentile for purposes of the section 10(b) and Rule 10b-5 claims. *See,* Total Equity Capital, LLC. v. Flurry, Inc., No. 15-CV-4168 (JMF), 2016 WL 3093993, at *3 (S.D.N.Y. June 1, 2016); In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Civ. No. 13-2100-SLR, 2015 WL 6039690, at *17 (D. Del. Oct. 15, 2015) (statements in articles not attributable to defendants).

The court additionally agrees with defendants that the "optimistic" statement (identified as statement #8) is not actionable because it was immaterial; it was only a vague statement of corporate optimism not capable of objective verification. 🚩 Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997) ("Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."). Further, the court concludes that plaintiffs have failed to sufficiently plead that the "layoff" statement (identified as statement #9) was false or misleading. Plaintiffs contend the statement "was directly contrary to the internal reality ... that Spirit had already been running such layoff 'exercises[.]" Doc. no. 49, ¶ 238. Although plaintiffs allege that Spirit had performed layoff analyses, plaintiffs do not allege the content of those analyses and they do not allege that any workforce decision as to layoffs had been made. The court concludes that plaintiffs' allegations do not demonstrate that statement #9 was false or misleading.

(ii). *Accounting Practices and Internal Controls*
**\*12** Next, plaintiffs allege that on October 31, 2019, Gentile, Garcia, and Gilson made materially false and misleading statements concerning Spirit's compliance with established accounting principles relating to contingent liabilities (Boeing

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 204 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Claims) and the effectiveness of Spirit's internal controls over financial reporting. The alleged false and misleading statements are as follows.

The Form 10-Q for the quarter ending September 26, 2019, signed by Garcia and Gilson and filed with the SEC, stated in relevant part:

> [T]he Company's financial statements ... have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and the instructions to Form 10-Q and Article 10 of Regulation S-X.

> * * * *

> In the opinion of management, the accompanying unaudited interim condensed consolidated financial statements contain all adjustments ... considered necessary to fairly present the results of operations for the interim period.

> * * * *

> Our President and Chief Executive Officer and Senior Vice President and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures as of September 26, 2019 and have concluded that these disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time period specified in the SEC rules and forms.

> * * * *

> There were no changes in our internal control over financial reporting during the quarter ended September 26, 2019, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Doc. no. 49, ¶¶ 240, 242, 244, 245; doc. no. 77-1, Appendix A, statements #10, #16, #17, and #18.

The Form 10-K for the year ending 2018, signed by Gentile, Garcia, and Gilson, and incorporated by reference in the Form 10-Q ending September 26, 2019, stated in part:

> Management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2018. In making this evaluation, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework (2013 Framework). Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2018.

Doc. no. 49, ¶ 246 (emphasis omitted); doc. no. 77-1, Appendix A, statement #11.

In connection with the Form 10-Q for the quarter ending September 26, 2019, Gentile and Garcia signed a certification pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (SOX certification) which stated in part:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report.

> *13 The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ... and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 205 of 330
Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

* * * *

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting ...

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * * *

The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Doc. no. 49, ¶¶ 248, 249; doc. no. 77-1, Appendix A, statements #12, #13, #14, and #15.

Initially, defendants argue the alleged statements are not actionable because the accounting issue the statements purportedly concealed—deficiency in Spirit's internal controls over its accounting processes—was "undisputedly immaterial." Doc. no. 77, ECF p. 27 (emphasis omitted). The deficiency, defendants assert, was " 'that [Spirit] did not comply with its established accounting processes related to certain potential contingent liabilities that were received by Spirit after the end of [the] third quarter 2019' " and that '[a]s a result of such non-compliance, the Company concluded that it should have recorded an incremental contingent liability of less than $8.0 million for the [third quarter of 2019].' " *Id.*, quoting doc. no. 49 at ¶¶ 206, 215. Defendants contend that, as plaintiffs in their consolidated complaint "concede," the less than $8.0 million contingent liability was "immaterial" to Spirit's financial results. *Id.*, citing ¶ 215. Because the

$8.0 million contingent liability was immaterial to Spirit's financial results, defendants maintain that any failure to disclose facts relating to the alleged weakness of Spirit's internal controls was immaterial. Thus, defendants contend that plaintiffs cannot establish the alleged statements were materially misleading.

Plaintiffs respond that the consolidated complaint plainly alleges that the undisclosed weakness in Spirit's internal controls was material. Plaintiffs point out that the consolidated complaint alleges that defendants admitted the materiality of the weakness in their 10-K Form for 2019 and that the weakness affected processes associated with 76 percent of Spirit's contracts. In addition, plaintiffs assert that the consolidated complaint alleges it was defendants' assurances of effective internal controls and not the size of errors in the financial results that were materially misleading. Further, plaintiffs contend that courts have previously ruled that the effectiveness of a company's internal controls is information a reasonable investor would consider significant in making an investment.

**\*14** An omitted fact is material "if there is a substantial likelihood that a reasonable [investor] would consider it important" in making an investment decision. 🏳 Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) (quotation marks and citation omitted). "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 🏳 *Id.* at 231-32 (quotation marks and citation omitted). "In the context of a Rule 12(b)(6) motion, the court is reminded that materiality is a mixed question of law and fact and ordinarily should be reserved for the trier of fact." 🏳 In re Sprint Corp. Securities Litigation, 232 F. Supp. 2d 1193, 1215 (D. Kan. 2002) (citation omitted). "Only if defendants' statements are obviously immaterial may the court grant defendants' request for dismissal." 🏳 *Id.* at 1215-16 (citation omitted).

Upon review, the court finds that dismissal is not appropriate on the ground of materiality. Viewing the factual allegations in the consolidated complaint and reasonable inferences from those allegations in plaintiffs' favor, the court cannot conclude that the alleged undisclosed weakness in Spirit's internal controls is obviously immaterial.

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

Next, defendants argue that the statement regarding the evaluation of the disclosure controls as of September 26, 2019 (statement #10, doc. no. 77-1), and the statement regarding the evaluation of the internal controls as of December 31, 2018 (statement #11, doc. no. 77-1), are not actionable. Defendants contend that plaintiffs have not averred that management did not evaluate the disclosure and internal controls and determine them to be effective. According to defendants, plaintiffs merely take issue with the effectiveness of the evaluations, which is an allegation of corporate mismanagement. Defendants maintain that corporate mismanagement is not actionable under the federal securities laws as the court ruled in Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662, 683 (D. Colo. 2007).

Plaintiffs counter that defendants have misread their allegations. They contend that they have alleged that defendants misrepresented the strength and quality of existing internal controls and concealed the existence of conduct actionable under the securities laws rather than alleging any matters of business judgment or mismanagement on the part of defendants. Plaintiffs assert that the consolidated complaint alleges that defendants falsely assured investors that Spirit's internal controls were effective, when they knew they were not. According to plaintiffs, defendants' statements were half-truths because they created the misimpression that Spirit's internal controls were effective. Plaintiffs contend that the allegations of the consolidated complaint are distinguishable from those in the Andropolis case cited by defendants.

The court, viewing the factual allegations and reasonable inferences in a light most favorable to plaintiffs, concludes that statements #10 and #11 are actionable. The court concludes plaintiffs' allegations with respect to the efficacy of the disclosure and internal controls are distinguishable from those in Andropolis and dismissal of plaintiffs' claims based upon that ruling is not warranted. [12] Therefore, the court concludes that statements #10 and #11 are actionable.

**\*15** In addition, defendants argue that the challenged statements made by Gentile and Garcia in the SOX certifications (statements #12, #13, #14, and #15 in doc. no. 77-1), are not actionable. Defendants assert that courts have ruled that SOX certifications are not independently actionable. Even if the SOX certifications were independently actionable, defendants contend that plaintiffs have not alleged anything to show that statements #12 through #15 were false at the time when they were made. Defendants assert that for

statements #12 and #13 to be false, plaintiffs must allege that Gentile or Garcia had "actual knowledge" that the Form 10-Q was materially misleading. As to statement #14, defendants contend that plaintiffs have failed to allege that defendants did not design disclosure controls and internal controls. Lastly, with respect to statement #15, defendants assert that plaintiffs have not alleged that their disclosure was based on something other than the recent evaluation of internal controls.

In response, plaintiffs cite case authority in which courts have determined SOX certifications to be actionable. Plaintiffs also contend, with respect to statements #12 and #13, that they have alleged defendants' knowledge or recklessness relating to Campbell's misconduct with respect to the EAC process. As to statement #14, plaintiffs assert that they have alleged the statement is actionable as a misleading "half-truth" because it creates the misimpression that Spirit's controls were effective, when they were not. Plaintiffs also assert that statement #15 is also actionable as a misleading "half-truth" because defendants omitted key facts about the existence of material weakness in the internal controls when they made the statement.

Upon review, the court declines to dismiss plaintiffs' claim based upon defendants' argument that SOX certifications are not independently actionable. The Tenth Circuit has not ruled on the issue. However, plaintiffs have cited cases, including City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 418 (D. Del. 2009), which have concluded SOX certifications can be actionable. *See also*, In re Toronto-Dominion Bank Securities Litigation, Civil No. 17-1665 (NLH/JS), 2018 WL 6381882, at *10 (D.N.J. Dec. 6, 2018) (citing the Delaware decision). Without a definitive ruling from the Tenth Circuit and district courts on both sides of the issue, *see*, Rok v. Identiv, Inc., No. 15-cv-5775-CRB, 2017 WL 35496, at *9, n. 14 (N.D. Calif. Jan. 4, 2017) (citing cases), the court finds that plaintiffs should be permitted to rely upon the SOX certifications as bases for their claims. The court thus turns to defendants' other arguments as to why the statements are not actionable.

As pointed out by defendants, statements #12 and #13 begin with the phrase "[b]ased on my knowledge" and "[t]o the best of my knowledge." The court agrees with defendants that with that qualifier, the falsity of the statements depends on what Gentile and Garcia knew at the time. The court concludes that plaintiffs have not sufficiently alleged facts to show that Gentile and Garcia had actual knowledge those

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 207 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

SOX certifications (statements #12 and #13) were false or misleading. In their response, plaintiffs point out that the consolidated complaint alleges that "Defendants discussed the EAC with Campbell at EAC reviews and other meetings, but willfully ignored whether Campbell's EAC calculations were supported, reliable, or accurate." Doc. no. 90, ECF p. 59. This information was provided by a confidential witness, designated as FE 9 in the consolidated complaint. While FE 9 indicated that Gentile and Garcia attended the EAC reviews and the Boeing Claims were raised in those reviews and were a "hot-button" issue, FE 9 does not provide any particularized facts to show that Gentile and Garcia knew about the alleged material weakness in internal controls. There are no factual allegations that Gentile and Garcia knew Campbell was understating the amount of the Boeing Claims. According to FE 9, the discrepancies between the actual value of the Boeing Claims and the value that Campbell accounted for in the EAC were not adequately discussed. Doc. no. 49, ¶ 182. However, there are no factual allegations that Gentile and Garcia knew there were any discrepancies and that such discrepancies needed to be addressed. And while FE 9 indicated that "Campbell had the final decision-making authority on the numbers for the claims estimates submitted in the EAC, *id.*, and that "Campbell had a 'tight grip' over the Boeing Claims and usually was the only speaker at such meetings on the issue," *id.*, at 183, there are no factual allegations that Gentile and Garcia knew that Campbell was manipulating the Boeing Claims. As the consolidated complaint fails to allege any knowledge of Campbell's misconduct by Gentile and Garcia, the court concludes that plaintiffs have failed to allege that the SOX certifications, based upon knowledge, designated as statements #12 and #13, were false or misleading when made by Gentile and Garcia.

**\*16** The court rejects defendants' challenges to statements #14 and #15. Viewing the allegations in a light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently alleged statements #14 and #15 were false or misleading statements.

Next, defendants challenge statement #16 in doc. no. 77-1 regarding accounting methodology and statement #17 in doc. no. 77-1 regarding adjustments. These statements were made by Garcia and Gilson in the Form 10-Q for the quarter ending September 26, 2019. Plaintiffs, in response, address defendants' arguments relating to statement #16 but do not specifically address defendants' substantive arguments relating to statement #17. The court, in its discretion, deems defendants' motion confessed as to statement #17, and upon

independent review, concludes that dismissal of plaintiffs' claim based upon statement #17 is appropriate for the reason provided by defendant – " 'Adjustments' is an accounting term of art, and [p]laintiffs fail to allege the issues later identified amounted to a failure to include such 'adjustments' in financial statements." Doc. no. 77, ECF. p. 34 (footnote and citation omitted). As to statement #16, viewing the allegations of the consolidated complaint in a light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently pleaded that statement #16 was false or misleading.

Finally, defendants challenge statement #18 in doc. no. 77-1, which was made by Garcia and Gilson in the Form10-Q for the quarter ending September 26, 2019. Specifically, defendants stated: "There were no changes in our internal control over financial reporting during the quarter ended September 26, 2019, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." Defendants contend that this statement says nothing about the sufficiency of Spirit's internal controls, only that they had not changed during the third quarter of 2019. Defendants point out that plaintiffs have not alleged that the internal controls changed.

Plaintiffs contend that this statement, along with other statements in the Form 10-Q and those incorporated by reference as well as the SOX certifications attached to the 10-Q, collectively created the misimpression that defendants' internal controls had been, and still were, effective, when they were not.

Upon review, the court agrees with defendants that plaintiffs have failed to sufficiently plead that statement #18 was a false or misleading statement of material fact. The court thus finds statement #18 is not actionable.

In sum, the court finds that statements #10, #11, #14, #15 and #16 in doc. no. 77-1 are actionable and statements #12, #13, #17 and #18 are not actionable.

B. Scienter

"[I]t is not enough for plaintiff[s] to point out misleading statements of material fact. Under the heightened pleading standards of the PSLRA, plaintiff[s] must state with particularity facts 'giving rise to a strong inference' that the defendants acted with scienter[.]" In re Level 3 Communications, Inc. Securities Litigation, 667 F.3d 1331, 1343 (10th Cir. 2012) (quoting Adams, 340 F.3d at

1105). Scienter is " 'a mental state embracing [1] intent to deceive, manipulate, or defraud,' or [2] recklessness.' " Smallen, 950 F.3d at 1304 (quoting Anderson v. Spirit Aerospace Holdings, Inc., 827 F.3d 1229, 1236-1237 (10th Cir. 2016) (quoting Adams, 340 F.3d at 1105); In re Zagg, Inc. Securities Litigation, 797 F.3d 1194, 1201 (10th Cir. 2015). " 'Intentional misconduct is easily identified since it encompasses deliberate illegal behavior." Smallen, 950 F.3d at 1304 (quoting Fleming, 264 F.3d at 1260, quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)). "Recklessness, on the other hand, is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " Smallen, 950 F.3d at 1304-1305 (quoting In re Zagg, 797 F.3d at 1201, quoting Fleming, 264 F.3d at 1258). In the securities fraud context, recklessness is a high bar. It is something akin to conscious disregard. Allegations of conduct that amount to negligence or even gross negligence will not suffice. In re Zagg, 797 F.3d at 1201.

**\*17** The PSLRA requires plaintiffs to, " 'with respect to each act or omission alleged ..., state with particularity facts giving rise to that the defendant[s] acted with the required state of mind' in violating the securities laws." Smallen, 950 F.3d at 1305 (quoting In re Level 3 Communications, 667 F.3d at 1333) (emphasis in original).

"Although an inference of scienter 'need not be irrefutable, i.e., of the "smoking-gun" genre,' it 'must be more than merely plausible or reasonable.' " Smallen, 950 F.3d at 1305 (quoting Tellabs, 551 U.S. at 324). "Because the inference must be 'powerful or cogent' not only in its own right but 'strong in light of other explanations['], [the court] must 'consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff[s].' " Id. (quoting Tellabs, 551 U.S. at 323-324). "Under this standard, a complaint survives dismissal 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " Id. (quoting Tellabs, 551 U.S. at 324).

### (i). Gentile

Defendants contend that plaintiffs have failed to plead particularized facts establishing that Gentile made any alleged false and misleading statements with scienter. As to the statements regarding the aircraft shipset production rate, defendants acknowledge plaintiffs' allegations as to Gentile having indicated at various times in 2019 the existence of a close working relationship between Spirit and Boeing, and that Gentile was "hands on" and "very engaged" with the 737 MAX program. Doc. no. 77, ECF p. 36 (citing doc. no. 49, ¶¶ 296-99, 306-08). However, those allegations, defendants assert, do not aver with particularity that Boeing told Spirit anything regarding the production rate that contradicted Gentile's statements. According to defendants, plaintiffs' allegations are "a less plausible variation on the oft-rejected contention that a defendant 'must have known' of fraud because of [his] position in the company." Id., ECF p. 37 (quotations omitted). In addition, defendants contend that Gentile's position and the fact he attended meetings discussing the EAC process do not contribute to a strong inference of scienter as to Gentile's statements regarding accounting issues and internal controls. Defendants further argue that Gentile's SOX certifications add nothing substantial to the scienter calculus. Finally, defendants argue that Gentile's stock sales during the Class Period are not indicative of scienter. They point out that Gentile's net holdings of Spirit stock increased during the Class Period and the "F" transaction code for the stock sales indicated they were sold for the "[p]ayment of exercise price or tax liability." Id., ECF p. 39. Also, defendants assert that while Gentile sold a greater percentage of stock in 2020 than in the previous three years, the stock sales did not go "well beyond" the patterns of normal stock trading which courts have found to support an inference of scienter. Id. (quotation omitted). And they point out plaintiffs have not alleged that any other individual defendants engaged in any suspicious stock sales, which they claim undercuts an inference of scienter.

**\*18** Plaintiffs argue that their allegations demonstrate that Gentile was informed of Boeing's instruction to cut the aircraft shipset production rate prior to his misstatements on October 31, 2019. In support, plaintiffs rely upon FE 7's account. Plaintiffs state that FE 7 detailed how, in light of Boeing's instruction to cut production, she was tasked with contributing data to reports to determine the number of layoffs necessary to implement that cut. She indicated that the subsequent layoff analyses were approved by Campbell and presented to Gentile by late October 2019. These allegations, plaintiffs assert, support a strong inference of scienter because

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 209 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

they show Gentile knew of the production cut at least through the layoff analyses, which contradicted his public statements. Plaintiffs also argue that it strains credulity that Gentile was not informed by Campbell, or by Garcia and Gilson, who mostly likely attended the meeting with Boeing, of the drastic production cut because of the importance of the 737 MAX program to Spirit's operations. Plaintiffs contend that the allegations regarding Boeing's close working relationship with Spirit and the importance of the 737 MAX program to Spirit's operations (accounting for over 50 percent of annual revenue), viewed holistically with the other scienter allegations, such as FE 7's account, supports a strong inference of scienter with respect to Gentile's production rate cut statements. Further, plaintiffs contend that Gentile's misleading statements about the production rate to analysts show his scienter.

As to misstatements regarding the effectiveness of Spirit's internal controls over financial reporting, plaintiffs argue that Gentile knew or recklessly ignored the material weakness in those controls. Plaintiffs rely upon the details given by FE 9, wherein she stated that she repeatedly confronted Campbell about using unvalidated, unsupported and unreasonably low estimates of costs, including costs associated with the claims submitted by Boeing in connection with the 737 MAX program, but he either bullied or ignored her. Plaintiffs also point out that FE 9 described how Gentile knew or recklessly ignored Campbell's conduct through regular meetings such as the EAC reviews. FE 9 stated that the Boeing Claims had ballooned, and they were affecting Spirit's financial reporting and were being used by Boeing in negotiations over other issues. According to plaintiffs, the ever-increasing Boeing Claims were a serious concern and were discussed at quarterly EAC Review meetings, monthly Executive Program Reviews for Spirit's 737 program and separate briefings, all of which FE 9 attended, along with Campbell and Gentile. Plaintiffs assert that FE 9's account also indicates that Gentile ignored the alleged discrepancies between the Boeing Claims and Campbell's valuations. Additionally, plaintiffs argue that the false SOX certifications support a strong inference of scienter because Gentile knew his certifications were false. Plaintiffs further argue that the importance of the EAC process to Spirit's operations (affecting 76 percent of Spirit's contracts) supports a strong inference of scienter.

Plaintiffs also argue that Gentile's stock sales occurred on February 6, 2020, just weeks before Spirit's admission that it had a material weakness in internal controls over the EAC process and the revelation of the full, devasting impact of

the 737 MAX production halt on Spirit's financial prospects. Plaintiffs contend that the timing, as well as the amount, of those sales support a strong inference of scienter for his misstatements. Specifically, as to amount, plaintiffs assert that they have alleged that over the course of two days, Gentile disposed of 22 percent of his Spirit stock for proceeds totaling $3.3 million, and these sales were much larger than his sales from 2016 to 2018. According to plaintiffs, the SEC filings do not explain whether the stock was sold for tax reasons, but regardless, plaintiffs contend the suspicious timing of those sales still supports an inference of scienter.

Upon review, the court finds that plaintiffs have failed to allege with particularity facts giving rise to a strong inference that Gentile made his alleged false and misleading statements with an intent to deceive or defraud or with recklessness. As stated, plaintiffs rely upon FE 7's account to establish that Gentile knew that his October 31, 2019 statements regarding the aircraft shipset production rate were false and misleading. According to FE 7, Gentile received the results of the layoff exercises implementing the production cut "just before the end of October 2019." Doc. no. 49, ¶ 105 (emphasis omitted). However, the consolidated complaint does not provide facts with sufficient particularity to establish that FE 7's statement is reliable and based on personal knowledge. The consolidated complaint does not provide factual averments sufficient to show that FE 7 was positioned to possess the information as to when Gentile received the results of the layoff exercises. *See*, 🚩 Zucco Partners, 552 F.3d at 995 ("[C]onfidential witness statements may only be relied upon where the confidential witnesses are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

**\*19** The consolidated complaint does not allege that FE 7 reported to Gentile. According to plaintiffs' allegations, FE 7 only had occasional contact with Gentile because of weekly performance meetings which Gentile attended once or twice per quarter. According to the consolidated complaint, FE 7 reported equally to Angel Little (Little) and Bill Brown (Brown). Although Brown reported to Gentile, FE 7 stated that she was tasked by Little, not Brown, to provide data to support other members of her team so they could analyze the appropriate workforce level needed to continue production at the new lower rate. The other members of the team were responsible for different components of the layoff exercises, and the results from their work "were then rolled up to" Brown and his direct reports, including Campbell, for review

2022 WL 377415

and approval. *Id.* at ¶ 104. FE 7 stated that assuming Mr. Brown agreed with the results of the exercises, Brown would report the results to Gentile for approval. *Id.* According to FE 7, it took "two to three weeks to complete the first round or iteration of such a layoff exercise" and the results were thereafter reported to Gentile. *Id.* at ¶ 105. However, there are no particularized allegations to show how FE 7 knew that the results of the exercises had been "rolled up" to Brown for review and approval and were presented to Gentile just before the end of October 2019.[13] FE 7's information appears to be based upon secondhand or hearsay information and there are no particularized allegations which would make that information sufficiently reliable, plausible, or coherent. *See,* [Zucco Partners, 552 F.3d at 997, n. 4](). The court concludes that the information provided by FE 7 is not sufficient to demonstrate that Gentile received or was aware of the layoff exercises just before the end of October 2019, and, therefore, knowingly or recklessly misled investors with his October 31, 2019 statements.[14] *See, e.g.,* [id. at 996-997]() (statements not based on confidential witnesses' personal knowledge are not sufficient to raise a strong inference of scienter); [Anderson, 827 F.3d at 1240]() (corroborating witness's account does not establish executives' knowledge because the witness's allegations do not establish that Spirit's executives had seen a cost-study report or were aware of regularly reported losses on projects).[15] , [16]

The court rejects the proposition that Gentile's knowledge should be inferred because the 737 MAX program was critical to Spirit's core operations, the company had a close working relationship with Boeing, and Gentile was "hands on" and "very engaged" with the 737 MAX program. With respect to core operations, plaintiffs contend that the facts concerning the production cut were "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." Doc. no. 90 (quoting [Hampton v. root9b Techs., Inc., Civil Action No. 15-cv-02152, 2016 WL 7971184, at *28 (D. Colo. Aug. 4, 2016)](), *objections to report and recommendation sustained on other grounds,* [2016 WL 9735744 (D. Colo. Sept. 21, 2016)](). However, the court notes that the Tenth Circuit has not yet adopted the "absurd" presumption, and the court is not convinced that the alleged facts constitute the "rare circumstances" in which core operations allegations might "conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations." [South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 786 (9th](

[Cir. 2008)](). Additionally, allegations of a close relationship between companies do not establish the kind of circumstantial evidence necessary to support a claim of fraudulent intent. [Vogel v. Sands Bros. & Co., Ltd., 126 F. Supp. 2d 730, 743 (S.D.N.Y. 2001)](). The court also notes that, while the Tenth Circuit has stated a defendant's position in the company is a relevant fact when analyzing scienter, it has also rejected "the notion that knowledge may be imputed solely from an individual's position within a company." [In re Zagg, Inc., 797 F.3d at 1205]() (quoting [Wolfe v. Aspenbio Pharma, Inc., 587 F. Appx. 493, 497 (10th Cir. 2014)]()); *see also,* [Anderson, 827 F.3d at 1245]() ("We cannot infer scienter based only on a defendant's position in a company or involvement with a particular project."); [Fleming, 264 F.3d at 1264]() ("[A]llegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate....") (quotation marks and citations omitted); *see also,* [Anderson, 827 F.3d at 1246]() (" 'Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the [securities laws' pleading] standard.' ") (quoting [South Ferry L.P. No. 2, 542 F.3d at 784]()). Here, the court concludes that knowledge of the production rate cut should not be imputed to Gentile based upon plaintiffs' contentions.[17]

**\*20** Turning to the alleged false and misleading statements relating to compliance with established accounting procedures and the effectiveness of internal controls, the court concludes that FE 9's account is not sufficient to establish that Gentile's statements were made with an intent to deceive or defraud or with recklessness. The consolidated complaint alleges that the material weakness was the result of Campbell intentionally underestimating the amount of Boeing Claims for the 737 program in the EAC process, which made the 737 program appear more profitable than it was. FE 9 said that Boeing Claims had become a hot-button issue and were being used by Boeing in negotiations over other issues with Spirit and potential offsets for amounts paid to Spirit. The increasing claims, FE 9 stated, were a concern to Spirit management and were discussed at EAC review meetings, attended by Gentile. According to FE 9, Gentile ignored the discrepancies as to the actual value of the Boeing Claims

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

versus Campbell's valuation of the claims. However, there are no particularized allegations that Gentile was aware of any such discrepancies and there are no particularized allegations to support an inference that the valuation discrepancies were obvious. FE 9 said that the discrepancies were not adequately discussed during the EAC reviews. According to FE 9, "this was because Defendant Campbell had the final decision-making authority on the numbers for the claims estimates submitted in the EAC, and he was generally the only one to speak to upper management[.]" Doc. no. 49, ¶ 182. She also said that "Defendant Campbell had a 'tight grip' over the Boeing Claims and usually was the only speaker at such meetings on the issue." *Id.* at 183. But there are no particularized factual averments which, if true, would show that Gentile knew, or that it was so obvious he must have known, that Campbell had the final decision-making authority on the Boeing Claims or was manipulating the Boeing Claims by underestimating them.[18] The fact that the Boeing Claims were generally discussed at the EAC reviews does not establish that the discrepancies in valuation of the Boeing Claims were discussed. And while FE 9 alleged that the PRO-3033 policy[19] was not genuinely followed, doc. no. 49, ¶¶ 161-162, there are no particularized facts alleged to the effect that Gentile had any knowledge that the PRO-3033 policy was not genuinely followed. Nor are there any particularized facts alleged to the effect that Andy Yacenda, one of Spirit's controllers for the 737 program, was acquiescing in Campbell's decisions, as alleged by FE 9. Further, there are no particularized facts averred to establish that Gentile was told or aware of any information that contradicted any of his statements. In the court's view, FE 9's account does not support a strong inference of scienter by Gentile with respect to the alleged false and misleading statements regarding compliance with established accounting procedures and the effectiveness of internal controls.[20]

" '[M]otive can be a relevant consideration' in making the scienter determination, and 'personal financial gain may weigh heavily in favor of a scienter inference.' " In re Level 3 Communications, 667 F.3d at 1345 (quoting Tellabs, 551 U.S. at 325). Unusual or suspicious stock sales by corporate insiders may provide circumstantial evidence of scienter. Zucco Partners, 552 F.3d at 1005. Nonetheless, plaintiffs' allegations concerning Gentile's stock sales do not support a strong inference of scienter. Even though Gentile sold roughly 22.5 percent of his common stock shortly before the disclosure, on February 28, 2020,

of the material weakness in the internal controls, the sales are not unusual when viewed in context. Gentile's stock holdings increased during the Class Period, and he retained a substantial percentage of his Spirit holdings. This consideration, in the court's view, rebuts any inference of scienter the court might otherwise draw regarding the stock sales. *See*, Smallen, 950 F.3d at 1310; In re Level 3 Communications, 667 F.3d at 1346-1347 (increased holdings weaken an inference of scienter). In addition, the court notes that Gentile's stock, which was acquired on January 21, 2020, was sold after Spirit had publicly announced on January 30, 2020, that it did not comply with its established accounting processes and that an internal review of its accounting process compliance was ongoing. *See*, Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (sales suspicious in timing when "calculated to maximize the personal benefit from undisclosed inside information"). Further, the court notes that plaintiffs do not allege that Garcia and Gilson sold any stock during the Class Period. " '[T]he failure of other defendants to sell their stock undermine[s] [plaintiffs'] theor[y] that negative information was withheld to obtain a higher sell price.' " Smallen, 950 F.3d at 1311 (quoting In re Scholastic, 252 F.3d 63, 75 (2d Cir. 2001)). Consequently, the court is not persuaded that Gentile's stock sales demonstrate that he had a motive to defraud investors with respect to the effectiveness of Spirit's internal controls.[21]

**\*21** Viewing all of plaintiffs' allegations holistically, *see*, In re Zagg, 797 F.3d at 1201, the court concludes that the inference of scienter is neither cogent nor as compelling as the competing inference of nonfraudulent intent. Plaintiffs fail to provide particularized facts giving rise to a strong inference that Gentile intentionally misrepresented the production rate or the compliance with established accounting principles and the effectiveness of the internal controls. Plaintiffs also argue that their allegations are sufficient to show recklessness. This court disagrees. "[R]ecklessness in this context is a particularly high standard, something closer to a state of mind approximating actual intent." In re Zagg, 797 F.3d at 1206 (quotation marks and citations omitted). The more compelling inference to be drawn from the allegations of plaintiffs' consolidated complaint is, at most, one of negligence on the part of Gentile, which is insufficient to avoid dismissal. "[A]llegations of negligence or even gross negligence fall below the high threshold for liability under Section 10(b) of the Exchange Act." Smallen, 950 F.3d at 1305 (quotation omitted).

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 212 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

In sum, the court concludes that the consolidated complaint fails to raise a strong inference that Gentile acted with scienter. The court is not persuaded that "a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations plaintiff[s] allege[ ]." In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1118 (10th Cir. 2015). The court therefore concludes that dismissal of plaintiffs' § 10(b) and Rule 10b-5 claims against Gentile is appropriate.

(ii).

*Garcia*

Defendants additionally contend that plaintiffs have failed to plead particularized facts establishing that Garcia made any alleged false and misleading statements with scienter. According to defendants, plaintiffs' allegations that Garcia, like Gentile, was positioned to know about the alleged improprieties in the EAC accounting process, and signed the SOX certifications, are insufficient to demonstrate a strong inference of scienter regarding the alleged false and misleading statements about compliance with established accounting procedures and the effectiveness of internal controls. Defendants assert that Garcia's resignation, following the announcement of Spirit's accounting issues, also does not support a strong inference of scienter because the resignation is equally consistent with nonfraudulent conduct.

As to the alleged false and misleading statements about the 737 MAX production rate, Garcia points out that there are no particularized facts averred which would support a conclusion that Garcia attended or was aware of any meeting where Boeing discussed the 737 MAX production cut. Garcia points out that FE 7 did not attend the subject meeting discussing the production rate cut and there are no allegations that FE 7 was told who attended the meeting. Although FE 7 believed that Garcia attended the meeting based upon her understanding that any revisions to the production schedule required his "sign off," Garcia points out that there are no allegations that the production schedule changed or that he signed off on any production changes. Garcia maintains that there are no particularized allegations which tie him to the meeting with Boeing where the production rate cut was discussed. Further, Garcia asserts that there are no particularized facts alleged to support an inference that he knew about the layoff exercises, for which FE 7 had been providing data.

Additionally, in his motion, Garcia asserts that there are no particularized factual allegations that he had any motive to commit fraud or that he profited in any way from the alleged false and misleading statements. The absence of a profit motive, Garcia argues, means that the circumstantial evidence of scienter must be more compelling. Garcia contends that the consolidated complaint fails on this score as well.

Plaintiffs respond that FE 7's account of Boeing's instruction to Spirit to cut production shows that Garcia had knowledge of that fact. Plaintiffs point out that FE 7 stated Garcia "most likely" attended the meeting and that FE 7 specified what was said at the meeting–specifically that Boeing instructed Spirit to cut production of 737 MAX shipsets in half. Doc. no. 90, ECF pp. 65-67. According to plaintiffs, FE 7's account, along with the core operations allegations, is sufficient to establish a strong inference of scienter with respect to Garcia's misstatements relating to the production rate.

**\*22** In addition, plaintiffs contend that Garcia knew of or recklessly ignored Campbell's misconduct in estimating the costs associated with the Boeing Claims through regular meetings such as the quarterly EAC reviews. Plaintiffs contend that Garcia ignored apparent discrepancies between the actual value of the Boeing Claims and the value Campbell assigned to them in the EAC. Plaintiffs also argue that Garcia's resignation strongly supports a scienter inference because it was suspicious in its timing and circumstances. According to plaintiffs, they adequately link Garcia's resignation to the alleged misconduct. Further, plaintiffs point out that Spirit acknowledged that remedial measures to address the EAC process deficiencies included management changes. Plaintiffs also contend that Garcia's SOX certifications support a strong inference of scienter because they have alleged Garcia knew his certifications were false. Lastly, plaintiffs contend that the importance of Boeing Claims and the EAC process to Spirit's bottom line supports a strong inference of scienter.

Upon review, the court concludes that plaintiffs have failed to plead with particularity facts sufficient to give rise to a strong inference that Garcia acted with an intent to deceive or with recklessness when making the alleged false and misleading statements. As to the alleged false and misleading statements concerning the 737 MAX production rate, the court concludes that FE 7's account is insufficient to establish that Garcia was aware of Boeing's instruction to cut production in half. FE 7 was not present at the meeting between Boeing and Spirit

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

where the production rate cut was purportedly discussed and was not told by her direct supervisor, Mr. Little, or by Campbell who attended the meeting. FE 7 also did not report to Garcia. According to FE 7, she believed Garcia attended the meeting because production rate changes or the production rate schedule required his "sign-off." Doc. no. 49, ¶¶ 52, 102. However, there are no particularized allegations of any change in the production rate schedule, referred to internally as the "Master Schedule," or that Garcia signed off on any change. The lack of any particularized allegations as to a change in the Master Schedule undermines the only basis for plaintiffs' allegations that Garcia attended the meeting where Boeing told Spirit to cut production in half. Further, there are no particularized allegations that Garcia received the results of the layoff exercises for which FE 7 provided data. The court concludes that FE 7's account is insufficient to establish that Garcia knew his statements about the aircraft shipset production rate were false and misleading or that he ignored obvious signs that his statements were false and misleading. Lastly, the court concludes that plaintiffs' allegations as to the 737 MAX program's importance to Spirit's operations and Garcia's position with the company are not sufficient to establish a strong inference of scienter for the reasons previously discussed with respect to Gentile.

Turning to the alleged false or misleading statements with respect to the compliance with established accounting procedures and the effectiveness of internal controls, the court concludes that FE 9's account is insufficient to establish that Garcia acted with an intent to deceive or with recklessness. There are no particularized allegations that Garcia knew or was aware of the discrepancies concerning the valuation of the Boeing Claims or was aware that the PRO-3033 policy was not being followed. In addition, there are no particularized allegations that Garcia ignored obvious signs of the alleged manipulation of the costs associated with the 737 program, including the Boeing Claims. The fact that Boeing claims were discussed at the EAC meetings, which Garcia attended, does not suggest that Garcia knew or recklessly ignored an undervaluation of the Boeing Claims. And as stated by Tenth Circuit, "mere attendance at meetings does not contribute to an inference of scienter." 🚩 Anderson, 827 F.3d at 1246; *see also,* 🚩 In re Level 3 Communications, 667 F.3d at 1344 (10th Cir. 2012) (concluding that the fact that the defendants "monitored the integration process through regular meetings and reports" was insufficient to "draw a strong inference" of the defendants' scienter). Further, the court concludes that Garcia's knowledge should not be

imputed based upon the alleged importance of the EAC process to Spirit's bottom line or Garcia's position with the company.

**\*23** As to the resignation of Garcia, which the company identified as a remedial measure in the 2020 annual report, the court concludes, like the Tenth Circuit in In re Zagg, that the resignation is "at most an acknowledgement that the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed at the time alleged omissions occurred." *Id.* at 1205; *see also,* 🚩 In re Hertz Global Holdings, Inc., 905 F.3d 106, 119 (3rd Cir. 2018) ("[P]leading scienter requires more than pleading a link between bad news and an executive's resignation. Changes in leadership are only to be expected when leadership fails ... [A]llegations [must] cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud."). The allegations in the consolidated complaint are not sufficient to demonstrate that Garcia's resignation resulted from his knowing or reckless disregard of noncompliance with established accounting procedures or the material weakness in the internal controls.

Additionally, "[plaintiffs'] bare assertion regarding [Garcia's] execution of the SOX certifications adds nothing substantial to the scienter calculus and at best, support[s] an inference of negligence." Smallen, 950 F.3d at 1311 n. 10 (quotation omitted). Further, the court notes that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." 🚩 Fleming Cos., 264 F.3d at 1261 (quotation marks and citation omitted).

Further, as to Garcia, plaintiffs fail to offer anything in the way of a motivation to mislead investors. "Although the absence of an apparent motive does not necessarily defeat a finding of scienter, it does make such a finding more difficult to sustain." Employees' Retirement System of Rhode Island v. Williams Companies, Inc., 889 F.3d 1153, 1173 (10th Cir. 2018). Moreover, it "mitigates an inference of scienter from the plaintiffs' other factual allegations." 🚩 Anderson, 827 F.3d at 1239.

Viewing plaintiffs' allegations holistically, *see,* 🚩 In re Zagg, 797 F.3d at 1201, the court concludes that the inference of scienter is neither cogent nor as compelling as the competing inference of a nonfraudulent intent. The court is not persuaded that "a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of

2022 WL 377415

nonfraudulent intent with respect to the misrepresentations plaintiff[s] allege[ ]." In re Gold Resource Corporation, 776 F.3d at 1118. The court therefore concludes that dismissal of the Section 10(b) and Rule 10b-5(b) claims against Garcia is appropriate.

(iii).

*Gilson*

Initially, defendants contend that plaintiffs' scienter allegations relating to Gilson fail for the same reasons that they fail as to Gentile and Garcia. Defendants maintain that plaintiffs' "positional" allegations and allegations with respect to Gilson's resignation do not establish scienter on Gilson's part. Doc. no. 77, ECF p. 41.

Defendants, however, recognize that the consolidated complaint includes additional scienter allegations with respect to the misstatements regarding compliance with established accounting procedures and the effectiveness of internal controls that are not alleged against Gentile and Garcia. Defendants acknowledge that the consolidated complaint alleges that FE 9 recalled a specific instance in "early or mid-2019" when she " 'discussed her concerns with Defendant Gilson.' " Doc. no. 77, ECF p. 41. The consolidated complaint specifically alleges that FE 9 "raised her concerns about these failures in the EAC process with respect to customer claims to Defendant Gilson directly." Doc. no. 49, ¶ 178. The pleading alleges that, because of her raising such concerns to Spirit's "Finance personnel" and causing an internal "conflict," FE 9 was called into a meeting in Gilson's office, arranged by the Finance personnel, to discuss these issues. At the meeting, FE 9 discussed her concerns with Gilson and other Finance personnel, but to no avail. FE 9 left the meeting completely disappointed with the response of Gilson and the other Finance personnel because they did not take any actions to remedy the problem and they accused her team of not supporting "Program personnel." *Id.* According to FE 9, "given his responsibilities as Spirit's Controller, Defendant Gilson should have been 'pounding the table' upon hearing of such failures, but instead FE 9 was 'shut down' once again." *Id.*

*24  Defendants contend, however, that plaintiffs' allegations fall short with respect to scienter. Defendants assert that the allegations do not reveal "*anything* that Gilson was actually told [at the] meeting." Doc. no. 77, ECF p. 41. Defendants maintain that without knowing what FE 9 specifically said to Gilson, it is impossible to determine

whether that information given as early as "early 2019," undermined Gilson's statements made on October 31, 2019. Defendants also point out that "FE 9 ultimately 'signed off' on the accounting entries 'in good faith' 'despite her concerns.' " Doc. no. 77, ECF p. 42 (quoting doc. no. 49, ¶¶ 176, n. 27, 178). Further, defendants assert that plaintiffs' allegations are insufficient to establish scienter because FE 9 did not work at Spirit during the Class Period and her position with the company is not adequately alleged.

Plaintiffs respond that their scienter allegations are sufficient as they show Gilson knowingly or recklessly misrepresented the effectiveness of Spirit's internal controls. Plaintiffs contend that Gilson knew of or recklessly disregarded the material weakness in Spirit's internal controls. Plaintiffs specifically rely upon their allegations that FE 9 raised her concerns about Campbell directly to Gilson because of her concerns about the weaknesses in Spirit's EAC process, but Gilson ignored her. Plaintiffs contend that her confrontation with Gilson, as well as her resignation shortly after her confrontation, support a strong inference of Gilson's scienter. Plaintiffs also point to their allegations that Gilson attended regular meetings such as the EAC Reviews where the Boeing Claims were discussed. Plaintiffs contend that even though FE 9 left Spirit's employment before the start of the Class Period, her allegations are nonetheless relevant because they provide insight into what Gilson knew at the start of the Class Period. Further, plaintiffs assert that FE 9's position with Spirit is sufficiently alleged.

Upon review, the court concludes that plaintiffs have failed to sufficiently plead with particularity facts giving rise to a strong inference that Garcia acted with an intent to deceive or with recklessness. The court concludes that FE 9's account is not sufficient to establish a strong inference that Gilson's alleged false and misleading statements with respect to compliance with established accounting procedures, and the effectiveness of internal controls, were made with intent to deceive or with recklessness. Plaintiffs fail to allege with particularity what was discussed at the meeting involving FE 9, Gilson, and Finance personnel. Without particularized allegations as to what was discussed, the consolidated complaint does not establish that Gilson was specifically informed by FE 9 of Campbell's manipulation of the Boeing Claims or any alleged material weakness in the internal controls. Indeed, plaintiffs' allegations with respect to the meeting do not mention anything specifically about the Boeing Claims. Doc. no. 49, ¶ 178. As pointed out by defendants, plaintiffs allege only that FE 9 "raised her

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

concerns about these failures in the EAC process with respect to customer claims." Doc. no. 49, ¶ 178. Also, plaintiffs' allegations indicate that other Finance personnel did not share her concerns, *id.*, and as pointed out by defendants, plaintiffs' allegations indicate that FE 9 signed off on the claims in the EAC "in good faith." *Id.*, ¶ 176 & n. 27. If other Finance personnel did not share FE 9's concerns and FE 9 signed off on the claims in the EAC in good faith despite her concerns, those concerns do not, in the court's view, provide a strong inference that Gilson acted with an intent to deceive or to defraud or with recklessness. Although plaintiffs contend that FE 9's resignation supports the assertion that Gilson acted with scienter, there are no particularized allegations that Gilson knew of the resignation or the reasons for her resignation. Further, the fact that a material weakness in the internal controls was later identified, resulting in Gilson's resignation, does not provide a strong inference that Gilson acted with an intent to deceive or to defraud or with recklessness at the time he made the alleged false and misleading statements.

**\*25** In addition, as pointed out by Gilson, the consolidated complaint fails to allege any motive on his part to commit securities fraud. Although plaintiffs need not show that Gilson acted with a particular motive, the failure to allege facts indicating a motive for securities fraud mitigates an inference of scienter. *See*, 🔖 Anderson, 827 F.3d at 1239.

The court further agrees with defendants that plaintiffs' remaining scienter allegations concerning Gilson fail for the same reasons previously discussed with respect to Gentile and Garcia.

Lastly, viewing plaintiffs' scienter allegations holistically, *see*, 🔖 In re Zagg, 797 F.3d at 1201, the court concludes that the inference of scienter is neither cogent nor as compelling as the competing inference of nonfraudulent intent. The court is not persuaded that "a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations plaintiff[s] allege[ ]." In re Gold Resource Corporation, 776 F.3d at 1118. The court therefore concludes that dismissal of the Section 10(b) and Rule 10b-5(b) claims against Gilson is appropriate.

(iv)

*Spirit*

Plaintiffs also allege liability under Section 10(b) and Rule 10b-5 on the part of Spirit. Corporations, like Spirit, have no state of mind of their own. Instead, scienter of the corporations' agents must be imputed to them. *See*, 🔖 Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1255 (11th Cir. 2008). In addition to the scienter allegations as to Gentile, Garcia, and Gentile, which the court has found to be insufficient to establish a strong inference of scienter, plaintiffs rely upon their allegations with respect to Campbell. [22] Plaintiffs assert that those allegations support a strong inference that Campbell acted with scienter. Defendants contend the scienter allegations as to Campbell are irrelevant on the issue of Spirit's scienter because Campbell did not make or issue any of the challenged statements. Plaintiffs counter that Campbell's scienter is imputable to Spirit, despite the fact he did not make or issue any of the alleged false or misleading statements. They point out that the Tenth Circuit authorizes corporate scienter to be evaluated by the state of mind of the individual corporate official, who not only made or issued a false and misleading statement, but who also "furnish[ed] information or language for inclusion therein, or the like." Doc. no. 90, ECF p. 77 (quoting Smallen, 950 F.3d at 1313). Plaintiffs posit that given Campbell's critical role with the 737 MAX program and his ownership of the EAC process for Spirit's 737 program, his scienter should be imputed to Spirit. According to plaintiffs, Campbell furnished false information for inclusion in the alleged misstatements regarding the 737 MAX production rate because he instructed the Business Operation Team, including FE 7, to create layoff analyses and similar planning reports to implement Boeing's production cut. In addition, they assert that Campbell furnished false information for inclusion in the alleged misstatements regarding the effectiveness of internal controls, including through quarterly EAC reviews. Plaintiffs maintain that they have sufficiently alleged facts giving rise to a strong inference of scienter with respect to Campbell.

**\*26** The Tenth Circuit has determined that corporate liability for a Section 10(b) and Rule 10b-5 violation may be established by looking to "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or *who furnish information or language for inclusion therein*, or the like)." Smallen, 950 F.3d at 1313 (emphasis added) (quotation marks and citation omitted). Initially, the court concludes that the consolidated complaint fails to allege particularized facts to establish that Campbell furnished information or language for inclusion in any of the alleged

false and misleading statements made with respect to the 737 MAX production rates. The consolidated complaint does allege that the layoff exercises were "rolled up" to Brown and his direct reports, including Campbell, for review and approval, doc. no. 49, ¶ 104, but there are no allegations that those exercises were furnished to Gentile for inclusion in any alleged false and misleading statements involving the 737 MAX production rate on October 31, 2019. As previously discussed, the account of FE 7 is insufficient to demonstrate that Gentile even received that information prior to his alleged misstatements. Further, there are no particularized allegations that Campbell furnished anything to Garcia or Gilson before their alleged misstatements. The court therefore concludes that Campbell's state of mind cannot be relied upon to establish Spirit's scienter for the 737 MAX production rate statements.

Regarding the statements with respect to compliance with the established accounting procedures and the effectiveness of internal controls, the consolidated complaint does allege, based upon FE 9's account, that Campbell understated or underestimated the amount of the Boeing Claims in the EAC process. Doc. no. 49, ¶ 170; ¶ 304. The consolidated complaint, however, does not plead particularized facts to demonstrate that Campbell furnished information for inclusion in the false and misleading statements at issue in this case. Nevertheless, even if the facts were sufficient for the court to conclude that Campbell furnished information for inclusion in those statements, the court finds that the consolidated complaint fails to allege particularized facts supporting a strong inference that Campbell acted with scienter (as opposed to negligence or gross negligence) in furnishing that information. The factual allegations are insufficient to support that Campbell acted with an intent to deceive, manipulate, or defraud investors or with recklessness when he furnished the information.[23] According to the consolidated complaint, Campbell engaged in the incorrect accounting "to make himself look better by showing better numbers to the Spirit Executive Team on the 737 program." Doc. no. 49, ¶ 305. As a result, the court concludes that Campbell's state of mind cannot establish Spirit's liability under Section 10(b). *See,* Pipefitters Local No. 636 Defined Ben. Plan v. Zale Corp., 499 F. Appx. 345 (5th Cir. 2012) ("[T]he most compelling inference was that [the vice president of marketing] acted with the intent to maintain the good appearance of her department rather than to defraud investors by falsely inflating the value of [the company].") The court therefore concludes that dismissal of the Section 10(b) and Rule 10b-5(b) claims against Spirit is appropriate.

VII.

*Count III – Claims Under Section 10(b)*
*and Rule 10b-5, Subsections (a) and (c)*

In addition to claims under subsection (b) of Rule 10b-5, plaintiffs allege claims under subsections (a) and (c). These claims are alleged against all defendants. Subsections (a) and (c) make it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a) and (c). While subsection (b) requires a plaintiff to establish that a false or misleading statement was made, subsections (a) and (c) "are not so restricted." Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972). To state a claim for a violation of subsections (a) and (c), a plaintiff must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." In re Alstom SA Securities Litigation, 406 F. Supp. 2d 433, 476 (S.D.N.Y 2005) (citing In re Global Crossing, Ltd. Securities Litigation, 322 F. Supp. 2d 319, 336 (S.D.N.Y 2004)).

**\*27** Defendants contend that plaintiffs' subsections (a) and (c) claims should be dismissed because those claims are simply a repackaging of their subsection (b) claim because they rely upon defendants' alleged material misrepresentations as the basis for the claims. Defendants point out that plaintiffs have not identified any material misrepresentation or sufficiently alleged that they disseminated any material misrepresentation with scienter. To the extent the claims are based on something besides a material misrepresentation, defendants argue that the claims fail because the only conduct alleged to be deceptive in the consolidated complaint was the purported misrepresentations. Further, defendants maintain that plaintiffs have failed to plead reliance, an essential element of subsections (a) and (c) claims. Defendants point out that aside from their alleged misrepresentations, none of their alleged conduct was publicly disclosed. Therefore, defendants contend that plaintiffs could not have relied upon that non-public conduct.

Plaintiffs respond that they have pled sufficient facts to support liability under subsections (a) and (c). Initially,

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 217 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

they point out that the mere fact certain elements of
their claims under subsections (a) and (c) also support a
misrepresentation claim under subsection (b) is not grounds
for dismissal. They assert that scheme-liability claims may
involve conduct similar to that underlying a subsection (b)
claim. In any event, plaintiffs contend that the consolidated
complaint alleges defendants "engaged in a scheme to assure
the market that Spirit could provide timely information
regarding any changes in production levels for 737 MAX
shipsets, and the revenue it could obtain from those sales,
to minimize investor concerns relating to the uncertainties of
Spirit's revenue stream created by the 737 MAX grounding."
Doc. no. 90, ECF p. 82. According to plaintiffs, the
alleged scheme included multiple actions distinct from the
alleged misrepresentations, including "(i) touting its close
relationship with Boeing in response to specific questions
from analysts to set the expectation in investors that Spirit
would immediately be aware of, respond to, and inform
investors of any requests for changes [ ]; (ii) deflecting
concerns about the number of 737 MAX shipsets Spirit
was storing for Boeing [ ]; and (iii) making no effort
to inform investors when Boeing ordered Spirit to cut
production in late September or early October 2019[ ]." *Id.*
These actions, plaintiffs contend, which are in furtherance of
defendants' scheme are actionable under subsections (a) and
(c). Additionally, plaintiffs contend that they have sufficiently
pled reliance upon defendants' scheme. Plaintiffs maintain
that it was the deceptive acts of defendants, rather than
a third party, that "mitigated uncertainty in the minds of
investors as to Spirit's shipset production and inflated the
price for Spirit shares." *Id.* They assert that the cases cited by
defendants in support of their reliance argument are factually
distinguishable.

Upon review, the court concludes that the claims under
subsections (a) and (c) should be dismissed as to all
defendants. "As with claims under subsection (b) of Rule
10b-5, claims under subsections (a) and (c) are subject to the
PSLRA, and thus, a 'strong inference' of scienter must be
pled 'with particularity.' " Takata, 2020 WL 2079375, at *14
(quoting 15 U.S.C. § 78u-4(b)(2)(A)). The court concludes
that plaintiffs have failed to allege particularized facts giving
rise to a strong inference that any of the defendants acted with
scienter when committing the alleged actions. Even when
plaintiffs' allegations are considered collectively, they do not,
in the court's view, create a cogent, compelling inference of
scienter on the part of the defendants.

## VIII.

### *Count II – Claims Under Section 20(a)*

As discussed, to state a claim under § 20(a) of the Securities
Exchange Act, plaintiffs must allege (1) a primary violation
of the securities laws; and (2) control over the primary
violator by the alleged controlling person." Fleming, 264
F.3d at 1270. Because the consolidated complaint fails to
state a primary violation under Section 10(b) and Rule 10b-5,
the court concludes that the claims under Section 20(a)
against the individual defendants, Gentile, Garcia, Gilson,
and Campbell also fail.

## IX.

### *Request to Amend Complaint*

**\*28** At the end of their response brief, plaintiffs request the
opportunity to amend the consolidated complaint if the court
grants any part of defendants' motions. The court, however,
concludes that plaintiffs have failed to adequately request
leave to amend their consolidated complaint. Plaintiffs'
"single sentence, lacking a statement for the grounds for
amendment and dangling at the end of [their] memorandum,
[does] not rise to the level of a motion for leave to
amend." Calderon v. Kan. Dept. of Social & Rehabilitation
Services, 181 F.3d 1180, 1186-87 (10th Cir. 1999). Plaintiffs
have not made any effort to indicate how amending the
consolidated complaint would cure the deficiencies in their
claims, specifically as to the scienter element. Plaintiffs
rely heavily upon confidential witnesses to support their
allegations, but do not indicate that the confidential witnesses
can provide more information that was not alleged or that
there are other confidential witnesses available to support
their claims. Because plaintiffs have failed to adequately
request amendment and to support that request and in the
absence of any indication that they can cure the deficiencies
of their consolidated complaint, specifically as to scienter,
the court concludes that the consolidated complaint should be
dismissed without leave to amend.

## X.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 218 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

*Conclusion*

Based upon the foregoing, Defendants Spirit AeroSystems Holdings, Inc., Thomas C. Gentile, and Shawn Campbell's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (doc. no. 77), Defendant Jose Garcia's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (doc. no. 78) and Defendant John Gilson's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (doc. no. 79) are **GRANTED**. Plaintiffs' Consolidated Class Action Complaint (doc. no. 49) is **DISMISSED WITH PREJUDICE**.

The Clerk of Court is **DIRECTED** to file this order and the accompanying judgment in Case Nos. 20-cv-00054-SPF-JFJ, 20-cv-00077-SPF-JFJ, and 20-cv-00117-SPF-JFJ.

IT IS SO ORDERED this 7 th day of January, 2022.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 377415

---

**Footnotes**

1    Jacob Goldman, Gary Smith, and Employees' Retirement System of the City of Providence.

2    In their response, plaintiffs request that the court disregard or strike the "excessive, overlong footnotes," in doc. no. 77, specifically, n. 2, n. 21, and n. 26 and "six-page, single-spaced 'Appendix A' " attached to doc. no. 77 on the ground they violate the court's page limit order. Doc. no. 90, n. 6. Upon review and in its discretion, the court declines plaintiffs' request. The court is not convinced the footnotes and Appendix A are improper.

3    Although plaintiffs have requested oral argument, the court concludes that oral argument is not necessary. The present motions, focusing, as they must, on what is (and is not) down in black and white in the papers before the court, do not, by their nature, call for oral argument. That said, if the court had concluded that oral argument would aid its consideration of these motions, it would have set them for argument.

4    The 737 NG is the third generation of the Boeing 737 airplane, and the 737 MAX is the fourth generation. The 737 MAX was announced in 2011 and began commercial flights in 2017.

5    It was later revealed that the crashes were caused by a problem with certain software in the 737 MAX flight control computer–specifically, an automated system called the Maneuvering Characteristics Augmentation System, which was designed to automatically take over the plane and point the nose downward if a sensor detected a "pitch-up" in flight that had not been commanded.

6    Plaintiffs refer to several former Spirit employees as "Confidential Former Employees." *E.g.*, Doc. no. 49, ¶ 45. For brevity, the court will refer to them simply as former employees.

7    FE 9 stated that the Boeing Claims were claims "Boeing made against Spirit for, *inter alia*, the time and expense Boeing had to expend for disruptions due to delays and certain quality issues with delivered shipsets." Doc. no. 49, ¶ 159.

8    Although Garcia and Gilson have filed separate dismissal motions (doc. nos. 78 and 79), they join and incorporate by reference the motion to dismiss of defendants Spirit, Gentile and Campbell (doc. no. 77). Garcia also joins and incorporates by reference Gilson's motion to dismiss.

9    ⚑ Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund, 575 U.S. 175 (2015).

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 219 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

**10**    The court agrees with defendants that a statement by Campbell revealing what Boeing told Spirit in the meeting constitutes hearsay.

**11**    Further, the court agrees with defendants that the allegations in the consolidated complaint with respect to the statements as reported by Jeffries LLC do not satisfy the requirements of 🚩Rule 9(b) and the PSLRA because plaintiffs do not allege the who (the speaker) and the when (when the statements were made).

**12**    In reply, defendants argue that statement #10 is not actionable because it "is not about internal controls at all, but rather disclosure controls, which the Complaint never addresses" and statement #11 is not actionable because plaintiffs' allegations do not relate to "as of December 31, 2018." Doc. no. 91, ECF pp. 14-15. The court declines to address these arguments since they were raised for the first time in reply.

**13**    The court notes that the consolidated complaint fails to describe with particularity the contents of the layoff analysis. *See*, 🚩Anderson, 827 F.3d at 1241 ("To create an inference of scienter based on [ ] reports, the plaintiffs must adequately describe the content of the reports[.]"). Also, it fails to allege whether Gentile had read the results or was aware of the results before the end of October 2019. *Id.* (confidential witness's allegations did not establish executives' knowledge because they did not establish the executives had seen the report or were aware of the reported losses).

**14**    The court notes that the consolidated complaint alleges that Gentile sent out weekly emails regarding Spirit's operations, including Spirit's relationship with Boeing and the 737 MAX production. According to FE 7, "in or around October 2019," Gentile told employees in one of the emails that "Spirit was keeping the same production schedule but said that there was a changing environment with Boeing." Doc. no. 49, ¶ 297. FE 7's account indicates that Gentile did not know of the alleged production rate cut in or around October 2019.

**15**    In their consolidated complaint, plaintiffs also noted that according to another confidential witness, FE 5, Gentile had daily communications with Boeing. Doc. no. 49, ECF p. 50, n. 11; ¶ 296. The level of detail in the complaint, however, is insufficient to show that FE 5, who was four levels below Gentile, was positioned to know the communications between Gentile and Boeing or the substance of those communications. FE 5's account is not sufficient to demonstrate a strong inference of scienter. *See*, 🚩Zucco Partners, LLC, 552 F.3d at 996-997 (statements of confidential witnesses not based on personal knowledge are not sufficient to raise a strong inference of scienter); 🚩Anderson, 827 F.3d at 1243 (relatively low-level employees could not provide evidence bearing on the executives' mental states).

**16**    The court rejects plaintiffs' argument that it strains credulity that Campbell and the other individual defendants did not advise Gentile of the production rate cut. As stated, under the heightened pleading standard of the PSLRA, plaintiffs must state with particularity facts giving rise to a strong inference that defendants acted with the requisite state of mind. Smallen, 950 F.3d at 1305. The court notes that Campbell did not report directly to Gentile. Further, as herein discussed, there are insufficient allegations to support a plausible inference that Garcia and Gilson were present at the meeting where Boeing instructed Spirit to cut the production rate in half.

**17**    Further, the court rejects plaintiffs' argument that Gentile's responses to analysts' questions relating to the 737 MAX production rates raise a strong inference of scienter, since there are no particularized facts that he knew of the production rate cut in advance of those responses.

**18**    The court notes that plaintiffs allege that despite her concerns, FE 9 signed off in good faith on the claims in the EAC. Doc. no. 49, ¶ 176 & n. 27.

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 220 of 330

Meitav Dash Provident Funds and Pension Ltd. v. Spirit..., Not Reported in Fed....

2022 WL 377415

19    According to the consolidated complaint, the PRO-3033 policy provided procedures for evaluating and validating the claims made by Spirit's customers, such as Boeing, and how the value of those claims should be factored in the EAC. Doc. no. 49, ¶ 161.

20    Plaintiffs also point to Gentile's execution of the SOX certifications to support a strong inference of scienter. The court finds "the presence of the SOX certifications unpersuasive because they are not accompanied by any 'particularized facts to support an inference that [Gentile] knew [his] sworn SOX statements were false at the time they were made." Smallen, 950 F.3d at 1311 n. 10 (quotation marks omitted). "[Plaintiffs'] bare assertion regarding [Gentile's] execution of the SOX certifications adds nothing substantial to the scienter calculus and, at best, support[s] an inference of negligence." *Id.* (quotation marks omitted); *see also,* In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1116 (10th Cir. 2015).

21    Further, the court is not persuaded that Gentile's stock sales demonstrate he had a motive to defraud investors about the 737 MAX production rate.

22    No claim under Section 10(b) and Rule 10b-5(b) has been alleged against Campbell.

23    In the consolidated complaint, plaintiffs allege that the timing and circumstances of Campbell's "resignation" support a strong inference of scienter. Relying upon FE 11, plaintiffs allege that Campbell was terminated and escorted from the premises a week before Garcia and Gilson resigned. Doc. no. 49, ¶ 314. Plaintiffs also allege that FE 9's account corroborates the reason for Campbell's termination. Id., ¶ 315. However, the court finds FE 11 and FE 9's accounts are not sufficient to establish that Campbell was terminated and the reasons for that termination. FE 11 and FE 9 left Spirit's employment in the fall of 2019. *Id.*, ¶ 56, ¶ 171.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 15

Rein v. Dutch Bros, Inc., Slip Copy (2024)
2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

2024 WL 3105004
United States District Court, S.D. New York.

Douglas REIN, individually and on behalf
of all others similarly situated, Plaintiff,
v.
DUTCH BROS, INC. et al., Defendants.

23 Civ. 1794 (PAE)
|
Signed June 24, 2024

**Attorneys and Law Firms**

Kim Elaine Miller, Kahn Swick & Foti, LLC, New York, NY, for Plaintiff.

Aric Hugo Wu, Cooley LLP, New York, NY, Patrick Gibbs, Cooley LLP, Palo Alto, CA, for Defendants.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

**\*1** Lead plaintiff Douglas Rein brings this putative federal securities class action against Dutch Bros, Inc. ("Dutch Bros") and its chief executive officer Jonathan Ricci and chief financial officer Charles L. Jemley (collectively, "Defendants") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 🚩15 U.S.C. §§ 78j(b) and 78t(a), and the implementing rule of the Securities and Exchange Commission, 17 C.F.R. § 240b-5 ("Rule 10b-5"). On behalf of himself and others who purchased Dutch Bros securities between November 10, 2021, and May 11, 2022 (the "class period"), Rein claims that Defendants made a series of false and misleading statements during the class period touting Dutch Bros' performance and prospects, which allegedly understated the threat to the company's sales and profitability presented by rising inflation affecting the cost of commodities key to its success.

Pending now is Defendants' motion to dismiss the Amended Complaint ("AC") for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the following reasons, the Court grants the motion and dismisses the AC in its entirety.

**I. Background**

**A. Factual Background**[1]

**1. The Parties**

Dutch Bros is a publicly traded company incorporated under Delaware law that operates and franchises drive-through coffee shops, which sell coffee and related products. AC ¶¶ 14, 22. On September 17, 2021, Dutch Bros went public, with an initial public offering ("IPO") in which it issued approximately 24.2 million shares of Class A common stock at a public offering price of $23 per share. *Id.* ¶¶ 28, 3. As of its IPO, Dutch Bros had 471 shops in 11 states. Its IPO was intended to facilitate the company's "expansion to at least 4,000 Dutch Bros locations in the United States." *Id.* ¶ 23.

**\*2** At all relevant times, Ricci was Dutch Bros' president and chief executive officer, and Jemley was its chief financial officer. *Id.* ¶¶ 15–16.

Lead plaintiff Rein is an investor who, during the class period, purchased Dutch Bros securities at what he alleges were "artificially inflated prices," which declined after Dutch Bros, on the last day of the class period, announced a decline in profitability. *Id.* ¶ 13.

**2. Rising Commodities Prices
Before and During the Class Period**

In the months leading up to, and during, the class period, inflation and commodities prices were rising in the United States. *See id.* ¶ 3. The Bureau of Labor Statistics' Consumer Price Index for All Urban Consumers rose to 5.4% in September 2021, 7.5% in January 2022, and reached 8.3% by April 2022. *Id.* Dairy and petroleum, the commodities most central to Dutch Bros' business, were subject to these trends. *Id.* The Department of Agriculture calculated the National All-Milk Price Received at $18.30 in September 2021, $23.90 in January 2022, and $27 in April 2022. The Department of Energy reported the Gasoline Average Retail Price in September 2021 as $3.272, as $3.413 in January 2022, $3.611 in February 2022, $4.322 in March 2022, and $4.213 in April 2022. *Id.* A September 2021 *Wall Street Journal* article noted that "[e]conomists anticipate that broader, longer-lasting inflationary pressures will emerge in coming quarters"; another, published November 2021, opined

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

that "[t]hings are going to get worse before they get better." *Id.* ¶ 26.

During the class period, Defendants made statements that were generally positive about Dutch Bros' past and forthcoming financial performance, notwithstanding that inflation in general and commodities costs in particular were rising. These statements were made in, *inter alia*, SEC filings, conference calls, and interviews. *See id.* ¶¶ 55–101.

In particular, Defendants stated that they believed that (1) given the particular ingredients that Dutch Bros required, Dutch Bros was not as susceptible to rising inflation rates and supply chain issues as other companies, (2) a price increase implemented just before the class period, and the option of future price increases, would help Dutch Bros weather the inflation it would face, and (3) inflation in gas, more than dairy, prices, was the company's biggest concern, but consumers would not necessarily cease drive-through coffee purchases as a result of rising gas prices. *See id.* The Court below reviews the specific challenged statements to these effects.

A confidential witness ("CW1")—who worked for Dutch Bros as a retail optimization manager—is cited in the AC as stating that, as of December 2021, Dutch Bros was aware of its potential need to combat rising dairy prices. *Id.* ¶¶ 18–21. CW1 and his team "worked on operational changes that would be effective in the field" and "created processes for field training," and designed "processes that would create efficiencies at the retail store-level." *Id.* ¶ 19. CW1 stated that, in or around December 2021, his team was tasked with "troubleshooting the issue of rising dairy costs[.]" *Id.* ¶ 21. This entailed steps such as "switch[ing] from purchasing dairy by the gallon to purchasing it by the half gallon." *Id.* CW1 stated that "finding additional sources of dairy, especially 2%, was important because the supply was also an issue around this time, not just the cost." *Id.* The AC does not address whether Dutch Bros adopted these or other suggestions.

### 3. Dutch Bros' Q1 2022 Earnings Drop, Reported May 11, 2022

**\*3** Through at least the end of 2021, Dutch Bros' performance remained stable. In the first quarter of 2022, ending March 31, 2022, however, Dutch Bros experienced "margin pressure"—that is, a decrease in its profit margins.

*Cf., e.g., id.* ¶¶ 102–111 (identifying Q1 losses in 2022 as turning point).

On May 11, 2022, the last day of the class period, after the markets closed, Dutch Bros issued its earnings release for the first quarter of 2022. It revealed a big drop in performance. *See id.* It reported a net loss that quarter of $16.3 million, compared to $4.8 million in the first quarter of 2021, and an adjusted net loss of $0.02 per share, "below the market's estimated earnings of $0.01 per share." *Id.* ¶ 102

In public statements that day, Defendants attributed these losses to three factors:

> "[Dutch Bros'] decision to be disciplined on the price [they] took, which [they] believe[d] [wa]s less than half as much as many of [their] peers; faster inflation and cost of goods, especially in dairy; the pull forward of deferred expenses related to the maintenance of shops; and normal new store inefficiency amplified by the volume of new and ramping units in quarter 1."

*Id.* ¶ 103. As to rising costs, Ricci stated on an earnings call that day:

> Unfortunately, in this past quarter, a confluence of cost pressures overwhelmed our decisions around price and resulted in near-term margin compression. We anticipated higher expenditures. However, we did not perceive the speed and magnitude of cost escalation within the quarter. Dairy, for example, which makes up 28% of our commodity based, rose almost 25% in Q1. While costs rose throughout the quarter, we experienced a change in sales trajectory from mid-March onward as macroeconomic headwinds accelerated and comps turned negative. We are monitoring these factors and have chosen to take a more conservative stance on our 2022 outlook given macroeconomic uncertainty.

*Id.* ¶ 104. During the May 11, 2022 earnings call, Jemley attributed the drop in sales to rising gasoline prices:

> [W]ithout claiming to be a macroeconomist, I will tell you that in mid-March when gas prices jumped the way they did, we saw an immediate flip on our daily sales. It was almost to the day of the way that, that works. So I think you could infer—and we believe that we've done some analysis on the gas prices and influence related to our daily sales, and we believe it has influenced it. And we believe that if gas prices stay inflated, it will continue to influence it.

*Id.* ¶ 110. Based on these metrics and what it termed "unanticipated" cost increases, Dutch Bros that day put forward a "more conservative" forecast of its earnings and "same shop sales" in 2022. *Id.* ¶ 105.

The next day, May 12, 2022, Dutch Bros' share price fell by $9.26 or 26.9%. *Id.* ¶ 111. That share price was 59.7% below what it had been at the start of the class period on November 10, 2021. *Id.*

Throughout the second quarter of 2022, margin pressure continued. In its Q2 earnings call on August 10, 2022, Dutch Bros stated that, "[l]ike many of our peers, the macroeconomic environment is impacting various aspects of our business, and our company-operated shop margins continue to be pressured by record inflation in the second quarter." *Id.* ¶ 115. It reported a 3% price increase in the second quarter and stated that it was continuing to evaluate "further menu pricing action as needed in the back half of the year." *Id.* On that earnings call, however, Jemley stated that Dutch Bros was "starting to [overcome] the inflation that began to show in Q2 of 2021." *Id.* ¶ 116.

### 4. The Individual Defendants' Stock Sales

**\*4** On approximately March 4, 2022—in the middle of the class period—Ricci and Jemley's "Lock-Up Agreements" with Dutch Bros' underwriters expired, freeing them to sell

Dutch Bros' shares they owned. *See id.* ¶ 6. Each executive had entered into a Rule 10b5-1 trading plan three months earlier: Ricci on December 7, 2021, and Jemley on December 9, 2021. After the expiration of the lock-up periods, both defendants made sales pursuant to these plans. Ricci sold a total of 71,125 shares of Dutch Bros common stock, with some sales on March 7, 2022, and the rest on May 9, 2022. *Id.* ¶ 128. [2] Those sales represented about 3.3% of the 2,133,794 fully vested shares of Dutch Bros common stock that Ricci had owned as of the expiration of the lock-up periods. *Id.* ¶ 129. Jemley sold 15,000 shares on March 4, 2022, and an additional 5,000 shares on April 5, 2022. *Id.* ¶ 132. Those sales represented about 2.1% of the 932,828 fully vested shares of Dutch Bros common stock that Jemley had owned. *Id.* ¶ 133.

### 5. The Appointment of a New President and CEO

In November 2022, Dutch Bros announced the appointment of a new president, Christine Barone; Ricci remained CEO. *Id.* ¶ 149. On August 8, 2023, Dutch Bros announced that Barone would replace Ricci as CEO in January 2024. *Id.* ¶ 150.

### B. Procedural History

On March 1, 2023, plaintiff Jerry Peacock filed this action on behalf of purchasers of Dutch Bros securities between March 1 and May 11, 2022. Dkt. 1. On May 1, 2023, Rein and two others filed motions to serve as lead plaintiff and for their respective attorneys to serve as lead counsel. *See* Dkts. 12–21. On August 3, 2023, the Court appointed Rein lead plaintiff and his attorneys lead counsel. Dkt. 29. Thereafter, Rein filed the now-operative AC, which moved the start of the class period earlier, to November 10, 2021. AC ¶ 2.

On September 28, 2023, Defendants filed their motion to dismiss the AC, Dkt. 32, a memorandum of law in support thereof, Dkt. 33 ("Def. Br."), and a declaration and attached exhibits, Dkt. 34 & Exs. 1–19. On October 26, 2023, Rein filed a brief in opposition. Dkt. 35 ("Pl. Br."). On November 9, 2023, Defendants filed a reply. Dkt. 36 ("Def. Reply Br.").

## II. Applicable Legal Standards

### A. Standards for Resolving a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*"). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

**\*5** Second, such a complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). *See ECA*, 553 F.3d at 196. In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements ... were false and misleading; they must demonstrate with

specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, the plaintiff "shall, with respect to each act or omission ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

### B. Elements of Rein's Claims

Rein brings claims under §§ 10(b) and 20(a) of the Exchange Act, and its implementing rule, Rule 10b-5. FAC ¶¶ 168–80.

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

To state a claim under § 10(b), a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks and citation omitted).

To state a claim under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108) (quotation marks omitted). If a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under a provision of the Exchange Act, then the § 20(a) claims must be dismissed. *See id.*

### 1. False or Misleading Statements or Omissions

To survive a motion to dismiss, the complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.' " *Matrixx Initiatives, 563 U.S. at 38* (emphasis omitted) (quoting *Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988)*). Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id. at 44*; *see also Basic, 485 U.S. at 239 n.17*. "Disclosure of ... information is not required ... simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002)*. An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make ... statements made, in light of the circumstances under which they were made, not misleading.' " *Matrixx Initiatives, 563 U.S. at 44* (quoting *17 C.F.R. § 240.10b-5(b)*); *see also In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239–40 (2d Cir. 2016)* ("pure omissions" of information, absent a duty to disclose, are not actionable; however, "half-truths"—"statements that are misleading ... by virtue of what they omit to disclose"—are).

**\*6** The materiality requirement, meanwhile, "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.' " *Matrixx Initiatives, 563 U.S. at 38* (quoting *Basic, 485 U.S. at 231–32*). As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448–49 (1976)*. The "materiality hurdle" is, therefore, "a meaningful pleading obstacle." *In re ProShares Tr. Sec. Litig., 728 F.3d 96, 102 (2d Cir. 2013)*. However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, 553 F.3d at 197* (quotation marks omitted).

Still, some statements are "too general to cause a reasonable investor to rely upon them" and thus inactionable under the securities laws as "puffery." *Id. at 206*. For example. "[g]eneral expressions of corporate optimism are 'too indefinite to be actionable under the securities laws.' " *Boca Raton Firefighters and Police Pension Fund v. Bahas, 506 F. App'x 32, 38 (2d Cir. 2012)* (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig., 163 F.3d 102, 108 (2d Cir. 1998)*).

### 2. Item 303

Also relevant here, Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. § 299.303, compels disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations ... [as well as] events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments)[,]" *id.* § 299.303(b)(2)(ii), as well as "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations[,]" *id.* § 299.303(b)(2)(i).

Although Item 303 itself does not support an independent cause of action, until recently, the law in this Circuit was such that "Item 303's affirmative duty to disclose in Form 10–Qs [could] serve as the basis for a securities fraud claim under Section 10(b)." *Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101–02 (2d Cir. 2015)*. The Circuit had held that failure to comply with an affirmative disclosure obligation, like Item 303, would cause a reasonable investor to assume the nonexistence of "known trends or uncertainties" of the type Item 303 covers, rendering omissions along these lines misleading. *Id.* However, on April 12, 2024, while this motion was pending, the Supreme Court held that "the failure to disclose information required by Item 303 can support a [§ 10(b) or] Rule 10b–5(b) claim only if the omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P., 144 S. Ct. 885, 892 (2024)*. It rejected the Circuit's prior reasoning as wrongly shifting the focus of § 10(b) and Rule 10b-5(b) "from fraud to disclosure." *Id.* Thus, Item 303 can support a claim under

Rein v. Dutch Bros, Inc., Slip Copy (2024)

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

these provisions only where there has been an otherwise-misleading statement. *See id.* at 892 n.2.

### 3. Application to Statements of Opinion

Like objective statements of material fact, subjective statements of opinion can be actionable as fraud. As the Supreme Court has clarified, and the Second Circuit has recognized, such statements of opinion can give rise to liability in two distinct ways.

**\*7** First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.' " *See Tongue v. Sanofi,* 816 F.3d 199, 209–10 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Labs. Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 186 (2015)). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Salomon Analyst Level 3 Litig.,* 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004). "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany v. Robertson Stephens, Inc.,* 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi,* 816 F.3d at 210 (citing *Omnicare,* 575 U.S. at 194–95). To adequately allege that a statement of opinion was misleading through the omission of material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* (quoting *Omnicare,* 575 U.S. at 194). As the Supreme Court has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuers possession at a time.' " *Id.* (quoting *Omicare,* 575 U.S. at 188–89). "The core inquiry," then, "is whether

the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.' " *Id.* (quoting *Omnicare,* 575 U.S. at 189).

The Supreme Court has instructed that its ruling that material omissions of facts may render a statement of opinion actionable should not be given "an overly expansive reading," and that establishing liability on such a theory "is no small task for an investor" to meet. *Id.* at 210 (quoting *Omnicare,* 575 U.S. at 194). "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts, and ... [do] not expect that *every* fact known to an issuer supports its opinion statement." *Id.* (quoting *Omnicare,* 575 U.S. at 189–90) (internal quotation marks omitted) (alterations and internal quotation marks omitted). "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.' " *Id.* (quoting *Omnicare,* 575 U.S. at 189).

Further, statements of opinion must be considered in the context in which they arise. Particularly in the context of formal documents filed with the SEC, " 'investors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments'; '[a]t the same time, an investor reads each statement within such a document ... in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.' " *Id.* (quoting *Omnicare,* 575 U.S. at 190). Moreover " 'the investor takes into account the customs and practices of the relevant industry' and ... 'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.' " *Id.* (quoting *Omnicare,* 575 U.S. at 190).

### 4. Scienter

**\*8** As noted, Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged,' " and "the court must take into account plausible opposing inferences." *ATSI*

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

*Commc'ns*, 493 F.3d at 99 (quoting 📙 *Tellabs*, 551 U.S. at 324). The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." 📙 *Tellabs*, 551 U.S. at 319 (quotation marks and citation omitted).

Plaintiffs "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." 📙 *ATSI Commc'ns*, 493 F.3d at 99. Where plaintiffs do not sufficiently allege that defendants had a motive to defraud the public, they "must produce a stronger inference of recklessness." 📙 *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." 📙 *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation and emphasis omitted). To qualify as reckless, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." 📙 *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting 📙⚠ *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)) (quotation marks omitted).

A plaintiff can establish recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." 📙 *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing 📙 *Novak*, 216 F.3d at 308). In other words, defendants have acted recklessly if they "understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." 📙 *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (quoting 📙 *Novak*, 216 F.3d at 308), *aff'd sub nom*, 📙 *Sanofi*, 816 F.3d 199. "The key, of course, is the honest belief of the management in the truth of information issued to the public." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 3d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom.*, 📙 *State Univ. Ret. Sys. of Ill. V. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009).

### 5. The PSLRA Safe Harbor for Forward-Looking Statements

The PSLRA amended the Exchange Act to provide a safe harbor for forward-looking statements. *See* 📙 15 U.S.C. § 78u–5(c). Forward-looking statements are defined as those that contain, among other things, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance," *Id.* § 78u–5(i)(1). A forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." 📙 *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories. *Id.* Materiality is defined above; the other two categories are defined as follows:

**\*9** *Meaningful cautionary language*: To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." 📙 *Id.* at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)). Language that is "vague" or "boilerplate" does not suffice. 📙 *Id.* at 772. "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.' " 📙 *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting 📙 *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). A plaintiff may establish that cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." 📙 *Halperin*, 295 F.3d at 359.

*Actual knowledge*: The scienter requirement for forward-looking statements—actual knowledge—is "stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof

Rein v. Dutch Bros, Inc., Slip Copy (2024)
2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

of knowing falsity." *Slayton*, 604 F.2d at 773 (quoting *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)) (internal quotation marks omitted). And under the heightened pleading standards, which apply to both scienter requirements, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.' " *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324).

### III. Discussion

Defendants move to dismiss all claims on two broad grounds: that (1) the challenged statements are not actionable, as each is either protected by the PSLRA safe harbor, a non-actionable statement of opinion, puffery, or an accurate statement of fact, Def. Br. at 19–22; and (2) in any event, in the AC does not adequately plead scienter, Def. Br. at 22–25.[3]

For the reasons that follow, defendants are correct on both points. The Court thus grants the motion to dismiss in its entirety.

#### A. Allegedly Actionable Statements

The Amended Complaint identifies 26 distinct statements —made in a range of fora—as allegedly materially false or misleading. The Court addresses these chronologically, sorting the communications at issue into eight groups.

#### 1. Statements Made During November 1, 2021 Earnings Call

On November 10, 2021, Dutch Bros issued a press release detailing its performance in the third quarter of 2021, ending on September 30, 2021. That day, Dutch Bros held a conference call with analysts and investors to discuss those results. The AC challenges the following four statements made on that earnings call:

**\*10**  • Ricci said, addressing the number of shops Dutch Bros opened in the third quarter of 2021: "A record 33 shops opened in this quarter, of which 30 were company-operated shops. The prior opening record was 26 shops in the fourth quarter of 2020, We achieved

this record despite the well documented industry supply chain challenges. The supply chain issues impacted everything from building materials to equipment to product." 11/10/21 Earnings Call Tr. 8; *see also* AC ¶ 56.

• Jemley said, in response to a question about why shop margins had been lower in third quarter 2021 versus the prior 12 months: "And you may have noted that we did take prices in early November, We have not taken any prices in our system of any significance since pre COVID. And so we've absorbed a little bit of general inflation, normal inflation, whether it's wage changes in markets that had legislated minimum wage, and they're getting to their last tiers or other general wage inflation, and we've been very thoughtful and careful about price escalation. And again, we've instituted a price increase to defend our margins going forward. So you've got both a seasonality aspect and then the lag of the current price increase versus what's happened inflationally over the last few quarters." 11/10/21 Earnings Call Tr. 13; *see also* AC ¶ 57.

• Jemley said, in response to a question about how to "think about the right [pricing] level in periods of outsized inflation"—whether to keep pricing higher to hold margins or price more modestly to protect traffic: "Okay. So historically, over the years, 1% to 2% pricing. And as I mentioned, very low pricing since pre COVID. The great thing, and Joth mentioned it in his script, that we have 12 ingredients. We have a—I don't want to simplify the supply chain and dismiss the great effort our teams make to get things to stores. But we don't have a complexity that others do, and therefore, we're not nearly as subject, at least to date, to the types of inflationary pressures that others are having. We believe that that price increase we just took will defend our margins again going into next year. And we want to just stay really focused on genuinely giving value to our customers, and we'll just monitor it, right? We don't have any hard and fast philosophy. It's an environment today where you've got to be able to pivot quickly, and that's the approach we'd like to take. I think we expect our margins to generally hold up. They are industry-leading, and we're very grateful to have that, and we'll watch this over time." 11/10/21 Earnings Call Tr. 14; *see also* AC 157.

• Jemley said, in response to a follow-up question on the previous answer asking what Dutch Bros' "basket of inflation was for commodity and labor in the third

quarter": "The basket is low single digits. And inflation, overall, it's very mild and tempered. And we don't say that thinking we're immune to the struggles that could happen going forward. But we've been very fortunate. Dairy is not really up, that's a big component of our cost structure. We're forward out on coffee, very long. And we have about a 3-bean blend that we can pivot around and manage our costs. And so we feel—we don't see the kind of pressure others are seeing." 11/10/21 Earnings Call Tr. 14; *see also* AC ¶ 58.

The AC pleads that the reason each statement is false or misleading is that Defendants failed to disclose, alongside it, that (1) they were "experiencing increased costs relating to commodities, including on dairy and petroleum," (2) as a result, Dutch Bros was experiencing "increased margin pressure and decreased earning and profitability," and (3) thus, "positive statements about [Dutch Bros'] business, operations, and prospects were materially misleading and/or lacked a reasonable basis." AC ¶ 60. The AC notes that in November 2021, at the time these statements were made, "inflation was skyrocketing," and "dairy prices were already rapidly rising (as opposed to being 'not really up'), with the USDA's 2021 all-milk price [ ] forecasted at $18.45 per cwt [hundredweight] in October (up from $18.15 per cwt in September) and 2022 all-milk price [ ] forecasted at $19.20 per cwt (up from $18.40 per cwt in September)." *Id.* It adds that, after the class period, Jemley "conceded that inflation actually 'began to show in Q2 of 2021.' " *Id.*

**\*11** These allegations, however, do not plead anything actionable under the PSLRA. As to the first two statements, the AC does not explain, let alone with particularity, how Ricci and Jemley's apparently accurate reports about Dutch Bros' shop openings and its price increase in Q3 2021 were made misleading by the absence of a reference to inflation. Even if "inflation was skyrocketing," AC ¶ 60, it would not make inaccurate the company's report as to the number of shops it had opened in that quarter. Nor can Dutch Bros' acknowledgment that its *lower* shop margins in 3Q 2021 were partially attributable to "what's happened inflationally" be fairly cast as misleadingly positive for failing to identify the actual inflation rates. *Cf.* 11/10/21 Tr. 13. At bottom, both statements recite apparently truthful statements about past events. And "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." 🏴 *Boca Raton Firefighters*, 506 F. App'x at 38–39 (quoting 🏴 *In re Sofamor Danek Group, Inc.*, 123 F.3d 394,

401 n.3 (6th Cir. 1997)); *see also Nadoff v. Duana Reader, Inc.*, 107 F. App'x 250, 252 (2d Cir. Aug. 17, 2004) ("Accurate statements about past performance are self evidently not actionable under the securities laws[.]").

As to the third statement, by Jemley, it is one of opinion: Jemley's comment captures his expressed "belie[f] that that price increase [Dutch Bros had] just t[aken] [would] defend [their] margins again going into next year." 11/10/21 Tr. 14. For this statement to be actionably false or misleading, the AC would need to plead either that Jemley did not actually hold this opinion or that the facts in support he referenced were untrue. *See* 🏴 *Sanofi*, 816 F.3d at 199. The AC relies on its contention that inflation and increased commodity costs were already evident in November 2021. *See* AC ¶ 60. But this argument does not say anything about whether Jemley then genuinely believed that price increases could enable Dutch Bros to preserve its margins "going into [the] next year." 11/10/21 Tr. 14. And Jemley's post–class period statement that inflation "began to show in Q2 of 2021" does not connote a disingenuous belief that Dutch Bros could effectively preserve its margins through price increases.

*See* 🏴 *Sanofi*, 816 F.3d at 211 (no liability where opinion statements did not conflict with information in possession at time statements were made). Further, the AC does not impugn as false or misleading the facts Jemley cited in support of his opinion: that Dutch Bros had relatively fewer inputs subject to inflationary pressure or supply chain issues than others in the market, and that, "to date" in November 2021, these inputs had not faced intense inflationary pressures. *Id.*; *see also* AC ¶ 60. That dairy and petroleum costs were rising is consistent with—if not the impetus for—Jemley's statement.

*See* 🏴 *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589–90 (S.D.N.Y. 2016) (opinion statement not actionable under PSLRA where operative complaint did not allege any facts cited in stating opinions were themselves false).

Finally, as to the fourth statement, the AC does not adequately plead that Jemley's statement about Dutch Bros' "basket of inflation" was false or misleading. In selectively quoting the statement, the AC tellingly omits its factual crux: that Dutch Bros' "basket of inflation" was in the low single digits. *Compare* AC ¶ 58, *with* 11/10/21 Earnings Call Tr. 14. The general, qualitative statements that followed—that inflation "overall" was "very mild and tempered," and that dairy prices specifically were "not really up"—must be read in conjunction with that quantitative disclosure. *See* 17 C.F.R. § 240.10b–5 (unlawful to "omit to state a material

Rein v. Dutch Bros, Inc., Slip Copy (2024)
2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

fact necessary in order to make the statements made, *in light of the circumstances under which they were made*, not misleading" (emphasis added)). No facts pled in the AC contradict that factual statement. *See generally* AC ¶ 60. And the AC does not plead that other species of data bearing on inflation—regarding the Consumer Price Index ("CPI"), or dairy products, or some other "basket" of goods—were necessary to make Jemley's statement non-misleading.

*See* 🔖 *Matrixx Initiatives, Inc.*, 563 U.S. at 44–45. On the facts pled, that statement, made in response to an investor's question of "can you share maybe what your basket of inflation was for commodity and labor in the third quarter?" 11/10/21 Tr. 13, was not misleading. On the contrary, Jemley's answer gave reasonable investors additional context for his more subjective statements that inflation was "mild" and dairy prices were "not really up." *See, e.g.*, 🔖 *In re Sanofi-Aventis Sec. Litig.*, No. 07 Civ. 10279 (GBD), 2009 WL 3094957, at *5 (S.D.N.Y. Sept. 25, 2009), *on reconsideration*, 2010 WL 2985912 (S.D.N.Y. July 27, 2010) ("[T]aken in context with the publicly available data, defendants' conclusions that the negative side effects were 'relatively mild and self-limiting' and their other characterizations, amount to little more than expressions of opinion which are not actionable misstatements under Rule 10b–5."); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 488 n.8 (D. Conn. 2013) ("[A] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysist and investors can draw their own conclusions about the company's condition[.]"). Accordingly, the AC does not adequately plead that this statement was false or misleading.

### 2. Statements Made in November 12, 2021 Quarterly Report

**\*12**  Rein next challenges three statements from Dutch Bros' third-quarter 2021 Form 10-Q, filed with the SEC on November 12, 2021. AC ¶¶ 61–64. These are:

- Under the "Commodity Risks" subsection of the broader "Quantitative and Qualitative Disclosures about Market Risk" section, the form states: "Our profitability is dependent on, among other things, our ability to anticipate and react to changes in the costs of key operating resources, including beverage, energy and other commodities. We have been able to partially offset cost increases resulting from several factors, including market conditions, shortages or interruptions in supply due to weather or other conditions beyond our control, governmental regulations and inflation, by increasing our menu prices, as well as making other operational adjustments that increase productivity. However, substantial increases in costs and expenses could impact our operating results to the extent that such increases cannot be offset by menu price increases." 11/12/21 Form 10-Q at 46; *see also* AC ¶ 61.

- Under the "Impact of Inflation" subsection of the same section, the form states: "The primary inflation factions affecting our operations are commodity and supplies, energy costs, and materials used in the construction of company-operated shops. Our leases require us to pay taxes, maintenance, repairs, insurance, and utilities, all of which are generally subject to inflationary increases. Finally, the cost of constructing our restaurants is subject to inflation, increasing the costs of labor and materials, and resulting in higher rent expense on new shops.

  While we have been able to partially offset inflation and other changes in the costs of core operating resources by gradually increasing menu prices, coupled with more efficient purchasing practices, productivity improvements and greater economies of scale, there can be no assurance that we will be able to continue to do so in the future. From time to time, competitive conditions could limit our menu pricing flexibility. In addition, macroeconomic conditions could make additional menu price increases imprudent. There can be no assurance that future cost increases can be offset by increased menu prices or that increased menu prices will be fully absorbed by our guests without any resulting change to their visit frequencies or purchasing patterns. In addition, there can be no assurance that we will generate same shop sales growth in an amount sufficient to offset inflationary or other cost pressures." 11/12/21 Form 10-Q at 46–47; *see also* AC ¶ 62.

- Under the "Risk Factors" section, the form states: "We also purchase significant amounts of dairy products, particularly milk, to support the needs of our shops. Additionally, and although less significant to our operations than coffee or dairy, other commodities, including but not limited to plant-based 'milks,' tea, sugar, syrups, energy and packaging material, such as plastics, corrugate, and canning materials, are important to our operations. Increases in the cost of dairy products and other commodities, such as petroleum which in turn

Pl. Appx. B-226

Rein v. Dutch Bros, Inc., Slip Copy (2024)

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

may increase the cost of our packing materials, or lack of availability, whether due to supply shortages, delays or interruptions in processing, or otherwise, especially in international markets, could harm our business." 11/12/21 Form 10-Q at 58; *see also* AC ¶ 63.

**\*13** The AC alleges that these statements were false or misleading essentially for the same reasons as the statements challenged in the November 10, 2021 Earnings Call. *See* AC ¶ 64.

For substantially the same reasons as above, the AC falls far short of pleading with the required particularity that these statements were false or misleading. On the contrary, based on the pleadings, each presented a measured assessment of the state of play as of the end of the third quarter of 2021: Dutch Bros had thus far coped with increased costs by increasing prices, but this strategy was not assured of success going forward, with rising dairy, coffee, and petroleum prices presenting a particular risk to "harm [Dutch Bros'] business." 11/12/21 Form 10-Q at 58. The AC characterizes these excerpts as misleadingly "positive statements about the Company's business, operations, and prospects," AC ¶ 64, but the qualified and caveated quality of nearly every full sentence in the Form 10-Q belies that characterization.[4]

Moreover, these challenged statements fall comfortably within the PSLRA safe-harbor, as they are both forward-looking and replete with meaningful cautionary language. "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.' " *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). Here, the allegedly undisclosed risk is addressed squarely by the cautionary language, as both address the potential impact on Dutch Bros' future margins should petroleum and dairy costs continue to rise. In its Form 10-Q, Dutch Bros elaborated on its then-strategy for handling inflation, but it repeatedly qualified that discussion with the caveat that increased petroleum, dairy, and other costs could defeat that strategy. Those candid assessments are not actionable under the PSLRA. *See, e.g.*, *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) (meaningful cautionary

language satisfied PSLRA safe-harbor requirement where it warned that "[p]roject's economic viability [was] subject to risks regarding capital costs, the very risks which ultimately materialized."); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 216–217 (S.D.N.Y. 2022) (company-specific warnings concerning significant uncertainty of "the timing and cost of the construction" of certain project sufficient to invoke safe harbor in case alleging fraud based on the same); *Olkey v. Hyperion 1999 Term Tr.*, 98 F.3d 2, 5 (2d Cir. 1996) (defendant not liable where it gave "prominent and specific" cautions regarding "exactly the risk the plaintiffs claim was not disclosed"). To the extent Reins claim is that Dutch Bros' failure to refer to specific inflationary rates precludes the PSLRA safe-harbor defense, that is wrong. The absence of that level of precision could not have misled a reasonable investor to think that the risk presented by increased commodity costs did not exist. *See In re Delcath Sys.*, 36 F. Supp. 3d at 333.

**\*14** Rein's attempt to salvage these claims by alleging Item 303 violations is unavailing, for multiple reasons. At the threshold, because the above statements are not false or misleading, the Supreme Court's recent decision in *Macquarie Infrastructure Corporation v. Moab Partners, L.P.*, 144 S. Ct. 885 (2024), appears to bar such a claim, insofar as it precludes claims based solely on an alleged Item 303 violation. *Id.* at 889 (Item 303 cannot support a private action under Rule 10b-5(b) "even if the failure does not render any 'statements made' misleading). Moreover, the AC's Item 303 arguments fail on their own terms. It alleges that Dutch Bros' inclusion of more specific disclosures in SEC filings after its financial troubles in the first quarter of 2022 shows that the above earlier disclosures did not "sufficiently convey the then-present risk that rising dairy and commodities prices were significantly outstripping Dutch Bros' pricing and/or margins" during 2021. AC ¶¶ 99, 101. But that argument rests on a logical fallacy. Dutch Bros' first quarter 2022 SEC filings report a "jump" in dairy and gas prices in 2022 that outpaced the company's pricing model, with adverse consequences including margin pressure. *Id.* ¶¶ 98, 100. These filings thus revealed that the very risk that the company had identified in its third quarter 2021 report had transpired: that "substantial increases in costs and expenses could impact our operating results to the extent that such increases cannot be offset by menu price increases." *Id.* ¶ 61. If anything, Dutch Bros' 2022 filings reflect the foresightedness of its 2021 filings.

The AC thus does not adequately plead that any statement in the November 12, 2021 Quarterly Report are actionable.

### 3. January 10, 2022 Form 8-K & January 11, 2022 Conference Interview

The AC alleges that the following statements in Dutch Bros' Form 8-K, filed with the SEC on January 11, 2022, and in an interview of Ricci the same day at an industry conference commenting on the material in the Form 8-K, were materially false or misleading: [5]

- A press release submitted with the Form 8-K quoting Ricci as "stating that Dutch Bros' '2020 and 2021 shop classes are performing at or above our volume expectations and within our margin expectations,' and that the Company expected 'fourth quarter revenue to exceed the upper end of the previously provided guidance, with mature shop level margins in line with expectations.' " AC ¶ 65. [6]

- Ricci, when asked by an interviewer at the conference to talk about "any supply chain challenges that you're facing" said: "You know we've certainly see things get a little bit better as the ports have freed up on the west coast and [ ] You know doesn't mean we aren't having challenges, but we know nothing that's gotten in the way of our ability to serve the customer, you may get a cup that doesn't have any printing on it, because the ink isn't available or the lid on our cups used to be blue now they're white because you can't get them[.] You know color differently, but you know, fortunately, our team's done a great job of managing some of the challenges that they've had they've gotten creative[.] And we haven't had the issues I you know we look at supply chain and inflation, I think the one area we're probably most concerned about is freight[.] And we seem to be doing pretty well on the cost of goods side and working with our suppliers on that end but afraid, as we grow across the country I think we're realizing[.] You know how much that impact is going to have you know, on us and learning about what the long term might look like." 1/11/2022 ICR Conference Tr. 7; *see also* AC ¶ 67.

The AC asserts that these statements were materially false or misleading on essentially the same grounds as it challenges the November 2021 statements. The AC adds that:

[A]t the time each statement was made, the macroeconomic conditions plaguing the U.S. economy and, in turn, Dutch Bros' business, were (as opposed to "get[ting] a little bit better") getting far worse, as the FOMC and Federal Reserve Chair Powell had now explicitly recognized inflation was not "transitory," Powell stated his expectation that elevated inflation would persist through "the middle of" 2022, and the CPI was up 6.8% year-over-year in November. At the time each statement was made, dairy prices were also rapidly rising, with the USDA's 2021 all-milk price was forecasted at $18.60 per cwt in December (up from $18.50 per cwt in November) and 2022 all-milk price was forecasted at $20.75 per cwt (up from $20.25 per cwt in November). Indeed, CW1 recalled that in or around December/late 2021, CW1's team was tasked with finding solutions to the issues of rising dairy costs and tighter dairy supply.

**\*15** *Id.* ¶ 68.

There is, however, a mismatch between the fact that the AC faults Dutch Bros for omitting (national inflationary trends) and the statements it challenges (the press release and Ricci's comments on Dutch Bros' metrics and performance during a discrete timeframe). "[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as 'what was revealed would not be so incomplete as to mislead.' " *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) (quoting *In re Bristol Myers*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)). Here, the company discussed shop margins for the fourth quarter of 2021 in a press release (margins which the AC does not contend were errantly reported or below the company's targets, *cf.* AC ¶¶ 102–09) and referenced inflation in passing during an interview response with respect to how supply chain issues had affected the company.

Rein v. Dutch Bros, Inc., Slip Copy (2024)

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

Addressing those distinct points did not oblige Dutch Bros to comment on "macroeconomic conditions plaguing the U.S. economy." AC ¶ 68; *see also Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 409 (S.D.N.Y. 2020) (where statement did not touch on certain compliance measures, not misleading to omit facts regarding those measures); *In re Ferroglobe PLC Secs. Litig.*, 19 Civ. 629 (RA), 2020 WL 6585715, at *7 (S.D.N.Y. Nov. 10, 2020) ("Ferroglobe's statements about macro-trends within its industry did not require an accompanying disclosure about the ancillary issues of pricing issues from that quarter. Nor did the mere mention of the concept of demand trigger a duty to disclose the Company's current financial health.").

The AC's references to statements by a confidential witness (CW1) do not alter this analysis. *See* AC ¶ 68. CW1's allegations—that the CW1's team was tasked with finding solutions to rising dairy costs and tighter dairy supply— are not in tension with the challenged statements. *See id.* Nowhere in the challenged comments from early 2022 did Dutch Bros suggest that dairy was not a concern on which it was deploying resources. On the contrary, in the interview, Ricci stated that "our team's done a great job of managing some of the challenges that they've had they've gotten creative" and that "we seem to be doing pretty well on the cost of goods side and working with our suppliers on that end." *Id.* ¶ 67. These comments fairly conveyed that the company was addressing the cost of goods and that he believed the team working on finding solutions to rising dairy costs had thus far done a good job.

**\*16** The AC thus fails to adequately plead that these comments were false or misleading.

### 4. March 1, 2022 Earnings Call

The AC next challenges two sets of statements made during a March 1, 2022 conference call with analysts and investors to discuss the content of the Form 8-K that Dutch Bros filed with the SEC that same day, which reported the company's performance during the fourth quarter (and thus the entirety) of 2021. AC ¶ 69. The first set consists of these:

- During the call, Ricci said: "While we are not immune to margin pressures but are managing it appropriately, we continue to look for operational improvements and further opportunities in our market-based pricing model. In addition, we will use segmentation, personalization

and innovation to excite our customers about our unique premium and, at times, higher-margin beverage offerings. In November, we successfully took a modest price increase of 2.9%. It was our first since prior to the pandemic and was well received by our customers, operators and franchisees." 3/1/2022 Earnings Call at 6; *see also* AC ¶ 70.

- Jemley stated: "[A]s we moved through the pandemic, we were very careful not to escalate our menu prices. In November, we took a modest price increase, which was our first measurable price increase in over a year for our company shops. That price advance landed well for us. It was appropriate relative to our desired positioning in the market .... Let's quickly look at the movement in beverage, food and packaging costs and labor costs, given those are the 2 most significant costs, and the industry in general has been challenged by these 2 areas over much of 2021. Beverage, food and packaging costs increased from 22.4% to 25.3% or 290 basis points. 120 basis points of that increase is related to the change in discounts. That leaves 170 basis points of real changes." 3/1/2022 Earnings Call at 8–9; *see also* AC ¶ 71.

- Jemley stated with respect to the fourth quarter of 2021: "Beverage, food and packaging costs increased from 22.9% to 26.8% or 390 basis points. 190 basis points of this increase is related to the change in discounts. That leaves 200 basis points of real change or 30 basis points more than the full year trends noted above. Two things to point out: first, we incurred a bit more ingredient costs, driven by inflation; and second, accelerating new shop development means we will have some cost efficiencies as we open up new shops and establish logistics in new markets .... We made the conscious decision to accelerate growth in the fourth quarter and into 2022. And while we always try to balance the profit growth equation in the near term, we are also keen to focus on long-term high-quality revenue that will yield lasting profit and growth." 3/1/2022 Earnings Call at 9–10; *see also* AC ¶ 71.

The AC claims that these statements gave a falsely positive impression of the company's financial situation without taking into inflationary pressure that it alleges was, by March 1, 2022, "decimat[ing] the Company's projected earnings and margins." AC ¶ 76.

These statements, each made during introductory remarks to a call summarizing fourth quarter and full-year performance, are not actionable. Each reported recent performance and

Rein v. Dutch Bros, Inc., Slip Copy (2024)

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

associated data. The AC does not allege that any of the data cited by Ricci and Jemley, or their limited commentary on it, was inaccurate. The AC instead emphasizes that later statements by Dutch Bros situated its troubles combatting inflation as starting during the first quarter of 2022. *See id.* But that does not put in question the accuracy of the historical data set out by Jemley or Ricci with respect to Q4 or year-end 2021 performance. Accurate statements of historical data are not a basis for Rule 10b-5 liability. *See* 🔖 *Boca Raton Firefighters*, 506 Fed. App'x at 38–39.

**\*17** The AC also challenges these statements from the March 1, 2022 Earnings Call:

- Jemley, when asked by a researcher if he anticipated additional price increases beyond the relatively modest one Dutch Bros had already implemented, stated: "So we look typically in a normal time frame. We're going to look at our pricing windows every 6 months, right, in the fall before holiday, in the spring before summer. And so we're very mindful of that. I think we've been fortunate to not have a lot of inflation drag, both in '21 and frankly, moving into early '22. And so we haven't felt compelled. We don't price to a margin. First of all, we want to price to what consumers are willing to pay. And so we're just—honestly, we're flexible and we're watching that closely, but we do, with the mindset of our relative position in the market and the customer, not to seek to a margin level. But we are feeling good as we enter '22 with the trajectory of our margins, given everything going on." 3/1/2022 Earnings Call at 15; *see also* AC ¶ 73.

- Jemley said, when asked "what guidance might be for the first quarter or the full year '22 on that restaurant operating margin line" given inflationary pressures: "Yes. So we're fortunate that the 2 big costs, cost of goods and labor, we don't have any real significant upward momentum in the labor line. So we're starting halfway better than everybody else, to begin with. And then secondly, we have a pretty simple pantry of goods. What we're really dealing with right now is freight and logistics costs going up. But we're able to do, as we've shown in Q4 and the walk I gave you in COGS, we're really able to handle that pretty effectively, and we'll get a full quarter of the price impact from November in our Q1. In terms of guiding a specific margin for Q1, I'd prefer not to do that, It is a—Q4 is the lowest seasonality, Q1 is the next lowest seasonality. And then we kind of get into Q2. But I just think from a—other than

the discount rollover from a year-over-year perspective, we're just not feeling compression in margins. And the biggest thing for us is our labor costs are stable." 3/1/2022 Earnings Call at 16; *see also* AC ¶ 74.

- Jemley said, in response to a questioner "looking to better contextualize the guidance [Dutch Bros had provided] for 1Q [2022]": "Yes. It was softer in January. It was better in February, less outages. We're sitting ahead of the mid-singles right now. We're—like everybody, don't know where the world is going to go over the next 30 days with all that's going on. And so we're just being a little tepid about how we look at things. It doesn't really move the needle much. The biggest revenue driver is annualization of new stores and new stores getting added. So it gets a lot of talk track and it is important to the underlying health of the business, but it's really not that financially meaningful right now as fast as we're growing the top line. That's why we don't -- we try not to overthink it." 3/1/2022 Earnings Call at 17; *see also* AC ¶ 75.

The AC alleges that these statements were materially false or misleading because Dutch Bros did not disclose the effect of increased dairy and petroleum costs: "[D]espite reassuring the market two-thirds of the way through 1Q22 that the 1Q22 results would be positive, and, in particular, that the Company's margins were healthy and not being compressed," the company later "reveal[ed], on May 11, 2022, that rising inflation and commodities prices had, in truth, decimated the Company's projected earnings and margins in 1Q22." AC ¶ 76.

**\*18** This claim fails for multiple reasons. First, the AC simplistically describes the above language as "reassuring the market two-thirds of the way through 1Q22 that the 1Q22 results would be positive." *Id.* Reading the statements on the call in full and in context, they were more nuanced and qualified. Jemley noted that Dutch Bros had "been fortunate to not have a lot of inflation drag, both in '21 and frankly, moving into early '22," but that positive assessment was supported by the company's performance data and not contradicted by any data cited in the AC. And the speakers' guardedly optimistic statements about the company's anticipated performance and margins were by and large conditional. 3/1/2022 Earnings Call at 15–17. Jemley stated that Dutch Bros was "feeling good as we enter '22 with the trajectory of our margins, *given everything going on*[,]" *id.* at 15 (emphasis added), adding that "*from a year-over-year perspective*, we're just not feeling compression in margins,"

Rein v. Dutch Bros, Inc., Slip Copy (2024)

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

*id.* at 16 (emphasis added). But, he added that Dutch Bros was remaining "flexible" as the company could not "know where the world is going to go over the next 30 days with all that's going on," *id.* at 16–17, and that the executives could evaluate the impact and efficacy of the company's pricing strategy to deal with cost of goods increases only after they received "a full quarter" of data "regarding the price impact from November [2021] in our Q1[,]" *id.* at 16. Contrary to the AC's characterization, these statements were not blanket assurances of a positive future.

Second, the AC is wrong to treat negative developments in 1Q22—in which Dutch Bros experienced accelerating "macroeconomic headwinds" that overtook its new-shop and price-oriented strategy for combatting inflation—as undermining what was said on the March 1 earnings call. The AC does not clearly situate these developments (and Dutch Bros' recognition of them) as having occurred as of March 1. Rather, it appears to situate this development in mid-March. *See, e.g.*, AC ¶¶ 91 (mid-March 2022), 104 (quoting Ricci as referencing mid-March as point when sales took a turn), 110 (same). The opinion statements of guarded optimism on the March 1 call cannot be impeached as false or misleading based on events that had not yet occurred or information that was not yet known to the speaker. *See* 🔖 *Vivendi, S.A.*, 838 F.3d at 262 ("Fraud depends on the state of events when a statement is made, not on what happens later.") (quoting 🔖 *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010)).

The AC thus fails to plead actionable statements during this earnings call.

### 5. March 9, 2022 Conference Interview

The AC next contends that the following statements made at a March 9, 2022, Bank of America–sponsored conference were materially false or misleading:

- Asked whether he was worried about higher gas prices, among other things, Jemley responded: "I think we are concerned about the environment around us as citizens. But for Dutch Bros, we're not greatly concerned about elevated energy prices and people's ability to still come and enjoy Dutch. We feel like that would be one of the latter places that people would decide not to spend money on. Elevated energy affects our freight cost, but

its—but we don't see it affecting our sales demand in the near term." AC ¶ 77.

- Asked about Dutch Bros' "moderate" pricing relative to peer companies given rising costs, Jemley responded: "[B]ecause we have a beverage-only menu, we have the power of good margins going in. We are not using margin on food, for example. So that set some context to why we sort of feel like we can give people a great value at a reasonable price .... Secondly, from a margin shape perspective, and Joth will talk about our cadence of how we actually think about price increases, but everybody's mind is around 2 things moving: one is commodity costs, and in our business that's cost of goods and labor. And really because we began this journey in a really good place with our culture and the take home pay that our people have and everything we do for our people and about our people, we have not had wage escalation pressure .... So you take that—half of that pressure off the table from a margin perspective. And you really just dial the margin pressure into freight and logistics costs, in the cost of goods, which allowed us, we don't price to margin, we price to consumers' willingness to pay, but those things work together to really be able to take a moderate reasonable price increase back in November to kind of put us in a good spot going into this year." *Id.* ¶ 78.

**\*19** - Responding to the same question, Ricci stated: "[W]e're going to evaluate it every 6 months. We'll look at it in the spring as we head into the late spring and summertime, and then we'll look at it again in the fall as we head into the holiday season and really into winter. And we'll evaluate our costs, we'll evaluate our dynamic pricing differences between our sizes. We'll look at what we think our promotional menu will drive for us. And we'll kind of look at it holistically versus just looking at it as menu items that and a price increases. So we're going to take a lot of factors into consideration as we think about price. And yes, we're watching it every day. We're talking about it a lot, but we're also going to be considerate to the consumer." *Id.* ¶ 79.

These statements are akin to those highlighted from the March 1 Earnings Call, as is the AC's theory as to why they were materially false or misleading. In essence, Jemley and Ricci again stated, as they had eight days earlier, that (1) Dutch Bros was not immune to rising costs; (2) various factors, with those cited here including a lack of wage pressure, fewer ingredient inputs, and a general optimism surrounding

**Rein v. Dutch Bros, Inc., Slip Copy (2024)**

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

consumer behavior, made them guardedly optimistic that the company could weather rising costs without substantial price increases; and (3) Dutch Bros was monitoring the situation. These statements are not actionable for the reasons given above. The one statement in this instance that is arguably new is Jemley's that the company "felt" consumers would still want to "enjoy Dutch," and be loath to cut out drive-through coffee, notwithstanding rising gas prices. That opinion statement is not actionable; the AC does not impeach it as contrary to the speaker's actual views or contrary to undisclosed known facts. It is also inactionable puffery. *See, e.g.,* 📙 *Robeco Capital Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (general, optimistic statements from defendant such as "[we] feel like [at home fitness] is a trend that's here to stay" were "textbook" cases of corporate puffery); *Schaffer v. Horizon Pharma PLC*, No. 16 Civ. 1763 (JMF), 2018 WL 481851 (S.D.N.Y. Jan. 18, 2018) (statements that a defendant-company was "on track" and had a "unique commercial business model" were inactionable puffery); 📙 *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements of "optimism" about margins and expectations of good performance were puffery).

In challenging the March 9 statements, the AC notes a later statement by Ricci, on May 11, 2022, that:

> [I]n mid-March when gas prices jumped the way they did, we saw an immediate flip on our daily sales. It was almost to the day of the way that, that works. So I think you could infer—and we believe that we've done some analysis on the gas prices and influence related to our daily sales, and we believe it has influenced it. And we believe that if gas prices stay inflated, it will continue to influence it.

AC ¶ 80. The AC implies that this statement reveals that, as of March 9, 2022, gas prices had already jumped, and Dutch Bros' sales "flip" had already occurred, such that Ricci and Jemley's statements at the Bank of America Conference were false or misleading. *See id.* But the AC does not adequately plead facts supporting that thesis. Although March 9 surely

approaches "mid-March," the AC does not anywhere allege that by March 9, the company had experienced the "jump" in gas prices or the downward "flip" in its daily sales, *See id.* Nor does it plead that by March 9 Jemley or Ricci had access to, or that Dutch Bros had generated, data akin to that on which Ricci relied two months later in May 2022. Absent concrete allegations that facts then known contradicted the statements defendants made on March 9, the AC fails to plead that these statements were actionable. *See, e.g.,* 📙 *Rombach*, 355 F.3d at 174–75 (upholding dismissal under 📙 Rule 9(b) and PSLRA based on failure to plead specific evidence contradicting challenged statements concerning company's financial health); 📙 *ATSI Comm'cns, Inc.*, 493 F.3d at 106 (dismissing for failure to plead falsity element where complaint did not plead temporal facts sufficient to support this claim).

### 6. 2021 Form 10-K

**\*20** On March 11, 2022, defendants filed Dutch Bros' 2021 Form 10-K with the SEC. The AC challenges the following statements in that filing.

- Under the "Commodity Risks" subsection of the "Quantitative and Qualitative Disclosures about Market Risk", the form stated: "Our profitability is dependent on, among other things, our ability to anticipate and react to changes in the costs of key operating resources, including beverage, energy, and other commodities. We have been able to partially offset cost increases resulting from several factors, including market conditions, shortages or interruptions in supply due to weather or other conditions beyond our control, governmental regulations and inflation by increasing our menu prices as well as making other operational adjustments that increase productivity. However, substantial increases in costs and expenses could impact our operating results to the extent that such increases cannot be offset by menu price increases." 3/11/2022 Form 10-K at 75; *see also* AC ¶ 82.

- Under the "Impact of Inflation" subsection of the "Quantitative and Qualitative Disclosures about Market Risk" section, the form stated: "The primary inflation factors affecting our operations are commodity and supplies, energy costs, and materials used in the construction of company-operated shops .... While

Rein v. Dutch Bros, Inc., Slip Copy (2024)
2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

we have been able to partially offset inflation and other changes in the costs of core operating resources by gradually increasing menu prices, coupled with more efficient purchasing practices, productivity improvements and greater economies of scale ....” 3/11/2022 Form 10-K at 76; *see also* AC ¶ 83.

The AC does not plead facts plausibly suggesting that these qualified statements were false or misleading, let alone materially so. The AC attempts this showing by seizing on excerpts of the Form 10-K. It notes, for example, the start of a sentence that begins, “*[w]hile* [Dutch Bros] ha[d] been able to partially offset inflation and other changes in the costs of core operating resources” by increasing prices in addition to other tweaks around the edges. AC ¶ 83 (quoting 3/11/2022 Form 10-K at 76) (emphasis added). But it omits the critical qualifiers that follow, such that the passage reads in full:

> While we have been able to partially offset inflation and other changes in the costs of core operating resources by gradually increasing menu prices, coupled with more efficient purchasing practices, productivity improvements and greater economies of scale, *there can be no assurance that we will be able to continue to do so in the future.* From time to time, competitive conditions could limit our menu pricing flexibility. In addition, macroeconomic conditions could make additional menu price increases imprudent. There can be no assurance that future cost increases can be offset by increased menu prices or that increased menu prices will be fully absorbed by our guests without any resulting change to their visit frequencies or purchasing patterns. In addition, there can be no assurance that we will generate same shop sales growth in an amount sufficient to offset inflationary or other cost pressures.

**\*21**  3/11/2022 Form 10-K at 76 (emphasis added). The portions that the AC cuts out overtly caution that the strategies Dutch Bros had thus far deployed to “partially offset inflation and other changes in the costs of core operating resources” might fail in the future. *Id.* The AC does not address, let alone explain, why these blunt risk disclosures, addressed at the very risk that it contends was concealed, are compatible with its claim of fraud. *See, e.g.*, *In re AppHarvest Sec. Litigation*, 2023 WL 4866233, at *41 (statements functioning as risk disclosures not false or misleading where they “warned investors of the types of risks inherent to businesses similar to [the defendant's]”).

The 2021 Form 10-K thus is not fairly pled as actionable.

### 7. April 6, 2022 Podcast Interview

The AC next challenges statements made by Ricci during a podcast interview published on April 6, 2022:

- Ricci stated, when asked about Dutch Bros’ competitive advantage over peer companies: “Our business is pretty simple, right? I mean, we keep a very simple ingredient base. We don't have ovens and kitchens and we're a drive-thru business. We have very few walk-in locations of the 575 locations we have today. We're really focused on doing what we do and doing it very, very well. We don't complicate it. A lot of people have talked about supply chain problems. In those issues that you're serving food and you have all of these 150 ingredients that maybe a classic QSR chain would have, we have basically 12 and then some extensions of that. So we're a simple model, we have a very simple menu. We have a core base of espresso and energy drinks and things like that.” AC ¶ 85.

- Ricci stated, when asked about how the IPO affected Dutch Bros: “Having done a few other public companies, I think that the structure and the discipline that being a public company creates, I think that makes you a better company. The infrastructure that you're, you know, really required to hire, the reporting that you're required to do, I think makes you better in everything else that you do. It forces you to look further out, it forces you to plan ahead, it forces you to be committed to a gameplan and be able to resource that. We're growing into that. We've put a lot of good people in place and we've added some great resources to the company over the last couple of

Pl. Appx. B-233   17

years to prepare for this, but I think we're still growing into that. I think our G&A still has some work to do." *Id.* ¶ 86.

- Ricci stated, when asked to discuss how "supply chain stuff, labor cost, commodity costs" "affects you, or maybe not as much as your peers or in others in the industry": "On the supply chain. You know, like I said earlier, we work with a pretty small ingredient base and so we're working very closely with a very small amount of suppliers that are doing that. Now, we've had the occasional trip up on a part for an ice machine or something that we could get and we've had to respond accordingly and be able to pivot, which our team again has done a great job of doing. We just certainly haven't seen the inflation or supply chain challenges that we've heard about with other companies, and it goes back to simple, right? I mean, the more simple the business, the more effective, and fortunately we have the numbers to back it up, and we sit in a pretty good spot." *Id.* ¶ 87.

- Ricci stated, when asked about Dutch Bros' financial situation: "Margin-wise, we've been told that our margin numbers and our EBITDA numbers are industry-leading, and maybe we'll let other people fill in the blanks related to that. But I think because our supply chain and our logistics and everything is so simple, you know we run a pretty efficient business with a lot of throughput." *Id.* ¶ 88.

**\*22** The AC alleges that these statements were materially false or misleading because they did not divulge relevant negative macroeconomic trends, and because by the time this interview was published, Q1 2022 had concluded—a quarter in which Dutch Bros later reported feeling the adverse effects of inflation on its profit margins. *See id.* ¶ 89.

Ricci's first two statements are plainly not actionable. In the first, he broadly described the company's business model. The AC does not dispute any fact referenced therein, nor explain why any was made misleading for failure to also address the subject of inflation. In the second, Ricci addressed how the IPO affected Dutch Bros, a subject even further afield from the impact of present-day inflation. *Cf.* 🔖 *Richman*, 868 F. Supp. 2d at 274.

The third and fourth statements do comment on conditions later in time, with the third stating that the company hadn't "seen the inflation or supply chain challenges that we've heard about with other companies" and that relatively speaking, "we

sit in a pretty good spot." The AC claims that these statements were misleading because, at some point towards the end of Q1 2022, Dutch Bros experienced a sharp increase in input costs as well as a drop in sales, putting pressure on its profit margins. *See* AC ¶¶ 102–111.

The passing reference to inflation in the third statement, however, is eclipsed by the more involved discussion elsewhere in the podcast interview of Dutch Bros' experience (or lack thereof) with supply-chain issues. And the AC does not allege that that discussion was misleading. *See* 🔖 *Sanofi*, 816 F.3d at 210 (statement or omission must be "misleading to a reasonable person reading the statement fairly and in context"). Read in context, that the discussion of supply chain issues contained a brief reference to inflation does not make the statement misleading for not having taken on the subject of commodities costs.

Further, to the extent the AC means to allege that these statements were misleading based on what was known to the company as of the moment in time the podcast aired, the AC lacks the specific time references necessary to support this claim. It does not allege when Ricci made the statements in the recorded podcast, as opposed to its air date of April 6, *see* AC ¶ 85. It does not allege that the podcast, the statements in which were largely big picture and historical, was made close in time to the air date. Nor does it that, whatever the date of Ricci's statements, Dutch Bros by then had experienced the adverse consequences that emerged late in Q1 (or tabulated its Q1 results). *See* ⚠️ *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016) (statements materially false and misleading only where alleged contradiction was apparent at time of statement). To the extent that Ricci's statements addressed the state of play before the "flip" in margins, these statements are compatible with the company's results. *See* 🔖 *Boca Raton Firefighters*, 506 F. App'x at 38–39. And to the extent that the AC faults Ricci's statements as falsely positive about future performance, they are forward looking, and not contradicted by well pled facts as to the speaker's knowledge at the time. *See, e.g.*, ⚠️ *Lopez*, 173 F. Supp. 3d at 39–41 (projections as to corporate earnings were forward-looking and preliminary even though made after the relevant quarter had closed); 🔖 *In re Lottery.com, Inc. Sec. Litig.*, No. 22 Civ. 07111 (JLR), 2024 WL 454298, at *19 (S.D.N.Y. Feb. 6, 2024) (same).

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

### 8. April 7, 2022 Interview

**\*23**  Finally, the AC challenges a statement made by Ricci contained in a podcast interview aired on the "Inside the Ice House" podcast feed on April 7, 2022. In response to a question as to whether Ricci saw "headwinds for your drive through [ ] from the recent rise in both coffee bean and gas prices," Ricci replied:

> A third of our business is done in espresso-based drinks. Coffee, technically, makes up a pretty small percentage of our overall cost of goods. We're not concerned about it. I think when you live in the coffee world, you're used to the C price going way up and way down and you just kind have to live in that commodity space, I think, related to fuel prices, most of our stands are, they are within a kind of a person's daily life, right? It's on the way to school or on the way to work or something that you're not going to stop doing anyway. I think that from the kind of the bubble that people live in, most of our stands to kind of work within that bubble. We'll see a little bit of hit related to kind of road trips. On the west coast, we have a stand that I hear about all the time in Davis, California. That's, if you're driving from the Bay Area to Tahoe, everyone says, "Well, I stop at that Dutch on my way to Tahoe," Well, the road trip may go down a little bit here as gas prices are high but I think for daily living, I wouldn't expect us to see much of a change.

AC ¶ 90. The AC contends that this statement was materially false or misleading because it projected a positive picture of Dutch Bros' business model without disclosing the difficulties presented by inflation and other macroeconomic trends, as surfaced late in Q1 2022. *Id.* ¶ 91.

For much the same reasons as above, the AC does not plead facts making this statement actionable, The AC does not plead when Ricci made the statements at issue, as opposed to the date the podcast became available, nor how that date compared to the date when Ricci became aware of the extent to which inflation had cut into Q1 profit margins. More important, the statement the AC challenges is forward-looking. Ricci projects how a "recent rise in coffee bean and gas prices" would affect Dutch Bros' business in the future. *See id.* ¶ 90. The AC does not plead that Ricci's generally put projection—that the company's future business would take "a bit of a hit" because "gas prices are high" causing "road trip[ ]" to "go down a little bit," but would not experience "much of a change"—was disbelieved by Ricci at the time it was made. *See id.* ¶¶ 90–91. This forward-looking

statement is thus a non-actionable of opinion and a statement protected under the PSLRA safe-harbor. *See* 🚩 *Slayton*, 604 F.3d at 777 (forward-looking statements protected by PSLRA safe-harbor where facts pled made it at least equally likely defendants did not know statements false at time made).

\* \* \*

For the above reasons, the AC does not adequately plead that any statement it challenges was materially false or misleading. That defeats all claims, both as to primary liability under Section 10(b) and Rule 10b-5, and secondary liability under Section 20(a). *Bristol-Myers*, 2023 WL 2308151, at \*9. For completeness, however, the Court assesses defendants' challenge to the AC's scienter allegations.

### B. Scienter

To adequately plead scienter, the AC must include sufficient allegation to raise a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The AC's relevant allegations are as follows. It alleges that Ricci and Jemley had a monetary motive to artificially inflate Dutch Bros' share price, based on the quantity and timing of their sales of stocks during the class period. *See* AC ¶¶ 136–139. It further alleges that a strong inference of scienter is shown by the individual defendants' high-level positions within Dutch Bros, by statements they made during and after the class period, by allegations from CW1, and by Ricci's January 2024 departure. *Id.* ¶¶ 140–50. As to Dutch Bros, the AC pursues a theory of *respondeat superior*, based on the scienter of the individual defendants. *Id.* ¶¶ 151–52. These allegations, however, do not support—more than the opposite inference —that the defendants acted intentionally or recklessly. *See* 🚩 *ATSI Commc'ns*, 493 F.3d at 99.

**\*24**  The Court's analysis begins with the stock sales, which the AC terms unusual. It alleges that Jemley and Ricci, capitalizing on Dutch Bros' artificially high share price, each sold shares on two days between the end of their lock-up agreements on March 4, 2022 and Dutch Bros' "corrective disclosures" on May 11, 2022, as follows:

**Charles L. Jemley Stock Sales[1]**

| Transaction Date | Shares Sold | Price Per Share |
|---|---|---|
| **CLASS PERIOD SALES** | | |
| 03/15/2022 | 1,600 | $47.89 |
| 03/15/2022 | 8,274 | $48.58 |
| 03/15/2022 | 5,126 | $49.35 |
| 04/05/2022 | 2,790 | $53.46 |
| 04/05/2022 | 1,400 | $54.04 |
| 04/05/2022 | 310 | $55.39 |
| 04/05/2022 | 400 | $56.61 |
| 04/05/2022 | 100 | $57.74 |
| **Total:** | **20,000** | |
| **POST–CLASS PERIOD SALES** | | |
| 08/15/2022 | 35,305 | $45.79 |
| 08/15/2022 | 47,995 | $46.61 |
| 08/15/2022 | 1,700 | $47.25 |
| **Total:** | **85,000** | |

**Jonathan Ricci Stock Sales[1]**

| Transaction Date | Shares Sold | Price Per Share |
|---|---|---|
| **CLASS PERIOD SALES** | | |
| 03/07/2022 | 37,918 | $45.39 |
| 03/07/2022 | 22,395 | $46.65 |
| 03/07/2022 | 10,312 | $47.26 |
| 03/07/2022 | 500 | $48.40 |
| 05/09/2022 | 38,532 | $41.66 |
| 05/09/2022 | 8,534 | $42.68 |
| 05/09/2022 | 22,859 | $43.66 |
| 05/09/2022 | 1,200 | $44.34 |
| **Total:** | **142,250** | |
| **POST–CLASS PERIOD SALES** | | |
| 08/15/2022 | 27,211 | $45.73 |
| 08/15/2022 | 42,939 | $46.64 |
| 08/15/2022 | 975 | $47.23 |
| 02/01/2023 | 67,817 | $36.67 |
| 02/01/2023 | 35,817 | $37.51 |
| 02/01/2023 | 56,366 | $38.57 |
| 08/01/2023 | 79,538 | $30.29 |
| 08/01/2023 | 462 | $30.86 |
| **Total:** | **311,125** | |

*See* Wu Decl., Exs. 14, 16. Significantly, Forms 4 supplied by defendants reveal that all of Jemley and Ricci's intra-class period sales were made pursuant to non-discretionary Rule 10b-5-1 plans. *See id.*, Exs. 13 (Ricci), 15 (Jemley).

These trades do not raise a strong inference of scienter. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, [and] the change in volume of insider sales[.]" *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020). It is undisputed that, during the class period, Ricci and Jemley sold 6.7% and 2.1% of their respective total holdings. *See* Def. Br. at 25 & n.11; PL Br. at 20 n.13; Def. Reply Br. at 9. These relatively modest figures are well below the proportion of a defendant's holdings which has been held sufficient to give rise to an inference of fraudulent intent. *See, e.g., City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd*, 565 F. Supp. 3d 478, 487–88 (S.D.N.Y. 2021) (no inference of scienter where defendants sold off 4% and 20%, respectively, of their holdings); *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (same where defendant sold 65% of shares); *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (same where defendant sold 44% of shares).

Rein fairly notes that Ricci was limited at all relevant times, under SEC Rule 144, to selling a maximum of 210,526 shares in any three-month period, such that he sold about 67% of the shares he *could have* sold. *See* PL Br. 21–22; *cf. In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) ("[T]he decisive question in assessing whether an insider's sales are indicative of scienter is how many shares the insider sold during the class period relative to the total number of shares that he or she *could have* sold."). But on the facts here, that point does not assist Rein, because Ricci forewent selling about 100,000 shares that he legally could have sold, suggesting that, to a significant extent, he "forwent [ ] the opportunity to turn a profit before disclosure of concealed bad news." *Id.* And the AC does not allege that Jemley was similarly limited, dimming any suspicious inference from his modest trading.

The AC therefore chiefly alleges that defendants' trades were suspicious not based on their sized but based on their timing. Some of each individual defendant's stock sales, it notes, occurred later in the class period, in Jemley's case five weeks (April 5, 2022) before the May 11, 2022, disclosure of its

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

lackluster first quarter 2022 performance, and in Ricci's case two days (May 9, 2022) before that date. But an inference of scienter derived from the timing of trades does not follow here. As the Form 4s for Jemley and Ricci demonstrate, these trades were each made pursuant to non-discretionary Rule 105b-1 agreements, entered into long before the company's struggles coping with inflation crystallized. *See* Wu Decl., Exs. 13, 15; *see also* AC ¶ 128 (Ricci entered into agreement on December 7, 2021, and Jemley on December 9, 2021). As the Second Circuit has held, "sales conducted pursuant to a 10b5-1 trading plan [cannot] be *timed* suspiciously[.]"

🚩 *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355–56 (2d Cir. 2022) (emphasis added). To be sure, "the mere existence of a trading plan will not defeat an otherwise strong inference of scienter where, as here, the plans were entered into during the class period[,]" *In re Aratana*, 315 F. Supp. 3d at 764. But the AC does not contain independent allegations supporting such an inference, but instead relies heavily on the timing of the stock sales. And the AC does not allege that the 10b5-1 agreements were suspect. The AC thus does not plausibly plead a financial motive on the individual defendants' part to conceal the challenges that inflation presented for Dutch Bros.

**\*25** Absent viable pleadings as to motive, the AC bears a "correspondingly greater burden in alleging conscious misbehavior or recklessness." *In re Aratana*, 315 F. Supp. 3d at 765 (quoting 🚩 *ECA*, 553 F.3d at 198–99) (internal quotation marks omitted). It does not carry that burden. The AC's remaining argument as to scienter is that inflation and other macroeconomic headwinds must have been damaging Dutch Bros' business long before defendants admitted as much, and that defendants, by virtue of their executive positions, must have known this, making their more positive assessments during the class period "conscious misbehavior or recklessness." *See* AC ¶¶ 140–50. But the AC lacks specific allegations to this effect. It does not specify the contrary information defendants ostensibly had at the time of the challenged statements.

That is fatal here. To adequately allege scienter circumstantially, a complaint must "specifically identify the reports or statements containing this information," *In re Aratana*, 315 F. Supp. 3d at 765. For example, "[w]ith respect to sales data and reports, pleadings are sufficiently specific

where the plaintiffs have alleged who prepared the reports, how frequently they were prepared, and who reviewed them," *Koplyay*, 2013 WL 6233908, at \*7. But the AC does not allege that any contrary such reports or statements with respect to Dutch Bros' performance existed, let alone when they were prepared and who was privy to them. The gist of its theory is instead the repeated *ipse dixit* that defendants *must* have known that inflation was or would harm Dutch Bros' performance more was being acknowledged. *See, e.g.*, AC ¶¶ 124, 125, 136–39, 144–48. But under the case law, a complaint's naked declaration to that effect does not suffice.

*See, e.g.*, 🚩 *Rombach*, 355 F.3d at 176 (affirming dismissal of PSLRA claims for failure to plead scienter, as complaint could not plausibly allege scienter using a "pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent.") (quoting 🚩 *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)); 🚩 *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (finding scienter allegations insufficient where facts not pled to suggest defendants had knowledge of or access to specific information contradicting public statements); *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528 (S.D.N.Y. 2020) ("Scienter cannot be inferred solely from the fact that, due to [a defendant's] board membership or executive managerial position, [he] had access to the company's internal documentation as well as any adverse information.").

The AC accordingly fails to adequately plead scienter. Such is an independent basis supporting its dismissal.

### CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss in its entirety and dismisses this case with prejudice. [7]

**\*26** SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

---

### Footnotes

1       These facts are drawn primarily from the AC. For the purpose of resolving the motion to dismiss, the Court
        assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See* *Koch*
        *v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considers documents incorporated
        into the AC by reference, documents publicly filed with the Securities Exchange Commission ("SEC"), *see*
        *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), transcripts of relevant earnings
        calls, *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018),
        and other "matters of which a Court may take judicial notice," *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d
        621, 627 (S.D.N.Y. 2008). As all documents attached to Defendants' declaration in support of dismissal fall
        into one or more of these categories, the Court considers them in resolving this motion. *See* Dkt. 34 ("Wu
        Decl."), Exs. 1, 2 ("3/11/22 Form 10-K"), 3 ("9/16/21 Prospectus"), 4 ("5/12/22 Form 10-Q"), 5 ("11/12/21 Form
        10-Q"), 6 ("11/10/21 Form 8-K"), 7 ("11/10/21 Earnings Call Tr."), 8 ("3/1/22 Earnings Call Tr."), 9 ("3/1/22
        Form 8-K"), 10 ("5/11/22 Form 8-K"), 11 ("5/11/22 Earnings Call Tr."), 12–16, 17 ("8/10/22 Earnings Call Tr."),
        18 ("1/11/22 ICR Interview Tr."), 19.

2       The AC overstates, by a factor of two, Ricci's stock sales. *See* AC ¶ 128. Rein's brief corrects this error.
        *See* Dkt. 35 at 20 n.13.

3       Defendants also argue that the AC fails to plead fraud with the particularity Rule 9(b) requires. *See*
        Def. Br. at 10–11; *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477–79 (S.D.N.Y. 2021) (complaint,
        which "rel[ied] primarily on bolded text in half-page block quotations to identify the allegedly misleading
        statements ... [and] ... include[d] a substantially similar paragraph containing some variation of the same five
        or so generalized, conclusory statements," failed Rule 9(b)). Finding the AC deficient on other grounds,
        the Court does not reach this issue. Defendants also challenge the AC's Section 20(a) claim as dependent
        on ill-pled primary violations of Section 10(b). Def. Br. at 25. That argument, as explained below, has merit.

4       Tellingly in this respect, the AC omits to quote the bulk of Dutch Bros' disclosures in its "Impact of Inflation"
        subsection. *See* AC ¶ 62.

5       The AC, in ¶ 66, mistakenly refers to a statement which the parties now agree was made a year later, in
        January 2023, outside the class period. *See* Def. Br. at 17 n.8; Pl. Reply at 7 n.3 ("Plaintiff incorrectly attributed
        the language in ¶ 66 to the 2021 ICR Conference when it was, in fact, from a 2023 Conference. Plaintiff
        retracts that statement."). The Court disregards this allegation.

6       The Court is unable to find the above-quoted language in the Form 8-K in the form produced by counsel
        on this motion. Regardless, because the AC alleges and defendants do not dispute that the statement was
        included in this filing, the Court considers it.

7       Rein seeks leave to amend in the event of dismissal, PL Br. at 25, but he does not say why "justice [would]
        so require" this. On the contrary, Rein has already amended once—the complaint challenged here is an
        amended complaint—and at the time Rein was given the opportunity to so file, the Court admonished him
        that "no further opportunities to amend will ordinarily be granted." *See* Dkt. 29 at 17; *see, e.g.*, *Document*
        *Techs., Inc. v. LDiscovery, LLC*, 731 F. App'x 31, 34–35 (2d Cir. 2018) (affirming dismissal with prejudice
        where plaintiff was "given adequate notice and opportunity to amend the deficiencies in its complaint and
        failed to do so"); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, 351 F. App'x 472, 474 (2d Cir.
        2009) (summary order) (affirming dismissal with prejudice where plaintiff "did not move for leave to replead
        in opposition to [defendant's] motion to dismiss his original complaint with prejudice"); *Horoshko v. Citibank,*

**Rein v. Dutch Bros, Inc., Slip Copy (2024)**

2024 WL 3105004, Fed. Sec. L. Rep. P 101,884

*N.A.*, 373 F.3d 248, 250 (2d Cir. 2004) (per curiam) (argument that district court abused discretion "in not permitting an amendment that was never requested" was "frivolous"). Closure in this litigation is particularly warranted, given that related shareholder litigation has been stayed in deference to this case. *See Hudson v. Ricci*, No 23 Civ. 5010 (PAE), Dkt. 12 (joint stipulation staying shareholder derivative case).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Pl. Appx. B-239

# TAB No. 16

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)

2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

2024 WL 4354809
United States District Court, S.D. New York.

ROOFERS LOCAL NO. 149 PENSION FUND, on
behalf of itself and all others similarly situated, Plaintiff,
v.
AMGEN INC., Robert A. Bradway,
and Peter H. Griffith, Defendants.

23 Civ. 2138 (JPC)
|
Signed September 30, 2024

**Synopsis**
**Background:** Investor brought putative action against corporation and two officers for securities fraud under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 and for control-person liability, alleging corporation made material misstatements and omissions by failing to disclose amount of audit adjustments proposed by Internal Revenue Service (IRS). Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, John P. Cronan, J., held that:

[1] investor adequately alleged company's omission of magnitude of potential liability to IRS rendered its disclosures about back-taxes dispute misleading;

[2] investor failed to allege that company made false statement regarding quantified nature of its potential liability to IRS;

[3] investor adequately alleged company and officers were aware of magnitude of potential liability; and

[4] investor adequately alleged omission of magnitude of potential liability was reckless.

Motion denied.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim; Motion to Amend the Complaint.

West Headnotes (20)

**[1]    Federal Civil Procedure    🔑 Claim for relief in general**

To state a claim to relief that is plausible on its face, the factual allegations of a complaint must be enough to raise a right to relief above the speculative level. Fed. R. Civ. P. 8.

**[2]    Federal Civil Procedure    🔑 Matters deemed admitted;  acceptance as true of allegations in complaint**

On a motion to dismiss for failure to state a claim, although the district court must accept as true the factual allegations in the complaint and draw all inferences in the plaintiff's favor, it need not accept as true legal conclusions couched as factual allegations. Fed. R. Civ. P. 12(b)(6).

**[3]    Securities Regulation    🔑 Manipulative, Deceptive or Fraudulent Conduct**

To state a claim under § 10(b) and Rule 10b-5(b), a plaintiff must plead (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. Securities Exchange Act of 1934 § 10, 🚩 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[4]    Federal Civil Procedure    🔑 Fraud, mistake and condition of mind**

To satisfy the heightened pleading standard for fraud claims, a plaintiff alleging securities fraud under § 10(b) and Rule 10b-5(b) must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. Securities Exchange Act of 1934 § 10, 🚩 15

U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b);
🚩 Fed. R. Civ. P. 9(b).

**[5]    Federal Civil Procedure  👉 Fraud, mistake and condition of mind**

Conclusory allegations or allegations unsupported by factual assertions are insufficient to satisfy the heightened pleading standard that applies to securities fraud claims under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 🚩 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b); 🚩 Fed. R. Civ. P. 9(b).

**[6]    Securities Regulation  👉 Pleading**

Securities fraud claims under § 10(b) must satisfy the heightened pleading requirements imposed by the Private Securities Litigation Reform Act (PSLRA). Securities Exchange Act of 1934 §§ 10, 21D, 🚩 15 U.S.C.A. §§ 78j(b), 78u-4(b).

**[7]    Securities Regulation  👉 Scienter**

In determining whether the pleaded facts give rise to a strong inference of scienter, as necessary for a securities fraud complaint under § 10(b) to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA), the court must take into account plausible opposing inferences. Securities Exchange Act of 1934 §§ 10, 21D, 🚩 15 U.S.C.A. §§ 78j(b), 78u-4(b).

**[8]    Securities Regulation  👉 Scienter**

For an inference of scienter to be strong, as necessary for a securities fraud complaint under § 10(b) to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA), a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts

alleged. Securities Exchange Act of 1934 §§ 10, 21D, 🚩 15 U.S.C.A. §§ 78j(b), 78u-4(b).

**[9]    Securities Regulation  👉 Misrepresentation**

The Private Securities Litigation Reform Act (PSLRA) does not demand that plaintiffs bringing securities fraud claims plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. 15 U.S.C.A. § 78u-4(b).

**[10]    Federal Civil Procedure  👉 Fraud, mistake and condition of mind**

The heightened pleading standard for fraud claims does not require plaintiffs in securities litigation to plead detailed evidentiary matter. 🚩 Fed. R. Civ. P. 9(b).

**[11]    Securities Regulation  👉 Matters to Be Disclosed**

Rule 10b-5's prohibition on misleading omissions requires disclosure of information necessary to ensure that statements already made are clear and complete. 17 C.F.R. § 240.10b-5(b).

1 Case that cites this headnote

**[12]    Securities Regulation  👉 Nondisclosure; Insider Trading**

In assessing whether an omission renders a statement inaccurate, incomplete, or misleading in violation of § 10(b) and Rule 10b-5, courts look at context and manner of presentation; the ultimate question, however, remains whether a reasonable investor could have been misled to believe something in contradiction to the omitted facts. Securities Exchange Act of 1934 § 10, 🚩 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[13]    Securities Regulation  👉 Matters to Be Disclosed**

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 248 of 330

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)
2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

Investor adequately alleged that company's omission of magnitude of its potential liability to IRS for back taxes and penalties under proposed audit adjustments rendered misleading its disclosures, first, that company was under audit for three tax years, then that IRS sent company notices of "significant" proposed adjustments for six years that "could have material impact" on its finances, and later, that IRS was seeking $3.6 billion for three years, supporting investor's claims under § 10(b) and Rule 10b-5; investor alleged company's potential liability for all six years was $10.7 billion, which was 162.4% of its net income, vague terms like "significant" and "material" did not allow investors to assess tax risk, and disclosing magnitude of risk would not require concession of liability. Securities Exchange Act of 1934 § 10, 🚩 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

[14]    **Securities Regulation** 🔑 Misrepresentation

Investor failed to adequately allege that company's statement in SEC filings that in "each of the matters described in this filing… in which [company] could incur a liability, [its] opponents seek an award of a not-yet-quantified amount of damages" such that none of those matters had "progressed sufficiently… to enable [company] to estimate a range of possible loss" was false with respect to IRS's proposed audit adjustments, and thus, statement did not support investors' claim under § 10(b) and Rule 10b-5, even if statement referred to IRS dispute; each filing referred reader to specific information about IRS dispute, which stated IRS had issued Notices of Proposed Adjustment (NOPAs) and Revenue Agent Reports (RARs), and NOPAs and RARs necessarily quantified amounts IRS sought. Securities Exchange Act of 1934 § 10, 🚩 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

[15]    **Securities Regulation** 🔑 Scienter

Under the scienter pleading requirement of the Private Securities Litigation Reform Act

(PSLRA), a securities fraud complaint will survive a motion to dismiss for failure to state a claim if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2)(A); Fed. R. Civ. P. 12(b)(6).

[16]    **Securities Regulation** 🔑 Scienter, Intent, Knowledge, Negligence or Recklessness

To plead scienter based on recklessness in the context of a securities fraud case based on an omissions theory of falsity, a plaintiff must establish both that the defendant breached a clear duty to disclose the omitted facts and that the breach involved conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2)(A).

[17]    **Securities Regulation** 🔑 Scienter, Intent, Knowledge, Negligence or Recklessness

Investor adequately alleged that company, its chief executive officer (CEO), and its chief financial officer (CFO) were aware of full amount of back taxes and penalties which IRS sought to recover pursuant to proposed audit adjustments, as necessary for investor to satisfy scienter element of securities fraud claim under § 10(b) and Rule 10b-5 under theory that company and officers were reckless in omitting full extent of company's potential liability when disclosing IRS disputes; investor alleged that IRS notified company it sought about $3.6 billion in back taxes for first three-year period and $5.1 billion in back taxes and $2 billion in penalties for next three-year period, and company's SEC filings, signed by officers, confirmed receipt of IRS notices, which quantified relief sought.

Securities Exchange Act of 1934 § 10, 🚩 15 U.S.C.A. § 78j(b); 15 U.S.C.A. § 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[18]     Securities Regulation** 🔑 Scienter, Intent, Knowledge, Negligence or Recklessness

Investor adequately alleged that company's omission of full magnitude of its potential liability to IRS for back taxes and penalties, as part of company's disclosures regarding dispute with IRS arising from alleged use of transfer pricing to claim lower taxes, was reckless under the circumstances, satisfying scienter pleading requirement for investor's securities fraud claim under § 10(b) and Rule 10b-5; investor alleged that IRS told company in notices of proposed adjustment that it sought to recover about $10.7 billion, which was about 40% of company's annual revenues, that company concealed degree of potential liability by describing it vaguely as "significant" even as analysts asked CEO to quantify it, and that degree of liability entitled investors to more clarity. Securities Exchange Act of 1934 §§ 10, 21D, 🚩 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2)(A); 17 C.F.R. § 240.10b-5(b).

**[19]     Securities Regulation** 🔑 Matters to Be Disclosed

Non-final nature of amounts of back taxes and penalties which IRS sought to recover from company, as reflected in Notices of Proposed Adjustment (NOPAs) and Revenue Agent Reports (RARs), did not preclude company from having clear duty to disclose full amount of its potential liability once it chose to speak publicly regarding back-taxes dispute, and thus, did not preclude investor's securities fraud claim against company under § 10(b) and Rule 10b-5 based on theory that company's vague, partial disclosures regarding dispute were misleading in light of omission of magnitude of company's potential liability, where investor alleged that through NOPAs and RARs, which were issued following painstaking investigation, IRS sought $10.7 billion in back taxes and penalties, plus interest on taxes. Securities Exchange Act of 1934 § 10, 🚩 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[20]     Federal Civil Procedure** 🔑 Pleading over

Investor's request for leave to amend securities fraud complaint against company and officers if district court, on company's and officers' motion to dismiss for failure to state a claim, should find investor's complaint "to be deficient in any respect" failed to specify how deficiencies in complaint could be cured through amendment, and thus, in granting motion in part as to investor's claim that company made affirmative misstatement, district court would not grant investor leave to file amended complaint, where investor only requested leave to amend in cursory manner, without explaining how it would replead affirmative-misstatement claim.

Securities Exchange Act of 1934 § 10, 🚩 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 15(a)(2).

**Attorneys and Law Firms**

Brian Cochran, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Samuel Howard Rudman, , Evan Jay Kaufman, Mark Tamerlane Millkey, Robbins Geller Rudman & Dowd LLP, Melville, NY, for Plaintiff.

Jay B. Kasner, Tansy Woan, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, Peter B. Morrison, Skadden, Arps, Slate, Meagher & Flom, LLP, Los Angeles, CA, for Defendants.

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

 **\*1**  Through an accounting technique known as "transfer pricing," multinational corporations can shift their profits to subsidiaries in low-tax jurisdictions, thereby lowering the consolidated entity's overall tax bill. Amgen, Inc. ("Amgen" or the "Company") used this technique to great effect over the past decade, claiming a median effective tax rate of just 12.5% by allocating billions of dollars in income to its Puerto Rico subsidiary. And by achieving such a low tax rate,

2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

the Company has been able to report higher earnings and consistently beat the market's expectations.

Amgen's aggressive accounting practices, however, quickly attracted the attention of the Internal Revenue Service ("IRS"), which conducted audits of the Company's 2010 to 2015 tax returns. After years-long examinations that involved hundreds of document requests, several tours of the Company's Puerto Rico facilities, and dozens of employee interviews, the IRS determined that Amgen had underpaid its taxes for those six years to the tune of approximately $8.7 billion and owed an additional $2 billion in penalties. Amgen made its dispute with IRS public but for years kept the size of the liability it was facing—more than an entire year of its profits—a secret. So when news finally broke that the IRS was seeking $10.7 billion in back taxes and penalties, plus interest, the Company's share price plummeted.

In this putative class action, Lead Plaintiff Asbestos Workers Pension Fund (the "Pension Fund") claims that, from July 29, 2020, through April 27, 2022 (the "Class Period"), Amgen and two of its high-level executives, Robert A. Bradway and Peter H. Griffith, misled investors about the extent of the potential tax liability the Company was facing in connection with its transfer-pricing dispute with the IRS. The Pension Fund alleges that while Defendants disclosed the existence of the IRS dispute and noted that the agency had proposed "significant adjustments," which "could have a material impact" on the Company's operations and cash flows, Defendants failed to inform investors about the true extent of the financial risk to the Company by hiding that the IRS was seeking to recover $10.7 billion. Through its Amended Complaint, the Pension Fund charges Defendants with violating Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 🔖 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. The Pension Fund also alleges that Bradway and Griffith, by virtue of their control over the Company, violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants have moved to dismiss both counts, arguing that the Amended Complaint's allegations do not establish that Defendants made any actionable misstatements or omissions, or that they did so with the requisite mental state. The Court held oral argument on Defendants' motion on July 18, 2024. For the following reasons, the Court concludes that the Pension Fund has plausibly alleged that Defendants' failure to disclose the true extent of the liability they faced from the IRS dispute could have misled Amgen's investors, and

that the Amended Complaint permits a strong inference that the omission of the Company's potential multi-billion-dollar liability was reckless under the circumstances. The Court therefore denies Defendants' motion to dismiss and orders them to answer the Pension Fund's allegations.

## I. Background

### A. Facts [1]

**\*2** "Amgen is an independent large biopharmaceutical company that discovers, develops, [manufactures], and markets medicines for grievous illnesses." Am. Compl. ¶ 2. Although headquartered in California, Amgen "claims to perform a substantial amount of its commercial manufacturing activities at its facility in Puerto Rico." *Id.* Bradway was Amgen's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Period, as well as the Company's President since 2010. *Id.* ¶ 18. From 2010 to 2012, immediately before assuming the role of CEO, Bradway was Amgen's Chief Operating Officer, and from 2007 to 2010, he was an Executive Vice President and the Company's Chief Financial Officer ("CFO"). *Id.* Griffith joined Amgen in 2019 as Executive Vice President of Finance and served as the Company's CFO during the Class Period. *Id.* ¶ 19. Prior to that, Griffith "was a partner at EY (formerly Ernst & Young)." *Id.*

"Prior to and during the Class Period, Amgen sought to reduce the amount of its U.S. income taxes by shifting income from the U.S. to Puerto Rico, which has a lower corporate income tax rate than the U.S., utilizing an accounting practice known as 'transfer pricing.' " *Id.* ¶ 3. Through transfer pricing, "companies attempt to shift tax liabilities to low-cost tax jurisdictions." *Id.* ¶ 32. The practice entails determining "the price one division in a company charges another division for goods and services provided," enabling "[m]ultinational corporations, such as Amgen ... to allocate earnings among their subsidiary and affiliate companies that are part of the parent organization." *Id.* ¶ 33. From 2010 to 2015, when Puerto Rico had a comparatively low tax rate, "Amgen utilized transfer pricing to shift a substantial amount of its taxable income from the U.S. to Puerto Rico." *Id.* ¶ 32. Thus, "Amgen's use of transfer pricing enabled the consolidated entity to benefit from an extremely low effective tax rate, which dramatically increased the Company's net income prior to and during the Class Period." *Id.* ¶ 3.

An article published in *The Wall Street Journal* on August 1, 2022 reported that "Amgen has claimed one of the lowest tax rates in the pharmaceutical industry, reporting a median effective tax rate of just 12.5% over the past decade, compared with an 18% median rate across the 10 largest U.S. drug companies." *Id.* ¶ 36. The Company's "2013-15 tax years were especially aggressive with Amgen claiming an effective tax rate of just 3.5%, 7.6%, and 13%, respectively." *Id.* These practices did not go unnoticed by U.S. tax authorities. "Amgen's aggressive transfer pricing practices caused the [IRS] to conduct multiple in-depth examinations of its transfer pricing methodologies." *Id.* ¶ 4. The IRS focused on two periods: initially Amgen's 2010 to 2012 tax years, and then Amgen's 2013 to 2015 tax years. *Id.*

In 2013, the IRS commenced an "examination of Amgen's federal income tax returns for its 2010-11 tax years," and subsequently expanded the audit "to include ... the 2012 tax year." *Id.* ¶ 57. In February 2017, Amgen disclosed in its Form 10-K [2] for the year ended December 31, 2016, that its "income tax returns are routinely audited by the tax authorities" in "the U.S. federal jurisdiction, various U.S. state jurisdictions and certain foreign jurisdictions," and that the Company was "currently under audit by the IRS for tax years ended December 31, 2010, 2011 and 2012." Dkt. 42 ("Woan Decl."), Exh. D ("2016 Form 10-K") at 94; *accord id.* at 33 ("Our tax returns are routinely examined by tax authorities in the United States and other jurisdictions in which we do business, and a number of audits are currently underway. Tax authorities are becoming more aggressive in their audits and are particularly focused on the allocations of income and expense among tax jurisdictions."). [3] Roughly contemporaneously with this filing, "[b]etween January and March 2017, Amgen received NOPAs [*i.e.*, Notices of Proposed Adjustments] from the IRS for its 2010-12 tax years informing Amgen it owed [ ] approximately $3.6 billion in back taxes, plus interest." Am. Compl. ¶ 65. A NOPA "provides taxpayers with a summary of the audit adjustments proposed by the IRS." *Id.* ¶ 84. The adjustments proposed in the NOPAs "related primarily to the allocation of profits between certain of Amgen's U.S. and Puerto Rico entities and allocated additional profits to the U.S." *Id.* ¶ 65.

**\*3** Next, on April 12, 2017, "Amgen received an RAR [*i.e.*, Revenue Agent Report] from the IRS" also for its 2010 to 2012 tax years, which contained "the proposed adjustments." *Id.* ¶ 66. An RAR "shows the changes the IRS has made to the income, credits, and deductions on the taxpayer's income tax return, as well as the income tax due, and penalties

and interest." *Id.* ¶ 85; *see* Woan Decl., Exh. S at 2 (IRS website page explaining: "Revenue Agent Reports (RARs) should contain all the information necessary to ensure a clear understanding of the adjustments and demonstrate how the tax liability was computed."). [4] A company can challenge adjustments proposed in NOPAs and RARs through the IRS's administrative appeals process and, if that fails, by filing a petition in the United States Tax Court. Am. Compl. ¶¶ 55-56. The Pension Fund alleges that the IRS's issuance of the NOPAs and the RAR for the 2010 to 2012 tax years meant that

> there was a greater than slight chance that Amgen would be obligated to pay more than $3 billion in additional income taxes because the IRS does not issue a NOPA or RAR until it has concluded an extensive transfer pricing examination supported by a thorough analysis of the underlying facts of the matter, which includes the determinations of legal and economic experts assigned to the case.

*Id.* ¶ 91; *see also id.* ¶¶ 92-95 (describing the process that typically leads up to the issuance of a NOPA and an RAR). The Pension Fund also alleges that the IRS "periodically met with senior Amgen officials to confirm all relevant facts developed during its examination" and that Amgen was given an opportunity—that it took—to respond to and discuss the IRS's proposed adjustments prior to the NOPAs and the RAR being issued. *Id.* ¶ 98. [5]

Amgen first disclosed that it had received the NOPAs and the RAR for the 2010 to 2012 tax years in multiple places of its Form 10-Q [6] for the quarter ended on March 31, 2017, which was filed with the SEC on April 26, 2017, Am. Compl. ¶ 83. Woan Decl., Exh. E ("Q1 2017 Form 10-Q") at 9-10, 33, 37. Amgen made these disclosures in a note regarding "Income taxes" in the subsection labeled "Notes to Condensed Consolidated Financial Statements," *id.* at 9-10, in a section on "Income taxes" in the "Management's Discussion and Analysis of Financial Condition and Results of Operations," *id.* at 33, and in a disclosure under "Risk Factors," *id.* at 37. While Amgen did not indicate the amount of the proposed adjustments in that quarterly report, Amgen stated throughout the report that it "disagree[d]

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 252 of 330

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)
2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

with the proposed adjustments and plan[ned] to initiate the administrative appeals process," and further that "[f]inal resolution of the IRS audit could have a material impact on [the Company's] results of operations and cash flows if not resolved favorably." *Id.* at 10; 33, 37; *accord* Am. Compl. ¶ 89. Amgen further noted that it "believe[d its] income tax reserves [were] appropriately provided for all open tax years." Q1 2017 Form 10-Q at 10, 33; *accord* Am. Compl. ¶ 89.

**\*4** The Company's annual report for the fiscal year ended December 31, 2017 included similar language. As it had done in the prior year's report, *see* 2016 Form 10-K at 33, Amgen stated that the Company faced a risk from tax authorities "becoming more aggressive in their audits" and being "particularly focused on the allocations of income and expenses among tax jurisdictions." Woan Decl., Exh. C ("2017 Form 10-K") at 35. That 2017 annual report disclosed that the modified RAR for tax years 2010 to 2012 received on November 29, 2017, like the original RAR for those years, proposed "substantial adjustments," and noted that "[f]inal resolution of the IRS audit could have a material impact on [the Company's] results of operations and cash flows if not resolved favorably." *Id.* at 35, 57, 99. Amgen further explained that while it believed its accrual for income taxes was appropriate, "due to the complexity of the provision for income taxes, the ultimate resolution of any tax matters may result in payments greater or less than amounts accrued." *Id.*

The next significant event occurred around early 2018, when the IRS began auditing Amgen's 2013 to 2015 tax years. *See* Am. Compl. ¶ 57 ("On February 14, 2018, the IRS requested Amgen's documentation for Amgen's transfer pricing practices for its 2013-15 tax years and opened an audit into its 2013-15 tax years on or before that date."). A little more than two years later, in April 2020, "Amgen received NOPAs proposing ... adjustments for its 2013-15 tax years, informing Amgen it owed at least approximately $5.1 billion in back taxes, plus interest, and approximately $2 billion in penalties for its 2013-15 tax years." *Id.* ¶ 67. The NOPAs once again focused on "the allocation of profits between certain of Amgen's U.S. and Puerto Rico entities." *Id.* Amgen disclosed its receipt of NOPAs for the 2013 to 2015 tax years in its Form 10-Q for the quarter ended March 31, 2020, but once again did not reveal the size of the proposed adjustments or penalties, explaining only that these were "similar to the [prior] proposed adjustments." Woan Decl., Exh. T ("Q1 2020 Form 10-Q") at 11, 37. In May 2020, "Amgen received an RAR for its 2013-15 tax years which included the proposed adjustments." Am. Compl. ¶ 68. [7] By this point, the IRS had

"informed Amgen it was seeking approximately $10.7 billion in back taxes for its 2010-15 years and penalties for its 2013-15 tax years." *Id.*

On July 29, 2020, the start of the Class Period, Amgen filed a Form 10-Q with the SEC for the quarter ended June 30, 2020. *Id.* ¶ 101; Woan Decl., Exh. F ("Q2 2020 Form 10-Q"). This quarterly report disclosed Amgen's receipt of the new RAR for the 2013 to 2015 tax years, reiterated that Amgen had received NOPAs for those years and RARs for the 2010 to 2012 tax years, and stated that resolution of these matters "could have a material impact" on the Company's financial statements. Q2 2020 Form 10-Q at 14, 43. While Amgen once again characterized the proposed adjustments as "significant" or "substantial," the Company did not disclose specific information revealing the magnitude of the IRS's proposed adjustments. *Id.* In the "Income taxes" section of that report, Amgen stated:

> As previously disclosed, we received a[n RAR] from the [IRS] for the years 2010, 2011 and 2012. The RAR proposes to make significant adjustments that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. In November 2017, we received a modified RAR that revised the IRS's calculations but continued to propose substantial adjustments. We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office, which currently has jurisdiction over the matter. If unable to reach resolution, we will vigorously contest the proposed adjustments through the judicial process. In addition, as previously reported, in April 2020, we received draft [NOPAs] and subsequently in May 2020, we received an RAR from the IRS for the years 2013, 2014 and 2015, which are similar to the proposed adjustments for the years 2010, 2011 and 2012 that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. We disagree with the proposed adjustments and calculations and will pursue resolution with the IRS administrative appeals office. We are also currently under examination by a number of other state and foreign tax jurisdictions.

**\*5** Final resolution of these complex matters is not likely within the next 12 months and could have a material impact on our condensed consolidated financial statements. We believe our accrual for income tax liabilities is appropriate based on past experience, interpretations of tax law and judgments about potential actions by tax

authorities; however, due to the complexity of the provision for income taxes, the ultimate resolution of any tax matters may result in payments substantially greater or less than amounts accrued.

*Id.* at 14. These same disclosures were made again in that quarterly report under "Income taxes" in "Management's Discussion and Analysis of Financial Condition and Results of Operations." *Id.* at 43; *accord* Am. Compl. ¶ 101. These disclosures were then repeated "in all material respects" in Amgen's Form 10-Q for the quarter ended September 30, 2020, its Form 10-K for the year ended December 31, 2020, and in its Form 10-Q for the quarter ended March 31, 2021. Am. Compl. ¶¶ 105, 177, 184, 190; *accord* Woan Decl., Exh. U ("Q3 2020 Form 10-Q") at 13, 44; Woan Decl., Exh. G ("2020 Form 10-K") at 43, 74, 80, 123;[8] Woan Decl., Exh. P ("Q1 2021 Form 10-Q") at 11, 35. None of those filings, however, disclosed the full degree of the potential liability. Am. Compl. ¶¶ 102-104, 106, 170, 178, 185, 191.

Like the Company's other quarterly reports, the report for the second quarter of 2020 included in "Notes to Condensed to Consolidated Financial Statements" a discussion of contingent liabilities under the note, "Contingencies and commitments," and the subheader, "Contingencies."[9] That section did not explicitly mention the NOPAs, the RARs, or any dispute with the IRS. This disclosure began with the following:

> In the ordinary course of business, we are involved in various legal proceedings, government investigations and other matters that are complex in nature and have outcomes that are difficult to predict. See our Annual Report on Form 10-K for the year ended December 31, 2019, Part I, Item 1A. Risk Factors-*Our business may be affected by litigation and government investigations.* We describe our legal proceedings and other matters that are significant or that we believe could become significant in this footnote; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; and in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2020.

> We record accruals for loss contingencies to the extent that we conclude it is probable that a liability has been incurred and the amount of the related loss can be reasonably estimated. We evaluate, on a quarterly basis, developments in legal proceedings and other matters that could cause

> an increase or decrease in the amount of the liability that has been accrued previously. Our legal proceedings involve various aspects of our business and a variety of claims, some of which present novel factual allegations and/or unique legal theories. In each of the matters described in this filing; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; or in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2020, in which we could incur a liability, our opponents seek an award of a not-yet-quantified amount of damages or an amount that is not material. In addition, a number of the matters pending against us are at very early stages of the legal process, which in complex proceedings of the sort we face often extend for several years. As a result, none of the matters described in this filing; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; or in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2020, in which we could incur a liability, have progressed sufficiently through discovery and/or the development of important factual information and legal issues to enable us to estimate a range of possible loss, if any, or such amounts are not material. While it is not possible to accurately predict or determine the eventual outcomes of these matters, an adverse determination in one or more of these matters currently pending could have a material adverse effect on our consolidated results of operations, financial position or cash flows.

**\*6** Q2 2020 Form 10-Q at 32; *accord* Am. Compl. ¶ 174. Following these paragraphs, Amgen listed specific ongoing litigation. Q2 2020 Form 10-Q at 32-34. This Contingencies disclosure, along with a list of ongoing litigation, was repeated in sum and substance in the report for the third quarter of 2020, Q3 2020 Form 10-Q at 31-33; the 2020 annual report, 2020 Form 10-K at 147-57; the report for the first quarter of 2021, Q1 2021 Form 10-Q at 23-24; the report for the second quarter of 2021, Woan Decl., Exh. H ("Q2 2021 Form 10-Q") at 27-28; the report for the third quarter of 2021, Woan Decl., Exh. I ("Q3 2021 Form 10-Q") at 30-32; and the 2021 annual report, 2021 Form 10-K at 144-51.

On February 9, 2021, Amgen filed its Form 10-K for the fiscal year ended December 31, 2020. Am. Compl. ¶ 184. That filing disclosed that the Company had "been unable

2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

to reach resolution at the administrative appeals level" and
that Amgen anticipated that it would receive a Notice of
Deficiency ("NOD") regarding its 2010 to 2012 tax years.
2020 Form 10-K at 43, 74, 80, 123; *accord* Am. Compl. ¶
71. This disclosure was repeated in the quarterly report for
the first quarter of 2021. Q1 2021 Form 10-Q at 11, 35, 43.
An NOD "is, according to the IRS, a 'legal determination
that is presumptively correct' " and is comprised of "[a]
letter explaining the purpose of the notice, the amount of
the deficiency, and the taxpayer's options[;] [a] waiver to
allow the taxpayer to agree to the additional tax liability[;] [a]
statement showing how the deficiency was computed[;] [and
an] explanation of the adjustments." Am. Compl. ¶ 108. As
expected, in May 2021, Amgen received an NOD, dated April
27, 2021, through which the IRS sought $3.6 billion in back
taxes, plus interest, from Amgen for the Company's 2010 to
2012 tax years. *Id.* ¶ 72. [10]

Amgen disclosed its receipt of the NOD three months later
when, "[a]fter the market closed on August 3, 2021," *id.* ¶
110, Amgen issued a press release with its financial results for
the second quarter of 2021 and announced that it had "filed a
petition in the U.S. Tax Court to contest notices of deficiencies
received from the IRS during the quarter for 2010, 2011 and
2012." Woan Decl., Exh. II at 17. Amgen further explained
in that release that the NODs sought to increase its "U.S.
taxable income by an amount that would result in additional
federal tax of approximately $3.6 billion, plus interest." *Id.*
This marked the first time Amgen revealed the amount of the
tax adjustment the IRS was seeking for the 2010 to 2012 tax
years. Am. Compl. ¶ 110. Following this disclosure, Amgen's
"common stock declined $15.77 per share, or 6.5%, from
$244.08 per share on August 3, 2021 to $228.31 per share on
August 4, 2021, on very high trading volume." *Id.* ¶ 7; *accord
id.* ¶ 111.

On August 3, 2021, Amgen also held a conference call
with analysts to discuss the quarterly financial results
announced in that day's press release, during which Griffith,
as the Company's CFO, fielded questions about Amgen's
tax liabilities. *Id.* ¶ 200. When asked if Amgen had run a
calculation "to establish what an upper bound of liability
for 2013 through" the time of the call would be, Griffith
demurred, stating:

> Look, we filed a petition with the
> U.S. tax court, in this case, [which]
> could take several years to resolve.

> The IRS is also proposing significant
> adjustments to 2013 to '15 related to
> the similar issues, as you know. We
> disagree — strongly disagree with the
> proposed adjustments. We're pursuing
> resolution with the IRS administrative
> appeals office on that. The IRS, as you
> noted, they're currently auditing years
> 2016 through '18. And so yes, we're
> sure they'll take the same position for
> the other periods under audit, and we
> believe that we have adequate reserves
> for that.

**\*7** *Id.*

The day after the press release and analyst call, Amgen
filed with the SEC its quarterly report for the quarter ended
June 30, 2021. *Id.* ¶ 112; *see* Q2 2021 Form 10-Q. That
report reiterated in multiple places information regarding the
NOD, including the additional tax liability of $3.6 billion
plus interest sought therein, and the petition Amgen filed
in the Tax Court. Q2 2021 Form 10-Q at 13, 40-41, 49-50.
Under "Income taxes" in "Notes to Condensed Consolidated
Financial Statements," Amgen stated:

> In 2017, we received a[n RAR] and a modified RAR
> from the [IRS] for the years 2010, 2011 and 2012
> proposing significant adjustments that primarily relate to
> the allocation of profits between certain of our entities in
> the United States and the U.S. territory of Puerto Rico. We
> disagreed with the proposed adjustments and calculations
> and pursued a resolution with the IRS administrative
> appeals office. As previously reported, we were unable
> to reach resolution with the IRS appeals office. In July
> 2021, we filed a petition in the U.S. Tax Court to contest
> two duplicate [NODs] for 2010, 2011 and 2012 that we
> received in May and July 2021. The duplicate [NODs]
> seek to increase our U.S. taxable income by an amount
> that would result in additional federal tax of approximately
> $3.6 billion, plus interest. Any additional tax that could
> be imposed would be reduced by up to approximately
> $900 million of repatriation tax previously accrued on our
> foreign earnings. In any event, we firmly believe that the
> IRS's positions in the Notices are without merit and we will
> vigorously contest the Notices through the judicial process.

> In addition, in 2020, we received an RAR and a modified
> RAR from the IRS for the years 2013, 2014 and 2015

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 255 of 330

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)
2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

also proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico, similar to those proposed for the years 2010, 2011 and 2012. We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office. We are currently under examination by the IRS for the years 2016, 2017 and 2018. We are also currently under examination by a number of other state and foreign tax jurisdictions.

Final resolution of these complex matters is not likely within the next 12 months. We believe that our accrual for income tax liabilities is appropriate based on past experience, interpretations of tax law, application of the tax law to our facts and judgments about potential actions by tax authorities; however, due to the complexity of the provision for income taxes and uncertain resolution of these matters, the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse impact on our condensed consolidated financial statements.

*Id.* at 13; *accord* Am. Compl. ¶ 114. These same disclosures also were made in this report under "Income taxes" in "Management's Discussion and Analysis of Financial Condition and Results of Operations," Q2 2021 Form 10-Q at 40-41, and in "Risks Related to Government Regulations and Third-Party Policies," *id.* at 49-50.

**\*8** Two days later, on August 6, 2021, Amgen "filed the prospectus for the issuance of approximately $5 billion in notes." Am. Compl. ¶ 211; *accord id.* ¶ 141. The prospectus incorporated by reference Amgen's Form 10-K for 2020 and Form 10-Qs for the first and second quarters of 2021. *Id.* ¶ 141. On August 9, 2021, Amgen successfully "sold approximately $5 billion in notes pursuant to" the prospectus. *Id.* ¶ 142. Shortly after this offering, Bradway was asked about Amgen's tax issues with the IRS at a healthcare conference. *Id.* ¶ 212. In response to a question about his level of concern and his outlook on the matter, Bradway essentially reiterated the Company's position in its SEC filings: "I think we've been very clear that we think the [IRS's] position is without merit. And it's as simple as that. We think their position is without merit. And we think we've taken appropriate adequate reserves for the matter in question." *Id.*

Amgen then filed two more reports with the SEC during the Class Period. On November 3, 2021, the Company filed its report for the quarter ended September 30, 2021, *id.* ¶ 214,

which contained the same disclosures concerning the NOPAs and the RARs, the NODs, and the Tax Court filing that were in the second quarter of 2021 report. Q3 2021 Form 10-Q at 13, 42-43; *see also id.* at 52 (similar). Then, on February 16, 2022, Amgen filed its annual report for its fiscal year ended December 31, 2021, Am. Compl. ¶ 221, which also contained those same disclosures. 2021 Form 10-K at 73, 79, 121-122; *see also id.* at 43 (similar). The 2021 annual report also stated that Amgen anticipated receiving an NOD for the 2013 to 2015 tax years and that it expected to contest any such notice "through the judicial process." *Id.* at 43, 73.

Amgen followed the 2021 Form 10-K with another debt offering. "On or about February 18, 2022, Amgen filed with the SEC a prospectus" for the sale of additional debt, incorporating by reference the 2021 Form 10-K. Am. Compl. ¶ 143. Four days later, "Amgen sold approximately $4 billion in notes" pursuant to the prospectus. *Id.* ¶ 144. The Pension Fund alleges that Amgen's creditworthiness would have been "negatively impacted" had it disclosed the proposed adjustment amounts from the IRS prior to the debt offerings, such that Amgen would not have been able "to raise funds on the terms as set forth in" the offerings. *Id.* ¶ 146; *see also id.* ¶¶ 249-250.

After the market closed on April 27, 2022, the last day of the Class Period, "Amgen announced its financial results for the first quarter of fiscal [year] 2022." *Id.* ¶ 118. In a press release that accompanied the announcement, "the Company disclosed that on April 18, 2022, it received from the IRS a[n NOD] associated with the second NOPAs and second RAR for Amgen's 2013-2015 tax years." *Id.*; *accord* Woan Decl., Exh. B at 13. The release further stated that the "[NOD] seeks to increase Amgen's U.S. taxable income for the 2013-2015 period by an amount that would result in additional federal tax of approximately $5.1 billion, plus interest" and that the "[NOD] proposes penalties of approximately $2 billion." Woan Decl., Exh. B at 13. Amgen expressed in the release that it "firmly believe[d] that the adjustments proposed by the IRS for the 2010-2015 period and the penalties proposed by the IRS for the 2013-2015 period are without merit," and described various reasons for that belief. *Id.* at 13-14.

Following this disclosure, Amgen's "common stock declined $10.66 per share, or 4.3%, from $248.79 per share on April 27, 2022 to $238.13 per share on April 28, 2022, on very high trading volume." Am. Compl. ¶ 8; *accord id.* ¶ 119. The Company's stock price "continued to fall over the next several days as the market digested the news, reaching a low of just

2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

$227.32 per share on May 2, 2022, 8.6% below the closing price on April 27, 2022." *Id.* ¶ 8.

**B. Procedural History**

**\*9** Roofers Local No. 149 Pension Fund filed the original Complaint in this action on March 13, 2023. Dkt. 1. On July 7, 2023, the Court appointed the Asbestos Workers Pension Fund as Lead Plaintiff. Dkt. 30. On August 31, 2023, the Pension Fund, on behalf of itself and the class it seeks to represent, filed the operative Amended Complaint, bringing two counts. Dkt. 34. First, the Pension Fund alleges that Defendants made a variety of misleading statements in violation of Section 10(b) of the Exchange Act, 🚩 *15 U.S.C. § 78j(b)*, and SEC Rule 10b-5(b), *17 C.F.R. § 240.10b-5*. [11] Am. Compl. ¶¶ 169-237, 263-272. In essence, the Pension Fund argues that Amgen made material misstatements and omissions by failing to disclose the amount of the IRS's proposed adjustments. Second, the Pension Fund alleges that by virtue of those alleged misstatements and omissions, and due to their control over Amgen, Bradway and Griffith violated Section 20(a) of the Exchange Act, *15 U.S.C. § 78t(a)*. Am. Compl. ¶¶ 273-278.

Defendants filed the instant motion to dismiss on November 6, 2023, Dkts. 40, 41 ("Motion"), 42. The Pension Fund filed its opposition on January 12, 2024, Dkts. 44, 45, and Defendants replied on February 26, 2024, Dkts. 50, 51 ("Reply"). On April 15, 2024, Defendants filed a letter regarding the United States Supreme Court's decision in *Macquarie Infrastructure Corp. v. Moab Partners, L. P., 601 U.S. 257, 144 S.Ct. 885, 218 L.Ed.2d 214 (2024)*, Dkt. 54, and the Pension Fund responded the following day, Dkt. 56. The Court held oral argument on Defendants' motion to dismiss on July 18, 2024. *See* Minute Entry July 18, 2024.

**II. Standards of Review**

**A. Federal Rule of Civil Procedure 12(b)(6)**

[1] [2] Defendants have moved to dismiss the Pension Fund's claims under *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim. To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " 🚩 *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)* (quoting 🚩 *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*).

A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🚩 *Id.* These "[f]actual allegations must be enough to raise a right to relief above the speculative level." 🚩 *Twombly, 550 U.S. at 555, 127 S.Ct. 1955*. Although the Court must "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor," *Biro v. Condé Nast, 807 F.3d 541, 544 (2d Cir. 2015)*, it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC, 570 F.3d 471, 475-76 (2d Cir. 2009)*.

**B. Securities Fraud Claims**

[3] Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 🚩 *15 U.S.C. § 78j(b)*. Rule 10b-5 provides, in relevant part, that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." *17 C.F.R. § 240.10b-5(b)*. To state a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." 🚩 *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011)* (internal quotation marks omitted).

**\*10** [4] [5] Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under 🚩 *Federal Rule of Civil Procedure 9(b)*. 🚩 *ATSI Commc'ns, 493 F.3d at 99*. Accordingly, a plaintiff alleging fraud under Section 10(b) and Rule 10b-5(b) must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." 🚩 *Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)*. Conclusory

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)
2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

allegations or allegations unsupported by factual assertions are insufficient. 🔖 *ATSI Commc'ns*, 493 F.3d at 99.

[6]  [7]  [8]  Securities fraud claims under Section 10(b) must also satisfy the heightened pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA"). 🔖 *Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 321, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)*. The PSLRA requires that "the complaint ... specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2) (A). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." 🔖 *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499. For an inference of scienter to be strong, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 🔖 *ATSI Commc'ns*, 493 F.3d at 99 (brackets and emphasis omitted) (quoting 🔖 *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499).

[9]  [10]  The Second Circuit also has cautioned that courts confronting securities fraud claims "must be careful not to mistake heightened pleading standards for impossible ones." 🔖 *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., 19 F.4th 145, 150 (2d Cir. 2021)* (internal quotation marks omitted). The PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." 🔖 *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). Nor does 🔖 Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation." 🔖 *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

### III. Discussion

### A. Section 10(b) and Rule 10b-5

In Count One, the Pension Fund alleges that Defendants made material misstatements and omissions by failing to disclose the amounts of the IRS's proposed tax adjustments until Amgen filed petitions in the Tax Court and further that these misstatements and omissions were made with the requisite scienter. *E.g.*, Am. Compl. ¶¶ 147, 169, 170(a)-(c), 177-178. Defendants move to dismiss Count One on both falsity and scienter grounds. Motion at 1-5.

#### 1. Material Misstatements and Omissions

The Pension Fund identifies two categories of misstatements or omissions that it claims are actionable under Section 10(b) and Rule 10b-5. First, the Pension Fund contends that Amgen's Class Period disclosures concerning the IRS transfer-pricing dispute were materially misleading because the Company failed to disclose that it was facing a potential liability of $10.7 billion in back taxes and penalties, plus interest on those taxes. Opposition at 11-14. Second, the Pension Fund argues that Amgen's statements in its Contingencies disclosures that the amounts sought by its opponents in the matters listed in those filings had not been quantified were affirmative misrepresentations given the proposed adjustment figures provided by the IRS. *Id.* at 19-21. [12]

#### a. Alleged Omissions

***11** The Pension Fund's claim for omissions-based liability is that, while Defendants truthfully disclosed receiving the NOPAs and the RARs in their Class Period SEC filings, Defendants kept investors in the dark as to the full extent of the liability the Company was facing by hiding the fact that the IRS was seeking $10.7 billion in back taxes and penalties, plus interest. *Id.* at 11 (arguing that Defendants violated their duty to tell the "whole truth" by omitting the magnitude of the potential liability). The Pension Fund contends that Defendants had a duty to disclose the $10.7 billion figure under two independent theories. First, the Pension Fund asserts that the omission of the amount rendered Defendants' disclosure of the IRS dispute unclear, incomplete, and thus potentially misleading because it prevented reasonable investors from understanding the true nature of the risk Amgen was facing. *Id.* at 11-14. Second, the Pension Fund maintains that Defendants were obligated to disclose the amount of the proposed adjustments under Accounting Standards Codification 450, a Generally Accepted Accounting Principles standard addressing the

recognition and disclosure of loss contingencies. *Id.* at 14–19; *see generally* 🔖 *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 582 (S.D.N.Y. 2020). Because the Court agrees that the Pension Fund has adequately pleaded that Defendants had a duty to disclose the $10.7 billion figure or otherwise inform investors as to the true extent of Amgen's potential liability under the first theory, it is not necessary to consider the second. [13] *See Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 227 n.5 (S.D.N.Y. 2023).

In addition to proscribing affirmative misstatements, Section 10(b) and Rule 10b-5(b) make it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). So although the Supreme Court has long made clear that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5," 🔖 *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), a person must supply relevant material information concerning a given subject when that person makes a statement that would otherwise "be inaccurate, incomplete, or misleading without further context," *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (internal quotation marks omitted); *see also* 🔖 *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

**[11]** **[12]** Thus, as the Supreme Court reaffirmed just this past term, Rule 10b-5's prohibition on misleading omissions "requires disclosure of information necessary to ensure that statements already made are clear and complete." *Macquarie Infrastructure Corp.*, 601 U.S. at 263, 144 S.Ct. 885; *see also* 🔖 *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."). In assessing whether an omission renders a statement inaccurate, incomplete, or misleading, courts look at "context and manner of presentation." 🔖 *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (internal quotation marks omitted). The ultimate question, however, remains whether a "reasonable investor could have been [misled] to believe something in contradiction to the omitted facts." *In re Sanofi-Aventis Sec.*

*Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. 2011); *see also* *Macquarie Infrastructure Corp.*, 601 U.S. at 263, 144 S.Ct. 885 ("Disclosure is required under [Section 10(b) and Rule 10b-5] only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.' " (quoting 🔖 *Siracusano*, 563 U.S. at 44, 131 S.Ct. 1309)).

Defendants principally argue that their failure to tell investors that the IRS was seeking $10.7 billion could not have been misleading in light of Amgen's "timely, robust disclosures about its dispute with the IRS and its impact on Amgen's financials." Motion at 10–11; *accord* Reply at 3–4. In its Form 10-K for the fiscal year ended December 31, 2016, for example, Amgen disclosed that it was "currently under audit by the IRS for tax years ended December 31, 2010, 2011 and 2012" and identified as a risk factor that "[t]ax authorities are becoming more aggressive in their audits and are particularly focused on the allocations of income and revenue among tax jurisdictions." 2016 Form 10-K at 33, 94. Then, in its quarterly report for the first quarter of 2017, Amgen disclosed that it had received NOPAs and an RAR corresponding to tax years 2010 through 2012 and emphasized that those notices contained "significant proposed adjustments relate[d] primarily to the allocation of profits between certain of [the Company's] entities." Q1 2017 Form 10-Q at 9–10, 33. Amgen also warned investors that the IRS audit "could have a material impact on [the Company's] results of operations and cash flows if not resolved favorably." *Id.* Amgen's SEC filings during and around the Class Period contained similar language, including with respect to its 2013 to 2015 tax years. *See, e.g.*, Q1 2020 Form 10-Q at 11, 37 (reiterating that the IRS was proposing "significant adjustments" relating to transfer pricing as to the 2010 to 2012 tax years and disclosing that the Company had received NOPAs for 2013 to 2015 that were "similar to the proposed adjustments" for 2010 to 2012); Q2 2020 Form 10-Q at 14, 43 (warning investors that the proposed adjustments were "significant," "substantial," "may result in payments substantially greater than amounts accrued," and "could have a material impact" on the Company's financial statements); 2020 Form 10-K at 43, 74, 80-81, 123 (similar).

**\*12** **[13]** The Court disagrees that these disclosures sufficiently informed investors as to the risks Amgen was facing from its transfer-pricing dispute with the IRS. The magnitude of the Company's potential liability to the IRS expressed in the NOPAs and RARs for the 2010 to 2015 tax years was enormous, even for a company the size of

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 259 of 330

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)
2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

Amgen: $10.7 *billion* in back taxes and penalties, with interest on the taxes due. Am. Compl. ¶¶ 68, 170(c). Put differently, as alleged, the IRS was seeking monetary relief from Amgen amounting to, for 2022, 139.4% of the Company's cash and cash equivalents, 290.6% of its stockholders' equity, 162.4% of its net income, 40.4% of the Company's revenue, and 16.3% of its assets. *Id.* ¶ 137 (referring to Amgen's financials for fiscal year 2022). Given the sheer size of the potential liability Amgen was facing, Defendants' vague characterizations of the amounts the IRS was seeking as "significant," "substantial," and potentially "material" rendered its disclosure of the tax dispute neither "clear" nor "complete." *Macquarie Infrastructure Corp.*, 601 U.S. at 263, 144 S.Ct. 885.

To the contrary, "investors were left in the dark about the magnitude of that liability." *Wang*, 661 F. Supp. 3d at 226. On an August 3, 2021 conference call, for example, Griffith referred to "a difference of opinion on the value of the significant risks" presented by the IRS dispute and emphasized the Company's "strong[ ] belie[f]" that the agency's position was "without merit," yet continued to describe the potential liability as merely "significant." Am. Compl. ¶ 200. But the Pension Fund plausibly pleads that milquetoast account of the risks involved—which could easily have referred to amounts far below Amgen's potential $10.7 billion liability—"did not reveal the information necessary for the investing public to make a proper assessment of the alleged risks" relating to the IRS dispute and, when contrasted with the Company's repeated, forceful rejections of the agency's position, could have misled investors regarding the risks involved. 🚩*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 WL 17815767, at *4 (2d Cir. Dec. 20, 2022) ("Having chosen to speak about their base of customers, Defendants had a duty to speak accurately, giving all material facts in addressing those issues to permit investors to evaluate the potential risks."), *vacated and remanded on other grounds by Macquarie Infrastructure Corp.*, 601 U.S. 257, 144 S.Ct. 885; 🚩*Meyer*, 761 F.3d at 251 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."). In other words, Defendants' omission of the $10.7 billion potential liability or other information from which investors could accurately assess the true nature of the IRS dispute concealed the extent of the risk the company was facing, making its use of vague qualifiers like "significant" and "substantial" plausibly misleading. *See* 🚩*Kleinman v.*

*Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) ("Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." (internal quotation marks omitted, alteration in original)).

Indeed, Defendants' disclosure of the IRS dispute without revealing its true scope calls to mind the Supreme Court's example in *Macquarie* of a child telling his parents that he had "dessert" when in fact he had eaten the "whole cake"—and this Court does not believe that analogy would have come out differently had the child described his treat as merely "significant" or "substantial" instead. *Macquarie Infrastructure Corp.*, 601 U.S. at 263, 144 S.Ct. 885. It was therefore unsurprising that when the truth regarding the potential liability Amgen was facing finally emerged, the Company's share price declined appreciably and the analyst community noted the importance to investors of those alleged corrective disclosures. *See* Am. Compl. ¶¶ 7-8 (alleging that the price of Amgen's common stock fell by 6.5% after the Company disclosed its $3.6 billion potential liability for tax years 2010 to 2012 and by 8.6% after it revealed the additional $7.1 billion potential liability for tax years 2013 to 2015); *id.* ¶ 162 (Jeffries analyst report stating that Amgen's disclosure of the additional potential liability for tax years 2013 to 2015 "certainly add[ed] noise to the story," observing that the IRS dispute had been "off the radar for most investors," and acknowledging the "lack of visibility" into the matter). Drawing all reasonable inferences in the Pension Fund's favor, as the Court must on a motion to dismiss, the omission of information sufficient to quantify the potential liability Amgen was facing could, under the circumstances alleged, plausibly have misled a reasonable investor regarding the financial risks facing the Company.

**\*13** The cases Defendants rely on in their briefing do not support their contention that terms like "significant," "substantial," and "material" would have been enough to alert reasonable investors to the size of the potential $10.7 billion liability. In one case Defendants rely on, 🚩*City of Pontiac*, the Second Circuit rejected the notion that a company being investigated by the Department of Justice for tax evasion was required to disclose, in addition to the existence of the investigation itself, that in fact the company was guilty of the alleged underlying offenses. 🚩*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Explaining that "disclosure is not a rite of confession" whereby companies

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)
2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

subject to an investigation must immediately capitulate to the government's position, the Second Circuit held that in those circumstances it was sufficient for the company to reveal the fact of the investigation and warn investors that it could be subject to "substantial monetary damages," among other relief. 🔖 *Id.* But nothing in this Court's Opinion suggests that Amgen was required to "confess" to having in fact underpaid its taxes. [14] The Company was (and is) free to vigorously dispute the legal and factual merits of the IRS's assessments, and to tell investors that it is doing so; what it cannot do consistent with Section 10(b) and Rule 10b-5, however, is present investors with an incomplete, unclear, and thus plausibly misleading picture of the financial risks posed by that dispute. [15]

Nor, as Defendants argue, does holding actionable Amgen's omission of the $10.7 billion figure conflict with the district court's reasoning in 🔖 *In re N2K*. There, the district court held that a prospectus was not misleading where it warned investors that the company expected to incur "significant losses" despite the company's failure to contemporaneously disclose that it had suffered a net loss of $13.7 million in its then-current quarter. 🔖 *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 205-06, 209-10 (S.D.N.Y. 2000). Even setting aside the difference in magnitude between $13.7 million and $10.7 *billion*, in 🔖 *In re N2K* the company had paired its general cautionary statements with "trends reflected by ... graphical depictions" specifically disclosing that it had suffered net losses of $13.2 million and $5.4 million in its prior two quarters, so the $13.7 million net loss it subsequently disclosed could not have come as much of a surprise to the reasonable investor. 🔖 *Id.* at 208-10 & n.7. Here, on the other hand, Amgen did not begin publishing any quantifiable information concerning the range of its potential liability to the IRS until well into the Class Period. Defendants' remaining cases are similarly inapposite.

**\*14**  While much of the parties' briefing appears to treat all of the Company's Class Period SEC filings as similarly situated for purposes of the Pension Fund's omissions theory, beginning with its Form 10-Q for the second quarter of 2021 Amgen's challenged disclosures included a statement that the IRS was specifically seeking $3.6 billion in back taxes and interest for its 2010 to 2012 tax years. *See, e.g.*, Q2 2021 Form 10-Q at 13, 40; Q3 2021 Form 10-Q at 13, 42; 2021 Form 10-K at 73, 79, 121. Although these later filings continued to omit the size of the liability the Company

was facing in connection with its 2013 to 2015 tax years, the inclusion of the $3.6 billion figure, in conjunction with Amgen's disclosures that its exposure for the later tax years was comparable to its exposure for the prior years, arguably suggests a different analysis. Even if such an argument had been properly presented, however, the Court would not conclude that Amgen's disclosures in these later filings were sufficient to warrant dismissal. To be sure, the $3.6 billion figure would have provided reasonable investors with at least some basis to estimate the possible exposure for the 2013 to 2015 tax years. But in reality, the liability Amgen was facing in connection with the 2013 to 2015 tax years was almost *double* the amount the IRS was seeking in connection with the earlier three years, representing $7.1 billion in additional back taxes and penalties, plus interest on the taxes due. Am. Compl. ¶ 63. And far from accurately informing investors that the very worst was still to come, Amgen's filings downplayed the 2013 to 2015 amounts as "similar" to the 2010 to 2012 amounts and continued to refer to the additional $7.1 billion in potential loss as merely "significant." *E.g.*, Q3 2021 Form 10-Q at 13.

For these reasons, the Pension Fund has adequately alleged that Defendants' Class Period disclosures regarding the IRS dispute were unclear, incomplete, and therefore plausibly misleading by virtue of omitting the fact that the liability Amgen faced was as high as $10.7 billion or otherwise disclosing facts sufficient to allow investors to assess the true extent of the risk.

#### b. Alleged Misstatements.

As noted, the Pension Fund also proceeds on an affirmative misstatement theory. Specifically, the Pension Fund alleges that Amgen's Class Period SEC filings contained material misstatements regarding the status of the Company's transfer-pricing dispute with the IRS. Opposition at 19. As noted, each of the quarterly and annual reports that Amgen filed with the SEC during the Class Period included a Note titled "Contingencies and commitments," found under the report's "Notes to Condensed Consolidated Financial Statements." Under "Contingencies and commitments" was the subtitle, "Contingencies." As an example, the Contingencies section in Amgen's Form 10-Q for the second quarter of 2020, the first SEC filing during the Class Period, included the following language:

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)
2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

Our legal proceedings involve various aspects of our business and a variety of claims, some of which present novel factual allegations and/or unique legal theories. ***In each of the matters described in this filing***; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; or in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2020, ***in which we could incur a liability, our opponents seek an award of a not-yet-quantified amount of damages or an amount that is not material.*** In addition, a number of the matters pending against us are at very early stages of the legal process, which in complex proceedings of the sort we face often extend for several years. ***As a result, none of the matters described in this filing***; in Note 19, Contingencies and commitments, to the consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2019; or in Note 13, Contingencies and commitments, to the condensed consolidated financial statements in our Quarterly Report on Form 10-Q for the period ended March 31, 2020, in which we could incur a liability, ***have progressed sufficiently through discovery and/or the development of important factual information and legal issues to enable us to estimate a range of possible loss***, if any, or such amounts are not material. While it is not possible to accurately predict or determine the eventual outcomes of these matters, an adverse determination in one or more of these matters currently pending could

have a material adverse effect on our consolidated results of operations, financial position or cash flows.

Q2 2020 Form 10-Q at 32 (emphasis added). The Contingencies section for the other Class Period quarterly reports and annual reports contained similar language. *See* Q3 2020 Form 10-Q at 31; 2020 Form 10-K at 147; Q1 2021 Form 10-Q at 23; Q2 2021 Form 10-Q at 27; Q3 2021 Form 10-Q at 30; 2021 Form 10-K at 144. In the Pension Fund's view, Amgen's dispute with the IRS, which is indeed described in each of the relevant filings, is a "matter[ ] described in this filing" for which the IRS, through its NOPAs and RARs, had in fact sought a specific amount of back taxes and other relief. Opposition at 19. The Pension Fund therefore argues that the emphasized language in the above passage was materially false or misleading as applied to the IRS dispute because it stated that for "each of the matters described in this filing" Amgen's opponents sought "an award of a not-yet-quantified amount of damages," and that as a result the Company was unable to "estimate a range of possible loss" for those matters. *Id.* at 19-20 (quoting Am. Compl. ¶¶ 174, 181, 195, 208) (emphasis removed).

**\*15** To start, it is far from clear that, at least as to the filings prior to the Q2 2021 Form 10-Q, a reasonable investor would have understood this passage to be referring to the IRS dispute. The Contingencies Note, where the challenged language in each filing resides, states at the outset that the purpose of the Note is to "describe [Amgen's] legal proceedings and other matters that are significant or that [the Company believes] could become significant *in this footnote.*" *E.g.*, Q2 2020 Form 10-Q at 32 (emphasis added). Then, immediately after the challenged passage, the Note states that "[c]ertain recent developments concerning our legal proceedings and other matters are discussed below" before listing a host of pending civil litigations involving Amgen. *Id.* at 32-34 (listing, for example, "*Genentech, Inc. v. Amgen Inc.*," "*Novartis Pharma AG v. Amgen Inc.*," and "*Humira* ® *Biosimilar Antitrust Class Actions*"). With that context, it appears far more likely that a reasonable investor would have understood even the facially broad language, "matters described in this filing," to mean only the discrete list of "legal proceedings and other matters" listed immediately after the quoted language in the Note itself, which list did not include the IRS dispute prior to the Q2 2021 Form 10-Q. *Id.*

Pl. Appx. B-256

 **[14]**  But even reading "matters described in this filing" to
include the IRS dispute not listed in the Note itself, the
Pension Fund's argument that a reasonable investor could
have understood Amgen to be saying that the IRS had not
stated a quantified amount in the NOPAs and RARs is
basically self-refuting. One of the defining characteristics
of a NOPA—again, a Notice of Proposed Adjustment—
is that it proposes an adjustment. *See* Am. Compl. ¶ 41
("[A]ll IRS proposed adjustments are set forth on Form
5701, *Notice of Proposed Adjustment*, which is generally
accompanied by Form 886-A, *Explanation of Items*. Form
5701 provides a summary of the proposed adjustments and
Form 886-A provides a detailed explanation of the basis
for each adjustment."). The same is essentially true of an
RAR, which "shows the changes the IRS has made to the
income, credits, and deductions on the taxpayer's income
tax return, as well as the income tax due, and penalties
and interest." *Id.* ¶ 43. Consistent with that reality, Amgen's
descriptions of the NOPAs and RARs it received made clear
that they sought a quantifiable amount of relief. *See, e.g.,*
Q2 2020 Form 10-Q at 14 (disclosing that "[t]he RAR
proposes to make significant adjustments"); *id.* (disclosing
that the Company received a modified RAR that "revised
the IRS's calculations but continued to propose substantial
adjustments"); *id.* (stating that the Company "disagree[s] with
the proposed adjustments and calculations"); *id.* (stating that
the "proposed adjustments" the Company received for tax
years 2013 to 2015 were similar to those it received for tax
years 2010 to 2012).

Considering the full context of the relevant filings, no
reasonable investor could thus have been left with the
impression that the IRS was not seeking a quantifiable
amount of relief through the NOPAs and RARs it sent to
Amgen. *See Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d
471, 481 (S.D.N.Y. 2023) ("The test for whether a statement
or omission is materially misleading ... is not whether the
statement is misleading in and of itself, but whether the
defendants' representations, taken together and in context,
would have misled a reasonable investor.") (quoting 🔖 *In re
Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016));

*see also* 🔖 *Fan v. StoneMor Partners LP*, 927 F.3d 710,
716 (3d Cir. 2019) ("[Courts] pay particular attention to
whether or not Defendants sufficiently disclosed facts and
information that would render the alleged misrepresentations
not misleading."). And although, as previewed above, certain
of Amgen's Class Period filings beginning with the Q2 2021
Form 10-Q did in fact list the IRS dispute as a matter to

which the "not yet quantified" statement and similar language
applied, those filings each expressly referred the reader to
a separate portion of the filing containing more specific
information regarding the dispute, which made clear both that
the overall dispute involved quantifiable amounts and that
the listed Tax Court matter in particular involved a claim for
additional taxes of $3.6 billion. *See, e.g.,* Q2 2021 Form 10-
Q at 13, 28; 2021 Form 10-K at 121, 151. So while the Court
concludes that the Amended Complaint plausibly alleges that
Amgen's disclosures failed to inform investors as to the true
extent of the liability the Company was facing, it does not
plausibly allege that Amgen made a material misstatement as
to whether it was facing a quantifiable loss at all.

 **\*16**  Accordingly, the Pension Fund has failed to adequately
plead falsity on an affirmative misstatement theory based on
the "not yet quantified" statement and similar language in
Amgen's Class Period SEC filings.

### 2. Scienter

Defendants also move to dismiss the Amended Complaint
for failure to adequately allege scienter. Motion at 26-30;
Reply at 10-12. Because the Court finds that the Pension
Fund has only pleaded falsity with respect to Defendants'
failure to adequately inform investors regarding the extent
of the liability it was facing in the IRS dispute, the Court
limits its analysis of scienter to that theory. For the following
reasons, the Court concludes that the Pension Fund has
sufficiently alleged that Defendants acted at least recklessly
in withholding from investors the true scope of that potential
liability, thereby satisfying their obligation to plead scienter.

 **[15]**  The PSLRA requires a complaint to "state with
particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind." 15 U.S.C.
§ 78u-4(b)(2)(A). The Second Circuit has recognized two
ways that a securities fraud plaintiff can plead a strong
inference of scienter under the PSLRA, either "by alleging
facts (1) showing that the defendants had both motive
and opportunity to commit the fraud or (2) constituting
strong circumstantial evidence of conscious misbehavior or
recklessness." 🔖 *Setzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204, 212 (2d Cir. 2020) (internal quotation marks
omitted). Whichever path the plaintiff takes, the "complaint
will survive 'if a reasonable person would deem the inference
of scienter cogent and at least as compelling as any opposing
inference one could draw from the facts alleged.' " 🔖 *Emps.'
Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)

2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

(2d Cir. 2015) (quoting 🚩 *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499).

 **[16]**  The Pension Fund primarily argues that the Amended Complaint has alleged a strong inference of scienter based on recklessness. To prevail on a recklessness approach in the context of a case based on an omissions theory of falsity, a plaintiff in this Circuit must establish both that the defendant breached a "clear duty to disclose" the omitted facts and that the breach involved "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." 🚩 *Setzer*, 968 F.3d at 213 (internal quotation marks omitted); *see also* 🚩 *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (requiring allegations of "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence").

 **[17]**  As an initial matter, the Amended Complaint adequately alleges that Defendants were aware of the full extent of the liability Amgen was potentially facing from the IRS dispute. By the time the Class Period began, the IRS had notified the Company that the agency was seeking "approximately $3.6 billion in back taxes for its 2010-12 tax years, at least approximately $5.1 billion in back taxes for its 2013-15 tax years, and approximately $2 billion in penalties for its 2013-15 tax years." Am. Compl. ¶ 63. Amgen's Class Period filings with the SEC, which repeatedly referred to the Company's receipt of NOPAs and RARs from the IRS, confirm that it was aware of the extent of the relief being sought by the agency. *See, e.g.*, Q2 2020 Form 10-Q at 14 (stating that Amgen received NOPAs and RARs for the 2010 to 2015 tax years that proposed adjustments to the Company's taxes). Many of those filings were signed by Bradway and/ or Griffith, *see, e.g.*, Am. Compl. ¶ 176, both of whom also addressed the IRS disputes publicly, *id.* ¶¶ 200, 212, 214, 242, and Defendants do not appear to dispute that Bradway and Griffith were aware of the magnitude of the IRS's proposed adjustments and penalties.

 **\*17**  The Court therefore agrees with the Pension Fund that it has plausibly alleged that, once Defendants chose to speak on the subject of the IRS dispute, their failure to adequately inform investors regarding the true extent of Amgen's potential liability violated a clear duty to disclose. That duty arises directly from Rule 10b-5, which "requires disclosure of

information necessary to ensure that statements already made are clear and complete." *Macquarie Infrastructure Corp.*, 601 U.S. at 263, 144 S.Ct. 885; *accord* 17 C.F.R. § 240.10b-5(b). The Amended Complaint plausibly alleges that Defendants' omission of any indication as to the true scope of the tax-related liability Amgen was facing prevented investors from being able to accurately assess the degree of the risk that the IRS's audits entailed. And, as alleged, it should have been obvious to Defendants that withholding from investors any indication that the size of the potential liability was as high as $10.7 billion—more than a full year's net-income for the company and approximately 40% of its annual revenues— would make its disclosure of the IRS dispute unclear and incomplete. *See* 🚩 *In re Perrigo*, 435 F. Supp. 3d at 588 ("The magnitude of a loss remains a relevant factor in assessing scienter." (internal quotation marks omitted)); 🚩 *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96-97 (2d Cir. 2016) (similar); *cf. Denny v. Canaan Inc.*, No. 21 Civ. 3299 (JPC), 2023 WL 2647855, at *14 (S.D.N.Y. Mar. 27, 2023) (holding that the magnitude of the loss did not raise an inference of scienter where "there [was] no indication that Defendants had access to [the relevant] information at the time of the [challenged statements]"). Griffith, for example, was asked by analysts on the August 3, 2021 conference call to quantify the potential liability the Company was facing for its later tax years, clearly communicating to Defendants that the market considered that information important in assessing the financial risks posed by the audit. *See* Am. Compl. ¶ 200 (asking Griffith whether Amgen had "establish[ed] what an upper bound of liability" would be). Accordingly, the Court holds that the Amended Complaint plausibly alleges that Defendants were under a clear duty to disclose, whether by stating the specific amount sought by the IRS or disclosing other facts sufficient to inform investors as to the true extent of the liability the Company was facing.

 **[18]**    **[19]**  The Court also agrees that the Pension Fund plausibly pleads that Defendants' failure to do so was reckless under the circumstances. Despite Amgen's size, a potential tax liability of up to $10.7 billion was "plainly" material to the Company's financial health and therefore Defendants "had to know that revealing the full extent of [the potential liability] would have been troubling news to its investors." 🚩 *Setzer*, 968 F.3d at 215.[16] Given the sheer size of the potential liability, investors were entitled to a greater degree of clarity once Defendants chose to speak on the matter. But, as alleged, instead of providing investors with candid information regarding the extent of the financial risks posed

2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

by the IRS dispute, Defendants hid the enormous liability
Amgen was facing behind a wall of opaque adjectives like
"significant" and "substantial." As alleged in the Amended
Complaint, Defendants "made a conscious decision" not to
reveal the extent of the potential liability for several years,
and in so doing understated and obfuscated the true nature
of the IRS dispute. 🚩 *Id.* The Court therefore agrees that the
Pension Fund adequately alleges that Defendants' failure to
disclose these facts "constituted conscious misbehavior, or, at
the very least, highly unreasonable conduct that represents an
extreme departure from the standards of ordinary care." 🚩 *Id.*
at 216 (cleaned up). And, while discovery may very well turn
up an innocent explanation for that failure, at this stage of
the litigation the Amended Complaint supports an inference
of scienter that is "cogent and at least as compelling as any
opposing inference one could draw from the facts alleged."
🚩*Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499.

Accordingly, the Court holds that the Pension Fund has
adequately alleged scienter with respect to Defendants'
failure to disclose the extent of Amgen's potential liability to
the IRS.

**B. Section 20(a)**

The Amended Complaint also alleges a control-person claim
against Bradway and Griffith under Section 20(a), 15 U.S.C.
§ 78t(a). Defendants do not develop any distinct arguments
for dismissal of this claim. *See* Motion at 30; Reply at 12
n.19. Because the Court concludes that the Pension Fund has
adequately alleged an underlying claim pursuant to Section
10(b) and Rule 10b-5, the Court denies Defendants' motion
to dismiss the Section 20(a) claim as well. *See, e.g.,* 🚩*Setzer*,
968 F.3d at 216.

**C. Leave to Amend**

**\*18** **[20]** Under Rule 15(a) of the Federal Rules of Civil
Procedure, a court "should freely give leave [to amend] when
justice so requires." Fed. R. Civ. P. 15(a)(2). The Pension
Fund has asked the Court for leave to further amend its
pleading "[s]hould the Court find the [Amended Complaint]
to be deficient in any respect." Opposition at 30 n.29. But that
cursory footnote gives no indication as to how the deficiencies
identified in the Pension Fund's affirmative-misstatement
theory could be cured through further amendment. The
request for leave to amend is therefore denied. *See* 🚩*Noto
v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022)
("[D]enial of leave to amend is proper where the request
gives no clue as to how the complaint's defects would be
cured." (internal quotation marks omitted)).

### IV. Conclusion

For these reasons, the Court denies Defendants' motion to
dismiss. Defendants are ordered to answer the Amended
Complaint on or before October 21, 2024.

The Clerk of Court is respectfully directed to change
the caption of this case to "*In re Amgen Inc. Securities
Litigation.*"

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2024 WL 4354809, Fed. Sec. L. Rep. P
101,939

---

## Footnotes

1   The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the
Amended Complaint, Dkt. 34 ("Am. Compl."), as well as documents incorporated by reference in the Amended
Complaint and other documents susceptible to judicial notice, including Amgen's legally required filings
with the SEC. *See* 🚩*Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011)
(explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged
within the four corners of the complaint to be true, and draw[ ] all reasonable inferences in plaintiff's favor");
🚩*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that, on a motion to

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 265 of 330

Rooters Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)
2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

dismiss, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

2   Form 10-K is a comprehensive financial report that public companies must file annually with the SEC. *See* 🚩 15 U.S.C. § 78m; 17 C.F.R. § 249.310.

3   Citations to pages in exhibits attached to the Woan Declaration refer to the pagination generated by the Electronic Case Filing system rather than the internal pagination of the documents, unless otherwise indicated.

4   NOPAs and RARs "are generally accompanied by Form 886-A." Am. Compl. ¶ 86. According to the Amended Complaint, Form 886-A

provides a detailed explanation of the audit adjustments and contains the following information:

[(a)] the case related facts, *e.g.*, the activity or non-activity the organization or plan has engaged in or started;

[(b)] the law, applicable code and regulation sections, and Rev. Rulings, Revenue Procedures, etc., that supports the IRS's position;

[(c)] the Government's position, which states why the application of the law to the facts supports the conclusion reached by the examination team;

[(d)] the taxpayer's position and authority the taxpayer is relying upon (as opposed to the IRS's conclusions); and

[(e)] the IRS's conclusion, setting forth the taxpayer's correct income tax liability after consideration of all of the above.

*Id.*; *see also* Woan Decl., Exh. S at 2-3 (describing the format of Form 886-A).

5   On November 29, 2017, Amgen received a modified RAR for the 2010 to 2012 tax years, which "revised the IRS's calculation but continued to propose substantial adjustments." Am. Compl. ¶ 66.

6   Form 10-Q is a comprehensive financial report that public companies must file with the SEC at the end of each of the first three quarters of the fiscal year. *See* 🚩 15 U.S.C. § 78m; 17 C.F.R. § 249.308a.

7   In September 2020, Amgen "received a revised RAR which continued to propose substantial adjustments for its 2013-15 tax years." Am. Compl. ¶ 68.

8   In Amgen's 2020 Form 10-K, this disclosure was made, in substance, under the "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as in the report of Amgen's independent auditor.

9   A Contingencies section also was located in Amgen's 2020 and 2021 Form 10-Ks in the report of Amgen's independent auditor under "Notes to Consolidated Financial Statements." *See, e.g.*, 2020 Form 10-K at 147; Woan Decl., Exh. K ("2021 Form 10-K") at 144.

10   In July 2021, Amgen received a duplicate NOD regarding the same tax years of 2010 to 2012. Am. Compl. ¶ 72.

Roofers Local No. 149 Pension Fund v. Amgen Inc., --- F.Supp.3d ---- (2024)

2024 WL 4354809, Fed. Sec. L. Rep. P 101,939

11    While the Amended Complaint does not specify under which subsection of Rule 10b-5 it brings Count One, the Pension Fund's opposition brief argues only a liability theory based on material misstatements and omissions and does not advance any theory of an independent scheme to defraud, *see generally* Dkt. 44 ("Opposition"). *See* Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021) ("Unlike the better-known subsection (b), [subsections (a) and (c)] do not require the defendant to make a misstatement or omission; they require only deceptive conduct."). At oral argument, the Pension Fund's counsel confirmed that it is not asserting any claim for scheme liability. Dkt. 61 ("Tr.") at 3:12-13.

12    The Pension Fund's briefing does not address, or addresses only in the most cursory fashion, many additional theories of liability asserted in the Amended Complaint, and the Court therefore deems those issues forfeited or abandoned.

13    At oral argument, counsel for the Pension Fund confirmed that its two duty-to-disclose theories are alternative. Tr. at 52:4-15.

14    As a result, to the extent that the Pension Fund seeks to hold Amgen separately liable for failing to "convey the likelihood that the IRS's determination will ultimately be affirmed in the Tax Court," Opposition at 13, that theory is rejected. It may be that, as the Pension Fund foreshadows, Amgen will face an uphill battle in the Tax Court, but those challenges are still pending and the Company was therefore under no duty to preemptively concede to the supposed strength of the agency's position. *See* City of Pontiac Policemen's & Firemen's Ret. Sys., 752 F.3d at 184.

15    Defendants' reliance on Banco Safra S.A. is similarly misplaced. In that case, the plaintiffs alleged that a company's "Offering Memorandum" was misleading because it failed to disclose that the company and one of its executives, who were subject to claims and investigations for corruption, were in fact guilty of participating in a bid-rigging scheme. *See* Banco Safra S.A.-Cayman Islands Branch v. Andrade Gutierrez Int'l S.A., No. 16 Civ. 9997 (JMF), 2018 WL 1276847, at *1 (S.D.N.Y. Mar. 8, 2018). The court rejected that argument under the logic of City of Pontiac and held that the company's disclosures, which specifically warned about the possibility that it could be suspended from public bidding as a result of such corruption, were sufficient to educate investors about the nature of the risk. Id. at *3-4. Here, again, the defect in Amgen's disclosures is not that it failed to resign itself to the correctness of the IRS's allegations, but that its vague descriptions of the amount the IRS was seeking could plausibly have misled investors regarding the extreme magnitude of the potential liability.

16    Defendants argue that they lacked a clear duty to disclose facts regarding the potential liability reflected in the IRS's NOPAs and RARs because those amounts were "non-final." Reply at 11. That is not dispositive. Through the NOPAs and RARs, the IRS sought $10.7 billion in back taxes and penalties, plus interest on the taxes, following what the Amended Complaint describes as a lengthy and painstaking investigation. *See* Am. Compl. ¶¶ 44-72. Under those circumstances, the Pension Fund plausibly alleges that disclosure of information sufficient to enable investors to understand the extent of the possible loss that Amgen was facing was necessary to make the Company's disclosures regarding the IRS dispute both clear and complete. *See* Macquarie Infrastructure Corp., 601 U.S. at 263, 144 S.Ct. 885.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 17

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)
2019 WL 6111516

2019 WL 6111516
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Lawrence ROUGIER, Lead Plaintiff,

v.

APPLIED OPTOELECTRONICS, INC, Chih-Hsiang
(Thompson) Lin, and Stefan J. Murry, Defendants.

Class Action Case No. 4:17-CV-2399
|
Signed 03/27/2019
|
Entered 03/28/2019

**Attorneys and Law Firms**

Andrew W. Rocco, Sebastiano Tornatore, Shannon L. Hopkins, Levy & Korsinsky LLP, Stamford, CT, Jamie J. Gilmore, Tanner and Associates, PC, Fort Worth, TX, Gregory M. Nespole, Levi & Korsinsky LLP, New York, NY, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for Lead Plaintiff.

Michael C. Holmes, Amy Tankersley Perry, Emily Schomburger Johnson, Robert Power Ritchie, Vinson & Elkins, Dallas, TX, Allison Lee Fuller, Jeffrey S. Johnston, Vinson & Elkins, Houston, TX, for Defendants.

**<u>ORDER</u>**

VANESSA D. GILMORE, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court is Defendants' Motion to Dismiss Plaintiff's First Consolidated Amended Class Action Complaint. **(Instrument No. 53).**

**I.**

**A.**

The case before the Court is a class action suit for violations of the federal securities laws. (Instrument No. 48). The suit is brought on behalf of purchasers and sellers of the common stock and or call options of Applied Optoelectronics, Inc. ("AOI") between February 23, 2017, and February 21, 2018

(the "Class Period"). *Id.* at 2. Lead Plaintiff Lawrence Rougier alleges that Defendants AOI, Chih-Hsiang (Thompson) Lin ("Lin"), and Stefan J. Murry ("Murry") carried out a scheme to mislead investors by concealing the significant known decrease in demand from Amazon, AOI's largest customer (accounting for 50-60% of AOI's total revenues) as a result of undisclosed product quantity and quality control issues that Plaintiff alleges prevented AOI from being able to timely produce the volume of 100G transceivers that Amazon was demanding, and the negative impact of competing manufacturing models. (Instrument No. 56 at 8).

**1. Applied Optoelectronics, Inc.'s Products**

Defendant Applied Optoelectronics, Inc. ("AOI") designs and manufactures fiber-optic networking products servicing four different markets: internet datacenters, cable television, fiber-to-the-home, and telecommunications. (Instrument No. 53 at 8). AOI's datacenter customers are generally large internet-based datacenter operators and contributed over 75% of AOI's revenue for 2016 and 2017. *Id.* at 8-9; (Instrument No. 56 at 11). AOI supplies its customers with optical transceivers that plug into switches and servers within the customers' datacenters and allow their network devices to send and receive data over fiber optic cables. (Instrument No. 53 at 9).

AOI's largest customers for the years 2016 and 2017 were Amazon, Microsoft, and Facebook. (Instrument No. 48 at 13).[1] Plaintiff alleges that Amazon represented over 50% of AOI's Class Period revenue. (Instrument No. 56 at 11). AOI's transceivers are plugged into switches and computer servers within these "hyperscale data centers" which store, process, and communicate massive amounts of data for websites, such as Facebook, or for "cloud computing" services, provided by companies including Amazon and Microsoft to other businesses. (Instrument No. 48 at 14). These hyperscale data centers then transmit data through network connections to internet service providers, then onto individual digital devices. *Id.* As consumers and businesses increase their consumption of digital bandwidth, datacenters must increase in physical size and accelerate their data transmission rates. *Id.* Because the transmission speed of the optical transceiver limits the speed at which a datacenter can communicate information, datacenter customers have sought faster, smaller, and more energy-efficient transceivers. *Id.* While transceivers capable of transmitting data at one gigabit per second ("Gbps" or "G") were cutting-edge in 2013, 40G transceivers had

2019 WL 6111516

almost completely supplanted both 1G and 10G transceivers by 2015. *Id.* at 14-15.

**\*2** 100G transceivers entered the market in late 2015, but in limited supply, and demand for 40G devices persisted. (Instrument No. 48 at 15). Plaintiff alleges that in 2016, the majority of AOI's datacenter sales were for 40G transceivers. *Id.* Plaintiff alleges, however, that by the beginning of the Class Period, customers' attention had turned to the newly developed 100G transceivers and the highly anticipated 200G and 400G transceivers. *Id.*

AOI describes itself as utilizing a "vertically integrated" manufacturing system. (Instrument No. 48 at 15). AOI operates manufacturing facilities in Sugarland, Texas, Ningbo, China, and Taiwan. *Id.* In Texas, AOI manufactures laser chips, subassemblies, and components. *Id.* The subassemblies are used by AOI's other facilities in manufacturing components. *Id.* In Taiwan, AOI manufactures optical components, which incorporate laser chips, subassemblies and components manufactured at the Texas location, as well as the transceivers used by the internet datacenters. *Id.* In China, AOI manufactures the more labor-intensive components and optical equipment systems, such as optical subassemblies. *Id.* The majority of AOI's optical transceivers utilize AOI's own lasers and subassemblies. *Id.* at 15-16.

### 2. AOI's Statements

Plaintiff's First Amended Complaint includes statements from confidential witnesses. Plaintiff's first confidential witness ("CW1") allegedly worked for AOI as an engineer involved with optical module and transceiver development, as well as manufacturing and procurement (i.e., procuring components that AOI did not manufacture itself at volume prices for the transceivers). (Instrument No. 48 at 16). Plaintiff's second confidential witness ("CW2") allegedly was a sales executive at AOI from May until October 2017 for both domestic and international customers purchasing AOI's laser chips. *Id.* at 20.

Plaintiff alleges that throughout the Class Period, Defendants claimed to "have good visibility into [their] customers" and that customers provided AOI with "committed orders" and "demand forecasts." (Instrument No. 56 at 12). According to CW2, AOI's customers were required under their supply agreements to provide AOI projections "before the beginning

of each year" of their requirements for the coming year. *Id.*; (Instrument No. 48 at 20-21). A customer communicates these projections to sales people via telephone calls or emails, which the AOI sales executive responsible for that customer then enters into the companywide SAP system. (Instrument No. 48 at 20-21). Plaintiff alleges that AOI's recently released contract with Facebook confirms AOI's model, alleging that Facebook's projections included minimum purchase commitments and six-month forecast requirements. (Instrument No. 56 at 12). Although Plaintiff alleges that "it can be inferred that Amazon had a similar agreement" as Facebook, Plaintiff does not allege that it can confirm that Amazon had such an agreement. (Instrument No. 48 at 23). According to CW2, during the Class Period, customer demand and order changes were monitored weekly and discussed at weekly sales meetings in the Houston office, attended by Fred Chang, who reported to Defendant Lin and who signed the Facebook contract on behalf of AOI. *Id.* at 21; (Instrument No. 56 at 12).

Plaintiff alleges that AOI obtained significant market share for 40G transceivers by capturing Amazon's massive demand, and AOI's internet data revenues doubled from 2014 to 2016. (Instrument No. 56 at 12). AOI attributed its quick rise in the transceiver market to its "vertical integration" model, which AOI claimed gave it a critical advantage over competitors during the transition from 40G to 100G transceivers throughout the Class Period. On February 23, 2017, the first day of the Class Period, AOI stated at its earnings call:

> **\*3** Our ability to internally manufacture lasers and light engines combined with our ability to quickly transition production between 40G and 100G products provides us with cost-leadership advantages, a faster time to market and the ability to quickly scale and adjust our throughput to meet growing demand.

(Instruments No. 48 at 16; No. 56 at 12). Defendant Murry further stated at the February 23, 2017, earnings call that AOI "expect[ed] to maintain [its] leadership position as [it] continue[d] the transition to 100G" and that "the similarity between 100G and 40G modules really gives us an advantage

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 270 of 330

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)

2019 WL 6111516

in terms of being able to ramp that up quickly." (Instruments No. 56 at 12; No. 48 at 16).

Plaintiff alleges that although Defendants publicly represented that AOI could make a seamless transition from one speed of transceiver to another, behind the scenes, AOI had supply chain issues, making it scramble to accommodate large-scale production of a proliferating array of products for its increasingly demanding customers. (Instrument No. 48 at 16). Chips containing lasers are key components in transceivers, with 40G transceivers containing four 10G chips and 100G transceivers containing four 25G chips. (Instrument No. 56 at 12). Each chip is tested at every stage of the transceiver assembly process to determine if the device is functioning properly, and the percentage of units that meet quality control standards is called the "yield." *Id.* at 12-13. CW1 stated that in 2015 or 2016, AOI recognized its difficulty meeting its desired yield rate of 90% and sent an engineer from the Houston facility to Taiwan to increase yield rates to 90% from its then rate of 40%. (Instrument No. 48 at 17). According to CW1, "[w]hen you just start a new product, you can't get 90% yield immediately" and the higher the speed, the more difficult it is to manufacture the chip. *Id.*; (Instrument No. 56 at 13).

CW1 further claimed that transitioning the manufacturing process from the chips for 40G transceivers to the chips for 100G transceivers was far from simple, an issue compounded by the fact that AOI produced multiple varieties of 40G and 100G transceivers. (Instrument No. 56 at 13). According to CW1, by the summer of 2017, AOI was "desperate" to increase chip production, but the difficulty in switching from the 10G chips, used for 40G transceivers, to the faster 25G chips, used for 100G transceivers, resulted in manufacturing delays, including delays in expanding the Houston facility's "chip coating capacity." *Id.* Plaintiff concludes that because of AOI's problems transitioning to 100G transceivers, he believes that the yield rate for 100G transceivers must have been even lower than 40%, which Plaintiff alleges was an "abysmal" rate. (Instrument No. 48 at 17).

Plaintiff additionally claims that AOI's chips were unreliable and prone to failure. (Instrument No. 56 at 13). According to CW1, AOI's senior management knew that the quality control department in Houston lacked the skills necessary to conduct quality assurance testing and troubleshooting for transceivers which customers sent back to AOI. *Id.* Consequently, AOI senior management delegated the responsibility of testing transceivers to research and development (R&D) engineers

who were underequipped to do both quality control and their own jobs. *Id.*; (Instrument No. 48 at 24). CW1 alleged that this was a major flaw in AOI's system which resulted in AOI's Taiwan facility sending a set of defective test transceivers to Amazon during the Class Period. (Instrument No. 48 at 25). Plaintiff concludes that Defendants' claim of vertical integration giving AOI a competitive advantage "in terms of being able to ramp that up quickly" was a charade resulting in inefficiencies and poor quality output. (Instrument No. 56 at 13).

**\*4** Plaintiff alleges that by May 2017, if not earlier, AOI knew or should have understood that large datacenter customers, particularly Amazon, were pursuing alternatives to AOI's optical transceivers, including the "merchant model," where end-users directed the custom assembly of transceivers using parts from a variety of suppliers. (Instrument No. 48 at 25). One such supplier, MACOM Technology Solutions Holdings Inc. ("MACOM"), stated as early as April 25, 2017, that it was being "actively pulled by top cloud data center customers [i.e. Amazon] to provide various solutions through various customers and channels to fulfill what [it] expect[ed] [to] be insatiable demand...." (Instrument No. 56 at 13-14).

Plaintiff alleges that AOI was aware of this "merchant model" and MACOM's increasing business with hyperscale datacenters, including Amazon. (Instrument No. 48 at 26). However, Defendants Lin and Murry dismissed any competitive pressure from the merchant model during a May 4, 2017, conference call. *Id.* During that call, Defendant Murry contended that "economically, [the merchant model] does not make sense" because the layers of complexity and additional profit margins associated with having multiple companies manufacture these datacenter products would not "result[ ] in a product that's less expensive for the end customer than buying it from AOI even at the profit margins or gross profit levels that we're at today." *Id.* Plaintiff further alleges that Defendant Lin added that the companies engaged in the merchant model would have "gross margin[s] [that] will be very low compared to AOI's" because the gross margin AOI obtained would have to be "divide[d] [ ] by 3 companies ... selling laser, doing types of manufacture, selling transceiver or selling chips." *Id.*

On June 26, 2017, it was announced that Amazon had partnered with MACOM and Fabrinet to provide Amazon with 100G transceivers. (Instruments No. 56 at 14; No. 48 at 26-27). Plaintiff alleges that as a result of AOI's inability to

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 271 of 330

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)
2019 WL 6111516

meet demand due to product quality and other issues, Amazon pieced together its own 100G transceivers using components from MACOM and Fabrinet. (Instrument No. 48 at 27).

On July 13, 2017, AOI issued a press release announcing preliminary second quarter 2017 earnings that Plaintiff alleges should have addressed the changed competitive landscape or the known expected decline in sales to Amazon. (Instrument No. 48 at 27). Defendant Lin stated: "I'm pleased to announce that we expect to deliver another record quarter with our top and bottom-line results expected to exceed our guidance" and attributing the results to "improvement[s] in our manufacturing costs, capacity expansion and solid execution by our production team." *Id.*

Plaintiff alleges that this positive preannouncement led to heavy trading volumes and an increase in AOI's share price of $5.40 to a closing price of $78.04 per share. (Instrument No. 48 at 46). The First Amended Complaint includes the statements of investment banking companies Piper Jaffray and Roth Capital Partners. *Id.* Piper Jaffray allegedly recognized AOI's "impressive quarter with revenue upside and record margin levels that have never been seen before in the optical component industry," and believed that "Applied [had] exceptional visibility through the remainder of 2017 ...." *Id.* Roth Capital Partners noted that the press release "didn't provide much detail as to where the specific strength came from, however we assume most of the upside came from datacenter, which continues to see tremendous potential for the company." *Id.*

AOI held its second quarter 2017 press release and earnings call on August 3, 2017. (Instrument No. 56 at 14). Defendant Lin revealed in the press release:

  **\*5** "We are pleased with our team's continued solid execution in the quarter, which marked our ninth consecutive quarter of generating record datacenter revenue. However, as we look into the third quarter, we see softer than expected demand for our 40G solutions with one of our large customers that will offset the sequential growth and increased demand we expect in 100G.

(Instrument No. 48 at 48). Defendant Murry reiterated the weakening demand for AOI's 40G products during the earnings call, stating:

          As we look into Q3, we see softer than expected demand for

our 40G solutions with one of our large datacenter customers that will offset sequential growth and increased demand we expect to see in 100G. This slowdown in 40G demand has been anticipated for some time, but the decline in Q3 is greater than previously expected.

*Id.* at 48-49. Defendants simultaneously claimed that the development was "recent" and "coming a little bit faster" than expected, while stating that Amazon had "a significant amount of committed orders and a good forecast" and with "meaningful 100 gig sales" from all three of AOI's large datacenter customers going forward. *Id.* Defendant Murry further assured investors that AOI's vertical integration model "gives us a significant cost [advantage] even against the MACOM-Fabrinet business model or any of the other competitive business models that we're aware of." *Id.* at 51.

Defendants also revealed for the first time that that the "change-over time" on the product lines was six weeks:

  "[T]here's about a 6-week time from when we produce a laser to when [it] actually gets shipped out as a transceiver. And so the time to actually shift over the production is not long, but the time to – between doing that shift and when you start to see the end product transceivers coming-out is about 6 weeks."

*Id.* at 50.

AOI's share price subsequently fell over 34% on August 4, 2017, to close at $64.60 per share. *Id.* at 51.

Plaintiff alleges that on October 12, 2017, AOI surprised investors with news that third quarter demand from Amazon was "lower ... overall" with revenues falling 20% below guidance and Amazon revenue dropping from 47% of total revenue during the second quarter of 2017 to a mere 10% during the third quarter of 2017. (Instrument No. 56 at 15). AOI shares fell over 20% on this news. *Id.* Plaintiff alleges that although AOI's failing vertical integration strategy allegedly caused the decrease in demand from Amazon, AOI stated that "we don't believe that this disruption in the order flow is related to anything AOI-specific" and that AOI "remain[s] a major supplier to all of our major customers for their long-reach transceiver needs and intra-datacenter applications." *Id.*

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)

2019 WL 6111516

On February 21, 2018, AOI announced that, despite prior representations that the third quarter 2017 100G sales decline was due only to Amazon's slight lag in transitioning from the 40G transceivers, its *100G* transceiver sales to Amazon had dropped from 56% of datacenter revenue during the third quarter of 2017 to 35% during the fourth quarter of 2017. (Instrument No. 56 at 15). On the news of the immense loss of Amazon market share, AOI's share price dropped over 20% from a close of $34.55 on February 21, 2018, to a close of $27.51 on February 22, 2018. *Id.*; (Instrument No. 48 at 31).

Plaintiff alleges that although Defendants repeatedly underscored the importance of the datacenter market for AOI's revenues, and in particular Amazon's contribution, Defendants knew that the vertical integration model was causing product defects and delays in transitioning from old to new products, prompting Amazon to obtain transceivers elsewhere. (Instrument No. 56 at 15).

**\*6** As to the individual Defendants, Plaintiff alleges that throughout the Class Period, Defendants Lin and Murry's direct proxies attended weekly R&D meetings where yield and quality issues were discussed and Defendants had access to notes from these meetings. (Instruments No. 56 at 15; No. 48 at 19-20, 61-62). Plaintiff alleges that Lin specifically received monthly status reports during the Class Period from each R&D manager detailing the yield and product quality issues. (Instrument No. 56 at 15-16). According to Plaintiff, Fred Chang, who reported directly to Lin, signed off on sales contracts and attended weekly sales meetings during the Class Period where all sales numbers and any changes were reported. *Id.* at 16. AOI allegedly entered all sales information into the company-wide SAP system, which was accessible by the individual Defendants. *Id.* Plaintiff concludes that Defendants Lin and Murry knew about product issues and declining sales data and demand forecasts from Amazon. *Id.* Plaintiff further alleges that Defendants Lin and Murry personally profited from their insider knowledge, selling AOI stock during the Class Period, with their largest sales occurring in May 2017, when news of Amazon's interest in the merchant model first became public, garnering both Defendants total profits of over $1.3 million. *Id.*

### B.

Mona Abouzied filed the class action suit on August 5, 2017. (Instrument No. 1). On August 16, 2017, a related action

was filed, *Ludwig v. Applied Optoelectronics, Inc. et al.*, No. 4:17-cv-2512 (S.D. Tex.) (Miller, J.). On October 3, 2017, the Court consolidated the *Ludwig* Action with the present action, *Abouzied v. Applied Optoelectronics, Inc. et al.*, No. 4:17-cv-2399 (S.D. Tex.) (Gilmore, J.).

On January 22, 2018, the Court appointed Lawrence Rougier as Lead Plaintiff. (Instrument No. 44). On March 6, 2018, Plaintiff Lawrence Rougier filed the First Amended Complaint. (Instrument No. 48). Plaintiff's First Consolidated Amended Class Action Complaint seeks to recover damages caused by Defendants' alleged violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j and 15 U.S.C. § 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. *Id.* at 10-11.

On April 4, 2018, Defendants filed their Motion to Dismiss the First Amended Complaint. (Instrument No. 53). Plaintiff filed his Response on May 4, 2018. (Instrument No. 56). Defendants filed their Reply on May 21, 2018. (Instrument No. 57).

### II.

Rule 12(b)(6) authorizes dismissal of a civil action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must articulate "the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Stated otherwise, in order to withstand a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 148 (5th Cir. 2010).

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)

2019 WL 6111516

When ruling on a 12(b)(6) motion, the Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[2] *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal quotation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court does not resolve any disputed fact issues. *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014). Instead, the Court assumes all well-pleaded facts contained in the complaint are true. *Wolcott*, 635 F.3d at 763. The Court will not, however "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (internal quotation omitted). Similarly, legal conclusions masquerading as factual conclusions need not be treated as true. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995); *see also Iqbal*, 556 U.S. at 678. Although all well-pleaded facts are viewed in the light most favorable to the plaintiff, *Turner*, 663 F.3d at 775, the Court "will not strain to find inferences favorable to the plaintiff." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (internal quotation omitted). Therefore, to avoid a dismissal for failure to state a claim, a plaintiff must plead specific facts. *Dorsey*, 540 F.3d at 338.

**\*7** Securities fraud allegations are subject to the pleading requirements of *Rule 9(b) of the Federal Rules of Civil Procedure. Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 934 (N.D. Tex. 1995). *Rule 9(b)* requires a plaintiff to plead "with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. The rule imposes a standard of pleading higher than the notice pleading requirement of Rule 8(a). "In cases of fraud, *Rule 9(b)* has long played that screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later." *United States ex. rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). "This Circuit's precedent interprets *Rule 9(b)* strictly, requiring the plaintiff to 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.' "

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009). "In cases concerning fraudulent misrepresentation and omission of facts, *Rule 9(b)* typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004)).

The particularity requirement under *Rule 9(b)* is further defined by the Private Securities Litigation Reform Act ("PSLRA"). *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005). Congress enacted the PSLRA in 1995 to "prevent the abuse of federal securities laws by private plaintiffs" by increasing the pleading requirements for plaintiffs alleging Section 10(b) or Rule 10b-5 claims. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). The PSLRA provides that " 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity* all facts on which that belief is formed.' " *Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 914 (N.D. Tex. 1998) (emphasis in original) (quoting 15 U.S.C. § 78u–4(b)(1)). In addition, a plaintiff must "distinguish among the defendants, attributing each allegedly fraudulent statement to a particular defendant or defendants." *Robertson v. Strassner*, 32 F. Supp. 2d 443, 446 (S.D. Tex. 1998) (Atlas, J.).

### III.

Defendants move for dismissal of all of Plaintiff's claims. (Instrument No. 53). Defendants contend that AOI timely and accurately disclosed changes in demand from one of its major customers and that Plaintiff is relying on hindsight to allege that AOI failed to disclose its anticipated demand reduction from Amazon. *Id.* at 7. Specifically, Defendants contend that (1) Plaintiff has failed to plead specific facts showing that Defendants' statements were materially false; (2) Plaintiff has failed to plead a strong inference of scienter under the heightened pleading standard of the PSLRA; and (3) the First

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 274 of 330

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)

2019 WL 6111516

Amended Complaint fails to plead any corrective disclosures revealing AOI's purported fraudulent scheme. *Id.* at 7-8.

To prevail on a claim that a defendant made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5 [promulgated to enforce Section 10(b)], a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 37-38 (2011). Defendants move to dismiss the First Amended Complaint for Plaintiff's failure to adequately plead elements (1), (2), and (6). (Instrument No. 53 at 7-8).

### A. Materially False and Misleading Statements

**\*8**  Defendants contend that the First Amended Complaint fails to explain why Defendants' public statements were misleading and that the First Amended Complaint engages in improper "puzzle pleading." (Instrument No. 53 at 15-16). Defendants further contend that the First Amended Complaint contains no statements that are materially false or misleading for reasons summarized as follows: (1) Plaintiff has failed to adequately plead that Amazon's forecasts showed a decline in demand prior to August 3, 2017; (2) Plaintiff's factual allegations do not show that AOI had *significant* manufacturing and quality control problems to quickly transition from 40G to 100G transceivers; (3) Plaintiff provides no well-pled allegations that manufacturing, quality control, or competitors caused Amazon's decrease in demand; (4) many of the alleged misstatements are inactionable because they contain pure "puffery," are forward-looking, or are statements of opinion. (Instruments No. 53 at 15-25; No. 57 at 6-11).

Plaintiff responds that the First Amended Complaint adequately pleads materially false and misleading statements because it shows that Defendants were releasing statements that were directly contradicted by declining sales forecasts from Amazon and committed orders from Amazon that were recorded in AOI's SAP system. (Instrument No. 56 at 17-18). Plaintiff further contends that Defendants failed to disclose that AOI was encountering significant manufacturing and quality control challenges in transitioning to 100G transceivers in late 2016 and into 2017. *Id.* at 21-22. Plaintiff also contends that Defendants misrepresented the cause of the decline in Amazon's orders, trying to make it seem that Amazon was slowly transitioning from 40G to

100G, when in reality AOI had production and quality control issues delaying production. *Id.* Plaintiff also contends that because Defendants provided investors with specific facts and misrepresented the present state of AOI, the statements are not puffery, protected as forward-looking, or inactionable opinion statements. *Id.* at 25-27.

A plaintiff making a Section 10(b) claim must show that the defendant made a statement that was "*misleading* as to a *material* fact." *Matrixx Initiatives*, 563 U.S. at 38 (emphasis in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). The question of materiality is an objective one that requires the plaintiff to establish that there was a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Basic*, 485 U.S. at 231-32. The "total mix" of information includes information that is readily available to the general public and facts known or reasonably available to shareholders. *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004). There is no bright-line rule for determining whether information withheld from a company's public disclosures is, or is not, material because determining materiality is a "fact-specific inquiry that requires consideration of the source, content, and context" of the allegedly omitted information. *Matrixx Initiatives*, 563 U.S. at 43 (citing *Basic*, 485 U.S. at 236).

### 1. Puzzle Pleading

Contrary to Defendants' contention, the First Amended Complaint is not a "puzzle pleading." *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015) (describing a puzzle pleading as a complaint where a court must "wade through a complaint and pick out properly pleaded segments"). The First Amended Complaint identifies each allegedly misleading statement, the individual speaker, the date on which the statement was made, the context in which the statement was made, and why the statement was misleading given AOI's internal quality control and yield issues and Amazon's decline in orders. Although Plaintiff recites the same boilerplate reasons for why Defendants' statements are misleading, Plaintiff's explanations for the falsity of Defendants' statements logically correspond with each alleged misstatement. This case, therefore, is not analogous to the cases Defendants have cited in support of their assertion that Plaintiff has failed to

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 275 of 330

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)
2019 WL 6111516

plead with particularity. *Cf.* 🔖*Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243-44 (N.D. Cal 1998) (65-page complaint failed to conform with Federal Rule of Civil Procedure 8 and required a "laborious deconstruction and reconstruction of a great web of scattered, vague, redundant, and often irrelevant allegations."); 🔖*Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178-79 (5th Cir. 1997) (oral statements with no time or place; prospectus excerpts with no analysis as to falsity; news articles with no indication of false statements or falsity explanation); 🔖*In re Entrust Sec. Litig.*, No. 2:00CV119, 2002 WL 31968321, at *2-3 (E.D. Tex. Sept. 30, 2002) (large block quotes with heavy reliance on third-party analyst statements and no context or significance attributed to them).

### 2. Defendants' Knowledge of Amazon's Declining Demand

**\*9** Plaintiff has not directly alleged that Defendants knew of Amazon's declining demand. The First Amended Complaint instead relies on factual allegations of surrounding circumstances to conclude that Defendants knew of Amazon's decrease in orders prior to their public disclosure of this information. Plaintiff specifically notes that throughout the Class Period, Defendants publicly touted their visibility into customers' future orders and AOI's forecasts in customer demand. Plaintiff identified numerous statements by Defendant Murry where Murry stated that "[s]trong customer demand for datacenter and solid execution by the AOI team will drive higher sequential datacenter revenue" (Feb. 23, 2017), that "we think we're doing a reasonably good job of anticipating and meeting the demands of the customers have [sic] told us that they're going to need for this year and next year," (Mar. 22, 2017), and "[b]ased on current orders and forecasts from our customers, we believe that 2017 datacenter revenue should grow by more than 85% compared with 2016." (Instrument No. 56 at 18). Plaintiff also provided the statements of CW2 who explained that AOI contractually required its customers to provide projections of their requirements for the coming year. Once AOI's sales personnel received the projections, they entered the information into AOI's SAP system to track developments and changes on a weekly basis. Plaintiff also asserts that it believes that Facebook's supply agreement, requiring accurate six-month rolling forecasts, mirrors Amazon's supply agreement with AOI.

Plaintiff cannot charge Defendants with intentionally misleading their investors about facts that Defendants may have become aware of *after* making allegedly misleading statements to the public. 🔖*Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005). However, Plaintiff's factual allegations support the inference that Defendants knew that Amazon had decreased its orders when they made their statements during the Class Period. Plaintiff has specifically noted that prior to the beginning of each year, AOI's customers provided their order forecasts. Thus, Defendants would have had Amazon's order forecasts prior to the beginning of the Class Period set at February 2017. Unless the drop was very sudden, a drop in anticipated future sales would have been preceded by a change in forecasts and committed purchase orders. Plaintiff's allegations that AOI actively tracked its customers' orders on a weekly basis and AOI was experiencing quality control and yield problems in 2016 support the inference that AOI knew prior to the February 2017 earnings call and press release that Amazon had decreased its orders. This inference is particularly compelling because Amazon represented over 50% of AOI's revenue and AOI's revenue from Amazon dropped so drastically from 47% of total revenue during the second quarter of 2017 (ending June 30, 2017) to 10% during the third quarter of 2017 (ending September 30, 2017). (Instrument No. 56 at 15). "Further discovery may refute the inferences, but it is not unwarranted to infer that when a company's big deal collapses so fast, something was amiss at the outset." 🔖*Plotkin*, 407 F.3d at 698; *see* 🔖*In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 745 (S.D. Tex. 2012) (Ellison, J.) (noting that, except for inferences to show a strong inference of scienter, the court must draw all reasonable inferences in favor of the plaintiff in its Rule 12(b)(6) analysis). Plaintiff has provided specific facts to support his assertion that Defendants delayed disclosing Amazon's decrease in demand of AOI's transceivers. Furthermore, Plaintiff has alleged sufficient facts to show that Defendants' omission regarding Amazon's decrease in demand is material. A reasonable investor would have viewed the drop in orders from Amazon, AOI's largest customer, as a significant fact to alter the total mix of information available.

### 3. AOI's Ability to Quickly Transition from 40G to 100G Transceivers

Plaintiff's factual allegations further support his allegation that Defendants made materially misleading statements

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 276 of 330

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)
2019 WL 6111516

regarding AOI's ability to transition from 40G to 100G transceivers. AOI released numerous statements, each identified and quoted in the First Amended Complaint, that AOI had the ability to meet the growing demand faster than competitors. Defendants specifically touted that AOI was the market share leader in the 100-gig web-scale transceivers and that AOI had no concerns about Amazon shifting to a competitor. (Instrument No. 48 at 41-43). Plaintiff's factual allegations show that these statements were misleading because AOI was experiencing quality control and yield issues that prevented its transition to 100G transceivers starting in 2016. Defendants counter that Plaintiff has not presented sufficient facts to show that these quality control issues were *significant* enough to affect AOI's transition to producing 100G transceivers. (Instrument No. 57 at 9). However, Plaintiff has alleged through the statements of his confidential informants that quality control and yield issues were a frequent topic at weekly meetings with senior executives. CW1 stated that Houston's facility had yet to expand its chip coating capacity and that AOI was "desperate" to increase its production capacity. (Instrument No. 48 at 19). Viewing the allegations in the light most favorable to Plaintiff, AOI could not truthfully state that it had a faster time to market for its 100G products. Even if its vertical integration model was theoretically more efficient than the merchant model, at the moment Defendants made their statements, they misrepresented AOI's ability to quickly transition to 100G transceivers.

### 4. The Cause of the Decline in Amazon's Orders

 *10  Plaintiff has provided sufficient factual allegations to show that AOI's quality control and yield setbacks led to Amazon's decrease in committed orders. The First Amended Complaint alleges that Amazon decreased its demand for transceivers because AOI could not provide Amazon with the quality and quantity of transceivers that Amazon desired. CW1's statements in the First Amended Complaint show that the quality control department at the Houston manufacturing facility lacked the skills necessary to conduct quality assurance testing and return material authorization troubleshooting for transceivers that customers sent back. The First Amended Complaint further alleges that Amazon required high numbers of test devices for its quality assurance process and that although it was known that "[y]ou want to send Amazon your best quality products," AOI had sent a defective set of test transceivers to Amazon. (Instrument No. 48 at 25). Plaintiff's allegations create an

inference that Amazon's shift to adopting the merchant model with MACOM and Fabrinet by the first quarter of 2017 and AOI's declining committed orders from Amazon were caused by AOI's production and quality control problems.

Plaintiff has further shown that rather than disclose AOI's own problems, AOI shifted the blame onto Amazon. After AOI revealed that Amazon had decreased its orders, Murry stated at the October 12, 2017 earnings call that "we believe that the disruption in order flow is related to the ongoing transition from 40G to 100G and not specific to AOI." (Instrument No. 48 at 53). Plaintiff's factual allegations show, however, that Amazon's decrease in orders was caused by AOI's internal production problems. The First Amended Complaint adequately pleads that Defendants made misrepresentations and omissions regarding the cause of Amazon's declining orders.

### 5. Whether the Alleged Misstatements are Inactionable as Forward-Looking, Puffery, or Opinion Statements

Defendants argue that many of the alleged false statements in the First Amended Complaint constitute "forward-looking statements" protected by the PSLRA's safe harbor provision.[3] A statement is inactionable if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). In determining whether a statement falls within the safe harbor, this Court must examine which aspects of the statement are alleged to be false. A forward-looking statement, for instance, whose falsity consists of a lie about a present fact is not protected by the PSLRA's safe harbor provision. *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) ("we join the First Circuit, Third Circuit, and Seventh Circuit in concluding that a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." (internal quotation omitted)).

The statements identified in the First Amended Complaint that contain forward-looking statements rely on present facts regarding AOI's vertical integration strength. Defendants allege that AOI disclosed detailed risk factors in its Form 10-Ks addressing the risks associated with these

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)

2019 WL 6111516

forward-looking statements. (Instrument No. 53 at 26-27). However, Defendants' statements projected a promising picture of increased revenues and manufacturing capacity while omitting material information regarding AOI's then inability to quickly transition from 40G to 100G and Amazon's subsequent decline in demand.

Similarly, Defendants' contention that the statements are inactionable puffery or merely opinion statements fails because the statements contain the allegedly false embedded fact that manufacturing issues at AOI were not responsible for Amazon's decrease in demand. "Non-actionable puffery are statements of the vague and optimistic type that cannot support a securities fraud action ... and contain no concrete factual or material misrepresentation." 🚩*Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014) (internal quotation omitted). Plaintiff has alleged specific facts to show that Defendants' statements were belied by AOI's actual ability to transition to 100G transceivers and AOI's prior but delayed disclosure that AOI would have a significant drop in orders from Amazon as a result of AOI's production problems. 🚩*In re BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) ("the plaintiff 'must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.' " (quoting 🚩*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015))). The First Amended Complaint alleges that Amazon's drop in demand was caused by AOI's manufacturing problems, although Defendants omitted these facts from investors. The First Amended Complaint therefore shows that Defendants either did not actually hold the opinion they orally stated or that Defendants omitted material facts that conflicted with what a reasonable investor would take from the statement itself. 🚩⚠*In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 892 (S.D. Tex. 2017) (Rosenthal, J.) (noting that under *Omnicare*, statements of opinion can be actionably misleading (1) when the speaker does not actually hold the expressed opinion; or (2) when the speaker omitted material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and those facts conflict with what a reasonable investor would take from the statement itself).

## B. Strong Inference of Scienter

**\*11** Defendants contend that Plaintiff's First Amended Complaint fails to plead a strong inference of scienter against Defendants, particularly individual Defendants Lin and Murry. (Instrument No. 53 at 29-31). Defendants also claim that Plaintiff improperly relies on allegations provided by confidential witnesses. *Id.*

## 1. Factual Allegations by Confidential Witnesses

Defendants contend that this Court must discount the allegations in the First Amended Complaint from confidential sources. (Instrument No. 53 at 31).

The Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* instructed that in determining whether the securities fraud complaint gives rise to a "strong inference" of scienter, courts must consider plausible competing inferences. 🚩551 U.S. 308, 323-24 (2007). Following *Tellabs*, courts have cautioned that anonymous allegations in a complaint frustrates a court's ability to consider plausible competing inferences. 🚩*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (citing 🚩*Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)). However, *Tellabs* did not prohibit a plaintiff from using confidential witness statements. The Fifth Circuit instead allows a plaintiff to use confidential sources as long as those sources are described " 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded.' " 🚩*Shaw*, 537 F.3d at 535 (quoting 🚩*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002)).

The First Amended Complaint uses information provided by two confidential witnesses. Plaintiff alleges that both CW1 and CW2 worked for AOI during the Class Period. Although they remain anonymous, Plaintiff has provided specific details about them, including their job descriptions, individual responsibilities within AOI, and specific employment dates for each witness. (Instrument No. 48 at 16-17, 20-21). Plaintiff's allegations that are based on his confidential sources are specific and provide the bases for those witnesses' conclusions regarding AOI's internal and manufacturing processes. Accordingly, the Court can consider the statements of the confidential witnesses, although those anonymous statements would be inadmissible at trial, to determine if they

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 278 of 330

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)

2019 WL 6111516

support Plaintiff's allegation of scienter in the First Amended Complaint.


## 2. The First Amended Complaint's Allegations of Scienter

A plaintiff bringing a Section 10(b) and Rule 10b-5 action must show that the defendant acted with a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976)). "To plead scienter adequately, plaintiffs must state with particularity facts giving rise to a strong inference that the party knew that it was publishing materially false information, or the party was severely reckless in publishing such information." *Shaw*, 537 F.3d at 534 (internal quotation omitted). Severe recklessness is not negligence, but is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading ... which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). Similarly, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 551 U.S. at 314; 15 U.S.C. § 78u-4(b)(2). "Accordingly, for purposes of a Rule 12(b)(6) motion to dismiss, a strong inference of scienter is one at least as compelling as any opposing inference of non-fraudulent intent." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 745.

**\*12** In showing that an individual defendant acted with scienter, a plaintiff "may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). Thus, a court must "look to the state of mind of the individual corporate official or officials who make or issue the statement ... rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

Plaintiff's First Amended Complaint identifies each Defendant making the allegedly materially false statements. Defendant Lin founded AOI and was its Chief Executive Officer ("CEO") since its inception. (Instrument No. 48 at 9). Defendant Murry has been AOI's Chief Financial Officer ("CFO") since August 2014 and Chief Strategy Officer since December 2012. *Id.*

Contrary to Defendants' contentions, the First Amended Complaint goes beyond generally alleging the collective knowledge of AOI's officers. The First Amended Complaint relates how, during the Class Period, Defendants received oral and written reports and attended internal meetings with senior executives, salespeople, and engineers to discuss AOI's manufacturing problems and Amazon's forecast and sales. Plaintiff alleges that Defendant Lin received reports from AOI's R&D manager that detailed AOI's manufacturing problems, including low yield and production issues. Plaintiff further alleges that AOI's Texas facility held weekly meetings with various product engineers, engineers, senior engineers, and with Lin's special assistant David Chen, who was also in charge of corporate quality assurance. (Instrument No. 48 at 17). According to Plaintiff, AOI's yield issues at their facility in Taiwan were a frequent topic of discussion at these meetings in Texas. *Id.*

Plaintiff provides fewer factual allegations regarding Defendant Murry's knowledge of AOI's yield issues. The First Amended Complaint alleges that Murry had access to AOI's SAP system, the company-wide enterprise resource planning program that includes customer relationship management tools that track customer forecasts and purchases. (Instrument No. 48 at 61). However, this allegation is a general claim about the existence of corporate reports that reveal contrary information to Murry's statements and is alone insufficient to survive a motion to dismiss. *Abrams*, 292 F.3d at 432.

The First Amended Complaint, however, contains specific and strong circumstantial evidence of conscious misbehavior or recklessness by Murry. For instance, Plaintiff alleges that Murry was privy to and participated in the creation, development and reporting of AOI's financial condition (*See* Instrument No. 48 at 71). Murry's statements admit that he had active involvement in AOI's manufacturing capabilities and Amazon's forecasts and sales. The First Amended Complaint alleges that AOI's yield and quality issues were widely known and discussed among AOI senior officials. Amazon was also AOI's largest customer during the Class Period contributing over 50% of AOI's revenue immediately prior to and during

Rougier v. Applied Optoelectronics, Inc, Not Reported in Fed. Supp. (2019)
2019 WL 6111516

the Class Period. (Instrument No. 48 at 13). Plaintiff alleges that although Amazon had decreasing forecasted purchases of transceivers, Murry delayed in disclosing this information to investors. "The Fifth Circuit has held that material misstatements as to a company's most significant asset can give rise to a strong inference that those misstatements were made with knowledge of their falsity or severe recklessness in not knowing that they were false." *In re OCA, Inc. Secs. & Derivative Litig.*, No. 05-2165, 2006 WL 3747560, at *18 (E.D. La. Dec. 14, 2006) (citing *Plotkin*, 407 F.3d at 699-700).

**\*13** Moreover, Plaintiff alleges that Murry and Lin had motives to delay disclosing the reality about AOI's sales of transceivers to Amazon. Specifically, Plaintiff alleges that Lin sold 12,186 shares during the Class Period for a gain of over $729,000 and Murry sold 11,498 shares (18% of his total holdings) during the Class Period for a gain of $630,468.77. (Instrument No. 56 at 34). Plaintiff alleges that Lin and Murry made the sales on two separate occasions in May 2017, when share prices were high immediately after AOI announced positive first quarter 2017 earnings on May 4, 2017 and before AOI disclosed Amazon's reduced demand of transceivers. (Instruments No. 48 at 62-63; No. 56 at 34-35); *see Shaw*, 537 F.3d at 543 ("Insider stock sales may be probative of scienter, however, if they occur in suspicious amounts or at suspicious times." (internal quotation omitted)). While Defendants have shown that Plaintiff has not alleged any smoking gun facts showing that Murry and Lin acted with scienter, Plaintiff need not plead these facts to withstand dismissal at this stage. "[U]nder the PSLRA circumstantial evidence can support a strong inference of scienter." *Nathenson*, 267 F.3d at 410. Plaintiff's factual allegations support his claim that Murry and Lin had the requisite scienter.

### C. Loss Causation

Defendants also move to dismiss the First Amended Complaint for failure to plead loss causation. Under the PSLRA, a plaintiff must plead a "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "For a plaintiff to plead loss causation adequately, the negative truthful information ('corrective disclosures') must not have already been known to the market: If it were, the stock price would have incorporated that information, and its disclosure could

not have caused a loss." *Alaska Elec. Pension Fund v. Asar*, 898 F.3d 648, 665 (5th Cir. 2018). "At the pleading stage, 'plaintiffs are required to allege the truth that emerged was 'related to' or 'relevant to' the defendants' fraud and earlier misstatements.' " *Id.* (quoting *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014)). Moreover, a plaintiff need not identify a single disclosure. "[R]ather, the truth can be gradually perceived in the marketplace through a series of partial disclosures." *Id.* (quoting *Amedisys*, 769 F.3d at 322).

Notably, this element of a Section 10(b) claim need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief" and provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a); *Dura Pharm.*, 544 U.S. at 346 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Plaintiff has identified three partially corrective disclosures that he alleges are directly relevant to the alleged false statements: (1) AOI's August 3, 2017, press release where it revealed for the first time that Amazon's demand for 40G transceivers was much less than the alleged previous misrepresentations ("we see softer than expected demand for our 40G solutions with one of our large customers") and AOI's admission that it took six weeks to produce new 100G transceivers; (2) AOI's October 12, 2017, press release and earnings call where it revealed for the first time that Amazon's softer than expected demand also included 100G products, resulting in a decline in Amazon revenue from 47% to 10% for both 40G and 100G transceivers; (3) AOI's disclosure on February 21, 2018, that the transition from 40G to 100G was not occurring as smoothly as Defendants had led investors to believe and that AOI was experiencing "inventory headwinds" with Amazon and that AOI's revenue, prior to previous representations, was primarily based on 40G products (58%), and its sales of 100G products had decreased from the previous quarter from 56% of revenue to 35%. (Instruments No. 48 at 48-55, 58-59, 65; No. 56 at 36-37). Plaintiff has additionally identified that subsequent to Defendants' disclosures, AOI's share price dropped by 20% to 34% each time. (Instrument No. 48 at 64-65). The First Amended Complaint sets forth the specific statements that relate to Defendants' previous statements and how the marketplace perceived these corrective disclosures. The partial corrective disclosures support an inference that

2019 WL 6111516

Defendants' misstatements and omissions concealed the circumstances that bear upon the loss and that the partial corrective disclosures were closely followed by a fall in AOI's stock price. The Court finds that Plaintiff's allegations satisfy Rule 8(a) in pleading loss causation.

 **\*14**  Accordingly, the Court finds that Defendants' Motion to Dismiss Plaintiff's claims under Section 10(b) is DENIED. (Instrument No. 53).

person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 383 (5th Cir. 2004). Defendants' Motion only argues that Plaintiff's Section 20(a) claims fail as a matter of law because his underlying Section 10(b) claims fail. Because this Court has found that Plaintiff has adequately pleaded his claims under Section 10(b), the Court finds that Defendants' Motion to Dismiss Plaintiff's Section 20(a) claims is DENIED. (Instrument No. 53).

### IV.

Plaintiff alleges that individual Defendants Lin and Murry are liable as control persons under Section 20(a) of the Exchange Act. (Instrument No. 48 at 73). Defendants move to dismiss Plaintiff's Section 20(a) claims against individual Defendants Lin and Murry. (Instrument No. 53 at 36).

Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). "Control

### V.

For the foregoing reasons, the Court finds that Defendants' Motion to Dismiss the First Amended Complaint is **DENIED. (Instrument No. 53)**.

The Clerk shall enter this Order and provide a copy to all parties.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6111516

---

### Footnotes

1    Plaintiff and Defendants both repeatedly refer to "Amazon," "Facebook," and "Microsoft," without specifying if they mean the parent companies or any similarly named subsidiaries.

2    Matters of which a court may take judicial notice include, for example, matters of public record. *See* Fin. Acquisition Partners LP v. Blackwell, 440 F.3d 278, 286 (5th Cir. 2006).

3    Defendants refer the Court specifically to Appendix B of their Motion to Dismiss, which collects and organizes each statement in the First Amended Complaint that is allegedly forward-looking. (Instrument No. 53-2).

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 18

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 282 of 330

Salinas v. City of Houston, Not Reported in Fed. Supp. (2023)
2023 WL 3899020

2023 WL 3899020
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Britttany SALINAS, et al., Plaintiffs,
v.
CITY OF HOUSTON, et al., Defendants.

CIVIL ACTION NO. 4:22-CV-04120
|
Signed June 8, 2023

**Attorneys and Law Firms**

Blas Hernandez Delgado, San Antonio, TX, for Plaintiffs.

Kelly Ann Dempsey, City of Houston Legal Department, Houston, TX, for Defendants City of Houston, The Houston Police Department.

Morgan Genell Latin, Kelly Ann Dempsey, City of Houston Legal Department, Houston, TX, for Defendants Officer M. Salazar, Officer N. Garcia.

**MEMORANDUM OPINION AND ORDER**

Kenneth M. Hoyt, United States District Judge

**I. INTRODUCTION**

 **\*1** Pending before the Court are the defendants', City of Houston, Texas, the Houston Police Department, Police Officer N. Garcia, & Police Officer M. Salazar, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) (Dkt. Nos. 17, 18, & 19). The plaintiffs, Brittany Salinas, et al., have filed responses to the defendants' motions (Dkt. Nos. 24, 25, & 26), and the defendants have filed replies (Dkt. Nos. 28, 29, & 30). After reviewing the motions, the pleadings, and the applicable law, the Court determines that the defendants' motions should be **GRANTED IN PART** and **DENIED IN PART**.

**II. LEAVE TO AMEND**

In their responses to the motions to dismiss, the plaintiffs move to amend their complaint for a second time. Federal Rule of Civil Procedure 15(a) instructs a court "to grant leave to amend 'freely,' and the language of this rule 'evinces a bias in favor of granting leave to amend.' " Lyn–Lea

Travel Corp. v. Am. Airlines, 283 F.3d 282, 286 (5th Cir. 2002) (quoting Chitimacha Tribe of La. v. Harry L. Laws Co., Inc., 690 F.2d 1157, 1162 (5th Cir. 1982)). Courts must weigh the following factors when considering leave to amend: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of the amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

The defendants oppose further amendment. They argue that the plaintiffs have failed to cure the same deficiencies to which they were alerted by the defendants' motions to dismiss the original complaint; that undue delay will prejudice them; that the plaintiffs have shown bad faith by failing to drop unfounded claims against the Houston Police Department; and that any amendments will be futile.

The Court determines that the total weight of the factors does not defeat Federal Rule of Civil Procedure 15(a)'s bias in favor of granting leave to amend. First, the plaintiffs have amended their complaint only once, so there has been no opportunity for repeated failures. Second, it is not clear how the defendants will be especially prejudiced by delay. Third, an amended complaint is not doomed to futility, as certain claims may be curable.

**III. CLAIMS DISMISSED WITH PREJUDICE**

That said, some of the plaintiffs' claims are not curable. Indeed, the defendants are correct that the plaintiffs have shown a degree of bad faith by failing to abandon their claims against the Houston Police Department. The Fifth Circuit's "cases uniformly show that unless the true political entity has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation except in concert with the government itself." Darby v. Pasadena Police Dep't, 939 F.2d 311, 314 (5th Cir. 1991). The City of Houston created the Houston Police Department by Houston Municipal Code 1968, Article II-Police Department § 34-1; Houston Ordinance No. 04-1075 § 10 and Ordinance No. 2011-108 § 7. The plaintiff has not alleged any steps the City of Houston has taken to grant the Houston Police Department jural authority. Accordingly, the claims against the Houston Police Department must be dismissed with prejudice.

Salinas v. City of Houston, Not Reported in Fed. Supp. (2023)

2023 WL 3899020

*2 The plaintiffs' Eighth and Fourteenth Amendment claims must also be dismissed with prejudice. *Morin v. Caire* is on point:

> The protections of the Eighth Amendment against cruel and unusual punishment are limited in scope to convicted prisoners and do not apply to pretrial detainees such as the plaintiffs ... And, although the Fourteenth Amendment's due process clause does apply to municipalities, the plaintiff has not pleaded any allegations upon which a procedural due process claim could be based, and the U.S. Supreme Court has recently determined that there is no substantive due process right to be free from criminal prosecution except upon probable cause. Thus, the plaintiffs' only remaining constitutional claims are premised on the protections of the Fourth Amendment against unreasonable search and seizure.

*Morin v. Caire, 77 F.3d 116, 120 (5th Cir. 1996)*. The plaintiffs do not—and cannot plausibly—allege that Mr.

Salinas was a convicted prisoner at the time of his death, so his Eighth Amendment claim fails. Finally, the plaintiffs argue that Mr. Salinas' Fourteenth Amendment rights were violated by the defendants' using force and authority to confine him, not rendering medical aid, and creating a harmful environment. The problem is that these "Fourteenth Amendment claims are based on alleged pretrial deprivations of his constitutional rights and, under the holding in *Albright*, such claims should be brought under the Fourth Amendment."

*Bosarge v. Mississippi Bureau of Narcotics, 796 F.3d 435, 441 (5th Cir. 2015)* (citing *Albright v. Oliver, 510 U.S. 266, 274 (1994)* (plurality opinion)).

## IV. CONCLUSION

Based on the foregoing analysis and discussion, the defendant's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART.** The plaintiffs' claims against the Houston Police Department are dismissed with prejudice. [1] The plaintiffs' Eighth and Fourteenth Amendment claims against the remaining defendants are also dismissed with prejudice. The plaintiffs shall file an amended complaint addressing its remaining claims within 14 days of this Order.

IT IS SO **ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3899020

---

**Footnotes**

[1]     Although the defendants assert the plaintiffs lack statutory standing, this argument does not imperil the Court's jurisdiction. "[S]tatutory standing is not indicative of Article III jurisdictional standing." *CamSoft Data Sys., Inc. v. Southern Elecs. Supply, Inc., 756 F.3d 327, 332 (5th Cir. 2014)*. Taking the opportunity to verify its jurisdiction, the Court is satisfied: the plaintiffs have alleged a concrete, particularized, actual injury in fact that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable ruling. *See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)*.

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 19

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 285 of 330

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)
2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

2019 WL 1382823
United States District Court, D. Colorado.

Lawrence Henry SMALLEN and Laura Anne
Smallen Revocable Living Trust, individually
and on behalf of all others similarly situated, and
UA Local 13 Pension Fund, individually and on
behalf of all others similarly situated, Plaintiffs,

v.

The WESTERN UNION COMPANY,
Hikmet Ersek, Scott T. Scheirman, Rajesh
K. Agrawal, and Barry Koch, Defendants.

Civil Action No. 17-cv-00474-KLM Consolidated
with, Civil Action No. 17-cv-00648-KLM
|
Signed 03/27/2019

**Attorneys and Law Firms**

Marc Ian Gross, Joseph Alexander Hood, II, Michael
Grunfeld, Jeremy Alan Lieberman, Pomerantz LLP-New
York, New York, NY, for Plaintiffs.

Chuan Cheng, Wheeler Trigg O'Donnell LLP, Holly Stein
Sollod, Claire Elizabeth Wells Hanson, Holland & Hart LLP,
Denver, CO, David Franklin Graham, Hille von Rosenvinge
Sheppard, Sidley Austin LLP, Chicago, IL, for Defendants.

**ORDER**

KRISTEN L. MIX, United States District Judge

**\*1** This matter is before the Court on the **Motion to
Dismiss the Consolidated Amended Complaint Pursuant
to Federal Rules of Civil Procedure 12(b)(6)** and 9(b)
**and the PSLRA** [#53],[1] filed by Defendants Hikmet Ersek
("Ersek"), Scott T. Scheirman ("Scheirman"), Rajesh K.
Agrawal ("Agrawal"), and The Western Union Company
("Western Union" or the "Company"), and on the **Motion to
Dismiss the Consolidated Amended Complaint Pursuant
to Federal Rules of Civil Procedure 12(b)(6)** and 9(b) **and
the PSLRA** [#55], filed by Defendant Barry Koch ("Koch").
Plaintiffs filed a combined Response [#63] in opposition to
the Motions [#53, #55], and Defendants filed separate Replies
[#70, #71]. The Court has reviewed the briefs, the entire case
file, and the applicable law, and is sufficiently advised in the

premises. As explained in detail below, the Motions [#53,
#55] are **GRANTED**.[2]

**I. Summary of the Case**[3]

Western Union is a "money transfer service" which "provides
money movement and payment services worldwide." *Am.
Compl.* [#40] ¶ 33. During the alleged Class Period (from
February 24, 2012, to May 2, 2017), Defendant Hikmet
Ersek ("Ersek") was the Chief Executive Officer ("CEO")
of the Company. *Id.* ¶¶ 1, 26. Defendant Scott T. Scheirman
("Scheirman") was the Company's Chief Financial Officer
("CFO") and an Executive Vice President from sometime
prior to the Class Period until December 31, 2013, and a
Senior Advisor until February 28, 2014. *Id.* ¶ 27. Defendant
Rajesh K. Agrawal ("Agrawal") was President of Western
Union Business Solutions from sometime prior to the Class
Period through December 2013, was Interim CFO from
January 2014 to July 2014, and CFO from July 2014 to after
the end of the Class Period. *Id.* ¶ 28. He also served as an
Executive Vice President during the entire Class Period. *Id.*
Defendant Barry Koch ("Koch") was the Chief Compliance
Officer from May 2013 until about November 2015. *Id.* ¶ 29.

Plaintiffs are investors who acquired Western Union
securities during the Class Period allegedly "at artificially
inflated prices" during the Class Period and who were
"damaged upon the revelation of the alleged corrective
disclosures." *Id.* ¶ 24. In short, Plaintiffs assert that, during
the Class Period, Defendants deliberately misled investors
regarding Western Union's regulatory compliance regarding
anti-money laundering ("AML") and anti-fraud practices. *Id.*
¶¶ 15-19.

**\*2** On January 19, 2017, Western Union "reached a
settlement with several federal regulators [including the
Federal Trade Commission ("FTC") ] in which it agreed
to pay" $586 million. *Id.* ¶ 2. As part of this settlement,
which covered a period from 2004 through December 2012,
Western Union admitted to criminal violations including
willfully failing to maintain an effective AML program
and aiding and abetting wire fraud,[4] which resulted in a
Deferred Prosecution Agreement ("DPA") between Western
Union and the Department of Justice ("DOJ"). *Id.* ¶¶
130-31, 139. In part, Western Union admitted to failing "to
implement proper controls and discipline agents." *Id.* As
stated by the DOJ, "[r]ather than ensuring their high volume

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

agents were operating above-board, Western Union rewarded them without regard to the blatant lack of compliance and illegal practices taking place." *Id.* As part of the settlement agreement, Western Union agreed to implement a number of compliance steps, including "ensuring that the Company a) conducts adequate due diligence on its agents; b) adequately monitors agent activity for anti-fraud and AML violations; c) takes prompt disciplinary action against agents that pose an unacceptable risk of money laundering and fraudulent practices; d) reports suspicious or illegal activity by its agents as required by the AML laws; and e) establishes executive review and bonus structures that account for compliance with U.S. law." *Id.* ¶ 16.

On January 31, 2017, Western Union also settled charges brought by the attorney generals of forty-nine states and the District of Columbia for an additional $5 million "to resolve their investigations into how fraudsters used Western Union's money transfer services to defraud customers." *Id.* ¶ 526. Between January 18, 2017, and February 1, 2017, the price of Western Union stock shares declined by 10.57%. *Id.* ¶ 527.

Plaintiffs state that as a result of Defendants' conduct, they "suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented information concerning Western Union's compliance efforts to the investing public." *Id.* ¶ 574. Plaintiffs therefore assert two claims: (1) violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder against all Defendants ("Claim One"), and (2) violation of § 20(a) of the Securities Exchange Act against the four individual Defendants, i.e., Defendants Ersek, Scheirman, Agrawal, and Koch ("Claim Two"). *Id.* ¶¶ 564-580.

## II. Standard of Review

### A. Fed. R. Civ. P. 12(b)(6)
The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted."). To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'

" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks omitted). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).

### B. Private Securities Litigation Reform Act of 1995 ("PSLRA")
**\*3** Because the PSLRA governs this case, the Court notes and applies guidance from the Tenth Circuit Court of Appeals regarding interpretation of the Act's "stringent" pleading requirements. *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1186 (10th Cir. 2003).

Under the PSLRA, "Section 10(b) and Rule 10b-5 create an implied private cause of action arising from fraud in the purchase or sale of securities." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018). Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 prohibits "any untrue statement of a material fact or [omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

misleading[,]...in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plausibly allege that "a defendant made statements that (1) contained false or misleading statements of material fact, (2) related to the purchase or sale of a security, (3) were made with intent to defraud investors or conscious disregard of a risk that shareholders would be misled (scienter), (4) led to reliance by the plaintiff, and (5) caused the plaintiff's loss (loss causation)." Nakkhumpun v. Taylor, 782 F.3d 1142, 1146-47 (10th Cir. 2015).

The PSLRA, 15 U.S.C. § 78u-4(b), "adjusts the general pleading standard applicable under Federal Rule of Civil Procedure 12(b)(6), which requires a plaintiff to plead sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Hampton, 897 F.3d at 1298 (internal quotation marks omitted). "Specifically, under the PSLRA, a plaintiff must meet a heightened pleading standard with regards to the first and third elements of a securities-fraud claim: that is, respectively, as to whether the statements at issue were false or misleading, and whether the defendant acted with the requisite scienter." Id.

> Under the Reform Act, a private complaint that alleges a violation of section 10(b) of the 1934 Act and Rule 10b-5 thereunder must first "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,... [must] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Pirraglia, 339 F.3d at 1186 (citation omitted). "To satisfy this statutory burden, a plaintiff must explain why the statement was misleading, and allege with particularity his basis for believing that the statement was false." Hampton, 897 F.3d at 1298 (internal quotation marks omitted).

> Second, in order to show that the defendant acted with the requisite state of mind for securities fraud cases, i.e., scienter, the complaint must also, "with respect to each act or omission alleged to violate the [the 1934 Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2).

*4 Pirraglia, 339 F.3d at 1186 (citation omitted).

When a complaint refers to an investigation of counsel as the basis for a plaintiff's allegations, as is the case here, see Am. Compl. [#40] at 5, the Court "treats [the allegations of the complaint] as having been made on information and belief."

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1098 (10th Cir. 2003). As indicated above, Plaintiffs must "state with particularity all facts upon which their belief is formed." Id. (citation omitted). The Tenth Circuit has interpreted the statutory language about stating "all" facts to mean that Plaintiffs must plead sufficient facts "to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements...were false or misleading." Id. at 1099.

> In deciding whether the factual allegations support a reasonable belief that fraud occurred, courts should evaluate the facts alleged as a whole, evaluating the level of detail, number, and coherence and plausibility of the allegations; whether the allegations are specific enough to be verified or refuted by a defendant without requiring the complaint to disclose how the plaintiff learned of such facts or experts to prove such facts at trial; whether the sources of the facts are disclosed and the reliability of those sources; and any other factors that might affect how strongly the facts alleged support a reasonable belief that the defendant's statements were false or misleading. To meet the standard, plaintiffs are not required to disclose the documentary or personal sources from which they learned the facts alleged in an information and belief complaint.

Id. at 1102-03.

"There is a meaningful distinction between statements of opinion and statements of fact; the former require a plaintiff to meet a higher pleading standard." Hampton, 897 F.3d at 1299. "Pure statements of opinion and statements of

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

optimism that are not capable of objective verification are not material misstatements unless they inaccurately represent the speakers' beliefs concerning then-present factual conditions. *Id.* (internal citations, brackets, and quotations marks omitted). "Statements of opinion or belief must rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Id.* (internal brackets and quotation marks omitted).

In *Pirraglia v. Novell, Inc.*, the court first analyzed the complaint's alleged false statements "to determine whether plaintiffs specifi[ed] each statement alleged to have been misleading, the reason or reasons why the statement [was] misleading, and, if an allegation regarding the statement or omission [was] made on information and belief,...[whether the complaint] state[d] with particularity all facts on which that belief [was] formed." *Id.* at 1189 (internal quotations omitted). Second, the court "proceed[ed] to examine whether plaintiffs met the scienter requirement," but only as to those statements which the court found met the above particularity requirements. *Id.* at 1190-91.

 **\*5** Regardless of the order in which the Court addresses the PSLRA's pleading requirements, the Court must decline a defendant's invitation to conclude that facts alleged by the plaintiffs are simply false, regardless of whether the plaintiffs' claims "seem far-fetched." 📁 *Pirraglia*, 339 F.3d at 1193-94. Moreover, the Court must accept the truth of the confidential witnesses' accounts as pled in the Amended Complaint [#40] and decline to assess those witnesses' credibility. 📁 *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239 (10th Cir. 2016) (citing 📁 *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ).

### III. Analysis

In the interest of efficiency, the Court addresses the allegations asserted against Defendants Ersek, Scheirman, Agrawal, and Western Union collectively but separately from those asserted against Defendant Koch, who filed his Motion to Dismiss [#55] separately from the other Defendants. However, as instructed by Tenth Circuit precedent, the Court has reviewed all of the allegations of the Amended Complaint [#40] and has assessed it holistically. *See* *Hampton*, 897 F.3d at 1298. The Court has examined the allegations of the lengthy Amended Complaint [#40] in their entirety,[5] and is

not required to make explicit findings of fact and conclusions of law on a Rule 12(b)(6) ruling. 📁 *Adams*, 340 F.3d at 1093.

### A. Claim One: Defendant Koch

Defendant Koch was Western Union's Chief Compliance Officer from May 2013 until about November 2015. *Am. Compl.* [#40] ¶ 29. He reported to the Compliance Committee of the Board of Directors (the "Board") after its creation in July 2013. *Id.* Plaintiffs note specifically that he attended the Compliance Committee meetings held on July 17, 2013 and September 9, 2013, and the full Board meeting held on October 11, 2013. *Id.* ¶ 92.

At the July 17, 2013 Compliance Committee meeting also attended by Defendant Ersek, Defendant Koch "described a draft risk assessment that would be the 'foundation' for the risk-based AML compliance program of Western Union's core consumer-to-consumer money transfer business." *Id.* ¶ 240. At the September 9, 2013 Compliance Committee meeting attended by Defendants Ersek and Koch, "it was announced that on July 31, 2013, management first submitted a written action plan to the Monitor for his consideration, providing an agreed-to methodology for measuring and ensuring compliance with the Monitor's recommendations."[6] *Id.* ¶ 242.

 **\*6** At the October 11, 2013 Board meeting attended by Defendants Ersek, Scheirman, and "likely" Agrawal, Defendant Koch "explained in a memorandum to the Board (using language that was also included in the risk assessment itself) that an 'AML Risk Assessment is the foundational document upon which [a financial institution's] risk-based AML Compliance program is based....Development and issuance of an AML Risk Assessment is also a regulatory expectation, evidenced in bank and [Money Services Businesses] examination manuals, and is implicitly required by the AML 'program requirement' of [the Bank Secrecy Act].' " *Id.* ¶ 243. According to his meeting

memorandum, "the '[i]nherent' '[g]eographic' risk for Western Union's consumer-to-consumer and business segments was 'Very High.' " *Id.*
On November 6, 2013, Western Union issued "a press release announcing that it would be joining the Blue Campaign, an anti-human trafficking initiative spearheaded by the U.S. Department of Homeland Security." *Id.* ¶ 405. Defendant Koch stated in the press release that "[e]nding human

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

trafficking is possible only if everyone steps in and plays a role. We are committed to using the trust, reach and power of our brand along with our Agent network to engage the public and arm them with awareness and the resources to spot the signs and report suspect activity." *Id.* At this time, Western Union was responding to two investigations– one aimed directly at Western Union– by the Department of Justice into "China Corridor agents" who facilitated the laundering of hundreds of millions of dollars used for human trafficking. *Id.* ¶¶ 131, 184, 251, 264-65. Plaintiffs argue: "Touting the Company's commitment to combating human trafficking and its agents' role in those efforts while failing to disclose the Company's failings with respect to those exact topics was therefore false and misleading." *Response* [#63] at 54. They further argue: "Even though Western Union[ ] only *admitted* to willful compliance failures as to the China Corridor Agents through 2012, it was still misleading for Koch to fail to disclose those very recent violations that subjected the Company to the substantial risk of an unprecedented forfeiture for a money services business." *Id.*

During his two and a half years as Chief Compliance Officer, Defendant Koch "regularly spoke at publicly advertised industry conferences, representing Western Union, where he portrayed Western Union as an industry leader in compliance by discussing best practices for compliance programs and combating human trafficking." *Am. Compl.* [#40] ¶ 247. On February 17, 2014, he "presented on best practices for detecting human trafficking at a conference hosted by the Council of Europe and Organization for Security and Cooperation in Europe." *Id.* On April 24, 2014, he "was one of three panelists on a publicly advertised webcast hosted by a law firm that addressed '[b]est practices for structuring and implementing compliance programs to identify and mitigate multiple financial crimes risk.' " *Id.* On October 23, 2014, he presented at the 8th Annual European AML Financial Crime Conference. *Id.* Defendant Koch left Western Union's employment no later than November 2015. *Id.* ¶ 247.

The first required element of a claim under Rule 10b-5 is that the defendant must have made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading. 🚩 *Grossman, 120 F.3d at 1118.* Plaintiffs direct the Court's attention to three asserted false or misleading statements made by Defendant Koch. *Response* [#63] at 53-54.

First, in connection with Western Union's 8th Annual AML, Anti-Fraud and Compliance Conference in September 2013, Defendant Koch stated: "Together with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud." *Id.* at 54 (citing *Am. Compl.* [#40] ¶ 395). Plaintiffs argue that this statement "was misleading absent disclosure of the fact that government investigations that were pending at the time posed the high risk of substantial liability for Western Union's compliance failures." *Response* [#63] at 54 (citing *Am. Compl.* [#40] ¶¶ 265, 268).

**\*7** Second, as discussed above, in a November 6, 2013 press release concerning Western Union's efforts to combat human trafficking, Defendant Koch stated: "Ending human trafficking is possible only if everyone steps in and plays a role. We are committed to using the trust, reach and power of our brand along with our Agent network to engage the public and arm them with awareness and the resources to spot the signs and report suspect activity." *Response* [#63] at 53 (citing *Am Compl.* [#40] ¶ 405). Plaintiffs argue that "[t]outing the Company's commitment to combating human trafficking and its agents' role in those efforts while failing to disclose the Company's failings with respect to those exact topics was therefore false and misleading." *Response* [#63] at 54 (citing *Am Compl.* [#40] ¶¶ 110-13, 131, 183-99, 251, 264-65).

Third, in connection with Western Union's 2014 Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference, Defendant Koch stated: "Western Union is committed to helping protect its customers against fraud and other financial crimes. It's the right thing to do for our customers and for our business." *Response* [#63] at 54 (citing *Am. Compl.* [#40] ¶ 436). Plaintiffs argue this statement was false and misleading in light of "Defendants' other statements touting the Company's compliance practices and its reasons for its compliance expenditures while failing to disclose current and past compliance failures or the true reason for its increased compliance costs." *Response* [#63] at 54.

Defendant Koch argues that these statements were mere puffery. *Motion* [#56] at 7-8, 11-12, 13; *Reply* [#71] at 13-15. In another securities-fraud case, *Grossman v. Novell, Inc.*, the allegedly "false and misleading" statements concerned the defendant's potential market-share gain, "compelling" opportunities, "smooth" mergers, and "accelerating" product development. 🚩 *120 F.3d at 1116-17.* The Tenth Circuit Court of Appeals held that such "vague statements of corporate optimism" were "not actionable because reasonable investors do not rely on them in making investment

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

decisions." *Id.* at 1119. "Statements classified as
'corporate optimism' or 'mere puffing' are typically forward-
looking statements, or are generalized statements of optimism
that are not capable of objective verification." *Id* The sum
of Plaintiffs' argument regarding whether Defendant Koch's
statements are puffery is a footnote summarily denying that
they are and referring the Court to a multi-page discussion
of puffery offered in connection with the other Defendants'
statements. *Response* [#63] at 55 n.24 (citing *Response* [#63]
at 43-47).

The Court finds that the three statements attributed to
Defendant Koch are nothing more than mere puffery
consisting of vague corporate optimism. The first statement
("Together with governments, regulators, law enforcement
authorities and financial service companies, we're fully
engaged in the fight against money laundering and fraud.") is
similar to a statement analyzed in another securities case, *In
re Sturm, Ruger & Co., Inc. v. Securities Litigation*, No. 3:09-
cv-1293 (CFD), 2011 WL 494753, at *5 (D. Conn. Feb. 7,
2011). There, the court found that the statement, "Employees
are fully engaged, and we see nothing but opportunities ahead
of us," was an expression of puffery and corporate optimism
not giving rise to a securities violation. 2011 WL 494753,
at *5. Here, the Court finds that the assertion that Western
Union was "fully engaged in the fight" constitutes similarly
inactionable puffery.

Defendant Koch's second statement ("Ending human
trafficking is possible only if everyone steps in and plays
a role. We are committed to using the trust, reach and
power of our brand along with our Agent network to
engage the public and arm them with awareness and the
resources to spot the signs and report suspect activity.") and
third statement ("Western Union is committed to helping
protect its customers against fraud and other financial crimes.
It's the right thing to do for our customers and for our
business.") constitute similarly inactionable statements of
puffery. Other courts have found that general language
regarding a company's commitment to risk management is
inactionable. For example, in *In re Vale S.A. Securities
Litigation*, No. 1:15-cv-9539-GHW, 2017 WL 1102666, at
*24 (S.D.N.Y. Mar. 23, 2017), the court held that the
company's claim to be "committed to achieving the highest
possible health and safety standards" was a "general, airy
statement of commitment routinely found to constitute non-
actionable puffery." In *Matana v. Merkin*, 989 F. Supp. 2d
313, 327 (S.D.N.Y. 2013), the court held that a statement that

the company "remain[ed] focused on preserving principal and
committed to managing risk" was "not actionable in fraud"
because the statement was puffery. In *Woodard v. Raymond
James Financial, Inc.*, 732 F. Supp. 2d 425, 434-35 (S.D.N.Y.
2010), the court held that "Raymond James' leadership
believes that the managed growth strategy, commitment to
risk management and conservative lending practices...will
continue to serve the company well in the coming year"
was puffery consisting of "nothing more than a general
platitude that accompanies nearly every press release or
public statement issued by a financial institution."

**\*8** Thus, because the statements made by Defendant Koch
and argued by Plaintiffs to be false and misleading are actually
nonactionable puffery, the Court finds that Plaintiffs fail to
sufficiently allege facts regarding the first required element of
a claim under Section 10b and Rule 10b-5, i.e., that Defendant
Koch made an untrue or misleading statement of material
fact, or failed to state a material fact necessary to make
statements not misleading. *See* Grossman, 120 F.3d at
1118. Accordingly, Claim One against Defendant Koch is
**dismissed**.

**B. Claim One: Defendants Ersek, Scheirman, Agrawal,
and Western Union** [7]

**1. Purported False or Misleading Statements**
With respect to Defendants Ersek, Scheirman, Agrawal,
and Western Union, Plaintiffs direct the Court's attention
to the following purportedly fraudulent misrepresentations/
omissions, which they divide into four categories: (1)
statements describing ongoing government investigations; (2)
statements explaining increased compliance expenditures; (3)
statements regarding legal compliance; and (4) statements
touting compliance practices. *Response* [#63] at 36-53. In
this section, the Court addresses the first three categories,
reserving discussion of the fourth category for the scienter
analysis below.

**a. Government Investigations**

Plaintiffs argue that Defendants made untrue or misleading
statements of material fact, or failed to state material
facts necessary to make statements not misleading,
regarding ongoing government investigations, including the
investigations brought by four separate U.S. Attorney offices,
the FTC, and state attorneys general. *Response* [#63] at 47-51.

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

### i. Filings with the Securities
### Exchange Commission ("SEC")

In support of this category of purportedly false/misleading statements regarding government investigations, Plaintiffs cite to the following allegations. *Id.* 1.

"On February 24, 2012, Western Union filed an annual report on Form 10-K with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "2011 10-K")." *Am. Compl.* [#40] ¶ 304. "The 2011 10-K...discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 308.

2. In March 2012, the Eastern District of Pennsylvania ("EDPA") served Western Union "with a federal grand jury [subpoena] seeking documents relating to Hong Fai... ."[8] *Id.* ¶ 264. "As the Class Period progressed, the Company received additional subpoenas from EDPA and the government interviewed several current Western Union employees as part of this investigation." *Id.*

3. On March 20, 2012, the Central District of California ("CDCA") "served the Company with a federal grand jury subpoena seeking documents relating to" U.S. Shen Zhou International Company ("Shen Zhou").[9] *Id.* ¶ 265. "When CDCA served the Company with this subpoena, it informed Western Union that the Company itself was 'a target of an ongoing investigation into structuring and money laundering.' " *Id.*

**\*9** 4. "On May 1, 2012, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the first quarter of 2012, which ended on March 31, 2012 (the "Q1 2012 10-Q")." *Id.* ¶ 316. "The Company...described in its Q1 2012 10-Q several ongoing government investigations and claimed that all of these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 318.

5. "[A]t the May 9, 2012 Investor Day conference, Mike Salop, Western Union's Senior Vice President of Investor Relations, specifically addressed DOJ's investigation into Shen Zhou—the agent in California that was arrested and late[r] pled guilty to structuring transactions—that the Company had announced in its 10-Q for the first quarter of 2012 and that Western Union was a target. He represented that '[w]e believe the company has robust compliance and anti-money laundering policies and processes in place, and we look forward to demonstrating that fact to the U.S. Attorney's office in Los Angeles.' Salop went on to state that '[w]e are not aware of any evidence that suggests that the company or any of its employees knowingly engaged in any conduct with this former agent that would constitute a violation of the law.' " *Id.* ¶ 326. "He explained: 'We have been cooperating with the government in connection with this particular case for almost two years and assisted the government prior to the time the former agent was arrested, just as we cooperate on a daily basis with law enforcement departments throughout the U.S.' " *Id.* ¶ 250.

6. "On August 2, 2012, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Scheirman, announcing the Company's financial and operating results for the second quarter of 2012, which ended on June 30, 2012 (the "Q2 2012 10-Q")." *Id.* ¶ 341. "The Company...described in its Q2 2012 10-Q several ongoing government investigations and claimed that all of these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 344.

7. Filed February 22, 2013, the 2012 10-K signed by Defendants Ersek and Scheirman essentially repeated the information in the 2011 10-K in that it "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 365, 368.

8. "On April 30, 2013, the Company held a conference call in connection with the release of its earnings for the first quarter of 2013. During this call, an analyst noted the fact that Ersek had mentioned a few times earlier in the call at a general level new compliance and regulatory actions in addition to the Southwest

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

Border Agreement that the Company had not disclosed previously and asked for more information about these activities. Ersek responded by explaining: 'It is no secret that the financial service[s] overall get more regulated and within that also we want to be best-in-class. We create this culture of compliance within our company. And we – so that's the environment we are in currently and we see that as a long-term competitive advantage.' Then, at Ersek's request, Scheirman followed-up by elaborating as follows: '[A]s Hikmet said that we are committed to a strong culture of compliance and invest in compliance programs. And let me give you a flavor of maybe some things that have been ongoing not only in the first quarter, but prior quarters, too. We're doing things to really protect the customer and protect the business. They might be things such as real-time risk assessment when the transaction happens at the point-of-sale, verification programs related to high principal transactions where we – whereby we call back the sender and make sure the transaction is appropriate. But, as Hikmet mentioned, we believe this will be a long-term competitive advantage for us. Near term, there are some headwinds but it's the right investment to make in the business. We believe it'll be a competitive advantage and we continue to work towards that....*But we will continue to comply with the letter and the spirit of the law and really see that as a competitive advantage long term.*' (Emphasis added). Ersek then explained that the Company was working to adapt to the U.S. and global trend of increasing regulations. Scheirman added that the Company's efforts often went above and beyond its technical legal requirements. He represented that '*everything isn't necessar[ily] black-and-white a rule, but we work with regulators in countries around the world to try to do the right thing for our business and for our customers.*' (Emphasis added)." *Id.* ¶ 374. "Later during this April 30, 2013 conference call, Defendant Scheirman explained that 'our goal is to comply with the letter and the spirit of the law, have best-in-class compliance programs, and really protect our customers and protect our businesses.' Defendant Ersek added, 'I think the general financial service industry is getting more regulated and we are very focused on that. I think we have a great compliance team in place and they are working hard. Generally, I see also being a market leader here as a competitive advantage.' " *Id.* ¶ 375.

**\*10** 9. "Specifically addressing the regulatory environment, Scheirman stated at [a] June 13, 2013

William Blair conference that 'the regulators start with the market leaders and we're clearly a market leader. And, again, we're going to partner with them because we share the same goals of protecting our customers, protecting our business systems and so forth.' " *Id.* ¶ 386.

10. On November 25, 2013, the Middle District of Pennsylvania ("MDPA") "served the Company with a grand jury subpoena seeking documents relating to complaints made to the Company by consumers anywhere in the world relating to fraud-induced money transfers since January 1, 2008." *Id.* ¶ 268. "When MDPA served the Company with this subpoena, it informed Western Union that the Company itself was the subject of this investigation." *Id.*

11. Filed February 24, 2014, the 2013 10-K signed by Defendants Ersek and Agrawal essentially repeated the information in the 2011 and 2012 10-Ks in that it "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 410, 413.

12. Filed July 31, 2014, the Q2 2014 10-Q signed by Defendants Ersek and Agrawal disclosed that the government had notified Western Union that it was a "target" of an investigation by the Southern District of Florida ("SDFL"). *Id.* ¶¶ 275, 428, 430.

13. Filed February 20, 2015, the 2014 10-K signed by Defendants Ersek and Agrawal essentially repeated the information in the 2011, 2012, and 2013 10-Ks in that it "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 446, 449.

14. Filed February 19, 2016, the 2015 10-K signed by Defendants Ersek and Agrawal, "discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators. Although the 2015 10-K disclosed that MDPA 'indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012,' the Company continued to claim that all of these investigations—including MDPA's—were too

Pl. Appx. B-287

8

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 473, 476.

15. Filed on May 3, 2016, the Q1 2016 10-Q signed by Defendants Ersek and Agrawal contained "substantially the same representations" but further "disclosed that MDPA 'indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012.' The Company, however, continued to claim that all of its ongoing government investigations—including MDPA's —were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶¶ 482, 483.

16. Filed August 3, 2016, the Q2 2016 10-Q signed by Defendants Ersek and Agrawal contained substantially the same information as the Q1 2016 10-Q and further "disclosed that MDPA 'indicated that it believes Western Union failed to timely terminate or suspend certain Western Union agents who allegedly paid or forwarded thousands of fraud-induced transactions sent from the United States to various countries from at least 2008 to 2012,' and that the 'FTC staff has advised the Company that it has been directed to request authority from the FTC to file a complaint against the Company in United States federal court if it is not able to reach an agreement with the Company.' The Company, however, continued to claim that all of these investigations— including MDPA's and FTC's—were too preliminary for the Company to be able to predict their outcomes. The Company also contested the FTC's position by taking the strong position that '[i]f the FTC files a complaint against the Company, the Company intends to defend itself vigorously.' " *Id.* ¶¶ 488-89.

**\*11** 17. Filed November 1, 2016, the Q3 2016 10-Q signed by Defendants Ersek and Agrawal contained substantially the same information as the Q2 2016 10-Q and further "disclosed that the FTC advised the Company 'of its view that the Company violated Section 5 of the Federal Trade Commission Act and the Telemarketing Sales rule by failing to take timely, appropriate, and effective measures to mitigate fraud in the processing of money transfers sent by consumers' and that the FTC staff 'believes that the Company bears responsibility for principal amounts of what it alleges to be hundreds of millions of dollars in fraud-induced money transfers, or a multiple thereof based

on the FTC's belief that fraud-induced money transfers are underreported by consumers, dating back to 2004.' The Company continued, however, to claim that all of these investigations—including MDPA's and FTC's— were too preliminary for the Company to be able to predict their outcomes. The Company also contested the FTC's position by declaring that '[t]he Company strongly disagrees with the FTC's assertions regarding its potential liability and any scope thereof' and that '[i]f the FTC files a complaint against the Company, the Company intends to defend itself vigorously.' " *Id.* ¶¶ 492-93; *see also id.* ¶ 263. Plaintiffs emphasize that "even though multiple DOJ offices had already taken the position that Western Union committed serious compliance violations, even when Defendants disclosed in the Company's 10-Q for the third quarter of 2016, filed on November 1, 2016, that the Company 'anticipate[d] entering into discussions with the United States Department of Justice to potentially resolve the four investigations' being conducted by the EDPA, CDCA, MDPA, and SDFL, Defendants continued to take the position that '[d]ue to the stage of these matters and the fact that no criminal charges or civil claims have been brought, the Company is unable to predict the outcome of these matters.' " *Id.* ¶ 282.

18. As part of the January 2017 settlement agreement with the DOJ, "Western Union admitted in the Statement of Facts...that its employees knew that its analyses and internal reports show that the amount of losses from fraudulent transactions sent through the Company was much higher than the amount identified in the Company's [Consumer Fraud Reports ("CFRs") ] database, because not every victim reported fraud to the Company." *Id.* ¶ 155. "In addition, as the FTC found, fraud complaints in Western Union's database represent only a small percentage of the actual fraud perpetrated through Western Union's money transfer system because (a) as recognized by Western Union's own internal reports, the vast majority of fraud victims do not complain directly to the Company; (b) Western Union has failed to log in its complaint database all of the complaints and reports about fraud that it has received or the particular money transfers related to the complaints; and (c) in many countries, Western Union did not provide a fraud hotline or a toll-free phone number for victims to call to report fraud. Because of these multiple factors, the FTC determined that since 2004, Western Union has likely been used to send billions of dollars in

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 294 of 330
Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)
2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

fraud-induced payments to telemarketers and con artists worldwide." *Id.* ¶ 156.

**\*12** Plaintiffs do not contest that, "[s]tarting in the first quarter of 2012, Western Union's annual and quarterly filings signed by Defendants Ersek and Scheirman and Agrawal disclosed the existence of these investigations into the Company's AML and anti-fraud programs." *Response* [#63] at 47; *see also id.* (stating that "Defendants made many statements related to the ongoing government investigations by four separate U.S. Attorney offices, the FTC, and state attorneys general that would culminate in the Joint Settlement"). Plaintiffs also concede that, "[a]s the Class Period progressed, Defendants continued to disclose the existence and topics of information requested in these and other investigations" and further disclosed that "Western Union was a 'target' or 'subject' of these investigations." *Id.*

Plaintiffs' primary concern, though, is that Defendants "stated at all times that these inquiries were too preliminary to be able to predict their outcomes '[d]ue to the stage of these matters and the fact that no criminal charges or civil claims have been brought.' " *Response* [#63] at 47 (quoting *Am. Compl.* [#40] ¶ 282). Plaintiffs argue that "[t]hese descriptions of the many ongoing government investigations were false and misleading because Western Union's potential liability was in fact substantial." *Response* [#63] at 48. They state that "Defendants downplayed the likely outcome of ongoing government investigations when they knew of substantial compliance failures that subjected Western Union to the high risk of significant liability." *Id.* at 49. Plaintiffs also state that "Defendants do not get credit for disclosing the existence of these inquiries and providing generic warnings when they failed to disclose essential information showing that those inquiries raised risks that were far-more substantial than they let on." *Id.* They further argue that "Defendants failed to disclose the FTC's reasons for concluding that consumers underreported fraud" and that, regardless of Defendants' "subjective beliefs, they had a duty to disclose information concerning FTC's position that contradicted the basis for their public statements." *Id.* at 49-50.

In support of their argument, Plaintiffs cite to several cases. *Id.* at 48. First, in 🔖*In re ITT Educational Services, Inc. Securities Litigation*, 34 F. Supp. 3d 298 (S.D.N.Y. 2014), contracts were signed between ITT (a for-profit college) and three student loan lenders which required ITT to pay for its students' loan default losses if those defaults reached a certain threshold. When the lenders informed

ITT that the threshold had been reached and consequently began demanding "increasingly large sums of money," ITT continued to publicly represent that its liabilities "[w]ould be [i]mmaterial." The court held that the defendants' public statements that "they were not expecting any significant liability under the [contracts] and that they could not predict the maximum potential liability to which they were exposed" was actionable where the plaintiffs had alleged that the defendants "knew that their liability...would be substantial." Here, the Court notes that there are no allegations in the present case similar to the fact in *ITT* that Defendants publicly stated that they were not expecting any significant liability; rather, they only stated that they could not predict the outcome of those investigations.

Plaintiffs cite to three other cases in support of their argument.

First, in 🔖*City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.*, No. 12-CV-5162, 2014 WL 4823876 (W.D. Ark. Sept. 26, 2014), the court held that the disclosure of an internal corruption investigation was misleading because the defendants omitted their prior knowledge of events, thereby misleading investors as to when the defendants learned of the suspected corruption.

Second, in 🔖*In re Van der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005), the court held that a generic warning by the defendants regarding potential regulatory risks was affirmatively and materially misleading when the company already knew or was recklessly ignorant that its business strategy relied on practices that violated New York Stock Exchange trading laws. Third, in *SEB Asset Management S.A. v. Western Union Company*, No. 13-cv-03325-MSK-MJW, 2014 WL 5708522 (D. Colo. Sept. 29, 2015)*SEB Asset Management S.A. v. Western Union Company*, No. 13-cv-03325-MSK-MJW, 2014 WL 5708522 (D. Colo. Sept. 29, 2015), the court held that statements acknowledging but downplaying the extent of Western Union's compliance problems in Mexico (statements like they "expected 'some slow down' " and "expected 'some challenges' ") gave rise to a duty to disclose after the point in time at which the defendants "would have had a meaningful estimate" of how many agents failed to meet compliance requirements. Based on allegations from a confidential witness, the court held that details regarding an action the defendants themselves were thinking of taking (i.e., the termination of 7,000 agents) should have been revealed even if Western Union had not yet decided that it would terminate those agents, because just the "potential termination of a large number of agents" gave rise to a duty to disclose.

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

**\*13** In Response, Defendants argue that "they were not required to hazard guesses simply based on the potential severity of the outcome – even if that outcome may later have come to pass." *Reply* [#70] at 58. They point out that "there were numerous factors potentially affecting the resolution or outcome of the investigations" and that "Plaintiff simply ignores all of these variables." *Id.* at 59.

In support, Defendants cite to the following cases. *Id.* at 58. First, in 🔖*In re FBR Inc. Securities Litigation*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008), the court held that there was no duty to disclose an "alleged regulatory violation related to a single, isolated event" in the absence of the risk having become a "near certainty." Second, in 🔖*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995), the Second Circuit held that prior United States Food and Drug Administration "(FDA)" inspections which did not result in "any sanctions" or "other adverse consequences" were not material and that the defendants need not disclose upcoming FDA inspection where an adverse result was not a "foregone conclusion." Third, in 🔖*In re Marsh & McLennan Companies, Inc. Securities Litigation*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006), the court held the defendants need not disclose where the result was not "substantially certain to occur" but that statements such as how the company "led the industry in terms of disclosure" were thus actionable. Fourth, in 🔖*Anderson*, 827 F.3d at 1229, the Tenth Circuit held that "the magnitude of the loss that Spirit ultimately sustained" did not necessarily constitute securities fraud when the plaintiffs' argument "amount[ed] to allegations of 'fraud by hindsight.'" *see also* 🔖*In re Sanofi Securities Litigation*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015) (similarly cautioning against finding "fraud by hindsight"). Fifth, in *Société Générale Securities Services, GcmH v. Caterpiller, Inc.*, No. 17 cv 1713, 2018 WL 4616356, at \*6 (N.D. Ill. Sept. 26, 2018), the plaintiff had "essentially argue[d] that [the defendant] should have admitted a securities or tax law violation while the investigations were ongoing and the failure to do so was both a material omission and a misstatement." The court found "such a position untenable. If every investigation or executed search warrant was evidence of wrongdoing then what purpose do hearings and trials have[?].. . [S]ecurities laws generally do not impose such a duty upon publicly traded corporations to confess uncharged, unadjudicated claims of wrongdoing."

The Court agrees with Defendants that the statements regarding ongoing government investigations during the Class Period were not false or misleading. For example, in 2012, 2013, 2014, and 2015, the annual 10-K filings each disclosed the investigations, stated that Western Union "could face significant fines, damage awards or regulatory consequences" and that the investigations "could have a material adverse effect on the Company's business, financial condition, results of operations, and cash flows." *See* [#57-3] at 22; [#57-13] at 24-25, 35-36, 39; [#57-19] at 31-32, 39; [#57-22] at 32-33, 41-42. Western Union disclosed that there were investigations and that the results of those investigations could be significant and material. Plaintiffs argue that the statements were false and misleading because Western Union's potential liability was substantial and that the "generic warnings" were insufficient. However, in their Response [#47] they have not pointed to what specific additional information they believe Western Union should have disclosed, and on the basis of these pleadings, the Court cannot determine that the investing public was deceived because Defendants stated that the investigations were too preliminary to predict their outcomes. The allegations before the Court, while certainly grave, fall far short of a finding that the outcomes of the investigations were near certainties or foregone conclusions.

**\*14** Plaintiffs relatedly argue that Defendants should have disclosed "the FTC's reasons for concluding that consumers underreported fraud" and that Defendants "had a duty to disclose information concerning FTC's position that contradicted the basis for their public statements." *Response* [#63] at 49-50. In support, Plaintiffs cite to 🔖*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318, 1326, 1329 (2015). However, the cited portions of *Omnicare* do not precisely stand for the proposition as enunciated by Plaintiffs. While *Omnicare* strongly suggests that a company should make clear, if it makes a statement, whether "the Federal Government [is] taking the opposite view," nothing in the decision mandates that the company must fully lay out the opposing view's arguments and reasoning, as Plaintiffs appear to assert here.

🔖135 S. Ct. at 1329; *Response* [#63] at 49-50. Further, to the extent that Plaintiffs argue that Defendants lied or misled regarding whether it agreed with the FTC's position that "consumers underreported fraud," it is clear that Defendants only stated that they disagreed with "potential liability and any scope thereof," and not that they disagreed that

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

"consumers underreported fraud." *Response* [#63] at 49; *Reply* [#70] at 60; *see also* [#57-25] at 11.

In short, the Court finds that the allegations here described by Plaintiffs do not constitute legally actionable false or misleading statements.

### ii. 2013 & 2014 Statements by Defendants Ersek and Agrawal

Next, Plaintiffs direct the Court's attention to three statements made by Defendants Ersek and Agrawal in 2013 and 2014. First, with respect to Defendant Ersek, they point to the following allegation:

> On February 12, 2013, Western Union issued a press release announcing its financial results for the fiscal year and fourth quarter of 2012. On the Company's earnings conference call that was held the same day, an analyst asked "what gives you confidence that there is nothing in the compliance or something that stings you that you don't know about[?] I mean I guess one of the ways to think about it I guess is there's probably – is there anything out there that can be as large as the situation that happened with [the Southwest Border Agreement] that can have that kind of an impact on price?" In response, Defendant Ersek represented: "The regulatory environment is challenging. Obviously we are in very regulated market, but all our investments, about $100 million a year we invest in anti-money laundering and compliance, are really putting us as an industry standard. Being a market leader puts us in an industry standard, and we want to be a best-in-class and see that as a long-term as a competitive advantage. I think regulators are looking also at us, and we do have a duty to satisfy customer needs and we are working very hard on that."

*Am. Compl.* [#40] ¶ 360. Plaintiffs further allege that on this same conference call "Defendants Ersek and Scheirman also continued to characterize the Company's compliance-related issues as limited to Mexico and Latin America as part of the Southwest Border Agreement, rather than the Company's more comprehensive failure to comply with pre-existing basic AML and anti-fraud requirements." *Id.* ¶ 361.

Second, also with respect to Defendant Ersek, Plaintiffs direct the Court's attention to the following allegation:

> At a May 8, 2013 Jefferies Global Technology, Media and Telecom Conference, Defendant Ersek stated that

the "regulatory environment" is "one of our biggest competenc[ies] here" as to the cross-border nature of the Company's business. The Jefferies analyst leading the discussion then picked up on these statements, as well as Defendants' consistent statements elsewhere that its compliance efforts are a "competitive advantage," and asked if the "worst is over" in terms of "compliance-related events." Ersek responded that "compliance culture is in our DNA[ ]. Meanwhile, I think, creating this culture of compliance is something that it's very important" because of the life-changing benefits of remittances that customers receive through the Company.

**\*15** *Id.* ¶ 381.

Third, with respect to Defendant Agrawal, Plaintiffs direct the Court's attention to the following allegation:

> In the Company's earnings conference call for the first quarter of 2014, held on May 1, 2014, Defendant Ersek stated as to the Company's ongoing compliance costs that "from today's points of view, I think, the team is doing a great job putting the teams right in place, that we have the compliance programs that it's competitive, even a competitive advantage. And I can see that part of that competitive advantage already in some countries like Mexico. ...And it's all over actually...and I think, we have a good program that we covered world[wide] with that investment....We did put programs, compliance programs, agent programs into place [in Mexico]. They're working." Then, in response to an analyst's question about MDPA's investigation into Western Union's compliance efforts, which the Company disclosed in its 2013 10-K, Defendant Agrawal represented that "[i]t's early in the process and it's something that we're working through. We have good monitoring systems in place. We have a multi-faceted program to prevent consumer fraud, and outreach program with consumers. So, that's about all we can say right now and we're working through that."

*Id.* ¶ 417.

Plaintiffs assert that "[b]y making these positive statements concerning ongoing regulatory investigations, Defendants were required—but failed—to give investors the full picture and disclose the underlying compliance failures that gave rise to the substantial risk of liability that Western Union faced." *Id.* at 51. In response, Defendants cite to *Employees Retirement System of the City of Providence v. Embraer S.A.*, 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30,

Smalien v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

2018), in which the court agreed with the argument that "[t]he Amended Complaint is premised on the faulty notion that Embraer was required to disclose details of the [United States Foreign Corrupt Practices Act] violations and admit that it had engaged in wrongdoing—before it had even been charged and before the investigations were even complete. However, the Second Circuit has held that disclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."

The Court finds that Plaintiffs overstate their case regarding Defendants' statements describing then-ongoing government investigations. First, regarding the February 12, 2013 statement by Defendant Ersek that the Company was a "market leader," *Am. Compl.* [#40] ¶ 360, Plaintiffs provide no allegations that, despite any problems Western Union may have been experiencing, the company was not still a market leader in this realm. For example, they could have alleged other companies which were actually market leaders at this time. Second, regarding the May 8, 2013 statement by Defendant Ersek that "compliance culture is in our DNA," the Court finds (despite Plaintiffs' assertion to the contrary, *see Response* [#63] at 50 n.20) that this type of statement is nothing more than unverifiable puffery. *See* 🚩 *Grossman, 120 F.3d at 1118*. Third, Plaintiffs point to Defendant Agrawal's May 1, 2014 statement that "'[i]t's early in the process and it's something that we're working through. We have good monitoring systems in place. We have a multi-faceted program to prevent consumer fraud, and outreach program with consumers." When read in the full context of Plaintiff's allegations, as provided above, it is clear that the point was made that there was an ongoing investigation, and accordingly, the Court finds that Defendant Agrawal's subsequent statement constitutes nothing more sinister than vague statements of corporate optimism, which are simply not actionable under the securities laws. *See* 🚩 *Pirraglia, 339 F.3d at 1189*. In short, the Court finds that the allegations here described by Plaintiffs do not constitute legally actionable false or misleading statements.

**\*16** Accordingly, to the extent Claim One is based on this category of purportedly false and misleading statements regarding government investigations, Claim One is **dismissed** against Defendants Ersek, Scheirman, Agrawal, and Western Union.

### b. Compliance Expenditures

Plaintiffs argue that Defendants made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding compliance expenditures. *Response* [#63] at 51-53. In addition to certain previously-quoted allegations which the Court has reviewed,[10] Plaintiffs cite to the following allegations in support of this category of purportedly false/misleading statements. *Id.* 1.

Two years prior to the Class Period (which begins on February 24, 2012), "[a]t a meeting of Western Union's Board of Directors on February 24-25, 2010, attended by Defendants Ersek [and] Scheirman, [i]t was...discussed...that Western Union conducted a test of 1,014 of its U.S.-based agents that showed that 27% of the agents visited during the review failed to meet compliance requirements. Based on these findings, Western Union retrained only 188 agents and did not take further steps to correct the issue outside of the sample that participated in the test." *Am. Compl.* [#40] ¶¶ 95-96.

2. "In the [August 2, 2012] Q2 2012 10-Q, the Company stated, in relevant part:

   Enhanced Regulatory Compliance

   We regularly review our compliance programs. In connection with that review and growing global regulatory complexity, and as we dialogue with governmental and regulatory authorities, we have made, and continue to make, enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity. These enhancements, along with other enhancements to improve consumer protection related to the Dodd-Frank Act and other matters, have resulted in, and in coming quarters we expect them to continue to result in, changes to certain of our business practices and increased costs. We believe some of these changes will have an adverse effect on our business, financial condition and results of operations.

   *Id.* ¶ 342.

3. "[A]t th[e] November 7, 2012 Citi Financial Technology Conference, Defendant Scheirman blamed

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

the Company's compliance costs and issues on 'glob[al]' trends, stating that '[w]e now spend over $100 million a year on compliance and just given how the compliance requirements are generally tightening around the globe, that's one spend we'll probably continue to increase as we move forward.' " *Id.* ¶ 358.

4. "On February 14, 2013, ...at the Goldman Sachs Technology & Internet Conference, Defendant Ersek explained that the Company was well-positioned to build its digital platform because 'we have the anti-money laundering system, we have everything there that we don't have to deal with so we are really building on our existing fundamentals and new channel on the send side called westernunion.com. That's the biggest advantage.' Ersek also continued to describe the Company's efforts to 'upgrade our compliance activities' as limited to the Southwest Border area and described these efforts as setting the 'long term industry standard and a competitive advantage for us,' rather than meeting minimum and basic legal requirements.' " *Id.* ¶ 363. [11]

**\*17** 5. In the 2012 10-K, filed on February 22, 2013, the Company stated, in pertinent part:

Our business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or their subagents to comply with those laws and regulations or their interpretation and increased costs or loss of business associated with compliance with those laws and regulations could have an adverse effect on our business, financial condition and results of operations....

...While we believe our fraud prevention efforts are effective and comply with applicable law, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem....

\*\*\*

We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory

requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements....

\*\*\*

...While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

\*\*\*

Our agents' or their subagents' failure to comply with federal and state laws and regulations as well as laws and regulations outside the United States could have an adverse effect on our business, financial condition and results of operations.

*Id* ¶ 366.

6. "On July 30, 2013, the Company held a conference call in connection with the release of its earnings for the second quarter of 2013. In response to a question about future compliance costs, Defendant Scheirman stated that compliance costs would likely increase as a result of the changing regulatory environment, rather than because of the Company's failure to meet current compliance requirements. He stated...'that having a robust compliance program and a strong culture of compliance is very important to us. And so broadly as we think about the global landscape, the regulatory environment continues to move. So as I think about 2014 and 2015, right now I'd expect our compliance and regulatory costs to increase. But what's important about that is that it protects the brand, it protects the customer, it protects our agents. And longer term we believe that's going to be a competitive advantage because of our scale and our scope of what we can do with compliance and the regulatory.' Defendant Ersek then added that 'I do see that as a competitive advantage. We have really the culture in our company. And the most importantly, it protects the consumer....We comply with all regulations world[wide] and try to be the best in class and leading our industry here.' " *Id.* ¶ 388.

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 299 of 330
Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)
2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

**\*18**  7. "On October 29, 2013, the Company reported its
third quarter 2013 financial results. A main topic on the
Company's earnings conference call for the third quarter
of 2013, held on that day was the Company's surprisingly
high increase in compliance costs for 2014. Defendant
Ersek stated:

As you are aware, regulatory requirements and
expectations around financial service companies are
escalating around the world. Some banks have recently
faced large fines, and some have announced billions
of dollars of incremental investments in compliance
areas. The environments continue to evolve. In the U.S.,
for example, we recently initiated agent procedures at
our 50,000 agent locations to comply with the Dodd-
Frank Remittance Transfer Rule. And I am pleased to
report that the procedures were implemented in time
for the October 28 deadline. As we mentioned, earlier
this year we have previously implemented new anti-
money laundering and fraud prevention enhancements in
countries such as Spain and UK.

Specifically addressing the Southwest Border
Agreement, Ersek stated that 'in the U.S., we are
now working with our third monitor on the Southwest
Border Agreement. As noted in an 8-K filed today, we
have agreed to an additional short-term extension to
this agreement to continue discussing amendments. We
could not conclude discussions on a long-term expansion
under the previous timeframe for reasons including
the recent passing of Arizona's primary attorney on
the matter.' " *Id.* ¶ 397. "Defendant Ersek also stated
on this October 29, 2013 call that '75% of our
network [of agents] are banks and financial institutions,'
which 'choose us because we have high standards
on compliance.' He also stated that the Company's
surprisingly high increase in compliance costs for the
following year was 'not specific to the Western Union.'
Ersek stated that Western Union was 'a market leader'
setting the 'industry standard.' " *Id.* ¶ 398. "At the end of
this October 29, 2013 conference [c]all, an analyst stated
that Defendants' comments earlier in the call 'sound[ed]
like what you guys are saying if you kind of roll up
all this commentary is that, it's essentially going to cost
you more than you previously thought to comply with
regulations that you already knew about...as opposed
to new regulations having just popped up in the last
couple of months since the last earnings call.' After
Defendant Ersek's equivocal response to this question,

Michael Salop, the Company's Senior Vice President of
Investor Relations, stated that '[a] lot of these things
are not necessarily black and white or haven't been
historically. So when we work with regulators around the
world and around the states and you get clarification on
what's needed and make agreement on what programs
you'll do, these things are kind of fluid. And so some of
these are interpretations of older rules, some of these are
new things, some of these are just clarifications with the
regulators, some of them are own reviews, so there's a
lot of different things going in here.' " *Id.* ¶ 399.

8. "The reason for the market's negative reaction
was because of the Company's substantial increase
in compliance costs, and corresponding decrease in
projected profits that resulted directly from those costs.
As Bloomberg reported on October 30, 'Western Union
Plunges 19% as Compliance Costs Rise.' Indeed,
Moody's Investors Service downgraded the rating of
Western Union's senior unsecured debt on November 18,
2013 because of the Company's 'unexpected increase in
compliance related costs' and the Company's projection
that it would not have any operating profit in 2014
as a result of those compliance costs." *Id.* ¶ 503.
"These increased compliance costs were a direct result
of the Company's compliance failures discussed above.
Although the Company did not disclose it at this time, it
took these steps as a result of the ongoing government
compliance failures and investigations that resulted in
the Joint Settlement." *Id.* ¶ 504.

**\*19**  9. The 2013 10-K, filed on February 24, 2014, largely
repeated the same statements in the 2012 10-K, *see*
§ III.B.1.b.5., with the following pertinent additions/
alterations:

Our business is subject to a wide range of laws and
regulations. Liabilities or loss of business resulting
from a failure by us, our agents or their subagents
to comply with laws and regulations and regulatory
or judicial interpretations thereof, including laws and
regulations designed to detect and prevent money
laundering, terrorist financing, fraud and other illicit
activity, and increased costs or loss of business
associated with complying with those laws and
regulations has had and we expect will continue to
have an adverse effect on our business, financial
condition and results of operations....

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

...While we believe our fraud prevention efforts are effective and comply with applicable law, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem....

...In 2013, the Company spent over $150 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona....

***

If we are unable to maintain our agent, subagent or global business payments networks under terms consistent with those currently in place, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected....

*Id.* ¶ 411.

10. A year later, the 2014 10-K, filed on February 20, 2015, largely repeated the same statements in the 2013 10-K, *see* § III.B.1.b.9., with the following pertinent additions/ alterations:

Our business is subject to a wide range and increasing number of laws and regulations....

***

...As of December 31, 2014, these programs included approximately 1,900 dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance....In 2014 , the Company spent over $180 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona....

***

If we are unable to maintain our agent, subagent or global business relationships under terms consistent with those currently in place, including due to increased costs or loss of business as a result of increased compliance requirements or difficulty for

us, our agents or their subagents in establishing or maintaining relationships with banks needed to conduct our services, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition and results of operations would be adversely affected...

*Id.* ¶ 447.

11. "At a June 9, 2015 William Blair Growth Stock Conference, Defendant Agrawal stated:

Our cross-border platform is really what sits at the center of our global money transfer business and I really believe that's unrivalled [sic] in its capabilities ....Our strong regulatory and compliance capabilities: we've been investing in this area for quite some time and we continue to strengthen our capabilities here, and we believe it's going to be a long-term competitive advantage for us in this global and complex environment that we're operating in....

**\*20** So the significant investment we've made in the compliance area is helping us stand apart from the rest of the market. And I believe that will be more and more the case....

And nobody really has the great technology and compliance engine in the middle that I talked about. That's very, very difficult to replicate for anybody. Very few players in the market have that kind of capability."

*Id.* ¶ 459.

12. "On the earnings call for the third quarter of 2015, held on October 29, 2015, Defendant Ersek stated:

We do see in some markets that competitors are finding it difficult to operate in the market because the regulatory environment is quite – asking a lot of questions and a lot of demands for them. And as you recall, we invested – started to invest about three years ago heavily into compliance. And obviously, we do see that pay back. And this year, investments will be about – it's currently running about 3.7% of our revenue.

But it's kind of a competency now for us, running the transaction through our compliance programs in a way that's like an engine makes us definitely in way

Pl. Appx. B-295

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

– a big competitive advantage. It means also that this regulatory environment will be in 200 countries. The compliance regulatory challenges won't be less in the future, that will continue. And we are committed to be in 200 countries where we operate and comply with the regulators. And it means also that we will be there, and that could be long-term a competitive advantage."

*Id.* ¶ 465.

13. A year later, the 2015 10-K, filed on February 19, 2016, largely repeated the same statements in the 2014 10-K, *see* § III.B.1.b.10., with the following pertinent additions/alterations:

...Liabilities or loss of business resulting from a failure by us, our agents or their subagents to comply with laws and regulations and regulatory or judicial interpretations thereof, including laws and regulations designed to protect consumers, or detect and prevent money laundering, terrorist financing, fraud and other illicit activity, and increased costs or loss of business associated with compliance with those laws and regulations has had and we expect will continue to have an adverse effect on our business, financial condition, results of operations, and cash flows....

***

...As of December 31, 2015, these programs included approximately 2,200 dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance....In 2015, we spent approximately $200 million on our compliance and regulatory programs....

***

If we are unable to maintain our agent, subagent or global business relationships under terms consistent with those currently in place, including due to increased costs or loss of business as a result of increased compliance requirements or difficulty for us, our agents or their subagents in establishing or maintaining relationships with banks needed to conduct our services, or if our agents or their subagents fail to comply with Western Union business and technology standards and contract requirements, our business, financial condition,

results of operations, and cash flows would be adversely affected....

*21 *Id.* ¶ 474.

14. "[A]t th[e] March 10, 2016 Investor Day Conference, David Thompson, Western Union's Chief Technology Officer, stated:

[W]e now have a state-of-the-art compliance platform both based on technology and people or compliance professionals....And we built this technology to prevent fraud in our network, protect our customers....And this is a very powerful capability for us in monitoring the suspicious activity and monitoring aggregation rules for our customers.

These rules also prevent and help us detect human trafficking, terrorist financing, child exploitation, and other activities that may not be allowed, like Internet gambling and associated activities. These rules are also in place to allow us to screen against government sanctions lists, and politically exposed lists provided by various governments. Now these are our proprietary tools that we've created that are a long-term competitive advantage for Western Union, and are very powerful capabilities that we provide to our partners and our customers.

So, in summary, at Western Union, we've created new technologies and platforms and processes to serve our customers. And we're now really at a state where we've transformed our capabilities....And it's exciting to be a part of this transformation at Western Union and deliver technologies that move money for better."

*Id.* ¶ 480.

15. "At a May 25, 2016 J.P. Morgan Global Technology Media and Telecom Conference, Defendant Ersek stated:

We came forward and made a big announcement that we're going to upgrade our, significantly we were always very focused on compliance, but significantly upgrade our compliance environment because the world was changing....

Western Union is, especially with the environment, helping the law enforcement governments to move good money. That's why we invested in the compliance. I think we don't want that money

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

because the good money supports people, supports governments, supports law enforcement, helps law enforcement...in a very efficient way. Money will move anyway, but it should move in a regulated way.

*Id.* ¶ 486.

16. "[T]he Federal Trade Commission ("FTC") found that for many years, Western Union knew that it failed to implement effective anti-fraud and AML programs 'to adequately and effectively detect and prevent consumer frauds employing Western Union's money transfer system.' The Company had knowledge of these inexcusable compliance deficiencies based on, among other things, '[i]nformation contained in Western Union's internal reports, communications, and other records demonstrat[ing] that the company has been aware of high levels of consumer fraud involving particular countries and agents, including network agents Western Union itself owns.' " *Id.* ¶ 9.

17. "As the Class Period progressed and Western Union became further ensnared in the government investigations that led to the Joint Settlement, the Company claimed to have begun taking steps to improve its compliance practices. The Statement of Facts that Western Union negotiated with DOJ to reach the Joint Settlement states that by September 2012—over six months after the Class Period began—Western Union began taking certain steps to improve its anti-fraud and AML compliance programs. But these efforts were too little, too late. As the DOJ Statement of Facts states, the Company did not significantly increase the number of compliance employees or its compliance budget until 2013 through 2015, well into the Class Period. Other remedial measures referenced in the Statement of Facts are not given specific dates, but rather, are described as 'continu[ing]' efforts. Western Union also admitted to DOJ that it willfully failed to implement an effective AML program and that it aided and abetted wire fraud through December 2012." *Id.* ¶ 144.

**\*22** 18. "In addition, even if Western Union implemented certain compliance measures beginning in late 2012, those efforts failed to cure the most serious compliance deficiency that the Company experienced. The FTC determined that although Western Union improved certain aspects of its anti-fraud program since 2012 because of the FTC's ongoing investigation, the Company continued well past that time to fail

'to promptly suspend and terminate agent locations facilitating fraud. Instead, Western Union has continued to profit from the activities of these agents.' These failures extended to agent 'locations that appeared to be complicit in paying out fraud-induced money transfers or repeatedly failed to comply with Western Union's anti-fraud and AML programs, policies, and procedures.' " *Id.* ¶ 148.

Plaintiffs argue that Defendants "falsely characterized the reason for Western Union's compliance expenditures during the Class Period." *Response* [#63] at 51. They state that "[a]ll of these statements were false and misleading because —contrary to the reasons that Defendants gave—Western Union's compliance expenditures were actually made in response to government investigations into the compliance failures that formed the basis for the Joint Settlement." *Id.* "When giving these reasons, Defendants left out the key reason for those efforts. Once Defendants chose to discuss Western Union's rationale for its increased compliance efforts, they had a duty to do so forthrightly and without omitting the most important reason." *Id.* at 52. They state that "Western Union's reason for its compliance expenditures is an objectively verifiable fact," and that "[t]he Joint Settlement makes clear that the actual reason for the Company's increased compliance costs was its reaction to the government investigations and its awareness of its significant compliance failures." *Id.*

In support, Plaintiffs cite to 🔖*Nakkhumpun v. Taylor*, 782 F.3d 1142 (10th Cir. 2015), in which the defendant had stated publicly that there was only one reason why something had occurred, i.e., that a deal to purchase a portion of the company had purportedly fell through because the potential buyer was unable to get financing, when the plaintiff had alleged facts clearly showing there was a different reason, i.e., that the investor's CEO had "unambiguous[ly]" stated that the deal fell through because the company was not worth what his company had initially thought. The Tenth Circuit held that the defendant had falsely "attributed the impasse" to "financing difficulties rather than valuation concerns," and that even if the defendant's stated reason was one of several possible reasons for an event, "[t]he existence of multiple explanations is what made [the defendant's] statement misleading." 🔖*Nakkhumpun, 782 F.3d at 1149.*

However, in reading the allegations as a whole, the Court believes that Plaintiffs overstate the effect of Defendants'

Smalien v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

individual statements here. First, unlike *Nakkhumpun*, the statements here do not "unambigious[ly]" state, or even suggest, that there was only one reason for increased compliance expenditures. Second, there is no indication in these allegations that "global trends" and "increasingly complex regulatory requirements" were not or could not have been additional reasons for increased compliance expenditures. Third, as Defendants argue, the FTC statement cited by Plaintiffs ("[A]s a result of the FTC's investigation, Western Union has improved aspects of its anti-fraud program since 2012.") refers to improvements, rather than investments, refers only to anti-fraud programs and not to AML specifically or other compliance areas, and does not indicate that the FTC investigation was the only reason Western Union increased its compliance expenditures regarding anti-fraud programs. *Reply* [#70] at 63 (citing *Response* [#63] at 51).

**\*23** Fourth, the Court is not convinced by the citations provided by Plaintiffs that Defendants characterized the Company's compliance difficulties and increased efforts as limited to issues raised by the SBA. *Am. Compl.* [#40] ¶¶ 361, 363, 447. The first statement cited by Plaintiffs discusses the transcript of a February 12, 2013 conference call, but there is no indication here that Defendants Ersek and Scheiman "continued to characterize the Company's compliance-related issues as limited to Mexico and Latin America as part of the [SBA], rather than the Company's more comprehensive failure to comply with pre-existing basic AML and anti-fraud requirements," as argued by Plaintiffs. *Id.* ¶ 361; *Defs.' Ex. 93* [#70-8] at 3.[12] The second statement cited by Plaintiffs discusses how pricing changes were related to issues raised by the SBA. *Id.* ¶ 363 (quoting *Defs.' Ex. 94* [#70-9] at 13). The third statement cited by Plaintiffs clearly shows that the SBA was only a partial reason for increased compliance expenditures: "In 2014, the Company spent over $180 million on its compliance and regulatory programs, including costs related to our amended settlement agreement with the State of Arizona...." *Am. Compl.* [#40] ¶ 447.

In short, the Court finds that Plaintiffs have failed to adequately allege that the statements in this category regarding compliance expenditures were legally actionable untrue or misleading statements of material fact, or that Defendants failed to state material fact necessary to make these statements not misleading. Accordingly, to the extent Claim One is based on this category of purportedly false and misleading statements regarding compliance

expenditures, Claim One is **dismissed** against Defendants Ersek, Scheirman, Agrawal, and Western Union.

### c. Compliance Practices

Plaintiffs argue that Defendants also made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding compliance practices. *Response* [#63] at 41-47. In addition to certain previously-quoted allegations which the Court has also reviewed,[13] Plaintiffs cite to the following allegations in support of this category of purportedly false/ misleading statements. *Id.*

1. "On March 13, 2012, [D]efendant Scheirman attended the Credit Suisse Global Services Conference. In response to a participant question about how the Company would maintain its pricing advantages in the face of competition from other companies offering similar services, Scheirman stated that Western Union's 'compliance programs' were 'really competitive strengths for us.' " *Am. Compl.* [#40] ¶ 311.

2. "On May 9, 2012, Western Union hosted an Investor Day for analysts, media representatives and investors. Defendants Ersek and Scheirman made positive statements during their presentation about the Company's compliance and regulatory capabilities. For example, Defendant Ersek focused a portion of his prepared remarks on describing the supposed strengths of Western Union's compliance and regulatory capabilities. He stated:

    **\*24** These strengths separate us from the competitors. I believe they are a huge competitive advantage. Our global network, our strong brand, our global organization and resources and our regulatory and anti-money laundering capabilities, there are not many companies worldwide which could show these capabilities to you....

    Our fourth competitive advantage is our global anti-money launder[ing] and regulatory capabilities. The regulations around our business are really highly complex, and we have regulatory complexity in all our markets. We have to comply with various Acts and interdictions lists around the world, as well as maintain a very active risk management system to detect and deter potential money laundering activities.

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 304 of 330

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

It sounds complex, and indeed it is complex, but we see that as a competitive advantage, as we comply with various Act and interdictions lists around the world in 200 countries....

To protect our customers, our brand, to comply with rules and regulations, globally we dedicate about 600 employees around the globe to these efforts, and we spend nearly about $60 million on anti-money laundering and regulatory environment."

*Id.* ¶ 321. "Later during this May 9, 2012 Investor Day conference, Defendant Ersek stated that Western Union had an advantage over technology companies because 'it's important to remember Western Union is today['s] market leader in money transfer business. We have built an incredible network over the years, now with 500,000 retail locations in 200 countries and territories. Our brand is well known and trusted around the globe. We have the regulatory and anti-money laundering capabilities to operate in all countries.' Ersek subsequently closed the conference by stating that the complexity of the business, including the 'regulatory environment' was good because although '[i]t scares to death, the competitors to enter this market,' Western Union has 'the competencies' to address these issues." *Id.* ¶ 322. "Also during this Investor Day conference, Defendant Scheirman stated in his prepared remarks that Western Union's 'compliance and regulatory capabilities' were among its 'strengths' that would allow the Company to 'deliver strong returns' for shareholders in the coming years." *Id.* ¶ 323.

3. "On May 16, 2012, Defendants Scheirman and Stockdale attended the J.P. Morgan Global Technology, Media and Telecom Conference. In response to an analyst's questions as to how Western Union could compete with technology startups, Scheirman responded that 'clearly just our compliance capabilities' were one of the Company's main advantages over other companies." *Id.* ¶ 328.

4. "On June 12, 2012, Western Union attended a William Blair & Co LLC Growth Stock Conference call for analysts, media representatives and investors. During his opening remarks, Defendant Ersek continued to represent that the Company's compliance efforts were a competitive 'strength.' He specifically touted the Company's AML program as a way of enabling customers to 'trust' in the Company. Ersek stated:

Before I discuss about our future strategies, let me talk about the core strengths of Western Union....And *the fourth one is the regulatory and anti-money laundering capabilities of Western Union. All thiscombination gives us a unique opportunity and unique fundamentalsfor Western Union* ....

*One of our very strong competitive advantages is our regulatory environment, our regulatory and anti-money laundering competency capabilities. It scares to death the competition to enter this market, the regulatory environment. And I always say, I know it's sometimes tough, but I always say it's good that the regulatory environment and we, as Western Union, have these capabilities to serve the customers and give the trust to the customers they believe at Western Union....*

**\*25** It's not that easy to have a money license in Gabon and Brazil or other states I'm talking about, *so it's a competitive advantage for Western Union and we are very proud of that*. (Emphasis added)."

*Id.* ¶ 333. "Later during this June 12, 2012 conference call, when an analyst asked about competition for sending money cross-border from companies such as PayPal, Defendant Ersek responded by again claiming that the Company's regulatory compliance efforts provided it with a competitive advantage. He stated, 'You have to get the regulatory environment, somebody has to do that. It's not easy to do that. You have to build the anti-money laundering [program], somebody has to do that. ...So that has been definitely something we are very proud [that] we buil[t].' " *Id.* ¶ 334.

5. "On July 24, 2012, Western Union issued a press release announcing its financial results from the second quarter of 2012. During the conference call that Western Union hosted that day after releasing these results, Defendant Ersek began his prepared remarks at the outset of the call by reiterating his message that the Company's 'global compliance capabilities' gave it a 'strong' foundation and 'competitive strength.' " *Id.* ¶ 336. "Later during the July 24, 2012 conference call, Defendant Scheirman described the effect of the Company's compliance efforts as part of the Southwest Border Agreement. He stated that '[w]e expect global spending on compliance activities over the next couple of years will not change significantly from the 2012 levels as the breadth and complexity of requirements

and sustainability around the globe continues to expand, but we view our ability to adapt to this environment as a long-term competitive advantage.' " *Id.* ¶ 337. "In response to an analyst's question later during this July 24, 2012 conference call concerning compliance costs, Defendant Ersek responded that the Company was 'very focused here and we are very serious' about 'upgrading our compliance.' He continued:

'[I]t's a competitive advantage, long term. I think we are investing heavily here to be, really acting as an industry leader. We are setting the tone here. And I think we are very focused here and I see that there is definitely a competitive advantage.' " Defendant Ersek subsequently repeated this message when he stated that '[a]s an industry leader, obviously, we are very active here upgrading, investing heavily' in order to address new regulatory and compliance issues." *Id.* ¶ 338.

6. "On September 18, 2012, Western Union issued a press release announcing that it was hosting the 7th Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference in Denver, Colorado, near its headquarters, on September 18-20. The Company described this conference as 'one of the biggest events of its kind' with the purpose of 'teaching best practices in identifying and preventing fraud and money laundering.' Western Union's Chief Compliance Officer stated that '[o]ur conference started in 2006 and we had one goal at that time: educate Agents on [AML] best practices, regulations, and law-enforcement trends. It's now one of North America's largest [AML]/anti-fraud conferences that helps professionals from a wide variety of industries better identify and protect their organizations, and consumers, from fraud.' The Company also stated in its press release that it is 'dedicated to fighting fraud and helps consumers protect themselves from scammers.' " *Id.* ¶ 347.

**\*26** 7. "On October 30, 2012, the Company held a conference call in connection with the release of its earnings for the third quarter of 2012. During this call, Defendant Ersek stated during that conference call that 'we are investing more in being an industry leader, putting some compliance requirements [in place] for our customers, which are tougher and higher than it was in the past....We are the industry leader, we are leading that and I think we are protecting our customer.' He also stated that '[w]e have made and will continue to make compliance-related enhancements and

changes around the world to meet new and evolving requirements....[W]e believe it is our responsibility to maintain our industry leadership by implementing rigorous compliance practices to protect our customers and agents around the world.' Defendant Ersek also reassured investors by representing that the Company could maintain its price premium in part because of the advantage that its 'great compliance' program gave it. Defendant Ersek also noted certain 'compliances changes' [sic] limited to issues 'related to our Southwest border agreement,' and did not address the Company's more comprehensive compliance deficiencies that would not become known until January 19, 2017." *Id.* ¶ 351.

8. "On November 7, 2012, at the Citi Financial Technology Conference, Defendant Ersek described Western Union's compliance efforts in response to the Southwest Border Agreement as going above and beyond the Company's minimum legal requirements. He characterized Western Union 'as an industry leader[ ] in this sector,' where the Company 'set[s] the standards hopefully.' Ersek also described the Company's compliance with the Southwest Border Agreement as meeting a 'quite high' and 'industry lead[ing]' standard. According to Ersek, the 'southwest border issue is unique to Western Union. It's an agreement which has been signed in 2010 and we are implementing the actions and I am very confident that the team is doing the right thing....[A]s an industry leader, in this sector, obviously we set the standards hopefully.' " *Id.* ¶ 357.

9. "At a June 13, 2013 William Blair & Company Growth Stock Conference, Defendant Scheirman stated:

[W]e have a strong brand. Our brand resonates very well with our target customer. Again, it stands for speed, trust, convenience, reliability and value. ...And we have robust compliance and regulatory capabilities. And any time you move money cross-border, you need to be very good at operations and very good at the compliance and the regulatory environment. So it's very complex and it's hard to do. And we've got those capabilities....

We very much can leverage our brand, our global operations and our compliance capabilities to [expand the online business]....

Western Union has strong foundational assets. A brand that is very much trusted by our customers

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

around the globe and that trust is so important when you're dealing with financial services....And we talked about global operations and our regulatory and compliance capabilities. And any time you're moving money cross-border, in 200 countries, 16,000 corridors, 135 currencies, it is so important to have strong regulatory and compliance and operational abilities."

*Id.* ¶ 385. "Specifically addressing the regulatory environment, Scheirman stated at this June 13, 2013 William Blair conference that 'the regulators start with the market leaders and we're clearly a market leader. And, again, we're going to partner with them because we share the same goals of protecting our customers, protecting our business systems and so forth.' " *Id.* ¶ 386.

10. Defendant Ersek "stated on [a] July 30, 2013 earnings call, in response to a question about the Company's pricing, '[w]e, as Western Union, I believe deserve the premium pricing. Our brand is very valuable. Our compliance programs are very valuable. We are protecting the customers. The customers trust us.' Toward the end of this call, Defendant Scheirman explained, in response to an analyst's question about a particular compliance practice, that 'the important point is we very much have a culture of compliance and want to have best-in-class compliance programs, that's very important for our brand, protecting our customers, our agents and so forth.' " *Id.* ¶ 389.

**\*27** 11. "On September 17, 2013, Western Union issued a press release announcing that it was hosting the 8th Annual Anti-Money Laundering, Anti-Fraud and Compliance Conference in its hometown of Engelwood, Colorado on September 17-18. The Company described this conference as '[o]ne of the largest events of its kind, [bringing] together diverse perspectives from industry experts in [AML], compliance and fraud who share best practices with some of Western Union's largest agents.' The Company's Chief Compliance Officer said in the press release that '[t]ogether with governments, regulators, law enforcement authorities and financial service companies, we're fully engaged in the fight against money laundering and fraud.' Western Union also took this opportunity to advertise that it 'invests millions each year to run compliance programs. The company continues to increase its headcount of employees who are dedicated to compliance, fighting fraud and helping to protect and empower consumers

around the globe. This dedication expands to those who are on the frontlines at approximately 520,000 Agent locations around the globe.' " *Id.* ¶ 395.

12. "On Western Union's earnings conference call for the fourth quarter and full year of 2013, held on February 11, 2014, Defendant Ersek continued to represent that "we are very much focused on our compliance activities. We are the industry leader; we are driving it; we are driving it.' He also stated that 'the regulator[y] environment is...changing very fast, evolving and we are on – I believe as a industry leader, we are setting your best practices. We are driving it. We have the great Compliance Officer. He hired very great people. We do invest – our CIO, David Thompson, is very focused on the...technology, how we can involve – activate the technology to be more effective on the compliance making. The most focus is on the know your agent and know your customer. And so there is some diligence activities and I believe, as we gave – we were anticipating that in Q3.' Ersek later explained that the increased compliance costs were 'mainly also know your agent and know your customer activities. We have to do more questions on your customers, ask the customer, register the customers, doing diligence on the customers. But, also on the agent side with the frontline associates, we are doing more diligence, understanding who is serving our customers. They trust us and they want to trust also to the front-line associates. We do some diligences there. And I think that's the main investment [that is] going to continue to happen in the future.' " *Id.* ¶ 408.

13. "At the Jefferies Global Technology, Media & Telecom Conference on May 7, 2014, Defendant Ersek stated that the Western Union's recent substantial compliance costs were now 'a competitive advantage...[because] law enforcement are really looking up to us [and] saying that, hey, it will be great as the leader, you are leading the market and be [sic] the best practice.' " *Id.* ¶ 423.

14. "At a June 11, 2014 William Blair Growth Stock Conference, Defendant Agrawal stated that '[w]e also have compliance and regularity capabilities that are strong and continue to get even better in this increasingly complex global environment.' Toward the end of his prepared remarks, he then stated that 'in summary, we have very strong foundational assets in place. Our global brand, our global operational and compliance capabilities and our presence in 200 countries and

territories around the world gives us a strong position from which to operate.' " *Id.* ¶ 425. He further stated that "one of the five reasons that Western Union was 'well positioned' to strengthen its consumer money transfer business was because of its '[c]ompliance and regulatory capabilities.' " *Id.* ¶ 426.

15. "On July 31, 2014, the Company filed its quarterly Form 10-Q with the SEC, announcing the Company's financial and operating results for the second quarter of 2013, which ended on June 30, 2014 (the "Q2 2014 10-Q")." *Id.* ¶ 428. "The Q2 2014 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q...." *Id.* ¶ 429. "The Q2 2014 10-Q contained signed certifications pursuant to [the Sarbanes-Oxley Act ("SOX") ] by Defendants Ersek and Agrawal, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 430.

**\*28** 16. "Western Union's pricing challenges that SunTrust['s Robinson Humphrey] discussed [in an August 1, 2014 report] were also a result of its compliance failures. As explained above, Defendants stated during the Class Period that the Company would maintain its pricing advantages in the face of competition from other companies because Western Union's 'compliance programs' were 'really competitive strengths for us.' Because the Company was now forced to substantially increase its compliance expenditures because of its severely deficient compliance program, it could no longer justify its premium pricing." *Id.* ¶ 516 (internal citation omitted).

17. "At a September 11, 2014 Deutsche Bank dbAccess Technology Conference, Defendant Agrawal stated:

> We believe that compliance can be a competitive advantage for us. It already is a competitive advantage, and I believe it can be a bigger competitive advantage for us as we operate because it's very difficult for most other organizations to spend at the level that we are, and we've been doing this for many years. This is not just a 2014 effort, we've been in the compliance area and investing there for quite some time....
>
> [W]e've been making a tremendous amount of progress [with complying with the amended Southwest Border Agreement]. The state has assigned

a monitor to be able to monitor the activities and to assess progress around our progress in making these changes. And we've been making great progress.

In response to a question about competition from other companies, including Apple's announcement that it was moving into the payments business, Defendant Agrawal promoted Western Union's compliance capabilities as giving it an advantage over other companies:

> And so, I think, we're really well-positioned....And it's about the global compliance capability that we have, that's not easy to replicate, the global operational capabilities. So we have a lot of advantages that will keep us well-positioned I believe....So I really believe that we are extremely well positioned. Nobody else has the global compliance capabilities that we have, the global operational capabilities. We operate in every country of the world and that's not an easy infrastructure to replicate. And so that's why I feel good about where we are."

*Id.* ¶ 432.

18. "On September 17, 2014, Western Union issued a press release announcing its 9th Annual Consumer Protection Compliance Conference. The Company described this conference as '[o]ne of the largest events of its kind, [bringing] together diverse perspectives from industry experts in [AML], compliance and fraud and human trafficking to share best practices with some of Western Union's largest Agents.' Defendant Ersek delivered a keynote address at this conference 'emphasizing the importance of compliance.' The Company's Chief Compliance Officer said in the press release that 'Western Union is committed to helping protect its customers against fraud and other financial crimes. It's the right thing to do for our customers and for our business.' " *Id.* ¶ 436.

19. "On October 30, 2014, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the third quarter of 2013, which ended on September 30, 2014 (the "Q3 2014 10-Q")." *Id.* ¶ 438. "The Q3 2014 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q...." *Id.* ¶ 439. "The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 308 of 330

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 440.

**\*29** 20. "In the conference call for earnings from the third quarter of 2014, held on October 30, 2014, Defendant Agrawal stated that '[w]e've been able to accomplish our key objectives on the compliance side, and we've also done it more efficiently.' In addition, Defendant Ersek stated that the Company had an advantage over smaller competitors who were 'having more trouble to compete in the market because they can't comply with the anti-money laundering requirements.' Defendant Ersek then stated that although the Company did not give guidance for the following year, he was 'excited about compliance investments, and that gives us a long-term competitive advantage and that helps us.' " *Id.* ¶ 434.

21. "On January 21, 2015, Western Union hosted the European Business Forum and Compliance Conference in Brussels for the second time. As was publicly reported, including by Western Union and major news publications, over 200 financial industry and regulatory experts attended this conference to discuss 'how to enable innovation in the payments industry to better meet consumer and business financial service needs in Europe, while meeting regulatory compliance.' The Company stated that this conference 'reflects the company's commitment as a leader in the payments industry to ensure customer needs are understood, while meeting regulatory compliance.' The forum was 'followed by a compliance conference attended by Western Union agents and partners from across Europe to focus on best practice[s] in anti-money laundering measures and fraud protection.' Ersek stated in connection with this conference that '[i]t's vital that consumers and businesses are protected when using financial services, especially payments and remittances, and that's why Western Union is committed to regulation to prevent financial crime. To meet this commitment, we continue to focus on our compliance efforts as a priority for our business.' " *Id.* ¶ 442.

22. "In its presentation from its February 10, 2015 earnings call for the fourth quarter and fiscal year 2014, the Defendant Ersek represented that one of Western Union's four 'key results' that it delivered in 2014 was '[e]nhanced global compliance programs.' " *Id.* ¶ 444.

23. "On February 20, 2015, the Company filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K")." *Id.* ¶ 446. "[I]n describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents and their subagents.' " *Id.* ¶ 448. "The 2014 10-K also discussed ongoing governmental investigations, consent agreements, and enforcement actions by regulators, but claimed that these investigations were too preliminary for the Company to be able to predict their outcomes." *Id.* ¶ 449. "The 2014 10-K contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 450.

24. "On April 30, 2015, the Company filed its quarterly Form 10-Q with the SEC, signed by Defendants Ersek and Agrawal, announcing the Company's financial and operating results for the first quarter of 2015, which ended on March 31, 2015 (the "Q1 2015 10-Q")." *Id.* ¶ 452. "The Q1 2015 10-Q contained substantially the same representations described in the Company's Q2 2012 10-Q...." *Id.* ¶ 453. "The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Ersek and Agrawal, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." *Id.* ¶ 454.

**\*30** 25 "At a May 19, 2015 JPMorgan Global Technology, Media and Telecom Conference, Defendant Ersek stated that even though the Company had to lower prices in Mexico, 'overall, I will say that our brand, our locations, our compliance programs, our trust does deserve a premium and the customers pay for that. So, they are happy with that.' Ersek also stated that 'our

investment in the technology over the last three years, and our investment in compliance,...it's good to invest in the compliance, it's a competitive advantage. Being regulated in 200 countries, it's a tough environment, it's good. We are investing there, it's a competitive advantage. We know how to do that, and that is also kind of a barrier for many to come and to operate in that corridor....Being an industry leader, we are doing the first attempt, and you are always setting the standards, but long-term, it will be done.' " *Id.* ¶ 456.

In short, Plaintiffs argue that Defendants "had a duty to disclose those serious current compliance failures, as well as ones from the recent past that subjected the Company to the material risk of substantial monetary sanctions." *Response* [#63] at 41.

In *SEB Asset Management S.A.*, 2014 WL 5708522, the Court considered some statements which were essentially identical in substance to some mentioned here. Those statements included the "frequent talking point" for Western Union that its "operations in 200 countries and territories" involved compliance expenses and burdens that its competitors would find difficult to match. The Court found that Western Union's "decision to embrace the benefits of strict regulatory compliance may have been sudden and opportunistic, but the Court has not alleged any facts to suggest that it was misleading" because the statements about Western Union being an industry leader were limited to predictions of how Western Union "would be a leader or trend-setter in the future." The Court noted that the "statements are patently true on their face – compliance with hundreds of discrete national and international regulations is difficult and costly, and those difficulties and costs also serve to discourage competitors from attempting to match the breadth of [Western Union's] market."

The parties also discuss the impact of *In re Level 3 Communications Securities Litigation*, 667 F.3d 1331, 1339 (10th Cir. 2012), on the issue of compliance practice statements. *Response* [#63] at 45 n.16; *Reply* [#70] at 50-51. The Tenth Circuit there held that statements such as "[a] majority of the physical network interconnections are completed" and "[m]ost of the physical integration of WilTel is now complete" were not puffery, because they had "some basis in objective and verifiable fact." *In re Level 3*, 667 F.3d at 1340-41. However, statements concerning "integration efforts and the customer experience"

and "general, forward-looking expressions of confidence" regarding integration efforts were deemed insufficiently concrete or specific to be actionable, even though they were made during a time when the company knew that integration was not going well. *Id.* at 1340.

The Court agrees with Defendants' assessment of these statements. They are all either "forward-looking statements predicting competitive advantages eventually to be gained from large, ongoing compliance investments" or "present-tense statements of opinions regarding the competitive advantages of having already established compliance infrastructure in more than 200 countries." *Reply* [#70] at 42. As such, the Court finds that these statements lack a demonstrable false basis and, in many cases, are mere puffery. *See* Grossman, 120 F.3d at 1119-20 ("Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions.").

For example, Plaintiffs point to the September 11, 2014 statements by Defendant Agrawal that compliance "already is a competitive advantage...we've been doing this for many years. This is not just a 2014 effort, we've been in the compliance area and investing there for quite some time" and that "[n]obody else has the global compliance capabilities that we have." *Am. Compl.* [#40] ¶ 432; *see also Response* [#63] at 46 n.17 (discussing statements where Defendants "characterized the Company as the *current* and best industry and market leader"). Especially when read in context, *see Defs.' Ex. 102* [#70-17], these statements are materially similar to those discussed in *SEB Asset Management S.A.*, 2014 WL 5708522, and Plaintiffs have provided no allegations from which the Court can reasonably infer that these statements were false, such as allegations showing that Western Union had *not* been investing in compliance prior to 2014 or that other competitors *did* indeed have similar global compliance capabilities at that time, or that Western Union was not a market leader, or despite any issues that Western Union may also have been experiencing. *See, e.g., Am. Compl.* [#40] ¶ 205 (stating that Western Union only had one main competitor, MoneyGram International, Inc., without sufficiently elaborating on comparative allegations that could show some of Defendants' statements were false or misleading).

**\*31** Further, as Defendants argue, many of these statements mention the competitive advantages held by Western Union based on the global scope of its compliance infrastructure

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

and continuing investments. *Reply* [#70] at 46. At most, the statements merely compare Western Union to its competitors and are not "absolute assurances" regarding compliance practices. *Id.* at 46-47. As one of many examples, this applies to the statement that, "longer term we believe [our increased compliance spending is] going to be a competitive advantage because of our scale and our scope of what we can do with compliance and the regulatory [sic]." *Am. Compl.* [#40] ¶ 388; *see also, e.g., id.* ¶¶ 333 (discussing "competitive advantage"), 334 (discussing the difficulty of navigating the regulatory environment for both Western Union and competitors), 336 (discussing "global compliance capabilities" as a competitive strength), 363 (discussing the "advantage" held by Western Union when compared to competitors with respect to its digital presence); *see also Defs.' Exs. 29, 88, 89, 94* [#57-29, #70-3, #70-4, #70-9].

Accordingly, to the extent Claim One is based on this category of purportedly false and misleading statements regarding compliance practices, Claim One is **dismissed** against Defendants Ersek, Scheirman, Agrawal, and Western Union.

### 2. Scienter

Plaintiffs argue that Defendants made untrue or misleading statements of material fact, or failed to state material facts necessary to make statements not misleading, regarding legal compliance. *Response* [#63] at 36-41. Specifically, they argue:

> Defendants' statements of legal compliance were false and misleading because, as Western Union admitted to DOJ, and as the FTC determined, the Company did not comply with its AML and anti-fraud obligations during the Class Period. Western Union's legal violations included admitted criminal liability for willfully failing to maintain an effective AML program as required by the BSA and willfully "failing to suspend and/or terminate complicit Agents" and "allowing them to continue to process fraud-induced monetary transactions" through 2012; as well as civil liability for violating the FTC Act by failing to detect and prevent consumer fraud and violating the Telemarketing Sales Rule by providing substantial assistance to parties that engaged in consumer fraud through the date of the Joint Settlement.

*Response* [#63] at 37-38. They further argue that "Defendants' statements touting Western Union's legal compliance gave investors the impression that the Company's

compliance practices were up to par. It was therefore misleading for Defendants to fail to disclose the many ways that Western Union engaged in activities that gave rise to the high probability of substantial government sanctions." *Id.* at 38. In other words, Plaintiffs assert that Defendants "did not disclose that Western Union *already* failed to comply with AML and anti-fraud laws and *already* faced the high risk of substantial monetary sanctions when they made those statements throughout the Class Period." *Id.* at 39 (emphasis in original).

Defendants essentially concede that the statements regarding actual legal compliance were technically false or misleading *except* that they were couched in terms of the truthful opinions of the speakers according to the information they had at the time when the statements were made. *Motion* [#54] at 40 (citing 🔖 *Omnicare, 135 S. Ct. at 1326-27* (holding that statements such as believing that the company's marketing practices were lawful were not false simply because the belief later turned out to be incorrect). Thus, in order to succeed here, Plaintiffs must provide allegations that (1) the speakers did not subjectively hold the stated beliefs at the times when the statements were made or (2) objectively, the speakers did not undertake any reasonable inquiry into the grounds underlying the statements before making the statements. *Omnicare*, S. Ct. at 1327, 1332. Based primarily on *Omnicare*, Defendants argue that "in order adequately to allege that the statements of opinion were false, Plaintiff[s] must plead with particularity facts that create a strong inference—at least as compelling as any competing innocent inferences—that each [Defendant] did not believe what he said but, instead, that each believed throughout the Class Period that the Company was engaged in ongoing violations of applicable legal requirements and believed that its compliance systems were fundamentally ineffectual." *Motion* [#54] at 42-43. Defendants assert that Plaintiffs have failed to provide adequate allegations demonstrating this. *Id.* at 43.

**\*32** The pleading requirements for scienter under the PSLRA have attracted special attention from the courts. "In a securities fraud case, the appropriate level of scienter is a mental state embracing intent to deceive, manipulate or defraud, or recklessness." 🔖 *Adams, 340 F.3d at 1105*. The Tenth Circuit has made clear that adequately pleading scienter requires the plaintiffs to plead "facts with particularity giving rise to a strong inference that defendants acted with the requisite [state of mind]," and the trial court is instructed to "look to the totality of the pleadings" to determine whether the

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

plaintiffs' allegations permit such an inference. 🚩 *Pirraglia,* *339 F.3d at 1190.* In addition, "an inference is a logical conclusion drawn from the facts." 🚩 *Adams,* 340 F.3d at 1105. "A strong inference of scienter" means "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Id.*

> To establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate:(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors....We also take into account evidence of motive and opportunity, for, while these factors are typically insufficient in themselves to show scienter, they may be important to the totality of the pleadings.

🚩 *Pirraglia,* 339 F.3d at 1191 (internal quotation marks and brackets omitted). Moreover:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favorable to plaintiff.

🚩 *Tellabs,* 551 U.S. at 323-24.

As noted above, the state of mind necessary to sustain allegations of securities fraud is either intent or recklessness.

"[P]laintiffs can adequately plead scienter by setting forth facts raising a strong inference of intentional *or* reckless misconduct." 🚩 *City of Philadelphia v. Fleming Cos., Inc.,* 264 F.3d 1245, 1259 (10th Cir. 2001) (emphasis in original).

> Recklessness, defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it, can also satisfy the scienter requirement for Section 10b-5. Simple negligence, however, does not satisfy the scienter requirement.

*Id.* at 1258 (internal citations and quotations omitted). Recklessness is "something akin to conscious disregard." 🚩 *In re Level 3,* 667 F.3d at 1343 n.12. "Negligence, and even gross negligence, fall 'below the high threshold for liability under Section 10(b) of the Exchange Act.' " *Sanchez v.* 🚩 *Crocs, Inc.,* 667 F. App'x 710, 719 (10th Cir. 2016) (quoting 🚩 *Dronsejko v. Thornton,* 632 F.2d 658, 668 (10th Cir. 2011) ).

Regarding the adequacy of a complaint's allegations of scienter, the court has made clear that at the 12(b)(6) stage, the court's role "is simply to determine whether the plaintiff raises a strong inference of scienter...." 🚩 *Pirraglia,* 339 F.3d at 1188. Courts have refused "to draw inferences in the plaintiff's favor when doing so would allow [him] to make allegations on information and belief without satisfying the particularity requirements of the [PSLRA]." *Id.*

In addition, the Tenth Circuit has provided other guidance about the sufficiency of a complaint alleging securities fraud that is useful here. Regarding allegations of reckless misconduct, the Court has concluded that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." 🚩 *Fleming,* 264 F.3d at 1260 (quoting 🚩 *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir. 2000) ). Further, "allegations that the defendant

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

possessed knowledge of facts that are later determined by a court to have been material, without more, [are] not sufficient to demonstrate that the defendant intentionally withheld these facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate or defraud." *Fleming, 264 F.3d at 1260*. In order to sufficiently allege recklessness, plaintiffs must present facts to show the "defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Id. at 1261*. Moreover, vague statements of corporate optimism are not actionable under the securities laws. *Pirraglia, 339 F.3d at 1189*. But "violation of a corporation's internal policies can support a claim of scienter when coupled with other evidence of intent to defraud, such as motive and opportunity." *Id. at 1192*.

**\*33** Also worth nothing is that the Tenth Circuit has rejected the notion that knowledge may be imputed to a high-ranking corporate officer because of his position alone:

> [A]llegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.[14] Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company.

*Fleming, 264 F.3d at 1264* (citing *In re: Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999)* ). Nevertheless, the seniority of management officials who are alleged to have engaged in fraudulent conduct "is a fact relevant in [the court's] weighing of the totality of the allegations." *Adams, 340 F.3d at 1106*. The cases have been careful to emphasize that "the important issue...is not whether [d]efendants knew the underlying facts, but whether [d]efendants knew that not disclosing [them] posed substantial likelihood of misleading

a reasonable investor." *Fleming, 264 F.3d at 1264* (citing *Schlifke v. Seafirst Corp., 866 F.2d 935, 946 (7th Cir. 1989)* ("[I]t is the *danger of misleading buyers* that must be actually known or so obvious that any reasonable man would be legally bound as knowing." (emphasis in original) ). Finally, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability with those senior officials were acting within the scope of their apparent authority." *Adams*, 340 F.3d at 1006.

In assessing whether allegations of a defendant's motives to mislead are sufficient to support a finding of the requisite scienter under the PSLRA, the Tenth Circuit has addressed only motives specifically and directly related to the alleged non-disclosure, finding that other alleged motives are not relevant to the inquiry. *See Fleming, 264 F.3d at 1268* (noting five asserted motives for the defendants' alleged fraudulent conduct, but concluding that only one arguably supported the plaintiffs' allegations because it was "specifically and directly related to the underlying facts" of the alleged non-disclosure). Moreover, it is also clear that "generalized motives shared by all companies and which are not specifically and uniquely related" to the defendant in particular, are "unavailing." *Id. at 1269*. Examples of such "shared business motives" are that the defendants desired to protect their own positions with the company, or that they wanted to protect the value of their own stock, or that they wanted to further the interests of the company. "Allegations that merely charge that executives aim to prolong the benefits they hold are, standing alone, insufficient to demonstrate the necessary strong inference of scienter....Similarly insufficient are allegations that corporate officers were motivated to defraud the public because an inflated stock price would increase their compensation." *Id. at 1270* (quoting *Philips v. LCI Int'l, Inc., 190 F.3d 609, 622 (4th Cir. 1999)* ); *see also Level 3, 667 F.3d at 1346* ("Nor does plaintiff's assertion that defendants' compensation hinged on the performance of Level 3's stock price and the successful integration of WilTel lead us to infer scienter."). In addition, when the complaint "includes nothing in the allegations of the defendants' motives to indicate that they are anything more than pure speculation," the court should not accord them much weight. *Adams, 340 F.3d at 1104-05*.

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

**\*34**  Thus, in order to pass muster under the PSLRA, the Amended Complaint [#40] must state with particularity facts giving rise to a strong inference of scienter. "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Level 3, 667 F.3d at 1343.* Here, taken as a whole, the Court finds that the Amended Complaint [#40] does not create an inference of scienter that is at least as strong as any opposing inference. For the reasons stated below, the Court concludes that Plaintiffs have failed to adequately allege the scienter necessary to state claims for securities fraud.

At the heart of the scienter inquiry in a case like this are the allegations about what information the individual Defendants knew and failed to report, and whether they knew or should have known that their non-disclosures were substantially likely to mislead a reasonable investor. *See Fleming, 264 F.3d at 1264.* In order to adequately plead scienter, Plaintiffs must allege that Defendants Ersek, Scheirman, and Agrawal each *either* knowingly or recklessly. To show knowledge, Plaintiffs must sufficiently allege that Defendants Ersek, Scheirman, and Agrawal knew about certain material information and that they knew that failure to disclose this information would likely mislead investors, thus showing intent. In the alternative, Plaintiffs must allege that the misrepresentation or omitted information was so obviously material that Defendants Ersek, Scheirman, and Agrawal must have been aware that non-disclosure would likely mislead investors, thus showing recklessness. *See generally Zagg, Inc. Sec. Litig., 797 F.3d 1194, 1202 (10th Cir. 2015).* Although recklessness may be established where a defendant ignores obvious signs of fraud, "an unseen red flag cannot be heeded." *Sanchez, 667 F. App'x at 720-722* (citing *Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 158 (2d Cir. 2012); Stephenson v. PricewaterhouseCoopers, LLP, 768 F. Supp. 2d 562, 574 (S.D.N.Y. 2011)* ). "Possession of documents and other information which...should have revealed red flags at most... raises an inference of gross negligence, but not fraud." *Id.* (citing *Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1210 (11th Cir. 2001)* (internal quotations omitted) ). Indeed, in order for recklessness to be adequately pled in a case asserting securities fraud claims against auditors, the Tenth Circuit has indicated that plaintiffs must cite "highly suspicious in-your-face facts that would cry out" that the

company's financial status was fraudulently misrepresented. *Sanchez, 667 F. App'x at 723* (citing *N.M. State Inv. Council v. Ernst & Young LLP, 641 F.3d 1089, 1103 (9th Cir. 2011)* ).

The crux of Plaintiffs' theory is that "Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded" the following, as summarized by Plaintiffs:

(i) Western Union's AML and anti-fraud efforts during the Class Period did not comply with applicable laws and regulations, including the BSA, the FTC Act, the [Telemarketing Sales Rules], the Telemarketing Act, the criminal wire fraud statute, the Dodd-Frank Act, and/or state or international AML or anti-fraud laws; (ii) Western Union's AML and anti-fraud efforts during the Class Period failed to comply with best practices and/or industry standard practices;

(iii) during the Class Period, Western Union failed to discipline or take corrective action against its agents or subagents that Defendants knew violated (or likely violated), and in some cases were complicit (or likely complicit) in violating, the laws described in (i) above and/or Company anti-fraud or AML policies, including by processing vast amounts of transactions that defrauded (or likely defrauded) Western Union's customers and/ or by structuring (or likely structuring) vast amounts of transactions;

**\*35**  (iv) Defendants failed to disclose Western Union's AML and anti-fraud compliance failures and certain related government enforcement actions that took place prior to the Class Period;

(v) government investigations and enforcement actions that were ongoing during the Class Period were nearly certain —based on Western Union's compliance failures before and during the Class Period—to result in severe monetary penalties and Western Union being required to undertake comprehensive and costly remedial actions;

(vi) Western Union could not maintain its competitive premium pricing during the Class Period while implementing effective compliance policies; and

(vii) Western Union's AML and anti-fraud efforts during the Class Period failed to comply with agreements

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 314 of 330

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

that Western Union reached to resolve government investigations and enforcement actions that were disclosed prior to the Class Period.

*Am. Compl.* [#40] ¶ 539 (incorporating ¶ 303). However, a careful reading of the cleverly-drafted Amended Complaint makes clear that the overwhelming majority of allegations of fraud depend on assertions that Defendants did not believe that compliance efforts were legally sufficient in making significant progress against major problems such as money laundering in light of the large and ever-mutating problem the Company faced from fraudsters from around the world. It goes without saying that the Amended Complaint cannot create a strong inference of the state of mind necessary to show securities fraud without sufficiently alleging that Defendants knew or recklessly disregarded these problems, i.e., that compliance efforts were dramatically failing. But behind the Amended Complaint's dense curtain of allegations relating to what was said when and about unresolved government investigations, Plaintiffs make very few particularized allegations about what the executives themselves knew at any given time. At best, the totality of the allegations regarding Defendants' conduct which bear on their state of mind leaves more questions about their intent than answers, and such allegations do not demonstrate more than, at most, gross negligence, which is insufficient to state a claim under Section 10(b). *See* 📙 *Sanchez*, 667 F. App'x at 719.

With a pleading as lengthy and repetitive as the Amended Complaint, the risks of attempting to list the allegations related to scienter are manifest and recognized by the Court. By sheer volume alone, one might conclude that the document must sufficiently allege Defendants' intent to commit fraud or their recklessness in doing so. Nevertheless, after an extremely careful review of the 176-page, 580-paragraph Amended Complaint, the Court cannot conclude that Plaintiffs have provided sufficient allegations to meet the high bar of pleading scienter here.

In addition to certain previously-quoted allegations which the Court has reviewed, [15] Plaintiffs also cite to the following allegations which, either alone or in combination with others, bear on the scienter issue in connection with legal compliance: 1. "Throughout the Class Period, Western Union represented to investors that it

complied with its AML and anti-fraud legal obligations. For example, in each 10-K that the Company filed during

the Class Period, Defendants represented, with minor variations, that 'we believe our fraud prevention efforts are effective and comply with applicable law' and that 'that Western Union is compliant with its [AML and other] regulatory responsibilities.' " *Am. Compl.* [#40] ¶ 76 (internal footnotes omitted). "Western Union also acknowledged in these annual filings that failing to comply with AML and anti-fraud laws and regulations posed one of the most significant risks that the Company faced. In each of these filings, Defendants stated that '[o]ur business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or our subagents to comply with those laws and regulations could have an adverse effect on our business, financial condition and results of operations'—or made substantially similar statements to the same effect." *Id.* ¶ 77.

**\*36** 2. In the 2011 10-K, filed on February 24, 2012, the Company stated in pertinent part:

Our business is subject to a wide range of laws and regulations intended to help detect and prevent money laundering, terrorist financing, fraud and other illicit activity. Failure by us, our agents or our subagents to comply with those laws and regulations could have an adverse effect on our business, financial condition and results of operations....

...While we believe our fraud prevention efforts are effective and comply with applicable law and best practices, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem....

\*\*\*

We have developed and continue to enhance our global compliance programs, including our anti-money laundering program, which comprises policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices....

\*\*\*

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

...While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

\*\*\*

Our agents' or subagents' failure to comply with federal and [state] laws and regulations as well as laws and regulations outside the United States could have an adverse effect on our business, financial condition and results of operations.

*Id.* ¶ 305. "In addition, in describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the 2011 10-K specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents.' " *Id.* ¶ 306.

3. "[A]t [a] May 16, 2012 J.P. Morgan Global Technology, Media and Telecom Conference, [Stewart] Stockdale stated that regulatory and compliance worldwide is something 'that obviously – it's a huge competency for Western Union to deal with[ ]in 200 countries. So, regulations in Europe, in Australia, in Asia Pacific and across the world is something that we deal with across every single region and country.' " *Id.* ¶ 329.

4. "On October 16, 2012, [Stewart] Stockdale spoke on behalf of Western Union at the University of Denver's Voices of Experience program. This speech was published online the following day, on October 17, 2012. Stockdale stated:

 **\*37** Western Union is uniquely positioned at going after that underserved 2-billion person market worldwide. What makes us unique that allow[s] us to have these relationships and really our core competencies to reach consumers in 200 countries and territories is really these four pillars of our strategy.... Three is the regulatory and AML capabilities of the Company in almost every jurisdiction around the world.

\*\*\*

What really is more difficult is to make sure that you're complying with all the laws around the world. And we spend a ton of money. And we have over 600 people on an ongoing basis monitoring the system on an ongoing basis. And you have to do that. One of the core capabilities is to being able to work with governments not only the U.S. government but the governments of Vietnam, the governments of India, the governments of China to make sure that this cash movement which is in the billions of dollars is all being monitored on an ongoing basis.

Stockdale then stated, in the context of discussion [sic] the Dodd-Frank regulations, that 'all regulation' 'becomes a competitive advantage for us...because if you're in front and you have the resources to implement and do it well.' " *Id.* ¶ 349.

5. In connection with the 2012 10-K (filed on February 22, 2013), the Company stated, in part: "[I]n describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents.' " *Id.* ¶ 367.

6. "At a May 16, 2013 JPMorgan Global Technology, Media and Telecom Conference, Defendant Scheirman stated that in the first quarter of the year, in 'a few of the markets, we continued to enhance our compliance programs. And our goal is to be best-in-class with compliance. Live to the letter and the spirit of the law. And so, we're doing things around fraud prevention, real-time risk assessment at the point of sale, customer callbacks and high principal.' Scheirman also stated that 'the depth and extent of our compliance practices' allows the Company to succeed in the online market because 'sometimes folks might underestimate' how important that is for cross-border money transfers '[b]ut we're very good at that.' " *Id.* ¶ 383.

7. In the 2013 10-K (filed February 24, 2014), the Company stated, in part: "In addition, in describing the 'wide range of

Case 4:24-cv-01940    Document 45-2    Filed on 03/14/25 in TXSD    Page 316 of 330

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents and their subagents.' " *Id.* ¶ 412.

**\*38** 8. "On the earnings conference call for the fourth quarter and fiscal year 2015, held on February 9, 2016, Defendant Ersek stated that Western Union's money transfer system 'is unique' and its success 'is that it works in 200 countries, it can pay out in 121 currencies, it can adapt to regulatory systems of 200 countries and make anti-money laundering, and process 22 transactions...per second.' He later explained that 'most of the agents are choosing the exclusivity because they know they have a quite stable partner, financially stable, good, anti-money laundering system, good settlement system, long run capability, great brand and they can drop money in 200 countries immediately.' " *Id.* ¶ 471.

9. In connection with the 2015 10-K (filed February 19, 2016), the Company stated, in part: "In addition, in describing the 'wide range of laws and regulations enacted by the United States federal government, each of the states, many localities and many other countries and jurisdictions, including the European Union,' the Company specifically noted 'an increasingly strict set of legal and regulatory requirements intended to help detect and prevent money laundering, terrorist financing, fraud, and other illicit activity' and described particular requirements of the BSA. The Company also noted that '[m]any other countries and states impose similar and, in some cases, more stringent requirements' and that '[t]hese requirements also apply to our agents and their subagents.' " *Id.* ¶ 475.

10. "DOJ's and FTC's actions against Western Union were based on the Company's violations of the following AML and anti-fraud laws and regulations:

a. Aiding and abetting wire fraud, pursuant to 18 U.S.C. §§ 2, 🚩1343, from 2004 through December 2012 'by failing to suspend and/or terminate complicit Agents [including subagents] and by allowing them to continue

to process fraud-induced monetary transactions.' Western Union admitted it was guilty of this charge.

b. Willfully failing to maintain an effective program as required by the BSA, pursuant to 🚩31 U.S.C. §§ 5318(g), 🚩5322, and related regulations, from 2004 through December 2012. Western Union admitted it was guilty of this charge.

c. Engaging in unfair acts or practices in violation of Section 5 of the FTC Act by failing to take timely, appropriate, and effective action to detect and prevent fraud-induced money transfers through the Company's system.

d. Engaging in deceptive telemarketing in violation of the Telemarketing Sales Rule by Western Union, its agents, or subagents providing substantial assistance or support to sellers or telemarketers who the Company or its agents or subagents knew or consciously avoided knowing (a) induced consumers to pay for goods and services through the use of false or misleading statements and (b) requested or received payment in advance of consumers obtaining a loan."

*Id.* ¶ 139.

The Court notes with respect to this final allegation that any admitted wrong-doing only covers the first fraction of the Class Period (i.e., February 24, 2012 through December 2012), that the admitted wrong-doing does not directly involve securities laws, and that Plaintiffs have not adequately tied any admitted wrong-doing to the scienter of Defendants.

As explained above, the Court finds that not only are many of these allegations inadequately particularized and merely conclusory, but taken as a whole, they do not create a strong inference that Defendants acted intentionally or recklessly. The Court is hard-pressed to draw any inference from these allegations that Defendants knew of or recklessly disregarded the full scope and extent of the alleged illicit behavior at Western Union, much less that they condoned it and defrauded investors despite it. Needless to say, in the absence of such an inference, not to mention the strong inference required by the PSLRA, Plaintiffs' claims cannot proceed.

**\*39** Nor are Plaintiffs' claims rescued by sufficient allegations regarding Defendants' motive and opportunity. For example, Plaintiffs allege that Defendant Ersek sold approximately 600,000 shares of Western Union stock during

Smalien v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

the Class Period for more than $12 million. *Am. Compl.* [#40] at 285. However, Plaintiffs fail to provide adequate context for these numbers, such as the price Defendant Ersek initially paid for that stock, so the Court can reach any conclusion as to what kind of financial gain is actually at issue here. *See Motion* [#54] at 85. Further, there are no allegations regarding what percentage of Defendant Ersek's total shares these stock sales consisted of, or whether he was buying other types of shares at the same time. *See id.*; *see, e.g.,* 🚩 *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 153 (D. Conn. 2007), aff'd, 312 F. App'x 400 (2d Cir. 2009) (finding no inference of fraud in the fact that a "[d]efendant...decreased his holdings by 30.84%," and noting that "[c]ourts have found no inference of scienter in cases involving similar and even greater percentages of sales"). Without these kinds of additional allegations, the mere allegation that Defendant Ersek sold 600,000 shares of Western Stock over a five year period for $12 million tells the Court very little and adds nothing material to the scienter analysis. The same goes for Plaintiffs' allegations regarding other Defendants and company executives' sales of shares during the class period. *Am. Compl.* [#40] ¶¶ 290-95. While "personal financial gain may weigh heavily in favor of a scienter inference," 🚩 *Level 3*, 667 F.3d at 1345, the absence of any cogent allegation of a financial benefit from the alleged fraud cuts the other way. *In re Gold Resource Corp. Sec. Litig.*, 776 F.3d 1103, 1117 n.8 (10th Cir. 2015).

In short, Plaintiffs produce no convincing allegations of a motive for Defendants to engage in fraud beyond the standard financial motives common to all for-profit businesses. Under these circumstances, it is more probable that the Western Union executives "were overly optimistic and failed to give weight to financial red flags, for the plaintiffs supply little reason to suspect malevolence rather than benign optimism." 🚩 *Spirit Aerosystems*, 827 F.3d at 1238. "The absence of a motive allegation...is not dispositive, but it is relevant, and in this case it counts against scienter." 🚩 *Level 3*, 667 F.3d at 1347; *see also* 🚩 *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994) ("Where a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater.").

At the end of the day, the court must decide if a reasonable person construing the allegations as a whole would deem the

inference of scienter cogent *and* at least as compelling as any plausible opposing inference one could draw from the facts alleged. 🚩 *Tellabs*, 551 U.S. at 324 (emphasis added). In other words, the court must "compare the parties' dual explanations" for the alleged failures to disclose and decide which is more cogent and compelling. *See, e.g.,* 🚩 *Spirit Aerosystems*, 827 F.3d at 1248. Defendants argue that "[t]he far more 'cogent and compelling' inference with respect to each of these Individual Defendants is that they genuinely believed what they said when they made the challenged statements." *Motion* [#54] at 16 (citing 🚩 *Tellabs, Inc.*, 551 U.S. at 324). Taken as a whole, Defendants appear to assert that the inference to be drawn from the failures to disclose alleged by Plaintiffs is that Defendants may have made errors in business judgment, but they did not commit fraud against investors. In the Court's view, this inference is equally strong as any inference regarding fraud.

A final word about recklessness under the PSLRA. Plaintiffs assert that even if the facts alleged do not show that Defendants knew, at the time when the omissions occurred, that their statements would likely mislead investors, there is enough to conclude that they "acted with a reckless disregard of a substantial likelihood of misleading investors." 🚩 *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015). They contend that the danger of misleading investors by not disclosing these facts was so obvious that Defendants must have been aware. But recklessness "is a particularly high standard" under the PSLRA. 🚩 *Dronsejko*, 632 F.3d at 668. The Tenth Circuit has noted that it is "something closer to a state of mind approximating actual intent." 🚩 *Zagg*, 797 F.3d at 1206. And Plaintiffs' allegations about recklessness are overwhelmingly conclusory. *See, e.g., Am. Compl.* [#40] ¶¶ 539, 544, 547, 559, 566, 568, 570, 573. These conclusory allegations of recklessness do nothing to advance facts demonstrating that conduct. Plaintiffs' statements made specifically about Defendants' conduct are equally weak. For example, the closest Plaintiffs come to discussing recklessness in connection with Defendants' specific conduct is as follows:

> **\*40** Defendants['] knowledge or reckless disregard of the deficiencies in Western Union's compliance program that contradicted their public statements is further supported by

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

their knowledge, as disclosed in the Company's periodic SEC filings throughout the Class Period, of the several federal and state government investigations, including by EDPA, MDPA, CDCA, SDFL, the FTC, and state attorneys general, that ultimately resulted in the Joint Settlement and the settlement with the state attorneys general that were announced in January 2017. As part of these investigations, Western Union produced many documents and witnesses to these regulatory authorities and claimed to have cooperated in these investigations. These investigations provided the basis for DOJ's and FTC's findings that Western Union's own internal reports, analyses and communications showed that the Company failed to maintain an effective compliance program, that it knew its agents were complicit in money laundering and consumer fraud, and that it failed to discipline its agents for those violations. These investigations also found that agents' rampant involvement in money laundering and consumer fraud were discussed by senior managers within the Company. Defendants thus had knowledge of the Company's compliance violations based on both a) the mass of underlying information showing those deficiencies as they occurred (including the Company's own internal reports, analyses, and communications) and b) that information having been reviewed in the course of the Company's producing it during the various lengthy government investigations that led to the Joint Settlement.

*Id.* ¶ 543. These and other statements and allegations of fact made in connection with those statements simply do not provide the necessary detail to show the level of recklessness required to adequately allege scienter on the part of each

Defendant. Simply stated, even if the Amended Complaint gives rise to *some* plausible inference of scienter, it is not the strong inference required by the PSLRA. *Tellabs*, 551 U.S. at 314. Hence, Claim One is **dismissed** in full to the extent it is asserted against Defendants Ersek, Scheirman, Agrawal, and Western Union. [16]

### C. Claim Two: Defendants Ersek, Scheirman, Agrawal, and Koch

Section 20 of the PSLRA provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter...[s]hall also be liable jointly and severally with and to the same extent as such controlled person...." 15 U.S.C. § 78t(a). To state a prima facie case of control person liability, plaintiffs must allege: (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). To make a showing that a person is a "control person," plaintiffs must "point to facts which indicate that the defendants had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Adams*, 340 F.3d at 1108. Allegations that a person is the chief executive officer of a company likely satisfy the control person test, and allegations that a person is the chief financial officer of a company may also do so when a plaintiff brings claims of securities fraud relating to official reports of the company's financial performance. *Id.* "Section 20 of the Exchange Act contains no requirement that plaintiffs must prove a control person's state of mind." [17] *Id.* at 1109.

**\*41** Because Plaintiffs have failed to allege "a primary violation of the securities laws" as asserted under Claim One, the Court finds that their Section 20(a) claim asserted under Claim Two is also not viable. *See Maher*, 144 F.3d at 1305. Hence, Claim Two is **dismissed** with respect to Defendants Ersek, Scheirman, Agrawal, and Koch.

### D. Amendment

Finally, the Court notes that Plaintiffs failed to make an argument that their Amended Complaint could be further amended yet again to correct any deficiencies. *See generally Response* [#63]. Consequently, the Court is not inclined to

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

permit further leave to amend. *See, e.g., In re Gold Res. Corp. Sec. Litig.*, 776 F.3d at 1118-19 (stating that "[t]he district court did not abuse its discretion in dismissing the complaint with prejudice where plaintiff's memorandum contained only one sentence at the very end of his brief alternatively requesting leave to amend in the event the district court should decide to dismiss his complaint").

IV. Conclusion

For the reasons set forth above, the Motions [#53, #55] are **GRANTED.** The claims are **dismissed with prejudice** and the Clerk of Court is directed to **enter** Final Judgment in favor of Defendants and **close** this case.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

---

## Footnotes

1   [#53] is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

2   This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#25, #26].

3   At this stage of the litigation, the Court accepts the well-pled factual allegations of the Amended Complaint [#40], as distinguished from conclusory allegations, as true. *Adams v. Kinder- Morgan, Inc.*, 340 F.3d 1083, 1088 (10th Cir. 2003). The court does not "take as true the complaint's legal conclusions." *Dronsejko v. Thornton*, 623 F.3d 658, 666 (10th Cir. 2011).

4   Despite Defendants having only admitted wrong-doing through December 2012, Plaintiffs make much of the fact that the FTC reviewed evidence through October 2015 in making its findings of fact, even though they admit that the FTC generally did not distinguish between pre- and post- 2012 conduct. *See, e.g.*, *Response* [#63] at 11-12.

5   The Amended Complaint [#40] is 176 pages long and consists of 580 paragraphs. The Court appreciates the inclusion of a lengthy Table of Contents, and understands that the stringent pleading requirements of the PSLRA may not promote brevity and conciseness in drafting complaints. Nevertheless, the Amended Complaint is packed with redundant factual and legal allegations which, if omitted, would likely reduce its length by more than half. Plaintiffs' counsel do themselves no favors by including such redundant material, which significantly prolongs judicial review. Because the filing of motions to dismiss is common in securities fraud cases and because the PSLRA mandates that cases must be stayed while motions to dismiss are pending, filing of prolix complaints works against the parties' interests and should be avoided.

6   The position of Monitor was a requirement of the Southwest Border Agreement ("SBA") signed on February 11, 2010, whose job was to monitor various aspects of Western Union's compliance requirements set out in the SBA. *See Am. Compl.* [#40] ¶¶ 86, 235.

7   Due to the repetitive nature of many of the statements to which Plaintiffs direct the Court's attention, the Court notes that it does not separately analyze every single statement but, rather, simply analyzes a material

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 320 of 330

Smallen v. Western Union Company, Not Reported in Fed. Supp. (2019)

2019 WL 1382823, Fed. Sec. L. Rep. P 100,395

and representative sample of each category throughout Section III.B. However, the Court has considered the pleadings in their entirety. *See* 🔖 *Adams,* 340 F.3d at 1093.

8   "Structuring" is an illegal practice in which a party evades "the law's recording and reporting requirements by breaking large transfers into multiple transactions at smaller amounts below the legal reporting threshold." *Am. Compl.* [#40] ¶ 63. Hong Fai was a Western Union agent which:

sent over $126 million in Western Union transactions from December 2007 through March 6, 2012. This agent was not terminated until March 19, 2012 even though Western Union admitted to DOJ in the Joint Settlement that "[a]s early as June 2007, [the Company] was aware of 'significant' compliance failures at Hong Fai involving structured transactions and failure to file [Suspicious Activity Reports ("SARs") ] for suspicious transactions." This knowledge was based on over a dozen onsite or transaction reviews that Western Union conducted. Western Union admitted that these reviews showed that the agent "repeatedly...violated certain elements of the [Bank Secrecy Act, as amended by the USA Patriot Act in 2001 ( 🔖 31 U.S.C. § 5311, et seq.), and rules promulgated thereunder (collectively, the "BSA") ] or certain aspects of Western Union policy." Despite Hong Fai's known and repeated violations that should have resulted in disciplinary action under Western Union policy, Western Union did not terminate the agent until 2012, only after law enforcement and Hong Fai's bank continued to raise concerns about illegal transactions and Hong Fai's failure to file SARs. Western Union also did not file any SARs identifying Hong Fai as a suspicious subject until after it terminated Hong Fai in 2012.

*Id.* ¶ 186; *see also* ¶¶ 187, 195.

9   "...Western Union admitted that between 2005 and 2010, Shen Zhou, one of four particularly egregious agents that sent structured transactions to China, sent more than $310 million to China, approximately half of which were structured." *Am. Compl.* [#40] ¶ 112. "The head of Shen Zhou was arrested in 2010 for his structuring activities and pled guilty in December 2013 to structuring international money transfers." *Id.* ¶ 188. "After he was arrested, he told law enforcement authorities that a Western Union Sales employee told him that he could open another Western Union agent location in the same area. This Sales employee even advised the agent on how to get away with this by cautioning him to use a relative's name instead of his own name when opening the new location." *Id.* ¶ 196. "[A]t a meeting of the Board's Governance Committee on September 22, 2010, attended by Defendant Ersek, it was discussed in reference to CDCA's investigation of Shen Zhou that a "large" Western Union agent in California was the subject of a criminal money-laundering investigation and that Western Union was "working with law enforcement to investigate the underlying activity." *Id.* ¶ 251.

10   *Am. Compl.* [#40] ¶¶ 360-61 (*see* § III.B.1.a.ii.), ¶ 374 (*see* § III.B.1.a.i.8.), ¶ 483 (*see* §

III.B.1.a.i.15.), ¶ 489 (*see* § III.B.1.a.i.16.), and ¶ 493 (*see* § III.B.1.a.i.17.).

11   The cited paragraph actually states, "[o]n February 14, 2013, 2012, at the Goldman Sachs Technology & Internet Conference...," but the context of this paragraph indicates that "2013," not "2012," is the correct date.

12   "[N]otwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Hampton v. root9B Techs., Inc.,* 897 F.3d 1291, 1297 (10th Cir. 2018) (internal quotation marks and brackets omitted). Thus, the Court can examine this document (and others cited in this Order) as one that is centrally referred to in the Amended Complaint and whose authenticity is not disputed. Here, specifically, the Court notes that, although only one page of the transcript is provided by Defendants, Plaintiffs have not

disputed the accuracy of the transcript or argued that a full transcript is required in order for the Court to accurately review its contents.

13 *Am. Compl.* [#40] ¶ 360 (*see* § III.B.1.a.ii.), ¶ 363 (*see* § III.B.1.b.4.), ¶¶ 374-75 (*see* § III.B.1.a.i.8.), ¶ 381 (*see* § III.B.1.a.ii.), ¶ 388 (*see* § III.B.1.b.6.), ¶ 398 (*see* § III.B.1.b.7.), ¶ 417 (*see* § III.B.1.a.ii.), ¶ 447 (*see* § III.B.1.b.10.), and ¶ 459 (*see* § III.B.1.b.11.).

14 As pointed out by the Court in *Fleming*, "the scienter pleading requirements of the PSLRA supercede the provisions of Rule 9(b) in securities fraud cases." 264 F.3d at 1255 n.13.

15 *Am. Compl.* [#40] ¶¶ 321-22 (*see* § III.B.1.c.2.), ¶ 366 (*see* § III.B.1.b.5.), ¶¶ 374-75 (*see* III.B.1.a.i.8.), ¶¶ 385-86 (*see* § III.B.1.c.9.), ¶ 388 (*see* § III.B.1.b.6.), ¶ 411 (*see* § III.B.1.b.9.), ¶ 425 (*see* § III.B.1.c.14.), ¶ 447 (*see* § III.B.1.b.10.), ¶ 448 (*see* § III.B.1.c.23.), ¶ 456 (*see* § III.B.1.c.25.), ¶ 465 (*see* § III.B.1.b.12.), and ¶ 474 (*see* § III.B.1.b.13.).

16 The Court reiterates once more that it is well aware that Western Union has been the subject of various investigations and has sometimes even admitted to misdeeds of varying levels occurring, in part, throughout the class period, as discussed throughout this Order and as explained at length in the Amended Complaint [#40]. However, while certainly informative, the legal standards under which those investigations occurred and by which Western Union's actions were measured are not the same as the standards for the securities law claims made here under the PSLRA. In other words, as the Court has found, simply because Western Union may have legally erred in some ways in no way automatically means that Western Union has also violated the PSLRA as claimed here.

17 "Section 20 does state that a controlling person is not liable if he acted in good faith and did not induce the acts on which the liability of the controlled person is founded. However, courts have held that these are affirmative defenses, to be pleaded and proved by defendants." *Adams,* 340 F.3d at 1109 n.5 (citing *Kaplan v. Rose,* 49 F.3d 1363, 1382-83 (9th Cir. 1994); *Gould v. Am.- Haw. S.S. Co.,* 535 F.2d 761, 779 (3d Cir. 1976) ).

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB No. 20

2021 WL 2555437, Fed. Sec. L. Rep. P 101,122

2021 WL 2555437
United States District Court, S.D. New York.

Daniel YANNES, Individually and On Behalf
of All Others Similarly Situated, Plaintiff,
v.
SCWORX CORP., and Marc S. Schessel, Defendants.

20-cv-03349 (JGK)
|
Signed 06/21/2021

**Attorneys and Law Firms**

Gregory Bradley Linkh, Glancy Prongay & Murray LLP, New York, NY, for Plaintiff.

Carole Rose Bernstein, Law Offices of Carole R. Bernstein, Westport, CT, for Defendant SCWorx Corp.

Paul Richard Bessette, Michael J. Biles, King & Spalding, L.L.P., Austin, TX, for Defendant Marc S. Schessel.

**MEMORANDUM OPINION AND ORDER**

JOHN G. KOELTL, District Judge:

 *1  This is a securities action brought on behalf of a putative class of all purchasers of publicly traded common stock of SCWorx Corporation ("SCWorx") between April 13, 2020 and April 17, 2020, inclusive (the "Class Period"). The lead plaintiff, Daniel Yannes, filed a Consolidated Class Action Complaint on October 19, 2020.

The plaintiff asserted violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against SCWorx and Marc S. Schessel, the Chief Executive Officer of SCWorx, as well as a claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Schessel. The defendants now move to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, the defendants' motion is **denied.**

**I.**

The following facts are drawn from the Consolidated Class Action Complaint ("CCAC") and documents referenced therein and are accepted as true for the purposes of this motion.

SCWorx, a Delaware corporation with its headquarters in New York City, is a provider of supply chain management software and related data analytics for healthcare providers. CCAC ¶¶ 3, 22. Schessel is the Company's founder, Chairman, and Chief Executive Officer ("CEO"), both throughout the Class Period and up to the present. Id. ¶ 24. SCWorx's shares trade publicly on the NASDAQ exchange under the symbol "WORX." Id. ¶ 22.

In early 2020, COVID-19 escalated to a global pandemic that "pushed hospital systems to the brink of collapse." Id. ¶ 33. In response to the urgent need for critical medical supplies, the defendants announced in a press release on March 20, 2020 the formation of a wholly-owned subsidiary, Direct-Worx LLC, to supply healthcare providers with critical personal protective equipment ("PPE"). Id. ¶ 34.

On April 13, 2020, the defendants announced a deal, valued at $840 million, to sell COVID-19 rapid test kits to a virtual healthcare provider named Rethink My Healthcare ("RMH"). Id. ¶ 5. The defendants' press release stated that RMH had signed a committed purchase order for two million test kits in the first week, with provision for additional weekly orders of two million kits per week for twenty-three weeks (the "Purchase Order"), valued at $35 million per week. Id. ¶¶ 5, 39. On news of the deal, SCWorx's share price increased from $2.25 per share to $12.02 per share. Id. ¶ 40.

The following day, Utopia Capital Research, a securities analyst, issued the "SCWorx Short Report" identifying "red flags" about SCWorx and raising doubts about its purported deal with RMH. Id. ¶ 50. The report referenced the SCWorx's "atrocious financials, dilution, [Schessel's] so-called 'dubious' past as an MMA (mixed martial arts) promot[er] that settled a securities violations class action lawsuit, a reverse merger involving thousands of cheap shares, press releases making hard to believe claims, terrible financials and ongoing dilution." Id. The report also noted that the committed purchase order from RMH for two million COVID-19 test kits, with provision for additional weekly orders of two million units for twenty-three weeks, was "very difficult to believe in light of the fact that the number of COVID-19 test[s] carried out in the USA amount[s] to only 298,499 since January 21, 2020" and because RMH was a

2021 WL 2555437, Fed. Sec. L. Rep. P 101,122

small company specializing in virtual healthcare services. Id. In response to this report, SCWorx's common stock closed down 30% at $8.45 per share on April 14, 2020, on over 18 million shares. Id. ¶ 8.

 **\*2**  On April 15, 2020, the defendants discussed the COVID-19 rapid test kits deal on a conference call with analysts and investors, during which Schessel told investors that he had "spent weeks researching over 30 product different lines [sic], distributors, intermediaries until [he] found an actual manufacturer that had a kit that ... had the proper FDA authorizations under the [E]mergency [A]uthorization [A]ct ... and had enough capacity on [its] line where [he] could purchase 25% of [its] capacity with options to grow that over time." Id. ¶¶ 42-43. On April 16, 2020, the defendants filed a Form 8-K with the Securities Exchange Commission ("SEC"), which revealed for the first time the purported supplier of the COVID-19 rapid test kits was ProMedical Equipment Pty Ltd. ("ProMedical"). Id. ¶ 45. The Form 8-K stated that on April 10, 2020, concurrently with SCWorx's acceptance of a purchase order from RMH, SCWorx entered into a supply agreement with ProMedical (the "Supply Agreement"), pursuant to which SCWorx agreed to purchase and ProMedical "agreed to supply an aggregate of 52 million COVID-19 Rapid Testing Units over a six month period, comprised of 2 million units per week, at a per unit price of $13.00, commencing April 24, 2020." Id.

On April 17, 2020, given the new information about the purported test kit supplier, Hindenburg Research issued a report entitled "SCWorx: Evidence Points to its Massive COVID-19 Test Deal Being Completely Bogus, Price Target Back to $2.25 Or Lower" (the "Hindenburg Report"). The Hindenburg Report concluded that, based on certain red flags, the deal was "completely bogus" and a "scam." Id. ¶¶ 52, 55. The Hindenburg Report stated that: (1) Schessel, the Company's CEO had "a checkered past," including pleading guilty to felony tax evasion charges and paying a judgement in a lawsuit alleging he submitted fraudulent expense reports; (2) ProMedical, the purported supplier of the tests, was "laden with red flags," including its CEO's being a convicted rapist who formerly ran another business accused of defrauding its investors and customers and the company was accused of "fraudulently mispresent[ing] itself" as an authorized seller of COVID-19 tests manufactured by a Chinese company Wondfo; and (3) RMH, as a "relatively unknown company ... founded less than 2 years ago," did not appear capable of "com[ing] up with the upwards of the $35 million per week it has committed to purchasing from SCWorx." Id. ¶¶ 52-54.

In response to the Hindenburg Report, SCWorx's share price fell by almost 14% from its opening price on April 17, 2020 of $7.77 to close at $6.72. Id. ¶ 56. The stock price continued to fall in the coming trading days by $0.97 or about 15% from the closing price on April 17, 2020, to close at $5.75 per share on April 21, 2020, on unusually heavy trading volume. Id.

On April 21, 2020, the SEC ordered the suspension of trading in SCWorx securities, effective April 22, due to "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace concerning SCWorx including (1) press releases and other publicly disseminated statements, since at least April 13, 2020, about SCWorx's agreement to sell COVID-19 tests, and (2) SCWorx's current report on Form 8-K filed on April 16, 2020, concerning SCWorx's agreement to sell COVID-19 tests." Id. ¶¶ 14, 57.

On April 30, 2020, the defendants filed a Form 8-K with the SEC, in which the defendants admitted that ProMedical could not supply the required tests, and consequently, the purchase order and supply agreements were terminated. Id. ¶¶ 15, 58. The Form 8-K also disclosed that a board member, Robert Christie, had resigned from the board of directors on April 23, 2020. Id. ¶ 59. In a subsequent Form 8-K, on May 5, 2020, SCWorx announced that on April 29, 2020, the employment of James (Tad) Schweikert at the Chief Operating Officer was terminated by mutual agreement. Id. ¶ 60.

The first complaint in this action was filed on April 29, 2020, and after appointment of the lead plaintiff, the CCAC was filed on October 19, 2020. See ECF Nos. 1, 45. The plaintiff alleges that between April 13, 2020 and April 17, 2020, inclusive, the defendants' statements about its COVID-19 rapid test kits deal were materially false and misleading, causing the plaintiff and other class members to suffer significant losses, because the defendants knew or recklessly disregarded that: (i) SCWorx's customer, RMH, was "unlikely to be able to pay for or handle the hundreds of millions of dollars in test kit orders provided for in the purchase order; and (ii) SCWorx's COVID-19 test kit supplier, ProMedical, could not supply the quantity or quality of tests described in the purchase order or supply agreement." Id. ¶¶ 16-17.

## II.

 **\*3**  In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true,

Yannes v. SCWorx Corp., Not Reported in Fed. Supp. (2021)

2021 WL 2555437, Fed. Sec. L. Rep. P 101,122

and all reasonable inferences must be drawn in the plaintiff's favor. 🚩 McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). [1] The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." 🚩 Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." 🚩 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🚩 Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of 🚩 Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). 🚩 Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." 🚩 ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); 🚩 ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See 🚩 Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." 🚩 Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see also 🚩 Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 607-08 (S.D.N.Y. 2015); 🚩 Silsby v. Icahn, 17 F. Supp.3d 348, 353-54 (S.D.N.Y. 2014), aff'd sub nom. Lucas v. Icahn, 616 F. App'x 448 (2d Cir. 2015).

### III.

The defendants move to dismiss the plaintiff's Section 10(b) and Rule 10b-5 claims on the grounds that the plaintiff has not adequately pleaded (1) the requisite scienter by SCWorx or Schessel, and (2) that the defendants made a materially false statement of fact or omission. The defendants also move to dismiss the plaintiff's Section 20(a) claim against Schessel because the plaintiff allegedly has failed to plead a primary violation of federal securities law by SCWorx.

### A.

To state a claim for securities fraud Section 10-b of the Exchange Act and SEC Rule 10b-5 "a plaintiff must allege that each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." 🚩 Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.), 988 F.3d 157, 167 (2d Cir. 2021).

**\*4** The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." 🚩 SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." 🚩 ATSI, 493 F.3d

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 326 of 330

Yannes v. SCWorx Corp., Not Reported in Fed. Supp. (2021)

2021 WL 2555437, Fed. Sec. L. Rep. P 101,122

at 99. As to the second method of establishing scienter, "courts have approved of claims when plaintiffs have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Pirnik v. Fiat Chrysler Autos., N.V., 15-CV-7199, 2016 WL 5818590, at *6 (S.D.N.Y. Oct. 5, 2016); see also Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (noting that "an egregious refusal to see the obvious, or to investigate the doubtful," may in some cases give rise to an inference of recklessness).

Courts must conduct the scienter analysis holistically to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences [and] [a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 323-24.

In this case, the defendants argue that the plaintiff has failed to plead scienter adequately because the CCAC does not allege facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. The defendants' principal arguments are that (1) Schessel cannot be held liable for conscious recklessness because he failed to predict that ProMedical would breach the Supply Agreement, and (2) the plaintiff has not identified any information that, at the time SCWorx entered into and publicly disclosed the Supply Agreement with ProMedical, placed Schessel or SCWorx on notice of ProMedical's inability to supply the quantity or quality of tests described in the Supply Agreement.

These arguments are unpersuasive. The defendants are correct that allegations of a defendant's failure to predict future events do not create a strong inference of scienter based on conscious recklessness, see, e.g., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 187 (2d Cir. 2014). However, "securities fraud claims typically have sufficed to state a claim based on recklessness ... where plaintiffs alleged facts demonstrating that defendants failed to

review or check information that they had a duty to monitor, or ignored obvious signs of fraud," Novak, 216 F.3d at 308, which is what the plaintiff has alleged here.

The CCAC does not merely allege that the defendants should have predicted ProMedical defaulting on the Supply Agreement. Rather, the CCAC references information that was publicly available at the time the defendants first announced their COVID-19 test kit deal on April 13, 2020, and that the defendants could have and should have learned in the course of reasonable due diligence about a potential business partner. As referenced in the Hindenberg Report, Wondfo issued an "official statement" on April 5, 2020, stating that it had "seen an infringement activity in connection with a company named [ProMedical] fraudulently misrepresent itself as being authorized ... to register and distribute" Wondfo's COVID-19 Antibody Test, and clarifying that ProMedical "was not an authorized representative nor distributor of Wondfo in Australia, America, and other countries/districts." See King Decl. Ex. 4, at 8. Furthermore, also based on publicly available information, the Hindenburg Report noted that ProMedical's CEO was a convicted felon and had previously run a company that was accused of defrauding its customers and investors. Id. at 11-12. Given that this information was publicly available and accessible to Schessel prior to the defendants' announcement of its COVID-19 test kit deal, it weighs in favor of an inference that Schessel either knew about ProMedical's inability to supply the quantity or quality of tests described in the Supply Agreement, or showed a reckless disregard for it. See Orthofix, 89 F. Supp. 3d at 618 (scienter inference supported by the allegation that information regarding the company's finances were "reasonably available" to the chief financial officer, even though the plaintiff did not specifically allege that the officer read the reports containing this information).

*5 Further supporting an inference of scienter are Schessel's representations to investors that he personally "spent weeks researching over 30 different lines [sic], distributors, intermediaries" before finding a test kit manufacturer that appeared to "to have all the attributes," including proper FDA authorization and "enough capacity," CCAC ¶ 43, but apparently failed to detect–or, worse yet, ignored–the red flags that the analysts at Hindenburg identified in one day. See Blank v. TriPoint Glob. Equities, LLC, 338 F. Supp. 3d 194, 215 (S.D.N.Y. 2018) (finding circumstances indicative of conscious recklessness where the complaint alleged that the

2021 WL 2555437, Fed. Sec. L. Rep. P 101,122

defendant failed to investigate or else he would have known about the fraud at issue all the while assuring the plaintiffs that he conducted due diligence); Citiline Holdings, Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (finding of scienter supported where the defendants "are alleged to have told the investing public that they monitored the value of their portfolio on a nearly real-time basis").

Moreover, the fact that the Hindenberg Report, questioning the validity of the defendants' COVID-19 test kit deal, was published only one day after the defendants' public disclosure of the Supply Agreement with ProMedical weighs in favor of inferring scienter based on recklessness. See In re Salix Pharms., Ltd., No. 14-CV-8925, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (finding that the "ease with which potential acquirers discovered [the defendant's] true inventory levels ... within days of performing their due diligence" supported a strong inference of scienter); In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (finding an inference of scienter where "in the course of one weekend the overvaluation of assets and underestimation of risk exposure in [the company's] financial statements" was discovered), on reconsideration, No. 07-CV-10453, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011), and on reconsideration, No. 07-CV-10453, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011).

The plaintiff's scienter allegations are further supported by the "core operations" doctrine, which provides that "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). Because the "core operations" doctrine predated the enactment of the PSLRA, the Court of Appeals for the Second Circuit has "not yet expressly addressed whether, and in what form, the ... doctrine survives as a viable theory of scienter." Frederick v. Mechel OAO, 475 F. App'x 353, 356 (2d Cir. 2012). But, at the very least, the doctrine can "provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently." New Orleans Emps. Ret. Sys. v. Celestica, Inc., 455 F. App'x 10, 14 n.3 (2d Cir. 2011). The CCAC alleges that SCWorx's test kit deal was "an exceptionally important" one for the Company–given that the deal had a total value of

$840 million, the Company "reported tangible assets of only approximately $1.2 million," and announcement of the deal more than quintupled the Company's share price–and that Schessel "held himself out to investors as the person most knowledgeable about SCWorx's business." CCAC ¶¶ 5-6, 62. Therefore, while the importance of the test kit deal to the Company cannot establish scienter on its own, it supplements the plaintiff's other evidence of scienter.

Therefore, drawing all inferences in the plaintiff's favor, as the Court must, the above allegations support finding that the "danger"–namely, ProMedical's inability to supply test kits as described in the Supply Agreement–was "either known to [Schessel] or so obvious that [Schessel] must have been aware of it," Novak, 216 F.3d at 308, and suffices to allege scienter adequately at this stage of the litigation.

*6 The defendants argue that a stronger competing inference to plaintiff's theory of scienter is that SCWorx was simply duped by ProMedical, or that ProMedical failed to deliver on its obligations, through no fault of the defendants. To establish scienter, the plaintiff's inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." Id. at 324; see also City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). Here, the particular allegations that information highlighting ProMedical's inability to supply the quantity or quality of tests described in the Supply Agreement was available to the defendants prior to the announcement of the test kit deal, coupled with Schessel's representations to investors about his involvement in selecting ProMedical as the supplier, and the fact that the Hindenburg Report was issued within twenty-four hours of revealing ProMedical's involvement in the deal make the inference that, at the very least, Schessel consciously disregarded red flags, at least as compelling as the inference that ProMedical duped the defendants.

Moreover, the timing and circumstances of resignations, although not themselves sufficient, can add to a pleading of circumstantial evidence of fraud. Orthofix, 89 F. Supp. 3d at 619; In re Sadia, S.A. Sec. Litig., 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009) (crediting termination of chief financial

Case 4:24-cv-01940   Document 45-2   Filed on 03/14/25 in TXSD   Page 328 of 330

Yannes v. SCWorx Corp., Not Reported in Fed. Supp. (2021)

2021 WL 2555437, Fed. Sec. L. Rep. P 101,122

officer and resignation of chairman and vice chairman that occurred less than two weeks after the company's fraud was revealed). Here, within two weeks of the issuance of the Hindenburg Report, SCWorx's board member, Robert Christie, resigned, and its Chief Operating Officer was terminated by mutual agreement, thus adding some further weight to an overall inference of scienter.

In light of the foregoing, a reasonable person would deem an inference of scienter for Schessel "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Furthermore, because the CCAC properly alleges scienter against a key officer of SCWorx, Schessel, it necessarily alleges scienter against SCWorx itself. See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant."); Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc., 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010) ("Because the plaintiffs have successfully pleaded scienter as to ... Arbitron's then-president, CEO, and chairman, they have also pleaded corporate scienter as to Arbitron."); see also Orthofix, 89 F. Supp. 3d at 619.

Accordingly, the plaintiff has alleged sufficient facts to support a strong inference of scienter with respect to both defendants.

### B.

The defendants next argue that the plaintiff has failed to adequately allege that the defendants made a materially false statement or omission. The defendants argue that the plaintiff failed to (1) plead facts showing that the allegedly challenged statements were false or misleading when they were made, and (2) plead that the defendants had a duty to disclose the facts that allegedly suggested RMH would be unable to pay SCWorx for the test kits.

Claims brought pursuant to Section 10(b) of the Exchange Act require the plaintiff to plead a material misstatement or omission. See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007).

A misrepresentation or omission is material if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision. See Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988). When evaluating an alleged omission, courts consider whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); see also Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996).

**\*7** The defendants argue that SCWorx's disclosure on April 30, 2020 that it terminated the Supply Agreement because ProMedical could not supply the required tests does not prove that the defendants' earlier statements were false when made. But contrary to the defendants' contention, the plaintiff has not merely attempted to plead "fraud-by-hindsight." Rather, as discussed above, the plaintiff alleges that publicly accessible information indicating that ProMedical could not supply the required tests was available to the defendants prior to SCWorx's announcement of the Purchase Order on April 13, 2020. Courts in this circuit have held that "[t]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." In re Bear Stearns, 763 F. Supp. 2d at 487; see also In re Atlas Air, 324 F. Supp. 2d at 494 (rejecting defendants' fraud-by-hindsight claim where plaintiffs' allegations that "the company failed to take into account information that was available to it" at the time it issued its incorrect financial results sufficiently pleaded fraud); In re Salix, 2016 WL 1629341, at \*17.

Nor does the plaintiff's allegation that on April 30, 2020, the defendants admitted that ProMedical could not supply the required tests, make this a fraud-by-hindsight case. "[The Court of Appeals for the] Second Circuit has explicitly recognized that plaintiffs may rely on post-class period data to confirm what a defendant should have known during the class period." In re Vivendi Universal, S.A., No. 02-CV-5571, 2004 WL 876050, at \*6 (S.D.N.Y. Apr. 22, 2004). See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir.2001); Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir.2000); Novak, 216 F.3d at 312-13; see also In re Salix, 2016 WL 1629341, at \*17 ("Although some of

2021 WL 2555437, Fed. Sec. L. Rep. P 101,122

Plaintiffs' allegations are based on events that occurred after the Class Period, Plaintiffs have met their burden of pleading scienter under the PSLRA, given the events alleged to have that occurred during the Class Period."). Statements provided in defendants' April 30, 2020 Form 8-K, which terminated the test kit deal given doubts as to ProMedical's ability to fulfill its obligations under the Supply Agreement such as securing the requisite FDA approvals, serve to confirm what the defendants were at least reckless in not knowing when the deal was announced on April 13 and when they reaffirmed the deal's legitimacy to investors throughout the class period, namely, the numerous concerns about ProMedical and its leadership. Therefore, the plaintiff has adequately alleged that the defendants made a material misrepresentation.

The defendants also argue that the plaintiff failed to plead an actionable omission by the defendants because the defendants did not have a duty to disclose the red flags that suggested RMH would be unable to pay SCWorx for the test kits, because these facts were already disclosed to the public on RMH's website at the time of the challenged statements.

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5," Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100-01 (2d Cir. 2015) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988)), and there is no duty to disclose information that is "equally available to both parties," In re WorldCom, Inc. Sec. Litig., 346 F.Supp.2d 628, 687-88 (S.D.N.Y.2004), or is "widely reported in readily available media," Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014).

In this case, the defendants are correct that they had no duty to disclose the red flags about RMH because they were publicly available. But this argument misses the mark for two reasons. First, the plaintiff did not allege that the failure to disclose the red flags about RMH was an actionable omission. Instead, the plaintiff relied on the red flags about RMH to provide further support for the inference that when the defendants announced the test kit deal, the deal was either recklessly misstated or entirely fabricated. Accordingly, the fact that the defendants did not have a duty to disclose the red flags is beside the point.

**\*8** Second, while focusing their argument on red flags about RMH, the defendants failed to address the omission that the plaintiff did allege, namely, the defendants' failure to reveal the identity of its test kit supplier, ProMedical, on the same day as it announced its deal with RMH–an omission that the plaintiff argues made the test kit deal appear more legitimate than it was. And while the defendants had no general duty to disclose all material information, "[o]nce a party chooses to speak, it has a duty to be both accurate and complete." Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002). As a result, "an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it ... materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008); see also City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 410 (S.D.N.Y. 2011). In this case, the plaintiff alleged that the defendants made a favorable announcement about a significant agreement about COVID test kits while omitting the identify of the supplier, and that this omission was materially misleading to investors. Further, unlike the red flags about RMH that were ascertainable from public sources, the identity of the supplier was not readily available to the market until SCWorx disclosed it several days later.

Accordingly, because the plaintiff has sufficiently alleged the defendants' misrepresentation and omission, the motion to dismiss the Section 10(b) claim is **denied**.

### C.

The defendants argue that Schessel cannot be held liable as a control person under Section 20(a) of the Exchange Act for the alleged securities violations of SCWorx because the plaintiff has failed to establish a primary violation of federal securities laws by SCWorx.

Because the plaintiff has alleged a plausible primary violation of Section 10(b) and Rule 10b-5, the defendants' motion to dismiss the plaintiff's Section 20(a) claim is **denied**.

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the motion to dismiss is **denied**. The Clerk of the Court is directed to close docket number 46.

**Yannes v. SCWorx Corp., Not Reported in Fed. Supp. (2021)**

2021 WL 2555437, Fed. Sec. L. Rep. P 101,122

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2555437, Fed. Sec. L. Rep. P 101,122

---

### Footnotes

1    Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.