## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| TERRY MONSKY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DIRECT DIGITAL HOLDINGS, INC., MARK WALKER, KEITH W. SMITH, DIANA DIAZ, and DIRECT DIGITAL MANAGEMENT, LLC,<br><br>Defendants. | Case No. 4:24-cv-01940 (consolidated with Case No. 4:24-cv-02567) |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED COMPLAINT

T<small>ABLE OF</small> C<small>ONTENTS</small>

Introduction ...........................................................................................................................1

Argument and Authorities .....................................................................................................1

    I.      The Opposition fails to identify any false or misleading statement ........................1

          A.      The Opposition has no comeback to the puffery nature of many CSs. ...........................................................................................................1

          B.      The CC continues to lack any actionable misstatement of fact. .................2

          C.      The CC continues to lack an actionably false or misleading omission. ...................................................................................................3

          D.      The Opposition cannot escape the PSLRA's safe harbor. ..........................9

    II.      The Opposition comes nowhere close to identifying a strong inference of scienter. ................................................................................................................11

          A.      The CC's scienter theory remains implausible, especially when juxtaposed against the backwards motive allegations. .............................11

          B.      The Opposition cannot make out a strong inference of scienter through the CC's circumstantial allegations. .............................................13

               1.      Plaintiff continues to lack particularized factual allegations demonstrating scienter. ................................................................13

               2.      Plaintiff's boilerplate scienter theories remain flawed. ................13

    III.      The Section 20(a) claim fails with the primary claim ...........................................15

Conclusion ...........................................................................................................................15

TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ...................................................................12

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) .......................................................................1

*Callinan v. Lexicon Pharm., Inc.*,
  479 F. Supp. 3d 379 (S.D. Tex. 2020) ....................................................14

*Carlton v. Cannon*,
  2016 WL 3959164 (S.D. Tex. July 22, 2016)..........................................12

*Colossus Media, LLC v. Adalytics Research, LLC*,
  2025 WL 712986 (D. Md. Mar. 5, 2025)................................................1, 3

*Crutchfield v. Match Grp., Inc.*,
  529 F. Supp. 3d 570 (N.D. Tex. 2021) .....................................................9

*Dorsey v. Portfolio Equities, Inc.*,
  540 F.3d 333 (5th Cir. 2008) ...................................................................13

*Fener v. Belo Corp.*,
  425 F. Supp. 2d 788 (N.D. Tex. 2006) ....................................................14

*Heck v. Orion Grp. Holdings, Inc.*,
  468 F. Supp. 3d 828 (S.D. Tex. 2020) ......................................................4

*Hershfang v. Citicorp*,
  767 F. Supp. 1251 (S.D.N.Y. 1991).........................................................8

*Higginbotham v. Baxter Int'l Inc.*,
  495 F.3d 753 (7th Cir. 2007) ....................................................................8

*Hutchins v. NBTY, Inc.*,
  2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012)..........................................6

*In re ArthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010).....................................................15

*In re Cassava Scis., Inc. Sec. Litig.*,
  2023 WL 3442087 (W.D. Tex. May 11, 2023) ........................................5

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018) ...................................................................9

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)...............................................................................................3

*Junius Constr. Co. v. Cohen*,
   178 N.E. 672 (N.Y. 1931).......................................................................................7

*Kleinman v. Elan Corp.*,
   706 F.3d 145 (2d Cir. 2013)....................................................................................8

*Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*,
   2015 WL 1143081 (S.D. Tex. Mar. 13, 2015)...............................................1, 2, 4

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016) .................................................................................5

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024)...............................................................................................7

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016)..................................................................11

*Nakkhumpun v. Taylor*,
   782 F.3d 1142 (10th Cir. 2015) .............................................................................7

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) ...............................................................................14

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*,
   58 F.4th 195 (5th Cir. 2023) .................................................................2, 6, 7, 11, 14

*Plaisance v. Schiller*,
   2019 WL 1205628 (S.D. Tex. Mar. 14, 2019).......................................................4

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir. 2005) .......................................................................2, 4, 5, 14

*Roofers Local No. 149 Pension Fund v. Amgen Inc.*,
   751 F. Supp. 3d 330 (S.D.N.Y. 2024)....................................................................5

*Rougier v. Applied Optoelectronics, Inc.*,
   2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)........................................................8

*Southland Securities Corp. v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) ...........................................................................8, 12

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)..........................................................................................12

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020) ..........................................................................4

