APPENDIX D

**DEFENDANTS' EXHIBIT LIST –
REPLY IN SUPPORT OF MOTION TO DISMISS**

| Exhibit / Tab No. | Date | Description | CC ₽ | Appx. page no. |
|---|---|---|---|---|
| 15. | 4/11/2025 | April 11, 2025 statement from the Media Rating Council, Inc. titled "MRC IVT Requirements and Processes for Pre-Bid – Comments on the Recent Adalytics Blog" | | Appx. D-001-011 |
| 16. | 5/20/2024 | May 20, 2024 article titled "A Colossal Mess" | 73 | Appx. D-012-022 |
| 17. | 12/21/2018 | December 21, 2018 *Wall Street Journal* article titled "The CEO Behind Tinder, OkCupid on the Future of Online Dating" | | Appx. D-023-027 |

# Exhibit 15

**Media Rating Council, Inc.**

420 Lexington Avenue
Suite 343
New York, NY 10170

Tel: (212) 972-0300
Fax: (212) 972-2786
www.mediaratingcouncil.org

April 11, 2025

# MRC IVT Requirements and Processes for Pre-Bid – Comments on the Recent Adalytics Blog

A recent blog post by an ad tech vendor, Adalytics, shared observations related to ad serving activity to robotic agents (bots) and observations related to certain Media Rating Council (MRC) accredited vendors (specifically, DoubleVerify/DV, HUMAN and Integral Ad Science/IAS) as well as made statements about MRC invalid traffic (IVT) requirements and processes. The blog was covered in various media publications.

It should be noted that MRC codifies requirements related to invalidity/validity and does not use the term fraud, as fraud is a legal term that implies intent that cannot always be discerned and is a narrower definition than validity. Often times, invalid traffic occurs without fraudulent intent (such as crawling or scraping content for classification), but this traffic is invalid for ad measurement. The bots mentioned in the blog post likely do not have fraudulent intent to generate ad revenue, but exist for benign purposes such as archiving web pages.

The MRC's review of this blog post found omissions related to and an incomplete understanding of MRC's IVT requirements as well as incomplete information related to audited vendor measurement and processes that may lead readers to incorrect conclusions. While MRC does not frequently comment publicly on audit matters, as our process involves confidential information about audited vendors (fully reviewed by our members), we believe the incomplete presentation of details related to these matters required us to comment, without compromising confidentiality.

MRC became aware of Adalytics' potential blog post as early as December 2024 and throughout early 2025, based on contacts for comment on it by various publications who were apparently informed about the content of the blog (at no point was the blog shared with MRC before publication). MRC did not offer comment with this type of severely limited context, however we did share information on our general requirements as background.

In summary, we had the following observations related to the blog post, all of which are explained further later in this memorandum:

**-MRC requires back end (post-serve) filtration of General Invalid Traffic (GIVT) on an impression by impression basis for all accredited digital vendors; this includes known Spiders and Bots as well as known dedicated Data Center IP addresses.**

**-MRC does not require pre-bid (upfront or pre-serve) filtration or blocking of IVT, in fact, our Standards discourage or caution against it in several instances. Full back end filtration is required to inform pre-bid and must be applied to all measured and reported impressions, regardless of pre-bid usage.**

**-MRC audits (across multiple periods over the course of recurring annual audits) for accredited digital vendors include testing of the application of the IAB Spiders and Bots list, (we noted that the declared bot referenced in the blog post is included in the applied IAB Spiders and Bots list), as part of required back end GIVT processes in production as applied to measured and reported impressions.**

**-MRC audits (across multiple periods over the course of recurring annual audits) for accredited digital vendors include testing of the application of industry data center lists such as the TAG Data Center IP list, including the known dedicated data center IP addresses, as part of required back end GIVT processes in production as applied to measured and reported impressions.**

**-Where pre-bid IVT detection is accredited, MRC audits (across multiple periods over the course of recurring annual audits) include testing of application of back end observations, including the IAB Spiders and Bots list and industry data center lists (e.g., the TAG Data Center IP list) used to inform bid request classification process and pre-bid files and databases.**

**-None of this is either based on sampling or reliant on DSPs or SSPs sharing or "passing" information (such as IP Address, User Agent or Device ID) to the vendors to create pre-bid assets for bid consideration.**

**-The decision to present a bid request or serve an ad solely rests with DSPs and SSPs and is dependent on what information they choose to compare to or assess within pre-bid products.**

**-HUMAN provides suggestions on whether a request is IVT or not based on back-end detection and filtration through an API. This is only provided to DSPs and SSPs, not advertisers or agencies. HUMAN does not directly filter requests, prevent ad serving or enable blocking, and the decisions to bid or not bid on these requests based on HUMAN's suggestions are solely made at the DSP/SSP level and outside of our audits.**

**-DV provides pre-bid segments and IVT classifications to DSPs, SSPs and advertisers/agencies through DSPs which may be queried through either an API configuration or a flat-file to help these organizations decide whether or not to filter a request for IVT or not based on back-end detection data, which is delivered through either a file upload or API. DV does not directly filter requests or prevent ad serving, but does enable blocking post-serve only where configured by DV's clients (which is evaluated as part of pre-bid audits).**

It should be noted that Adalytics did not reach out to MRC to seek clarification on our requirements at any point during the compilation of their blog post, nor did they present perceived shortcomings of our process to us. We generally welcome such outreach, even from unaudited/unaccredited vendors, and if verifiable information leads to the need to improve or update our requirements or processes, we strive to reflect this in updated requirements as evidenced by the many updated Standards and Guidelines issued by MRC (including the IVT Standards which have been updated and supplemented with Interim Updates many times since their initial release to reflect new observations).

