# APPENDIX E

## DEFENDANTS' UNPUBLISHED CASES/AUTHORITIES
## REPLY IN SUPPORT OF MOTION TO DISMISS

| Case /Tab No. | CASE/AUTHORITY NAME | Appx. page no. |
|---|---|---|
| 28. | *Carlton v. Cannon*, 2016 WL 3959164 (S.D. Tex. July 22, 2016) | Appx. E-001-009 |
| 29. | *Colossus Media, LLC v. Adalytics Research, LLC*, 2025 WL 712986 (D. Md. Mar. 5, 2025) | Appx. E-010-019 |

# Case No. 28

Case 4:24-cv-01940   Document 46-3   Filed on 04/14/25 in TXSD   Page 3 of 20

Carlton v. Cannon, Not Reported in Fed. Supp. (2016)
2016 WL 3959164, Fed. Sec. L. Rep. P 99,239

2016 WL 3959164
United States District Court, S.D. Texas, Houston Division.

Dave CARLTON, et al., Plaintiffs,
v.
Fred CANNON, et al., Defendants.

CIVIL ACTION NO. H-15-012
|
Signed 07/22/2016

**Attorneys and Law Firms**

Nicholas Porritt, Adam Marc Apton, Levi & Korsinsky, LLP, Washington, DC, R. Dean Gresham, Gresham PC, Dallas, TX, Laurence M. Rosen, Phillip Kim, The Rosen Law Firm, P.A., New York, NY, James L. Gascoyne, Gascoyne Bullion PC, Sugar Land, TX, for Plaintiffs.

Amy Pharr Hefley, David D. Sterling, Baker Botts LLP, Elizabeth Gene Myers, N. Scott Fletcher, Jones Day, Cristina Espinoza Rodriguez, Hogan Lovells US LLP, Noelle M. Reed, Wallis Mizell Hampton, Skadden Arps et al., Houston, TX, Peter A. Spaeth, Gregory D. Chisholm, Alexandra Boudreau, Peter J. Kolovos, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, Michael G. Bongiorno, Wilmer Cutler Pickering Hale Dorr LLP, New York, NY, Jan Nielsen Little, Julia Sun Choe, Steven P. Ragland, Justina Kahn Sessions, Keker Van Nest LLP, San Francisco, CA, for Defendants.

## MEMORANDUM AND OPINION

Lee H. Rosenthal, United States District Judge

*1 Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), imposes civil liability on a person who "controls" another person who violated the federal securities laws. In its May 4, 2016 Memorandum and Opinion, the court dismissed the control-person claims against KiOR's CEO, Fred Cannon; its CFO, John Karnes; and its cofounder and majority shareholder, Vinod Khosla. The plaintiffs moved the court to reconsider its holding that they failed to allege a control-person claim against Karnes. (Docket Entry No. 124). The plaintiffs do not seek reconsideration of the court's holdings as to the claims against Cannon and Karnes under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), or the claims against Cannon and Khosla under § 20(a).

In this Memorandum and Opinion, the court amends its previous analysis to clarify the legal standard for control-person liability under § 20(a) and the application of that standard to the plaintiffs' allegations against Karnes. Although the analysis has changed, the outcome does not. The plaintiffs have not sufficiently alleged a control-person claim against Karnes, and the motion for reconsideration is denied for the reasons explained below.

**I. The Legal Standard for a Motion for Reconsideration**

The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration. *See St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997) ("[T]he Federal Rules of Civil Procedure do not recognize a general motion for reconsideration."). A court retains the power to revise an interlocutory order before entering judgment adjudicating the parties' claims, rights, and liabilities. FED. R. CIV. P. 54(b). A Rule 59(e) motion "calls into question the correctness of a judgment," *Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004) (citing *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)); a motion that asks the court to change an order or judgment is generally considered a motion to alter or amend under Rule 59(e), *T-M Vacuum Products, Inc. v. TAISC, Inc.*, No. 07-cv-4108, 2008 WL 2785636, at *2 (S.D. Tex. July 16, 2008).

A Rule 59(e) motion " 'must clearly establish either a manifest error of law or fact or must present newly discovered evidence' and 'cannot be used to raise arguments which could, and should, have been made before the judgment issued.' " *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). Changing an order or judgment under Rule 59(e) is an "extraordinary remedy" that courts use sparingly. *Templet*, 367 F.3d at 479; *see also* 11 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2810.1 at 124 (2d ed. 1995). The Rule 59(e) standard "favors denial of motions to alter or amend a judgment." *S. Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993). A motion to reconsider may not be used to relitigate matters, raise arguments, or submit evidence that could have been presented before the judgment or order was entered. 11 WRIGHT & MILLER § 2810.1 at 127–28 (footnotes omitted).

**II. Analysis**

Case 4:24-cv-01940   Document 46-3   Filed on 04/14/25 in TXSD   Page 4 of 20

Carlton v. Cannon, Not Reported in Fed. Supp. (2016)
2016 WL 3959164, Fed. Sec. L. Rep. P 99,239

**\*2** The court's May 4, 2016 Memorandum and Opinion held that the plaintiffs' allegation that Cannon violated § 10(b) was sufficient to avoid dismissal. The plaintiffs argue that because they adequately alleged Cannon's individual primary liability, they also adequately alleged KiOR's corporate liability under respondeat superior. If KiOR is the "controlled" entity, the plaintiffs reason, Karnes is secondarily liable for KiOR's primary violation because he had the power as CFO to "control" the company. The plaintiffs contend that the court was wrong in holding that "Karnes could not be liable under Section 20(a) of the Exchange Act because he had not committed a primary violation under Section 10(b)...." (Docket Entry No. 125 at p. 12). The court's statement that "Karnes is not liable under § 10(b), so he cannot be liable under a control-person theory," is the basis for the motion to reconsider. (Docket Entry No. 113 at p. 92).

The court agrees that this statement is not well-phrased. The court agrees that Karnes himself need not have committed a primary violation as a prerequisite to control-person liability under § 20(a). A more accurate and precise statement would be that Karnes is not liable for either a primary violation of § 10(b) of the Exchange Act or liable as a control person. While the court wrongly stated the basis for control-person liability, that error does not change the outcome.

The defendants present three arguments in response to the plaintiffs' motion. The first is that the plaintiffs waived their control-person claim against Karnes based on KiOR's primary violation. The second is that even if the plaintiffs did not waive this claim, KiOR's corporate liability is secondary and control-person liability cannot be based on a secondary violation. Finally, the defendants argue that the third amended complaint does not allege that Karnes had the power to, or did, control KiOR.

Each of these arguments is addressed below.

### A. Waiver

A motion for reconsideration "cannot be used to raise arguments which could, and should, have been made before the judgment issued. [Nor can it] be used to argue a case under a new legal theory." *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (quotation marks omitted); *see also Williams v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 470 Fed.Appx. 309, 313 (5th Cir. 2012) (per curiam). The first question is whether the plaintiffs timely asserted a control-person claim against Karnes based on KiOR's primary liability, or whether they changed the basis for imposing control-person liability on Karnes after the court ruled on the motion to dismiss, waiving the claim by failing to assert it earlier.

In their third amended complaint, the plaintiffs alleged that "[t]hroughout the class period, the individual defendants exercised their power and authority to cause KiOR to engage in the wrongful acts complained of herein. The individual defendants therefore were 'controlling persons' of KiOR within the meaning of Section 20(a) of the Exchange Act." (Docket Entry No. 86 at ¶ 241). In their response to the motion to dismiss, however, the plaintiffs did *not* argue that KiOR had committed a primary violation or explain that Karnes faced § 20(a) liability based on his control over KiOR. Rather, the plaintiffs argued that because their third amended complaint "supported a claim against Cannon and Karnes under Section 10(b) of the Exchange Act, Cannon's and Karnes's motions to dismiss the Section 20(a) claim must be denied." (Docket Entry No. 97 at p. 62). In their motion for reconsideration, by contrast, the plaintiffs argue that because "KiOR is a primary violator" and that because "Karnes controlled KiOR," Karnes is subject to control-person liability. (Docket Entry No. 125 at p. 9–10).

