Case 4:24-cv-01940   Document 52   Filed on 08/07/25 in TXSD   Page 1 of 19

United States District Court
Southern District of Texas
**ENTERED**
August 07, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TERRY MONSKY, *et al.*, § | |
| § | |
| Plaintiffs, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:24-CV-01940 |
| § | |
| DIRECT DIGITAL HOLDINGS, INC., *et* § | |
| *al.*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

**I.   INTRODUCTION**

Pending before the Court is the defendants', Direct Digital Holdings, Inc. ("Direct Digital"), Mark Walker, Diana Diaz, Susan Echard, Keith W. Smith, and Direct Digital Management, LLC (collectively "defendants"). motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 44). The lead plaintiff, Donald W. Hutchings[1], has filed a response to the defendant's motion (Dkt. No. 45), and the defendant has filed a reply (Dkt. No. 46).  After reviewing the motion, the pleadings, the relevant exhibits, and the applicable law, the Court determines that the defendant's motion should be **GRANTED** .

---

[1] Hutchings (individually and as Trustee of the Brady Adam Hutchings Irrevocable Trust U/A DTD 12/18/2012, the Donald W. Hutchings Living Trust U/A DTD 09/19/1994, the Donald W. Hutchings Principal Residence Trust U/A DTD 09/19/1994, the Hutchings Community Property Trust U/A DTD 05/20/2015, the Jay Whitney Hutchings Irrevocable Trust, Grantors Donald W. Hutchings and Pamela Paul Hutchings, dated December 18, 2012, and the Pamela Paul Hutchings Principal Residence Trust U/A DTD 09/19/1994)) (collectively, "Hutchings") was appointed as Lead Plaintiff for the putative class action pursuant to 15 U.S.C. § 78u-(a)(3)(B)(iii) upon his own motion [Dkt. No. 16] to represent all parties similarly situated in this consolidated action. [Dkt. No. 31].

## II.     FACTUAL BACKGROUND

For purposes of the motion before the Court, the following factual background has been taken from the Consolidated Complaint. The defendants, for the purpose of their motion, agree to this basic outline of events.

### a. Direct Digital's Business and Stock Price History During the Class Period

Direct Digital is a holding company for Direct Digital Holdings, LLC that was formed by Smith and Walker in 2018 through the acquisition of three subsidiary companies. Walker serves as the Chief Executive Officer and Smith serves as the President of Direct Digital. Through ownership of the common stock of Direct Digital, Smith and Walker control seventy-seven percent of the eligible voting shares of Direct Digital. Through its subsidiaries, Direct Digital is engaged in the business of both buying and selling online advertising. Direct Digital's primary subsidiary is Colossus Media, LLC ("Colossus") which accounted for seventy-eight percent of Direct Digital's 2023 revenue. Colossus operates as a selling platform allowing Direct Digital to sell hundreds of billions of digital ad impressions each month to a variety of customers including Trade Desk and Google. Colossus achieves these ad sales primarily through "cookies" and other user identification tools in order to facilitate the sale of specific, individual ads to target individual internet users.

Direct Digital offered its common stock shares for sale on the NASDAQ stock exchange under the ticker symbol "DRCT" in February of 2022. Relevant to the allegations

before the Court, Direct Digital's stock price on November 8, 2023, closed at $2.52 per share. On November 9, 2023, Direct Digital released its 2023 Q3 results with a revenue of $59.5 million and an EBITDA of $5.4 million which significantly exceeded various publicly available estimates. These increased revenues were primarily the result of the success of Direct Digital's subsidiary Colossus. After these positive results, Direct Digital issued revised guidance for 2023 Q4 from, using the bottom of the guidance range, $125 million to $170 million for fiscal year 2023. Apparently based on this news, the common stock price of Direct Digital increased from $2.61 on the day of the announcement to $5.34 on Monday November 13, 2024, and continued to rise to a high during the relevant period of $32.51 on March 15, 2024. Direct Digital reaffirmed this upward revision on at least five occasions between November 11, 2023 and February 1, 2024.