*Yannes v. SCWorx Corp.*,
    2021 WL 2555437 (S.D.N.Y. June 21, 2021) .............................................................15

**STATUTES**

15 U.S.C. § 78u-5 ..........................................................................................................9, 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) .....................................................................................................5, 8, 9

## Introduction[1]

Congress enacted the PSLRA to filter out meritless securities-fraud lawsuits like this one, in which "securities plaintiffs" try to "find a road to success in the rearview mirror." *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 101 (2d Cir. 2023). Defendants' Motion to Dismiss ("Motion" or "MTD") laid out the various defects in Plaintiff's Consolidated Complaint ("CC") and the various challenged statements ("CSs") contained therein. Plaintiff's Opposition does nothing to rescue the CC from those shortcomings, skipping over binding Fifth Circuit authority when most convenient and exaggerating the CC's allegations, which have only grown more dubious in recent months. *See Colossus Media, LLC v. Adalytics Research, LLC*, 2025 WL 712986, at *6-11 (D. Md. Mar. 5, 2025) (concluding that Direct Digital pleaded a prima facie defamation claim as to the Adalytics blog post that undergirded the CC and its cited articles); Ex. 15, 4/11/25 MRC Statement at 1, 9 (statement by the Media Rating Council—a not-for-profit industry self-regulatory body—criticizing an Adalytics post as "incomplete" and containing "omissions" that "may lead a reader to imply issues that were not confirmed directly"). Beneath Plaintiff's empty rhetoric lies the same sort of fraud-by-hindsight pleading this Court dismissed in *Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 2015 WL 1143081 (S.D. Tex. Mar. 13, 2015), which the Opposition tellingly buries in a lone footnote halfway through.

### Argument and Authorities

**I.    The Opposition fails to identify any false or misleading statement.**

**A.    The Opposition has no comeback to the puffery nature of many CSs.**

The Opposition tries to sidestep the obvious puffery nature of the CSs by insisting that these (concededly) "vague statements" are actionable because they are "contextually connected to

---

[1] Unless otherwise noted, all internal quotation marks, citations, and footnotes from quoted material have been omitted.

more concrete misstatements." Opp 14. But the supposedly "concrete misstatements" it identifies are nothing more than generalized terms—*e.g.*, "platform," "infrastructure," "operating leverage," and "inventory quality"—for which the CC never specifies falsity with particularity. That leaves Plaintiff clinging to inapposite cases involving "precise information" about "confirming" deadlines, *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 220 (5th Cir. 2023), or statements of facts about "signed, allegedly lucrative contracts" to "create an impression that a substantial payoff would soon flow from the contracts" when the company actually "embarked on a speculative venture," *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698-99 (5th Cir. 2005). Those statements are nothing like the CSs, which convey "nothing more than corporate optimism" about Direct Digital's future prospects. *McDermott*, 2015 WL 1143081, at \*7.

### B. The CC continues to lack any actionable misstatement of fact.

The Opposition presses only an omissions theory as to the "cookie transition" and "guidance-miss explanation" statements. *Infra* I.C. And it makes no headway in attacking the remaining arguably factual statements discussed in the Motion.

*"Committed" to "growth initiatives."* The Opposition claims (in a footnote) that "Smith's November 9, 2023 statement that Defendants were committed to executing Q3's growth initiatives in Q4" is "plausibly rendered false by the fact that Defendants immediately reversed course in 'November/December.'" Opp. 14 n.8. But the CC never alleges that Direct Digital abandoned the growth initiatives that Smith was actually speaking about, MTD 10, much less "reversed course" on them. Defendants' Motion further explained that Direct Digital's steps to prepare for a cookie-free future during the "*November/December*" timespan do not show falsity as to Smith's November *9* statement, which did not say Direct Digital would eschew preparations for a cookie-free future in the first place. MTD 10-11. The Opposition has no response to those points.

*Addressing IVT.* The Opposition says the CS that Direct Digital "address[es] IVT" in

several ways, including "sophisticated technology," CC ¶ 97, is false because "the technology failed to detect the mis-declaration issue." Opp. 15. But the Opposition ignores the reality—and the caselaw from this Circuit—that identifying processes or safeguards is not tantamount to guaranteeing a 100% prevention rate. MTD 11-12 & n.10. Indeed, despite declaring "the Company's efforts to address IVT were far less effective than implied," Opp. 15, the Opposition tellingly neglects to challenge the concrete 1% IVT rate the Company actually disclosed, CC ¶ 97.