Adalytics is not audited or accredited by MRC so their processes of discovery and testing and, most importantly, their projection of the impact of findings (or implied impacts in most cases) have not been reviewed by MRC for controls and appropriateness.

<u>MRC IVT Requirements</u>

Related to this specific blog post, Adalytics references certain excerpts of MRC's IVT Standard (the first and only IVT Standard that has been produced in our industry to guide the detection and filtration of IVT) including aspects related to known spiders/bots and known invalid data center traffic. These are General Invalid Traffic (GIVT) requirements of all MRC audited and accredited digital measurement organizations, not just IVT focused organizations. It should be noted that GIVT is IVT that can be identified by list-based or parameter driven techniques and MRC requires multiple types of GIVT be detected beyond known bots and data centers, not all GIVT "self-declares" and not all GIVT is "benign" such as content scrapers, but it is all invalid for ad measurement.

The first salient point related to this is that the MRC requires **back end (post-serve) filtration of GIVT. The MRC does not require pre-bid (front-end) filtration of such activity, in fact our Standards discourage it in several instances.**

The MRC IVT Standards Sections 4.2 and 4.2.1, which were not referenced in Adalytics' blog post, directly cover front-end IVT techniques and our requirements of them.

https://mediaratingcouncil.org/sites/default/files/Standards/IVT%20Addendum%20Update%200062520.pdf

An excerpt from these sections states (our emphasis added):

> *"**Up-front detection techniques where a bid request is not fulfilled or otherwise blocked due to IVT must be employed with caution because they are particularly prone to telegraphing detection techniques, in most cases, to the traffic source because of an element of blocking that becomes apparent.** As such, they tend to become less effective over time without additional research and development into new detection methodologies. **Application of these techniques on an up-front basis is not required. Back-end detection and removal techniques are more invisible to the source, and therefore less prone to signaling detection methodologies to IVT perpetrators, however they may add complexity to reporting and processing, since data that flows through the measurement organization will therefore contain IVT transactions that are removed in later stages.** See further guidance on up-front techniques in Section 4.2.1 below."*

While the MRC has reservations about the risks and effectiveness of pre-bid approaches to IVT, in our 2020 IVT Standards update, we sought to standardize requirements for use of these approaches and to enable an audit framework as these approaches are desired, often by ad serving organizations. Section 4.2.1 goes on to summarize these requirements. This includes the stipulation that back-end detection and filtration techniques are required for compliance with the Standard and that digital measurement organizations employing up-front IVT filtration techniques must do so in combination with required back-end detection and filtration techniques.

**It should be noted that MRC recognizes the desire for pre-bid approaches in the industry for efficiency of budgets, assurance of demonetization, carbon considerations and**

**avoidance reasons. MRC also recognizes the thought that known GIVT pre-bid filtration may pose diminished risk of reverse engineering. However, IVT decisions are often made holistically and not distinguished between GIVT/SIVT. MRC holds that pre-bid filtration poses risks detailed above and may also mask the occurrence of IVT in back-end reporting, limiting the ability for measurement users to identify properties with higher levels of invalid traffic. Further, while a known bot in the GIVT category declaring or using a known data center may be widely known to be invalid, blocking (which often is based on a range of IVT decisions and telemetry including SIVT) may allow that bot to collect information about decisions or a vendors' detection techniques at scale to A/B test for IVT weaknesses. For this reason, MRC continues to discourage pre-bid filtration or blocking without care and does not require it. See further discussion below regarding potentially lower-risk DSP/SSP blocking.**

The Standard also states that it is understood that a measurement organization may not have full visibility into how their up-front resources are deployed by an ad-server, platform or network and as a result, may not be able to directly quantify the impact on requests, bids, blocks or impressions. This is a key aspect that may not be fully explored in Adalytics' blog that we will discuss later.

Finally, the Standard states that in certain cases, measurement organizations may employ up-front techniques where a bid is pre-emptively invalidated based on IVT, but is still fulfilled with an impression served. Such approaches may obviate some of the requirements of up-front approaches discussed above such as those related to preventing reverse engineering (as the bid request would still be fulfilled and not known to a potential bad actor) and disclosure as filtration of impressions would still be reported. Again, a key distinction that does not appear to be fully considered in Adalytics' blog, but may actually account for a large majority of its observations.

If up-front techniques are based on list-based resources developed and deployed based on back-end techniques such as spiders and bots, they may be considered deterministic and require less support than probabilistic techniques.

<u>MRC Accreditation of Vendors</u>

MRC accreditation is based on annual audits by independent CPAs under AICPA's Attestation Standards and reviewed by our members that includes review and inspection of code, tests of controls, data analytics and designed activity testing in production environments. It also includes visibility into production data collection and reported results which cannot be gleaned from external processes.