The record shows that the plaintiffs changed their theory of liability in the motion for reconsideration. Although the plaintiffs' third amended complaint alleged control-person liability against Karnes based on KiOR's primary violation, the plaintiffs did not raise or brief that issue in responding to the motion to dismiss. A party waives claims it fails to raise or brief. *United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010). The plaintiffs' brief in response to Karnes's motion to dismiss did not argue or point to record or case-law support for the proposition that Karnes was liable as a control person for KiOR's primary violation. As a result, neither Karnes's reply brief nor the court's Memorandum and Opinion addressed that argument.

**\*3** A motion for reconsideration cannot be used to advance a new legal theory that could have been raised before the court ruled. The motion for reconsideration can be denied on that basis. The court will, however, also address the merits of the plaintiffs' arguments, which provide independent grounds for denying reconsideration.

### B. The Legal Standard for Control-Person Liability
Section 20(a) provides:

Case 4:24-cv-01940    Document 46-3    Filed on 04/14/25 in TXSD    Page 5 of 20

Carlton v. Cannon, Not Reported in Fed. Supp. (2016)
2016 WL 3959164, Fed. Sec. L. Rep. P 99,239

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). A control-person claim requires sufficient factual allegations that a "controlled" individual or entity violated the securities laws and that the defendant had the power to "control" that individual or entity. The legal standard for each requirement is addressed below.

### 1. Who Can Be "Controlled"?

"Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2003). Although the Fifth Circuit has not directly addressed the issue, other courts hold that the primary violator can be a corporation and need not be named in the same action against the defendant allegedly subject to control-person liability. *In re Supreme Specialties, Inc., Sec. Litig.*, 438 F.3d 256, 285 (3d Cir. 2006), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, L.T.D.*, 551 U.S. 308 (2007) ("[T]here is no requirement in the language of [§ 20(a) ] that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants.");*Kemmerer v. Weaver*, 445 F.2d 76, 78 (7th Cir. 1971) (control-person liability adequately alleged based on a primary violation by a nondefendant, since-dissolved association); *In re Hayes Lemmerz Int'l, Inc.*, 271 F. Supp. 2d 1007, 1021 n.11 (E.D. Mich. 2003) ("[I]f the complaint states a primary violation by the Company, even if the Company is not named in the complaint as a defendant, then a § 20 claim can stand if the individuals were controlling persons.").

Courts have also held that the Bankruptcy Code's automatic-stay provision, 11 U.S.C. § 362(a)(1), does not prevent a plaintiff from asserting a control-person claim when the primary violator, as here, is a corporation in bankruptcy. *In re Thornburg Mortg., Inc., Sec. Litig.*, 824 F. Supp. 2d 1214, 1279 (D. N.M. 2011) (collecting cases).[1] The courts reason that the "liability of the primary violator is simply an element of proof of a section 20(a) claim, and...liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong." *In re CitiSource, Inc., Sec. Litig.*, 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988). As one district court in this circuit has explained, "nothing in familiar and conceptually related attribution principles such as conspiracy membership, agency, or aider and abettor, demands a visiting of actual liability upon an active wrongdoer as a condition to an attribution of that liability." *Keys v. Wolfe*, 540 F. Supp. 1054, 1062 (N.D. Tex. 1982) (Higginbotham, J.), *rev'd in part on other grounds,* 709 F.2d 413 (5th Cir. 1983).

---

[1] For example, at least three circuit courts have allowed § 20(a) claims to proceed against individual defendants based on primary violations by a corporation subject to the automatic stay. *See, e.g.*, *In re Suprema*, 438 F.3d at 285–86; *In re Stone & Webster, Inc., Sec. Litig.*, 424 F.3d 24, 27 (1st Cir. 2005); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1059–60, 1065–66 (9th Cir. 2000).

### 2. Who Has "Control"?

**\*4** "The legislative history of [§ 20(a) ] demonstrates that Congress enacted [that] section[ ] to address the specific evil of persons seeking to evade liability under the [securities laws] by organizing 'dummies,' that, acting under their control, would commit the prohibited acts." *Paul F. Newton & Co. v. Tex. Commerce Bank*, 630 F.2d 1111, 1118 (5th Cir. 1980). In keeping with the "remedial purpose of the federal securities acts," *id.* at 1119, the SEC has interpreted the term "control" broadly to include "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise," 17 C.F.R. § 230.405.

Case 4:24-cv-01940 Document 46-3 Filed on 04/14/25 in TXSD Page 6 of 20

Carlton v. Cannon, Not Reported in Fed. Supp. (2016)
2016 WL 3959164, Fed. Sec. L. Rep. P 99,239

In the Fifth Circuit, alleging and proving control-person liability does not require pleading facts that would show the control person's "participation in the wrongful transaction." *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981).[2] At the same time, "status alone will not automatically cause [a defendant] to be deemed a...controlling person." *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). The precise legal standard remains somewhat unclear. Among other questions, the Fifth Circuit has asked whether the defendant:

- had "effective day-to-day control" of the corporation, *Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187, 195 (5th Cir. 1979), *modified on other grounds on panel reh'g*, 611 F.2d 105 (5th Cir. 1980) (per curiam);

- had "the requisite power to directly or indirectly control or influence corporate policy," *Thompson*, 636 F.2d at 958;

- had "actual power or influence over the controlled person," *Dennis*, 918 F.2d at 509;[3] or

- "actual[ly] exercise[d]...that power," *Abbot v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1993) (declining to establish a controlling legal standard); *see also Heck v. Triche*, 775 F.3d 265, 283 n.18 (5th Cir. 2014) (same).

2   *But see, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (requiring culpable participation); *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 885 (3d Cir. 1975) (same).

3   *Dennis* also stated that a plaintiff must show that the defendant "induced or participated in the alleged violation." 918 F.2d at 509. As a later Fifth Circuit panel recognized, this holding conflicts with the circuit's earlier decision in *Thompson*, which rejected an actual-participation requirement. *Abbot v. Equity Grp., Inc.*, 2 F.3d 613, 620 n.18 (5th Cir. 1993). Under the prior-panel-precedent rule, the court must follow *Thompson* to the extent *Dennis* is inconsistent. *Smith v. GTE*, 236 F.3d 1292, 1300 n.8 (5th Cir. 2001) ("[T]he holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court.").

The circuits have offered additional, varying approaches. *Metge v. Baehler*, 762 F.2d 621 (8th Cir. 1985), set out the most widely cited test. A plaintiff must show that the defendant: (1) "actually participated in (i.e., exercised control over) the operations of the corporation in general" and (2) "possessed the power to control the specific transaction or activity upon which the primary violation is predicated," even though "he need not prove that this later power was exercised." *Id.* at 631 (quotation marks omitted). The Fifth Circuit has repeatedly declined to address the extent to which its case law fits within *Metge*'s framework or whether it has adopted either or both of *Metge*'s prongs. *Heck v. Triche*, 775 F.3d 265, 283 n.18 (5th Cir. 2014);*Abbot v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1993).[4]

4   A court in this district has held that neither Fifth Circuit precedent nor the large size of modern corporations supported applying *Metge*'s first prong because it is "unlikely...that any single individual would have control of every particular division or engagement" of a "large, complex" firm. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. 01-cv-3624, 2003 WL 230688, at *17–18 (S.D. Tex. Jan. 28, 2003).

**\*5** Whatever control-person liability demands beyond a defendant's corporate status but short of culpable participation in the primary violation, a plaintiff "must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck*, 775 F.3d at 283 (quoting *Meek v. Howard, Weil, Laboisse, Friedrichs, Inc.*, 95 F.3d 45, at *3 (5th Cir. 1996) (per curiam) (unpublished)). The Fifth Circuit case law demonstrates that the ability-to-control requirement plays an important role in § 20(a) liability.