    Later publicly available information purports to reveal that during this period in late 2023, Colossus lost partial access to the business provided by Trade Desk and Google, its largest partners, due to issues related to the platform's ability to correctly identify individual users. Direct Digital did not disclose this change in business relationships to stock owners. Direct Digital also, in light of these changing business relationships, accelerated a strategy in the way it identified individual users, a core part of its business model, from sometime to in 2023 to the end of 2024. Direct Digital did not disclose this change in strategy to its stock owners. Google also notified Direct Digital that it would be short-paying an invoice during sometime in January 2024 that resulted in a net loss to the company.

On March 26, 2024, Direct Digital announced $157.1 million in revenues for fiscal year 2023 on $41 million in revenue for Q4 of 2023. In their announcement of the short fall of the revised guidance issued on November 9, 2023, Direct Digital failed to disclose the change in business relationships that had occurred with Trade Desk and Google. After the release of this news, Direct Digital's common stock price per share fell from $32.51 to $26.51 on March 26, 2024, $16.04 on March 27, and $15.24 by March 28. The complaint also asserts, an alleged indication of the defendants' intentional or extremely reckless intention, that on April 17, 2024, Direct Digital's independent auditor resigned. Direct Digital's common stock price per share dropped from a close of $6.93 on April 23, to a close of $6.24 per share the next day.

On May 10, 2024, a third-party research firm published a report detailing discrepancies in the individual user identifications used by Colossus to auction advertising with Trade Desk. In the wake of this report, other articles were published detailing the changed business relationship between Colossus and Trade Desk as well as Google. Between May 8, when a pre-publication version of the report began circulating, and publication on May 10, the common stock price per share of Direct Digital fell from $4.56 to $3.97.

On October 15, 2024, Direct Digital filed its form 10-K for 2023. It confirmed that Google had short-paid 2023 invoices; that individual user identification issues continued to negatively affect Direct Digital's revenue; that a significant customer had paused working with the Direct Digital in a period in May 2024, after the third-party report; and,

that the significant customer had not yet resumed its previous rate of business with Direct Digital. On the same day, Direct Digital filed form 10-Qs for 2024 Q1 and Q2. These forms revealed that for the period Q1 Direct Digital had $22.27 million in revenue and $3.8 million in net loss and for Q2 $21.8 million in revenue and a $3.1 million net loss. After the release of these postings, Direct Digital's common stock price fell to $2.77 per share on October 16, 2024.

### b. Alleged Misrepresentations

The Consolidated Complaint alleges that between November 10, 2023 and October 15, 2024 (the "Class Period"), the plaintiff purchased shared of Direct Digital common stock based on false or misleading statements because the defendants concealed the severe disruption to Direct Digital's subsidiary Colossus' revenue. These disruptions, the Consolidated Complaint asserts, eventually caused Direct Digital to experience significant losses leading to the decline of the price per share from the previously outlined peak of $32.51 on March 26, to $2.77 on October 16. The plaintiffs, as investors, claim that they suffered monetary damages as a result.

The Consolidated Complaint blames the defendants for causing these losses by engaging in a course of fraudulent conduct that deceived the plaintiff and other class-member investors in the process. Allegedly, the defendants artificially inflated Direct Digital's stock price by making overly optimistic, false and/or misleading statements and concealing truths about the Colossus subsidiary's business, financial status and outlook. The information concerned material losses due to the disruption in Colossus' relationship

to Trade Desk and Google. Individual defendants are quoted at length, both within Direct Digital's SEC filings and in publicly available statements, as proof of the alleged fraud. These statements are contained in paragraphs 94 – 133 of the Consolidated Complaint and are referenced in summary in the defendants' motion to dismiss. The following representative statements, emphasized in the Consolidated Complaint, are reprinted here as representative of the allegations:

- "We remain committed to the executing on the same growth and investment initiatives that led us to the strong third quarter results we are reporting today." (quoting Smith in November 9, 2023 (3Q2023) Press Release (Form 8-K)).

- Increasing the "expect[ed] revenue to be in the range of $170 million to $190 million. . . demonstrates the strength of our operating leverage." (quoting Diaz in November 9, 2023 (3Q2023) Press Release (Form 8-K) (alterations in original)).