*Q1 2024 financials.* The Opposition cannot impugn the accuracy of Walker's statement, published in a May 10 article, that "[t]he financial solvency of our company is very sound." CC ¶ 118. The Opposition instead focuses on the ensuing clause, which consists of a reporter's paraphrasing and a snippet of a quotation: "adding that it remains profitable and its first-quarter performance was 'up 20% year over year.'" Opp. 22-24 (citing CC ¶ 118). Yet the Motion explained not only that "it," here, meant Colossus (not DDH as a whole), but more importantly, "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (cited at MTD 13). At most, the Opposition identifies a plurality of lower-court authority on attribution of paraphrased statements, offering only hollow distinctions for Defendants' cases. *Compare* Opp. 23, *with* MTD 13-14 & n.11. But it cannot credibly suggest that the "it" *must* be Direct Digital, when the article also speaks in terms of "Colossus" as its own SSP and the "Impacts on Colossus." Ex. 4. The far more plausible inference is that Walker was accurately referencing Colossus's growth, since neither the CC nor the Opposition even try to explain why Walker would supposedly lie about Direct Digital's Q1 2024 financial metrics in May, only to disclose them in October. *Infra* II.A.

**C.    The CC continues to lack an actionably false or misleading omission.**

The Opposition—like the CC—relies heavily on an omissions theory. But the law and the

facts (or lack thereof) continue to stand firmly in its way.

   ***Cookie-transition impact.*** The Opposition only briefly defends the theory that Defendants failed to timely reveal the financial impact associated with Direct Digital's (publicly disclosed) transition to a cookie-free environment. Opp. 18-19. But all it can muster is an inapposite case,[2] coupled with the CC's fraud-by-hindsight narrative, in which (a) taking steps during Q4 2023 to transition away from cookies and (b) later announcing decreased revenue from the transition, must mean that (c) all of those facts were contemporaneously apparent and available when Defendants spoke. This Court has already rejected that mode of pleading—which applies to falsity *and* scienter. *McDermott*, 2015 WL 1143081, at *10 (recognizing that "later results," standing alone, "do not establish that the earlier statements were false when made"); *contra* Opp. 19 n.12.[3]

   ***User ID issues.*** The Opposition does not dispute that a company cannot misleadingly omit information it does not have. MTD 15. So it throws up its hands and suggests Defendants *must* have known of the purported early 2023 Trade Desk partial blockage based on later (unspecified and unquantified) changes to Trade Desk's deal volume (which, even in the CC's inaccurate telling, made up only 6% of revenue for *one* of Direct Digital's subsidiaries). Opp. 2, 13-14 & n.16; *infra* n.7. Plaintiff's citation to *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005), for that theory is an enormous tell, as that case actually announced a general "rule" that later-emerging facts "*cannot*" be used to plead securities fraud and only referenced extreme "circumstances" that serve as a narrow exception to that rule—where, for example, "the fact that

---

[2] *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 655 (N.D. Ill. 2020) (cited at Opp. 19) (discussing only whether present-tense statements of growth were forward-looking and recognizing that "exact range" of financial metric would not be definitively known even after quarter's end).

[3] *See also, e.g., Plaisance v. Schiller*, 2019 WL 1205628, at *24 (S.D. Tex. Mar. 14, 2019) (invoking "fraud by hindsight" authority and holding "the fact that EXXI's ultra-deep drilling activities were ultimately not successful is not probative of falsity"); *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 848 (S.D. Tex. 2020) (referring to "fraud by hindsight" as "where a plaintiff alleges the fact that a company reports negative results means that the company's prior reports of good results must have been false").

a business files for bankruptcy on 'Day Two,' may, under the right surrounding circumstances, provide grounds for inferring that the business was performing poorly on 'Day One.'" *Id.* (emphasis added). Nothing of the sort is alleged here.

Even *if* Direct Digital were aware of the early 2023 Trade Desk User ID issue, the Opposition still lacks a coherent explanation for why Defendants were then obligated to disclose that issue when they made the CSs months later—*after* experiencing record revenues *despite* the alleged partial blockage. MTD 15. The best the Opposition can do is repeatedly declare the Trade Desk issue a "plague[]" and "crisis" presenting a "devastating" undisclosed "risk" to Colossus. Opp. 5, 13, 16. That is nonsense. Rule 9(b) and the PSLRA require particularized facts—not adjectives—to state a claim for falsity. *See, e.g.*, *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016) ("whether Diodes's workplace conditions 'profoundly' contributed to the labor shortage is an adverb, not a factual assertion"). And if the supposed "risk" was that Direct Digital had an approximately 1% IVT rate circa late 2023, that is something Direct Digital *publicly disclosed* on the first day of the Class Period (and Plaintiff does not contest, *supra* I.B). CC ¶ 97.[4]