DV, HUMAN and IAS are all MRC audited and accredited for **back end** detection and filtration of GIVT (required of all accredited digital services) and Sophisticated Invalid Traffic (SIVT; an encouraged but not required aspect of MRC's Standard that involves non-list based or non-parameter-driven techniques) for certain formats and environments specified on our site:

https://mediaratingcouncil.org/accreditation/digital

Back end IVT is expected to be applied for all traffic on an impression by impression basis. There is no sampling present in any of the IVT services MRC currently audits and accredits, but if sampling is applied, MRC also has methodological and error disclosure requirements.

In addition, DV and HUMAN are MRC audited and accredited for Pre-Bid IVT **detection (not prevention of ad serving or decisions to serve ads or not)** again for certain formats and environments detailed on our site.

**IAS is not audited nor accredited for Pre-Bid IVT detection or their publisher tools mentioned in the blog post. IAS will be submitting it's Pre-Bid IVT detection to audit during 2025.**

**For DV, neither the Scibids targeting product nor the DV publisher tools mentioned in the blog post are audited or accredited.**

<u>Pre-Bid</u>

Another issue we noted with Adalytics' blog post is the implication that accredited pre-bid IVT measurement is expected to result in direct prevention of ad serving and that a reader may conclude that observations of ads served to bots may be an indication that pre-bid detection is not functioning as represented or intended. Adalytics' blog recognizes this may not be the case as the Caveats and Limitations section at the end of the blog states:

*"Thus, it can be difficult to determine or infer who was "responsible" or made a "decision" that resulted in an ad being served to a bot. Even if a vendor has correctly identified a user as a bot, sometimes other stakeholders may intentionally or inadvertently still authorize an ad to be served to that bot.*

*For example, a vendor may correctly identify a bot, and pass that information to another vendor who controls the ad serving or bidding decisioning process. That second vendor - for a number of reasons - may disregard, ignore, or fail to action the accurate and correct bot classification returned by the first vendor."*

As recognized formally in our IVT Standard, often times, and as is the case for DV and HUMAN, a measurement vendor is not able to make ad serving decisions (to serve an ad or to respond to a bid in any way). Instead, both vendors provide assets for pre-bid detection that must be actioned by ad servers and configured by their clients.

Without compromising sensitive methodological details, in general, these services either provide files or databases that can be queried through API by ad serving organizations that list IP addresses, User Agents and other heuristics such as Device ID that have been observed to be invalid using back-end detection techniques (as required by MRC).

**This functionality does not require "passing" of IP addresses or User Agents from ad serving organizations to the vendors to build pre-bid assets or lists, but it is based only on available or observable information using back end post-serve telemetry or observations (tagging at a site or ad level) and effectiveness of application of these assets depends on what a DSP or SSP chooses to compare the vendor assets to during decisioning. This is important to note as much of the reporting surrounding this blog post fails to understand that DSPs and SSPs generally communicate with each other, not ad tech vendors, and also continually mixes back end filtration with pre-bid detection. Open programmatic DSPs and SSPs generally utilize the IAB Tech Lab's OpenRTB protocol for communication**

**regarding requests and bids. User Agent and IP Address are part of this protocol, but recommended, not required fields, that may not be available or included for various reasons outside of MRC's purview.**

**Ad tech vendors are not reliant on DSPs or SSPs to collect things like User Agent or IP address for IVT consideration. Instead vendor tags are either present on properties (pages, apps, etc.) and/or are embedded within creatives delivered to them and are able to directly collect this information and apply it on the back end. However, once vendors produce pre-bid files/databases for use by DSPs or SSPs or are asked to evaluate a bid request based on these back end observations, the ad serving organization can choose to evaluate User Agent, IP Address or Device ID (all three, any combo of the three or none). The vendor's configuration and implementation guides allow and encourage utilizing all available information, but what a DSP or SSP chooses to use and compare is out of the vendor's control.**

**These files and databases are updated (near real time for database APIs and every several minutes for flat files) and made available to client users. For HUMAN, clients of their audited pre-bid product (Ad Fraud Defense) are generally ad tech platforms (DSPs and SSPs) and DV offers their audited pre-bid product to DSPs and SSPs, as well as to advertisers/agencies, which must be enabled and configured through their DSP.**

When a DSP receives a bid request or when an SSP decides to send a bid request, they are able to cross-reference the pre-bid files or query the database APIs for an IVT determination based on back-end observations. It is ultimately the DSP's or SSP's decision (based on client configurations) on how to use and configure these pre-bid functions, what information they cross-reference and query and how to respond to or send a bid request and serve an ad. Neither DV nor HUMAN have control over these decisions. MRC's audit of vendor pre-bid services are limited to the compliant production, accuracy, functionality and availability of files and databases, and do not include upstream processes at DSPs or SSPs outside of the vendor's control or purview. MRC does not produce requirements for or have insight into billing or financial arrangements that may include billing for measurement (regardless of validity or delivery), ad serving or impressions (valid or invalid) per our mandate, and our audits focus on measurement and report of ad activity.

HUMAN does not enable post-serve blocking and their pre-bid metrics only classify requests as GIVT or SIVT. DV does enable post-serve blocking based on client configuration, but note this does not impact an ad server's decision to serve an ad, only restricts delivery of it. MRC's audits note a small % of ads are blocked as configured by DV clients using their pre-bid service, but delivered ads are monitored and subject to back end filtration. This functionality is evaluated as part of pre-bid audits where present.