The Fifth Circuit has found support for a control-person claim when the defendant's role gave him the power to control the fraudulent transaction or activity. In *Thompson*, for example, the plaintiff sued several officers, directors, and shareholders in a mortgage-loan-marketing company. 636 F.2d at 949. The Fifth Circuit considered whether the district court erred in failing to grant a director-defendant's motion for judgment as a matter of law dismissing the control-person claim. Because the evidence showed that the defendant "was not only a 24% stockholder and an officer and director, but was apparently involved in the day-to-day coordination of the loan gathering,"—the conduct forming the basis for the primary violation—the Fifth Circuit held that the plaintiff had

Case 4:24-cv-01940 Document 46-3 Filed on 04/14/25 in TXSD Page 7 of 20

Carlton v. Cannon, Not Reported in Fed. Supp. (2016)
2016 WL 3959164, Fed. Sec. L. Rep. P 99,239

"established that [the defendant] had the requisite power to directly or indirectly control or influence corporate policy." *Id.* at 958.

*Heck v. Triche*, 775 F.3d 265 (5th Cir. 2014), the Fifth Circuit's most recent discussion of control-person liability, is similar.[5] The primary violator in *Heck* was the CEO of an antique-investment firm who issued allegedly misleading prospectuses to raise money from private investors. The control-person defendant was a certified public accountant who helped draft the prospectuses. *Id.* at 268. The Fifth Circuit found a sufficient basis to support control-person liability. *Id.* at 282–84. The court reasoned that the CEO "was dependent" on the defendant "to get him out of debt," that the defendant "contributed and approved the financial concepts detailed in the prospectus," and that the CEO "checked in with [the defendant] after every investment." *Id.* at 284. The court concluded that "[t]he evidence permit[ted] a finding that [the defendant] effectively controlled [the CEO] in the creation of [the company], drafting the relevant portions of the [company's] pool document, soliciting loans from investors, and pledging of [the company's] inventory...." *Id.*

[5] Although the claim in *Heck* arose under Louisiana state law, the Fifth Circuit construed the Louisiana and the federal control-person statutes in a parallel fashion. *See* 775 F.3d at 283.

When the Fifth Circuit has found insufficient support for a control-person claim, the defendant's role put the fraudulent transaction or activity outside his ability to control. In *Dennis*, for example, the record showed that one defendant "owned a minority position" in the corporation, another was a director who "had no knowledge" of the allegedly fraudulent operations, and a third was a "nominal shareholder" who had "tried numerous times to obtain information concerning the [allegedly fraudulent] financial conduct...but was always rebuffed." *Dennis*, 918 F.2d at 509–10. The circuit court affirmed summary judgment for the defendants dismissing the control-person claims against them. *Id.*

*Abbot v. Equity Group, Inc.*, 2 F.3d 613 (5th Cir. 1993), is similar. The plaintiffs asserted control-person claims against a surety corporation and a bonding-agent corporation based on their participation in allegedly fraudulent financial transactions. The primary violator was a partnership formed to operate a Houston apartment community. The court granted the two defendants summary judgment dismissing the control-person claims. The evidence showed that neither they "nor their respective employees and representatives were stockholders, directors, officers, employees, or partners of [the primary-violator corporation]; they did not attend its board or committee meetings; they were not involved in decisions by [the primary violator] to purchase properties for syndications to investors; they were not involved in operations of properties purchased by [the primary violator] or its affiliates; and they were not otherwise involved in the general operations of [the primary violator], including business, financial and marketing plans." *Id.* at 620. The court rejected the argument that the defendant companies could be liable as control persons because their participation was essential to financing the allegedly fraudulent transactions. That evidence did not show an ability to control the primary violator and was not "probative of [the defendants'] influence beyond the [allegedly fraudulent] transaction" at issue. *Id.* at 620–21.

**\*6** *Meek* is another similar case. The court granted the two brokerage-firm defendants summary judgment on the control-person claims because the evidence did not show their ability to control the specific fraud the primary-violator broker allegedly perpetrated. 95 F.3d at \*3. Although the record showed that the brokerage firms "had influence over [the broker's] commodities trading," it did not show that the firms "had anything to do with [the broker's] handling of the [plaintiffs'] securities investments, or any power to control his handling of those investments." *Id.*

Based on this case law, the question is whether the plaintiffs have "at least [alleged facts] show[ing] that [Karnes] had an ability to control the specific transaction or activity upon which the primary violation is based." *See id.* at 283.

### C. Discussion

#### 1. The Interplay Between Control-Person and Respondeat Superior Liability

Karnes argues that because KiOR's respondeat superior liability is itself a form of secondary liability, it cannot be the basis for a control-person claim, which requires a primary violation. Section 20(a) does not require the "controlled" person to have committed a "primary," as opposed to a "secondary," violation. The statute merely states that a "controlled" person may be "any person liable under any provision of this chapter." 15 U.S.C. § 78t(a). Nor does the case law support the distinction Karnes advocates. The

Case 4:24-cv-01940   Document 46-3   Filed on 04/14/25 in TXSD   Page 8 of 20

Carlton v. Cannon, Not Reported in Fed. Supp. (2016)
2016 WL 3959164, Fed. Sec. L. Rep. P 99,239

Supreme Court has made clear that "[a]ny person *or entity*... may be liable *as a primary violator* under Section 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) (emphasis added). The Fifth Circuit has rejected the argument that § 20(a) "exclude[s] the application of common law agency principles such as respondeat superior." *Newton*, 630 F.2d at 1114.

If, as Karnes argues, respondeat superior liability cannot give rise to a control-person claim, that would shield from § 20(a) liability any defendant alleged to have controlled a corporation liable under § 10(b). This conclusion follows from the fact that a corporation "can conduct its affairs only through its officers and employees." *Holmes v. Bateson*, 583 F.2d 542, 560 (1st Cir. 1978). "One of the cornerstones of corporate law is that a corporation is responsible for the acts and omissions of its agents, officers, and employees acting under the corporate manner." *Id.*; *see also* RESTATEMENT (THIRD) OF AGENCY § 2.04 (respondeat superior makes an employer "subject to liability for torts committed by employees while acting within the scope of their employment."). And respondeat superior "long has been applied to impose...liability in federal securities and criminal cases even where the principal itself has committed no primary violation." *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550 (S.D.N.Y. 2007).

A primary violation of the Exchange Act occurs when "any *person*, directly or indirectly ...use[s] or employ[s], in connection with the purchase or sale of any security...any manipulative or deceptive device." 15 U.S.C. § 78j(b) (emphasis added). A "person" is "a natural person, *company*, government, or political subdivision, agency, or instrumentality of a government." 15 U.S.C. § 78c(a)(9) (emphasis added). As a result, "[i]n order for a company to be liable as a 'person' under Section 10(b), agency liability must be recognized, because an entity can only act through its agents." *Alvarado v. Morgan Stanley Dean Witter, Inc.*, 448 F. Supp. 2d 333, 338 (D. P.R. 2006). When a primary violator's conduct is attributed to a corporation under respondeat superior, the Fifth Circuit has treated that corporation as a primary violator. *Southland*, 365 F.3d at 383. Other circuits' case law is consistent. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003); *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001).

**\*7** Karnes relies on the Fifth Circuit's decision in *Newton* to argue that respondeat superior liability cannot support a control-person claim. The *Newton* court held that "common law agency principles, including the doctrine of respondeat superior, remain viable in actions brought under the Securities Exchange Act and provide a means of imposing secondary liability for violations of the [Exchange] Act independent of § 20(a)." 630 F.2d at 1118. These two liability theories are complementary, not contradictory. "Under respondeat superior liability it is the employing organization that is liable. Whereas, under control person liability, responsibility can be imposed upon the supervisor of the primary participant, even though the supervisor is not the employing organization." JAMES D. COX & THOMAS LEE HAZEN, 2 TREATISE ON THE LAW OF CORPORATIONS § 12:9 (3d ed. 2015). Recognizing this distinction, the *Newton* court reasoned that Congress enacted § 20(a) to reach those corporate officers on "whom agency law or other common law principles would not [otherwise] impose liability." *Newton*, 630 F.2d at 1118; *see also In re Villa*, 261 F.3d 1148, 1153 (11th Cir. 2001) (citing *Newton* and concluding that "corporate officers and directors, persons who are presumptively beyond the reach of respondeat superior, may be caught in the net of § 20(a)" (footnote omitted)).