- "We address IVT [invalid traffic] a number of fronts, including sophisticated technology, which detects and avoids IVT on the front end; direct publisher and inventory relationships, for supply path optimization; and ongoing campaign and inventory performance review, to ensure inventory quality and brand protection controls are in place." (November 9, 2023 (3Q2023) Form 10-Q).

- "[F]or the remainder of 2023, we believe our technology strategy, infrastructure and operational investments will continue to bear fruit." (quoting Walker on November 11, 2023 earnings conference call).

- "[W]e're revising our full year 2023 revenue guidance upwards to a range of $170 million to $190 million. . . and continuing our operational excellence." (quoting Walker on November 11, 2023 earnings conference call).

- Responding to a conference call participant's question about the larger market and confidence in marketing relationships; "but we are pretty confident in the relationships that we've been able to build and the platform that we've been able to establish." (quoting Walker on November 11, 2023 earnings conference call).

- Commenting on changes in market technology at a conference: "we actually during the month[s] of November [and] December have actually already started working on that. . . we are being proactive and starting to make that transition." Further commenting that "we were able to raise guidance to about 170 to 190 million of top line revenue and we expect for us to be within that range." (quoting Walker at a December 5, 2023 conference).

- Commenting on changes in market technology at a conference: "I think one of the things that our company has done is we've been prepping for this for the last year and specifically in Q4 we started taking steps to automatically change our platform to adjust for this change which is coming on in six

months." Further commenting that "we're projected to be somewhere in the hundred, the guidance we give is 170 to 190 million of top line revenue grow. Um, so with that we've been able to grow and I think the market has finally started catching up with our story." (quoting Walker at a January 9, 2024 conference).

- Commenting on the state of the company: "A significant milestone for the team was crossing $100 million in revenues in, and, importantly, just in Q3 we raised our guidance again to a range of $170 million to $190 million for FY 2023." (quoting Walker in a February 1, 2024 news website interview).

- "[D]ue to proactive measures we are taking in the face of changing macro industry trends, we are confident our company is in a position to build on the successes of 2023. . . and continue our strong revenue growth and market share gains in 2024." (quoting Walker in March 26, 2024 (4Q2023) Press Release (Form 8-K)).

- Explaining lower than expected revenue in the Fourth Quarter of 2023 and Fiscal Year 2023: "In the fourth quarter, based upon value changes, it became clearer cookie deprecation would begin at Q1 2024. In addition, we noted softer demand that our revised guidance called for. As such, our team proactively began our transition off of cookies for media transactions. As a result, we believe our strategic decision to accelerate our investments has positioned us well for the future and ahead of our peers. In addition, in Q4,

we did our complete beta testing on our original schedule for several strategic publishers, including Dotdash Meredith, Weather.com, NBCU and Arete Group, which would have increased overall the pressure count. These strategic publishers have all been launched in Q1 of 2024. . . [W]e are confident the strategic measures in internal calibrations were made in Q4 2023 will position the company to build on the successes of 2023 and continue revenue growth and market share gains in 2024." (quoting Walker on a March 26, 2024 earnings conference call).

- Explaining lower than expected revenue in the Fourth Quarter of 2023 and Fiscal Year 2023: "revenue for the fourth quarter of 2023 was lower than anticipated due to lower-than-anticipated demand, a delay in the release of Tier 1 publishers from beta testing and proactive efforts by the company during the fourth quarter to accelerate the transition towards a cookie-less advertising platform." (quoting Diaz on a March 26, 2024 earnings conference call).

- Responding to a request for reasons for the revenue shortfall in 4Q2023: "I would say the softer demand was a combination of the change that we saw with making the transition over cookies because of the platform impact that we actually had in Q4." (quoting Walker on a March 26, 2024 earnings conference call).

- Commenting on the financial state of the company, "very sound. . . remains profitable. . . first-quarter [2024] performance was 'up 20% year over year." (May 10, 2024 statement in response to the third-party analyst report) (alterations in complaint).