With respect to Google's purported temporary suspension, the Opposition does not dispute the basic principle that a company need not disclose every operational issue—only those that otherwise would render a public statement misleading. MTD 16. That explains why the Opposition picks fights with its own sources, claiming that Direct Digital had *not* "fully rectified" the issue, despite the CC recounting that the issue "*was* rectified and Colossus was reinstated by Google's

---

[4] Plaintiff's cited authority on this point is inapposite. *See In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *3, 7 (W.D. Tex. May 11, 2023) (company touted test result of its "primary drug" candidate but omitted "unfavorable data," "highly anomalous" results, a "missing data point," and involvement of interested party that raised "grave concerns" of test's efficacy); *Roofers Local No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 347-48 (S.D.N.Y. 2024) (concluding that, given its "sheer size," tax liability that exceeded company's cash and cash equivalents was fraudulently omitted from risk disclosures).

5

DSP." Opp. 16; CC ¶ 71 (emphasis added); *see also* Ex. 16, 5/20/24 Article (cited at CC ¶ 73) (reporting that Google's "DV360 start[ed] [sic] buying again"). The Court should reject those backtracking efforts, just as it should see through the Opposition's attempt (at 17) to bolster the temporary Q4 2023 Google allegation by referencing a quarter-over-quarter decrease in Direct Digital's 1Q *2024* revenue—which naturally says nothing about what Defendants knew (or could have disclosed) when Q1 2024 had either not started (for CSs 7-8) or had just begun (for CSs 9-11). And the Court need only examine Plaintiff's cited authority to see how dramatically it diverges from the allegations here. *See Six Flags*, 58 F.4th 208-10, 217-19 (defendants maintained that parks were "progressing nicely" and development partner had "a lot of assets," "continu[ed] to pay," and "financing [was] in place," when in fact there had been "essentially no construction" and the development partner "was firing its employees, was underpaying its workers, had stopped construction, and had 'zero funds' to finance the project"); *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *5 (E.D.N.Y. Mar. 30, 2012) (defendants omitted that company's largest customer was soliciting competitive bids and could permanently injure its business, while reaping $73 million in insider sales).

**Short pay.** In attacking statements that the cookie transition and decreased demand were "two primary factors" for the guidance miss, the Opposition presses a mathematical fallacy: that the short pay *must* have "had the largest financial impact on Q4 2023" because it "account[ed] for more than $8.8 million of the $12.9 million shortfall" from the low end of the guidance range. Opp. 9-10. That does not follow. The $12.9 million shortfall is the culmination of *all factors* that caused Direct Digital to underperform its revenue expectations. Hence, if Direct Digital expected—but did not receive—revenue greater than $8.8 million on account of the cookie transition or decreased demand, then those factors would indeed be more "primary" to the guidance

miss than the short pay. The absence of facts allowing for that comparison therefore remains fatal.[5]

The Opposition fares no better analogizing to the half-truth example recounted in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024), in which the speaker makes "a tacit representation that the land to be conveyed was subject to *no other[]*" roads, and certainly none "vastly greater in degree" of risk. *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (N.Y. 1931) (emphasis added) (discussed in *Macquarie*). The CS here made no such representation that the factors enumerated were the *only factors*, or that no additional factors bore on the guidance miss. CC ¶ 113.[6] That puts this case on all fours with decisions like *Impax* and *Smallen* (cited at MTD 18), which Plaintiff either ignores (as to *Impax*) or offers a non-distinction (as to *Smallen*) that only ends up highlighting the shortcoming here. Opp. 10 n.3 ("the [*Smallen*] court did not agree with the plaintiffs' characterization of what the misleading statements meant to convey and why they were purportedly misleading in the first instance").

From there, the Opposition embellishes the CC. Plaintiff suggests that Direct Digital somehow recanted the decreased-Q4 demand factor in its October 2024 10-K, when actually the "increase in 2023 sell Side (Colossus) demand" referenced (at Opp. 11) was a *year-over-year* increase in 2023 demand—not a quarter-over-quarter increase in Q4 2023 demand. CC ¶ 87. Similarly, Plaintiff conclusorily declares the short pay, unlike the two enumerated factors, was not "transitory in nature," Opp. 10, when actually the CC's own allegations state that the purported Google[7] suspension was "temporar[y]" and the alleged issue "was rectified and Colossus was

---

[5] In *Six Flags* (cited at Opp. 11), it did not matter "how much revenue was overstated" since the bare fact of an overstatement was false and misleading. 58 F.4th at 220-21. Here, the "how much" question is critical because Plaintiff attacks the *degree* to which Defendants attributed the guidance miss to certain factors.