**It should also be noted that for commonly known GIVT, such as that listed within the IAB Spiders and Bots list or the TAG Data Center IP list, a DSP or SSP (and even publisher) can subscribe to and utilize these lists themselves in their decisioning without reliance on a vendor, and such use likely comes with minimal risk as it does not incorporate other IVT telemetry. However, vendors may provide more complete and comprehensive consideration of all IVT (all GIVT as well as SIVT). MRC also encourages third-party measurement of IVT where possible. MRC does not produce requirements for nor audit ad serving processes. We do audit certain organizations and services that may serve ads, but that is**

**limited to back-end measurement of delivery (and IVT filtration), not ad serving decisions nor pre-bid considerations.**

<u>Specific Bots</u>

Adalytics' blog post referenced three distinct bots: HTTP Archive, an undisclosed bot and URLScan.io.

HTTP Archive is a declared bot present on the IAB Spiders and Bots list (since 2013) as including "PTST" in the User Agent string. MRC audits (regular recurring annual audits) test the requirement that accredited digital vendors apply the IAB Spiders and Bots list (updated regularly) in production for back end filtration including HTTP Archive as required by our IVT Standard. MRC audits also test the requirement that back end detection using this list inclusive of this bot is used to inform audited and accredited pre-bid products. MRC has not tested each of the example observations in Adalytics' blog post, but seeks to obtain reasonable assurance via observation and testing of application of the IAB bots list to measured and reported production traffic at the audited vendors. MRC believes the vendors likely have readily available information regarding each of the observations in the blog post and how they were classified with respect to IVT pre and post and encourages these vendors to share that information with clients and perhaps, publicly.

For the undisclosed bot, we cannot confirm the above as the identity of the bot was not shared in Adalytics' blog. If Adalytics would like to privately identify this to MRC, we can work to investigate its occurrence, however, Adalytics also notes that this bot does not declare its User Agent as robotic and is not listed on the IAB Spiders and Bots list. Adalytics' blog post mentions that this bot may use data centers (perhaps some dedicated known IVT data centers) and also may exhibit SIVT traits. More on that below.

Finally, the URLScan.io bot does not declare its User Agent as robotic and is not listed on the IAB Spiders and Bots list. However, the referrer Domain is declared for traffic generated by this bot. Our audits are able to inspect how traffic generated by this bot is treated by audited vendors in production as part of recurring audit processes. Adalytics' blog post mentions that this bot may use data centers (perhaps some dedicated known IVT data centers) and also may exhibit SIVT traits. More on that below.

<u>Data Centers</u>

Adalytics' blog post mentions that both the declared and undeclared bots often make use of well-known data center IPs. It's important to note that GIVT requirements and the associated TAG data center IP list used by accredited vendors, is limited to known invalid data center IPs dedicated to IVT or non-human activity, not mixed used data center IPs or unknown special purpose data center IPs that may require SIVT techniques to detect.

However, well-known cloud hosting data center IPs are included on TAG's list along with other known dedicated data center IPs.

MRC audits (regular recurring annual audits) test the requirement that accredited digital vendors apply industry data center lists (e.g., the TAG data center IP list; updated regularly) in production for back end filtration including known dedicated data centers as required by our IVT Standard.

**Appx. D-008**

MRC audits also test the requirement that back end detection using data center lists are used to inform audited and accredited pre-bid products. MRC has not tested each of the example observations in Adalytics' blog post, but seeks to obtain reasonable assurance via observation and testing of application of industry data center lists (e.g., the TAG data center IP list) to measured and reported production traffic at the audited vendors. MRC believes the vendors likely have readily available information regarding each of the observations in the blog post and how they were classified with respect to IVT pre and post and encourages these vendors to share that information with clients and perhaps, publicly.

SIVT

As mentioned above, Sophisticated Invalid Traffic, or SIVT, is not required for all digital measurement providers, but is strongly encouraged. SIVT has been audited and accredited for DV, IAS and HUMAN for backend detection and filtration and for DV and HUMAN for pre-bid detection for certain formats and environments specified on our site.

SIVT goes beyond IVT that can be detected and measured using list-based or parameter driven techniques, is far more difficult to detect and may vary from vendor to vendor. MRC does not require accredited SIVT vendors to identify all SIVT, as it's impossible to determine this with evolving sophistication of IVT techniques. Instead, MRC IVT Standards define multiple SIVT categories and techniques and require accredited SIVT vendors to assess risk in each category, and develop corresponding techniques and controls for each, assessed and tested for effectiveness by our audits. It's very likely a material amount of SIVT goes undetected and MRC pushes for continuous improvement through our processes and Standards to attempt to promote as thorough detection approaches as possible.

Pre-bid SIVT functions in much the same way as detailed above, with back end observations of SIVT associated with IPs, UAs and device IDs as well as properties used to inform pre-bid files and databases for DSP/SSP consideration in their serving decisions. Again, the vendors do not make these decisions, and MRC requires backend filtration and detection for SIVT across all categories even when pre-bid is present.