This court found that the plaintiffs' third amended complaint adequately alleged Cannon's primary violation. KiOR may be liable "with respect to those same...statements, as having respondeat superior liability for those violations by [Cannon]." *See Southland*, 365 F.3d at 383. But even if KiOR is a "controlled" entity under § 20(a), the plaintiffs must also sufficiently allege that it was Karnes who had the power to "control" KiOR in order to allege control-person liability against him.

### 2. Whether the Plaintiffs' Allegations Show That Karnes Controlled KiOR

The court's May 4, 2016 Memorandum and Opinion identified Cannon's statements about how the Columbus plant operated from November 2012 to January 2014 as giving rise to liability under § 10(b). Cannon made these statements on earnings calls and in press releases. The plaintiffs' theory was that Cannon misrepresented the severity of the problems at the Columbus plant by downplaying them as normal "start-up" issues that did not implicate KiOR's core technology or impede the plant's ability to operate at commercial scale. (Docket Entry No. 97 at p. 8). The theory was that

Case 4:24-cv-01940 Document 46-3 Filed on 04/14/25 in TXSD Page 9 of 20

Carlton v. Cannon, Not Reported in Fed. Supp. (2016)
2016 WL 3959164, Fed. Sec. L. Rep. P 99,239

Cannon misled investors into believing that KiOR "was a viable business" when it was not. (*Id.*). Although respondeat superior imputes Cannon's wrongful conduct to KiOR, the plaintiffs must still plead facts sufficient to allege that Karnes had "an ability to control the specific transaction or activity upon which the primary violation is based." *Heck*, 775 F.3d at 283.

The plaintiffs have not alleged facts showing or supporting an inference that Karnes, the company's CFO, had the ability to control what KiOR, acting through its agents, said in press releases or on earnings calls about plant operations or company technology. Nor do the pleadings allege facts that show or support the inference that Karnes had the ability to control Cannon's allegedly misleading statements that gave rise to his and KiOR's liability under § 10(b). The plaintiffs have not alleged that Karnes was involved in overseeing the Columbus plant operations or responsible for developing or monitoring the technology or its implementation, much less that he had the power to control Cannon's or KiOR's public statements about those topics or areas.[6]

[6] The court's dismissal of the § 20(a) claims against Khosla, the majority shareholder, is consistent with this analysis. As the court explained in its Memorandum and Opinion, even if Khosla was heavily involved in KiOR's affairs, without factual allegations showing or supporting an inference that he had the ability to control the press-release and earnings-call statements giving rise to § 10(b) liability, the control-person claims against him fail.

The plaintiffs stress Karnes's role as a high-ranking corporate officer and his participation in the day-to-day operations of the company. (Docket Entry No. 125 at p. 11). The plaintiffs appear to suggest that because KiOR is the "controlled" entity, and because it may be liable under respondeat superior, alleging Karnes's general participation in corporate governance is enough. The case law makes clear that "status alone will not automatically cause [a defendant] to be deemed a ...controlling person," *Dennis*, 918 F.2d at 509. General allegations about day-to-day participation in corporate affairs are insufficient to allege the ability to control the "*specific*" transaction identified as the basis for primary liability. *See Heck*, 775 F.3d at 283 (emphasis added); *see also Metge*, 762 F.2d at 631 (requiring both actual participation in corporate affairs and "the power to control the specific transaction or activity upon which the primary violation is predicated" (quotation marks omitted)).

**\*8** The plaintiffs also argue that Karnes is liable as a control person because he had a "duty" to "correct promptly any public statements issued by KiOR which had become materially false or misleading." (Docket Entry No. 125 at p. 11). Section 20(a) liability is based on the power to control, not on a duty to correct. Even if Karnes had this duty, and breached it, that does not show that he had the ability to control Cannon's statements, imputed to KiOR, that violated § 10(b).

The plaintiffs cite two district court cases, but each is different and distinguishable. In *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705 (N.D. Tex. 2008), the court held that the plaintiffs had sufficiently alleged a control-person claim against a company's internal director. This director allegedly reviewed the company's financial statements and internal accounting controls during the relevant period. The company was the primary violator liable under § 10(b) for failing to disclose related-party transactions. The plaintiffs alleged that the defendant was the "independent director and chair" of the audit committee "charged with reviewing and approving all related-party transactions" when the failure to disclose occurred. *Id.* at 716. The allegations pleaded facts showing the defendant's "ability to control the specific transaction or activity upon which the primary violation [was] based." *Heck*, 775 F.3d at 283.

*In re TETRA Technologies, Inc., Securities Litigation*, No. 08-cv-965, 2009 WL 6325540 (S.D. Tex. July 9, 2009), *aff'd on reh'g*, 2009 WL 6326865 (S.D. Tex. Aug. 10, 2009), is similar to *Zagami*. The plaintiffs asserted a control-person claim against a corporate officer. The primary violator, the company, was liable under § 10(b) for "misstatements that insurance costs would be reimbursed when they knew that the insurance claims had already been denied." *Id.* at \*2. The court held that the plaintiffs had stated a control-person claim because they had sufficiently alleged the defendant's "involvement and supervision of the insurance claims" and "control over the insurance receivables situation." *Id.* at \*1.

In *Zagami* and *TETRA*, the complaints plausibly alleged a control-person claim based on facts showing or supporting an inference that the control-person defendant had the power to control the conduct forming the basis of the § 10(b) violation. The allegations here, by contrast, show a CFO who had neither the power to control the type of statements alleged to be misleading nor the specific statements that gave rise to

Case 4:24-cv-01940   Document 46-3   Filed on 04/14/25 in TXSD   Page 10 of 20
**Carlton v. Cannon, Not Reported in Fed. Supp. (2016)**
2016 WL 3959164, Fed. Sec. L. Rep. P 99,239

Cannon's and KiOR's § 10(b) liability. The plaintiffs have not alleged a basis to impose control-person liability on Karnes.

### III. Conclusion

The motion for reconsideration is denied. (Docket Entry No. 124).

SIGNED on July 22, 2016, at Houston, Texas.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3959164, Fed. Sec. L. Rep. P 99,239

---

**End of Document**     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 29

2025 WL 712986
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

COLOSSUS MEDIA, LLC

v.

ADALYTICS RESEARCH, LLC

Civil Action No. DKC 24-1402
|
Filed March 5, 2025

**Attorneys and Law Firms**

Ava E. Lias Booker, Melissa O. Martinez, McGuireWoods LLP, Baltimore, MD, Daniel P. Withers, I, Pro Hac Vice, McGuireWoods, LLP, Dallas, TX, Lucy Jewett Wheatley, Pro Hac Vice, McGuireWoods LLP, Richmond, VA, Robert Muckenfuss, Pro Hac Vice, McGuireWoods LLP, Charlotte, NC, for Colossus Media, LLC.

Koushik Bhattacharya, Schulman Bhattacharya, LLC, North Bethesda, MD, for Adalytics Research, LLC.

**MEMORANDUM OPINION**

DEBORAH K. CHASANOW, United States District Judge

 *1  Presently pending and ready for resolution in this false advertising and defamation case brought by Plaintiff Colossus Media, LLC ("Colossus" or "Plaintiff") against Defendant Adalytics Research, LLC ("Adalytics" or "Defendant") is the motion to dismiss filed by Defendant. (ECF No. 19). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be denied.

**I. Background** [1]

[1] The following facts are set forth in the amended complaint and construed in the light most favorable to Plaintiff.

Plaintiff "is a sell-side platform ("SSP") that provides advertisers of all sizes a programmatic advertising platform that automates the sale of ad[vertisement ("ad")] inventory between advertisers and agencies leveraging proprietary technology." (ECF No. 9 ¶ 1). Plaintiff's parent company is Direct Digital Holdings, Inc. ("DRCT"). (ECF No. 9 ¶ 1).

"Publishers auction advertising space on their websites through SSPs like Colossus SSP. Large brands and other advertisers buy advertising space through DSPs [demand side platforms]." (ECF No. 9 ¶ 11). Plaintiff "transacts with DSPs to deliver ad inventory to target audiences. Advertisers want to ensure that their ads are going to their respective target audiences. To ensure that ads are served to the buyer's target audience, SSPs and DSPs use cookie-based user IDs to identify, track, and categorize consumers." [2] (ECF No. 9 ¶ 12).