- "[Direct Digital] remains operationally well-positioned and financially strong. . . and is experiencing continued growth into 2024. We maintain a solid financial relationship with our partners." (May 10, 2024 statement in response to the third-party analyst report) (alterations in complaint).

### III.   CONTENTIONS OF THE PARTIES

The defendants assert as their primary reason for dismissal of the lawsuit that the misrepresentations alleged in the Consolidated Complaint are non-actionable expressions of corporate optimism about Direct Digital's financial performance and future prospects; as well, they assert the statements were in many cases, not false. The defendants also argue that the Consolidated Complaint fails to plead scienter or particularized allegations giving rise to a strong inference of scienter, as required by Rule 9(b) and the PSLRA. Finally, the Complaint's derivative claims under § 20(a) of the Exchange Act fail because the primary claims under § 10(b) do not meet the established pleading requirements for a fraud claim.

Dismissal is improper, the plaintiff contends, because the Consolidated Complaint sets out specific facts demonstrating that the defendants engaged in a pattern of misrepresentations and omissions during the Class Period. In its view, the Complaint sufficiently alleges that the defendants' quarterly statements on November 9–11, 2023,

December 5, 2024, February 1, 2024, March 26, 2024, and May 10, 2024, were materially false or omitted material information when made. Moreover, the temporal proximity between the defendants' alleged misleading statements and the tardy disclosures demonstrate falsity. The defendants also made actionable misrepresentations related to the Company's core Colossus subsidiary. Finally, the Consolidated Complaint alleges facts that "in totality" give rise to a strong inference that the defendants knew or were reckless in failing to know about the ongoing problems facing Direct Digital's operations.

## IV.  Further Briefing

Before analyzing the defendants' motion to dismiss, the Court turns to the additional briefing filed by the parties in this case. Prior to the pending motion to dismiss and owing to the complexity of the case, the parties jointly stipulated to a modified briefing schedule and increased page limits. [Dkt. No. 42.] While the Federal Rules of Civil Procedure do not outline when the Court should permit the filing of a sur-reply, a Court may permit a sur-reply in the interest of justice and when resolving a case on the merits. *See Austin v. Kroger Texas, LP,* 864 F.3d 326, 338 (5th Cir. 2017). In doing so, a court considers potential prejudice to the parties and whether the sur-reply, and response to the sur-reply, will supplement the record. *Id.* Sur-replies are heavily disfavored, especially where the additional briefing addresses arguments previously addressed in the briefing already on the record. *Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749, 751 n.2 (5th Cir. 2014) (per curiam). As another court noted, "the need for post-reply briefing should be

rare." *Cuellar v. Rodriquez,* No. EP-23-CV-00237-KC-MAT, 2023 WL 6135685 at *1 (W.D. Tex. Sept. 19, 2023).

After reviewing the proposed sur-reply and response to the sur-reply offered in this case, the Court finds that there is no cause to consider either of the filings. The parties' additional briefing does not introduce new evidence or developments in the law since the initial briefing. Furthermore, the parties in this case had already agreed to a briefing scheduling order and increased page limits. Hence, the motions for leave to file a sur-reply, [Dkt. No. 47], and leave to file a response to sur-reply, [Dkt. No. 50], are **DENIED.**

V.   **STANDARD OF REVIEW**

A motion to dismiss for failure to plead with the heightened specificity required by Rule 9(b), as "reinforce[d]" by the PSLRA, is properly raised in a Rule 12(b)(6) motion to dismiss for failure to state a claim. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 n. 8 (5th Cir.2009); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir.2004). The Court accepts as true all well-pleaded facts and construes them in the light most favorable to the plaintiff. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir.2002). The Court does not, however, "strain to find inferences favorable to the plaintiff," nor does it "accept conclusory allegations, unwarranted deductions, or legal conclusions." *See Southland*, 365 F.3d at 361 (internal quotation marks omitted); *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir.1996). Dismissal is proper when it "appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle

[it] to relief." *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir. 2000) (internal quotation marks omitted).