[6] *Nakkhumpun v. Taylor* (cited at Opp. 10) is even further afield, as it involved a defendant making a "false statement" by affirmatively misstating the reason for the termination of a deal. 782 F.3d 1142, 1148 (10th Cir. 2015).

[7] As the MTD explained (at 6 n.5), Plaintiffs' attribution of the short pay to Google—despite Direct Digital being only indirectly connected to Google through its intermediary Bidswitch—is pure (if ultimately immaterial) speculation.

reinstated by Google's DSP." CC ¶¶ 71, 131. Dissatisfied with his own factual allegations, Plaintiff tries to fill the gaps with rhetorical commentary from an online article. Opp. 12 (citing ADOTAT article). But it is well settled that the Court must decide falsity for itself—not by using "market reaction [a]s a gauge for falsity." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 155 (2d Cir. 2013); *see also Hershfang v. Citicorp*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991) ("The complaint must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders.").

Finally, the Opposition claims that a more detailed disclosure of the short pay could not have been "premature" because "it had already occurred." Opp. 11. But the occurrence of an event *begs*—not answers—the reasonable-time-to-investigate question. MTD 18-19; *e.g.*, *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) (no obligation to "jump the gun with half-formed stories *as soon as a problem comes to their attention*") (emphasis added). Plaintiff has no response to Defendants' authority, apart from (a) naked speculation that Direct Digital must have known the reason for the short pay, Opp. 12 n.5, and (b) the distinguishable case of *Rougier v. Applied Optoelectronics, Inc.*, where defendants "touted their visibility into customers' future orders and [internal] forecasts in customer demand" while concealing that its largest customer's demand "had dropped…drastically." 2019 WL 6111516, at *1, *9 (S.D. Tex. Mar. 27, 2019).

***Pulse 2.0 Article.*** Plaintiff has no excuse for his Rule 9(b) failure to identify "when" Walker made the statement published in the February 1, 2024 Pulse 2.0 Article. *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.* (cited at Opp. 21) did not eliminate that requirement; it acknowledged that it was "*arguable* whether the plaintiffs adequately allege when" certain "statements, took place," and only "assume[d] *arguendo*" the complaint sufficed because it provided a specific, less-than-one-month window in which they must have occurred. 365 F.3d

353, 372-73 (5th Cir. 2004) (emphases added). No such for-argument's-sake assumption can be made here, where only Plaintiff's say-so—not factual allegations—declares that the article "was published shortly after Walker provided his answers." Opp. 21 n.18.[8]

Sensing this temporal dilemma, the Opposition pivots to the fact that Direct Digital's *LinkedIn account* provided a link to the Pulse 2.0 interview on February 2, 2024, thanking Pulse 2.0 "for diving into the story behind Direct Digital Holdings." Opp. 21-22. What could possibly be false or misleading about that tag line or the mere linkage of the article is hard to understand. But even worse, this "unattributed website statement" is completely disconnected from any Individual Defendant who "made or authorized" the statement with "the requisite scienter," much less constitutes the sort of "extraordinary and dramatic" statement that "must have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 627-28 (S.D. Tex. 2018) (dismissing claim as to "unattributed statement" on website that "could have been written by someone with no specific information, passed to [the company's] marketing or investor-relations department, and displayed on the website with no oversight from senior ranks").

### D.    The Opposition cannot escape the PSLRA's safe harbor.

Faced with the PSLRA's blackletter definition of a forward-looking statement, 15 U.S.C. § 78u-5(i)(1), which encompasses Direct Digital's guidance projections and plans for future operations, the Opposition claims that such statements are "not forward-looking" because of an

---

[8] Plaintiff's tangent on the amended complaint in *Crutchfield* (Opp. 21) goes nowhere. That complaint referenced a specific December 20, 2018 video interview that was quoted in a December 21, 2018 article, which itself stated that the defendant "*recently* sat down" for the interview. Dkt. 45-1, Pl. Appx A-039; Ex. 17, WSJ Article (emphasis added). The court's resulting opinion did not discuss the timing issue, simply concluded that the complaint "adequately specified at least some allegedly misleading statements or omissions," Pl. Appx. A-200, and did not recant the principle from its original opinion that failure to plead the "when" of a statement falls short of the "heightened pleading standards required by Rule 9(b)." *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 591 (N.D. Tex. 2021).