It's possible some of the observed activity in Adalytics' blog manifests as SIVT (recognized by Adalytics in the blog) if the User Agent is not properly declared as robotic, designed to spoof or simulate valid/human activity, mixed used or unknown data centers are used (or not at all) and through other means designed to mask this activity. While MRC thoroughly assesses accredited SIVT vendors across all required categories, we cannot definitively say all activity was properly detected as SIVT where applicable. MRC plans to incorporate some of the direct observations in our required testing as part of ongoing efforts, however, it should be noted that the focus of Adalytics' blog post was on missed basic GIVT and known activity.

MRC's Perspective on Adalytics:

MRC has no direct relationship with Adalytics; as previously noted they are not in the audit/accreditation process. Typically, MRC's only formal relationship with vendors is an audit and industry self-regulatory relationship but that does not exist with Adalytics. Further, MRC has no visibility into Adalytics' processes or services they provide to customers, the rigor of their research and the relevant standards compliance of their measurement. Given all this and the fact

that Adalytics positions itself as a vendor competitive to many vendors it often writes about, MRC takes care to consider their findings, as we would with any vendor.

While Adalytics' blog posts are often extensive with screenshots and detailed analysis that includes observations that can be confirmed, Adalytics also takes care at the end of each blog post to disclaim direct conclusions, they often state they cannot quantify impact of any findings or financial harm, intent or fault along with other stated caveats and limitations (an example of this for the blog subject to this release is noted above in the Pre-Bid section). However, they often pose questions or may lead a reader to imply issues that were not confirmed directly in their work or that MRC and our audits have found at times to be based on incomplete understanding of our requirements or processes. While Adalytics has published blog posts for some time, and much of these historical and even recent posts did not intersect with MRC audits as they involved unaudited/unaccredited services or aspects of measurement, over the past few years MRC has reviewed several that have been relevant to our activities. We actively review external research and unaudited vendor collateral for continuous self-assessment of our process and requirements and often times speak to many practitioners in our industry (audited or otherwise) to do the same.

MRC does believe that Adalytics' blogs promote discussion within the industry around important issues, focus on improvement and transparency and have been leveraged by MRC to seek audited services to improve rigor and transparency. We have also used these posts and other industry research to challenge our processes and requirements and see this impact as positive.

MRC has spent considerable time and effort considering the findings of Adalytics that intersect with our audits over time as shared with and reviewed by our members, and while we believe this has had some merit in terms of pushing for further rigor and transparency, we often times see little real impact from these findings related to our requirements or processes, unlike what Adalytics or other readers of their material sometimes imply or hypothesize.

MRC will continue to work to fulfill our mission in working across the industry to standardize measurement and independently audit services that voluntarily submit to our processes against these standards with the single goal of improving the validity, reliability and effectiveness of the measurement ecosystem. This includes transparency and education as it is clear that MRC can work harder to educate the industry regarding our requirements and processes and audited services can do more to educate the industry, beyond their customers, regarding how their services work including any limitations of measurement.

If you have any questions regarding this or would like to learn more about MRC and our specific requirements, our activities or membership in MRC, please contact us at staff@mediaratingcouncil.org.

**About MRC**
The Media Rating Council is a non-profit industry association established in 1963 comprised of leading television, radio, print and digital media companies, as well as advertisers, advertising agencies and trade associations, whose goal is to ensure measurement services that are valid, eliable and effective. Measurement services desiring MRC accreditation are required to disclose to their customers all methodological aspects of their service; comply with the MRC Minimum Standards for Media Rating Research as well as other applicable industry measurement guidelines; and submit to MRC-designed audits to authenticate and illuminate their procedures.

In addition, the MRC membership actively pursues research issues they consider priorities in an effort to improve the quality of research in the marketplace. Currently approximately 110 research products are audited by the MRC. Additional information about MRC can be found at www.mediaratingcouncil.org.

**Media Contact**
Bill Daddi, DBC Brand Communications
917-620-3717
bill@daddibrand.com

#
#
#

# Exhibit 16



More...     Podcast

Login     Subscribe

Marketecture  >  Posts  >  A Colossal Mess

# A Colossal Mess

 Ari Paparo
May 20, 2024

    

No one could avoid the mess of allegations and lawsuits relating to the SSP Colossus, so we go deep on everything you need to know. And the pod this week focuses on attribution and MMM.



*Ad*

*RainBarrel is a cookieless, consented audience graph that helps advertisers interact with their best-fit customers. Digital advertising shouldn't be a black box — which is why RainBarrel was created by media buyers, for media buyers. Get started with RainBarrel audiences on DV360, The Trade Desk, LiveRamp, and more, or try out RainBarrel for free at* [rbarrel.com](http://rbarrel.com).

      1       

# IAB Tech Lab: Open RTB

For the tenth anniversary of the IAB Tech Lab we have a special series of interviews with the people responsible for the most impactful standards to come out of that organization.

Arguably the spec with he greatest economic impact has to be OpenRTB, or oRTB. Before oRTB every connection between buyer and seller was custom and cumbersome. Bill Simmons of the Trade Desk joins us to tell us how this was fixed.

*Due to the generosity of the IAB Tech Lab, these interviews will remain outside the paywall for all users.*



Watch our interview about oRTB

---

# Podcast: Ron Jacobson on attribution, MMM, and MTA



 ♡ 1  💬  ⤴

Appx. D-014

Ron is the CEO of Rockerbox, an independent attribution company. He tells us about how modern attribution is working without cookies, and what that means for *Media Mix Models* (MMM) and Multi-Touch Attribution (MTA).