[2] Plaintiff provides the following example to illustrate this technical process:
> Person A visits ESPN's website on his laptop. Person A is associated with a sports audience segment, and the internet browser declares a user ID for Person A that is sent to an SSP. The advertising space on the ESPN webpage that Person A is viewing is effectively for auction or sale, and the SSP sends a request for bids on that ad space to a DSP. To send the bid request, the SSP matches Person A's user cookie ID with a DSP user ID within the parameters of the DSP's targeted sports audience segment. Based on the match between the SSP user ID and the corresponding DSP user ID within the targeted sports segment, the DSP then bids on the ad space on behalf of the brand. The brand's ad then appears on the ESPN website that Person A is viewing.

(ECF No. 9 ¶ 12).

Plaintiff alleges that this process happens "extremely quickly-in less than half a second-and on a massive scale." (ECF No. 9 ¶ 13). Plaintiff transacts with several DSPs, some directly and others indirectly. (ECF No. 9 ¶ 14). The majority of Plaintiff's "business comes from transactions with DSPs that Colossus SSP sends through ... [a company called] BidSwitch, an intermediary that helps connect SSPs with DSPs." (ECF No. 9 ¶ 14). When Plaintiff used an intermediary such as BidSwitch, "there is an additional layer of ID matching." (ECF No. 9 ¶ 14).

One of the DSPs Plaintiff transacts with through BidSwitch is a DSP called The Trade Desk ("Trade Desk"). (ECF No. 9 ¶ 14). Plaintiff describes this process as follows:

**\*2** [W]hen Person A visits the ESPN website, and the browser-declared user cookie ID for Person A is associated with a sports segment and sent to Colossus SSP, instead of matching Person A's user cookie ID with a DSP user ID such as a Trade Desk ID ("TDID"), Colossus SSP matches the user cookie ID with a BidSwitch ID. BidSwitch then matches the BidSwitch user ID with a user ID on the DSP side. This matched user ID on the DSP side may or may not be a TDID depending on which DSPs BidSwitch decides to send the bid request to. Colossus SSP has no control or knowledge of the DSPs to which BidSwitch sends a particular bid request, the DSP user IDs, or the value of any particular DSP user ID.

(ECF No. 9 ¶ 14).

Plaintiff alleges that Defendant "is a for-profit company that purports to conduct advertising analytics to serve brands and advertisement buyers." (ECF No. 9 ¶ 16). "Adalytics provides so-called analysis on digital advertising performance and advertising technology vendors, publishers, and campaigns that improperly serve advertisements. Advertisement buyers pay Adalytics for information on ad technology vendors and publishers that improperly serve their advertisements." (ECF No. 9 ¶ 17). Plaintiff alleges that Defendant "acknowledges that its posts are generated to advertise its services, stating: 'Like many other companies, we release thought leadership on systemic issues affecting brands and their media investments ... to ... attract new clientele.' " (ECF No. 9 ¶ 18).

Plaintiff further alleges that "Adalytics' business thrives on creating distrust between advertiser buyers and advertising technology vendors and products. Adalytics is known for publishing inflammatory blog posts regarding advertising technology vendors and products for the purpose of winning new advertiser customers." (ECF No. 9 ¶ 19).

In May 2024, several reporters reached out to Plaintiff about an advance copy of a blog post about Plaintiff the reporters received from Defendant. (ECF No. 9 ¶ 20). "Based on the limited information that the reporters provided to Colossus SSP about the post, Colossus SSP knew that Adalytics' post contained false and inaccurate information about Colossus SSP." (ECF No. 9 ¶ 20).

Plaintiff contends that Plaintiff and its parent company reached out to Defendant on May 8 and May 9, 2024, to tell Defendant that its post "contained false and inaccurate statements." (ECF No. 9 ¶ 21). Plaintiff and its parent company asked for a copy of the post to allow Plaintiff to give Defendant information to correct these false statements. (ECF No. 9 ¶ 21). Plaintiff and its parent company also notified Defendant "that they were prepared to provide all the facts and information establishing Adalytics' post was false." (ECF No. 9 ¶ 21). Plaintiff alleges that Defendant refused to provide Plaintiff with a copy of the post prior to publishing it, and Defendant also refused to speak with Plaintiff before Defendant published the post. (ECF No. 9 ¶ 22).

On May 10, 2024, Defendant published the blog post: "Are user IDs declared consistently in ad auctions?" on its website. (ECF No. 9 ¶ 23). Plaintiff contends that "[t]he post makes false and misleading statements about Colossus SSP and its business to instill distrust of Colossus SSP and other ad technology products among ad buyers and other ad technology vendors for the purpose of winning new business from ad buyers." (ECF No. 9 ¶ 23). Plaintiff alleges that "[t]he post portrayed Colossus SSP as mis-declaring user IDs in its bid requests for the purpose of selling ad space at higher prices to ad buyers seeking to serve advertisements to a targeted audience." (ECF No. 9 ¶ 24). Specifically, Plaintiff alleges that:

[i]n the post, Adalytics purported to analyze and compare advertisements and bid responses on the Trade Desk DSP through 16 different SSPs, including Colossus SSP, in order to match the TDID declared by the SSP in its bid request and the actual cookie TDID stored in the user's browser. The post concluded that Colossus SSP is the only SSP for which there were consistent misdeclarations of user IDs —that is, the TDID declared by Colossus SSP in its bid request did

not match the user's actual cookie TDID. The post further concluded that for the other fifteen SSPs, the TDID declared by the SSP "always perfectly" matched the user's actual cookie TDID.

**\*3** (ECF No. 9 ¶ 25).

Plaintiff contends that these statements "are false and misleading" because Plaintiff "does not mis-declare or otherwise manipulate or alter user IDs in its bid requests." (ECF No. 9 ¶ 26). Plaintiff alleges that "it is not possible for Colossus SSP to mis-declare a user's TDID because Colossus SSP connects to Trade Desk through BidSwitch and has no control or knowledge of whether BidSwitch sends a particular bid request to Trade Desk or another DSP." (ECF No. 9 ¶ 26). Further, "[e]ven if BidSwitch sends a bid request to Trade Desk, Colossus SSP has no knowledge of the TDIDs or the values associated with those TDIDs." (ECF No. 9 ¶ 26).

Although Defendant's post acknowledged that Plaintiff "connected to Trade Desk through BidSwitch," the post "concluded that the mis-declared user TDIDs in Colossus SSP's bid requests were unrelated to BidSwitch." Additionally, the amended complaint alleges that the post falsely found that for the other fifteen SSPs that transact with Trade Desk that Defendant studied,

> the TDID declared by the SSP in its bid response 'always perfectly' matched the TDID in the user's browser. The post further stated that there were no technical explanations for the mis-declared user IDs in Colossus SSP bid requests, furthering the post's false, defamatory, and disparaging conclusion that Colossus SSP mis-declared user TDIDs.

(ECF No. 9 ¶ 27). Additionally, Plaintiff alleges that "[t]he post falsely defines Colossus SSP's activity as 'Sophisticated Invalid Traffic' or '[c]ookie stuffing, recycling or harvesting (inserting, deleting or misattributing cookies thereby manipulating or falsifying prior activity of users).' " (ECF No. 9 ¶ 32).

Plaintiff contends that "there were discrepancies between the TDID sent in the bid response and the TDID in the user's browser for transactions between Trade Desk and other SSPs that connect to Trade Desk through an intermediary." (ECF No. 9 ¶ 28). Plaintiff alleges upon information and belief Defendant "doctored" a screenshot in its post to illustrate a lack of discrepancies for a different SSP. (ECF No. 9 ¶¶ 29-30).

Plaintiff alleges upon information and belief that Defendant "actively worked to amplify these false statements in the marketplace in an attempt to destroy Colossus SSP's business and reputation." (ECF No. 9 ¶ 31). Plaintiff alleges that Defendant acted with knowledge because "[a]s a company that claims expertise in advertising technology and programmatic advertising, Adalytics would be well aware that Colossus SSP, because its transactions occur within fractions of a second and go through an intermediary, could not systematically 'fake' TDIDs to generate more revenue, as the Adalytics post states and/or implies." (ECF No. 9 ¶ 33).