Federal Rule of Civil Procedure 9(b) and the PSLRA require that the circumstances supporting a claim for securities fraud be pleaded "with particularity." Fed. R. Civ. O. 9(b); 15 U.S.C. § 78u–4(b). Rule 9(b) states, in relevant part: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA correspondingly requires, in relevant part, that a securities fraud complaint: "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1). In addition, the complaint "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

Read together, Rule 9(b) and the PSLRA direct the pleader to:

(1) specify ... each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

>(5) plead with particularity what the person making the misrepresentation obtained thereby; and
>
>(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). These elements establish the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id*. A district court must dismiss a Section 10(b)/Rule 10b–5 complaint that does not meet these requirements. 15 U.S.C. § 78u–4(b)(3)(A).

Nevertheless, when considering the pleadings under a FRCP 12(b)(6) standard, the Court's task is ultimately limited to deciding whether a plaintiff is entitled to offer evidence in support of the claims, not whether the plaintiff will eventually prevail. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999). In this regard, its review is limited to the allegations in the complaint and to those documents attached to a defendant's motion to dismiss to the extent that those documents are referred to in the plaintiff's complaint and are central to the claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

## VI.    ANALYSIS & DISCUSSION

### a. Section 10b and Rule 10b-5 Claim

To assert a cause of action for a private securities fraud claim based on Section 10(b) and Rule 10b–5 the plaintiff must establish: "(1) a material misrepresentation (or

omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) loss causation." *Owens v. Jastrow,* 789 F.3d 529, 535 (5th Cir.2009) (quotation omitted).

The complaint must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent" to survive a motion to dismiss. *See Tchuruk*, 291 F.3d at 350. The defendant argues in the motion that the plaintiff's Consolidated Complaint does not contain allegations of either a misstatement or omission. The defendant also argues that the plaintiff's allegations do not establish the required scienter. The Court will address these assertions.

### b. "Actionably False or Misleading Statement"

For the purposes of Section 10(b) and Rule 10b-5[2], a defendant makes a misrepresentation when "the information disclosed, understood as a whole, would mislead a reasonable potential investor." *Securities and Exchange Commission v. Sethi,* 910 F.3d 198, 206 (5th Cir. 2018) (quoting *Laird v. Integrated Recs., Inc.*, 897 F.2d 826, 832 (5th Cir. 1990)). "To allege a material misrepresentation or omission as a basis of a securities fraud claim with sufficient particularity under Rule 9(b) and the PSLRA, the complaint must specify, among other things, each allegedly misleading statement and explain why it is misleading." *Oklahoma Firefighters Pension and Retirement Sys. v. Six Flags*

---

[2] The scope of liability under Section 10(b) and Rule 10b–5 is the same and the Court treats the case law addressing each as applicable to the other. *See SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002).

*Entertainment Corp.,* 58 F.4th 195, 211 (5th Cir. 2023) (citations omitted). Additionally, "'industry-specific and inherently fact-bound proposition[s] [] are inappropriate at the pleading stage." *Id.* at 214 (citing *Spitzberg v. Houston American Energy Corp.,* 758 F.3d 676, 690 (5th Cir. 2023).

"[G]eneralized positive statements about a company's progress are not a basis for liability." *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 419 (5th Cir. 2001). Representations made are non-actionable, known as 'puffery,' when "they are 'of the vague and optimistic type ... and contain no concrete factual or material misrepresentation.'" *Oklahoma Firefighters,* 58 F.4th at 220. Likewise, abstract statements that do not "convey precise information on which investors are likely to rely when valuing corporations" are puffery and cannot form the basis of liability in a Rule 10/10b-5 suit. *Id.* Furthermore, "Rule 10b-5(b) does not proscribe pure omissions" and it "'bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.'" *Macquarie Infrastructure Corp. v. Moab Partners, LP,* 601 U.S. 257, 264 (2024) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) and Rule 10b–5(b)). "'Silence, absent a duty to disclose, is not misleading under Rule 10b–5.'" *Id.* at 265 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239, n.17 (1988)).