"omission of present facts." Opp. 15. In support, the Opposition cites several cases clarifying that statements about *present facts* are not forward-looking and that a *mixed present/future statement* is not protected with respect to the part of the statement referring to the present. Opp. 15 (collecting cases). Those principles are true as far as they go, but they have no bearing on Defendants' quintessentially forward-looking revenue guidance and other predictions. *See* MTD 19-20.

The Opposition does not question Defendants' authority explaining that guidance statements after quarter-end remain forward-looking if financial results have not yet been tabulated, MTD 20-22, and concedes that the CC does not allege when revenues were tabulated. *See* Opp. 19 ("even if Defendants had not yet precisely tallied the lost revenues"). The Opposition cites CC ¶ 50 for the assertion that "revenues [are] tallied in real-time," Opp. 19, but that paragraph purports to describe *accounting* revenue-recognition rules, not when the company tabulates revenue into quarterly results that an executive can compare and track against forecasted guidance. The Opposition's additional assertion that "[i]f considered opinions," the near- and post-quarter-end guidance statements "would be *current* opinions," Opp. 18 n.11, is another way of incorrectly suggesting such statements were not forward-looking.

When, as here, the PSLRA's definition of forward-looking statement encompasses a challenged statement, *see* Defs.' App'x A (identifying forward-looking statements), the CC must overcome both prongs of the safe harbor. MTD 19-22 (citing 15 U.S.C. § 78u-5(c)(1)). The Opposition fails to explain how it overcomes either. With respect to the first prong, *i.e.*, that the statements were identified as forward-looking and accompanied by meaningful cautionary language, Defendants cited the cautionary language accompanying CSs 2, 4, and 5 made November 9, 2023. MTD 20-21. The Opposition argues that this cautionary language was insufficient given the "already-partially-materialized risk to the Company's relationships with its

key customers," Opp. 15 n.9, but that argument assumes that Defendants knew of purported user ID problems from The Trade Desk prior to November 9, 2023, which the CC never alleges. With respect to the second prong, *i.e.*, where "the plaintiff fails to prove that the forward-looking statement...was made with actual knowledge" of falsity, the Opposition simply refers the Court to its scienter section. Opp. 15 n.9, 18. The Opposition's scienter arguments, however, do not make the required showing, *infra* II, and are particularly inadequate to overcome the even "higher scienter standard" needed to show "actual knowledge" of falsity. *Six Flags*, 58 F.4th at 214-15.[9]

## II.    The Opposition comes nowhere close to identifying a strong inference of scienter.

### A.    The CC's scienter theory remains implausible, especially when juxtaposed against the backwards motive allegations.

The Opposition still lacks an answer to the vexing questions posed by the CC's scienter theory, including what Walker and Diaz stood to gain by reaffirming Q4 2023 guidance, only to voluntarily disclose the shortfall weeks later. MTD 24. Plaintiff cannot liken that explanatory gap to the "reckless[] gamble" in *Six Flags* (cited at Opp. 1, 30), where "Defendants were motivated…to hide the true" facts "to achieve the target EBITDA" and "receive equity awards of 600% and 300% of their base salaries." 58 F.4th at 215. Nor can Plaintiff make sense of the CC by confusingly asserting that he "does not allege the guidance was always impossible to meet" while simultaneously disagreeing that Defendants "needed time to discover the [revenue] shortfall." *Compare* Opp. 28, with *id.* at 30 n.25. Which is it?

Plaintiff then suggests the "delay[]" in Defendants' discussing the short pay in the October 2024 10-K "further supports an inference of Defendants' intent to mislead." Opp. 28, 30.[10] But

---

[9] The Opposition's arguments as to why Defendants' opinion statements are actionable recite the *Omnicare* standard and add little beyond the Opposition's other arguments. Opp. 15-16, 20, 24 n.22. These arguments fail for the same reasons that the Opposition cannot show a false or misleading statement or scienter.

[10] The only authority Plaintiff cites on this point bears scant resemblance to this case. *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 575, 584 (S.D.N.Y. 2016) (defendants failed to disclose DOJ subpoena for

harping on that timing only begs the same unanswered question—what did Walker and Diaz stand to gain from the purported delay? *See Southland*, 365 F.3d at 369 ("The fact that other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit."). The far more compelling, non-culpable inference remains that Direct Digital investigated the short pay and, unable to resolve it or determine its impetus, disclosed it in the first 10-K filed after securing a replacement auditor. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) (holding that the "most cogent inference" was that company was "carefully review[ing] all of the relevant evidence and was at worst negligent as to the effect of the delay on investors").