Also this week we discuss Colossus (see below) and Israeli fake content farms.

Listen to the pod now:

- [Spotify](#)
- [Apple](#)
- [Anywhere you listen](#)

---

# A Colossal mess



The big ad tech news this week was about the SSP Colossus and allegations they were defrauding buyers by replacing low quality user IDs with high value ones. We discuss this at length in this week's pod, and are covering the facts below.

 ♡ 1  

This, honestly, was my first reaction.



Turns out they do exist. Colossus is an SSP focused on reaching multicultural audiences (their words, from their S1) which was acquired by Direct Digital Holdings, a public company under the ticker $DRCT. The company has both a buy-side and sell-side business, but most of the growth is coming from the SSP. According to their most recent financial filing in 2023 the SSP more than doubled in revenue to $112 million with a take rate of 13.5%.

Interestingly, DRCT is in jeopardy of being delisted after their auditor resigned and the company was unable to file timely financial statements (SEC docs). There is no indication as to why their auditor resigned or whether that is relevant in any way to this discussion.

## Adalytics report accuses of fraud

Adalytics is an independent auditor of programmatic advertising, and has been in the news over the past year for pointing out various problems, such as the well-covered existence of the "www3" version of the Forbes website (see previous newsletter).

The Adalytics report claims that the IDs being sent from Colossus to The Trade Desk ("TTD") were consistently not matching the IDs present when TTD responded to the bid request, and

 ♡ 1   💬   

report is that this behavior is a form of fraud. The report also indicates that they used TTD for convenience, and the same behavior could be present on other buyers.

It can be a little hard to get your head around what is being alleged here, so let me break it down step-by-step.

**Step 1**: Prebid loads and allows SSPs to collect data and send that data to their servers for auction. **In this step, the identity of the user is the SSP's identity, not the DSP's identity.** Even if the browser has a set cookie from TTD or another buyer, the SSP cannot read that cookie since cookies are domain specific.

**Step 2**: Colossus uses BidSwitch to manage auctions. Colossus looks up the BidSwitch ID that corresponds to the Colossus ID in a match table Colossus hosts, and sends a requests to BidSwitch with this matched ID. This is the step that could have shenanigans, since **the SSP could send BidSwitch the wrong ID, either on purpose or by accident**.

**Step 3**: BidSwitch looks up the IDs of all of Colossus' trading partners and sends auction requests to them with the buyers' IDs in the uid field. TTD at this point should be getting their own ID in the bid request, and it should, most of the time, match the ID that's actually on the user's browser.

**Step 4**: TTD's bid response is sent through and appears in the browser. In this response, TTD repeats back the uid they were sent. Here is where Adalytics is noticing the discrepancy. TTD can also detect the discrepancy because when they run the ad's code on the browser they can natively read their own ID from the browser, and see that it doesn't match.

## AdExchanger gets more context

Here's where it starts going off the rails. James Hercher of AdExchanger [covers the Adalytics report](#) and gets a lot of interesting background. The whole article is worth reading, but the highlights include:

- Colossus throws BidSwitch under the bus, says it's their fault. BidSwitch (owned by Criteo) denies this.
- Google's DV360 had previously turned off Colossus for quality issues, then turned them back on.
- TTD says they don't include Colossus in buys by default because of known quality issues but that they allow individual buyers to target. Curious.

 

SSP mentioned in the Adalytics report for more than a year,"

—TTD statement regarding Colossus

## Colossus strikes back

Living up to their brand name, Colossus wasn't going down easy. A couple of days later they filed suit against Adalytics.

Colossus also published an explainer video showing how the browser's cookie can sometimes not match the cookie returned by the bid response.

You can make your own judgement, but I spoke with several industry experts who made the case that this video is unpersuasive in multiple ways. Foremost, the video does not show any real-world context in which the browser's cookie was set in a seemingly incorrect way, nor how the server-side match tables may have been involved. Sincera CEO Mike O'Sullivan whipped up his own video showing a similar set of actions.

Meanwhile, everyone's favorite anti-fraud crusader, Dr. Fou, chimed in on Reddit saying that everything was working as expected. The masses told him he was wrong, as did I on the podcast. I also mentioned that Colossus is a client of Fou, and he corrected me to assert that they are not a client, they just get unlimited usage of his tech for free.

## Ari does some journalism

Power brokerage firm Medialink then slid into my DMs with an offer to interview the executives of Colossus. That counts as journalism in my book, so I got on the phone with Geoff Schmidt, the VP of Technology and Anu Pillai, the CTO of the holding group. Geoff indicated that he was the creator of the video in question.

I learned two interesting nuggets that had not been reported previously. First, I asked Geoff about the Google DV360 issue alluded to in the AdExchanger article. He confirmed that it happened and that they had a hard time getting a meeting with Google since they had an indirect connection through BidSwitch. He said they didn't know how to fix the issues being described by Google, so they took the drastic step of **nuking their entire cookie pool and starting over**. Apparently, that did the trick and DV360 starting buying again. This is the ad tech version of "have you tried unplugging it and then plugging it back in?"

Second, based on some chatter I had heard I asked if the company used TapAd for any "ID Bridging" type activity. (Note, throughout this whole episode we've been dealing with stable




and Anu confirmed they had experimented with TapAd, but no longer used them but instead they are currently using LiveIntent. I was unable to get any more details about how, exactly, LiveIntent is being used.