Plaintiff contends that Defendant acted with malice by distributing the post to the media without asking Plaintiff for an explanation. (ECF No. 9 ¶ 35). Plaintiff alleges that this demonstrated that Defendant's "only goal was to spark demand for its 'ad transparency' services by creating a media firestorm" about Plaintiff. (ECF No. 9 ¶ 35).

**\*4** Several media outlets published articles based on Defendant's post. Plaintiff contends that the "articles further demonstrate the defamatory meaning of the Adalytics post: that Colossus SSP misdeclared user IDs in its bid requests for the purpose of increasing its sales." (ECF No. 9 ¶ 36).

Plaintiff alleges that Defendant's post "has caused massive harm to Colossus SSP's business and reputation and threatens its very existence." (ECF No. 9 ¶ 42). Plaintiff alleges that on or about May 8 or 9, 2024, after Defendant shared an advanced copy of the post with the media, "on May 9, 2024, Trade Desk suspended business with Colossus SSP because of the post's claims that Colossus SSP misrepresented user IDs in its bid requests." (ECF No. 9 ¶ 43). Additionally, several hours after Defendant published the post on May 10, 2024, BidSwitch suspended Plaintiff from its platform because of the claims in Defendant's post. This caused Plaintiff "significant financial harm" because "the majority of

Colossus SSP's revenue ... comes from transactions through BidSwitch." (ECF No. 9 ¶ 44). Lastly, Plaintiff alleges that in addition to the financial harm, Defendant's post has damaged Plaintiff's "reputation and goodwill by accusing Colossus SSP of engaging in fraudulent activity and impeaching Colossus SSP's honesty, integrity, and core business." (ECF No. 9 ¶ 45).

Plaintiff filed a complaint against Defendant on May 14, 2024 for violations of 15 U.S.C. § 1125 ("the Lanham Act"), as well as defamation and injurious falsehood under Maryland law. (ECF No. 1). On June 3, 2024, Plaintiff filed an amended complaint. (ECF No. 9). Plaintiff asserts federal question jurisdiction and supplemental jurisdiction over the state law claims, and Plaintiff also asserts diversity jurisdiction. On July 3, 2024, Defendant filed a motion to dismiss the amended complaint. (ECF No. 19). On July 31, 2024, Plaintiff filed a response in opposition to Defendant's motion to dismiss. (ECF No. 22). On August 14, 2024, Defendant filed a reply in support of its motion to dismiss. (ECF No. 23).

**II. Standard of Review**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). "[T]he district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor." *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021). A plaintiff's complaint needs only satisfy the standard of Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed.R.Civ.P. 8(a)(2)). A Rule 8(a)(2) "showing" requires "stat[ing] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays*, 992 F.3d at 299-300 (quoting *Iqbal*, 556 U.S. at 663). Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

**III. Analysis**

**\*5** Plaintiff's amended complaint has three counts: federal false advertising and unfair competition under the Lanham Act (Count I), defamation (Count II), and injurious falsehood (Count III). (ECF No. 9). In its motion to dismiss, Defendant argues that Plaintiff has failed to state a claim for each of these counts. (ECF No. 19).

**A. Exhibits**

Defendant attaches several exhibits to its motion to dismiss: the blog post, email correspondence between Plaintiff and Defendant, and an article written based on Defendant's post. (ECF Nos. 19-2; 19-3; 19-4). Defendant argues that the court should consider the exhibits when resolving the motion to dismiss [3] because all three exhibits are "integral to the complaint," and "there can be no dispute" as to the post's authenticity, the correspondence is authentic, and "there can be no dispute" as to the authenticity of the article. (ECF No. 19-1, at 7 n.1, 8 n.2, 15 n.5).

[3] In the alternative, Defendant argues that the court should treat the motion to dismiss as a motion for summary judgment. (ECF No. 23, at 19). Under Fed. R. Civ. P. 12(d), a court may convert a motion to dismiss into a motion for summary judgment and consider outside documents. "The court should not make such a conversion where the parties are not given notice and are not afforded the opportunity to conduct reasonable discovery." *Aegis Bus. Credit, LLC v. Brigade Holdings, Inc.*, No. 8:21-CV-00668-AAQ, 2022 WL 3716543, at \*5 (D.Md. Aug. 29, 2022) (citing *Carter v. Baltimore Cty., Maryland*, 39 Fed.Appx. 930, 932-33 (4th Cir. 2002)). Defendant raises this argument in its Reply. Accordingly, Plaintiff has not been given adequate notice, and the court will not convert the motion to dismiss into a motion for summary judgment.

Plaintiff argues that the court should not consider the exhibits. Plaintiff contends that while the blog post is integral to its complaint, there is a dispute regarding the authenticity of the version presented by Defendant. Plaintiff alleges that the version attached to the complaint is just one version of several versions that Defendant provided to third parties. (ECF No. 22, at 27-28). Additionally, Plaintiff argues that the correspondence and article are not integral to the complaint, and Plaintiff disputes the authenticity of the correspondence because it "contains several redactions and is incomplete." (ECF No. 22, at 27).

"As a general rule, the court does not consider extrinsic evidence at the motion to dismiss stage[.]" *Faulkenberry v. U.S. Dep't of Def.*, 670 F.Supp.3d 234, 249 (D.Md. 2023) (quoting *Reamer v. State Auto. Mut. Ins. Co.*, 556 F.Supp.3d 544, 549 (D.Md. 2021), *aff'd*, No. 21-2432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022)). "However, 'the court may consider, without converting the motion to dismiss into one for summary judgment, documents attached to the complaint as exhibits, and documents attached to a motion to dismiss if the document is integral to the complaint and there is no dispute about the document's authenticity.' " *Faulkenberry*, 670 F.Supp.3d at 249 (quoting *Reamer*, 556 F.Supp.3d at 549). "A document is integral to the complaint if its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Faulkenberry*, 670 F.Supp.3d at 249 (quoting *Reamer*, 556 F.Supp.3d at 549) (internal quotation marks omitted).

**\*6** As discussed above, there is a dispute regarding the authenticity of the post and the correspondence, and the article is not integral to the complaint. Therefore, at the motion to dismiss stage, the court will not consider the documents outside of the complaint.

### B. Count I: Lanham Act False Advertising and Unfair Competition

Plaintiff alleges that Defendant violated the Lanham Act by making "false and misleading statements in commercial advertising and promotion." (ECF No. 9 ¶ 47). Further, Plaintiff alleges that these statements "were made in an effort to damage Colossus SSP's business and reputation for the purpose of selling Adalytics' services and winning new business from ad buyers." (ECF No. 9 ¶ 48). Plaintiff alleges that the "statements are false and misleading descriptions of fact that have or are likely to cause confusion, mistake, or deception and misrepresented the nature, characteristics, and qualities of Colossus SSP's business and the services that it offers." (ECF No. 9 ¶ 49). Plaintiff contends that the "statements have materially influenced, or are likely to materially influence, purchasing decisions because publishers, ad buyers, and ad technology vendors are misled to incorrectly believe that Colossus SSP is disreputable, is untrustworthy, and employs fraudulent business practices when it does not." (ECF No. 9 ¶ 50). Lastly, Plaintiff alleges that the false statements "have caused and will continue to cause the loss of goodwill and the loss of current and prospective customers and industry partners." (ECF No. 9 ¶ 52).

Defendant argues that Plaintiff has failed to state a claim under the Lanham Act because the blog post is not commercial speech required for commercial advertising or promotion under the Lanham Act, Plaintiff did not adequately allege that the post proximately caused its damages, and Plaintiff failed to identify any false or misleading description of fact. (ECF No. 19-1, at 7-15).

In relevant part, the Lanham Act provides that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> ....
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

The United States Court of Appeals for the Fourth Circuit has held that:

> [A] plaintiff asserting a false advertising claim under the Lanham Act must establish that:
>
> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

**\*7** *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (citations omitted). The parties dispute whether Plaintiff has alleged the first and fifth elements.