After reviewing the statements offered by the plaintiff as evidence of false or misleading statements, the Court concludes that none of the statements constitute either materially false statements or omissions that would lead a rational investor to rely on them. *See ABC Arbitrage,* 291 F.3d at 359 ("[P]rojections of future performance [are] not worded

16 / 19

as guarantees [and] are generally not actionable under the federal securities law' as a matter of law."). The statements offered by the plaintiff "are vague, optimistic generalizations that would not convey to a reasonable investor [that] such aspirations are guaranteed or even likely." *Oklahoma Firefighters,* 58 F.4th at 220. Of the seventeen statements offered in the Consolidated Complaint, at least nine are statements that are either the press releases for the third quarter of 2023 or refer to projected future earnings based on the success the company experienced in the third quarter of 2023. The plaintiff does not dispute that success. At least four of those statements refer to Direct Digital's acceleration of a change in business strategy which would likely lead a rational investor to anticipate change rather than simply a repetition of previous results. Here, again, the plaintiff does not dispute that Direct Digital undertook these changes. At least three of the statements state either a weaker demand for Direct Digital's services or a "softening" of the market. This, in fact, is precisely what the plaintiff alleges happened. The remaining statements offered by the plaintiff are vague statements expressing general optimism about the company's future that are not legally actionable.

Nevertheless, the plaintiff argues, in essence, that by not disclosing day-to-day business difficulties the defendants made material omissions; however, the defendants do not have a duty to disclose "any and all material information." *Macquarie Infrastructure Corp. v. Moab Partners, LP,* 601 U.S. 257, 264 (2024). Moreover, the defendants' statements did not "convey precise information on which investors are likely to rely" regarding the business relationships of a subsidiary of the Direct Digital's operation., which

information forms the core of the plaintiff's complaint. *Oklahoma Firefighters,* 58 F.4th at 220. The defendants were "under no duty to cast [the Company's] business in a pejorative, rather than a positive, light." *Rosenzwig v Azurix Corp.,* 332 F.3d 854, 869 (5th Cir. 2003); *see also Abrams,* 292 F.3d at 433 ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance.")). The general statements offered in the Consolidated Complaint did not trigger a duty to disclose the difficulties that the plaintiff now claims, with the benefit of hindsight, constitute material omissions. "[C]ompany officials should not," however, "be held responsible for failure to foresee future events." *Abrams,* 292 F.3d at 433.

Because the statements offered by the plaintiff in the Consolidated Complaint are neither material misrepresentations nor material omissions, the Court does not need to proceed to an analysis of the parties' arguments on the requisite scienter. Hence, the plaintiffs' Section 10b and Rile 10b-5 claim are dismissed.

## VII. Section 20(a) Claim

The plaintiff's Section 20(a) claim is a derivative claim of § 10(b). *See Oklahoma Firefighters,* 58 F.4th at 221. Based on the Court's discussion of failure of the primary claim, which discussion is applicable here, the Section 20(a) claim must be dismissed.

## VIII. Leave to Amend

If the plaintiff seeks leave to amend, he "must give the court at least some notice of what. . . [his] amendments would be and how those amendments would cure the initial

complaint's defects." *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021) (citation omitted). The court may deny leave "[i]f the plaintiff does not provide a copy of the amended complaint [or] explain how the defects could be cured." *Id*. (citation omitted).

The plaintiffs make a request seeking leave to amend in the concluding sentence of their response to the defendants' motion. A district court has discretion to grant or deny motions to amend pleadings. Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"). Although Rule 15(a) "evinces a bias in favor of granting" such a motion, deference is not warranted here because the plaintiff has not presented any new information that cures the existing deficiencies. Accordingly, the request for leave to amend is denied. *See id.* at 864–65. (none of the considerations are such that deference should be afforded to the plaintiffs); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## IX.   CONCLUSION

Based on the foregoing analysis and discussion, the defendant's motion to dismiss is **GRANTED**. The plaintiff's motion for leave to amend is **DENIED**.

It is so **ORDERED**.

SIGNED on August 7, 2025, at Houston, Texas.

                                          Kenneth M. Hoyt
                                          United States District Judge