The Opposition only exaggerates the incoherence of the CC's scienter theory by pointing out that *Smith*—who made just one, benign CS on November 9—sold some of his stock on December 11 and 12, 2023. Opp. 29. The Opposition relegates that CS to a one-sentence footnote, Opp. 14 n.8; *supra* I.B, all but conceding the CC named Smith as a defendant only to manufacture a claim of 'insider trading.'[11] What is more, the Opposition ignores the robust Fifth Circuit authority (cited at MTD 25-26) that "even unusual sales by one insider do not give rise to a strong inference of scienter when other defendants"—here, Walker and Diaz—"do not sell some or all of their shares during the Class Period." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002); *see* Opp. 29 n.24 (citing only out-of-Circuit authority). That principle is particularly important here, where the non-selling defendants sold *nothing* and yet are the ones that actually made the CSs and purportedly carried out the fraudulent scheme.

---

*multiple years*, all while denying existence of "investigation that could have a material impact on its business").

[11] Plaintiff insists that, even if Smith lacks primary liability under § 10(b), he has secondary liability as a "control person of Direct Digital" under § 20(a). Opp. 29 n.24. But the CC pleads no connection between Smith and the other CSs in this case apart from his bare executive status, which does not suffice for control-person liability. CC ¶¶ 30, 32; *see, e.g., Carlton v. Cannon*, 2016 WL 3959164, at *4, *7 (S.D. Tex. July 22, 2016) ("status alone" and "[g]eneral allegations about day-to-day participation in corporate affairs" are insufficient support for control-person liability).

**B.**   **The Opposition cannot make out a strong inference of scienter through the CC's circumstantial allegations.**

       **1.**   **Plaintiff continues to lack particularized factual allegations demonstrating scienter.**

The Opposition cannot point to any factual allegations in the CC identifying what, specifically, the Individual Defendants knew and when that are probative of scienter. So it relies instead on anonymous sources that had no interaction with the Individual Defendants and seeks to stretch these sources to support points they cannot substantiate. The Opposition, for instance, repeatedly asserts that Defendants knew in 2023 of The Trade Desk's alleged detection of user ID issues, despite *no source* stating that. *E.g.*, Opp. 1, 2, 5, 13, 15, 16, 17, 26, 27. It recounts the allegations attributed to the "confidential witness" Colossus "media manager," without explaining how or why that CW would "know when and why the 92% customer 'pulled the connection.'" Opp. 8. And it does not even *defend* the reliability of the "person familiar with the situation" and a "publisher executive familiar with Colossus," Ex. 13, 5/10/24 AdAge, despite relying on allegations in the CC that were derived exclusively from these "sources." These assertions are not particularized pleadings of alleged facts sufficient under the PSLRA.

       **2.**   **Plaintiff's boilerplate scienter theories remain flawed.**

*Core Operations.* The Opposition tries desperately to shoehorn this case into the narrow, four-factor "core operations" doctrine. Opp. 26-29. That effort fails at every turn, with Plaintiff's cited authority only serving to demonstrate what this case is not.

*First*, the Opposition ignores Fifth Circuit authority indicating that a 90-employee company like Direct Digital should not qualify for the core operations exception. MTD 28-29. In fact, the Opposition proves Defendants' point by (a) citing *Dorsey v. Portfolio Equities, Inc.*, in which a *zero-employee* company "was dependent upon" its *eight-employee* managing company for revenue, 540 F.3d 333, 342 (5th Cir. 2008), (b) retreating to out-of-circuit cases, and (c) seeking

to move the goal posts by improperly isolating the number of *Colossus* employees, when what matters is that Defendants were executives of the larger holding company. Opp. 27 & n.23.

*Second*, the Opposition wrongly conflates the requirement that an issue be "critical to the company's *continued vitality*" with any issue that involves a company's largest customer. Plaintiff's own authority demonstrates the company-derailing facts required to satisfy this second factor. *See Plotkin*, 407 F.3d at 692, 694, 700 ("struggling," "fledgling" company entered agreements that would increase its revenue *thirty-fold* but went bankrupt eight months later when it did not "receive even a dollar" under those agreements); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 422, 425 (5th Cir. 2001) (executive of less-than-40-employee, single-product company falsely stated that patent covered the drug involving "[s]ubstantially all of the Company's efforts and expenditures"). Those oft-distinguished[12] cases bear no resemblance to the mere *eight* percent shortfall from FY 2023 revenue guidance at issue in this case.