## Time to MECE this baby

*MECE = Mutually Exclusive, Collectively Exhaustive.*

Here are your options for what actually happened:

**Option 1: Nothing happened,** IDs sometimes don't match. Given this was found by Adalytics, Google and TTD, we can rule this out.

**Option 2: There's a bug in the way Colossus reads and writes cookies from the browser.** Imagine if Colossus occasionally (or regularly) writes the wrong cookie ID to the browser. This would cause their match table to mismatch to older, more valuable IDs.

**Option 3: There's a bug in the Colossus match table.** Same net effect as Option 2, and very possible. Note, the evidence for options 2 and 3 include the anecdote about how nuking the cookie database temporarily solved the DV360 problem.

**Option 4: Fraud.** Colossus is intentionally mismatching IDs in their match tables to make more money. This would be intentional fraud and is essentially what people are assuming they are doing.

**Option 5: LiveIntent.** They have an ID bridging solution in place, it could be causing ID mismatches to happen, presumably by accident.

**Option 6: BidSwitch**. The company accused BidSwitch of being the problem, but this seems extremely unlikely given the company's history and reputation.

**Option 7: TTD**. In the Reddit thread Dr. Fou seems to point the finger at TTD for buying the wrong users, but that doesn't hold water given they are operating properly in other SSPs, and given the Google problems.

After speaking with the technical leadership of the company, I did not get the impression that they were RTB masterminds. Having seen what tricky people can do to make money in this ecosystem, I just didn't get that I-worked-at-Appnexus-I-can-make-money-at-will vibe at all. As such, if I was a betting man, I would say **options 2, 3, or 5** are the most likely and that this whole shit show is the result of bugs or misconfigurations.

  ♡ 1

Appx. D-019

## Why are we still talking about this?

Mike O'Sullivan coined the phrase "ad tech Rashomon" to describe this mess since there's so much going on. The biggest story-within-a-story is why we're giving so much ink and attention to what is frankly a third-tier SSP.

According to multiple sources, the reason why Colossus remains relevant and in business is because major blue chip brands have commitments to buy from minority-owned media. These sources say that is the reason why DSPs like TTD leave them integrated for PMPs even though the quality is not up to the standards to be part of default buys. It's worth noting that you can find Colossus in the ads.txt file of major media companies like USA Today (Gannett), the NY Post (News Corp), etc. so read into the "minority owned media" thing however you'd like.

BidSwitch, meanwhile, quite reasonably turned them off. Meaning that unless they get a direct integration with TTD and others there will be a major interruption in buying and revenue for the company. I understand there is a lot of backroom discussions for the pipes to be turned on, but it isn't clear what's going to happen.

And, finally, we have the lawsuit against Adalytics, which presumably will have a discovery process that will answer all of our questions once and for all.

---

# Reading list

- Sincera found publishers are partnering with 3P vendors that generate programmatic ad revenue via paid traffic and point it to subdomains that the 3P vendors own. The vendor ContentIQ, owned by Israeli company Perion, makes it super easy to create MFA sites. MFA-as-a-Service. The other company is also an Israeli public company, Samyo News owned by Viewbix. (link)

- OpenAI releases multi-modal GPT-4o with "Her" mode and big price cuts the day before Google's IO. (link)

- Google I/O - Publishers freaking out about SGE — Search Generated Results. (link)

- Netflix plans to launch its own ad tech platform "by next year" + partner with programmatic (TTD, DV360 and Magnite named) and measurement companies (iSpot, TVIsion). (link)

- Netflix also breaks into sports rights with 3 year deal w/ NFL for Christmas Day

 

## Reply

Newest first ⌄

Add your comment...

Login

Login or Subscribe to participate.

## Keep reading



**Hot Takes from Advertising Week**



**Our 100th episode, plus some side dishes**



**Some lessons from good ad tech marketing**

Symitri is the new TrustX

  1  

**Appx. D-021**

View more ›



**Home**

Posts

Newsletters

**More...**

Marketecture.tv Interviews

The Monopoly Report

Ad Tech Explained

MarketectureMedia (About, Ads)

Po...

Po...

E...     Subscribe

  

Get Smart. Fast. Marketecture goes deep on ad tech and programmatic advertising.

© 2024 Marketecture Media, Inc..

Privacy Policy     Terms of Use

 ♡ 1  💬  ⌇

Appx. D-022

# Exhibit 17

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/the-ceo-behind-tinder-okcupid-on-the-future-of-online-dating-11545318030

BUSINESS | MANAGEMENT & CAREERS

# The CEO Behind Tinder, OkCupid on the Future of Online Dating

Match Group chief Mandy Ginsberg talks about her first year on the job, the Facebook threat and tackling loneliness through technology

By *Chip Cutter*  Follow

*Updated Dec. 21, 2018 9:52 am ET*



Match Group chief Mandy Ginsberg, shown at a conference in October, says she got her best career advice from her mother: 'If you want something, open up your mouth and ask. What's the worst thing that could happen? Someone could say no.' PHOTO: PATRICK T. FALLON/BLOOMBERG NEWS

A decade ago, when Mandy Ginsberg asked couples how they met, some would give a fictitious answer: "Oh, we met through friends." When she then revealed she worked at an online dating company, their answers shifted: "Oh, we actually met through Match," they told her.

In her nearly 13 years at Match Group Inc.,  MTCH **0.67%** ▲  where she became chief executive in January, Ms. Ginsberg has watched the stigma of online dating fade almost entirely. Today, many people even proudly pursue a multiapp dating strategy.

**Appx. D-024**

Match owns well-known dating apps including Tinder, Hinge and OkCupid, along with lesser-known brands such as PetPeopleMeet.com, devoted to single pet lovers, and LDSPlanet.com, focused on those in the Mormon Church. The Dallas-based company is expanding in Latin America, Japan, South Korea and India to tap what it estimates is a market of 600 million singles.



0:10  ADVERTISEMENT

🔊 **Click for Sound**

Ad

Mandy Ginsberg, CEO of the Match Group, which owns dating apps like Tinder and OkCupid, talks to The Wall Street Journal about the best way to run a meeting, how to say no to an executive, and juggling work and parenting. Photo: Natalia V. Osipova/The Wall Street Journal

Her first year at the helm has been an eventful one. After unsuccessfully trying to acquire the dating app Bumble, Match sued its rival last spring for infringing patents for "swiping" and other features that have made Tinder popular. Bumble called Match a "bully" and filed a $400 million lawsuit in response. Then in May, Facebook announced its entry into online dating, causing Match's stock to drop 22% in a day, although it later recovered.

Despite the competitive pressures, the online dating business "will never, ever, ever get stale," said Ms. Ginsberg, who recently sat down with The Wall Street Journal. "We need human connections. Even if we don't want them, it's this underlying craving to go seek them." Here are edited excerpts:

**The Wall Street Journal:** Are you losing a lot of sleep over the Facebook move?

**Ms. Ginsberg:** There are a lot of other things that make me lose sleep. I worry: "What's the roadmap look like? Are we innovating enough? Do we have the right

talent?"

You can't underestimate Facebook, but I do feel confident that, with Tinder, our big growth engine, people who are 21 years old are not going to be like, "Oh, I'm going to get rid of my Tinder app in order to use Facebook."

**WSJ:** Who isn't using your apps today, and where do you see the greatest potential?

**Ms. Ginsberg:** There are pockets of really interesting opportunity. For example, we launched Chispa about eight months ago, focused on the Latino community in the U.S., which has been really underserved. The biggest opportunity, frankly, is outside of the U.S. and Western Europe.

**WSJ:** How do you go about gaining users in countries with dating cultures not quite like the U.S.?

**Ms. Ginsberg:** With OkCupid, there are all these really compelling questions to get to know people. In India, those questions are different. "Paneer on pizza: Yes or no?" "Should women work after they get married?" You wouldn't ask that in the U.S. We're taking a product and making sure that it becomes much more relevant.

**WSJ:** How have your products changed in the #MeToo era?

**Ms. Ginsberg:** I'm a woman and a mom of a 20-year-old who uses dating apps. I think a lot about the safety and security, in particular, of our female users. It helps for us to have a portfolio [of matchmaking apps] because if there's bad behavior on one app, we can identify that user, we'll kick him off all the apps. I do say "him" because generally we see more bad behavior with men.

When I started this year, I thought hard about what else should we do. I kicked off a safety advisory council. Tarana Burke, who founded the [original] #MeToo movement, is on it. They've really been helpful in identifying if there are any gaps or what we should be doing differently.

**WSJ:** Match Group is more than 80%-owned by Barry Diller's IAC/InterActive Corp. What advice has he given you?

**Ms. Ginsberg:** He's a very instinctive decision-maker. He likes to get to the heart of a problem, and he pushes individuals and the team to get there. It's not always easy. He's been known for being a guy who believes in tension and challenging executives. But I think we're all for the better.

**WSJ:** What's an example of a problem you might bring to him?

**Ms. Ginsberg:** Barry Diller is [focused] around consumer delight. As we look at the Tinder roadmap and ... really think through how we create more of a lifestyle experience, it's pretty interesting to see where Barry lights up. He says, "You guys aren't understanding the psyche of the consumer." It's not necessarily that he's like, "OK, here's how you should have solved the idea." It's more about the dialogue and the discussion.

**WSJ:** What's the best career advice you ever received?

**Ms. Ginsberg:** My mother, growing up, said, "If you want something, open up your mouth and ask. What's the worst thing that could happen? Someone could say no." You have to be willing to hear no. I don't think women do it as much as men, so hopefully I will inspire other women to open up their mouth and ask.

**WSJ:** What will Match look like in 2025?

**Ms. Ginsberg:** Despite so much technology, people are more disconnected than ever. It's really important that products like ours are all about human connections and connecting people one on one. It's going to continue to happen over a cup of coffee or a glass of wine. And it should—people are lonely out there.

Video is going to play a role. Whether people ultimately meet face to face, which I hope they do, even having that connection and that video connection...is going to be really important. We need to look in each other's eyes, and we need to be able to share each other's lives, even if it's for five minutes, an hour or for five years.

**Write to** Chip Cutter at chip.cutter@wsj.com

*Appeared in the December 22, 2018, print edition as 'The Matchmaker-in-Chief'.*

**Further Reading**