### 1. Commercial Advertisement

"The Lanham Act does not define 'commercial advertising or promotion.' And neither the Supreme Court nor [the Fourth Circuit] has determined how to assess whether a communicative message is commercial advertising or promotion." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F.App'x 251, 256 (4th Cir. 2017), cited approvingly in *De Simone v. VSL Pharmaceuticals, Inc.*, 36 F.4th 518, 532 (4th Cir. 2022). In *Handsome Brook Farm*, the court cited to multiple other circuit courts that adopted all four factors defining commercial advertisement set out in *Gordon & Breach Science Publishers v. Am. Institute of Physics*, 859 F.Supp. 1521, 1536 (S.D.N.Y. 1994). *Handsome Brook Farm*, 700 F.App'x at 256. The *Handsome Brook Farm* panel ultimately agreed with the Sixth Circuit and adopted three of the four factors, stating that commercial advertisement under the Lanham Act is (1) "commercial speech" (2) "for the purpose of influencing consumers to buy goods or services" and "while the representation need not be a classic advertising campaign, but may include more informal types of promotion, the representations [(3)] must be sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within that industry." *Handsome Brook Farm*, 700 F.App'x at 256 (first quoting *Gordon & Breach Sci. Publishers*, 859 F.Supp. at 1536); and then citing *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 800-01 (6th Cir. 2015)).

While *Handsome Brook Farm* is an unpublished opinion, the Fourth Circuit cited *Handsome Brook Farm* in a later published opinion, *De Simone v. VSL Pharmaceuticals, Inc.*, 36 F.4th 518, 532 (4th Cir. 2022), and set out a summary of the test from *Handsome Brook Farm.* The Fourth Circuit stated that "[u]nder the Lanham Act, 'commercial advertising or promotion' is 'commercial speech ... for the purpose of influencing consumers to buy goods or services.' " *De Simone*, 36 F.4th at 532 (quoting *Handsome Brook Farm*, 700 F.App'x at 256).

The panel in *Handsome Brook Farm* stated:

Neither our precedent, nor the Supreme Court, has issued any determinative standard by which to assess if a message is commercial speech. The Supreme Court has highlighted a handful of considerations, and our own cases have been similarly context-specific. These factors are all illustrative, but none are determinative. A message may bear many of these qualities yet not be commercial speech; and a message may lack some of these qualities yet still be commercial speech. The Supreme Court has identified three qualities of commercial speech: whether the message is economically motivated, promotes a specific product, and is an advertisement. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) .... Our own precedent has alluded to yet another quality of commercial speech: whether the message is "placed in a commercial context and [is] directed at the providing of services rather than toward an exchange of ideas." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 286 (4th Cir. 2013) (quoting *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176 (N.D. 1986), *cert. denied*, 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986)).

**\*8** *Handsome Brook Farm*, 700 F.App'x at 257–58.

In *De Simone*, the Fourth Circuit quoted *Handsome Brook Farm*, finding that:

Speech is more likely commercial when the declarant "hoped to realize an economic gain when disseminating its message." [*Handsome Brook Farm*, 700 F.App'x] at 258. "When a message communicates both commercial and noncommercial speech, it is treated like commercial speech unless the commercial and noncommercial messages are inextricably intertwined." [*Handsome Brook Farm*, 700 F.App'x] at 261 (cleaned up).

*De Simone*, 36 F.4th at 532.[4]

4  In *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), the case cited in *Handsome Brook Farm*, the Court noted that where "the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase." *Id.* at 796. Here, neither party analyzes whether the post contains both commercial and noncommercial speech, and whether those messages are inextricably intertwined.

Plaintiff has alleged commercial speech under the detailed framework set out in *Handsome Brook Farm*, as well as under the framework set out in *De Simone*. Plaintiff asserts

that Defendant's post was economically motivated because Plaintiff alleges that "[a]dvertisement buyers pay Adalytics for information on ad technology vendors and publishers that improperly serve their advertisements." (ECF No. 9 ¶ 17). Further, Plaintiff asserts that Defendant "hoped to realize an economic gain" because Plaintiff alleges that "Adalytics acknowledges that its posts are generated to advertise its services, stating: 'Like many other companies, we release thought leadership on systemic issues affecting brands and their media investments ... to ... attract new clientele.' " (ECF No. 9 ¶ 18). Plaintiff also alleges that Defendant's "business thrives on creating distrust between advertiser buyers and advertising technology vendors and products. Adalytics is known for publishing inflammatory blog posts regarding advertising technology vendors and products for the purpose of winning new advertiser customers." (ECF No. 9 ¶ 19).

While Plaintiff does not contend that Defendant promotes a specific product in the post itself, Plaintiff alleges that the post serves as an advertisement for its product because Defendant posts "inflammatory blog posts regarding advertising technology vendors and products for the purpose of winning new advertiser customers." (ECF No. 9 ¶ 19).

Accordingly, at this motion to dismiss stage, Plaintiff has sufficiently alleged commercial speech. Defendant does not argue that Plaintiff fails to allege the other elements of a commercial advertisement; accordingly, Plaintiff has sufficiently alleged commercial advertisement.

### 2. False Statements of Fact

Plaintiff alleges that "[t]he post portrayed Colossus SSP as mis-declaring user IDs in its bid requests for the purpose of selling ad space at higher prices to ad buyers seeking to serve advertisements to a targeted audience." (ECF No. 9 ¶ 24). Plaintiff further alleges that:

> **\*9** In the post, Adalytics purported to analyze and compare advertisements and bid responses on the Trade Desk DSP through 16 different SSPs, including Colossus SSP, in order to match the TDID declared by the SSP in its bid request and the actual cookie TDID stored in the user's browser. The post concluded that Colossus SSP is the only SSP for which there were consistent misdeclarations of user IDs —that is, the TDID declared by Colossus SSP in its bid request did not match the user's actual cookie TDID. The post further concluded that for the other fifteen SSPs, the TDID declared by the SSP "always perfectly" matched the user's actual cookie TDID.

(ECF No. 9 ¶ 25). Plaintiff alleges that these statements "are false and misleading." (ECF No. 9 ¶ 26). Plaintiff states that it "does not mis-declare or otherwise manipulate or alter user IDs in its bid requests." Plaintiff contends that

> it is not possible for Colossus SSP to mis-declare a user's TDID because Colossus SSP connects to Trade Desk through BidSwitch and has no control or knowledge of whether BidSwitch sends a particular bid request to Trade Desk or another DSP. And even if BidSwitch sends a bid request to Trade Desk, Colossus SSP has no knowledge of the TDIDs or the values associated with those TDIDs.

(ECF No. 9 ¶ 26).

Additionally, Plaintiff alleges that, while the post falsely stated that for the other fifteen SSPs, the TDIDs " 'always perfectly' matched the user's actual cookie TDID," "there were discrepancies between the TDID sent in the bid response and the TDID in the user's browser for transactions between Trade Desk and other SSPs that connect to Trade Desk through an intermediary." (ECF No. 9 ¶¶ 27-28). Plaintiff alleges upon information and belief Defendant "doctored" a screenshot in its post to illustrate a lack of discrepancies for a different SSP. (ECF No. 9 ¶¶ 29-30).

Defendant argues that, taken in context of the full post, the statements were not false or misleading. (ECF No. 19-1, at 17-19). Defendant cites to multiple other parts of the post and correspondence with Plaintiff to show that, when viewed as a whole, the post does not accuse Plaintiff of intentionally misrepresenting user IDs. (ECF Nos. 19-1, at 17-19; 23,

at 6-9). While Plaintiff also states that the post should be considered "in its entirety" (ECF No. 22, at 8), Plaintiff did not attach the post, and Plaintiff contends that there are several other versions of the post.

Defendant is attempting to pursue summary judgment at the motion to dismiss stage. At the motion to dismiss stage, the question is whether Plaintiff has plausibly alleged a false or misleading statement in the complaint. As set out above, Plaintiff has alleged that Defendant made a false or misleading statement in its post.

### 3. Injury

Plaintiff alleges that after Defendant shared an advanced copy of the post with the media on or about May 8 or 9, 2024, "on May 9, 2024, Trade Desk suspended business with Colossus SSP because of the post's claims that Colossus SSP misrepresented user IDs in its bid requests." (ECF No. 9 ¶ 43). Additionally, several hours after Defendant published the post on May 10, 2024, BidSwitch suspended Plaintiff from its platform because of the claims in Defendant's post. This caused Plaintiff "significant financial harm" because "the majority of Colossus SSP's revenue ... comes from transactions through BidSwitch." Lastly, Plaintiff alleges that in addition to the financial harm, Defendant's post has damaged Plaintiff's "reputation and goodwill by accusing Colossus SSP of engaging in fraudulent activity and impeaching Colossus SSP's honesty, integrity, and core business." (ECF No. 9 ¶¶ 44-45).

 *10 Defendant argues that Plaintiff has not sufficiently alleged that Plaintiff's injuries were proximately caused by Defendant's post. (ECF No. 19, at 15). Defendant cites one of the articles published on May 10, 2024, that reported that Trade Desk had known about the issues with Plaintiff for over a year. Defendant further quotes the article, seemingly to suggest that BidSwitch suspended relations with Plaintiff because Plaintiff implied BidSwitch was at fault for the mismatched user IDS. (ECF No. 19-1, at 16). Defendant also argues that despite Plaintiff's claim that Defendant's post has damaged Plaintiff's "reputation and goodwill by accusing Colossus SSP of engaging in fraudulent activity," the post did not accuse Plaintiff of fraudulent activity. (ECF No. 19-1, at 16). Lastly, Defendant argues that "any purportedly defamatory statements made by other publications should be addressed with those other publications." (ECF No. 19-1, at 16).

As discussed above, the court will not consider the article at this motion to dismiss stage. Moreover, Plaintiff has alleged that Defendant's post, and not just the other article, caused Plaintiff injury. Plaintiff alleged that Defendant gave the media a copy of the post prior to publishing it, and Trade Desk suspended business with Plaintiff on May 9, 2024, a day before the May 10, 2024, article was published. (ECF No. 9 ¶ 43). Therefore, at this stage, Plaintiff has sufficiently alleged that Defendant caused Plaintiff injury. Accordingly, Plaintiff has plausibly alleged a violation under the Lanham Act, and Defendant's motion to dismiss will be denied as to this claim.

### C. Count II: Defamation

Plaintiff alleges that Defendant's post was defamation under Maryland law. (ECF No. 9 ¶¶ 53-59). Plaintiff alleges that Defendant "published false statements to the public, actual and prospective customers of Colossus SSP, and members of the industry." (ECF No. 9 ¶ 54). Plaintiff alleges that Defendant acted with "actual malice" because Defendant "knew that its statements were false and/or misleading based on its expertise in advertising technology and programmatic advertising" and because Plaintiff repeatedly informed Defendant that the post was false before Defendant published the post. (ECF No. 9 ¶ 58).

Plaintiff also alleges that "Adalytics' false, misleading, disparaging, and defamatory statements directly and proximately injured Colossus SSP, causing the loss of customers and industry partners and resulting in special damages, as well as the loss of good will and reputational injury." (ECF No. 9 ¶ 59).

Defendant argues that Plaintiff has failed to state a defamation claim under Maryland law because Plaintiff did not allege defamatory statements. (ECF No. 19-1, at 21). Additionally, Plaintiff failed to allege properly that Defendant had the required degree of fault to allege legal fault. (ECF No. 19-1, at 22).

This court has previously stated:

> Under Maryland law, a properly pleaded defamation claim is accompanied by specific facts establishing the following four elements: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Piscatelli v. Van Smith*, 424 Md. 294, 306 (2012)

(quoting *Indep. Newspapers, Inc. v. Brodie*, 407 Md. 415, 441 (2009)).

*Baker-Proctor v. PNC Bank, N.A.*, No. 21-CV-3299-DKC, 2023 WL 1801932, at *2 (D.Md. Feb. 7, 2023). The parties dispute whether Plaintiff has alleged the first and third elements.

> For purposes of the first element, a "defamatory statement" is one that tends to expose a person to " 'public scorn, hatred, contempt, or ridicule,' " which, as a consequence, discourages " 'others in the community from having a good opinion of, or associating with, that person.' " *Brodie*, 407 Md. at 441, 966 A.2d at 448 (quoting *Offen* [*v. Brenner*], 402 Md. [191] [ ] 198–99, 935 A.2d [719,] 724 (2007)).

*Piscatelli*, 424 Md. at 306.

As discussed above, Plaintiff has alleged that Defendant made "false and misleading" statements that damaged Plaintiff's "reputation and goodwill." Plaintiff alleged that the "[t]he post portrayed Colossus SSP as mis-declaring user IDs in its bid requests for the purpose of selling ad space at higher prices to ad buyers seeking to serve advertisements to a targeted audience." (ECF No. 9 ¶ 24). Plaintiff has also alleged that Defendant's post led to some of its business partners suspending their relationships with Plaintiff, meaning "others in the community" were discouraged from "associating with" Plaintiff.

To satisfy the element of legal fault, a plaintiff can allege negligence or actual malice, alleging a defendant "published a statement with actual knowledge of its falsity." *Metro. Fin. Servs. v. Vales*, No. 2005-CV-2330-DKC, 2005 WL 8174682, at *3 (D.Md. Nov. 14, 2005) (citing *Samuels v. Tschechtelin*, 135 Md.App. 483, 544 (2000)). Plaintiff has sufficiently alleged actual knowledge because Plaintiff alleged that Defendant "knew that its statements were false and/or misleading based on its expertise in advertising technology and programmatic advertising" and because Plaintiff repeatedly informed Defendant that the post was false before Defendant published the post. (ECF No. 9 ¶ 58). Accordingly, Plaintiff has sufficiently alleged a defamation claim under Maryland law, and Defendant's motion to dismiss will be denied as to this claim.

### D. Count III: Injurious Falsehood

Plaintiff alleges that Defendant's post was injurious falsehood because Defendant "published false, misleading, and disparaging statements about Colossus SSP's business to the public, actual and prospective customers of Colossus SSP, and members of the industry." (ECF No. 9 ¶ 61). Plaintiff alleges that Defendant acted with "actual malice" because Defendant "knew that its statements were false and/or misleading based on its expertise in advertising technology and programmatic advertising" and because Plaintiff repeatedly informed Defendant that the post was false before Defendant published the post. (ECF No. 9 ¶ 58).

Defendant argues that Plaintiff has not adequately pled actual malice and special damages. (ECF No. 19-1, at 25-27).

"To maintain a claim for injurious falsehood, the plaintiff must establish that the defendant acted with malice in publishing to a third party a known falsity that caused special damages." *Redmonds Enter., Inc. v. CSX Transp., Inc.*, No. 16-CV-3943-CCB, 2017 WL 2335598, at *4–5 (D.Md. May 30, 2017) (citing *Nat'l Bd. for Certification in Occupational Therapy, Inc. v. Am. Occupational Therapy Ass'n*, 24 F.Supp.2d 494, 511 (D.Md. 1998)). "A plaintiff has pled special damages where it asserts the loss of a present or prospective advantage." *Redmonds Enter., Inc.*, No. 2017 WL 2335598, at *5 (citing *Nat'l Bd.*, 24 F.Supp.2d at 511). Under Fed. R. Civ. P. 9(g), "[i]f an item of special damage is claimed, it must be specifically stated."

As discussed above, Plaintiff has alleged Defendant acted with malice in publishing a known falsity because Plaintiff alleged Defendant knew the statements in the post were false. Additionally, Plaintiff has pled special damages because Plaintiff alleged that Trade Desk and BidSwitch suspended relationships with Plaintiff after the post was published. At this stage, Plaintiff has sufficiently alleged injurious falsehood, and Defendant's motion to dismiss will be denied as to this claim.

### IV. Conclusion

**\*12** For the foregoing reasons, Defendant's motion to dismiss will be denied. A separate order will follow.

**All Citations**

Slip Copy, 2025 WL 712986

---

End of Document     © 2025 Thomson Reuters. No claim to original U.S. Government Works.