*Third*, the Opposition comes nowhere close to identifying an egregious falsehood that would have been "readily apparent to the speaker." In *Six Flags*, the defendants expressly stated that they "comprehensive[ly] review[ed]" project timelines, such that the "disastrous state" of the company's parks would have been "readily apparent." 58 F.4th at 219. And even then, those core operations allegations had to be "*combined*" with robust motive and circumstantial allegations. *Id.* at 218-19 (emphasis added). The Opposition can point to no similarly rich scienter narrative here, just Defendants' generic comments regarding Direct Digital's operations and revenue guidance, coupled with the conclusory assertion that "critical operational issues would have been obvious to the Company's top officers and majority owners." Opp. 27.

---

[12] *See Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 810 n.22 (N.D. Tex. 2006) (distinguishing 5% overstatement from *Plotkin's* "thirty-fold increase in revenue"); *Callinan v. Lexicon Pharm., Inc.*, 479 F. Supp. 3d 379, 436 (S.D. Tex. 2020) (distinguishing *Dorsey* and *Nathenson* because company employed 120 to 202 people and did not depend on drug approval for its survival).

*Fourth*, with respect to the last core operations factor, the only thing that is "internally inconsistent" is the Opposition. It declares that Defendants' statements "regarding the primary factors" for the revenue shortfall "were inconsistent," while *also* claiming that Walker and Diaz made the "same misrepresentation" and thus must have been "coordinated" in their supposed deceit. Opp. 28. As discussed above, the more plausible inference is that Walker and Diaz both *accurately* relayed two of the primary reasons for the guidance miss, which poses no inconsistency with Direct Digital's later discussion of an *additional* factor. *Supra* I.C. Plaintiff's citation to *In re ArthroCare Corp. Securities Litigation*—in which a defendant "made several specific denials" of allegations despite being "confronted…with evidence of various fraudulent practices," 726 F. Supp. 2d 696, 712, 717 (W.D. Tex. 2010)—is therefore inapposite.

*Unrelated Auditor Resignation.* Even as inaccurately described in analyst reports, Direct Digital's auditor's resignation allegedly related to SOC-1 reports for *vendors* (not Direct Digital) and verifying *impression counts* (never challenged in the CC). Opp. 28-29. That hardly links the resignation to Defendants' knowledge of the alleged user-ID problems animating Plaintiff's fraud theory, much less to support scienter. And the one case Plaintiff cites confirms that the "circumstances of resignations"—here, that the auditor allegedly resigned for reasons *unrelated to this case*—are what matters, not the mere resignation itself. *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *6 (S.D.N.Y. June 21, 2021) (resignations are "not themselves sufficient"); MTD 29-30.

## III.    The Section 20(a) claim fails with the primary claim.

The Opposition does not dispute that the § 20(a) claim requires a cognizable primary claim. MTD 30. Because the CC's § 10(b) claim fails, so does its § 20(a) claim.

CONCLUSION

The Court should dismiss the CC with prejudice.

15

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ Danny David*
     Danny David
       *Attorney-In-Charge*
     Texas Bar No. 24028267
     Federal I.D. No. 37808
     Amy Pharr Hefley
     Texas Bar No. 24046046
     Federal I.D. No. 870378
     Anthony J. Lucisano
     Texas Bar No. 24102118
     Federal I.D. No. 3369146
     Frank Mace
     Texas Bar No. 24110609
     Federal I.D. No. 3385915
     Claire M. Mahoney
     Texas Bar No. 24132497
     Federal I.D. No. 3885858
     910 Louisiana Street
     Houston, Texas 77002
     (713) 229-4055
     (713) 229-2855 (Fax)
     danny.david@bakerbotts.com
     amy.hefley@bakerbotts.com
     anthony.lucisano@bakerbotts.com
     frank.mace@bakerbotts.com
     claire.mahoney@bakerbotts.com

**ATTORNEYS FOR DEFENDANTS
DIRECT DIGITAL HOLDINGS, INC., MARK D.
WALKER, DIANA P. DIAZ, KEITH W. SMITH,
AND DIRECT DIGITAL MANAGEMENT, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served via ECF and/or electronic mail on all counsel of record on this 14th day of April, 2025.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley